No. 23-55805

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
————————————

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs-Appellees*,

V.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant-Appellant.*
————————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge
————————————

## DECLARATION OF JOHN D. ECHEVERRIA
## IN SUPPORT OF EMERGENCY MOTION UNDER CIRCUIT RULE 27-3
## FOR A STAY PENDING APPEAL AND FOR AN INTERIM
## ADMINISTRATIVE STAY

### RELIEF REQUESTED BY OCTOBER 2, 2023
————————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
HELEN H. HONG
MICA L. MOORE
*Deputy Solicitors General*

R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA 94102-7004
  (415) 510-3479
  John.Echeverria@doj.ca.gov
*Attorneys for Defendant-Appellant*

September 26, 2023

## DECLARATION OF JOHN D. ECHEVERRIA

I, John D. Echeverria, declare:

1. I am a Deputy Attorney General with the California Department of Justice and serve as counsel to Defendant-Appellant Rob Bonta, in his official capacity as Attorney General of the State of California, in the above-captioned matter. I make this declaration in support of the Emergency Motion under Circuit Rule 27-3 for a Stay Pending Appeal and for an Interim Administrative Stay, for which immediate relief is requested. Except as otherwise stated herein, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would testify competently as to those facts.

2. This case is an appeal from the district court's order entered on September 22, 2023, declaring California Penal Code section 32310 ("Section 32310") unconstitutional under the Second Amendment and permanently enjoining its enforcement. Section 32310 imposes certain restrictions on magazines capable of holding more than ten rounds of ammunition, defined as "large-capacity magazines." D. Ct. Dkt. 149. The district court stayed enforcement of its order for ten days, and that temporary stay will expire on October 2, 2023. Attached hereto as **Exhibit 1** is a true and correct copy of the district court's decision permanently enjoining enforcement of Section 32310.

1

3.      On May 17, 2017, the initial complaint was filed in this action,

asserting that Section 32310, in its entirety, violates the Second Amendment and

that the possession restrictions codified at Sections 32310(c) and (d), also violate

the Takings Clause and the Due Process Clause.  D. Ct. Dkt. 1.

4.      On May 26, 2017, Plaintiffs Virginia Duncan, Richard Lewis,

Patrick Lovette, David Marguglio, Christopher Waddell, and California Rifle &

Pistol Association Inc. (collectively, Plaintiffs) filed a motion for preliminary

injunction, seeking to enjoin the Attorney General, his agents, employees, and

those working in active concert with him from enforcing Sections 32310(c)

and (d).  D. Ct. Dkt. 6.

5.      The Attorney General opposed the motion for preliminary

injunction on June 5, 2017.  D. Ct. Dkt. 9.

6.      The district court held a hearing on the preliminary injunction on

June 13, 2017.  On June 29, 2017, the district court issued a preliminary injunction

enjoining enforcement of Sections 32310(c) and (d).  D. Ct. Dkt. 28.  This Court

affirmed the preliminary injunction in an unpublished memorandum.  *See Duncan*

*v. Becerra*, 742 Fed. App'x 218, 221-222 (9th Cir. 2018).

7.      In March 2018, while the interlocutory appeal was pending,

Plaintiffs filed a motion for summary judgment on all claims.  D. Ct. Dkt. 50.  The

Attorney General opposed the motion.  D. Ct. Dkt. 53.  Attached hereto as

**Exhibit 2** is a true and correct copy of the Expert Report of Dr. Louis Klarevas, which was attached as Exhibit 3 to the Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment.

8.      Attached hereto as **Exhibit 3** is a true and correct copy of the Expert Report of Dr. Christopher S. Koper, which was attached as Exhibit 4 to the Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment.

9.      Attached hereto as **Exhibit 4** is a true and correct copy of Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, *Recommendation on the Importability of Certain Semiautomatic Rifles* (1989), which was attached as Exhibit 12 to the Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment.

10.      In March 2019, the district court issued an order granting Plaintiffs' motion for summary judgment, and entered judgment in favor of Plaintiffs.  D. Ct. Dkt. 87.  The Attorney General timely appealed that order and judgment on April 4, 2019.  D. Ct. Dkt. 96.  The district court stayed enforcement of its judgment pending appeal later that day.  D. Ct. Dkt. 97.  The stay order provided that, during

3

the appeal, the preliminary injunction of Sections 32310(c) and (d) would remain in effect and that the permanent injunction of Section 32310(a) and (b) would remain in effect for any person or business who had manufactured, imported, sold, or bought an LCM between the entry of the judgment on March 29, 2019 and 5:00 p.m. the following day, when the stay order would take effect. D. Ct. Dkt. 97 at 6.

11. In August 2020, a three-judge panel of this Court affirmed the district court's judgment. *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020). The en banc Court subsequently reversed the district court's judgment and instructed the district court to enter judgment in the Attorney General's favor. *Duncan v. Bonta*, 19 F.4th 1087, 1113 (9th Cir. 2021) (en banc), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022) (en banc). The en banc Court stayed the issuance of the mandate for 150 days or until final disposition of the case if the plaintiffs filed a petition for a writ of certiorari. No. 19-55376, Dkt. 169 (9th Cir. Dec. 20, 2021) (en banc).

12. Plaintiffs filed a petition for writ of certiorari with the U.S. Supreme Court in February 2022. *Duncan v. Bonta*, No. 21-1194 (Feb. 28, 2022). On June 23, 2022, the U.S. Supreme Court issued its decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

13. On June 30, 2022, the Supreme Court granted the petition for writ of certiorari, vacated the en banc Court's judgment, and remanded the case for

"further consideration in light of" *Bruen*. *Duncan v. Bonta*, 142 S. Ct. 2895 (2022). This Court then directed the parties to "file supplemental briefs on the effect of *Bruen* on this appeal, including whether the en banc panel should remand this case to the district court for further proceedings in the first instance." *Duncan v. Bonta*, No. 19-55376, Dkt. 202. The Court remanded the case to the district court for further proceedings consistent with *Bruen*. *Id.*, Dkt. 215.

14.     Thereafter, on September 26, 2022, the district court entered an order spreading the mandate. D. Ct. Dkt. 111. In that order, the district court provided that its previously entered preliminary injunction enjoining enforcement of Sections 32310(c) and (d) would remain in effect "for all those who previously acquired and possessed magazines legally (including those persons and business entities who acquired magazines between March 29 and April 5, 2019)." *Id.*

15.     On November 10, 2022, the Attorney General filed a supplemental brief, including ten declarations from historians, academics, and social scientists, addressing issues relevant to the *Bruen* standard. D. Ct. Dkt. 118.

16.     Attached hereto as **Exhibit 5** is a true and correct copy of the Supplemental Declaration of Lucy P. Allen, dated November 10, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-1).

17.     Attached hereto as **Exhibit 6** is a true and correct copy of the Declaration of Dennis Baron, dated November 7, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-2).

18.     Attached hereto as **Exhibit 7** is a true and correct copy of the Declaration of Ryan Busse, dated November 9, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt.118-3).

19.     Attached hereto as **Exhibit 8** is a true and correct copy of the Declaration of Saul Cornell, dated November 10, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-4).

20.     Attached hereto as **Exhibit 9** is a true and correct copy of the Supplemental Declaration of John J. Donohue, dated November 8, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-5).

21.     Attached hereto as **Exhibit 10** is a true and correct copy of the Supplemental Declaration of Louis Klarevas, dated November 10, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-6).

22.     Attached hereto as **Exhibit 11** is a true and correct copy of the Declaration of Brennan Rivas, dated November 8, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-7).

23. Attached hereto as **Exhibit 12** is a true and correct copy of the Declaration of Randolph Roth, dated November 9, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-8).

24. Attached hereto as **Exhibit 13** is a true and correct copy of the Declaration of Robert Spitzer, dated November 10, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-9).

25. Attached hereto as **Exhibit 14** is a true and correct copy of the Declaration of Michael Vorenberg, dated November 10, 2022 and submitted with the Attorney General's November 10 supplemental brief (D. Ct. Dkt. 118-10).

26. In his supplemental brief, the Attorney General requested that the court stay any adverse judgment pending appeal. D. Ct. Dkt. 118 at 61-63.

27. Plaintiffs filed a supplemental brief on December 1, 2022, D. Ct. Dkt. 130.

28. On December 12, 2022, the district court held a status conference and a hearing in this case, consolidated with hearings in three other Second Amendment cases pending before the Court in which the Attorney General is a defendant: *Miller v. Bonta*, No. 3:19-cv-1537-BEN-JLB (challenge to California's Assault Weapons Control Act); *Rhode v. Bonta*, No. 3:18-cv-00802-BEN-JLB (challenge to background check requirement for ammunition purchases); and *Fouts v. Bonta*, 3:19-cv-01662-BEN-JLB (challenge to restrictions on billy clubs).

Attached hereto as **Exhibit 15** is a true and correct copy of the transcript of the December 12 hearing.

29.     During the December 12 hearing, the district court ordered the Attorney General to prepare spreadsheets or surveys of relevant historical laws within 30 days. Ex. 15 at 38. The court ordered the Attorney General to prepare a survey of laws "in effect at the time the Second Amendment was adopted" through the year 1888 (20 years after ratification of the Fourteenth Amendment to the United States Constitution). *Id.* at 29-30. The court also permitted the Attorney General to prepare a second survey of laws enacted after 1888. *Id.* at 32-33. This order was issued in all four cases heard during the December 12 hearing.

30.     On December 15, 2022, the district court entered the same order in all four Second Amendment cases before the court at the consolidated hearing. This order required the Attorney General to "create, and the plaintiffs shall meet and confer regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in chronological order" that shall "begin at the time of the adoption of the Second Amendment and continue through twenty years after the Fourteenth Amendment." D. Ct. Dkt. 134. The order also permitted the Attorney General to create a second survey "covering a time period following that of the first list." *Id.*

31.     On January 11, 2023, the Attorney General filed two surveys of relevant state, territorial, and local laws, ordinances, regulations, and authorities

8

that the Attorney General views as relevantly similar analogues to the challenged provisions in this matter:  one survey of laws enacted from the pre-founding period to 1888 and a separate survey from 1889 through the 1930s.  D. Ct. Dkt. 139. Attached hereto as **Exhibit 16** is a true and correct copy of the Declaration of John D. Echeverria re Submission of Surveys and the two annexed surveys of relevant laws.

32.     On February 7, 2023, the district court issued an order requiring the Attorney General to file an additional brief identifying "the best historical regulation that is a proper analogue and relevantly similar to a statewide prohibition on possession of an ammunition device or a limit on an amount of ammunition."  D. Ct. Dkt. 140.  This additional brief was to be filed on February 10, 2023, three days after entry of that order.

33.     On February 10, 2023, the parties filed supplemental briefs.  D. Ct. Dkts. 141-143.  The Attorney General's brief was accompanied by a declaration of counsel, attaching copies of additional expert witness declarations relevant to this action that were prepared after the filing of the Attorney General's December 13 supplemental brief.  D. Ct. Dkt. 142-1.

34.     Attached hereto as **Exhibits 17** and **18** are true and correct copies of excerpts from the transcript of the Deposition of Stephen C. Helsley, dated January 19, 2023, from the matter, *Oregon Firearms Fed'n v. Brown*, U.S. District

9

Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM, *appeal docketed*, Nos. 23-35478, 23-35479 (9th Cir. July 17, 2023), and submitted with the Attorney General's February 10 supplemental brief in this matter.

35.     Attached hereto as **Exhibit 19** is a true and correct copy of the Supplemental Expert Report and Declaration of Colonel (Ret.) Craig Tucker, dated January 6, 2023, served in the matter, *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.), and submitted with the Attorney General's February 10 supplemental brief in this matter.

36.     Attached hereto as **Exhibit 20** is a true and correct copy of the Declaration of Kevin Sweeney, dated February 5, 2023, filed in *Oregon Firearms Fed'n v. Brown*, U.S. District Court for the District of Oregon, Case Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM (D. Or.), *appeal docketed*, Nos. 23-35478, 23-35479 (9th Cir. July 17, 2023), and submitted with the Attorney General's February 10 supplemental brief.

37.     The supplemental brief repeated the Attorney General's request for a stay of any adverse judgment, at least for a sufficient period to allow him to seek a stay from this Court.  D. Ct. Dkt. 142 at 25 n.26.

38.     On February 10, 2023, the Attorney General filed a brief in compliance with the district court's February 7 order.  D. Ct. Dkt. 143.

39.     On February 21, 2023, the parties filed supplemental responsive briefs.  D. Ct. Dkt. 144, 145.  In his responsive brief, the Attorney General reiterated a request for a stay of any adverse judgment for a sufficient period to allow him to seek a stay from this Court.  D. Ct. Dkt. 145 at 10 n.10.

40.     On September 22, 2023, the district court issued an order declaring that Section 32310 violates the Second Amendment and enjoining permanently its enforcement.  Ex. 1 at 71.  The court stayed enforcement of its order for 10 days from the date of its issuance, *id.*, and that temporary stay is set to expire on October 2, 2023.

41.     On September 26, 2023, I conferred with Plaintiffs' counsel, Anna M. Barvir, by telephone to inform Plaintiffs that the Attorney General was planning to seek a stay pending appeal from this Court, consistent with the district court's decision.  I inquired whether Plaintiffs oppose the Attorney General's motion for a stay of the order and permanent injunction pending appeal to preserve the status quo.  I was informed that Plaintiffs oppose this emergency motion, though they agree with the State's election not to seek a stay with respect to the portions of the district court's injunction of Sections 32310(c) and (d) for large-capacity magazines that were lawfully acquired before the district court's order.

42.     The Attorney General seeks an immediate stay of the order and permanent injunction pending appeal to preserve the longstanding status quo.  An

immediate stay is needed to prevent irreparable harm to the Attorney General that would result if the challenged provisions of Section 32310 were enjoined during this appeal; if the decision is ultimately reversed on appeal, it would be impracticable, if not impossible, to remove large-capacity magazines that entered the State during the appeal. A stay pending appeal will preserve enforcement of a vital public safety measure that has been in effect for decades and is in the public interest.

43. The Attorney General's concerns are not theoretical, in light of what occurred in 2019 after the district court issued its prior judgment without any stay. *Duncan v. Becerra*, 366 F. Supp. 3d 1131 (S.D. Cal. 2019), *aff'd*, 970 F.3d 1133 (9th Cir. 2020), *reh'g en banc granted*, 988 F.3d 1209 (2021), *rev'd*, 19 F.4th 1087 (9th Cir. 2021) (en banc), c*ert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022). While the Attorney General promptly applied to the district court *ex parte* for an immediate stay pending appeal and a temporary stay pending disposition of the stay application, the district court did not issue a stay pending appeal until four days later, making the stay effective the following day and permitting anyone who acquired a large-capacity magazine during the interim following the entry of judgment to keep them during the appeal. D. Ct. Dkt. 97 at 6. During the period between the entry of judgment on March 29, 2019 and the eventual stay pending appeal that took effect

12

on April 4, 2019, over one million large-capacity magazines reportedly flooded into the State. Many remain in the State to this day. Attached hereto as **Exhibit 21** is a true and correct copy of Matthew Green, *Gun Groups: More than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, *available at* https://bit.ly/3wfinEU (last visited September 26, 2023).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 26, 2023, at San Francisco, California.

_____ s/ John D. Echeverria _____

John D. Echeverria

13

# INDEX OF EXHIBITS

**Exhibit**  **Document Description**

1    Decision, dated September 22, 2023 (D. Ct. Dkt. 149)

2    Expert Report of Dr. Louis Klarevas (Decl. of John D. Echeverria in Supp. of Def.'s Opp'n. to Pls.' Mot. for Summ. J., Ex. 3) (D. Ct. Dkt. 53-4)

3    Expert Report of Dr. Christopher S. Koper (Decl. of John D. Echeverria in Supp. of Def.'s Opp'n. to Pls.' Mot. for Summ. J., Ex. 4) (D. Ct. Dkt. 53-5)

4    Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms, *Recommendation on the Importability of Certain Semiautomatic Rifles* (1989) (Decl. of John D. Echeverria in Supp. of Def.'s Opp'n. to Pls.' Mot. for Summ. J., Ex. 12) (D. Ct. Dkt. 53-7)

5    Supplemental Declaration of Lucy P. Allen, dated November 10, 2022 (D. Ct. Dkt. 118-1)

6    Declaration of Dennis Baron, dated November 7, 2022 (D. Ct. Dkt. 118-2)

7    Declaration of Ryan Busse, dated November 9, 2022 (D. Ct. Dkt. 118-3)

8    Declaration of Saul Cornell, dated November 10, 2022 (D. Ct. Dkt. 118-4)

9    Supplemental Declaration of John J. Donohue, dated November 8, 2022 (D. Ct. Dkt. 118-5)

10    Supplemental Declaration of Louis Klarevas, dated November 10, 2022 (D. Ct. Dkt. 118-6)

# INDEX OF EXHIBITS

| Exhibit | Document Description |
|---|---|
| 11 | Declaration of Brennan Rivas, dated November 8, 2022 (D. Ct. Dkt. 118-7) |
| 12 | Declaration of Randolph Roth, dated November 9, 2022 (D. Ct. Dkt. 118-8) |
| 13 | Declaration of Robert Spitzer, dated November 10, 2022 (D. Ct. Dkt. 118-9) |
| 14 | Declaration of Michael Vorenberg, dated November 10, 2022 (D. Ct. Dkt. 118-10) |
| 15 | Reporter Transcript of the December 12, 2022 Consolidated Hearing/Status Conference, *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Miller v. Bonta*, No. 3:19-cv-1537-BEN-JLB (S.D. Cal.); *Rhode v. Bonta*, No. 3:18-cv-00802-BEN-JLB (S.D. Cal.); and *Fouts v. Bonta*, No. 3:19-cv-01662-BEN-JLB (S.D. Cal.) |
| 16 | Declaration of John D. Echeverria re Submission of Surveys and the Two Annexed Surveys of Relevant Laws, dated January 11, 2023 (D. Ct. Dkt. 139) |
| 17 | Excerpts from the transcript of the Deposition of Stephen C. Helsley – Vol. I, *Oregon Firearms Fed'n v. Brown*, Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM (D. Or. Jan. 19, 2023) (Decl. of John D. Echeverria in Supp. of Def.'s Brief in Response to the Court's Order Entered on December 15, 2022, Ex. 1) (D. Ct. Dkt. 142-1) |

# INDEX OF EXHIBITS

| Exhibit | Document Description |
|---------|---------------------|
| 18 | Excerpts from the transcript of the Deposition of Stephen C. Helsley – Vol. II, *Oregon Firearms Fed'n v. Brown*, Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM (D. Or. Jan. 30, 2023) (Decl. of John D. Echeverria in Supp. of Def.'s Brief in Response to the Court's Order Entered on December 15, 2022, Ex. 2) (D. Ct. Dkt. 142-1) |
| 19 | Supplemental Expert Report and Declaration of Colonel (Ret.) Craig Tucker, *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal. Jan. 6, 2023) (Decl. of John D. Echeverria in Supp. of Def.'s Brief in Response to the Court's Order Entered on December 15, 2022, Ex. 3) (D. Ct. Dkt. 142-1) |
| 20 | Declaration of Kevin Sweeney, *Oregon Firearms Fed'n v. Brown*, Nos. 2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM, 3:22-cv-01869-IM (D. Or. Feb. 5, 2023) (Decl. of John D. Echeverria in Supp. of Def.'s Brief in Response to the Court's Order Entered on December 15, 2022, Ex. 4) (D. Ct. Dkt. 142-1) |
| 21 | Matthew Green, *Gun Groups: More than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, https://bit.ly/3wfinEU |

3

# EXHIBIT 1

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., | Case No.: 17-cv-1017-BEN (JLB) |
| Plaintiffs, | |
| v. | **DECISION** |
| ROB BONTA, in his capacity as Attorney General of the State of California, | |
| Defendant. | |

    We begin at the end.  California's ban and mandatory dispossession of firearm magazines holding more than 10 rounds (California Penal Code § 32310(c) and (d)), as amended by Proposition 63, was preliminarily enjoined in 2017.[1]  That decision was affirmed on appeal.[2]  In 2019, summary judgment was granted in favor of Plaintiffs and § 32310 in its entirety was judged to be unconstitutional.[3]  Initially, that decision was also

---

[1] *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1138 (S.D. Cal. 2017).
[2] *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018).
[3] *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1133 (S.D. Cal. 2019).

affirmed on appeal.[4]  However, the decision was re-heard and reversed by the court of appeals *en banc*.[5]  In 2022, the United States Supreme Court granted certiorari, vacated the appellate *en banc* decision, and remanded the case.[6]  The court of appeals, in turn, remanded the case to this Court "for further proceedings consistent with *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)."[7]  All relevant findings of fact and conclusions of law set forth in the prior decision concluding § 32310 is unconstitutional are incorporated herein.

## I.  **INTRODUCTION**

"There is a long tradition of widespread lawful gun ownership by private individuals in this country," according to the United States Supreme Court.[8] Americans have an individual right to keep and bear firearms.[9]  The Second Amendment to the United States Constitution "guarantee[s] the individual right to possess and carry weapons in case of confrontation."[10] This guarantee is fully binding on the States and limits their ability to devise solutions to social problems.[11] And the guarantee protects "the possession of weapons that are 'in common use,'"[12] or arms that are "typically

---

[4] *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021).
[5] *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (*en banc*).
[6] *Duncan v. Bonta*, 142 S. Ct. 2895 (2022).
[7] *Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022).
[8] *Staples v. United States*, 511 U.S. 600, 610 (1994).
[9] *District of Columbia v. Heller*, 554 U.S. 570, 630 (1980).
[10] *Id.* at 606 (quoting 2 Tucker's Blackstone 143) ("This may be considered as the true palladium of liberty …. The right to self defence is the first law of nature:  in most governments it has been the study of rulers to confine the right within the narrowest limits possible.").
[11] *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 785 (2010) (emphasis in original).
[12] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022).

2

possessed by law-abiding citizens for lawful purposes."[13] These are the decisions this Court is bound to apply.  "It's our duty as judges to interpret the Constitution based on the text and original understanding of the relevant provision—not on public policy considerations, or worse, fear of public opprobrium or criticism from the political branches."[14]

This case is about a California state law that makes it a crime to keep and bear common firearm magazines typically possessed for lawful purposes.  Based on the text, history, and tradition of the Second Amendment, this law is clearly unconstitutional.

The detachable firearm magazine solved a problem with historic firearms: running out of ammunition and having to slowly reload a gun.[15] When more ammunition is needed in case of confrontation, a larger the magazine is required.  Many gun owners want to have ready more than 10 rounds in their guns.  As a result, in the realm of firearms, magazines that hold more than 10 rounds are possibly the most commonly owned thing in America.  These larger magazines number over one hundred million.  For handguns, the most popular sizes range up to 17 rounds; the most popular size for rifles is

---

[13] *Caetano v. Massachusetts*, 577 U.S. 411, 416 (Alito and Thomas concurring) (quoting *Heller*, 554 U.S. at 625, in turn quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."

[14] *United States v. Rahimi*, 61 F.4th 443, 462 (5th Cir. 2023) (Ho, J., concurring) (citations omitted).

[15] *United States v. Gonzalez*, 792 F. 3d. 534, 536–37 (5th Cir. 2015) ("The problem of limited ammunition capacity has plagued rifles since their invention centuries ago.  The earliest rifles fired a single shot, leaving the user vulnerable during reloading.  Numerous inventions have sought to eliminate this problem.  But from repeating rifles to clips, none has proved as effective as the magazine.") (citing David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. R. 849 (2015)).

1
2

30 rounds.  Yet, regardless of the overwhelming popularity of larger magazines, California continues to prohibit any magazine capable of holding more than 10 rounds.[16]

3
4
5
6
7
8
9
10

There is no American tradition of limiting ammunition capacity and the 10-round limit has no historical pedigree and it is arbitrary and capricious.  It is extreme.  Our federal government and most states impose no limits[17] and in the states where limits are imposed, there is no consensus.  Delaware landed on a 17-round magazine limit.[18] Illinois and Vermont picked limits of 15 rounds for handguns and 10 rounds for a rifles.[19] Colorado went with a 15-round limit for handguns and rifles, and a 28-inch tube limit for shotguns.[20] New York tried its luck at a 7-round limit; that did not work out.[21]  New Jersey started with a 15-round limit and then reduced the limit to 10-rounds.[22]  The fact

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

---

[16] *See* Cal. Penal Code § 32310 and § 16740.  The term "large-capacity magazine" is defined in California Penal Code § 16740 as "any ammunition feeding device with the capacity to accept more than 10 rounds," but excludes: (a) a "feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds," (b) a ".22 caliber tube ammunition feeding device," and (c) a "tubular magazine that is contained in a lever-action firearm."

[17] Federal law imposes only a sentencing enhancement.  United States Sentencing Guideline § 2K2.1(a)(4)(B) increases the base offense level for a violation of 18 U.S.C. § 922(g)(1) (felon in possession) when the offense involves a firearm with an attached magazine larger than 15 rounds.  *United States v. Lucas*, No. 22-50064, 2023 U.S. App. LEXIS 14768, at *7 (9th Cir. June 14, 2023).

[18] *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, Civil Action No. 22-951-RGA, 2023 U.S. Dist. LEXIS 51322, at *4 (D. Del. Mar. 27, 2023) ("'Large-capacity magazine[s]' are those 'capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition.'").

[19] 720 ILCS 5/24-1.10(a); Vt. Stat. Ann. tit. 13, § 4021.

[20] Colo. Rev. Stat. Ann. § 18-12-301.

[21] The 7-round limit was found to be unconstitutional.  *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 269 (2d Cir. 2015).

[22] "New Jersey once imposed a fifteen-round limit on magazine capacity.  Now it claims a lower limit of ten is essential for public safety.  The Second Amendment demands more than back-of-the-envelope math."  *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. AG N.J.*, 974 F.3d 237, 260 (3d Cir. 2020) (Matey, J. dissenting).

1
2
that there are so many different numerical limits demonstrates the arbitrary nature of magazine capacity limits.

3
4
5
6
7
8
9
In a stealth return to the interest balancing test rejected by *Heller* and *Bruen*, the State ostensibly justifies its magazine limits by deeming the smaller magazines "well-suited" for its citizens.[23]  Suitability, in turn, is based on concocted statistics about what a hypothetical average person needs to defend against an attacker or attackers in an average self-defense situation.  Based on this hypothetical statistically average case scenario, the State permits its citizen to have a gun, but the State decides the number of rounds in the gun that it finds suitable.[24]

10
11
12
13
14
15
[23] At least a dozen times in its briefing before this Court, the State of California insists magazines larger than 10 rounds are unsuitable.  Here are some examples.  "[T]he Attorney General has demonstrated that LCMs are not necessary or even *suitable* to engage in private self-defense."  Dkt. 145, at 9.  "Nor are LCMs particularly *suitable* for self-defense."  Dkt. 142, at 8.  "[T]he accessory at issue here (an LCM) is not *well-suited* for lawful self-defense."  *Id.*

16
17
18
19
[24] And be grateful for 10 rounds.  *Duncan*, 19 F.4th at 1168 n.10, *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022) (Bumatay, J., dissenting) ("California currently allows more than 2.2 rounds in a magazine, and does not prohibit carrying multiple magazines.  But don't be fooled.  Under the majority's Version 2.2 of the Second Amendment, there is no reason a state couldn't limit its citizens to carrying a (generous) 3 rounds total for self-defense.").

20
21
22
23
24
25
26
27
28
As this Court explained in its prior decision, "[a]rtificial limits will eventually lead to disarmament.  It is an insidious plan to disarm the populace and it depends on for its success a subjective standard of 'necessary' lethality.  It does not take the imagination of Jules Verne to predict that if all magazines over 10 rounds are somehow eliminated from California, the next mass shooting will be accomplished with guns holding only 10 rounds.  To reduce gun violence, the state will close the newly christened 10-round 'loophole' and use it as a justification to outlaw magazines holding more than 7 rounds.  The legislature will determine that no more than 7 rounds are 'necessary.'  Then the next mass shooting will be accomplished with guns holding 7 rounds.  To reduce the new gun violence, the state will close the 7-round 'loophole' and outlaw magazines holding more than 5 rounds determining that no more than 5 rounds are 'suitable.'  And so it goes, until the only lawful firearm law-abiding responsible citizens will be permitted to possess is a single-shot handgun.  Or perhaps, one gun, but no ammunition.  Or ammunition issued only to persons deemed trustworthy."  *Duncan*, 366 F. Supp. 3d at 1146 n.33.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In so doing, the State denies a citizen the federal constitutional right to use common weapons of their own choosing for self-defense.  There have been, and there will be, times where many more than 10 rounds are needed to stop attackers.[25]  Yet,

---

[25] Some have wishfully believed "there is no evidence that anyone ever has been unable to defend his or her home and family due to the lack of a large-capacity magazine," or that more than 10 rounds is ever needed.  But there is actually the evidence to support this.  In fact, the State's own expert reports otherwise.

*See Duncan*, 366 F. Supp. 3d at 1134 ("As two masked and armed men broke in, Susan Gonzalez was shot in the chest.  She made it back to her bedroom and found her husband's .22 caliber pistol.  Wasting the first rounds on warning shots, she then emptied the single pistol at one attacker.  Unfortunately, now out of ammunition, she was shot again by the other armed attacker.  She was not able to re-load or use a second gun.  Both she and her husband were shot twice.  Forty-two bullets in all were fired.  The gunman fled from the house—but returned.  He put his gun to Susan Gonzalez's head and demanded the keys to the couple's truck.

When three armed intruders carrying what look like semi-automatic pistols broke into the home of a single woman at 3:44 a.m., she dialed 911.  No answer.  Feng Zhu Chen, dressed in pajamas, held a phone in one hand and took up her pistol in the other and began shooting.  She fired numerous shots.  She had no place to carry an extra magazine and no way to reload because her left hand held the phone with which she was still trying to call 911.  After the shooting was over and two of the armed suspects got away and one lay dead, she did get through to the police.  The home security camera video is dramatic.

A mother, Melinda Herman, and her nine-year-old twins were at home when an intruder broke in.  She and her twins retreated to an upstairs crawl space and hid.  Fortunately, she had a .38 caliber revolver.  She would need it.  The intruder worked his way upstairs, broke through a locked bedroom door and a locked bathroom door, and opened the crawl space door.  The family was cornered with no place to run.  He stood staring at her and her two children.  The mother shot six times, hitting the intruder five times, when she ran out of ammunition.  Though injured, the intruder was not incapacitated.  Fortunately, he decided to flee.") (Citations omitted).

More examples have been reported since those words were written.  When four suspects in a stolen car with stolen guns and ammunition used stolen house keys to enter the victims' home in Tallahassee, Florida at 3:37 a.m., the victim fired 25 rounds before the suspects retreated out of the home.  *Police: Tallahassee homeowner shot 2 out of 4 home invasion suspects, all 4 charged*, ABC27 WTXL (May 24, 2019) https://www.wtxl.com/news/local-news/tpd-investigating-home-invasion-robbery [https://perma.cc/AQ36-S2ZH].

6

under this statute, the State says "too bad." It says, if you think you need more than 10 chances to defend yourself against criminal attackers, you must carry more magazines. Or carry more bullets to hand reload and fumble into your small magazine while the attackers take advantage of your pause. On the other hand, you can become a criminal, too. So, the previously law-abiding California citizen who buys and keeps at her bedside a nationally popular Glock 17 (with its standard 17-round magazine) becomes the criminal, because the State dictates that a gun with a 17-round magazine is not well-suited for home defense.[26]

---

In Kentucky, when a home intruder wearing a bulletproof vest shot and killed one daughter asleep in her bed, the father awoke and needed to fire 11 shots from one gun and 8 shots from a second gun, while suffering 3 gunshot wounds himself, to protect his other daughter, his wife, and himself. Krista Johnson and Hayes Gardner, *Jordan Morgan's death: Suspect Shannon Gilday arrested in Madison County*, Louisville Courier J. (Feb. 28, 2022), https://www.courier-journal.com/story/news/local/2022/02/28/shannon-gilday-arrested-in-jordan-morgan-richmond-ky-shooting/6941351001/ [https://perma.cc/Q49M-ZFF9].

On a Chicago train this year, a citizen was robbed at gunpoint by a suspect who had been previously arrested 32 times. The victim, a bank security guard, shot back 18 times (4 of the rounds jammed) before the suspect retreated off the train. *Arrested 32 times since 2014, man allegedly engaged in a 'firefight' with a concealed carry holder on a CTA train*, CWBChicago (Jan. 22, 2023), https://cwbchicago.com/2023/01/arrested-32-times-since-2014-man-allegedly-engaged-in-a-firefight-with-a-concealed-carry-holder-on-a-cta-train.html [https://perma.cc/EAV2-8F2E].

[26] Criminals sometimes do not abide by gun regulations and pass around "gang guns" with magazines larger than 10 rounds. *See, e.g.*, *People v. Cyrus*, No. E075271, 2023 Cal. App. Unpub. LEXIS 1301, at *5 (Mar. 3, 2023) (describing a Glock .40 cal. handgun and 29-round magazine and explaining, "[a] 'gang gun' is a gun that is passed around the gang and used by numerous gang members to commit crimes.).

1   Numbers vary, but some estimate that 81 million Americans own between 415[27]

2   and 456[28] million firearms.  Further, millions of Americans across the country own large

3   capacity magazines.  "One estimate . . . shows that . . . civilians possessed about 115

4   million LCMs out of a total of 230 million magazines in circulation.  Put another way,

5   half of all magazines in America hold more than 10 rounds."[29] A more recent large-scale

6   survey estimates that Americans today own 542 million rifle and handgun magazines that

7   hold more than 10 rounds.[30]  Home defense and target shooting are the two most

8   common reasons for owning these larger magazines.[31]  Moreover, the survey reports 48%

9   of gun owners have owned a handgun or rifle magazine that holds more than 10 rounds.[32]

10  But California bans these typically possessed magazines kept and used for self-defense.

11   Why are larger magazines chosen for self-defense?  Crime happens a lot.  One

12  recent estimate holds that guns are needed defensively approximately 1,670,000 times a

13  year.[33]  Another report, originally commissioned and long cited by the Centers for

14  Disease Control and Prevention estimated that there are between 500,000 and 3,000,000

---

[27] William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 7 (Geo. McDonough Sch. of Bus. Rsch. Paper No. 4109494, 2022), available at https://ssrn.com/abstract=4109494 [https://perma.cc/83XT-75YG].

[28] *See* Suppl. Decl. of Louis Klarevas, Dkt. 137-5 ("Suppl. Klarevas Decl."), at ¶ 15 and n.13.

[29] *Duncan*, 970 F.3d at 1142, *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

[30] English, *supra*, at 25 ("These estimates suggest that Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds.").  Plaintiff's expert, Stephen Helsley, a retired California Department of Justice Assistant Director of the Division of Law Enforcement, estimates there are between 500 million and one billion magazines able to hold more than 10 rounds.  *See* Declaration of Helsley in Support of Plfs.' Suppl. Br., Exh. 10, Dkt. 132-4, at ¶ 11.

[31] English, *supra*, at 23.

[32] *Id.* at 22.

[33] *Id.* at 35.

8

1   defensive gun uses in the United States every year.[34]  Woe to the victim who runs out of

2   ammunition before armed attackers do.  The police will mark the ground with chalk,

3   count the number of shell casings, and file the report.

4          All of this was decided earlier.

5          What remains to be done?  California Penal Code § 32310 must be assessed in

6   light of *Bruen*.  Now, on remand, the State has to justify this ban under *Bruen*, which

7   makes clear that "[t]o justify its regulation, the government may not simply posit that the

8   regulation promotes an important interest."[35]  After all, "'the very enumeration of the

9   right takes out of the hands of government—even the Third Branch of Government—the

10  power to decide on a case-by-case basis whether the right is really worth insisting

11  upon.'"[36]  So, the State must demonstrate that its extreme ban is consistent with this

12  Nation's historical tradition of firearms regulation.  As explained below, there is no

13  national tradition of prohibiting or regulating firearms based on firing capacity or

14  ammunition capacity.

15  **II.   CONSTITUTIONAL STANDARDS**

16         The Second Amendment provides: "A well regulated Militia, being necessary to

17  the security of a free State, the right of the people to *keep and bear* Arms, shall not be

18

19  _____

20  [34] *See* Inst. of Med. & Nat'l Rsch. Council, *Priorities for Research to Reduce the Threat*
21  *of Firearm-Related Violence* 15 (The Nat'l Acads. Press ed., 2013),
    https://doi.org/10.17226/18319 [https://perma.cc/K3N4-FEXQ].  For many years the
22  CDC's "fast facts" webpage referred to this report.  The report itself had two different
23  ranges.  The second rage estimated from 60,000 to 2,500,000 annual defensive gun uses
    in America.  *See* Internet Archive Wayback Machine, CDC Firearm Violence Prevention,
24  captured July 26, 2021,
25  https://web.archive.org/web/20210726233739/https://www.cdc.gov/violenceprevention/fi
    rearms/fastfact.html.  The Court notes that the CDC has changed its reporting to delete
26  reference to this study and the Court will not comment on how or why that happened as
27  the CDC website does not reflect why it was deleted.
    [35] *Bruen*, 142 S. Ct. at 2126.
28  [36] *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).

1   infringed."[37]  "[T]he Second Amendment extends, prima facie, to all instruments that

2   constitute bearable arms, even those that were not in existence at the time of the

3   founding."[38]  According to *Heller*, "[t]he Second Amendment is naturally divided into

4   two parts: its prefatory clause and its operative clause.  The former does not limit the

5   latter grammatically, but rather announces a purpose.  The Amendment could be

6   rephrased, 'Because a well regulated Militia is necessary to the security of a free State,

7   the right of the people to keep and bear Arms shall not be infringed.'"[39] "The first salient

8   feature . . . is that it codifies a 'right of the people.'"[40]  *Heller* then examines the

9   substance of the constitutional right, the verbs *to keep* and *to bear* and their object: *arms*.

10  So, what does it mean to keep and bear arms?

11      The Supreme Court concludes, "[t]he 18th-century meaning [of "arms"] is no

12  different from the meaning today.  The 1773 edition of Samuel Johnson's dictionary

13  defined 'arms' as 'weapons of offence, or armour of defence.'  Timothy Cunningham's

14  important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his

15  defence, or takes into his hands, or useth in wrath to cast at or strike another.'"[41]  In the

16  past, the term "arms" included weapons that were not specifically designed for military

17  use and were not employed in a military capacity.  "Although one founding-era thesaurus

18  limited 'arms' . . . to 'instruments of offence generally made use of in war,' even that

19  source stated that all firearms constituted 'arms,'" according to *Heller*.[42]  And it is now

20  clear that "the Second Amendment extends, prima facie, to all instruments that constitute

21  bearable arms, even those that were not in existence at the time of the founding."[43]

22

23

---

24  [37] U.S. Const. amend. II (emphasis added).

25  [38] *Caetano*, 577 U.S. 411 (quoting *Heller*, 554 U.S. at 581).

    [39] *Heller*, 554 U.S. at 577 (citations omitted).

26  [40] *Heller*, 554 U.S. at 579.

    [41] *Heller*, 554 U.S. at 581 (citations omitted).

27  [42] *Heller*, 554 U.S. at 581 (citations omitted).

28  [43] *Heller*, 554 U.S. at 582.

*Heller* later describes the types and kinds of arms that are guaranteed Second Amendment protection. But first, *Heller* describes the meanings of "to keep" and "to bear" arms.

"We turn to the phrases 'keep arms' and 'bear arms.' Johnson defined 'keep' as, most relevantly, 'to retain; not to lose,' and 'to have in custody.' Webster defined it as 'to hold; retain in one's power or possession'. . . .Thus the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"[44] "Keep arms," according to *Heller,* "was simply a common way of referring to possessing arms, for militiamen and everyone else."[45] "To bear" meant to carry for the purpose of being armed and ready in case of conflict with another person. *Heller* even cited with approval the meaning of the phrase "carries a firearm" proposed by Justice Ginsburg in *Muscarello v. United States*: "as the Constitution's Second Amendment indicates: 'wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.'"[46] Providing our modern understanding of the Second Amendment's text, *Heller* concludes, "[p]utting all of these textual elements together, we find that they *guarantee the individual right to possess and carry weapons in case of confrontation.*"[47]

Very important in the past, still important in the future, *Heller* describes the concept of America's militia. "In *Miller*, we explained that 'the Militia comprised all

---

[44] *Heller*, 554 U.S. at 582 (citations omitted).

[45] *Heller*, 554 U.S. at 583.

[46] *Heller*, 554 U.S. at 584 (quoting *Muscarello*, 524 U.S. 125, 143 (1998) (Ginsburg, J. dissenting).

[47] *Heller*, 554 U.S. at 592 (emphasis added). "As the most important early American edition of Blackstone's Commentaries (by the law professor and former Antifederalist St. George Tucker) made clear in the notes to the description of the arms right, Americans understood the 'right of self-preservation' as permitting a citizen to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Id*. at 595 (quoting 1 Blackstone's Commentaries, 145-46, n.42 (1803)).

17-cv-1017-BEN (JLB)

1  males physically capable of acting in concert for the common defense.'"[48] And *Heller*

2  explains why the militia was important.  Two of the three reasons remain important

3  today.  "There are many reasons why the militia was thought to be 'necessary to the

4  security of a free State.'  First, of course, it is useful in repelling invasions and

5  suppressing insurrections. . . . Third, when the able-bodied men of a nation are trained in

6  arms and organized, they are better able to resist tyranny."[49] Once one understands the

7  history of tyrants resorting to taking away people's arms to suppress political opposition,

8  *Heller* explains, one can see that the militia clause fits perfectly with the operative clause.

9  *Heller* teaches,

10  
11  
12  
13  
14  
15  
16  
17  

> We reach the question, then: Does the preface fit with an
> operative clause that creates an individual right to keep and bear
> arms?  It fits perfectly, once one knows the history that the
> founding generation knew and that we have described above.
> That history showed that the way tyrants had eliminated a
> militia consisting of all the able-bodied men was not by
> banning the militia but simply by taking away the people's
> arms, enabling a select militia or standing army to suppress
> political opponents.  This is what had occurred in England that
> prompted codification of the right to have arms in the English
> Bill of Rights.[50]

18  
19  
20  
21  
22  
23  
24  

        While the protection of a citizen militia was important, most people regarded the

Second Amendment as even more important for its protection of self-defense and

hunting.  "The prefatory clause does not suggest that preserving the militia was the only

reason Americans valued the ancient right*; most undoubtedly thought it even more

important for self-defense and hunting.*"[51] After all, "'[t]he right to self defence is the

first law of nature: in most governments it has been the study of rulers to confine the right

25  
26  ---
27  [48] *Heller*, 554 U.S. at 595.
28  [49] *Heller*, 554 U.S. at 598 (citations omitted).
[50] *Heller*, 554 U.S. at 598.
[51] *Heller*, 554 U.S. at 599 (emphasis added).

12

within the narrowest limits possible.  Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.'"[52] As one commentator wrote at the time the Fourteenth Amendment was adopted in 1868, "[t]he purpose of the Second Amendment is to secure a well-armed militia. . . . But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons."[53]  In this way, a general public knowledge and skill with weapons of war is beneficial to the nation at large and is protected by the Second Amendment.  "No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right."[54] And "[t]he right to bear arms has always been the distinctive privilege of freemen."[55] In the end, the Supreme Court deems the Second Amendment as valuable for both preserving the militia and for self-defense – which is the heart of the right. *McDonald* put it this way:

> In *Heller*, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense.  As we put it, self-defense was "the central component of the right itself."[56]

---

[52] *Heller*, 554 U.S. at 606 (citation omitted).

[53] *Heller*, 554 U.S. at 618 (quoting J. Pomeroy, *An Introduction to the Constitutional Law of the United States* §239, pp. 152-153 (1868)).

[54] *Heller*, 554 U.S. at 619 (quoting B. Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880)).

[55] *Heller*, 554 U.S. at 619 (quoting J. Ordronaux, *Constitutional Legislation in the United States* 241-242 (1891)).

[56] *McDonald*, 561 U.S. at 926-27.

13

*Heller* specifically considered "whether a District of Columbia prohibition on the *possession* of *usable* handguns in the home violates the Second Amendment to the Constitution."[57] And "District of Columbia law also require[d] residents to keep their lawfully owned firearms, such as registered long guns, 'unloaded and dissembled or bound by a trigger lock or similar device' unless they are located in a place of business or are being used for lawful recreational activities."[58] In the end, the Supreme Court struck down both parts of the statute. "In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."[59] While reaching its conclusion, the Supreme Court considered what types of firearms were, and were not, protected by the Constitution. Highlighting the central tenant of the Second Amendment, the Supreme Court wrote,

> We may as well consider at this point (for we will have to consider eventually) what types of weapons *Miller* permits. Read in isolation, *Miller's* phrase "part of ordinary military equipment" could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller's* "ordinary military equipment" language must be read in tandem with what comes after: "Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." The traditional militia was formed from a pool of men bringing arms "in common use at the time" for lawful purposes like self-defense. "In the colonial and revolutionary war era, small-arms weapons[60] used by

---

[57] *Heller*, 554 U.S. at 573 (emphasis added).
[58] *Heller*, 554 U.S. at 575. The Court declared both aspects of the statute to be in violation of the Second Amendment.
[59] *Heller*, 554 U.S. at 635.
[60] Not cannons or mortars.

14

1
2
3
4

> militiamen and weapons used in defense of person and home
> were one and the same." . . . We therefore read *Miller* to say
> only that the Second Amendment does not protect those
> weapons not typically possessed by law-abiding citizens for
> lawful purposes.[61]

5
6
7
8
9

Since it was "the conception of the militia at the time of the Second Amendment's ratification [that] the body of all citizens capable of military service, [citizens] would bring the sorts of lawful weapons that they possessed at home to militia duty,"[62] the right to keep and carry arms means "the sorts of weapons protected were those 'in common use at the time.'"[63]

10

### A. Magazines Are Protected "Arms"

11
12
13
14
15
16
17
18
19
20

The State argues that larger capacity magazines are not "arms."  First, the State argues that magazines are not essential to the use of firearms and consequently would have been thought of as accessories.  But magazines are "integral components to vast categories of guns."  *Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1276 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).  "Most pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds."  *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (*en banc*).  While the Second Amendment does not explicitly mention ammunition or magazines supplying ammunition, "without bullets, the right to bear arms would be meaningless."[64] This is because the right to keep firearms

21
22
23
24
25
26
27
28

---

[61] *Heller*, 554 U.S. at 624-25 (citations omitted).  If it existed at the time and were in common use, as it is today, would a militia member bring a firearm with a magazine that holds more than 10 rounds?  The answer is, yes, of course.

[62] *Heller*, 554 U.S. at 627.

[63] *Heller*, 554 U.S. at 627 citation omitted).

[64] *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)

15

1    for protection implies a corresponding right to obtain the bullets necessary to use them.

2    "The possession of arms also implied the possession of ammunition."[65]

3         By extension, "arms" includes the magazine component necessary to supply the

4    bullet into the chamber of the gun.  "[O]ur case law supports the conclusion that there

5    must also be some corollary, albeit not unfettered, right to possess the magazines

6    necessary to render those firearms operable."[66] "It is hard to imagine something more

7    closely correlated to the right to use a firearm in self-defense than the ability to

8    effectively load ammunition into the firearm."[67]

9         Put more broadly, "the Second Amendment protects ancillary rights necessary to

10   the realization of the core right to possess a firearm for self-defense."[68]  Consequently,

11   whether thought of as a firearm able to fire a certain number of rounds because of its

12   inserted magazine, or as a separate ammunition feeding component, magazines are usable

13   "arms" within the meaning of the Second Amendment.  As the Third Circuit Court of

14   Appeals found, "[w]e therefore must first determine whether the regulated item is an arm

15   under the Second Amendment.  The law challenged here regulates magazines, and so the

16   question is whether a magazine is an arm under the Second Amendment.  The answer is

17   yes." [69]

18        Proffering two subsidiary arguments, the State says: (1) a magazine of some size

19   may be necessary, but a magazine larger than 10 rounds is not necessary to operate a

20   firearm and thus a larger magazine is not a protected "arm"; and (2) statistically people

21   rarely fire more than 10 rounds in self-defense so it can be said that a magazine larger

22

23

24   _____

25   [65] *United States v. Miller*, 307 U.S. 174, 180 (1939).
     [66] *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015)
26   [67] *Barnett v. Raoul*, 2023 U.S. Dist. LEXIS 74756, *26 (S.D. Ill. Apr. 28, 2023).
     [68] *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).
27   [69] *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. of N.J.*, 910 F/3d 106, 116 (3d Cir.
28   2018).

                                             16

1  than 10 rounds is rarely *used* for self-defense, and if a larger magazine is not commonly

2  *used* for self-defense then it is not a protected "arm."

3       For the first argument, the State claims that if a standard 17-round magazine is

4  detached from a standard Glock 17 pistol, the 17-round magazine is no longer a weapon

5  (by itself) and because the Glock 17 pistol could still function with a substitute 10-round

6  magazine, then the 17-round standard Glock magazine does not come within the

7  definition of "arms" that the Second Amendment protects.[70] In contrast, according to the

8  State, a magazine holding 10 or less may qualify as a protected "arm," but a magazine

9  able to hold 11 or more is not a protected "arm."  What the State seems to be really

10 saying is that a magazine may be a protected arm, but only the State has the right to pick

11 the number of rounds a citizen may have in his gun.

12      This Court disagrees.  The Supreme Court has not described protected arms in

13 subdivided categories.  When *Heller* found handguns were protected, it did not

14 distinguish between semiautomatic pistols and revolvers.  *Heller* did not classify

15 protected handguns according to the number of rounds one could hold or the caliber of

16 the ammunition that could be fired.  It did not suggest that typically possessed arms could

17 be subcategorized and subjected to judicial ad hoc constitutional determinations.

18 Whether thought of holistically as a "handgun" irrespective of magazine size as *Heller*

19 does, or as an entirely separate attachment, both firearms and their magazines (of all

20 typical sizes) are "arms" covered by the text of the Second Amendment.  "This is not

21 even a close call."[71] As this Court has said before, "[n]either magazines, nor rounds of

---

[70] Of course, the argument admits, *sub silentio*, that some magazines are necessary to operate a gun.  The State says: "To be sure, some type of magazine is essential to the use of many handguns.  But there is no evidence in this record . . . that a magazine capable of firing more than 10 rounds without reloading is necessary to the function of any modern firearm."  Def's Suppl. Br., Dkt. 118 at n.10.

[71] *Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS 74756, at *26–27 (S.D. Ill. Apr. 28, 2023);  *Hanson v. District of Columbia*, Civil Action No. 22-2256 (RC), 2023 U.S. Dist. LEXIS 68782, at *17 (D.D.C. Apr. 20, 2023) ("At least three

17-cv-1017-BEN (JLB)

1  ammunition, nor triggers, nor barrels are specifically mentioned in the Second

2  Amendment . . . But without a right to keep and bear triggers, or barrels, or ammunition

3  and the magazines that hold ammunition, the Second Amendment right would be

4  meaningless."[72]  Using reasoning that is still persuasive, the Ninth Circuit agreed,

5  explaining "[p]ut simply, a regulation cannot permissibly ban a protected firearm's

6  components critical to its operation."  More recently, counsel for California's Governor

7  in a related fee-shifting case agreed while pointing out that "[t]he large-capacity

8  magazines ban appears in the Penal Code's title on 'Firearms,'" and "a restriction on the

9  ammunition that may be used in a firearm is a restriction on firearms."[73] Leaving no

10  doubt, even the (vacated) Ninth Circuit's *en banc* decision assumed that § 32310

11  implicates the Second Amendment.[74]

12         Relatedly, the State argues that it is only restricting a firearm component or an

13  accessory.[75] "LCMs are not weapons in themselves," says the State, "nor are they

---

15  Courts of Appeals have concluded that LCMs are "arms" within the meaning of the

16  Second Amendment."); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety &
   Homeland Sec.*, Civil Action No. 22-951-RGA, 2023 U.S. Dist. LEXIS 51322, at *19 (D.

17  Del. Mar. 27, 2023); *contra, Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246
   JJM-PAS, 2022 U.S. Dist. LEXIS 227097, at *33–34 (D.R.I. Dec. 14, 2022); *Or.*

18  *Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391,
   at *23–25 (D. Or. Dec. 6, 2022).

19
   [72] *Duncan*, 366 F. Supp. 3d at 1142–43 (citing *Fyock v. City of Sunnyvale*, 779 F.3d 991,

20  998 (9th Cir. 2015); *Teixeira v. Cty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en

21  banc); *Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018).
   [73] *Miller v. Bonta*, 22cv1446-BEN (JLB), Intervenor-Def's Suppl. Br., Dkt. 35, at 14.

22  [74] *Duncan*, 19 F.4th at 1103, *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S.

23  Ct. 2895 (2022).
   [75] Instead of isolating the magazine from the gun, the better understanding is to consider

24  the magazine as part of the gun.  There is a federal law analogue leading to the

25  conclusion that a magazine is correctly regarded as a component part of a gun.  The Arms

26  Control Export Act criminalizes the unlicensed export of firearms and their components.
   22 U.S.C. § 2778(b).  Firearm magazines come within the Act because "a magazine is

27  'useful' only when used in conjunction with that end-item [a rifle]: its sole purpose is to

28  load cartridges into the breech so that they can be fired . . . ."[75]  In this view, the

18

1   necessary to operate any firearm for self-defense."  California residents who purchased

2   new pistols in the last decade are probably surprised to hear that magazines are not

3   necessary to operate a pistol.  After all, another state law known as the Unsafe Handgun

4   Act requires new semiautomatic pistols to have an integrated magazine-disconnect

5   mechanism in order to be sold to the public.[76]

6           A magazine-disconnect mechanism prevents a pistol from firing at all, even if one

7   round is left loaded in the chamber, if the magazine is not inserted into the pistol.  The

8   state-mandated magazine-disconnect mechanism thus prevents the operation of the

9   firearm without its magazine.[77]  While rifles are not required to have a magazine-

10  disconnect mechanism, the State must concede that at least for semiautomatic handguns

11  the State deems "not unsafe," firearms for self-defense will not function without a

12  magazine.[78]  Modern magazines, submits the State, are more like founding-era cartridge

13  boxes or "ancillary equipment associated with soldiering" that were not strictly necessary

14  to fire a gun.  Today, however, as pointed out above, some semiautomatic firearms will

15  not function at all without a magazine, while others can fire no more than one round.  As

16

17  _____

18

19  magazine is a necessary component part of a gun which, in turn, would obviously fall
    under the text of the Second Amendment protection of "arms."

20  [76] "California's Unsafe Handgun Act (the 'UHA') seeks to prevent accidental discharges
    by requiring handguns to have particular safety features . . . [t]he UHA requires certain

21  handguns to have a magazine disconnect mechanism ("MDM"), which prevents a
    handgun from being fired if the magazine is not fully inserted." *Boland v. Bonta*, No.

22  SACV2201421CJCADSX, 2023 WL 2588565, at *1 (C.D. Cal. Mar. 20, 2023) (citing

23  Cal. Penal Code §§ 16900, 31910(b)(5)).

24  [77] Semiautomatic pistols elsewhere in the nation usually do not have a magazine-
    disconnect mechanism so a pistol can still fire one chambered round without its

25  magazine.  Of course, one need not go too far out on a limb to say that a semi-automatic

26  pistol that can fire only 1-round is not the sort of self-defense weapon most people would
    choose.

27  [78] To be precise, revolvers are handguns that do not require a magazine-disconnect

28  mechanism, but that is because a revolver does not have a detachable magazine.

1  such, a magazine is an essential component without which a semiautomatic firearm is
2  useless for self-defense.  Therefore, a magazine falls within the meaning of "arms."[79]

3      **B. LCMs Are _Used_ for Self-Defense**

4          Notwithstanding that the Second Amendment protects the right to "keep and bear,"
5  the State's more troubling argument is that magazines holding more than 10 rounds are
6  not _used_ for self-defense.  By "used," the State means actually fired.  The State
7  asserts, "there is no evidence that LCMs are frequently used in self-defense."
8  Continuing, the State asserts, "[t]o the contrary, the record reflects that it is exceedingly
9  rare for an individual, in a self-defense situation, to fire more than ten rounds."  But
10 without conceding the accuracy of the State's position, infrequent use or "exceedingly
11 rare" is not the same as _never_.  To support the State's argument, it relies on a
12 statistician's conclusion that an average of only 2.2 rounds are fired in an average self-
13 defense situation.  Because more than 10 rounds in the average situation are not being
14 fired for self-defense, the argument goes, magazines holding more than 10 rounds are not
15 _used_ or needed for self-defense.  And because the Second Amendment protects
16 (according to the State) only those arms commonly "used" for self-defense, the State says

---

[79] _See e.g., Hanson v. D.C._, No. CV 22-2256 (RC), 2023 WL 3019777, at *7 (D.D.C. Apr. 20, 2023) ("The District's logic, by contrast, would allow it to ban _all_ magazines (not just LCMs) — a result even the District does not endorse here — because a firearm technically does not require _any_ magazine to operate; one could simply fire the single bullet in the firearm's chamber.  The Court will therefore follow the persuasive reasoning of _ANJRPC, Kolbe_, and _Duncan_ in concluding that LCMs are "arms" within the meaning of the Second Amendment."); _see also Barnett v. Raoul_, No. 3:23-CV-00141-SPM, 2023 WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023) ("Defendants' argument is not persuasive. The Seventh Circuit has recognized the Second Amendment as extending to "corollaries to the meaningful exercise of the core right to possess firearms for self-defense."  It is hard to imagine something more closely correlated to the right to use a firearm in self-defense than the ability to effectively load ammunition into the firearm.").

17-cv-1017-BEN (JLB)

1  larger capacity magazines are not commonly "used," and therefore they are not protected

2  arms.[80]

3       It is a remarkable reading of *Heller, McDonald, Caetano,* and *Bruen* to say that if a

4  gun is not fired more than 10 times in self-defense then the gun's larger magazine is not

5  being "used" in self-defense, and if not "used" in self-defense, then not protected by the

6  Second Amendment.  Yet, this is the State's theme.

7       In this Court's view, it is a crabbed reading of the Supreme Court's Second

8  Amendment decisions and not relevant to the text, history and tradition test.  The

9  Supreme Court uses several descriptive phrases to describe the kinds of firearms that are

10  protected by the Constitution.  But common to all is the notion that to be protected, an

11  arm needs only to be regarded as *typically* possessed or carried, or *commonly* kept, by

12  citizens to be ready for use, if needed.  The Supreme Court has not said that the actual

13  firing of a gun is any part of the test.  Indeed, the Second Amendment does not say that

14  the right of the People to keep only such firearms as they actually shoot, shall not be

15  infringed.

16       *McDonald* begins, "[t]wo years ago, in *District of Columbia v. Heller*, we held that

17  the Second Amendment protects the right to keep and bear arms *for the purpose of self-*

18  *defense*, and we struck down a District of Columbia law that banned the possession of

19  handguns in the home."[81]  What mattered is the purpose for which handguns were

20  possessed, not necessarily the actual use.

21

22

---

23  [80] A similar argument was made by the State in *N.A. for Gun Rights v. Lamont*, Case No.

24  22-1118 (JBA), 2023 U.S. Dist. LEXIS 134880, *40 (D. Conn. Aug. 3, 2023)
   ("Defendants maintain that after *Bruen*, Plaintiffs must show not only that the weapons

25  and accoutrements are commonly owned, but they are commonly possessed and used *for*
   *self-defense* base on *Bruen*'s repeated use of the phrase 'common use' for self-defense.")

26  (emphasis added), and in *Oregon Firearms Federation v. Kotek*, Case No. 22cv1815-IM,

27  *67 (D. Ore. July 14, 2023) ("Defendants … argue for an interpretation of 'use' that
   includes some objective metric of an LCM's actual use in self-defense.").

28  [81] 561 U.S. at 749-50 (citation omitted) (emphasis added).

1   The State puts its weight on the words "use," "uses," and "used."  One problem
2   with the State's view is that it treats the Supreme Court's opinion language like the
3   language of a statute.  That is a mistake.  "Because 'opinions, unlike statutes, are not
4   usually written with the knowledge or expectation that each and every word may be the
5   subject of searching analysis,' we do not follow statutory canons of construction with
6   their focus on 'textual precision' when interpreting judicial opinions."[82]

7   Under the State's reading, a homeowner who displays a handgun with a 17-round
8   magazine to scare away home invaders, has not "used" the 17-round magazine.  Under
9   the State's reading, even a citizen who fires his semiautomatic firearm 10 times or less to
10  defend himself, has not *used* his 17-round magazine in self-defense.  Admittedly, one can
11  find different meanings of the term "use."  For example, in the context of a criminal
12  statute, the Supreme Court acknowledged "use" offers different possible meanings.
13  "[T]he word 'use' poses some interpretational difficulties because of the different
14  meanings attributable to it.  Consider the paradoxical statement: 'I *use* a gun to protect
15  my house, but I've never had to *use* it.'"[83]  Consequently, context is important, whether
16  interpreting a statute or understanding an opinion.[84]

17  So, considering the words "use" or "used" in context, the State's notion is far
18  removed from the meaning indicated by the Supreme Court.  *Heller* considered merely
19  the simple possession of *usable* handguns in the home.  Focusing on the right to possess a
20  usable arm, *Heller* said, "[w]e consider whether a District of Columbia prohibition on the
21  possession of *usable* handguns in the home violates the Second Amendment to the

22
23
24

25  [82] *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766, 770 (9th Cir.
26  2023) (citations omitted).
    [83] *Bailey v. United States*, 516 U.S. 137, 143 (1996) (emphasis in original).
27  [84] *Muscarello v. United States*, 524 U.S. 125, 144 (1998) ("Noting the paradoxical
    statement, 'I *use* a gun to protect my house, but I've never had to *use* it,' the Court in
28  *Bailey* emphasized the importance of context.")

22

17-cv-1017-BEN (JLB)

Constitution."[85]  Actual firing of a handgun in the District was irrelevant.  Statistical surveys of shots fired in self-defense were not determinative – they were not even mentioned.  *Heller* used a simpler test.  Constitutional protection is afforded to weapons "typically possessed by law-abiding citizens for lawful purposes," focusing on typicality and possession rather than frequency of firing.[86]

*McDonald* says "the right was also valued because the possession of firearms was thought to be essential for self-defense."  *McDonald's* focus is on possession.[87]  And *McDonald* says the right applies "to handguns because they are 'the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,'" focusing on a national subjective preference for handguns.[88]  There was no effort by the Supreme Court to condition the constitutional right upon some objective metric of actual handgun firing in self-defense.

*Bruen* says, "[t]he Second Amendment guaranteed to 'all Americans' the right to bear commonly used arms in public."  *Bruen* appears to focus on commonality.[89]  *Bruen* injects some ambiguity with the following phraseology, "the Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"[90]  *Bruen* noted that in that case, no party disputed that handguns are weapons "in common use" today for self-defense, but did not say what it meant by "use."[91]  So, what does the Supreme Court mean by its phrase "in common use?"  Is the focus placed on a weapon's commonality in society or the frequency of a weapon's firing?  *Bruen* answers the question elsewhere in its opinion.  Commonality is the focus.  Consider the following

---

[85] 554 U.S. at 573 (emphasis added).
[86] 554 U.S. at 625; *see also* at 720 (Breyer, J., dissenting) (describing the majority test in the same terms).
[87] 561 U.S. at 787.
[88] *Id.* at 767 (citations omitted).
[89] 142 S. Ct. at 2156 (citing *Heller*, 554 U.S. at 581).
[90] *Id.* at 2128 (citing *Heller*, 554 U.S. at 627).
[91] *Id.* at 2134.

1   sentence from *Bruen*: "Drawing from this historical tradition, we explained there that the

2   Second Amendment protects only the carrying of weapons that are those 'in common use

3   at the time,' *as opposed to those that 'are highly unusual in society at large*.'"[92] Or

4   consider this sentence from *Bruen's* footnote 13: "Even assuming that pocket pistols

5   were, as East Jersey in 1686 deemed them, 'unusual or unlawful,' it appears that they

6   were commonly used at least by the founding."[93] *Bruen* contrasts common pistols against

7   unusual pistols. The focus remains on commonality, not the frequency of actual

8   discharge in self-defense scenarios. Put simply, Second Amendment protection envelops

9   weapons commonly or typically subjectively chosen by citizens to keep in case of

10  confrontation.

11          From *Bruen*, it is evident that the Supreme Court's focus is on whether a weapon is

12  common (or unusual) amongst the citizenry. This, in turn, requires some sort of

13  generalized numerical estimation of citizen ownership or gauge of present popularity. In

14  *Caetano*, the concurring Justices explained that, "[t]he more relevant statistic is that

15  'hundreds of thousands of Tasers and stun guns have been sold to private citizens,' who it

16  appears may lawfully possess them in 45 States."[94] That Ms. Caetano did not actually

17  energize and fire her stun gun made no difference to the Supreme Court. In her case, she

18  did no more than display the weapon. "She stood her ground [and] displayed the stun

19  gun."[95] Absent from the opinion is any discussion about the average number of times a

20  stun gun is energized in an average self-defense scenario. Absent from the opinion is any

21  objective metric counting the frequency with which stun guns have been fired. The

22

23  ───────────────

24  [92] *Id.* at 2143 (emphasis added).

25  [93] *Id.* at n.13 (citation omitted).

26  [94] 577 U.S. at 420 (citations omitted) ("While less popular than handguns, stun guns are
    widely owned and accepted as a legitimate means of self-defense across the country.

27  Massachusetts' categorical ban of such weapons therefore violates the Second
    Amendment.").

28  [95] *Id.* at 413, (Alito, J., concurring).

17-cv-1017-BEN (JLB)

measure of constitutional protection was that the stun gun was "used" in the sense that stun guns are widely *owned* to satisfy a subjective need for protection and that the number in existence was in the hundreds of thousands.

Applying the same measure to magazines, because it is the case that magazines holding more than 10 rounds are owned and possessed by millions of Americans to meet a subjective need for self-defense, this fact alone entitles such magazines to Second Amendment protection. When a magazine is commonly owned by Americans with the subjective intention of using it for self-defense, it is enough to say that it is in common use (or typically used) for self-defense, as the Supreme Court employs the phrase in its opinions.[96]

Probably the vast majority of Americans that own magazines of 11 rounds or more keep them and use them for self-defense in the same way that a driver puts on and uses a seat belt in the case of a collision. Though collisions rarely happen, the seat belt is used for protection and to be ready for the unexpected collision. A reserve canopy is being used on a parachute jump, although it is not deployed, in case the main parachute fails. A cell phone in one's pocket is being used when waiting for a telephone call or in the event one needs to make a call. In the same way, a firearm kept on one's nightstand is used for self-defense even when the night is quiet. It is kept and used in case of confrontation. A person may happily live a lifetime without needing to fire their gun in self-defense. But that is not to say that such a person does not *use* their gun for self-defense when he or she keeps it under the bed with a hope and a prayer that it never has to be fired.

In 2016, an 81-year old Uniontown, Pennsylvania man and his elderly sister were at home when at night an intruder broke in. In the ensuing struggle, the older man fired

---

[96] At the margin, there may be a weapon that is commonly owned that is not commonly used for self-defense. One could imagine perhaps a reproduction of an 18th century flintlock or a World War II German Luger being commonly owned, but used only as curios or museum pieces.

1    one shot from his gun at his attacker.  The victim said he had never before fired his gun

2    and that it had been sitting on his nightstand for thirty years.[97] California would say that

3    the victim did not *use* his gun for self-defense on any day of those preceding thirty years.

4    And if his gun had a magazine with eleven or more rounds in it (the news report does not

5    say), California would argue that the victim never did *use* his large capacity magazine in

6    self-defense.  This Court would say that the victim *used* his gun every night of the thirty

7    years he subjectively kept it on his bedroom nightstand in case of confrontation,

8    including the night of the burglary.  And if his gun had been equipped with a large

9    capacity magazine, it could correctly be said that he also *used* the large capacity

10    magazine for self-defense every night of the thirty years he subjectively kept it on his

11    bedroom nightstand in case of confrontation.

12    **C. The Invention of the 2.2 Shot Average**

13    Without agreeing that when the Supreme Court discusses firearms "in common

14    use" it means commonly fired, even if it did, the State's statistic is suspect.  California

15    relies entirely on the opinion of its statistician for the hypothesis that defenders fire an

16    average of only 2.2 shots in cases of confrontation.

17    Where does the 2.2 shot average originate?  There is no national or state

18    government data report on shots fired in self-defense events.  There is no public

19    government database.  One would expect to see investigatory police reports as the most

20    likely source to accurately capture data on shots fired or number of shell casings found,

21    although not every use of a gun in self-defense is reported to the police.  As between the

22    two sides, while in the better position to collect and produce such reports, the State's

23

24

25

26    [97] *81-year-old fatally shoots home invasion suspect, says gun had never been used in 30*

27    *years*, WXPI-TV 11 News (Nov. 4, 2016),  https://www.wpxi.com/news/81-year-old-

28    fatally-shoots-home-invasion-suspect-says-gun-had-never-been-used-in-30-
years/464100332/  [https://perma.cc/FRP6-MA9P].

17-cv-1017-BEN (JLB)

Attorney General has not provided a single police report to the Court or to his own expert.[98]

Without investigatory reports, the State's expert turns to anecdotal statements, often from bystanders, reported in news media, and selectively studied. She indicates she conducted two studies.[99] Based on these two studies of newspaper stories, she opines that it is statistically rare for a person to fire more than 10 rounds in self-defense and that only 2.2 shots are fired on average.[100] Unfortunately, her opinion lacks classic indicia of reliability and her two studies cannot be reproduced and are not peer-reviewed. "Reliability and validity are two aspects of accuracy in measurement. In statistics, reliability refers to reproducibility of results."[101] Her studies cannot be tested because she

_____

[98] Allen asked the State for police reports, but she did not receive them. *See* Transcript, Preliminary Injunction Hearing, 10/19/20, 153:1-16:

"THE COURT: Let me ask you a question. Did you ever ask, for example, [Deputy Attorney General] Mr. Echeverria if he would get you the law enforcement reports of home defense shootings that may have occurred where the homeowner or the person at home fired shots at someone that was intruding?

THE WITNESS: Yes. So I did ask both from the State of California as well as from a number of other states that I have worked for, I have asked for data on incidents of exactly that, or whether there was a broader set of data that they had that I could then review.

THE COURT: And did you get that from the State of California?

THE WITNESS: I did not. It was my understanding that the State of California did not have that data or did not have that in a way that it could be reviewed. That that is not -- that is not a type of data that is collected."

[99] Lucy Allen Supp. Decl. Dkt 118-1.

[100] Allen Supp. Decl. Dkt 118-1, at ¶10. Of course, though one may assume that "LCMs" are only used .3% of the time, for the unfortunate homeowner who makes up part of the .3%, it is 100% of his time.

[101] Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed.), 211 Reference Guide on Statistics, 2011 WL 7724256, 10 and n.37 ("*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 n.9 (1993), for example, distinguishes "evidentiary reliability" from reliability in the technical sense of giving consistent results. We use "reliability" to denote the latter.").

1   has not disclosed her data.  Her studies have not been replicated.  In fact, the formula

2   used to select 200 news stories for the Factiva study is incomprehensible.

3         For one study, Allen says she conducted a search of stories published in the NRA

4   Institute for Legislative Action magazine (known as the Armed Citizen Database)

5   between 2011 and 2017.  There is no explanation for the choice to use 2011 for the

6   beginning.  After all, the collection of news stories goes back to 1958.  Elsewhere in her

7   declaration she studies mass shooting events but for that chooses a much longer time

8   period reaching back to 1982.  Likewise, there is no explanation for not updating the

9   study after 2017.

10         However it is that they were chosen, some 736 incidents in the Armed Citizen

11   Database were said to be analyzed and the number of shots tabulated, but details are

12   completely absent.  Allen does not list the 736 stories.  Nor does she reveal how she

13   assigned the number of shots fired in self-defense when the news accounts use phrases

14   like "the intruder was shot" but no number of shots was reported, or "there was an

15   exchange of gunfire," or "multiple rounds were fired."  She includes in her 2.2 average of

16   defensive shots fired, incidents where no shots were fired.[102]  One would expect the

17   impact of Allen's choice to include a zero for a no-shot event to be significant because

18   (even using her number) 32.1% of the events in the home in California were no-shot

19   events.[103]  She also reported no incidents in California where more than 10 shots were

20   fired in self-defense among the stories she reviewed.  It seems obvious that in a state

21   where magazines holding more than 10 rounds have been illegal to buy or sell for twenty

22   years, law-abiding citizens are using the smaller magazines that the law requires for self-

23   defense.  Absent from the expert opinion is a statistic reporting the average number of

24

25

26

27   [102] Allen Supp. Decl. Dkt 118-1 n.10 ("[T]he average includes instances when no shots
      are fired.").

28   [103] Allen Supp. Decl. Dkt 118-1 at ¶ 12 (table).

shots fired by criminals. Also absent is the number of intruders or whether the homeowner was able to escape unharmed.

In another example, it is not evident from the study how she counted the number of shots fired for one story in the collection where a homeowner "fired back" and three intruders suffered eight gunshot wounds. Considering most victims miss some of their shots, one would expect in defending against three attackers that more than eight shots were fired in self-defense. Instead, all that the Court is told is:

> When the exact number of shots fired was not specified, we used the average for the most relevant incidents with [a] known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.[104]

She does not reveal the imputed number substitute value that she used where the exact number of shots fired was not specified, so her result cannot be reproduced. Interestingly, substituting an imputed average value for all of the times the number of shots fired is unknown, tends to bring the overall average of shots fired down towards 2.2. For example if there are ten incidents of self-defense where nine times the victim fired two shots and one time the victim fired thirteen shots, the average number of shots fired would be 3.1 but the percentage of times more than ten shots were needed for self-defense would be 10%.

For a second study, Allen says she conducted a word search of a news aggregator called Factiva. Factiva is a commercial database behind a paywall to which the Court and the public have no access. Even if one did have access to the Factiva database, one could not repeat her study. Allen's methodology for the Factiva study is incomprehensible. For the Factiva database of 70 million news stories, her word search

---

[104] Allen Supp. Decl. Dkt 118-1 n.8.

1   returned 35,000 stories.[105] From there she somehow selected 200 stories of defensive gun

2   use in the home and set out to analyze the events.[106] As with the Armed Citizen study,

3   Allen does not provide a list of the 200 stories she analyzed.  Compare that to the long,

4   detailed list of 179 mass shooting stories she includes in the second part of her

5   declaration.  For the Factiva study, there is no way to check her analysis or her math.

6   And once again she includes in the averages those events where no shots were fired,

7   bringing the overall average down.[107]

8        Had a table of the stories she and her team analyzed been supplied, it would

9   certainly reveal important information.  For example, this Court randomly selected two

10  pages from Allen's mass shooting table: pages 10 and 14.  From looking at these two

11  pages (assuming that the sources for the reports were accurate and unbiased) the Court is

12  able to make statistical observations, including the observation that the number of shots

13  fired were unknown 69.04% of the time.  Without a similar table for the NRA or Factiva

14  studies, this Court cannot ascertain the number of shots fired in each incident, the number

15  of times a homeowner possessed a LCM, the number of times the number of shots fired

16  were unknown, whether the homeowner was unharmed, or the number of intruders.

17       Allen's 2.2 shot average is suspect for larger reasons.  The whole statistical

18  exercise is based on hearsay (anecdotes) upon hearsay news reporting, rather than police

19  investigatory reports.  A database of news articles lacks the usual indicia of accuracy and

20  reliability of admissible evidence.  According to fifteen national polls conducted by non-

21  law enforcement agencies, there may be from 760,000 defensive handgun uses to

22

23

---

24  [105] Exh. A at ¶18.

25  [106] *Id*. at ¶ 19.

26  [107] Allen Depo. Jan. 12, 2021 at 119:10-18 ("Q.  So numerically speaking, inclusion of
    incidents where the number is zero would tend to drag the average number of shots fired
    down; would you tend to agree with that?  A.  So it includes those with zero.  That's

27  correct.  Q.  Okay.  And have you ever looked at the average number of shots fired when

28  shots were fired?  A.  No.").

1    3,600,000 defensive uses each year.[108] Compared to the comprehensive details given for
2    her study on mass shooting events, the NRA and Factiva studies are curiously lacking in
3    depth and breadth and causes the Court to deeply discount her opinion.

4    The Court is aware of its obligation to act as a gatekeeper to keep out junk science
5    where it does not meet the reliability standard of *Daubert v. Merrell Dow*
6    *Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and Federal Rule of Evidence 702.[109] In a
7    bench trial, the relevancy bar is low and Rule 702 is to be applied with a liberal thrust
8    favoring admission.[110] While opinions and evidence may have been deemed admissible,
9    in some cases, the evidence has been given very little weight or no weight at all.  This is
10   the fact finder's role.[111] "Challenges that go to the weight of the evidence are within the
11   province of a fact finder . . . ."[112] So, while questionable expert testimony was admitted, it
12   has now been weighed in light of all of the evidence.

13   In assessing expert witness opinion, a court looks to see whether the opinion given
14   is newly made or whether it grew naturally out of research conducted outside of the
15   litigation.[113] Bias may be evident, according to legal authorities, where the expert forms
16
17   _____

18   [108] Plaintiffs' Exh. 10-10, John R. Lott, Jr., *More Guns, Less Crime* 3d. (2010), at 12.
19   [109] *See Estate of Barabin v. AstenJohnson, Inc.,* 740 F.3d 457, 463 (9th Cir.2014),
     *overruled on other grounds*, *United States v. Bacon*, 976 F.3d 766 (9th Cir. 2020) (en
20   banc) (duty falls squarely upon the district court to act as gatekeeper to exclude junk
21   science).
     [110] *Messick v. Novartis Pharm. Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014).
22   [111] *Primiano v. Cook,* 598 F.3d 558, 568 (9th Cir. 2010) (though opinion of doctor is
23   admitted, jury may reject the opinion); *see also, e.g., United States v. Vallejo,* 237 F.3d
     1008, 1021 (9th Cir. 2001) (admissibility of expert opinion different than weight to be
24   accorded).
25   [112] *City of Pomona v. SQM North Am. Corp.,* 750 F.3d 1036, 1044 (9th Cir. 2014).
     [113] *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995) (after
26   remand) ("One very significant fact to be considered is whether the experts are proposing
27   to testify about matters growing naturally and directly out of research they have
     conducted independent of the litigation, or whether they have developed their opinions
28   expressly for purposes of testifying."); *Cabrera v. Cordis Corp.,* 134 F.3d 1418, 1422

31

an opinion without peer-reviewed scientific support or before examining sufficient data.[114] Bias may also be evident where an expert opinion is formed solely for the purposes of litigation.  Here, the Court is mindful that, "[f]or scientific evidence to be admissible, the proponent must show the assertion is 'derived by a scientific method,'" and "[o]pinion based on 'unsubstantiated and undocumented information is the antithesis of scientifically reliable expert opinion.'  "The court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance."[115] Methods and procedures must be followed and undisciplined speculation is not science.[116]

"To aid courts in exercising this gatekeeping role, the Supreme Court has suggested a non-exclusive and flexible list of factors that a court may consider when determining the reliability of expert testimony, including: (1) whether a theory or technique can be tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential error rate of the theory or technique; and (4) whether the theory or technique enjoys general acceptance within the relevant scientific community."[117]  Allen's study relies on unverified, uncorroborated second or third hand anecdotal information.  Normally, "a witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the

---

(9th Cir.1998) (expert's development of opinion expressly for purposes of testifying is a significant consideration in evaluating opinion).

[114] B. Black & P. Lee, *Expert Evidence* (West 1997), Ch. 4(IV)(B), at 147.

[115] *Id.*

[116] *Daubert*, 509 U.S. at 589–90. ("The subject of an expert's testimony must be 'scientific . . .  knowledge.'  The adjective 'scientific' implies a grounding in the methods and procedures of science.  Similarly, the word 'knowledge' connotes more than subjective belief or unsupported speculation.").

[117] *Messick*, 747 F.3d at 1197 (quoting *Daubert,* 509 U.S. at 592–94).

matter."[118] Assuming its relevance in the first instance for *Bruen* purposes, the statistical analysis has minimal indicia of accuracy or reliability.

In the end, Allen opines that an average of 2.2 shots are fired in self-defense gun scenarios and only .3% of such incidents involve more than 10 shots fired. Yet, even .3% is a lot in terms of actual times a citizen needs to fire his gun in self-defense. Using the estimate from the Centers for Disease Control mentioned earlier of 500,000 to 3,000,000 times per year nationally, and extrapolating the .3% where more than 10 shots were fired (per Allen's report), would mean defensive gun uses of more than 10 shots happen between 1,500 and 9,000 times, every year (based on the CDC annual number of defensive gun uses cited on the website Allen cited and relied on[119]).

### D. <u>Magazines Holding More Than 10 Rounds Are Not Dangerous and Unusual</u>

Taking another tack, the State reframes the "dangerous and unusual" test as a "dangerous *or* unusual" test and then objects that magazines able to hold more than 10 rounds are unusually dangerous. As the Court has stated, all guns and ammunition are dangerous.[120] However, magazines holding more than 10 rounds are not both "dangerous and unusual," which is the Supreme Court's test. So-called large capacity magazines

---

[118] Federal Rule of Evidence 602.

[119] In her Supplemental Declaration, at footnote 4, Dkt. 118-1, Allen cites a Heritage Foundation online visual database: https://datavisualizations.heritage.org/firearms/defensive-gun-uses-inthe-us. If one looks at the Heritage Foundation description of its visual database research, one would see that it acknowledges the CDC report that Americans use their firearms defensively between 500,000 and 3,000,000 million times each year.

[120] *Staples*, 511 U.S. at 611 ("Despite their potential for harm, guns generally can be owned in perfect innocence.").

17-cv-1017-BEN (JLB)

1  banned in California are commonly-owned by law-abiding citizens across the nation[121]

2  and number in the millions.[122]

3  **E.  The Most-Useful-for-Military-Service Nostrum**

4  The State argues, and some courts have reasoned, that magazines holding more

5  than 10 rounds are "most useful in military service" and therefore, can be banned.[123]  The

6  Supreme Court said no such thing.[124]  *Caetano* addresses this question and says, "*Heller*

7  rejected the proposition 'that only those weapons useful in warfare are protected.'"[125]

8  *Heller* was explaining *United States v. Miller.*[126] In *Miller*, the Supreme Court applied a

9  reasonable-relationship-to-militia-use test to a short-barreled shotgun, asking whether the

10 shotgun would have a reasonable relationship to the preservation or efficiency of a well-

11 regulated militia.  Finding none, it decided the Second Amendment did not guarantee the

12 right to keep that particular firearm.[127]  *Miller*'s realm of Second Amendment protection

13 encircled a firearm if it was reasonably related to militia use.  This "reasonably-related"

14 construct received a nod again in *Lewis v. U.S.*,[128] where the Supreme Court sang *Miller*'s

---

17 [121] "It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms." Kopel, *supra*, *The History of Firearm Magazines*, at 874, Declaration of Anna M. Barvir in Support of Plfs.' Suppl. Br., Exh. 39, Dkt. 132-6, at 125.

20 [122] *See* nn. 28-31, *supra*, and accompanying text.

[123] *See, e.g.*, *Hanson v. D.C.*, No. CV 22-2256-RC, 2023 WL 3019777, at *28–29 (D.D.C. Apr. 20, 2023) ("LCMs are not covered by the Second Amendment because they are most useful in military service.").

[124] *See, e.g.*, *Bevis v. City of Naperville*, No. 22 C 4775, 2023 U.S. Dist. LEXIS 27308, at *22 (N.D. Ill. Feb. 17, 2023) ("Relatedly, the Supreme Court has unequivocally dismissed the argument that 'only those weapons useful in warfare are protected.' To the extent that the Seventh Circuit classified the weapon as either 'civilian' or 'military,' the classification has little relevance.") (citation omitted).

[125] *Caetano*, 577 U.S. at 412 (quoting *Heller*, 554 U.S. at 624–25).

[126] 307 U.S. 174 (1939)

[127] *Id.* ("Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.").

[128] 445 U.S 55, 65 n.8 (1980).

34

refrain, "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'"  There was no undercutting of *Miller* in the *Heller* or *Bruen* decisions. Rather, *Heller* embraced *Miller* and said "[w]e therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.  That accords with the historical understanding of the scope of the right."[129] And *Bruen* "quoted, explained, re-affirmed, and then applied" *Miller*.[130]  *Heller* took the already expansive zone of protection for weapons that could be used by the militia and focused on the core use of firearms for self-defense.

In other words, *Heller* made the logical connection between weapons commonly possessed by law-abiding citizens for lawful purposes that would also be useful, if necessary, for military purposes, *i.e.*, in the militia.  Since *Miller*, the Supreme Court has enlarged the breadth of firearms protected by the Second Amendment to include commonly owned firearms useful for the core right of self-defense and other lawful purposes like hunting, sporting, and target shooting.  Until the Supreme Court clearly says otherwise, commonly owned weapons that are useful for war and are reasonably related to militia use are also fully protected, so long as they are not useful solely for military purposes.  Firearms with magazines holding more than 10 rounds are such reasonably-related arms.  Even *Miller* understood the Constitution to protect the possession of ammunition.  For the militia system to function, "[t]he possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former."[131]  All considered, the best reading of "arms"

---

[129] *Heller*, 554 U.S. at 625.

[130] *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at *7 (W.D.N.C. Mar. 2, 2023).

[131] *Miller*, 307 U.S. at 180 (quoting The American Colonies In The 17th Century, Osgood, Vol. 1, ch. XIII).

1  includes magazines.[132]

2  ## III.  *BRUEN* AND THE MAGAZINE CAPACITY LIMIT

3        Plaintiffs challenge § 32310, which prohibits manufacturing, importing, keeping

4  for sale, offering for sale, giving, lending, buying, receiving or possessing a magazine

5  able to hold more than 10 rounds.  For simple possession of a magazine holding more

6  than 10 rounds, the crime is an infraction under § 32310(c).  It is a much more serious

7  crime to acquire a magazine holding more than 10 rounds in California by importing,

8  buying, borrowing, receiving, or manufacturing.  These acts may be punished as a

9  misdemeanor or a felony under § 32310(a).  Under the subsection's provision, "or

10  imprisonment pursuant to subdivision (h) of Section 1170," punishment may be either a

11  misdemeanor or a felony.

12        This Court concludes, once again, that manufacturing, importing, selling, giving,

13  loaning buying, receiving, acquiring,[133] possessing, storing, or using commonly-owned

14  magazines capable of holding more than 10 rounds for self-defense at home or in public

15  is protected by the Second Amendment.  Whether 50-round, 75-round, or 100-round

16  drum magazines are constitutionally protected is a different question because they may be

17  much less common and may be unusual.

18        ### A.      Remand for *Bruen* Review

19        This case was remanded from the United States Court of Appeals for the Ninth

20  Circuit in order to consider the challenged laws under the recent Supreme Court decision

21

22  _____

23  [132] *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014) ("Because

24  restrictions on ammunition may burden the core Second Amendment right of self-defense
   and the record contains no persuasive historical evidence suggesting otherwise, section

25  613.10(g) regulates conduct within the scope of the Second Amendment.").

26  [133] "This acquisition right is protected as an 'ancillary right' necessary to the realization
   of the core right to possess a firearm for self-defense."  *Renna v. Becerra*, No. 20-cv-

27  02190-DMS (DEB), 2021 WL 1597933, at *6 (S.D. Cal. Apr. 23, 2021) (quoting
   *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017)) (*en banc*) (core

28  Second Amendment right "wouldn't mean much" without ability to acquire arms).

17-cv-1017-BEN (JLB)

1   in *Bruen*.  Under *Bruen*, the government must affirmatively prove that its firearm

2   regulation is part of a constitutional historical tradition.  It is the same text, history, and

3   tradition standard the Court used in *Heller* and *McDonald*.  What is different is that the

4   old means-end, interest balancing, tiers-of-scrutiny test is no longer viable.[134]  The State

5   now has a second chance to defend its large capacity magazine ban and must do so

6   applying the *Bruen* test.

7           *Bruen* says,

8               When the Second Amendment's plain text covers an
9               individual's conduct, the Constitution presumptively protects
                that conduct.  *The government must then justify its regulation*
10              *by demonstrating that it is consistent with the Nation's*
                *historical tradition of firearm regulation.*  Only then may a
11              court conclude that the individual's conduct falls outside the
12              Second Amendment's "unqualified command."[135]

13   And *Bruen* confirms, once again, that the Second Amendment applies to modern arms.

14   "Thus, even though the Second Amendment's definition of 'arms' is fixed according to

15   its historical understanding, that general definition covers modern instruments that

16   facilitate armed self-defense," like magazines able to hold more than 10 rounds.[136]

17          i.   **Already Determined: No Historical Pedigree**

18          This Court previously determined that a ban on magazines able to hold more than

19   10 rounds has no historical pedigree.  Detachable magazines were invented in the late

20   19th Century.[137]  In 1990, New Jersey introduced the first ban on detachable magazines,

21

22   _____

23   [134] *Baird v. Bonta*, 2023 WL 5763345, *5 (9th Cir. Sept. 7, 2023) ("In *Bruen*, the
     Supreme Court expressly rejected the use of such 'means-end scrutiny in the Second
24   Amendment context' and described the two-step approach as 'one step too many.'").
     [135] 142 S. Ct. at 2129–30 (emphasis added).
25   [136] *Id.* at 2132.
     [137] "In 1879, Remington introduced the first 'modern' detachable rifle magazine.  In the
26   1890s, semiautomatic pistols with detachable magazines followed.  During WWI,
27   detachable magazines with capacities of 25 to 32-rounds were introduced."  Plaintiff's
     Exh. 2 (Stephen Helsley Report), at 4.
28
                                    37

1  initially imposing a 15-round limit and later a 10-round limit.  California put its ban in

2  place in the year 2000.  A historical tradition of magazine bans, this is not.

3  Before *Bruen*, the State unpersuasively argued that its magazine capacity

4  restriction was analogous to a handful of state machinegun firing-capacity regulations

5  from the 1920's and 1930's and one District of Columbia law from 1932—a law the

6  Supreme Court ignored while dismantling the District of Columbia's handgun ban in

7  *Heller*.  That argument remains unpersuasive today.  That was pre-*Bruen*.  *Bruen* invites

8  a look farther back into the Nation's history.

9  ## ii.    The State Asked for Time for Discovery

10  Because the *Bruen* approach places the burden upon the government to justify its

11  firearm restrictions by demonstrating that they are consistent with the Nation's historical

12  tradition of firearm regulation as understood at the founding, and because judicial review

13  under the *Bruen* standard is in its infancy, the State has been given generous time and

14  leeway to satisfy its new burden.  The State's experts have been studying historic firearm

15  regulations for more than 20 years.[138]  This Court has reviewed all of the declarations of

16  the State's experts and historians as well as many of their cited sources, and finds no

17  support for the State's ban.

18

19

20  [138] The State's expert, professor Robert Spitzer, has studied gun policy for 30 years.  *See*

21  Decl. of Robert Spitzer, Dkt. 137-8 ("Spitzer Decl."), at ¶ 5.  The State's expert,
professor Saul Cornell, said that he has been studying gun regulations for 20 years.  That

22  was in 2017.  *See* Saul Cornell, Five Types of Gun Laws the Founding Fathers Loved,
Salon (Oct. 22, 2017, 7:29 a.m.), https://www.salon.com/2017/10/22/five-types-of-gun-

23  laws-the-founding-fathers-loved_partner/ [https://perma.cc/73SL-VAKV].  Ten years

24  ago, Mark Anthony Frasetto compiled a list of over 1,000 historical gun laws spanning
the years 1607 to 1934 and available on the Social Science Research Network.

25  [https://perma.cc/Q2L8-SW6U].  His law collection was not unknown.  It was described

26  in detail in 2017 by professor Spitzer in his article *Gun Law History in the United States*
*and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017), and included in

27  professor Cornell's Compendium of Works cited in his Declaration, Dkt. 154-3, at 1707–

28  33.

38

### iii.    Some Text, History, and Tradition Analysis is Already Done

Some of the time spent analyzing text, history, and tradition, has already been done by the Supreme Court.  To begin, "the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'"[139] Further, "the right to 'bear arms' refers to the right to 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.'"[140] The Supreme Court explains that the terms "keep" and "bear" mean that the Second Amendment's text protects a citizen's right to "'keep' firearms in their home, at the ready for self-defense," and to carry arms on one's person in and outside the home in case of confrontation.[141]  As to the types of weapons the Second Amendment protects, *Bruen* echoes *Heller*, *McDonald*, *Caetano*, *Miller*, and Blackstone, pronouncing that it "protects the possession and use of weapons that are 'in common use at the time.'"[142]

In this case, Plaintiffs are law-abiding citizens who want to possess (or keep) and carry (or bear), magazines able to hold more than 10 rounds commonly-owned for lawful purposes.  Plaintiffs' proposed conduct is covered by the plain text of the Second Amendment.  Under the plain text, the State's statute infringes on the constitutional rights of American citizens.  Therefore, Plaintiffs have met their burden of showing that the prohibited magazines fall within the Second Amendment's text.

*Bruen* next instructs courts to assess whether the initial conclusion is confirmed by the historical understanding of the Second Amendment.  *Bruen* has already confirmed that the Second Amendment protects an individual right to armed self-defense.  It repeats

---

[139] *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).
[140] *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 584).
[141] *Id.*
[142] *Id.* at 2128 (citations omitted).

1   *Heller*'s lesson to not engage in means-end scrutiny, because, "[a] constitutional

2   guarantee subject to future judges' assessments of its usefulness is no constitutional

3   guarantee at all."[143]  After all, "[t]he Second Amendment 'is the very product of an

4   interest balancing by the people' and it 'surely elevates above all other interests the right

5   of law-abiding, responsible citizens to use arms' for self-defense.  It is this balance—

6   struck by the traditions of the American people—that demands our unqualified

7   deference."[144]

8       **B.    *Bruen*'s Guidelines for Historical Inquiry**

9       For conducting a historical inquiry, *Bruen* identifies a number of guidelines.  First,

10  "when a challenged regulation addresses a general societal problem that has persisted

11  since the 18th century, the lack of a distinctly similar historical regulation addressing that

12  problem is relevant evidence that the challenged regulation is inconsistent with the

13  Second Amendment."[145]  Second, "if earlier generations addressed the societal problem,

14  but did so through materially different means, that also could be evidence that a modern

15  regulation is unconstitutional."[146]  Third, "if some jurisdictions actually attempted to

16  enact analogous regulations during this timeframe, but those proposals were rejected on

17  constitutional grounds, that rejection surely would provide some probative evidence of

18  unconstitutionality."[147]  Fourth, "cases implicating unprecedented societal concerns or

19  dramatic technological changes may require a more nuanced approach."[148] Fifth, "[w]hen

20  confronting such present-day firearm regulations, this historical inquiry that courts must

21  conduct will often involve reasoning by analogy."[149] "Determining whether a historical

22

23

---

24  [143] *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).

25  [144] *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).
     [145] *Bruen*, 142 S. Ct. at 2131.

26  [146] *Id.*

27  [147] *Id.*
     [148] *Id.* at 2132.

28  [149] *Id.*

1  regulation is a proper analogue for a distinctly modern firearm regulation requires a

2  determination of whether the two regulations are 'relevantly similar.'"[150]  *Bruen* notes,

> analogical reasoning under the Second Amendment is neither a
> regulatory straightjacket nor a regulatory blank check.  On the
> one hand, courts should not "uphold every modern law that
> remotely resembles a historical analogue," because doing so
> "risks endorsing outliers that our ancestors would never have
> accepted."  On the other hand, analogical reasoning requires
> only that the government identify a well-established and
> representative historical analogue, not a historical twin.  So
> even if a modern-day regulation is not a dead ringer for
> historical precursors, it still may be analogous enough to pass
> constitutional muster.[151]

11  In surveying American history, the task is to stay within *Bruen*'s guardrails.  As to the

12  road ahead, it is a road back to 1791.

### i.   The Significant Time Period—1791 to 1868

14      *Bruen* teaches the most significant historical evidence comes from 1791, and

15  secondarily 1868.  For the Second Amendment (and other protections in the Bill of

16  Rights), "Constitutional rights are enshrined with the scope they were understood to have

17  *when the people adopted them*."[152]  The Second Amendment was adopted in 1791.

18  "[W]e have generally assumed that the scope of the [Second Amendment] protection

19  applicable to the Federal Government and States is pegged to the public understanding of

---

[150] *Id.*

[151] *Id.* at 2133.

[152] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35); *cf. Kennedy v. Bremerton*, 142 S. Ct.
2407, 2428 (2022) ("[T]his Court has instructed that the Establishment Clause must be
interpreted by reference to historical practices and understandings.  The line . . . has to
accord with history and faithfully reflect the understanding of the Founding Fathers.")
(cleaned up); *Riley v. California*, 573 U.S. 373, 403 (2014) ("Our cases have recognized
that the Fourth Amendment was the founding generation's response to the reviled
'general warrants' and 'writs of assistance' of the colonial era.").

1  the right when the Bill of Rights was adopted in 1791."[153]  Consequently, whatever

2  evolving standards of gun regulation the state legislature thought was good policy in the

3  year 2000 (when it decided 11 rounds is not well-suited for a person to have in a gun) or

4  the year 2016 (when it was amended by Proposition 63), or today, is not the test for

5  constitutional scrutiny.

6      Courts are to "afford greater weight to historical analogues more contemporaneous

7  to the Second Amendment's ratification."[154]  British sources pre-dating the Constitution

8  are not particularly instructive because the American Revolution was a rejection of

9  British rule.  Sources post-enactment are also less helpful.[155]  "[T]o the extent later

10  history contradicts what the text says, the text controls . . . .  Thus, post-ratification

11  adoption or acceptance of laws that are inconsistent with the original meaning of the

12  constitutional text obviously cannot overcome or alter that text."[156]  Late 19th century

13  evidence is not particularly instructive, "because post-Civil War discussions of the right

14  to keep and bear arms 'took place 75 years after the ratification of the Second

15  Amendment, they do not provide as much insight into its original meaning as earlier

16  sources.'"[157]  Even so, evidence from the time period enforces the claim that the right to

17

18

19  [153] *Bruen*, 142 S. Ct. at 2137.

20  [154] *Rahimi*, 61 F.4th at 456; *contra Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th
    Cir. 2023) ("For most cases, the Fourteenth Amendment Ratification Era understanding

21  of the right to keep and bear arms will differ from the 1789 understanding.  And in those
    cases, the more appropriate barometer is the public understanding of the right when the

22  States ratified the Fourteenth Amendment and made the Second Amendment applicable

23  to the States.").

24  [155] *Bruen*, 142 S. Ct. at 2136 ("Similarly, we must also guard against giving
    postenactment history more weight than it can rightly bear.").

25  [156] *Id.* at 2137 (citations omitted) (cleaned up).

26  [157] *Id.* (quoting *Heller*, 554 U.S. at 614).  There is little reason to rely on laws from the
    later part of the 1800's or the 1900's rather than ones put into effect at the time of the

27  founding in view of *Bruen*'s central question about the meaning of the Second
    Amendment as understood by the people who adopted it.  *See Worth v. Harrington*, No.

28  21-cv-01348-KMM-LIB, 2023 WL 2745673, at *12 (D. Minn. Mar. 31, 2023) ("But the

42

1   keep and bear arms continued to be regarded as a fundamental right.  The Supreme Court

2   gauged the most explicit evidence appeared in the Freedmen's Bureau Act of 1866.  "The

3   most explicit evidence of Congress' aim," according to *McDonald,* "appears in § 14 of

4   the Freedmen's Bureau Act of 1866, which provided that 'the right . . . to have full and

5   equal benefit of all laws and proceedings concerning personal liberty, personal security

6   [and] . . . including the constitutional right to bear arms, shall be secured to and enjoyed

7   by all the citizens.'"[158]  *McDonald* points to one senator's description of the right to bear

8   arms for one's defense as an "indispensable safeguard of liberty."  *McDonald* writes,

> "Every man . . . should have the right to bear arms
> for the defense of himself and family and his
> homestead.  And if the cabin door of the freedman
> is broken open and the intruder enters for purposes
> as vile as were known to slavery, then should a
> well-loaded musket be in the hand of the occupant
> to send the polluted wretch to another world,
> where his wretchedness will forever remain
> complete."[159]

Thus, it can be said that, even at the time of the Fourteenth Amendment, the right to keep

and bear guns was a necessary right to preserve.  "In sum, it is clear that the Framers and

---

Commissioner offers no persuasive reason why this Court should rely upon laws from the second half of the nineteenth century to the exclusion of those in effect at the time of the founding in light of *Bruen*'s warnings not to give post-Civil War history more weight than it can rightly bear."); *Firearms Pol'y Coalition, Inc. v. McCraw*, No. 4:21-cv-01245-P, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022); *United States v. Harrison*, No. CR 22-00328-PRW, 2023 WL 1771138, at *8 (W.D. Okla. Feb. 3, 2023) (quoting *Bruen*, 142 S. Ct. at 2136 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.")); *contra Hanson*, No. CV 22-2256-RC, 2023 WL 3019777, at *16 ("In this case, it is appropriate to apply 20th century history to the regulation at issue.").

[158] *McDonald*, 561 U.S. at 773.

[159] *McDonald*, 561 U.S. at 775-76 (citation omitted).

43

1    ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among

2    those fundamental rights necessary to our system of ordered liberty."[160]

3         *Bruen* and *Heller* have already considered some of the historical firearm statutes.

4    Consequently, we know that colonial laws restricting handguns that were dangerous and

5    unusual in the 1690's do not justify modern laws restricting handguns.  The Court

6    explains that even if handguns were considered "dangerous and unusual" in the 1690's, it

7    would not matter because handguns are common today.  As *Bruen* puts it,

8           Whatever the likelihood that handguns were considered

9           "dangerous and unusual" during the colonial period, they are
       indisputably in "common use" for self-defense today.  They are,

10          in, fact, "the quintessential self-defense weapon."  Thus, even if

11          these colonial laws prohibited the carrying of handguns because
       they were considered "dangerous and unusual weapons" in the

12          1690s, they provide no justification for laws restricting the
       public carry of weapons that are unquestionably in common

13          use.

14

15       **C.**    **The State's List of Relevant Laws**

16        To aid in the task of looking for a national "historical tradition of firearm

17   regulation," the State was directed to create a list of relevant laws regulating arms dating

18   from the time of the Second Amendment (1791) to 20 years after the Fourteenth

19   Amendment (1868 + 20).  This was not an acknowledgement that 20 years after the

20   Fourteenth Amendment is a relevant period.  Twenty years after the Fourteenth

21   Amendment is an admittedly arbitrary limit and probably includes laws too late to shed

22   much light.

23        In any event, the State went far beyond.  The State produced a list of 316 laws

24   covering 550 years—from 1383 to 1933.[161]  Many of the entries are not relevant because

25

26

27   [160] *McDonald*, 561 U.S. at 778.

28   [161] *See* Def's Survey of Relevant Statutes, Dkt. 139-1 to 3 (citations to the individual law
entries herein are indicated by brackets [--]).

1   they came much earlier or later than the most significant time period of 1791–1868.  The

2   first fourteen listed laws pre-date the Second Amendment.[162]  On the other end, the last

3   225 laws post-date the adoption of the Fourteenth Amendment.  Also, two-thirds of the

4   State's list (199 laws) are restrictions on *use*—not on possession or acquisition.  Here, the

5   magazine ban prohibits possession, manufacturing, giving, lending, offering for sale, etc.,

6   rather than regulating the *use* or *manner* of carrying ammunition or its magazines.

7   Twenty-two tax laws are included in the State's historical list, yet the law challenged here

8   imposes no tax on magazines.  The State's historical list also includes, surprisingly, 38

9   laws that applied only to particular groups, such as slaves, Blacks, or Mulattos.  Those

10  laws are not relevant to the magazine prohibition challenged in this case.  "And

11  Founding-era statutes that disarmed groups of persons who governments thought might

12  be dangerous because of their race or religion were not considered analogous to modern

13  carry prohibitions on released felons also thought to be dangerous: 'any such analogy

14  would be far too broad.'"[163]  Even if they were, this Court would give such

15  discriminatory laws little or no weight.

16

17

18

19  _____

20  [162] The State includes in its list a concealed carry statute in East New Jersey from 1686

21  which treated pocket pistols as "unusual" weapons.  [6].  *Bruen* bulldozed that citation.
    The East New Jersey statute was too old and too different.  *Bruen* found little there to

22  commend a present-day ban on carrying pistols.  The statute prohibited only the

23  concealed carrying of pocket pistols; it did not prohibit possession or public carrying.
    *Bruen*, 142 S. Ct. at 2143.  The statute did not apply to all pistols, much less all firearms.

24  Moreover, even if pocket pistols were uncommon in 1686 in East New Jersey, they were

25  commonly used by the time of the founding.  *Id.* at 2144 and n.13.  The statute did not
    survive the merger of East and West New Jersey in 1702.  Consequently, the Court made

26  short work of the history summing it up, "[a]t most eight years of history in half a Colony

27  roughly a century before the founding sheds little light on how to properly interpret the
    Second Amendment."  *Id.* at 2144.

28  [163] *Baird*, 2023 WL 5763345 at *8 (citations omitted).

**IV.**     <u>IN AMERICA PEOPLE WERE GENERALLY FREE TO CARRY FIREARMS PUBLICLY AND PEACEABLY FROM 1791 to 1868</u>

**A.**     <u>Traditions</u>

The history and tradition of the United States is a tradition of widespread gun ownership and expertise. *Bruen* says, "those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so."[164] Thomas Jefferson pointed out that our soldiers were good shots because they had practiced with guns since they were children. Jefferson wrote,

> I inclose you a list of the killed, wounded, and captives of the enemy from the Commencement of hostilities at Lexington in April 1775, until November 1777. since which there has been no event of any consequence ... I think that upon the whole it has been about one half the number lost by them. In some instances more, but in others less. *This difference is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy.*[165]

Then, having firearms was commonplace. Carrying firearms was accepted. Proficiency with firearms was encouraged. Readiness with firearms was required. Then, as now, terrorizing with a firearm or carrying a firearm with the intent to assault another was punishable. But, "[n]one of the [] historical limitations on the right to bear arms . . . operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."[166]

Notwithstanding having significant time to do so, the State has identified no

---

[164] 142 S. Ct. at 2146.

[165] Letter from Thomas Jefferson, to Giovanni Fabbroni, *Founders Online*, National Archives (June 8, 1778), https://founders.archives.gov/documents/Jefferson/01-02-02-0066 [https://perma.cc/8VTV-K9HB]; [Original source: *The Papers of Thomas Jefferson*, vol. 2, *1777–18 June 1779*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1950, pp. 195–98] (emphasis added).

[166] *Bruen*, 142 S. Ct. at 2150.

1    historical statute or national tradition of firearm regulation so broad in its coverage or so

2    far reaching in its effect as its large capacity magazine ban.  So, what are the traditions of

3    firearm regulation evidenced by the State's law list?

4         Historical regulations are considered chronologically, "mindful that greater weight

5    attaches to laws nearer in time to the Second Amendment's ratification."[167]  The Court

6    has reviewed every law cited in the State's list.  It has sometimes searched for the actual

7    text of a cited law rather than the parties' summary in order to understand any legal

8    nuance.  It has reviewed the laws with a view to understanding the tradition of all the

9    states and their contexts.  For example, as the nation expanded old states became interior

10    states and new states became frontier states.  Frontier states often had different social and

11    security concerns than did the interior of the new nation.  The Court sought to understand

12    how states responded to new technological developments in ammunition, revolvers,

13    repeaters, and high-capacity, fast-shooting, lever-action rifles.

14         The State's experts opine that gun laws were plentiful and widespread and firearm

15    regulation was the norm.  But, if the test were to look at gun laws with that level of

16    generality, no gun law would ever fail scrutiny and *Heller*, *McDonald* and *Bruen* could

17    not have been decided as they were.  Furthermore, as will be shown, it is an exaggeration.

18    The State also says regulations on dangerous or unusual *weapons* existed throughout

19    American history.  By "weapons," the State means non-firearms.

20         Relevantly similar regulations are *firearm* prohibitions—not bladed or melee

21    weapon regulations.  And neither "dangerous or unusual" nor "unusually dangerous" is

22    the test, although the State cannot point to an outright prohibition on even unusual or

23    unusually dangerous *firearms* until Alabama's 1868 prohibition on the dangerous and

24    unusual rifle-walking cane.  [87]

25         Because the State cannot find a historic regulation of *firearms*, it turns to the

26

27 _____

28    [167] *Rahimi*, 61 F.4th at 456.

historic regulations of *weapons*, whether bladed weapons, melee weapons, blunt weapons, or leaded weapons.  Yet, the Supreme Court does not look to knife laws when reviewing a restriction about guns.  *Bruen* teaches that a state's burden is to identify a historical tradition of *firearm* regulation, not a tradition of knife regulation.  Underscoring the importance of its words, three different times *Bruen* repeats the specific phrase "firearm regulation," as in the following instances: (1) "Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of *firearm regulation*;[168] (2) "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of *firearm regulation*;"[169] and (3) "[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical tradition of *firearm regulation*."[170]  In contrast, the *Bruen* majority opinion did not mention bowie knives at all.  The Supreme Court was not interested in traditions of knife regulation or melee regulation.  Even in the dissent, bowie knife laws were hardly mentioned.  Consequently, when the State asserts, "weapons restrictions proliferated," it misses the mark by referring to non-firearm weapon restrictions or concealed carrying restrictions.[171]

　　　　During the most important period of history, there were relatively few firearm regulations.[172]  This conclusion can be drawn from inspecting the State's historic law list, and is confirmed by at least one historian: "Between 1607 and 1815 . . . the colonial and

---

[168] *Bruen*, 142 S. Ct. at 2126 (emphasis added).

[169] *Id.* at 2130 (emphasis added).

[170] *Id.* at 2135 (emphasis added).

[171] Def's Br. in Resp., Dkt. 142, at 20.

[172] It is true that there were laws criminalizing the *use* of guns for criminal acts such as carrying a gun with intent to assault another, or displaying a gun in a threatening manner.  These were crimes of violence, not crimes of possession.  California, as it should, has similar laws today, such as California Penal Code § 245(a)(2) & (3) (assault with a deadly weapon - firearm) and § 417(a)(2) (exhibition of a firearm in a rude, angry, or threatening manner).

48

1   state governments of what would become the first fourteen states neglected to exercise

2   any police power over the ownership of guns by members of the body politic . . . . These

3   limits on colonial and early state regulation of arms ownership outlined a significant zone

4   of immunity around the private arms of the individual citizen."[173]  It is a conclusion

5   confirmed by the Supreme Court.  "Apart from a few late 19th-century outlier

6   jurisdictions, American governments simply have not broadly prohibited the public carry

7   of commonly used firearms for personal defense."[174]

8          There were regional differences, no doubt.[175]  As the nation aged, northern states

9   had virtually no restrictions on guns and none on ammunition while southern states

10  tended to mainly prohibit concealed carrying.[176]  In short, the State argues that because

11  some states have regulated in some ways the use of some *weapons* (primarily knives and

12  melee devices), that translates into the State being able to regulate any magazine in any

13  way.  That is a *non sequitur* and in this particular case—a bridge too far.

14              **i.   No Prohibitions on Possessing Guns**

15         It is remarkable to discover that there were no outright prohibitions on keeping or

16  possessing guns.  No laws of any kind.[177]  Based on a close review of the State's law list

---

19  [173] Robert H. Churchill, *Forum: Rethinking the Second Amendment*, 25 L. & Hist. Rev.
    139, 161 (2007).

20  [174] *Bruen*, 142 S. Ct. at 2156.

21  [175] "[T]here were profound regional differences in early America."  Decl. of Saul Cornell,
    Dkt. 118-4 ("Cornell Decl.") at n.49.

22  [176] Don B. Kates, Jr., *Restricting Handguns* 12 (North River Press ed., 1979), found in
23  Compendium Works Cited in Decl. of Randolph Roth, Dkt. 118-8, at n.53 and 0349 ("By
    1850, every Western state barred the carrying of concealed weapons.  In contrast, none of
24  the Northeastern states adopted even that mild a restriction until nearly the turn of the
    twentieth century.  Until 1924, for instance, the only gun law in New Jersey was the
25  prohibition of dueling.").

26  [177] According to one scholar, the first prohibition on simple ownership of a gun came in
27  1911.  Churchill, *supra*, at 139 n.61 ("The first law restraining gun ownership by citizens
    mentioned in the secondary literature is New York's 1911 Sullivan Law, which
28  prohibited the ownership of concealable arms without a police permit."); *see also* David

1  and the Court's own analysis, Plaintiffs are correct in asserting that there are no
2  Founding-era categorical bans on firearms in this nation's history.  Though it is the
3  State's burden, even after having been offered plenty of opportunity to do so, the State
4  has not identified any law, anywhere, at any time, between 1791 and 1868 that prohibited
5  simple possession of a gun or its magazine or any container of ammunition (unless the
6  possessor was an African-American or a slave or a mulatto).[178]

7       Surely, with 315 other entries in the State's law list, there must be many other laws
8  in the relevant time period of demonstrating a tradition of firearm regulation analogous to
9  the large capacity magazine ban.  What else is there?

10         **ii.   No Gun Laws In The Northern States For 50 Years**

11       From the adoption of the Second Amendment through the next 50 years, there
12  were no firearm restrictions in any states north of the Mason-Dixon Line.[179]  One could

15  B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900*
16  50 J. of Legis., Apr. 25, 2023, at 45–46 (2024), https://ssrn.com/abstract=4393197
   [https://perma.cc/P85U-ASTZ] ("Before, during, and after the Revolution, no state
17  banned any type of arm, ammunition, or accessory.  Nor did the Continental Congress,
   the Articles of Confederation Congress, or the federal government created by the U.S.
18  Constitution in 1787 . . . . There is no evidence that any of the Founders were concerned
19  about individuals having too much firepower.  After a long, grueling war against the
   world's strongest military, limiting individuals' capabilities was not a concern.").
20  [178] Even before *Bruen* was decided, at least one other judge has applied the text, history,
21  and tradition test with analogical reasoning for a 10-round magazine ban, and came to the
   same conclusion.  *See Ass'n of N.J. Rifle & Pistol Clubs Inc. v. AG N.J.*, 974 F.3d 237,
22  258 (3d Cir. 2020) (Matey, J. dissenting) ("This history reveals a long gap between the
23  development and commercial distribution of magazines, on the one hand, and limiting
   regulations, on the other hand. . . . Some will argue there must be an outer boundary to
24  this analysis that, when crossed, renders a magazine dangerous and unusual.  If so, it does
25  not appear in the history and traditions of our Nation. . . . As a result, and limited to this
   record, I would hold that magazines are arms protected by the Second Amendment and
26  an act limiting magazine capacity to 10 rounds burdens the Appellants' Second
27  Amendment rights.").
28  [179] The Mason-Dixon Line established the boundary line between Pennsylvania and
   Maryland.  Beyond its importance as a literal boundary between states, "the Mason-

live in any of the northern states without restrictions of almost any kind.[180]  A gun owner enjoyed freedom with no infringing prohibitions from 1789 to 1845 in Pennsylvania, New York, Connecticut, Massachusetts, New Hampshire, Rhode Island, Vermont, Maine, Ohio, Illinois, Michigan, or Indiana.  One might never be subject to a later surety statute in Massachusetts (1836) [29] and Maine (1841) [46].[181]  If anything, regulations were not about what kind of firearm one was *not* allowed to keep, but about the kind of firearm one was *required* to buy and have ready for militia duties.

The same was largely true south of the Mason-Dixon Line (disregarding laws targeting slaves and Indians, neither of which were considered to be citizens by lawmakers).  A citizen could reside in any of the northern states and half of the southern states for the first fifty years free from state government firearm restrictions.  This

---

Dixon Line has become known as the boundary between the North and the South.  It took on that association on March 1, 1790, when the Pennsylvania Assembly passed legislation ending slavery in the state.  Thus, the Mason-Dixon Line became the legal and the philosophical boundary between slave territory and free land, since slavery was still allowed in Maryland.  That was especially true after the Missouri Compromise was passed in 1820, which prohibited slavery north of the Mason-Dixon Line.  To the many slaves who used whatever means necessary to reach free land, the Mason-Dixon Line became important to their freedom.  For the slaves located in Maryland, they only needed to get to the state line to secure their freedom, although many continued traveling north in an attempt to get as far away from their former masters as possible." Kathryn DeVan, *Our Most Famous Border: The Mason-Dixon Line*, Pa. St. Univ. (fall 2008), https://pabook.libraries.psu.edu/literary-cultural-heritage-map-pa/feature-articles/our-most-famous-border-mason-dixon-line [https://perma.cc/B6WN-DHAC].

[180] The State lists one New Jersey statute from 1799 as a law purportedly prohibiting the carrying of a pistol with the intent to assault [19], but this appears to be a sentencing enhancement statute applicable only if one was apprehended for burglary.  *See* An Act to Describe, Apprehend and Punish Disorderly Persons (1799), Duke Ctr. For Firearms L., *Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources*, https://firearmslaw.duke.edu/laws/charles-nettleton-laws-of-the-state-of-new-jersey-page-474-image-501-1821-available-at-the-making-of-modern-law-primary-sources/.

[181] That the two states would share similar laws makes sense since Maine was part of the larger Commonwealth of Massachusetts prior to achieving statehood in 1820.

1  understanding is based on a methodical reading and assessment of the laws set out in the

2  State's survey.  While the parties' experts express some disagreements, their contrary

3  opinions are unpersuasive.

4          In the northern states there were hardly any firearm laws at all, let alone a tradition

5  of criminalizing the act of keeping or carrying any firearm.  For the District of Columbia,

6  governed by Congress, there were no firearm laws for the first 80 years until a concealed

7  carry prohibition was enacted in 1871.  [97].   Maine enacted its first law, a gunpowder

8  storage regulation to prevent fires, in 1821.  [27].  Massachusetts enacted its first firearm

9  statute in 1836 as a surety law [29] with Maine following suit in 1841.  [46].  *Bruen*

10 already notes that under the surety laws everyone started out with robust carrying rights

11 and *Bruen* saw little evidence that the laws were enforced.

12         Illinois was admitted to the Union in 1818.  In 1845, Illinois enacted its first

13 firearm statute criminalizing carrying a gun *with the intent to assault another person*.

14 [49].  Indiana became a state in 1816.  In 1855, Indiana criminalized shooting a gun, or

15 throwing stones or sticks, at a train.  [62].  The law did not concern keeping any gun

16 whatsoever, or carrying a gun anywhere, in any manner whatsoever.[182]  Ohio became a

17 state in 1808. The State's law list shows no Ohio state laws respecting firearms until

18 1859.  [70].  Ohioans did not have a gun law until nearly 70 years after the adoption of

19 the Second Amendment.  Its first gun law was one that prohibited carrying a pistol, bowie

20 knife, dirk, or other dangerous weapon *concealed*.  California enacted its first gun

21 regulation in 1853, which criminalized the act of having "upon him any pistol, gun, knife,

---

[182] The State's law list erroneously describes the 1855 Indiana law as one prohibiting the carrying of a pistol with the intent to injure another.  This appears to be a scrivener's error.  Although the State does not include it in its law list, Indiana may have enacted an earlier statute prohibiting carrying a pistol concealed, with an exception made for travelers.  "In *State v. Mitchell*, 3 Blackf. 229, 1833 WL 2617 (Ind. 1833), the Supreme Court of Indiana, in a one-sentence opinion, upheld a state statute prohibiting the general public from carrying concealed weapons."  *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 933 (9th Cir. 2016).

52

1   dirk, bludgeon, or other offensive weapon, with intent to assault any person." [57].

2   In short, the history and tradition of the northern states, states north of the Mason-

3   Dixon Line, was to leave firearm ownership and use completely unregulated. From the

4   time of the adoption of the Second Amendment to the time of the adoption of the

5   Fourteenth Amendment, there were no state gun laws in Pennsylvania, New York,

6   Connecticut, Rhode Island, Vermont, New Hampshire, Michigan, Wisconsin, Minnesota,

7   Iowa, Nebraska, Kansas, Missouri, or the District of Columbia. In Massachusetts and

8   Maine there were only surety statutes. In New Jersey there was a sentencing

9   enhancement for carrying a pistol while committing a burglary. In this half of the nation,

10  keeping and bearing firearms was done freely without government interference.

11                    **iii.   <u>No Gun Laws In The Southern States For 50 Years</u>**

12  South of the Mason-Dixon Line, where slavery was practiced, there were many

13  laws restricting firearms for slaves, African-Americans, and Indians. Setting aside that

14  obviously unconstitutional tradition, among the southern states firearm ownership was

15  largely unregulated for at least the first 50 years after 1791. Like the northern states,

16  from 1791 to 1868 there were no state gun laws in Delaware, North Carolina, South

17  Carolina, Mississippi, Florida, West Virginia, and Texas, according to the State's law list.

18  The few laws in other southern states that did exist concerned mainly: (1) carrying

19  a pistol *with the intent to assault another*; and (2) carrying a pistol in a *concealed*

20  manner. Tennessee enacted the first firearm regulation in the southern states in 1801 in

21  the form of a surety law— it was a law dismissed by *Bruen*. [20]. A decade later in

22  1811, Maryland passed the second firearm regulation in the south. [23]. The Maryland

23  law was, not a prohibition, but a sentencing enhancement for carrying a pistol *with the*

24  *intent to assault another*.

25  In 1813, Louisiana passed the first law prohibiting the carrying of a *concealed* gun.

26

27

28

17-cv-1017-BEN (JLB)

1    [24].[183]  *Bruen* noticed that a Louisiana court found the prohibition on concealed carrying

2    constitutional only because it permitted open carrying of a firearm.[184]  Kentucky passed a

3    prohibition on carrying a *concealed* pistol that year, although it is omitted from the

4    State's law list.  Perhaps it is omitted because Kentucky's concealed carry law was struck

5    down as unconstitutional a short time later.  The only other firearm regulation in the

6    south during this time period was Georgia's 1816 law prohibiting the carrying of a pistol

7    *with intent to assault* another person.  [25].

8        Around 50 years after the Second Amendment, four southern states passed their

9    own first firearm regulations, also in the form of *concealed* carry prohibitions.  In 1837,

10   Arkansas banned carrying a pistol concealed unless on a journey.  [32].  In 1837, Georgia

11   added its own prohibition on carrying a pistol concealed.  [33].  The constitutionality of

12   the Georgia law was upheld because open carry was unregulated.[185]  In 1838, Virginia

13   prohibited carrying a pistol concealed.  [40].  In 1839, Alabama prohibited carrying a

14   firearm concealed [41], later adding exceptions for self-defense and for travelers.  [45].[186]

15       Three more regulations were enacted in the south in the years leading up to the

16   Fourteenth Amendment's adoption.  In 1856, Tennessee passed a law affecting only

17   minors.  [65].  In 1868, Florida prohibited carrying secretly "arms of any kind whatever"

18

19

20   _____

     [183] Louisiana reenacted similar, if not the same, statutes two more times, in 1842 and
21   again in 1855.  [63].

22   [184] 142 S. Ct. at 2146 and n.19 (quoting *State v. Chandler*, 5 La. 489, 490 (1850)
     ("Louisiana concealed-carry prohibition 'interfered with no man's right to carry arms (to
23   use its words) "in full open view," which places men upon an equality'")).

24   [185] *Nunn v. State*, 1 Ga. 243, 251 (1846) ("We are of the opinion, then, that so far as the
     act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is
25   valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of
     his constitutional right to keep and bear arms.  But that so much of it, as contains a
26   prohibition against bearing arms openly, is in conflict with the Constitution, and void.").

27   [186] *Lockett v. State*, 47 Ala. 42, 45–46 (1872) ("Nor is it required that he should have any
     necessity for the use of his pistols.  It is enough if he was traveling on a journey, long or
28   short.").

and the outright carrying of a pistol or other arm or weapon.  [90].  The Florida law was not scrutinized in a published court decision.[187]

Significantly, the first restriction on a *dangerous and unusual* firearm did not occur until 1868, the year the Fourteenth Amendment was adopted.  That year, Alabama prohibited carrying a rifle walking cane.  [87].  A rifle walking cane was a single shot rifle disguised to appear as a walking cane with a variety of handles.  When fired, one bullet would exit through the bottom of the cane.  It was patented in 1858 and manufactured by the E. Remington & Sons company until approximately 1888, with less than 2,000 produced.[188]  Remington was the only major gun maker to produce a rifle walking cane gun.  California currently has a law prohibiting possession of a "cane gun." *See* Cal. Penal Code § 24410.

In short, the history and tradition of the states south of the Mason-Dixon Line, was to leave firearm ownership and use mostly unregulated.  At least for the first half of the century, in this half of the nation, keeping and bearing firearms was done freely, with a handful of states enacting prohibitions on carrying pistols in public in a concealed manner, and Maryland and Georgia making it a crime to carry a firearm with the intent to assault another person.

---

[187] However, an 1867 court decision considered an earlier law where only *concealed* carrying was prohibited.  *See Sutton v. State*, 12 Fla. 135, 136 (1867) ("The statute under which this indictment was found provides, 'that hereafter it shall not be lawful for any person in this State to carry arms of any kind secretly on or about their person, &c.: Provided, that this law shall not be so construed as to prevent any person from carrying arms openly outside of all their clothes' . . . . The statute was not intended to infringe upon the rights of any citizen to bear arms for the 'common defense.'  It merely directs how they shall be carried, and prevents individuals from carrying concealed weapons of a dangerous and deadly character, on or about the person, for the purpose of committing some malicious crime, or of taking some undue advantage over an unsuspecting adversary.").

[188] *See* Remington Soc'y of Am., *Remington Cane Guns*, https://www.remingtonsociety.org/remington-cane-guns/ [https://perma.cc/A74W-EHPT] (last visited May 26, 2023).

1

      iv.   **Territories**

2      Among the State's law list is a number of regulations from 19th century territories.

3 *Bruen* has already considered such laws and decided they are not particularly helpful for

4 several reasons.  "First, the bare existence of these localized restrictions cannot overcome

5 the overwhelming evidence of an otherwise enduring American tradition . . . ."[189]  "These

6 territorial 'legislative improvisations,' which conflict with the Nation's earlier approach

7 to firearm regulation, are most unlikely to reflect 'the origins and continuing significance

8 of the Second Amendment' and we do not consider them 'instructive.'"[190]  "Second,

9 because these territorial laws were rarely subject to judicial scrutiny, we do not know the

10 basis of their perceived legality . . . . we fail to see how they inform 'the origins and

11 continuing significance of the Amendment.'"[191]  "Finally, these territorial restrictions

12 deserve little weight because they were—consistent with the transitory nature of

13 territorial government—short lived . . . . Thus, they appear more as passing regulatory

14 efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an

15 enduring American tradition of state regulation."[192]  One commentator disagrees.[193]

16 Even so, the territorial regulations suggest an absence of gun bans during the most

17 important historical period.

18      None of the territorial regulations from 1791 to 1868 prohibited a firearm.  There

19 were no prohibitions on owning firearms of any type.  There were no prohibitions on

20 keeping a firearm of any type for self-defense, whether in the home or in public.  The

21 first territorial regulation came approximately 47 years after the Second Amendment (in

22 1839) and prohibited the carrying of a firearm in a *concealed* manner in the Florida

23

24

---

25 [189] *Bruen*, 142 S. Ct. at 2154.
[190] *Id.* (quoting *Heller*, 554 U.S. at 614).
26 [191] *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 592).
[192] *Id*. (citations omitted).
27 [193] *See* Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash.
28 Univ. L. Rev. (2023), https://ssrn.com/abstract=4372185.

1  Territory.  [42].  In other words, for the first 40 years of the nation's history, the only
2  territorial restriction on firearms, was in the Florida territory taken from Spain in 1819.

3      In 1853, the New Mexico Territory also adopted a *concealed* carrying prohibition.
4  [58].  In 1854, the Washington Territory prohibited *exhibiting* a pistol in a rude, angry, or
5  threatening manner, reenacting a similar law in 1859.  [60, 71].  The Nebraska Territory
6  made it a crime to carry a pistol *with the intent to assault* another person in 1858.  [68]
7  The Colorado Territory (in 1862 and again in 1867) and the Montana Territory (in 1864)
8  restricted the *concealed* carrying of a pistol in a city, town, or village.  [75, 79, 84].
9  While these territorial laws do evidence some later restrictions on the manner of carrying
10 firearms in some public places, they do not not evidence a history or tradition of
11 prohibiting any firearms of any type.

12              **v.   California's First Concealed Carry Law Was a Failure**

13      In 1863, California's homicide rate reached "catastrophic levels."[194]  With no
14 Second Amendment analogue in the state constitution, California's solution was to ban
15 carrying concealed weapons.  The experiment failed.  In 1870, the legislature repealed the
16 law, because it disarmed the good citizen, but the law was not followed by "the vast
17 majority of roughs, fighting men, and predatory characters,"[195] and the police were "apt
18 to arrest any quiet citizen" with a concealed weapon.[196]

19          **B.   Historical Twins**

20      *Bruen* concluded that "[n]one of these historical limitations on the right to bear
21 arms approach New York's proper-cause requirement because none operated to prevent

---

23
24 [194] Decl. of Randolph Roth, Dkt. 118-8 ("Roth Decl."), at ¶ 36.
25 [195] *Id.* at ¶ 37 and n.84 (citing Clayton E. Cramer and Joseph E. Olson, *The Racist
26 Origins of California's Concealed Weapon Permit Law*, SSRN (Aug. 12, 2016) (quoting
   *The Carrying of Concealed Weapons*, Daily Alta (San Francisco) California, March 13,
27 1869, at 2, and *Concealed Deadly Weapons*, Sacramento Daily Union, December 16,
   1870, at 2.)).
28 [196] *Id.*

                                57

1  law-abiding citizens with ordinary self-defense needs from carrying arms in public for

2  that purpose."[197]  The same can be said about California's magazine ban.  To paraphrase

3  the Supreme Court, none of these historical limitations on the right to bear arms approach

4  California's complete ban on magazines able to hold more than 10 rounds.  None

5  operated to prevent law-abiding citizens from possessing as much ammunition as they

6  thought best.

7        A historical twin is not unimaginable.  It could have been the case that the early

8  states prohibited having large capacity gunpowder sacks, or, they might have prohibited

9  carrying more than 10 lead bullets.  There were no such restrictions.   There are no

10  Founding-era dead ringers or historical twins.  Of course, the State does not need to find a

11  historical twin, but a second cousin twice-removed, is not enough.

12  **V.    ANALOGUES**

13        Although the State does not identify any historical twins of its restrictions on

14  magazines, it may not have to.  A history and tradition of a relevantly similar firearm

15  regulation could suffice.  After all, it can be argued that removable magazines represent a

16  dramatic change in technology and the State is attempting to address a modern societal

17  concern.  In such cases, *Bruen* allows a more nuanced approach.  On one hand, compared

18  to muskets of the colonial era, a Glock 17 with its 17-round magazine clearly represents a

19  dramatic technological advancement.  On the other hand, the lever-action repeating

20  Henry and Winchester rifles popular at the time of the Fourteenth Amendment were

21  already dramatic technological advancements in firearms.  These popular lever-action

22  rifles had large tubular magazines that held a lot of ammunition and could be fired

23  multiple times in succession, accurately and quickly.  Yet, there are no state prohibitions

24  on possession or manufacture of these lever-action rifles in the State's law list.

25        In any event, while California does not need to identify a dead ringer for its

26

27  _____

28  [197] 142 S. Ct. at 2150.

magazine ban, "California cannot satisfy the requirement for a closely analogous historical regulation by reference to any general firearm regulation California might unearth."[198]

### A.   The State's Best Historic Analogue? A New York City Gunpowder Storage Law Following the Worst City Fire in Colonial America

Asked to identify the best historic analogue to its sweeping prohibition on large capacity magazines, the State identified a New York City gunpowder storage law following the worst city fire in Colonial America.  With the assistance of scholars who have studied historic laws for years the State identified a 1784 statute regulating the amount of gunpowder that could be stored inside a New York City building.[199]  Because the State has identified this as its best analogue, it deserves closer consideration.

The gunpowder storage law has nothing to do with gun violence.  It was *a fire safety regulation*.  Unsurprisingly, the law was enacted after New York City suffered two great fires, one of which is described as, "The most destructive fire in colonial North America."[200]  The first fire, in the year 1776, burned much of Manhattan to the ground and destroyed 493 houses in its path.  In 1778, a second fire swept through the city and destroyed 54 more houses and several warehouses.[201]  After these two terrible fires the New York State legislature responded with a law for New York City limiting the quantity of gunpowder that a person could store in any one building to 28 pounds.  It applied only

---

[198] *Baird*, 2023 WL 5763345, at *8.
[199] *See* Defendant's Response Brief in Response to the Court's Order Entered on February 7, 2023, Dkt. 143, at 1, identifying 1784 Laws of N.Y. 627, chapter 28.
[200] New York City Fire Museum, *The Great New York Fire of 1776* (Mar. 21, 2023), https://www.nycfiremuseum.org/greatfire1776 [https://perma.cc/A3BW-TQRP].
[201] Richard Howe, *Notes on the Great Fires of 1776 and 1778* (2014), The Gotham Center for New York City History, https://www.gothamcenter.org/blog/notes-on-the-great-fires-of-1776-and-1778 [https://perma.cc/WJ4V-3QKP].

17-cv-1017-BEN (JLB)

1   to that part of Manhattan from city hall on the south end to one mile north.[202] Gunpowder

2   was to be stored in fireproof stone jugs or tin canisters holding no more than 7 pounds

3   each.  Reinforcing that the law was enacted to prevent fires, it also required gunpowder

4   be contained to prevent spills during transport through the streets.[203]

5        There was much the law did not do.  It did not limit the total amount of gunpowder

6   a person could own or use, as long as quantities over 28 pounds were kept in the public

7   magazine or in additional buildings.  It placed no limit on the number of lead bullets a

8   person could keep or possess.  It did not restrict a person from keeping his firearms

9   loaded with gunpowder and bullets in his home, business, or when in public.  Beyond the

10   one mile stretch of lower Manhattan island, the law had no application anywhere else in

11   the state.  And 28 pounds is a lot of gunpowder.  One New York militia soldier was

12   required to bring ¼ pound of gunpowder when called to muster.[204] So, 28 pounds of

13   gunpowder could outfit 112 militia men.  As the State's expert Professor Cornell notes,

14   "Twenty to thirty pounds of gunpowder is certainly not an inconsiderable amount."[205]

---

[202] "[I]t shall not be lawful . . . to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the northward of the city hall . . . except in the public magazine at the Fresh-water . . . ."

[203] The law specified, "[a]nd in order to prevent any fatal consequences which may arise, from the carriage of gun powder, in and through the streets of the city of new York, by carts, carriages, or by hand, or otherways [sic], it shall be in a tight cask, well headed and hooped, and shall be put into bags or leather-cases, and intirely [sic] covered therewith, so as that none be spilt or scattered in the passage thereof . . . ."  1784 Laws of N.Y at 628.

[204]  *See* Stats. at Large, New York 1867, Chapter X, Title VII, Article 1, §6, at 287 (eff. 1835) (penalties for militia men ill-equipped) ("[F]or want of two spare flints and a knapsack, twenty four cartridges, shot-pouch, powder-horn, twenty balls, and *a quarter of a pound of powder*, twenty five cents each . . . ."), https://books.google.com/books/content?id=RkkwAQAAMAAJ&pg=PA287&img=1&zoom=3&hl=en&bul=1&sig=ACfU3U3ooEDz2oBmZb_g3qythhk8S6UJOg&ci=99%2C102%2C820%2C820&edge=0 [https://perma.cc/KS72-L87G].

[205] Saul Cornell & Nathan DeNiro, *A Well Regulated Right*, 73 Fordham L. Rev. 487 n.173 (2004).

1    For nuanced analogues, the New York City gunpowder storage law fails the why

2  and how tests.[206]  The "why" of the large capacity magazine ban is to introduce a "critical

3  pause" into a mass shooter's unrelenting attack.  The "why" of the historic gunpowder

4  storage law is to reduce the risk of building fires.  The "how" of the large capacity

5  magazine ban is limiting the number of ammunition rounds that can be loaded in a gun

6  for self-defense.  The "how" of the historic gunpowder storage law burden was

7  generously limiting the storage (and not the amount loaded into guns for self-defense) of

8  gunpowder for a geographic area smaller than one square mile.  In the end, the State's

9  proposed analogue is not relevantly similar.

10    One other gunpowder storage law mentioned by the State which applied only in the

11  city of Boston, Massachusetts, fares no better.  This was also a *fire* safety regulation—

12  nothing more.[207]  "The ordinance did not prohibit *carrying* loaded firearms within the

13  City of Boston—only leaving them unattended in a building—and . . . this law was for

14  the protection of those fighting fires."[208]  In fact, one scholar mused, "Strictly speaking,

15  the law did not forbid bringing an unloaded gun into a building, and then loading it when

16  inside.  So, occupants of homes or businesses remained free to keep loaded guns."[209]

17  Moreover, the State offers no evidence that the Massachusetts law was enforced.  A

18  search of *Thacher's Reports*, a collection of reports of criminal cases tried in the City of

19  Boston Municipal Court from 1823–1843 reveals no such prosecutions.[210]

---

21  [206] Courts should examine "how and why the regulations burden a law-abiding citizens'
22  right to armed self-defense."  *Bruen*, 142 S. Ct. at 2132-33.
23  [207] *See Renna*, 20-cv-2190-DMS-DEB, 2023 WL 2846937, *12–13 (citing *Jackson v.
24  *City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014) (stating "Boston's
    firearm-and-gunpowder storage law is historically distinct from the challenged firearm
25  regulation in light of *Heller*").
26  [208] Clayton E. Cramer and Joseph Edward Olson, *Pistols, Crime, and Public: Safety in
    Early America*, 44 Willamette L. Rev. 699, 705 (2008) (emphasis in original).
27  [209] *Id.*
28  [210] *Thacher's Reports* may be found at https://www.mass.gov/info-details/historical-
    massachusetts-cases#1800-1899-.

This whole gunpowder storage argument has been raised before and it has been rejected before.  It was raised a dissent in *Heller* and relied on the same laws of New York and Massachusetts, and the same writings of Cornell.[211]  The *Heller* majority was unimpressed.  *Heller* says,

> The other laws Justice Breyer cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home.  Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns.[212]

Applying the same reasoning to this case, the early fire-safety gunpowder storage laws do not remotely burden the self-defense right as much as an absolute ban on magazines holding more than 10 rounds.

**B.    The State's Historic Analogue No. 2: Concealed Carry Laws**

Next, the State turns to historic laws regulating the *concealed* carrying of bowie knives, dirks, sword canes, and some pistols, as analogues.

**i.    Pocket Pistols**

Some historic laws prohibited carrying a pocket pistol in a concealed manner.  By 1868, about a dozen states had laws prohibiting carrying concealed pistols.  Importantly, the concealed carry laws did not prohibit either keeping pistols for all lawful purposes or carrying all guns openly.  And none included long guns or ammunition containers in their restrictions.  Pocket pistols were entirely lawful to keep and use at home for self-defense.

Prohibiting the concealed carrying of a pistol was constitutionally permissible only when a citizen could freely keep and carry the same gun openly.   The statutes were often tested in court, suggesting that any broad carrying restriction ran close to the

---

[211] *Heller*, 554 U.S. at 684–86 (Breyer, J., dissenting).
[212] *Id*. at 631–32.

17-cv-1017-BEN (JLB)

constitutional line.  Today's large capacity magazine ban prohibits carrying magazines in any manner -- and even more restrictively prohibits simple possession.

Historic concealed carry laws for pistols have a different "why" and "how" than do the State's large capacity magazine ban.  The "why" of a concealed carry law was to prevent unfair surprise attacks by a person who appeared to be unarmed.  The "how" of the historic concealed carry prohibitions was to proscribe the manner of carrying a pocket pistol and only when in public.  The substantial burden imposed by the large capacity magazine ban is not analogous to the burden created by a concealed carry restriction for public carrying of a pocket pistol.  Such a history and tradition of concealed carry prohibitions are not nuanced analogues for California's magazine ban as they are not relevantly similar.

### ii.  Dirks, Daggers, Sword Canes, and Bowie Knives

The State now asks the Court to compare firearms equipped with large capacity magazines to knives.  Undoubtedly, dirks, daggers, and bowie knives are dangerous.  But dirks, daggers, sword canes, and bowie knives were not firearms; they were bladed instruments.  *Bruen* says the state's burden is to identify a historical *firearm* regulation, not a knife regulation.  In the dissent, knives were cited only where territorial laws also affected the carrying of pistols, presumably because of the pistols.[213]  *Heller* did not mention knife laws at all in evaluating the District of Columbia's handgun ban.  And the Supreme Court's plurality did not mention bowie knives in evaluating Chicago's handgun ban, except as an example of Reconstruction-era efforts to disarm African-Americans.[214]  This is not to say that bowie knives are not "arms" imbued with Second

---

[213] *Id.* at 2186 (Breyer, J. dissenting) ("For example, Georgia made it unlawful to carry, 'unless in an open manner and fully exposed to view, any pistol, (except horseman's pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives, manufactured and sold for the purpose of offence and defence.' Ga. Code § 4413 (1861).").

[214] *McDonald*, 561 U.S. at 771.

63

Amendment protection.[215] Historical knife laws would be relevant in evaluating a modern prohibition on knives.  It is simply to say that historical *firearm* regulations are obviously more likely to be relevant analogues for modern *firearm* restrictions.

Even if knife regulations were relevant, they would not help the State much.[216] There were laws restricting bowie knives in some states in the 1800's, but not the vast majority of states.  There is also little evidence of actual prosecutions for simply

---

[215] *See, e.g.*, David B. Kopel, Clayton E. Cramer and Joseph E. Olson, *Knives and the Second Amendment*, 47 U. Mich. J. L. Reform 167, 168 (2013); Defs.' Compendium of Works, Dkt. 158-2, at 65, 67 ("This Article analyzes Second Amendment protection for the most common 'arm' in the United States – the knife.").

[216] This opinion is shared by two historians.  *See* David B. Kopel and Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. of Legis., Apr. 25, 2023, at 168–69 (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197 [https://perma.cc/P85U-ASTZ] ("Bans on modern rifles and magazines cannot be rescued by diverting attention away from the legal history of firearms law, and instead pointing to laws about other arms.  Dozens of state and territorial legislatures enacted laws about Bowie knives, as well as dirks and daggers.  Prohibitory laws for these blades are fewer than the number of bans on carrying handguns, and *Bruen* found the handgun laws insufficient to establish a tradition constricting the Second Amendment.

As for other non-blade impact weapons, the sales and manufacture bans in a minority of states for slungshots and knuckles could be considered as involving arms "not typically possessed by law-abiding citizens for lawful purposes."

Other flexible impact arms, most notably blackjacks, were "typically possessed by law-abiding citizens for lawful purposes," especially by law enforcement officers.  Likewise, modern semiautomatic rifles and standard magazines are also highly preferred by today's law enforcement officers.

For blackjacks and sand clubs, only one state, New York, enacted a sales and manufacture ban. That came at a time when the legislature was unencumbered by a Second Amendment enforceable against the states or by a state constitution right to arms.  As *Bruen* teaches, a lone eccentric state does not create a national legal tradition.

For every arm surveyed in this article, the mainstream American legal tradition was to limit the mode of carry (no concealed carry), to limit sales to minors (either with bans or requirements for parental permission), and/or to impose extra punishment for use in a crime.

The fact that most states banned concealed carry of Bowie knives is not a precedent to criminalize the mere possession of modern rifles and magazines.").

possessing a bowie knife, much less a judicial opinion on constitutionality.  One court observed that a Tennessee bowie knife law was generally disregarded.[217]

The argument that a cluster of laws prohibiting the carrying of dangerous knives could justify a gun ban, lost its wind in *McDonald*.  If the regulation of knives was not a sufficient analogue for restricting handguns in Chicago, neither are regulations of dirks, daggers, sword canes, and bowie knives useful analogues for prohibiting modern magazines.

### C.   The State's Historic Analogue No. 3: Guns Set as Traps

Historic laws prohibiting trap guns are proposed as a third analogue by the State. What the State does not admit or seem to recognize is that "trap guns" are not guns at all. They are a method by which a gun, any gun, can be set up to fire indiscriminately through the use of springs, strings, or other atypical triggering mechanism without needing an operator.  Nonetheless, absent from our history is a tradition of trap gun restrictions in the important years between the 1791 and 1868.  The 1771 New Jersey trap gun law, upon which the State relies, predates the Declaration of Independence, New Jersey statehood,[218] and the Second Amendment.  Ninety-five years passed before a second restriction on trap gun was enacted and that one applied only to the Utah Territory (1865).  [80].  Within the states, the first regulation on setting a trap gun, was enacted in Minnesota in 1873.  [109].  Two states followed later in 1875 (Michigan) and 1884

---

[217] *See, e.g.*, *Day v. State*, 37 Tenn. 496, 499 (Tenn. 1858) ("It is a matter of surprise that these sections of this act, so severe in their penalties, *are so generally disregarded* in our cities and towns.") (describing state law prohibiting the concealed carrying of bowie knives) (emphasis added).

[218] New Jersey was one of the few states that did not have in its state constitution a provision like the Second Amendment.  (Six states do not have provisions protecting a right to arms in their state constitutions:  California, New Jersey, New York, Maryland, Minnesota, and Iowa.)  *See* David B. Kopel and Clayton E. Cramer, *State Court Standards of Review for the Right to Keep and Bear Arms*, 50 Santa Clara L. Rev 1113, 1145 n.51 (2010).

Case: 23-55805, 09/26/2023, ID: 12799542, DktEntry: 2-2, Page 84 of 1105

Case 3:17-cv-01017-BEN-JLB   Document 149   Filed 09/22/23   PageID.18531   Page 66 of 71


1  (Vermont).  In other words, trap guns were not prohibited by law in the District of

2  Columbia or 36 of the 37 states (then existing), until 1873.  California did not enact its

3  own trap gun law until 1957.[219]  Court decisions between 1791 and 1868 recognized that

4  it was entirely lawful to use trap guns (or spring guns, as they were sometimes called) to

5  defend one's property.[220]  If this is what a national tradition of trap gun regulation looks

6  like, it is a strange look, indeed.

7        Claiming trap guns were "dangerous weapons commonly used for criminal

8  behavior and not for self-defense,"[221] the State has a problem with the facts.  There is

9  little historical evidence that trap guns were used for criminal behavior.  Rather, guns

10

11 ─────────────────────

12 [219] *See* Cal. Fish & Game Code § 2007.

13 [220] *See, e.g.*, *Gray v. Combs*, 7 J. J. Marsh, 478 (Ky. 1832) (one who sets traps or spring
   guns to protect valuable property by means of which another is killed while attempting to
   enter the premises is guilty of no crime); *Loomis v. Terry*, 1837 WL 2808 (N.Y. Sup. Ct.
   1837) ("It is not like setting spring guns with public notice of the fact; for even that has
   been held warrantable as being necessary (*Ilott v. Wilkes*, 3 Barn. & Ald. 304)."); *State v.
   Moore*, 31 Conn. 479, 479–80 (Conn. 1863) ("Breaking and entering a shop in the night
   season with intent to steal, is by our law burglary, and the placing of spring guns in such
   a shop for its defense, would be justified if a burglar should be killed by them."); 
   *Maenner v. Carroll*, 46 Md. 193, 208 (Md. Ct. App. 1877) ("While it is decided that
   traps, spring-guns, and other dangerous instruments, may be lawfully placed on private
   grounds, for the purpose of deterring trespassers or catching strange animals doing
   damage . . . ."); *see also Simpson*, 59 Ala. at 18 (citing *Moore*, 31 Conn. at 479) ("The
   setting a spring-gun on his premises, by the owner, is culpable only because of the intent
   with which it is done.  Unless the public safety is thereby endangered, it is not indictable.
   If dangerous to the public, it is indictable as a nuisance."); *United States v. Gilliam*, 25 F.
   Cas. 1319, 1320 and n.2 (D.C. Crim. Ct. 1882) ("The setting of a spring-gun as a
   protection for property, though not in itself unlawful and indictable, is certainly
   undeserving of encouragement. . . .") (citing English common law and the court of King's
   Bench, *Ilott v. Wilkes*, 3 Barn. & Ald. 304 ('A trespasser, having knowledge that there are
   spring-guns in a wood, although he may be ignorant of the particular spots where they are
   placed, cannot maintain an action for an injury received in consequence of his accidental
   treading on the latent wire connecting with the gun, and thereby letting it off.')).

   [221] Defs' Br. in Resp., Dkt. 145, at 10 (quoting *Oregon Firearms Fed'n, Inc. v. Brown*,
   No. 2:22-cv-01815-IM, 2022 WL 17454829, at *13 (D. Or. Dec. 6, 2022), *appeal
   dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022)).

66

17-cv-1017-BEN (JLB)

1    were set as traps by common people to protect their property from thieves and sometimes

2    for self-defense against burglars.  Perhaps just as often trap guns were used to hunt game.

3    Historian and expert witness for the State, Robert Spitzer opines about trap guns: (1)

4    "[t]hose who set gun traps typically did so to defend their places of business, properties,

5    or possessions;" and (2) "opinion was more divided . . . with some arguing that thieves or

6    criminals hurt or killed by the devices had it coming."[222]  So, when the State claims trap

7    guns were used by criminals and not for self-defense, it gets the facts backwards.  The

8    how and why of the two types of regulations are not relevantly similar, thus trap gun laws

9    are not useful analogues for prohibiting modern magazines.

10        **D.    The Best Analogue: Laws Requiring Citizens to Keep and Carry**

11              **Sufficient Bullets and Gunpowder for Service in the Militia**

12        California ignores Founding-era laws that present the best analogue to its present-

13   day magazine law.  These are the manifold early militia laws requiring each citizen, not

14   to limit the amount of ammunition he could keep, but to arm himself with *enough*

15   ammunition: at least 20 rounds.[223]

16        Government remains fixed on the notion that it alone can decide that anything

17   larger than a 10-round magazine is not "suitable" for a citizen to have.  But, there are no

18   analogous cases in our history.  There are no cases where American government dictated

19   that lever-action rifles were unsuitable because single shot rifles were good enough, or

20

21

22

---

23   [222] (U.S.D.C. Oregon Dkt. 17-2 at ¶¶ 34–53) (first filed in the instant case).

24   [223] *See, e.g.*, 1784 Mass. Acts 142; 1786 N. Y. Laws 228; 1785 Va. Statutes at Large 12
     (12 Hening c. 1); 1 Stat. 271 (1792) (Militia Act); Herbert L. Osgood, *The American

25   Colonies in the Seventeenth Century*, 499–500 (1904) (explaining that states often
     required citizens to equip themselves with adequate firearms and ammunition, including

26   between 20 and 24 cartridges at minimum); *Silveira v. Lockyer*, 328 F.3d 567, 586 (9th

27   Cir. 2003) ("Much as building codes today require smoke detectors in the home, a man
     had to have a bullet mould, a pound of powder, four pounds of lead, and twenty bullᵉᵗs, to

28   be produced when called for by a militia officer.") (Kleinfeld, J., dissenting).

1    revolvers were unsuitable because derringers were good enough.[224] These choices have

2    always belonged to the People to decide for themselves how much firepower they need.

3        The right to have firearms for social security was important at the time the

4    Constitution was adopted.  There were many enemies of the young nation.  An armed

5    citizenry provided a much-needed deterrent effect.  Early citizens remembered how the

6    Minutemen of Lexington and Concord, Massachusetts, by assembling as a militia, fought

7    back against the hostile British march to take away guns and gunpowder in April 1776.

8        During the Nation's founding-era, federal and state governments enacted laws for

9    the formation and maintenance of citizen militias.  Three such statutes are described in

10   *Miller*.[225]  Rather than restricting too much firing capacity, the laws mandated a

11   minimum firing capacity.  These statutes required citizens to arm themselves with arms

12   and a minimum quantity of bullets and gunpowder, not to disarm themselves.  When

13   Congress passed the Militia Act in 1792,[226]  the law required a citizen to be equipped to

14   fire at least 20 to 24 shots.[227] A 1786 New York law required "no less than Twenty-four

15   Cartridges," and a 1785 Virginia law required a cartridge box and "four pounds of lead,

16

17

---

18   [224] "I surveyed the gun regulations in the Duke Historical Database from the early

19   medieval period through 1885 to see what terminology was used.  None of the laws that
     prohibit weapons, aside from the Maryland statute above, specifies a gun part or

20   ammunition case or accoutrements of any kind.  Although many present a list of banned
     or prohibited weapons – usually without defining them [the assumption is that the reader

21   knows what they refer to], none of the laws mention cartridge boxes, bullets, barrels, or

22   other parts of any weapons."  Declaration of Dennis Baron, Dkt. 118-2, at ¶ 56.
     [225] 307 U.S. 174 (1939)

23   [226] 1 Stat. 271, 2 Cong. Ch. 33.

24   [227] "That every citizen so enrolled and notified, shall, within six months thereafter,
     provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare

25   flints, and a knapsack, a pouch with a box therein to contain not less than *twenty-four*

26   *cartridges*, suited to the bore of his musket or firelock, each cartridge to contain a proper
     quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn,

27   *twenty balls* suited to the bore of his rifle and a quarter of a pound of powder."

28   (Emphasis added).

1    including twenty blind cartridges." In 1776, Paul Revere's Minutemen were required to

2    have 30 bullets and gunpowder.

3          These and other citizen militia laws demonstrate that, contrary to the idea of a

4    firing-capacity upper limit on the number of rounds permitted, there was a legal

5    obligation for the average citizen to have at least 20 rounds available for immediate

6    use.[228] There were no upper limits like § 32310; there were floors and the floors were

7    well above 10 rounds.[229] California's large capacity magazine ban is a diametrically

8    opposed analogue.

9          As one court explained, "[u]nder *Bruen*, the Second Amendment does not 'forbid

10   all laws other than those that *actually existed* at or around the time of the Second

11   Amendment's adoption,' but rather 'the Second Amendment must, at most, forbid laws

12   that could not have existed under the understanding of the right to bear arms that

13   prevailed at the time.'"[230] California's large capacity magazine ban did not exist and

14   could not have existed under the understanding of the Second Amendment at the time of

15   the Founding.  This is clear because militia laws of the federal and state governments

16   required citizens to keep and carry more ammunition supplies than 10 rounds.  A

17   prohibition like § 32310 would have been impossible to enforce and runs contrary to

18   legal commands for militia readiness.

19   **VI.    CONCLUSION**

20         Removable firearm magazines of all sizes are necessary components of

21   semiautomatic firearms.  Therefore, magazines come within the text of the constitutional

22

23

-------

24   [228] *Teixeira v. Cty. Of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (citing Joyce Lee

25   Malcolm, *To Keep and Bear Arms* 139 (1994)) ("the colonial militia played a primarily
     defensive role . . . . The dangers all the colonies faced . . . were so great that not only

26   militia members but all householders were ordered to be armed.").

27   [229] *Duncan*, 366 F. Supp. at 1150.

     [230] Def's Br. in Resp., Dkt. 142 at 16 (quoting *United States v. Kelly*, No. 3:22-cr-00037,
28   2022 U.S. Dist. LEXIS 215189, at *14 n.7 (M.D. Tenn. Nov. 16, 2022)).

17-cv-1017-BEN (JLB)

1   declaration that the right to keep and bear arms shall not be infringed.  Because millions
2   of removable firearm magazines able to hold between 10 and 30 rounds are commonly
3   owned by law-abiding citizens for lawful purposes, including self-defense, and because
4   they are reasonably related to service in the militia, the magazines are presumptively
5   within the protection of the Second Amendment.  There is no American history or
6   tradition of regulating firearms based on the number of rounds they can shoot, or of
7   regulating the amount of ammunition that can be kept and carried.  The best analogue that
8   can be drawn from historical gun laws are the early militia equipment regulations that
9   required all able-bodied citizens to equip themselves with a gun and a minimum amount
10  of ammunition in excess of 10 rounds.

11      Because the State did not succeed in justifying its sweeping ban and dispossession
12  mandate with a relevantly similar historical analogue, California Penal Code § 32310, as
13  amended by Proposition 63, is hereby declared to be unconstitutional in its entirety and
14  shall be enjoined.  At this time, the Court's declaration does not reach the definition of a
15  large capacity magazine in California Penal Code § 16740 where it is used in other parts
16  of the Penal Code to define other gun-related crimes or enhance criminal penalties.

17      One government solution to a few mad men with guns is a law that makes into
18  criminals responsible, law-abiding people wanting larger magazines simply to protect
19  themselves.  The history and tradition of the Second Amendment clearly supports state
20  laws against the use or misuse of firearms with unlawful intent, but not the disarmament
21  of the law-abiding citizen.  That kind of a solution is an infringement on the
22  Constitutional right of citizens to keep and bear arms.  The adoption of the Second
23  Amendment was a freedom calculus decided long ago by our first citizens who cherished
24  individual freedom with its risks more than the subservient security of a British ruler or
25  the smothering safety of domestic lawmakers.  The freedom they fought for was worth
26  fighting for then, and that freedom is entitled to be preserved still.

27      The Attorney General respectfully requests a stay of any judgment in Plaintiffs'
28  favor for a sufficient period to seek a stay from the Court of Appeals.  Dkt. 118 at 61–63;

Dkt. 142 at 25.  That request is granted.  Therefore, the enforcement of the injunction is hereby stayed for ten days.

**IT IS HEREBY ORDERED** that:

1. Defendant Attorney General Rob Bonta, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order, or know of the existence of this injunction order, are enjoined from enforcing California Penal Code § 32310.

2. Defendant Rob Bonta shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.

3. This injunction is stayed for ten (10) days from the date of this Order.

**IT IS SO ORDERED.**

Date: September 22, 2023        _____

                                HON. ROGER T. BENITEZ
                                United States District Judge

71

17-cv-1017-BEN (JLB)

# EXHIBIT 2

1   XAVIER BECERRA
    Attorney General of California
2   TAMAR PACHTER
    Supervising Deputy Attorney General
3   NELSON R. RICHARDS
    ANTHONY P. O'BRIEN
4   Deputy Attorneys General
    ALEXANDRA ROBERT GORDON
5   Deputy Attorney General
    State Bar No. 207650
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5509
    Fax: (415) 703-5480
8   E-mail:
    Alexandra.RobertGordon@doj.ca.gov
9   *Attorneys for Defendant*
    *Attorney General Xavier Becerra*

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  | **VIRGINIA DUNCAN, et al.,** | 17-cv-1017-BEN-JLB |
    | Plaintiffs, | |
17  | | |
    | v. | **REVISED EXPERT REPORT OF** |
18  | | **DR. LOUIS KLAREVAS** |
19  | **XAVIER BECERRA, in his official** | Judge: Hon. Roger T. Benitez |
    | **capacity as Attorney General of the** | Action Filed: May 17, 2017 |
20  | **State of California, et al.,** | |
21  | Defendants. | |

22

23

24

25

26

27

28

1

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00074

# EXPERT REPORT OF DR. LOUIS KLAREVAS

## I.   ASSIGNMENT

I was retained by counsel for the Defendant Xavier Becerra, in his official capacity as Attorney General of California, for the purposes of providing an expert opinion on large-capacity magazines and mass shootings.

## II.   QUALIFICATIONS AND BACKGROUND

I am a security policy analyst and, currently, Associate Lecturer of Global Affairs at the University of Massachusetts–Boston.  I am also the author of *Rampage Nation: Securing America from Mass Shootings* (Prometheus 2016), one of the most comprehensive studies on gun massacres in the United States.

I am a political scientist by training, with a B.A. from the University of Pennsylvania and a Ph.D. from American University.  My most recent research examines the nexus between American public safety and large-scale gun violence.

During the course of my nearly 20-year career as an academic, I have served on the faculties of the George Washington University, the City University of New York, and New York University.  At New York University, I founded and coordinated the graduate concentration in Transnational Security.  I have also served as a Defense Analysis Research Fellow at the London School of Economics and Political Science and as United States Senior Fulbright Scholar in Security Studies at the University of Macedonia.

In addition to having made well over 100 media and public speaking appearances, I am the author or co-author of more than 20 scholarly articles and over 70 commentary pieces.  My most recent research project (undertaken in collaboration with Prof. David Hemenway of Harvard University) assesses the effectiveness of restrictions on large-capacity magazines in reducing gun massacres.

Last year, I served on a team of experts, coordinated through Johns Hopkins University, tasked with examining the implications of allowing guns on college

2

1  campuses. Furthermore, I was one of 32 experts surveyed by the *New York Times*

2  for a review of proposals aimed at curbing gun violence in the United States.[1]

3     Besides the present case, I have been retained by the California Attorney

4  General's office in *Wiese v. Becerra*, Case Number 2:17-cv-00903-WBS-KJN,

5  Eastern District of California, Sacramento Division. *Wiese* is similar to the present

6  case in that it also involves a challenge against California's regulation of large-

7  capacity magazines. Earlier this year, I served as an expert for the State of

8  Colorado, as it defended a legal challenge to its ban on large-capacity magazines in

9  *Rocky Mountain Gun Owners, et al. v. Hickenlooper*, Case Number 2013CV33879,

10  District Court, City and County of Denver, Colorado. This is the only time that I

11  have testified or been deposed in a legal proceeding in the past five years. I have

12  also provided consultative services to the United States Institute of Peace and the

13  Federal Bureau of Investigation.

14     A more detailed list of my credentials and professional experiences can be

15  found in my curriculum vitae, which is attached as Appendix A.

16  **III. RETENTION AND COMPENSATION**

17     I am being compensated for my time in this case on an hourly basis at a rate of

18  $300 per hour. My compensation is not contingent on the results of my analysis or

19  the substance of my testimony.

20  **IV. BASIS FOR OPINION AND MATERIAL CONSIDERED**

21     My opinion is based on the pleadings filed in this case, including the Court's

22  Order of June 29, 2017, granting a temporary injunction, as well as the materials

23  discussed in this report, including the resources cited in the footnotes and the data

24  presented in Appendix B.

25

26  [1] Quoctrung Bui and Margaret Sanger-Katz, "How to Prevent Gun Deaths? Where
    Experts and the Public Agree," *New York Times*, January 10, 2017, *available at*
27  https://www.nytimes.com/interactive/2017/01/10/upshot/How-to-Prevent-Gun-
    Deaths-The-Views-of-Experts-and-the-Public.html (last accessed October 4, 2017).
28

## V.   OPINION

It is my professional opinion, based upon my extensive review and analysis of data from the past five decades, that: (1) gun massacres presently pose the deadliest threat to the safety and security of American society, and the problem is growing; (2) gun massacres involving large-capacity magazines, on average, have resulted in a greater loss of life than similar incidents that did not involve large-capacity magazines; and (3) jurisdictions where bans on the possession of large-capacity magazines were in effect experienced fewer gun massacres, per capita, than jurisdictions where such bans were not in effect. As a result, restrictions on LCMs have the potential to significantly reduce the number of lives lost in mass shootings.[2]

### A.   Gun Massacres Are a Growing Threat to Public Safety

In 1984, an individual armed with, among other firearms, an Uzi assault weapon walked into a McDonald's restaurant in San Ysidro, California, and murdered 21 people, making it the deadliest mass shooting in American history at the time. It was a tragic marker that was short-lived, as the United States experienced several deadlier shootings in the years that followed: 23 people killed in a gun rampage in Killeen, Texas, in 1991; 32 people killed in a gun rampage at

---

[2] In my book *Rampage Nation*, I defined a mass shooting as "any violent attack that results in four or more individuals incurring gunshot wounds." I then differentiated between three different categories of mass shooting: (1) Nonfatal are those mass shootings in which no one dies; (2) Fatal are those mass shootings in which at least one victim dies; and (3) High-Fatality are those mass shootings in which six or more victims die. Throughout my book and in this report, I use the terms "high-fatality mass shooting" and "gun massacre" interchangeably. Of the three categories of mass shooting, gun massacres are the deadliest, resulting in the highest fatality tolls per individual incidents. Given that gun massacres are the most lethal and most disturbing, my original dataset in *Rampage Nation* focused on and surveyed all known gun massacres in the United States from 1966-2015. Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 47-48 (Prometheus 2016).

4

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00077

1    Virginia Tech in Blacksburg, Virginia, in 2007; 27 people killed, including 20 first-
2    graders, in a gun rampage in Newtown, Connecticut, in 2012; 49 people killed in a
3    gun rampage in Orlando, Florida. This year, the United States reached a new
4    milestone when a gunman attacked a crowd of concert-attendees in Las Vegas,
5    Nevada, murdering an unprecedented 58 people in a single shooting. All six
6    massacres had one factor in common: the perpetrator used a semiautomatic firearm
7    armed with an ammunition-feeding device holding more than 10 bullets.[3] Such
8    ammunition-feeding devices are frequently referred to as large-capacity magazines
9    (LCMs).[4]

10       In the past decade, gun massacres—like the Newtown, Orlando, Las Vegas,
11   and Sutherland Springs rampages—have been the deadliest individual acts of
12   violence in the United States. In fact, every single intentional act of violence in the
13   past decade that has claimed ten or more lives has been a mass shooting (*see* App.
14   B, tbl. 1), making gun attacks the greatest and most credible threat to the security
15   and safety of American society in the present era.

16       In preparation for my book *Rampage Nation*, I assembled 50 years of data
17   capturing all known gun massacres in the United States.[5] Since 1968, there have
18
19   _____

     [3] App. B, tbl. 2.

20   [4] Magazines can come in a variety of capacities, including but not limited to 5, 8,
21   10, 15, 17, 20, 30, 40, 50, and even 100 rounds. The definition of "large-capacity
     magazine" varies by state. For instance, California and Connecticut define them as
22   ammunition-feeding devices holding more than 10 bullets, whereas Colorado and
23   New Jersey define them as ammunition-feeding devices holding more than 15
     bullets. *See* Law Center to Prevent Gun Violence, *Large Capacity Magazines*,
24   *available at* http://smartgunlaws.org/gun-laws/policy-areas/classes-of-
25   weapons/large-capacity-magazines (last accessed October 4, 2017). For purposes
     of this report, unless otherwise stated, LCMs will hereinafter refer to magazines
26   with a capacity greater than 10 rounds.

27   [5] My book, which was published in 2016, covered the 50-year period of 1966-2015.
28   In preparation of this report, I have updated the dataset of gun massacres to cover

                                        5
_____
EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00078

1    been a total of 114 gun massacres, resulting in the loss of a combined 1,035 lives.

2    *See* App. B, tbl. 2 & figs. 1-2.  The data show that the past decade (2008-2017) has

3    been the worst on record, accounting for nearly one-third of all gun massacre

4    incidents from the past five decades (37 out of 114) and over 40 percent of all

5    deaths lost in such high-fatality mass shootings (428 out of 1,035).[6]  In fact, this

6    past year (2017) is the deadliest year of the past 50 years, with 100 people dying in

7    gun massacres.[7]  In other words, mass shootings pose a grave threat to the United

8    States, and the threat is growing.

9    **B.    The Use of LCMs Is a Major Factor in the Rise of Gun Massacre Violence**

10

11   A review of the data from the past 50 years indicates that gun massacres have

12   grown in terms of frequency and lethality.  The data also point to another striking

13   pattern: the use of LCMs in the commission of gun massacres has risen in vast

14   proportions. *See* App. B, tbl. 2 & figs. 3-4.

15   A comparison of the ten-year period of 1968-1977 with the most recent

16   decade of 2008-2017 shows that the number of gun massacres involving LCMs has

17   increased eight-fold, from three to 24.  Even more disturbing, the number of deaths

18   attributable to LCM-involving gun massacres has jumped over 17-fold between the

19   same two ten-year periods, from 19 to 330.  Indeed, the 24 LCM-involving gun

20   massacres from the past decade account for 45 percent of all LCM-involving gun

21   massacres since 1968, and the 330 deaths attributable to the 24 incidents of the past

22   decade account for 55 percent of all deaths resulting from LCM-involving gun

23   massacres since 1968.  To present the data in another manner, between 1968-1977,

24   only 17 percent of gun massacres involved LCMs, and those shootings accounted

25   ———————————————

the 50-year period from 1968 to 2017.

26   [6] App. B, tbl. 2 & figs. 1-2.

27   [7] *Id.*

28

6

1    for only 16 percent of all gun massacre fatalities from that decade. By contrast,

2    between 2008-2017, 65 percent of gun massacres involved LCMs, and those

3    shootings accounted for 77 percent of all gun massacre fatalities from that decade.

4    These are gigantic increases of 282 percent and 381 percent, respectively.[8]

5         LCMs provide multiple advantages to active shooters. Offensively, LCMs

6    increase kill potential. Basically, the more bullets a gunman can fire at a target, the

7    more potential wounds he can inflict. Furthermore, the more bullets that strike a

8    victim, the higher the odds that that person will die. There are two forces that allow

9    LCMs to increase kill potential: rapid-fire capability and multiple-impact

10    capability.

11         When inserted into either a semiautomatic or fully-automatic weapon, an

12    LCM facilitates the ability of an active shooter to fire a large number of rounds at

13    an extremely quick rate. This phenomenon—rapid-fire capability—comes in handy

14    when a target is in a gunman's line of sight for only a few seconds. For example,

15    rapid-fire capability allows a decent shooter to fire three rounds per second with a

16    semiautomatic firearm and ten rounds per second with an automatic firearm. That

17    results in numerous chances to hit a target in a very short window of opportunity.

18         LCMs also facilitate the ability of a shooter to strike a human target with

19    more than one round. This phenomenon—multiple-impact capability—increases

20    the chances that the victim, when struck by multiple rounds, will die. At least two

21    separate studies have found that, when compared to the fatality rates of gunshot

22    wound victims who were hit by only a single bullet, the fatality rates of those

23    victims hit by more than one bullet were over 60 percent higher.[9] The implication

24

25    [8] App. B, tbl. 2 & figs. 3-4.

26    [9] Daniel W. Webster, et al., "Epidemiologic Changes in Gunshot Wounds in Washington, DC, 1983-1990," 127 *Archives of Surgery* 694-698 (June 1992); and

27    Christopher S. Koper & Jeffrey A. Roth, The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome

28

1    is straightforward: being able to strike human targets with more than one bullet

2    increases the shooter's chances of killing his victims.  In essence, LCMs are force

3    multipliers when it comes to kill potential—and the evidence from gun massacres

4    supports this commonsense conclusion.

5         Of the 114 gun massacres since 1968, 53 involved LCMs, resulting in a

6    cumulative 600 deaths.  *See* App. B, tbl. 2 & fig. 5.  The average death toll for the

7    53 gun massacres involving LCMs is 11.32 fatalities per shooting.[10]  By contrast,

8    the average death toll for the 61 incidents for which there is no evidence of LCM

9    usage is 7.13 fatalities per shooting.[11]  In other words, the use of LCMs in

10   massacres resulted in a 59 percent increase in fatalities per incident.[12]  In the past

11

Measures and Some Lessons for Policy Evaluation, 17 *Journal of Quantitative*

12   *Criminology* 33-74 (March 2001); *see also*, Angela Sauaia, et al., Fatality and

13   Severity of Firearm Injuries in a Denver Trauma Center, 2000-2013, 315 *J. of the*

14   *Am. Med. Ass'n* 2465-2467 (June 14, 2015).

[10] App. B, tbl. 2 & fig. 5.

15
[11] *Id.*  T-tests confirm that the differences in death tolls by LCM status are

16   statistically significant (p < .01 level).  The difference remained statistically

17   significant (p < .01 level) regardless of whether non-LCM incidents were limited to

18   only those that did not involve LCMs or also included incidents for which the LCM
     status was unknown.

19   [12] The standard methodology is to attribute all deaths in LCM-involving mass

20   shootings to the use of LCMs and to treat cases for which the status of LCM usage
     is unknown as incidents not involving LCMs.  *See* Gary Kleck, Large-Capacity

21   Magazines and the Casualty Counts in Mass Shootings, 17 *Justice Research &*

22   *Policy* 28-47 (June 2016).  Therefore, the calculation of the 11.32 mean average is
     determined by dividing the total number of gun massacres involving LCMs (53)

23   into the total number of deaths resulting from those incidents (600).  App. B, tbl. 2

24   & fig. 5.  However, some of the people murdered in five of the 53 LCM-involving
     gun massacres were shot and killed by firearms that were not LCM-capable.  When

25   these five shootings are adjusted to reflect only deaths that were the result of LCM-

26   capable firearms—San Ysidro (19 out of 21 deaths), Littleton (5 out of 13 deaths),
     Kirkwood (5 out of 6 deaths), Aurora (10 out of 12 deaths), and Newtown (26 out

27   of 27 deaths)—the cumulative death toll decreases to 586.  This adjustment drops

28   the average death toll per LCM-involving incident to 11.06 fatalities, which in turn

8

1   decade, the difference is even more pronounced: 7.54 versus 13.75 deaths per

2   incident.[13] This is a 82 percent increase in the average death toll, attributed to the

3   use of LCMs. Moreover, since 1968, LCMs have been used in 74 percent of all

4   gun massacres with 10 or more deaths, as well as in 100 percent of all gun

5   massacres with 20 or more deaths—establishing a relationship between LCMs and

6   the deadliest gun massacres.[14]

7        In addition to the offensive advantage that LCMs provide, there is the

8   advantage of extended cover. During an active shooting, perpetrators are either

9   firing their guns or not firing their guns. While pulling the trigger, it is extremely

10  difficult for those in harm's way to take successful defensive maneuvers. But if

11  gunmen run out of bullets, there is a lull in the shootings. This precious down-time

12  affords those in the line of fire with a chance to flee, hide, or fight back.

13       There are countless examples of individuals fleeing or taking cover while

14  active shooters paused to reload. For instance, in 2012, nine first-graders at Sandy

15  Hook Elementary School in Newtown, Connecticut, literally pushed their attacker

16  aside as he was swapping out magazines, allowing them to escape from their

17

---

18  results in a 55-percent increase (as opposed to a 59-percent increase) in deaths per
incident attributed to the use of LCMs. The revised fatality attributions are based
19  on my review of official government documents and autopsy reports pertaining to
20  the three respective mass shootings. Furthermore, the calculation of the 7.13 mean
21  average is determined by dividing the number of incidents for which the status of
    LCM usage was either none or unknown (61) into the total number of deaths
22  resulting from those incidents (435). However, removing the nine cases wherein
23  the status of LCM usage is unknown from the set of 61 total cases results in 52
    incidents and 373 cumulative fatalities. This adjustment decreases the average
24  death toll per non-LCM-involving incident to 7.17 fatalities, which in turn results in
25  a 58 percent increase (as opposed to a 59 percent increase) in deaths per incident
    attributed to the use of LCMs. App. B, tbl. 2 & fig. 5.

26  [13] App. B, tbl. 2 & figs. 1-5.

27  [14] App. B, tbl. 2.

28

1    classroom and dash to safety.[15]  There is also the possibility that someone will rush

2    a rampage gunman and try to tackle him (or at the very least try to wrestle his

3    weapon away from him) while he pauses to reload.[16]  In recent history, there have

4    been numerous instances of active shooters being physically confronted by

5    unarmed civilians while reloading, bringing their gun attacks to an abrupt end.  The

6    following list is just a sampling of examples.[17]

7

8    [15] *See* Klarevas, *Rampage Nation*, *supra* note 2, at 22.

9    [16] The longer a shooter can fire without interruption, the longer he can keep
10   potential defenders at bay.  The longer potential defenders are kept from physically
11   confronting a gunman, the more opportunity there is for the shooter to inflict
     damage.

12   [17] *See* Rich Schapiro, "LIRR Massacre 20 Years Ago: 'I Was Lucky,' Says Hero
13   Who Stopped Murderer," *New York Daily News*, December 7, 2013, *available at*
14   http://www.nydailynews.com/new-york/nyc-crime/lirr-massacre-20-years-lucky-
     hero-stopped-murderer-article-1.1540846 (last accessed October 4, 2017); *see also*
15   Eric Schmitt, "Gunman Shoots at White House from Sidewalk," *New York Times*,
16   October 30, 1994, *available at* http://www.nytimes.com/1994/10/30/us/gunman-
     shoots-at-white-house-from-sidewalk.html (last accessed October 4, 2017); *see also*
17   Timothy Egan, "Oregon Student Held in 3 Killings; One Dead, 23 Hurt at His
     School," *New York Times*, May 22, 1998, *available at* http://www.nytimes.com/
18   1998/05/22/us/shootings-school-overview-oregon-student-held-3-killings-one-
19   dead-23-hurt-his.html (last accessed October 4, 2017); *see also* Ken Ritter, "Trial
     Begins in Las Vegas Casino Gunfire Case, *San Diego Union-Tribune*, July 7, 2009,
20   *available at* http://www.sandiegouniontribune.com/sdut-us-casino-shooting-trial-
     070709-2009jul07-story.html (last accessed October 4, 2017); *see also* "Capitol
21   Gunfire Suspect Tried Reloading," *Huntsville Item*, January 22, 2010, *available at*
22   http://www.itemonline.com/news/local_news/report-capitol-gunfire-suspect-tried-
     reloading/article_7f321cc6-170e-578c-928f-fbc702f1228a.html (last accessed
23   October 4, 2017); *see also* Adam Nagourney, "A Single, Terrifying Moment: Shots
24   Fired, a Scuffle and Some Luck," *New York Times*, January 9, 2011, *available at*
     http://www.nytimes.com/2011/01/10/us/10reconstruct.html (last accessed October
25   4, 2017); *see also* Joe Kemp, "Student Hailed Hero for Tackling Gunman Who
26   Opened Fire in Seattle Pacific University, Killing One," *New York Daily News*,
27   June 6, 2014, *available at* http://www.nydailynews.com/news/crime/student-hailed-
     hero-tackling-gunman-opened-fire-seattle-pacific-university-killing-article-
28   1.1819485 (last accessed October 4, 2017).

10

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00083

## Examples of Active Shooters Who Were Physically Confronted While Reloading

| Date | Perpetrator | Target | Location |
|------|-------------|--------|----------|
| December 7, 1993 | Colin Ferguson | Long Island Rail Road | Garden City, NY |
| October 29, 1994 | Francisco Duran | White House | Washington, DC |
| May 21, 1998 | Kipland Kinkel | Thurston High School | Springfield, OR |
| July 6, 2007 | Steven Zegrean | New York-New York Casino | Las Vegas, NV |
| January 21, 2010 | Fausto Cardenas | Texas State Capitol | Austin, TX |
| January 8, 2011 | Jared Loughner | Rep. Gabrielle Giffords Event | Tucson, AZ |
| June 5, 2014 | Aaron Ybarra | Seattle Pacific University | Seattle, WA |

### C.   Restrictions on LCMs Result in Fewer Gun Massacres

In light of the growing threat posed by rampage violence, legislatures have enacted measures in an effort to reduce the carnage of mass shootings.  Prominent among these measures are restrictions on LCMs.  There are at least two rationales for restricting magazine capacity.  First, because LCMs, on average, produce higher death tolls in gun massacres, limiting magazine capacity aims to reduce the loss of life attributable to the increased kill potential of LCMs.  Second, because LCMs allow rampage gunmen to fire more bullets without interruption, resulting in fewer opportunities for potential victims to take life-saving measures, limiting magazine capacity aims to create conditions which force mass shooters to pause in order to reload fresh magazines.  This, in turn, provides authorities and civilians with precious seconds that can be exploited to escape, seek cover, or take other defensive measures, including attacking the gunmen.

In 1994, the United States enacted the Federal Assault Weapons Ban (AWB). Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as

11

1   former 18 U.S.C. § 922(v), (w)(1) (1994)).  The law, which was in effect for only a

2   ten-year period before sun-setting, regulated certain firearms and their components.

3   Among its provisions, the AWB prohibited the manufacture, sale, transfer, or

4   possession of *new* magazines with a capacity greater than 10 rounds.  *Id*.[18]  With

5   regard to the frequency and lethality of gun massacres, the AWB clearly had a

6   positive impact in reducing the number and carnage of such shootings.

7        In the 10-year period prior to the AWB (September 13, 1984-September 12,

8   1994), there were a total of eight gun massacres involving magazines with a

9   capacity greater than 10 rounds.  *See* App. B, tbl. 2 & fig. 6.  These eight gun

10  massacres claimed a combined 73 lives.  During the 10-year period the AWB was

11  in effect (September 13, 1994-September 12, 2004), there were six gun massacres

12  involving magazines with a capacity greater than 10 rounds.  These six gun

13  massacres claimed a combined 50 lives.  In the ten-year period immediately

14  following the expiration of the AWB (September 13, 2004-September 12, 2014),

15  there were 24 gun massacres involving magazines with a capacity greater than 10

16  rounds.  These 24 gun massacres claimed a combined 230 lives.[19]

17       In terms of incidents, the AWB ushered in a period marked by a 25-percent

18  decrease in the number of gun massacres involving magazines with a capacity

19  greater than 10 rounds.  In contrast, the decade following the ban was marked by a

20  300-percent increase in the number of gun massacres involving magazines with a

21  capacity greater than 10 rounds.  In terms of fatalities, the AWB ushered in a period

22  marked by a 32 percent decrease in the cumulative number of lives lost in gun

23  massacres involving magazines with a capacity greater than 10 rounds.  In contrast,

24

25  [18] Magazines lawfully in circulation prior to the AWB's date of effect (September

26  13, 1994) were exempted (i.e., grandfathered) from the ban.  Former 18 U.S.C.
    § 922 (v)(2) (1994).

27  [19] App. B, tbl. 2 & fig. 6.

28

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00085

1   the decade following the ban was marked by a 360 percent increase in the

2   cumulative number of lives lost in gun massacres involving magazines with a

3   capacity greater than 10 rounds.[20]

4       Since 1990, several states have also enacted restrictions on LCMs,

5   predominantly in an effort to reduce the loss of life in mass shootings.[21]  On March

6   30, 1990, New Jersey became the first state to regulate LCMs.  Seven states and the

7   District of Columbia have since followed suit: Hawaii (July 1, 1992), Maryland

8   (June 1, 1994), Massachusetts (July 23, 1998), California (January 1, 2000), New

9   York (November 1, 2000), Washington, D.C. (March 31, 2009), Connecticut (April

10  4, 2013), and Colorado (July 1, 2013).[22]

11

12  [20] *Id.*  In terms of all gun massacres, regardless of whether or not the shootings
    involved LCMs, patterns in the same directions were noted. For instance, the period

13  of the AWB was marked by a 37 percent decrease in gun massacre incidents and a
    43 percent decrease in gun massacre deaths, when compared to the 10-year period

14  immediately preceding the AWB.  By contrast, the 10-year period immediately

15  following the AWB was marked by a 183 percent increase in gun massacre

16  incidents and a 239 percent increase in gun massacre deaths, when compared to the
    decade of the AWB.  *See* Klarevas, *Rampage Nation, supra* note 2, at 242.

17
    [21] For a review of state laws that regulate LCMs, *see* Law Center to Prevent Gun
18  Violence, Large Capacity Magazines, *supra* note 1. States differ on the
    ammunition-capacity threshold of LCMs.  California, Connecticut, Hawaii,
19  Maryland, Massachusetts, New York, and Washington, D.C., define LCMs as
20  ammunition feeding devices holding more than 10 bullets, whereas Colorado and
    New Jersey define LCMs as ammunition feeding devices holding more than 15
21  bullets.  States also differ on whether to exempt LCMs that were in circulation or
22  owned prior to their respective bans going into effect—a practice known as
    "grandfathering."  Colorado, Connecticut, Maryland Massachusetts grandfather
23  pre-ban LCMs.  Hawaii, New Jersey, New York, and Washington, D.C., do not
24  grandfather pre-ban LCMs.  Pursuant to a preliminary injunction issued by the
    court in the current matter, California is prohibited from enforcing a law that would
25  prohibit LCMs that were legally possessed prior to January 1, 2000.  If the
26  injunction is lifted, California would join Hawaii, New Jersey, New York, and
    Washington, D.C. in not grandfathering previously-owned LCMs.  *Id.*
27
    [22] Through a referendum on Proposition 63 (November 8, 2016), California voters
28

13

1      In the field of epidemiology, a common method for assessing the impact of

2  laws and policies is to measure the rate of onset of new cases of a problem,

3  comparing the rate when and where the laws and policies were in effect against the

4  rate when and where the laws and policies were not in effect.  This measure, known

5  as the incidence rate, allows public health experts and criminologists to identify

6  discernable differences, per capita, over a period of time.  Relevant to the present

7  case, calculating incidence rates across jurisdictions, in a manner that accounts for

8  whether or not LCM bans were in effect during the period of observation, allows

9  for the assessment of the effectiveness of such bans.  In addition, fatality rates—the

10  number of deaths, per capita, that result from particular activities across different

11  jurisdictions—also provide insights into the impact of LCM bans on gun

12  massacres.[23]

13    Since 1990, when the first LCM ban took effect in New Jersey, there have

14  been 69 gun massacres in the United States.[24]  Calculating gun massacre incidence

15  rates for the time-period 1990-2017, across jurisdictions with and without bans on

16  the possession of LCMs, reveals that the enactment of an LCM ban resulted in an

---

decided to enhance their existing regulations on LCMs by prohibiting the ownership of all ammunition magazines with a capacity greater than 10 bullets, including any previously "grandfathered" LCMs.  The relevant California statutes can be found at Cal. Penal Code §§ 16740, 32310-32450.  The particular provisions that are the subject of the current litigation are codified at Cal. Penal Code §§ 32310, 32390.  California's new LCM ban was set to take effect on July 1, 2017, although the State is temporarily enjoined from enforcing it pursuant to a ruling in the current case.

[23] For purposes of this report, incidence and fatality (i.e., mortality) rates are calculated in accordance with the methodological principles established by the Centers for Disease Control and Prevention.  *See* Centers for Disease Control and Prevention, *An Introduction to Applied Epidemiology and Biostatistics* (2012).

[24] App. B, tbl. 2.  There were no LCM bans in effect prior to 1990.  Therefore, a priori, 1990 is the logical starting point for an analysis of the impact of LCM bans.

14

1    79 percent difference, with ban states experiencing a far lower rate of incidence.

2    *See* App. B, tbl. 3.[25]  Even if the examination is limited to the last 13 years (2005-

3    2017), which covers the years when the nationwide AWB was no longer in effect,

4    the difference in incidence rates is still 56 percent, with LCM-ban states again

5    experiencing far fewer gun massacres per capita.[26]

6         It should be noted that the aforementioned incidence rates pertain to all gun

7    massacres, regardless of the weaponry they involved.  When calculations go a step

8    further and are limited to gun massacres involving LCMs, the difference is even

9    more pronounced.  *See* App. B, tbl. 3.  In terms of incidence rates, for the time-

10   period since 1990, the benefit for jurisdictions that regulated LCMs was a 105

11   percent difference, when compared to jurisdictions that did not regulate LCMs.[27]

12   Again, even if the examination is limited to post-federal AWB era, the difference in

13   incidence rates for LCM-involving gun massacres was 88 percent, again with

14   LCM-ban states experiencing far fewer attacks involving LCMs.[28]

15        In terms of fatality rates, the patterns are similar.  *See* App. B, tbl. 4.  From

16   1990-2017, the difference in rates was 101 percent, with jurisdictions that had LCM

17   bans in effect experiencing drastically fewer deaths per capita than those areas

18   which did not regulate LCMs.  Even after the federal AWB expired, drastically

19   cutting the number of areas restricting LCMs, states with LCM bans experienced

20   fewer gun massacre deaths per capita, marked by a 74 percent difference in fatality

21

22   [25] For purposes of coding, between September 13, 1994, and September 12, 2004,
     the federal AWB was in effect.  During that ten-year period, all 50 states and the
23   District of Columbia were under legal conditions that banned the possession of
24   certain prohibited LCMs.  As such, the entire country is coded as being under a
     LCM ban during the decade the AWB was in effect.
25
     [26] App. B, tbl. 3.
26   [27] *Id.*

27   [28] *Id.*

28

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00088

1   rates.  Limiting analysis to only those gun massacres that involved LCMs indicates

2   that the difference in gun massacre fatality rates for LCM-ban jurisdictions was

3   even greater when compared to the fatality rates for jurisdictions that opted not to

4   regulate LCMs.  In terms of LCM-involving gun massacres, the differences in

5   fatality rates between the two categories of jurisdictions were 126 percent and 106

6   percent for the time-periods 1990-2017 and 2005-2017, respectively, in both

7   instances to the benefit of states that regulated LCMs.[29]

8          Basically, all of the above epidemiological calculations lead to the same

9   conclusion: when LCM bans are in effect, per capita, fewer gun massacres occur

10  and fewer people die in such high-fatality mass shootings.

11         The intent underlying most LCM bans is to restrict the circulation of LCMs.

12  The reasoning is that, if there are fewer LCMs in circulation within their

13  jurisdictions, then gunmen will be forced to use firearms with lower ammunition-

14  capacities, resulting in attacks that do not kill enough victims to rise to the level of

15  a gun massacre (six or more victims being shot to death in a mass shooting).[30]

16  Moreover, even if gunmen opt to use semiautomatic firearms equipped with

17  magazines, bans should still result in fewer opportunities to acquire and utilize

18  LCMs prohibited by law to perpetrate gun massacres.  The epidemiological data

19  clearly lend support to both of these premises, in turn furthering the argument that

20  bans on the possession of LCMs enhance public safety.

21

22

23

24  [29] App. B, tbl. 4.

25  [30] For instance, a gunman armed with a six-shot revolver can, in theory, kill six
    people without having to reload.  However, to kill more people, that same gunman

26  would require a way to fire additional ammunition, and the most efficient way to do
    so is to utilize a firearm armed with a LCM.  Restricting the ability of gunmen to

27  deliver large capacities of ammunition without interruption can result in fewer lives

28  lost in shootings.

16

1       While imposing constraints on LCMs will not result in the prevention of all

2  future mass shootings, the data suggest that denying rampage gunmen access to

3  LCMs will result in a significant number of lives being saved.

4

5                       Respectfully Submitted,

6

7

8

9

10                       Louis Klarevas, Ph.D.

                             January 5, 2018

11                       Queens, NY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00090

**Appendix A**

**Curriculum Vitae of Dr. Louis Klarevas**

Exhibit 3
Page 00091

**Louis J. Klarevas**

**Education**

Ph.D.   International Relations, 1999
        School of International Service
        American University

B.A.    Political Science, *Cum Laude*, 1989
        School of Arts and Sciences
        University of Pennsylvania

**Current Position**

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, 2015-

**Representation**

Trident Media Group
41 Madison Avenue
New York, NY 10010

**Professional Experience**

Expert Witness for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 3:17-cv-1017-BEN, 2017

Expert Witness for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 2:17-cv-00903-WBS-KJN, 2017

Expert Witness for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, 2016-2017

Member, Guns on Campus Assessment Group, Johns Hopkins University Center for Gun Policy and Research, 2016

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, 2015

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2012

Clinical Assistant Professor, Center for Global Affairs, New York University, 2006-2011

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, 2009-2011

Exhibit 3
Page 00092

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, 2007-2011

Consultant, Academy for International Conflict Management and Peacebuilding, United States Institute of Peace, Washington, D.C., 2008-2009

Assistant Professor of Political Science, City University of New York – College of Staten Island, 2003-2006

Adjunct Professor, Center for Global Affairs, New York University, 2004-2006

Consultant, United States Institute of Peace, Washington, DC, 2005

Associate Fellow, European Institute, London School of Economics and Political Science, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, 2002-2003

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, D.C., 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, D.C., 1998-1999

Research Associate, United States Institute of Peace, Washington, D.C., 1992-1998

Adjunct Professor of International Relations, School of International Service, American University, Washington, D.C., 1994

Faculty Advisor, National Youth Leadership Forum, Washington, D.C., 1992

Dean's Scholar, School of International Service, American University, Washington, D.C., 1989-1992

**Courses Taught**

American Government and Politics (undergraduate)
Counter-Terrorism and Homeland Security (graduate)
European-Atlantic Relations (undergraduate)
International Political Economy (graduate and undergraduate)
International Politics in a Post-Cold War Era (graduate)
International Relations (undergraduate)
International Security (graduate)
Machinery and Politics of American Foreign Policy (graduate)
Role of the United States in World Affairs (graduate)
Security Policy (graduate)
Theories of International Politics (graduate)
Transnational Security (graduate)
Transnational Terrorism (graduate, undergraduate, and senior seminar)
United States Foreign Policy (graduate and undergraduate)

Exhibit 3
Page 00093

**Books**

*Rampage Nation: Securing America from Mass Shootings* (2016)
http://www.penguinrandomhouse.com/books/252353/rampage-nation-by-louis-klarevas

**Scholarship**

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

3

Exhibit 3
Page 00094

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti,* University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey,*" *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.–Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis)

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

**Book Reviews**

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974, Presidential Studies Quarterly*, June 2012

"The Life-Cycle of Regimes: Oran Young's *International Cooperation,*" *Millennium*, Winter 1990 (co-authored with Nanette S. Levinson)

4

Exhibit 3
Page 00095

**Commentaries and Correspondence**

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," *New York Daily News*, November 7, 2017

"Why Mass Shootings Are Getting Worse," *New York Daily News*, October 2, 2017

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015

"International Law and the 2012 Presidential Elections," Vitoria Institute Website, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," *New York Daily News*, April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"Crack Down on Handguns – They're a Tool of Terror, Too," *New York Daily News*, October 25, 2007

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"Not a Divorce," *Survival*, Winter 2003-2004

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Death Be Not Proud," *The New Republic*, October 27, 2003 (correspondence)

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

Exhibit 3
Page 00096

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993

**Commentaries for *Foreign Policy* – http://www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – http://www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

Exhibit 3
Page 00097

**Commentaries Written for *The Huffington Post* – http://www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

7

Exhibit 3
Page 00098

**Legal Analyses Written for *Writ* – http://writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)

**Columns Written (in Greek) for *To Vima* Newspaper (Athens)**

"Time to Pay," August 2003

"Does Turkey Have an Ulterior Motive?" July 2003

"Will They Make Up?" June 2003

"Don't Take the Bait," May 2003

"If the Cheers Turn to Jeers," April 2003

"The Power of a Niche Identity," April 2003

"If You Can't Beat Them, Join Them," April 2003

"Show Me the Euros," March 2003

Exhibit 3
Page 00099

**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Exhibit 3
Page 00100

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

10

Exhibit 3
Page 00101

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

Exhibit 3
Page 00102

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

## Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers

National Science Foundation, Division of Social and Economic Sciences

*American Political Science Review*

*Comparative Political Studies*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

Brill Publishers

12

Exhibit 3
Page 00103

**Service to University, Profession, and Community**

Expert Witness for State of California, 2017

Expert Witness for State of Colorado, 2016-2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

13

Exhibit 3
Page 00104

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Department Liaison, Commencement, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society of the George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

14

Exhibit 3
Page 00105

**Associations and Organizations (Past and Present)**

Academy of Political Science

American Political Science Association

Anderson Society of American University

Carnegie Council Global Ethics Network

International Political Science Association

International Studies Association

Museum of Modern Art

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Sigma Nu Fraternity

Social Science Research Network

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Honors and Awards**

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2003

United States Institute of Peace Certificate of Meritorious Service, 1996

15

Exhibit 3
Page 00106

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

16

Exhibit 3
Page 00107

**Appendix B**

**Tables and Figures in Support of Expert Report Submitted by Dr. Louis Klarevas**

Exhibit 3
Page 00108

### Appendix B – Table 1

### The 10 Deadliest Intentional Acts of Violence of the Past Decade, 2008-2017

|  | Deaths | Incident Type | Date | Perpetrator | City | State |
|---|---|---|---|---|---|---|
| 1 | 58 | Mass Shooting | 10/1/2017 | Stephen Paddock | Las Vegas | NV |
| 2 | 49 | Mass Shooting | 6/12/2016 | Omar Mateen | Orlando | FL |
| 3 | 27 | Mass Shooting | 12/14/2012 | Adam Lanza | Newtown | CT |
| 4 | 26 | Mass Shooting | 11/5/2017 | Devin Kelley | Sutherland Springs | TX |
| 5 | 14 | Mass Shooting | 12/2/2015 | Syed Rizwan Farook and Tashfeen Malik | San Bernardino | CA |
| 6 | 13 | Mass Shooting | 4/3/2009 | Jiverly Wong | Binghamton | NY |
| 7 | 13 | Mass Shooting | 11/5/2009 | Nidal Hasan | Fort Hood | TX |
| 8 | 12 | Mass Shooting | 7/20/2012 | James Holmes | Aurora | CO |
| 9 | 12 | Mass Shooting | 9/16/2013 | Aaron Alexis | Washington | DC |
| 10 | 10 | Mass Shooting | 3/10/2009 | Michael McLendon | Kinston, Samson, and Geneva | AL |

1

Exhibit 3
Page 00109

## Appendix B – Table 2

### Gun Massacres in the United States, 1968-2017

| | Date | City | State | Perpetrator(s) | LCM | Deaths |
|---|---|---|---|---|---|---|
| 1 | 3/16/1968 | Ironwood | MI | Eric Pearson | N | 7 |
| 2 | 6/25/1968 | Good Hart | MI | Undetermined | N | 6 |
| 3 | 12/19/1968 | Napa | CA | Charles Bray | N | 6 |
| 4 | 9/3/1971 | Phoenix | AZ | John Freeman | N | 7 |
| 5 | 6/21/1972 | Cherry Hill | NJ | Edwin Grace | Y | 6 |
| 6 | 1/7/1973 | New Orleans | LA | Mark Essex | N | 7 |
| 7 | 6/21/1973 | Palos Hills | IL | William Workman | N | 7 |
| 8 | 4/22/1973 | Los Angeles | CA | William Bonner | N | 7 |
| 9 | 6/9/1973 | Boston | MA | George O'Leary | N | 6 |
| 10 | 11/4/1973 | Cleveland | OH | Cyril Rovansek | N | 7 |
| 11 | 2/18/1974 | Fayette | MS | Frankie Lias | N | 7 |
| 12 | 11/13/1974 | Amityville | NY | Ronald DeFeo | N | 6 |
| 13 | 3/30/1975 | Hamilton | OH | James Ruppert | N | 11 |
| 14 | 10/19/1975 | Sutherland | NE | Erwin Simants | N | 6 |
| 15 | 3/12/1976 | Trevose | PA | George Geschwendt | N | 6 |
| 16 | 7/12/1976 | Fullerton | CA | Edward Allaway | Y | 7 |
| 17 | 7/23/1977 | Klamath Falls | OR | DeWitt Henry | Y | 6 |
| 18 | 8/26/1977 | Hackettstown | NJ | Emile Benoist | N | 6 |
| 19 | 7/16/1978 | Oklahoma City | OK | Harold Stafford, Roger Stafford, and Verna Stafford | N | 6 |
| 20 | 1/3/1981 | Delmar | IA | Gene Gilbert | N | 6 |
| 21 | 1/7/1981 | Richmond | VA | Artie Ray Cherry, Michael Finazzo, and Tyler Frndak | N | 6 |
| 22 | 5/2/1981 | Clinton | MD | Ronald Ellis | N | 6 |
| 23 | 8/21/1981 | Indianapolis | IN | King Bell | N | 6 |
| 24 | 2/17/1982 | Farwell | MI | Robert Haggart | N | 7 |
| 25 | 8/9/1982 | Grand Prairie | TX | John Parish | N | 6 |
| 26 | 8/20/1982 | Miami | FL | Carl Brown | N | 8 |
| 27 | 9/7/1982 | Craig | AK | Undetermined | N | 8 |
| 28 | 9/25/1982 | Wilkes-Barre | PA | George Banks | Y | 13 |
| 29 | 2/18/1983 | Seattle | WA | Kwan Fai Mak and Benjamin Ng | N | 13 |
| 30 | 3/3/1983 | McCarthy | AK | Louis Hastings | N | 6 |
| 31 | 10/11/1983 | College Station and Hempstead | TX | Eliseo Moreno | N | 6 |
| 32 | 4/15/1984 | Brooklyn | NY | Christopher Thomas | N | 10 |
| 33 | 5/19/1984 | Manley Hot Springs | AK | Michael Silka | N | 8 |
| 34 | 6/29/1984 | Dallas | TX | Abdelkrim Belachheb | Y | 6 |
| 35 | 7/18/1984 | San Ysidro | CA | James Huberty | Y | 21 |
| 36 | 10/18/1984 | Evansville | IN | James Day | N | 6 |
| 37 | 8/20/1986 | Edmond | OK | Patrick Sherrill | N | 14 |
| 38 | 12/8/1986 | Oakland | CA | Rita Lewis and David Welch | Y | 6 |
| 39 | 2/5/1987 | Flint | MI | Terry Morris | N | 6 |
| 40 | 4/23/1987 | Palm Bay | FL | William Cruse | Y | 6 |
| 41 | 7/12/1987 | Tacoma | WA | Daniel Lynam | N | 7 |
| 42 | 9/25/1987 | Elkland | MO | James Schnick | N | 7 |
| 43 | 12/30/1987 | Algona | IA | Robert Dreesman | N | 6 |
| 44 | 2/16/1988 | Sunnyvale | CA | Richard Farley | N | 7 |
| 45 | 9/14/1989 | Louisville | KY | Joseph Wesbecker | Y | 8 |
| 46 | 6/18/1990 | Jacksonville | FL | James Pough | Y | 9 |
| 47 | 1/26/1991 | Chimayo | NM | Ricky Abeyta | N | 7 |
| 48 | 8/9/1991 | Waddell | AZ | Jonathan Doody and Alessandro Garcia | N | 9 |
| 49 | 10/16/1991 | Killeen | TX | George Hennard | Y | 23 |
| 50 | 11/7/1992 | Morro Bay and Paso Robles | CA | Lynwood Drake | N | 6 |
| 51 | 1/8/1993 | Palatine | IL | James Degorski and Juan Luna | N | 7 |
| 52 | 5/16/1993 | Fresno | CA | Allen Heflin and Johnnie Malarkey | Y | 7 |
| 53 | 7/1/1993 | San Francisco | CA | Gian Luigi Ferri | Y | 8 |
| 54 | 12/7/1993 | Garden City | NY | Colin Ferguson | Y | 6 |
| 55 | 4/20/1999 | Littleton | CO | Eric Harris and Dylan Klebold | Y | 13 |
| 56 | 7/12/1999 | Atlanta | GA | Cyrano Marks | U | 6 |
| 57 | 7/29/1999 | Atlanta | GA | Mark Barton | Y | 9 |
| 58 | 9/15/1999 | Fort Worth | TX | Larry Ashbrook | Y | 7 |
| 59 | 11/2/1999 | Honolulu | HI | Byran Koji Uyesugi | Y | 7 |
| 60 | 12/26/2000 | Wakefield | MA | Michael McDermott | Y | 7 |

2

Exhibit 3
Page 00110

## Appendix B – Table 2 (Cont.)

## Gun Massacres in the United States, 1968-2017

|     | Date | City | State | Perpetrator(s) | LCM | Deaths |
|-----|------|------|-------|----------------|-----|--------|
| 61 | 12/28/2000 | Philadelphia | PA | Shihean Black, Dawud Faruqi, Khalid Faruqi, and Bruce Veney | Y | 7 |
| 62 | 8/26/2002 | Rutledge | AL | Westley Harris | N | 6 |
| 63 | 1/15/2003 | Edinburg | TX | Humberto Garza, Robert Garza, Rodolfo Medrano, and Juan Ramirez | U | 6 |
| 64 | 7/8/2003 | Meridian | MS | Douglas Williams | N | 6 |
| 65 | 8/27/2003 | Chicago | IL | Salvador Tapia | N | 6 |
| 66 | 3/12/2004 | Fresno | CA | Marcus Wesson and Sebhrenah Wesson | N | 9 |
| 67 | 11/21/2004 | Birchwood | WI | Chai Soua Vang | Y | 6 |
| 68 | 3/12/2005 | Brookfield | WI | Terry Ratzmann | Y | 7 |
| 69 | 3/21/2005 | Red Lake | MN | Jeffrey Weise | Y | 9 |
| 70 | 1/30/2006 | Goleta | CA | Jennifer San Marco | Y | 7 |
| 71 | 3/25/2006 | Seattle | WA | Kyle Huff | Y | 6 |
| 72 | 6/1/2006 | Indianapolis | IN | James Stewart and Desmond Turner | Y | 7 |
| 73 | 12/16/2006 | Kansas City | KS | Hersel Isadore | N | 6 |
| 74 | 4/16/2007 | Blacksburg | VA | Seung Hui Cho | Y | 32 |
| 75 | 10/7/2007 | Crandon | WI | Tyler Peterson | Y | 6 |
| 76 | 12/5/2007 | Omaha | NE | Robert Hawkins | Y | 8 |
| 77 | 12/24/2007 | Carnation | WA | Michele Anderson and Joseph McEnroe | U | 6 |
| 78 | 2/7/2008 | Kirkwood | MO | Charles Lee Thornton | Y | 6 |
| 79 | 9/2/2008 | Alger | WA | Isaac Zamora | U | 6 |
| 80 | 12/24/2008 | Covina | CA | Bruce Pardo | Y | 8 |
| 81 | 1/27/2009 | Los Angeles | CA | Ervin Lupoe | N | 6 |
| 82 | 3/10/2009 | Kinston, Samson, and Geneva | AL | Michael McLendon | Y | 10 |
| 83 | 3/29/2009 | Carthage | NC | Robert Stewart | N | 8 |
| 84 | 4/3/2009 | Binghamton | NY | Jiverly Wong | Y | 13 |
| 85 | 11/5/2009 | Fort Hood | TX | Nidal Hasan | Y | 13 |
| 86 | 1/19/2010 | Appomattox | VA | Christopher Speight | Y | 8 |
| 87 | 8/3/2010 | Manchester | CT | Omar Thornton | Y | 8 |
| 88 | 1/8/2011 | Tucson | AZ | Jared Loughner | Y | 6 |
| 89 | 7/7/2011 | Grand Rapids | MI | Rodrick Dantzler | N | 7 |
| 90 | 8/7/2011 | Copley Township | OH | Michael Hance | N | 7 |
| 91 | 10/12/2011 | Seal Beach | CA | Scott Dekraai | N | 8 |
| 92 | 12/25/2011 | Grapevine | TX | Aziz Yazdanpanah | N | 6 |
| 93 | 4/2/2012 | Oakland | CA | One Goh | N | 7 |
| 94 | 7/20/2012 | Aurora | CO | James Holmes | Y | 12 |
| 95 | 8/5/2012 | Oak Creek | WI | Wade Page | Y | 6 |
| 96 | 9/27/2012 | Minneapolis | MN | Andrew Engeldinger | Y | 6 |
| 97 | 12/14/2012 | Newtown | CT | Adam Lanza | Y | 27 |
| 98 | 7/26/2013 | Hialeah | FL | Pedro Vargas | Y | 6 |
| 99 | 9/16/2013 | Washington | DC | Aaron Alexis | N | 12 |
| 100 | 7/9/2014 | Spring | TX | Ronald Lee Haskell | Y | 6 |
| 101 | 9/18/2014 | Bell | FL | Don Spirit | U | 7 |
| 102 | 2/26/2015 | Tyrone | MO | Joseph Jesse Aldridge | U | 7 |
| 103 | 5/17/2015 | Waco | TX | Unidentified | Y | 9 |
| 104 | 6/17/2015 | Charleston | SC | Dylann Storm Roof | Y | 9 |
| 105 | 8/8/2015 | Houston | TX | David Conley | U | 8 |
| 106 | 10/1/2015 | Roseburg | OR | Christopher Harper-Mercer | Y | 9 |
| 107 | 12/2/2015 | San Bernardino | CA | Syed Rizwan Farook and Tashfeen Malik | Y | 14 |
| 108 | 2/21/2016 | Kalamazoo | MI | Jason Dalton | Y | 6 |
| 109 | 4/22/2016 | Piketon | OH | Undetermined | U | 8 |
| 110 | 6/12/2016 | Orlando | FL | Omar Mateen | Y | 49 |
| 111 | 5/27/2017 | Brookhaven | MS | Corey Godbolt | U | 8 |
| 112 | 9/10/2017 | Plano | TX | Spencer Hight | Y | 8 |
| 113 | 10/1/2017 | Las Vegas | NV | Stephen Paddock | Y | 58 |
| 114 | 11/5/2017 | Sutherland Springs | TX | Devin Kelley | Y | 26 |

**Note:** The incidents highlighted in gray represent the 20 gun massacres that occurred at a time when and place where a ban on certain LCMs was in effect. Incidents marked as LCM-positive involved fatalities resulting from a firearm armed with least one magazine capable of holding more than 10 bullets. Y=Yes / N=No / U=Undetermined.

3

Exhibit 3
Page 00111

## Appendix B – Table 3

### Gun Massacre Incidence Rates by Whether or Not LCM Bans Were in Effect

#### 1990-2017 (All Incidents N=69)

|  | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Incidence Rate | .327 | .142 | 79% |
| Number of Incidents | 49 | 20 | |

#### 2005-2017 (All Incidents N=47)

|  | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Incidence Rate | .171 | .096 | 56% |
| Number of Incidents | 39 | 8 | |

#### 1990-2017 (Incidents Only Involving LCMs N=44)

|  | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Incidence Rate | .227 | .071 | 105% |
| Number of Incidents | 34 | 10 | |

#### 2005-2017 (Incidents Only Involving LCMs N=32)

|  | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Incidence Rate | .123 | .048 | 88% |
| Number of Incidents | 28 | 4 | |

Note: Incidence rates are calculated per one million people. All population data used to calculate incidence rates in this table are drawn from United States Census Bureau, "Population and Housing Unit Estimates Tables," https://www.census.gov/programs-surveys/popest/data/tables.html (last accessed January 4, 2018). The percentage difference refers to percentage difference between the two incidence rates—the rate for the jurisdictions where an LCM ban was in effect and the rate for the jurisdictions where an LCM ban was not in effect. All percentage differences were calculated using the Calculator Soup online percentage difference calculator. As the Calculator Soup website states, "Percentage difference equals the absolute value of the change in value, divided by the average of the 2 numbers, all multiplied by 100." The calculator and formula are available at the following website: https://www.calculatorsoup.com/calculators/algebra/percent-difference-calculator.php (last accessed January 4, 2018).

Exhibit 3
Page 00112

**Appendix B – Table 4**

**Gun Massacre Fatality Rates by Whether or Not LCM Bans Were in Effect**

**1990-2017 (Fatalities in All Incidents N=699)**

| | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Fatality Rate | 3.58 | 1.17 | 101% |
| Number of Fatalities | 535 | 164 | |

**2005-2017 (Fatalities in All Incidents N=522)**

| | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Fatality Rate | 1.96 | 0.90 | 74% |
| Number of Fatalities | 447 | 75 | |

**1990-2017 (Fatalities in Incidents Only Involving LCMs N=521)**

| | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Fatality Rate | 2.87 | 0.65 | 126% |
| Number of Fatalities | 429 | 92 | |

**2005-2017 (Fatalities in Incidents Only Involving LCMs N=412)**

| | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Fatality Rate | 1.62 | 0.50 | 106% |
| Number of Fatalities | 370 | 42 | |

Note: Fatality rates are calculated per one million people. All population data used to calculate fatality rates in this table are drawn from United States Census Bureau, "Population and Housing Unit Estimates Tables," https://www.census.gov/programs-surveys/popest/data/tables.html (last accessed January 4, 2018). The percentage difference refers to percentage difference between the two fatality rates—the rate for the jurisdictions where an LCM ban was in effect and the rate for the jurisdictions where an LCM ban was not in effect. All percentage differences were calculated using the Calculator Soup online percentage difference calculator. As the Calculator Soup website states, "Percentage difference equals the absolute value of the change in value, divided by the average of the 2 numbers, all multiplied by 100." The calculator and formula are available at the following website: https://www.calculatorsoup.com/calculators/algebra/percent-difference-calculator.php (last accessed January 4, 2018).

Exhibit 3
Page 00113



Appendix B – Figure 1

Gun Massacre Incidents by Decade, 1968-2017

Exhibit 3
Page 00114



Appendix B – Figure 2

Gun Massacre Deaths by Decade, 1968-2017

Exhibit 3
Page 00115

Appendix B – Figure 3

Gun Massacre Incidents Involving LCMs by Decade, 1968-2017



Exhibit 3
Page 00116

8

Appendix B – Figure 4

Gun Massacre Deaths from Incidents Involving LCMs by Decade, 1968-2017



Exhibit 3
Page 00117

9

**Appendix B – Figure 5**

**Gun Massacre Incidents and Deaths by Magazine Capacity, 1968-2017**



| | Incidents | Deaths |
|---|---|---|
| LCMs | 53 | 600 |
| No LCMs | 52 | 373 |
| Unknown LCMs | 9 | 62 |
| Total | 114 | 1035 |

Exhibit 3
Page 00118

## Appendix B – Figure 6

### LCM-Involving Gun Massacre Incidents and Deaths by Decade Before, During, and After the Federal Assault Weapons Ban



Note: The Federal Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.

Exhibit 3
Page 00119

11

# EXHIBIT 3

1   XAVIER BECERRA
    Attorney General of California
2   TAMAR PACHTER
    Supervising Deputy Attorney General
3   NELSON R. RICHARDS
    ANTHONY P. O'BRIEN
4   Deputy Attorneys General
    ALEXANDRA ROBERT GORDON
5   Deputy Attorney General
    State Bar No. 207650
6     455 Golden Gate Avenue, Suite 11000
      San Francisco, CA 94102-7004
7   Telephone: (415) 703-5509
    Fax: (415) 703-5480
8   E-mail:
    Alexandra.RobertGordon@doj.ca.gov
9   *Attorneys for Defendant*
    *Attorney General Xavier Becerra*

10

11            IN THE UNITED STATES DISTRICT COURT

12        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16   | **VIRGINIA DUNCAN, et al.,** | 17-cv-1017-BEN-JLB |

                        Plaintiffs,

17
                                      **EXPERT REPORT OF**
18        v.                          **DR. CHRISTOPHER S. KOPER**

19   **XAVIER BECERRA, in his official**   Judge:  Hon. Roger T. Benitez
     **capacity as Attorney General of the**  Action Filed:  May 17, 2017
20   **State of California, et al.,**

21                        Defendants.

22

23

24

25

26

27

28

          EXPERT REPORT OF DR. CHRISTOPHER S. KOPER  (17-cv-1017-BEN-JLB)

                                                    Exhibit 4
                                                    Page 00122

# EXPERT REPORT OF DR. CHRISTOPHER S. KOPER

## I. ASSIGNMENT

I was retained by counsel for Defendant California Attorney General Xavier Becerra for the purpose of preparing an expert report on the potential efficacy of California's new ban on possession of large capacity ammunition magazines.

## II. QUALIFICATIONS AND BACKGROUND

I am an Associate Professor for the Department of Criminology, Law and Society at George Mason University, in Fairfax, Virginia and the principal fellow of George Mason's Center for Evidence-Based Crime Policy. I have been studying firearms issues since 1994. My primary areas of focus are firearms policy and policing issues. My credentials, experience, and background are stated in my curriculum vitae, a true and correct copy of which is attached as Exhibit A.

In 1997, my colleague Jeffrey Roth and I conducted a study on the impact of Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 (hereinafter the "federal assault weapons ban" or the "federal ban"), for the United States Department of Justice and the United States Congress.[1] I updated the original 1997 study in 2004[2] and briefly revisited the issue again by re-examining my 2004 report in 2013.[3] To my knowledge, these are the most comprehensive studies to have examined the efficacy of the federal ban on assault weapons and ammunition feeding devices holding more than ten rounds of ammunition

---

[1] Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report* (1997), attached hereto as Exhibit B (hereinafter, "*Impact Evaluation*").

[2] Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004), attached hereto as Exhibit C (hereinafter, "*Updated Assessment of the Federal Assault Weapons Ban*").

[3] Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994- 2004: Key Findings and Implications*, ch. 12, 157-171, in Reducing Gun Violence in America: Informing Policy with Evidence (Daniel S. Webster & Jon S. Vernick eds. 2013), attached hereto as Exhibit D (hereinafter "*America's Experience with the Federal Assault Weapons Ban*").

1   (hereinafter referred to as "large-capacity magazines" or "LCMs").[4]  My 1997

2   study was based on limited data, especially with regard to the criminal use of large-

3   capacity magazines.  As a result, my conclusions on the impact of the federal ban

4   are most accurately and completely set forth in my 2004 and 2013 reports.

5       This report summarizes some of the key findings of those studies regarding the

6   federal ban and its impact on crime prevention and public safety.  I also discuss the

7   results of a new research study I directed that investigated current levels of criminal

8   activity with high capacity semiautomatic weapons as measured in several local and

9   national data sources.[5]  Based upon my findings, I then provide some opinions on

10  the potential impact and efficacy of prohibitions and restrictions on large-capacity

11  magazines, like those contained in California Penal Code section 32310

12  (hereinafter, "Section 32310").

13      As discussed below, it is my considered opinion that California's LCM ban

14  has the potential to prevent and limit shootings, particularly those involving high

15  numbers of shots and victims, and thus likely to advance California's interests in

16  protecting its populace from the dangers of such shootings.

17  **III. RETENTION AND COMPENSATION**

18      I am being compensated for my time on this case on an hourly basis at a rate

19  of $150 per hour.  My compensation is not contingent on the results of my analysis

20  or the substance of my testimony.

21

22  [4] As discussed below, there have been some additional academic and non-academic studies that have examined more limited aspects of the ban's effects.

23  [5] Christopher S. Koper et al., *Criminal Use of Assault Weapons and High Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*,

24  Journal of Urban Health (October 2, 2017) DOI 10.1007/s11524-017-0205-7,

25  *available at* http://em.rdcu.be/wf/click?upn=KP7O1RED-2BlD0F9LDqGVeSCt PCwMbqH-2BMWBUHgPpsN5I-3D_aLASUIDI3T0TZ55mA5wcKyxiF1pNAQ-

26  2FS0QcxHHbBP65v2wnicdu8DEAbXOHNYJipa4WGEmYqVQvkFcdtrFEsYjZA uWYuv7oZRi5azzY-2B5kRSTavg1BTwrdRnUNdQZVTcHVKQjHpPzJRCNju

27  QtSjVJuN-2F-2BNTasWPxQOVBf1pq1NLGA3TvS1NOwbCbQHSILbi3GA hoVkr0iwOIrRLgL8INPZXWLjKU6PJ-2F84jalWCxLaJiY74BdpLrwOkfJQ3Cvy-

28  2F04YQt1UhIlsfJNdtP7DBeGw-3D-3D (last visited Oct. 5, 2017).

2

## IV. BASES FOR OPINION AND MATERIAL COVERED

The opinions I provide in this expert report are based solely on the findings of the materials cited in the footnotes and text, as well as the materials attached as exhibits to this report.

## V. OPINION

### A. Summary of Findings

Based on my research, I found, among other things, that assault pistols are used disproportionately in crime in general, and that assault weapons more broadly were disproportionately used in murder and other serious crimes in some jurisdictions for which there was data. I also found that assault weapons and other firearms with large capacity magazines are used in a higher share of mass public shootings and killings of law enforcement officers.

The evidence also suggests that gun attacks with semiautomatics—especially assault weapons and other guns equipped with large capacity magazines—tend to result in more shots fired, more persons wounded, and more wounds per victim, than do gun attacks with other firearms. There is evidence that victims who receive more than one gunshot wound are substantially more likely to die than victims who receive only one wound. Thus, it appears that crimes committed with these weapons are likely to result in more injuries, and more lethal injuries, than crimes committed with other firearms.

In addition, there is some evidence to suggest that assault weapons are more attractive to criminals, due to the weapons' military-style features and particularly large magazines. Based on these and other findings in my studies discussed below, it is my considered opinion that California's recently enacted ban on large capacity magazines, which is in some ways stronger than the federal ban that I studied, is likely to advance California's interest in protecting public safety. Specifically, it has the potential to: (1) reduce the number of crimes committed with firearms with large capacity magazines; (2) reduce the number of shots fired in gun crimes; (3)

3

1    reduce the number of gunshot victims in such crimes; (4) reduce the number of

2    wounds per gunshot victim; (5) reduce the lethality of gunshot injuries when they

3    do occur; and (6) reduce the substantial societal costs that flow from shootings.

4    **B.    Criminal Uses and Dangers of Large-Capacity Magazines**

5    Large-capacity magazines allow semiautomatic weapons to fire more than 10

6    rounds without the need for a shooter to reload the weapon.[6]  Large-capacity

7    magazines come in a variety of sizes, including but not limited to 17-round

8    magazines, 25- or 30-round magazines, and drums with the capacity to accept up to

9    100 rounds.

10   The ability to accept a detachable magazine, including a large-capacity

11   magazine, is a common feature of guns typically defined as assault weapons.[7]  In

12   addition, LCMs are frequently used with guns that fall outside of the definition of

13   an assault weapon.

14   LCMs are particularly dangerous because they facilitate the rapid firing of

15   high numbers of rounds.  This increased firing capacity thereby potentially

16   increases injuries and deaths from gun violence.  *See* Updated Assessment of the

17   Federal Assault Weapons Ban at 97 (noting that "studies ... suggest that attacks

18   with semiautomatics—including [assault weapons] and other semiautomatics with

19   LCMs—result in more shots fired, persons wounded, and wounds per victim than

20   do other gun attacks").

21

22   [6] A semiautomatic weapon is a gun that fires one bullet for each pull of the trigger
     and, after each round of ammunition is fired, automatically loads the next round and
23   cocks itself for the next shot, thereby permitting a faster rate of fire relative to non-
     automatic firearms.  Semiautomatics are not to be confused with fully automatic
24   weapons (*i.e.*, machine guns), which fire continuously so long as the trigger is
     depressed.  Fully automatic weapons have been illegal to own in the United States
25   without a federal permit since 1934.  *See Updated Assessment of the Federal
     Assault Weapons Ban*, at 4 n.1.

26   [7] Although the precise definition used by various federal, state, and local statutes
     has varied, the term "assault weapons" generally includes semiautomatic pistols,
27   rifles, and shotguns with military features conducive to military and potential
     criminal applications but unnecessary in shooting sports or for self-defense.

28

1    As such, semiautomatics equipped with LCMs have frequently been employed

2 in highly publicized mass shootings, and are disproportionately used in the murders

3 of law enforcement officers, crimes for which weapons with greater firepower

4 would seem particularly useful. *See Updated Assessment of the Federal Assault*

5 *Weapons Ban* at 14-19, 87.

6    During the 1980s and early 1990s, semiautomatic firearms equipped with

7 LCMs were involved in a number of highly publicized mass murder incidents that

8 first raised public concerns and fears about the accessibility of high powered,

9 military-style weaponry and other guns capable of discharging high numbers of

10 rounds in a short period of time. For example:

11
12
13
14
- On July 18, 1984, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California McDonald's restaurant, using an Uzi carbine, a shotgun, and another semiautomatic handgun, and equipped with a 25-round LCM;

15
16
- On January 17, 1989, Patrick Purdy used a civilian version of the AK-47 military rifle and a 75-round LCM to open fire in a Stockton, California schoolyard, killing five children and wounding 29 other persons;

17
18
19
- On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, a number of other firearms, and multiple 30-round magazines, killed seven and wounded 15 people at his former workplace in Louisville, Kentucky;

20
21
22
- On October 16, 1991, George Hennard, armed with two semiautomatic handguns with LCMs (and reportedly a supply of extra LCMs), killed 22 people and wounded another 23 in Killeen, Texas;

23
24
- On July 1, 1993, Gian Luigi Ferri, armed with two Intratec TEC-DC9 assault pistols and 40- to 50-round magazines, killed nine and wounded six at the law offices of Pettit & Martin in San Francisco, California; and

25
26
27
- On December 7, 1993, Colin Ferguson, armed with a handgun and multiple LCMs, opened fire on commuters on a Long Island Rail Road train, killing 6 and wounding 19.

28

5

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00127

1    *See Updated Assessment of the Federal Assault Weapons Ban* at 14.[8]

2      More recently, in the years since the expiration of the federal ban in 2004,

3 there has been another well-publicized series of mass shooting incidents involving

4 previously banned assault weapons and/or LCMs. Some of the more notorious of

5 these incidents include:

6     • On April 16, 2007, Seung-Hui Cho, armed with a handgun and multiple
7       LCMs, killed 33 (including himself) and wounded 23 on the campus of
8       Virginia Tech in Blacksburg, Virginia;

9     • On January 8, 2011, Jared Loughner, armed with a handgun and multiple
10      LCMs, killed 6 and wounded 13, including Congresswoman Gabrielle
        Giffords, in Tucson, Arizona;

11    • On July 20, 2012, James Holmes, armed with a Smith & Wesson M&P 15
12      assault rifle, 100-round LCMs, and other firearms, killed 12 and wounded 58
13      in a movie theater in Aurora, Colorado;

14    • On December 14, 2012, Adam Lanza, armed with a Bushmaster AR-15-style
15      assault rifle, two handguns, and multiple LCMs, killed 26 (20 of whom were
16      young children) and wounded 2 at Sandy Hook Elementary School in
        Newtown, Connecticut;

17    • On December 2, 2015, Syed Rizwan Farook and Tashfeen Malik, armed with
18      2 AR-15 style rifles, semiautomatic handguns, and LCMs, killed 14 and
19      injured 21 at a workplace party in San Bernardino, California; and

20

21

---

22 [8] Additional details regarding these incidents were obtained from: Violence Policy
Center, *Mass Shootings in the United States Involving High-Capacity Ammunition
23 Magazines*, *available at* http://www.vpc.org/fact_sht/VPCshootinglist.pdf
(hereinafter, "Violence Policy Center Report"); Mark Follman, Gavin Aronsen &
24 Deanna Pan, *US Mass Shootings, 1982-2012: Data from Mother Jones'
Investigation*, updated Feb. 27, 2013, *available at* http://www.motherjones.com/
25 politics/2012/12/mass-shootings-mother-jones-full-data (hereinafter, "Follman,
Aronsen & Pan 2013"); and Mark Follman, Gavin Aronsen & Jaeah Lee, *More
26 Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines*,
Feb. 27, 2013, *available at* http://www.motherjones.com/politics/2013/02/assault-
27 weapons-highcapacity-magazines-mass-shootings-feinstein (hereinafter, "Pollman,
Aronsen & Lee 2013").

28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00128

1  • On June 12, 2016, Omar Mateen, armed with a Sig Sauer MCX rifle, a Glock
2     17 semiautomatic handgun, and LCMs, killed 49 and injured 53 in a nightclub
3     in Orlando, Florida.[9]

4     There is evidence to suggest that the particularly large ammunition capacities
5  of assault weapons, along with their military-style features, are more attractive to
6  criminals than lawful users. *See Updated Assessment of the Federal Assault*
7  *Weapons Ban* at 17-18. The available evidence also suggests that large-capacity
8  magazines, along with assault weapons, pose particular dangers by their large and
9  disproportionate involvement in two aspects of crime and violence: mass shootings
10 and murders of police. *See Updated Assessment of the Federal Assault Weapons*
11 *Ban* at 14- 19, 87.

12    With respect to mass shootings, the available evidence before the federal
13 assault weapons ban was enacted in 1994 and after its expiration in 2004 both
14 support this conclusion. Prior to the federal ban, assault weapons or other
15 semiautomatics with LCMs were involved in 6, or 40%, of 15 mass shooting
16 incidents occurring between 1984 and 1993 in which 6 or more persons were killed
17 or a total of 12 or more were wounded. See *Updated Assessment of the Federal*
18 *Assault Weapons Ban* at 14.[10]

19    More recently, a *Mother Jones* media investigation and compilation of 62
20 public mass shooting incidents that involved the death of four or more people, over
21 the period 1982-2012, showed that, of the cases where magazine capacity could be
22 determined, 31 of 36 cases, or 86%, involved a large-capacity magazine. Including

23

24 [9] For details on these incidents, see Marc Follman et al., *US Mass Shootings, 1982-*
25 *2017: Data from Mother Jones' Investigation*, Mother Jones (June 14, 2017)
   *available at* http://www.motherjones.com/politics/2012/12/mass-shootings-mother-
26 jones-full-data/.
   [10] These figures are based on tabulations conducted by my research team and me
27 using data reported in Gary Kleck, *Targeting Guns: Firearms and Their Control*
   (1997) at 124-26.
28

7

1   all cases, including those where magazine capacity could not be determined, exactly

2   half of the cases (31 of 62) are known to have involved an LCM.[11]

3       LCMs, because they can be and are used both with assault weapons and guns

4   that fall outside the definition of an assault weapon, appear to present even greater

5   dangers to crime and violence than assault weapons alone.

6       Prior to the federal assault weapons ban, for example, guns with LCMs were

7   used in roughly 13-26% of most gun crimes (as opposed to somewhere between

8   about 1% and 8% for assault weapons alone). *See Updated Assessment of the*

9   *Federal Assault Weapons Ban* at 15, 18-19; *see also America's Experience with the*

10  *Federal Assault Weapons Ban* at 161-62.  More recent data discussed below

11  suggest that guns with LCMs now represent an even higher share of guns used in

12  crime.

13      It also appears that guns with LCMs have been used disproportionately in

14  murders of police. Specifically, data from prior to the federal ban indicated that

15  LCMs were used in 31% to 41% of gun murders of police in contrast to their use in

16  13-26% of gun crimes overall.  *See Updated Assessment of the Federal Assault*

17  *Weapons Ban* at 18; *see also America's Experience with the Federal Assault*

18  *Weapons Ban* at 162.  More recent data discussed below also show a similar pattern

19  of guns with LCMs being more common among weapons used in gun murders of

20  police.

21      In addition, the available evidence suggests that gun attacks with

22  semiautomatics—including both assault weapons and guns equipped with LCMs—

23  tend to result in more shots fired, more persons wounded, and more wounds

24  inflicted per victim than do attacks with other firearms. *See Updated Assessment of*

25  ───────────────────────────────

    [11] This investigation and compilation of data on mass shootings was done by

26  reporters at *Mother Jones* magazine. *See* Follman, Aronsen & Pan 2013; *see also*

    Follman Aronsen & Lee 2013; Mark Follman, Gavin Aronsen & Deanna Pan, *A*

27  *Guide to Mass Shootings in America* (updated Feb. 27, 2013), *available at*

    http://www.motherjones.com/politics/2012/07/mass-shootings-map.

28

1   *the Federal Assault Weapons Ban* at 97; *see also America's Experience with the*
2   *Federal Assault Weapons Ban* at 166-67.

3       For example, in mass shooting incidents that resulted in at least 6 deaths or at
4   least 12 total gunshot victims from 1984 through 1993, offenders who clearly
5   possessed assault weapons or other semiautomatics with LCMs wounded or killed
6   an average of 29 victims in comparison to an average of 13 victims wounded or
7   killed by other offenders. *See Updated Assessment of the Federal Assault Weapons*
8   *Ban* at 85-86; *see also America's Experience with the Federal Assault Weapons*
9   *Ban* at 167.

10      Working under my direction, Luke Dillon, a graduate student at George
11  Mason University, recently analyzed the *Mother Jones* data from 1982 through
12  2012 for his Master's thesis, and compared the number of deaths and fatalities of
13  the 62 mass shootings identified therein to determine how the presence of assault
14  weapons and LCMs impacted the outcome.[12]  With respect to LCMs, Mr. Dillon
15  compared cases where an LCM was known to have been used (or at least possessed
16  by the shooter) against cases where either an LCM was not used or not known to
17  have been used.  He found that the LCM cases (which included assault weapons)
18  had significantly higher numbers of fatalities and casualties:  an average of 10.19
19  fatalities in LCM cases compared to 6.35 fatalities in non-LCM/unknown cases.
20  Mr. Dillon also found an average of 12.39 people were shot but not killed in public
21  mass shootings involving LCMs, compared to just 3.55 people shot in the non-
22  LCM/unknown LCM shootings.  These findings reflect a total victim differential of
23  22.58 killed or wounded in the LCM cases compared to 9.9 in the non-

24
25
26  ───────────────
    [12] *See* Luke Dillon, Mass Shootings in the United States: An Exploratory Study of
27  the Trends from 1982 to 2012 (2013) (unpublished M.A. thesis, George Mason
    University, Department of Criminology, Law and Society).
28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00131

1   LCM/unknown LCM cases.[13]  All of these differences were statistically significant

2   and not a result of mere chance.

3        Similarly, a study of handguns attacks in Jersey City, New Jersey during the

4   1990s found that the average number of victims wounded in gunfire incidents

5   involving semiautomatic pistols was 15% higher than in those involving revolvers.

6   The study further found that attackers using semiautomatics to fire more than ten

7   shots were responsible for nearly 5% of all gunshot victims and that 100% of these

8   incidents involved injury to at least one victim.  *See Updated Assessment of the*

9   *Federal Assault Weapons Ban* at 84-86, 90-91; *see also America's Experience with*

10  *the Federal Assault Weapons Ban* at 167.[14]

11       Similar evidence comes from other local studies.  Between 1992 and 1995,

12  gun homicide victims in Milwaukee who were killed by guns with LCMs had 55%

13  more gunshot wounds than those victims killed by non-LCM firearms.  Further, a

14  study of gun homicides in Iowa City (IA), Youngstown (OH), and Bethlehem (PA)

15  from 1994 through 1998 found gun homicide victims killed by pistols averaged 4.5

16  gunshot wounds as compared to 2 gunshot wounds for those killed by revolvers.

17  *See Updated Assessment of the Federal Assault Weapons Ban* at 86.

18       And, in an analysis I conducted of guns recovered by police in Baltimore, I

19  also found LCMs to be associated with gun crimes that resulted in more lethal and

20  injurious outcomes.  For instance, I found, among other things, that guns used in

21  shootings that resulted in gunshot victimizations were 17% to 26% more likely to

22

23  [13] The patterns were also very similar when comparing the LCM cases against just
    those cases in which it was clear that an LCM was not used (though this was a very
24  small number).

25  [14] Note that these data were collected in the 1990s during the years of the federal
    LCM ban and in a city that was also subject to state-level LCM restrictions on
26  magazines holding more than 15 rounds.  Hence, these findings may not generalize
    well to other locations and the current timeframe.  More specifically, given recent
27  increases in the use of firearms with LCMs as discussed below, the Jersey City
    results may understate the current share of gunshot victimizations resulting from
28  incidents with more than 10 shots fired.

1  have LCMs than guns used in gunfire cases with no wounded victims, and guns
2  linked to murders were 8% to 17% more likely to have LCMs than guns linked to
3  non-fatal gunshot victimizations.  *See Updated Assessment of the Federal Assault*
4  *Weapons Ban* at 87.

5      In short, while tentative, the available evidence suggests more often than not
6  that attacks with semiautomatics, particularly those equipped with LCMs, result in
7  more shots fired, leading both to more injuries and injuries of greater severity.
8  Such attacks also appear to result in more wounds per victim.  This is significant
9  because gunshot victims who are shot more than once are more than 60% more
10 likely to die than victims who receive only one gunshot wound.  *See Updated*
11 *Assessment of the Federal Assault Weapons Ban* at 87 (citing studies showing 63%
12 increase and 61% increase, respectively, in fatality rates among gunshot victims
13 suffering more than one wound).

14     In addition, diminishing the number of victims of shootings by even a small
15 percentage can result in significant cost savings because of the significant social
16 costs of shootings, as discussed herein.

17 **C.   Effects of the 1994 Federal Assault Weapons Ban**

18     **1.   Provisions of the Federal Assault Weapons Ban**

19     Enacted on September 13, 1994—in the wake of many of the mass shootings
20 described above—the federal assault weapons ban imposed prohibitions and
21 restrictions on the manufacture, transfer, and possession of both certain
22 semiautomatic firearms designated as assault weapons and certain LCMs.  Pub. L.
23 No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former
24 18 U.S.C. § 922(v), (w)(1) (1994).

25     The federal assault weapons ban was to expire after ten years, unless renewed
26 by Congress.  Pub. L. No. 103-322, tit. XI, § 110105(2).  Congress did not renew

27

28

<div style="text-align:center">11</div>

1    the ban, and thus, by its own terms, the federal ban expired on September 13,

2    2004.[15]

3          **a.**    **Banned Assault Weapons and Features**

4       As noted, the federal assault weapons ban imposed a ten-year ban on the

5    manufacture, transfer, or possession of what the statute defined as "semiautomatic

6    assault weapons." The federal ban was not a prohibition on all semiautomatic

7    firearms; rather, it was directed against those semiautomatics having features that

8    are useful in military and criminal applications but that are unnecessary in shooting

9    sports or for self-defense.

10      Banned firearms were identified under the federal law in two ways: (i) by

11    specific make and model; and (ii) by enumerating certain military-style features and

12    generally prohibiting those semiautomatic firearms having two or more of those

13    features.

14       First, the federal ban specifically prohibited 18 models and variations of

15    semiautomatic guns by name (*e.g.*, the Intratec TEC-9 pistol and the Colt AR-15

16    rifle), as well as revolving cylinder shotguns. This list also included a number of

17    foreign rifles that the federal government had banned from importation into the

18    country beginning in 1989 (*e.g.*, the Avtomat Kalashnikov models). And, indeed,

19    several of the guns banned by name were civilian copies of military weapons and

20    accepted ammunition magazines made for those military weapons. A list of the

21    weapons banned by name in the 1994 law is set forth in Table 2-1 of the *Updated*

22    *Assessment of the Federal Assault Weapons Ban* at 5.

23      Second, the federal assault weapons ban contained a "features test" provision

24    that generally prohibited other semiautomatic guns having two or more military-

---

25    [15] I understand that California prohibited assault weapons in 1989, before the

26    federal ban, but grandfathered most existing assault weapons; and that California

       prohibited large-capacity magazines in 2000 but grandfathered existing LCMs. I

27    am not aware of any specific studies of the effects of these California laws on gun

       markets or gun violence.

28

1  style features.  Examples of such features include pistol grips on rifles, flash

2  suppressors, folding rifle stocks, threaded barrels for attaching silencers, and the

3  ability to accept detachable magazines.  This "features test" of the federal ban is

4  described more fully in Table 2-2 of the *Updated Assessment of the Federal Assault*

5  *Weapons Ban* at 6, and in Table 12-1 of *America's Experience with the Federal*

6  *Assault Weapons Ban* at 160.

### b.  Banned Large-Capacity Magazines

8  The federal ban also prohibited most ammunition feeding devices holding

9  more than ten rounds of ammunition (which I have referred to herein as "large-

10  capacity magazines" or "LCMs").   The federal ban on LCMs extended to LCMs or

11  similar devices that had the capacity to accept more than ten rounds of ammunition,

12  or that could be "readily restored or converted or to accept" more than ten rounds of

13  ammunition.[16]

### c.  Exemptions and Limitations to the Federal Ban

15  The 1994 federal assault weapons ban contained several important exemptions

16  that limited its potential impact, especially in the short-term.  *See Updated*

17  *Assessment of the Federal Assault Weapons Ban* at 10-11.

18  First, assault weapons and LCMs manufactured before the effective date of the

19  ban were "grandfathered" in and thus legal to own and transfer.  Estimates suggest

20  that there may have been upward of 1.5 million assault weapons and 25-50 million

21  LCMs thus exempted from the federal ban.  Moreover, an additional 4.8 million

22  pre-ban LCMs were imported into the country from 1994 through 2000 under the

23  grandfathering exemption.  Importers were also authorized to import another 42

24  million pre-ban LCMs, which may have arrived after 2000.  *See Updated*

---

[16] Technically, the ban prohibited any magazine, belt, drum, feed strip, or similar device that had the capacity to accept more than 10 rounds of ammunition, or which could be readily converted or restored to accept more than 10 rounds of ammunition.  The ban exempted attached tubular devices capable of operating only with 22 caliber rimfire (*i.e.*, low velocity) ammunition.

1   *Assessment of the Federal Assault Weapons Ban* at 10; *see also America's*

2   *Experience with the Federal Assault Weapons Ban* at 160-61.

3       Furthermore, although the 1994 law banned "copies or duplicates" of the

4   named firearms banned by make and model, federal authorities emphasized exact

5   copies in enforcing this provision. Similarly, the federal ban did not apply to a

6   semiautomatic weapon possessing only one military-style feature listed in the ban's

7   features test provision.[17] Thus, many civilian rifles patterned after military

8   weapons were legal under the ban with only slight modifications. *See Updated*

9   *Assessment of the Federal Assault Weapons Ban* at 10-11.[18]

10       **D.   Impact of the Federal Assault Weapons Ban**

11       This section of my report discusses the empirical evidence of the impact of the

12   federal assault weapons ban. I understand that the Plaintiffs in this litigation

13   contend that California's prohibition on the possession of LCMs will not have an

14   effect on crime or gunshot victimization because criminal users of firearms will not

15   comply with California's ban. In my opinion, that contention misunderstands the

16   effect of possession bans. The issue is not only whether criminals will be unwilling

17   to comply with such laws, though this could be an important consideration

18   depending on the severity of penalties for possession or use. The issue is also how

19   possession bans affect the availability of weapons for offenders. Examining the

20   _____

21   [17] It should be noted, however, that any firearms imported into the country must
still meet the "sporting purposes test" established under the federal Gun Control

22   Act of 1968. In 1989, the federal Bureau of Alcohol, Tobacco, Firearms and
Explosives ("ATF") determined that foreign semiautomatic rifles having any one of

23   a number of named military features (including those listed in the features test of
the 1994 federal assault weapons ban) fail the sporting purposes test and cannot be

24   imported into the country. In 1998, the ability to accept an LCM made for a
military rifle was added to the list of disqualifying features. Consequently, it was

25   possible for foreign rifles to pass the features test of the federal assault weapons
ban, but not meet the sporting purposes test for imports. *See Updated Assessment*

26   *of the Federal Assault Weapons Ban* at 10 n.7.

    [18] Examples of some of these modified, legal versions of banned guns that

27   manufacturers produced in an effort to evade the ban are listed in Table 2-1 of the
*Updated Assessment of the Federal Assault Weapons Ban* at 5.

28

1  effects of the federal ban on LCMs could cast some light on how a state or local
2  prohibition on possession of LCMs may diminish their availability for offenders.  It
3  is difficult, however, to assess trends in LCM use because of limited information.
4  *See infra* at 20. For that reason, this section discusses the impacts of the federal ban
5  both on LCM use, for which information is limited, and on ownership and use of
6  assault weapons, for which there is more information.

### 1.   Assault Weapons

8       Prior to the federal ban, the best estimates are that there were approximately
9  1.5 million privately owned assault weapons in the United States (less than 1% of
10  the total civilian gun stock). *See America's Experience with the Federal Assault
11  Weapons Ban* at 160-61; *see also Updated Assessment of the Federal Assault
12  Weapons Ban* at 10.

13       Although there was a surge in production of assault weapon-type firearms as
14  Congress debated the ban in 1994, the federal ban's restriction of new assault
15  weapon supply helped drive up the prices for many assault weapons (notably
16  assault pistols) and appeared to make them less accessible and affordable to
17  criminal users. *See America's Experience with the Federal Assault Weapons Ban* at
18  162-63; *see also Updated Assessment of the Federal Assault Weapons Ban* at 25-
19  38.

20       Analyses that my research team and I conducted of several national and local
21  databases on guns recovered by law enforcement indicated that crimes with assault
22  weapons declined after the federal assault weapons ban was enacted in 1994.

23       In particular, across six major cities (Baltimore, Miami, Milwaukee, Boston,
24  St. Louis, and Anchorage), the share of gun crimes involving assault weapons
25  declined by 17% to 72%, based on data covering all or portions of the 1995-2003
26  post-ban period. *See Updated Assessment of the Federal Assault Weapons Ban* at
27  2, 46-60; *see also America's Experience with the Federal Assault Weapons Ban* at
28  163.

1   This analysis of local data is consistent with patterns found in the national data

2   on guns recovered by law enforcement agencies around the country and reported to

3   the ATF for investigative gun tracing.[19]  Specifically, although the interpretation is

4   complicated by changes in tracing practices that occurred during this time, the

5   national gun tracing data suggests that use of assault weapons in crime declined

6   with the onset of the 1994 federal assault weapons ban, as the percentage of gun

7   traces for assault weapons fell 70% between 1992-93 and 2001-02 (from 5.4% to

8   1.6%).  And, notably, this downward trend did not begin until 1994, the year the

9   federal ban was enacted.  *See Updated Assessment of the Federal Assault Weapons*

10  *Ban* at 2, 39-46, 51-52; *see also America's Experience with the Federal Assault*

11  *Weapons Ban* at 163.[20]

12   In short, the analysis that my research team and I conducted indicates that the

13  criminal use of assault weapons declined after the federal assault weapons ban was

14  enacted in 1994, independently of trends in gun crime.  *See Updated Assessment of*

15  *the Federal Assault Weapons Ban* at 51-52; *see also America's Experience with the*

16  *Federal Assault Weapons Ban* at 163.

17   This decline in crimes with assault weapons was due primarily to a reduction

18  in the use of assault pistols.  Assessment of trends in the use of assault rifles was

19  complicated by the rarity of crimes with such rifles and by the substitution in some

20  cases of post-ban rifles that were very similar to the banned models.  In general,

21  however, the decline in assault weapon use was only partially offset by substitution

22

23  [19] A gun trace is an investigation that typically tracks a gun from its manufacture to
    its first point of sale by a licensed dealer.  It is undertaken by the ATF, upon request

24  by a law enforcement agency.  The trace is generally initiated when the requesting
    law enforcement agency provides ATF with a trace request including identifying

25  information about the firearm, such as make, model and serial number.  For a full
    discussion of the use of ATF gun tracing data, see section 6.2 of *Updated*

26  *Assessment of the Federal Assault Weapons Ban* at 40-46.

    [20] These findings are consistent with other tracing analyses conducted by ATF and

27  the Brady Center to Prevent Gun Violence.  *See Updated Assessment of the Federal*
    *Assault Weapons Ban* at 44 n.43.

28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00138

1    of post-ban assault weapon-type models.  Even counting the post-ban models as

2    assault weapons, the share of crime guns that were assault weapons fell 24% to

3    60% across most of the local jurisdictions studied.  Patterns in the local data

4    sources also suggested that crimes with assault weapons were becoming

5    increasingly rare as the years passed.  *See Updated Assessment of the Federal*

6    *Assault Weapons Ban* at 46-52; *see also America's Experience with the Federal*

7    *Assault Weapons Ban* at 163-64.

8        Thus, while developing a national estimate of the number of assault weapons

9    crimes prevented by the federal ban is complicated by the range of estimates of

10   assault weapon use and changes therein derived from different data sources,

11   tentatively, it appears that the federal ban prevented a few thousand crimes with

12   assault weapons annually.  For example, using 2% as the best estimate of the share

13   of gun crimes involving assault weapons prior to the ban, and 40% as a reasonable

14   estimate of the post-ban drop in this figure, implies that almost 2,900 murders,

15   robberies, and assaults with assault weapons were prevented in 2002.  *See Updated*

16   *Assessment of the Federal Assault Weapons Ban* at 52 n.61.[21]  If this tentative

17   conclusion is correct, then contrary to Plaintiffs' contention, prohibitions like the

18   federal ban do have an impact on criminal users of guns.

19       **2.   Large-Capacity Magazines**

20       Assessing trends in LCM use is much more difficult because there was, and is,

21   no national data source on crimes with LCMs, and few local jurisdictions maintain

22   this sort of information.

23       It was possible, nonetheless, to examine trends in the use of guns with LCMs

24   in four jurisdictions:  Baltimore, Milwaukee, Anchorage, and Louisville.  In all four

25

26   _____

     [21] While it seems likely that some or all of these crimes happened regardless, as
27   perpetrators merely substituted some other gun for the assault weapon, it also seems
     likely that the number of victims per shooting incident, and the number of wounds
28   inflicted per victim, was diminished in some of those instances.

1   jurisdictions, the overall share of crime guns equipped with LCMs rose or remained

2   steady through at least the late 1990s.  This failure to reduce overall LCM use for at

3   least several years after the federal ban was likely due to the immense stock of

4   exempted pre-ban magazines, which, as noted, was enhanced by post-ban imports.

5   *See Updated Assessment of the Federal Assault Weapons Ban* at 68-79; *see also*

6   *America's Experience with the Federal Assault Weapons Ban* at 164.

7       My studies did show that crimes with LCMs may have been decreasing by the

8   early 2000s, but the available data in the four cities I investigated were too limited

9   and inconsistent to draw any clear overall conclusions in this regard.  *See America's*

10   *Experience with the Federal Assault Weapons Ban* at 164; *Updated Assessment of*

11   *the Federal Assault Weapons Ban* at 68-79.

12       However, a later investigation by *The Washington Post* of LCM use in

13   Virginia, analyzing data maintained by the Virginia State Police as to guns

14   recovered in crimes by local law enforcement officers across the state, suggests that

15   the ban may have had a more substantial impact on the supply of LCMs to criminal

16   users by the time it expired in 2004.  In Virginia, the share of recovered guns with

17   LCMs generally varied between 13% and 16% from 1994 through 2000 but fell to

18   9% by 2004.  Following expiration of the federal ban in 2004, the share of Virginia

19   crime guns with an LCM rose to 20% by 2010.  *See America's Experience with the*

20   *Federal Assault Weapons Ban* at 165.[22]  These data suggest that the federal ban

21   [22] The results of *The Washington Post's* original investigation (which are what are
conveyed in *America's Experience with the Federal Assault Weapons Ban* at 165)

22   are reported in David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in*

23   *Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/

24   AR2011012203452.html, and attached as Exhibit E to this report.  In early 2013,
*The Washington Post* updated this analysis, and slightly revised the figures it

25   reported by identifying and excluding from its counts more than 1,000 .22-caliber
rifles with large-capacity tubular magazines, which were not subject to the federal

26   ban (and which are similarly not subject to California's ban on large-capacity
magazines).  *See* David S. Fallis, *Data Indicate Drop in High-Capacity Magazines*

27   *During Federal Gun Ban*, Wash. Post, Jan. 10, 2013, *available at*
https://www.washingtonpost.com/investigations/data-point-to-drop-in-high-

28   capacity-magazines-during-federal-gun-ban/2013/01/10/d56d3bb6-4b91-11e2-
(continued...)

18

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00140

1     may have been reducing the use of LCMs in gun crime by the time it expired in

2     2004, and that it could have had a stronger impact had it remained in effect.

3          **3.      Summary of Results of the Federal Assault Weapons Ban**

4         The federal ban's exemption of millions of pre-ban assault weapons and

5     LCMs meant that the effects of the law would occur only gradually—and that those

6     effects were still unfolding when the ban expired in 2004. Nevertheless, while the

7     ban did not appear to have a measurable effect on overall gun crime during the

8     limited time it was in effect, as just discussed, my studies and others do appear to

9     show a significant impact on the number of gun crimes involving assault weapons

10    and a possibly significant impact (based on *The Washington Post's* analysis of

11    Virginia data, see Fallis, *supra*, at Exhibits E & F) on those crimes involving

12    LCMs.[23]

13        Moreover, as set forth in my 2013 book chapter, there is evidence that, had the

14    federal ban remained in effect longer (or were it renewed), it could conceivably

15    have yielded significant additional societal benefits as well, potentially preventing

16    hundreds of gunshot victimizations annually and producing millions of dollars of

17    (...continued)
a6a6-aabac85e8036_story.html?utm_term=.44aa13f8e442, and attached as Exhibit
18    F to this report. This updated data is reported above.

19    [23] In our initial 1997 study on the impact of the federal assault weapons ban, Jeffrey
Roth and I also estimated that gun murders were about 7% lower than expected in
20    1995 (the first year after the ban), adjusting for pre-existing trends. *See Impact
Evaluation* at 6, 79-85. However, the very limited post-ban data available for that
21    study precluded a definitive judgment as to whether this drop was statistically
meaningful. My later findings on LCM use made it difficult to credit the ban with
22    this effect, however, and I did not update it for the 2004 report. *See Updated
Assessment of the Federal Assault Weapons Ban* at 92 n.109. Other national
23    studies of trends in gun violence have failed to find an effect of the federal ban on
gun murders (which is consistent with my conclusions in the 2004 report but must
24    also be interpreted in light of the ban's limitations and delayed effects as discussed
above), though they also suggest that the ban may have reduced fatalities and
25    injuries from public mass shootings. Mark Gius, *An Examination of the Effects of
Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder
26    Rates*, 21 Applied Econ. Letters 265, 265-267 (Nov. 26, 2013) (hereinafter, "Gius
2013"); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on
27    Public Mass Shootings*, 22 Applied Econ. Letters 281, 281-84 (Aug. 1, 2014)
(hereinafter, "Gius 2014").

28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00141

1   cost savings per year in medical care alone.  Indeed, reducing shootings by even a

2   very small margin could produce substantial long term savings for society,

3   especially as the shootings prevented accrue over many years.  *See America's*

4   *Experience with the Federal Assault Weapons Ban* at 166-67; *see also Updated*

5   *Assessment of the Federal Assault Weapons Ban* at 100 n.118.  Some studies have

6   shown that the lifetime medical costs for gunshot injuries are about $28,894

7   (adjusted for inflation).  Thus, even a 1% reduction in gunshot victimizations at the

8   national level would result in roughly $18,781,100 in lifetime medical costs savings

9   from the shootings prevented each year.  *See America's Experience with the*

10  *Federal Assault Weapons Ban* at 166-67; *see also Updated Assessment of the*

11  *Federal Assault Weapons Ban* at 100 n.18.

12      The cost savings potentially could be substantially higher if one looks beyond

13  just medical costs.  For example, some estimates suggest that the full societal costs

14  of gun violence—including medical, criminal justice, and other government and

15  private costs (both tangible and intangible)— could be as high as $1 million per

16  shooting.  Based on those estimates, even a 1% decrease in shootings nationally

17  could result in roughly $650 million in cost savings to society from shootings

18  prevented each year.  *See America's Experience with the Federal Assault Weapons*

19  *Ban* at 166-67.

20  **E.    More Recent Research on Criminal Use of Large Capacity**
**        Magazines**
21

22      To provide an updated examination of the assault weapons and LCM issue,

23  my colleagues and I recently investigated current levels of criminal activity with

24  assault weapons and other high capacity semiautomatic firearms in the United

25  States using several local and national data sources.[24]  I focus here on the results

26  pertaining to the use of guns with LCMs overall.  Sources for this portion of the

27  _____
    [24] See Koper et al., *supra* note 5.

28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00142

1  analysis included guns recovered by police in eight large cities (Hartford, CT;

2  Syracuse, NY; Baltimore, MD; Richmond, VA; Minneapolis, MN; Milwaukee, WI;

3  Kansas City, MO; and Seattle, WA), guns used in murders of police throughout the

4  nation, and guns used in firearm mass murder incidents in which at least four

5  people were murdered with a firearm (irrespective of the number of additional

6  victims shot but not killed).  The use of guns with LCMs was measured precisely

7  for the Syracuse, Baltimore, and Richmond analyses, which were based on data

8  sources having an indicator for magazine capacity, and some of the mass murder

9  incidents. For other analyses, use of guns with LCMs was approximated based on

10  recoveries of semiautomatic firearm models that are commonly manufactured and

11  sold with LCMs.  I refer to these guns collectively as LCM firearms.

12      In short, the findings of this study reinforce many of the points made above

13  based on my earlier research.  In the police databases, which covered varying time

14  periods from 2008 through 2014, LCM firearms generally accounted for 22-36% of

15  crime guns, with some estimates upwards of 40% for cases involving shootings.[25]

16  Although these estimates may overstate LCM use somewhat (since some estimates

17  were based on measurement of LCM compatible firearms that may not all have

18  been equipped with LCMs), they suggest that LCMs are used in a substantial share

19  of gun crimes.  Consistent with prior research, we also found that LCM firearms are

20  more heavily represented among guns used in murders of police and mass murders.

21  For the period of 2009 through 2013, LCM firearms constituted 41% of guns used

22  in murders of police, with annual estimates ranging from 35% to 48%. Further, our

23  analysis of a sample of 145 mass murders that occurred from 2009 through 2015

24  suggested that LCM firearms were involved in as many as 57% of these incidents

25  ─────────────
26  [25] An exception is that crime guns were least likely to be equipped with LCMs in
   Syracuse (14.6%). This may be attributable to New York State LCM restrictions
   that have been in effect since the early 2000s, but our study did not address this
27  question.

28

1  based on cases for which a definitive determination could be made (as a caveat,

2  precise data on the guns and magazines used were not available for most cases).

3  The identified LCM cases typically occurred in public locations (80%) and resulted

4  in more than twice as many people shot on average as did other incidents—a

5  statistically significant difference that is not likely due to chance (13.7 victims on

6  average for LCM cases versus 5.2 for other cases).

7        Our study also revealed that LCM firearms have grown substantially as a share

8  of guns used in crime since the expiration of the federal LCM ban.  This conclusion

9  is based on guns used in murders of police nationally (2003-2013) as well as guns

10  recovered by police in Baltimore (2004-2014), Richmond (2003-2009), and

11  Minneapolis (2006-2014).[26]  For these data sources and time frames, the percentage

12  of guns that were LCM firearms increased (in relative terms) by 33-49% in the

13  Baltimore, Minneapolis, and national data, and by 112% in the Richmond data.[27]

14        This upward trend in criminal use of LCM firearms implies possible increases

15  in the level of gunfire and injury per gun attack since the expiration of the federal

16  LCM ban.  Consistent with this inference, national data that we compiled from the

17  federal Centers for Disease Control and Prevention and the Federal Bureau of

18  Investigation show that gun homicides and assault-related non-fatal shootings rose

19  by about 29% relative to the level of overall reported violent gun crimes

20  (homicides, assaults, and robberies) between 2003-2005 and 2010-2012.[28]

21

22  [26] Note that Maryland restricted LCMs with more than 20 rounds throughout this
    period and extended these restrictions to LCMs with more than 10 rounds in 2013.

23  [27] For example, the share of guns used in police murders that were LCM firearms
24  rose from 30.4% for the 2003-2007 period to 40.6% for the 2009-2013 period (a
    relative increase of 33.6%).  In the Richmond data, LCM firearms increased from
25  10.4% of guns recovered by police for the 2003-2004 period to 22% for the 2008-
    2009 period (a relative increase of 111.5%).

26  [28] See Koper et al., *supra* note 5.  This trend was driven by assault-weapon-related
    non-fatal shootings, which have been trending upward since the early 2000s and
27  recently reached their highest rates since 1995.  *See* Katherine A. Fowler et al.,
    *Firearm Injuries in the United States*, 79 Preventive Med. 5, 5-14 (Oct. 2015).

28

1   Although the correlation of these trends does not prove causation, they suggest the

2   possibility that greater use of LCM firearms has contributed to higher levels of

3   shootings in recent years.

4   **VI.   SECTION 32310 -- CALIFORNIA'S LARGE-CAPACITY MAGAZINE
        PROHIBITION**

5

6       **A.   The LCM Ban**

7       On July 1, 2016, the State of California enacted Senate Bill No. 1446 (2015-

8   2016 Reg. Sess.), which prohibited the possession of LCMs (defined under Section

9   16740 as "a feeding device with the capacity to accept more than 10 rounds")

10  beginning on July 1, 2017.  Cal. Stats. 2016, ch. 58 (SB 1446) § 1.  SB 1446, which

11  went into effect on January 1, 2017, amended Section 32310 to state that, beginning

12  on July 1, 2017, any person possessing an LCM, with exemptions not relevant here,

13  would be guilty of an infraction punishable by a fine starting at $100 for the first

14  offense.  Cal. Stats. 2016, ch. 58 (S.B. 1446) § 1 (amending Section 32310 to add a

15  new subdivision (c).).  The law also provided that anyone possessing an LCM may,

16  prior to July 1, 2017, dispose of the magazine by any of the following means: (1)

17  removing it from the state; (1) selling it to a licensed firearms dealer; (3) destroying

18  it; or (4) surrendering it to a law enforcement agency for destruction.  Cal. Stats.

19  2016, ch. 58 (S.B. 1446) § 1 (amending Section 32310 to add a new subdivision

20  (d)).  The Senate Bill Analysis noted that the amendments were necessary because

21  the prior version of the law, which did not prohibition possession of LCMs, was

22  "very difficult to enforce."  Sen. Bill No. 1446, 3d reading Mar. 28, 2016 (2015-

23  2016 Reg. Sess.) (Cal. 2016)).

24      On November 8, 2016, California voters passed Proposition 63, the "Safety for

25  All Act of 2016."  Prop. 63, § 1, as approved by voters (Gen. Elec. Nov. 8, 2016)).

26  The measure included several provisions—including amendments to Section

27  32310—intended to close "loopholes that leave communities throughout the state

28  vulnerable to gun violence and mass shootings."  Prop. 63, § 2, ¶ 5.  The

1  amendments to Section 32310 largely mirror the same amendments made under

2  SB 1446.  Both provisions prohibit the possession of LCMs on or after July 1,

3  2017, and list options for the disposal of LCMs before that date.  Prop. 63 also

4  increased the potential consequence for violations of the possession ban, from an

5  infraction to an infraction or a misdemeanor.  Prop. 63, § 6.1.  References to

6  Section 32310 in this brief are to the statute as amended by Proposition 63.

7  **B.    The Potential Impact and Efficacy of California's Ban on**
   **Possession of LCMs**

8

9       California's ban on possession was only recently passed, and I have not

10 undertaken any study or analysis of this law.  Nevertheless, it is my considered

11 opinion that, based on the similarities of Section 32310 to the federal ban, the

12 impacts of the federal ban and the ways in which Section 32310 address some of

13 the weaknesses of the federal ban, Section 32310 is likely to advance California's

14 interest in protecting public safety.[29]

15

16 ─────────────────────
   [29] A few studies of state-level assault weapon and LCM bans have examined the
   effects of these laws on gun violence and other crimes.  In those studies that have
17 examined gun homicides and other shootings (the crimes that are logically most
   likely to be affected by LCM bans), evidence has been mixed.  Although states with
18 assault weapon and LCM laws tend to have lower gun murder rates, this association
   is not statistically significant when controlling for other social and policy factors.
19 However, other evidence from these studies suggests these laws may produce
   statistically significant reductions in fatalities from public mass shootings.  *See*
20 Gius 2013 at 265-67; *see also* Gius 2014 at 281-84; Eric W. Fleegler et al., *Firearm*
   *legislation and firearm-related fatalities in the United States*, 173 JAMA Internal
21 Med. 732, 732-40 (2013); Christopher S. Koper & Jeffrey A. Roth, *The Impact of*
   *the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: an Assessment*
22 *of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 Journal
   of Quantitative Criminology 33-74 (2001); *see also Updated Assessment of the*
23 *Federal Assault Weapons Ban* at 81 n.95.  Nonetheless, it is difficult to draw
   definitive conclusions from these studies for several reasons including the
24 following.  For one, there is little evidence on how state LCM bans affect the
   availability and use of LCMs over time.  Further, studies have not generally
25 accounted for important differences in state assault weapons laws—most notably,
   whether they include LCM bans—and changes in these provisions over time.
26 Perhaps most importantly, to the best of my knowledge, there have not been any
   studies examining the effects of LCM laws that ban LCMs without grandfathering,
27 as done by the new California statute.  Hence, these studies have limited value in
   assessing the potential effectiveness of California's new law.

28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00146

1   California's LCM ban is more robust than the expired federal ban, and may be
2   more effective more quickly due to its elimination of grandfathering for previously
3   owned LCMs.  While the LCM ban was arguably the most important feature of the
4   1994 federal ban (given that LCMs are the key feature contributing to an assault
5   weapon's firepower, and that the reach of the LCM ban was much greater than the
6   assault weapons ban as many semiautomatic guns that were not banned could still
7   accept LCMs), my studies as to the effects of the federal ban indicated that the
8   LCM ban was likely not as efficacious in reducing the use of these magazines in
9   crime as it otherwise might have been because of the large number of pre-ban
10  LCMs which were exempted from the ban.  *The Washington Post*'s investigation of
11  recovered guns with LCMs in Virginia, which showed an increasing decline in the
12  number of recovered guns with LCMs the longer the ban was in effect, similarly
13  suggests that the grandfathering of pre-ban LCMs delayed the full impact of the
14  federal ban.  See Fallis, *supra*, attached as Exhs. E & F.  In my opinion, eliminating
15  the grandfathering of pre-ban LCMs, as done by California's new law, would have
16  improved the efficacy of the federal ban.

17      In my opinion, based on the data and information contained in this report and
18  the sources referred to herein, a complete ban on the possession of LCMs has the
19  potential to:  (1) reduce the number of crimes committed with LCMs; (2) reduce the
20  number of shots fired in gun crimes; (3) reduce the number of gunshot victims in
21  such crimes; (4) reduce the number of wounds per gunshot victim; (5) reduce the
22  lethality of gunshot injuries when they do occur; and (6) reduce the substantial
23  societal costs that flow from shootings.

24      Through Section 32310 (c) and (d), California has enacted a ban on the
25  possession of LCMs.  Like federal restrictions on fully automatic weapons and
26  armor piercing ammunition, I believe this measure has the potential to help prevent
27  the use and spread of particularly dangerous weaponry, and is a reasonable and
28

25

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00147

1  well-constructed measure that is likely to advance California's interest in protecting

2  its citizens and its police force.

3                                            Respectfully Submitted,

4

5

6  Dr. Christopher S. Koper
   October 5, 2017
7  Ashburn, Virginia

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

26

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00148

# EXHIBIT 4



**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

JUL 06 1989

MEMORANDUM T0:   Director

FROM:   Associate Director (Compliance Operations)

SUBJECT:   Report and Recommendation on the
Importability of Certain Semiautomatic Rifles

The working group has completed its evaluation of the semiautomatic rifles whose importation was suspended pending a determination as to whether these weapons are, as required by 18 U.S.C. § 925(d)(3), of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes".

Attached for your review and approval is the report and recommendation on the importability of these rifles.

*Daniel R. Black*
Daniel Black

Attachment

Approved: *Stephen E. Higgins 7/6/89*

Disapprove: _____

Page 1

**REPORT AND RECOMMENDATION OF THE ATF WORKING GROUP
ON THE IMPORTABILITY OF CERTAIN
SEMIAUTOMATIC RIFLES**

## SUSPENSION OF ASSAULT-TYPE RIFLE IMPORTATIONS

On March 14, 1989, ATF announced that it was suspending, effective immediately, the importation of several makes of assault-type rifles, pending a decision as to whether these weapons meet the statutory test that they are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The announcement stated that ATF would not approve, until further notice, the importation of AKS-type weapons, Uzi carbines, FN/FAL-type weapons, FN/FNC-type weapons and Steyr Aug semiautomatic weapons. On April 5, 1989, the suspension was expanded to include all similar assault-type rifles.

For purposes of this suspension, assault-type rifles were rifles which generally met the following criteria:

      a.  military appearance

      b.  large magazine capacity

      c.  semiautomatic version of a machinegun

Based on these criteria, ATF suspended action on pending applications and suspended outstanding permits covering certain firearms listed in Attachment 1. These included both centerfire and .22 rimfire caliber firearms. At that time, ATF indicated that the reexamination of these weapons would take approximately 90 days.

This ATF working group was established to conduct the reevaluation of the importability of these semiautomatic rifles. This report represents the findings and recommendations of the working group.

## BACKGROUND

Section 925(d)(3) of Title 18, United States Code, as amended, provides in pertinent part that:

      The Secretary shall authorize a firearm. . .to be imported or
      brought into the United States . . if the firearm . .

            (3) is of a type that does not fall within the definition
            of a firearm as defined in section 5845(a) of the
            Internal Revenue Code of 1954 and is generally
            recognized as particularly suitable for or readily

Exhibit 12
Page 00536

adaptable to sporting purposes, excluding surplus
military firearms. . .

This provision was originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, and was also contained in Title I of the Gun Control Act of 1968, which amended Title IV later that year. According to the Senate Report on Title IV, this provision was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167.

Moreover, there is legislative history which indicates that Congress intended the standard to allow the importation of traditional sporting rifles, while excluding military-type rifles. The Senate Report on the Gun Control Act observed that the importation standards ". . . are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms." S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968). Significantly, the rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.[1]

An explanation of the effect of this section by one of the sponsors of the bill specifically stated that military firearms would not meet the "sporting purposes" test for importation. The mere fact that a military firearm may be used in a sporting event does not make it importable as a sporting firearm[2].

There is a reference in the Senate Report on Title IV which notes that the importation prohibition ". . . would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes, or for personal protection." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167. However, this language is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting since firearms particularly suitable for those purposes can obviously be used for other purposes such as recreational shooting and personal protection.

The determination of a weapon's suitability for sporting purposes "rest[s] directly with the Secretary of the Treasury." 114 Cong. Rec. 27465 (1968) (Statement of Sen. Murphy). While the legislative history suggests that the term "sporting purposes" refers to the traditional sports of target shooting, trap and skeet shooting, and hunting, the statute itself provides no criteria beyond the "generally recognized" language of section 925(d)(3). S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2167. The Senate Report on the Gun Control Act stated:

> The difficulty of defining weapons characteristics to meet this target [of eliminating importation of weapons used in crime] without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00537

Following enactment of the Gun Control Act in 1968, the Secretary established a Firearms Evaluation Panel to provide guidelines for implementation of the "sporting purposes" test of section 925(d)(3). This panel was composed of representatives from the military, law enforcement, and the firearms industry. The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction. An evaluation sheet (ATF Form 4590) was developed thereafter by ATF and put into use for evaluating handguns pursuant to section 925(d)(3). Attachment 2.

The 1968 Firearms Evaluation Panel did not propose criteria for evaluating rifles and shotguns under section 925(d)(3). Other than surplus military firearms which Congress addressed separately, long guns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes. Thus, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns. Until recently, all rifles and shotguns were approved for importation so long as they were not otherwise excluded by section 925(d)(3). Only rifles and shotguns covered by the National Firearms Act (NFA), 26 U.S.C. S 5845(a) (for example, machineguns and short-barreled rifles and short-barreled shotguns), and surplus military rifles and shotguns had been denied importation.

The Firearms Evaluation Panel did briefly comment on whether a model BM59 Beretta, 7.62mm NATO Caliber Sporter Version Rifle was suitable for sporting purposes. Minutes of the Firearms Advisory Panel, December 10, 1968. Attachment 3. It was the consensus of the Panel that this rifle did have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of the Beretta BM59, together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle, be authorized for importation. (The Beretta BM59 and the Cetme, the predecessor to the HK91, are two of the rifles whose importation has been suspended. The SIG-AMT is no longer being produced.) However, the Panel recommended that importation of these weapons should include the restriction that they not possess combination flash suppressors/grenade launchers.

The working group found the Panel's consideration of these rifles to be superficial and unpersuasive. The vast majority of the work of the 1968 Panel was devoted to handguns and the establishment of the factoring criteria for the importation of handguns. Indeed, we found compelling evidence that these rifles are not generally recognized as particularly suitable for sporting purposes.

The first time that ATF looked beyond the restrictions on NFA and surplus military rifles and shotguns and undertook a meaningful analysis under the "sporting purposes" test was in 1984. At that time, ATF was faced with a new breed of imported shotgun. It was clear that the historical assumption that all shotguns were sporting was no longer viable. Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes. This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to provide evidence of sporting purposes for the weapon, ATF was provided information that the weapon was suitable for police/combat style competitions. ATF determined that this type of competition did not constitute "sporting purposes" under the statute, and that this shotgun was not suitable for traditional sporting purposes, such as hunting, and trap and skeet shooting. Accordingly, importation was denied. Attachment 4.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles   Exhibit 12
Page 00538

Thereafter, in 1986, the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). After examination and testing of the weapon, ATF found that it was a semiautomatic version of a selective fire military-type assault shotgun. In this case, ATF determined that, due to its weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS-12 was not particularly suitable for or readily adaptable to sporting purposes. Again, ATF refused to recognize police/combat competitions as a sporting purpose under section 925(d)(3). The shotgun was reviewed on the basis of its suitability for traditional shotgun sports of hunting, and trap and skeet shooting and its importation was denied. Attachment 5. This decision was upheld by the United States District Court in Gilbert Equipment Company, Inc. v. Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989). The case is currently on appeal to the Eleventh Circuit.

These two cases involving shotguns represent ATF's first thorough examination of the suitability of certain combat-type weapons for sporting purposes. In these cases ATF adopted an interpretation of sporting as being limited to certain traditional sports and not simply any lawful activity in which the weapons might be employed.

## ANALYSIS

A. Defining the type of weapon under review.

As noted above, section 925(d)(3) expressly provides that the Secretary shall authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, in its explanation of section 925(d)(3), the Senate Report on the Gun Control Act stated:

> This subsection gives the Secretary authority to permit the importation of ammunition and certain types of firearms--(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machinegun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, et seq.) and suitable for sporting purposes (in the case of surplus military weapons this type is limited to shotguns and rifles) and those taken out of the United States. (Emphasis added.)

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

In light of the statutory mandate that types of firearms be scrutinized, the working group first attempted to determine whether the semiautomatic rifles suspended from importation fall within a type of firearm.

The working group determined that the semiautomatic rifles in question are generally semiautomatic versions of true selective fire military assault rifles.[3] As a class or type of firearm they are often referred to as "assault rifles," "assault-type rifles," "military style rifles," or "paramilitary rifles."[4] Since we are only concerned with semiautomatic rifles, it is somewhat of a misnomer to refer to these weapons as "assault rifles." True assault rifles are selective fire

Exhibit 12
Page 00539

weapons that will fire in a fully automatic mode.[5] For the purposes of this paper, it was necessary to settle on one term that best describes the weapons under consideration, and we will refer to these weapons as "semiautomatic assault rifles." They represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle. The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK47, is a weapon designed for killing or disabling the enemy and, as described below, has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles.[6] These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. These features and characteristics are as follows:

1. Military Configuration.

    a. Ability to accept a detachable magazine. Virtually all modern military firearms are designed to accept large, detachable magazines.[7] This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less.[8] That a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

    b. Folding/telescoping stocks. Many military firearms incorporate folding or telescoping stocks.[9] The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

    c. Pistol grips. The vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon.[10] In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions.

    d. Ability to accept a bayonet. A bayonet has distinct military purposes.[11] First, it has a psychological affect on the enemy. Second, it enables soldiers to fight in close quarters

with a knife attached to their rifles. We know of no traditional sporting application for a bayonet.

e. Flash suppressor. A flash suppressor generally serves one or two functions. First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired fully automatic.[12] From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Those flash suppressors which also serve to dampen "muzzle climb" have a limited benefit in sporting uses by allowing the shooter to reacquire the target for a second shot. However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result. There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb. In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

f. Bipods. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.[13] The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired fully automatic. Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability. However, traditional sporting rifles do not come equipped with bipods, nor are they specifically designed to accommodate them. Instead, bipods for sporting firearms are generally designed to attach to a detachable "sling swivel mount" or simply clamp onto the firearm.

g. Grenade launcher. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.[14] Such launchers are generally of two types. The first type is a flash suppressor designed to function as a grenade launcher. The second type attaches to the barrel of the rifle either by screws or clamps. We are not aware of any particular sporting use for grenade launchers.

h. Night sights. Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.[15] Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally illegal to hunt at night.

2. Whether the weapon is a semiautomatic version of a machinegun.

The vast majority of modern military firearms are selective fire, i.e., they can shoot either fully automatic or semiautomatic. Since machineguns are prohibited from importation (except for law enforcement use) the manufacturers of such weapons have developed semiautomatic versions of these firearms.[16]

3. Whether the rifle is chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles    Exhibit 12
Page 00541

Modern military assault rifles and submachineguns are generally chambered to accept a centerfire cartridge case of 2.25 inches or less.[17] On the other hand, while many traditional sporting rifles will fire a cartridge of 2.25 inches or less, such firearms usually do not have the other military features outlined in Items 1a-h.

These features and characteristics are not usually found on traditional sporting firearms.[18] This is not to say that a particular rifle having one or more of the listed features should necessarily be classified as a semiautomatic assault rifle. Indeed, many traditional sporting firearms are . semiautomatic or have detachable magazines. Thus, the criteria must be viewed in total to determine whether the overall configuration places the rifle fairly within the semiautomatic assault rifle category.

Using these criteria, we determined that, on balance, all of the firearms on the original suspension list are properly included in the semiautomatic assault rifle category, with the exception of the .22 rimfire caliber rifles and the Valmet Hunter. While the .22 rimfire caliber rifles bear a striking resemblance to the true assault rifle, these rifles employ, by and large, conventional .22 rimfire caliber semiautomatic mechanisms.[19] Moreover, they are not semiautomatic versions of a machinegun and contain only a few of the other relevant characteristics. Further, the working group determined that, in general, .22 caliber rifles are generally recognized as suitable for small game hunting. The Valmet Hunter, while based on the operating mechanism of the AK47 assault rifle, has been substantially changed so that it is now akin to a traditional sporting rifle and does not properly fall within the semiautomatic assault rifle category. More specifically, its receiver has been modified and its pistol grips, bayonet, and flash suppressor have been removed. The trigger mechanism has been moved to the rear of the modified receiver to facilitate its use with a traditional sporting stock. Also, its military-style sights have been replaced with traditional sporting-style sights. See Attachment 6.

B. Scope of "Sporting Purposes".

The second step of our process was to determine the scope of "sporting purposes" as used in the statute. This is a critical aspect of the process. The broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test. A narrower interpretation which focuses on the traditional sports of hunting and organized marksmanship competition would result in a more selective importation process.[20]

To determine the proper interpretation, we consulted the statute itself, its legislative history, applicable case law, the work of the original Firearms Evaluation Panel, and prior interpretations by ATF. In terms of the statute itself, the structure of the importation provisions would suggest a somewhat narrow interpretation. In this regard, firearms are prohibited from importation (section 922(1)) with certain specific exceptions (section 925(d)(3)). A broad interpretation which permits virtually any firearm to be imported because someone may wish to use it in some lawful shooting activity would render the statute meaningless.

As discussed earlier, the legislative history suggests a narrow meaning and indicates that the term "sporting purposes" refers to the traditional sports of target shooting, skeet and trap shooting, and hunting. Moreover, the history discussed earlier strongly suggests that Congress intended the provision to allow the importation of traditional sporting type rifles while excluding military type rifles. There is nothing in its history to indicate that it was intended to recognize every conceivable

type of activity or competition which might employ a firearm. To the contrary, the history indicates that mere use in some competition would not make the rifle a sporting rifle.

Finally, the 1968 Firearms Evaluation Panel specifically addressed at least one informal shooting activity and determined that it was not a legitimate sporting purpose under the statute. The panel addressed what is commonly referred to as "plinking" (shooting at randomly selected targets such as bottles and cans). It was the Panel's view that "while many persons participated in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . ."
See Attachment 3.

Based on the above, the working group determined that the term "sporting purpose" should properly be given a narrow reading. It was determined that while hunting has been a recognized rifle sport for centuries, and competitive target shooting is a recognized rifle sport, the so-called activity of plinking is not a recognized sport. Moreover, we believe that reference to sporting purposes was intended also to stand in contrast to military and law enforcement applications. Consequently, the working group does not

believe that police/combat-type competitions should be treated as sporting activities. This position is supported by the court's decision in Gilbert Equipment Company, Inc., v Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989) and is consistent with prior interpretations of ATF as noted on pages 4 and 5 in discussing the Striker-12 shotgun and USAS-12 shotgun.

C. Suitability.

The final step in our review involved an evaluation of whether semiautomatic assault rifles are a type of rifle generally recognized as particularly suitable for or readily adaptable to the traditional sporting applications discussed above.

The criminal misuse of semiautomatic assault rifles is a matter of significant public concern and was an important factor in the decision to suspend their importation. Nevertheless, the working group did not consider criminal misuse as a factor in its analysis of the importability of this type of rifle. Instead, the working group confined its analysis to the question of whether this type of rifle meets the test provided in section 925(d)(3).

Rather than criminal misuse, our comprehensive examination of this issue focused on the legal analysis and technical assessment of these firearms discussed earlier. In addition, the working group used the information gathered under Items 1-7 outlined in the next section in determining whether this type of firearm is generally recognized as particularly suitable for sporting purposes. These items take into account technical and marketing data, expert opinions, the recommended uses of the firearms, and data on the actual uses for which the weapons are employed in this country.

In evaluating these firearms, we believe that all rifles which are fairly typed as semiautomatic assault rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability.[21] Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type.

Exhibit 12
Page 00543

This is consistent with the approach taken with respect to handguns since 1968. Although certain handguns may be used or recommended for sporting purposes, they may fall within the type of easily concealable handguns barred from importation by the administrative factoring criteria used by ATF to determine the importability of handguns. Furthermore, a pistol specifically designed for target shooting, but lacking a safety as required by the factoring criteria, would be a type of handgun prohibited from importation as not particularly suitable for sporting purposes for this reason. Finally, just as ATF allows handguns to be modified so as to meet the factoring criteria, a semiautomatic assault rifle could be modified into a sporting configuration and be importable, as was done in the case of the Valmet Hunter referred to earlier.

D. Evaluation of Information from Outside Sources

As part of our comprehensive analysis as to whether semiautomatic assault rifles meet the statutory criteria for importation, the following sources of information were also considered:

  1. How has the weapon been advertised, marketed and categorized by the manufacturer and/or importer?

  2. How has the use of the rifle been described by firearms technical writers?

  3. What is the rifle's reported use by importers?

  4. Do hunting guides recommend the rifle?

  5. Do editors of hunting magazines recommend the rifle?

  6. Is the rifle used in target shooting competitions?

  7. Do State game commissions allow the use of the rifle to hunt?

Items 1-6 focus upon how the rifles are marketed, advertised, and recommended for use. Item 7 addresses the legal restrictions pertaining to the use of the weapons for sporting purposes.

The working group reviewed the advertising and marketing literature concerning each of the weapons (Item 1) and reviewed evaluations of the firearms by technical writers (Item 2). In addition, the working group solicited information from the importers of the weapons and other knowledgeable sources (Items 3-6).

Questionnaires were drafted and sent out to licensed hunting guides, State game and fish commissions, local hunting associations, competitive shooting groups, and hunting/shooting magazine editors to determine the extent to which the weapons are used for sporting purposes or recommended for such use. The working group believed that the actual uses of the weapons for sporting purposes would be a factor to be considered in determining whether this type of rifle meets the sporting purposes test.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00544

The review of advertising and marketing literature indicates that these rifles are not generally marketed for hunting or competitive shooting. The review of the technical evaluations revealed that these rifles are not regarded as suitable for these sporting activities.22

To the extent that the technical evaluations made recommendations with respect to the use of the rifles suspended from importation, the majority recommended them for law enforcement or military use or for activities such as collecting, plinking, home and self-defense, and combat target shooting. Only 5 of over 50 evaluations reviewed contained recommendations for the use of these firearms for hunting purposes.

The importers were asked to submit information concerning the sporting uses of the semiautomatic rifles they import. Thirty-nine importers were asked to submit this information and 19 responded. In general, their comments were conclusory and stated that their weapons could be used for sporting purposes. A small number of importers, e.g., Gun South, Inc., and Heckler & Koch, Inc., provided more specific data showing the sporting uses made of their firearms by their customers.

Of 3 hunting associations to whom questionnaires were sent, 2 responded. They stated that they place no restrictions on the use of semiautomatic rifles by their members, on the minimum caliber of ammunition used to hunt large game, or on the number of rounds allowed in semiautomatic rifle magazines. However, over 1,800 hunting guides were sent questionnaires and, of these, 706 responded. Over 73 percent of those responding indicated that their patrons used either bolt or lever action rifles for hunting. Only 10 of the 706 guides indicated that their patrons had used any of the rifles whose importation had been temporarily suspended.

Of the 20 hunting/shooting editors to whom questionnaires were sent, 14 responded. Nine of the fourteen editors recommended semiautomatic rifles for use in hunting large game, including 5 who recommended use of any of the rifles subject to the temporary suspension. Eleven of the fourteen editors recommended semiautomatic rifles for target competitions, including 7 who recommended semiautomatic assault rifles for such use.

The recommendations of editors were contradictory. One editor pointed out that what made the assault rifle successful as a military weapon made the semiautomatic version totally unfit for any other use. On the other hand, another editor stated that semiautomatic rifles had certain advantages over conventional sporting rifles especially for the physically disabled and left-handed shooters. While this may be true, there appears to be no advantage to using a semiautomatic assault rifle as opposed to a semiautomatic sporting rifle.

A total of 54 competitive shooting groups were sent a questionnaire and 53 groups responded (some of the responses were from unsolicited groups). Fifty of these groups indicated that they sponsor high power rifle competition events. While none of the groups prohibited the use of the semiautomatic assault rifles in their competitions, none stated that any of the rifles covered by the temporary suspension were used in a specific event.

Finally, the information gathered under Item 7 reveals that most of these weapons could legally be used in most States for most hunting purposes.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00545

The working group reviewed all of the information gathered under Items 1-6 and determined that while these weapons may legally be used for sporting purposes in most States, the evidence was compelling that, as a type of firearm, the semiautomatic assault rifle is not generally recognized as particularly suitable for sporting purposes. The working group found persuasive the technical and expert evaluations of these firearms which generally did not recommend them as particularly suitable for sporting purposes. The group was also impressed by the comments of the hunting guides which showed that these rifles were not widely used for hunting purposes. The comments of the hunting guides are consistent with the opinion of the technical experts who generally do not recommend the rifles for hunting purposes.

The opinions of the editors were fairly divided with respect to the sporting uses of these rifles. The importers generally recommended their own weapons for such uses. The competitive shooting groups indicated that the rifles could be used in certain shooting events. Thus, while there was some evidence that these rifles could be used for hunting and target shooting, there was no evidence of any widespread use for such purposes. The mere fact that they are not generally prohibited from use for sporting purposes does not mean that the rifles meet the test for importation.

### CONCLUSIONS

The working group has dealt with a complex issue, the resolution of which has required the group to take into account interpretations of law, technical assessments of firearms and their physical characteristics, marketing data, the assessment of data compiled from responses to questionnaires and, finally, Bureau expertise with respect to firearms. We fully recognize that particular findings as well as the results will be controversial.

From the cross section of representation within ATF, we have brought to bear our technical, legal, and administrative expertise to resolve the issues in what we believe to be a fair manner, taking into consideration all points of view. While some of the issues were difficult to resolve, in the end we believe that the ultimate conclusion is clear and compelling. These semiautomatic assault rifles were designed and intended to be particularly suitable for combat rather than sporting applications. While these weapons can be used, and indeed may be used by some, for hunting and target shooting, we believe it is clear that they are not generally recognized as particularly suitable for these purposes.

The purpose of section 925(d)(3) was to make a limited exception to the general prohibition on the importation of firearms, to preserve the sportsman's right to sporting firearms. This decision will in no way preclude the importation of true sporting firearms. It will only prevent the importation of military-style firearms which, although popular among some gun owners for collection, self-defense, combat competitions, or plinking, simply cannot be fairly characterized as sporting rifles.

Therefore, it is the finding of the working group that the semiautomatic assault rifle is not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes and that importation of these rifles should not be authorized under 18 U.S.C. § 925(d)(3).

Report and Recommendation on the Importability of Certain Semiautomatic Rifles   Exhibit 12
Page 00546

Based on our evaluation, we recommend that the firearms listed on Attachment 7 not be authorized for importation. For the reasons discussed in this report, we recommend that the firearms listed on Attachment 8 be authorized for importation. These are the .22 rimfire caliber rifles and the Valmet Hunter which we do not believe are properly included in the category of semiautomatic assault rifles. Attachment 9 is a compilation of the responses from the questionnaires. Attachment 10 combines the criteria for identifying semiautomatic assault rifles and the items considered in assessing suitability. Attachments 11 and 12 contain the data compiled for each of the criteria listed in Attachment 10. Finally, Attachment 13 contains the source materials used in locating persons and organizations who were sent questionnaires.

NOTES

1. Paul Wahl, ed., Gun Trader's Guide, 13th Edition, (South Hackensack, NJ. 1987), 155-162.

2. Although a firearm might be recognized as "suitable" for use in traditional sports, it would not meet the statutory criteria unless it were recognized as particularly suitable for such use. Indeed, Senator Dodd made clear that the intent of the legislation was to" [regulate] the importation of firearms by excluding surplus military handguns; and rifles and shotguns that are not truly suitable for sporting purposes." 114 Cong. Rec. 13325 (1968) (Statement of Sen. Dodd) [emphasis added].

Similarly, it is apparent that the drafters of the legislation did not intend for "sports" to include every conceivable type of activity or competition which might employ a firearm; otherwise a "sporting purpose" could be advanced for every firearm sought to be imported. For example, in response to Sen. Hansen's question concerning the meaning of "sporting purposes" in the bill which became section 925(d), Senators Dodd and Hansen engaged in the following colloquy:

Mr. HANSEN. Would the Olympic shooting competition be a "sporting purpose? "

Mr. DODD. I would think so.

Mr. HANSEN. What about trap and skeet shooting?

Mr. DODD. I would think so. I would think trap and skeet shooting would certainly be a sporting activity.

Mr. HANSEN. Would the Camp Perry national matches be considered a "sporting purpose?"

Mr. DODD. Yes: that would not [sic] fall in that arena. It should be described as a sporting purpose.

Mr. HANSEN. I understand the only difference is in the type of firearms used at Camp Perry which includes a wide variety of military types as well as commercial.

Page  13

Would all of these firearms be classified as weapons constituting a "sporting purpose?"

Mr. DODD. No. I would not say so. I think when we get into that, we definitely get into military type of weapon for use in matches like these at Camp Perry; but I do not think it is generally described as a sporting weapon. It is a military weapon. I assume they have certain types of competition in which they use these military weapons as they would in an otherwise completely sporting event. I do not think that fact would change the nature of the weapon from a military to a sporting one.

Mr. HANSEN. Is it not true that military weapons are used in Olympic competition also?

Mr. DODD. I do not know. Perhaps the Senator can tell me. I am not well informed on that.

Mr. HANSEN. It is my understanding that they are. Would the Senator be inclined to modify his response if
I say that is true? (27461)

Mr. DODD. It is not that I doubt the Senator's word. Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event. I think the Senator would agree with that. I do not know how else we could describe it.

Mr. HANSEN. <u>If I understand the Senator correctly, he said that despite the fact that a military weapon may be used in a sporting event it did not, by that action become a sporting rifle Is that correct?</u>

Mr. DODD. That would seem right to me ….. As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons…… I think the Senator and I know what a genuine sporting gun is.

114 Cong. Rec. 27461-62 (1968).(Emphasis added.)

3.  Ken Warner, ed., <u>Gun Digest 1989</u>, (Northbrook, Il. 1988), pp. 293-300; William S. Jarrett, ed., <u>Shooter's Bible, No. 80</u>, (Hackensack, NJ. 1988), pp. 345-363; Edward Clinton Ezell, <u>Small Arms of the World</u>, (Harrisburg, Pa. 1983), p. 844; Pete Dickey, "The Military Look-Alikes," <u>American Rifleman</u>, (April 1980), p. 31. Also, see generally, Ian V. Hogg, ed., <u>Jane's Infantry Weapons</u>, <u>1987-88</u>, (New York 1987); Jack Lewis, ed., <u>The Gun Digest Book of Assault Weapons</u>, (Northbrook, Il. 1986).

4.  Art Blatt, "Tomorrow's State-of-the-Art Sporting Rifle," <u>Guns & Ammo</u>, (July 1981), p. 48; Jarrett, pp. 345-363; Warner, pp. 293-300.

5.  Daniel D. Musgrave and Thomas B.Nelson, <u>The World's Assault Rifles</u>, (Virginia, 1967), p. 1.

6.  See generally, Angus Laidlaw, ed., <u>Paul Wahl's Big _ Gun Catalog/1</u>, (Bogota, NJ. 1988); Musgrave and Nelson; Hogg; Jarrett; and Warner.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00548

7. Ibid.

8. Arizona, 5 rounds; Colorado, 6 rounds; Michigan 6 rounds; New Hampshire, 5 rounds; New York, 6 rounds; North Carolina, 6 rounds; North Dakota, 8 rounds; Oregon, 5 rounds; Pennsylvania, semiautomatic rifles prohibited; Vermont, 6 rounds.

9. See generally, Hogg; Musgrave and Nelson; Ezell; Warner; Jarrett; Laidlaw; and Lewis.

10. Ibid.

11. Ibid.

12. Ibid.

13. Ibid.

14. Ibid.

15. Ibid.

16. Ezell, p. 844; Dickey, p. 31.

17. Musgrave and Nelson, pp. 11-29; and, see generally, Hogg; and Ezell.

18. Ezell, pp.844-866; and, see generally, Warner; Jarrett; and Laidlaw.

19. See, for example, Walter Rickell, "The Plinker's AK GunsMagazine, (July 1986) p. 21; John Lachuk, "Bantam Battle Rifles," Guns & Ammo, (January 1987), p. 37; John Lachuk, ".22 Erma Carbine," Guns & Ammo, (May 1968), p. 58; JackLewis, "Something New: The AK in Twenty-Two," Gun World, (July 1985), p. 32; Roger Combs, "A Most Unique Carbine," Gun World, (December 1985), p. 28; Garry James, "Mitchell Arms AK-22," Guns & Ammo, (November 1985), p. 72.

20. See note 2, colloquy between Senators Dodd and Hansen.

21. Ibid.

22. See generally, bibliography.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00549

BIBLIOGRAPHY

"Armalite AR-180 Rifle," American Rifleman, (February 1981), 65-66.

"Beretta AR. 70 Rifle," American Rifleman, (March 1988), 64-66.

Blatt, Art. "Beretta M-70/Sport Rifle," Guns & Ammo, (December 1983), 64-65.

Blatt, Art. "Tomorrow's Sporting Rifles," Guns & Ammo, (July 1981), 48-57, 78, 79.

Bruce, Robert. "The AUG Assault System," Guns Magazine, (September 1986), 37-39, 42,43, 57-61.

Clapp, Wiley. "Great To-Do With the Daewoo," The Gun Digest Book of Assault Weapons, (1986), 82-87.

Combs, Roger. "A Most Unique Carbine," Gun World, (December 1985), 28-31, 47.

Combs, Roger. "Galil 7.62mm Nato Rifle", Gun World, (October 1985), 32-36.

Combs, Roger. "The Avtomat Kalashnikov Goes .22," The Gun Digest Book of Assault Weapons, (1986), 182-195.

Combs, Roger. "The Uniquely Unique F-11," The Gun Digest Book of Assault Weapons, (1988), 188-195.

"Cooking and Heckling with H & K's HK94A3," Gun World, (August 1984), 18-20.

Davis, Russ. "Have Your AK and Shoot it, Too," Guns Magazine, (February 1987), 39, 62-64.

Dickey, Pete. "The Military Look-Alikes," American Rifleman, (April 1980), 30-31, 76.

Egolf, Dick. "Heckler & Koch's Super Semi-Auto," American Rifleman, (June 1985), 29-32, 65-67.

Ezell, Edward Clinton. Small Arms of the World. Harrisburg: Stackpole Books, 1983.

"FN FNC Rifle," American Rifleman,(January 1988), 58-60.

Ferguson, Tom. "A Hard Look at The AR-180", The Gun Digest Book of Assault Weapons, (1986), 121-127.

French, Howard. "H & K's 9mm Paracarbine," Guns & Ammo, (November 1983), 42-44.

Grennell, Dean A. "The Mitchell AK-47," Gun World, (September 1986), 40-41.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles   Exhibit 12
Page 00550

"Heckler & Koch 91," American Rifleman, (October 1981), 56-58.

"Heckler & Koch Model 94 Carbine," American Rifleman, (February 1988), 46-48.

Hogg, Ian V., ed. Janes' Infantry Weapons. 1987-1988. New York: Jane's Publishing Company, 1987.

Hunnicutt, Robert W. "The Bullpups Have Arrived", American Rifleman, (March 1987), 30-35, 70-71.

James, Frank W. "The Springfield Armory SAR-3, " Special Weapons and Tactics, (July 1989), 42-46.

James, Garry. "Austrailian LlAlA Rifle," Guns & Ammo, (December 1987),

James, Garry. "Chinese AK-47 .223," Guns & Ammo, (August 1986), 84-86.

James, Garry. "Mitchell Arms AK-22," Guns & Ammo, (November 1985), 72-73, 97.

James, Garry. "Mitchell Heavy Barrel AK-47," Guns & Ammo, (November 1986), 83-84.

James, Garry. "PTK Chinese M-14S Rifle," American Rifleman, (July 1988), 81-82.

James, Garry. "The SAR-48 Rifle, Springfield Armory Reproduces a Classic," Guns & Ammo, (August 1985), 64-66.

Jarrett, William S., ed. Shooter's Bible. No. 80. Hackensack: Stoeger Publishing Company, 1988.

Kapelsohn, Emanuel. "Steyr's Space-Age AUG," The Gun Digest Book of Assault Weapons, (1986), 45-49.

Karwan, Chuck. "The Fetching Famas," Gun World, (October 1988), 18-21, 78.

Karwan, Chuck. "The Rugged Rifles of Springfield Armory," Gun World, (March 1989), 72-76.

Karwan, Chuck. "ilalmet's Assault Family," The Gun Digest Book of Assault Weapons, (1986), 70-75.

Lachuk, John. ".22 Erma Carbine," Guns & Ammo, (May 1968), 58-60.

Lachuk, John. "Bantam Battle Rifles," Guns & Ammo, (January 1987), 36-39, 75-76.

Laidlaw, Angus, ed. Paul Wahl's Big Gun Catalog/l. Bogatao Paul Wahl Corporation, 1988.

Lewis, Jack, ed. The Gun Digest Book of Assault Weapons. Northbrook: DBI Books, Inc., 1986.

Lewis, Jack. "A Family Affair," The Gun Digest Book of Assault Weapons, (1986), 76-81.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00551

Lewis, Jack. "EMF's Look-Alike AP-74," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 166-171.

Lewis, Jack. "Something New: The AK in Twenty-Two," <u>Gun World</u>, (July 1985), 32-35.

Lewis, Jack. "Springfield's S.A.R. 48," <u>The Gun Digit Book of Assault Weapons</u>, (1968), 88-93.

Lewis, Jack. "The Why and How of Rimfires," <u>The Gun Digest Book of Assault Weapons</u>, (1986), 160-171.

Mason, James D. "The Maadi in America," <u>Guns Magazine</u>, (January 1983), 33-35, 78.

Musgrave, Daniel D. and Nelson, Thomas B. <u>The World's Assault Rifles</u>. Washington, DC: Goetz Company, 1967.

O'Meara, Robert. "The Guns of Israel," <u>Guns Magazine</u>, (January 1989), 33-35, 51.

Paige, Alan. "The AK-47 As A Bullpup?" <u>Firepower</u>, (January 1989), 48-53.

Rees, Clair. "Valmet M71-S," <u>Guns & Ammo</u>, (October 1976), 86, 137.

Rickell, Walter. "The Plinker's AK," <u>Guns Magazine</u>, (July 1986), 21.

Roberts, J.B. "Bernosky Wins His Fourth," <u>American Rifleman</u>, (Oct. 1980), 49-51.

Sanow, Ed. "National Match AK-47/S," <u>Firepower</u>, (January 1989), 66-71.

Shults, Jim. "The Mean Machine," <u>Gun World</u>, (April 1982), 26-28.

"Springfield Armory S.A.R. 48," <u>American Rifleman</u>, (March 1986), 57-58.

Steele, Kevin E. "Beretta BM-59," <u>Guns Magazine</u>, (January 1983), 14.

Steele, Kevin E. "Sporting Firearms Update," <u>Guns Magazine</u>, (Feburary 1980), 52-55, 79, 84-85.

"Steyr-AUG: The Terrible Toy," <u>Gun World</u>, (December 1984), 32-35.

Swenson, Thomas J. "The Incredible Uzi," <u>Guns & Ammo</u>, (Jaunary 1982), 32-36, 76.Tappan, Mel. "Survive: Survival Rifles-Part 2, " <u>Guns & Ammo</u>, (August 1978), 68, 96-97.

Traister, John. "AK Rifle: Chinese AKS or Type 56S," <u>American Rifleman</u>, (May 1988), 50-51.

"UZI Semi-Automatic .45 Carbine," <u>American Rifleman</u>, (January 1986), 59.

"Uzi Semi-Automatic Carbine," <u>American Rifleman</u>, (August 1981), 55-57.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00552

"Valmet M78 Rifle," American Rifleman, (April 1988), 64-66

Wahl, Paul, ed. Gun Trader's Guide, 13th Edition, South Hackensack: Stoeger Publishing Company, 1987.

Warner, Ken, ed. Gun Digest 1989. Northbrook: DBI Books, Inc., 1988.

Wood, J.B. "Beretta's AR70 Sporter," Guns Magazine, (March 1986), 38-39, 65-66.

Woods, Jim. "Firepower From the Far East-Daewoo," Guns Magazine, (February 1986), 28-29, 60-61.

Zwirz, Bob. "Valmet's Military Look," Gun World, (September 1988), 28-30.

> NOTE: This information was extracted from the document titled, **"Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles",** published in a memorandum to the Director, Stephen E. Higgins from the Associate Director, Daniel R. Black and approved on July 6, 1989.

Exhibit 12
Page 00553

# EXHIBIT 5

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6     Fax:  (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                        CIVIL DIVISION

12

| | |
|---|---|
| 13  **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,** | Case No.   17-cv-1017-BEN-JLB |
| | **SUPPLEMENTAL DECLARATION OF LUCY P. ALLEN** |
| 17                       Plaintiffs, | Courtroom:     5A |
| | Judge:         Hon. Roger T. Benitez |
| 18        **v.** | Action Filed:  May 17, 2017 |
| 20  **ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,** | |
| 22                       Defendants. | |

23

24

25

26

27

28

## SUPPLEMENTAL DECLARATION OF LUCY ALLEN

I, Lucy P. Allen, declare under penalty of perjury under the laws of the United States that the information in this declaration is true:

1.     I previously submitted a declaration in connection to the Attorney General's Opposition to Plaintiffs' Motion for Preliminary Injunction, which was filed with this Court on June 5, 2017 (the "2017 Declaration"), and an expert report filed with this Court on April 9, 2018 (the "2018 Report). [1]  I make this supplemental declaration providing additional data and analysis in connection to Defendants' Supplemental Brief in Response to the Court's Order of September 26, 2022.

2.     I am a Managing Director of NERA Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice and Chair of NERA's Product Liability and Mass Torts Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.

3.     In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving economics and statistics. I have been qualified as an expert and testified in court on various economic and statistical issues relating to the flow of guns into the criminal market. I have testified at trials in Federal and State Courts, before the New York City Council Public Safety Committee, the American Arbitration Association and the Judicial Arbitration Mediation Service, as well as in depositions.

---

[1] My 2018 Report was marked as Exhibit 1 to the Declaration of John Echeverria and filed in this matter at Docket Number 53-4.

4.     I have an A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers. My resume with recent publications and testifying experience is included as Exhibit A.

5.     This declaration reports the results of my analyses with respect to the following issues: (a) the number of rounds of ammunition fired by individuals using a gun in self-defense; and (b) the outcomes when large-capacity magazines are used in public mass shootings, including the associated number of casualties.

**OPINIONS**

**A.     Number of Rounds Fired by Individuals in Self-Defense**

6.     Plaintiffs claim the "large-capacity magazines" covered by California Penal Code section 32310 (which are magazines capable of holding more than ten rounds) are commonly used for lawful purposes, including for self-defense.[2]

7.     The number of rounds commonly needed by individuals to defend themselves cannot be practically or ethically determined with controlled scientific experiments and there is no source that systematically tracks or maintains data on the number of rounds fired by individuals in self-defense. Due to these limitations, I have analyzed available data sources to estimate the number of rounds fired by individuals to defend themselves. In particular, I have analyzed data from the NRA Institute for Legislative Action, as well as my own study of news reports on incidents of self-defense with a firearm. In all, I have analyzed almost 1,000 incidents of self-defense

_____

[2] See, for example, Complaint for Declaratory and Injunctive Relief, filed May 17, 2017, ¶¶2, 47.

with a firearm and found that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

8.      The NRA maintains a database of "Armed Citizen" stories describing private citizens who have successfully defended themselves, or others, using a firearm ("NRA Armed Citizen database"). According to the NRA, the "Armed Citizen" stories "highlight accounts of law-abiding gun owners in America using their Second Amendment rights to defend self, home and family."[3] Although the methodology used to compile the NRA Armed Citizen database of stories is not explicitly detailed by the NRA, the NRA Armed Citizen database is a useful data source in this matter for at least three reasons. First, the Armed Citizen database was the largest collection of accounts of citizen self-defense compiled by others that I was able to find.[4] Second, the incidents listed in the Armed Citizen database highlight the very conduct that Plaintiffs claim the California law impedes (*i.e.*, the use of firearms by law-abiding citizens for self-defense).[5] Third, the Armed Citizen database is compiled by an entity that actively opposes restrictions on magazine capacity and restrictions on the possession and use of firearms in general.[6] In light of the positions taken by the entity compiling the data, I would expect that any selection bias would be in favor of stories that put use of guns in self-defense in the best possible light and

---

[3] NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017.

[4] Note that in 2020, after the time my research was conducted, The Heritage Foundation began an online database of its own sample of defensive gun use incidents (https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us).

[5] Complaint for Injunctive and Declaratory Relief, May 17, 2017, ¶47.

[6] See, for example, NRA Civil Rights Defense Fund website, http://www.nradefensefund.org/current-litigation.aspx, accessed October 12, 2018.

1 might highlight the apparent need of guns and/or multiple rounds in self-defense

2 incidents.

3     9.    My team and I performed an analysis of incidents in the NRA Armed

4 Citizen database that occurred between January 2011 and May 2017.[7] For each

5 incident, the city/county, state, venue (whether the incident occurred on the street, in

6 the home, or elsewhere) and the number of shots fired were tabulated.[8] The

7 information was gathered for each incident from both the NRA synopsis and, where

8 available, an additional news story. An additional news story was found for over 95%

9 of the incidents in the NRA Armed Citizen database.

10     10.    According to this analysis of incidents in the NRA Armed Citizen

11 database, it is rare for a person, when using firearms in self-defense, to fire more than

12 ten rounds. Out of 736 incidents, there were two incidents (0.3% of all incidents), in

13 which the defender was reported to have fired more than 10 bullets.[9] Defenders fired

14 2.2 shots on average.[10] In 18.2% of incidents, the defender did not fire any shots.

15

16     [7] My collection and coding of the NRA Armed Citizen stories was last
performed in mid-2017.

    [8] The following incidents were excluded from the analysis: (1) duplicate
incidents, (2) wild animal attacks, and (3) one incident where the supposed victim
later pleaded guilty to covering up a murder. When the exact number of shots fired
was not specified, we used the average for the most relevant incidents with known
number of shots. For example, if the story stated that "shots were fired" this would
indicate that at least two shots were fired and thus we used the average number of
shots fired in all incidents in which two or more shots were fired and the number of
shots was specified.

    [9] Note that the only two incidents with more than 10 bullets fired were added
to the NRA Armed Citizen database in 2016 and 2017 after an earlier analysis that I
had conducted of the database had been submitted to and cited by the Court in
*Kolbe v. O'Malley*, Case No. CCB-13-2841 (Dkt. 79).

    [10] Note that the analysis is focused on shots fired when using a gun in self-

                                             (continued…)

These incidents highlight the fact that in many instances defenders are able to defend themselves without firing any shots. For example, according to one of the incidents in the NRA Armed Citizen Database:

> "A man entered a Shell station in New Orleans, La. and attempted to rob a cashier, by claiming he was carrying a gun. The cashier responded by retrieving a gun and leveling it at the thief, prompting the criminal to flee. (The Times Picayune, New Orleans, La. 09/02/15)"[11]

11.    For incidents occurring in the home (56% of total), defenders fired an average of 2.1 shots, and fired no shots in 16.1% of incidents. For incidents occurring outside the home (44%) of total, defenders fired an average of 2.2 shots, and fired no shots in 20.9% of incidents.[12] The table below summarizes these findings:

---

defense and therefore the average includes instances when no shots are fired. If one calculates the average excluding incidents of self-defense with a gun without firing shots, the average is still low, 2.6 shots when at least one shot is fired.

[11] "Gas station clerk scares off robber," NRA-ILA Armed Citizen, September 9, 2015.

[12] A separate study of incidents in the NRA Armed Citizen database for an earlier period (the five-year period from 1997 through 2001) found similar results. Specifically, this study found that, on average, 2.2 shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. See, Claude Werner, "The Armed Citizen – A Five Year Analysis," http://gunssaveslives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables, accessed January 10, 2014.

### Number of Shots Fired in Self-Defense
### Based on NRA Armed Citizen Incidents in the United States
### January 2011 - May 2017

| | Shots Fired by Individual in Self-Defense | | |
| | Overall | Incidents in Home | Outside the Home |
|---|---|---|---|
| Average Shots Fired | 2.2 | 2.1 | 2.2 |
| Number of Incidents with No Shots Fired | 134 | 66 | 68 |
| Percent of Incidents with No Shots Fired | 18.2% | 16.1% | 20.9% |
| Number of Incidents with >10 Shots Fired | 2 | 2 | 0 |
| Percent of Incidents with >10 Shots Fired | 0.3% | 0.5% | 0.0% |

**Notes and Sources:**
Data from NRA Armed Citizen database covering 736 incidents (of which 411 were in the home) from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks, and one incident where the supposed victim later pleaded guilty to covering up a murder.

12.   We also performed the same analysis of the NRA Armed Citizen database limited to incidents that occurred in California. According to this analysis, defenders in California fired 2.0 shots on average. Out of 47 incidents, there were no incidents in which the defender was reported to have fired more than 10 bullets. In 27.7% of incidents, the defender did not fire any shots, and simply threatened the offender with a gun. For incidents occurring in the home (60% of total), defenders fired an average of 1.9 shots, and fired no shots in 32.1% of incidents. For incidents occurring outside the home (40% of total), defenders fired an average of 2.2 shots and fired no shots in 21.1% of incidents. The table below summarizes these findings for California:

Supplemental Declaration of Lucy P. Allen
(17-cv-1017-BEN-JLB)

**Number of Shots Fired in Self-Defense**
**Based on NRA Armed Citizen Incidents in California**
**January 2011 - May 2017**

|  | Shots Fired by Individual in Self-Defense | | |
|  | Overall | Incidents in Home | Outside the Home |
| --- | --- | --- | --- |
| Average Shots Fired | 2.0 | 1.9 | 2.2 |
| Number of Incidents with No Shots Fired | 13 | 9 | 4 |
| Percent of Incidents with No Shots Fired | 27.7% | 32.1% | 21.05% |
| Number of Incidents with >10 Shots Fired | 0 | 0 | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% | 0.0% | 0.0% |

**Notes and Sources:**
Data from NRA Armed Citizen database covering 47 incidents In California (of which 28 were in the home) from January 2011 through May 2017. Excludes repeat stories, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

13.    In addition to our analysis of incidents in the NRA Armed Citizen database, we performed a systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, focusing on the same types of incidents as the NRA stories and covering the same time period.[13]

14.    To identify relevant news stories to include in our analysis, we performed a comprehensive search of published news stories using Factiva, an online news reporting service and archive owned by Dow Jones, Inc. that aggregates news content from nearly 33,000 sources.[14] The search was designed to return stories about

---

[13] This analysis was initially conducted to research issues regarding self-defense in the home, which was a focus before the 2022 *New York State Rifle & Pistol Association v. Bruen* Supreme Court decision. The analysis of the NRA Armed Citizen incidents described above indicates that the number of shots fired in self-defense outside the home is similar to those inside the home.

[14] Factiva is often used for academic research. For example, a search for the

(continued…)

7

1    the types of incidents that are the focus of the NRA Armed Citizen database and that

2    Plaintiffs claim the California law impedes – in particular, the use of firearms for

3    self-defense.[15] The search identified all stories that contained the following keywords

4    in the headline or lead paragraph: one or more words from "gun," "shot," "shoot,"

5    "fire," or "arm" (including variations on these keywords, such as "shooting" or

6    "armed"), plus one or more words from "broke in," "break in," "broken into,"

7    "breaking into," "burglar," "intruder," or "invader" (including variations on these

8    keywords) and one or more words from "home," "apartment," or "property"

9    (including variations on these keywords).[16] The search criteria match approximately

10   90% of the NRA stories on self-defense with a firearm in the home, and an analysis

11   of the 10% of stories that are not returned by the search shows that the typical number

12   of shots fired in these incidents was no different than in other incidents.[17] The search

13   covered the same period used in our analysis of incidents in the NRA Armed Citizen

---

term "Factiva" on Google Scholar yields over 28,000 results. As another example, a search on Westlaw yields at least 83 expert reports that conducted news searches using Factiva.

[15] NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-*citizen*/, accessed May 28, 2017. See, also, Complaint for Declaratory and Injunctive Relief, filed May 17, 2017, ¶47.

[16] The precise search string used was: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"). An asterisk denotes a wildcard, meaning the search includes words which have any letters in place of the asterisk. For example, a search for shoot* would return results including "shoots," "shooter" and "shooting." The search excluded duplicate stories classified as "similar" on Factiva.

[17] The analysis and search would have used criteria to match actual incidents involving Plaintiffs or California residents, but, based on the Complaint for Injunctive and Declaratory Relief, Plaintiffs have not identified any incidents of the type they claim the California law will impede.

database (January 2011 to May 2017). The region for the Factiva search was set to "United States." The search returned approximately 35,000 stories for the period January 2011 to May 2017.[18]

15.    Using a random number generator, a random sample of 200 stories was selected for each calendar year, yielding 1,400 stories in total.[19] These 1,400 stories were reviewed to identify those stories that were relevant to the analysis, *i.e.*, incidents of self-defense with a firearm in or near the home. This methodology yielded a random selection of 200 news stories describing incidents of self-defense with a firearm in the home out of a population of approximately 4,800 relevant stories.[20] Thus, we found that out of the over 70 million news stories aggregated by Factiva between January 2011 and May 2017, approximately 4,800 news stories were on incidents of self-defense with a firearm in the home. We analyzed a random selection of 200 of these stories.

---

[18] The effect of using alternative keywords was considered. For example, removing the second category ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and including incidents in which the assailant was already inside the home and/or was known to the victim was considered. *A priori*, there was no reason to believe that a larger number of shots would be used in these incidents and based on an analysis of the NRA stories we found that the number of shots fired in incidents when defending against someone already in the home was not different than those with an intruder.

[19] The random numbers were generated by sampling with replacement.

[20] The approximately 4,800 relevant news stories were estimated by calculating the proportion of relevant news stories from the 200 randomly selected stories each year and applying that proportion to the number of results returned by the search for each year of the analysis. For example, in 2017, 33 out of 200 (17%) randomly selected news stories involved incidents of self-defense with a firearm in the home. Applying that proportion to the 1,595 results from the Factiva search in 2017 yields 263 relevant news stories in 2017. This process was repeated every year to arrive at a total of 4,841 relevant news stories from 2011-2017.

16.     For each news story, the city/county, state and number of shots fired were tabulated. When tabulating the number of shots fired, we used the same methodology as we used to analyze stories in the NRA Armed Citizen database.[21] We then identified other stories describing the same incident on Factiva based on the date, location and other identifying information, and recorded the number of times that each incident was covered by Factiva news stories.

17.     To determine the average number of shots fired per *incident*, we first determined the average number of shots fired per *story* and then analyzed the number of stories per incident. According to our study of a random selection from approximately 4,800 relevant stories on Factiva describing incidents of self-defense with a firearm in the home, the average number of shots fired per story was 2.61. This is not a measure of the average shots fired *per incident*, however, because the number of stories covering an incident varies, and the variation is not independent of the number of shots fired. We found that there was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering an incident.[22] We found that on average the more shots fired in a

---

[21] When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

[22] Based on a linear regression of the number of news stories as a function of the number of shots fired, the results were statistically significant at the 1% level (more stringent than the 5% level commonly used by academics and accepted by courts. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980).)

10

defensive gun use incident, the greater the number of stories covering an incident. For example, as shown in the table below, we found that incidents in Factiva news stories with zero shots fired were covered on average by 1.8 news stories, while incidents with six or more shots fired were covered on average by 10.4 different news stories.

---

**Average Number of News Stories by Number of Shots Fired In Factiva Stories on Incidents of Self-Defense with a Firearm January 2011 - May 2017**

| Number of Shots Fired By Defender | Average Number of News Stories |
| --- | --- |
| 0 | 1.8 |
| 1 to 2 | 2.8 |
| 3 to 5 | 3.8 |
| 6 or more | 10.4 |

**Notes and Sources:**
Based on news stories describing defensive gun use in a random selection of Factiva stories between 2011 and May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 16.

---

18.    After adjusting for this disparity in news coverage, we find that the average number of shots fired per incident covered is 2.34. [23] Note that this

---

[23] The adjustment reflects the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home. The formula used for the adjustment is:

$$\frac{\sum_{i=1}^{n}\left(Shots\ Fired_i \times \frac{R_i}{C_i}\right)}{\sum_{i=1}^{n}\left(\frac{R_i}{C_i}\right)}$$

where:

(continued…)

11

1   adjustment does not take into account the fact that some defensive gun use incidents
2   may not be picked up by *any* news story. Given the observed relationship that there
3   are more news stories when there are more shots fired, one would expect that the
4   incidents that are not written about would on average have fewer shots than those
5   with news stories. Therefore, the expectation is that these results, even after the
6   adjustment, are biased upward (*i.e.*, estimating too high an average number of shots
7   and underestimating the percent of incidents in which no shots were fired).

9       19.    As shown in the table below, according to the study of Factiva news
10  stories, in 11.6% of incidents the defender did not fire any shots, and simply
11  threatened the offender with a gun. In 97.3% of incidents the defender fired 5 or
12  fewer shots. There were no incidents where the defender was reported to have fired
13  more than 10 bullets.

---

$n$ = random selection of news stories on incidents of self-defense with a firearm in the home

$R_i$ = number of search results on Factiva in the calendar year of incident $i$

$C_i$ = number of news stories covering incident $i$

Supplemental Declaration of Lucy P. Allen
(17-cv-1017-BEN-JLB)

**Number of Shots Fired in Self-Defense in the Home
Based on Random Selection of News Stories in Factiva
January 2011 - May 2017**

| | |
|---|---|
| Estimated population of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with ≤5 Shots Fired | 195 |
| Percent of Incidents with ≤5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

**Notes and Sources:**
Based on news stories describing defensive gun use in a random selection of Factiva stories between 2011 and May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 16. Number of incidents probability-weighted as per footnote 18.

20.     In sum, an analysis of incidents in the NRA Armed Citizen database, as well as our own study of a random sample from approximately 4,800 news stories describing incidents of self-defense with a firearm, indicates that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

13

Supplemental Declaration of Lucy P. Allen
(17-cv-1017-BEN-JLB)

**B.    Public Mass Shootings**

21.    We analyzed the use of large-capacity magazines in public mass shootings using four sources for identifying public mass shootings: Mother Jones,[24] the Citizens Crime Commission of New York City,[25] the Washington Post[26] and the Violence Project.[27, 28] The analysis focused on public mass shootings because it is my understanding that the state of California is concerned about public mass shootings and enacted the challenged law, in part, to address the problem of public mass shootings.

---

[24] "US Mass Shootings, 1982-2022: Data From Mother Jones' Investigation," Mother Jones, updated October 14, 2022, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data.

[25] "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update. Additional details on the mass shootings were obtained from an earlier source by the Citizens Crime Commission. "Mass Shooting Incidents in America (1984-2012)," Citizens Crime Commission of New York City, http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[26] "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021.

[27] "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[28] When I began research in 2013 on mass shootings, I found Mother Jones and Citizens Crime Commission to maintain the most comprehensive lists of relevant mass shootings. More recently, two additional sources, the Washington Post and The Violence Project, have compiled lists of public mass shootings. The Violence Project began work on its mass shootings database in September 2017 and its database first went online in November 2019, while the Washington Post first published its mass shootings database in February 14, 2018. There is substantial overlap between the mass shootings in all four sources. For example, the Mother Jones data contains 93% of the mass shootings in the Citizens Crime Commission data for the years covered by both data sources, 1984 to 2016, while the Washington Post contains 94% of the mass shootings in The Violence Project data for the years covered by both data sources, 1966 to 2019.

14

22.     The type of incident considered a mass shooting is generally consistent across the four sources. In particular, all four sources consider an event a mass shooting if four or more people were killed in a public place in one incident, and exclude incidents involving other criminal activity such as a robbery.[29]

_____

[29] Citizen Crime Commission describes a mass shooting as "four or more victims killed" in "a public place" that were "unrelated to another crime (e.g., robbery, domestic violence)." Citizen Crime notes that its sources include "news reports and lists created by government entities and advocacy groups." "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update.

Mother Jones describes a mass shooting as "indiscriminate rampages in public places resulting in four or more victims killed by the attacker," excluding "shootings stemming from more conventionally motivated crimes such as armed robbery or gang violence." Although in January 2013 Mother Jones changed its definition of mass shooting to include instances when three or more people were killed, for this declaration we only analyzed mass shootings where four or more were killed to be consistent with the definition of the other three sources. "A Guide to Mass Shootings in America," Mother Jones, updated October 14, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. See also, "What Exactly is a Mass Shooting," Mother Jones, August 24, 2012. http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting.

The Washington Post source describes a mass shooting as "four or more people were killed, usually by a lone shooter" excluding "shootings tied to robberies that went awry" and "domestic shootings that took place exclusively in private homes." A The Washington Post notes that its sources include "Grant Duwe, author of 'Mass Murder in the United States: A History,' Mother Jones and Washington Post research," as well as "Violence Policy Center, Gun Violence Archive; FBI 2014 Study of Active Shooter Incidents; published reports." "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

The Violence Project indicates that it uses the Congressional Research Service definition of a mass shooting: "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or

(continued…)

15

23.    Each of the four sources contains data on mass shootings covering different time periods. The Mother Jones data covers 112 mass shootings from 1982 to October 13, 2022,[30] the Citizens Crime Commission data covers 80 mass shootings from 1984 to February 2018,[31] the Washington Post data covers 185 mass shootings from 1966 to May 12, 2021,[32] and The Violence Project data covers 182 mass shootings from 1966 to May 14, 2022.[33, 34]

---

other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project notes that its sources include "Primary Sources: Written journals / manifestos / suicide notes etc., Social media and blog posts, Audio and video recordings, Interview transcripts, Personal correspondence with perpetrators" as well as "Secondary Sources (all publicly available): Media (television, newspapers, magazines), Documentary films, Biographies, Monographs, Peer-reviewed journal articles, Court transcripts, Law Enforcement records, Medical records, School records, Autopsy reports." "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/methodology/, accessed January 17, 2020.

[30] "A Guide to Mass Shootings in America," Mother Jones, updated October 14, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. Excludes mass shootings where only three people were killed. Note this analysis of the Mother Jones data may not match other analyses because Mother Jones periodically updates its historical data.

[31] "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, February 2018 update.

[32] "The terrible numbers that grow with each mass shooting," *The Washington Post*, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[33] "Mass Shooter Database," *The Violence Project* https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[34] Note that I have updated this mass shooting analysis to include more recent incidents, as well as more recently available details. In my 2017 declaration in *Virginia Duncan et al. v. California Attorney General*, I included data on mass shootings through April 2017. In my 2018 declaration in *Rupp v. California Attorney General*, I updated the analysis to include data on mass shootings through

(continued…)

16

24.    Note that the two more recently compiled sources of mass shootings, the Washington Post and The Violence Project, include additional mass shootings that were not covered by either Mother Jones or Citizens Crime Commission.  In general, we found that these additional mass shootings were less covered by the media and involved fewer fatalities and/or injuries than the ones previously identified by Mother Jones or Citizens Crime Commission. For example, using the mass shooting data for the period 1982 through 2019, we found that the median number of news stories for a mass shooting included in Mother Jones and/or Citizen Crime Commission was 317, while the median for the additional mass shootings identified in the Washington Post and/or The Violence Project was 28.[35] In addition, we found an average of 21 fatalities or injuries for a mass shooting included in Mother Jones and/or Citizen Crime Commission, while only 6 fatalities or injuries for the additional mass shootings identified in the Washington Post and/or The Violence Project.

---

September 2018. The analyses in both of these declarations included mass shootings only from Mother Jones and the Citizen Crime Commission. In my 2020 declaration in *James Miller et al. v. California Attorney General*, I updated the analysis to include mass shootings through December 2019 and added mass shootings from two more sources, the Washington Post and the Violence Project. The number of mass shootings, as well as some details about the shootings, are not identical across these declarations for three main reasons. First, I have updated the analysis to include more recent incidents as well as more recently available details. Second, starting in 2020, I added two more sources (Washington Post and Violence Project), which include additional mass shootings and details not included in the initial sources. Third, even though Mother Jones included instances when three or more people were killed, for my declarations and reports starting in 2020, I only included mass shootings where four or more were killed to be consistent with the definition of the other three sources.

[35] The search was conducted over all published news stories on Factiva. The search was based on the shooter's name and the location of the incident over the period from one week prior to three months following each mass shooting.

17

25.     We combined the data from the four sources for the period 1982 through 2019, and searched news stories on each mass shooting to obtain additional details on the types of weapons used as well as data on shots fired where available. We identified, based on this publicly available information, which mass shootings involved the use of large-capacity magazines. See attached Exhibit B for a summary of the combined data based on Mother Jones, Citizens Crime Commission, the Washington Post, the Violence Project, and news reports.

**1.     Use of large-capacity magazines in public mass shootings**

26.     Based on the data through 2019, we found that large-capacity magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in public mass shootings. Magazine capacity is known in 105 out of the 161 mass shootings (or 65%) considered in this analysis. Out of the 105 mass shootings with known magazine capacity, 63 (or 60%) involved large-capacity magazines. Even assuming the mass shootings with unknown magazine capacity *all* did not involve large-capacity magazines, 63 out of 161 mass shootings or 39% of mass shootings involved large capacity magazines. (See table below.)

27.     Based on our analysis of the public mass shootings data through 2019, casualties were higher in the mass shootings that involved weapons with large-capacity magazines than in other mass shootings. In particular, we found an average number of fatalities or injuries of 27 per mass shooting with a large-capacity magazine versus 9 for those without. Focusing on just fatalities, we found an average number of fatalities of 10 per mass shooting with a large-capacity magazine versus 6 for those without. (See table below.)

18

**Numbers of Fatalities and Injuries in Public Mass Shootings
January 1982 - December 2019**

| Weapon Used | # of Incidents | Average # of | | |
|---|---|---|---|---|
| | | Fatalities | Injuries | Total |
| LCM | 63 | 10 | 17 | 27 |
| Non-LCM | 42 | 6 | 3 | 9 |
| Unknown | 56 | 5 | 3 | 7 |

**Notes and Sources:**

Casualty figures exclude the shooter. LCM classification and casualties based on
review of stories from Factiva/Google searches.

28.     In addition to the analysis using data through 2019 discussed above, we analyzed more recent mass shootings, including from January 2020 through October 2022.[36] Based on our analysis of this more recent data, we found similar results. In particular, we found casualties were higher in the mass shootings that involved weapons with large-capacity magazines than in other mass shootings. The table below summarizes these results using data for the period 1982 through October 2022.

---

[36] Note, however, that the Citizens Crime Commission data was last updated in February 2018 and the Washington Post was last updated in May 2021.

19

**Numbers of Fatalities and Injuries in Public Mass Shootings January 1982 - October 2022**

| Weapon Used | # of Incidents | Average # of | | |
| --- | --- | --- | --- | --- |
| | | Fatalities | Injuries | Total |
| LCM | 73 | 10 | 16 | 25 |
| Non-LCM | 42 | 6 | 3 | 9 |
| Unknown | 64 | 5 | 3 | 7 |

**Notes and Sources:**

Casualty figures exclude the shooter. LCM classification and casualties based on review of stories from Factiva/Google searches.

29.     Our results are consistent with those of other studies that have analyzed mass shootings. Note that although the other studies are based on alternate sets of mass shootings, including covering different years and defining mass shootings somewhat differently, the results are similar in finding that fatalities and injuries are larger in mass shootings in which large capacity magazines are involved. A 2019 academic article published in the *American Journal of Public Health* by Klarevas et al. found that "[a]ttacks involving LCMs resulted in a 62% higher mean average death toll."[37] This study found an average number of fatalities of 11.8 per mass shooting with a large-capacity magazine versus 7.3 for those without. The results in this study were based on 69 mass shootings between 1990 and 2017.[38] An analysis

---

[37] Louis Klarevas, Andrew Conner, and David Hemenway, "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017," *American Journal of Public Health* (2019).

[38] The Klarevas et al. study defines mass shootings as "intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators" and, unlike my analysis, does not exclude incidents in private places or incidents involving other criminal activity such as robbery.

20

of the mass shootings detailed in a 2016 article by Gary Kleck yielded similar results (21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without).[39] The Kleck study covered 88 mass shooting incidents between 1994 and 2013.[40] In a 2018 study, Koper et al. found that mass shootings involving assault weapons and large-capacity magazines resulted in an average of 13.7 victims versus 5.2 for other cases.[41] The Koper et al. study covered

[39] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[40] The Kleck study defines a mass shooting as "one in which more than six people were shot, either fatally or nonfatally, in a single incident." See, Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[41] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," *Journal of Urban Health* (2018).

21

145 mass shootings between 2009 and 2015.[42] The table below summarizes their results.

| Comparison of Studies on the Use of Large-Capacity Magazines in Mass Shootings | | | | | | |
|---|---|---|---|---|---|---|
| | | Criteria | Time Period | # of Incidents | Avg. # of Fatalities + Injuries / Fatalities | |
| Source | # Victims | Other Criteria | | | With LCM | Without LCM |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Allen (2020)[1] | at least 4 killed[2] | Includes shootings "in a public place in one incident, and exclude[s] incidents involving other criminal activity such as a robbery" | 1982-2019 | 161 | 27 / 10 | 9 / 6 |
| Kleck et al. (2016)[3] | at least 6 shot | Excludes "spree shootings" and includes shootings in both "public" and "private" places | 1994-2013 | 88 | 21 / n/a | 8 / n/a |
| Klarevas et al. (2019)[4] | at least 6 killed[2] | Includes "intentional crimes of gun violence" | 1990-2017 | 69 | n/a / 12 | n/a / 7 |
| Koper et al. (2018)[5] | at least 4 killed[2] | Includes shootings in both public and private places | 2009-2015 | 145 | 14 / n/a | 5 / n/a |

**Notes and Sources:**

[1] Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction in *James Miller et al. v. Xavier Becerra et al.,* dated January 23, 2020.

[2] Excluding shooter.

[3] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 Justice Research and Policy 28 (2016).

[4] Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," American Journal of Public Health (2019).

[5] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," Journal of Urban Health (2018). Note that the Koper et al study includes shootings involving both LCM and assault weapons.

## 2.  Number of rounds fired in public mass shootings with large-capacity magazines

30.  In addition, the data indicates that it is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings. Of the 63 mass shootings we analyzed through 2019 that are known to have involved a large-capacity magazine, there are 43 in which the number of shots

---

[42] The Koper et al. study defined mass shooting as "incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed."

fired is known. Shooters fired more than ten rounds in 40 of the 43 incidents, and the average number of shots fired was 103.

31.    Updating this analysis to include the 179 mass shootings through October 2022 yields similar results. In particular, of the 73 mass shootings we analyzed through 2022 that are known to have involved a large-capacity magazine, there are 49 in which the number of shots fired is known. Shooters fired more than ten rounds in 46 of the 49 incidents, and the average number of shots fired was 102.

**3.    Percent of mass shooters' guns legally obtained**

32.    The data on public mass shootings indicates that the majority of guns used in these mass shootings were obtained legally.[43] Of the 161 mass shootings analyzed through 2019, there are 100 where it can be determined whether the gun was obtained legally. According to the data, shooters in 77% of mass shootings obtained their guns legally (77 of the 100 mass shootings) and 79% of the guns used in these 100 mass shootings were obtained legally (184 of the 234 guns). (Note that even if one assumes that *all* of the mass shootings where it is not known were assumed to be illegally obtained, then one would find 48% of the mass shootings and 61% of the guns were obtained legally.) Updating this analysis to use the 179 mass shootings through 2022 yields similar results.[44]

---

[43] The determination of whether guns were obtained legally is based on Mother Jones and Washington Post reporting.

[44] In particular, the 77% and 79% become 79% and 80% when updating the analysis to include mass shootings through 2022. The 48% and 61% become 50% and 62%.

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

2    the United States of America that the foregoing is true and correct.

3       Executed on November 10, 2022, at New York, New York.

4

5

6

7                    _____

8                         Lucy Allen

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INDEX OF EXHIBITS

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of Lucy P. Allen | 1-7 |
| B | Public Mass Shootings Data, 1982 – October 2022 | 8-17 |

# EXHIBIT A



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

## Exhibit A

# LUCY P. ALLEN
# MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present     **National Economic Research Associates, Inc.**
<u>Managing Director</u>. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
<u>Senior Vice President (2003-2016)</u>.
<u>Vice President (1999-2003)</u>.
<u>Senior Consultant (1994-1999)</u>.

1992-1993     **Council of Economic Advisers, Executive Office of the President**
<u>Staff Economist</u>.  Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*.  Working Group member of the President's National Health Care Reform Task Force.

1986-1988
1983-1984     **Ayers, Whitmore & Company (General Management Consultants)**
<u>Senior Associate</u>.   Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.

1

Lucy P. Allen

|  |  |
|---|---|
|  | Marketing plan to increase international market share for major accounting firm. |
| Summer 1985 | **WNET/Channel Thirteen, Strategic Planning Department**<br>Associate.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support. |
| 1981-1983 | **Arthur Andersen & Company**<br>Consultant.   Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company. |

**Teaching**

| 1989- 1992 | **Teaching Fellow, Yale University**<br>Honors Econometrics<br>Intermediate Microeconomics<br>Competitive Strategies<br>Probability and Game Theory<br>Marketing Strategy<br>Economic Analysis |
|---|---|

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

 "Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

2

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Declaration before the United States District Court, Eastern District of Washington at Yakima, in *Brumback et al. v. Ferguson et al.,* 2022.

Trial Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Supplemental Declaration before the United States District Court, Southern District of California, in *James Miller et al. v. California Attorney General et al.*, 2022.

Declaration before the United States District Court, Northern District of Texas, Dallas Division, in *Samir Ali Cherif Benouis v. Match Group, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

4

Lucy P. Allen

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.,* 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.*, 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.*, 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2020.

Declaration before the United States District Court for the Northern District of Georgia, in *Sunil Amin et al. v. Mercedes-Benz USA, LLC and Daimler AG*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Declaration before the United States District Court for the Southern District of California in *James Miller et al. v. Xavier Becerra et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

5

Lucy P. Allen

Testimony and Declaration before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Declaration before the United States District Court Western District of Oklahoma in *In re: Samsung Top-Load Washing Machine Marketing, Sales Practices and Products Liability Litigation*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

Deposition Testimony before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc*., 2018.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America et al.*, 2018.

Deposition Testimony before the District Court for the State of Nevada in *Dan Schmidt v. Liberator Medical Holdings, Inc., et al.*, 2018.

Deposition Testimony before the United States District Court, Northern District of Illinois, Eastern Division, in *In re the Allstate Corporation Securities Litigation,* 2018.

Deposition Testimony before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. Xavier Becerra et al.*, 2018.

Declaration before the Superior Court of the State of Vermont in *Vermont Federation of Sportsmen's Club et al. v. Matthew Birmingham et al.,* 2018.

Testimony before the American Arbitration Association in *Arctic Glacier U.S.A., Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Marvin Pearlstein v. Blackberry Limited et al.*, 2018.

Deposition Testimony before the United States District Court, Eastern District of Texas, in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Deposition Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2018.

6

Lucy P. Allen

Testimony, Deposition Testimony and Declaration before the United States District Court, District of New Jersey, in *Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Gurbir Grewal et al.,* 2018.

Deposition Testimony before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Deposition Testimony and Declarations before the United States District Court, Southern District of New York, in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Deposition Testimony before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

**EXHIBIT B**

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

*18 mass shootings since Allen (2020):*

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Raleigh spree shooting | Hedingham, NC | 10/13/22 | MJ | - | 5 | 2 | 7 | - | - | 2 |
| 2. Highland Park July 4 parade shooting | Highland Park, IL | 7/4/22 | MJ | Yes | 7 | 48 | 55 | 83[ba] | Yes | 1 |
| 3. Tulsa medical center shooting | Tulsa, OK | 6/1/22 | MJ | - | 4 | 9[bb] | 13[bb] | 37[bc] | Yes | 2 |
| 4. Robb Elementary School massacre | Uvalde, TX | 5/24/22 | MJ | Yes | 21 | 17 | 38 | 315[bd] | Yes | 1[be] |
| 5. Buffalo supermarket massacre | Buffalo, NY | 5/14/22 | MJ/VP | Yes | 10 | 3 | 13 | 60[bf] | Yes | 1 |
| 6. Sacramento County church shooting | Sacramento, CA | 2/28/22 | MJ | Yes | 4 | 0 | 4 | - | Yes[bg] | 1 |
| 7. Oxford High School shooting | Oxford, MI | 11/30/21 | MJ/VP | Yes | 4 | 7 | 11 | 30[bh] | Yes[bi] | 1 |
| 8. San Jose VTA shooting | San Jose, CA | 5/26/21 | MJ/VP | Yes | 9 | 0 | 9 | 39[bj] | Yes[bk] | 3 |
| 9. Canterbury Mobile Home Park shooting | Colorado Springs, CO | 5/9/21 | WaPo | Yes | 6 | 0 | 6 | 17[bl] | - | 1 |
| 10. FedEx warehouse shooting | Indianapolis, IN | 4/15/21 | MJ/VP/WaPo | Yes | 8 | 7 | 15 | - | Yes | 2[bm] |
| 11. Orange office complex shooting | Orange, CA | 3/31/21 | MJ/VP/WaPo | - | 4 | 1 | 5 | - | - | 1 |
| 12. Essex Royal Farms shooting | Baltimore County, MD | 3/28/21 | WaPo | - | 4 | 1 | 5 | - | Yes[bn] | 1 |
| 13. King Soopers supermarket shooting | Boulder, CO | 3/22/21 | MJ/VP | Yes | 10 | 0 | 10 | - | Yes | 2 |
| 14. Atlanta massage parlor shootings | Atlanta, GA | 3/16/21 | MJ/VP/WaPo | Yes | 8 | 1 | 9 | - | Yes[bo] | 1 |
| 15. Hyde Park shooting | Chicago, IL | 1/9/21 | WaPo | - | 5 | 2 | 7 | - | - | 1 |
| 16. Englewood block party shooting | Chicago, IL | 7/4/20 | WaPo | - | 4 | 4 | 8 | - | - | - |
| 17. Springfield convenience store shooting | Springfield, MO | 3/15/20 | WaPo | - | 4 | 2 | 6 | - | Yes[bp] | 2 |
| 18. Molson Coors shooting | Milwaukee, WI | 2/26/20 | MJ/VP/WaPo | - | 5 | 0 | 5 | 12[bq] | - | 2[br] |

*161 mass shootings in Allen (2020):*

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 19. Jersey City Kosher Supermarket | Jersey City, NJ | 12/10/19 | MJ/VP/WaPo | - | 4 | 3 | 7 | - | Yes | 5 |
| 20. Football-watching party | Fresno, CA | 11/17/19 | WaPo | - | 4 | 6 | 10 | - | - | 2 |
| 21. Halloween Party | Orinda, CA | 11/1/19 | WaPo | - | 5 | 0 | 5 | - | - | 1 |
| 22. Tequila KC bar | Kansas City, KS | 10/6/19 | WaPo | - | 4 | 5 | 9 | - | No | 2 |
| 23. Midland-Odessa Highways | Odessa, TX | 8/31/19 | MJ/VP/WaPo | - | 7 | 25 | 32 | - | No | 1 |
| 24. Dayton | Dayton, OH | 8/4/19 | MJ/VP/WaPo | Yes | 9 | 27 | 36 | 41[f] | Yes | 1/2 |
| 25. El Paso Walmart | El Paso, TX | 8/3/19 | MJ/VP/WaPo | Yes | 22 | 26 | 48 | - | Yes | 1 |

Page 1 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| | Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 26. | Casa Grande Senior Mobile Estates | Santa Maria, CA | 6/19/19 | WaPo | | 4 | 0 | 4 | - | | 1 |
| 27. | Virginia Beach Municipal Center | Virginia Beach, VA | 5/31/19 | MJ/VP/WaPo | Yes | 12 | 4 | 16 | - | Yes | 2 |
| 28. | Henry Pratt Co. | Aurora, IL | 2/15/19 | MJ/VP/WaPo | - | 5 | 6 | 11 | - | No | 1 |
| 29. | SunTrust Bank | Sebring, FL | 1/23/19 | MJ/VP/WaPo | | 5 | 0 | 5 | | Yes | 1 |
| 30. | Borderline Bar & Grill | Thousand Oaks, CA | 11/7/18 | MJ/VP/WaPo | Yes | 12 | 1 | 13 | 50 [g] | Yes | 1 |
| 31. | Tree of Life Synagogue | Pittsburgh, PA | 10/27/18 | MJ/VP/WaPo | - | 11 | 6 | 17 | - | Yes | 4 |
| 32. | T&T Trucking | Bakersfield, CA | 9/12/18 | MJ/VP/WaPo | No | 5 | 0 | 5 | - | - | 1 |
| 33. | Capital Gazette | Annapolis, MD | 6/28/18 | MJ/VP/WaPo | - | 5 | 2 | 7 | - | Yes | 1 |
| 34. | Santa Fe High School | Santa Fe, TX | 5/18/18 | MJ/VP/WaPo | No | 10 | 13 | 23 | - | - | 2 |
| 35. | Waffle House | Nashville, TN | 4/22/18 | MJ/VP/WaPo | - | 4 | 4 | 8 | - | Yes | 1 |
| 36. | Detroit | Detroit, MI | 2/26/18 | VP | - | 4 | 0 | 4 | - | - | |
| 37. | Stoneman Douglas HS | Parkland, FL | 2/14/18 | CC/MJ/VP/WaPo | Yes | 17 | 17 | 34 | - | Yes | 1 |
| 38. | Pennsylvania Carwash | Melcroft, PA | 1/28/18 | MJ/VP/WaPo | - | 4 | 1 | 5 | - | - | 3 [h] |
| 39. | Rancho Tehama | Rancho Tehama, CA | 11/14/17 | MJ/VP/WaPo | Yes | 4 | 10 | 14 | 30 [i] | No | 2 |
| 40. | Texas First Baptist Church | Sutherland Springs, TX | 11/5/17 | CC/MJ/VP/WaPo | Yes | 26 | 20 | 46 | 450 [j] | Yes | 1 |
| 41. | Las Vegas Strip | Las Vegas, NV | 10/1/17 | MJ/VP/WaPo | Yes | 58 | 422 | 480 | 1100 [k] | Yes | 23 |
| 42. | Taos and Rio Arriba counties | Abiquiu, NM | 6/15/17 | WaPo | No | 5 | 0 | 5 | - | - | 1 |
| 43. | Fiamma Workplace | Orlando, FL | 6/5/17 | CC/MJ/VP/WaPo | No | 5 | 0 | 5 | - | - | 1 |
| 44. | Marathon Savings Bank | Rothschild, WI | 3/22/17 | VP/WaPo | - | 4 | 0 | 4 | - | - | 2 |
| 45. | Club 66 | Yazoo City, MS | 2/6/17 | VP/WaPo | - | 4 | 0 | 4 | - | - | 1 |
| 46. | Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/17 | CC/MJ/VP/WaPo | No | 5 | 6 | 11 | 15 [l] | Yes | 1 |
| 47. | Cascade Mall | Burlington, WA | 9/23/16 | CC/MJ/VP/WaPo | - | 5 | 0 | 5 | - | - | 1 |
| 48. | Dallas Police | Dallas, TX | 7/7/16 | CC/MJ/VP/WaPo | Yes | 5 | 11 | 16 | - | Yes | 3 |
| 49. | Walgreens Parking Lot | Las Vegas, NV | 6/29/16 | WaPo | - | 4 | 0 | 4 | - | - | 1 |
| 50. | Orlando Nightclub | Orlando, FL | 6/12/16 | CC/MJ/VP/WaPo | Yes | 49 | 53 | 102 | 110 [m] | Yes | 2 |
| 51. | Franklin Avenue Cookout | Wilkinsburg, PA | 3/9/16 | VP/WaPo | Yes | 6 | 3 | 9 | 48 [n] | No | 2 |
| 52. | Kalamazoo | Kalamazoo County, MI | 2/20/16 | MJ/VP/WaPo | Yes | 6 | 2 | 8 | - | Yes | 1 |
| 53. | San Bernardino | San Bernardino, CA | 12/2/15 | CC/MJ/VP/WaPo | Yes | 14 | 22 | 36 | 150 [o] | Yes | 4 |

Page 2 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| | Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 54. | Tennessee Colony campsite | Anderson County, TX | 11/15/15 | VP/WaPo | | 6 | 0 | 6 | | | 1 |
| 55. | Umpqua Community College | Roseburg, OR | 10/1/15 | CC/MJ/VP/WaPo | - | 9 | 9 | 18 | - | Yes | 6 |
| 56. | Chattanooga Military Center | Chattanooga, TN | 7/16/15 | CC/MJ/VP/WaPo | Yes | 5 | 2 | 7 | - | Yes | 3 |
| 57. | Charleston Church | Charleston, SC | 6/17/15 | CC/MJ/VP/WaPo | Yes | 9 | 3 | 12 | - | Yes | 1 |
| 58. | Marysville High School | Marysville, MN | 10/24/14 | CC/MJ/VP/WaPo | Yes | 4 | 1 | 5 | - | No | 1 |
| 59. | Isla Vista | Santa Barbara, CA | 5/23/14 | MJ/VP/WaPo | No | 6 | 13 | 19 | 50 [p] | Yes | 3 |
| 60. | Alturas Tribal | Alturas, CA | 2/20/14 | MJ/VP/WaPo | - | 4 | 2 | 6 | - | - | 2 |
| 61. | Washington Navy Yard | Washington, D.C. | 9/16/13 | CC/MJ/VP/WaPo | No | 12 | 8 | 20 | - | Yes | 2 |
| 62. | Hialeah | Hialeah, FL | 7/26/13 | CC/MJ/VP/WaPo | Yes | 6 | 0 | 6 | 10 [q] | Yes | 1 |
| 63. | Santa Monica | Santa Monica, CA | 6/7/13 | CC/MJ/VP/WaPo | Yes | 5 | 3 | 8 | 70 [r] | Yes | 2 |
| 64. | Federal Way | Federal Way, WA | 4/21/13 | MJ/VP/WaPo | - | 4 | 0 | 4 | - | Yes | 2 |
| 65. | Upstate New York | Herkimer County, NY | 3/13/13 | MJ/VP/WaPo | | 4 | 2 | 6 | - | Yes | 1 |
| 66. | Newtown School | Newtown, CT | 12/14/12 | CC/MJ/VP/WaPo | Yes | 27 | 2 | 29 | 154 | No | 4/3 |
| 67. | Accent Signage Systems | Minneapolis, MN | 9/27/12 | CC/MJ/VP/WaPo | Yes | 6 | 2 | 8 | 46 | Yes | 1 |
| 68. | Sikh Temple | Oak Creek, WI | 8/5/12 | CC/MJ/VP/WaPo | Yes | 6 | 4 | 10 | - | Yes | 1 |
| 69. | Aurora Movie Theater | Aurora, CO | 7/20/12 | CC/MJ/VP/WaPo | Yes | 12 | 70 | 82 | 80 | Yes | 4 |
| 70. | Seattle Café | Seattle, WA | 5/30/12 | CC/MJ/VP/WaPo | No | 5 | 1 | 6 | - | Yes | 2 |
| 71. | Oikos University | Oakland, CA | 4/2/12 | CC/MJ/VP/WaPo | No | 7 | 3 | 10 | - | Yes | 1 |
| 72. | Su Jung Health Sauna | Norcross, GA | 2/22/12 | MJ/WaPo | - | 4 | 0 | 4 | - | Yes | 1 |
| 73. | Seal Beach | Seal Beach, CA | 10/14/11 | CC/MJ/VP/WaPo | No | 8 | 1 | 9 | - | Yes | 3 |
| 74. | IHOP | Carson City, NV | 9/6/11 | CC/MJ/VP/WaPo | Yes | 4 | 7 | 11 | - | Yes | 3 |
| 75. | Akron | Akron, OH | 8/7/11 | VP | No | 7 | 2 | 9 | 21 [s] | - | - |
| 76. | Forum Roller World | Grand Prairie, TX | 7/23/11 | WaPo | - | 5 | 4 | 9 | - | - | 1 |
| 77. | Grand Rapids | Grand Rapids, MI | 7/7/11 | CC | Yes | 7 | 2 | 9 | 10 | - | 1 |
| 78. | Family law practice | Yuma, AZ | 6/2/11 | WaPo | - | 5 | 1 | 6 | - | - | 1 |
| 79. | Tucson | Tucson, AZ | 1/8/11 | CC/MJ/VP/WaPo | Yes | 6 | 13 | 19 | 33 | Yes | 1 |
| 80. | Jackson | Jackson, KY | 9/11/10 | VP | No | 5 | 0 | 5 | 12 [t] | - | - |
| 81. | City Grill | Buffalo, NY | 8/14/10 | VP/WaPo | - | 4 | 4 | 8 | 10 [u] | - | 1 |

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| | Case | Location | Date | Source | Large Capacity Mag.?[x] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 82. | Hartford Beer Distributor | Manchester, CT | 8/3/10 | CC/MJ/VP/WaPo | Yes | 8 | 2 | 10 | 11 | Yes | 2 |
| 83. | Yoyito Café | Hialeah, FL | 6/6/10 | CC/VP/WaPo | No | 4 | 3 | 7 | 9 [v] | - | - |
| 84. | Hot Spot Café | Los Angeles, CA | 4/3/10 | VP/WaPo | - | 4 | 2 | 6 | 50 [w] | - | 1 |
| 85. | Coffee Shop Police | Parkland, WA | 11/29/09 | CC/MJ/VP/WaPo | No | 4 | 0 | 4 | - | No | 2 |
| 86. | Fort Hood | Fort Hood, TX | 11/5/09 | CC/MJ/VP/WaPo | Yes | 13 | 32 | 45 | 214 | Yes | 1 |
| 87. | Worth Street | Mount Airy, NC | 11/1/09 | VP/WaPo | - | 4 | 0 | 4 | 16 [x] | No | 1 |
| 88. | Binghamton | Binghamton, NY | 4/3/09 | CC/MJ/VP/WaPo | Yes | 13 | 4 | 17 | 99 | Yes | 2 |
| 89. | Carthage Nursing Home | Carthage, NC | 3/29/09 | CC/MJ/VP/WaPo | No | 8 | 2 | 10 | - | Yes | 2 |
| 90. | Skagit County | Alger, WA | 9/2/08 | VP/WaPo | - | 6 | 4 | 10 | - | No | 2 |
| 91. | Atlantis Plastics | Henderson, KY | 6/25/08 | CC/MJ/VP/WaPo | No | 5 | 1 | 6 | - | Yes | 1 |
| 92. | Black Road Auto | Santa Maria, CA | 3/18/08 | VP/WaPo | - | 4 | 0 | 4 | 17 [y] | - | 1 |
| 93. | Northern Illinois University | DeKalb, IL | 2/14/08 | CC/MJ/VP/WaPo | Yes | 5 | 21 | 26 | 54 | Yes | 4 |
| 94. | Kirkwood City Council | Kirkwood, MO | 2/7/08 | CC/MJ/VP/WaPo | No | 6 | 1 | 7 | - | No | 2 |
| 95. | Youth With a Mission and New Life Church | Colorado Springs, CO | 12/9/07 | VP/WaPo | Yes | 4 | 5 | 9 | 25 [z] | - | 3 |
| 96. | Westroads Mall | Omaha, NE | 12/5/07 | CC/MJ/VP/WaPo | Yes | 8 | 5 | 13 | 14 | No | 1 |
| 97. | Crandon | Crandon, WI | 10/7/07 | CC/MJ/WaPo | Yes | 6 | 1 | 7 | 30 [aa] | Yes | 1 |
| 98. | Virginia Tech | Blacksburg, VA | 4/16/07 | CC/MJ/VP/WaPo | Yes | 32 | 17 | 49 | 176 | Yes | 2 |
| 99. | Trolley Square | Salt Lake City, UT | 2/12/07 | CC/MJ/VP/WaPo | No | 5 | 4 | 9 | - | No | 2 |
| 100. | Amish School | Lancaster County, PA | 10/2/06 | CC/MJ/VP/WaPo | No | 5 | 5 | 10 | - | Yes | 3 |
| 101. | The Ministry of Jesus Christ | Baton Rouge, LA | 5/21/06 | VP/WaPo | - | 5 | 1 | 6 | - | - | 1 |
| 102. | Capitol Hill | Seattle, WA | 3/25/06 | CC/MJ/VP/WaPo | Yes | 6 | 2 | 8 | - | Yes | 4 |
| 103. | Goleta Postal | Goleta, CA | 1/30/06 | CC/MJ/VP/WaPo | Yes | 7 | 0 | 7 | - | Yes | 1 |
| 104. | Sash Assembly of God | Sash, TX | 8/29/05 | VP/WaPo | - | 4 | 0 | 4 | - | - | 2 |
| 105. | Red Lake | Red Lake, MN | 3/21/05 | CC/MJ/VP/WaPo | No | 9 | 7 | 16 | - | No | 3 |
| 106. | Living Church of God | Brookfield, WI | 3/12/05 | CC/MJ/VP/WaPo | Yes | 7 | 4 | 11 | - | Yes | 1 |
| 107. | Fulton County Courthouse | Atlanta, GA | 3/11/05 | VP/WaPo | - | 4 | 0 | 4 | - | No | 1 |
| 108. | Damageplan Show | Columbus, OH | 12/8/04 | CC/VP/WaPo | No | 4 | 3 | 7 | 15 [ab] | Yes | 1 |
| 109. | Hunting Camp | Meteor, WI | 11/21/04 | CC/VP/WaPo | Yes | 6 | 2 | 8 | 20 | - | 1 |

Page 4 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| | Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 110. | ConAgra Foods Plant | Kansas City, KS | 7/3/04 | VP/WaPo | - | 6 | 1 | 7 | 10 [ac] | - | 2 |
| 111. | Stateline Tavern | Oldtown, ID | 10/24/03 | VP/WaPo | Yes | 4 | 0 | 4 | 14 [ad] | - | 1 |
| 112. | Windy City Warehouse | Chicago, IL | 8/27/03 | CC/VP/WaPo | No | 6 | 0 | 6 | - | - | - |
| 113. | Lockheed Martin | Meridian, MS | 7/8/03 | CC/MJ/VP/WaPo | - | 6 | 8 | 14 | - | Yes | 5 |
| 114. | Labor Ready | Huntsville, AL | 2/25/03 | VP/WaPo | - | 4 | 1 | 5 | - | - | 1 |
| 115. | Bertrand Products | South Bend, IN | 3/22/02 | VP/WaPo | - | 4 | 2 | 6 | - | - | 2 |
| 116. | Burns International Security | Sacramento, CA | 9/10/01 | VP/WaPo | Yes | 5 | 2 | 7 | 200 [ac] | - | 2 |
| 117. | Bookcliff RV Park | Rifle, CO | 7/3/01 | VP/WaPo | No | 4 | 3 | 7 | 6 [af] | - | 1 |
| 118. | Navistar | Melrose Park, IL | 2/5/01 | CC/MJ/VP/WaPo | Yes | 4 | 4 | 8 | - | Yes | 4 |
| 119. | Houston | Houston, TX | 1/9/01 | VP | - | 4 | 0 | 4 | - | - | - |
| 120. | Wakefield | Wakefield, MA | 12/26/00 | VP/WaPo | Yes | 7 | 0 | 7 | 37 | Yes | 3 |
| 121. | Mount Lebanon | Pittsburgh, PA | 4/28/00 | VP/WaPo | No | 5 | 1 | 6 | - | Yes | 1 |
| 122. | Mi-T-Fine Car Wash | Irving, TX | 3/20/00 | VP/WaPo | - | 5 | 1 | 6 | - | - | - |
| 123. | Hotel | Tampa, FL | 12/30/99 | CC/MJ/VP/WaPo | No | 5 | 3 | 8 | - | Yes | 2 |
| 124. | Xerox | Honolulu, HI | 11/2/99 | CC/MJ/VP/WaPo | Yes | 7 | 0 | 7 | 28 | Yes | 1 |
| 125. | Wedgwood Baptist Church | Fort Worth, TX | 9/15/99 | CC/MJ/VP/WaPo | Yes | 7 | 7 | 14 | 30 | Yes | 2 |
| 126. | Atlanta Day Trading | Atlanta, GA | 7/29/99 | MJ/VP/WaPo | - | 9 | 13 | 22 | - | Yes | 4 |
| 127. | Albertson's Supermarket | Las Vegas, NV | 6/3/99 | VP/WaPo | - | 4 | 1 | 5 | - | - | 1 |
| 128. | Columbine High School | Littleton, CO | 4/20/99 | CC/MJ/VP/WaPo | Yes | 13 | 23 | 36 | 188 | No | 4 |
| 129. | New St. John Fellowship Baptist Church | Gonzalez, LA | 3/10/99 | VP/WaPo | - | 4 | 4 | 8 | - | - | 1 |
| 130. | Thurston High School | Springfield, OR | 5/21/98 | CC/MJ/VP/WaPo | Yes | 4 | 25 | 29 | 50 | No | 3 |
| 131. | Westside Middle School | Jonesboro, AR | 3/24/98 | CC/MJ/VP/WaPo | Yes | 5 | 10 | 15 | 26 | No | 9/10 |
| 132. | Connecticut Lottery | Newington, CT | 3/6/98 | CC/MJ/VP/WaPo | Yes | 4 | 0 | 4 | 5 | Yes | 1 |
| 133. | Caltrans Maintenance Yard | Orange, CA | 12/18/97 | CC/MJ/VP/WaPo | Yes | 4 | 2 | 6 | 144 | Yes | 1 |
| 134. | Erie Manufacturing | Bartow, FL | 12/3/97 | VP | - | 4 | 0 | 4 | 12 [ag] | - | - |
| 135. | R.E. Phelon Company | Aiken, SC | 9/15/97 | CC/MJ/VP/WaPo | No | 4 | 3 | 7 | - | No | 1 |
| 136. | News and Sentinel | Colebrook, NH | 8/20/97 | VP/WaPo | - | 4 | 4 | 8 | - | - | 2 |
| 137. | Fire Station | Jackson, MS | 4/25/96 | VP/WaPo | - | 5 | 3 | 8 | - | - | 3 |

Page 5 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)[f] Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 138. Fort Lauderdale | Fort Lauderdale, FL | 2/9/96 | CC/MJ/VP/WaPo | No | 5 | 1 | 6 | 14 [ah] | Yes | 2 |
| 139. Little Chester Shoes | New York, NY | 12/19/95 | VP/WaPo | Yes | 5 | 3 | 8 | - | - | 1 |
| 140. Piper Technical Center | Los Angeles, CA | 7/19/95 | CC/VP/WaPo | Yes | 4 | 0 | 4 | - | - | 1 |
| 141. Walter Rossler Company | Corpus Christi, TX | 4/3/95 | CC/MJ/VP/WaPo | No | 5 | 0 | 5 | - | Yes | 2 |
| 142. Puppy creek | Hoke County, NC | 12/31/94 | VP | - | 5 | 1 | 6 | - | - | 1 |
| 143. Air Force Base | Fairchild Base, WA | 6/20/94 | CC/MJ/VP/WaPo | Yes | 4 | 23 | 27 | 50 [ai] | Yes | 1 |
| 144. Chuck E. Cheese | Aurora, CO | 12/14/93 | CC/MJ/VP/WaPo | No | 4 | 1 | 5 | - | - | 1 |
| 145. Long Island Railroad | Garden City, NY | 12/7/93 | CC/MJ/VP/WaPo | Yes | 6 | 19 | 25 | 30 | Yes | 1 |
| 146. Unemployment Office | Oxnard, CA | 12/2/93 | VP/WaPo | - | 4 | 4 | 8 | - | - | 1 |
| 147. Family Fitness Club | El Cajon, CA | 10/14/93 | VP/WaPo | - | 4 | 0 | 4 | - | Yes | 1 |
| 148. Luigi's Restaurant | Fayetteville, NC | 8/6/93 | CC/MJ/VP/WaPo | No | 4 | 8 | 12 | - | Yes | 3 |
| 149. Washington County Bar | Jackson, MS | 7/8/93 | WaPo | - | 5 | 0 | 5 | - | - | 1 |
| 150. 101 California Street | San Francisco, CA | 7/1/93 | CC/MJ/VP/WaPo | Yes | 8 | 6 | 14 | 75 | No | 3 |
| 151. Card club | Paso Robles, CA | 11/8/92 | VP/WaPo | - | 6 | 1 | 7 | - | - | 1 |
| 152. Watkins Glen | Watkins Glen, NY | 10/15/92 | CC/MJ/VP/WaPo | No | 4 | 0 | 4 | - | Yes | 1 |
| 153. Lindhurst High School | Olivehurst, CA | 5/1/92 | CC/MJ/VP/WaPo | No | 4 | 10 | 14 | - | Yes | 2 |
| 154. Phoenix | Phoenix, AZ | 3/15/92 | VP | - | 4 | 0 | 4 | - | - | |
| 155. Royal Oak Postal | Royal Oak, MI | 11/14/91 | CC/MJ/VP/WaPo | Yes | 4 | 4 | 8 | - | Yes | 1 |
| 156. Restaurant | Harrodsburg, KY | 11/10/91 | VP/WaPo | No | 4 | 0 | 4 | 6 [aj] | No | 1 |
| 157. University of Iowa | Iowa City, IA | 11/1/91 | CC/MJ/VP/WaPo | No | 5 | 1 | 6 | - | Yes | 1 |
| 158. Luby's Cafeteria | Killeen, TX | 10/16/91 | CC/MJ/VP/WaPo | Yes | 23 | 20 | 43 | 100 | Yes | 2 |
| 159. Post office | Ridgewood, NJ | 10/10/91 | VP/WaPo | Yes | 4 | 0 | 4 | - | - | 2 |
| 160. GMAC | Jacksonville, FL | 6/18/90 | CC/MJ/VP/WaPo | Yes | 9 | 4 | 13 | 14 | Yes | 2 |
| 161. Standard Gravure Corporation | Louisville, KY | 9/14/89 | CC/MJ/VP/WaPo | Yes | 8 | 12 | 20 | 21 | Yes | 5 |
| 162. Stockton Schoolyard | Stockton, CA | 1/17/89 | CC/MJ/VP/WaPo | Yes | 5 | 29 | 34 | 106 | Yes | 2 |
| 163. Montefiore School | Chicago, IL | 9/22/88 | VP/WaPo | No | 4 | 2 | 6 | - | - | 1 |
| 164. Old Salisbury Road | Winston-Salem, NC | 7/17/88 | VP/WaPo | - | 4 | 5 | 9 | - | - | 1 |
| 165. ESL | Sunnyvale, CA | 2/16/88 | CC/MJ/VP/WaPo | No | 7 | 4 | 11 | - | Yes | 7 |

Page 6 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| | Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 166. | Shopping Centers | Palm Bay, FL | 4/23/87 | CC/MJ/VP/WaPo | Yes | 6 | 14 | 20 | 40 [ak] | Yes | 3 |
| 167. | United States Postal Service | Edmond, OK | 8/20/86 | CC/MJ/VP/WaPo | No | 14 | 6 | 20 | - | Yes | 3 |
| 168. | Anchor Glass Container Corporation | South Connellsville, PA | 3/16/85 | VP/WaPo | No | 4 | 1 | 5 | - | - | 1 |
| 169. | Other Place Lounge | Hot Springs, AR | 7/24/84 | VP/WaPo | No | 4 | 1 | 5 | - | - | 1 |
| 170. | San Ysidro McDonald's | San Ysidro, CA | 7/18/84 | CC/MJ/VP/WaPo | Yes | 21 | 19 | 40 | 257 | Yes | 3 |
| 171. | Dallas Nightclub | Dallas, TX | 6/29/84 | CC/MJ/VP/WaPo | Yes | 6 | 1 | 7 | - | No | 1 |
| 172. | Alaska Mining Town | Manley Hot Springs, AK | 5/17/84 | VP/WaPo | No | 7 | 0 | 7 | - | - | 1 |
| 173. | College Station | Collge Station, TX | 10/11/83 | VP | - | 6 | 0 | 6 | - | - | - |
| 174. | Alaska Back-County | McCarthy, AK | 3/1/83 | VP/WaPo | - | 6 | 2 | 8 | - | - | 2 |
| 175. | Upper West Side Hotel | New York, NY | 2/3/83 | VP | No | 4 | 1 | 5 | - | - | 1 |
| 176. | The Investor | Noyes Island, AK | 9/6/82 | WaPo | - | 8 | 0 | 8 | - | - | 1 |
| 177. | Welding Shop | Miami, FL | 8/20/82 | MJ/VP/WaPo | No | 8 | 3 | 11 | - | Yes | 1 |
| 178. | Western Transfer Co. | Grand Prairie, TX | 8/9/82 | VP/WaPo | - | 6 | 4 | 10 | - | - | 3 |
| 179. | Russian Jack Springs Park | Anchorage, AK | 5/3/82 | VP/WaPo | - | 4 | 0 | 4 | - | No | 1 |
| | | | | LCM Avg. (1982-2019): | | 10 | 17 | 27 | 103 | | |
| | | | | Non-LCM Avg. (1982-2019): | | 6 | 3 | 9 | 16 | | |
| | | | | LCM Avg. (1982-Oct. 2022): | | 10 | 16 | 25 | 102 | | |
| | | | | Non-LCM Avg. (1982-Oct. 2022): | | 6 | 3 | 9 | 16 | | |

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982-2022: Data from Mother Jones' Investigation," updated October 14, 2022). MJ indicates a mass shooting identified by Mother Jones.

The Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017). CC indicates a mass shooting identified by Citizens Crime Commission of New York City data.

The Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting,", updated May 12, 2021). WaPo indicates a mass shooting identified by The Washington Post.

The Violence Project ("Mass Shooter Database," updated May 14, 2022). VP indicates a mass shooting identified by the Violence Project.

[a]   Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition. Stories from Factiva and Google searches reviewed to determine whether an LCM was involved.

[b]   Offender(s) are not included in counts of fatalities and injuries. Stories from Factiva and Google searches reviewed to determine number of fatalities and injuries.

Page 7 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

[c] Offender(s) are not included in counts of fatalities and injuries. Stories from Factiva and Google searches reviewed to determine number of fatalities and injuries.

[d] Except where noted, all data on shots fired obtained from CC.

[e] The determination of whether guns were obtained legally was based on Mother Jones and Washington Post reporting.

[ba] "'This is the norm in our country': Highland Park Mayor speaks to Senate committee about gun violence," *CBS Chicago*, July 20, 2022.

[bb] MJ reported "fewer than 10" injuries for this incident.

[bc] "Update: Man among those killed held door to allow others to escape, Tulsa police chief says," *TulsaWorld*, June 2, 2022.

[bd] "The gunman in Uvalde carried more ammunition into Robb Elementary School than a U.S. soldier carries into combat," *CBS News*, May 27, 2022.

[be] "Uvalde gunman legally bought AR rifles days before shooting, law enforcement says," *The Texas Tribune*, May 25, 2022.

[bf] "Buffalo shooting suspect says his motive was to prevent 'eliminating the white race'," *NPR*, June 16, 2022.

[bg] "Sacramento Church Mass Shooting Follows Disturbing Trend of Domestic Violence, Mass Shooting Connection; Rise of Ghost Guns," *Everytown*, March 7, 2022.

[bh] "Oxford High School shooter fired 30 rounds, had 18 more when arrested, sheriff says," *Fox2Detroit*, December 1, 2021.

[bi] "Father of suspected Oxford High School shooter bought gun 4 days before shooting," *Fox 2 Detroit*, December 1, 2021.

[bj] "VTA shooter fired 39 rounds during attack; carried 32 high-capacity magazines," *KTVU Fox 2*, May 27, 2021.

[bk] "Sam Cassidy legally owned guns used in San Jose VTA shooting: Sheriff," *Kron4*, May 28, 2021.

[bl] "Colorado Springs shooter who killed 6 at party had "displayed power and control issues," police say," *The Denver Post*, May 11, 2021.

[bm] "Indianapolis FedEx Shooter Who Killed 4 Sikhs Was Not Racially Motivated, Police Say," *NPR*, July 28, 2021.

[bn] "Police Investigate Three Separate Fatal Shooting Incidents In Baltimore County," *Baltimore County Government Website*, March 29, 2021.

[bo] "Atlanta Shooting Suspect Bought Gun on Day of Rampage," *Courthouse News*, March 26, 2021.

[bp] "Search warrant reveals new information in Springfield Kum & Go shooting," *Springfield News-Leader*, April 8, 2020.

[bq] "'There was no warning this was going to happen,' Miller shooting witnesses told investigators," *WISN 12 News*, November 24, 2020.

[br] "Milwaukee Miller brewery shooting: Six Molson Coors workers, including shooter, dead in rampage," *Milwaukee Journal Sentinel*, February 26, 2020.

Page 8 of 10

Exhibit B_Allen
Page 15

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

[f] "The Dayton gunman killed 9 people by firing 41 shots in 30 seconds. A high-capacity rifle helped enable that speed," *CNN*, August 5, 2019.

[g] "Authorities Describe 'Confusion And Chaos' At Borderline Bar Shooting In California," *NPR*, November 28, 2018.

[h] "Suspect in quadruple killing at car wash dies," CNN, January 30, 2018.

[i] "California gunman fired 30 rounds at elementary school, left when he couldn't get inside," *ABC News*, November 15, 2017.

[j] "'Be quiet! It's him!' Survivors say shooter walked pew by pew looking for people to shoot," *CNN*, November 9, 2017.

[k] "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review Journal*, November 22, 2017

[l] "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond," *Washington Post*, January 9, 2017.

[m] "'We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando," *The Telegraph*, June 13, 2016.

[n] "Two men charged with homicide in connection with Wilkinsburg backyard ambush," *Pittsburgh's Action News*, June 24, 2016.

[o] "San Bernardino Suspects Left Trail of Clues, but No Clear Motive," *New York Times*, December 3, 2015.

[p] "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage," *Los Angeles Times*, June 4, 2014.

[q] "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage," *NBC News*, July 28, 2013.

[r] "Police Call Santa Monica Gunman 'Ready for Battle,'" *New York Times*, June 8, 2013.

[s] "Questions linger in slayings; investigation continues in rampage as community searches for answers on why gunman shot eight people," *The Beacon Journal*, August 14, 2011.

[t] "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops," *CBS News*, September 13, 2010.

[u] "Ex-gang member guilty of shooting 5 in deadly 17-second rampage," *NBC*, April 1, 2011.

[v] "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead," *Sun-Sentinel*, June 7, 2010.

[w] "Man convicted of killing 4 at Los Angeles restaurant," *Associated Press*, March 15, 2016.

[x] "4 Victims In Mount Airy Shooting Related, Police Say," *WXII 12 News*, November 2, 2009.

[y] "Arrested suspect might have warned of Santa Maria shooting", *Associated Press*, March 20, 2008.

[z] "Profile: New information released on Matthew Murray, gunman in church-related shootings in Colorado; Larry Bourbannais, wounded in one of the shootings, discusses his experience," *NBC News*, December 11

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

aa "Small Town Grieves for 6, and the Killer," *Los Angeles Times* , October 9, 2007.

ab "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," *New York Times* , January 15, 2005.

ac "Sixth person dies of injuries from shooting at Kansas meatpacking plant," *Associated Press* , July 3, 2004.

ad "Four Killed In Oldtown Shooting," *The Miner* , October 30, 2003.

ae "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press* , September 14, 2001.

af "Gunman kills 3, wounds 4 in Rifle rampage; mental patient is arrested," *The Denver Post* , April 2, 2015.

ag "Unfinished business," *Dateline NBC* , December 21, 2006.

ah "5 Beach Workers in Florida are Slain by Ex-Colleague," *New York Times* , February 10, 1996.

ai "Man Bent On Revenge Kills 4, Hurts 23 -- Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," *The Seattle Times* , June 21, 1994.

aj "Man Killed Estranged Wife, Three Others as They Drove to Dinner," *Associated Press* , November 11, 1991.

ak "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," *Chicago Tribune* , April 25, 1987.

# EXHIBIT 6

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9                IN THE UNITED STATES DISTRICT COURT

10            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                         CIVIL DIVISION

12

| | |
|---|---|
| 13  **VIRGINIA DUNCAN, RICHARD** | Case No. 17-cv-1017-BEN-JLB |
| 14  **LEWIS, PATRICK LOVETTE,** | |
|     **DAVID MARGUGLIO,** | |
| 15  **CHRISTOPHER WADDELL, and** | **DECLARATION OF DENNIS** |
|     **CALIFORNIA RIFLE & PISTOL** | **BARON** |
| 16  **ASSOCIATION, INC., a California** | |
|     **corporation,** | Courtroom:    5A |
| 17 | Judge:         Hon. Roger T. Benitez |
|                        Plaintiffs, | Action Filed:  May 17, 2017 |
| 18      **v.** | |
| 19 | |
|     **ROB BONTA, in his official capacity as** | |
| 20  **Attorney General of the State of** | |
|     **California; and DOES 1-10,** | |
| 21 | |
|                        Defendants. | |
| 22 | |

23

24

25

26

27

28

## DECLARATION OF DENNIS BARON

I, Dennis Baron, declare under penalty of perjury that the following is true and correct:

1.   I have been retained by the State of California to provide expert opinion and testimony regarding Corpus Linguistics research.  I am being compensated at a rate of $350 per hour.

2.   I have evaluated the historical use of the terms *arms* and *accoutrements* in order to show that large-capacity magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

## BACKGROUND AND QUALIFICATIONS

3.   I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and

1  law. I have also published books on language reform, on usage, and on gender in
2  language.

3      4.    Most relevant for this report, I published two books on language and
4  law: *The English-Only Question: An Official Language for Americans?* (Yale Univ.
5  Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free*
6  *Speech* (Cambridge Univ. Press, January 2023). In addition, I served as lead author
7  on what came to be called "the Linguists Brief" in *District of Columbia v. Heller*
8  (2008), a brief cited both by J. Scalia in his opinion in the case, and by J. Stevens in
9  his dissent. I was a co-author on another brief by professors of linguistics and
10  corpus linguistics, in *New York State Rifle and Pistol Ass'n. v. Bruen* (No. 20-843,
11  2022), which J. Breyer cited in his dissent. In that dissent, J. Breyer also quoted
12  directly from my essay "Corpus evidence and the meaning of 'bear arms'"
13  (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical
14  meaning and the Second Amendment at the Federalist Society at the Univ. of
15  Chicago Law School, at the Neubauer Symposium on Historical Semantics at the
16  Univ. of Chicago, at Brigham Young Univ. Law School, at Stanford University,
17  and at the conference "*Heller* after Ten Years" at Hastings College of Law. I've
18  also written opinion essays on historical meaning and the Second Amendment for
19  the *Washington Post* and the *Los Angeles Times*. And I have submitted a
20  declaration on behalf of the State of Rhode Island in *Ocean State Tactical, LLC, et*
21  *al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.). In the
22  past twenty years I have been an expert consultant in perhaps a dozen cases
23  involving document interpretation.

24      5.    My forthcoming essay, "Look It Up in Your *Funk and Wagnalls*: How
25  Courts Define the Words of the Law," an analysis of how courts incorporate
26  information from dictionaries and digitized corpora as they ascertain legal meaning,
27  will appear in the next issue of the academic journal of the Dictionary Society of
28  North America, *Dictionaries*.

2

6.     This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large digitized corpora consisting of many millions of words.

**OPINIONS**

I.   **SUMMARY OF CONCLUSIONS**

7.     Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements*. Nor does *arms* refer to *parts* of weapons, for example the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets. Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition; arms and accoutrements;* or *arms, ammunition, and accoutrements*. A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier or militia member's kit, or equipment. For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term *accoutrements* occurs alone, as *in the accoutrements of a soldier*, it may include both arms and accessories. But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories. And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

8.     Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks). And they often specified, separately, the

1  different accessories that officers and the rank and file soldiers were also required
2  to have.

3  **II.  THEORY AND METHODOLOGY**

4      9.    Corpus linguistics as a field developed in the late 1960s, when scholars
5  began using computer programs to analyze large bodies of digitized text. Initial
6  work in corpus linguistics did not typically involve legal issues. Literary scholars
7  developed computerized concordances to the works of Shakespeare, Milton, and
8  other major English writers. Scholars plotted the frequency of words and phrases in
9  order to develop a picture of an author's style, and to determine authorship of a
10  particular work when the provenance was in doubt. Soon, in addition to solving
11  literary mysteries, the methodologies developed by corpus linguists were
12  successfully applied in a number of criminal cases in the US and in England
13  involving, for example, the authorship of a ransom note or an email.

14      10.   Lexicographers, who began compiling large analog databases of text in
15  the late 19th century, began to digitize their libraries of paper data and to add to that
16  material, assembling computerized databases of historical and contemporary text
17  and, more recently, of spoken language as well, in order to arrive at more precise
18  definitions of the multiple senses of words and phrases.

19      11.   As a graduate student at the Univ. of Michigan in 1970, I coded analog
20  texts from the *Oxford English Dictionary* files to help build the computerized
21  database for the Dictionary of Early Modern English, the period from 1500–1800
22  that is particularly relevant to the language of the Founding Era. Today, major
23  dictionaries like the *Oxford English Dictionary* and the Merriam-Webster suite of
24  dictionaries rely on public databases of oral and written language, as well as their
25  own proprietary databases, in order to revise older definitions and to track the
26  spread of new words and meanings. The great dictionary makers of Europe use
27  similar databases in their own work.
28

12.   Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a subset of Corpus Linguistics. LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as Original Public Meaning (OPM)—in statutes and in the Constitution. The promise of LCL attracted jurists as well as scholars with a specific interest in language and law. In *Muscarello v. United States* (524 US 125 1998), a case which held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or truck, can be deemed to be within the scope of the statutory phrase 'carries a firearm,'" J. Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to clarify the meaning of the words *carry*, *vehicle*, and *weapon*. In her dissent, J. Ginsburg expressed skepticism that either dictionary evidence, or Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question. Her critique did not deter courts from performing other computerized data searches to determine legal meaning. In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute (*United States v. Costello*, 2012). Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean 'provide shelter' as well as the narrower sense, 'hide someone from the authorities.' But in the context of the Immigration Act, *harbor* appears alongside other terms involving secret, illegal activity, and so even though, using more rigorous parameter's showed that Posner's Google search may have been flawed, his understanding of the word *in context* seems clearly to be correct.

13.   More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, published "Judging Ordinary Meaning" (*Yale Law Journal* 127), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity. Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary*, as well, allowing a more precise interpretation of historical text data.

14.   In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by J. Alito in his concurrence in *Facebook v. Duguid* (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

15.   Several large databases have come online in the past few years that facilitate LCL research. They have proved invaluable to me in compiling this report. Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), covering the years 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth

6

1    century, the Corpus of Historical American English (COHA), which was initially

2    developed at BYU as well but is now independent of that institution, currently

3    contains 475 million words of text from 1820–2020. The size of these databases

4    continues to grow as more works are digitized, coded, and added to the corpora.

5          16.   Critics of LCL have complained that databases like COFEA and COEME

6    contain only texts written by "elites," whose language may differ from that of

7    "ordinary people" who do not write at all, or who for various reasons do not write

8    texts likely to be included in the available corpora. It is certainly the case that many

9    printed books and periodicals, along with documents like the Constitution, its

10    amendments, and state and federal statutes, tend to be written by educated

11    specialists and professional writers, and although ordinary people are expected to

12    understand the language of the Constitution, the Declaration of Independence, and

13    other founding documents, as well as the laws that govern the nation, such texts

14    typically require specialized knowledge. A reading-difficulty formula like the

15    commonly-used Flesch-Kincaid scale suggests that the Declaration of

16    Independence and the Constitution require a fifteenth-grade reading level, while

17    according to one comprehensive study, *Adult Literacy in America* (US Department

18    of Education, 1993), the average American today tends to have a seventh-grade

19    reading level.

20          17.   In order to counter any "elite" bias that may be found in databases like

21    COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases

22    covering the period 1750–1900, focusing for this report on the Founding Era and on

23    the period of Reconstruction after the passage of the Fourteenth Amendment. Print

24    technology remained relatively static between the 1450s, when printing presses first

25    appeared in Europe, and the early 19th century, when the Industrial Revolution

26    drastically changed print technology. The first printing press was adapted by

27    Gutenberg from the design of the traditional wine press, and printing was a slow

28    and labor intensive process. As a result, newspapers in the founding era were small,

1  averaging four to eight pages. Publication was less frequent as well. Papers tended
2  to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the
3  Founding Era and later, during Reconstruction, provided average Americans with
4  their principal access to all the critical events and documents of their time, along
5  with coverage of local and international news. Even though newspaper subscribers
6  tended to be "elites," newspaper content was widely shared by word-of-mouth:
7  ultimately, most Americans in the Founding Era, including those who would be
8  classified as illiterate or poorly educated by today's standards, got their news from
9  newspapers.

10  18.  The invention of the steam engine in the 19th century, along with growth
11  of paper mills that facilitated the production from wood pulp of large and
12  inexpensive rolls of newsprint, led to a revolution in print technology. This led to
13  an explosion in the size of newspapers and the frequency of their publication, to the
14  point where, at their height, papers in big cities were publishing several editions a
15  day. This growth in newspapers, along with a substantial increase in periodical and
16  book production, paralleled a growth in literacy in the US and Europe that tracked
17  the industrial revolution and the subsequent rise in universal public education. By
18  the end of the Civil War, there were more readers than ever, and they demanded
19  more reading material.

20  19.  As for the question of "elites," as the principal means of communicating
21  news and information, the newspapers of the 18th and 19th centuries embodied
22  much of the language of the "ordinary people" who read them. Newspapers also
23  provide researchers with more data for the 19th century than a corpus like COHA,
24  which covers the same period but tends to focus on literary and specialized texts
25  rather than material for the general reader.

26  20.  Since the 1960s, database compilers have been able to track
27  contemporary spoken English more successfully, though for obvious reasons, none
28  of the databases for the Founding Era and for the post-Civil War period cover the

spoken language of Americans. Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

21.   The newspaper databases I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (digitized by the British Library); and two private subscription services, newspapers.com and newspaperarchive.com. For this report, newspapers.com provides the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later 19th century.

22.   All the databases contain some duplicates. COFEA and COEME digitize multiple editions of the same work; and the newspaper databases contain a number of duplicate stories because, particularly in the period of newspaper growth during the 19th century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not. Still, the databases often offer more insight into the meaning of words and phrases than simply going to a dictionary. Jurists from Learned Hand to Felix Frankfurter to Frank Easterbrook and Richard Posner have warned their colleagues not to make a fortress of the dictionary. The corpora are by necessity incomplete. LCL doesn't replace dictionary look-ups, but it does provide an important supplement to them.

## III.   THE MEANING OF ARMS AND ACCOUTREMENTS IN THE DATABASES

23.   I was asked to look at the meaning of *arms* and *accoutrements*, along with the phrase *arms* and *accoutrements,* current in the Founding Era and during the period immediately following the adoption of the Fourteenth Amendment, focusing on whether the word *accoutrements* may be considered analogous to the present-day use of the term *magazine* in reference to firearms.

9

24.   In the eighteenth and nineteenth centuries, *magazine* was a word that meant 'storehouse, depot.' A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits. The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the nineteenth century, and the term was relatively rare until the 1920s. Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms*.

25.   The data on *accoutrements* suggest that the analogous LCMs are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military. *Cartridges, cartridge boxes* and later, *magazines*, are not arms in and of themselves.

26.   The *Oxford English Dictionary* (OED), the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement*; the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

27.   *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxes, and other formal attire). But the military sense of *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers. The example given to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here

1   Wellington, recognized by all as a consummate soldier who would soon defeat
2   Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms*
3   and *accoutrements*.

4       28.   The term *accoutrement-maker*, though not defined separately by the
5   *OED*, is illustrated with examples referring to a manufacturer of military
6   accessories rather than arms; and the term *accoutrement shop* has this 1831
7   example where guns and accoutrements are differentiated: "The crowd was so great
8   in the Rue de Richelieu, . . . especially about the gunsmiths and accoutrement shops
9   in the vicinity of the Palais Royal." [*United Service Jrnl*. i. 325]

10      29.   The *OED* definitions are instructive. But in order to determine more
11  specifically what the term *accoutrements* refers to, I consulted two digitized
12  historical databases, or corpora. A COFEA database search for the occurrence
13  *accoutrements* within 6 words of *arms* returned 873 hits (including a small number
14  of duplicates). A similar search of COEME returned 126 hits, the earliest from
15  1656. I determined that the two search terms, *arms* and *accoutrements*, often appear
16  together as a single phrase, *arms and accoutrements*, typically in military contexts
17  having to do with an army or militia unit. *Accoutrements* often occurs in a list
18  alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition,*
19  though when *ammunition* is not listed separately, the term *accoutrements* will
20  generally include *ammunition*. *Accoutrements* sometimes occurs in a list alongside
21  *clothing*, suggesting it may not always include uniforms (this finding informs the
22  *OED* definition: military equipment other than arms and uniforms). But
23  occasionally, *accoutrements* may include items classified as part of a uniform
24  (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where
25  the term usually refers to clothing associated with particular professions or
26  activities). In sum, in the vast majority of examples, *accoutrements* functions as a
27  catch-all term for military equipment *separate* from, and not including, *arms*.
28

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

30.   But English usage is never simple. As linguists often say, "all grammars leak"—which is to say, there are always a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation: it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military *accoutrements*, such as paper-caps, paper-belts, wooden swords, &c. were beating up for recruits in Parliament-street, Boston. [*The American jest book*: Part I[-II], 1789; emphasis added; here military accoutrements includes toy swords.]

31.   This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that arms may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements provided by the militia law.

32.   But besides a handful of exceptions, in literally hundreds and hundreds of cases, *arms* and *accoutrements* are treated as separate items of military gear. Here are some typical examples from the Founding Era:

> **1776**: Fire arms and accoutrements
>
> **1780**: arms, ammunition, accoutrements, drums and fifes in possession of the respective regiments.
>
> **1795**: you will march . . . with arms and accoutrements in good order. If any volunteer should want arms and ammunition, bring them forward, and they shall be supplied as well as possible. [COEME; the other examples are from COFEA]
>
> **1798**: To hold his powder and his ball, his gun, accoutrements

12

1    and all . . . [This example rhymes because it's from a poem,

2    indicating that the idiomatic phrase arms and accoutrements has

3    become part of the general language available not just to military

4    specialists but also to poets and novelists.]

5    33.   A second COFEA search, for *accoutrements* alone, returned 1,235 hits.

6    COEME yields 771 hits. These searches add a number of non-military contexts,

7    where accoutrements refers to religious gear (robes, mitres, and so on) as well as

8    other sorts of fancy or special clothing. These non-military examples do not

9    reference weapons, ammunition, or other military equipment.

10   34.   I supplemented my COFEA search with a search of the newspaper

11   database, newspapers.com, for the Founding Era period, 1750–1800. The

12   newspaper databases do not permit the kind of collocate searches that COFEA,

13   COEME, and COHA allow. Entering two search terms returns results in which

14   either one or both terms occur on the same page, though not necessarily in the same

15   sentence, or even in the same article, and not necessarily as linked terms. There are

16   1,392 hits for *accoutrements*. There are 692 matches for the exact phrases *arms and*

17   *accoutrements*.

18   35.   Here's a mid-18th century British example from the newspapers.com

19   corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:

20   36.   This Militia shall receive their Arms, Accoutrements, and

21   Ammunition from the Ordnance. *Derby Mercury*, 1756.

22   37.   Similarly, there's this "ploughshares into swords" example of a

23   Cambridge University library to be converted to a military barracks:

24   [T]he new Building intended for a publick Library . . . may be

25   converted into a Barrack, and be supplied with Provisions, Arms,

26   and Accoutrements, at the Expence of the University. 1756

27   38.   A search of the Readex database of America's Historical Newspapers

28   returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. This early

13

example from the colonial period appeared in the **Boston Evening Post** in 1750. It distinguishes *arms* from uniforms, accoutrements, and other military equipment:

> All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions, and all other Things necessary for a Gentleman Ranger.

39.   This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that arms and accoutrements are distinct categories in the new nation as well:

> The militia . . . must be considered as the palladium of our security . . . . The formation and discipline of the militia of the continent should be absolutely uniform; and that the same species of arms, accoutrements, and military apparatus, should be introduced in every part of the United States.

40.   The text of a bill in Congress to establish a uniform militia appeared in the *New York Journal*, in 1790. It confirms the Founding-Era sense that *arms*, *ammunition*, and *accoutrements* make up distinct and separate elements of a soldier's kit:

> There shall be appointed an adjutant general for each state . . . whose duty it shall be to . . . report[] the actual situation of their arms, accoutrements, and ammunition. . . Every non-commissioned officer or private . . . for appearing at such meeting or rendezvous without his arms, ammunition, or accoutrements, as directed by this act, shall pay the sum of twenty-five cents.

41.   And this cite from 1868 clearly distinguishes what counts as arms, and what counts, separately, as accoutrements:

> At Watertown Arsenal, Massachusetts . . . the following Arms, &c., will be sold:10,699 rifled and smooth-bore Muskets . . . ; 261 Carbines . . . ; 305 Sabres . . . ; lot of cavalry accoutrements, consisting of Bayonet Scabbards, Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c."

42.   The newspaper data parallels that of COFEA: the phrase *arms and*

*accoutrements* is almost always military. The phrase sometimes occurs alongside *ammunition* as a separate list item. *Accoutrements*, when it appears alone, is a more general term, used both for military and other gear, though in non-military contexts it is more directed toward clothing rather than 'equipment' (priests' robes, ministerial garb, fancy ball gowns, badges of office), as is also indicated in the *OED* citations. In non-military contexts, *accoutrements* carries the suggestion of ceremonial gear, and less commonly, nonmilitary tools of the trade.

43.   It's clear that *arms and accoutrements* was, during the 18th and 19th centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and battery* or *breaking and entering*. Such pairs take on the characteristics of a formula, and often appear in the same order (this order may be dictated by logical succession of events, or it may be random). *Eggs and bacon* is rarer than *bacon and eggs*. And it would be unusual to find *battery and assault*. Such ordered pairs are called "irreversible binomials," though there's nothing but custom (as in *salt and pepper*) and sometimes logic (as in breaking and entering) to prevent anyone from reversing the order.

44.   The word *accoutrements* typically occurs in a list after *arms* (more rarely, it may occur before *arms* as well), and it is typically a separate category from *arms* (though not always, as the above examples show).

45.   There are over 47,000 citations in newspapers.com for *arms* or *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms and accoutrements*. Examining a selection of the 15,799 citations of the phrase confirms that both in England and the US, *arms* and *accoutrements* are separate categories. Here is one example from Gloucestershire, in England, dated 1868:

[A] letter was received from the Home Secretary, pointing out the danger

15

1    of permitting an accumulation of arms and accoutrements to take place in

2    prisons, and requesting, if there were any arms or munitions of war stored

3    in the prison, that they should be removed to the nearest military depot.

4    46.   A similar cite from Iowa in 1868: "Persons having in their possession any

5    arms, accoutrements or ammunition belonging to the State, are requested to return

6    the same at once to the Adjutant General, as proper places have been provided by

7    the State for the safe keeping of all such property."

8    47.   And this, from Stroudsburg, PA, also 1868: "More than half of the

9    Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements,

10   and probably made their way to the gold regions of Colorado and Montana."

11   48.   The circa-1868 data confirmed the Founding Era data that *accoutrements*

12   is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the

13   terms refer to separate categories of equipment.

14   49.   One final note on *accoutrements*. The U.S. Supreme Court's recent

15   decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843,

16   2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the

17   North Carolina Supreme Court affirming Huntley's conviction for carrying a

18   shotgun illegally "to the terror of the people," as forbidden by the Statute of

19   Northampton in 1328. In that decision, the Court states, A gun is an 'unusual

20   weapon,' wherewith to be armed and clad. No man amongst us carries it about with

21   him, as one of his everyday accoutrements—as a part of his dress.

22   50.   In the citation above, *accoutrements* does not refer to weaponry, but to

23   the more general category of 'everyday attire, or clothing.' It may be normal to

24   wear a shirt, or a belt, or shoes, but it's not normal, the Court is saying, to wear a

25   gun in North Carolina in 1843. It's legal—the Court agrees—to carry a gun for any

26   lawful purpose, "either of business or amusement"—but it's not *normal* or typical

27   to do so. In affirming Huntley's conviction, the Court noted that his purpose in

28   carrying a shotgun was not a legal one.

16

## IV. SOME HISTORICAL NOTES ON THE USE OF THE WORD MAGAZINE

51.    Since the technology of arms and ammunition was changing by the mid-nineteenth century, I also searched for new uses of the term magazine in relation to *arms* and *accoutrements*. With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term *magazine* starts to appear in the sense 'ammunition container' (replacing the earlier *cartridge box* or *cartridge case*). According to the *OED*, in the 18th and early 19th centuries, magazine referred generally to 'a storehouse,' and in military contexts it referred specifically to a storehouse for gunpowder. (The sense of 'storehouse' also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of 'depot, warehouse,' is cognate with the French word *magasin*, 'a shop or store').

52.    Although most uses of the word *magazine* still refer to printed periodicals, during the 19th century, one sense of the term *magazine* narrows, referring more and more to an 'ammunition container,' a primary sense of the word in reference to firearms today. The *OED* defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

53.    COFEA and COEME do not cover the period past 1800. COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s. Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses. Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. *Magazines* meaning 'devices for holding bullets' form only a very small subset of these citations. It took some thirty to forty years for the 'bullet holder'

17

1  sense of the word *magazine* to become more common, and even then, text

2  references to ammunition magazines often appear, not in general discourse, but in

3  legislation restricting their size or use.

4    54.   Most militia laws and regulations from the Founding Era specify

5  minimum requirements for soldiers' weapons, ammunition, and accoutrements.

6  Most laws regulating weapons in the mid-19th century restrict or ban specific kinds

7  of weapons, often enumerating them, sometimes in terms we find colorful today but

8  which were common at the time (Arkansas toothpicks, Bowie knives, slung shots,

9  swords in canes, pistols capable of being concealed in a pocket). Occasionally these

10 laws further identified such weapons as those used by "brawlers," thieves, robbers,

11 or others bent on illegal activities. Other weapons restrictions follow the English

12 tradition of limiting possession of weapons by social class, nationality, or race.

13   55.   Although militia laws do specify weapons and other required

14 accoutrements or pieces of military equipment, including horses for the officers,

15 those laws that prohibit certain kinds of weapons during the two critical periods

16 (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one

17 exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles,

18 except by the owner thereof on his removal to reside out of this province, or any

19 gun barrels, gun locks, or bayonets, be carried out of his province, without the leave

20 of the council of safety for the time being." [1776 Md. Laws 146].

21   56.   I surveyed the gun regulations in the Duke Historical Database from the

22 early medieval period through 1885 to see what terminology was used. None of the

23 laws that prohibit weapons, aside from the Maryland statute above, specifies a gun

24 part or ammunition case or accoutrements of any kind. Although many present a list

25 of banned or prohibited weapons—usually without defining them [the assumption

26 is that the reader knows what they refer to], none of the laws mention cartridge

27 boxes, bullets, barrels, or other parts of any weapons.

28

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

57.   Later, however, in the decades after the introduction of *magazines* as 'carriers or holders of bullets,' laws and regulations against their nonmilitary use started to appear. Here's a 1919 Maine law banning guns with loaded magazines: No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.

58.   Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states. Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

59.   A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

60.   Finally, the Federal Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms: "(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition."

61.   The Act also provides a specific definition of "machine gun": "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

19

## V. CONCLUSION

62.   In effect, then, *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms. In non-military contexts this does not apply: the *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

63.   But there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

64.   In addition, 'bullet holders,' whether they are called *cartridge cases*, *magazines*, or simply, *machine guns*, both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

65.   To repeat, there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November _7_, 2022, at _Champaign_, IL.


_____
Dennis Baron

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

# EXHIBIT 7

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA 90013-1230
     Telephone: (213) 269-6177
6  Fax: (916) 731-2144
     E-mail: Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
8  *State of California*

9             IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                      CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          Case No. 3:17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**                   **DECLARATION OF RYAN BUSSE**
    **CHRISTOPHER WADDELL, and**
15  **CALIFORNIA RIFLE & PISTOL**         Courtroom:    5A
    **ASSOCIATION, INC., a California**   Judge:        Hon. Roger T. Benitez
16  **corporation,**                      Action Filed: May 17, 2017

17                        Plaintiffs,

18        **v.**

19
    **ROB BONTA, in his official capacity as**
20  **Attorney General of the State of**
    **California; and DOES 1-10,**
21
22                       Defendants.

23

24

25

26

27

28

---

Declaration of Ryan Busse (3:17-cv-1017-BEN-JLB)

# DECLARATION OF RYAN BUSSE

I, Ryan Busse, declare under penalty of perjury that the following is true and correct:

1.      I am a former senior executive in the firearms industry and the author of *Gunfight:  My Battle Against the Industry that Radicalized America* (New York: PublicAffairs, 2021).  I make this declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of August 29, 2022.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.      I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $150 per hour.

## BACKGROUND AND QUALIFICATIONS

4.      I was raised with firearms as an integral part of my life.  I began shooting with various guns as a young boy and continued to regularly use and study guns throughout my life (I am now 52).  After graduating college, I entered the firearms industry in 1992.  I became a sales executive in the firearms industry in 1995, and I spent more than 25 years in this role.  While in the industry, I developed innovative sales teams, maintained relationships with the largest national retailers, and was responsible for worldwide sales of millions of firearms.  I built a dealer-direct sales network that included more than 2500 firearms dealers including locations in all 50 states, and I regularly visited these dealers.  In my job, I also studied and built sales programs that relied on understanding the technical nature of most firearms available in the U.S. market, including AR-platform and other types of rifles.  During my career I played an integral role in building one of the largest firearms companies in the United States, Kimber, and I was nominated by shooting industry leadership many times for the SHOT Business "Shooting Industry Person

1    of the Year" Award.[1]  I served in an executive sales capacity as Vice President of

2    Sales until August 2020.  While in the industry I served as an advisor to the United

3    States Senate Sportsmen's Caucus, and as the board chairman for Backcountry

4    Hunters & Anglers, a national wildlife conservation and hunting organization.

5          5.      I left the firearms industry because I was concerned about what I

6    believed to be irresponsible and dangerous marketing and sales practices.  Since I

7    left, I have served as an advisor to the 2020 Biden presidential campaign, I have

8    testified twice before the U.S. Congress about the firearms industry and gun policy

9    (before the House Committee on Oversight and Reform[2] and the Joint Economic

10   Committee[3], respectively), I have been called to testify in closed-door briefings at

11   the U.S. Senate, and I currently serve as a Senior Advisor to Giffords.  I remain a

12   proud and active gun owner, outdoorsman, and advocate for responsible gun

13   ownership.  I have provided expert witness testimony in *Miller v. Bonta*, No. 3:19-

14   cv-01537-BEN-JLB (S.D. Cal.).

15                              **OPINIONS**

16          6.    When I first started my work in the gun industry neither AR-15s nor

17   large-capacity magazines (those capable of holding more than 10 rounds) were

18   common. There was an unspoken agreement in the industry that tactical guns and

19   gun paraphernalia—and virtually all large capacity magazines were considered

20   tactical at this time—would not be displayed at trade shows or used at industry-

21   sponsored shooting events. Individuals who brought such rifles to shooting events

22   were asked not to return. This remained true as late as 2007. It was not until very

23

24   _____

25          [1] SHOT Business is a trade publication of the shooting and firearms industry,
     and "Person of the Year" was the highest award given to an individual in the
26   firearms industry.

27          [2] See https://bit.ly/3CVDQc4.

28          [3] See https://bit.ly/3My2gLJ. .

1  recently that the gun industry began to push AR-15s leading to their popularization

2  today.

3       7.     Despite the recent popularization of large-capacity magazines, it is

4  important to note that I am not aware of a single existing firearm that requires a

5  high-capacity magazine to function as designed. By this, I mean that all firearms

6  that can accept a large-capacity magazine can also accept a magazine that holds 10

7  or fewer rounds and function precisely as intended. This is true even of AR-style

8  rifles. Although many AR-style rifles are sold with a 30-round magazine, the

9  manufacturers all offer the optional purchase of 10-round or even lower-capacity

10  magazines. There are many pistols (such at the very popular Model 1911—which

11  was the accepted sidearm of the U.S. Military for decades and is still one of the

12  most widely sold guns in the United States) that are built for magazines of eight

13  rounds or less. While larger 10-plus round magazines exist for the 1911 and other

14  similar pistols, a smaller magazine (standard seven or eight round) are considered

15  preferable by almost all consumers because the physical size/profile of the shorter

16  magazine is easier to carry, shoot and conceal. Still today, the 1911 and other

17  similar guns which are built to function with sub-10 round magazines are built by

18  many gun companies (Smith and Wesson, Ruger, Kimber, Springfield, Rock Island,

19  Dan Wesson, and many other companies build and sell these 1911 pistols) and they

20  are sold in high volumes by most retailers in the United States. These guns are still

21  considered extremely effective self-defense firearms by many of the leading

22  firearms trainers in the country.

23       8.   Today there are also many handguns that can accept a magazine within

24  15–20-plus rounds, but these handguns can accept and fully function with a

25  magazine that holds 10 or fewer rounds. Firearm manufacturers have been

26  providing these lower capacity magazines for years and can easily modify a "high

27  capacity" magazine into one that will accept only 10 rounds but still function just

28

as designed in a firearm. In 1994, Congress enacted the Violence Crime Control and Law Enforcement Act that prohibited the possession of "large capacity ammunition feeding devices" defined as any magazine capable of accepting more than ten rounds of ammunition. California enacted a ban on the sale of large capacity magazines in 2000 and that law is still on the books today. Since that enactment, and still today, firearms manufacturers build and sell dozens of gun models and magazines that are compliant with that California law. I am not aware of any assertion that these guns, built for and sold in California, are incapable of functioning as designed.

9. Because a large capacity magazine is not a required component for a firearm to operate, it can and should be characterized as a firearms accessory. There is a massive market for magazines that far surpasses that of the market for firearms themselves in terms of numeric sales. There are companies, such as Magpul, that entirely specialize in firearms accessories including large capacity magazines. In fact, most firearms manufacturers do not consider the magazines as integral enough to build their own magazines for their own guns. In almost all cases even the largest gun manufacturers contract with "accessory makers" who build magazines and then supply them to the gun manufacturer who then sells the magazines with the guns but also as an "add-on" accessory. Based on my experience, these magazines are a large profit center for the gun industry and sales of these magazines are treated as a category separate from gun sales throughout the sales chain. For example, I am aware of compensation programs from gun manufacturers that offer increased payment for magazines as opposed to guns, and retailers often incentivize their employees to push a buyer to purchase additional magazines because it is known that consumers view the purchase of magazines as separate from the gun and they are therefore viewed as "add-on sales" for retailers. These magazines are almost always manufactured by third party companies (not the manufacturer of the firearm). The degree to which a magazine is viewed as an accessory by firearms

1   retailers is reinforced by the fact that when manufacturers add additional magazines

2   to the gun at the time of sale as an incentive to encourage consumers to purchase

3   the gun, the practice often upsets the retailers who view this as taking away an

4   accessory sale they could have made.

5        10. In my experience, magazines are often used as marketing tactics to

6   increase sales. Many gun buyers are encouraged to buy extra magazines of various

7   sizes and they are encouraged to build an excess supply of more magazines than are

8   needed even though these accessories basically never wear out. While it is possible

9   for someone who shoots high volumes to eventually wear out a magazine, these

10  shooters are exceptionally rare. Additionally, when a magazine begins to wear out

11  you can purchase a new spring tune-up kit for the magazine and thereby refurbish

12  the magazine.

13       11. It is also important to note that even the ability of guns to accept an

14  external magazine is not as ubiquitous as one would be led to believe. Fixed

15  magazine firearms are and have long been extremely prevalent. The majority of

16  hunting rifles have a fixed internal magazine, all revolvers hold ammunition in what

17  is in essence a circular fixed magazine, almost all shotguns are built with fixed

18  magazines or without any magazine at all, some tactical rifles, and most tactical

19  shotguns are built with, and function with fixed magazines.

20       12. Lastly, many widely available guns including all AR-15 style rifles

21  accept all other AR-15 magazines. In other words, the magazine is a universal

22  accessory much like tires that fit many brands of cars. This is true of AR-15

23  magazines regardless of capacity or size (a 10 round AR-15 magazine will function

24  in all other AR-15 style firearms). It is also true of the 1911 style pistol which is

25  one of the most popular self-defense guns in history. This century-old design is still

26  a leading seller and its standard specifications call for a seven or eight round

27  magazines. Dozens of the largest manufacturers in the world currently offer 1911

28  pistol models and magazines from each are interchangeable between all of these

1   others. This interchangeability of magazines as accessories is illustrated by the fact
2   that third party manufacturers who produce magazines for multiple gun companies
3   will sometimes mistakenly ship a magazine from "company A" to "company B"
4   because the only difference is the marking (there is no functional difference). I have
5   personally witnessed this on multiple occasions.

6          13.    Based on my experience, a large-capacity magazine is not necessary to
7   use a firearm effectively for self-defense or other sporting purpose, like hunting.

8          Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the
9   laws of the United States of America that the foregoing is true and correct.

10         Executed on November 9, 2022, at Kalispell, Montana.

13   _____
14                Ryan Busse

# EXHIBIT 8

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta, in his*
    *official capacity as Attorney General of the*
8   *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                       CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          17-cv-1017-BEN-JLB
14  **LEWIS, PATRICK LOVETTE,**
    **DAVID MARGUGLIO,**                  **DECLARATION OF SAUL**
15  **CHRISTOPHER WADDELL, and**          **CORNELL**
    **CALIFORNIA RIFLE & PISTOL**
16  **ASSOCIATION, INC., a California**   Courtroom:    5A
    **corporation,**                      Judge:        Hon. Roger T. Benitez
17                                        Action Filed:  May 17, 2017
                         Plaintiffs,
18
19          **v.**

20  **ROB BONTA, in his official capacity as**
    **Attorney General of the State of**
21  **California; and DOES 1-10,**

22                         Defendants.

23

24

25

26

27

28

                               1
           Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

## DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare under penalty of perjury that the following is true and correct:

1.      I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  In *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.  This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past.  My report explores these issues in some detail.  Finally, I have been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.      I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in

1  conferences on the topic of the Second Amendment and the history of gun

2  regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA

3  Law School, the University of Pennsylvania Law School, Columbia Law School,

4  Duke Law School, Pembroke College Oxford, Robinson College, Cambridge,

5  Leiden University, and McGill University.[1]

6       4.      My writings on the Second Amendment and gun regulation have been

7  widely cited by state and federal courts, including the majority and dissenting

8  opinions in *Bruen*.[2] My scholarship on this topic has appeared in leading law

9  reviews and top peer-reviewed legal history journals. I authored the chapter on the

10  right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-

11  authored the chapter in *The Cambridge History of Law in America* on the Founding

12  era and the Marshall Court, the period that includes the adoption of the Constitution

13  and the Second Amendment.[3] Thus, my expertise not only includes the history of

14  gun regulation and the right to keep and bear arms, but also extends to American

15  legal and constitutional history broadly defined.  I have provided expert witness

16  testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No.

17  14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo.

18  D. Ct., Boulder Cnty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller*

19  *v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG

20  (S.D. Cal.), 34 F.4th 704 (9th Cir. 2022); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D.

21  Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-

22  cv-01537-BEN-JLB (S.D. Cal.).

23

24         [1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Exhibit 1.

25         [2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

26         [3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber

27  eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544

28  (Christopher Tomlins & Michael Grossberg eds., 2008).

**RETENTION AND COMPENSATION**

5.     I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports; $750 per hour for depositions and court appearances; and an additional $100 per hour for travel time.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

6.     The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit, my review of the local ordinances at issue in this lawsuit, my education, expertise, and research in the field of legal history.  The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

**SUMMARY OF OPINIONS**

7.     Understanding text, history, and tradition require a sophisticated grasp of historical context.  One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment.

8.     It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights claims.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4]  Each of the new states, either by

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal*

(continued…)

3

1  statute or judicial decision, adopted multiple aspects of the common law, focusing

2  primarily on those features of English law that had been in effect in the English

3  colonies for generations.[5]  No legal principle was more important to the common

4  law than the concept of the peace.[6]  As one early American justice of the peace

5  manual noted:  "the term peace, denotes the condition of the body politic in which

6  no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading

7  source of early American views about English law, opined that the common law

8  "hath ever had a special care and regard for the conservation of the peace; for peace

9  is the very end and foundation of civil society."[8]

10         9.     In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of

11  Blackstone's authority as a guide to how early Americans understood their

12  inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous

13  terms that there was a "well established historical tradition of prohibiting the

14  carrying of dangerous and unusual weapons."[9]  The dominant understanding of

15  the Second Amendment and its state constitutional analogues at the time of their

16  _____

17  *Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

18         [5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

19

20         [6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH 105-109, 227-228 (University of North Carolina Press, 2009).

21

22         [7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

23         [8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

24         [9] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms.  The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1713 (2012).  It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016).

25

26

27

28

1  adoption in the Founding period forged an indissoluble link between the right to

2  keep and bear arms with the goal of preserving the peace.[10]

3       10.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined

4  with the scope they were thought to have when the people adopted them."[11]

5  Included in this right was the most basic right of all: the right of the people to

6  regulate their own internal police.  Although modern lawyers and jurists are

7  accustomed to thinking of state police power, the Founding generation viewed this

8  concept as a right, not a power.[12]  The first state constitutions clearly articulated

9  such a right — including it alongside rights more familiar to modern Americans,

10  most notably, the right to bear arms.[13]  Pennsylvania's Constitution framed this

11  estimable right succinctly: "That the people of this State have the sole, exclusive

12  and inherent right of governing and regulating the internal police of the same."[14]

---

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937).  For a more recent elaboration of the concept, JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013), 44-45.  On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569, 576-77 (2017).

[11] *Heller*, 554 U.S. at 634–35; William J. Novak, *Common Regulation: Legal Origins of State Power in America*, 45 HASTINGS L.J. 1061, 1081–83 (1994); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. POL'Y HIST. 47 (2008).

[12] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," see generally Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015).  *See also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005), 82-87; Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[13] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[14] Modern style police forces did not emerge until the middle of the next century, and although these early police forces were modeled on military style organizations, they did not routinely carry firearms until after the Civil War, see Scott W. Phillips, *A Historical Examination of Police Firearms*, 94 THE POLICE JOURNAL 122 (2021).

5

1   Thus, if Justice Scalia's rule applies to the scope of the right to bear arms, it must
2   also apply to the scope of the right of the people to regulate their internal police.
3   The history of gun regulation in the decades after the right to bear arms was
4   codified in both the first state constitutions and the federal bill of rights underscores
5   this important point.

6     11. In the years following the adoption of the Second Amendment and its
7   state analogues, firearm regulation increased. Indeed, the individual states exercised
8   their police powers to address longstanding issues and novel problems created by
9   firearms in American society. In particular, the states regulated and when
10  appropriate prohibited categories of weapons deemed to be dangerous *or* unusual.

11  **I. THE HISTORICAL INQUIRY REQUIRED BY *BRUEN*, *MCDONALD*, AND**
12    ***HELLER***

13    12. The United States Supreme Court's decisions in *Heller*, *McDonald*[15],
14  and *Bruen* have directed courts to look to text and history for guideposts in
15  evaluating the scope of permissible firearms regulation under the Second
16  Amendment. In another case involving historical determinations, Justice Thomas,
17  the author of the majority opinion in *Bruen*, has noted that judges must avoid
18  approaching history, text, and tradition with an "ahistorical literalism."[16] Legal
19  texts must not be read in a decontextualized fashion detached from the web of
20  historical meaning that made them comprehensible to Americans living in the past.
21  Instead, understanding the public meaning of constitutional texts requires a solid
22  grasp of the relevant historical contexts.[17]

23    13. Following the mandates set out in *Heller, McDonald* and more recently
24  in *Bruen*, history provides essential guideposts in evaluating the scope of

25         _____
   [15] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).
26     [16] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019)
 (Thomas, J.) (criticizing "ahistorical literalism").
27     [17] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist*
28  *Translation*, 84 FORDHAM L. REV. 935 (2015).

1  permissible regulation under the Second Amendment.[18]  Moreover, as *Bruen* makes

2  clear, history neither imposes "a regulatory straightjacket nor a regulatory blank

3  check."[19]  The Court acknowledged that when novel problems created by firearms

4  are at issue the analysis must reflect this fact: "other cases implicating

5  unprecedented societal concerns or dramatic technological changes may require a

6  more nuanced approach."[20]  *Bruen* differentiates between cases in which contested

7  regulations are responses to long standing problems and situations in which modern

8  regulations address novel problems with no clear historical analogues from the

9  Founding era or the era of the Fourteenth Amendment.

10      14.    In particular, *Bruen* suggests three key contextually dependent

11  inquiries[21] courts must conduct to analyze the history of regulation and try and infer

12  what the absence of a regulatory tradition means as a matter of law:

13     •  When a challenged regulation addresses a general societal problem that

14         has persisted since the 18th century, the lack of a distinctly similar

15         historical regulation addressing that problem is relevant evidence that

16         the challenged regulation is inconsistent with the Second Amendment;

17     •  Likewise, if earlier generations addressed the societal problem, but did

18         so through materially different means, that also could be evidence that

19         a modern regulation is unconstitutional; and

20     •  If some jurisdictions actually attempted to enact analogous regulations

21         during this timeframe, but those proposals were rejected on

22         constitutional grounds, that rejection surely would provide some

23         probative evidence of unconstitutionality.

24      15.    A mechanistic strategy of digital searching for historical gun laws would

25  be incapable of answering those historical inquiries.  Instead, a historian seeking to

---

[18] *Bruen*, 142 S. Ct. at 2127.
[19] *Id*. at 2133.
[20] *Id*. at 2132.
[21] *Id*. at 2131.

7

answer those inquires would need to holistically research and analyze how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, respond to the societal ills created by those changes.

16.    In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[22] Indeed, such research is still ongoing: new materials continue to emerge; and in the months since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[23]

17.    Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[24]

18.    One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard-wired into the Second

---

[22] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[23] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[24] *Bruen*, 142 S. Ct. at 2132–33.

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

1   Amendment itself.  As Justice Scalia noted in *Heller*, and Justice Thomas reiterated

2   in *Bruen*, the original Second Amendment was a result of interest balancing

3   undertaken by the people themselves in framing the federal Constitution and the

4   Bill of Rights.  Thus, from its outset the Second Amendment recognizes both the

5   right to keep and bear arms and the right of the people to regulate arms to promote

6   the goals of preserving a free state. An exclusive focus on rights and a

7   disparagement of regulation is thus antithetical to the plain meaning of the text of

8   the Second Amendment.  Although rights and regulation are often cast as

9   antithetical in the modern gun debate, the Founding generation saw the two goals as

10  complimentary.  Comparing the language of the Constitution's first two

11  amendments and their different structures and word choice makes this point crystal

12  clear.  The First Amendment prohibits "abridging" the rights it protects. In standard

13  American English in the Founding era, to "abridge" meant to "reduce."  Thus, the

14  First Amendment prohibits a diminishment of the rights it protects.  The Second

15  Amendment's language employs a very different term, requiring that the right to

16  bear arms not be "infringed."[25]  In Founding-era American English, the word

17  "infringement" meant to "violate" or "destroy."  In short, when read with the

18  Founding era's interpretive assumptions and legal definitions in mind, the two

19  Amendments set up radically different frameworks for evaluating the rights they

20  enshrined in constitutional text.  Members of the Founding generation would have

21  understood that the legislature could regulate the *conduct* protected by the Second

22  Amendment and comparable state arms bearing provisions as long such regulations

23  did not destroy the underlying *right*.

24  _____

25      [25] The distinction emerges clearly in a discussion of natural law and the law
    of nations in an influential treatise on international law much esteemed by the
26  Founding generation:  "Princes who infringe the law of nations, commit as great a
    crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE
    PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was
27  among those included in the list of important texts Congress needed to procure, *see*
    Report on Books for Congress, [23 January] 1783," *Founders Online,* National
28  Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

19.     John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[26]

20.     Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[27]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[28]  Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[29]  Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[30]   And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[31]

21.     Regulation, including robust laws, were not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[32]  As one

---

[26] *Liberty,* A NEW LAW DICTIONARY (1792) *See  also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[27] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[28] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[29] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[30] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[31] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

[32] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001)

(continued…)

1  patriotic revolutionary era orator observed, almost a decade after the adoption of the

2  Constitution: "True liberty consists, not in having *no government*, not in a

3  *destitution of all law*, but in our having an equal voice in the formation and

4  execution of the laws, according as they effect [*sic*] our persons and property."[33]

5  By allowing individuals to participate in politics and enact laws aimed at promoting

6  the health, safety, and well-being of the people, liberty flourished.[34]

7      22.    The key insight derived from taking the Founding era conception of

8  rights seriously and applying the original understanding of the Founding era's

9  conception of liberty is the recognition that regulation and liberty were not

10  antithetical to one another.  The inclusion of rights guarantees in constitutional texts

11  was not meant to place them beyond the scope of legislative control.  "The point of

12  retaining natural rights," originalist scholar Jud Campbell reminds us "was not to

13  make certain aspects of natural liberty immune from governmental regulation.

14  Rather, retained natural rights were aspects of natural liberty that could be restricted

15  only with just cause and only with consent of the body politic."[35]  Rather than limit

16  rights, regulation was the essential means of preserving rights, including self-

17  (discussing how the early modern language of rights incorporated aspects of natural

18  rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL.

19  THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

20  [33] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text

21  available in the Evans Early American Imprint Collection) (emphasis in original).

22  [34] *See* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998), 17-36 (examining neo-Roman theories of free citizens and how it impacted the

23  development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007), 125-27, 139-43

24  (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

25

26  [35] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half*

27  *Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206

28  (2016) (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

1   defense.[36]  In fact, without robust regulation of arms, it would have been impossible

2   to implement the Second Amendment and its state analogues.  Mustering the militia

3   required keeping track of who had weapons and included the authority to inspect

4   those weapons and fine individuals who failed to store them safely and keep them

5   in good working order.[37]  The individual states also  imposed loyalty oaths,

6   disarming those who refused to take such oaths.  No state imposed a similar oath as

7   pre-requisite to the exercise of First Amendment-type liberties.  Thus, some forms

8   of prior restraint, impermissible in the case of expressive freedoms protected by the

9   First Amendment or comparable state provisions, were understood by the Founding

10  generation to be perfectly consistent with the constitutional right to keep and bear

11  arms.[38]

12        23.    In keeping with the clear public meaning of the Second Amendment's

13  text and comparable state provisions, early American governments enacted laws to

14  preserve the rights of law-abiding citizens to keep and bear arms and promote the

15  equally vital goals of promoting public safety.  As long as such laws did not destroy

16  the right of self-defense, the individual states enjoyed broad latitude to regulate

17  arms.[39]

---

18  [36] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15
19  GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-
    shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the
20  inclusion of the Second Amendment in the Bill of Rights placed certain forms of
    regulation out of bounds totally anachronistic.  This claim has no foundation in
21  Founding-era constitutional thought, but reflects the contentious modern debate
    between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's
22  debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND
    THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021),
23  https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf
    [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of*
24  *What?*, 132 HARV. L. REV. 120, 123 (2019).

    [37] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE
25  RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

26  [38] Saul Cornell,  *Commonplace or Anachronism: The Standard Model, the*
    *Second Amendment, and the Problem of History in Contemporary Constitutional*
27  *Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

28  [39] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early*
    *American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

12

## II. FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

24.     Guns have been regulated from the dawn of American history.[40]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[41]  Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen's* framework.[42]

25.     The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to preserve the peace.[43]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[44]  To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government. In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[45]

---

[40] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[41] *Id.*

[42] Ruben & Miller, *supra* note 22, at 1.

[43] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[44] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[45] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

13

26.     *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[46]  Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[47]

27.     Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment.  A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem.  In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[48]

28.     The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[49]  Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America.  These low levels of

---

[46] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 198-201 (2016).

[47] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA 10-16 (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY xvi-xxii (2006).

[48] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[49] It is important to recognize that there were profound regional differences in early America. See JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE 170–176 (1988).  These differences also had important consequences for the evolution of American law.  *See generally* David Thomas Konig, *Regionalism in Early American Law, in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

violence among persons of European ancestry contrasted with the high levels of violence involving the tribal populations of the region. The data presented in Figure 1 is based on the pioneering research of Ohio-State historian Randolph Roth. It captures one of the essential facts necessary to understand what fears motivated American gun policy in the era of the Second Amendment. The pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military style weapons which were relatively expensive and had little utility in a rural society. Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[50] Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life. Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[51]

29. Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period. Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes. Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge. Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily

---

[50] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[51] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

a function of aesthetics or the potent symbolism of the hearth, as many today assume. As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded. Why do they always show the gun over the fireplace? Because that's the warmest, driest place in the house."[52] Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses. Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[53]

**Figure 1**



Figure 2.3  Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

30.     As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment. Nor were guns the primary weapon of choice for those with evil intent during this period.[54] The problem the Founding generation faced was that Americans were reluctant to purchase the type

---

[52] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[53] Sweeney, *supra* note 50.

[54] HAAG, *supra* note 46.

1    of weapons needed to effectively arm their militias.  When the U.S. government

2    surveyed the state of the militia's preparedness shortly after Jefferson took office in

3    1800, the problem had not been solved.  Although Massachusetts boasted above

4    80% of its militia armed with military quality weapons, many of the southern states

5    lagged far behind, with Virginia and North Carolina hovering at about less than half

6    the militia properly armed.[55]

7         31.    Government policy, both at the state and federal level, responded to

8    these realities by requiring a subset of white citizens, those capable of bearing arms,

9    to acquire at their own expense a military quality musket and participate in

10   mandatory training and other martial activities.[56]  Gun policy in the Founding era

11   reflected these realities, and accordingly, one must approach any analogies drawn

12   from this period's regulations with some caution when applying them to a modern

13   heterogeneous industrial society capable of producing a bewildering assortment of

14   firearms whose lethality would have been almost unimaginable to the Founding

15   generation.[57]  Put another way, laws created for a society without much of a gun

16   violence problem enacted at a time of relative gun scarcity, at least in terms of

17   militia weapons, have limited value in illuminating the challenges Americans face

18   today.

19        32.    The other aspect of gun policy that needs to be acknowledged is the

20   active role the federal government took in encouraging the manufacturing of

21   military arms.  The American firearms industry in its infancy was largely dependent

22   on government contracts and subsidies.  Thus, government had a vested interest in

23   determining what types of weapons would be produced.[58]  Government regulation

24   _____

25   [55] Sweeney, *supra* note 50.

26   [56] SAUL CORNELL, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006) at 68-70.

27   [57] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

28   [58] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun*

(continued…)

17

1   of the firearms industry also included the authority to inspect the manufactures of

2   weapons and impose safety standards on the industry.[59]  Some states opted to tax

3   some common weapons to discourage their proliferation.[60]

4        33.    The calculus of individual self-defense changed dramatically in the

5   decades following the adoption of the Second Amendment.[61]  The early decades of

6   the nineteenth century witnessed a revolution in the production and marketing of

7   guns.[62]  The same technological changes and economic forces that made wooden

8   clocks and other consumer goods such as Currier and Ives prints common items in

9   many homes also transformed American gun culture.[63]  These same changes also

10  made handguns and a gruesome assortment of deadly knives, including the dreaded

11  Bowie knife, more common.  The culmination of this gradual evolution in both

12  firearms and ammunition technology was the development of Samuel Colt's pistols

13

14  _____

*Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal,
15  *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q.
526, 526 (2014).

16      [59] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To
Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth,"
17  ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this
Commonwealth, shall, before the same shall be sold, and before the same shall be
18  stocked, be proved by the person appointed according to the provisions of an act . .
. . . ."); § 2 ("That if any person of persons, from and after the passing of this act,
19  shall manufacture, within this Commonwealth, any musket or pistol, or shall sell
and deliver, or shall knowingly purchase any musket or pistol, without having the
20  barrels first proved according to the provisions of the first section of this act,
marked and stamped according the provisions of the first section of the act.")

21      [60] 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue,
chap. 25, § 27, pt. 15. ("The following subjects shall be annually listed, and be
22  taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-
cane and rifle cane, used or worn about the person of any one at any time during the
23  year, one dollar and twenty-five cents. Arms used for mustering shall be exempt
from taxation."); *see also* 1866 Ga. Law 27, An Act to authorize the Justices of the
24  Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for
county purposes, and to regulate the same.
25
        [61] Cornell, *supra* note 3 at 745.
26
        [62] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American
27  Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).

        [63] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW
28  AMERICAN HISTORY (Eric Foner ed., 1990).

1   around the time of the Mexican-American War.[64]  Economic transformation was

2   accompanied by a host of profound social changes that gave rise to America's first

3   gun violence crisis.  As cheaper, more dependable, and easily concealable handguns

4   proliferated in large numbers, Americans, particularly southerners, began sporting

5   them with alarming regularity.  The change in behavior was most noticeable in the

6   case of handguns. [65]

7        34.    The response of states to the emergence of new firearms that

8   threatened the peace was regulation. In short, when confronted by  changes in

9   technology, consumer behavior, and faced with novel threats to public safety, the

10  individual states enacted laws to address these problems.  In every instance apart

11  from a few outlier cases in the Slave South, courts upheld such limits on the

12  unfettered exercise a right to keep and bear arms.  The primary limit identified by

13  courts in evaluating such laws was the threshold question about abridgement: did

14  the law negate the ability to act in self-defense.[66] In keeping with the clear

15  imperative hard-wired into the Second Amendment, states singled out weapons that

16  posed a particular danger for regulation or prohibition.  Responding in this fashion

17  was entirely consistent with Founding-era conceptions of ordered liberty, the

18  Second Amendment and comparable state arms bearing provisions.

19       35.    Not all guns were treated equally by the law in early America. Some

20  guns were given heightened constitutional protection and others were treated as

21  ordinary property subject to the full force of state police power authority.[67]  The

22  fact that some weapons were treated in the same fashion as other forms of property

---

[64] WILLIAM N. HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND (1st ed. 1996) at 23.

[65] Cornell, *supra* note 9, at 1716.

[66] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[67] Saul Cornell, *History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49 HASTINGS CONST. L.Q. 145 (2022).

19

did not mean government authority over them was unlimited any more than it implied that people's homes, chattels, or other forms of property were somehow not protected by law.  Property rights in early America were highly venerated, but they were always subject to forms of regulation by the people themselves acting through their legislatures.  Regulating guns and gun powder were basic exercises of the sovereignty of the people.  The decision of legislatures to determine which dangerous weapons were exempted from the full protection of the constitutional right to keep and bear arms flowed inexorably out of the police power enjoyed by states, localities, and in some limited situations the Federal government when regulating land or property under its jurisdiction.

III.  **TECHNOLOGY, MARKETING, CONSUMER BEHAVIOR, AND REGULATION: THE AMERICAN PARADIGM OF GUN REGULATION EMERGES**

36.     Political scientist Robert Spitzer's overview of the history of firearms regulation underscores the dynamic governing this important tradition: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[68]  States and localities have regulated gunpowder and arms since the earliest days of the American Republic.  The statutes at issue in this case fit squarely within this long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present.[69]  The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

37.     The claim that firearms capable of firing more than ten rounds without reloading "are nothing new" ignores the history of firearms technology, production, and use.  In 1791, virtually all firearms were single-shot, muzzle-loading black

---

[68]  *Supra* note 39.
[69]  *Supra* note 40.

1   powder weapons.  At that time, guns capable of firing more than a single round
2   could best be described as exotic.

3       38.    For example, the Girondoni rifle was a commercial failure.  There are
4   no mentions of the Girondoni rifle in the thousands of documents collected in *The*
5   *Founders Archive Online*, or the hundreds of thousands of documents amassed in
6   the *BYU Corpora of Founding Era English.* Given these deafening silences in the
7   historical record it strains credulity to argue that ordinary Americans at the time of
8   the Second Amendment were thinking about such weapons as the Bill of Rights
9   was framed.

10  **IV.  THE POLICE POWER AND FIREARMS REGULATION**

11      39.    The 1776 Pennsylvania Constitution, the first revolutionary
12  constitution to assert a right to bear arms, preceded the assertion of this right by
13  affirming a more basic rights claim:  "That the people of this State have the sole,
14  exclusive and inherent right of governing and regulating the internal police of the
15  same."[70]  The phrase "internal police" had already become common, particularly in
16  laws establishing towns and defining the scope of their legislative authority enjoyed
17  by representative bodies to craft laws to promote public health and safety.[71]  By the
18  early nineteenth century, the term "police" was a fixture in American law.[72]  Thus,
19  an 1832 American encyclopedia confidently asserted that police, "in the common

---

20
21      [70] PA. CONST. OF 1776, Ch. I, art iii.

22      [71] For other examples of constitutional language similar to Pennsylvania's
    provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF
23  1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An
    Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW
24  YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to
    incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST
25  OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF
    NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS
26  OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE
    REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S.
    Cushing, eds. 1849).

27      [72] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL
28  RIGHTS 2, n.2 (1904).

acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[73] The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

40.   The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[74]  The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today. Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[75]

41.   Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "it ought to be left to the state governments to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other."[76] Federalist Tench Coxe concurred, asserting that "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters

---

[73] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

[74] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[75] SAUL CORNELL, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 139 (1999).

[76] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[77]  State police power authority was at its pinnacle in matters relating to guns or gun powder.[78]  Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[79]  New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[80]

42.     The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. The application of the police power to firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland*.[81]  This was so even though gunpowder was essential to the operation of firearms at that

---

[77] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[78] CORNELL, THE POLICE POWER, *supra* note 36.

[79] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[80] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[81] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

1  time and gun powder regulations necessarily affected the ability of gun owners to
2  use firearms for self-defense, even inside the home.

3      43.    A slow process of judicializing this concept of police, transforming the
4  Founding era's idea of a "police right" into a judicially enforceable concept of the
5  "police power" occurred beginning with the Marshall Court and continuing with the
6  Taney Court.[82]

7      44.    Nor was Chief Justice John Marshall unique in highlighting the
8  centrality of this idea to American law.[83] The ubiquity of the police power
9  framework for evaluating the constitutionality of legislation regarding firearms
10 reflected the centrality of this approach to nearly every question of municipal
11 legislation touching health or public safety in early America.[84]  Massachusetts
12 Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era
13 elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a
14 decision that became a foundational text for lawyers, judges, and legislators looking
15 for guidance on the meaning and scope of the police power.  Shaw described the
16 police power in the following manner:

17

18      [82] Eras of Supreme Court history are typically defined by the tenure of the
19 Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief
   overview, *see* "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL
20 SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-
   court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-
21 court-1801-1835/. The Taney Court period covered the years 1836-1864. See "The
   Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct.
22 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-
   courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/.

23      [83] In the extensive notes he added as editor of the 12th edition of James Kent's
   classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that
24 regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES
   KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes,
25 Jr., ed. 12 ed. 1873).

26      [84] FREUND, *supra* note 72, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S
   WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996) at 65-
27 66; Christopher Tomlins, *To Improve the State and Condition of Man: The Power
   to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005);
28 DUBBER, *supra* note 12, at 82-87.

[T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise. There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[85]

45.    In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures. Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[86]  A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[87]

46.    No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance. Rather, it was well understood that the exercise of this power would need to adapt to changing

---

[85] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[86] CORNELL, THE POLICE POWER, *supra* note 36.

[87] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

25

1   circumstances and new challenges as they emerged.  This conception of law was

2   familiar to most early American lawyers and judges who had been schooled in

3   common law modes of thinking and analysis.[88]  Throughout the long sweep of

4   Anglo-American legal history, government applications of the police power were

5   marked by flexibility, allowing local communities to adapt to changing

6   circumstances and craft appropriate legislation to deal with the shifting challenges

7   they faced.[89]  This vision of the police power was articulated forcefully by the

8   Supreme Court in the License Cases when Justice McClean wrote this about the

9   scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised
> under the changing exigencies of society. In the progress of
> population, of wealth, and of civilization, new and vicious
> indulgences spring up, which require restraints that can only be
> imposed by new legislative power. When this power shall be
> exerted, how far it shall be carried, and where it shall cease, must
> mainly depend upon the evil to be remedied.[90]

15       47.    One of the most important early American gun-related cases discussed

16   in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power

17   jurisprudence was used by antebellum judges to adjudicate claims about gun rights

18   and the right of the people to regulate.[91]  The case is a classic example of

19   antebellum police power jurisprudence.  The Supreme Court of Alabama evaluated

20   the statute by focusing on the scope of state police power authority over guns.  "The

21   terms in which this provision is phrased," the court noted, "leave with the

22   Legislature the authority to adopt such regulations of police, as may be dictated by

---

[88] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 1790-1900: LEGAL THOUGHT BEFORE MODERNISM 147-148 (2013).

[89] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[90] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[91] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

26

1  the safety of the people and the advancement of public morals."[92]  In the court's

2  view, the regulation of arms was at the very core of state police power.[93]  The

3  judicial determination was straight forward:  was the challenged law a legitimate

4  exercise of the police power or not?

5  **V.   RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO**

6  **REGULATE FIREARMS (1863-1877)**

7       48.   Founding-era constitutions treated the right of the people to regulate

8  their internal police separately from the equally important right of the people to

9  bear arms.  These two rights were separate in the Founding era but were mutually

10  reinforcing: both rights were exercised in a manner that furthered the goal of

11  ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation

12  of the connection between these two formerly distinct rights, fusing the two

13  together as one single constitutional principle.  This change reflected two profound

14  transformations in American politics and law between 1776 and 1868.  First, the

15  judicial concept of police power gradually usurped the older notion of a police right

16  grounded in the idea of popular sovereignty.  As a result, state constitutions no

17  longer included positive affirmations of a police right.  Secondly, the constitutional

18  "mischief to be remedied" had changed as well.[94]  Constitution writers in the era of

19

20  _____

[92] *Id.* at 616.

21  [93] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms.  For a useful discussion of

22  *Bliss* in terms of the police power, *see* FREUND, *supra* note 72, at 91.

23  [94] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng. Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by

24  an understanding of the state of the common law prior to its enactment and the mischief that the common law had failed to address and that new legislation had intended to remedy — continued to shape Anglo-American views of statutory

25  construction, and legal interpretation more generally, well into the nineteenth century.  For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8,

26  at *61.  The relevance of common law modes of statutory construction to interpreting antebellum law, including the mischief rule, is clearly articulated in 1

27  ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S. Converse 1822).  For a modern scholarly discussion of the rule, *see*

28  Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

1  the American Revolution feared powerful standing armies and sought to entrench

2  civilian control of the military.  By contrast, constitution writers in the era of the

3  Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart

4  Kings using their standing army to oppress American colonists.  In place of these

5  ancient fears, a new apprehension stalked Americans:  the proliferation of

6  especially dangerous weapons and the societal harms they caused.[95]

7      49.   The new language state constitutions employed to describe the right to

8  bear arms enacted during Reconstruction responded to these changed circumstances

9  by adopting a new formulation of the venerable right codified in 1776, linking the

10  right to bear arms inextricably with the states broad police power to regulate

11  conduct to promote health and public safety.[96] For example, the 1868 Texas

12  Constitution included new language that underscored the indissoluble connection

13  that Anglo-American law had long recognized between the right to keep and bear

14  arms and regulation of guns.  "Every person shall have the right to keep and bear

15  arms, in the lawful defence of himself or the government, under such regulations as

16  the Legislature may prescribe."[97]  Nor was Texas an outlier in this regard.  Sixteen

17  state constitutions adopted during this period employed similarly expansive

18  language.[98]  Millions of Americans living in the newly organized western states and

19  newly reconstructed states of the former confederacy adopted constitutional

20  provisions that reflected this new formulation of the right to bear arms.  Thus,

21

22      [95] *See McDonald*, 561 U.S. at 767–68

23      [96] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth
Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War
America*, 55 U.C. DAVIS L. REV. 65 (2022).

25      [97] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional
provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The
people have the right to bear arms for their security and defense; but the legislature
shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6
("[T]he people have the right to bear arms for their security and defense, but the
legislature may regulate the exercise of this right by law.").

28      [98] Cornell, *supra* note 96, at 75–76.

millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[99]

50.    This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies.  The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[100]

51.    Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety.  Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder.  In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of an expansive view of state police power.  As heirs to the antebellum Whig vision of a well-regulated society, Reconstruction-era Republicans used government power aggressively to protect the rights of recently freed slaves and promote their vision of ordered liberty.[101]

52.    Indeed, the passage of the Fourteenth Amendment was premised on the notion that the individual states would not cede their police power authority to the federal government.  The author of Section One of the Fourteenth Amendment, John Bingham, reassured voters that the states would continue to bear the primary

---

[99] *Id.*

[100] Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

[101] Robert J. Kaczorowski*, Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance* 53 BUFFALO L. REV. 1215 (2005-2006).

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

1    responsibility for "local administration and personal security."[102]  As long as state

2    and local laws were racially neutral and favored no person over any other, the

3    people themselves, acting through their representatives, were free to enact

4    reasonable measures necessary to promote public safety and further the common

5    good. [103]

6        53.    It would be difficult to understate the impact of this new paradigm for

7    gun regulation on post-Civil War legislation.  Across the nation legislatures took

8    advantage of the new formulation of the right to bear arms included in state

9    constitutions and enacted a staggering range of new laws to regulate arms.  Indeed,

10   the number of laws enacted skyrocketed, increasing by over four hundred percent

11   from antebellum levels.[104] Not only did the number of laws increase, but the

12   number of states and localities passing such laws also expanded.[105]

13       54.    Henry Campbell Black, the author of *Black's Law Dictionary*,

14   described the police power as "inalienable" and echoed the view of a long line of

15   jurists who noted that the scope of the power was not easily defined and the

16   determination of its limits was best left to courts on a case-by-case basis.[106]  Indeed,

17   even the most ardent critics of the police power, such as conservative legal scholar

18   Christopher G. Tiedeman, acknowledged that "police power of the State extends to

19

20

21

---

22       [102] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as
     quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of
23   the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L.
     REV. 1043, 1058 (2010).

24       [103] For a discussion of how the courts wrestled with the meaning of the
     Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM
25   POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 173-4 (1998).

26       [104] *See* Spitzer, *supra* note 40, at 59–61 tbl. 1.

         [105] *Id.*
27
         [106] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344
28   (2d ed., 1897).

1   the protection of the lives, limbs, health, comfort and quiet of all persons, and the

2   protection of all property within the State."[107]

3       55.     In keeping with the larger goals of Reconstruction, Republicans sought

4   to protect the rights of African Americans to bear arms but were equally insistent on

5   enacting strong racially neutral regulations aimed at public safety.  Violence

6   directed against African Americans, particularly the campaign of terror orchestrated

7   by white supremacist para-military groups prompted Republican dominated

8   legislatures in the Reconstruction South to pass a range of racially neutral gun

9   regulations.[108]  The racially neutral gun laws enacted by Republicans were in part a

10  reaction to the discriminatory black codes passed by neo-confederate legislatures

11  earlier in Reconstruction.  The Black Codes violated the Second Amendment, but

12  the wave of firearms legislation passed by Republican controlled state legislatures

13  in the South were consciously crafted to honor the Second Amendment and protect

14  individuals from gun violence.[109]

15      56.     The laws enacted during Reconstruction underscore the fact that robust

16  regulation of firearms during Reconstruction was not a novel application of the

17  police power, but an expansion and continuation of antebellum practices.

18  Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in

19  police power regulations of guns.  American states had regulated arms since the

20

21  _____

22  [107] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE
    POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27
23  Vt. 140, 149-50 (1854)).

24  [108] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in
    Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas,
    *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in
25  Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

26  [109] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment,
    and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J.
27  Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons
    from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205
28  (2005) (discussing Republican use of federal power to further their aims, including
    to enforce the Fourteenth Amendment).

dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## VI. LARGE-CAPACITY MAGAZINES, THE POLICE POWER, AND THE LATEST FACE OF TERROR

57.    Another major inflection point in the history of firearms regulation emerged in the context of the debate on assault weapons and large-capacity magazines, which were closely connected to the rise of mass shootings in the last decades of the twentieth century.[110]  California began restricting large-capacity magazines in 2000.[111]  Proposals to ban large-capacity magazines are part of a larger national movement to deal with the carnage caused by high capacity, high velocity weapons. The effort to ban such weapons and accessories parallels earlier efforts to deal with machine guns and semi-automatic weapons during the 1920s.[112]

58.    Legislative efforts to ban these weapons fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror.  During America's first gun violence crisis in the Jacksonian era, states targeted pistols that were easily concealed, and in the New Deal era, states singled out gangster weapons such as the notorious Thompson sub-machine gun (or "Tommy Gun"), treating these weapons as sufficiently dangerous or unusual to warrant extensive regulation, or prohibition.  The same imperatives and constitutional logic guided both regulatory regimes.[113]

59.    The history of the AR-15 illustrates that the earlier dynamic governing firearms regulation established in the nineteenth-century continues to shape

---

[110] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al., *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020).

[111] 1999 Cal. Stat. 1781, §§ 3, 3.5 (S.B. 23) (now codified at Cal. Penal Code § 32310(a)).

[112] Spitzer, *supra* note 40.

[113] *Id.*

32

1  American public policy and law.  Regulation of firearms follows a well-worn path.

2  Technological innovation is only part of this equation.  In addition, weapons must

3  also achieve sufficient market penetration to create a potential for criminal abuse.

4  At this point legislatures attempt to find a means to address the problem posed by

5  these weapons without trenching on constitutionally protected liberties.[114]

6       60.    Understanding the marketing strategies tying these weapons to the

7  military makes clear that efforts to regulate these weapons by using these same

8  features is hardly cosmetic.  Moreover, focusing exclusively on technology and

9  ignoring the social history of these weapons, their popularity and potential for

10  abuse, misses an important point about the history of firearms technology and

11  government regulation.  The history and tradition of arms regulation has always

12  recognized that weapons that had the ability to inspire *terrorem populi* is a

13  legitimate justification for regulation.  The perpetrator of the Sandy Hook

14  Elementary Mass Shooting used a Bushmaster AR-15-type weapon that was

15  marketed with a slogan that traded on hyper-aggressive forms of toxic masculinity:

16  "Consider Your Man Card Reissued."[115]

17       61.    There is little disputing the fact that, despite protestations by gun

18  rights advocates and industry executives that these weapons are merely "sporting

19  rifles," the marketing campaigns used to sell these tells a different story.  The

20  success of these weapons commercially was inextricably linked to marketing

21  strategies that tied these weapons to their origins in the military. These sales

22  strategies deliberately evoked images of military assault capabilities.[116] The

23  _____

24  [114] *Id.*

    [115] ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA 128-135 (Boston:
25  Northeastern Univ. Press 2001); Cornell and DeDino, *supra* note 39.

26  [116]  Mark Berman & Todd C. Frankel, *Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused
27  gun manufacturers of "manipulative marketing campaigns" and profiting off violence*, WASHINGTON POST (July 27, 2022, 7:19 PM),
    https://www.washingtonpost.com/national-security/2022/07/27/companies-made-
28  more-than-1b-selling-powerful-guns-civilians-report-says/.

1   advertisement from two popular arms manufacturers pictured below are illustrative

2   of these campaigns.[117]  Ruger explicitly employs the term "Tactical Rifle" and Sig

3   Sauer's choice of imagery unambiguously links its weapons to images of military

4   close quarter combat.



62.     In the case of large-capacity magazines, the example of the Newtown
massacre is instructive.  Bushmaster developed an advertising campaign that
included product placement in violent video games targeting young men.  The

[117] CAROLYN MALONEY, SUPPLEMENTAL MEMORANDUM: THE COMMITTEE'S
INVESTIGATION INTO GUN INDUSTRY PRACTICES AND PROFITS (JUL. 27, 2022),
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%
20Supplemental%20MEMO%20for%20the%207-27-
2022%20FC%20Gun%20Manufacturer%20Hearing.pdf.

34

image below shows a used magazine retrieved from the floor of Sandy Hook Elementary School and a similar magazine from a popular violent video game.[118]



63.    *Bruen* did not address these technology-focused arguments.  The New York law in question singled out handguns, not large-capacity magazines.  From the perspective of text, history, and tradition, the key legal fact is that that these weapons are perceived by important segments of the public as weapons capable of provoking a terror.[119]  Firearms manufacturers created a type of  weapon that could receive high capacity magazines and marketed their products with a clear demographic in mind, stressing characteristics and cultural associations that tied them to war and then used these associations to effectively market them.  The fact

_____

[118]  Rick Rojas, Karen Zraick and Troy Closson, *Sandy Hook Families Settle with Gunmaker for 73 Million Dollars*, NEW YORK TIMES, published Feb. 15, 2022, updated Feb. 17, 2022, https://www.nytimes.com/2022/02/15/nyregion/sandy-hook-families-settlement.html.

[119] Mass shootings have been rendered more deadly by the proliferation of assault weapons, *see* John Donahue III & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STANFORD LAW SCHOOL BLOGS (Oct. 15, 2019), https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/.  For the most recent assessment of the impact of assault weapons on the American gun violence problem, *see* Christopher S. Koper et. al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. URB. HEALTH 313 (2018).

1  that a successful marketing strategy earned gun companies significant profits is a

2  fact that contradicts the claims of gun rights advocates these magazines are no

3  different than other magazines available to consumers.  If that were true, then gun

4  companies would have abandoned these marketing strategies long ago and replaced

5  them with something more effective.  It would be illogical and run counter to the

6  most basic principles of Anglo-American law to argue that people themselves are

7  powerless to regulate these magazines to mitigate the threats they pose to peace and

8  public safety.  The appeal of these magazines and their contribution to gun violence

9  are two sides of the same coin.[120]  A government's ability to address the negative

10 effects of these weapons is well within the scope of its police powers, as historically

11 understood.

**VII. BRUEN'S FRAMEWORK AND MODERN LARGE-CAPACITY MAGAZINES**

12

13      64.     The power to regulate and in some cases prohibit dangerous or unusual

14 weapons has always been central to the police power authority of states and

15 localities.  At different moments in American history communities have deemed

16 categories of weapons to be especially dangerous and have regulated them, and

17 when it appeared necessary enacted bans on some types of weapons.  Such

18 determinations were not made based on technological features in isolation but

19 reflected the ancient common law tradition of singling out weapons capable of

20 producing a terror.  Such weapons undermined the peace and the constitutional

21 imperative embedded in the text of the Second Amendment to protect the security

22 of a free state.  Defining exactly which category of weapons have fallen outside of

23 _____

24      [120] Polly Mosendz, *Why Gunmakers Would Rather Sell AR-15s Than Handguns*, BLOOMBERG (June 20, 2018, 3:00 AM), https://www.bloomberg.com/news/articles/2018-06-20/why-gunmakers-would-rather-sell-ar-15s-than-handguns; John J. Donohue, *The Swerve to "Guns Everywhere": A Legal and Empirical Evaluation*, 83 Law & Contemp. Problems 117 (2020); Christopher S. Koper, *Assessing The Potential to Reduce Deaths And Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other High-Capacity Semiautomatic 19 Firearms,* CRIMINOLOGY & PUBLIC POLICY 147 (2020); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on Public Mass Shootings,* 22 APPLIED ECON. LETTERS 281 (2014).

25

26

27

28

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

1  the scope of constitutional protection has shifted over time as society has addressed

2  new developments in firearms technology, evolving societal norms, and other

3  changes.  In short, social, and economic transformation were always accompanied

4  by legal transformation.  Put another way, as times change, the law changes with

5  them.

6  //

7  //

8  //

1

2   Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws

3 of the United States of America that the foregoing is true and correct.

4   Executed on November 10, 2022, at Redding, Connecticut.

5

6

7          *Saul Cornell*

8           Saul Cornell

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

## INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| 1 | Curriculum Vitae of Saul Cornell | 1-15 |

# EXHIBIT 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✻ Bronx, NY 10458 ✻ 203 826-6608 (c) ✻ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book

| Book Publications |
|---|

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell] (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000) (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### **Scholarly Articles, Book Chapters, and  Essays:**

"History and Tradition or Fantasy  and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional   Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55  University  of California, Davis Law Review  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55  University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace," 80 Law and Contemporary Problems (2017): 11-54

"Half Cocked': The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment," 107 Northwestern Journal of Criminal Law 107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward 92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History," American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae 84 (2015): 1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in the History of Constitutional Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82 (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique,"  Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

### Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

### Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

- Stanford Law Review
- Yale Law Journal

**Book Manuscript Reviewer:**

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

**Invited Lectures:**

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

### **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment" "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?" Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux, France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association, (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up: The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*," SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*" Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online*  30, 2015 [with Eric Ruben]
- PBS, "Need to  Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal"  Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," To the Point*, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR) March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR) Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World* February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

---

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004, 2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

---

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

## **Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

### State Courts:

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

### Amicus Briefs:

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii* N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief*, Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]
Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]
Amicus Brief*, Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]
Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]
Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]
Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

## **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

# EXHIBIT 9

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his*
*official capacity as Attorney General of the*
*State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

|  |  |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | Case No. 17-cv-1017-BEN-JLB<br><br>**SUPPLEMENTAL DECLARATION OF JOHN J. DONOHUE**<br><br>Courtroom:    5A<br>Judge:          Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

## SUPPLEMENTAL DECLARATION OF JOHN J. DONOHUE

I, John J. Donohue, declare under penalty of perjury that the following is true and correct:

1.     I previously submitted a declaration in support of the Attorney General's Opposition to Plaintiffs' Motion for Preliminary, which was filed with this Court on June 5, 2017 ("2017 Declaration" hereinafter), and an expert rebuttal report filed with this Court on April 9, 2018 ("2018 Report, hereinafter).[1]  I make this supplemental declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of September 26, 2022.

2.     This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.     I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $850 per hour.

### BACKGROUND AND QUALIFICATIONS

4.     I am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School.  A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

5.     Since submitting my 2017 Declaration in this matter, I have provided additional testimony as an expert witness.  I filed an expert declaration in *Chambers v. City of Boulder*, Case No. 2018CV30581, in the District Court of Boulder County in September 2020, involving a challenge to the City of Boulder's restrictions on assault weapons.

6.     At the request of the United States Department of Justice, I filed an expert declaration in July 2020 and testified at trial in April 2021 in a case arising

---

[1] My 2018 Report was marked as Exhibit 2 to the Declaration of John Echeverria and filed in this matter at Docket Number 53-4.

out of the Sutherland Springs mass shooting that killed 26 in November 2017: *Holcombe, et al. v. United States*, Case No. 5:18-CV-555-XR (W.D. Tex.).  On December 9, 2020, I submitted an expert report on behalf of the City of San Francisco in a wrongful conviction lawsuit, *Caldwell v. City of San Francisco*, Case No. 12-cv-1892 DMR, United States District Court, Northern District of California, Oakland Division.

7.     I was the main author of the Brief of Amici Curiae Social Scientists and Public Health Researchers in Support of Respondents, which was submitted to the United States Supreme Court on September 21, 2021 in *New York State Rifle & Pistol Association v. Bruen*, Case No. 20-843.

8.     On January 24, 2022, I submitted an expert declaration in *Worth v. Harrington,* a lawsuit in the District of Minnesota (Case No. 21-cv-1348) challenging how Minnesota regulates the concealed carry of firearms by individuals aged 18 to 20.  I was deposed in this case on March 28, 2022.

9.     On May 31, 2022, I submitted an expert declaration in *Meyer v. Raoul,* a lawsuit in the Southern District of Illinois (Case No. 21-cv-518-SMY) challenging how Illinois regulates the concealed carry of firearms by individuals aged 18 to 20.

10.     On September 14, 2022, I submitted an expert declaration in *Viramontes v. The County of Cook*, a lawsuit in the Northern District of Illinois (Case No. 1:21-cv-04595) challenging the Blair Holt Assault Weapons Ban enacted by Cook County, Illinois in 2006.

11.     On October 13, 2022, I submitted an expert declaration in *Miller v. Bonta,* a lawsuit in the Southern District of California (Case No. 3:19-cv-01537-BEN-JLB) challenging how California regulates the assault weapons.

**OPINIONS**

I.   **THE GROWING PROBLEM OF PUBLIC MASS SHOOTING IN THE UNITED STATES**

12.     I have been asked by the California Department of Justice to update the opinions expressed in my 2017 Declaration with currently available information.  I continue to stand by the opinions and conclusions expressed in my 2017 Declaration, as well as those in my 2018 Report.

13.     At the time of my 2017 Declaration, I stressed that the problem of active shooter incidents, which had been on the rise, would only be getting worse if significant action was not taken to address it.  Sadly, my predictions based on the growing lethality of weaponry in the United States have been fulfilled.  As bad as the active shooter problem looked in 2018, it is considerably worse today, as seen in the same FBI active shooter data now extended through 2021 in Figure 1.  While 2017 was the peak of active shooter incidents at 30 up until that point, last year the number more than doubled to 61.

14.     The ominous and steep upward trend in the FBI data charting the growth in active shooter incidents is unmistakable.  Not surprisingly, the number of mass shootings clearly is higher following the termination of the federal assault weapons ban in 2004.  In that year, the FBI counted 4 active shooter incidents in which 14 died.  Since then, the mayhem has accelerated so much that in 2021 the FBI counted 61 active shooter incidents killing 103.[2]

---

[2]  FBI, "Active Shooter Incidents in the United States in 2021," https://www.fbi.gov/file-repository/active-shooter-incidents-in-the-us-2021-052422.pdf/view.

Supplemental Declaration of John J. Donohue (17-cv-1017-BEN-JLB)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15

Figure 1



16    15.    Since my 2017 Declaration, the United States has experienced

17  numerous, devastating mass shootings, including the March 22, 2021 shooting at

18  King Soopers supermarket in Boulder, Colorado (10 killed); the May 26, 2021

19  shooting in San Jose, California (9 killed); the May 14, 2022 shooting in Buffalo,

20  New York (10 killed); the May 24, 2022 shooting at Robb Elementary in Uvalde,

21  Texas (19 children and 2 adults killed); and the July 4, 2022 shooting at a Fourth of

22  July parade in Highland Park, Illinois (7 killed).  These figures do not reflect the

23  countless people injured, both physically and emotionally, and the devastation

24  inflicted on the communities in which they occurred.

25    16.    Tellingly, the recent 18-year-old Buffalo shooter, who killed 10 using

26  the same weapon as the Sandy Hook shooter—a Bushmaster XM-15 semiautomatic

27  rifle with a high-capacity magazine—had written, "I am well aware that my actions

28

will effectively ruin my life.  If I'm not killed during the attack, I will go to prison for an inevitable life sentence."[3]

17.    Both the February 2018 mass killing at Parkland High School and the May 2022 mass killing in Uvalde, Texas – where police delayed entering the school during a shooting – vividly underscored how police responses to violence are impaired when the officers are confronted by a shooter armed with an assault rifle and high-capacity magazines.

18.    Decades of research has shown that there is a considerable variation in the survivability of assault depending on the instrumentality employed.  A seminal 1972 study by UC Berkeley Professor Frank Zimring found "that the outcome of gun assaults had a large random element, and that the power of the firearm was one systematic factor influencing the likelihood that an individual with a gunshot injury would survive."[4]

19.    A meticulous study by Anthony Braga and Phil Cook in 2018 has powerfully confirmed this instrumentality effect.  Braga and Cook examined the files of 511 gunshot victims kept by the Boston Police Department and found that survivability from gunshot wounds varied considerably based on attributes of the weapon and ammunition that generated the wound.  Specifically, the death rate from handgun assault injuries increased substantially as the caliber of the firearm increased—even though the caliber was not correlated with observable indicators of the intent and determination to kill by the shooter.  The shooter's use of a medium

_____

[3] Ashley Parker, Tyler Pager, and Colby Itkowitz, "From Sandy Hook to Buffalo and Uvalde: Ten years of failure on gun control," *Washington Post*, May 22, 2022; Jesse McKinley, Jonah E. Bromwich, Andy Newman and Chelsia Rose Marcius, "Buffalo Suspect Planned Attack for Months, Online Posts Reveal," *The New York Times*, May 16, 2022; Craig Whitlock, David Willman, and Alex Horton, "Massacre Suspect Said He Modified Bushmaster Rifle to Hold More Ammunition," *Washington Post*, May 15, 2022.

[4] The description of the Zimring study comes from Braga and Cook (2018), infra, note 5.

1  caliber handgun (.38, .380, and 9 mm) more than doubled the odds that the

2  wounded victim would die compared to small caliber handguns (.22, .25, and .32).

3  Large caliber handguns (.357 magnum, or greater) more than doubled the odds of

4  death compared to medium caliber handguns.

5        20.     The authors conclude that:

6        The results here support the view that the intrinsic power and lethality of
         the weapon had a direct effect on the likelihood that a victim of a
7        criminal shooting died.  For Boston, in the period studied here, simply
         replacing larger-caliber guns with small-caliber guns with no change in
8        location or number of wounds would have reduced the gun homicide rate
         by 39.5 percent.  It is plausible that larger reductions would be associated
9        with replacing all types of guns with knives or clubs (p.8, Braga and
         Cook 2018).[5]

10

11       21.     Of course, the conclusion of the Braga and Cook study—that

12  switching to less deadly firearm options could reduce firearm deaths—applies

13  directly to bans on assault weapons and high-capacity magazines.  The greater the

14  lethality of the weapon, the more killed and injured in active shooter incidents.

15  This was clearly illustrated in a study for the *Journal of the American Medical*

16  *Association* that examined deaths and injuries documented in the FBI Active

17  Shooter Database from 2000-2017.[6]  The authors found that deaths and injuries

18  were substantially higher for the 61 active shooter incidents using a semiautomatic

19  rifle versus the 187 episodes using some other firearm.  Specifically, in the

20  incidents in which the shooter employed a semi-automatic rifle the average number

21  killed or wounded was 9.72 versus only 5.47 killed or wounded when other

22  firearms were used.  (Note that the authors excluded the horrific Las Vegas

23

24       [5] Anthony A. Braga and Philip J. Cook, "The Association of Firearm Caliber
    with Likelihood of Death from Gunshot Injury in Criminal Assaults," *JAMA
25  Network Open*. 2018; 1(3):e180833. doi:10.1001/jamanetworkopen.2018.0833,
    https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2688536.
26
         [6] Elzerie de Jager, et al., "Lethality of Civilian Active Shooter Incidents With
27  and Without Semiautomatic Rifles in the United States," *JAMA*.
    2018;320(10):1034-1035. doi:10.1001/jama.2018.11009,
28  https://jamanetwork.com/journals/jama/fullarticle/2702134.

shooting from the numbers above, since that case was so extreme, with 60 killed and almost 500 wounded—all with semi-automatic rifles.)

22.     This instrumentality effect was further demonstrated in an article I authored with Phil Cook since my 2017 Declaration, demonstrating that the federal assault weapons ban—which banned both new semi-automatic assault rifles with certain features that made them attractive to mass shooters *and* new ammunition magazines that could hold more than ten rounds—suppressed deaths in public mass shootings.[7]  Figure 2 below shows that the deaths that occurred from these public mass shootings over the period from 1985-2019 in five year increments.  The Figure highlights that by the second half of the ten-year existence of the federal assault weapons ban (1999-2004), fatalities from public mass shootings using banned weaponry had virtually been cut in half (falling from 30 down to 16).  Conversely, there was no decline in public mass shooting deaths over this period with non-banned weaponry.

23.     After the federal ban lapsed in 2004, the deaths from public mass shootings using the previously banned weaponry rose sharply:  rising from 16 in the last five years of the federal ban to 271 in the five-year span from 2015-2019—with the latter figure 17 times as high as the former.  Meanwhile, there was relatively little movement in public mass shooting deaths using the less-lethal weaponry (neither an assault weapon nor a high-capacity magazine).  Indeed, as the Figure 2 illustrates, there was roughly the same number of deaths from less lethal weaponry in the five-years prior to the federal assault weapons ban (1990-1994) as there was from 2015-2019—specifically 83 in the pre-ban period and 81 in the final period.

24.     Figure 2 also highlights that while there was a roughly comparable *number of incidents* of public mass shootings that used either the most lethal

---

[7] Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," *JAMA*. 2022; 328(12):1191-1192, https://jamanetwork.com/journals/jama/fullarticle/2796675.

1  (previously federally banned) weaponry or less lethal firearms not subject to the

2  federal ban, the incidents involving assault weapons and/or high-capacity

3  magazines were far more lethal.  Specifically, the 18 public mass shootings

4  conducted with the most lethal weapons killed 271 (roughly 15 deaths per episode),

5  while the 14 public mass shootings with the less lethal firearms killed 81 (about 5.8

6  deaths per episode).

Figure 2

Victim Counts for Mass Public Shootings in the United States, 1985 - 2019
Using Assault Weapons and/or High-Capacity Magazines versus Other Firearms



in the last five year period, the 18 incidents with the more lethal weapons were far more deadly than the 14 incidents with the less lethal firearms.

25.    One of the unfortunate consequences of the continuing advances in the

lethality and power of modern firearms is that without appropriate government

action the dangers posed by civilian weaponry will continue to outpace any

legitimate crime-reducing benefit that firearms might provide.  The lesson of the

November 2017 massacre at the Sutherland Springs Baptist Church in Texas

highlights the growing dangers.  The killer in that case used an AR-15 that was

modified to include a laser scope and features that could allow large capacity

magazines to be more quickly reloaded to maintain a relentless barrage.  The killer

1   stood outside the church and fired straight through the walls of the church as he

2   strafed along at just above the top of the levels of the church pews, allowing him to

3   shoot 254 shots from **outside** the church in a matter of minutes on his way to killing

4   26 men, women, and children.  No portable weapon in civilian hands at the time of

5   the adoption of the Second Amendment could possibly generate this degree of

6   destruction.  The evident social harms will only grow as gun technology increases

7   firearm lethality.

8        26.    My 2017 Declaration explained that the increase in gun massacre

9   incidents and fatalities closely tracks the growth in the U.S. of assault weapons

10  sales, the removal of potential liability on the part of gun merchants, and intense

11  advertising of the militarized upgrades, from high-capacity magazines to flash

12  suppressors and other tactical accessories, which has only continued since my

13  declaration.  Research published following the mass shootings in Buffalo, New

14  York and Uvalde, Texas killing a total of 31 in May 2022 further confirms these

15  findings.[8]  Specifically, an analysis of mass shooting data by a group of injury

16  epidemiologists and trauma surgeons reached the following conclusion:

17       We calculated that the risk of a person in the U.S. dying in a mass
         shooting was 70% lower during the period in which the assault weapons
18       ban was active.  The proportion of overall gun homicides resulting from
         mass shootings was also down, with nine fewer mass-shooting-related
19       fatalities per 10,000 shooting deaths.[9]

20

21  **II.   INTERNATIONAL EFFORTS TO ADDRESS ASSAULT WEAPONS AND MASS
         SHOOTINGS**

22       27.    I noted in my 2017 Declaration that Australia had banned assault

23  weapons back in 1996.  In 2019, New Zealand followed the Australian lead after a

24

25

26       [8] Klein, Michael, 2022, Did the assault weapons ban of 1994 bring down
    mass shootings? Here's what the data tells us, *The Conversation*, June 8, 2022,
27  https://theconversation.com/did-the-assault-weapons-ban-of-1994-bring-down-
    mass-shootings-heres-what-the-data-tells-us-184430.
28       [9] *Id.*

9

1   horrific mass murder with an assault rifle,[10] and Canada just announced in May

2   2022 its plans for a similar gun buyback for its current stock of assault weapons

3   after its own horrendous mass shooting prompted the enactment of a ban on assault

4   weapons in 2020.[11]  Tellingly, in announcing an array of stringent gun safety

5   measures, Canadian Prime Minister Justin Trudeau showed that he has learned from

6   the lamentable experience of mass killings in the United States: "We need only look

7   south of the border to know that if we do not take action, firmly and rapidly, it gets

8   worse and worse and more difficult to counter."

9   **III.  THREATS TO CIVIL PEACE AND TO DEMOCRACY ITSELF**

10          28.    There is also a larger issue at stake with the proliferation of assault

11   weapons and high-capacity magazines:  their capacity to facilitate political violence

12   and threaten American democracy.  The concern is heightened by the sharp rise in

13   the percentage of Americans who think that violence against the government could

14   be appropriate, which doubled from 16 percent in 2010 to 34 percent in 2021 (over

15   40 percent of Republicans and independents and 23 percent of Democrats agreed).[12]

16

17          [10] Associated Press, "New Zealanders hand in 50,000 guns after assault

18   weapon ban," Dec. 21, 2019, https://www.nbcnews.com/news/world/new-
     zealanders-hand-50-000-guns-after-assault-weapon-ban-n1106081 ("The

19   government banned the most lethal types of semi-automatic weapons less than a
     month after [2019] a lone gunman in March [2019] killed 51 worshippers at two

20   Christchurch mosques.  The police then launched a six-month program to buy the
     newly banned weapons from owners.").

21          [11] The Prime Minister also announced that magazine size would be restricted

22   to five rounds in long guns.  Justin Trudeau, "Further strengthening our gun control
     laws,' (May 30, 2022), https://pm.gc.ca/en/news/news-releases/2022/05/30/further-

23   strengthening-our-gun-control-laws; Amanda Coletta, "Canada vows to 'freeze'
     handgun sales, buy back assault-style weapons," The Washington Post (May 30,

24   2022)("[T]he government banned 1,500 makes and models of "military-style
     assault weapons" in 2020, after a gunman posing as a police officer charged across

25   rural Nova Scotia, killing 22 people, including a Royal Canadian Mounted Police
     officer, in the country's deadliest mass shooting.").

26          [12] Meryl Kornfield and Mariana Alfaro, "1 in 3 Americans say violence
     against government can be justified, citing fears of political schism, pandemic,"

27   Washington Post, January 1, 2022,
     https://www.washingtonpost.com/politics/2022/01/01/1-3-americans-say-violence-

28   against-government-can-be-justified-citing-fears-political-schism-pandemic/.

29.     The extent and severity of these concerns have been clarified by the events surrounding the "Stop the Steal" rally of January 6, 2021, which I have written elsewhere has provided new insight into the dangers of such weaponry and the utter folly of many of the claims of the gun lobby:

> Consider the gun lobby protestation that "Gun control simply doesn't work."  Imagine for a moment what that rally would have looked like in Houston, Texas, or some other "gun-friendly" jurisdiction.  Without Washington, DC's profoundly wise firearm restrictions [including its assault weapons ban], a very large number of the rioters would have been marching on the U.S. Capitol armed with assault rifles equipped with high-capacity magazines and other highly lethal weapons.  When the mob storming the Capitol spun out of control, guns would have been flashing everywhere, and it is not hard to imagine that bullets would have been cutting down scores or even hundreds of victims.  Those who remember the 1970 Kent State massacre understand that once the bullets start flying in a riotous atmosphere, the consequences quickly turn lethal and dire….
>
> The pernicious Proud Boys leader Enrique Tarrio [now under indictment for seditious conspiracy],[13] who had planned to address the crowd before the U.S. Capitol riot, was thankfully taken off the streets two days earlier when he was arrested for tearing down a Black Lives Matter banner on a Washington, DC, church and lighting it on fire.  At the time of his arrest, Tarrio was carrying two high-capacity magazines festooned with the Proud Boys logo.  Washington, DC's wise prohibition on such unnecessary accoutrements to lethal weaponry managed to keep one conspiring criminal away from the U.S. Capitol on January 6, and thousands of others, knowing of Washington, DC's strict gun laws, were dissuaded from carrying weapons because of these laws.
>
> [Moreover, the claim that assault weapons could protect American democracy is fanciful.]  First, the thought that private gun owners could stand up to the modern U.S. military if it backed a tyrannical federal government is absurd. There is no circumstance in which private citizens in modern America could promote democracy by using assault weapons to kill government employees to show their disapproval of what they perceive to be a "tyrannical" government.  Second, the idea that gun owners can be expected to *oppose* rather than support the tyrant was dealt a fatal blow by the violence at the U.S. Capitol.[14]

---

[13] Spencer Hsu, "Proud Boys leader Tarrio, 4 top lieutenants charged with seditious conspiracy in widening Jan 6 case", *Washington Post*, June 6, 2022, https://www.washingtonpost.com/dc-md-va/2022/06/06/tarrio-proud-boys-seditious-conpiracy/.

[14] John Donohue, "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf.

Supplemental Declaration of John J. Donohue (17-cv-1017-BEN-JLB)

**CONCLUSION**

30.    As discussed in my 2017 Declaration, the problem of mass shootings in the United States is growing worse and is exacerbated by the ready availability of assault weapons and high-capacity magazines.  These weapons are far more likely to be used for criminal purposes and to be employed in an effort to thwart American democracy than to protect the Republic. Additional information gathered since my declaration only serves to reinforce those opinions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 8, 2022, at Stanford, California.

_____
John J. Donohue III

## INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of John J. Donohue | 1-29 |

# EXHIBIT A

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail:  jjd@stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

**EMPLOYMENT**

**Full-time Positions**

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
  - William H. Neukom Professor of Law, February 2002 – June 2004.
  - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
  - Academic Associate Dean for Research, since July 2001 – July 2003.
  - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
  - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
  - Harry B. Reese Teaching Professor, 1994-1995
  - Professor of Law, May 1991-September 1994
  - Associate Professor, May 1989-May 1991
  - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

**Temporary Appointments**

- Affiliated Research Professor, American Bar Foundation, September 2020 – August 2025.
- Visiting Professor, Tel Aviv University School of Law, May 2022.
- Lecturer on the Economics of Crime, Bogota Summer School in Economics, Universidad del Rosario, Bogota, Colombia,  June 2020.
- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.

Exhibit A_Donohue
Page 1

- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009.
- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.
- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.
- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).


**EDUCATION**
**Yale University, 1981-1986**
- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation:  "A Continuous-Time Stochastic Model of Job Mobility:  A Comparison of Male-Female Hazard Rates of Young Workers."  Awarded with Distinction by Yale.
  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.
- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.


**Harvard Law School, 1974-1977 (J.D.)**

- Graduated Cum Laude.

2

- Activities:  Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year):  (a) First Semester:  Massachusetts Advocacy Center; (b) Second Semester:  Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions.  Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against BechtelCorporation's adherence to the Arab Boycott of Israeli companies.

**Hamilton College, 1970-1974 (B.A.)**
- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:

  - Brockway Prize (Highest GPA Freshman Year)
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics

- President, Root-Jessup Public Affairs Council.


**PUBLICATIONS**
**Books and Edited Volumes:**
- Law and Economics of Discrimination, Edward Elgar Publishing, 2013.

- Employment Discrimination:  Law and Theory, Foundation Press, 2005, 2021 (5th edition) (with George Rutherglen).

- Economics of Labor and Employment Law:  Volumes I and II, Edward Elgar Publishing, 2007.  http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070

- Foundations of Employment Discrimination Law, Foundation Press, 2003 (2d edition).

- Foundations of Employment Discrimination Law, Oxford University Press, 1997 (Initial edition).

**Book Chapters:**
- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).

- "The Death Penalty" Chapter in Encyclopedia of Law and Economics, Spring (2013) and in Alain Marciano & Giovanni Battista Ramello eds., Encyclopedia of Law and Economics (2019).

- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, Controlling Crime: Strategies and Tradeoffs (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin" in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer?  The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

3

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business (2005).

- "The Evolution of Employment Discrimination Law in the 1990s: A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., Handbook of Employment Discrimination Research (2005).

- "The Impact of Concealed Carry Laws" in Jens Ludwig and Philip Cook, Evaluating Gun Policy: Effects on Crime and Violence (Washington D.C.: Brookings, 2003).

**Articles:**

- Phil Cook and John Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," JAMA. 2022;328(12):1191-1192.
  https://jamanetwork.com/journals/jama/fullarticle/2796675.

- John J. Donohue, Samuel V. Cai, Matthew V. Bondy, and Philip J. Cook, (2022) "More Guns, More Unintended Consequences: The Effects of Right-to-Carry on Criminal Behavior and Policing in US Cities," https://www.nber.org/papers/w30190.
  - Featured in August 2022 Issue of NBER Digest.
  - Featured in August 11, 2022 issue of *The Economist*: "A Supreme Court ruling could spell even more gun crime: Right-to-carry laws are associated with increases in violence."
- "The Supreme Court's gun decision will lead to more violent crime," *Washington Post*, July 8, 2022, https://www.washingtonpost.com/outlook/2022/07/08/guns-crime-bruen-supreme-court/.

- Daniel Cerqueira, Danilo Coelho, John J. Donohue III, Marcelo Fernandes, & Jony Pinto Junior, "A panel-based proxy for gun prevalence in US and Mexico" *International Review of Law & Economics* (2022). https://www.sciencedirect.com/science/article/abs/pii/S0144818822000369.

- "Increasing murders but overall lower crime suggests a growing gun problem," Am J Public Health. (2022).

- "An expert draws 7 lessons about US gun laws from the murder of Ahmaud Arbery and the Rittenhouse verdict," The Conversation (December 6, 2021), https://theconversation.com/an-expert-draws-7-lessons-about-us-gun-laws-from-the-murder-of-ahmaud-arbery-and-the-rittenhouse-verdict-172741.

- Lisa Vicen, Samuel Levander, & John J. Donohue III, 'NYSRPA v. Bruen': Studies Show Direct Link Between Right-to-Carry and Violent Crime Increase, The National Law Journal, November 4, 2021. https://www.law.com/nationallawjournal/2021/11/04/nysrpa-v-bruen-studies-show-direct-link-between-right-to-carry-and-violent-crime-increase/.

- "Will the Supreme Court Avoid Further Self-Inflicted Second Amendment Wounds?" Brennan Center for Justice (June 2021), https://www.brennancenter.org/sites/default/files/2021-06/Donohue_final.pdf. This is part of the Brennan Center for Justice *Protests, Insurrection, and the Second Amendment* series.

- "We Must Confront the Threats to America's Democracy" 56 *Idaho Law Review* 119 (2020)."

- The Impact of Legalized Abortion on Crime over the Last Two Decades" *American Law and Economics Review* (Fall 2020)(with Steven Levitt), Volume 22, Issue 2, Pages 241–302.

4

https://academic.oup.com/aler/article/22/2/241/5973959?guestAccessKey=917acf36-918d-4310-9d22-73c713757238

- ■ NBER Working Paper No. 25863, May 2019, https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3391510.

  - o Featured on Freakonomics Radio, "Abortion and Crime, Revisited." https://podcasts.apple.com/us/podcast/freakonomics-radio/id354668519?i=1000444184627."

- "The Swerve to 'Guns Everywhere:' A Legal and Empirical Evaluation" 83 *Law and Contemporary Problems* 117-136 (2020). https://scholarship.law.duke.edu/lcp/vol83/iss3/7.

- Daniel Cerqueira, Danilo Santa Cruz Coelho, John J. Donohue, Marcelo Fernandes & Jony Arrais Pinto, A Panel-Based Proxy for Gun Prevalence in the US (Nat'l Bureau of Econ. Research, Working Paper No. 25530, 2019), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3332277.

- "That Assault Weapon Ban? It Really Did Work" *The New York Times*, September 5, 2019, (with Theodora Boulouta), https://www.nytimes.com/2019/09/04/opinion/assault-weapon-ban.html?action=click&module=Opinion&pgtype=Homepage.

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Control Analysis" *Journal of Empirical Legal Studies*, April 2019 (with Abhay Aneja and Kyle Weber), https://onlinelibrary.wiley.com/doi/full/10.1111/jels.12219.

- "RTC Laws Increase Violent Crime: Moody and Marvell Have Missed the Target," *Econ Journal Watch*, Vol. 16, No. 1, 97-113, March 2019 (with Abhay Aneja and Kyle Weber), https://econjwatch.org/File+download/1103/DonohueAnejaWeberMar2019.pdf?mimetype=pdf

- "It's Going to Take More Than Background Checks and AR-15 Bans to Stop Mass Shootings," *Time.com*, November 16, 2018. http://time.com/5456015/gun-control-background-checks-ar15-mass-shootings/

- "What's in a denial? Bayesian Analysis shows that Kavanaugh lied about denials under oath and Trump was foolish to believe MBS," November 2, 2018 (with Aaron Edlin). https://works.bepress.com/john_donohue/176/

- "Brett Kavanaugh won't keep Americans safe," CNN.com, September 5, 2018. https://www.cnn.com/2018/09/05/opinions/kavanaugh-wont-keep-america-safe-donohue/

- "More Gun Carrying, More Violent Crime," *Econ Journal Watch*, Vol. 15, No. 1, 67-82, January 2018. https://econjwatch.org/articles/more-gun-carrying-more-violent-crime

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, January 2018 (with Abhay Aneja, and Kyle Weber).

- "Saving lives by regulating guns: Evidence for policy," *Science* Dec. 8, 2017, Vol. 358, Issue 6368, pp. 1259-1261, http://science.sciencemag.org/content/358/6368/1259.full (with Phil Cook).

- "Laws Facilitating Gun Carrying and Homicide," American Journal of Public Health, Vol 107, No. 12, 1864-1865, December 2017, http://ajph.aphapublications.org/doi/10.2105/AJPH.2017.304144.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.

5

- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694
    - Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html
    - Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments
- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html
- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).
- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3
- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al). http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf
- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html
- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016), http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp
- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/
- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/
- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html
- "The Demise of the Death Penalty in Connecticut," Legal Aggregate - Stanford Law School (June 2016), https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/
- "On Justice Scalia's Legacy," Legal Aggregate - Stanford Law School (February 14, 2016) https://law.stanford.edu/2016/02/15/stanford-law-faculty-on-justice-scalia/
- "Empirical Evaluation of Law:  The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.
- "Capital Punishment Does not Deter Homicides," Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides
- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227
    - Reprinted under the title "Does the Death Penalty Deter Killers?" Newsweek, August 19, 2015.

6

https://www.newsweek.com/does-death-penalty-deter-killers-364164

- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/

- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590

   - Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/

- "The 10 day period is reasonable," San Francisco Daily Journal, September 3, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973:  Are There Unlawful Racial, Gender, and Geographic Disparities?" 11 Journal of Empirical Legal Studies 637 (2014).

- "The Impact of Right to Carry Laws and the NRC Report:  The Latest Lessons for the Empirical Evaluation of Law and Policy," NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)

- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/

- Outlier Nation:  Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).

- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch

- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html

- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39

- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).

- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).

- "What Can Be Done to Stem Gun Violence?"  San Francisco Chronicle, December 21, 2012.  http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qlkJJ2

- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.

- "Time To Kill the Death Penalty?" The California Progress Report, June 28, 2012.

- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).

7

- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," American Law and Economics Review (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang). See January 2014 Revision released as an NBER working paper above.

- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.

- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).

- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. (Fall 2009) (with Steve Shavell).

- "Estimating the Impact of the Death Penalty on Murder," 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).

- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.

- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again:  The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).

- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract

- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.

- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society 10: 333 (2008) at http://pun.sagepub.com

- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).

- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds., Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.

- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.

- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.

- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig), http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx.

- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).

8

- "The Discretion of Judges and Corporate Executives:  An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4.  Available at: http://www.bepress.com/ev/vol3/iss8/art4

- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).

- "The Death Penalty:  No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.

  - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice:  Top Economists Take on Today's Problems (2008).

- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.

- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).

  - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology  406-407 (2d ed. 2008).

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Foundations of Law and Economics, Edward Elgar Publishing (2010)

- "Does Terrorism Increase Crime?  A Cautionary Tale," (with Daniel Ho), 2005.

- "Fighting Crime:  An Economist's View," 7 The Milken Institute Review 46 (2005).

  - Reprinted in Kurt Finsterbusch, ed., Social Problems (McGraw-Hill, 2006).

- "Guns, Crime, and the Impact of State Right-to-Carry Laws," 73 Fordham Law Review 623 (2004).

- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", The Economists' Voice: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4

- "The Employment Consequences of Wrongful-Discharge Laws:  Large, Small, or None at All?" American Economic Review:  Papers and Proceedings May, 2004 (with David Autor and Stewart Schwab).

- "Further Evidence that Legalized Abortion Lowered Crime:  A Reply to Joyce," 39 Journal of Human Resources 29 (Winter 2004)(with Steven Levitt).

- "A Clarification on Data Availability," Science: Vol. 301: No. 5641. (September 26, 2003), p. 1849, http://www.jstor.org/stable/3835157.

- "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," Criminology & Public Policy (July 2003, Volume 2, Issue 3) at pp. 397-410.

- "Shooting Down the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1193 (2003)(with Ian Ayres).

- "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1371 (2003)(with Ian Ayres).

9

- "Can Guns, Or Gun Violence, Be Controlled?" (Reviewing James Jacobs, Can Gun Control Work?), The American Prospect (December 16, 2002), p. 35, http://prospect.org/article/books-review-4.

- "The Search for Truth:  In Appreciation of James J. Heckman," 27 Law and Social Inquiry 23 (2002).

- "The Schooling of Southern Blacks:  The Roles of Social Activism and Private Philanthropy, 1910-1960," Quarterly Journal of Economics (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.

  - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).

  - Reprinted in American Bar Foundation, Anaylyzing Law's Reach:  Empirical Research on Law and Society (2008)

- "The Impact of Race on Policing and Arrests," Journal of Law and Economics, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.

- "The Impact of Legalized Abortion on Crime," Quarterly Journal of Economics (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

  - Reprinted in Robert Cooter and Francesco Parisi, eds., Recent Developments In Law And Economics, Edward Elgar Publishing (2010).

- "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 Stanford Law Review 897 (2001).

  - Reprinted in Michael Zimmer, Charles Sullivan et al, Cases and Materials on Employment Discrimination (6th edition)(2003).

- "Nondiscretionary Concealed Weapons Law:  A Case Study of Statistics, Standards of Proof, and Public Policy," American Law and Economics Review 436 (1999)(with Ian Ayres).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

- "Why We Should Discount the Views of Those Who Discount Discounting," 108 Yale Law Journal 1901 (1999).

- "Understanding the Time Path of Crime," 88 Journal of Criminal Law and Criminology 1423 (1998).

- "Discrimination in Employment," The New Palgrave Dictionary of Law and Economics (1998).

  - Excerpted in Lynne Dallas, Law and Public Policy:  A Socio-Economic Approach at page 261 (2003).

- "The Legal Response to Discrimination:  Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).

- "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).

- "Allocating Resources Among Prisons and Social Programs in the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).

  - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),

- "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).

- "Did Miranda Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).

10

- "Some Thoughts on Affirmative Action," 75 Washington University Law Quarterly 1590 (1997).

- "Executive Compensation," 3 Stanford Journal of Law, Business & Finance 1 (1997).

- "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., The Crime Conundrum:  Essays on Criminal Justice  45 (1997). Reissued by Routledge eBooks 2019.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 Journal of Legal Studies 427 (1995) (with Peter Siegelman).

- "Employment Discrimination Law in Perspective:  Three Concepts of Equality," 92 Michigan Law Review 2583 (1994).

- Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).

  - Translated into Chinese and published in Peking University Law Review (2007).

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 Journal of Legal Studies 543 (1994).

- "Liberal Law and Economics," (reviewing Rethinking the Progressive Agenda by Susan Rose-Ackerman), 13 Journal of Policy Analysis and Management 192 (1994).

- Review of Richard Epstein's Forbidden Grounds:  The Case Against Employment Discrimination Laws, 31 Journal of Economic Literature 1477 (1994).

- "Law and Macroeconomics:  Employment Discrimination Over the Business Cycle," 66 University of S. Calif. L. Rev. 709 (1993) (with Peter Siegelman).

- "Advocacy Versus Analysis In Assessing Employment Discrimination Law," 44 Stanford Law Review 1583 (1992).

  - Reprinted in Christopher McCrudden, Anti-Discrimination Law (2003).

- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).

- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 Law and Contemporary Problems 195 (1991).

- "Re-Evaluating Federal Civil Rights Policy," 79 Georgetown Law Journal 1713 (1991) (with James Heckman).

- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 Harvard Law Review 1093 (1991).

  - Reprinted in Saul Levmore, Foundations of Tort Law 160 (1994).

- "Continuous versus Episodic Change:  The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 Journal of Economic Literature 1603 (December 1991) (with James Heckman).

  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 Harvard Journal of Law and Public Policy 41 (1991).

- "Studying the Iceberg From Its Tip:  A Comparison of Published and Unpublished Employment Discrimination Cases," 24 Law and Society Review 1133 (1990) (with Peter Siegelman).

11

- "Prohibiting Sex Discrimination in the Workplace:  An Economic Perspective," 56 University of Chicago Law Review 1337 (1989).

- "The Law & Economics of Tort Law:  The Profound Revolution," 102 Harvard Law Review 1047 (1989).

- "Using Market Incentives to Promote Auto Occupant Safety," 7 Yale Law and Policy Review 449 (1989).

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," 99 Yale Law Journal 549 (1989).

     -  Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.

- "Reply to Professors Ellickson and Stigler," 99 Yale Law Journal 635 (1989).

- "Law and Economics:  The Road Not Taken," 22 Law and Society Review 903 (1988).

- "Further Thoughts on Employment Discrimination Legislation:  A Reply to Judge Posner," 136 U. Pa. L. Rev. 523 (1987).

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," Chicago Tribune, sec.1, pg. 15, July 22, 1987.

- "Posner's Third Symphony:  Thinking about the Unthinkable," 39 Stanford Law Review 791 (1987)(with Ian Ayres).

- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., Research in Population Economics, vol.6, Greenwich, Conn.:  JAI Press (1987).

- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Is Title VII Efficient?" 134 U. Pa. L. Rev. 1411 (1986).

     -  Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De  Gruyter, New York (1994).

- "Section I Cases," Sherman's Summations, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.

- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.

- "Godfrey v. Georgia:  Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 Catholic University Law Review 13 (1980).

- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

## Blog Posts:

- "Packed and Loaded: Stanford's John Donohue on Supreme Court's Guns Decision," *Stanford Law School Legal Aggregate Blog* (Jun. 24, 2022), https://law.stanford.edu/2022/06/24/packed-and-loaded-stanfords-john-donohue-on-supreme-courts-guns-decision/?utm_source=june302022&utm_medium=mc&utm_campaign=law%40stanford&utm_content=Stanford-law-news.

12

- "Guns, Mass Shootings, and the Law in the U.S.," *Stanford Law School Legal Aggregate Blog* (Dec. 10, 2021), https://law.stanford.edu/2021/12/10/stanfords-john-donohue-on-guns-mass-shootings-and-the-law-in-the-u-s/.

- "Stanford's John Donohue on One Tragic Week, Two Mass Shootings, and the Uniquely American Gun Problem," *Stanford Law School Legal Aggregate Blog* (March 25, 2021), https://law.stanford.edu/2021/03/25/stanfords-john-donohue-on-one-tragic-week-with-two-mass-shootings-and-the-uniquely-american-gun-problem.

- "Open Carry Laws, Guns on Capitol Hill, and a Police Force Outgunned by Militias," *Stanford Law School Legal Aggregate Blog* (January 19, 2021), https://law.stanford.edu/2021/01/19/open-carry-laws-guns-on-capitol-hill-and-a-police-force-outgunned-by-militias/.

- "Remembering Justice Ginsburg," *Stanford Law School Legal Aggregate Blog* (September 19, 2020), https://law.stanford.edu/2020/09/19/stanford-laws-john-donohue-remembers-justice-ginsburg/.

- "The Assault Weapon Ban Saved Lives," (with Theodora Boulouta), *Stanford Law School Legal Aggregate Blog*, October 15, 2019, https://stanford.io/2MWNsrV.

- "Stanford Law's John Donohue on Mass Shootings and Gun Regulation in the U.S.," *Stanford Law School Legal Aggregate Blog*, August 6, 2019, https://law.stanford.edu/2019/08/06/stanford-laws-john-donohue-on-mass-shootings-and-gun-regulation-in-the-u-s/.

- "Stanford Law Faculty Remember Justice Stevens." *Stanford Law School Legal Aggregate Blog*, July 18, 2019, https://law.stanford.edu/2019/07/18/stanford-law-faculty-remember-justice-stevens/.

- "Arming Teachers Is Not a Good Option," *Scientific American*, February 28, 2018, https://blogs.scientificamerican.com/observations/arming-teachers-is-not-a-good-option/.

- "Another Mass Shooting: An Update on U.S. Gun Laws," *Stanford Law School Legal Aggregate Blog*, February 18, 2018, https://law.stanford.edu/2018/02/18/another-mass-shooting-qa-us-gun-laws/.

- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," Stanford Law School Legal Aggregate Blog, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-and-law/.

- "*Moore v. Texas* and the Pathologies that Still Mar Capital Punishment in the U.S.," *Stanford Law School Legal Aggregate Blog*, March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/.

- "Trump and Gun Policy," *Stanford Law School Legal Aggregate Blog*, November 12, 2016, http://stanford.io/2eoWnna.

- "Facts Do Not Support Claim That Guns Make Us Safer" *Stanford Law School Legal Aggregate Blog*, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/.

- "When will America wake up to gun violence?" *CNN.com*, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html.

- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).

- "Have "Woman-Protective" Studies Resolved the Abortion Debate?  Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).

- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).

13

- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

**WORKSHOPS AND ADDRESSES:**

- "Can We Get Strong Gun Safety Legislation Passed?" Vi Seminar, **Palo Alto, CA**, July 18, 2022.

- Panelist, "Inside the Brain of the Mass Shooter and the Impact of Their Criminal Behavior," Symposium on "The Law and Neuroscience of Mass Shootings," held virtually at Fordham Law School, November 1, 2022.

- "*Bruen*, Permissive Gun Carrying, Constitutional Law, and Violent Crime," Faculty Workshop, **Stanford Law School**, July 13, 2022.

- "Effectiveness of Permissive Gun Laws: Carry Laws, Stand Your Ground," Annals Authors' Conference, **University of Connecticut**, Hartford, April 7, 2022.

- "Permissive Gun Carrying Laws and Violent Crime," ETH, Zurich, April 6, 2022; Law and Economics Workshop, **Tel Aviv University School of Law**, May 11, 2022.

- "Guns and Crime in American Life and Law," **University of Zurich**, April 5, 2022.

- "Do Permissive Gun Carrying Laws Increase Violent Crime?" Applied Webinar at the **Sao Paulo School of Economics**, November 17, 2021.

- "Mass Shootings, Gun Laws and the Evolution of the Second Amendment – Where Do We Go from Here?" Minnesota Continuing Legal Education Webcast, November 2, 2021.

- Discussant of Richard Berk, "Firearm Sales in California Through the Myopic Vision of an Interrupted Time Series Causal Analysis," Online Causal Inference Seminar, **Stanford University**, April 6, 2021.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," American Law and Economics Association Meetings, **NYU School of Law**, May 18, 2019; Department of Economics, **University of California, Irvine**, October 13, 2020; **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021; Crime Seminar, **Northwestern Law School**, March 3, 2022.

- Discussant of Chika Okafor, "Prosecutor Politics: The Impact of Election Cycles on Criminal Sentencing in the Era of Rising Incarceration," **Harvard Kennedy School** Program in Inequality and Social Policy, March 22, 2021.

- "Guns and Crime," Economic Analysis of Crime course, **Bocconi University**, Dept. of Social and Political Sciences, March 8, 2021.

- Discussant, "How the Massachusetts assault weapons ban enforcement notice changed firearm sales," Firearms and Policy session, **Assoc. for Public Policy Analysis and Management (APPAM) Virtual Fall Research Conference**, November 12, 2020.

- "We Must Confront the Threats to America's Democracy," Idaho Law Review Election Law Symposium, **University of Idaho College of Law**, October 20, 2020.

- "The Impact of Legalized Abortion on Crime over the Last Two Decades," Department of Economics, **University of California, Irvine**, October 13, 2020.

- "The Death Penalty: Informing Policy Through Empirical Research," Program in Criminal Law and Policy, **University of Arizona College of Law**, October 6, 2020.

- Discussant, "Mandatory Retirement Improved Performance on State Supreme Courts," Law and Economics Session, **NBER Summer Institute**, July 22, 2020.

14

- Discussant, "Measuring Racial Discrimination in Bail Decisions," Crime Session, **NBER Summer Institute**, July 15, 2020.

- "Guns and Empirical Evidence in Second Amendment Litigation," **Columbia Law School**, March 24, 2020; **Yale Law School**, March 25, 2020 (Zoom Presentation).

- Panelist, "Guns, Schools, and Adolescents: A Disaster Waiting to Happen," Psychiatry Grand Rounds,

- Sapp Center for Science Teaching and Learning, **Stanford University School of Medicine**, February 20, 2020.

- "The Power of Data to Change Hearts, Minds, and Public Policy," Law and Policy Lab, **Stanford Law School**, February 13, 2020.

- "The Move to 'Guns Everywhere'," Inaugural Cooter-Rubinfeld Lecture, **University of California, Berkeley, Law School**, February 6, 2020.

- "The Swerve:  A Legal and Empirical Evaluation of the Move to 'Guns Everywhere,'" Law and Economic Studies Workshop, **Columbia Law School**, September 23, 2019; Conference on Gun Rights and Regulations Outside the Home, **Duke Law School**, September 27, 2019.

- "Evidence to Guide Gun-related Public Policy," Conference on Gun Violence Epidemic, **Stanford Medical School**, September 16, 2019; Lecturer, Physicians and Social Responsibility Course, **Stanford Medical School**, October 7, 2019; Lecturer, Data Science Course, **Department of Statistics, Stanford University**, November 1, 2019.

- "The Legal and Political Battle over Gun Policy in America," **Hamilton College**, June 7, 2019.

- "Impact of Right to Carry Laws on Violent Crime," Public Policy colloquium, **Stanford Economics Department**, January 22, 2018; SPILS Methods Workshop, **Stanford Law School**, January 25, 2018; Quantlaw, **University of Arizona Law School**, March 2, 2018; Stanford/Berkeley Causal Inference Conference, **Stanford Graduate School of Business**, April 23, 2019; **Baldy Center/Law School Distinguished Speaker Series**, University at Buffalo School of Law, May 3, 2019; Conference on "Synthetic Controls and Related Methods," **Institute for Data, Systems, and Society, MIT**, May 21, 2019.

- "Guns, Abortion, and the Death Penalty: Informing Policy Through Empirical Research," Politics and Public Policy Lecture Series, **Stanford University**, April 1, 2019.

- "Dangers of Guns Carried Outside the Home for Protection," **GVPedia Conference**, Denver, Colorado, April 6, 2019.

- "Understanding California's Red Flag Law: How to Remove Guns from People Who Are a Threat to Themselves or Others," **Stanford Law School**, February 12, 2019.

- "Guns and Crime: Current Empirical and Legal Debates," **Fellowship Forum**, January 22, 2019.

- "Gun Policy in America at a Critical Juncture," SAFE, **Stanford Medical School**, September 17, 2018.

- "Empirical Evaluation of Law and Policy: The Battle for Truth," **Woodside Rotary Club**, September 12, 2018.

- "Discussing America's Second Amendment," **San Jose Museum of Quilts & Textiles**, July 15, 2018.

- "The Legal Battle to End the Death Penalty in Connecticut," **Law School of the University of Reggio Calabria,** Italy, June 15, 2018.

- Panelist, "Newtown and Gun Violence in the US, Humanity is Indivisible Series, **Stanford University**, May 31, 2018.

- "Gun Policy In California and the US," Human Rights Seminar; **Stanford Medical School**, May 29, 2018.

15

- "Gun Policy in the Wake of Parkland," Sigma Alpha Epsilon Leadership Speaker Series, **Stanford Law School**, March 13, 2018; Stanford in Government event, Haas Center, **Stanford University**, April 20, 2018.

- Panelist, Town Hall Meeting on Gun Violence with Congresswoman Jackie Speier, **Burlingame High School**, April 14, 2018.

- Moderator, In Studio Conversation with Berkeley Law School Dean Erwin Chemerinsky: "Defining the Limits of Free Speech," **Palo Alto League of Women's Voters**, March 27, 2018. https://youtu.be/cqHEIAVoTLY

- "More than Thoughts & Prayers," **American Constitution Society** and the **Federalist Society, U.C. Hastings School of Law**, March 14, 2018.

- Panelist, "Addressing Gun Violence," **American Constitution Society**, Stanford Law School, March 8, 2018.

- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017.

- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.

- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, **Cornell University**, October 13, 2017.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar,** April 24, 2017; Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.

- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, **JFK University School of Law,** March 18, 2017.

- "The Evidence on Guns and Gun Laws," **Federal Bar Council Program on Guns and Gun Laws** -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School**, October 17, 2016.

- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.

- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies; **University of California, Riverside**, October 24, 2016.

- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University**, August 25, 2016.

- "The Battle Over Gun Policy In America," Physicians and Social Responsibility" seminar; **Stanford Medical School**, October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association**, April 27, 2016; **The League of Women Voters of Palo Alto**, April 19, 2016; Human Rights and Health Seminar, **Stanford University**, April 12, 2016; Bechtel International Center, **Stanford University**, February 23, 2016; Stanford in Government Seminar, Haas Center, **Stanford University**, February 2, 2016.

- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), **AEA Annual Meeting**, San Francisco, January 5-7, 2016.

- "Race and Arbitrariness in the Connecticut Death Penalty," **University of Connecticut School of Law**, Nov. 20, 2015.

16

- *"Connecticut v. Santiago* and the Demise of the Connecticut Death Penalty," Faculty Workshop, **Stanford Law School**, August 19, 2015.

- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, **Covington and Burling, New York**, May 14, 2015; **NBER Summer Institute**, Cambridge, MA, July 23, 2015; Faculty Workshop, **Stanford Law School**, November 11, 2015.

- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, **Bocconi University School of Law, Milan, Italy**, June 18, 2015.

- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" **Stanford Law School**, Legal Theory Workshop, March 1, 2007; Faculty Workshop, **Tel Aviv University School of Law**, May 14, 2007; Faculty Workshop, **University of Haifa Law School**, May 16, 2007; Law and Economics Workshop, **Georgetown Law School**, September 19, 2007; Law and Economics Workshop, **St. Gallen Law School**, Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 21, 2008; Faculty Workshop, **University of Virginia Law School,** October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, **Universitat Pompeu Fabra (Barcelona),** June 15, 2009; **Google, Milan**, Italy, June 8, 2015.

- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, **Columbia Law School**, May 15, 2015.

- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, **Yale Law School**, April 17, 2015.

- "Assessing the Development and Future of Empirical Legal Studies," **Stanford Law School** course on Modern American Legal Thought, February 25, 2015.

- Commentator:  "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, **Boalt Hall**, Berkeley, CA, November 7,  2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973:  Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, **Economics Department, Rice University**, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, **University of Virginia Law School**, September 11, 2014; Faculty Colloquium, **University of San Diego School of Law**, October 3, 2014.

- "What's Happening to the Death Penalty?  A Look at the Battle in Connecticut," **Hamilton College**, Clinton, New York, June 6, 2014.

- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School,** May 15, 2014.

- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.

- "Guns: Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.

- "The Impact of Antidiscrimination Law:  The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Reducing Gun Violence," Forum on Gun Violence Reduction, **Mountainview City Hall**, Mountainview, CA, Feb. 8, 2014.

17

- "Gun Policy Debate," **C-SPAN**. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.

- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, **Stanford Law School**, November 20, 2013.

- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16, 2010; **NBER Summer Institute** Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden, CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.

- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013;  8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.

- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.

- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013

- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?"  **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Stemming Gun Violence," **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series

- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://www.fondazioneveronesi.it/scienceforpeace2012/

- Seminar Presentation, "America's Criminal Justice System," **Renaissance Weekend**, Santa Monica, CA., Feb. 19, 2012.

- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILLS Fellow's Workshop, **Stanford Law School**, February 2, 2012.

- "New Evidence in the 'More Guns, Less Crime' Debate:  A Synthetic Controls Approach," Conference on Empirical Legal Studies, **Northwestern Law School**, November 4, 2011.

18

- "Drug Legalization and its Alternatives," *Lessons from the Economics of Crime: What Works in Reducing Offending?* **CESifo Venice Summer Institute Workshop,** July 22 , 2011.

- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," **Yale Center for the Study of Globalization,** May 12, 2011.

- Plenary Session:  Flashes of Genius (Glimpses of <u>Extra</u>-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" **Renaissance Weekend**, Liguna Niguel, CA., Feb. 18, 2011.

- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), **Stanford Law School**, January 25, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, **Stanford Law School**, April 5, 2011.

- "Empirical Evaluation of Law:  The Dream and the Nightmare," SPILS Fellows Lecture, **Stanford Law School**, January 15, 2015; Legal Studies Workshop, **Stanford Law School**, Feb. 7, 2011; **Renaissance Weekend**, Liguna Niguel, CA., Feb. 20, 2011; **University of Denver Sturm College of Law**, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, **Columbia University**, May 20, 2011.

- Death Sentencing in Connecticut," **American Society of Criminology Annual Meeting**, San Francisco, Nov. 17, 2010.

- "The Impact of Right to Carry Laws and the NRC Report:  Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, **Yale Law School**, Nov. 6, 2010.

- Commentator, "A Test of Racial Bias in Capital Sentencing," **NBER Political Economy Program Meeting**, April 23, 2010.

- "The (Lack of a) Deterrent Effect of Capital Punishment," Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.

- Keynote Address, "The Evolution of Econometric Evaluation of Crime and Deterrence,"1st Paris& Bonn Workshop on Law and Economics:  The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre,** September 24, 2009.

- Comment on Cook, Ludwig, and Samaha, "Gun Control after *Heller*: Litigating Against Regulation," NBER Regulation and Litigation Conference, **The Boulders**, Carefree, Arizona, September 11, 2009.

- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona),** June 18, 2009.

- Comment on Joanna Shepherd's "The Politics of Judicial Opposition," Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany**, June 12, 2009.

- "The Great American Crime Drop of the '90s:  Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty," **Hamilton College**, Clinton, NY, June 5, 2009.

- "The Impact of the ADA on the Employment and Earnings of the Disabled," **American Law and Economics Association Meetings**, University of San Diego, May 15, 2009.

- "Crime and Punishment in the United States," **Eastern State Penitentiary, Yale Alumni Event**, Philadelphia, PA, April 26, 2009.

- "Measuring Culpability in Death Penalty Cases," Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.

- "Autopsy of a Financial Crisis," Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan**, March 23, 2009.

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop**, NYU Law School**, March 10, 2009.

- Intelligence-Squared Debate:  "Guns Reduce Crime," **Rockefeller University**, New York, October 28, 2008.

- "The D.C. Handgun Controls: Did the Supreme Court's Decision Make the City Safer?" Debate, **The Contemporary Club of Albemarle**, Charlottesville, VA, October 23, 2008.

- "Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement,"  Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School**, October 11, 2008.

-  "Empirical Evaluation of Gun Policy," **Harvard Law School**, October 9, 2008.

- "Assessing the Relative Benefits of Incarceration:  The Overall Change Over the Previous Decades and the Benefits on the Margin," **Russell Sage Foundation**, New York, May 3, 2007; Law and Economics Workshop, **Tel Aviv University School of Law**, May 28, 2008.

- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.

- "Evaluating Connecticut's Death Penalty Regime," Faculty Public Interest Conversation, **Yale Law School**, April 9, 2008.

- "The Death Penalty in Connecticut and the United States," **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law:  Criminal Sentencing and the Death Penalty, **Fordham Law School**, April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live. WNPR. Connecticut, March 10, 2008.

- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.

- "The Empirical Revolution in Law and Policy:  Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School,** Novermber 9, 2007.

- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.

- "Empirical Evaluation of Law:  The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School, Switzerland**, June 25, 2007.

- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.

- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, **Yale Law School, "**Rethinking the Incarceration Revolution Part II:  State Level Analysis," April 14, 2006.

- "Corporate Governance in America:  The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.

20

- "The U.S Tort System," (Latin American) Linkages Program, **Yale Law School**, February 13, 2007.

- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.

- **"**Economic Models of Crime and Punishment," Punishment: The U.S. Record: A Social    Research Conference at **The New School**, New York City, Nov. 30, 2006

- Comment on Baldus et al, "Equal Justice and the Death Penalty: The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of   Texas Law, School**, Austin, Texas, October 27, 2006.

- "Empirical Evaluation of Law: The Promise and the Peril," **Harvard Law School**, October  26, 2006.

- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland**, March 9, 2007.

- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.

- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.

- "Landmines and Goldmines: Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," **Rosenthal Lectures, Northwestern University School of Law**, April 4-6, 2006.

- "The Impact of Legalized Abortion on Crime," **American Enterprise Institute**, March 28, 2006.

- "The Impact of Damage Caps on Malpractice Claims: Randomization Inference with Difference-in-Differences,"**Conference on Medical Malpractice, The Rand Corporation**, March 11, 2006.

- "Powerful Evidence the Death Penalty Deters?" **Leighton Homer Surbeck Chair Lecture, Yale Law School**, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, **University of Connecticut Law School,** October 18, 2005; Faculty Workshop, **UCLA Law School**, February 3, 2006; Law and Economics Workshop, **Stanford Law School**, February 16, 2006; ; Law Faculty, **University of Cambridge, Cambridge, England**, February 28, 2006; **University of Illinois College of Law,** Law and Economics Workshop, March 2, 2006; Faculty Workshop, **Florida State University Law School**, March 30, 2006; **ALEA**, Berkeley, CA May 6, 2006; **University of Chicago Law School,** Law and Economics Workshop, May 9, 2006.

- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School,  January 31, 2006.

- "Witness to Deception: An Insider's Look at the Disney Trial," **2005-2006 Distinguished Lecture, Boston University School of Law**, November 10, 2005; Center for the Study of Corporate Law, **Yale Law School**, November 3, 2005; **Law Offices of Herbert Smith, London, England**, February 23, 2006; Law Faculty, **University of Cambridge, Cambridge, England**, February 27, 2006.

- "Understanding the Surprising Fall in Crime in the 1990s," **Rotary Club**, Orange, CT, August 5, 2005; Faculty Workshop, **Yale School of Management**, September 21, 2005.

- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, **Yale School of Management**, September 8, 2005.

- "Crime and Abortion," **Museo de la Cuidad de Mexico**, Mexico City, October 20, 2003.

21

- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," **MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice**, San Francisco, CA, February 28, 2003.

- "Shooting Down the More Guns, Less Crime Hypothesis," **Stanford Law School**, Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, **Boalt Hall**, University of California, Berkeley, Feb. 24, 2003; Development Workshop, **Stanford Law School**, April 25, 2003; Faculty Workshop, **Stanford Law School**, July 2, 2003; Law and Public Affairs Program Workshop, **Princeton University,** September 29, 2003; Stanford Alumni Weekend, **Stanford University**, October 17, 2003; Faculty Workshop, **CIDE**, Mexico City, October 20, 2003.

- **"**The Impact of Legalized Abortion on Teen Childbearing," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2002.

- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, **Stanford Law School**, October 4, 2000; First-Year Orientation, **Stanford Law School**, September 5, 2001; Faculty Workshop, **Harvard Law School**, April 26, 2002; Faculty Workshop, **Columbia Law School**, April 29, 2002.

- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.

- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations:  Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School**, Oct. 18, 2001.

- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2001; Labor and Employment Seminar, **NYU Law School**, October 16, 2001; Faculty Workshop, **Stanford Law School**, September 18, 2002;  **Yale Law School**, January, 2004.

- "Racial Profiling:  Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference**, San Francisco, CA, November 15, 2000.

- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.

- "Corporate Governance in Developing Countries:  Opportunities and Dangers," Conference on Neoliberal Policies for Development:  Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000

- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, **Yale Law School**, September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School**, October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, **Baruch College**, November 9, 1999; MacArthur Foundation Social  Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences,** October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.

22

- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.

- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop**, University of Wisconsin School of Social Science**, February 19, 1999.

- "What Do We Know About Options Compensation?" Institutional Investors Forum**, Stanford Law School**, May 29, 1998.

- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.

- "Understanding The Time Path of Crime," Presentation at Conference on <u>Why is Crime Decreasing?</u> **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan Law School**, February 18, 1999.

- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.

- "Some Thoughts on Affirmative Action," Presentation at a conference on <u>Rethinking Equality in the Global Society</u>, **Washington University School of Law**, November 10, 1997.

- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.

- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business**, University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.

- "Crime in America:  Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?"  TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.

- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.

- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.

- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.

- "The Power of Law:  Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?"  The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.

- "Public Action, Private Choice and Philanthropy:  Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.

23

- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.

- Commentator, Symposium on Labor Law, **University of Texas Law School**, November 10-11, 1995.

- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.

- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.

- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law**, February 27, 1995.

- "The Selection of Employment Discrimination Disputes for Litigation:  Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University**, Law and Economics Seminars, October 31, 1994.

- "Is the United States at the Optimal Rate of Crime?"  Faculty Workshop, **Indiana University School of Law**, Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law**, April 18, 1994; Law and Economics Workshop, **Stanford Law School**, April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School**, May 13, 1994; **American Bar Foundation**, September 7, 1994; Faculty Workshop, **DePaul Law School**, September 21, 1994; Law and Economics Workshop, **University of Chicago Law School**, October 11, 1994; Faculty Seminar, **Stanford Law School**, October 31, 1994; Law and Economics Luncheon, **Stanford Law School**, November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law**, Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School**, November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School**; Law and Economics Workshop, **Yale Law School**, February 1, 1996; Faculty Workshop, **Cornell Law School**, April 10, 1996; Faculty Workshop, **Tokyo University Law School**, June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.

- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law**, September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law**, September 20, 1994.

- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University**, May 17, 1994.

- "Does Law Matter in the Realm of Discrimination?"  **Law and Society Summer Institute**, Pala Mesa Lodge, Fallbrook, California, June 25, 1993.

- Commentator, "The Double Minority:  Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research**, March 28, 1993.

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," Economic Analysis of Civil Procedure, **University of Virginia School of Law**, March 26, 1993.

- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society**, February 23, 1993.

- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School**, May 15, 1992.

- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies**, Fairfax, Virginia, March 27, 1992.

24

- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School**, February 26, 1992.

- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School**, February 13, 1992.

- "Law & Macroeconomics:  The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University**, November 6, 1991; Faculty Workshop, **University of North Carolina Law School**, Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law**, December 11, 1991; Law and

- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.

- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.

- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.

- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.

- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.

- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?"  Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School**, February 26, 1991.

- Panel Member, "The Law and Economics of Employment Discrimination," **AALS Annual Meeting**, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.

- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.

- "The Effects of Fee Shifting on the Settlement Rate:  Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure:  Issues in Controversy," June 16, 1990.

- "Studying the Iceberg From Its Tip?:  An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," **Law and Society Meetings**, Berkeley, California, May 31, 1990.

- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.

- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.

- "Continuous versus Episodic Change:  The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.

25

- "Sex Discrimination in the Workplace:  An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.

- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting;** Madison, Wisconsin, June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.

- "Law & Economics:  The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.

- "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon. **Chicago Bar Association**, May 31, 1988.

- "The Morality of the Death Penalty."  A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.

- "Models of Deregulation of International Capital Markets."  A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.

- "Is Title VII Efficient?"  A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.

- "The Senate's Role in Confirming Supreme Court Nominees:  The Historical Record," **Northwestern University School of Law**, September 22, 1987.

- "Diverting the Coasean River:  Incentive Schemes to Reduce Unemployment Spells," **Yale Law School** Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; **AALS Annual Meeting**, New Orleans, January 7, 1989.

- "Women in the Labor Market--Are Things Getting Better or Worse?"  **Hamilton College**, February 23, 1987.

- "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.

- "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.

- "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.

- "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## AWARDS

- **47th Tikkun Olam Award**, The Haiti Jewish Refugee Legacy Project, February 2014, "Awarded for incredibly significant work that explores and inspires the search for justice and taking serious, correct and timely action." Tikkun Olam is a Hebrew phrase that means 'repairing the world.' https://haitiholocaustsurvivors.wordpress.com/guest-posts/47th-tikkun-olam-award-to-professor-john-j-donohue-iii/

26

**PROFESSIONAL ACTIVITIES**

- Member, Stanford Law School academic reading group evaluating the criminal law opinions of U.S. Supreme Court nominee Judge Ketanji Brown Jackson for the ABA Standing Committee on the Federal Judiciary, March 2022.

- Member, USF Institute for Nonviolence and Social Justice Leadership Council, University of San Francisco, June 2021 – present.

- Member, Criminal Justice Expert Panel, @CJExpertPanel, providing information on the relevance of criminal justice research to current events, beginning April 2021.

- Statistical Consultant to the Fairness Committee of the 9th Circuit Court of Appeals investigating issues of sentencing disparities by race, ethnicity, and gender in federal criminal sentencing, March 2018 – March 2020.

- Legal Scholarship Network Advisory Board Member, SSRN.

- Member, Committee on Law and Justice, National Research Council, October 2011 – December 2018.

- Fellow of the Society for Empirical Legal Studies, 2015 - present.

- Member, International Advisory Council, Economic Order Study Center, Federal University of San Paolo, Brazil.

- Co-Editor (with Steven Shavell), American Law and Economics Review, May 2006 – August 2012.

- President, American Law and Economics Association, May 2011 – May 2012.

- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012.  Member, Board of Directors from November 2011 - November 2014.

- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011; Testified again before the Connecticut Judiciary Committee on March 14, 2012.

- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.

- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.

- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.

- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.

- Evaluated the Connecticut death penalty system: "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/.

- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004.  Resulting Publication:  National Research Council, Measuring Racial Discrimination (2004), http://www.nap.edu/catalog/10887.html.

- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.

- Editorial Board, Journal of Empirical Legal Studies, July 2003 – present.

- Editorial Board, International Review of Law and Economics, October 1999 – present.

- Editorial Board, Law and Social Inquiry, February 2000 – present.

27

- Board of Editors, American Law and Economics Review, August 1998 – April 2013.

- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11, 1998.

- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996.  Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.

- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).

- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.

- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).

- Chair, AALS Section on Law and Economics, January 1990-January 1991.

- Economic Consultant to Federal Courts Study Committee.  Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee.  February 1989-March 1990.

- Member, 1990 AALS Scholarly Papers Committee.

- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law.  Since December 1987.

- Associate Editor, Law and Social Inquiry.  Summer 1987-December 1989.

- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management.  Chicago, Illinois. May 23, 1988.

- Member, Congressman Bruce Morrison's Military Academy Selection Committee.  Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

**PRO BONO LEGAL WORK**

- Co-wrote amicus brief for the United States Supreme Court for "Social Scientists and Public Health Researchers in Support of Respondents" in New York State Rifle & Pistol Association v. Bruen, which discusses the evidence that right-to-carry laws increase violent crime in the brief, September 21, 2021.

- Co-wrote amicus brief for the United States Supreme Court for "Public Health Researchers and Social Scientists in Support of Respondents" in New York State Rifle & Pistol Association v. City of New York, which quotes my article Right-to-Carry Laws and Violent Crime in the brief, August 12, 2019.

- Co-wrote amicus brief for the 9th Circuit Court of Appeals for "Empirical Scholars Concerning Deterrence and the Death Penalty In Support of Petitioner/Appellee," Jones v. Davis, No. 09 Cv. 2158 CJC, which discusses the lack of deterrence of the death penalty, March 6, 2015.

- Death Penalty case:  Heath v. Alabama.  Fall 1986-Fall 1989.

- Wrote brief opposing death sentence in Navy spy case.  Court ruled in favor of defendant John A. Walker on September 13, 1985.

- Staff Attorney, Neighborhood Legal Services, January-July 1981.

- Appealed sentence of death for Georgia defendant to the United States Supreme Court.  Sentence vacated on May 27, 1980.  Baker v. Georgia.

28

- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

**RESEARCH GRANTS**

- Stanford University Research Fund, January 1997 and January 1998.
- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.
- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

**BAR ADMISSIONS**

- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 3, 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

**PROFESSIONAL and HONORARY ASSOCIATIONS**

- American Academy of Arts and Sciences (since April 2009).
- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.
- Stanford Center for Racial Justice – August 2020 to present.
- American Law Institute (since September 29, 2010).
- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).
- American Bar Association
- American Economic Association
- American Law and Economics Association

**PERSONAL**

- Born:  January 30, 1953.

Exhibit A_Donohue
Page 29

# EXHIBIT 10

1   Rob Bonta
    Attorney General of California
2   Mark R. Beckington
    Supervising Deputy Attorney General
3   Robert L. Meyerhoff
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6     Fax:  (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9           IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                    CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          Case No. 3:17-cv-01017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**
    **CHRISTOPHER WADDELL, and**          **SUPPLEMENTAL**
15  **CALIFORNIA RIFLE & PISTOL**          **DECLARATION OF LOUIS**
    **ASSOCIATION, INC., a California**    **KLAREVAS**
16  **corporation,**
                                          Courtroom:     5A
17                       Plaintiffs,      Judge:         Hon. Roger T. Benitez
                                          Action Filed:  May 17, 2017
18         **v.**

19
    **ROB BONTA, in his official capacity as**
20  **Attorney General of the State of**
    **California; and DOES 1-10,**
21
                         Defendants.
22

23

24

25

26

27

28

_____

## SUPPLEMENTAL DECLARATION OF LOUIS KLAREVAS

I, Louis Klarevas, declare under penalty of perjury that the following is true and correct:

1.      I previously submitted a Revised Expert Report, which was incorporated into the record as Exhibit 3 of the Declaration of Deputy Attorney General John D. Echeverria in Support of Defendants' Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment, filed with this Court on April 9, 2018 ("2018 Report" hereinafter).[1]  I make this supplemental declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of September 26, 2022.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.      I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $600 per hour for testimony (in deposition and in court) and $480 per hour for all other services.

## BACKGROUND AND QUALIFICATIONS

4.      In addition to my background and qualifications summarized in my 2018 Report, I have subsequently submitted declarations under oath in the following cases: *Miller v. Bonta*, Case No. 3:19-cv-01537-BEN-JLB, Southern District of California; *Jones v. Bonta*, Case No. 19-cv-01226-L-AHG, Southern District of California; and *Nguyen v. Bonta*, Case No. 20-cv-02470-WQH-MDD, Southern District of California.  *Miller* involves a challenge to California's regulation of assault weapons.  *Jones* involves a challenge to California's regulation of firearm sales to individuals 18 to 20 years old.  *Nguyen* involves a challenge to California's regulation limiting the sale of certain firearms to one purchase per

---

[1] My 2018 Revised Expert Report can be found at Dkt. 53-4 at 87-132.

1 month.  While I was never deposed in *Miller* and *Jones*, I was deposed in *Nguyen*
2 and testified under oath in court in *Miller*.

3     5.     In 2021, I was also retained by the Government of Canada in the
4 following cases which involved challenges to Canada's regulation of certain
5 categories of firearms: *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney*
6 *General of Canada*, Federal Court, Court File No.: T-569-20; *Canadian Coalition*
7 *for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File
8 No.: T-577-20; *Hipwell v. Attorney General of Canada*, Federal Court, Court File
9 No.: T-581-20; *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court
10 File No.: T-677-20; *Generoux, et al. v. Attorney General of Canada*, Federal Court,
11 Court File No.: T-735-20; and *Eichenberg, et al. v. Attorney General of Canada*,
12 Federal Court, Court File No.: T-905-20.  I testified under oath in a consolidated
13 court proceeding involving all six cases in the Federal Court of Canada.

14     6.     A true and correct copy of my current curriculum vitae is attached as
15 **Exhibit A** to this declaration.

16                          **OPINIONS**

17 **I.    THE RELATIONSHIP BETWEEN MASS SHOOTINGS, LARGE-CAPACITY**
18 **MAGAZINE USE, AND LEGAL RESTRICTIONS ON LARGE-CAPACITY**
   **MAGAZINES (LCMS)**

19     7.     I have been asked by the California Department of Justice to
20 supplement the opinions expressed in my 2018 Report with currently available
21 information.  In my 2018 Report, based on the review of relevant data and the
22 analyses performed in my 2018 Report, I opined:

23     (1) gun massacres presently pose the deadliest threat to the safety and
24     security of American society, and the problem is growing; (2) gun massacres
        involving large-capacity magazines, on average, have resulted in a greater
25     loss of life than similar incidents that did not involve large-capacity
        magazines; and (3) jurisdictions where bans on the possession of large-
26     capacity magazines were in effect experienced fewer gun massacres, per
        capita, than jurisdictions where such bans were not in effect.[2]

27     _____

28     [2] 2018 Report, at 4.

The primary conclusion of my 2018 Report was that "restrictions on LCMs have the potential to significantly reduce the number of lives lost in mass shootings."[3]  I continue to stand by the opinions and conclusions expressed in my 2018 Report.

8.     Furthermore, in the four-and-a-half-year time period following my 2018 Report being filed with this Court, I have continued to analyze gun massacres resulting in six or more fatalities (also known as "high-fatality mass shootings" in the academic literature), including the relationship between LCM use and high-fatality mass shootings rates.[4]  My research indicates that, with regard to gun massacres, the aforementioned patterns identified in my 2018 Report continue to hold.  Nothing has changed since 2018 to alter my conclusions.

9.     Based on this recent research, it is still my opinion that, in terms of gun massacres, restrictions on LCMs have the potential to significantly reduce the frequency and lethality of mass shooting violence.  As I stated in my 2018 Report, "While imposing constraints on LCMs will not result in the prevention of all future mass shootings, the data suggest that denying rampage gunmen access to LCMs will result in a significant number of lives being saved."[5]  I remain steadfast in this conclusion.

## II.    DOUBLE-DIGIT-FATALITY MASS SHOOTINGS IN AMERICAN HISTORY

10.     I have also been asked to examine the historical occurrence and distribution of mass shootings resulting in 10 or more victims killed since 1776 (see Table 1 and Fig. 1).  A lengthy search uncovered several informative findings.[6]  In

---

[3] Ibid.

[4] See, Louis Klarevas, et al. *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2007*, 109 Am. J. of Pub. Health 1754 (2019), *available at* https://ajph.aphapublications.org/doi/full/10.2105/AJPH.2019.305311 (last accessed November 6, 2022).

[5] 2018 Report, at 17.

[6] I searched for firearm-related "murders," using variations of the term,

(continued…)

terms of the origins of this form of extreme gun violence, there is no known occurrence of a mass shooting resulting in double-digit fatalities at any point in time during the 173-year period between the nation's founding in 1776 and 1948. The first known mass shooting resulting in 10 or more deaths occurs in 1949. In other words, for 70 percent of its 247-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.[7] After the first such incident in 1949, 17 years pass until a similar mass shooting occurs in 1966. The third such mass shooting then occurs 9 years later, in 1975. And the fourth such incident occurs 7 years after, in 1982. Basically, the first few mass shootings resulting in 10 or more deaths did not occur until the post-World War II era, and they occurred with relative infrequency, although the temporal gap between these first four incidents shrank with each event (Table 1 and Fig. 2).[8]

11. The distribution of double-digit-fatality mass shootings changes in the early 1980s, when five such events take place in a span of five years (Table 1 and Fig. 2). This timeframe also reflects the first time that assault weapons with LCMs are used to perpetrate mass shootings resulting in 10 or more deaths: the 1982 Wilkes-Barre, PA, massacre (involving an AR-15 rifle and resulting in 13 deaths) and the 1984 San Ysidro, CA, massacre (involving an Uzi pistol and resulting in 21 deaths). But this cluster of incidents is followed by a 20-year period in which only 2 double-digit-fatality mass shootings occur (Fig. 2). This period of time from

---

setting a minimum fatality threshold of 10 in the Newspaper Archive online newspaper repository, available at www.newspaperarchive.com (last accessed Oct. 2, 2022). The Newspaper Archive contains local and major metropolitan newspapers dating back to 1607. Incidents of large-scale, inter-group violence such as mob violence, rioting, combat or battle skirmishes, and attacks initiated by authorities acting in their official capacity were excluded.

[7] Using the Constitution's effective date of 1789 as the starting point would lead to the conclusion that, for 68 percent of its 234-year existence as a nation, the United States did not experience a mass shooting resulting in double-digit fatalities.

[8] Figs. 1-2 are reproduced in larger form as **Exhibit B** of this Declaration.

1987-2007 correlates with two important pieces of federal firearms legislation: the 1986 Firearm Owners Protection Act and the 1994 Federal Assault Weapons Ban.

**Table 1**

**Mass Shootings Resulting in Double-Digit Fatalities in U.S. History, 1776-2022**

|    | Date | Location | Deaths | Involved Assault Weapon(s) | Involved Large-Capacity Magazine(s) |
|----|------|----------|--------|----------------------------|-------------------------------------|
| 1  | 9/6/1949 | Camden, NE | 13 | N | N |
| 2  | 8/1/1966 | Austin, TX | 14 | N | Y |
| 3  | 3/30/1975 | Hamilton, OH | 11 | N | N |
| 4  | 9/25/1982 | Wilkes-Barre, PA | 13 | Y | Y |
| 5  | 2/18/1983 | Seattle, WA | 13 | N | N |
| 6  | 4/15/1984 | Brooklyn, NY | 10 | N | N |
| 7  | 7/18/1984 | San Ysidro, CA | 21 | Y | Y |
| 8  | 8/20/1986 | Edmond, OK | 14 | N | N |
| 9  | 10/16/1991 | Killeen, TX | 23 | N | Y |
| 10 | 4/20/1999 | Littleton, CO | 13 | Y | Y |
| 11 | 4/16/2007 | Blacksburg, VA | 32 | N | Y |
| 12 | 3/10/2009 | Geneva County, AL | 10 | Y | Y |
| 13 | 4/3/2009 | Binghamton, NY | 13 | N | Y |
| 14 | 11/5/2009 | Fort Hood, TX | 13 | N | Y |
| 15 | 7/20/2012 | Aurora, CO | 12 | Y | Y |
| 16 | 12/14/2012 | Newtown, CT | 27 | Y | Y |
| 17 | 9/16/2013 | Washington, DC | 12 | N | N |
| 18 | 12/2/2015 | San Bernardino, CA | 14 | Y | Y |
| 19 | 6/12/2016 | Orlando, FL | 49 | Y | Y |
| 20 | 10/1/2017 | Las Vegas, NV | 60 | Y | Y |
| 21 | 11/5/2017 | Sutherland Springs, TX | 25 | Y | Y |
| 22 | 2/14/2018 | Parkland, FL | 17 | Y | Y |
| 23 | 5/18/2018 | Santa Fe | 10 | N | N |
| 24 | 10/27/2018 | Pittsburgh, PA | 11 | Y | Y |
| 25 | 11/7/2018 | Thousand Oaks, CA | 12 | N | Y |
| 26 | 5/31/2019 | Virginia Beach, VA | 12 | N | Y |
| 27 | 8/3/2019 | El Paso, TX | 23 | Y | Y |
| 28 | 3/22/2021 | Boulder, CO | 10 | Y | Y |
| 29 | 5/14/2022 | Buffalo, NY | 10 | Y | Y |
| 30 | 5/24/2022 | Uvalde, TX | 21 | Y | Y |

Note: Death tolls do not include perpetrators. An incident was coded as involving an assault weapon if at least one of the firearms discharged was defined as an assault weapon in (1) the 1994 federal Assault Weapons Ban; (2) the statutes of the state where the gun massacre occurred; or (3) a legal or judicial declaration issued by a state official. An incident was coded as involving a large-capacity magazine if at least one of the firearms discharged was armed with a detachable ammunition-feeding device holding more than 10 bullets.

5





12.    It is well-documented in the academic literature that, after the Assault Weapons Ban expired in 2004, mass shooting violence increased substantially.[9]

---

[9] See, for example, Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016), at 238-245, 348-50 (attached as **Exhibit C**); Louis Klarevas, et al., supra note 4 (attached as **Exhibit D**); Charles DiMaggio, et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 Journal of Trauma and Acute Care Surgery 11 (2019) (attached as **Exhibit E**); Lori Post, et al., *Impact of*

(continued…)

Mass shootings that resulted in 10 or more deaths were no exception, following the same pattern.  In the 56 years from 1949 through 2004, there were a total of 10 mass shootings resulting in double-digit fatalities.  In the 18 years since 2004, there have been 20 double-digit-fatality mass shootings.  In other words, the average rate of occurrence has increased over six-fold (Table 1 and Fig. 2).

13.    The other pattern that stands out from the historical plotting of the data is that 100 percent of mass shootings resulting in more than 14 deaths involved LCMs holding more than 10 bullets.  As with the analyses of gun massacres discussed in the previous section, death tolls in double-digit-fatality mass shootings are related to the use of LCMs—a firearms technology that, in terms of mass shootings, serves as a force multiplier (Table 1 and Fig. 2).

## III.    THE AVAILABILITY OF LCMS IN THE U.S. CIVILIAN FIREARM MARKETPLACE

14.    I have, furthermore, been asked to perform a decade-by-decade analysis of the civilian firearms market in the United States for purposes of identifying how many current makes and models of firearms (handguns and long guns) were sold with factory-issue magazines having a capacity greater than 10 rounds of ammunition.[10]  The information is drawn from *Gun Digest*, which since its 1955 edition has systematically published this data in what is now known as the *Gun Digest* GUNDEX.[11]  The objective of this evaluation is to identify the

_____

*Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*, 7 JMIR Public Health and Surveillance (2021) (attached as **Exhibit F**); and Philip J. Cook and John J. Donohue, "Regulating Assault Weapons and Large-Capacity Magazines for Ammunition," 328 *JAMA*, September 27, 2022 (attached as **Exhibit G**).

[10] Air, pellet, and BB guns have been excluded from this analysis in Section III of this Declaration.

[11] GUNDEX is a registered trademark of *Gun Digest*.  While *Gun Digest* has provided information on guns available for purchase in the United States since the

(continued…)

1    percentage of factory-issue firearms sold with LCMs in the American marketplace

2    that were available from the mid-1950s until the mid-1990s.

3         15.    As mentioned above, in 1994, Congress enacted the federal assault

4    weapons ban, which prohibited the manufacture, transfer, or possession of *new*

5    LCMs that were not legally in circulation prior to the ban taking effect.  As such,

6    after the ban took effect on September 13, 1994, firearms sold in the civilian

7    marketplace were not sold with new magazines holding more than 10 rounds of

8    ammunition.  Therefore, additional analysis beyond the mid-1990s is unnecessary,

9    as the peak of LCM prevalence prior to nationwide restriction of such ammunition-

10   feeding devices would have presumably been 1994, immediately prior to the ban's

11   effect.  For purposes of this analysis, data is drawn from the 1955, 1965, 1975,

12   1985, and 1995 editions of the GUNDEX.  These editions, respectively, reflect

13   market availability of firearms in 1954, 1964, 1974, 1984, and 1994.[12]

14

15   _____

16   publication of its first edition in 1944, it was not until the 1955 edition that *Gun
     Digest* began presenting this information in a quasi-systematic fashion, including

17   make, model, and estimated price (at the time of publication).  *Gun Digest* first
     referenced its catalog as the GUNDEX in its 1984 edition.  Prior to that, it was

18   referred to as the *Gun Digest* "Complete Compact Catalog."  Describing to the
     Complete Compact Catalog in its 1980 edition, *Gun Digest* wrote: "Its all-inclusive

19   nature provides, if you look at a lot of them, a history of firearms availability in the
     United States. It covers virtually all firearms available to U.S. shooters, whether

20   manufactured in the United States or elsewhere, or marketed by United States firms
21   or others, and whether the arm is rimfire, centerfire, muzzleloader, rifle, handgun,

22   shotgun."  *Gun Digest, 34th Anniversary, 1980 Deluxe Edition* (1979), at 288

23   (attached as **Exhibit H**).

24        [12] The 1995 *Gun Digest*, which contains the 1995 GUNDEX, was published
     in 1994.  Despite being in the 1995 edition, the 1995 GUNDEX predominantly

25   captures guns available in the marketplace in 1994.  The same pattern holds for all

26   *Gun Digest* GUNDEXs—they reflect the firearms available in the American
     marketplace in the year of publication (not the year of the *Gun Digest*'s annual

27   edition, which is the year appearing on the cover).  Again, every annual *Gun Digest*

28   is published in the year prior to the edition listed on the cover.

16.    Table 2 shows the number of firearms, current at-the-time, being sold with factory-issue magazines holding more than 10 rounds of ammunition at mid-decade, between 1955 and 1995.  According to *Gun Digest*, in 1954, only two firearms were sold in the United States with factory-issue LCMs.  By 1994, this number had reached 152 firearms available in the civilian marketplace.  As a share of all firearms available in the American marketplace in the decades prior to the federal assault weapons ban taking effect, the range ran from a low of approximately 1-percent in the 1950s and 1960s to a high of approximately 7-percent of all firearms sold with factory-issue large-capacity magazines in the 1990s (immediately prior to the federal ban imposing prohibitions on such LCMs).

**Table 2**

**Number and Share of Factory-Issue Guns Sold with LCMs in U.S., 1955-1995**

| | Number of Factory-Issue Firearms Sold with LCMs | Number of Firearms Available in Civilian Market | Factory-Issue Firearms Sold with LCMs as a Share of All Available Firearms in Marketplace |
|---|---|---|---|
| 1955 | 2 | 301 | 1% |
| 1965 | 3 | 510 | 1% |
| 1975 | 14 | 834 | 2% |
| 1985 | 69 | 1,270 | 5% |
| 1995 | 152 | 2,108 | 7% |

Sources: *Gun Digest, 1955*; *Gun Digest, 1965*; *Gun Digest, 1975*; *Gun Digest, 1985*; and *Gun Digest, 1995*.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 10, 2022, at Nassau County, New York.



Louis Klarevas

9

## INDEX OF EXHIBITS

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of Louis J. Klarevas | 1-19 |
| B | Figure 1:  Mass Shootings Resulting in Double-Digit Fatalities in American History (1776-2022)<br><br>Figure 2: Mass Shootings Resulting in Double-Digit Fatalities in American History (1949-2022) | 20-21 |
| C | Louis Klarevas, *Rampage Nation: Securing America From Mass Shootings* 238-245, 348-50 (2016) | 22-27 |
| D | Louis Klarevas, et al. *The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2007*, 109 Am. J. of Pub. Health 1754 (2019) | 28-35 |
| E | Charles DiMaggio, et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 Journal of Trauma and Acute Care Surgery 11 (2019) | 36-44 |
| F | Lori Post, et al., *Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*, 7 JMIR Public Health and Surveillance (2021) | 45-54 |
| G | Philip J. Cook and John J. Donohue, "*Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*," 328 *JAMA*, September 27, 2022 | 55-56 |
| H | *Gun Digest, 34th Anniversary, 1980 Deluxe Edition* 288 (1979) | 57-58 |

# EXHIBIT A

# Louis J. Klarevas

**Email: ljk2149@tc.columbia.edu**

**Education**

Ph.D.  International Relations, 1999
School of International Service
American University
Washington, DC

B.A.  Political Science, *Cum Laude*, 1989
School of Arts and Sciences
University of Pennsylvania
Philadelphia, PA

**Author**

*Rampage Nation: Securing America from Mass Shootings*

**Current Positions**

Research Professor, Teachers College, Columbia University, New York, NY, 2018-Present

Faculty Affiliate, Media and Social Change Lab (MASCLab), Teachers College, Columbia University, New York, NY, 2019-Present

**Professional Experience**

*Academic Experience (Presented in Academic Years)*
Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, Boston, MA, 2015-2020

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2011-2012

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, New York, NY, 2009-2011

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, New York, NY, 2007-2011

Clinical Faculty, Center for Global Affairs, New York University, New York, NY, 2006-2011

Exhibit A_Klarevas
Page 1

Adjunct Professor, Center for Global Affairs, New York University, New York, NY, 2004-2006

Assistant Professor of Political Science, City University of New York – College of Staten Island, Staten Island, NY, 2003-2006

Associate Fellow, European Institute, London School of Economics and Political Science, London, England, UK, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, London, England, UK, 2002-2004

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, DC, 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, DC, 1998-1999

Adjunct Professor of International Relations, School of International Service, American University, Washington, DC, 1994-1995

Dean's Scholar, School of International Service, American University, Washington, DC, 1989-1992

*Professional Experience (Presented in Calendar Years)*

Expert for Cook County, Illinois, *Viramontes v. County of Cook*, United States District Court for Northern District of Illinois, Case Number 21-cv-04595, Chicago, IL, 2022-

Expert for Government of Canada, *Parker and K.K.S. Tactical Supplies Ltd. v. Attorney General of Canada*, Federal Court, Court File No.: T-569-20, 2021-

Expert for Government of Canada, *Canadian Coalition for Firearm Rights, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-577-20, 2021-

Expert for Government of Canada, *Hipwell v. Attorney General of Canada*, Federal Court, Court File No.: T-581-20, 2021-

Expert for Government of Canada, *Doherty, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-677-20, 2021-

Expert for Government of Canada, *Generoux, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-735-20, 2021-

Expert for Government of Canada, *Eichenberg, et al. v. Attorney General of Canada*, Federal Court, Court File No.: T-905-20, 2021-

Expert for State of California, *Nguyen v. Bonta*, United States District Court for Southern District of California, Case Number 20-cv-02470-WQH-MDD, San Diego, CA, 2021-

Expert for State of California, *Jones v. Bonta*, United States District Court for Southern District of California, Case Number 19-cv-01226-L-AHG, San Diego, CA, 2021-

Expert for State of California, *Miller v. Becerra*, United States District Court for Southern District of California, Case Number 19-cv-1537-BEN-JLB, San Diego, CA, 2019-

Expert for Plaintiffs, *Ward et al. v. Academy Sports + Outdoor*, District Court Bexar County, Texas, 224th Judicial District, Cause Number 2017CI23341, Bexar County, TX, 2019-

Expert for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 17-cv-1017-BEN-JLB, San Diego, CA, 2017-

Expert for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 17-cv-00903-WBS-KJN, Sacramento, CA, 2017-

Expert for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, Denver, CO, 2016-2017

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, Washington, DC, 2015

Writer, Prometheus Books, Amherst, NY, 2012-2015

Consultant, United States Institute of Peace, Washington, DC, 2005, 2008-2009

Research Associate, United States Institute of Peace, Washington, DC, 1992-1998

Faculty Advisor, National Youth Leadership Forum, Washington, DC, 1992

**Courses Taught**

*Graduate*
Counter-Terrorism and Homeland Security
International Political Economy
International Politics in a Post-Cold War Era
International Security
Machinery and Politics of American Foreign Policy
Role of the United States in World Affairs
Security Policy
Theories of International Politics
Transnational Security
Transnational Terrorism
United States Foreign Policy

*Undergraduate*
American Government and Politics
European-Atlantic Relations
International Political Economy
International Relations
Transnational Terrorism
United States Foreign Policy

Exhibit A_Klarevas
Page 3

**Scholarship**

"State Firearm Laws, Gun Ownership, and K-12 School Shootings: Implications for School Safety," *Journal of School Violence*, 2022 (co-authored with Paul M. Reeping, Sonali Rajan, et al.)

"The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990-2017," *American Journal of Public Health*, November 2019 (co-authored with Andrew Conner and David Hemenway)

"Changes in U.S. Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban," *Journal of Trauma and Acute Care Surgery*, May 2019 (correspondence)

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

*Rampage Nation: Securing America from Mass Shootings*, Prometheus Books, 2016

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974*, *Presidential Studies Quarterly*, June 2012 (book review)

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006 (correspondence)

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

"Not a Divorce," *Survival*, Winter 2003-2004 (correspondence)

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti*, University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey*," *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis) [Reproduced as "Prospects for Greek-

5

Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)]

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

### Commentaries and Correspondence

"Why Our Response to School Shootings Is All Wrong," *Los Angeles Times*, May 25, 2022 (co-authored with Sonali Rajan and Charles Branas)

"COVID-19 Is a Threat to National Security. Let's Start Treating It as Such," *Just Security*, August 6, 2020 (co-authored with Colin P. Clarke)

"If the Assault Weapons Ban 'Didn't Work,' Then Why Does the Evidence Suggest It Saved Lives?" *Los Angeles Times*, March 11, 2018 (correspondence)

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015 [Reproduced as "Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns." *Vice*, December 4, 2015]

"International Law and the 2012 Presidential Elections," Vitoria Institute, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998 [Reproduced as "Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998]

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993


**Commentaries Written for *New York Daily News* –**
**https://www.nydailynews.com/authors/?author=Louis+Klarevas**

"Careful How You Talk about Suicide, Mr. President," March 25, 2020 (co-authored with Sonali Rajan, Charles Branas, and Katherine Keyes)

"Only as Strong as Our Weakest Gun Laws: The Latest Mass Shooting Makes a Powerful Case for Federal Action," November 8, 2018

"What to Worry, and not Worry, About: The Thwarted Pipe-Bomb Attacks Point to Homeland Security Successes and Vulnerabilities," October 25, 2018

"After the Santa Fe Massacre, Bury the 'Good Guy with a Gun' Myth: Armed Staffers Won't Deter Shooters or Keep Kids Safe," May 22, 2018

"It's the Guns (and Ammo), Stupid: Dissuading Killers and Hardening Targets Matter Too, But Access to Weapons Matters Most," February 18, 2018

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," November 7, 2017

"Why Mass Shootings Are Getting Worse: After Vegas, We Urgently Must Fix Our Laws," October 2, 2017

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Crack Down on Handguns – They're a Tool of Terror, Too," October 25, 2007

**Commentaries Written for *The Huffington Post* – www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

**Commentaries for *Foreign Policy* – www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011

**Commentaries for *The New Republic* – www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

"Death Be Not Proud," October 27, 2003 (correspondence)

**Legal Analyses Written for *Writ* – writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)


**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Mass Shootings: What We Know, What We Don't Know, and Why It All Matters," keynote presentation to be delivered at the Columbia University Center for Injury Science and Prevention Annual Symposium, virtual meeting, May 2020

"K-12 School Environmental Responses to Gun Violence: Gaps in the Evidence," paper presented at Society for Advancement of Violence and Injury Research Annual Meeting, virtual meeting, April 2020 (co-authored with Sonali Rajan, Joseph Erardi, Justin Heinze, and Charles Branas)

"Active School Shootings," Post-Performance Talkback following Presentation of *17 Minutes*, Barrow Theater, New York, January 29, 2020 (co-delivered with Sonali Rajan)

"Addressing Mass Shootings in Public Health: Lessons from Security Studies," Teachers College, Columbia University, November 25, 2019

"Rampage Nation: Securing America from Mass Shootings," Swarthmore College, October 24, 2019

"Rampage Nation: Securing America from Mass Shootings," University of Pennsylvania, February 9, 2018

"Treating Mass Shootings for What They Really Are: Threats to American Security," Framingham State University, October 26, 2017

"Book Talk: Rampage Nation," Teachers College, Columbia University, October 17, 2017

Participant, Roundtable on Assault Weapons and Large-Capacity Magazines, Annual Conference on Second Amendment Litigation and Jurisprudence, Law Center to Prevent Gun Violence, October 16, 2017

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

11

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Journal of Public Health*

*American Political Science Review*

*British Medical Journal (BMJ)*

*Comparative Political Studies*

*Injury Epidemiology*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

*Victims & Offenders*

*Violence and Victims*

Brill Publishers

Johns Hopkins University Press

Routledge

**Service to University, Profession, and Community**

Member, Regional Gun Violence Research Consortium, Nelson A. Rockefeller Institute of Government, State University of New York, 2022-

Founding Member, Scientific Union for the Reduction of Gun Violence (SURGE), Columbia University, 2019-

Contributing Lecturer, Johns Hopkins University, Massive Open Online Course on Evidence-Based Gun Violence Research, Funded by David and Lucile Packard Foundation, 2019

Member, Group of Gun Violence Experts, *New York Times* Upshot Survey, 2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Commencement Liaison, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society, George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

17

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991


**Affiliations, Associations, and Organizations (Past and Present)**

Academy of Political Science (APS)

American Political Science Association (APSA)

Anderson Society of American University

Carnegie Council Global Ethics Network

Columbia University Scientific Union for the Reduction of Gun Violence (SURGE)

Firearm Safety among Children and Teens (FACTS)

International Political Science Association (IPSA)

International Studies Association (ISA)

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Regional Gun Violence Research Consortium

Society for Advancement of Violence and Injury Research (SAVIR)

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Grants, Honors, and Awards**

Co-Investigator, A Nationwide Case-Control Study of Firearm Violence Prevention Tactics and Policies in K-12 School, National Institutes of Health, 2021-2024 (Charles Branas and Sonali Rajan MPIs)

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2002-2003

United States Institute of Peace Certificate of Meritorious Service, 1996

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

**E     IBIT B**





# EXHIBIT C



# LOUIS KLAREVAS

# RAMPAGE NATION

## SECURING AMERICA FROM MASS SHOOTINGS






Prometheus Books

59 John Glenn Drive
Amherst, New York 14228





BREAKING THE TRINITY    239

in a class all by itself. No other advanced, Western democracy experiences the magnitude of gun violence that presently afflicts American society.[28] This is particularly true when it comes to mass shootings.[29]

\* \* \*

The United States does little to regulate firearms, especially at the federal level.[30] While it goes to great lengths to restrict access to WMDs and IEDs, the same can't be said for its efforts to keep firearms out of the hands of high-risk individuals. Indeed, the American experience with gun control nationwide is so limited that it can actually be chronicled in a few bullet points:




- The National Firearms Act of 1934: Heavily regulated machine guns, short-barrel rifles and shotguns, and silencers.
- The Federal Firearms Act of 1938: Established a federal licensing system to regulate manufacturers, importers, and dealers of firearms.
- The Omnibus Crime Control and Safe Streets Act of 1968: Prohibited anyone under twenty-one years of age from purchasing a handgun.
- The Gun Control Act of 1968: Required that all interstate firearms transfers or sales be made through a federally licensed firearms dealer and prohibited certain categories of people—felons (indicted or convicted), fugitives, drug abusers, mentally ill persons (as determined by adjudication), illegal aliens, dishonorably discharged servicemen, US-citizenship renouncers, and domestic abusers—from possessing firearms.[31]
- The Firearm Owners Protection Act of 1986: Barred the purchase or transfer of automatic weapons without government approval.
- The Undetectable Firearms Act of 1988: Required that all firearms have at least 3.7 oz. of metal that can be detected by a metal detector.
- The Gun-Free School Zones Act of 1990: Criminalized possession or discharge of a firearm in a school zone.
- The Brady Handgun Violence Prevention Act of 1993: Required

Exhibit C_Klarevas
Page 23



**240    PART 3: PRESCRIPTION**

that anyone attempting to purchase a firearm from a federally licensed dealer pass a background check.[32]

• The Federal Assault Weapons Ban of 1994: Banned the sale and possession of semiautomatic assault weapons and extended-capacity magazines not grandfathered prior to the enactment of the law.[33]

Of all of these measures, the National Firearms Act of 1934 and the Assault Weapons Ban of 1994 (AWB) were the only ones instituted primarily in an effort to reduce the carnage of mass shootings. The former was passed in response to a series of bloody gangland executions, including the infamous 1929 St. Valentine's Day massacre in Chicago.[34] While there are still machine guns in circulation, the National Firearm Act, in conjunction with the Firearm Owners Protection Act of 1986, sharply cut the availability of machine guns, which likely explains the complete elimination of massacres perpetrated with such automatic-fire weapons.



Like the National Firearms Act, the AWB was introduced following several high-profile mass shootings in the early 1990s: the Luby's restaurant, 101 California Street office complex, and Long Island Railroad train car massacres.[35] Signed into law by President Bill Clinton, the AWB went into effect on September 13, 1994. At the insistence of the gun-rights lobby, however, the bill contained a ten-year sunset provision. As Congress never renewed the ban, it automatically expired on September 13, 2004.



The decade the law was in effect nonetheless resulted in a unique experiment, allowing us to discern what impact, if any, the ban had on gun violence in general and mass shootings in particular. As to the former, the academic consensus seems to be that the AWB had a minimal impact on reducing violent crime.[36] This hardly comes as a surprise. After all, most crimes don't involve assault weapons. The real test should be: Did it succeed in its intended purpose of reducing rampage violence? The answer is a resounding yes.

Let's take a closer look.

The best way to assess the impact of something is to conduct what, in social science, we commonly refer to as a time-series analysis. Basically, that's a fancy name for a before-and-after test. Figures 7.1

Exhibit C_Klarevas
Page 24

Case: 23-55805, 09/26/2023, ID: 12799542, DktEntry: 2-2, Page 402 of 1105

BREAKING THE TRINITY    241



Fig. 7.1. Gun Massacres Before, During, and After the Assault Weapons Ban of 1994.

Note: The lines in the graph demarcate the start and end points of the Assault Weapons Ban, which was in effect from September 13, 1994, through September 12, 2004. The data are drawn from Table 3.2.

Exhibit C_Klarevas
Page 25

Case: 23-55805, 09/26/2023, ID: 12799542, DktEntry: 2-2, Page 403 of 1105

242    PART 3: PRESCRIPTION



Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.
Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.
The data are drawn from Table 3.2.

|  | Decade Before AWB | Decade During AWB | Decade After AWB |
|---|---|---|---|
| Incidents | 19 | 12 | 34 |
| Deaths | 155 | 89 | 302 |

Exhibit C_Klarevas
Page 26



BREAKING THE TRINITY    243

and 7.2 provide a look at the before-and-after pictures. In the decade prior to the enactment of the AWB, the United States experienced nineteen gun massacres that resulted in 155 cumulative deaths, for an average death toll of 8.2 fatalities per incident. During the ten-year period that the AWB was in effect, the numbers declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident.[37] What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.[38] Since 1966, the longest streaks without a gun massacre prior to era of the AWB were two instances of consecutive years (1969–1970 and 1979–1980).[39] Then, all of a sudden, from September 1994 to April 1999, the country experienced a long calm. As further evidence of the AWB's effectiveness, once it expired, rampages returned with a vengeance. In the ten years after the ban, the number of gun massacres nearly tripled to thirty-four incidents, sending the total number of deaths skyrocketing to 302, for an average of 8.9 fatalities per incident.[40] These numbers paint a clear picture: America's experiment, while short-lived, was also extremely successful.[41]

### ZEROING OUT GUN MASSACRES

The biggest takeaway from America's experience with a ban on assault weapons and extended-capacity magazines is that gun-control legislation can save lives. But is there a way to get to zero? Is there a way to eliminate gun massacres once and for all? For that, we have to look overseas for insights.

One of the biggest obstacles to successful gun control is the ability to transport firearms across open, contiguous borders. In the United States, it's a problem that allows guns to flow freely from states with lax laws into states with strict laws. A common complaint frequently leveled by elected officials in places like California, Illinois, Maryland, New York, and Massachusetts is that people just need to drive across a state line and they can readily obtain firearms that they can then easily—if perhaps illegally—bring back into their jurisdictions.[42] That

Exhibit C_Klarevas
Page 27

# EXHIBIT D

**AJPH** OPEN-THEMED RESEARCH

# The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017

*Louis Klarevas, PhD, Andrew Conner, BS, David Hemenway, PhD*

*Objectives.* To evaluate the effect of large-capacity magazine (LCM) bans on the frequency and lethality of high-fatality mass shootings in the United States.

*Methods.* We analyzed state panel data of high-fatality mass shootings from 1990 to 2017. We first assessed the relationship between LCM bans overall, and then federal and state bans separately, on (1) the occurrence of high-fatality mass shootings (logit regression) and (2) the deaths resulting from such incidents (negative binomial analysis). We controlled for 10 independent variables, used state fixed effects with a continuous variable for year, and accounted for clustering.

*Results.* Between 1990 and 2017, there were 69 high-fatality mass shootings. Attacks involving LCMs resulted in a 62% higher mean average death toll. The incidence of high-fatality mass shootings in non–LCM ban states was more than double the rate in LCM ban states; the annual number of deaths was more than 3 times higher. In multivariate analyses, states without an LCM ban experienced significantly more high-fatality mass shootings and a higher death rate from such incidents.

*Conclusions.* LCM bans appear to reduce both the incidence of, and number of people killed in, high-fatality mass shootings. (*Am J Public Health.* 2019;109:1754–1761. doi: 10.2105/AJPH.2019.305311)

The recent spate of gun massacres in the United States has re-energized the debate over how to prevent such tragedies.[1] A common response to high-profile acts of gun violence is the promotion of tighter gun legislation, and there is some evidence that laws imposing tighter restrictions on access to firearms have been associated with lower levels of mass shootings.[2] One proposal that has received renewed interest involves restricting the possession of large-capacity magazines (LCMs).[3–5] This raises an important question: what has been the impact of LCM bans on high-fatality mass shootings?

In an attempt to arrest an uptick in mass shooting violence in the early 1990s, Congress in 1994 enacted the federal assault weapons ban, which, among other things, restricted ownership of certain ammunition-feeding devices.[6,7] The law, which contained a sunset provision, was allowed to expire a decade later. Pursuant to that ban (18 USC §921(a) [1994]; repealed), it was illegal to possess LCMs—defined as any ammunition-feeding device holding more

than 10 bullets—unless the magazines were manufactured before the enactment of the ban. LCM restrictions are arguably the most important component of assault weapons bans because they also apply to semiautomatic firearms without military-style features.[8,9]

Beginning with New Jersey in 1990, some states implemented their own regulations on LCMs. Today, 9 states and the District of Columbia restrict the possession of LCMs. The bans vary along many dimensions, including maximum bullet capacity of permissible magazines, grandfathering of existing LCMs, and applicable firearms. Moreover, overlaps sometimes exist between assault weapons bans and LCM bans, but not in all states. For example, California instituted a ban

on assault weapons in 1989, but LCMs remained unregulated in the state until 1994, when the federal ban went into effect. In 2000, California's own statewide ban on LCMs took effect as a safeguard in the event the federal ban expired, which happened in 2004.[10,11]

LCMs provide a distinct advantage to active shooters intent on murdering numerous people: they increase the number of rounds that can be fired at potential victims before having to pause to reload or switch weapons. Evidence shows that victims struck by multiple rounds are more likely to die, with 2 studies finding that, when compared with the fatality rates of gunshot wound victims who were hit by only a single bullet, the fatality rates of those victims hit by more than 1 bullet were more than 60% higher.[12,13] Being able to strike human targets with more than 1 bullet increases shooters' chances of killing their victims. Analyses of gunshot wound victims at level I trauma centers have suggested that this multiple-impact capability is often attributable to the use of LCMs.[14,15]

In addition, LCMs provide active shooters with extended cover.[16] During an attack, perpetrators are either firing their guns or not firing their guns. While gunmen are firing, it is extremely difficult for those in the line of fire to take successful defensive maneuvers. But if gunmen run out of bullets, there are lulls in the shootings, as the perpetrators are forced to pause their attacks to reload or change weapons. These pauses provide opportunities for people to intervene and disrupt a shooting. Alternatively, they provide individuals in

**ABOUT THE AUTHORS**

*Louis Klarevas is with the Teachers College, Columbia University, New York, NY. Andrew Conner is with the Frank H. Netter, MD, School of Medicine, Quinnipiac University, North Haven, CT. David Hemenway is with the Harvard T. H. Chan School of Public Health, Harvard University, Boston, MA.*

*Correspondence should be sent to Louis Klarevas, Research Professor, Office of the Provost, Teachers College, Columbia University, 525 W 120th St, New York, NY 10027 (e-mail: ljk2149@tc.columbia.edu). Reprints can be ordered at http://www.ajph.org by clicking the "Reprints" link.*

*This article was accepted July 22, 2019.*

*doi: 10.2105/AJPH.2019.305311*

Exhibit D_Klarevas
Page 28

**AJPH** OPEN-THEMED RESEARCH

harm's way with a chance to flee or hide. Legislative endeavors that restrict access to LCMs are implemented with the express objective of reducing an active shooter's multiple-impact capability and extended cover.[10]

Although mass shootings have received extensive study, there has been little scholarly analysis of LCM bans.[17–24] The studies undertaken that have broached the subject of ammunition capacity have primarily concentrated on the effect of LCM bans on violent crimes other than mass shootings or on the impact of the assault weapons bans on mass shootings.[25–27]

Evidence suggests that firearms equipped with LCMs are involved in a disproportionate share of mass shootings.[10,20,28] Proponents of LCM bans believe that without LCMs, fewer people will be killed in a mass shooting, other things equal. In turn, fewer shootings will cross the threshold required to be classified as what we call a "high-fatality mass shooting" (≥ 6 victims shot to death). If LCM bans are effective, we should expect to find that high-fatality mass shootings occur at a lower incidence rate when LCM bans are in place, and fewer people are killed in such attacks. But have LCM bans actually saved lives in practice? To our knowledge, the impact of LCM bans has never been systematically assessed. This study fills that void.

## METHODS

Mass shootings have been defined in a variety of ways, with some analyses setting the casualty threshold as low as 2 people wounded or killed and others requiring a minimum of 7 gunshot victims.[18,22,29] We focused on high-fatality mass shootings—the deadliest and most disturbing of such incidents—which are defined as intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators.[20,30,31] After an exhaustive search, we identified 69 such incidents in the United States between 1990 and 2017. We then discerned whether each high-fatality mass shooting involved a LCM—unless otherwise stated, defined consistent with the 1994 federal ban as a detachable ammunition-feeding device capable of holding more than 10 bullets. (See Table 1 for a list of incidents and for additional details on

the search and identification strategy we employed.)

The first state to enact an LCM ban was New Jersey in 1990. Since then, another 8 states and the District of Columbia have enacted LCM bans (Table A, available as a supplement to the online version of this article at http://www.ajph.org).[10] With no LCM bans in effect before 1990, a priori we chose that year to begin our analysis to avoid inflating the impact of the bans. Our data set extends 28 years, from 1990 through 2017. As a secondary analysis, we used a 13-year data set, beginning in 2005, the first full year after the federal assault weapons ban expired.

Our primary outcome measures were the incidence of high-fatality mass shootings and the number of victims killed. We distinguished between high-fatality mass shootings occurring with and without a ban in effect. Because the federal ban was in effect nationwide from September 13, 1994, through September 12, 2004, we coded every state as being under an LCM ban during that 10-year timeframe.

Our interest was in the effect of LCM bans. We ran regression analyses to determine if any relationship between LCM bans and high-fatality mass shootings can be explained by other factors. In our state–year panel multivariate analyses, the outcome variables were (1) whether an LCM-involved high-fatality mass shooting occurred, (2) whether any high-fatality mass shooting occurred, (3) the number of fatalities in an LCM-involved high-fatality mass shooting, and (4) the number of fatalities in any high-fatality mass shooting. Our analyses first combined and then separated federal and state LCM bans.

Consistent with the suggestions and practices of the literature on firearm homicides and mass shootings, our explanatory variables are population density; proportion of population aged 19 to 24 years, aged 25 to 34 years, that is Black, and with a college degree; real per-capita median income; unemployment rate; and per-capita prison population.[2,26,27,32] We also added a variable for percentage of households with a firearm. All regression models controlled for total state population. When the dependent variable reflected occurrences of incidents (ordered choice data), we used logit regression; we ran probit regression as a sensitivity analysis. We had multiple observations for individual

states. To control for this, we utilized cluster-robust standard errors to account for the clustering of observations. When the dependent variable reflected deaths (count data), we used negative binomial regression; Gius used a Poisson regression, and we used that approach as a sensitivity analysis.[26] We included state fixed effects. We used a continuous variable for year because the rate of high-fatality mass shootings has increased over time. For purposes of sensitivity analysis, we also replaced the linear yearly trend with a quadratic function. We performed multivariate statistical analyses by using Stata/IC version 15.1 (StataCorp LP, College Station, TX).

Population data came from the US Census Bureau, unemployment data came from the Bureau of Labor Statistics, and imprisonment data came from the Bureau of Justice Statistics. The percentage of households with a firearm was a validated proxy (the percentage of suicides that are firearm suicides) derived from Centers for Disease Control and Prevention National Vital Statistics Data.[33]

## RESULTS

Between 1990 and 2017, there were 69 high-fatality mass shootings (≥ 6 victims shot to death) in the United States. Of these, 44 (64%) involved LCMs, 16 did not (23%), and for 9 (13%) we could not determine whether LCMs were used (Table 1). The mean number of victims killed in the 44 LCM-involved high-fatality mass shootings was 11.8; including the unknowns resulted in that average falling to 11.0 (not shown). The mean number of victims killed in high-fatality mass shootings in which the perpetrator did not use an LCM was 7.3 (Table B, available as a supplement to the online version of this article at http://www.ajph.org); including the unknowns resulted in that average falling to 7.1 (not shown). When we excluded unknown cases, the data indicated that utilizing LCMs in high-fatality mass shootings resulted in a 62% increase in the mean death toll.

Data sets of mass shooting fatalities by their nature involve truncated data, with the mode generally being the baseline number of fatalities required to be included in the data set (6 fatalities in the current study). Our data

Exhibit D_Klarevas
Page 29

**AJPH** OPEN-THEMED RESEARCH

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|---|---|---|---|---|---|---|---|
| | | | | | | | **TABLE 1—High-Fatality Mass Shootings in the United States, 1990–2017** |
| 1 | Jun 18, 1990 | Jacksonville | FL | Y | 9 | N | N |
| 2 | Jan 26, 1991 | Chimayo | NM | N | 7 | N | N |
| 3 | Aug 9, 1991 | Waddell | AZ | N | 9 | N | N |
| 4 | Oct 16, 1991 | Killeen | TX | Y | 23 | N | N |
| 5 | Nov 7, 1992 | Morro Bay and Paso Robles | CA | N | 6 | N | N |
| 6 | Jan 8, 1993 | Palatine | IL | N | 7 | N | N |
| 7 | May 16, 1993 | Fresno | CA | Y | 7 | N | N |
| 8 | Jul 1, 1993 | San Francisco | CA | Y | 8 | N | N |
| 9 | Dec 7, 1993 | Garden City | NY | Y | 6 | N | N |
| 10 | Apr 20, 1999 | Littleton | CO | Y | 13 | Y | Y |
| 11 | Jul 12, 1999 | Atlanta | GA | U | 6 | Y | Y |
| 12 | Jul 29, 1999 | Atlanta | GA | Y | 9 | Y | Y |
| 13 | Sep 15, 1999 | Fort Worth | TX | Y | 7 | Y | Y |
| 14 | Nov 2, 1999 | Honolulu | HI | Y | 7 | Y | Y |
| 15 | Dec 26, 2000 | Wakefield | MA | Y | 7 | Y | Y |
| 16 | Dec 28, 2000 | Philadelphia | PA | Y | 7 | Y | Y |
| 17 | Aug 26, 2002 | Rutledge | AL | N | 6 | Y | Y |
| 18 | Jan 15, 2003 | Edinburg | TX | U | 6 | Y | Y |
| 19 | Jul 8, 2003 | Meridian | MS | N | 6 | Y | Y |
| 20 | Aug 27, 2003 | Chicago | IL | N | 6 | Y | Y |
| 21 | Mar 12, 2004 | Fresno | CA | N | 9 | Y | Y |
| 22 | Nov 21, 2004 | Birchwood | WI | Y | 6 | N | N |
| 23 | Mar 12, 2005 | Brookfield | WI | Y | 7 | N | N |
| 24 | Mar 21, 2005 | Red Lake | MN | Y | 9 | N | N |
| 25 | Jan 30, 2006 | Goleta | CA | Y | 7 | Y | N |
| 26 | Mar 25, 2006 | Seattle | WA | Y | 6 | N | N |
| 27 | Jun 1, 2006 | Indianapolis | IN | Y | 7 | N | N |
| 28 | Dec 16, 2006 | Kansas City | KS | N | 6 | N | N |
| 29 | Apr 16, 2007 | Blacksburg | VA | Y | 32 | N | N |
| 30 | Oct 7, 2007 | Crandon | WI | Y | 6 | N | N |
| 31 | Dec 5, 2007 | Omaha | NE | Y | 8 | N | N |
| 32 | Dec 24, 2007 | Carnation | WA | U | 6 | N | N |
| 33 | Feb 7, 2008 | Kirkwood | MO | Y | 6 | N | N |
| 34 | Sep 2, 2008 | Alger | WA | U | 6 | N | N |
| 35 | Dec 24, 2008 | Covina | CA | Y | 8 | Y | N |
| 36 | Jan 27, 2009 | Los Angeles | CA | N | 6 | Y | N |
| 37 | Mar 10, 2009 | Kinston, Samson, and Geneva | AL | Y | 10 | N | N |
| 38 | Mar 29, 2009 | Carthage | NC | N | 8 | N | N |
| 39 | Apr 3, 2009 | Binghamton | NY | Y | 13 | Y | N |
| 40 | Nov 5, 2009 | Fort Hood | TX | Y | 13 | N | N |
| 41 | Jan 19, 2010 | Appomattox | VA | Y | 8 | N | N |

*Continued*

Exhibit D_Klarevas
Page 30

**AJPH** OPEN-THEMED RESEARCH

**TABLE 1—**Continued

| Incident | Date | City | State | LCM | Deaths, No. | State LCM Ban | Federal Assault Weapons Ban |
|---|---|---|---|---|---|---|---|
| 42 | Aug 3, 2010 | Manchester | CT | Y | 8 | N | N |
| 43 | Jan 8, 2011 | Tucson | AZ | Y | 6 | N | N |
| 44 | Jul 7, 2011 | Grand Rapids | MI | Y | 7 | N | N |
| 45 | Aug 7, 2011 | Copley Township | OH | N | 7 | N | N |
| 46 | Oct 12, 2011 | Seal Beach | CA | N | 8 | Y | N |
| 47 | Dec 25, 2011 | Grapevine | TX | N | 6 | N | N |
| 48 | Apr 2, 2012 | Oakland | CA | N | 7 | Y | N |
| 49 | Jul 20, 2012 | Aurora | CO | Y | 12 | N | N |
| 50 | Aug 5, 2012 | Oak Creek | WI | Y | 6 | N | N |
| 51 | Sep 27, 2012 | Minneapolis | MN | Y | 6 | N | N |
| 52 | Dec 14, 2012 | Newtown | CT | Y | 27 | N | N |
| 53 | Jul 26, 2013 | Hialeah | FL | Y | 6 | N | N |
| 54 | Sep 16, 2013 | Washington | DC | N | 12 | Y | N |
| 55 | Jul 9, 2014 | Spring | TX | Y | 6 | N | N |
| 56 | Sep 18, 2014 | Bell | FL | U | 7 | N | N |
| 57 | Feb 26, 2015 | Tyrone | MO | U | 7 | N | N |
| 58 | May 17, 2015 | Waco | TX | Y | 9 | N | N |
| 59 | Jun 17, 2015 | Charleston | SC | Y | 9 | N | N |
| 60 | Aug 8, 2015 | Houston | TX | U | 8 | N | N |
| 61 | Oct 1, 2015 | Roseburg | OR | Y | 9 | N | N |
| 62 | Dec 2, 2015 | San Bernardino | CA | Y | 14 | Y | N |
| 63 | Feb 21, 2016 | Kalamazoo | MI | Y | 6 | N | N |
| 64 | Apr 22, 2016 | Piketon | OH | U | 8 | N | N |
| 65 | Jun 12, 2016 | Orlando | FL | Y | 49 | N | N |
| 66 | May 27, 2017 | Brookhaven | MS | U | 8 | N | N |
| 67 | Sep 10, 2017 | Plano | TX | Y | 8 | N | N |
| 68 | Oct 1, 2017 | Las Vegas | NV | Y | 58 | N | N |
| 69 | Nov 5, 2017 | Sutherland Springs | TX | Y | 25 | N | N |

*Note.* LCM = large-capacity magazine; N = no; U = unknown; Y = yes. From September 13, 1994, until and including September 12, 2004, each and every state, including the District of Columbia, was subject to a ban on LCMs pursuant to the federal assault weapons ban. To collect the data in Table 1, we searched the following news media resources for every shooting that resulted in 6 or more fatalities: America's Historical Newspapers, EBSCO, Factiva, Gannett Newsstand, Google News Archive, Lexis-Nexis, Newspaper Archive, Newspaper Source Plus, Newspapers.com, Newswires, ProQuest Historical Newspapers, and ProQuest Newsstand. We also reviewed mass shooting data sets maintained by *Mother Jones*, the *New York Times*, and *USA Today*. In addition to news media sources, we reviewed reports on mass shootings produced by think tank, policy advocacy, and governmental organizations, including the US Federal Bureau of Investigation Supplementary Homicide Reports, the crowdsourced Mass Shooting Tracker, and the open-source databases maintained by the Gun Violence Archive and the Stanford University Geospatial Center. Finally, when it was relevant, we also reviewed court records as well as police, forensic, and autopsy reports. As a general rule, when government sources were available, they were preferred over other sources. Furthermore, when media sources conflicted on the number of casualties or the weaponry involved, the later sources were privileged (as later reporting is often more accurate).

set of high-fatality mass shootings was no exception. As such, the median average number of fatalities for each subset of incidents—those involving and those not involving LCMs—was necessarily lower than the mean average. Nevertheless, like the mean average, the median average was higher when LCMs were employed—a median average of 8 fatalities per incident compared with 7 fatalities per incident for attacks not involving LCMs.

For the 60 incidents in which it was known if an LCM was used, in 44 the perpetrator used an LCM. Of the 44 incidents in which the perpetrators used LCMs, 77% (34/44) were in nonban states. In the 16 incidents in which the perpetrators did not use LCMs, 50% (8/16) were in nonban states (Table B, available as a supplement to the online version of this article at http://www.ajph.org). Stated differently, in nonban states, 81% (34/42) of high-fatality mass shooting perpetrators used LCMs; in LCM-ban states, only 55% (10/18) used LCMs.

Exhibit D_Klarevas
Page 31

**AJPH** OPEN-THEMED RESEARCH

The rate of high-fatality mass shootings increased considerably after September 2004 (when the federal assault weapons ban expired). In the 10 years the federal ban was in effect, there were 12 high-fatality mass shootings and 89 deaths (an average of 1.2 incidents and 8.9 deaths per year). Since then, through 2017, there have been 48 high-fatality mass shootings and 527 deaths (an average of 3.6 incidents and 39.6 deaths per year in these 13.3 years).

Of the 69 high-fatality mass shootings from 1990 to 2017, 49 occurred in states without an LCM ban in effect at the time and 20 in states with a ban in effect at the time. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 11.7 per billion population; the annual incidence rate for high-fatality mass shootings in states with an LCM ban was 5.1 per billion population. In that 28-year period, the rate of high-fatality mass shootings per capita was 2.3 times higher in states without an LCM ban (Table 2).

Non–LCM ban states had not only more incidents but also more deaths per incident (10.9 vs 8.2). The average annual number of high-fatality mass shooting deaths per billion population in the non–LCM ban states was

127.4. In the LCM states, it was 41.6 (Table 2).

For the time period beginning with the first full calendar year following the expiration of the federal assault weapons ban (January 1, 2005–December 31, 2017), there were 47 high-fatality mass shootings in the United States. Of these, 39 occurred in states where an LCM ban was not in effect, and 8 occurred in LCM ban locations. The annual incidence rate for high-fatality mass shootings in states without an LCM ban was 13.2 per billion population; for states with an LCM ban, it was 7.4 per billion population (Table 2). During this period, non–LCM ban states had not only more incidents but also more deaths per incident (11.4 vs 9.4). In terms of high-fatality mass shooting deaths per billion population, the annual number of deaths in the non–LCM ban states was 150.6; in the LCM ban states it was 69.2 (Table 2).

When we limited the analysis solely to high-fatality mass shootings that definitely involved LCMs, the differences between ban and nonban states became larger. For example, for the entire period of 1990 to 2017, of the 44 high-fatality mass shootings that involved LCMs, the annual incidence rate for LCM-involved high-fatality mass shootings

in nonban states was 8.1 per billion population; in LCM–ban states it was 2.5 per billion population. The annual rate of high-fatality mass shooting deaths in the non–LCM ban states was 102.1 per billion population; in the LCM ban states it was 23.3. In terms of LCM-involved high-fatality mass shootings, we also found comparable wide differences in incidence and fatality rates between ban and nonban states for the post–federal assault weapons ban period (2005–2017; Table 2).

We found largely similar results in the multivariate analyses (1990–2017). States that did not ban LCMs were significantly more likely to experience LCM-involved high-fatality mass shootings as well as more likely to experience any high-fatality mass shootings (regardless of whether an LCM was involved). States that did not ban LCMs also experienced significantly more deaths from high-fatality mass shootings, operationalized as the absolute number of fatalities (Table 3).

When the LCM bans were separated into federal and state bans, both remained significantly related to the incidence of LCM-involved high-fatality mass shooting events and to the number of LCM-involved high-fatality mass shooting deaths. The associations between federal and state bans and

| TABLE 2—High-Fatality Mass Shootings (≥ 6 Victims Shot to Death) by Whether LCM Bans Were in Effect: United States, 1990–2017 | | | | | | |
|---|---|---|---|---|---|---|
| | Average Annual Population, No. (Millions) | Total Incidents, No. | Annual Incidents per Billion Population, No. | Total Deaths, No. | Annual Deaths per Billion Population, No. | Deaths per Incident, No. |
| All high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 49 | 11.7 | 534 | 127.4 | 10.9 |
| LCM ban states | 140.7 | 20 | 5.1 | 164 | 41.6 | 8.2 |
| All high-fatality mass shootings, 2005–2017 (13 y) | | | | | | |
| Non–LCM ban states | 227.8 | 39 | 13.2 | 446 | 150.6 | 11.4 |
| LCM ban states | 83.4 | 8 | 7.4 | 75 | 69.2 | 9.4 |
| LCM-involved high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 34 | 8.1 | 428 | 102.1 | 12.6 |
| LCM ban states | 140.7 | 10 | 2.5 | 92 | 23.3 | 9.2 |
| LCM-involved high-fatality mass shootings, 2005–2017 (13 y) | | | | | | |
| Non–LCM ban states | 227.8 | 28 | 9.5 | 369 | 124.6 | 13.2 |
| LCM ban states | 83.4 | 4 | 3.7 | 42 | 38.7 | 10.5 |
| Non-LCM high-fatality mass shootings, 1990–2017 (28 y) | | | | | | |
| Non–LCM ban states | 149.7 | 8 | 1.9 | 56 | 13.4 | 7.0 |
| LCM ban states | 140.7 | 8 | 2.0 | 60 | 15.2 | 7.5 |

*Note.* LCM = large-capacity magazine.

Exhibit D_Klarevas
Page 32

**AJPH** OPEN-THEMED RESEARCH

TABLE 3—Multivariate Results of the Relationship Between LCM Bans and High-Fatality Mass Shootings (≥6 Victims Shot to Death), 1990–2017 Combined Federal and State Large Capacity Magazine Bans: United States

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| All LCM bans (federal and state) | −2.217 (−3.493, −0.940) | −5.912 (−9.261, −2.563) | −1.283 (−2.147, −0.420) | −3.660 (−5.695, −1.624) |
| Population density | −0.011 (−0.029, 0.006) | 0.013 (−0.068, 0.095) | 0.001 (−0.003, 0.006) | 0.011 (−0.005, 0.026) |
| % aged 19–24 y | −0.480 (−1.689, 0.730) | −2.496 (−5.893, 0.901) | 0.283 (−0.599, 1.164) | −0.585 (−2.666, 1.495) |
| % aged 25–34 y | −0.801 (−1.512, −0.089) | −2.390 (−4.391, −0.388) | −0.337 (−0.871, 0.197) | −1.114 (−2.463, 0.235) |
| % Black | −0.227 (−1.062, 0.607) | −0.654 (−2.831, 1.522) | −0.163 (−0.703, 0.377) | −0.261 (−1.391, 0.870) |
| % with a bachelor's degree or higher | −0.009 (−0.492, 0.474) | −0.469 (−1.590, 0.652) | 0.143 (−0.214, 0.501) | 0.183 (−0.715, 1.081) |
| Percentage of households with a firearm (proxy) | −0.047 (−0.195, 0.101) | −0.147 (−0.546, 0.251) | −0.020 (−0.131, 0.091) | −0.084 (−0.368, 0.200) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.072 (−0.293, 0.149) | −0.476 (−1.081, 0.129) | 0.041 (−0.135, 0.216) | −0.182 (−0.628, 0.263) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.012, 0.001) | −0.007 (−0.017, 0.004) | −0.001 (−0.006, 0.003) | −0.003 (−0.012, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.31 | 0.16 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.49.
[a]Logit regression.
[b]Negative binomial regression.

the overall incidence of all high-fatality mass shootings as well as the total number of victims in these events remained strongly negative but were only sometimes statistically significant (Table 4).

In terms of sensitivity analyses, using probit instead of logit gave us similar results (not shown). When the outcome variable was the number of high-fatality mass shooting deaths, we obtained largely similar results concerning the association between LCM bans and the outcome variables, regardless of whether we used Poisson or negative binomial regression (not shown). Moreover, replacing the linear yearly trend with a quadratic function did not change the major results of the analyses (not shown). Variance inflation factors for all the independent variables never exceeded 10.0, with the variance inflation factor for LCM ban variables always being less than 2.0, indicating that there were no significant multicollinearity issues (Tables 3 and 4).

## DISCUSSION

In the United States, LCMs are disproportionately used in high-fatality mass shootings (incidents in which ≥6 victims are shot to death). In at least 64% of the incidents

since 1990, perpetrators used LCMs. (For 23%, we determined that they did not involve LCMs, and a determination could not be made for the remaining 13%.) Previous research has shown that LCM firearms are used in a high share of mass murders (typically defined as ≥4 homicides) and murders of police.[9]

We could not find reliable estimates of LCM firearms in the US gun stock. However, it is likely much lower than 64%, given that commonly owned firearms such as revolvers, bolt-action rifles, and shotguns are not typically designed to be LCM-capable. During the decade the federal assault weapons ban was in effect, no firearms were legally manufactured with LCMs for sale in the United States. In the postban era, semiautomatic firearms, especially pistols, are often sold with factory-issue LCMs, but firearms that are not semiautomatic are not sold with such magazines.

Why do we find LCMs so prominent among high-fatality mass shootings? We suspect there are 2 main reasons. The first is that perpetrators probably deliberately select LCMs because they facilitate the ability to fire many rounds without having to stop to reload. The second reason is that the ability of shooters to kill many victims—especially the 6 victims required to be included in our data set—may be reduced if LCMs are not

available. In other words, the first explanation is that shooters perceive LCMs to be more effective at killing many people; the second explanation is that LCMs are indeed more effective at killing many people.

High-fatality mass shootings are not common, even in the United States. Between 1990 and 2017, there has been an average of 2.5 incidents per year, with an average of 25 people killed annually in such attacks. However, the number of incidents and the number of people killed per incident have been increasing since the end of the federal assault weapons ban.

In our study, we found that bans on LCMs were associated with both lower incidence of high-fatality mass shootings and lower fatality tolls per incident. The difference in incidence and overall number of fatalities between bans, with and without bans, was even greater for LCM-involved high-fatality mass shootings.

The multivariate results are largely consistent with these bivariate associations. When we controlled for 10 independent variables often associated with overall crime rates, as well as state and year effects, states with LCM bans had lower rates of high-fatality mass shootings and fewer high-fatality mass shooting deaths. When we investigated federal and state bans separately in the multiple

Exhibit D_Klarevas
Page 33

**AJPH** OPEN-THEMED RESEARCH

TABLE 4—Multivariate Results of the Relationship Between Large Caliber Magazine Bans and High-Fatality Mass Shootings (≥ 6 Victims Shot to Death), 1990–2017 Separate Federal and State Large Caliber Magazine Bans: United States

| | LCM-Involved High-Fatality Mass Shootings, b (95% CI) | | All High-Fatality Mass Shootings, b (95% CI) | |
|---|---|---|---|---|
| | Incidents[a] | No. Deaths[b] | Incidents[a] | No. Deaths[b] |
| Federal LCM ban | −1.434 (−2.622, −0.245) | −3.571 (−7.103, −0.038) | −0.895 (−1.806, 0.016) | −2.570 (−4.902, −0.238) |
| State LCM bans | −2.603 (−4.895, −0.311) | −8.048 (−15.172, −0.925) | −1.277 (−2.977, 0.422) | −3.082 (−7.227, 1.064) |
| Population density | −0.012 (−0.055, 0.030) | −0.001 (−0.085, 0.083) | 0.001 (−0.003, 0.006) | 0.009 (−0.007, 0.024) |
| % aged 19–24 y | −0.311 (−1.499, 0.878) | −2.589 (−6.057, 0.879) | 0.342 (−0.551, 1.236) | −0.531 (−2.759, 1.698) |
| % aged 25–34 y | −0.812 (−1.532, −0.093) | −2.660 (−4.848, −0.471) | −0.323 (−0.864, 0.217) | −0.848 (−2.236, 0.539) |
| % Black | −0.229 (−1.101, 0.643) | −0.770 (−3.232, 1.693) | −0.150 (−0.698, 0.398) | −0.154 (−1.321, 1.013) |
| % with a bachelor's degree or higher | −0.031 (−0.447, 0.509) | −0.479 (−1.577, 0.618) | 0.156 (−0.199, 0.511) | 0.269 (−0.567, 1.106) |
| Percentage of households with a firearm (proxy) | −0.055 (−0.210, 0.101) | −0.227 (−0.651, 0.196) | −0.019 (−0.133, 0.094) | −0.107 (−0.399, 0.186) |
| Median household income | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Unemployment rate | −0.061 (−0.284, 0.162) | −0.420 (−1.041, 0.201) | 0.046 (−0.132, 0.224) | −0.157 (−0.619, 0.305) |
| Imprisonment rate (per 100 000 population) | −0.006 (−0.013, 0.000) | −0.012 (−0.026, 0.002) | −0.002 (−0.007, 0.003) | −0.003 (−0.014, 0.007) |
| Total population | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) | 0.000 (0.000, 0.000) |
| Pseudo $R^2$ | 0.30 | 0.15 | 0.26 | 0.11 |

*Note.* CI = confidence interval; LCM = large-capacity magazine. There were a total of 1428 observations in state-years (51 jurisdictions—all 50 states plus Washington, DC—over a 28-year period). Mean variance inflation factor = 3.45.
[a]Logit regression.
[b]Negative binomial regression.

regressions, both were significantly associated with the incidence of LCM-involved high-fatality mass shootings as well as the number of victims in LCM-involved attacks. The relationship between these bans, considered separately, and all high-fatality mass shooting incidence and deaths is often not statistically significant, although this may be attributable to lack of statistical power (number of observations) to find a statistically significant effect.

Our analysis provides answers to 4 important questions:

1. How often are LCMs used in high-fatality mass shootings? At minimum, 64% of high-fatality mass shootings perpetrated between 1990 and 2017 involved LCMs.
2. Are more people killed when LCMs are used? Yes, and the difference in our data set is substantial and statistically significant (11.8 vs 7.3). We should add that our results likely underestimate the difference because we have a truncated sample (we only examined incidents with at least 6 victim fatalities), compounded by the fact that the number of homicide incidents fell as the number of victims increased.
3. Do states with LCM bans experience high-fatality mass shootings involving LCMs at a lower rate and a lower fatality

count than those states with no such bans in effect? Yes. In fact, the effect is more pronounced for high-fatality mass shootings involving LCMs than for those not involving LCMs.
4. Do states with LCM bans experience high-fatality mass shootings (regardless of whether they involve LCMs) at a lower rate and a lower fatality count than states with no such bans in effect? Yes.

## Limitations

Our study had various limitations. First, although we carefully searched for every high-fatality mass shooting, it is possible that we might have missed some. Nevertheless, we suspect that this is unlikely, because it would mean that others who compiled lists have also missed the same ones, for we checked our list against multiple sources.

Second, our definition of a high-fatality mass shooting is a shooting that results in 6 or more fatal victims. A different threshold criterion (e.g., 6 or more people shot; 5 or more victims killed), might lead to somewhat different results. We expect that as the number of victims in a shooting increases, the likelihood that the perpetrator used an LCM

also increases. Indeed, of the 13 high-fatality mass shootings with 10 or more fatalities in our data set, 12 (92%) involved an LCM.

Third, although many high-fatality mass shootings tend to be highly publicized, in 13% of the incidents we reviewed, we could not determine whether an LCM was used. As a sensitivity analysis, we assessed the assumptions that all of the unknown cases first did, and then did not, involve LCMs. Neither assumption appreciably changed our main results (not shown).

Fourth, as a general rule, clustering standard errors is most appropriate when there is a large number of treated units. Although during the decade of the federal assault weapons bans all 50 states plus the District of Columbia regulated LCMs, during the remaining time periods under examination, only 8 jurisdictions regulated LCMs. As a result, there is the possibility that the standard errors were underestimated in our analyses.[34]

Fifth, there were only 69 events that met our criterion for a "high-fatality mass shooting." Although 69 is a horrific number of incidents, for statistical purposes, it is a relatively small number and limits the power to detect significant associations. For example, we did not have the statistical power (and thus did not even try) to determine whether

Exhibit D_Klarevas
Page 34

**AJPH** OPEN-THEMED RESEARCH

different aspects of the various LCM laws might have differential effects on the incidence of high-fatality mass shootings. Moreover, because of suboptimal statistical power, there is also the possibility that the magnitude of the effects detected was overestimated.[35]

## Public Health Implications

LCMs increase the ability to fire large numbers of bullets without having to pause to reload. Any measure that can force a pause in an active shooting—creating opportunities for those in the line of fire to flee, take cover, or physically confront a gunman—offers a possibility of reducing the number of victims in such an attack. To put it in different terms, if the only firearms available were 18th-century muskets, it is doubtful that mass shootings would be the social problem they are today.

The impact of individual state firearm laws is reduced by the fact that guns often move across state lines—occasionally purchased in locales with more permissive laws and taken to states with more restrictive laws. This is partly why efforts aimed at reducing the frequency and lethality of mass shootings must necessarily be multifaceted and multidisciplinary. Legal restrictions on firearms are merely a part of this broader, public health approach. That being said, the theory behind reducing the availability of LCMs to reduce the number of victims in mass shootings makes sense, and our empirical results, consistent with much of the limited literature on mass shootings, suggest that LCM bans have been effective in saving lives. *AJPH*

## CONTRIBUTORS

L. Klarevas and D. Hemenway designed the study, collected the data, and contributed equally to all parts of the study. A. Conner ran the statistical analyses and helped construct the tables that report the results of the multivariate analyses. All authors approved the final article as submitted.

## ACKNOWLEDGMENTS

The authors would like to thank John Berrigan, research assistant at the Harvard Injury Control Research Center, for his assistance with the undertaking of this study.

## CONFLICTS OF INTEREST

L. Klarevas has, in the past 2 years, served as an expert to the states of Colorado and California in civil litigation that involved the constitutionality of state restrictions on large-capacity magazines. The authors have no additional conflicts of interest to report.

## HUMAN PARTICIPANT PROTECTION

No protocol approval was needed because no human participants were involved in this study.

## REFERENCES

1. Wintemute GJ. How to stop mass shootings. *N Engl J Med.* 2018;379(13):1193–1196.

2. Reeping PM, Cerda M, Kalesan B, Wiebe DJ, Galea S, Branas CC. State gun laws, gun ownership, and mass shootings in the US: cross sectional time series. *BMJ.* 2019;364(8190):l542–l548.

3. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times.* October 5, 2017. Available at: https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed June 10, 2019.

4. Kamerow D. Guns don't kill crowds, people with semi-automatics do. *BMJ.* 2011;342(1):d477.

5. Barry CL, Webster DW, Stone E, Crifasi CK, Vernick JS, McGinty EE. Public support for gun violence prevention policies among gun owners and non–gun owners in 2017. *Am J Public Health.* 2018;108(7):878–881.

6. Lenett MG. Taking a bite out of violent crime. *Univ Dayton Law Rev.* 1995;20(2):573–617.

7. Muchnick JY. The assault weapons ban: saving lives. *Univ Dayton Law Rev.* 1995;20(2):641–651.

8. Koper CS, Roth JA. The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol.* 2001;17(1):33–74.

9. Koper CS, Johnson WD, Nicholas JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. *J Urban Health.* 2018;95(3):313–321.

10. Giffords Law Center to Prevent Gun Violence. Large capacity magazines. Available at: http://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines. Accessed June 10, 2019.

11. Giffords Law Center to Prevent Gun Violence. Assault weapons. Available at: https://lawcenter.giffords.org/gun-laws/policy-areas/hardware-ammunition/assault-weapons. Accessed June 10, 2019.

12. Webster DW, Champion HR, Gainer PS, Sykes L. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. *Arch Surg.* 1992;127(6):694–698.

13. Koper CS, Roth JA. A priori assertions versus empirical inquiry: a reply to Kleck. *J Quant Criminol.* 2001;17(1):81–88.

14. Livingston DH, Lavery RF, Lopreiato MC, Lavery DF, Passannante MR. Unrelenting violence: an analysis of 6,322 gunshot wound patients at a level I trauma center. *J Trauma Acute Care Surg.* 2014;76(1):2–9.

15. Manley NR, Fabian TC, Sharpe JP, Magnotti LJ, Croce MA. Good news, bad news: an analysis of 11,294 gunshot wounds (GSWs) over two decades in a single center. *J Trauma Acute Care Surg.* 2017;84(1):58–65.

16. McCullough J. *The Ultimate Guide to US Army Combat Skills, Tactics and Techniques.* New York, NY: Skyhorse; 2012.

17. Fox JA, DeLateur MJ. Mass shootings in America: moving beyond Newtown. *Homicide Stud.* 2014;18(1):125–145.

18. Krouse WJ, Richardson DJ. Mass murder with firearms: incidents and victims, 1999–2013. CRS Report R.44126. Washington, DC: Congressional Research Service; 2015.

19. Wilson LC. *The Wiley Handbook of the Psychology of Mass Shootings.* Hoboken, NJ: Wiley; 2016.

20. Klarevas L. *Rampage Nation: Securing America From Mass Shootings.* Amherst, NY: Prometheus; 2016.

21. Schildkraut J, Elaass HJ. *Mass Shootings: Media, Myths, and Realities.* Denver, CO: Praeger; 2016.

22. Schildkraut J. *Mass Shootings in America: Understanding the Debates, Causes, and Responses.* Denver, CO: ABC-CLIO; 2018.

23. Rocque M, Duwe G. Rampage shootings: an historical, empirical, and theoretical overview. *Curr Opin Psychol.* 2018;19(1):28–33.

24. Phaneuf SW. Mass shootings: understanding the complexities. In: Hilinski-Rosick CM, Lee DR, eds. *Contemporary Issues in Victimology: Identifying Patterns and Trends.* New York, NY: Lexington; 2018.

25. Moody CE, Marvell TB. Clustering and standard error bias in fixed effects panel data regressions. *J Quant Crim;* 2018:1–23.

26. Gius M. The impact of state and federal assault weapons ban on public mass shootings. *Appl Econ Lett.* 2015;22(4):281–284.

27. Blau BM, Gorry DH, Wade C. Guns, laws and public shootings in the United States. *Appl Econ.* 2016;48(49):4732–4746.

28. Follman M, Aronsen G, Pan D. A guide to mass shootings in America. *Mother Jones.* May 31, 2019. Available at: https://www.motherjones.com/politics/2012/07/mass-shootings-map. Accessed June 10, 2019.

29. Kleck G. Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages. *Justice Res Policy.* 2016;17(1):28–47.

30. Webster DW, Donohue JJ, Klarevas L, et al. Firearms on college campuses: research evidence and policy implications. Report of the Johns Hopkins University Center for Gun Policy and Research. Baltimore, MD: Johns Hopkins Bloomberg School of Public Health; 2016.

31. Kleck G. *Targeting Guns: Firearms and Their Control.* Hawthorne, NY: Aldine de Gruyter; 1997.

32. Hemenway D. *Private Guns, Public Health.* Ann Arbor, MI: University of Michigan Press; 2017.

33. Azrael D, Cook PJ, Miller M. State and local prevalence of firearms ownership: measurement, structure and trends. *J Quant Criminol.* 2004;20(1):43–62.

34. Conley TG, Taber CR. Inference with "difference in differences" with a small number of policy changes. *Rev Econ Stat.* 2011;93(1):113–125.

35. Button KS, Ioannidis JPA, Mokrysz C, et al. Power failure: why small sample size undermines the reliability of neuroscience [erratum *Nat Rev Neurosci.* 2013;14(6):451]. *Nat Rev Neurosci.* 2013;14(5):365–376.

Exhibit D_Klarevas
Page 35

# EXHIBIT E

AAST 2018 PODIUM PAPER

# Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data

**Charles DiMaggio, PhD, MPH, Jacob Avraham, MD, Cherisse Berry, MD, Marko Bukur, MD, Justin Feldman, ScD, Michael Klein, MD, Noor Shah, MD, Manish Tandon, MD,** *and* **Spiros Frangos, MD, MPH**, *New York, New York*

Downloaded from https://journals.lww.com/jtrauma by BhDMf5ePHKav1zEoum1tQfN4a+kJLhEZgbsIHo4XMi0hCywCX1AWnYQp/IQrHD3i3D0OdRyi7TvSFl4Cf3VC4/OAVpDDa8K2+Ya6H515kE= on 01/01/2019

## AAST Continuing Medical Education Article

### Accreditation Statement
This activity has been planned and implemented in accordance with the Essential Areas and Policies of the Accreditation Council for Continuing Medical Education through the joint providership of the American College of Surgeons and the American Association for the Surgery of Trauma. The American College Surgeons is accredited by the ACCME to provide continuing medical education for physicians.

*AMA PRA Category 1 Credits™*
The American College of Surgeons designates this journal-based CME activity for a maximum of 1 *AMA PRA Category 1 Credit™*. Physicians should claim only the credit commensurate with the extent of their participation in the activity.

Of the *AMA PRA Category 1 Credit™* listed above, a maximum of 1 credit meets the requirements for self-assessment.

### Credits can only be claimed online



AMERICAN COLLEGE OF SURGEONS
*Inspiring Quality:*
Highest Standards, Better Outcomes

100+*years*

### Objectives
After reading the featured articles published in the *Journal of Trauma and Acute Care Surgery*, participants should be able to demonstrate increased understanding of the material specific to the article. Objectives for each article are featured at the beginning of each article and online. Test questions are at the end of the article, with a critique and specific location in the article referencing the question topic.

### Claiming Credit
To claim credit, please visit the AAST website at http://www.aast.org/ and click on the "e-Learning/MOC" tab. You must read the article, successfully complete the post-test and evaluation. Your CME certificate will be available immediately upon receiving a passing score of 75% or higher on the post-test. Post-tests receiving a score of below 75% will require a retake of the test to receive credit.

### System Requirements
The system requirements are as follows: Adobe® Reader 7.0 or above installed; Internet Explorer® 7 and above; Firefox® 3.0 and above, Chrome® 8.0 and above, or Safari™ 4.0 and above.

### Questions
If you have any questions, please contact AAST at 800-789-4006. Paper test and evaluations will not be accepted.

### Disclosure Information
In accordance with the ACCME Accreditation Criteria, the American College of Surgeons, as the accredited provider of this journal activity, must ensure that anyone in a position to control the content of *J Trauma Acute Care Surg* articles selected for CME credit has disclosed all relevant financial relationships with any commercial interest. Disclosure forms are completed by the editorial staff, associate editors, reviewers, and all authors. The ACCME defines a `commercial interest' as "any entity producing, marketing, re-selling, or distributing health care goods or services consumed by, or used on, patients." "Relevant" financial relationships are those (in any amount) that may create a conflict of interest and occur within the 12'months preceding and during the time that the individual is engaged in writing the article. All reported conflicts are thoroughly managed in order to ensure any potential bias within the content is eliminated. However, if you'perceive a bias within the article, please report the circumstances on the evaluation form.

Please note we have advised the authors that it is their responsibility to disclose within the article if they are describing the use of a device, product, or drug that is not FDA approved or the off-label use of an approved device, product, or drug or unapproved usage.

### Disclosures of Significant Relationships with Relevant Commercial Companies/Organizations by the Editorial Staff
Ernest E. Moore, Editor: PI, research support and shared U.S. patents Haemonetics; PI, research support, Instrumentation Laboratory, Inc.; Co-founder, Thrombo Therapeutics. Associate Editors David Hoyt, Ronald V. Maier and Steven Shackford have nothing to disclose. Editorial staff and Angela Sauaia have nothing to disclose.

### Author Disclosures
The authors have nothing to disclose.

### Reviewer Disclosures
The reviewers have nothing to disclose.

### Cost
For AAST members and *Journal of Trauma and Acute Care Surgery* subscribers there is no charge to participate in this activity. For those who are not a member or subscriber, the cost for each credit is $25.

From the Department of Surgery, Division of Trauma and Critical Care Surgery (C.D., J.A., C.B., M.B., J.F., M.K., N.S., M.T., S.F.), New York University School of Medicine, New York, New York.

Address for reprints: Charles DiMaggio, PhD, MPH, Department of Surgery, New York University School of Medicine, 462 First Ave, NBV 15, New York, NY 10016-9196; email: Charles.DiMaggio@nyumc.org.

77th Annual Meeting of AAST and the World Trauma Congress, Sep 26 - 29, 2018, San Diego, California.

DOI: 10.1097/TA.0000000000002060

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Exhibit E_Klarevas
Page 36

*DiMaggio et al.*

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

| | |
|---|---|
| **BACKGROUND:** | A federal assault weapons ban has been proposed as a way to reduce mass shootings in the United States. The Federal Assault Weapons Ban of 1994 made the manufacture and civilian use of a defined set of automatic and semiautomatic weapons and large capacity magazines illegal. The ban expired in 2004. The period from 1994 to 2004 serves as a single-arm pre-post observational study to assess the effectiveness of this policy intervention. |
| **METHODS:** | Mass shooting data for 1981 to 2017 were obtained from three well-documented, referenced, and open-source sets of data, based on media reports. We calculated the yearly rates of mass shooting fatalities as a proportion of total firearm homicide deaths and per US population. We compared the 1994 to 2004 federal ban period to non-ban periods, using simple linear regression models for rates and a Poisson model for counts with a year variable to control for trend. The relative effects of the ban period were estimated with odds ratios. |
| **RESULTS:** | Assault rifles accounted for 430 or 85.8% of the total 501 mass-shooting fatalities reported (95% confidence interval, 82.8–88.9) in 44 mass-shooting incidents. Mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides (coefficient for year, 0.7; $p = 0.0003$), with increment in year alone capturing over a third of the overall variance in the data (adjusted $R^2 = 0.3$). In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides ($p = 0.03$). Mass-shooting fatalities were 70% less likely to occur during the federal ban period (relative rate, 0.30; 95% confidence interval, 0.22–0.39). |
| **CONCLUSION:** | Mass-shooting related homicides in the United States were reduced during the years of the federal assault weapons ban of 1994 to 2004. (*J Trauma Acute Care Surg.* 2019;86: 11–19. Copyright © 2018 American Association for the Surgery of Trauma.) |
| **LEVEL OF EVIDENCE:** | Observational, level II/IV. |
| **KEY WORDS:** | Firearms; mass-shootings; assault weapons; epidemiology. |

Increases in firearm-related injuries, particularly mass-shooting related fatalities, in the United States have contributed to a polarizing and sometimes contentious debate over gun ownership and limiting weapons characterized as assault weapons.[1,2] Despite the increasing sense that there is an epidemic of indiscriminate firearm violence in our schools and public spaces, there is a paucity of public health evidence on the topic. Among a number of recommendations, a federal Assault Weapons Ban (AWB) has been proposed as a way to prevent and control mass shootings in the United States. In this article, we assess evidence for the effectiveness of such a ban in preventing or controlling mass-shooting homicides in the United States.

While mass shootings occur in other industrialized nations, the United States is particularly prone to these crimes. In a recent 30-year period, the United States had double the number of mass-shooting incidents than the next 24 industrialized nations combined.[3] Any public perception of recent increases in the number of these events is borne out by analysis of available data.[4] By one measure, there have been more deaths due to mass shootings in the United States in the past 18 years than in the entire 20th century.[5] While there is some debate about the role of mental illness in mass shootings,[6–8] many high-profile recent mass shootings (Aurora, CO; Roseburg, OR; San Bernadino, CA; Newtown, CT; Orlando; Las Vegas; Sutherland Springs, TX) have been characterized by the use of semiautomatic assault rifles,[9] leading some to advocate for restrictions on the manufacture and sale of these weapons.

While survey results indicate that researchers in criminology, law and public health rank an assault weapons ban as one of the most effective measures to prevent mass shootings, and that 67% of the US general population support such a ban,[10] the existing evidence on banning assault weapons is scant and sometimes contradictory. Most evidence is related to the Federal AWB of 1994, which made illegal the manufacture and use by civilians of a defined set of automatic and semiautomatic weapons and large capacity magazines. Formally known as "The Public Safety and Recreational Firearms Use Protection Act", the AWB was part of the broader "Violent Crime Control and Law Enforcement Act of 1994. The ban lasted 10 years, expiring in 2004 when the US Congress declined to renew it.

In a study soon following the implementation of the 1994 ban, researchers reported a 55% decrease in the recovery of assault weapons by the Baltimore City Police in the first 6 months of 1995, indicating a statistically significant 29 fewer such firearms in the population.[11] In a 2009 study based on ICD9 external cause of injury codes for patients younger than 18 years in the United States, 11 states with assault and large-capacity magazine bans, as well as other firearm laws, were compared with 33 states without such restrictions. The incidence of firearm injuries per 1,000 traumatic injuries was significantly lower in states with restrictive laws, 2.2 compared with 5.9.[12] In contrast, a comprehensive 2001 evaluation of the AWB itself concluded that there was "no evidence of reductions in multiple-victim gun homicides or multiple-gunshot wound victimizations". The authors cautioned their results should be "interpreted cautiously" because of the short period since the ban's inception, and that future assessments were warranted.[13] More recent studies, while not primarily addressing the US Federal AWB have found results generally consistent with its effectiveness in preventing mass-shooting fatalities.[14,15]

We believe sufficient time has passed and enough data have accumulated to treat the period from 1994 to 2004 as a naturalistic pre-post observational comparison period for the association of the AWB with changes in mass-shootings in the United States. Because there is no authoritative source or registry, or even a widely agreed upon definition for these incidents, we obtained data from three open source references and restricted our analyses to only those incidents confirmed by all three sources. We assess evidence for the potential effectiveness of such a ban in preventing and controlling mass-shooting homicides in the United States. We hypothesized that the implementation of the Federal AWB contributed to a reduction in mass shooting deaths as measured by the number and rate of mass shooting fatalities before, during, and after the federal AWB.

## METHODS

Mass incident shooting data were obtained from three independent, well-documented and referenced online sources: Mother Jones Magazine, the Los Angeles Times and Stanford

*© 2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Exhibit E_Klarevas
Page 37

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

University.[16–18] These sources have each been the basis for a number of previous studies.[19–26] Data from the three online open-source references were combined. Analyses were restricted to incidents reported by all three sources. Entries were further restricted to those for which four or more fatalities (not including the shooter) were reported, which meets the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Yearly homicide data were obtained from the US Centers for Disease Control and Prevention Web-based Injury Statistics Query and Reporting System (WISQARS) an online database of fatal and nonfatal injury.[29] Because 2017 data were not yet available in the WISQARS system, data for firearm-related homicide data for that year were obtained from a separate online source.[30]

A variable was created to indicate the 1994 to 2004 period as the federal ban period. We attempted to identify incidents involving assault weapons. An assault weapon has been defined as semiautomatic rifle that incorporates military-style features such as pistol grips, folding stocks, and high-capacity detachable magazines.[31] In this study, assault weapons were identified using the text search terms "AK," "AR," "MCX," "assault," "assault," or "semiautomatic" in a text field for weapon details. These terms were based on descriptions of the federal assault ban legislative language.[32] The total number of mass shooting fatalities and injuries were aggregated by year and merged with the yearly firearm homicide data.

The rate of mass shooting fatalities per 10,000 firearm homicide deaths was calculated. For the years covered by the data sources, we calculated (1) the total and yearly number of mass-shooting incidents that met the strictest criteria and were confirmed by all three sources, (2) the number of all weapon (assault and nonassault weapons) mass-shooting fatalities, and (3) the case-fatality ratio of all-weapon mass-shooting fatalities per 100 total mass-shooting fatalities and injuries. This yearly case-fatality ratio was plotted with overlying Loess line for trend and standard error limits. We also plotted the yearly rate of mass shooting fatalities per 10,000 firearm-related homicides with an overlying simple linear model with year as the predictor for (1) the total period, and (2) for preban, ban, and postban periods.

We evaluated assumptions of normality and linearity of the data using graphical methods such as density plots and Q-Q normal plots as well as summary statistics. We tested the hypothesis that the federal ban period was associated with a decrease in the number and rate of mass-shooting fatalities in the United States with a multiple linear regression model, with total homicide-based mass-shooting fatality rate as the outcome variable, a dichotomous indicator variable for the federal ban period as the predictor variable, and year as a control variable for trend over time. We calculated the relative risk of mass shooting fatalities during the federal ban period compared to nonban periods by using the "epitab" function of the R "epitools" package. This estimate is based on the ratio of the fatality rate during the ban period divided by the fatality rate during the nonban period. All results are presented with two-sided *p* values with a significance level of 0.05 and/or 95% confidence intervals (CI). We conducted subgroup analysis with data restricted to incidents in which an assault-type weapon was explicitly noted.

We conducted analyses to test the sensitivity of our results to the choice of denominator with linear regression models controlling

for trend with yearly rates based on (1) CDC WISQARS homicide data ending in 2016, (2) extrapolated CDC WISQARS homicide data for 2017, and (3) population denominator-based rates. We tested the robustness of our underlying modeling assumptions with an alternate mixed-effects generalized linear model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion.

The study was determined to be exempt as nonidentifiable data. The study data and analytic code are available for download at http://www.injuryepi.org/styled-2/.

## RESULTS

The three data sources listed incidents ranging in number from 51 (LA Times) to 335 (Stanford) and in dates from 1966 (Stanford) to 2018 (LA Times). There were a total of 51 reported cases of mass shootings between 1981 and 2017 confirmed by all three sources. Forty-four of these incidents met the strictest criteria for mass shootings (4 or more killed), totaling 501 all-weapon fatalities. In total 1,460 persons were injured or killed over the 37-year period, for a total case-fatality ratio of 34.3% (95% CI, 31.9–36.8). The overall rate of mass shooting fatalities per 10,000 firearm-related homicides was 10.2 (95% CI, 9.4–11.2). There was an increase in the all-weapon yearly number of mass-shooting fatalities in the United States during the study period, (Fig. 1) and evidence of a decrease in case fatality in the post-2010 period (Fig. 2). Incidents in which weapons were characterized as assault rifles accounted for 430 or 85.8% of mass-shooting fatalities (95% CI, 82.8–88.9). Weapons characterized as assault rifles accounted for *all* mass-shooting fatalities in 15 (62.5%) of the 24 (95% CI, 42.6–78.9) years for which a mass-shooting incident was reported, accounting for a total of 230 fatalities in those years.

Between 1981 and 2017, mass shootings in the United States accounted for an increasing proportion of all firearm-related homicides, with increment in year accounting for nearly 32% of the overall variance in the data. During the years in which the AWB was in effect, this slope decreased, with an increase in the slope of yearly mass-shooting homicides in the postban period



**Figure 1.** Mass shooting deaths. United States 1981–2017.

Exhibit E_Klarevas
Page 38

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*



**Figure 2.** Case fatality per 100 total mass-shooting injuries with loess smoothing line for trend and standard error bounds. United States 1981–2017.

(Fig. 3). A similar pattern was evident in data restricted to those incidents characterized as involving assault weapons (Fig. 4).

In a linear regression model controlling for yearly trend, the federal ban period was associated with a statistically significant 9 fewer mass shooting–related deaths per 10,000 firearm homicides per year (Table 1). The model indicated that year and federal ban period alone accounted for nearly 40% of all the variation in the data (adjusted $R^2 = 0.37$). A subanalysis



**Figure 3.** Mass shooting deaths per 10,000 firearm-related homicides with linear trends for preban, ban, and postban periods. United States 1981–2017.



**Figure 4.** Mass-shooting shooting deaths per 10,000 firearm-related homicides restricted to incidents involving assault weapons with linear trends for preban, ban, and postban periods. United States 1981–2017.

restricted to just those incidents characterized by the use of an assault weapon indicated that seven preventable deaths during the ban period were due to assault weapons alone (Table 2).

The risk of mass shooting fatalities during the federal van period was 53 per 140,515 total firearm homicides compared with 448 during the nonban periods, for a risk ratio of 0.30 (95% CI, 0.22–0.39). The calculated risk ratio for the association of the federal ban period with mass-shooting fatalities as a proportion of all firearm-related homicides was 0.29 (95% CI, 0.22–0.29), indicating that mass shooting fatalities were 70% less likely to occur during the federal ban period.

The results of our sensitivity analyses were consistent with our main analyses for total mass shooting fatalities. In a linear regression analysis controlling for yearly trend and restricted to the period ending in 2016 using just CDC WISQARS homicide data as the denominator, the effect of ban period was associated with a statistically significant eight fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.0; $p = 0.05$). In a similar model using extrapolated CDC WISQARS homicide data for 2017 instead of Online Gun Violence Archive data as the denominator, the effect of ban

**TABLE 1.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | *t* | *p* |
|---|---|---|---|---|
| (Intercept) | −1409.4 | 333.0 | −4.2 | 0.0002 |
| Year | 0.7 | 0.2 | 4.3 | 0.0001 |
| Ban Period | −8.6 | 3.9 | −2.2 | 0.03 |

© 2018 American Association for the Surgery of Trauma.

Exhibit E_Klarevas
Page 39

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
Volume 86, Number 1

*DiMaggio et al.*

**TABLE 2.** Linear Regression Effect of 1994–2004 Federal Assault Weapon Ban on Mass-Shooting Deaths Characterized by Use of Assault Weapon per 10,000 Firearm Homicides, United States, 1981–2017

| Variable | Estimate | Std. Error | t | p |
|---|---|---|---|---|
| (Intercept) | −1219.7 | 333.9 | −3.7 | 0.0009 |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

period was associated with a statistically significant 9 fewer mass shooting related deaths per 10,000 firearm homicides per year (coefficient for ban period, 8.6; $p = 0.03$). A model based on the total yearly US population as the denominator, the effect of ban period was associated with a statistically significant 0.4 fewer mass shooting related deaths per 10,000,000 population (coefficient for ban period, 0.4; $p = 0.02$).

The results of a mixed-effects generalized linear Poisson model of yearly mass shooting fatality counts with an observation-level random effect to account for overdispersion were very similar whether the offset variable was the number of total firearm deaths or the population size. In either case, the assault weapons ban period was associated with an approximately 85% reduction in mass shooting fatalities (Table 3).

## DISCUSSION

Recently, 75% of members of the American College of Surgeons Committee on Trauma endorsed restrictions to "civilian access to assault rifles (magazine fed, semiautomatic, i.e., AR-15),"[33] and 76% of the Board of Governors were in favor of a limit to "… civilian access to ammunition designed for military or law enforcement use (that is, armor piercing, large magazine capacity)."[34] In 2015, the American College of Surgeons joined seven of the largest most prestigious professional health organizations in the United States and the American Bar Association to call for "restricting the manufacture and sale of military-style assault weapons and large-capacity magazines for civilian use."[35] This analysis adds evidence to support these recommendations.

No observational epidemiologic study can answer the question whether the 1994 US federal assault ban was causally related to preventing mass-shooting homicides. However, this study adds to the evidence by narrowly focusing our question on the potential effect of a national-assault weapon ban on mass shootings as measured through the lens of case fatality. While the data are amenable to a number of additional analyses, such as stratification by location (e.g. school vs. nonschool) or by characterization of large-capacity magazines versus non large-capacity magazine, we chose to focus only on year of occurrence and total number of fatalities. In this way, we relied on the least subjective aspects of the published reports. We believe our results support the conclusion that the ban period was associated with fewer overall mass-shooting homicides. These results are also consistent with a similar study of the effect of a 1996 ban on assault type weapons in Australia after which mass-shooting fatalities dropped to zero.[36]

While the absolute effects of our regression analyses appears modest (7 to 9 fewer deaths per 10,000 firearm-homicides),

it must be interpreted in the context of the overall number of such fatalities, which ranges from none to 60 in any given year in our data. However, if our linear regression estimate of 9 fewer mass shooting–related deaths per 10,000 homicides is correct, an assault weapons ban would have prevented 314 of the 448 or 70% of the mass shooting deaths during the nonban periods under study. Notably, this estimate is roughly consistent with our odds ratio estimate and Poisson model results.

Our results add to the documentation that mass shooting–related homicides are indeed increasing, most rapidly in the postban period, and that these incidents are frequently associated with weapons characterized as assault rifles by the language of the 1994 AWB. We did not find an increase in the case fatality ratio of mass-shooting deaths to mass-shooting injuries. This might at first seem counterintuitive and paradoxical. The destructive effect of these weapons is unequivocal. They are engineered to cause maximum tissue damage rapidly to the greatest number of targets. However, it may be that the use of these kinds of weapons results in indiscriminate injury with additional rounds more likely to injure more people increasing the denominator in a case-fatality ratio. By contrast, the use of nonassault weapons may result in more precise targeting of victims. It is also possible that improvements in trauma care are driving down case fatality.[37] Also, it is worth noting that in absolute terms, there were many more fatalities outside the ban period and that survivable injury comes with its own physical, emotional, and economic costs, which have been estimated at US $32,237 per hospital admission.[38]

Despite US federal funding restrictions on firearm-related research dating to 1996,[39,40] there is a small but growing number of analyses of mass shooting violence in the United States. Many articles have focused on the mental health aspects of these incidents,[41–43] or on social effects like increased firearm acquisition following mass shootings.[44,45] However, fewer studies have taken a strictly public health or clinical approach. Among these, an autopsy-based study of the incidence and severity of mass-shooting casualties concluded the wound patterns differed sufficiently from combat injuries to require new management strategies, indicating there is much to be learned from a systematic epidemiological perspective.[46] Recently, there have been calls to remove such funding restrictions from both academics and elected officials from across the political spectrum.[47,48]

Our choice of data and analytic approach may reasonably be debated. We chose to base our analyses on the yearly rate of mass shooting fatalities per 10,000 overall firearm homicides. This is not a population-based risk estimate, but is in fact a risk as commonly used in the epidemiologic literature which is essentially a probability statement, that is, the number of events

**TABLE 3.** Exponentiated Coefficients Generalized Linear Poisson Model

| Variable | Homicide Offset | | Population Offset | |
|---|---|---|---|---|
| | Estimate | 95% CI | Estimate | 95% CI |
| Year | 0.6 | 0.2 | 3.7 | 0.0008 |
| Ban | −6.7 | 3.9 | −1.7 | 0.09 |

Effect of 1994–2004 federal assault weapon ban on mass-shooting death counts. United States, 1981–20017.

© *2018 American Association for the Surgery of Trauma.*

**15**

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Exhibit E_Klarevas
Page 40

*DiMaggio et al.*
*J Trauma Acute Care Surg*
*Volume 86, Number 1*

that occurred over the number of times that event could occur. It is the risk of a homicide occurring as a result of a mass shooting. It may be considered a strong assumption to build mass shooting death rates based on the overall firearm homicide rate. The demographics of most homicide victims may differ appreciably from those of mass shooting victims. We selected this approach from among a number of imperfect potential denominators, believing that basing the rates on the number of firearm-homicides partly controls for secular trends in overall homicides and firearm availability. Our sensitivity analyses indicate that our results were robust to most any choice of denominator. We chose linear regression as our primary model because it was straightforward, accessible to most readers, accounted for linear trends in the data, and returned results in the metric in which we were most interested, that is, changes in the rate of fatalities. Our comparative Poisson model results were essentially consistent with the primary model.

These analyses are subject to a number of additional limitations and caveats, primary among which is that there is no authoritative source of data on mass shooting, and any one source may be biased and incomplete. It was for this reason that we chose to combine three independent sources of data, each with its own strengths and weaknesses, and base our analyses only on those numbers that were verified by all three sources. We further restricted our analyses to only the number of fatalities and the year in which the incident occurred, and to the strictest definition of mass shootings as defined by the Federal Bureau of Investigation.[27,28] Even with this approach, the data remain imprecise and subject to differing definitions. We attempted to compensate for this by framing our questions as precisely as possible, following the advice of the scientist and statistician John Tukey to pursue, "… an approximate answer to the right question ...(rather) than the exact answer to the wrong question..."

In this study, we failed to falsify the hypothesis that the AWB was associated with a decrease in mass shooting fatalities in the United States. However, it is important to note that our model did not include important and potentially confounding factors like state-level and local differences in assault weapon laws following the sun downing of the federal AWB. Additional analyses including such variables and using approaches like propensity score matching and regression discontinuity[49] with data further aggregated to state and local levels are necessary to test the strength and consistency of our results.

Federally referenced denominator data were not available for the last year of the study. We chose to use data from the Online Gun Violence Archive to account for firearm homicide in 2017. This resource is a nonpartisan not-for-profit group founded and maintained by a retired computer systems analyst and gun advocate.[50] The alternative would have been to extrapolate from the CDC data, but the 15,593 firearm-related homicides reported by the Online Gun Violence Archive in 2017 was more consistent with the 14,415 reported by CDC in 2016 compared with the 11,599 predicted by an extrapolation and returned more conservative estimates of the increased rate of recent mass shootings. We note there were many years in which the number of mass-shooting fatalities is listed as zero. There were, in fact, fatalities and incidents in those years that could meet a definition of mass shooting, but they were not reported by all three sources, or did not meet the strict criteria we set for this analysis.

An assault weapon ban is not a panacea, nor do our analyses indicate that an assault weapon ban will result in fewer overall firearm-related homicides. It is important to recognize that suicides make up the majority of firearm-related deaths in the United States, accounting for 60.7% of 36,252 deaths from firearms in 2015.[51] However, while this is a critically important issue in its own right, suicides differ fundamentally from mass-shootings, and are unlikely to be affected by an assault weapons ban. Also, compared with the 501 mass-shooting fatalities we counted, there were 489,043 firearm-related homicides in the United States. Public health efforts should be directed at reducing all gun violence and must be multipronged, including targeted initiatives to address mental illness and reducing access to weapons in those with a propensity for violence. However, taken in the context of the increase in mass shootings in the United States, these results support the conclusion that the federal AWB of 1994 to 2004 was effective in reducing mass shooting–related homicides in the United States, and we believe our results support a re-institution of the 1994 federal assault weapons ban as a way to prevent and control mass shooting fatalities in the United States.

### DISCLOSURE

The authors have no conflicts of interest to declare.
There are no federal or nonfederal funding sources associated with this study.

### REFERENCES

1. Wolchover N. Why gun control is so contentious in the US. *LiveScience*. 20 July 2012 https://www.livescience.com/21741-gun-control-second-amendment.html. Accessed 10 August 2018.
2. Bond S. Students take the lead in US gun control debate. *Financial Times*. 23 February 2018. https://www.ft.com/content/9341021e-1818-11e8-9376-4a6390addb44. Accessed 10 August 2018.
3. Lemieux F. 6 things to know about mass shootings in America. *Scientific American*. 13 June 2016. https://www.scientificamerican.com/article/6-things-to-know-about-mass-shootings-in-america/. Accessed 6 June 2018.
4. Webster DW. The true effect of mass shootings on Americans. *Annals of Internal Medicine*. 16 May 2017. The http://annals.org/aim/fullarticle/2624992/true-effect-mass-shootings-americans. Accessed 6 June 2018.
5. Katsiyannis A, Whitford DK, Ennis RB. Historical examination of United States intentional mass school shootings in the 20th and 21st centuries: implications for students, schools, and society. *Child Fam Stud*. (19 April 2018). https://doi.org/10.1007/s10826-018-1096-2.
6. Follman M. Mass shootings: maybe what we need is a better mental-health policy. *Mother Jones*. 9 November 2012. https://www.motherjones.com/politics/2012/11/jared-loughner-mass-shootings-mental-illness/. Accessed 11 August 2018.
7. Carey B. "Are mass murderers insane? Usually not, researchers say". *New York Times*. 8 November 2017. https://www.nytimes.com/2017/11/08/health/mass-murderers-mental-illness.html. Accessed 11 August 2018.
8. Duwe G, Rocque M. Actually, there is a clear link between mass shootings and mental illness. *Los Angeles Times*. 23 February 2018. http://www.latimes.com/opinion/op-ed/la-oe-duwe-rocque-mass-shootings-mental-illness-20180223-story.html. Accessed 11 August 2018.
9. Gillin J, Greenberg J, Jacobson L, Valverde M. The facts on mass shootings in the United States. *Politifact*. 8 November 2017. http://www.politifact.com/truth-o-meter/article/2017/nov/08/facts-mass-shootings-united-states/. Access 6 June 2018.
10. Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? Experts rank gun laws. *New York Times*. 5 October 2017. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html. Accessed 6 June 2018.

© 2018 American Association for the Surgery of Trauma.

Exhibit E_Klarevas
Page 41

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

DiMaggio et al.

11. Weil DS, Knox RC. The Maryland ban on the sale of assault pistols and high-capacity magazines: estimating the impact in Baltimore. *Am J Public Health*. 1997;87(2):297–298.

12. Safavi A, Rhee P, Pandit V, Kulvatunyou N, Tang A, Aziz H, Green D, O'Keeffe T, Vercruysse G, Friese RS, et al. Children are safer in states with strict firearm laws: a national implant sample study. *J Trauma Acute Care Surg*. 2014;76(1):146–150; discussion 150–1.

13. Koper CS, Roth JA. The impact of the 1994 Federal Assault Weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *J Quant Criminol*. 2001; Vol. 17, No. 1.

14. Gius M. The impact of state and federal assault weapons bans on public mass shootings. *Applied Economics Letters*. 2015;22(4):281–284.

15. Lemieux F, Bricknell S, Prenzler T. Mass shootings in Australia and the United States, 1981-2013. *Journal of Criminological Research, Policy and Practice*. 1(3):131–142.

16. Follman M, Aronsen G, Pan D, Caldwell M. US mass shootings, 1982-2018: data from mother Jones' investigation. *Mother Jones*. 2012; https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/. Accessed 3 June 2018.

17. The Los Angeles times staff. "Deadliest U.S. mass shootings", 1984-2017. *Los Angeles Times*. Oct 1, 2017, timelines latimes.com/deadliest-shooting-rampages/. Accessed 29 August 2018.

18. Stanford mass shootings in America, courtesy of the Stanford Geospatial Center and Stanford libraries. 2016. Available at: https://library.stanford.edu/projects/mass-shootings-america. Accessed 29 August 2018.

19. Fox JA, Levin J, Fridel EE. *Extreme Killing: Understanding Serial and Mass Murder*. Sage Publications; 2018.

20. Dillon L. *Mass Shootings in the U.S.: An Exploratory Study of the Trends from 1982–2012*. PhD thesis; 2014.

21. Lankford A. Public mass shooters and firearms: a cross-national study of 171 countries. *Violence Vict*. 2016;31(2):187.

22. Lowe SR, Galea S. The mental health consequences of mass shootings. *Trauma Violence Abuse*. 2017;18(1):62–82.

23. Fox JA, Fridel EE. The tenuous connections involving mass shootings, mental illness, and gun laws. *Violence Gend*. 2016;3(1):14–19.

24. Luca M, Malhotra DK, Poliquin C. The impact of mass shootings on gun policy. *Harvard Business School NOM Unit Working Paper No*. 2016;1:16–126.

25. Buchholtz LK. Command-directed mental health evaluations and mental health related discharges from the U.S. military: an argument for command authority. *J Health Care Finance*. 2016.

26. Bradley K. Code blue: the expanding field of tactical/battlefield medicine. *J Law Enforcement*. 2017;6(2).

27. Smart R. Mass shootings: definitions and trends. RAND Corporation. https://www.rand.org/research/gun-policy/analysis/supplementary/mass-shootings.html. Accessed 2 June 2018.

28. Krouse WJ, Richardson DJ. *Mass Murder with Firearms: Incidents and Victims, 1999–2013*. Washington, D.C.: Congressional Research Service, R44126 2015.

29. Centers for Disease Control and Prevention. CDC's WISQARS (web-based injury statistics query and reporting system). https://www.cdc.gov/injury/wisqars/fatal.html. Accessed 12 February 2018.

30. The online gun violence archive: past summary ledgers. http://www.gunviolencearchive.org/past-tolls. Accessed 12 February 2018.

31. Studdert DM, Donohue JJ, Mello MM. Testing the immunity of the firearm industry to tort litigation. *JAMA Intern Med*. 2017;177(1):102–105.

32. Public Safety and Recreational Firearms Act. P.L. 103-322, Title XI. 103rd Cong. (1994).

33. Kuhls DA, Campbell BT, Burke PA, Allee L, Hink A, Letton RW, Masiakos PT, Coburn M, Alvi M, Lerer TJ, et al. Survey of American College of Surgeons Committee on trauma members on firearm injury: consensus and opportunities. *J Trauma Acute Care Surg*. 2017;82(5):877–886.

34. Puls M, Kuhls D, Campbell B, Burke P, Michelassi F, Stewart R. Survey of the American College of Surgeons Board of governors on firearm injury prevention: consensus and opportunities. *Bull Am Coll Surg*. 2017; 102(10):30–36.

35. Weinberger SE, Hoyt DB, Lawrence HC 3rd, Levin S, Henley DE, Alden ER, Wilkerson D, Benjamin GC, Hubbard WC. Firearm-related injury and death in the U.S.: a call to action from 8 health professional organizations and the American Bar Association. *Ann Intern Med*. 2015;162(7):513–516.

36. Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA*. 2016;316(3): 291–299.

37. DiMaggio C, Ayoung-Chee P, Shinseki M, Wilson C, Marshall G, Lee DC, Wall S, Maulana S, Leon Pachter H, Frangos S. Traumatic injury in the U.S.: in-patient epidemiology 2000-2011. *Injury*. 2016;47(7):1393–1403.

38. Peek-Asa C, Butcher B, Cavanaugh JE. Cost of hospitalization for firearm injuries by firearm type, intent, and payer in the U.S. *Inj Epidemiol*. 2017; 4(1):20.

39. Wexler L. "gun shy: how a lack of funds translates to inadequate research on gun violence in America". *Hopkins Bloomberg Public Health Fall*. 2017; https://magazine.jhsph.edu/2017/fall/features/cassandra-crifasi-hopkins-moderate-gun-owner-gun-policy-researcher/how-the-dickey-amendment-affects-gun-violence-research.html. Access 5 June 2018.

40. Greenberg J. Spending bill's gun research line: does it nullify dickey amendment? *Politifact*. 27 March 2018. http://www.politifact.com/truth-o-meter/article/2018/mar/27/spending-bills-gun-research-line-does-it-matter/. Accessed 6 June 2018.

41. Pinals DA, Anacker L. Mental illness and firearms: legal context and clinical approaches. *Psychiatr Clin North Am*. 2016;39(4):611–621.

42. Leiner M, De la Vega I, Johansson B. Deadly mass shootings, mental health, and policies and regulations: what we are obligated to do!. *Front Pediatr*. 2018;6:99.

43. Swartz MS, Bhattacharya S, Robertson AG, Swanson JW. Involuntary outpatient commitment and the elusive pursuit of violence prevention. *Can J Psychiatry*. 2017;62(2):102–108.

44. Studdert DM, Zhang Y, Rodden JA, Hyndman RJ, Wintemute GJ. Handgun acquisitions in California after two mass shootings. *Ann Intern Med*. 2017; 166(10):698–706.

45. Stroebe W, Leander NP, Kruglanski AW. The impact of the Orlando mass shooting on fear of victimization and gun-purchasing intentions: not what one might expect. *PLoS One*. 2017;12(8):e0182408.

46. Smith ER, Shapiro G, Sarani B. The profile of wounding in civilian public mass shooting fatalities. *J Trauma Acute Care Surg*. 2016;81(1):86–92.

47. Behrman P, Redding CA, Raja S, Newton T, Beharie N, Printz D. Society of Behavioral Medicine (SBM) position statement: restore CDC funding for firearms and gun violence prevention research. *Transl Behav Med*. 2018.

48. Wong S. "GOP chairman: congress should rethink CDC ban on gun violence research". *The Hill*. 15 February 2018 http://thehill.com/homenews/house/374149-gop-chairman-congress-should-rethink-cdc-ban-on-gun-violence-research. Accessed 5 June 2018.

49. Basu S, Meghani A, Siddiqi A. Evaluating the health impact of large-scale public policy changes: classical and novel approaches. *Annu Rev Public Health*. 2017;38:351–370.

50. Drange M. The Kentucky gun owner who developed his own count of gun violence in the US. *The Guardian*. 23 April 2016. https://www.theguardian.com/world/2016/apr/23/kentucky-gun-owner-gun-violence-archive-mark-bryant. Accessed 5 June 2018.

51. Murphy SL, Xu J, Kochanek KD, Curtin SA, Elizabeth Arias E. *National Vital Statistics Reports*. Volume 66, Number 6 November 27, 2017. Deaths: Final Data for 2015. Centers for Disease Control and Prevention.

## DISCUSSION

**Ernest E. "Gene" Moore, MD** (Denver, Colorado): Thank you, Dr. Rotondo and Dr. Reilly. Can I please have the discussion video. [sounds of a gun shooting]. Well, that is the AR15 rifle. Literally, 30 potential lethal shots delivered within 10 seconds. Is this safe to have in our society?

I congratulate Dr. DiMaggio and his colleagues from NYU for their superb presentation on a very timely issue. The AAST has had a long-term interest in reducing gun violence in the United States, and has recently published our 14-point approach. Access to assault rifles is one of them. At a reductionist level, mass shootings are the net result of (1) a deranged person intending to kill random individuals in a populated area, and (2) the use of an assault rifle. Since we seem to be unable to identify

© *2018 American Association for the Surgery of Trauma.*

17

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Exhibit E_Klarevas
Page 42

*DiMaggio et al.*

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

the active shooter preemptively, we are left with the alternative solution of eliminating the weapon.

The presentation today provides evidence that a federal assault weapon ban can reduce mass shootings. According to our recent national trauma surgeon surveys, three-fourths of us in the audience, including me, would like to believe the analysis; but I think we need to consider some of the potential limitations.

Many of these issues relate to the fact that research support for gun violence control in the United States remains frustratingly suppressed and fundamentally inadequate. The general lack of information, low quality of data, and need to merge data sets from diverse sources – medical, coroner, police, legal, and behavioral – compounded by scarce funding and public controversy, undermine research to inform policy and enlighten the public. The fact that you had to compare three open-access databases to be certain that the reported mass shootings occurred underscores this deficiency.

Furthermore, there is no definition of a mass shooting, although you employed perhaps the most acceptable at the moment – the FBI's definition. Could you explain for us the rationale for this definition?

You present an analysis of 44 events with four or more deaths, including the shooter, from 1981 to 2017 – a 36-year period; whereas, others suggest a much higher incidence, such as Klaveras, who reported 69 shootings of six or more over the past 27 years.

Identifying all known mass shootings per year during a study period would be useful to appreciate the overall trends, as your data somewhat understates the magnitude of mass shootings in the United States.

You employed the Gun Violence Archive to estimate homicides in 2017. Why did you not use this source for mass shootings? The Archive has reported an alarming 261 mass shootings – defined as six or more shot – thus far in 2018. Nonetheless, in the sample you studied, assault rifles accounted for greater than 85 percent of the fatalities, and this is the key issue.

You have evaluated the impact of the federal assault rifle ban by analyzing the rate of mass shootings per 10,000 firearm homicide deaths per year to adjust for confounders. This would assume that the factors influencing mass shootings are the same as those for homicides, which seems very unlikely. You have idicated that you analyzed mass-shooting fatalities per population per year; perhaps you could elaborate more about this analysis.

Another confounder as acknowledged in the presentation is the impact of individual state limitations on magazine capacity. The first state to enforce these limitations was New Jersey in 1990, and now at least eight states and Washington, D.C., have these restrictions in effect. How can we distinguish the effects of this policy? And could this be a potential bridge to ultimately reestablish a national assault rifle ban?

You have also calculated the case fatality of all weapons in mass shootings per 100 total shootings, finding a decrease since 2010. While you conjecture this may be due to indiscriminate injury from assault rifles or possibly attributed to better trauma care, I am uncertain how this is relevant to the issue of banning assault rifles. The Las Vegas shooting is a cogent example of how these data may be misleading.

Finally, there is the issue of so-called falsification that could be addressed by examining other causes of trauma mortality during this time period.

In sum, this study adds to overwhelming evidence that assault rifles are an essential component in the dramatic escalation of mass shootings in the United States. While the scientific data to support a federal ban on civilian assault rifles is imperfect due to inadequate research support, I submit collectively the existing information argues strongly for enactment of this measure, and compliment the authors for their timely contribution.

**Sheldon H. Teperman, MD** (Bronx, New York): Dr. DiMaggio, your home institution, Bellevue, plays a seminal role in the trauma center safety of our nation.

In fact, right now, your trauma medical director is not present with us, but he is at home on guard for the U.N. General Assembly. But in New York, we don't see long-gun injuries. New York has the Safe Act, and there is an assault weapons ban. So why is it so important to America's trauma center – Bellevue – that we see a national ban on assault rifles?

**Charles E. Lucas, MD** (Detroit, Michigan): Thank you for your nice presentation. How many of these incidents occurred in an inner-city environment, where most of the victims that we treat have received multiple wounds which were purposely inflicted in order to compete competitively for the distribution of heroin and other drugs? Also, how many of the assailants were African-American?

**Martin A. Croce, MD** (Memphis, Tennessee): Thank you. I want to commend the authors for an excellent study, and really, not so much to ask any questions but I rise to put out a plea to the membership that this issue is a public health problem.

This is not a right versus left problem, this is not a Second Amendment problem. This is a public health problem.

And to quote Wayne Meredith at one of the recent Board meetings, "Our primary goal is to reduce the number of bullet holes in people." So I implore the Membership to correct this dearth of research that is going on about gun violence in order to promote a public health approach, so that we can reduce the number of bullet holes in people.

**Deborah A. Kuhls, MD** (Las Vegas, Nevada): And to carry on that thought, I would urge the authors to incorporate the public health data from the CDC when it is available, because part of the methodological issues for this paper is that one data set was used for a certain period of time.

But for the last year, the CDC data was not used because it was not available, so I would urge you to not only do that analysis, but I would also urge the Journal of Trauma to consider an update to that article when that is available. Thank you.

**Charles DiMaggio, MPH, PhD** (New York, New York): Thank you very much for all these comments and questions.

Dr. Moore, so with regard to your observation about the reductionist approach to looking at this particular issue, that puts me in the mind very much of the traditional epidemiologic triad of agent, host, and environment, and if you break one link in that connection, you can break the transmission. In this case, we could call assault weapons one link, whether it's agent or host, we can decide.

With regards to the rationale for the definition, I think it's reflective of the lack of research in this area.

A case definition is an essential and critical first step in any epidemiologic investigation, and you can see that we are barely there. I think the FBI definition makes sense, I think it's the oldest one, I think it's informed by expert consensus.

*© 2018 American Association for the Surgery of Trauma.*

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Exhibit E_Klarevas
Page 43

*J Trauma Acute Care Surg*
*Volume 86, Number 1*

*DiMaggio et al.*

And I think all the other definitions are based in some form on that, which is why we chose it. And I would urge that if we are going to be doing this research going forward, probably it would be best if we all had the consensus that that be the definition.

Why did we not use the Gun Violence Archive to estimate some of these results, and why are our numbers so much smaller than some of the other numbers? I have to agree, our numbers are very much an under-count.

We restricted our analysis to these three databases. And so the limiting factor was the one database. And I can tell you it was the LA Times – they had the fewest number. And if it wasn't in the LA Times, then the other databases didn't contribute to this data set.

We felt that the important aspect of this particular study was to demonstrate the relative effects, merits or associations with the assault weapon ban as opposed to documenting the absolute numbers.

So the Gun Archive, for example, defines mass shootings as four or more deaths or injuries. That really raises the number of deaths that can be included. We didn't include it, but I think going forward we absolutely should.

With regard to the analysis using population denominators, we agree, actually, that gun homicides are an imperfect denominator. We also felt that population was an imperfect denominator. And again, as we keep on circling around, it has to do with the data in this case.

We did feel that gun homicides captured something about gun availability and criminality in the United States, although homicides themselves differ very much from these mass shooting fatalities.

We do note that our population-based results essentially mirrored the gun homicide results, indicating that, at least for the relative effects and benefits of the assault weapons ban, the results are robust and invariant to the choice of denominator in this case.

Can we distinguish local effects, and could this possibly be a bridge to reestablishing an assault rifle ban? The short answer is yes and yes. We can distinguish local effects.

We took a very broad approach on this particular study as a first pass on the data. But, there are data sources (and even within the data sources we used) where you can tease out local, municipal and state policies.

Also, we can link our data to other sources that have those variables. There are statistical methods available that will not only account for those variables, but also allow us to measure or estimate in some way the contribution of local or regional variation in these policies to the overall effectiveness.

The issue of the case fatality rate is very interesting and challenging. I want to note that there was a paper in JAMA on September 11th – just a couple of weeks ago – looking at mass shooter fatalities, that came essentially to the same conclusion – that there has been this recent decrease.

In our paper, in this write-up, we look at three potential explanations, and one of them is, first of all, it's just a matter of denominator. These are indiscriminate weapons.

You have someone shooting at a large group of people, and there are going to be more injuries and more casualties, and it just inflates the denominator in this case.

The second thing is, the obverse of that, is single-fire weapons, guns, are very personal weapons. They're usually characterized by someone who knows who they want to kill. And finally, we feel that perhaps there may be some improvement by the folks in this room in treating these.

I'm going to close at this point, given the time constraints.

*© 2018 American Association for the Surgery of Trauma.*

**19**

Copyright © 2018 Wolters Kluwer Health, Inc. All rights reserved.

Exhibit E_Klarevas
Page 44

# EXHIBIT F

JMIR PUBLIC HEALTH AND SURVEILLANCE Post et al

Original Paper

# Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis

Lori Post[1], PhD; Maryann Mason[1], PhD; Lauren Nadya Singh[1], MPH; Nicholas P Wleklinski[2], MD; Charles B Moss[3], PhD; Hassan Mohammad[1]; Tariq Z Issa[2], BA; Adesuwa I Akhetuamhen[2], MD; Cynthia A Brandt[4], MD, MPH; Sarah B Welch[1], MPH; James Francis Oehmke[1], PhD

[1]Buehler Center for Health Policy and Economics, Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[2]Feinberg School of Medicine, Northwestern University, Chicago, IL, United States
[3]Institute of Food and Agricultural Sciences, University of Florida, Gainsville, FL, United States
[4]Yale Center for Medical Informatics, Yale School of Medicine, Yale University, New Haven, CT, United States

**Corresponding Author:**
Lori Post, PhD
Buehler Center for Health Policy and Economics
Feinberg School of Medicine
Northwestern University
420 E Superior
Chicago, IL, 60611
United States
Phone: 1 203 980 7107
Email: lori.post@northwestern.edu

## Abstract

**Background:** Public mass shootings are a significant public health problem that require ongoing systematic surveillance to test and inform policies that combat gun injuries. Although there is widespread agreement that something needs to be done to stop public mass shootings, opinions on exactly which policies that entails vary, such as the prohibition of assault weapons and large-capacity magazines.

**Objective:** The aim of this study was to determine if the Federal Assault Weapons Ban (FAWB) (1994-2004) reduced the number of public mass shootings while it was in place.

**Methods:** We extracted public mass shooting surveillance data from the Violence Project that matched our inclusion criteria of 4 or more fatalities in a public space during a single event. We performed regression discontinuity analysis, taking advantage of the imposition of the FAWB, which included a prohibition on large-capacity magazines in addition to assault weapons. We estimated a regression model of the 5-year moving average number of public mass shootings per year for the period of 1966 to 2019 controlling for population growth and homicides in general, introduced regression discontinuities in the intercept and a time trend for years coincident with the federal legislation (ie, 1994-2004), and also allowed for a differential effect of the homicide rate during this period. We introduced a second set of trend and intercept discontinuities for post-FAWB years to capture the effects of termination of the policy. We used the regression results to predict what would have happened from 1995 to 2019 had there been no FAWB and also to project what would have happened from 2005 onward had it remained in place.

**Results:** The FAWB resulted in a significant decrease in public mass shootings, number of gun deaths, and number of gun injuries. We estimate that the FAWB prevented 11 public mass shootings during the decade the ban was in place. A continuation of the FAWB would have prevented 30 public mass shootings that killed 339 people and injured an additional 1139 people.

**Conclusions:** This study demonstrates the utility of public health surveillance on gun violence. Surveillance informs policy on whether a ban on assault weapons and large-capacity magazines reduces public mass shootings. As society searches for effective policies to prevent the next mass shooting, we must consider the overwhelming evidence that bans on assault weapons and/or large-capacity magazines work.

*(JMIR Public Health Surveill 2021;7(4):e26042)*  doi: 10.2196/26042



XSL·FO
RenderX

JMIR PUBLIC HEALTH AND SURVEILLANCE
Post et al

## KEYWORDS

firearm surveillance; assault weapons ban; large-capacity magazines; guns control policy; mass shootings; regression lines of discontinuity

## Introduction

### Background

Approximately 44,000 people are killed and an additional 100,000 people are injured by a gun each year in the United States [1,2]. Mass shooting fatalities, as a particular type of gun injury event, account for <1% of all gun deaths [3] and have largely been ignored until recently [4,5]; yet, mass shooting events occur multiple times per year [6]. This information is based on insights from firearm surveillance performed by a variety of researchers, and state and federal agencies on incidence, prevalence, risk factors, injuries, deaths, and precipitating events, similar to the surveillance of infectious diseases such as COVID-19 [7-21]. Teutch and Thacker [22] defined public health surveillance as

*the ongoing systematic collection, analysis, and interpretation of health data, essential to the planning, implementation, and evaluation of public health practice, closely integrated to the dissemination of these data to those who need to know and linked to prevention and control.*

Not only do surveillance systems generate hypotheses to test but they also provide the data to test them.

The Federal Assault Weapons Ban (FAWB, also known as the Public Safety and Recreational Firearms Use Protection Act) included a ban on the manufacture for civilian use or sale of certain semiautomatic firearms defined as assault weapons as well as certain large-capacity magazines (LCMs). The Act was in effect for 10 years from 1994 until it sunsetted in 2004. Semiautomatic weapons (rapid fire) and assault weapons (second grip plus other features) are distinct; however, the two are often incorrectly conflated as similar [23-26]. Semiautomatic weapons are defined as weapons that automatically load another cartridge into a chamber, preparing the weapon for firing, but requiring the shooter to manually release and press the trigger for each round [23-26]. By contrast, automatic weapons are similarly self-loading, but allow for a shooter to hold the trigger for continuous fire [27]. Furthermore, the FAWB also prohibited certain ammunition magazines that were defined as "large-capacity" cartridges [28] containing more than 10 bullets [29]. These LCMs can feed ammunition to semiautomatic weapons that do not meet the criteria of being considered assault weapons. Furthermore, LCMs are considered one of the most important features of the FAWB as research has found a relationship between bans on LCMs and casualty counts at the state level [30-34]. The 10-year federal ban was signed into law by President Clinton on September 13, 1994 [28].

Firearm surveillance data have been used to test potential policy responses to prevent mass shootings, including the FAWB [32,34-39], Extreme Risk Protection Orders (also known as red flag laws) [40-45], and federal and state LCM bans [31,32,46]. In particular, it seems likely that the FAWB and LCM bans have potential to affect mass shootings because they regulate weapons and ammunition formats that are designed to enable rapid discharge, which is a key feature in mass shooting incidents [24,47]. Other types of gun deaths may not be responsive to the FAWB or LCM bans. As an example, Extreme Risk Protection Orders or "Red Flag" orders [43,48], which temporarily prohibit at-risk individuals from owning or purchasing firearms, may be effective for preventing firearm suicides or domestic violence homicides [49] but less effective for public mass shooters [50,51]. The prohibition of LCMs may have no impact on firearm suicide because suicide decedents only require one bullet to kill themselves [52].

Several studies during and after the FAWB attempted to determine if gun policy that restricts the production and sale of assault weapons and LCMs decreased gun deaths [53,54]. These initial studies make meaningful contributions to the literature because they describe what constitutes assault weapons, magazine capacity, ballistics, and loopholes in the FAWB legislation [3,53-57]. However, these studies have found little to no evidence that these policies have had any overall effect on firearm homicides, gun lethality, or overall crime [58-61]. Since deaths from public mass shootings comprise less than 1% of all homicides based on our definition, testing whether or not the FAWB/LCM ban has an impact on homicide would wash out the effect. Since the FAWB/LCM ban may be effective at specific types of gun deaths, sampling must be limited to specific types of shooters over overall gun deaths or tests for lethality [62,63]. Finally, the variation in research findings is related to differences in research design, sampling frame, and case definition of a public mass shooting [3,53-56,64,65].

Our study differs from other studies that evaluated the efficacy of the FAWB because we used economic methods and a different outcome variable. Specifically, we focused on whether the FAWB resulted in fewer public mass shooting "events," whereas other studies evaluated the number of gun injuries and deaths that occurred during the course of a mass shooting.

### Objective

The aim of this study was to test whether curbing *access to certain types of guns and magazines* will decrease mass shooting *events*. We sought to empirically answer if there was a relationship between the FAWB and a reduction in mass shooting events.

## Methods

### Data Source

We created a firearm surveillance system based on the National Institute of Justice–funded Violence Project dataset, which culled mass shooting events from 1966 to 2019 [6]. Consistent with earlier studies, we rely on the original Federal Bureau of Investigation (FBI) definition of a massacre, specifically where 4 or more people are killed within a single timeframe. We differentiate our mass shootings from others in that our inclusion criteria require the shootings to have occurred in a public setting.

XSL•FO
RenderX

Exhibit F_Klarevas
Page 46

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                                      Post et al

We adapted this definition to only include massacres that involved gun deaths of 4 or more victims to isolate a particular type of mass shooter [66]. Many firearm surveillance systems that include mass shootings use a lower threshold of persons shot and many do not include deaths. An FBI report on active shooters in mass shooting events identified planning and preparation behaviors that are central to prevention [67]. This more narrow definition isolates premeditation, whereas broader definitions may include shooters that are more reactive [68]. Our case definition does not include family annihilators or felony killers because *familicides are defined by the victim-offender relationship, public massacres are defined by location, and felony killings are distinguished by motive* [69]. This differentiation is consistent with other mass shooting studies [70-72].

We examined the annual number of public mass shootings occurring between 1966 and 2019 that resulted in 4 or more fatalities. The hypothesis was that the FAWB reduced the number of public mass shootings per year during the period of the ban. We used regression discontinuity analysis to test the hypothesis. Regression discontinuity analysis is a standard economist tool used in policy analysis taking advantage of quasi-experimental designs [65,73].

**Analyses**

Regression discontinuity analysis allows for discontinuities or shifts in both the intercept and the slope of the trend line at both the onset and sunset of the FAWB. That is, we introduced intercept shift parameters in 1995 and 2005, and trend shift parameters for the periods 1995-2004 and 2005-2019. A statistically significant shift in a parameter indicates a discontinuity (ie, a finding that the FAWB had a statistically significant effect on the number of public mass shootings). We tested for statistical significance of the intercept and trend shift parameters both independently and jointly. All statistical inference was based on a significance level set at .05. We used the Huber-White robust residuals, which attenuate problems of autocorrelation, heteroscedasticity, and some types of model misspecification [74].

We then used the estimated model for two types of counterfactual analysis. First, we used the model to predict the number of public mass shootings that would have occurred had the FAWB not been in place. The difference between this counterfactual prediction and the modeled number of incidents with the FAWB in place provided an estimate of the number of public mass shootings that the FAWB prevented.

Second, we projected forward the number of public mass shootings that would have occurred had the FAWB been permanent (ie, continued from 2004 through to the end of the sample period). We note that in some sense, this is an "out of sample" exercise because even though the sample extends to 2019, the FAWB ended in 2004; thus, this exercise would not pick up events in the past 15 years that would have augmented or compromised the effects of the FAWB. The difference between the modeled number of public mass shootings and the projected counterfactual number of public mass shootings could provide an estimate of the number of public mass shootings that the FAWB prevented.

We performed a regression of the 5-year moving average of public mass shootings on the US population in millions, the homicide rate, and discontinuity variables to capture both the effects of the FAWB and its discontinuation. We did not introduce a trend line for the entire sample period because it is highly collinear with the population variable. For the period of the FAWB's implementation, we originally introduced an intercept shift, time trend, and shift in the homicide rate; for the post-FAWB period, we introduced an intercept shift and a time trend. Due to collinearity, we retained only the trend shift in the final model for the FAWB period; for the post-FAWB period, we retained both the intercept and the trend shift.

## Results

We identified a total of 170 public mass shooting events, the primary outcome variable, with 4 or more fatalities between 1966 and 2019. The 5-year cumulative number of public mass shootings is shown in Figure 1, providing a visualization of the impacts of the FAWB on the number of shootings. The first mass shooting occurred in 1966; hence, the first data point for the cumulative number of shootings over the previous 5 years occurs in 1970. For 1966 and 1967, the cumulative number of public mass shootings was 3. This number then increased to 12 in 1993 and declined to 3 in 2004. After 2004, the cumulative number of public mass shootings increased to 81 in 2019. The last year of the ban, 2004, experienced the fewest public mass shootings through 2019.

The regression results showed excellent explanatory power ($R^2$=0.94). The coefficient on population was positive and statistically significant (.044, $P$<.001). This coefficient means that for every increase in population of 1 million people, there are an additional .044 public mass shooting events per year. The coefficient on the homicide rate was negative and statistically significant (–.249, $P$=.01). The coefficient on the time trend for the FAWB period captures the effect of the FAWB; this coefficient was negative and statistically significant (–.187, $P$=.001). Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. The intercept discontinuity for 2005-2019 was negative and statistically significant (–2.232, $P$=.001), and the trend coefficient was positive and statistically significant (.081, $P$=.001).



JMIR PUBLIC HEALTH AND SURVEILLANCE

Post et al

**Figure 1.** Public mass shooting trend line using five year moving averages (1966-2019).



These results are graphed in Figure 2 in which the black stars represent the actual data and the green line represents the predicted numbers of public mass shootings from the regression discontinuity model. A bending of the trend during the FAWB period to become downward sloping at the end of the period is apparent, as is the return of the upward trajectory upon expiration of the FAWB. The red squares represent the projected numbers of public mass shootings during the FAWB period had there been no FAWB. The difference between the red squares and the green lines represents the predicted number of public mass shootings averted by the FAWB. The model predicts that 11 public mass shootings were averted over the period of 1995-2004.

The blue diamonds represent the projected effects of a continuation of the FAWB through 2019 based on the observed trend from 1995 to 2004. This projection indicates that 30 public mass shootings would have been prevented from 2005 to 2019 had the FAWB been left in place.

**Figure 2.** Regression lines from discontinuity analysis of the federal assault weapons ban (1994-2004).



XSL•FO
RenderX

Exhibit F_Klarevas
Page 48

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                    Post et al

## Discussion

### Principal Findings

In total, 1225 people were killed in a mass shooting over the past 53 years with more than half occurring in the last decade, a function of increases in mass shootings and weapon lethality [62,63,75]. Public mass shooting fatalities and injuries far outpace population growth [75]. Between 1966 and 2019, the US population increased by 67% [76], whereas public mass shooting deaths increased by over 5-fold. The rise in public mass shootings throughout the sample period is in fact partially a function of population growth and homicide rate, along with the effects of the FAWB and its removal. An increase in the US population of 1 million people was associated with an increase of .040 ($P$<.005) public mass shootings per year. During the post-FAWB period, the increase in population from approximately 300 million in 2005 to 330 million in 2019 should be associated with an increase of 1.2 public mass shootings per year, compared to the actual increase of 4 public mass shootings per year in the data (5-year moving average). After controlling for population growth and homicide rate, a positive and statistically significant coefficient (.081, $P$=.001) on the 2005-2018 trend was seen. This further indicates a separate, nonpopulation trend of increasing violence operating during the post-FAWB period. The negative coefficient on the homicide rate invalidates the hypothesis that decreases in the numbers of public mass shootings are simply reflections of an overall decreasing homicide rate. The negative intercept discontinuity is consistent with an effect of the FAWB that persists somewhat beyond the immediate end of the ban. The positive trend coefficient is consistent with the hypothesis that the FAWB was associated with a decrease in the number of public mass shootings, as the expiration of the FAWB was associated with a shift from a downward trend to an upward trend in the number of public mass shootings per year.

The most striking finding from this study is that there was a reduction in the number of public mass shooting events while the FAWB was in place. Using prediction models in combination with regression slopes, we estimate that 11 public mass shootings were avoided due to the FAWB. By projecting what would have happened if the FAWB remained in place, we found that there would have been significantly fewer public mass shootings if the FAWB had remained in place to 2019. Remarkably, although it is intuitive that the removal of assault weapons and magazine clips will reduce the lethality of a mass shooting, we observed an inverse relationship between weapons/ammunition and mass shooting events, meaning that mass shooters may be less likely to perpetrate a mass shooting without rapid fire military-style weapons. This is an independent effect, which indirectly leads to fewer injuries and deaths. DiMaggio et al [64] also found evidence of a decrease in public mass shootings during the ban; however, their study period was shorter and was restricted to 51 public mass shootings. Unlike our study, they implicitly modeled public mass shootings as a random instance of general gun homicides that had a high death count [64]. In contrast, our findings suggest that public mass shootings are a unique type of premeditated gun violence. We found that prior to enactment of the FAWB, the rate of public

mass shootings was increasing. During enactment of the FAWB, there was a downward trend of mass shooting events. After the FAWB was lifted, public mass shootings increased dramatically. Firearm homicides in general follow no such patterns.

This effect was not found in the work of Koper, Roth, and colleagues [53-55]; however, their inclusion of all gun homicides masks the ban's effect on mass shootings. Even though Peterson and Densley's [77] work focused on perpetrator histories and not the FAWB, their findings that ease of gun access is characteristic of public mass shooters further supports our study. We restricted the inclusion criteria to public mass shootings to specifically test the effectiveness of the FAWB on public mass shooting events.

Regardless of the FAWB, bringing a semiautomatic rifle with high magazine capacity to a massacre significantly increases the number of fatalities and injuries. The increase in deaths is a function of rapid fire and increased ballistic energy. The increase in injuries is also a function of rapid fire and high-capacity magazines, enabling the shooter to shoot more people in crowded venues quickly before the crowd can disperse or hide. When controlling for the FAWB, the use of assault rifles decreased by half during implementation of the ban and tripled after the ban was lifted. This is a particularly important finding given that the FAWB had loopholes and that overall violent crime is decreasing [78]. First, all people with an assault weapon prior to the FAWB were allowed to retain their semiautomatic weapons [54,64]. Second, without a buyback program, semiautomatic weapons remained in the community [54,64]. Third, the ban did not target some military assault-like weapons [54,64]. Finally, a major loophole found in gun control legislation is that buyers can bypass background checks by purchasing their weapons and ammunition from gun shows, through illegal purchasing, or legally purchasing their guns and ammunition from another gun owner [57,63,79-87]. Even with these loopholes and issues, there was still a significant reduction in public mass shootings during the FAWB. These loopholes indicate that most people who purchase assault weapons do not become mass shooters; however, mass shooters require assault weapons and LCMs to carry out a mass shooting. Ban effectiveness might have improved if all assault weapons were included in the FAWB.

Some recent studies have specifically analyzed the effects of LCM bans on the incidence of public mass shootings. In a review of state legislation, Webster et al [88] found that bans of LCMs were associated with a significant reduction in the incidence of fatal public mass shootings. This study shows that the FAWB, which included a ban on LCMs, was associated with fewer fatalities and injuries during mass shootings in addition to fewer public mass shooting events. Koper et al [27] previously reported that 19% of public mass shootings resulting in 4 or more fatalities included the use of LCMs, while only 10% involved an assault weapon. Klarevas et al [29] found a similar pattern in shootings of 6 or more people, in which 67% of shooters utilized LCMs, whereas only 26% utilized an assault weapon. Because our study only looked at effects of the FAWB, which included an LCM ban, we were only able to determine the combined effects of limiting assault weapons and LCMs. To be clear, the reduction in the number of public mass

XSL·FO
**RenderX**

Exhibit F_Klarevas
Page 49

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                      Post et al

shootings, and resulting fatalities and injuries, may be a function of the ban on assault weapons, assault weapons plus LCMs, or only LCMs. We cannot separate out their independent effects at the national level.

Unlike our study, Webster et al [88] did not evaluate the incidence of assault weapons used in public mass shootings. Rather, they focused on fatalities from public mass shootings vs public mass shooting events. Although Webster et al [88] utilized the FBI Supplemental Homicide Report as their dataset, which is a voluntary reporting measurement system prone to errors in reporting, their findings are applicable to our analysis.

## Limitations

Although we found statistically significant decreases during the FAWB, we cannot isolate aspects of the policy that are attributed to the decline. Most notably, the FAWB also included LCMs during the ban. It may be that the type of gun and/or the type of magazine resulted in a decline. Indeed, assault weapons and LCMs provide the means to carry out a mass shooting; however, there are likely other factors beyond this study that partially explain the radical increase in public mass shootings in the post-FAWB period. For example, the FAWB was in place from 1994 to 2004, which is the same time period that the US population largely adopted the internet, along with associated social communication software and websites. This may have resulted in better tracking of public mass shootings or increased media coverage. Because our study specifically targeted the federal legislation, we omitted state-level gun policies such as state-level prohibitions on certain types of guns, LCMs, or more lethal types of bullets. It is likely that the internet serves as a contagion and as a guide to potential mass shooters, allowing them to access weapons and multiple stories about other mass shooters [62,67,89,90].

## Conclusions

In summary, public mass shootings are a unique and specific type of homicide by a gun. We found evidence that public mass shootings are qualitatively different from general homicides because after the FAWB expired, mass shooting events increased while general homicides decreased. The increase in public mass shootings was more dramatic in the final 10 years of the study period following the end of the FAWB. We suspect that these outcomes may be improved by removing existing semiautomatic weapons with large bullet capacity by creating a buyback program for all rapid-firing weapons. Moreover, the legislation would be strengthened if it closed loopholes that allow gun buyers to get around the background check legislation and other purchase prohibitions by exempting gun shows and internet or person-to-person purchases, which were exempted from the FAWB and LCM ban [87].

## Acknowledgments

The Violence Project Mass Shooter database generated data for our surveillance. This study was financially supported by the Buehler Endowment at Feinberg School of Medicine.

## Conflicts of Interest

None declared.

## References

1. Web-based Injury Statistics Query and Reporting System. Centers for Disease Control and Prevention, Injury Prevention and Control. 2020 Jul 01. URL: https://www.cdc.gov/injury/wisqars/index.html [accessed 2021-01-15]
2. Christensen AJ, Cunningham R, Delamater A, Hamilton N. Introduction to the special issue on gun violence: addressing a critical public health challenge. J Behav Med 2019 Aug;42(4):581-583. [doi: 10.1007/s10865-019-00075-8] [Medline: 31367923]
3. Drake B. Mass shootings rivet national attention, but are a small share of gun violence. Pew Research Center. 2013 Sep 17. URL: https://www.pewresearch.org/fact-tank/2013/09/17/mass-shootings-rivet-national-attention-but-are-a-small-share-of-gun-violence/ [accessed 2020-12-10]
4. Bowers TG, Holmes ES, Rhom A. The nature of mass murder and autogenic massacre. J Police Crim Psych 2009 Nov 7;25(2):59-66. [doi: 10.1007/s11896-009-9059-6]
5. Delisi M, Scherer AM. Multiple homicide offenders. Crim Justice Behav 2016 Jun 30;33(3):367-391. [doi: 10.1177/0093854806286193]
6. Mass shooter database. The Violence Project. 2020. URL: https://www.theviolenceproject.org/ [accessed 2021-01-14]
7. Shelby D. Association between adult alcohol misuse, adult mental health, and firearm storage practices in households with children: findings from the Behavioral Risk Factor Surveillance System (BRFSS). MPH Thesis. ScholarWorks @ Georgia State University. 2021 Dec 09. URL: https://scholarworks.gsu.edu/iph_theses/725 [accessed 2021-01-08]
8. Loder R, Mishra A, Atoa B, Young A. Spinal injury associated with firearm use. Cureus 2021 Mar 16;13(3):e13918 [FREE Full text] [doi: 10.7759/cureus.13918]
9. Mueller KL, Trolard A, Moran V, Landman JM, Foraker R. Positioning public health surveillance for observational studies and clinical trials: The St. Louis region-wide hospital-based violence intervention program data repository. Contemp Clin Trials Commun 2021 Mar;21:100683 [FREE Full text] [doi: 10.1016/j.conctc.2020.100683] [Medline: 33385095]



Exhibit F_Klarevas
Page 50

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                                 Post et al

10.  Horn DL, Butler EK, Stahl JL, Rowhani-Rahbar A, Littman AJ. A multi-state evaluation of the association between mental health and firearm storage practices. Prev Med 2021 Apr;145:106389. [doi: 10.1016/j.ypmed.2020.106389] [Medline: 33385422]

11.  Gunn JF, Boxer P. Gun laws and youth gun carrying: results from the youth risk behavior surveillance system, 2005-2017. J Youth Adolesc 2021 Mar;50(3):446-458. [doi: 10.1007/s10964-020-01384-x] [Medline: 33420890]

12.  Rozel J, Soliman L, Jain A. The gun talk: how to have effective conversations with patients and families about firearm injury prevention. In: Zun LS, Nordstrom K, Wilson MP, editors. Behavioral Emergencies for Healthcare Providers. Switzerland: Springer; Jan 05, 2021:465-473.

13.  Keyes KM, Kandula S, Olfson M, Gould MS, Martínez-Alés G, Rutherford C, et al. Suicide and the agent–host–environment triad: leveraging surveillance sources to inform prevention. Psychol Med 2021 Mar 05;51(4):529-537. [doi: 10.1017/s003329172000536x]

14.  Bluestein G, Hallerman T. Future directions for firearm injury intervention, policy, and research. In: Lee LK, Fleeger EW, editors. Pediatric Firearm Injuries and Fatalities: The Clinician's Guide to Policies and Approaches to Firearm Harm Prevention. Switzerland: Springer; Feb 06, 2021:223-234.

15.  Oehmke J, Moss C, Singh L, Oehmke T, Post L. Dynamic panel surveillance of COVID-19 transmission in the United States to inform health policy: observational statistical study. J Med Internet Res 2020 Oct 05;22(10):e21955 [FREE Full text] [doi: 10.2196/21955] [Medline: 32924962]

16.  Oehmke J, Oehmke T, Singh L, Post L. Dynamic panel estimate-based health surveillance of SARS-CoV-2 infection rates to inform public health policy: model development and validation. J Med Internet Res 2020 Sep 22;22(9):e20924 [FREE Full text] [doi: 10.2196/20924] [Medline: 32915762]

17.  Post L, Benishay E, Moss C, Murphy R, Achenbach C, Ison M, et al. Surveillance metrics of SARS-CoV-2 transmission in central Asia: longitudinal trend analysis. J Med Internet Res 2021 Feb 03;23(2):e25799 [FREE Full text] [doi: 10.2196/25799] [Medline: 33475513]

18.  Post LA, Issa TZ, Boctor MJ, Moss CB, Murphy RL, Ison MG, et al. Dynamic public health surveillance to track and mitigate the US COVID-19 epidemic: longitudinal trend analysis study. J Med Internet Res 2020 Dec 03;22(12):e24286 [FREE Full text] [doi: 10.2196/24286] [Medline: 33216726]

19.  Post LA, Lin JS, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 wave two surveillance in East Asia and the Pacific: longitudinal trend analysis. J Med Internet Res 2021 Feb 01;23(2):e25454 [FREE Full text] [doi: 10.2196/25454] [Medline: 33464207]

20.  Post LA, Marogi E, Moss CB, Murphy RL, Ison MG, Achenbach CJ, et al. SARS-CoV-2 surveillance in the Middle East and North Africa: longitudinal trend analysis. J Med Internet Res 2021 Jan 15;23(1):e25830 [FREE Full text] [doi: 10.2196/25830] [Medline: 33302252]

21.  Post LA, Argaw ST, Jones C, Moss CB, Resnick D, Singh LN, et al. A SARS-CoV-2 surveillance system in Sub-Saharan Africa: modeling study for persistence and transmission to inform policy. J Med Internet Res 2020 Nov 19;22(11):e24248 [FREE Full text] [doi: 10.2196/24248] [Medline: 33211026]

22.  Teutsch S, Thacker S. Planning a public health surveillance system. Epidemiol Bull 1995 Mar;16(1):1-6. [Medline: 7794696]

23.  Jacobs J, Fuhr Z. The Safe Act: New York's ban on assault weapons and large capacity magazines. Crim Law Bull 2017 Jun 29;53(1):4 [FREE Full text]

24.  Wallace EG. Assault weapon myths. South Ill Univ Law J 2018 Nov 18;43:193. [doi: 10.4135/9781452229300.n127]

25.  Kopel D, Lowy J, Rostron A. Heller and "Assault Weapons". Campbell Law Rev 2018 Feb 02;40(2):461-480 [FREE Full text]

26.  Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 20;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

27.  Koper CS, Johnson WD, Nichols JL, Ayers A, Mullins N. Criminal use of assault weapons and high-capacity semiautomatic firearms: an updated examination of local and national sources. J Urban Health 2018 Jun;95(3):313-321 [FREE Full text] [doi: 10.1007/s11524-017-0205-7] [Medline: 28971349]

28.  United States Congress House Committee on the Judiciary. Subcommittee on Crime and Criminal Justice. Public Safety and Recreational Firearms Use Protection Act. In: Hearing before the Subcommittee on Crime and Criminal Justice of the Committee on the Judiciary, House of Representatives, One Hundred Third Congress, second session, on H.R. 3527. Washington, DC: US Government; Apr 25, 1994.

29.  Klarevas L, Conner A, Hemenway D. The effect of large-capacity magazine bans on high-fatality mass shootings, 1990–2017. Am J Public Health 2019 Dec;109(12):1754-1761. [doi: 10.2105/ajph.2019.305311]

30.  Kleck G. Large-capacity magazines and the casualty counts in mass shootings. Justice Res Policy 2016 Jun 01;17(1):28-47. [doi: 10.1177/1525107116674926]

31.  Abbasi J. Large-capacity magazine bans linked with fewer mass shootings, deaths. JAMA 2020 Jan 14;323(2):108-109. [doi: 10.1001/jama.2019.20457] [Medline: 31851333]

32.  Koper CS. Assessing the potential to reduce deaths and injuries from mass shootings through restrictions on assault weapons and other high‐capacity semiautomatic firearms. Criminol Public Policy 2020 Jan 10;19(1):147-170. [doi: 10.1111/1745-9133.12485]

XSL•FO
RenderX

Exhibit F_Klarevas
Page 51

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                        Post et al

33. Towers S, Wallace D, Hemenway D. Temporal trends in public mass shootings: high-capacity magazines significantly increase fatality counts, and are becoming more prevalent. medRxiv preprint server. 2019 Dec 15. URL: https://www.medrxiv.org/content/10.1101/2019.12.12.19014738v1 [accessed 2021-04-17]

34. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

35. Lowy J. Comments on assault weapons, the right to arms, and the right to live. Harv J Law Public Policy 2020;43(2):375-386 [FREE Full text]

36. Kim A. United States gun policy and the effect on mass shootings. California State University Northridge Scholarworks Open Access Repository. Northridge, CA: CSU Northridge University Library; 2020 Aug 25. URL: http://hdl.handle.net/10211.3/217278 [accessed 2020-12-06]

37. Pfau MW. Defining the deadly: definitional argument and the assault weapons ban controversy. Argum Advocacy 2020 Jul 20;56(3):155-173. [doi: 10.1080/10511431.2020.1793276]

38. Balakrishna M, Wilbur KC. How the Massachusetts Assault Weapons Ban Enforcement Notice changed firearm sales. SSRN J 2021 Feb 4:1-51 [FREE Full text] [doi: 10.2139/ssrn.3779510]

39. Soto L, Chheda S, Soto J. Reducing fatalities in mass attacks and the related matter of gun control policy following the El Paso August 2019 shooting. Tex Hisp J Law Policy 2020;26:85.

40. Nagin DS, Koper CS, Lum C. Policy recommendations for countering mass shootings in the United States. Criminol Public Policy 2020 Jan 10;19(1):9-15. [doi: 10.1111/1745-9133.12484]

41. Gay C. 'Red Flag' laws: how law enforcement's controversial new tool to reduce mass shootings fits within current Second Amendment jurisprudence. Boston Coll Law Rev 2020 Apr 30;61(4):1491-1533 [FREE Full text]

42. Nielsen D. Disarming dangerous persons: how Connecticut's Red Flag Law saves lives without jeopardizing constitutional protections. Quinnipiac Health Law J 2020;23(3):253.

43. Blocher J, Charles J. Firearms, extreme risk, and legal design: "Red Flag" laws and due process. Virginia Law Rev 2020 Oct 19;106(6):1285.

44. Kopel DB. Red Flag Laws: proceed with caution. Law Psychol Rev 2020 Jul 16:forthcoming [FREE Full text] [doi: 10.2139/ssrn.3653555]

45. Blodgett S. Dementia, guns, Red Flag laws: Can Indiana's Statute balance elders' constitutional rights and public safety? NAELA J 2020 Sep;16:1-22 [FREE Full text]

46. Kerr S. "What We Need Is Bullet Control": could regulation of bullets reduce mass shootings? In: Crews G, editor. Handbook of Research on Mass Shootings and Multiple Victim Violence. Hershey, PA: IGI Global; Oct 2019:432-446.

47. Moore EE. Another mass shooting: Time to ban the assault rifle. J Trauma Acute Care Surg 2018 Jun;84(6):1036. [doi: 10.1097/TA.0000000000001863] [Medline: 29799817]

48. Delaney GA, Charles JD. A double-filter provision for expanded Red Flag laws: a proposal for balancing rights and risks in preventing gun violence. J Law Med Ethics 2020 Dec;48(4_suppl):126-132. [doi: 10.1177/1073110520979412] [Medline: 33404308]

49. Honberg RS. Mental illness and gun violence: research and policy options. J Law Med Ethics 2020 Dec;48(4_suppl):137-141. [doi: 10.1177/1073110520979414] [Medline: 33404306]

50. Laqueur HS, Wintemute GJ. Identifying high‐risk firearm owners to prevent mass violence. Criminol Public Policy 2019 Dec 16;19(1):109-127. [doi: 10.1111/1745-9133.12477]

51. Pallin R, Schleimer JP, Pear VA, Wintemute GJ. Assessment of extreme risk protection order use in California from 2016 to 2019. JAMA Netw Open 2020 Jun 01;3(6):e207735 [FREE Full text] [doi: 10.1001/jamanetworkopen.2020.7735] [Medline: 32556258]

52. Hurka S, Knill C. Does regulation matter? A cross‐national analysis of the impact of gun policies on homicide and suicide rates. Regul Gov 2018 Dec 21;14(4):787-803. [doi: 10.1111/rego.12235]

53. Koper C, Roth J. The impact of the 1994 Federal Assault Weapon Ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. J Quant Criminol 2001 Mar;17(1):33-74.

54. Koper C, Woods D, Roth J. Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003. Report to the National Institute of Justice, United States Department of Justice. 2004 Jul. URL: https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf [accessed 2020-12-11]

55. Roth J, Koper C, Adams W, Johnson S, Marcotte J, McGready J, et al. Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 Final Report. Urban Institute. Washington, DC: The Urban Institute; 1997 Mar 13. URL: https://www.urban.org/research/publication/impact-evaluation-public-safety-and-recreational-firearms-use-protection-act-1994/view/full_report [accessed 2021-02-10]

56. Webster D, Vernick J, McGinty E, Alcorn T. Regulating Gun Sales: An Excerpt from Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Baltimore, MD: Johns Hopkins University Press; 2013.

57. Jacobs J. Can Gun Control Work? (Studies in Crime and Public Policy). Oxford: Oxford University Press; Oct 14, 2004.



JMIR PUBLIC HEALTH AND SURVEILLANCE                                                    Post et al

58. Lee LK, Fleegler EW, Farrell C, Avakame E, Srinivasan S, Hemenway D, et al. Firearm laws and firearm homicides: a systematic review. JAMA Intern Med 2017 Jan 01;177(1):106-119. [doi: 10.1001/jamainternmed.2016.7051] [Medline: 27842178]

59. Gius M. An examination of the effects of concealed weapons laws and assault weapons bans on state-level murder rates. Appl Econ Lett 2013 Nov 26;21(4):265-267. [doi: 10.1080/13504851.2013.854294]

60. Cook P, Goss K. The Gun Debate: What Everyone Needs to Know. New York: Oxford University Press; May 01, 2014.

61. Cook P, Goss K. The Gun Debate: What Everyone Needs to Know, 2nd Edition. New York: Oxford University Press; Apr 16, 2020.

62. Lankford A, Silver J. Why have public mass shootings become more deadly? Criminol Public Policy 2019 Dec 16;19(1):37-60. [doi: 10.1111/1745-9133.12472]

63. Schiff M. IZA Discussion Paper 12784: Greater US gun ownership, lethality and murder rates: analysis and policy proposals. IZA Institute of Labor Economics. 2019 Nov 27. URL: https://www.iza.org/publications/dp/12784/greater-us-gun-ownership-lethality-and-murder-rates-analysis-and-policy-proposals [accessed 2021-04-17]

64. DiMaggio C, Avraham J, Berry C, Bukur M, Feldman J, Klein M, et al. Changes in US mass shooting deaths associated with the 1994–2004 federal assault weapons ban: Analysis of open-source data. J Trauma Acute Care Surg 2019 Jan;86(1):11-19. [doi: 10.1097/ta.0000000000002060]

65. World Telecommunication/ICT Indicators Database 2020 (24th Edition). International Telecommunications Union. Geneva: International Telecommunications Union; 2021 Jan. URL: https://www.itu.int/en/ITU-D/Statistics/Pages/publications/wtid.aspx [accessed 2021-04-17]

66. Lopez G. America's unique gun violence problem, explained in 17 maps and charts. Vox. 2021 Mar 23. URL: https://www.vox.com/policy-and-politics/2017/10/2/16399418/boulder-colorado-mass-shooting-gun-violence-statistics-charts [accessed 2021-03-29]

67. Silver J, Simons A, Craun S. A study of the pre-attack behaviors of active shooters in the United States between 2000 and 2013. FBI Documents. Washington, DC: US Department of Justice, Federal Bureau of Investigations; 2018. URL: https://www.fbi.gov/file-repository/pre-attack-behaviors-of-active-shooters-in-us-2000-2013.pdf/view [accessed 2020-10-25]

68. DeFoster R, Swalve N. Guns, culture or mental health? Framing mass shootings as a public health crisis. Health Commun 2018 Oct;33(10):1211-1222. [doi: 10.1080/10410236.2017.1350907] [Medline: 28841045]

69. Fridel EE. A multivariate comparison of family, felony, and public mass murders in the United States. J Interpers Violence 2021 Feb;36(3-4):1092-1118. [doi: 10.1177/0886260517739286] [Medline: 29294976]

70. Duwe G. Mass murder in the United States: a history. Jefferson, NC: McFarland & Company; Jan 07, 2007.

71. Fox J, Levin J. Mass confusion concerning mass murder. Criminologist 2015;40(1):8-11 [FREE Full text] [doi: 10.4135/9781412950619.n277]

72. Fox JA, Levin J. Firing back: the growing threat of workplace homicide. An Am Acad Pol Soc Sci 2016 Sep 08;536(1):16-30. [doi: 10.1177/0002716294536001002]

73. Stevenson AJ, Flores-Vazquez IM, Allgeyer RL, Schenkkan P, Potter JE. Effect of removal of Planned Parenthood from the Texas Women's Health Program. N Engl J Med 2016 Mar 03;374(9):853-860. [doi: 10.1056/nejmsa1511902]

74. Freedman DA. On the so-called "Huber Sandwich Estimator" and "Robust Standard Errors". Am Statistician 2006 Nov;60(4):299-302. [doi: 10.1198/000313006x152207]

75. Duwe G. Mass shootings are getting deadlier, not more frequent. Politico Magazine. 2017 Oct 04. URL: https://www.politico.com/magazine/story/2017/10/04/mass-shootings-more-deadly-frequent-research-215678/ [accessed 2021-01-30]

76. Population Trends. United States Census Bureau. 2019. URL: https://www.census.gov/ [accessed 2019-08-26]

77. Peterson J, Densley J. We have studied every mass shooting since 1966. Here's what we've learned about the shooters. Los Angeles Times. 2019 Aug 04. URL: https://www.latimes.com/opinion/story/2019-08-04/el-paso-dayton-gilroy-mass-shooters-data [accessed 2020-02-01]

78. Klingner DE, Williams E. Topic: Public Safety. Public Integrity 2019 Mar 06;21(2):220-224. [doi: 10.1080/10999922.2019.1565268]

79. Hand C. Gun control and the Second Amendment. Minneapolis, MN: ABDO; Dec 15, 2016.

80. Popovits A. Dominican University of California Political Science & International Studies (Senior Thesis). 2020 May. URL: https://tinyurl.com/se3vrmd6 [accessed 2020-12-01]

81. Miller SV. What Americans think about gun control: evidence from the General Social Survey, 1972-2016. Soc Sci Quart 2018 Nov 18;100(1):272-288. [doi: 10.1111/ssqu.12555]

82. Kellner D. School shootings, societal violence and gun culture. In: Shapiro H, editor. The Wiley Handbook on Violence in Education: Forms, Factors, and Preventions. Medford, MA: John Wiley & Sons, Inc; 2018:53-68.

83. Schildkraut J. Assault weapons, mass shootings, and options for lawmakers. Rockefeller Institute of Government. 2019 Mar 22. URL: https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/ [accessed 2021-02-11]

84. Jacobs J, Fuhr Z. The potential and limitations of universal background checking for gun purchasers. Wake Forest J Law Policy 2017;7(2):537-583.


XSL·FO
RenderX

Exhibit F_Klarevas
Page 53

# EXHIBIT G

Opinion



# Regulating Assault Weapons and Large-Capacity Magazines for Ammunition

**Philip J. Cook, PhD**
Duke University,
Durham,
North Carolina.

**John J. Donohue, PhD, JD**
Stanford University,
Stanford, California.



Viewpoint pages 1177, 1179, 1181, 1183, 1185, 1187, 1189, 1193, 1195, and 1197 and Editorial page 1201



Supplemental content

**Mass public shootings in the US** account for a small fraction of all firearm-related homicides, but have an out-sized role in stoking the public's concern with firearm violence. The vivid instances of attacks on people in churches, schools, and offices and at other public gathering places do vastly disproportionate damage to peace of mind by creating a sense of peril in places that should feel safe. These attacks have been increasing in frequency and deadliness in recent years. As reducing this particular type of firearm violence becomes more urgent, the case for a variety of prevention measures becomes even stronger.

This Viewpoint focuses on a measure that is highly specific to the gun violence problem—stringent regulation of assault weapons and large-capacity magazines (LCMs) for ammunition. Federal law banned the introduction of new LCMs and military-style semiautomatic firearms between 1994 and 2004, but that regulation ended in 2004 and Congress did not renew it. Now, years later, the nation is experiencing the dire effects of opening the door to the manufacture and import of these weapons; it is time to close that door.

## History and Current Status of Bans

The history of federal bans on weapons of mass destruction goes back to the 1934 National Firearms Act. Among other provisions, the Act required sub-machine guns and other firearms capable of fully

---

> Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.

---

automatic fire (ie, firing several shots with a single pull of the trigger) to be registered with the federal government.[1] All transactions involving such weapons were taxed at $200, a high confiscatory amount at the time. The registration and tax requirement remained in place, although inflation has substantially undercut the force of the transfer fee. The Act was expanded by Congress in 1986 to end the sale of new fully automatic weapons. There is every reason to believe that these restrictions have been effective. Even though the Thompson submachine gun was a notorious gangster weapon in the 1920s, fully automatic weapons of any kind are rarely used in crime in modern times or in mass public shootings.[1]

The 1994 Federal Assault Weapons Ban extended the regulation of military-style weapons to include some semi-automatic firearms. These weapons fire 1 round of ammunition for each pull of the trigger, and are capable of firing at a rate of roughly 1 per second. The 1994 Assault Weapons Ban ended the legal manufacture and import of specified firearms, as well as ammunition-feeding devices (magazines) that held more than 10 rounds of ammunition. At the time, most prohibited assault weapons were equipped with detachable magazines that held 30 rounds and could accept magazines that could hold as many as 50 or 100 rounds, thus making it possible to fire dozens of rounds without pausing to reload.[2]

The 1994 federal ban on new assault weapons had gaping loopholes. First, the federal ban did not restrict possession or transactions of existing assault weapons and LCMs. Second, manufacturers found ways to slightly modify the design of some of the banned weapons so that they met the letter of the law while preserving the military appearance and the possibility of accepting LCMs and firing high-powered ammunition quickly. Still, there is evidence that the ban had some salutary effect on mass public shootings.

The LCM ban, also in effect during 1994 to 2004, was not subject to the redesign problem because it provided a bright line that was difficult for manufacturers to overcome. There were, however, an estimated 25 million LCMs in circulation when the ban was enacted, and those remained in circulation, but with no new additions.[2] It was not just assault weapons (as defined) that were designed to use LCMs, but a variety of other semiautomatic firearms as well, so the LCM ban had much broader scope.

When the law expired in 2004, manufacturing and importations of LCMs and previously banned weapons resumed, and a surge of sales followed. Current estimates suggest that approximately 20 million assault weapons are owned by private individuals in the US, with millions of new assault weapons manufactured and imported each year.[3] The industry initially advertised these weapons as "assault rifles," and continues to promote them with military allusions but has now rebranded this type of weapon as the "modern sporting rifle."

Seven states have some version of a ban or stringent restrictions on assault weapons: California, Connecticut, Hawaii, Maryland, Massachusetts, New Jersey, and New York, as well as the District of Columbia.[4] These laws are being challenged in the courts as a violation of the Second Amendment, but have survived these challenges to date.

**Corresponding Author:** Philip J. Cook, PhD, Sanford School of Public Policy, Duke University, PO Box 90545, Durham, NC 27708 (pcook@duke.edu).

© 2022 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by a Columbia University Libraries User on 09/27/2022

Exhibit G_Klarevas
Page 55

Opinion   Viewpoint

## Evidence of Potential Effectiveness of a National Ban

A review conducted by the RAND Corporation concluded that the handful of published studies on the effect of the ban on mass public shootings was "inconclusive" due in part to flaws in the analysis used by the 3 studies with positive findings.[4] But it is unlikely the surge in mass public shootings that involved assault weapons and LCMs that occurred after the ban would have happened if the ban had remained in place. The logic is straightforward. The sales of these weapons, which had declined during the ban, expanded greatly following its repeal, making them more widely available to everyone including would-be mass murderers.

To document recent trends in such mass public shootings requires a precise definition. One common definition for mass public shootings has several elements,[5,6] including: (1) a minimum of 4 homicides; (2) a public location; and (3) circumstance not attributable to robbery, other felonious activity, or commonplace conflict in families or among acquaintances. A comprehensive compilation of such events is the Violence Project's database of mass shootings in the US,[7] which includes the number of people killed and injured in each event and the type of weapon or weapons used.

Information from this database indicates that in the years following when the law expired in 2004, the number of mass shooting incidents greatly increased and the number of fatalities increased even more. During the period from 2015 to 2019, the number of incidents reached 33 (or 6.6 per year), which was almost twice the number during the decade the Federal Assault Weapons Ban was in effect (eFigure and eTable in the Supplement). The number of fatalities from shootings that involved banned weapons decreased during the second half of the ban (2000-2004) and then surged during subsequent periods, reaching a total of 271 during 2015 to 2019. It was during that 5-year interval from 2015 to 2019 that 5 of the top-10 deadliest mass public shootings in US history occurred, and all were committed with assault weapons.[8] The number of fatalities resulting from mass public shootings with other weapons has remained relatively flat.

## The Australian Ban on Rapid-Fire Weapons

The Australian experience has factored into the debate over reinstituting the assault weapons ban in the US. In Australia, the impetus for banning semiautomatic weapons was a 1996 mass public shoot-

ing in Port Arthur, Tasmania, in which a young man killed 35 people with a semiautomatic rifle. Swift action by the federal and state legislatures produced legislation that banned not only manufacture and import, but private possession of semiautomatic rifles. To ease the transition, a series of firearm buybacks were instituted, and 1 million weapons were ultimately relinquished, estimated to be one-third of all privately owned guns. Australia had 11 mass shootings during the decade prior to the ban,[9] and 1 since then (a family killing in 2018 that would not count as a mass public shooting by the US definition).

The Australian experience is illustrative as a proof of concept for other countries, including the US. Of note, the ban covered all semiautomatic rifles, not just those with the specific features suggestive of use in warfare as opposed to hunting. The ban on possession of existing guns rather than only on the introduction of new guns greatly accelerated its apparent effectiveness.

## Potential Next Steps

On July 29, 2022, the US House of Representatives passed the Assault Weapons Ban of 2022. To a large extent this bill reinstituted the 1994 ban, including the ban on the sale of new semiautomatic firearms deemed to be assault weapons, and of new LCMs holding more than 10 rounds. An important innovation is that for LCMs, the bill only allows continued possession and use of existing devices, but not transfer. However, given the reality that the US Senate will not enact this bill, it is useful to consider other approaches.

States could institute or expand assault weapon bans. Indeed, just a ban on LCMs would be a promising first step, impeding access to these products by individuals who could otherwise use them to fire multiple rounds of ammunition at large numbers of people before law enforcement can be mobilized to stop the killing.

## Conclusions

In 2017, the *New York Times* polled "32 current or retired academics in criminology, public health and law, who have published extensively in peer-reviewed academic journals on gun policy"[10] to ask them what measures would be most effective in dealing with the mass shooting problem in the US, and an assault weapons ban was deemed overall by this panel to be the single most effective measure. The evidence in support of a ban has grown tragically stronger since then.[10]

### ARTICLE INFORMATION

**Conflict of Interest Disclosures:** Dr Donohue reported serving as an expert witness for various government entities on matters related to assault weapons bans based on his research in this area.

### REFERENCES

**1.** Cook PJ, Goss KA. *The Gun Debate: What Everyone Needs to Know.* 2nd ed. Oxford University Press; 2020.

**2.** Koper CS. An updated assessment of the federal assault weapons ban: impacts on gun markets and gun violence, 1994-2003. Accessed September 6, 2022. https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf

**3.** Bump P. Tallying America's fascination with AR-15-style rifles. Accessed September 6, 2022. https://www.washingtonpost.com/politics/2022/05/26/tallying-americas-fascination-with-ar-15-style-rifles/

**4.** Smart R, Morral AR, Smucker S, et al. *The Science of Gun Policy.* RAND; 2020.

**5.** Duwe G. Patterns and prevalence of lethal mass violence. *Criminol Public Policy.* 2020;19(1):17-35. doi:10.1111/1745-9133.12478

**6.** Smart R, Schell TL. Mass shootings in the United States. Accessed September 6, 2022. https://www.rand.org/research/gun-policy/analysis/essays/mass-shootings.html

**7.** Violence Project. Mass shooter database: version 5.0. Accessed August 30, 2022. https://

www.theviolenceproject.org/mass-shooter-database/

**8.** Wikipedia. Mass shootings in the United States. Accessed August 31, 2022. https://en.wikipedia.org/wiki/Mass_shootings_in_the_United_States

**9.** Chapman S, Alpers P, Jones M. Association between gun law reforms and intentional firearm deaths in Australia, 1979-2013. *JAMA.* 2016;316(3):291-299. doi:10.1001/jama.2016.8752

**10.** Sanger-Katz M, Bui Q. How to reduce mass shooting deaths? experts rank gun laws. Published October 5, 2017. Accessed September 6, 2022. https://www.nytimes.com/interactive/2017/10/05/upshot/how-to-reduce-mass-shooting-deaths-experts-say-these-gun-laws-could-help.html

© 2022 American Medical Association. All rights reserved.

Downloaded From: https://jamanetwork.com/ by a Columbia University Libraries User  on 09/27/2022

Exhibit G_Klarevas
Page 56

JMIR PUBLIC HEALTH AND SURVEILLANCE                                                  Post et al

85. Braga AA, Brunson RK, Cook PJ, Turchan B, Wade B. Underground gun markets and the flow of illegal guns into the Bronx and Brooklyn: a mixed methods analysis. J Urban Health 2020 Sep 04:online ahead of print. [doi: 10.1007/s11524-020-00477-z] [Medline: 32888157]

86. Chai C. Gun control: can we take a shot at it? AMASS 2019;24(2):34-36.

87. Goldberg J. The case for more guns (and more gun control). The Atlantic. 2012 Dec. URL: https://www.theatlantic.com/magazine/archive/2012/12/the-case-for-more-guns-and-more-gun-control/309161/ [accessed 2020-11-20]

88. Webster DW, McCourt AD, Crifasi CK, Booty MD, Stuart EA. Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States. Criminol Public Policy 2020 Jan 30;19(1):171-212. [doi: 10.1111/1745-9133.12487]

89. Lankford A, Madfis E. Media coverage of mass killers: content, consequences, and solutions. Am Behav Sci 2018 Mar 20;62(2):151-162. [doi: 10.1177/0002764218763476]

90. Kien S, Begay T, Lee A, Stefanidis A. Social media during the school shooting contagion period. Violence Gender 2019 Dec 01;6(4):201-210. [doi: 10.1089/vio.2019.0043]

## Abbreviations

**FAWB:** Federal Assault Weapons Ban
**FBI:** Federal Bureau of Investigation
**LCM:** large-capacity magazine

*Edited by G Eysenbach, T Sanchez; submitted 19.02.21; peer-reviewed by T Alcorn; comments to author 12.03.21; revised version received 24.03.21; accepted 30.03.21; published 22.04.21*

*Please cite as:*
*Post L, Mason M, Singh LN, Wleklinski NP, Moss CB, Mohammad H, Issa TZ, Akhetuamhen AI, Brandt CA, Welch SB, Oehmke JF*
*Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*
*JMIR Public Health Surveill 2021;7(4):e26042*
*URL: https://publichealth.jmir.org/2021/4/e26042*
*doi: 10.2196/26042*
*PMID: 33783360*

©Lori Post, Maryann Mason, Lauren Nadya Singh, Nicholas P Wleklinski, Charles B Moss, Hassan Mohammad, Tariq Z Issa, Adesuwa I Akhetuamhen, Cynthia A Brandt, Sarah B Welch, James Francis Oehmke. Originally published in JMIR Public Health and Surveillance (https://publichealth.jmir.org), 22.04.2021. This is an open-access article distributed under the terms of the Creative Commons Attribution License (https://creativecommons.org/licenses/by/4.0/), which permits unrestricted use, distribution, and reproduction in any medium, provided the original work, first published in JMIR Public Health and Surveillance, is properly cited. The complete bibliographic information, a link to the original publication on https://publichealth.jmir.org, as well as this copyright and license information must be included.



Exhibit F_Klarevas
Page 54

# EXHIBIT H

# Gun Digest

## 34th Anniversary
## 1980 Deluxe Edition

## Includes 16 Pages in Full Color

THE WORLD'S
GREATEST GUN BOOK

**ALL NEW:**

● Technical Articles by Qualified Experts
● Field Tests and Evaluations by Shooters
● History and Analysis for Students of the Gun

**PLUS:**

The most comprehensive catalog of firearms and accessories available to shooters.

## Edited by Ken Warner
### John T. Amber, Editor Emeritus

Exhibit H_Klarevas
Page 57

# THE COMPLETE COMPACT CATALOG

It is problematical whether people mostly buy GUN DIGEST for its remarkable catalog or for its feature section designed to be good reading. Certainly, people *use* the catalog pages of GUN DIGEST more. A copy of this book is to be found within reach of virtually every sales executive and store owner in the firearms industry, and it is certainly a mainstay for gunwriters and editors. Our catalog section is the big question-answerer.

Inflation has brought, to a degree, hard times to those who prepare catalogs that show prices. There was a time when we went to all the shows and made all the phone calls and got, in addition to all the details, the year's prices. Indeed, in the old days as far back as GUN DIGEST goes, there were times when the prices didn't change from year to year.

That is all gone. Inflation has made it virtually impossible for even factory people to keep track of prices. A publication which must be early, as this one is, can only print those prices in effect at the time it goes to press. Those are the prices you see here. At the very least, they provide an absolutely sound starting point for shoppers.

Showing prices is not, however, the principal function of the GUN DIGEST catalog section. Its all-inclusive nature provides, if you look at a lot of them, a history of firearms availability in the United States. It covers virtually all firearms available to U.S. shooters, whether manufactured in the United States or elsewhere, or marketed by United States firms or others, and whether the arm is rimfire, centerfire, muzzleloader, rifle, handgun, shotgun. Indeed, air arms have always been—since they became a factor—listed in GUN DIGEST.

There are things besides guns important to firearms users and those have always been listed in the GUN DIGEST catalog. Sights and accessories, scopes and mounts, books, addresses of associations and clubs and manufacturers—all these are important and sometimes imperative reference needs of gun users.

It is important to note that GUN DIGEST is a commercial venture by itself. It makes its money from its readers and it makes no money through advertising. No one pays to be listed in GUN DIGEST; any legitimate producer of any legitimate product or service who will meet our deadlines regarding essential details and photographs, will be listed. In fact, if they don't meet our deadlines, we go after them. And if that fails, we will present what we can find out without them.

Here it is, then: 180 pages of pure objective fact—what's available, who makes it, where it is, what it looks like, and, within limits imposed from without, how much it costs. There is no other source that presents this information with such completeness and in such compact convenience.

Making it happen is, by the way, hard work.



Harold A. Murtz, Senior Staff Editor, handles the GUN DIGEST catalog and edits GUNS ILLUSTRATED each year.



This trio— Bob Anderson, Lilo Anderson, Harold A. Murtz— hold down the Northfield editorial offices



Pamela J. Johnson, DBI artist, finds a table full of Digest layouts each spring.

# EXHIBIT 11

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6     Fax:  (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his
    official capacity as Attorney General of the
8   State of California*

9           IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                    CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          Case No. 17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**
    **CHRISTOPHER WADDELL, and**          **DECLARATION OF BRENNAN**
15  **CALIFORNIA RIFLE & PISTOL**         **RIVAS**
    **ASSOCIATION, INC., a California**
16  **corporation,**                      Courtroom:    5A
                                          Judge:        Hon. Roger T. Benitez
17                         Plaintiffs,    Action Filed: May 17, 2017

18          **v.**

19
    **ROB BONTA, in his official capacity as**
20  **Attorney General of the State of**
    **California; and DOES 1-10,**
21
                            Defendants.
22

23

24

25

26

27

28

---

Declaration of Brennan Rivas
(17-cv-1017-BEN-JLB)

**DECLARATION OF BRENNAN RIVAS**

I, Brennan Rivas, declare under penalty of perjury that the following is true and correct:

1. I have been retained by the State of California to provide expert opinion and testimony regarding historical regulations that prohibited the public carry and possession of certain weapons. I am being compensated at a rate of $130 per hour.

2. I have evaluated the historical justifications and purposes of laws restricting the carrying of certain weapons, in addition to their scope in restricting the use of certain weapons associated with urgent societal problems of the time while simultaneously protecting the right to use other weapons for constitutionally protected, lawful purposes.

**BACKGROUND AND QUALIFICATIONS**

3. I have a Ph.D. in history from Texas Christian University, awarded in 2019. My expertise includes historical weapon regulations in the United States. I have several publications on this topic, including peer-reviewed articles in the *Southwestern Historical Quarterly*, and a chapter in an edited collection forthcoming by Oxford University Press; earlier this year, my article, "Enforcement of Public Carry Restrictions: Texas as a Case Study (June 2022), was published in the *UC Davis Law Review*.

4. I am currently completing a book manuscript, based upon my dissertation research, which traces the development and implementation of weapon and firearm policies in Texas across a century-long period.

5. I have provided expert witness testimony in *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.).

6. A true and correct copy of my current curriculum vitae is attached as **Exhibit A** to this declaration.

1

**OPINIONS**

7.     As discussed in this declaration, the proliferation of 19th century firearm restrictions, including those enacted in Texas, Tennessee, and Arkansas, demonstrate a robust governmental response to the scourge of gun violence that swept the Nation.  Importantly, these restrictions did not flatly ban the carry or possession of all arms, and instead targeted only those weapons that posed significant risk to public safety at that time.

## I.     BRIEF HISTORY OF THE COLT REVOLVER AND THE SPREAD OF HANDGUN VIOLENCE IN THE 19TH CENTURY

8.     The field of gun law history is a relatively young and obscure one, though it will undoubtedly continue to grow as Second Amendment jurisprudence generates a need for more and better scholarship on the subject.  My research, which represents some of the most in-depth work on nineteenth-century gun regulations, shows that there are historical firearm regulations similar to both California's restrictions on large-capacity magazines and its restrictions on assault weapons.  Notably, during this period, several states prohibited the sale, gift, transfer, or importation of certain types of revolvers and other pistols which people of the time associated with criminal activity.

9.     The revolver design that came to dominate American markets during the mid- and late nineteenth century was patented by Samuel Colt in 1836.  He was not the first inventor to produce a multi-shot pistol, but he was the first whose creation became technologically and socially significant.  Even though Colt had a working revolver by the mid-1830s, it took decades for his invention to become commercially successful.

10.     The Colt revolver diverged from pistols then widely available in two critical ways.  First, it was breech-loading, meaning that ammunition did not need to be inserted through the end of the barrel (muzzle-loading).  Second, it provided multiple shots without reloading; the standard design eventually settled at six

2

1    rounds.  The earliest revolvers (those manufactured prior to and during the Civil

2    War) were of the "cap and ball" type, which required a delicate and time-

3    consuming reloading process.  By about the 1870s, technological developments in

4    the design and functionality of ammunition meant that later models of Colt's could

5    use individual cartridges; these could be inserted fairly quickly into the cylinder,

6    which made the reloading process much more swift—a boon on the battlefield, but

7    a new danger in other contexts.

8         11.      Though Colt's revolver was a revolutionary device that represented a

9    paradigmatic shift in firearm technology, his company struggled to reach its

10    potential.  The expiration of Colt's patent in 1857 opened the door for other

11    manufacturers to enter the market without having to endure the same decades-long

12    startup cost.  Meanwhile, the growing crisis over slavery and its looming prospect

13    of war gave Colt what he had always wanted—substantial government patronage.

14    Southern states ordered as many revolvers as they could in the lead-up to Fort

15    Sumter, and Colt's Patent Fire Arms Manufacturing Company was more than

16    willing to deliver.  But the far more important contracts came from the United

17    States military, whose orders for pistols like Colt's revolver skyrocketed during the

18    course of the Civil War.[1]  Wartime production by Colt, in addition to the new

19    entrants into the market (like Smith & Wesson), created an unprecedented

20    infrastructure to manufacture staggeringly large quantities of pistols.  As production

21    capacity increased and the U.S. military demobilized, more of these weapons

22    became available to and affordable for American consumers; by the 1870s, the net

23    result was more and cheaper pistols spread throughout the country[2], introducing the

24    United States to its first experience with rampant gun violence.

25         [1] On the life of Samuel Colt and the history of his firearm manufacturing

26    companies, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that*

27    *Changed America* (New York: Scribner, 2020).

28         [2] Colt's Army revolvers cost about $20 at the time of the Civil War, but

                                              (continued…)

1        12.    The Civil War Era, making up the central three decades of the

2    nineteenth century (1840-1870), marked a sharp departure for the United States in

3    terms of violence and homicide in comparison to other Western nations.  Distrust in

4    governing institutions and tremendous economic change wrought by

5    industrialization primed Americans for homicidal violence to a degree that was

6    unprecedented in American history.  In northern cities, rising population levels

7    accompanied urbanization, labor agitation, and poverty, which caused an increase

8    in homicide and crime.  Though military victory and a renewed faith in American

9    government reduced homicide in northern states after the 1860s, the rates for the

10   1870s and 1880s in the north remained higher than those from the more peaceful

11   era prior to the 1840s, and by the close of the 1890s northern homicide rates began

12   ratching upward yet again.[3]  Broader crime rates for the late nineteenth century

13   are harder to pin down than those for homicide, but the development of urban,

14   industrial life produced abundant opportunities for the criminally inclined.  That

15   city governments enacted new criminal ordinances and increased funding for police

16   strongly suggests that urban residents perceived themselves to be more vulnerable

17   to victimization than they had been in the past.  In the southern states, the

18   subsequent entrants into the market sold small pocket pistols for as little as a couple

19   of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-

20   367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the
     catalog but retailed elsewhere for something closer to $18 (see pp. 367).

21   Meanwhile, the smaller caliber pocket pistols from other brands could be ordered

22   for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online,
     see https://bit.ly/3VeUhHo.

23      [3] On homicide in American history, particularly as broken down into

24   northern and southern regions, see Randolph Roth, *American Homicide*
     (Cambridge: Belknap Press of Harvard University Press, 2009), 297-326, 386-388

25   (for trends in northern areas); 185 (for data-supported charts showing trends in

26   homicide for large cities across the entire nineteenth century); 184 (complicating
     data from pp. 185 by showing that some rural northern areas experienced sharp rise

27   in crime after 1865 and therefore emulated what took place in the American South

28   during that time).

1  revolutionary consequences of emancipation and Reconstruction created an
2  atmosphere of distrust of government and one's neighbor, mutual hatred, and
3  deeply ideological partisanship that resulted in tremendous, gut-wrenching violence
4  suffered primarily by Black Americans and their political allies.  The disruption of
5  war, occupation, and frequent changes in state government and constitutional
6  structure bred attitudes of vigilantism and disregard for the judicial process.  Rates
7  of violence and homicide remained quite high in the southern states across the
8  nineteenth century.[4]  The proliferation of deadly weapons, and especially easily
9  concealable pistols, to a point of near ubiquity in American communities rendered
10 the interpersonal conflicts that erupted as a result of urbanization, Reconstruction,
11 economic hardship, and social dislocation all the more deadly.

12 **II.    GOVERNMENTAL RESPONSES TO THE RISE IN HANDGUN VIOLENCE**

13      13.    The response to this gun violence varied across the United States.  The
14 most popular approach was the enactment or strengthening of public carry laws.
15 Jurisdictions that did not already have such laws were likely to enact them, and
16 those using the older mechanism of sureties to keep the peace were likely to
17 transition toward the implementation of criminal statutes mandating fines and/or
18 jail time for violators.[5] These public carry regulations targeted concealable items
19 like pistols, sword canes, and daggers that were used in the commission of crimes
20 and generally referred to as deadly weapons.  The closing third of the nineteenth
21 century saw a flurry of this activity as states and municipalities tried new penalties,

---

[4] Roth, *American Homicide*, 411-434.

[5] The Repository of Historical Gun Laws, a database maintained by the Duke Center for Firearms Law, reflects that American state and local governments enacted statutes and ordinances specifically relating to "carrying weapons" in large numbers during the period from the close of the Civil War in 1865 through the end of the nineteenth century.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

5

1  added new weapons to the lists of prohibited weapons, and generally attempted to

2  eliminate small, easily concealable weapons from the public sphere.[6]

3       14.    Another strategy employed by state governments to reduce gun

4  violence and gun crime was to tax certain types of firearms.  In 1894, Georgia

5  enacted a new occupation tax law that applied to "dealers in pistols and other

6  weapons."  A dealer in "pistols, toy pistols shooting cartridges, pistol or rifle

7  cartridges, dirks, bowie-knives, or metal knucks" had to pay twenty-five dollars per

8  place of business.[7]  In 1907, the Texas legislature placed a fifty-percent sales tax

9  upon pistols; dealers had to report their sales and pay the required tax to the state

10  comptroller's office on a quarterly basis.[8]  Sales and occupation taxes like these

11  tended to be less about generating revenue than regulating an activity that was

12  frowned upon by society more generally.  Occupation tax laws applied to vendors

13  who appealed to vices like smoking, gambling, and playing games as well as

14  peddlers and itinerant salesmen.  When a Texas appellate court upheld the stringent

15  sales tax (over loud complaints by dealers), the judge described the business of

16  selling pistols as one "hurtful to the welfare of society" and among that class of

17  occupations "detrimental to the health, morals, or good order of society."  As a

18  result, the court reasoned that the legislature "would have the right, not only to levy

19  
_____

20      [6] In the second half of the nineteenth century, items like metal knuckles and
21  razor blades became targets for proscription alongside bowie knives, pistols, and
sword canes.

22      [7] Acts of the General Assembly of the State of Georgia (1894) available
online from the Digital Library of Georgia; see

23  https://dlg.usg.edu/record/dlg_zlgl_75343012/fulltext.text and

24  https://dlg.usg.edu/collection/dlg_zlgl?range%5Byear_facet%5D%5Bbegin%5D=1
880&range%5Byear_facet%5D%5Bend%5D=1899&sort=year+desc.  Also, there

25  were likely many more occupation taxes, though they have not been
comprehensively indexed as of yet.

26  
27      [8] An Act providing for the levy and collection of an occupation tax . . .,
General Laws of Texas, §XVIII (1907).  See also Brennan Gardner Rivas, "The

28  Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the
Lone Star State, 1836-1930, (PhD diss., Texas Christian University, 2019) 161-162.

1    an excessive tax, which would be prohibitory thereof, but could go further and

2    absolutely prohibit any one from engaging therein."[9]

3         15.    Arkansas and Tennessee, for example, adopted a two-pronged

4    approach that displayed attributes of both public carry laws as well as dealer

5    regulations.  The first prong was to prohibit the public carrying of pistols.[10]  Courts

6    in both states struck down early versions of the laws because they applied to all

7    revolvers, including those being issued to certain classes of soldiers by the United

8    States military.[11]  But they were quickly amended to exclude "army and navy

9    pistols"—those types or models in use by the US military—when carried openly in

10   the hand.  By exempting these models, Arkansas and Tennessee lawmakers made

11   their gun policies comport with the reigning Second Amendment jurisprudence of

12   their day, which held that militia arms enjoyed special protection from certain

13   forms of regulation.

14        16.    Unlike today, where laws generally prevent the civilian sale of

15   military-grade weapons while carving out protections for self-defense weapons,

16   Americans of the nineteenth century did just the opposite; case law at that time held

17   that a citizen's militia obligation conferred upon certain kinds of firearms,

18   especially muskets and rifles, a protected status under the law as "militia arms,"

19   while those smaller weapons which lent themselves to concealability and were

20   more conducive to interpersonal violence could be prohibited.  This view of arms

21   and their place in society changed in the twentieth century as a result of substantial

22

23

24        [9] *Caswell & Smith v. State*, 148 SW 1159 (Tex. App. 1912).

25        [10] See 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace
26   and Prevent Homicide, ch. 13, § 1; 1874-1875 Acts of Ark., An Act to Prohibit the
     Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1.

27        [11] *Andrews v. State*, 50 Tenn. 165 (1871); *Wilson v. State*, 33 Ark. 557
28   (1878).

1   alterations to the militia system (and the development of the National Guard) as

2   well as the advent of automatic and select-fire weapons for military use.

3       17.   When the Tennessee high court struck down the initial statute, which

4   prohibited the carrying of *all* pistols, lawmakers swiftly wrote a replacement statute

5   that, "it shall not be lawful for any person to publicly carry a dirk, sword cane,

6   Spanish stiletto, belt or pocket pistol, or revolver, other than an army pistol, or such

7   as are commonly carried and used in the United States army, and in no case shall it

8   be lawful for any person to carry such army pistol publicly or privately about his

9   person in any other manner than openly in his hands."[12]  It is worth noting that even

10  the exempted army/navy pistols could not be carried concealed, or even visible

11  within a waistband or hip holster; the only way to carry legally exempted pistols

12  was to hold them in one's hand.  The purpose of this additional phrase was to

13  curtail as much as possible the carrying of these weapons in public spaces so that a

14  person would only do so in the event of a real emergency.  Arkansas's replacement

15  statute was similar to that of Tennessee.[13]  The Tennessee Supreme Court upheld

16  that state's replacement statute against constitutional challenge.[14]  The revised

17  Arkansas statute received no notable challenge.

18

19

20      [12] 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent

21  Homicide, ch. 90, § 1; *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

22      [13] 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent

    Crime, chap. XCVI, § 1-2 ("That any person who shall wear or carry, in any

23  manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a

    cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such

24  pistols as are used in the army or navy of the United States, shall be guilty of a

25  misdemeanor. . . . Any person, excepting such officers or persons on a journey, and

    on his premises, as are mentioned in section one of this act, who shall wear or carry

26  any such pistol as i[s] used in the army or navy of the United States, in any manner

27  except uncovered, and in his hand, shall be guilty of a misdemeanor.").

28      [14] *State v. Wilburn*, 66 Tenn. 57, 61 (1872).

18.     The second prong which these states employed was a prohibition on the sale of certain pistols.  Tennessee prohibited "any person to sell, or offer to sell, or bring into the State for the purpose of selling, giving away, or otherwise disposing of, belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols."[15]  Arkansas followed suit but went even further by prohibiting the sale of pistol cartridges as well.  "Any person who shall sell, barter, or exchange, or otherwise dispose of, or in any manner furnish to any person any dirk or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or any pistol, of any kind of whatever, except as are used in the army or navy of the United States, and known as the navy pistol, or any kind of cartridge for any pistol, or any person who shall keep such arms or cartridges for sale, shall be guilty of a misdemeanor."[16]

19.     Throughout the nineteenth century, Americans voiced their displeasure with the practice of carrying weapons in public spaces.[17]  Condemnations of such behavior and calls for regulations rang out across the country and became increasingly common during the late nineteenth century when economic and technological developments had made them easier to produce and cheaper to purchase.  Arkansas and Tennessee were no exception to this national rule, and commentators there engaged in the same discourse of their counterparts elsewhere.  The "shocks and violent convulsions which have been so fatal to law and order in the South" were well known, as was the fact that "the pistol, the knife, the shotgun

---

[15] 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1; *State v. Burgoyne*, 75 Tenn. 173, 173-74 (1881).

[16] Acts of the General Assembly of Arkansas, No. 96 § 3 (1881).

[17] For example, see Patrick Charles, Armed in America 152 (2018) (noting the Georgia Supreme Court's view that it was "at a loss to follow the line of thought that extends the guarantee to the right to carry pistols, dirks, Bowie-knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day." (quoting *Hill v. State*, 53 Ga. 472, 474 (1874))).

9

and the bludgeon too often do their bloody work."[18]  After the 1875 statute went into effect in Arkansas, news editors began praising it as "about the best law that has ever been enacted in this state," and one that, had it been in effect since statehood in 1836, "would have saved the lives of thousands of good men who have fallen victim to the vice of carrying deadly weapons, or from the results and natural consequences thereof."[19]  Some judges in Tennessee began handing down penalties of a fifty-dollar fine plus sixty days in jail, and "as a result few persons carry deadly weapons in [that] county."[20]  Reports of this rigid enforcement in Tennessee elicited praise among Arkansans, who viewed it as a social benefit that in Tennessee "men who for years converted themselves into walking arsenals discover that they can pursue their ordinary vocations without fear that they may at any moment be called upon to defend their persons against assault."[21]  From their perspective, the distrust of one's fellow community members that went along with habitual gun-toting was a burden of fear that could only be lifted by prohibiting deadly weapons in the public sphere.  Middle-class Americans, white southerners included, held the view that

---

[18] "Crime in the South" *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2.

[19] *Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2.

[20] The practice began with Judge Horrigan of Shelby County, the seat of which is Memphis, Tennessee.  Judge Quarles of Nashville declared his intention to follow suit.  *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4. Judge Allen of Davidson County, Tennessee pledged to "impartially enforce the law" regarding weapons and "declared that 'it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail.  That only ruffians carried pistols and it gave them an unfair advantage over other citizens.'" *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4.

[21] *Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4.

10

carrying deadly weapons was not honorable, and that such behavior should be stopped.[22]

20.    To fully understand these regulations, it is necessary to understand the different kinds of pistols and revolvers available during this time period.  First, at the larger end of the spectrum was the "army pistol" or "holster pistol," which was originally fashioned after the "horse pistols" that had been adopted by mounted units in Europe and the United States.  Such pistols were typically designed to be carried in a saddle mounted holster and could weigh four pounds or more when loaded.  Though the firearm became slightly smaller and more conducive to being worn on the person by officers beginning in the 1870s, they remained the largest gun in Colt's pistol lineup and carried a higher caliber; they were issued in large numbers by the United States Army and Navy during the Civil War and postbellum eras.[23]  The Arkansas and Tennessee restrictions carved out an exception for these weapons, but only when carried openly in the hand.

21.    Second, "belt pistols" were midsized models and would have been worn in a hip holster attached to the belt.  These midsized pistols became popular among civilians and may have been the most common type of revolver in the country around the time of the Civil War.  The Colt navy pistol took on that moniker during the antebellum years when that model featured an engraving of a

---

[22] For an example from Arkansas and Tennessee, see *Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4 (reporting that a Tennessee district judge stated "that only ruffians carried pistols and it gave them an unfair advantage over other citizens,").  See also Mark Anthony Frassetto, "The Myth of Open Carry," *UC Davis Law Review* 55 (June 2022), 2518-2519.

[23] On size, variability, and manufacture of Colt pistols, see Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter that Changed America* (New York: Simon and Schuster, 2021); Martin Rywell, *Colt Guns* 66–67, 84–93 (Harriman, TN: Pioneer Press, 1953); R. L. Wilson, *The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present* 173 (New York: Simon & Schuster, 1979).

11

naval battle.  In the postbellum decades, "army" or "holster" models became smaller and the differences between them and Colt's "navy" pistols lessened[24]; during the period in which these statutes were written—about fifteen years after the Civil War—the "army/navy" description most likely reflected this technological evolution by referring to the larger, heavier, higher caliber pistols with longer barrels that were then issued by the United States military.  The sales bans under discussion here generally included "belt" pistols, so it remains unclear whether and to what extent the Colt's Navy pistol (which was technically a "belt" model) would have received exemption on the basis of its name and/or its use by the military forces.

22.     Finally, the third kind of pistol available was the "pocket pistol." These were substantially smaller than the holster and belt models.  Pocket pistols ranged from single-shot, muzzle-loading derringers with barrels under two inches to revolvers like Colt's "pocket navy" six-shooter with a three-inch barrel.  After the Civil War, military purchases slowed, which led gun manufacturers to pivot toward civilian sales.  They marketed pocket pistols heavily.  For instance, Colt's produced both a "ladies' model" as well as a "house" pistol—though the latter became more widely known as a "Fisk" for its use in the infamous murder of the robber baron Jim Fisk in 1872.[25]  The explosion in production was all the more pronounced by the entry of imitation brands that used lower quality metals with less sophisticated workmanship to sell pocket pistols at much lower prices than the competition.[26]

---

[24] See note 23, above.

[25] For example, see The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) (referring to pocket pistols, including "the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by [Edward] Stokes in the murder of Fisk").

[26] See note 23, above.

1   These cheap revolvers could be had for a few dollars, with used ones selling for

2   even less.[27]

3       23.     It is in this context that the public carry regulations and associated

4   sales bans and prohibitory taxes mentioned above must be understood.  A

5   confluence of technical advancements and social changes resulted in the

6   widespread adoption of new weapons, causing new societal problems that increased

7   levels of interpersonal violence and ratcheted up public fear.  In response, state

8   legislatures enacted regulations targeting the source of that problem.  In addition to

9   other dangerous weapons, Tennessee and Arkansas targeted "pocket pistols"—

10  designed to be concealed from public view and increasingly easy to obtain by those

11  wishing to cause harm, were a target of these laws.  The legislatures of both

12  Tennessee and Arkansas prohibited both the public carrying of these weapons, as

13  well as their sale to the general public.  These regulations remained in force well

14  into the twentieth century.

15      24.     Previous scholarship addressing these statutes has cast them as racially

16  motivated.[28]  These articles did not investigate deeply the primary sources of the

17  time.  My research shows that these accounts have misrepresented the Tennessee

18  and Arkansas statutes, which were enacted as a public safety measure rather than an

19

20      [27] Colt's Army revolvers cost about $20 at the time of the Civil War, but
    subsequent entrants into the market sold small pocket pistols for as little as a couple

21  of dollars.  For example, see digitized Sears and Roebuck catalog (1898), pp. 365-
    367.  Regardless of caliber, the pistols from Colt's ran about $12 to $13 in the

22  catalog but retailed elsewhere for something closer to $18 (see pp. 367).
    Meanwhile, the smaller caliber pocket pistols from other brands could be ordered

23  for as little as $1.40 (see pp. 365).  For the 1898 Sears & Roebuck catalog online,

24  see

25  https://archive.org/details/consumersguideno00sear/page/365/mode/1up?q=pistol.

26      [28] For example, Stefan B. Tahmassebi, "Gun Control and Racism," *George

27  Mason University Civil Rights Law Journal* 2, no. 1 (Summer 1991), 74-75; Robert
    Leider, "Our Non-originalist Right to Bear Arms," *Indiana Law Journal* 89, no. 4,

28  1619-1620.

attempt to disarm Black residents.  The argument made by other scholars, again based on little more than inference, has been that most white men served in the Civil War or had the means to purchase a "army/navy" pistol, and that the army/navy exception was tantamount to a whites-only exception to this policy.[29] Civil War soldiers on both sides of the conflict were unlikely to be issued a revolver unless they were officers, cavalry, or artillery; a great number of enlisted soldiers who possessed revolvers during the conflict had purchased them on their own, and at times their carrying of the weapons caused sufficient trouble within the ranks that officers confiscated them.  Others discarded heavy and seemingly unnecessary pistols on long, grueling marches.[30]  Confederate service did not automatically correlate to white possession of an exempted pistol.

25.     Rather than impute racism to these laws simply because of their occurrence during Reconstruction, we should embed them within their appropriate political and cultural context.  The fact that Tennessee's legislature amended the public carry law so swiftly to add the army/navy exception could indicate to the casual observer that white residents were dissatisfied with the original statute; however, when the statutes and their constitutional challenges are placed in chronological order and interpreted in light of the other primary sources of the era (particularly newspapers and the widespread social contempt for publicly carrying deadly weapons), it is clear that racism was not behind the army/navy exemption.

---

[29] Tahmassebi, "Gun Control and Racism," 74-75.

[30] On pistols and other arms issued during the Civil War, see Katelyn Brown, "Armed to the Teeth," *Military Images* 33, no. 4 (Autumn 2015), 32-36; Joseph G. Bilby, *Civil War Firearms: Their Historical Background and Tactical Use* (Conshohcken, PA: Combined Books, 1996); Graham Smith, *Civil War Weapons* (New York: Chartwell, 2011); Jack Coggins, *Arms and Equipment of the Civil War* (New York: Fairfax Press, 1982); *Arms and Equipment of the Union* (Alexandria, VA: Time-Life Books, 1999); Ken Bauman, *Arming the Suckers: A Compilation of Illinois Civil War Weapons* (Dayton, OH: Morningside House, 1989).

Instead, it represented the best effort of Tennessee lawmakers to emulate the kind of comprehensive public carry prohibition that was in force in Texas[31] while also respecting the parameters set forth by the state supreme court in *Andrews v. State*. The amendatory statute did not simply provide an exemption for army/navy pistols—it specified that even those pistols could not be carried in public unless openly in the hand.  Just like today, it was not common at that time to see a person walking along a public street carrying a gun in hand; such behavior would have been understood as an emergency requiring the intervention of local officers of the law.

### III.   THE RECENT EMERGENCE OF LARGE-CAPACITY MAGAZINES

26.   As explained below, the modern large-capacity magazine as we know it today was not widely distributed in the United States until quite recently. The semi-automatic weapons with which twenty-first century Americans associate large capacity magazines were either not in existence or not manufactured in large numbers until the twentieth century. Nineteenth-century magazines capable of storing more than ten rounds of ammunition at a time were not usually detachable (which made for slower reloading time) or were designed for large, military-grade firearms that were not capable of being used or carried for personal use.

_____

[31] Texas featured a comprehensive deadly weapon law that prohibited the open or concealed carrying of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense."  There were a few exceptions, such as for travelers, peace officers, and anyone who "has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing."  *General Laws of Texas*, ch. XXXIV, §1 (1871).  The original statutes in Arkansas and Tennessee indicate legislative intent to enact a comprehensive law like this one, but the decisions from their state courts in *Wilson* and *Andrews*, respectively, prevented them from doing so; in Texas, on the other hand, cases *English* and *Duke* upheld the constitutionality of the deadly weapon law without requiring an army/navy exception.  See *English v. State of Texas*, 35 Tex. 473 (1872); *State of Texas v. Duke* 42 Tex. 455 (1874).

15

27.     In the decades following the Civil War, lever-action rifles became commercially available to American consumers for the first time. Lever-action rifles permitted the user to fire multiple shots without reloading. The lever-action design usually featured a fixed, tubular magazine that was loaded through a loading port on the side of the firearm. While there are a handful of examples of these fixed tubular magazines capable of holding more than ten cartridges during that time period, such as the famous Winchester Model 1873 Repeating Rifle,[32] between each shot the user had to engage the lever action to discharge the spent shell and load a fresh cartridge from the magazine into the chamber. And when all rounds had been expended, the user had to individually load cartridges back into the magazine by inserting them through the loading port.

28.     In fact, developments in cartridge design in the second half of the 19th Century led to a shift toward smaller, not larger, magazine capacities, such that the Winchester 1883 Hotchkiss Repeater was chambered for the newer 45-70 US Government cartridge and featured a magazine in the butt stock that held 6 rounds.[33] And the Winchester Model 1894 Repeating Rifle was chambered for various center-fire cartridges and its maximum magazine capacity was only 8 rounds.[34]

29.     Around the turn of the twentieth century, John M. Browning began working on the design of semi-automatic firearms, which functioned through a "blowback" method in which "The recoil from the exploded cartridge ejects the empty shell, cocks the hammer, and throws a fresh cartridge into the chamber."[35] This design was sometimes referred to as "automatic," though its function aligns

---

[32] Thomas Henshaw, *The History of Winchester Firearms, 1866-1992* (Clinton, NJ: Winchester Press, 1993), 13-19.

[33] Henshaw, *Winchester Firearms*, 23-24. On cartridges, see Frank C. Barnes and Stan Skinner, *Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges* 11th ed. (Iola, WI: Gun Digest Books, 2009), 96-97.

[34] Henshaw, *Winchester Firearms*, 41.

[35] "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

16

1  with our current definition of "semi-automatic"; it was also referred to as "auto-

2  loading" or "self-loading." Winchester released its Model 1903 Automatic Rifle,

3  which employed this method, and featured a 10-round, fixed, tubular magazine for

4  .22 caliber cartridges. According to its product description, "…all that is necessary

5  to do to shoot the ten cartridges that the magazine holds is to pull the trigger for

6  each shot."[36] Winchester did not release a semi-automatic sporting rifle featuring a

7  detachable magazine until its Model 1905 Self-Loading Rifle, and that detachable

8  box magazine held only five cartridges in a single column.[37] The subsequent semi-

9  automatic model, called the Model 1907 Self-Loading Rifle, featured a 5-round

10  detachable box magazine.

11      30.    A major rival of Winchester was Marlin Firearms, a company that

12  became a highly popular producer of lever-action rifles. Marlin did not begin

13  manufacturing semi-automatic rifles until 1931 when the company (under new

14  leadership) released the 22 Caliber Autoloading Rifle, also called the Model 50 /

15  50E.[38] It came with a six-round detachable clip magazine.[39]

16      31.    As the twentieth century wore on, both Marlin and Winchester

17  featured semi-automatic rifles as a part of their regular lineup of sporting firearms,

18  though lever-action, pump action, and bolt action designs tended to be more

19  popular.[40] The magazine capacities of their semi-automatic models with detachable

20  magazines remained at or below 10 rounds with very few exceptions. In 1948,

21  Marlin released the Model 89C chambered for .22 caliber long rifle rounds, which

22  was sold with a standard 7-shot clip magazine. Beginning in 1953, new models

23     [36] "Model 1903," Catalogue No. 71 (June 1904), 60. Winchester Repeating
Arms Company Catalogs 1904-1908, Rare Books, McCracken Research Library,
Buffalo Bill Center of the West, Cody, Wyoming.

     [37] Henshaw, *Winchester Firearms*, 61-61.

25     [38] William S. Brophy, *Marlin Firearms: A History of the Guns and the
Company that Made Them* (Harrisburg, PA: Stackpole Books, 1989), 300-301.

26     [39] Brophy, *Marlin Firearms*, 301.

27     [40] See the catalogs of Marlin Firearms and Winchester Repeating Arms
Company for the 1950s through the 1990s. Winchester Catalogs, Rare Books; and
Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research

28  Library, Buffalo Bill Center of the West, Cody, Wyoming.

17

1     were sold with two 5-shot clip magazines. In 1957, that changed once again when

2     standard magazines for new manufactures was a 12-shot clip magazine.[41] The last

3     year in which Marlin featured the Model 89C was 1961; for the next two decades or

4     more, the company's standard magazine sizes tended to max out at 7 rounds.[42]

5          32.     Even though Winchester produced semi-automatic rifles before

6     Marlin, the company did not sell rifles with a standard clip magazine capacity over

7     10 rounds to civilians through at least 1996.[43] For a brief period in the 1970s (1974-

8     1978), the company produced the Model 490 Repeating (Autoloading) 22 Rim Fire

9     Rifle. These firearms came with a standard 5-round clip magazine and were shown

10     with that magazine in Winchester catalogs; customers who wish to purchase

11     magazines holding 10 or 15 rounds had to do so as accessories.[44]

12          33.     Records relating to the production and advertisement of rifles

13     manufactured by two of the most popular brands shows that even though detachable

14     clip/box magazines have been in existence since the early twentieth century, they

15     were not generally sold with a capacity of more than 10 rounds until recently. In

16     fact, these records show that during most of the twentieth century standard clip/box

17     magazine sizes usually ranged from 3 to 7 rounds.[45]

18     **IV. CONCLUSIONS**

19          34.     An important lesson that the study of history shows us is that

20     nineteenth-century Americans confronted a gun violence problem, and their

21

22     [41] Brophy, *Marlin Firearms*, 306-307.

23     [42] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

24     [43] Marlin Catalogs, Folders 1/13-1/16, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

25     [44] Henshaw, *Winchester Firearms*, 174. Winchester Catalogs 1970-1975,

26     Folder 1/3, MS 162, Winchester and Marlin Catalogs and Literature, McCracken Research Library, Buffalo Bill Center of the West, Cody, Wyoming.

27     [45] See the catalogs of Marlin Firearms and Winchester Repeating Arms Company for the 1950s through the 1990s. Winchester Catalogs, Rare Books; and Winchester and Marlin Catalogs and Literature, MS 162, McCracken Research

28     Library, Buffalo Bill Center of the West, Cody, Wyoming.

18

1  solution was the enactment of state and local regulations that might limit the

2  number of pistols in circulation. These took the form of public carry laws,

3  prohibitive taxes, and other sales restrictions.  These states targeted pocket pistols

4  and other types of weapons that, due to their concealability, were associated with

5  forms of criminal activity that were threatening the public at that time.

6      35.    These restrictions on pocket pistols provide historical precedent for

7  California's restrictions on large-capacity magazines. As explained above, large-

8  capacity magazines as we understand them today only became commercially

9  available for the first time in the later parts of the twentieth and earlier parts of the

10  twenty-first.  Thus, like with pocket pistols in the latter half of the nineteenth

11  century, these large-capacity magazines are associated with new social problems

12  and criminal use (*e.g.,* the rise of high-casualty mass shootings).  California's

13  regulation, being a prohibition on the sale, transfer, and manufacture of such

14  magazines, is thus quite similar to the sale restrictions in Tennessee and Arkansas.

15      36.    As stated above, and as with any historical research project, my work

16  in this area is still ongoing.  There is significant research and analysis to be done on

17  the drafting and enforcement of these statutes, as well as the attitudes of residents

18  toward them as time wore on.  Very little research that is based upon primary

19  sources, other than the review of case law and historical statutes, has yet been

20  conducted.  Still, this brief account of pistol regulations from late-nineteenth

21  century Tennessee and Arkansas demonstrates an important theme in the history of

22  firearms and weapons regulations in the United States: that states enacted

23  restrictions upon certain types of weapons, like pocket pistols, that were uniquely

24  adaptable to and associated with certain types of crime that threatened public safety

25  at the time, while also ensuring that the right of individuals to arm themselves for

26  self-defense in an emergency or upon their private property was not destroyed.

27

28

1       I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3       Executed on November 8, 2022, at Fort Worth, TX.

*Brennan Rivas*
_____
Brennan Rivas

Declaration of Brennan Rivas
(17-cv-1017-BEN-JLB)

## INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of Brennan Gardner Rivas | 1-4 |

# EXHIBIT A

# Brennan Gardner Rivas
Curriculum Vitae · Oct 2022

## Employment
Lloyd Lewis Fellow in American History, The Newberry Library, 2021-2022
Bill & Rita Clements Fellow for the Study of Southwestern America, Southern Methodist
     University, Clements Center for Southwest Studies, 2020-2021
Lecturer in American History (full-time), Texas Christian University, Department of History,
     2019-2020

## Education
Ph.D., History, Texas Christian University, 2019
     Thesis: "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, & Knuckles in
     the Lone Star State, 1836-1930"
     Advisor: Gregg Cantrell
M.A., History, Texas Christian University, 2013
     Thesis: "Texas Antitrust Law: Formulation and Enforcement, 1889-1903"
B.A. with Honors, History, Oklahoma State University, 2010

## Publications
*Refereed Journal Articles*
"An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-
1900," *Southwestern Historical Quarterly* 121 (Jan 2018): 284-303.

*Law Articles*
"Strange Bedfellows: Racism and Gun Rights in American History and Current Scholarship"
in Joseph Blocher and Jake Charles, eds., *New Histories of Gun Rights and Regulation: Essays
     on the Place of Guns in American Law and Society* (New York: Oxford University Press,
     forthcoming)
"Enforcement of Public Carry Restrictions: Texas as a Case Study," *U.C. Davis Law Review*
     (May 2022)
"The Problem with Assumptions: Reassessing the Historical Gun Policies of Arkansas and
     Tennessee," *Second Thoughts*, Duke Center for Firearms Law (Jan 2022)

*Short Pieces*
"Charles F. Cooley," in *Wanted in America: Posters Collected by the Fort Worth Police
     Department, 1898-1903*, edited by LeAnna Schooley and Tom Kellam. Fort Worth: TCU
     Press, 2019.
Review of David R. Berman, *George Hunt: Arizona's Crusading Seven-Term Governor*, in
     *Southwestern Historical Quarterly* 114, no. 3 (January 2016): 327-329.

## Public History
"In the Past, Americans Confronted Gun Violence by Taking Action," *Washington Post: Made
     by History Blog* (Jun 2022)

1

~ Op-ed showcasing open-mindedness of 19th century Americans about experimenting with
new gun control measures
"The Origin of Public Carry Laws in Texas," *Texas Gun Sense Blog* (Feb 2021)
"Texas Gun Laws," Online Primary Source Collection, hosted by Omeka
~ Online collection featuring primary sources from my research; feature exhibit titled
"Crafting a Public Carry Law"
"The Deadly Weapon Laws of Texas," Preserving Our Past: Community History Workshop,
Center for Texas Studies at TCU (Nov 2020)
~ Public lecture featuring special insights for genealogical researchers
"The Deadly Weapon Laws of Texas," Graduate/Undergraduate Public History Seminar,
Tarleton State University (Sept 2020)
~ Research presentation focusing on interpretation of county court records
"When Texas Was the National Leader in Gun Control: How the Land of Gunslinger Mythology
Regulated Weapons to Reduce Violence," *Washington Post: Made by History Blog* (Sept 2019)
~ Op-ed highlighting long history of weapon regulation in Texas

## Fellowships and Awards
Lloyd Lewis Fellowship in American History, 2021-2022
~ Awarded by the Newberry Library to scholars using its collection to research topics in
American history
Bill & Rita Clements Fellowship for the Study of Southwestern America, 2020-2021
~ Awarded by the SMU Clements Center for Southwest Studies to two scholars of Texas,
the Southwest, or the U.S.-Mexico borderlands who are developing first books
The Benjamin W. Schmidt Memorial Scholarship, 2018-2019
~ Awarded by the TCU Department of History to a PhD candidate who shows exceptional
professional promise; highest departmental prize for graduate students
Texas Christian University Department of History, Shinko and Thomas McDonald Research
Prize in Texas History, 2019, 2017
~ Awarded by the TCU Department of History to a graduate student with the best research
on antebellum Texas history

## Works in Progress
*The Revolver Must Go: The Rise and Fall of a Gun Control Movement in Texas*
Aim: Scholarly monograph exploring the rise of a gun control movement in nineteenth-century
Texas and the regulatory strategies which it embraced. Widespread acceptance of strict,
ambitious gun control laws in the "Wild West" belies current assumptions about Texas and
challenges the reigning interpretation of the Second Amendment as a guarantor of expansive
gun rights
Status: Editing manuscript

"The Texas Anti-Trust Movement: Antimonopoly, Populism, and Reform in the Long
Progressive Era"
Aim: Scholarly article interpreting Texas antitrust policy an example of innovative reform in the
Great Plains and trans-Mississippi West
Status: Research and writing in progress

2

## University Teaching Experience

*Instructor of Record*

Lecturer in American History, Texas Christian University                    2019-2020
　　　"American History to 1877: Social Movements & the Politics of Slavery" (HIST 10603)
　　　"American History since 1877: The Quest for Equality" (HIST 10613)
　　　"History of Texas: A Transnational Look at the American Southwest" (HIST 40743)

*Graduate Student Instructor*

Teaching Assistant, Texas Christian University                    2017-2018
　　　American History to 1877 (HIST 10603)
　　　American History since 1877 (HIST 10613)

*Teaching Interests*

American History, Legal History, Southwestern Borderlands, Civil War Era, American West, Gilded Age & Progressive Era, Women's History

## Conference Presentations & Invited Talks

"Reassessing Assumptions about Historical Arkansas and Tennessee Handgun Regulations," Race and Guns Roundtable, Duke Center for Firearms Law, Durham, North Carolina, November 2021

"Enforcement of Public Carry Restrictions: Texas as a Case Study," The Second Amendment at the Supreme Court: 700 Years of History and the Modern Effects of Guns in Public, Davis, California, October 2021

"Race & Guns," Newberry Library Colloquium, Chicago, Illinois, October 2021

"Unlawful Carrying: Enforcing the Pistol Law in Texas, 1870-1920," Texas State Historical Association Annual Meeting, Corpus Christi, Texas, February 2019

"Regulating Deadly Weapons in Nineteenth-Century Texas," Invited Lecturer, Los Bexareños Hispanic Genealogical and Historical Conference, San Antonio, Texas, September 2018

"Impregnable Citadels of Capital: American Monopolies in the British Radical Press," Southern Conference on British Studies Annual Meeting, St. Pete Beach, Florida, November 2016

"Dating Violence in Texas: Why the State Family Code Obstructs Accurate Reporting about Sexual Assault," TCU Women & Gender Studies Research Symposium, 2015

## Service

Invited Guest, "How to Make the Most of Your Time in Graduate School," Dept. of History Orientation Day, 2020
　　　~ Advise incoming graduate students on strategies for success in the PhD program, emphasizing importance of intellectual development

Panelist, "Everything You Wanted to Know about TCU but Were Too Afraid to Ask," Dept. of History Orientation Day, 2016
　　　~ Provide honest and confidential information to prospective graduate students

Graduate Student Mentor, 2015
　　　~ Informal departmental program designed to ease the transition for incoming graduate students

3

**Professional Memberships**
Society for Historians of the Gilded Age and Progressive Era
Texas State Historical Association
Southern Historical Association
American Historical Association

**Languages**
Spanish (Proficient)
Latin (Proficient)

4

# EXHIBIT 12

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA 90013-1230
     Telephone: (213) 269-6177
6   Fax: (916) 731-2144
    E-mail: Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                       CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**      Case No. 17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**
    **CHRISTOPHER WADDELL, and**     **DECLARATION OF RANDOLPH**
15  **CALIFORNIA RIFLE & PISTOL**    **ROTH**
    **ASSOCIATION, INC., a California**
16  **corporation,**                Courtroom:   5A
                                     Judge:       Hon. Roger T. Benitez
17                      Plaintiffs,  Action Filed: May 17, 2017

18           v.

19
    **ROB BONTA, in his official capacity as**
20  **Attorney General of the State of**
    **California; and DOES 1-10,**
21
                        Defendants.
22

23

24

25

26

27

28

---

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

**DECLARATION OF RANDOLPH ROTH**

I, Randolph Roth, declare under penalty of perjury that the following is true and correct:

1.      I am an Arts and Sciences Distinguished Professor of History and Sociology at The Ohio State University.  I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently as to those facts.

2.      I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $250 per hour.

**BACKGROUND AND QUALIFICATIONS**

3.      I received a B.A. in History with Honors and Distinction in 1973 from Stanford University, where I received the James Birdsall Weter prize for the outstanding honors thesis in History. I received a Ph.D. in History in 1981 from Yale University, where I received the Theron Rockwell Field prize for the outstanding dissertation in the Humanities and the George Washington Eggleston prize for the outstanding dissertation in American history.  I have taught courses in history, the social sciences, and statistics since 1978, with a focus on criminology and the history of crime.  A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

4.      I am the author of *American Homicide* (The Belknap Press of the Harvard University Press, 2009), which received the 2011 Michael J. Hindelang Award from the American Society of Criminology awarded annually for the book published over the three previous years that "makes the most outstanding contribution to research in criminology over the previous three years,"[1] and the 2010 Allan Sharlin Memorial Prize from the Social Science History Association for

---

[1] See American Society of Criminology, Michel J. Hindelang outstanding Book Award Recipients, https://asc41.com/about-asc/awards/michael-j-hindelang-outstanding-book-award-recipients/.

1    outstanding books in social science history.[2]  *American Homicide* was also named

2    one of the Outstanding Academic Books of 2010 by *Choice*, and the outstanding

3    book of 2009 by *reason.com*.  The book is an interregional, internationally

4    comparative study of homicide in the United States from colonial times to the

5    present.  I am a Fellow of the American Association for the Advancement of

6    Science, and I have served as a member of the National Academy of Sciences

7    Roundtable on Crime Trends, 2013-2016, and as a member of the Editorial Board

8    of the *American Historical Review*, the most influential journal in the discipline.

9        5.    I am the principal investigator on the National Homicide Data

10    Improvement Project, a project funded by the National Science Foundation (SES-

11    1228406, https://www.nsf.gov/awardsearch/showAward?AWD_ID=1228406) and

12    the Harry Frank Guggenheim Foundation to improve the quality of homicide data

13    in the United States from 1959 to the present. The pilot project on Ohio has drawn

14    on a wide range of sources in its effort to create a comprehensive database on

15    homicides (including narratives of each incident) based on the mortality statistics of

16    the Ohio Department of Health, the confidential compressed mortality files of the

17    National Center for Health Statistics, the F.B.I.'s Supplementary Homicide Reports,

18    death certificates, coroner's reports, the homicide case files of Cincinnati,

19    Cleveland, and Columbus, obituaries, and newspaper accounts.

20        6.    I have published numerous essays on the history of violence and the

21    use of firearms in the United States, including a) "Guns, Gun Culture, and

22    Homicide: The Relationship between Firearms, the Uses of Firearms, and

23    Interpersonal Violence in Early America," *William and Mary Quarterly* (2002) 59:

24    223-240 (https://www.jstor.org/stable/3491655#metadata_info_tab_contents); b)

25    "Counting Guns: What Social Science Historians Know and Could Learn about

26

27          —————————————

         [2] See Social Science History Association, Allan Sharlin Memorial Book

28    Award, https://ssha.org/awards/sharlin_award/.

1   Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social*

2   *Science History* (2002) 26: 699-708

3   (https://www.jstor.org/stable/40267796#metadata_info_tab_contents); c) "Why

4   Guns Are and Aren't the Problem: The Relationship between Guns and Homicide

5   in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining,

6   eds., *A Right to Bear Arms? The Contested Role of History in Contemporary*

7   *Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution

8   Scholarly Press, 2019); and d) "The Opioid Epidemic and Homicide in the United

9   States," co-authored with Richard Rosenfeld and Joel Wallman, in the *Journal of*

10  *Research in Crime and Delinquency* (2021)

11  (https://www.researchgate.net/publication/348513393_The_Opioid_Epidemic_and_

12  Homicide_in_the_United_States).

13      7.      I am also co-founder and co-director of the Historical Violence

14  Database.  The web address for the Historical Violence Database is:

15  http://cjrc.osu.edu/research/interdisciplinary/hvd. The historical data on which this

16  declaration draws are available through the Historical Violence Database. The

17  Historical Violence Database is a collaborative project by scholars in the United

18  States, Canada, and Europe to gather data on the history of violent crime and

19  violent death (homicides, suicides, accidents, and casualties of war) from medieval

20  times to the present.  The project is described in Randolph Roth et al., "The

21  Historical Violence Database: A Collaborative Research Project on the History of

22  Violent Crime and Violent Death." *Historical Methods* (2008) 41: 81-98

23  (https://www.tandfonline.com/doi/pdf/10.3200/HMTS.41.2.81-

24  98?casa_token=PfjkfMsciOwAAAAA:1HrNKToUGfQT4T-

25  L4wqloRc2DFsM4eRmKEc346vchboaSh-X29CkEdqIe8bMoZjBNdk7yNh_aAU).

26  The only way to obtain reliable historical homicide estimates is to review every

27  scrap of paper on criminal matters in every courthouse (indictments, docket books,

28  case files, and judicial proceedings), every jail roll and coroner's report, every diary

1   and memoir, every article in every issue of a number of local newspapers, every

2   entry in the vital records, and every local history based on lost sources, local

3   tradition, or oral testimony. That is why it takes months to study a single rural

4   county, and years to study a single city.[3]

5       8.    I have provided expert witness testimony in *Miller v. Bonta*, No. 3:19-

6   cv-01537-BEN-JLB (S.D. Cal.).

7       9.    My work on data collection and my research for *American Homicide*,

8   together with the research I have conducted for related essays, has helped me gain

9   expertise on the causes of homicide and mass violence, and on the role technology

10  has played in changing the nature and incidence of homicide and mass violence. I

11  hasten to add that the insights that my colleagues and I have gained as social

12  science historians into the causes of violence and the history of violence in the

13  

14  [3] It is also essential, in the opinion of historians and historical social scientists
    involved in the Historical Violence Database, to use capture-recapture mathematics,

15  when multiple sources are available, to estimate the number of homicides where
    gaps or omissions exist in the historical record. The method estimates the

16  percentage of the likely number of homicides that appear in the surviving records
    by looking at the degree to which homicides reported in the surviving legal sources

17  overlap with homicides reported in the surviving non-legal sources (newspapers,
    vital records, diaries, etc.). A greater degree of overlap means a higher percentage

18  in the surviving records and a tighter confidence interval. A lesser degree of
    overlap, which typically occurs on contested frontiers and during civil wars and

19  revolutions, means a lower percentage and a wider confidence interval. See

20  Randolph Roth, "American Homicide Supplemental Volume: Homicide Estimates"
    (2009) (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Homicide-

21  Estimates.pdf); Roth, "Child Murder in New England," *Social Science History*

22  (2001) 25: 101-147
    (https://www.jstor.org/stable/1171584#metadata_info_tab_contents); Roth and

23  James M. Denham, "Homicide in Florida, 1821-1861: A Quantitative Analysis,"

24  *Florida Historical Quarterly* 86 (2007): 216-239; and Douglas L. Eckberg, "Stalking

25  the Elusive Homicide: A Capture-Recapture Approach to the Estimation of Post-
    Reconstruction South Carolina Killings." *Social Science History* 25 (2001): 67-91

26  (https://www.jstor.org/stable/1171582#metadata_info_tab_contents).

27  

28

1   United States stem from our tireless commitment to empiricism. Our goal is to

2   gather accurate data on the character and incidence of violent crimes and to follow

3   the evidence wherever it leads, even when it forces us to accept the fact that a

4   hypothesis we thought might be true proved false. As my colleagues and I are fond

5   of saying in the Criminal Justice Network of the Social Science History

6   Association, the goal is not to be right, but to get it right. That is the only way to

7   design effective, pragmatic, nonideological laws and public policies that can help us

8   address our nation's problem of violence.

9                                          **OPINIONS**

10  **I.   SUMMARY OF OPINIONS**

11          10.    I have been asked by the California Department of Justice to provide

12  opinions on the history of homicides and mass murders in the United States, with

13  special attention to the role that technologies have played in shaping the character

14  and incidence of homicides and mass murders over time, and the historical

15  restrictions that local and federal authorities have imposed in response to new

16  technologies that they deemed particularly lethal, prone to misuse, and a danger to

17  the public because of the ways in which they reshaped the character and incidence

18  of homicides and mass murders.

19          11.    For the past thirty-five years, I have dedicated my career to

20  understanding why homicide rates rise and fall over time, in hopes of understanding

21  why the United States—which, apart from the slave South, was perhaps the least

22  homicidal society in the Western world in the early nineteenth century—became by

23  far the most homicidal, as it remains today.  I discovered that the key to low

24  homicide rates over the past 450 years has been successful nation-building. High

25  homicide rates among unrelated adults—friends, acquaintances, strangers—

26  coincide with political instability, a loss of trust in government and political leaders,

27  a loss of fellow feeling among citizens, and a lack of faith in the justice of the social

28

1   hierarchy.[4]  As a nation, we are still feeling the aftershocks of our catastrophic

2   failure at nation-building in the mid- and late-nineteenth century, from the political

3   crisis of the late 1840s and 1850s through the Civil War, Reconstruction, and the

4   rise of Jim Crow.

5        12.    Our nation's homicide rate would thus be high today even in the

6   absence of modern technologies that have made firearms far more capable of

7   injuring multiple people over a short span of time than they were in colonial and

8   Revolutionary era.  But the evidence also shows that the availability of guns and

9   changes in firearms technology, especially the emergence of modern breech-

10   loading firearms in the mid-nineteenth century, and of rapid-fire semiautomatic

11   weapons and extended magazines in the late twentieth century, have pushed the

12   homicide rate in United States well beyond what it would otherwise have been.

13        13.    My opinion will address in turn: 1) firearms restrictions on colonists

14   from the end of the seventeenth century to the eve of the Revolution, when

15   homicide rates were low among colonists and firearms were seldom used in

16   homicides among colonists when they did occur; 2) the development during the

17   Founding and Early National periods of laws restricting the use or ownership of

18   concealable weapons in slave and frontier states, where homicide rates among

19   persons of European ancestry soared after the Revolution in large part because of

---

20   [4] See Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or
21   Deter) Homicide," *Homicide Studies* (2012) 16: 196-217
      (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token=dk
22   P_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRl
23   iTesFI_1SDY6tepvZbjwiRWPEom7M), for an introduction to the ways that social
      science historians can measure the feelings and beliefs that lead to successful
24   nation-building.  My research has shown that those measures have gone up and
25   down with homicide rates among unrelated adults in the United States from
      colonial times to the present.  In social science history, as in the non-experimental
26   historical sciences (geology, paleontology, evolutionary biology), correlations that
27   persist across wide stretches of time and space are not random. They reveal deep
      patterns that are causal.
28

1  the increased manufacture and ownership of concealable percussion cap pistols and
2  fighting knives; 3) the spread of restrictions on carrying concealed weapons in
3  every state but Vermont by World War I, as homicide rates rose across the nation,
4  beginning around the time of the Mexican War of 1846-1848 and lasting until
5  World War I—a rise caused in part by the invention of modern revolvers, which
6  were used in a majority of homicides by the late nineteenth century; 4) the
7  difficulty that local and federal officials faced from the colonial era into the early
8  twentieth century in addressing the threat of mass murders, which, because of the
9  limitations of existing technologies, were carried out by large groups of individuals
10  acting in concert, rather than by individuals or small groups; and 5) the spread of
11  restrictions in the twentieth and early twenty-first centuries on new technologies,
12  including rapid-fire firearms and large capacity magazines, that changed the
13  character of mass murder, by enabling individuals or small groups to commit mass
14  murder.

15  **II.  GOVERNMENT REGULATION OF FIREARMS IN RESPONSE TO HOMICIDE TRENDS**

16
17      **A.  Homicide and Firearms in the Colonial Era (1688-1763)**

18      14.     In the eighteenth century, the use and ownership of firearms by Native
19  Americans and African Americans, enslaved and free, were heavily regulated.[5]  But
20  laws restricting the use or ownership of firearms by colonists of European ancestry
21  were rare, for two reasons.  First, homicide rates were low among colonists from
22  the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-
23  1763, thanks to political stability, a surge in patriotic fellow feeling within the
24  British empire, and greater trust in government.[6]  By the late 1750s and early 1760s,
25

26      [5] Clayton E. Cramer, "Colonial Firearms Regulation" (April 6, 2016).
27  Available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2759961.

28      [6] Randolph Roth, *American Homicide* (Cambridge: The Belknap Press of
                                                    (continued…)

the rates at which adult colonists were killed were roughly 5 per 100,000 adults per year in Tidewater Virginia, 3 per 100,000 in Pennsylvania, and 1 per 100,000 in New England.[7]  Violence among colonists was not a pressing problem on the eve of the Revolution.

15.     Second, the impact of firearms on the homicide rate was modest, even though household ownership of firearms was widespread.[8]  Family, household, and intimate partner homicides were rare, and only 10 to 15 percent of those homicides were committed with guns.[9]  And because the homicide rate among unrelated adults was low, the proportion of nondomestic homicides committed with guns was similarly low—never more than 10 to 15 percent.[10]

16.     Firearm use in homicides was generally rare because muzzle-loading firearms had significant limitations as murder weapons in the colonial era.[11]  They

_____

Harvard University Press, 2009), 63, noting that "Fear of Indians and slaves, hatred of the French, enthusiasm for the new colonial and imperial governments established by the Glorious Revolution, and patriotic devotion to England drew colonists together.  The late seventeenth century thus marks the discernible beginning of the centuries-long pattern linking homicide rates in America with political stability, racial, religious, and national solidarity, and faith in government and political leaders."

[7] Roth, *American Homicide*, 61-63, and especially the graphs on 38, 39, and 91.  By way of comparison, the average homicide rate for adults in the United States from 1999 through 2016—an era in which the quality of emergency services and wound care was vastly superior to that in the colonial era—was 7 per 100,000 per year.  See CDC Wonder Compressed Mortality Files, ICD-10 (https://wonder.cdc.gov/cmf-icd10.html, accessed September 8, 2022).

[8] Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116.

[9] Roth, "Why Guns Are and Aren't the Problem," 116.

[10] Ibid., 116-119.

[11] Ibid., 117.

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

1    were lethal and accurate enough at short range, but they were liable to misfire, given

2    the limits of flintlock technology; and with the exception of a few double-barreled

3    pistols, they could not fire multiple shots without reloading.[12]  They could be used

4    effectively to threaten and intimidate, but once they were fired (or misfired), they

5    lost their advantage: they could only be used as clubs in hand-to-hand combat.

6    They had to be reloaded manually to enable the firing of another shot, which was a

7    time-consuming process that required skill and experience.[13]  And more important,

8    muzzle-loading firearms could not be used impulsively unless they were already

9    loaded for some other purpose.[14]  It took at least half a minute (and plenty of elbow

10   room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and

11   shot or ball were at hand.[15]  The user had to pour powder down the barrel, hold it in

12   place with wadding, and drop or ram the shot or ball onto the charge.[16]  The firing

13   mechanism also had to be readied, often with a fresh flint.[17]  And muzzle-loading

14   guns were difficult to keep loaded for any length of time, because black powder

15   absorbed moisture and could corrode the barrel or firing mechanism or make the

16   charge liable to misfire.[18]  The life of a charge could be extended by storing a gun

17   in a warm, dry place, typically over a fireplace, but even there, moisture from

---

[12] Ibid.

[13] Harold L. Peterson, *Arms and Armor in Colonial America, 1526-1783* (New York: Bramhall House, 1956), 155-225; Priya Satia, *Empire of Guns: The Violent Making of the Industrial Revolution* (New York: Penguin Press, 2018), 9-10; and Satia, "Who Had Guns in Eighteenth Century Britain?" in Tucker, Hacker, and Vining, *Firearms and the Common Law*, 41-44.

[14] Roth, "Why Guns Are and Aren't the Problem," 117.

[15] Ibid.

[16] Ibid.

[17] Ibid.

[18] Ibid.

1   boiling pots, drying clothes, or humid weather could do damage.[19]  That is why

2   most owners stored their guns empty, cleaned them regularly, and loaded them

3   anew before every use.[20]

4       17.   The infrequent use of guns in homicides in colonial America reflected

5   these limitations.  Family and household homicides—most of which were caused

6   by abuse or fights between family members that got out of control—were

7   committed almost exclusively with hands and feet or weapons that were close to

8   hand: whips, sticks, hoes, shovels, axes, or knives.[21]  It did not matter whether the

9   type of homicide was rare—like family and intimate homicides—or common, like

10  murders of servants, slaves, or owners committed during the heyday of indentured

11  servitude or the early years of racial slavery.[22]  Guns were not the weapons of

12  choice in homicides that grew out of the tensions of daily life.[23]

13      18.   When colonists anticipated violence or during times of political

14  instability gun use was more common.  When homicide rates were high among

15  unrelated adults in the early and mid-seventeenth century, colonists went armed to

16  political or interpersonal disputes,[24] so the proportion of homicides committed with

17  firearms was at that time forty percent and rose even higher in contested areas on

18  the frontier.[25]  Colonists also armed themselves when they anticipated hostile

19  encounters with Native Americans, so three-fifths of homicides of Native

20  _____

21      [19] Ibid.

22      [20] Ibid.; and Herschel C. Logan, *Cartridges: A Pictorial Digest of Small Arms
23  Ammunition* (New York: Bonanza Books, 1959), 11-40, 180-183.

        [21] Roth, "Why Guns Are and Aren't the Problem," 117.

24      [22] Ibid.

25      [23] Ibid.  Contrary to popular belief, dueling was also rare in colonial America.
26  Roth, *American Homicide*, 45, 158.

27      [24] Roth, "Why Guns Are and Aren't the Problem," 118-119.

28      [25] Ibid., 116-117.

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

Americans by European Americans in New England were committed with firearms.[26]  And slave catchers and posses kept their firearms at the ready, so ninety percent of runaway slaves who were killed in Virginia were shot.[27]  Otherwise, however, colonists seldom went about with loaded guns, except to hunt, control vermin, or muster for militia training.[28]  That is why firearms had a modest impact on homicide rates among colonists.

**B.  The Rise in Violence in the South and on Contested Frontiers during the Early National Period, the Role of New Technologies and Practices, and Regulations on Concealable Weapons (1790s-1840s)**

19.    The Founding Generation was zealous in its defense of the people's rights, and so enshrined them in the Constitution.  At the same time, they recognized that some citizens could be irresponsible or motivated by evil intent and could thus threaten the security of the government and the safety of citizens.[29]  The threats that such citizens posed to public safety could be checked in most instances by ordinary criminal statutes, drawn largely from British common law.  But at

---

[26] Ibid., 118-119 (reporting that "In New England, 57 percent of such homicides were committed with guns between the end of King Phillip's War in 1676 and the end of the eighteenth century").

[27] Ibid., 118 (reporting that "Petitions to the Virginia House of Burgesses for compensation for outlawed slaves who were killed during attempts to capture them indicate that 90 percent were shot").

[28] Ibid., 118-119.

[29] On the fears of the Founders that their republic might collapse because selfish or unscrupulous citizens might misuse their liberties, see Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 65-70, 282-291, 319-328, 413-425, 463-467; Drew R. McCoy, *The Last of the Fathers: James Madison and the Republican Legacy* (New York: Cambridge University Press, 1989), 42-45; and Andrew S. Trees, *The Founding Fathers and the Politics of Character* (Princeton: Princeton University Press, 2003), 6-9, 60-65, 86-104, 113-114.

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

1  times those threats could be checked only by statutes that placed limits on basic

2  rights.[30]

3       20.    The Founders were aware that the rate at which civilians killed each

4  other or were killed by roving bands of Tories or Patriots rose during the

5  Revolution.[31]  And they recognized that more civilians, expecting trouble with

6  _____

7       [30] On the Founders' belief that rights might have to be restricted in certain
instances, see Terri Diane Halperin, *The Alien and Sedition Acts: Testing the*
8  *Constitution* (Baltimore: Johns Hopkins University Press, 2016), 1-8, on restraints
on freedom of speech and the press during the administration of John Adams;
9  Leonard Levy, *Jefferson and Civil Liberties: The Darker Side* (Cambridge: The
Belknap Press of Harvard University Press, 1963), 93-141, on loosening restrictions
10  on searches and seizures during the administration of Thomas Jefferson; and Patrick
J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to*
11  *Concealed Carry* (New York: Prometheus Books, 2018), 70-121, especially 108-
12  109, as well as Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and*
*the Origins of Gun Control in America* (New York: Oxford University Press, 2006),
13  39-70, and Jack N. Rakove, "The Second Amendment: The Highest State of
14  Originalism," in Carl T. Bogus, ed., *The Second Amendment in Law and History:*
*Historians and Constitutional Scholars on the Right to Bear Arms* (New York: The
15  New Press, 2000), 74-116, on the limited scope of the Second Amendment. Jack N.
16  Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution*
17  (New York: Alfred A. Knopf, 1996), 291, notes that "Nearly all the activities that
constituted the realms of life, liberty, property, and religion were subject to
18  regulation by the state; no obvious landmarks marked the boundaries beyond which
19  its authority could not intrude, *if* its actions met the requirements of law." See also
20  Rakove, "The Second Amendment: The Highest State of Originalism," Chicago-
Kent Law Review 76 (2000), 157
21  (https://scholarship.kentlaw.iit.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&arti
22  cle=3289&context=cklawreview): "[At] the time when the Second Amendment was
adopted, it was still possible to conceive of statements of rights in quite different
23  terms, as assertions or confirmations of vital principles, rather than the codification
24  of legally enforceable restrictions or commands."

25       [31] Roth, *American Homicide*, 145-149; Holger Hoock, *Scars of*
26  *Independence: America's Violent Birth* (New York: Broadway Books / Penguin
Random House, 2017), 308-322; Alan Taylor, *Divided Ground: Indians, Settlers,*
27  *and the Northern Borderland of the American Revolution* (New York: Knopf,
2006), 91-102; George C. Daughan, *Revolution on the Hudson: New York City and*
28
(continued…)

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

neighbors, public officials, and partisans, were likely to go about armed during the Revolution, which is why the proportion of homicides of European Americans by unrelated adults rose to 33 percent in Virginia and 46 percent in New England.[32] But the surge in violence ended in New England, the Mid-Atlantic states, and the settled Midwest once the Revolutionary crisis was over.  In those areas homicide rates fell to levels in some instances even lower than those which had prevailed in the early and mid-eighteenth century.  By the 1820s, rates had fallen to 3 per 100,000 adults per year in Cleveland and Philadelphia, to 2 per 100,000 in rural Ohio, and to 0.5 per 100,000 in northern New England.  Only New York City stood out, at 6 per 100,000 adults per year.[33]  And the proportion of domestic and nondomestic homicides committed with firearms was correspondingly low— between 0 and 10 percent—because people once again generally refrained, as they had from the Glorious Revolution through the French and Indian War, from going about armed, except to hunt, control vermin, or serve in the militia.[34]

---

the Hudson River Valley in the American War for Independence (New York: W. W. Norton, 2016), 137-138; John B. Frantz and William Pencak, eds., Beyond Philadelphia: The American Revolution in the Pennsylvania Hinterland (University Park: Pennsylvania State University Press, 1998), 42-43, 141-145, 149-152; Francis S. Fox, Sweet Land of Liberty: the Ordeal of the American Revolution in Northampton County, Pennsylvania (University Park: Pennsylvania State University Press, 2000), 25-27, 32, 64-65, 91-92, 114; and Fox Butterfield, All God's Children: The Bosket Family and the American Tradition of Violence (New York: Vintage, 1996), 3-18.

[32] Roth, "Why Guns Are and Aren't the Problem," 119-120.

[33] Roth, American Homicide, 180, 183-186; and Eric H. Monkkonen, Murder in New York City (Berkeley: University of California Press, 2001), 15-16.

[34] For detailed figures and tables on weapons use in homicides by state, city, or county, see Roth, "American Homicide Supplemental Volume: Weapons," available through the Historical Violence Database, sponsored by the Criminal Justice Research Center at the Ohio State University (https://cjrc.osu.edu/sites/cjrc.osu.edu/files/AHSV-Weapons-10-2009.pdf).  On weapons use in homicides in the North, see Figures 25 through 46.

13

21.     The keys to these low homicide rates and low rates of gun violence in New England, the Mid-Atlantic states, and the settled Midwest were successful nation-building and the degree to which the promise of the democratic revolution was realized.  Political stability returned, as did faith in government and a strong sense of patriotic fellow feeling, as the franchise was extended and political participation increased.[35]  And self-employment—the bedrock of citizenship, self-respect, and respect from others—was widespread.  By 1815, roughly 80 percent of women and men owned their own homes and shops or farms by their mid-thirties; and those who did not were often white-collar professionals who also received respect from their peers.[36]  African Americans still faced discrimination and limits on their basic rights in most Northern states.  But despite these barriers, most African Americans in the North were optimistic, after slavery was abolished in the North, about earning their own living and forming their own churches and voluntary organizations.[37]

22.     That is why there was little interest among public officials in the North in restricting the use of firearms during the Early National period, except in duels. They took a strong stand against dueling in the wake of Alexander Hamilton's

---

[35] Roth, *American Homicide*, 180, 183-186.

[36] Ibid., 180, 183-186.

[37] Ibid., 181-182, 195-196; Leon F. Litwack, *North of Slavery: The Negro in the Free States, 1790-1860* (Chicago: University of Chicago Press, 1961); Joanne Pope Melish, *Disowning Slavery: Gradual Emancipation and "Race" in New England, 1780-1860* (Ithaca: Cornell University Press, 1998); Sean White, *Somewhat More Independent: The End of Slavery in New York City, 1780-1810* (Athens: University of Georgia Press, 1991); and Graham R. Hodges, *Root and Branch: African Americans in New York and East Jersey, 1613-1863* (Chapel Hill: University of North Carolina Press, 1999).

1    death, because of the threat the practice posed for the nation's democratic polity

2    and the lives of public men: editors, attorneys, military officers, and politicians.[38]

3        23.    Laws restricting the everyday use of firearms did appear, however, in

4    the early national period in a number of slave states,[39] where violence among

5    citizens increased after the Revolution to extremely high levels.  Revolutionary

6    ideas and aspirations wreaked havoc on the status hierarchy of the slave South,

7    where homicide rates ranged from 8 to 28 per 100,000 adults per year.[40]  Poor and

8    middle-class whites were increasingly frustrated by their inability to rise in a

9    society that remained class-bound and hierarchical.[41]  Prominent whites were

10   subjected to the rough and tumble of partisan politics and their position in society

11   was threatened by people from lower social positions.[42]  African Americans

12   despaired over the failure of the abolition movement in the South, and whites were

13   more fearful than ever of African American rebellion.[43]  As a result, impatience

14   with restraint and sensitivity to insult were more intense in the slave South, and

15   during this period the region saw a dramatic increase in the number of deadly

16   quarrels, property disputes, duels, and interracial killings.[44]  The violence spread to

17   _____

18       [38] Joanne B. Freeman, *Affairs of Honor: National Politics in the New
     Republic* (New Haven: Yale University Press, 2001); and C. A. Harwell, "The End
19   of the Affair? Anti-Dueling Laws and Social Norms in Antebellum America,"
     *Vanderbilt Law Review* 54 (2001): 1805-1847
20   (https://scholarship.law.vanderbilt.edu/cgi/viewcontent.cgi?article=1884&context=
21   vlr).

22       [39] Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic:
     Dueling, Southern Violence, and Moral Reform* (Westport, Connecticut: Praeger,
23   1999); and Cornell, *Well-Regulated Militia*, 141-144.

24       [40] Roth, *American Homicide*, 180, 199-203.

25       [41] Ibid., 182.

26       [42] Ibid.

27       [43] Ibid.

28       [44] Ibid., 182, 199-203.

1  frontier Florida and Texas, as well as to southern Illinois and Indiana—wherever

2  Southerners settled in the early national period.[45]  During the Early National period,

3  the proportion of homicides committed with firearms went up accordingly, to a

4  third or two-fifths, as Southerners armed themselves in anticipation of trouble, or

5  set out to cause trouble.[46]

6         24.     Citizens and public officials in these states recognized that concealable

7  weapons—pistols, folding knives, dirk knives, and Bowie knives—were used in an

8  alarming proportion of the era's murders and serious assaults.[47]  They were used to

9  ambush both ordinary citizens and political rivals, to bully or intimidate law-

10  abiding citizens, and to seize the advantage in fist fights.  As the Grand Jurors of

11  Jasper County, Georgia, stated in a plea to the state legislature in 1834 for

12  restrictions on concealable weapons,

13        The practice which is common amongst us with the young the middle
14        aged and the aged to arm themselves with Pistols, dirks knives sticks &
      spears under the specious pretence of protecting themselves against
15        insult, when in fact being so armed they frequently insult others with
16        impunity, or if resistance is made the pistol dirk or club is immediately
      resorted to, hence we so often hear of the stabbing shooting & murdering
17        so many of our citizens.[48]

18

19

20

21        [45] Ibid., 162, 180-183, 199-203; Roth and James M. Denham, "Homicide in
22  Florida, 1821-1861," *Florida Historical Quarterly* 86 (2007): 216-239; John Hope
Franklin, *The Militant South, 1800-1861* (Cambridge: Belknap Press of Harvard
23  University Press, 1961); and Bertram Wyatt-Brown, *Southern Honor: Ethics and*
*Behavior in the Old South* (New York: Oxford University Press, 1982).
24
      [46] Roth, "American Homicide Supplemental Volume: Weapons," Figures 51
25  through 57.

26        [47] Roth, *American Homicide*, 218.

27        [48] Ibid., 218-219.  See also the concerns of the Grand Jurors of Wilkes
28  County, Georgia, Superior Court Minutes, July 1839 term.

The justices of the Louisiana Supreme Court echoed these sentiments—"unmanly" men carried concealed weapons to gain "secret advantages" over their adversaries.[49] These concealed weapons laws were notably difficult to enforce, however, and did not address underlying factors that contributed to rising homicide rates. Nevertheless, these laws represent governmental efforts at that time to address the use of new weapons in certain types of crime.

25.   The pistols of the early national period represented a technological advance.  Percussion-lock mechanisms enabled users to extend the life of a charge, because unlike flint-lock mechanisms, they did not use hydroscopic black powder in their priming pans; they used a sealed mercury-fulminate cap as a primer and seated it tightly on a small nipple (with an inner diameter the size of a medium sewing needle) at the rear of the firing chamber, which restricted the flow of air and moisture to the chamber.  Percussion cap pistols, which replaced flint-lock pistols in domestic markets by the mid-1820s, could thus be kept loaded and carried around for longer periods without risk of corrosion.[50]  The new types of knives available in this era also represented technological advances over ordinary knives because they were designed expressly for fighting.  Dirks and Bowie knives had longer blades than ordinary knives, crossguards to protect the combatants' hands, and clip points to make it easier to cut or stab opponents.[51]

26.   The violence in the slave South and its borderlands, and the technological advances that exacerbated it, led to the first prohibitions against carrying certain concealable weapons, which appeared in Kentucky, Louisiana,

_____

[49] Roth, *American Homicide*, 219.

[50] Roth, "Why Guns Are and Aren't the Problem," 117.

[51] Harold L. Peterson, *American Knives: The First History and Collector's Guide* (New York: Scribner, 1958), 25-70; and Peterson, *Daggers and Fighting Knives in the Western World, from the Stone Age till 1900* (New York: Walker, 1968), 67-80.

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

1   Indiana, Arkansas, Georgia, and Virginia between 1813 and 1838.  These laws

2   differed from earlier laws that restricted access to arms by Native Americans or by

3   free or enslaved African Americans, because they applied broadly to *everyone* but

4   also applied more *narrowly* to certain types of weapons and to certain types of

5   conduct.  Georgia's 1837 law "against the unwarrantable and too prevalent use of

6   deadly weapons" was the most restrictive.  It made it unlawful for merchants

7
8      and any other person or persons whatsoever, to sell, or offer to sell, or to
       keep, or have about their person or elsewhere . . . Bowie, or any other
9      kind of knives, manufactured or sold for the purpose of wearing, or
       carrying the same as arms of offence or defence, pistols, dirks, sword
10     canes, spears, &c.

11  The sole exceptions were horseman's pistols—large weapons that were difficult to

12  conceal and were favored by travelers.  But the laws in the other five states were

13  also strict: they forbid the carrying of concealable weapons in all circumstances.

14  Indiana made an exemption for travelers.[52]

15      27.    Thus, during the lifetimes of Jefferson, Adams, Marshall, and

16  Madison, the Founding Generation passed laws in a number of states that restricted

17  the use or ownership of certain types of weapons after it became obvious that those

18  weapons, including certain fighting knives and percussion-cap pistols, were being

19

20

21

22      [52] Cramer, *Concealed Weapons Laws*, especially 143-152, for the texts of
    those laws.  Alabama and Tennessee prohibited the concealed carrying of fighting
23  knives, but not pistols.  See also the Duke Center for Firearms Law, Repository of
    Historical Gun Laws (https://firearmslaw.duke.edu/search-
24  results/?_sft_subjects=dangerous-or-unusual-weapons, accessed September 9,
    2022).  Note that the Georgia Supreme Court, in *Nunn v. State*, 1 Ga. 243 (1846),
25  held that prohibiting the concealed carry of certain weapons was valid, but that the
    state could not also prohibit open carry, which would destroy the right to bear arms.
26  That decision put Georgia in line with the five other states that had prohibited the
27  carrying of concealable firearms.

28

1   used in crime by people who carried them concealed on their persons and were thus

2   contributing to rising crime rates.[53]

### C. Homicide, Concealable Weapons, and Concealable Weapons Regulations from the Mexican War through the Early Twentieth Century (1846-1920s)

28.     By the early twentieth century, every state except Vermont either

banned concealed firearms or placed severe restrictions on their possession.[54]  They

did so in response to two developments: the nationwide surge in homicide rates,

from the North and South to the Trans-Mississippi West; and the invention of new

firearms, especially the revolver, which enabled the firing of multiple rounds in

succession without reloading and made the homicide problem worse.  Between the

mid-nineteenth and the early twentieth century homicide rates fell in nearly every

Western nation.[55]  But in the late 1840s and 1850s those rates exploded across the

---

[53] Cramer, *Concealed Weapons Laws*, 69-96; Cramer, *For the Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms* (Westport, Connecticut: Praeger Publishers, 1994); Don B. Kates, Jr., "Toward a History of Handgun Prohibition in the United States," in Cates, ed., *Restricting Handguns: The Liberal Skeptics Speak Out* (Croton-on-Hudson, New York: North River Press, 1979), 7-30; and Philip D. Jordan, *Frontier Law and Order—10 Essays* (Lincoln: University of Nebraska Press, 1970), 1-22. Thomas Jefferson and John Adams died on July 4, 1826, John Marshall on July 6, 1835, and James Madison on July 28, 1836.  On the history of firearms regulations that pertained to African Americans, see Robert J. Cottrol and Raymond T. Diamond, "The Second Amendment: Toward an Afro-Americanist Reconsideration," *Georgetown Law Journal* 80 (1991): 309-361 (https://digitalcommons.law.lsu.edu/cgi/viewcontent.cgi?referer=&httpsredir=1&article=1283&context=faculty_scholarship); Cottrol and Diamond, "Public Safety and the Right to Bear Arms" in David J. Bodenhamer and James W. Ely, Jr., eds., *The Bill of Rights in Modern America*, revised and expanded (Bloomington: Indiana University Press, 2008), 88-107; and Cramer, *For the Defense of Themselves and the State*, 74, 83-85, 97-140.

[54] Kates, "Toward a History of Handgun Prohibition," 7-30; and Jordan, *Frontier Law and Order*, 17-22.

[55] Roth, *American Homicide*, 297-300.

19

United States and spiked even higher during the Civil War and Reconstruction, not only in the South and the Southwest, where rates had already risen in the early national period, but in the North.  Americans, especially men, were more willing to kill friends, acquaintances, and strangers.  And so, the United States became—and remains today—by far the most murderous affluent society in the world.[56]

29.     The increase occurred because America's heretofore largely successful effort at nation-building failed catastrophically at mid-century.[57]  As the country struggled through the wrenching and divisive changes of the mid-nineteenth century—the crises over slavery and immigration, the decline in self-employment, and rise of industrialized cities—the patriotic faith in government that most Americans felt so strongly after the Revolution was undermined by anger and distrust.[58]  Disillusioned by the course the nation was taking, people felt increasingly alienated from both their government and their neighbors.[59]  They were losing the sense that they were participating in a great adventure with their fellow Americans.[60]  Instead, they were competing in a cutthroat economy and a combative political system against millions of strangers whose interests and values were antithetical to their own.[61]  And most ominously, law and order broke down in

---

[56] Ibid., 297-300.

[57] Ibid., 299-302, 384-385; and Roth, "American Homicide: Theory, Methods, Body Counts," *Historical Methods* 43 (2010): 185-192.

[58] Roth, *American Homicide*, 299-302, 384-385.  See also Randolph Roth, "Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217 (https://journals.sagepub.com/doi/pdf/10.1177/1088767912442501?casa_token=dkP_nZZxCaYAAAAA:vL522E2inh9U2gr4X2qAhPnqRminWEjLv8nbwrNEhqNpRliTesFI_1SDY6tepvZbjwiRWPEom7M).

[59] Roth, *American Homicide*, 300.

[60] Ibid.

[61] Ibid.

1    the wake of the hostile military occupation of the Southwest, the political crisis of

2    the 1850s, the Civil War, and Reconstruction.[62]

3         30.    The proportion of homicides committed with firearms increased as

4    well from the Mexican War through Reconstruction, as it had during previous

5    increases in nondomestic homicides during the Revolution, in the postrevolutionary

6    South, and on contested frontiers.[63]  Because the pistols, muskets, and rifles in use

7    in the early years of the crisis of the mid-nineteenth century were still

8    predominantly single-shot, muzzle-loading, black powder weapons, the proportion

9    of homicides committed with guns stayed in the range of a third to two-fifths,

10   except on the frontier.[64]  Concealable fighting knives, together with concealable

11   percussion-cap pistols, remained the primary murder weapons.  But in time, new

12   technologies added to the toll in lives, because of their lethality and the new ways

13   in which they could be used.

14        31.    Samuel Colt's cap-and-ball revolvers, invented in 1836, played a

15   limited role in the early years of the homicide crisis, but they gained popularity

16   quickly because of their association with frontiersmen, Indian fighters, Texas

17   Rangers, and cavalrymen in the Mexican War.[65]  They retained some of the

18   limitations of earlier firearms, because their rotating cylinders—two of which came

19   with each revolver—had to be loaded one chamber at a time.  Users had to seat a

20   percussion cap on a nipple at the rear of each chamber, pour powder into each

21   chamber, secure the powder with wadding, and ram the bullet down the chamber

22   with a rod or an attached loading lever.  Thus cap-and-ball revolvers, like muzzle-

23   _____

24        [62] Ibid., 299-302, 332, 337, 354.

25        [63] Roth, "Why Guns Are and Aren't the Problem," 116-117.

26        [64] Roth, "American Homicide Supplemental Volume: Weapons," Figures 25 through 46, and 51 through 57.

27        [65] Patricia Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016).

28

1    loaders, could not be loaded quickly, nor could they be kept loaded indefinitely
2    without risk of damaging the charge or the gun.  But they were deadlier than their
3    predecessors, because they made it possible for a person to fire five or six shots in
4    rapid succession and to reload quickly with the second cylinder.[66]

5         32.    Smith and Wesson's seven-shot, .22 caliber, breech-loading, Model 1
6    rimfire revolver, invented in 1857, appeared on the market when the homicide crisis
7    was already well underway.  But it had none of the limitations of percussion-cap
8    pistols or cap-and-ball revolvers.  It could be loaded quickly and easily because it
9    did not require powder, wadding, and shot for each round; and it could be kept
10   loaded indefinitely because its corrosive powder was encapsulated in the bullet.[67]
11   And it did not require a new percussion cap for each chamber, because the primer
12   was located in a rim around the base of the bullet, set to ignite as soon as it was hit
13   by the hammer.[68]  As Smith and Wesson noted in its advertisements,

14         Some of the advantages of an arm constructed on this plan are:

15         The convenience and safety with which both the arm and ammunition
16         may be carried;

17         The facility with which it may be charged, (it requiring no ramrod,
18         powder-flask, or percussion caps);

19         Certainty of fire in damp weather;

20

21         [66] Edward C. Ezell, *Handguns of the World: Military Revolvers and Self-
22   Loaders from 1870 to 1945* (Harrisburg, Pennsylvania: Stackpole Books, 1981), 24-
23   28; Julian S. Hatcher, *Pistols and Revolvers and Their Use* (Marshallton, Delaware:
     Small-Arms Technical Publishing Company, 1927), 8-11; and Charles T. Haven
24   and Frank A. Belden, *A History of the Colt Revolver and the Other Arms Made by
     Colt's Patent Fire Arms Manufacturing Company from 1836 to 1940* (New York:
25   Bonanza Books, 1940), 17-43.

26         [67] Roy G. Jinks, *History of Smith and Wesson* (North Hollywood: Beinfeld,
27   1977), 38-57.

28         [68] Ibid., 38-57.

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

That no injury is caused to the arm or ammunition by allowing it to remain charged any length of time.[69]

33.     Smith and Wesson had created a near-perfect murder weapon.  It was lethal, reliable, easy to carry and conceal, capable of multiple shots, and ready to use at any time.[70]  Its only drawbacks were its small caliber and low muzzle velocity, which limited its ability to stop an armed or aggressive adversary on the first shot, and the difficulty and danger of reloading.  The reloading problem was remedied by Colt's development in 1889 of the first double-action commercial revolver with a swing-out cylinder and Smith and Wesson's addition in 1896 of an ejector to push out spent cartridges.[71]

34.     These new weapons were not the primary cause of the surge in violence that occurred in the United States from the Mexican War through Reconstruction.  But they did contribute to the later stages of the crisis, as they superseded knives and black powder handguns as the primary weapons used in interpersonal assaults, not only because of their greater lethality, but because they were used in novel ways.[72]  Easily concealed, they became the weapons of choice for men who stalked and ambushed estranged spouses or romantic partners, for suspects who killed sheriffs, constables, or police officers, and for self-styled

_____

[69] Ibid., 39.

[70] Ibid., 38-57.

[71] Rick Sapp, *Standard Catalog of Colt Firearms* (Cincinnati: F+W Media, 2011), 96; Jeff Kinard, *Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 163; and Jinks, *History of Smith and Wesson*, 104-170.

[72] Roth, "Why Guns Are and Aren't the Problem," 124-126 (recognizing that "Americans used the new firearms in ways they could never use muzzle-loading guns [. . .] The ownership of modern breech-loading [firearms] made the homicide rate worse in the United States than it would have been otherwise because it facilitated the use of *lethal* violence in a *wide variety of circumstances*.") (emphasis added).

toughs who engaged in shootouts in bars, streets, and even churchyards.[73]  And as modern, breech-loading firearms replaced the muzzle-loading and cap-and-ball gunstock from the late 1850s through World War I, the proportion of homicides committed with firearms continued to climb even when homicide rates fell for a short time, as they did at the end of Reconstruction.[74]  Ominously, too, firearms invaded families and intimate relationships, so relatives, spouses, and lovers were as likely to be killed with guns as unrelated adults—something that had never happened before in America's history.[75]  That is why the proportion of homicides committed with firearms—overwhelmingly, concealed revolvers—reached today's levels by the 1920s, ranging from a median of 56 percent in New England and over 70 percent in the South and West.[76]  And that is why every state in the Union except one restricted the right to carrying certain concealable weapons.  The lone holdout was Vermont, the state with the lowest homicide rate.[77]

35.     It is important to note that state legislators experimented with various degrees of firearm regulation, as the nation became more and more violent.  In Texas, where the homicide rate soared to at least 76 per 100,000 adults per year from June, 1865, to June, 1868,[78] the legislature passed a time-place-manner restriction bill in 1870 to prohibit the open or concealed carry of a wide range of

_____

[73] Ibid., 124-125.

[74] Ibid., 125-127.

[75] Ibid., 125.

[76] Roth, "American Homicide Supplemental Volume: Weapons," Figures 2 through 7.

[77] Roth, *American Homicide*, 184; and Horace V. Redfield, *Homicide, North and South: Being a Comparative View of Crime against the Person in Several Parts of the United States* (Columbus: Ohio State University Press, 2000).

[78] Roth, Michael D. Maltz, and Douglas L. Eckberg, "Homicide Rates in the Old West," *Western Historical Quarterly* 42 (2011): 192 (https://www.jstor.org/stable/westhistquar.42.2.0173#metadata_info_tab_contents).

1  weapons, including firearms, on social occasions;[79] and it followed in 1871 with a

2  bill banning in most circumstances the carrying, open or concealed, of small deadly

3  weapons, including pistols, that were not designed for hunting or militia service.[80]

---

[79] Brennan Gardner Rivas, "Enforcement of Public Carry Restrictions: Texas as a Case Study," *UC Davis Law Review* 55 (2021): 2609-2610 (https://lawreview.law.ucdavis.edu/issues/55/5/articles/files/55-5_Rivas.pdf). "Be it enacted by the Legislature of the State of Texas, That if any person shall go into any church or religious assembly, any school room or other place where persons are assembled for educational, literary or scientific purposes, or into a ball room, social party or other social gathering composed of ladies and gentlemen, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster or perform any other public duty, or any other public assembly, and shall have about his person a bowie-knife, dirk or butcher-knife, or fire-arms, whether known as a six-shooter, gun or pistol of any kind, such person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof shall be fined in a sum not less than fifty or more than five hundred dollars, at the discretion of the court or jury trying the same; provided, that nothing contained in this section shall apply to locations subject to Indian depredations; and provided further, that this act shall not apply to any person or persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law." An Act Regulating the Right to Keep and Bear Arms, 12th Leg., 1st Called Sess., ch. XLVI, § 1, 1870 Tex. Gen. Laws 63. See also Brennan Gardner Rivas, "The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930" (Ph.D. dissertation: Texas Christian University, 2019) (https://repository.tcu.edu/handle/116099117/26778).

[80] Rivas, "Enforcement of Public Carry Restrictions," 2610-2611.  Rivas, quoting the law, says that "The first section stated, 'That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he has reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and, on conviction thereof shall, for the first offense, be punished by fine of not less than twenty-five nor more than one hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent

(continued…)

---

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

1
2
3
4

_____

offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fines imposed and collected shall go into the treasury of the county in which they may have been imposed; provided that this section shall not be so construed as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided, further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.' An Act to Regulate the Keeping and Bearing of Deadly Weapons, 12th Leg. Reg. Sess., ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25.  The third section of the act reads, 'If any person shall go into any church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind, or into a ball room, social party, or social gathering, or to any election precinct on the day or days of any election, where any portion of the people of this State are collected to vote at any election, or to any other place where people may be assembled to muster, or to perform any other public duty, (except as may be required or permitted by law,) or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured and sold for the purposes of offense and defense, unless an officer of the peace, he shall be guilty of a misdemeanor, and, on conviction thereof, shall, for the first offense, be punished by fine of not less than fifty, nor more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not more than ninety days.' Id. § 3."  The law did not apply, however, 'to a person's home or business, and there were exemptions for "peace officers" as well as travelers; lawmakers and jurists spent considerable time fleshing out who qualified under these exemptions, and how to allow those fearing an imminent attack to carry these weapons in public spaces.  Also, the deadly weapon law did not apply to all guns or firearms but just pistols.  The time-place-manner restrictions, however, applied to any "fire-arms . . . gun or pistol of any kind" and later "pistol or other firearm," as well as "any gun, pistol . . . .'"

These laws were enforced with little or no racial bias until the 1890s, when white supremacists disfranchised African Americans, legalized segregation, and took firm control of the courts and law enforcement.[81]

36.     California's legislature, recognizing that the homicide rate had reached catastrophic levels (over 65 per 100,000 adults per year),[82] banned concealed weapons in 1863, because, as the editor of the *Daily Alta Californian* declared,

> During the thirteen years that California has been a State, there have been more deaths occasioned by sudden assaults with weapons previously concealed about the person of the assailant or assailed, than by all other acts of violence which figure on the criminal calendar…. For many sessions prior to the last, ineffectual efforts were made to enact some statute which would effectually prohibit this practice of carrying concealed weapons.  A radical change of public sentiment demanded it, but the desired law was not passed until the last Legislature, by a handsome majority.[83]

37.     But the legislature repealed the law in 1870, as public sentiment veered back toward the belief that the effort to make California less violent was hopeless, and that the only protection law-abiding citizens could hope for was to arm themselves.  And the legislature once again had the enthusiastic support of the

---

[81] Rivas, "Enforcement of Public Carry Restrictions," 2609-2620.  The study draws on enforcement data from four Texas counties, 1870-1930: 3,256 total cases, of which 1,885 left a record of final adjudication.

[82] Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 183. On violence in California and across the Far West, see Roth, Maltz, and Eckberg, "Homicide Rates in the Old West," 173-195; Clare V. McKanna, Jr., *Homicide, Race, and Justice in the American West, 1880-1920* (Tucson: University of Arizona Press, 1997); McKanna, *Race and Homicide in Nineteenth-Century California* (Reno: University of Nevada Press, 2002); and John Mack Faragher, *Eternity Street: Violence and Justice in Frontier Los Angeles* (New York: W. W. Norton, 2016); and Roth, *American Homicide*, 354.

[83] Clayton E. Cramer and Joseph Olson, "The Racist Origins of California's Concealed Weapon Permit Law," Social Science Research Network, posted August 12, 2016, 6-7 (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2599851).

editor of the *Daily Alta Californian*, which then opined, "As the sovereignty resides in the people in America, they are to be permitted to keep firearms and other weapons and to carry them at their pleasure."[84]   A number of counties dissented, however, and made it a misdemeanor to carry a concealed weapon without a permit—ordinances that they enforced.[85]   In 1917, the state made it a misdemeanor to carry a concealed weapon in incorporated cities and required that gun dealers register handgun sales and send the Dealer's Record of Sale to local law enforcement.[86]   And in 1923, the state extended the licensing requirement to unincorporated areas and prohibited non-citizens from carrying concealed weapons.[87]

        38.     Other states, like Ohio, tried to have it both ways.  The Ohio legislature banned the carrying of concealable weapons in 1859, citing public safety.  But it directed jurors, in the same law, to acquit persons who carried such weapons,

> If it shall be proved to the jury, from the testimony on the trial of any case presented under the first section of this act, that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family.[88]

_____

    [84] Cramer and Olson, "Racist Origins of California's Concealed Weapon Permit Law," 7-10.

    [85] Ibid., 11.

    [86] Ibid., 11-13.

    [87] Ibid., 13-15.  Note that the title of the Cramer and Olson essay is misleading.  It does not refer to the origins of the laws discussed here or to the ways in which they were enforced.  It refers instead to an unsuccessful effort in 1878 and a successful effort in 1923 to deny resident aliens the right to bear arms.

    [88] Joseph R. Swan, *The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860* (Cincinnati: Robert Clarke & Co., 1860), 452.

28

1    The burden of proof remained with the person who carried the concealed weapon.

2       39.    It is important to remember, however, that even when states enacted

3    different types of firearms restrictions, the fact remains that many jurisdictions

4    enacted statutory restrictions at that time to ensure the safety of the public and law

5    enforcement.

6  **III.  ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM
        MASS MURDERERS FROM THE REVOLUTION INTO THE EARLY
7        TWENTIETH CENTURY**

8       40.    The Republic faced threats not only from individual murderers, but

9    from groups of murderers.  Mass murder has been a fact of life in the United States

10   since the mid-nineteenth century, when lethal and nonlethal violence of all kinds

11   became more common.  But mass murder was a group activity through the

12   nineteenth century because of the limits of existing technologies.[89]  The only way to

13   kill a large number of people was to rally like-minded neighbors and go on a

14   rampage with clubs, knives, nooses, pistols, shotguns, or rifles—weapons that were

15   certainly lethal but did not provide individuals or small groups of people the means

16   to inflict mass casualties on their own.  Mass killings of this type were rare in the

17   colonial, Revolutionary, and Early National eras, outside of massacres of Native

18   Americans or irregular warfare among citizens seeking political power.[90]  But from

19   the 1830s into the early twentieth century, mass killings were common.

---

[89] On the history of mob violence, including riots and popular protests that led to mass casualties, see Paul A. Gilje, *Rioting in America* (Bloomington: Indiana University Press, 1996); and David Grimsted, *American Mobbing: Toward Civil War* (New York: Oxford University Press, 1996).

[90] For examples of massacres of unarmed Native Americans, see the murder in 1623 of six Massachusetts men by a party from Plymouth Colony, led by Captain Miles Standish [Roth, *American Homicide*, 42]; and the massacre in 1782 of 96 pacifist Moravian Delaware Indians at Gnadenhutten in present-day Ohio [Rob Harper, "Looking the Other Way: The Gnadenhutten Massacre and the Contextual Interpretation of Violence," *William and Mary Quarterly* (2007) 64: 621-644 (https://www.jstor.org/stable/25096733#metadata_info_tab_contents)]. For

(continued…)

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

41.     Examples include Nat Turner's rebellion in Southampton County, Virginia, in 1831, which claimed sixty-nine lives; the murder of seventeen Mormons, perpetrated by militia men and vigilantes at Haun's Mill, Missouri in 1838; Bloody Monday in Louisville, Kentucky, where an assault by nativist Protestants on Irish and German Catholics in 1855 left twenty-two people dead; and the murder of nineteen Chinese Americans by a racist mob in Los Angeles in 1871. Because these mass killings were almost always spontaneous and loosely organized, they were difficult for government to prevent.  Worse, in some incidents, such as the Haun's Mill Massacre, state and local governments were complicit; and in others, state and local governments turned a blind eye to the slaughter, as was the case in the murder of Chinese farm workers in Chico, California, in 1877.[91]

---

examples of political conflict among colonists that led to mass killings, see the confrontation in 1655 at Severn River in Maryland between opposed factions in the English Civil War [Aubrey C. Land, *Colonial Maryland: A History* (Millwood, New York: Kato Press, 1981), 49-54] and the slaughter in 1782 of rebel prisoners at Cloud's Creek, South Carolina, by Tory partisans under the leadership of William Cunningham [J. A. Chapman, *History of Edgefield County* (Newberry, South Carolina: Elbert H. Aull, 1897), 31-34]; see also Fox Butterfield, *All God's Children: The Bosket Family and the American Tradition of Violence* (New York: Vintage, 2008), 5-6.

[91] David F. Almendinger, Jr., *Nat Turner and the Rising in Southampton County* (Baltimore: Johns Hopkins Press, 2014); Patrick H. Breen, *The Land Shall Be Deluged in Blood: A New History of the Nat Turner Revolt* (New York: Oxford University Press, 2015); Stephen B. Oates*, The Fires of Jubilee: Nat Turner's Fierce Rebellion* (New York: Harper and Row, 1975); Stephen C. LeSueur, *The 1838 Mormon War in Missouri* (Columbia: University of Missouri Press, 1987), 162-168; Brandon G. Kinney*, The Mormon War: Zion and the Missouri Extermination Order of 1838* (Yardley, Pennsylvania: Westholme, 2011); Mary Alice Mairose, "Nativism on the Ohio: the Know Nothings in Cincinnati and Louisville, 1853-1855" (M.A. thesis, Ohio State University, 1993); W. Eugene Hollon, *Frontier Violence: Another Look* (New York: Oxford University Press, 1974), 93-95; Faragher, *Eternity Street*, 463-480; and Sucheng Chan, *The Bitter-Sweet Soil: The Chinese in California Agriculture, 1860-1910* (Berkeley: University of California Press, 1986), 372.

42.     The Federal government did act during Reconstruction, however, to prevent mass murder when formally organized white supremacist organizations engaged in systematic efforts to deprive African Americans of their civil rights, which had been guaranteed by the Thirteenth, Fourteenth, and Fifteenth Amendments.  The Ku Klux Klan Acts of 1870 and 1871, meant to prevent assassinations and mass shootings and lynchings by white supremacist terrorists, were effective when enforced by the federal government and the U.S. Army.[92]  But when federal troops were withdrawn, white supremacist mass killings resumed.  In New Orleans, for example, an ultimately successful effort by white-supremacist Democrats to seize control of the city's government by violent means left dozens of Republican officials and police officers shot dead and scores wounded.[93] And the Klan Acts did nothing to prevent mass murders by spontaneous mobs and loosely organized vigilantes.  Rioters and vigilantes remained a threat well into the twentieth century.  In 1921 more than three hundred African American citizens were murdered in the Tulsa Race Massacre in Oklahoma.[94]

---

[92] Alan Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper and Row, 1975).

[93] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 151-158.  See also LeeAnna Keith, *The Colfax Massacre: The Untold Story of Black Power, White Terror, and the Death of Reconstruction* (New York: Oxford University Press, 2008); and Gilles Vandal, *Rethinking Southern Violence: Homicides in Post-Civil War Louisiana, 1866-1884* (Columbus: Ohio State University Press, 2000), 67-109.

[94] On the deadly race riots of 1919-1921, see William M. Tuttle, Jr., *Race Riot: Chicago in the Red Summer of 1919* (New York: Atheneum, 1970); Scott Ellsworth, *Death in a Promised Land: The Tulsa Race Riot of 1921* (Baton Rouge: Louisiana State University Press, 1982); and Tim Madigan, *The Burning: Massacre, Destruction, and the Tulsa Race Riot of 1921* (New York: Thomas Dunne Books / St. Martin's Press, 2001).

## IV. ADDRESSING THREATS TO THE REPUBLIC AND ITS CITIZENS FROM MASS MURDERERS FROM THE EARLY TWENTIETH CENTURY TO THE PRESENT

43.    The character of mass murder began to change in the late nineteenth and early twentieth century with the invention and commercial availability of new technologies that gave individuals or small groups of people the power to kill large numbers of people in a short amount of time.  These technologies proved useful to criminal gangs, anarchists, and factions of the labor movement intent on killing adversaries, public officials, and law enforcement officers.  The technologies that were most widely used by criminals and terrorists were dynamite, invented by Alfred Nobel in 1866, and the Thompson submachine gun, invented in 1918 by General John T. Thompson, who improved upon a pioneering German design.

44.    The advantage of dynamite over nitroglycerin and other explosives used in mining and construction was its power and its stability, which made accidental explosions rare.  The advantages of submachine guns over existing machine guns as weapons of war were that they were light enough to be carried and operated by a single individual, and they were capable of firing .45 caliber bullets from 20-round clips or 50- or 100-round drum magazines at a rate of 600 to 725 rounds per minute.[95]

45.    Criminals and terrorists quickly discovered how accessible and useful these new technologies were.  They could be purchased legally by private citizens. In the 1920s, Thompson submachine guns were expensive.  They sold for $175 to $225 each, at a time when a new Ford cost $440 (the rough equivalent of $2996 to $3852 today, when a base model of the AR-15 semiautomatic rifle can be purchased for less than $400 and a 30-round magazine for as little as $10).[96]  That

---

[95] Herta E. Pauli, *Alfred Nobel: Dynamite King, Architect of Peace* (New York: L. B. Fisher, 1942); and Bill Yenne, *Tommy Gun: How General Thompson's Submachine Gun Wrote History* (New York: Thomas Dunne Books, 2009).

[96] Yenne, *Tommy Gun*, 86. Estimates vary on the purchasing power of 1919
(continued…)

1  is why Thompsons were favored by those with resources: law enforcement, the

2  Irish Republican Army, Sandinista rebels in Nicaragua, and bank robbers.

3  Dynamite, however, cost only 18 cents a pound (the rough equivalent of $3.08

4  today), so it was favored by labor activists and anarchists.[97]  Federal, state, and

5  local officials and law enforcement officers suddenly confronted novel threats to

6  their personal safety.  Submachine guns were used most notoriously in gangland

7  slayings in Chicago during the Prohibition Era, such as the St. Valentine's Day

8  Massacre and the Kansas City Massacre.[98]  Dynamite was used in a string of

9  anarchist bombings in 1919-1920.  Those included the murder of 38 people and the

10  wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice

11  officials, newspaper editors, and businessmen (including John D. Rockefeller), and

12

13  _____

14  dollars in today's dollars, but $1.00 in 1919 was worth roughly $17.12 today.  See
    the CPI Inflation Calculator (https://bit.ly/3CS5UNl), accessed October 4, 2022.

15  The prices of AR-15 style rifles today are from guns.com

16  (https://www.guns.com/firearms/ar-15-rifles?priceRange=%24250%20-
    %20%24499), accessed October 4, 2022.  The prices of 30-round magazines of

17  .233 caliber ammunition are from gunmagwarehouse.com

18  (https://gunmagwarehouse.com/all-magazines/rifles/magazines/ar-15-magazines),
    accessed October 4, 2022.

19
    [97] Department of Commerce, Bureau of the Census, *Fourteenth Census of the*
20  *United States Manufactures: Explosives* (Washington, D.C.: Government Printing

21  Office, 1922), 6.  Note that a pound of dynamite would be far more expensive
    today—potentially hundreds of thousands of dollars—because it would require the

22  purchase of a blasting license, a storage bunker, and an isolated plot of land for the
    storage bunker.  See U.S Department of Justice, Bureau of Alcohol, Tobacco,

23  Firearms, and Explosives, Enforcement Programs and Services, *ATF Federal*

24  *Explosives Law and Regulations, 2012*
    (https://www.atf.gov/explosives/docs/report/publication-federal-explosives-laws-

25  and-regulations-atf-p-54007/download), accessed October 4, 2022.

26
    [98] William Helmer and Arthur J. Bilek, *The St. Valentine's Day Massacre:*
27  *The Untold Story of the Bloodbath That Brought Down Al Capone* (Nashville:

28  Cumberland House, 2004); and Yenne, *Tommy Gun*, 74-78, 91-93.

a failed attempt to kill Attorney General A. Mitchell Palmer and his family.[99]
Dynamite was also used effectively for malicious, private ends. For example,
Osage Indians were murdered by an individual in Oklahoma in an attempt to gain
their headrights and profit from insurance policies on them.[100]

46.     Because of the threats these new technologies posed for public safety,
public officials widened their regulatory focus beyond concealed and concealable
weapons. Thirteen states restricted the capacity of ammunition magazines for
semiautomatic and automatic firearms between 1927 and 1934,[101] and Congress
passed the National Firearms Acts of 1934 and 1938, which restricted ownership of
machine guns and submachine guns (known today as automatic weapons) because
of their ability to fire rapidly from large-capacity magazines.[102] And the Organized
Crime Control Act of 1970 restricted ownership of a wide range of explosives,

---

[99] Paul Avrich, *Sacco and Vanzetti: The Anarchist Background* (Princeton: Princeton University Press, 1991), 140-156, 181-195; Beverly Gage, *The Day Wall Street Exploded: A Story of American in Its First Age of Terror* (New York: Oxford University Press, 2009); David Rapoport, *Waves of Global Terrorism: From 1879 to the Present* (New York: Columbia University Press, 2022), 65-110. Consider also the bombing of the office of the *Los Angeles Times* in 1910 by two union activists, which killed 21 persons and injured 100 more, in Louis Adamic, *Dynamite: The Story of Class Violence in America* (New York: Viking, 1931).

[100] For this and other murders of Osage people see David Grann, *Killers of the Flower Moon: The Osage Murders and the Birth of the FBI* (New York, Doubleday, 2017).

[101] Robert J. Spitzer, "Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," *Law and Contemporary Problems* 83 (2020): 238 (https://scholarship.law.duke.edu/lcp/vol83/iss3/13). In the same period, five additional states restricted magazine capacity for fully automatic weapons, but not semiautomatic weapons.

[102] The National Firearms Act of 1934, 48 Statute 1236 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1934.pdf); and the National Firearms Act of 1938, 52 Statute 1250 (https://homicide.northwestern.edu/docs_fk/homicide/laws/national_firearms_act_of_1938.pdf).

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

1    building upon regulations that began in 1917 with the passage of the Federal

2    Explosives Act, which restricted the distribution, storage, possession, and use of

3    explosive materials during the time of war.[103]

4        47.    Since 1970, public officials have continued to reserve the right to

5    regulate the sale, ownership, and control of new technologies that can be used by

6    individuals or small groups to commit mass murder.  The Homeland Security Act

7    of 2002 improved security at airports and in cockpits to ensure that airplanes could

8    not be used by terrorists to commit mass murder.  The Secure Handling of

9    Ammonium Nitrate Act of 2007 restricted access to large quantities of fertilizer to

10   prevent terrorist attacks like the one that killed 165 people in Oklahoma City in

11   1995.[104]  And in the wake of the massacre of 58 people and wounding of hundreds

12   of others at a concert in Las Vegas in 2017, the Trump administration issued a

13   regulation that banned the sale or possession of bump stocks.  It gave owners 90

14   days to destroy their bump stocks or turn them in to the Bureau of Alcohol,

15   Tobacco, Firearms, and Explosives.[105]

16       48.    In recent decades, criminal organizations, terrorists, and lone gunmen

17   with an intent to commit mass murder have also discovered the effectiveness of

18   rapid-fire semiautomatic weapons with large capacity magazines.  These weapons,

19   which were designed for offensive military applications rather than individual self-

20   _____

21       [103] The Organized Crime Control Act of 1970, 84 Statute 922; and the
     Federal Explosives Act of 1917, 40 Statute 385.

22       [104] Public Law 107-296, November 25, 2002, "To Establish the Department
23   of Homeland Security" (https://www.dhs.gov/xlibrary/assets/hr_5005_enr.pdf); and
     6 U.S. Code § 488a - Regulation of the sale and transfer of ammonium nitrate
24   (https://www.law.cornell.edu/uscode/text/6/chapter-1/subchapter-VIII/part-J).  The
25   ammonium nitrate regulations were to be enforced no later than 90 days after
     December 26, 2007.  Accessed August 31, 2022.
26
27       [105] *New York Times*, December 18, 2018
     (https://www.nytimes.com/2018/12/18/us/politics/trump-bump-stocks-ban.html),
28   accessed October 4, 2022.

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

defense, emerged from technologies developed for military use during the Cold War. The signature military firearm of that era—the M-16 rifle with a 30-round magazine and a muzzle velocity of over 3,000 feet per second[106]—was capable of firing 750 to 900 rounds per minute when set on fully automatic. But the M-16 was used more often in combat—and more accurately, effectively, and sustainably as a weapon for inflicting mass casualties—when set on semiautomatic, which was standard military procedure. That is why the U.S. Army defines "rapid fire" as 45 rounds per minute, not 750 to 900.[107] And that is why in 1998 the U.S. Marine Corps adopted the M-16A4, which replaced the "fully automatic" switch with a three-round burst—an alteration that slows the potential rate of fire, conserves ammunition, and improves accuracy.[108]

49.    The muzzle velocity of semiautomatic handguns, like the Glock 17, is far lower than that of an M-16 or its civilian counterparts: around 1,350 feet per second. But technological advances have increased the speed at which semiautomatic handguns can be fired. An expert can fire an entire 30-round clip from a Glock 17 handgun in five seconds.[109] And they are affordable. A new

---

[106] Muzzle velocity is the speed at which a round exits the barrel of a firearm.

[107] Sections 8-17 through 8-22 (Rates of Fire), Sections 8-23 and 8-24 (Follow Through), and Sections B-16 through B22 (Soft Tissue Penetration), in *TC 3-22.9 Rifle and Carbine Manual*, Headquarters, Department of the Army (May 2016). Available at the Army Publishing Directorate Site (https://armypubs.army.mil/epubs/DR_pubs/DR_a/pdf/web/ARN19927_TC_3-22x9_C3_FINAL_WEB.pdf), accessed October 4, 2022.

[108] See military-today.com (http://www.military-today.com/firearms/m16.htm), accessed October 4, 2022.

[109] See Jerry Miculek, "Dual Glock 17 Rapid Fire 60 Rounds in 5 Seconds! 660 RPM." YouTube (https://www.youtube.com/watch?v=1H5KsnoUBzs), accessed September 1, 2022.

36

semiautomatic handgun can be purchased for less than $200 and equipped with a 33-round magazine for less than $15.[110]

50.  It did not take criminals, terrorists, and lone gunmen long to adopt the rapid-fire semiautomatic handguns and rifles with large capacity magazines that poured onto the domestic market in the 1970s and 1980s.  These firearms can inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff.

51.  Manufacturers soon discovered ways to increase the rate of fire of these new semiautomatic weapons even further.  Some innovations, such as bump stocks and modification kits, allowed owners to transform semiautomatic rifles into fully automatic rifles.  And in response to the Trump administration's regulatory ban on the production and sale of bump stocks and modification kits, the firearms industry has developed "binary" triggers that fire when pulled *and when released*— a modification that doubles the rate at which semiautomatic weapons can be fired.[111]

[110] See guns.com for the price of semiautomatic handguns (https://www.guns.com/firearms/handguns/semi-auto?priceRange=Less%20than%20%24250) and bymymags.com for the price of large capacity magazines (https://www.buymymags.com/), accessed October 4, 2022.

[111] Bureau of Alcohol, Tobacco, Firearms, and Explosives, Office of Enforcement Programs and Services, Office of Field Operations, "Open Letter to All Federal Firearms Licensees," March 22, 2022 (https://www.atf.gov/firearms/docs/open-letter/all-ffls-mar-2022-open-letter-forced-reset-triggers-frts/download), accessed October 4, 2022.  The ATF has not banned the production, sale, or ownership of binary triggers, but the several states have done so, citing the threat they pose to the safety of the public and law enforcement.  Those states include North Dakota, Hawaii, Connecticut, New Jersey, Maryland, Washington, California, D.C., Iowa, New York, Rhode Island, and Florida. (https://lundestudio.com/are-binary-triggers-legal/), accessed October 4, 2022.  See also americanfirearms.org, "A Complete Guide to Binary Triggers," (https://www.americanfirearms.org/guide-to-binary-triggers/), accessed October 4, 2022.

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

52.     Just as dangerous, however, were modifications that helped users fire more rapidly with semiautomatic firearms.  The modifications included "fixes" as simple as stretching a rubber band from the trigger to the trigger guard of an AR-15—the civilian version of the M-16, which differs from the military model only in its lack of a switch for fully automatic.  The band pushes the trigger forward more rapidly after each round and enables users to fire rapid semiautomatic bursts with help of the weapon's natural recoil.  The rubber band method works because manufacturers have increased the fire rate of semiautomatic weapons by decreasing the pressure it takes to pull the trigger.[112]

53.     The threat to public safety and law enforcement posed by semiautomatic rifles—with or without dangerous modifications—is a modern phenomenon that has a direct correlation with mass murder and mass shootings.  The danger these firearms pose is intrinsically different from past weaponry.  In the same way that the Colt cap-and-ball revolvers and breech-loaded firearms resulted in increased deaths by firearms, the development of semiautomatic rifles and handguns dramatically increased the number killed or wounded in mass shootings from 1966 to the present (see Figure 1, below).

Figure 1

|  | Mass shootings with non-semiautomatic/non-automatic firearm | Mass shootings with semiautomatic handgun | Mass shootings with semiautomatic rifle | Mass shootings with automatic firearms |
|---|---|---|---|---|
| Average Killed | 5.4 | 6.5 | 9.2 | 8.1 |
| Average Wounded | 3.9 | 5.8 | 11.0 | 8.1 |

---

[112] See "Rapid Manual Trigger Manipulation (Rubber Band Assisted)," YouTube (https://www.youtube.com/watch?v=PVfwFP_RwTQ), accessed October 4, 2022.

Declaration of Randolph Roth (17-cv-1017-BEN-JLB)

| Average Victims | 9.3 | 12.3 | 20.2 | 16.2 |
|---|---|---|---|---|
| Number of Mass Shootings | 52 | 82 | 40 | 8 |

Note that mass shootings with semiautomatic rifles have been as deadly as mass shootings with fully automatic weapons.[113]

54.     And the threat posed by semiautomatic rifles is amplified when they are used in conjunction with extended magazines (more than 10 rounds) (see figure 2, below).

Figure 2

| | No extended magazine | Extended magazine |
|---|---|---|
| Mass shootings | 10.3 | 26.4 |

---

[113] The data are from the Violence Project (https://www.theviolenceproject.org/mass-shooter-database/), accessed October 4, 2022.  The Violence Project, which has compiled data on mass shootings from 1966 through 2021, defines a mass shooting as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project database provides information on the weapons used in the shootings.  It notes, for instance, that two shooters who possessed semiautomatic rifles at the times of their crimes did not use them, and that 8 shooters had illegal, fully automatic weapons.  Those automatic weapons included 2 Uzi submachine guns, 3 machine pistols, 1 M-16, and 2 AK-47 rifles converted to automatic.  I have not participated in Violence Project or in the collection of their data.  In Figure 1, however, I have added the data from the six mass shootings that occurred from January through August, 2022, that fit the Violence Project's definition of a mass shooting.  Three were committed with semiautomatic rifles and three with semiautomatic handguns.  The table does not include the Las Vegas shooting of 2017 (58 killed, 887 wounded).

39

| with semiautomatic handgun | | |
|---|---|---|
| Mass shootings with semiautomatic rifle | 13.0 | 37.1 |

55.    Without extended magazines, semiautomatic rifles cause an average of 40 percent more deaths and injuries in mass shootings than regular firearms, and semiautomatic handguns 11 percent more than regular firearms.  But with extended magazines, semiautomatic rifles cause an average of 299 percent more deaths and injuries than regular firearms, and semiautomatic handguns 184 percent more than regular firearms. In combination, semiautomatic firearms and extended magazines are extraordinarily lethal.[114]

56.    For these reasons, local governments have enacted bans on the sale of semiautomatic rifles with features that enhance their military utility, as the federal government did from 1994 to 2004.  And local governments have banned the sale of large capacity magazines, because they allow mass murderers to prolong their attacks before citizens or law enforcement can intervene—usually when the shooter is reloading.  For example, the shooter who wounded U.S. House Representative Gabby Giffords in Tucson, Arizona, in 2011 was able to fire 31 rounds with a Glock 19 semiautomatic handgun in a matter of seconds before bystanders could disarm him as he changed magazines.  Every one of those rounds hit an individual, killing six and injuring twelve.[115]

V.   CONCLUSION

57.    From the Founding Generation to the present, the people of the United States and their elected representatives have recognized that there are instances in

---

[114] The data are from the Violence Project.

[115] "2011 Tucson Shooting," Wikipedia (https://en.wikipedia.org/wiki/2011_Tucson_shooting), accessed September 2, 2022.

1   which the security of the republic and the safety of its citizens require government-

2   imposed restrictions.  That is why the majority of states passed and enforced laws

3   against the carrying of concealable weapons, why the federal government passed

4   the Ku Klux Klan Acts during Reconstruction, and why states, municipalities, and

5   the federal government have passed and enforced laws since World War I to restrict

6   ownership or control of modern technologies that enable criminals, terrorists, and

7   malicious or delusional individuals to commit mass murder.  Public officials are not

8   required to pass such laws, of course, but historically, they have always retained the

9   ability to do so.  There is no evidence in the historical record to suggest that they

10  took their decisions lightly when they imposed these restrictions on weapons and

11  armed voluntary organizations.  And mass murders by individuals, including mass

12  shootings, are a recent phenomenon, caused by changes in technology that emerged

13  in the late nineteenth through the late twentieth century.  Public officials today are

14  confronting a criminological problem that did not exist in the Founding Era, nor

15  during the first century of the nation's existence.

16

17       I declare under penalty of perjury under the laws of the United States of

18  America that the foregoing is true and correct.

19       Executed on November 9, 2022, at Dublin, Ohio.

20

21

22                                              _____

23                                              Randolph Roth

24

25

26

27

28

## INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|:---:|:---:|:---:|
| A | Curriculum Vitae of Randolph Roth | 1-26 |

# EXHIBIT A

Randolph Roth                                                         Page 1


Curriculum Vitae

RANDOLPH ROTH

Department of History                        6987 Grandee Cliffs Drive
The Ohio State University                    Dublin, OH  43016
Columbus, OH  43210-1367
(614) 292-6843                               (614) 889-5043
FAX:  614-292-2822
E-mail:  roth.5@osu.edu

**Table of Contents**

**Personal**                                                    2

Education                                                       2
Academic Positions                                              2
Honorary Positions                                              2
Professional Honors and Awards for Scholarship                  2
Professional Honors and Awards for Teaching                     3
Grants                                                          3

**Bibliography and Research**                                   4-17

**Teaching**                                                    18-20

**Service**                                                     21-26

Randolph Roth                                                      Page 2

**Personal**

Marital Status:          Married          Allison Sweeney
Children:                Alexander

**Education**

1981, Ph.D. in History, Yale University (thesis, "Whence This Strange Fire? Religious and Reform Movements in Vermont, 1791-1843," David Brion Davis and Howard R. Lamar, advisors)

1973, B.A., with honors and distinction, in History, Stanford University (thesis, "Progressive Reform and Socialism in Berkeley, California, 1877-1924," Carl Degler and Barton Bernstein, advisors)

**Academic Positions**

1985-present, The Ohio State University: College of Arts and Sciences Distinguished Professor of History and Sociology
1978-1985, Grinnell College: Assistant Professor of History
1978, University of Vermont: Instructor in History
1974-1977, Graduate Teaching Assistant, Yale University

**Honorary Positions**

2012, Wayne N. Aspinall Visiting Chair Professor, University of Colorado Mesa

**Professional Honors and Awards for Scholarship**

2013-2016, Member, Roundtable on Crime Trends in America, National Research Council, National Academy of Sciences

2012, Fellow, American Association for the Advancement of Science

2011, Michael J. Hindelang Award, American Society of Criminology, for the outstanding contribution to criminology over the previous three years

2010, Allan Sharlin Memorial Award, Social Science History Association, for an outstanding book in social science history

2010, Outstanding Academic Books, *Choice*

Randolph Roth                                                        Page 3

1988, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village
Research Society, for distinguished work in the history of rural society

1982, Thorton Rockwell Field Prize, Yale University, for the outstanding
dissertation in the Humanities

1982, George Washington Eggleston Prize, Yale University, for the
outstanding dissertation in American history

1973, James Birdsdall Weter Prize, Stanford University, for the
outstanding senior thesis in history

## Professional Honors and Awards for Teaching

2017, Rodica C. Botoman Award for Distinguished Undergraduate Teaching and
Mentoring, College of Arts and Humanities

2013, Outstanding Teaching Award, College of Arts and Sciences Student
Council

2009, Ohio State University Alumni Award for Distinguished Teaching

2007, Distinguished Teaching Award, Ohio Academy of History

1995, Clio Award, Phi Alpha Theta Honor Society, for Distinguished Teaching in
History at Ohio State University

## Grants

2013-2014, Research Grant, Harry Frank Guggenheim Foundation

2012-2015, Research Grant, National Science Foundation (SES-1228406)

2000, Fellowship for University Teachers, National Endowment for the
Humanities

1998-2000, Research Grant and Supplemental Research Grant, National Science
Foundation (SBR-9808050)

1992, Fellow, Workshop on the Rhetoric of Social History, University of
Iowa

Randolph Roth                                                      Page 4

1989-1990, Research Fellowship, Harry Frank Guggenheim Foundation

1987, National Endowment for the Humanities, Summer Stipend

1983, Research Fellowship for Recent Recipients of the Ph.D., American Council of Learned Societies

1981, Fred Harris Daniels Fellowship, American Antiquarian Society

**Bibliography and Research**

**Books**

*American Homicide* (an interregional study of violent crime and violent death in America from colonial times to the present). The Belknap Press of Harvard University Press (2009), 655 pp.

*The Democratic Dilemma: Religion, Reform, and the Social Order in the Connecticut River Valley of Vermont, 1791-1850*. Cambridge University Press (1987), 399 pp.

**Edited Volumes**

Co-founder and co-director, Historical Violence Database (on-line database on violent crime, violent death, and collective violence).  Web address: www.sociology.ohio-state.edu/cjrc/hvd

American Homicide Supplementary Volume (on-line supplement to *American Homicide*, including detailed appendices on methods, supplemental tables, graphs, and statistical analyses), approx. 750 pp. Web address: http://cjrc.osu.edu/researchprojects/hvd/AHsup.html

**Essays on Historical Subjects**

"Homicide and the Opioid Epidemic: A Longitudinal Analysis," co-authored with Richard Rosenfeld and Joel Wallman. *Homicide Studies* (forthcoming).

"The Opioid Epidemic and Homicide in the United States," co-authored with Richard Rosenfeld and Joel Wallman. *Journal of Research in Crime and Delinquency* 58: 1 (2021): 1-46.

Randolph Roth                                                          Page 5

"Homicide-Suicide by Women against Intimate Partners," co-authored with Wendy C. Regoeczi, in Todd Shackelford, ed., *Sage Handbook of Domestic Violence* (Newbury Park: Sage Publications, 2020), v 1, 318-329.

"Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 113-133.

"Does Better Angels of Our Nature Hold Up as History?" *Historical Reflections* 44: 1 (2018): 91-103.

"Criminologists and Historians of Crime: A Partnership Well Worth Pursuing." *Crime, History, and Societies* 21: 2 (2017): 387-400.

"How Exceptional Is the History of Violence and Criminal Justice in the United States? Variation across Time and Space as the Keys to Understanding Homicide and Punitiveness," in Kevin Reitz, ed. *American Exceptionalism in Crime and Punishment* (Oxford University Press, 2017).

"Getting Things Wrong Really Does Help, as Long as You Keep Trying to Get Things Right: Developing Theories About Why Homicide Rates Rise and Fall" in Michael D. Maltz and Stephen Rice, eds., *Envisioning Criminology: Researchers on Research as a Process of Discovery* (Springer Verlag, 2015), 143-150.

"Roundtable on History Meets Biology: Introduction," *American Historical Review* (2014) 119: 1492-1499. Principal author and organizer of the Roundtable.

"Emotions, Facultative Adaptation, and the History of Homicide," *American Historical Review* (2014) 119: 1529-1546.

"Gender, Sex, and Intimate-Partner Violence in Historical Perspective," in Rosemary Gartner and William McCarthy, eds., *Oxford Handbook on Gender, Sex, and Crime* (Oxford University Press, 2014), 175-190.

"The Importance of Testing Criminological Theories in Historical Context: The Civilization Thesis versus the Nation-Building Hypothesis," *Criminology* online: Presidential Session Papers from the American Society of Criminology (2014)

"Making Sense of Violence? Reflections on the History of Interpersonal Violence in Europe," *Crime, History, and Societies* (2013) 17: 5-26. Richard McMahon, Joachim Eibach, and Randolph Roth. Introduction to a special issue solicited by the Board of Editors of *Crime, History, and Societies*, co-edited with Joachim

Randolph Roth                                                    Page 6

Eibach, University of Berne, and Richard McMahon, University of Liverpool.

"Scientific History and Experimental History," *Journal of Interdisciplinary History* (2013) 43: 443-458.

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," *Homicide Studies* (2012) 16: 196-217.

"Yes We Can: Working Together toward a History of Homicide That Is Empirically, Mathematically, and Theoretically Sound," *Crime, History, and Societies* (2011) 15: 131-145.

"Biology and the Deep History of Homicide," *British Journal of Criminology* (2011) 51: 535-555.

"Homicide Rates in the Old West." *Western Historical Quarterly*. Randolph Roth, Michael D. Maltz, and Douglas L. Eckberg (2011) 42: 173-195.

"American Homicide: Theory, Methods, Body Counts." *Historical Methods* (2010) 43: 185-192.

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death." *Historical Methods*. Randolph Roth, Cornelia Hughes Dayton, Kenneth Wheeler, James Watkinson, Robb Haberman, James M. Denham, and Douglas L. Eckberg (2008) 41: 81-98.

"Homicide in Florida, 1821-1861: A Quantitative Analysis." *Florida Historical Quarterly*. Randolph Roth and James M. Denham (2007) 86: 216-239.

 "Guns, Murder, and Probability: How Can We Decide Which Figures to Trust?" *Reviews in American History* (2007) 35: 165-75.

"Twin Evils?  Slavery and Homicide in Early America," in Steven Mintz and John Stauffer, eds., *The Problem of Evil: Slavery, Freedom, and the Ambiguities of American Reform*. Amherst: University of Massachusetts Press (2007), 74-88.

"Rural Communities," in Feintuch, Burt and David H. Watters, eds., *Encyclopedia of New England*. Yale University Press (2005), 53-55.

"Counting Guns: What Social Science Historians Know and Could Learn about Gun Ownership, Gun Culture, and Gun Violence in the United States," *Social Science History* (2002) 26: 699-708.

"Guns, Gun Culture, and Homicide: The Relationship between Firearms, the Uses of Firearms, and Interpersonal Violence in Early America," *William and Mary*

Randolph Roth                                                                Page 7

*Quarterly* (2002) 59: 223-240.

"Homicide in Early Modern England, 1549-1800: The Need for a Quantitative Synthesis." *Crime, History, and Societies* (2001) 5: 33-67.

"Child Murder in New England," *Social Science History* (2001) 25: 101-147.

"Spousal Murder in Northern New England, 1791-1865," in Christine Daniels, ed., *Over the Threshold: Intimate Violence in Early America, 1640-1865*. Routledge Press (1999), 65-93.

"`Blood Calls for Vengeance!': The History of Capital Punishment in Vermont," in Michael Sherman, ed., *Vermont State Government*. Vermont Secretary of State and Vermont Historical Society (1997), 10-25.

"The Generation Conflict Reconsidered," in *American Vistas*, ed. Leonard Dinnerstein & Kenneth T. Jackson. Oxford University Press (7th ed. 1995), 116-127.

"The Other Masonic Outrage: The Death and Transfiguration of Joseph Burnham," *Journal of the Early Republic* (1994) 14: 35-69.

"The First Radical Abolitionists: The Reverend James Milligan and the Reformed Presbyterians of Vermont," *New England Quarterly* (1982) 55: 540-563.

**Essays on Methods and Theory**

"'To Err Is Human': Uniformly Reporting Medical Errors and Near Misses, a Naïve, Costly, and Misdirected Goal." *Journal of the American College of Surgeons*. Charles H. Andrus, Eduardo G. Villasenor, John B. Kettelle, Randolph Roth, Allison M. Sweeney, and Nathaniel M. Matolo (2003) 196: 911-918.

"Is There a Democratic Alternative to Republicanism?  The Rhetoric and Politics of Synthesis in American History," in Jeffrey Cox and Sheldon Stromquist, eds., *Contesting the Master Narrative: Essays in Social History*. University of Iowa Press (1998), 210-256.

"Did Class Matter in American Politics? The Importance of Exploratory Data Analysis," *Historical Methods* (1998) 31: 5-25.

"Is History a Process? Revitalization Theory, Nonlinearity, and the Central Metaphor of Social Science History," *Social Science History* (1992) 16: 197-243.

"Ecological Regression and the Analysis of Voter Behavior," *Historical Methods*

Randolph Roth                                                    Page 8

(1986) 19: 103-117.

**Public History Essays**

"Can Faith Change the World?  Religion and Society in Vermont's Age of
Reform," *Vermont History* (2001) 69: 7-18.

"Wayward Youths:  Raising Adolescents in Vermont, 1777-1815," *Vermont
History* (1991) 59: 85-96.

"Why Are We Still Vermonters?  Vermont's Identity Crisis and the Founding of
the Vermont Historical Society," *Vermont History* (1991) 59: 197-211.

**Works in Progress**

*Child Murder in America*. An interregional study of murders of and by children
from colonial times to the present (in manuscript through early 20th century)

"How Scientific Is Environmentalist History? The Rhetoric and Politics of
Speaking for Nature" (essay in manuscript)

**Editorial Boards**

2014-2017, *American Historical Review*
2012-2016, 1995-2005, *Historical Methods*
2011- , *Homicide Studies*
2004- , *Crime, History, and Societies*

**Invited Lectures**

"The History of Police Involved Homicides in the United States," Mary
Immaculate College & the University of Limerick, Ireland, October 26, 2021.

"Firearms and Homicide in the United States: A History," British Crime
Historians Symposium, Leeds University, Great Britain, Scheduled for September
2-3, 2021.

"The History of Cross-National Homicide Rates: What We Can Learn from the
Available Historical Data, and Why We Have to Worry about Learning the
Wrong Lessons," Bielefeld University, Germany, scheduled for April 29, 2020.
Postponed.

Randolph Roth                                                                                    Page 9

"Inequality," Ashland University, October 16, 2019.

"The History of Gun Violence in America," Shasta Seminar, Wesleyan University, October 28, 2017.

"Why Guns Are and Aren't the Problem," Ashland University Center for the Study of Nonviolence, Ashland University, April 1, 2017.

"Firearms and Violence in American History," Aspen Institute, September 15, 2016, Washington, D.C.

"Homicide in the United States: The Long History and Recent Trends," The Donald and Margaret Sherman Violence Prevention Lecture, Jerry Lee Center of Criminology, University of Pennsylvania, April 10, 2015.

"The History of Child Murder," Andrew Young School of Public Policy, Georgia State University, January 28, 2014.

"The Causes of Homicide," National Institute of Justice, December 2, 2013.

"Biology, History, and the Causes of Homicide," School of Law, University of Buffalo, October 10, 2013.

"Bio-Historical Co-Evolution and the Biology of Social Behavior: The Prospects for a New Institute on History and the Sciences," Max Planck Institutes, Berlin, Germany, June 27, 2013.

"Deterrence, Judicial Tolerance, and the Homicide Problem in America," Robina Institute of Criminal Law and Justice, University of Minnesota, April 26, 2013

"Child Murder in America: A History," Population Studies Center and Department of History, University of Michigan, April 8, 2013

"America's Homicide Problem," Northwestern University School of Law, November 16, 2012

"American Homicide," Aspinall Lecture, Colorado Mesa University, April 5, 2012

"Quantitative Analysis of the History of Crime and Violence: Achievements and Prospects," Keynote Address, Conference on "Making Sense of Violence," University of Bern, September 8, 2011

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences,

Randolph Roth                                                                 Page 10

and the Social Sciences in the Study of Violence." Conference on Emerging Disciplines, Humanities Research Center, Rice University, February 25, 2011

"American Homicide," Washington Forum, Ohio University, Athens, Ohio, May 25, 2010

"Can We Learn to Play Well with Others? Enlisting the Humanities, the Sciences, and the Social Sciences in the Study of Violence." Presidential Plenary Address, Southwestern Social Science Association, Houston, Texas, April 1, 2010

"Homicide on Florida's Antebellum Frontier," Robert and Rose Stahl Criminal Justice Lecture, Lawton M. Chiles Center for Florida History, Florida Southern College, Lakeland, Florida, March 25, 2010

"Homicide in the American Backcountry, 1717-1850," Keynote Address at the "From Borderland to Backcountry Conference: Frontier Communities in Comparative Perspective" at the University of Dundee, Scotland, July 7, 2009

"Research Strategies for Studying the History of Crime and Violence," Seminar on Crime and Criminal Justice, Northwestern University School of Law, Nov. 15, 2007

"American Homicide: Its History," Ohio State University at Newark, Nov. 6, 2007

"American Homicide: A Political Hypothesis" and "The Case for Social Science History," Northern Illinois University, April 4-5, 2007

"What Historians Can and Might Learn from Legal Sources." Seminar in Early American History, Northwestern University, Jan. 31, 2007

"Why Is America a Homicidal Nation? A Political Hypothesis," lecture in the Historical Approaches in the Social Sciences series, State University of New York at Binghamton, Oct. 12, 2006

"The History of American Homicide," Winter College, Ohio State University, Sarasota, Florida, February 24, 2006

"The Role of Small Arms in American History," Small Arms Working Group, Harry Frank Guggenheim Foundation, Columbia University, June 2005

"Why is the United States So Homicidal Compared to Other Western Democracies?  A Political and Psychological Hypothesis," Center for Historical Research and Documentation on War and Contemporary Societies, Belgian Ministry of Scientific Research, Brussels, Belgium, December 2004

Randolph Roth                                                        Page 11

"The History of American Homicide," Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University, November 2004

"Peaceable Kingdoms? Harmony and Hostility in the Early American Family," Plenary Session, Society of Historians of the Early American Republic, July 22, 2004

"American Homicide," Department of History, Miami University, March, 2004

"Slavery, Freedom, and the History of African-American Homicide." School of Law and Department of History, University of Chicago, January, 2003

"American Homicide," School of Law, Stanford University, February, 2003

Workshop of the Study of the History of Homicide, Department of History, Stanford University, February, 2003

"American Homicide," Social Science Faculty Seminar, Stanford University, February, 2003

"American Homicide," School of Law, Northwestern University, September, 2003

"American Homicide," School of Law, University of Chicago, November, 2002

"Twin Evils?: The Relationship between Slavery and Homicide," Department of History, Yale University, May, 2002

"The Puzzle of American Homicide," School of Law, Northwestern University, November, 2001

"Why Northern New Englanders Seldom Commit Murder:  An Interregional History of Homicide in America," and "The Historical Database Project on Crime and Violence in America," two lectures presented at the Charles Warren Center, Harvard University.  May, 2000

"Understanding Homicide in America:  An Interregional Approach," presentation to the Early American History Seminar, University of Pennsylvania, October, 1999

"Can Faith Change the World?"  Keynote address, Conference on Reform in Antebellum Vermont, Vermont Historical Society, September, 1999

"Why Northern New Englanders Seldom Commit Murder," presentation to the

Randolph Roth                                                          Page 12

Center for Research on Vermont, the University of Vermont, and the Vermont Council on the Humanities. The presentation was televised in Vermont. It also made the evening news in Burlington and an AP wire story on my presentation was printed widely in newspapers in New Hampshire and Vermont, April, 1999

**Papers Delivered at Professional Meetings (recent)**

"The Difficulty of Counting the Number of Children Killed in Homicides in the United States, 1959-Present." Social Science History Association, November 23, 2019, Chicago.

"Police Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 13, 2019, San Francisco, with Wendy Regoczi and Rania Issa.

"Can Criminologists and Historians of Crime Work Together More Fruitfully in the Future?" Social Science History Association, November 3, 2017, Montreal.

"Comparing Data Sources on the Police Use of Lethal Force," American Society of Criminology, November 15, 2017, Philadelphia, with Wendy Regoczi and Rania Issa.

"The History of Mass Murder," American Historical Association, January 6, 2017, Denver.

"The Historians' Role in Criminal Justice Research," American Society of Criminology, November 16, 2016, New Orleans

"Police and Security Guard Involved Homicides in Ohio, 1959-1988," American Society of Criminology, November 18, 2016, New Orleans

"Why History and Biology Matter to One Another: The Epigenetics of Social Behavior," American Historical Association, New York City, January 4, 2015

"The National Homicide Data Improvement Project, 1959-Present: Why Research in Multiple Sources Changes Dramatically Our Understanding of the Incidence and Character of Homicides in the United States," American Society of Criminology, San Francisco, November 19, 2014

"The Relationship between Guns, Homicides, and Suicide in American History," Organization of American Historians, Atlanta, April 4, 2014

"Situating Crime in Macro-Social and Historical Context," Presidential Panel, American Society of Criminology, Atlanta, November 22, 2013

Randolph Roth                                                    Page 13

"Has Violence Declined since the Middle Ages?" Presidential Panel, American Society of Criminology, Chicago, November 15, 2012

"The Sudden Appearance of Sexual Serial Killers in Late-Nineteenth Century America," Organization of American Historians, Houston, March 20, 2011

"The Biology of Social Behavior" at the annual conference of the Society of Historians of the Early American Republic, Philadelphia, July 15, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the American Society of Criminology meeting in Washington, D.C., November 16, 2011

"Measuring Feelings and Beliefs that May Facilitate (or Deter) Homicide," at the Social Science History Association meeting in Boston, November 20, 2011

"Author Meets Critics" session on *American Homicide* at the European Social Science History conference in Ghent, Belgium, April 13, 2010. Discussants: Manuel Eisner, Peter King, and Pieter Spierenburg

"The Relationship between Guns and Homicide in American History," American Society of Criminology conference in San Francisco, November 18, 2010

"Author Meets Critics" session on American Homicide at the Social Science History Association conference in Chicago, November 20, 2010. Discussants: Richard McMahon, Douglas Eckberg, Donald Fyson, and John Carter Wood

"Does Honor Hold the Key to Understanding Violence in the Early Republic,"Society for Historians of the Early American Republic, Springfield, Illinois, July 2009.

"The Difficulty of Reconciling the Homicide Counts in the National Center for Health Statistics Mortality Data and the FBI Supplementary Homicide Reports," Social Science History Association, Long Beach, California, November, 2009

"Homicide in American History," Ohio Academy of History, Dayton, Ohio, April 12, 2008

"Quantification and Social Theory in the Study of Crime and Violence," in the Presidential Panel on "History in the Social Science History of Association: Disciplinary Developments," Social Science History Association, Chicago, Nov. 15-18, 2007

"Are Modern and Early Modern Homicide Rates Comparable?  The Impact of

Randolph Roth                                                                        Page 14

Non-Emergency Medicine," Social Science History Association, Chicago, Nov. 15-18, 2007

"How Homicidal Was Antebellum Florida?" Gulf South History and Humanities Conference, Pensacola, Florida, Oct. 6, 2006

"Probability and Homicide Rates: Why We Can Be Certain the Nineteenth-Century West Was Violent."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"The Historical Violence Database: A Collaborative Research Project on the History of Violent Crime and Violent Death."  Social Science History Association convention in Minneapolis, Nov. 2-5, 2006

"Big Social Science: What Could We Learn about Violent Crime If We Had Enough Money to Study It Properly? Possibilities for Collaborative Research Projects," Social Science History Association, Portland, Oregon, November 3-6, 2005

**Reviews**

T. Cole Jones, *Captives of Liberty: Prisoners of War and the Politics of Vengeance in the American* Revolution (American Historical Review, 2021).

Chris Murphy, *The Violence Inside Us: A Brief History of an Ongoing American Tragedy* (Criminal Law and Criminal Justice Books, 2020).

Jeffrey S. Adler, *Murder in New Orleans: The Creation of Jim Crow Policing*. (Punishment and Society, 2020).

Heidi J. Osselaer, *Arizona's Deadliest Gunfight: Draft Resistance and Tragedy at the Power Cabin, 1918*. (Western Historical Quarterly, 2020).

Iain McGilchrist, *The Master and His Emissary: The Divided Brain and the Making of the Western World*. (Journal of Interdisciplinary History, 2011).

Heather Cox Richardson, *Wounded Knee: Party Politics and the Road to an American Massacre*. (*Journal of the Civil War Era*, 2011).

Bill Neal, *Sex, Murder, and the Unwritten Law: Gender and Judicial Mayhem, Texas Style*. (New Mexico Historical Quarterly, 2010).

Gordon Morris Bakken and Brenda Farrington, *Women Who Kill Men: California Courts, Gender, and the Press*. (Pacific Northwest Quarterly, 2010).

Randolph Roth                                                        Page 15

Jack D. Marietta and Gail S. Rowe, *Troubled Experiment: Crime, Justice, and Society in Pennsylvania, 1682-1800*. (William and Mary Quarterly, 2010).

Mark R. Pogrebin, Paul B. Stretesky, and N. Prabha Unnithan, *Guns, Violence, and Criminal Behavior: The Offender's Perspective*. (Criminal Justice Review, 2010)

Nicole Rafter, *The Criminal Brain: Understanding Biological Theories of Crime*. (Journal of Interdisciplinary History, 2009.)

Laura Browder, *Her Best Shot: Women and Guns in America* (Winterthur Portfolio 2007).

Paul M. Searls, *Two Vermonts: Geography and Identity, 1865-1910* (Vermont History, 2006).

Anu Koskivirta, *The Enemy Within: Homicide and Control in Eastern Finland in the Final Years of Swedish Rule, 1748-1808* (English Historical Review 2005).

Irene Quenzler Brown and Richard D. Brown, *The Hanging of Ephraim Wheeler: A Story of Rape, Incest, and Justice in Early American* (H-SHEAR, 2003).

T. D. S. Bassett, *The Gods of the Hills* (New England Quarterly, 2001).

Karen Halttunen, *Murder Most Foul: The Killer and the American Gothic Imagination* (H-SHEAR, 1999).

Charles E. Clark, *The Meetinghouse Disaster* (Journal of American History, 1999).

Nicholas N. Kittrie and Eldon D. Wedlock, Jr., *The Tree of Liberty: A Documentary History of Rebellion and Political Crime in America* (Journal of the Early Republic, 1998).

Robert E. Shalhope, *Bennington and the Green Mountain Boys: The Emergence of Liberal Democracy in Vermont, 1790-1850* (Reviews in American History, 1997).

Daniel Doan, *Indian Stream Republic: Settling a New England Frontier* (Journal of the Early Republic, 1997).

Thomas H. Jeavons, *When the Bottom Line is Faithfulness: Management of Christian Service Organizations* (American Historical Review, 1996).

Randolph Roth                                                      Page 16

N. Prabha Unnithan, *The Currents of Lethal Violence:  an Integrated Model of Suicide & Homicide* (Justice Quarterly, 1995).

Edward Jarvis, *Traditions and Reminiscences of Concord, Massachusetts, 1779-1878* (Journal of the Early Republic, 1995).

Charles Hoffman and Tess Hoffman, *Brotherly Love:  Murder and the Politics of Prejudice in Nineteenth-Century Rhode Island* (American Historical Review, 1994).

Richard Bushman, *The Refinement of America:  Persons, Houses, Cities* (Pennsylvania History, 1994).

Michael Bellisiles, *Revolutionary Outlaws:  Ethan Allen and Vermont's Struggle for Independence* (William and Mary Quarterly, 1994).

David G. Hackett, *The Rude Hand of Innovation:  Religion and Social Order in Albany, New York, 1652-1836* (American Historical Review, 1992).

Nat Brandt, *The Congressman Who Got Away With Murder* (New York History, 1992).

Tamara Plakins Thornton, *Cultivating Gentlemen:  The Meaning of Country Life Among the Boston Elite, 1785-1860* (American Historical Review, 1991).

George M. Thomas, *Revivalism and Cultural Change:  Christianity, Nation Building, and the Market in the Nineteenth-Century United States* (Pennsylvania History, 1991).

Richard D. Brown, *Knowledge is Power:  The Diffusion of Information in Early America, 1700-1865* (The History of Education Quarterly, 1990).

William J. Gilmore, *Reading Becomes a Necessity of Life:  Material and Cultural Life in Rural New England, 1780-1865* (Vermont History, 1990).

Ruth Alden Doan, *The Miller Heresy, Millennialism, and American Culture* (Journal of the Early Republic, 1988).

William Lynwood Montell, *Killings:  Folk Justice in the Upper South* (International Journal of Oral History, 1987).

David R. Kasserman, *Fall River Outrage:  Life, Murder, and Justice in Early Industrial New England* (Journal of American History, 1987).

Robert J. Wilson III, *The Benevolent Diety:  Ebenezer Gay and the Rise of*

Randolph Roth                                                                    Page 17

*Rational Religion in New England* (New England Quarterly, 1985).

**Languages**

German
Spanish
French (reading)

**Quantitative Skills**

Probability and Statistics (including econometric techniques of political analysis, exploratory data analysis, and log-linear and logit analysis)
Calculus and Analytical Geometry
Linear Algebra and Nonlinear Dynamics
Differential and Series Equations
Abstract Algebra

Randolph Roth                                                                 Page 18

## Teaching

### Graduate

| | |
|---|---|
| History 7000 | Topics in American History to 1877 |
| History 7003 | Readings in the Early Republic and Antebellum America |
| History 7650 | Studies in World History |
| History 7900 | Colloquium in the Philosophy of History, Historiography, and the Historian's Skills |
| History 8000 | Seminar in Early American History |

### Undergraduate

| | |
|---|---|
| History 2001 | American Civilization, 1607-1877 (and Honors) |
| History 2015 | History of American Criminal Justice |
| History 2650 | World History since 1914 |
| History 2800 | Introduction to Historical |
| History 3164 | World History since 1914: Readings |
| History 3193 | Individual Studies / Research Internships in History |
| History 3700 | American Environmental History |
| History 4650 | History of Violence: Readings in World / Global / Transnational History |
| History 4675 | Global History of Violence: Research Seminar |
| History 5900 | Introduction to Quantitative Methods in History |
| History 598 | Religious and Reform Movements (Senior Colloquium) |
| History 598 | Research Seminar on Violent Crime and Death in the U.S. |
| History 557.02 | Jeffersonian and Jacksonian Democracy, 1800-1840 Thought |
| History 282 | American Religious History |

## Publications on Teaching

Founder and contributor to *Retrieving the American Past*, Department of History and Pearson Publishing, a flexible, problem-oriented publication for teaching classes in American History. Author of modules on "Violent Crime in Early America," "Marriage in Colonial America," and "Growing Up in Nineteenth-Century America."

## Ph.D Students Supervised

Daniel Vandersommers, "Laboratories, Lyceums, and Lords: Zoos, Zoology, and the Transformation of Humanism in Nineteenth-Century America," August 2014. Recipient of a Presidential Fellowship, 2013-2014, the most prestigious

Randolph Roth                                                          Page 19

University fellowship for senior graduate students. Assistant Professor of History, University of Dayton.

Michael Alarid, ""Caudillo Justice: Intercultural Conflict and Social Change in Santa Fe, New Mexico, 1837-1853," June 2012. Assistant Professor of History, University of Nevada at Las Vegas.

Matthew Foulds, "Enemies of the State: Methodists, Secession and Civil War in Western Virginia, 1844-1865," December 2011. Former Assistant Professor of History, Shepherd University

Jeanette Davis Mantilla, "Hush, Hush Miss Charlotte: Twenty-Five Years of Civil Rights Struggles in San Francisco, 1850-1875," April 2000. Administrator in Charter School Division of the Department of Education, State of Ohio

Ken Wheeler, "The Antebellum College in the Old Northwest: Higher Education and the Defining of the Midwest," January 1999. Professor of History, Reinhardt College. Author of *Cultivating Regionalism: Higher Education and the Making of the American Midwest* (Northern Illinois University Press, 2011)

Ross Bagby, "The Randolph Slave Saga." July 1998. Librarian and independent scholar

Marianne Holdzkom, "Parody and Pastiche Images of the American Revolution in Popular Culture, 1765-1820," May 1995. Professor of Social and International Studies, Southern Polytechnic State University

David Thomas, "Religion in the Far West: Oregon's Willamette Valley, 1830-1850," November 1993. Professor of History, Union College

**Recent Senior Honors Thesis Students Supervised (recently)**

Maggie Seikel, "The Great Depression in More Ways than One: Why Do Americans Commit Suicide More Often during Economic Crises?" (Anticipated 2021).

Margo Hertzer, "Police Involved Homicides in Ohio, 1959-1988." (Anticipated 2021).

Laura Janosik, "Homicides Involving Women in Ohio, 1959-1988." (2020). Prospective applicant to graduate school in history.

Randolph Roth                                                    Page 20

Ben St. Angelo, "How Labor Disputes Led to Violence: Personalities, Paternalism, and Power at Republic Steel in Youngstown, Ohio: 1937." (2017). Ph.D. student in History at Ohio State University.

Sarah Paxton, "The Bloody Ould Sixth Ward: Crime and Society in Five Points, New York" (2012). Ph.D. candidate in criminal justice history J.D. candidate at the Moritz School of Law at Ohio State University (twin degree program).

Kristen Gaston, "Restoration of the Cuyahoga River" (2012). Ph.D. candidate in Environmental History at the University of Cincinnati.

Alexandra Finley, "Founding Chestnut Ridge: The Origins of Central West Virginia's Multiracial Community" (2010). Ph.D. candidate in early American history at the College of William and Mary. Recipient of the first Annual Prize at Ohio State for the outstanding senior honors thesis in the Department of History.

Randolph Roth                                                          Page 21

## Service

### Service in Professional Organizations

2018-present, Allen Sharlin Book Prize Committee, Social Science History Association

2013-present, Grant Review Board, Harry Frank Guggenheim Foundation

2008-present, Editorial Board, *Crime, History, and Societies*.

2011-present, Editorial Board, *Homicide Studies*.

2014-2017, Board of Editors, *American Historical Review*

2014-15, 2016-17, Program Committee, American Society of Criminology

2014-2017, Research Awards Committee, Ohio Academy of History.

2011-2014, Chair, Distinguish Teaching Award Committee, Ohio Academy of History

2010-2011, Allan Sharlin Memorial Prize Committee, Social Science History Association

2010- ,Ohio Violent Death Reporting System Advisory Board

2010-2013, Advisory Board, Society for Historians of the Early American Republic

2008- , Society for the Scientific Detection of Crime, Columbus, Ohio

2009-2011, Youth Violence Prevention Advisory Board (Columbus)

2003, Nominating Committee, Social Science History Association

2002- , Co-founder and co-director, Historical Violence Database

1995-1997, ABC-Clio America:  History and Life Award Committee, Organization of American Historians

1987-1993, Chair, Methods and Theory Network, Social Science History Association

Randolph Roth                                                            Page 22

1987, Program Committee, Social Science History Association

**Reviews of Manuscripts**

American Historical Review
Journal of American History
William and Mary Quarterly
Journal of the Early Republic
Social Science History
Journal of Interdisciplinary History
Historical Methods
Journal of Women's History
Journal of the Family
Crime, History, and Societies
European Journal of Criminology
American Journal of Sociology
Sociological Quarterly
Criminology
Criminal Justice Review
Journal of Criminal Law and Criminology
Law and Social Inquiry
Homicide Studies
International Criminal Justice Review
International Journal of Law, Crime, and Justice
Law and Society Review
City and Community
Eras Review
Western Historical Quarterly
Canadian Journal of Sociology
Journal of the Gilded Age

**Memberships in Professional Organizations (current)**

American Historical Association
Organization of American Historians
Social Science History Association
European Social Science History Association
American Society of Criminology
Homicide Studies Working Group
American Association for the Advancement of Science

**Service at Ohio State University**

Randolph Roth                                                      Page 23

**Department**

2006-2010, 2018-present, Undergraduate Placement / Enhancement Officer

1994-2015, 2018-present, Undergraduate Teaching Committee

2017-2018, Chair of Grievance Committee

2015-2017, 1991-1993, Chair of Graduate Studies

2012-2013, Chair of Undergraduate Studies

2011-2013, Advisory Committee and Salary Committee

1987-1991, History Department Promotion & Tenure Committee

**College of Humanities**

2007-2009, Curriculum Committee, College of Humanities

2002-2005, College of Humanities Computing Advisory Committee

1996-1997, College of Humanities Committee on the Center for the Study and Teaching of Writing, 1996-7; Affiliated Faculty Member, 2000-

**College of Arts and Sciences**

2006-2009, Alternate, Arts and Sciences Faculty Senate

2006- , Advisory Board, Criminal Justice Research Center, Department of Criminology and Sociology

2004- , Fellow, Center for Law, Policy, and Social Science, Moritz College of Law

2000- , Fellow, Criminal Justice Research Center, College of Social and Behavior Sciences

**Graduate School**

2018- , Graduate Awards Review Committee

Randolph Roth                                                          Page 24

**Ohio Department of Higher Education**

2020- , Transfer Assurance Guide Review Panel, Ohio Articulation and Transfer Network

**Service at Grinnell College**

Chairman, African-American Studies Committee

Rosenfield Program on Public Affairs Committee

Faculty-Trustee Committee

**Community Service**

2001-2008, Chair, Community Services Advisory Commission, City of Dublin: advises City Council on all matters concerning utilities, policing, transportation, parks, recreation, waste management, etc.,

2004-present, Green Team, environmental projects volunteer organization, City of Dublin

2003-12, Committee to create an Indian burial mound and pioneer historic park at the Wright-Holder earthworks, City of Dublin

1997-present, Assistant Scoutmaster, Troop 299, Dublin / Citizenship Merit Badge Counselor / Eagle Scout Association / Philmont Staff Association / Distinguished Service Award, 2014 / Meritorious Service Award, 2006 / Bridge Builder Award, 2002

1997-2003, Good Schools Committee, Dublin City Schools, campaign committee for school bond and levy issues

1995-2005, President, Citizens for Dublin, city-wide association of civic association officers and city commission members

1995-1998, Vice-Chair, Transportation Task Force, City of Dublin

1995-1997, Community Plan Steering Committee, City of Dublin

Randolph Roth                                                           Page 25

1988-present, President / Vice President / Trustee, East Dublin Civic Association

1987-present, Nature Conservancy / Volunteer Service Awards / Volunteer Crew Leader

**Outreach / Media Appearances**

Testimony to Oversight Committee of the Ohio Senate, December 22, 2020, on so-called "Stand Your Ground" laws.

B.R.E.A.D. (an interfaith organization dedicated to Building Responsibility Equality and Dignity), January 13, 2020, on gun violence in central Ohio.

Testimony to Federalism Committee of the Ohio House of Representatives, June 12, 2019, on concealed carry laws.

Worthington Senior Citizen Center, Inequality in the U.S., April 15, 2019

Canfield Residence Hall, Discussion of History of Criminal Enterprise in the U.S. with Undergraduate Students, April 10, 2019

"Gun Ownership in Decline," *Columbus Dispatch*, December 11, 2017.

"How the Erosion of Trust Leads to Murders and Mass Shootings," invited editorial, *Washington Post*, October 6, 2017

"Mass Murder in American History," CSpan-3, April 2, 2017

All Sides with Ann Fisher, WOSU Radio, "Mass Murder and Terrorism," December 9, 2015 and June 13, 2106; "The Recent Rise in Homicide in the United States," March 14, 2017.

Consultant for the TLC Channel, "Who Do You Think You Are Anyway?" 2013-2014

Appeared on the CSPAN Book Channel on September 1, 2012 (http://www.c-span.org/LocalContent/Columbus/)

Appeared on the History Channel, "Seven Deadly Sins," January 3, 2009 (A&E Home Video)

"It's No Mystery: Why Homicide Declined in American Cities during the First Six Months of 2009," History News Network, November 22, 2009

Randolph Roth                                                        Page 26

(http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%2011-22-2009%205-2010.pdf and
http://cjrc.osu.edu/researchprojects/hvd/AHSV/It's%20No%20Mystery%20Further%20Thoughts%201-1-2010%205-2010.pdf)

Radley Balko, editor of reason.com, named *American Homicide* the best book of 2009 (http://reason.com/archives/2009/12/30/the-year-in-books)

"American Homicide," address to Columbus Rotary Club, October 24, 2011

Radio interviews: Execution Watch with Ray Hill on KPFT Houston, Texas, and WPFW Washington, D.C., Nov. 10, 2009; Focus 580 with David Inge, WILL, Champaign-Urbana, Illinois, December 7, 2009; RadioWest with Doug Fabrizio, KUER and XM Public Radio Channel 133, Salt Lake City, Utah, Dec. 17, 2009; The Mark Johnson Show of the Radio Vermont Group, WDEV, Waterbury, Vermont, Dec. 30, 2009; The Current with Anna Maria Tremonti on the CBC, Toronto, Canada, January 6, 2010; The Marc Steiner Show on WEAA in Baltimore, January 26, 2010; by ABC Radio, Sydney, Australia, interviewed on March 3, 2010 for broadcast the week of March 8, 2010; by the Extension with Dr. Milt Rosenberg on WGN Radio 720 AM Chicago, broadcast December 9, 2010; the Gil Gross Show, KKSF Radio 910 AM, San Francisco, July 27, 2012; and The Marc Steiner Show on WEAA in Baltimore, December 17, 2012; *American Homicide* was the subject of an editorial by op-ed writer Gregory Rodriguez in the *Los Angeles Times*, Sunday, April 12, 2010 (**http://www.latimes.com/news/opinion/commentary/la-oe-rodriguez12-2010apr12,0,3217212.column**)

*American Homicide* was the subject of an editorial by Raina Kelley in *Newsweek*, Nov. 5, 2009 (http://www.newsweek.com/id/221271).

*American Homicide* was cited favorably in the *New York Times Sunday Magazine* in an article by Jeffrey Rosen, "Prisoners of Parole," January 10, 2010; and in the *Washington Post*, Nov. 22, 2009

Newspaper articles: quoted and/or reviewed in the *Washington Post*, the *Washington Times*, the *National Review*, the *Economist*, the *Wall Street Journal*, the *Boston Globe*, the *Chicago Tribune*, the *San Francisco Chronicle*, the *Los Angeles Times*, the *New York Times*, New York *Newsday*, the *Chronicle of Higher Education*, and the *Columbus Dispatch*, which ran a front-page article on Roth's work in a Sunday edition

# EXHIBIT 13

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax: (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                        CIVIL DIVISION

12

13

14   **VIRGINIA DUNCAN, RICHARD**          Case No. 17-cv-1017-BEN-JLB
     **LEWIS, PATRICK LOVETTE,**
15   **DAVID MARGUGLIO,**                  **DECLARATION OF ROBERT**
     **CHRISTOPHER WADDELL, and**          **SPITZER**
16   **CALIFORNIA RIFLE & PISTOL**
     **ASSOCIATION, INC., a California**   Courtroom:    5A
17   **corporation,**                      Judge:        Hon. Roger T. Benitez
                                           Action Filed:  May 17, 2017
18                          Plaintiffs,

19               v.

20   **ROB BONTA, in his official capacity as**
     **Attorney General of the State of**
21   **California; and DOES 1-10,**

22                          Defendants.

23

24

25

26

27

28

**DECLARATION OF ROBERT SPITZER**

I, Robert Spitzer, declare under penalty of perjury that the following is true and correct:

1.     I have been asked by the California Department of Justice to render an opinion on the history of firearms restrictions enacted in the early twentieth century, addressing machine guns (fully automatic firearms), semiautomatic firearms, and ammunition feeding devices, and tracing those regulations back to earlier hardware and use restrictions on other types of weapons enacted in the nineteenth century and earlier.

2.     This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.     I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $500 per hour.

**BACKGROUND AND QUALIFICATIONS**

4.     I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I earned my Ph.D. in Government from Cornell University.  I reside in Williamsburg, Virginia.  A copy of my curriculum vitae is attached as Exhibit A to this Declaration.

5.     I have been studying and writing about gun policy for over thirty years.  My first publication on the subject appeared in 1985.  Since then, I have published six books and over one hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995. It examines firearms policy in the United States through the lenses of history, law, politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge Publishers.  My two most recent books on gun policy, *Guns across*

1

1  *America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford

2  University Press, 2023), both deal extensively with the study of historical gun laws.

3  I am frequently interviewed and quoted in the national and international media on

4  gun-related matters.  For over twenty years, I have been a member of the National

5  Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun

6  Violence).

7      6.    I have provided written testimony as an expert witness in *Worman v.*

8  *Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the constitutionality of

9  Massachusetts' restrictions on assault weapons, and in *Miller v. Bonta*, No. 3:19-

10  cv-01537-BEN-JLB, which concerns the constitutionality of California's

11  restrictions on assault weapons.  I have co-authored amicus briefs in numerous

12  cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d

13  1185 (2003); *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, 556 U.S.

14  848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell*

15  *v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011);

16  and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR

17  12069 (2012).

18      7.    I have also presented written testimony to the U.S. Congress on "The

19  Second Amendment: A Source of Individual Rights?" submitted to the Judiciary

20  Committee, Subcommittee on the Constitution, Federalism, and Property Rights,

21  U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand

22  Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee

23  on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington,

24  D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun

25  Silencers," submitted to Committee on Natural Resources, Subcommittee on

26  Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's

27  Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C.,

28  September 12, 2017.

**OPINIONS**

## I.   INTRODUCTION

1.   The current controversy surrounding legislative efforts to restrict semi-automatic assault weapons and large capacity magazines would seem to be a purely contemporary matter, responding to the modern phenomenon of mass shootings. The effort to restrict such weapons was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others.  Later that year, California enacted the first assault weapons ban in the country.  Five years later, Congress enacted a limited ten year ban.[1]  As of this writing, eight states plus the District of Columbia have similar bans in place.[2]  These jurisdictions represent approximately 89 million people, or approximately 26.8% of the U.S. population.[3] Twelve states plus the District of Columbia restrict large capacity magazines

---

[1] Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 25-26, 205-11.

[2] Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 14-15.  The nine American jurisdictions with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Maryland, Massachusetts, New Jersey, and New York.  Notably, the U.S. House of Representatives passed a renewed federal assault weapons ban with magazine limitations in 2022 (H.R. 1808, 117th Cong. (2022)). Delaware recently enacted its assault weapons and large-capacity magazine restrictions in June 2022.  *See* Governor Carney Signs Package of Gun Safety Legislation (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.

[3] See U.S. Census, National Population Totals and Components of Change: 2020-2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2021 state population estimates). The total population in these jurisdictions is estimated to be 88,976,315 out of a U.S. total of 331,501,080.

Declaration of Robert Spitzer (17-cv-1017-BEN-JLB)

1 (LCMs).[4]  These jurisdictions represent more than 103 million individuals, or

2 approximately 31.2% of the U.S. population.[5]  And in 2022, the U.S. House of

3 Representatives passed a renewed nationwide assault weapons ban with LCM

4 restrictions.[6]

5      2.    These recent efforts to restrict assault weapons and LCMs are simply

6 the latest chapter in a centuries-long effort to protect the public from harm and to

7 dampen weapons-related criminality.  The pattern of criminal violence and

8 concerns for public safety leading to weapons restrictions is not new; in fact, it can

9 be traced back to the Nation's beginnings.  While the particular weapons

10 technologies and public safety threats have changed over time, governmental

11 responses to the dangers posed by certain weapons have remained constant.

12 Current restrictions on assault weapons and detachable ammunition magazines are

13 historically grounded.  They are part of a pattern in America's history of legislative

14 restrictions on particular weapons stretching back centuries.

15

16

17

18      _____

19     [4] Giffords Law Center, Large Capacity Magazines,
https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-

20 capacity-magazines/; Spitzer, *The Gun Dilemma*, 30.  The thirteen jurisdictions are
California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii,

21 Maryland, Massachusetts, New Jersey, New York, Rhode Island, Vermont, and

22 Washington.  With two exceptions, all of these restrictions impose a ten-round limit
on magazines, as did the 1994 federal law, and Hawaii's restrictions apply to only

23 handguns.

24     [5] U.S. Census, National Population Totals and Components of Change: 2020-

25 2021, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-
total.html#par_textimage_2011805803 (2021 state population estimates).  The total

26 population in these jurisdictions is estimated to be 103,503,256 out of a U.S. total

27 of 331,501,080.

28     [6] H.R. 1808, 117th Cong. (2022).

## II.  REGULATORY HISTORY OF FULLY AUTOMATIC AND SEMI-AUTOMATIC FIREARMS (EARLY TWENTIETH CENTURY)

3.     A clear example of this historical pattern is provided by early twentieth-century restrictions related to fully automatic firearms.  While weapons capable of firing rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute,[7] it and its successors were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus, owing to the Gatlin gun's size and weight.  Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger.  The development of a fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, came to fruition during World War I, and to devastating effect, where tripod-mounted machine guns on the battlefield, like the Maxim, which initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[8]

4.     Out of World War I came a practical, lighter-weight, reliable, hand-held, fully automatic weapon: the Thompson submachine gun, widely known as the Tommy gun.  Though it was developed for use in World War I, it came too late in

---

[7] The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and the Spanish-American War of 1898.  Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367-68; "Gatling Gun," *History.com,* September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

[8] Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 127; "How The Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

1  the war to have much effect.  Its inventor, John Thompson, patented his .45 caliber

2  gun in 1920.[9]  The Tommy gun was initially unregulated after World War I and

3  made available for civilian purchase, typically with either a 20-30 round stick

4  magazine or a 100-round drum magazine.  (The U.S. military showed little interest

5  in acquiring the weapon, as the military largely demobilized and contracted sharply

6  in size after the war.[10])  It was only at this point—in the early 1920s—that such

7  hand-held weapons operated reliably, were made available to civilians, and began

8  to circulate in society,[11] though sales in the early 1920s were sluggish.  By 1925,

9  Thompson's marketing company, Auto Ordnance, had sold only about 3,000 of the

10  15,000 it had manufactured up to this point, including to police forces and

11  individuals.[12]  Before the early 1920s, these weapons were unregulated for the

12  obvious reason that they did not exist or were not circulating widely in society.

13  When they did begin to circulate, however, their uniquely destructive capabilities

14  rapidly became apparent, especially to the emergent Prohibition-fueled gangster

15  organizations of the 1920s.  Another automatic weapon developed for World War I

16  was the Browning Automatic Rifle (BAR).  It fired a .30-06 caliber round, could

17  receive a 20-round box magazine, and could fire up to 650 rounds per minute.  The

18

19  _____

20  [9] Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts
About the Thompson Submachine Gun," *Military History Now,* January 16, 2015,

21  https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-

22  amazing-facts-about-the-thompson-submachine-gun/.

23  [10] John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975),
149-52.

24  [11] Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal

25  Service?" *The National Interest*, July 3, 2020,

26  https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-
service-164096.

27  [12] Lee Kennett and James LaVerne Anderson, *The Gun in America*

28  (Westport, CT: Greenwood Press, 1975), 203.

6

BAR first appeared on the battlefield in 1918.[13]  It, too, made its way into civilian life and found favor among criminals and gangsters in the 1920s and early 1930s.[14] Like contemporary assault weapons and their use in mass shootings, guns like the Tommy gun and the BAR were actually used relatively infrequently by criminals generally, but when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929.[15]

> **A.  State-Level and Nationwide Attempts to Regulate Automatic and Semi-Automatic Firearms in the Early Twentieth Century**

5.      In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws; eight of these laws were passed in 1927 alone (see Exhibits B and D).  These state (and eventual federal) enactments were anticipated, justified, and promoted by the National Conference of Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory

---

[13] Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[14] Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12.  The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example.  Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[15] Chris McNab, *Firearms and American Law Enforcement Deadly Force* (NY: Osprey Publishing, 2009), 97-98.

law."[16]  (Today, the organization is known as the Uniform Law Commission.)  In 1923, the Commission organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms."  In 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."[17]  In 1930, it issued a model firearms act focusing on "guns of the pistol type."  In 1932, it issued a model act "intended not only to curb the use of the machine gun, but to make it unwise for any civilian to possess one of the objectionable type."  The Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a partly concealable type of machine gun-the Thompson .45 inch caliber submachine gun becoming most popular. . . ."[18]

6.      Congress enacted a machine gun ban for the District of Columbia in 1932 which included as a machine gun "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading."[19]  The National Rifle Association endorsed DC's ban, stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."[20]  In his testimony before Congress in 1934 on

---

[16] Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

[17] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928).

[18] "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[19] "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45 ; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

[20] S. Rep. No. 72-575, at 5-6 (1932).

8

1   the bill that became the National Firearms Act, NRA vice president Milton A.

2   Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . .

3   the association I represent is absolutely favorable to reasonable legislation.  We are

4   responsible for the uniform firearms act. . . . in the District of Columbia.  It is on

5   the books now."[21]

6         7.    In 1934, Congress enacted the National Firearms Act, which imposed

7   a series of strict (and effective[22]) requirements on the civilian acquisition and

8   general circulation of fully automatic weapons, like the Tommy gun.  The National

9   Firearms Act imposed a tax on the manufacture, sale, and transfer of listed

10   weapons, including machine guns, sawed-off shotguns and rifles, silencers, and

11   "any other weapons" with certain firing capabilities.  Such weapons had to be

12   registered with the Treasury Department, and the owners fingerprinted and subject

13   to a background check, with the payment of a $200 tax.[23]  The early models of the

14   Tommy gun could fire "an astounding 1,500 rounds per minute.  A Tommy gun

15   could go through a 100-round drum magazine in four seconds.  Later versions fired

16   600 to 700 rounds per minute."[24]

17         8.    In his opening statement to the Ways and Means Committee of the

18   U.S. House of Representatives, Attorney General Homer Cummings made clear

---

21   [21] "Hearings Before the Committee on Ways and Means," 36.

22   [22] Philip J. Cook and Kristin A. Goss, *The Gun Debate,* 2nd ed. (NY: Oxford
23   University Press, 2020), 13; Spitzer, *The Politics of Gun Control*, 195-96.
      According to the ATF's national registry of machine guns, 726,951 are registered
24   with the government as of 2020.  Such weapons are rarely used in crimes.  Firearms
25   Commerce in the United States Annual Statistical Update 2020, United States
      Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, 15,
26   https://www.atf.gov/file/149886/download.

27   [23] 48 Stat. 1236.

28   [24] Moss, "From Gangland to the Battlefield."

9

1  that the bill under consideration was designed to fight the epidemic of gun crime

2  where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes
> rapidly from State to State, has created a situation which is giving
> concern to all who are interested in law and order. . . . there are more
> people in the underworld today armed with deadly weapons, in fact,
> twice as many, as there are in the Army and the Navy of the United
> States combined. . . . In other words, roughly speaking, there are at least
> 500,000 of these people who are warring against society and who are
> carrying about with them or have available at hand, weapons of the most
> deadly character.[25]

As one member of the committee observed, "The question in my mind and I think

in the majority of the committee is what we can do to aid in suppressing violations

by such men as [John] Dillinger and others."[26]

9.    To address the problem, the original version of the bill proposed

regulating both semi-automatic and fully automatic firearms, as it defined restricted

machine guns this way: "The term 'machine gun' means any weapon designed to

shoot automatically or semiautomatically 12 or more shots without reloading."[27]

The final version of the bill limited restrictions to fully automatic firearms.

Contemporary assault weapons that fire semi-automatically, like AR-platform

rifles, are excluded from the National Firearms Act.

10.    In addition to the National Firearms Act's restrictions on fully

automatic weapons, during this same time period, at least seven states plus the

District of Columbia, and as many as eleven states, enacted laws restricting semi-

---

[25] "Hearings Before the Committee on Ways and Means," 4.  The version of
the bill that appears on page 1 of the Hearings had this definition of machine gun:
"The term 'machine gun' means any weapon designed to shoot automatically or
semiautomatically twelve or more shots without reloading."

[26] "Hearings Before the Committee on Ways and Means," 42.

[27] Ibid., 52.

automatic weapons (see Exhibit B).[28]  The reason for restricting semi-automatic firearms is not hard to discern.  With the exception of the District of Columbia's restrictions on semi-automatic weapons, these restrictions all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology: an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[29]

11.    As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time.  By that time, gun technology was now available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices.  Again, the lesson is the same: once these technologies began to spread in civil society, regulatory efforts proliferated.

**B.    State Regulation of Ammunition Feeding Devices**

12.    Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on ammunition magazines or their equivalent, as both automatic and semi-automatic weapons are predicated on some kind of mechanical

---

[28] See also Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 68-71. The language of the restrictions in Illinois, Maine, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

[29] Spitzer, *The Gun Dilemma*, 32-33.  In 1913, Florida enacted this measure: "It shall, at any time, be unlawful to hunt game in Marion County with guns—known as Automatic guns."  While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

1   loading function or device that automatically feeds new rounds into the firing

2   chamber after the previous round is fired.  As is the case with contemporary state

3   limitations on ammunition magazine capacity, state laws enacted early in the

4   twentieth century imposed restrictions based on the number of rounds that could be

5   fired without reloading, ranging from more than one (Massachusetts and

6   Minnesota) up to a high of eighteen (Ohio).

7       13.   Magazine firing limits were imposed in three categories of state laws

8   (see Table 1 below): twelve states plus the District of Columbia regulating semi-

9   automatic and fully automatic weapons (California, District of Columbia,

10  Louisiana, Massachusetts, Michigan, Minnesota, New Jersey, North Carolina,

11  Ohio, Rhode Island, South Carolina, South Dakota, and Virginia[30]); nine states

12  regulated fully automatic weapons only, where the regulation was defined by the

13  number of rounds that could be fired without reloading or by the ability to receive

14  ammunition feeding devices (Illinois, Minnesota, New Jersey, North Dakota,

15  Oregon, Pennsylvania, Texas, Vermont, and Wisconsin[31]); and four states restricted

16

17      [30] 1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650,
18  650, 652 (District of Columbia); Act of July 2, 1931, 1931 Ill. Laws 452, 452; Act
    of July 7, 1932, no. 80, 1932 La. Acts 336; 1927 Mass. Acts 413, 413-14; Act of
19  June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act
    No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn.
20  Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I.
    Pub. Laws 256, 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform
21  Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934,
22  ch. 96, 1934 Va. Acts 137, 137.  Two of these states enacted early laws focused on
    such weapons' use in hunting.  New Jersey had a 1920 law making it "unlawful to
23  use in hunting fowl or animals of any kind any shotgun or rifle holding more than
24  two cartridges at one time, or that may be fired more than twice without reloading."
    1920 N.J. Laws 67, ch. 31, Section 9.  North Carolina made it "unlawful to kill
25  quail with any gun or guns that shoot over two times before reloading" in 1917.
26  1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

27      [31] 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and
28  Transportation of Machine Guns, §§ 1-2; 1927 N.J. Laws 180-81, A Supplement to

(continued…)

1    all guns that could receive any type of ammo feeding mechanism or round feeding

2    device and fire them continuously in a fully automatic manner (California, Hawaii,

3    Missouri, and Washington State)[32].

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20    _____

21    an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2; 1931 N.D.
      Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns,
22    Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-
      2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929
23    Pa. Laws 777, §1; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining
      "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine
24    Guns. . . , ch. 82, §§ 1-4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit
      the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess.
25    Laws 245, 164.01.

26

27        [32] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws
      335.
28

13

## TABLE 1

### AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917-1934[33]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br>-District of Columbia (12 rounds; 1932)<br>-Louisiana (8 rounds; 1932)<br>-Massachusetts (1 round; 1927)<br>-Michigan (16 rounds; 1927)<br>-Minnesota (1 round; 1933)<br>-New Jersey (2 rounds; hunting only; 1920)<br>-North Carolina (2 rounds; hunting only; 1917)<br>-Ohio (18 rounds; 1933)<br>-Rhode Island (12 rounds; 1927)<br>-South Carolina (8 rounds; 1934)<br>-South Dakota (5 rounds; 1933)<br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br>-Minnesota (12 rounds; 1933)<br>-New Jersey (any removable device holding rounds; 1927)<br>-North Dakota (loadable bullet reservoir; 1931)<br>-Oregon (2 rounds; 1933)<br>-Pennsylvania (2 rounds; 1929)<br>-Texas (5 rounds; 1933)<br>-Vermont (6 rounds; 1923)<br>-Wisconsin (2 rounds; 1933) | -California (1927)<br>-Hawaii (1933)<br>-Missouri (1929)<br>-Washington State (1933) |

See Exhibit D for statutory text.

---

[33] Including the District of Columbia. Note that California, Minnesota, and New Jersey appear twice in this table. The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934. See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

14.    A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

> all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber *in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.*[34]

The other three states in this category (Hawaii, Missouri, Washington[35]) utilized this same description.  In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).  The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[36]  (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as noted previously.[37]  The final version of the 1934 bill was limited to fully automatic firearms only and did not include any limitation by number of rounds fired.)  Regulations concerning removable magazines and magazine capacity were in fact common as early as the 1920s—the period of time when these weapons and devices began to make their way into civilian life and also contributed to violence and criminality—as these

---

[34] 1927 Cal. Stat. 938 (emphasis added).

[35] 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[36] "National Firearms Act," Hearings Before the Committee on Ways and Means, House of Representatives, on H.R. 9066, April 16, 18, and May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 52.

[37] Ibid., 45.

1    regulations were adopted by nearly half of all states, representing approximately

2    58% of the American population at that time.[38]

3    ### C.    Lessons from the Regulation of Automatic and Semi-
4             Automatic Firearms and Ammunition Feeding Devices in the
5             Early Twentieth Century

6    15.    The lesson from this sequence of events early in the twentieth century

7    demonstrates that changes in gun policy followed a series of steps that respond to

8    developments in firearms technologies and their use in crime, each dependent on

9    the previous step.  *First*, a new gun or gun technology is invented.  *Second*, it may

10   then be patented, though the patenting of a design or idea by no means assures that

11   it will proceed beyond this point.  *Third*, it may then be developed with a focus on

12   military applications and supplying military needs, not directly for civilian

13   acquisition or use.  *Fourth*, some military-designed weapons may then spread to, or

14   be adapted to, civilian markets and use.  *Finally*, if such weapons then circulate

15   sufficiently in society to pose a safety, violence, or criminological problem or

16   threat, calls for government regulation or restriction then may lead to gun

17   policy/law changes.  New gun laws are not enacted when firearm technologies are

18   invented or conceived.  They are enacted when those technologies circulate

19   sufficiently in society to spill over into criminal or other harmful use, presenting

20   public safety concerns that governments attempt to address through their police and

21   policy-making powers.

22   16.    This lesson is significant because some argue that the absence of

23   government gun regulations in history—at the time of the invention of various

24   weapons or weapons developments—means that regulations now are unjustifiable,

25   or have no historical basis.  For example, David Kopel argues that "[m]agazines of

26   _____

27   [38] U.S. Census, Historical Population Change Data (1910-1920) (using 1920
     census data), https://www.census.gov/data/tables/time-series/dec/popchange-data-
28   text.html.

1   more than ten rounds are older than the United States."[39]   Drawing on examples like

2   a firearm "created around 1580" capable of firing sixteen "'superposed' loads"

3   (with each round stacked on top of the other); the Puckle gun said to fire eleven

4   shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and

5   the Pepperbox pistol of the early 1800s,[40]   Kopel suggests that "magazines of more

6   than ten rounds are older than the Second Amendment."[41]   Therefore, by Kopel's

7   reckoning, since these weapons existed early in (or even before) the country's

8   existence, and were not specifically regulated, ipso facto, today's governments are

9   unable to regulate assault weapons, like AR-platform rifles, or magazines

10   exceeding certain capacities (typically, a ten-round limit).[42]

11        17.   Kopel's and similar arguments[43] fail for two sets of reasons.  First, as

12   explained in the following section, this sort of narrative misrepresents the

13   availability and capabilities of these early weapons.  Second, the account fails to

14   understand the relationship between firearms' technological development, their

15   spread into civil society, and government gun policy.  As one gun history expert

16   noted, "the guns of 1830 were essentially what they had been in 1430: single metal

17   tubes or barrels stuffed with combustible powder and projectiles" where "after

---

[39] David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," *Albany Law Review* 78 (2014-2015): 851.

[40] Ibid., 852-54.

[41] Ibid., 849.

[42] Ibid., 871-72 ("a court which today ruled that [10-round] magazines are 'dangerous and unusual' would seem to have some burden of explaining how such magazines, after a century and a half of being 'in common use' and 'typically possessed by law-abiding citizens for lawful purposes,' became 'dangerous and unusual' in the twenty-first century.").

[43] Declaration of Ashley Hlebinsky in Support Of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB, United States District Court For The Southern District Of California, filed September 27, 2019 (Plaintiffs' Trial Exhibit 2).

every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . .; then ignite the gunpowder and send the projectile on its way."[44]  The firearms and firearm feeding devices regulated in the early twentieth century represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.

### D.    The History of Pre-Twentieth Century Firearms Technologies

18.    As researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier).  Kopel's example of a firearm from the late 1500s that could fire up to sixteen rounds is drawn from a book titled, *Firearms Curiosa*.  But this book's very title indicates why this narrative is irrelevant to the modern gun debate.  The definition of "curiosa" is something that is rare or unusual.  As the book's author, Lewis Winant says, his book is about "oddity guns" and "peculiar guns."[45]  That is, they were anything but common, ordinary, or found in general circulation.  Winant's description of the sixteen shot gun from the 1500s is that "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[46]  A "Roman candle charge" was defined by Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[47]  In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that

---

[44] Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3-4.

[45] Lewis Winant, *Firearms Curiosa* (New York: Bonanza Books, 1955), 8, 9.

[46] Ibid., 168.

[47] Ibid., 166.

1   cannot be controlled by the operator once the initial charge is ignited.  Winant

2   concludes: "Of all the ideas for producing multishot firearms the scheme of

3   superimposing loads in one barrel is probably the oldest, the most discredited, the

4   most frequently recurring, and also the most readily accepted as new."[48]

5       19.    An early multi-shot gun, the "Puckle Gun," patented in 1718 in

6   London by James Puckle, could fire nine rounds per minute (hardly comparable to

7   the firing capabilities of semi- and fully automatic weapons of the early twentieth

8   century or modern era).  The patent drawing of this weapon shows it sitting on a

9   tripod on the ground.[49]  It was not a held-held weapon.  In the patent, Puckle

10  described it as "a portable Gun or Machine (by me lately invented) called a

11  DEFENCE."[50]  It was indeed a military weapon, as Winant says: "Of the oddities

12  among military weapons none has received more publicity than the Puckle gun. . . .

13  The Puckle invention was probably the first crank-operated machine gun.  It

14  embodied several elements that closely resemble construction features of Gatling,

15  Hotchkiss and other manually-operated machine guns."  Winant continued, "It is

16  doubtful that any of the Puckle guns that may have been actually produced ever saw

17  service.  A different account of this weapon says: "There is in fact no record of such

18  a gun ever having been built,"[51] although there are claims to the contrary.  A

19  contemporaneous poet, commenting on 'Puckle's Machine Company', wrote 'Fear

20

21

22

23

24
_____

25  [48] Ibid., 166.

26  [49] Ibid., 220.

27  [50] Ibid., 219.

28  [51] Ellis, *The Social History of the Machine Gun,* 13.

1  not, my friends, this terrible machine. They're only wounded who have shares

2  therein.'"[52]  This weapon "never advanced beyond the prototype stage."[53]

3      20.    In short, it was an experimental weapon designed for military use, and

4  the patent's reference to "DEFENCE" was clearly a reference to military defense,

5  not personal defense. As this account confirms, it was likely never even

6  manufactured beyond perhaps a prototype. It was a failed effort, even though later

7  gun inventors learned from its failure.

8      21.    Kopel also cites the example of the Jennings multi-shot flintlock rifle

9  from 1821, capable of firing up to twelve "superposed" shots before reloading.[54]

10  Yet according to *Flayderman's Guide to Antique American Firearms,* its

11  production quantity was so small as to be "unknown" and therefore is "extremely

12  rare," unsurprising since it utilized fatally defective "superposed" firing (discussed

13  earlier) relying on twelve individual touchholes.[55]  Similar problems plagued or

14  doomed multi-shot flintlock pistols of the early nineteenth century. According to

15  Carl P. Russell: "Flintlock revolving pistols had been given trials and some

16  practical use very early in the nineteenth century, but the loose priming powder in

17  the pan of each cylinder constituted a hazard that was never eliminated."[56]

18      22.    Another example often cited is the Girandoni (or Girardoni) air rifle, a

19  military weapon developed for crack shots in the Austrian army that was capable of

20

---

21  [52] Winant, *Firearms Curiosa*, 219-21. See also "The Puckle Gun: Repeating
Firepower in 1718," December 25, 2016,

22  https://www.youtube.com/watch?v=GPC7KiYDshw.

23      [53] Rasenberger, *Revolver*, 3.

24      [54] Kopel, "The History of Firearm Magazines and Magazine Prohibitions,"
853.

25

26      [55] Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th
ed. (Iola, IA: Gun Digest Books, 2007), 683.

27      [56] Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of
Nebraska Press, 1957), 91.

28

1   firing up to 20 rounds.  One of these was taken along on the Lewis and Clark

2   expedition of 1804-1806.[57]  But these guns were a rarity, as they were extremely

3   expensive, fragile, and complex, and few were made—no more than about 1,500.[58]

4   In fact, the rifles never caught on as they proved to be impractical on the battlefield,

5   and even more so for civilian use.  To wit: "Leather gaskets needed to be constantly

6   maintained and swelled with water to sustain pressure.  Once empty the reservoirs

7   required a significant effort and 1500 strokes to restore full power.  A supply wagon

8   was subsequently outfitted with a mounted pump to readily supply soldiers but this

9   negated one of the key features—mobility.  The rudimentary fabrication methods of

10  the day engineered weak threading on the reservoir neck and this was the ultimate

11  downfall of the weapon.  The reservoirs were delicate in the field and if the riveted

12  brazed welds parted the weapon was rendered into an awkward club as a last

13  resort."[59]  It was pulled from military service by 1815.[60]

14

15

16

---

17  [57] David Kopel, "The history of magazines holding 11 or more rounds:
18  Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014,
19  https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-
    history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/.  The
20  Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but
    to impress the Native Americans they encountered.  Whenever they planned to fire
21  the gun, they were careful to prepare it before encountering Native Americans so
22  that they were not aware of the extensive pre-fire preparations needed.  See Stephen
    E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and
23  passim.

24  [58] Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May
25  14, 2013, https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

    [59] John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure,"
26  *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-
27  girandoni-air-rifle-deadly-under-pressure.

28  [60] Markowitz, "The Girandoni Air Rifle."

1      23.    To take another example, the Volcanic repeating pistol, patented in

2  1854, was said to have the ability to fire up to "ten or greater rounds."[61]  The

3  Volcanic Repeating Arms Company was founded in 1855, and it experimented with

4  a number of design innovations.  But the company was "short-lived" and went

5  "defunct" in 1866, even though its partners included Horace Smith, Daniel B.

6  Wesson, and Courtlandt Palmer.[62]  Its patent and technological work were

7  important for subsequent developments, especially for Smith and Wesson's later

8  work, but the actual weapons produced by Volcanic were few, flawed, and

9  experimental,[63] dubbed "radical defects" by Winchester himself.[64]  In 1857 and

10  1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust

11  for many decades" until the company finally sold them for fifty cents each to

12  employees.[65]

13      24.    Another account laboring to establish early gun firing provenance

14  asserts that "[s]emi-automatic technology was developed in the 1880s" with the

15  "Mannlicher rifle. . . generally attributed to be the first semi-automatic rifle."[66]  Yet

16  this "development" was initially a failure: "Ferdinand von Mannlicher's Model

17  1885 self-loading rifle design" was "a failure, never seeing anything even

18  resembling mass production."[67]  The true semi-automatic weapon did not become

---

19
20      [61] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 6 (Plaintiffs' Trial Exhibit 2).

21      [62] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51-52.

22      [63] "Volcanic Repeating Arms," https://military-
23  history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

24      [64] Quoted in Haag, *The Gunning of America,* 56.

25      [65] Haag, *The Gunning of America*, 60.

26      [66] Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8 (Plaintiffs' Trial
27  Exhibit 2).

28      [67] Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*,
(continued…)

22

feasible and available until the beginning of the twentieth century, and the primary market was the military.[68]

25.    The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver.  The reason: pepperboxes were "heavy, lumpy, and impractical."[69]  By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[70]  Further, "[t]hey also had a nasty habit of discharging all their barrels at once.  No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[71]  Indeed, the Colt revolver was "the first widely used multishot weapon,"[72] although it took decades for this and similar revolvers to catch on.

26.    Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun

---

May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[68] Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom,* July 2022, 32-39.

[69] Rasenberger, *Revolver*, 54.

[70] Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[71] Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154.  By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison."  Winant, *Pepperbox Firearms,* 32.

[72] Rasenberger, *Revolver*, 401.

Declaration of Robert Spitzer (17-cv-1017-BEN-JLB)

1   repeaters appeared late in the Civil War.[73]  Even so, the "standard infantry weapon

2   [in the Civil War] remained the single-shot, muzzle-loaded weapon."[74]

3       27.     As noted, the idea of an available, affordable, reliable multi-shot

4   firearm did not arise until the development of Colt's multi-shot revolver in the

5   1830s.  Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first

6   practical firearm that could shoot more than one bullet without reloading.[75]  Even

7   then, Colt could not readily manufacture multi-shot weapons for many years

8   because he could find no market for them, either from the government or the public.

9   The government, in fact, dismissed such firearms as mere "novelties."[76]  After an

10  1837 test of Colt's gun and others the government concluded that it was "entirely

11  unsuited to the general purposes of the service."[77]  The government also rejected

12  the weapon after tests in 1836, 1840, and 1850.  Colt's early failure to cultivate

13  either a military or a civilian market in the U.S. drove him to bankruptcy and then

14  to market his guns to European governments in the 1840s.  The gun made

15  appearances in the pre-Civil War West, yet even during the Civil War, "Colt's

16  revolver was a sideshow through most of the war. . . ."[78]  And though the Colt-type

17  revolver "had proved itself, the official sidearm of the United States Army [in the

18

19

20  ───────────────

    [73] Kopel, "The history of magazines holding 11 or more rounds"; Kennett

21  and Anderson, *The Gun in America*, 112-13.

22      [74] Snow and Drew, *From Lexington to Desert Storm*, 90.  As Civil War

23  historian James M. McPherson noted, even though some repeating rifles appeared
    in the Civil War as early as 1863, single-shot muzzle-loaders "remained the

24  principal infantry weapons throughout the war."  *Battle Cry of Freedom* (NY:
    Oxford University Press, 1988), 475.

25      [75] Rasenberger, *Revolver*, 3-5, 401.

26      [76] Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 24.

27      [77] Rasenberger, *Revolver*, 136.

28      [78] Ibid.*,* 390.

1    Civil War] remained a single shot pistol."[79]  It took the Colt's use during the Civil

2    War to finally spur the post-Civil War proliferation of the Colt-type revolver and

3    similar firearms into society.[80]

4         28.    While inventor Benjamin Henry claims credit for developing the first

5    practical, lever action repeating rifle (patented in 1860), his competitor Winchester

6    "deftly gutted" the Henry Arms Company, coopting it to form the Winchester Arms

7    Company in 1866, paving the way for Winchester's dominance.[81]  The Winchester

8    rifle could fire up to fifteen rounds without reloading.  Yet the widely known

9    Winchester 1873, "was designed for sale to the Government as a military arm."[82]  A

10   gun whose legendary status wildly outdistanced its actual production and impact, it

11   was nevertheless an important firearm in the late nineteenth century, although this

12   "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s.  Its

13   celebrity biography backdated its diffusion and even its popularity."[83]  In fact, the

14   slogan stating that the Winchester "won the West" was invented by a Winchester

15   executive as a marketing ploy in 1919.[84]  Additionally, the Winchester was not a

16   semi-automatic firearm; it was a lever-action rifle that required the shooter to

17   manipulate a lever in a forward-and-back motion before each shot.  And when the

18   gun was emptied, it had to be manually reloaded, one round at a time.[85]  The

19   Winchester Model 1905, then called a "self-loading" rifle, was a true semi-

20

21         [79] Kennett and Anderson, *The Gun in America*, 91.

22         [80] Haag, *The Gunning of America,* 34-37, 46-64.  As Haag said, "the Civil
     War saved" the gun industrialists (65).

23

24         [81] Haag, *The Gunning of America*, 96.

25         [82] Koller, *The Fireside Book of Guns*, 112.

26         [83] Haag, *The Gunning of America,* 179.

27         [84] Ibid., 353.

28         [85] Normally, a Remington-type rifle is loaded from a feed ramp on the side of
     the rifle.

1   automatic firearm.  It could receive a five or ten round box magazine, although
2   from 1905 to 1920 only about 30,000 of the guns were made.  Even in World
3   War I, soldiers primarily used bolt-action one shot rifles that could fire about
4   twelve rounds per minute.[86]

5       29.    With all this, the Winchester was by no means universally embraced
6   by long gun users.  Indeed, "a good many westerners would have nothing to do
7   with the early Winchesters or other repeaters, for reasons they considered very
8   sound, and not until the 1880s did the repeating rifle assert its dominance over the
9   single-shot breechloader."[87]  According to A.C. Gould, writing in 1892, single-shot
10  rifles were: "less complicated, and less liable to get out of order; will shoot a
11  greater variety of ammunition; will shoot uncrimped ammunition, patched or
12  unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be
13  used; a greater range of rear sights on tang can be used."[88]

14      30.    The rise in the circulation of multi-shot handguns in society was
15  accompanied by the rapid spread of concealed carry restrictions (see Exhibits B-E),
16  especially in the post-Civil War period, precisely because of their contribution to
17  escalating interpersonal violence.[89]  By the end of the nineteenth century, virtually

18

19  [86] Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns
20  Have Advanced Since The Second Amendment," *Military & Defense,* December
    17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-
21  174927324.html; Phil Bourjaily, "Blast From the Past: Winchester Model 1905,"
    *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-
22  past-winchester-model-1905/.

23  [87] Louis A. Garavaglia and Charles G. Worman, *Firearms of the American*
24  *West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

25  [88] Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-*
26  *1894,* 131.

27  [89] Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin,
    TX: University of Texas Press, 1979); Randolph Roth, *American Homicide*
28  (Cambridge, MA: Belknap Press, 2012), 218-219.

1   every state in the country prohibited or severely restricted concealed gun and other

2   weapons carrying.[90]  It was only in the post-World War I era when multi-shot semi-

3   automatic and fully automatic long guns began to circulate appreciably in society

4   and came to be associated with criminal use that they became a regulatory and

5   public policy concern.

6       31.   As noted earlier, the problems with arguments claiming that historical

7   multi-shot weapons were both viable and commonly possessed before the late

8   nineteenth century are two-fold: they misrepresent the actual past of the weapons

9   cited, and even more importantly fail to understand the connection between gun

10  technology developments and the steps leading up to changes in gun-related public

11  policy to regulate threats posed by those developments.  As discussed previously,

12  that process has occurred, both historically and in the modern era, through a series

13  of sequential steps.

14      32.   First, a new gun or gun technology must be invented.  Second, it is

15  then normally patented, noting that there are many steps between a patent, actual

16  gun production, distribution and dissemination.  As Lewis Winant sardonically

17  observed, "Many patents are granted for arms that die a-borning."[91]  And as gun

18  expert Jack O'Connor wrote, "many types of guns were invented, produced and

19  discarded through the early years of the development of the United States."[92]

20  Third, weapons development is historically tied to military need and military

21  acquisition, not directly for civilian use or self-defense applications.  Military

22  weaponry is developed without consideration of potential civilian use and the

23

24  _____

25      [90] Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

26      [91] Winant, *Firearms Curiosa*, 36.

27      [92] Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

28

1    consequences of dissemination in the civilian market.[93]  Fourth, some military-

2    designed weapons may then spill over into, or be adapted to, civilian markets and

3    use.  Fifth, if such weapons then circulate sufficiently to pose a public safety or

4    criminological problem or threat, calls for government regulation or restriction then

5    may lead to gun policy/law changes.  This general sequence is echoed in works like

6    the *Buyer's Guide to Assault Weapons.*[94]

7    　　　33.　Again, to simply assert or assume that past firearms

8    design/development, invention, or patenting equals commonality, viability, or a

9    measurable presence or impact on society, is a leap in logic without historical

10    foundation.  It would be as logical to reject modern governmental regulation of

11    electric power through such government agencies as state power commissions and

12    the Federal Energy Regulatory Commission because no such regulation was

13    enacted around the time of Benjamin Franklin's experiments with electricity in the

14    mid-eighteenth century.  The fact that inventors worked on new firearm designs and

15    modifications tells us nothing about the consequences of such designs for society

16    and public policy.  And the existence of such designs does not equal general

17    availability, much less societal circulation and use of these weapons.  Other

18    weapons subject to government restriction in our history further illustrate these

19    principles.

---

23    　　[93] Note that the third step, and perhaps the second, do not apply to non-
24    firearms weapons discussed here—in particular the Bowie knife and various clubs.
     These weapons were mostly not developed for military use, though Bowie knives,
25    for example, were carried by some soldiers during the Civil War.  Knives and clubs
     are far simpler technologically compared to firearms (and of course do not rely on
26    ammunition) and thus were much more easily made, reproduced, and circulated.

27    　　[94] Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest
28    Books, 2008), 4-7.

Declaration of Robert Spitzer (17-cv-1017-BEN-JLB)

1
2
3

**III. HISTORICAL HARDWARE RESTRICTIONS ON KNIVES, BLUNT WEAPONS, PISTOLS, AND TRAP GUNS IN THE EIGHTEENTH AND NINETEENTH CENTURIES**

4     34.     Similar to government regulation of certain types of firearms and

5   ammunition feeding devices in the early twentieth century, which occurred only

6   after the weapons technologies matured, entered the civilian market, and threatened

7   the public through criminal use, government regulation of other weapons typically

8   followed a version of this trajectory around the time of the ratification of the

9   Fourteenth Amendment in the 1860s and even earlier.

10
11

**A.     Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives**

12     35.     The Bowie knife is generally credited with having been invented by

13   the brother of adventurer Jim Bowie, Rezin Bowie.  The knife was named after Jim

14   Bowie, who reputedly killed one man and wounded another using a "big knife"

15   given to him by his brother in the alternately notorious or celebrated "Sandbar

16   Duel" in 1827.[95]  Bowie died at the Alamo in 1836.

17     36.     The "Bowie knife" rapidly became known in the 1830s for the

18   distinctive type of long-bladed single-edged knife with a hand guard identified with

19   Bowie, the man after whom the knife was named.  The Bowie legend, the explosive

20   growth and spread of Bowie-related mythology (only magnified by his death at the

21   Alamo), and the knife's distinctive features, encouraged its proliferation,[96] referred

22

23

24   [95] "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676-77).

25

26

27   [96] Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39-63.

28

29

to by one historian as "the craze for the knives."[97]  As was true of other knives with long, thin blades,[98] they were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate.[99]  Indeed, such knives were known as "fighting knives"[100] that were "intended for combat."[101]  In the early nineteenth century "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[102]  In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[103]

37.    Homicide rates increased in the South in the early nineteenth century, as did laws restricting concealed weapons carrying.  Dueling also persisted during this time, even as the practice was widely deplored by religious and other groups, in

---

[97] Davis, *Three Roads to the Alamo*, 583.

[98] Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

[99] Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485.

[100] Randolph Roth, *American Homicide* (Cambridge, MA: Harvard University Press, 2009), 218.

[101] Flayderman, *The Bowie Knife*, 59.

[102] Roth, *American Homicide*, 218.

[103] Quoted in Roth, *American Homicide*, 218-19.

Declaration of Robert Spitzer (17-cv-1017-BEN-JLB)

1   newspapers, by anti-dueling societies and political leaders.[104]  Bowie knife expert

2   Norm Flayderman provides abundant and prolific evidence of the early criminal use

3   of Bowie knives in the 1830s, quoting from dozens of contemporaneous newspaper

4   and other accounts, and providing references to literally hundreds of additional

5   articles and accounts attesting to the widespread use of Bowie knives in fights,

6   duels, brawls and other criminal activities.[105]  Flayderman concludes that, as early

7   as 1836, "most of the American public was well aware of the Bowie knife."[106]

8   (Very much like contemporary assault weapons,[107] the Bowie knife's notorious

9   reputation also, if perversely, fanned its sale and acquisition.[108])  All this led to

10   widespread enactment of laws prohibiting dueling in the states[109] and even in the

11   halls of Congress, where a constitutional amendment in the form of a joint

12   resolution prohibiting dueling was introduced as early as 1838.  In 1839, Congress

13   passed a measure barring dueling in the District of Columbia.[110]  Both pistols and

14   knives were prominently used in such affairs.[111]

---

[104] Baugh, *Rendezvous at the Alamo*, 51.

[105] Flayderman, *The Bowie Knife*, 25-64; 495-502.

[106] Ibid., 43.

[107] Ryan Busse, *Gunfight* (NY: Public Affairs, 2021), 12-15,65; David Altheide, "The cycle of fear that drives assault weapon sales," *The Guardian,* March 2, 2013, https://www.theguardian.com/commentisfree/2013/mar/02/cycle-fear-assault-weapon-sales; Rukmani Bhatia, "Guns, Lies, and Fear," *American Progress*, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear/.

[108] Flayderman, *The Bowie Knife*, 46.

[109] A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws yields 35 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[110] H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[111] Roth, *American Homicide*, 180-83, 210-17.

38.     In the 1840 case of *Aymette v. State*, the Supreme Court of Tennessee upheld the conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837-1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[112]  In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[113]  The court continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens. . . ."[114]  Further, the court added that the state law existed "to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms. . . ."[115]

39.     The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[116]  In the 1830s,

---

[112] *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

[113] Ibid., 156.

[114] Ibid., 157.

[115] Ibid.

[116] The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53-54.

1   four states enacted laws barring the carrying of Bowie knives by name.  From then

2   to the start of the twentieth century, every state plus the District of Columbia (with

3   the sole exception of New Hampshire) restricted Bowie knives: a total of at least 38

4   states (including the District of Columbia) barred or restricted Bowie knives by

5   name; and another 12 states enacted laws barring the category or type of knife

6   embodied by the Bowie knife but without mentioning them by name (see Exhibits

7   C and E) totaling 49 states plus the District of Columbia.[117]  Several states banned

8   the possession of Bowie knives outright, and others imposed taxes on the ability for

9   individuals to acquire or possess them.  See Exhibit E.  The desirability and utility

10  of concealed carry restrictions were precisely that they pushed dangerous weapons

11  out of public spaces and places, improving public safety through the deterrent and

12  punishment effects of such laws, and also discouraging the settlement of private

13  grievances and disputes in public through weapons-fueled violence.

14  **B.   Historical Restrictions on Clubs and Other Blunt Weapons**

15  40.   A very similar and analogous set of hardware restrictions was enacted

16  regarding clubs and other blunt weapons.  See Exhibits C and E.  Nearly all were

17  anti-carry laws, which also generally included pistols and knives.  As the table in

18  Exhibit C shows, at least six distinct types of clubs and blunt objects were regulated

19  in the United States.  Notably, every single state in the nation (except for New

20  Hampshire) had laws restricting one or more types of clubs.

21  41.   Among the six types, 15 states barred bludgeon carrying.  A bludgeon

22  is a short stick with a thickened or weighted end used as a weapon.[118] The earliest

23  state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s

24  and 1800s, and 4 in the early 1900s (as with each of these chronological categories,

25  _____

26  [117] Initial bowie law enactment by decade: 1830s: 4 states; 1840s: 1 state;
     1850s: 7 states; 1860s: 5 states; 1870s: 14 states; 1880s: 10 states; 1890s: 8 states;

27  1900s: 1 state.  See Exhibits C and E.

28  [118] https://www.merriam-webster.com/dictionary/bludgeon.

Declaration of Robert Spitzer (17-cv-1017-BEN-JLB)

1   the state law total exceeds the total number of states because some states enacted
2   the same or similar laws in multiple centuries).

3       42.    A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,
4   usually made of wood, plastic, or metal,[119] that is traditionally carried by police,
5   often called a nightstick or baton.  Seventeen states had anti-billy club laws; the
6   earliest law appears to have been enacted in 1866.  Fourteen states enacted such
7   laws in the 1800s; 10 states did so in the early 1900s.

8       43.    At least 14 states barred the carrying of "clubs" more generically,
9   without specifying the type.  The oldest anti-club law was 1664; 7 states enacted
10   these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

11       44.    Anti-slungshot carry laws were enacted by 43 states.  A slungshot (or
12   slung shot) is a hand-held weapon for striking that has a piece of metal or stone at
13   one end attached to a flexible strap or handle that was developed roughly in the
14   1840s (the first "known use" of slungshot was 1842).[120]  By one account,
15   "[s]lungshots were widely used by criminals and street gang members in the 19th
16   Century.  They had the advantage of being easy to make, silent, and very effective,
17   particularly against an unsuspecting opponent.  This gave them a dubious
18   reputation, similar to that carried by switchblade knives in the 1950s, and they were
19   outlawed in many jurisdictions.  The use as a criminal weapon continued at least up
20   until the early 1920s."[121]

21       45.    In a criminal case considered the most famous of those involving
22   lawyer Abraham Lincoln, the future president defended a man charged with

23   _____

24      [119] https://www.merriam-webster.com/dictionary/billy%20club.  One of the
25   earliest references to a "billy" was a 1857 newspaper article describing "an
   indiscriminate attack with slung-shot, billies, clubs, &c."  Local Intelligence,
26   Delaware Republican, June 15, 1857, https://bit.ly/3V9nVO7.

27      [120] See https://www.merriam-webster.com/dictionary/slungshot.

28      [121] "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

34

1    murdering another using a slung shot.  In the 1858 trial of William "Duff"

2    Armstrong, Lincoln succeeded in winning Armstrong's acquittal.[122]

3        46.    These weapons were viewed as especially dangerous or harmful when

4    they emerged in society, given the ubiquity of state enactments against carrying

5    them enacted after their invention.  These devices were invented and appeared in

6    society during an identifiable period of time in the mid-nineteenth century, sparking

7    subsequent wide-ranging prohibitions.  The earliest anti-Slungshot law was enacted

8    in 1850; 42 states legislated against them in the 1800s (including the District of

9    Columbia), and 11 states in the early 1900s (note this incorporates laws enacted in

10   more than one century by a few states).

11       47.    Sandbags, also known as sand clubs, were also a specific focus in anti-

12   carry laws as well.  Consisting of nothing more than sand poured into a bag, sack,

13   or sock (although it could also be something dense and heavy, like a lock in the end

14   of a sock),[123] their particular appeal was that they could be dispensed with by

15   simply pouring the sand out, leaving nothing more than an empty cloth bag.  The

16   first anti-sandbag law was 1866, with 10 states enacted such laws—7 in the 1800s

17   and 7 in the early 1900s.

18       48.    Only 4 states did not have any prohibitions in any of these categories,

19   but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative

20   provisions against the carrying of any concealed/dangerous/deadly weapons.  One

---

[122] Lincoln was able to discredit the testimony of a witness who claimed to see Armstrong strike the victim at night because of the full moon.  Lincoln used as evidence an Almanac to prove that on the night in question, there was no full moon. Judson Hale, "When Lincoln Famously Used the Almanac," *Almanac,* May 4, 2022, https://www.almanac.com/abraham-lincoln-almanac-and-murder-trial.

[123] https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/.

1  state, New Hampshire, may not have enacted such a law during this time but did at

2  some point.[124]

3  ### C.  Historical Restrictions on Pistol Carrying

4      49.    Carry restriction laws were widely enacted from the 1600s through the

5  start of the twentieth century, spanning over three centuries.  As early as 1686, New

6  Jersey enacted a law against wearing weapons because they induced "great fear and

7  quarrels."[125]  Massachusetts followed in 1750.  In the late 1700s, North Carolina

8  and Virginia passed similar laws.  In the 1800s, as interpersonal violence and gun

9  carrying spread, 43 states joined the list; 3 more did so in the early 1900s (see

10  Exhibit B).  The eighteenth century laws generally restricted more general carrying

11  of firearms, usually if done in crowded places, or in groups of armed people.  The

12  laws of the nineteenth century forward generally restricted concealed weapons

13  carrying.  Among the earliest laws criminalizing the carrying of concealed weapons

14  was that of Louisiana in 1813.  Concealed carry laws normally targeted pistols as

15  well as the types of knives and various types of clubs discussed here (see Exhibit E

16  for text of most such laws).

17  ### D.  Historical Restrictions on Trap Guns

18      50.    Not to be confused with firearms used in trapshooting, trap guns were

19  devices or contraptions rigged in such a way as to fire when the owner need not be

20

21  _____

22  [124] Up to 2010, New Hampshire had this law on the books: "159:16 Carrying
23  or Selling Weapons.  Whoever, except as provided by the laws of this state, sells,
   has in his possession with intent to sell, or carries on his person any stiletto, switch
   knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty
24  of a misdemeanor; and such weapon or articles so carried by him shall be
25  confiscated to the use of the state."  In 2010, the law was amended when it enacted
   HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare
26  N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665)...

27  [125] The Grants, Concessions, And Original Constitutions of The Province of
28  New Jersey 290 (1881).

present.  Typically, trap guns could be set to fire remotely (without the user being present to operate the firearm) by rigging the firearm to be fired with a string or wire when tripped.[126]  This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[127]

51.    Also sometimes referred to as "infernal machines,"[128] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders. Unlike the other weapons restrictions examined here, opinion was more divided on the relative merits or wisdom of setting such devices, with some arguing that thieves or criminals hurt or killed by the devices had it coming,[129] though the

---

[126] See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[127] 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

[128] E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.

[129] For example, this small item appeared in the Bangor (Maine) Daily Whig on October 27, 1870: "A burglar while attempting to break into a shop in New York, Monday night, had the top of his head blown off by a trap-gun so placed that it would be discharged by any one tampering with the window.  A few such 'accidents' are needed to teach the thieves who have lately been operating in this city, a lesson."

weight of opinion seemed mostly against such devices.[130]  Those who set gun traps typically did so to defend their places of business, properties, or possessions.  This 1870 newspaper account from an incident in New York City provides an example where a burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured Agostino."  After the verdict the man continued to be held under $2,000 bail.[131]

52.    Inevitably, however, the traps sometimes wound up hurting or killing innocents, even including the person who set the trap.  For example, this 1891 newspaper account from Chillicothe, Missouri illustrated the problem: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[132]

53.    In all, at least 16 states had anti-trap gun laws (see Exhibits B and F). The earliest such law encountered was the 1771 New Jersey law (above).  Nine laws were enacted in the 1700s-1800s, and 9 in the early 1900s (counting states that enacted multiple laws across the centuries).

**IV.  CONCLUSION**

54.    What does the law say, and what should the law be, regarding the regulation of firearms and other harmful or dangerous weapons and accessories, in the light of the Supreme Court's ruling in the *Bruen* decision?  Given the

---

[130] This is my observation based on my reading of historic newspaper accounts from the late 1800s, and from the number of anti-trap gun laws enacted. As policing became more consistent, professional, and reliable, support for vigilante-type actions like setting trap guns seems to have declined.

[131] . "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.  See Exhibit G.

[132] "Shot by a Trap-Gun," *South Bend Tribune*, February 11, 1891, https://bit.ly/3CtZsfk.  See Exhibit G.

1   importance of history, especially, though not limited to, the founding era and the

2   Reconstruction era, the lesson is abundantly clear.  Firearms and other dangerous

3   weapons were subject to remarkably strict, consistent, and wide-ranging regulation

4   throughout our history when they entered society, proliferated, and resulted in

5   violence, harm, or contributed to criminality.  This historical record from the 1600s

6   through the early twentieth century, as seen in the examples examined here, is even

7   more remarkable given that the United States was an evolving and developing

8   nation-state that could not claim to have reached maturity until the twentieth

9   century.  The historical record summarized here makes clear that contemporary

10   restrictions among the states pertaining to assault weapons and large capacity

11   ammunition magazines are merely the latest iteration of a centuries-long tradition of

12   weapons regulations and restrictions.  Gun ownership is as old as the country.  But

13   so are gun and other dangerous weapons laws, which have adapted to changes in

14   threats to public safety.

15       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

16   laws of the United States of America that the foregoing is true and correct.

17       Executed on November 10, 2022, at Cortland, NY.

18

19

20       *Robert J. Spitzer*

21       Robert Spitzer

22

23

24

25

26

27

28

## INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of Robert J. Spitzer | 1-50 |
| B | Firearm Hardware Restrictions Table | 51-53 |
| C | Dangerous Weapons Restrictions | 54-57 |
| D | Machine Gun And Semi-Automatic Firearms Laws | 58-93 |
| E | Dangerous Weapons Laws | 94-171 |
| F | Trap Gun Restrictions | 172-180 |
| G | *The Buffalo Commercial: Buffalo, New* York, Newspapers.com (Nov. 1, 1870), https://www.newspapers.com/image/264632378/. | 181-182 |

# EXHIBIT A

September 2022

# Curriculum Vitae

## Robert J. Spitzer

### Distinguished Service Professor, Emeritus
### SUNY Cortland

<u>Address</u>:    5333 Center St.
Alexandria, VA  23188
(607) 423-1781
Robert.spitzer@cortland.edu; robertjspitzer53@gmail.com
https://sites.google.com/site/robertspitzercortland/

<u>Education</u>:    A.B. (Political Science), <u>summa cum laude</u>, SUNY College at Fredonia, 1975.
M.A. Cornell University, 1978.
Ph.D. Cornell University, 1980.

<u>Positions Held</u>:

Department Chair, SUNY Cortland, 2008-2020.
Interim Department Chair, SUNY Cortland, 2004-2005.
Distinguished Service Professor, SUNY Cortland, 1997.
Visiting Professor, Cornell University, Spring, 2009, Spring 1993; Summers 1980, 1988-1990, 1992-2017.
Professor, SUNY Cortland, 1989 to 1997.
Continuing Appointment, SUNY Cortland, 1986.
Associate Professor, SUNY Cortland, 1984 to 1989.
Department Chair, SUNY Cortland, 1983 to 1989.
Visiting Professor, SUNY College of Technology, Utica-Rome, Graduate Division, 1985, 1986, 1988.
Copy Editor, <u>Administrative Science Quarterly</u>, 1982 to 1983.
Adjunct Professor, Tompkins-Cortland Community College, 1982-83.
Assistant Professor, SUNY Cortland, 1979 to 1984.
Instructor, Cornell University, 1979.
Instructor, Eisenhower College, 1978-1979.
Research Assistant, Theodore J. Lowi and Benjamin Ginsberg, 1976-1978.
Reporter (Stringer), Buffalo Courier-Express; Dunkirk Evening Observer, 1974-75.

1

Honors:

Fellow, the Royal Society for Arts, Manufactures and Commerce (RSA), London, England, 2020.

Founding member, Regional Gun Violence Research Consortium, coordinated with the Rockefeller Institute of Government. Consortium of gun policy experts from eight states to advance research on gun policy, 2018-present.

Member, SUNY Research Council, an advisory council to the SUNY Board of Trustees, SUNY System Administration, campus leadership teams, and the leadership team of the Research Foundation (RF) for SUNY, 2018-2021.

Member, Scholars Strategy Network, 2015-present. Created to improve public policy and strengthen democracy by connecting scholars and their research to policymakers, citizens associations, and the media.

Winner, Pi Sigma Alpha (the national political science honors society) Chapter Advisor of the Year Award for 2013.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2010.

Winner, Outstanding Achievement in Research Award, SUNY Cortland, 2005.

Winner, State University of New York's Chancellor's Excellence in Scholarship and Creative Activities Award, 2003.

SUNY Cortland Nominee, National Scholar Competition of the Honor Society of Phi Kappa Phi, 1994-95.

Winner, New York State/United University Professions Excellence Award, 1991, for "outstanding professional performance and superior service."

Member, New York State Commission on the Bicentennial of the U.S. Constitution, 1986-1990.

Member, New York State Ratification Celebration Committee for U.S. Constitution Bicentennial, 1987-88.

Member, National Bicentennial Competition on the Constitution and the Bill of Rights, 1987-1991.

Who's Who in the World, 1996.

Dictionary of International Biography, 1995.

Who's Who in the East, 1995-96; 1997-98

Ex officio member, Cortland County Bicentennial Committee, 1987-89.

Chair, SUNY Cortland Bicentennial Committee, 1987-89.

Phi Eta Sigma, SUNY Cortland, 1994.

Phi Kappa Phi, SUNY Cortland, 1990.

Men of Achievement (1986)

Contemporary Authors, vol. 112 (1985) and subsequent updates.

International Authors and Writers Who's Who, 1985-present.

International Who's Who in Education, Winter 1985-86.

Herbert H. Lehman Graduate Fellowship, 1975-79.

Who's Who Among Students in American Universities and Colleges, 1974-75.

Phi Beta Kappa Club, SUNY College at Fredonia, 1975.

2

Phi Alpha Theta (History), SUNY College at Fredonia, 1974.
Phi Mu Alpha Sinfonia, (Music), SUNY College at Fredonia, 1973.

Research Fellowships and Projects:

Individual Development Awards, SUNY Cortland, 2001, 2003, 2005, 2006, 2007, 2008, 2009, 2014, 2017, 2020.
Title "F" Leave with pay, Spring 1994.
Professional Development and Quality of Working Life Award, 1989, 1993, 1998, 1999.
National Endowment for the Humanities (NEH) Research Grant for Study of the Constitution, 1986. Project Proposal: "The Presidential Veto: Constitutional Antecedents and Modern Applications."
SUNY Cortland Faculty Research Program Grant, "The Presidential Veto, 1986.
Consultant for Reporting Research Corporation, "Quality of Earnings Report," Thornton L. O'Glove, author; research on presidential veto use, 1984-1987.
SUNY University Awards Program Research Fellowship, "The Right to Life Party and New York State Politics, 1983.
SUNY Cortland Faculty Research Program Fellowship, "New York State Parties and Politics," 1980.

Publications and Papers:

Books:

The Presidency and Public Policy:  The Four Arenas of Presidential Power (University, AL:  The University of Alabama Press, 1983).  A study of the President's relations with Congress in the making of domestic policy.  Revised version of doctoral dissertation.

The Right to Life Movement and Third Party Politics (Westport, CT: Greenwood Press, 1987).  A study of the New York multi-party system, single-issue third parties, and the state-based Right to Life Party.

The Presidential Veto:  Touchstone of the American Presidency (Albany, NY: SUNY Press, 1988), with a foreword by Louis Fisher. A study of the constitutional antecedents and modern applications of the veto power. Published as part of SUNY Press Series on Leadership, edited by Barbara Kellerman.

Editor, The Bicentennial of the U.S. Constitution:  Commemoration and Renewal (Cortland, NY: SUNY Cortland, 1990). A compendium of articles based on presentations given at SUNY Cortland pertaining to the Constitution's Bicentennial.  Contributors include Senator Daniel Patrick Moynihan, Theodore J. Lowi, Judith A. Best, and Robert

3

Spitzer.

President and Congress:  Executive Hegemony at the Crossroads of American Government (New York: McGraw-Hill; and Temple University Press, 1993). Published simultaneously by co-publishing agreement in paper by McGraw-Hill, and hardcover by Temple. An analytic survey and critique of presidential-congressional relations. Received Honorable Mention for the Richard Neustadt Award for Best Book on the Presidency for 1993.

Editor, Media and Public Policy (New York: Praeger, 1993). Published in Praeger's Political Communications Series, edited by Robert E. Denton, Jr. A collection of original essays dealing with various aspects of media's impact on public policy. Contributors include Doris Graber, Julio Borquez, Wenmouth Williams, Marion Just, Ann Crigler, Michael Hawthorne, Dean Alger, Jerry Medler, Michael Medler, Montague Kern, Robert Sahr, Holli Semetko, Edie Goldenberg, Patrick O'Heffernan, and Robert Spitzer.

The Politics of Gun Control (New York: Chatham House, 1995; 2nd edition, 1998; 3rd edition, CQ Press, 2004; 4th ed. 2008; 5th ed., Paradigm/Routledge Publishers 2012; 6th ed., Routledge, 2015, 7th ed., 2018; 8th ed. 2021). A comprehensive political and policy analysis of the gun issue that applies policy theory to the key elements of the gun debate, including analysis of the Second Amendment, cultural-historical factors, interest group behavior, criminological consequences, legislative and executive politics.

Editor, Politics and Constitutionalism: The Louis Fisher Connection, (Albany, NY: SUNY Press, 2000). A collection of original essays inspired by the works of Louis Fisher. Contributors include Neal Devins, Nancy Kassop, Dean Alfange, David Adler, Loch Johnson, Michael Glennon, Louis Fisher, and Robert Spitzer. Published as part of the SUNY Press Book Series on American Constitutionalism. Nominated by SUNY Press for the 2001 Silver Gavel Award of the American Bar Association.

The Right to Bear Arms: Rights and Liberties Under the Law (Santa Barbara, CA: ABC-CLIO, 2001). An extensive analysis of the Second Amendment "right to bear arms" from legal, historical, and political perspectives. Published as part of the "America's Freedoms" Series edited by Donald Grier Stephenson.

Essentials of American Politics, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 2002; 2nd edition, 2006). A synthetic, analytic look at American government and politics.

The Presidency and the Constitution: Cases and Controversies, co-authored with Michael A. Genovese (NY: Palgrave/Macmillan, 2005). A combination of analysis and cases examining the courts' view of presidential power.

4

Saving the Constitution from Lawyers: How Legal Training and Law Reviews Distort Constitutional Meaning (New York: Cambridge University Press, 2008). A sweeping indictment of the legal community when it enters into the realm of constitutional interpretation.

We the People: Essentials Edition, co-authored with Benjamin Ginsberg, Johns Hopkins; Theodore Lowi, Cornell; Margaret Weir, Berkeley. (W.W. Norton, 7th ed. 2009; 8th ed. 2011; 9th ed., 2013; 10th ed. 2015; 11th ed. 2017; 12th ed. 2019; 13th ed. 2021).

Gun Control: A Documentary and Reference Guide (Westport, CT: Greenwood Publishing Group, 2009). A combination of analysis, commentary, and original historical and contemporary documents pertaining to the gun issue published in Greenwood's Documentary and Reference Series.

The Gun Debate: An Encyclopedia of Gun Rights and Gun Control, co-authored with Glenn Utter (Grey House Publishers, 2011; third edition 2016). An A-Z compendium of gun issues.

Guns across America: Reconciling Gun Rules and Rights (New York: Oxford University Press, 2015); revised paperback edition published 2017. Argues that our understanding of the gun issue as it has evolved in the U.S. is upside down, looking at gun law history, the Second Amendment, stand your ground laws, and New York State gun laws.

The Gun Dilemma: How History Is Against Expanded Gun Rights (New York: Oxford University Press, 2023, forthcoming). Argues that the courts are ushering in a new era of expanded gun rights, despite the fact that such a movement is contrary to our gun history by examining assault weapons, ammunition magazines, silencers, gun brandishing, and the Second Amendment sanctuary movement.

Book Series Editor, Series on American Constitutionalism, SUNY Press, 1996-present. Books include:
    Daniel Hoffman, Our Elusive Constitution, (1997)
    Martin Sheffer, God and Caesar: Belief, Worship, and Proselytizing Under the First Amendment, (1999)
    Daniel Levin, Representing Popular Sovereignty: The Constitution in American Political Culture, (1999)
    Robert Spitzer, ed., Politics and Constitutionalism, (2000)
    Laura Langer, Judicial Review in State Supreme Courts (2002)
    Ian Brodie, Friends of the Court (2002)
    Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2002)
    Artemus Ward, Deciding to Leave: The Politics of Retirement from the United States Supreme Court (2003)

5

James T. McHugh, Ex Uno Plura: State Constitutions and Their Political Cultures (2003)

Stephen Newman, ed., Constitutional Politics in Canada and the United States (2004).

Stephen Kershnar, Justice for the Past (2004).

Timothy R. Johnson, Oral Arguments and Decision Making on the U.S. Supreme Court (2004).

Christopher P. Banks, David B. Cohen, and John C. Green, eds., The Final Arbiter: The Consequences of Bush v. Gore for Law and Politics (2005)

Kenneth D. Ward and Cecilia R. Castillo, eds., The Judiciary and American Democracy: Alexander Bickel, the Countermajoritarian Difficulty, and Contemporary Constitutional Theory (2005).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Politics of State Constitutional Reform (2006).

Frank P. Grad and Robert F. Williams, State Constitutions for the Twenty-first Century: Drafting State Constitutions, Revisions, and Amendments (2006).

G. Alan Tarr and Robert F. Williams, eds., State Constitutions for the Twenty-first Century: The Agenda of State Constitutional Reform, 3 vols. (2006).

Cary Federman, The Body and the State: Habeas Corpus and American Jurisprudence (2006).

Christopher S. Kelley, ed., Executing the Constitution: Putting the President Back into the Constitution (2006).

David Fagelson, Justice as Integrity: Tolerance and the Moral Momentum of Law (2006).

Christopher Shortell, Rights, Remedies, and the Impact of State Sovereign Immunity (2008).

Robert Blomquist, The Quotable Judge Posner (2010).

Kirk A. Randazzo, Defenders of Liberty or Champions of Security? (2010).

Pamela Corley, Concurring Opinion Writing on the U.S. Supreme Court (2010).

Samuel Leiter and William Leiter, Affirmative Action in Antidiscrimination Law and Policy (2nd ed. 2010).

Julia R. Azari, et al., eds., The Presidential Leadership Dilemma (2013).

Stephen A. Simon, Universal Rights and the Constitution (2014).

Kirk A. Randazzo and Richard W. Waterman, Checking the Courts (2014).

Anthony Maniscalco, Public Spaces, Marketplaces, and the Constitution (2015).

Goirgi Areshidze et al., eds., Constitutionalism, Executive Power, and the Spirit of Moderation (2016).

Peter J. Galie, et al., eds., New York's Broken Constitution (2016).

Robert J. Hume, Ethics and Accountability on the U.S. Supreme Court (2017).

Michael A. Dichio, The U.S. Supreme Court and the Centralization of Federal Authority (2018).

Clyde H. Ray, John Marshall's Constitutionalism (2019).

Daniel P. Franklin, et al., The Politics of Presidential Impeachment (2020).

> Robert M. Howard, et al., <u>Power, Constraint, and Policy Change: Courts and Education Finance Reform</u> (2021).
> Mark C. Dillon, <u>The First Chief Justice</u> (2022).

Book Series Editor, <u>Presidential Briefing Books</u>, Routledge, 2015-present.
> Mary Stuckey, <u>Political Rhetoric</u> (2015)
> Michael A. Genovese, <u>Presidential Leadership in an Age of Change</u> (2015)
> Christopher Fettweis, <u>Making Foreign Policy Decisions</u> (2016)
> Nancy Maveety, <u>Picking Judges</u> (2016)
> Richard S. Conley, <u>Presidential Relations with Congress</u> (2017)
> Andrew L. Stigler, <u>Governing the Military</u> (2019)
> Graham G. Dodds, <u>The Unitary Presidency</u> (2020)

Member, Board of Editors for the <u>Encyclopedia of Guns in American Society</u>, 2 vols. (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011). Winner of the Booklist Editors' Choice Award for 2003, American Library Association.

Member, Board of Editors, <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011-2016.

<u>Book Chapters</u>:

"Third Parties in New York," in <u>Governing New York State</u> (formerly <u>New York State Today</u>), ed. by Robert Pecorella and Jeffrey Stonecash (Albany, N.Y.:  SUNY Press, 1984, 1989, 1994, 2001, 2006). Chapter revised for second, third, fourth, and fifth editions.

"Gun Control: Constitutional Mandate or Myth," in <u>Social Regulatory Policy: Recent Moral Controversies in American Politics</u>, ed. by Raymond Tatalovich and Byron Daynes (Boulder, CO:  Westview Press, 1988), 111-141.

"The President's Veto Power," in <u>Inventing the American Presidency: Early Decisions and Critical Precedents</u>, ed. by Thomas Cronin (Lawrence, KA:  University Press of Kansas, 1989), 154-179.

"President and Congress," in <u>The CQ Guide to the Presidency</u>, ed. by Michael Nelson (Washington, D.C.:  Congressional Quarterly, Inc., 1989; revised for 2nd ed., 1996 and 3rd ed. 2002; 4th ed. 2007; 5th ed. 2012).

Nineteen entries in <u>Encyclopedia of American Political Parties and Elections</u>, ed. by L. Sandy Maisel (New York:  Garland Pub., 1991): American Labor Party, Benjamin Bubar,

7

closed primary, Conservative Party, cross-endorsement rule, Free Soil Party, Greenback Party, Liberal Party, Liberty Party, John V. Lindsay, Allard K. Lowenstein, open primary, Right to Life Committee, Right to Life Party, Prohibition Party, Alex Rose, split ticket voting, telethons, Mary Jane Tobin.

Author of "Thought Boxes" for Theodore J. Lowi and Benjamin Ginsberg, American Government: Freedom and Power (NY: W.W. Norton, 1990, 1992, 1994, 1996, 1998); 50 for 1st ed.; 30 additional for 2nd ed., 45 additional for 3rd ed.; 29 for 4th ed., 26 for 5th.

"Executive Vetoes," in Encyclopedia of the American Legislative System, ed. by Joel Silbey (NY: Charles Scribner's Sons, 1993).

"The Conflict Between Congress and the President Over War," in The Presidency and the Persian Gulf War, ed. by Marcia Whicker, Raymond Moore, and James Pfiffner (New York: Praeger, 1993).

"Is the Separation of Powers Obsolete?" in The Presidency Reconsidered, ed. by Richard W. Waterman (Itasca, IL: F.E. Peacock, 1993); also in Understanding the Presidency, ed. by James Pfiffner and Roger Davidson (NY: Longman, 1997; 2nd ed. 2000; 3rd ed. 2002; 4th ed. 2006).

Seven entries in the Encyclopedia of the American Presidency, ed. by Leonard W. Levy and Louis Fisher (NY: Simon and Schuster, 1994), including "Council on Environmental Quality," "Office of Intergovernmental Relations," "Presentation Clause," "Signing Statements," "Item Veto," "Pocket Veto," "Regular Veto".

Two entries in the Encyclopedia of the United States Congress, ed. by Donald C. Bacon, Roger H. Davidson, and Morton Keller (NY: Simon and Schuster, 1994), including "Separation of Powers" and "Presidential Veto".

"The President, Congress, and the Fulcrum of Foreign Policy," in The Constitution and the Conduct of American Foreign Policy, ed. by David Gray Adler, with an introduction by Arthur Schlesinger, Jr. (Lawrence, KS: University Press of Kansas, 1996), 85-113.

"Resources Development in the EOP," in The Executive Office of the President, ed. by Harold Relyea (Westport, CT: Greenwood Press, 1997).

"Council on Environmental Quality," in the Oxford Historical Guide to American Government (NY: Oxford University Press, 1997).

"From Presidential Shield to 'Go Ahead, Make My Day': The Presidential Veto and the Constitutional Balance of Power," in Liberty Under Law, ed. by Kenneth Grasso and Cecilia R. Castillo (Lanham, MD: University Press of America, 1997; 2nd ed. 1998).

8

"Multi-Party Politics in New York," in Multi-Party Politics and American Democracy, ed. by Paul Herrnson and John Green (Rowman & Littlefield, 1997; revised for second edition, 2002).

Author of "Cultures" and "Debates" boxes for Benjamin Ginsberg, Theodore Lowi, and Margaret Weir, We the People (NY: W.W. Norton, 1997, 1999). 19 for 1st ed.; 17 for 2nd ed.

"Gun Control: Constitutional Mandate or Myth?" in Moral Controversies in American Politics, ed. by Raymond Tatalovich and Byron Daynes (NY: M.E. Sharpe, 1998; 2005; 2010), 164-195. Revised for new editions.

"The Right to Life Party" and related entries in The Encyclopedia of American Third Parties, ed. by Immanuel Ness and James Ciment (NY: M.E. Sharpe, 2000).

"New York, New York: Start Spreadin' the News," in Prayers in the Precincts, ed. by John Green, Mark Rozell, and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000).

"The Clinton Crisis and Its Consequences for the Presidency," in The Clinton Scandal and the Future of American Politics, ed. by Mark Rozell and Clyde Wilcox (Washington, DC: Georgetown University Press, 2000), 1-17.

"Saving the Constitution from Lawyers," in Politics and Constitutionalism, ed. by Spitzer (Albany, NY: SUNY Press, 2000).

"Gun Control and Policy" and "Veto Power" for the Encyclopedia of American Political History, ed. by Paul Finkelman (Washington, D.C.: Congressional Quarterly, 2000).

"Article I, Section 7," in The Constitution and Its Amendments, ed. by Roger Newman (NY: Macmillan, 2001).

"Lost and Found: Researching the Second Amendment," in The Second Amendment in Law and History, ed. by Carl Bogus (NY: The New Press, 2001), 16-47.

"Veto Power" in The Oxford Companion To United States History ed. by Paul Boyer (NY: Oxford University Press, 2001).

"The Independent Counsel and the Post-Clinton Presidency" in The Presidency and the Law: The Clinton Legacy, ed. by David Adler and Michael Genovese (Lawrence, KS: University Press of Kansas, 2002), 89-107.

9

"The Veto King: The 'Dr. No' Presidency of George Bush," in <u>Honor and Loyalty: Inside the Politics of the Bush White House</u>, ed. by Leslie Feldman and Rosanna Perotti (Westport, CT: Greenwood Press, 2002), 233-53.

Fifty-two entries in the <u>Encyclopedia of Guns in American Society</u>, ed. by Gregg Lee Carter (Santa Barbara, CA: ABC-CLIO, 2003; second ed. 2011): including AWARE, assault weapons, Assault Weapons ban of 1994, automatic weapons laws, background checks, Brady Law, Harlon Carter, Eddie Eagle, Federation for NRA, Firearms Owners Protection Act of 1986, NRA-ILA, LSAS, Licensing, MMM, MAVIA, National Board for the Promotion of Rifle Practice, National Guard, NRA, NRA PVF, Presser v. Illinois, Quilici v. Morton Grove, Safety Courses, SAS, semiautomatic weapons, speedloaders, Turner Diaries, Waiting Periods.

Nine entries for the <u>Encyclopedia of the American Presidency</u>, ed. by Michael Genovese (NY: Facts on File, 2004): Edward Corwin, Council on Environmental Quality, Gramm-Rudman-Hollings, Persian Gulf War, legislative veto, presentation clause, item veto, pocket veto, veto.

"Third Parties," "Presidents," and "The Right to Life Party" for <u>The Encyclopedia of New York State</u>, ed. by Peter Eisenstadt (Syracuse: Syracuse University Press, 2004).

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," <u>Transformed By Crisis: The Presidency of George W. Bush and American Politics</u>, ed. by Jon Kraus, Kevin McMahon, and David Rankin (NY: Palgrave Macmillan, 2004), 141-165.

"The Presidential Veto Is An Effective Tool for Governing," in <u>Debating the Presidency</u>, Robert P. Watson and David Freeman, eds. (Dubuque, IA: Kendall/Hunt, 2005).

"Veto: The Power to Say 'No,'" in <u>Thinking About the Presidency</u>, ed. by Gary L. Gregg (Lanham, MD: Rowman & Littlefield, 2005).

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Executing the Constitution</u>, ed. By Chris Kelley (Albany: SUNY Press, 2006), 109-126.

"Gun Violence and Gun Control," in <u>Social Issues in America: An Encyclopedia</u>, 8 vols., ed. By James Ciment (NY: M.E. Sharpe, 2006).

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," <u>The Presidency and the Challenge of Democracy</u>, ed. By Michael Genovese and Lori Cox Han (New York: Palgrave Macmillan, 2006), 93-117.

"Right to Bear Arms," <u>Encyclopedia of American Civil Liberties</u>, 4 vols., ed. By Paul

10

Finkelman (NY: Routledge, 2006).

"Gun Violence is a Serious Problem," Gun Violence: Opposing Viewpoints, Margaret Haerens, ed. (New York: Thomson Gale, 2006).

"The Commander-in-Chief Power in the George W. Bush Administration," Presidential Power in America, ed. By Lawrence R. Velvel (Andover, MA: Doukathsan Press, 2007).

"Presidential Veto" and "Gun Control," Encyclopedia of American Government and Civics ed. Michael Genovese and Lori Cox Han (New York: Facts-on-File, 2008).

"Gerald R. Ford," Encyclopedia of Political Communication ed. By Lynda Lee Kaid and Christina Holtz-Bacha (Thousand Oaks, CA: Sage Pubs., 2008).

"Leading Elite Opinion: Law Reviews and the Distortion of Scholarship," in Leadership at the Crossroads, Vol 2, "Leadership and Politics," ed. By Michael Genovese and Lori Cox Han (Westport, CT: Praeger, 2008).

"Gun Control Policy," in Encyclopedia of Issues in U.S. Public Policy, ed. By Mark Rushefsky (Farmington Hills, MI: Gale Publishing, 2009).

"'Hot' and 'Not-So-Hot' Buttons in the 2008 Presidential Election," in Winning the Presidency 2008, William Crotty, ed. (Boulder, CO: Paradigm Publishers, 2009).

"Resolved, that the President Should Not be Given a Line Item Veto," in Debating Reform: Conflicting Perspectives on How to Fix the American Political System, Richard Ellis and Michael Nelson, eds. (Washington, D.C.: CQ Press, 2010; revised for 2nd ed. 2013).

"Looking Through the Other End of the Telescope: Playing in Lowi's Arenas," in Political Science as Public Philosophy: Essays in Honor of Theodore J. Lowi, Benjamin Ginsberg and Gwendolyn Mink, eds. (New York: W.W. Norton, 2010).

"Why Do Americans Love Guns So Much, and Does Everyone Own One?" You Asked: 20 Questions About America, U.S. Department of State, 2010.

"Liberals and the Presidency," Contending Approaches to the American Presidency, Michael Genovese, ed. (Washington, DC: CQ Press, 2011).

"Is the Constitutional Presidency Obsolete?" The American Presidency in the 21st Century, Charles Dunn, ed. (Lexington: University Press of Kentucky, 2011).

"Gun Control," in Governing America, ed. By Paul Quirk and William Cunion (New

11

York: Facts on File, 2011).

"Stricter Gun Laws are Reasonable and Sensible," for <u>Issues: Understanding Controversy and Society</u>, ABC-CLIO, 2011. Web. 28 September.

"Gun Control," <u>Encyclopedia of Applied Ethics</u>, 2nd ed., Vol. 2, Ruth Chadwick, ed. (San Diego: Academic Press/Elsevier, 2012), 538-44.

"Hot Button Issues in the Presidential Campaign: 47% Yes, Guns No?" <u>Winning the Presidency 2012</u>, William J. Crotty, ed. (Boulder, CO: Paradigm Publishers, 2013).

"Meaning of the Second Amendment: The Motives Behind the Second Amendment: Federalism and Military Preparedness." <u>American Government</u>. ABC-CLIO, 2013. Web. September 10.

"Clinton and Gun Control: Boon or Bane?" <u>A True Third Way? Domestic Policy and the Presidency of William Jefferson Clinton</u>, Richard Himmelfarb, ed. (New York: Nova Publishers, 2014), 81-92.

"Gun Control," <u>American Governance</u>, 5 vols. Stephen L. Schechter, ed. (Detroit: Macmillan, 2016).

"John Tyler and the Constitution," <u>American Presidents and the Constitution</u>, Ken Gormley, ed. (New York: New York University Press, 2016).

"The Unitary Executive and the Bush Presidency," <u>The George W. Bush Presidency</u>, Meena Bose, ed. (New York: Nova Publishers, 2016).

"Stricter Gun Laws are Reasonable and Sensible," <u>Gun Control in the United States: A Reference Handbook</u>, Gregg Lee Carter, ed. (Santa Barbara, CA: ABC-CLIO, 2017).

"Gun Policy Research: Personal Reflections on Public Questions," <u>Guns: Interdisciplinary Approaches to Politics, Policy, and Practice</u>, Jennifer Carlson, Kristin Goss and Harel Shapira, eds. (New York: Routledge, 2019).

"Conclusion: The Five Rules of Trump," <u>Presidential Leadership and the Trump Presidency: Executive Power and Democratic Governance</u>, Charles Lamb and Jacob Neiheisel, eds. (New York: Palgrave Macmillan, 2020).

"Looking Down the Barrel of the 2020 Elections," <u>The 2020 Presidential Election: Key Issues and Regional Dynamics</u>, Luke Perry, ed. (New York: Palgrave Macmillan, 2022).

"Gun Policy and Politics in America," <u>Developments in American Politics 9</u>, Gillian
12

Peele, Bruce Cain, Jon Herbert, Andrew Wroe, eds. (Palgrave/Macmillan, 2022).

"To Brandish or Not to Brandish: The Consequences of Gun Display," New Histories of Gun Rights and Regulation: Essays on the Place of Guns in American Law and Society, Joseph Blocher, Jacob Charles, and Darrell A.H. Miller, eds. (NY: Oxford University Press, forthcoming).

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today" and "US tragedies from guns have often – but not always – spurred political responses," The Conversation on Gun Control (Baltimore: Johns Hopkins University Press, 2023, forthcoming).


Articles:

"Jamestown:  Anatomy of an All-American City," Sunday Buffalo Courier Express Magazine, August 24, 1975.

"The Democratic National Telethons: Their Successes and Failures," with John W. Ellwood, The Journal of Politics, 41 (August, 1979): 828-864.

"The Presidency and Public Policy: A Preliminary Inquiry," Presidential Studies Quarterly, 9 (Fall, 1979): 441-457.

"Presidential Policy Determinism: How Policies Frame Congressional Responses to the President's Legislative Program," Presidential Studies Quarterly, 13 (Fall, 1983): 556-574.

"A Political Party is Born: Single-Issue Advocacy and the Election Law in New York State," National Civic Review, 73(July/August, 1984): 321-328.

"More Parties Mean Better Parties," Party Line, 17 (September 1984).

"Shooting Down Gun Myths," America, June 8, 1985, pp. 468-69.  Reprinted in: the Des Moines Register, October 24, 1985; Criminal Justice, ed. by Susan Bursell (St. Paul, MN: Greenhaven Press, 1986); U.S. News and World Report educational study unit on Gun Control, April/May, 1987; Gun Control, ed. by Robert Emmet Long (New York: H.W. Wilson Co., 1989); and The Informed Argument, 2nd ed., 3rd ed., Robert K. Miller, ed. (NY:  Harcourt, Brace, Jovanovich, 1989, 1992).

"The Item Veto: A Bad Idea That Lives On," America, June 15, 1985.

"The Item Veto Reconsidered," Presidential Studies Quarterly 15(Summer, 1985):

13

611-17.

"Promoting Policy Theory:  Revising the Arenas of Power" Policy Studies Journal, 15 (June 1987), 675-89. Reprinted in Public Policy Theories, Models, and Concepts, ed. by Daniel C. McCool (Prentice-Hall, 1995).

"A Course Module:  The Politics of Abortion," NEWS for Teachers of Political Science, 53 (Spring, 1987).

"But for A Single Vote...," New York Delegate, July, 1987. Abridged version appeared on editorial page of the Rochester Times Union, 2/10/87.

"Multi-Party Politics in New York: A Cure for the Political System?", Election Politics, 5 (Summer, 1988): 14-16.

"From Complexity to Simplicity: More on Policy Theory and the Arenas of Power," Policy Studies Journal, 17 (Spring, 1989): 529-36.

"Complexity and Induction: Rejoinder to Kellow," Policy Studies Journal, 17(Spring, 1989): 547-49.

"Liberalism and Juridical Democracy," PS:  Political Science and Politics, 23(December 1990): 572-74.

"Presidential Prerogative Power: The Case of the Bush Administration and Legislative Powers," PS:  Political Science and Politics, 24 (March 1991): 38-42.

"Separation of Powers and the War Power," Oklahoma City University Law Review, 16, 2(Summer 1991): 279-293.

"The Disingenuous Presidency: Reagan's Veto and the `Make-My-Day' President," Congress and the Presidency, 21 (Spring, 1994): 1-10.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," Pace Law Review, 15, 1 (Fall 1994), 111-39.

"Can 3.5 Million Americans Be Wrong?" The Spectator, May 27, 1995, 12-13.

"The Constitutionality of the Presidential Line-Item Veto," Political Science Quarterly, 112 (Summer, 1997): 261-84.

"The Item Veto Dispute and the Secular Crisis of the Presidency," Presidential Studies Quarterly, 28 (Fall 1998): 799-805.

14

"Clinton's Impeachment Will Have Few Consequences for the Presidency," <u>PS: Political Science and Politics</u>, 32 (September 1999).

"The Gun Dispute," <u>American Educator</u>, 23 (Summer 1999): 10-15.  Reprinted in <u>Annual Editions: Criminal Justice</u> (Dushkin/McGraw-Hill, 2000); and in <u>Criminology</u> (Dushkin/McGraw-Hill, 2001).

"The Changing Face of Gun Politics," <u>Congress Monthly</u>, September/October 2000.

"Lost and Found: Researching the Second Amendment," <u>Chicago-Kent Law Review</u> 76 (2000): 349-401. Cited in 2002 by the U.S. Court of Appeals for the Ninth Circuit, <u>Silveira v. Lockyer</u> (312 F.3d 1052; 2002); 2002 U.S. App. LEXIS 24612.

"The 'Protective Return' Pocket Veto: Presidential Aggrandizement of Constitutional Power," <u>Presidential Studies Quarterly</u> 31 (December 2001), 721-34.

"The Second Amendment 'Right to Bear Arms' and the *Emerson C*ase," <u>St. John's Law Review</u> 77 (Winter 2003): 1-27.

"Gun Laws and Policies: A Dialogue," <u>Focus on Law Studies</u> 18(Spring 2003): 1-17.

"Don't Know Much About History, Politics, or Theory," <u>Fordham Law Review</u> 73 (November 2004), 721-30.

"Seven Modest Tips on Publishing," <u>PS: Political Science and Politics</u> 38(October 2005): 746-47.

"Re-Examining the War Power," with Michael Genovese, <u>The PRG Report</u> 30(Fall 2005).

"Tactics, Turnout, and Timing in the Elections of 2004," with Glenn Altschuler, <u>American Literary History</u> 19(Spring 2007): 108-19.

"Reducing Firearm Violence: A Research Agenda," co-authored, <u>Injury Prevention</u> 13 (April 23, 2007), 80-84.

"Why History Matters: Saul Cornell's Second Amendment and the Consequences of Law Reviews," <u>Albany Government Law Review</u> 1(Spring 2008): 312-53.

"Saving the Presidency From Lawyers," <u>Presidential Studies Quarterly</u> 38(June 2008): 329-46.

15

"Still Saving the Constitution from Lawyers: A Response," Gonzaga Law Review 46(December 2010/11): 103-16.

"Gun Law, Policy, and Politics," Government, Law and Policy Journal 14(Summer 2012): 57-64.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," Presidential Studies Quarterly 42(September 2012): 637-55.

"Gun Laws," New York State Bar Association Journal 84(July/August 2012), 35-42.

"Misfire in the 2012 Election," Presidents and Executive Politics Report 35(Fall 2012).

"Writing the Gun Debate," Los Angeles Review of Books, February 10, 2013.

"A Historical Look at Gun Control in America," WCNY Magazine, May/June 2013.

"What's Old Is New Again: Political Science, Law, and Constitutional Meaning," PS: Political Science and Politics 46(July 2013): 493-97.

"Separating Truth and Myth in the American Gun Debate," The Islamic Monthly, Fall 2013.

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," White House Studies 12(October 2013): 125-46.

"A Look at the 2014 Elections," WNCY Magazine, March/April 2014.

"New York State and the New York SAFE Act: A Case Study in Strict Gun Laws," Albany Law Review, 78 (2014/2015): 749-87.

"The Unitary Executive and the Bush Presidency," Social Science Docket, 15(Summer-Fall 2015).

"Gun Rights, Tyranny, and Rebellion: John Locke, the American Constitution and the Right to Bear Arms," The Critique (July/August 2016).

"Gun Law History in the United States and Second Amendment Rights," Law and Contemporary Problems 80, 2(2017): 55-83.

"Researching Gun Policy: Futile or Feasible?" Items: Insights from the Social Sciences, Social Science Research Council, October 17, 2018.

16

"Effective Gun Regulation Can Be Compatible with Gun Rights," The Regulatory Review, University of Pennsylvania Program on Regulation, November 6, 2018.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Law and Contemporary Problems 83, 3(2020): 231-55.

"Federalism Run Amok: The Second Amendment Sanctuary Movement," *Publius,* forthcoming.

Op-Ed Articles

"Court Rulings on 2nd Amendment:  No Individual Right to Keep Arms," Des Moines Register, October 24, 1985.

"Gun Control and Pressure Politics," Syracuse Post-Standard, November 30, 1985.

"Pocket Vetoes and Abuse of Power," Rochester Times Union, January 7, 1987.

"But for One Vote, a Different Nation," Rochester Times Union, February 10, 1987.

"Reagan's Veto: It's Mostly Show and Not Much Go," Rochester Times Union, September 14, 1987.

"The Great Gun Fallacy," Syracuse Post-Standard, March 30, 1989.

"Four Cases on Right to Bear Arms," Syracuse Post-Standard, April 22, 1989.

"Don't Start Line-Item Veto," Syracuse Post-Standard, May 9, 1990.

"Clinton Must Balance Activism, Congress' Constitutional Power," Syracuse Post-Standard, January 21, 1993.

"More Permits Mean Less Crime, But Not in Cities," Los Angeles Times, February 19, 1996.

"Door No. 1: Muskets? Or Door No. 2: Free Speech?" Christian Science Monitor, September 19, 1997.

"Assault Weapons Ban," Christian Science Monitor, April 16, 1998.

"As a National Candidate, Pataki Faces Big Hurdles," Syracuse Post-Standard, February 10, 1999.

17

"Gun Industry Doesn't Know What's Good for It: Regulation," Syracuse Post-Standard, April 20, 1999.

"The Gun Saga in Congress," Intellectual Capital, 4 (May 13-20, 1999).

"Hidden Gun Control or Consumer Protection?" Intellectual Capital, 4 (June 10-17, 1999).

"Welcome to Soviet – er, New York – Politics," Intellectual Capital 5(February 10-17, 2000).

"Gun Control After Columbine," Intellectual Capital 5(April 20-27, 2000).

"Good May Come From Shooting Tragedies," The Catholic Review, March 30, 2000.

"Why Would Anyone Want the Job Now?" Chicago Tribune, November 15, 2000.

"The Supreme Court, Bush, and the Election of the Century," Syracuse Post-Standard, December 18, 2000.

"Ashcroft Playing Politics With the Right to Bear Arms," Syracuse Post-Standard, June 12, 2001.

"Exposure Erodes Clout of NRA," Columbus Dispatch, April 24, 2003.

"Hazing Scandals," Syracuse Post-Standard, November 6, 2003.

"Endorsement Fever," with Glenn Altschuler, Syracuse Post-Standard, February 18, 2004.

"NRA Loses Its Political Firepower," Los Angeles Times, April 12, 2004. Also in the Deseret News.

"A 'Tortured' Interpretation of the President's Vast Powers," Syracuse Post-Standard, June 18, 2004.

"Clearing the Air," Syracuse Post-Standard, August 4, 2004.

"Why Gun Ban Died Quietly," San Jose Mercury News, Sunday "Perspectives," September 19, 2004.

"To Pledge or Not to Pledge," Christian Science Monitor, August 18, 2005. Also

18

published in the <u>Deseret News</u>, <u>Sacramento Bee</u>, the <u>Fresno Bee</u>, the <u>Modesto Bee</u>, the <u>Ithaca Journal</u>, the <u>Johnstown Breeze</u>, Yahoo.com, and World News Network (wn.com), among others.

"Can He Hear You Now? The Defense of Bush's Domestic Spying is Nothing But Static," <u>Syracuse Post-Standard</u>, January 29, 2006.

"Working Hard to Misconstrue the 2nd Amendment," History News Network ([www.hnn.us](www.hnn.us)), March 12, 2007.

"Teens With AK-47 Not Exercising a 'Right,'" <u>Syracuse Post-Standard</u>, January 3, 2008.

"Is Bush Inventing Another Constitutional Power?" History News Network ([www.hnn.us](www.hnn.us)) January 7, 2008.

"The 'Pocket Veto' Peril," <u>Los Angeles Times</u>, January 8, 2008. Reprinted in the <u>St. Louis Post-Dispatch</u>, <u>St. Paul Pioneer Press</u>, <u>Wilmington Star News</u> (NC), <u>News and Observer</u> (NC), <u>The Morning Call</u> (Pa.), <u>Contra Costa Times</u> (CA), the <u>Sun News</u> (FL), <u>The Vindicator</u>, among others.

"Democrats Can Prevent Catastrophe and Hillary Should Help," with Glenn Altschuler, <u>Cleveland Plain Dealer</u>, February 15, 2008.

"Trouble Ahead?" with Glenn Altschuler, <u>Syracuse Post-Standard</u>, February 15, 2008.

"Saving the Constitution from Lawyers, Parts I, II, III," The Faculty Lounge ([www.thefacultylounge.org](www.thefacultylounge.org)), April 16, 19, 22, 2008.

"Saving the Constitution from Lawyers," History News Network ([www.hnn.us](www.hnn.us)), June 9, 2008.

"Heller's Manufactured Gun Rights Can Be Traced to a Flawed Law Review Article," History News Network ([www.hnn.us](www.hnn.us)), June 30, 2008.

"Lincoln, FDR, Bush: Which Doesn't Belong?" History News Network ([www.hnn.us](www.hnn.us)), January 12, 2009.

"Early Voting for New York Elections," <u>Cortland Standard</u>, May 27, 2009.

"A Better Way to Run Our Elections," <u>Syracuse Post Standard</u>, June 3, 2009.

"Senate 'Resolution,'" with Glenn Altschuler, The Huffington Post ([www.huffingtonpost.com](www.huffingtonpost.com)), posted December 22, 2009.

19

"Pres. Obama: Don't Make This Veto Mistake," The Huffington Post (www.huffingtonpost.com), posted January 4, 2010.

"Upset About a Census of People? How About a Census of Guns?" The Huffington Post (www.huffingtonpost.com), posted April 1, 2010.

"Bart Stupak's First 'Profiles in Courage' Moment," The Huffington Post (www.huffingtonpost.com), posted April 10, 2010.

"Are These Guys Really Militias?" *The Huffington Post* (www.huffingtonpost.com), posted April 20, 2010.

"Incorporating Guns?" *The Huffington Post*, posted June 29, 2010.

"Why Gun Ruling is a Teachable Moment," CNN.COM, June 30, 2010.

"Why Obama Must Embrace the Veto Strategy," *The Huffington Post*, posted January 5, 2011.

"A Sensible Approach to Guns, From NY to Arizona," *Syracuse Post Standard,* January 16, 2011.

"Double Congress's Pay," *The Huffington Post*, January 18, 2011.

"Campuses Just Say 'No' to Guns," *The Huffington Post*, February 27, 2011.

"Obama, War Powers, and Yoo," *The Huffington Post*, March 29, 2011.

"I'm Not a Candidate, but I Play One on TV," with Glenn Altschuler, *The Huffington Post*, April 11, 2011.

"The Constitution We Nearly Had," *The Huffington Post,* September 15, 2011.

"Libya and Iraq: A Stop and Think Moment," *The Huffington Post,* October 24, 2011.

"The GOP and Presidential Power," *The Huffington Post,* January 3, 2012.

"The Disappearing Faculty," *The Huffington Post,* February 1, 2012.

"The 'Good-Guy-Bad-Guy' Myth Laid Bare," *The Huffington Post*, March 28, 2012.

"The NRA's Silent Motive," *Salon*, April 3, 2012.

20

"Why We've Learned Nothing from Watergate," *The Huffington Post,* June 20, 2012.

"The NRA's 'Fast and Furious' Gun Walking,' *The Huffington Post,* June 29, 2012.

"Not so Fast: House Committee Wrong on Gun-Running Story," *Syracuse Post-Standard,* July 4, 2012.

"Aurora Won't Change Anything," *Salon,* July 23, 2012.

"Not in New York," *Syracuse Post-Standard* Sunday Opinion, July 29, 2012.

"Sex, Politics, and the Porn Star DA," *The Huffington Post*, November 20, 2012.

"Who Gets Guns," *The Blue Review* (thebluereview.org), December 19, 2012.

"Five Myths About Gun Control," *The Washington Post*, Sunday Outlook Section, December 23, 2012.

"Government can Improve Gun Records," *The Hill,* January 15, 2013.

"Doing Nothing on US Gun Laws No Longer an Option," *The Independent* (Britain), January 17, 2013.

"The President's Need for Speed," *The New York Daily News,* January 17, 2013.

"No Need for Panic," *Cortland Standard*, March 28, 2013.

"From *Duck Dynasty* to the *Ivory Tower*," *The Huffington Post*, September 3, 2013.

"A History Lesson for Foes of N.Y. Gun Law," *New York Daily News,* January 3, 2014.

"History Shows Gun Laws Were Common in U.S.," *Syracuse Post-Standard,* January 7, 2014.

"An Assault Weapons Gambit Backfires," *New York Daily News,* April 9, 2014.

"Sensible Regulation of Guns is Necessary," *Rochester Democrat and Chronicle,* April 13, 2014.

"Cortland Can Help Shine Light on Crimes," *Syracuse Post Standard,* April 27, 2014.

"The Jets, Michael Vick and a College Dilemma," *The Huffington Post,* April 28, 2014.

21

"Obama's Executive Orders: Can We Talk?" *The Huffington Post,* November 18, 2014.

"Leading By Veto," *Los Angeles Times,* February 3, 2015.

"How Obama Can Use Veto Power Without Being President No," *Syracuse Post Standard,* February 8, 2015.

"Stand Your Ground Makes No Sense," *New York Times,* May 4, 2015.

"Gun Laws are as Old as Gun Ownership," *ACS Blog*, American Constitution Society, May 18, 2015.

"Why Are Assault Weapon Sales Jumping? Because They're Fun," *Los Angeles Times,* June 12, 2015.

"Guns Were Much More Strictly Regulated in the 1920s and 1930s than They Are Today," *History News Network,* June 14, 2015. Also in *Time Magazine*, June 15, 2015.

"Why Assault Rifle Sales Are Booming," *Chicago Tribune,* June 15, 2015.

"Think the Charleston shooting will lead to new gun control laws? It won't." *Washington Post,* June 18, 2015.

"The Politics of the Fourth of July from Musical Theatre," *Huffington Post,* June 29, 2015.

"Flanagan's Gun Permit, and Mine," *N.Y. Daily News,* August 31, 2015.

"Why the Oregon Shooting Likely Won't Change Anything," *U.S. News and World Report,* October 2, 2015.

"Obama's Guantanamo Paradox," with Chris Edelson, *U.S. News and World Report,* November 30, 2015.

"Arming Everyone is Not the Answer," *N.Y. Daily News,* December 6, 2015.

"Why Guns for all Is Not a Good Idea," *Syracuse Post-Standard,* December 13, 2015.

"President Obama's Recent Vetoes Were Unconstitutional. Congress Should Sue Him." *Washington Post,* December 30, 2015.

"Obama Should be Sued over Unconstitutional Vetoes," *Syracuse Post-Standard,*

22

January 1, 2016.

"Nutty Gun Rhetoric Meets Reality," *U.S. News and World Report,* January 7, 2016.

"Anti-Fluoride Advocate No Expert," *Cortland Standard,* February 16, 2016.

"What the Orlando Shooting Shows About the Importance of Gun Laws," *Washington Post,* June 14, 2016.

"Orlando Shooting: Reaction from Cortland Gun Law Expert," *Syracuse Post Standard,* June 19, 2016.

"Even in the Wild West, There Were Rules About Carrying Concealed Weapons," *Los Angeles Times,* June 19, 2016.

"Here's What it Would Take for the U.S. to Ban Assault Weapons Again," *MarketWatch,* June 24, 2016.

"Political Gridlock, Past and Present," *Washington Times,* in conjunction with the National Constitutional Literacy Campaign, September 12, 2016.

"Guns Return to American Elections," *US Election Analysis 2016: Media, Voters and the Campaign*, Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 18, 2016.

"Gun Rules and Rights: Where's the Problem?" Guns Issue, CLOG, 2017.

"Why Congress Will Let Trump Keep Business Ties—for Now," *Syracuse Post Standard,* January 15, 2017.

"Why There Will Be No Trump Impeachment Now—Even Though There Should Be," *Huffington Post,* January 18, 2017.

"The NRA Wants to Suppress One of Guns' Most Important Safety Features," *Washington Post*, January 23, 2017; *Chicago Tribune*, January 24, 2017.

"Trump's Tax Returns and Tax Reform: Can We Get Both?" *Syracuse Post Standard,* April 16, 2017.

"Armed Private Militias like Charlottesville's Offend the Founding Fathers' Intent," *NY Daily News,* August 16, 2017.

23

"Private Militias and Gun Rights," *Syracuse Post Standard,* August 20, 2017.

"Americans Used to Be Good at Gun Control. What Happened?" *New York Times,* October 3, 2017.

"An American Standoff," *New York Daily News,* October 8, 2017.

"Laws We Used to Have on the Books Could Have Prevented the Florida School Shooting," *Washington Post,* February 15, 2018.

"The NRA's Journey from Marksmanship to Political Brinkmanship," *The Conversation,* February 23, 2018.

"How to Keep the Deadliest Guns Out of Dangerous Hands," *New York Daily News,* March 5, 2018.

"You Can Report a Bad Driver; Why Not an Angry Gun Owner?" *Syracuse Post Standard,* March 11, 2018.

"Here's What Trump Doesn't Know about Knives, Guns and Murder," *Washington Post,* May 9, 2018.

"'Stand Your Ground' Laws Have Failed to Stem Crime or Improve Safety," Rockefeller Institute of Government, June 4, 2018.

"What's Behind NRA TV's Grotesque Take on 'Thomas & Friends,'" *CNN.com,* September 13, 2018.

"The Gun Safety Issue is Actually Helping Democrats," *New York Times,* November 12, 2018.

"Impeachment: Be Careful What You Ask For," *Syracuse Post Standard,* December 30, 2018.

"Why the Supreme Court Will Almost Surely Strike Down New York City's Gun Law," *New York Daily News,* January 24, 2019.

"Why 'Vice' Deserves an Oscar," *Los Angeles Times,* February 7, 2019.

"One Year Later: Parkland Shifted the Politics of Guns," *Syracuse Post Standard,* February 17, 2019.

"There's No Second Amendment Right to Large-Capacity Magazines," *New York Times,*

24

August 6, 2019.

"Can the NRA Survive its Current Crisis?" *History News Network*, hnn.us, August 11, 2019.

"Trump Should Seize This Pivotal Moment and Stop Waffling on Gun Control," *CNN.com,* August 24, 2019.

"One Gun Policy Idea We Can Agree On: Magazine Regulation," *Second Thoughts,* The Center for Firearms Law at Duke University, October 10, 2019.

"William Barr's Upside-Down Constitution," *History News Network,* December 1, 2019.

"Gun Rights Sanctuaries Threaten Law and Order," *Syracuse Post Standard,* February 2, 2020.

"Why Are People Bringing Guns to Anti-quarantine Protests? To Be Intimidating," *Washington Post,* April 27, 2020.

"The NRA is Doomed. It Has Only Itself to Blame." *Washington Post,* August 8, 2020.

"Guns Don't Belong Near Polling Places. Right Wingers Want Them There Anyway." *Washington Post,* September 30, 2020.

"President Trump's Record on Promises: Did He Keep Them?" *Syracuse Post Standard,* October 1, 2020.

"Originalism, Shot Full of Holes: A Primer for Amy Coney Barrett," *New York Daily News,* October 14, 2020.

"Guns and the 2020 Elections," *US Election Analysis 2020,* Daniel Jackson, et al., eds. Centre for Politics & Media Research and the Centre for the Study of Journalism, Culture and Community at Bournemouth University, UK, November 15, 2020.

"Capitol Riot a Fitting End to Trump Presidency Built on Lies," *Syracuse Post-Standard,* January 8, 2021.

"The Problem with a Self-Pardon," *History News Network,* January 14, 2021.

"The Supreme Court's intent isn't concealed: Conservatives are hell bent on expanding gun rights," *NY Daily News,* April 26, 2021.

25

"Expert Opinion: The Coming Collision of Gun Laws and Rights," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, May 10, 2021.

"The NRA could be winning its long game even as it appears to be in dire straits," *The Conversation,* November 24, 2021.

"Texas and New York: A Tale of Two State Gun Laws," *New York Daily News*, January 25, 2022.

"Despite Tragedy, College Campuses Remain Safe," *Virginia Daily Press/Virginian-Pilot,* February 8, 2022.

"Sandy Hook-Remington gun marketing settlement shows how to fight gun companies," *NBC THINK,* February 19, 2022.

"The Sandy Hook-Remington Settlement: Consequences for Gun Policy," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, March 21, 2022.

"Study of US Government Requires Examination of Conflict," *Virginia Daily Press/Virginian-Pilot,* May 1, 2022.

"How the NRA evolved from backing a 1934 ban on machine guns to blocking nearly all firearm restrictions today," *The Conversation,* May 25, 2022.  150

"The NRA wasn't always opposed to gun restrictions," *Chicago Sun-Times,* May 27, 2022.

"Originalism, History, and Religiosity are the Faults of Alito's Reasoning in *Dobbs*," *History News Network,* May 29, 2022.

"US tragedies from guns have often – but not always – spurred political responses," *The Conversation,* June 8, 2022.

"How the Supreme Court rewrote history to justify its flawed gun decision," *NBC THINK,* June 23, 2022.

"The Road Ahead for Gun Laws in New York State," *New York Daily News*, June 28, 2022.

"Understanding the New Gun Policy Collision," Regional Gun Violence Research Consortium, Rockefeller Institute of Government, July 12, 2022.

26

Testimony, Briefs, and Reports:
"Report of a Survey of Contributors to the Democratic Telethon," A Report to the Democratic National Committee, Washington, D.C., January 1974.

"Election Laws, Registration and Voting:  Some Recommendations," Testimony presented before the New York State Assembly Committee on Election Law, Albany, N.Y., May 15, 1980.

"New York's Multi-Party System," a presentation given before members of the Mexican and Canadian Parliaments at the Rockefeller Institute for Governmental Studies, Albany, N.Y., October 29, 1982.

"Comments and Recommendations on `The New York State Assembly: The Need for Improved Legislative Management,'" co-authored with Henry Steck, prepared for the New York State Assembly Republican Study Group, September, 1985.

"Registration, Voting, and the New York Election Law," Testimony presented before the Governor's Task Force to Encourage Electoral Participation, World Trade Center, New York City, December 21, 1987.

"The Pocket Veto and Sine Die Adjournments," Testimony presented to the Rules Committee, Subcommittee on the Legislative Process, House of Representatives, Washington D.C., July 26, 1989.

"Issues Pertaining to the Pocket Veto," Testimony presented to the Judiciary Committee, Subcommittee on Economic and Commercial Law, House of Representatives, Washington, D.C., May 9, 1990.

"The Stealth Veto: Does the President Already Possess Item Veto Powers?"  Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, U.S. Senate, Washington, D.C., June 15, 1994.

"The Hidden History of the Second Amendment," The National Press Club, Washington, D.C., May 12, 1998.

"The Second Amendment: A Source of Individual Rights?" Testimony presented to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998.

"The Gun Industry: The NRA's Silent Partner," National Press Briefing, Atlanta, GA, February 2, 1999.

"Program Review: SUNY Oswego Political Science Department," prepared as part of the
27

department's review and assessment process, March 2001.

Meeting on Executive Order 13233, pertaining to presidential records access, hosted by Alberto Gonzales, Office of Legal Counsel, the White House, Washington, D.C., December 7, 2001.

Article ("Lost and Found: Researching the Second Amendment," Chicago-Kent Law Review, 2000) cited as controlling authority by the U.S. Court of Appeals, Ninth Circuit, in the case of *Silveira v. Lockyer* (312 F.3d 1052; 9th Cir. 2002); 2002 U.S. App. LEXIS 24612.

Coauthor, *amicus curiae* brief in the case of *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003).

White House meeting on changing standards regarding FOIA requests, access to Executive Branch documents, and presidential library design, hosted by White House Counsel Alberto Gonzales and White House Staff Secretary Brett Kavanaugh, Washington, D.C., July 17, 2003.

Invited participant and panelist, "National Research Collaborative Meeting on Firearms Violence," hosted by the Firearm and Injury Center at the University of Pennsylvania, and the Joyce Foundation, Philadelphia, PA, June 15-17, 2005.

Program Review Report, SUNY Geneseo Political Science Department, March, 2009.

Coauthor with Louis Fisher, *amicus curiae* brief in the case of *Republic of Iraq et al. v. Beaty et. al.,* U.S. Supreme Court, filed March 25, 2009; case decided June 8, 2009 (556 U.S. 848; 2009).

Testimony on bills to enact early voting and other state voting reform measures before the New York State Senate Standing Committee on Elections, Syracuse, NY, May 14, 2009.

Co-author, *amicus* brief in the cases of *NRA v. City of Chicago* and *McDonald v. Chicago*, U.S. Supreme Court, argued March 2, 2010, decided June 28, 2010, 561 U.S. 742 (2010).

Consultant for plaintiffs in *Conservative Party of New York and Working Families Party v. NYS Board of Elections* (10 Civ. 6923 (JSR)), 2010, U.S. District Court for the Southern District of New York.

Co-author, *amicus* brief in the case of *Ezell v. Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011).

28

Co-author, *amicus* brief in the case of *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069, 2012.

Invited panelist and contributor to conference and report, Institute of Medicine and the National Research Council of the National Academies, "Committee on Priorities for a Public Health Research Agenda to Reduce the threat of Firearm-Related Violence," National Academies Keck Center, 500 Fifth St., NW, Washington, DC, April 23, 2013.

"Perspectives on the 'Stand Your Ground' Movement," Testimony submitted to the U.S. Senate Committee on the Judiciary, Subcommittee on the Constitution, Civil Rights and Human Rights, Hearing on "'Stand Your Ground' Laws: Civil Rights and Public Safety Implications of the Expanded Use of Deadly Force," Washington, D.C., October 29, 2013.

Testimony on the Hearing Protection Act to deregulate gun silencers submitted to the U.S. House of Representatives Committee on Natural Resources, Subcommittee on Federal Lands, for Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

Expert testimony submitted for the State of Massachusetts, Office of Attorney General, in the case of *Worman v. Baker,* No. 1:17-cv-10107-WGY, United States District Court for the District of Massachusetts, submitted September 15, 2017, challenging Massachusetts state assault weapons restrictions. In 2019 the U.S. Court of Appeals for the First Circuit upheld the Massachusetts law (922 F.3d 26).

Member, Regional Gun Violence Research Consortium Organizing Committee, a Task Force organized by NY Governor Andrew Cuomo and the State Department of Education to research and investigate the causes of gun violence in a multi-state effort. February 2018.

Program Review Report, SUNY New Paltz Political Science and International Relations Departments, April 2019.

Consultant on Facebook policies and actions regarding gun issues, Quonundrums Market Research for Facebook, August 17, 2021.

Several of my publications cited in the case ruling of *Duncan v. Bonta,* U.S. Court of Appeals for the Ninth Circuit, November 30, 2021.

Papers and Presentations (not including those given on the Cortland campus):

29

"The President as Policy-Maker:  The Arenas of Presidential Power from 1954 to 1974," American Political Science Association, Washington, D.C., August 28-31, 1980.

"The Right-to-Life Movement as a Third Party:  The Policy Environment and Movement Politics," American Political Science Association, New York City, September 3-6, 1981. Reprinted by Rockefeller Institute for Governmental Studies Working Papers, Vol. I, No. 4, September, 1982.

"Viable Democracy or the French Fourth Republic:  Multi-Party Politics in New York," New York State Political Science Association, Albany, April 6, 1984.

"The Right-to-Life Movement as Partisan Activity," American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

"Biting the Bullet:  Gun Control and Social Regulation," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

"The Presidential Veto," Northeastern Political Science Association, Boston, MA, November 13-15, 1986.

"Perspectives on the Presidential Veto Power:  Antecedents and Evolution," Bicentennial Conference on the Presidency, co-sponsored by the Center for the Study of the Presidency, the Chautauqua Institution and Gannon University, Erie, PA, April 24-26, 1987.

"The Transformation of a Kingly Power:  The Presidential Veto, Past and Present," American Political Science Association, Chicago, IL, September 3-6, 1987.

"The Pocket Veto:  Expanding Presidential Prerogatives Through the Back Door," American Political Science Association, Washington, D.C., September 1-4, 1988.

"Liberalism and Juridical Democracy; or What's Interesting About Interest Group Liberalism," Western Political Science Association, Newport Beach, CA., March 22-24, 1990.

"Separation of Powers and the War Power," presentation sponsored by the Federalist Society, Cornell University School of Law, April 20, 1990.

"Is the Separation of Powers Obsolete?  An Inquiry into Critiques of the Congressional-Presidential Balance of Power," American Political Science Association, Washington, D.C., August 29-September 1, 1991.

"Hate Speech and the College Campus," conference on Two Hundred Years of Free

30

Expression, SUNY Oneonta, October 2-3, 1992.

"From Presidential Shield to `Go Ahead, Make My Day':  The Presidential Veto and the Constitutional Balance of Power," featured paper presenter for Fall 1992 Symposium on American Constitutionalism, Southwest Texas State University, San Marcos, TX, October 30, 1992.

"The Reagan Presidency and the Veto Power: Symbols and Actions of the `Make-My-Day' President," Southern Political Science Association, Savannah, GA, November 3-6, 1993.

"Tenure, Speech, and the Jeffries Case: A Functional Analysis," conference on academic Freedom and Tenure, sponsored by New York City Bar Association and Pace University Law School, New York City, March 8, 1994.

"`It's My Constitution, and I'll Cry If I Want To': Constitutional Dialogue, Interpretation, and Whim in the Inherent Item Veto Dispute, " American Political Science Association, Chicago, August 31-September 3, 1995. Winner, 1996 Presidency Research Group Founders' Award for Best Paper on the Presidency presented at the 1995 APSA. Paper received mention in the Washington Post, September 24, 1995.

"Guns and Violence," presentation before Bryn Mawr Presbyterian Church Task Force on Violence, Bryn Mawr, PA, October 8, 1995.

"Guns, Militias, and the Constitution," Distinguished Lecture Series, Utica College, Utica NY, March 26, 1996.

"The Right to Bear Arms: A Constitutional and Criminological Analysis of Gun Control," the Cornell University School of Law, October 8, 1996.

"The Veto King: The `Dr. No' Presidency of George Bush," Conference on the Presidency of George Bush, Hofstra University, Hempstead, NY, April 17-19, 1997.

"Saving the Constitution from Lawyers," American Political Science Association, Washington, D.C., August 28-31, 1997.

"Revolution, the Second Amendment, and Charlton Heston," Gettysburg College, Gettysburg, PA, October 30, 1997.

"Recent Developments in The Politics of Gun Control," Gettysburg College, Gettysburg, PA, November 10, 1998.

"The Second Amendment, Disarmament, and Arms Control," Communitarian Summit,

31

the Washington National Airport Hilton, Arlington, VA, February 27-28, 1999.

"The Argument Against Clinton's Impeachment," Hyde Park Session, American Political Science Association, Atlanta, September 2-5, 1999.

"Gun Politics After Littleton," Gettysburg College, Gettysburg, PA, November 9, 1999.

"Lost and Found: Researching the Second Amendment," Symposium on "The Second Amendment: Fresh Looks," Chicago-Kent Law School and the Joyce Foundation, Chicago, April 28, 2000.

"The Independent Counsel and the Presidency After Clinton," American Political Science Association, Washington, D.C., August 31-September 3, 2000.

"From Columbine to Santee: Gun Control in the 21st Century," Idaho State University, Pocatello, Idaho, April 19, 2001.

"Gun Control in the New Millennium," Gettysburg College, Gettysburg, PA, November 13, 2001.

"Gun Rights for Terrorists? Gun Control and the Bush Presidency," A Presidency Transformed By Crises: The George W. Bush Presidency, SUNY Fredonia, NY, October 17-18, 2002.

"Gun Control and the Bush Presidency," Gettysburg College, Gettysburg, PA, November 21, 2002.

"The Ashcroft Justice Department and the Second Amendment," American Bar Association Annual Meeting, San Francisco, August 8-11, 2003.

"The Bush Presidency and 9/11," Keynote Address, Conference on 9/11, Cazenovia College, NY, September 11, 2003.

"Report of the National Task Force on Presidential Communication to Congress," co-author, Tenth Annual Texas A&M Conference on Presidential Rhetoric, George Bush Presidential Library and Conference Center, College Station, TX, March 4-7, 2004.

"Don't Know Much About History, Politics, or Law: Comment," Conference on The Second Amendment and the Future of Gun Regulation, co-sponsored by the Fordham School of Law, the Second Amendment Research Center, and the John Glenn Institute for Public Service and Public Policy of the Ohio State University, April 13, 2004, New York City.

32

"Bush vs. Kerry: Election of the Century?" Colgate University, Hamilton, NY, October 20, 2004.

"The Commander-in-Chief Power and Constitutional Invention in the Bush Administration," a paper presented at a Conference on "Is the Presidency Dangerous to Democracy?", Loyola Marymount University, Los Angeles, CA, February 7, 2005.

Participant, "The Wheler Family Address on International Relations," Academic Conference on World Affairs, Cazenovia College, Cazenovia, NY, September 9, 2005.

"What Ever Happened to Gun Control?", Gettysburg College, Gettysburg, PA, November 1, 2005.

"Clinton and Gun Control: Boon or Bane?" a paper presented at the 11th Presidential Conference on William Jefferson Clinton, Hofstra University, Hempstead, NY, November 10-12, 2005.

"George W. Bush and the Unitary Executive," Keynote Address for "Quest," SUNY Oswego Scholars Day, April 19, 2006.

"Resolving Conflict with Intractable Foes:  The Lessons of International Relations Theory Applied to the Modern Gun Control Debate," Bryant University, Smithfield, RI, April 24, 2006.

"The Unitary Executive and the Commander-in-Chief Power," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

"The 2006 Elections," LeMoyne College, Syracuse, NY, November 29, 2006.

"In Wartime, Who Has the Power?" Symposium on Presidential Power and the Challenge to Democracy, Idaho State University, Pocatello, ID, April 26, 2007.

"Saul Cornell's Second Amendment: Why History Matters," Conference on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law, and Public Policy, Albany Law School, Albany, NY, October 18-19, 2007.

"Gun Control and the 2008 Elections," Third Annual Harry F. Guggenheim Symposium on Crime in America, John Jay College, New York City, December 3-4, 2007.

"The Post-Cold War Vice Presidency," Cornell Adult University, Cornell University, Ithaca, NY, July 31, 2008.

33

"Is the Presidency Constitutional?" Roundtable panel on Restoring the Constitutional Presidency, APSA, Boston, August 28-31, 2008.

"The Future of the American Presidency," Board of the Bristol Statehouse, Bristol, RI, November 30, 2008.

"Is the Constitutional Presidency Obsolete? The Future of the American Presidency," Symposium on The Future of the American Presidency, Regent University, Virginia Beach, VA, February 6, 2009.

"The Failure of the Pro-Gun Control Movement," SUNY Oneonta, March 19, 2009.

"The Post-Bush Presidency and the Constitutional Order," American Political Science Association, Toronto, Canada, September 3-6, 2009.

"Inventing Gun Rights: The Supreme Court, the Second Amendment, and Incorporation," SUNY Geneseo, March 24, 2010.

"Intelligence Don't Matter," Keynote Address to Phi Kappa Phi Induction Ceremony, SUNY Cortland, April 17, 2010.

"The Law and Politics of Gun Control after Tucson," 6th Annual Harry Frank Guggenheim Symposium on Crime in America, conference on "Law and Disorder: Facing the Legal and Economic Challenges to American Criminal Justice," John Jay College of Criminal Justice, CUNY, New York City, January 31-February 1, 2011.

"Looking Ahead to the 2012 Elections," Tompkins County Democratic Committee, Ithaca, NY, August 7, 2011.

"Growing Executive Power: The Strange Case of the 'Protective Return' Pocket Veto," American Political Science Association, Seattle, WA, September 1-4, 2011.

"Gun Control and the Second Amendment," OASIS Conference, Syracuse, NY, October 3, 2011

"Comparing the Constitutional Presidencies of George W. Bush and Barack Obama: War Powers, Signing Statements, Vetoes," conference on "Change in the White House? Comparing the Presidencies of George W. Bush and Barack Obama," Hofstra University, Hempstead, NY, April 19, 2012.

"Watergate After 40 Years: Dick Cheney's Revenge," American Political Science Association, New Orleans, LA, August 30-September 2, 2012.

34

"The Media, American Elections, and Democracy," OASIS, Syracuse, NY, October 22, 2012.

"Hot Button Issues in the 2012 Presidential Campaign," Hiram College Conference on the 2012 Elections, Hiram, Ohio, November 15-17, 2012.

"Gun Legislation and Obstacles to Effective Gun Control," Metropolitan Black Bar Association, New York City Bar Association, November 29, 2012.

"Guns and America," Syracuse University, Syracuse, NY, February 19, 2013.

"The Constitution Between Opponents," conference on "The State of the Presidency," Andrus Center for Public Policy, Boise State University, Boise, ID, February 28, 2013.

"Gun Policy at a Crossroads," Thursday Morning Roundtable, Syracuse, NY, March 7, 2013.

"Gun Policy Cycles and History," Pediatric Grand Rounds at the Upstate Golisano Children's Hospital, Syracuse, NY, March 13, 2013.

"Gun Law and the Constitution," Monroe County Bar Association, Rochester, NY, March 21, 2013.

"The Architecture of the Gun Control Debate," Goldfarb Center for Public Affairs, Colby College, Waterville, ME, April 2, 2013.

"The Campbell Debates: This Assembly Supports the NY SAFE Act," Syracuse University, April 5, 2013.

"What has Sandy Hook Changed? The Evolving Gun Debate," Reisman Lecture Series, Cazenovia College, Cazenovia, NY, April 17, 2013.

"Gun Policy Change: Infringing Rights, or Following History?" Jefferson Community College, Watertown, NY, April 18, 2013.

"Under the Gun," Conference on "Gun Violence, Gun Laws, and the Media," Center on Media, Crime and Justice, John Jay College of Criminal Justice, New York, May 14-15, 2013.

"Five Myths of the Gun Debate," Lawman of the Year, Cortland County Lawman Committee, Cortland, NY, May 20, 2013.

35

"Gun Law History," Sterling Historical Society, Sterling, NY, June 27, 2013.

"Analyzing the New York SAFE Act," League of Women Voters Forum, Cortland, NY, September 12, 2013.

"Constitution Day, the Second Amendment, and Guns," OASIS, Syracuse, NY, September 16, 2013.

"The Second Amendment and Guns in America," Values, Arts, and Ideas Series Constitution Day Speaker, Manchester University, North Manchester, Indiana, September 17, 2013.

"Live By History, Die By History: The Second Amendment, Heller, and Gun Policy," Georgetown University, Washington, DC, October 18, 2013.

"American Gun Policy," "Gun Violence: A Comparative Perspective," and "American History and Foreign Policy, 1960-1990," King's College, London, England; Southbank Centre, "Superpower Weekend," November 8-11, 2013.

"Gun Politics and the Electoral Process," Oneida County Women's Democratic Club and County Committee, Utica, NY, November 17, 2013.

"The Second Amendment and the Hidden History of Gun Laws," Institute for Legislative Studies, University of North Carolina, Greensboro, NC, November 20-21, 2013.

"The Future of Gun Regulation After Newtown," Fordham University, New York, NY, January 21, 2014.

"The 2014 Elections: The End of the Obama Era?" 22nd Annual Chautauqua, Homer, NY, August 3, 2014.

"New York State and the NY SAFE Act: A Case Study in Strict Gun Laws," conference on "A Loaded Debate: The Right to Keep and Bear Arms in the 21st Century," Albany Law School, Albany, NY, October 9, 2014.

"Is Gun Control Un-American or at Least Unconstitutional?" Temple Concord, Syracuse, NY, October 14, 2014.

"The American Gun Debate is Under Water," TEDxCortland Talk, Hathaway House, Solon, NY, October 25, 2014.

"The Unitary Executive and the Bush Presidency," Conference on the Presidency of George W. Bush," Hofstra University, Hempstead, NY, March 24-26, 2015.

36

"Assessing the Obama Presidency," Western Political Science Association, Las Vegas, NV, April 1-3, 2015.

"Gun Laws, Gun Policies, and the Second Amendment," Central New York Council of the Social Studies Professional Development Day Conference, Carnegie Conference Center, Syracuse, NY, October 20, 2015.

"The 2016 Elections," The Cornell Club of Cortland County, November 17, 2015, Cortland, NY.

"Gun Law History in the U.S. and Second Amendment Rights," Conference on The Second Amendment: Legal and Policy Issues, New York University Law School and the Brennan Center for Justice, New York City, April 8, 2016.

"The Presidential Elections," The Century Club, June 7, 2016, Syracuse, NY.

"The 2016 Elections," Chautauqua, August 3, 2016, Homer, NY.

"The 2016 Elections" Cortland Rotary, Cortland, N.Y. September 20, 2016.

"The 2016 Elections," Cortland Community Roundtable, October 6, 2016.

"TrumPocalypse 2016," Finger Lakes Forum, Geneva, N.Y., October 16, 2016.

"The 2016 Elections," Homer Congregational Church, Homer, N.Y., October 30, 2016.

"Had Enough? Only Five More Days," OASIS, November 3, 2016, Syracuse, N.Y.

"Guns for Everyone?" OASIS, November 14, 2016, Syracuse, N.Y.

"Sizing Up the Trump Presidency," Cortland County Democratic Party, June 1, 2017.

"Understanding Impeachment," Ladies Literary Society, Lafayette, NY, June 7, 2017.

"Guns Across America," Ithaca College, Ithaca, NY, September 21, 2017.

Guest panelist, "Gun Studies Symposium," University of Arizona, Tucson, AZ, October 20, 2017.

"Gun Policy and Schools After Parkland," SUNY Student Assembly Annual Conference, Syracuse, NY, April 7, 2018.

37

"Gun Laws, History, and the Second Amendment: What Does the Constitution Allow?" Clemson University, SC, April 17, 2018.

"Gun Violence and the History of Gun Laws," League of Women Voters of Tompkins County, Ithaca, NY, May 23, 2018.

"The Unknown History of Gun Laws in America," Madison-Chenango Call to Action, Hamilton, NY, June 20, 2018.

"It's All Academic: The Meaning of the Second Amendment Versus Heller," Conference on "The Second Amendment: Its Meaning and Implications in Modern America," Lincoln Memorial University School of Law, Knoxville, TN, January 18, 2019.

"Mulling Over the Mueller Report," Indivisible Cortland County, Homer, NY, June 15, 2019.

"Gun Accessories and the Second Amendment: Assault Weapons, Magazines, and Silencers," Symposium on Gun Rights and Regulation Outside the Home, Duke University, Durham, NC, September 27, 2019.

"Gun Policy 101: What Policymakers and the Public Need to Know," Rockefeller Institute of Government, Albany, NY, October 1, 2019.

Guest expert, Federalist Society Teleforum on *New York State Rifle and Pistol Association v. NYC,* November 22, 2019.

"To Brandish or Not to Brandish: The Consequences of Gun Display," Duke University Law School Conference on Historical Gun Laws, June 19, 2020 (virtual).

"The 2020 Elections," Cortland Country Club, October 14, 2020.

Panelist, "Gun Law, Politics, and Policy," Midwest Political Science Association, Chicago, April 14-17, 2021 (virtual).

"Gun Violence," Beaches Watch, Florida, August 4, 2021 (virtual).

"Challenging Conversations: Gun Control," Lockdown University (virtual), April 5, 2022.

"Scholars' Circle: Gun Control," June 30, 2022 (virtual).

"Gun Rules and Regulations," Clubhouse AverPoint, July 2, 2022 (virtual).

38

"A Nation in Crisis: Are Guns the Problem?" Center for Ethics and Human Values' Civil Discourse Forum, The Ohio State University, Columbus, OH, September 23, 2022.

"Explaining the 2022 Midterm Elections," OSHER Lifelong Learning Institute at the College of William and Mary, Williamsburg, Va., October 13, 2022.

Panel Participation:

Discussant, "Historical Transformations of Political Institutions in the U.S.," Social Science History Association, Rochester, N.Y., November 7-9, 1980.

Chair, "The Political Economy of Single Issue Movements," 1981 American Political Science Association, New York City, September 3-6.

Discussant, "New York Republicans:  An Emerging Majority Party?", New York State Political Science Association, Albany, N.Y., April 2-3, 1982.

Round table panel member, "Perspectives on the Reagan Administration," New York State Political Science Association, New York, N.Y., April 8-9, 1983.

Discussant, "Toward a Theory of the Chief Executive," 1983 American Political Science Association, Chicago, Ill., September 1-4, 1983.

Chair and Discussant, "Political Parties and Party Organization," 1984 American Political Science Association, Washington, D.C., August 30 - September 2, 1984.

Discussant, "Reforming the Presidential Selection Process," New York State Political Science Association, New York, N.Y., April 25-26, 1985.

Chair, "Theoretical Approaches to Policy Concerns," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "Perspectives on Presidential Influence," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Discussant, "The Item Veto," American Political Science Association, New Orleans, La., August 29 - September 1, 1985.

Chair, "Mobilizing Interests on National Policies," American Political Science Association, Washington, D.C., August 28-31, 1986.

Discussant, "The News Media and American Politics," American Political Science

39

Association, Washington, D.C., August 28-31, 1986.

Chair, "Perspectives on the Bicentennial of the U.S. Constitution," New York State Political Science Association, New York City, April 3-4, 1987.

Discussant, "The Presidency in Comparative Perspective," and "Media and Models of Public Policy-Making," American Political Science Association, Atlanta, Aug. 31 - Sept. 3, 1989.

Discussant, "Presidents and Economic Interests," American Political Science Association, Washington, D.C., August 29 - September 1, 1991.

Panel Chair, "The Presidential Role in Policy Making," American Political Science Association, Chicago, September 3-6, 1992.

Discussant, "Presidential Influence on Congress," American Political Science Association, Washington, D.C., September 2-5, 1993.

Discussant, "Bureaucratic Politics," Southern Political Science Association, November 3-6, 1993.

Discussant, "The President's Extra-Constitutional Power," American Political Science Association, New York City, September 1-4, 1994.

Discussant, "Roundtable on the President and Congress in a Republican Age," Western Political Science Association, San Francisco, March 14-16, 1996.

Chair, "Militias, the Second Amendment, and the State: Constitutional, Social, and Historical Implications," American Political Science Association, San Francisco, August 29-September 1, 1996.

Chair, "Roundtable on Teaching the Presidency," American Political Science Association, August 29-September 1, 1996.

Chair, "The Constitutionalism and Presidentialism of Louis Fisher," American Political Science Association, Washington, D.C., August 28-31, 1997.

Chair, "The President as Legislative Leader," American Political Science Association, Boston, September 3-6, 1998.

Chair, Roundtable on "Memo to the President," American Political Science Association, Atlanta, September 2-5, 1999.

40

Discussant, "Firearms in the U.S.," Midwest Political Science Association, Chicago, April 27-30, 2000.

Chair and discussant, Roundtable on "Is the Presidency Changed?" APSA, San Francisco, August 30-September 2, 2001.

Chair and discussant, "Presidential Use of Strategic Tools," APSA, Boston, August 29 - Sept. 1, 2002.

Discussant, "Executing the Constitution," APSA, Boston, August 29 - Sept. 1, 2002.

Chair, "Marketing the President," APSA, Philadelphia, August 28-31, 2003.

Discussant, "Media Coverage of the Presidency," APSA, Philadelphia, August 28-31, 2003.

Chair and discussant, "Does Presidential Leadership in Foreign Policy Matter?" APSA, Chicago, September 2-5, 2004.

Roundtable member, "The Ins and Outs of Obtaining a Book Contract," APSA, Chicago, September 2-5, 2004.

Discussant, "Presidential Power: Lessons From the Past," APSA, Washington, D.C., September 1-4, 2005.

Chair and Discussant, "The Unitary Executive in a Separated System," APSA, Philadelphia, August 31-September 3, 2006.

Panel chair, "The Culpability of Congress," Conference on Presidential Power in America: The Constitution, the Defense of a Nation and the National Ethos, Massachusetts School of Law Conference Series, Andover, MA, October 14-15, 2006.

Panel chair, "Keeping the Modern Presidency in Check and Balance," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Presidential Endings: George W. Bush and the Final Two Years," APSA, Chicago, August 30-September 2, 2007.

Discussant, "Staffing and Decisionmaking in the White House," APSA, Boston, August 28-31, 2008.

Panel Chair, "Early Assessments of the Obama Presidency," APSA, Washington, D.C., September 2-5, 2010.

41

Discussant, "Historical Perspectives on the Presidency," APSA, Chicago, August 29-Sept. 1, 2013.

Discussant, "Politics and Presidential Travel," APSA, Washington, D.C., August 27-31, 2014.

Discussant, "The Obama Presidency and Constitutional Law," APSA, San Francisco, Sept. 3-6, 2015.

Discussant, "Presidents, the Courts and the Law," APSA, Philadelphia, Sept. 1-4, 2016.

Discussant, "Executive Power and Democratic Functioning in the Trump Era," APSA, Boston, MA, August 30-September 2, 2018.

Panel chair, "Assessing the Presidency of Donald Trump," APSA, Washington, DC, August 29-September 1, 2019.

Roundtable, "Gun Law, Politics, and Policy," Midwest Political Science Association, April 17, 2021 (virtual).

Roundtable, "Guns and the Political Moment: Political Violence, Self-Defense, and Reckoning with Race," Midwest Political Science Association, Chicago, April 7, 2022.

Book Reviews:

The American Presidency, by Richard M. Pious, reviewed in The Journal of Politics, November, 1979.

The Politics of Mistrust, by Aaron Wildavsky and Ellen Tenenbaum, reviewed in Administrative Science Quarterly, December, 1981.

Review essay, The President as Policymaker, by Laurence E. Lynn and David DeF. Whitman, review essay in Administrative Science Quarterly, March, 1982.

PL94-142:  An Act of Congress, by Erwin L. Levine and Elizabeth M. Wexler, reviewed in the American Political Science Review, June, 1982.

Pure Politics and Impure Science, by Arthur M. Silverstein, reviewed in Administrative Science Quarterly, June, 1984.

Review essay, The President's Agenda, by Paul Light, reviewed in Administrative

42

Science Quarterly, September, 1984.

The Evolution of American Electoral Systems, by Paul Kleppner, et al., reviewed in the American Political Science Review, December, 1983.

A Case of Third Party Activism, by James Canfield, reviewed in Perspective, July-August, 1984.

Winners and Losers:  Campaigns, Candidates and Congressional Elections, by Stuart Rothenberg, reviewed in the American Political Science Review, December, 1984.

The Political Presidency, by Barbara Kellerman, reviewed in Perspective, January-February, 1985.

Presidents and Promises, by Jeff Fishel, reviewed in the American Political Science Review, December, 1985.

The Elections of 1984, ed. by Michael Nelson, reviewed in Perspective, May/June, 1985.

Economic Conditions and Electoral Outcomes, by Heinz Eulau and Michael S. Lewis-Beck, reviewed in Perspective, May/June, 1986.

Presidential Transitions:  Eisenhower Through Reagan, by Carl M. Brauer, in Perspective, January/February, 1987.

Religion and Politics in the United States, by Kenneth D. Wald, in Journal for the Scientific Study of Religion, September, 1988.

Abortion and Divorce in Western Law, by Mary Ann Glendon, in The Annals of the American Academy of Political and Social Science, September, 1988.

The American Political Economy, by Douglas Hibbs, in Perspective, Spring, 1988.

God in the White House, by Richard G. Hutcheson, Jr., in Perspective, Fall, 1988.

The Reagan Legacy, Charles O. Jones, ed., in Social Science Quarterly, June, 1989.

Dilemmas of Presidential Leadership From Washington Through Lincoln by Richard Ellis and Aaron Wildavsky, in Perspective, September, 1989.

Taming the Prince by Harvey Mansfield, Jr., in Governance, April, 1990.

Public Policy and Transit System Management, ed. by George M. Guess, in Perspective,

43

Spring, 1991.

The Myth of Scientific Public Policy, by Robert Formaini, in Perspective, Winter, 1992.

The Bush Presidency: First Appraisals, ed. by Colin Campbell and Bert Rockman in Public Administration Review, May/June, 1992.

The Illusion of a Conservative Reagan Revolution, by Larry Schwab, in Policy Currents, May, 1992.

The Vital South: How Presidents Are Elected, by Earl Black and Merle Black, in Perspective, Fall, 1993.

The Presidential Pulse of Congressional Elections, by James E. Campbell, in The Journal of American History, March, 1995.

Out of Order, by Thomas Patterson, in Presidential Studies Quarterly, Summer, 1994.

Congress, the President, and Policymaking, by Jean Schroedel, in the American Political Science Review, December, 1994.

The President and the Parties, by Sidney Milkis, in Governance, January 1995.

The Myth of the Modern Presidency, by David K. Nichols, PRG Report, Spring, 1995.

The End of the Republican Era, by Theodore Lowi, The Journal of American History, December, 1995.

Strategic Disagreement: Stalemate in American Politics by John B. Gilmour, in Governance (9), 1996.

Rivals For Power: Presidential-Congressional Relations, by James Thurber, in American Political Science Review, March, 1997.

American Presidential Elections, ed. by Harvey Schantz, in Perspectives, Spring 1997.

The Power of Separation by Jessica Korn, in Congress & the Presidency, Spring 1997.

Strong Presidents by Philip Abbott, in Perspective, Fall 1997.

Other People's Money: Policy Change, Congress, and Bank Regulation, by Jeffrey Worsham, in Perspectives, Spring 1998.

44

A Third Choice, in Journal of American History, December 1998.

Politics, Power and Policy Making: The Case of Health Care Reform in the 1990s, by Mark Rushefsky and Kant Patel in Perspectives, Winter 1999.

The Paradoxes of the American Presidency, by Thomas Cronin and Michael Genovese, for the American Political Science Review, March 1999.

Republic of Denial, by Michael Janeway, for Perspectives, Spring 2000.

The Art of Political Warfare, by John Pitney, Rhetoric and Public Affairs, Summer 2001.

Arming America, by Michael Bellesiles, Congress Monthly, January/February 2002.

Gun Violence in America by Alexander DeConde, Law and Politics Book Review, August 2001; also in Historynewsnetwork.org, 8/01.

Presidents as Candidates, by Kathryn D. Tenpas, in Rhetoric and Public Affairs, Spring 2002.

The Trouble With Government, by Derek Bok, Perspectives, Spring 2002.

King of the Mountain, by Arnold M. Ludwig, Rhetoric and Public Affairs, Winter 2002.

Power, the Presidency, and the Preamble, by Robert M. Saunders, Presidential Studies Quarterly, December 2002.

Presidents, Parliaments, and Policy, ed. by Stephen Haggard and Mathew McCubbins, Perspectives, Winter 2003.

The Modern American Presidency, by Lewis L. Gould, Rhetoric and Public Affairs.

Watergate: The Presidential Scandal that Shook America, by Keith W. Olson, Perspectives,  Summer 2003.

The Militia and the Right to Arms, or, How the Second Amendment Fell Silent, by H. Richard Uviller and William G. Merkel, Journal of American History, March 2004.

Power Without Persuasion: The Politics of Direct Presidential Action, by William G. Howell, Perspectives on Politics, June 2004.

The George W. Bush Presidency: An Early Assessment, ed. By Fred Greenstein, Perspectives, Spring 2004.

45

The Invention of the United States Senate, by Daniel Wirls and Stephen Wirls, Perspectives, Summer 2004.

The Mythic Meanings of the Second Amendment, by David C. Williams, Law and Politics Book Review, April 2004.

Empowering the White House, by Karen M. Hult and Charles E. Walcott, Rhetoric and Public Affairs, Fall 2005.

Defining Americans:  The Presidency and National Identity, by Mary E. Stuckey, Perspectives, Spring 2005.

Presidential Leadership: Rating the Best and Worst in the White House, ed. By James Taranto and Leonard Leo, Rhetoric and Public Affairs, Summer 2006.

A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America, by Saul Cornell, American Journal of Legal History, October 2006.

The Founders' Second Amendment: Origins of the Right to Bear Arms, by Stephen Halbrook, Law and Politics Book Review 18(October 2008).

Out of the Shadow: George H.W. Bush and the End of the Cold War, by Christopher Maynard, Journal of American History (September 2009).

Guns, Democracy, and the Insurrectionist Idea, by Joshua Horwitz, Law and Politics Book Review 19(June 2009).

Talking Together, by Lawrence Jacobs, Fay Lomax Cook, and Michael Delli Carpini, dailykos.com, posted June 20, 2009, with Glenn Altschuler.

Accidental Presidents, by Philip Abbott, Presidential Studies Quarterly, June 2010.

The Co-Presidency of Bush and Cheney, by Shirley Anne Warshaw, Congress and the Presidency, 2010.

Crisis and Command: The History of Executive Power from George Washington to George W. Bush, by John Yoo, Presidential Studies Quarterly (December 2010).

Declaring War: Congress, the President, and What the Constitution Does Not Say, by Brien Hallett, Law and Politics Book Review 22(November 2012).

Congress vs. the Bureaucracy: Muzzling Agency Public Relations, by Mordecai Lee, The
46

Journal of American History (December 2012).

Arming and Disarming, by R. Blake Brown, Law and History Review (November 2013).

Reclaiming Accountability: Transparency, Executive Power, and the U.S. Constitution, by Heidi Kitrosser, Congress and the Presidency 42(2015).

The Six-Shooter State: Public and Private Violence in American Politics by Jonathan Obert and The Lives of Guns ed. by Jonathan Obert, Andrew Poe and Austin Sarat, Perspectives on Politics 17(September 2019).

The Toughest Gun Law in the Nation by James B. Jacobs and Zoe Fuhr, Criminal Law and Criminal Justice Books, March 2020.

Warped Narratives: Distortion in the Framing of Gun Policy by Melissa K. Merry, Perspectives on Politics 18(September 2020).

The Uses and Misuses of Politics: Karl Rove and the Bush Presidency by William G. Mayer, Presidential Studies Quarterly (December 2022).


Selected Media Appearances/Quotations:

NBC's "Today Show"; ABC's "Good Morning America" and "Network Nightly News"; PBS's "News Hour"; CNN's "Lou Dobbs," "NewsStand," "CNN & Co." CNN's HLN, and "Insight"; CNBC's "Upfront Tonight"; MSNBC's "Countdown with Keith Olbermann," "All In With Chris Hayes," "Ali Velshi," "Fresh Air With Terry Gross," "The Diane Rehm Show," 1A with Joshua Johnson, NPR; NHK Television (Japan); CGTN (China), documentary films "Guns and Mothers" (PBS, 2003), "Under the Gun" (Katie Couric Film Company, Epix, 2016), "The Price of Freedom" (Flatbush Pictures/Tribeca Films, 2021). Quoted in or by the New York Times, the Washington Post, Time Magazine, Newsweek, Der Spiegel (Germany), USA Today, the Los Angeles Times, the Wall Street Journal, the Christian Science Monitor, the Boston Globe, the Chicago Tribune, the Philadelphia Inquirer, the Miami Herald, Houston Chronicle, the St. Louis Post-Dispatch, San Francisco Chronicle, the Dallas Morning News, the Baltimore Sun, the Detroit Free Press, the Seattle Post-Intelligencer, Newsday, the Denver Post, Kansas City Star, Dallas News, Pittsburgh Post-Gazette, New Orleans Times Picayune, Orlando Sentinel, Columbus Dispatch, Buffalo News, San Jose Mercury News, Albany Times-Union, St. Petersburg Times, Arkansas Democrat-Gazette, Newark Star-Ledger, Bergen Record, Congress Daily, The Hill, CQ Report, Rolling Stone, The Nation, Ladies Home Journal, the National Journal, The Spectator, Legal Times, Financial Times, Toronto Globe, al Jazeera, Reuters, Bloomberg News, Knight Ridder, AP, Gannett, Newhouse, Scripps Howard, McClatchy, Hearst, the BBC (Britain), CBC (Canada), the

47

Voice of America, Radio Free Europe, ABC News Online, Fox News Online, National Public Radio, CBS Radio, media outlets in South Korea, India, Brazil, Denmark, Spain, France, Norway, Germany.

Regular panelist on "The Ivory Tower," a weekly public affairs program broadcast on WCNY-TV, Syracuse, NY, from 2002-2021. A half hour discussion of the week's events conducted by five academics from area colleges.

Professional Associations:

Scholars Strategy Network.
American Political Science Association.
Center for the Study of the Presidency.
Presidents and Executive Politics Section (formerly the Presidency Research Group),
    APSA; served on Governing Board of PRG, 1991 to 2003.
New York Political Science Association.
Pi Sigma Alpha.
Phi Kappa Phi.

Teaching Areas:

American Government:  courses taught include Introduction to American Government, The Legislative Process, Political Parties and Social Movements, The American Presidency, Media and Politics, Gun Control Politics and Policy, State and Local Government, Abortion Politics, Elections and American Politics, Media and War, internships in Washington, D.C., Albany, and Cortland County, Seminars on the Decline of Parties and Third Parties, American Institutions, Current Developments in American Politics, and Introduction to College Life.

Public Policy:  courses taught include Introduction to Public Policy, Gun Policy. Areas of interest include policy theory, policy formation and decisionmaking, and policy implementation.

Teaching-Related Awards:

Three-time recipient of the SUNY Cortland Student Government Association Outstanding Faculty Award (the "DiGiusto Award"), 1987, 1991, and 2003, for "Outstanding Service to Students."  (The only faculty member ever to win this award more than once.)

48

Other Professional Activities

External Reviewer, University of Michigan-Dearborn, Project to Expand Promotion and Tenure Guidelines (PTIE) to Inclusively Recognize Innovation and Entrepreneurial Impact, 2021.

Member, Howard Penniman Graduate Scholarship Selection Committee, Pi Sigma Alpha, 2018.

Member, Advisory Board of Pi Sigma Alpha Undergraduate Journal of Politics, 2014-2016.

Executive Council, Pi Sigma Alpha National Board, 2014-18.

Fund and organizing leader for American Political Science Association's new Distinguished Teaching Award, 2011-12.

Chair, Presidency Research Group Task Force on Membership and Recruitment, 2007-08.

Chair, Richard E. Neustadt Award Committee for Best Book on the Presidency published in 2005, Presidency Research Group, 2006.

President, Presidency Research Group, American Political Science Association, 2001-2003; Vice-President 1999-2001.

Chair, Best Paper Award Committee, Presidency Research Group, American Political Science Association, for 1991 and 1992 conferences.

Member, Governing Board of the Presidency Research Group of the American Political Science Association, 1991-2003.

Editor, PRG Report, 1993-1997.

Board of Editors, State University of New York Press, 1993-1996; 1997-2000. Board Chair, 1998-2000.

Member, Leonard D. White Award Committee for Best Dissertation in Public Administration, American Political Science Association, 1995.

Conference Organizing Committee, "Presidential Power: Forging the Presidency for the 21st Century," Columbia University, November 15-16, 1996.

Chair, E.E. Schattschneider Award Committee, best doctoral dissertation in American Politics, American Political Science Association, 1997.

Secretary/Treasurer, Presidency Research Group, 1997-99.

Book and article reviews for Houghton Mifflin, Cengage Learning, Random House, McGraw-Hill, St. Martins, W.W. Norton, Oxford University Press, Cambridge University Press, University of Chicago Press, University of California Press, Princeton University Press, Cornell University Press, UNC Press, Pearson Longman, Allyn & Bacon, Palgrave/Macmillan, University of New Mexico Press, Texas A&M University Press, Chatham House, CQ Press, HarperCollins, SUNY Press, Thompson Wadsworth, University of Michigan Press, University of Missouri Press, Westview Press, Brooking Institution, Rowman and Littlefield, Routledge, University of Alabama Press, American Political Science Review, PS, Comparative Politics, American Journal of Political Science, Policy Studies Journal, Policy Studies Review, Political Science Quarterly, the Journal of Politics, Western Political Quarterly, Polity, Social Science Quarterly, Political Behavior, American Politics Quarterly, Political Communication, Legislative Studies Quarterly, Government and Policy, Congress and the Presidency, Social Science Journal, Journal of Policy History, Political Research Quarterly, Presidential Studies Quarterly, Politics and Policy, and the National Science Foundation.


Selected Community Service

Administrative Law Judge/Hearing Officer for Cortland County Board of Health, 1994-present; for Tompkins County, 1997-present; for Chenango County, 1997-present; for Madison County, 2006-2021.

Member, City of Cortland Planning Commission, 2009-2012.

Chair, SUNY Press Board of Editors, 1998-2000 (board member 1993-96, 1997-2000).

Board President, Cortland County Arts Council, 1989-1990 (board member, 1987-1990).

Chair, Homer Zoning Board of Appeals, 1995-1997; board member 1988-1997.

Board member, Cortland County Landmark Society, 1989-1995.

Chair, Planning Committee on Codes and Safety for the village of Homer's Odyssey 2010 Project, 1996.

# E    IBIT B

EXHIBIT B

FIREARM HARDWARE RESTRICTIONS TABLE
(YEARS OF ENACTMENT)[1]

| STATE[2] | TRAP GUNS[3] | CONCEALED CARRY[4] | AUTOMATIC FIREARMS | SEMI-AUTOMATIC FIREARMS | AMMUNITION FEEDING DEVICES/ FIRING LIMITS |
|---|---|---|---|---|---|
| Alabama | | 1839, 1841 | | | |
| Alaska | | 1896 | | | |
| Arizona | | 1889 | | | |
| Arkansas | | 1820,1837 | | | |
| California | | 1850, 1864 | 1927, 1933 | | 1927, 1933 |
| Colorado | | 1862 | | | |
| Connecticut | | 1890, 1923 | | | |
| Delaware | | 1852 | 1931 | | |
| District of Columbia | | 1857, 1871 | 1932 | 1932 | 1932 |
| Florida | | 1887 | 1913[5], 1933 | | |
| Georgia | | 1837 | | | |
| Hawaii | | 1913 | 1933 | | 1933 |
| Idaho | | 1909 | | | |

[1] Further research may yield additional laws regulating firearm hardware.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

[3] Sometimes trap guns were also referred to as "infernal machines."

[4] These laws prohibited the concealed carrying of certain enumerated weapons or types of weapons. The early laws restricted general weapons carrying, whether concealed or open.

[5] "It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns."

1

| Illinois | | 1881 | 1931 | 1931[†] | 1931 |
|---|---|---|---|---|---|
| Indiana | | 1820 | 1927, 1929 | | |
| Iowa | | 1882, 1887, 1897, 1929 | 1927 | | |
| Kansas | | 1901 | 1933 | | |
| Kentucky | | 1812, 1813 | | | |
| Louisiana | | 1813 | 1932 | 1932[†] | 1932 |
| Maine | | 1840 | | | |
| Maryland | 1910 | 1872 | 1927 | | |
| Massachusetts | | 1751 | 1927 | 1927 | 1927 |
| Michigan | 1875, 1931 | 1887 | 1927, 1929 | 1927, 1929 | 1927 |
| Minnesota | 1873, 1903 | 1881 | 1933 | 1933 | 1933 |
| Mississippi | | 1878 | | | |
| Missouri | 1891[6] | 1873 | 1929 | | 1929 |
| Montana | | 1864, 1865 | | | |
| Nebraska | | 1881 | 1929 | | |
| Nevada | | 1881, 1925 | | | |
| New Hampshire | 1915 | | | | |
| New Jersey | 1771 | 1686 | 1927, 1934 | | 1920, 1927 |
| New Mexico | | 1852, 1853 | | | |
| New York | 1870[7] | 1891 | 1931, 1933 | | |

---

[6] Chillicothe, Mo.: "George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead." "Shot by a Trap-Gun," South Bend Tribune, Feb. 11, 1891, https://bit.ly/3CtZsfk.

[7] New York City, NY: A burglar was killed by a gun-trap set by a shopkeeper at 301 East 23rd St. A jury concluded that the burglar's death was caused by the trap-gun. The article notes: "As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured

2

| North Carolina | | 1792 | | | 1917 |
|---|---|---|---|---|---|
| North Dakota | 1891, 1895 | 1895 | 1931 | | 1931 |
| Ohio | | 1859 | 1933 | 1933 | 1933 |
| Oklahoma | | 1890 | | | |
| Oregon | 1925 | 1853 | 1933 | | 1933 |
| Pennsylvania | | 1851 | 1929 | | 1929 |
| Rhode Island | 1890, 1892 | 1893 | 1927 | 1927 | 1927 |
| South Carolina | 1855, 1931 | 1880 | 1934 | 1934† | 1934 |
| South Dakota | 1909 | 1877 | 1933 | 1933 | 1933 |
| Tennessee | | 1821 | | | |
| Texas | | 1870 | 1933 | | 1933 |
| Utah | 1865, 1901 | 1877, 1888 | | | |
| Vermont | 1884, 1912 | 1895, 1897 | 1923 | | 1923 |
| Virginia | | 1794, 1838 | 1934 | 1934 | 1934 |
| Washington | 1909 | 1881 | 1933 | | 1933 |
| West Virginia | | 1870 | 1925 | | |
| Wisconsin | 1872, 1921 | 1858 | 1929, 1933 | | 1933 |
| Wyoming | | 1876 | 1933 | | |
| Total Laws | 16 | 50 | 31 | 8–11 | 23 |

SOURCE:  Duke Law, Duke Center for Firearms Law, Repository of Historical Gun Laws, https://firearmslaw.duke.edu/repository/search-the-repository/

†Ambiguous law that could apply to semi-automatic in addition to automatic firearms.

---

Agostino." After the verdict the man continued to be held under $2000 bail. "The Man Trap," The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870, https://bit.ly/3SDv2Nf.

3

# E    IBIT C

EXHIBIT C

DANGEROUS WEAPONS RESTRICTIONS
(YEARS OF ENACTMENT)[1]

| STATE[2] | BOWIE KNIVES | Bludgeon | Billy/Billie Clubs | Clubs | Slung Shot | Sand Bag Sand Club | Pistols | Any Concealed /Deadly/Dan gerous Weapon |
|---|---|---|---|---|---|---|---|---|
| Alabama | 1837, 1839, 1841, 1867, 1876, 1877, 1879, 1892 | | | 1805 | 1873 | | 1839, 1841 | |
| Alaska | 1896[†] | | | | 1896-99 | | 1896 | 1896 |
| Arizona | 1889, 1901 | | | | 1873, 1889 1893, 1901 | | 1889 | 1867 |
| Arkansas | 1871, 1875 | | | 1835 | 1871 | | 1820, 1837 | |
| California | 1855, 1896 | 1849, 1853, 1876 | 1917, 1923 | | 1864, 1923 | 1917, 1923 | 1850, 1864 | 1849 |
| Colorado | 1862, 1867, 1877, 1881 | 1876 | | | 1886 | | 1862 | 1862 |
| Connecticut | 1890[†] | | | | 1890 | | 1890, 1923 | |
| Delaware | 1881[†] | | | 1797 | | | 1852 | |

---

[1] Further research may yield additional laws regulating dangerous weapons.

[2] In addition to state laws, this chart provides the year of enactment of local ordinances adopted within the states.

1

Exhibit C_Spitzer
Page 54

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| District of Columbia | 1871 | | | | 1871 | | 1857, 1871 | |
| Florida | 1835, 1868, 1893[†] | | 1888 | | 1868, 1888 | | 1887 | |
| Georgia | 1860, 1873 | 1816 | | | 1860 | | 1837 | |
| Hawaii | 1852, 1913 | | | | 1852, 1913 | | 1913 | |
| Idaho | 1879, 1909 | 1875 | | | 1879 | | 1909 | 1864 |
| Illinois | 1876, 1881 | 1845 | | | 1881, 1893 | | 1881 | |
| Indiana | 1859 | | | 1804, 1855, 1881, 1905 | 1875, 1905 | | 1820 | 1831 |
| Iowa | 1882, 1887, 1900 | | 1882 | | 1882 | 1887, 1900 | 1882, 1887, 1897, 1929 | |
| Kansas | 1862, 1883, 1887 | | 1862, 1887 | | 1883, 1887, 1899 | | 1901 | |
| Kentucky | 1859 | | | 1798 | 1859 | | 1812, 1813 | |
| Louisiana | 1870 | | | | | | 1813 | 1813, 1842, 1870 |
| Maine | 1840, 1841, 1884[†] | | | 1786 | | | 1840 | 1841 |
| Maryland | 1872, 1886, 1888, 1890 | 1809, 1874, 1886 | 1872, 1874 1884, 1886 1890, 1927 | | 1886 | 1890 | 1872 | |
| Massachusetts | 1836[†] | | | 1750 | 1850, 1927 | | 1751, 1814 | |
| Michigan | 1891 | 1927, 1929 | 1887, 1891, 1927, 1929 | 1913 | 1887, 1891, 1929 | 1887, 1891, 1927, 1929 | 1887 | |
| Minnesota | 1882 | | | | 1882, 1888 | 1888 | 1881 | 1882 |
| Mississippi | 1878 | | | 1799, 1804 | 1878 | | 1878 | |
| Missouri | 1871, 1897, 1917, 1923 | | 1871, 1897, 1923 | 1818 | 1883, 1888, 1897, 1917 | | 1873 | |

2

Exhibit C_Spitzer
Page 55

|  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|
| Montana | 1864, 1879, 1885 | 1887 |  |  |  |  | 1864, 1865 | 1888 |
| Nebraska | 1877, 1890, 1899 | 1858 | 1872, 1890, 1899 |  | 1890 |  | 1881 |  |
| Nevada | 1873 | 1872 |  |  | 1881 |  | 1881, 1925 |  |
| New Hampshire |  |  |  |  |  |  |  |  |
| New Jersey | 1871, 1905† | 1799, 1877, 1927 | 1871, 1927 |  | 1871, 1873, 1927 | 1871, 1927 | 1686 |  |
| New Mexico | 1853, 1887 | 1887 |  |  | 1853, 1859, 1869, 1887 |  | 1852, 1853 |  |
| New York | 1866, 1885, 1911† | 1911, 1913, 1931 | 1866, 1881, 1884, 1885, 1900, 1911, 1913, 1931 | 1664 | 1866 | 1866, 1881, 1900, 1911, 1913, 1931 | 1891 |  |
| North Carolina | 1858, 1879 |  |  |  | 1879 |  | 1792, 1858 | 1858 |
| North Dakota | 1895, 1915† | 1915 | 1915 |  | 1895 | 1915 | 1895 |  |
| Ohio | 1859, 1880, 1890 |  |  |  |  |  | 1859 | 1788, 1859, 1880 |
| Oklahoma | 1890, 1891, 1903 |  | 1890, 1891 |  | 1890, 1891, 1903 | 1890 | 1890 |  |
| Oregon | 1885† |  | 1898, 1917 |  | 1885, 1917 | 1917 | 1853 |  |
| Pennsylvania | 1897 |  | 1897 |  | 1851 |  | 1851 |  |
| Rhode Island | 1893, 1896, 1908 |  | 1893, 1908 |  | 1893, 1896 |  | 1893 |  |
| South Carolina | 1880, 1923 |  |  |  | 1880 |  | 1880 |  |
| South Dakota | 1903† |  |  |  | 1877, 1903 |  | 1877 |  |
| Tennessee | 1838, 1856, 1863, 1867, |  |  |  | 1879, 1882, 1893 |  | 1821 |  |

3

Exhibit C_Spitzer
Page 56

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1871, 1881, 1893 | | | | | | | |
| Texas | 1871, 1897 | | | 1899 | 1871, 1879, 1889, 1897, 1899 | | 1870 | |
| Utah | 1877 | | | | | | 1877, 1888 | |
| Vermont | 1895† | | | | 1895 | | 1895, 1897 | |
| Virginia | 1887 | | | 1792 | 1887 | | 1794 | |
| Washington | 1854, 1859 1869 | | | | | | 1881 | 1854, 1859, 1869, 1881, 1883, 1892, 1896, 1897 |
| West Virginia | 1882, 1891, 1925 | | 1870, 1882, 1891, 1925 | | 1891 | | 1870 | |
| Wisconsin | 1883 | | | | 1883, 1888 | | 1858 | 1883 |
| Wyoming | 1884 | 1876, 1893 | | | 1884, 1890, 1899 | | 1876 | |
| Total Laws | 106 | 25 | 44 | 17 | 79 | 21 | 64 | 24 |

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

† States that prosecuted/regulated/barred knives more generally without specifically mentioning Bowie knives.

4

Exhibit C_Spitzer
Page 57

# EXHIBIT D

EXHIBIT D

MACHINE GUN AND SEMI-AUTOMATIC FIREARMS LAWS[1]

## CALIFORNIA:

1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2.

§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties.

§ 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

1933 Cal. Stat. 1169

§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…

§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums,

---

[1] Further research may yield additional laws regulating firearm hardware.

1

belts or other separable mechanical device having a capacity greater than ten cartridges.

1933 Cal. Stat. 1169
§ 2. [E]very person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun … is guilty of a public offense…
§ 3. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

## DELAWARE:

1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1.
On and after the passage and approval of this Act it is and shall be unlawful for any person or persons other than the State Military Forces or duly authorized Police Departments to have a machine gun in his or their possession, within the State of Delaware. Any person or persons convicted under the provisions of this Act shall be deemed guilty of a felony and shall be punished by either fine or imprisonment, or both, in the discretion of the Court . . . .

## DISTRICT OF COLUMBIA:

District of Columbia 1932:
1932, Public-No. 275-72D Congress
CHAPTER 465
H.R. 8754
AN ACT To Control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties to prescribe rules of evidence, and for other purposes.
DEFINITIONS

2

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length. "Sawed-off shotgun" as used in this Act, means any shotgun with a barrel less than twenty inches in length. "Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading. . . .

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law -enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place

3

of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded. At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years. No machine gun, sawed-off shotgun, or

blackjack shall be sold to any person other than the persons designated in section

4

14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia. This section shall not apply to sales at wholesale to licensed dealers.

DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun. sawed - oft shotgun, or blackjack without being licensed as hereinafter provided. No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed -oil shotgun, or blackjack.

DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act. 1. The business shall be carried on only in the building designated in the license. 2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read. 3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun,

or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained

from the superintendent of police of the District of Columbia. 4. A true record shall be made in a book kept for the purpose the form of which may be prescribed by the Commissioners, of pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale. 5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other

5

and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years. 6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol,

machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: Provided, however, That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: Provided, however, That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen,

or other duly appointed law -enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public

Exhibit D_Spitzer
Page 63

carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers
and retail dealers licensed under section 10 of this Act.
PENALTIES
SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.
CONSTITUTIONALITY
SEC. 16. If any part of this Act is for any reason declared void, provision not to affect remainder, such invalidity shall not affect the validity of the remaining portions of this Act.
Approved, July 8, 1932.
https://www.loc.gov/resource/llsalvol.llsal_047/?sp=675&st=text&r=0.041,0.112,0.75,0.862,0

## **FLORIDA:**

1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8.
It shall, at any time, be unlawful to hunt wild game in Marion County with guns–known as Automatic guns.

1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1.
That it shall be unlawful for any person to throw any bomb or to shoot off or discharge any machine guns upon, across or along any road, street or highway in the State of Florida, or upon or across any public park in the State of Florida, or in, upon or across any public place where people are accustomed to assemble in the State of Florida, and the casting of such bomb or the discharge of such machine gun in, upon or across such public street, or in, upon or across such public park, or in, upon or across such public place, whether indoors or outdoors, including all theatres and athletic stadiums, with intent to do bodily harm to any person or with intent to do damage to the property of any person, shall be a felony and shall be punishable by death.

7

**HAWAII:**

1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.

Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

1933 Haw. Sess. Laws 36, An Act Regulating the Sale, Transfer, and Possession of Firearms and Ammunition, § 2.

Definitions. "Firearm" as used in this Act means any weapon, the operating force of which is an explosive. This definition includes pistols, revolvers, rifles, shotguns, machine guns, automatic rifles, noxious gas projectors, mortars, bombs, cannon and sub-machine guns. The specific mention herein of certain weapons does not exclude from the definition other weapons operated by explosives. "Crime of violence" as used in this Act means any of the following crimes, namely: murder, manslaughter, rape, kidnapping, robbery, burglary, and those certain crimes set forth in Sections 4130 and 4131 of said Revised Laws. "Pistol" or "revolver" as used in this Act, means and includes any firearm of any shape whatsoever with barrel less than twelve inches in length and capable of discharging loaded ammunition or any noxious gas. ""Person" as used in this Act includes

8

individuals, firms, corporations and copartnerships, and includes wholesale and retail dealers.

## ILLINOIS:

1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2.

§ 1. For purposes of this Act the term "machine gun" apples to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. The term "manufacturer" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that 1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns. 2. The provisions of this Act shall not apply to the Army, Navy or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns. 3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics. 4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers 5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

9

1931 Ill. Laws 453, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 4.

Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun. Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business for inspection by such officer.

1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7.

Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

## INDIANA:

1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1.

. . . [W]hoever shall be the owner of, or have in his possession, or under his control, in an automobile, or in any other way, a machine gun or bomb loaded with explosives, poisonous or dangerous gases, shall be deemed guilty of a felony, and upon conviction thereof, shall be imprisoned for a term of not less than one year nor more than five years.

1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2.

Whoever shall discharge, fire off, or operate any loaded machine gun, or whoever shall drop form an airplane, automobile, or from any building or structure, or who shall throw, hurl, or drop from ground or street, or keep in his possession and under his control any bomb filled with deadly or dangerous explosives, or dangerous or poisonous gases, shall be deemed guilty of a felony and upon conviction shall be imprisoned for a term of not less than two nor more than ten years.

10

1929 Ind. Acts 139, Criminal Offenses—Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch.55, § 1.

Be it enacted by the general assembly of the State of Indiana, That any person who being over sixteen years of age, commits or attempts to commit either the crime of rape, robbery, bank robbery, petit larceny or grand larceny while armed with a pistol, revolver, rifle, shotgun, machine gun or any other firearm or any dangerous or deadly weapon, or while any other person present and aiding or assisting in committing or attempting ot commit either of said crimes is armed with any of said weapons, shall be guilty of a seperate felony in addition to the crimes above named and upon conviction shall be imprisoned for a determinate period of not less than ten years nor more than twenty years . . . .

## IOWA:

1927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1-2.

§ 1. No person, firm, partnership, or corporation shall knowingly have in his or its possession or under his or its control any machine gun which is capable of being fired from the shoulder or hip of a person, and by the recoil of such gun.

§ 2. No person, firm, partnership, or corporation shall do any act with the intent to enable any other person, firm, partnership, or corporation to obtain possession of such gun.

## KANSAS:

1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Ulawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1-3.

§ 1. That is shall be unlawful for any person, firm, or corporation other than a sheriff or other peace officer or any military unit of the state or of the United States or any common carrier for hire, to transport or have in his possession or under his control a firearm known as a machine rifle, machine gun, or submachine gun: Provided, That banks, trust companies or other institutions or corporations subject to unusual hazard from robbery or holdup, may secure permits form the sheriff of the county in which they are located for one or more of their employees to have such firearms: Provided further, That museums, American Legions posts, and other

11

similar patriotic organizations may possess such firearms, when no usable as a weapon and when possessed as a curiosity, ornament or keepsake.

§ 2. That any person violating the provisions of the preceding section shall be guilty of a felony, and upon conviction shall be subject to imprisonment in the state penitentiary for not less than one year nor more than five years.

§ 3. Upon complaint being made on oath to any officer authorized to issue process for the apprehension of offenders that a firearm or firearms known as a machine rifles, machine guns or sub-machine guns as described in this act, are concealed in any particular house or place, and if such magistrate shall be satisfied that there are reasonable grounds for believing same to be true, he shall issue a warrant to search the house or place for such firearms . . . .

## LOUISIANA:

1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a Penalty for a Violation Hereof . . . , §§ 1-2.

§ 1. . . . for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that (exceptions for law enforcement, military, war relics, museums, guards, messengers) . . . .

## MARYLAND:

1927 Md. Laws 156, § 388-B.

That not person, persons house, company, association or body corporate, shall deposit, keep or have in his, her, their or its possession any spirituous or fermented liquors, or intoxicating drinks of any kind whatsoever, or any article used or sold as a beverage in the composition of which, whiskey, brandy, high wines or alcoholic, spirituous or fermented liquors shall be an ingredient or ingredients, in any automobile or other vehicle in which any device for the prevention or arrest or apprehension of said motor vehicle, or the occupants thereof of the type commonly known as a smoke screen is carried, whether the said device be attached as a part of said motor vehicle in which any gun, pistol, revolver, rifle machine gun, or other

dangerous or deadly weapon of any kind whatsoever is carried, whether in said automobile or vehicle, or on the person of any occupant of the same.

## MASSACHUSETTS:

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
. . . Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . .

1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123)
§ 1. In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breach, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action, shall be deemed to be a machine gun for the purposes of said sections, and of sections one hundred and thirty-one and one hundred and thirty one B. . .
§ 2. . . Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. . .

13

## MICHIGAN:

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA:

1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3.
§ 1. Definitions. (a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of the Act. (b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accommodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun

14

within the provisions of this Act. (c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

§ 2. Application. This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not usable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers . . .

§ 3. Machine guns prohibited. Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

### MISSOURI:

1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2.

§ 1. Unlawful to sell, deliver, transport or have in possession any machine gun. – It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

15

§ 2. The term "machine-gun" defined – The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

## NEBRASKA:

1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2.
§ 1. Machine Guns – Sale Unlawful – Penalty – It shall be unlawful for any person, firm or corporation, its or their agents or servants, to sell or cause to be sold or otherwise to dispose of any machine gun to any person in the State of Nebraska, except officers of the law, agents of the United States government, or agents of the law enforcement department of the State of Nebraska. If any person, firm or corporation, or its or their agents or servants violate any of the provisions of this section, they shall be deemed guilty of a misdemeanor and upon conviction thereof, shall be fined in a sum not less than one thousand dollars nor more than ten thousand dollars.
§ 2. U.S. Army and National Guard Exempt – It shall be unlawful for any person or persons, except officers of the law, soldiers of the United States Army, or officers and enlisted men of the National Guard of this state, to transport any machine gun on any highway within this state, or to have in possession for any unlawful purpose any machine gun. Any person violating any of the provisions of this section shall be deemed guilty of a felony and upon conviction thereof, shall be imprisoned in the state penitentiary for not less than one year nor more than ten years.

## NEW JERSEY:

1920 N.J. Laws 67, An Act to Amend an Act Entitled, "An Act for the Protection of Certain Kinds of Birds, Game and Fish, to Regulate Their Method of Capture, and Provide Open and Close Seasons for Such Capture and Possession," ch. 31, § 9.
It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun rifle or firearm when hunting for game or fowl under a penalty of twenty dollars for each offense.

16

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2.

§ 1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; provided, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees.

1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5.

§ 1. A gangster is hereby declared to be an enemy of the state.

§ 2. Any person in whose possession is found a machine gun or a submachine gun is declared to be a gangster; provided, however, that nothing in this section contained shall be construed to apply to any member of the military or naval forces of this State, or to any police officer of the State or of any county or municipality thereof, while engaged in his official duties.

§ 3. Any person, having no lawful occupation, who is apprehended while carrying a deadly weapon, without a permit so to do and how has been convicted at least

17

three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster.

§ 4. Any person, not engaged in any lawful occupation, known to be a member of any gang consisting of two or more persons, who has been convicted at least three times of being a disorderly person, or who has been convicted of any crime, in this or in any other State, is declared to be a gangster; provided, however, that nothing in this section contained shall in any wise be construed to include any participant or sympathizer in any labor dispute.

§ 5. Any person convicted of being a gangster under the provisions of this act shall be guilty of a high misdemeanor, and shall be punished by a fine not exceeding ten thousand dollars ($10,000.00), or by imprisonment not exceeding twenty years, or both.

## NEW YORK:

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.
A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3.
§ 1. . . A person who sells or keeps for sale, or offers or gives, disposes of or transports any instrument or weapon of the kind usually known as a machine-gun or a sub-machine gun to any person is guilty of a felony, except that the manufacture of machine-guns and sub-machine guns as merchandise and the sale and shipment thereof direct to regularly constituted or appointed state or municipal police departments, sheriffs, policemen, and other peace officers, and to state prisons, penitentiaries and county jails, and to military and naval organizations shall be lawful.
§ 3. . . . A machine gun is a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun. A person who

possesses or uses such machine-gun is guilty of a felony. The presence of such machine-gun in any room, dwelling, structure, or vehicle shall be presumptive evidence of its illegal possession by all the persons occupying the place where such machine gun is found.

## NORTH CAROLINA:

1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.
That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

## NORTH DAKOTA:

1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2.
§ 1. The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon mechanism or instrument not requiring the trigger be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.
§ 2. Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or a bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun, automatic rifle, or a caliber larger than twenty-two or a bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any

19

municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

## OHIO:

1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

That § 12819 of the General Code be supplemented . . . to read as follows: Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine

gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

## OREGON:

1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4.
§ 3. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun . . .
§ 4. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are herby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken . . .

1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2.
On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearms capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person" as used in this acts shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one nor more than five years.

21

**PENNSYLVANIA:**

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1-4

§ 1. Be it enacted, etc., That the term "machine gun" as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

§ 2. It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own or have in possession any machine gun. Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

§ 4. Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran

22

applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: § 3.

§ 3. Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall upon conviction of such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

## RHODE ISLAND:

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 12.

§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "crime of violence" shall mean and include nay of the following crimes or any attempt to commit any of the same, viz.murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or

<div align="center">23</div>

similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to members thereof when at or going to or from their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

§ 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one years from date of issue, if it appears the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the

Exhibit D_Spitzer
Page 81

fingerpring, name, address, description and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issuing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8.

§ 1. When used in this act the following words and phrases shall be construed as follows: "Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .

§ 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act.

§ 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney general may prescribe.

§ 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

25

1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3
§ 1. When used in this act the following words and phrases shall be construed as follows: "pistol" shall include any Pistol or revolver, and any shot gun, rifle or similar weapon with overall less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only. "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading. "Firearm shall include any machine gun or pistol. . . "Crime of violence" shall mean and include any of the following crimes or any attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering. "sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly. . .
§ 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase own, carry or have in his possession or under his control any firearm.

**SOUTH CAROLINA:**

1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6.
§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device.
§ 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun.
§ 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store,

keep, possess, or have in possession, except as hereinafter provided, any firearem of the type defined above or commonly known as a machine gun.

§ 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun.

§ 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permiteed by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date

Exhibit D_Spitzer
Page 84

application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued.

§ 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

## SOUTH DAKOTA:

1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8.

§ 1. "machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device. "Crime of Violence" apples to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny. "Person" applied to and includes firm, partnership, association or corporation.

§ 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

§ 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy by the person in whose possession the machine gun may be found; or (b) when in the possession of, or used by, an unnaturalized foreign born person, who has been convicted of a crime of violence in any court of record, state or federal of the United States of America, its territories or insular possessions; or (c) when the machine gun is of the kind described in §8 and has not been registered as in said section required; or (d) when empty or loaded pistol shells of 30 or larger caliber which have been or are susceptible or use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. Exceptions. Nothing contained in this act shall prohibit or interfere with (1.) the manufacture for, and sale of, machine guns to the miltary forces or the peace

28

officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; (2.) The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; (3.) The possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifstly not aggresive or offensive.

§ 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provisions of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, nfor not exceeding six months or by both such fine and imprisonment.

§ 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of STate, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, ande from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section shall be presumed to possess the same for offensive and aggressive purpose.

## **TEXAS:**

1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6

§ 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device. "Person" applies to and includes firm, partnership, association or corporation.

29

§ 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two nor more than ten (10) years.

§ 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than (10) years.

§ 4. [Excludes military, police, unusable keepsakes, prison officers.]

§ 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

**VERMONT:**

1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1.

A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

**VIRGINIA:**

1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7.

§ 1. Where used in this act; (a) "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading. (b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, . . .

30

§ 2. Possession or use of machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term not less than twenty years.

§ 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

§ 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (b) When in the possession of , or used by, an unnaturalized foreign born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or (d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one hundredths millimeter ) or larger caliber which have been or are susceptible to use in the machine gun are found in the immediate vicinity thereof.

§ 5. The presence of a machine gun in any room, boat, or vehicle shall be prima facie evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

§ 6. (excludes military police etc. )

§ 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, load, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold. . .

## WASHINGTON:

1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5.

§ 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: provided, however, that such limitation shall not apply to any peace officer in the discharge

31

of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

§ 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

§ 3. Any person violating any of the provisions of this act shall be guilty of a felony.

§ 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Washington to seize said machine gun, or parts thereof, wherever and whenever found.

§ 5. This act is necessary for the immediate preservation of public health and safety, and shall take effect immediately.

## WEST VIRGINIA:

1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b.
It shall be unlawful for any person, firm or corporation to place or keep on public display to passersby on the streets, for rent or sale, any revolver, pistol, dirk, bowie knife, slung shot or other dangerous weapon of like kind or character or any machine gun, sub-machine gun or high powered rifle or any gun of similar kind or character, or any ammunition for the same. All dealers licensed to sell any of the forgoing arms or weapons shall take the name, address, age and general appearance of the purchaser, as well as the maker of the gun, manufacturer's serial number and caliber, and report the same at once in writing to the superintendent of the department of public safety. It shall be unlawful for any person to sell, rent, give or lend any of the above mentioned arms to an unnaturalized person.

1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b.
(b) It shall be unlawful for any person to carry, transport, or have in his possession any machine gun, sub-machine gun, and what is commonly known as a high

32

powered rifle, or any gun of a similar kind or character, or any ammunition therefor, except on his own premises or premises leased to him for a fixed term, until such person shall have first obtained a permit from the superintendent of the department of public safety of this state, and approved by the governor, or until a license therefore shall have been obtained from the circuit court as in the case of pistols and all such licenses together with the numbers identifying such rifle shall be certified to the superintendent of the department of public safety. Provided, further, that nothing herein shall prevent the use of rifles by bona fide rifle club members who are freeholders or tenants for a fixed term in this state at their usual or customary place of practice, or licensed hunters in the actual hunting of game animals. No such permit shall be granted by such superintendent except in cases of riot, public danger, and emergency, until such applicant shall have filed his written application with said superintendent of the department of public safety, in accordance with such rules and regulations as may from time to time be prescribed by such department of public safety relative thereto, which application shall be accompanied by a fee of two dollars to be used in defraying the expense of issuing such permit and said application shall contain the same provisions as are required to be shown under the provisions of this act by applicants for pistol licenses, and shall be duly verified by such applicant, and at least one other reputable citizen of this state. Any such permit as granted under the provisions of this act may be revoked by the governor at his pleasure upon the revocation of any such permit the department of public safety shall immediately seize and take possession of any such machine gun, sub-machine gun, high powered rifle, or gun of similar kind and character, held by reason of said permit, and any and all ammunition therefor, and the said department of public safety shall also confiscate any such machine gun, sub-machine gun and what is commonly known as a high powered rifle, or any gun of similar kind and character and any and all ammunition therefor so owned, carried, transported or possessed contrary to the provisions of this act, and shall safely store and keep the same, subject to the order of the governor.

## WISCONSIN:

1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1.
Any person who shall own, use or have in his possession a machine gun shall be punished by imprisonment in the state prison for a term the minimum of which shall be one year and the maximum fifteen years. Nothing in this section shall be construed as prohibiting police officers, national guardsmen, sheriffs and their deputies from owning, using or having in their possession a machine gun while actually engaged in the performance of their lawful duties; nor shall any person or

Exhibit D_Spitzer
Page 90

organization be prohibited form possessing any machine gun received from the government as a war trophy.

1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01 to 164.06. 164.01 Definitions (a) "Machine gun" applies to and includes a weapon of any description by whatever name known from which more than two shots or bullets may be discharged by a single function of the firing device. . .

164.02 Use of Machine Gun is a Separate Crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.

164.03 Possession for Aggressive Purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term not less than ten years.

164.04 Possession when Presumed For Aggressive Purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose; (1) when the machine gun is on premises not owned or rented, for a bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or (2) when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or (3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or (4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

164.05 Presumptions from Presence of Gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of , machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger

Exhibit D_Spitzer
Page 91

caliber, for a purpose manifestly not aggressive or offensive. . . [manufacturers and owners required to register].

1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1.

No person shall sell, possess, use or transport any machine gun or other full automatic firearm, nor shall any person sell, possess, use or transport any bomb, hand grenade, projectile, shell or other container of any kind or character into which tear gas or any similar substance is used or placed for use to cause bodily discomfort, panic, or damage to property. (2) Any person violating any of the provisions of this section shall be punished by imprisonment in the state prison for a term of not less than one year nor more than three years. (3) [doesn't apply to police, military etc.].

## WYOMING:

1933 Wyo. Sess. Laws 117, An Act Relating to the Registering and Recording of Certain Facts Concerning the Possession and Sale of Firearms by all Wholesalers, Retailers, Pawn Brokers, Dealers and Purchasers, Providing for the Inspection of Such Register, Making the Violation of the Provisions Hereof a Misdemeanor, and Providing a Penalty Therefor, ch. 101, §§ 1-4.

§ 1. All wholesalers, retailers, dealers and pawn brokers are hereby required to keep a record of all firearms which may come into their possession, whether new or second hand, which record shall be known as the Firearms Register. Such register shall contain the following information, to wit: the name of the manufacturer, person, persons, firm or corporation from whom the firearm was obtained, the date of its acquisition, its manufacturer's number, its color, its caliber, whether the same is new or second hand, whether it is automatic, a revolver, a single shot pistol, a rifle, a shot gun or a machine gun, the name of the party to whom said firearm is sold in such purchasers handwriting and the date of such sale.

§ 2. Every person who purchases any firearm from any retailer, pawn broker or dealer, shall sign his name or make his mark properly witnessed, if he cannot write, on said Firearm Register, at the time of the delivery to him of any firearm so purchased.

§ 3. The firearm register, herein required to be kept, shall be prepared by every wholesaler, retailer, pawn broker and dealer in firearms in the state of Wyoming within 30 days after this Act shall become effective and shall thereafter be continued as herein provided. It shall be kept at the place of business of said

wholesaler, retailer, pawn broker or dealer, and shall be subject to inspection by any peace officer at all reasonable times.

§ 4. Any person, firm or corporation who shall fail or refuse to comply with the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in a sum not to exceed $100.00, or imprisoned in the County Jail for a period of not to exceed six months, or by both such fine and imprisonment.

SOURCE:   https://firearmslaw.duke.edu/repository/search-the-repository/

36

# EXHIBIT E

EXHIBIT E

DANGEROUS WEAPONS LAWS[1]

## ALABAMA

1837 Ala. Acts 7, An Act to Suppress the Use of Bowie Knives, §§ 1, 2.
Be it enacted by the Senate and House of Representatives of the State of Alabama in General Assembly convened, That if any person carrying any knife or weapon, known as Bowie Knives or Arkansaw [sic] Tooth-picks, or either or any knife or weapon that shall in form, shape or size, resemble a Bowie-Knife or Arkansaw [sic] Tooth-pick, on a sudden rencounter, shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought.
And be it further enacted, [t]hat for every such weapon, sold or given, or otherwise disposed of in this State, the person selling, giving or disposing of the same, shall pay a tax of one hundred dollars, to be paid into the county Treasury; and if any person so selling, giving or disposing of such weapon, shall fail to give in the same to his list of taxable property, he shall be subject to the pains and penalties of perjury.

1839 Ala. Acts 67, An Act to Suppress the Evil Practice of Carrying Weapons Secretly, § 1
That if any person shall carry concealed about his person any species of fire arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon, the person so offending shall, on conviction thereof, before any court having competent jurisdiction, pay a fine not less than fifty, nor more than five hundred dollars, to be assessed by the jury trying the case; and be imprisoned for a term not exceeding three months, at the discretion of the Judge of said court.

1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4.
Everyone who shall hereafter carry concealed about his person, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any species of firearms, or air gun, unless such person shall be threatened with, or have good cause to apprehend an attack, or be travelling, or setting out on a journey, shall on conviction, be fined not less than fifty nor more than three hundred dollars: It shall devolve on the person setting up

---

[1] Further research may yield additional laws regulating firearm hardware.

1

the excuse here allowed for carrying concealed weapons, to make it out by proof, to the satisfaction of the jury; but no excuse shall be sufficient to authorize the carrying of an air gun, bowie knife, or knife of the like kind or description.

The Revised Code of Alabama Page 169, Image 185 (1867) available at The Making of Modern Law: Primary Sources.

Taxation, § 10. On All pistols or revolvers in the possession of private persons not regular dealers holding them for sale, a tax of two dollars each; and on all bowie knives, or knives of the like description, held by persons not regular dealers, as aforesaid, a tax of three dollars each; and such tax must be collected by the assessor when assessing the same, on which a special receipt shall be given to the tax payer therefor, showing that such tax has been paid for the year, and in default of such payment when demanded by the assessor, such pistols, revolvers, bowie knives, or knives of like description, must be seized by him, and unless redeemed by payment in ten days thereafter, with such tax, with an additional penalty of fifty per cent., the same must be sold at public outcry before the court house door, after five days notice; and the overplus remaining, if any, after deducting the tax and penalty aforesaid, must be paid over to the person from whom the said pistol, revolver, bowie knife, or knife of like description, was taken, and the net amount collected by him must be paid over to the collector every month, from which, for each such assessment and collection, the assessor shall be entitled to fifty cents, and when the additional penalty is collected, he shall receive fifty per cent. additional thereto.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 882, Image 898 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Peace, § 4109. Carrying Concealed Weapons – Any person who, not being threatened with, or having good reason to apprehend, an attack, or traveling, or setting out on a journey, carries concealed about his person a bowie knife, or any other knife or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or an air gun, must be fined, on conviction, not less than fifty, nor more than three hundred dollars; and may also be imprisoned in the county jail, or sentenced to hard labor for the county, for not more than six months. (Footnote – Not unconstitutional. – 1 Ala. 612 Co-extensive only with necessity – 49 Ala. 355. . .)

2

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 989, Image 1005 (1877) available at The Making of Modern Law: Primary Sources.

Proceedings In Circuit and City Courts, § 4809. Carrying Concealed Weapons. – In an indictment for carrying concealed weapons, it is sufficient to charge that the defendant "carried concealed about his person a pistol, or other description of fire-arms," or "a bowie-knife, or other knife or instrument of the like kind or description," without averring the want of a legal excuse on his part; and the excuse, if any, must be proved by the defendant, on the trial, to the satisfaction of the jury.

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permanent Acts of the Session of 1876-7 have been Incorporated Page 901, Image 917 (1877) available at The Making of Modern Law: Primary Sources.

Offenses Against Public Health, etc. § 4230 (3751). Selling, giving, or lending, pistol or bowie knife, or like knife, to boy under eighteen. – Any person who sells, gives, or lends, to any boy under eighteen years of age, any pistol, or bowie knife, or other knife of like kind or description, must on conviction, be fined not less than fifty, nor more than five hundred dollars.

3

Wade Keyes, The Code of Alabama, 1876 : with References to the Decisions of the Supreme Court of the State upon the Construction of the Statutes; and in Which the General and Permenent Acts of the Session of 1876-7 have been Incorporated Page 883, Image 899 (1877) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Dangerous or Unusual Weapons | Alabama | 1873

Offenses Against Public Justice, &c. § 4110. Carrying, concealed, brass knuckles and slung-shots. – Any person who carries, concealed about his person, brass knuckles, slung-shot, or other weapon of like kind or description, shall, on conviction thereof, be fined not less than twenty, nor more than two hundred dollars, and may also, at the discretion of the court trying the case, be imprisoned in the county jail, or sentenced to hard labor for the county, for a term not exceeding six months. § 4111. Carrying rifle or shot-gun walking canes. – Any person who shall carry a rifle or shot-gun walking cane, shall, upon conviction, be fined not less than five hundred dollars, nor more than one thousand dollars, and be imprisoned in the penitentiary not less than two years.

J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama], with the Charter Page 148-49, Image 148-49 (1879) available at The Making of Modern Law: Primary Sources.

§ 428. Any person who, not being threatened with or having good reason to apprehend an attack, or travelling or setting out on a journey, carries concealed about his person a bowie-knife or any other knife of like kind or description, or a pistol or fire-arms of any other kind or description, air gun, slung-shot, brass-knuckles, or other deadly or dangerous weapon, must, on conviction, be fined not less than one nor more than one hundred dollars.

William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, Entitled "An Act to Adopt a Code of Laws for the State Alabama " with Such Statutes Passed at the Session of 1896-97, as are Required to be Incorporated Therein by Act Approved February 17, 1897; and with Citations to the Decisions of the Supreme Court of the State Construing or Mentioning the Statutes Page 1137, Image 1154 (Vol. 1, 1897) available at The Making of Modern Law: Primary Sources.

[License Taxes; From Whom and For What Business Required; Prices; County Levy,] Taxation, § 27. For dealers in pistols, or pistol cartridges, or bowie-knives, or dirk-knives, whether principal stock in trade or not, three hundred dollars. Any cartridges, whether called rifle or pistol cartridges, or by any other name, that can be used in a pistol, shall be deemed pistol cartridges within the meaning of this

4

subdivision. Any person or firm who orders for another, or delivers any cartridges within this state, shall be deemed a dealer under this provision.

## ALASKA

Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905 139 1906.
That it shall be unlawful for any person to carry concealed about his person, in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

1896-99 Alaska Sess. Laws 1270, An Act To Define And Punish Crimes In The District Of Alaska And To Provide A Code Of Criminal Procedure For Said District, chap. 6, § 117.
That it shall be unlawful for any person to carry concealed about his person in any manner whatever, any revolver, pistol, or other firearm, or knife (other than an ordinary pocket knife), or any dirk or dagger, slung shot, metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

## ARIZONA

1889 Ariz. Sess. Laws 16, An Act Defining And Punishing Certain Offenses Against The Public Peace, § 1.
If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in his saddlebags, any pistol, dirk, dagger, slung shot, sword cane, spear, brass knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition thereto, shall forfeit to the County in which his is convicted, the weapon or weapons so carried.

1893 Ariz. Sess. Laws 3, An Act To Regulate And Prohibit The Carrying Of Deadly Weapons Concealed, § 1.
It shall be unlawful for any person to have or carry concealed on or about his person any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife of

5

weapon except a pocket-knife not manufactured and used for the purpose of offense and defense.

1901 Arizona 1251-53, Crimes Against the Public Peace, §§ 381, 385, 390.
§ 381. It shall be unlawful for any person (except a peace officer in actual service and discharge of his duty) , to have or carry concealed on or about his person, any pistol or other firearm, dirk, dagger, slung shot, sword cane, spear, brass knuckles or other knuckles of metal, bowie-knife or any kind of knife or weapon, except a pocket knife, not manufactured and used for the purpose of offense and defense.
§ 385. If any person within any settlement, town, village or city within this territory shall carry on or about his person, saddle, or in saddlebags, any pistol, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie- knife or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by a fine of not less than twenty-five nor more than one hundred dollars; and in addition shall forfeit to the county in which he is convicted the weapon or weapons so carried.
§ 390. Persons travelling may be permitted to carry arms within settlements or towns of the territory, for one half hour after arriving in such settlements or towns, and while going out of such towns or settlements; and sheriffs and constables of the various counties of this territory and their lawfully appointed deputies may carry weapons in the legal discharge of the duties . . .

1901 Ariz. Acts 1252, Crimes and Punishments, §§ 387, 391.
§ 387. If any person shall go into church or religious assembly, any school room, or other place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show or public exhibition of any kind or into a ball room, social party or social gathering, to any election precinct, on the day or days of any election, where any portion of the people of this territory are collected to vote at any election, or to any other place where people may be assembled to minister, or to perform any other public duty, or to any other public assembly, and shall have or carry about his person a pistol or other firearm, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie knife or any other kind of knife manufactured and sold for the purposes of offense or defense, he shall be punished by a fine not less than fifty or more than five hundred dollars, and shall forfeit to the county the weapon or weapons so found on his person.
§ 391. It shall be the duty of the keeper of each and every hotel, boarding house and drinking saloon, to keep posted in a conspicuous place in his bar room, or reception room . . . a plain notice to travelers to divest themselves of their weapons in accordance with section 382 . . .

6

## ARKANSAS

Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835).
Race and Slavery Based | Arkansas | 1835
§ 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offense.

Josiah Gould A Digest of the Statutes of Arkansas All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 380 381–82 (1837).
Every person who shall wear any pistol, dirk, butcher or large knife, or a sword in a cane, concealed as a weapon, unless upon a journey, shall be adjudged guilty of a misdemeanor.

George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City Page 230-231, Image 230-231 (1871) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Arkansas | 1871
City Ordinances, § 287. Whenever there shall be found upon the person of any one, who has been found guilty of a breach of the peace, or for conduct calculated to provoke a breach of the peace, any pistol, revolver, bowie-knife, dirk, rifle, shot gun, slung-shot, colt, or knuckles of lead, brass or other metal; or when, upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of any one while in the act or commission of the act aforesaid, such person shall be fined not less than twenty-five nor more than five hundred dollars, in addition to the penalty for the breach of the peace aforesaid.

Act of Feb. 16, 1875,1874-75 Ark. Acts 156.
§ 1. That any person who shall wear or carry any pistol of any kind whatever, or any dirk, butcher or bowie knife, or a sword or a spear in a cane, brass or metal knucks, or razor, as a weapon, shall be adjudged guilty of a misdemeanor, and

7

upon conviction thereof, in the county in which said offense shall have been committed, shall be fined in any sum not less than twenty-give nor more than one hundred dollars, to be recovered by presentment or indictment in the Circuit Court, or before any Justice of the Peace of the county wherein such offense shall have been committed; Provided, That nothing herein contained shall be so construed as to prohibit any person wearing or carrying any weapon aforesaid on his own premises, or to prohibit persons traveling through the country, carrying such weapons while on a journey with their baggage, or to prohibit any officer of the law wearing or carrying such weapons when engaged in the discharge of his official duties, or any person summoned by any such officer to assist in the execution of any legal process, or any private person legally authorized to execute any legal process to him directed.

1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI (96), § 1-2.
That any person who shall wear or carry, in any manner whatever, as a weapon, any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy of the United States, shall be guilty of a misdemeanor. . . . Any person, excepting such officers or persons on a journey, and on his premises, as are mentioned in section one of this act, who shall wear or carry any such pistol as i[s] used in the army or navy of the United States, in any manner except uncovered, and in his hand, shall be guilty of a misdemeanor.

## **CALIFORNIA**

1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127.
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, Passed at the Sessions of 1850-51-52-53. To Which are Prefixed the Declaration of Independence, the Constitutions of the United States and of California, the Treaty of Queretaro, and the Naturalization Laws of the United States Page 663-664, Image 682-683 (1853) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | California | 1853
Compiled Laws of California, § 127.

8

If any person shall be found having upon him or her any picklock, crow, key, bitt, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, shop, warehouse, or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any money, goods, and chattels, every person so offending shall, on conviction thereof, be imprisoned in the county jail not more than two years; and if any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars or imprisoned in the county jail not more than three months.

William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., Etc. Page 334, Image 340 (1861) available at The Making of Modern Law: Primary Sources.

Crimes and Punishments, Art. 1904. That any person in this state having, carrying or procuring from another person any dirk, dirk-knife, bowie-knife, sword, sword-cane, pistol, gun or other deadly weapon, who shall, in the presence of two or more persons, draw or exhibit any of said deadly weapons in a rude, angry and threatening manner, not in necessary self-defense, or who shall, in any manner, unlawfully use the same, in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county of this state, shall be fined in any sum not less than one hundred, nor more than five hundred dollars, or imprisonment in the county jail not less than one nor more than six months, at the discretion of the court, or both such fine and imprisonment, together with the costs of prosecution; which said costs shall, in all cases be computed and collected in the same manner as costs in civil cases. . . provided, nevertheless, that no sheriff, deputy sheriff, marshal, constable or other peace officer, shall be held to answer under the provisions of this act, for drawing or exhibiting any of the weapons herein-before mentioned, while in the lawful discharge of his or their duties. . .

Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and

9

Statutory Constructions of the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon Page 261, Image 272 (1868) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | California | 1864

An Act to Prohibit the Carrying of Concealed Weapons, § 1.

Every person not being peace-officer, provost-marshal, enrolling-officer, or officer acting under the laws of the United States in the department of the provost-marshal of this State, State and Federal assessors, collectors of taxes and licenses while in the performance of official duties, or traveler, who shall carry or wear any dirk, pistol, sword in cane, slungshot, or other dangerous or deadly weapon concealed, shall, upon conviction thereof before any court of competent jurisdiction, be deemed guilty of a misdemeanor, and shall be imprisoned in the county jail for not less than thirty nor more than ninety days, or fined in any sum not less than twenty nor more than two hundred dollars. § 2. Such persons, and no others, shall be deemed travelers within the meaning of this act, as may be actually engaged in making a journey at the time.


L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896 Page 37, Image 35 (1896) available at The Making of Modern Law: Primary Sources. Misdemeanors. § 53.

No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of 18 years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon, or any combustible or dangerous material, without the written consent of the parent or guardian of such minor.


L. W. Moultrie, Charter and Ordinances of the City of Fresno Page 30, Image 28 (1896) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Fresno, § 8.

Any person excepting peace officers and travelers, who shall carry concealed upon his person any pistol or firearm, slungshot, dirk or bowie-knife, or other deadly weapon, without a written permission (revocable at any time) from the president of the board of trustees, is guilty of a misdemeanor.

10

1917 Cal. Sess. Laws 221-225, An act relating to and regulating the carrying, possession, sale or other disposition of firearms capable of being concealed upon the person; prohibiting the possession, carrying, manufacturing and sale of certain other dangerous weapons and the giving, transferring and disposition thereof to other persons within this state; providing for the registering of the sales of firearms; prohibiting the carrying or possession of concealed weapons in municipal corporations; providing for the destruction of certain dangerous weapons as nuisances and making it a felony to use or attempt to use certain dangerous weapons against another, § 5.

Carrying Weapons | California | 1917

§ 5. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver, or other firearm, or any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, or bombshell or any other dangerous or deadly instrument or weapon, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.

1923 Cal. Stat. 695 An Act to Control and Regulate the Possession, Sale and Use of Pistols, Revolvers, and Other Firearms Capable of Being Concealed Upon the Person

Dangerous or Unusual Weapons, Felons, Foreigners and Others Deemed Dangerous By the State | California | 1923

§ 1. On and after the date upon which this act takes effect, every person who within the State of California manufactures or causes to be manufactured, or who imports into the state, or who keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, or metal knuckles, or who carries concealed upon his person any explosive substance, other than fixed ammunition, or who carries concealed upon his person any dirk or dagger, shall be guilty of a felony and upon a conviction thereof shall be punishable by imprisonment in a state prison for not less than one year nor for more than five years.

§ 2. On and after the date upon which this act takes effect, no unnaturalized foreign born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the

11

State of California or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver or other firearm capable of being concealed upon the person.

## COLORADO

1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1.
If any person or persons shall, within any city, town, or village in this Territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol, bowie knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in a sum not less than five, nor more than thirty-five dollars.

1867 Colo. Sess. Laws 229, Criminal Code, § 149.
Carrying Weapons | Colorado | 1867
If any person or persons shall, within any city, town or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person, any pistol, bowie-knife, dagger or other deadly weapon, such person shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than five nor more than thirty-five dollars. The provision of this section shall not be construed to apply to sheriffs, constables and police officers, when in the execution of their official duties.

1876 Colo. Const. 30, art. II, § 13.
Post-Civil War State Constitutions | Colorado | 1876
That the right of no person to keep and bear arms in defense of his home, person and property, or in aid of the civil power when hereto legally summoned, shall be called in question; but nothing herein contained shall be construed to justify the practice of carrying concealed weapons.

1876 Colo. Sess. Laws 304, General Laws, § 154:
[I]f any person shall have upon him any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, such person, on conviction shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail no exceeding six months.

Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, Together with the Charter of Georgetown, and the Amendments Thereto: A Copy of the Patent Heretofore Issued to Georgetown by the

12

Government of the United States, and the Rules and Order of Business Page 100, Image 101 (1877) available at The Making of Modern Law: Primary Sources. Offenses Affecting Streets and Public Property, § 9.

If any person or persons, within the corporate limits of Georgetown, shall be found carrying concealed, upon his or her person, any pistol, bowie knife, dagger, or other deadly weapon, such person shall, on conviction thereof, be fined in a sum not less than five dollars, nor more than fifty dollars.

Colo. Rev. Stat 1774, Carrying Concealed Weapons—Penalty—Search Without Warrant—Jurisdiction of Justice, § 248. (1881)

No person, unless authorized so to do by the chief of police of a city, mayor of a town or the sheriff of a county, shall use or carry concealed upon his person any firearms, as defined by law, nor any pistol, revolver, bowie knife, dagger, sling shot, brass knuckles or other deadly weapon . . . .

Isham White, The Laws and Ordinances of the City of Denver, Colorado Page 369, Image 370 (1886) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | Colorado | 1886

City of Denver, Slung Shot – Brass Knuckles, § 10.

Whenever there shall be found upon the person of anyone who is guilty of a breach of the peace, or of conduct calculated to provoke a breach of the peace, any slung shot, colt, or knuckles of lead, brass or other metal, or, when upon trial, evidence shall be adduced proving that such weapons were in the possession or on the person of anyone while in the act of commission of the acts aforesaid, such person shall upon conviction be fined not less than twenty-five dollars nor more than three hundred dollars.

## **CONNECTICUT**

Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City Page 164, Image 167 (1890) available at The Making of Modern Law: Primary Sources.

Good Order and Decency § 192.

Every person who shall carry in said City, any steel or brass knuckles, pistol, or any slung shot, stiletto or weapon of similar character, or shall carry any weapon concealed on his person without permission of the Mayor or Superintendent of Police in writing, shall, on conviction, pay a penalty of not less than five, nor more than fifty dollars for every such offense.

Exhibit E_Spitzer
Page 106

## DELAWARE

1797 Del. Laws 104, An Act For the Trial Of Negroes, ch. 43, § 6.
Race and Slavery Based | Delaware | 1797
And be it further enacted by the authority aforesaid, That if any Negro or Mulatto slave shall presume to carry any guns, swords, pistols, fowling pieces, clubs, or other arms and weapons whatsoever, without his master's special license for the same, and be convicted thereof before a magistrate, he shall be whipped with twenty-one lashes, upon his bare back.

1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1.
That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than two hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and peace officers.

Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix Page 987, Image 1048 (1893) available at The Making of Modern Law: Primary Sources.
An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1.
§ 1. That if any person shall carry concealed a deadly weapon upon or about his person other than an ordinary pocket knife, or shall knowingly sell a deadly weapon to a minor other than an ordinary pocket knife, such person shall, upon conviction thereof, be fined not less than twenty-five nor more than one hundred dollars or imprisoned in the county jail for not less than ten nor more than thirty days, or both at the discretion of the court: Provided, that the provisions of this section shall not apply to the carrying of the usual weapons by policemen and other peace officers.
§ 2. That if any person shall, except in lawful self-defense discharge any firearm in any public road in this State, shall be deemed guilty of a misdemeanor and upon

14

conviction thereof shall be punished by fine not exceeding fifty dollars or by imprisonment not exceeding one month, or both at the discretion of the court.

## DISTRICT OF COLUMBIA

An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872).
Carrying Weapons || 1871
Ch. XXV. Be it enacted by the Legislative Assembly of the District of Columbia, That it shall not be lawful for any person or persons to carry or have concealed about their persons any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles, within the District of Columbia; and any person or persons who shall be duly convicted of so carrying or having concealed about their persons any such weapons shall forfeit and pay, upon such a conviction, not less than twenty dollars nor more than fifty dollars, which fine shall be prosecuted and recovered in the same manner as other penalties and forfeitures are sued for and recovered: Provided, That the officers, non-commissioned officers, and privates of the United States army, navy, and marine corps, police officers, and members of any regularly organized militia company or regiment, when on duty, shall be exempt from such penalties and forfeitures.

## FLORIDA

John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840 Page 423, Image 425 (1839) available at The Making of Modern Law: Primary Sources.
An Act to Prevent any Person in this Territory from Carrying Arms Secretly. Be it Enacted by the Governor and Legislative Council of the Territory of Florida, That from and after the passage of this act, it shall not be lawful for any person in this Territory to carry arms of any kind whatsoever secretly, on or about their persons; and if any dirk, pistol, or other arm, or weapon, except a common pocket-knife, shall be seen, or known to be secreted upon the person of any one in this Territory, such person so offending shall, on conviction, be fined not exceeding five hundred dollars, and not less than fifty dollars, or imprisoned not more than six months, and not less than one month, at the discretion of the jury: Provided, however, that this law shall not be so construed as to prevent any person from carrying arms openly, outside of all their clothes; and it shall be the duty of judges of the superior courts in this Territory, to give the matter contained in this act in special charge to the grand juries in the several counties in this Territory, at every session of the courts.

15

Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892) 2425.
Manufacturing or selling slung shot: Whoever manufactures, or causes to be manufactured, or sells or exposes for sale any instrument or weapon of the kind usually known as slung-shot, or metallic knuckles, shall be punished by imprisonment not exceeding six months, or by fine not exceeding one hundred dollars.

1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, chap. 7, § 10.
Sentence Enhancement for Use of Weapon | Florida | 1868
Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace, is armed with or has on his person slung shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding three months, or by fine not exceeding one hundred dollars.

James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, Page 403, Image 419 (1881) available at The Making of Modern Law: Primary Sources. [1868]
Offences Against Public Peace, § 13.
Whoever shall carry arms of any kind whatever, secretly, on or about their person, or whoever shall have about or on their person any dirk, pistol or other arm or weapon, except a common pocket knife, upon conviction thereof shall be fined in a sum not exceeding one hundred dollars, or imprisoned in the county jail not exceeding six months.

Florida Act of Aug. 6, 1888, chap. 1637, subchap. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) 2423.
Persons Engaged in criminal offense having weapons. – Whoever, when lawfully arrested while committing a criminal offense or a breach or disturbance of the public peace is armed or has on his person slung-shot, metallic knuckles, billies, firearms or other dangerous weapon, shall be punished by imprisonment not exceeding one year and by fine not exceeding fifty dollars.

## GEORGIA

Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the

Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions Page 599, Image 605 (1821) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Georgia | 1816

Offences Against the Public Peace, (1816) § 19.

If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with intent feloniously to break and enter into any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, or shall have upon him any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, ware-house, store, shop, coach-house, stable, or out-house, with intent to steal any goods or chattels; every such person shall be deemed a rogue and vagabond, and on conviction, shall be sentenced to undergo an imprisonment in the common jail of the county, or in the penitentiary, at hard labour, for such period of time as the jury shall recommend to the court.

1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1.

[A]ny person other than the owner, who shall sell or furnish to any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for the purpose of offence or defense, shall, on indictment and conviction, be fined by the Court in a sum not exceeding five hundred dollars, and imprisoned in the common Jail of the county not exceeding six months . . .

R. H. Clark, The Code of the State of Georgia (1873) § 4528 – Deadly weapons not to be carried in public places

No person in this State is permitted or allowed to carry about his or her person, any dirk, bowie knife, pistol or revolver, or any kind of deadly weapon, to any Court of justice, or any election ground, or precinct, or any place of public worship, or any other public gathering in this State, except militia muster grounds; and if any person or persons shall violate any portion of this section, he, she or they shall be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not less than twenty nor more than fifty dollars for each and every such offense, or imprisonment in the common jail of the county not less than ten nor more than twenty days, or both, at the discretion of the Court.

17

## HAWAII

1852 Haw. Sess. Laws 19, Act to Prevent the Carrying of Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1852
§ 1. Any person not authorized by law, who shall carry, or be found armed with, any bowie-knife, sword-cane, pistol, air-gun, slung-shot or other deadly weapon, shall be liable to a fine of no more than Thirty, and no less than Ten Dollars, or in default of payment of such fine, to imprisonment at hard labor, for a term not exceeding two months and no less than fifteen days, upon conviction of such offense before any District Magistrate, unless good cause be shown for having such dangerous weapons: and any such person may be immediately arrested without warrant by the Marshal or any Sheriff, Constable or other officer or person and be lodged in prison until he can be taken before such Magistrate.

1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons
Dangerous or Unusual Weapons | Hawaii | 1913
§ 3089. Persons not authorized; punishment. Any person not authorized by law, who shall carry, or be found armed with any bowie-knife, sword-cane, pistol, air-gun, slung-shot, or other deadly weapon, shall be liable to a fine of not more than Two Hundred and Fifty Dollars and not less than Ten Dollars, or in default of payment of such fine, to imprisonment of a term not exceeding one year, nor less than three months, upon conviction for such offense, unless good cause be shown for having such dangerous weapon; and any such person may be immediately arrested without warrant by the high sheriff, or any sheriff, policeman, or other officer or person.

## IDAHO

Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875).
Carrying Weapons | Idaho | 1875
§ 133. If any person shall have found upon him or her any pick-lock, crow-key, bit or other instrument or tool, with intent feloniously to crack and enter into any dwelling-house, store, shop, warehouse, or other building containing valuable property, or shall be found in the aforesaid buildings with intent to steal any money, goods and chattels, every person so offending shall, on conviction thereof, be imprisoned in the Territorial prison for a term not less than one year nor more than five years; and if any person shall have upon him or her any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person, every

18

such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894 Page 118-119, Image 119-120 (1894) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Idaho | 1879
Carrying Concealed Weapons, § 36.
Every person not being a sheriff, deputy sheriff, constable or other police officer, who shall carry or wear within the incorporated limits of Boise City, Idaho, any bowie knife, dirk knife, pistol or sword in cane, slung-shot, metallic knuckles, or other dangerous or deadly weapons, concealed, unless such persons be traveling or setting out on a journey, shall, upon conviction thereof before the city magistrate of said Boise City, be fined in any sum not exceeding twenty-five dollars for each offense, or imprisoned in the city jail for not more than twenty days, or by both such fine and imprisonment.

1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1.
Carrying Weapons | Idaho | 1909
If any person, (excepting officials of a county, officials of the State of Idaho, officials of the United States, peace officers, guards of any jail, any officer of any express company on duty), shall carry concealed upon or about his person any dirk, dirk knife, bowie knife, dagger, slung shot, pistol, revolver, gun or any other deadly or dangerous weapon within the limits or confines of any city, town or village, or in any public assembly, or in any mining, lumbering , logging, railroad, or other construction camp within the State of Idaho . . . .

Exhibit E_Spitzer
Page 112

## ILLINOIS

Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A. D. 1844-'5: Together with an Appendix Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force Page 176, Image 188 (1845) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Illinois | 1845
Criminal Jurisprudence, § 139.
If any person shall be found,, having upon him or her, any pick-lock, crow, key, bit, or other instrument or tool, with intent feloniously to break and enter into any dwelling house, store, warehouse, shop or other building containing valuable property, or shall be found in any of the aforesaid buildings with intent to steal any goods and chattels, every such person so offending, shall, on conviction, be deemed a vagrant, and punished by confinement in the penitentiary, for any term not exceeding two years. And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined, in a sum not exceeding one hundred dollars, or imprisoned, not exceeding three months.

Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-2 and 1873-4, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874 Page 360, Image 368 (1874) available at The Making of Modern Law: Primary Sources.
Disorderly Conduct: Disturbing the Peace, § 56.
Whoever, at a late and unusual hour of the night time, willfully and maliciously disturbs the peace and quiet of any neighborhood or family, by loud or unusual noises, or by tumultuous or offensive carriage, threatening, traducing, quarreling, challenging to fight or fighting, or whoever shall carry concealed weapons, or in a threatening manner display any pistol, knife, slungshot, brass, steel or iron knuckles, or other deadly weapon, day or night, shall be fined not exceeding $100.

20

Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments Page 64, Image 64 (1876) available at The Making of Modern Law: Primary Sources.
Misdemeanors, § 39.
No person, except peace officers, shall carry or wear under their clothes, or concealed about their person, any pistol, revolver, slung-shot, knuckles, bowie-knife, dirk-knife, dirk, dagger, or any other dangerous or deadly weapon, except by written permission of the Captain of Police.

Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882 Page 375, Image 392 (1882) available at The Making of Modern Law: Primary Sources. [1881]
Deadly Weapons: Selling or Giving to Minor. § 54b.
Whoever, not being the father, guardian, or employer or the minor herein named, by himself or agent, shall sell, give, loan, hire or barter, or shall offer to sell, give, loan, hire or barter to any minor within this state, any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character, capable of being secreted upon the person, shall be guilty of a misdemeanor, and shall be fined in any sum not less than twenty-five dollars ($25), nor more than two hundred ($200).

Revised Ordinances of the City of Danville [Illinois] Page 66, Image 133 (1883) available at The Making of Modern Law: Primary Sources.
Ordinances of the City of Danville. Concealed Weapons. § 22.
Whoever shall carry concealed upon or about his person any pistol, revolver, derringer, bowie-knife, dirk, slung-shot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon of like character, capable or being concealed upon the person, or whoever shall in a threatening or boisterous manner, flourish or display the same, shall be fined not less than one dollar, nor more than one hundred dollars; and in addition to the said penalty shall, upon the order of the magistrate before whom such conviction is had, forfeits the weapon so carried to the city.

Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88. Possession or sale forbidden, § 1.

Be it enacted by the people of the state of Illinois represented in the General Assembly. That whoever shall have in his possession, or sell, or give or loan, hire or barter, or whoever shall offer to sell, give loan, have or barter, to any person within this state, any slung shot or metallic knuckles, or other deadline weapon of like character, or any person in whose possession such weapons shall be found, shall be guilty of a misdemeanor . . .

## **INDIANA**

1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4.

And be it further enacted, That no slave or mulatto whatsoever shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive, but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof thereof made before any justice of the peace of the district where such seizure shall be, shall by his order be forfeited to the seizor, for his use and moreover every such offender shall have and receive by order of such justice any number of loashes not exceeding thirty nine on his or her bare back, well laid for every such offense.

1855 Ind. Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1.

That any person who shall shoot a gun, pistol, or other weapon, or throw a stone, stick, clubs, or any other substance whatever at or against any locomotive, or car, or train of cars containing persons on any railroad in this State, shall be deemed guilty of a misdemeanor . . .

1859 Ind. Acts 129, An Act to Prevent Carrying Concealed or Dangerous Weapons, and to Provide Punishment Therefor.

§ 1. Be it enacted by the General Assembly of the State of Indiana, That every person not being a traveler, who shall wear or carry any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon concealed, or who shall carry or wear any such weapon openly, with the intent or avowed purpose of injuring his fellow man, shall, upon conviction thereof, be fined in any sum not exceeding five hundred dollars.

Exhibit E_Spitzer
Page 115

1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, And Prescribing Penalties Therefore, § 1.

That if any person shall draw or threaten to use any pistol, dirk, knife, slung shot, or any other deadly or dangerous weapon upon any other person he shall be deemed guilty of a misdemeanor, and upon conviction therefor, shall be fined in any sum not less than one nor more than five hundred dollars, to which may be added imprisonment in the county jail not to exceed six months; That the provisions of this act shall not apply to persons drawing or threatening to use such dangerous or deadly weapons in defense of his person or property, or in defense of those entitled to his protection by law.

The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1 Page 366, Image 388 (1881) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Indiana | 1881
Crimes. § 1957. Attacking Public Conveyance. 56. Whoever maliciously or mischievously shoots a gun, rifle, pistol, or other missile or weapon, or throws a stone, stick, club, or other substance whatever, at or against any stage-coach, locomotive, railroad-car, or train of cars, or street-car on any railroad in this State, or at or against any wharf-boat, steamboat, or other water-craft, shall be imprisoned in the county jail not more than one year nor less than thirty days, and fined not more than one hundred dollars nor less than ten dollars.

1905 Ind. Acts 677, Public Conveyance—Attacking, § 410.
Sensitive Places and Times | Indiana | 1905
Whoever maliciously or mischievously shoots a gun, rifle, pistol or other weapon, or throws a stone, stick, club or any other substance whatever, at or against any stage coach, or any locomotive, railroad car, or train of cars, street car, or interurban car on any railroad in this state, or at or against any wharf-boat, steamboat, or other watercraft, shall be imprisoned in the county jail not less than thirty days nor more than one year, and fined not less than ten dollars nor more than one hundred dollars.

## IOWA

S. J. Quincy, Revised Ordinances of the City of Sioux City. Sioux City, Iowa Page 62, Image 62 (1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1882
Ordinances of the City of Sioux City, Iowa, § 4.

23

No person shall, within the limits of the city, wear under his clothes, or concealed about his person, any pistol, revolver, slung-shot, cross-knuckles, knuckles of lead, brass or other metal, or any bowie-knife, razor, billy, dirk, dirk-knife or bowie-knife, or other dangerous weapon. Provided, that this section shall not be so construed as to prevent any United States, State, county, or city officer or officers, or member of the city government, from carrying any such weapon as may be necessary in the proper discharge of his official duties.

Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1887
Carrying Concealed Weapons Prohibited, § 105.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sand bag, air guns of any description, dagger, bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device; provided that this section shall not be construed to prohibit any officer of the United States, or of any State, or any peace officer, from wearing and carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Iowa | 1900
Ordinances City of Des Moines, Weapons, Concealed, § 209.
It shall be unlawful for any person to carry under his clothes or concealed about his person, or found in his possession, any pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sand bag, air guns of any description, dagger, bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. Provided, that this section shall not be construed to prohibit any officer of the United States or of any State, or any peace officer from wearing or carrying such weapons as may be convenient, necessary and proper for the discharge of his official duties.

## KANSAS

1883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Kansas | 1862
An Ordinance Relating to Misdemeanors, § 23.
For carrying or having on his or her person in a concealed manner, any pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city, a fine not less than three nor more than one hundred dollars.

883 Kan. Sess. Laws 159, An Act To Prevent Selling, Trading Or Giving Deadly Weapons Or Toy Pistols To Minors, And To Provide Punishment Therefor, §§ 1-2.
§ 1. Any person who shall sell, trade, give, loan or otherwise furnish any pistol, revolver, or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind, shall be deemed guilty of a misdemeanor, and shall upon conviction before any court of competent jurisdiction, be fined not less than five nor more than one hundred dollars.
§ 2. Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor, and upon conviction before any court of competent jurisdiction shall be fined not less than one nore more than ten dollars.

25

O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council Page 162, Image 157 (1887) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Kansas | 1887

Weapons, § 27. Any person who in this city shall draw any pistol or other weapon in a hostile manner, or shall make any demonstration or threat of using such weapon on or against any person; or any person who shall carry or have on his or her person, in a concealed manner, any pistol, dirk, bowie-knife, revolver, slung-shot, billy, brass, lead, or iron knuckles, or any deadly weapon, within this city, shall be fined not less than five dollars, nor more than one hundred dollars: Provided, that this ordinance shall not be so construed as to prohibit officers of the law while on duty from being armed.

## KENTUCKY

1798 Ky. Acts 106. No negro, mulatto, or Indian whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive but all and every gun, weapon and ammunition found in the possession or custody of any negro, mulatto or Indian may be seized by any person and upon due proof thereof made before any justice of the peace of the county where such seizure shall be shall by his order, be forfeited to the seizor for his own use, and moreover every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her back, well laid for every such offense.

1859 Ky. Acts 245, An Act to Amend An Act E ntitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.

If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.

## LOUISIANA

1813 La. Acts 172, An Act Against Carrying Concealed Weapons, and Going Armed in Public Places in an Unneccessary Manner, § 1.

Carrying Weapons | Louisiana | 1813

Be it enacted by the senate and house of representatives of the state of Louisiana, in general assembly convened, That from and after the passage of this act, any person who shall be found with any concealed weapon, such as a dirk, dagger,

26

knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him that do not appear in full open view, any person so offending, shall on conviction thereof before any justice of the peace, be subject to pay a fine . . . .

Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842).
Carrying Weapons | Louisiana | 1842
[A]ny person who shall be found with any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon concealed in his bosom, coat, or in any other place about him, that do not appear in full open view, any person so offending, shall, on conviction thereof, before an justice of the peace, be subject to pay a fine not to exceed fifty dollars, nor less than twenty dollars . . . .

1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . . , § 73.
Subject(s): Sensitive Places and Times
[I]t shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor; and on conviction shall be punished by a fine of not less than one hundred dollars, and imprisonment in the parish jail not less than one month . . . .

La. Const. of 1879, art. III.
Post-Civil War State Constitutions | Louisiana | 1879
A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be abridged. This shall not prevent the passage of laws to punish those who carry weapons concealed.

## MAINE

An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in CUMBERLAND GAZETTE (Portland, MA.), Nov. 17, 1786, at 1. On October 26, 1786 the following was passed into law by the Massachusetts Assembly: That from & after the publication of this act, if any persons, to the number of twelve, or more, being armed with clubs or other weapons; or if any number of persons, consisting of thirty, or more, shall be unlawfully, routously, rioutously or tumultuously assembled, any Justice of the Peace, Sheriff, or Deputy ... or Constable ... shall openly make [a] proclamation [asking them to disperse, and if they do not disperse within one hour, the officer is] ... empowered, to require the aid of a sufficient number of persons in arms ... and if any such person or persons [assembled illegally] shall be killed or wounded, by reason of his or their resisting the persons endeavoring to disperse or seize them, the said Justice, Sheriff, Deputy-Sheriff, Constable and their assistants, shall be indemnified, and held guiltless.

The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix Page 709, Image 725 (1847) available at The Making of Modern Law: Primary Sources.
Justices of the Peace, § 16.
Any person, going armed with any dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without a reasonable cause to fear an assault on himself, or any of his family or property, may, on the complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace for a term, not exceeding one year, with the right of appeal as before provided.

1841 Me. Laws 709, ch. 169, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury or violence to his person, or to his family or property, he may, on complaint of any person having resonable cause to fear an injury or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

28

The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884 Page 928, Image 955 (1884) available at The Making of Modern Law: Primary Sources.

Prevention of Crimes, § 10.

Whoever goes armed with any dirk, pistol, or other offensive and dangerous weapon, without just cause to fear an assault on himself, family, or property, may, on complaint of any person having cause to fear an injury or breach of the peace, be required to find sureties to keep the peace for a term not exceeding one year, and in case of refusal, may be committed as provided in the preceding sections.

## MARYLAND

The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | Maryland | 1809

If any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent feloniously to break and enter into any dwelling-house, ware-house, stable or out-house, or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent feloniously to assault any person, or shall be found in or upon any dwelling-house, warehouse, stable or out-house, or in any enclosed yard or garden, or area belonging to any house, with an intent to steal any goods or chattels, every such person shall be deemed a rouge and vagabond, and, on being duly convicted thereof, shall be sentenced to undergo a confinement in the said penitentiary for a period of time not less than three months nor more than two years, to be treated as law prescribes.

1872 Md. Laws 57, An Act To Add An Additional Section To Article Two Of The Code Of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," To Prevent The Carrying Of concealed Weapons In Said City, § 246.

Carrying Weapons | Maryland | 1872

It shall not be lawful for any person to carry concealed, in Annapolis, whether a resident thereof or not, any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon, under a penalty of a fine of not less than three, nor more than ten dollars in each case, in the discretion of the Justice of the Peace, before whom the same may be tried, to be collected. . .

29

John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein Page 1457, Image 382 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Sensitive Places and Times | Maryland | 1874
Election Districts–Fences. § 99.
It shall not be lawful for any person in Kent county to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction thereof before any justice of the peace of said county, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county until the same shall be paid.

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein Page 522-523, Image 531-532 (Vol. 1, 1888) available at The Making of Modern Law: Primary Sources.
Sentence Enhancement for Use of Weapon | Maryland | 1884
City of Baltimore, § 742.
Whenever any person shall be arrested in the city of Baltimore, charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall be taken before any of the police justices of the peace of the said city, and any such person shall be found to have concealed about his person any pistol, dirk knife, bowie-knife, sling-shot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon whatsoever, such person shall be subject to a fine of not less than five dollars nor more than twenty-five dollars in the discretion of the police justice of the peace before whom such person may be taken, and the confiscation of the weapon so found, which said fine shall be collected as other fines are now collected; provided, however, that the provisions of this section shall not apply to those persons who, as conservators of the peace are entitled or required to carry a pistol or other weapon as a part of their official equipment.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1:
That from and after the passage of this act, it shall not be lawful for any person in Calvert County to carry, on the days of election and primary election within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife,

Exhibit E_Spitzer
Page 123

razor, billy or bludgeon, and any person violating the provisions of this act, shall
be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court
of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for
each such offense. . .

John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the
General Assembly of Maryland March 14, 1888. Including also the Acts of the
Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the
State Page 468-469, Image 568-569 (Vol. 1, 1888) available at The Making of
Modern Law: Primary Sources.
Carrying Weapons | Maryland | 1886
Concealed Weapons, § 30.
Every person, not being a conservator of the peace entitled or required to carry
such weapon as a part of his official equipment, who shall wear or carry any pistol,
dirk-knife, bowie- knife, slung-shot, billy, sand-club, metal knuckles, razor, or any
other dangerous or deadly weapon of any kind whatsoever, (penknives excepted,)
concealed upon or about his person; and every person who shall carry or wear any
such weapon openly, with the intent or purpose of injuring any person, shall, upon
conviction thereof, be fined not more than five hundred dollars, or be imprisoned
not more than six months in jail or in the house of correction.

1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives,
Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of
Election in said County, Within One Mile of the Polls § 1.
That from and after the passage of this act, it shall not be lawful for any person in
Calvert County to carry, on the days of election and primary election within three
hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife,
razor, billy or bludgeon, and any person violating the provisions of this act, shall
be deemed guilty of a misdemeanor and on conviction thereof by the Circuit Court
of Calvert County . . . shall be fined not less than ten nor more than fifty dollars for
each such offense. . .

31

John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-1892, and of 1892-1893, up to the Summer Recess of 1893 Page 297-298, Image 306-307 (1893) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Maryland | 1890

Ordinances of Baltimore, § 742A.

Every person in said city of Baltimore not being a conservator of the peace, entitled or required to carry such weapons as a part of his official equipment, who shall wear or carry any pistol, dirk-knife, bowie-knife, sling-shot, billy, sand-club, metal knuckles, razor or any other dangerous or deadly weapon of any kind whatsoever, (pen knives excepted.) concealed upon or about his person; and every person who shall carry or wear such weapons openly, with the intent or purpose of injuring any person, shall, upon a conviction thereof, be fined not more than five hundred dollars, and be imprisoned not more than six months in jail or in the house of correction; that this act shall not release or discharge any person or persons already offending against the general law in such cases made and provided, but any such person or persons may be proceeded against, prosecuted and punished under the general law of this State as if this act had not been passed.

## MASSACHUSETTS

1750 Mass. Acts 544, An Act For Preventing And Suppressing Of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

If any persons to the number of twelve or more, being armed with clubs or other weapons. . . shall be unlawfully, riotously, or tumultuously assembled . . . (Read riot act, if don't disperse) . . . It shall be lawful for every officer . . . to seize such persons, and carry them before a justice of the peace; and if such persons shall be killed or hurt by reason of their resisting . . . officers and their assistants shall be indemnified and held guiltless.

32

Theron Metcalf, The Revised Statutes of the Commonwealth of Massachusetts, Passed November 4, 1835; to Which are Subjoined, an Act in Amendment Thereof, and an Act Expressly to Repeal the Acts Which are Consolidated Therein, Both Passed in February 1836; and to Which are Prefixed, the Constitutions of the United States and of the Commonwealth of Massachusetts Page 750, Image 764 (1836) available at The Making of Modern Law: Primary Sources.
Of Proceedings to Prevent the Commission of Crimes, § 16.
If any person shall go armed with a dirk, dagger, sword, pistol, or other offensive and dangerous weapon, without reasonable cause to fear an assault or other injury, or violence to his person, or to his family or property, he may, on complaint of any person having reasonable cause to fear an injury, or breach of the peace, be required to find sureties for keeping the peace, for a term not exceeding six months, with the right of appealing as before provided.

1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1, 2.
All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . ; § 2 That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.

1850 Mass. Gen. Law, chap. 194, §§ 1, 2, as codified in Mass. Gen. Stat., chap. 164 (1873) § 10.
Whoever when arrested upon a warrant of a magistrate issued against him for an alleged offense against the laws of this state, and whoever when arrested by a sheriff, deputy sheriff, constable, police officer, or watchman, while committing a criminal offense against the laws of this state, or a breach or disturbance of the public peace, is armed with, or has on his person, slung shot, metallic knuckles, bills, or other dangerous weapon, shall be punished by fine . . .

1850 Mass. Gen. Law, chap. 194, §§ 1, 2 as codified in Mass. Gen. Stat., chap. 164 (1873) § 11.
Whoever manufactures, or causes to be manufactured, or sells, or exposes for sale, any instrument or weapon of the kind usually known as slung shot, or metallic

Exhibit E_Spitzer
Page 126

knuckles, shall be punished by fine not less than fifty dollars, or by imprisonment in the jail not exceeding six months.

1927 Mass. Acts 416, An Act Relative to Machine Guns and Other Firearms, ch. 326, § 5 (amending §10)
Carrying Weapons | Massachusetts | 1927
Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty… or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and a half years in a jail . . .

## **MICHIGAN**

1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1.
It shall be unlawful for any person, except officers of the peace and night-watches legitimately employed as such, to go armed with a dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sand bag, skull cracker, slung shot, razor or other offensive and dangerous weapon or instrument concealed upon his person.

1891 Mich. Pub. Acts 409, Police Department, pt 15:. . . . And all persons who shall carry concealed on or about their persons, any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag, false knuckles, or other dangerous weapon, or who shall lay in wait , lurk or be concealed, with intent to do injury to any person or property, who shall threaten to beat or kill another or injure him in his person or property . . . shall be deemed a disorderly person, and upon conviction thereof may be punished by a fine not exceeding one hundred dollars and the costs of prosecution, and in imposition of any such fine and costs the court may make a further sentence that in default of payment, such offender be imprisoned in the city prison. . .

1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.

34

Dangerous or Unusual Weapons | Michigan | 1927

It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. . . .

1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3.
Dangerous or Unusual Weapons | Michigan | 1929

It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact.

## MINNESOTA

W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884 Page 289, Image 295 (1884) available at The Making of Modern Law: Primary Sources.
Concealed Weapons – License, § 1.

It shall be unlawful for any person, within the limits of the city of St. Paul, to carry or wear under his clothes, or concealed about his person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon. § 2. Any such weapons or weapons, duly adjudged by the municipal court of said city to have been worn or carried by any person, in violation of the first section of this ordinance, shall be forfeited or confiscated to the said city of St. Paul, and shall be so adjudged. § 3. Any policeman of the city of St. Paul, may, within the limits of said city, without a warrant, arrest any person or persons, whom such policeman may find in the act of carrying or wearing under their clothes, or concealed about

35

their person, any pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, bowie-knife, dirk-knife or razor, or any other dangerous or deadly weapon, and detain him, her or them in the city jail, until a warrant can be procured, or complaint made for the trial of such person or persons, as provided by the charter of the city of St. Paul, for other offenses under said charter, and for the trial of such person or persons, and for the seizure and confiscation of such of the weapons above referred to, as such person or persons may be found in the act of carrying or wearing under their clothes, or concealed about their persons.

George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889 Page 1006, Image 1010 (Vol. 2, 1888) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | Minnesota | 1888
Making, Selling, etc., Dangerous Weapons, §§ 333-334.
§ 333. A person who manufactures, or causes to be manufactured, or sells, or keeps for sale, or offers or gives or disposes of any instrument or weapon of the kind usually known as slung-shot, sand-club, or metal knuckles, or who, in any city of this state, without the written consent of a magistrate, sells or gives any pistol or fire-arm to any person under the age of eighteen years, is guilty of a misdemeanor.
Carrying, using, etc., certain Weapons . . . .
§ 334. A person who attempts to use against another, or who, with intent so to use, carries, conceals, or possesses any instrument or weapon of the kind commonly known as a slung-shot, sand-club, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon, is guilty of a misdemeanor.

## MISSISSIPPI

1799 Miss. Laws 113, A Law For The Regulation Of Slaves. No Negro or mulatto shall keep or carry any gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun, weapon and ammunition found in the possession or custody of any negro or mulatto may be seized by any person . . . every such offender shall have and receive by order of such justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

1804 Miss. Laws 90, An Act Respecting Slaves, § 4. No Slave shall keep or carry any gun, powder, shot, club or other weapon whatsoever offensive or defensive, except tools given him to work with . . .

1878 Miss. Laws 175, An Act To Prevent The Carrying Of Concealed Weapons And For Other Purposes, § 1.

That any person not being threatened with or havin good and sufficient reason to apprehend an attack, or traveling (not being a tramp) or setting out on a long journey, or peace officers, or deputies in discharge of their duties, who carries concealed in whole or in part, any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description shall be deemed guilty of a misdemeanor, and on conviction, shall be punished for the first offense by a fine of not less than five dollars nor more than one hundred dollars . . .

## MISSOURI

Organic Laws:-Laws of Missouri Territory, (Alphabetically Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates Page 374, Image 386 (1818) available at The Making of Modern Law: Primary Sources. 1818.

Slaves, § 3. No slave or mulatto whatsoever, shall keep or carry a gun, powder, shot, club or other weapon whatsoever, offensive or defensive; but all and every gun weapon and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person and upon due proof made before any justice of the peace of the district [county] where such seizure shall be, shall by his order be forfeited to the seizor, for his own use, and moreover, every such offender shall have and receive by order of such justice any number of lashes not exceeding thirty nine on his or her bare back well laid on for every such offence. § 4. Every free negro or mulatto, being a housekeeper may be permitted to keep one gun, powder and shot; and all negroes or mulattoes bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder shot and weapons, offensive and defensive, by license from a justice of the peace of the district [county] wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes or of the owners of such as are slaves.

Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City Page 491-492, Image 499-500 (1871) available at The Making of Modern Law: Primary Sources.

37

Carrying Weapons | Missouri | 1871
Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10.
§ 9. Hereafter it shall not be lawful for any person to wear under his clothes, or concealed about his person, any pistol, or revolver, colt, billy, slung shot, cross knuckles, or knuckles of lead, brass or other metal, bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, within the City of St. Louis, without written permission from the Mayor; and any person who shall violate this section shall be deemed guilty of a misdemeanor, and, upon conviction thereof, be fined not less than ten nor more than five hundred dollars for each and every offence.
§ 10. Nothing in the preceding section shall be so construed as to prevent any United States, State, county or city officer, or any member of the city government, from carrying or wearing such weapons as may be necessary in the proper discharge of his duties.

1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure"
§ 1274.
If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the siting of court, or into any other public assemblage of persons met for any lawful purpose other than for militia drill or meetings called under the militia law having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons shall exhibit and such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by both such fine and imprisonment.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.

38

Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.
It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged Page 508, Image 515 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Missouri | 1897
Concealed Weapons – Carrying of, § 7.
Any person who shall in this city wear under his clothes or carry concealed upon or about his person, or be found having upon or about his person concealed, any pistol or revolver, colt, billy, slung shot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, bowie knife, or any knife resembling a bowie knife, or any other dangerous or deadly weapon, shall be deemed guilty of a misdemeanor.

Joplin Code of 1917, Art. 67, § 1201. Missouri. Weapons; Deadly.
If any person shall carry concealed upon or about his person a dangerous or deadly weapon of any kind or description, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for educational, political, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful

39

purpose other than for militia drill, or meetings called under militia law of this state, having upon or about his person, concealed or exposed, any kind of firearms, bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slung shot, or other similar deadly weapons, or shall, in the presence of one or more persons, exhibit any such weapon in a rude, angry or threatening manner, or shall have any such weapons in his possession when intoxicated, or directly or indirectly shall sell or deliver, loan or barter, to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall be deemed guilty of a misdemeanor. Provided, that nothing contained in this section shall apply to legally qualified sheriffs, police officers, and other persons whose bona fide duty is to execute process, civil or criminal, make arrests, or aid in conserving the public peace, nor to persons traveling in a continuous journey peaceably through this state.

1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17.
Sensitive Places and Times | Missouri | 1923
Any person, while in charge of, or a passenger thereon, who shall carry on his person, or in, on, or about, any wagon, buggy, automobile, boat, aeroplane, or other conveyance or vehicle whatsoever, in, or upon which any intoxicating liquor, including wine or beer, is carried, conveyed or transported in violation of any provision of the laws of this state, any revolver, gun or other firearm, or explosive, any bowie knife, or other knife having a blade of more than two and one-half inches in length, any sling shot, brass knucks [sic], billy, club or other dangerous weapon, article or thing which could, or might, be used in inflicting bodily injury or death upon another, shall be deemed guilty of a felony, and, upon conviction thereof, shall be punished by the imprisonment in the state penitentiary for a term of not less than two years. Provided, that this section shall not apply to any person or persons transporting intoxicating liquor for personal use and not for sale in violation of law. Provided, that this section shall not apply to any person or passenger who did not know that such vehicle or conveyance was being used for unlawful purposes.

## MONTANA

1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1.
If any person shall within any city, town, or village in this territory, whether the same is incorporated or not, carry concealed upon his or her person any pistol,

40

bowie-knife, dagger, or other deadly weapon, shall, on conviction thereof before any justice of the peace of the proper county, be fined in any sum not less than twenty five dollars, nor more than one hundred dollars.

1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23.

If any person shall, by previous appointment or agreement, fight a duel with a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon, and in so doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guilty of murder in the first degree, and, upon conviction thereof, shall be punished accordingly [death by hanging].

1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63.

Every person in this territory having, carrying, or procuring from another person, any dirk, dirk-knife, sword, sword-cane, pistol, gun, or other deadly weapon, who shall in the presence of one or more persons, draw or exhibit any of said deadly weapons in a rude or angry or threatening manner, not in necessary self defense, or who shall in any manner unlawfully use the same in any fight or quarrel, the person or persons so offending, upon conviction thereof in any criminal court in any county in this territory shall be fined in any sum not less than ten dollars nor more than one hundred dollars, or imprisoned in the county jail not less than one month nor more than three months, at the discretion of the court, or by both such fine and imprisonment, together with the costs of prosecution, which said costs shall in all cases be computed and collected in the same manner as costs in civil cases; and all fines and forfeitures arising under the provisions of this act shall be paid into the county treasury for school purposes: Provided, that no sheriff, deputy sheriff, constable, marshal, or other peace officer, shall be held to answer, under the provisions of this act, for drawing or exhibiting any of the weapons hereinbefore mentioned while in the lawful discharge of his or their duties.

1887 Mont. Laws 549, Criminal Laws, § 174.

If any person shall have upon him or her any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than three months.

Exhibit E_Spitzer
Page 134

## NEBRASKA

1858 Neb. Laws 69, An Act To Adopt And Establish A Criminal code For The Territory Of Nebraska, § 135.
And if any person shall have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon with intent to assault any person, every such person, on conviction, shall be fined in a sum not exceeding one hundred dollars. . .

Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska Page 36, Image 36 (1872) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1872
Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1.
Be it ordained by the Mayor and Councilmen of the City of Nebraska City, That it shall be, and it is hereby declared to be unlawful for any person to carry, openly or concealed, any musket, rifle, shot gun, pistol, sabre, sword, bowie knife, dirk, sword cane, billy slung shot, brass or other metallic knuckles, or any other dangerous or deadly weapons, within the corporate limits of Nebraska City, Neb; Provided, that nothing herein contained shall prevent the carrying of such weapon by a civil or military officer, or by a soldier in the discharge of his duty, nor by any other person for mere purposes of transportation from one place to another.

W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska Page 344, Image 356 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Nebraska | 1890
Ordinances of Omaha, Concealed Weapons, § 10.
It shall be unlawful for any person to wear under his clothes, or concealed about his person, any pistol or revolver, colt, billy, slung-shot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a bowie knife, or any other dangerous or deadly weapon within the corporate limits of the city of Omaha. Any person guilty of a violation of this section shall, on conviction, be fined not exceeding one hundred ($100) dollars for each and every offense; nothing in this section, however, shall be so construed as to prevent the United States Marshals and their deputies, sheriffs and their deputies, regular or special police officers of the city, from carrying or wearing such weapons as may be deemed necessary in the proper discharge of their duties. Provided, however, If it shall be proved from

42

the testimony on the trial of any such case, that the accused was, at the time of carrying any weapon as aforesaid, engaged in the pursuit of lawful business, calling or employment and the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid, for the defense of his person, property or family, the accused shall be acquitted.

Compiled Ordinances of the City of Fairfield, Clay County, Nebraska Page 34, Image 34 (1899) available at The Making of Modern Law: Primary Sources. Carrying Weapons | Nebraska | 1899
Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1.
It shall be unlawful for any person to carry upon his person any concealed pistol, revolver, dirk, bowie knife, billy, sling shot, metal knuckles, or other dangerous or deadly weapons of any kind, excepting only officers of the law in the discharge or their duties; and any person so offending shall be deemed guilty of a misdemeanor, and on conviction thereof, shall be subject to the penalty hereinafter provided. § 2.
Any such weapon or weapons, duly adjudged by the Police Judge of said city to have been worn or carried by any person in violation of the first section of this ordinance, shall be forfeited or confiscated to the City of Fairfield and shall be so adjudged.

## **NEVADA**

Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, Inclusive Page 563, Image 705 (Vol. 1, 1873) available at The Making of Modern Law: Primary Sources.
Of Crimes and Punishments, §§ 35-36.
§ 35. If any person shall by previous appointment or agreement, fight a duel with a rifle, shotgun, pistol, bowie knife, dirk, smallsword, backsword, or other dangerous weapon, and in doing shall kill his antagonist, or any person or persons, or shall inflict such wound as that the party or parties injured shall die thereof within one year thereafter, every such offender shall be deemed guiltily of murder in the first degree and upon conviction thereof shall be punished accordingly.
§ 36. Any person who shall engage in a duel with any deadly weapon although no homicide ensue or shall challenge another to fight such duel, or shall send or deliver any verbal or written message reporting or intending to be such challenge, although no duel ensue, shall be punished by imprisonment in the State prison not

less than two nor more than ten years, and shall be incapable of voting or holding any office of trust or profit under the laws of this State.

David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto Page 1077, Image 1085 (1885) available at The Making of Modern Law: Primary Sources.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Nevada | 1881
An Act to prohibit the carrying of concealed weapons by minors. § 1.
Every person under the age of twenty-one (21) years who shall wear or carry any dirk, pistol, sword in case, slung shot, or other dangerous or deadly weapon concealed upon his person, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined not less than twenty nor more than two hundred ($200) dollars, or by imprisonment in the county jail not less than thirty days nor more than six months or by both such fine and imprisonment.

## NEW JERSEY

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290 (1881) (1686)
An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain

44

till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.
That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

45

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 86- 87, Image 86-87 (1874) available at The Making of Modern Law: Primary Sources.

Carrying Weapons, Registration and Taxation | New Jersey | 1873

An Ordinance In Relation to the Carrying of Dangerous Weapons. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.

That with the exceptions made in the second section of this ordinance, no person shall, within the limits of Jersey City, carry, have or keep on his or her person concealed, any slung-shot, sand-club, metal knuckles, dirk or dagger not contained as a blade of a pocket knife, loaded pistol or other dangerous weapon. § 2. That policemen of Jersey City, when engaged in the performance of police duty, the sheriff and constables of the County of Hudson, and persons having permits, as hereinafter provided for, shall be and are excepted from the prohibitions of the first section of this ordinance. § 3. The Municipal Court of Jersey City may grant permits to carry any of the weapons named in the first section to such persons as should, from the nature of their profession, business or occupation, or from peculiar circumstances, be allowed so to do; and may, in granting such permits, impose such conditions and restrictions in each case as to the court shall seem proper. All applications for permits shall be made in open court, by the applicant in person, and in all cases the court shall require a written endorsement of the propriety of granting a permit from at least three reputable freeholders; nor shall any such permit be granted to any person until the court is satisfied that such person is temperate, of adult age, and capable of exercising self-control . Permits shall not be granted for a period longer than one year, and shall be sealed by the seal of the court. The possession of a permit shall not operate as an excuse unless the terms of the same are strictly complied with. In cases of emergency, permits may be granted by a single Justice of the Municipal Court, or by the Chief of Police, to be in force not longer than thirty days, but such permit shall not be renewable. §4. That no person shall, within the limits of Jersey City, carry any air gun or any sword cane. § 5. The penalty for a violation of this ordinance shall be a fine not exceeding fifty dollars, or imprisonment in the city prison not exceeding ten days, or both fine and imprisonment not exceeding the aforesaid amount and time, in the discretion of the court.

1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1.

Any person who shall carry any revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor or any knife with a blade of five inches in length or over concealed in or about his clothes or person, shall be guilty of a misdemeanor, and upon conviction thereof shall be punishable by a fine not exceeding two hundred dollars or imprisonment at hard labor, not exceeding two years, or both;. . . .

1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1.

Manufacturing, Inspection and Sale of Gunpowder and Firearms | New Jersey | 1927

No pawnbroker shall hereafter sell or have in his possession for sale or to loan or give away, any machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Any pawnbroker violating the provisions of this act shall be guilty of a high misdemeanor and punished accordingly.

## NEW MEXICO

Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources.

Sentence Enhancement for Use of Weapon | New Jersey | 1799

[An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2.

And whereas diverse ill disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses, with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purpose into execution; Be it further enacted, That if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement, with an intent to break and enter into any dwelling-house or out-house; or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or upon any dwelling-house, ware-house, stable, barn, coach-house, smoke-house or out-house, or in any enclosed yard or garden, or area belonging to

47

any house, with an intent to steal any goods or chattels, then he or she shall be deemed and adjudged to be a disorderly person.

1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25.
That from and after the passage of this act, it shall be unlawful for any person to carry concealed weapons on their persons, or any class of pistols whatever, bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slung shot, or any other deadly weapon, of whatever class or description that may be, no matter by what name they may be known or called under the penalties and punishment which shall hereinafter be described.

Ordinances of Jersey City, Passed By The Board Of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto Page 41, Image 41 (1874) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New Jersey | 1871
An Ordinance To Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: § 1.
That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry, have, or keep concealed on his or her person any instrument or weapon commonly known as a slung-shot, billy, sand-club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, under the penalty of not exceeding twenty dollars for each offense. § 2. That it shall not be lawful for any person or persons (excepting policemen and private watchmen when on duty), within the corporate limits of Jersey City, to carry or wear any sword in a cane, or air-gun, under the penalty of not exceeding twenty dollars for each offense. § 3. Any forfeiture on penalty arising under this ordinance may be recovered in the manner specified by the City Charter, and all persons violating any of the provisions aforesaid shall, upon conviction, stand committed until the same be paid.

Exhibit E_Spitzer
Page 141

Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871 Page 304, Image 350 (1877) available at The Making of Modern Law: Primary Sources. Sentence Enhancement for Use of Weapon | New Jersey | 1877
An Act Concerning Disorderly Persons, § 2.
And whereas, diverse ill-disposed persons are frequently apprehended, having upon them implements for house-breaking, or offensive weapons, or are found in or upon houses, warehouses, stables, barns or out-houses, areas of houses, coach-houses, smoke-houses, enclosed yards, or gardens belonging to houses (as well as places of public resort or assemblage), with intent to commit theft, misdemeanors or other offences; and although their evil purposes are thereby manifested, the power of the justices of the peace to demand of them sureties for their good behavior hath not been of sufficient effect to prevent them from carrying their evil purposes into execution; if any person shall be apprehended, having upon him or her any picklock, key, crow, jack, bit or other implement with an intent to break and enter into any building: or shall have upon him or her any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person; or shall be found in or near any dwelling house, warehouse, stable, barn, coach-house, smoke-house, or out-house, or in any enclosed yard or garden, or area belonging to any house, or in any place of public resort or assemblage for business, worship, amusement, or other lawful purposes with intent to steal any goods or chattels, then he or she shall be deemed and adjudged a disorderly person.


An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887).
Brandishing, Carrying Weapons, Dangerous or Unusual Weapons, Firing Weapons, Transportation | New Mexico | 1887
§ 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted. . . .


## NEW YORK

The Colonial Laws Of New York From The Year 1664 To The Revolution, Including The Charters To The Duke Of York, The Commissions And Instructions

49

To Colonial Governors, The Dukes Laws, The Laws Of The Dongan And Leisler Assemblies, The Charters Of Albany And New York And The Acts Of The Colonial Legislatures From 1691 To 1775 Inclusive Page 687, Image 689 (1894) available at The Making of Modern Law: Primary Sources.
Race and Slavery Based | New York | 1664
Laws of the Colony of New York. And be it further enacted by the authority aforesaid that it shall not be lawful for any slave or slave to have or use any gun, pistol, sword, club or any other kind of weapon whatsoever, but in the presence or by the direction of his her or their Master or Mistress, and in their own ground on Penalty of being whipped for the same at the discretion of the Justice of the Peace before whom such complaint shall come or upon the view of the said justice not exceeding twenty lashes on the bare back for every such offense.

George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects Page 321, Image 324 (Vol. 1, 1881) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1881
Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9.
Every person who shall within this state use, or attempt to use, or with intent to use against any other person, shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any instrument or weapon of the kind commonly known as a slung-shot, billy, sand club or metal knuckles, and any dirk shall be deemed guilty of felony, and on conviction thereof may be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment.

George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) available at The Making of Modern Law: Primary Sources.
Carrying, Using, Etc., Certain Weapons, § 410.
A person who attempts to use against another, or who, with intent so to use, carries, conceals or possesses any instrument or weapon of the kind commonly known as the slung-shot, billy, sand –club or metal knuckles, or a dagger, dirk or dangerous knife, is guilty of a felony. Any person under the age of eighteen years who shall have, carry or have in his possession in any public street, highway or place in any city of this state, without a written license from a police magistrate of such city, any pistol or other fire-arm of any kind, shall be guilty of a

50

misdemeanor. This section shall not apply to the regular and ordinary transportation of fire-arms as merchandise, or for use without the city limits. § 411. Possession, Presumptive Evidence. The possession, by any person other than a public officer, of any of the weapons specified in the last section, concealed or furtively carried on the person, is presumptive evidence of carrying, or concealing, or possessing, with intent to use the same in violation of that section.

Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations Page 215, Image 216 (1885) available at The Making of Modern Law: Primary Sources.
[Offenses Against the Public Peace and Quiet,] § 7.
Any person who shall carry about his or her person any dirk, bowie knife, sword or spear cane, pistol, revolver, slung shot, jimmy, brass knuckles, or other deadly or unlawful weapon, or shall use any deadly or unlawful weapon, with intent to do bodily harm to any person, shall be subject to a fine of not less than twenty-five nor more than one hundred dollars, or to imprisonment in the penitentiary of the county for not less than thirty days nor longer than three months, or to both such fine and imprisonment.

Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | New York | 1866
An Act to Prevent the Furtive Possession and use of slung-shot and other dangerous weapons. Ch. 716, § 1.
Every person who shall within this state use, or attempt to use or with intent to use against any other person shall knowingly and secretly conceal on his person, or with like intent shall willfully and furtively possess any possess any instrument or weapon of the kind commonly known as slung-shot, billy, sand club or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket knife), or sword-cane or air-gun shall be deemed guilty of felony, and on conviction thereof be punished by imprisonment in the state prison, or penitentiary or county jail, for a term not more than one year, or by a fine not exceeding five hundred dollars, or by both such fine and imprisonment. § 2. The having possession of any of the

51

weapons mentioned in the first section of this act by any other than a public officer, willfully and secretly concealed on the person or knowingly and furtively carried thereon, shall be presumptive evidence of so concealing and possessing or carrying the same with the intent to use the same in violation of the provisions of this act.

1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1900
Making, et cetera, dangerous weapons. – A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as slunghsot, billy, sand-club or metal knuckles, or who, in any city or incorporated village in this state, without the written consent of the police magistrate, sells or gives any pistol or other firearm, to any person under the age of eighteen years or without a like consent sells or gives away any air-gun, or spring-gun, or other instrument or weapon in which the propelling force is a spring or air to any person under the age of twelve years, or who sells or gives away any instrument or weapon commonly known as a toy pistol, in or upon which any loaded or blank cartridges are used or may be used, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.
Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | New York | 1911
Section[] eighteen hundred and ninety-six . . . [is] hereby amended . . . § 1896. Making and disposing of dangerous weapons. A person who manufactures, or causes to be manufactured, or sells or keeps for sale, or offers, or gives, or disposes of any instrument or weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, to any person; or a person who offers, sells, loans, leases or gives any gun, revolver, pistol or other firearm or any airgun, spring-gun or other instrument or weapon in which the propelling force is a spring or air or any instrument or weapon commonly known as a toy pistol or in or upon which any loaded or blank cartridges are used, or may be used, or any loaded or blank cartridges or ammunition therefor, to any person under the age of sixteen years, is guilty of a misdemeanor.

1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1.

Section . . . eighteen hundred and ninety-seven . . . [is] hereby amended to read as follows: § 1897. Carrying and use of dangerous weapons. A person who attempts to use against another, or who carries, or possesses any instrument or weapon of the kind commonly known as a blackjack, slunghsot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instrument or weapon, is guilty of a felony. Any person under the age of sixteen years, who shall have, carry, or have in his possession, any of the articles named or described in the last section, which is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor. . . . Any person over the age of sixteen years, who shall have or carry concealed upon his person in any city, village, or town of this state, any pistol, revolver, or other firearm without a written license therefor, theretofore issued to him by a police magistrate of such city or village, or by a justice of the peace of such town, or in such manner as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons

Carrying Weapons, Dangerous or Unusual Weapons | New York | 1913

§ 1. A person who attempts to use against another, or who carries or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb or bombshell, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous or deadly instruments or weapon, is guilty of a felony.

1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1.

Dangerous or Unusual Weapons | New York | 1931

A person who attempts to use against another an imitation pistol, or who carries or possesses any instrument or weapon of the kind commonly known as a black-jack, slungshot, billy, sand club, sandbag, metal knuckles, bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or any other dangerous or deadly instrument, or weapon is guilty of a misdemeanor, and if he has been previously convicted of any crime he is guilty of a felony.

53

## NORTH CAROLINA

1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15.
The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation.

North Carolina: N.C. Sess. Laws (1879) chap. 127, as codified in North Carolina Code, Crim. Code, chap. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor.
If any one, except when on his own premises, shall carry concealed about his person any pistol, bowie knife, dirk, dagger, slungshot, loaded case, brass, iron or metallic knuckes or razor or other deadly weapon or like kind, he shall be guilty of a misdemeanor, and be fined or imprisoned at the discretion of the court. And if anyone not being on his own lands, shall have about his person any such deadly weapon, such possession shall be prima facie evidence of the concealment thereof. . .

## NORTH DAKOTA

1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13.
§ 7312. Carrying or using slung shot. Every person who carries upon his person, whether concealed or not, or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.
§ 7313. Carrying concealed weapons. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapon, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5.
§ 1. Any person other than a public officer, who carries concealed in his clothes any instrument or weapon of the kind usually known as a black-jack, slung-shot,

54

billy, sand club, sand bag, bludgeon, metal knuckles, or any sharp or dangerous weapon usually employed in attack or defense of the person, or any gun, revolver, pistol or other dangerous fire arm loaded or unloaded, or any person who carries concealed nitro-glycerin, dynamite, or any other dangerous or violent explosive, or has the same in his custody, possession or control, shall be guilty of a felony. . . .

## OHIO

1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . . , ch. 6. Sentence Enhancement for Use of Weapon | Ohio | 1788
Burglary . . . If the person or persons so breaking and entering any dwelling house, shop, store or vessel as aforesaid, shall commit, or attempt to commit any personal abuse, force, or violence, or shall be so armed with any dangerous weapon or weapons as clearly to indicate a violent intention, he, she or they so offending, upon conviction thereof, shall moreover, forfeit all his, her or their estate, real and personal, to this territory, out of which the party injured shall be recompensed as aforesaid, and the offender shall also be committed to any gaol [jail] in the territory for a term not exceeding forty years.

1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1.
Carrying Weapons | Ohio | 1859
[W]hoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court.

Joseph Rockwell Swan, The Revised Statutes of the State of Ohio, of a General Nature, in Force August 1, 1860. With Notes of the Decisions of the Supreme Court Page 452, Image 464 (1860) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1859
An Act to Prohibit the Carrying or Wearing of Concealed Weapons, §§ 1-2.
§ 1. Be it enacted by the General Assembly of the State of Ohio, that whoever shall carry a weapon or weapons, concealed on or about his person, such as a pistol, bowie knife, dirk, or any other dangerous weapon, shall be deemed guilty of a misdemeanor, and on conviction of the first offense shall be fined not exceeding

<center>55</center>

two hundred dollars, or imprisoned in the county jail not more than thirty days; and for the second offense, not exceeding five hundred dollars, or imprisoned in the county jail not more than three months, or both, at the discretion of the court. Sec. § 2. If it shall be proved to the jury, from the testimony on the trial of any case presented under the [section of this act banning the carrying of concealed weapons], that the accused was, at the time of carrying any of the weapon or weapons aforesaid, engaged in the pursuit of any lawful business, calling, or employment, and that the circumstances in which he was placed at the time aforesaid were such as to justify a prudent man in carrying the weapon or weapons aforesaid for the defense of his person, property or family, the jury shall acquit the accused.

Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880 Page 1633, Image 431 (Vol. 2, 1879) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Ohio | 1880
Offences Against Public Peace, § 6892.
Whoever carries any pistol, bowie-knife, dirk, or other dangerous weapon, concealed on or about his person, shall be fined not more than two hundred dollars, or imprisoned not more than five hundred dollars, or imprisoned not more than three months, or both.

## **OKLAHOMA**

1890 Okla. Laws 495, art. 47
Brandishing, Carrying Weapons, Hunting, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible | Oklahoma | 1890
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
§ 2. It shall be unlawful for any person in the Territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
§ 3. It shall be unlawful for any person within this Territory, to sell or give to any minor any of the arms or weapons designated in sections one and two of this article.

§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under to other circumstances: Provided, however, That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.

§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while traveling or removing from one place to another, and not otherwise.

§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this Territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19.

§ 18. Every person who manufactures or causes to be manufactured, or sells or offers or keeps for sale, or gives or disposes of any instrument or weapon of the kind usually known as slung shot, or of any similar kind is guilty of a misdemeanor.

§ 19. Every person who carries upon his person, whether concealed or not or uses or attempts to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

General Laws Relating to Incorporated Towns of Indian Territory Page 37, Image 33 (1890) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1890
Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3.

To wear or carry any pistol of any kind whatever, or any dirk, butcher knife or bowie knife, or a sword, or a spear in a cane, brass or metal knuckles or a razor, slung shot, sand bag, or a knife with a blade over three inches long, with a spring handle, as a weapon.

Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory) Page 495-496, Image 511-512 (1891) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oklahoma | 1891
Concealed Weapons, §§ 1, 2, 4-10.
§ 1. It shall be unlawful for any person in the Territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.
§ 2. It shall be unlawful for any person in this territory of Oklahoma, to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon, except as in this article provided.
§ 4. Public officers while in the discharge of their duties or while going from their homes to their place of duty, or returning therefrom, shall be permitted to carry arms, but at no other time and under no other circumstances: Provided, however That if any public officer be found carrying such arms while under the influence of intoxicating drinks, he shall be deemed guilty of a violation of this article as though he were a private person.
§ 5. Persons shall be permitted to carry shot-guns or rifles for the purpose of hunting, having them repaired, or for killing animals, or for the purpose of using the same in public muster or military drills, or while travelling or removing from one place to another, and not otherwise.
§ 6. Any person violating the provisions of any one of the forgoing sections, shall on the first conviction be adjudged guilty of a misdemeanor and be punished by a fine of not less than twenty-five dollars nor more than fifty dollars, or by imprisonment in the county jail not to exceed thirty days or both at the discretion of the court. On the second and every subsequent conviction, the party offending shall on conviction be fined not less than fifty dollars nor more than two hundred and fifty dollars or be imprisoned in the county jail not less than thirty days nor more than three months or both, at the discretion of the court.
§ 7. It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly, any school room or other place where persons are assembled for public worship, for amusement, or for educational or scientific

58

purposes, or into any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering, or to any election, or to any place where intoxicating liquors are sold, or to any political convention, or to any other public assembly, any of the weapons designated in sections one and two of this article.

§ 8. It shall be unlawful for any person in this territory to carry or wear any deadly weapons or dangerous instrument whatsoever, openly or secretly, with the intent or for the avowed purpose of injuring his fellow man.

§ 9. It shall be unlawful for any person to point any pistol or any other deadly weapon whether loaded or not, at any other person or persons either in anger or otherwise.

§ 10. Any person violating the provisions of section seven, eight, or nine of this article; shall on conviction, be punished by a fine of not less than fifty dollars, nor more than five hundred and shall be imprisoned in the county jail for not less than three nor more than twelve months.

Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25.
It shall be unlawful for any person in the territory of Oklahoma to carry concealed on or about his person, saddle, or saddle bags, any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense except as in this article provided.

## OREGON

1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2.
§ 1. It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.
§ 2. Any person violating any of the provisions of section one of this act shall be deemed guilty of a misdemeanor, and, upon conviction thereof, shall be punished by a fine of not less than ten dollars nor more than two hundred dollars, or by imprisonment in the county jail not less than five days nor more than one hundred days, or by both fine and imprisonment, in the discretion of the court.

Laws of Oregon (1885), An Act to Prevent Persons from Carrying Concealed Weapons, § 1-4, p. 33, as codified in Ore. Code, chap. 8 (1892) § 1969.

59

It shall be unlawful for any person to carry concealed about his person in any manner whatever any revolver, pistol, or other fire-arm, or any knife (other than an ordinary pocket knife), or any dirk or dagger, slung-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.

The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order Page 259, Image 261 (1898) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Oregon | 1898
An Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2.
It shall be unlawful for any person to carry any sling shot, billy, dirk, pistol or any concealed deadly weapon or to discharge any firearms, air gun, sparrow gun, flipper or bean shooter within the corporate limits of the city, unless in self-defense, in protection of property or an officer in the discharge of his duty; provided, however, permission may be granted by the mayor to any person to carry a pistol or revolver when upon proper representation it appears to him necessary or prudent to grant such permission.

1917 Or. Sess. Laws 804-808, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, §§ 7-8.
Carrying Weapons | Oregon | 1917
§ 7. Any person who attempts to use, or who with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any loaded pistol, revolver or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slung-shot, billy, sandclub, sandbag, metal knuckles, bomb or bomb-shell, or any other dangerous or deadly weapon or instrument, is guilty of a felony. The carrying or possession of any of the weapons specified in this section by any person while committing, or attempting or threatening to commit a felony, or a breach of the peace, or any act of violence against the person or property of another, shall be presumptive evidence of carrying or possessing such weapon with intent to use the same in violation of this section.
Any person who violates the provisions of this section shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than $50.00 nor more than $500.00, or by imprisonment in the county jail for not less

60

than one month nor more than six months, or by imprisonment in the penitentiary for not exceeding five years.

§ 8. Whenever any person shall be arrested and it shall be discovered that such person possesses or carries or has possessed or carried upon his person any loaded pistol, revolver or other firearm, or any weapon named or enumerated in Section 7 of this Act, in violation of any of the sections of this Act, it shall be the duty of the person making the arrest to forthwith lay an information for a violation of said section or sections against the person arrested before the nearest or most accessible magistrate having jurisdiction of the offense, and such magistrate must entertain and examine such information and act thereon in the manner prescribed by law. Section 11. Any person not a citizen of the United States of America, who shall be convicted of carrying a deadly weapon, as described in Sections 1, 2 and 7 of this Act, shall be guilty of a felony and on conviction thereof shall be punished by imprisonment in the State prison for a period not exceeding five years.

## PENNSYLVANIA

1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop Of Philadelphia, To Convey Certain Real Estate In The Borough Of York, And A supplement To The Charter Of Said Borough, § 4.
That any person who shall willfully and maliciously carry any pistol, gun, dirk knife, slung shot, or deadly weapon in said borough of York ,shall be deemed guilty of a felon, and being thereof convicted shall be sentenced to undergo an imprisonment at hard labor for a term not less than 6 months nor more than one year and shall give security for future good behavior for such sum and for such time as the court before whom such conviction shall take place may fix . . . .

Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions Page 86, Image 86 (1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Pennsylvania | 1897
An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12.
No person shall willfully carry concealed upon his or her person any pistol, razor, dirk or bowie-knife, black jack, or handy billy, or other deadly weapon, and any person convicted of such offense shall pay a fine of not less than five dollars or more than fifty dollars with costs.

## RHODE ISLAND

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1.
No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his persons . . . [additional fine provided if intoxicated while concealed carrying].

1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, §§1-3.
Carrying Weapons, Sentence Enhancement for Use of Weapon | Rhode Island | 1893
§ 1. No person shall wear or carry in this state any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy, brass or metal knuckles, slung shot, pistol or fire arms of any description, or other weapons of like kind and description concealed upon his person: Provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this act.
§ 2. Any person convicted of a violation of the provisions of section 1 shall be fined not less than twenty dollars nor more than two hundred dollars, or be imprisoned not less than six months nor more than one year.
§ 3. Whenever any person shall be arrested charged with any crime or misdemeanor, or for being drunk or disorderly, or for any breach of the peace, and shall have concealed upon his person any of the weapons mentioned in section 1, such person, upon complaint and conviction , in addition to the penalties provided in section 2, shall be subject to a fine of not less than five dollars nor more than twenty five dollars, and the confiscation of the weapon so found.

General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State Page 1010-1011, Image 1026-1027 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Rhode Island | 1896
Offences Against Public Policy, §§ 23, 24, 26.

62

§ 23. No person shall wear or carry in this state any dirk, bowie-knife, butcher knife, dagger, razor, sword-in-cane, air-gun, billy, brass or metal knuckles, slung-shot, pistol or fire-arms of any description, or other weapons of like kind and description concealed upon his person: provided, that officers or watchmen whose duties require them to make arrests or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provisions of this and the two following sections.

§ 24. Any person convicted of a violation of the provisions of the preceding section shall be fined not less than ten nor more than twenty dollars, or be imprisoned not exceeding three months, and the weapon so found concealed shall be confiscated . . . .

§ 26. No negative allegations of any kind need be averred or proved in any complaint under the preceding three sections, and the wearing or carrying of such concealed weapons or weapons shall be evidence that the wearing or carrying of the same is unlawful; but the respondent in any such case my show any fact that would render the carrying of the same lawful under said sections.

1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws
Carrying Weapons | Rhode Island | 1908

§ 23. No person shall wear or carry in this state any dirk, dagger, razor, sword-in-cane, bowie knife, butcher knife, or knife of any description having a blade of more than three inches in length, measuring from the end of the handle, where the blade is attached to the end of said blade, any air gun, billy, brass or metal knuckles, slung-shot, pistol or firearms of any description, or other weapons of like kind and description, concealed upon his person: Provided, that officers or watchmen whose duties require them to arrest or to keep and guard prisoners or property, together with the persons summoned by such officers to aid them in the discharge of such duties, while actually engaged in such duties, are exempted from the provision of this and the two other following sections.

## SOUTH CAROLINA

1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894). § 129 (2472.)
§ 1. Be it enacted by the Senate and House of Representatives of the State of South Carolina, not met and sitting in General Assembly, and by the authority of the same, That any person carrying a pistol , dirk, dagger, slung shot, metal knuckles, razor, or other deadly weapon usually used for the infliction of personal injury, concealed about his person shall be guilty of a misdemeanor and upon conviction

63

thereof, before a Court of competent jurisdiction shall forfeit to the County the weapon so carried concealed and be fined in a sum not more than two hundred dollars, or imprisoned for not more than twelve months, or both, in the discretion of the Court.

§ 2. It shall be the duty of every Trial Justice, Sheriff, Constable, or other peace officer, to cause all persons violating this Act to be prosecuted therefor whenever they shall discover a violation hereof.

1923 S.C. Acts 221

If any person shall knowingly sell, offer for sale, give, or in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie knife, dirk, loaded cane or sling shot, he shall be guilty of a misdemeanor. Any person being the parent or guardian, of or attending in loco parentis to any child under the age of twelve years who shall knowingly permit such child to have the possession or custody of, or use in any manner whatever any gun, pistol, or other dangerous firearm, whether such firearm be loaded or unloaded, or any person who shall knowingly furnish such child any firearm, shall be guilty of a misdemeanor, and, upon conviction, shall be fined not exceeding Fifty Dollars or imprisoned not exceeding thirty days.

## SOUTH DAKOTA

S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471.

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471

§ 470. Every person who carries upon his person, whether concealed or not, or uses or attempt to use against another, any instrument or weapon of the kind usually known as slung shot, or of any similar kind, is guilty of a felony.

§ 471. Every person who carries concealed about his person any description of firearms, being loaded or partly loaded, or any sharp or dangerous weapons, such as is usually employed in attack or defense of the person, is guilty of a misdemeanor.

## TENNESSEE

1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch 137, § 2.
That if any person shall wear any Bowie knife, Arkansas tooth pick, or other knife or weapon that shall in form, shape or size resemble a Bowie knife or Arkansas toothpick under his clothes, or keep the same concealed about his person, such person shall be guilty of a misdemeanor, and upon conviction thereof shall be fined in a sum not less than two hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months.

1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1.
That if any merchant, . . . shall sell, or offer to sell . . . any Bowie knife or knives, or Arkansas tooth picks . . . such merchant shall be guilty of a misdemeanor, and upon conviction thereof upon indictment or presentment, shall be fined in a sum not less than one hundred dollars, nor more than five hundred dollars, and shall be imprisoned in the county jail for a period not less than one month nor more than six months.

1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4.
That if any person carrying any knife or weapon known as a Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife, on a sudden rencounter [sic], shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony, and upon conviction thereof shall be confined in the jail and penitentiary house of this state, for a period of time not less than three years, nor more than fifteen years.

Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871 Page 125, Image 794 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources. [1856]
Offences Against Public Policy and Economy. § 4864.
Any person who sells, loans, or gives, to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor, and shall

Exhibit E_Spitzer
Page 158

be fined not less than twenty-five dollars, and be imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 190, Image 191 (1863) available at The Making of Modern Law: Primary Sources.
Offences Affecting Public Safety: Carrying Concealed Weapons, § 3.
It shall not be lawful for any person or persons to carry concealed about his or their persons any pistol, Bowie-knife, dirk, or any other deadly weapon; and any person so offending, shall upon conviction thereof before the Recorder, be fined not less than ten nor more than fifty dollars for each and every offence.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of The State, Offences Against Public Peace, §§ 4746, 4747, 4753, 4757.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor.
§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the State for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding section.
§ 4753. No person shall ride or go armed to the terror of the people, or privately carry any dirk, large knife, pistol or any dangerous weapon, to the fear or terror of any person.
§ 4757. No person shall either publicly or privately carry a dirk, sword-cane, Spanish stiletto, belt or pocket pistol, except a knife, conspicuously on the strap of a shot-pouch, or on a journey to a place out of his county or State.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 50, Image 50 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations of the State. Selling Liquors or Weapons to Minors. § 4864.
Any person who sells, loans or gives to any minor a pistol, bowie-knife, dirk, Arkansas toothpick, hunter's knife, or like dangerous weapon, except a gun for hunting or weapon for defense in traveling, is guilty of a misdemeanor and shall be

66

fined not less than twenty-five dollars, and imprisoned in the county jail at the discretion of the court.

William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 44, Image 44 (1867) available at The Making of Modern Law: Primary Sources.
Police Regulations Of the State. Offences Against Public Peace. Concealed Weapons. §§ 4746-4747.
§ 4746. Any person who carries under his clothes or concealed about his person, a bowie-knife, Arkansas tooth-pick or other knife or weapon of like form and shape or size, is guilty of a misdemeanor. Selling such weapons misdemeanor.
§ 4747. It is a misdemeanor to sell, or offer to sell, or to bring into the state for the purpose of selling, giving away or otherwise disposing of any knife or weapon mentioned in the preceding Section.

James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code Page 108, Image 203 (Nashville, 1871) available at The Making of Modern Law: Primary Sources.
Elections.
§ 2. That it shall not be lawful for any qualified voter or other person attending any election in this State, or for any person attending any fair, race course, or other public assembly of the people, to carry about his person, concealed or otherwise, any pistol, dirk, Bowie-knife, Arkansas toothpick, or weapon in form, shape, or size resembling a Bowie knife or Arkansas tooth-pick, or other deadly or dangerous weapon.
§ 3. That all persons convicted under the second section of this act shall be punished by fine of not less than fifty dollars, and by imprisonment, or both, at the discretion of the court.

Tenn. Pub. Acts (1879), chap. 186, as codified in Tenn. Code (1884). 5533: It shall not be lawful for any person to carry, publicly or privately, any dirk, razor concealed about his person, sword cane, loaded cane, slung-shot or brass knucks, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol used in warfare, which shall be carried openly in hand.

William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix Page 340-341, Image 345-346 (1881) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1. That every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined form ten to fifty dollars, at the discretion of the court, but upon conviction of every such subsequent offense, shall be fined fifty dollars; Provided, however, that no ordinary pocket knife and common walking-canes shall be construed to be deadly weapons.

Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises Page 364-365, Image 372-373 (1893) available at The Making of Modern Law: Primary Sources.

Ordinances of the City of Nashville, § 738.

Every person found carrying a pistol, bowie-knife, dirk-knife, slung-shot, brass knucks, or other deadly weapon, shall be deemed guilty of a misdemeanor, and, upon conviction of such first offense, shall be fined from ten to fifty dollars, at the discretion of the court; but, upon conviction of every subsequent offense, shall be fined fifty dollars; Provided, however, That no ordinary pocket-knife and common walking canes shall be construed to be deadly weapons. . .

## TEXAS

1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons.

§ 1. Be it enacted by the Legislature of the State of Texas, That any person carrying on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense, unless he had reasonable grounds for fearing an unlawful attack on his person, and that such ground of attack shall be immediate and pressing; or unless having or carrying the same on or about his person for the lawful defense of the State, as a militiaman in actual service, or as a peace officer or policeman, shall be guilty of a misdemeanor, and on conviction thereof shall, for the first offense, be punished by fine of not less then than twenty-five nor more than one

Exhibit E_Spitzer
Page 161

hundred dollars, and shall forfeit to the county the weapon or weapons so found on or about his person; and for every subsequent offense may, in addition to such fine and forfeiture, be imprisoned in the county jail for a term not exceeding sixty days; and in every case of fine under this section the fined imposed and collected shall go into the treasury of the county in which they may have been imposed; provided, that this section shall not be so contrued as to prohibit any person from keeping or bearing arms on his or her own premises, or at his or her own place of business, nor to prohibit sheriffs or other revenue officers, and other civil officers, from keeping or bearing arms while engaged in the discharge of their official duties, nor to prohibit persons traveling in the State from keeping or carrying arms with their baggage; provided further, that members of the Legislature shall not be included under the term "civil officers" as used in this act.

§ 2. Any person charged under the first section of this act, who may offer to prove, by way of defense, that he was in danger of an attack on his person, or unlawful interference with his property, shall be required to show that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage; and that the weapon so carried was borne openly and not concealed beneath the clothing; and if it shall appear that this danger had its origin in a difficulty first commenced by the accused, it shall not be considered as a legal defense.

Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879).
Art. 163.
If any person other than a peace officer, shall carry any gun, pistol, bowie knife, or other dangerous weapon, concealed or unconcealed, on any day of election , during the hours the polls are open, within the distance of one-half mile of any poll or voting place, he shall be punished as prescribed in article 161 of the code. Art. 318. If any person in this state shall carry on or about his person, saddle, or in his saddle bags, any pistol, dirk, dagger, slung-shot, sword cane, spear, brass-knuckles, bowie knife, or any other kind of knife manufactured or sold for purposes of offense or defense, he shall be punished by fine . . . in addition thereto, shall forfeit to the county in which he is convicted, the weapon or weapons so carried.

1897 Tex. Gen. Laws 221, An Act To Prevent The Barter, Sale And Gift Of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, Or Knuckles Made Of Any

Exhibit E_Spitzer
Page 162

Metal Or Hard Substance To Any Minor Without The Written Consent Of The Parent Or Guardian Of Such Minor. . ., chap. 155.

That if any person in this State shall knowingly sell, give or barter, or cause to be sold, given or bartered to any minor, any pistol, dirk, dagger, slung shot, sword-cane, spear or knuckles made of any metal or hard substance, bowie knife or any other knife manufactured or sold for the purpose of offense or defense, without the written consent of the parent or guardian of such minor, or of someone standing in lieu thereof, he shall be punished by fine of not less then twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not less than ten nor more than thirty days, or by both such fine and imprisonment and during the time of such imprisonment such offender may be put to work upon any public work in the county in which such offense is submitted.

Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General Character in Force August 7th, Page 220, Image 225 (1899) available at The Making of Modern Law: Primary Sources.
Brandishing | Texas | 1899
Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4.
If any person shall, within the city limits, draw any pistol, gun, knife, sword-cane, club or any other instrument or weapon whereby death may be caused, in a threatening manner, or for the purpose of intimidating others, such person shall be deemed guilty of an offense.

## **UTAH**

Dangerous and Concealed Weapon, Feb. 14, 1888, reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14.
Any person who shall carry and slingshot, or any concealed deadly weapon, without the permission of the mayor first had and obtained, shall, upon conviction, be liable to a fine not exceeding fifty dollars.

Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force 105, 106-7 (1877) (Provo, Utah).
§ 182: Every person who shall wear, or carry upon his person any pistol, or other firearm,
slungshot, false knuckles, bowie knife, dagger or any other dangerous or deadly weapon, is guilty of an offense, and liable to a fine in any sum not exceeding twenty-five dollars; Provided, that nothing in this section, shall be construed to

apply to any peace officer, of the United States, the Territory of Utah, or of this city.[2]

## **VERMONT**

Ordinances of the City of Barre, Vermont
Carrying Weapons, Firing Weapons | Vermont | 1895
CHAPTER 16, § 18.
No person, except on his own premises, or by the consent and permission of the owner or occupant of the premises, and except in the performance of some duty required by law, shall discharge any gun, pistol, or other fire arm loaded with ball or shot, or with powder only, or firecrackers, serpent, or other preparation whereof gunpowder or other explosive substance is an ingredient, or which consists wholly of the same, nor shall make any bonfire in or upon any street, lane, common or public place within the city, except by authority of the city council.
CHAPTER 38, SEC. 7. No person shall carry within the city any steel or brass knuckles, pistol, slung shot, stilletto, or weapon of similar character, nor carry any weapon concealed on his person without permission of the mayor or chief of police in writing.[3]

---

[2] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

[3] See http://www.supremecourt.gov/DocketPDF/18/18-280/99640/20190514123503867_Charles%20Appendix.pdf.

## VIRGINIA

Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803) available at The Making of Modern Law: Primary Sources.

Race and Slavery Based | Virginia | 1792

[An Act to Reduce into one, the Several Acts Concerning Slaves, Free Negroes, and Mulattoes (1792),] §§ 8-9.

§8. No negro or mulatto whatsoever shall keep or carry any gun, powder, shot, club, or other weapon whatsoever, offensive or defensive, but all and every gun, weapon, and ammunition found in the possession or custody of any negro or mulatto, may be seized by any person, and upon due proof thereof made before any Justice of the Peace of the County or Corporation where such seizure shall be, shall by his order be forfeited to the seizor for his own use ; and moreover, every such offender shall have and receive by order of such Justice, any number of lashes not exceeding thirty-nine, on his or her bare back, well laid on, for every such offense.

§ 9. Provided, nevertheless, That every free negro or mulatto, being a house-keeper, may be permitted to keep one gun, powder and shot; and all negroes and mulattoes, bond or free, living at any frontier plantation, may be permitted to keep and use guns, powder, shot, and weapons offensive or defensive, by license from a Justice of Peace of the County wherein such plantation lies, to be obtained upon the application of free negroes or mulattoes, or of the owners of such as are slaves.

The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia Page 897, Image 913 (1887) available at The Making of Modern Law: Primary Sources.

Carrying Weapons | Virginia | 1887

Offences Against the Peace, § 3780. Carrying Concealed Weapons, How Punished. Forfeiture and Sale of Weapons. If any person carry about his person, hid from common observation, any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, he shall be fined not less than twenty nor more than one hundred dollars, and such pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind, shall be forfeited to the commonwealth and may be seized by an officer as forfeited; and upon the conviction of the offender the same shall be sold and the proceeds accounted for and paid over as provided in section twenty-one hundred and ninety: Provided, that this section shall not apply to any police officer, town or city sergeant, constable, sheriff, conservator of the peace, or collecting officer, while in the discharge of his official duty.

72

## WASHINGTON

1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1854
Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30.
Brandishing | Washington | 1859
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife or other dangerous weapon, shall, on conviction thereof, be imprisoned in the county jail not exceeding one year, and be fined in any sum not exceeding five hundred dollars.

1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32.
Brandishing | Washington | 1869
Every person who shall, in a rude, angry or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon, shall on conviction thereof, be imprisoned in the county jail not exceeding one year and be fined in any sum not exceeding five hundred dollars.

1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929.
Carrying Weapons | Washington | 1881
If any person carry upon his person any concealed weapon, he shall be deemed guilty of a misdemeanor, and, upon conviction, shall be fined not more than one hundred dollars, or imprisoned in the county jail not more than thirty days[.]

1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15.
Carrying Weapons | Washington | 1881
[T]o regulate the transportation, storage and sale of gunpowder, giant powder, dynamite, nitro-glycerine, or other combustibles, and to provide or license magazines for the same, and to prevent by all possible and proper means, danger or

73

risk of injury or damages by fire arising from carelessness, negligence or otherwise
. . . to regulate and prohibit the carrying of deadly weapons in a concealed manner;
to regulate and prohibit the use of guns, pistols and firearms, firecrackers, and
detonation works of all descriptions[.]

William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington,
Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956,
Image 731 (Vol. 2, 1897) available at The Making of Modern Law: Primary
Sources.
Brandishing | Washington | 1881
Flourishing Dangerous Weapon, etc. Every person who shall in a manner likely to
cause terror to the people passing, exhibit or flourish, in the streets of an
incorporated city or unincorporated town, any dangerous weapon, shall be deemed
guilty of a misdemeanor, and on conviction thereof shall be punished by a fine in
any sum not exceeding twenty-five dollars. Justices of the peace shall have
exclusive original jurisdiction of all offenses arising under the last two preceding
sections.

1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6,
§ 29, pt. 15.
Carrying Weapons | Washington | 1883
[The city has power] to regulate and prohibit the carrying of deadly weapons in a
concealed manner; to regulate and prohibit the use of guns, pistols, and fire-arms,
fire crackers, bombs and detonating works of all descriptions . . . .

Albert R. Heilig, Ordinances of the City of Tacoma, Washington Page 333-334,
Image 334-335 (1892) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1892
Ordinances of the City of Tacoma, An Ordinance Defining Disorderly Persons and
Prescribing the Punishment for Disorderly Conduct Within the City of Tacoma. All
persons (except police officers and other persons whose duty it is to execute
process or warrants or make arrests) who shall carry upon his person any concealed
weapon consisting of a revolver, pistol or other fire arms or any knife (other than
an ordinary pocket knife) or any dirk or dagger, sling shot or metal knuckles, or
any instrument by the use of which injury could be inflicted upon the person or
property of any other person.

74

Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896 Page 309-310, Image 315-316 (1896) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1896
Ordinances of Spokane, An Ordinance to Punish the Carrying of Concealed Weapons within the City of Spokane, § 1.
If any person within the City of Spokane shall carry upon his person any concealed weapon, consisting of either a revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars, nor more than one hundred dollars and costs of prosecution, and be imprisoned until such fine and costs are paid; provided, that this section shall not apply to police officers and other persons whose duty is to execute process or warrants or make arrests, or persons having a special written permit from the Superior Court to carry weapons

Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897 Page 1956-1957, Image 731-732 (Vol. 2, 1897) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Washington | 1897
Carrying Concealed Weapons, § 7084.
If any person shall carry upon his person any concealed weapon, consisting of either a revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person, shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be fined not less than twenty dollars nor more than one hundred dollars, or imprisonment in the county jail not more than thirty days, or by both fine and imprisonment, in the discretion of the court: Provided, That this section shall not apply to police officers and other persons whose duty it is to execute process or warrants or make arrests.

75

## WEST VIRGINIA

1882 W. Va. Acts 421–22
Carrying Weapons | West Virginia | 1882
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metalic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less that twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one, nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired, and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peacable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment, he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was, in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be construed as to prevent any officer charged with the execution of the laws of the state from carrying a revolver or other pistol, dirk or bowie knife.

1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7.
Carrying Weapons | West Virginia | 1891
If a person carry about his person any revolver or other pistol, dirk, bowie knife, razor, slung shot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor, and fined not less than twenty-five nor more than two hundred dollars, and may, at the discretion of the court, be confined in jail not less than one nor more than twelve months; and if any person shall sell or furnish any such weapon as is hereinbefore mentioned to a person whom he knows, or has reason, from his appearance or otherwise, to believe to be under the age of twenty-one years, he shall be punished as hereinbefore provided; but nothing herein contained shall be so construed as to prevent any person from keeping or carrying about his dwelling house or premises,

76

any such revolver or other pistol, or from carrying the same from the place of purchase to his dwelling house, or from his dwelling house to any place where repairing is done, to have it repaired and back again. And if upon the trial of an indictment for carrying any such pistol, dirk, razor or bowie knife, the defendant shall prove to the satisfaction of the jury that he is a quiet and peaceable citizen, of good character and standing in the community in which he lives, and at the time he was found with such pistol, dirk, razor or bowie knife, as charged in the indictment he had good cause to believe and did believe that he was in danger of death or great bodily harm at the hands of another person, and that he was in good faith, carrying such weapon for self-defense and for no other purpose, the jury shall find him not guilty. But nothing in this section contained shall be so construed as to prevent any officer charged with the execution of the laws of the State, from carrying a revolver or other pistol, dirk or bowie knife.

1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms. . . , ch. 3, § 7, pt. a. Carrying Weapons, Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible, Registration and Taxation | West Virginia | 1925
§ 7 (a). If any person, without a state license therefor, carry about his person any revolver or other pistol, dirk, bowie-knife, slung shot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon of like kind or character, he shall be guilty of a misdemeanor and upon conviction thereof be confined in the county jail for a period of not less than six nor more than twelve months for the first offense; but upon conviction of the same person for the second offense in this state, he shall be guilty of a felony and be confined in the penitentiary not less than one or more than five years, and in either case fined not less than fifty nor more than two hundred dollars, in the discretion of the court. . . .

## WISCONSIN

1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, chap. 6, § 3, pt. 56.
To regulate or prohibit the carrying or wearing by any person under his clothes or concealed about his person any pistol or colt, or slung shot, or cross knuckles or knuckles of lead, brass or other metal or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon and to provide for the confiscation or sale of such weapon.

77

## WYOMING

1884 Wyo. Sess. Laws, chap. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983.
Whoever shall, in the presence of one or more persons, exhibit any kind of fire-arms, Bowie Knife, dirk, dagger, slung-shot or other deadly weapon, in a rude, angry or threatening manner not necessary to the defense of his person, family or property, shall be deemed guilty of misdemeanor, and on conviction thereof, shall be punished by a fine not less than ten dollars, nor more than one hundred dollars, or by imprisonment in the county jail not exceeding six months . . . .

Wyo. Comp. Laws (1876) chap. 35 § 127, as codified in Wyo. Rev. Stat., Crimes (1887) Having possession of offensive weapons. § 1027.
If any person or persons have upon him any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person, every such person, on conviction, shall be fined in any sum not exceeding five hundred dollars, or imprisoned in the county jail not exceeding six months.

A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming Page 131-132; Image 132-133 (1893) available at The Making of Modern Law: Primary Sources.
Carrying Weapons | Wyoming | 1893
Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1.
It shall be unlawful for any person in said city to keep or bear upon the person any pistol, revolver, knife, slungshot, bludgeon or other lethal weapon, except the officers of the United States, of the State of Wyoming, of Carbon County and of the City of Rawlins. § 2. Any person convicted of a violation of the preceding section shall be fined not exceeding one hundred dollars, or imprisoned in the city jail not exceeding thirty days. § 3. Persons not residing in said city shall be notified of this Ordinance by the police or any citizen, and after thirty minutes from the time of notification, shall be held liable to the penalties of this article, in case of its violation. § 4. The city marshal and policemen of the city shall arrest, without warrant, all persons found violating the provisions of this article, and are hereby authorized to take any such weapon from the person of the offender and to imprison the offender for trial, as in case of violations of other Ordinances of said city.

SOURCE:  https://firearmslaw.duke.edu/repository/search-the-repository/

# EXHIBIT F

EXHIBIT F

TRAP GUN RESTRICTIONS[1]

**MARYLAND:**

1910 Md. Laws 521, § 16c.
Sensitive Places and Times | Maryland | 1910
§ 16c. That it shall be unlawful for any person to hunt, pursue or kill any of the birds or animals named in Section 12, 13, 14 and 14A of this Act, or any insectivorous birds (excepting English sparrows), in Allegany County on Sunday, or on election days, and it shall be prima facie evidence of a violation of this Act if any person is found in the fields or woods with on a gun on Sunday or on election days, or to hunt or kill in any trap or destroy any of the birds . . .

**MICHIGAN:**

1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1.
Dangerous or Unusual Weapons | Michigan | 1875
[I]f any person shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, he shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or device so set shall be deemed to be manslaughter.

1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236.
Dangerous or Unusual Weapons | Michigan | 1931
Setting spring guns, etc.–Any person who shall set any spring or other gun, or any trap or device operating by the firing or explosion of gunpowder or any other explosive, and shall leave or permit the same to be left, except in the immediate presence of some competent person, shall be guilty of a misdemeanor, punishable by imprisonment in the county jail not more than one year, or by a fine of not more than five hundred dollars, and the killing of any person by the firing of a gun or device so set shall be manslaughter.

---

[1] Further research may yield additional laws regulating trap guns.

1

## MINNESOTA:

The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota Page 993, Image 287 (Vol. 2, 1873) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Minnesota | 1873

Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65.

§ 64. The setting of a so-called trap or spring gun, pistol, rifle, or other deadly weapon in this state is hereby prohibited and declared to be unlawful.

§ 65. Any person offending against the foregoing section shall be punished as follows: If no injury results therefrom to any person, the person so offending shall be punished by imprisonment in the county jail of the proper county for a period not less than six months, or by fine not exceeding five hundred dollars, or by both fine and imprisonment, at the discretion of the court. If death results to any human being from the discharge of a weapon so unlawfully set, the person so offending shall, upon conviction thereof, be punished by imprisonment in the state prison for a term not exceeding fifteen nor less than ten years. If any person is injured, but not fatally, by the discharge of any weapon so unlawfully set, the person so offending, upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years, in the discretion of the court.

## MISSOURI:

"Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891: "Chillicothe, Mo., Feb. 11 – In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead."[2]

---

[2] See https://bit.ly/3CtZsfk.

## NEW HAMPSHIRE:

1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18.
Dangerous or Unusual Weapons | New Hampshire | 1915
A person who violates a provision of this part is guilty of a misdemeanor and shall be fined as follows . . . [p]rovided, however, that a person violating the prohibition against setting a spring gun the object of which is to discharge a firearm, shall be fined not more than five hundred dollars nor less than fifty dollars, and shall be liable for twice the amount of the damage caused by his act, to be recovered by the person sustaining the injury or loss.

## NEW JERSEY:

1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.
Dangerous or Unusual Weapons | New Jersey | 1771
And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.

## NEW YORK:

"The Man Trap," The Buffalo Commercial, Nov. 1, 1870:  "Coroner Flynn and the jury previously impaneled yesterday morning concluded the inquest on the body of George Tweedle, the burglar, who was shot by the trap-gun in the shop of Joseph J. Agostino . . . .  A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter.  The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow. . . . The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by Joseph D. Agostino.  As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent

person, the jury censured Agostino.  He will not be released, however, but will be held under $2,000 bail."[3]

**NORTH DAKOTA:**

1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1.
Dangerous or Unusual Weapons | North Dakota | 1891
That it shall be unlawful for any person or persons to kill, ensnare or trap in any form or manner, or by any device whatever, or for any purpose, any buffalo, elk, deer, antelope or mountain sheep between the 1st day of January and the 1st day of September of each and every year. And it shall be unlawful for any person or persons, at any time, to use or employ any hound or dogs of any kind in running or driving any buffalo, elk, deer, antelope or mountain sheep, or to set any gun or guns or gun trap to be discharged upon or by, any buffalo, elk, deer, antelope or mountain sheep as driven or pursued in any manner whatever.

The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the Amendments Thereto Page 1259, Image 1293 (1895) available at The Making of Modern Law: Primary Sources.
Dangerous or Unusual Weapons | North Dakota | 1895
Setting Spring Gun, Trap or Device. Every person who sets any spring or other gun or trap or device operating by the firing or exploding of gunpowder or any other explosive, and leaves or permits the same to be left, except in the immediate presence of some competent person, shall be deemed to have committed a misdemeanor; and the killing of any person by the firing of a gun or other device so set shall be deemed to be manslaughter in the first degree.

**OREGON:**

1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2.
Dangerous or Unusual Weapons | Oregon | 1925
§ 1. It shall be unlawful for any person to place or set any loaded spring-gun or set-gun, or any gun or firearm or other device of any kind designed for containing or firing explosives in any place whatsoever where the same may be fired, exploded or discharged by the contract of any person or animal with any string, wire, rod,

---

[3] See https://bit.ly/3yUSGNF.

4

stick, spring or other contrivance affixed thereto or connected therewith or with the trigger thereof.

§ 2. Any person who shall violate any of the provisions of this act shall be deemed guilty of a misdemeanor and shall be punished by a fine of not less than $100 nor more than $500, or by imprisonment in the county jail not less than thirty days nor more than six months, or by both such fine and imprisonment; provided, however, that this act shall not apply to any loaded spring-gun or set-gun or firearm or any device placed for the purpose of destroying gophers, moles or other burrowing rodents.


**RHODE ISLAND:**

1890 R.I. Pub. Laws 17, An Act In Amendment Of And IN Addition to Chapter 94 Of The Public Statutes Of Birds, § 6;
1892 R.I. Pub. Laws 14, An Act In Amendment Of Chapter 92 Of The Public Statutes, Entitled "Of Firearms And Fireworks, § 6.
Hunting | Rhode Island | 1890, 1892
§ 6. Every person who shall at any time of year, take, kill or destroy any quail or partridge, by means of any trap, snare, net or spring, or who shall construct, erect, set, repair, maintain or tend any trap, snare, net, or spring for the purpose of taking, killing or destroying any quail or patridge, or who shall shoot any water fowl by means or by the use of any battery, swivel, punt or pivot gun, shall be fined for each offence, twenty dollars. Provided, however, that at such seasons as the taking, killing or destroying of such birds is prohibited by this chapter, any person may snare on his own land.

**SOUTH CAROLINA:**

Edmund William McGregor Mackey, The Revised Statutes of the State of South Carolina, Prepared by Commissioners under an Act of the General Assembly, Approved March 9, 1869, to Which is Prefixed the Constitution of the United States and the Constitution of South Carolina Page 404, Image 482 (1873) available at The Making of Modern Law: Primary Sources.
Hunting | South Carolina | 1855
Hunting, General Provisions, § 21.
That it shall not be lawful for any non-resident of this State to use a gun, set a trap or decoy, or to employ any other device for killing or taking deer, turkeys, ducks or other game, not to set a trap, seine, or net, or draw or use the same, or any other contrivance for taking or killing fish, within the territorial limits of this State.

5

1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1.
Dangerous or Unusual Weapons | South Carolina | 1931
Be it enacted by the General Assembly of the State of South Carolina: That it shall be unlawful for any person, firm, or corporation to construct, set, or place a loaded trap gun, spring gun, or any like device in any manner in any building, or in any place within this State, and any violation to the provisions of this Act shall be deemed a misdemeanor and punished by fine of not less than One Hundred ($100.00) Dollars and not more than Five Hundred ($500.00) Dollars, or by imprisonment of not less than thirty (30) days nor more than one (1) year, or by both fine and imprisonment, in the discretion of the Court.

**SOUTH DAKOTA:**

1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22.
Hunting | South Dakota | 1909
§ 21. No person shall at any time catch, take or kill any of the birds or animals mentioned in this chapter in any other manner than by shooting them with a gun held to the shoulder of the person discharging the same.
§ 22. No person shall at any time set, lay or prepare or have in possession, any trap, snare, artificial light, net, bird line, swivel gun or set gun or any contrivance whatever for the purpose of catching, taking or killing any of the same animals or birds in this chapter mentioned, except that decoys and stationary blinds may be used in hunting wild geese, brant and ducks. The use of rifles in the hunting of said birds is prohibited.

**UTAH:**

An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866).
Sentence Enhancement for Use of Weapon | Utah | 1865
§ 102. If any person maliciously injure, deface or destroy any building or fixture attached thereto, or wilfully and maliciously injure, destroy or secrete any goods, chattels or valuable paper of another, or maliciously, prepare any dead fall, or dig any pit, or set any gun, or arrange any other trap to injure another's person or

6

property, he shall be imprisoned not more than one year, or fined not exceeding five hundred dollars, or both fined and imprisoned at the discretion of the court; and is liable to the party injured in a sum equal to three times the value of the property so destroyed or injured or damage sustained, in a civil action.

1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.  Dangerous or Unusual Weapons | Utah | 1901

§ 1. Infernal machine defined. That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.

§ 2. That every person who delivers or causes to be delivered, to any express or railway company or other common carrier to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature therof, or sends the same through mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.

§ 3. Penalty for constructing or having in possession – That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

## **VERMONT:**

1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1
Dangerous or Unusual Weapons | Vermont | 1884

A person who sets a spring gun trap, or a trap whose operation is to discharge a gun or firearm at an animal or person stepping into such trap, shall be fined not less than fifty nor more than five hundred dollars, and shall be further liable to a person suffering damage to his own person or to his domestic animals by such traps, in a civil action, for twice the amount of such damage. If the person injured dies, his

<div align="center">7</div>

personal representative may have the action, as provided in sections two thousand one hundred and thirty-eight and two thousand one hundred and thirty-nine of the Revised Laws.

1912 Vt. Acts and Resolves 261
Dangerous or Unusual Weapons | Vermont | 1912
. . . and provided further that a person violating the prohibition against setting a spring gun or other device the object of which is to discharge a firearm shall be fined not more than five hundred dollars nor less than fifty dollars, and shall also be liable for twice the amount of the damage caused by his act to be recovered by the person sustaining the injury or loss, in an action on this section.


## WASHINGTON:

1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3.
Dangerous or Unusual Weapons | Washington | 1909
§ 266. Setting Spring Guns. Every person who shall set a so-called trap, spring pistol, rifle, or other deadly weapon, shall be punished as follows: 1. If no injury result therefrom to any human being, by imprisonment in the county jail for not more than one year or by a fine of not more than one thousand dollars, or by both. 2. If injuries not fatal result therefrom to any human being, by imprisonment in the state penitentiary for not more than twenty years. 3. If the death of a human being results therefrom, by imprisonment in the state penitentiary for not more than twenty years.

8

## WISCONSIN:

David Taylor, The Revised Statutes of the State of Wisconsin, as Altered and Amended by Subsequent Legislation, Together with the Unrepealed Statutes of a General Nature Passed from the Time of the Revision of 1858 to the Close of the Legislature of 1871, Arranged in the Same Manner as the Statutes of 1858, with References, Showing the Time of the Enactment of Each Section, and Also References to Judicial Decisions, in Relation to and Explanatory of the Statutes Page 1964, Image 859 (Vol. 2, 1872) available at The Making of Modern Law: Primary Sources.

Dangerous or Unusual Weapons | Wisconsin | 1872

Offenses Cognizable Before Justices, Miscellaneous. § 53. Any person or persons in this State who shall hereafter set any gun, pistol or revolver, or any other firearms, for the purpose of killing deer or any other game, or for any other purpose, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined in a sum not exceeding fifty dollars, and shall be imprisoned in the county jail of the proper county for a term of not less than twenty days.

1921 Wis. Sess. Laws 870, An Act . . . Relating to Wild Animals, ch. 530, § 1. Hunting | Wisconsin | 1921

(29.22)(1) No person shall hunt game with any means other than the use of a gun held at arm's length and discharged from the shoulder; or place, spread or set any net, pitfall, spring gun, pivot gun, swivel gun, or other similar contrivance for the purpose of catching, or which might catch, take or ensnare game . . . and no person shall carry with him in any automobile any gun or rifle unless the same is unloaded, and knocked down or unloaded and inclosed within a carrying case[.]

# E     IBIT G

Case 3:17-cv-01017-BEN-JLB   Document 118-9   Filed 11/10/22   PageID.8998   Page 229 of 230

The Buffalo Commercial (Buffalo, New York) · Tue, Nov 1, 1870 · Page 4

https://www.newspapers.com/image/264632378

Downloaded on Aug 8, 2022

gentleman will now be brought to a summary conclusion.

## THE MAN TRAP.

### Inquest on the Body of Tweedle, the Burglar, Blown to Pieces by a Gun-Trap.

#### From the N. Y. Standard, Oct. 20th.

Coroner FLYNN and the jury previously impanelled yesterday morning concluded the inquest on the body of GEORGE TWEEDLE, the burglar, who was shot by the trap-gun in the shop of JOSEPH J. AGOSTINO, at No. 301 East Twenty-third street, on Wednesday morning. AGOSTINO and many of his friends were present, and some few of the intimates of the deceased also looked on with interest. The first and only witness examined was Officer OLIVER WINSHIP, of the Eighteenth Precinct. He testified that early that morning, before seven o'clock, he was informed that the body of a man was lying in the back-yard of AGOSTINO's gun-shop. He went there and found the body as described. The hat, shown to the jury, he identified as the one found lying beside the body, having evidently been worn by the burglar. It was a round black felt hat, and its tattered and riddled appearance showed how terrible must have been the charge in the weapon. It was filled with little holes made by small shot, and the whole top had been blown open. The chisel and piece of stick were also shown. The officer found a hole in one of the shutters of the rear window, which looked as if an attempt had been made to pry it open. A Springfield musket was fastened to the sill, inside, with the muzzle three inches from the shutter. The other end of the barrel rested on a block of wood, and one end of a string was tied to the hammer, passed over a small pulley, and the other end fastened to the shutter, so that, on opening the latter, the discharge would follow.

Nothing further was elicited from this witness, and the case was here rested, there being no more testimony. The jury retired, and in a short time returned with a verdict setting forth the cause of death to have been a musket shot wound from a weapon placed as a trap by JOSEPH D. AGOSTINO. As there is a statute against the use of such infernal machines, which might cause loss of life to some innocent person, the jury censured AGOSTINO. He will not be released, however, but will be held under $3,000 bail.

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers

Newspapers
by ancestry
https://www.newspapers.com/image/513456592

The South Bend Tribune (South Bend, Indiana) · Wed, Feb 11, 1891 · Page 3

Downloaded on Aug 8, 2022

## Shot by a Trap-Gun.

CHILLICOTHE, Mo., Feb. 11.— In the circuit court George Dowell, a young farmer, was fined $50 under an old law for setting a trap-gun. Dowell set the gun in his corn-crib to catch a thief, but his wife was the first person to visit the crib and on opening the door was shot dead.

Copyright © 2022 Newspapers.com. All Rights Reserved.

Newspapers

# EXHIBIT 14

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
    300 South Spring Street, Suite 1702
5   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6177
6   Fax: (916) 731-2144
    E-mail:  Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
8  *State of California*

9                IN THE UNITED STATES DISTRICT COURT

10            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                          CIVIL DIVISION

12

13  | | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,** | 17-cv-1017-BEN-JLB **DECLARATION OF MICHAEL VORENBERG** |
| Plaintiffs, | Courtroom:     5A<br>Judge:          Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |
| **v.** | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,** | |
| Defendants. | |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF MICHAEL VORENBERG

I, Michael Vorenberg, declare under penalty of perjury that the following is true and correct:

1.    I am an associate professor of history at Brown University.  I make this declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of September 26, 2022.

2.    This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.    I received my A.B. from Harvard University in 1986, and my Ph.D. in history from Harvard in 1995.  After receiving my Ph.D., I began a postdoctoral fellowship at the W.E.B. Du Bois Institute at Harvard, and then served as an assistant professor of History at the State University of New York at Buffalo.  I joined the faculty at Brown University in 1999, and have taught history there ever since.

4.    I have concentrated my research on the history of the U.S. Civil War and Reconstruction.  My first book, *Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*, was published by Cambridge University Press in 2001.  The book was a Finalist for the Gilder Lehrman Lincoln Prize.  I am also the author of *The Emancipation Proclamation: A Brief History with Documents*, published by Bedford/St. Martin's in 2010.  I am the author of a number of articles and essays on Reconstruction and the law.  These include: "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Southern Illinois University Press, 2018); Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of*

1

1     *the Thirteenth Amendment* (Columbia University Press, 2010); "Reconstruction as a

2     Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions*

3     *in the History of Postbellum America* (Oxford University Press, 2006); and

4     "Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (Dec.

5     2005), 416-26. I have provided expert witness testimony in *Miller v. Bonta*, No.

6     3:19-cv-01537-BEN-JLB (S.D. Cal.).

7           5.      My curriculum vitae is attached as Exhibit A.

8           6.      I have been retained by the California Department of Justice to serve

9     as an expert witness in this case.  I am being compensated at a rate of $250 per

10     hour.

**OPINIONS**

11

12     **I.**    **Summary**

13           7.      This declaration provides results of an investigation into the existence,

14     usage, and regulation of high-capacity firearms (guns capable of firing more than

15     10 rounds without re-loading) during the Reconstruction period of U.S. History

16     (1863-1877), with special focus on the period during Reconstruction when the

17     Fourteenth Amendment to the U.S. Constitution was created, ratified, and enforced

18     (1866-1876).  The result of the investigation can be summarized as follows:  There

19     were high-capacity firearms during Reconstruction, and all of them, including those

20     that could easily be carried by a single individual, were regarded in all the states at

21     the time as weapons suitable only for law enforcement officers, not for ordinary

22     citizens.  With very few exceptions, almost all of which were in the Western

23     Territories, high-capacity firearms during the era were understood to be weapons of

24     war or anti-insurrection, not weapons of individual self-defense.

25           8.      Evidence for these assertions does not necessarily take the form of

26     statutes or court decisions, and that is entirely unsurprising:  explicit legal text

27     prohibiting civilian possession of the most dangerous weapons of war was not

28     commonly the means by which such weapons were regulated in the United States

during the Civil War and Reconstruction.[1]  Rather, prohibitions existed in the policies and practices of the U.S. army and its auxiliary or allied units, such as the state-wide militias that operated as law enforcement bodies during Reconstruction. No statutes or court opinions can be found during the period that banned civilian possession of artillery pieces, hundreds of which existed unused after the Civil War, but of course the absence of such express prohibitions cannot be read as evidence that civilians were allowed to possess such pieces.  Rather, policy and practice dictated that only the U.S. army and its allied military units could possess such weapons.  High-capacity firearms, which like artillery pieces were created as weapons of war, were regulated in the same way, through policy and practice limiting possession of such firearms to the U.S. army and its allied military units. Unlike artillery pieces, however, high-capacity firearms during Reconstruction did come to be regarded by their manufacturers as having a potential market among U.S. civilians.

9.      However, efforts to create a market for high-capacity firearms in the United States during Reconstruction failed miserably.  Americans who were not part of legal law enforcement bodies rarely bought high-capacity firearms.  One reason why these firearms failed to sell was the regulatory climate surrounding them.  U.S. and pro-Union state authorities sometimes seized shipments of such weapons on the assumption that they were intended for use by insurrectionary groups.  Because of the negligible demand for such weapons, owners of gun shops rarely stocked them.  The primary, almost exclusive buyers of high-capacity weapons during Reconstruction were a small number of U.S. army units and state law enforcement bodies.  Manufacturers of high-capacity firearms during Reconstruction thus looked outside the United States for buyers.  The Winchester Repeating Rifle Company, the only company to produce such weapons during post-

---

[1] In contrast, state and local laws did regulate other types of weapons, such as concealable weapons associated with criminal use, during this period.

Civil War Reconstruction, stayed afloat during Reconstruction only by selling high-capacity firearms to foreign armies.

10.    During Reconstruction, high-capacity firearms did not circulate widely among the civilian population; thus there was no need for legislative efforts to regulate them among civilians.  Instead, during Reconstruction, high-capacity firearms were possessed almost exclusively by the U.S. army and related military units, and they were regulated by the policies and practices of the army and these related military units.

**II.    SCOPE**

   **A.    Time Period Covered**

11.    The time period covered by this declaration is Reconstruction, typically defined as 1863-1877.  This is the time period assigned to Reconstruction in the most commonly used study of the period, Eric Foner's *Reconstruction*.[2]  The start point of 1863 correlates to the Emancipation Proclamation, the final version of which was signed by President Abraham Lincoln on January 1, 1863.  The endpoint correlates to March 1877, when a new president, the Republican Rutherford B. Hayes, was inaugurated after a months-long contested election; and Hayes, once in office, oversaw the removal of all remaining U.S. troops in southern states that had been part of the Confederate States of America, the rebellious entity that had fought the United States during the Civil War of 1861-1865.  Within the general period of Reconstruction, the more narrow time period examined in this declaration is 1866-1876.  This is the period covering events relevant to the relationship between the Fourteenth Amendment and firearms during the greater period of Reconstruction.  Such events include (in chronological order):  the passage by the U.S. Congress of the Civil Rights Act of 1866 and the new Freedman's Bureau Act (the initial Freedman's Bureau Act, passed in March 1865, was for one year only); the passage

_____

[2] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Harper and Row, 1988), xxvii.

1  of the Fourteenth Amendment by Congress in 1866; the passage by Congress of the

2  Reconstruction Act of 1867 (sometimes referred to as the "Military Reconstruction

3  Act"); the adoption of the Fourteenth Amendment by state ratification in 1868; the

4  enforcement of the Fourteenth Amendment by U.S. Statutes adopted in 1870-71;

5  and the first interpretation of the Fourteenth Amendment's relation to the Second

6  Amendment by the U.S. Supreme Court, in *U.S. v. Cruikshank* of 1876 (92 U.S.

7  542).  This declaration also mentions the opinion in *Presser v. Illinois* (116 U.S.

8  252 (1886)), even though it came well after Reconstruction, because the events that

9  led to the case occurred in early 1879, very soon after the end of Reconstruction.

10       **B.    Geographical Focus**

11       12.    This declaration covers the geographic area of the entire United States,

12  both its states and territories, during Reconstruction.  However, its particular

13  regional focus is on the southern states that had declared themselves seceded in

14  1860-61 and had joined together into the Confederacy by April 1861.  These states

15  collectively represented the region during 1866-1876 where there was the most

16  frequent use of firearms, mainly because of armed conflict either between

17  contending factions within these states or between the U.S. army and insurgents in

18  these states.  Even more specifically, this was the only region outside of the

19  Western Territories where Henry Rifles and Winchester Repeating Rifles were

20  used.  As will be explained later, these are the weapons examined most closely in

21  this declaration (see IV. Historical Background and Terminology).  In the Western

22  Territories during Reconstruction, these weapons were used primarily by the U.S.

23  army against Native Americans in the so-called "Indian Wars" that extended from

24  the 1860s to the 1890s.  Some civilian U.S. citizens in the Western Territories

25  during this period also possessed these weapons.  However, as with all firearms in

26  the region at the time, it is difficult to determine how common possession of Henry

27  Rifles and Winchester Repeating Rifles was in the Western Territories in the

28  Reconstruction period.  Also, laws in these territories in this period were in flux, so

1    it is difficult to know whether possession by civilian U.S. citizens there was lawful.

2    Whatever the laws were at any given moment in this region during Reconstruction,

3    the number of non-army U.S. citizens in the Western Territories was always

4    negligible.

5    **III.   RESEARCH MATERIALS AND METHODOLOGY**

6            13.    Research materials included standard scholarly works on firearms and

7    U.S. history for the period of Reconstruction—roughly twenty scholarly books and

8    thirty scholarly articles.  Materials also included newspaper and magazine articles

9    contemporary to the period studied.  Hundreds of these are accessible and were

10   accessed via commonly used databases by scholars, such as Chronicling America,

11   Pro-Quest Historical Newspapers, and the Hathi Trust. U.S. government documents

12   and documents from U.S. states and territories were accessed via the Hein Online

13   database or the Nexis Uni database (a version of the better-known Lexis Nexis legal

14   database).

15           14.    All of these documents, whether contemporary to the period studied or

16   produced by scholars after that period, were searched for information regarding

17   firearms—especially Henry Rifles and Winchester Repeating Rifles—with special

18   attention to the presence, use, and regulation of these firearms during the

19   Reconstruction era (1863-1877).

20           15.    In all my research, I gave more weight to evidence that attested to

21   firearms being owned and/or used than to evidence that manufacturers of the

22   firearms or other sellers were trying to get people to buy and use them.

23   Advertisements for the firearms are not evidence of possession.  However, if

24   advertising material provided testimony of the firearms being owned or used, I

25   treated that testimony as legitimate evidence, albeit evidence that might have been

26   embellished, even invented, for the sake of sales.

27

28

**IV.    HISTORICAL BACKGROUND AND TERMINOLOGY**

**A.    Firearm Capacity at or near the Founding**

16.   Weapons capable of holding more than ten rounds did exist by the time that the Second Amendment was adopted in 1791, but only in very small numbers, and almost exclusively in Europe.  Those that might have existed in the U.S. at the time were made to order by individual gunsmiths for individual customers.  These bespoke weapons were extraordinarily rare in the United States surrounding the period of the adoption of the Second Amendment.

17.   One of these rare guns was the "Cookson" or "Hill" model, based on the "Lorenzoni system" established in Europe in the 1600s.  Only one gun of this type definitively existed in early America; it was an 11-shot rifle mentioned in an account of 1722 from Boston.  Even if others of this type existed in British North America, they would not have been well known.  According to one expert, the slightest defect in these weapons would lead to an explosion, so they required perfect construction by "fine craftsmen."  Thus, only "wealthy sportsmen" could afford them.[3]

18.   Another rare high-capacity gun of the era was the Girardoni (or Girandoni) air rifle, which could hold at least 20 rounds.  The Girardoni was manufactured exclusively in Europe.  Most of the guns manufactured were custom-ordered in the late 1700s by the Austrian army, which used the weapons with some success.  To maintain a military advantage, the Austrians demanded that the guns be manufactured in secret.[4]  No Girardoni is known to have appeared in America prior to 1800.  There were about 30-40 guns on the Lewis and Clark expedition of 1804-1806, including a single Girardoni. Expedition leaders used it not for self-defense or hunting but for one purpose only: to impress Native Americans with

---

[3] Harold L. Peterson, *Arms and Armor in Colonial America (New York: Bramhall House*, 1956), 215-17.

[4] W. H. B. Smith, *Gas, Air and Spring Guns of the World* (Harrisburg, Penn.: Military Service Publishing Company, 1957). 30.

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1   white Americans' advanced technology.[5]  Its presence on the expedition is not

2   evidence that the gun was well-known to Americans of the period, much less to

3   Americans at the time of the Second Amendment's adoption more than ten years

4   earlier.

5        19.  The final example of a high-capacity gun of the era was the "Belton,"

6   though this gun held fewer than ten rounds. Joseph Belton, who traveled between

7   Philadelphia and England, owned a nine-shot repeating gun.  It had almost certainly

8   been produced in England in 1758.  In 1777, during the American Revolution,

9   Belton demonstrated the gun to seven Americans known for their military or

10  technical expertise.  They supported his petition to the Continental Congress of an

11  order of 100 similar weapons to be delivered by Belton.  Congress soon canceled

12  the order because of the extraordinary expense Belton demanded.  An expert on the

13  "Belton" gun has come to the conclusion that of the 100 guns initially ordered,

14  "none was ever made."[6]

15       **B.    The Henry Rifle and the Winchester Repeating Rifle**

16       20.    For the purposes of this declaration, a high-capacity firearm is defined

17  as a firearm that can hold more than 10 rounds.  The magazine holding the rounds

18  can either be integral to the gun or external to it.  The gun itself can be carried by a

19  single person.  Finally, the gun must have the potential for common usage:  it has to

20  be mass-manufactured or have the potential to be mass-manufactured, thus

21  excluding experimental weapons that were never widely adopted.

22

---

23       [5] Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla.:
24  Arthur H. Clark, 2012), 94; S. K. Wier, "The Firearms of the Lewis and Clark
     Expedition" (2010),
25  http://www.westernexplorers.us/Firearms_of_Lewis_and_Clark.pdf (accessed Nov.
     7, 2022).
26       [6] Robert Held, *The Belton Systems, 1758 and 1784-86: America's First
     Repeating Firearms* (Lincoln, R.I.: Andrew Mowbray, 1986), 33-39 (quote at 39).
27  The prototype gun from 1758 that is believed to have been Belton's is preserved at
     the National Museum of American History; see
28  https://americanhistory.si.edu/collections/search/object/nmah_440031 (accessed
     Nov. 7, 2022).

1      21.    Within these specifications, there were only two high-capacity

2  firearms in the entire world that were produced during Reconstruction: the Henry

3  Rifle and the Winchester Repeating Rifle.  I note the exclusion here of the Gatling

4  Gun.  That weapon was indeed a high-capacity firearm produced during

5  Reconstruction, but it could not be carried by a single person, as it was massive in

6  size and nearly 200 pounds in weight.

7      22.    The Henry Rifle and the Winchester Repeating Rifle were nearly the

8  same weapon.  Manufacturing of the Henry began soon after the weapon was

9  patented, in 1860.  In 1866, the Winchester Repeating Rifle was established in New

10  Haven, Connecticut.  Its owner, Oliver Winchester, hired the inventor of the Henry,

11  who designed a slightly modified version of the Henry Rifle.  The new model was

12  dubbed a Winchester Repeating Model.  Because it was released in 1866, it was

13  sometimes called the "Winchester 66."  In 1873, a new model of Winchester was

14  released, the "Winchester 73."  The rifle was nearly the same as the "Winchester

15  66" but used a slightly different type of ammunition.  All of these rifles, the Henry

16  and the two models of the Winchester, had the following features: they held fifteen

17  rounds in a chamber fixed within a stock just below the rifle barrel; they used a

18  lever below the trigger to eject spent shells and load new rounds; and they were

19  easily reloaded.  The Winchester was easier to reload than the Henry—it had a

20  "gate" on the side near the trigger that allowed the user to feed rounds into the gun

21  during lulls in firing or after all the rounds in the chamber were spent).

22  Advertisements for Henrys and Winchesters claimed that the weapons could fire

23  two rounds per second (this rate might have been exaggerated—some of the same

24  ads made the false claim that the guns held eighteen rounds, not fifteen—but all

25  agreed that the rifle could fire at a rate at least as fast as any existing rifle).

26      23.    There were other individual-use weapons during the Reconstruction

27  era that could fire multiple shots in rapid sequence, but none had a higher capacity

28  than ten rounds.  Some sidearms, most notably six-shot revolvers, could fire rounds

in rapid sequence.  But no sidearm held more than ten rounds.  Certain rifles beside the Henry and Winchester could fire multiple rounds rapidly, but none held more than ten rounds. These included the Spencer Rifle (4-round capacity) and the Sharps Rifle (7-round capacity).  The U.S. army and the Confederate army approved the adoption of the Spencer and Sharps rifles.  These weapons were known either by their company name or by the generic term "repeaters" or "repeating rifles."  Henrys and Winchesters were also repeating rifles, but because they were in a class of their own, due to their high capacity, they were generally known only as Henrys or as Winchesters.  In the language of the day, they did not fall into the generic category of "repeaters" or "repeating rifles" (thus a very well-armed individual of the period might be described as having "a revolver, a repeater, and a Winchester"—three distinct categories).

24.    This declaration occasionally uses the term "Henry-Winchester." Although the Winchester Repeating Rifle effectively replaced the Henry Rifle, Henry Rifles continued to be used long after Winchesters began to be produced.  At certain times and places during Reconstruction, both types of weapons might be found in possession of a single, armed group.  For such situations, the phrase "Henry Rifles and/or Winchester Repeating Rifles" would be appropriate, but seeing how cumbersome that phrase is, it has been shortened in this declaration to "Henry-Winchester" or "Henry-Winchesters."

### C.    The Henry Rifle and the American Civil War

25.    Production and sales numbers reveal that Henry Rifles and their successors, Winchester Repeating Rifles, were uncommon during the Civil War and Reconstruction compared to other rifles.[7]  Until 1866, manufacturers of Henrys and

---

[7] Unless otherwise noted, this declaration relies on two sources for numbers of Henry Rifles and Winchester Repeating Rifles manufactured and sold:  Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); and John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955).

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

Winchesters concentrated their marketing efforts within the United States on trying to persuade the U.S. army and pro-Union state militias to adopt the high-capacity rifles as standard weapons for soldiers.[8]  The U.S. War Department never adopted Henry-Winchesters.  The army's chief of ordnance, General James Ripley, reported early in the war that these rifles, along with lower-capacity rifles were "too complicated, too heavy, and too costly . . . and apt to waste ammunition."[9]  The ordinance department never changed its position on Henry-Winchesters.  During the Civil War, the U.S. army opted instead for single-shot rifles and, in some instances, low-capacity "repeaters" (rifles that held magazines of two to seven rounds).  The U.S. army did allow individual commanders of army units or allied units to buy Henry-Winchesters for their soldiers.  For example, of the 900 Henry rifles sold during 1862, 300 went to Kentucky's pro-Union state militia.[10]  Although some military units that purchased Henry Rifles were able to do so using funds allotted to them by state governments, most of the soldiers and officers who purchased the weapons used their own money.  By the end of the Civil War in 1865, U.S. soldiers had purchased about 8,500 Henry Rifles; most of those had been bought with the soldiers' own money.  By contrast, the U.S. government had purchased nearly 107,000 Spencer single-shot rifles for use by the army.[11]

26.     Meanwhile during the Civil War, the Confederate War Department also never adopted Henry Rifles.  Whether that was by choice is unclear. Oliver Winchester, who had the greatest control of the company that made Henrys, declared that he did not want the weapons sold to Confederates.  His policy may have been due to pure loyalty to the Union cause or to fear that he would be

---

[8] Haag, *The Gunning of America*, 65-81.  During the Civil War, the pro-Union border states of Kentucky and Missouri had state-wide militias that were authorized by state governments to fight for the Union.

[9] Haag, *The Gunning of America*, 70.

[10] Haag, *The Gunning of America*, 76.

[11] Haag, *The Gunning of America*, 81.

(continued…)

11

1    charged with treason by the U.S. government if he facilitated gun sales to the

2    rebels.  Some Confederate soldiers were able to acquire Henrys by theft or by using

3    agents who purchased them in the North and smuggled them to the South.[12]  Most

4    Confederates knew about the weapon.  A widely-circulated story told of a

5    Confederate soldier who called the gun "that damned Yankee rifle that can be

6    loaded on Sunday and fired all week."  One of the soldiers in Robert E. Lee's Army

7    of Northern Virginia regretted that "we never did secure the Winchester."[13]  Some

8    Confederate soldiers did manage to obtain Henry-Winchesters, either by smuggling

9    or, more commonly, by confiscating them from captured Union soldiers.  In late

10   1862, for example, a number of pro-Union Kentucky soldiers who had just acquired

11   Henry Rifles were overrun by pro-Confederate Kentuckians and Tennesseans.  As

12   many as 300 Henry rifles ended up in Confederate hands as a result.[14]  These

13   weapons probably did not stay with the southerners for very long.  By June 1865,

14   all of the major Confederate armies had surrendered.  Typically, surrender required

15   all Confederate soldiers to "stack arms."  If they had sidearms, they could keep

16   them, but any rifles had to be relinquished.  Confederate veterans would thus have

17   been prohibited from having Henry-Winchesters.  At least some ex-Confederate

18   soldiers ended up with Henry-Winchesters, however, though not legally.  If they

19   failed to turn in their rifles, they were in violation of the "parole" agreement that

20   protected them from imprisonment after surrender.  Some ex-Confederates

21   managed to get Henry-Winchesters by stealing them from U.S. army depots.

22   Others bought them from smugglers who had gotten the weapons in Mexico and

23   then carried them across the border to Texas.  Henry-Winchesters were easier to

24   _____

25   [12] Haag, *The Gunning of America*, 65.  For evidence that U.S. authorities would have regarded the sale of Henrys to Confederates as treasonous, and thus that Winchester had good reason to avoid such sales, see Haag, *The Gunning of America*, 90.

27   [13] Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38.

28   [14] Haag, *The Gunning of America*, 76.

12

1  find in Mexico than in the U.S. in 1864-1867.  They had been sold by the thousands
2  to the Juaristas, the rebel force that would ultimately wrest Mexico from
3  Maximilian, the self-proclaimed "Emperor" installed in Mexico City by Napoleon
4  III of France.

5      27.    Not only the Juaristas but other non-U.S., non-Confederate armies
6  possessed Henry-Winchesters.  Indeed, foreign armies were the main market for
7  Henry-Winchester manufacturers during Reconstruction.  Had it not been for the
8  war in Mexico, along with the Franco-Prussian War and the various armed conflicts
9  between the Russian and Ottoman empires—all wars involving thousands of
10  Henry-Winchesters—the manufacturers of these weapons would likely have gone
11  bankrupt.[15]

12      28.    In the United States by 1866, Henry-Winchesters did exist, to be sure,
13  but in much smaller numbers than in foreign countries.  U.S. veterans of the Civil
14  War could possess Henry rifles.  Beginning in May 1865, U.S. army volunteers
15  began mustering out in significant numbers.  The non-regular U.S. army (that is, the
16  volunteer force), nearly a million strong by April 1865, would fall well below
17  100,000 by the end of the year.  Unlike ex-Confederate soldiers, ex-U.S. soldiers
18  could keep their rifles upon discharge.  This meant that U.S. soldiers at the time
19  who had Henry rifles might continue to possess them once they re-entered civilian
20  life. However, the number of such U.S. veterans who kept their Henrys was small,
21  perhaps 7,500,[16] and those that opted to keep them paid dearly.  The U.S. army did
22  not simply give weapons away for free to discharging soldiers who had acquired

23      _____
    [15] Haag, *The Gunning of America*, 109-42.

24      [16] The figure of 7,500 Henrys kept by pro-Union soldiers after the war is
    reached in the following way. 8,500 had been purchased by or for U.S. soldiers. See
25  Haag, *The Gunning of America*, 81.  Of these, roughly 2,000 were purchased for
    soldiers (based on a count of regiments known to have bought the rifles with public
26  funds).  Thus 6,500 Henrys were privately owned by soldiers.  Of the roughly 2,000
    Henrys purchased for soldiers, 808 were known to have been bought by the soldiers
27  at the end of the war.  See 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance
    Stores," *U.S. Congressional Serial Set* (1871), pp. 167-172.  Thus, a generous
28  estimate of how many U.S. veterans had Henrys after the war is 7,500.

1     them at no cost from their military units.  Rather, soldiers wanting to keep their

2     weapons had to buy them at market value.  A Spencer carbine (a short-barreled,

3     repeating rifle, and one of the most popular weapons among U.S. soldiers), would

4     cost a discharging soldier about $10 (roughly $175 in 2022 dollars).  A Henry

5     would cost at least $30 (roughly $525 in 2022 dollars).  A private in the U.S. army

6     typically made $13 per month.  If he had a Spencer that he wanted to buy, he would

7     have to pay less than one month's wages—not a bad deal for a perfectly sound and

8     popular rifle.  If he wanted to buy a Henry, though, that would cost him more than

9     two months' wages, and there would be little to persuade him that the difference in

10     price corresponded to the difference in value.  The result was that very few Henrys

11     were purchased by discharged U.S. soldiers.  According to a U.S. army report, 808

12     Henrys were purchased by discharging Civil War soldiers, compared to 8,289

13     Spencer Carbines.[17] Henrys that were not purchased went to the U.S. War

14     Department's ordnance department, which did not sell them.

15         29.     By the end of the Civil War in 1865, very few combatants had used

16     Henry Rifles, and fewer still had kept them once they were discharged.  The result

17     was that only a small number of Henrys were in circulation in the United States

18     immediately after the war—perhaps 10,000, and this in a country of roughly 35

19     million people.[18]  Those veterans who possessed the guns understood that they were

20     weapons of war—they had used them as such—rather than weapons of individual

21     self-defense.  Maybe veterans kept them as souvenirs, maybe as commodities to be

22
23          [17] General Orders, No. 101, May 30, 1865, *The War of the Rebellion* (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43; 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," *U.S. Congressional Serial Set* (1871), pp. 167-172.

24
25          [18] 11,000 Henry Rifles were produced between 1861 and 1865; see Parsons, *The First Winchester*, 48.  Assuming that all were sold—a generous assumption—then 2,500 were sold to civilians and 8,500 to U.S. soldiers (the 8,500 figure comes from note 12 above).  Of the 8,500 U.S. soldiers who had Henrys, 7,500 kept them after the war; see note 12 above.  Thus 10,000 Henrys were in circulation after the war (again, a generous estimate).  The U.S. census of 1860 reported just over 31 million Americans; the census of 1870 reported just over 38 million.  Thus 35 million is given as an estimate of the population of the United States in 1865.

26
27
28

14

sold at a later date, maybe as novelties to be displayed at local shooting contests or social gatherings (rifle clubs and shooting galleries were common in the North). Maybe they planned to travel to or through the Western Territories, where Henrys were gaining a reputation as good weapons against hostile Native Americans or roaming bands of criminals, known as "highwaymen" or "road agents."  Regardless of why a U.S. veteran might have kept a Henry, he would have understood that it was an uncommon weapon, and one not intended for individual self-defense.  It was strictly a weapon of war.

### D.     State Secession, State Readmission, State Redemption

30.     Reconstruction was a time period (1863-1877) but also a process.  The process was described by President Abraham Lincoln in his last public speech (April 11, 1865) as getting "the seceded States, so called," which were "out of their proper practical relation with the Union," back into their "proper practical relation" with the Union.[19]  To better understand this process, one must understand the meaning of key terms used during the Reconstruction period: state secession, state readmission, and state redemption.

### 1.     State Secession

31.     Lincoln used the phrase "seceded States, so called" because he did not accept the constitutionality of state secession.  All eleven states of the Confederacy had declared themselves "seceded" from the Union by May 20, 1861.  The governments of all of these states regarded state secession, by which they meant a breaking-off from the Union, as constitutional.  The Lincoln administration rejected this interpretation and declared instead that the "so-called" seceded states had remained in the Union but had had their governments overtaken by disloyal, insurrectionary groups.  Reconstruction, therefore, would be complete when all of the "so-called" seceded states had governments that were loyal to the Union.  The

---

[19] Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4.

1  presidential administrations of the Reconstruction era that followed Lincoln's

2  (Andrew Johnson's and Ulysses S. Grant's) adopted this understanding of

3  secession.  So, too, did all the Reconstruction-era Congresses, though a minority of

4  Congressmen took a somewhat different view, claiming that secession was indeed

5  unconstitutional but that the states in question had indeed broken off from the

6  Union and therefore could be treated as territories.  This declaration does not delve

7  into the question of the constitutionality of secession.  It simply notes that U.S.

8  lawmakers of the Reconstruction era generally regarded secession as

9  unconstitutional and a form of insurrection.

10         **2.     State Readmission**

11         32.    There were competing views among U.S. lawmakers during

12  Reconstruction as to when a "so-called" seceded state could be deemed

13  "readmitted" to the Union.  The dominant view among U.S. lawmakers was that a

14  state was deemed readmitted when Congress agreed to seat Representatives and

15  Senators from that state. This meaning of state readmission is used in this

16  declaration. In justifying federal intervention into "so-called" seceded states and the

17  imposition of qualifications on states for readmission, national law makers relied on

18  two constitutional principles: 1) "war powers"; and 2) the "guarantee clause"—the

19  clause of the U.S. Constitution declaring that "The United States shall guarantee to

20  every State in this Union a Republican Form of Government" (U.S.C., Art. IV, Sec.

21  4).  This declaration does not delve into the question of the legitimacy and scope of

22  these constitutional principles.  It simply notes that these were the principles of the

23  time used to justify federal policy towards the "so-called" seceded states during

24  Reconstruction.

25         **3.     State Redemption**

26         33.    Between 1866 and 1871, all of the "so-called" seceded states were

27  readmitted to the Union.  At the point of readmission, each state had a government

28  that was loyal to the Union and controlled by a political party affiliated with the

1  national Republican Party, which for all the years of Reconstruction was the Party

2  in control of the U.S. government.  In 1866-68, the last years of the administration

3  of Andrew Johnson, he renounced the Republican Party and declared himself a

4  Democrat, which he had been prior to the Civil War, but the U.S. government as a

5  whole was still Republican.  The Republicans in Congress beginning in December

6  1866 had a two-thirds majority that allowed them to override Johnson's vetoes; and

7  beginning in March 1867, with the Reconstruction Act, they effectively took

8  control of the "Commander-in-Chief" powers typically vested in the Executive

9  branch. In each state after readmission there was internal conflict.  Part of that

10  conflict involved efforts by Democrats, many of whom were former Confederates

11  or Confederate-sympathizers, to take control of the state government from

12  Republicans.  By 1877, the Democrats had taken control of the governments of all

13  the states of the former Confederacy.  At the point when Democrats took control of

14  a state, they declared the state "redeemed" and began rolling back reforms instituted

15  by prior Republican state authorities.  In this declaration, state redemption means

16  the period when Democrats declared a state "redeemed" and began instituting

17  reactionary measures.

18  **E.     Militias**

19      34.    Militias have a long history in the United States, and they have been

20  studied extensively by scholars investigating the Second Amendment, especially for

21  the period of Colonial America and the Early Republic.  Militias existed during

22  Reconstruction, but the militias of that period were fundamentally different from

23  the militias of the earlier periods.

24      35.    By the time that the Civil War broke out in 1861, well-organized state

25  militias such as had existed in the Early Republic technically existed but were

26  practically defunct, except in frontier states like Missouri and Texas.  Militias by

27  1861 essentially existed as volunteer local groups authorized by state governments

28  but were only lightly controlled by those governments.  Such militias were used, to

17

1  be sure.  Local militias in Virginia in 1859, for example, had worked together with

2  a unit of the U.S. army commanded by Robert E. Lee to put down the effort by

3  John Brown to seize the U.S. armory at Harpers Ferry and distribute arms to

4  enslaved Black Americans in the region.

5       36.    The fact that state militias did technically exist by 1861 became very

6  important once the Civil War broke out.  The power under the U.S. Constitution for

7  a President to call up state militias is what Abraham Lincoln invoked at the start of

8  the war when he authorized up to 75,000 men to come together to put down the

9  insurrection in the southern states.  The Confederate States of America, which

10 adopted a constitution quite similar to the U.S. Constitution, invoked this same

11 authority when calling up its national army.

12       37.    Although soldiers had been called to national armies in their role as

13 state militiamen, the armed units that formed the basis of national armies during the

14 Civil War were not state-based militia units but rather state-formed regiments

15 approved as national army units by the U.S. War Department (hence only in rare

16 instances would a regiment be a replica of a local militia unit).  Nonetheless, the

17 national armies continued to be managed at times by laws designed in the pre-war

18 era to manage state militias.  In July 1862, for example, the United States passed a

19 Militia Act that standardized the terms of membership in state-wide militias even

20 though state-wide militias had grown defunct in the North prior to the war; only in

21 this way—by legislating via the old state militia system—did the U.S. War

22 Department have the authority to manage the personnel of the national army.  The

23 July 1862 Act significantly declared that Black Americans could not be denied

24 admission to state militias.  That was a pivotal development, as most state militias

25 prior to the war (all of them in the South, most of those in the North), had denied

26 membership to Black Americans.

27       38.    When the Civil War ended in mid-1865, state militias, which had been

28 given new life by the war, thrived, but not everywhere.  In the North, they fell again

into disuse, though they would begin to appear again with strength in the late 1870s and 1880s.  In the border states of Missouri and Kentucky, which had remained loyal to the Union despite being slave states, state militias continued to be important, as guerrillas caused disturbances in the states long after the Civil War was over.  In the states of the former Confederacy after the war, the state militias had the most visible—and notorious—presence.  Invoking newly passed discriminatory state laws ("Black Codes"), or simply acting on their own discretion, southern state militias, which excluded all Black Americans, harassed, assaulted, and even killed Black Americans and pro-Union whites.  These militias were composed mostly of former Confederate soldiers, many of whom wore their Confederate uniforms while in action.  These militias were regarded by U.S. lawmakers as pernicious and unlawful.  Leaving aside the obvious illegality of the many acts committed by these militias, they were in violation of U.S. law simply by wearing Confederate uniforms.[20]

39.    In March 1867, the U.S. Congress abolished all southern state militias, with some exceptions.  Exempted were the border states, the four slave states that had never seceded, though Kentucky and Missouri were the only border states with state militias, and both states would disband their militias by 1868.  Also exempted were two states that had joined the Confederacy:  Arkansas and Tennessee.[21] Arkansas was exempted because it had proven itself to President Johnson as a genuinely loyal state.  It had established a loyal state government, led by Governor Powell Clayton, that conformed to the guidelines that Abraham Lincoln had laid

---

[20] James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, *Opinions of the Attorney Genera*l, 11:208-9. For these immediate post-war southern militias, see William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67.

[21] 14 U.S. Statutes 487, Chap 170, Sec. 6 (Approved March 2, 1867); James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 112.

(continued…)

1   out in December 1863 and that Johnson had affirmed soon after taking office.

2   Arkansas in 1868 created a state militia that U.S. authorities regarded as a

3   legitimate armed organization loyal to the United States.[22]  Tennessee was

4   exempted because it, too, had established a loyal state government, led by Governor

5   William ("Parson") Brownlow.  It had gone one step further.  It had ratified the

6   Fourteenth Amendment, passed by Congress in mid-1866, thus becoming the first

7   southern state to do so and, as a result, becoming the first formerly seceded state to

8   be formally readmitted to the Union.  With Brownlow's urging, Tennessee in 1866

9   had created a state militia, the "Tennessee State Guard."  This organization was

10  composed of both white and black members; it was well-armed (with Enfield

11  single-shot rifles, not with Henrys or Winchesters); and it drilled regularly.  Former

12  Confederates in the state despised the force.[23]

13      40.    After Congress in 1867 abolished all but the exempted southern state

14  militias, some of the newly created pro-Union governments in the non-exempted

15  southern states created new state militias that were expressly tasked with subduing

16  insurrection and anti-black activities.  Such states included Louisiana, North

17  Carolina, South Carolina, and Texas.  Loyal state governments in Alabama and

18  Florida proclaimed an intention to organize such new state militias, but they never

19  followed through.  A loyal government in Mississippi in 1870 went so far as to

20  organize such a state militia, but the force was never used.  The state militias of the

21  South that did exist and saw action, those in Arkansas, Louisiana, North Carolina,

22  Tennessee, South Carolina, and Texas, were wholly new innovations (though Texas

23  made the dubious claim that the pre-war Texas Rangers was a predecessor

24  organization).  The new, post-1867 southern state militias were under the direct

25  _____

26      [22] Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," *Arkansas Historical Quarterly*, 64 (Winter 2005), 356-58.

27      [23] Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119.

28

1   control of the state (the Governor and/or state adjutant general), as opposed to

2   merely authorized by the governor.  They drilled and paraded regularly.  They were

3   paid and armed by the state, with the arms kept in state-maintained, state-guarded

4   armories or arsenals.  Finally, all of the militias allowed if not encouraged Black

5   American men to join, though some, like North Carolina's, segregated white

6   companies from black companies.  The high number of Black Americans in the

7   southern state militias led some people at the time as well as some early historians

8   to call these organizations "Negro Militias."  This declaration does not use that

9   label.  Pre-Civil War state militias in the South, in contrast to these wholly new

10  post-war organizations, were unpaid, self-armed, and all-white.[24]

11      41.    Two of the new southern state militias, those of Louisiana and South

12  Carolina, are particularly relevant to the subject of this declaration.  As will be

13  discussed below, the state militias of Louisiana and South Carolina—and only those

14  state militias—were armed with Winchester Repeating Rifles.

15      42.    The composition of and membership requirements of the new state

16  militias indicate much about attitudes toward firearms regulation among law

17  makers of the time.  The inclusion of Black Americans in the militias was part of a

18  larger understanding among Republicans in the era of the Fourteenth Amendment

19  that regulations restricting blacks from possessing firearms were no longer to be

20  regarded as constitutional.[25]  The new militias did more than include blacks.  They

21  excluded some whites, specifically those who were regarded as still supporting the

22

23      [24] Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University
    of Texas Press, 1957), 3-33; Otis A. Singletary, "The Texas Militia During

24  Reconstruction," *Southwestern Historical Quarterly*, 60 (July 1956), 25-28; Allan
    Robert Purcell, "The History of the Texas Militia, 1835-1903" (Ph.D. diss.,

25  University of Texas, Austin, 1981), 221-27.

26      [25] Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, "'This
    Right is Not Allowed by Governments That Are Afraid of the People': The Public

27  Meaning of the Second Amendment when the Fourteenth Amendment was
    Ratified," *George Mason Law Review*, 17 (2010), 823-863, esp. 852-863.

28                                                    (continued…)

1   Confederate cause.[26]  Thus, the new state militias that began forming in 1868, the

2   same year as the adoption of the Fourteenth Amendment, indicated that lawmakers

3   understood that Black Americans' security required not simply the absence of

4   regulations denying them arms but the presence of regulations denying arms to

5   those who were known to support insurrection against the United States and

6   violence against blacks.

7            **F.      The U.S. Army During Reconstruction**

8            43.     The U.S. army began occupying parts of the South as soon as the Civil

9   War broke out and would not end its occupation until 1877, the end of

10  Reconstruction, when it removed its last units from Florida, Louisiana, and South

11  Carolina.  During the war, the U.S. army had exclusive police powers in the

12  occupied South until or unless local policing institutions—courts and

13  constabularies—were deemed loyal to the United States.  At that point, the U.S.

14  army cooperated with local police institutions to "keep the peace."  Yet U.S.

15  commanders retained the power, which they had had since the start of the war, to

16  declare martial law in an area, thus suspending the civil institutions there.  This

17  arrangement carried over from the Civil War into the early years of post-war

18  Reconstruction.  Until April 1866, U.S. troops had unrestrained power to operate

19  within state boundaries to keep the peace.  As part of that power, they could use

20  troops as police and hold their own courts that could try civilians.[27]

21           44.     The army also was willing to use this power in states that had never

22  declared themselves seceded.  The army had overseen arrests and prosecutions of

23  alleged traitors in Indiana in 1864, actions that were ultimately deemed

24  unconstitutional in the U.S. Supreme Court's post-war *Milligan* opinion. In June

25  1866, the army had intervened in New York and Vermont to capture Irish

26  nationalists known as Fenians who had fought against British troops in Canada and

27
28
_____
[26] Singletary, *Negro Militia and Reconstruction*, 23-24.
[27] Sefton, *The U.S. Army and Reconstruction*, 5-106.

22

then crossed over to the United States.  (Neither Henrys nor Winchesters were used in the conflicts between the Fenians and Canadian troops.)  General-in-Chief Ulysses S. Grant ordered General George Meade to inform the New York and Vermont governors that they should call out volunteer militia units to capture the Fenians.[28]

45.    The federal-state structure of armed enforcement that took place during the 1866 Fenian crisis was the model that U.S. authorities had in mind for the South once the southern states began creating pro-Union state militias.  The hope was that the southern states would end up like New York and Vermont during the Fenian crisis:  they would develop and sustain new, pro-Republican state militias that would be the primary armed force in the states, with the U.S. army playing only an ancillary role.

46.    This plan for U.S. army-southern state militia cooperation nearly came apart beginning in April 1866. In that month, President Andrew Johnson proclaimed that a state of "cessation of hostilities" existed in all the southern states but Texas (in August 1866 he would proclaim that in Texas, too, there was a "cessation of hostilities").  Johnson thus effectively removed "war powers" as a constitutional justification for the army's presence in the South.  His move was part of his general turn against the Republican program of Reconstruction.  Also in April 1866, he vetoed the Civil Rights Act of 1866, a veto that Congress overrode.  Two months earlier, he had vetoed the act renewing the Freedman's Bureau.  Eventually, Congress passed a new act for the Bureau, which Johnson again vetoed but Congress overrode.  Both the Civil Rights Act and the Freedman's Bureau Act established, among other things, that the army would continue to have policing powers in the southern states.  Those powers were to be used specifically to put down insurrectionaries who threatened to undermine the civil rights of Black

---

[28] W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71.

23

1    Americans or in any way jeopardize pro-Union citizens and institutions.  The Civil

2    Rights Act contained a military provision that empowered the army to act reactively

3    or preemptively against any actual or anticipated insurrectionary threat.[29]  Even

4    though Congress was able to sustain this military provision as well as the rest of the

5    Civil Rights Act of 1866 against Johnson's veto, the military provision was

6    jeopardized by Johnson's declaration of a "cessation of hostilities."  The declaration

7    signaled that Johnson might not sustain the army in its duties specified by

8    Congressional measures like the Civil Rights Act.  Also in April 1866, the U.S.

9    Supreme Court announced that it was ruling in favor of the plaintiff in the *Milligan*

10   case (the actual opinion was not issued until January 1867).  That case was

11   narrowly about the power of the army to try civilians in areas where civil courts

12   were operative; more broadly it was about the power of the army to have any

13   authority at all to occupy an area ostensibly at peace.

14       47.    U.S. Republican authorities moved quickly to protect their power to

15   occupy the formerly rebel South.  Secretary of War Stanton prepared an order that

16   invoked the military provision of the Civil Rights Act of 1866 to justify continued

17   military occupation of the South.  This was a novel move, as it allowed military

18   occupation in the absence of "war powers."  The Civil Rights Act was justified not

19   by "war powers" but by the Thirteenth Amendment abolishing slavery.  A small

20   number of Republicans, most notably Representative John Bingham, thought the

21   Civil Rights Act needed more justification than that.  For this reason, among others,

22   Bingham pressed for a new constitutional amendment, which ultimately emerged as

23   the Fourteenth Amendment.  The resolution for the amendment was passed by

24   Congress a few months after the Civil Rights Act and sent to the states for

25

26   _____

27       [29] Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of
     Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest
     Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.:

28   Southern Illinois University Press, 2018), 60-88.

1  ratification.  Congress would ultimately declare that the Civil Rights Act of 1866
2  was authorized by the Fourteenth as well as the Thirteenth Amendments.

3      48.    The military provision of the Civil Rights Act of 1866 was not enough
4  to put U.S. military occupation of the South on sure footing.  The President still
5  controlled the army in his capacity as commander-in-chief.  Congress thus began to
6  wrest control of the army from President Johnson.  First, it passed the
7  Reconstruction Act of 1867, which formalized military occupation and required
8  southern states to ratify the Fourteenth Amendment in order to be readmitted to the
9  Union.  Then Congress passed measures (most notably the Tenure of Office Act)
10 that shifted aspects of army control from the President to Congress.  Then it
11 impeached Johnson, though Johnson was ultimately acquitted by the Senate.  In the
12 meantime, the army and the U.S. Attorney General opted to take the narrowest
13 possible reading of the Milligan decision, such that the only power deemed out of
14 the army's hands in occupied areas was the power to try civilians if civilian courts
15 were operative.  By 1868, then, the year of the Fourteenth Amendment's adoption,
16 the U.S. army had secured for itself a place in the southern states as a legitimate
17 occupying force in the South.  It would affirm this status with the acts of 1870 and
18 1871 enforcing the Fourteenth Amendment as well as the Fifteenth Amendment,
19 which had been adopted in 1870.  The last of these enforcement acts, the so-called
20 "KKK Act," was aimed directly at breaking up the Ku Klux Klan and similar
21 insurrectionary, paramilitary organizations that terrorized Black Americans and
22 pro-Union whites ("terror" was one of the most commonly used words of the time
23 to describe the Klan's intent toward Black Americans).

24     49.    The reason to understand this sequence of events is to appreciate the
25 army's distinctive, unprecedented role in the era of the Fourteenth Amendment.  It
26 did not operate under martial law.  It had the power to declare martial law, but in
27 practice, it avoided using that power.  Instead, it looked to pro-Republican state
28 governors to declare martial law if martial law was deemed necessary (and such

1  gubernatorial declarations were extraordinarily rare during Reconstruction).

2  Furthermore, in the wake of *Milligan*, it yielded to the states the judicial power it

3  had wielded prior to 1866. States' attorneys and state courts were to be the main

4  sites of judicial action, though the U.S. Attorney General reserved the power to

5  remove cases to federal courts if they involved matters relating to civil and political

6  rights covered by national legislation (to help centralize federal judicial activity in

7  the South, the Department of Justice was created in 1870).  During the era of the

8  Fourteenth Amendment, then, the main role of the U.S. army was to act as an

9  ancillary police force to the state militias or other local and state policing

10  operations.  In this capacity, the army worked with states to detect and arrest

11  insurrectionaries and civil-rights violators.  Although sometimes those arrested

12  would stand trial in a federal court—this happened most famously in the South

13  Carolina Ku Klux Klan trials of 1871-72—the army and agents of the Department

14  of Justice looked to the state courts to be the primary judicial institutions of locales.

15  As an example: President Ulysses S. Grant in 1871, in his capacity as commander-

16  in-chief of the U.S. army, ordered all insurrectionaries in South Carolina to turn in

17  their firearms to legitimate authorities.  If insurrectionaries were found who had not

18  turned in their weapons, they could be arrested and denied habeas corpus rights

19  under Grant's order.[30]  However, prosecutions and trials of such insurrectionaries

20  going forward would be conducted by state authorities, if those authorities were

21  known to be loyal to the United States.  In its capacity as an ancillary police force

22  to state militias, with both armed organizations committed to subduing

23  insurrectionaries and civil-rights violators, the U.S. army sought to prevent

24  weapons from reaching unlawful insurgent groups.  Army officers relied on their

25  ─────────────────

26  [30] Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, pp. 4086-87 (March 24, 1871), 4089-90 (Oct. 12,

27  1871), 4090-92 (Oct. 17, 1871), 4092-93 (Nov. 3, 1871; this proclamation revoked suspension of habeas corpus in Marion County, South Carolina), 4093-4095 (Nov.

28  10, 1871).

1   own intelligence operators as well as private intelligence agencies like the

2   Pinkertons to learn of arms shipments.  By the terms of the Civil Rights Act of

3   1866 and the Enforcement Acts of 1870, the U.S. army and related military units

4   were authorized to act preemptively to prevent insurrectionaries from making

5   armed assaults on loyal Unionists.  The seizure of weapons intended for

6   insurrectionaries thus represented a lawful use of military authority under the

7   Fourteenth Amendment.[31]

8       50.     As a result, any southern person or combination of persons considering

9   having Henry or Winchester rifles shipped to them faced the prospect that the U.S.

10  army or state militia might keep the shipment from reaching them and that, even if

11  the shipment did reach them, the policing forces could arrest them and confiscate

12  the weapons.

13  **V.    FINDINGS:  HIGH-CAPACITY FIREARMS DURING RECONSTRUCTION**

14      **A.   Overview:  Henry Rifles and Winchester Repeating Rifles**
          **During Reconstruction**
15

16      51.     An oft-cited scholar in legal debates over firearms contends that "the

17  Winchester Model 1866 . . . became a huge commercial success.  So by the time the

18  Fourteenth Amendment was ratified in 1868, rifles holding more than 10 rounds

19  were common in America."  The first part of this statement is true: the "Winchester

20  66" did become a commercial success.  The author neglects to mention, however,

21  that prior to the end of Reconstruction, that commercial success was due almost

22  entirely to sales to foreign armies.  Thus it does not follow that the success of the

23  company during Reconstruction is evidence of the presence of Winchesters in the

24  United States.  Indeed, the author's second statement, that "rifles holding more than

25

26

27  _____
    [31] No U.S. court ever denied the constitutionality of such seizures of weapons
    or the legislation that authorized the seizures. See Vorenberg, "The 1866 Civil
28  Rights Act and the Beginning of Military Reconstruction."

                                                        (continued…)

1   10 rounds were common in America" at the time of the Fourteenth Amendment, is

2   false.[32]

3       52.     Rifles holding more than 10 rounds made up a tiny fraction of all

4   firearms in the United States during Reconstruction.  Furthermore, as will be

5   discussed in more detail below, possession of such rifles—legal possession, that

6   is—was limited almost exclusively to U.S. soldiers and civilian law enforcement

7   officers.

8       **B.    Henrys and Winchesters in the Reconstruction-Era West**

9       53.     One of the places that Henrys and Winchesters could be found during

10  Reconstruction was in the West, though the weapons did not proliferate there at the

11  time at anything like the scale invented by novelists and film-makers of the late

12  nineteenth and twentieth centuries.

13      54.     With the passage of the Homestead Act (1862), the end of the Civil

14  War (1865), the completion of the first transcontinental railroad (1869), and the

15  discovery of gold in the Black Hills of Dakota Territory, the appeal of traveling to

16  _____

17      [32] David Kopel, "The History of Magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post*, May 29, 2014,

18  https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/

19  (accessed September 22, 2022).  Kopel's contention also appears on page 4 of his co-authored Amicus Brief in a federal case from California, *Fyock v. City of*

20  *Sunnyvale*, Case No. 14-15408 (9th Cir. 2015).  See David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional

21  Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.).  For the number of Henrys

22  and Winchesters manufactured 1861-1877, as well as the number of these rifles shipped to foreign armies, see John E. Parsons, *The First Winchester: The Story of*

23  *the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. To understand the scale of these numbers, one should contrast them to the

24  production and sales of other rifles of the era.  For example, according to Parsons, the total number of Henrys and Winchesters manufactured in 1861-1877 was

25  164,466 (this includes the 56,000 shipped to foreign armies), whereas in the same period, 845,713 Springfield "trap-door" single-shot rifles were manufactured. See

26  "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3; some of the data in

27  this report is aggregated and printed at the Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoor-production-serial-numbers.htm.

28                                                                    (continued…)

or through the Western Territories increased.  Because law enforcement was minimal in the region, and also because the U.S. army could offer travelers and settlers little protection—they were too consumed during the era with subduing Native Americans—Americans came to regard self-defense as particularly important in the region.  The Winchester company tried to capitalize on the situation by touting the benefits of its rifle.  The "Winchester 73" model in particular was aimed at Westerners or potential Westerners.  The company emphasized that the speed and high capacity of the rifle allowed a single person to hold off a band of outlaws or hostile Native Americans.[33]  The marketing campaign was aimed especially at Americans hoping to travel to the Western Territories.  The campaign had minimal success.

55.    Many travelers to the West carried firearms, to be sure, but a very small number of those arms were Henrys or Winchesters.  Most of the accounts of privately held Winchesters during Reconstruction that I found in the research for this declaration did come from the Western Territories, but there were fewer than fifteen such accounts that were not expressly fictional.  Two such accounts became legendary, mainly because the manufacturers of the Henry-Winchesters used them to advertise their rifles.  One account was of two former U.S. soldiers who were part of a mining operation in the Rocky Mountains and used their Henry Rifles to defeat some raiding Blackfoot Indians.  Another was of a private guard hired by Wells Fargo to accompany a cash shipment to the West; he was attacked by robbers near Nevada City and used his Henry Rifle to kill them all.  It might be noted that

---

[33] See, for example, the ad printed over three issues in the *Wyoming Leader* (March 16, April 21, May 8, 1868, always p. 4).  Ads for Winchesters that said nothing of their possible purposes appeared occasionally in newspapers published in the in Western Territories; see for example, a gun dealer's ad for "Sharps and Winchester Rifles" as specialties: *Bismarck Tri-Weekly Tribune* (Dakota Territory), June 29, 1877, p. 4.  On the post-Reconstruction invention of the myth of Winchesters proliferating in the Reconstruction-era West, see Haag, *The Gunning of America*, 179-202, 353-68.

(continued…)

these stories, assuming they are true, did not involve individual self-defense by ordinary civilians.  They involved defense of economic enterprises by trained gunmen.[34]  Less oft-told incidents involving Henrys and Winchesters from the Western Territories involved brutal violence between thuggish combatants.  There was no heroic road warrior or "Indian fighter" in these tales, and thus they were not likely to build appeal for the rifles.  Particularly gruesome were the murder-by-Winchester accounts stemming from the Horrell-Higgins feud in New Mexico Territory near the Texas border.[35]

56.    Because some Henrys and Winchesters found their way to the Western Territories, and because some of the U.S. army operations against Native Americans took place in Western *states* as well as the Western Territories, Henrys and Winchesters may have ended up in the Western states during Reconstruction (these included California, Colorado, Nevada, and Oregon).  However, I found no significant evidence of Henrys or Winchesters in the Western states.[36]

57.    The Winchester company hoped that West-bound Americans' desire to hunt, and not just their wish for protection, would fuel sales of their weapon.  The great bison hunts on the Plains were famous by the late 1860s, and the Winchester company tried to capitalize on the craze.  Its marketing effort failed. Bison-hunters preferred other models.  It did not help that the most famous Western hunter of the

---

[34] Williamson, *Winchester*, 42-44.

[35] C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49.

[36] Exceptions to this statement about the absence of Henry-Winchesters in western states are the state armories in these states. Reports from these armories sometimes mention the rifles. For example, the armory in the state penitentiary at Salem, Oregon in 1868 had 13 Henry rifles and zero Winchesters, compared to hundreds of other firearms. Because this was a penitentiary armory, the Henrys that were there necessarily were for use by law enforcement officers, not individuals seeking self-defense. "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95.

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1    time, Buffalo Bill Cody, did not use a Winchester.  His famous gun, which he

2    dubbed "Lucretia Borgia," was a single-shot Springfield.

3         58.    The Winchester company had only marginally more success trying to

4    sell its guns elsewhere to hunters and "sportsmen," a term used to describe not only

5    hunters but competitive target-shooters.  The only place where Winchesters caught

6    on for hunting was in Africa, where American and European "big game" hunters

7    wanted to shoot large animals with as many rounds as possible, in as fast a time as

8    possible, in order to avoid being killed by the prey.[37]  Target-shooters demanded

9    accuracy of their guns, and potential buyers worried that a rifle built for capacity

10   and speed would lose something in accuracy.  To assuage such concerns, a

11   Winchester model that began selling in early 1877 (the "Winchester 76") came with

12   the option of a "set trigger," such that the shooter could set the trigger by moving it

13   very slightly forward, at which point only a tiny bit of pull would set off the shot.

14   The "set trigger" type of Winchester was more popular at shooting contests than

15   earlier Winchesters, but it still was not as popular as other rifles, especially

16   Remingtons and Springfields.  One reason why was its price.  The "set trigger"

17   version of the Winchester was typically $10 more than the "standard trigger"

18   models, which already were on the expensive side ("standard trigger" Winchesters

19   were typically 20-30% more expensive than Remingtons and Springfields).

20        59.    Meanwhile, U.S. army units in the West rarely possessed Winchesters

21   during Reconstruction.  The army had continued its Civil War-era policy of non-

22   adoption of Winchesters.  Yet soldiers in the West did understand the weapons'

23   lethality, in part because they had seen it first-hand in their skirmishes and battles

24   with the Sioux and their allies on the Plains.  U.S. soldiers in the West at first

25

26   [37] My research uncovered fewer than ten accounts of African big-game
     hunting that appeared in U.S. publications during Reconstruction. As an example,
27   see "Lovejoy," "Letter from Africa," *Fayette County Herald* (Washington, Ohio),
     Dec. 21, 1871, p.2 (by "accounts" I mean supposedly true accounts; there were
28   even more accounts that were expressly fictional).

1   assumed that the Natives were getting the weapons legally from traders who were

2   operating with the approval of the U.S. Bureau of Indian Affairs.  That assumption

3   fueled long-standing hostility of the U.S. army toward the Bureau.  The main

4   newspaper of the armed services of the time, the *Army and Navy Journal*, published

5   a satirical piece in 1867 pretending to be a Native American expressing gratitude to

6   the Bureau for allowing tribes to acquire single-shot guns and suggesting that the

7   Bureau might now "give us Spencer or Henry rifles."[38]

8       60.    In fact, the Sioux and their allies did not get their Henrys (or

9   Winchesters) from the Bureau.  Many of the weapons had been seized from

10  American emigrants and settlers whom the Natives had attacked.  Many also had

11  been robbed from shippers heading to or through the Western Territories.

12      61.    Here it is important to understand that no matter who might want a

13  Henry-Winchester, they were dependent on a successful shipping operation.  The

14  weapons were manufactured in New Haven, Connecticut and shipped around the

15  country to U.S. ordnance depots, state arsenals, private gun stores, and, in rare

16  cases, individuals (individual mail-order did not become common until the 1890s,

17  and the first mail-order guns were shipped by Sears in the early 1900s).[39]  There

18  was no U.S. parcel post until 1913; all shipping was done by private companies like

19  Wells Fargo.  These companies divided up regions of the country, a legal

20  monopolistic practice, in order to maximize profits.  In practical terms, this meant

21  that shipping costs were high, so buyers would be reluctant to ship goods that could

22  be lost.  Loss was a very real possibility when it came to shipping weapons to

23  hostile areas.  Shipping companies might use armed guards—some, as we have

24  seen, armed with Henrys or Winchesters—but the guards stood little chance against

25  an enemy that outnumbered them and was armed with the same type of guns.  The

26  cost of the risk was passed from the manufacturers and "jobbers" who arranged for

27      [38] *Army and Navy Journal*, June 1, 1867, p. 350.

28      [39] Williamson, *Winchester*, 178.

sales to the consumers.  The risk-induced increase in cost was a disincentive to prospective individual or gun-store buyers in the West.  This was one more factor providing a disincentive not only to potential private buyers but to the U.S. army to adopt Henry-Winchesters.

62.     Whatever the root causes of the minimal proliferation of Winchesters among non-Natives of the West, the result was that Natives were more likely to use Winchesters than anyone else in the region.  The most heavily armed Americans of the region, those of the U.S. cavalry units assigned to the Western Territories, used for the most part their army-issued single-shot Springfield rifles.  Meanwhile, as a U.S. Colonel noted, Winchesters and lower-capacity repeating rifles in the late 1860s transformed "the Plains Indian from an insignificant, scarcely dangerous adversary into as magnificent a soldier as the world can show."[40]

63.     The truth of that observation was borne out at the Battle of Little Big Horn in 1876.  Famously, the U.S. army commanded by George Custer was wiped out by the Plains Indians.  Most of Custer's troops carried single-shot Springfield rifles.  The Native Americans carried a variety of weapons, many of which were Winchesters.[41]  One of Custer's underlings, Marcus Reno, wrote after the battle that "the Indians had Winchester rifles and the column [of U.S. cavalry] made a large target for them and they were pumping bullets into it.[42]  Weaponry was not the sole reason for Custer's defeat that day at the Little Big Horn.  Still, it is worth noting that "the gun that won the West" was in the hands of Native Americans, not U.S. soldiers, at the most famous battle in the West of all time.

---

[40] Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299. In the northwest part of the Western Territories, the Nez Perce also were fond of Winchesters. Chief Joseph usually kept one close at hand. See Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12.

[41] Hämäläinen, *Lakota America*, 340.

[42] Haag, *The Gunning of America*, 176-77.

33

64.     Humiliated by Custer's defeat, the U.S. army in the West still did not choose to adopt Winchesters after Little Big Horn.  However, an increasing number of regiments in the West did act on their own to use ordnance funds to buy Winchesters.  Although the army did not officially adopt the Winchester, it did all it could to keep the weapon, along with lower-capacity repeating rifles, out of the hands of the Plains Indians.  Right away after Custer's defeat the army banned traders from trading any types of guns to any types of Natives, friendly or hostile.  U.S. officers sought to arrest traders who had been selling Winchesters to Plains Indians against government policy.[43]  Meanwhile, American civilians in the Western Territories demanded that Canadian authorities also intervene to keep Winchesters from Native Americans, specifically the Blackfoot.[44]

65.     It is impossible to know all the reasons why the U.S. army did not adopt Henrys or Winchesters before or even soon after Little Big Horn, but one reason was the same one that had lingered on Americans' minds ever since the Henry Rifle was introduced in the early 1860s:  the fear that the weapon was as dangerous to its user as it was to its intended target.  The stories that manufacturers had helped circulate early on from the West about the power of the rifle to allow one person to defeat many failed to muster much enthusiasm for the weapon.  It did not help that some assessments from experts were negative.  At a showcase of firearms in Switzerland soon after the Civil War, a judge rendered the verdict that the rifle seemed delicate and unnecessarily lethal—"more wonderful than practical."[45]  Back in the U.S., skeptics worried that the rifle would fail at a crucial moment or explode.  When it came to Henrys and Winchesters, argued a writer for the *New York Herald*, the most widely circulating newspaper in the country, the "dangers are too many."[46]

---

[43] *Chicago Daily Tribune*, July 23, 1876, p. 4.

[44] *Chicago Daily Tribune*, April 15, 1878, p. 4.
[45] Haag, *The Gunning of America*, 70.
[46] "Breech-Loading Arms," *New York Herald*, Oct. 12, 1866, p. 4.

**C.   Henrys and Winchesters in the Reconstruction-Era North**

66.   The North was the region in the United States where Henrys and Winchesters were hardest to find, either because they were deemed too dangerous or because northerners already felt themselves well-armed.  Recall that hundreds of thousands of U.S. soldiers had returned home from the Civil War with rifles in hand, almost all of the weapons Spencers or Sharps or Enfield, rarely Henrys.

67.   The near-absence of Henry-Winchester rifles in the North became clear during the "Great Strike" of 1877.  The "Great Strike" began as a local labor action in West Virginia and turned into a massive strike stretching from Philadelphia to Chicago.  Mob violence was prevalent.  In this months-long episode, during which thousands of Americans were injured and hundreds were killed, there were only two incidents that I found involving Henrys or Winchesters. In Chicago during the rioting, a U.S. soldier fired a Henry rifle in response to civilians pelting his regiment with rocks.  He may purposefully have avoided shooting anyone—no one was hit.  But the sound of the shot went a long way toward quieting the crowd.  The soldier in question was from a regiment that had been assigned to the Western Territories but transferred temporarily to Chicago to put down the unrest.  That explained why he had a Henry.  His regiment likely acquired Henrys to fight Plains Indians; now he used the weapon—albeit sparingly—to subdue strikers.[47]  In Jackson County, Kansas, just north of Topeka, railroad managers armed forty employees with Winchester rifles, ordering them to scare off the local strikers.  To give the gang the veneer of a legitimate posse, the managers arranged for the local sheriff to deputize the gunmen.  Violence ensued when the "posse" confronted the strikers, and at least one of the strikers was killed, though not necessarily by a Winchester.[48]

---

[47] Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52.

[48] "A Tough Customer," *St. Louis Globe-Democrat*, Oct. 1, 1877, p. 4.

68.     In general, however, Henrys and Winchesters were rare to find among northerners during Reconstruction.  They were sometimes mentioned in ads displayed in northern publications aimed at hunters and target-shooters.  If the ads were any indication of the target audience, the hoped-for buyers of the rifles were elites—not the types who showed up during the mobbing of the Great Strike of 1877—and they were interested in peaceful shooting contests, not fending off potential violent attackers.[49]  Reports from state adjutant generals in the North sometimes show Henrys and Winchesters in arsenal inventories, but these guns were always far outnumbered by the more popular rifles of the era in the region— Sharps, Spencers and Springfields.

69.     Beginning in about the mid-1870s, northerners became more interested in owning Winchesters and modern rifles in general, not for purposes of self-defense but for purposes of collective defense of their communities and states.  This was the period when National Guard units came into being, beginning in the northern states.  They were in effect state militias.  The engine that drove their creation was not a fear of tyranny or of insurrection but a nationalistic fervor fueled in particular by the nation's Centennial, which began to be celebrated in the early 1870s even before the major exhibitions and commemorations of 1876.[50]  With the rise of this movement came a perceived business opportunity for the Winchester company, which began placing ads for their rifles in northern newspapers,

---

[49] See, for example, an ad for many types of guns, including "Henry's Sporting Rifle," in Wilkes' *Spirit of the Times: The American Gentleman's Newspaper*, March 24, 1866, p. 59 (the ad was reprinted in the same weekly publication irregularly through June 16, 1866).

[50] Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. Hannah's dissertation is crucial for countering the assumption, now rejected by historians, that the rise of the National Guard movement in the northern states was a reaction to events in the South of the 1870s or to the Great Strike of 1877. See also, Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

(continued…)

magazines, and gun catalogs.  The greatest number of ads appeared in western Pennsylvania.[51]  The ads seem to have had some effect.  A newspaper published in northwestern Pennsylvania reported in October 1877 that "Winchester rifles are becoming quite fashionable in this section, and are rapidly displacing the old double-barreled rifles. . . . The Remington rifle is highly spoken of by those who have used it, but it is not a repeater, or 'stem-winder,' and so the Winchester is ahead."[52]

70.    The rise of National Guard units in northern states in the late 1870s inspired private armed companies to form, drill, and parade.  One of these groups was the Lehr und Wehr Verein of Chicago, Illinois, led by the Socialist activist Henry Presser.  Presser's company paraded one day in the spring of 1879.  They carried rifles—not Winchesters but Springfields.  Socialist sympathizers nearby joined with the group, and Presser was arrested and tried for organizing a private militia.  His case ended up in the Supreme Court, which ruled in the *Presser* case in 1886 that the armed company's actions were indeed unlawful.

**D.    Henrys and Winchesters in the Reconstruction-Era South**

71.    In the South during Reconstruction, high-capacity firearms proliferated far more than in any other region of the country.  The reason for this proliferation is clear: Winchester Repeating Rifles were the preferred weapon of two large state militias, those of Louisiana and South Carolina, that were organized to put down insurrection against state and national authority as well as terrorism against Black Americans.

72.    The story of the South Carolina state militia getting armed with Winchesters begins with the inauguration of Robert K. Scott as the state's governor in 1868.  Scott, a white man, was a pro-Reconstruction Republican.  He had been

_____

[51] See, for example, *James Bown and Son's Illustrated Catalogue and Price List*, 29th annual ed. (Pittsburgh, Penn., 1877), 33.

[52] *The Forest Republican* (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4.

1    born in Pennsylvania, he grew up in Ohio, and he became a high-ranking officer in

2    the U.S. army during the Civil War.  After the war, he was an officer in the

3    Freedman's Bureau.  As Governor of South Carolina, he endorsed and helped

4    arrange the creation of a pro-Republican state militia open to Black Americans and

5    pro-Republican whites.

6         73.    The state act creating the state militia was adopted in 1868.  The

7    militia was always a work-in-progress, so it is impossible to know exactly how

8    many men served in it at any given time.  A reasonable estimate is that 1000 men

9    were in the militia by 1869.  Scott hoped that the force would grow eventually to

10   6000.  Although the militia was open to pro-Republican whites, most of the

11   members were Black Americans.  The state did not have enough arms to supply the

12   men.  In the summer of 1869, the state's adjutant general traveled to Washington,

13   D.C. to arrange with the U.S. War Department for an allotment of funds to pay for

14   arms for the state militia.  This arrangement was a restoration of a policy that had

15   long been in place but had often fallen into disuse:  the U.S. War Department would

16   pay each state an annual allotment to sustain its state militia. With the funds that the

17   South Carolina adjutant general received in mid-1869, he helped arrange the

18   purchase of hundreds of guns, both Winchesters and Springfields.[53]

19        74.    By August 1869, Winchesters had begun to arrive in South Carolina,

20   earmarked for members of the state militia.  In the middle of that month, a company

21   of Black American state militiamen armed with Winchesters appeared at a wharf in

22   Charleston.  The occasion was the arrival of a white baseball team from Savannah,

23   which was scheduled to play a white team in Charleston.  A few days earlier, the

24   team had made the same trip.  But when it arrived, Black American civilians had

25   decided to disrupt the match as a form of protest.  They showed up on the streets,

26

27        [53] Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina*
     (Columbia: University of South Carolina Press, 1996), 75; Singletary, *Negro*
28   *Militia and Reconstruction*, 20-21.

got in the way of the white players as they made their way to the field, and hurled insults.  The team turned around and headed back to Savannah.  This time, on August 15, the Mayor of Charleston was prepared to make sure that things went smoothly—though not in a way that whites in the city would approve of.  He had given the order for the company of black state militiamen to arrive at the wharf and escort the Savannah baseball team to the playing fields. The game took place. But white Democrats in the city as well as the rest of the state (and throughout the whole of the former Confederacy) were furious.[54]  Meanwhile, Black Americans throughout the state celebrated the role that members of their race would play in the keeping of the peace.

75.   From late 1869 to early 1871, companies of black state militiamen armed with Winchesters appeared regularly across South Carolina.  At first, Governor Scott was thrilled with the organization.  On March 29, 1870, he delivered a speech that extolled the Black-American dominated militia as the best way to ensure that peace would return to the state and that future elections would be fairly held.  He particularly recommended that state militias be armed with Winchesters.  He had seen first-hand how these weapons intimidated potentially violent protesters even without being fired.  His neighboring state of Georgia should have such a militia staffed with blacks and armed with Winchesters, Scott advised. "I tell you the Winchester rifle is the best law that you can have there," he declared.  Georgia, one of the states that had had its pro-Democrat, anti-black militia dissolved by Congress in 1867, never did create a new militia.  Scott knew that it wouldn't.  His speech was meant to announce not only to South Carolina but to neighboring states that the old ways of the Confederacy were gone for good.  Members of the opposition to Scott and the Republicans in South Carolina became

---

[54] *Washington Evening Star*, Aug. 16, 1869, p. 1.

(continued…)

1  furious.  Many called him "Winchester Scott" and bewailed "Scott's Winchester

2  Rifle tactics."[55]

3      76.     During the election season of 1870, Scott decided that he had erred.

4  Opposition papers regularly reprinted his "Winchester" speech and attacked Scott

5  as a tyrant trying to stir up a race war.  Much more troubling was the fact that state

6  chapters of the Ku Klux Klan began plotting a response to Scott's speech and the

7  existence of the militia.

8      77.     The Klan had decided to meet Winchesters with Winchesters.  They

9  sent agents to the North to buy crates of Winchesters and ship them to South

10  Carolina in crates with false labels ("Agricultural Implements" said one; "Dry

11  Goods" said another).  The state militia and the U.S. army were able to intercept

12  some of the crates, but others arrived at their destination.  The Klan and auxiliary

13  white supremacist groups distributed the weapons to Scott's opponents in towns

14  across the state.[56]  Violence broke out across the state.  That was a regular

15  occurrence during election season, but this time the lethality was more severe than

16  usual.  Both sides had Winchesters.

17      78.     With the help of the intervention of the U.S. army and his own state

18  militia, Scott was able to win re-election in 1870.  Almost immediately he tried to

19  draw down the violence in the state by attempting to remove Winchesters from the

20  population.  Aided by U.S. army units, his administration attempted to confiscate as

21  many Winchesters as they could from insurrectionary groups like the Klan.  Then

22  he asked those state militiamen who were holding onto their Winchesters instead of

23  storing them in state arsenals to turn the weapons in.  Some Winchesters did end up

24  coming back into state arsenals, either by way of confiscation from Klansmen or

25  voluntary submissions by militiamen.  But most of the Winchesters stayed in

26  circulation.  Scott suspended the state militia.

27      [55] See, for example, *Charleston News*, Oct. 17, 1870, p. 2.

28      [56] Zuczek, *State of Rebellion*, 79-80.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

79.     In early 1874, South Carolina was again the site of violent uprisings from insurrectionists, and the pro-Republican government responded by re-forming the state militia.  The adjutant general of the state reported that he barely had any guns for the men.  In fact, a report he had issued the year before declared that there were 627 Winchesters in state arsenals.  Probably the official was worried that widespread arming of Black Americans and white Republicans with Winchesters would create a mini-civil war like the one in 1870.[57]  The re-activated state militia was poorly organized and poorly armed.  For armed support between 1874 and 1876, the Republican administration of the state relied mostly on the U.S. army.

80.     Then, in 1876, came the final battles between pro-Republican, U.S.-authorized armed men (the U.S. army units and state militia) and the insurrectionary opposition forces, the "Red Shirts."  Of the many reasons that the opposition forces could be categorized as insurrectionary, perhaps the most obvious was that they regularly stole weapons, including Winchesters, from state arsenals.[58]  When the voting in 1876 was over, the two sides in the struggle each declared victory.  Two governors then existed, and since no one was going to accept a resolution of the crisis by law, the state was in political chaos, with armed groups on each side ready to go to battle.  When companies of armed men marched for their respective candidates, plenty of them carried Winchesters.  Only some of those Winchesters had been obtained legally.  Those carried by the "Red Shirts" had almost certainly been stolen from state depots.

81.     The Louisiana state militia was created in 1870.  The story of how Louisiana state militiamen ended up armed with Winchesters starts before the organization was created.  In 1868, the New Orleans metropolitan police force was re-organized under Republican leadership.  It now used "Metropolitans" as its nickname.  Its members included Black Americans as well as whites of varying

---

[57] Zuczek, *State of Rebellion*, 140-41.

[58] Zuczek, *State of Rebellion*, 171.

ethnicities, the city being one of the most ethnically diverse in the country.  The number of Metropolitans in 1868 was small—perhaps just over 100—but by 1870 that number was close to 700.  During its earliest years, from 1868 to 1870, the Metropolitans' superintendent, A. S. Badger, armed many of the men with Winchesters.  In 1870, Governor Henry Warmoth engineered the creation of the state militia.  Warmoth envisioned a state militia that would be composed of 2,500 Black Americans and 2,500 white former Confederates.  The Confederates, in theory, would be loyal to the United States and thus supportive of Reconstruction programs created by Republicans.  Anyone could see that the two sides of this force would not fit together easily.  To help foster something approaching unity across the state militia, Warmoth appointed James Longstreet, a former Confederate General, as head of the state militia.  As part of the act creating the state militia, the New Orleans Metropolitans were incorporated into the state militia.  The Metropolitans after 1870 were thus both an urban police force and a company of state militiamen.  In this latter role, they were authorized to operate outside of city limits.  The Metropolitans were the best-trained unit in the state militia.  Because many of their number carried Winchesters, they were also the best armed.[59]

82.    Between 1870 and 1874, politics in Louisiana was multifaceted and ever-shifting.  Warmoth regularly changed his political stances, outside blocs suddenly gained inside influence, and through it all, pro-Democratic factions, supported by armed "White Leagues," tried to resurrect the Old South on the soil of Louisiana.  In 1872, William Kellogg won the governorship.  Kellogg was a Republican, one more radical than Warmoth and more in line with the Republicans in the U.S. Congress. Warmoth in 1872 had sided with John McEnery, a former

---

[59] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889* (Baton Rouge: Louisiana State University Press, 1996), 130-31; Singletary, *Negro Militia and Reconstruction*, 69-70.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1   Confederate, an anti-Reconstruction Democrat, and a leading voice for state

2   redemption.

3       83.   The state militia, composed of a group loyal to the Warmoth-McEnery

4   faction and a group loyal to Kellogg, was rendered ineffective after 1872 by its lack

5   of cohesion.  Individual units within the state militia were nonetheless important, as

6   they were the only legitimate state-level armed forces.  Of these units, the

7   Metropolitans remained the most effective and best armed, as they still carried

8   Winchesters, whereas most of the other units did not.  In politics, whoever

9   controlled the Winchester-armed Metropolitans would always have an advantage

10  because, as Governor Scott of South Carolina had said in 1870, "the Winchester

11  rifle is the best law that you can have."  By late April 1873, William Kellogg, the

12  newly elected Governor, had established control of the Metropolitans.

13  Unfortunately, he had established that control too late to use the Metropolitans to

14  help avert the worst racial massacre that the state had ever seen, probably the worst

15  racial massacre of Reconstruction: the Colfax Massacre of April 13, 1873.

16      84.   The tragedy of the Colfax Massacre has been the subject of much

17  historical study, but never from the perspective of a Winchester Repeating Rifle.

18  The combatants at Colfax, in Grant Parish, about 200 miles northwest of New

19  Orleans, consisted of one legitimate armed force and one illegitimate one.  The

20  legitimate armed force was a unit of the state militia led by William Ward, a Black

21  American who had fought for the U.S. during the Civil War.  More than 100 of

22  Ward's men, perhaps more than 150, would be murdered at Colfax.  The

23  illegitimate armed force was a "posse" deputized by two local men, one who

24  claimed to be a judge and one who claimed to be a sheriff.  In fact, as all in the

25  "posse" knew, the so-called judge and so-called sheriff had held those positions

26  under the former governor, not under the current governor, who had denied them

27  commissions that would have kept them in office.  The claim of the "judge" and

28  "sheriff" was that the former governor had in fact won the 1872 election and thus

that they held their positions legitimately.  (Election-result denial is not a new phenomenon; it was rampant in the South during Reconstruction.)  Years later, when the Colfax episode came before the U.S. Supreme Court in the form of the *Cruikshank* case, Justice Bradley, author of the controlling opinion, declared that leaders of the so-called posse were private citizens, not state officers.  Bradley was technically right.  But at the time of the Colfax Massacre, the lead murderers had donned masks of state-legitimated authority.  Neither the legitimate nor the illegitimate side at Colfax carried Winchesters.  But if William Ward had had his way, his side would have had them.

85.    Two days before the massacre, Ward had left Colfax for New Orleans. He knew that violence might erupt in Colfax, and he wanted to persuade Governor Kellogg to send military support.  Almost certainly, Ward was going to ask Kellogg to send the Winchester-armed Metropolitans.  Ward never made it to New Orleans. Even if he had, the Metropolitans could not have made it to Colfax in time to stop the massacre.  They might not have been willing to go—it would be another ten days beyond the massacre before their loyalty to Kellogg was cemented.  The important point amid all these hypotheticals is this:  William Ward believed that a cadre carrying Winchesters was the best chance his men had.

86.    By October 1873, the Metropolitans had pledged their loyalty to Kellogg, and Kellogg had helped secure for them and other state militia units hundreds of new Winchesters.  Kellogg dispatched the Metropolitans to Grant Parish, the site of the Colfax Massacre, to reestablish control of the area for the Republicans.  They and their Winchesters arrived at the end of the month—more than 25 weeks after William Ward had hoped they would come.[60]

87.    The power of the Metropolitans, along with their Winchesters, would soon stripped away.  Opponents of Kellogg gained control of the Metropolitans'

---

[60] *New Orleans Republican*, June 13, 1873, p. 1; *Ouachita Telegraph*, October 24, 1873, p 1.

1    Board by early 1864.  They reduced the numbers of the force and limited their
2    geographical range to New Orleans and its outskirts.  If violence broke out in a
3    rural area like Grant Parish, there would be nothing that the Metropolitans could do
4    about it. Then, on September 14, 1874, came the final blow: the Battle of Liberty
5    Place, fought in the heart of New Orleans.  Thousands of White Leaguers launched
6    a coordinated attack on the city.  Some of them may have been carrying
7    Winchesters, but none of the reports from that day mentioned Winchesters in their
8    hands.  The Metropolitans had Winchesters, of course, but they were outnumbered
9    more than 10 to 1 and easily overwhelmed.  After the White Leaguers had
10   demonstrated their superior force, Governor Kellogg knew that he might soon be
11   removed, so he engineered a compromise that kept him in office.  Part of the deal
12   was the disbandment of the state militia.  Thus ended the prospect of a reign-by-
13   Winchester Republican regime in Louisiana.[61]

14       88.    In the brief time that Winchesters were in the hands of southern state
15   militias, the rifles showed that they could do much to intimidate the forces of white
16   supremacy and insurrection.  But there was a dark flip side to the positive quality of
17   this particular high-capacity firearm.

18       89.    Those opposed to the state militias and to Reconstruction in general
19   used the presence of Winchesters in state militias as fodder to attack all
20   Republicans and especially Black Americans.  At a rally in April 1870, a Georgia
21   Black-American leader, Simeon Beard, pleaded for more guns so blacks could have
22   their own militia rather than relying on the U.S. army.  "We don't want soldiers; we
23   want the power to raise a militia; we want guns put in our hands, and we will see
24   whether we cannot protect ourselves.  Give us this, and we will give you the State
25   of Georgia evermore."  In response, a redeemer newspaper editor mocked Black
26   Americans like Beard who clamored "lustily for arms," including "Winchester

27   _____

28       [61] Rousey, *Policing the Southern City*, 155-56.

45

1    rifles." The redeemer editor then brought up the South Carolina experiment with

2    Winchester-armed state militias as evidence that the lives of ordinary white people

3    were in grave danger: "There are thousands of white people in this State who have

4    no arms at all, not even a pistol, while there is not one negro in three who does not

5    own some sort of firearm. They are armed now-fully armed. It is the white people

6    who need arms, not the negroes."[62]

7        90.    The Winchester was as much a symbolic weapon as a real one in the

8    battles between Republicans and Redeemers in the Reconstruction-era southern

9    states. Republicans saw the gun as the emblem of power—the sign that the cause

10   of Reconstruction had a strong, locally controlled force behind it. The Redeemers

11   saw the gun as evidence of the Republicans' tyranny and barbarity. In Texas,

12   Democrats opposed to Reconstruction howled that there must be "no money, no

13   Winchester rifles and ammunition" for Republicans—this despite the fact that

14   Republicans in the state had never suggested arming themselves with

15   Winchesters.[63]

16       91.    In terms of real as opposed to imagined Winchesters, even though the

17   weapons in Louisiana and South Carolina were housed under guarded armories,

18   they could still end up in the hands of insurrectionaries or criminals. In Louisiana,

19   as in all the states of Reconstruction, there were internal, often violent conflicts

20   over the control of the state government. By various means, from outright theft to

21   the legitimate winning of a state election, the opposition to a Republican

22   government in a state like Louisiana could gain access to Winchesters. Once these

23   weapons were in the hands of insurrectionary groups, they could end up with

24   anyone, including an outlaw with no particular political persuasion. That is

25   probably how a Winchester ended up among a large cache of arms held by the

26

27   [62] *Georgia Weekly Telegraph and Georgia Journal & Messenger*, April 5,
     1870, pp. 4, 8.

28   [63] *The Weekly Democratic Statesman* (Austin, Texas), August 24, 1871, p. 2.

1    husband-wife team known as the Guillorys, a pair of marauding thieves who went

2    on a rampage near Opelousas, Louisiana in the late summer of 1873.  When a posse

3    caught up with them, it easily dispatched the couple, killing the husband and

4    seriously wounding the wife.[64]

5        92.    By 1874, all of the state militias had been disbanded.  Redeemers—

6    those in each state wanting state redemption from Reconstruction—had been

7    against the state militias from the start and were glad to see them go.  By the end of

8    Reconstruction, all of the southern states had reverted to their pre-1867 militia

9    system, 1867 being the year that the U.S. Congress abolished all southern militias

10   except those in Arkansas and Tennessee.[65]  Under the renewed militia system,

11   volunteer militias could form on their own with the explicit or implicit approval of

12   state governors.  Because most of the southern state governments after 1874 were

13   ruled by pro-redemption Democrats, most of the militias that formed after 1874

14   were of the sort that would have been considered insurrectionary by pro-

15   Reconstruction Republicans in the states as well as by the Congressional

16   Republicans who had abolished such militias in 1867.

17       93.    The three states that were not controlled by Redeemers after 1874 were

18   Florida, Louisiana, and South Carolina.  In Louisiana and South Carolina, the 1876

19   state elections were disputed (so, too, quite famously, was the national election of

---

[64] "Another Battle," *The Opelousas Journal*, Aug. 29, 1873, p. 3.  A side note to the episode:  No one in the posse had a Winchester, and the Guillorys in the exchange of gunfire opted not to use their Winchester, only their low-capacity rifles and shotguns.

[65] The Texas Rangers claimed to be a state militia loyal to the U.S. right up until it was disbanded in 1877, but by 1874, if not earlier, the group was clearly on the side of the Democrats in the state.  A number of Democrats in 1877 pleaded with the state government not to disband the Rangers.  One wealthy Democrat in 1877 even offered the state government a voluntary donation of Winchesters for the state militia (the militia had not used Winchesters prior to that point).  The state government rejected the offer and disbanded the militia. See Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70; Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93.

(continued…)

47

1876).  In both states, as a result, the two contending sides, pro-redemption Democrats and pro-Reconstruction Republicans, claimed victory and claimed that their gubernatorial candidate was the legitimate governor of the state.  In each of these states, therefore, there were two governors.  Meanwhile, in Florida, there was no dispute over the governor's office, but there was conflict nonetheless because the electoral board of the state was controlled by pro-Reconstruction Republicans while the rest of the state government was controlled by pro-redemption Democrats.[66]  As a result of the internal conflicts within Florida, Louisiana, and South Carolina, the U.S. army dispatched troops to the capitals of each state.  The troops were intended to "keep the peace" in all the states, to ensure that the pro-Reconstruction Republican governors of Louisiana and South Carolina were accepted as the only legitimate governors of the states, and to protect the Florida electoral board from being disbanded by pro-redemption Democrats.

94.    The circumstances described above had important consequences for who came to possess Henrys and Winchesters by the end of Reconstruction. In Louisiana and South Carolina prior to 1874, these high-capacity firearms were possessed and regulated by pro-Reconstruction Republicans, who possessed them specifically for the purpose of state defense against armed insurrectionaries allied with pro-redemption Democrats.  Once pro-redemption Democrats in these states after 1874 claimed that their "governor" was the only legitimate governor of the state—a position supported by most whites in each state—the "governor" in question used his alleged authority to distribute Winchesters held in state armories to pro-redemption volunteer militia groups.  In Louisiana, the pro-redemption groups known as White Leaguers in 1876-77 marched through the streets of New Orleans demanding that their "governor," Francis T. Nicholls, be recognized as the

---

[66] Jerrell H. Shofner, "Florida Courts and the Disputed Election of 1876," *Florida Historical Quarterly*, 48 (July 1969), 26-46.

(continued…)

1  sole governor of the state.  At least 500 of the White Leaguers, but probably

2  hundreds more, carried Winchester rifles.[67]  According to a Black American who

3  later testified about events in New Orleans at the time, some of the White Leaguers

4  not only paraded with their Winchesters but also wore their old Confederate

5  uniforms.[68]  The U.S. army regarded these marchers as insurrectionaries.

6      95.    A similar situation played out in South Carolina, though there, the pro-

7  redemption Democrats were known as Red Shirts.  Beginning in 1874 and

8  continuing through 1876, South Carolina Red Shirts created volunteer militias that

9  obtained Winchesters from pro-redemption authorities in the state government.

10  There were many Winchesters to be had in that state, as the pro-Reconstruction

11  Governor Robert "Winchester" Scott back in 1869-1870 had purportedly ordered

12  thousands of them.  The exact number that Scott had acquired remains in dispute.[69]

13  Whatever the number was, it seems that only a few hundred ended up in the hands

14  of Red Shirts in the 1874-76 period, though that was still a few hundred more than

15  Republicans of the era thought was legal.[70]

16      96.    Despite these developments, the total number of Henrys and

17  Winchesters in the southern states during Reconstruction remained small relative to

18  firearms in general in the country—no more than 8,000, I would estimate.[71]

---

[67] *Chicago Daily Inter Ocean*, January 12, 1877, p. 1; *New Orleans Republican*, March 13, 1877, p. 2.

[68] Testimony of William Murrell, *Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States* (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521.

[69] During the U.S. Congressional investigations into Klan activities, investigators tried to ascertain how many Winchesters had actually arrived in South Carolina for Scott's militia; they failed to learn what the number was, though one witness did confirm that the Winchesters that did arrive there were intended for the state militia, including the Black Americans among them. See 42nd  Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), *U.S. Congressional Serial Set* (1871), p. 467; and ibid., vol. 4 (South Carolina,), p. 767.

[70] Zuczek, *State of Rebellion*, 140-41, 170-71 (some of the Winchesters were referred to as "militia guns"; see ibid., 171).

[71] This estimate is based on the assumption that all 6,000 Winchesters that
(continued…)

49

1  Equally important, almost all of these high-capacity firearms were in the hands of

2  law enforcement officers, either U.S. soldiers, pro-Reconstruction militias, or pro-

3  Redemption militias.  These last set of armed bodies were illegitimate, to be sure—

4  chapters of the KKK were among them—but, importantly, even they regarded it

5  essential to claim that it was their status as militiamen, and only that status, that

6  legitimated their possession of high-capacity firearms.

7       97.    With only a few exceptions (fewer than five), all reliable reports in

8  which Henrys or Winchesters were mentioned in accessible records from the

9  Reconstruction South indicate that they were regarded solely as firearms for

10  legitimate law enforcement officers.[72]  An example of an exception comes from

11  Marianna, Florida in September 1869.  There, a group of about twenty-five Black

12  Americans, including women and children, were having a barbecue.  From the

13  woods nearby an unseen assailant fired "thirteen or fourteen shots in rapid

14  succession," killing and wounding many of the party.  The U.S. officer who later

15  reported on the episode assumed that the assailant had used a Henry rifle because of

16  the speed and volume of the shots fired.  He wrote to his superior asking for a

17  "first-class detective" to be sent to the town to investigate who the perpetrator or

18  perpetrators might be.  "If detectives can't be furnished," he added, "a few Henry

19  rifles would have an excellent moral effect here."[73]

20       98.    At least some state-level law enforcement officials outside of

21  Louisiana and South Carolina ended up with Henrys or Winchesters.  A pro-

_____

22  Governor Scott ordered for the South Carolina state militia were delivered (the
23  exact number delivered is unknown, and most likely it is lower).  When this number
   is combined with the roughly 1,000 Winchesters used to arm the Metropolitans in
24  Louisiana over a six-year period, along with perhaps another 1,000 stolen from U.S.
   army depots, the sum is 8,000.

25  [72] This declaration does not accept as evidence second- or third-hand rumors
   of Henrys or Winchesters being present, though even such rumors prior to 1870
26  were infrequent.

27  [73] J. Q. Dickinson to "Hamilton," in 42nd  Cong., 2nd sess., "Affairs in
   Insurrectionary States," vol. 13 (Florida), *U.S. Congressional Serial Set* (1871), pp.
28  289-90.

                                                    (continued…)

1  Republican jailer in a sheriff's office in Alabama was able to use a Winchester to
2  fend off attacking Klansmen in January 1871.[74]  In 1873, a dozen men in
3  southwestern Texas deputized to fight Native Americans near the Mexican border
4  were successful in subduing the Natives and, in reward, were presented by the state
5  legislature with Winchester rifles (they had not used Winchesters to fight the
6  Natives, though the Natives that they fought might well have used Winchesters).[75]
7  The most revealing example comes from 1875 Mississippi, in the testimony of
8  Sheriff John Milton Brown of Coahoma.  Brown was the first Black American
9  sheriff anywhere in Mississippi.  He reported that Black Americans in his region
10  had no guns and implied that they had been ordered to turn in their arms to the
11  white insurrectionaries who controlled most of the state.  Brown, though, had not
12  turned in any weapons because he believed that his position as sheriff allowed him
13  to keep his weapons.  As he told an investigator, he had "one Henry rifle" and he
14  thought that he "was justified in having that, because I was sheriff."[76]

15      99.    Americans have long disputed and no doubt will continue to dispute
16  the meaning, implications, and correctness of the U.S. Supreme Court's two earliest
17  "Second Amendment" opinions, which were offered during or soon after
18  Reconstruction:  *U.S. v. Cruikshank* and *Presser v. Illinois*.[77]  But one issue
19  regarding those cases is beyond dispute: they did not involve high-capacity
20  firearms.  There were no Henrys or Winchesters at Colfax on the tragic day of the
21  massacre there in 1873.  There were none in the hands of the military companies

22
23  [74] 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama), *U.S. Congressional Serial Set* (1871), pp. 414-15.
24  [75] *Texas Session Laws*, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26.
25  [76] 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of
26  Migration of Negroes from Southern to Northern States," *U.S. Congressional Serial Set* (1879-88), 357.
27  [77] *U.S. v. Cruikshank*, 92 U.S. 542 (1875); *Presser v. Illinois*, 116 U.S. 252
28  (1886).

(continued…)

that marched on that spring day in Chicago in 1879—the episode that would lead to the 1886 *Presser* decision (Presser's men carried single-shot Remington rifles).[78] On the question of whether the law could treat high-capacity firearms differently from other types of weapons, the Reconstruction-era Justices had nothing to say. But the land they lived in, the land they ruled over, was one where high-capacity firearms were held only by a select few, almost all of whom were U.S. soldiers or civilian law enforcement officers sworn to uphold the U.S. government. These gunmen held their distinctive weapons not to defend themselves as individuals from imagined foes but to defend their state and country against all-too-real criminals and insurrectionaries.

100.   Many of these gunmen were Black Americans, specifically the Black American men who made up the largest contingents of southern state militias. Serving in these militias was one of many ways that Black Americans demonstrated their gun-bearing rights. Other ways that this right was demonstrated are well known to scholars: Black Americans helped make sure that the U.S. government and state authorities overturned white supremacist efforts to ban blacks from militias, deny them access to firearms, or seize their firearms (these efforts had been embodied in the southern state Black Codes of 1865-67, which were overturned by the Civil Rights Act of 1866 and the Fourteenth Amendment of 1868). It is worth noting, though, that a Black American who carried a Winchester for a state militia was different from the much larger population of Black Americans who did not belong to state militias. The Winchester-toting black militiaman held his gun only with the authorization of and regulation by the state government. He did not own his gun. It belonged to the state. It was supposed to be in an armory, not at a private home, when not in militia-use. Hypothetically, if Black Americans wanted Henrys or Winchesters at their homes, they might lawfully have been allowed to

---

[78] "The Reds," *Chicago Daily Tribune*, March 23, 1879, p. 7.

1  have them there.  But this hypothetical scenario is irrelevant.  Southern Black

2  Americans for the most part lacked the means to buy Winchesters.  Mostly rural

3  workers, their wages were notoriously low—sometimes only in the form of shares

4  of crops—and they would not be inclined to spend $30 to $40 on a gun that would

5  represent perhaps 3 to 6 months wages.  There was no necessity for them to do so:

6  perfectly adequate guns for individual self-defense, even some "repeaters," would

7  have been in their price range.

8      101.   The Fourteenth Amendment assured Black Americans that they could

9  possess firearms for self-defense but did not assure them that they could possess

10  any firearms they wanted, including high-capacity rifles.  This same principle of the

11  Amendment held equally true for whites.

12      102.   Americans in the Reconstruction-era South understood perhaps better

13  than anyone that Henrys and Winchesters were weapons for organized military use

14  that did not belong in the general population.  Except for a small number of

15  insurrectionary militias, like the Ku Klux Klan, the enemies of the Republican state

16  administrations in Louisiana and South Carolina that armed their state militias with

17  high-capacity firearms did not respond by trying to obtain the same weapons for

18  themselves.  Rather, they responded by demanding the removal of the weapons and

19  the organizations that carried them.  When these opposition factions came into

20  power in 1877, they disbanded the state militias and warehoused the Winchesters.

21  To be sure, they maintained laws that allowed citizens to possess firearms for their

22  individual self-defense, but they did not view high-capacity firearms as appropriate

23  for such a purpose.

24      103.   My examination of statutes and state-level court opinions from the

25  Reconstruction-era South revealed that firearms were sometimes mentioned as

26  weapons of individual self-defense, but in such instances, the types of firearms

27

28

1    mentioned were, with one exception, low-capacity firearms such as pistols,

2    revolvers, muskets, and rifles.[79]

3        104.   The one potential exception comes from a Tennessee state court

4    opinion of 1871, *Andrews v. State*.  The court in *Andrews* ruled that among the

5    weapons a citizen might possess were rifles "of all descriptions," including "the

6    shot gun, the musket, and repeater."[80]  This opinion has been cited by at least one

7    scholar as evidence that high-capacity firearms were understood to be possible

8    weapons of individual self-defense.[81]  Yet, a "repeater" at the time of the *Andrews*

9    opinion (1871), and during the whole of Reconstruction, would have been

10   understood to be a low-capacity repeating rifle, such as a Spencer or Sharps, neither

11   of which could hold more than ten rounds.  The parlance of the day put Henrys and

12   Winchesters in a separate category from "repeaters."  Again and again during

13   Reconstruction, from the Western Territories to the northern and southern states,

14   when a cache of firearms was described, Henrys and Winchesters, though obviously

15   repeating rifles, were always listed separately from "repeaters."  Furthermore, the

16   firearms mentioned in Judge Thomas J. Freeman's majority opinion in *Andrews*—

17   shotguns, muskets, repeaters—were mentioned exclusively in terms of what a

18   person might possess in his role as a member of the militia.  The chief judge of the

19   court, Alfred O. P. Nicholson, joined in that opinion.  There was one judge on the

20   court, though, who believed that the Andrews opinion should go further—that it

21   should allow individuals to possess any weapon, regardless of what the militias in

22   the state did or did not possess.  That judge, Thomas A. R. Nelson, expressed his

23

24        [79] The survey that I conducted was of all state statutes and state-level cases in
25   the period 1863-1877 from the South relating to regulation of weapons. A list of
     state-level cases from all states appears at https://guncite.com/court/state/ (accessed
     September 25, 2022).

26        [80] *Andrews v. State*, 50 Tenn. (3 Heisk.) 179 (1871).

27        [81] See, for example, Kopel, "The Second Amendment in the 19th Century,"
     B.Y.U. L. Rev. 1359, 1418-21 (1998).

28                                                                (continued…)

1   view in a concurring opinion, which he alone signed.  The opinion did not mention
2   Henrys or Winchesters as weapons that he thought that any individual might
3   possess.[82]

4       105.   Even more revealing evidence for Reconstruction-era officials
5   believing that high-capacity firearms should be regulated comes from Louisiana.
6   Of the states that had militias that carried Henrys or Winchesters, Louisiana was the
7   only one that left behind a readily accessible record of how these high-capacity
8   firearms were to be managed by state authorities.  All arms for the state militia were
9   overseen by the state adjutant general, James Longstreet.  A former Confederate
10  General who joined the Louisiana Republican Party after the Civil War—a move
11  that forever marked him as a turncoat by his former Confederate comrades—
12  Longstreet well understood the ongoing insurrectionary intentions of former
13  Confederates in his state and elsewhere.  He thought it crucial to ensure that such
14  men did not end up with Winchesters, and that they be incited as little as possible
15  by the sight of Winchesters being carried in public by their organized enemies,
16  Black-American militiamen foremost among them.  For these reasons, he took
17  extraordinary precautions concerning the Winchesters that were held in the New
18  Orleans armory.  His orders for the armory began with typical provisions such as
19  putting guards around the building and making sure that all guns inside were racked
20  when not in authorized use.  Then, in the last provision of his orders, he turned
21  specifically to Winchesters.  They were not to "be taken to pieces, or any part of
22  [them] removed . . . unless authorized by the Division Commander."  The
23  Winchesters were also not to be used for "parade or drill upon the streets or public
24  highways" without the Division Commander's authority.  Such restrictions were
25  not put on the other weapons in the arsenal; they were only for the Winchesters.[83]

---

26      [82] *Andrews v. State*, 50 Tenn. (3 Heisk.) 193-200 (1871).

27      [83] Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in *Annual Report of the Adjutant General of the State of Louisiana*, for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39.

28

## VI. CONCLUSION. RECONSTRUCTION AND TODAY: CONTINUITY AND CHANGE

106.    How does the situation surrounding high-capacity firearms today compare to the Reconstruction era?  High-capacity firearms are still being sold under the name Winchester, by companies such as Browning, but the Winchester Repeating Rifle Company ceased to exist long ago.  Of course, high-capacity firearms can be found under plenty of other names today.  But whereas today the owners of such firearms might be civilians, in the Reconstruction era they would be almost exclusively soldiers or law enforcement officers.  There were civilians during Reconstruction who owned high-capacity rifles, to be sure.  Yet almost all such civilians were "frontiersmen" of the Western Territories, and the population of the Western Territories was tiny compared to the population of the United States as a whole.  Furthermore, Henrys and Winchesters, the only high-capacity firearms of the era, were not the preferred firearms of the "frontiersmen" of the region.

107.    By far the largest population possessing Henrys and Winchesters during Reconstruction were members of state-wide militias.  These organizations no longer exist under their Reconstruction name of "state militias."  They evolved into the National Guard, a term first used in place of "state militias" in the North in the 1880s but ultimately applied to all state-level forces that were auxiliary to the U.S. army, including those in the South. National Guard units today are not analogues to the Reconstruction-era state militias; they are direct descendants.[84] And they operate in exactly the same way.  They are under the command of state governors but can be used as auxiliary forces of the U.S. army—that is, they can be "federalized."[85]  Membership in the National Guard, like membership in the

---

[84] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

[85] The statutory language that enabled Abraham Lincoln to call up state militias in 1861, which was then invoked occasionally during Reconstruction to

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1    Reconstruction-era state militias, is regulated.  National Guard units, like

2    Reconstruction-era state militias, are expected to have proficiency with the weapons

3    they use and to have unfailing allegiance to the recognized governments of their

4    state and nation.  Their access to high-capacity firearms is regulated.  Such weapons

5    are typically kept under guard in a central location, such as an armory, and

6    dispensed to their users only for purposes of drilling, training, or actual use on those

7    occasions when National Guard units are called out.  Beside today's National

8    Guard, other users of high-capacity firearms at present include civilian law

9    enforcement officers.  As this declaration has shown, the analogs of such officials

10   during the Reconstruction era—urban policemen, sheriffs, or U.S. marshals—also

11   were known on occasion to carry high-capacity firearms.

12       108.   What is distinctly different today compared to Reconstruction is the

13   ownership of high-capacity firearms by Americans who have no connection to the

14   military or law enforcement.  If such owners along with their weapons were

15   transported by a time machine back to the Reconstruction-era South, they would

16   find themselves suspected of being outlaws by law enforcement officers.  If they

17   then gathered together into organized companies, they would be considered

18   insurrectionary militias, which is precisely how the Ku Klux Klan was regarded

19   during Reconstruction by the U.S. army, the state militias, and other legitimate,

20   pro-Union law enforcement officials.

21

22

23   federalize state militias, now resides in the statute that enables the President to
     federalize the National Guard; see 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A
24   Stat. 15; Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006, 119 Stat.
     3440).  One of the reasons for the rise in significance of the National Guard after
25   Reconstruction was the federal "Posse Comitatus Act" of 1878, which prohibited
     the direct intervention of the U.S. army into states except in extraordinary
26   circumstances.  After that legislation, the National Guard units were needed not so
     much as auxiliaries to the U.S. army as substitutes for them.  On the "Posse
27   Comitatus Act" see Gautham Rao, "The Federal "Posse Comitatus" Doctrine:
     Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," *Law*
28   *and History Review*, 26 (Spring, 2008), 1-56.

1        Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the

2    laws of the United States of America that the foregoing is true and correct.

3        Executed on November 10, 2022, at Providence, Rhode Island.

4

5

6

7    Michael Vorenberg

8    Michael Vorenberg

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

## INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of Michael Vorenberg | 1-10 |

# EXHIBIT A

## <u>CURRICULUM VITAE</u>

**Michael Vorenberg**
Associate Professor of History
Brown University

<u>Education</u>   Ph.D. in History, Harvard University, November 1995 (American History)
A.M. in History, Harvard University, March 1990 (American History)
A.B. in History, Harvard University, June 1986, *summa cum laude* (Ancient History)

### <u>Professional Appointments</u>

Associate Professor of History (with tenure), Brown University, 2004-
Vartan Gregorian Assistant Professor, Brown University, 2002-2004
Assistant Professor, History Department, Brown University, 1999-
Assistant Professor, History Department, SUNY at Buffalo, 1996-99
Post-Doctoral Fellow, W.E.B. Du Bois Center, Harvard University, 1995-96
Lecturer, History and Literature Program, Harvard University, 1995-96

### <u>Scholarship</u>

**Books**
*Lincoln's Peace: The Elusive End of the American Civil War* (forthcoming
with Alfred A. Knopf).
*The Emancipation Proclamation: A Brief History with Documents* (Bedford/St.
Martin s, 2010).
*Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth
Amendment*.  Cambridge: Cambridge University Press, 2001.
(Paperback edition, 2004.)

**Chapters in Books**
"The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian
Samito, ed., *The Greatest and and the Grandest Act: The Civil Rights Act of 1866
from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University
Press, 2018), 60-88.
"The Thirteenth Amendment," in *1865: America Makes War and Peace* in *Lincoln's
Final Year* (Carbondale, Ill.: Southern Illinois University Press, 2015), 7-21.
"Liberté,  galité, and Lincoln: French Readings of an American President," in Richard
Carwardine and Jay Sexton, eds., *The Global Lincoln* (New York: Oxford
University Press, 2011), 95-106.
"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in
Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary
Relevance of the Thirteenth Amendment* (New York: Columbia University Press,
2010).

"Did Emancipation Create American Citizens : Abraham Lincoln s View" (in Russian), in Victoria Zhuravleva, ed., *Abraham Lincoln: Lessons of History and the Contemporary World* (Moscow: Russian State University for the Humanities Press, 2010).

"Abraham Lincoln s Fellow Citizens Before and After Emancipation," in William A. Blair and Karen Fisher Younger, eds., *Lincoln's Proclamation: Emancipation Reconsidered* (Chapel Hill: University of North Carolina Press, 2009), 151-169.

"The Thirteenth Amendment Enacted," in Harold Holzer and Sara Vaughn Gabbard, eds., *Lincoln and Freedom: Slavery, Emancipation, and The Thirteenth Amendment* (Carbondale, Ill.: Southern Illinois University Press, 2007).

"After Emancipation: Abraham Lincoln s Black Dream," in John Y. Simon, Harold Holzer, and Dawn Vogel, eds., *Lincoln Revisited* (New York: Fordham University Press, 2007)

"Slavery Reparations in Theory and Practice: Lincoln s Approach," in Brian Dirck, ed., *Lincoln Emancipated: The President and the Politics of Race* (DeKalb: Northern Illinois Univ. Press, 2007).

"Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions in the History of Postbellum America* (New York: Oxford University Press, 2006).

"The World Will Forever Applaud: Emancipation," in Aaron Sheehan-Dean, ed., *The Struggle for a Vast Future: The American Civil War* (Oxford, UK: Osprey, 2006).

"Emancipating the Constitution: Francis Lieber and the Theory of Amendment," in Charles R. Mack and Henry H. Lesesne, eds., *Francis Lieber and the Culture of the Mind* (Columbia: Univ. of South Carolina Press, 2005).

"The Chase Court (1864-1873): Cautious Reconstruction," in Christopher Tomlins, ed., *The United States Supreme Court: ThePursuit of Justice* (Boston: Houghton Mifflin, 2005).

"Bringing the Constitution Back In: Amendment, Innovation, and Popular Democracy during the Civil War Era," in Meg Jacobs, William Novak, and Julian Zelizer, eds., *The Democratic Experiment: The Promise of American Political History* (Princeton: Princeton University Press, 2003).

"The King s Cure: Abraham Lincoln and the End of Slavery," in Charles Hubbard, ed., *Lincoln Reshapes the Presidency* (Mercer, Penn.: Mercer Univ. Press, 2004).

"Rutherford B. Hayes," in Alan Brinkley and Davis Dyer, eds., *TheReader's Companion to the American Presidency*. Boston: Houghton Mifflin, 2000.

"Abraham Lincoln and the Politics of Black Colonization," in Thomas F. Schwartz, ed., *"For a Vast Future Also": Essays from the Journal of the Abraham Lincoln Association*. New York: Fordham University Press, 1999. (Reprint of article listed below.)

Michael Vorenberg c.v., page 2

**Refereed Journal Articles**

"Spielberg s *Lincoln*: The Great Emancipator Returns," *Journal of the Civil War Era*, 3 (December 2013), 549-72.

"Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (December 2005), 416-26.

" The Deformed Child : Slavery and the Election of 1864." *Civil War History*, 47 (September 2001), 240-257.

"Abraham Lincoln and the Politics of Black Colonization." *Journal of the Abraham Lincoln Association*, 14 (Summer 1993): 23-46.

**Non-Refereed Journal Articles**

"Emancipation   Then What ," *New York Times*, "Disunion" Blog, January 15, 2013, http://opinionator.blogs.nytimes.com/2013/01/15/emancipation-then-what/  php true& type blogs& r 0

"Hearts of Blackness: Reconsidering the Abolitionists   Again," *Reviews in American History*, 32 (March 2004), 33-40.

"The Battle Over Gettysburg: What Lincoln Would Have Said about September 11, 2001." *Brown Alumni Magazine*, 103 (Jan./Feb. 2003), 27.

"Recovered Memory of the Civil War," *Reviews in American History*, 29 (Dec. 2001), 550-58.

**Invited Lectures**

"A Righteous Peace: Abraham Lincoln, the Civil War, and the End of Slavery," The Humanities Forum, Providence College, Oct. 18, 2019.

"How Wars End--or Don t: The Civil War as a Case Study," Henry E. Huntington Society of Fellows Lecture, May 8, 2019.

"Lincoln s Peace: The Struggle to End the American Civil War," Occidental College (Billington Lecture), Feb. 21, 2019.

"The Fate of Slavery after Emancipation," The Great Lectures Series (as OAH Distinguished Lecturer), New York City, October 14, 2017.

"Abraham Lincoln, the Thirteenth Amendment, and the Struggle for American Peace and Freedom," University of Saint Mary Annual Lincoln Lecture, Topeka, Kansas, February 20, 2017.

"The 14th Amendment as an Act of War," Boston College, Clough Center, Newton, Massachusetts, September 20, 2016.

"Born in the USA   So What " Worcester Polytechnic Institute, Constitution Day University Speaker, Worcester, Massachusetts, September 19, 2016.

"The Slave Power on the Gallows: The Deeper Meaning of the Execution of Henry Wirz, Confederate Commandant," University of California, Berkeley, Legal History Workshop, March 29, 2016.

Salmon P. Chase Symposium on the Thirteenth Amendment (participant), Georgetown Law Center, Dec. 4-5, 2015, Washington, DC.

"The Last Surrender: Looking for the End of the Civil War," presented at The Lincoln Forum, Gettysburg, Pennsylvania, November 17, 2015.

Michael Vorenberg c.v., page 3

"Voting Rights and the Meaning of Freedom: The View from the Civil War Era," Annual Lincoln Legacy Lecture, University of Illinois at Springfield, October 15, 2015.

"Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment," Roger Williams University, October 6, 2015.

"Lincoln and the Jews, Freedom and Discrimination," Brown Hillel Alumni Association, New York City, May 17, 2015.

"When Should History Say That Slavery Ended in the United States ," Center for Slavery and Justice, Brown University, May 8th, 2015.

"Lincoln, the Constitution, and the Civil War," Community College of Rhode Island, April 29, 2015.

"Judgment at Washington: Henry Wirz, Lew Wallace, and the End of the Civil War," Annual Symposium of Capitol Historical Society, Washington, DC, May 2, 2014.

"Emancipation, Lincoln, and the Thirteenth Amendment," Dole Forum, Dole Institute of Politics, University of Kansas, Lawrence, Kansas, November 21, 2013.

"Spielberg s Lincoln and the Relation between Film and History," Department of History, Loyola University, Chicago, Illinois, November 13, 2013.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Newberry Library Colloquium, Chicago, Illinois, November 6, 2013.

"Reconstruction and the Origins of Civil Rights," National Endowment for the Humanities Summer Institute on Civil Rights History, Harvard University, Cambridge, Massachusetts, July 1, 2013.

"The Origins and Process of Emancipation," Emancipation at 150 Symposium, Boston College Clough Center, Newton, Massachusetts, April 23, 2013.

"Emancipation   Then What   Citizenship " Emancipation Proclamation Symposium, University of Michigan, October 26, 2012.

"Blood, Allegiance, Belief: The Meanings of Citizenship in the Civil War Era," University of Michigan Law School, January 31, 2012.

"American by War: The People and Their Nations during the Civil War," Phillips Andover Academy, Andover, MA, Nov. 17, 2011.

"Birthright and the Myth of Liberal Citizenship," JANUS Forum, Brown University, Nov. 15, 2011.

"American by War: The People and Their Nations during the Civil War," Western Kentucky University, Bowling Green, KY, Oct. 12, 2011.

"The Elections of 1860 and 2010 and the Politics of Citizenship," Colby College Symposium on the American Civil War Sesquicentennial, Waterville, Maine, November 10, 2010.

"Americans Debate Citizenship   Then and Now," Brown Club of England, October 12, 2010, London.

"War Powers, *Ex Parte Merryman*, and the Relevance of the American Civil War," American Bar Association Workshop for High School Teachers, Washington, D.C., June 19, 2010

"Originalism and the Meanings of Freedom," Georgetown Law School, Washington, D.C., March 30, 2010.

"Abraham Lincoln, Politician," Rotary Club of Rhode Island, Warwick, R.I., November 6, 2008.

<div style="text-align:center">Michael Vorenberg c.v., page 4</div>

"Lincoln the Citizen," Abraham Lincoln Symposium, National Archives, Washington, D.C., September 20, 2008.

"Emancipation and its Meaning in Current Scholarship," National Endowment for the Humanities Summer Institute on "Slavery and Emancipation," Philadelphia, Pennsylvania, July 28, 2008.

"Lincoln the Citizen  Or Lincoln the Anti-Citizen ," Abraham Lincoln Symposium, Springfield, Illinois, February 12, 2008.

"The Tangled History of Civil Rights and Citizenship in the Civil War Era," University of Virginia School of Law, November 2007.

"Civil Liberties and Civil Rights: The Civil War Era," American Bar Association, Chicago, May 2006.

"Race, the Supreme Court, and the Retreat from Reconstruction," Boston College School of Law, April 2007.

"Forever Free: The Meanings of Emancipation in Lincoln s Time and Ours," St. Louis University, December 7, 2006.

"Slavery Reparations in Historical Context," Connecticut College, New London, Connecticut, March 2, 2006.

"Abraham Lincoln, The Civil War and the Conflicting Legacies of Emancipation," presented as part of the "Forever Free" series, Providence Public Library, Providence, R.I., January 26, 2006.

"Abraham Lincoln, War Powers, and the Impact of the Civil War on the U.S. Constitution," presented at symposium on "War Powers and the Constitution," Dickinson College, Dickinson, Penn., October 3, 2005.

"Reconsidering Law, the Constitution, and Citizenship," presented at "New Directions in Reconstruction" symposium, Beaufort, S.C., April 15-18, 2004.

"Abraham Lincoln, Slavery, and Modern Legacies," Public History Series, University of Las Vegas, Nevada, February 12, 2004.

"Oaths, African Americans, and Citizenship," University of Nevada at Las Vegas Law School, February 12, 2004.

"Reconsidering the Era of the Oath: African Americans Before Union Military Courts during the American Civil War," presented to the Law and  History symposium, Northwestern University Law School, Chicago, Ill., November 3, 2003.

"Racial and Written Constitutions in Nineteenth-Century America," presented to the workshop of the Department of History, Boston College, Newton, Massachusetts, March 2003.

"Abraham Lincoln, Abolition, and the Impact of the Civil War on the Cult of the Constitution," presented at the Social Law Library, Suffolk University, Boston, Massachusetts, February 2002.

 "Francis Lieber, Constitutional Amendments, and the Problem of Citizenship," presented at The Francis Lieber Symposium, University of South Carolina, Columbia, S.C., November 2001.

"How Black Freedom Changed the Constitution," presented at the "Writing the Civil War" symposium, Atlanta History Center, Atlanta, Georgia, September 2001.

Michael Vorenberg c.v., page 5

"From a Covenant with Death to a Covenant with Life: The Constitution s Transformation during the American Civil War," presented as the Annual Constitutional Anniversary Lecture, National Archives, Washington, D.C., September 2001.

"New Perspectives on Abraham Lincoln, Emancipation, and the Civil War," presented to the Civil War Round Table of Rhode Island, Cranston, Rhode Island, June 2001.

"Historical Roots of the Modern Civil Rights Movement: The Constitution," presented at the Civil Rights Summer Institute, Harvard University, Cambridge, Massachusetts, June 2001.

"Race, Law, and the Invention of the State Action Doctrine in the Late Nineteenth Century," presented at the Columbia University Law School, New York City, April 2001.

"A King s Cure, a King s Style: Lincoln, Leadership, and the Thirteenth Amendment," presented at the "Abraham Lincoln and the Legacy of the Presidency" conference, Lincoln Memorial University, Harrogate, Tennessee, April 2001.

"The Tangled Tale of Civil War Emancipation," presented at the University of Richmond, Richmond, Virginia, March 2001.

"The King s Cure: Abraham Lincoln, the Thirteenth Amendment, and the Fate of Slavery," presented at the Abraham Lincoln Institute of the Mid-Atlantic, Washington, D.C., March 2001.

"Race, the Supreme Court, and the Retreat from Reconstruction," presented at the Boston College School of Law, Newton, Mass., April 2000.

**Papers Read or Discussed**

"Prisoners of Freedom, Prisoners of War: An Untold Story of Black Incarceration--And How it Might be Told," Brown Legal History Workshop, Oct. 28, 2019.

"Bearer of a Cup of Mercy: Lew Wallace s American Empire," Henry E. Huntington Library, Research Fellows Meeting, Feb. 6, 2019.

"Anti-Imperialism and the Elusive End of the American Civil War," presented at the "Remaking North American Sovereignty" Conference, Banff, Alberta, Canada, July 31, 2015.

"The Election of 1864: Emancipation Promised, Emancipation Deferred," presented at The Annual Meeting of the Organization of American Historians, Atlanta, Georgia, April 11, 2014.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Department of History, Northwestern University, Evanston, Ill., Nov. 15, 2013.

"Birth, Blood, and Belief: Allegiance and the American Civil War," presented at the Elizabeth Clark Legal History Workshop Series, Boston University School of Law, Nov. 16, 2011.

"French Readings of Lincoln s Role in the Creation of American Citizenship," presented at the conference on European Readings of Abraham Lincoln, His Times and Legacy, American University of Paris, Paris, France, October 18, 2009.

Michael Vorenberg c.v., page 6

"Was Lincoln s Constitution Color-Blind ," presented at the Abraham Lincoln Bicentennial Symposium, Harvard University, Cambridge, Mass., April 24, 2009.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," presented at conference on Slavery, Abolition, and Human Rights: Interdisciplinary Perspectives on the Thirteenth Amendment, April 17, 2009

"Did Emancipation Create American Citizens    Abraham Lincoln's View," presented at the conference on Abraham Lincoln: Issues of Democracy and Unity, Russian State University, Moscow, Feb. 8, 2009.

"The Racial and Written Constitutions of Nineteenth-Century America," Cogut Center for the Humanities, Brown University, Nov. 4, 2008.

"Civil War Era State-Building: The Human Cost," Boston University Political History Workshop, March 19, 2008.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," annual meeting of the *Law and Society Association*, Montreal, May 30, 2008.

"Claiming Citizenship: Black and White Southerners Make Their Cases During the Civil War," presented at the annual meeting of the *Southern Historical Association*, Memphis, November 2004.

"Imagining a Different Reconstruction Constitution," presented at the annual meeting of the Social Science History Association, Baltimore, November 2003.

"West of Reconstruction: Resolving Mexican-American Property and Citizenship in the Civil War Era," presented at the annual meeting of the *American Historical Association*, San Francisco, California, January 2002.

"The Limits of Free Soil: The Resolution of Mexican Land Claims during the American Civil War," presented at the annual meeting of the *Organization of American Historians*, St. Louis, Missouri, April 2000.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Nineteenth-Century America," presented at the annual meeting of the *American Society for Legal History*, Toronto, Ontario, October 1999.

"Law, Politics, and the Making of California Free Soil during the American Civil War," presented at the annual meeting of the *Western History Association*, Portland, Oregon, October 1999.

"Land Law in the Era of Free Soil: The Case of New Almaden," *American Society for Environmental History*, Tucson, Arizona, April 1999.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Antebellum America," presented at the annual meeting of the *Society for Historians of the Early American Republic*, Harpers Ferry, W.V., July 1998.

"The Constitution in African-American Culture: Freedom Celebrations and the Thirteenth Amendment," presented to the *W.E.B. Du Bois Institute*, Harvard University, Cambridge, Massachusetts, April 1996.

"Civil War Emancipation and the Sources of Constitutional Freedom," presented at the annual meeting of the *Organization of American Historians*, Washington, D.C., April 1995.

Michael Vorenberg c.v., page 7

"The Origins and Original Meanings of the Thirteenth Amendment," presented at the annual meeting of the *American Society for Legal History*, Washington, D.C., October 1994.

"Civil War Emancipation in Theory and Practice: Debates on Slavery and Race in the Border States, 1862-1865," presented at the *Southern Labor Studies Conference*, Birmingham, Alabama, October 1993.

## Service

### University

Anna S. K. Brown Library advisory committee, member, 2016-present.

Co-Organizer (with Faiz Ahmed, Rebecca Nedostup, Emily Owens), Brown Legal History Workshop, 2015-present.

Political Theory Project, Advisory Board, 2010-2019

Organizer and Presenter, "Abraham Lincoln for the 21st Century: A Symposium honoring the Abraham Lincoln Bicentennial," John Hay Library, Brown University, Feb. 27-28, 2009.  Plenary lecture by Benjamin Jealous, president of NAACP, and six symposium participants.  Funding secured from Rhode Island Foundation, Rhode Island Lincoln Bicentennial Commission, Brown Provost, Brown Dean of Faculty, History Department, Africana Studies Department

### Profession

Program Committee, Society of Civil War Historians, 2022 annual conference, 2020-present.

Cromwell Prize Committee, American Society for Legal Historians, 2014-2017.

Board of Editors, *Law and History Review*, 2004-2013 (reappointed 2009).

Advisory Committee, United States Abraham Lincoln Bicentennial Commission, 2002-10.

Board of Advisors, Lincoln Prize, Gettysburg Institute (2000-present).

Co-Chair, Local Arrangements Committee, Annual Meeting of the Society for Historians of the Early American Republic, Providence, Rhode Island, Summer 2004.

Referee for National Endowment for the Humanities Scholarly Editions, 2002; Summer Grants, 2001-2003.

Committee Member, Local Arrangements Committee, Annual Meeting of the American Society for Environmental History, to be held in Providence, Rhode Island, Spring 2003.

Referee for article manuscripts submitted to the *Journal of American History*, *Law and History Review*, *Law and Social Inquiry*, *Journal of the Civil War Era*, and *Civil War History*.

Referee for book manuscripts submitted to Houghton Mifflin, Harvard University Press, Oxford University Press, New York University Press, University of Chicago Press, University of Illinois Press, and University of North Carolina Press.

Advisory Editor for *Proteus* (special issue devoted to the American Civil War, Fall 2000).

Michael Vorenberg c.v., page 8

**Community**

Lecture on American Citizenship and Exclusion, Center for Reconciliation, Providence, R.I., July 2018.

Instructor in co-taught course at the Rhode Island Adult Correctional Institute (ACI) through the Brown University BELLS program, 2013.

Lecture on Reconstruction-Era Constitutional Amendments, Barrington, RI, Open Classroom, April 4, 2013.

Lecture on 150th Anniversary of the Emancipation Proclamation, Wheeler School, Providence, Rhode Island, January 17, 2013.

Rhode Island Civil War Sesquicentennial Commission, 2011- .

Rhode Island Abraham Lincoln Bicentennial Commission (appointed by Governor), 2005-2009.

Lecturer on the Brown Steering Committee on Slavery and Justice, The Wheeler School, Providence, Rhode Island, November 2006.

Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., April 2006.

Seminar leader for National Endowment for the Humanities "Teaching American History" initiative at Rhode Island Historical Society, Providence, R.I., September 2005.

Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., March 2005.

Advisor to the Burrillville, Rhode Island, School Department, on securing and administering a "Teaching American History" grant from the United States Department of Education, 2001-2002.

**Academic Honors and Fellowships**

Ray Allen Billington Professor, Occidental College/Henry E. Huntington Library, 2018-19.

Pembroke Center for the Study of Women and Gender Fellowship, Brown University, 2016-17.

National Endowment for the Humanities Long-Term Fellowship, Massachusetts Historical Society, Boston, Massachusetts, 2014.

National Endowment for the Humanities Long-Term Fellowship, Newberry Library, Chicago, Illinois, 2013.

Finalist, CIES Fulbright Fellowship for University of Rome III (2010-11 competition)

Cogut Center for the Humanities Fellowship, Brown University, Fall 2008.

William McLoughlin Prize for Teaching in the Social Sciences, Brown University, 2007.

Karen Romer Prize for Undergraduate Advising, Brown University, 2007.

History News Network (HNN) "Top Young Historian," 2005 (1 of 12 named in the U.S.).

Vartan Gregorian Assistant Professorship, Brown University, 2002-2004.

Finalist, Lincoln Prize, 2002 (for *Final Freedom*).

American Council of Learned Societies/Andrew W. Mellon Fellowship, 2002-03.

Kate B. and Hall J. Peterson Fellowship, American Antiquarian Society, 2002-03.

Salomon Research Award, Brown University, 2002-2003.

National Endowment for the Humanities Summer Stipend, 2001.

Julian Park Fund Fellowship, SUNY at Buffalo, 1998.

Michael Vorenberg c.v., page 9

Research Development Fund Fellowship, SUNY at Buffalo, 1997.
Harold K. Gross Prize for Best Dissertation at Harvard in History, 1996.
Delancey Jay Prize for Best Dissertation at Harvard on Human Liberties, 1996.
W.E.B. Du Bois Fellowship, Harvard University, 1995.
Whiting Fellowship in the Humanities, 1994.
Bowdoin Prize for Best Essay at Harvard in the Humanities, 1993.
Indiana Historical Society Graduate Fellowship, 1993.
W. M. Keck Fellowship, Henry E. Huntington Library, 1993.
Everett M. Dirksen Congressional Research Fellowship, 1993.
Mark DeWolfe Howe Fellowship, Harvard Law School, 1993.
Charles Warren Center Research Fellowship, Harvard History Dept., 1991-2.
Derek Bok Award for Distinction in Teaching at Harvard, 1991.
Philip Washburn Prize for Best Senior Thesis at Harvard in History, 1986.

# EXHIBIT 15

**CERTIFIED COPY**

1               UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3                BEFORE THE HONORABLE
          ROGER T. BENITEZ, DISTRICT JUDGE PRESIDING

4 _____

5 VIRGINIA DUNCAN, et al.,   ) Case No: 3:17-cv-01017-BEN-JLB
                    )
6 Plaintiffs,         ) Motion Hearings
                    ) Department 5A
7       v.          )
                    ) Date: 12/12/2022
8 ROB BONTA, in his official )
 capacity as attorney general )
9 of the State of California  )
                    )
10 Defendants.         )
                    )
11 _____

12 KIM RHODE, et al.,     ) Case No: 3:18-cv-00802-BEN-JLB
                    )
13 Plaintiffs,         )
                    )
14 v.               )
                    )
15 ROB BONTA, in his official )
 capacity as attorney general )
16 of the State of California, )
                    )
17 Defendants.         )
18 _____

 JAMES MILLER, et al.,   ) Case No: 3:19-cv-01537-BEN-JLB
19                    )
 Plaintiffs,         )
20                    )
 v.               )
21                    )
 CALIFORNIA ATTORNEY GENERAL )
22 ROB BONTA, et al.,     )
                    )
23 Defendants.         )
24 _____

25       **--- caption continued on the following page ---**

```
 1  _____

 2  RUSSELL FOUTS, et al.,        ) Case No: 3:19-cv-01662-BEN-JBL
                                  )
 3  Plaintiffs,                   )
                                  )
 4  v.                            )
                                  )
 5  ROB BONTA, in his official    )
    capacity as attorney general  )
 6  of the State of California.   )
                                  )
 7  Defendants.                   )
                                  _____
 8
                    REPORTER'S TRANSCRIPT OF PROCEEDINGS
 9
                         Pages 1 through 51
10
```

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Pages 1 through 51

--- **appearances continued on the following page** ---

```
REPORTED BY:            Abigail R. Torres, CSR, RPR/RMR, FCRR
                        CSR No. 13700
                        United States District Court
                        Southern District of California
                        333 West Broadway, Suite 420
                        San Diego, California 92101
```

```
 1    APPEARANCES:

 2
      For the Plaintiffs:    MICHEL & ASSOCIATES, PC
 3    Duncan, et al.         180 East Ocean Boulevard, Suite 200
                             Long Beach, California 90802
 4                           By:  ANNA M. BARVIR, ESQ.
                             By:  SEAN A. BRADY, ESQ.
 5                           By:  KONSTADINOS T. MOROS, ESQ.

 6    For the Defendants:    DEPARTMENT OF JUSTICE
      Becerra, et al.        OFFICE OF ATTORNEY GENERAL
 7                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 9012
 8                           Los Angeles, California 90013
                             By:  KEVIN J. KELLY, ESQ.
 9                                    -oOo-
                             DEPARTMENT OF JUSTICE
10                           OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
11                           300 South Spring Street, Suite 1702
                             Los Angeles, California 90013
12                           By:  MARK R. BECKINGTON, ESQ.

13    APPEARANCES:

14    For the Plaintiffs:    MICHEL & ASSOCIATES, PC
      Rhode, et al.          180 East Ocean Boulevard, Suite 200
15                           Long Beach, California 90802
                             By:  ANNA M. BARVIR, ESQ.
16                           By:  SEAN A. BRADY, ESQ.
                             By:  KONSTADINOS T. MOROS, ESQ.
17
      For the Defendants:    DEPARTMENT OF JUSTICE
18    Becerra, et al.        OFFICE OF ATTORNEY GENERAL
                             GOVERNMENT LAW SECTION
19                           1300 I Street, Suite 125
                             Sacramento, California 95814
20                           By:  ANTHONY P. O'BRIEN, ESQ.
                                      -oOo-
21                           DEPARTMENT OF JUSTICE
                             OFFICE OF ATTORNEY GENERAL
22                           GOVERNMENT LAW SECTION
                             300 South Spring Street, Suite 1702
23                           Los Angeles, California 90013
                             By:  MARK R. BECKINGTON, ESQ.

24

25        --- appearances continued on the following page ---
```

```
 1   APPEARANCES:

 2   For the Plaintiffs:      DILLON LAW GROUP, APC
     Miller, et al.,          2647 Gateway Road, Suite 105, No. 255
 3                            Carlsbad, California 92009
                              By:  JOHN W. DILLON, ESQ.
 4
     For the Defendants:      DEPARTMENT OF JUSTICE
 5   Becerra, et al.,         OFFICE OF ATTORNEY GENERAL
                              GOVERNMENT LAW SECTION
 6                            300 South Spring Street, Suite 9012
                              Los Angeles, California 90013
 7                            By:  KEVIN J. KELLY, ESQ.
                                        -oOo-
 8                            DEPARTMENT OF JUSTICE
                              OFFICE OF ATTORNEY GENERAL
 9                            GOVERNMENT LAW SECTION
                              300 South Spring Street, Suite 1702
10                            Los Angeles, California 90013
                              By:  MARK R. BECKINGTON, ESQ.
11
     APPEARANCES:
12
     For the Plaintiffs:      LAW OFFICE OF ALAN BECK
13   Fouts, et al.,           2692 Harcourt Drive
                              San Diego, California 92123
14                            By:  ALAN A. BECK, ESQ.
                                        -oOo-
15                            STAMBOULIEH LAW, PLLC
                              PO Box 428
16                            Olive Branch, Mississippi 38654
                              By:  STEPHEN D. STAMBOULIEH, ESQ.
17
     For the Defendants:      DEPARTMENT OF JUSTICE
18   Becerra, et al.          OFFICE OF ATTORNEY GENERAL
                              GOVERNMENT LAW SECTION
19                            1300 I Street, Suite 125
                              Sacramento, California 95814
20                            By:  ANTHONY P. O'BRIEN, ESQ.
                                        -oOo-
21                            DEPARTMENT OF JUSTICE
                              OFFICE OF ATTORNEY GENERAL
22                            GOVERNMENT LAW SECTION
                              300 South Spring Street, Suite 1702
23                            Los Angeles, California 90013
                              By:  MARK R. BECKINGTON, ESQ.
24

25
```

```
 1    SAN DIEGO, CALIFORNIA; MONDAY, DECEMBER 12, 2022; 10:38 A.M.

 2                              -oOo-

 3          THE COURT:  Good morning.

 4          THE CLERK:  Calling 1, 2, 3, and 4 on calendar.

 5          One, 17-cv-1017, Duncan, et al., v. Becerra, et al.

 6          Two, 18-cv-0802, Rhode, et al., v. Becerra, et al.

 7          Three, 19-cv-1537, Miller, et al., v. Becerra, et al.

 8          Four, 19-cv-1662, Fouts, et al., v. Becerra, et al.

 9          All set for status conference.

10          THE COURT:  All right, Counsel.  Thank you for being

11    here this morning.  Let's start with the Plaintiff.

12          If you would please identify yourself.  Please speak

13    slowly, clearly, so that my court reporter can take down your

14    names and so that I can, hopefully, do justice to them.  Okay?

15          MS. BARVIR:  Thank you, Your Honor.

16          Anna Barvir, B-a-r-v-i-r, for Plaintiff Virginia

17    Duncan, et al.

18          THE COURT:  All right.

19          MR. BRADY:  Good morning, Your Honor.

20          Sean Brady, S-e-a-n, B-r-a-d-y, on behalf of the

21    Plaintiffs.

22          MR. MOROS:  Good morning, Your Honor.

23          Konstadinos Moros on behalf of the Plaintiffs.  That's

24    K-o-n-s-t-a-d-i-n-o-s.  And last name is Moros, M-o-r-o-s.

25          THE COURT:  Okay.  And for the State?
```

```
 1              MR. O'BRIEN:  Good morning, Your Honor.
 2              Deputy Attorney General Anthony O'Brien,
 3   A-n-t-h-o-n-y; O, apostrophe, B-r-i-e-n, on behalf of the
 4   Attorney General and the Fouts and Rhode matter.
 5              THE COURT:  Okay.
 6              MR. KELLY:  Your Honor, excuse me.  I'm also
 7   appearing -- I'm appearing on behalf of the State and the
 8   Attorney General in the Duncan and Miller matters.
 9              My name is Kevin Kelly.  K-e-v-i-n.  Kelly, K-e-l-l-y.
10   Deputy Attorney General.  Thank you.
11              THE COURT:  I'm sorry.  You're on Duncan and Miller?
12              MR. KELLY:  Correct, Your Honor.
13              THE COURT:  Okay.  Boy, I hope I can keep all this
14   straight.  Okay.
15              MR. BECKINGTON:  Good morning, Your Honor.
16              Mark Beckington, B-e-c-k-i-n-g-t-o-n.  I'm joining
17   Mr. O'Brien and Mr. Kelly on all four cases.
18              THE COURT:  I'm sorry?
19              MR. BECKINGTON:  I'm joining Mr. Kelly and Mr. O'Brien
20   on all four of the cases.
21              THE COURT:  On all four.  I remember you from the
22   Miller case.
23              MR. BECKINGTON:  Yes, Your Honor.
24              THE COURT:  Yeah.  Okay.  Great.
25              All right.  All right.  Let's see Plaintiff in the
```

1    Rhode case.

2           MR. BRADY:  Your Honor, Sean Brady on behalf of the

3    Plaintiffs on Rhode.

4           MS. BARVIR:  Anna Barvir on behalf of the Plaintiffs

5    and Rhode as well.

6           THE COURT:  All right.  And on the Fouts matter?

7           MR. STAMBOULIEH:  Steven Stamboulieh,

8    S-t-a-m-b-o-u-l-i-e-h, for Plaintiff Fouts.

9           THE COURT:  I'm sorry.  Just a second.

10          Can you repeat your last name again for me, please?

11          MR. STAMBOULIEH:  Stamboulieh, S-t-a-m-b-o-u-l-i-e-h.

12          MR. BECK:  Alan Beck on behalf of the Plaintiffs.

13   A-l-a-n.  Last name B-e-c-k, sir.

14          THE COURT:  Okay.  Have I missed anyone?

15          MR. DILLON:  Your Honor, this is John Dillon appearing

16   on behalf of the Plaintiffs for the Millers and --

17          THE COURT:  I'm sorry.  For Miller?

18          MR. DILLON:  Yes.

19          THE COURT:  And?

20          MR. DILLON:  John Dillon.

21          THE COURT:  Just on the Miller case?

22          MR. DILLON:  Yeah, just for Miller.

23          THE COURT:  All right.  Have I missed anyone?

24          Okay.  Well, thank you so much for being here this

25   morning.  The reason why I called the status conference -- and

1   I called all these cases at the same time -- is because, you

2   know, a great deal of my life over the last few years has been

3   devoted to dealing with these Second Amendment cases.

4           As you probably know, I have four of these cases and

5   recently inherited the fee-shifting case from two other judges.

6   And I've spent an awful lot of time, an awful lot of time, and

7   read an awful lot of material and heard testimony on some of

8   these -- at least one of these cases, anyway.

9           And so I thought that, given the fact that these cases

10  have been returned to me following the Bruen opinion, that I

11  didn't want to duplicate effort.  First of all, my time, as I'm

12  sure your time, my law clerk's time is valuable.

13          And so I thought that perhaps there was some way that

14  we could approach a joint methodology for dealing with all of

15  these cases, essentially, at one time and in one -- in one way.

16  So my understanding of -- of Heller, is that Heller has not

17  changed.  It has not been overruled.  It is still good law.

18          Bruen, the Bruen opinion, I believe, discarded the

19  intermediate scrutiny test that I also thought was not very

20  useful; and has, instead, replaced it with a text history and

21  tradition test.  Now, the text history and tradition issue is

22  pretty much common, I think, to all of these cases.

23          There may be some nuance as to whether, for example,

24  in some case the -- the history and tradition may effect

25  ammunition.  In another case, it may effect the type of weapon,

1    for example, whether it's a rifle or a dirk or a dagger.  But

2    in the end, it's the same.  We're basically looking at the same

3    body of history and tradition that we're going to be looking at

4    in all of the cases.

5         So I have an idea of how this case ought to go

6    forward, and I'll tell you what I would like to have -- by the

7    way, I might add, I'm not sure, Mr. O'Brien, whether you filed

8    the supplemental brief in the Fouts case.  I'm not sure who

9    filed that.

10        MR. O'BRIEN:  Yes, Your Honor, I did.

11        THE COURT:  All right.  Well, let me compliment you on

12   that, because one of the things that I thought you did that I

13   really appreciated was you filed several declarations.  One of

14   those declarations did a historical analysis of several rules,

15   laws, regulations, and so on and so forth, all of which I have

16   read, I might add.  So --

17        You can sit down.

18        -- I found that to be very, very helpful.

19        But I would like to ask you folks to do something a

20   little bit different; very similar.  But I don't have the

21   staff.  I don't have, really, the resources to do this, at

22   least not to do it in a timely fashion.

23        So I thought that I would ask you to do something for

24   me, which is to, essentially, do a similar survey as,

25   Mr. O'Brien, you did in the -- in the Fouts case.

1          And I would like that survey, if you would.  I mean,

2    I'm sure you all have access to Excel spreadsheets and so on.

3    But I'd like to see a survey that does the following for me:

4    First of all, on a chronological bases, starting with date, the

5    date of any law, regulation, ordinance, restriction.  And I'm

6    going to refer to those from now on as "restrictions."  Okay.

7    Generically, okay, restriction or regulation.  Okay.

8          So if you could start out chronologically, if you

9    would give me the date, and then if you would tell me what was

10   it that was restricted.  So, for example, in many of those

11   regulations, they regulate dirks, daggers, metal knuckles.  In

12   some cases, it might be storage of gunpowder or cartridges.

13   Some of them, some of these, are "use" regulations.  In other

14   words, you cannot use these while committing a crime.  You

15   cannot use them while breaking and entering into somebody's

16   property.  You cannot display them in anger.

17          So what is it exactly that the law or the regulation

18   restricted?  What type of weapon?  What was the weapon that was

19   being restricted?  Was it a knife? a Bowie knife? a stiletto?

20   metal knuckles? pistols? rifles?  Then I would like to know

21   whether or not that statute was repealed and, if it was

22   repealed, what was repealed by, and was it replaced by

23   something else?  And if so, if you would do the same analysis?

24   Again, continuing a chronological order.  Right?

25          And then, finally, whether or not that regulation or

1  restriction was reviewed by court or courts?  And if so, what

2  was the -- what was the outcome?  For example, was it found to

3  be unconstitutional, or was it found to be constitutional?  And

4  if you'll give me a citation so that I can then go and look at

5  the cases and see what the cases say.

6          I think -- so to pose an example, I think there are

7  one or two regulations that I have found that restricted --

8  specifically restricted billys.  Okay.  So in the Fouts case, I

9  think that would be particularly relevant.  I think I found one

10 or two that restricted rifles and shotguns.  I think I found

11 one or two that restrict certain ammunition, cartridges.

12 Right.  I think I found one that restricts a weapon that can

13 fire more than 16 or 18 rounds.  And I found one that dealt

14 with machine guns and automatic rifles.

15         You see, that's the sort of thing that I've read

16 through that I've captured, but I can't really capture it in a

17 way that I think that the Supreme Court would like us to do it,

18 which is a chronological order, so that we can determine what

19 regulations, what tradition exists with regards to restrictions

20 at the adoption of the Second Amendment; and then I think,

21 secondarily, at the time that the Fourteenth Amendment was

22 adopted.

23         I think with that body of information, I think this

24 Court would be in a much better position to make a decision as

25 to what to do in each one of these cases.

1   So the cases have been sent back to me, given the

2 Bruen opinion, and I'm now going to attempt to deal with them,

3 but I don't want to have to deal and read the same stuff over

4 and over and over again, because I've already read some of it

5 twice. And, frankly, there's a lot of material there. I don't

6 know how many boxes of five-inch binders I have, but it's a

7 lot, and I have only so much time.

8   So I would suggest both sides, if you can, please do

9 that for me. Okay. And I think that would be very helpful.

10   Now, as far as actually setting a hearing to -- to

11 hear your arguments on these, I don't think there's any use in

12 taking any evidence, meaning testimony, from anyone in any of

13 these cases.

14   I mean, the history and tradition is what it is. I

15 don't need, you know, Mr. Spitzer or Mr. Cornell to tell me

16 what his view of the history and tradition is. I see no point

17 in that; nor do I think any additional discovery is necessary

18 or additional expert work is necessary. So, anyway, that's

19 my -- that's my initial thought on this case.

20   If anyone has any suggestions on how we can go about

21 proceeding with these cases, I would love to hear your views.

22 I may not adopt your suggestion, but I'll certainly consider

23 it. So if -- if anybody wants to address what I have said, or

24 anything else on how we proceed with these cases, please feel

25 free to speak up.

1         Maybe we'll start with Duncan, since it was the first

2 case that I dealt with.

3         So do you have anything you want to add?

4         MS. BARVIR: Should I move here?

5         THE COURT: Yeah. Whatever. If you feel comfortable

6 there at the table, that's fine.

7         MS. BARVIR: Again, Anna Barvir for Plaintiff Virginia

8 Duncan.

9         Thank you, Your Honor, for your thoughtful

10 consideration of all four matters. I'm sorry. I'm -- we've

11 heard what -- that Your Honor is asking for from each party. I

12 think that makes a lot of sense, though I do want to, I think,

13 perhaps, focus the Court a little bit on what Plaintiffs' view

14 as the kind of proper way of reviewing this case. And in our

15 position, it doesn't really rely on -- it actually shouldn't

16 rely, and it might be improper to rely on the sorts of -- even

17 the laws that Your Honor is referencing in this survey and/or

18 spreadsheet that we were talking about just now.

19         It is our position that Heller already tells -- Your

20 Honor, tells all of us how to analyze this. The -- this is an

21 arms banned possession case. So the Heller court then, backed

22 up by the decision in Bruen, already handled that entire

23 analysis. The analysis starts with --

24         THE COURT: But if that were so, why would the Ninth

25 Circuit have kicked it back to me? I mean, I agree with you in

1    concept, but, you know, the Ninth Circuit kicked it back to me,

2    so...

3            MS. BARVIR:  Excuse me.  I think that's a good

4    question, and perhaps that's why Your Honor is, I think,

5    intelligent, smart to ask the parties to do what we're doing.

6    But I think that -- excuse me -- the Ninth Circuit also has a

7    lot of these -- had a lot of these cases before it.  And,

8    obviously, all of the pro Second Amendment cases had gone up to

9    en banc, and perhaps the Court wasn't willing to handle those

10   at that point.

11           I'm not trying to cast aspersions, but I think we can

12   all kind of agree that we've seen a lot of decisions that are

13   not upholding lower-court decisions that strike California

14   state laws, gun control laws, just overturned.

15           So perhaps they'd like to see that Your Honor do some

16   more work on this case, but I don't think it requires --

17           THE COURT:  Would you like some water?

18           MS. BARVIR:  Yes.

19           I don't think that that requires us to do a new

20   analysis of all the history that's out there.  The Heller court

21   was very -- had done a very detailed deep dive into all of the

22   historical laws that are banning possession of arms and other

23   types of gun control laws since the Founding and before.

24           And it found that the test is if it's -- excuse me --

25   that the only time the State can lawfully ban a firearm or

1  other type of arm that is protected by the Second Amendment is

2  if it's dangerous and unusual.  The flip side being, typically

3  possessed by law-abiding citizens for lawful purposes or

4  other -- we've also heard it called the "common use" test.  And

5  so that test came out of the Court's analysis of the history

6  and tradition.

7        So if the Court -- so the question that really is

8  posed -- that Duncan poses this Court today, is whether or not

9  magazines, and maybe more specifically magazines capable of

10 holding more than ten rounds, are protected arms, bearable

11 arms, under the Second Amendment's text.

12       And then, secondly, if there -- excuse me --

13 otherwise, if there's a longstanding tradition, meaning are

14 they dangerous and unusual.  And this Court has already found

15 that -- I mean, we have a really large record showing that

16 they're not dangerous and unusual.  And several courts have

17 agreed with that finding both in the Ninth Circuit and other

18 circuits have found it or they have been willing to accept it.

19 And I don't think that Heller or -- I mean, I'm sorry -- I do

20 not think Bruen changed that outcome.

21       So that's what we would like Your Honor to consider

22 and to look at and perhaps think about when we are doing this

23 search for more historical restrictions.

24       THE COURT:  Let me ask you a question that I think has

25 troubled me somewhat.  So I think facts matter.  And in

1  certain -- and in cases -- every case, there are parties that

2  have greater access to evidence than others.  Right.  And at

3  least in California, we have a presumption, for example, that

4  when a party has the largest body of evidence but fails to

5  present it, there's a presumption that if the evidence were to

6  be considered by the Court, that the presumption would be that

7  the party who has a greater body of evidence, that it would be

8  held against him.

9       Now, one of the things that I'm concerned about, for

10  example, is I just read someone said, "There's no evidence that

11  a homeowner has ever fired more than ten rounds in defense."

12  And I kind of think that that's -- I mean, I think probably the

13  best evidence of that would be the State.  The State would have

14  the investigative reports, police reports, and so on, to

15  explain that.

16       But I wonder if you agree with that statement, that

17  there are no cases where a homeowner or a business owner has

18  ever fired more than ten rounds in defense.  And if so, and if

19  that's the case, have you provided the Court with any

20  information to support that?

21       MS. BARVIR:  I don't -- I don't, standing here, know

22  that that's true.  I think that part of that is -- it's a kind

23  of a false thing to do when you're limited to that number,

24  anyway, but also --

25       THE COURT:  I understand you.  I understand -- I hear

1   you.  I hear you.  But I -- particularly in the Miller case, I

2   took issue with Ms. Alan's -- Ms. Alan's analysis.  And then I

3   think I read something recently -- I can't recall which court

4   it was -- but somebody said, "Oh, there's no evidence that a

5   homeowner has fired more than ten rounds."

6           And defense -- and of course all that anyone has to do

7   is go on the Internet and do a cursory search and find out that

8   that's not true.

9           MS. BARVIR:  Right.

10          THE COURT:  And I wonder if you've done that.

11          MS. BARVIR:  I think when we were here on MSJ -- and

12  that's why we had this conversation several years ago.

13          THE COURT:  You know, I'm sorry.  But as I said, I

14  have four of these, and if I get you all confused with one

15  another, please forgive me.  You know, I'm not as young as I

16  used to be, so...

17          MS. BARVIR:  None of us are.

18          When we were here on MSJ, I think we had this

19  conversation as well.  And a lot of times that was coming

20  from -- you know, from Plaintiffs' side was coming from, I

21  guess you could say, anecdotal news stories.  Because we don't

22  -- we aren't the State.  We don't have access to those same

23  sorts of records.

24          I don't think that it's true that that's never

25  happened.  That there's no evidence that it's ever happened.

1   But, again, even if it never happened, which I find

2   extraordinarily hard to believe -- the police do it all the

3   time -- it's not a relevant matter because the test --

4           THE COURT:  Yeah, I know.

5           MS. BARVIR:  -- for common use is typically

6   possession.

7           THE COURT:  I heard you.  I know that.  But I was just

8   wondering if you agreed with that statement that there's no

9   evidence that the homeowner has ever fired more than ten

10  rounds, and just wanted to pick your brain on that.

11          Okay.  I distracted you.

12          MS. BARVIR:  That's okay.  I have nothing more to add.

13          THE COURT:  Okay.  Great.

14          MS. BARVIR:  So thank you for your time.

15          THE COURT:  Sometimes -- sometimes less is more.

16  Okay.

17          Anyone else?  No one else?  Gee, I'm so glad.

18          MR. KELLY:  Your Honor, could I be heard?

19          THE COURT:  No.  Sorry.  I've heard all I need to

20  hear.

21          No.  Go ahead.

22          MR. KELLY:  So the State would like to renew its

23  request for an addition discovery period, not a lengthy

24  discovery period in this action.  Just a three-month is all we

25  would ask for.

```
 1              THE COURT:  Tell me why.
 2              MR. KELLY:  Sorry, Your Honor?
 3              THE COURT:  Tell me why.
 4              MR. KELLY:  There's two reasons:  First of all, this
 5    is a brand-new area of law, and it's a brand new area of
 6    historical analysis.  And a three-month period would give our
 7    experts more time to actually look into this.  I think we
 8    submitted a declaration from Professor Schrag, who details the
 9    types of work that is required of historians when they approach
10    an issue like this.
11              And, also, Professor Cornell in his declaration also
12    said that, "This work is still ongoing, and we did our level
13    best" --
14              THE COURT:  What happens in three months when the work
15    stops?  What's the -- what's the miracle?  Was the miracle
16    pertinent?  Drops down in three months and work stops?
17              MR. KELLY:  Well, Your Honor, obviously, I can't
18    represent that new evidence will be found, but that's also
19    because I don't know what I don't know, at this point, and
20    neither do our experts.
21              So we would, again, renew our request for an
22    additional discovery period followed by supplemental briefing.
23              And -- excuse me -- I had another point to make on
24    that.
25              THE COURT:  Okay.  Go ahead.
```

1           MR. KELLY:  So we would also want an opportunity for

2 our experts to examine the evidence, the new evidence that the

3 plaintiffs included in their response to our supplemental

4 briefing.  And that would also give our experts a chance to do

5 so, and then --

6           THE COURT:  So give me an example.

7           MR. KELLY:  So I will give -- one moment, Your Honor.

8           So the Plaintiffs brought or included a declaration

9 from Ashley Hlebinsky, who claimed that "repeating rifles were

10 not commonly owned in the nineteenth century," presumably in

11 response to our declaration from Professor Vorenberg.

12           THE COURT:  I'm sorry.  They said "they were not"?

13           MR. KELLY:  They were not commonly owned in the

14 nineteenth century.

15           THE COURT:  She says they were not.

16           MR. DILLON:  No.

17           THE COURT:  No.  I think you're wrong.  I think you're

18 opposite.  I think she says --

19           MR. KELLY:  Opposing counsel will correct me if I'm

20 wrong.

21           THE COURT:  Yeah, I think you're wrong.  I think she

22 said the opposite.

23           MR. DILLON:  I don't believe that's the case that she

24 said they were not.

25           (Court reporter interruption.)

```
1              MR. DILLON:  John Dillon on behalf of the Miller
2    defendants.
3              THE COURT:  Yeah.  So she said they were commonly
4    owned.
5              MR. DILLON:  Yeah.
6              THE COURT:  So the Model 94 Winchester --
7              MR. DILLON:  She was rebutting Dr. Saul Cornell's
8    statement that these guns were, in fact, not common.  That's
9    what his testimony was, Your Honor.
10             THE COURT:  All you got to do, if you look at
11   Professor Cornell's declarations and you look at the website
12   that he refers to -- to Winchester -- to the Winchester
13   company, if you look at that website, you see that, in fact,
14   they were commonly owned.
15             So, I mean, what are you going to do?  You going to --
16             MR. KELLY:  Your Honor, if --
17             THE COURT:  How are you going to -- I mean, if you
18   look at Mr. Vorenberg's declaration, and you look at -- for
19   example, as I sit here right now, I can recall one instance
20   that he talks about where two miners were mining for borax.
21             Do you recall the incidents?
22             MR. KELLY:  Sorry.  Do I recall the incidents, Your
23   Honor?
24             THE COURT:  Yeah.
25             MR. KELLY:  I do not, no.
```

1          THE COURT:  Okay.  So two miners were mining for

2     borax.  And I can't recall whether it was Montana or Wyoming or

3     Nebraska, or whatever.  These are just two miners, two common

4     folks that were miners for miners -- I mean, mining for borax,

5     and they're attacked by a band of 40 Indians.  And these two

6     miners happen to have Henry rifles, and they were able to

7     defeat the 40 Indians that were attacking them.

8          So the point -- the point was, if you look at Mr. --

9     Professor Cornell's -- if you look at Professor Vorenberg's

10    materials, which I have looked at, you see that the statement

11    that they were not commonly owned is just not true.

12         For example, there's a statement in there about how

13    after the Civil War many of the -- of the soldiers, when they

14    were released from duty, were, in fact, allowed to buy the

15    repeating rifles and took the repeating rifles home.

16         And you can do the statistical analysis, by the way,

17    which I sat down and did because maybe I have too much time on

18    my hands.  But there was an awful lot of those weapons that

19    wound up in civilian hands.

20         So, I mean, the evidence is there.  You can call, I

21    suppose, this person for a deposition and take her deposition.

22    But I don't think, no matter what she says, it's not going to

23    contradict her own experts' declarations and the materials that

24    they themselves refer to.

25         You follow what I'm saying?  Okay.

```
 1          MR. KELLY:  Your Honor, I do have another example of

 2   something we would want to explore and --

 3          THE COURT:  Okay.  Give me one more.

 4          MR. KELLY:  So the Plaintiffs also include a

 5   declaration from Clayton Cramer --

 6          THE COURT:  Okay.

 7          MR. KELLY:  -- presumably in response to Professor

 8   Roth's position that mass murder was not a new phenomenon or --

 9   excuse me -- mass murder, yes, correct, is a new phenomenon at

10   this point.  And we would want -- to my knowledge, Mr. Cramer

11   was not disclosed as an expert, was not deposed in any prior

12   proceeding in Duncan.

13          And we would first want an opportunity for Professor

14   Roth to examine the new evidence that the Plaintiffs have

15   brought, as well as potentially depose Mr. Cramer on that

16   issue.

17          THE COURT:  Well, before I get to that issue, let me

18   point out something, Mr. Kelly.  I don't know how long you've

19   been in this case.  But you said something about -- going back

20   to the reason why you needed three months; that you needed --

21   that this was a new area and so on and so forth.

22          Did I get you right?

23          MR. KELLY:  That's correct, Your Honor.

24          THE COURT:  Yeah.  How long you have been in this

25   case, Mr. Kelly?
```

1          MR. KELLY:  Several weeks, Your Honor.

2          THE COURT:  It's not fair to dump you into a case like

3     this.  Mr. -- Professor Cornell has gone on record and stated

4     -- in 2017, Professor Cornell stated that he had been

5     researching and writing on the history and tradition of Second

6     Amendment regulations for two decades.  That's 20 years,

7     20 years before 2017.  We're now in 2023.  Add five years to

8     that; that's 25 years.  That's a quarter of a century that

9     Professor Cornell has been writing, researching on the history

10    of and tradition of the Second Amendment.

11         And I've read an awful lot of that material.

12    Professor Cornell cites to Spitzer.  Spitzer cites to

13    Vorenberg.  Vorenberg cites to Bazilli.  Bazilli, I think it

14    is, who cites to -- these folks have been working on this for a

15    really, really long time.

16         In 2000- -- well, as you probably know in the Rhode --

17    Rhode case, I issued an opinion where I said that the State's

18    regulation had no historical pedigree, and I was right.  The

19    Ninth Circuit asked the State to file a supplemental brief on

20    the issue of the historical pedigree.

21         In response to that request from the Ninth Circuit,

22    the State at Footnote 3, page 11 of its response, cites to Saul

23    Cornell and Nathan DeNino, "A Well Regulated Right.  The Early

24    American Origins of Gun Control," 2004, surveying firearms

25    regulations from Founding era through the nineteenth century.

1          Mr. Kelly, with all due respect, Mr. Cornell and all

2     these other folks have been researching and writing on this

3     issue for 25 years.  We're not here, looking -- this is not a

4     question for the missing link.  We're not looking for truffles.

5     If it's a history and tradition, 25 years of research and

6     writing should have disclosed it by now.

7          And as you know, probably in Bruen -- I think it was

8     in Bruen.  It might have been in Heller, as well, where the

9     Court said, "Look, 'a lot of' doesn't show a history and

10    tradition."  Right.  So I don't think -- I mean, with all due

11    respect, I understand what you're doing, and I appreciate that.

12    And I'm sorry that you got dumped into this just a few -- just

13    a few weeks ago.

14          But, realistically, you don't need more time.  I might

15    give you a little more time to depose the one expert, and that

16    might be it, but that's about it.  Okay.

17          MR. KELLY:  Thank you, Your Honor.

18          THE COURT:  All right.  Is there anything else you

19    wanted to add?

20          MR. KELLY:  Actually, a point of clarification, Your

21    Honor.

22          THE COURT:  Sure.  Go ahead.

23          MR. KELLY:  Would Your Honor like us to submit one set

24    of briefing for all four matters, or one for each matter?

25          THE COURT:  I'm open to suggestions.  I don't want to

1  have to be rereading the same stuff over and over and over

2  again.  So what do you think?

3          MR. KELLY:  Your Honor, I think they should be heard

4  separately.  I think as Your Honor said, you know, there is

5  some overlap here in terms of the historical analysis,

6  et cetera.  But there's also enough nuance among the cases

7  that, I think, both, as a matter of fairness, and to make your

8  burden easier, they should be heard separately.

9          For example, I think the textual analyses is different

10  in these case; the first prong under Bruen as to whether the

11  regulated items constitute arms under the Second Amendment.

12  And our position is a different analysis in each case.

13          THE COURT:  Okay.  Well, what you say makes sense.

14  All right.  So how about if what we do is we have a joint

15  historical analysis?  In other words, what I suggested at the

16  very beginning of this hearing?  How about if we have that as

17  one?

18          And, yes, I can understand how you might want to

19  argue, for example, that in the Fouts case, looking at the

20  historical analysis, there's, you know, history and tradition.

21  And that you might want to brief that separately.

22          Yeah, I can understand what you're saying.  I'll hear

23  from the Plaintiffs in just a second, see if they have a

24  different idea.  But that makes sense.  I can go along with it.

25          MR. KELLY:  Thank you, Your Honor.

27

```
 1              THE COURT:  All right.  Thank you.

 2              Anyone else?

 3              All right.  Let's go back to the Plaintiffs.  Anyone

 4      have anything you want to comment in response?

 5              MR. BRADY:  Sure, Your Honor.  Sean Brady on behalf of

 6      the Plaintiffs.

 7              I agree.  I think that makes sense.  But to address

 8      the nuance, there are some things that are going to sort of be

 9      boilerplate with respect to this compendium of Excel

10      spreadsheet of the laws.  If the State prepares that, they're

11      going to have to prepare that for all the cases.  Right.  So it

12      wouldn't be an additional burden on them.

13              THE COURT:  I want you to look at it, and see if you

14      agree or disagree because I want to know, you know, if there's

15      disagreement.  Right.

16              MR. BRADY:  If Your Honor would like us to meet and

17      confer, you know -- I guess our position is that it's the

18      State's burden to research and present these laws, and they've

19      had adequate time for that.  We don't need to get into --

20              THE COURT:  I think I agree.  But I think it's always

21      really a good idea to meet and confer.  So if you could do

22      that, that would be wonderful.

23              MR. BRADY:  Absolutely.  And if Your Honor wants us to

24      do that prior to -- instead of dressing it in our opposition

25      and meeting and conferring beforehand, we're more than happy to
```

1    do that.

2            THE COURT:  Why don't you do that.  And then if

3    there's any disagreement, if there's any disagreement, then we

4    can deal with that later.  Right.

5            So here's something that I do with jury instructions.

6    I ask the parties to meet and confer and come up with an

7    agreed-upon body of jury instructions.  Okay.  And then if

8    there are any jury instructions that they disagree with, then

9    they can file a brief to tell me what instructions they

10   disagree with and what other instructions they want me to give.

11           Perhaps this is a good policy for us to apply here.

12   If you meet and confer and agree on the historical analysis,

13   then that's great.  You can submit that.  And if there are any

14   disagreements, then you can submit that separately.

15           How's that?  That work?

16           MR. BRADY:  I think that works, Your Honor.

17           THE COURT:  Mr. Kelly?

18           MR. KELLY:  Yeah, that works for us, Your Honor.

19           THE COURT:  Great.

20           MR. BRADY:  This meet-and-confer process, though, is

21   there going to be another status conference or -- that's my

22   only concern.  Or are we just going to address it in our

23   briefing?

24           THE COURT:  No.  I don't think we need another

25   meet-and-confer conference after this.  I think -- look, I

1   don't want to slow-walk these cases.  These are important cases

2   both to the State and to the Plaintiffs and the people that

3   insist that they have these rights, and I think we need to move

4   these cases along.

5           So a meet-and-confer.  Give me an agreed-upon

6   historical analysis, and then what I will do is I will give you

7   a time period for that to be filed.  I'll give you a time

8   period for additional briefs to be filed, and then we're going

9   to have hearings, and we're going to put these cases to bed.

10          MR. MOROS:  Your Honor, one question.

11          Is the State to be limited in the presentation of its

12  laws to laws before the year 1900?  Because I know in their

13  supplemental briefing, they went into twentieth century laws,

14  and our position is those aren't relevant.  But if you want a

15  comprehensive view, just to get everything.

16          THE COURT:  You know, frankly, I don't see much point

17  in those because I think that there would be so many laws.  I

18  mean, let's face it, after -- there came a point when -- when

19  they began to grow exponentially.

20          I think in the Bruen opinion it talks about -- the way

21  I see it, it places greater emphasis on those laws that were,

22  essentially, in effect at the time the Second Amendment was

23  adopted, and then with a secondary emphasis at the time that

24  the Fourteenth Amendment incorporated the Second Amendment by

25  reference.  I think that's the time period.

1          In fact, I think the one -- if I'm not mistaken, the

2    one statute that regulates -- that was submitted in the Fouts

3    case, it talks about machine guns and automatic rifles, is a

4    1927 statute, if I'm not mistaken; which, frankly, I thought

5    was irrelevant, anyway.

6          So why don't we limit it to -- how about this?  How

7    about, let's say, 20 years -- how about an arbitrary and

8    capricious number that I'm going to give you?  Twenty years

9    after the Second Amendment was incorporated by the Fourteenth

10   Amendment -- or the Fourteenth Amendment was adopted.  How's

11   that?

12         MR. MOROS:  So, 1888.  Okay.

13         THE COURT:  All right.  Twenty years after the

14   Fourteenth Amendment was adopted.

15         MR. KELLY:  Your Honor, we would object to that.

16         THE COURT:  Why?

17         MR. KELLY:  In Bruen, it specifically says that

18   statutes after the Fourteenth Amendment's ratification can be

19   used as evidence so long as they do not conflict with the

20   restrictions that were in place prior to then around the

21   Founding and the Reconstruction period.

22         So we would want to reserve our right to introduce

23   those laws if -- if we do, in fact, do that.

24         THE COURT:  Can you cite me to the page in Bruen?

25         MR. KELLY:  Yes, Your Honor.

1      THE COURT:  And if that were the case, why would --

2  why would the Supreme Court have overturned the New York

3  statute on concealed carry?  Since there were -- I would

4  imagine there's probably 100, if not 200, statutes that have

5  prohibited the methodology for obtaining concealed carry

6  permits.

7      MR. KELLY:  So, Your Honor, the page we're referring

8  to is at 142, Supreme Court page 2153, Note 28.

9      THE COURT:  Can you read it for me?  Because I -- I

10  don't have a photographic memory.

11      MR. KELLY:  Sure, Your Honor.  Just give us one

12  moment.

13      Your Honor, the footnote says:  "We will not address

14  any of the twentieth century historical evidence brought to

15  bear by respondent or their amici.  As with their

16  late-nineteenth-century evidence, the twentieth century

17  evidence presented by Respondent's in the amici --"

18      (Court reporter interruption.)

19      MR. KELLY:  "-- the twentieth century evidence

20  presented by Respondents and their amici does not provide

21  insight into the meaning of the Second Amendment when it

22  contradicts earlier evidence."

23      And we would argue that that footnote would allow us

24  to introduce statutes and regulations post-Reconstruction so

25  long as they do not contradict earlier restrictions.

1      THE COURT:  The problem with that, though, as I

2   said -- how many -- how many laws have been enacted?  I mean,

3   just look at California.  Let's just take, for example, the

4   Miller case, right, the AR-15-type regulations.

5      How many of those laws have been enacted since 1927?

6   Lots and lots and lots and lots.  But how does that help me

7   decide the history and tradition of regulation of rifles --

8      MR. KELLY:  I think, Your Honor --

9      THE COURT:  -- at the time the Second Amendment was

10   adopted, or at the time the Fourteenth Amendment was adopted?

11   All that tells me is -- has happened after the Civil War when

12   states found out that, yes, they could restrict certain

13   firearms.  Right.  That all of a sudden there was an explosion

14   of restrictions because the states found out, "Hey, guess what?

15   We can do this."  So then they did it.

16      But how does that help me determine the history and

17   tradition of these laws at the time the Second Amendment was

18   adopted or at the time that the Nineteenth -- I mean the

19   Fourteenth Amendment was adopted?

20      MR. KELLY:  Your Honor, I'm only speculating that

21   these laws are out there.  I personally do not know.  I think

22   we would just want to reserve our right and not be barred from

23   doing so should it come to that.

24      THE COURT:  I'll tell you what I'll do.  I'll let you

25   file a separate one.  You can file -- you can file a separate

 1   survey, and we'll call it "Post 20 years after" -- "20 Years

 2   After the Ratification of the Fourteenth Amendment."

 3           How's that?

 4           MR. KELLY:  That sounds good, Your Honor.

 5           THE COURT:  And include as many as you want.  In fact,

 6   the more the merrier.

 7           MR. DILLON:  Your Honor, if I may?

 8           THE COURT:  Yes, go ahead.

 9           MR. DILLON:  I just wanted to clarify on the parameter

10   of exactly what you're requesting.  As I heard you, you're

11   looking for a single spreadsheet-style chronological order of

12   all the statutes, ordinances, restrictions that the State can

13   come up with that identify what was restricted, what act was

14   restricted, whether it was a law that was repealed or not

15   repealed, and whether or not it was ever brought before a

16   court.

17           And then they'll present -- they'll draft that

18   document with no argument, no expert witness testimony.

19           THE COURT:  Correct.

20           MR. DILLON:  It will just be a straight list of the

21   laws.  We will have a chance to review it as Plaintiffs.  And

22   like a summary judgment, if we have a contested issue of the

23   summary of the law that they present, we can note that contest

24   in the -- you know, a joint document?  Is that what you're --

25           THE COURT:  Sounds reasonable.  Sounds reasonable to

```
 1   me.
 2            MR. DILLON:  No problem.  Thank you, Your Honor.
 3            MR. KELLY:  Your Honor, I think we would object to
 4   that as well.  I think we would want, if we need to, to
 5   introduce experts to interpret some of the laws and the
 6   standards --
 7            THE COURT:  No.
 8            MR. KELLY:  -- in the language --
 9            THE COURT:  No.
10            MR. KELLY:  -- and the statute --
11            THE COURT:  No.  Look -- no, no.
12            Mr. Kelly, with all due respect, I don't need -- every
13   one of these experts that you've put forth, I have read, just
14   like experts that they have put forth, like Mr. Copill, for
15   example.  Your experts -- these are people that have, you know,
16   biased points of view.  I mean, Mr. Bosey, for example -- I
17   hope I'm pronouncing his name.  The fellow who worked for --
18            MR. MOROS:  Kimber, Your Honor.
19            THE COURT:  Kimber.  Yeah.  Who at some point in time
20   had an epiphany and realized that all the work that he'd been
21   doing for all these years, selling these weapons to the public
22   was not good.  And now he works -- he's a consultant for
23   Everytown -- I'm trying to remember.
24            Anyway, look.  These people's opinions of what these
25   statutes say, right, means nothing.  It means nothing.  It's
```

1   like, I remember -- I think it was Justice Brier in -- I think

2   it was Bruen, who talked about, "Well, we need to have this

3   factual record," and this and that, what have you.

4        No.  702 says that the admission of expert testimony

5   is help -- is possible if, because of the expert's knowledge,

6   skill, or experience, it will assist the trier of fact.  Okay.

7        But there's nothing.  I mean, I've read these

8   declarations.  Every one of these folks come in here with a

9   biased -- it's not like they're really neutral experts, okay,

10  or they're not experts who've come up on these opinions as a

11  result of these cases, okay, doing research for these cases.

12       These are all people that already come with

13  preconceived ideas and opinions, but their opinion is not worth

14  any more than your opinion or her opinion.  They're going to

15  tell me, "Well, in my opinion, if you look at this statute,

16  this statute means that -- you know, that the State of Wyoming

17  regulated concealed carry of brass knuckles," and so I can read

18  that.  I can figure that out by myself.

19       MR. KELLY:  Well, Your Honor, I think the issue that

20  we might have with simply creating a spreadsheet and submitting

21  it to the Court doesn't take into account that restrictions

22  were found in places other than statutes.  In our supplemental

23  briefing, we -- Professor Vorenberg testified as to how, for

24  example, in the Reconstruction period, the U.S. Army acted to

25  restrict firearms with magazines or carrying more than ten

1   rounds.

2           THE COURT:  When was the Reconstruction period?  It

3   was after the Civil War.

4           MR. KELLY:  Correct, Your Honor.

5           THE COURT:  Yeah.  It was after the Fourteenth

6   Amendment?

7           MR. KELLY:  It was during the same period, Your Honor;

8   during the same time period.

9           THE COURT:  And why would I want to give -- in fact, I

10  think there was some discussion about this.  I thought maybe it

11  was in Bruen.

12          Why would I want to give any credit to -- to what the

13  U.S. Army was doing in their territories?  In fact, I think,

14  wasn't it Bruen that somewhat criticizes applying laws that

15  were regulations that were used in territories that --

16          MR. KELLY:  Your Honor, it goes to the history and

17  tradition of firearm regulations.  That may not be a statute.

18          THE COURT:  But, look.  If it's the State's position

19  that there's a long history and tradition to regulating

20  firearms, if that's your position, you don't need to present

21  any evidence.  I'll buy that.  I understand that.

22          Any time the State can get their -- the ability to

23  regulate something, they'll do it, and they've been regulating

24  firearms for a long time.  Right.  But that doesn't mean that

25  it's an analog to the particular statute that's at issue in the

1    cases that I have before me.

2          So the fact that, for example, in the territories in

3    the Reconstruction period, the Army may not have wanted to have

4    people to have this, that or whatever, that doesn't help me.

5    It's not an analog.

6          Yes, we know.  We know.  We know.  We don't have -- I

7    don't need to take testimony of the fact that there's a history

8    and tradition in the United States in regulating firearms.

9    Right.  But if that were the test, if that were the test,

10   Heller would not have been decided the way it was, and neither

11   would McDonald, and neither would Bruen, and neither would

12   Caetano.

13         That's not the test.  But the test is, is there a

14   reasonable analog?  It doesn't have a twin.  It doesn't have to

15   be a twin.  But is there a reasonable analog in the history and

16   tradition of firearm regulation or arms regulation?  Because in

17   the Fouts case, we're dealing with billy clubs.

18         Is there an analog in the history and tradition of

19   regulating this type of weapon, this type of conduct, this type

20   of behavior?  That's what we're looking at.

21         So, anyway, all right.  Anyone else?

22         Yes.

23         MR. O'BRIEN:  Your Honor, just wanted to check.

24         With respect to Fouts and Rhode, what the Court's

25   requesting here, what effect does it have on kind of the

1    existing posture of those cases?

2          With respect to Fouts, the Plaintiffs have an

3    opposition brief due on the 22nd, currently.  And Rhode, there

4    hasn't been any order with respect to briefing.  So I'm just

5    trying to check and see what's the -- what is kind of the

6    process going forward.

7          THE COURT:  Thank you.  I appreciate your mentioning

8    that.

9          So here's what I'd like for you to do.  As I said,

10   Professor Cornell, Spitzer, and some of these other folks, they

11   have been working on this for a really long time.  So it really

12   shouldn't take them really long to be able to come up with

13   this -- with a survey that I've requested.  So I'm going to ask

14   that that be done within 30 days.  Okay.

15         I will then -- given that, I will then give each side

16   an opportunity to file a brief, and the reason why I use the

17   word "brief," it's because I want it to be brief.  Okay.  I'm

18   not going to -- I'm not going to require a 25-page maximum, but

19   I don't think it needs to be 25 pages for you to tell me what

20   the analogs are that I should apply in your case.  And I'll

21   give you 30 days to do that.  Then I'll give you 10 days to

22   each side to file a response.

23         Now, Mr. Kelly, you said you wanted to take somebody's

24   deposition, and I'm more than happy to give you a chance to

25   depose someone.  See what happens.

1        So who did you want to depose?

2        MR. KELLY:  Mr. Cramer, Your Honor.

3        THE COURT:  Mr. Cramer.  Whose witness is Mr. Cramer?

4        MS. BARVIR:  Clayton Cramer is the Duncan Plaintiffs'

5   declarant.  He was responding, I think, to Professor Roth.

6        I would think that if Your Honor is going to give the

7   State some time to depose our witness, we should also get the

8   chance to depose Mr. Roth.  He was also not disclosed at any

9   point prior to filing that.

10       THE COURT:  You each have 20 days to work out an

11  agreement to -- one, to depose Mr. Cramer, to depose Mr. Roth.

12  Okay.

13       MR. STAMBOULIEH:  Yes, Your Honor.  I'm with --

14  Stephen Stamboulieh for the Fouts Plaintiffs.

15       Plaintiff Cramer is also going to be our expert even

16  though we're outside the discovery deadline.  He has,

17  obviously, not been disclosed to them as an expert, just like

18  their witnesses were not disclosed to us as an expert.

19       I'm not really sure that he needs to be deposed since

20  he's just going to be responding to Mr. Spitzer's declaration

21  of what the -- what he's found the historical analogs to be.

22  So I'm not really sure, other than wasting money and time, what

23  a deposition would bring to them.

24       I did have one question, and I -- the page length for

25  the supplemental briefs, my understanding of the local rules is

1   that we were limited to 25 pages.  We have not filed motions to

2   strike.  We have not tried to burden the docket with anything.

3   I figured I would just ask the Court.

4            Do we have the same page limit that the Defendants do,

5   which I believe was 36 pages?  We're not going to burden --

6            THE COURT:  I don't think we need 36 pages, especially

7   if we're breaking it up.  Okay.  So we've got -- so we have

8   the -- so we have the historical survey.  Right.  I don't know

9   why you would need 36 pages.  So why would you need 36 pages to

10  tell me that the history and tradition of arm regulations --

11  I'm going to use the Fouts case -- for billys is consistent

12  with the history and tradition of that which has been provided

13  to me by way of that survey?  You don't need 36 pages;

14  25 pages, max, for any opening brief, and 10 pages for any

15  reply.

16           MR. STAMBOULIEH:  Let me go back one step, Your Honor.

17           They filed the supplemental brief that this Court

18  ordered.  I'm not sure the actual date; October 17th, I

19  believe.  And they took 36 pages.  Ours is coming up.  The

20  response is due on the 22nd.

21           So my question to the Court, and perhaps the Court

22  just answered me when you limited it to 25 pages.  The reason

23  that we might need to go a little bit beyond that page limit,

24  Your Honor, is they've raised this issue and said that there's

25  really been no historical analysis of the "dangerous" -- and

1    they corrected it to be "or unusual" instead of "dangerous and

2    unusual" language.

3           THE COURT:  Yeah.  I noted that.  I noted that.  I

4    found that to be rather distressing, even though in the -- in

5    the past, they have referred to some instances as "dangerous or

6    unusual."  But as Justice Alito pointed out in his concurring

7    opinion in Caetano, anyone with a ninth-grade education can

8    read the Heller opinion and determine that, in fact, it is

9    "dangerous and unusual," i.e., the conjunctive, not a

10   disjunctive.

11          So I don't know why that keeps popping up.  I mean, I

12   heard some supposedly distinguished legal scholar make that

13   same error, and I don't know whether that's intentional or not.

14   I hope that's not intentional.

15          MR. STAMBOULIEH:  Well, the Supreme Court said

16   "dangerous and unusual," Your Honor, so we're going to go with

17   what the Supreme Court --

18          THE COURT:  That's a good thing to do.

19          MR. STAMBOULIEH:  Right.

20          THE COURT:  That's a really good thing to do.

21          MR. STAMBOULIEH:  So my question, Your Honor -- and

22   I'm sorry for taking so long on this.

23          THE COURT:  It's okay.

24          MR. STAMBOULIEH:  We have briefed "dangerous and

25   unusual."  It takes us beyond 35 pages.  It's about 35 pages.

1  We've briefed it.  So to the extent the Court wants to see

2  it -- if the Court limits us to 25, we'll cut the "dangerous

3  and unusual" and just cite back "see Supreme Court.  See

4  Justice Alito" who references Caetano --

5      THE COURT:  Are you saying -- are you talking about

6  whether or not the weapon is dangerous and unusual, or are you

7  talking about the fact that the test that some folks referred

8  to it as "dangerous or unusual"?  You follow what I'm saying?

9  Are you talking about the weapon?  Because, certainly, I can

10  understand, particularly in your case, talking about whether or

11  not the weapon is or is not dangerous and unusual.

12      But I don't want to talk about whether or not the test

13  is "dangerous and unusual" or "dangerous or unusual."  That has

14  been decided by somebody who's way above my pay grade.  Okay.

15      MR. BECK:  Alan Beck for the Plaintiffs Fouts, Your

16  Honor.

17      Our briefing also indicates that the phrase "dangerous

18  and unusual" doesn't actually refer to any sort of intrinsic

19  property of an arm.  Historically, in Heller, the Court

20  references the tradition of prohibiting carrying "dangerous and

21  unusual" weapons.

22      And after we took a look at what that actually was,

23  that -- that typically refers to prohibitions on carrying in

24  certain manners, that were actually what terrified people.

25      So our position is that the possession of any weapon

1  cannot be justified simply through this historical tradition of

2  carrying dangerous and unusual weapons, because it doesn't

3  refer to types of weapons; it refers to certain types of

4  conduct with weapons.

5          And in light of the fact that the State's brief was

6  36 pages, we're just hoping to have an equal-length brief as

7  the brief they filed so we can demonstrate that to the Court,

8  Your Honor.

9          THE COURT:  And you've already prepared this, you're

10  telling me?

11          MR. BECK:  Yes, Your Honor.

12          THE COURT:  Okay.  File it.

13          MR. BECK:  Thank you.

14          THE COURT:  File it.  Thank you for making my life

15  that much more difficult, but whatever.  Okay.  File it.  I'm

16  done.

17          Okay.  So -- so --

18          MR. O'BRIEN:  Your Honor --

19          THE COURT:  You have 30 days to file the survey.  You

20  have 30 days after that to file any brief that you wish to

21  file.  And this goes for both sides.  Having looked at the

22  survey, having made your decisions, et cetera, you've got

23  30 days after that to file your brief.  You've got 10 days

24  after that to file any opposition that you want to in that

25  brief.  You have 20 days to depose Mr. Cramer and Mr. Roth.

1        Anything else?

2        MR. O'BRIEN:  Your Honor, if I may.  With respect to

3   the survey due in 30 days --

4        THE COURT:  Yes.

5        MR. O'BRIEN:  -- we would request, if possible, to

6   extend that to 60 days.

7        THE COURT:  I could probably do it -- if I had the

8   time and the resources, I think I could probably do that in

9   probably less than two weeks.  The State has unlimited

10  resources.  You can do this.  Trust me, you can do it.  I've

11  looked at it.  And if I had the resources and the time to do

12  it, I could do it in probably -- I could probably do it in a

13  week.

14       MR. O'BRIEN:  Well, you know, I understand where the

15  Court is coming from.

16       I think that there's a couple of issues.  One, we do

17  have a holiday period, and I think that our resources will be

18  limited at least, you know --

19       THE COURT:  Yeah.  I hear you.  I feel your pain.

20       MR. O'BRIEN:  -- to the last week, so I think to

21  expand beyond that, that takes away one week.

22       Also, as we note, even in Fouts, even, you know, in a

23  case where, you know, we provided a lot of that historical, you

24  know, information, it's still, I think with respect to what the

25  Court's asking for, is going to, you know, require, you know,

1   some additional time, especially in researching each of those

2   laws and determining whether or not they were challenged, and

3   what the -- what the disposition was in those cases.

4        THE COURT:  I would imagine, Mr. O'Brien, with all due

5   respect, that whoever came up with that -- I don't know,

6   whatever it is, 40 pages, 30 pages of statutes or whatever,

7   already has, pretty much, that information.  And if they

8   submitted it to the Court for purposes of persuading the Court,

9   they should also have the information to determine, for

10  example, whether or not that statute has been previously held

11  unconstitutional or constitutional, and should be able to

12  provide me with a citation.

13       I don't think 30 days is unreasonable.  I understand,

14  but my order remains.  All right.

15       Is there anything else?  I'm sorry.  I don't --

16       Yeah, go ahead.

17       MR. O'BRIEN:  One more, Your Honor.

18       You know, we would just also request with respect

19  to -- as you're allowing for -- I believe, in the Miller or the

20  Duncan cases, for deposing Professor Cramer.  I don't know what

21  Professor Cramer or Mr. Cramer will testify to with respect to

22  Fouts.  I would -- if we need to depose him, and I don't know

23  if they're -- you know, we want to have that opportunity to do

24  so if we need.

25       THE COURT:  Well, if you don't know what you want from

1   them in Fouts, what's the point of deposing him?

2          MR. O'BRIEN:  Well, we need to have an opportunity to

3   review his -- his declaration and --

4          THE COURT:  Was the declaration already filed or not?

5          MR. STAMBOULIEH:  The declaration is not filed yet,

6   Your Honor.  The declaration, I would think, is probably

7   substantially complete.  It's a rebuttal of Mr. Spitzer's

8   expert report.

9          THE COURT:  Tell you what we'll do.  Let's leave that

10  up in the air.  You take a look at it.  When you get the

11  opposition -- opposition, you get the declaration.

12         I've read Mr. Spitzer's declaration.  I'd say it's

13  probably one of the better ones I think that I've read.  If

14  after you read -- and, hopefully, you'll read it pretty

15  quickly.  But it isn't Mr. Cramer -- or is it Professor or

16  Mr. Cramer?  I hate to insult people.  But whatever it is he

17  says, if you think you need to depose him, let me know and let

18  me know quickly.

19         And if I decide that, in fact, that deposition is

20  necessary, I'll probably order that deposition to be taken on

21  very short notice, in which case I will allow you to take the

22  deposition of Mr. Spitzer.  And we'll take it from there.

23         We're going to get all this done, folks, in the time

24  period that I have set.

25         As I said, these are important cases to the State and

1    to the Plaintiffs and to the -- to the People of the State of

2    California.  So I want to move it along.  And that's that.

3    Okay.  I really appreciate you all being here.

4            MR. BRADY:  Regretfully, Your Honor, I have to raise

5    one issue --

6            THE COURT:  What's that?

7            MR. BRADY:  -- about the Rhode case that may,

8    unfortunately, complicate things.

9            And that is, the Rhode case, the analysis is a little

10   bit different than these other cases which have to do with

11   whether these specific items, right, are protected.  Here we're

12   talking about -- I don't think that there's any dispute that

13   ammunition is protected, and sale of it.  But what I suspect

14   the State, and what we've seen in the Ninth Circuit briefing,

15   their position is going to be that background checks on any

16   arm, regardless, are going to be covered historically, because

17   Bruen suggested that background checks on carry license are

18   going to be protected.

19           Our position is, obviously, going to be ammunition is

20   different, right, because the State admits that this is the

21   very first time that ammunition background check has ever been

22   put in place.  So our position is going be that's treated

23   differently.

24           But I think that we need, potentially, a backup

25   argument to make in case the State's argument carries the day

1  that background checks are generally okay or outside the scope

2  of the Second Amendment, and that is to point out that even if

3  background checks on ammunition are outside of the scope of the

4  Second Amendment, at some point the burden on them becomes so

5  great that --

6  THE COURT:  Well, I already decided that.  Didn't I

7  already decide in the ammunition case --

8  MR. BRADY:  Yes.

9  THE COURT:  -- that I thought that requiring people to

10  pay $19 every time they buy ammunition is unreasonable?

11  MR. BRADY:  Correct.

12  THE COURT:  I thought I decided that.

13  MR. BRADY:  You did, Your Honor.

14  THE COURT:  So we don't need to rehash stuff that

15  we've already gone through.

16  I think the question -- I think the question is:  Is

17  there any history or tradition that supports these background

18  checks?

19  Now, with that, Counsel, let me just say this.  The

20  Bruen case did say that background checks were okay, right,

21  with regard to the concealed carry.  Now, they also said,

22  however, that you can't impose unreasonable restrictions

23  because, you know, you can regulate the Second Amendment out of

24  existence by imposing regulations on something.  Right.

25  MR. BRADY:  Correct.  And that's what I was getting

```
1   at, Your Honor.  If you're saying that your previous findings

2   are the law of the case and the findings up to this point --

3            THE COURT:  I'm not changing my mind.

4            MR. BRADY:  Okay.  Then I -- so no --

5            THE COURT:  You know, but I do want to raise

6   something, by the way.  You know, I'm glad you mentioned that.

7   I'm going to take a wild guess that your position is that any

8   background check for buying ammunition is not reasonable.  I'm

9   putting words in your mouth.  Okay.

10           Now, I said that this regulation -- which is not what

11  the legislature had originally enacted; right?

12           MR. BRADY:  Correct.

13           THE COURT:  This -- the way the bureaucracy has now

14  regulated purchases of ammunition is unreasonable.  But I guess

15  what I'm offering to you folks to talk about is whether or

16  not -- and I don't expect that this will be fruitful, but I

17  have to offer it because I think it's possible that if there

18  was a consent decree that said that the regulation of

19  purchasing ammunition as set forth by the legislature in the

20  legislative enactment would be what would be required, my

21  analysis might be very different.

22           And so I'm thinking that that perhaps might be a way

23  to compromise a resolution of that case.  I just offer that as

24  an idea, folks, but you can do with it whatever you wish.

25           I've spent about as much time on this case as I'm
```

1    going to.  So I need to go, unless there's something really,

2    really, really important you need to address.

3         MR. BECKINGTON:  Your Honor, I apologize for testing

4    your patience.  I'll be very brief.

5         THE COURT:  Okay.

6         MR. BECKINGTON:  Just for the clarification of the

7    record, we did have a motion for reconsideration.  We did have

8    requests, I think, both in the Miller and in Fouts and Rhode

9    for the additional time to do discovery, to submit evidence,

10   et cetera.

11        Is the Court making a formal rule on those matters --

12        THE COURT:  Nothing -- nothing is -- the only thing

13   that has changed -- the only thing that has changed since I

14   issued my rulings on the cases that I've issued rulings is what

15   Bruen -- the Bruen opinion says, which is that we consider the

16   history and tradition of the firearm regulation or the arm

17   regulation.  Okay.  That's the only thing that has changed.

18        All right.  Thank you.  Thank you very much.

19        MR. O'BRIEN:  Just one other thing, Your Honor.

20   Apologize.  Is the Court going to be issuing a written order?

21   We did the best we can to kind of keep track of what you were

22   looking for with respect to the survey, but I just wanted to

23   clarify that as well.

24        THE COURT:  Well, you couldn't write that fast?

25        MR. O'BRIEN:  I tried, Your Honor.

1          MR. DILLON:  We have to summarize, Your Honor.

2          MR. O'BRIEN:  Yeah.

3          THE COURT:  We'll do our best.  I'll issue a written

4   order.  Thank you very much.  And I appreciate you all being

5   here.

6          (The proceedings were adjourned at 11:50 a.m.)

7                        -oOo-

8                  **C E R T I F I C A T E**

9          I, Abigail R. Torres, certify that I am a duly
    qualified and acting Official Court Reporter for the United
10  States District Court; that the foregoing is a true and
    accurate transcript of the proceedings as taken by me in the
11  above-entitled matter on December 12, 2022, and that the format
    used complies with the rules and requirements of the United
12  States Judicial Conference.

13  DATED:  December 20, 2022, San Diego.
    S/ABIGAIL R. TORRES
14  _____
    Abigail R. Torres, CSR No. 13700
15  U.S. Official Court Reporter

16

17

18

19

20

21

22

23

24

25

**EXHIBIT 16**

1  ROB BONTA
   Attorney General of California
2  MARK BECKINGTON
   Supervising Deputy Attorney General
3  KEVIN J. KELLY
   Deputy Attorney General
4  JOHN D. ECHEVERRIA
   Deputy Attorney General
5  State Bar No. 268843
    455 Golden Gate Avenue, Suite 11000
6   San Francisco, CA  94102-7004
    Telephone:  (415) 510-3479
7   Fax:  (415) 703-1234
    E-mail:  John.Echeverria@doj.ca.gov
8  *Attorneys for Defendant Rob Bonta,
   In his official capacity as Attorney*

9

10            IN THE UNITED STATES DISTRICT COURT

11        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

| | |
|---|---|
| **VIRGINIA DUNCAN et al.,** | Case No. 3:17-cv-01017-BEN-JLB |
| Plaintiffs, | **DECLARATION OF JOHN D. ECHEVERRIA RE SUBMISSION OF SURVEYS IN RESPONSE TO THE COURT'S ORDER ENTERED ON DECEMBER 15, 2022** |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California,** | Dept:         5A |
| | Judge:      Hon. Roger T. Benitez |
| Defendant. | Action Filed:  May 17, 2017 |

I, John D. Echeverria, declare as follows:

1.      I am a Deputy Attorney General with the California Department of Justice and serve as counsel to Defendant Rob Bonta, in his official capacity as Attorney General of the State of California ("Defendant"), in the above-captioned matter.  Except as otherwise stated, I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness I could testify competently as to those facts.

2.      On December 15, 2022, the Court entered an Order providing that "[t]he state defendants shall create, and the plaintiffs shall meet and confer

1

1    regarding, a survey or spreadsheet of relevant statutes, laws, or regulations in

2    chronological order." Dkt. 134. The Order provides:

> The listing shall begin at the time of the adoption of the Second
> Amendment and continue through twenty years after the Fourteenth
> Amendment. For each cited statute/law/regulation, the survey shall
> provide: (a) the date of enactment; (b) the enacting state, territory, or
> locality; (c) a description of what was restricted (e.g., dirks, daggers,
> metal knuckles, storage of gunpowder or cartridges, or use regulations);
> (d) what it was that the law or regulation restricted; (e) what type of
> weapon was being restricted (e.g., knife, Bowie Knife, stiletto, metal
> knuckles, pistols, rifles); (f) if and when the law was repealed and
> whether it was replaced; (g) whether the regulation was reviewed by a
> court and the outcome of the courts review (with case citation).
> Defendants may create a second survey covering a time period following
> that of the first list. If opposing parties cannot agree on the inclusion of a
> particular entry on the survey, the disagreement shall be indicated and
> described on a separate list.

       3.    The parties have met and conferred by email, as required by the

December 15 Order. In compliance with the Court's Order, Defendant is hereby

submitting Defendant's two surveys of relevant laws with a separate list of

Plaintiffs' disagreements about the relevance of those laws.

       4.    Attached hereto as **Exhibit 1** is a true and correct copy of Defendant's

Survey of Relevant Statutes (Pre-Founding – 1888).

       5.    Attached hereto as **Exhibit 2** is a true and correct copy of Defendant's

Survey of Relevant Statutes (1889 – 1930s).

       6.    Attached hereto as **Exhibit 3** is a separate list of Plaintiffs'

Disagreements re Defendant's Survey of Relevant Statutes (Pre-Founding – 1930s).

       7.    The surveys have been filed in compliance with the Court's Order

directing the parties to identify all relevant laws, statutes, and regulations from the

time of the Second Amendment to twenty years after adoption of the Fourteenth

Amendment. In compliance with that Order and in recognition of the historical

inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms

laws, some of which were drafted well before the Thirteenth Amendment's

abolition of slavery and the Fourteenth Amendment's Equal Protection

Clause. While our subsequent briefing, as ordered by the Court, will explain in

1  more detail the historical context and relevance of such laws, the Attorney General
2  emphasizes his strong disagreement with racial and other improper discrimination
3  that existed in some such laws, and which stand in stark contrast to California's
4  commonsense firearm laws, which are designed to justly and equitably protect all
5  Californians.  The listing of such racist and discriminatory statutes should in no
6  way be construed as an endorsement of such laws by the Attorney General or his
7  counsel in this matter.

8       I declare under penalty of perjury under the laws of the United States of
9  America that the foregoing is true and correct.  Executed on January 11, 2023, at
10 San Francisco, California.

                                                _s/ John D. Echeverria_
                                                John D. Echeverria

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)[1, 2]**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 1 | 1383 | England | 7 Rich. 2, ch. 13 (1383) | Prohibited possession of launcegays.  Punished by forfeiture of the weapon. | Launcegay | | |
| 2 | 1396 | England | 20 Rich. 2, ch. 1 (1396) | Prohibited possession of launcegays.  Punished by forfeiture of the weapon. | Launcegay | | |
| 3 | 1541 | England | 33 Hen. 8, ch. 6 §§ 1, 18 (1541) | Prohibited possession of any crossbow, handgun, hagbutt, or demy hake.  Exempted subjects living within 12 miles of the Scottish border.  Punishable by forfeiture or payment of 10 pounds. | Pistol; Crossbow | | |
| 4 | 1606 | England | 4 Jac. I, ch. 1 (1606) | Repealed exemption for subjects living with 12 miles of the Scottish border for the keeping of crossbows, handguns, and demy hakes. | Club; Other weapon | | |
| 5 | 1664 | New York | The Colonial Laws of New York from the Year 1664 to the Revolution . . ., at 687 (1894) | Prohibited a slave from possessing or using a gun, pistol, sword, club, or other kind of weapon unless in the presence and at the direction of their Master or Mistress. | Gun; Pistol; Sword; Club; Other kind of weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments | |

[1] In compliance with the Court's Order dated December 15, 2022 (Dkt. 134), Defendant created this survey of statutes, laws, and regulations that Defendant has determined are relevant to this action.  Plaintiffs disagree that nearly all of those statutes, laws, and regulations are relevant in this case, and in compliance with the Court's December 15 Order, the chart reflects Plaintiffs' position regarding the relevance of each law.

[2] The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment.  In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause.  While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians.  The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | | to the U.S. Constitution | |
| 6 | 1686 | New Jersey | The Grants, Concessions, and Original Constitutions of The Province of New Jersey 289-90 (1881) (1686) | Prohibited the carrying "privately" of any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons. Punishable by fine of 5 pounds for first conviction, and punishable by imprisonment for 6 months and a fine of 10 pounds. | Pistol; Skeines; Stilettoes; Dagger; Dirk; Other unusual or unlawful weapons | | |
| 7 | 1689 | England | English Bill of Rights of 1689, 1 Wm. & Mary ch. 2, § 7 | Provided a right for Protestants to have "Arms for their Defense . . . as allowed by law." | Arms for defense | | |
| 8 | 1750 | Massachusetts | 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs and Unlawful Assemblies, ch. 17, § 1 | Prohibited the carrying of a club or other weapon while unlawfully, riotously, or tumultuously assembling. Punishable by seizing the weapon and a hearing before the court. | Club; Other weapon | | |
| 9 | 1769 | England | 1 Blackstone ch. 1 (1769) | Recognized the "fifth and last auxiliary right," which provided that Protestant subjects had the right to "arms for their defence" "such as are allowed by law." | Arms for defense | | |
| 10 | 1771 | New Jersey | 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | Prohibited the setting of any trap gun intended to discharge by any string, rope, or other contrivance. Punishable by forfeiture of the firearm and fine of 6 pounds. | Trap gun | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| 11 | 1783 | Massachusetts – City of Boston | 1783 Mass. Acts 37, § 2 | Prohibited the possession of any "fire arms," and among other devices, loaded with any gun powder.  Punishable by forfeiture and sale at public auction. | Gunpowder | | |
| 12 | 1784 | New York – City of New York City | 1784 Laws of N.Y. 627, ch. 28 | Prohibited any person to keep any quantity of gun powder exceeding 28 pounds and required storage in separate containers.  Punishable by forfeiture and fine. | Gunpowder | | |
| 13 | 1786 | Massachusetts | An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, MA), Nov. 17, 1786, at 1 | Prohibited being armed with a club or other weapon while rioting. | Club; Other weapon | | |
| 14 | 1788 | Ohio [Territory] | 1788-1801 Ohio Laws 20, A Law Respecting Crimes and Punishments . . ., ch. 6 | Prohibited the carrying of any "dangerous weapon" that indicates a violent intention while committing a burglary.  Punishable by imprisonment for up to 40 years. | Any dangerous weapon | | |
| 15 | 1792 | Virginia | Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force . . . ., at 187 (1803), §§ 8-9 | Prohibited any "negro or mulatto" from possessing or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 16 | 1797 | Delaware | Del. Laws 104, An Act for the Trial of Negroes, ch. 43, § 6 | Prohibited "any Negro or Mulatto slave" from carrying guns, swords, pistols, fowling pieces, clubs, or other arms and weapons without the master's special license. | Gun; Sword; Pistol; Fowling pieces; Club; other arms and weapons | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 17 | 1798 | Kentucky | 1798 Ky. Acts 106 | Prohibited "negro, mulatto, or Indian" from possessing or carrying a gun, powder, shot, club, or other weapon or ammunition. | Gun; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 18 | 1799 | Mississippi [Territory] | 1799 Miss. Laws 113, A Law for The Regulation of Slaves | Prohibited any "Negro or mulatto" from carrying gun, powder, shot, club, or other weapon. Also prohibits a "negro or mulatto" from possessing a gun, weapon, or ammunition. | Gun; Powder; Shot; Cub; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 19 | 1799 | New Jersey | Charles Nettleton, Laws of the State of New-Jersey, at 474 (1821), [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 20 | 1801 | Tennessee | 1801 Tenn. Act 260-61 | Prohibited the private carrying of "any dirk, large knife, pistol, or any other dangerous weapon, to | Dirk; Large knife; Pistol; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | the fear or terror of any person," unless a surety is posted. Punishable as for "breach of the peace, or riot at common law." | Other dangerous weapon | | |
| 21 | 1804 | Indiana [Territory] | 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4 | Prohibited a "slave or mulatto" from carrying or possessing a gun, powder, shot, club or other weapon and ammunition. | Gun; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 22 | 1804 | Mississippi [Territory] | 1804 Miss. Laws 90, An Act Respecting Slaves, § 4 | Prohibited a "Slave" from keeping or carrying a gun, powder, shot, club, or other weapon. | Gun; Powder; Shot; Club; Other weapon; Ammunition | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 23 | 1811 | Maryland | The Laws of Maryland, with the Charter, the Bill Of Rights, the Constitution of the State, and Its Alterations, the Declaration of Independence, and the Constitution of the United States, and Its Amendments, at 465 (1811) | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment for 3 months to 2 years. | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 24 | 1813 | Louisiana | 1813 La. Acts 172, An Act Against Carrying | Prohibited the carrying of any concealed weapon, including a | Dirk; Dagger; | | |

**_Duncan v. Bonta_**, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Concealed Weapons, and Going Armed in Public Places in an Unnecessary Manner, § 1 | dirk, dagger, knife, pistol, or any other deadly weapon. | Knife; Pistol; Other deadly weapon | | |
| 25 | 1816 | Georgia | Lucius Q.C. Lamar, A Compilation of the Laws of the State of Georgia, Passed by the Legislature since the Year 1810 to the Year 1819, Inclusive. Comprising all the Laws Passed within those Periods, Arranged under Appropriate Heads, with Notes of Reference to those Laws, or Parts of Laws, which are Amended or Repealed to which are Added such Concurred and Approved Resolutions, as are Either of General, Local, or Private Moment. Concluding with a Copious Index to the Laws, a Separate one to the Resolutions, at 599 (1821), Offences Against the Public Peace, (1816) § 19 | Prohibited the carrying of any pistol, hanger, cutlass, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by imprisonment with hard labor for a period of time to be determined by a jury. | Picklock; Key; Crow; Jack; Bit or other implement; Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 26 | 1818 | Missouri [Territory] | Organic Laws:-Laws of Missouri Territory, (Alphabetically | Prohibited "slave or mulatto" from carrying a gun, powder, shot, club or other weapon and | Gun; Powder; Shot; | Unconstitutio nal under the Thirteenth | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | Arranged):-Spanish Regulations for the Allotment of Lands:- Laws of the United States, for Adjusting Titles to Lands, &c. to Which are Added, a Variety of Forms, Useful to Magistrates, at 374 (1818), Slaves, § 3 | from possessing a gun or ammunition. | Club; Other weapon; Ammunition | and/or Fourteenth Amendments to the U.S. Constitution | |
| 27 | 1821 | Maine | 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 1 | Prohibited any person from possessing any gunpowder, in any quantity, unless permitted by local rules and regulations. | Gunpowder | | |
| 28 | 1835 | Arkansas [Territory] | Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds., 1835) | Prohibited any "slave or mulatto" from keeping or carrying a gun, powder, shot, club, or other weapon. | Firearm; Powder; Shot; Club; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 29 | 1836 | Massachusetts | Mass. Rev. Stat., ch. 134, § 16 (1836) | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Punishable by finding sureties for keeping the peace for a term up to 6 months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 30 | 1836 | Connecticut – Cities of Hartford, New Haven, New | 1836 Conn. Acts 105, ch. 1, § 20 | Authorizing the local court of common counsel to prohibitand regulate the storage of gun powder. | Gunpowder | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | London, Norwich, and Middletown | | | | | |
| 31 | 1837 | Alabama | 1837 Ala. Acts 7, §§ 1, 2 | Imposed tax of $100 on any person selling, giving, or disposing of any Bowie knife or Arkansas toothpick. Failure to pay the tax was subject to penalty of perjury. | Knife | Tax reduced in 1851. | |
| 32 | 1837 | Arkansas | Josiah Gould, A Digest of the Statutes of Arkansas Embracing All Laws of a General and Permanent Character in Force the Close of the Session of the General Assembly of 1856 380 381–82 (1837) | Prohibited the concealed carrying of any pistol, dirk, butcher or large knife, sword cane, unless "upon a journey." | Pistol; Dirk; Butcher knife; Sword cane | | *State v. Buzzard*, 4 Ark. 18 (1842) (upholding law under the Second Amendment and state constitution); *Fife v. State*, 31 Ark. 455 (1876) |
| 33 | 1837 | Georgia | Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December 1837, at 90-91 (1838) | Prohibited any merchant, or "any other person or persons whatsoever," to sell, offer to sell, keep, or have on their person or elsewhere any Bowie knife or "any other kind of knives, manufactured and sold for the purpose of wearing, or carrying the same as arms of offence or defence," pistols, swords, sword canes, or spears. Exempted | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear | | *Nunn v. State*, 1 Ga. 243 (1846) (held unconstitutional under Second Amendment). |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | "such pistols as are known as horseman's pistols" from these restrictions.  Punishable by a fine of up to $100-500 for the first offense and $500-1,000 for subsequent offenses. | | | |
| 34 | 1837 | Mississippi | 1837 Miss. L. 291-92 | Prohibited the use of any rifle, shotgun, sword cane, pistol, dirk, dirk knife, Bowie knife, or any other deadly weapon in a fight in which one of the combatants was killed, and the exhibition of any dirk, dirk knife, Bowie knife, sword, sword cane, or other deadly weapon in a rude or threatening manner that was not in necessary self-defense. Punishable by liability to decedent and a fine of up to $500 and imprisonment for up to 3 months. | Rifle; Shotgun; Sword cane; Pistol; Dirk; Dirk knife; Bowie knife; Sword; Sword cane; Other deadly weapon | | |
| 35 | 1837 | Mississippi – Town of Sharon | 1837 Miss. L. 294 | Authorized the town of Sharon to enact "the total inhibition of the odious and savage practice" of carrying dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 36 | 1837 | Tennessee | 1837-38 Tenn. Pub. Acts 200-01, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 2 | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, or other knife or weapon. Punishable by fine of $200-500 and imprisonment for 3-6 months. | Bowie knife; Arkansas toothpick; Other knife or weapon | | *Haynes v. Tennessee*, 24 Tenn. 120 (1844) (upheld conviction for unlawful |

9

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | | | carrying of a Bowie knife). |
| 37 | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 200, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in this State, ch. 137, § 1. | Prohibited any merchant from selling a Bowie knife or Arkansas tooth pick. Punishable by fine of $100-500 and imprisonment for $1-6 months. | Bowie knife; Arkansas toothpick | | |
| 38 | 1837 | Tennessee | 1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4 | Prohibited the stabbing or cutting of another person with any knife or weapon known as a "Bowie knife, Arkansas tooth pick, or any knife or weapon that shall in form, shape or size resemble a Bowie knife," regardless of whether the person dies. Punishable by imprisonment for 3-15 years. | Bowie knife; Arkansas toothpick; Any knife or weapon that resembles a bowie knife | | |
| 39 | 1838 | Tennessee | Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-38, at 200-01, ch. 137 | Prohibited the sale or transfer of any Bowie knife or knives, Arkansas toothpicks, or "any knife or weapon that shall in form shape or size resemble a Bowie knife or any Arkansas toothpick." | Bowie knife; Arkansas toothpick; Any similar knife | | *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840) (upheld under state constitution). |
| 40 | 1838 | Virginia | Acts of the General Assembly of Virginia, Passed at the Session of 1838, at 76-77, ch. 101 (1838) | Prohibited "habitually or generally" carrying any concealed pistol, dirk, Bowie knife, or any other weapon of like kind. | Pistol; Dirk; Bowie knife; Other similar weapon | | |
| 41 | 1839 | Alabama | 1839 Ala. Acts 67, § 1 | Prohibited the concealed carrying of "any species of fire | Knife; Deadly weapon | | *State v. Reid*, 1 Ala. 612 |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | arms, or any bowie knife, Arkansas tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." Punished by fine of $50-100 and imprisonment not to exceed 3 months. | | | (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 42 | 1839 | Florida [Territory] | John P. Duval, Compilation of the Public Acts of the Legislative Council of the Territory of Florida, Passed Prior to 1840, at 423 (1839), An Act to Prevent any Person in this Territory from Carrying Arms Secretly | Prohibited the concealed carrying of "any dirk, pistol, or other arm, or weapon, except a common pocket-knife." Punishable by fine of $50-500 or imprisonment for 1-6 months. | Dirk; Pistol; Other arm or weapon | | |
| 43 | 1839 | Mississippi – Town of Emery | 1839 Miss. L. 385, ch. 168 | Authorized the town of Emery to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 44 | 1840 | Mississippi – Town of Hernando | 1840 Miss. L. 181, ch. 111 | Authorized the town of Hernando to enact restrictions on the carrying of dirks, Bowie knives, or pistols. | Dirk; Bowie knife; Pistol | | |
| 45 | 1841 | Alabama | 1841 Ala. Acts 148–49, Of Miscellaneous Offences, ch. 7, § 4 | Prohibited the concealed carrying of "a bowie knife, or knife or instrument of the like kind or description, by whatever name called, dirk or any other deadly weapon, pistol or any | Knife; Pistol; Air gun; Other deadly weapon | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | species of firearms, or air gun," unless the person is threatened with an attack or is traveling or "setting out on a journey." Punished by a fine of $50-100. | | | |
| 46 | 1841 | Maine | 1841 Me. Laws 709, ch. 169, § 16. | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to six months. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 47 | 1841 | Mississippi | 1841 Miss. 52, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife. | Bowie knife | Tax reduced in 1850 | |
| 48 | 1842 | Louisiana | Henry A. Bullard & Thomas Curry, 1 A New Digest of the Statute Laws of the State of Louisiana, from the Change of Government to the Year 1841 at 252 (E. Johns & Co., New Orleans, 1842) | Prohibited the carrying of " any concealed weapon, such as a dirk, dagger, knife, pistol, or any other deadly weapon." Punishable by fine of $20-50. | Dirk; Dagger; Knife; Pistol; Other deadly weapon | | |
| 49 | 1845 | Illinois | Mason Brayman, Revised Statutes of the State of Illinois: Adopted by the General Assembly of Said State, at Its Regular Session, Held in the Years A.D. 1844-45: Together with an Appendix | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon or other offensive weapon, with intent to assault any person. Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | Containing Acts Passed at the Same and Previous Sessions, Not Incorporated in the Revised Statutes, but Which Remain in Force , at 176 (1845), Criminal Jurisprudence, § 139 | | | | |
| 50 | 1846 | North Carolina | 1846 N.C. L., ch. 42 | Prohibited "any slave" from receiving any sword, dirk, Bowie knife, gun, musket, firearms, or "any other deadly weapons of offense" without written permission. | Sword; Dirk; Bowie knife; Gun; Musket; Firearms; Other deadly weapons of offense | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 51 | 1847 | Maine | The Revised Statutes of the State of Maine, Passed October 22, 1840; To Which are Prefixed the Constitutions of the United States and of the State of Maine, and to Which Are Subjoined the Other Public Laws of 1840 and 1841, with an Appendix, at 709 (1847), Justices of the Peace, § 16 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault.  Upon complaint of any person, the person intending to carry such weapons may be required to find sureties for keeping the peace for up to one year. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 52 | 1849 | California – City of San Francisco | 1849 Cal. Stat. 245, An Act to Incorporate the City of San Francisco, § 127 | Prohibited the carrying, with intent to assault any person, any pistol, gun, knife, dirk, bludgeon, or other offensive | Pistol; Gun; Knife; Dirk; | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|----------------------|---------------|-----------------|
| | | | | weapon with the intent to assault another person.. Punished by fine of up to $100 and imprisonment for up to 3 months. | Bludgeon; Other offensive weapon | | |
| 53 | 1850 | Mississippi | 1850 Miss. 43, ch. 1 | Imposed an annual property tax of 50 cents on each Bowie knife. | Bowie knife | Tax increased to $1 in 1854 | |
| 54 | 1851 | Alabama | 1851-52 Ala. 3, ch. 1 | Tax of $2 on "every bowie knife or revolving pistol." | Bowie knife; Pistol | Additional weapons added in 1867. | |
| 55 | 1851 | Illinois – City of Chicago | Ordinances of the City of Chicago, Ill., ch. 16, § 1 | Prohibiting the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent written permission of the authorities. Punishable by a fine of $25 per offense. | Gunpowder | | |
| 56 | 1851 | Pennsylvania – City of Philadelphia | 1851 Pa. Laws 382, An Act Authorizing Francis Patrick Kenrick, Bishop of Philadelphia, to Convey Certain Real Estate in the Borough of York, and a Supplement to the Charter of Said Borough, § 4 | Prohibited the willful and malicious carrying of any pistol, gun, dirk, knife, slungshot, or deadly weapon. Punishable by imprisonment for 6 months to 1 year and security for future good behavior. | Pistol; Gun; Dirk; Slungshot; Deadly weapon | | |
| 57 | 1853 | California | S. Garfielde, Compiled Laws of the State of California: Containing All the Acts of the Legislature of a Public and General Nature, Now in Force, | Prohibited carrying of pistol, gun, knife, dirk, bludgeon, or other offensive weapon with intent to assault. Punishable by fine of up to $100 or imprisonment for up to 3 months. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Passed at the Sessions of 1850-51-52-53, § 127 | | | | |
| 58 | 1853 | New Mexico [Territory] | 1853 N.M. Laws 406, An Act Prohibiting the Carrying of Weapons Concealed or Otherwise, § 25 | Prohibited the carrying of a concealed pistol, Bowie knife, cuchillo de cinto (belt buckle knife), Arkansas toothpick, Spanish dagger, slungshot, or any other deadly weapon. | Pistol; Bowie knife; Cuchillo de cinto (belt buckle knife); Arkansas toothpick; Spanish dagger; Slungshot; Other deadly weapon | *See also* 1859 N.M. L. 94-96 (same). | |
| 59 | 1854 | Mississippi | 1854 Miss. 50, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, Arkansas toothpick, sword cane, and dueling or pocket pistol. | Bowie knife; Arkansas toothpick; Sword cane; Dueling or pocket pistol | Amended in 1856 to exclude pocket pistols from the tax | |
| 60 | 1854 | Washington [Territory] | 1854 Wash. Sess. Law 80, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 61 | 1855 | California | 1855 Cal. L. 152-53, ch. 127 | Provided that a person who killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon" would pay the decedent's debts and be liable to | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | the decedent's family for liquidated damages. | Other dangerous weapon | | |
| 62 | 1855 | Indiana | 1855 Ind. Acts 153, An Act to Provide for the Punishment of Persons Interfering with Trains or Railroads, ch. 79, § 1 | Prohibited the carrying of any dirk, pistol, Bowie knife, dagger, sword in cane, or any other dangerous or deadly weapon with the intent of injuring another person. Exempted any person who was a "traveler." Punishable by fine up to $500. | Dirk; Pistol; Bowie knife; Dagger; Sword cane; Other dangerous or deadly weapon | *See also* 1859 Ind. L. 129, ch. 78 (same); 1881 Ind. L. 191, ch. 37. | |
| 63 | 1855 | Louisiana | 1855 La. L. 148, ch. 120 | Prohibited the concealed carrying of "pistols, bowie knife, dirk, or any other dangerous weapon." | Pistol; Bowie knife; Dirk; Other dangerous weapon | | |
| 64 | 1856 | Mississippi | 1856-1857 Miss. L. 36, ch. 1 | Imposed an annual property tax of $1 on each Bowie knife, dirk knife, or sword cane. | Bowie knife; Dirk knife; Sword cane | Modified in 1861 to preclude collection of the tax during the Civil War (1861-1862 Miss. L. 134, ch. 125) | |
| 65 | 1856 | Tennessee | 1855-56 Tenn. L. 92, ch. 81 | Prohibited the sale or transfer of any pistol, Bowie knife, dirk, Arkansas toothpick, or hunter's knife to a minor. Excepted the transfer of a gun for hunting. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife | | |

**Duncan v. Bonta**, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 66 | 1856 | Texas | Tex. Penal Code arts. 611-12 (enacted Aug. 28, 1856) | Provided that the use of a Bowie knife or a dagger in manslaughter is to be deemed murder. | Bowie knife; Dagger | | *Cockrum v. State*, 24 Tex. 394 (1859) (upheld under Second Amendment and Texas Constitution). |
| 67 | 1858 | Minnesota – City of St. Paul | Ordinances of the City of St. Paul, Minn., ch. 21, § 1 | Prohibited the keeping, sale, or giving away of gun powder or gun cotton "in any quantity" absent payment of $5 to the City Treasurer and written permission of the authorities.  Authorized any person to "keep for his own use" no more than 1 pound of gun powder or gun cotton at any one time.  Punishable by a fine not to exceed $50 per offense. | Gunpowder | | |
| 68 | 1858 | Nebraska [Territory] | 1858 Neb. Laws 69, An Act to Adopt and Establish a Criminal code for the Territory of Nebraska, § 135 | Prohibited the carrying of a pistol, gun, knife, dirk, bludgeon or other offensive weapon with the intent to assault a person.  Punishable by fine up to $100. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 69 | 1859 | Kentucky – Town of Harrodsburg | 1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23 | Prohibited the selling, giving, or loaning of a concealed pistol, dirk, Bowie knife, brass knuckles, slungshot, colt, cane-gun, or other deadly weapon to a "minor, slave, or free negro." Punishable by fine of $50. | Pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Colt; Cane-gun; | Unconstitutional under the Thirteenth and/or Fourteenth Amendments | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Other deadly weapon | to the U.S. Constitution | |
| 70 | 1859 | Ohio | 1859 Ohio Laws 56, An Act to Prohibit the Carrying or Wearing of Concealed Weapons, § 1 | Prohibited the concealed carrying of any pistol, Bowie knife, or any other "dangerous weapon." Punishable by fine of up to $200 or imprisonment of up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | | |
| 71 | 1859 | Washington [Territory] | 1859 Wash. Sess. Laws 109, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 30 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 72 | 1860 | Georgia | 1860 Ga. Laws 56, An Act to add an additional Section to the 13th Division of the Penal Code, making it penal to sell to or furnish slaves or free persons of color, with weapons of offence and defence; and for other purposes therein mentioned, § 1. | Prohibited the sale or furnishing of any gun, pistol, Bowie knife, slungshot, sword cane, or other weapon to a "slave or free person of color." Punishable by fine up to $500 and imprisonment up to 6 months. | Gun; Pistol; Bowie knife; Slungshot; Sword cane; Other weapon | Unconstitutional under the Thirteenth and/or Fourteenth Amendments to the U.S. Constitution | |
| 73 | 1861 | California | William H. R. Wood, Digest of the Laws of California: Containing All Laws of a General Character Which were in | Prohibited the display of any dirk, dirk-knife, Bowie knife, sword, sword cane, pistol, gun, or other deadly weapon in a threatening manner, or use of | Dirk; Bowie knife; Sword; Sword cane; Pistol; | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Force on the First Day of January, 1858; Also, the Declaration of Independence, Constitution of the United States, Articles of Confederation, Kentucky and Virginia Resolutions of 1798-99, Acts of Congress Relative to Public Lands and Pre-Emptions. Together with Judicial Decisions, Both of the Supreme Court of the United States and of California, to Which are Also Appended Numerous Forms for Obtaining Pre-Emption and Bounty Lands, Etc., at 334 (1861) | such weapon in a fight. Punishable by a fine of $100-500 or imprisonment for 1-6 months. | Gun; Other deadly weapon | | |
| 74 | 1861 | Nevada [Territory] | 1861 Nev. L. 61 | Provided that the killing of another in a duel with a rifle, shotgun, pistol, Bowie knife, dirk, small-sword, back-sword, or other "dangerous weapon" in the killing of another in a duel is to be deemed murder. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small-sword; Back-sword; Other dangerous weapon | | |
| 75 | 1862 | Colorado [Territory] | 1862 Colo. Sess. Laws 56, § 1 | Prohibited the concealed carrying in any city, town, or village any pistol, Bowie knife, | Pistol; Bowie knife; Dagger; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|-------------|----------|--------------------------|-----------------------|---------------|-----------------|
| | | | | dagger, or other deadly weapon. Punished by fine of $5-35. | Other deadly weapon | | |
| 76 | 1863 | Kansas – City of Leavenworth | C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix, at 45 (1863), An Ordinance Relating to Misdemeanors, § 23 | Prohibited the carrying of any concealed "pistol, dirk, bowie knife, revolver, slung shot, billy, brass, lead or iron knuckles, or any other deadly weapon within this city." Punishable by a fine of $3-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Brass; lead or iron knuckles; Other deadly weapon | | |
| 77 | 1863 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 190 (1863), Offences Affecting Public Safety: Carrying Concealed Weapons, § 3 | Prohibited the carrying of a concealed pistol, Bowie knife, dirk, or any other deadly weapon. Punishable by fine of $10-50. | Pistol; Bowie knife; Dirk; Other deadly weapon | | |
| 78 | 1864 | California | Theodore Henry Hittell, The General Laws of the State of California, from 1850 to 1864, Inclusive: Being a Compilation of All Acts of a General Nature Now in Force, with Full References to Repealed Acts, Special and Local Legislation, and Statutory Constructions of | Prohibited the concealed carrying of any dirk, pistol, sword cane, slungshot, or "other dangerous or deadly weapon." Exempted any peace officer or officer acting under the law of the United States. Punishable by imprisonment for 30-90 days or fine of $20-200. | Dirk; Pistol; Sword cane; Slungshot; Other deadly or dangerous weapon | Repealed 1869-70 Cal. Sess. Laws, ch. 63 (provided that pending cases be heard and tried as if not repealed) | |

**Duncan v. Bonta**, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | the Supreme Court. To Which are Prefixed the Declaration of Independence, Constitution of the United States, Treaty of Guadalupe Hidalgo, Proclamations to the People of California, Constitution of the State of California, Act of Admission, and United States Naturalization Laws, with Notes of California Decisions Thereon, at 261, § 1 (1868) | | | | |
| 79 | 1864 | Montana [Territory] | 1864 Mont. Laws 355, An Act to Prevent the Carrying of Concealed Deadly Weapons in the Cities and Towns of This Territory, § 1 | Prohibited the carrying of a concealed "any pistol, bowie-knife, dagger, or other deadly weapon" within any town or village in the territory. Punishable by fine of $25-100. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 80 | 1865 | Utah [Territory] | An Act in relation to Crimes and Punishment, Ch. XXII, Title VII, Sec. 102, in Acts, Resolutions and Memorials Passed at the Several Annual Sessions of the Legislative Assembly of the Territory of Utah 59 (Henry McEwan 1866), § 102 | Prohibited the "set[ting] of any gun." Punishable by imprisonment of up to 1 year or a fine of up to $500. | Trap gun | | |

***Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB**
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 81 | 1866 | New York | Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete Index, at 2512 (Vol. 3, 1882), An Act to Prevent the Furtive Possession and use of slungshot and other dangerous weapons, ch. 716, § 1 | Prohibited using, attempting to use, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, and any dirk or dagger, or sword cane or air-gun. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Sword cane; Air gun | | |
| 82 | 1866 | North Carolina | 1866 N.C. L. ch. 21, at 33-34, § 11 | Imposed a $1 tax on every dirk, Bowie knife, pistol, sword cane, dirk cane, and rifle cane used or worn during the year. | Dirk; Bowie knife; Pistol; Sword cane; | | |

***Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB**
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Dirk cane; Rifle cane | | |
| 83 | 1867 | Alabama | 1867 Ala. Rev. Code 169 | Tax of $2 on pistols or revolvers in the possession of private persons, excluding dealers, and a tax of $3 on "all bowie knives, or knives of the like description." Non-payment was punishable by seizure and, unless payment was made within 10 days with a penalty of an additional 50%, subject to sale by public auction. | Pistol; Bowie knife | | |
| 84 | 1867 | Colorado [Territory] | 1867 Colo. Sess. Laws 229, § 149 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon within any city, town, or village in the territory. Punishable by fine of $5-35. Exempted sheriffs, constables, and police officers when performing their official duties. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 85 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 44 (1867), Police Regulations of the State, Offences Against Public | Prohibited the carrying of a concealed Bowie knife, Arkansas tooth pick, dirk, sword cane, Spanish stiletto, belt or pocket pistol, or other knife or weapon. Also prohibited selling such a weapon or using such a weapon to threaten people. | Bowie knife; Arkansas toothpick; Dirk; Sword cane; Spanish stiletto; Belt; Pocket pistol; Other knife or weapon | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | Peace, §§ 4746, 4747, 4753, 4757 | | | | |
| 86 | 1867 | Tennessee – City of Memphis | William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, from 1826 to 1867, Inclusive, Together with the Acts of the Legislature Relating to the City, with an Appendix, at 50 (1867), Police Regulations of the State. Selling Liquors or Weapons to Minors, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling. Punishable by fine of minimum $25 and imprisonment. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | | |
| 87 | 1868 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4111 (Act of Aug. 5, 1868, at 1) | Prohibited the carrying of any rifle or "shot-gun walking cane." Punishable by fine of $500-1000 and imprisonment of no less than 2 years. | Rifle; Shotgun walking cane | | |
| 88 | 1868 | Florida | Fla. Act of Aug. 8, 1868, as codified in Fla. Rev. Stat., tit. 2, pt. 5 (1892), at 2425 | Prohibited the manufacture or sale of slungshots or metallic knuckles. Punishable by imprisonment for up to 6 months or a fine up to $100. | Slungshot; Metallic knuckles | | |
| 89 | 1868 | Florida | 1868 Fla. Laws 2538, Persons Engaged in Criminal Offence, Having Weapons, ch. 7, § 10 | Prohibited the carrying of a slungshot, metallic knuckles, billies, firearms or other dangerous weapon if arrested for committing a criminal offence or disturbance of the peace. Punishable by imprisonment up to 3 months or a fine up to $100. | Slungshot; Metallic knuckles; Billy; Firearms; Other dangerous weapon | | |

24

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 90 | 1868 | Florida | James F McClellan, A Digest of the Laws of the State of Florida: From the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One, Inclusive, at 403 (1881), Offences Against Public Peace, § 13 (Fla. Act of Aug. 6, 1868, ch. 1637) | Prohibited the carrying "about or on their person" any dirk, pistol or other arm or weapon, except a "common pocket knife." Punishable by fine up to $100 or imprisonment up to 6 months. | Dirk; Pistol; Other arm or weapon | | |
| 91 | 1869 | Tennessee | 1869-70 Tenn. L. 23-24, ch. 22 | Prohibited the carrying of any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." | Pistol; Dirk; Bowie knife; Arkansas toothpick; Other "deadly or dangerous weapon" | | *Andrews v. State*, 50 Tenn. 165 (1871) (upheld under state constitution) |
| 92 | 1869 | Washington [Territory] | 1869 Wash. Sess. Laws 203-04, An Act Relative to Crimes and Punishments, and Proceedings in Criminal Cases, ch. 2, § 32 | Prohibited exhibiting, in a rude, angry, or threatening manner, a pistol, Bowie knife, or other dangerous weapon. Punishable by imprisonment up to 1 year and a fine up to $500. | Pistol; Bowie knife; Other dangerous weapon | | |
| 93 | 1870 | Georgia | 1870 Ga. L. 421, ch. 285 | Prohibited the open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of | Dirk; Bowie knife; Pistol; Revolver; | Law enforcement exception added in | *Hill v. State*, 53 Ga. 472 (1874) (upheld |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | justice, or any general election ground or precinct, or any other public gathering," except for militia musters. | Any kind of deadly weapon | 1879. *See* 1879 Ga. L. 64, ch. 266 | under state constitution) |
| 94 | 1870 | Louisiana | 1870 La. Acts 159–60, An Act to Regulate the Conduct and to Maintain the Freedom of Party Election . . ., § 73 | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife or other dangerous weapon on an election day during the hours the polls are open or during registration. Punishable by fine of minimum $100 and imprisonment of minimum 1 month. | Gun; Pistol; Bowie knife; Other dangerous weapon | | |
| 95 | 1870 | New York | "The Man Trap," The Buffalo Commercial, Nov. 1, 1870 | Referenced prohibition on the use of "infernal machines." | Trap gun; Infernal machine | | |
| 96 | 1871 | Arkansas – City of Little Rock | George Eugene Dodge, A Digest of the Laws and Ordinances of the City of Little Rock, with the Constitution of State of Arkansas, General Incorporation Laws, and All Acts of the General Assembly Relating to the City 230-31 (1871) | Prohibited carrying of a pistol, revolver, Bowie knife, dirk, rifle, shot gun, slungshot, colt, or metal knuckles while engaged in a breach of the peace. Punishable by a fine of $25-500. | Pistol; Revolver; Bowie knife; Dirk; Rifle; Shotgun; Slungshot; Colt; Metal knuckles | | |
| 97 | 1871 | District of Columbia | An Act to Prevent the Carrying of Concealed Weapons, Aug. 10, 1871, reprinted in Laws of the District of Columbia: 1871-1872, Part II, 33 (1872) (Dist. of Col., An | Prohibited the carrying or having concealed "any deadly or dangerous weapons, such as daggers, air-guns, pistols, Bowie knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slungshots, or brass or | Dangerous weapon; Dagger; Air-guns; Pistols; Bowie knife; Dirk; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|----------------|------------------|
| | | | Act to Prevent the Carrying of Concealed Weapons, 1871, ch. XXV) | other metal knuckles." Punishable by forfeiture of the weapon and a fine of $20-50. | Razor; Sword-cane; Slungshot; Metal knuckles | | |
| 98 | 1871 | Mississippi | 1871 Miss. L. 819-20, ch. 33 | Imposed property tax on pistols, dirks, Bowie knives, and sword canes. | Pistol; Dirk; Bowie knife; Sword cane | *See also* 1876 Miss. L. 131, 134, ch. 103; 1878 Miss. L. 27, 29, ch. 3; 1880 Miss. L. 21, ch. 6; 1892 Miss L. 194, ch. 74; 1894 Miss L. 27, ch. 32 | |
| 991 | 1871 | Missouri – City of St. Louis | Everett Wilson Pattison, The Revised Ordinance of the City of St. Louis, Together with the Constitution of the United States, and of the State of Missouri; the Charter of the City; and a Digest of the Acts of the General Assembly, Relating to the City, at 491-92 (1871), Ordinances of the City of St. Louis, Misdemeanors, §§ 9-10. | Prohibited the carrying of a concealed pistol, or revolver, colt, billy, slungshot, cross knuckles, or knuckles of lead, brass or other metal, Bowie knife, razor, dirk knife, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon without written permission from the Mayor.  Punishable by fine of $10-500. | Pistol; Revolver; Colt; Billy; Slungshot; Cross knuckles; Metal knuckles; Bowie knife; Razor; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|------------------|
| 100 | 1871 | Tennessee | James H. Shankland Public Statutes of the State of Tennessee, since the Year 1858. Being in the Nature of a Supplement to the Code, at 108 (Nashville, 1871) | Prohibited the carrying of a pistol, dirk, Bowie knife, Arkansas tooth pick, or other weapon in the shape of those weapons, to an election site. Punishable by fine of minimum $50 and imprisonment at the discretion of the court. | Pistol; Dirk; Bowie knife; Arkansas toothpick | | |
| 101 | 1871 | Texas | 1871 Tex. Laws 25, An Act to Regulate the Keeping and Bearing of Deadly Weapons. § 1 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any other kind of knife used for offense or defense, unless carried openly for self-defense. Punishable by fine of $20-100, forfeiture of the weapon, and for subsequent offenses, imprisonment up to 60 days. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any other kind of knife used for offense or defense | | *English v. State*, 35 Tex. 473 (1872) (upheld as constitutional under Second Amendment and Texas Constitution); *State v. Duke*, 42 Tex. 455 (1875) (upheld as constitutional under Texas Constitution) |
| 102 | 1871 | Texas | Tex. Act of Apr. 12, 1871, as codified in Tex. Penal Code (1879). Art. 163. | Prohibited the carrying of a concealed or open gun, pistol, Bowie knife, or other dangerous weapon within a half mile of a polling site on an election day. Also prohibited generally carrying a pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass-knuckles; Bowie knife; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|--------------|----------|---------------------------|----------------------|---------------|-----------------|
| | | | | other kind of knife used for offense or defense. Punishable by fine and forfeiture of the weapon. | Other dangerous weapon; Other knife used for offense or defense | | |
| 103 | 1872 | Maryland – City of Annapolis | 1872 Md. Laws 57, An Act to Add an Additional Section to Article Two of the Code of Public Local Laws, Entitled "Anne Arundel County," Sub-title "Annapolis," to Prevent the Carrying of Concealed Weapons in Said City, § 246 | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, razor, brass, iron or other metal knuckles, or any other deadly weapon. Punishable by a fine of $3-10. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Razor; Brass; Metal knuckles; Other deadly weapon | | |
| 104 | 1872 | Nebraska – City of Nebraska | Gilbert B. Colfield, Laws, Ordinances and Rules of Nebraska City, Otoe County, Nebraska, at 36 (1872), Ordinance No. 7, An Ordinance Prohibiting the Carrying of Fire Arms and Concealed Weapons, § 1 | Prohibited the carrying openly or concealed of a musket, rifle, shot gun, pistol, sabre, sword, Bowie knife, dirk, sword cane, billy slungshot, brass or other metallic knuckles, or any other dangerous or deadly weapons. | Musket; Rifle; Shot gun; Pistol; Sabre; Sword; Bowie knife; Dirk; Sword cane; Billy; Slungshot; Metal knuckles; Other dangerous or | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | | deadly weapons | | |
| 105 | 1873 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4110 (Act of Apr. 8, 1873, p. 130) | Prohibited the concealed carrying of any brass knuckles, slungshots, or "other weapon of like kind or description." Punishable by a fine of $20-200 and imprisonment or term of hard labor not to exceed 6 months. | Metal knuckles; Slungshot | | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 106 | 1873 | Georgia | R. H. Clark, The Code of the State of Georgia (1873) § 4528 | Prohibited the carrying of any dirk, Bowie knife, pistol, or other deadly weapon to a court, election site, precinct, place of worship, or other public gathering site.  Punishable by fine of $20-50 or imprisonment for 10-20 days. | Dirk; Bowie knife; Pistol; Any kind of deadly weapon | | |
| 107 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2, as codified in Mass. Gen. Stat., ch. 164 (1873) § 10 | Prohibited the carrying of a slungshot, metallic knuckles, bills, or other dangerous weapon if arrested  pursuant to a warrant or while committing a crime. Punishable by fine. | Slungshot; Metallic knuckles; Billy; Other dangerous weapon | | |
| 108 | 1873 | Massachusetts | 1850 Mass. Gen. Law, ch. 194, §§ 1, 2 as codified in Mass. Gen. Stat., ch. 164 (1873) § 11 | Prohibited manufacturing or selling a slungshot or metallic knuckles.  Punishable by fine up | Slungshot; Metallic knuckles | | |

**Duncan v. Bonta**, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|----------------|------------------|
| | | | | to $50 or imprisonment up to 6 months. | | | |
| 109 | 1873 | Minnesota | The Statutes at Large of the State of Minnesota: Comprising the General Statutes of 1866 as Amended by Subsequent Legislation to the Close of the Session of 1873: Together with All Laws of a General Nature in Force, March 7, A.D. 1873 with References to Judicial Decisions of the State of Minnesota, and of Other States Whose Statutes are Similar to Which are Prefixed the Constitution of the United States, the Organic Act, the Act Authorizing a State Government, and the Constitution of the State of Minnesota, at 993 (Vol. 2, 1873), Of Crimes and Their Punishment, Setting Spring Guns Unlawful, § 64-65 | Prohibited the setting of any spring or trap gun.  Punished by imprisonment for at least 6 months or a fine of up to $500 if no injury results; imprisonment for up to 5 years if non-fatal injury results; and imprisonment for 10-15 years if death results. | Spring gun; Trap gun | | |
| 110 | 1873 | Nevada | Bonnifield, The Compiled Laws of the State of Nevada. Embracing Statutes of 1861 to 1873, | Prohibited dueling and killing a person with a rifle, shotgun, pistol, Bowie knife, dirk, small | Rifle; Shotgun; Pistol; Bowie knife; | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|----------------|------------------|
| | | | Inclusive, at 563 (Vol. 1, 1873), Of Crimes and Punishments, §§ 35-36 | sword, backsword, or other dangerous weapon. | Dirk; Small sword; Back sword; Other dangerous weapon | | |
| 111 | 1873 | Tennessee | Seymour Dwight Thompson, A Compilation of the Statute Laws of the State of Tennessee, of a General and Permanent Nature, Compiled on the Basis of the Code of Tennessee, With Notes and References, Including Acts of Session of 1870-1871, at 125 (Vol. 2, 1873), Offences Against Public Policy and Economy, § 4864 | Prohibited selling, loaning, or giving to a minor a pistol, Bowie knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except a gun for hunting or self defense in traveling. Punishable by fine of minimum $25 and imprisonment for a term determined by the court. | Pistol; Bowie knife; Dirk; Arkansas toothpick; Hunter's knife; Dangerous weapon | | |
| 112 | 1874 | Alabama | 1874 Ala. L. 41, ch. 1 | Imposed $25 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Increased tax to $50 in 1875-76. | |
| 113 | 1874 | Illinois | Harvey Bostwick Hurd, The Revised Statutes of the State of Illinois. A. D. 1874. Comprising the Revised Acts of 1871-72 and 1873-74, Together with All Other General Statutes of the State, in Force on the First Day of July, 1874, at 360 (1874), | Prohibited the carrying a concealed weapon, including a pistol, knife, slungshot, brass, steel, or iron knuckles, or other deadly weapon while disturbing the peace. Punishable by fine up to $100. | Pistol; Knife; Slungshot; Other deadly weapon | | |

**_Duncan v. Bonta_**, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | Disorderly Conduct: Disturbing the Peace, § 56 | | | | |
| 114 | 1874 | New Jersey – City of Jersey City | Ordinances of Jersey City, Passed by the Board of Aldermen since May 1, 1871, under the Act Entitled "An Act to Re-organize the Local Government of Jersey City," Passed March 31, 1871, and the Supplements Thereto, at 41 (1874), An Ordinance to Prevent the Carrying of Loaded or Concealed Weapons within the Limits of Jersey City. The Mayor and Aldermen of Jersey City do ordain as follows: §§ 1-2 | Prohibited the carrying of a concealed slungshot, billy, sandclub or metal knuckles, and any dirk or dagger (not contained as a blade of a pocket-knife), and loaded pistol or other dangerous weapon, including a sword in a cane, or air-gun. punishable by confiscation of the weapon and a fine of up to $20. Exempted policemen of Jersey City. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk; Dagger; Pistol; Other dangerous weapon; Sword cane; Air gun | | |
| 115 | 1874 | Virginia | 1874 Va. L. 239, ch. 239 | Included the value of all "rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind" in list of taxable personal property. | Rifle; Musket; Other firearm; Bowie knife; Dirk | | |
| 116 | 1875 | Alabama | 1875-1876 Ala. L. 82, ch. 1 | Imposed $50 occupational tax on dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Added pistol cartridges in 1886 and increased the tax to $300 in 1887. | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 117 | 1875 | Alabama | 1875-1876 Ala. L. 46, ch. 2 | Imposed tax rate of 0.75% of the value of any pistols, guns, dirks, and Bowie knives. | Pistols; Guns; Dirks; Bowie knives | Tax rate reduced to 55 cents in 1882, with additional weapons added. | |
| 118 | 1875 | Arkansas | Act of Feb. 16, 1875, 1874-75 Ark. Acts 156, § 1 | Prohibited the carrying in public of any "pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by a fine of $25-100. | Pistol; Dirk; Butcher knife; Bowie knife; Sword cane; Metal knuckles | | *Wilson v. State*, 33 Ark. 557 (1878) (held unconstitutional). |
| 119 | 1875 | Idaho [Territory] | Crimes and Punishments, in Compiled and Revised Laws of the Territory of Idaho 354 (M. Kelly, Territorial Printer 1875), § 133. | Prohibited the carrying of "any pistol, gun, knife, dirk, bludgeon, or other offensive weapon, with intent to assault any person." Punishable by imprisonment for up to 3 months or a fine up to $100. | Pick-lock; Crow-key; Bit; Other instrument or tool; Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 120 | 1875 | Indiana | 1875 Ind. Acts 62, An Act Defining Certain Misdemeanors, and Prescribing Penalties Therefore, § 1 | Prohibited the drawing or threatening to use a pistol, dirk, knife, slungshot, or any other deadly or dangerous weapon. Punishable by fine of $1-500, and potentially imprisonment up to 6 months. | Pistol; Dirk; Knife; Slungshot; Other deadly or dangerous weapon | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 121 | 1875 | Michigan | 1875 Mich. Pub. Acts 136, An Act To Prevent The Setting Of Guns And Other Dangerous Devices, § 1 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | | |
| 122 | 1876 | Alabama | 1876-77 Ala. Code 882, § 4109 | Prohibited the carrying of a Bowie knife, pistol, or air gun, or any other weapon of "like kind or description," unless threatened with or having good cause to fear an attack or while traveling or setting out on a journey. Punishable by a fine of $50-300 and imprisonment or hard labor for no more than 6 months. | Bowie knife; Pistol; Air gun; Other similar weapon | | *State v. Reid*, 1 Ala. 612 (1840) (upheld under Alabama Constitution); *Whatley v. State*, 49 Ala. 355 (1947) (necessity required). |
| 123 | 1876 | Colorado | 1876 Colo. Sess. Laws 304, § 154 | Prohibited the carrying with intent to assault another any pistol, gun, knife, dirk, bludgeon, or other offensive weapon. | Pistol; Gun; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 124 | 1876 | Georgia | 1876 Ga. L. 112, ch. 128 | Prohibited the transfer of any pistol, dirk, Bowie knife, or sword cane to a minor. | Pistol; Dirk; Bowie knife; Sword cane | | |
| 125 | 1876 | Illinois – Village of Hyde Park | Consider H. Willett, Laws and Ordinances Governing the Village of Hyde Park [Illinois] Together with Its Charter and General Laws | Prohibited the carrying a concealed pistol, revolver, slungshot, knuckles, Bowie knife, dirk knife, dirk, dagger, or any other dangerous or deadly | Pistol; Revolver; Slungshot; Knuckles; Bowie knife; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | Affecting Municipal Corporations; Special Ordinances and Charters under Which Corporations Have Vested Rights in the Village. Also, Summary of Decisions of the Supreme Court Relating to Municipal Corporations, Taxation and Assessments, at 64 (1876), Misdemeanors, § 39 | weapon without written permission from the Captain of Police. Exempted peace officers. | Dirk; Dagger; Other dangerous or deadly weapon | | |
| 126 | 1876 | Wyoming [Territory] | Wyo. Comp. Laws (1876) ch. 35, § 127, as codified in Wyo. Rev. Stat., Crimes (1887), Having possession of offensive weapons, § 1027 | Prohibited the carrying of a pistol, knife, dirk, bludgeon, or other offensive weapon with the intent to assault a person. Punishable by fine up to $500 or imprisonment up to 6 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 127 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 6, § 4230 | Prohibited the sale, giving, or lending of any pistol, Bowie knife, or "like knife" to any boy under the age of 18. | Pistol; Bowie knife | | *Coleman v. State*, 32 Ala. 581 (1858) (affirming conviction of letting minor obtain a pistol). |
| 128 | 1877 | Alabama | Wade Keyes, The Code of Alabama, 1876, ch. 3, § 4109 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or description, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon, unless the person was | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | | threatened with, or had good reason to apprehend, an attack, or "while traveling, or setting out on a journey." Punishable by fine of $50-300 and imprisonment of not more than 6 months. | dangerous weapon | | |
| 129 | 1877 | Colorado – Town of Georgetown | Edward O. Wolcott, The Ordinances of Georgetown [Colorado] Passed June 7th, A.D. 1877, at 100, § 9 | Prohibited the concealed carrying of any pistol, Bowie knife, dagger, or other deadly weapon. Punishable by a fine of $5-50. | Pistol; Bowie knife; Dagger; Other deadly weapon | | |
| 130 | 1877 | New Jersey | Mercer Beasley, Revision of the Statutes of New Jersey: Published under the Authority of the Legislature; by Virtue of an Act Approved April 4, 1871, at 304 (1877), An Act Concerning Disorderly Persons, § 2 | Prohibited The carrying of "any pistol, hanger, cutlass, bludgeon, or other offensive weapon, with intent to assault any person." Punishable as a "disorderly person." | Pistol; Hanger; Cutlass; Bludgeon; Other offensive weapon | | |
| 131 | 1877 | South Dakota [Territory] | S.D. Terr. Pen. Code (1877), § 457 as codified in S.D. Rev. Code, Penal Code (1903), §§ 470-471. | Prohibited the carrying, "whether concealed or not," of any slungshot, and prohibited the concealed carrying of any firearms or sharp or dangerous weapons. | Slungshot; Firearm; Sharp or dangerous weapon | | |
| 132 | 1877 | Utah – City of Provo [Territory] | Chapter 5: Offenses Against the Person, undated, reprinted in The Revised Ordinances Of Provo City, Containing All The Ordinances In Force | Prohibited carrying a pistol, or other firearm, slungshot, false knuckles, Bowie knife, dagger or any other "dangerous or deadly weapon." Punishable by fine up to $25. | Pistol; Other firearm; Slungshot; Metal knuckles; Bowie knife; | | |

**Duncan v. Bonta**, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | 105, 106-07 (1877) (Provo, Utah). § 182: | | Dagger; Other dangerous or deadly weapon | | |
| 133 | 1878 | Alabama – City of Uniontown | 1878 Ala. L. 437, ch. 314 | Authorized Uniontown to license dealers of pistols, Bowie knives, and dirk knives. | Pistol; Bowie knife; Dirk | Added dealers of "brass knuckles" in 1884. Similar to law enacted in 1884 authorizing Tuscaloosa to regulate dealers in pistols, Bowie knives, shotguns or firearms, and knives "of like kind or description." 1884-1885 Ala. 323, ch. 197 | |
| 134 | 1878 | Mississippi | 1878 Miss. Laws 175, An Act to Prevent the Carrying of Concealed Weapons and for Other Purposes, § 1 | Prohibited the carrying of a concealed Bowie knife, pistol, brass knuckles, slungshot or other deadly weapon.  Excepted travels other than "a tramp."  Punishable by fine of $5-100. | Bowie knife; Pistol; Brass knuckles; Slungshot; Other deadly weapon | Prohibited weapons were expanded in 1896 | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 135 | 1879 | Alabama – City of Montgomery | J. M. Falkner, The Code of Ordinances of the City Council of Montgomery [Alabama] (1879), § 428 | Prohibited carrying of a concealed Bowie knife, pistol, air gun, slungshot, brass knuckles, or other deadly or dangerous weapon. Punishable by a fine of $1-100. | Bowie knife; Pistol; Air gun; Slungshot; Metal knuckles; Other deadly or dangerous weapon | | |
| 136 | 1879 | Idaho – City of Boise [Territory] | Charter and Revised Ordinances of Boise City, Idaho. In Effect April 12, 1894, at 118-19 (1894), Carrying Concealed Weapons, § 36 | Prohibited the carrying a concealed Bowie knife, dirk knife, pistol or sword in cane, slungshot, metallic knuckles, or other dangerous or deadly weapon, unless traveling or setting out on a journey. Punishable by fine up to $25 and/or imprisonment up to 20 days. | Bowie knife; Dirk; Pistol; Sword cane; Slungshot; Metallic knuckles; Other dangerous or deadly weapons | | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution) |
| 137 | 1879 | Louisiana | La. Const. of 1879, art. III | Provided the right to bear arms, but authorizes the passage of laws restricting the carrying of concealed weapons. | Concealed weapons | | |
| 138 | 1879 | Montana [Territory] | 1879 Mont. Laws 359, Offences against the Lives and Persons of Individuals, ch. 4, § 23 | Prohibited dueling and killing a person involved with a rifle, shot-gun, pistol, Bowie knife, dirk, small-sword, back-sword, or other dangerous weapon. Punishable by death by hanging. | Rifle; Shotgun; Pistol; Bowie knife; Dirk; Small sword; Back sword; Other |  |  |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | dangerous weapon | | |
| 139 | 1879 | North Carolina | North Carolina: N.C. Sess. Laws (1879), ch. 127, as codified in North Carolina Code, Crim. Code, ch. 25 (1883) § 1005, Concealed weapons, the carrying or unlawfully, a misdemeanor | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, dagger, slungshot, loaded case, metal knuckles, razor, or other deadly weapon. Exemption for carrying on the owner's premises. Punishable by fine or imprisonment at the discretion of the court. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | | |
| 140 | 1880 | Ohio | Michael Augustus Daugherty, The Revised Statutes and Other Acts of a General Nature of the State of Ohio: In Force January 1, 1880, at 1633 (Vol. 2, 1879), Offences Against Public Peace, § 6892 | Prohibited the concealed carrying of any pistol, Bowie knife, dirk, or other dangerous weapon. Punishable by a fine of up to $200 or imprisonment for up to 30 days for the first offense, and a fine of up to $500 or imprisonment for up to 3 months for the second offense. | Pistol; Bowie knife; Other dangerous weapon | | |
| 141 | 1880 | South Carolina | 1880 S.C. Acts 448, § 1, as codified in S.C. Rev. Stat. (1894), § 129 | Prohibited the carrying of a concealed pistol, dirk, dagger, slungshot, metal knuckles, razor, or other deadly weapon. Punishable by fine up to $200 and/or imprisonment up to 1 year. | Pistol; Dirk; Dagger; Slungshot; Metal knuckles; Razor; Other deadly weapon | | |
| 142 | 1881 | Alabama | 1880-1881 Ala. L. 38-39, ch. 44 | Prohibited the concealed carrying of any Bowie knife, or any other knife of like kind or | Bowie knife; Pistol; Air gun; | Amended in 2022 to remove | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | description, pistol, or firearm of "any other kind or description," or air gun.  Punishable by fine of $50-300 and imprisonment of not more than 6 months.  Further provided that fines collected under the statute would be monetary and not in-kind payments. | Slungshot; Metal knuckles; Other deadly or dangerous weapon | prohibition on concealed carry of Bowie knives.  *See* Ala. Stat. § 13A-11-50. | |
| 143 | 1881 | Arkansas | 1881 Ark. Acts 191, ch. 96, § 1-2 | Prohibited the carrying of any dirk, Bowie knife, sword, spear cane, metal knuckles, razor, or any pistol (except pistols that are used in the Army or Navy if carried openly in the hand). | Dirk; Bowie knife; Sword; Spear cane; Metal knuckles; Razor; Pistol | | |
| 144 | 1881 | Colorado | Colo. Rev. Stat 1774, § 248 (1881) | Prohibited the concealed carrying of any firearms, any pistol, revolver, Bowie knife, dagger, slingshot, brass knuckles, or other deadly weapon, unless authorized by chief of police. | Pistol; Revolver; Bowie knife; Dagger; Slingshot; Metal knuckles; Other deadly weapon | | |
| 145 | 1881 | Delaware | 1881 Del. Laws 987, An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, ch. 548, § 1 | Prohibited the carrying of concealed deadly weapons or selling deadly weapons other than an ordinary pocket knife to minors.  Punishable by a fine of $25-200 or imprisonment for 10-30 days. | Deadly weapon | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 146 | 1881 | Illinois | Ill. Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code 73 (1885), ch. 38, Possession or sale forbidden, § 1 | Prohibited the possession, selling, loaning, or hiring for barter of a slungshot or metallic knuckles or other deadly weapon.  Punishable as a misdemeanor. | Slungshot; Metallic knuckles; Other deadline weapon | | |
| 147 | 1881 | Illinois | Harvey Bostwick Hurd, Late Commissioner, The Revised Statutes of the State of Illinois. 1882. Comprising the "Revised Statutes of 1874," and All Amendments Thereto, Together with the General Acts of 1875, 1877, 1879, 1881 and 1882, Being All the General Statutes of the State, in Force on the First Day of December, 1882, at 375 (1882), Deadly Weapons: Selling or Giving to Minor, § 54b. | Prohibited selling, giving, loaning, hiring for barter any minor a pistol, revolver, derringer, Bowie knife, dirk or other deadly weapon. Punishable by fine of $25-200. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Other deadly weapon | | |
| 148 | 1881 | Indiana | The Revised Statutes of Indiana: Containing, Also, the United States and Indiana Constitutions and an Appendix of Historical Documents. Vol. 1, at 366 (1881), Crimes, § 1957 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol, or other missile or weapon, or throwing a stone, stick, club, or other substance at a vehicle.  Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other missile or weapon; Stone; Stick; Club; Other substance | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 149 | 1881 | Nevada | David E. Baily, The General Statutes of the State of Nevada. In Force. From 1861 to 1885, Inclusive. With Citations of the Decisions of the Supreme Court Relating Thereto, at 1077 (1885), An Act to prohibit the carrying of concealed weapons by minors, § 1 | Prohibited a minor from carrying a concealed dirk, pistol, sword in case, slungshot, or other dangerous or deadly weapon. Punishable by fine of $20-200 and/or imprisonment of 30 days to 6 months. | Dirk; Pistol; Sword in case; Slungshot; Other dangerous or deadly weapon | | |
| 150 | 1881 | New York | George S. Diossy, The Statute Law of the State of New York: Comprising the Revised Statutes and All Other Laws of General Interest, in Force January 1, 1881, Arranged Alphabetically According to Subjects, at 321 (Vol. 1, 1881), Offenses Against Public Decency; Malicious Mischief, and Other Crimes not Before Enumerated, Concealed Weapons, § 9 | Prohibited using, attempting to use, or concealing a slungshot, billy, sandclub or metal knuckles, and any dirk. Punishable by imprisonment for up to 1 year and/or a fine up to $500. | Slungshot; Billy; Sandclub; Metal knuckles; Dirk | | |
| 151 | 1881 | Tennessee – City of Nashville | William King McAlister Jr., Ordinances of the City of Nashville, to Which are Prefixed the State Laws Chartering and Relating to the City, with an Appendix, at 340-41 | Prohibited the carrying of pistol, Bowie knife, dirk, slungshot, brass knuckles, or other deadly weapon. Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Metal knuckles; | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | (1881), Ordinances of the City of Nashville, Carrying Pistols, Bowie-Knives, Etc., § 1 | | Other deadly weapon | | |
| 152 | 1881 | Washington [Territory] | 1881 Wash. Code 181, Criminal Procedure, Offenses Against Public Policy, ch. 73, § 929 | Prohibited the carrying of "any concealed weapon." Punishable by fine up to $100 or imprisonment up to 30 days. | Concealed weapon | | |
| 153 | 1881 | Washington – City of New Tacoma [Territory] | 1881 Wash. Sess. Laws 76, An Act to Confer a City Govt. on New Tacoma, ch. 6, § 34, pt. 15 | Authorized New Tacoma to regulate transporting, storing, or selling gunpowder, giant powder, dynamite, nitroglycerine, or other combustibles without a license, as well as the carrying concealed deadly weapons, and the use of guns, pistols, firearms, firecrackers. | Gunpowder; Giant powder; Dynamite; Nitroglycerine; Other combustible; Concealed deadly weapon; Gun; Pistol; Firearm | | |
| 154 | 1881 | Washington [Territory] | William Lair Hill, Ballinger's Annotated Codes and Statutes of Washington, Showing All Statutes in Force, Including the Session Laws of 1897, at 1956 (Vol. 2, 1897) | Prohibited exhibiting a dangerous weapon in a manner likely to cause terror. Punishable by fine up to $25. | Dangerous weapon | | |
| 155 | 1882 | Georgia | 1882-83 Gal. L. 48-49, ch. 94 | Prohibited the concealed carrying of any "pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold | Pistol; Dirk; Sword cane; speak Bowie knife; | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | for the purpose of offense and defense." | Other kind of knife | | |
| 156 | 1882 | Georgia | 1882-83 Ga. L. 37, ch. 18 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | Raised to $100 in 1884. | |
| 157 | 1882 | Iowa – City of Sioux City | S. J. Quincy, Revised Ordinances of the City of Sioux City, Iowa, at 62 (1882), Ordinances of the City of Sioux City, Iowa, § 4. | Prohibited the carrying a concealed pistol, revolver, slungshot, cross-knuckles, knuckles of lead, brass or other metal, or any Bowie knife, razor, billy, dirk, dirk knife or Bowie knife, or other dangerous weapon. | Pistol; Revolver; Slungshot; Cross-knuckles; Metal Knuckles; Bowie knife; Razor; Billy; Dirk; Other dangerous weapon | | |
| 158 | 1882 | West Virginia | 1882 W. Va. Acts 421-22; W. Va. Code, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Also prohibited selling any such weapon to a minor. Punishable by fine of $25-200 and imprisonment of 1-12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | *State v. Workman*, 35 W. Va. 367 (1891) (upheld under the Second Amendment), *abrogated by New York State Rifle & Pistol Ass'n v. Bruen*, 142 |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|---------------|-----------------|
| | | | | | | | S. Ct. 2111, 2153 (2022) |
| 159 | 1883 | Illinois – City of Danville | Revised Ordinances of the City of Danville [Illinois], at 66 (1883), Ordinances of the City of Danville. Concealed Weapons, § 22. | Prohibited the carrying of a concealed pistol, revolver, derringer, Bowie knife, dirk, slungshot, metallic knuckles, or a razor, as a weapon, or any other deadly weapon.  Also prohibited displaying the weapon in a threatening or boisterous manner.  Punishable by fine of $1-100 and forfeiting the weapon, if ordered by the magistrate. | Pistol; Revolver; Derringer; Bowie knife; Dirk; Slungshot; Metallic knuckles; Razor; Other deadly weapon | | |
| 160 | 1883 | Kansas | 1883 Kan. Sess. Laws 159, An Act to Prevent Selling, Trading Or Giving Deadly Weapons or Toy Pistols to Minors, and to Provide Punishment Therefor, §§ 1-2 | Prohibited the selling, trading, giving, or loaning of a pistol, revolver, or toy pistol, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind.  Also prohibited the possession of such weapons by any minor.  Punishable by fine of $5-100.  Also prohibited a minor from possessing a pistol, revolver, toy pistol by which cartridges may be exploded, dirk, Bowie knife, brass knuckles, slungshot, or other dangerous weapon.  Punishable by fine of $1-10. | Pistol; Revolver; Toy pistol; Dirk; Bowie knife; Brass knuckles; Slungshot; Other dangerous weapons | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 161 | 1883 | Missouri | 1883 Mo. Laws 76, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes And Criminal Procedure" § 1274 | Prohibited the carrying of a concealed fire arms, Bowie knife, dirk, dagger, slungshot, or other deadly weapon to a church, school, election site, or other public setting or carrying in a threatening manner or while intoxicated.  Punishable by fine of $25-200 and/or by imprisonment up to 6 months. | Fire arms; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon | | |
| 162 | 1883 | Washington – City of Snohomish [Territory] | 1883 Wash. Sess. Laws 302, An Act to Incorporate the City of Snohomish, ch. 6, § 29, pt. 15 | Authorized City of Snohomish to regulate and prohibit carrying concealed deadly weapons and to prohibit using guns, pistols, firearms, firecrackers, bombs, and explosives. | Deadly weapon; Gun; Pistol; Firearm; Firecracker; Bomb | | |
| 163 | 1883 | Wisconsin – City of Oshkosh | 1883 Wis. Sess. Laws 713, An Act to Revise, consolidate And Amend The Charter Of The City Of Oshkosh, The Act Incorporating The City, And The Several Acts Amendatory Thereof, ch. 6, § 3, pt. 56 | Prohibited the carrying of a concealed pistol or colt, or slungshot, or cross knuckles or knuckles of lead, brass or other metal or Bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon. Punishable by confiscation of the weapon. | Pistol; Colt; Slungshot; Cross knuckles; Knuckles of lead; Metal knuckles; Bowie knife; Dirk; Dagger; Any other dangerous or deadly weapon | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 164 | 1884 | Georgia | 1884-85 Ga. L. 23, ch. 52 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife | Reduced to $25 in 1888. | |
| 165 | 1884 | Maine | The Revised Statutes of the State of Maine, Passed August 29, 1883, and Taking Effect January 1, 1884, at 928, (1884), Prevention of Crimes, § 10 | Prohibited the carrying of a dirk, dagger, sword, pistol, or other offensive and dangerous weapon without reasonable cause to fear an assault. | Dirk; Dagger; Sword; Pistol; Other offensive and dangerous weapon | | |
| 166 | 1884 | Minnesota – City of Saint Paul | W. P. Murray, The Municipal Code of Saint Paul: Comprising the Laws of the State of Minnesota Relating to the City of Saint Paul, and the Ordinances of the Common Council; Revised to December 1, 1884, at 289 (1884), Concealed Weapons – License, § 1 | Prohibited the carrying of a concealed pistol or pistols, dirk, dagger, sword, slungshot, cross-knuckles, or knuckles of lead, brass or other metal, Bowie knife, dirk knife or razor, or any other dangerous or deadly weapon. Punishable by seizure of the weapon. | Pistol; Dirk; Dagger; Sword; Slungshot; Cross-knuckles; Metal knuckles; Bowie knife; Dirk; Razor; Other dangerous or deadly weapon | | |
| 167 | 1884 | Tennessee | Tenn. Pub. Acts (1879), ch. 186, as codified in Tenn. Code (1884) | Prohibited the carrying, "publicly or privately," of any dirk, razor, sword cane, loaded cane, slungshot, brass knuckles, Spanish stiletto, belt or pocket pistol, revolver, or any kind of pistol. | Dirk; Razor; Sword cane; Loaded cane; Slungshot; Metal knuckles; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | | Spanish stiletto; Pistol; Revolver | | |
| 168 | 1884 | Vermont | 1884 Vt. Acts & Resolves 74, An Act Relating To Traps, § 1 | Prohibited the setting of any spring gun trap. Punishable by a fine of $50-500 and liability for twice the amount of any damage resulting from the trap. | Spring gun | | |
| 169 | 1884 | Wyoming [Territory] | 1884 Wyo. Sess. Laws, ch. 67, § 1, as codified in Wyo. Rev. Stat., Crimes (1887): Exhibiting deadly weapon in angry manner. § 983 | Prohibited exhibiting in a threatening manner a fire-arm, Bowie knife, dirk, dagger, slungshot or other deadly weapon. Punishable by fine of $10-100 or imprisonment up to 6 months. | Pistol; Bowie knife; Dirk; Dagger; Slungshot; Other deadly weapon | | |
| 170 | 1885 | Montana [Territory] | 1885 Mont. Laws 74, Deadly Weapons, An Act to Amend § 62 of Chapter IV of the Fourth Division of the Revised Statutes, § 62-63 | Prohibited possessing, carrying, or purchasing a dirk, dirk-knife, sword, sword cane, pistol, gun, or other deadly weapon, and from using the weapon in a threatening manner or in a fight. Punishable by fine of $10-100 and/or imprisonment for 1-3 months. | Dirk; Sword; Sword cane; Pistol; Gun; Other deadly weapon | | |
| 171 | 1885 | New York | George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-85, at 172 (1885), Carrying, Using, Etc., Certain Weapons, § 410 | Prohibited using or attempting to use, carrying, concealing, or possessing a slungshot, billy, sandclub or metal knuckles, or a dagger, dirk or dangerous knife. Punishable as a felony, and as a misdemeanor if a minor. | Slungshot; Billy; Sandclub; Metal knuckles; Dagger; Dirk; | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | Dangerous knife | | |
| 172 | 1885 | New York – City of Syracuse | Charter and Ordinances of the City of Syracuse: Together with the Rules of the Common Council, the Rules and Regulations of the Police and Fire Departments, and the Civil Service Regulations, at 215 (1885), [Offenses Against the Public Peace and Quiet,] § 7 | Prohibited the carrying or using with the intent to do bodily harm a dirk, Bowie knife, sword or spear cane, pistol, revolver, slungshot, jimmy, brass knuckles, or other deadly or unlawful weapon. Punishable by a fine of $25-100 and/or imprisonment for 30 days to 3 months. | Dirk; Bowie knife; Sword; Spear cane; Pistol; Revolver; Slungshot; Jimmy; Metal knuckles; Other deadly or unlawful weapon | | |
| 173 | 1885 | Oregon | 1885 Or. Laws 33, An Act to Prevent Persons from Carrying Concealed Weapons and to Provide for the Punishment of the Same, §§ 1-2 | Prohibited the concealed carrying of any revolver, pistol, or other firearm, or any knife (other than an "ordinary pocket knife"), or any dirk, dagger, slungshot, metal knuckles, or any instrument that could cause injury. Punishable by a fine of $10-200 or imprisonment for 5-100 days. | Revolver; Pistol; Other firearm; Knife; Dirk; Dagger; Slungshot; Metal knuckles | | |
| 174 | 1886 | Colorado – City of Denver | Isham White, The Laws and Ordinances of the City of Denver, Colorado, at 369, § 10 (1886) | Prohibited the carrying of any slungshot, colt, or metal knuckles while engaged in any breach of the peace. Punishable by a fine of $25-300. | Slungshot; Colt; Metal knuckles | | |
| 175 | 1886 | Georgia | 1886 Ga. L. 17, ch. 54 | Imposed $100 occupational tax on dealers of pistols, revolvers, | Pistol; Revolver; Dirk; | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | dirks, Bowie knives, and "pistol or revolver cartridges." | Bowie knife; Pistol or revolver cartridges | | |
| 176 | 1886 | Maryland – County of Calvert | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of Election in said County, Within One Mile of the Polls § 1 | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day.  Punishable by a fine of $10-50. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon | | |
| 177 | 1886 | Maryland – County of Calvert | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Acts of the Session of 1888 Incorporated Therein, and Prefaced with the Constitution of the State, at 468-69 (Vol. 1, 1888), Concealed Weapons, § 30 | Prohibited the carrying of a concealed  pistol, dirk knife, Bowie knife, slungshot, billy, sandclub, metal knuckles, razor, or any other dangerous or deadly weapon.  Punishable by fine of up to $500 or imprisonment of up to 6 months. | Pistol; Dirk; Bowie knife; Slungshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | | |
| 178 | 1886 | Maryland | 1886 Md. Laws 315, An Act to Prevent the Carrying of Guns, Pistols, Dirk-knives, Razors, Billies or Bludgeons by any Person in Calvert County, on the Days of | Prohibited the carrying of a gun, pistol, dirk, dirk-knife, razor, billy or bludgeon on an election day within 300 yards of the polls.  Punishable by fine of $10-50. | Gun; Pistol; Dirk; Razo; Billy; Bludgeon | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Election in said County, Within One Mile of the Polls § 1 | | | | |
| 179 | 1887 | Alabama | 1886 Ala. L. 36, ch. 4 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridges; Bowie knife; Dirk | | |
| 180 | 1887 | Iowa – City of Council Bluffs | Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa, at 206-07 (1887), Carrying Concealed Weapons Prohibited, § 105 | Prohibited the carrying of a concealed pistol or firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material , or any sandbag, air guns of any description, dagger, Bowie knife, or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon, instrument or device. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | | |
| 181 | 1887 | Kansas – City of Independence | O. P. Ergenbright, Revised Ordinances of the City of Independence, Kansas: Together with the Amended Laws Governing Cities of the Second Class and Standing Rules of the City Council, at 162 (1887), Weapons, § 27 | Prohibited using a pistol or other weapon in a hostile or threatening manner.  Also prohibited carrying a concealed pistol, dirk, Bowie knife, revolver, slungshot, billy, brass, lead, or iron knuckles, or any deadly weapon.  Punishable by fine of $5-100. | Pistol; Dirk; Bowie knife; Revolver; Slungshot; Billy; Metal knuckles; Any deadly weapon | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 182 | 1887 | Michigan | 1887 Mich. Pub. Acts 144, An Act to Prevent The Carrying Of Concealed Weapons, And To Provide Punishment Therefore, § 1 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, air gun, stiletto, metallic knuckles, pocket-billy, sandbag, skull cracker, slungshot, razor or other offensive and dangerous weapon or instrument. | Dirk; Dagger; Sword; Pistol; Air gun; Stiletto; Metallic knuckles; Billy; Sand bag; Skull cracker; Slungshot; Razor; Other offensive and dangerous weapon or instrument | | |
| 183 | 1887 | Montana [Territory] | 1887 Mont. Laws 549, Criminal Laws, § 174 | Prohibited the carrying of a any pistol, gun, knife, dirk-knife, bludgeon, or other offensive weapon with the intent to assault a person.  Punishable by fine up to $100 or imprisonment up to 3 months. | Pistol; Knife; Dirk; Bludgeon; Other offensive weapon | | |
| 184 | 1887 | New Mexico [Territory] | An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55, 58 (1887) | Defined "deadly weapons" as including pistols, whether the same be a revolved, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, Bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can | Pistol; Dagger; Bowie Knife; Poniard; Butcher Knife; Dirk | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slungshots, bludgeons or any other deadly weapons. | | | |
| 185 | 1887 | Virginia | The Code of Virginia: With the Declaration of Independence and the Constitution of the United States; and the Constitution of Virginia, at 897 (1887), Offences Against the Peace, § 3780 | Prohibited the carrying of a concealed pistol, dirk, Bowie knife, razor, slungshot, or any weapon of the like kind. Punishable by fine of $20-100 and forfeiture of the weapon. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Any weapon of the like kind | | |
| 186 | 1888 | Maryland – County of Kent | John Prentiss Poe, The Maryland Code : Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 incorporated therein, at 1457 (Vol. 2, 1888), Election Districts–Fences, § 99 | Prohibited carrying, on days of an election, any gun, pistol, dirk, dirk-knife, razor, or billy or bludgeon. Punishable by a fine of $5-20. | Gun; Pistol; Dirk; Razor; Billy; Bludgeon | | |
| 187 | 1888 | Florida | Fla. Act of Aug. 6, 1888, ch. 1637, subch. 7, § 10, as codified in Fla. Rev. State., tit. 2, pt. 5 (1892) | Prohibited the concealed carrying of slungshot, metallic knuckles, billies, firearms, or other dangerous weapons if arrested for committing a criminal offense or disturbance of the peace. Punishable by | Slungshot; Metallic knuckles; Billy; Firearms; Other | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | imprisonment up to 1 year and a fine up to $50. | dangerous weapon | | |
| 188 | 1888 | Georgia | 1888 Ga. L. 22, ch. 123 | Imposed $25 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | Raised to $100 in 1890. | |
| 189 | 1888 | Maryland – City of Baltimore | John Prentiss Poe, The Maryland Code. Public Local Laws, Adopted by the General Assembly of Maryland March 14, 1888. Including also the Public Local Acts of the Session of 1888 Incorporated Therein, at 522-23 (Vol. 1, 1888), City of Baltimore, § 742 | Prohibited the carrying of a pistol, dirk knife, Bowie knife, slingshot, billy, brass, iron or any other metal knuckles, razor, or any other deadly weapon if arrested for being drunk and disorderly.  Punishable by fine of $5-25, and confiscation of the weapon. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Metal knuckles; Razor; Other deadly weapon | | |
| 190 | 1888 | Minnesota | George Brooks Young. General Statutes of the State of Minnesota in Force January 1, 1889, at 1006 (Vol. 2, 1888), Making, Selling, etc., Dangerous Weapons, §§ 333-34 | Prohibited manufacturing, selling, giving, or disposing of a slingshot, sandclub, or metal knuckles, or selling or giving a pistol or firearm to a minor without magistrate consent.  Also prohibited carrying a concealed slingshot, sandclub, or metal knuckles, or a dagger, dirk, knife, pistol or other fire-arm, or any dangerous weapon. | Slingshot; Sandclub; Metal knuckles; Dagger; Dirk; Knife; Pistol; Any dangerous weapon | | |
| 191 | 1888 | Utah – City of Salt Lake City | Dangerous and Concealed Weapon, Feb. 14, 1888, | Prohibited carrying a slingshot or any concealed deadly weapon | Slingshot; Deadly weapon | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (Pre-Founding – 1888)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| | | [Territory] | reprinted in The Revised Ordinances Of Salt Lake City, Utah 283 (1893) (Salt Lake City, Utah). § 14 | without permission of the mayor. Punishable by fine up to $50. | | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)[1,2]

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|-----------------------|---------------|-----------------|
| 192 | 1889 | Arizona [Territory] | 1889 Ariz. Sess. Laws 16, § 1 | Prohibited carrying of any pistol, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife, or any knife manufactured to offensive or defensive purposes. Punishable by a fine of $25-100 and forfeiture of the weapon. | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Brass knuckles; Bowie knife; Other offensive or defensive knife | | |
| 193 | 1889 | Idaho [Territory] | The Act of the Territory of Idaho approved February 4, 1889 (Sess. Laws 1889, p. 27) | Prohibited private persons from carrying "deadly weapons" within any city, town or village. | Deadly weapons | | *In re Brickey*, 8 Idaho 597 (1902) (held unconstitutional under the Second Amendment and state constitution) |
| 194 | 1889 | Pennsylvania – City of Johnstown | Laws of the City of Johnstown, Pa., Embracing City Charter, Act of Assembly of May 23, 1889, | Prohibited the concealed carrying of any pistol, razor, dirk, Bowie knife, blackjack, handy billy, or other deadly | Pistol; Razor; Dirk; Bowie knife; | | |

[1] In compliance with the Court's Order dated December 15, 2022 (Dkt. 134), Defendant created this survey of statutes, laws, and regulations that Defendant has determined are relevant to this action.  Plaintiffs disagree that nearly all of those statutes, laws, and regulations are relevant to the historical analysis required in this case, and in compliance with the Court's December 15 Order, the chart reflects Plaintiffs' position regarding the relevance of each law.

[2] The surveys have been filed in compliance with the Court's Order directing the parties to identify all relevant laws, statutes, and regulations from the time of the Second Amendment to twenty years after adoption of the Fourteenth Amendment.  In compliance with that Order and in recognition of the historical inquiry mandated by *Bruen*, the spreadsheets identify hundreds of relevant firearms laws, some of which were drafted well before the Thirteenth Amendment's abolition of slavery and the Fourteenth Amendment's Equal Protection Clause.  While our subsequent briefing, as ordered by the Court, will explain in more detail the historical context and relevance of such laws, the Attorney General emphasizes his strong disagreement with racial and other improper discrimination that existed in some such laws, and which stand in stark contrast to California's commonsense firearm laws, which are designed to justly and equitably protect all Californians.  The listing of such racist and discriminatory statutes should in no way be construed as an endorsement of such laws by the Attorney General or his counsel in this matter.

**Duncan v. Bonta**, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | for the Government of Cities of the Third Class, General and Special Ordinances, Rules of Select and Common Councils and Joint Sessions, at 86 (1897), An Ordinance for the Security of Persons and Property of the Inhabitants of the City of Johnstown; The preservation of the Public Peace and Good Order of the City, and Prescribing Penalties for Offenses Against the Same, § 12 | weapon.  Punishable by fine of $5-50. | Blackjack; Billy; Other deadly weapon | | |
| 195 | 1890 | Connecticut – City of New Haven | Charles Stoers Hamilton, Charter and Ordinances of the City of New Haven, Together with Legislative Acts Affecting Said City, at 164, § 192 (1890) | Prohibited the concealed carrying of any metal knuckles, pistol, slungshot, stiletto, or similar weapons, absent written permission of the mayor or superintendent of police.  Punishable by a fine of $5-50. | Metal knuckles; Slungshot; Stiletto | | |
| 196 | 1890 | Georgia | 1890 Ga. L. 38, ch. 131 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, or Bowie knives. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver cartridges | | |
| 197 | 1890 | Louisiana | 890 La. L. 39, ch. 46 | Prohibiting the transfer of any pistol, dirk, Bowie knife, or "any other dangerous weapon, which may be | Pistol; Dirk; Bowie knife; | | |

***Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB**
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|----------------|------------------|
| | | | | carried concealed on a person to any person under the age of 21. | Other dangerous weapon | | |
| 198 | 1890 | Maryland – City of Baltimore | John Prentiss Poe, The Baltimore City Code, Containing the Public Local Laws of Maryland Relating to the City of Baltimore, and the Ordinances of the Mayor and City Council, in Force on the First Day of November, 1891, with a Supplement, Containing the Public Local Laws Relating to the City of Baltimore, Passed at the Session of 1892 of the General Assembly, and also the Ordinances of the Mayor and City Council, Passed at the Session of 1891-92, and of 1892-1893, up to the Summer Recess of 1893, at 297-98 (1893), Ordinances of Baltimore, § 742A | Prohibited the carrying of a concealed pistol, dirk-knife, Bowie knife, slingshot, billy, sandclub, metal knuckles, razor or any other dangerous or deadly weapon, or who openly carries with the intent to injure a person. Punishable by fine of up to $500 and imprisonment up to 6 months. | Pistol; Dirk; Bowie knife; Slingshot; Billy; Sandclub; Metal knuckles; Razor; Other dangerous or deadly weapon | | |
| 199 | 1890 | Nebraska – City of Omaha | W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or | Pistol; Revolver; Colt; Billy; Slungshot; Metal knuckles Dirk; Dagger; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | the United States and the Constitution of the State of Nebraska, at 344 (1890), Ordinances of Omaha, Concealed Weapons, § 10 | deadly weapon. Punishable by fine up to $100. | Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 200 | 1890 | Nebraska – City of Omaha | W. J. Connell, The Revised Ordinances of the City of Omaha, Nebraska, Embracing All Ordinances of a General Nature in Force April 1, 1890, Together with the Charter for Metropolitan Cities, the Constitution of the United States and the Constitution of the State of Nebraska, at 344 (1890), Ordinances of Omaha, Concealed Weapons, § 10. | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, brass knuckles or knuckles of lead, dirk, dagger, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon. Punishable by fine up to $100. | Pistol; Revolver; Colt; Billy; Slungshot; Metal knuckles; Dirk; Dagger; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 201 | 1890 | Oklahoma [Territory] | 1890 Okla. Laws 495, art. 47, §§ 1, 2, 10; Leander G. Pitman, The Statutes of Oklahoma, 1890. (From the Laws Passed by the First Legislative Assembly of the Territory), at 495-96 (1891) | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or any other knife or instrument manufactured or sold solely for defense. Also prohibited the carrying of any pistol, revolver, Bowie knife, dirk knife, loaded cane, billy, metal knuckles, or "any other offensive or defense weapon." Punishable by a fine of $50- | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Other knife; Loaded cane; Billy; Other offensive or defensive weapon | | |

4

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | 500 and imprisonment for 3-12 months. | | | |
| 202 | 1890 | Oklahoma [Territory] | 1890 Okla. Sess. Laws 475, Crimes Against The Public Health And Safety, §§ 18-19 | Prohibited the manufacture, sale, giving, or disposing of any instrument or weapon usually known as a slungshot, and prohibited the carrying any slungshot or similar weapon. | Slungshot | | |
| 203 | 1890 | Oklahoma – Town of Checotah [Territory] | General Laws Relating to Incorporated Towns of Indian Territory, at 37 (1890), Revised Ordinances of the Town of Checotah, Ordinance No. 11, § 3 | Prohibited the carrying of any pistol; dirk; butcher knife; Bowie knife; sword; spear-cane, metal knuckles, razor, slungshot, sandbag, or a switchblade. | Pistol; Dirk; Butcher knife; Sword; Spear cane; Metal knuckles; Razor; Slungshot; Sandbag; Switchblade | | |
| 204 | 1891 | Michigan | 1891 Mich. Pub. Acts 409, Police Department, pt 15 | Prohibited the carrying of a concealed pistol, revolver, Bowie knife, dirk, slungshot, billie, sandbag, false knuckles, or other dangerous weapon.  Also prohibited lurking or being concealed with the intent to injure a person or property, or threatening to beat or kill a person or property.  Punishable by fine up to $100 and the costs of | Pistol; Revolver; Bowie; Dirk; Slungshot; Billy; Sandbag; False knuckles; Other dangerous weapon | | |

5

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | prosecution, and in default of payment, imprisonment. | | | |
| 205 | 1891 | Missouri | "Shot by a Trap-Gun," The South Bend Tribune, Feb. 11, 1891 | Fined farmer for setting a trap gun that killed his wife. | Trap gun | | |
| 206 | 1891 | North Dakota | 1891 N.D. Laws 193, An Act to Amend Sections 1 and 2 of Chapter 63 of the General Laws of 1883, ch. 70, § 1 | Prohibited the setting of any gun or gun trap to be discharged at certain animals. | Trap gun | | |
| 207 | 1891 | West Virginia | 1891 W. Va. Code 915, Of Offences Against the Peace, ch. 148, § 7 | Prohibited the carrying of a pistol, dirk, Bowie knife, razor, slungshot, billy, metallic or other false knuckles, or any other dangerous or deadly weapon.  Also prohibited selling such a weapon to a minor.  Punishable by fine of $25-200 and imprisonment for 1-12 months. | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | |
| 208 | 1892 | Alabama | 1892 Ala. L. 183, ch. 95 | Imposed $300 occupational tax on dealers of pistols, pistol cartridges, Bowie knives, and dirk knives, and clarified that cartridges that can be used in a pistol shall be deemed pistol cartridges. | Pistol; Pistol cartridges; Bowie knife; Dirk | | |
| 209 | 1892 | Georgia | 1892 Ga. L. 25, ch. 133 | Imposed $100 occupational tax on dealers of pistols, revolvers, dirks, Bowie knives, and metal knuckles. | Pistol; Revolver; Dirk; Bowie knife; Pistol or revolver | | |

***Duncan v. Bonta***, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | | cartridges; Metal knuckles | | |
| 210 | 1892 | Washington – City of Tacoma | Albert R. Heilig, Ordinances of the City of Tacoma, Washington, at 333-34 (1892) | Prohibited the carrying of a concealed a revolver, pistol or other fire arms or any knife (other than an ordinary pocket knife) or any dirk or dagger, slingshot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person. | Revolver; Pistol; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Instrument that causes injury | | |
| 211 | 1893 | Arizona [Territory] | 1893 Ariz. Sess. Laws 3, § 1 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use). | Pistol; Other firearm; Dirk; Dagger; Slungshot; Sword-cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) | | |
| 212 | 1893 | Delaware | Revised Statutes of the State of Delaware, of Eight Hundred and Fifty-Two. As They Have Since Been Amended, Together with the Additional Laws of a Public and General Nature, Which Have Been Enacted Since the Publication of the | Prohibited the concealed carrying of deadly weapons or selling deadly weapons other than an ordinary pocket knife, and prohibited discharging any firearm in any public road.  Punishable by fine of $25-100 or by | Deadly weapon | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Revised Code of Eighteen Fifty-Two. To the Year of Our Lord One Thousand Eight Hundred and Ninety-Three; to Which are Added the Constitutions of the United States and of this State, the Declaration of Independence, and Appendix, at 987 (1893), An Act Providing for the Punishment of Persons Carrying Concealed Deadly Weapons, § 1 | imprisonment for 10-30 days. | | | |
| 213 | 1893 | North Carolina | 1893 N.C. L. 468-69, ch. 514 | Prohibiting the transfer of any pistol, pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane, or slingshot to a minor. | Pistol; Pistol cartridge; Metal knuckles; Bowie knife; Dirk; Loaded cane; Slingshot | | |
| 214 | 1893 | Rhode Island | 1893 R.I. Pub. Laws 231, An Act Prohibiting The Carrying Of Concealed Weapons, chap. 1180, § 1 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slungshot, pistol, or firearm of any description. | Dirk; Bowie knife; Butcher knife; Dagger; Razor; Sword Cane; Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 215 | 1893 | Tennessee – City of Nashville | Claude Waller, Digest of the Ordinances of the City of Nashville, to Which are Prefixed the State Laws Incorporating, and Relating to, the City, with an Appendix Containing Various Grants and Franchises, at 364-65 (1893), Ordinances of the City of Nashville, § 738 | Prohibited the carrying of a pistol, Bowie knife, dirk knife, slungshot, brass knucks, or other deadly weapon. Punishable by fine of $10-50 for a first offense and $50 for subsequent offenses. | Pistol; Bowie knife; Dirk; Slungshot; Brass knuckles; Other deadly weapon | | |
| 216 | 1893 | Wyoming – City of Rawlins | A. McMicken, City Attorney, The Revised Ordinances of the City of Rawlins, Carbon County, Wyoming, at 131-32 (1893), Revised Ordinances of the City of Rawlins, Article VII, Carrying Firearms and Lethal Weapons, § 1 | Prohibited a person from possessing or carrying a pistol, revolver, knife, slungshot, bludgeon or other lethal weapon. Punishable by fine up to $100 or imprisonment up to 30 days. | Pistol; Revolver; Knife; Slungshot; Bludgeon; Other lethal weapon | | |
| 217 | 1895 | North Dakota | 1895 N.D. Rev. Codes 1293, Penal Code, Crimes Against the Public Health and Safety, ch. 40, §§ 7312-13 | Prohibited the carrying of any slungshot or similar weapon, and the concealed carrying of any firearm or any "sharp or dangerous weapon." | Slungshot; Firearm; Sharp or dangerous weapon | | |
| 218 | 1895 | North Dakota | The Revised Codes of the State of North Dakota 1895 Together with the Constitution of the United States and of the State of North Dakota with the | Prohibited the setting of any spring or trap gun. | Trap gun | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Amendments Thereto, at 1259 (1895) | | | | |
| 219 | 1895 | Vermont – City of Barre | Ordinances of the City of Barre, Vermont, ch. 16, § 18 (1895) | Prohibited discharging a gun, pistol, or other loaded firearm, firecracker, serpent, or other explosive, unless on a person's own property or with the permission of the property owner.  Also prohibited making a bonfire in the street except with city council permission and the carrying of concealed steel or brass knuckles, a pistol, slungshot, stiletto, or weapon of similar character. | Steel or brass knuckles; Pistol; Slungshot; Stiletto; Weapon of similar character; Gun; Loaded firearm; Firecracker; Serpent | | |
| 220 | 1896 | California – City of Fresno | L. W. Moultrie, City Attorney, Charter and Ordinances of the City of Fresno, 1896, at 37, § 53 (1896) | Prohibited the transfer to any minor under the age of 18 any gun, pistol or other firearm, dirk, Bowie knife, powder, shot, bullets, or any combustible or dangerous material, absent written consent of parent or guardian. | Gun; Pistol; Dirk; Bowie knife; Powder; Shot; Bullets | | |
| 221 | 1896 | California – City of Fresno | L. W. Moultrie, Charter and Ordinances of the City of Fresno, at 30, § 8 (1896) | Prohibited the concealed carrying of any pistol or firearm, slungshot, dirk, Bowie knife, or other deadly weapon, absent written permission. | Pistol; Firearm; Slungshot; Dirk; Bowie knife; Other deadly weapon | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 222 | 1896 | Mississippi | 1896 Miss. L. 109-10, ch. 104 | Prohibited the carrying of a concealed Bowie knife, dirk, butcher knife, pistol, brass or metallic knuckles, slingshot, sword, or other deadly weapon "of like kind or description." | Bowie knife; Dirk; Butcher knife; Pistol; Metal Knuckles; Slingshot; Sword; Other deadly weapon of like kind | | |
| 223 | 1896 | Rhode Island | General Laws of the State of Rhode Island and Providence Plantations to Which are Prefixed the Constitutions of the United States and of the State, at 1010-11 (1896), Offences Against Public Policy, §§ 23, 24, 26 | Prohibited the carrying of any dirk, Bowie knife, butcher knife, dagger, razor, sword cane, air-gun, billy, metal knuckles, slingshot, pistol, or firearm of any description. Exempted officers or watchmen whose duties required them to make arrests or guard prisoners or property. | Dirk; Bowie knife; Butcher knife; Dagger; Razor; Sword cane; Air gun; Billy; Metal knuckles; Slingshot; Pistol; Other firearm | | |
| 224 | 1896 | Washington – City of Spokane | Rose M. Denny, The Municipal Code of the City of Spokane, Washington. Comprising the Ordinances of the City (Excepting Ordinances Establishing Street Grades) Revised to October 22, 1896, at 309-10 (1896), Ordinances of Spokane, An Ordinance to Punish the Carrying of | Prohibited the carrying of a concealed revolver, pistol or other fire-arms, or any knife (other than an ordinary pocket knife) or any dirk or dagger, sling-shot or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property. punishable by fine of $25-100, cost of prosecution, and | Revolver; Pistol; Other firearms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Concealed Weapons within the City of Spokane, § 1 | imprisonment until fines/costs are paid. | | | |
| 225 | 1897 | Alabama | William Logan Martin, Commissioner, The Code of Alabama, Adopted by Act of the General Assembly of the State of Alabama, Approved February 16, 1897, § 27 (1897) | Tax of $300 on the sale of pistols, pistol cartridges, Bowie knives, and dirk knives. | Pistol; Pistol cartridge; Bowie knife; Dirk | | |
| 226 | 1897 | Missouri – City of Saint Joseph | William K. Amick, The General Ordinances of the City of Saint Joseph (A City of the Second Class) Embracing all Ordinances of General Interest in Force July 15, 1897, together with the Laws of the State of Missouri of a General Nature Applicable to the City of St. Joseph. Compiled and Arranged, at 508 (1897), Concealed Weapons – Carrying of, § 7 | Prohibited the carrying of a concealed pistol or revolver, colt, billy, slungshot, cross knuckles or knuckles of lead, brass or other metal, dirk, dagger, razor, Bowie knife, or any knife resembling a Bowie knife, or any other dangerous or deadly weapon. | Pistol; Revolver,; Colt; Billy; Slungshot; Metal knuckles; Dirk; Dagger; Razor; Bowie knife; Any knife resembling a bowie knife; Other dangerous or deadly weapon | | |
| 227 | 1897 | Texas | 1897 Tex. Gen. Laws 221, An Act to Prevent the Barter, Sale And Gift of Any Pistol, Dirk, Dagger, Slung Shot, Sword Cane, Spear, or Knuckles Made of Any Metal Or Hard Substance to Any Minor Without the Written Consent of the | Prohibited the selling or giving to a minor a pistol, dirk, dagger, slungshot, sword cane, spear or knuckles made of any metal or hard substance, Bowie knife or any other knife manufactured or sold for the purpose of offense or | Pistol; Dirk; Dagger; Slungshot; Sword cane; Spear; Knuckles; Bowie knife; Any other knife | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Parent or Guardian of Such Minor. . ., ch. 155 | defense without the consent of their parent or guardian. Punishable by fine of $25-200 and/or imprisonment for 10-30 days. | used for offense or defense | | |
| 228 | 1897 | Washington | Richard Achilles Ballinger, Ballinger's Annotated Codes and Statutes of Washington: Showing All Statutes in Force, Including the Session Laws of 1897, at 1956-57 (Vol. 2, 1897), Carrying Concealed Weapons, § 7084 | Prohibited the carrying of a concealed revolver, pistol, or other fire-arms, or any knife, (other than an ordinary pocket knife), or any dirk or dagger, sling-shot, or metal knuckles, or any instrument by the use of which injury could be inflicted upon the person or property of any other person.  Punishable by fine of $25-100 and/or imprisonment for 30 days. | Revolver; Pistol; Other fire-arms; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Any instrument that can cause injury | | |
| 229 | 1898 | Georgia | 1898 Ga. L. 60, ch. 103 | Prohibited the concealed carry of any pistol, dirk, sword cane, spear, Bowie knife, other kind of knife "manufactured and sold for purpose of offense and defense," and any "kind of metal knucks." | Bowie knife; Other knife manufactured for wearing or carrying for offense or defense; Pistol; Sword; Sword cane; Spear; Metal knuckles | | |
| 230 | 1898 | Oregon – City of Oregon City | The Charter of Oregon City, Oregon, Together with the Ordinances and Rules of Order, 259 (1898), An | Prohibited the carrying of any slingshot, billy, dirk, pistol, or "any concealed deadly weapon," and the | Slingshot; Billy; Dirk; Pistol; | | |

***Duncan v. Bonta**, No. 3:17-cv-01017-BEN-JLB*
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | Ordinance Providing for the Punishment of Disorderly Persons, and Keepers and Owners of Disorderly Houses, § 2 | discharge of any firearm, air gun, sparrow gun, flipper, or bean shooter, unless in self-defense. | Concealed deadly weapon; Firearm; Air gun; Sparrow gun; Flipper; Bean shooter | | |
| 231 | 1899 | Alaska | Fred F. Barker, Compilation of the Acts of Congress and Treaties Relating to Alaska: From March 30, 1867, to March 3, 1905, at App. A, p. 139 (30 Stat. L. 1253 (1899)); 1896-99 Alaska Sess. Laws 1270, ch. 6, § 117 | Prohibited concealed carrying in any manner any revolver, pistol, other firearm, knife (other than an "ordinary pocket knife"), dirk, dagger, slingshot, metal knuckles, or any instrument that could cause injury to a person or property. | Pistol; Revolver; Other firearm; Knife; Dirk; Dagger; Slingshot; Metal knuckles; Other instrument | | |
| 232 | 1899 | Nebraska – City of Fairfield | Compiled Ordinances of the City of Fairfield, Clay County, Nebraska, at 34 (1899), Ordinance No. 20, An Ordinance to Prohibit the Carrying of Concealed Weapons and Fixing a Penalty for the violations of the same. Be it ordained by the Mayor and Council of the City of Fairfield, Nebraska: § 1 | Prohibited the carrying of a concealed pistol, revolver, dirk, Bowie knife, billy, slingshot, metal knuckles, or other dangerous or deadly weapons.  Punishable by forfeiture and "shall be so adjudged." | Pistol; Revolver; Dirk; Bowie knife; Billy; Slingshot; Metal knuckles; Other dangerous or deadly weapons | | |
| 233 | 1899 | Texas – City of San Antonio | Theodore Harris, Charter and Ordinances of the City of San Antonio. Comprising All Ordinances of a General | Prohibited drawing in a threatening manner a pistol, gun, knife, sword cane, club or any other instrument or | Pistol; Gun; Knife; Sword cane; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Character in Force August 7th, at 220 (1899), Ordinances of the City of San Antonio, Ordinances, ch. 22, § 4 | weapon that may cause death. | Club; Any other instrument or weapon that causes death | | |
| 234 | 1900 | Iowa – City of Des Moines | William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa, at 89-90, (1900), Ordinances City of Des Moines, Weapons, Concealed, § 209 | Prohibited the carrying of a concealed pistol or other firearms, slungshot, brass knuckles, or knuckles of lead, brass or other metal or material, or any sandbag, air guns of any description, dagger, Bowie knife, dirk knife, or other knife or instrument for cutting, stabbing or striking, or other dangerous or deadly weapon. | Pistol; Slungshot; Metal knuckles; Sandbag; Air guns; Dagger; Bowie knife; Instrument for cutting; stabbing or striking; Other dangerous or deadly weapon | | |
| 235 | 1900 | New York | 1900 N.Y. Laws 459, An Act to Amend Section Four Hundred and Nine of the Penal Code, Relative to Dangerous Weapons, ch. 222, § 1 | Prohibited manufacturing or selling a slungshot, billy, sandclub or metal knuckles, and prohibited selling a firearm to a minor in any city or incorporated village without written consent of police magistrate. Exempted any officer of the United States or peace officer when necessary and proper to discharge official duties. | Slungshot; Billy; Sandclub; Metal knuckles; Pistol; Other firearm | | |
| 236 | 1901 | Arizona [Territory] | 1901 Ariz. 1251-53, §§ 381, 385, 390 | Prohibited the concealed carrying of any pistol or other firearm, dirk, dagger, | Pistol; Other firearm; Dirk; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| | | | | slungshot, sword cane, spear, brass knuckles, Bowie knife (or any kind of knife, except a pocket knife not manufactured for offensive or defensive use). Exempted peace officers in discharge of official duties. Punishable by a fine of $25-100 and forfeiture of the weapon. | Dagger; Slungshot; Sword cane; Spear; Metal knuckles; Bowie knife; Any kind of knife (other than pocket knife) | | |
| 237 | 1901 | Utah | 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3 | Prohibited the construction and possession of any "infernal machine," defined as a device with a loaded firearm that is capable of igniting when moved, handled, or opened. | Infernal machine | | |
| 238 | 1903 | Oklahoma [Territory] | Wilson's Rev. & Ann. St. Okla.(1903) § 583, c. 25 | Prohibited the concealed carrying of any pistol, revolver, Bowie knife, dirk, dagger, slungshot, sword cane, spear, metal knuckles, or other kind of knife manufactured for defense. | Pistol; Revolver; Bowie knife; Dirk; Dagger; Slungshot; Sword Cane; Spear; Metal knuckles; Other knife | | |
| 239 | 1903 | South Dakota | S.D. Rev. Code, Penal Code 1150 (1903) §§ 470, 471 | Prohibited the carrying of a concealed slungshot, | Slungshot; Firearm; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | firearm, or sharp or dangerous weapon. | Sharp or dangerous weapon | | |
| 240 | 1905 | Indiana | 1905 Ind. Acts 677, Public Conveyance—Attacking, § 410 | Prohibited maliciously or mischievously shooting a gun, rifle, pistol or other weapon, or throwing a stone, stick, club or any other substance at a vehicle. Punishable by imprisonment for 30 days to 1 year and a fine of $10-100. | Gun; Rifle; Pistol; Other weapon; Stone; stick; Club; Any other substance | | |
| 241 | 1905 | New Jersey | 1905 N.J. Laws 324-25, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 172, § 1 | Prohibited the carrying of a concealed revolver, pistol or other deadly, offensive or dangerous weapon or firearm or any stiletto, dagger or razor. Punishable by fine up to $200 and/or imprisonment with hard labor up to 2 years. | Revolver; Pistol; Other deadly; offensive or dangerous weapon or firearm or any stiletto; Dagger; razor | *State v. Angelo*, 3 N.J. Misc. 1014, 1015 (1925) (upheld conceal carry ban) | |
| 242 | 1908 | Rhode Island | 1908 (January Session) R.I. Pub. Laws 145, An Act in Amendment of section 23 of chapter 283 of the General Laws, § 23 | Prohibited the carrying of any dirk, dagger, razor, sword cane, Bowie knife, butcher knife, air-gun, billy, metal knuckles, slungshot, pistol, other firearm. Exempted officers or watchmen. | Dirk; Dagger; Razor; Sword cane; Bowie knife; Butcher knife; Air gun; Billy; Metal knuckles; Slungshot; Pistol; Other firearm. | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 243 | 1909 | Idaho | 1909 Id. Sess. Laws 6, An Act To Regulate the Use and Carrying of Concealed Deadly Weapons and to Regulate the Sale or Delivery of Deadly Weapons to Minors Under the Age of Sixteen Years to Provide a Penalty for the Violation of the Provisions of this Act, and to Exempt Certain Persons, § 1 | Prohibited the carrying a concealed dirk, Bowie knife, dagger, slungshot, pistol, revolver, gun, or any other deadly or dangerous weapon in any public setting. | Dirk; Bowie knife; Dagger; Slungshot; Pistol; Revolver; Other deadly or dangerous weapon | No longer restricts concealed carrying of a slungshot. *See* Idaho Stats. Ch. 33, § 18-3302(2)(a)(b)(i). | *State v. Hart*, 66 Idaho 217 (1945) (upheld under state constitution) |
| 244 | 1909 | South Dakota | 1909 S.D. Sess. Laws 450, An Act for the Preservation, Propagation, Protection, Taking, Use and Transportation of Game and Fish and Establishing the Office of State Game Warden and Defining His Duties, ch. 240, §§ 21-22 | Prohibited the setting or possession of any "set gun." | Set gun | | |
| 245 | 1909 | Washington | 1909 Wash. Sess. Laws 973, An Act Relating to Crimes and Punishments and the Rights and Custody of Persons Accused or Convicted of Crime, and Repealing Certain Acts, ch. 249, ch. 7, §266, pts. 1-3 | Prohibited the setting of any trap, spring pistol, rifle, or other deadly weapon. Punishable by imprisonment for up to 1 year or a fine of up to $1,000.  Further punishable by imprisonment for up to 20 years for non-fatal or fatal injuries resulting from the trap or | Trap gun | | |
| 246 | 1911 | New York | 1911 N.Y. Laws 442, An Act to Amend the Penal | Prohibited the manufacture, sale, giving, or disposing of | Blackjack; Slungshot; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Law, in Relation to the Sale and Carrying of Dangerous Weapons, ch. 195, § 1 | any weapon of the kind usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, or metal knuckles, and the offering, sale, loaning, leasing, or giving of any gun, revolver, pistol, air gun, or spring-gun to a person under the age of 16. | Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Gun; Revolver; Pistol; Air gun; Spring gun | | |
| 247 | 1911 | New York | 1911 N.Y. Laws 442-43, An Act to Amend the Penal Law, in Relation to the Sale and Carrying of Dangerous Weapons. ch. 195, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, or bludgeon, and the carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instrument or weapon" with intent to use the weapon unlawfully against another. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or deadly weapon | | |
| 248 | 1912 | Vermont | 1912 Vt. Acts and Resolves 261 | Prohibited the setting of any spring gun. Punishable by a fine of $50-500 and liability for twice the amount of damage resulting from the trap. | Spring gun | | |
| 249 | 1913 | Florida | 1913 Fla. 117, An Act to Regulate the Hunting of Wild Deer etc., § 8 | Prohibited hunting wild game with automatic guns. | Machine guns | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 250 | 1913 | Hawaii [Territory] | 1913 Haw. Rev. Laws ch. 209, § 3089, Carrying Deadly Weapons, § 3089. | Prohibited the carrying a Bowie knife, sword cane, pistol, air-gun, slungshot, or other deadly weapon. Punishable by fine of $10-250 or imprisonment for 3-12 months, unless good cause can be shown for carrying the weapon. | Bowie knife; Sword cane; Pistol; Air gun; Slungshot; Other deadly weapon | | |
| 251 | 1913 | Iowa | 1913 Iowa Acts 307, ch. 297, §§ 1, 2 | Prohibited the carrying of a concealed dirk, dagger, sword, pistol, revolver, stiletto, metallic knuckles, picket billy, sandbag, skull cracker, slungshot, or other offensive and dangerous weapons or instruments. Also prohibited the selling, keeping for sale, offering for sale, loaning, or giving away any dirk, dagger, stiletto, metallic knuckles, sandbag, or "skull cracker." Exempted the selling or keeping for sale of "hunting and fishing knives." | Dirk; Dagger; Sword; Pistol; Revolver; Stiletto; Metallic knuckles; Picket; Billy; Sand bag; Skull cracker; Slungshot; Other offensive and dangerous weapons or instruments | | |
| 252 | 1913 | New York | 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1, Carrying and Use of Dangerous Weapons Carrying Weapons, Dangerous or Unusual Weapons, § 1 | Prohibited the carrying or possession of any weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, bomb, or bombshell, and the | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bludgeon; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | carrying or possession of any dagger, dirk, dangerous knife, razor, stiletto, or other "dangerous or deadly instruments or weapon." | Bomb; Bombshell; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Other dangerous or deadly weapon | | |
| 253 | 1915 | New Hampshire | 1915 N.H. Laws 180-81, An Act to Revise and Amend the Fish and Game Laws, ch. 133, pt. 2, § 18 | Prohibited the setting of a spring gun. Punished by a fine of $50-500. | Spring gun | | |
| 254 | 1915 | North Dakota | 1915 N.D. Laws 96, An Act to Provide for the Punishment of Any Person Carrying Concealed Any Dangerous Weapons or Explosives, or Who Has the Same in His Possession, Custody or Control, unless Such Weapon or Explosive Is Carried in the Prosecution of a Legitimate and Lawful Purpose, ch. 83, §§ 1-3, 5 | Prohibited the concealed carrying of any instrument or weapon usually known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, or any sharp or dangerous weapon, any gun, revolver, pistol, or "other dangerous fire arm," nitroglycerin, dynamite, or any other dangerous or violent explosive. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Any sharp or dangerous weapon; Any Gun; Revolver; Pistol; Dangerous firearm; Explosive | | |
| 255 | 1917 | California | 1917 Cal. Stat. 221, § 1 | Prohibited the manufacture, leasing, keeping for sale, offering, giving, or disposing of any instrument or weapon of the kind commonly known as a blackjack, | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dirk, or dagger. | Metal knuckles; Dirk; Dagger | | |
| 256 | 1917 | California | 1917 Cal. Stat. 221, § 2 | Prohibited the possession of any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, bomb, or bombshells, and the carrying of any dirk or dagger. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Bomb; Bombshells; Dirk; Dagger | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |
| 257 | 1917 | California | 1917 Cal. Stat. 221, § 5 | Prohibited the use, or carrying or possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or other "dangerous or deadly instrument or weapon." | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Loaded pistol; Revolver; Other firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bomb; Bombshell; Other deadly or dangerous weapon | Repealed and replaced by 1923 Cal. Stat. 695 (1923) | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 258 | 1917 | Missouri – City of Joplin | Joplin Code of 1917, Art. 67, § 1201. | Prohibited the carrying of a concealed firearm, Bowie knife, spring-back knife, razor, knuckles, bill, sword cane, dirk, dagger, slungshot, or other similar deadly weapons in a church, school, election site, court, or other public setting. Also prohibits using the weapon in a threatening manner, using while intoxicated, or selling to a minor. | Firearms; Bowie knife; Spring-back knife; Razor; Knuckle; Billy; Sword cane; Dirk; Dagger; Slungshot; Other deadly weapons | | |
| 259 | 1917 | North Carolina – Harnett County | 1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1 | Prohibited killing quail with a gun that shoots over two times before reloading. | Gun that shoots over two times before reloading (machine gun) | | |
| 260 | 1917 | Oregon | 1917 Or. Sess. Laws 804-08, An Act Prohibiting the manufacture, sale, possession, carrying, or use of any blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, dirk, dagger or stiletto, and regulating the carrying and sale of certain firearms, and defining the duties of certain executive officers, and providing penalties for violation of the provisions of this Act, § 7 | Prohibited the attempted use, or the carry and possession with the intent to use, any dagger, dirk, dangerous knife, razor, stiletto, loaded pistol, revolver, or other firearm, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, bomb, bombshell, or any other "dangerous or deadly weapon." Punishable by a fine of $50-500 or | Dagger; Dirk; Dangerous knife; Razor; Stiletto; Pistol; Revolver; Other Firearm; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Bomb; | | *Oregon v. Blocker*, 291 Or. 255 (1981) (struck down the ban on clubs as contrary to Oregon Constitution) |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|--------------------------|-----------------------|---------------|-----------------|
| | | | | imprisonment for 1-6 months. | Bombshell; Other dangerous or deadly weapon | | |
| 261 | 1923 | California | 1923 Cal. Stat. 695, § 1 | Prohibited the manufacture, importation, keeping for sale, offering or exposing for sale, giving, lending, or possession of any instrument or weapon commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles, and the concealed carrying of any dirk or dagger.  Punishable by imprisonment for 1-5 years. | Blackjack; Slungshot; Billy; Sandclub; Sandbag; Metal knuckles; Dirk; Dagger | Replaced in 1953 with enactment of Cal. Penal Code § 12020 | |
| 262 | 1923 | Missouri | 1923 Mo. Laws 241-42, An Act to Provide the Exercise of the Police Powers of the State by and through Prohibiting the Manufacture, Possession, Transportation, Sale and Disposition of Intoxicating Liquors. . .§ 17 | Prohibited the carrying, while a passenger or operating a moving vehicle, of a revolver, gun or other firearm, or explosive, any Bowie knife, or other knife having a blade of more than two and one-half inches in length, any slingshot, brass knucks, billy, club or other dangerous weapon.  Punishable by imprisonment of minimum 2 years. | Revolver; Gun; Explosive; Bowie knife; Other knife having a blade of more than two and one-half inches in length; Slingshot; Metal knuckles; Billy; Club; Other dangerous weapon | | |
| 263 | 1923 | South Carolina | 1923 S.C. Acts 221 | Prohibited the selling or giving to a minor a pistol or | Pistol; Pistol cartridge; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|------|------|------|------|------|------|------|
| | | | | pistol cartridge, brass knucks, Bowie knife, dirk, loaded cane or slingshot. Also prohibited a parent from giving such a weapon to their child under 12 years old. Punishable by fine up to $50 or imprisonment up to 30 days. | Metal knuckles; Bowie knife; Dirk; Loaded cane; Slingshot | | |
| 264 | 1923 | Vermont | 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1 | Prohibited using, carrying, or possessing a machine gun or automatic rifle while hunting. | Machine gun; Automatic rifle | | |
| 265 | 1925 | | 1925 Or. Laws 42, An Act Prohibiting the Placing of Spring-Guns or Set-Guns; and Providing a Penalty Therefor, ch. 31, §§ 1-2 | Prohibited the setting of any loaded spring gun. Punishable by a fine of $100-500 or imprisonment for 30 days to 6 months. Exception for setting of trap gun to destroy burrowing rodents. | Spring gun; Set gun | | |
| 266 | 1925 | West Virginia | 1925 W.Va. Acts 25-30, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and | Prohibited unlicensed carrying of a pistol, dirk, Bowie knife, slungshot, razor, billy, metallic or other false knuckles, or any other dangerous or deadly weapon. Punishable by imprisonment for 6-12 months for the first offense, and for 1-5 years for subsequent offenses, and in | Pistol; Dirk; Bowie knife; Razor; Slungshot; Billy; Metal knuckles; Other dangerous or deadly weapon | | *City Of Princeton* v. *Buckner*, 180 W. Va. 457, 462 (1988) (held unconstitutional under state constitution); *Application of Metheney*, 182 |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Possession of Weapons and Fire Arms. . . , ch. 3, § 7(a) | either case, a fine of $50-200. | | | W. Va. 722 (1990) |
| 267 | 1925 | West Virginia | 1925 W.Va. Acts 31-32, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace . . . , ch. 3, § 7, pt. b | Prohibited publicly displaying for rent or sale any revolver, pistol, dirk, Bowie knife, slungshot, other dangerous weapon, machine gun, submachine gun, or high powered rifle. Requires dealers to keep a register. Prohibited selling, renting, giving, or lending any of these weapons to an unnaturalized person. | Revolver; Pistol; Dirk; Bowie knife; Slungshot; Machine gun; Other dangerous weapon; Submachine gun; High powered rifle | | |
| 268 | 1925 | West Virginia | 1925 W.Va. Acts 30-31, 1st Extraordinary Sess., An Act to Amend and Re-Enact Section Seven . . . Relating to Offenses Against the Peace; Providing for the Granting and Revoking of Licenses and Permits Respecting the Use, Transportation and Possession of Weapons and Fire Arms . . . , ch. 3, § 7, pt. b | Prohibited carrying, transporting, or possessing a machine gun, submachine gun, or high powered rifle except on their own premises and with a permit. Also provides guidelines for such a permit. | Machine gun; Submachine gun; High powered rifle | | |
| 269 | 1927 | California | 1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously | Prohibited a person, firm, or corporation possessing a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1 2 | | | | |
| 270 | 1927 | Indiana | 1927 Ind. Acts 469, Public Offenses—Ownership, Possession or Control of Machine Guns or Bombs—Penalty, ch. 156, § 1 | Prohibited owning or possessing a machine gun or bomb in an automobile. Punishable by imprisonment for 1-5 years. | Machine gun; Bomb | | |
| 271 | 1927 | Indiana | 1927 Ind. Acts 469, Operation of Machine Guns, Discharge of Bombs—Offense and Penalty:, ch. 156, § 2 | Prohibited discharging a machine gun or bomb. Punishable by imprisonment for 2-10 years. | Machine gun; Bomb | | |
| 272 | 1927 | Iowa | 927 Iowa Acts 201, An Act to prohibit the Possession or Control of Machine Guns. . . ., §§ 1 2 | Prohibited possession of a machine gun. | Machine gun | | |
| 273 | 1927 | Maryland | 1927 Md. Laws 156, § 388-B | Prohibited possession of liquor in an automobile that also carries a gun, pistol, revolver, rifle machine gun, or other dangerous or deadly weapon. | Gun; Pistol; Revolver; Machine gun; Other dangerous or deadly weapon | | |
| 274 | 1927 | Massachusetts | 1927 Mass. Acts 416, An Act Relative to Machine | Prohibited the carrying of a pistol, revolver, machine gun, stiletto, dagger, dirk | Pistol; Revolver; Machine gun; | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Guns and Other Firearms, ch. 326, § 5 | knife, slungshot, metallic knuckles, or sawed off shotgun, billy, or dangerous weapon if arrested upon a warrant for an alleged crime. Punishable by imprisonment of 6 months to 2.5 years. | Stiletto; Dagger; Dirk; Slungshot; Metallic knuckles; Sawed-off shotgun; Billy; Dangerous weapon | | |
| 275 | 1927 | Massachusetts | 1927 Mass. Acts 413, An Act Relative to Machine Guns and Other Firearms, ch. 326, §§ 1-2 (amending §§ 121, 123) | Prohibited selling, renting, or leasing a pistol, revolver, or machine gun to a person without a license to possess the same. | Pistol; Revolver; Machine gun | | |
| 276 | 1927 | Michigan | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, bludgeon.  Punishable by fine up to $1,000 or imprisonment. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub; Bludgeon | | |
| 277 | 1927 | Michigan | 1927 Mich. Pub. Acts 888-89, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also Prohibited the same for a muffler or silencer. Punishable by fine of $1,000 and/or imprisonment up to 5 years. | Machine gun; Silencer | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 278 | 1927 | New Jersey | 1927 N.J. Laws 742, A Further Supplement to an Act Entitled, "An Act for the Punishment of Crimes," ch. 321, § 1 | Prohibited a pawnbroker from selling or possessing for sale, loan, or to give away a machine gun, automatic rifle, revolver, pistol, or other firearm, or other instrument of any kind known as a blackjack, slungshot, billy, sandclub, sandbag, bludgeon, metal knuckles, dagger, dirk, dangerous knife, stiletto, bomb or other high explosive. Punishable as a high misdemeanor. | Machine gun; Automatic rifle; Revolver; Pistol; Blackjack; Slungshot; Billy; Sandclub; Sandbag; Bludgeon; Metal knuckles; Dagger; Dirk; Dangerous knife; Stiletto; Bomb; Other high explosive | | |
| 279 | 1927 | New Jersey | 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | Prohibited selling, giving, loaning, delivering or furnishing, or possessing a machine gun or automatic rifle to another person without a license. | Machine gun; Automatic rifle | | |
| 280 | 1927 | Rhode Island | 1927 (January Session) R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 5, 6 | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or possessing a machine gun. | Pistol; Machine gun | | |
| 281 | 1927 | Rhode Island | 1927 R. I. Pub. Laws 256, An Act to Regulate the Possession of Firearms: §§ 1, 4, 7, 8. | Prohibited carrying a concealed pistol and Prohibited manufacturing, selling, purchasing, or | Pistol; Machine gun; Silencer | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | possessing a machine gun or silencer. | | | |
| 282 | 1927 | Rhode Island | 1927 R.I. Pub. Laws 256, An Act to Regulate the Possession of Firearms, §§1, 3 | Prohibited a person who has previously been convicted of a violent crime from owning, carrying, or possessing any firearm (including machine gun or pistol). | Machine gun; Pistol | | |
| 283 | 1929 | Indiana | 1929 Ind. Acts 139, Criminal Offenses— Commission of or Attempt to Commit Crime While Armed with Deadly Weapon, ch. 55, § 1 | Prohibited being armed with a pistol, revolver, rifle shotgun, machine gun, or any other firearm or dangerous weapon while committing or attempting to commit a crime of rape, robbery, bank robbery, or larceny. Punishable by imprisonment for 10-20 years, in addition to the punishment for the original crime. | Pistol; Revolver; Rifle; Shotgun; Machine gun; Dangerous or deadly weapon | | |
| 284 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun, silencer, bomb, bombshell, blackjack, slungshot, billy, metallic knuckles, sandclub, sandbag, bludgeon, or any gas ejecting device. | Machine gun; Silencer; Bomb; Bombshell; Blackjack; Slungshot; Billy; Metallic knuckles; Sandclub, Sandbag, Bludgeon, Gas ejecting device | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| 285 | 1929 | Michigan | 1929 Mich. Pub. Acts 529, An Act to Regulate and License the Selling, Purchasing, Possessing and Carrying of Certain Firearms, § 3 | Prohibited manufacturing, selling, or possessing a machine gun or firearm that can be fired more than 16 times without reloading. Also Prohibited the same for a muffler or silencer. | Machine gun; Silencer | | |
| 286 | 1929 | Missouri | 1929 Mo. Laws 170, Crimes and Punishment, Prohibiting the Sale, Delivery, Transportation, Possession, or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law, §§ 1-2 | Prohibited selling, delivering, transporting, and possessing a machine gun. Punishable by imprisonment of 2-30 years and/or fine up to $5,000. | Machine gun | | |
| 287 | 1929 | Nebraska | 1929 Neb. Laws 674, An Act Prohibiting the Sale, Possession and Transportation of Machine Guns within the State of Nebraska; and Prescribing Penalties for the Violation of the Provisions Hereof, ch. 190, §§ 1-2 | Prohibited selling or otherwise disposing of a machine gun. Punishable by fine of $1,000-$10,000. Also Prohibited transporting or possessing a machine gun. Punishable by imprisonment for 1-10 years. | Machine gun | | |
| 288 | 1929 | Pennsylvania | 1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns: §§1 4 | Prohibited selling, giving, transferring, or possessing a machine gun. Punishable by fine up to $1,000 and imprisonment by separate or solitary confinement at labor up to 5 years. Also Prohibited using a machine | Machine gun | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | | gun during an attempted crime. Punishable by separate and solitary confinement at labor for up to 10 years. | | | |
| 289 | 1929 | Pennsylvania | 1929 Pa. Laws 777, An Act prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns, § 3 | Prohibited being armed with a machine gun while committing a crime. Punishable by imprisonment with solitary confinement up to 10 years. | Machine gun | | |
| 290 | 1929 | Wisconsin | 1928-1929 Wis. Sess. Laws 157, An Act to Create . . . the Statutes, Relating to Machine Guns and Providing a Penalty, ch. 132, § 1 | Prohibited owning, using, or possession a machine gun. Punishable by imprisonment of 1-15 years. | Machine gun | | |
| 291 | 1931 | Delaware | 1931 Del. Laws 813, An Act Making it Unlawful for any Person or Persons Other than the State Military Forces or Duly Authorized Police Departments to have a Machine Gun in his or their Possession, and Prescribing a Penalty for Same, ch. 249, § 1 | Prohibited a person from possessing a machine gun. Punishable by fine and/or imprisonment. | Machine gun | | |
| 292 | 1931 | Illinois | 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | Prohibited selling, loaning, or giving away, purchasing, possessing, carrying, or transporting any machine gun. | Machine gun | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 293 | 1931 | Illinois | 1931 Ill. Laws 454, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, § 7 | Prohibited being armed with a machine gun while committing arson, assault, burglary, kidnapping, larceny, rioting, or robbery. Punishable by imprisonment for 5 years to life. | Machine gun | | |
| 294 | 1931 | Michigan | 1931 Mich. Pub. Acts 671, The Michigan Penal Code, ch. 37, § 236 | Prohibited the setting of any spring or trap gun. | Spring gun; Trap gun | | |
| 295 | 1931 | New York | 1931 N.Y. Laws 1033, An Act to Amend the Penal Law in Relation to Carrying and Use of Glass Pistols, ch. 435, § 1 | Prohibited using an imitation pistol and carrying or possessing a black-jack, slungshot, billy, sandclub, sandbag, metal knuckles, bludgeon, dagger, dirk, dangerous knife, razor, stiletto, imitation pistol, machine gun, sawed off shot-gun, or ay other dangerous or deadly weapon. | Imitation pistol; Blackjack; Slungshot; Metal knuckles; Bludgeon; Dagger; Dirk; Dangerous knife; Razor; Stiletto; Machine gun; Sawed-off shot gun; Other dangerous or deadly weapon | | |
| 296 | 1931 | North Dakota | 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2 | Prohibited selling, giving, loaning, furnishing, or delivering a machine gun, submachine gun, automatic rifle, or bomb (without a license). Punishable by imprisonment up to 10 years and/or fine up to $3,000. | Machine gun; Submachine gun; Automatic rifle; Bomb | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 297 | 1931 | South Carolina | 1931 S.C. Acts 78, An Act Declaring it unlawful for any person, firm, or corporation to place a loaded trap gun, spring gun, or any like devise in any building, or in any place, and providing punishment for the violation thereof: § 1 | Prohibited the setting of any loaded trap gun or spring gun.  Punishable by a fine of $100-500 or imprisonment of 30 days to 1 year. | Trap gun; Spring gun | | |
| 298 | 1932 | District of Columbia | District of Columbia 1932: 1932, Public-No. 275-72D Congress, ch. 465 | Prohibited being armed with or having readily available any pistol or other firearm while committing a violent crime. In addition to being punished for the crime, will also be punished with imprisonment (various terms depending on the number of previous convictions). Additionally, Prohibited people convicted of violent crimes from owning or possessing a pistol. Prohibited carrying a concealed deadly or dangerous weapon. Regulates the sale and transfer of pistols. | Pistol; Deadly or dangerous weapon | | |
| 299 | 1932 | Louisiana | 1932 La. Acts 337-38, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, and Providing a | Prohibited selling, loaning, giving, purchasing, possession, carrying, or transporting a machine gun. | Machine gun | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | Penalty for a Violation Hereof . . . , §§ 1 2 | | | | |
| 300 | 1933 | California | 1933 Cal. Stat. 1169 | Prohibited a person, firm, or corporation from selling, possessing or transporting a machine gun. Punishable by imprisonment up to 3 years and/or fine up to $5,000. | Machine gun | | |
| 301 | 1933 | Florida | 1933 Fla. Laws 623, An Act to Prevent Throwing of Bombs and the Discharge of Machine Guns Upon, or Across Any Public Road in the State of Florida . . ., ch. 16111, § 1 | Prohibited throwing a bomb or shooting a machine gun across or along a street or highway, any public park or place where people assemble with the intent to do bodily harm. Punishable by death. | Bomb; Machine gun | | |
| 302 | 1933 | Hawaii | 1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2 | Prohibited a person, firm, or corporation from owning, possessing, selling, or transporting a machine gun, shell cartridge, or bomb containing or capable of emitting tear gas or other noxious gas. | Machine gun; Shell cartridge; Bomb | | |
| 303 | 1933 | Kansas | 1933 Kan. Sess. Laws 76, An Act Relating to Machine Guns and Other Firearms Making the Transportation or Possession Thereof Unlawful in Certain Cases, Providing for Search, Seizure and Confiscation Thereof in Certain Cases, Relating to the Ownership | Prohibited possession of a machine rifle, machine gun, or submachine gun. | Machine gun | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| | | | and Registration of Certain Firearms, and Providing Penalties for the Violation of this Act, ch. 62, §§ 1 3 | | | | |
| 304 | 1933 | Minnesota | 1933 Minn. Laws 231-33, An Act Making It Unlawful to Use, Own, Possess, Sell, Control or Transport a "Machine Gun", as Hereinafter Defined, and Providing a Penalty for the Violation Thereof, ch. 190, §§ 1-3 | Prohibited owning, controlling, using, possessing, selling, or transporting a machine gun. | Machine gun | | |
| 305 | 1933 | New York | 1933 N.Y. Laws 1639, An Act to Amend the Penal Law, in Relation to the Sale, Possession and Use of Sub-Machine Guns, ch. 805, §§ 1, 3 | Prohibited selling, giving, disposing of, transporting, or possessing a machine gun or submachine gun to a person guilty of a felony. | Machine gun | | |
| 306 | 1933 | Ohio | 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1 | Prohibited owning, possessing, and transporting a machine gun, light machine gun, or submachine gun without a permit. Punishable by imprisonment of 1-10 years. | Machine gun; Light machine gun; Submachine gun | | |
| 307 | 1933 | Oregon | 1933 Or. Laws 489, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, ch. 315, §§ 3-4 | Prohibited possession of a machine gun. Also Prohibited carrying a concealed machine gun, pistol, revolver, or other firearm. | Machine gun; Pistol; Revolver; Other firearm | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
Defendant's Survey of Relevant Statutes (1889–1930s)

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|---|---|---|---|---|---|---|---|
| 308 | 1933 | Oregon | 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207, Oregon Code 1930, § 2 | Prohibited a unnaturalized person and person convicted of a felony against another person or the government from owning or possessing a pistol, revolver, other firearm, or machine gun. Punishable by imprisonment for 1-5 years. | Pistol; Revolver; Other firearm; Machine gun | | |
| 309 | 1933 | South Dakota | 1933 S.D. Sess. Laws 245-47, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto, ch. 206, §§ 1-8 | Prohibited possession of a machine gun during a violent crime. Punishable by imprisonment up to 15 years. Prohibited using a machine gun offensively or aggressively; punishable by imprisonment up to 15 years. Requires manufacturers to keep a register of machine guns and for owners to converted their machine guns to pistols to register the weapon. | Machine gun | | |
| 310 | 1933 | Texas | 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, 6 | Prohibited possession of a machine gun; punishable by imprisonment up to 10 years. Prohibited selling, leasing, giving, bartering, exchanging, or trading a machine gun; punishable by imprisonment for 2 months to 10 years. | Machine gun | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-------------------|--------------|----------|---------------------------|------------------------|----------------|------------------|
| 311 | 1933 | Washington | 1933 Wash. Sess. Laws 335-36, An Act Relating to Machine Guns, Regulating the Manufacture, Possession, Sale of Machine Guns and Parts, and Providing Penalty for the Violation Thereof, and Declaring an Emergency, ch. 64, §§ 1-5 | Prohibited manufacturing, owning, buying, selling, loaning, furnishing, transporting, or possessing a machine gun. | Machine gun | | |
| 312 | 1934 | New Jersey | 1934 N.J. Laws 394-95, A Further Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 155, §§ 1-5 | Declares a person who possesses a machine gun or submachine gun a "gangster" and therefore, enemy of the state. Also declares a person who carries a deadly weapon without a permit a "gangster." If convicted a "gangster," punishable by fine up to $10,000 and/or imprisonment up to 20 years. | Machine gun; Submachine gun; Deadly weapon | | |
| 313 | 1934 | South Carolina | 1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6 | Prohibited transporting, possessing, selling, renting, or giving a firearm or machine gun. Punishable by fine up to $1,000 and imprisonment with solitary confinement up to 20 years. | Firearm; Machine gun | | |
| 314 | 1934 | Virginia | 1934 Va. Acts 137-39, An Act to define the term "machine gun"; to declare the use and possession of a machine gun for certain | Prohibited possession or use of a machine gun during a violent crime; punishable by death or imprisonment for a minimum of 20 years. | Machine gun | | |

*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB
**Defendant's Survey of Relevant Statutes (1889–1930s)**

| No. | Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation | Repeal Status | Judicial Review |
|-----|-----|-----|-----|-----|-----|-----|-----|
| | | | purposes a crime and to prescribe the punishment therefor, ch. 96, §§ 1-7 | Prohibited unlawful possession or use of a machine gun for offensive or aggressive purposes; punishable by imprisonment for a minimum of 10 years. Requires manufacturers to keep a register of machine guns. | | | |
| 315 | 1931-1933 | Wisconsin | 1931-1933 Wis. Sess. Laws 245-47, An Act . . .Relating to Machine Guns and to Make Uniform the Law with Reference Thereto, ch. 76, § 1, pt. 164.01-164.06 | Prohibited using or possessing a machine gun during an attempted violent crime; punishable by imprisonment of minimum 20 years. Prohibited use of a machine gun for offensive or aggressive purposes; punishable by imprisonment of minimum 10 years. | Machine gun | | |
| 316 | 1931-1933 | Wisconsin | 1931-1933 Wis. Sess. Laws 778, An Act . . . Relating to the Sale, Possession, Transportation and Use of Machine Guns and Other Weapons in Certain Cases, and Providing a Penalty, ch. 359, § 1 | Prohibited selling, possessing, using, or transporting a machine gun, automatic firearm, bomb, hand grenade, projectile, shell, or other container that can contain tear or other gas. Punishable by imprisonment for 1-3 years. | Machine gun; Automatic firearm; Bomb; Hand grenade; Projectile; Shell; Other container that can contain gas | | |

**EXHIBIT 17**

# Deposition of Stephen C. Helsley

# Oregon Firearms Federation, Inc., et al. v. Brown, et al.

# January 19, 2023



**206.287.9066 | 800.846.6989**
**1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101**
**www.buellrealtime.com**
email: info@buellrealtime.com



Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

_____

OREGON FIREARMS FEDERATION,        )
INC., et al.,                      )
                                   )
            Plaintiffs,            )
                                   ) Case Nos.
      v.                           ) 2:22-cv-01815-IM
                                   ) 3:22-cv-01859-IM
KATE BROWN, et al.,                ) 3:22-cv-01862-IM
                                   ) 3:22-CV-01869-IM
            Defendants.            )
_____    )
                                   )
                                   )
      (Continued)                  )
_____

* VIDEOCONFERENCE *

VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

OF EXPERT

STEPHEN C. HELSLEY
_____

Witness located in:

El Dorado Hills, California

* All participants appeared via videoconference *

DATE TAKEN:  January 19, 2023

REPORTED BY:  Tia B. Reidt, Washington RPR, CSR #2798
                         Oregon #22-0001
_____

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

                                                                        Page 2

 1              (Continued)                    )
                                               )
 2    MARK FITZ, et al.,                       )
                                               )
 3                       Plaintiffs,           )
            v.                                 )
 4                                             )
      ELLEN F. ROSENBLUM, et al.,              )
 5                                             )
                         Defendants.           )
 6    _____         )
      KATERINA B. EYRE, et al.,                )
 7                                             )
                         Plaintiffs,           )
 8          v.                                 )
                                               )
 9    ELLEN F. ROSENBLUM, et al.,              )
                                               )
10                       Defendants.           )
      _____         )
11    DANIEL AZZOPARDI, et al.,                )
                                               )
12                       Plaintiffs,           )
            v.                                 )
13                                             )
      ELLEN F. ROSENBLUM, et al.,              )
14                                             )
                         Defendants.           )
15    _____

16

17

18

19

20

21

22

23

24

25

                        BUELL REALTIME REPORTING, LLC
                        206.287.9066  I  800.846.6989

Ex. 1_Echeverria Decl.
Page 4
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 3

```
 1                        APPEARANCES

 2

    For Oregon Firearms Federation and the Witness:
 3
                    LEONARD WILLIAMSON
 4                  VAN NESS WILLIAMSON
                    960 Liberty Street SE, Suite 100
 5                  Salem, OR 97302
                    (503) 365-8800
 6                  L.williamson@vwllp.com

 7
    For the State of Oregon Defendants:
 8
                    HARRY WILSON
 9                  MARKOWITZ HERBOLD
                    1455 SW Broadway, Suite 1900
10                  Portland, OR 97201
                    (503) 972-5076
11                  HarryWilson@markowitzherbold.com

12

13  For the Proposed Intervenor-Defendant Oregon Alliance
    for Gun Safety:
14
                    ZACHARY J. PEKELIS
15                  W. SCOTT FERRON
                    PACIFICA LAW GROUP
16                  1191 Second Avenue, Suite 2000
                    Seattle, WA 98101
17                  (206) 245-1700
                    Zach.Pekelis@PacificaLawGroup.com
18
19  Videographer:
                    CATHY ZAK
20                  BUELL REALTIME REPORTING
                    1325 Fourth Avenue, Suite 1840
21                  Seattle, WA 98101
                    (206) 287-9066
22                  Info@buellrealtime.com

23                   *   *   *   *   *

24

25
```

Ex. 1_Echeverria Decl.
Page 5
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 4

```
 1                        EXAMINATION INDEX

 2     EXAMINATION BY:                    PAGE

 3     Mr. Wilson                        6

 4     Mr. Pekelis                       85

 5     Mr. Williamson                    103

 6

 7                         EXHIBIT INDEX

 8     EXHIBIT     DESCRIPTION                        PAGE

 9     EXHIBIT 27   Declaration of Stephen Helsley.   12

10     EXHIBIT 28   Declaration of Massad Ayoob in    67
                    Support of Plaintiffs' Motion
11                  For Preliminary Injunction;
                    Exhibits A-C.
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Ex. 1_Echeverria Decl.
Page 6
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

                                                                               Page 5

1       El Dorado Hills, California; Thursday, January 19, 2023

2                           1:49 p.m.

3                            -o0o-

4

5               THE VIDEOGRAPHER:  Good afternoon.

6           This is the deposition of Stephen Helsley in

7    the matter of Oregon Firearms Federation, Inc. et al.

8    v. Brown et al., Case Numbers 2:22-cv-01815-IM,

9    3:22-cv-01859-IM, 3:22-cv-01862-IM, and

10   3:22-CV-01869-IM in the United States District Court

11   for the District of Oregon and was noticed by Markowitz

12   Herbold.

13          The time now is approximately 1:50 p.m. on

14   this 19th day of January 2023, and we are convening via

15   Buell virtual depositions.

16          My name is Cathy Zak from Buell Realtime

17   Reporting, LLC, located at 1325 4th Avenue, Suite 1840,

18   in Seattle, Washington 98101.

19          Will counsel please identify themselves for

20   the record.

21              MR. WILSON:  Harry Wilson, special

22   assistant Attorney General for the state of Oregon for

23   defendants.

24              MR. WILLIAMSON:  Leonard Williamson for

25   plaintiffs OFF here in Oregon.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 6

1           MR. PEKELIS:  Zach Pekelis for intervenor

2      defendant Oregon Alliance for Gun Safety, and I'm in

3      Seattle, Washington.

4           THE WITNESS:  And Steve Helsley, witness.

5           THE VIDEOGRAPHER:  Thank you.

6      The court reporter may now swear in the

7      witness.

8           THE COURT REPORTER:  Can I please get a

9      stipulation from counsel to swear in the witness, as

10     I'm a Washington State court reporter and notary, and

11     the witness is in California?

12          MR. WILSON:  So stipulated.

13          MR. WILLIAMSON:  So stipulated.

14          MR. PEKELIS:  Same.

15

16               STEPHEN C. HELSLEY,

17     Having been first duly sworn by the

18     Certified Court Reporter, was deposed as follows:

19

20               EXAMINATION

21     BY MR. WILSON:

22     Q.  Good afternoon, Mr. Helsley.  My name is Harry

23     Wilson.  As you just heard, I am an attorney for the

24     state of Oregon.

25          Could we begin today by having you state your

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 7

1   full name for the record?

2       A.  Yes.  It's Steven, S-T-E-P-H-E-N; Craig,

3   C-R-A-I-G; Helsley, H-E-L-S-L-E-Y.

4       Q.  Mr. Helsley, do you understand that the oath

5   that you just took is the same oath that you would take

6   if we were in a courtroom?

7       A.  I do.

8       Q.  Do you understand that this deposition is

9   being transcribed by a court reporter?

10      A.  I do.

11      Q.  And do you also understand that this

12  deposition is being recorded by audio and video?

13      A.  I do.

14      Q.  Do you understand that we may be able to

15  playback that video or read from the transcript at a

16  hearing or a trial on this matter?

17      A.  I do.

18      Q.  Okay.

19          This afternoon I'm going to ask you a series

20  of questions in this deposition.  And unless you tell

21  me that you don't understand my question, I will assume

22  that you've understood it.

23          Does that make sense?

24      A.  It does.

25      Q.  Mr. Helsley, is there anything that would

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 8

1    prevent you from thinking clearly today?

2        A.   No.

3        Q.   Is there anything that would prevent you from

4    testifying truthfully today?

5        A.   No.

6        Q.   As we go through the questions, please feel

7    free to -- if there comes a point, you know, in the

8    next few hours that you would like to take a break,

9    just let me know, and I would be happy to go off the

10   record and do that.  Just so you know, if there's a

11   question pending, I will ask that you answer that

12   question before we take the break.

13           Make sense?

14       A.   I understand.

15       Q.   Okay.

16           Mr. Helsley, is it correct that presently you

17   are a retired peace officer from the California

18   Department of Justice?

19       A.   That is correct.

20       Q.   And about how many years did you serve as a

21   peace officer for the California Department of Justice?

22       A.   26 years.

23       Q.   Did you serve exclusively within the state of

24   California?

25       A.   I did.

Ex. 1_Echeverria Decl.
Page 10
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 65

1          The time is 3:42 p.m.

2    BY MR. WILSON:

3          Q.  Welcome back, Mr. Helsley.

4          So I'm still on your report.  At this time, I

5    would like to take a look -- go to page 13.

6          A.  Got it.

7          Q.  And in the middle of that page, there's a

8    number 2, and then it says in italics "Limiting the

9    law-abiding citizen to a magazine of ten rounds limits

10   their ability

11   to protect themselves from violent criminals in certain

12   situations.  Such limits on magazine capacity are

13   likely to impair the ability of citizens to engage in

14   lawful self-defense in those crime incidents

15   necessitating that the victim fire many rounds to stop

16   the aggressive actions of offenders, while having

17   negligible impact on the ability of criminals to carry

18   out violent crimes."

19          Mr. Helsley, did you write that sentence --

20   those two sentences yourself?

21          A.  As best I can recall, I did.

22          Q.  And then there follows on, after that 2,

23   page 14 through to page 15, a number of paragraphs

24   discussing the use of firearms in self-defense

25   situations.

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 66

1      Did you write those paragraphs yourself?

2      A.  Let me see the -- the paragraphs on page 14?

3      Q.  Yes.

4      A.  Well, if I didn't write something, I would

5   have put quotes on it and attributed it, so I don't --

6   I don't remember this specifically.  But again, if --

7   if it's not mine, I would have quoted it.

8           MR. WILSON:  I'd like to introduce an

9   exhibit now.  And I'll put it in the chat.  I'm also

10  going to email it around.

11          Leonard, I don't have the witness's email

12  address, and I'm just going to send it to you.  And so

13  after I hit send here, maybe we can go off the record

14  for a minute while we work on getting that exhibit on

15  screen?

16          So I'm hitting send now.

17          THE VIDEOGRAPHER:  Would you like to go

18  off the record now?

19          MR. WILSON:  And, yes, let's go off the

20  record.  Thank you.

21          THE VIDEOGRAPHER:  Going off the record.

22      The time is 3:45 p.m.

23          (Pause in the proceedings.)

24          THE VIDEOGRAPHER:  We are back on the

25  record.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                          Stephen C. Helsley

Page 67

1      The time is 3:52 p.m.

2    BY MR. WILSON:

3      Q.  Okay.

4      Mr. Helsley, we are marking what is

5    Exhibit 28, and I'll let the court reporter do that.

6         (Exhibit 28 marked for identification.)

7         THE COURT REPORTER:  Exhibit 28 has been

8    marked.

9    BY MR. WILSON:

10     Q.  And then Mr. Helsley, Exhibit 28 should be

11   what you are looking at in front of you on your phone.

12   And if you would just tell me, does the first

13   page appear to be a court document captioned

14   "Declaration of Massad Ayoob in Support of Plaintiff's

15   Motion for Preliminary Injunction Exhibits A through

16   C"?

17     A.  No.

18     Q.  What do you see?

19     A.  The document that I just opened up is, I

20   think, the same one that I got before.  It starts off

21   with Stephen J. Joncus, OSB Number 013072.

22     Q.  Okay.

23     I think -- I think you're probably looking at

24   your expert report.

25     A.  Yes, I am.  But that's the one I just -- that

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                Stephen C. Helsley

Page 68

1    I just -- oh, wait one minute.  No.  That's -- oh,

2    shame on me.  I didn't scroll down far enough.

3            Okay.  Now I've got it.

4        Q.  Okay.

5            So what you're looking at says "Declaration of

6    Massad Ayoob"?

7        A.  Correct.

8        Q.  Okay.

9            So that has been marked as Exhibit 28.

10           And then Exhibit 27 is your expert report.

11   And I'm going to put that on the Zoom screen, and I

12   just want you to confirm that that is, in fact, what

13   you see when I put it on the screen.  So give me just a

14   second.

15           Okay.  Do you see on the screen

16   "Declaration" --

17       A.  I do.

18       Q.  -- "of Stephen Helsley"?

19           Okay.

20       A.  Wait.

21           Yeah.

22           Oops.  Yes.

23       Q.  Great.  Okay.

24           So Mr. Helsley, we were just discussing

25   Section 2 of your report on page 13, and I'm scrolling

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 69

1    down to that.  And you'll see on the screen I'm just

2    putting some highlighting.

3        A.  Mm-hm.

4        Q.  Do you see that?

5        A.  Yes, I do.

6        Q.  Okay.

7            Is that the section from your report that we

8    just read?

9        A.  Yes, it is.

10       Q.  Okay.

11           Now Mr. Helsley, could you, on your phone, on

12   Exhibit 28, scroll to the second page of the

13   declaration of Massad Ayoob and look at the bottom of

14   that page, paragraph 5 at the very bottom, and tell me

15   when you get there.

16       A.  On what -- what page this is?

17       Q.  On page 2, paragraph 5.

18       A.  Page 2.  Page 2, paragraph -- got it.

19       Q.  So paragraph 5 of Exhibit 28 of Mr. Ayoob's

20   declaration states "Limiting the law-abiding citizen to

21   a magazine of ten rounds or less will clearly limit

22   their ability to protect themselves from violent

23   criminals in certain situations.  Such limits on

24   magazine capacity are likely to impair the ability of

25   citizens to engage in lawful self-defense in those

Ex. 1_Echeverria Decl.
Page 15
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 70

1    crime incidents, necessitating that

2    the victim fire many rounds in order to stop the

3    aggressive actions of offenders."

4          Mr. Helsley, would you agree that that

5    language in paragraph 5 of Mr. Ayoob's declaration is

6    nearly identical to the language in Section 2 of your

7    declaration?

8          A.  Let me see here.  "Limiting --" (witness

9    mumbling/reading.)

10         Yes.  It is for about the first half of it,

11   yes.

12         Q.  Mr. Helsley, do you know Mr. Ayoob?

13         A.  I do not.

14         Q.  Have you ever had a conversation with him?

15         A.  No.

16         Q.  Mr. Helsley, did you copy your language in

17   your expert report from Mr. Ayoob's report here in

18   front of you?

19         A.  I don't think so.  I certainly am not inclined

20   to do that sort of a thing.  I don't recall doing it.

21   I don't think I did it.

22         Q.  Mr. Helsley, if you look back to your

23   report -- and I'm going to scroll down here -- you'll

24   see that I'm going to highlight this paragraph that

25   begins "Likewise."

Ex. 1_Echeverria Decl.
Page 16
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 71

1      A.   Mm-hm.

2      Q.   That is a paragraph in your expert report;

3   correct?

4      A.   Let me see.

5           Yeah.

6      Q.   And then if you could, on Mr. Ayoob's report,

7   please scroll to page 8, paragraph 18.

8      A.   Page 8, paragraph 18.

9           Got it.

10      Q.   Okay.

11           So the paragraph in Exhibit 27, which is your

12   report, states "Likewise, the average homeowner who

13   keeps a defensive firearm is unlikely to have time to

14   gather spare ammunition or magazines."

15           In Mr. Ayoob's report, paragraph 18 states

16   "The homeowner who keeps a defensive firearm and is

17   awakened in the night by an intruder is most unlikely

18   to have time to gather spare ammunition."

19           And then both paragraphs continue on until the

20   end of the paragraph.

21           Would you agree that the language in these two

22   paragraphs is almost but not entirely identical?

23      A.   They're similar.

24      Q.   For example, in the paragraph in your report

25   you wrote "Ideally, one hand would be occupied with the

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 72

1    handgun and the other with a telephone to call police."

2          And in Mr. Ayoob's report, it states "Ideally,

3    one hand would be occupied with the handgun itself, and

4    the other, with a telephone to call the police."

5          Do you agree that those are nearly identical?

6       A.  Yes.

7       Q.  So I guess my same question.  Did you copy

8    your report from Mr. Ayoob's report?

9       A.  Well, I don't -- I don't know that I ever saw

10   his report.  Again, I'm not sure of the time sequence

11   as to when I prepared this, but I don't -- I don't know

12   him, and I don't -- I don't recall seeing a report from

13   him, but they're clearly similar.

14      Q.  Mr. Helsley, if you'd go to page 15 of

15   Mr. Ayoob's report.  And just to help you find it,

16   page 15 is Mr. Ayoob's signature page.

17      A.  Okay.  I'm getting there.

18          Yeah.

19      Q.  And do you see that it's dated May 19th, 2017?

20      A.  Yes.

21      Q.  Your report, in contrast, on page 17, it's

22   dated December 20th, 2022; is that correct?

23      A.  Yes.

24      Q.  Is it fair to say that you created your report

25   after Mr. Ayoob signed and filed this report?

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 73

1      A.  It seems like it, yes.

2      Q.  If you look at page 14 of your report, at the

3  top of the page, and I've scrolled to it here just so

4  you can see, beginning "The off-duty officer and the

5  private law-abiding citizen are thus unlikely to have

6  much, if any, spare ammunition on their person or

7  elsewhere readily accessible."

8          If you could also scroll to page 11 of

9  Mr. Ayoob's report, paragraph 27, please.

10     A.  Page 11.  Got it.

11     Q.  You'll see that paragraph 27 of Mr. Ayoob's

12  report also begins "The off-duty officer and the

13  law-abiding citizen alike are not likely to have that

14  volume of spare ammunition on their person or elsewhere

15  readily

16  accessible."

17          Would you agree that paragraph 27 of

18  Mr. Ayoob's report and the paragraph of your report

19  that begins "The off-duty officer" are nearly

20  identical?

21     A.  Yes.

22     Q.  I'm now looking at the paragraph beginning

23  "Criminals bent on causing harm" in your report.

24  That's paragraph 27.  And I'm on page 8, paragraph 20

25  of Mr. Ayoob's report.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 74

1          Would you please compare the first three

2    sentences of the paragraph in your report, and I'll

3    highlight them for you, to the sentences in paragraphs

4    20 and 21 in Mr. Ayoob's report?

5          Would you agree they are nearly identical?

6      A.  Yes.

7      Q.  The paragraph beginning "The virtuous citizen"

8    in your report appears to be nearly identical to the

9    paragraph beginning -- or the paragraph numbered Number

10   24 in Mr. Ayoob's report, which also begins with the

11   words "The virtuous citizen."

12         And it's my same question:  Are those

13   paragraphs nearly identical?

14     A.  Yes.

15     Q.  The paragraph beginning "Supporters of the

16   magazine capacity limitation" in your report appears to

17   be identical to the paragraph numbered paragraph 30 in

18   Mr. Ayoob's report.

19         Would you agree that those paragraphs are

20   nearly identical?

21     A.  Yes.

22     Q.  And then there's a paragraph that starts

23   "Finally, it's worth noting," in Exhibit 27, that's

24   your report.  And I ask that you compare that to

25   paragraph 11 of Mr. Ayoob's report and tell me whether

Ex. 1_Echeverria Decl.
Page 20
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 75

1   you believe that those paragraphs are nearly identical.

2        A.  You said 11 in his?

3        Q.  Mm-hm.  Yes.

4        A.  Paragraph 11.  Which paragraph is -- am I

5   comparing it with on the screen?

6        Q.  The paragraph beginning --

7        A.  "Finally"?

8        Q.  -- "Finally, it is worth noting."

9        A.  This 11 on my computer is "It is difficult to

10  say exactly."

11           So am I supposed to be on page 4?

12       Q.  Yes.  Page 4 of Exhibit 28, Mr. Ayoob's

13  report, paragraph 11, beginning "It is difficult to say

14  exactly."

15       A.  I just don't see it on my cell phone here.

16           My 11 says "It is difficult to say exactly how

17  many private citizens."

18           Oh, there -- okay.  There -- there it is.

19           "Finally..." (witness mumbling/reading.)

20           Yes.

21       Q.  Mr. Helsley, we've been discussing the

22  paragraphs in your report under Section 2, which began

23  with the italicized words "Limiting the law-abiding

24  citizen" and which began on page 13 and have run all

25  the way through page 15 of your report.

Ex. 1_Echeverria Decl.
Page 21
2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 76

1          When did you write these paragraphs?

2       A.   That's a -- that's a very good question.  I

3   don't know.

4          This was a document, I believe, that I'd

5   written in the main part for a California case, and

6   then I was requested to become involved in the Oregon

7   case.  And I just -- I -- I don't remember when it

8   was -- when I wrote it, primarily because the last

9   three or so years have been a blur because I've been

10  hospitalized and all sorts of surgeries and things.  I

11  just believe that I wrote this principally some years

12  ago, but I don't know when exactly I wrote it.

13      Q.   You mentioned that the -- in the last several

14  years that you've undergone some hospitalizations.  And

15  let me just say I'm sorry to hear that and I hope that

16  your health is improved and you feel like you're in

17  good shape.

18         My question is, is it -- is it possible that

19  during that period, you copied the words of Mr. Ayoob

20  at some point, and they have now been submitted as part

21  of your report, but they are not, in fact, your

22  original opinion and work?

23      A.   Well, I -- I would have written it before I

24  had the medical problems like in the area of, you know,

25  2017.  But I'm just saying I can't -- some of this

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 77

1    stuff is a blur.

2              I know that these things represent my

3    opinions.  I've just never copied the works of other

4    folks.  It's certainly -- there's certainly a strong

5    comparison.  But I don't think when I wrote it because

6    I don't remember the sequence of events, because the --

7    the attorney that I worked with in California, I've

8    done a lot of work there.  And the attorney here asked

9    permission of them to use some of the work that I had

10   done, and I updated it, I thought.  But beyond that, I

11   just can't say.

12              MR. WILLIAMSON:  Counsel?

13              MR. WILSON:  Go ahead.

14              MR. WILLIAMSON:  Yeah.  Can we go off the

15   record for a moment?

16              MR. WILSON:  Sure.

17              THE VIDEOGRAPHER:  Going off the record.

18        The time is 4:12 p.m.

19              (Pause in the proceedings.)

20              THE VIDEOGRAPHER:  We are back on the

21   record.

22        The time is 4:15 p.m.

23              MR. WILSON:  Mr. Williamson, would you

24   like to make a statement on the record?

25              MR. WILLIAMSON:  Yes.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 78

1        So as I've been listening to the direct

2   examination of Mr. Helsley, it occurred to me in

3   looking at the Exhibit 1, Helsley Exhibit 1, as counsel

4   scrolled through it, it looked unfamiliar to me in

5   certain sections of it that I specifically discussed

6   with Mr. Helsley on the phone and then updated and

7   changed and sent the approved exhibit to my support

8   staff to attest his declaration and final filing with

9   the court.

10       And I'm looking back at my email from December

11  29th to my legal assistant with the updated exhibit

12  attached to it.  I've compared it to the one that's

13  filed with the court and attached to his declaration,

14  and it's the wrong one.  It simply looks like a copy of

15  the one that was filed in the California case in 2017.

16            MR. WILSON:  Okay.

17  BY MR. WILSON:

18      Q.  With that statement made by Mr. Waters,

19  Mr. Helsley, I'm going to follow up with a couple

20  questions.  Okay?

21      A.  Very good.

22      Q.  First of all, your lawyer has just made a

23  statement on the record that he believes that the wrong

24  exhibit may have been filed in this case.

25            The document that we have on the screen, which

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                     Stephen C. Helsley

Page 79

1   is Exhibit 27, and I'm scrolling to the top here, is

2   titled "Expert Witness Report of Steven Helsley, Oregon

3   Firearms Federation, Inc., et al., v. Brown et al."

4           Earlier we talked about whether this was a

5   report you believe that you created.

6           Do you still believe that this is a report

7   that you created and you wrote?

8       A.  Correct.

9       Q.  And then at the -- I'm scrolling down to the

10  end of it.  You'll see this is on page 17 of

11  Exhibit 27.  It's dated December 20th, 2022.  There's a

12  signature.

13          And as we discussed earlier, that is your

14  signature; correct?

15      A.  Correct.

16      Q.  Do you have a recollection of executing this

17  report on December 20th, 2020?

18      A.  I have a recollection of the January 2nd

19  because something was emailed to me on the 30th or

20  29th, and I couldn't get to it.  And then we had to

21  change the date because it had rolled over to '23.  I

22  remember that.

23          The reason that I don't remember specifically

24  is because I've had a number of these California,

25  Washington DC, Oregon, where I've been sending things

BUELL REALTIME REPORTING, LLC
206.287.9066  I  800.846.6989

2d2d2168-0c87-408d-8a37-17183014be83

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 80

1    back and forth, and I don't remember this specifically.

2       Q.  Before you append your signature to a document

3    to be filed in court, do you review that document

4    carefully?

5       A.  Yes.  And I had reviewed this one.  I wasn't

6    clear as to what the relevance was to this case because

7    I had written the first part of this, and

8    Mr. Williamson and I had discussed that.

9          And then it seemed to me that all of a sudden,

10   the second half appeared.  And I just assumed that, you

11   know, everybody knew what they were doing and that was

12   supposed to be part of the package.

13      Q.  So is it your testimony that you did not

14   review the second half of the report to confirm that it

15   was your own work?

16      A.  No, no.  It -- I didn't know whether the

17   second half of the report was something that was going

18   to be -- that was relevant to this case.

19      Q.  So is it your testimony that the second half

20   of the report -- and I think when we say "second half

21   of the report," what we mean is Exhibit Helsley-1 --

22   that you are referring to the portion that begins on

23   page 9; correct?

24      A.  Yes.

25      Q.  Does it remain your testimony that the second

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 81

1   half of the report is entirely your own work?

2       A.  Best I can recall, yes.

3       Q.  And do you have -- can you account for why it

4   is that many of the paragraphs in this report appear to

5   be identical or nearly identical to paragraphs in

6   Mr. Ayoob's report?

7       A.  I cannot.

8       Q.  Given the similarity between the paragraphs in

9   Mr. Ayoob's declaration and in your report, can you say

10  confidently that the court can fairly rely on your

11  expert work in -- what you've submitted here as your

12  own product?

13      A.  When you say what I've submitted here, you're

14  now referring to Part 1 and Part 2?

15      Q.  Why don't I withdraw that question and try to

16  ask it in a better way.

17          Mr. Helsley, can you say with confidence that

18  the portion of your expert report beginning on page 9

19  and continuing on through the end is your work with

20  enough confidence to ask the court to rely on it?

21      A.  Well, if the -- if the issue is the content, I

22  clearly agree on the content.

23          If your question is solely about did I author

24  it, content aside, well, you know, as best I can

25  recall, I did.  But if I wrote this, which I think I

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 82

1   did, it was years ago, I think.  I think this was -- I

2   think this was, for the most part, written probably in

3   2017.

4        Q.  So you can't remember exactly when it was you

5   created this second portion of your report?

6        A.  I can remember -- no.  Well, the second

7   portion being Part 1, as I see it, yeah, I remember

8   that specifically because Mr. Williamson and I

9   discussed that because I was on a very short timeline

10  to produce that because I got pulled into this, I want

11  to say, mid-December, and it's -- I think this may have

12  been -- the second half now that we're comparing with

13  what Massad did, this may have been something to do

14  with the Duncan case.  And if it is, then I've already

15  been deposed extensively on that report.

16       Q.  I just want to kind of make sure I fully

17  understand what we've talked about over the last few

18  minutes.

19          Is it your testimony that you are not entirely

20  confident that you are the original author of portions

21  of your report beginning on page 9, which is on the

22  screen in front of you, and continuing to the end?

23       A.  Well, as to confidence, I can't say because I

24  just don't remember.  Again, I think this was written

25  some time ago.  It's probably why I don't remember it.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 83

1      But it's just not my style to copy things

2  without attributing them.  And I just -- I don't know.

3  I don't think so.

4      Q.  So you don't know -- you don't know for sure,

5  but you don't think so?

6      A.  Correct.

7      I don't know for sure because I simply don't

8  remember.  It's too long ago.

9      Q.  Mr. Helsley, when was the last time you went

10  to The SHOT Show?

11      A.  Went where?

12      Q.  The SHOT Show.

13      A.  Probably, oh, 15 years ago.

14      Q.  Gotcha.

15      And when was the last time you saw Andrei

16  Ugarov in person?

17      A.  I saw him -- I saw him in 2011 or '12 in

18  person.  And then I saw him, I think, in 2015.

19      Q.  Did you see him when you were in Russia in

20  2020?

21      A.  Yes.  I stayed with him at his house.

22      Q.  So you saw him in 2020.  Is that --

23      A.  Oh, no.  No, no.  I saw him -- I stayed with

24  him, I believe it was, in 2009 or '10 at his home in

25  Moscow.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen C. Helsley

Page 84

1      Q.  Where did you stay in Russia in 2020?

2      A.  I wasn't there that year.  I was there in '17

3   and, I believe, in '10.

4      Q.  Okay.  I'm sorry.  I must have written

5   something down wrong.

6          I understand you took an anniversary trip one

7   year?

8      A.  Yes, in '17.

9      Q.  In '17.  Okay.

10          Where did you stay in 2017?

11      A.  We were on a cruise, and so we -- we stayed on

12   the ship, and then we, you know, got on a bus and

13   toured around.

14          MR. WILSON:  Okay.  I have no further

15   questions at this time.  We -- the state -- the

16   defendants will want to keep this deposition open

17   pending any changes that are made to the declaration.

18   Of course, we reserve all rights to challenge,

19   depending on what gets filed and what gets done.

20   Thanks.

21          THE COURT REPORTER:  Any questions from

22   other counsel?

23          MR. PEKELIS:  Yeah.  I have some

24   questions.

25          And Mr. Helsley, my name is --

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

Page 85

1      Can we take the declaration down?

2              MR. WILSON:  Yeah.  Just a second, and I

3  will do that.

4

5                      EXAMINATION

6  BY MR. PEKELIS:

7      Q.  Good afternoon, Mr. Helsley.  My name is Zach

8  Pekelis, and I'm the attorney for intervenor defendant

9  Oregon Alliance For Gun Safety in this case.

10             And given the uncertainties about your report

11  and what the correct version is, I'm not going to ask

12  you about that at all, and we're just going to wait

13  until we have whatever the intended correct final

14  version of it is.  And like defendants, we'll reserve

15  the right to reopen or keep open the deposition.

16             All the ground rules and principles that were

17  discussed by defendant's counsel earlier today,

18  Mr. Wilson, still apply.

19             Does that make sense?

20      A.  Yes.

21      Q.  What did you do to prepare for today's

22  deposition?

23      A.  Nothing in particular.

24      Q.  So I take it you did not read the declaration

25  that you submitted in this case before today's

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen C. Helsley

                                                               Page 106

1                          C E R T I F I C A T E

2

3    STATE OF WASHINGTON

4    COUNTY OF PIERCE

5

6         I, Tia Reidt, a Certified Court Reporter in and

7    for the State of Washington, do hereby certify that the

8    foregoing transcript of the deposition of STEPHEN C.

9    HELSLEY, having been duly sworn, on January 19, 2023, is

10   true and accurate to the best of my knowledge, skill and

11   ability.

12        IN WITNESS WHEREOF, I have hereunto set my hand

13   and seal this 26th day of January, 2023.

14

15

16        _____

17        /S/ Tia B. Reidt
          Tia B. Reidt, RPR, CSR Oregon #22-0001
18        NOTARY PUBLIC, State of
          Washington.
19        My commission expires
          5/15/2026.

20

21

22

23

24

25

# EXHIBIT 18

# Deposition of Stephen Helsley - Vol. II

# Oregon Firearms Federation, Inc., et al. v. Brown, et al.

# January 30, 2023



**206.287.9066 I 800.846.6989**
**1325 Fourth Avenue, Suite 1840, Seattle, Washington 98101**
**www.buellrealtime.com**
email: info@buellrealtime.com



Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 107

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

_____

OREGON FIREARMS FEDERATION,     )
INC., et al.,                   )
                                )
          Plaintiffs,           )     Case Nos.
                                )     2:22-cv-01815-IM
   vs.                          )     3:22-cv-01859-IM
                                )     3:22-cv-01862-IM
KATE BROWN, et al.,             )     3:22-cv-01869-IM
                                )
          Defendants.           )
_____ )
MARK FITZ, et al.,              )     VIDEO-RECORDED
                                )     VIDEOCONFERENCE
          Plaintiffs,           )     DEPOSITION OF
                                )     STEPHEN HELSLEY,
   vs.                          )     VOLUME II
                                )
ELLEN F. ROSENBLUM, et al.,     )
                                )
          Defendants.           )
_____ )     *CAPTION
KATERINA B. EYRE, et al.,       )      CONTINUES*
                                )
          Plaintiffs,           )
                                )
   vs.                          )
                                )
ELLEN F. ROSENBLUM, et al.,     )
                                )
          Defendants.           )
_____


DATE TAKEN:   JANUARY 30, 2023

REPORTED BY:  LORRIE R. CHINN, RPR,
Washington Certified Court Reporter No. 1902
Oregon Certified Court Reporter No. 97-0337

BUELL REALTIME REPORTING, LLC
206.287.9066  |  800.846.6989

Ex. 2_Echeverria Decl.
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 108

1   DANIEL AZZOPARDI, et al.,      )
                                   )
2              Plaintiffs,         )
                                   )
3      vs.                         )
                                   )
4   ELLEN F. ROSENBLUM, et         )
    al.,                           )
5              Defendants.         )
                                   )
6

7

8   _____

9           VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION

10                            OF

11                     STEPHEN HELSLEY
                         VOLUME II

12  _____

13                       10:06 a.m.

14

15             EL DORADO HILLS, CALIFORNIA

16     (All participants appeared via videoconference.)

17

18

19

20

21

22

23

24

25

Ex. 2_Echeverria Decl.
Page 36
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 109

```
 1            R E M O T E   A P P E A R A N C E S

 2

 3    FOR THE OFF PLAINTIFFS (via videoconference):

 4            LEONARD W. WILLIAMSON
              Van Ness, Williamson, LLP
 5            960 Liberty Street, Suite 100
              Salem, Oregon 97302
 6            503.365.8800
              l.williamson@vwllp.com
 7

 8    FOR THE DEFENDANTS (via videoconference):

 9            HARRY B. WILSON
              Markowitz Herbold, PC
10            1455 SW Broadway, Suite 1900
              Portland, Oregon 97201-3412
11            503.295.3085
              harrywilson@markowitzherbold.com
12

13    FOR THE PROPOSED INTERVENOR-DEFENDANT OREGON ALLIANCE

14    FOR GUN SAFETY:

15            ZACHARY J. PEKELIS
              Pacifica Law Group, LLP
16            1191 Second Avenue, Suite 2000
              Seattle, Washington 98101-3404
17            206.245.1700
              zach.pekelis@pacificalawgroup.com
18

19    ALSO PRESENT (via videoconference):

20            MELODY SORENSEN, VIDEOGRAPHER

21

22

23

24

25
```

Ex. 2_Echeverria Decl.
Page 37
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 110

1          VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION
               OF STEPHEN HELSLEY, VOLUME II
2
                     EXAMINATION INDEX
3

4    EXAMINATION BY:                              PAGE

5    Mr. Pekelis                                   112

6    Mr. Wilson                                    159

7    Mr. Williamson                                163

8    Mr. Pekelis                                   166

9

10                    EXHIBIT INDEX

11   EXHIBITS FOR IDENTIFICATION                  PAGE

12   Exhibit 51    Corrected Declaration of Stephen   115
                   Helsley
13
     Exhibit 52    Declaration of Stephen Helsley in  125
14                 Support of Plaintiffs'
                   Supplemental Brief; Exhibit 10 -
15                 Duncan vs. Becerra

16   Exhibit 53    Top 10 Most Audacious Shootouts in  144
                   US History
17

18

19

20

21

22

23

24

25

Ex. 2_Echeverria Decl.
Page 38
eca924fc-a9ca-4c74-bbda-8156300a7993

Page 111

```
1              EL DORADO HILLS, CALIFORNIA; JANUARY 30, 2023

2                          10:06 a.m.

3                          --oOo--

4

5              THE VIDEOGRAPHER:  We are now on the

6    record.  This is Volume 2 of the virtual video-recorded

7    deposition of Stephen Helsley in the matter of Oregon

8    Firearms Federation, Inc., et al., versus Brown, et

9    al., in the United States District Court, District of

10   Oregon, Portland Division.  The case numbers are

11   2:22-cv-01815-IM, 3:22-cv-01859-IM, 3:22-cv-01862-IM,

12   and 3:22-cv-01869-IM.

13             The time is now approximately 10:06 a.m. on

14   January 30th, 2023.  My name is Melody Sorensen from

15   Buell Realtime Reporting.  Will counsel please identify

16   themselves for the record.

17                  MR. PEKELIS:  Zachary Pekelis --

18                  MR. WILLIAMSON:  Leonard Williamson

19   representing OFF Plaintiffs.

20                  MR. WILSON:  Harry Wilson, special

21   assistant attorney general, for Defendants.

22                  MR. PEKELIS:  Zachary Pekelis for

23   Intervenor-Defendant, Oregon Alliance For Gun Safety.

24                  THE VIDEOGRAPHER:  The court reporter

25   today is Lorrie Chinn, who will now swear in the
```

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 112

1   witness.

2

3   STEPHEN HELSLEY,      witness herein, having been first

4                        duly sworn under oath, was

5                        examined and testified as follows:

6

7                  E X A M I N A T I O N

8   BY MR. PEKELIS:

9       Q.  Mr. Helsley, good morning again.

10      A.  Good morning.

11      Q.  Nice to see you.  We met last week at your

12  deposition on January 19th, 2023.  Do you remember

13  that?

14      A.  Yes.

15      Q.  And this is a continuation or a reopening of

16  your deposition in the same case.  Do you understand

17  that?

18      A.  Yes.

19      Q.  So the same guidelines and rules that

20  Mr. Wilson went over at your deposition on January 19th

21  still apply.  Does that make sense to you?

22      A.  I understand.

23      Q.  And I'll just go over a couple of those that I

24  think are the most important.  Especially given that

25  this is taking place over Zoom, it's important to make

Ex. 2_Echeverria Decl.
Page 40
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 113

1    sure that I've finished asking my questions before you

2    begin your answer.  So leave a little bit of a pause

3    perhaps.  Does that sound good?

4         A.  Yes.

5         Q.  And then you understand the oath that you took

6    today?

7         A.  Say again.

8         Q.  Do you understand the oath that you took

9    today?

10        A.  Yes.

11        Q.  And is there anything that might prevent you

12   from understanding my questions and answering them

13   truthfully?

14        A.  No.

15        Q.  Okay.  What did you do to prepare for today's

16   deposition?

17        A.  Well, I read a variety of documents that were

18   emailed to me.  I had to go through and find the errors

19   in the transcript from the first hearing.  That's what

20   I spent a great deal of time doing.

21        Q.  Anything else that you did in preparation?

22        A.  No.

23        Q.  And what were the documents that were emailed

24   to you that you mentioned, besides the transcript of

25   the January 19th deposition?

Ex. 2_Echeverria Decl.
Page 41
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 114

1    A.  I think I'd defer to Mr. Williamson on that

2    because his office shipped me a whole variety of

3    things, and I don't know that I can recall them all.

4    Q.  Can you recall any of them?

5    A.  Yeah.  It was essentially the same thing that

6    I've seen before:  My resume, my statements in this

7    case, the documents I wrote for it, and there was

8    material in there regarding the Duncan case in

9    California.

10   Q.  Would that be your declaration that you

11   submitted in the Duncan case?

12   A.  I'm sorry.  You have to speak up.  I can't --

13   Q.  Would that be your declaration that you

14   submitted in the Duncan case?

15   A.  Yeah.  I don't know whether the declaration

16   was there.  I know that I was deposed, and I saw the

17   transcript for being deposed in that case.

18   Q.  I see.  How about your declaration in that

19   case, did you review that?

20   A.  There was -- there was too much material for

21   me to read.  I got it at about 8 o'clock this morning,

22   and so I don't know what all is there because I

23   couldn't get through it all.

24   Q.  Understood.  Anything else that you did to

25   prepare for today's deposition?

Ex. 2_Echeverria Decl.
Page 42
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                                    Stephen Helsley - Vol. II

Page 156

1   and people who are particularly good at it can do a

2   magazine change in probably less than a second.

3        Q.   What would you say that the average range is

4   in terms of time to change a magazine?

5        A.   Well, it depends on how you carry it, you

6   know, is it in your pocket or is it in a magazine pouch

7   on your belt?  Are you wearing a coat over the top of

8   the magazine?

9        Q.   How about just from the time that the magazine

10  is in your hand, the new magazine is in your hand?

11       A.   Okay.  It depends a little bit on how the

12  magazine release works.  Some of the older pistols had

13  a -- like the Walther P38, for instance, had a thing

14  that you had to push to clear the way for the magazine

15  to go into the frame.

16       Q.   How about for a modern handgun?

17       A.   Modern -- if the magazine has been -- the

18  empty magazine has been released from the firearm and

19  you have a magazine in your hand and you're slamming it

20  home, again, if you're well trained, in the second

21  range.

22       Q.   And how about if your training is merely

23  average?

24       A.   Well, then it can be more substantial because

25  you're not familiar with how it should be done.  You

Ex. 2_Echeverria Decl.
Page 43
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 157

1    may have to look to make sure the magazine fits into

2    the magazine well in the firearm.  It could be three

3    seconds, four seconds to do it.

4        Q.  Okay.  Would you say that the stress of an

5    actual firearm confrontation could make that changing a

6    magazine take longer?

7        A.  Yes.

8        Q.  When an armed attacker pauses to reload, would

9    you agree that it can provide an opportunity for

10   victims to flee or attempt to disarm him?

11       A.  In theory, yes.  Again, the magazine change

12   can happen so quickly, depending on the shooter's

13   skill, that it's almost invisible.  So, yeah, I mean,

14   it's possible that citizens could attack a shooter who

15   is doing a magazine change.  I suppose it's happened,

16   but it's pretty unlikely.

17       Q.  Understood.  The last thing I wanted to ask

18   you about, in your January 19th deposition, Mr. Wilson

19   showed you the declaration from Massad Ayoob.  Do you

20   recall that?

21       A.  Yes.

22       Q.  And we saw that several portions of your

23   expert report were identical to Mr. Ayoob's declaration

24   in Duncan.  Do you recall that?

25       A.  I do.

Ex. 2_Echeverria Decl.
Page 44
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 158

1      Q.  And I noticed that the material in your

2  corrected declaration, Exhibit 51, is the same.  It

3  hasn't been changed and it's still identical in certain

4  respects to Ayoob's declaration.  Do you have any

5  further light to shed on why there were those

6  similarities and overlap between your declaration and

7  Mr. Ayoob's?

8      A.  I certainly wish I had some because it's been

9  a source of pretty substantial anxiety for me since --

10 during the last week.  But, no, I don't.  I said before

11 I just don't remember.  I don't recall.  I don't know

12 how it could have gotten there.  I don't know that --

13 yeah.  I'm puzzled.  I just don't know.

14     Q.  Is it possible that maybe some of the

15 attorneys in the Duncan case who were assisting you

16 with the preparation of your declaration may have

17 inserted some of the language from Ayoob's declaration

18 without telling you?

19     A.  I don't think so.

20     Q.  Okay.  I don't have any other questions.

21 Thank you for your time, Mr. Helsley.

22     A.  You bet.

23

24

25                              '

Ex. 2_Echeverria Decl.
Page 45
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 159

1                        E X A M I N A T I O N

2      BY MR. WILSON:

3          Q.   Good morning, Mr. Helsley.  This is Harry

4      Wilson.  We spoke a week or so ago as well.  And I am

5      an attorney and the special assistant attorney general

6      representing the Defendants in this matter.

7               Do you remember our conversation last

8      January 19th?

9          A.   I do.

10         Q.   I have just a few brief questions.

11     Mr. Pekelis just asked you about the conversation you

12     and I had with respect to the portions of your original

13     declaration in this matter that appeared to be

14     identical to the declaration of a Mr. Massad Ayoob from

15     2017.

16               Since that time you've submitted a corrected

17     declaration, and that corrected declaration has been

18     listed as Exhibit 51, correct?

19         A.   Correct.

20         Q.   As Mr. Pekelis just pointed out, the corrected

21     declaration does not appear to change any of the

22     material you and I discussed that seemed to be

23     identical to the declaration of Mr. Ayoob, correct?

24         A.   Correct.

25         Q.   And since the time you and I last talked on

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 160

1    January 19th, 2023, have you had any conversations with

2    Mr. Ayoob about why your expert report is similar to

3    his expert declaration?

4        A.   No.  I don't know him.  I've never spoken to

5    him.

6        Q.   One thing I just wanted to quickly check is

7    that Mr. Pekelis put on the screen Exhibit 52.  And if

8    the videographer and the court reporter could put that

9    back up on the screen for just one moment.

10        Great.  Thank you.  And please scroll to what

11   is listed as page 20 -- oh, I'm terribly sorry.  I said

12   the wrong number.  I'm looking for Exhibit 52, not 50

13   -- is this 52?  Yes, it is.  I'm sorry.  So please keep

14   scrolling down.

15            THE VIDEOGRAPHER:  (Scrolling).

16        Q.   And I would like to scroll to the signature

17   page of this document.  So, Mr. Helsley, you signed

18   this Exhibit 52, this expert report, on October 6th,

19   2017, correct?

20        A.   Correct.

21        Q.   And do you remember the date that the

22   declaration of Massad Ayoob was signed?

23        A.   Oh, I have no idea.

24        Q.   And we discussed it during the deposition we

25   had last January 19th.  And to refresh your

Ex. 2_Echeverria Decl.
Page 47
eca924fc-a9ca-4c74-bbda-8156300a7993

Page 161

1  recollection, I'll represent to you that we discussed

2  that his declaration was signed on May 19th of 2017.

3  Does that sound familiar to you?

4       A.  Well, not really, but I'll take your word for

5  it.

6       Q.  Why don't I just send it to you.  I'm going to

7  send it to Leonard and to -- Lorrie, I'll send this to

8  you as well.

9            THE REPORTER:  Thank you.

10            MR. PEKELIS:  Harry, can I just

11  interject?  It is already marked as an exhibit.  I

12  don't know if you plan to use 28, which is already

13  marked.

14            MR. WILSON:  Yes.  This is Exhibit 28.

15  And if everyone already has it, that's the one I'm

16  going to refer to.

17            THE VIDEOGRAPHER:  So do you want me to

18  stop sharing this one?

19            MR. WILSON:  Yes, please.  And, Melody,

20  I don't have your email address, but I'm looking to

21  place on the screen Exhibit 28.  Do you need that?

22            THE VIDEOGRAPHER:  Yes.  It's

23  happymel45@hotmail.com.

24       Q.  BY MR. WILSON:  So, Mr. Helsley, those

25  documents are circulating now to the videographer and

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 162

1    the court reporter, so give me just a moment.

2              MR. PEKELIS:  I sent one out as well,

3    and mine actually has the exhibit sticker on it.  I

4    don't know if you want to use that.

5              MR. WILSON:  Great.

6              THE VIDEOGRAPHER:  I did get that.  I

7    got that one, so...

8              MR. WILSON:  Why don't we use that one.

9    And if you could scroll to page 15 of Exhibit 28.

10             THE VIDEOGRAPHER:  Just a second.

11   Sorry.

12             MR. WILSON:  That's okay.

13             THE VIDEOGRAPHER:  (Scrolling).  Just a

14   minute.

15        Q.  BY MR. WILSON:  Okay.  Great.  So,

16   Mr. Helsley, does this refresh your recollection that

17   Mr. Ayoob's declaration was signed on May 19th of 2017?

18        A.  Yes.

19        Q.  And so is it correct to say that your

20   declaration in the Duncan matter -- your expert report

21   in the Duncan matter, which was signed on October 6th

22   of 2017, was signed after Mr. Ayoob submitted his

23   declaration on May 19th of 2017?

24        A.  Yes.

25        Q.  Okay.  I don't have any further questions.

Ex. 2_Echeverria Decl.
Page 49
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 163

1          THE VIDEOGRAPHER:  Do you have any

2    further questions, Mr. Pekelis?

3          MR. PEKELIS:  No, I don't.

4          THE VIDEOGRAPHER:  Mr. Williamson, any

5    questions?

6          MR. WILLIAMSON:  Yes, I do have some

7    follow-up questions.  Thank you.

8

9              E X A M I N A T I O N

10   BY MR. WILLIAMSON:

11      Q.  If we could bring up Exhibit 53, please.

12   Mr. Helsley, you indicated you didn't know who

13   FlameHorse was; is that correct?

14      A.  Correct.

15      Q.  Could the videographer hover above the word

16   FlameHorse?  And could you click on the word

17   FlameHorse?  And could you scroll about halfway down

18   there?  Pause right there, please.  Do you see where it

19   says who is behind the Listverse?  On the left-hand

20   side of the left column do you see where it says who is

21   behind the Listverse, Mr. Helsley?

22      A.  Yeah, Jamie Frater.

23      Q.  Do you know that person?

24      A.  I do not.

25      Q.  Is that the person you attributed the material

Ex. 2_Echeverria Decl.
Page 50
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

                                                                    Page 164

1    to originally?

2          A.  Yes.

3          Q.  Okay.  And counsel asked you if you had ever

4    treated a gunshot wound.  Do you remember that

5    question?

6          A.  Correct.

7          Q.  When you were shot, did you treat yourself?

8          A.  No.

9          Q.  You didn't administer any first aid to

10   yourself?

11         A.  I'm sorry.  You're a little bit garbled.

12         Q.  Sure.  The question is, did you attempt to

13   administer any first aid to yourself?

14         A.  I still can't get what you're saying.

15         Q.  The question is, when you were shot, did you

16   attempt to administer any first aid to yourself?

17         A.  No.

18         Q.  Okay.  Do you recall last week on the 19th the

19   confusion around the originally dated report -- expert

20   report dated December 20 and the report that you

21   approved as dated December 29?  Do you remember that

22   confusion?

23         A.  Do I recall the confusion?

24         Q.  Yes.

25         A.  Yes, I do.

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 165

1    Q.   Do you recall contributing or making or

2    directing the changes to the report that ended up being

3    the final one dated December 29th?

4    A.   Yes.  In particular it was the additional

5    articles I had written.

6    Q.   In addition to the articles, you mean

7    additional insertions of Measure 114; is that correct?

8    A.   Yeah.

9    Q.   Between December 29 when that was dated and

10   when the declaration was resubmitted last week with the

11   correct report, did you direct any additional changes

12   to occur to your expert report?

13   A.   There was a lot of back and forth, but I can't

14   recall directing any changes.  If they were, they were

15   so minor that I don't -- you know, I don't recall them.

16   Q.   Okay.  If I'm following the exhibits here

17   correctly, Exhibit 51 is the corrected declaration.

18   Could the videographer pull that up and then go down to

19   page 23, please?  Not page 23 of the -- yeah, page 23

20   at the top there.  Right there.  Scroll down to about

21   the middle of the page.  There you go.

22        Mr. Helsley, do you see the title of that

23   document there?

24   A.   I do.

25   Q.   And I'm going to read it aloud here:

Ex. 2_Echeverria Decl.
Page 52
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 166

1    Deposition of Stephen Helsley, Monday, December 18th,

2    2017.  Do you recall that deposition?

3        A.  Yes, I do.

4        Q.  And that deposition would have occurred after

5    Mr. Massad Ayoob's declaration and the one that you

6    submitted October 6th of 2017; is that correct?

7        A.  Correct.

8        Q.  Okay.  I have no other questions.  Thank you.

9              THE VIDEOGRAPHER:  Are there any other

10   questions?

11             MR. WILSON:  No redirect.

12             THE VIDEOGRAPHER:  Mr. Pekelis?  Do you

13   have anything further, Mr. Pekelis?  You're muted.

14             MR. PEKELIS:  I guess I have one -- just

15   one -- a couple more questions.

16

17              E X A M I N A T I O N

18    BY MR. PEKELIS:

19        Q.  So, Mr. Helsley, just to go back to the

20   question of the similarities -- the identical aspects

21   of your declaration and Mr. Ayoob's declaration, would

22   you agree that based on the identical language

23   contained therein, it's clear that either you copied

24   Mr. Ayoob's declaration or he copied yours?

25        A.  I think that's a reasonable conclusion.

Ex. 2_Echeverria Decl.
Page 53
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 167

1       Q.   Okay.   I don't have anything else.   Thank you,

2   sir.

3                  THE VIDEOGRAPHER:   Anyone else?

4                  MR. WILLIAMSON:   Nothing here.

5                  THE VIDEOGRAPHER:   We are going off the

6   record at 11:45, and this concludes this deposition for

7   today.

8                  (Deposition adjourned at 11:45 a.m.)

9                  (Reading and signing was not requested

10                  pursuant to FRCP Rule 30(e).)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ex. 2_Echeverria Decl.
Page 54
eca924fc-a9ca-4c74-bbda-8156300a7993

Oregon Firearms Federation, Inc., et al. v. Brown, et al.                    Stephen Helsley - Vol. II

Page 168

1                          REPORTER'S CERTIFICATE

2

3          I, LORRIE R. CHINN, the undersigned Certified Court
     Reporter, pursuant to RCW 5.28.010 authorized to administer
4    oaths and affirmations in and for the State of Washington, do
     hereby certify:
5
           That the sworn testimony and/or remote proceedings, a
6    transcript of which is attached, was given before me at the
     time and place stated therein; that any and/or all witness(es)
7    were duly sworn remotely to testify to the truth; that the
     sworn testimony and/or remote proceedings were by me
8    stenographically recorded and transcribed under my
     supervision, to the best of my ability; that the foregoing
9    transcript contains a full, true, and accurate record of all
     the sworn testimony and/or remote proceedings given and
10   occurring at the time and place stated in the transcript; that
     a review of which was requested; that I am in no way related
11   to any party to the matter, nor to any counsel, nor do I have
     any financial interest in the event of the cause.
12
           Reading and signing was not requested pursuant to
13   FRCP Rule 30(e).

14         WITNESS MY HAND AND DIGITAL SIGNATURE this 3rd day of
     February, 2023.
15

16

17

18   LORRIE R. CHINN, RPR, CCR
     Washington State Certified Court Reporter No. 1902
19   Oregon State Certified Court Reporter No. 97-0337
     lorrie@buellrealtime.com
20

21

22

23

24

25

Ex. 2_Echeverria Decl.
Page 55
eca924fc-a9ca-4c74-bbda-8156300a7993

**EXHIBIT 19**

1  ROB BONTA
   Attorney General of California
2  P. PATTY LI
   Supervising Deputy Attorney General
3  ANNA FERRARI
   Deputy Attorney General
4  State Bar No. 261579
   JOHN D. ECHEVERRIA
5  Deputy Attorney General
   State Bar No. 268843
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone:  (415) 510-3479
     Fax:  (415) 703-1234
8    E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Rob Bonta,*
9  *in his official capacity* [1]

10          IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                   WESTERN DIVISION

13

14

15  **STEVEN RUPP; STEVEN**          8:17-cv-00746-JLS-JDE
    **DEMBER; CHERYL JOHNSON;**
16  **MICHAEL JONES;**               **SUPPLEMENTAL EXPERT**
    **CHRISTOPHER SEIFERT;**         **REPORT AND DECLARATION**
17  **ALFONSO VALENCIA; TROY**       **OF COLONEL (RET.) CRAIG**
    **WILLIS; and CALIFORNIA RIFLE** **TUCKER**
18  **& PISTOL ASSOCIATION,**
    **INCORPORATED,**
19
                       Plaintiffs,   Courtroom:   8A
20                                   Judge:       The Honorable Josephine
         **v.**                                   L. Staton
21
22  **ROB BONTA, in his official capacity**   Action Filed:  April 24, 2017
    **as Attorney General of the State of**
23  **California; and DOES 1-10,**

24                       Defendants.

25

26  _____

27       [1] Rob Bonta has succeeded former Attorney General Xavier Becerra as the
    Attorney General of the State of California. Pursuant to Federal Rule of Civil
28  Procedure 25(d), Attorney General Bonta, in his official capacity, is substituted as
    the defendant in this case.

                                 1

## SUPPLEMENTAL EXPERT REPORT AND DECLARATION
## OF COLONEL (RET.) CRAIG TUCKER

I, Colonel (Ret.) Craig Tucker, declare under penalty of perjury that the following is true and correct:

1.     I have been asked by the Office of the Attorney General of the California Department of Justice to prepare an expert report and declaration on the purpose, use, and features of certain semiautomatic firearms. This supplemental expert report and declaration ("Report") is based on my own personal knowledge and experience, and, if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Report.

## PROFESSIONAL QUALIFICATIONS

2.     I am a Colonel, US Marine Corps, (Retired). I served as an infantry officer in the Marine Corps for 25 years. I have commanded infantry units from platoon to regiment. I commanded Regimental Combat Team -7 (RCT-7) in Iraq from February 2004 to April 2005. During my time in Iraq, I commanded 22 different US Marine, US Army, and Iraqi Army battalions and exercised tactical control over Naval Special Warfare and US Special Forces, and supported National Tier 1 assets. I commanded the Regiment in both Fallujah battles and numerous smaller battles. I was the target of 9 assassination attempts and was wounded in Husaybah Iraq in July 2004. Upon my return from Iraq, I was assigned to the US Marine Corps National Training Center and was responsible for training and certifying units for combat in Iraq and Afghanistan.

3.     I have received two Legion of Merit awards for exceptional meritorious conduct in the performance of outstanding combat services, the Military Order of the Purple Heart, the Navy Commendation Medal for Heroic Action, the Combat Action Ribbon, and seven Sea Service Deployment Ribbons, among other awards.

2

1    4.    After I retired from military service in 2006, I served as an Assistant

2    Deputy Administrator for the Office of Secure Transportation (OST), National

3    Nuclear Security Agency.  OST is a paramilitary organization consisting of federal

4    agents armed with M4s.[2]  I was also the Department's Render Safe program in

5    Albuquerque NM.

6    5.    In 2012, I joined Innovative Reasoning LLC, which provides

7    professional support services to the U.S. Department of Defense and other

8    government clients.  While at Innovative Reasoning, I developed training programs

9    and planning capabilities for the Marine Corps, and I developed and taught a

10   training course on tactical decision-making for law enforcement officers.

11   6.    Through my military service, I gained extensive knowledge and

12   familiarity with the full range of US combat weapon systems.  The automatic rifle

13   is the foundational combat weapon system.  Ground and aviation weapon systems

14   are specifically designed to support the automatic rifle.  My primary purpose in the

15   latter stages of my career was coordinating, and teaching others to coordinate, air

16   and ground weapon systems to support the rifleman and his automatic rifle.

17   7.    I have fired the Colt AR-15 5.56 rifle and the Smith and Wesson 5.56

18   AR rifle.  Both are advertised as the civilian version of the M16 combat rifle.  In

19   addition to my automatic rifle experience, I have extensive experience with the

20   AK-47, having been on the receiving end of hundreds of 7.62 rounds; an experience

21   best typified during the Battle of Hit when a single individual with one rifle and

22   apparently inexhaustible supply of 7.62 ammo and magazines kept nine Marines

23   pinned down for 15 minutes until a LAV-25 20mm chain gun solved the problem.  I

24   have extensive experience with the Colt 1911 .45 caliber semi-automatic and the

25   Berretta .9m semi-automatic pistol and used both weapons in Iraq.

26

27

28

---

[2] The M4 is a gas-operated, magazine-fed carbine.  It is the shortened version of the M16 assault rifle.

3

8.      I currently serve as a trainer and planner for the City of Albuquerque's Office of Emergency Management.

9.      I hold a B.S. in Criminal Justice from the University of Dayton, a Master of Military Art and Science from U.S. Army Command and General Staff College and the U.S. Army School of Advanced Military Studies, and a Master's degree in National Security and Strategic Studies from the College of Naval Warfare, where I graduated with the highest distinction.

10.     A copy of my curriculum vitae is attached as **Exhibit A** to this Report.

11.     I have been retained by the California Department of Justice to serve as an expert witness in this case.  I am being compensated at a rate of $200 per hour.

### OPINIONS

12.     I have reviewed the statutory definitions of an "assault weapon," as defined under California's Assault Weapons Control Act (AWCA) in California Penal Code section 30515(a).[3]  Under Penal Code section 30515(a), a semiautomatic centerfire rifle that does not have a fixed magazine qualifies as an assault weapon if it has any of the following features:  (1) a pistol grip that protrudes conspicuously beneath the action of the weapon; (2) a thumbhole stock; (3) a folding or telescoping stock; (4) a grenade or flare launcher; (5) a flash suppressor; or (6) a forward pistol grip.[4]  A semiautomatic centerfire rifle also qualifies as an assault weapon if it is equipped with a fixed magazine with the capacity to hold more than 10 rounds or has an overall length of less than 30 inches.[5]  I have also reviewed the list of rifles that qualify as "assault weapons"

---

[3] See Cal. Penal Code § 30515, https://bit.ly/3CtxfEj.

[4] Cal. Penal Code § 30515(a)(1)(A)-(F).

[5] Cal. Penal Code § 30515(a)(2)-(3).

1   under California Penal Code § 30510(a), which have many of the same features and
2   accessories listed in § 30515(a).

3       13.    I am familiar with the features, accessories, and capabilities of rifles
4   regulated by Penal Code § 30515(a).  The AR-15, like the M4, is an offensive
5   combat weapon system.  The only difference is the AR-15 cannot fire on full-auto
6   (continual shots fired in succession so long as the trigger is pulled) or burst (several
7   shots fired in succession with a single pull of the trigger)—a picayune difference
8   that cannot serve to support a non-combat role for the AR-15.  In my experience,
9   soldiers are trained to set select-fire weapons to semi-auto mode, so that a single
10  round is fired with each pull of the trigger.  An M4 or M16 on full-automatic is an
11  area fire weapon: the auto rate of fire makes the weapon too difficult to control on a
12  point target.  Rifle fire on full automatic is not aimed fire, uses an excessive amount
13  of ammunition and will damage the weapon if used too often.  In fact, in my 14
14  months of combat, I did not once see an M4 or M16 fired on full auto.  Semi-auto
15  function is used almost exclusively in combat.  When operated in semi-auto mode,
16  the AR-15 and M4 share the same rates of fire, the same maximum effective range,
17  the same maximum range, use the same magazines designed for combat and the
18  same ammunition.  The AR-15 and M4 are both designed to fire a .223 round that
19  tumbles upon hitting flesh and rips thru the human body.  A single round is capable
20  of severing the upper body from the lower body, or decapitation.  The round is
21  designed to kill, not wound, and both the AR-15 and M4 contain barrel rifling to
22  make the round tumble upon impact and cause more severe injury.  The
23  combination of automatic rifle and .223 round is a very efficient killing system.
24  The same can be said of the AR-15.

25      14.    Automatic rifles, like the M-16 and its more modern carbine variant
26  M4, are functionally similar to semiautomatic rifles regulated under California's
27  AWCA and  often are equipped with the very same features, like pistol grips and
28  adjustable stocks.  It is my opinion, based on my military service, that these

5

1   features, individually and in combination, make semiautomatic rifles more lethal
2   and most useful in combat settings, as described in more detail below.

3        15.   Detachable magazines:  In order for a rifle to qualify as an assault
4   weapon under California Penal Code § 30515(a), the rifle must have the capability
5   of accepting a detachable ammunition magazine (by not having a fixed magazine).
6   Detachable magazines improve the killing efficiency of automatic rifles, allowing
7   the combat rifleman to efficiently carry a combat load of 120 rounds in four 30-
8   round magazines, to rapidly change magazines in combat, and to increase killing
9   efficiency by significantly reducing reload time.  Changing magazines during
10  intense combat is the most important individual skill taught to Marines.  During
11  intense combat, the detachable magazine provides a rifleman the capability to fire
12  120 rounds on semi-automatic in three minutes at a high-sustained rate of 45 rounds
13  per minute.  In a civilian self-defense context, by contrast, an individual would not
14  have a need for such a high rate of fire.

15       16.   Pistol grip protruding beneath the action of a rifle:  I am a 15th Award
16  Expert on the M16 and M4.  I carried an M4 every day for 14 months during my
17  time in command of RCT-7 in Iraq.  I used an M4 in combat, and I killed with it.
18  The pistol grip beneath the action of an automatic rifle serves only two purposes.
19  First, the pistol grip allows the rifleman to pull the rifle into her shoulder with each
20  shot, an action which increases stock weld, reduces semi-automatic/automatic
21  recoil, and reduces barrel rise.  Stock weld or cheek weld refers to the firmness of
22  the contact between the rifle stock, the shooter's cheek, and the shooter's shoulder.
23  A firm stock weld is required for effective semi-automatic and automatic rapid fire.
24  Absent any pistol grip, a semi-automatic rifle would be difficult to operate when
25  fired rapidly, as the rifle barrel would seesaw up and down with each shot fired in
26  succession.  Second, the pistol grip functions as a hand rest to reduce hand/finger
27  fatigue during long combat engagements.  Both actions increase the killing

28

1   efficiency of automatic rifles and are necessities in sustained combat operations of
2   weeks or months when firing a rifle rapidly.

3       17.   <u>Forward pistol grip</u>:  The forward pistol grip provides leverage to
4   tighten a stock weld on short barrel automatic weapons and reduces recoil and
5   barrel rise on short barrel automatic rifles.  Forward pistol grips were added to the
6   M4 to increase M4 killing efficiency.

7       18.   <u>Folding stock</u>:  A folding stock causes weapon instability.  For that
8   reason, folding stock automatic rifles are designed for military personnel, whose
9   primary weapon is vehicle or air-mounted (tank, Bradly, Apache), who may be
10  required to escape from a mangled vehicle, or who may need to abandon a
11  destroyed weapon system and need a substitute weapon for offensive combat.
12  Outside of the military context, folding stocks that are not properly locked in place
13  can cause significant safety risks to the shooter due to recoil.

14      19.   <u>Grenade or flare launcher</u>:  A Marine Corps fireteam consists of a
15  fireteam leader, a rifleman, an assault gunner, and a grenadier.  The grenadier is
16  armed with a grenade launcher.  The grenadier uses the grenade launcher to
17  suppress or kill human beings so the rest of the fireteam can maneuver into position
18  to kill those humans with automatic rifle fire.  The launcher is a separate weapon
19  system attached to as few rifles as possible dependent on the combat mission.  In
20  my experience, grenade launchers attached to rifles are cumbersome, difficult to
21  aim, difficult to carry, and are not as effective as a standalone grenade launcher.
22  They have no legitimate use in self-defense.

23      20.   <u>Flash suppressor/flash hider</u>:  The purpose of the flash suppressor is to
24  reduce combat signature by cooling and dispersing burning gases.  This makes it
25  more difficult for the enemy to pinpoint a rifleman's location, especially in low
26  light conditions.  The flash suppressor facilitates night combat operations by
27  reducing muzzle flash and mitigating muzzle flash impact on night vision goggles.
28

1   This accessory serves specific combat-oriented purposes and is not needed for self-

2   defense.

3       21.   <u>Fixed magazine with the capacity to accept more than 10 rounds</u>:

4   Automatic rifles are offensive combat weapons systems designed to kill efficiently

5   and effectively. Any increase to magazine capacity increases the killing efficiency

6   of the automatic rifle. A 30-round fixed magazine can fire more rounds in a given

7   amount of time than three 10-round detachable magazines, which would need to be

8   reloaded to fire the same number of rounds, slowing down the rate of fire.

9   Similarly, a 100-round drum magazine can fire more rounds in a given period of

10  time than ten 10-round detachable magazines. As noted above in connection with

11  detachable magazines, an individual using a rifle in self-defense would not need

12  such a high, continuous rate of fire.

13      22.   The AR-15 is an offensive combat weapon no different in function or

14  purpose than an M4. In my opinion, both weapons are designed to kill as many

15  people as possible, as efficiently as possible, and serve no legitimate sporting or

16  self-defense purpose. Self-defense and military combat are different. The weapons

17  and accessories needed in one may not be needed or appropriate in the other. For

18  instance, when I was serving in the military, I carried my M4 for offensive combat

19  and a handgun for self-defense. Defensive combat is generally up close and very

20  personal. At that range, it is very difficult to use a rifle as a defensive weapon,

21  except as a blunt force instrument. My 9mm pistol was the self-defense weapon of

22  choice, and we were trained to expend only 1-2 rounds per adversary in pistol

23  combat. The features identified in California Penal Code § 30515(a) enhance the

24  lethality of both semiautomatic and automatic rifles and are most appropriate for

25  combat applications when used in conjunction with those types of weapons

26  systems.

27

28

8

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 6, 2023 at Sandia Park, New Mexico

_____
Col. (Ret.) Craig Tucker

# EXHIBIT A

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

**CITY OF ALBUQUERQUE OFFICE OF EMERGENCY MANAGEMENT (07/2021-PRESENT)**

- Training and Education Coordinator/Acting Senior OEM Planner
  - Coordinate with County and State agencies to develop training and exercise programs that prepare the City of Albuquerque to mitigate, respond to, and recover from disasters.
  - Develop response plans for wildfire, flood, earthquake, and weapons release and test the plans in tabletop exercises and drills.
  - *In coordination with Albuquerque Public Schools developed and executed a school drill assessment/evaluation program.*
  - *Created, developed, and initiated training for APS, APD, and AFR on a doctrinal, best-practices-based approach to "Command and Control, Active Shooter, in a School, School in Session"*
  - Develop a training and exercise program to meet FEMA National Qualification Standards.
  - Serve as the Operations Chief for EOC activations and training.
  - Responsible for Plans updates and revisions, including a rewrite of the CABQ Comprehensive Emergency Management Plan.
  - Write and manage OEM Grants, including SHSGP, EMPG and Hazard Mitigation Grants.

**RAVENSWOOD SOLUTIONS INC. (10/2019 – 06/2021)**

- Program Manager, US Marine Corps Operations
  - Provide subject matter expertise and develop capture plans to provide live, virtual, and constructive capabilities in support of the Commandant's Planning Guidance.
  - Project Manager for Ravenswood Solutions live-instrumented training and AAR support to MAGTF Warfighting Exercise-20 (MWX 20), the largest instrumented exercise in USMC history.
  - Co-authored White Paper on the application of machine-learning and Artificial intelligence to support unit readiness reporting.
  - Provided subject matter expertise to support ML/AI Wargaming prototype development.
-

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Project Director, Middle East Operations

  o Lead planner and primary proposal author of a of a multi-corporation proposal to develop an 800-structure urban live fire and maneuver range in a Gulf Coast Coalition country.

  o Lead planner and primary proposal author of a multi-corporation proposal to develop a comprehensive training program for an emergent Marine Corps in a Gulf Coast Country.

- Program Manager, National Security Operations

  o Provide subject matter expertise, develop, and supervise training services in support of Department of Energy nuclear security and non-proliferation operations.

- Independent Contractor (01/2022 – 06/2022)

  o Acted as the Ravenswood Solutions Inc. US Marine Corps subject matter expert.

  o Acted as the Ravenswood Solutions Inc., training and leadership subject matter expert.

**INNOVATIVE REASONING, LLC  (08/2012 - 09/2019)**

- Director, Studies and Analysis

  o Provided analyses, recommendations and participated as the senior tactical SME in support of the following Marine Corps Combat Development Command requirements.

    • Development of the U.S. Marine Corps post-war on terror Training Strategy.

    • Development of an adaptive planning capability employing multi-agent modeling, experiential learning theory, and machine learning.

    • Improving Small Unit Leader Decision-making through training in Recognition Primed Decision-making and experiential learning theory.

    • Chaired US Marine Corps 3d Annual Maneuver Warfare Conference (2018).

- Director, Federal Programs

  o Provided direction, supervision, and oversight to 5 program managers assigned to DOD and Department of Energy contracts in the United States and overseas.

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Program Director, Law Enforcement Tactical Decision-making

  - Created, certified, and taught tactical decision -making courses focused on making decision in high risk, low occurrence, fast moving circumstances with risk of death, serious injury.

  - Developed and taught 400+ series of National Incident Management Courses to support local law enforcement requirements.

**DEPARTMENT OF ENERGY (09/2006 – 07/2012)**

  - Render Safe, Program Manager (SES)

    - Responsible for the Department of Energy (DOE) operational elements conducting nuclear counterterrorism and nuclear accident response in support of Tier 1 elements.

    - Responsible for organizing, resourcing, developing, and executing crisis response render-safe operations in support of Presidential and National Security policy.

  - Assistant Deputy Administrator (SES), Office of Secure Transportation (OST)

    - Responsible for the safe and secure transportation of nuclear weapons, materials, and components in the continental United States.

    - Acted as the Senior Energy Official and National Nuclear Security Administration Incident Commander for incidents involving OST assets and during DHS-directed NIMS National Training Programs

    - Provided leadership, vision, and direction to a 1000+ mixed para-military and civilian workforce.

    - Developed and implemented innovative security practices focused on intelligence-driven operations, leadership, and performance-based approach to training. Resulting security Doctrine provided a blueprint for significant changes to DOE physical security doctrine.

    - Provided astute and responsible management of a $270 million budget.

**UNITED STATES MARINE CORPS (06/1981- 08/2006)**

  - Director of Training, Tactical Training Exercise Control Group (TTECG) (07/2005-08/2006)

    - Selected by the Commandant to rebuild and lead the Marine Corps

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

Service-level pre-deployment training program.

- Responsible for the successful integration of emergent and innovative urban operations with conventional combined arms operations. Trained organizations from the US and numerous allied countries.

- Managed a training budget of $30 million. Developed and implemented new approaches to training to maximize effective use of increased training budget. Increased the number of Marines/units trained per year and successfully integrated complex, multi-discipline training requirements into a coherent, effective training program

o Commanding Officer, Regimental Combat Team 7 (RCT-7) (06/2003 - 07/2005)

- Commanded U.S. Marine Corps Regimental Combat Team 7 during Operation Iraqi Freedom II. Tour included 14 months of continuous combat command in Al Anbar Province.

- Commanded RCT-7 during major urban combat operations to include battles of Fallujah I, Al Fajr (Fallujah II), Husaybah, Ramadi, and Hit.

- Developed and implemented successful strategic plans for reconstruction of western Iraq; managed over $200 million in construction and procurement contracts. Responsibilities included establishing border security, counter-terrorism operations, infrastructure development, and security forces training.

- Acted as Superintendent for an elementary school system consisting of 12 elementary schools throughout Al AnBar province. Constructed the schools, hired teachers, hired administrators, and provided safety and security for students, teachers, and staff.

- Responsible for the Force Protection and security of US bases and approximately 20,000 military and contractor personnel.

o Director of Operations, Training and Education Command (06/2002-05/2003)

- Responsible for the Marine Corps' training programs, with an 80,000+ personnel annual throughput.

- Developed and successfully initiated programming and procurement for the Marine Corps' 10-year range modernization and instrumentation plan. Established and chaired Range Instrumentation Working Group.

- U.S. Marine Corps Service-level representative to the OSD working group responsible for developing training transformation strategies.

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289

- Successfully led USMC effort to meet the congressionally mandated requirement to replace Vieques Island with a CONUS based amphibious live-fire training capability within the year.

o Commander, 2nd Battalion, 7th Marine Regiment,

o Director of Operations, 7th Marine Regiment.

o Director of Operations, 13th Marine Expeditionary Unit (13th MEU).

- Responsible for leadership and performance of a task-organized team with 1000+ members.

- Served as primary planner in Naval and Joint crisis action planning and execution, to include the development of training plans, equipment procurement, and exercise development for the organization's worldwide contingency operations.

o Operations Planner, I Marine Expeditionary Force (I MEF). Primary planner and architect for a multi-national effort to rewrite the operations plan for defense of the Republic of Korea.

o Commander, Presidential Security Force, Camp David, MD

- Commanding Officer of Marine Corps Detachment responsible for the security of the Presidential Retreat at Camp David.
- Successfully balanced a 33% reduction in force structure with implementation of an innovative physical security plan that integrated personnel reductions, new technologies, and manpower, while increasing the security posture.

o Commanding Officer:
- Weapons Company, Marine Infantry Battalion. (1988-1989)
- Infantry Company, Marine Infantry Battalion. (1986-1988)
- Guard Company, Nuclear Weapons Security, Adak, AK. (1984-1986)
- Headquarters Company, Supply Battalion. (1983-1984)

**AWARDS**
(2) Legions of Merit with Combat Valor device, Purple Heart, Navy Commendation Medal for Heroic Action, Combat Action Ribbon, (7) Sea Service Deployment Ribbons, numerous other awards, and

Craig A. Tucker
Colonel, US Marine Corps, (Ret)
65 Harms Rd
Sandia Park NM 87047
catucker@protonmail.com
505-504-4289
decorations.


**PAPERS**
- "On Demand Readiness for Army Commanders Through AI and Machine Learning" (2020) (White Paper for Army Applied Laboratory and the Office of Naval Research. (co-authored with SOMETE Technology and Lockheed Martin)

- "Band of Brothers: The 2D Marine Division and the Tiger Brigade in the Persian Gulf War"
  An Analysis of the Impact of Organizational Culture on Tactical Joint Warfare (School of Advanced Military Studies, US Army Command and General Staff College)

- "False Prophets: The Myth of Maneuver Warfare and the Inadequacies of FMFM 'Warfighting'" (School of Advanced Military Studies, US Army Command and General Staff College,

- "Towards an Intellectual Component to Joint Doctrine: The Philosophy and Practice of Experiential Intelligence" (Naval War College)


**EDUCATION**
- B.S. Criminal Justice, University of Dayton
- MMAS, U.S. Army Command and General Staff College
- MMAS, US Army School of Advanced Military Studies
- MA, National Security and Strategic Studies, College of Naval Warfare (Highest Distinction)

# EXHIBIT 20

**Harry B. Wilson, OSB #077214**
HarryWilson@MarkowitzHerbold.com
**Hannah K. Hoffman, OSB #183641**
HannahHoffman@MarkowitzHerbold.com
**MARKOWITZ HERBOLD PC**
1455 SW Broadway, Suite 1900
Portland, OR  97201-3412
(503) 295-3085

      Special Assistant Attorneys General for Defendants

**Ellen F. Rosenblum, OSB #753239**
Attorney General
**Brian Simmonds Marshall, OSB #196129**
Senior Assistant Attorney General
Brian.S.Marshall@doj.state.or.us
**DEPARTMENT OF JUSTICE**
100 SW Market Street
Portland, OR 97201
(971) 673-1880

      Attorneys for Defendants

<div align="center">

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PENDLETON DIVISION

</div>

| | |
|---|---|
| OREGON FIREARMS FEDERATION, INC., et al., | Case No. 2:22-cv-01815-IM (lead case) |
| | 3:22-cv-01859-IM (trailing case) |
|                   Plaintiffs, | 3:22-cv-01862-IM (trailing case) |
| | 3:22-cv-01869-IM (trailing case) |
|       v. | **DECLARATION OF KEVIN SWEENEY** |
| TINA KOTEK, et al., | |
|                   Defendants, | |
|       and | |
| OREGON ALLIANCE FOR GUN SAFETY, | |
|               Intervenor-Defendant. | |

**Page 1 -  DECLARATION OF KEVIN M. SWEENEY**

MARK FITZ, et al.,

                               Plaintiffs,

        v.

ELLEN F. ROSENBLUM, et al.,

                               Defendants.

KATERINA B. EYRE, et al.,

                               Plaintiffs,

        v.

ELLEN F. ROSENBLUM, et al.,

                               Defendants,

        and

OREGON ALLIANCE FOR GUN SAFETY,

                               Intervenor-Defendant.

DANIEL AZZOPARDI, et al.,

                               Plaintiffs,

        v.

ELLEN F. ROSENBLUM, et al.,

                               Defendants.

## <u>DECLARATION OF KEVIN M. SWEENEY</u>

I, Kevin M. Sweeney, declare the following:

1.      I am over the age of eighteen (18) years, competent to testify to the matters contained in this declaration, and testify based on my personal knowledge and information.

2.      I am a Professor of History *emeritus* at Amherst College.  From 1989 to 2016, I taught history and American Studies at Amherst.   I regularly offered courses on colonial American history, the era of the American Revolution, and early American material culture, which focused on studying the production and use of home furnishings and other artifacts in common use

dating from the 1600s, 1700s, and early 1800s. During these years, in my own research on material culture, I made use of colonial-era probate inventories to study such topics as home furnishings in an effort to discover what types of possession were commonly found in households, to measure changes in standards of living, and to gain insights into domestic architecture.[1] I also examined critically and wrote about the strengths and weaknesses of these sources, their usefulness and pitfalls.[2] For decades, historians who are aware of these records' usefulness and their limitations have used estate inventories to study agricultural changes in England, wealth and social structures in England and its colonies, the institution of slavery in colonial American and the lives of slaves, and household possessions in America, England, and France.[3]

3.      My current research on seventeenth and eighteenth-century firearms and militias utilizes similar types of methodologies, documentary sources, and period artifacts. This project, which has been going on for over a decade, was initially inspired by my skepticism of the controversial claims and pretended use of evidence from probate inventories in Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Alfred A. Knopf, 2000). As part of my on-going project, I have given papers at the annual meetings of the American Historical Association and the Organization of American Historians, at conferences on firearms and society at Stanford and Wesleyan Universities, and elsewhere, and published two essays "Firearms Militias, and the Second Amendment" (2013) and "Firearms Ownership and

---

[1] Kevin M. Sweeney, "Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800 in *Material Life in America, 1600-1860,* Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-261-290.

[2] Kevin M. Sweeney, "Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987*, Peter Benes, editor (Boston: Boston University Press, 1989), 32-40.

[3] Some notable examples which also contain informed observations on the use of probate inventories, their biases, and how to deal with the biases see: James Horn, *Adapting to a New World: English Society in the Seventeenth-Century Chesapeake* (Chapel Hill: University of North Carolina Press, 1994); Gloria L. Main, *Tobacco Colony: Life in Early Maryland, 1650-1720* (Princeton: Princeton University Press, 1982), esp. 49, 282-286171-174; Philip D. Morgan, *Slave Counterpoint: Black Culture in the Eighteenth-Century Chesapeake & Lowcountry* (Chapel Hill: University of North Carolina Press, 1998); Carole Shammas, *The Pre-Industrial Consumer in England and America* (Oxford: Oxford University Press, 1990). esp. 19-20; Lorna Weatherill, *Consumer Behaviour & Material Culture in Britain 1660-1760*, 2nd. ed. (London: Routledge, 1996), esp. 201-207.

**Page 3 - DECLARATION OF KEVIN M. SWEENEY**

Militias in Seventeenth- and Eighteenth-Century England and America" (2019). A third essay is forthcoming on **"**Revolutionary State Militias in the Backcountry and Along the Frontiers," and I am currently working on a fourth essay as well as working on a book-length manuscript. My curriculum vitae, detailing my education, experience, and publications, is attached to this declaration as **Exhibit A**.

4.      I have been retained by the State of Oregon Defendants to provide an expert opinion on repeating firearms in eighteenth-century America. I make this declaration on the basis of my training, professional expertise, and research. For my work in this case, I am being compensated at a rate of $50 per hour.

5.      During the 1700s, most gun owners in the British American colonies and in the newly independent republic of the United States possessed and used single shot, muzzle-loading, flintlock firearms. As Harold Peterson stated in his classic 1956 book -- *Arms and Armor in Colonial America, 1526-1783:*"The period began in 1689 with the muzzle-loading smooth-bore musket and pistol as the most popular weapons. In 1783, almost a hundred years later, the period ended with the same weapons [i.e. muzzle-loading smooth-bore muskets and pistols] still supreme, and without even any notable improvements in their design or construction."[4] Peterson continued: "Breech-loaders and repeaters had appeared frequently on the scene but had made little impression upon it."[5]

6.      Evidence compiled during a decade of research using eighteenth-century probate inventories, militia muster lists, newspapers, and other documentary sources confirms the validity of Peterson's basic conclusions while offering three minor modifications. First, these weapons described by Peterson [i.e., the muzzle-loading smooth-bore musket and pistol] were still "supreme" in 1800 and probably as late as 1810. Second, most muzzle-loading, flintlock long arms that were privately owned and used during this period were not muskets, but lighter firearms that were usually cheaper and had narrower bores than did muskets. Finally, it is more accurate to

---

[4] Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (Harrisburg, Penn.: Stackpole Publishing 1956), 221.

[5]      *Ibid.*, 221.

**Page 4 -   DECLARATION OF KEVIN M. SWEENEY**

say that repeaters had *occasionally* appeared on the scene and not "frequently" as Peterson believed. Here, he was probably misled by the preference that private collectors and institutional collections had (and still have) for obtaining rare examples of unusual or innovative firearms.

**I.    Firearms Owned By Eighteenth-Century Americans**

7.    Today, we tend to refer to any muzzle-loading eighteenth-century gun as a musket, and this is what Peterson did in the statement quoted above. However, Peterson knew better, as did Ben Franklin. In the mid-1740s, Franklin informed the readers of his Philadelphia newspaper that a "Musket" was "the Name of a particular Kind of Gun."[6] An eighteenth-century musket was a sturdy, muzzle-loading military firearm that fired a single lead ball weighing about an ounce, had a sling for ease of carrying on long marches, and had a lug near the muzzle for attaching a bayonet. It weighed about 10 to 11 pounds and was .69 caliber in its bore if French or .75 caliber if English, with an average barrel length of 44 inches.[7] On a battlefield, a musket was more than just a firearm: because of its weight and sturdy construction and because of its bayonet, a musket also functioned as a club and a spear. These capabilities were integral to its role as an eighteenth-century military arm. The combination of these features and capabilities made a musket "a Universal Weapon."[8]

8.    Eighteenth-century muskets did have two serious drawbacks which they shared with all flintlock, muzzle-loading smoothbores. First, their accuracy and range were limited. The round ball fired by these weapons was not very aerodynamic, and this produced a great deal of drag that reduced its velocity. A musket's smooth-bore barrel also lacked rifling, which were spiral grooves cut inside the barrel. When a ball traveled down a barrel with rifling, the grooves imparted a spin to the ball that stabilized and flattened its trajectory, increasing its distance and accuracy. (The effect of rifling on a rifle ball's flight can be compared to throwing a spiral pass

---

[6]    "Form of Association" in *The Papers of Benjamin Franklin*, ed., Leonard W. Labaree, et al., 40 volumes to date (New Haven: Yale University Press, 1959-), Vol. 3, 208.

[7] Author's estimate of barrel averages calculated from data found in George C. Neumann, *Battle Weapons of the American Revolution*, (Texarkana, Texas: Scurlock, 1998), 121-141.

[8] Stuart Reid, *The Flintlock Musket: Brown Bess and Charleville 1715-1865*(Oxford: Osprey, 2016), 61, 55-60.

**Page 5 -    DECLARATION OF KEVIN M. SWEENEY**

in football which also flattens trajectory and improves accuracy.)  While a smooth-bore musket may have been just as accurate as an eighteenth-century muzzle-loading rifle at distances of up to 50 yards, most authorities agree that a musket was not very accurate at ranges beyond 100 yards.[9]  Today, pistols and most long arms other than shotguns have rifled barrels.

9.      Loading and reloading eighteenth-century muskets was a complicated and relatively slow process by today's standards.  To load a musket, a shooter held it in front of him parallel to the ground, pulled back the gun's cock to its half cock position to prevent a premature discharge, and then took from a cartridge box an individual paper cartridge that contained a pre-measured load of gunpowder and a ball.  Next one opened the priming pan, bit the cartridge and poured a small amount of powder into the priming pan which was then closed shut.  Following this, the shooter placed the musket upright on the ground and poured the remainder of the cartridge's gun powder down the barrel, and then crammed the paper cartridge with its ball into the barrel.  (The cartridge's paper wrapper served as wadding, holding the ball in place.)  A ramrod was used to push the cartridge paper and ball down the barrel, after which the ramrod was recovered and secured in its resting place under the barrel.  The musket was then raised, placed on full cock, aimed, and the trigger pulled.  Pulling the trigger released the cock, which held a flint that moved forward, striking a steel frizzen, creating sparks that ignited the powder in the priming pan which in turn ignited the charge of powder placed in the barrel, creating an explosion that—finally—discharged the musket ball.  As a rule, a musket could realistically be loaded and fired two or three times a minute in combat by well-equipped and trained soldiers.[10]

10.      The process of loading and reloading a musket took even longer if instead of using a prepared paper cartridge, one used gunpowder from a powder horn to prime the pan and

---

[9] Reid, *Flintlock Musket*, 34.  For a claim that a rifle had an advantage over a musket at distances greater than 50 yards see John F. Winkler, *Point Pleasant, 1774: Prelude to the American Revolution* (Oxford: Osprey, 2014), 29.  For a claim that a rifle and a musket were equally accurate at 100 yards see Alexander Rose, *American Rifle, A Biography* (New York: Delta Trade Paperbacks, 2009), 20.

[10] Jeremy Black, *European Warfare, 1660-1815* (New Haven: Yale University Press, 1994), 40; Hew Strachan, *European Armies and the Conduct of War* (London: George Allen & Unwin, 1983), 17.

**Page 6 -   DECLARATION OF KEVIN M. SWEENEY**

then poured into the horn's measuring cap the amount of powder needed to charge the barrel. With this procedure one also had to remove an individual musket ball from a shot pouch and place it in the barrel after pouring down the measured charge of powder. The ball was then rammed home. Using this method of loading not only took longer, but also lacked the wadding provided by a paper cartridge which helped hold the ball in place. According to the results of one modern test, wadding also increased a smoothbore's muzzle velocity by about 30%.[11] Most hunters, backwoods men with muzzle-loading rifles, and many colonial militiamen lacked cartridge boxes and paper cartridges and instead used powder horns and shot bags.

11.     Even with these drawbacks, colonial governments and later state governments armed troops with these muskets during the French and Indian War (1754-1763) and the Revolutionary War (1775-1783). There really weren't serious alternatives. As a result, the British Ordnance Office loaned colonial governments 22,000 muskets to arm provincial troops raised for active service in the field during the French and Indian War, and at least 100,000 European muskets—most of them French—were imported during the American War for Independence.[12] During the French and Indian War, the British also sent muskets to arm Georgia and North Carolina militiamen who lacked arms, and state governments sometimes provided arms for mobilized militiamen during the Revolutionary War.[13]

12.     As a rule, American colonists preferred lighter firearms that were better suited than muskets for pest control, birding, or hunting. Especially popular in New England were locally made or imported smoothbore and fusils that weighed only 6 to 7 pounds and had narrower bores of .60 to .65 caliber, with average barrel lengths of 50 inches.[14] The narrower

---

[11] Glenn Foard, *Battlefield Archaeology of the English Civil War* British Series 570 (Oxford: British Archaeological Reports, 2012), 105.

[12] De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I.: Mowbray, 2009), 120-123; George D. Moller, *American Military Shoulder Arm*s, 2 volumes (Albuquerque, N.M., 2011), Vol. 1, Appendix 5, 484-485.

[13] Kevin M. Sweeney, "Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, eds. *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of Massachusetts Press, 2013), 335, 348, 351-352.

[14] Author's estimate of barrel averages calculated from data found in Neumann, *Battle Weapons of the American Revolution*, 150-166.

**Page 7 -   DECLARATION OF KEVIN M. SWEENEY**

bores used smaller and lighter projectiles, required less powder for each shot, and thus reduced the weight of the lead ammunition one carried.[15]  Some New England fowlers could outrange muskets and some were modified to carry a bayonet.[16]  However, because of their lighter weights and sleeker construction, they were not necessarily as sturdy or as "soldier-proof" as a musket nor as effective as a club.

13.     Many residents living in the colonies stretching from New York to Virginia owned "trade guns."  These were inexpensive, muzzle-loading, single shot, smooth-bore firearms designed and produced for trade with Native Americans.  Some of these guns weighed as little as 5.5 pounds, had bores of .57 to .62 caliber, and barrels only 36 to 40 inches long.[17]  Because of these features, they were much easier to handle than a musket and employed about half the weight of lead and powder than compared to a musket for each shot.  However, these light, often cheaply constructed firearms did not function well as clubs and were not designed to carry a bayonet.

14.     In the backcountry of Pennsylvania and the colonies further south there was a distinct minority of men who owned more expensive locally made long rifles.  As a rule, these firearms weighed from 7 to 8 pounds, had .58 to .62 caliber bores—though some were even smaller—and barrels averaging 42 inches in length, and fired projectiles weighing much less than musket balls.[18]  Because of the barrel's rifling, these guns were more accurate than smoothbore muskets and outranged them.  However, they took more time to reload because riflemen had to use powder horns and bullet pouches instead of paper cartridges, and reloading became harder as

---

[15] Steven C. Eames, *Rustic Warriors: Warfare and the Provincial Soldier on the New England Frontier, 1689-1748* (New York: New York University Press, 2011), 121-122; Neumann, *Battle Weapons of the American Revolution*, 206-210.

[16] Douglas D. Scott, et al., "Colonial Era Firearm Bullet Performance: Live Fire Experimental Study for Archaeological Interpretation" (April 2017), 26, 36; Tom Grinslade, *Flintlock Fowlers: The First Guns Made in America* (Texarkana, Texas: Scurlock Publishing 2005), 59,72, 73, 75.

[17] M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology 1497-1792* (Washington, D.C.: Smithsonian Institution Press, 1980), 283; Neumann, *Battle Weapons of the American Revolution*, 203-205.

[18] Author's estimate of barrel averages calculated from barrels lengths of individual muskets given in Neumann, *Battle Weapons of the American Revolution*, 215-225.

**Page 8 -   DECLARATION OF KEVIN M. SWEENEY**

gunpowder residue built up in the grooves of the barrel's rifling.[19]  Additionally, these long rifles were not designed to take a bayonet, and they could break if used as a club.

15.    Muzzle-loading pistols were not as popular as long arms which—as experts have pointed out—"could economically be used dually for protection and hunting."[20]  Pistols were therefore found in only a minority of eighteenth-century probate inventories (Table 1).  It took about 15 seconds to reload a pistol, and as a result, they were often made in pairs "so that the owner might have two shots at his command."[21]  Instead of taking time to reload a pistol on a battlefield, cavalry troopers used discharged pistols as clubs or threw them at enemy cavalrymen.[22]  As it was, period pistols were discharged in close proximity to their targets because their low muzzle velocity of 330-440 f/s limited the range and impact of their projectiles.  By comparison, muzzle velocities produced by reproductions of eighteenth-century muskets (780 f/s to 870 f/s), fowlers (1160 f/s to 1444 f/s) and rifles (1195 f/s to 1320 f/s) are much higher.[23]

16.    Civilian officials and military officers generally had a low opinion of trade guns, fowlers and even the period's American-made long rifles.  During the French and Indian War, firearms in use in New Hampshire were said to be "in general of the meanest Sort" while those in Connecticut "which belong to private persons [were] mostly poor and undersized and unfit for an expedition."[24]  In 1756, most of New York's militia were armed with guns "chiefly for the Indian

---

[19] John W. Wright, "The rifle in the American Revolution," *American Historical Review* Vol. 29, No. 2 (January 1924), 293-299.

[20] Jeff Kinard, Pistols: *An Illustrated History of their Impact* (Santa Barbara, CA: ABC-CLIO, 2004), 45.

[21] Harold L. Peterson, *Treasury of the Gun* (New York: Golden Press, 1962), 189.

[22] For use of muzzle-loading pistols as clubs and missiles on battlefields see C. H. Firth, *Cromwell's Army* 2nd ed. (Oxford: Oxford University Press, 1911), 142; David Blackmore, *Arms & Armour of the English Civil Wars* (London: Royal Armouries, 1990), 49.

[23] Scott, et al., "Colonial Era Firearm Bullet Performance," 26, 36; Douglas D. Scott, et al. "Firearm Bullet Performance: Phase II, Live Fire Experimental Study for Archaeological Interpretation," 31.  Both reports are available online.

[24] "Blair Report on the State of the Colonies" in Louis K. Koontz, *The Virginia Frontier, 1754-1763* (Baltimore: The Johns Hopkins Press, 1925), 170, hereafter cited as the "Blair Report"; Governor Thomas Fitch to Sir Thomas Robinson, August 1, 1755 in *Collections of the Connecticut Historical Society*, Vol. 1, 265-266.

**Page 9 -   DECLARATION OF KEVIN M. SWEENEY**

Trade," and not muskets.[25]  Later, George Washington referred to such smooth-bore long arms as "trash or light arms."[26]  Over the course of the Revolutionary War, he and his officers even phased out the use of rifles in the Continental Army, rearming soldiers with muskets fitted with bayonets.[27]  Governor Thomas Jefferson characterized most of the privately owned smoothbore guns carried by his state's militiamen as "such firelocks [i.e. flintlocks] as they had provided to destroy noxious animals which infest their farms."[28]

17.      Data drawn from group of probate inventories of males who died during the second half of the eighteenth-century confirm these period observations concerning the preferences of American gun owners (Table 1).  These sources can be particularly useful and quite reliable for assessing the preferences of period gunowners for different types of firearms.  Even cursory descriptions of firearms as "a gun" can be revealing when combined with the price that individuals taking the inventory assigned.  Most guns in the inventory were long arms valued at £1 (i.e. 20 shillings), which was the usual cost of a single shot muzzle loading firearm.  Such weapons would have been affordable given the fact that a daily wage during the period for unskilled day labor usually varied between 1 and a half and 2 shillings.  While there was an obvious preference for long arms, muskets and rifles constituted a minority of such weapons.

18.      The more expensive guns found in these 3,249 eighteenth-century probate inventories were also likely to be some type of muzzle loading, single-shot long arms.  As a rule, rifles were valued at £2 to £3, which was twice or three times the cost of common muzzle-loading smoothbore long arms.  Expensive smoothbore weapons were likely to be imported fowlers or guns ornamented with silver mountings.  Occasionally, one sees double barreled guns which, along with a pair of pistols, was the period's more realistic provision for being able to

---

[25] "Blair Report," 171.

[26] General George Washington to Gentlemen, Feb. 7, 1777 in Nathaniel Bouton, ed., *Documents and Records Relating to the State of New Hampshire during the Period of the Revolution from 1776 to 1783* (Concord, N.H.: Edward A. Jenks, State Printer, 1874), Vol. 8, 485.

[27] Wright, "Rifle in the American Revolution," 297-298.

[28] Thomas Jefferson, *Notes on the State of Virginia*, edited by William Peden (New York: W. W. Norton, 1982), 88.

**Page 10 - DECLARATION OF KEVIN M. SWEENEY**

readily discharge more than one shot.  Only one gun found in this database of 3,249 probate inventories may have been a repeater: an "air gun" owned by Philippe Guillaume Chion [Philip Williamson?], Charleston merchant, who died in 1797.[29]  However, as is noted below in paragraph 40, not all air guns available in America were repeaters.

**Table 1: Firearms in Probate Inventories of Male Decedents Filed between 1740-1800**

| Region | Number of Sampled Male Inventories | Percentage of Inventories with Firearms | Percentage of Inventories with Muskets | Percentage of Inventories with Rifles | Percentage of Inventories with Pistols |
|---|---|---|---|---|---|
| New England 1740-1798 | 1057 | 46.1% | 0.8% | 0.0% | 2.8% |
| New York and New Jersey 1740-1798 | 569 | 35.0% | 1.9% | 0.5% | 5.8% |
| Pennsylvania 1740-1797 | 532 | 32.0% | 0.2% | 2.3% | 5.1% |
| Maryland and Virginia 1740-1797 | 632 | 58.4% | 1.3% | 5.1% | 9.0% |
| South Carolina 1740-1797 | 459 | 62.9% | 3.7% | 4.1% | 23.3% |
| Totals | 3249 | 46.6%* | 1.4%* | 2.0%* | 7.8%* |

**Note:** *The percentages at the bottoms of the columns are not averages of the percentages in the columns, but percentages of the total of 3249 inventories found in each category: 1514 inventories with firearms, 45 inventories with muskets, 66 inventories with rifles and 254 inventories with pistols. **Sources:** The sources for the probate inventories used in this table are listed in Kevin M. Sweeney, "Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *A Right to Bear Arms? The Contested History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Press, 2019), 70-71.

19.     Partial militia returns from the state of Virginia dating from 1781 to 1784 provide additional evidence that American consumers preferred smoothbore firearms that were not muskets.  Even though state law required "every militia-man to provide himself with arms [i.e. muskets] usual in regular service [i.e. the Continental Army] . . . this injunction was always in

---

[29] Inventory of Philippe Guillaume Choin, 1797, South Carolina Inventories and Appraisement Books, Vol. C, 1793-1800, 212-213. at Fold 3 by Ancestry https://www.fold3.com/publication/700/south-carolina-estate-inventories-and-bills-of-sale-1732-1872. <Accessed online 1/23/2023 at 6:00 P.M.>

**Page 11 - DECLARATION OF KEVIN M. SWEENEY**

differently complied with."[30]  Most did not own muskets, even in wartime.  Only about 16.7% of the privately owned long arms were muskets, while another 20.3% were rifles owned by residents of the state's western counties.[31]  By contrast, 63.0% of the privately owned long arms were smoothbores that were not muskets.[32]

**Table 2:  Partial Virginia Militia Returns Indicating Types of Arms in Use, 1781–1784**

| Year | Number of Counties | Number of public muskets | Number of private muskets | Number of private long arms* | Number of private rifles | Number of private pistols | Total Number of Guns |
|------|------|------|------|------|------|------|------|
| 1781 | 27 | 1502 | 1333 | 4225 | 1293 | 204 | 8557 |
| 1782 | 10 | 565 | 242 | 2113 | 767 | 60 | 3747 |
| 1784 | 15 | 541 | 441 | 1260 | 392 | 68 | 2702 |
| ALL | 52 | 2608 | 2016 | 7598 | 2452 | 332 | 15006 |

**Note:** *Number of "private long arms" are privately owned long arms that were not muskets and not rifles.
**Sources:** Militia Returns 1777-1784, microfilm, Accession 36929; State Government Records Collection; "General Return of Arms, Accoutrements, and Military Stores, 19th May, 1784," Accession 36912, House of Delegates, Executive Communications, Library of Virginia, Richmond

20.    A large portion of the firearms used in eighteenth-century America would have been imported from England.  At the time, most English firearms were fabricated by large-scale putting-out systems that obtained barrels from one set of suppliers, got gunlocks from other sources, and assembled the parts at yet another site where the firearms also would have been stocked by craftsmen who were woodworkers.  By the mid-eighteenth-century, gun manufacturing in Birmingham, England involved "at least thirty different 'sub-trades' or manual

---

[30] Jefferson, *Notes on the State of Virginia*, 88.

[31] Calculated from data in Table 2.

[32] *Ibid.*.

**Page 12 – DECLARATION OF KEVIN M. SWEENEY**

manufacturing processes."[33] In particular, this is how firearms were made for the British army and for the export trade to Africa and England's colonies.[34]

21.     Other than American long rifles and some New England fowlers, most eighteenth-century firearms used by colonists were not likely to have been custom made or "one-off" products. During the years from 1756 to 1763, at least 36,592 firearms were imported into the thirteen American colonies from England for civilian customers.[35]  Another 18,900 trade guns were imported to sell to Native American customers.[36]  Advertisements indicate that urban gunsmiths in the colonies sold imported firearms and made use of imported gunlocks and barrels. Most of the pistols sold in the colonies were not produced in the colonies.[37]  A rare surviving account book of an inland gunsmith, John Partridge Bull of Deerfield, indicates that he made only three new guns over a period of 20 years from 1768 to 1788, while performing 452 repairs on existing firearms.[38] When it came to his gunsmithing business, this skilled craftsman may have had more in common with a twentieth-century TV repairman than he did with Samuel Colt or Eli Whitney.

## II.     References to Repeating Arms in Eighteenth-Century Media

22.     So, how common were repeating weapons in eighteenth-century America?  The short answer is not very common; they were in fact extraordinarily rare.  Information drawn from eighteenth-century advertisements and news reports found in *America's Historical Newspapers*—a searchable database of 5,000 newspapers, with 450 dating from before 1800—tells much the same story.[39]  This newspaper database was searched by entering the terms "gun,"

---

[33] David Williams, *The Birmingham Gun Trade* (Stroud, Gloucestershire, Eng.: The History Press, 2009), 21.

[34] Williams, *Birmingham Gun Trade*, 21-24; De Witt Bailey, *Small Arms of the British Forces in America 1664-1815* (Woonsocket, R.I: Andrew Mowbrey, 2009), 93-102.

[35] Bailey*, Small Arms*, 237.

[36] De Witt Bailey, "The Wilson Gunmakers to Empire, 1730-1832" American Society of Arms Collectors *Bulletin* No. 85, 19.

[37] Jeff Kinard*, Pistols: An Illustrated History of Their Impact* (Santa Barbara: ABC-CLIO, 2003), 46.

[38] Susan McGowan, "Agreeable to his Genuis: John Partridge Bull (1731-1813), Deerfield, Massachusetts" (M.A. thesis, Trinity College, 1988), 5, 39-40, 74-75.

[39] *America's Historical Newspapers* (Chester, VT: Readex, 2004).

**Page 13 - DECLARATION OF KEVIN M. SWEENEY**

"musket," "fowler," "rifle," "pistol," "shot" and "militia,"  The search turned up 9 references to what appear to be repeating guns.  To the information discovered by searching period newspapers can be added one more well-known instance of an unpublicized demonstration of a repeating firearm that took place in Philadelphia in April of 1777.  This makes a total of 10 references to eighteenth-century repeaters in the period from 1720 to 1800.

23.     What do these period references to repeating guns tell us about their features and how they were employed, how they were regarded, and why they remained relatively uncommon in eighteenth-century America?  The earliest known reference in an American newspaper to a repeating firearm is reported in the *Boston News-Letter* of September 12, 1723:  "Delegates from several Nations of Indians were Entertained with the sight of a Gun which has but one Barrel and one Lock," but fired "Eleven Bullets successively in about Two Minutes" after being loaded only once.  This firearm was made by John Pimm, a Boston gunsmith, who was active in the 1720s, but had died by 1730.  This gun was not being offered for sale; no examples of a repeating long-arm by Pimm survive; it was a novelty.  There is, however, a six-shot revolver with a flint ignition system made by John Pimm in the collection of the Cody Firearms Museum at the Buffalo Bill Center of the West.[40]

---

[40] John Pimm's 1715 revolver with a hand rotated cylinder and flint priming system bears an apparent resemblance to a modern Smith & Wesson .38 caliber revolver.  Brown, *Firearms in Colonial America*, 255-256.  Cut into the rotating cylinder were six chambers into which a small amount of gunpowder and a ball could be placed.  The shooter rotated by hand the cylinder to align one of the chambers with both the barrel and firearm's hammer which held a flint.  The shooter then slid open the priming vent on the cylinder for the chamber aligned with the hammer and the barrel.  He then pulled back the hammer by hand.  Finally, pulling the trigger caused the hammer to strike the metal frizzen with the flint, creating a flash which entered the open vent on the cylinder and set off the powder in the chamber and discharged the ball.  To fire again, the shooter again rotated by hand the cylinder to align a loaded chamber with the barrel and hammer and repeated the process outlined above.  Primm's pistol could deliver six shots after being loaded once, but it was not a rapid-fire weapon, and it took time to reload the individual chambers with powder and ball.

Similar pistols and long arms with revolving cylinders moved by hand first appeared in Germany between 1490-1530.  Brown, *Firearms in Colonial America*, 50.  However, they remained rare in the American colonies, expensive, and suffered from mechanical problems because of the inability of gunsmiths to fit together the moving parts with enough precision to prevent loose powder from jamming the cylinder or producing an accidental discharge of the six chambers simultaneously.  Brown, *Firearms in Colonial, America*, 50-51; Graeme Rimer, et al., *Smithsonian Firearms: An Illustrated History,* (New York: D. K. Publishing 2014), 56.  The revolver patented by Samuel Colt in 1836 and produced in his factory in Paterson, New Jersey

24.     The next reference in an American newspaper to a repeating firearm is contained in an advertisement in the March 2, 1730 issue of Boston's *New-England Weekly Journal*. It was for a firearm employing an uncertain type of mechanism that made it possible to fire a succession of twenty projectiles "at once Loading." This advertisement also makes clear the novelty of such a repeating firearm. Samuel Miller, a Boston gunsmith, was charging Boston residents 9 pence each just to see the gun and 2 shillings—the equivalent of a day's wage of unskilled labor—to see it fired. Basically, this gun was being used in an eighteenth-century version of a sideshow. There is no indication that Miller was producing or selling such firearms.

25.     However, in the *Boston Gazette* for April 12, 1756, gunsmith John Cookson advertised for sale a gun capable of firing 9 bullets in rapid succession. It was "A handy Gun of 9 and a half Weight; having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said Gun will fire 9 Times distinctly, as quick, or slow as you please, which one turn with Handle or the Said Gun, it doth charge the Gun with Powder and Bullet, and doth prime and shut the Pan, and cock the Gun." The advertisement provides a spot-on description of three repeating firearms found in the collections of the Milwaukee Public Museum, Royal Armouries Museum in Leeds, and the Victoria and Albert Museum in London that were all produced sometime around 1690 by John Cookson, an English gunsmith.[41] These were expensive and heavy firearms that weighed about 9 and a half pounds unloaded and over 10 pounds when loaded with 9 balls and powder charges.

26.     Cookson's English repeater employed what was known as the Lorenzoni breech-loading system. [42] This system placed at the breech-end of the barrel a complex and delicate

---

employed percussion caps in its priming system and remains the first practical revolver to enter production. The cylinder rotated when the gun was cocked and fired when the trigger was pulled. However, even sales of this mechanically successful firearm were insufficient to prevent the bankruptcy in 1843 of Colt's first gun manufactory. See Peterson, *Treasury of the Gun*, 211.

[41] Brown, *Firearms in Colonial America*, 144-146; David S. Weaver and Brian Goodwin, "John Cookson, gunmaker," *Arms & Armour*, Vol. 19 (June 2022), 43-63.

[42] Sometime around 1660 Michele Lorenzoni, a Florentine gunmaker, produced a repeating flintlock firearm that employed a lever system to feed into the breech powder and shot. His firearm drew upon earlier versions of this system developed by Giacomo Berselli, another Italian gunsmith, who had built upon earlier innovations by gunsmiths, Peter and Mathias Kaltoff. Brown, *Firearms in Colonial America*, 105-107, 144-145; Peterson, *Treasury of the Gun,* 229-231.

**Page 15 - DECLARATION OF KEVIN M. SWEENEY**

gunlock operated by a handle or lever attached to the left side of the lock.  Separate tubes in the stock of the firearm were filled with priming powder, gunpowder for each charge, and 9 to 11 balls.  The shooter pointed the gun barrel towards the ground and pushed the handle or lever down and forward, which rotated a mechanism located inside the gun lock that simultaneously brought forward one ball, enough gunpowder to discharge it, and enough primer to set off the charge in the barrel when the trigger was pulled.  To recharge and again fire the gun, the shooter again pointed the barrel towards the ground, pushed on the lever and then pulled the trigger.  If the parts of the gun lock did not fit tightly or if the shooter failed to lock it in the proper position when firing, flame might leak back and explode the black powder stored in the butt.  Catastrophic failures happened because the period's methods of fabrication were not reliably capable of producing the fitting precision parts needed to prevent such malfunctions caused by errant sparks.

27.     Sometime before 1701, John Cookson moved to Boston.[43]  Despite Cookson's exceptional skill as a gunsmith, he apparently stopped making repeating firearms during his 60 years in Boston.  There are no surviving eighteenth-century, American-made Cookson repeaters.[44]  This is actually not surprising given the fact that American-made guns were typically "utilitarian in nature, certainly nothing like the fine magazine breech-loading repeaters normally associated with the name John Cookson."[45]  The authors of a recent essay speculate that the 1756 newspaper advertisement "could have involved one of the repeaters which he had brought from England when he emigrated and which, at his age of 82 at the time, he had decided to sell."[46]  The four known firearms that John Cookson did make in America are different types of single-shot firearms: one is a breech-loader, the others are muzzle-loading.[47]

---

Today this type of repeating firearm is generally identified by English and American collectors and curators as employing the Lorenzoni system.

[43] Weaver and Godwin, "John Cookson, gunmaker," 51-56, 59-61

[44] *Ibid.*, 56, 60. Weaver and Godwin make clear that the firearm referred to as a "Volitional Cookson Repeating Flintlock" in the collection of the National Firearms Museum in Washington, D.C. was made in the late 1600s by John Shaw, a London gunsmith.

[45] *Ibid.*, 55.

[46] *Ibid.*, 60.

[47] *Ibid.*, 56-57.

**Page 16 - DECLARATION OF KEVIN M. SWEENEY**

28.    The next appearance of an identifiable repeating firearm dates to April of 1777 and comes from the records and correspondence of the Continental Congress.  Joseph Belton wrote to the Continental Congress claiming that he had a method "wherein a common small arm, may be maid [sic.] to discharge eight balls one after another, in eight, five or three seconds of time."[48]  He also claimed that such a gun could be made to discharge "sixteen or twenty, in sixteen, ten or five seconds."[49]  Its stated range was a mere 20 to 30 yards.  On July 10, 1777, Belton demonstrated a firearm that successively discharged 16 bullets.  He also claimed that this weapon could "do execution [at] 200 yards" which would have been a dramatic—and somewhat inexplicable—increase in the weapon's supposed range of 20 to 30 yards.[50]  In any event, Belton and Congress failed to agree on a financial arrangement.  Belton requested the princely sum of £13,000—£1000 from each of the 13 states—to compensate him for inventing this system, though he subsequently reduced his demand to only £500 from each of the states.[51]  There is no documentary or physical evidence indicating that Belton produced any of these firearms in 1777.

29.    The specific design of the firearm that Belton demonstrated in 1777 remains unclear.  There is a brass-barreled, flintlock fusil in the collection of the Smithsonian Institution that has been proposed as the actual gun or a prototype for the gun that Joseph Belton demonstrated in 1777.[52]  It is engraved "IOS. BELTON INVENTOR ET ARTIFEX – PHILAL-

---

[48] Quoted in Brown, *Firearms in Colonial American*, 317.  This letter and others are reproduced in their entirety at Joseph Belton to the Continental Congress, April 1, 1777 at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence_between_John_Belton [sic.]_and_ the_ Continental _Congress.

[49] *Ibid.*

[50] Letter with Enclosure, Joseph Belton to the Continental Congress, July 10, 1777, at "Correspondence between John [sic.] Belton and the Continental Congress" at https://en.wikkisource/ Correspondence_between_John_Belton [sic.]_and_ the_ Continental _Congress.

[51] Joseph Belton to the Continental Congress, May 7, 1777 and Joseph Belton to John Hancock, May 8, 1777 at https://en.wikkisource/ Correspondence_between_John_Belton [sic.]_and_ the_ Continental _Congress.

[52] Robert Held, "The Guns of Joseph Belton Part I" *American Rifleman* (March 1987), 36-39, 68-69; *Oregon Firearms Federation v. Brown*, U.S. Dist. Ct. Civ. No. 2:22-cv-01815-IM (lead case), Declaration of Ashley Hlebinsky (ECF 72) at 18, n 24.

**Page 17 - DECLARATION OF KEVIN M. SWEENEY**

MDCCLVIII [i.e. 1758]".  An additional engraving on the gun refers to "CAPT JOSEPH BELTON OF Philad."[53]  However, the Joseph Belton who arrived in Philadelphia in 1775 and who came into contact with Benjamin Franklin and subsequently other members of the Continental Congress and the Continental Army was a 1769 graduate of the College of Rhode Island, which is today Brown University.[54]  In 1758, this Joseph Belton was not in Philadelphia; he was not a captain; and he was not then a gunsmith.  Despite claims to the contrary, it is unlikely that this particular gun was demonstrated in Philadelphia in July of 1777.[55]

30.     However as Harold Peterson suggested many years ago, it is quite likely that the firearm demonstrated in 1777 employed some version of what is known as a superimposition system.[56]  In the simplest version of a superimposed or superposed system of loading a firearm, a series of alternating powder charges and balls are loaded directly into a gun's barrel.  There is no detachable or integral magazine, just a standard barrel that is loaded from the muzzle in an alternating sequence of gunpowder and balls.  All of these charges were—ideally—set off in order from front to back by igniting the powder charge located behind the ball closest to the muzzle of the gun's barrel.  There is no magazine involved, and the ensuing discharge of balls is uncontrolled after it is initiated.

31.     The superposed system for discharging a succession of balls had been tried as early as 1580 by a German gunsmith working in London.[57]  Today, early flintlock pistols that used a simple superposed loading system are sometimes referred to as "Roman candle pistols" because they employed "the same principle as the firework" which involves setting off "a chain

---

[53] Smithsonian National Firearms Collection, :https://americanhistory.si.edu/collections/search/object,nmah_440031 Accessed 2/2/2013.

[54] Benjamin Franklin to Silas Deane, August 27, 1775 in *Papers of Benjamin Franklin*, Vol. 22, 183-185, especially footnote, 2.

[55] Quite distinct from the questions raised by what is known of Joseph Belton's biography is the claim in Adam Weinstein "I am Tired of Being Tired" December 21, 2018 that his grandfather, Kenneth Weinstein, a gunsmith, fabricated this particular firearm. adamweinstein.substack.com/p/i-am-tired-of-being-tired <Accessed 2/2/2023 at 12:00PM>.

[56] Peterson, *Arms and Armor in Colonial America*, 218.

[57] Peterson, *Treasury of the Gun*, 195.

**Page 18 - DECLARATION OF KEVIN M. SWEENEY**

reaction of multiple discharges."[58]  Other writers also liken flintlock long arms that employed a simple superposed system of multiple charges to "Roman candles".[59]

32.     Later in London, Joseph Belton was involved in producing a sophisticated and controllable version of a firearm employing a superposed system.  In 1784, Belton went to England where he failed to interest the English Ordnance Department in some version of his superposed system.  By 1786, he had entered into a partnership with London gunsmith William Jover (active 1750-1810).  Together they produced for Britain's East India Company a smoothbore repeating firearm with a sliding gunlock, that moved down the barrel to ignite a succession of powder charges that propelled a series of musket balls contained in a replaceable metal magazine holding 7 projectiles.  There are two authentic examples of this particular firearm in the collection of the Royal Armouries, National Firearms Center in Leeds, England.

33.     Belton's 1786 firearm allowed the shooter to control the weapon's discharge and aim each shot, which was not possible with the simpler superposed system.  As the 1786 firearm's moving gunlock lined up with the next powder charge and ball, the shooter primed a pan, pulled back the cock on the sliding gunlock, and then pulled a trigger firing off a single projectile.  Because of the need to cock and prime each time before pulling the trigger and firing the gun, this was not a rapid-fire repeating arm.  This firearm was also something of a challenge to handle.  It weighs 10 pounds unloaded and would have weighed close to 11 pounds when loaded.  Jonathan Ferguson, the Keeper of Firearms and Artillery at the Leeds Firearms Center observes in an on-line video that managing the weapon is "a bit of a three-handed job."[60]

34.     A much cruder version of a firearm employing a superposed system was produced in America in the early 1790s.  A July 20, 1793 newspaper report in *Philadelphia's Gazette of the United States* from Elizabeth Town, Pennsylvania describes a firearm created by "the ingenious and

---

[58] Jeff Kinard, *Pistols: An Illustrated History of their Impact* (Santa Barbara, CA: ABC-CLIO, 2004), 37.

[59] Brown, *Firearms in Colonial America*, 100; Peterson, *Treasury of the Gun*, 197.

[60] Jonathan Ferguson, "Flintlock Repeating − 1786" youtube.com/watch?v=-wOmUM40G2U.  <Accessed online 11/6/2022 at 4:00 P.M>

**Page 19 - DECLARATION OF KEVIN M. SWEENEY**

philosophic Mr. Chambers of Mercersburg in Pennsylvania." This was Joseph Gaston Chambers (1756-1829). According to the news report, this pistol "discharged six balls in succession, with only one loading and once drawing the trigger, exclusive of the reserve shot, which went off with the drawing of another trigger." Later in the year, Chambers attempted to interest the United States War Department in buying long arms employing his version of the superposed system.

35.     A drawing that was probably done later reveals that Chambers's superposed system for a musket employed two gunlocks: one near the front of the barrel and the other in the usual location at the barrel's breech. First a powder charge was poured down the barrel followed by a traditional spherical ball which was pushed down to the breech. This was the reserve shot. Next a succession of 8 special, cylindrically shaped bullets with conical tails and 8 powder charges were pushed down the barrel. Pulling a cord triggered the lock near the front of the barrel and ignited the first powder charge closest to the muzzle, which fired the first cylindrical projectile. A hole in the next projectile carried the charge through it and down its conical tail, which ignited the charge, which propelled the second cylindrical charge, and so on. Finally, the spherical ball resting at the barrel's breech was discharged by pulling the second trigger near the breech.[61] Chamber's system did not employ a detachable magazine, and once initiated, the gun's discharge could not be controlled. A drawing of this firearm is attached as **Exhibit B.**

36.     Chambers's initial efforts to win government interest in 1793 and a patent for his invention were unsuccessful. A demonstration in May of 1793 failed to impress the War Department. Later in 1813, Chambers did secure a patent and supplied the U.S. Navy with 200 repeating muskets and 100 repeating pistols and also sold weapons to the state of Pennsylvania.[62] The Navy's use of these weapons attracted the attention of the British and Dutch governments. However, in the end, Chambers's system with its unusual projectiles failed to obtain sustained interest from any government. His guns did work, but they could also produce devastating malfunctions. As historian Andrew Fagal has pointed out, cramming the gun's barrel with

---

[61] For the best description of the system and an illustration of how the gun was loaded see Fagal, "The Promise of American Repeating Weapons, 1791-1821" pages 2-3 of 6.

[62] Peterson, *Treasury of the Gun*, 197.

**Page 20 - DECLARATION OF KEVIN M. SWEENEY**

projectiles and gunpowder produced what was potentially a pipe bomb.[63]  All superposed weapons were difficult to load correctly, and if the bullets did not fit tightly, flame could leak around them and set off all the charges at once.[64]  In the 1820s, the "complexity and inherent dangers" of superposed systems that filled gun barrels with multiple charges of explosive gun powder "led to their wholesale abandonment."[65]

37.    A safer alternative to the systems employed by Cookson and Chambers was an air gun that did not use black powder as a propellant.  There are two advertisements—one for a demonstration and one for an auction—that contained references to an air gun able to fire 20 times with a single charging.  The February 10, 1792, issue of New York City's *Daily Advertiser* announced "To the Curious" daily exhibitions of an air gun.  This gun was supposedly made by a young man who was a native of Rhode Island, though in an advertisement almost two years later, it was claimed that the gun was made in New York City by "An American Artist."  This gun discharged twenty times without needing to renew the propellant provided by compressed air.  Each pull of the trigger provided enough air to send a ball through an inch-thick board at a distance of sixty yards.  For 6 pence, a resident of the city could see Gardiner Baker demonstrate the air gun twice a day—Tuesday and Friday afternoons excepted—at his museum located at no. 13 Maiden Lane.  There is no indication that Gardiner Baker, "the young man in Rhode Island" or the "American Artist" in New York was marketing air guns.  Instead, once again a repeater was being featured as a novelty in a show put on for paying customers.

38.    The air gun demonstrated by Baker appears to have resembled or possibly might have been an actual example of a European air rifle designed by Bartholomeo Girardoni in 1779.  A Girardoni air gun had a magazine with a capacity of 22 balls, each of which was propelled by discharges of compressed air from a replaceable cannister carried in the gun's stock.  The gun

---

[63] Fagal, "The Promise of American Repeating Weapons, 1791-1821," page 4 of 6.

[64] Peterson, *Treasury of the Gun*, 198.

[65] Andrew J. B. Fagal, "The Promise of American Repeating Weapons, 1791-1821" page 2 of 6. <Accessed online 10/25/2022 at 4:55 P.M>  Fagal is currently an assistant editor of the Papers of Thomas Jefferson at Princeton University.

**Page 21 - DECLARATION OF KEVIN M. SWEENEY**

weighed about 10 pounds—which was about the same as a musket—but was shorter, being only four feet in length overall.  As contemporaries in Europe reported, these air guns were not without their problems: "Due to their construction, these guns were much more difficult to use effectively than normal, as one had to handle them much more cautiously and carefully."[66]  In the late 1700s, the Austrian Army, which had a peacetime establishment of 304,628 men, purchased 1,500 Girardoni air rifles that, theoretically, could have armed only 0.5% of its soldiers.[67]  As it turned out, "after a while no more than one-third of them were in a usable state," and they were all phased out by 1810 if not before.[68]

39.     The American military's use of a Girardoni air rifle was more limited in number and briefer in its timespan, but is also much better known.  On their 1804-1806 expedition to the Pacific Ocean and back, Lewis and Clark and their "Corps of Discovery" carried with them a single Girardoni air rifle.[69]  While it was occasionally used for hunting, their air rifle was primarily employed to impress Natives that they encountered along the way.  As Private Joseph Whitehouse recorded in his journal: "Captain Lewis took his Air Gun and shot her off, and by the Interpreter, told them that there was medicine in her, and that she could do very great execution."  "They all stood amazed at this curiosity."[70]  Eight decades after John Pimm's repeating firearm had been used to impress Native Americans in Boston, Lewis and Clark—like the showman Philadelphia Gardiner Baker—were still able to exploit the rarity of a repeating gun to awe and entertain.

40.     It is possible that someone in the United States may have been marketing Girardoni air rifles or something very similar to them in the mid-1790s.  An announcement for a public

---

[66] Quoted in Frederick J. Chiaventone, "The Girardoni Air Rifle: The Lewis and Clark Expedition's Secret Weapon" *Military Heritage*  Vol. 14  No. 5 (January 2015), 19.

[67] Richard Bassett, *For God and Kaiser: The Imperial Austrian Army* (New Haven: Yale University Press, 2015), 186.

[68] Chiaventone, "Girardoni Air Rifle," 19.

[69] For the identification of the air rifle on the Lewis and Clark Expedition as a Girardoni see Madeline Hiltz, "The Lewis and Clark Air Rifle: A Blast from the Past" *War History on Line* (June 16, 2021) https://warhistoryonline.com/war-articles/lewis-and-clark-air-rifle.html?firefox=1 <Accessed online 1/21/2023, 8:00AM>

[70] Chiaventone, "Girardoni Air Rifle," 66.

**Page 22 - DECLARATION OF KEVIN M. SWEENEY**

auction in the issue of the Boston *Columbian Centinel* for March 7, 1795 listed among the items to be sold "a Magazine Air-Gun, equipped for hunting, and will carry ball or shot."  This air gun appears to be a repeating gun because of its reference to a "Magazine."  However, one should not automatically assume that all early air guns were repeaters.  Air rifles made by Isaiah Lukens (1779-1846) of Pennsylvania were single shot air guns, though some writers erroneously assume that they were repeaters like Girardoni's air rifle.[71]  It wasn't until the 1880s that two Michigan companies—the most famous of which was the Daisy Manufacturing Company—would begin marketing the first commercially successful, mass-produced repeating air rifles, aiming them at a youth market, employing a lever-action operating system, and shooting BB-caliber pellets.

41.     Two more references to what appear to be repeating firearms were discovered in eighteenth-century newspapers.  One from the August 19, 1793 issue of the Concord, New Hampshire *Mirrour* contains a vague report of a repeating weapon supposedly designed by an "Artist in Virginia".  However, this particular news report has been dismissed as a fabrication.[72] The other reference to what does appear to be an identifiable type of repeating firearm was contained in a large advertisement in the October 26, 1785 issue of the *Columbian Herald* in Charleston, South Carolina.  It was placed by James Lambet Ransier, a native of Liege, which was a center of small arms manufacturing in the Low Countries.  Ransier announced that he had "a beautiful and complete assortment of Firearms" and in particular, he could furnish guns "that will fire four different times, with only charging once; or, if the person pleases, he may fire four different times one after another, with only one single lock."

42.     Ransier appears to be describing imported Belgian or French-made Segales pistols which had four rifled barrels.  These were small pistols that had a box lock and a swiveling

---

[71] Nancy McClure, "Treasures from Our West: Lukens Air Rifle" August 3, 2014, Buffalo Bill Center of the West. <Accessed online on 10/31/2022, at 10:40 A.M>  On November 2, 2022, I received an email from Danny Michael, Curator of the Cody Firearms Museum at the Buffalo Bill Center of the West, confirming that their Lukens air rifle is a single shot weapon.

[72] Many aspects of the news report in the *Mirrour* raise fundamental questions about its believability, as does the fact that it was immediately followed by a news report on a Sea Monster.  An intensive search of Virginia newspapers in *America's Historical Newspapers* failed to uncover the supposed origin of the news report.  Because it could not be confirmed and because of its lack of detail and credibility, the report was dismissed.

**Page 23 - DECLARATION OF KEVIN M. SWEENEY**

breech attached to a cluster of four separate barrels: two upper barrels placed on top of two lower barrels. The box lock had two triggers and two hammers holding two flints, while the swiveling or rotating breech had four frizzens that were attached to the barrels. Each barrel was loaded separately at the muzzle with powder and ball. The two upper barrels could be fired one at a time by pulling each of the individual triggers in succession or fired simultaneously by pulling both triggers at once (which could be risky). After discharging the two upper barrels, the shooter then swiveled the rotating breech and the cluster of four barrels by pulling on the pistol's trigger guard. Once rotated to the upper position, the two barrels formerly in the lower position could now be fired when the triggers were pulled individually or simultaneously. However, as experts have pointed out: "All revolvers, and other multibarrel guns, of the muzzle-loading type were at risk from a dangerous chain reaction, in which firing one chamber could accidently set off all the others."[73] If this happened, the gun would explode in the shooter's hand.

43.     Finally, something needs to be said about a gun which—ironically—was never found in the 13 Colonies, but has assumed an out-sized importance in the minds of some writing about colonial Americans and their presumed interest in and familiarity with repeating firearms.[74] In the early 1700s, James Puckle, an English lawyer, writer, and part-time inventor created a firearm fed by a 11-shot magazine located at the back of the gun that was rotated by a crank. Rotating the crank aligned a power charge and bullet in the magazine with the weapon's barrel. After locking the magazine and the barrel together, the operator had to manually prime each shot and pull back the cock before pulling the trigger for each discharge of the weapon. Because of the time needed to prime and cock the hammer before each shot and to change the magazine after it was emptied, the gun had a rate of fire of only 9 rounds per minute. It was

---

[73] Rimer, *Smithsonian's Firearms,* 56.

[74] Clayton E. Cramer and Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America" *Willamette Law Review* Vol. 44. No. 4 (Summer 2008), 716-717; David B. Kopel, "The History of Firearm Magazines and Magazine Prohibitions" *Albany Law Review* Vol. 78, No. 2 (2014-2015), 852.

**Page 24 - DECLARATION OF KEVIN M. SWEENEY**

never used in battle.  The company producing it went out of business before 1730.  This gun had no discernable impact on colonial Americans nor on the development of firearms technology.[75]

44.      However, the Puckle gun lives on in the imaginations of some.[76]  Because of its weight, the Puckle gun used a tripod.  Visually the weapon bears an undeniable physical resemblance to certain .30 caliber machine guns used in World War II.  As a result, some refer to it today as "an eighteenth-century machine gun."  It was not a machine gun as we understand and use the term today, in either its mode of operation or its rate of fire.  The machine gun, invented by Hiram Maxim in 1884, used the recoil action of the gun to load it continuously and discharge spent cartridges.  Just pull the trigger and it kept firing bullets as long as the operator's assistant kept feeding it an ammo belt.  Another less common version of the machine gun diverted some of the gasses produced by discharging the weapon into a tube with a piston that automatically and repeatedly loaded the gun and ejected spent cartridges.  (A modern assault rifle uses a similar system that also employs diverted gasses to operate a piston.)  The .30 caliber medium machine gun used by the American army during World War II fired approximately 500 rounds a minute.  The only thing this weapon had in common with the eighteenth-century Puckle Gun was its use of a tripod.

45.      In summary, period probate inventories and newspapers indicate that repeating firearms were extraordinarily rare in eighteenth-century America.  Like muskets, repeaters were regarded as military firearms.  In 1777, the Continental Congress demonstrated an interest in Joseph Belton's firearm, and in 1813 the United States Navy purchased 200 muskets and 100 pistols produced by Joseph Gaston Chambers.  However, such superposed systems were in the assessment of military historian Joseph G. Bilby "a developmental dead end."[77]  Well into the third-quarter of the nineteenth century, the American government armed the overwhelming

---

[75] Brown, *Firearms in Colonial America*, 239. Brown appears to misstate the capacity of the magazine as 9-shot, when it was actually a 11-shot magazine.

[76] See note 74 above.

[77] Joseph G. Bilby, *A Revolution in Arms: History of the First Repeating Rifles* (Yardly, Penn.: Westholme Publishing, 2015), 41.

**Page 25 - DECLARATION OF KEVIN M. SWEENEY**

majority of its soldiers with muzzle-loading single-shot long arms.  Even during the Civil War, the Union army made only limited use of the much more reliable repeating long arms made by Samuel Colt, the Spencer Arms Company, and the New Haven Arms Company, which was owned by Oliver Winchester and produced a repeater designed by Benjamin Henry.[78]

46.      The earlier lack of enthusiasm for repeating firearms among eighteenth-century Americans is unsurprising given the colonists' demonstrated preferences for inexpensive, light firearms that used less gunpowder and lead than did muskets.  By contrast, most of the period's repeating arms were expensive, heavy, and required greater expenditures—that were often uncontrollable—of gunpowder and lead.  Because repeating firearms contained multiple charges of explosive black powder gunpowder, they were also more dangerous than a gun using a smaller charge of gunpowder and a single projectile.  Some of these repeating firearms had the potential to turn into a Roman candle or a pipe bomb.  As Harold Peterson has observed "As long as the powder and ball had to be loaded separately there was no hope for a simple and safe magazine repeater."[79]  For these reasons, eighteenth-century advertisements and homes were filled with muzzle-loading, single shot firearms.

47.      The fact that some repeating firearms had been produced in Europe for four centuries by 1800 does not necessarily support the conclusion that Americans in the late 1700s would have assumed that such weapons would inevitably become reliable, safe, and widely available.  An individual looking back from 1800 might have been just as likely to conclude that very little progress had been made over the previous four centuries.  It was still not possible to manufacture with precision and in any quantity firearms with closely fitting parts that could contain the destructive explosive potential associated with the use of black powder gunpowder.  The superposed systems employed by Belton and Chambers, the Girardoni air rifle, and the Puckle Gun proved to be dead ends.  Calling these weapons and others like them "eighteenth-century assault rifles" or "an eighteenth-century machine gun" are examples of modern-day

---

[78] Bilby, *Revolution in Arms*, 44-48, 60-91.

[79] Peterson, *Treasury of the Gun*, 233.

**Page 26 - DECLARATION OF KEVIN M. SWEENEY**

rhetoric, not evidence of inevitable developments in firearms technology. As George Basalla, an historian of technology, has cautioned: "All too often it is assumed that the development of technology is rigidly unilinear."[80]

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Dated this 5 day of February, 2023.

Kevin M. Sweeney

---

[80] George Basalla, *The Evolution of Technology* (New York: Cambridge University Press, 1988), 189.

**Page 27 - DECLARATION OF KEVIN M. SWEENEY**

1

**Curriculum Vitae: Kevin M. Sweeney**


Home Address:  9 Orchard Street,
                Greenfield, MA  01301


Home Phone:   (413) 774-5027
E-mail:         kmsweeney@amherst.edu


**Education:**  Ph.D. in History   1986, Yale University.
               B.A.  in History   1972, Williams College.


**Employment:**

2000-2016   Professor of History and American Studies, Amherst College.
1993-2000   Associate Professor of History and American Studies, Amherst College.
1989-1993   Assistant Professor of History and American Studies, Amherst College.
1986-1989   Director of Academic Programs, Historic Deerfield, Deerfield, Mass.
1985-1986   Assistant Professor, Winterthur Museum, Winterthur, Delaware.
1980-1984   Administrator-Curator, Webb-Deane-Stevens Museum, Wethersfield, Conn.
1978-1980   History Instructor, Westover School, Middlebury, Conn.


**Other Academic Appointments:**

2007        Visiting Faculty, American Studies Seminar, American Antiquarian Society, Worcester,
              Mass.
1987-1989   Assistant Professor of American Studies at Smith College under the Five
              College Program.
1985-1986   Adjunct Assistant Professor, Early American Culture, University of
              Delaware.
1982-1984   Visiting Lecturer in American Studies, Trinity College, Hartford, Conn..
1981        Adjunct, Art History Department, University of Hartford.


**Declarations Filed as an Expert Witness:**

2022        *Hanson v. District of Columbia*, Case No. 1:22-cv-02256-RC.
2023        *Delaware State Sportsmen's Assoc., Inc. v. Delaware Dept. of Safety and Homeland
              Security*, United States District Court, District of Delaware, Case No. 1:22-cv-00951-RGA.


**Academic Honors and Prizes:**

2003   Book Prize, New England Historical Association.
2003   Award of Merit, American Association for State and Local History.

2

1995   Harold L. Peterson Award, Eastern National Parks & Monuments Association.
1986   Jamestown Prize of the Institute of Early American History and Culture, Williamsburg, VA.
1986   Frederick W. Beinecke Prize in History, Yale University.
1973   Mary Cady Tew Prize in History, Yale University.
1972   William Bradford Turner Prize in American History, Williams College.
1971   Phi Beta Kappa, Williams College.

**Publications:**

### Books

With Evan Haefeli, co-editors, *Captive Histories: English, French and Native Narratives of the 1704 Deerfield Raid* (Amherst, Mass.: University of Massachusetts Press, 2006).

With Evan Haefeli, *Captors and Captives: The 1704 French and Indian Raid on Deerfield* (Amherst, Mass.: University of Massachusetts Press, 2003). Awarded 2003 Book Prize, New England Historical Association and 2003 Award of Merit, American Association for State and Local History.

### Articles/Book Chapters/Catalogue Essays

"Revolutionary State Militias in the Backcountry and Along the Frontiers," *The American Revolution on the Frontier*, edited by Seanegan Sculley, Sons of the American Revolution 2022 Conference Proceedings, (publication forthcoming).

"Firearms Ownership and Militias in Seventeenth- and Eighteenth-Century England and America" in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, editors *A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment* (Washington, D.C.: Smithsonian Scholarly Press, 2019), 54-71.

"Firearms, Militias, and the Second Amendment" in Saul Cornell and Nathan Kozuskanich, editors, *The Second Amendment on Trial: Critical Essays on District of Columbia v. Heller* (Amherst: University of Massachusetts Press, forthcoming August 2013), 310-382.

"Mary Rowlandson: Taken by Indians," *American Heritage* 58:5 (Fall 2008): 23-25.

"Early American Religious Traditions: Native Visions and Christian Providence," *OAH Magazine of History* (January 2008):8-13.

With Jessica Neuwirth, Robert Paynter, Braden Paynter and Abbott Lowell Cummings, "Abbott Lowell Cummings and the Preservation of New England," *The Public Historian* 29:4 (Fall 2007):57-81.

With Evan Haefeli, "*The Redeemed Captive* as Recurrent Political Text" *The New England Quarterly* (September 2004):341-367.

"The 1704 French and Indian Raid on Deerfield" *New England Ancestors* 5:1 (Winter 2004): 23-26.

"Regions and the Study of Material Culture: Explorations along the Connecticut River" for *American Furniture*, Luke Beckerdite, editor (Milwaukee, Wis.: Chipstone Foundation/ the University Press of New England, 1995), 145-166.

With Evan Haefeli, "Revisiting *The Redeemed Captive*: New Perspectives on the 1704 Attack on Deerfield" *William and Mary Quarterly* 3rd ser. 52:1(January 1995):3-46. Awarded the 1995 Harold L. Peterson Award, Eastern National Parks & Monument Association, and the 1995 Essay Prize, Society of Colonial Wars.

With Evan Haefeli, "Wattanummon's World: Personal and Tribal Identity in the Algonquian Diaspora, c. 1660-1712" in William Cowan, ed., *Papers of the Twenty Fifth Algonquian Conference* (Ottawa, 1994), 212-224.

"High Style Vernacular: Lifestyles of the Colonial Elite " in *Of Consuming Interests: The Style of Life in Eighteenth-Century America*, edited by Ronald Hoffman, Cary Carson, and Peter J. Albert (Charlottesville: University of Virginia Press, 1994),1-58.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1995.

"Meetinghouses, Town Houses, and Churches: Changing Perceptions of Sacred and Secular Space in Southern New England, 1725-1850" *Winterthur Portfolio* 28:1 (Winter 1994):59-93.

"Using Tax Lists to Detect Biases in Probate Inventories," *Early American Probate Inventories: Dublin Seminar for New England Folklife Annual Proceedings 1987,* Peter Benes, ed. (Boston: Boston University Press, 1989), 32-40.

"Gentlemen Farmers and Inland Merchants: The Williams Family and Commercial Agriculture in Pre-Revolutionary Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1986*, Peter Benes, ed. (Boston University Press, 1988), 60-73.

"Furniture and the Domestic Environment in Wethersfield, Connecticut, 1640-1800," *Connecticut Antiquarian* 36:2 (1984): 10-39. Revised and reprinted in *Material Life in America, 1600-1860*, Robert B. St. George, editor (Boston: Northeastern University Press, 1988), 261-290.

"From Wilderness to Arcadian Vale: Material Life in the Connecticut River Valley, 1635 to 1760" and "Gravestones" in *The Great River: Art and Society of The Connecticut Valley, 1635-1820* (Wadsworth Atheneum, Hartford, CT., 1985), 17-27, 485-523.  Volume awarded the Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1985.

"Where the Bay Meets the River: Gravestones and Stonecutters in the River Towns of Western Massachusetts, 1690-1810," *Markers III*, David Watters, ed. (Association for Gravestone Studies, 1985),1-46.

"Mansion People: Class, Kinship and Architecture in Western Massachusetts in the Mid-18th Century," *Winterthur Portfolio* (Winter 1984):231-255.

"Furniture and furniture making in mid-eighteenth-century Wethersfield, Connecticut" *Antiques* 125:5 (May 1984), 1156-1163.

4

"River Gods in the Making: The Williams Family in Western Massachusetts," *Dublin Seminar for New England Folklife, Annual Proceedings 1981*, Peter Benes, ed. (Boston University Press, 1982), pp. 101-116. Reprinted in a *Place Called Paradise: 1654-2004*, edited by Kerry Buckley (Amherst, Mass.: University of Massachusetts Press, 2004), 76-90.

**Exhibitions:**

2007-2008    Consultant, "Shays's Rebellion," N. E. H. Funded Web-Exhibition, Springfield Technical Community College and Pocumtuck Valley Memorial Association.

2003-2005    Consultant and Contributor, "The Many Stories of 1704," N.E.H. Funded Web-exhibition, Pocumtuck Valley Memorial Association. 2005 Museums and Webs Award Winner; 2005 Award of Merit, American Association for State and Local History; 2007 Merlot History Classics Award and others.

1984-1985    Consultant and Contributor, "The Great River: Art and Society of the Connecticut Valley, -1820" Catalogue awarded Charles F. Montgomery Prize for 1985 by the Decorative Arts Society; Award of Merit from the American Association for State and Local History, 1986; Honorable Mention, E. Harold Hugo Memorial Book Prize, Old Sturbridge Village, 1986.

1982         Consultant and Contributor, "Two Towns: Concord and Wethersfield - A Comparative Exhibition of Regional Culture, 1635-1850," 1982. N. E. H. Funded Exhibition.

**Films/Videos:**

2012         Contributor, *Cherry Cottage, The Story of an American House*, Dave Simonds, Williamstown, Mass.

2009         Contributor, *The Forgotten War: The Battle for the North Country,* Mountain Lake Public Television, Plattsburg, NY.

2005         Contributor, *Captive: The Story of Esther,* VisionTV and Aboriginal Peoples Television Network, Canada.

2003         Contributor, *New England's Great River: Discovering the Connecticut,* Vermont Public Television, Burlington, VT

**Memberships in Professional and Scholarly Societies:**

American Historical Association.
Colonial Society of Massachusetts.
Massachusetts Historical Society.
Organization of American Historians.
Society of Military Historians

**Other Professional Activities**

| | |
|---|---|
| 2008-2010 | Chair, History Department, Amherst College. |
| 2005-2007 | Chair, American Studies Department, Amherst College. |
| 2003-2004 | Consultant, "Remembering 1704: Context and Commemoration of the Deerfield Raid" Pocumtuck Valley Memorial Association and Historic Deerfield, Inc. |
| 1997-2001 | Consultant, "Turns of the Centuries" Project, Pocumtuck Valley Memorial Association. |
| 1997-1999 | Chair, History Department, Amherst College. |
| 1997-1998 | Consultant, Exhibition entitled "Performing Arts: The Refinement of Rural New England," Historic Deerfield., Inc. |
| 1996-1998 | Member, Advisory Committee for the Dickinson Homestead, Amherst College. |
| 1994-1995 | Chair, Committee on Priorities and Resources, Amherst College. |
| 1993-1995 | Chair, American Studies Department, Amherst College |
| 1992 | Consultant, "Forty Acres: A Reinterpretation Initiative," Porter-Phelps-Huntington Foundation, Hadley, Mass. |
| 1991 | Consultant, "Furniture-making in Central New England, 1790-1850," Old Sturbridge Village. |
| 1991-1994 | Member, Five College Standing Committee on American Indian Studies. |
| 1986-1989 | Member, Five College American Studies Steering Committee. |
| 1981-1986 | Member, Advisory Committee for Historic Deerfield. |

1/27/2023



# EXHIBIT 21

 **KQED**

 Sign In

 **News** **Politics** **Science** **Education** **Housing** **Immigration** **Criminal Justice** Silicon Valley

THE CALIFORNIA REPORT

# Gun Groups: More Than A Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension

By Matthew Green    Apr 12, 2019

🔖 **Save Article**

   ○

*This article is more than 4 years old.*



A Colt AR-15 with a high-capacity magazine that holds more than 30 rounds. *(Thomas Cooper/Getty Images)*

More than a million high-capacity ammunition magazines flooded into California during a one-week window created when a federal judge temporarily threw out the state's ban, gun owners' groups estimated Thursday.

---

**RELATED STORIES**

 Newsom Pushes for Tougher Gun Restrictions Following Spate of Mass Shootings

---

 How Effective Are California's 'Red Flag' Gun Laws? San Francisco and San Diego Are Trying to Find Out

---

 SFMTA's Jeffrey Tumlin | CA Gun Violence

The magazines aren't tracked. But there are plenty of anecdotal indications that the floodgates briefly opened when U.S. District Judge Roger Benitez overturned the state's nearly 20-year-old ban in late March.

Gun control advocates, however, said the projections are inflated and self-serving as gun rights organizations try to make the case that high-capacity magazines bans are impractical.

The judge halted sales a week later, but ruled that those who bought the magazines can legally own them while the state appeals his ruling.

"Everything was all sold out. I basically took whatever I could get," said Chris Puehse, who owns Foothill Ammo in Shingle Springs, east of Sacramento.

He fielded dozens of telephone calls while buyers stacked up 20 deep in his one-man store to buy the hundreds of magazines that arrived in two shipments last week. He had just six left by the time Benitez reinstated the ban last Friday.

"People loved it. It was like we were out of prison and were not treated like bastard stepchildren of the country anymore," he said.

Puehse said that 30-round magazines for military-style rifles, handgun magazines holding 17 to 20 bullets, all selling for less than $30 each, almost immediately "disappeared."

"They wanted to grab more than I let them, otherwise they would have been gone even

faster than a few hours," he said. "Because of that one slip-up, in one week you literally had millions of magazines come into the state that were bought legally. These magazines are here to stay."

Hours before Benitez again halted sales, California Attorney General Xavier Becerra warned that the state was in danger of becoming "the wild, wild West for high-capacity magazines."

"There are those who are now trying to flood the state of California with what were until this decision illegal high-capacity magazines, the type of magazines that are used in firearms to commit the mass shootings that we've seen throughout the country," Becerra said.

The magazines allow shooters to fire more bullets without stopping to reload. Gun owners' organizations — and Judge Benitez — said that's helpful to ward off multiple home invaders, but opponents said it gives victims less time to escape or tackle a mass shooter as he reloads.

During that short window, a number of ammunition manufacturers around the country sought to take advantage of the opportunity. South Carolina-based Palmetto State Armory announced in a Facebook ad that it was "prepared to send a whole lot of freedom to our friends in California," but warned of delays due to high demand.

"The pipeline was open and it was flowing, on all platforms — people showing up (in stores), online — I'm guessing that UPS and FedEx had a field day," said Gun Owners of California president Sam Paredes. "It was a frenzy."

He said an estimate of a million magazines "seems a little bit low."
California's more than 2.5 million gun owners together have nearly 20 million guns, many of which can use the extended magazines.

Staff attorneys with the Giffords Law Center to Prevent Gun Violence in San Francisco said they've seen no evidence to back up the million-magazine estimate, and said gun rights organizations have a vested interest in inflating the number of law-abiding owners.

"They have a very specific purpose and intent here to try to set up for the court that these are devices that are very commonly used and possessed" and therefore should not be banned again, said Ari Freilich, an attorney with the center.

The problem isn't the new owners who will use them legally for target shooting or self-

defense, he said, it's that some will fall into the hands of criminals or be used by mass shooters.

Reformers expect the 9th U.S. Circuit Court of Appeals to keep the ban on sales while reinstating a 2016 state law and ballot measure banning possession even by those who purchased the magazines legally.

Opponents of California's law are counting on the U.S. Supreme Court to ultimately side with Benitez's ruling, that the bans infringe on the Second Amendment right to bear arms.

# KQED

**Stay in touch. Sign up for our daily newsletter.**

Email Address:

**Sign Up**

To learn more about how we use your information, please read our privacy policy.



Copyright © 2023 KQED Inc. All Rights Reserved.

Terms of Service  Privacy Policy  Inside the Reporting Process  Contest Rules