UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

# FILED

OCT 10 2023

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| VIRGINIA DUNCAN; et al., | No.    23-55805 |
| Plaintiffs-Appellees, | D.C. No. 3:17-cv-01017-BEN-JLB Southern District of California, San Diego |
| v. | |
| ROB BONTA, in his official capacity as Attorney General of the State of California, | ORDER |
| Defendant-Appellant. | |

Before:  MURGUIA, Chief Judge, and S.R. THOMAS, GRABER, WARDLAW, PAEZ, BERZON, IKUTA, HURWITZ, R. NELSON, BUMATAY and VANDYKE, Circuit Judges.

California Penal Code section 32310(a) creates criminal liability for "any person . . . who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives" a large-capacity magazine ("LCM"), which is defined as "any ammunition feeding device with the capacity to accept more than 10 rounds".  Cal. Penal Code § 16740.  Plaintiffs—five individuals and the California Rifle & Pistol Association, Inc.—filed this action in the Southern District of California challenging the constitutionality of Section 32310 under the Second Amendment.  On September 22, 2023, the district court issued an order declaring Section 32310 "unconstitutional in its entirety" and enjoining California officials from enforcing

the law. *Duncan v. Bonta*, No. 17-CV-1017-BEN (JLB), 2023 WL 6180472, at *35–36 (S.D. Cal. Sept. 22, 2023). On September 26, Defendant Rob Bonta, the Attorney General of California, filed an emergency motion for a partial stay pending appeal. The Attorney General seeks to stay "all portions of the order except those regarding Sections 32310(c) and (d), which relate to large-capacity magazines that were acquired and possessed lawfully prior to the district court's order granting a permanent injunction." Mot. at 2. We grant the motion.

When deciding whether to grant a stay pending appeal, "a court considers four factors: '(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Nken v. Holder*, 556 U.S. 418, 425–26 (2009) (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)). Here, a stay is appropriate.

First, we conclude that the Attorney General is likely to succeed on the merits.[1] In *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court

---

[1] Importantly, this order granting a partial stay pending appeal, neither decides nor prejudges the merits of the appeal, which will be decided after full briefing and oral argument. *Cf. Doe v. San Diego Unified Sch. Dist.*, 19 F.4th 1173, 1177 n.4 (9th Cir. 2021) (explaining that "predicting the likelihood of success of the appeal" is a "step removed from the underlying merits" (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 660–61 (9th Cir. 2021))); *Doe #1 v. Trump*, 957

reiterated that "[l]ike most rights, the right secured by the Second Amendment is

not unlimited." 142 S. Ct. 2111, 2128 (2022) (quoting *Dist. of Columbia v. Heller*,

554 U.S. 570, 626 (2008)). The Attorney General makes strong arguments that

Section 32310 comports with the Second Amendment under *Bruen*. Notably, ten

other federal district courts have considered a Second Amendment challenge to

large-capacity magazine restrictions since *Bruen* was decided. Yet only one of

those courts—the Southern District of Illinois—granted a preliminary injunction,

finding that the challenge was likely to succeed on the merits. *See Barnett v.*

*Raoul*, 2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) (granting plaintiffs' preliminary

injunction); *Or. Firearms Fed'n v. Kotek*, 2023 WL 4541027 (D. Or. July 14, 2023)

(holding that the state's restriction on large-capacity magazines did not violate the

Second Amendment); *Brumback v. Ferguson*, 2023 WL 6221425 (E.D. Wash. Sept.

25, 2023) (denying plaintiffs' motion for a preliminary injunction); *Nat'l Ass'n for*

---

F.3d 1050, 1062 (9th Cir. 2020) (noting that when adjudicating a motion before considering the merits of the underlying appeal, "we must take care not to prejudge the merits of the appeal, but rather to assess the posture of the case in the context of the necessity of a stay pending presentation to a merits panel"). Our dissenting colleagues fault us for granting a stay pending appeal in a summary order. A summary order is not unusual in these circumstances, given the time constraints and limited briefing. Indeed, earlier this year, the Seventh Circuit granted a similar stay in a single sentence: "based on our review of the parties' submissions, the breadth of the litigation, and the differing conclusions reached by different district judges, we conclude that the stay of the district court's order already entered will remain in effect until these appeals have been resolved and the court's mandate has issued." *Herrera v. Raoul*, No. 23-1793 (7th Cir. May 12, 2023) (order).

*Gun Rights v. Lamont*, 2023 WL 4975979 (D. Conn. Aug. 3, 2023) (same); *Herrera v. Raoul*, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) (same); *Hanson v. Dist. of Columbia*, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) (same); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 2023 WL 2655150 (D. Del. Mar. 27, 2023) (same); *Bevis v. City of Naperville, Ill.*, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) (same); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022) (same); *Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782 (D. Or. 2022) (same). In that case, the Seventh Circuit subsequently stayed the district court's order pending appeal—the very relief the Attorney General seeks here. *Herrera v. Raoul*, No. 23-1793 (7th Cir. May 12, 2023) (order).

Second, the Attorney General has shown that California will be irreparably harmed absent a stay pending appeal by presenting evidence that large-capacity magazines pose significant threats to public safety. If a stay is denied, California indisputably will face an influx of large-capacity magazines like those used in mass shootings in California and elsewhere. As Plaintiffs concede, "[i]n 2019, when the district court first enjoined section 32310, decades of pent-up demand unleashed and Californians bought millions of magazines over ten rounds, essentially buying the nation's entire stock of them in less than one week." Resp. at 10–11.

Third, it does not appear that staying portions of the district court's order while the merits of this appeal are pending will substantially injure other parties interested in the proceedings. This stay does not interfere with the public's ability "to purchase and possess a wide range of firearms, as much ammunition as they want, and an unlimited number of magazines containing ten rounds or fewer." Mot. at 12. Section 32310 has no effect on these activities.

Finally, we conclude that the public interest tips in favor of a stay. The public has a compelling interest in promoting public safety, as mass shootings nearly always involve large-capacity magazines, and, although the public has an interest in possessing firearms and ammunition for self-defense, that interest is hardly affected by this stay.

In sum, we conclude that a stay pending appeal is warranted. We emphasize that at this stage of the litigation, we decide only whether to stay, in part, the district court's order while this appeal is pending.

Some of our colleagues have raised procedural questions regarding the propriety, under circuit rules and practices, of the en banc panel's decision to accept this appeal as a comeback case. These contentions are without merit. The Supreme Court has held that the governing statute leaves it to each Court of Appeals "to establish the procedure for exercise of the [en banc] power." *Western Pac. R.R. Corp. v. Western Pac. R.R. Co.*, 345 U.S. 247, 257 (1953). In this circuit,

"matters arising after remand" are directed to the en banc court, which "will decide whether to keep the case or to refer it to the three judge panel." Ninth Cir. Gen. Order 3.6(b). Here, the en banc panel has exercised its discretion to keep the comeback appeal, as our rules contemplate. "[W]hen a case is heard or reheard *en banc*, the *en banc* panel assumes jurisdiction over the entire case, *see* 28 U.S.C. § 46(c) . . . ." *Summerlin v. Stewart*, 309 F.3d 1193, 1193 (9th Cir. 2002) (Mem.). General Order 6.4, moreover, provides that emergency motions in potential comeback cases are directed to the previous panel that heard the case, which in this case, is the en banc court. Ninth Cir. Gen. Order 6.4(a). Thus, both this appeal and the motion for an emergency stay are properly before the en banc panel.

One of our colleagues raises novel questions about whether our rules are consistent with 28 U.S.C. § 46(c). We have asked the parties to brief these issues and will address them in due course.

The Attorney General's emergency motion for a partial stay pending appeal (Doc. 2) is **GRANTED**.

1   *Duncan v. Bonta*, No. 23-55805

2   R. NELSON, Circuit Judge, dissenting:

3   I join Judge Bumatay's dissent, as the majority's decision to stay the district

4   court's order pending appeal cannot be squared with *New York State Rifle & Pistol*

5   *Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

6   But I have a more fundamental concern with the majority's decision to

7   proceed with this new appeal en banc in the first instance.  No other circuit court

8   would allow a prior en banc panel to hear a comeback case without an intervening

9   majority vote of the active judges.

10   In 2022, this panel remanded the prior appeal to the district court and the

11   mandate issued.  When this new appeal was filed, the appeal could have been sent

12   to a three-judge panel; or a new en banc vote could have been requested from "all

13   circuit judges in regular active service," 28 U.S.C. § 46(c).  Both those options are

14   firmly rooted in § 46's statutory text and consistent with our General Orders.

15   Moreover, either option would avoid disenfranchising seven new active judges (a

16   full quarter of the court's active judges) from participating in this new appeal.  Our

17   General Orders do not require this.  And we have never followed this process in

18   such circumstances.

19   The majority, however, chose a third option—one that raises serious

20   questions about this panel's statutory authority under § 46(c) that we must now

1

1   address.  And these statutory concerns are determinative, as five of the seven

2   judges in the majority (more than 70 percent) are senior judges.  Complying with

3   statutory requirements is not voluntary.  *See, e.g.*, *Am.-Foreign S.S. Corp.*, 363

4   U.S. 685, 685–86 (1960), *superseded by statute* § 46(c) (1963) (holding that prior

5   version of § 46 did not permit senior judges ever to serve on an en banc panel);

6   *United States v. Hudspeth*, 42 F.2d 1013, 1015 (7th Cir. 1994) (holding that as

7   amended § 46(c) did not allow a judge who took senior status between the

8   argument and the decision to serve on the en banc panel), *superseded by statute*

9   § 46(c) (1996).

10      Just four years ago, we were chastened by the Supreme Court for ignoring

11  § 46 in an en banc case.  *See, e.g.*, *Yovino v. Rizo*, 139 S. Ct. 706, 708 (2019)

12  (vacating our en banc decision for counting a judge's determinative vote who

13  passed away before the decision).  We should not proceed down such an uncertain

14  statutory path, particularly when viable alternatives are available.  Our decision to

15  proceed with this process undermines public confidence in the process and our

16  ultimate decision.  I respectfully dissent.

1  *Duncan v. Bonta*, No. 23-55805
2  BUMATAY, Circuit Judge, joined by IKUTA, R. NELSON, and VANDYKE,
3  Circuit Judges, dissenting:
4
5      If the protection of the people's fundamental rights wasn't such a serious

6  matter, our court's attitude toward the Second Amendment would be laughably

7  absurd. For years, this court has shot down every Second Amendment challenge to

8  a state regulation of firearms—effectively granting a blank check for governments

9  to restrict firearms in any way they pleased. We got here by concocting a two-part

10  tiers-of-scrutiny test, which permitted judges to interest-balance away the Second

11  Amendment guarantee. But this approach was "nothing more than a judicial sleight-

12  of-hand, . . .feign[ing] respect to the right to keep and bear arms" but never enforcing

13  its protection. *Duncan v. Bonta*, 19 F.4th 1087, 1147 (9th Cir. 2021) (en banc)

14  (Bumatay, J., dissenting).

15      Several of us warned that our precedent contradicted the commands of both

16  the Constitution and the Supreme Court. *See id.* (Bumatay, J., dissenting, joined by

17  Ikuta & R. Nelson, JJ.); *id.* at 1159 (VanDyke, J., dissenting). We cautioned this

18  very panel of the need to jettison our circuit's ahistorical balancing regime and

19  adhere to an analysis more faithful to the constitutional text and its historical

20  understanding. But our warnings went unheard.

21      Last year, the Supreme Court had enough of lower courts' disregard for the

22  Second Amendment. It decisively commanded that we must no longer interest-

1   balance a fundamental right and that we must look to the Second Amendment's text,

2   history, and tradition to assess modern firearm regulations. *N.Y. State Rifle & Pistol*

3   *Ass'n v. Bruen*, 142 S. Ct. 2111, 2129–31 (2022). Now, firearm regulations may

4   stand only after "the government . . . affirmatively prove[s] that [they are] part of the

5   historical tradition that delimits the outer bounds of the right to keep and bear arms."

6   *Id.* at 2127.

7        Despite this clear direction, our court once again swats down another Second

8   Amendment challenge. On what grounds? Well, the majority largely doesn't think

9   it worthy of explanation. Rather than justify California's law by looking to our

10  historical tradition as *Bruen* commands, the majority resorts to simply citing various

11  non-binding district court decisions. There's no serious engagement with the Second

12  Amendment's text. No grappling with historical analogues. No putting California

13  to its burden of proving the constitutionality of its law. All we get is a summary

14  order, even after the Supreme Court directly ordered us to apply *Bruen* to this very

15  case. The Constitution and Californians deserve better.

16                              * * *

17       At issue here is California's ban on so-called large-capacity magazines.[1] *See*

18  Cal. Penal Code § 32310. These magazines refer to "any ammunition feeding device

---

[1] We use the term "large-capacity magazine" for consistency with the majority but note that magazines with the capacity to accept more than ten rounds of

2

1   with the capacity to accept more than 10 rounds." Cal. Penal Code § 16740.

2   California law prohibits manufacturing, importing, selling, receiving, or purchasing

3   these magazines. *See* Cal. Penal Code § 32310(a). The law also punishes possessing

4   large-capacity magazines with up to one year of imprisonment. § 32310(c). The

5   law requires persons who possessed this type of magazine before July 1, 2017, to

6   remove, sell, or surrender the magazine. § 32310(d).

7       California's ban on large-capacity magazines has moved up and down the

8   federal courts since 2017. That year, several California citizens challenged the law's

9   constitutionality. Two years later, the district court ruled that the ban was

10   unconstitutional. *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1147 (S.D. Cal. 2019).

11   On appeal, a three-judge panel affirmed that decision. *Duncan v. Becerra*, 970 F.3d

12   1133, 1141 (9th Cir. 2020). Our court took the case en banc. *Duncan v. Becerra*,

13   988 F.3d 1209, 1210 (9th Cir. 2021). A majority of that eleven-judge panel reversed,

14   holding that interest-balancing favored the constitutionality of the law—just as we

15   have done for every firearm regulation that our court has encountered. *Duncan v.*

16   *Bonta*, 19 F.4th 1087 (9th Cir. 2021) (en banc). All four of us dissented from that

17   decision. *Id.* at 1140 (Bumatay, J., dissenting, joined by Ikuta & R. Nelson, JJ.); *id.*

18   at 1159 (VanDyke, J., dissenting). The Supreme Court vacated our en banc interest-

---

ammunition are standard issue for many firearms. Thus, we would be more correct
to refer to California's ban on "standard-capacity magazines."

1  balancing and remanded for further consideration in light of *Bruen*. *Duncan v.*
2  *Bonta*, 142 S. Ct. 2895 (2022). Our en banc panel then remanded the case to the
3  district court. *Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022).

4       The district court again ruled that California's large-capacity magazine ban
5  violated the Constitution—this time using the clear instructions from *Bruen*.
6  *Duncan v. Bonta*, No. 17-cv-1017-BEN (JLB), 2023 WL 6180472, at *35 (S.D. Cal.
7  Sept. 22, 2023). In a thorough 71-page opinion, the district court held that magazines
8  were protected arms under the Second Amendment and that California failed to meet
9  its burden of showing a historical analogue for the prohibition. *Id.* The district court
10 enjoined California officials from enforcing § 32310. *Id.* at *36. At California's
11 request, the district court stayed its order for ten days. *Id.* California then appealed
12 to our court. It now seeks an emergency stay of the injunction pending appeal,
13 except as to enforcing § 32310(d).

14      In an unusual move, our en banc panel retained the emergency stay motion as
15 a comeback case in the first instance—bypassing our traditional three-judge
16 consideration of motions. Indeed, it's perhaps the first time our court has ever done
17 so. The majority then granted an administrative stay, with four judges dissenting.
18 Now a majority of the en banc court grants the stay pending appeal—with little
19 analysis or explanation of *Bruen*'s requirements—saving California's ban on large-
20 capacity magazines yet again.

4

1       Three times now, the Supreme Court has warned courts not to treat the Second

2   Amendment as a disfavored right.  *See District of Columbia v. Heller*, 554 U.S.

3   570, 594 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010); *Bruen*,

4   142 S. Ct. at 2156.  We should follow the Supreme Court's direction.  Reviewing

5   our historical tradition consistent with *Bruen* demonstrates that the Second

6   Amendment does not countenance California's ban on large-capacity magazines.

7       Because the majority once again deprives Californians of a fundamental right,

8   we respectfully dissent.

9                                            **I.**

10           **The Second Amendment's Text and Historical Understanding**

11      The operative clause of the Second Amendment commands that the "right of

12  the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.

13  It codifies a preexisting, fundamental right—one rooted in the "natural right of

14  resistance and self-preservation."  *Heller*, 554 U.S. at 594 (quoting 1 Blackstone,

15  Commentaries on the Laws of England 140).  Thus, central to the Second

16  Amendment right is the "inherent right of self-defense."  *Id.* at 628.  And the right is

17  so "deeply rooted in this Nation's history and tradition" that it is "fully applicable to

18  the States."  *McDonald*, 561 U.S. at 750, 767 (simplified).

19      Despite lower courts' treatment of the constitutional provision for many years,

20  the right to bear arms is not a "second-class right, subject to an entirely different

1  body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156

2  (simplified). The Second Amendment is not subject to "any judge-empowering

3  interest-balancing inquiry." *Id.* at 2129 (simplified). That's because '[t]he very

4  enumeration of the right takes out of the hands of government—even the Third

5  Branch of Government—the power to decide on a case-by-case basis whether the

6  right is *really worth* insisting upon." *Id.* (quoting *Heller*, 554 U.S. at 634). The

7  Court thus rejected the two-part "means-end scrutiny" test adopted by our court. *Id.*

8  at 2127.

9      In its place, the Supreme Court directed lower courts to follow a "fairly

10  straightforward" methodology "centered on constitutional text and history." *Id.*

11  at 2128–29, 2131. Under this framework, courts are guided by "the plain text of the

12  Second Amendment." *Id.* at 2134. And "when the Second Amendment's plain text

13  covers an individual's conduct, the Constitution presumptively protects that

14  conduct." *Id.* at 2126. Of course, this does not mean the Second Amendment's

15  "textual elements" give people the "right to keep and carry any weapon whatsoever

16  in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*,

17  554 U.S. at 626).

18      So what do the Second Amendment's "textual elements" convey?

1  First, when considering the "people" protected by the Second Amendment,

2  "ordinary, law-abiding, adult citizens" are easily encompassed within the term.  *Id.*

3  at 2134.

4  Second, "Arms" refers to "weapons 'in common use' today for self-defense."

5  *Id.*  Such a definition excludes "dangerous and unusual weapons."  *Id.* at 2128.  And

6  "Arms" does not mean "only . . . those arms in existence in the 18th century."  *Id.*

7  at 2132 (quoting *Heller*, 554 U.S. at 554).  Instead, it "covers modern instruments

8  that facilitate armed self-defense."  *Id.*

9  Third, "keep" and "bear" denote the "course of conduct" protected by the

10  Second Amendment.  *Id.* at 2134–35.  In *Bruen*, the ordinary definition of "bear"

11  "naturally encompasses" "carrying handguns publicly for self-defense."  *Id.*  And at

12  a minimum, "keep" encompasses the possession of "firearms in the[] home, at the

13  ready for self-defense."  *Id.* at 2134.

14  If the "course of conduct" at issue falls within the "textual elements" of the

15  Second Amendment, then the Constitution "presumptively protects that conduct."

16  *Id.* at 2130, 2134.  The burden then falls on the government to prove that the firearm

17  regulation is "consistent with this Nation's historical tradition of firearm regulation."

18  *Id.* at 2126.

19  To answer this question, we must engage in "reasoning by analogy—a

20  commonplace task for any lawyer or judge."  *Id.* at 2132.  Thus, courts must

7

1   determine whether a historical regulation serves as a "proper analogue" to modern

2   firearm regulations. *Id.* And whether a historical regulation is a good fit as a

3   historical analogue depends on whether they are "relevantly similar." *Id.*

4   (simplified). In turn, we judge similarity based on the "how and why" of the two

5   regulations. *Id.* at 2132–33. That is, "whether modern and historical regulations

6   impose a comparable burden on the right of armed self-defense and whether that

7   burden is comparably justified are central considerations when engaging in an

8   analogical inquiry." *Id.* at 2133 (simplified).

9       In conducting our inquiry, the Court left us with a warning: "[T]he Second

10   Amendment is neither a regulatory straightjacket nor a regulatory blank check." *Id.*

11   While we are under no duty to "uphold every modern law that remotely resembles a

12   historical analogue," this inquiry "requires only that the government identify a well-

13   established and representative historical *analogue*, not a historical *twin*." *Id.*

14   (simplified). So while the government doesn't need a "dead ringer for historical

15   precursors," it also cannot satisfy its burden by resorting to historical "outliers." *Id.*

16   (simplified).

17       To illustrate how this methodology works, we can look to the Court's analysis

18   of New York's public-carry law in *Bruen*. New York sought to justify its restricted

19   public-carry licensure scheme by referencing: (1) colonial and founding era

20   common-law offenses prohibiting unpeaceable, public carry, *id.* at 2145–46; (2)

1  mid-18th century proscriptions on concealed carrying of pistols and other small

2  weapons, *id.* at 2146–47; and (3) mid-18th century surety statutes that required

3  certain individuals to post bond before carrying weapons publicly, *id.* at 2148–50.

4  The Court understood these historical regulations to raise the kinds of public-safety

5  concerns raised by a strict public-carry requirement.  But "because none operated to

6  prevent law-abiding citizens with ordinary self-defense needs from carrying arms in

7  public for that purpose," they could not suffice to establish a "relevantly similar"

8  analogue.  *Id.* at 2132, 2150.

9      Finally, before turning to the application of this law to this case, we address a

10  criticism often lodged at the Court's so-called "text, history, and tradition"

11  approach—the confusion between "history" and "tradition."  What do "history" and

12  "tradition" mean in this context?  Do they mean something different?  Well, when

13  assessing analogous regulations under the Second Amendment, it is relatively

14  straightforward.

15      *History* means that analogous laws must be sufficiently "longstanding" and

16  from the relevant "timeframe."  *Id.* at 2131, 2133 (citing *Heller*, 554 U.S. at 626).

17  That's because "not all history is created equal."  *Id.* at 2136.  History's role in this

18  inquiry is to help establish the public meaning of the Constitution as "understood . . .

19  when the people *adopted*" it.  *Id.* (citing *Heller*, 554 U.S. at 634–35).  Thus,

20  "[h]istorical evidence that long predates [ratification] may not illuminate the scope

9

1    of [a constitutional] right if linguistic or legal conventions changed [or became

2    obsolete] in the intervening years." *Id.* at 2136.  Likewise, "we must also guard

3    against giving postenactment history more weight than it can rightly bear." *Id.*  The

4    further we depart from ratification, the greater the chance we stray from the "original

5    meaning of the constitutional text." *Id.* at 2137 (simplified).  Thus, the Court tells

6    us that the public understanding of the Second Amendment from only two historical

7    timeframes is relevant—from the adoption of the Second Amendment in 1789 and

8    from the ratification of the Fourteenth Amendment in 1868.  *Id.*  Thus, laws enacted

9    after the "end of the 19th century" must be given little weight.  *Id.* at 2136–37

10   (simplified).

11       *Tradition*, on the other hand, connotes that the comparison must be to laws

12   with wide acceptance in American society.  *Id.* at 2136.  Take territorial restrictions.

13   The Court considered them unhelpful for historical analysis because they were

14   "transitory" and "short lived."  *Id.* at 2155.  Such "passing regulatory efforts by not-

15   yet-mature jurisdictions" do little to show what is "part of an enduring [and broad]

16   American tradition of state regulation."  *Id.*  This is all the more true because

17   territorial laws governed less than 1% of the American population at the time.  *Id.*

18   Tradition thus demands that we don't justify modern regulations with reference to

19   "outliers," such as a law from a "single State, or a single city, that contradicts the

20   overwhelming weight of other evidence" on the meaning of the Second Amendment

1    right. *Id.* at 2154 (simplified).  On the other hand, laws that enjoyed "widespread"

2    and "unchallenged" support form part of our tradition.  *Id.* at 2137 (simplified).

3        With this understanding of the Second Amendment, we now turn to the

4    emergency motion.

5    <div align="center">**II.**</div>

6    <div align="center">**California Is Not Entitled to a Stay**</div>

7        The State of California moves for an emergency stay of the injunction against

8    enforcement of the State's large-capacity magazine ban pending appeal.

9        On review of a stay pending appeal, we must determine whether (1) California

10    has made "a strong showing that [it] is likely to succeed on the merits;" (2) California

11    will be "irreparably injured absent a stay;" (3) issuance of the stay will "substantially

12    injure the other parties interested in the proceeding;" and (4) the "public interest lies"

13    with a stay.  *Nken v. Holder*, 556 U.S. 426, 426 (2009) (simplified).  The first two

14    factors are "the most critical"; the last two factors become relevant only if California

15    establishes the first two and they merge into one inquiry assessing the balance of the

16    public and State's interests.  *Id.* at 434; *see also Doe #1 v. Trump*, 984 F.3d 848, 861

17    (9th Cir. 2020) ("When the Government is a party to the case, the balance of the

18    equities and public interest factors merge.") (simplified).  Ultimately, the issuance

19    of a stay is a matter of discretion and California "bears the burden of showing that

20    the circumstances justify an exercise of that discretion." *Nken*, 556 U.S. at 433–34.

1    None of these factors support California's request for a stay. Taking seriously

2    that "[a] stay is not a matter of right," *id.* at 433, we thus should have denied the

3    State relief.

4                                              **A.**

5            **California's Magazine Ban Has No Likelihood of Success**

6    California cannot succeed on the merits of this appeal.

7            As a recap, to determine whether a modern regulation survives a Second

8    Amendment challenge, we first determine whether California's regulation burdens

9    conduct within the Amendment's textual elements. *Bruen*, 142 S. Ct. at 2126. If so,

10   "the Constitution presumptively protects that conduct" and the burden shifts to

11   California to establish that the regulation is "consistent with this Nation's historical

12   tradition of firearm regulation." *Id.* To meet this burden, California must provide

13   sufficient historical analogues to show that the regulation may escape the Second

14   Amendment's "unqualified command." *Id.* (simplified).

15           California's large-capacity magazine ban fails under this framework because

16   possessing magazines holding more than ten rounds of ammunition by law-abiding

17   citizens is protected conduct under the Second Amendment,[2] and California has

18   failed to show that the ban aligns with our historical tradition of firearm regulation.

---

[2] California does not dispute that Plaintiffs-Appellees are law-abiding citizens and, thus, part of the "people" protected by the Second Amendment. Likewise,

1  **1.** **Large-Capacity Magazines Are Protected "Arms" Under the**
2  **Second Amendment**

3  To start, California halfheartedly suggests that large-capacity magazines are

4  not "Arms" under the Second Amendment.  We can easily dispense with this

5  argument.

6  The term "bearable arms" includes any "[w]eapons of offence" or "thing that

7  a man wears for his defence, or takes into his hands," that is "carr[ied] . . . for the

8  purpose of offensive or defensive action." *Heller*, 554 U.S. at 581, 584 (simplified).

9  Magazines are included within that definition.  Without protection of the components

10  that render a firearm operable, like magazines, the Second Amendment right would

11  be meaningless.  After all, constitutional rights "implicitly protect those closely

12  related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016)

13  (Thomas, J., concurring).  If not, then States could make an easy end-run around the

14  Second Amendment by simply banning firearm components, such as magazines and

15  ammunition.  Our court has thus recognized a "right to possess the magazines

16  necessary to render . . . firearms operable." *Fyock v. Sunnyvale*, 779 F.3d 991, 998

17  (9th Cir. 2015), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.  Firearm

18  magazines, including those holding more than ten rounds, fall into that category.

---

possession of a firearm falls within the "keep and bear" textual element and so it is
conduct protected by the Second Amendment.  We thus focus on the disputed
elements of this challenge.

13

1    And it makes no difference that large-capacity magazines did not exist at the

2    time of the Founding.  While the Second Amendment's "meaning is fixed according

3    to the understandings of those who ratified it, the Constitution can, and must, apply

4    to circumstances beyond those the Founders specifically anticipated." *Bruen*, 142

5    S. Ct. at 2132 (simplified).  Thus, "the Second Amendment extends, prima facie, to

6    all instruments that constitute bearable arms, even those that were not in existence

7    at the time of the founding." *Heller*, 554 U.S. at 582.  So it is the common possession

8    of large-capacity magazines that governs our analysis, not their specific historical

9    pedigree.

10   **2.    Large-Capacity Magazines Are Commonly Possessed for Self-**
11   **Defense**

12   California mainly argues that large-capacity magazines are not in "common

13   use" for lawful purposes like self-defense.  We take this question in two parts: First,

14   whether large-capacity magazines are in "common use."  Second, whether they are

15   used for self-defense.

16   **a.    Common Use**

17   Both as a matter of modern statistics and historical analogy, large-capacity

18   magazines and their analogues are in common use today and were at the time of the

19   Second Amendment's incorporation.

20   While estimates vary, it is undisputed that more than 100 million large-

21   capacity magazines circulate in the United States.  One recent study cited by the

1 district court found that Americans own 542 million magazines that hold more than

2 10 rounds today. *Duncan*, 2023 WL 6180472, at *4.[3]  And this fact isn't surprising

3 given that those magazines are a standard component on many of the Nation's most

4 popular firearms, such as the Glock pistol, which commonly comes with a magazine

5 that can hold 17 rounds.  They are lawful in at least 41 States and under federal law.

6 They account for half of all magazines owned in the United States today.

7      And as a historical matter, the initial three-judge panel in this case rightfully

8 concluded that "[f]irearms or magazines holding more than ten rounds have been in

9 existence—and owned by American citizens—for centuries.  Firearms with greater

10 than ten round capacities existed even before our nation's founding, and the common

11 use of [large-capacity magazines] for self-defense is apparent in our shared national

12 history." *Duncan*, 970 F.3d at 1147; *see also* David B. Kopel, *The History of Firearm*

13 *Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015) ("In terms

14 of large-scale commercial success, rifle magazines of more than ten rounds had

15 become popular by the time the Fourteenth Amendment was being ratified.").

16      We briefly chronicled the history of firearms firing more than ten rounds in

17 the United States in our previous en banc dissent.  *See Duncan*, 19 F.4th at 1154–55

18 (Bumatay, J., dissenting).  From this history, the clear picture emerges that firearms

---

[3] The district court also noted that Plaintiffs-Appellees' expert estimates there are between 500 million and one billion magazines able to hold more than 10 rounds.  *Duncan*, 2023 WL 6180472, at *4 n.30.

15

able to fire more than ten rounds were widely possessed by law-abiding citizens by the Second Amendment's incorporation. In that way, today's large-capacity magazines are "modern-day equivalents" of these historical arms.

**b. Lawful Purpose**

While acknowledging that large-capacity magazines are commonly owned in this country, California argues that these magazines are not in common use for lawful purposes like self-defense. California's argument goes like this: Because an average of only 2.2 shots are fired in self-defense situations, magazines carrying more than ten shots are not *used* for self-defense. There are two main problems with this argument.

First, as an empirical and factual matter, the district court's findings undercut the State's argument. After examining the record, the district court concluded that California's 2.2 average-shot statistic was "suspect." *Duncan*, 2023 WL 6180472, at *12. Such a statistic, the district court said, "lacks classic indicia of reliability" and is based on "studies [that] cannot be reproduced and are not peer-reviewed." *Id.* at *13. Instead, the studies used by California's expert relied on "anecdotal statements, often from bystanders, reported in news media, and selectively studied" without any aid of investigatory reports. *Id.* (noting that California has not provided a single police report to the court or to the State's own expert, no national or state government data report on shots fired in self-defense events exists, and no public

1  government database corroborates the State expert's conclusions).  The district court

2  also noted that the State's expert found that though it is "exceedingly rare" for a

3  person to fire more than 10 rounds in self-defense, that is not "never," and

4  California's 2.2 statistic is only an average in those rare situations.  *Id.* at *20, 27.

5  In this emergency appeal, California doesn't contend that the district court's factual

6  determinations are clearly erroneous and we are bound by them.  *Index Newspapers*

7  *LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 824 (9th Cir. 2020) ("To decide whether

8  the [movants] have demonstrated a likelihood that they will succeed on the merits of

9  their claim, we review the district court's findings of fact for clear error.").

10  Second, and more importantly, California misunderstands the "lawful

11  purposes" inquiry.  As discussed below, the Supreme Court has never looked at the

12  average number of times that a handgun had been fired in self-defense to determine

13  whether it is commonly used for that purpose.  *See Heller*, 554 U.S. at 628–36.

14  Likewise, it is unnecessary to look at how often a law-abiding citizen fired a firearm

15  more than ten times to fend off an attacker for our inquiry.  Indeed, it would be

16  troubling if our constitutional rights hung on such thin evidence.

17  And California's conception of a firearm's "use" is overly cramped.  While

18  "use" will encompass the number of times the firearm is discharged, it is not limited

19  to that.  "Use" will also cover the possession of a firearm for a purpose even if not

20  actually fired.  Our criminal laws don't require the discharge of the firearm for it to

17

1    be "used." *See, e.g., Smith v. United States*, 508 U.S. 223 (1993).  That's like saying

2    we don't "use" our seatbelts whenever our cars don't crash.  *Cf. Bailey v. United*

3    *States*, 516 U.S. 137, 143 (1996) (acknowledging that "use draws meaning from its

4    context," such that someone can "*use* a gun to protect [his] house" while "never

5    ha[ving] to *use* it" (simplified)).  And that a citizen did not expend a *full* magazine

6    does not mean that the magazine was not "used" for self-defense purposes, further

7    undermining California's focus on the 2.2 statistic.

8          It is also immaterial that large-capacity magazines are not strictly "necessary"

9    to ward off attackers.  Lawful *purpose*, not *necessity*, is the test.  And so it is not

10   dispositive that a firearm or its component is not used to the *full extent* of its

11   capabilities or that it is not *absolutely necessary* to accomplish its purpose.  *See*

12   *Heller*, 554 U.S. at 629 (holding it irrelevant to the constitutionality of D.C.'s

13   "handgun" ban that the law allowed citizens the possession of substitutes, like "long

14   guns").  Indeed, we are glad that most law-abiding citizens never have to discharge

15   their firearms in self-defense.

16         Rather than going down this statistical rabbit hole, the Supreme Court looked

17   to Americans' overall *choice* to use a firearm for self-defense.  Take *Heller* and the

18   District of Columbia's handgun ban.  The Court didn't dissect statistics on self-

19   defense situations or look at anecdotes of a handgun's use in self-defense.  Instead,

20   "[i]t is enough to note," the Court observed, "that the American people have

1 considered the handgun to be the quintessential self-defense weapon." *Heller*, 554

2 U.S. at 629. To the Court, it was sufficient that the handgun was "overwhelmingly

3 chosen by American society for th[e] lawful purpose" of self-defense. *Id.* at 628.

4 Thus, "banning from the home the most preferred firearm in the nation to keep and

5 use for protection of one's home and family would fail constitutional muster" under

6 any standard of review. *Id.* at 628–29 (simplified). So "[w]hatever the reason" for

7 its "popular[ity]," we look to Americans' choice to use a firearm for self-defense to

8 find its purpose—not finely cut statistics of shots fired or news clippings. *Id.* at 629.

9 And unless it can be proven that a certain firearm is unsuitable for self-defense, we

10 must respect the people's choice.

11     Here, large-capacity magazines are the most common magazine chosen by

12 Americans for self-defense. Indeed, millions of semiautomatic pistols, the

13 "quintessential self-defense weapon" for the American people, *id.*, come standard

14 with magazines carrying over ten rounds. That many citizens rely on large-capacity

15 magazines to respond to an unexpected attack is enough for our inquiry. *See Ass'n*

16 *of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116

17 (3d Cir. 2018) ("The record shows that millions of magazines are owned, often come

18 factory standard with semi-automatic weapons, are typically possessed by law-

19 abiding citizens for hunting, pest-control, and occasionally self-defense[.]"

20 (simplified)), *abrogated by Bruen*, 142 S. Ct. at 2111. Even our court has

19

1    begrudgingly admitted as much. *See Fyock*, 779 F.3d at 998 ("[W]e cannot say that

2    the district court abused its discretion by inferring from the evidence of record that,

3    at a minimum, [large-capacity] magazines are in common use. And, to the extent

4    that certain firearms capable of use with a magazine—e.g., certain semiautomatic

5    handguns—are commonly possessed by law-abiding citizens for lawful purposes,

6    our caselaw supports the conclusion that there must also be some corollary, albeit

7    not unfettered, right to possess the magazines necessary to render those firearms

8    operable" (simplified)).[4]

9       In sum, firearms with magazines capable of firing more than ten rounds are

10    commonplace in America today. And they are widely possessed for the purpose of

11    self-defense, the very core of the Second Amendment. Accordingly, an

12    overwhelming majority of citizens who own and use large-capacity magazines do so

13    for lawful purposes. "Under our precedents, *that is all that is needed* for citizens to

14    have a right under the Second Amendment to keep such weapons." *Friedman v. City*

---

[4] California argues that our inquiry here must be objective rather than "subjective." We addressed this question in our en banc dissent. *See Duncan*, 19 F.4th at 1153–54 (Bumatay, J., dissenting) (observing that courts have relied on both an "objective and largely statistical inquiry" on common usage as well as "broad patterns of use and the subjective motives of gun owners") (quoting *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 256 (2d Cir. 2015)). Because large-capacity magazines represent half of all magazines in the country, we need not settle this question here. Given their overwhelming numbers, they are *necessarily* used for lawful purposes.

1    *of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J.,

2    dissenting from denial of certiorari) (emphasis added).

3    **3.**    **The Large-Capacity Magazine Ban Is Not Consistent with the**
4    **Nation's Historical Tradition of Firearm Regulation**

5    Once it is established that large-capacity magazines are protected arms used

6    for lawful purposes, California has the burden of showing that its ban on large-

7    capacity magazines is "consistent with this Nation's historical tradition of firearm

8    regulation." *Bruen*, 142 S. Ct. at 2135. To meet this burden, California must show

9    historical regulations that are analogues to its modern magazine ban. We recently

10    explored how this comparison works—

> 11    In determining whether the modern regulation and the historical
> 12    analogue are "relevantly similar," we must look to the "how and why"
> 13    of the two regulations; that is, "whether modern and historical
> 14    regulations impose a comparable burden on the right of armed self-
> 15    defense and whether that burden is comparably justified are central
> 16    considerations when engaging in an analogical inquiry."

18    *Teter v. Lopez*, 76 F.4th 938, 951 (9th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2132–

19    33).

20    California points to four historical analogues to defend its absolute ban on

21    large-capacity magazines: (1) regulations on "trap gun" contraptions; (2) regulations

22    on the carry of fighting knives and certain blunt objects and on the concealed carry

23    of pistols and revolvers; (3) regulations on the use and possession of fully automatic

1  and semi-automatic firearms and ammunition feeding devices; and (4) regulations

2  on the storage of gunpowder.

3  But these historical analogues do not even come close to the "relevantly

4  similar" laws required by the Supreme Court.

5  **a.  Laws Regulating Trap-Gun Mechanisms**

6  California first points to regulations on "trap gun" mechanisms as a historical

7  analogue for the banning of large-capacity magazines.  These devices refer to string

8  or wire contraptions that allowed a firearm to be discharged remotely when

9  triggered—without a user present.  According to California, 16 States had laws

10  against trap-gun devices, with the laws being enacted after the 1870s except for a

11  New Jersey ordinance dating to 1771.[5]  The New Jersey law, for example, proscribed

12  "a most dangerous Method of setting Guns" when the gun is rigged "in such

13  Manner" as to "discharge itself, or be discharged by any String, Rope, or other

14  Contrivance."  1763–1775 N.J. Laws 346, An Act for the Preservation of Deer and

15  Other Game, and to Prevent Trespassing with Guns, ch. 539, §10.

16  Even if these laws are temporally relevant and could be considered part of our

17  tradition, there's an obvious problem with California's comparison of trap-gun

---

[5] Several of the States that California cites for anti-trap laws seemingly only banned the use of trap devices for hunting.  We count Maryland, Rhode Island, South Carolina (in 1869), South Dakota, and Wisconsin as having only hunting—not absolute—bans.

1  devices to large-capacity magazines—trap-gun devices are not a firearm or even part

2  of a firearm.  According to California's expert, the devices are made from string or

3  wire hooked up to firearms.  So it's doubtful that trap-gun devices themselves fall

4  with the "Arms" protected by the Second Amendment.  *See Bruen*, 142 S. Ct.

5  at 2132; *Heller*, 554 U.S. at 581–84 (concluding that to "bear arms" includes any

6  "[w]eapons of offence" or "thing that a man wears for his defence, or takes into his

7  hands," that is "carr[ied] . . . for the purpose of offensive or defensive action").

8      But even if we viewed trap-gun contraptions as subject to the Second

9  Amendment's protection, the burdens of regulating trap-gun mechanisms are not at

10  all analogous to the burdens of banning large-capacity magazines.  These anti-trap

11  laws only proscribed the method of discharging of a firearm *remotely*.  None worked

12  to punish the possession of any firearm or necessary firearm component.  Nor did

13  they restrict a person's direct use of a firearm for self-defense or limit the number of

14  bullets a person may discharge from the firearm.  So these laws are not "relevantly

15  similar" to California's ban on the most common magazine used in the Nation.

16      **b.   Laws Regulating the Carry of Fighting Knives and Blunt**
17          **Objects and the Concealed Carry of Pistols**

18      California next justifies its ban by looking at laws regulating the carrying of

19  bowie knives, long-bladed knives, clubs, and blunt weapons and the concealed carry

20  of pistols.  According to California, in the 1830s, four States enacted laws barring

21  the carrying of bowie knives, which later expanded to most States by the 20th

23

1   century.  California's expert also asserts that several States enacted "anti-carry laws"

2   for clubs and other blunt weapons.  Finally, California claims that, by 1868, about a

3   dozen States had laws prohibiting carrying concealed pistols.  These historical

4   analogues also fail to meet California's burden.

5        Again, assuming the laws are historically relevant and part of our tradition,

6   most of these statutes suffer from a similar flaw: They did not ban the *possession* of

7   a weapon.  Instead, they mostly regulated the open or concealed carrying of certain

8   knives, clubs, or firearms.  As for laws on knives and clubs, they dealt mostly with

9   carrying, concealed carry, or taxes.[6]  In its emergency motion, California identifies

10  no specific historical law banning the possession of a knife or club.[7]  As for the

11  concealed-pistol laws, the district court concluded that none prohibited keeping

---

[6] *See, e.g.*, 1837 Miss. Laws 294 (prohibiting the use of bowie knives, dirks, and some pistols in any fight in which a combatant was killed, as well as prohibited their exposition in a rude or threatening manner unnecessary for self-defense); 1871 Miss. Laws 819–20 (taxing bowie knives, dirks, sword canes, and pistols); 1839 Ala. Laws 67 (banning concealed carry of "any species of fire arms, or any bowie knife," dirk, or "any other deadly weapon"); 1887 Va. Acts 897 (banning concealed carry of certain weapons, including dirks and bowie knives); 1927 R.I. Pub. Laws 256 (allowing one-year concealed carry permits). *See also* David B. Kopel et al., Knives and the Second Amendment, 47 U. Mich. J.L. Reform 167, 180 (2013).

[7] On appeal in a separate case, the State of Hawaii identified one statute banning the possession of bowie knives: an 1837 Georgia statute that said that no one shall "keep, or have about or on their person or elsewhere . . . Bowie, or any other kind of knives." *Teter*, 76 F.4th at 951 (quoting 1837 Ga. Laws 90, An Act to Guard and Protect the Citizens of this State, Against the Unwarrantable and too Prevalent Use of Deadly Weapons, §1).  Our court held that this "one solitary statute is not enough to demonstrate a *tradition* of an arms regulation." *Id*. at 952.

1   pistols for all lawful purposes or carrying the guns openly. *Duncan*, 2023 WL

2   6180472, at *62. Nor has California identified laws banning the possession of a

3   pistol at home.

4       On the other hand, we agree with the district court that it is "remarkable" that

5   no law categorically banning all law-abiding citizens from keeping or possessing a

6   firearm existed during the relevant time periods. *Id.* at *49. According to one

7   scholar cited by the district court, the first regulation prohibiting all law-abiding

8   citizens from simple ownership of a gun came in 1911—too late for our purposes.

9   *Id.* (citing Robert H. Churchill, *Forum: Rethinking the Second Amendment*, 25 L. &

10  Hist. Rev. 139, 161 (2007)).

11      California argues that this distinction makes no difference—that we should

12  treat anti-carry and anti-possession laws as equivalent. But that ignores both *Heller*

13  and *Bruen*. In *Bruen*, we are told that the "central" consideration in assessing

14  historical analogues is "whether modern and historical regulations impose a

15  comparable burden on the right of armed self-defense and whether that burden is

16  comparably justified." *Bruen*, 142 S. Ct. at 2133. In fact, the Court in *Bruen* rejected

17  surety laws that required certain persons to post bond before carrying weapons in

18  public as being insufficiently analogous to restrictions on public carry for law

19  abiding citizens. It did so because the surety laws did not amount to a "*ban*[] on

25

1   public carry" and their "burden" on public carry was "likely too insignificant." *Id.*

2   at 2148–49.

3       And in *Heller*, the Supreme Court made clear that the need for "defense of

4   self, family, and property is most acute" at "the home." 554 U.S. at 628. The Second

5   Amendment then "surely elevates above all other interests the right of law-abiding,

6   responsible citizens to use arms in defense of *hearth and home*." *Id.* at 635

7   (emphasis added). Thus, prohibitions "banning from the home" the "most preferred

8   firearm in the nation to 'keep' and use for protection" does not pass "constitutional

9   muster." *Id.* at 628–29.

10      Contrary to the State's contention, the distinction between anti-carry and anti-

11  possession laws is critical. The former limits only the way a person may *use* a

12  firearm in *public*. The latter categorically denies all *possession* of a firearm for any

13  purpose—even at *home*. While restrictions on carrying a firearm—whether open or

14  concealed—are a significant burden, the burden of prohibiting a large-capacity

15  magazine *anywhere,* including in the home for self-defense, is greater in kind and

16  magnitude.

17      Indeed, we recently rejected a similar argument when Hawaii made it illegal

18  to possess "butterfly knives." *See Teter*, 76 F.4th at 951. We noted that laws

19  banning carrying a weapon are "different" than laws banning possession because

20  "they regulate different conduct." *Id.* Thus, when confronted with statutes that

1    regulated only the carry of knives, we considered it more important that Hawaii had

2    not identified a statute "categorically bann[ing] the possession of any type of

3    pocketknife." *Id.*

4             **c.**    **Laws Regulating Fully Automatic and Semi-Automatic**
5                     **Firearms and Ammunition Feeding Devices.**

6          California next argues that 20th-century restrictions on automatic and semi-

7    automatic firearms and ammunition feeding devices act as historical analogues.

8    California groups a wide range of laws in this category. Some focused solely on

9    semi-automatic weapons capable of firing a set number of rounds. Others on only

10    fully automatic firearms. *Id.* More still covered firearms of both types. *Id.* The one

11    commonality for all these laws is that they were all enacted after 1917, with most

12    passed after 1932. Thus, they cannot serve as historical analogues justifying a large-

13    capacity magazine ban.

14          Given their recent vintage, these regulations offer little support for the original

15    public meaning of the Second Amendment. To be clear, post-ratification history can

16    be relevant to show how meaning has been "liquidate[d] & settle[d]." *Bruen*, 142 S.

17    Ct. at 2136. But we must be careful not to "giv[e] postenactment history more

18    weight than it can rightly bear." *Id.* at 2136. Immediate post-ratification history is

19    the strongest at illuminating the understanding of those steeped in the contemporary

20    understanding of a constitutional provision. But evidence from later in time

21    diminishes in relevance—otherwise, we risk "adoption or acceptance of laws that

1    are inconsistent with the original meaning of the constitutional text [to] overcome or

2    alter that text." *Id.* at 2137 (quoting *Heller v. District of Columbia*, 670 F.3d

3    1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Thus, the Supreme

4    Court has largely cabined our inquiry to the period "through the end of the 19th

5    century." *Id.* at 2136 (quoting *Heller*, 554 U.S. at 605).

6          Here, the restrictions on automatic and semi-automatic firearms and

7    ammunition feeding devices are far too late to shed meaningful light on the original

8    meaning of the Second Amendment. Laws passed nearly half a century after the

9    ratification of the Fourteenth Amendment do little to clarify what was understood

10    when the constitutional text was adopted.

11          Plus, to the extent that these laws ban automatic weapons or features of

12    automatic weapons, like machine guns, such weapons are not analogous to large-

13    capacity magazines. Those weapons function differently, have a different historical

14    lineage and record of use, and offer a different type of hazard than large-capacity

15    magazines. Accordingly, automatic weapons would warrant a separate consideration

16    of history and tradition under the Second Amendment. These laws thus offer no

17    relevance for large-capacity magazines, which are in "common use" today and

18    analogous to arms in "common use" at the time of the ratification of the Fourteenth

19    Amendment.

20              **d.**    **Laws Regulating Gunpowder Storage**

1     California lastly relies on 18th- and 19th-century gunpowder-storage laws.

2     Concerned with the dangers of massive fires and explosions, the laws prohibited the

3     stockpiling of large quantities of gunpowder in one place.  Take the 1784 New York

4     City law.  It made it unlawful "to have or keep any quantity of gun powder exceeding

5     twenty-eight pounds weight, in any one place, less than one mile to the northward

6     of the city hall . . . except in the public magazine at the Fresh-water."  1784 N.Y.

7     Laws 627, An Act to Prevent the Danger Arising from the Pernicious Practice of

8     Lodging Gun Powder in Dwelling Houses, Stores, or Other Places, ch. 28.  Another

9     1821 Maine law did the same "for the prevention of damage by Fire."  1821 Me.

10    Laws 98–99, An Act for the Prevention of Damage by Fire, and the Safe Keeping of

11    Gun Powder, ch. 25, §5.

12    These gunpowder-storage restrictions fail to establish a historical tradition

13    supporting a large-capacity magazine ban.  First, these laws do not offer a

14    comparable burden on the possession of a firearm or the way it is discharged.  While

15    California's ban on large-capacity magazines is directed at prohibiting a firearm

16    from firing more than ten rounds at once, the gunpowder laws were only directed at

17    preventing the accumulation of explosive material.  Foreclosing gun owners from

18    using the most common magazine is a starkly greater burden than limiting the

19    storage of gunpowder for fire safety.  In other words, gunpowder storage laws would

29

1  have a minimal effect on law-abiding citizens' use of firearms for self-defense. The

2  same cannot be said for limits on firing more than ten rounds at once.

3      Indeed, the Supreme Court was well acquainted with these gunpowder laws

4  at the time of *Heller*. Justice Breyer, in dissent, referred extensively to these laws

5  as an analogue to the District of Columbia's handgun ban. *Heller*, 554 U.S. at 685–

6  87 (Breyer, J., dissenting). But the Court rejected that comparison: "Justice

7  BREYER cites . . . gunpowder-storage laws that he concedes did not clearly prohibit

8  loaded weapons, but required only that excess gunpowder be kept in a special

9  container or on the top floor of the home. Nothing about those fire-safety laws

10  undermines our analysis; they do not remotely burden the right of self-defense as

11  much as an absolute ban on handguns." *Id.* at 632 (majority opinion). Likewise,

12  those fire-safety laws do not create a comparable burden to the absolute ban on the

13  most owned magazines.

14                                        *

15      Based on this analysis, no historical analogue justifies California's ban. It

16  thus will not succeed on the merits.

17                          **B.**

18      **California's Asserted Irreparable Injury Does Not Justify a Stay**

19      Beyond likelihood of success on the merits, California also fails to establish a

20  sufficient irreparable injury to warrant a stay. "[A]t this juncture, the government

1  has the burden of showing that irreparable injury is likely to occur during the period

2  before the appeal is decided." *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020).

3      Often, a State may "suffer a form of irreparable injury" when it is "enjoined

4  by a court from effectuating statutes enacted by representatives of its people."

5  *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (simplified) (Roberts, C.J., in

6  chambers); *see also Coalition for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th

7  Cir. 1997). But that doesn't always settle the question. We've long said that the

8  government "cannot reasonably assert that it is harmed in any legally cognizable

9  sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d

10  719, 727 (9th Cir. 1983); *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)

11  (holding that the government "cannot suffer harm from an injunction that merely

12  ends an unlawful practice").

13      With this background, California cannot make a strong showing of irreparable

14  harm sufficient to tip this factor in favor of a stay. California argues that without a

15  stay, large-capacity magazines would immediately flood the State. But, as we've

16  said, California does not suffer any harm by being prevented from infringing Second

17  Amendment rights.

18      Even still, nothing in the district court's injunction prevents California's

19  enforcement of its rigorous background, registration, and prohibited-person laws.

20  *See, e.g.*, Cal. Penal Code § 30370 (setting out the background check procedure for

31

1  approving purchase or transfer of ammunition); Cal. Penal Code § 29810 (restricting

2  certain felons from possessing magazines); Cal. Code Regs. Tit. 11, § 5483

3  (requiring maintenance of transaction records for large-capacity magazines); Cal.

4  Penal Code § 16150(b) (defining ammunition as "any bullet, cartridge, magazine,

5  clip, speed loader, autoloader, ammunition feeding device, or projectile capable of

6  being fired from a firearm with a deadly consequence").

7      Moreover, we cannot ignore large-capacity magazines' ubiquity elsewhere in

8  the country.  As stated earlier, it is undisputed that over 100 million large-capacity

9  magazines exist nationwide—with some estimates being five times that number.

10  They account for half of all magazines nationwide.  Likely tens of millions of these

11  magazines already exist in other parts of the Ninth Circuit.  Indeed, the majority even

12  concedes that Californians purchased millions of large-capacity magazines in 2019.

13  Given the widespread popularity and common usage of large-capacity magazines,

14  we need not defer to California's speculative prediction of catastrophic harm.

15      Given these considerations, California has not made a sufficient showing of

16  irreparable harm.

17                                    **C.**

18                    **The Balance of Interests Favors No Stay**

19      For the balance-of-interests factor, we generally "explore the relative harms

20  to [an] applicant and respondent, as well as the interests of the public at large."

32

1   *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 580 (2017) (per curiam)

2   (simplified).  Given California's failure to satisfy the first two stay factors, we don't

3   need to address this factor.  *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir.

4   2020).  But even if California could meet the first two stay factors, it still cannot

5   prevail on the last.

6           We acknowledge that California has a legitimate interest in promoting public

7   safety and preventing gun violence.  And, in general, the State may enact laws to

8   further these aspirations.  We also don't doubt California's sincere belief that large-

9   capacity magazines may pose "particular threats to public safety."  For example,

10  California points to statistics showing the use of large-capacity magazines in mass

11  shootings.  While California's concerns are serious, they are not enough to tip this

12  factor in favor of a stay.

13          We reach this conclusion for three reasons:

14          First, "[i]t is always in the public interest to prevent the violation of a party's

15  constitutional rights."  *Index Newspapers*, 977 F.3d at 838 (simplified); *see also*

16  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) ("[E]nforcement of an

17  unconstitutional law is always contrary to the public interest.").  California's ban

18  deprives its citizens of the ability to fire a gun more than ten times in self-defense.

19  Contrary to the majority's claim, the existence of a "wide range of firearms"—which

33

1    cannot fire more than ten rounds without reloading—does not mitigate that

2    deprivation.  So the public interest favors denying a stay here.

3         Second, as stated above, California can have "no legitimate interest in

4    enforcing an unconstitutional ordinance."  *KH Outdoor, LLC v. City of Trussville*,

5    458 F.3d 1261, 1272 (11th Cir. 2006).  So any conversation about the importance of

6    the State's interests in public safety and the prevention of gun violence ends when

7    the means used to further them violate the Constitution.  Thus, California cannot

8    point to a strong interest on its side.

9         Finally, we cannot forget that the Supreme Court has very clearly ended

10   interest balancing when it comes to the Second Amendment.  The Second

11   Amendment, the Court said, "is the very *product* of an interest balancing by the

12   people and it surely elevates above all other interests the right of law-abiding,

13   responsible citizens to use arms for self-defense."  *Bruen*, 142 S. Ct. at 2131

14   (simplified).  It is "this balance—struck by the traditions of the American people—

15   that demands our unqualified deference."  *Id.*  And we cannot backdoor interest-

16   balancing through the stay factors.  Thus, while we understand the right to bear arms'

17   "controversial public safety implications," *McDonald*, 561 U.S. at 783, that does not

18   give us license to ignore its "unqualified command," *Bruen*, 142 S. Ct. at 2126

19   (simplified).

34

1    The balance of public and State interests is clear.  It weighs against granting

2    a stay.

3                                         **III.**

4        Over and over, our circuit has enjoined government actions that would lead to

5    "the deprivation of constitutional rights," much like the district court did here.

6    *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (simplified).  We have done

7    this for the First Amendment, *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707,

8    731 (9th Cir. 2022), the Fourth Amendment, *Melendres*, 695 F.3d at 1002, and the

9    Fifth Amendment, *Rodriguez*, 715 F.3d at 1144–45.  Today, the majority proves yet

10   again that our court treats the Second Amendment as somehow inferior to the others.

11   But the right of the people to keep and bear arms cannot be dismissed as "second-

12   class."  *McDonald*, 561 U.S. at 780; *Bruen*, 142 S. Ct. at 2156.

13       This court has repeatedly acquiesced to the violation of Californians' right to

14   bear arms.  Now it does so again, without even analyzing the merits of this case.

15   Enough should be enough.

16       We respectfully dissent.