No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

VIRGINIA DUNCAN, ET AL.,
*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,
*Defendant and Appellant*.

———————————

## On Appeal from the United States District Court
## for the Southern District of California
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge

———————————

## APPELLANT'S OPENING BRIEF

———————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

## TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................1

Jurisdictional statement ................................................................................3

Statement of the issues .................................................................................4

Addendum of statutory provisions .............................................................5

Statement of the case ....................................................................................5

    A.    Large-capacity magazines ..................................................................5

    B.    California's regulation of large-capacity magazines ...........................7

    C.    Procedural history ..............................................................................9

        1.    Pre-*Bruen* proceedings ........................................................9

        2.    Post-*Bruen* proceedings .....................................................10

Summary of the argument ..........................................................................13

Standard of review .....................................................................................14

Argument ....................................................................................................15

I.    Section 32310 is consistent with the Second Amendment ...........................15

    A.    Plaintiffs have not established that large-capacity magazines are presumptively protected by the Second Amendment .........................16

        1.    "Arms" ................................................................................17

        2.    "Common use for self-defense" ...........................................20

        3.    "Most useful in military service" .........................................27

        4.    "Dangerous and unusual" .....................................................28

    B.    California's restrictions on large-capacity magazines are consistent with this Nation's historical tradition ..............................31

        1.    This case implicates *Bruen*'s "more nuanced" approach to the historical inquiry .........................................................32

        2.    Throughout American history, governments have restricted or prohibited especially dangerous weapons as they proliferated and imperiled public safety .........................36

i

## TABLE OF CONTENTS
### (continued)

|  |  | Page |

| 3. | The large-capacity magazine restrictions challenged here are consistent with that historical tradition | 45 |
| 4. | The district court's historical analysis was flawed | 48 |
| II. | Section 32310 does not violate the Takings Clause or the Due Process Clause | 52 |
| III. | The en banc panel has authority to decide this appeal | 55 |
| Conclusion | | 59 |
| Statement of related cases | | 60 |
| Certificate of compliance | | 61 |
| Certificate of service | | 62 |

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Bevis v. City of Naperville* (*Bevis I*)
___ F. Supp. 3d ____, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023) ..... 37, 38, 44

*Bevis v. Naperville* (*Bevis II*)
___ F.4th ____, 2023 WL 7273709 (7th Cir. Nov. 3, 2023) ........... 23, 26, 27, 31

*Brown v. Maryland*
25 U.S. (12 Wheat) 419 (1827) ........................................................ 39

*Brumback v. Ferguson*
2023 WL 6221425 (E.D. Wash. Sept. 25, 2023) ............................................ 31

*Caetano v. Massachusetts*
577 U.S. 411 (2016) ........................................................................ 24, 29

*Carson Harbor Vill., Ltd. v. Unocal Corp.*
270 F.3d 863 (9th Cir. 2001) ........................................................ 26

*City & Cnty. of San Francisco v. Garland*
42 F.4th 1078 (9th Cir. 2022) ........................................................ 15

*Clark v. Cmty. for Creative Non-Violence*
468 U.S. 288 (1984) ........................................................................ 16

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Security* (*DSSA*)
___ F. Supp. 3d ____, 2023 WL 2655150 (D. Del. Mar. 27, 2023) .......... *passim*

*District of Columbia v. Heller*
554 U.S. 570 (2008) ........................................................................ *passim*

*Duncan v. Becerra*
742 Fed. App'x 218 (9th Cir. 2018) ................................................ 9

*Duncan v. Becerra*
970 F.3d 1133 (9th Cir. 2020) ........................................................ 10

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Duncan v. Bonta*
  142 S. Ct. 2895 (2022)................................................................11, 28

*Duncan v. Bonta*
  19 F.4th 1087 (9th Cir. 2021)....................................................*passim*

*Duncan v. Bonta*
  49 F.4th 1228 (9th Cir. 2022)...............................................................11

*Friedman v. City of Highland Park*
  784 F.3d 406 (7th Cir. 2015).............................................................23

*Fyock v. Sunnyvale*
  779 F.3d 991 (9th Cir. 2015)............................................. 17, 19, 20, 30

*Gallinger v. Becerra*
  898 F.3d 1012 (9th Cir. 2018)..............................................................5

*Hanson v. District of Columbia*
  ___ F. Supp. 3d ____, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ...........*passim*

*Herrera v. Raoul*
  ___ F. Supp. 3d ____, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023)...........42, 51

*Holliday Amusement Co. of Charleston, Inc. v. South Carolina*
  493 F.3d 404 (4th Cir. 2007)...............................................................53

*Jackson v. City & Cnty. of San Francisco*
  746 F.3d 953 (9th Cir. 2014)...............................................................19

*Knick v. Twp. of Scott, Pa.*
  139 S. Ct. 2162 (2019).......................................................................54

*Kolbe v. Hogan*
  849 F.3d 114 (4th Cir. 2017).......................................................5, 23, 28, 29

*Laurel Park Cmty., LLC v. City of Tumwater*
  698 F.3d 1180 (9th Cir. 2012)..............................................................54

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Lucas v. South Carolina Coastal Council*
  505 U.S. 1003 (1992)..........................................................................53

*Luis v. United States*
  578 U.S. 5 (2016)...............................................................................19

*Maryland Shall Issue, Inc. v. Hogan*
  963 F.3d 356 (4th Cir. 2020).............................................................53

*McCullen v. Coakley*
  573 U.S. 464 (2014)...........................................................................36

*McDonald v. City of Chicago*
  561 U.S. 742 (2010).....................................................................41, 46

*Mugler v. Kansas*
  123 U.S. 623 (1887)...........................................................................53

*Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*)
  ___ F. Supp. 3d ____, 2023 WL 4975979 (D. Conn. Aug. 3, 2023)..........*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*
  142 S. Ct. 2111 (2022)................................................................*passim*

*Ocean State Tactical, LLC v. Rhode Island*
  646 F. Supp. 3d 368 (D.R.I. 2022).................................. 17, 18, 31, 54

*Or. Firearms Fed'n v. Kotek*
  ___ F. Supp. 3d ____, 2023 WL 4541027 (D. Or. July 14, 2023) ............*passim*

*Schaffer ex. rel. Schaffer v. Weast*, 546 U.S. 49 (2005) .......................16

*Shenker v. Baltimore & Ohio R.R. Co.*
  374 U.S. 1 (1963).............................................................................55

*Sutfin v. State*
  261 Cal. App. 2d 50 (1968)..............................................................54

v

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Teixeira v. Cnty. of Alameda*
    873 F.3d 670 (9th Cir. 2017)............................................................19

*Teter v. Lopez*
    76 F.4th 938 (9th Cir. 2023)...........................................................30

*Thompson v. Mahre*
    110 F.3d 716 (9th Cir. 1997).................................................15, 26

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023)...............................................21, 31

*United States v. Am.-Foreign S.S. Corp.*
    363 U.S. 685 (1960)....................................................................58

*United States v. Cox*
    906 F.3d 1170 (10th Cir. 2018)....................................................18

*United States v. Wood*
    299 U.S. 123 (1936)....................................................................36

*W. Pac. R.R. Corp. v. W. Pac. R.R. Co.*
    345 U.S. 247 (1953)....................................................................55

*Yovino v. Rizo*
    139 S. Ct. 706 (2019)..................................................................57

**STATUTES AND BILLS**

**Federal**

United States Code, Title 18
    § 922(w) .......................................................................................6

United States Code, Title 28
    § 46(c) ..................................................................................*passim*
    § 1291............................................................................................4
    § 1331............................................................................................3

**TABLE OF AUTHORITIES**
(continued)

Page

National Firearms Act of 1934, Pub. L. No. 73-474,
    48 Stat. 1236 (1934)..................................................................................45

Violent Crime Control and Law Enforcement Act of 1994,
    Pub. L. No. 103-322, 108 Stat. 1796 (1994).......................................6

**California**

California Penal Code
    § 1170(h) ...............................................................................................8
    § 12020(a)(2)..........................................................................................7
    § 16740 ..............................................................................................5, 7
    § 16740(a)..........................................................................................9, 52
    § 30515(a)(2).........................................................................................7
    § 30515(a)(5).........................................................................................7
    § 30515(a)(10).......................................................................................7
    § 32310..........................................................................................*passim*
    § 32310(a)........................................................................................4, 7, 8
    § 32310(c)...................................................................................4, 8, 9, 52
    § 32310(d) ..................................................................................4, 8, 9, 52

1999 Cal. Stat. Ch. 1781 (Senate Bill 23)............................................7
    § 3.........................................................................................................7
    § 3.5......................................................................................................7

2013 Cal. Stat. Ch. 5299, § 1 (Assembly Bill 48).................................7

2016 Cal. Stat. Ch. 58, § 1 (Senate Bill 1446).......................................8

2016 California Proposition 63
    § 2(12) ..................................................................................................8
    § 3(8) ....................................................................................................8
    § 6.1......................................................................................................8

**TABLE OF AUTHORITIES**
(continued)

Page

**Colorado**

Colo. Rev. Stat.
  § 18-12-301 ............................................................................6
  § 18-12-302 ............................................................................6

**Connecticut**

Conn. Gen. Stat. § 53-202w ...................................................6

1832 Conn. Acts 391, ch. 25 .................................................39

1836 Conn. Acts 105, ch. 1, § 20 .........................................39

**Delaware**

Del. Code Title 11
  § 1468.....................................................................................6
  § 1469.....................................................................................6

**District of Columbia**

D.C. Code § 7-2506.01(b)......................................................6

**Hawaii**

Haw. Rev. Stat. § 134-8(c) ....................................................6

**Illinois**

720 Ill. Comp. Stat. 5/24-1.10 ..............................................6

**Massachusetts**

Mass Gen. Laws Ann. Chapter 140
  § 121.......................................................................................6
  § 131M ...................................................................................6

1750 Mass. Acts 544, Chapter 17, § 1..................................38

1771-1772 Mass. Province Laws 167, Chapter 9 .................39

1782-1783 Mass. Acts 120, Chapter 46.................................39

viii

# TABLE OF AUTHORITIES
## (continued)

**Page**

1786 Mass. Acts 87, Chapter 38 ................................................................38

**<u>Maine</u>**

1821 Me. Laws 98, Chapter 25, § 1 ..........................................................39

**<u>Maryland</u>**

Md. Code, Crim. Law § 4-305(b) ...............................................................6

**<u>Michigan</u>**

1927 Mich. Pub. Acts 887, Act No. 372 ...................................................45

**<u>New Hampshire</u>**

1825 N.H. Laws 73, Chapter 61 ...............................................................39

**<u>New Jersey</u>**

N.J. Stat. Ann.
    § 2C:39-1(y) ..........................................................................................6
    § 39-3(j) .................................................................................................6
    § 39-9(h) ................................................................................................6

1763-1775 N.J. Laws 346, Chapter 539, § 10 .........................................38

*Laws of the State of New Jersey* (Nettleton ed., 1821) ......................... 46

**<u>New York</u>**

N.Y. Pen. Law
    § 265.00 .................................................................................................6
    § 265.02(8) ............................................................................................6
    § 265.10 .................................................................................................6

1772 N.Y. Laws 682 .................................................................................39

1772 N.Y. Laws 683 .................................................................................39

1784 N.Y. Laws 627, Chapter 28 .............................................................39

## TABLE OF AUTHORITIES
### (continued)

Page

1849 N.Y. Laws 403 ......................................................................41
   § 1 .............................................................................................41
   § 2 .............................................................................................41

**Ohio**

1788-1801 Ohio Laws 20, Chapter 6 ...........................................38

1933 Ohio Laws 189 .....................................................................45

**Oregon**

2022 Oregon Ballot Measure 114, § 11 .........................................6

**Rhode Island**

R.I. Gen. Laws
   § 11-47.1-2 ...............................................................................6
   § 11-47.1-3 ...............................................................................6

1927 R.I. Pub. Laws 256 ..............................................................45

**Vermont**

13 V.S.A. § 4021 ............................................................................6

1849 Vt. Acts & Resolves 26, No. 36
   § 1 .............................................................................................41
   § 2 .............................................................................................41

**Washington**

Wash. Rev. Code
   § 9.41.010 .................................................................................6
   § 9.41.370 .................................................................................6

**England**

7 Rich. 2, ch. 13 (1383) ................................................................37

## TABLE OF AUTHORITIES
### (continued)

<b>Page</b>

33 Hen. 8, ch. 6 (1541) ...................................................37

§ 1...................................................................37

§ 18.................................................................37

**COURT RULES**

Ninth Circuit General Orders

Gen. Order 1.12 ..............................................55

Gen. Order 3.6(b)....................................12, 56

Gen. Order 5.1(a)(4) .......................................57

Gen. Order 6.4(a) ...........................................57

Ninth Circuit Rules

Rule 28-2.7 .......................................................5

Rule 35-3 ........................................................56

**OTHER AUTHORITIES**

Blackstone, *Commentaries on the Laws of England* (1769) ...........................29, 36

Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016)................................................30

Czachor, *Who was Robert Card? Confirmed Details on Maine Gunman*, CBS News, Oct. 28, 2023, https://tinyurl.com/mr2t5y4x .................35

*Public Papers of George Clinton* (Wynkoop Hallenbeck Crawford Co. ed., 1900) ...............................................18

Sharpe, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* (1782) ................................37

*The Dispatches of Field Marshal the Duke of Wellington (1799-1818)* (Murray ed., 1838). ..........................................18

U.S. Bureau of Alcohol, Tobacco, and Firearms, *Firearm Commerce in the United States*, https://tinyurl.com/3u7u9u5f/ .........................................25

## TABLE OF AUTHORITIES

**Page**

White, *What We Know About the Gun Used in the Monterey Park Shootings*, N.Y. Times, Jan. 26, 2023, https://tinyurl.com/26dku4nv ...........................................................................35

**INTRODUCTION**

When the Supreme Court announced its framework for reviewing Second Amendment claims in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2133 (2022), it emphasized that the framework was not meant to impose "a regulatory straightjacket" on the States. *Bruen* reiterated that the "right secured by the Second Amendment is not unlimited"—and is not "a right to keep and carry any weapon whatsoever." *Id.* at 2128 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). It preserved the Court's prior holding that certain weapons "may be banned." *Heller*, 554 U.S. at 627; *see, e.g.*, *id.* ("M-16 rifles and the like"); *id.* at 625 ("short-barreled shotguns"). And it suggested that when plaintiffs challenge modern firearms restrictions addressing dramatic advancements in weapons technology, reviewing courts should follow a nuanced approach—one that is sensitive to the reality that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132.

The plaintiffs in this case challenge California's restrictions on large-capacity magazines, a modern technology that allows shooters to use semiautomatic firearms to rapidly fire many consecutive rounds without pausing to reload. Large-capacity magazines present an unprecedented concern for our society: when paired with semiautomatic firearms, they enable lone gunmen to murder large numbers of

1

innocent civilians in mass shootings that now occur with devastating frequency. Federal courts across the Nation have had the opportunity to apply *Bruen*'s framework to similar restrictions on large-capacity magazines. The vast majority have rejected challenges to those restrictions or held that they are unlikely to succeed on the merits. Those decisions are correct.

A faithful application of *Bruen* and *Heller* establishes that large-capacity magazines are not presumptively protected by the Second Amendment: they are not "Arms" themselves; they are not necessary to the function of any protected firearm; and their objective characteristics make them suitable for offensive and military uses rather than ordinary self-defense. And even if they were presumptively protected, California's law is consistent with our Nation's long tradition of restricting and prohibiting particular weapons technologies that are especially dangerous and present an emerging threat to public safety. Any minimal burden it imposes on the Second Amendment right is comparable to the burdens imposed by its historic precursors, and is comparably justified.

The analysis of the district court below is at odds with Supreme Court precedent. The district court appears to believe that *any* weapon (or weapon accessory) is presumptively protected by the Second Amendment so long as it has been purchased in large numbers by certain gun owners in parts of the country that do not prohibit that weapon. *See, e.g.*, 1-ER-27. But in *Heller* itself, the Supreme

2

Court examined the objective characteristics of weapons and their suitability for self-defense to determine whether those weapons were within the scope of the Second Amendment; it did not merely engage in a counting exercise. Having concluded that large-capacity magazines are presumptively protected based on its numbers-only approach, the district court proceeded to conduct a historical analysis that discounted or ignored every historical precursor identified by the State. *See* 1-ER-46-69. That analysis disregards *Bruen*'s instruction that States are not required to identify a "historical *twin*" or "a dead ringer" to justify a firearms regulation—especially when that regulation addresses technologies that did not exist, and thus could not have been regulated, in the relevant historical periods. *Bruen*, 142 S. Ct. at 2133.

The district court's analysis not only contravenes *Heller* and *Bruen*, it would hamstring legitimate efforts by modern legislatures to respond to dramatic changes in weapons technology and the unprecedented societal concerns created by those new technologies. This Court should correct the district court's errors at every stage of *Bruen*'s analytical framework.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over plaintiffs' federal constitutional claims under 28 U.S.C. § 1331. The district court declared California Penal Code Section 32310 unconstitutional in its entirety and permanently enjoined the Attorney

3

General from enforcing that statute on September 22, 2023.  1-ER-72-73.  The Attorney General appealed on the same day.  17-ER-4082.[1]  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether California's restrictions on large-capacity magazines, Cal. Penal Code § 32310(a)-(d), violate the Second Amendment.

2.      Whether California's restrictions on the possession of large-capacity magazines, Cal. Penal Code § 32310(c)-(d), constitute a compensable taking of private property for public use under the Takings Clause or violate the Due Process Clause.

In addition, this Court directed the parties (C.A. Dkt. 12) to address:

3.      Whether the en banc panel that heard and determined appeal No. 19-55376 has statutory authority under 28 U.S.C. § 46(c) to decide this appeal, including:  (i) when a case or controversy in the courts of appeals may be heard and determined, or reheard and determined, by the en banc court rather than by a three-judge panel; and (ii) when senior judges may participate in an en banc decision.

---

[1] The district court entered a separate judgment on October 12, 2023.  1-ER-2.

## ADDENDUM OF STATUTORY PROVISIONS

An addendum of pertinent statutory provisions has been filed with this brief. Ninth Cir. R. 28-2.7.

## STATEMENT OF THE CASE

### A.    Large-Capacity Magazines

Modern semiautomatic weapons fire one bullet for each pull of the trigger and automatically load the next round after the prior round is fired.  10-ER-2317. Many semiautomatic weapons accept "magazines," devices that store ammunition and (when used with a semiautomatic firearm) feed rounds into the chamber of the firearm.  15-ER-3554.  California defines "large-capacity magazines" to include most ammunition-feeding devices capable of holding more than 10 rounds of ammunition.  Cal. Penal Code § 16740.  Large-capacity magazines are manufactured in a variety of sizes, such as 17-round, 25-round, or 30-round magazines.  10-ER-2317; *see also id.* (describing magazines "with the capacity to accept up to 100 rounds").

Shooters equipped with semiautomatic firearms and large-capacity magazines may fire many consecutive rounds without pausing to reload—depriving victims of critical opportunities to flee, take cover, or intervene and confront the shooter.  10-ER-2274.  As a result, "more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines."  *Gallinger v. Becerra*, 898 F.3d 1012, 1019 (9th Cir. 2018) (quoting *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th

5

Cir. 2017) (en banc) *abrogated on other grounds by Bruen*, 142 S. Ct. 2111); *see also* 10-ER-2322-2324. Mass shooters who use large-capacity magazines inflict nearly three times as many deaths and injuries on average compared to those who do not. 7-ER-1534-1535. Large-capacity magazines were used in nearly 80 percent of the mass shootings resulting in 10 or more fatalities since 1968—and 100 percent of the mass shootings resulting in 20 or more fatalities. 8-ER-1694.

Beginning in 1994, a federal statute prohibited the possession and transfer of all "large capacity ammunition feeding devices" capable of holding more than ten rounds, except for those lawfully possessed at the time of its enactment. *See* Pub. L. No. 103-322, § 110103, 108 Stat. 1796, 1998-2000 (1994); *see* 18 U.S.C. § 922(w) (repealed). That ban expired in 2004, *see* 108 Stat. 2000, but 14 States and the District of Columbia continue to restrict the size of firearm magazines. *See* Cal. Penal Code § 32310; Colo. Rev. Stat. §§ 18-12-301, 18-12-302; Conn. Gen. Stat. § 53-202w; Del. Code tit. 11, §§ 1468, 1469; D.C. Code § 7-2506.01(b); Haw. Rev. Stat. § 134-8(c); 720 Ill. Comp. Stat. 5/24-1.10; Md. Code, Crim. Law § 4-305(b); Mass Gen. Laws Ann. Ch. 140, §§ 121, 131M; N.J. Stat. Ann. §§ 2C:39-1(y), 39-3(j), 39-9(h); N.Y. Pen. Law §§ 265.00, 265.02(8), 265.10; 2022 Oregon Ballot Measure 114, § 11; R.I. Gen. Laws §§ 11-47.1-2, 11-47.1-3; 13 V.S.A. § 4021; Wash. Rev. Code §§ 9.41.010, 9.41.370.

## B.  California's Regulation of Large-Capacity Magazines

California began regulating large-capacity magazines in 2000.  *See* 1999 Cal. Stat. 1781 §§ 3, 3.5 (S.B. 23) (now codified at Cal. Penal Code § 32310(a)).[2]  The statutory definition includes "any ammunition feeding device with the capacity to accept more than 10 rounds," excluding .22 caliber tube ammunition feeding devices, tubular magazines that are contained in lever-action firearms, and magazines permanently altered to accept fewer rounds.  Cal. Penal Code § 16740.

California initially prohibited the manufacture, importation, sale, keeping for sale, offering or exposing for sale, giving, and lending of large-capacity magazines. Cal. Penal Code § 12020(a)(2) (2000).  After the federal ban expired in 2004, California prohibited the purchase and receipt of large-capacity magazines.  *See* 2013 Cal. Stat. 5299, § 1 (A.B. 48).  But those restrictions were "very difficult to enforce" because California did not also prohibit the possession of large-capacity magazines, 12-ER-2867, and police could not easily distinguish between grandfathered magazines and magazines that had been unlawfully acquired, 10-ER-2173.

---

[2] California separately defines as "assault weapons" certain semiautomatic firearms that have fixed magazines with the capacity to accept more than 10 rounds.  *See* Cal. Penal Code § 30515(a)(2), (a)(5), (a)(10).  A different appeal currently pending before this Court presents a Second Amendment challenge to California's restrictions on some of those categories of assault weapons.  *See Miller v. Bonta*, No. 23-2979.

In 2016, California voters enacted Proposition 63 to address that problem. Prop. 63 § 2(12); *see also* 2016 Cal. Stat. Ch. 58, § 1 (S.B. 1446) (similar statute enacted by Legislature). Proposition 63 was intended to "make it illegal in California to possess the kinds of military-style ammunition magazines that enable mass killings like those at Sandy Hook Elementary School; a movie theater in Aurora, Colorado; Columbine High School; and an office building at 101 California Street in San Francisco, California." Prop. 63 § 3(8). To accomplish that objective, voters prohibited the possession of large-capacity magazines and required those who possessed them to take steps to permanently modify them or remove them from the State. *Id.* § 6.1; *see* Cal. Penal Code § 32310(d).

California's restrictions on large-capacity magazines are codified in California Penal Code Section 32310. Section 32310(a) provides that "any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives" a large-capacity magazine is guilty of a misdemeanor or a felony. Cal. Penal Code § 32310(a); *see also id.* § 1170(h). Section 32310(c) provides that individuals who possess a large-capacity magazine on or after July 1, 2017 are guilty of an infraction or misdemeanor. *Id.* § 32310(c). Section 32310(d) requires owners of large-capacity magazines to remove the magazine from the State, sell it to a licensed firearm dealer, or turn it over to a law enforcement agency for destruction.

8

*Id.* § 32310(d).  Alternatively, owners may permanently modify any prohibited magazine "so that it cannot accommodate more than 10 rounds."  *Id.* § 16740(a).

Magazines holding 10 or fewer rounds remain legal in California and are "widely available."  10-ER-2172.  Every firearm that can accept a detachable "large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended."  7-ER-1584.  Law-abiding residents may purchase as many of those magazines—and as many approved firearms—as they want, and may possess and use them for self-defense and other lawful purposes.

### C.  Procedural History

#### 1.  Pre-*Bruen* proceedings

Plaintiffs filed this lawsuit in 2017, shortly before Section 32310's possession restrictions took effect.  They allege that Section 32310 violates the Second Amendment and that the possession ban in Sections 32310(c) and (d) violates the Takings Clause and the Due Process Clause.  17-ER-4041-4059.  The district court preliminary enjoined enforcement of Section 32310's possession restrictions, and a divided three-judge panel of this Court affirmed in an unpublished memorandum. *See Duncan v. Becerra*, 742 Fed. App'x 218, 221-222 (9th Cir. 2018).  In 2019, the district court granted summary judgment to plaintiffs and permanently enjoined enforcement of Section 32310 in its entirety.  1-ER-74-159.

9

After a divided panel of this Court again affirmed the district court, *Duncan v. Becerra*, 970 F.3d 1133, 1141 (9th Cir. 2020) (No. 19-55376), the full Court granted rehearing en banc and reversed, *Duncan v. Bonta*, 19 F.4th 1087, 1096 (9th Cir. 2021). The en banc panel "assum[ed], without deciding, that California's law implicates the Second Amendment" and then held that the law satisfied intermediate scrutiny. *Id.* at 1103. It also held that Section 32310's possession restrictions did not violate the Takings Clause, reasoning that "[t]he government acquires nothing by virtue of the limitation on the capacity of magazines," and that "the law does not deprive owners of all economic use" because it allows large-capacity magazine owners to "modify or sell their nonconforming magazines." *Id.* at 1096. Because plaintiffs' due process claim "essentially restate[d] the takings claim," it "fail[ed] for the same reasons." *Id.*

### 2. Post-*Bruen* proceedings

Plaintiffs filed a petition for a writ of certiorari. *Duncan v. Bonta*, No. 21-1194 (Feb. 28, 2023). While that petition was pending, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). That decision announced a framework for evaluating Second Amendment claims that is "centered on constitutional text and history." *Id.* at 2128-2130. Under the *Bruen* framework, the initial inquiry is whether "the Second Amendment's plain text covers an individual's conduct." *Id.* at 2129-2130. If so, "the Constitution

10

presumptively protects that conduct," and "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130.

After issuing its decision in *Bruen*, the Supreme Court vacated the judgment of the en banc Court in this case and remanded for further proceedings in light of *Bruen*. *Duncan v. Bonta*, 142 S. Ct. 2895 (2022). This Court then remanded the case to the district court for further proceedings consistent with *Bruen*. *Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022) (en banc). The district court ordered the parties to "file any additional briefing that is necessary to decide this case in light of *Bruen*," but it declined to reopen discovery. Dkt. 111 at 2; Dkt. 112.[3] The court noted that it would "decide the case on the briefs and the prior record or schedule additional hearings." Dkt. 111 at 2.

On September 22, 2023, without scheduling any evidentiary hearings or holding a trial, the district court again permanently enjoined Section 32310. 1-ER-3-73. As to *Bruen*'s initial inquiry, the court reasoned that "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense" and asserted that "[r]emovable firearm

---

[3] Unless otherwise specified, "Dkt." refers to the district court docket below in No. 17-cv-01017, and "C.A. Dkt." refers to the docket in this Court in No. 23-55805. Pincites are to the pagination included in the ECF header for the docket entry.

magazines of all sizes are necessary components of semiautomatic firearms." 1-ER-18; 1-ER-71. It also concluded that large-capacity magazines are "'in common use today' for self-defense," *Bruen*, 142 S. Ct. at 2134, because they enjoy "present popularity" and have been "subjectively chosen by citizens to keep in case of confrontation." 1-ER-26.

As to the inquiry into historical tradition, the district court observed that "California's large capacity magazine ban did not exist and could not have existed under the understanding of the Second Amendment at the time of the Founding." 1-ER-71, *see* 1-ER-46-71. It concluded that the State had failed to identify any "relevantly similar" historical analogues to Section 32310. 1-ER-72. The court entered final judgment in plaintiffs' favor on all claims, "incorporating all relevant findings of fact and conclusions of law set forth in" its 2019 summary judgment order. Dkt. 158; *see* 1-ER-2 (separate judgment).

The Attorney General appealed and sought a stay pending appeal in this Court. 17-ER-4063-4064; C.A. Dkt. 2. The en banc panel that considered the prior appeal from the district court's summary judgment order (No. 19-55376) elected to accept this appeal as a comeback case under General Order 3.6(b) and granted a stay pending appeal. C.A. Dkt. 3, 10.

## SUMMARY OF THE ARGUMENT

The threshold inquiry under *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), is whether plaintiffs have carried their burden to establish that the Second Amendment presumptively protects the possession of large-capacity magazines. They have not. Large-capacity magazines do not fit within the ordinary meaning or historical understanding of the term "Arms," and they are not necessary to the function of any protected firearm. The objective characteristics of large-capacity magazines show that they are not "in common use for self-defense" as the Supreme Court has understood and applied that concept; they instead are most suitable for *offensive* and military uses. Those characteristics, as well as the exceptional dangerousness of large-capacity magazines—especially in mass-shooting situations—place them outside the presumptive scope of the Second Amendment.

And even assuming that large-capacity magazines are presumptively protected, California's restrictions are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. As the Supreme Court recognized, when a firearms law addresses a dramatic change in weapons technology—like modern large-capacity magazines—the historical inquiry called for by *Bruen* requires a nuanced approach. Because no government in historic times had to confront that technology or the societal

13

concerns it creates, defining historical traditions too narrowly would improperly convert the Second Amendment into a regulatory straightjacket. The historical tradition that is relevant here spans from the colonial era to the ratification of the Fourteenth Amendment and beyond: governments have restricted or outright prohibited especially dangerous weapons technologies after they emerged and began to imperil public safety—while at the same time allowing the continued possession and use of a wide range of weapons for self-defense. California's prohibition on large-capacity magazines imposes a comparable burden on the right of armed self-defense, and is comparably justified.

As to the remaining issues, plaintiffs' claim under the Takings Clause fails for the reasons previously identified by the en banc panel. A State's exercise of its police power to prohibit the possession of dangerous weapons accessories does not effect a taking of property—especially where (as here) the State allows the owners of those accessories to sell them, move them to another State, or continue to possess them in-state after modifying them to accept fewer rounds. Plaintiffs' due process claim fails for the same reasons. Finally, the en banc panel's decision to keep this comeback case was consistent with 28 U.S.C. § 46(c).

## STANDARD OF REVIEW

The Attorney General appealed after the district court granted summary judgment to the plaintiffs. As plaintiffs described the relevant proceedings below,

14

the district court gave "each party another brief to supplement the . . . summary judgment record," and plaintiffs remained "the moving party on the motion for summary judgment being supplemented." Dkt. 114 at 27. The district court then entered a decision and judgment in favor of plaintiffs on all of their claims based on the supplemented summary judgment record. *See* 1-ER-2; 1-ER-73; *see also* Dkt. 158. This Court reviews "the legal conclusions supporting declaratory judgments and permanent injunctions granted at summary judgment de novo." *City & Cnty. of San Francisco v. Garland*, 42 F.4th 1078, 1084 (9th Cir. 2022); *see also Thompson v. Mahre*, 110 F.3d 716, 719 (9th Cir. 1997) ("[T]here is no such thing as a finding of fact on summary judgment.").

## ARGUMENT

### I.  SECTION 32310 IS CONSISTENT WITH THE SECOND AMENDMENT

The Second Amendment "codified a *pre-existing* right." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). "'[L]ike most rights, the right secured by the Second Amendment is not unlimited.'" *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022) (quoting *Heller*, 554 U.S. at 626). It has never been understood as "a right to keep and carry any weapon whatsoever." *Id.* Certain weapons and instruments "may be banned." *Heller*, 554 U.S. at 627. And the analytical framework announced in *Bruen* did not change that: the Court did not "decide anything about the kinds of weapons that people may possess." 142 S.

15

Ct. at 2157 (Alito, J., concurring). A proper application of the *Bruen* framework confirms that California's restrictions on large-capacity magazines are consistent with the Second Amendment.

### A. Plaintiffs Have Not Established That Large-Capacity Magazines Are Presumptively Protected by the Second Amendment

The threshold question under the *Bruen* framework is whether plaintiffs have carried their burden to establish that "the Constitution presumptively protects" their proposed course of conduct. *Bruen*, 142 S. Ct. at 2130; *cf. Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57 (2005); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984). To answer that question, the Court addresses whether "the Second Amendment's plain text covers [the] conduct." *Bruen*, 142 S. Ct. at 2129-2130. That inquiry considers the conduct in light of "the normal and ordinary meaning of the Second Amendment" as well as its "historical background." *Id.* at 2127 (internal quotation marks omitted).

The Second Amendment's text protects "the right of the people to keep and bear Arms." The meaning of the term "Arms" is broad. *See Heller*, 554 U.S. at 581. But the Supreme Court has emphasized that not every "*type of weapon*" is "eligible for Second Amendment protection." *Id.* at 622. In determining what types of weapons are within the scope of the Second Amendment right, the Supreme Court has pointed to three related principles: only "weapons 'in common use' today for self-defense" are eligible for protection, *Bruen*, 142 S. Ct. at 2134;

16

"weapons that are most useful in military service . . . may be banned," *Heller*, 554 U.S. at 627; and so too may "'dangerous and unusual weapons,'" *id.*; *see Bruen*, 142 S. Ct. at 2128. Those considerations establish that the large-capacity magazines restricted by Section 32310 are not presumptively protected by the Second Amendment.

### 1. "Arms"

As a matter of text and historical understanding, a magazine is not an "Arm." While the Second Amendment includes a "corollary . . . right to possess the magazines necessary to render [protected] firearms operable," that right is "not unfettered." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. There is no persuasive textual or historical basis for extending it to magazines containing more than 10 rounds.

The meaning of the term "Arms" is "fixed according to its historical understanding." *Bruen*, 142 S. Ct. at 2132. Arms are "'[w]eapons of offence, or armour of defence.'" *Heller*, 554 U.S. at 581. Put differently, they are "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Id.* Magazines do not fit those definitions. While a magazine "is something that a person" can "'take[] into his hands,'" it "is not a 'thing . . . use[d] in wrath to *cast at or strike* another.'" *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 386 (D.R.I. 2022). It instead facilitates

17

striking another only when used in conjunction with a firearm. *Cf. United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) ("A silencer is a firearm accessory; it's not a weapon in itself.").

At the founding, moreover, "there was a clear distinction between 'Arms' and 'accoutrements.'" *Ocean State Tactical*, 646 F. Supp. 3d at 387; *see* 7-ER-1563; 7-ER-1569-1579. "Arms" was "used as a general term for weapons." 7-ER-1563. But it did "not include" ammunition or ammunition containers—such as cartridge boxes or cartridge cases—which were instead "included in the category *accoutrements*." *Id*. The Continental Congress thus promised to pay the States for "[e]very horse and all arms *and accoutrements*, which shall be taken, by the enemy in action." 2 *Public Papers of George Clinton* 828 (Wynkoop Hallenbeck Crawford Co. ed., 1900) (emphasis added). The Duke of Wellington described the need "to collect the wounded and their arms *and accoutrements*" from a battlefield. 7-ER-1570 (emphasis added); *see* 10 *The Dispatches of Field Marshal the Duke of Wellington (1799-1818)* 495 (Murray ed., 1838). And "in literally hundreds and hundreds of" other founding-era examples, "*arms* and *accoutrements* are treated as separate items of military gear." 7-ER-1572. The historical predecessors of magazines—cartridges, cartridge boxes, and cartridge cases—"were part of the

18

general category of military accoutrements" and "not arms." 7-ER-1570 (emphasis omitted).[4]

Of course, the Second Amendment also "protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017). For example, "'the right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them," even though the Second Amendment "does not explicitly protect ammunition." *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. And for "semiautomatic handguns" and other protected firearms that are "use[d] with a magazine," the same logic suggests that there is a corresponding "right to possess the magazines necessary to render those firearms operable." *Fyock*, 779 F.3d at 998; *see Luis v. United States*, 578 U.S. 5, 27 (2016) (Thomas, J., concurring) (citing *Jackson*, 746 F.3d at 967) ("Without protection for [certain] closely related rights, the Second Amendment would be toothless.").

That corresponding right is protected by California law: Gun owners may lawfully acquire, possess, and use magazines that are necessary to render any authorized semiautomatic firearm operable—because every firearm that can accept

---

[4] The term "magazine" was not used to refer to a firearm accessory containing bullets until the late nineteenth century. 7-ER-1570.

a detachable "large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended." 7-ER-1584. So "while magazines may be necessary to render firearms operable" in some circumstances, *large-capacity* magazines, "as a subset of magazines, are *never* necessary to render firearms operable." *Or. Firearms Fed'n v. Kotek*, ___ F. Supp. 3d ____, 2023 WL 4541027, at *26 (D. Or. July 14, 2023) (emphasis added).

The district court below identified no persuasive support for its conclusion that "[r]emovable firearm magazines *of all sizes* are necessary components of semiautomatic firearms." 1-ER-71 (emphasis added). It asserted that "[t]he Supreme Court has not described protected arms in subdivided categories," noting that *Heller* "did not distinguish between semiautomatic pistols and revolvers." 1-ER-19. But that misses the point. It was undisputed in *Heller* that both of those weapons were part of a "class of '*arms*.'" *Heller*, 554 U.S. at 628 (emphasis added). Magazines are not arms as that term was historically understood; they are only eligible for protection under a corollary right that is "not unfettered" and is limited to those "magazines necessary to render [protected] firearms operable." *Fyock*, 779 F.3d at 998.

### 2. "Common use for self-defense"

Even if Section 32310 did regulate "Arms," that would not establish that large-capacity magazines are presumptively protected by the Second Amendment.

20

The Supreme Court has emphasized that "individual self-defense is 'the *central component*' of the Second Amendment." *Bruen*, 142 S. Ct. at 2133. Courts must therefore assess whether a weapon is "'in common use' today for self-defense" in determining whether it is presumptively protected. *Id.* at 2134; *see id.* at 2162 (Kavanaugh, J., concurring) (emphasizing this "important limitation"); *Heller*, 554 U.S. at 624; *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023).

In making that assessment in *Heller*, the Supreme Court did not merely consider the prevalence of handguns (which was undisputed). It examined the objective features of handguns to explain why they qualify as a "self-defense weapon." 554 U.S. at 629. The Court explained that handguns are "easier to store in a location that is readily accessible in an emergency" due to their small size. *Id.* They are also "easier to use for those without the upper-body strength to lift and aim a long gun"; they "can be pointed at a burglar with one hand while the other hand dials the police"; and they "cannot easily be redirected or wrestled away by an attacker." *Id.* In the same opinion, the Court recognized that other types of weapons fall outside the scope of the Second Amendment—"such as short-barreled shotguns," and "M-16 rifles and the like"—without *any* discussion of their popularity or prevalence. *Id.* at 625, 627. What mattered to the Court was an "examin[ation]" of "the character of the weapon." *Id.* at 622; *see id.* at 623 ("[T]he

21

Second Amendment right, whatever its nature, extends only to certain types of weapons.").

The objective characteristics of large-capacity magazines show why they are ill-suited to "ordinary self-defense." *Bruen*, 142 S. Ct. at 2156. The whole point of self-defense is to ward off attackers and protect the lives of victims and their families. But if "stressed individuals . . . spray[ed] bullets from a high-capacity magazine" it would "put family members and neighbors at considerable risk." 10-ER-2235. Bullets "fired by a modern weapon with an LCM will easily penetrate walls, threatening family members or occupants in attached dwellings." 10-ER-2234; *see also Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*), ___ F. Supp. 3d ____, 2023 WL 4975979, at *21 (D. Conn. Aug. 3, 2023) (same); *Hanson v. District of Columbia*, ___ F. Supp. 3d ____, 2023 WL 3019777, at *3 (D.D.C. Apr. 20, 2023) (discussing why "high capacity magazines are dangerous in self-defense situations" due to "grave risks to others in the household, passerby, and bystanders"). The record reflects that large-capacity magazines were created not for self-defense, but as offensive instruments that "allow a shooter to fire a large number of rounds at an extremely quick rate"—thus "increas[ing] the shooter's chances of killing his victims." 10-ER-2272-2273; *see* 10-ER-2317; 12-ER-2741-2742; *infra* pp. 27-28.

22

The district court below focused its analysis on the fact that "millions of Americans across the country own large capacity magazines," concluding that "this fact alone entitles such magazines to Second Amendment protection." 1-ER-10; 1-ER-25. That numbers-only inquiry cannot be squared with how the Supreme Court has examined whether weapons are in common use for self-defense. *Supra* p. 21. And it would not make for a sensible or administrable constitutional standard.

A rigid reliance on "numerical estimation[s] of citizenship ownership" and "gauge[s] of present popularity" (1-ER-26) would lead to "circular" and "absurd" results. *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015); *see also Bevis v. Naperville* (*Bevis II*), ___ F.4th ____, 2023 WL 7273709, at *15 (7th Cir. Nov. 3, 2023). It would allow the government to ban any new weapon before it became widespread and then point to the scarcity of that weapon as the very reason why the ban is constitutional. *But see Friedman*, 784 F.3d at 409 ("A law's existence can't be the source of its own constitutional validity."). On the other hand, if an unprotected weapon (like the M16) became lawful in some parts of the country, all it would take to establish a presumptive constitutional right to possess that weapon would be an aggressive marketing (or giveaway) campaign. *See Kolbe v. Hogan*, 849 F.3d 114, 141 (4th Cir. 2017) (en banc) *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (without statutes prohibiting short-barreled

shotguns and machineguns "they too could be sufficiently popular to find safe haven in the Second Amendment").

Plaintiffs' own submissions illustrate the perils of a numbers-only approach. They submitted two wildly different estimates of the number of large-capacity magazines—one nearly five times greater than the other. *Compare* 16-ER-3658, *with* 4-ER-721-722. Plaintiffs' expert candidly acknowledged that he "extrapolat[ed] from indirect sources" to arrive at one of those estimates, and that his figure "cannot be confirmed as unequivocally accurate." 16-ER-3658. Yet the district court uncritically accepted those estimates as "alone entitl[ing] such magazines to Second Amendment protection." 1-ER-27. And it did so without accounting for the reality that "a relatively small percentage of gun owners possess a disproportionate number of LCMs." *Kotek*, 2023 WL 4541027, at *27; *see also* 10-ER-2233 ("LCM ownership by household is also likely to be concentrated, with increased numbers of LCMs held by a declining share of households.").

In their briefing below, *see* Dkt. 132 at 29, plaintiffs sought support for the numbers-only approach in Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016). He observed that a "relevant statistic" in that case was that "'[h]undreds of thousands of [t]asers and stun guns have been sold to private citizens.'" *Id.* at 420 (Alito, J., concurring). But even Justice Alito did not invoke a numbers-only approach: he also stressed that the case involved non-lethal

24

weapons that were "widely . . . accepted as a legitimate means of self-defense across the country." *Id.* In any event, the opinion for the Court certainly did not endorse converting Second Amendment analysis into a mere counting exercise. *See id.* at 411-412 (per curiam). And for good reason. If the fact "that 'approximately 200,000 civilians owned stun guns'" (*id.* at 420 (Alito, J., concurring)) alone entitled that weapon to constitutional protection, that would prove far too much: There are over *700,000* federally-registered machineguns in the United States.[5] But the Supreme Court has pointed to machineguns as the paradigmatic example of a weapon that is *not* in common use for self-defense—emphasizing that it would be "startling" to conclude that "restrictions on machineguns [are] unconstitutional." *Heller*, 554 U.S. at 624.

To the extent that the Court is inclined to consider statistical evidence, the salient number in this case is how often civilians need to fire more than 10 shots in self-defense. The record establishes that those situations are remarkably rare. An analysis of self-defense incidents reported in the NRA Armed Citizens database found that more than 10 bullets were fired in only 2 out of 736 incidents. 7-ER-1519; *see also* 15-ER-3599 (similar results for earlier period). A separate analysis

---

[5] *See* U.S. Bureau of Alcohol, Tobacco, and Firearms, *Firearm Commerce in the United States*, 16 https://tinyurl.com/3u7u9u5f/ (741,146 registered machineguns in the United States in May 2021).

of published news stories found no reported incidents in which the defender fired more than 10 bullets. *See* 7-ER-1522-1528. And the average number of bullets fired in those self-defense incidents—somewhere between 2 and 3, *see* 7-ER-1519; 7-ER-1526—is far below California's capacity limit.[6]

As the district court noted, some modern gun owners may nonetheless express a desire to possess a large-capacity magazine for self-defense, and a large-capacity magazine could conceivably be used in a self-defense situation. 1-ER-27. But the same things could be said of short-barreled shotguns and M16s—neither of which is protected by the Second Amendment. *See Heller*, 554 U.S. at 625, 627; *see also Bevis II*, 2023 WL 7273709, at *12. Nor would it make sense to define the metes

---

[6] The district court took issue with the Attorney General's evidence about the number of shots fired in self-defense situations. *See* 1-ER-28-35. For instance, it criticized the Attorney General's expert for relying on hearsay in news articles to compile the underlying data, 1-ER-32, and for not disclosing the underlying articles, 1-ER-31-32. Those criticisms are not persuasive: "experts are entitled to rely on hearsay in forming their opinions," *Carson Harbor Vill., Ltd. v. Unocal Corp.*, 270 F.3d 863, 873 (9th Cir. 2001); *see* Fed. R. Evid. 703, and the Attorney General in fact produced all of the relevant articles to plaintiffs in advance of the expert's deposition. In addition, in the posture of resolving a summary judgment motion, *see supra* pp. 14-15, the district court ignored plaintiffs' failure to introduce any responsive evidence establishing a material number of self-defense situations in which defenders fired more than 10 bullets. Ultimately, however, the district court appears to have relied on the State's evidence of 2 times out of 736 incidents (1-ER-35), paired with its own puzzling assertion that this 0.26% rate "is a lot" (*id.*). The district court did not make any factual findings—nor could it have given the summary judgment posture. *See Thompson v. Mahre*, 110 F.3d 716, 719 (9th Cir. 1997).

and bounds of the Second Amendment based on the "subjective" preferences (1-ER-27) of certain modern gun owners. That approach would be limitless: "If the subjective intent of an individual were enough to show that a firearm or firearm accessory is used for . . . self-defense[,] then nearly every firearm or firearm accessory purchased in this country would satisfy that test." *Kotek*, 2023 WL 4541027, at *30.

### 3. "Most useful in military service"

Relatedly, large-capacity magazines "are most useful in military service." *Heller*, 554 U.S. at 627 (weapons that are most useful in military service—including "M-16 rifles and the like—may be banned"). That conclusion was the basis for the Seventh Circuit's recent decision rejecting a motion to preliminarily enjoin Illinois' ban on large-capacity magazines (and assault weapons). *See Bevis II*, 2023 WL 7273709, at *12-14. And it is supported by the history of large-capacity magazines and their objective characteristics.

As the federal Bureau of Alcohol, Tobacco, and Firearms has explained, "detachable large capacity magazine[s] [were] originally designed and produced for the military assault rifles from which they were derived." 12-ER 2741-2742. Those "modern military firearms are designed to accept large, detachable magazines" in order to "provide[] the soldier with a fairly large ammunition supply and the ability to rapidly reload." 12-ER-2787. Large capacity magazines are thus

"indicative of military firearms." *Id.* And "[w]hatever their other potential uses,"

they "are unquestionably most useful in military service." *Kolbe*, 849 F.3d at 137;

*see also Duncan v. Bonta*, 19 F.4th 1087, 1102, 1105 (9th Cir. 2021) (en banc),

*cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022) (prior en banc decision

noting that large-capacity magazines "likely are 'most useful in military service,'

at least in an ordinary understanding of that phrase," and "that the benefits of a

large-capacity magazine are most helpful to a soldier");[7] *Kotek*, 2023 WL

4541027, at *34 ("LCMs, even in civilian hands, are closely related to weapons

used in warfare."); *Hanson*, 2023 WL 3019777, at *8 (large-capacity magazines

"'are particularly designed and most suitable for military . . . applications'

because" they give shooters the "'ability to reload rapidly,' 'hit multiple human

targets very rapidly,' and 'deliver extraordinary firepower'").

### 4. "Dangerous and unusual"

Finally, in discussing "limit[s] on the right to keep and carry arms," the

Supreme Court has pointed to the long "historical tradition of prohibiting the

carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *see*

*Bruen*, 142 S. Ct. at 2128. Such weapons "fall outside of the Second

---

[7] The prior en banc decision in *Duncan* was vacated in light of *Bruen*, *see supra*
p. 11, and does not control the analysis here or otherwise bind this Court. This
brief cites only portions of that decision that are relevant to the present dispute and
were not affected by *Bruen*.

Amendment's protections." *E.g.*, *Kotek*, 2023 WL 4541027, at *34 (citing *Bruen*, 142 S. Ct. at 2128). Blackstone elaborated on that tradition in his *Commentaries on the Laws of England*, the lead historical source cited by *Heller* on this point. He explained that "[t]he offence of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace . . . and is particularly prohibited." 4 Blackstone, *Commentaries on the Laws of England* 148 (1769). The English government could thus prohibit the use of a weapon with exceptionally dangerous qualities, like a crossbow. *See, e.g.*, *Bruen*, 142 S. Ct. at 2140 (discussing prohibition under Henry VIII).

Large-capacity magazines also "have uniquely dangerous propensities." *E.g.*, *Kotek*, 2023 WL 4541027, at *34. Not only were they created and designed to allow soldiers "to hit 'multiple human targets very rapidly,'" *e.g.*, *Kolbe*, 849 F.3d at 137, but the record establishes that they triple the number of deaths and injuries sustained in mass-shooting incidents, and have been used in the vast majority of American mass-shootings in the last half-century, *see* 7-ER-1534-1535; 8-ER-1694.

The district court rejected these considerations out of hand. It observed that "all guns and ammunition are dangerous," and that large-capacity magazines are not "both 'dangerous and unusual'" because they are "commonly-owned" and "number in the millions." 1-ER-35; 1-ER-36; *cf. Caetano*, 577 U.S. at 417 (Alito,

29

J., concurring); *Fyock*, 779 F.3d at 997. Here again, however, it cannot be that a hyper-dangerous weapon like "a grenade launcher or a flamethrower" would suddenly "become[] constitutionally protected" if its numbers increased to the point that it was no longer "unusual" in a strict numerical sense. *NAGR*, 2023 WL 4975979, at *16. The better understanding is that the term "unusual" conveys some heightened "level of lethality or capacity for injury" that makes a particular type of weapon "especially dangerous." *Id.* (discussing *Heller* and the historical sources cited therein); *cf.* Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688 (2016) (describing rhetorical device where "two terms separated by a conjunction work together as a single complex expression").

A three-judge panel of this Court recently concluded that whether a weapon is "'dangerous and unusual'" is an issue "as to which [the government] bears the burden of proof in the second prong of the *Bruen* analysis." *Teter v. Lopez*, 76 F.4th 938, 949-950 (9th Cir. 2023), *pet. for rehearing en banc filed*, No. 20-15948, C.A. Dkt. 135 (9th Cir. Sept. 20, 2023). That also is not the best understanding of Supreme Court precedent and should be overruled. The Supreme Court discussed this principle—along with common use for self-defense and "most useful in military service"—as part of its threshold discussion of what "sorts of weapons [are] protected" by the Second Amendment. *Heller*, 554 U.S. at 627; *see also*

30

*Bruen*, 142 S. Ct. at 2128. That "threshold inquiry" is what this Court has described as "*Bruen* step one," which the Court evaluates *before* addressing whether the government has adequately justified a restriction on a type of weapon that is presumptively protected. *Alaniz*, 69 F.4th at 1128.[8] Applying that threshold inquiry, courts across the Nation have correctly concluded that large-capacity magazines are not presumptively protected by the Second Amendment. *See Bevis II*, 2023 WL 7273709, at *14 (consolidated decision affirming orders denying preliminary injunctive relief and vacating order granting relief); *Kotek*, 2023 WL 4541027, at *26, 33-34; *Brumback v. Ferguson*, 2023 WL 6221425, at *10 (E.D. Wash. Sept. 25, 2023) (denying preliminary injunctive relief); *NAGR*, 2023 WL 4975979, at *26 (same); *Ocean State Tactical*, 646 F. Supp. 3d at 388 (same).

### B. California's Restrictions on Large-Capacity Magazines Are Consistent with This Nation's Historical Tradition

Even if the Court holds (or assumes) that large-capacity magazines are presumptively protected by the Second Amendment, California's magazine restrictions are justified because they are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127; *see id.* at 2130.

---

[8] *See also NAGR*, 2023 WL 4975979, at *17 (analyzing "dangerous and unusual" characteristics of large-capacity magazines as part of *Bruen*'s threshold inquiry); *Kotek*, 2023 WL 4541027, at *34 (same).

The historical analysis required by *Bruen* is not meant to impose "a regulatory straightjacket." 142 S. Ct. at 2133. The government must justify a regulation by establishing that it falls within a historical tradition of laws that are "relevantly similar," in the sense that they "impose a comparable burden on the right of armed self-defense" that "is comparably justified." *Id.* at 2128, 2132, 2133. There is no need to identify "a historical *twin*" or "a dead ringer" for purposes of that "analogical inquiry." *Id.* at 2133. And when the challenged regulation "implicat[es] unprecedented societal concerns or dramatic technological changes," that "may require a more nuanced approach." *Id.* at 2132. Applying that framework here, California's modern restrictions on large-capacity magazines fit comfortably within the robust historical tradition of restricting or prohibiting weapons with features that make them especially dangerous or particularly susceptible to criminal misuse, especially after those weapons have proliferated in the commercial market to the point that they present a substantial threat to public safety.

### 1. This case implicates *Bruen*'s "more nuanced" approach to the historical inquiry

It should not be controversial that the "nuanced" approach described in *Bruen* is appropriate here. 142 S. Ct. at 2132. Large-capacity magazines both "represent a 'dramatic technological change'" and "implicate [a]n 'unprecedented societal concern.'" *Kotek*, 2023 WL 4975979, at *36, *38; *see Del. State Sportsmen's*

32

*Ass'n v. Del. Dep't of Safety & Homeland Security* (*DSSA*), ___ F. Supp. 3d ____, 2023 WL 2655150, at \*10 (D. Del. Mar. 27, 2023); *Hanson*, 2023 WL 3019777, at \*13; *see also* 1-ER-60 (district court's acknowledgment that "it can be argued that removable magazines represent a dramatic change in technology and the State is attempting to address a modern societal concern").

Large-capacity magazines are a "relatively recent phenomenon" that differ profoundly from technologies available at the time of the founding and the ratification of the Fourteenth Amendment. *E.g.*, *Kotek*, 2023 WL 4541027, at \*38-39. Weapons capable of holding more than ten rounds were "extraordinarily rare" at the founding and were "almost exclusively in Europe." 10-ER 2102. During that period, most American gun owners used single-shot, muzzle-loading firearms. 7-ER-1608-1609; 8-ER-1801-1802. Those weapons "had to be reloaded manually," round by round, a "time-consuming process that required skill and experience." 8-ER-1802.

The early repeating rifles invoked by plaintiffs below (*see* Dkt. 132 at 41) did not become commercially available in any significant numbers until "the decades following the Civil War." 8-ER-1782; 9-ER-1889-1890. To fire multiple rounds with one of those rifles, a shooter had to "manipulate a lever in a forward-and-back motion before each shot." 9-ER-1889. And when the magazine was empty, it had to be "manually reloaded, one round at a time." *Id*. At the time when the

Fourteenth Amendment was ratified, repeating rifles were mostly exported or purchased by the military. 10-ER-2122-2123. They made up less than 0.2% of all firearms in the United States in 1872. *Hanson*, 2023 WL 3019777, at *13.

Semiautomatic weapons and detachable magazines did not emerge until around the turn of the twentieth century. 8-ER-1782-1784. And "technological improvements" after 1979 have "fostered" the increased prevalence of large-capacity magazines in the commercial marketplace: advances in plastic polymer and "double-stack magazine" capabilities enabled large-capacity magazines to become "more reliable," "greatly reduced the risk of misfeed," and allowed "relatively larger capacity magazines" for "relatively smaller cartridges." 16-ER-3808-3809. That dramatically reduced "the time and effort involved in reloading" and enabled a rapid "rate of shooting [that] would have been impossible" with the technologies available at the time of the ratification of the Second and Fourteenth Amendments. *Kotek*, 2023 WL 4541027 at *38, *39.

Those technological advancements have contributed directly and substantially to the unprecedented rise in shootings in which lone gunmen use "semiautomatic handguns and rifles with large capacity magazines" to "inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff." 8-ER-1830. Notwithstanding plaintiffs' arguments to the contrary, *see* Dkt. 132 at 48-51, that is a distinctly new and modern phenomenon: There were three shootings

34

in the three decades after World War II in which a lone gunman killed 10 or more victims. 8-ER-1694. There were three such shootings in 2009 *alone*, each one involving a large-capacity magazine. *Id.*; 10-ER-2303. And since then there have been 15 more shootings in which lone gunmen murdered 10 or more people—all but two involving large-capacity magazines. 8-ER-1694; *see also* 10-ER-2303.[9] Those massacres are an "unprecedented societal concern" (*Bruen*, 142 S. Ct. at 2132) if ever there was one.

*Bruen* explains why these considerations warrant a more nuanced approach. When a technology or societal concern has "persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." 142 S. Ct. at 2131. But the "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 2132. When legislatures charged with protecting the safety of their communities enact laws addressing

---

[9] That figure does not include further bloodshed occurring after the record was compiled. *See* Czachor, *Who was Robert Card? Confirmed Details on Maine Gunman*, CBS News, Oct. 28, 2023, https://tinyurl.com/mr2t5y4x (noting that the Lewiston shooter used "an assault rifle with an extended magazine"); White, *What We Know About the Gun Used in the Monterey Park Shootings*, N.Y. Times, Jan. 26, 2023, https://tinyurl.com/26dku4nv (noting that a "large-capacity magazine" was recovered at the scene of the Monterey Park shooting).

novel firearms technologies or new societal concerns, it stands to reason that there will be no historical precursors addressing the same technologies and concerns. *Cf. McCullen v. Coakley*, 573 U.S. 464, 481 (2014) (governments do not "regulate for problems that do not exist"). Without "a nuanced approach," *Bruen*'s "analogical inquiry" would unduly constrain legitimate regulatory efforts in precisely the way that the Supreme Court warned against. 142 S. Ct. at 2132, 2133.

### 2. Throughout American history, governments have restricted or prohibited especially dangerous weapons as they proliferated and imperiled public safety

The regulatory tradition that is relevant here dates back to before the founding. In ratifying the Second Amendment, the founding generation "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 599). That "*pre-existing* right" was "not unlimited." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). As Blackstone described it, the right was understood as "a public allowance"—subject to "due restrictions" necessary to protect the peace. 1 Blackstone, *Commentaries* 139.[10] Those restrictions included the long "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 626; *see* 4 Blackstone, *Commentaries* 148; *supra*

---

[10] *See generally United States v. Wood*, 299 U.S. 123, 138 (1936) ("Undoubtedly, as we have frequently said, the framers of the Constitution were familiar with Blackstone's Commentaries.").

pp. 28-29.  Consistent with that tradition, and without interfering with the public carry of other weapons for self-defense, *see Bruen*, 142 S. Ct. at 2142, the Crown restricted especially dangerous weapons like crossbows and launcegays to preserve the public order, *id.* at 2140; *see, e.g.*, 7 Rich. 2, ch. 13 (1383); 33 Hen. 8, ch. 6, §§ 1, 18 (1541); *see generally* Sharpe, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17-18 (ed. 1782).

That English tradition continued in America throughout each of the periods that *Bruen* identified as relevant to its historical inquiry.  *See* 142 S. Ct. at 2142-2156.  During the colonial and founding era, most violent crimes were committed with weapons such as clubs, dirks, and daggers.  *See* 8-ER-1803; *Bevis v. City of Naperville* (*Bevis I*), ___ F. Supp. 3d ____, 2023 WL 2077392, at *10 (N.D. Ill. Feb. 17, 2023) ("As early guns proved unreliable, many citizens resorted to clubs and other blunt weapons.").  States and colonies responded by "singl[ing] out weapons that posed a particular danger for regulation or prohibition."  7-ER-1607.  In 1686, for example, after a period of internal "'strife and excitement,'" *Bruen*, 142 S. Ct. at 2144, East New Jersey prohibited the concealed carrying of "pocket pistol[s], skeins, stilladers, daggers or dirks, or other unusual or unlawful weapons."  *Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289-290 (1881).  Other colonies and early States prohibited the carrying of clubs and similar weapons increasingly used as fighting instruments.

9-ER-1897; 9-ER-1961-1964; *see Bevis I*, 2023 WL 2077392, at \*11 (detailing restrictions).[11]

Many of these colonial- and founding-era restrictions focused on weapons other than firearms because guns were not "the primary weapon of choice for those with evil intent during this period." 7-ER-1604; *Bevis I*, 2023 WL 2077392, at \*10. The guns available at the time "took too long to load"; they could not be kept pre-loaded because black powder was "corrosive" and "attracted moisture"; and therefore they were "seldom used to commit crimes." 7-ER-1603; *see* 9-ER-1881-1882; 8-ER-1800-1804. But when technologies or practices associated with firearms posed an unusual danger to public safety, colonies and early States responded by regulating or prohibiting them. In 1771, for instance, New Jersey prohibited the keeping of firearms configured as "trap guns," which used string or wire so that a loaded firearm would discharge automatically when a trap was sprung. *See* 1763-1775 N.J. Laws 346, ch. 539, § 10 ("Penalty for Setting loading guns"); 9-ER-1901. "Those who set gun traps typically did so to defend their

---

[11] *See, e.g.*, 1750 Mass. Acts 544, ch. 17, § 1 (prohibited the carry of "clubs and other weapons" in a group of 12 or more); 1786 Mass. Acts 87, ch. 38 (prohibited being armed with a club or other weapon while rioting); 1788-1801 Ohio Laws 20, ch. 6 (prohibited the carry of any "dangerous weapon" while committing a burglary); *Laws of the State of New Jersey* 474 (Nettleton ed., 1821), § 2 (1799 law prohibiting the carry of any pistol, hanger, cutlass, bludgeon, or other "offensive weapon" with intent to commit assault).

places of business, properties, or possessions." 9-ER-1902. But that dangerous weapon configuration "[i]nevitably . . . wound up hurting or killing innocent[]" bystanders who set off the trap. *Id*. Several other States and territories followed New Jersey's lead in the nineteenth century. 9-ER-1957-1959; 9-ER-2082-2086.

Colonies and early States also heavily regulated gunpowder to prevent mass fatalities as a result of explosions or fires. *See Kotek*, 2023 WL 4541027, at *40; *see, e.g.*, 1771-1772 Mass. Province Laws 167, ch. 9; 1772 N.Y. Laws 682; 1782-1783 Mass. Acts 120, ch. 46; 1784 N.Y. Laws 627, ch. 28; 1821 Me. Laws 98, ch. 25, § 1; 1825 N.H. Laws 73, ch. 61; 1832 Conn. Acts 391, ch. 25; 1836 Conn. Acts 105, ch. 1, § 20. Those laws typically prohibited certain methods of storing gunpowder, restricted the quantity that could be stored in a particular location, and allowed government officials to remove it when necessary to prevent explosions. *See* 7-ER-1610-1613. For instance, New York prohibited all persons (other than shopkeepers and retailers) "to have or keep in any Place within two Miles of" New York City Hall "more than Six Pounds of Gun-Powder," and gave city officials broad authority to transfer powder to the public magazine for safe storage. 1772 N.Y. Laws 682, 683. While such regulations "necessarily affected the ability of gun owners to use firearms for self-defense" by restricting the availability of gunpowder, they were considered to be at the "very core of the police power." 7-ER-1612; 7-ER-1611; *see Brown v. Maryland*, 25 U.S. (12 Wheat) 419, 442-443

(1827) ("The power to direct the removal of gunpowder is a branch of the police power.").

As the nineteenth century progressed, States restricted the use or possession of new types of weapons posing particular dangers to public safety. One notorious example was the "Bowie knife," a weapon used by Jim Bowie in a duel in 1827 that became widespread in the 1830s. *See* 9-ER-1893; *DSSA*, 2023 WL 2655150, at *11. Bowie knives were "designed expressly for fighting": they had "longer blades than ordinary knives," "crossguards to protect the combatants' hands," and "clip points to make it easier to cut or stab opponents." 8-ER-1810. They were "widely used in fights and duels." 9-ER-1894; *see Kotek*, 2023 WL 4541027, at *41. By 1840, at least five States or territories had enacted laws restricting the carrying of Bowie knives or other fighting knives. *See* 9-ER-1961-1964; *see, e.g.*, 9-ER-2067 (1836 Tennessee statute); 9-ER-2003 (1839 Alabama statute). Nearly every State enacted a law restricting Bowie knives by the end of the nineteenth century, whether by outlawing their possession, carry, or sale; enhancing criminal penalties; or taxing their ownership. 9-ER-1897; *see* 9-ER-1961-1964; 9-ER-2003-2080 (collecting laws); *DSSA*, 2023 WL 2655150, at *11-12 (Bowie knife regulations were "extensive and ubiquitous" after such knives "proliferated in civil society").

States also began to regulate new types of "melee weapons" as they became prevalent and imperiled public safety. *DSSA*, 2023 WL 2655150, at *11; 9-ER-1897-1900. The slungshot, for example, is a hand-held impact weapon with a weighted object at the end of a flexible strap. 9-ER-1898. It was developed in the 1840s and soon became "widely used by criminals and street gang members." *Id.* New York and Vermont passed laws in 1849 prohibiting the manufacture, sale, and possession of slungshots. 1849 N.Y. Laws 403, §§ 1-2; 1849 Vt. Acts & Resolves 26, No. 36 §§ 1-2. Forty-one States and the District of Columbia had enacted anti-slungshot laws by the end of the nineteenth century. 9-ER-1899.

These state responses to emerging weapons that posed exceptional dangers were not identical. But a uniform response is neither realistic nor desirable in a federal system where "[s]tate and local" governments may "experiment[]" with reasonable weapons restrictions. *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion). The States' varied approaches all reflect extensive governmental efforts to address the use of especially dangerous weapons in ways that increasingly threatened public safety. 8-ER-1810. The States routinely "respond[ed] to growing rates of violence and lethality caused by modern innovations in technology and changing patterns of human behavior by regulating the particular kinds of weapons or modes of carry that were being most often employed by those causing the violence, while leaving open alternative avenues

41

for lawful possession" of a wide range of permissible weapons "for purposes of self-defense." *NAGR*, 2023 WL 4975979, at *33; *see DSSA*, 2023 WL 2655150, at *12; *Herrera v. Raoul*, ___ F. Supp. 3d ____, 2023 WL 3074799, at *6-7 (N.D. Ill. Apr. 25, 2023).

And while particular types of firearms were not a frequent subject of regulation during the early period, when they did not present comparable threats to public safety, *see supra* p. 38, the States responded quickly when advances in firearms technology presented exceptional dangers to society. By the mid-1820s, percussion-cap pistols replaced flint-lock pistols in domestic markets. 8-ER-1810. The new pistols could "be kept loaded and carried around for longer periods without risk of corrosion." *Id.* The invention of revolver pistols in the 1830s enabled the firing of six rounds in succession without reloading. 8-ER-1768-1769; 9-ER-1888. Those new technologies led to an upswing in the use of pistols in interpersonal assaults as they became prevalent in civil society. *See* 8-ER-1769-1771; 8-ER-1810-1812. Several States promptly responded by enacting laws restricting the carry of concealable pistols. 8-ER-1770-1781; 8-ER-1810-1812; 9-ER-1957-1959.[12]

---

[12] In *Bruen*, the Supreme Court held that those nineteenth century statutes did not support a modern-day law prohibiting a law-abiding citizen from carrying any sort of handgun publicly for self-defense. *See* 142 S. Ct. at 2146-2147; *cf. id.* at 2143

And when automatic and semiautomatic firearm technologies became prevalent and began to imperil public safety in the twentieth century, the States (and the federal government) again swiftly moved to regulate them. *See Kotek*, 2023 WL 4541027, at *23-25. Of course, historical evidence from long after the ratification of the Fourteenth Amendment "cannot provide much insight into the meaning of the Second Amendment [if] it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154. But here, there is no contradictory earlier evidence because the emergence of automatic and semiautomatic firearms reflected dramatic technological innovations. *See supra* pp. 33-34. The regulatory response to those uniquely dangerous new weapons was consistent with historical responses to comparably dangerous weapons in earlier eras. *See generally Bruen*, 142 S. Ct. at 2136 ("'a regular course of practice' can 'liquidate & settle the meaning of' disputed or indeterminate 'terms & phrases' in the Constitution" (citation omitted)).

---

(even assuming "that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today"). But *Bruen* did not "decide anything about the kinds of weapons that people may possess," *id.* at 2157 (Alito, J., concurring), and the cited statutes are relevant here as part of the longstanding tradition of States responding to contemporary threats to public safety presented by emerging weapons that are especially dangerous at the time.

The first fully automatic handheld firearm marketed for civilian purchase in the United States was the "Tommy gun," a sub-machine gun. 9-ER-1869-1870. It was developed for military use in World War I and entered the U.S. market in the 1920s. *Id.* The most important semiautomatic handgun to enter the U.S. market in the early twentieth century was a Colt pistol that accepted detachable magazines holding seven rounds. *Kotek*, 2023 WL 4541027, at *23. It did not circulate widely in the United States until after World War I, resulting from the sale of postwar surplus. *Id.*

As those new weapons began to circulate more widely, "their uniquely destructive capabilities rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of the 1920s." 9-ER-1870. The destruction caused by those weapons, including in the infamous St. Valentine's Day Massacre in Chicago in 1929, prompted governments across the Nation to regulate them between 1925 and 1934. 8-ER-1826-1827; 9-ER-1871. In all, 32 States enacted some form of regulation on automatic or semiautomatic weapons. *See* 9-ER-1871; *Bevis I*, 2023 WL 2077392, at *12.

And many States focused their restrictions on the increased round capacity that contributed to the dangerous nature of these weapons. *See* 9-ER-1876-1878. From 1927 to 1934, over a dozen States restricted semiautomatic firearms, fully automatic firearms, or both based on their ability to fire a certain number of shots

44

without reloading.  *See* 9-ER-1878; 9-ER-1966-2001 (collecting statutes).  For example, Rhode Island, Michigan, and Ohio restricted weapons capable of firing 12, 16, and 18 shots (respectively) without reloading.  1927 Mich. Pub. Acts 887, Act No. 372; 1927 R.I. Pub. Laws 256; 1933 Ohio Laws 189.  And Congress restricted the possession in the District of Columbia of semiautomatic weapons capable of firing more than 12 shots without reloading.  9-ER-1872; 9-ER-1967-1968.[13]

### 3. The large-capacity magazine restrictions challenged here are consistent with that historical tradition

The operative inquiry here is whether California's restrictions on large-capacity magazines are "relevantly similar" to our Nation's long historical tradition of responding to especially dangerous weapons technologies presenting an emerging threat to public safety.  *Bruen*, 142 S. Ct. at 2132.  *Bruen* did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment."  *Id.*  As discussed above, however, it did emphasize the need for a "nuanced approach" in cases like this one, where the challenged regulations address modern weapons technologies that could not possibly have been restricted or prohibited during the relevant historical periods.

---

[13] Congress also passed the National Firearms Act, which significantly restricted fully automatic weapons nationwide through tax and registration requirements.  8-ER-1827; 9-ER-1873; *see* Pub. L. No. 73-474, 48 Stat. 1236 (1934).

*Id.*; *see supra* pp. 33-34.  Requiring spot-on "historical precursors," or defining historical traditions too narrowly, would prohibit legitimate state experimentation with reasonable regulations responding to new weapons that imperil public safety. *See generally McDonald*, 561 U.S. at 785 (plurality opinion).

Under the proper approach, the "*central* considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133 (internal quotation marks omitted).  In both respects, the large-capacity magazine regulations challenged here are consistent with our Nation's historical tradition of responding to particularly dangerous weapons that "circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers."  9-ER-1880; *see supra* pp. 36-45.

As to burden, ever since the founding, governments have heavily restricted or prohibited particularly dangerous arms.  In the early days, when the "use of guns in homicides" was "infrequent," 8-ER-1803, many of those regulations focused on especially lethal knives and blunt instruments often used in fights, murders, and other criminal activities, *see supra* pp. 37-38.  But even before the founding there were restrictions and prohibitions on especially dangerous types of firearms or firearms configurations, and as new firearms technologies presented similar

46

concerns, they too were restricted or outright prohibited. *See supra* pp. 38-39. The specific approaches varied as different concerns arose in different regions, but the common theme is that governments restricted or prohibited weapons that had proven to be especially lethal and prone to criminal misuse—while preserving access to knives, long guns, handguns, and other weapons suitable for self-defense.

The law challenged here imposes a comparable burden on the right to armed self-defense. *See, e.g.*, *Kotek*, 2023 WL 4541027, at 39-46; *Hanson*, 2023 WL 3019777, at *15-17; *DSSA*, 2023 WL 2655150, at *12-13. It prohibits only certain magazines that contain far more rounds than the typical number fired in self-defense scenarios—and that make semiautomatic firearms exceptionally lethal as offensive weapons in the hands of mass shooters. *Supra* pp. 6, 22-26. The challenged law does not prevent any law-abiding gun owner from using any authorized firearm for self-defense or other lawful purposes. 7-ER-1584. All firearms that can accept a detachable large-capacity magazine can also accept a magazine that holds ten or fewer rounds and work as intended. *Id*. And gun owners are free to purchase as much ammunition, and as many magazines containing ten or fewer rounds, as they want. The challenged restrictions impose at most a minimal burden on a law-abiding citizen's right to armed self-defense. *See DSSA*, 2023 WL 2655150, at *12 ("[T]he burden that the challenged regulations impose is slight.").

That modest burden is also comparably justified when compared with historical precursors. *See, e.g.*, *Kotek*, 2023 WL 4541027, at 39-46; *Hanson*, 2023 WL 3019777, at *15; *DSSA*, 2023 WL 2655150, at *13. The modern societal concern addressed here involves an exceptionally grave threat to public safety: a recent and unprecedented rise in lone shooters using firearms equipped with large-capacity magazines to murder many victims in a matter of minutes. *See supra* pp. 5-6, 34-35. The justification for regulating large-capacity magazines is surely comparable to the historical justification for our Nation's long tradition of regulating emerging weapons whose dangerous characteristics gave rise to "pressing public safety concerns" about murder and mayhem. *DSSA*, 2023 WL 2655150, at *13. Since the founding, States have restricted or prohibited those weapons, "while leaving open alternative avenues for lawful possession of firearms for purposes of self-defense." *NAGR*, 2023 WL 4975979, at *33.

### 4. The district court's historical analysis was flawed

In reaching a different conclusion about the constitutionality of California's large-capacity magazine restrictions, the district court employed a historical analysis that was fundamentally flawed. 1-ER-38-71. To be sure, the district court quoted *Bruen*'s statement that "'cases implicating unprecedented social concerns or dramatic technological changes may require a more nuanced approach," 1-ER-42, as well as *Bruen*'s directive that States need not identify "a historical twin" or

48

"a dead ringer for historical precursors," 1-ER-43. But it did not heed those words. Instead of seeking a comprehensive understanding of the Nation's historical traditions, the district court ordered the State to identify the single "best historical regulation" analogous to the statute challenged here. 17-ER-4081. And when it issued its decision, the court emphasized that "[t]here are no Founding-era dead ringers or historical twins"—while hypothesizing that a "historical twin is not unimaginable" because early States could have prohibited "large capacity gunpowder sacks" or "carrying more than 10 lead bullets." 1-ER-60.

The district court faulted the State for supposedly failing to identify a relevant historical tradition, *see, e.g.*, 1-ER-11, but its own analysis ignored historical precursors that are directly relevant to the question of how States may respond to especially dangerous weapons technologies that imperil public safety. For instance, the court refused to "look to knife laws" like restrictions on Bowie knives "when reviewing a restriction about guns." 1-ER-50. But it acknowledged that knives are "'arms' imbued with Second Amendment protection," 1-ER-65-66, and *Bruen* itself states that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," 142 S. Ct. at 2127; *see id.* at 2132 (the "historical inquiry that courts must conduct will often involve reasoning by analogy"). The district court also rejected any analogy to trap guns, *see supra* p. 38, reasoning that

49

they are not "guns at all" but instead "a method by which a gun . . . can be set up to fire indiscriminately." 1-ER-67. Of course, the large-capacity magazines that California prohibits are not guns either, but firearm accessories that present a similar (or greater) degree of risk to innocent bystanders. *See supra* pp. 19-20.

As to historical timeframe, the district court discounted evidence of laws from before 1791. *See, e.g.*, 1-ER-46-47. It reasoned that "British sources pre-dating the Constitution are not particularly instructive because the American Revolution was a rejection of British rule." 1-ER-44. That is a surprising assertion given that the Second Amendment "codified a *pre-existing* right." *Heller*, 554 U.S. at 592. The English Bill of Rights "has long been understood to be the predecessor to our Second Amendment," *id.* at 593, and a British tradition that "long predates" the Second Amendment still "illuminate[s] the scope of the right" if it "prevailed up to the period immediately before and after the framing of the Constitution." *Bruen*, 141 S. Ct. at 2136 (internal quotation marks omitted); *see supra* p. 36.

On the other hand, the district court discounted laws enacted after the ratification of the Fourteenth Amendment in 1868 as "too late to shed much light." 1-ER-46; *see also* 1-ER-58. That ignored *Bruen*'s teaching that in some circumstances (like this one, *supra* p. 43) post-ratification evidence can help "settle the meaning" of the Constitution. *Bruen*, 142 S. Ct. at 2136. Even as to firearms laws enacted between 1791 and 1868, the district court dismissed the relevance of

50

statutes that restricted pistols on the ground that they "did not *prohibit*" pistols. 1-ER-64 (emphasis added). According to the court, laws regulating the "*use* or *manner* of carrying" guns can never be comparable to restrictions on "possession, manufacturing, giving, lending, [or] offering for sale." 1-ER-47. But *Bruen*'s framework necessarily involves reasoning by analogy to "relevantly similar" laws, not to identical ones. 142 S. Ct. at 2132.

By applying a blinkered approach to that analogical inquiry, the district court never considered the longstanding tradition apparent from a more comprehensive understanding of our Nation's history: from the founding era to the present, "[f]irearms and accessories, along with other dangerous weapons, were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality." *DSSA*, 2023 WL 2655150, at *12 (internal quotation marks omitted); *see also Herrera*, 2023 WL 3074799, at *6-7; *NAGR*, 2023 WL 4975979, at *33; *supra* pp. 36-45.

The district court's approach to Second Amendment analysis would upend that centuries-old tradition. By discounting or dismissing "well-established and representative historical analogue[s]," *Bruen*, 142 S. Ct. at 2133 (emphasis omitted), the district court concluded that "there were relatively few" relevant restrictions—and no relevant prohibitions—"[d]uring the most important period of history." 1-ER-50. In the district court's view, "the history and tradition of the

51

northern states . . . was to leave firearm ownership and use completely unregulated," 1-ER-55; and "the history and tradition of the [southern] states . . . was to leave firearm ownership and use mostly unregulated," 1-ER-57. Under the district court's view of history and *Bruen*, it appears that no state regulation banning *any* firearm (let alone any firearm accessory) would be "consistent with the Nation's historical tradition." 142 S. Ct. at 2130. That is exactly the kind of "regulatory straightjacket" that the Supreme Court disclaimed. *Id.* at 2133.

## II. SECTION 32310 DOES NOT VIOLATE THE TAKINGS CLAUSE OR THE DUE PROCESS CLAUSE

Plaintiffs also claim that Section 32310's possession restrictions facially violate the Takings and Due Process Clauses. 17-ER-4043; *see* Cal. Penal Code § 32310(c) (prohibiting possession of large-capacity magazines); *id.* § 32310(d) (requiring owners to sell magazine, surrender it to the police for destruction, or remove it from State); *see also id.* § 16740(a) (allowing owners, alternatively, to permanently modify magazine). Before *Bruen*, the district court entered summary judgment for plaintiffs on those claims, *see* 1-ER-154-159; Dkt. 88, and the en banc panel reversed as to both claims, *Duncan*, 19 F.4th at 1096, 1111-1113. After the judgment of the en banc panel was vacated for further proceedings in light of *Bruen*'s new Second Amendment framework, plaintiffs told the district court that they "rest[ed] on the takings and due process arguments they made in their" pre-*Bruen* motion for summary judgment. Dkt. 132 at 55. The district court

incorporated its prior rulings as to both claims into its new final judgment without any additional analysis or response to this Court's reasoning. *See* 1-ER-2; Dkt. 158.

Both of those claims still fail, for all the reasons identified in this Court's prior en banc decision. As to the Takings Clause, "[n]othing in the case law suggests that any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item." *Duncan*, 19 F.4th at 1112. To the contrary, the case law says the opposite: a "property owner necessarily expects the uses of his property to be restricted, from time to time, by various measures newly enacted by the State in legitimate exercise of its police powers." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1027 (1992); *see also Mugler v. Kansas*, 123 U.S. 623, 669 (1887) (similar). "[I]n the case of personal property" in particular, an owner "ought to be aware of the possibility that new regulation might even render his property economically worthless," *id.* at 1027-1028, or prohibit the continued possession of that property altogether, *see, e.g.*, *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 364-367 (4th Cir. 2020), *cert. denied*, 141 S. Ct. 2595 (2021) (prohibition on possession of "bump stocks" not a taking); *Holliday Amusement Co. of Charleston, Inc. v. South Carolina*, 493 F.3d 404, 410-411 (4th Cir. 2007) (prohibition on previously-legal gambling machines not a taking).

53

What is more, the law challenged here allows "an owner of a large-capacity magazine [to] continue to use the magazine, either by modifying it to accept a smaller number of bullets or by moving it out of state, or the owner may sell it." *Duncan*, 19 F.4th at 1112; *see Ocean State Tactical*, 646 F. Supp. 3d at 392. [14]  If an owner declines those options, and instead surrenders a large-capacity magazine to a law enforcement agency for safe destruction, that does not convert Section 32310 into a physical taking.  *See Duncan*, 19 F.4th at 1113 ("the government here in no meaningful sense takes title to, or possession of" any magazines); *Ocean State Tactical*, 646 F. Supp. 3d at 392 (similar).  Nor does California's law "deprive an owner of 'all economically beneficial use of the property.'"  *Duncan*, 19 F.4th at 1112 (quoting *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1188 (9th Cir. 2012)); *see id.* ("Plaintiffs have neither asserted nor introduced evidence that no firearms dealer will pay for a magazine or that modification of a magazine is economically impractical.").[15]

---

[14] *See also* 17-ER-4032 (noting "countless articles and videos online on how to modify LCMs to hold 10 rounds" and a "number of different ways" to achieve compliance).

[15] Even if Section 32310 were held to effect a taking, that would not support affirmance of the injunction entered by the district court.  *See Knick v. Twp. of Scott, Pa.*, 139 S. Ct. 2162, 2176 (2019) ("equitable relief is generally unavailable" where "state governments provide just compensation remedies"); *Sutfin v. State*, 261 Cal. App. 2d 50, 53 (1968) (recovery for taking of "personal" property may be "had through inverse condemnation").

Finally, "Plaintiffs' due process claim essentially restates the takings claim, and it fails for the same reasons." *Duncan*, 19 F.4th at 1096.

## III. THE EN BANC PANEL HAS AUTHORITY TO DECIDE THIS APPEAL

Under 28 U.S.C. § 46(c), "Cases and controversies shall be heard and determined by a court or panel of not more than three judges . . . , unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in regular active service." 28 U.S.C. § 46(c). That provision is a "grant of power" to the courts of appeals "to order hearings and rehearings en banc and to establish the procedure governing the exercise of that power." *W. Pac. R.R. Corp. v. W. Pac. R.R. Co.*, 345 U.S. 247, 267 (1953). But it does not "compel the court to adopt any particular procedure," *id.*; each circuit may "devise its own administrative machinery," *id.* at 250; *cf. Shenker v. Baltimore & Ohio R.R. Co.*, 374 U.S. 1, 5 (1963) (Third Circuit's en banc voting procedure was "clearly within the scope of the court's discretion").

The Ninth Circuit's General Orders address the procedural scenario that was encountered by the en banc panel here. General Order 1.12 defines "Comeback Cases" to "mean[] subsequent appeals or petitions from a district court case or agency proceeding involving substantially the same parties and issues from which there previously had been a calendared appeal or petition." This appeal is plainly a "comeback case" in relation to the prior appeal in No. 19-55376: both arose from

the same district court case; they involve the same parties and claims; and both concern the district court's decision to grant the same summary judgment motion, *see supra* pp. 14-15.

The appeal in No. 19-55376 was initially heard by a three-judge panel. Thereafter, a majority of the active circuit judges voted to rehear the case en banc. No. 19-55376, C.A. Dkt. 117 (Feb. 26, 2021). The en banc panel was properly constituted: it "consist[ed] of the Chief Judge of this circuit and 10 additional judges . . . drawn by lot from the active judges of the Court." Ninth Cir. R. 35-3. The en banc panel issued a decision and, after the Supreme Court vacated the judgment, the en banc panel remanded to the district court for further proceedings in light of *Bruen*. No. 19-55376, C.A. Dkt. 215 (Sept. 23, 2022). This appeal arose when the district court again granted summary judgment to plaintiffs on all their claims, after the parties supplemented the prior record. *See* 1-ER-2; 1-ER-71-73; Dkt. 158.

The General Orders describe the procedure for comeback cases "[w]here a new appeal is taken following a remand or other decision by an en banc court." Ninth Cir. Gen. Order 3.6(b). Under that procedure, "[t]he en banc court will decide whether to keep the case or to refer it to the three judge panel." *Id.* That is

precisely what the en banc panel did here when it elected to keep the case.  C.A. Dkt. 3 at 1.[16]

That action was consistent with 28 U.S.C. § 46(c).  This comeback appeal is part of the same "[c]ase[] and controvers[y]" as the appeal in No. 19-55376.  28 U.S.C. § 46(c).  It is undisputed that the full Court had already ordered en banc review in this case, by a majority vote of the circuit judges "in regular active service" at the time.  *Id.*  The fact that some of the judges on the en banc panel have since taken senior status does not raise any "serious question[] about this panel's statutory authority under § 46(c)."  C.A. Dkt. 10 at 7 (R. Nelson, J., dissenting).  To the contrary, Section 46(c) expressly contemplates that senior judges are eligible "to continue to participate in the decision of a case or controversy that was heard or reheard by the court in banc at a time when such judge was in regular active service."  28 U.S.C. § 46(c); *see also* Ninth Cir. Gen. Order 5.1(a)(4).

The Supreme Court's decision in *Yovino v. Rizo*, 139 S. Ct. 706 (2019), is not to the contrary.  It held that the vote of a judge who died before an en banc decision was issued could not be counted:  the deceased judge "was without power

---

[16] The en banc panel's disposition of the emergency motion for a stay pending appeal was authorized by General Order 6.4(a), which provides that if an emergency motion "arises in a potential comeback case," "the previous panel" may elect "to consider the motion."

to participate in the en banc court's decision at the time it was rendered" because he "was neither an active *nor a senior judge*" at that time. *Id.* at 709 (emphasis added). Older cases holding that senior judges could not serve on en banc courts at all are also inapposite, because they construed an earlier version of Section 46(c). *See, e.g.*, *United States v. Am.-Foreign S.S. Corp.*, 363 U.S. 685, 685 (1960). That version provided that "'[a] court in banc shall consist of all active circuit judges of the circuit.'" *Id*. Congress made a different choice when it enacted the current version of Section 46(c), which allows senior judges to participate in en banc panels in circumstances like those presented here.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should remand for entry of judgment in favor of the Attorney General.

Dated:  November 21, 2023                    Respectfully submitted,

/s/ Mica L. Moore

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*
MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*
*Attorneys for Defendant and Appellant*

## STATEMENT OF RELATED CASES

The Attorney General is aware of the following related cases:

- *Miller v. Bonta*, No. 23-2979 (9th Cir.): Appeal from a final judgment permanently enjoining enforcement of California Penal Code Sections 30600, 30605, and 30800 as applied to Section 30515(a)(1) through (8), which impose restrictions on assault weapons.

- *Or. Firearms Fed'n v. Kotek*, No. 23-35540 (9th Cir.):  Appeal from a final judgment upholding Oregon Ballot Measure 114, which imposes restrictions concerning large-capacity magazines, defined under Oregon law as firearm magazines capable of holding more than 10 rounds of ammunition.


 Dated:  November 21, 2023      */s/ Mica L. Moore*

60

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** <u>No. 23-55805</u>

I am the attorney or self-represented party.

**This brief contains <u>13,473 words</u>,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ x ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** <u>/s/ Mica L. Moore</u>    **Date:** <u>November 21, 2023</u>
*(use "s/[typed name]" to sign electronically-filed documents)*

61

## CERTIFICATE OF SERVICE

I certify that on November 21, 2023, I electronically filed the foregoing document with the Clerk of the Court of the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. I certify that all other participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Dated:  November 21, 2023            */s/ Mica L. Moore*
                              _____

62