No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees,*

V.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant.*

———————————

**On Appeal from the United States District Court
for the Southern District of California
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge**

———————————

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 1 of 17**

———————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023



# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Virginia Duncan, et al | |
| | Civil Action No.  17-cv-01017-BEN-JLB |
| **Plaintiff,** | |
| **V.** | |
| Xavier Becerra in his official capacity as Attorney General of the State of California | **JUDGMENT IN A CIVIL CASE** |
| **Defendant.** | |

**Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

Judgment is in favor of Plaintiffs' on all claims in accordance with this Court's September 22, 2023, Decision, (Dkt.No.[149]). Case is closed.

**Date:** _____ 10/12/2023 _____

**CLERK OF COURT**
**JOHN MORRILL, Clerk of Court**
By:  s/  D.Frank

D.Frank, Deputy

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., | Case No.: 17-cv-1017-BEN (JLB) |
| Plaintiffs, | |
| v. | **DECISION** |
| ROB BONTA, in his capacity as Attorney General of the State of California, | |
| Defendant. | |

We begin at the end.  California's ban and mandatory dispossession of firearm magazines holding more than 10 rounds (California Penal Code § 32310(c) and (d)), as amended by Proposition 63, was preliminarily enjoined in 2017.[1]  That decision was affirmed on appeal.[2]  In 2019, summary judgment was granted in favor of Plaintiffs and § 32310 in its entirety was judged to be unconstitutional.[3]  Initially, that decision was also

---

[1] *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1138 (S.D. Cal. 2017).
[2] *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir. 2018).
[3] *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1133 (S.D. Cal. 2019).

1    affirmed on appeal.[4]   However, the decision was re-heard and reversed by the court of
2    appeals *en banc*.[5]   In 2022, the United States Supreme Court granted certiorari, vacated
3    the appellate *en banc* decision, and remanded the case.[6]   The court of appeals, in turn,
4    remanded the case to this Court "for further proceedings consistent with *New York State*
5    *Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022)."[7]   All relevant findings of fact
6    and conclusions of law set forth in the prior decision concluding § 32310 is
7    unconstitutional are incorporated herein.

8    **I.    INTRODUCTION**

9        "There is a long tradition of widespread lawful gun ownership by private
10   individuals in this country," according to the United States Supreme Court.[8]  Americans
11   have an individual right to keep and bear firearms.[9]   The Second Amendment to the
12   United States Constitution "guarantee[s] the individual right to possess and carry
13   weapons in case of confrontation."[10] This guarantee is fully binding on the States and
14   limits their ability to devise solutions to social problems.[11] And the guarantee protects
15   "the possession of weapons that are 'in common use,'"[12] or arms that are "typically

16

17

18   _____

19
20   [4] *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *reh'g en banc granted,
     opinion vacated*, 988 F.3d 1209 (9th Cir. 2021).
21   [5] *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021) (*en banc*).
22   [6] *Duncan v. Bonta*, 142 S. Ct. 2895 (2022).
     [7] *Duncan v. Bonta*, 49 F.4th 1228, 1231 (9th Cir. 2022).
23   [8] *Staples v. United States*, 511 U.S. 600, 610 (1994).
24   [9] *District of Columbia v. Heller*, 554 U.S. 570, 630 (1980).
     [10] *Id.* at 606 (quoting 2 Tucker's Blackstone 143) ("This may be considered as the true
25   palladium of liberty …. The right to self defence is the first law of nature:  in most
     governments it has been the study of rulers to confine the right within the narrowest
26   limits possible.").
27   [11] *McDonald v. City of Chicago, Illinois*, 561 U.S. 742, 785 (2010) (emphasis in
     original).
28   [12] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2128 (2022).

17-cv-1017-BEN (JLB)

1  possessed by law-abiding citizens for lawful purposes."[13] These are the decisions this
2  Court is bound to apply.  "It's our duty as judges to interpret the Constitution based on
3  the text and original understanding of the relevant provision—not on public policy
4  considerations, or worse, fear of public opprobrium or criticism from the political
5  branches."[14]

6       This case is about a California state law that makes it a crime to keep and bear
7  common firearm magazines typically possessed for lawful purposes.  Based on the text,
8  history, and tradition of the Second Amendment, this law is clearly unconstitutional.

9       The detachable firearm magazine solved a problem with historic firearms: running
10  out of ammunition and having to slowly reload a gun.[15]  When more ammunition is
11  needed in case of confrontation, a larger the magazine is required.  Many gun owners
12  want to have ready more than 10 rounds in their guns.  As a result, in the realm of
13  firearms, magazines that hold more than 10 rounds are possibly the most commonly
14  owned thing in America.  These larger magazines number over one hundred million.  For
15  handguns, the most popular sizes range up to 17 rounds; the most popular size for rifles is

---

[13] *Caetano v. Massachusetts*, 577 U.S. 411, 416 (Alito and Thomas concurring) (quoting *Heller*, 554 U.S. at 625, in turn quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)) ("We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes."

[14] *United States v. Rahimi*, 61 F.4th 443, 462 (5th Cir. 2023) (Ho, J., concurring) (citations omitted).

[15] *United States v. Gonzalez*, 792 F. 3d. 534, 536–37 (5th Cir. 2015) ("The problem of limited ammunition capacity has plagued rifles since their invention centuries ago.  The earliest rifles fired a single shot, leaving the user vulnerable during reloading.  Numerous inventions have sought to eliminate this problem.  But from repeating rifles to clips, none has proved as effective as the magazine.") (citing David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 ALB. L. R. 849 (2015)).

17-cv-1017-BEN (JLB)

1  30 rounds.  Yet, regardless of the overwhelming popularity of larger magazines,

2  California continues to prohibit any magazine capable of holding more than 10 rounds.[16]

3  　　　There is no American tradition of limiting ammunition capacity and the 10-round

4  limit has no historical pedigree and it is arbitrary and capricious.  It is extreme.  Our

5  federal government and most states impose no limits[17] and in the states where limits are

6  imposed, there is no consensus.  Delaware landed on a 17-round magazine limit.[18]

7  Illinois and Vermont picked limits of 15 rounds for handguns and 10 rounds for a rifles.[19]

8  Colorado went with a 15-round limit for handguns and rifles, and a 28-inch tube limit for

9  shotguns.[20]  New York tried its luck at a 7-round limit; that did not work out.[21]  New

10  Jersey started with a 15-round limit and then reduced the limit to 10-rounds.[22]  The fact

———————————————

[16] *See* Cal. Penal Code § 32310 and § 16740.  The term "large-capacity magazine" is defined in California Penal Code § 16740 as "any ammunition feeding device with the capacity to accept more than 10 rounds," but excludes: (a) a "feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds," (b) a ".22 caliber tube ammunition feeding device," and (c) a "tubular magazine that is contained in a lever-action firearm."

[17] Federal law imposes only a sentencing enhancement.  United States Sentencing Guideline § 2K2.1(a)(4)(B) increases the base offense level for a violation of 18 U.S.C. § 922(g)(1) (felon in possession) when the offense involves a firearm with an attached magazine larger than 15 rounds.  *United States v. Lucas*, No. 22-50064, 2023 U.S. App. LEXIS 14768, at *7 (9th Cir. June 14, 2023).

[18] *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, Civil Action No. 22-951-RGA, 2023 U.S. Dist. LEXIS 51322, at *4 (D. Del. Mar. 27, 2023) ("'Large-capacity magazine[s]' are those 'capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition.'").

[19] 720 ILCS 5/24-1.10(a); Vt. Stat. Ann. tit. 13, § 4021.

[20] Colo. Rev. Stat. Ann. § 18-12-301.

[21] The 7-round limit was found to be unconstitutional.  *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 269 (2d Cir. 2015).

[22] "New Jersey once imposed a fifteen-round limit on magazine capacity.  Now it claims a lower limit of ten is essential for public safety.  The Second Amendment demands more than back-of-the-envelope math."  *Ass'n of N.J. Rifle & Pistol Clubs Inc. v. AG N.J.*, 974 F.3d 237, 260 (3d Cir. 2020) (Matey, J. dissenting).

4

1  that there are so many different numerical limits demonstrates the arbitrary nature of

2  magazine capacity limits.

3      In a stealth return to the interest balancing test rejected by *Heller* and *Bruen*, the

4  State ostensibly justifies its magazine limits by deeming the smaller magazines "well-

5  suited" for its citizens.[23]   Suitability, in turn, is based on concocted statistics about what a

6  hypothetical average person needs to defend against an attacker or attackers in an average

7  self-defense situation.   Based on this hypothetical statistically average case scenario, the

8  State permits its citizen to have a gun, but the State decides the number of rounds in the

9  gun that it finds suitable.[24]

10

11

12  [23] At least a dozen times in its briefing before this Court, the State of California insists
magazines larger than 10 rounds are unsuitable.  Here are some examples.  "[T]he

13  Attorney General has demonstrated that LCMs are not necessary or even *suitable* to
engage in private self-defense."  Dkt. 145, at 9.  "Nor are LCMs particularly *suitable* for

14  self-defense."  Dkt. 142, at 8.  "[T]he accessory at issue here (an LCM) is not *well-suited*
for lawful self-defense."  *Id.*

15  [24] And be grateful for 10 rounds.  *Duncan*, 19 F.4th at 1168 n.10, *cert. granted, judgment*

16  *vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir.
2022) (Bumatay, J., dissenting) ("California currently allows more than 2.2 rounds in a

17  magazine, and does not prohibit carrying multiple magazines.  But don't be fooled.
Under the majority's Version 2.2 of the Second Amendment, there is no reason a state

18  couldn't limit its citizens to carrying a (generous) 3 rounds total for self-defense.").

19      As this Court explained in its prior decision, "[a]rtificial limits will eventually lead
to disarmament.  It is an insidious plan to disarm the populace and it depends on for its

20  success a subjective standard of 'necessary' lethality.  It does not take the imagination of
Jules Verne to predict that if all magazines over 10 rounds are somehow eliminated from

21  California, the next mass shooting will be accomplished with guns holding only 10
rounds.  To reduce gun violence, the state will close the newly christened 10-round

22  'loophole' and use it as a justification to outlaw magazines holding more than 7 rounds.
The legislature will determine that no more than 7 rounds are 'necessary.'  Then the next

23  mass shooting will be accomplished with guns holding 7 rounds.  To reduce the new gun
violence, the state will close the 7-round 'loophole' and outlaw magazines holding more

24  than 5 rounds determining that no more than 5 rounds are 'suitable.'  And so it goes, until
the only lawful firearm law-abiding responsible citizens will be permitted to possess is a

25  single-shot handgun.  Or perhaps, one gun, but no ammunition.  Or ammunition issued
only to persons deemed trustworthy."  *Duncan*, 366 F. Supp. 3d at 1146 n.33.

26

27

28

   In so doing, the State denies a citizen the federal constitutional right to use common weapons of their own choosing for self-defense.  There have been, and there will be, times where many more than 10 rounds are needed to stop attackers.[25]  Yet,

---

[25] Some have wishfully believed "there is no evidence that anyone ever has been unable to defend his or her home and family due to the lack of a large-capacity magazine," or that more than 10 rounds is ever needed.  But there is actually the evidence to support this.  In fact, the State's own expert reports otherwise.

   *See Duncan*, 366 F. Supp. 3d at 1134 ("As two masked and armed men broke in, Susan Gonzalez was shot in the chest.  She made it back to her bedroom and found her husband's .22 caliber pistol.  Wasting the first rounds on warning shots, she then emptied the single pistol at one attacker.  Unfortunately, now out of ammunition, she was shot again by the other armed attacker.  She was not able to re-load or use a second gun.  Both she and her husband were shot twice.  Forty-two bullets in all were fired.  The gunman fled from the house—but returned.  He put his gun to Susan Gonzalez's head and demanded the keys to the couple's truck.

   When three armed intruders carrying what look like semi-automatic pistols broke into the home of a single woman at 3:44 a.m., she dialed 911.  No answer.  Feng Zhu Chen, dressed in pajamas, held a phone in one hand and took up her pistol in the other and began shooting.  She fired numerous shots.  She had no place to carry an extra magazine and no way to reload because her left hand held the phone with which she was still trying to call 911.  After the shooting was over and two of the armed suspects got away and one lay dead, she did get through to the police.  The home security camera video is dramatic.

   A mother, Melinda Herman, and her nine-year-old twins were at home when an intruder broke in.  She and her twins retreated to an upstairs crawl space and hid.  Fortunately, she had a .38 caliber revolver.  She would need it.  The intruder worked his way upstairs, broke through a locked bedroom door and a locked bathroom door, and opened the crawl space door.  The family was cornered with no place to run.  He stood staring at her and her two children.  The mother shot six times, hitting the intruder five times, when she ran out of ammunition.  Though injured, the intruder was not incapacitated.  Fortunately, he decided to flee.") (Citations omitted).

   More examples have been reported since those words were written.  When four suspects in a stolen car with stolen guns and ammunition used stolen house keys to enter the victims' home in Tallahassee, Florida at 3:37 a.m., the victim fired 25 rounds before the suspects retreated out of the home.  *Police: Tallahassee homeowner shot 2 out of 4 home invasion suspects, all 4 charged*, ABC27 WTXL (May 24, 2019) https://www.wtxl.com/news/local-news/tpd-investigating-home-invasion-robbery [https://perma.cc/AQ36-S2ZH].

6

under this statute, the State says "too bad."  It says, if you think you need more than 10 chances to defend yourself against criminal attackers, you must carry more magazines.  Or carry more bullets to hand reload and fumble into your small magazine while the attackers take advantage of your pause.  On the other hand, you can become a criminal, too.  So, the previously law-abiding California citizen who buys and keeps at her bedside a nationally popular Glock 17 (with its standard 17-round magazine) becomes the criminal, because the State dictates that a gun with a 17-round magazine is not well-suited for home defense.[26]

---

In Kentucky, when a home intruder wearing a bulletproof vest shot and killed one daughter asleep in her bed, the father awoke and needed to fire 11 shots from one gun and 8 shots from a second gun, while suffering 3 gunshot wounds himself, to protect his other daughter, his wife, and himself.  Krista Johnson and Hayes Gardner, *Jordan Morgan's death: Suspect Shannon Gilday arrested in Madison County*, Louisville Courier J. (Feb. 28, 2022), https://www.courier-journal.com/story/news/local/2022/02/28/shannon-gilday-arrested-in-jordan-morgan-richmond-ky-shooting/6941351001/ [https://perma.cc/Q49M-ZFF9].

On a Chicago train this year, a citizen was robbed at gunpoint by a suspect who had been previously arrested 32 times.  The victim, a bank security guard, shot back 18 times (4 of the rounds jammed) before the suspect retreated off the train.  *Arrested 32 times since 2014, man allegedly engaged in a 'firefight' with a concealed carry holder on a CTA train*, CWBChicago (Jan. 22, 2023), https://cwbchicago.com/2023/01/arrested-32-times-since-2014-man-allegedly-engaged-in-a-firefight-with-a-concealed-carry-holder-on-a-cta-train.html [https://perma.cc/EAV2-8F2E].

[26] Criminals sometimes do not abide by gun regulations and pass around "gang guns" with magazines larger than 10 rounds.  *See, e.g.*, *People v. Cyrus*, No. E075271, 2023 Cal. App. Unpub. LEXIS 1301, at *5 (Mar. 3, 2023) (describing a Glock .40 cal. handgun and 29-round magazine and explaining, "[a] 'gang gun' is a gun that is passed around the gang and used by numerous gang members to commit crimes.).

7

17-cv-1017-BEN (JLB)

Numbers vary, but some estimate that 81 million Americans own between 415[27] and 456[28] million firearms. Further, millions of Americans across the country own large capacity magazines. "One estimate . . . shows that . . . civilians possessed about 115 million LCMs out of a total of 230 million magazines in circulation. Put another way, half of all magazines in America hold more than 10 rounds."[29] A more recent large-scale survey estimates that Americans today own 542 million rifle and handgun magazines that hold more than 10 rounds.[30] Home defense and target shooting are the two most common reasons for owning these larger magazines.[31] Moreover, the survey reports 48% of gun owners have owned a handgun or rifle magazine that holds more than 10 rounds.[32] But California bans these typically possessed magazines kept and used for self-defense.

Why are larger magazines chosen for self-defense? Crime happens a lot. One recent estimate holds that guns are needed defensively approximately 1,670,000 times a year.[33] Another report, originally commissioned and long cited by the Centers for Disease Control and Prevention estimated that there are between 500,000 and 3,000,000

---

[27] William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 7 (Geo. McDonough Sch. of Bus. Rsch. Paper No. 4109494, 2022), available at https://ssrn.com/abstract=4109494 [https://perma.cc/83XT-75YG].

[28] *See* Suppl. Decl. of Louis Klarevas, Dkt. 137-5 ("Suppl. Klarevas Decl."), at ¶ 15 and n.13.

[29] *Duncan*, 970 F.3d at 1142, *reh'g en banc granted, opinion vacated*, 988 F.3d 1209 (9th Cir. 2021), *and on reh'g en banc sub nom. Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022).

[30] English, *supra*, at 25 ("These estimates suggest that Americans have owned some 542 million rifle and handgun magazines that hold over 10 rounds."). Plaintiff's expert, Stephen Helsley, a retired California Department of Justice Assistant Director of the Division of Law Enforcement, estimates there are between 500 million and one billion magazines able to hold more than 10 rounds. *See* Declaration of Helsley in Support of Plfs.' Suppl. Br., Exh. 10, Dkt. 132-4, at ¶ 11.

[31] English, *supra*, at 23.

[32] *Id.* at 22.

[33] *Id.* at 35.

8

1  defensive gun uses in the United States every year.[34]  Woe to the victim who runs out of

2  ammunition before armed attackers do.  The police will mark the ground with chalk,

3  count the number of shell casings, and file the report.

4          All of this was decided earlier.

5          What remains to be done?  California Penal Code § 32310 must be assessed in

6  light of *Bruen*.  Now, on remand, the State has to justify this ban under *Bruen*, which

7  makes clear that "[t]o justify its regulation, the government may not simply posit that the

8  regulation promotes an important interest."[35]  After all, "'the very enumeration of the

9  right takes out of the hands of government—even the Third Branch of Government—the

10  power to decide on a case-by-case basis whether the right is really worth insisting

11  upon.'"[36]  So, the State must demonstrate that its extreme ban is consistent with this

12  Nation's historical tradition of firearms regulation.  As explained below, there is no

13  national tradition of prohibiting or regulating firearms based on firing capacity or

14  ammunition capacity.

15  **II.   CONSTITUTIONAL STANDARDS**

16          The Second Amendment provides: "A well regulated Militia, being necessary to

17  the security of a free State, the right of the people to *keep and bear* Arms, shall not be

18

19  _____

20  [34] *See* Inst. of Med. & Nat'l Rsch. Council, *Priorities for Research to Reduce the Threat*

21  *of Firearm-Related Violence* 15 (The Nat'l Acads. Press ed., 2013),

     https://doi.org/10.17226/18319 [https://perma.cc/K3N4-FEXQ].  For many years the

22  CDC's "fast facts" webpage referred to this report.  The report itself had two different

23  ranges.  The second rage estimated from 60,000 to 2,500,000 annual defensive gun uses

     in America.  *See* Internet Archive Wayback Machine, CDC Firearm Violence Prevention,

24  captured July 26, 2021,

25  https://web.archive.org/web/20210726233739/https://www.cdc.gov/violenceprevention/fi

     rearms/fastfact.html.  The Court notes that the CDC has changed its reporting to delete

26  reference to this study and the Court will not comment on how or why that happened as

27  the CDC website does not reflect why it was deleted.

     [35] *Bruen*, 142 S. Ct. at 2126.

28  [36] *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).

9

1  infringed."[37]  "[T]he Second Amendment extends, prima facie, to all instruments that
2  constitute bearable arms, even those that were not in existence at the time of the
3  founding."[38]  According to *Heller*, "[t]he Second Amendment is naturally divided into
4  two parts: its prefatory clause and its operative clause.  The former does not limit the
5  latter grammatically, but rather announces a purpose.  The Amendment could be
6  rephrased, 'Because a well regulated Militia is necessary to the security of a free State,
7  the right of the people to keep and bear Arms shall not be infringed.'"[39] "The first salient
8  feature . . . is that it codifies a 'right of the people.'"[40]  *Heller* then examines the
9  substance of the constitutional right, the verbs *to keep* and *to bear* and their object: *arms*.
10  So, what does it mean to keep and bear arms?

11      The Supreme Court concludes, "[t]he 18th-century meaning [of "arms"] is no
12  different from the meaning today.  The 1773 edition of Samuel Johnson's dictionary
13  defined 'arms' as 'weapons of offence, or armour of defence.'  Timothy Cunningham's
14  important 1771 legal dictionary defined 'arms' as 'any thing that a man wears for his
15  defence, or takes into his hands, or useth in wrath to cast at or strike another.'"[41]  In the
16  past, the term "arms" included weapons that were not specifically designed for military
17  use and were not employed in a military capacity.  "Although one founding-era thesaurus
18  limited 'arms' . . . to 'instruments of offence generally made use of in war,' even that
19  source stated that all firearms constituted 'arms,'" according to *Heller*.[42]  And it is now
20  clear that "the Second Amendment extends, prima facie, to all instruments that constitute
21  bearable arms, even those that were not in existence at the time of the founding."[43]
22
23

---

24  [37] U.S. Const. amend. II (emphasis added).
25  [38] *Caetano*, 577 U.S. 411 (quoting *Heller*, 554 U.S. at 581).
26  [39] *Heller*, 554 U.S. at 577 (citations omitted).
    [40] *Heller*, 554 U.S. at 579.
27  [41] *Heller*, 554 U.S. at 581 (citations omitted).
    [42] *Heller*, 554 U.S. at 581 (citations omitted).
28  [43] *Heller*, 554 U.S. at 582.

10

17-cv-1017-BEN (JLB)

*Heller* later describes the types and kinds of arms that are guaranteed Second Amendment protection.  But first, *Heller* describes the meanings of "to keep" and "to bear" arms.

"We turn to the phrases 'keep arms' and 'bear arms.'  Johnson defined 'keep' as, most relevantly, 'to retain; not to lose,' and 'to have in custody.'  Webster defined it as 'to hold; to retain in one's power or possession'. . . .Thus the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'"[44]  "Keep arms," according to *Heller,* "was simply a common way of referring to possessing arms, for militiamen and everyone else."[45]  "To bear" meant to carry for the purpose of being armed and ready in case of conflict with another person.  *Heller* even cited with approval the meaning of the phrase "carries a firearm" proposed by Justice Ginsburg in *Muscarello v. United States*: "as the Constitution's Second Amendment indicates: 'wear, bear, or carry upon the person or in the clothing or in a pocket, for the purpose of being armed and ready for offensive or defensive action in a case of conflict with another person.'"[46] Providing our modern understanding of the Second Amendment's text, *Heller* concludes, "[p]utting all of these textual elements together, we find that they *guarantee the individual right to possess and carry weapons in case of confrontation*."[47]

Very important in the past, still important in the future, *Heller* describes the concept of America's militia.  "In *Miller*, we explained that 'the Militia comprised all

---

[44] *Heller*, 554 U.S. at 582 (citations omitted).
[45] *Heller*, 554 U.S. at 583.
[46] *Heller*, 554 U.S. at 584 (quoting *Muscarello*, 524 U.S. 125, 143 (1998) (Ginsburg, J. dissenting).
[47] *Heller*, 554 U.S. at 592 (emphasis added).  "As the most important early American edition of Blackstone's Commentaries (by the law professor and former Antifederalist St. George Tucker) made clear in the notes to the description of the arms right, Americans understood the 'right of self-preservation' as permitting a citizen to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Id*. at 595 (quoting 1 Blackstone's Commentaries, 145-46, n.42 (1803)).

1   males physically capable of acting in concert for the common defense.'"[48] And *Heller*

2   explains why the militia was important.  Two of the three reasons remain important

3   today.  "There are many reasons why the militia was thought to be 'necessary to the

4   security of a free State.'  First, of course, it is useful in repelling invasions and

5   suppressing insurrections. . . . Third, when the able-bodied men of a nation are trained in

6   arms and organized, they are better able to resist tyranny."[49] Once one understands the

7   history of tyrants resorting to taking away people's arms to suppress political opposition,

8   *Heller* explains, one can see that the militia clause fits perfectly with the operative clause.

9   *Heller* teaches,

10            We reach the question, then: Does the preface fit with an
          operative clause that creates an individual right to keep and bear
11        arms?  It fits perfectly, once one knows the history that the
          founding generation knew and that we have described above.
12        That history showed that the way tyrants had eliminated a
          militia consisting of all the able-bodied men was not by
13        banning the militia but simply by taking away the people's
          arms, enabling a select militia or standing army to suppress
14        political opponents.  This is what had occurred in England that
          prompted codification of the right to have arms in the English
15        Bill of Rights.[50]

16

17

18        While the protection of a citizen militia was important, most people regarded the

19   Second Amendment as even more important for its protection of self-defense and

20   hunting.  "The prefatory clause does not suggest that preserving the militia was the only

21   reason Americans valued the ancient right; *most undoubtedly thought it even more*

22   *important for self-defense and hunting*."[51] After all, "'[t]he right to self defence is the

23   first law of nature: in most governments it has been the study of rulers to confine the right

24

25   _____

26   [48] *Heller*, 554 U.S. at 595.

27   [49] *Heller*, 554 U.S. at 598 (citations omitted).

28   [50] *Heller*, 554 U.S. at 598.
     [51] *Heller*, 554 U.S. at 599 (emphasis added).

17-cv-1017-BEN (JLB)

within the narrowest limits possible.  Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction.'"[52] As one commentator wrote at the time the Fourteenth Amendment was adopted in 1868, "[t]he purpose of the Second Amendment is to secure a well-armed militia. . . . But a militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons."[53]  In this way, a general public knowledge and skill with weapons of war is beneficial to the nation at large and is protected by the Second Amendment.  "No doubt, a citizen who keeps a gun or pistol under judicious precautions, practices in safe places the use of it, and in due time teaches his sons to do the same, exercises his individual right."[54] And "[t]he right to bear arms has always been the distinctive privilege of freemen."[55]  In the end, the Supreme Court deems the Second Amendment as valuable for both preserving the militia and for self-defense – which is the heart of the right. *McDonald* put it this way:

> In *Heller*, we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense.  As we put it, self-defense was "the central component of the right itself."[56]

---

[52] *Heller*, 554 U.S. at 606 (citation omitted).
[53] *Heller*, 554 U.S. at 618 (quoting J. Pomeroy, *An Introduction to the Constitutional Law of the United States* §239, pp. 152-153 (1868)).
[54] *Heller*, 554 U.S. at 619 (quoting B. Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880)).
[55] *Heller*, 554 U.S. at 619 (quoting J. Ordronaux, *Constitutional Legislation in the United States* 241-242 (1891)).
[56] *McDonald*, 561 U.S. at 926-27.

13

17-cv-1017-BEN (JLB)

1    *Heller* specifically considered "whether a District of Columbia prohibition on the

2    *possession* of *usable* handguns in the home violates the Second Amendment to the

3    Constitution."[57] And "District of Columbia law also require[d] residents to keep their

4    lawfully owned firearms, such as registered long guns, 'unloaded and dissembled or

5    bound by a trigger lock or similar device' unless they are located in a place of business or

6    are being used for lawful recreational activities."[58]  In the end, the Supreme Court struck

7    down both parts of the statute.  "In sum, we hold that the District's ban on handgun

8    possession in the home violates the Second Amendment, as does its prohibition against

9    rendering any lawful firearm in the home operable for the purpose of immediate self-

10   defense."[59] While reaching its conclusion, the Supreme Court considered what types of

11   firearms were, and were not, protected by the Constitution.  Highlighting the central

12   tenant of the Second Amendment, the Supreme Court wrote,

> We may as well consider at this point (for we will have to
> consider eventually) what types of weapons *Miller* permits.
> Read in isolation, *Miller's* phrase "part of ordinary military
> equipment" could mean that only those weapons useful in
> warfare are protected.  That would be a startling reading of the
> opinion, since it would mean that the National Firearms Act's
> restrictions on machineguns (not challenged in *Miller*) might be
> unconstitutional, machineguns being useful in warfare in 1939.
> We think that *Miller's* "ordinary military equipment" language
> must be read in tandem with what comes after: "Ordinarily
> when called for militia service able-bodied men were expected
> to appear bearing arms supplied by themselves and of the kind
> in common use at the time."  The traditional militia was formed
> from a pool of men bringing arms "in common use at the time"
> for lawful purposes like self-defense.  "In the colonial and
> revolutionary war era, small-arms weapons[60]  used by

---

[57] *Heller*, 554 U.S. at 573 (emphasis added).

[58] *Heller*, 554 U.S. at 575.  The Court declared both aspects of the statute to be in
violation of the Second Amendment.

[59] *Heller*, 554 U.S. at 635.

[60] Not cannons or mortars.

14

1
2
3
4

> militiamen and weapons used in defense of person and home
> were one and the same." . . . We therefore read *Miller* to say
> only that the Second Amendment does not protect those
> weapons not typically possessed by law-abiding citizens for
> lawful purposes.[61]

5
6
7
8
9

Since it was "the conception of the militia at the time of the Second Amendment's ratification [that] the body of all citizens capable of military service, [citizens] would bring the sorts of lawful weapons that they possessed at home to militia duty,"[62] the right to keep and carry arms means "the sorts of weapons protected were those 'in common use at the time.'"[63]

10      **A. Magazines Are Protected "Arms"**

11
12
13
14
15
16
17
18
19
20
21

The State argues that larger capacity magazines are not "arms."  First, the State argues that magazines are not essential to the use of firearms and consequently would have been thought of as accessories.  But magazines are "integral components to vast categories of guns."  *Fyock v. City of Sunnyvale*, 25 F.Supp.3d 1267, 1276 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015).  "Most pistols are manufactured with magazines holding ten to seventeen rounds, and many popular rifles are manufactured with magazines holding twenty or thirty rounds."  *Kolbe v. Hogan*, 849 F.3d 114, 129 (4th Cir. 2017) (*en banc*).  While the Second Amendment does not explicitly mention ammunition or magazines supplying ammunition, "without bullets, the right to bear arms would be meaningless."[64] This is because the right to keep firearms

22
23
24

_____

25
26

[61] *Heller*, 554 U.S. at 624-25 (citations omitted).  If it existed at the time and were in common use, as it is today, would a militia member bring a firearm with a magazine that holds more than 10 rounds?  The answer is, yes, of course.

27      [62] *Heller*, 554 U.S. at 627.

[63] *Heller*, 554 U.S. at 627 citation omitted).

28      [64] *Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)

17-cv-1017-BEN (JLB)

1   for protection implies a corresponding right to obtain the bullets necessary to use them.

2   "The possession of arms also implied the possession of ammunition."[65]

3   　　　　By extension, "arms" includes the magazine component necessary to supply the

4   bullet into the chamber of the gun.  "[O]ur case law supports the conclusion that there

5   must also be some corollary, albeit not unfettered, right to possess the magazines

6   necessary to render those firearms operable."[66] "It is hard to imagine something more

7   closely correlated to the right to use a firearm in self-defense than the ability to

8   effectively load ammunition into the firearm."[67]

9   　　　　Put more broadly, "the Second Amendment protects ancillary rights necessary to

10  the realization of the core right to possess a firearm for self-defense."[68]  Consequently,

11  whether thought of as a firearm able to fire a certain number of rounds because of its

12  inserted magazine, or as a separate ammunition feeding component, magazines are usable

13  "arms" within the meaning of the Second Amendment.  As the Third Circuit Court of

14  Appeals found, "[w]e therefore must first determine whether the regulated item is an arm

15  under the Second Amendment.  The law challenged here regulates magazines, and so the

16  question is whether a magazine is an arm under the Second Amendment.  The answer is

17  yes." [69]

18  　　　　Proffering two subsidiary arguments, the State says: (1) a magazine of some size

19  may be necessary, but a magazine larger than 10 rounds is not necessary to operate a

20  firearm and thus a larger magazine is not a protected "arm"; and (2) statistically people

21  rarely fire more than 10 rounds in self-defense so it can be said that a magazine larger

22

23

24

25  [65] *United States v. Miller*, 307 U.S. 174, 180 (1939).

26  [66] *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015)
    [67] *Barnett v. Raoul*, 2023 U.S. Dist. LEXIS 74756, *26 (S.D. Ill. Apr. 28, 2023).

27  [68] *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).
    [69] *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. of N.J.*, 910 F/3d 106, 116 (3d Cir.

28  2018).

16

1  than 10 rounds is rarely *used* for self-defense, and if a larger magazine is not commonly

2  *used* for self-defense then it is not a protected "arm."

3      For the first argument, the State claims that if a standard 17-round magazine is

4  detached from a standard Glock 17 pistol, the 17-round magazine is no longer a weapon

5  (by itself) and because the Glock 17 pistol could still function with a substitute 10-round

6  magazine, then the 17-round standard Glock magazine does not come within the

7  definition of "arms" that the Second Amendment protects.[70]  In contrast, according to the

8  State, a magazine holding 10 or less may qualify as a protected "arm," but a magazine

9  able to hold 11 or more is not a protected "arm."  What the State seems to be really

10 saying is that a magazine may be a protected arm, but only the State has the right to pick

11 the number of rounds a citizen may have in his gun.

12      This Court disagrees.  The Supreme Court has not described protected arms in

13 subdivided categories.  When *Heller* found handguns were protected, it did not

14 distinguish between semiautomatic pistols and revolvers.  *Heller* did not classify

15 protected handguns according to the number of rounds one could hold or the caliber of

16 the ammunition that could be fired.  It did not suggest that typically possessed arms could

17 be subcategorized and subjected to judicial ad hoc constitutional determinations.

18 Whether thought of holistically as a "handgun" irrespective of magazine size as *Heller*

19 does, or as an entirely separate attachment, both firearms and their magazines (of all

20 typical sizes) are "arms" covered by the text of the Second Amendment.  "This is not

21 even a close call."[71]  As this Court has said before, "[n]either magazines, nor rounds of

---

[70] Of course, the argument admits, *sub silentio*, that some magazines are necessary to
operate a gun.  The State says: "To be sure, some type of magazine is essential to the use
of many handguns.  But there is no evidence in this record . . . that a magazine capable of
firing more than 10 rounds without reloading is necessary to the function of any modern
firearm."  Def's Suppl. Br., Dkt. 118 at n.10.

[71] *Barnett v. Raoul*, No. 3:23-cv-00209-SPM, 2023 U.S. Dist. LEXIS 74756, at *26–27
(S.D. Ill. Apr. 28, 2023);  *Hanson v. District of Columbia*, Civil Action No. 22-2256
(RC), 2023 U.S. Dist. LEXIS 68782, at *17 (D.D.C. Apr. 20, 2023) ("At least three

17

17-cv-1017-BEN (JLB)

1    ammunition, nor triggers, nor barrels are specifically mentioned in the Second

2    Amendment . . . But without a right to keep and bear triggers, or barrels, or ammunition

3    and the magazines that hold ammunition, the Second Amendment right would be

4    meaningless."[72]  Using reasoning that is still persuasive, the Ninth Circuit agreed,

5    explaining "[p]ut simply, a regulation cannot permissibly ban a protected firearm's

6    components critical to its operation."  More recently, counsel for California's Governor

7    in a related fee-shifting case agreed while pointing out that "[t]he large-capacity

8    magazines ban appears in the Penal Code's title on 'Firearms,'" and "a restriction on the

9    ammunition that may be used in a firearm is a restriction on firearms."[73] Leaving no

10   doubt, even the (vacated) Ninth Circuit's *en banc* decision assumed that § 32310

11   implicates the Second Amendment.[74]

12        Relatedly, the State argues that it is only restricting a firearm component or an

13   accessory.[75] "LCMs are not weapons in themselves," says the State, "nor are they

---

16   Courts of Appeals have concluded that LCMs are "arms" within the meaning of the
     Second Amendment."); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety &
17   Homeland Sec.*, Civil Action No. 22-951-RGA, 2023 U.S. Dist. LEXIS 51322, at *19 (D.
     Del. Mar. 27, 2023); *contra, Ocean State Tactical, LLC v. Rhode Island*, No. 22-cv-246
18   JJM-PAS, 2022 U.S. Dist. LEXIS 227097, at *33–34 (D.R.I. Dec. 14, 2022); *Or.
     Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391,
19   at *23–25 (D. Or. Dec. 6, 2022).
     [72] *Duncan*, 366 F. Supp. 3d at 1142–43 (citing *Fyock v. City of Sunnyvale*, 779 F.3d 991,
20   998 (9th Cir. 2015); *Teixeira v. Cty. Of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en
     banc); *Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106, 116 (3d Cir. 2018).
21   [73] *Miller v. Bonta*, 22cv1446-BEN (JLB), Intervenor-Def's Suppl. Br., Dkt. 35, at 14.
     [74] *Duncan*, 19 F.4th at 1103, *cert. granted, judgment vacated*, 213 L. Ed. 2d 1109, 142 S.
22   Ct. 2895 (2022).
     [75] Instead of isolating the magazine from the gun, the better understanding is to consider
23   the magazine as part of the gun.  There is a federal law analogue leading to the
     conclusion that a magazine is correctly regarded as a component part of a gun.  The Arms
24   Control Export Act criminalizes the unlicensed export of firearms and their components.
     22 U.S.C. § 2778(b).  Firearm magazines come within the Act because "a magazine is
25   'useful' only when used in conjunction with that end-item [a rifle]: its sole purpose is to
     load cartridges into the breech so that they can be fired . . . ."[75]  In this view, the

18

17-cv-1017-BEN (JLB)

1  necessary to operate any firearm for self-defense."  California residents who purchased

2  new pistols in the last decade are probably surprised to hear that magazines are not

3  necessary to operate a pistol.  After all, another state law known as the Unsafe Handgun

4  Act requires new semiautomatic pistols to have an integrated magazine-disconnect

5  mechanism in order to be sold to the public.[76]

6       A magazine-disconnect mechanism prevents a pistol from firing at all, even if one

7  round is left loaded in the chamber, if the magazine is not inserted into the pistol.  The

8  state-mandated magazine-disconnect mechanism thus prevents the operation of the

9  firearm without its magazine.[77] While rifles are not required to have a magazine-

10  disconnect mechanism, the State must concede that at least for semiautomatic handguns

11  the State deems "not unsafe," firearms for self-defense will not function without a

12  magazine.[78]  Modern magazines, submits the State, are more like founding-era cartridge

13  boxes or "ancillary equipment associated with soldiering" that were not strictly necessary

14  to fire a gun.  Today, however, as pointed out above, some semiautomatic firearms will

15  not function at all without a magazine, while others can fire no more than one round.  As

16

17  _____

18

19  magazine is a necessary component part of a gun which, in turn, would obviously fall
   under the text of the Second Amendment protection of "arms."

20  [76] "California's Unsafe Handgun Act (the 'UHA') seeks to prevent accidental discharges
   by requiring handguns to have particular safety features . . . [t]he UHA requires certain

21  handguns to have a magazine disconnect mechanism ("MDM"), which prevents a

22  handgun from being fired if the magazine is not fully inserted." *Boland v. Bonta*, No.
   SACV2201421CJCADSX, 2023 WL 2588565, at *1 (C.D. Cal. Mar. 20, 2023) (citing

23  Cal. Penal Code §§ 16900, 31910(b)(5)).

24  [77] Semiautomatic pistols elsewhere in the nation usually do not have a magazine-
   disconnect mechanism so a pistol can still fire one chambered round without its

25  magazine.  Of course, one need not go too far out on a limb to say that a semi-automatic

26  pistol that can fire only 1-round is not the sort of self-defense weapon most people would
   choose.

27  [78] To be precise, revolvers are handguns that do not require a magazine-disconnect

28  mechanism, but that is because a revolver does not have a detachable magazine.

17-cv-1017-BEN (JLB)

1  such, a magazine is an essential component without which a semiautomatic firearm is

2  useless for self-defense.  Therefore, a magazine falls within the meaning of "arms."[79]

3     **B. LCMs Are *Used* for Self-Defense**

4        Notwithstanding that the Second Amendment protects the right to "keep and bear,"

5  the State's more troubling argument is that magazines holding more than 10 rounds are

6  not *used* for self-defense.  By "used," the State means actually fired.  The State

7  asserts, "there is no evidence that LCMs are frequently used in self-defense."

8  Continuing, the State asserts, "[t]o the contrary, the record reflects that it is exceedingly

9  rare for an individual, in a self-defense situation, to fire more than ten rounds."  But

10  without conceding the accuracy of the State's position, infrequent use or "exceedingly

11  rare" is not the same as *never*.  To support the State's argument, it relies on a

12  statistician's conclusion that an average of only 2.2 rounds are fired in an average self-

13  defense situation.  Because more than 10 rounds in the average situation are not being

14  fired for self-defense, the argument goes, magazines holding more than 10 rounds are not

15  *used* or needed for self-defense.  And because the Second Amendment protects

16  (according to the State) only those arms commonly "used" for self-defense, the State says

17

18

19

20  [79] *See e.g., Hanson v. D.C.*, No. CV 22-2256 (RC), 2023 WL 3019777, at *7 (D.D.C.
Apr. 20, 2023) ("The District's logic, by contrast, would allow it to ban *all* magazines

21  (not just LCMs) — a result even the District does not endorse here — because a firearm
technically does not require *any* magazine to operate; one could simply fire the single

22  bullet in the firearm's chamber.  The Court will therefore follow the persuasive reasoning
of *ANJRPC, Kolbe*, and *Duncan* in concluding that LCMs are "arms" within the meaning

23  of the Second Amendment."); *see also Barnett v. Raoul*, No. 3:23-CV-00141-SPM, 2023

24  WL 3160285, at *8 (S.D. Ill. Apr. 28, 2023) ("Defendants' argument is not persuasive.
The Seventh Circuit has recognized the Second Amendment as extending to "corollaries

25  to the meaningful exercise of the core right to possess firearms for self-defense."  It is

26  hard to imagine something more closely correlated to the right to use a firearm in self-
defense than the ability to effectively load ammunition into the firearm.").

27

28

17-cv-1017-BEN (JLB)

1 larger capacity magazines are not commonly "used," and therefore they are not protected
2 arms.[80]

3      It is a remarkable reading of *Heller, McDonald, Caetano,* and *Bruen* to say that if a
4 gun is not fired more than 10 times in self-defense then the gun's larger magazine is not
5 being "used" in self-defense, and if not "used" in self-defense, then not protected by the
6 Second Amendment.  Yet, this is the State's theme.

7      In this Court's view, it is a crabbed reading of the Supreme Court's Second
8 Amendment decisions and not relevant to the text, history and tradition test.  The
9 Supreme Court uses several descriptive phrases to describe the kinds of firearms that are
10 protected by the Constitution.  But common to all is the notion that to be protected, an
11 arm needs only to be regarded as *typically* possessed or carried, or *commonly* kept, by
12 citizens to be ready for use, if needed.  The Supreme Court has not said that the actual
13 firing of a gun is any part of the test.  Indeed, the Second Amendment does not say that
14 the right of the People to keep only such firearms as they actually shoot, shall not be
15 infringed.

16      *McDonald* begins, "[t]wo years ago, in *District of Columbia v. Heller*, we held that
17 the Second Amendment protects the right to keep and bear arms *for the purpose of self-*
18 *defense*, and we struck down a District of Columbia law that banned the possession of
19 handguns in the home."[81]  What mattered is the purpose for which handguns were
20 possessed, not necessarily the actual use.

21
22
─────────────────────
23 [80] A similar argument was made by the State in *N.A. for Gun Rights v. Lamont*, Case No.
24 22-1118 (JBA), 2023 U.S. Dist. LEXIS 134880, *40 (D. Conn. Aug. 3, 2023)
   ("Defendants maintain that after *Bruen*, Plaintiffs must show not only that the weapons
25 and accoutrements are commonly owned, but they are commonly possessed and used *for*
   *self-defense* base on *Bruen*'s repeated use of the phrase 'common use' for self-defense.")
26 (emphasis added), and in *Oregon Firearms Federation v. Kotek*, Case No. 22cv1815-IM,
27 *67 (D. Ore. July 14, 2023) ("Defendants … argue for an interpretation of 'use' that
   includes some objective metric of an LCM's actual use in self-defense.").
28 [81] 561 U.S. at 749-50 (citation omitted) (emphasis added).

1    The State puts its weight on the words "use," "uses," and "used."  One problem

2    with the State's view is that it treats the Supreme Court's opinion language like the

3    language of a statute.  That is a mistake.  "Because 'opinions, unlike statutes, are not

4    usually written with the knowledge or expectation that each and every word may be the

5    subject of searching analysis,' we do not follow statutory canons of construction with

6    their focus on 'textual precision' when interpreting judicial opinions."[82]

7    Under the State's reading, a homeowner who displays a handgun with a 17-round

8    magazine to scare away home invaders, has not "used" the 17-round magazine.  Under

9    the State's reading, even a citizen who fires his semiautomatic firearm 10 times or less to

10   defend himself, has not *used* his 17-round magazine in self-defense.  Admittedly, one can

11   find different meanings of the term "use."  For example, in the context of a criminal

12   statute, the Supreme Court acknowledged "use" offers different possible meanings.

13   "[T]he word 'use' poses some interpretational difficulties because of the different

14   meanings attributable to it.  Consider the paradoxical statement: 'I *use* a gun to protect

15   my house, but I've never had to *use* it.'"[83]  Consequently, context is important, whether

16   interpreting a statute or understanding an opinion.[84]

17   So, considering the words "use" or "used" in context, the State's notion is far

18   removed from the meaning indicated by the Supreme Court.  *Heller* considered merely

19   the simple possession of *usable* handguns in the home.  Focusing on the right to possess a

20   usable arm, *Heller* said, "[w]e consider whether a District of Columbia prohibition on the

21   possession of *usable* handguns in the home violates the Second Amendment to the

---

[82] *Upper Skagit Indian Tribe v. Sauk-Suiattle Indian Tribe*, 66 F.4th 766, 770 (9th Cir. 2023) (citations omitted).

[83] *Bailey v. United States*, 516 U.S. 137, 143 (1996) (emphasis in original).

[84] *Muscarello v. United States*, 524 U.S. 125, 144 (1998) ("Noting the paradoxical statement, 'I *use* a gun to protect my house, but I've never had to *use* it,' the Court in *Bailey* emphasized the importance of context.")

22

1   Constitution."[85]  Actual firing of a handgun in the District was irrelevant.  Statistical

2   surveys of shots fired in self-defense were not determinative – they were not even

3   mentioned.  *Heller* used a simpler test.  Constitutional protection is afforded to weapons

4   "typically possessed by law-abiding citizens for lawful purposes," focusing on typicality

5   and possession rather than frequency of firing.[86]

6        *McDonald* says "the right was also valued because the possession of firearms was

7   thought to be essential for self-defense."  *McDonald's* focus is on possession.[87]  And

8   *McDonald* says the right applies "to handguns because they are 'the most preferred

9   firearm in the nation to 'keep' and use for protection of one's home and family,'"

10  focusing on a national subjective preference for handguns.[88]  There was no effort by the

11  Supreme Court to condition the constitutional right upon some objective metric of actual

12  handgun firing in self-defense.

13       *Bruen* says, "[t]he Second Amendment guaranteed to 'all Americans' the right to

14  bear commonly used arms in public."  *Bruen* appears to focus on commonality.[89]  *Bruen*

15  injects some ambiguity with the following phraseology, "the Second Amendment

16  protects the possession and use of weapons that are 'in common use at the time.'"[90]

17  *Bruen* noted that in that case, no party disputed that handguns are weapons "in common

18  use" today for self-defense, but did not say what it meant by "use."[91] So, what does the

19  Supreme Court mean by its phrase "in common use?"  Is the focus placed on a weapon's

20  commonality in society or the frequency of a weapon's firing?  *Bruen* answers the

21  question elsewhere in its opinion.  Commonality is the focus.  Consider the following

22

23

---

24  [85] 554 U.S. at 573 (emphasis added).

24  [86] 554 U.S. at 625; *see also* at 720 (Breyer, J., dissenting) (describing the majority test in

25  the same terms).

25  [87] 561 U.S. at 787.

26  [88] *Id.* at 767 (citations omitted).

27  [89] 142 S. Ct. at 2156 (citing *Heller*, 554 U.S. at 581).

27  [90] *Id.* at 2128 (citing *Heller*, 554 U.S. at 627).

28  [91] *Id.* at 2134.

23

17-cv-1017-BEN (JLB)

sentence from *Bruen*: "Drawing from this historical tradition, we explained there that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' *as opposed to those that 'are highly unusual in society at large*.'"[92] Or consider this sentence from *Bruen's* footnote 13: "Even assuming that pocket pistols were, as East Jersey in 1686 deemed them, 'unusual or unlawful,' it appears that they were commonly used at least by the founding."[93] *Bruen* contrasts common pistols against unusual pistols. The focus remains on commonality, not the frequency of actual discharge in self-defense scenarios. Put simply, Second Amendment protection envelops weapons commonly or typically subjectively chosen by citizens to keep in case of confrontation.

From *Bruen*, it is evident that the Supreme Court's focus is on whether a weapon is common (or unusual) amongst the citizenry. This, in turn, requires some sort of generalized numerical estimation of citizen ownership or gauge of present popularity. In *Caetano*, the concurring Justices explained that, "[t]he more relevant statistic is that 'hundreds of thousands of Tasers and stun guns have been sold to private citizens,' who it appears may lawfully possess them in 45 States."[94] That Ms. Caetano did not actually energize and fire her stun gun made no difference to the Supreme Court. In her case, she did no more than display the weapon. "She stood her ground [and] displayed the stun gun."[95] Absent from the opinion is any discussion about the average number of times a stun gun is energized in an average self-defense scenario. Absent from the opinion is any objective metric counting the frequency with which stun guns have been fired. The

---

[92] *Id.* at 2143 (emphasis added).

[93] *Id.* at n.13 (citation omitted).

[94] 577 U.S. at 420 (citations omitted) ("While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment.").

[95] *Id.* at 413, (Alito, J., concurring).

24

measure of constitutional protection was that the stun gun was "used" in the sense that stun guns are widely *owned* to satisfy a subjective need for protection and that the number in existence was in the hundreds of thousands.

Applying the same measure to magazines, because it is the case that magazines holding more than 10 rounds are owned and possessed by millions of Americans to meet a subjective need for self-defense, this fact alone entitles such magazines to Second Amendment protection. When a magazine is commonly owned by Americans with the subjective intention of using it for self-defense, it is enough to say that it is in common use (or typically used) for self-defense, as the Supreme Court employs the phrase in its opinions.[96]

Probably the vast majority of Americans that own magazines of 11 rounds or more keep them and use them for self-defense in the same way that a driver puts on and uses a seat belt in the case of a collision. Though collisions rarely happen, the seat belt is used for protection and to be ready for the unexpected collision. A reserve canopy is being used on a parachute jump, although it is not deployed, in case the main parachute fails. A cell phone in one's pocket is being used when waiting for a telephone call or in the event one needs to make a call. In the same way, a firearm kept on one's nightstand is used for self-defense even when the night is quiet. It is kept and used in case of confrontation. A person may happily live a lifetime without needing to fire their gun in self-defense. But that is not to say that such a person does not *use* their gun for self-defense when he or she keeps it under the bed with a hope and a prayer that it never has to be fired.

In 2016, an 81-year old Uniontown, Pennsylvania man and his elderly sister were at home when at night an intruder broke in. In the ensuing struggle, the older man fired

---

[96] At the margin, there may be a weapon that is commonly owned that is not commonly used for self-defense. One could imagine perhaps a reproduction of an 18th century flintlock or a World War II German Luger being commonly owned, but used only as curios or museum pieces.

25

1    one shot from his gun at his attacker.  The victim said he had never before fired his gun

2    and that it had been sitting on his nightstand for thirty years.[97] California would say that

3    the victim did not *use* his gun for self-defense on any day of those preceding thirty years.

4    And if his gun had a magazine with eleven or more rounds in it (the news report does not

5    say), California would argue that the victim never did *use* his large capacity magazine in

6    self-defense.  This Court would say that the victim *used* his gun every night of the thirty

7    years he subjectively kept it on his bedroom nightstand in case of confrontation,

8    including the night of the burglary.  And if his gun had been equipped with a large

9    capacity magazine, it could correctly be said that he also *used* the large capacity

10   magazine for self-defense every night of the thirty years he subjectively kept it on his

11   bedroom nightstand in case of confrontation.

12   ### C. <u>The Invention of the 2.2 Shot Average</u>

13        Without agreeing that when the Supreme Court discusses firearms "in common

14   use" it means commonly fired, even if it did, the State's statistic is suspect.  California

15   relies entirely on the opinion of its statistician for the hypothesis that defenders fire an

16   average of only 2.2 shots in cases of confrontation.

17        Where does the 2.2 shot average originate?  There is no national or state

18   government data report on shots fired in self-defense events.  There is no public

19   government database.  One would expect to see investigatory police reports as the most

20   likely source to accurately capture data on shots fired or number of shell casings found,

21   although not every use of a gun in self-defense is reported to the police.  As between the

22   two sides, while in the better position to collect and produce such reports, the State's

23

24

25   _____

26   [97] *81-year-old fatally shoots home invasion suspect, says gun had never been used in 30*

27   *years*, WXPI-TV 11 News (Nov. 4, 2016),  https://www.wpxi.com/news/81-year-old-
     fatally-shoots-home-invasion-suspect-says-gun-had-never-been-used-in-30-

28   years/464100332/  [https://perma.cc/FRP6-MA9P].

17-cv-1017-BEN (JLB)

Attorney General has not provided a single police report to the Court or to his own expert.[98]

Without investigatory reports, the State's expert turns to anecdotal statements, often from bystanders, reported in news media, and selectively studied. She indicates she conducted two studies.[99] Based on these two studies of newspaper stories, she opines that it is statistically rare for a person to fire more than 10 rounds in self-defense and that only 2.2 shots are fired on average.[100] Unfortunately, her opinion lacks classic indicia of reliability and her two studies cannot be reproduced and are not peer-reviewed. "Reliability and validity are two aspects of accuracy in measurement. In statistics, reliability refers to reproducibility of results."[101] Her studies cannot be tested because she

---

[98] Allen asked the State for police reports, but she did not receive them. *See* Transcript, Preliminary Injunction Hearing, 10/19/20, 153:1-16:

"THE COURT: Let me ask you a question. Did you ever ask, for example, [Deputy Attorney General] Mr. Echeverria if he would get you the law enforcement reports of home defense shootings that may have occurred where the homeowner or the person at home fired shots at someone that was intruding?

THE WITNESS: Yes. So I did ask both from the State of California as well as from a number of other states that I have worked for, I have asked for data on incidents of exactly that, or whether there was a broader set of data that they had that I could then review.

THE COURT: And did you get that from the State of California?

THE WITNESS: I did not. It was my understanding that the State of California did not have that data or did not have that in a way that it could be reviewed. That that is not -- that is not a type of data that is collected."

[99] Lucy Allen Supp. Decl. Dkt 118-1.

[100] Allen Supp. Decl. Dkt 118-1, at ¶10. Of course, though one may assume that "LCMs" are only used .3% of the time, for the unfortunate homeowner who makes up part of the .3%, it is 100% of his time.

[101] Federal Judicial Center, *Reference Manual on Scientific Evidence* (3d ed.), 211 Reference Guide on Statistics, 2011 WL 7724256, 10 and n.37 ("*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 n.9 (1993), for example, distinguishes "evidentiary reliability" from reliability in the technical sense of giving consistent results. We use "reliability" to denote the latter.).

1    has not disclosed her data.  Her studies have not been replicated.  In fact, the formula
2    used to select 200 news stories for the Factiva study is incomprehensible.

3          For one study, Allen says she conducted a search of stories published in the NRA
4    Institute for Legislative Action magazine (known as the Armed Citizen Database)
5    between 2011 and 2017.  There is no explanation for the choice to use 2011 for the
6    beginning.  After all, the collection of news stories goes back to 1958.  Elsewhere in her
7    declaration she studies mass shooting events but for that chooses a much longer time
8    period reaching back to 1982.  Likewise, there is no explanation for not updating the
9    study after 2017.

10          However it is that they were chosen, some 736 incidents in the Armed Citizen
11    Database were said to be analyzed and the number of shots tabulated, but details are
12    completely absent.  Allen does not list the 736 stories.  Nor does she reveal how she
13    assigned the number of shots fired in self-defense when the news accounts use phrases
14    like "the intruder was shot" but no number of shots was reported, or "there was an
15    exchange of gunfire," or "multiple rounds were fired."  She includes in her 2.2 average of
16    defensive shots fired, incidents where no shots were fired.[102]  One would expect the
17    impact of Allen's choice to include a zero for a no-shot event to be significant because
18    (even using her number) 32.1% of the events in the home in California were no-shot
19    events.[103]  She also reported no incidents in California where more than 10 shots were
20    fired in self-defense among the stories she reviewed.  It seems obvious that in a state
21    where magazines holding more than 10 rounds have been illegal to buy or sell for twenty
22    years, law-abiding citizens are using the smaller magazines that the law requires for self-
23    defense.  Absent from the expert opinion is a statistic reporting the average number of

24

25

26

27    [102] Allen Supp. Decl. Dkt 118-1 n.10 ("[T]he average includes instances when no shots
       are fired.").
28    [103] Allen Supp. Decl. Dkt 118-1 at ¶ 12 (table).

17-cv-1017-BEN (JLB)

shots fired by criminals. Also absent is the number of intruders or whether the homeowner was able to escape unharmed.

In another example, it is not evident from the study how she counted the number of shots fired for one story in the collection where a homeowner "fired back" and three intruders suffered eight gunshot wounds. Considering most victims miss some of their shots, one would expect in defending against three attackers that more than eight shots were fired in self-defense. Instead, all that the Court is told is:

> When the exact number of shots fired was not specified, we used the average for the most relevant incidents with [a] known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.[104]

She does not reveal the imputed number substitute value that she used where the exact number of shots fired was not specified, so her result cannot be reproduced. Interestingly, substituting an imputed average value for all of the times the number of shots fired is unknown, tends to bring the overall average of shots fired down towards 2.2. For example if there are ten incidents of self-defense where nine times the victim fired two shots and one time the victim fired thirteen shots, the average number of shots fired would be 3.1 but the percentage of times more than ten shots were needed for self-defense would be 10%.

For a second study, Allen says she conducted a word search of a news aggregator called Factiva. Factiva is a commercial database behind a paywall to which the Court and the public have no access. Even if one did have access to the Factiva database, one could not repeat her study. Allen's methodology for the Factiva study is incomprehensible. For the Factiva database of 70 million news stories, her word search

---

[104] Allen Supp. Decl. Dkt 118-1 n.8.

1   returned 35,000 stories.[105] From there she somehow selected 200 stories of defensive gun

2   use in the home and set out to analyze the events.[106] As with the Armed Citizen study,

3   Allen does not provide a list of the 200 stories she analyzed.  Compare that to the long,

4   detailed list of 179 mass shooting stories she includes in the second part of her

5   declaration.  For the Factiva study, there is no way to check her analysis or her math.

6   And once again she includes in the averages those events where no shots were fired,

7   bringing the overall average down.[107]

8       Had a table of the stories she and her team analyzed been supplied, it would

9   certainly reveal important information.  For example, this Court randomly selected two

10  pages from Allen's mass shooting table: pages 10 and 14.  From looking at these two

11  pages (assuming that the sources for the reports were accurate and unbiased) the Court is

12  able to make statistical observations, including the observation that the number of shots

13  fired were unknown 69.04% of the time.  Without a similar table for the NRA or Factiva

14  studies, this Court cannot ascertain the number of shots fired in each incident, the number

15  of times a homeowner possessed a LCM, the number of times the number of shots fired

16  were unknown, whether the homeowner was unharmed, or the number of intruders.

17      Allen's 2.2 shot average is suspect for larger reasons.  The whole statistical

18  exercise is based on hearsay (anecdotes) upon hearsay news reporting, rather than police

19  investigatory reports.  A database of news articles lacks the usual indicia of accuracy and

20  reliability of admissible evidence.  According to fifteen national polls conducted by non-

21  law enforcement agencies, there may be from 760,000 defensive handgun uses to

22

23

24  [105] Exh. A at ¶18.

25  [106] *Id*. at ¶ 19.

26  [107] Allen Depo. Jan. 12, 2021 at 119:10-18 ("Q.  So numerically speaking, inclusion of
    incidents where the number is zero would tend to drag the average number of shots fired

27  down; would you tend to agree with that?  A.  So it includes those with zero.  That's
    correct.  Q.  Okay.  And have you ever looked at the average number of shots fired when

28  shots were fired?  A.  No.").

1  3,600,000 defensive uses each year.[108] Compared to the comprehensive details given for

2  her study on mass shooting events, the NRA and Factiva studies are curiously lacking in

3  depth and breadth and causes the Court to deeply discount her opinion.

4       The Court is aware of its obligation to act as a gatekeeper to keep out junk science

5  where it does not meet the reliability standard of *Daubert v. Merrell Dow*

6  *Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and Federal Rule of Evidence 702.[109] In a

7  bench trial, the relevancy bar is low and Rule 702 is to be applied with a liberal thrust

8  favoring admission.[110] While opinions and evidence may have been deemed admissible,

9  in some cases, the evidence has been given very little weight or no weight at all.  This is

10  the fact finder's role.[111] "Challenges that go to the weight of the evidence are within the

11  province of a fact finder . . . ."[112] So, while questionable expert testimony was admitted, it

12  has now been weighed in light of all of the evidence.

13       In assessing expert witness opinion, a court looks to see whether the opinion given

14  is newly made or whether it grew naturally out of research conducted outside of the

15  litigation.[113] Bias may be evident, according to legal authorities, where the expert forms

16

17  _____

18  [108] Plaintiffs' Exh. 10-10, John R. Lott, Jr., *More Guns, Less Crime* 3d. (2010), at 12.

19  [109] *See Estate of Barabin v. AstenJohnson, Inc.,* 740 F.3d 457, 463 (9th Cir.2014),

20  *overruled on other grounds*, *United States v. Bacon*, 976 F.3d 766 (9th Cir. 2020) (en
banc) (duty falls squarely upon the district court to act as gatekeeper to exclude junk

21  science).

22  [110] *Messick v. Novartis Pharm. Corp.,* 747 F.3d 1193, 1196 (9th Cir. 2014).

22  [111] *Primiano v. Cook,* 598 F.3d 558, 568 (9th Cir. 2010) (though opinion of doctor is

23  admitted, jury may reject the opinion); *see also, e.g., United States v. Vallejo,* 237 F.3d

24  1008, 1021 (9th Cir. 2001) (admissibility of expert opinion different than weight to be
accorded).

25  [112] *City of Pomona v. SQM North Am. Corp.,* 750 F.3d 1036, 1044 (9th Cir. 2014).

26  [113] *Daubert v. Merrell Dow Pharm., Inc.,* 43 F.3d 1311, 1317 (9th Cir. 1995) (after

27  remand) ("One very significant fact to be considered is whether the experts are proposing
to testify about matters growing naturally and directly out of research they have

28  conducted independent of the litigation, or whether they have developed their opinions
expressly for purposes of testifying."); *Cabrera v. Cordis Corp.,* 134 F.3d 1418, 1422

1    an opinion without peer-reviewed scientific support or before examining sufficient

2    data.[114] Bias may also be evident where an expert opinion is formed solely for the

3    purposes of litigation.  Here, the Court is mindful that, "[f]or scientific evidence to be

4    admissible, the proponent must show the assertion is 'derived by a scientific method,'"

5    and "[o]pinion based on 'unsubstantiated and undocumented information is the antithesis

6    of scientifically reliable expert opinion.'  "The court must assess the expert's reasoning or

7    methodology, using as appropriate criteria such as testability, publication in peer-

8    reviewed literature, known or potential error rate, and general acceptance."[115] Methods

9    and procedures must be followed and undisciplined speculation is not science.[116]

10        "To aid courts in exercising this gatekeeping role, the Supreme Court has

11   suggested a non-exclusive and flexible list of factors that a court may consider when

12   determining the reliability of expert testimony, including: (1) whether a theory or

13   technique can be tested; (2) whether it has been subjected to peer review and publication;

14   (3) the known or potential error rate of the theory or technique; and (4) whether the

15   theory or technique enjoys general acceptance within the relevant scientific

16   community."[117]  Allen's study relies on unverified, uncorroborated second or third hand

17   anecdotal information.  Normally, "a witness may testify to a matter only if evidence is

18   introduced sufficient to support a finding that the witness has personal knowledge of the

19

20

21

22

_____

23   (9th Cir.1998) (expert's development of opinion expressly for purposes of testifying is a
     significant consideration in evaluating opinion).

24   [114] B. Black & P. Lee, *Expert Evidence* (West 1997), Ch. 4(IV)(B), at 147.

25   [115] *Id.*

26   [116] *Daubert*, 509 U.S. at 589–90. ("The subject of an expert's testimony must be
     'scientific . . . knowledge.'  The adjective 'scientific' implies a grounding in the methods

27   and procedures of science.  Similarly, the word 'knowledge' connotes more than
     subjective belief or unsupported speculation.").

28   [117] *Messick*, 747 F.3d at 1197 (quoting *Daubert,* 509 U.S. at 592–94).

17-cv-1017-BEN (JLB)

1  matter."[118] Assuming its relevance in the first instance for *Bruen* purposes, the statistical
2  analysis has minimal indicia of accuracy or reliability.

3      In the end, Allen opines that an average of 2.2 shots are fired in self-defense gun
4  scenarios and only .3% of such incidents involve more than 10 shots fired.  Yet, even .3%
5  is a lot in terms of actual times a citizen needs to fire his gun in self-defense.  Using the
6  estimate from the Centers for Disease Control mentioned earlier of 500,000 to 3,000,000
7  times per year nationally, and extrapolating the .3% where more than 10 shots were fired
8  (per Allen's report), would mean defensive gun uses of more than 10 shots happen
9  between 1,500 and 9,000 times, every year (based on the CDC annual number of
10 defensive gun uses cited on the website Allen cited and relied on[119]).

11     **D. <u>Magazines Holding More Than 10 Rounds Are Not Dangerous and Unusual</u>**

12      Taking another tack, the State reframes the "dangerous and unusual" test as a
13 "dangerous *or* unusual" test and then objects that magazines able to hold more than 10
14 rounds are unusually dangerous.  As the Court has stated, all guns and ammunition are
15 dangerous.[120] However, magazines holding more than 10 rounds are not both "dangerous
16 and unusual," which is the Supreme Court's test.  So-called large capacity magazines

---

23 [118] Federal Rule of Evidence 602.
24 [119] In her Supplemental Declaration, at footnote 4, Dkt. 118-1, Allen cites a Heritage
   Foundation online visual database:
25 https://datavisualizations.heritage.org/firearms/defensive-gun-uses-inthe-us.  If one looks
26 at the Heritage Foundation description of its visual database research, one would see that
   it acknowledges the CDC report that Americans use their firearms defensively between
27 500,000 and 3,000,000 million times each year.
28 [120] *Staples*, 511 U.S. at 611 ("Despite their potential for harm, guns generally can be
   owned in perfect innocence.").

1  banned in California are commonly-owned by law-abiding citizens across the nation[121]

2  and number in the millions.[122]

3  **E.  The Most-Useful-for-Military-Service Nostrum**

4      The State argues, and some courts have reasoned, that magazines holding more

5  than 10 rounds are "most useful in military service" and therefore, can be banned.[123]  The

6  Supreme Court said no such thing.[124]  *Caetano* addresses this question and says, "*Heller*

7  rejected the proposition 'that only those weapons useful in warfare are protected.'"[125]

8  *Heller* was explaining *United States v. Miller*.[126]  In *Miller*, the Supreme Court applied a

9  reasonable-relationship-to-militia-use test to a short-barreled shotgun, asking whether the

10  shotgun would have a reasonable relationship to the preservation or efficiency of a well-

11  regulated militia.  Finding none, it decided the Second Amendment did not guarantee the

12  right to keep that particular firearm.[127]  *Miller*'s realm of Second Amendment protection

13  encircled a firearm if it was reasonably related to militia use.  This "reasonably-related"

14  construct received a nod again in *Lewis v. U.S.*,[128] where the Supreme Court sang *Miller*'s

---

17  [121] "It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms." Kopel, *supra*, *The History of Firearm Magazines*, at 874, Declaration of Anna M. Barvir in Support of Plfs.' Suppl. Br., Exh. 39, Dkt. 132-6, at 125.

20  [122] *See* nn. 28-31, *supra*, and accompanying text.

[123] *See, e.g.*, *Hanson v. D.C.*, No. CV 22-2256-RC, 2023 WL 3019777, at *28–29 (D.D.C. Apr. 20, 2023) ("LCMs are not covered by the Second Amendment because they are most useful in military service.").

[124] *See, e.g.*, *Bevis v. City of Naperville*, No. 22 C 4775, 2023 U.S. Dist. LEXIS 27308, at *22 (N.D. Ill. Feb. 17, 2023) ("Relatedly, the Supreme Court has unequivocally dismissed the argument that 'only those weapons useful in warfare are protected.' To the extent that the Seventh Circuit classified the weapon as either 'civilian' or 'military,' the classification has little relevance.") (citation omitted).

[125] *Caetano*, 577 U.S. at 412 (quoting *Heller*, 554 U.S. at 624–25).

[126] 307 U.S. 174 (1939)

[127] *Id*. ("Certainly it is not within judicial notice that this weapon is any part of the ordinary military equipment or that its use could contribute to the common defense.").

[128] 445 U.S 55, 65 n.8 (1980).

refrain, "the Second Amendment guarantees no right to keep and bear a firearm that does not have 'some reasonable relationship to the preservation or efficiency of a well regulated militia.'"  There was no undercutting of *Miller* in the *Heller* or *Bruen* decisions.  Rather, *Heller* embraced *Miller* and said "[w]e therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.  That accords with the historical understanding of the scope of the right."[129] And *Bruen* "quoted, explained, re-affirmed, and then applied" *Miller*.[130]  *Heller* took the already expansive zone of protection for weapons that could be used by the militia and focused on the core use of firearms for self-defense.

In other words, *Heller* made the logical connection between weapons commonly possessed by law-abiding citizens for lawful purposes that would also be useful, if necessary, for military purposes, *i.e.*, in the militia.  Since *Miller*, the Supreme Court has enlarged the breadth of firearms protected by the Second Amendment to include commonly owned firearms useful for the core right of self-defense and other lawful purposes like hunting, sporting, and target shooting.  Until the Supreme Court clearly says otherwise, commonly owned weapons that are useful for war and are reasonably related to militia use are also fully protected, so long as they are not useful solely for military purposes.  Firearms with magazines holding more than 10 rounds are such reasonably-related arms.  Even *Miller* understood the Constitution to protect the possession of ammunition.  For the militia system to function, "[t]he possession of arms also implied the possession of ammunition, and the authorities paid quite as much attention to the latter as to the former."[131]  All considered, the best reading of "arms"

---

[129] *Heller*, 554 U.S. at 625.
[130] *United States v. Saleem*, No. 3:21-cr-00086-FDW-DSC, 2023 WL 2334417, at *7 (W.D.N.C. Mar. 2, 2023).
[131] *Miller*, 307 U.S. at 180 (quoting The American Colonies In The 17th Century, Osgood, Vol. 1, ch. XIII).

1  includes magazines.[132]

2  ## III.  *BRUEN* AND THE MAGAZINE CAPACITY LIMIT

3  Plaintiffs challenge § 32310, which prohibits manufacturing, importing, keeping

4  for sale, offering for sale, giving, lending, buying, receiving or possessing a magazine

5  able to hold more than 10 rounds.  For simple possession of a magazine holding more

6  than 10 rounds, the crime is an infraction under § 32310(c).  It is a much more serious

7  crime to acquire a magazine holding more than 10 rounds in California by importing,

8  buying, borrowing, receiving, or manufacturing.  These acts may be punished as a

9  misdemeanor or a felony under § 32310(a).  Under the subsection's provision, "or

10 imprisonment pursuant to subdivision (h) of Section 1170," punishment may be either a

11 misdemeanor or a felony.

12 This Court concludes, once again, that manufacturing, importing, selling, giving,

13 loaning buying, receiving, acquiring,[133] possessing, storing, or using commonly-owned

14 magazines capable of holding more than 10 rounds for self-defense at home or in public

15 is protected by the Second Amendment.  Whether 50-round, 75-round, or 100-round

16 drum magazines are constitutionally protected is a different question because they may be

17 much less common and may be unusual.

18 ### A.    Remand for *Bruen* Review

19 This case was remanded from the United States Court of Appeals for the Ninth

20 Circuit in order to consider the challenged laws under the recent Supreme Court decision

21

22

---

23 [132] *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014) ("Because

24 restrictions on ammunition may burden the core Second Amendment right of self-defense
and the record contains no persuasive historical evidence suggesting otherwise, section

25 613.10(g) regulates conduct within the scope of the Second Amendment.").

26 [133] "This acquisition right is protected as an 'ancillary right' necessary to the realization
of the core right to possess a firearm for self-defense."  *Renna v. Becerra*, No. 20-cv-

27 02190-DMS (DEB), 2021 WL 1597933, at *6 (S.D. Cal. Apr. 23, 2021) (quoting
*Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017)) (*en banc*) (core

28 Second Amendment right "wouldn't mean much" without ability to acquire arms).

36

17-cv-1017-BEN (JLB)

1   in *Bruen*.  Under *Bruen*, the government must affirmatively prove that its firearm
2   regulation is part of a constitutional historical tradition.  It is the same text, history, and
3   tradition standard the Court used in *Heller* and *McDonald*.  What is different is that the
4   old means-end, interest balancing, tiers-of-scrutiny test is no longer viable.[134]  The State
5   now has a second chance to defend its large capacity magazine ban and must do so
6   applying the *Bruen* test.

7       *Bruen* says,

8           When the Second Amendment's plain text covers an
9           individual's conduct, the Constitution presumptively protects
        that conduct.  *The government must then justify its regulation*
10          *by demonstrating that it is consistent with the Nation's*
        *historical tradition of firearm regulation.*  Only then may a
11          court conclude that the individual's conduct falls outside the
12          Second Amendment's "unqualified command."[135]

13  And *Bruen* confirms, once again, that the Second Amendment applies to modern arms.
14  "Thus, even though the Second Amendment's definition of 'arms' is fixed according to
15  its historical understanding, that general definition covers modern instruments that
16  facilitate armed self-defense," like magazines able to hold more than 10 rounds.[136]

17        **i.**   **Already Determined: No Historical Pedigree**

18      This Court previously determined that a ban on magazines able to hold more than
19  10 rounds has no historical pedigree.  Detachable magazines were invented in the late
20  19th Century.[137]  In 1990, New Jersey introduced the first ban on detachable magazines,

---

23  [134] *Baird v. Bonta*, 2023 WL 5763345, *5 (9th Cir. Sept. 7, 2023) ("In *Bruen*, the
Supreme Court expressly rejected the use of such 'means-end scrutiny in the Second
24  Amendment context' and described the two-step approach as 'one step too many.'").
25  [135] 142 S. Ct. at 2129–30 (emphasis added).
26  [136] *Id.* at 2132.
[137] "In 1879, Remington introduced the first 'modern' detachable rifle magazine.  In the
27  1890s, semiautomatic pistols with detachable magazines followed.  During WWI,
28  detachable magazines with capacities of 25 to 32-rounds were introduced."  Plaintiff's
Exh. 2 (Stephen Helsley Report), at 4.

37

17-cv-1017-BEN (JLB)

initially imposing a 15-round limit and later a 10-round limit.  California put its ban in place in the year 2000.  A historical tradition of magazine bans, this is not.

Before *Bruen*, the State unpersuasively argued that its magazine capacity restriction was analogous to a handful of state machinegun firing-capacity regulations from the 1920's and 1930's and one District of Columbia law from 1932—a law the Supreme Court ignored while dismantling the District of Columbia's handgun ban in *Heller*.  That argument remains unpersuasive today.  That was pre-*Bruen*.  *Bruen* invites a look farther back into the Nation's history.

### ii.   The State Asked for Time for Discovery

Because the *Bruen* approach places the burden upon the government to justify its firearm restrictions by demonstrating that they are consistent with the Nation's historical tradition of firearm regulation as understood at the founding, and because judicial review under the *Bruen* standard is in its infancy, the State has been given generous time and leeway to satisfy its new burden.  The State's experts have been studying historic firearm regulations for more than 20 years.[138]  This Court has reviewed all of the declarations of the State's experts and historians as well as many of their cited sources, and finds no support for the State's ban.

---

[138] The State's expert, professor Robert Spitzer, has studied gun policy for 30 years.  *See* Decl. of Robert Spitzer, Dkt. 137-8 ("Spitzer Decl."), at ¶ 5.  The State's expert, professor Saul Cornell, said that he has been studying gun regulations for 20 years.  That was in 2017.  *See* Saul Cornell, Five Types of Gun Laws the Founding Fathers Loved, Salon (Oct. 22, 2017, 7:29 a.m.), https://www.salon.com/2017/10/22/five-types-of-gun-laws-the-founding-fathers-loved_partner/ [https://perma.cc/73SL-VAKV].  Ten years ago, Mark Anthony Frasetto compiled a list of over 1,000 historical gun laws spanning the years 1607 to 1934 and available on the Social Science Research Network. [https://perma.cc/Q2L8-SW6U].  His law collection was not unknown.  It was described in detail in 2017 by professor Spitzer in his article *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemp. Probs. 55 (2017), and included in professor Cornell's Compendium of Works cited in his Declaration, Dkt. 154-3, at 1707–33.

### iii.    Some Text, History, and Tradition Analysis is Already Done

Some of the time spent analyzing text, history, and tradition, has already been done by the Supreme Court.  To begin, "the 'textual elements' of the Second Amendment's operative clause—'the right of the people to keep and bear Arms, shall not be infringed'—'guarantee the individual right to possess and carry weapons in case of confrontation.'"[139] Further, "the right to 'bear arms' refers to the right to 'wear, bear, or carry ... upon the person or in the clothing or in a pocket, for the purpose ... of being armed and ready for offensive or defensive action in a case of conflict with another person.'"[140] The Supreme Court explains that the terms "keep" and "bear" mean that the Second Amendment's text protects a citizen's right to "'keep' firearms in their home, at the ready for self-defense," and to carry arms on one's person in and outside the home in case of confrontation.[141]  As to the types of weapons the Second Amendment protects, *Bruen* echoes *Heller*, *McDonald*, *Caetano*, *Miller*, and Blackstone, pronouncing that it "protects the possession and use of weapons that are 'in common use at the time.'"[142]

In this case, Plaintiffs are law-abiding citizens who want to possess (or keep) and carry (or bear), magazines able to hold more than 10 rounds commonly-owned for lawful purposes.  Plaintiffs' proposed conduct is covered by the plain text of the Second Amendment.  Under the plain text, the State's statute infringes on the constitutional rights of American citizens.  Therefore, Plaintiffs have met their burden of showing that the prohibited magazines fall within the Second Amendment's text.

*Bruen* next instructs courts to assess whether the initial conclusion is confirmed by the historical understanding of the Second Amendment.  *Bruen* has already confirmed that the Second Amendment protects an individual right to armed self-defense.  It repeats

---

[139] *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).
[140] *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 584).
[141] *Id.*
[142] *Id.* at 2128 (citations omitted).

17-cv-1017-BEN (JLB)

1  *Heller*'s lesson to not engage in means-end scrutiny, because, "[a] constitutional

2  guarantee subject to future judges' assessments of its usefulness is no constitutional

3  guarantee at all."[143]  After all, "[t]he Second Amendment 'is the very product of an

4  interest balancing by the people' and it 'surely elevates above all other interests the right

5  of law-abiding, responsible citizens to use arms' for self-defense.  It is this balance—

6  struck by the traditions of the American people—that demands our unqualified

7  deference."[144]

8  **B.**   ***Bruen*'s Guidelines for Historical Inquiry**

9  For conducting a historical inquiry, *Bruen* identifies a number of guidelines.  First,

10  "when a challenged regulation addresses a general societal problem that has persisted

11  since the 18th century, the lack of a distinctly similar historical regulation addressing that

12  problem is relevant evidence that the challenged regulation is inconsistent with the

13  Second Amendment."[145]  Second, "if earlier generations addressed the societal problem,

14  but did so through materially different means, that also could be evidence that a modern

15  regulation is unconstitutional."[146]  Third, "if some jurisdictions actually attempted to

16  enact analogous regulations during this timeframe, but those proposals were rejected on

17  constitutional grounds, that rejection surely would provide some probative evidence of

18  unconstitutionality."[147]  Fourth, "cases implicating unprecedented societal concerns or

19  dramatic technological changes may require a more nuanced approach."[148] Fifth, "[w]hen

20  confronting such present-day firearm regulations, this historical inquiry that courts must

21  conduct will often involve reasoning by analogy."[149] "Determining whether a historical

22

23  ───────────────

24  [143] *Id.* at 2129 (quoting *Heller*, 554 U.S. at 634).

25  [144] *Bruen*, 142 S. Ct. at 2131 (quoting *Heller*, 554 U.S. at 635).
   [145] *Bruen*, 142 S. Ct. at 2131.

26  [146] *Id.*

27  [147] *Id.*
   [148] *Id.* at 2132.

28  [149] *Id.*

40

1  regulation is a proper analogue for a distinctly modern firearm regulation requires a

2  determination of whether the two regulations are 'relevantly similar.'"[150]  *Bruen* notes,

> analogical reasoning under the Second Amendment is neither a
> regulatory straightjacket nor a regulatory blank check.  On the
> one hand, courts should not "uphold every modern law that
> remotely resembles a historical analogue," because doing so
> "risks endorsing outliers that our ancestors would never have
> accepted."  On the other hand, analogical reasoning requires
> only that the government identify a well-established and
> representative historical analogue, not a historical twin.  So
> even if a modern-day regulation is not a dead ringer for
> historical precursors, it still may be analogous enough to pass
> constitutional muster.[151]

11  In surveying American history, the task is to stay within *Bruen*'s guardrails.  As to the

12  road ahead, it is a road back to 1791.

### i.   The Significant Time Period—1791 to 1868

14      *Bruen* teaches the most significant historical evidence comes from 1791, and

15  secondarily 1868.  For the Second Amendment (and other protections in the Bill of

16  Rights), "Constitutional rights are enshrined with the scope they were understood to have

17  *when the people adopted them*."[152]  The Second Amendment was adopted in 1791.

18  "[W]e have generally assumed that the scope of the [Second Amendment] protection

19  applicable to the Federal Government and States is pegged to the public understanding of

---

[150] *Id.*

[151] *Id.* at 2133.

[152] *Id.* at 2136 (quoting *Heller*, 554 U.S. at 634–35); *cf. Kennedy v. Bremerton*, 142 S. Ct. 2407, 2428 (2022) ("[T]his Court has instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings.  The line . . . has to accord with history and faithfully reflect the understanding of the Founding Fathers.") (cleaned up); *Riley v. California*, 573 U.S. 373, 403 (2014) ("Our cases have recognized that the Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial era.").

1    the right when the Bill of Rights was adopted in 1791."[153]  Consequently, whatever

2    evolving standards of gun regulation the state legislature thought was good policy in the

3    year 2000 (when it decided 11 rounds is not well-suited for a person to have in a gun) or

4    the year 2016 (when it was amended by Proposition 63), or today, is not the test for

5    constitutional scrutiny.

6        Courts are to "afford greater weight to historical analogues more contemporaneous

7    to the Second Amendment's ratification."[154]  British sources pre-dating the Constitution

8    are not particularly instructive because the American Revolution was a rejection of

9    British rule.  Sources post-enactment are also less helpful.[155]  "[T]o the extent later

10   history contradicts what the text says, the text controls . . . . Thus, post-ratification

11   adoption or acceptance of laws that are inconsistent with the original meaning of the

12   constitutional text obviously cannot overcome or alter that text."[156]  Late 19th century

13   evidence is not particularly instructive, "because post-Civil War discussions of the right

14   to keep and bear arms 'took place 75 years after the ratification of the Second

15   Amendment, they do not provide as much insight into its original meaning as earlier

16   sources.'"[157]  Even so, evidence from the time period enforces the claim that the right to

17

18

19   [153] *Bruen*, 142 S. Ct. at 2137.

20   [154] *Rahimi*, 61 F.4th at 456; *contra Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th
     Cir. 2023) ("For most cases, the Fourteenth Amendment Ratification Era understanding
21   of the right to keep and bear arms will differ from the 1789 understanding.  And in those
     cases, the more appropriate barometer is the public understanding of the right when the
22   States ratified the Fourteenth Amendment and made the Second Amendment applicable
     to the States.").
23
24   [155] *Bruen*, 142 S. Ct. at 2136 ("Similarly, we must also guard against giving
     postenactment history more weight than it can rightly bear.").
25   [156] *Id.* at 2137 (citations omitted) (cleaned up).
     [157] *Id.* (quoting *Heller*, 554 U.S. at 614).  There is little reason to rely on laws from the
26   later part of the 1800's or the 1900's rather than ones put into effect at the time of the
     founding in view of *Bruen*'s central question about the meaning of the Second
27   Amendment as understood by the people who adopted it.  *See Worth v. Harrington*, No.
     21-cv-01348-KMM-LIB, 2023 WL 2745673, at *12 (D. Minn. Mar. 31, 2023) ("But the
28

1   keep and bear arms continued to be regarded as a fundamental right.  The Supreme Court

2   gauged the most explicit evidence appeared in the Freedmen's Bureau Act of 1866.  "The

3   most explicit evidence of Congress' aim," according to *McDonald,* "appears in § 14 of

4   the Freedmen's Bureau Act of 1866, which provided that 'the right . . . to have full and

5   equal benefit of all laws and proceedings concerning personal liberty, personal security

6   [and] . . . including the constitutional right to bear arms, shall be secured to and enjoyed

7   by all the citizens.'"[158]  *McDonald* points to one senator's description of the right to bear

8   arms for one's defense as an "indispensable safeguard of liberty."  *McDonald* writes,

> "Every man . . . should have the right to bear arms
> for the defense of himself and family and his
> homestead.  And if the cabin door of the freedman
> is broken open and the intruder enters for purposes
> as vile as were known to slavery, then should a
> well-loaded musket be in the hand of the occupant
> to send the polluted wretch to another world,
> where his wretchedness will forever remain
> complete."[159]

16   Thus, it can be said that, even at the time of the Fourteenth Amendment, the right to keep

17   and bear guns was a necessary right to preserve.  "In sum, it is clear that the Framers and

---

Commissioner offers no persuasive reason why this Court should rely upon laws from the second half of the nineteenth century to the exclusion of those in effect at the time of the founding in light of *Bruen*'s warnings not to give post-Civil War history more weight than it can rightly bear."); *Firearms Pol'y Coalition, Inc. v. McCraw*, No. 4:21-cv-01245-P, 2022 WL 3656996, at *11 (N.D. Tex. Aug. 25, 2022); *United States v. Harrison*, No. CR 22-00328-PRW, 2023 WL 1771138, at *8 (W.D. Okla. Feb. 3, 2023) (quoting *Bruen*, 142 S. Ct. at 2136 (Barrett, J., concurring) ("[T]oday's decision should not be understood to endorse freewheeling reliance on historical practice from the mid-to-late 19th century to establish the original meaning of the Bill of Rights.")); *contra Hanson*, No. CV 22-2256-RC, 2023 WL 3019777, at *16 ("In this case, it is appropriate to apply 20th century history to the regulation at issue.").

[158] *McDonald*, 561 U.S. at 773.

[159] *McDonald*, 561 U.S. at 775-76 (citation omitted).

43

1  ratifiers of the Fourteenth Amendment counted the right to keep and bear arms among

2  those fundamental rights necessary to our system of ordered liberty."[160]

3      *Bruen* and *Heller* have already considered some of the historical firearm statutes.

4  Consequently, we know that colonial laws restricting handguns that were dangerous and

5  unusual in the 1690's do not justify modern laws restricting handguns.  The Court

6  explains that even if handguns were considered "dangerous and unusual" in the 1690's, it

7  would not matter because handguns are common today.  As *Bruen* puts it,

8       Whatever the likelihood that handguns were considered
9       "dangerous and unusual" during the colonial period, they are
         indisputably in "common use" for self-defense today.  They are,
10       in fact, "the quintessential self-defense weapon."  Thus, even if
         these colonial laws prohibited the carrying of handguns because
11       they were considered "dangerous and unusual weapons" in the
12       1690s, they provide no justification for laws restricting the
         public carry of weapons that are unquestionably in common
13       use.

14

15      **C.    The State's List of Relevant Laws**

16      To aid in the task of looking for a national "historical tradition of firearm

17  regulation," the State was directed to create a list of relevant laws regulating arms dating

18  from the time of the Second Amendment (1791) to 20 years after the Fourteenth

19  Amendment (1868 + 20).  This was not an acknowledgement that 20 years after the

20  Fourteenth Amendment is a relevant period.  Twenty years after the Fourteenth

21  Amendment is an admittedly arbitrary limit and probably includes laws too late to shed

22  much light.

23      In any event, the State went far beyond.  The State produced a list of 316 laws

24  covering 550 years—from 1383 to 1933.[161]  Many of the entries are not relevant because

25

26

27  [160] *McDonald*, 561 U.S. at 778.

28  [161] *See* Def's Survey of Relevant Statutes, Dkt. 139-1 to 3 (citations to the individual law
    entries herein are indicated by brackets [--]).

44

1    they came much earlier or later than the most significant time period of 1791–1868.  The

2    first fourteen listed laws pre-date the Second Amendment.[162]  On the other end, the last

3    225 laws post-date the adoption of the Fourteenth Amendment.  Also, two-thirds of the

4    State's list (199 laws) are restrictions on *use*—not on possession or acquisition.  Here, the

5    magazine ban prohibits possession, manufacturing, giving, lending, offering for sale, etc.,

6    rather than regulating the *use* or *manner* of carrying ammunition or its magazines.

7    Twenty-two tax laws are included in the State's historical list, yet the law challenged here

8    imposes no tax on magazines.  The State's historical list also includes, surprisingly, 38

9    laws that applied only to particular groups, such as slaves, Blacks, or Mulattos.  Those

10   laws are not relevant to the magazine prohibition challenged in this case.  "And

11   Founding-era statutes that disarmed groups of persons who governments thought might

12   be dangerous because of their race or religion were not considered analogous to modern

13   carry prohibitions on released felons also thought to be dangerous: 'any such analogy

14   would be far too broad.'"[163]  Even if they were, this Court would give such

15   discriminatory laws little or no weight.

16

17

18

19
_____

20   [162] The State includes in its list a concealed carry statute in East New Jersey from 1686

21   which treated pocket pistols as "unusual" weapons.  [6].  *Bruen* bulldozed that citation.

     The East New Jersey statute was too old and too different.  *Bruen* found little there to

22   commend a present-day ban on carrying pistols.  The statute prohibited only the

23   concealed carrying of pocket pistols; it did not prohibit possession or public carrying.

     *Bruen*, 142 S. Ct. at 2143.  The statute did not apply to all pistols, much less all firearms.

24   Moreover, even if pocket pistols were uncommon in 1686 in East New Jersey, they were

25   commonly used by the time of the founding.  *Id.* at 2144 and n.13.  The statute did not

     survive the merger of East and West New Jersey in 1702.  Consequently, the Court made

26   short work of the history summing it up, "[a]t most eight years of history in half a Colony

27   roughly a century before the founding sheds little light on how to properly interpret the

     Second Amendment."  *Id.* at 2144.

28   [163] *Baird*, 2023 WL 5763345 at *8 (citations omitted).

17-cv-1017-BEN (JLB)

**IV.**   **IN AMERICA PEOPLE WERE GENERALLY FREE TO CARRY FIREARMS PUBLICLY AND PEACEABLY FROM 1791 to 1868**

**A.**   **Traditions**

The history and tradition of the United States is a tradition of widespread gun ownership and expertise. *Bruen* says, "those who sought to carry firearms publicly and peaceably in antebellum America were generally free to do so."[164] Thomas Jefferson pointed out that our soldiers were good shots because they had practiced with guns since they were children. Jefferson wrote,

> I inclose you a list of the killed, wounded, and captives of the enemy from the Commencement of hostilities at Lexington in April 1775, until November 1777. since which there has been no event of any consequence ... I think that upon the whole it has been about one half the number lost by them. In some instances more, but in others less. *This difference is ascribed to our superiority in taking aim when we fire; every soldier in our army having been intimate with his gun from his infancy.*[165]

Then, having firearms was commonplace. Carrying firearms was accepted. Proficiency with firearms was encouraged. Readiness with firearms was required. Then, as now, terrorizing with a firearm or carrying a firearm with the intent to assault another was punishable. But, "[n]one of the [] historical limitations on the right to bear arms . . . operated to prevent law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose."[166]

Notwithstanding having significant time to do so, the State has identified no

---

[164] 142 S. Ct. at 2146.

[165] Letter from Thomas Jefferson, to Giovanni Fabbroni, *Founders Online*, National Archives (June 8, 1778), https://founders.archives.gov/documents/Jefferson/01-02-02-0066 [https://perma.cc/8VTV-K9HB]; [Original source: *The Papers of Thomas Jefferson*, vol. 2, *1777–18 June 1779*, ed. Julian P. Boyd. Princeton: Princeton University Press, 1950, pp. 195–98] (emphasis added).

[166] *Bruen*, 142 S. Ct. at 2150.

1   historical statute or national tradition of firearm regulation so broad in its coverage or so
2   far reaching in its effect as its large capacity magazine ban.  So, what are the traditions of
3   firearm regulation evidenced by the State's law list?

4          Historical regulations are considered chronologically, "mindful that greater weight
5   attaches to laws nearer in time to the Second Amendment's ratification."[167]  The Court
6   has reviewed every law cited in the State's list.  It has sometimes searched for the actual
7   text of a cited law rather than the parties' summary in order to understand any legal
8   nuance.  It has reviewed the laws with a view to understanding the tradition of all the
9   states and their contexts.  For example, as the nation expanded old states became interior
10  states and new states became frontier states.  Frontier states often had different social and
11  security concerns than did the interior of the new nation.  The Court sought to understand
12  how states responded to new technological developments in ammunition, revolvers,
13  repeaters, and high-capacity, fast-shooting, lever-action rifles.

14         The State's experts opine that gun laws were plentiful and widespread and firearm
15  regulation was the norm.  But, if the test were to look at gun laws with that level of
16  generality, no gun law would ever fail scrutiny and *Heller*, *McDonald* and *Bruen* could
17  not have been decided as they were.  Furthermore, as will be shown, it is an exaggeration.
18  The State also says regulations on dangerous or unusual *weapons* existed throughout
19  American history.  By "weapons," the State means non-firearms.

20         Relevantly similar regulations are *firearm* prohibitions—not bladed or melee
21  weapon regulations.  And neither "dangerous or unusual" nor "unusually dangerous" is
22  the test, although the State cannot point to an outright prohibition on even unusual or
23  unusually dangerous *firearms* until Alabama's 1868 prohibition on the dangerous and
24  unusual rifle-walking cane.  [87]

25         Because the State cannot find a historic regulation of *firearms*, it turns to the

26

27  _____

28  [167] *Rahimi*, 61 F.4th at 456.

17-cv-1017-BEN (JLB)

1    historic regulations of *weapons*, whether bladed weapons, melee weapons, blunt

2    weapons, or leaded weapons.  Yet, the Supreme Court does not look to knife laws when

3    reviewing a restriction about guns.  *Bruen* teaches that a state's burden is to identify a

4    historical tradition of *firearm* regulation, not a tradition of knife regulation.  Underscoring

5    the importance of its words, three different times *Bruen* repeats the specific phrase

6    "firearm regulation," as in the following instances: (1) "Rather, the government must

7    demonstrate that the regulation is consistent with this Nation's historical tradition of

8    *firearm regulation*;[168] (2) "The government must then justify its regulation by

9    demonstrating that it is consistent with the Nation's historical tradition of *firearm*

10   *regulation*;"[169] and (3) "[T]he burden falls on respondents to show that New York's

11   proper-cause requirement is consistent with this Nation's historical tradition of *firearm*

12   *regulation*."[170]  In contrast, the *Bruen* majority opinion did not mention bowie knives at

13   all.  The Supreme Court was not interested in traditions of knife regulation or melee

14   regulation.  Even in the dissent, bowie knife laws were hardly mentioned.  Consequently,

15   when the State asserts, "weapons restrictions proliferated," it misses the mark by

16   referring to non-firearm weapon restrictions or concealed carrying restrictions.[171]

17        During the most important period of history, there were relatively few firearm

18   regulations.[172]  This conclusion can be drawn from inspecting the State's historic law list,

19   and is confirmed by at least one historian: "Between 1607 and 1815 . . . the colonial and

20

21   _____

22   [168] *Bruen*, 142 S. Ct. at 2126 (emphasis added).

23   [169] *Id.* at 2130 (emphasis added).

24   [170] *Id.* at 2135 (emphasis added).

     [171] Def's Br. in Resp., Dkt. 142, at 20.

25   [172] It is true that there were laws criminalizing the *use* of guns for criminal acts such as

26   carrying a gun with intent to assault another, or displaying a gun in a threatening manner.
     These were crimes of violence, not crimes of possession.  California, as it should, has

27   similar laws today, such as California Penal Code § 245(a)(2) & (3) (assault with a
     deadly weapon - firearm) and § 417(a)(2) (exhibition of a firearm in a rude, angry, or

28   threatening manner).

     48

state governments of what would become the first fourteen states neglected to exercise any police power over the ownership of guns by members of the body politic . . . . These limits on colonial and early state regulation of arms ownership outlined a significant zone of immunity around the private arms of the individual citizen."[173]  It is a conclusion confirmed by the Supreme Court.  "Apart from a few late 19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense."[174]

There were regional differences, no doubt.[175]  As the nation aged, northern states had virtually no restrictions on guns and none on ammunition while southern states tended to mainly prohibit concealed carrying.[176]  In short, the State argues that because some states have regulated in some ways the use of some *weapons* (primarily knives and melee devices), that translates into the State being able to regulate any magazine in any way.  That is a *non sequitur* and in this particular case—a bridge too far.

### i.   No Prohibitions on Possessing Guns

It is remarkable to discover that there were no outright prohibitions on keeping or possessing guns.  No laws of any kind.[177]  Based on a close review of the State's law list

---

[173] Robert H. Churchill, *Forum: Rethinking the Second Amendment*, 25 L. & Hist. Rev. 139, 161 (2007).

[174] *Bruen*, 142 S. Ct. at 2156.

[175] "[T]here were profound regional differences in early America."  Decl. of Saul Cornell, Dkt. 118-4 ("Cornell Decl.") at n.49.

[176] Don B. Kates, Jr., *Restricting Handguns* 12 (North River Press ed., 1979), found in Compendium Works Cited in Decl. of Randolph Roth, Dkt. 118-8, at n.53 and 0349 ("By 1850, every Western state barred the carrying of concealed weapons.  In contrast, none of the Northeastern states adopted even that mild a restriction until nearly the turn of the twentieth century.  Until 1924, for instance, the only gun law in New Jersey was the prohibition of dueling.").

[177] According to one scholar, the first prohibition on simple ownership of a gun came in 1911.  Churchill, *supra*, at 139 n.61 ("The first law restraining gun ownership by citizens mentioned in the secondary literature is New York's 1911 Sullivan Law, which prohibited the ownership of concealable arms without a police permit."); *see also* David

1  and the Court's own analysis, Plaintiffs are correct in asserting that there are no
2  Founding-era categorical bans on firearms in this nation's history.  Though it is the
3  State's burden, even after having been offered plenty of opportunity to do so, the State
4  has not identified any law, anywhere, at any time, between 1791 and 1868 that prohibited
5  simple possession of a gun or its magazine or any container of ammunition (unless the
6  possessor was an African-American or a slave or a mulatto).[178]

7      Surely, with 315 other entries in the State's law list, there must be many other laws
8  in the relevant time period of demonstrating a tradition of firearm regulation analogous to
9  the large capacity magazine ban.  What else is there?

10          ii.   **No Gun Laws In The Northern States For 50 Years**

11      From the adoption of the Second Amendment through the next 50 years, there
12  were no firearm restrictions in any states north of the Mason-Dixon Line.[179]  One could

_____

15  B. Kopel and Joseph G.S. Greenlee, *This History of Bans on Types of Arms Before 1900*
16  50 J. of Legis., Apr. 25, 2023, at 45–46 (2024), https://ssrn.com/abstract=4393197
   [https://perma.cc/P85U-ASTZ] ("Before, during, and after the Revolution, no state
17  banned any type of arm, ammunition, or accessory.  Nor did the Continental Congress,
   the Articles of Confederation Congress, or the federal government created by the U.S.
18  Constitution in 1787 . . . . There is no evidence that any of the Founders were concerned
19  about individuals having too much firepower.  After a long, grueling war against the
   world's strongest military, limiting individuals' capabilities was not a concern.").
20  [178] Even before *Bruen* was decided, at least one other judge has applied the text, history,
21  and tradition test with analogical reasoning for a 10-round magazine ban, and came to the
   same conclusion.  *See Ass'n of N.J. Rifle & Pistol Clubs Inc. v. AG N.J.*, 974 F.3d 237,
22  258 (3d Cir. 2020) (Matey, J. dissenting) ("This history reveals a long gap between the
23  development and commercial distribution of magazines, on the one hand, and limiting
   regulations, on the other hand. . . . Some will argue there must be an outer boundary to
24  this analysis that, when crossed, renders a magazine dangerous and unusual.  If so, it does
25  not appear in the history and traditions of our Nation. . . . As a result, and limited to this
   record, I would hold that magazines are arms protected by the Second Amendment and
26  an act limiting magazine capacity to 10 rounds burdens the Appellants' Second
27  Amendment rights.").
28  [179] The Mason-Dixon Line established the boundary line between Pennsylvania and
   Maryland.  Beyond its importance as a literal boundary between states, "the Mason-

50

**ER_52**

live in any of the northern states without restrictions of almost any kind.[180]  A gun owner enjoyed freedom with no infringing prohibitions from 1789 to 1845 in Pennsylvania, New York, Connecticut, Massachusetts, New Hampshire, Rhode Island, Vermont, Maine, Ohio, Illinois, Michigan, or Indiana.  One might never be subject to a later surety statute in Massachusetts (1836) [29] and Maine (1841) [46].[181]  If anything, regulations were not about what kind of firearm one was *not* allowed to keep, but about the kind of firearm one was *required* to buy and have ready for militia duties.

The same was largely true south of the Mason-Dixon Line (disregarding laws targeting slaves and Indians, neither of which were considered to be citizens by lawmakers).  A citizen could reside in any of the northern states and half of the southern states for the first fifty years free from state government firearm restrictions.  This

_____

Dixon Line has become known as the boundary between the North and the South.  It took on that association on March 1, 1790, when the Pennsylvania Assembly passed legislation ending slavery in the state.  Thus, the Mason-Dixon Line became the legal and the philosophical boundary between slave territory and free land, since slavery was still allowed in Maryland.  That was especially true after the Missouri Compromise was passed in 1820, which prohibited slavery north of the Mason-Dixon Line.  To the many slaves who used whatever means necessary to reach free land, the Mason-Dixon Line became important to their freedom.  For the slaves located in Maryland, they only needed to get to the state line to secure their freedom, although many continued traveling north in an attempt to get as far away from their former masters as possible."  Kathryn DeVan, *Our Most Famous Border: The Mason-Dixon Line*, Pa. St. Univ. (fall 2008), https://pabook.libraries.psu.edu/literary-cultural-heritage-map-pa/feature-articles/our-most-famous-border-mason-dixon-line [https://perma.cc/B6WN-DHAC].

[180] The State lists one New Jersey statute from 1799 as a law purportedly prohibiting the carrying of a pistol with the intent to assault [19], but this appears to be a sentencing enhancement statute applicable only if one was apprehended for burglary.  *See* An Act to Describe, Apprehend and Punish Disorderly Persons (1799), Duke Ctr. For Firearms L., *Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources*, https://firearmslaw.duke.edu/laws/charles-nettleton-laws-of-the-state-of-new-jersey-page-474-image-501-1821-available-at-the-making-of-modern-law-primary-sources/.

[181] That the two states would share similar laws makes sense since Maine was part of the larger Commonwealth of Massachusetts prior to achieving statehood in 1820.

17-cv-1017-BEN (JLB)

1 understanding is based on a methodical reading and assessment of the laws set out in the

2 State's survey.  While the parties' experts express some disagreements, their contrary

3 opinions are unpersuasive.

4   In the northern states there were hardly any firearm laws at all, let alone a tradition

5 of criminalizing the act of keeping or carrying any firearm.  For the District of Columbia,

6 governed by Congress, there were no firearm laws for the first 80 years until a concealed

7 carry prohibition was enacted in 1871.  [97].   Maine enacted its first law, a gunpowder

8 storage regulation to prevent fires, in 1821.  [27].  Massachusetts enacted its first firearm

9 statute in 1836 as a surety law [29] with Maine following suit in 1841.  [46].  *Bruen*

10 already notes that under the surety laws everyone started out with robust carrying rights

11 and *Bruen* saw little evidence that the laws were enforced.

12   Illinois was admitted to the Union in 1818.  In 1845, Illinois enacted its first

13 firearm statute criminalizing carrying a gun *with the intent to assault another person*.

14 [49].  Indiana became a state in 1816.  In 1855, Indiana criminalized shooting a gun, or

15 throwing stones or sticks, at a train.  [62].  The law did not concern keeping any gun

16 whatsoever, or carrying a gun anywhere, in any manner whatsoever.[182]  Ohio became a

17 state in 1808. The State's law list shows no Ohio state laws respecting firearms until

18 1859.  [70].  Ohioans did not have a gun law until nearly 70 years after the adoption of

19 the Second Amendment.  Its first gun law was one that prohibited carrying a pistol, bowie

20 knife, dirk, or other dangerous weapon *concealed*.  California enacted its first gun

21 regulation in 1853, which criminalized the act of having "upon him any pistol, gun, knife,

---

22

23

24 [182] The State's law list erroneously describes the 1855 Indiana law as one prohibiting the
carrying of a pistol with the intent to injure another.  This appears to be a scrivener's

25 error.  Although the State does not include it in its law list, Indiana may have enacted an
earlier statute prohibiting carrying a pistol concealed, with an exception made for

26 travelers.  "In *State v. Mitchell*, 3 Blackf. 229, 1833 WL 2617 (Ind. 1833), the Supreme
Court of Indiana, in a one-sentence opinion, upheld a state statute prohibiting the general

27 public from carrying concealed weapons."  *Peruta v. Cnty. of San Diego*, 824 F.3d 919,

28 933 (9th Cir. 2016).

17-cv-1017-BEN (JLB)

1  dirk, bludgeon, or other offensive weapon, with intent to assault any person." [57].

2      In short, the history and tradition of the northern states, states north of the Mason-

3  Dixon Line, was to leave firearm ownership and use completely unregulated. From the

4  time of the adoption of the Second Amendment to the time of the adoption of the

5  Fourteenth Amendment, there were no state gun laws in Pennsylvania, New York,

6  Connecticut, Rhode Island, Vermont, New Hampshire, Michigan, Wisconsin, Minnesota,

7  Iowa, Nebraska, Kansas, Missouri, or the District of Columbia. In Massachusetts and

8  Maine there were only surety statutes. In New Jersey there was a sentencing

9  enhancement for carrying a pistol while committing a burglary. In this half of the nation,

10  keeping and bearing firearms was done freely without government interference.

11             **iii.**   **No Gun Laws In The Southern States For 50 Years**

12      South of the Mason-Dixon Line, where slavery was practiced, there were many

13  laws restricting firearms for slaves, African-Americans, and Indians. Setting aside that

14  obviously unconstitutional tradition, among the southern states firearm ownership was

15  largely unregulated for at least the first 50 years after 1791. Like the northern states,

16  from 1791 to 1868 there were no state gun laws in Delaware, North Carolina, South

17  Carolina, Mississippi, Florida, West Virginia, and Texas, according to the State's law list.

18      The few laws in other southern states that did exist concerned mainly: (1) carrying

19  a pistol *with the intent to assault another*; and (2) carrying a pistol in a *concealed*

20  manner. Tennessee enacted the first firearm regulation in the southern states in 1801 in

21  the form of a surety law— it was a law dismissed by *Bruen*. [20]. A decade later in

22  1811, Maryland passed the second firearm regulation in the south. [23]. The Maryland

23  law was, not a prohibition, but a sentencing enhancement for carrying a pistol *with the*

24  *intent to assault another*.

25      In 1813, Louisiana passed the first law prohibiting the carrying of a *concealed* gun.

26

27

28

17-cv-1017-BEN (JLB)

[24].[183]  *Bruen* noticed that a Louisiana court found the prohibition on concealed carrying constitutional only because it permitted open carrying of a firearm.[184]  Kentucky passed a prohibition on carrying a *concealed* pistol that year, although it is omitted from the State's law list.  Perhaps it is omitted because Kentucky's concealed carry law was struck down as unconstitutional a short time later.  The only other firearm regulation in the south during this time period was Georgia's 1816 law prohibiting the carrying of a pistol *with intent to assault* another person.  [25].

Around 50 years after the Second Amendment, four southern states passed their own first firearm regulations, also in the form of *concealed* carry prohibitions.  In 1837, Arkansas banned carrying a pistol concealed unless on a journey.  [32].  In 1837, Georgia added its own prohibition on carrying a pistol concealed.  [33].  The constitutionality of the Georgia law was upheld because open carry was unregulated.[185]  In 1838, Virginia prohibited carrying a pistol concealed.  [40].  In 1839, Alabama prohibited carrying a firearm concealed [41], later adding exceptions for self-defense and for travelers.  [45].[186]

Three more regulations were enacted in the south in the years leading up to the Fourteenth Amendment's adoption.  In 1856, Tennessee passed a law affecting only minors.  [65].  In 1868, Florida prohibited carrying secretly "arms of any kind whatever"

---

[183] Louisiana reenacted similar, if not the same, statutes two more times, in 1842 and again in 1855.  [63].

[184] 142 S. Ct. at 2146 and n.19 (quoting *State v. Chandler*, 5 La. 489, 490 (1850) ("Louisiana concealed-carry prohibition 'interfered with no man's right to carry arms (to use its words) "in full open view," which places men upon an equality'")).

[185] *Nunn v. State*, 1 Ga. 243, 251 (1846) ("We are of the opinion, then, that so far as the act of 1837 seeks to suppress the practice of carrying certain weapons secretly, that it is valid, inasmuch as it does not deprive the citizen of his natural right of self-defence, or of his constitutional right to keep and bear arms.  But that so much of it, as contains a prohibition against bearing arms openly, is in conflict with the Constitution, and void.").

[186] *Lockett v. State*, 47 Ala. 42, 45–46 (1872) ("Nor is it required that he should have any necessity for the use of his pistols.  It is enough if he was traveling on a journey, long or short.").

17-cv-1017-BEN (JLB)

1    and the outright carrying of a pistol or other arm or weapon.  [90].  The Florida law was
2    not scrutinized in a published court decision.[187]

3          Significantly, the first restriction on a *dangerous and unusual* firearm did not occur
4    until 1868, the year the Fourteenth Amendment was adopted.  That year, Alabama
5    prohibited carrying a rifle walking cane.  [87].  A rifle walking cane was a single shot
6    rifle disguised to appear as a walking cane with a variety of handles.  When fired, one
7    bullet would exit through the bottom of the cane.  It was patented in 1858 and
8    manufactured by the E. Remington & Sons company until approximately 1888, with less
9    than 2,000 produced.[188]  Remington was the only major gun maker to produce a rifle
10   walking cane gun.  California currently has a law prohibiting possession of a "cane gun."
11   *See* Cal. Penal Code § 24410.

12         In short, the history and tradition of the states south of the Mason-Dixon Line, was
13   to leave firearm ownership and use mostly unregulated.  At least for the first half of the
14   century, in this half of the nation, keeping and bearing firearms was done freely, with a
15   handful of states enacting prohibitions on carrying pistols in public in a concealed
16   manner, and Maryland and Georgia making it a crime to carry a firearm with the intent to
17   assault another person.

---

[187] However, an 1867 court decision considered an earlier law where only *concealed* carrying was prohibited.  *See Sutton v. State*, 12 Fla. 135, 136 (1867) ("The statute under which this indictment was found provides, 'that hereafter it shall not be lawful for any person in this State to carry arms of any kind secretly on or about their person, &c.: Provided, that this law shall not be so construed as to prevent any person from carrying arms openly outside of all their clothes' . . . . The statute was not intended to infringe upon the rights of any citizen to bear arms for the 'common defense.'  It merely directs how they shall be carried, and prevents individuals from carrying concealed weapons of a dangerous and deadly character, on or about the person, for the purpose of committing some malicious crime, or of taking some undue advantage over an unsuspecting adversary.").

[188] *See* Remington Soc'y of Am., *Remington Cane Guns*, https://www.remingtonsociety.org/remington-cane-guns/ [https://perma.cc/A74W-EHPT] (last visited May 26, 2023).

###### iv.  Territories

Among the State's law list is a number of regulations from 19th century territories. *Bruen* has already considered such laws and decided they are not particularly helpful for several reasons.  "First, the bare existence of these localized restrictions cannot overcome the overwhelming evidence of an otherwise enduring American tradition . . . ."[189]  "These territorial 'legislative improvisations,' which conflict with the Nation's earlier approach to firearm regulation, are most unlikely to reflect 'the origins and continuing significance of the Second Amendment' and we do not consider them 'instructive.'"[190]  "Second, because these territorial laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality . . . . we fail to see how they inform 'the origins and continuing significance of the Amendment.'"[191]  "Finally, these territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived . . . . Thus, they appear more as passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood, rather than part of an enduring American tradition of state regulation."[192]  One commentator disagrees.[193] Even so, the territorial regulations suggest an absence of gun bans during the most important historical period.

None of the territorial regulations from 1791 to 1868 prohibited a firearm.  There were no prohibitions on owning firearms of any type.  There were no prohibitions on keeping a firearm of any type for self-defense, whether in the home or in public.  The first territorial regulation came approximately 47 years after the Second Amendment (in 1839) and prohibited the carrying of a firearm in a *concealed* manner in the Florida

---

[189] *Bruen*, 142 S. Ct. at 2154.
[190] *Id.* (quoting *Heller*, 554 U.S. at 614).
[191] *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 592).
[192] *Id*. (citations omitted).
[193] *See* Andrew Willinger, *The Territories Under Text, History, and Tradition*, 101 Wash. Univ. L. Rev. (2023), https://ssrn.com/abstract=4372185.

17-cv-1017-BEN (JLB)

1   Territory.  [42].  In other words, for the first 40 years of the nation's history, the only

2   territorial restriction on firearms, was in the Florida territory taken from Spain in 1819.

3   In 1853, the New Mexico Territory also adopted a *concealed* carrying prohibition.

4   [58].  In 1854, the Washington Territory prohibited *exhibiting* a pistol in a rude, angry, or

5   threatening manner, reenacting a similar law in 1859.  [60, 71].  The Nebraska Territory

6   made it a crime to carry a pistol *with the intent to assault* another person in 1858.  [68]

7   The Colorado Territory (in 1862 and again in 1867) and the Montana Territory (in 1864)

8   restricted the *concealed* carrying of a pistol in a city, town, or village.  [75, 79, 84].

9   While these territorial laws do evidence some later restrictions on the manner of carrying

10  firearms in some public places, they do not not evidence a history or tradition of

11  prohibiting any firearms of any type.

12                  **v.   California's First Concealed Carry Law Was a Failure**

13  In 1863, California's homicide rate reached "catastrophic levels."[194]  With no

14  Second Amendment analogue in the state constitution, California's solution was to ban

15  carrying concealed weapons.  The experiment failed.  In 1870, the legislature repealed the

16  law, because it disarmed the good citizen, but the law was not followed by "the vast

17  majority of roughs, fighting men, and predatory characters,"[195] and the police were "apt

18  to arrest any quiet citizen" with a concealed weapon.[196]

19          **B.   Historical Twins**

20  *Bruen* concluded that "[n]one of these historical limitations on the right to bear

21  arms approach New York's proper-cause requirement because none operated to prevent

22

23  _____

24  [194] Decl. of Randolph Roth, Dkt. 118-8 ("Roth Decl."), at ¶ 36.

25  [195] *Id.* at ¶ 37 and n.84 (citing Clayton E. Cramer and Joseph E. Olson, *The Racist*

26  *Origins of California's Concealed Weapon Permit Law*, SSRN (Aug. 12, 2016) (quoting

27  *The Carrying of Concealed Weapons*, Daily Alta (San Francisco) California, March 13,
    1869, at 2, and *Concealed Deadly Weapons*, Sacramento Daily Union, December 16,

28  1870, at 2.)).
    [196] *Id.*

17-cv-1017-BEN (JLB)

1  law-abiding citizens with ordinary self-defense needs from carrying arms in public for

2  that purpose."[197]  The same can be said about California's magazine ban.  To paraphrase

3  the Supreme Court, none of these historical limitations on the right to bear arms approach

4  California's complete ban on magazines able to hold more than 10 rounds.  None

5  operated to prevent law-abiding citizens from possessing as much ammunition as they

6  thought best.

7       A historical twin is not unimaginable.  It could have been the case that the early

8  states prohibited having large capacity gunpowder sacks, or, they might have prohibited

9  carrying more than 10 lead bullets.  There were no such restrictions.   There are no

10 Founding-era dead ringers or historical twins.  Of course, the State does not need to find a

11 historical twin, but a second cousin twice-removed, is not enough.

12 **V.   <u>ANALOGUES</u>**

13      Although the State does not identify any historical twins of its restrictions on

14 magazines, it may not have to.  A history and tradition of a relevantly similar firearm

15 regulation could suffice.  After all, it can be argued that removable magazines represent a

16 dramatic change in technology and the State is attempting to address a modern societal

17 concern.  In such cases, *Bruen* allows a more nuanced approach.  On one hand, compared

18 to muskets of the colonial era, a Glock 17 with its 17-round magazine clearly represents a

19 dramatic technological advancement.  On the other hand, the lever-action repeating

20 Henry and Winchester rifles popular at the time of the Fourteenth Amendment were

21 already dramatic technological advancements in firearms.  These popular lever-action

22 rifles had large tubular magazines that held a lot of ammunition and could be fired

23 multiple times in succession, accurately and quickly.  Yet, there are no state prohibitions

24 on possession or manufacture of these lever-action rifles in the State's law list.

25      In any event, while California does not need to identify a dead ringer for its

26

27  ─────────────────────

28  [197] 142 S. Ct. at 2150.

1    magazine ban, "California cannot satisfy the requirement for a closely analogous
2    historical regulation by reference to any general firearm regulation California might
3    unearth."[198]

4    **A.    The State's Best Historic Analogue? A New York City Gunpowder**
5    **Storage Law Following the Worst City Fire in Colonial America**

6    Asked to identify the best historic analogue to its sweeping prohibition on large
7    capacity magazines, the State identified a New York City gunpowder storage law
8    following the worst city fire in Colonial America.  With the assistance of scholars who
9    have studied historic laws for years the State identified a 1784 statute regulating the
10   amount of gunpowder that could be stored inside a New York City building.[199] Because
11   the State has identified this as its best analogue, it deserves closer consideration.

12   The gunpowder storage law has nothing to do with gun violence.  It was *a fire*
13   *safety regulation*.  Unsurprisingly, the law was enacted after New York City suffered two
14   great fires, one of which is described as, "The most destructive fire in colonial North
15   America."[200]  The first fire, in the year 1776, burned much of Manhattan to the ground
16   and destroyed 493 houses in its path.  In 1778, a second fire swept through the city and
17   destroyed 54 more houses and several warehouses.[201]  After these two terrible fires the
18   New York State legislature responded with a law for New York City limiting the quantity
19   of gunpowder that a person could store in any one building to 28 pounds.  It applied only

20
21
22

---

23
24   [198] *Baird*, 2023 WL 5763345, at *8.
     [199] *See* Defendant's Response Brief in Response to the Court's Order Entered on
25   February 7, 2023, Dkt. 143, at 1, identifying 1784 Laws of N.Y. 627, chapter 28.
     [200] New York City Fire Museum, *The Great New York Fire of 1776* (Mar. 21, 2023),
26   https://www.nycfiremuseum.org/greatfire1776 [https://perma.cc/A3BW-TQRP].
     [201] Richard Howe, *Notes on the Great Fires of 1776 and 1778* (2014), The Gotham
27   Center for New York City History, https://www.gothamcenter.org/blog/notes-on-the-
     great-fires-of-1776-and-1778 [https://perma.cc/WJ4V-3QKP].
28

17-cv-1017-BEN (JLB)

to that part of Manhattan from city hall on the south end to one mile north.[202] Gunpowder was to be stored in fireproof stone jugs or tin canisters holding no more than 7 pounds each.  Reinforcing that the law was enacted to prevent fires, it also required gunpowder be contained to prevent spills during transport through the streets.[203]

There was much the law did not do.  It did not limit the total amount of gunpowder a person could own or use, as long as quantities over 28 pounds were kept in the public magazine or in additional buildings.  It placed no limit on the number of lead bullets a person could keep or possess.  It did not restrict a person from keeping his firearms loaded with gunpowder and bullets in his home, business, or when in public.  Beyond the one mile stretch of lower Manhattan island, the law had no application anywhere else in the state.  And 28 pounds is a lot of gunpowder.  One New York militia soldier was required to bring ¼ pound of gunpowder when called to muster.[204]  So, 28 pounds of gunpowder could outfit 112 militia men.  As the State's expert Professor Cornell notes, "Twenty to thirty pounds of gunpowder is certainly not an inconsiderable amount."[205]

---

[202] "[I]t shall not be lawful . . . to have or keep any quantity of gun powder exceeding twenty-eight pounds weight, in any one place, less than one mile to the northward of the city hall . . . except in the public magazine at the Fresh-water . . . ."

[203] The law specified, "[a]nd in order to prevent any fatal consequences which may arise, from the carriage of gun powder, in and through the streets of the city of new York, by carts, carriages, or by hand, or otherways [sic], it shall be in a tight cask, well headed and hooped, and shall be put into bags or leather-cases, and intirely [sic] covered therewith, so as that none be spilt or scattered in the passage thereof . . . ."  1784 Laws of N.Y at 628.

[204] *See* Stats. at Large, New York 1867, Chapter X, Title VII, Article 1, §6, at 287 (eff. 1835) (penalties for militia men ill-equipped) ("[F]or want of two spare flints and a knapsack, twenty four cartridges, shot-pouch, powder-horn, twenty balls, and *a quarter of a pound of powder*, twenty five cents each . . . ."), https://books.google.com/books/content?id=RkkwAQAAMAAJ&pg=PA287&img=1&zoom=3&hl=en&bul=1&sig=ACfU3U3ooEDz2oBmZb_g3qythhk8S6UJOg&ci=99%2C102%2C820%2C820&edge=0 [https://perma.cc/KS72-L87G].

[205] Saul Cornell & Nathan DeNiro, *A Well Regulated Right*, 73 Fordham L. Rev. 487 n.173 (2004).

1    For nuanced analogues, the New York City gunpowder storage law fails the why

2    and how tests.[206]  The "why" of the large capacity magazine ban is to introduce a "critical

3    pause" into a mass shooter's unrelenting attack.  The "why" of the historic gunpowder

4    storage law is to reduce the risk of building fires.  The "how" of the large capacity

5    magazine ban is limiting the number of ammunition rounds that can be loaded in a gun

6    for self-defense.  The "how" of the historic gunpowder storage law burden was

7    generously limiting the storage (and not the amount loaded into guns for self-defense) of

8    gunpowder for a geographic area smaller than one square mile.  In the end, the State's

9    proposed analogue is not relevantly similar.

10    One other gunpowder storage law mentioned by the State which applied only in the

11    city of Boston, Massachusetts, fares no better.  This was also a *fire* safety regulation—

12    nothing more.[207]  "The ordinance did not prohibit *carrying* loaded firearms within the

13    City of Boston—only leaving them unattended in a building—and . . . this law was for

14    the protection of those fighting fires."[208]  In fact, one scholar mused, "Strictly speaking,

15    the law did not forbid bringing an unloaded gun into a building, and then loading it when

16    inside.  So, occupants of homes or businesses remained free to keep loaded guns."[209]

17    Moreover, the State offers no evidence that the Massachusetts law was enforced.  A

18    search of *Thacher's Reports*, a collection of reports of criminal cases tried in the City of

19    Boston Municipal Court from 1823–1843 reveals no such prosecutions.[210]

20

21

22    [206] Courts should examine "how and why the regulations burden a law-abiding citizens' right to armed self-defense."  *Bruen*, 142 S. Ct. at 2132-33.

23    [207] *See Renna*, 20-cv-2190-DMS-DEB, 2023 WL 2846937, *12–13 (citing *Jackson v.*

24    *City & Cnty. of San Francisco*, 746 F.3d 953, 963 (9th Cir. 2014) (stating "Boston's firearm-and-gunpowder storage law is historically distinct from the challenged firearm

25    regulation in light of *Heller*").

26    [208] Clayton E. Cramer and Joseph Edward Olson, *Pistols, Crime, and Public: Safety in Early America*, 44 Willamette L. Rev. 699, 705 (2008) (emphasis in original).

27    [209] *Id.*

28    [210] *Thacher's Reports* may be found at https://www.mass.gov/info-details/historical-massachusetts-cases#1800-1899-.

17-cv-1017-BEN (JLB)

This whole gunpowder storage argument has been raised before and it has been rejected before.  It was raised a dissent in *Heller* and relied on the same laws of New York and Massachusetts, and the same writings of Cornell.[211]  The *Heller* majority was unimpressed.  *Heller* says,

> The other laws Justice Breyer cites are gunpowder-storage laws that he concedes did not clearly prohibit loaded weapons, but required only that excess gunpowder be kept in a special container or on the top floor of the home.  Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns.[212]

Applying the same reasoning to this case, the early fire-safety gunpowder storage laws do not remotely burden the self-defense right as much as an absolute ban on magazines holding more than 10 rounds.

**B.    The State's Historic Analogue No. 2: Concealed Carry Laws**

Next, the State turns to historic laws regulating the *concealed* carrying of bowie knives, dirks, sword canes, and some pistols, as analogues.

**i.    Pocket Pistols**

Some historic laws prohibited carrying a pocket pistol in a concealed manner.  By 1868, about a dozen states had laws prohibiting carrying concealed pistols.  Importantly, the concealed carry laws did not prohibit either keeping pistols for all lawful purposes or carrying all guns openly.  And none included long guns or ammunition containers in their restrictions.  Pocket pistols were entirely lawful to keep and use at home for self-defense.

Prohibiting the concealed carrying of a pistol was constitutionally permissible only when a citizen could freely keep and carry the same gun openly.   The statutes were often tested in court, suggesting that any broad carrying restriction ran close to the

_____

[211] *Heller*, 554 U.S. at 684–86 (Breyer, J., dissenting).
[212] *Id*. at 631–32.

1  constitutional line.  Today's large capacity magazine ban prohibits carrying magazines in
2  any manner -- and even more restrictively prohibits simple possession.

3       Historic concealed carry laws for pistols have a different "why" and "how" than do
4  the State's large capacity magazine ban.  The "why" of a concealed carry law was to
5  prevent unfair surprise attacks by a person who appeared to be unarmed.  The "how" of
6  the historic concealed carry prohibitions was to proscribe the manner of carrying a pocket
7  pistol and only when in public.  The substantial burden imposed by the large capacity
8  magazine ban is not analogous to the burden created by a concealed carry restriction for
9  public carrying of a pocket pistol.  Such a history and tradition of concealed carry
10 prohibitions are not nuanced analogues for California's magazine ban as they are not
11 relevantly similar.

12            **ii.   Dirks, Daggers, Sword Canes, and Bowie Knives**

13      The State now asks the Court to compare firearms equipped with large capacity
14 magazines to knives.  Undoubtedly, dirks, daggers, and bowie knives are dangerous.  But
15 dirks, daggers, sword canes, and bowie knives were not firearms; they were bladed
16 instruments.  *Bruen* says the state's burden is to identify a historical *firearm* regulation,
17 not a knife regulation.  In the dissent, knives were cited only where territorial laws also
18 affected the carrying of pistols, presumably because of the pistols.[213]  *Heller* did not
19 mention knife laws at all in evaluating the District of Columbia's handgun ban.  And the
20 Supreme Court's plurality did not mention bowie knives in evaluating Chicago's
21 handgun ban, except as an example of Reconstruction-era efforts to disarm African-
22 Americans.[214] This is not to say that bowie knives are not "arms" imbued with Second

23
24
_____

25 [213] *Id.* at 2186 (Breyer, J. dissenting) ("For example, Georgia made it unlawful to carry,
26 'unless in an open manner and fully exposed to view, any pistol, (except horseman's
   pistols,) dirk, sword in a cane, spear, bowie-knife, or any other kind of knives,
27 manufactured and sold for the purpose of offence and defence.' Ga. Code § 4413
   (1861).").
28 [214] *McDonald*, 561 U.S. at 771.

17-cv-1017-BEN (JLB)

Amendment protection.[215] Historical knife laws would be relevant in evaluating a modern prohibition on knives.  It is simply to say that historical *firearm* regulations are obviously more likely to be relevant analogues for modern *firearm* restrictions.

Even if knife regulations were relevant, they would not help the State much.[216] There were laws restricting bowie knives in some states in the 1800's, but not the vast majority of states.  There is also little evidence of actual prosecutions for simply

---

[215] *See, e.g.*, David B. Kopel, Clayton E. Cramer and Joseph E. Olson, *Knives and the Second Amendment*, 47 U. Mich. J. L. Reform 167, 168 (2013); Defs.' Compendium of Works, Dkt. 158-2, at 65, 67 ("This Article analyzes Second Amendment protection for the most common 'arm' in the United States – the knife.").

[216] This opinion is shared by two historians.  *See* David B. Kopel and Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. of Legis., Apr. 25, 2023, at 168–69 (2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197 [https://perma.cc/P85U-ASTZ] ("Bans on modern rifles and magazines cannot be rescued by diverting attention away from the legal history of firearms law, and instead pointing to laws about other arms.  Dozens of state and territorial legislatures enacted laws about Bowie knives, as well as dirks and daggers.  Prohibitory laws for these blades are fewer than the number of bans on carrying handguns, and *Bruen* found the handgun laws insufficient to establish a tradition constricting the Second Amendment.

As for other non-blade impact weapons, the sales and manufacture bans in a minority of states for slungshots and knuckles could be considered as involving arms "not typically possessed by law-abiding citizens for lawful purposes."

Other flexible impact arms, most notably blackjacks, were "typically possessed by law-abiding citizens for lawful purposes," especially by law enforcement officers.  Likewise, modern semiautomatic rifles and standard magazines are also highly preferred by today's law enforcement officers.

For blackjacks and sand clubs, only one state, New York, enacted a sales and manufacture ban. That came at a time when the legislature was unencumbered by a Second Amendment enforceable against the states or by a state constitution right to arms.  As *Bruen* teaches, a lone eccentric state does not create a national legal tradition.

For every arm surveyed in this article, the mainstream American legal tradition was to limit the mode of carry (no concealed carry), to limit sales to minors (either with bans or requirements for parental permission), and/or to impose extra punishment for use in a crime.

The fact that most states banned concealed carry of Bowie knives is not a precedent to criminalize the mere possession of modern rifles and magazines.").

17-cv-1017-BEN (JLB)

1  possessing a bowie knife, much less a judicial opinion on constitutionality.  One court
2  observed that a Tennessee bowie knife law was generally disregarded.[217]

3       The argument that a cluster of laws prohibiting the carrying of dangerous knives
4  could justify a gun ban, lost its wind in *McDonald*.  If the regulation of knives was not a
5  sufficient analogue for restricting handguns in Chicago, neither are regulations of dirks,
6  daggers, sword canes, and bowie knives useful analogues for prohibiting modern
7  magazines.

8       **C.   The State's Historic Analogue No. 3: Guns Set as Traps**

9       Historic laws prohibiting trap guns are proposed as a third analogue by the State.
10  What the State does not admit or seem to recognize is that "trap guns" are not guns at all.
11  They are a method by which a gun, any gun, can be set up to fire indiscriminately
12  through the use of springs, strings, or other atypical triggering mechanism without
13  needing an operator.  Nonetheless, absent from our history is a tradition of trap gun
14  restrictions in the important years between the 1791 and 1868.  The 1771 New Jersey trap
15  gun law, upon which the State relies, predates the Declaration of Independence, New
16  Jersey statehood,[218] and the Second Amendment.  Ninety-five years passed before a
17  second restriction on trap gun was enacted and that one applied only to the Utah Territory
18  (1865).  [80].  Within the states, the first regulation on setting a trap gun, was enacted in
19  Minnesota in 1873.  [109].  Two states followed later in 1875 (Michigan) and 1884

20

21

---

22  [217] *See, e.g.*, *Day v. State*, 37 Tenn. 496, 499 (Tenn. 1858) ("It is a matter of surprise that
23  these sections of this act, so severe in their penalties, *are so generally disregarded* in our
   cities and towns.") (describing state law prohibiting the concealed carrying of bowie
24  knives) (emphasis added).
25  [218] New Jersey was one of the few states that did not have in its state constitution a
   provision like the Second Amendment.  (Six states do not have provisions protecting a
26  right to arms in their state constitutions:  California, New Jersey, New York, Maryland,
27  Minnesota, and Iowa.)  *See* David B. Kopel and Clayton E. Cramer, *State Court
   Standards of Review for the Right to Keep and Bear Arms*, 50 Santa Clara L. Rev 1113,
28  1145 n.51 (2010).

(Vermont).  In other words, trap guns were not prohibited by law in the District of Columbia or 36 of the 37 states (then existing), until 1873.  California did not enact its own trap gun law until 1957.[219]  Court decisions between 1791 and 1868 recognized that it was entirely lawful to use trap guns (or spring guns, as they were sometimes called) to defend one's property.[220]  If this is what a national tradition of trap gun regulation looks like, it is a strange look, indeed.

Claiming trap guns were "dangerous weapons commonly used for criminal behavior and not for self-defense,"[221] the State has a problem with the facts.  There is little historical evidence that trap guns were used for criminal behavior.  Rather, guns

---

[219] *See* Cal. Fish & Game Code § 2007.

[220] *See, e.g.*, *Gray v. Combs*, 7 J. J. Marsh, 478 (Ky. 1832) (one who sets traps or spring guns to protect valuable property by means of which another is killed while attempting to enter the premises is guilty of no crime); *Loomis v. Terry*, 1837 WL 2808 (N.Y. Sup. Ct. 1837) ("It is not like setting spring guns with public notice of the fact; for even that has been held warrantable as being necessary (*Ilott v. Wilkes*, 3 Barn. & Ald. 304)."); *State v. Moore*, 31 Conn. 479, 479–80 (Conn. 1863) ("Breaking and entering a shop in the night season with intent to steal, is by our law burglary, and the placing of spring guns in such a shop for its defense, would be justified if a burglar should be killed by them."); *Maenner v. Carroll*, 46 Md. 193, 208 (Md. Ct. App. 1877) ("While it is decided that traps, spring-guns, and other dangerous instruments, may be lawfully placed on private grounds, for the purpose of deterring trespassers or catching strange animals doing damage . . . ."); *see also Simpson*, 59 Ala. at 18 (citing *Moore*, 31 Conn. at 479) ("The setting a spring-gun on his premises, by the owner, is culpable only because of the intent with which it is done.  Unless the public safety is thereby endangered, it is not indictable.  If dangerous to the public, it is indictable as a nuisance."); *United States v. Gilliam*, 25 F. Cas. 1319, 1320 and n.2 (D.C. Crim. Ct. 1882) ("The setting of a spring-gun as a protection for property, though not in itself unlawful and indictable, is certainly undeserving of encouragement. . . .") (citing English common law and the court of King's Bench, *Ilott v. Wilkes*, 3 Barn. & Ald. 304 ('A trespasser, having knowledge that there are spring-guns in a wood, although he may be ignorant of the particular spots where they are placed, cannot maintain an action for an injury received in consequence of his accidental treading on the latent wire connecting with the gun, and thereby letting it off.')).

[221] Defs' Br. in Resp., Dkt. 145, at 10 (quoting *Oregon Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 WL 17454829, at *13 (D. Or. Dec. 6, 2022), *appeal dismissed*, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022)).

17-cv-1017-BEN (JLB)

were set as traps by common people to protect their property from thieves and sometimes for self-defense against burglars.  Perhaps just as often trap guns were used to hunt game.  Historian and expert witness for the State, Robert Spitzer opines about trap guns: (1) "[t]hose who set gun traps typically did so to defend their places of business, properties, or possessions;" and (2) "opinion was more divided . . . with some arguing that thieves or criminals hurt or killed by the devices had it coming."[222]  So, when the State claims trap guns were used by criminals and not for self-defense, it gets the facts backwards.  The how and why of the two types of regulations are not relevantly similar, thus trap gun laws are not useful analogues for prohibiting modern magazines.

> **D.**    **The Best Analogue: Laws Requiring Citizens to Keep and Carry Sufficient Bullets and Gunpowder for Service in the Militia**

California ignores Founding-era laws that present the best analogue to its present-day magazine law.  These are the manifold early militia laws requiring each citizen, not to limit the amount of ammunition he could keep, but to arm himself with *enough* ammunition: at least 20 rounds.[223]

Government remains fixed on the notion that it alone can decide that anything larger than a 10-round magazine is not "suitable" for a citizen to have.  But, there are no analogous cases in our history.  There are no cases where American government dictated that lever-action rifles were unsuitable because single shot rifles were good enough, or

---

[222] (U.S.D.C. Oregon Dkt. 17-2 at ¶¶ 34–53) (first filed in the instant case).

[223] *See, e.g.*, 1784 Mass. Acts 142; 1786 N. Y. Laws 228; 1785 Va. Statutes at Large 12 (12 Hening c. 1); 1 Stat. 271 (1792) (Militia Act); Herbert L. Osgood, *The American Colonies in the Seventeenth Century*, 499–500 (1904) (explaining that states often required citizens to equip themselves with adequate firearms and ammunition, including between 20 and 24 cartridges at minimum); *Silveira v. Lockyer*, 328 F.3d 567, 586 (9th Cir. 2003) ("Much as building codes today require smoke detectors in the home, a man had to have a bullet mould, a pound of powder, four pounds of lead, and twenty bull[et]s, to be produced when called for by a militia officer.") (Kleinfeld, J., dissenting).

1   revolvers were unsuitable because derringers were good enough.[224] These choices have
2   always belonged to the People to decide for themselves how much firepower they need.

3        The right to have firearms for social security was important at the time the
4   Constitution was adopted.  There were many enemies of the young nation.  An armed
5   citizenry provided a much-needed deterrent effect.  Early citizens remembered how the
6   Minutemen of Lexington and Concord, Massachusetts, by assembling as a militia, fought
7   back against the hostile British march to take away guns and gunpowder in April 1776.

8        During the Nation's founding-era, federal and state governments enacted laws for
9   the formation and maintenance of citizen militias.  Three such statutes are described in
10  *Miller*.[225]  Rather than restricting too much firing capacity, the laws mandated a
11  minimum firing capacity.  These statutes required citizens to arm themselves with arms
12  and a minimum quantity of bullets and gunpowder, not to disarm themselves.  When
13  Congress passed the Militia Act in 1792,[226]  the law required a citizen to be equipped to
14  fire at least 20 to 24 shots.[227] A 1786 New York law required "no less than Twenty-four
15  Cartridges," and a 1785 Virginia law required a cartridge box and "four pounds of lead,

----

18  [224] "I surveyed the gun regulations in the Duke Historical Database from the early
19  medieval period through 1885 to see what terminology was used.  None of the laws that
20  prohibit weapons, aside from the Maryland statute above, specifies a gun part or
    ammunition case or accoutrements of any kind.  Although many present a list of banned
21  or prohibited weapons – usually without defining them [the assumption is that the reader
    knows what they refer to], none of the laws mention cartridge boxes, bullets, barrels, or
22  other parts of any weapons." Declaration of Dennis Baron, Dkt. 118-2, at ¶ 56.
23  [225] 307 U.S. 174 (1939)
    [226] 1 Stat. 271, 2 Cong. Ch. 33.
24  [227] "That every citizen so enrolled and notified, shall, within six months thereafter,
25  provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare
    flints, and a knapsack, a pouch with a box therein to contain not less than *twenty-four*
26  *cartridges*, suited to the bore of his musket or firelock, each cartridge to contain a proper
27  quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn,
    *twenty balls* suited to the bore of his rifle and a quarter of a pound of powder."
28  (Emphasis added).

17-cv-1017-BEN (JLB)

1    including twenty blind cartridges." In 1776, Paul Revere's Minutemen were required to
2    have 30 bullets and gunpowder.

3          These and other citizen militia laws demonstrate that, contrary to the idea of a
4    firing-capacity upper limit on the number of rounds permitted, there was a legal
5    obligation for the average citizen to have at least 20 rounds available for immediate
6    use.[228] There were no upper limits like § 32310; there were floors and the floors were
7    well above 10 rounds.[229] California's large capacity magazine ban is a diametrically
8    opposed analogue.

9          As one court explained, "[u]nder *Bruen*, the Second Amendment does not 'forbid
10   all laws other than those that *actually existed* at or around the time of the Second
11   Amendment's adoption,' but rather 'the Second Amendment must, at most, forbid laws
12   that could not have existed under the understanding of the right to bear arms that
13   prevailed at the time.'"[230] California's large capacity magazine ban did not exist and
14   could not have existed under the understanding of the Second Amendment at the time of
15   the Founding.  This is clear because militia laws of the federal and state governments
16   required citizens to keep and carry more ammunition supplies than 10 rounds.  A
17   prohibition like § 32310 would have been impossible to enforce and runs contrary to
18   legal commands for militia readiness.

19   **VI.   <u>CONCLUSION</u>**

20         Removable firearm magazines of all sizes are necessary components of
21   semiautomatic firearms.  Therefore, magazines come within the text of the constitutional

---

[228] *Teixeira v. Cty. Of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (citing Joyce Lee
Malcolm, *To Keep and Bear Arms* 139 (1994)) ("the colonial militia played a primarily
defensive role . . . . The dangers all the colonies faced . . . were so great that not only
militia members but all householders were ordered to be armed.").
[229] *Duncan*, 366 F. Supp. at 1150.
[230] Def's Br. in Resp., Dkt. 142 at 16 (quoting *United States v. Kelly*, No. 3:22-cr-00037,
2022 U.S. Dist. LEXIS 215189, at *14 n.7 (M.D. Tenn. Nov. 16, 2022)).

1  declaration that the right to keep and bear arms shall not be infringed.  Because millions

2  of removable firearm magazines able to hold between 10 and 30 rounds are commonly

3  owned by law-abiding citizens for lawful purposes, including self-defense, and because

4  they are reasonably related to service in the militia, the magazines are presumptively

5  within the protection of the Second Amendment.  There is no American history or

6  tradition of regulating firearms based on the number of rounds they can shoot, or of

7  regulating the amount of ammunition that can be kept and carried.  The best analogue that

8  can be drawn from historical gun laws are the early militia equipment regulations that

9  required all able-bodied citizens to equip themselves with a gun and a minimum amount

10  of ammunition in excess of 10 rounds.

11        Because the State did not succeed in justifying its sweeping ban and dispossession

12  mandate with a relevantly similar historical analogue, California Penal Code § 32310, as

13  amended by Proposition 63, is hereby declared to be unconstitutional in its entirety and

14  shall be enjoined.  At this time, the Court's declaration does not reach the definition of a

15  large capacity magazine in California Penal Code § 16740 where it is used in other parts

16  of the Penal Code to define other gun-related crimes or enhance criminal penalties.

17        One government solution to a few mad men with guns is a law that makes into

18  criminals responsible, law-abiding people wanting larger magazines simply to protect

19  themselves.  The history and tradition of the Second Amendment clearly supports state

20  laws against the use or misuse of firearms with unlawful intent, but not the disarmament

21  of the law-abiding citizen.  That kind of a solution is an infringement on the

22  Constitutional right of citizens to keep and bear arms.  The adoption of the Second

23  Amendment was a freedom calculus decided long ago by our first citizens who cherished

24  individual freedom with its risks more than the subservient security of a British ruler or

25  the smothering safety of domestic lawmakers.  The freedom they fought for was worth

26  fighting for then, and that freedom is entitled to be preserved still.

27        The Attorney General respectfully requests a stay of any judgment in Plaintiffs'

28  favor for a sufficient period to seek a stay from the Court of Appeals.  Dkt. 118 at 61–63;

Dkt. 142 at 25.  That request is granted.  Therefore, the enforcement of the injunction is hereby stayed for ten days.

**IT IS HEREBY ORDERED** that:

1. Defendant Attorney General Rob Bonta, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order, or know of the existence of this injunction order, are enjoined from enforcing California Penal Code § 32310.

2. Defendant Rob Bonta shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.

3. This injunction is stayed for ten (10) days from the date of this Order.

**IT IS SO ORDERED.**

Date: September 22, 2023

_____
HON. ROGER T. BENITEZ
United States District Judge

71

17-cv-1017-BEN (JLB)

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., | Case No.: 3:17cv1017-BEN (JLB) |
| Plaintiffs, | **ORDER GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, DECLARING CALIFORNIA PENAL CODE § 32310 UNCONSTITUTIONAL and ENJOINING ENFORCEMENT** |
| v. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | |

Individual liberty and freedom are *not* outmoded concepts. "The judiciary is – and is often the only – protector of individual rights that are at the heart of our democracy." -- Senator Ted Kennedy, Senate Hearing on the Nomination of Robert Bork, 1987.[1]

## I.   INTRODUCTION

As two masked and armed men broke in, Susan Gonzalez was shot in the chest. She made it back to her bedroom and found her husband's .22 caliber pistol. Wasting the first rounds on warning shots, she then emptied the single pistol at one attacker. Unfortunately, now out of ammunition, she was shot again by the other armed attacker.

---

[1] Norma Vieira & Leonard Gross, *Supreme Court Appointments: Judge Bork and the Politicization of Senate Confirmations* 26 (Southern Illinois University Press 1998).

She was not able to re-load or use a second gun.  Both she and her husband were shot twice.  Forty-two bullets in all were fired.  The gunman fled from the house—but returned.  He put his gun to Susan Gonzalez's head and demanded the keys to the couple's truck.[2]

When three armed intruders carrying what look like semi-automatic pistols broke into the home of a single woman at 3:44 a.m., she dialed 911.  No answer.  Feng Zhu Chen, dressed in pajamas, held a phone in one hand and took up her pistol in the other and began shooting.  She fired numerous shots.  She had no place to carry an extra magazine and no way to reload because her left hand held the phone with which she was still trying to call 911.  After the shooting was over and two of the armed suspects got away and one lay dead, she did get through to the police.  The home security camera video is dramatic.[3]

A mother, Melinda Herman, and her nine-year-old twins were at home when an intruder broke in.  She and her twins retreated to an upstairs crawl space and hid.  Fortunately, she had a .38 caliber revolver.  She would need it.  The intruder worked his way upstairs, broke through a locked bedroom door and a locked bathroom door, and opened the crawl space door.  The family was cornered with no place to run.  He stood staring at her and her two children.  The mother shot six times, hitting the intruder five

---

[2] *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1130-31 (S.D. Cal. 2017) (citing *Jacksonville Times-Union*, July 18, 2000).

[3] Lindsey Bever, *Armed Intruders Kicked in the Door*, Washington Post (Sept. 24, 2016), https://www.washingtonpost.com/news/true-crime/wp/2016/09/24/armed-intruders-kicked-in-the-door-what-they-found-was-a-woman-opening-fire/?noredirect=on&utm_term=.80336ab1b09e; *see also YouTube*, https://youtu.be/ykiSTkmt5-w (last viewed Mar. 20, 2019); Habersham, Raisa, *Suspect Faces Murder Charge 18 Months After Homeowner Shot at Him, Intruders,* The Atlanta-Journal-Constitution (Mar. 30, 2018) https://www.ajc.com/news/crime--law/suspect-faces-murder-charge-months-after-homeowner-shot-him-intruders/W4CW5wFNFdU6QIEFo0CtGM (last visited Mar. 27, 2019).  Although this news account is not in the parties' exhibits, it is illustrative.

3:17cv1017-BEN (JLB)

1    times, when she ran out of ammunition.  Though injured, the intruder was not

2    incapacitated.  Fortunately, he decided to flee.[4]

3    **A.  A Need for Self-Defense**

4         In one year in California (2017), a population of 39 million people endured 56,609

5    robberies, 105,391 aggravated assaults, and 95,942 residential burglaries.[5]  There were

6    also 423 homicides in victims' residences.[6] There were no mass shootings in 2017.

7    Nationally, the first study to assess the prevalence of defensive gun use estimated that

8    there are 2.2 to 2.5 million defensive gun uses by civilians each year.  Of those, 340,000

9    to 400,000 defensive gun uses were situations where defenders believed that they had

10   almost certainly saved a life by using the gun.[7] Citizens often use a gun to defend against

11   criminal attack.  A Special Report by the U.S. Department of Justice, Bureau of Justice

12   Statistics published in 2013, reported that between 2007 and 2011 "there were 235,700

13   victimizations where the victim used a firearm to threaten or attack an offender."[8] How

14   many more instances are never reported to, or recorded by, authorities?  According to

15   another U.S. Department of Justice, Bureau of Justice Statistics, Special Report, for each

---

18   [4] Robin Reese, *Georgia Mom Shoots Home Invader, Hiding With Her Children*, ABC
19   News (Jan. 8, 2013), https://abcnews.go.com/US/georgia-mom-hiding-kids-shots-
20   intruder/story?id=18164812 (last viewed Mar. 22, 2019) (includes video and recording of
     911 call).  Although this news account is not in the parties' exhibits, it is illustrative.
21   [5] Xavier Becerra, *Crime in California (2017)* and *Homicide in California (2017),*
22   (https://openjustice.doj.ca.gov/resources/publications).  Under Rules of Evidence 201(b)
     courts may take judicial notice of some types of public records, including reports of
23   administrative bodies.
24   [6] *Id.*
     [7] *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature*
25   *of Self–Defense with a Gun,* 86 J. Crim. L. & Criminology 150, 164, 177 (1995) (cited in
     *Heller v. D.C. (Heller II)*, 670 F.3d 1244, 1262 (D.C. Cir. 2011).
26   [8] *See* Planty, Michael and Truman, Jennifer, *Firearm Violence, 1993-2011* (2013), at p.11
27   and Table 11  www.bjs.gov/content/pub/pdf/fv9311.pdf (last visited Mar. 19, 2019).
     Under Rules of Evidence 201(b) courts may take judicial notice of some types of public
28   records, including reports of administrative bodies.

3

1    year between 2003 and 2007, an estimated 266,560 burglaries occurred during which a

2    person at home became a victim of a violent crime or a "home invasion."[9]  "Households

3    composed of single females with children had the highest rate of burglary while someone

4    was at home."[10]  Of the burglaries by a stranger where violence occurred, the assailant

5    was armed with a firearm in 73,000 instances annually (on average).[11]  During a burglary,

6    rape or sexual assault occurred 6,387 times annually (on average), while a homicide

7    occurred approximately 430 times annually (on average).[12]

8         Fortunately, the Second Amendment protects a person's right to keep and bear

9    firearms.  The Second Amendment provides: "A well regulated Militia, being necessary

10   to the security of a free State, the right of the people to keep and bear Arms, shall not be

11   infringed."  U.S. Const. amend. II.  "As interpreted in recent years by the Supreme Court,

12   the Second Amendment protects 'the right of law-abiding, responsible citizens to use

13   arms in defense of hearth and home.'"  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 676–

14   77 (9th Cir. 2017), *cert. denied sub nom. Teixeira v. Alameda Cty.*, 138 S. Ct. 1988

15   (2018) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).  At the core of

16   the Second Amendment is a citizen's right to have in his and her home for self-defense

17   common firearms.  *Heller*, 554 U.S. at 629.  "[O]ur central holding in *Heller* [is] that the

18   Second Amendment protects a personal right to keep and bear arms for lawful purposes,

19   most notably for self-defense within the home."  *McDonald v. City of Chicago*, 561 U.S.

20   742, 780 (2010).

21

22

23   _____

24   [9] Catalano, Shannan, *Victimization During Household Burglary*, U.S. D.O.J., Bureau of
25   Justice Statistics (Sept. 2010) https://www.bjs.gov/content/pub/pdf/vdhb.pdf  (last visited
     Mar. 28, 2019).  Under Rules of Evidence 201(b) courts may take judicial notice of some
26   types of public records, including reports of administrative bodies.
27   [10] *Id.* at p.3.
     [11] *Id.* at p.10.
28   [12] *Id.*

4

1    As evidenced by California's own crime statistics, the need to protect one's self
2    and family from criminals in one's home has not abated no matter how hard they try.
3    Law enforcement cannot protect everyone.  "A police force in a free state cannot provide
4    everyone with bodyguards.  Indeed, while some think guns cause violent crime, others
5    think that wide-spread possession of guns on balance reduces violent crime.  None of
6    these policy arguments on either side affects what the Second Amendment says, that our
7    Constitution protects 'the right of the people to keep and bear Arms.'"  *Silveira v.*
8    *Lockyer*, 328 F.3d 567, 588 (9th Cir. 2003) (Kleinfeld, J., dissenting from denial of
9    rehearing *en banc*).  However, California citizens, like United States citizens everywhere,
10   enjoy the right to defend themselves with a firearm, if they so choose.  To protect the
11   home and hearth, citizens most often choose a handgun, while some choose rifles or
12   shotguns.

13   **B.  Are 10 Rounds Always Enough?**

14        If a law-abiding, responsible citizen in California decides that a handgun or rifle
15   with a magazine larger than 10 rounds is the best choice for defending her hearth and
16   home, may the State deny the choice, declare the magazine a "nuisance," and jail the
17   citizen for the crime of possession?  The Attorney General says that is what voters want
18   in hopes of preventing a rare, but horrible, mass shooting.  The plaintiffs, who are also
19   citizens and residents of California, say that while the goal of preventing mass shootings
20   is laudable, banning the acquisition and possession of magazines holding more than 10
21   rounds is an unconstitutional experiment that poorly fits the goal.  From a public policy
22   perspective, the choices are difficult and complicated.  People may cede liberty to their
23   government in exchange for the promise of safety.  Or government may gain compliance
24   from its people by forcibly disarming all.[13]  In the United States, the Second Amendment

25

26   _____

27   [13]  *E.g.,* on November 10, 1938, the day after the horrific Night of Broken Glass, or
28   *Kristallnacht*, the Nazis issued an order that "Jews may not henceforth buy or carry
     weapons," and those found in possession of arms "would be sent to concentration camps

takes the legislative experiment off the table.[14]  Regardless of current popularity, neither a legislature nor voters may trench on constitutional rights.  "An unconstitutional statute adopted by a dozen jurisdictions is no less unconstitutional by virtue of its popularity." *Silveira*, 312 at 1091.

## C.  Mass Shooting vs. Common Crimes

When they occur, mass shootings are tragic.  Innocent lives are senselessly lost while other lives are scarred forever.  Communities are left shaken, frightened, and grieving.  The timeline of the tragedy, the events leading up to the shooting, and the repercussions on family and friends after the incident, fill the national media news cycle for days, weeks and years.  Who has not heard about the Newtown, Connecticut, mass shooting at Sandy Hook Elementary School, or the one at a high school in Parkland, Florida?  But an individual victim gets little, if any, media attention, and the attention he or she gets is local and short-lived.  For example, who has heard about the home invasion attack on Melinda Herman and her twin nine-year old daughters in Georgia only one month after the Sandy Hook incident?[15]  Who has heard of the attacks on Ms. Zhu Chen

---

for twenty years." *First Anti-Jew Laws Issued, Possession of Arms*, New York Times (Nov. 11, 1938).

[14]  "To be sure, assault rifles and large capacity magazines are dangerous.  But their ability to project large amounts of force accurately is exactly why they are an attractive means of self-defense.  While most persons do not require extraordinary means to defend their homes, the fact remains that some do.  Ultimately, it is up to the lawful gun owner and not the government to decide these matters.  To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitution and to our political tradition.  The rights contained in the Second Amendment are 'fundamental' and 'necessary to our system of ordered liberty.'  The government recognizes these rights; it does not confer them."  *Friedman v. City of Highland Park*, 784 F.3d 406, 417-18 (7th Cir. 2015) (Manion, J., dissenting).

[15]  Phillips, Rich, *Armed Mom Takes Down Home Invader*, CNN (Jan. 11, 2013) https://www.cnn.com/2013/01/10/us/home-invasion-gun-rights (includes video) (last visited Mar. 22, 2019).

1    or Ms. Gonzalez and her husband?[16] Are the lives of these victims worth any less than

2    those lost in a mass shooting?  Would their deaths be any less tragic?  Unless there are a

3    lot of individual victims together, the tragedy goes largely unnoticed.

4         That is why mass shootings can seem to be a common problem, but in fact, are

5    exceedingly rare.  At the same time robberies, rapes, and murders of individuals are

6    common, but draw little public notice.  As in the year 2017, in 2016 there were numerous

7    robberies, rapes, and murders of individuals in California and no mass shootings.[17]

8    Nevertheless, a gubernatorial candidate was successful in sponsoring a statewide ballot

9    measure (Proposition 63).  Californians approved the proposition and added

10   criminalization and dispossession elements to existing law prohibiting a citizen from

11   acquiring and keeping a firearm magazine that is able to hold more than 10 rounds.  The

12   State now defends the prohibition on magazines, asserting that mass shootings are an

13   urgent problem and that restricting the size of magazines a citizen may possess is part of

14   the solution.  Perhaps it is part of the solution.

15        Few would say that a 100 or 50-round rifle magazine in the hands of a murderer is

16   a good idea.  Yet, the "solution" for preventing a mass shooting exacts a high toll on the

17   everyday freedom of ordinary law-abiding citizens.  Many individual robberies, rapes,

18   and shootings are not prevented by the State.  Unless a law-abiding individual has a

19   firearm for his or her own defense, the police typically arrive after it is too late.  With

20   rigor mortis setting in, they mark and bag the evidence, interview bystanders, and draw a

21   chalk outline on the ground.  But the victim, nevertheless, is dead, or raped, or robbed, or

22   traumatized.

23        As Watson County Sheriff Joe Chapman told CNN about Melinda Herman and her

24   twin nine-year-old daughters in the attic (the third incident described above), "[h]ad it not

---

[16] *See* n.2-3, *supra*.
[17] Xavier Becerra, *Crime in California (2016)* and *Homicide in California (2016)*,
(https://openjustice.doj.ca.gov/resources/publications).

3:17cv1017-BEN (JLB)

1  turned out the way that it did, I would possibly be working a triple homicide, not having a

2  clue as to who it is we're looking for."[18]  The Second Amendment protects the would-be

3  American victim's freedom and liberty to take matters into one's own hands and protect

4  one's self and family until help arrives.

5  **D.  California Law Makes it a Crime to Have More Than 10 Rounds**

6         For all firearms, California law allows only the acquisition and possession of

7  magazines that hold ten rounds or less.[19]  Claiming that the *average* defensive use of a

8  gun requires firing only 2.2 rounds, the State's voters and legislators have decided that a

9  responsible, law-abiding citizen *needs* no more than ten rounds to protect one's self,

10  family, home, and property.  "No one except trained law enforcement should be able to

11  possess these dangerous ammunition magazines [which hold more than 10 rounds]."

12  Proposition 63; *A.G.'s Oppo. to P's Motion for Summary Jgt.*, at 20 ("LCMs *are not*

13  *necessary* to exercise 'the fundamental right of self defense in the home.'") (emphasis

14  added); *A.G.'s Oppo. to P's Motion for Summary Jgt.*, at 21 ("There is simply no study or

15  systematic data to suggest that LCMs are *necessary* for self-defense.") (emphasis added)

16  (citations omitted).  Susan Gonzalez and her husband, the single woman awoken in the

17  night, and the mother home alone with her nine-year-old twin daughters all needed to fire

18  considerably more than 2.2 shots to protect themselves.[20]  In fact, Gonzalez and the mom

19  of twins ran out of ammunition.

20         In other words, a Californian may have a pistol with a 10-round magazine in hopes

21  of fighting off a home invasion robbery.  But if that Californian grabs a pistol containing

22  a 17-round magazine, it is now the home-defending victim who commits a new crime.

23

24  _____

25  [18] Phillips, Rich, *Armed Mom Takes Down Home Invader*, CNN (Jan. 11, 2013)

26  https://www.cnn.com/2013/01/10/us/home-invasion-gun-rights (includes video) (last
   visited Mar. 22, 2019)

27  [19] There is an exception for "tubular" magazines which are typically found in lever action
   rifles.

28  [20] *See* n.2-4, *supra*.

8

That is because California law declares acquisition and possession of a magazine able to hold more than ten rounds (*i.e.,* a "large capacity magazine" or "LCM") a crime.  *See* Cal. Penal Code § 32310;[21] § 16740.[22]  For simple possession of a magazine holding

---

[21] Section 32310 states:

(a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b) For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

(c) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:

    (1) Remove the large-capacity magazine from the state;

    (2) Sell the large-capacity magazine to a licensed firearms dealer; or

    (3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

Cal. Penal Code § 32310 (2019)(West).

[22] Section 16740 states:

As used in this part, "large-capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:

    (a) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.

    (b) A .22 caliber tube ammunition feeding device.

    (c) A tubular magazine that is contained in a lever-action firearm.

1   more than 10 rounds, the crime is an infraction under § 32310(c).  It is a much more

2   serious crime to acquire a magazine holding more than 10-rounds in California by

3   importing, buying, borrowing, receiving, or manufacturing.  These acts may be punished

4   as a misdemeanor or a felony under § 32310(a) ("any person in this state who

5   manufactures or causes to be manufactured, imports into the state, keeps for sale, or

6   offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity

7   magazine is punishable by imprisonment in a county jail not exceeding one year or

8   imprisonment pursuant to subdivision (h) of Section 1170").  Under the subsection's

9   provision, "or imprisonment pursuant to subdivision (h) of Section 1170," punishment

Cal. Penal Code § 16740 (2019)(West).

10

1   may be either a misdemeanor or a felony.[23] California's gun laws are lengthy and

2   complicated.[24]  The statutes concerning magazines alone are not simple.[25]

_____

[23] *See e.g., People v. Le Bleu*, 2018 Cal. App. Unpub. LEXIS 7851*1 (Nov. 13, 2018) ("count 5 charged him with felony receipt of a large-capacity magazine (Pen. Code, § 32310, subd. (a))."); *People v. Obrien*, 2018 Cal. App. Unpub. LEXIS 4992*1 (July 23, 2018) (based on handgun with 16 rounds of ammunition found under car seat, "[t]he People charged Obrien in a three-count felony complaint with . . . manufacturing, importing, keeping for sale, or giving or receiving a large capacity magazine (§ 32310, subd. (a))."); *People v. Rodriguez*, 2017 Cal. App. Unpub. LEXIS 5194*1 (July 26, 2017) ("Defendant Santino Rodriguez pleaded no contest to possessing a large-capacity magazine, a felony, and the trial court placed him on probation for three years."); *People v. Verches*, 2017 Cal. App. Unpub. LEXIS 3238*11-12 (May 9, 2017) (California resident who purchased three 30-round magazines at Nevada gun show and returned to California charged with felony importation of a large capacity magazine under former Cal. Pen. Code § 12020(a)(2)).

[24] In a dissent, Judge Tallman describes as "substantial" the burden imposed by the myriad anti-gun legislation in California and the decisions upholding the legislation. Judge Tallman notes, "Our cases continue to slowly carve away the fundamental right to keep and bear arms.  Today's decision further lacerates the Second Amendment, deepens the wound, and resembles the Death by a Thousand Cuts.  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 694 (9th Cir. 2017), *cert. denied sub nom. Teixeira v. Alameda Cty., Cal.*, 138 S. Ct. 1988 (2018).

[25] Here is an example of the way in which the state's firearm laws are so complex as to obfuscate the Second Amendment rights of a citizen who intends to abide by the law.  A person contemplating either returning home from an out-of-state hunting trip with a 30-round rifle magazine or who is considering buying, borrowing, or being given, or making his own 15-round handgun magazine, will have to do the following legal research.

First, he or she must find and read § 32310.  Hardly a model of clarity, § 32310(a) begins with references to unnamed exceptions at "Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2."  Once the reader finds the exceptions and determines that he or she is not excepted, he or she must still find the definition of a "large-capacity magazine," itself something of a misnomer.  Section 32310 is no help.  "Large-capacity magazines" are defined in a distant section of the Penal Code under § 16740 and defined in terms of an uncommonly small number of rounds (10).  *See* n.22, *supra*.  Having found § 16740, and now mentally equipped with the capacity-to-accept-more-than-10-rounds definition of a "large capacity magazine," the citizen reader can return to § 32310(c) and find that mere possession is unlawful and punishable as an increasingly severe infraction.

3:17cv1017-BEN (JLB)

**ER_84**

1

2

_____

3
4
Unfortunately, he or she may incorrectly believe that criminal possession will be his or her only crime if the hunter brings a large capacity magazine back home from the hunting trip, because that is criminalized as "importing" under § 32310(a).

5
6
7
8
9
10
11
12
13
And § 32310(a) also covers buying, receiving, and making his or her own large capacity magazine. Even if the citizen realizes that he or she commits a crime by importing, buying, receiving, or manufacturing a large capacity magazine, the citizen will probably read § 32310(a) as punishing these crimes as misdemeanors. However, the careful reader who follows up on the odd reference to section (h) of § 1170 may understand that these offenses may also be punished as felonies. Section 1170(h)(1) states, "[e]xcept as provided in paragraph (3), a felony punishable pursuant to this subdivision where the term is not specified in the underlying offense shall be punishable by a term of imprisonment in the county jail for 16 months, or two or three years." California refers to such crimes that may be punished as either felonies or misdemeanors as "wobblers." And is the citizen wrong to think that simply *loaning* a large capacity magazine *is* lawful under § 32415? Section 32415, titled *Loan of lawfully possessed large-capacity magazine between two individuals; application of Section 32310*, states,

14
15
16
17
18
19
20
Section 32310 does not apply to the loan of a lawfully possessed large-capacity magazine between two individuals if all of the following conditions are met: (a) The person being loaned the large-capacity magazine is not prohibited by Chapter 1 (commencing with Section 29610), Chapter 2 (commencing with Section 29800), or Chapter 3 (commencing with Section 29900) of Division 9 of this title or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition[; and] (b) The loan of the large-capacity magazine occurs at a place or location where the possession of the large-capacity magazine is not otherwise prohibited, and the person who lends the large-capacity magazine remains in the accessible vicinity of the person to whom the large-capacity magazine is loaned.

21
22
23
24
25
26
27
28
It is enough to make an angel swear. Suffice it to say that either the law-abiding hunter returning home with a 30-round rifle magazine, or the resident that receives from another a 15-round pistol magazine, or the enthusiast who makes a 12-round magazine out of a 10-round magazine, may be charged not with a minor infraction but with a felony. And perhaps not ironically, conviction as a felon carries with it the complete forfeiture of Second Amendment rights for a lifetime. For Second Amendment rights, statutory complexity of this sort extirpates as it obfuscates. And in the doing, it violates a person's constitutional right to due process. "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally*).

12

Absent from these provisions is any qualifying language: *all* forms of possession by ordinary citizens are summarily criminalized.  For example, the statutes make no distinction between possessing and storing a 15-round magazine at home (a reasonable non-threatening act) and carrying a rifle with a 100-round magazine while sitting outside a movie theatre or school (a potentially threatening and suspicious act).  Each constitutes criminal possession and is prohibited outright.  *C.f.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 417 (7th Cir. 2015) (Manion, J., dissenting) ("Notably absent from this provision is any qualifying language: *all* forms of possession are summarily prohibited.  Other laws notwithstanding, the ordinance makes no distinction between storing large-capacity magazines in a locked safe at home and carrying a loaded assault rifle while walking down Main Street.  Both constitute 'possession' and are prohibited outright.").  According to the U.S. Supreme Court's reasoning, acquiring, possessing, or storing a commonly-owned 15-round magazine at home for self-defense is protected at the core of the Second Amendment.  Possessing a loaded 100-round rifle and magazine in a crowded public area may not be.

All Californians, like all citizens of the United States, have a fundamental Constitutional right to keep and bear common and dangerous arms.  The nation's Founders used arms for self-protection, for the common defense, for hunting food, and as a check against tyranny.  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 686 (9th Cir. 2017)

---

Unfortunately, firearm regulations are often complex and prolix.  For example, U.S. House of Representative Steve Scalise, R-La., remarked that a hunter would need to bring along an attorney to make sure the hunter did not accidently commit a felony under recently proposed federal legislation.  According to PBS News Hour, Scalise said, "'What it would do is make criminals out of law-abiding citizens . . . . If you go hunting with a friend and your friend wants to borrow your rifle, you better bring your attorney with you because depending on what you do with that gun you may be a felon if you loan it to him.'"  Matthew Daly, *Gun control legislation pass House, but faces dim prospects in Senate,* PBS News Hour, https://www.pbs.org/newshour/politics/gun-control-legislation-pass-house-but-faces-dim-prospects-in-senate (last visited Mar. 1, 2019).

1   (en banc) ("[T]he right to bear arms, under both earlier English law and American law at

2   the time the Second Amendment was adopted, was understood to confer a right upon

3   individuals to have and use weapons for the purpose of self-protection, at least in the

4   home."), and ("The British embargo and the colonists' reaction to it suggest . . . the

5   Founders were aware of the need to preserve citizen *access* to firearms in light of the risk

6   that a strong government would use its power to disarm the people.  Like the British right

7   to bear arms, the right declared in the Second Amendment of the U.S. Constitution was

8   thus 'meant to be a strong moral check against the usurpation and arbitrary power of

9   rulers, and as a necessary and efficient means of regaining rights when temporarily

10  overturned by usurpation.'") (citations omitted).

11       Today, self-protection is most important.  In the future, the common defense may

12  once again be most important.  Constitutional rights stand through time holding fast

13  through the ebb and flow of current controversy.  Needing a solution to a current law

14  enforcement difficulty cannot be justification for ignoring the Bill of Rights as bad

15  policy.   Bad political ideas cannot be stopped by criminalizing bad political speech.

16  Crime waves cannot be broken with warrantless searches and unreasonable seizures.

17  Neither can the government response to a few mad men with guns and ammunition be a

18  law that turns millions of responsible, law-abiding people trying to protect themselves

19  into criminals.  Yet, this is the effect of California's large-capacity magazine law.

20              **II.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

21       Plaintiffs have challenged California's firearm magazine law as being

22  unconstitutional.  They now move for summary judgment.  The standards for evaluating a

23  motion for summary judgment are well known and have changed little since discussed by

24  the U.S. Supreme Court thirty years ago in a trilogy of cases (*Celotex Corp. v. Catrett*,

25  477 U.S. 317 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and

26  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986)).  The standards

27  need not be repeated here.

28

3:17cv1017-BEN (JLB)

**A. The Second Amendment**

Plaintiffs contend that there is no genuine dispute that the Second Amendment to the United States Constitution protects the individual right of every law-abiding citizen to acquire, possess, and keep common firearms and their common magazines holding more than 10 rounds – magazines which are typically possessed for lawful purposes. Plaintiffs also contend that the state of California has not carried its burden to demonstrate a reasonable fit between the flat ban on such magazines and its important interests in public safety. Plaintiffs contend that the state's magazine ban thus cannot survive constitutionally-required heightened scrutiny and they are entitled to declaratory and injunctive relief as a matter of law. Plaintiffs are correct.

### 1. The Supreme Court's Simple Heller Test

In *Heller,* the U.S. Supreme Court provided a simple Second Amendment test in crystal clear language. It is a test that anyone can understand. The right to keep and bear arms is a right enjoyed by law-abiding citizens to have arms that are not unusual "in common use" "for lawful purposes like self-defense." *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008); *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1271 (2011) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny."). It is a hardware test. Is the firearm hardware commonly owned? Is the hardware commonly owned by law-abiding citizens? Is the hardware owned by those citizens for lawful purposes? If the answers are "yes," the test is over. The hardware is protected.

Millions of ammunition magazines able to hold more than 10 rounds are in common use by law-abiding responsible citizens for lawful uses like self-defense. This is enough to decide that a magazine able to hold more than 10 rounds passes the *Heller* test and is protected by the Second Amendment. The simple test applies because a magazine is an essential mechanical part of a firearm. The size limit directly impairs one's ability to defend one's self.

15

1       Neither magazines, nor rounds of ammunition, nor triggers, nor barrels are

2   specifically mentioned in the Second Amendment.  Neither are they mentioned in *Heller.*

3   But without a right to keep and bear triggers, or barrels, or ammunition and the

4   magazines that hold ammunition, the Second Amendment right would be meaningless.

5   *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[T]o the extent that

6   certain firearms capable of use with a magazine—*e.g.*, certain semi-automatic

7   handguns—are commonly possessed by law-abiding citizens for lawful purposes, our

8   case law supports the conclusion that there must also be some corollary, albeit not

9   unfettered, right to possess the magazines necessary to render those firearms operable.");

10  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("We

11  recognized in *Jackson* that, although the Second Amendment 'does not explicitly protect

12  ammunition, [but] without bullets, the right to bear arms would be meaningless.'  *Jackson*

13  thus held that 'the right to possess firearms for protection implies a corresponding right'

14  to obtain the bullets necessary to use them.") (citations omitted); *see also Ass'n of N.J.*

15  *Rifle & Pistol Clubs v. A.G. N.J.,* 910 F.3d 106, 116 (3rd Cir. 2018) ("The law challenged

16  here regulates magazines, and so the question is whether a magazine is an arm under the

17  Second Amendment.  The answer is yes.  A magazine is a device that holds cartridges or

18  ammunition.  Regulations that eliminate 'a person's ability to obtain or use ammunition

19  could thereby make it impossible to use firearms for their core purpose.'  Because

20  magazines feed ammunition into certain guns, and ammunition is necessary for such a

21  gun to function as intended, magazines are 'arms' within the meaning of the Second

22  Amendment.") (citations omitted).  Consequently, the same analytical approach ought to

23  be applied to both firearms and the ammunition magazines designed to make firearms

24  function.

25      Under the simple test of *Heller*, California's § 32310 directly infringes Second

26  Amendment rights.  It directly infringes by broadly prohibiting common firearms and

27  their common magazines holding more than 10 rounds, because they are not unusual and

28  are commonly used by responsible, law-abiding citizens for lawful purposes such as self-

1    defense.  And "that is all that is needed for citizens to have a right under the Second

2    Amendment to keep such weapons."  *Friedman v. City of Highland Park*, 136 S. Ct. 447,

3    449 (2015) (Justices Thomas and Scalia dissenting from denial of certiorari)

4    (commenting on what *Heller*'s test requires).  Although it may be argued that a 100-

5    round, or a 50-round, or possibly even a 30-round magazine may not pass the *Heller*

6    hardware test, because they are "unusual," the State has proffered no credible evidence

7    that would support such a finding.  Using the simple *Heller* test, a decision about firearm

8    hardware regulations could end right here.

9        This is not to say the simple *Heller* test will apply to non-hardware firearm

10   regulations such as gun store zoning laws,[26] or firearm serial number requirements.[27]  *Cf.*

11   *Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106, 127 (3rd Cir. 2018) (Bibas,

12   J., dissenting) ("Not every gun law impairs self-defense.  Our precedent applies

13   intermediate scrutiny to laws that do not affect weapons' function, like serial-number

14   requirements.  But for laws that do impair self-defense, strict scrutiny is apt.").

15       *2. Commonality*

16       Magazines holding more than 10 rounds are used for self-defense by law-abiding

17   citizens.  And they are common.[28]  Lawful in at least 41 states and under federal law,

18   these magazines number in the millions.  Plaintiff's Exh. 1 (James Curcuruto Report), at

19   3 ("There are at least *one hundred million* magazines of a capacity of more than ten

20   rounds in possession of American citizens, commonly used for various lawful purposes

---

[26] *Teixeira,* 873 F.3d at 670.

[27] *United States v. Marzzarella*, 614 F.3d 85, 101 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011) ("[W]e hesitate to say Marzzarella's possession of an unmarked firearm [without a serial number] in his home is unprotected conduct.  But because § 922(k) would pass muster under either intermediate scrutiny or strict scrutiny, Marzzarella's conviction must stand.").

[28] Some magazine sizes are, no doubt, more common than others.  While neither party spends time on it, it is safe to say that 100-round and 75-round magazines are not nearly as common as 30-round rifle magazines and 15-round pistol magazines.

17

1  including, but not limited to, recreational and competitive target shooting, home defense,

2  collecting and hunting.") (emphasis added); Plaintiff's Exh. 2 (Stephen Helsley Report),

3  at 5 ("The result of almost four decades of sales to law enforcement and civilian clients is

4  millions of semiautomatic pistols with a magazine capacity of more than ten rounds and

5  likely *multiple millions* of magazines for them.") (emphasis added); *Fyock,* 779 F.3d at

6  998 ("[W]e cannot say that the district court abused its discretion by inferring from the

7  evidence of record that, at a minimum, magazines are in common use.  And, to the extent

8  that certain firearms capable of use with a magazine — e.g., certain semi-automatic

9  handguns — are commonly possessed by law-abiding citizens for lawful purposes, our

10  case law supports the conclusion that there must also be some corollary, albeit not

11  unfettered, right to possess the magazines necessary to render those firearms operable.");

12  *Ass'n of N.J. Rifle & Pistol Clubs,* 910 F.3d at 116 ("The record shows that *millions of*

13  *magazines* are owned, often come factory standard with semi-automatic weapons, are

14  typically possessed by law-abiding citizens for hunting, pest-control, and occasionally

15  self-defense and there is no longstanding history of LCM regulation.") (citations omitted)

16  (emphasis added); *NYSR&PA v. Cuomo*, 804 F.3d 242, 255-57 (2nd Cir. 2015) (noting

17  large-capacity magazines are "in common use" as the term is used in *Heller* based on

18  even the most conservative estimates); *Heller v. District of Columbia*, 670 F.3d 1244,

19  1261 (D.C. Cir. 2011) ("We think it clear enough in the record that . . . magazines

20  holding more than ten rounds are indeed in 'common use'. . . . As for magazines, fully 18

21  percent of all firearms owned by civilians in 1994 were equipped with magazines holding

22  more than ten rounds, and approximately 4.7 million more such magazines were imported

23  into the United States between 1995 and 2000.  *There may well be some capacity above*

24  *which magazines are not in common use but*, if so, the record is devoid of evidence as to

25  what that capacity is; in any event, *that capacity surely is not ten*.") (emphasis added); *cf.*

26  *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (noting imprecision of the term

27  "common" by applying the Supreme Court test in *Caetano* of 200,000 stun guns owned

28  and legal in 45 states being "common"); *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1195

n.3 (E.D. Cal. 2018) ("[T]he court holds that California's large capacity magazine ban burdens conduct protected by the Second Amendment because these magazines are commonly possessed by law-abiding citizens for lawful purposes . . . ."); *Ass'n of N.J. Rifle & Pistol Clubs v. Grewal*, 2018 U.S. Dist. LEXIS 167698, at *32-33 (D. N.J. Sep. 28, 2018) ("[T]he Court is satisfied, based on the record presented, that magazines holding more than ten rounds are in common use and, therefore, entitled to Second Amendment protection."); *compare United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) ("Silencers, grenades, and directional mines are not 'typically possessed by law-abiding citizens for lawful purposes,' and are less common than either short-barreled shotguns or machine guns.  The weapons involved in this case therefore are not protected by the Second Amendment.") (citations omitted).

The Attorney General argues, even so, that it is permissible to ban common handguns with common magazines holding more than 10 rounds because the possession of firearms with *other* smaller magazines is allowed.[29]  But *Heller* says, "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."  554 U.S. at 629; *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1033 (2016) (Alito, J., and Thomas, J., concurring) ("But the right to bear other weapons is 'no answer' to a ban on the possession of protected arms.").  *Heller* says, "It is enough . . . that the American people have considered the handgun to be the quintessential self-defense weapon."  *Id.*  California's complete prohibition of common handguns with commonly-sized magazines able to hold more

---

[29] California is now in the unique position of being able to say that many firearms are currently sold with magazines holding 10 rounds or less because it banned selling firearms with larger magazines 20 years ago; since that time the marketplace has adapted. Neither party addresses the larger question of whether a state may infringe on a constitutional right, and then argue that alternatives exist because the marketplace has adjusted over time.  The question is not answered here.

1  than 10 rounds is invalid.[30]  "A weapon may not be banned unless it is *both* dangerous

2  *and* unusual."  *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., and

3  Thomas, J., concurring) (emphasis in original).

4          To the extent that magazines holding more than 10 rounds may be less common

5  within California, it would likely be the result of the State long criminalizing the buying,

6  selling, importing, and manufacturing of these magazines.  Saying that large capacity

7  magazines are uncommon because they have been banned for so long is something of a

8  tautology.  It cannot be used as constitutional support for further banning.  *See Friedman*

9  *v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) ("Yet it would be

10  absurd to say that the reason why a particular weapon can be banned is that there is a

11  statute banning it, so that it isn't commonly used.  A law's existence can't be the source

12  of its own constitutional validity.").

13          Since the 1980s, one of the most popular handguns in America has been the Glock

14  17 pistol, which is designed for, and typically sold with, a 17-round magazine.  One of

15  the most popular youth rifles in America over the last 60 years has been the Ruger 10/22.

16  Six million have been sold since it was introduced in 1964.  It is designed to use

17  magazines manufactured by Ruger in a variety of sizes: 10-round, 15-round, and 25-

18  round.  Over the last three decades, one of the most popular civilian rifles in America is

19  the much maligned AR-15 style rifle.  Manufactured with various characteristics by

20  numerous companies, it is estimated that more than five million have been bought since

21  the 1980s.  These rifles are typically sold with 30-round magazines.  These commonly-

22

23  _____

24  [30] "There are many reasons that a citizen may prefer a handgun for home defense: It is

25  easier to store in a location that is readily accessible in an emergency; it cannot easily be
   redirected or wrestled away by an attacker; it is easier to use for those without the upper-

26  body strength to lift and aim a long gun; it can be pointed at a burglar with one hand
   while the other hand dials the police.  Whatever the reason, handguns are the most

27  popular weapon chosen by Americans for self-defense in the home, and a complete
   prohibition of their use is invalid."  *Heller*, 554 U.S. at 629.

28

3:17cv1017-BEN (JLB)

1   owned guns with commonly-sized magazines are protected by the Second Amendment

2   and *Heller*'s simple test for responsible, law-abiding citizens to use for target practice,

3   hunting, and defense.

4       **3. Lethality is Not the Test**

5       Some say that the use of "large capacity magazines" increases the lethality of gun

6   violence. They point out that when large capacity magazines are used in mass shootings,

7   more shots are fired, more people are wounded, and more wounds are fatal than in other

8   mass shootings.[31] That may or may not be true. Certainly, a gun when abused is lethal.

9   A gun holding more than 10 rounds is lethal to more people than a gun holding less than

10  10 rounds, but it is not constitutionally decisive. Nothing in the Second Amendment

11  makes lethality a factor to consider because a gun's lethality, or dangerousness, is

12  assumed. The Second Amendment does not exist to protect the right to bear down

13  pillows and foam baseball bats. It protects guns and every gun is dangerous. "If *Heller*

14  tells us anything, it is that firearms cannot be categorically prohibited just because they

15  are dangerous." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J. and

16  Thomas, J., concurring); *Maloney v. Singas*, 2018 U.S. Dist. LEXIS 211546 *19

17  (E.D.N.Y. Dec. 14, 2018) (striking down 1974 ban on possession of dangerous nunchaku

18  in violation of the Second Amendment and quoting *Caetano*). "[T]he relative

19  dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms

20  commonly used for lawful purposes." *Id.*

21      California law presently permits the lethality of a gun with a 10-round magazine.

22  In other words, a gun with an 11-round magazine or a 15-round magazine is apparently

23  too lethal to be possessed by a law-abiding citizen. A gun with a 10-round magazine is

24  not. Missing is a constitutionally-permissible standard for testing acceptable lethality.

25  The Attorney General offers no objective standard. *Heller* sets out a commonality

---

[31] *See generally*, DX-3 Revised Expert Report of Dr. Louis Klarevas.

1    standard that can be applied to magazine hardware: is the size of the magazine

2    "common"?  If so, the size is constitutionally-protected.

3        If the "too lethal" standard is followed to its logical conclusion, the government

4    may dictate in the future that a magazine of eight rounds is too lethal.  And after that, it

5    may dictate that a gun with a magazine holding three rounds is too lethal since a person

6    usually fires only 2.2 rounds in self-defense.  This stepped-down approach may

7    continue[32] until the time comes when government declares that only guns holding a single

8    round are sufficiently lacking in lethality that they are both "safe" to possess *and*

9    powerful enough to provide a means of self-defense.[33]

10

11

12    [32] Constitutional rights would become meaningless if states could obliterate them by
enacting incrementally more burdensome restrictions while arguing that a reviewing

13    court must evaluate each restriction by itself when determining its constitutionality.

14    *Peruta v. Cty. of San Diego*, 824 F.3d 919, 953 (9th Cir. 2016) (Callahan, J., dissenting).

15    [33] Artificial limits will eventually lead to disarmament.  It is an insidious plan to disarm

16    the populace and it depends on for its success a subjective standard of "necessary"
lethality.  It does not take the imagination of Jules Verne to predict that if all magazines

17    over 10 rounds are somehow eliminated from California, the next mass shooting will be
accomplished with guns holding only 10 rounds.  To reduce gun violence, the state will

18    close the newly christened 10-round "loophole" and use it as a justification to outlaw
magazines holding more than 7 rounds. The legislature will determine that no more than

19    7 rounds are "necessary."  Then the next mass shooting will be accomplished with guns
holding 7 rounds.  To reduce the new gun violence, the state will close the 7-round

20    "loophole" and outlaw magazines holding more than 5 rounds determining that no more

21    than 5 rounds is "necessary."   And so it goes, until the only lawful firearm law-abiding
responsible citizens will be permitted to possess is a single-shot handgun.  Or perhaps,

22    one gun, but no ammunition.  Or ammunition issued only to persons deemed trustworthy.

23    This is not baseless speculation or scare-mongering.  One need only look at New

24    Jersey and New York.  In the 1990's, New Jersey instituted a prohibition on what it
would label "large capacity ammunition magazines."  These were defined as magazines

25    able to hold more than 15 rounds.  Slipping down the slope, last year, New Jersey

26    lowered the capacity of permissible magazines from 15 to 10 rounds.  *See* Firearms, 2018
N.J. Sess. Law Serv. Ch. 39 (ASSEMBLY No. 2761) (WEST).  At least one bill had been

27    offered that would have reduced the allowed capacity to only five rounds.  (*See* New

28    Jersey Senate Bill No. 798, introduced in the 2018 Session, amending N.J.S. 2C:39-1(y)

1   As a matter of public policy, people can debate who makes the decision about how
2   much lethality a citizen can possess.  As policy, the State says a law-abiding, responsible
3   person needs only 10 rounds.  If you judge for yourself that you will need more than 10
4   rounds, however, the crime is yours.  And, too bad if you complied with the law but
5   needed 11 rounds to stop an attacker, or a group of attackers, or a mob.  Now, you are
6   dead.  By living a law-abiding, responsible life, you have just become another "gun
7   violence" statistic.  And your statistic may be used to justify further restrictions on gun
8   lethality for future law-abiding citizens.

9   ### 4. Conclusion Under Heller Test

10   In *Heller*, the Supreme Court held that the Second Amendment protects an
11   individual right to possess a "lawful firearm in the home operable for the purpose of
12   immediate self-defense.'"  *Pena v. Lindley*, 898 F.3d 969, 975 (9th Cir. 2018), *pet'n for*
13   *cert. filed* (1/3/19) (quoting *Heller*, 554 U.S. at 635).  "The Court also wrote that the
14   amendment 'surely elevates above all other interests the right of *law-abiding, responsible*

15
16
17   ————————————

18   definition of large capacity magazine from 15 to 5 rounds.)  Less than a decade ago,
19   sliding down the slope ahead of its neighbor, New York prohibited magazines able to
     hold more than 10 rounds *and* prohibited citizens from filling those magazines with more
20   than 7 rounds (*i.e.,* a seven round load limit).  "New York determined that only
     magazines containing seven rounds or fewer can be safely possessed."  *New York State*
21   *Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 264 (2nd Cir. 2015) (declaring
22   unconstitutional New York seven round load limit).

23   Other than the commonality test, there should be no restriction on how many
     rounds in a magazine a citizen may use for self-defense or to bring for use in a militia.
24   Otherwise, what the Founders sought to avoid will be accomplished in our lifetime.  "The
25   problem the Founders sought to avoid was a disarmed populace.  At the margins, the
     Second Amendment can be read various ways in various cases, but there is no way this
26   Amendment, designed to assure an armed population, can be read to allow government to
27   disarm the population."  *Silveira v. Lockyer*, 328 F.3d 567, 588 (9th Cir. 2003) (Kozinski,
     J., dissenting).
28

3:17cv1017-BEN (JLB)

1  *citizens* to use arms in defense of hearth and home.'" *United States v. Torres*, 911 F.3d

2  1253, 1259 (9th Cir. 2019) (quoting *Heller*, 554 U.S. at 635).

3       California's law prohibiting acquisition and possession of magazines able to hold

4  any more than 10 rounds places a severe restriction on the core right of self-defense of

5  the home such that it amounts to a destruction of the right and is unconstitutional under

6  any level of scrutiny. *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 961 (9th Cir. 2014),

7  *cert. denied*, 135 S. Ct. 2799 (2015) ("A law that imposes such a severe restriction on the

8  core right of self-defense that it 'amounts to a destruction of the Second Amendment

9  right,' is unconstitutional under any level of scrutiny.") (citing *Heller*, 554 U.S. at 629);

10  *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 945 (2018)

11  ("A law that imposes such a severe restriction on the fundamental right of self defense of

12  the home that it amounts to a destruction of the Second Amendment right is

13  unconstitutional under any level of scrutiny.") (citation omitted).  The criminalization of

14  a citizen's acquisition and possession of magazines able to hold more than 10 rounds hits

15  directly at the core of the right of self-defense in the home.  It is a complete ban on

16  acquisition.  It is a complete ban on possession.  It is a ban applicable to all ordinary law-

17  abiding responsible citizens.  It is a ban on possession that applies inside a home and

18  outside a home.[34]

19

20

---

21  [34] "Possession" is a broad concept in California criminal law.  Possession may be actual

22  or constructive.  "[Possession] does not require that a person be armed or that the weapon
    [ ] be within a person's immediate vicinity." *In re Charles G.*, 14 Cal. App. 5th 945, 951

23  (Ct. App. 2017), *as modified* (Aug. 31, 2017) (citations omitted).  "Rather, it
    encompasses having a weapon in one's bedroom or home or another location under his or

24  her control, even when the individual is not present at the location." *Id.*; *People v.*

25  *Douglas*, No. B281579, 2019 WL 621284, at *4 (Cal. Ct. App. Feb. 13, 2019) (male
    defendant had constructive possession of box of ammunition in bedroom dresser drawer

26  where men's clothing was found mixed with girlfriend's clothing); *People v. Osuna*, 225
    Cal. App. 4th 1020, 1029 (2014), *disapproved on other grounds, People v. Frierson*, 4

27  Cal. 5th 225 (2017) ("A defendant possesses a weapon when it is under his dominion and

28  control.  A defendant has actual possession when the weapon is in his immediate

1    California's ban goes farther than did the District of Columbia's ordinance in

2    *Heller.*  With respect to long guns, in the *Heller* case, while a citizen was required to keep

3    his or her self-defense firearm inoperable, he or she could still possess the rifle – yet it

4    failed the simple *Heller* test.  *Jackson v. City & Cty. of San Francisco*, 135 S. Ct. 2799

5    (2015) (Thomas, J., dissenting from denial of certiorari) ("Less than a decade ago, we

6    explained that an ordinance requiring firearms in the home to be kept inoperable, without

7    an exception for self-defense, conflicted with the Second Amendment because it "made it

8    impossible for citizens to use their firearms for the core lawful purpose of self-defense.")

9    (citing *Heller*).  A government regulation that allowed a person to acquire an arm and

10   allowed a person to possess the arm still failed the *Heller* test.  California's law, which

11   neither allows acquisition, nor possession, nor operation, in the home for self-defense

12   must also fail the *Heller* test.

13       The California ban leaves no room for an ordinary citizen to acquire, keep, or bear

14   a larger capacity magazine for self-defense.  There are no permitted alternative means to

15   possess a firearm holding more than 10 rounds for self-defense, regardless of the threat.

16   *Compare, e.g., Wilson v. Lynch*, 835 F.3d 1083, 1093 (9th Cir. 2016) (18 U.S.C.

17   § 922(d)(3) prohibition on selling firearm to marijuana card holder was not severe burden

18   on core Second Amendment rights because the bar applied to "only the sale of firearms to

19   Wilson — not her *possession* of firearms") (emphasis added); *United States v. Chovan*,

20   735 F.3d 1127, 1138 (9th Cir. 2013) (describing *Heller II*'s reasoning that the District of

21   Columbia's gun registration requirements were not a severe burden because they do not

22   prevent an individual from *possessing* a firearm in his home or elsewhere).  Simply put,

23

24   ───────────────

25   possession or control.  He has constructive possession when the weapon, while not in his
     actual possession, is nonetheless under his dominion and control, either directly or
26   through others.").  The concept of constructive possession of a firearm can also be found
     in federal criminal law.  *See e.g., United States v. Schrag*, 542 F. App'x 583, 584 (9th Cir.
27   2013) (defendant had constructive possession of wife's pistol found on top of refrigerator
     in the home in violation of probation condition).
28

1  § 32310's ban on common magazines able to hold more than 10 rounds flunks the simple

2  *Heller* test.  Because it flunks the *Heller* test, there is no need to apply some lower level

3  of scrutiny.  *Cf. Wrenn v. D.C.*, 864 F.3d 650, 666 (D.C. Cir. 2017) ("*Heller I*'s

4  categorical approach is appropriate here even though our previous cases have always

5  applied tiers of scrutiny to gun laws.").

6      In addition to their usefulness for self-defense in the home, of course, larger

7  capacity magazines are also lawful arms from home with which militia members would

8  report for duty.  Consequently, possession of a larger capacity magazine is also

9  categorically protected by the Second Amendment under *United States v. Miller,* 307

10  U.S. 174 (1939).  "*Miller* and *Heller* recognized that militia members traditionally

11  reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and

12  that the Second Amendment therefore protects such weapons as a class, regardless of any

13  particular weapon's suitability for military use.'"  *Caetano v. Massachusetts*, 136 S. Ct.

14  1027, 1032 (2016) (Alito, J., concurring) (citations omitted).

15  **B.  The Historical Prohibitions Exception**

16      The State argues that the *Heller* test is a non-issue because the *Heller* test does not

17  apply to historically-accepted prohibitions on Second Amendment rights.  Large capacity

18  magazines have been the subject of regulations since the 1930s according to the State.

19  Based on this view of history, the State asserts that magazine capacity regulations are

20  historically accepted laws beyond the reach of the Second Amendment.  If its historical

21  research is accurate, the State would have an argument.  "At the first step of the inquiry,

22  'determining the scope of the Second Amendment's protections requires a textual and

23  historical analysis of the amendment.'"  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682

24  (9th Cir. 2017), *cert. denied sub nom. Teixeira v. Alameda Cty., Cal.*, 138 S. Ct. 1988

25  (2018) (citation omitted).  Courts ask whether the challenged law "falls within a 'well-

26  defined and narrowly limited' category of prohibitions 'that have been historically

27  unprotected,'" *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014) *cert.

28  denied*, 135 S. Ct. 2799 (2015) (citations omitted).  "To determine whether a challenged

26

1  law falls outside the historical scope of the Second Amendment, we ask whether the
2  regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or
3  whether the record includes persuasive historical evidence establishing that the regulation
4  at issue imposes prohibitions that fall outside the historical scope of the Second
5  Amendment." *Id.* (citations omitted).

6       History shows, however, restrictions on the possession of firearm magazines of any
7  size have no historical pedigree.  To begin with the regulation at issue, Cal. Penal Code
8  § 32310, applies to detachable magazines.  The detachable magazine was invented in the
9  late 19th Century.  "In 1879, Remington introduced the first 'modern' detachable rifle
10  magazine.  In the 1890s, semiautomatic pistols with detachable magazines followed.
11  During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced."
12  Plaintiff's Exh. 2 (Stephen Helsley Report), at 4.

13       The oldest statute limiting the permissible size of a detachable firearm magazine, on
14  the other hand, is quite young.  In 1990, New Jersey introduced the first ban on detachable
15  magazines, banning magazines holding more than 15 rounds.  N.J.S. 2C:39 (1990).  Eight
16  other states eventually followed.  The federal government first regulated detachable
17  magazines in 1994.  The federal statute addressed magazines holding more than 10 rounds
18  but lapsed in 2004 and has not been replaced.

19       To sum up, then, while detachable firearm magazines have been common for a
20  century, government regulation of the size of a magazine is a recent phenomenon and still
21  unregulated in four-fifths of the states.  The record is empty of the persuasive historical
22  evidence needed to place a magazine ban outside the ambit of the Second Amendment.
23  Thus, it can be seen that California's prohibition on detachable ammunition magazines
24  larger than 10 rounds is a type of prohibition that has not been historically accommodated
25  by the Second Amendment.

26       Faced with a dearth of magazine capacity restrictions older than 1990, the Attorney
27  General pivots and tries a different route.  He argues that the historical prohibition question
28  is not one of detachable magazine size, but instead is a question of firearm "firing-

capacity."  With this change of terms and shift of direction, the Attorney General contends that firearm firing-capacity restrictions have been subject to longstanding regulation dating back to the 1920s.  Yet, even his new focus falters under a close look at the historical record.

First, firearms with a firing-capacity of more than 10 rounds existed long before the 1920s.  Plaintiff's Exh. 2 (Stephen Helsley Report), at 4 ("Firearms with a capacity exceeding10-rounds date to the 'dawn of firearms.'  In the late-l5th Century, Leonardo Da Vinci designed a 33-shot weapon.  In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle . . . .  Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806—the magazine for which held twenty-two .46 caliber balls.  Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War.  During that same period, revolvers with a capacity of 20-rounds were available but enjoyed limited popularity because they were so ungainly.").  Yet, despite the existence of arms with large firing-capacity during the time of the adoption of the Second Amendment, more than a century passed before a firing-capacity law was passed.

It is interesting to note that during the Nation's founding era, states enacted regulations for the formation and maintenance of citizen militias.  Three such statutes are described in *United States v. Miller*, 307 U.S. 174 (1939).  Rather than restricting firing capacity, they required firing capacity.  These statutes required citizens to equip themselves with arms and a minimum quantity of ammunition for those arms.  None placed an upper limit of 10-rounds, as § 32310 does.  Far from it.  Each imposed a floor of at least 20-rounds.  *Id.* at 180-83 (Massachusetts law of 1649 required carrying "twenty bullets," while New York 1786 law required "a Box therein to contain no less than Twenty-four Cartridges," and Virginia law of 1785 required a cartridge box and "four pounds of lead, including twenty blind cartridges").  In 1776, Paul Revere's Minutemen (a special group of the Massachusetts militia) were required to have ready 30 bullets and gunpowder.  These early American citizen militia laws suggest that, contrary to the idea of a firing-capacity

upper limit on the number of rounds a citizen was permitted to keep with one's arms, there was an obligation that citizens would have at least 20 rounds available for immediate use. Simply put, there were no upper limits; there were floors and the floors were well above 10 rounds.

The Attorney General makes no mention of the founding-era militia firing-capacity minimum requirements. Instead he focuses on a handful of Thompson machine gun-era statutes. In 1927, Michigan passed a restriction on firearms with a firing-capacity over 16 rounds. Rhode Island restricted arms with a firing-capacity over 12 rounds. Ohio began licensing firearms with a firing-capacity over 18 rounds in 1933. All were repealed. The District of Columbia first restricted firearms with a firing-capacity of 12 or more rounds in 1932. None of these laws set the limit as low as ten.

The Attorney General names five additional states that enacted firing-capacity restrictions in the 1930s with capacity limits less than 10 rounds. But he is not entirely accurate. His first example is not an example, at all. For his first example, he says that, "[i]n 1933, South Dakota banned any 'weapon from which more than *five shots* or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine [by a single function of the firing device].'" Def's Oppo. (4/9/18) at 4 (emphasis in original). Actually, this was not a ban. This was South Dakota's definition of a machine gun. S.D. Ch. 206 (S.B. 165) *Enacting Uniform Machine Gun Act*, § 1 (1933), Exh. A to Def.'s Request for Judicial Notice (filed 4/9/18) ("'Machine Gun' applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device."). In fact, the statute did not ban machine guns. The statute did not criminalize mere possession (except by a felon or by an unnaturalized foreign-born person). Unlike Cal. Penal Code § 32310, the South Dakota statute criminalized possession or use of a machine gun only "for offensive or aggressive purpose," (Ch. 206 § 3), and added a harsh penalty for use during a crime of violence. Ch. 206 § 2. Specifically excepted from the regulation was possession of a

29

machine gun for defensive purposes. Ch. 206 § 6(3) ("Nothing contained in this act shall prohibit or interfere with the possession of a machine gun . . . for a purpose manifestly not aggressive or offensive."). The 1933 South Dakota statute protected a law-abiding citizen's right to possess a machine gun with a firing-capacity over five rounds for self-defense and defense of home and family and any other purpose not manifestly aggressive or offensive. California's § 32310, in contrast, criminalizes for all reasons possession of a magazine holding more than 10 rounds. So much for the first example.

The Attorney General's second example of a longstanding firing-capacity prohibition is a Virginia ban enacted in 1934. However, like the first South Dakota example, the second example is not an example, at all. The Attorney General describes the law as a ban on firearms that discharge seven rounds rapidly. It is not ban. It also defines "machine gun."[35] It criminalizes the offensive/aggressive possession of a machine gun[36] and it imposes a death penalty for possessing/using a machine gun in the perpetration of a crime of violence.[37] However, most importantly, like the 1933 South Dakota statute, the 1934 Virginia statute protected a law-abiding citizen's right to possess a machine gun for self-defense and defense of home and family and any other purpose not manifestly

---

[35] "'Machine gun' applies to and includes a weapon . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons . . . from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading." Virginia Ch. 96, § 1(a) (1934), Ex. B to Def.'s Request for Judicial Notice (filed 4/9/18).

[36] "Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime. . . ." Virginia Ch. 96, § 3 (1934), Ex. B to Def.'s Request for Judicial Notice (filed 4/9/18).

[37] "Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment . . . ." Virginia Ch. 96, § 2 (1934), Ex. B to Def.'s Request for Judicial Notice (filed 4/9/18).

1   aggressive or offensive.[38]   As discussed above, California's § 32310, in criminalizing

2   possession of magazines holding more than 10 rounds, makes no distinction between use

3   for an offensive purpose and use for a defensive purpose.  So much for the second example.

4       The Attorney General's final three examples are state machine gun bans.  The first

5   cited is an Illinois enactment (in 1931) described as, "An Act to Regulate the Sale,

6   Possession and Transportation of Machine Guns."  Ex. C to Def.'s Request for Judicial

7   Notice (filed 4/9/18).  Louisiana enacted (in 1932) Act No. 80, the second cited, which

8   likewise was passed "to regulate the sale, possession and transportation of machine guns."

9   Ex. D to Def.'s Request for Judicial Notice (filed 4/9/18).  The third cited example is like

10  the first two.  It is an Act passed by the South Carolina legislature in 1934 titled, An Act

11  Regulating the Use and Possession of Machine Guns.  Ex. E to Def.'s Request for Judicial

12  Notice (filed 4/9/18).  These three statutes are examples of machine gun bans that are

13  prohibited because of their ability to continuously fire rounds with a single trigger pull,

14  rather than their overall firing-capacity.

15      Machine guns[39] have been subject to federal regulation since the enactment of the

16  National Firearms Act of 1934.  *See Sonzinsky v. United States*, 300 U.S. 506, 511-12

17

18  _____

19

20  [38] "Nothing contained in this act shall prohibit or interfere with . . . The possession of a
    machine gun . . . for a purpose manifestly not aggressive or offensive."  Virginia Ch. 96,

21  §6(Third) (1934), Ex. B to Def.'s Request for Judicial Notice (filed 4/9/18).

22  [39] The Supreme Court knows the difference between the fully automatic military machine
    gun M-16 rifle, and the civilian semi-automatic AR-15 rifle.  *See Staples v. United States*,

23  511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle,
    and is, unless modified, a semiautomatic weapon.  The M-16, in contrast, is a selective

24  fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic
    or automatic fire."); *but see Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017)

25  ("Although an M16 rifle is capable of fully automatic fire and the AR-15 is limited to

26  semiautomatic fire, their rates of fire (two seconds and as little as five seconds,
    respectively, to empty a thirty-round magazine) are nearly identical.  Moreover, in many

27  situations, the semiautomatic fire of an AR-15 is more accurate and lethal than the

28  automatic fire of an M16.  Otherwise, the AR-15 shares the military features — the very

31

3:17cv1017-BEN (JLB)

(1937) ("The term 'firearm' is defined by § 1 [of the National Firearms Act] as meaning a shotgun or a rifle having a barrel less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive, if capable of being concealed on the person, *or a machine gun*. . . .") (emphasis added). Since machine guns are not typically possessed by law-abiding citizens for lawful purposes, they are not protected by the Second Amendment. *Heller*, 554 U.S. at 625; *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (*Heller* observed, "state militias, when called to service, often had asked members to come armed with the sort of weapons that were 'in common use at the time' and it thought these kinds of weapons (which have changed over the years) are protected by the Second Amendment in private hands, while military-grade weapons (the sort that would be in a militia's armory), such as machine guns, and weapons especially attractive to criminals, such as short-barreled shotguns, are not."). Because machine guns, like grenades and shoulder-fired rocket launchers, are not commonly possessed by law-abiding citizens for lawful purposes, they are specific arms that fall outside the safe harbor of the Second Amendment. Consequently, these machine gun statutes cited by the Attorney General do not stand as proof of long-standing prohibitions on the firing-capacity of Second Amendment-protected commonly possessed firearms.

To reiterate, the earliest regulation of a detachable ammunition magazine limit occurred in New Jersey in 1990 and limited the number of rounds to a maximum of 15. The earliest federal restriction on a detachable magazine was enacted in 1994, limited the maximum number of rounds to 10, and expired after ten years. As to the Attorney General's alternate argument about "firing-capacity," the earliest firing-capacity regulation appeared in the 1920s and 1930s in three states (Michigan, Rhode Island, and Ohio) and affected firearms able to fire more than 18, 16, or 12 rounds, depending on the state. No

---

qualities and characteristics — that make the M16 a devastating and lethal weapon of war.").

3:17cv1017-BEN (JLB)

regulation on "firing-capacity" set a limit as low as California's 10-round limit. Each was repealed and thus not longstanding. Two more states (North Dakota and Virginia) defined a machine gun. Interestingly, while penalizing machine gun use when purposed for aggressive or offensive use, both states also protected citizen machine gun possession for defensive use or any other use that was not manifestly aggressive or offensive. Three other states (Illinois, Louisiana, and South Carolina) simply defined and banned machine guns altogether. The District of Columbia appears to be the single jurisdiction where a firing-capacity restriction has been in place since the 1930s. Even there, the limit was not as low as California's limit of 10 rounds.

On this record, there is no longstanding historically-accepted prohibition on detachable magazines of any capacity. *Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106, n.18 (3rd Cir. 2018) ("LCMs were not regulated until the 1920s, but most of those laws were invalidated by the 1970s. The federal LCM ban was enacted in 1994, but it expired in 2004. While a lack of longstanding history does not mean that the regulation is unlawful, the lack of such a history deprives us of reliance on *Heller's* presumption that such regulation is lawful.") (citations omitted); *Heller v. D.C.*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity.").

Moreover, there is no longstanding historically-accepted prohibition on firearms according to their "firing-capacity" except in the case of automatic fire machine guns. On the other hand, there is an indication that founding-era state regulations, rather than restricting ammunition possession, mandated citizens of militia age to equip themselves with ready ammunition in amounts of at least 20 rounds.

## C. The Heightened Scrutiny Test

### 1. Failing the Simple Heller Test

Section 32310 runs afoul of the Second Amendment under the simple *Heller* test. It fails the *Heller* test because it criminalizes a law-abiding citizen's possession of a

1   common magazine that is used for lawful purposes and prohibits its use for self-defense

2   in and around the home.  It strikes at the core of the inalienable Constitutional right and

3   disenfranchises approximately 39 million state residents.

4          This conclusion should not be considered groundbreaking.  It is simply a

5   straightforward application of constitutional law to an experimental governmental

6   overreach that goes far beyond traditional boundaries of reasonable gun regulation.  That

7   § 32310 was not challenged earlier is due in part to the Ninth Circuit's pre-*Heller*

8   understanding that an individual lacked Second Amendment rights and thus lacked

9   Article III standing to challenge gun regulations.  *See Silveira v. Lockyer,* 312 F.3d 1052,

10  1066–67 (9th Cir. 2002), *as amended* (Jan. 27, 2003) ("Because we hold that the Second

11  Amendment does not provide an individual right to own or possess guns or other

12  firearms, plaintiffs lack standing to challenge the [California Assault Weapons Control

13  Act].").  That was the state of the law when California passed its first iteration of

14  § 32310[40] with a grandfather clause now called a "loophole" permitting citizens to keep

15  and possess magazines able to hold more than 10 rounds.[41]  The lack of an earlier

16  constitutional challenge was also due to the recency of the Supreme Court's decision that

17  the Second Amendment applies to the states.  *See McDonald v. City of Chicago*, 561 U.S.

18  742, 784-85 (2010) ("Under our precedents, if a Bill of Rights guarantee is fundamental

19  from an American perspective . . . that guarantee is fully binding on the States . . . .").  In

20  other words, when California began experimenting with its larger-capacity magazine ban

21  less than twenty years ago, it appeared that the Second Amendment conferred no rights

22  on individual citizens and did not apply to the states, and that an individual lacked Article

23  III standing in federal court to challenge the ban.  During that time, California passed

24  more and more gun regulations, constricting individual rights further and further, to the

25  point where state undercover agents surveil California residents attending out-of-state

26

27  ────────────

28  [40] Former § 12020 was re-codified at § 32310, effective Jan. 1, 2012.
     [41] The grandfather clause is now described by the State as a loophole.

3:17cv1017-BEN (JLB)

1   gun shows, obtain search warrants for their homes, and prosecute those returning with a

2   few thirty-round magazines.  *See e.g., People v. Verches*, 2017 WL 1880968 (Cal. Ct.

3   App. May 9, 2017) (California resident convicted of marijuana possession and importing

4   three large-capacity magazines purchased at a Reno, Nevada gun show and placed on

5   three years formal felony probation).

6           The magazine ban arbitrarily selects 10 rounds as the magazine capacity over

7   which possession is unlawful.  The magazine ban admits no exceptions, beyond those for

8   law enforcement officers, armored truck guards, and movie stars.  The ban does not

9   distinguish between citizens living in densely populated areas and sparsely populated

10  areas of the state.  The ban does not distinguish between citizens who have already

11  experienced home invasion robberies, are currently threatened by neighborhood burglary

12  activity, and those who have never been threatened.  The ban does not distinguish

13  between the senior citizen, the single parent, and the troubled and angry high school

14  drop-out.  Most importantly, the ban does not distinguish between possession in and

15  around one's home, and possession in or around outdoor concerts, baseball fields, or

16  school yards.  The ban on magazines that hold more than 10 rounds amounts to a

17  prohibition on an entire class of "arms" that is overwhelmingly chosen by American

18  citizens for the lawful purpose of self-defense.  The prohibition extends to one's home

19  where the need to defend self, family, and property is most acute.  And like the ban struck

20  down in *Helle*r, the California ban threatens citizens, not with a minor fine, but a

21  substantial criminal penalty.  *Heller*, 554 U.S. at 634 ("The District law, by contrast, far

22  from imposing a minor fine, threatens citizens with a year in prison (five years for a

23  second violation) for even obtaining a gun in the first place.  See D. C. Code § 7-

24  2507.06.").  "If a law burdens conduct protected by the Second Amendment . . . *Heller*

25  mandates some level of heightened scrutiny."  *Bauer v. Becerra*, 858 F.3d 1216, 1221

26  (9th Cir. 2017), *cert. denied,* 138 S. Ct. 982 (2018).  Under any level of heightened

27  scrutiny, the ban fails constitutional muster.

28

3:17cv1017-BEN (JLB)

### 2. The Tripartite Binary Test with a Sliding Scale and a Reasonable Fit

Beyond the simple *Heller* test, for a Second Amendment question, the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit. In other words, there are three different two-part tests, after which the sliding scale of scrutiny is selected. Most courts select intermediate scrutiny in the end. Intermediate scrutiny, in turn, looks for a "reasonable fit." It is an overly complex analysis that people of ordinary intelligence cannot be expected to understand. It is the wrong standard. But the statute fails anyhow.

#### a. burden & scrutiny

First, a court must evaluate the burden and then apply the correct scrutiny. *United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019); *Jackson*, 746 F.3d at 960 (citing *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013)). "This two-step inquiry: '(1) asks whether the challenged law burdens conduct protected by the Second Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny.'" *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 982 (2018) (quoting *Jackson*, 746 F.3d at 960). As discussed, § 32310 burdens conduct protected by the Second Amendment.

#### b. presumptively lawful or historical regulation

In determining whether a given regulation falls within the scope of the Second Amendment under the first step of this inquiry, another two-step test is used. "[W]e ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment." *Id.* (citations omitted). If the regulation is presumptively lawful, the inquiry ends. Likewise, if the regulation is a historically approved prohibition not offensive to the Second Amendment, the inquiry ends.

Section 32310 fails both parts of the test. A complete ban on ammunition magazines of any size is not one of the presumptively lawful regulatory measures

1  identified in *Heller*.  As discussed, neither is there any evidence that magazine capacity
2  restrictions have a historical pedigree.

3        **c. closeness to the core and severity of the burden**

4     If the constitutional inquiry may continue, then the correct level of scrutiny must
5  be selected.  For that selection a third two-step evaluation is required.  The first step
6  measures how close the statute hits at the core of the Second Amendment right.  The
7  second step measures how severe the statute burdens the Second Amendment right.
8  "Because *Heller* did not specify a particular level of scrutiny for all Second Amendment
9  challenges, courts determine the appropriate level by considering '(1) how close the
10  challenged law comes to the core of the Second Amendment right, and (2) the severity of
11  the law's burden on that right.'"  *Bauer v. Becerra*, 858 F3d 1216, 1222 (9th Cir. 2017),
12  *cert. denied,* 138 S. Ct. 982 (2018) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th
13  Cir. 2016)).  *Fyock v. City of Sunnydale*, 779 F.3d 991, 999 (9th Cir. 2015), recognized
14  that a regulation restricting law-abiding citizens from possessing large-capacity
15  magazines within their homes hits at the core of the Second Amendment.  *Fyock* said,
16  "[b]ecause Measure C restricts the ability of law abiding citizens to possess large
17  capacity magazines within their homes for the purpose of self-defense, we agree with the
18  district court that Measure C may implicate the core of the Second Amendment."  *Id.;*
19  *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1278 (N.D. Cal. 2014), *aff'd sub nom.*
20  *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ("[T]he court concludes that the
21  Sunnyvale law burdens conduct near the core of the Second Amendment right.").  "No
22  one doubts that under *Heller I* this core protection covers the right of a law-abiding
23  citizen to keep in the home common firearms for self-defense."  *Wrenn v. D.C.*, 864 F.3d
24  650, 657 (D.C. Cir. 2017).[42]

---

28  [42] And the core may extend beyond the home.  "[W]e conclude: the individual right to
  carry common firearms beyond the home for self-defense—even in densely populated

*Heller* says the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of their home. 554 U.S. at 635. Guided by this understanding, for selecting the appropriate level of judicial scrutiny, the Ninth Circuit uses a sliding scale. "[O]ur test for the appropriate level of scrutiny amounts to 'a sliding scale.'" *Silvester*, 843 F.3d at 821. "A law that imposes such a severe restriction on the fundamental right of self-defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny." *Bauer v. Becerra*, 858 F3d 1216, 1222 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 982 (2018) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). This is the case here.

### d. the sliding scale of scrutiny – strict scrutiny

Further down the scale, a law that implicates the core of the Second Amendment right and severely burdens that right warrants *strict scrutiny*. *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) ("We strictly scrutinize a 'law that implicates the core of the Second Amendment right and severely burdens that right.'") (citation omitted). Even if § 32310's complete ban did not amount to a destruction of Second Amendment rights, it would still merit the application of strict scrutiny. A law like § 32310 that prevents a law-abiding citizen from obtaining a firearm with enough rounds to defend self, family, and property in and around the home certainly implicates the core of the Second Amendment. When a person has fired the permitted 10 rounds and the danger persists, a statute limiting magazine size to only 10 rounds severely burdens that core right to self-defense.

A complete ban on a 100-round or 50-round magazine may be a mild burden. An annual limit on the number of larger capacity magazines that a citizen may purchase might place a moderate burden. A serial number requirement for the future manufacturing, importing, or selling of larger capacity magazines would not be a severe

---

areas, even for those lacking special self-defense needs—falls within the core of the Second Amendment's protections." *Wrenn v. D.C.*, 864 F.3d 650, 661 (D.C. Cir. 2017).

3:17cv1017-BEN (JLB)

1   burden.  Requiring a background check for purchasers of larger-capacity magazines may

2   or may not be a severe burden.  *See e.g., Heller II,* 670 F.3d at 1258 (reasoning that the

3   District of Columbia's gun registration requirements were not a severe burden because

4   they do not prevent an individual from possessing a firearm in his home).

5         But California's ban is far-reaching, absolute, and permanent.  The ban on

6   acquisition and possession on magazines able to hold more than 10 rounds, together with

7   the substantial criminal penalties threatening a law-abiding, responsible, citizen who

8   desires such magazines to protect hearth and home, imposes a burden on the

9   constitutional right that this Court judges as severe.  *Cf. Peruta v. Cty. of San Diego*, 824

10  F.3d 919, 950 (9th Cir. 2016) (en banc) (Callahan, J., dissenting) (courts should consider

11  Second Amendment challenges to firearm restrictions in context to ensure the restrictions

12  are not "tantamount to complete bans on the Second Amendment right to bear arms

13  outside the home for self-defense"), *cert. denied*, 137 S. Ct. 1995 (2017).

14        Some have said that the burden is minor because there are other choices.  *E.g.,*

15  *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1278 (N.D. Cal. 2014), *aff'd sub nom.*

16  *Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ("Individuals have countless other

17  handgun and magazine options to exercise their Second Amendment rights . . .

18  Accordingly, a prohibition on possession of magazines having a capacity to accept more

19  than ten rounds applies only the most minor burden on the Second Amendment.").  But

20  describing as minor, the burden on responsible, law-abiding citizens who may not possess

21  a 15-round magazine for self-defense because there are other arms permitted with 10 or

22  fewer rounds, is like saying that when government closes a Mormon church it is a minor

23  burden because next door there is a Baptist church or a Hindu temple.  Indeed, *Heller*

24  itself rejected this mode of reasoning: "It is no answer to say, as petitioners do, that it is

25  permissible to ban the possession of handguns so long as the possession of other firearms

26  (*i.e.,* long guns) is allowed."  554 U.S. at 629; *see also Parker v. District of Columbia,*

27  478 F.3d 370, 400 (D.C. Cir. 2007) ("The District contends that since it only bans one

28  type of firearm, 'residents still have access to hundreds more,' and thus its prohibition

1   does not implicate the Second Amendment because it does not threaten total

2   disarmament.  We think that argument frivolous.  It could be similarly contended that all

3   firearms may be banned so long as sabers were permitted."), *aff'd sub nom. Heller,* 554

4   U.S. at 570.

5        Others have acknowledged that the burden on a citizen may be severe but consider

6   it a worthwhile tradeoff.  *San Francisco Veteran Police Officers Ass'n v. City & Cty. of*

7   *San Francisco,* 18 F. Supp. 3d 997, 1005 (N.D. Cal. 2014) ("Nonetheless, in those rare

8   cases, to deprive the citizen of more than ten shots may lead to his or her own death.  Let

9   this point be conceded.").  In a peaceful society, a 10-round limit may not be severe.

10  When thousands of people are rioting, as happened in Los Angeles in 1992, or more

11  recently with Antifa members in Berkeley in 2017, a 10-round limit for self-defense is a

12  severe burden.  When a group of armed burglars break into a citizen's home at night, and

13  the homeowner in pajamas must choose between using their left hand to grab either a

14  telephone, a flashlight, or an extra 10-round magazine, the burden is severe.  When one is

15  far from help in a sparsely populated part of the state, and law enforcement may not be

16  able to respond in a timely manner, the burden of a 10-round limit is severe.  When a

17  major earthquake causes power outages, gas and water line ruptures, collapsed bridges

18  and buildings, and chaos, the burden of a 10-round magazine limit is severe.  When food

19  distribution channels are disrupted and sustenance becomes scarce while criminals run

20  rampant, the burden of a 10-round magazine limit is severe.  Surely, the rights protected

21  by the Second Amendment are not to be trimmed away as unnecessary because today's

22  litigation happens during the best of times.  It may be the best of times in Sunnyvale; it

23  may be the worst of times in Bombay Beach or Potrero.  California's ban covers the

24  entire state at all times.

25        While *Chovan* instructs that the level of scrutiny depends on closeness to the core

26  and "the severity of the law's burden," it offers no guide to evaluating the burden.  *United*

27  *States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013).  In *Jackson*, the burden of a

28  regulation was not severe.  *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 964

1  (9th Cir. 2014) ("Section 4512 does not impose the sort of severe burden that requires the

2  higher level of scrutiny."). In *Jackson*, the court found that the ordinance did not

3  substantially prevent law-abiding citizens from using firearms to defend themselves in

4  the home because it only regulated storage when not carrying them. *Id.* Consequently,

5  the court found that the requirement did not impose a severe burden because, "San

6  Franciscans are not required to secure their handguns while carrying them on their

7  person." *Id.* In contrast, § 32310 imposes a complete ban on the acquisition and

8  possession of a magazine able to hold more than 10 rounds. It is a crime whether a

9  person is keeping and carrying the magazine for self-defense in the home, while using it

10 for target practice to maintain proficiency, while brandishing it to protect property from

11 rioters, or when needing it for hunting dangerous animals. Strict scrutiny applies.[43]

12      The State argues that the Ninth Circuit has already determined as a matter of law

13 that intermediate scrutiny applies to large-capacity magazine bans, citing *Fyock*, 779 F.3d

14 at 999. Def.'s Oppo. to Plaintiff's Mot. for Summary Judgment, at 14. Not so. In the

15 context of an appeal from a preliminary injunction ruling, *Fyock* decided whether the

16

17

18 [43] Strict scrutiny is also called for in the context of an armed defense of hearth and home
   because a person's privacy interests are protected by the Constitution. The protection for
19 one's privacy may be near its zenith in the home. Other privacy invasions in the home
   are subjected to strict scrutiny. "This enactment involves . . . a most fundamental aspect
20 of 'liberty,' the privacy of the home in its most basic sense, and it is this which requires
   that the statute be subjected to 'strict scrutiny.'" *Poe v. Ullman*, 367 U.S. 497, 548
21 (1961) (applying strict scrutiny to a Connecticut contraceptive criminal statute). "The
22 Fourth and Fifth Amendments were described . . . as protection against all governmental
   invasions 'of the sanctity of a man's home and the privacies of life.' We recently
23 referred . . . to the Fourth Amendment as creating a 'right to privacy, no less important
   than any other right carefully and particularly reserved to the people.'" *Griswold v.*
24 *Connecticut*, 381 U.S. 479, 484–85 (1965) (applying strict scrutiny to contraceptive law)
25 (citations omitted). Just as we would not allow "the police to search the sacred precincts
   of the marital bedrooms for telltale signs of the use of contraceptives," (*id.*), we should
26 not allow the police to search the private environs of law-abiding, responsible citizens for
27 self-defense magazines that the State deems too large and dangerous.

28

1    district court had abused its discretion.  The district court made a preliminary judgment

2    that the burden was not severe from Sunnyvale's large capacity magazine ban.  The

3    district court used its discretion and declined to issue a preliminary injunction.  *Fyock*

4    decided that the district court had not abused its discretion.  Specifically, the *Fyock* court

5    concluded, "For these reasons, there was no abuse of discretion in finding that the impact

6    Measure C may have on the core Second Amendment right is not severe and that

7    intermediate scrutiny is warranted."  *Id.*  *Fyock*'s conclusion about the severity of

8    Sunnyvale's large-capacity magazine ban was fact-bound.  It did not announce as a

9    matter of law that magazine capacity bans of any kind never impose a severe burden on

10   Second Amendment rights.  Nor could it.  Even the least searching form of heightened

11   scrutiny (*i.e.,* intermediate scrutiny) requires the government to establish a reasonable fit.

12     That the assessment of Sunnyvale's ban was fact-bound is illustrated by its

13   immediately preceding sentence, where the *Fyock* court noted the Sunnyvale ban

14   permitted possession of large-capacity magazines for use with some firearms.  *Id.* ("To

15   the extent that a lawfully possessed firearm could not function with a lower capacity

16   magazine, Measure C contains an exception that would allow possession of a large-

17   capacity magazine for use with that firearm.") (citing Sunnyvale, Cal. Muni. Code §

18   9.44.050(c)(8)).  It also imposed a minor penalty and did not make an exception for

19   movie props or retired police officers.  As this Court reads it, *Fyock* did not decide that

20   all magazine bans merit only intermediate scrutiny.

21     Section 32310's wide ranging ban with its acquisition-possession-criminalization

22   components exacts a severe price on a citizen's freedom to defend the home.

23   Consequently, § 32310 merits strict judicial scrutiny.  "A law that implicates the core of

24   the Second Amendment right and severely burdens that right warrants strict scrutiny."

25   *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (citing *Chovan*, 735 F.3d at 1138);

26   *compare United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) (finding federal

27   ban on firearm possession by an alien while in the United States is not a severe burden

28   because alien may remove himself from the ban by acquiring lawful immigration status);

1  *and Mahoney v. Sessions*, 871 F.3d 873, 879 (9th Cir. 2017), *cert. denied sub nom.*

2  *Mahoney v. City of Seattle, Wash.*, 138 S. Ct. 1441 (2018) (holding that a city policy

3  regulating the use of department-issued firearms while police officers are *on duty* is not a

4  severe Second Amendment burden).

5       Strict scrutiny requires the Government to prove that the restriction on a

6  constitutional right furthers a compelling interest and is narrowly tailored to achieve that

7  interest. *Mance v. Sessions*, 896 F.3d 699, 705-06 (5th Cir. 2018), *pet'n for cert. filed*

8  (Nov. 19, 2018) (applying strict scrutiny in Second Amendment case).  California's ban

9  on magazines able to hold more than 10 rounds fails strict scrutiny.  The State has not

10  offered a compelling interest for the ban, arguing that intermediate scrutiny should be the

11  test.  If preventing mass shootings is the state's interest, it is not at all clear that it would

12  be compelling since such events are exceedingly rare.  If the state's interest is in forcing a

13  "pause" during a mass shooting for a shooter to be apprehended, those events are even

14  more rare.

15       More certain, however, is that the ban is not narrowly tailored or the least

16  restrictive means of achieving these interests.  Instead it is a categorical ban on

17  acquisition and possession for all law-abiding, responsible, ordinary citizens.  Categorical

18  bans are the opposite of narrowly tailored bans.  The § 32310 ban on possession applies

19  to areas in the state where large groups gather and where no one gathers.  It applies to

20  young persons with long rap sheets and to old persons with no rap sheets.  It applies to

21  draft dodgers and to those who have served our country.  It applies to those who would

22  have 1000 large magazines for a conflagration and to those who would have one large

23  magazine for self-defense.  It applies to perpetrators as well as it applies to those who

24  have been victims.  It applies to magazines holding large, powerful rounds and to

25  magazines holding small, more-impotent rounds.  It applies to rifles with bump-stocks

26  and pistols for purses.

27       Section 32310 is not narrowly tailored; it is not tailored at all.  It fits like a burlap

28  bag.  It is a single-dimensional, prophylactic, blanket thrown across the population of the

1    state.  As such, § 32310 fails strict scrutiny and violates the Second Amendment.  *Cf.*

2    *Mance v. Sessions*, 896 F.3d 390, 405 (5th Cir. 2018) (Ho, J., dissenting from denial of

3    rehearing *en banc*) ("The ban on interstate handgun sales fails strict scrutiny.  After all, a

4    categorical ban is precisely the opposite of a narrowly tailored regulation.  It applies to all

5    citizens, not just dangerous persons.  Instead of requiring citizens to comply with state

6    law, it forbids them from even trying.  Nor has the Government demonstrated why it

7    needs a categorical ban to ensure compliance with state handgun laws.  Put simply, the

8    way to require compliance with state handgun laws is to require compliance with state

9    handgun laws.").

10                          **e. intermediate scrutiny**

11        Even under the lowest formulation of heightened scrutiny, intermediate scrutiny,

12   Section § 32310 fails because it is not a reasonable fit.  *Cf. Morris v. U.S. Army Corps of*

13   *Engineers*, 990 F. Supp. 2d 1082, 1087 (D. Idaho 2014) (banning firearm with

14   ammunition in camping tents imposed *severe burden calling for strict scrutiny but*

15   *unconstitutional even under intermediate scrutiny*).  Where a restriction "does not

16   'severely burden' or even meaningfully impact the core of the Second Amendment right,

17   . . . intermediate scrutiny is . . . appropriate." *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th

18   Cir. 2017), *cert. denied,* 138 S. Ct. 982, 200 L. Ed. 2d 249 (2018) (citing *Silvester v.*

19   *Harris*, 843 F.3d 816, 821 (9th Cir. 2016) and *United States v. Chovan*, 735 F.3d 1127,

20   1138 (9th Cir. 2013)) (applying intermediate scrutiny to California's $19 DROS fee).

21   The State argues as a foregone conclusion that intermediate scrutiny is the correct point

22   on the sliding scale for a regulation on magazines.  According to the State, *Fyock*'s

23   approval of "intermediate scrutiny" is controlling, and other courts have applied

24   intermediate scrutiny to regulations on large capacity magazines. As discussed, *supra*,

25   *Fyock* held that the district court did not abuse its discretion in finding Sunnyvale's

26   magazine capacity restriction did not have a severe impact.  779 F.3d at 999.  That

27   approach was consistent with past cases analyzing the appropriate level of scrutiny under

28   the second step of *Heller*, as the Ninth Circuit has typically applied intermediate scrutiny

1   – especially for non-hardware Second Amendment cases.  *See e.g.*, *Silvester*, 843 F.3d at

2   823 (applying intermediate scrutiny to ten-day waiting period for the purchase of

3   firearms); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014)

4   (applying intermediate scrutiny to mandatory handgun storage procedures in homes and

5   banning the sale of hollow-point ammunition in San Francisco); *Chovan*, 735 F.3d at

6   1138 (applying intermediate scrutiny to prohibition on domestic violence misdemeanants

7   possessing firearms).  But it is the wrong standard to apply here.

8                  *i. tailoring required: "a reasonable fit"*

9          To pass intermediate scrutiny, a statute must still be a reasonable fit.  "Our

10  intermediate scrutiny test under the Second Amendment requires that (1) the

11  government's stated objective . . . be significant, substantial, or important; and (2) there .

12  . . be a 'reasonable fit' between the challenged regulation and the asserted objective."

13  *Silvester*, 843 F.3d at 821–22 (quoting *Chovan*, 735 F.3d at 1139).

14         For intermediate scrutiny "the burden of justification is demanding and it rests

15  entirely on the State."  *Tyler v. Hillsdale County Sheriff's Dept.*, 837 F. 3d 678, 694 (6th

16  Cir. 2016) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996) (considering the

17  constitutionality of 18 U.S.C. § 922(g)(4)'s permanent gun ban for person previously

18  treated for mental illness).

19                 *ii. four important California interests*

20         In this case, the Attorney General identifies four State interests or objectives.  Each

21  is important.  The State interests are: (1) protecting citizens from gun violence; (2)

22  protecting law enforcement from gun violence; (3) protecting the public safety (which is

23  like protecting citizens and law enforcement from gun violence); and (4) preventing

24  crime.  *See* Oppo. at 9; 17-18.  The question then becomes, whether § 32310's ban on

25  acquisition and possession of firearm magazines holding more than 10 rounds is a

26  reasonable fit for achieving these important goals.  This Court finds on the evidentiary

27  record before it that § 32310—the prohibition on magazines able to hold more than 10

28

1 rounds and the acquisition-possession-criminalization components of § 32310—is not a
2 reasonable fit.

3       The Attorney General says that empirical evidence is not required to shoulder his
4 burden.  Oppo. at 19.  He says that the required substantial evidence demonstrating a
5 reasonable fit can take other, softer forms such as "history, consensus, and simple
6 common sense," as well as "correlation evidence" and even simply "intuition."  Oppo. at
7 19-20.  Intuition?  If this variety of softer "evidence" were enough, all firearm restrictions
8 except an outright ban on all firearms would survive review.  Yet, as the Second Circuit
9 cautioned, "on intermediate scrutiny review, the state cannot 'get away with shoddy data
10 or reasoning.'  To survive intermediate scrutiny, the defendants must show '*reasonable*
11 inferences based on *substantial* evidence' that the statutes are substantially related to the
12 governmental interest."  *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d
13 242, 264 (2d Cir. 2015), *cert. denied sub nom.*, *Shew v. Malloy*, 136 S. Ct. 2486 (2016)
14 (citations omitted) (emphasis in original) (striking down New York State's 7-round
15 magazine limit).  When considering whether to approve a state experiment that has, and
16 will, irrevocably harm law-abiding responsible citizens who want for lawful purposes to
17 have common firearms and common magazines that hold more than 10 rounds, this Court
18 declines to rely on anything beyond hard facts and reasonable inferences drawn from
19 convincing analysis amounting to substantial evidence based on relevant and accurate
20 data sets.

21                  *iii.  the State's evidence*

22       The State's theoretical and empirical evidence is not persuasive.  Why 10 rounds
23 as a limit?  The State has no answer.  Why is there no thought given to possession in and
24 around a home?  It is inconclusive at best.  In fact, it is reasonable to infer, based on the
25 State's own evidence, that a right to possess magazines that hold more than 10 rounds
26 may promote self-defense – especially in the home – as well as being ordinarily useful
27 for a citizen's militia use.  California must provide more than a rational basis to justify its
28 sweeping ban.  *See e.g., Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("Illinois

1  had to provide us with more than merely a rational basis for believing that its uniquely

2  sweeping ban [on carrying guns in public] is justified by an increase in public safety.  It

3  has failed to meet this burden.").

4    Mass shootings are tragic.  But they are rare events.  And of these rare events,

5  many are committed without large capacity magazines.  For example, in the two high

6  school incidents in 2018 one assailant used a shotgun and a .38 revolver (at Santa Fe

7  High School, Santa Fe, Texas) while the other used an AR-15-style rifle but with 10-

8  round magazines (at Stoneman Douglas High School in Parkland, Florida).  In the attack

9  at the Capital Gazette newspaper (Annapolis, Maryland), 5 people were killed and 2

10  injured by an assailant with a shotgun and smoke grenades.  The Attorney General has

11  not supplemented the record with a police report of the single mass shooting in California

12  last year (at the Borderline Bar and Grill in Thousand Oaks, California).  However, press

13  reports indicate the shooter used a legally purchased pistol with an "extended"

14  magazine.[44]  Another report said seven 30-round magazines were found at the scene.[45]

15  Eighteen years of a state ban on acquiring large-capacity magazines did not prevent the

16  assailant from obtaining and using the banned devices.  The news pieces do not report

17  witnesses describing a "critical pause" when the shooter re-loaded.  And the stories do

18  not say where or how the 30-round magazines were acquired.

19    The findings from the Mayors Against Illegal Guns survey 2009-2013 (AG Exhibit

20  17), were addressed in the Order of June 28, 2017.  *See also, AG Oppo. To Mot PI*,

21  Gordon Declaration Exh. 59.  The observations are still true.  "To sum up, of the 92 mass

22  killings occurring across the 50 states between 2013 and 2009, only ten occurred in

---

25  [44] Aarthun, Sarah and Adone, Dakin, *What We Know About the Shooting at Borderline
26  Bar & Grill*, CNN (Nov. 9, 2018) https://www.cnn.com/2018/11/08/us/thousand-oaks-
bar-shooting-what-we-know/index.html (last visited Mar. 26, 2019).

27  [45] *Authorities Describe 'Confusion And Chaos' at Borderline Bar Shooting in California,*
28  NPR (Nov. 28, 2018) https://www.npr.org/2018/11/28/671353612/no-motive-yet-found-
for-mass-shooting-at-borderline-bar-and-grill (last visited Mar. 26, 2019).

3:17cv1017-BEN (JLB)

1  California.  Of those ten, the criminalization and dispossession requirements of § 32310

2  would have had no effect on eight of the shootings, and only marginal good effects had it

3  been in effect at the time of the remaining two shootings.  On this evidence, § 32310 is

4  not a reasonable fit.  It hardly fits at all.  It appears on this record to be a haphazard

5  solution likely to have no effect on an exceedingly rare problem, while at the same time

6  burdening the Constitutional rights of many other California law-abiding responsible

7  citizen-owners of gun magazines holding more than 10 rounds."

8        In opposition to the motion for summary judgment, the state attempts to bolster the

9  data from the Mayors' survey with a Mother Jones Magazine 36-year survey of mass

10  shootings from 1982 to 2018.  See *Oppo. to MSJ* Exhibit 16.[46]  The Mother Jones

---

[46] This Court has observed that the quality of the evidence relied on by the State is
remarkably thin.  The State's reliance and the State's experts' reliance on compilations
such as the Mother Jones Magazine survey is an example.  The survey is found in the
Attorney General's Opposition to Plaintiff's Motion for Summary Judgment at Exhibit
37.  It purports to be a survey of mass shootings.  It does not indicate how its data is
selected, or assembled, or tested.  It is unaccompanied by any declaration as to its
accuracy.  It is probably not peer-reviewed.  It has no widely-accepted reputation for
objectivity.  While it might be something that an expert considers in forming an
admissible opinion, the survey by itself would be inadmissible under the normal rules of
evidence.

The State says that the survey "has been cited favorably in numerous cases," citing
three decisions.  *Id*. at n. 13.  Of the three cases listed, however, the survey is not
mentioned at all in one case, mentioned only as something an expert relied on in the
second case, and mentioned only in passing as "exhaustive" but without analysis in the
third.  On the other hand, after the Attorney General's brief was filed, the Third Circuit
noted issues with the Mother Jones Magazine survey, remarking, "Mother Jones has
changed it definition of a mass shooting over time, setting a different minimum number
of fatalities or shooters, and may have omitted a significant number of mass shooting
incidents."  *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*,
910 F.3d 106, 113 (3d Cir. 2018); see also *Ass'n of New Jersey Rifle & Pistol Clubs, Inc.
v. Grewal*, No. 317CV10507PGSLHG, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018)
(state's expert Lucy Allen admitted that the Mother Jones survey omitted 40% of mass
shooting cases).

1  findings are even less convincing than those from the Mayors' survey.  Mother Jones

2  Magazine lists 98 mass shooting events in the last 36 years.  This is an average of 2.72

3  events per year in the entire United States.  Of the 98 events over the last 36 years, 17

4  took place in California.  This is an average of one event every two years in the most

5  populous state in the nation.

6      According to data from this 36-year survey of mass shootings, California's

7  prohibition on magazines holding more than 10 rounds would have done nothing to keep

8  a shooter from shooting more than 10 rounds.  That is because normally the perpetrator

9  brings multiple weapons.[47]  The more weapons, the greater the firepower and the greater

10

11  _____

12      In another case about prison conditions, a Mother Jones Magazine article was
   stricken as inadmissible for purposes of summary judgment, which is how such writings

13  would usually be treated.  See *Aaron v. Keith*, No. 1:13-CV-02867, 2017 WL 663209, at

14  *2 (W.D. La. Feb. 14, 2017) (striking a Mother Jones article from the record and
   remarking, "[t]he case law is consistent: newspaper articles are hearsay and do not

15  constitute competent summary judgment evidence.").

16  [47]  For example each of the following incidents involved multiple firearms: (1) Yountville
   3/9/18: shotgun and rifle; (2) Rancho Tehema 11/14/17: two illegally modified rifles; (3)

17  San Francisco 6/14/17: two pistols, one with 30-round magazine stolen in Utah (per

18  http://www.foxnews.com/us/2017/06/24/police-ups-shooter-in-san-francisco-armed-with-
   stolen-guns.html); (4) Fresno 4/18/17: one revolver; (5) San Bernardino 12/2/15:

19  (terrorists) two rifles, two pistols, and a bomb; (6) Santa Barbara 5/23/14: three pistols

20  and two hunting knives; (7) Alturas 2/20/14: two handguns and a butcher knife; (8) Santa
   Monica 6/7/13: pistol, rifle assembled from parts, bag of magazines, and vest (per

21  http://www.scpr.org/news/2013/06/09/37636/police-look-for-motive-in-santa-monica-

22  shooting-on/); (9) Oakland 4/2/12: one pistol (with four 10-round magazines, per
   https://www.mercurynews.com/2012/04/04/oakland-university-shooting-one-goh-

23  charged-with-seven-counts-of-murder-may-be-eligible-for-death-penalty/); (10) Seal

24  Beach 10/12/11: two pistols and a revolver; (11) Goleta 1/30/06: one pistol (shooter lived
   in New Mexico where pistol and 15-round magazine were legally purchased, per

25  https://www.independent.com/news/2013/jan/31/goleta-postal-murders/); (12) Orange

26  12/18/97: one rifle (actually a rifle, shotgun, and handgun, per LA Times article at
   http://articles.latimes.com/1997/dec/19/news/mn-172 ); (13) San Francisco 7/11/93: three

27  pistols; (14) Olivehurst 5/1/92: sawed-off rifle and a shotgun; (15) Stockton 1/17/89: rifle
   and pistol; (16) Sunnyvale 2/16/88: two pistols, two revolvers, two shotguns, and a rifle;

28  (17) San Ysidro 7/18/84: one pistol, one rifle, and a shotgun.

3:17cv1017-BEN (JLB)

1  the potential for casualties.  In 14 of the 17 California mass shooting events, multiple

2  weapons were brought.  For example, in the 1988 mass shooting event in Sunnyvale, the

3  shooter brought two pistols, two revolvers, two shotguns, and a bolt action rifle (all

4  obtained legally).  No large capacity magazines were used.  *See* AG Exh.16, at 736[48] ;

5  DX-10 at 517 (Appendix B, Case No.91).

6       California's large capacity magazine prohibition also had no effect on the three

7  single weapon mass shooting events.  In the Fresno event in April 2017, a revolver was

8  used.  For those unschooled on firearms, a revolver does not use a magazine of any size.

9  In the next mass shooting event in Oakland in April 2012, the shooter used a pistol with

10  four California-legal 10-round magazines.  In the third mass shooting event in Goleta in

11  January 2006, the shooter did use a pistol with a 15-round magazine.[49]  However, the

12  shooter resided in New Mexico.  She purchased the firearm and its 15-round magazine

13  legally in New Mexico.  She then traveled into California to Goleta to the postal facility

14  where she had been employed three years prior.  By 2006, California already prohibited a

15  person from bringing into the state a large capacity magazine, but it did not prevent the

16  Goleta tragedy from taking place.

17       In fact, only three of the 17 California mass shooting events reported in the Mother

18  Jones 36-year survey featured a large capacity magazine used by the shooter.  One is the

19  Goleta event described above where the magazine was legally purchased in another state

20  and illegally brought into California.  The second event is like the Goleta event.  In San

21  Francisco June 2017, a perpetrator used two pistols, both stolen.  One pistol had a 30-

22  round magazine.[50]  This firearm was reported stolen in Utah and must have been illegally

23

24  ―――――――――――

25  [48] The Mother Jones survey does not say that large capacity magazines were used.

26  [49] The Mother Jones survey does not say that large capacity magazines were used,
   however newspapers reported a 15-round magazine was found.  See

27  https://www.independent.com/news/2013/jan/31/goleta-postal-murders/.

28  [50] See http://www.foxnews.com/us/2017/06/24/police-ups-shooter-in-san-francisco-
   armed-with-stolen-guns (last visited Mar. 26, 2019).

3:17cv1017-BEN (JLB)

1   imported into California.[51]  The other pistol had been reported stolen in California, but

2   news reports do not mention a large capacity magazine.[52]  It bears noting that California's

3   large capacity magazine prohibition did not prevent these mass shootings.

4          The third event is the Santa Monica June 2013 event where the shooter was armed

5   with multiple firearms and 40 large-capacity magazines.  As the Court pointed out in its

6   earlier order, in the Santa Monica incident, the shooter brought multiple firearms.  He

7   used an AR-15, a revolver, and 3 zip guns.  He reportedly possessed forty 30-round

8   magazines.  He killed five victims.  The survey notes that the AR-15 and the illegal

9   magazines may have been illegally imported from outside of California.  Receiving and

10  importing magazines holding any more than 10 rounds was already unlawful under

11  California law at the time of the Santa Monica tragedy.  In that instance, criminalizing

12  possession of magazines holding any more than 10 rounds likely would not have

13  provided any additional protection from gun violence for citizens or police officers.  Nor

14  would it have prevented the crime.

15         To summarize, the 36-year survey of mass shootings by Mother Jones magazine

16  put forth by the AG as evidence of the State's need for § 32310, undercuts its own

17  argument.  The AG's evidence demonstrates that mass shootings in California are rare,

18  and its criminalization of large capacity magazine acquisition and possession has had no

19  effect on reducing the number of shots a perpetrator can fire.  The only effect of § 32310

20  is to make criminals of California's 39 million law-abiding citizens who want to have

21  ready for their self-defense a firearm with more than 10 rounds.

22         Some would say that this straight up reading and evaluation of the State's main

23  evidence places "too high [an] evidentiary burden for the state.'"  *Duncan v. Becerra*,

24  742 F. App'x 218, 223 (9th Cir. 2018) (dissent).  They would say that "the question is not

25  whether the state's evidence satisfies the district court's subjective standard of

26  _____

27  [51] *Id.*

28  [52] *Id.*

51

3:17cv1017-BEN (JLB)

**ER_124**

1  empiricism." *Id.*  These voices would not test the state's evidence.  They would not

2  require the same rigor a judge usually employs to test the accuracy and persuasiveness of

3  a party's evidence.  Once the state offers any evidence, the evidence would simply be

4  accepted and deemed sufficient to prove the reasonableness of the fit of the regulation for

5  state's experimental solution.

6       For example, according to this view, the Mayors' survey "easily satisfies" the

7  state's evidentiary burden.  *Id.*  It can be said that the Mother Jones Magazine survey

8  does meet the very low standard of "relevant."  But relevant evidence does not mean

9  persuasive, substantial, or admissible evidence.  That a survey of news articles collected

10  by a biased interest group shows that out of 98 examples, not a single shooter was limited

11  to 10 shots while § 32310 was in effect (or would have been limited to 10 shots if had §

12  32310 been in effect), is not substantial or persuasive evidence of § 32310's reasonable

13  fit.  Certainly, the evidence need not be perfect or overwhelming.  But for a statute that

14  trenches on a constitutional right, the state's explanation for such a law needs to have

15  some enduring substance or gravitas, like the Liberty Bell.

16       Where did this idea come from, the idea that a court is *required* to fully credit

17  evidence only "reasonably believed to be relevant?"  *Fyock*, 779 F.3d at 1000.  Or the

18  critique that a court errs by employing a "subjective standard of undefined empirical

19  robustness."  *Duncan*, 742 F. App'x at 224 (dissent).  *Pena v. Lindley*, 898 F.3d 969 (9th

20  Cir. 2018) (*pet'n for cert. filed*) advances this soft approach.  "We do not impose an

21  unnecessarily rigid burden of proof."  *Id.* at 979.  We allow California to rely on any

22  material reasonably believed to be relevant to substantiate its interests."  *Id.*  "We are

23  weighing a legislative judgment, not evidence in a criminal trial."  *Id.*  "We should not

24  conflate legislative findings with 'evidence' in the technical sense."  *Id.*  But, when did

25  we jettison Senator Kennedy's observation and become deferential, if not submissive, to

26  the State when it comes to protecting constitutional rights?

27       This is federal court.  The Attorney General has submitted two unofficial surveys

28  to prove mass shootings are a problem made worse by firearm magazines holding more

1   than 10 rounds.  Do the surveys pass the Federal Rule of Evidence Rule 403 test for

2   relevance?  Yes.  Are the surveys admissible under Federal Rule of Evidence Rule 802?

3   No.  They are double or triple hearsay.  No foundation has been laid.  No authentication

4   attempted.  Are they reliable?  No.  Are they anything more than a selected compilation

5   of news articles – articles which are themselves inadmissible?  No.  Are the compilers

6   likely to be biased?  Yes.[53]

7        Where are the actual police investigation reports?  The Attorney General,

8   California's top law enforcement officer, has not submitted a single official police report

9   of a shooting.  Instead, the Attorney General relies on news articles and interest group

10  surveys.  Federal Constitutional rights are being subjected to litigation by inference about

11  whether a pistol or a rifle in a news story might have had an ammunition magazine that

12  held more than 10 rounds.  This is not conflating legislative findings with evidence in the

13  technical sense.  This is simply evaluating the empirical robustness of evidence in the

14  same objective way used every day by judges everywhere.  Perhaps this is one more

---

17  [53] The organization that published the Mayors' survey changed its name to Everytown for
    Gun Safety.  Everytown for Gun Safety keeps a running tally of school shootings.  A
18  Washington Post piece noted that "Everytown has long inflated its total by including
19  incidents of gunfire that are not really school shootings."  The Washington Post identified
    an example of an Everytown shooting incident.  There a 31-year old man committed
20  suicide outside an elementary school that had been closed for seven months.  "There were
21  no teachers.  There were no students."  *See* John Woodward Cox and Steven Rich, *No,
    There Haven't Been 18 School Shootings in 2018 - That Number is Flat Wrong,* Wash.
22  Post (Feb. 15, 2018) https://www.washingtonpost.com/local/no-there-havent-been-18-
23  school-shooting-in-2018-that-number-is-flat-wrong/2018/02/15/65b6cf72-1264-11e8-
    8ea1-c1d91fcec3fe_story.html?noredirect=on&utm_term=.4100e2398fa0 (last visited
24  Mar. 26, 2019).
25        The U.S. Department of Education does no better.  It reported nearly 240 school-
26  related shootings in 2015-2016.  But NPR did an investigation and could confirm only 11
    incidents.  *See* Kamenetz, Anya, Arnold, Alexis, and Cardinali, Emily, *The School
27  Shootings That Weren't*, NPR Morning Edition (Aug. 27, 2018),
    https://www.npr.org/sections/ed/2018/08/27/640323347/the-school-shootings-that-werent
28  (last visited mar. 26, 2019).

3:17cv1017-BEN (JLB)

1   reason why the Second Amendment has been described as "the Rodney Dangerfield of

2   the Bill of Rights."  *Mance v. Sessions*, 896 F.3d 390, 396 (5th Cir. 2018) (Willett, J.,

3   dissenting).  Obeisance to *Heller* and the Second Amendment is offered and then given

4   *Emeritus* status, all while its strength is being sapped from a lack of exercise.

5       According to *Pena*, "[w]e do not substitute our own policy judgment for that of the

6   legislature," protests the Attorney General.  *Pena*, 898 F.3d at 979.  "We owe the

7   legislature's findings deference," says the State.  *Id.*  This case is not about weak-kneed

8   choice between competing policy judgments.  Deference in the sphere of pure political

9   policy is understandable.  But that is not this case.

10      This case is about a muscular constitutional right and whether a state can impinge

11  and imprison its citizens for exercising that right.  This case is about whether a state

12  objective is possibly important enough to justify the impingement.  The problem with

13  according deference to the state legislature in this kind of a case, as in the *Turner*

14  *Broadcasting* approach, is that it is exactly the approach promoted by dissenting Justice

15  Breyer and *rejected* by the Supreme Court's majority in *Heller*.[54]  Yet, *Turner* deference

16  arguments live on like legal zombies lurching through Second Amendment jurisprudence.

17      Even with deference, meaningful review is required.  "Although we do accord

18  substantial deference to the predictive judgments of the legislature when conducting

19  intermediate scrutiny, the State is not thereby insulated from meaningful judicial review."

20

21  _____

22  [54] In his dissent, Justice Breyer made the ultimately-rejected deference argument clear:

23  "There is no cause here to depart from the standard set forth in *Turner,* for the District's
    decision represents the kind of empirically based judgment that legislatures, not courts,

24  are best suited to make.  In fact, deference to legislative judgment seems particularly
    appropriate here, where the judgment has been made by a local legislature, with

25  particular knowledge of local problems and insight into appropriate local solutions.

26  Different localities may seek to solve similar problems in different ways, and a 'city must
    be allowed a reasonable opportunity to experiment with solutions to admittedly serious

27  problems.'"  *District of Columbia v. Heller*, 554 U.S. 570, 704-05 (2008) (Breyer, J.,
    dissenting) (citations omitted).

28

1   *Heller v. District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011) (quoting *Turner II*,

2   520 U.S. at 195 & *Turner I*, 512 U.S. at 666) (internal quotations omitted)).  Quite the

3   contrary, a court must determine whether the legislature has "based its conclusions upon

4   substantial evidence." *Turner II*, 520 U.S. at 196.  Despite whatever deference is owed,

5   the State still bears the burden "affirmatively [to] establish the reasonable fit we require."

6   *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).  Simply noting that a

7   study has been offered and experts have opined, is an inadequate application of

8   intermediate scrutiny, even when according deference to the predictive judgment of a

9   legislature.  *Turner* itself shows why.  There, the Supreme Court extensively analyzed

10  over the course of *twenty pages* the empirical evidence cited by the government, and only

11  then concluded that the government's policy was grounded on reasonable factual findings

12  supported by evidence that is substantial for a legislative determination."  *See Turner II*,

13  520 U.S. at 196-224.

14      There is another problem with according deference in this case.  Strictly put, this

15  case in not solely about legislative judgments because § 32310(c) and (d) are the products

16  of a ballot proposition.  No federal court has deferred to the terms of a state ballot

17  proposition where the proposition trenches on a federal constitutional right:

18      As one court stated, no court has accorded legislative deference to ballot
        drafters.   Legislatures receive deference because they are better equipped

19      than the judiciary to amass and evaluate the vast amounts of data bearing
        upon complex and dynamic issues.  Because the referendum process does

20      not invoke the same type of searching fact finding, a referendum's fact
        finding does not "justify deference."

21

22

23  *Vivid Entm't, LLC v. Fielding*, 965 F. Supp. 2d 1113, 1127 (C.D. Cal. 2013), *aff'd*, 774

24  F.3d 566 (9th Cir. 2014) (citations and internal quotations omitted); *see also California*

25  *Prolife Council Political Action Comm. v. Scully*, 989 F. Supp. 1282, 1299 (E.D.

26  Cal.1998), *aff'd*, 164 F.3d 1189 (9th Cir. 1999) ("Because the referendum process does

27  not invoke the same type of searching fact finding, a referendum's fact finding does not

28  justify deference.").  The initiative process inherently lacks the indicia of careful debate

3:17cv1017-BEN (JLB)

1  that would counsel deference.  *Carver v. Nixon*, 72 F.3d 633, 645 (8th Cir. 1995) (process

2  of legislative enactment includes deliberation, compromise and amendment, providing

3  substantial reasons for deference that do not exist with respect to ballot measures);

4  *Yniguez v. Arizonans for Official English,* 69 F.3d 920, 945 (9th Cir. 1995), *vacated on*

5  *other grounds*, 520 U.S. 43 (1997) (deference normally accorded legislative findings does

6  not apply with same force when First Amendment rights are at stake; in addition, because

7  measure was a ballot initiative, it was not subjected to extensive hearings or considered

8  legislative analysis before passage); *Daggett v. Webster*, No. 98-223-B-H, 1999 WL

9  33117158, at *1 (D. Me. May 18, 1999) (no court has given legislative deference to a

10  ballot proposition).

11       In this case, as in *Scully*, California argues that *Turner Broadcasting* requires

12  deference be given to the predictive judgments embodied in its statute.  The *Scully* court

13  rejected the approach.  It reasoned persuasively:

14       [T]he deference formulation, however, ignores the context of the quotation
         which requires federal courts to "accord substantial deference to the predictive
15       judgments of Congress."  Thus, the deference recognized in *Turner* is the
         consequence, at least in part, of the constitutional delegation of legislative
16       power to a coordinate branch of government, a factor not present in the instant
         case.  Of course, this is not to say that the predictive judgments of state
17       legislatures are not entitled to due weight.  It would seem odd, however, that
         this court would be required to give greater deference to the implied predictive
18       judgments of a state's legislation than the state's own courts would.  In this
         regard, California courts accord deference to the predictive judgments of their
19       legislature on a sliding scale, according significant deference to economic
         judgments, but employing "greater judicial scrutiny" "when an enactment
20       intrudes upon a constitutional right."  It is of course true that deference in the
         federal courts is not simply a function of the separation of powers doctrine.  It
21       also rests upon the legislative branch being "better equipped than the judiciary
         to 'amass and evaluate the vast amounts of data' bearing upon . . . complex
22       and dynamic" issues.  Once again, given that the statutes at bar are the product
         of the initiative process, their adoption did not enjoy the fact gathering and
23       evaluation process which in part justifies deference.  In any event, the
         deference federal courts accord legislative predictive judgments "does not
24       mean . . . that they are insulated from meaningful judicial review altogether.
         On the contrary, we have stressed in First Amendment cases that the deference

25

26

27

28

afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'" Thus, courts are obligated to "assure that, in formulating its judgments, Congress has drawn reasonable inferences, based on substantial evidence."

*California Prolife Council Political Action Comm*, 989 F. Supp. at 1299 (citations omitted). The 2016 amendments to § 32310 were added by ballot measure and are owed no legislative deference by this Court. The remaining part of § 32310 is the product of ordinary legislation. Impinging on a federal constitutional right as it does, it is not insulated from meaningful judicial review.

The legislative deference doctrine fits better where the subject is technical and complicated. One example is the regulation of elections. *See Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 402–03 (2000) ("Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments—at least where that deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge."). Another is the regulation of public broadcast media. *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 103 (1973) ("That is not to say we 'defer' to the judgment of the Congress and the Commission on a constitutional question, or that we would hesitate to invoke the Constitution should we determine that the Commission has not fulfilled its task with appropriate sensitivity to the interests in free expression. The point is, rather, that when we face a complex problem with many hard questions and few easy answers we do well to pay careful attention to how the other branches of Government have addressed the same problem."). Even in these areas of deference, federal courts do not swallow whole a state's legislative judgment.

Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the

1
2
3

burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

4  *Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983).  From broadcasting regulation

5  comes another example of deference.  Even so, deference there does not mean merely

6  observant acquiescence when First Amendment rights are concerned.  "That Congress'

7  predictive judgments are entitled to substantial deference does not mean, however, that

8  they are insulated from meaningful judicial review altogether.  On the contrary, we have

9  stressed in First Amendment cases that the deference afforded to legislative findings does

10  'not foreclose our independent judgment of the facts bearing on an issue of constitutional

11  law.'"  *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 129 (1989).  Threats to

12  Second Amendment rights ought to be treated with at least the same rigor.

13      The Attorney General argues that the state "must be allowed a reasonable

14  opportunity to experiment with solutions to admittedly serious problems."  This notion

15  was first expressed in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976).

16  The context was a city zoning choice from a different era about where to permit adult

17  theaters.  Wrote the Court, "[i]t is not our function to appraise the wisdom of its decision

18  to require adult theaters to be separated rather than concentrated in the same areas."  *Id.*

19  "Since what is ultimately at stake is nothing more than a limitation on the place where

20  adult films may be exhibited" and "few of us would march our sons and daughters off to

21  war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the

22  theaters of our choice," the Court accorded the city authority to experiment.  *Id.*  That is

23  not comparable to the deadly serious question of whether the state may experiment with a

24  low 10-round limit on the number of shots a person may have in her pistol for protection.

25  In any event, should courts be so deferential when the State chooses to experiment with

26  other constitutionally protected rights?

27      The notion of permitting a city to experiment with zoning decisions about the

28  unwanted secondary effects of adult commercial enterprises, was repeated in *City of*

3:17cv1017-BEN (JLB)

1  *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986), and echoed in *Jackson v. City*
2  *and County of San Francisco*, 746 F.3d 953, 969 (9th Cir. 2014) (approving a city ban on
3  sales of hollow point ammunition). *Jackson* was a Second Amendment case that
4  reasoned that a city prohibition affected "only the sale of hollow-point ammunition
5  within San Francisco, not the use or possession of such bullets" and concluded, "[s]uch a
6  sales prohibition burdens the core right of keeping firearms for self-defense only
7  indirectly, because Jackson is not precluded from using the hollow-point bullets in her
8  home if she purchases such ammunition outside of San Francisco's jurisdiction."  The
9  *Jackson* hollow-point ordinance is far different than California's § 32310.  Under
10  § 32310, no person may use a magazine holding more than 10-rounds for self-defense in
11  her home even if she purchases it outside of the state.  Instead, she will become a
12  criminal subject to arrest, prosecution, conviction, and incarceration.  This kind of
13  government experimentation, the Second Amendment flatly prohibits.

14  No case has held that intermediate scrutiny would permit a state to impinge even
15  slightly on the Second Amendment right by employing a known failed experiment.
16  Congress tried for a decade the nationwide experiment of prohibiting large capacity
17  magazines.  It failed.  California has continued the failed experiment for another decade
18  and now suggests that it may continue to do so *ad infinitum* without demonstrating
19  success.  That makes no sense.

20  ### iv.  the important interests of the State

21  The state has important interests.  Public safety.  Preventing gun violence.
22  Keeping our police safe.  At this level of generality, these interests can justify any law
23  and virtually any restriction.  Imagine the crimes that could be solved without the Fourth
24  Amendment.  The state could search for evidence of a crime anywhere on a whim.
25  Without the First Amendment, the state could better police the internet.  The state could
26  protect its citizens from child pornography, sex trafficking, and radical terrorists.  The
27  state could limit internet use by its law-abiding citizens to, say, 10 hours a day or 10
28  websites a day.  Perhaps it could put an end to Facebook cyberbullying.

1      The Attorney General articulates four important objectives to justify this new

2  statutory bludgeon.  They all swing at reducing "gun violence."  The bludgeon swings to

3  knock large capacity magazines out of the hands of criminals.  If the bludgeon does not

4  work, then the criminals still clinging to their large capacity magazines will be thrown in

5  jail while the magazines are destroyed as a public nuisance.  The problem is the bludgeon

6  indiscriminately hammers all that is in its path.  Here, it also hammers magazines out of

7  the hands of long time law-abiding citizens.  It hammers the 15–round magazine as well

8  as the 100–round drum.  And it throws the law-abiding, self-defending citizen who

9  continues to possess a magazine able to hold more than 10 rounds into the same jail cell

10  as the criminal.  Gun violence to carry out crime is horrendous and should be condemned

11  by all and punished harshly.  Defensive gun violence may be the only way a law-abiding

12  citizen can avoid becoming a victim.  The right to keep and bear arms is not the only

13  constitutional right that has controversial public safety implications.  All of the

14  constitutional provisions that impose restrictions on law enforcement and on the

15  prosecution of crimes fall into the same category.  *McDonald v. City of Chicago, Ill.*, 561

16  U.S. 742, 783 (2010).

17              ***v.  an ungainly "fit"***

18     "[T]he next question in our intermediate scrutiny analysis is whether the law is

19  'narrowly tailored to further that substantial government interest.' . . . As the Supreme

20  Court succinctly noted in a commercial speech case, narrow tailoring requires 'a fit

21  between the legislature's ends and the means chosen to accomplish those ends.'"

22  *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1204 (9th Cir. 2013) (*quoting*

23  *Bd. of Tr. of the State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)).

24      The "fit" of § 32310 is, at best, ungainly and very loose.  That is all that it takes to

25  conclude that the statute is unconstitutional.  The fit is like that of a father's long raincoat

26  on a little girl for Halloween.  The problem of mass shootings is very small.  The state's

27  "solution" is a triple extra-large and its untailored drape covers all the law-abiding and

28  responsible of its 39 million citizens.  Some of the exceptions make the "fit" even worse.

1  For example, § 32310 makes an exception for retired peace officers, but not for CCW

2  holders or honorably discharged members of the armed forces.  There is no evidence that

3  a retired peace officer has better firearms training.[55]  And in any event, for whatever

4  training they receive, does it matter that they are trained to use a 10-round magazine, a

5  15-round magazine, a 30-round magazine, and if so, what is the difference?  The State

6  does not provide any insight.  Another example is the exception for movie props.  Why in

7  the interest of public safety does the movie industry need to use a genuine large capacity

8  magazine for a prop?  Is it too far-fetched to require the Hollywood creators of Mickey

9  Mouse, Jaws, and Star Wars, to use a non-working magazine in place of a genuine large

10  capacity magazine?  Most importantly by far, however, is that the cloak of the law needs

11  at least some arm holes to fit.  It has none because it ignores the fact that magazines

12  holding more than 10 rounds are commonly possessed by law-abiding, responsible

13  citizens, and it affords no room for these citizens to defend their homes against attack.

14       A reasonable fit to protect citizens and law enforcement from gun violence and

15  crime, in a state with numerous military bases and service men and service women,

16  would surely permit the honorably discharged member of the U.S. Armed Forces who

17  has lawfully maintained a magazine holding more than 10 rounds for more than twenty

18  years to continue to keep and use his or her magazine.  These citizens are perhaps the best

19  among us.  They have volunteered to serve and have served and sacrificed to protect our

20  country.  They have been specially trained to expertly use firearms in a conflict.  They

21  have proven their good citizenship by years of lawfully keeping firearms as civilians.

22

23  _____

24  [55] A similar exception for retired police officers permitting possession and use of

25  otherwise banned assault weapons in California, was declared unconstitutional in *Silveira v. Lockyer*, 312 F.3d 1052, 1091 (9th Cir. 2002) ("We thus can discern no legitimate state

26  interest in permitting retired peace officers to possess and use for their personal pleasure military-style weapons.  Rather, the retired officer's exception arbitrarily and

27  unreasonably affords a privilege to one group of individuals that is denied to others,

28  including plaintiffs.").

1    What possibly better citizen candidates to protect the public against violent gun-toting
2    criminals.

3          Similarly, a reasonable fit  would surely make an exception for a Department of
4    Justice-vetted, privately-trained, citizen to whom the local sheriff has granted a permit to
5    carry a concealed weapon, and who owns a weapon with a magazine holding more than
6    10 rounds.  California's statute does not except such proven, law-abiding, trustworthy,
7    gun-owning individuals.  Quite the opposite.  Under the statute, all these individuals will
8    be subject to criminal prosecution, should they not dispossess themselves of magazines
9    holding more than 10 rounds.

10         Ten years of a federal ban on large-capacity magazines did not stop mass shootings
11   nationally.  Twenty years of a California ban on large capacity magazines have not
12   stopped mass shootings in California.  Section 32310 is a failed policy experiment that
13   has not achieved its goal.  But it has daily trenched on the federal Constitutional right of
14   self-defense for millions of its citizens.  On the full record presented by the Attorney
15   General, and evidence upon which there is no genuine issue, whatever the fit might be, it
16   is not a reasonable fit.

17                                *vi. irony*

18         Perhaps the irony of § 32310 escapes notice.  The reason for the adoption of the
19   Second Amendment was to protect the citizens of the new nation from the power of an
20   oppressive state.  The anti-federalists were worried about the risk of oppression by a
21   standing army.  The colonies had witnessed the standing army of England marching
22   through Lexington to Concord, Massachusetts, on a mission to seize the arms and
23   gunpowder of the militia and the Minutemen—an attack that ignited the Revolutionary
24   war.  With Colonists still hurting from the wounds of war, the Second Amendment
25   guaranteed the rights of new American citizens to protect themselves from oppressors
26   foreign and domestic.  So, now it is ironic that the State whittles away at the right of its
27   citizens to defend themselves from the possible oppression of their State.

28

3:17cv1017-BEN (JLB)

1

### vii.  turning the Constitution upside down

2    In the year 2000, California started its "experiment" in banning magazines holding

3 more than 10-rounds.  The statute included a grandfather clause permitting lawful owners

4 of larger magazines to keep them.  *See Senate Committee Rpt (Perata) SB 23 (Mar.*

5 *1999)*, ("The purpose of this bill is to make all but the possession of 'large-capacity

6 magazines' a crime punishable as an alternative misdemeanor/felony ('wobbler')"; "The

7 bill would make it a crime to do anything with detachable large capacity magazines after

8 January 1, 2000 – except possess and personally use them – punishable as a

9 misdemeanor/felony."; "One could still possess those magazines after January 1,

10 2000.").[56]  Relying at least in part on the State's representation, law-abiding citizens did

11 not object.  Time passed.  Now, these still law-abiding owners of larger magazines are

12 told that the grandfather clause is a dangerous "loophole" that needs closing.   Section

13 2.12 of Proposition 63 declared, "Today, California law prohibits the manufacture,

14 importation and sale of military-style, large capacity ammunition magazines, but does not

15 prohibit the general public from possessing them.  *We should close that loophole.*  No

16 one except trained law enforcement should be able to possess these dangerous

17 ammunition magazines."  (Emphasis added.)   Plaintiffs who have kept their own larger

18 capacity magazines since 1999, and now face criminal sanctions for continuing to possess

19 them, no doubt feel they have been misled or tricked by their lawmakers.

20    The Attorney General explains that the grandfathering provision made the prior

21 version of § 32310 very difficult to enforce.  Because large capacity magazines lack

22 identifying marks, law enforcement officers are not able to tell the difference between

23 grandfathered magazines and more recently smuggled, or manufactured, illegal

24

25

26    ───────────────

27

28 [56] http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml (last visited March 12, 2019).

3:17cv1017-BEN (JLB)

1    magazines.[57] Consequently, explains the Attorney General, "the possession loophole in

2    Section 32310 undermined existing LCM restrictions."  Def.'s Oppo. to Ps' MSJ, at 7.  In

3    an analogous First Amendment case, the Supreme Court called this approach turning the

4    Constitution upside down. The Court explained:

> We confronted a similar issue in *Ashcroft v. Free Speech Coalition,* 535 U.S.
> 234 (2002), in which the Government argued that virtual images of child
> pornography were difficult to distinguish from real images.  The
> Government's solution was "to prohibit both kinds of images."  We rejected
> the argument that "protected speech may be banned as a means to ban
> unprotected speech," concluding that it "turns the First Amendment upside
> down."  As we explained: "The Government may not suppress lawful speech
> as the means to suppress unlawful speech.  Protected speech does not
> become unprotected merely because it resembles the latter.  The Constitution
> requires the reverse."

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 474–75 (2007)

(finding issues advocacy may not be suppressed even though it is sometimes difficult to

distinguish it from advocacy for the election or defeat of a candidate which may be

regulated).  The analog is that the State may not now ban lawfully-kept large capacity

magazines owned since 1999 as a means to ban large capacity magazines unlawfully

manufactured or imported after January 1, 2000.  Lawful arms do not become

unprotected merely because they resemble unlawful arms.  "The Government's proposed

prophylaxis – to protect against the violations of the few, we must burden the

constitutional rights of the many – turns the Second Amendment on its head.  Our

Founders crafted a Constitution to promote the liberty of the individual, not the

convenience of the Government."  *Mance v. Sessions*, 896 F.3d 390, 405 (5th Cir. 2018)

(Ho, J., dissenting from denial of rehearing en banc), *pet'n for cert. filed* (Nov. 21, 2018).

---

[57] California could have addressed this concern by requiring a serial number on
manufactured or imported large capacity magazines, as did the federal law.  *See e.g.,* 27
C.F.R. § 478.92(c)(1) ("Each person who manufactures or imports any large capacity
ammunition feeding device manufactured after September 13, 1994, shall legibly identify
each such device with a serial number.").

### *viii. other arguments*

### **(1).  uniquely dangerous?**

The State argues that magazines able to hold more than 10 rounds are uniquely dangerous because they enable a shooter to fire more rounds in a given period, resulting in more shots fired, more victims wounded, more wounds per victim, and more fatalities. Actually, many larger capacity magazines are not uniquely dangerous because they are not much larger.  For example, a 12 or 15-round magazine is commonly owned and only slightly larger than the permitted 10-round magazines and enables a shooter to fire slightly more rounds, resulting only sometimes in slightly more rounds fired, or slightly more victims wounded, or slightly more wounds per victim, or slightly more fatalities. Conversely, a 12 or 15-round magazine may be the slight, but saving, difference needed for an overwhelmed homeowner trying to protect herself from a group of attacking invaders.  The State may be correct that a 100-round magazine is uniquely dangerous.

The State relies on expert witness, Professor Louis Klarevas.  Professor Klarevas says that banning large capacity magazines will reduce violence and force shooters to take a critical pause.  *See* DX-3.   However, in a piece by Professor Klarevas dated 2011, he offers that the Tucson shooting would have likely still happened with a ban on high capacity magazines.  He wrote, "But, even if . . . the federal government were to ban extended clips, the sad fact is that the Tucson shooting likely still would have happened . . . .  Moreover, even if Loughner showed up with a six-bullet revolver as opposed to a 30-round Glock, he likely still would have shot people.  What's more, a person set on inflicting mass casualties will get around any clip prohibitions by having additional clips on his person (as Loughner did anyway) or by carrying more than one fully loaded weapon."[58]

---

[58] Klarevas, Louis, *Closing the Gap*, The New Republic (Jan. 13, 2011), https://newrepublic.com/article/81410/us-gun-law-reform-tucson (las visited May 1, 2018).

3:17cv1017-BEN (JLB)

**ER_138**

1

**(2.)  Kolbe v. Hogan**

2     The State rests much of its argument on the decision in *Kolbe v. Hogan*, 849 F.3d

3   114, 137 (4th Cir. 2017) (en banc), *cert. denied,* 138 S. Ct. 469 (2017).  The State cites

4   *Kolbe's* observation that large capacity magazines enable a shooter to hit "multiple

5   human targets very rapidly" and "contribute to the unique function of any assault weapon

6   to deliver extraordinary firepower."  Considering this, *Kolbe* found that assault weapons

7   and large capacity magazines are military weapons, and that military weapons are not

8   protected by the Second Amendment.  It is interesting to note, that the Maryland statute

9   at issue in that case did not ban the possession of a large capacity magazine.  *Id.* at 123

10   ("The [Firearm Safety Act] does not ban the possession of a large-capacity magazine.").

11     *Kolbe* concluded that large capacity magazines were beyond the protection of the

12   Second Amendment.  *Id.* at 137.  The court reached that conclusion based on the thought

13   that such magazines are "most useful" in military service.  *Id*.  That large capacity

14   magazines are useful in military service, there is no doubt.  But the fact that they may be

15   useful, or even "most useful," for military purposes does not nullify their usefulness for

16   law-abiding responsible citizens.  It is the fact that they are commonly-possessed by these

17   citizens for lawful purposes that places them directly beneath the umbrella of the Second

18   Amendment.  *Kolbe*'s decision that large capacity magazines are outside the ambit of the

19   Second Amendment is an outlier and unpersuasive.  Beyond this, this Court is

20   unpersuaded by *Kolbe*'s interpretation of *Miller* finding that weapons most useful for

21   military service are not protected.  The dissenting *Kolbe* judges persuasively pointed out

22   that the approach turns Supreme Court precedent upside down.  *Id.* at 156-57 (Traxler,

23   Niemeyer, Shedd, and Agee, Js., dissenting) ("Under [that] analysis, a settler's musket,

24   the only weapon he would likely own and bring to militia service, would be most useful

25   in military service—undoubtedly a weapon of war—and therefore not protected by the

26   Second Amendment.  This analysis turns *Heller* on its head.").

27

28

3:17cv1017-BEN (JLB)

### (3.) Dr. Christopher S. Koper

The State relies on an expert, Dr. Christopher S. Koper.[59]  Dr. Koper, in turn, relies in part on an analysis performed by a graduate student.  DX-4 at 131.  The graduate student, in turn, relies on a collection of data by Mother Jones Magazine from 1982 through 2012.  *Id.*  The resulting master's thesis is unpublished and unavailable.  *Id.* at n.12.  Dr. Koper also relies on studies in localities outside of California from the 1990s for which he notes that the "findings may not generalize well to other locations and the current timeframe."  *Id.* at n. 14.  He describes some of this evidence as "tentative."  *Id.* at 133.  Dr. Koper concedes that he knows of no studies on the effects on gun violence of California's ban on assault weapons in 1989 and the ban on larger magazines in 2000.  *Id.* at n. 15.  He notes that "it is difficult to assess trends in LCM use because of limited information."  *Id.* at 137.  Specifically, Dr. Koper notes the paucity of solid data on the

---

[59] The Attorney General relies on expert reports of Christopher S. Koper, Lucy Allen, John J. Donohue, Louis Klarevas, and Daniel W. Webster.  Each of the reports lacks an authenticating declaration.  Under Rule 56(c)(4), "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Each of these expert reports fail to comply in several respects.  First, the reports are not signed under penalty of perjury.  Second, no person certifies that the statements are true and correct.  Third, none of the reports are accompanied by any separate sworn declaration, an alternative mechanism that courts have found to satisfy Rule 56(c)'s functional concerns.  *See, e.g., Am. Federation of Musicians of United States and Canada v. Paramount Pictures Corp.*, 2017 WL 4290742 (9th Cir. Sep. 10, 2018) (finding an unsworn expert report accompanied by the expert's sworn declaration satisfied the functional concerns behind Rule 56(c)(4)).

The Court has reviewed other courts' decisions on similar facts and concludes that these unsworn expert reports do not qualify for an exception, particularly because of those courts that accepted unsworn expert reports the reports otherwise satisfied Rule 56(c)'s requirements.  For example, in *Single Chip Systems Corp. v. Intermec IP Corp.*, 2006 WL 4660129 (S.D. Cal. Nov. 6, 2006), the district court admitted unsworn expert reports where the reports stated in their introductions "that the contents were made on personal knowledge, that the facts would be admissible in evidence, and that the affiants [we]re competent to testify to the information contained herein."  *Id.* at *6.

3:17cv1017-BEN (JLB)

1   use of large capacity magazines.  He explains, "[a]ssessing trends in LCM use is much

2   more difficult because there was, and is, no national data source on crimes with LCMs,

3   and few local jurisdictions maintain this sort of information." *Id.* at 139.  He notes,

4   "there is little evidence on how state LCM bans affect the availability and use of LCMs

5   over time." *Id.* at n. 29.  He states, "[p]erhaps most importantly, to the best of my

6   knowledge, there have not been any studies examining the effects of LCM laws that ban

7   LCMs without grandfathering, as done by the new California statute.  Hence, these

8   studies have limited value in assessing the potential effectiveness of California's new

9   law." *Id.*  Finally, Dr. Koper acknowledges that while he does have an opinion, it is *not*

10  based on a study of § 32310.  He explains, "I have not undertaken any study or analysis

11  of this law." *Id.* at 146.

12                          **(4.)  Daniel W. Webster**

13          The State also relies on the expert report of Daniel W. Webster, a professor of

14  health policy and management.  *See* DX-18 at 775.  Professor Webster also has an

15  opinion, but foundational data is vaporous.  For example, Webster notes that,

16  "[u]nfortunately, data to more definitively determine the connections between

17  ammunition capacity and gun violence outcomes—the number of shots fired, the rate of

18  fire, the number of victims, the number of wounds per victims, lethality of woundings—

19  have not been collected in any population." *Id.* at 780-81.  For his own analysis, Webster

20  relies, in part, on Dr. Koper's re-analysis, of his graduate student's analysis, of Mother

21  Jones Magazine's collection of shooting incidents.  *Id.* at 780 ("Similarly, Professor

22  Christopher Koper's re-analysis of his student's data from Mother Jones magazine's

23  study of public mass murders with firearm. . . .").  Webster also acknowledges the

24  paucity of data-based analysis regarding mass shootings.  He admits, "[a]lthough no

25  formal, sophisticated analyses of the data on mass shootings in public places by lone

26  shooters for the period 1982-2012 collected by Mother Jones magazine has been

27  performed to my knowledge, a temporal pattern can be discerned that is consistent with a

28  hypothesized protective effect of the federal assault weapon and LCM ban and a harmful

1   effect of the expiration of that ban." *Id.* at 787-88.  He also says, "[t]o date, there are no

2   studies that have examined separately the effects of an assault weapons ban, on the one

3   hand, and a LCM ban, on the other hand . . . ." *Id.* at 790.  Webster opines that a

4   magazine limit lower than 10 rounds could be justified. *Id.* at 791.

5                                   **(5.)  John J. Donohue**

6        The State also relies on the expert report of John J. Donohue, a professor of law at

7   Stanford Law School.  *See* DX-2.  According to his report in this case, he also prepared

8   an expert report in the *Fyock* case.  *Id.* at ¶ 6.  Some of his observations should be

9   discounted.  Professor Donohue reports that national surveys "consistently find a

10  persistent decline in household gun ownership," describing a 2013 report from the Pew

11  Research Center. *Id.* at ¶ 14 and n.5.  He describes this as reliable social science data. *Id.*

12  at ¶ 15.  The Court reviewed the Pew Research piece he cited.  The first sentence notes

13  the absence of definitive data, cautioning that, "[t]here is no definitive data source from

14  the government or elsewhere" on gun ownership rates.[60] It says that surveys provide

15  conflicting results.  In the paragraph directly following the portion quoted in Professor

16  Donohue's expert report, the Pew Research report describes a Gallup Organization

17  survey.  That survey concludes not that there has been a persistent decline, but rather that

18  the gun ownership rate of 43% is "the same as it was 40 years earlier."[61]

19       Professor Donohue also opines that private individuals, unlike police officers,

20  "only need to scare off criminals (or hold them off until the police arrive)." *Id.* at ¶ 21.

21  This is obviously a generalization.  The generalization would not have been true for

22  Susan Gonzalez or the mother of twins whose assailants were not scared off despite each

23  victim emptying her gun. *See* n.2 & 4, *supra*.  Instead of "holding them off till the police

24  _____

25

26  [60] Pew Research Center, *Why Own a Gun? Protection is Now Top Reason, Section 3:*
    *Gun Ownership trends and Demographics* (Mar. 12, 2013) http://www.people-
27  press.org/2013/03/12/section-3-gun-ownership-trends-and-demographics (last visited
    Apr. 30, 2018), at 1.
28  [61] *Id.* at 2.

3:17cv1017-BEN (JLB)

1  arrived," the only assailants remaining at the scene when the police arrived in any of the
2  three incidents described above was a fatally-wounded assailant.  Professor Donohue
3  again generalizes in his conclusion opining that a 10-round magazine "is sufficient" and
4  higher capacity magazines are "not required" for defending one's home.  Dx-2 at 9.
5  Again, generalizations like these are no more than generalizations, and personal, not
6  expert, opinions.  Yet, for such an important context as the defense of self and loved
7  ones, generalizations are dangerous.  Relying on generalizations like these may lead to a
8  thousand underreported tragedies for law-abiding citizen victims who were supposed to
9  need only 2.2 rounds and no more than 10 rounds to scare off criminal assailants.

### (6.)  Carlisle Moody

11      The State provides the deposition testimony of Carlisle Moody, a professor, who
12  opines that, "[f]irearms fitted with large capacity magazines can be used to cause death
13  and injury in public shooting incidents, and can also result in more rounds fired and more
14  homicides in general than similar firearms with smaller magazines," but concedes this
15  conclusion is simply theoretical.  DX-7 at 472-73 (Q.  And what is the basis for that
16  statement?  How did you arrive at that conclusion?  A.  Just theoretically.").  Furthermore,
17  the same can be said of a 10-round magazine versus a 7-round magazine, or a 7-round
18  magazine versus a 2-round Derringer.

### (7.)  Sandy Hook commission

20      The State relies on the report of a commission reviewing the Sandy Hook shooting.
21  DX-28.  However, it misquotes the commission's findings, saying "[d]ue to their
22  lethality, LCMs 'pose a distinct threat to safety in private settings as well as places of
23  assembly."  Def. Opposition to Plaintiff's Motion for Summary Judgment at 11.  What
24  was reported is, "[t]he Commission found that certain types of ammunition and
25  magazines that were readily available at the time it issued its Interim Report posed a
26  distinct threat to safety in private settings as well as in places of assembly."  *Id.* at 1097.
27  The commission goes on to recommend a ban on armor-piercing and incendiary bullets (a
28  good idea) as well as large-capacity magazines (without specifying size).  *Id.*

### (8.)  large magazines not characteristically used for home?

The State asserts that large capacity magazines are not "weapons of the type characteristically used to protect the home," citing *Hightower v. City of Boston*, 693 F.3d 61, 71 (1st Cir. 2012).  *Hightower* was unconcerned with magazine size.  Instead, it was a regulatory challenge brought by a former law enforcement officer whose permit to carry a revolver was revoked.  Any inference to be drawn about magazines from the one-half sentence quoted is dicta.  There is no convincing evidence that magazines holding more than 10 rounds are not characteristically used to protect one's home.  The large numbers in circulation and human nature suggests otherwise.  "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016).

### (9.)  large magazines cause collateral damage?

The State argues that where a larger capacity magazine-equipped firearm is used in lawful self-defense, the magazines can cause collateral damage and injury when civilians fire more rounds than necessary, thereby endangering themselves and bystanders.  Yet, one of the State's experts, Lucy P. Allen, opines that defenders average only 2.3 shots per defensive incident and that no one has shot more than 10 rounds in defense.[62]  This implies that on average, a magazine able to hold more than 10 rounds in the hands of a citizen firing in self-defense, will not cause any additional collateral damage and will not increase any danger to themselves or bystanders.  State expert John J. Donahue goes farther and opines that private individuals only need to "brandish" a gun to scare off criminals.  So, the notion that a stray round may penetrate a wall does not translate into

---

[62] Gary Kleck testified that no one has researched the question of whether defensive gun use requires more than 10 rounds.  Nevertheless, violent crimes where victims face multiple offenders are commonplace and it requires more than one round to shoot one attacker.  DX-8 at 490.

any greater risk of bystander injury when a large capacity magazine is used by a defender since it will likely be used only for brandishing or for the average 2.3 shots. Even safer may be a large capacity magazine on an AR-15 type of rifle as it is likely to be more persuasive when brandished at criminal assailants than would a five-shot revolver. It is worth noting that in evaluating the strength of the government's fear of bystander injury, the State has not identified one incident where a bystander was hurt from a citizen's defensive gun use, much less a defensive use of a gun with a high capacity magazine. The worrisome scenario is improbable and hypothetical.

### (10.) mass shooters prefer large magazines?

The State argues that mass shooters often use large capacity magazines precisely because they inflict maximum damage on as many people as possible. Perhaps this is true. There are no police investigative reports provided recounting a mass shooter's answer to the question: why select a large-capacity magazine. More importantly, many mass shooters do not select large capacity magazines, at all. The two incidents involving mass shootings at public high schools in 2018 are good examples. Instead of a pistol or rifle and large-capacity magazines, a shotgun and a revolver were the firearms selected by the mass shooter during the 2018 incident at Santa Fe High School in Galveston, Texas.[63] Also rejecting large capacity magazines last year, the shooter in the Parkland, Florida, high school mass shooting carried 150 rounds in 10-round magazines.[64]

Further undercutting the government's fear is the opinion of expert Gary Kleck, who says that mass shooters who do choose a high capacity magazine are mistaken in

---

[63] https://www.usatoday.com/story/news/2018/05/19/texas-school-shooting-timeline-how-30-minute-attack-unfolded/625913002/ (last visited Mar. 13, 2019).

[64] McCardle, Mairead, *Report: Parkland Shooter Did Not Use High-Capacity Magazines*, National Review (Mar. 1, 2018) https://www.nationalreview.com/2018/03/report-parkland-shooter-did-not-use-high-capacity-magazines/ (last visited Mar. 22, 2019) ("The 19-year-old school shooter who killed 17 in Florida on Valentine's Day had 150 rounds of ammunition in 10-round magazines. Larger ones would not fit in his bag, Florida state senator Lauren Book revealed.").

72

1  thinking it will enable them to cause more harm.  "Right.  They can do everything that

2  that mass shooter might want to do if they had 10-round magazines rather than 30-round

3  magazines.  There's a difference between hypothetical potential and the reality of mass

4  shootings . . ."  DX-8 at 492.

5  **(11.)  disproportionately used against police?**

6  The State argues that large-capacity magazines are disproportionately used against

7  police, citing an undated, unsigned, document created by an organization named the

8  Violence Policy Center (DX-20 at 799-807).  Def. Opposition to Plaintiff's Motion for

9  Summary Judgment, at 18.  The document says nothing about violence against police.

10  Elsewhere, the State itself notes that between 2009 and 2013, large-capacity magazine

11  firearms constituted less than half of the guns used in murders against police (41%).  See

12  DX-4 at 143.  In the FBI's 2016 report on law enforcement officers killed and assaulted,

13  the average number of rounds fired by a criminal at a police officer was 9.1.  Since 2007,

14  the average number of rounds fired has never exceeded 10, and for seven of the years the

15  average was under 7.[65]  In other words, regardless of the magazine size used by a

16  criminal shooting at a police officer, the average number of rounds fired is 10 or less,

17  suggesting that criminalizing possession of a magazine holding more than 10 will have

18  no effect (on average).

19  The statistical average of 9.1 rounds fired is consistent with a declaration of Phan

20  Ngo, Director of the Sunnyvale Department of Public Safety.  In his declaration, Ngo

21  states that as a Deputy Chief at the San Jose Police Department he oversaw a 2016

22  shooting of a police officer.  He stated that "the suspect fired 9 rounds at the officers,

23

24

25

26  [65] FBI 2016 Law Enforcement Officers Killed & Assaulted, at Table 18,

27  https://ucr.fbi.gov/leoka/2016/tables/table-18.xls (last visited Mar. 19, 2019).  Under
   Rules of Evidence 201(b) courts may take judicial notice of some types of public records,

28  including reports of administrative bodies.

3:17cv1017-BEN (JLB)

1  with an AR pistol type, semi-automatic weapon."[66]  Ngo goes on to state that "also

2  recovered at the scene was a Mag Pro 30 clip (large capacity magazine) that still had 21

3  [] rounds in the clip."[67]  Fortunately, none of the officers were injured.

4                              **(12.)  the critical "pause"**

5          The State argues that smaller magazines create a "critical pause" in the shooting of

6  a mass killer.  "The prohibition of LCMs helps create a "critical pause" that has been

7  proven to give victims an opportunity to hide, escape, or disable a shooter."  Def. Oppo.,

8  at 19.  This may be the case for attackers.  On the other hand, from the perspective of a

9  victim trying to defend her home and family, the time required to re-load a pistol after the

10  tenth shot might be called a "lethal pause," as it typically takes a victim much longer to

11  re-load (if they can do it at all) than a perpetrator planning an attack.  In other words, the

12  re-loading "pause" the State seeks in hopes of stopping a mass shooter, also tends to

13  create an even more dangerous time for every victim who must try to defend herself with

14  a small-capacity magazine. The need to re-load and the lengthy pause that comes with

15  banning all but small-capacity magazines is especially unforgiving for victims who are

16  disabled, or who have arthritis, or who are trying to hold a phone in their off-hand while

17  attempting to call for police help.  The good that a re-loading pause might do in the

18  extremely rare mass shooting incident is vastly outweighed by the harm visited on

19  manifold law-abiding, citizen-victims who must also pause while under attack.  This

20  blanket ban without any tailoring to these types of needs goes to show § 32310's lack of

21  reasonable fit.

22

23

24

25  ————————————

26  [66] Declaration of Chief  Phan Ngo, in support of Amici Curiae the City and County of
    San Francisco, the City of Los Angeles, and the City of Sunnyvale, at para. 7, filed Oct.
27  19, 2017, in *Duncan v. Becerra*, Ninth Circuit Appeal No 17-56081 (docket 29).
28  [67] *Id.*

                                              74

1          **(13.)** *Turner's* **requirement**

2          Lastly, the State argues that it is not required to prove that § 32310 will eliminate

3   or reduce gun violence or mass shootings, or that there is scientific consensus as to the

4   optimal way to reduce the dangerous impact of large-capacity magazines, or that § 32310

5   will not be circumvented by criminals.  All that must be shown, it contends, is that the

6   State "has drawn reasonable inferences based on substantial evidence," citing *Turner*

7   *Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994).  Def. Oppo., at n. 14.

8          Even *Turner* does not expect a judicial milquetoast naivete, but a muscular

9   "meaningful review" and independent judgment of the facts.  Remember, the *Turner*

10  Court returned the case to the district court because of an inadequate record.  *E.g., id.* at

11  667-68 ("The paucity of evidence . . . is not the only deficiency in this record.  Also

12  lacking are any findings concerning the actual effects . . . [and] the record fails to

13  provide any judicial findings concerning the availability and efficacy of 'constitutionally

14  acceptable less restrictive means' of achieving the Government's asserted interests."); *id.*

15  at 673 (Blackmun, J., concurring) ("Justice Kennedy asks the three-judge panel to take

16  additional evidence on such matters as whether the must-carry provisions really respond

17  to threatened harms to broadcasters [and] whether §§ 4–5 'will in fact alleviate these

18  harms in a direct and material way.'").  Congress had set out numerous "unusually

19  detailed statutory findings" within the Act being reviewed.  *Id*. at 646.  These "legislative

20  facts" were the product of three years of congressional hearings.  *Id*. at 632.  It was in this

21  unusual context in which the Court said that the predictive judgments of Congress are

22  entitled to substantial deference.

23          No similar unusually detailed congressional findings or predictive judgments after

24  years of hearings are present in the case of California Penal Code § 32310.  On the

25  contrary, the 2016 criminalization and dispossession amendments added in § 32310 (c)

26  and (d) were not the product of legislative action, at all.  These were, instead, the product

27  of a complicated state referendum question known as Proposition 63.  *Cf. Perry v.*

28  *Schwarzenegger*, 704 F. Supp. 2d 921, 994–95 (N.D. Cal. 2010), *aff'd sub nom. Perry v.*

1   *Brown*, 671 F.3d 1052 (9th Cir. 2012), and *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052

2   (9th Cir. 2012) ("That the majority of California voters supported Proposition 8 is

3   irrelevant, as 'fundamental rights may not be submitted to a vote; they depend on the

4   outcome of no elections.'").  To the extent one could argue that federal courts owe some

5   judicial deference to the judgment of a state legislature (as opposed to deference to a co-

6   equal branch of the U.S. Congress), in passing the longer-standing part of § 32310, the

7   1999 California legislature was more concerned with defining assault weapons and

8   judged the possession of a large capacity magazine should remain lawful.

9   **(14.)  *Turner*-style deference rejected in *Heller***

10  *Turner*-style deference for Second Amendment review was specifically argued for

11  by Justice Breyer and rejected by the Court in *Heller*.  *See e.g., Heller v. D.C.*, 670 F.3d

12  1244, 1280 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("It is ironic, moreover, that

13  Justice Breyer's dissent explicitly advocated an approach based on *Turner Broadcasting*;

14  that the *Heller* majority flatly rejected that *Turner Broadcasting*-based approach; and that

15  the majority opinion here nonetheless turns around and relies expressly and repeatedly on

16  *Turner Broadcasting*.").

17  **(15.)  even *Turner* requires tailoring for a reasonable fit**

18  Even under *Turner*'s intermediate scrutiny, a reasonable fit requires tailoring, and a

19  broad prophylactic ban on acquisition or possession of all magazines holding more than

20  10 rounds for all ordinary, law-biding, responsible citizens is not tailored at all.  *Turner*,

21  512 U.S. at 682–83 (O'Connor, J., concurring in part and dissenting in part) ("A

22  regulation is not 'narrowly tailored'—even under the more lenient [standard applicable to

23  content-neutral restrictions]—where . . . a substantial portion of the burden on speech

24  does not serve to advance [the State's content-neutral] goals. . . . "Broad prophylactic

25  rules in the area of free expression are suspect.  Precision of regulation must be the

26  touchstone . . . .").  The State notes that Vermont enacted a recent prohibition on

27  magazines holding more than 10 rounds for rifles or 15 rounds for a handgun.  Def.'s

28  Response to Plaintiffs' Supp. Brief, at n. 2.  Vermont's regulation evidences more

1    tailoring than does § 32310 and makes room for a home owner to have 15 rounds (50%
2    more) for defense.

3                    **(16.)  "10" appears to be an arbitrary number**

4        So, how did California arrive at the notion that any firearm magazine size greater
5    than a 10-round magazine is unacceptable?  It appears to be an arbitrary judgment.  The
6    Attorney General says it is not.  Def's Response to Plaintiffs' Supp. Brief, at 9.  He notes
7    that other large-capacity magazine bans and the former federal ban settled on 10 rounds.
8    The State does not, however, say why California (or any jurisdiction, for that matter)
9    place the limit at 10.  One author surmised from a comparison, that California lawmakers
10   simply "borrowed the large-capacity magazine ban from the federal moratorium."
11   Stricker, Brent W., *Gun Control 2000: Reducing the Firepower*, 31 McGeorge L. Rev.
12   293, 301.  The State notes a 10-round limit was included in its firing-capacity legislation
13   prohibiting machine guns in 1933.  The significance of 10 rounds, however, is not
14   addressed.  Larger magazines were not commonplace in 1933.  By 1999, when California
15   first banned the sale, manufacturing, and importation of magazines able to hold more
16   than 10-rounds (in former § 12020(a)(2)), larger magazines numbered in the millions.

17       While the State's more recent legislation imposing a ban on magazines able to hold
18   more than 10 rounds (§32310(b), 2016 Cal. Legis. Serv. Ch. 58 (S.B. 1446) (WEST))
19   was superseded by Proposition 63's passage, the Attorney General does not identify any
20   of the legislative discussions bearing on the 10-round limit.  The 1994 federal ban with its
21   10-round limit lapsed in 2004.  Federal law has no limit on permissible magazine size.  In
22   U.S. Sentencing Guidelines for firearm offenses (§2K2.1(a)) and the comments
23   thereunder, a "large capacity magazine" is defined for purposes of sentencing as a
24   magazine "that could accept more than 15 rounds of ammunition."  *See* § 2K2.1 comment
25   n.2 (2018); *United States v. Cherry*, 855 F.3d 813, 815 (7th Cir. 2017) (describing same);
26   *United States v. Henry*, 819 F.3d 856, 867 (6th Cir. 2016) (same).

27       The State argues only that it is not required to explain why it has selected 10 as the
28   number.  Def's Response to Plaintiffs' Supp. Brief, at 9-10.  Perhaps not.  But the 10-

1  round limit appears to be arbitrary.  A reasoned explanation or a considered judgment
2  would tend to demonstrate why the "fit" of a total ban on magazines larger than 10-
3  rounds is reasonable or how the ban is narrowly tailored.  Perhaps it is an unintentional
4  legacy from the 1930s when generally larger detachable magazines were rare, our
5  military's popular WW I Colt .45 M1911 pistol held a magazine holding 7-8 rounds, and
6  otherwise 5 or 6 shot revolvers ruled.  Surly, *Turner* deference does not mean a federal
7  court is relegated to rubber-stamping a broad-based arbitrary incursion on a constitutional
8  right founded on speculative line-drawing and without any sign of tailoring for fit.

9  ### (17.)  *Fyock v. Sunnyvale*

10  So, what about the *Fyock* decision.  *Fyock*, like the Ninth Circuit decision in this
11  case, are both appeals from preliminary injunction requests.  Preliminary injunction
12  appeals are reviewed narrowly.  *Compare Fyock,* 779 F.3d at 995 ("As we have
13  previously noted, there are limitations to interlocutory appeals of this nature given the
14  narrow scope of our review:  In some cases, parties appeal orders granting or denying
15  motions for preliminary injunctions in order to ascertain the views of the appellate court
16  on the merits of the litigation, but . . . due to the limited scope of our review . . . our
17  disposition of appeals from most preliminary injunctions may provide little guidance as
18  to the appropriate disposition on the merits."), *with Duncan v. Becerra*, 742 F. App'x
19  218, 220 (9th Cir. 2018) ("We do not 'determine the ultimate merits,' but rather
20  'determine only whether the district court correctly distilled the applicable rules of law
21  and exercised permissible discretion in applying those rules to the facts at hand.'").
22  Preliminary injunction motions typically present complicated legal and factual questions
23  on an abbreviated time frame.  Orders are not final.  Appellate review does not go to the
24  merits but to whether the district court properly exercised judicial discretion or made a
25  clear error of judgment.  *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir.
26  2011) ("The grant or denial of a preliminary injunction lies within the discretion of the
27  district court and we may reverse a district court only where it relied on an erroneous
28  legal premise or abused its discretion.").

3:17cv1017-BEN (JLB)

1    A preliminary injunction decision is a fact-bound decision. *Fyock* concerned a city

2    ordinance covering only residents of Sunnyvale, California. This case concerns a state-

3    wide statute. The Sunnyvale ordinance carved out exceptions for nine categories,

4    including category eight ("Any person lawfully in possession of a firearm that the person

5    obtained prior to January 1, 2000, if no magazine that holds fewer than 10 rounds of

6    ammunition is compatible with the firearm and the person possesses the large-capacity

7    magazine solely for use with that firearm."). *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d

8    1267, 1272 (N.D. Cal. 2014). The state statute § 32310 includes no exception like

9    Sunnyvale's category eight. The Sunnyvale ordinance required non-exempt persons to,

10   *inter alia*, remove their large capacity magazines from the City of Sunnyvale. *Id.* The

11   state statute § 32310 requires non-exempt persons to remove their large-capacity

12   magazines from California. The City of Sunnyvale is a small, populous, municipality

13   with uniquely-trained public safety officers. The State of California is one of the largest

14   states in the Union and includes everything from areas where populations are small and

15   far from emergency services to the second largest city in the United States.

16   The district court in *Fyock*, found that " magazines having a capacity to accept

17   more than ten rounds are in common use, and are therefore not dangerous and unusual."

18   *Fyock,* 25 F. Supp. 3d 1267 at 1275. The district court found that it does not matter

19   whether large capacity magazines are commonly used for self-defense explaining,

20   "Second Amendment rights do not depend on how often the magazines are used. Indeed,

21   the standard is whether the prohibited magazines are 'typically *possessed* by law-abiding

22   citizens for lawful purposes,' not whether the magazines are often *used* for self-defense."

23   *Id.* at 1276. The district court found that if few people require a particular firearm for

24   self-defense, that should be a cause for celebration, not a reason to place large capacity

25   magazines beyond Second Amendment protection. *Id.* ("The fact that few people 'will

26   require a particular firearm to effectively defend themselves,'. . . should be celebrated,

27   and not seen as a reason to except magazines having a capacity to accept more than ten

28   rounds from Second Amendment protection."). The district court found that the large

1    capacity magazines qualify as "arms" for purposes of the Second Amendment. *Id.* The

2    district court concluded that the Sunnyvale ordinance banned conduct that is protected by

3    the Second Amendment. *Id.* at 1277. These are all points with which this Court agrees.

4        The divergence of opinion comes with the selection of the level of heightened

5    scrutiny required. Like this Court's conclusion about § 32310, the district court in *Fyock*

6    found that the Sunnyvale ordinance burdens conduct near the core of the Second

7    Amendment right. *Id*. at 1278. But the district court in *Fyock* judged the burden of the

8    Sunnyvale ordinance to be minor and applied intermediate scrutiny and found the fit of

9    the ordinance to be reasonable. *Id.* at 1278-79. This Court, on the other hand, has

10   considered the burden of the state statute on all the citizens of the state, finds the burden

11   to be severe, and even under intermediate scrutiny, a reasonable fit to be lacking. These

12   are ultimately informed judgment calls. The district court's *Fyock* judgment was

13   preliminary. This Court's judgment is no longer preliminary. If this judgment is

14   appealed, the Court of Appeals will have the opportunity to rule *on the merits*, for the

15   first time.

16       California Penal Code § 32310 unconstitutionally impinges on the Second

17   Amendment rights of law-abiding responsible ordinary citizens who would like to

18   acquire and possess for lawful purposes firearm magazines able to hold more than 10

19   rounds. Section 32310 is a complete ban that fails the simple Supreme Court test of

20   *Heller.* Alternatively, § 32310 strikes at the core of the Second Amendment right of self-

21   defense and severely burdens that right, triggering strict scrutiny. Because the statute

22   imposes a broad prophylactic ban that is the opposite of a regulation using the least

23   restrictive means to achieve a compelling interest, § 32310 fails constitutional muster

24   under the test of strict scrutiny. Finally, even under the modest and forgiving standard of

25   intermediate scrutiny, § 32310 is a poor fit to accomplish the State's important interests.

26   It hardly fits at all. Therefore, this statute fails intermediate scrutiny. While, it may be

27   possible to fashion a restriction on uncommonly large magazines that is tailored to the

28   manifold local contexts present across the entire state so as to achieve a reasonable fit,

1   here, the bottom line is clear.  The State has not carried its burden to justify the

2   restrictions on firearm magazines protected by the Second Amendment based on the

3   undisputed material facts in evidence.  That is not to be lamented.  It ought to provide re-

4   assurance.  To borrow a phrase, "[j]ust as it is the 'proudest boast of our free speech

5   jurisprudence' that we protect speech that we hate, [and] . . . the proudest boast of our

6   free exercise jurisprudence that we protect religious beliefs that we find offensive," it is

7   the proudest boast of our Second Amendment jurisprudence that we protect a citizen's

8   right to keep and bear arms that are dangerous and formidable.  *See Masterpiece*

9   *Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1737 (2018).

### III.   The Takings Clause

11         Plaintiffs also contend that the State's confiscatory and retrospective ban on the

12   possession of magazines over ten rounds without government compensation constitutes

13   an unconstitutional taking.  "For centuries, the primary meaning of "keep" has been "to

14   retain possession of."  There is only one straightforward interpretation of "keep" in the

15   Second Amendment, and that is that "the people" have the right to retain possession of

16   arms, subject to reasonable regulation and restrictions."  *Silveira v. Lockyer*, 328 F.3d

17   567, 573 (9th Cir. 2003) (Kleinfeld, J., dissenting from denial of rehearing en banc).  The

18   Attorney General asserts that, when the government acts pursuant to its police power to

19   protect the safety, health, and general welfare of the public, a prohibition on possession

20   of property declared to be a public nuisance is not a physical taking.  *See* Oppo. at 22,

21   (citing *Chicago, B. & Q. Railway Co. v. Illinois*, 200 U.S. 561, 593–594 (1906) and *Akins*

22   *v. United States,* 82 Fed. Cl. 619, 622 (2008)).  The Attorney General then cites a few

23   courts that have rejected Takings Clause challenges to laws banning the possession of

24   dangerous weapons.  *See* Oppo. at 23 (citing *Akins*, 82 Fed. Cl. at 623–24 (restrictions on

25   manufacture and sale of machine guns not a taking) and *Gun South, Inc. v. Brady*, 877

26   F.2d 858, 869 (11th Cir. 1989) (temporary suspension on importation of assault weapons

27   not a taking)).

28

1    California has deemed large-capacity magazines to be a nuisance.  *See* Cal. Pen.

2    Code § 32390.  That designation is dubious.  The Supreme Court recognized a decade

3    before *Heller*, "[g]uns in general are not 'deleterious devices or products or obnoxious

4    waste materials.'"  *Staples v. United States*, 511 U.S. 600, 610 (1994) (citation omitted).

5    Casting a common sized firearm magazine able to hold more than 10 rounds as a

6    nuisance, as a way around the Second Amendment, is like banning a book as a nuisance,

7    as a way around the First Amendment.  It conjures up images from Ray Bradbury's

8    novel, *Fahrenheit 451*, of firemen setting books on fire, or in this case policemen setting

9    magazines on fire.

10    Plaintiffs remonstrate that the law's forced, uncompensated, physical dispossession

11    of magazines holding more than 10 rounds as an exercise of its "police power" cannot be

12    defended.  Supreme Court precedent casts doubt on the State's contrary theory that an

13    exercise of the police power can never constitute a physical taking.  In *Loretto*, the

14    Supreme Court held that a law requiring physical occupation of private property was both

15    "within the State's police power" *and* an unconstitutional physical taking.  *Loretto v.*

16    *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).   The Court explained that

17    whether a law amounts to a physical taking is "a separate question" from whether the

18    state has the police power to enact the law.  *Id.* at 425–26 ("It is a separate question,

19    however, whether an otherwise valid regulation so frustrates property rights that

20    compensation must be paid.  We conclude that a permanent physical occupation

21    authorized by government is a taking without regard to the public interests that it may

22    serve.").  In a similar vein, the Supreme Court holds that a law enacted pursuant to the

23    state's "police powers to enjoin a property owner from activities akin to public

24    nuisances" is not immune from scrutiny under the regulatory takings doctrine.  *Lucas v.*

25    *South Carolina Coastal Council*, 505 U.S. 1003, 1020–27 (1992).  The Court reasoned

26    that it was true "*[a] fortiori*" that the "legislature's recitation of a noxious-use

27    justification cannot be the basis for departing from our categorical rule that total

28    regulatory takings must be compensated."  *Id.* at 1026.

3:17cv1017-BEN (JLB)

1   Recently, the Supreme Court summarized some of the fundamental principles of
2   takings law in *Murr v. Wisconsin*, 137 S. Ct. 1933 (2017). "The Takings Clause of the
3   Fifth Amendment provides that private property shall not be taken for public use, without
4   just compensation. The Clause is made applicable to the States through the Fourteenth
5   Amendment. As this Court has recognized, the plain language of the Takings Clause
6   requires the payment of compensation whenever the government acquires private
7   property for a public purpose, but it does not address in specific terms the imposition of
8   regulatory burdens on private property." *Id.* at 1942 (quotations and citations omitted).
9   *Murr* notes that almost a century ago, the Court held that "while property may be
10  regulated to a certain extent, if regulation goes too far it will be recognized as a taking."
11  *Id.* (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

12      Takings jurisprudence is flexible. There are however, two guides set out by *Murr*
13  for detecting when government regulation is so burdensome that it constitutes a taking.
14  "First, with certain qualifications a regulation which denies all economically beneficial or
15  productive use of land will require compensation under the Takings Clause. Second,
16  when a regulation impedes the use of property without depriving the owner of all
17  economically beneficial use, a taking still may be found based on a complex of factors,
18  including (1) the economic impact of the regulation on the claimant; (2) the extent to
19  which the regulation has interfered with distinct investment-backed expectations; and (3)
20  the character of the governmental action." *Murr*, 137 S. Ct. at 1938 (citations and
21  quotation marks omitted). "[A] physical *appropriation* of property g[ives] rise to a *per se*
22  taking, without regard to other factors." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427
23  (2015).

24      The dispossession requirement of § 32310(c) & (d) imposes a rare hybrid taking.
25  Subsection (d)(3) is a type of physical appropriation of property in that it forces owners
26  of large capacity magazines to "surrender" them to a law enforcement agency "for
27  destruction." Thus, (d)(3) forces a *per se* taking requiring just compensation. But there
28  are two other choices. Subsection (d)(2) forces the owner to sell his magazines to a

1   firearms dealer.  It is a fair guess that the fair market value of a large capacity magazine I

2   the shadow of a statute that criminalizes commerce and possession in the State of

3   California, will be near zero.  Of course, the parties spend little time debating the future

4   fair market value for to-be-relinquished magazines.  Subsection (d)(1) forces the owner to

5   "remove" their large capacity magazines "from the state," without specifying a method or

6   supplying a place.  This choice obviously requires a place to which the magazines may be

7   lawfully removed.  In other words, (d)(1) relies on other states, in contrast to California,

8   which permit importation and ownership of large capacity magazines.  With the typical

9   retail cost of a magazine running between $20 and $50, the associated costs of removal

10  and storage and retrieval may render the process costlier than the fair market value (if

11  there is any) of the magazine itself.  Whatever stick of ownership is left in the magazine-

12  owner's "bundle of sticks," it is the short stick.

13          Here, California will deprive Plaintiffs not just of the *use* of their property, but of

14  *possession*, one of the most essential sticks in the bundle of property rights.  Of course, a

15  taking of one stick is not necessarily a taking of the whole bundle.  *Murr*, 137 S. Ct. at

16  1952 (Roberts, C.J., dissenting) ("Where an owner possesses a full 'bundle' of property

17  rights, the destruction of one strand of the bundle is not a taking, because the aggregate

18  must be viewed in its entirety.").  Nevertheless, whatever expectations people may have

19  regarding property regulations, they "do not expect their property, real or personal, to be

20  actually occupied or taken away."  *Horne*, 135 S. Ct. at 2427.  Thus, whatever might be

21  the State's authority to ban the sale or use of magazines over 10 rounds, the Takings

22  Clause prevents it from compelling the physical dispossession of such lawfully-acquired

23  private property without just compensation.

## IV.   CONCLUSION

25          Magazines holding more than 10 rounds are "arms."  California Penal Code

26  Section 32310, as amended by Proposition 63, burdens the core of the Second

27  Amendment by criminalizing the acquisition and possession of these magazines that are

28  commonly held by law-abiding citizens for defense of self, home, and state.  The

84

3:17cv1017-BEN (JLB)

1  regulation is neither presumptively legal nor longstanding.  The statute hits at the center

2  of the Second Amendment and its burden is severe.  When the simple test of *Heller* is

3  applied, a test that persons of common intelligence can understand, the statute fails and is

4  an unconstitutional abridgment.  It criminalizes the otherwise lawful acquisition and

5  possession of common magazines holding more than 10 rounds – magazines that law-

6  abiding responsible citizens would choose for self-defense at home.  It also fails the strict

7  scrutiny test because the statute is not narrowly tailored – it is not tailored at all.  Even

8  under the more forgiving test of intermediate scrutiny, the statute fails because it is not a

9  reasonable fit.  It is not a reasonable fit because, among other things, it prohibits law-

10  abiding concealed carry weapon permit holders and law-abiding U.S Armed Forces

11  veterans from acquiring magazines and instead forces them to dispossess themselves of

12  lawfully-owned gun magazines that hold more than 10 rounds or suffer criminal

13  penalties.  Finally, subsections (c) and (d) of § 32310 impose an unconstitutional taking

14  without compensation upon Plaintiffs and all those who lawfully possess magazines able

15  to hold more than 10 rounds.[68]

16       Accordingly, based upon the law and the evidence, upon which there is no genuine

17  issue, and for the reasons stated in this opinion, Plaintiffs' motion for summary judgment

18  is granted.[69]  California Penal Code § 32310 is hereby declared to be unconstitutional in

19  its entirety and shall be enjoined.

20

21

22  [68] This declaration concerns the current version of § 32310.  But similar constitutional
defects can be found in the prior iterations of the statute.  The Court's declaration does

23  not affect the definition of a large-capacity magazine where it is used in other parts of
California's Penal Code to define gun-related crimes and to enhance penalties.

24  [69] The Attorney General asks the Court to take judicial notice of exhibits A through Q

25  which are copies of statutes and ordinances from various jurisdictions. (Dkt. No. 53-1.)
The request is granted.  The Attorney General objects to various declarations submitted

26  by Plaintiffs. (Dkt. No. 53-13.)  Those objections are overruled.  Plaintiffs object to
various declaration and exhibits submitted by the Attorney General. (Dkt. No. 57-2.)

27  Those objections are overruled.

28

3:17cv1017-BEN (JLB)

This decision is a freedom calculus decided long ago by Colonists who cherished individual freedom more than the subservient security of a British ruler. The freedom they fought for was not free of cost then, and it is not free now.

**IT IS HEREBY ORDERED** that:

1. Defendant Attorney General Xavier Becerra, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order, or know of the existence of this injunction order, are enjoined from enforcing California Penal Code section 32310.

2. Defendant Becerra shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute. The government shall file a declaration establishing proof of such notice.

DATED: March 29, 2019

HON. ROGER T. BENITEZ
United States District Judge

3:17cv1017-BEN (JLB)

**ER_159**