No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant*.

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 6 of 17**

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

# EXHIBIT 32



THE COMPLETE BOOK OF

# AUTOPISTOLS
## BUYER'S GUIDE

2013

**New and proven autopistols for competition, hunting, recreation and personal defense!**

| | |
|---|---|
| 74 • BERETTA | 88 • SIG SAUER |
| 75 • COLT | 91 • SMITH & WESSON |
| 78 • GLOCK | 92 • SPRINGFIELD |
| 80 • KAHR | 94 • TAURUS |
| 82 • KIMBER | 95 • WILSON COMBAT |
| 87 • RUGER | 98 • DIRECTORY |

Prices are Manufacturers' Suggested Retail.

Complete Book of Autopistols 2013 • **73**

# Handguns: Autoloaders



### AMERICAN TACTICAL IMPORTS FX45

**Caliber:** .45 ACP. **Barrel:** 3.18 inches, 4.25 inches, 4.75 inches, 5 inches. **Weight:** 38.4-49.6 ounces. **Grips:** Mahogany. **Sights:** Fixed, fixed front, adjustable rear. **Features:** Single-action, matte black, blued or stainless finish, 7/8/10-shot mag capacity. **MSRP:** $499.95-899.95.



### ARMALITE AR-24

**Caliber:** 9mm. **Barrel:** 3.89 inches, 4.67 inches. **Weight:** 33.4-34.9 ounces. **Grips:** Composite. **Sights:** Three-dot fixed or adjustable. **Features:** Double-action/single-action, manganese phosphate, heat-cured epoxy finish, 10/13/15-shot mag capacity. **MSRP:** $550-631.



### AUTO ORDNANCE 1911

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 39 ounces. **Grips:** Polymer, wood. **Sights:** Blade front, drift-adjustable rear. **Features:** Single-action, blued finish 7-shot mag capacity. **MSRP:** $637-662. From Kahr Arms.

### BERETTA 21 BOBCAT

**Caliber:** .22 LR, .25 ACP. **Barrel:** 2.4 inches. **Weight:** 11.5 ounces. **Grips:** Polymer. **Sights:** Fixed blade front. **Features:** Double-action/single-action, black, Inox finish, 7/8-shot mag capacity. **MSRP:** $310-350.



### BERETTA 3032 TOMCAT

**Caliber:** .32 ACP. **Barrel:** 2.4 inches. **Weight:** 14.5 ounces. **Grips:** Polymer, wood. **Sights:** Blade front, notch rear. **Features:** Double-action/single-action, black, Inox finish, 7/8/13-shot mag capacity. **MSRP:** $390-430.



### BERETTA 84FS/85FS CHEETAH

**Caliber:** .380 ACP. **Barrel:** 3.8 inches. **Weight:** 23.3 ounces. **Grips:** Polymer. **Sights:** Fixed blade front, dovetailed rear. **Features:** Double-action/single-action, black, nickel finish, 8/10/13-shot mag capacity. **MSRP:** $770-830.



### BERETTA 87 TARGET

**Caliber:** .22 LR. **Barrel:** 5.9 inches. **Weight:** 40.9 ounces. **Grips:** Polymer, walnut. **Sights:** Adjustable target. **Features:** Single-action, blued finish, 10-shot mag capacity. **MSRP:** $880.



### BERETTA M9/92FS/96A1

**Caliber:** 9mm, .40. **Barrel:** 4.9 inches. **Weight:** 32.5-34.4 ounces. **Grips:** Polymer, Technopolymer. **Sights:** Three-dot. **Features:** Double-action/single-action, Bruniton finish, 10/15/17-shot mag capacity. **MSRP:** $650-795.

000203
ER_1075



**BERETTA NANO**

**Caliber:** 9mm. **Barrel:** 3.07 inches. **Weight:** 17.67 ounces. **Grips:** Technopolymer. **Sights:** Three-dot, low-profile. **Features:** Double-action-only, black nitride finish, 6-shot mag capacity. **MSRP:** $475.

**BERSA THUNDER**

**Caliber:** .22 LR, .380 ACP, 9mm, .40, .45 ACP. **Barrel:** 3.25 inches, 3.5 inches, 4.25 inches. **Weight:** 16.4-30.7 ounces. **Grips:** Polymer, rubber wraparound. **Sights:** Fixed. **Features:** Double-action/single-action, matte, satin nickel or duo-tone finish, 7/8/10/13/15-shot mag capacity. **MSRP:** $335-525.

**BERETTA Px4 STORM**

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3 inches, 3.2 inches, 4 inches, 4.6 inches. **Weight:** 26.1-28.6 ounces. **Grips:** Polymer. **Sights:** Three-dot. **Features:** Double-action/single-action, black, dark earth finish, 9/10/12/13/14/15/17-shot mag capacity. **MSRP:** $550-1,035.

**CARACAL C/F**

**Caliber:** 9mm, .40. **Barrel:** 3.66 inches, 4.09 inches. **Grips:** Polymer. **Sights:** Two- or three-dot, low-profile. **Features:** Double-action-only, striker-fired, Plasox, black finish, 15/18-shot mag capacity. **MSRP:** $499-525.

**BERETTA U22 NEOS**

**Caliber:** .22 LR. **Barrel:** 4.5 inches, 6 inches. **Weight:** 31.7-36.2 ounces. **Grips:** Polymer. **Sights:** Adjustable target. **Features:** Single-action, black or inox finish, 10-shot mag capacity. **MSRP:** $275-375.

**CIMARRON M1911**

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 40 ounces. **Grips:** Wood. **Sights:** Fixed. **Features:** Single-action, parkerized, blued, nickel finish, 7-shot mag capacity. **MSRP:** $540-633.

**BERSA BP CONCEALED CARRY**

**Caliber:** 9mm. **Barrel:** 3.3 inches. **Weight:** 21.5 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Double-action-only with short reset, matte black, olive drab or duo-tone finish, 8-shot mag capacity. **MSRP:** $444-455.

**COLT 1991**

**Caliber:** .38 Super, .45 ACP. **Barrel:** 4.25 inches, 5 inches. **Weight:** 32-37 ounces. **Grips:** Rubber composite, rosewood. **Sights:** White-dot, high-profile. **Features:** Single-action, stainless, blued finish, 7/8-shot mag capacity. **MSRP:** $928-1,021.

000204

ER_1076

# Handguns: Autoloaders



## COLT DEFENDER

**Caliber:** 9mm, .45 ACP. **Barrel:** 3 inches. **Weight:** 24-25 ounces. **Grips:**Hogue wraparound. **Sights:** Novak Low-Mount Carry with dots. **Features:** Single-action, Cerakote, stainless finish, 7/8-shot mag capacity. **MSRP:** $1,066.



## COLT GOLD CUP

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 37 ounces. **Grips:** Rubber wraparound. **Sights:** BoMar-style, adjustable. **Features:** Single-action, stainless, blued finish, 8-shot mag capacity. **MSRP:** $1,158-1,180.



## COLT MUSTANG POCKETLITE

**Caliber:** .380 ACP. **Barrel:** 2.75 inches. **Weight:** 12.5 ounces. **Grips:** Composite. **Sights:** High-profile. **Features:** Single-action, stainless, brushed finish, 6-shot mag capacity. **MSRP:** $649.



## COLT NEW AGENT

**Caliber:** .45 ACP. **Barrel:** 3 inches. **Weight:** 22.5-23 ounces. **Grips:** Rosewood, Crimson Trace Lasergrips. **Sights:** Trench-style. **Features:** Single-action or double-action-only, blued finish, 7-shot mag capacity. **MSRP:** $1,041-1,326.



## COLT XSE

**Caliber:** .45 ACP. **Barrel:** 4.25 inches, 5 inches. **Weight:** 27-36 ounces. **Grips:** Rosewood. **Sights:** Novak Low-Mount Carry. **Features:** Single-action, stainless or blued finish, 8-shot mag capacity. **MSRP:** $1,072-1,223.



## CZ 75

**Caliber:** 9mm, .40. **Barrel:** 4.6 inches. **Weight:** 35.2 ounces. **Grips:** Plastic, rubber. **Sights:** Fixed. **Features:** Double-action/single-action, black Polycoat, matte stainless, polished stainless finish, 10(.40)/16(9mm)-shot mag capacity. **MSRP:** $499-711.



## CZ 97

**Caliber:** .45 ACP. **Barrel:** 4.53 inches. **Weight:** 40.6 ounces. **Grips:** Aluminum. **Sights:** Fixed fiber optic, fixed tritium. **Features:** Double-action/single-action, black Polycoat, glossy blue finish, 10-shot mag capacity. **MSRP:** $686-792.



## CZ 2075 RAMI)

**Caliber:** 9mm, .40. **Barrel:** 2.9 inches. **Weight:** 24.5 ounces. **Grips:** Rubber. **Sights:** Fixed/fixed night sights. **Features:** Double-action/single-action, black Polycoat finish, 14/10(9mm)-shot mag capacity, 9/7(.40)-shot mag capacity. **MSRP:** $595-660.



## CZ CZECHMATE

**Caliber:** 9mm. **Barrel:** 5.4 inches. **Weight:** 48 ounces. **Grips:** Aluminum. **Sights:** C-More Red Dot, fixed target. **Features:** Single-action, black Polycoat finish, 20/26-shot mag capacity. **MSRP:** $3,220.



## CZ P-01/P-06

**Caliber:** 9mm, .40. **Barrel:** 3.7 inches. **Weight:** 28-29.1 ounces. **Grips:** Rubber. **Sights:** Fixed. **Features:** Double-action/single-action, black Polycoat finish, 10(.40)/14(9mm)-shot mag capacity. **MSRP:** $608-660.



## CZ P-07

**Caliber:** 9mm, .40. **Barrel:** 3.8 inches, 4.5 inches. **Weight:** 27.2 ounces. **Grips:** Polymer stippling. **Sights:** Fixed/tall adjustable. **Features:** Double-action/single-action, black/OD green frame finish, 12/16-shot mag capacity. **MSRP:** $483-528.



## CZ P-09

**Caliber:** 9mm, .40. **Barrel:** 4.53 inches. **Weight:** 27.2 ounces. **Grips:** Polymer stippling, interchangeable backstraps. **Sights:** Fixed. **Features:** Double-action/single-action, black Polycoat finish, 15/19-shot mag capacity. **MSRP:** $514-528.



## CZ SP-01

**Caliber:** 9mm. **Barrel:** 4.61 inches. **Weight:** 38.4 ounces. **Grips:** Rubber. **Sights:** Fixed, fixed tritium. **Features:** Double-action/single-action, black Polycoat finish, 12(.40)/18(9mm)-shot mag capacity. **MSRP:** $680-737.



## CZ TACTICAL SPORT

**Caliber:** 9mm, .40. **Barrel:** 5.4 inches. **Weight:** 45.3 ounces. **Grips:** Wood. **Sights:** Fixed Target. **Features:** Single-action, dual-tone finish, 17/20-shot mag capacity. **MSRP:** $1,272.



## DAN WESSON 1911

**Caliber:** 9mm, .45 ACP. **Barrel:** 3.5 inches, 4.25 inches, 5 inches. **Weight:** 24.96-38.7 ounces. **Grips:** Stipple shadow, cocobolo, G10. **Sights:** Novak Low-Mount Night, Heinie Straight Eight, adjustable, fixed. **Features:** Single-action, black "Duty" finish, 7/8/9-shot mag capacity. **MSRP:** CCO $1,558, ECO $1,623-1662, Guardian $1,558-1,619, Pointman 9 $1,558, V-Bob-$1,766-2,077. From CZ-USA.



## DAN WESSON HAVOC

**Caliber:** .38 Super, 9mm. **Barrel:** 4.25 inches. **Weight:** 35.2 ounces. **Grips:** G10. **Sights:** C-More. **Features:** Single-action, black finish, 21-shot mag capacity. **MSRP:** $4,299. From CZ-USA.

# Handguns: Autoloaders



**DAN WESSON MAYHEM/TITAN**

**Caliber:** .40, 10mm. **Barrel:** 5 inches, 6 inches. **Weight:** 51.2-76.8 ounces. **Grips:** G10. **Sights:** Trilium, adjustable, Fiber optic. **Features:** Single-action, black finish, 13/17-shot mag capacity. **MSRP:** $3,829-3,699. From CZ-USA.

**FNH USA FN FIVE-SEVEN**

**Caliber:** 5.7x28mm. **Barrel:** 4.8 inches. **Weight:** 20.8 ounces. **Grips:** Rubber. **Sights:** Adjustable three-dot). **Features:** Single-action, black finish, 10/20-shot mag. capacity. **MSRP:** $1,329.

**FNH USA FNS**

**Caliber:** 9mm, .40. **Barrel:** 3.56 inches, 4 inches, 5 inches. **Weight:** 25.2-29.5 ounces. **Grips:** Polymer. **Sights:** Three-dot or three-dot night. **Features:** Double-action-only, black, black or stainless finish, FNS Conversion Kit and Competition models available,10/12/14/17-shot mag capacity. **MSRP:** $699-749.

**FNH USA FNX**

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 4 inches, 4.5 inches. **Weight:** 21.9-32.2 ounces. **Grips:** Polymer. **Sights:** Fixed three-dot combat with deep-V rear notch. **Features:** Double-action/single-action, black, two-tone finish, 10/14/15/17-shot mag capacity. **MSRP:** $699-824.

**FNH USA FNX-45 TACTICAL**

**Caliber:** .45 ACP. **Barrel:** 5.3 inches. **Weight:** 33.6 ounces. **Grips:** Polymer. **Sights:** Fixed 3-dot, high-profile night sights with optional electronic red-dots. **Features:** Double-action/single-action, black, two-tone or flat dark earth finish, 10/15-shot mag capacity. **MSRP:** $795, Tactical $1,399.

**FRANKLIN ARMORY XO-26**

**Caliber:** .223/5.56mm, 6.8 SPC, 300 Blackout/.300 Whisper, 7.62x39mm .450 Bushmaster. **Barrel:** 11.5 inches. **Weight:** 6.4 pounds. **Grips:** Magpul MIAD & RVG. **Sights:** Steel YHM Quick Deployment. **Features:** Semi-auto, custom tune trigger, free-float handguard, CA models available, hardcoat Type III anodize, salt bath nitride finish, 9/25/30-shot mag capacity. **MSRP:** $1,559.99-1,769.99.

**FRANKLIN ARMORY SALUS BILLET PISTOL**

**Caliber:** .223/5.56mm, 7.62x39mm. **Barrel:** 7.5 inches. **Weight:** 5.2 pounds. **Grips:** Ergo. **Sights:** None. **Features:** Semi-auto, custom tune trigger, free-float handguard, CA models available, hardcoat Type III anodize, salt bath nitride finish, 30-shot mag capacity. **MSRP:** $1,389.99-1,444.99.

**GLOCK 17/22**

**Caliber:** 9mm, .40. **Barrel:** 4.48 inches. **Weight:** 22.05-22.92 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Safe Action, Gen4 option available, black finish, 15/17-shot mag capacity. **MSRP:** $599-696.

000207
ER_1079



**GLOCK 19/23**

**Caliber:** 9mm, .40. **Barrel:** 4.01 inches. **Weight:** 20.99-21.31 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Safe Action, Gen4 option available, black finish, 13/15-shot mag capacity. **MSRP:** $599-696.

**GLOCK 29/30/36**

**Caliber:** .45 ACP, 10mm. **Barrel:** 3.77 inches. **Weight:** 20.11-24.69 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Safe Action, black finish, 6/10-shot mag capacity. **MSRP:** $637-734.

**GLOCK 20/21**

**Caliber:** .45 ACP, 10mm. **Barrel:** 4.6 inches. **Weight:** 26.28-27.68 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Safe Action, Gen4 option available, black finish, 13/15-shot mag capacity. **MSRP:** $637-734.

**GLOCK 31/32/33**

**Caliber:** .357 SIG. **Barrel:** 3.42 inches, 4.01 inches, 4.48 inches. **Weight:** 19.75-23.28 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Safe Action, Gen4 option available, black finish, 10/13/15-shot mag capacity. **MSRP:** $599-696.

**GLOCK 17L/24**

**Caliber:** 9mm, .40. **Barrel:** 6.02 inches. **Weight:** 23.63-26.7 ounces. **Grips:** Polymer. **Sights:** Adjustable. **Features:** Safe Action, black finish, 15/17-shot mag capacity. **MSRP:** $750.

**GLOCK 34/35**

**Caliber:** 9mm, .40. **Barrel:** 5.31 inches. **Weight:** 22.92-24.69 ounces. **Grips:** Polymer. **Sights:** Adjustable. **Features:** Safe Action, Gen4 option available, black finish, 15/17-shot mag capacity. **MSRP:** $679-729.

**GLOCK 26/27**

**Caliber:** 9mm, .40. **Barrel:** 3.42 inches. **Weight:** 19.75 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Safe Action, Gen4 option available, black finish, 10/12-shot mag capacity. **MSRP:** $599-696.

**GLOCK 37/38/39**

**Caliber:** .45 GAP. **Barrel:** 3.42 inches, 4.01 inches, 4.48 inches. **Weight:** 19.33-26.1 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Safe Action, Gen4 option available, black finish, 6/8/10-shot mag capacity. **MSRP:** $614-711.

**Complete Book of Autopistols 2013 • *79***



# Handguns: Autoloaders

## HECKLER & KOCH HK45

**Caliber:** .45 ACP. **Barrel:** 3.94 inches, 4.53 inches. **Weight:** 24.48-25.28 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Double-action/single-action or double-action-only, black finish, 8/10-shot mag capacity. **MSRP:** $1,193-1,260.

## HECKLER & KOCH P30

**Caliber:** 9mm, .40. **Barrel:** 3.86 inches, 4.44 inches. **Weight:** 22.88-24.32 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Double-action/single-action or double-action-only, black finish, 10/13/15-shot mag capacity. **MSRP:** $1054-1,108.

## HECKLER & KOCH P2000

**Caliber:** 9mm, .40. **Barrel:** 3.26 inches, 3.66 inches. **Weight:** 24 ounces. **Grips:** Polymer. **Sights:** Three-dot (optional tritium). **Features:** Double-action/single-action or double-action-only, black finish, 9/10/12/13-shot mag capacity. **MSRP:** $941-983.

## HECKLER & KOCH USP/USP COMPACT

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.58 inches to 5.09 inches. **Weight:** 23.52-33.6 ounces. **Grips:** Polymer. **Sights:** Fixed or adjustable. **Features:** Double-action/single-action or double-action-only, black finish, 8/10/12/13/15-shot mag capacity. **MSRP:** $902-1,325.

## KAHR CM SERIES

**Caliber:** 9mm, .40. **Barrel:** 3 inches, 3.1 inches. **Weight:** 14-15.8 ounces. **Grips:** Soft polymer, textured. **Sights:** Drift-adjustable, white-bar-dot combat rear. **Features:** Double-action-only, black frame, matte stainless slide finish, 6/7-shot mag capacity. **MSRP:** $485.

## KAHR CW SERIES

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.5 inches, 3.6 inches. **Weight:** 15.8-19.7 ounces. **Grips:** Polymer. **Sights:** Drift-adjustable, white-bar-dot combat rear. **Features:** Double-action-only, black frame, matte stainless slide finish, 6/7-shot mag capacity. **MSRP:** $485.

## KAHR K SERIES

**Caliber:** 9mm, .40. **Barrel:** 3 inches, 3.46 inches, 3.5 inches. **Weight:** 20.2-22.2 ounces. **Grips:** Polymer. **Sights:** Drift-adjustable, white-bar-dot combat rear (optional tritium). **Features:** Double-action-only, black, matte stainless finish, 6/7-shot mag capacity. **MSRP:** $855-1,054.

## KAHR MK SERIES

**Caliber:** 9mm, .40. **Barrel:** 3 inches, 3.1 inches. **Weight:** 20.2-21.2 ounces. **Grips:** Hard nylon. **Sights:** Drift-adjustable, white-bar-dot combat rear (optional tritium). **Features:** Double-action-only, matte stainless finish, 5/6/7-shot mag capacity. **MSRP:** $855-1,054.

000209
ER_1081



**KAHR P SERIES**

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.54 inches, 3.56 inches, 3.6 inches. 3.64 inches. **Weight:** 13.1-16.5 ounces. **Grips:** Polymer. **Sights:** Drift-adjustable, white-bar-dot combat rear (optional tritium). **Features:** Double-action-only, matte black, two-tone finish, 6/7-shot mag capacity. **MSRP:** $739-973.

**KAHR P380 SERIES**

**Caliber:** .380 ACP. **Barrel:** 2.53 inches. **Weight:** 9.97 ounces. **Grips:** Polymer. **Sights:** Drift-adjustable, white-bar-dot combat rear (optional tritium). **Features:** Double-action-only, matte black, two-tone finish, 6-shot mag capacity. **MSRP:** $649-949.

**KAHR PM SERIES**

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.1 inches, 3.24 inches. **Weight:** 12.1-15.3 ounces. **Grips:** Polymer. **Sights:** Drift-adjustable, white-bar-dot combat rear (optional tritium or CT laser). **Features:** Double-action-only, matte black, two-tone, 5/6/7-shot mag capacity. **MSRP:** $786-1,049.

**KAHR T/TP SERIES**

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.96 inches, 4 inches, 4.04 inches. **Weight:** 16.4-24.9 ounces. **Grips:** Hogue Pau Ferro wood, polymer. **Sights:** Drift-adjustable, white-bar-dot combat rear (optional Novak tritium). **Features:** Double-action-only, matte stainless, two-tone finish, 7/8-shot mag capacity. **MSRP:** $697-968.

**KEL-TEC PF-9/P-11**

**Caliber:** 9mm. **Barrel:** 3.1 inches. **Weight:** 12.7-14 ounces. **Grips:** Polymer. **Sights:** Fixed, high-visibility, tritium. **Features:** Double-action-pistol, blued, parkerized, hard chrome finish, 7/10-shot mag capacity. **MSRP:** $333-390.

**KEL-TEC P-32/P-3AT**

**Caliber:** .32 ACP, .380 ACP. **Barrel:** 2.7 inches. **Weight:** 6.6-8.3 ounces. **Grips:** Polymer. **Sights:** Integrated. **Features:** Double-action-only, blued, parkerized, hard chrome finishes, 6/7-shot mag capacity. **MSRP:** $318-377.

**KEL-TEC PLR-16/PLR-22**

**Caliber:** .22 LR, 5.56mm. **Barrel:** 9.2 inches, 10.1 inches. **Weight:** 44.8-54.72 ounces. **Grips:** Glass-fiber-reinforced polymer. **Sights:** Adjustable, AR-15-type front. **Features:** Semi-auto (gas-piston or blowback), blued finish, 10/26-shot mag capacity (compatible with M16 or Atchison mags). **MSRP:** $390-665.

**KEL-TEC PMR-30**

**Caliber:** .22 Mag. **Barrel:** 4.3 inches. **Weight:** 13.6 ounces. **Grips:** Polymer. **Sights:** Fiber-optic, dovetailed aluminum front. **Features:** Single-action, black finish, 30-shot mag capacity. **MSRP:** $415.

**000210**
**ER_1082**



## Handguns: Autoloaders

**KIMBER AEGIS II**

Caliber: 9mm. Barrel: 3 inches, 4 inches, 5 inches. Weight: 25-31 ounces. Grips: Rosewood. Sights: Fixed Tactical Wedge tritium, KimPro II finish, 8/9-shot mag capacity. MSRP: $1,331.

**KIMBER COVERT II**

Caliber: .45 ACP. Barrel: 3 inches, 4 inches, 5 inches. Weight: 25-31 ounces. Grips: Digital camo, Crimson Trace Lasergrips. Sights: Fixed Tactical Wedge tritium. Features: Single-action, dark earth frame, matte black slide finish, 7-shot mag capacity. MSRP: $1,657.

**KIMBER CDP II**

Caliber: 9mm, .45 ACP. Barrel: 3 inches, 4 inches, 5 inches. Weight: 25-31 ounces. Grips: Rosewood, Crimson Trace Lasergrips. Sights: Fixed Meprolight three-dot trilium. Features: Single-action, KimPro II finish, 7-shot mag capacity. MSRP: $1,331-1,631.

**KIMBER CRIMSON CARRY II**

Caliber: .45 ACP. Barrel: 3 inches, 4 inches, 5 inches. Weight: 25-31 ounces. Grips: Rosewood, Crimson Trace Lasergrips (red or green laser). Sights: Fixed low-profile. Features: Single-action, satin silver frame, matte black slide finish, 7/8-shot mag capacity. MSRP: $1,206-1,293.

**KIMBER CLASSIC CARRY PRO**

Caliber: .45 ACP. Barrel: 4 inches. Weight: 35 ounces. Grips: Bone. Sights: Fixed low-profile three-dot night sights. Features: Single-action, charcoal blue finish, 8-shot mag capacity. MSRP: $2,056.

**KIMBER CUSTOM II**

Caliber: .38 Super, 9mm, .45 ACP, 10mm. Barrel: 5 inches. Weight: 38 ounces. Grips: Synthetic, bone. Sights: Fixed low-profile, Kimber adjustable. Features: Single-action, matte black, charcoal blue, satin silver finish, 7-shot mag capacity. MSRP: $871-2,020.

**KIMBER COMPACT II/ PRO CARRY II**

Caliber: .38 Super, 9mm, .45 ACP. Barrel: 4 inches. Weight: 27-35 ounces. Grips: Synthetic. Sights: Fixed low-profile. Features: Single-action, satin silver, matte black finish, 7-shot mag capacity. MSRP: $919-1,128.

**KIMBER CUSTOM SHOP**

Caliber: .45 ACP. Barrel: 3 inches, 5 inches. Weight: 25-39 ounces. Grips: Rosewood or Micarta. Sights: Sighting trough, tritium, Kimber adjustable. Features: Single-action, KimPro II finish, 7/8-shot mag capacity. MSRP: $1,351-2,405.



**KIMBER ECLIPSE II**

**Caliber:** .45 ACP, 10mm. **Barrel:** 3 inches, 4 inches, 5 inches. **Weight:** 31-38 ounces. **Grips:** Laminated. **Sights:** Fixed Meprolight three-dot tritium. **Features:** Single-action, stainless finish, 7/8-shot mag capacity. **MSRP:** $1,289-1,393.

**KIMBER SAPPHIRE ULTRA II**

**Caliber:** 9mm. **Barrel:** 3 inches. **Weight:** 25 ounces. **Grips:** Blue/black G10. **Sights:** Fixed Tactical Wedge tritium. **Features:** Single-action, satin silver frame, bright blue PVD slide, 8-shot mag capacity. **MSRP:** $1,652.

**KIMBER GOLD MATCH II**

**Caliber:** 9mm, .45 ACP. **Barrel:** 5 inches. **Weight:** 38 ounces. **Grips:** Rosewood, laminated. **Sights:** Kimber adjustable. **Features:** Single-action, blued, stainless, satin silver finish, 8-shot mag capacity. **MSRP:** $1,393-1,882.

**KIMBER SOLO**

**Caliber:** 9mm. **Barrel:** 2.7 inches. **Weight:** 17 ounces. **Grips:** Synthetic, G-10, Rosewood Crimson Trace Lasergrips. **Sights:** Fixed low-profile, three-dot tritium. **Features:** Single-action, KimPro II finish, 6/8-shot mag capacity. **MSRP:** $815-1,223.

**KIMBER RAPTOR II**

**Caliber:** .45 ACP. **Barrel:** 3 inches, 4 inches, 5 inches. **Weight:** 25-38 ounces. **Grips:** Zebra wood, rosewood. **Sights:** Fixed Tactical Wedge tritium. **Features:** Single-action, KimPro II finish, 7/8-shot mag capacity. **MSRP:** $1,295-1,657.

**KIMBER SUPER CARRY**

**Caliber:** .45 ACP. **Barrel:** 3 inches, 4 inches, 5 inches. **Weight:** 25-38 ounces. **Grips:** Micarta/laminated wood, G10. **Sights:** Tritium. **Features:** Single-action, rounded heel frame, KimPro II finish, 7/8-shot mag capacity. **MSRP:** $1,596-1,699.

**KIMBER RIMFIRE**

**Caliber:** .22 LR. **Barrel:** 5 inches. **Weight:** 23 ounces. **Grips:** Synthetic, rosewood. **Sights:** Kimber adjustable. **Features:** Single-action, KimPro II finish, 10-shot mag capacity. **MSRP:** $871-1,220.

**KIMBER TACTICAL II**

**Caliber:** 9mm, .45 ACP. **Barrel:** 3 inches, 4 inches, 5 inches. **Weight:** 25-40 ounces. **Grips:** Laminated. **Sights:** Fixed Meprolight three-dot tritium. **Features:** Single-action, KimPro II finish, 7-shot mag capacity. **MSRP:** $1,317-1,490.

# Handguns: Autoloaders



## KIMBER TLE II

**Caliber:** .45 ACP, 10mm. **Barrel:** 3 inches, 4 inches, 5 inches. **Weight:** 25-39 ounces. **Grips:** Synthetic, Crimson Trace Lasergrips. **Sights:** Fixed Meprolight three-dot tritium. **Features:** Single-action, KimPro II finish, 7/8-shot mag capacity. **MSRP:** $1,080-1,518.

## KIMBER ULTRA CARRY II

**Caliber:** 9mm, .45 ACP. **Barrel:** 3 inches. **Weight:** 25 ounces. **Grips:** Synthetic, double-diamond. **Sights:** Fixed low-profile. **Features:** Single-action, matte black or satin silver finish, 7-shot mag capacity. **MSRP:** $919-1,066.

## KIMBER WARRIOR

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 39 ounces. **Grips:** Kimber G10 tactical. **Sights:** Fixed Tactical Wedge tritium. **Features:** Single-action, KimPro II finish, 7-shot mag capacity. **MSRP:** $1,512-1,665.

## MAGNUM RESEARCH BABY DESERT EAGLE II

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.64 inches, 3.93 inches, 4.52 inches. **Weight:** 33.9-38.6 ounces. **Grips:** Polymer. **Sights:** Fixed white three-dot combat. **Features:** Double-action/single-action, matte black finish, 10/12/15-shot mag capacity. **MSRP:** $616-630.

## MAGNUM RESEARCH DESERT EAGLE MARK XIX

**Caliber:** .357 Mag, .44 Mag, .50 AE. **Barrel:** 6 inches, 10 inches. **Weight:** 69.8-72.4 ounces. **Grips:** Polymer. **Sights:** Fixed combat. **Features:** Single-action, matte black, chrome, nickel, 24k gold, titanium gold, tiger stripes finish, 7/8/9-shot mag capacity. **MSRP:** $1,563-2,153.

## MAGNUM RESEARCH DESERT EAGLE 1911

**Caliber:** .45 ACP. **Barrel:** 4.33 inches, 5.05 inches. **Weight:** 33.9-38.2 ounces. **Grips:** Wood. **Sights:** High-profile sculptured rear, pinned-in blade front. **Features:** Single-action, matte black finish, 8-shot mag capacity. **MSRP:** $874.

## MAGNUM RESEARCH MICRO DESERT EAGLE

**Caliber:** .380 ACP. **Barrel:** 2.22 inches. **Weight:** 14 ounces. **Grips:** Polymer. **Sights:** Fixed. **Features:** Double-action-only, nickel finish, 6-shot mag capacity. **MSRP:** $467-479.

## MASTERPIECE ARMS PROTECTOR

**Caliber:** .32 ACP, .380 ACP. **Barrel:** 2.25 inches. **Weight:** 10.9-11.3 ounces. **Grips:** Polymer, aluminum. **Sights:** Fixed. **Features:** Double-action-only, matte black finish, 5-shot mag capacity. **MSRP:** $350.95-375.95.

000213
ER_1085



**MASTERPIECE ARMS
DEFENDER**

**Caliber:** 9mm, 5.7x28mm, .45 ACP. **Barrel:** 3.25 inches, 3.5 inches, 5 inches, 6 inches. **Weight:** 54-87 ounces. **Grips:** Polymer. **Sights:** Fixed, winged front, peep rear. **Features:** Single-action, matte black, grim reaper, camo pattern finish, 20/30-shot mag capacity. **MSRP:** $488.95-687.95.

**NAA GUARDIAN**

**Caliber:** .25 NAA, .32 ACP, .32 NAA, .380 ACP. **Barrel:** 2.18 inches, 2.49 inches. **Weight:** 13.5 ounces, 18.7 ounces. **Grips:** Pebble finish Hogue. **Sights:** Fixed low-profile. **Features:** Double-action-only, stainless finish, 6-shot mag capacity. **MSRP:** $402-479.

**NIGHTHAWK
DOMINATOR/ENFORCER**

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 38-39 ounces. **Grips:** Cocobolo, G10. **Sights:** Novak Low Mount Tritium Night Sights or Heinie Slant-Pro Night Sights, Heinie Sights/ Fiber Optic Front Sights available. **Features:** SA, Perma Kote finish, 8-shot mag capacity. **MSRP:** $3,250-3,395.

**NIGHTHAWK GRP**

**Caliber:** .45 ACP. **Barrel:** 4.25 inches, 5 inches. **Weight:** 35 ounces. **Grips:** CTC Lasergrips, Gator Back VZ. **Sights:** Novak Extreme Duty adjustable night sights. **Features:** SA, 2 models, GRP (Global Response Pistol) Recon has a light rail frame, lightweight aluminum match trigger, integrated rail, Perma Kote finish, 8-shot mag. **MSRP:** $2,895-3,099.

**NIGHTHAWK
RICHARD HEINIE**

**Caliber:** 9mm, .45 ACP. **Barrel:** 4.25 inches, 5 inches. **Weight:** 35-40 ounces. **Grips:** Cocobolo or Alumagrips. **Sights:** Heinie Straight "8" Slant Pro Night or fixed. **Features:** SA, built w/ Richard Heinie, specially selected barrel, finishes in PermaKote or titanium blue, 8-shot mag. **MSRP:** $2,895-3,395, Signature Series $3,450-3,550.

**NIGHTHAWK T3**

**Caliber:** .45 ACP. **Barrel:** 4.25 inches. **Weight:** 32 ounces. **Grips:** Black G10. **Sights:** Heinie Slant-Pro Straight Eight w/ tritium inserts. **Features:** SA, extended mag well, bushing match grade stainless steel barrel that is crowned flush w/ forged slide stop, aluminum trigger, new stainless or Perma Kote finish, 8-shot mag. **MSRP:** $2,699.

**NIGHTHAWK
TALON/PREDATOR**

**Caliber:** .45 ACP. **Barrel:** 3.6 inches, 4.25 inches, 5 inches. **Weight:** 31-39 ounces. **Grips:** Rubber, wood (Talon). **Sights:** Novak LoMount night or Heinie Slant Pro Straight Eight. **Features:** SA, Talon: match grade bushing or bull barrel, Predator: identical to Talon plus three different barrel sizes and one-piece stainless steel barrel, 7/8-shot mag. **MSRP:** Talon $2,420-2,624, Predator $2,824-2,925.

**PARA USA AGENT/OFFICER**

**Caliber:** 9mm, .45 ACP. **Barrel:** 3 inches. **Weight:** 30 ounces. **Grips:** VZ Gator, cocobolo, G10. **Sights:** Trijicon, fiber optic front and fixed rear. **Features:** Single-action or LDA (double-action), black Ionbond finish, 6/7/8/9-shot mag capacity. **MSRP:** $949-1,399.

Complete Book of Autopistols 2013 • 85



# Handguns: Autoloaders

### PARA USA BLACK OPS

**Caliber:** .45 ACP. **Barrel:** 4.25 inches, 5 inches, 5.5 inches. **Weight:** 39-40 ounces. **Grips:** VZ G10. **Sights:** Trijicon 3-dot night, XS high-profile. **Features:** Single-action, Picatinny rail, black Ionbond finish, 8/14-shot mag capacity. **MSRP:** $1,257-1,325.

### PARA USA CUSTOM

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 5 inches. **Weight:** 35-42 ounces. **Grips:** VZ G10. **Sights:** Fiber optic front, adjustable target rear. **Features:** Single-action, HD extractor, ambi safeties, black Ionbond finish, 10/14/16/18-shot mag capacity. **MSRP:** $1,299-2,149.

### PARA USA ELITE

**Caliber:** 9mm, .45 ACP. **Barrel:** 3.5 inches, 4.25 inches, 5 inches, 6 inches. **Weight:** 32-42 ounces. **Grips:** VZ Operator II, VZ Para G10, cocobolo. **Sights:** Fiber optic front, adjustable target or fixed rear, Trijicon night. **Features:** Single-action, satin stainless, two-tone, black Ionbond finish, 7/8/9-shot mag capacity. **MSRP:** $949-1,299.

### PARA USA EXPERT

**Caliber:** .45 ACP. **Barrel:** 3 inches, 5 inches. **Weight:** 32-42 ounces. **Grips:** Polymer. **Sights:** Fiber-optic front with two-dot rear. **Features:** Single-action, black nitride or stainless finish, 7/8/14-shot mag capacity. **MSRP:** $663-919.

### PARA USA WARTHOG

**Caliber:** .45 ACP. **Barrel:** 3 inches. **Weight:** 32 ounces. **Grips:** Polymer. **Sights:** Fiber-optic front with two-dot rear. **Features:** Single-action, black nitride or stainless finish, 10-shot mag capacity. **MSRP:** $884-919.

### REMINGTON 1911 R1

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 38.5-42 ounces. **Grips:** Walnut, wood laminate. **Sights:** Fixed or adjustable. **Features:** Single-action, satin black oxide, stainless finish, 7/8-shot mag capacity. **MSRP:** $729-1,299.

### ROCK RIVER ARMS 1911 POLY

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 32.64 ounces. **Grips:** Polymer. **Sights:** Dovetailed. **Features:** Single-action, parkerized black, tan, OD green finish, 7-shot mag capacity. **MSRP:** $800.

### ROCK RIVER ARMS LAR-9/LAR-15

**Caliber:** 9mm, .223/5.56mm. **Barrel:** 7 inches, 10.5 inches. **Weight:** 75.2-88 ounces. **Grips:** Hogue rubber pistol. **Sights:** A2 front. **Features:** Semi-auto, black finish, 10/20/30-shot mag capacity. **MSRP:** $945-1,140.

000215
ER_1087



**ROCK RIVER ARMS LAR-PDS**

**Caliber:** .223/5.56mm. **Barrel:** 9 inches. **Weight:** 80 ounces. **Grips:** Hogue rubber pistol. **Sights:** None. **Features:** Semi-auto, black finish, 30-shot mag capacity. **MSRP:** $1,185-1,335.

**RUGER LC9**

**Caliber:** 9mm. **Barrel:** 3.12 inches. **Weight:** 17.1-17.7 ounces. **Grips:** Glass-filled nylon. **Sights:** Adjustable three-dot (optional Crimson Trace or LaserMax laser). **Features:** Double-action-only, blued finish, 7-shot mag capacity. **MSRP:** $443-619.

**RUGER 22/45**

**Caliber:** .22 LR. **Barrel:** 4 inches, 4.4 inches, 4.5 inches, 5.5 inches. **Weight:** 22.8-33 ounces. **Grips:** Polymer, cocobolo. **Sights:** Fixed front, adjustable or fixed rear. **Features:** Single-action, black, stainless, blued, 10-shot mag capacity. **MSRP:** $349-469.

**RUGER LCP**

**Caliber:** .380 ACP. **Barrel:** 2.75 inches. **Weight:** 9.4-10 ounces. **Grips:** Glass-filled nylon. **Sights:** Fixed (Crimson Trace or LaserMax laser). **Features:** Double-action-only, blued finish, 6-shot mag capacity. **MSRP:** $379-549.

**RUGER 22 CHARGER**

**Caliber:** .22 LR. **Barrel:** 10 inches. **Weight:** 56 ounces. **Grips:** Laminate. **Sights:** None. **Features:** Single-action, satin black finish, 10-shot mag capacity. **MSRP:** $389.

**RUGER MARK III**

**Caliber:** .22 LR. **Barrel:** 4.75 inches, 5.5 inches, 6 inches, 6.88 inches. **Weight:** 35-45 ounces. **Grips:** Polymer, cocobolo. **Sights:** Fixed or fiber-optic front with adjustable rear, or fixed. **Features:** Single-action, blued, satin stainless finish, 10-shot mag capacity. **MSRP:** $379-659.

**RUGER LC380**

**Caliber:** .380 ACP. **Barrel:** 3.12 inches. **Weight:** 17.2 ounces. **Grips:** Glass-filled nylon. **Sights:** Adjustable three-dot. **Features:** Double-action-only, blued finish, 7-shot mag capacity. **MSRP:** $449.

**RUGER P95**

**Caliber:** 9mm. **Barrel:** 3.9 inches. **Weight:** 27 ounces. **Grips:** Polymer. **Sights:** Fixed three-dot. **Features:** Double-action/single-action, blued, stainless, 10/15-shot mag capacity. **MSRP:** $399-429.

Complete Book of Autopistols 2013 • **87**



# Handguns: Autoloaders

**RUGER SR1911**

**Caliber:** .45 ACP. **Barrel:** 4.25 inches, 5 inches. **Weight:** 36.4-39 ounces. **Grips:** Hardwood. **Sights:** Fixed Novak three-dot. **Features:** Single-action, low-glare stainless finish, 7/8-shot mag capacity. MSRP: $829.

**RUGER SR22**

**Caliber:** .22 LR. **Barrel:** 3.5 inches. **Weight:** 17.5 ounces. **Grips:** Glass-filled nylon. **Sights:** Adjustable three-dot. **Features:** Double-action-only, black or silver anodized finish, 10-shot mag capacity. MSRP: $399-439.

**RUGER SR9/SR40**

**Caliber:** 9mm, .40. **Barrel:** 3.5 inches, 4.14 inches. **Weight:** 23.4-26.5 ounces. **Grips:** Glass-filled nylon. **Sights:** Adjustable three-dot. **Features:** Double-action-only, black nitride or stainless, 9/10/15/17-shot mag capacity. MSRP: $529.

**RUGER SR45**

**Caliber:** .45 ACP. **Barrel:** 4.5 inches. **Weight:** 30.2 ounces. **Grips:** Glass-filled nylon. **Sights:** Adjustable three-dot. **Features:** Double-action-only, black nitride or stainless, 10-shot mag capacity. MSRP: $529.

**SARSILMAZ K2**

**Caliber:** 9mm, .40, .45 ACP, 10mm. **Barrel:** 4.59 inches. **Weight:** 40.21 ounces. **Grips:** Black polymer. **Sights:** Adjustable three-dot. **Features:** Double-action/single-action, blued finish, 14/19/21-shot mag capacity. MSRP: $660. From EAA.

**SCCY CPX**

**Caliber:** 9mm. **Barrel:** 3.1 inches. **Weight:** 15 ounces. **Grips:** Textured polymer. **Sights:** Adjustable rear. **Features:** DAO w/ second strike capability, polymer frame, lock breech, stainless steel slide and barrel, ambi safety, internal hammer, mag finger rest, black (CB) or two-tone finish (TT), 9-shot mag capacity. MSRP: $314-334.

**SHOOTERS ARMS COMMODORE**

**Caliber:** .45 ACP. **Barrel:** 4.25 inches. **Weight:** 38.4 ounces. **Grips:** Plastic. **Sights:** Dovetailed front, combat rear. **Features:** Single-action, extended slide stop and safety lock, matte black finish, 8-shot mag capacity. MSRP: $499.95. From Century Arms.

**SIG SAUER 1911**

**Caliber:** .45 ACP. **Barrel:** 4.2 inches, 5 inches. **Weight:** 29.5-41.6 ounces. **Grips:** Wood, Ergo XT, Hogue, G10. **Sights:** Low-profile, SIGLITE night, adjustable. **Features:** Single-action, Nitron finish, 7/8/9-shot mag capacity. MSRP: $1,170-1,456.

000217
ER_1089



### SIG SAUER 1911 TRADITIONAL

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 4.2 inches, 5 inches. **Weight:** 29.5-41.6 ounces. **Grips:** Wood, Ergo XT **Sights:** Low-profile, SIGLITE night, adjustable. **Features:** Single-action, black Nitron, stainless or two-tone, 7/8-shot mag capacity. **MSRP:** $1,128-1,213.

### SIG SAUER M11-A1

**Caliber:** 9mm. **Barrel:** 3.9 inches. **Weight:** 32 ounces. **Grips:** Polymer. **Sights:** SIGLITE. **Features:** Double-action/single-action, black Nitron finish, 15-shot mag capacity. **MSRP:** $1,125.

### SIG SAUER MOSQUITO

**Caliber:** .22 LR. **Barrel:** 3.9 inches, 4.9 inches. **Weight:** 24.6-27.8 ounces. **Grips:** Polymer. **Sights:** Adjustable. **Features:** Double-action/single-action, Nitron, various finishes,10-shot mag capacity. **MSRP:** $390-502.

### SIG SAUER P210

**Caliber:** 9mm. **Barrel:** 4.7 inches. **Weight:** 37.4 ounces. **Grips:** Wood. **Sights:** Post and notch, adjustable target. **Features:** Single-action, black Nitron finish, 8-shot mag capacity. **MSRP:** $2,199-2,399.

### SIG SAUER P220

**Caliber:** .45 ACP. **Barrel:** 3.9 inches, 4.4 inches, 5 inches. **Weight:** 29.6-39.1 ounces. **Grips:** Polymer, wood, aluminum, Hogue, G10. **Sights:** Contrast, SIGLITE, TRUGLO, adjustable. **Features:** Single-action, double-action/single-action or double-action-Kellerman, Nitron finish, 6/8/10-shot mag capacity. **MSRP:** $926-1,375.

### SIG SAUER P224

**Caliber:** 9mm, .357 SIG, .40. **Barrel:** 3.5 inches. **Weight:** 25.4 ounces. **Grips:** Polymer, Hogue G10. **Sights:** SIGLITE night. **Features:** Double-action/single-action or double-action-Kellerman, Nitron finish, 10/12-shot mag capacity. **MSRP:** $1,125-1,218.

### SIG SAUER P226

**Caliber:** 9mm, .357 SIG, .40. **Barrel:** 4.4 inches, 5 inches, 6 inches. **Weight:** 23.7-47.2 ounces. **Grips:** Polymer, wood, Ergo, aluminum, Hogue, G10, Nill. **Sights:** SIGLITE, TruGlo, contrast, adjustable. **Features:** Single-action, double-action/single-action, double-action-Kellerman, Nitron finish, 10/12/14/15/17/19/20-shot mag capacity. **MSRP:** $656-2,747.

### SIG SAUER P227

**Caliber:** .45 ACP. **Barrel:** 3.9 inches, 4.4 inches, 4.9 inches. **Weight:** 30-32.5 ounces. **Grips:** Polymer. **Sights:** Contrast, SIGLITE. **Features:** Double-action/single, Nitron finish, 10-shot mag capacity. **MSRP:** $993-1,228.

**Complete Book of Autopistols 2013** • *89*



# Handguns: Autoloaders

**SIG SAUER P229**

Caliber: 9mm, .357 SIG, .40. Barrel: 3.9 inches, 4.3 inches, 4.4 inches, 4.5 inches. Weight: 23.7-40.2 ounces. Grips: Polymer, wood, Ergo, aluminum, Hogue, G10. Sights: SIGLITE, TruGlo, contrast, adjustable. Features: Single-action, double-action/single-action, double-action-Kellerman, Nitron finish, 10/12/13/15-shot mag capacity. MSRP: $626-1,368.

**SIG SAUER P232**

Caliber: .380 ACP. Barrel: 3.6 inches. Weight: 18.5-23.6 ounces. Grips: Hogue rubber. Sights: Contrast, SIGLITE night. Features: Double-action/single-action, Nitron finish, 7-shot mag capacity. MSRP: $649-799.

**SIG SAUER P238**

Caliber: .380 ACP. Barrel: 2.7 inches. Weight: 15.2-20.1 ounces. Grips: Polymer, wood, aluminum, G10, Hogue rubber. Sights: SIGLITE night, TruGlo. Features: Single-action, Nitron finish, 6/7-shot mag capacity. MSRP: $679-829.

**SIG SAUER P239**

Caliber: 9mm, .357 SIG, .40. Barrel: 3.6 inches, 4 inches. Weight: 29.5 ounces. Grips: Polymer. Sights: Contrast, SIGLITE. Features: Double-action/single-action or double-action-Kellerman, Nitron finish, 7/8-shot mag capacity. MSRP: $858-1,015.

**SIG SAUER P250**

Caliber: .380 ACP, 9mm, .357 SIG, .40, .45 ACP. Barrel: 3.6 inches, 3.9 inches, 4.7 inches. Weight: 19.4-29.4 ounces. Grips: Polymer. Sights: Contrast, SIGLITE night. Features: Double-action/single-action, Nitron finish, 6/9/10/12/13/14/15/17-shot mag capacity. MSRP: $570-813.

**SIG SAUER P290**

Caliber: 9mm. Barrel: 2.9 inches. Weight: 20.5 ounces. Grips: Polymer. Sights: SIGLITE night. Features: Double-action-only, Nitron finish, 6-shot mag capacity. MSRP: $570-642.

**SIG SAUER P516/ P522/P556**

Caliber: .22 LR, 5.56mm. Barrel: 7.5 inches, 10 inches, 10.6 inches. Weight: 84-107.2 ounces. Grips: Magpul MOE, polymer. Sights: Flip-up iron, hooded or combat front with mini red-dot. Features: Semi-auto (gas-piston or blowback), black hardcoat anodized or Nitron finish, 10/25/30-shot mag capacity. MSRP: $572-1,666.

**SIG SAUER P938**

Caliber: 9mm. Barrel: 3 inches. Weight: 16 ounces. Grips: Wood, Hogue G10. Sights: SIGLITE, TruGlo. Features: Single-action, nitron finish, 6/7-shot mag capacity. MSRP: $795-823.

000219
ER_1091



**SIG SAUER SP2022**

**Caliber:** 9mm, .357 SIG, .40. **Barrel:** 3.9 inches. **Weight:** 29 ounces. **Grips:** Polymer. **Sights:** Contrast, SIGLITE night. **Features:** Double-action/single-action or double-action-only, black Nitron or two-tone finish, 10/12/15-shot mag capacity. **MSRP:** $570-710.

**SMITH & WESSON BODYGUARD**

**Caliber:** .380 ACP. **Barrel:** 2.75 inches. **Weight:** 11.85 ounces. **Grips:** Polymer. **Sights:** Fixed front, adjustable rear. **Features:** Double-action-only, matte black finish, 6-shot mag capacity. **MSRP:** $419.

**SMITH & WESSON M&P**

**Caliber:** 9mm, .357 SIG, .40, .45 ACP. **Barrel:** 3.5 inches, 4 inches, 4.25 inches, 4.5 inches, 5 inches. **Weight:** 19-29.6 ounces. **Grips:** Polymer, Crimson Trace Lasergrips. **Sights:** Fixed or adjustable. **Features:** Striker-fired, black Melonite or dark earth brown, 6/7/8/10/12/15/17-shot mag capacity. **MSRP:** $449-829.

**SMITH & WESSON M&P C.O.R.E.**

**Caliber:** 9mm, .40. **Barrel:** 4.25 inches, 5 inches. **Weight:** 20-29.6 ounces. **Grips:** Polymer (enhanced Palmswell). **Sights:** White dovetailed front, fixed 2-dot rear, slide cut to accept red dot optics. **Features:** Striker-fired, Melonite finish, 15/17-shot mag capacity. **MSRP:** $729.

**SMITH & WESSON PERFORMANCE CENTER**

**Caliber:** .45 ACP. **Barrel:** 4.25 inches, 5 inches. **Weight:** 29.6-40.5 ounces. **Grips:** G10 custom. **Sights:** Post front, adjustable rear. **Features:** Single-action, stainless steel, scandium alloy, round-butt, PC action job, lightening cuts, 8-shot mag capacity. **MSRP:** $1,539.

**SMITH & WESSON PRO**

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3 inches, 4.25 inches, 5 inches. **Weight:** 24-41 ounces. **Grips:** Polymer, synthetic, wood. **Sights:** Dovetail front, adjustable rear, Novak, white three-dot. **Features:** Single-action or double-action-only, black Melonite, matte silver, two-tone finish, 7/8/10/15/17-shot mag capacity. **MSRP:** $669-1,519.

**SMITH & WESSON RIMFIRE**

**Caliber:** .22 LR. **Barrel:** 4.1 inches, 5.5 inches, 7 inches. **Weight:** 24-42 ounces. **Grips:** Polymer, Soft Touch, wood. **Sights:** Adjustable, Patridge front. **Features:** Single-action, black, blued, two-tone or real tree APG HD finish, 10/12-shot mag capacity. **MSRP:** $329-1,369.

**SMITH & WESSON SD VE**

**Caliber:** 9mm, .40. **Barrel:** 4 inches. **Weight:** 22.7 ounces. **Grips:** Polymer. **Sights:** White three-dot. **Features:** Striker-fired, two-tone finish, 10/14/16-shot mag capacity. **MSRP:** $379.

# Handguns: Autoloaders



**SMITH & WESSON SHIELD**

**Caliber:** 9mm, .40. **Barrel:** 3.1 inches. **Weight:** 19 ounces. **Grips:** Polymer. **Sights:** White three-dot. **Features:** Striker-fired, black Melonite finish, 6/7/8-shot mag capacity. **MSRP:** $449.

**SPRINGFIELD EMP**

**Caliber:** 9mm, .40. **Barrel:** 3 inches. **Weight:** 26-33 ounces. **Grips:** Cocobolo, G10. **Sights:** Trilium three-dot. **Features:** Single-action, black frame, stainless slide finish, 8/9-shot mag capacity. **MSRP:** $1,345.

**SPRINGFIELD LOADED**

**Caliber:** 9mm, .45 ACP. **Barrel:** 5 inches. **Weight:** 39-41 ounces. **Grips:** Cocobolo, G10. **Sights:** Low-profile, dovetail front, adjustable rear. **Features:** Single-action, Parkerized, stainless, 7/9-shot mag capacity. **MSRP:** $1,003-1,387.

**SPRINGFIELD MIL-SPEC**

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 39 ounces. **Grips:** Cocobolo. **Sights:** Fixed combat three-dot. **Features:** Single-action, parkerized, stainless finish, 7-shot mag capacity. **MSRP:** $768-843.

**SPRINGFIELD OPERATOR**

**Caliber:** .45 ACP. **Barrel:** 4 inches, 5 inches. **Weight:** 31-42 ounces. **Grips:** Pachmayr wraparound, cocobolo. **Sights:** Low-profile, dovetail front, adjustable rear, tritium inserts. **Features:** Single-action, black, olive drab finish, 7-shot mag capacity. **MSRP:** $1,387.

**SPRINGFIELD PROFESSIONAL MODEL CUSTOM**

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 38 ounces. **Grips:** Cocobolo. **Sights:** Trilium three-dot. **Features:** Single-action, Black T finish, 7-shot mag capacity. **MSRP:** $2,647.

**SPRINGFIELD RANGE OFFICER**

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 40 ounces. **Grips:** Cocobolo. **Sights:** Low-profile, adjustable, target. **Features:** Single-action, black finish, 7-shot mag capacity. **MSRP:** $939.

**SPRINGFIELD TROPHY MATCH/TRP**

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 40-45 ounces. **Grips:** Cocobolo, G10. **Sights:** Low-profile, dovetail front, adjustable rear. **Features:** Single-action, black, stainless finish, 7-shot mag capacity. **MSRP:** $1,605-1,867.

000221
ER_1093



**SPRINGFIELD XD**

**Caliber:** 9mm, .357 SIG, .40, .45 ACP. **Barrel:** 3 inches, 4 inches, 5 inches. **Weight:** 26-33 ounces. **Grips:** Polymer. **Sights:** Three-dot, dovetail (optional trilium). **Features:** Ultra Safety Assurance (USA), black, two-tone, dark earth, OD green finish, 9/10/12/13/16-shot mag capacity. **MSRP:** $549-750.

**STEYR ARMS M-A1**

**Caliber:** 9mm, .357 Sig, .40. **Barrel:** 4 inches. **Weight:** 27.02 ounces. **Grips:** Polymer. **Sights:** Triangular/trapezoid **Features:** Double-action-only, Mannox finish, 10/15/17-shot mag capacity. **MSRP:** $560.

**SPRINGFIELD XD^M**

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.8 inches, 4.5 inches, 5.25 inches. **Weight:** 27-32 ounces. **Grips:** Polymer. **Sights:** Three-dot, dovetail. **Features:** Ultra Safety Assurance (USA), black, two-tone, OD green finish, 11/13/16/19-shot mag capacity. **MSRP:** $639-749.

**STEYR ARMS S-A1**

**Caliber:** 9mm, .40. **Barrel:** 3.6 inches, 3.78 inches. **Weight:** 26.07-26.57 ounces. **Grips:** Polymer. **Sights:** Triangular/trapezoid. **Features:** Double-action-only, Mannox finish, 10-shot mag capacity. **MSRP:** $560.

**SPRINGFIELD XD^S**

**Caliber:** 9mm, .45 ACP. **Barrel:** 3.3 inches. **Weight:** 21.5-23 ounces. **Grips:** Polymer. **Sights:** Fiber-optic front, dovetail rear. **Features:** Ultra Safety Assurance (USA), black finish, 5/7-shot mag capacity. **MSRP:** $559-669

**STI DOUBLE STACK**

**Caliber:** .38 Super, 9mm, .357 SIG, .40, .45 ACP, 10mm. **Barrel:** 3.9 inches, 4.15 inches, 5 inches, 6 inches. **Weight:** 33.5-44.6 ounces. **Grips:** Polymer. **Sights:** Fixed or adjustable. **Features:** Single-action, black, blued, stainless, hard chrome or two-tone finish. **MSRP:** $1,649-3,655.

**STEYR ARMS C-A1**

**Caliber:** 9mm. **Barrel:** 3.6 inches. **Weight:** 27.02 ounces. **Grips:** Polymer. **Sights:** Triangular/trapezoid or three-dot. **Features:** Double-action-only, Mannox finish, 10/15/17-shot mag capacity. **MSRP:** $560.

**STI LAWMAN**

**Caliber:** 9mm, .45 ACP. **Barrel:** 3.24 inches, 4.26 inches, 5.11 inches. **Weight:** 24.8-38.9 ounces. **Grips:** G10 Micarta. **Sights:** STI ramp front, Tactical adjustable rear. **Features:** Single-action, blued finish, 8/9-shot mag capacity. **MSRP:** $1,455.

# Handguns: Autoloaders



## STI SINGLE STACK

**Caliber:** .38 Super, 9mm, .40, .45 ACP. **Barrel:** 3.4 inches, 3.9 inches, 4.15 inches, 5 inches, 6 inches. **Weight:** 28-40 ounces. **Grips:** Rosewood, G10, STI Alumagrips. **Sights:** Fixed or adjustable. **Features:** Single-action, black, blued, stainless, hard chrome or two-tone finish. **MSRP:** $699-1,944.



## STOEGER COUGAR

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.6 inches. **Weight:** 32-32.6 ounces. **Grips:** Synthetic. **Sights:** White three-dot. **Features:** Double-action/single-action, black nitride finish, 8/11/15-shot mag capacity. **MSRP:** $469-509.



## TAURUS 24/7 G2

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.5 inches, 4.2 inches. **Weight:** 27-28 ounces. **Grips:** Polymer. **Sights:** Adjustable rear. **Features:** Double-action/single-action, blued or matte stainless finish, 10/12/15/17-shot mag capacity. **MSRP:** $498-539.

## TAURUS 609TI-PRO

**Caliber:** 9mm. **Barrel:** 3.25 inches. **Weight:** 19.7 ounces. **Grips:** Polymer. **Sights:** Heinie Straight Eight. **Features:** Double-action/single-action, Shadow gray, titanium finish, 13-shot mag capacity. **MSRP:** $608.



## TAURUS 700

**Caliber:** .380 ACP, 9mm, .40. **Barrel:** 3.2 inches, 3.3 inches. **Weight:** 10.2-19 ounces. **Grips:** Polymer. **Sights:** Fixed or adjustable. **Features:** Double-action/single-action or double-action-only, blued, matte stainless finish, 6/7-shot mag capacity. **MSRP:** $199-498.



## TAURUS 800

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.5 inches, 4 inches. **Weight:** 24.7-30.2 ounces. **Grips:** Polymer. **Sights:** Novak or fixed three-dot. **Features:** Double-action/single-action, black Tenifer, blued, matte stainless finish, 12/15/17-shot mag capacity. **MSRP:** $623-686.



## TAURUS 1911

**Caliber:** 9mm, .45 ACP. **Barrel:** 5 inches. **Weight:** 38-39.4 ounces. **Grips:** Walnut, polymer. **Sights:** Novak. **Features:** Single-action, blued, matte stainless or two-tone finish, 8/9-shot mag capacity. **MSRP:** $712-947.



## TAURUS LARGE FRAME

**Caliber:** 9mm, .40. **Barrel:** 5 inches. **Weight:** 34 ounces. **Grips:** Rubber. **Sights:** Fixed. **Features:** Double-action/single-action, blued or matte stainless finish, 10/11/17-shot mag capacity. **MSRP:** $483-938.



**TAURUS MEDIUM FRAME**

**Caliber:** .380 ACP, .38 Super, 9mm, .40, .45 ACP. **Barrel:** 3.25 inches, 3.63 inches, 4 inches, 4.25 inches. **Weight:** 18.7-30 ounces. **Grips:** Mother of pearl, rubber, rosewood. **Sights:** Fixed. **Features:** Double-action/single-action, stainless, blued, gold, blue/gold finish, 8/10/15/17/19-shot mag capacity. **MSRP:** $633-701.

**TAURUS MILLENNIUM PRO**

**Caliber:** 9mm, .40, .45 ACP. **Barrel:** 3.25 inches. **Weight:** 18.7-22.2 ounces. **Grips:** Polymer. **Sights:** Heinie Straight Eight. **Features:** Double-action/single-action, blued, matte stainless finish, 6/10/12-shot mag capacity. **MSRP:** $467-498.

**TAURUS SMALL FRAME**

**Caliber:** .22 LR, .25 ACP. **Barrel:** 2.75 inches. **Weight:** 12.3 ounces. **Grips:** Synthetic, rosewood, wood. **Sights:** Fixed. **Features:** Double-action-only, blued, matte stainless, nickel or two-tone finish, 8/9-shot mag capacity. **MSRP:** $266-539.

**THOMPSON CUSTOM 1911**

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 31.5-39 ounces. **Grips:** Laminate with medallion. **Sights:** Low-profile iron. **Features:** Single-action, stainless finish, 7-shot mag capacity. **MSRP:** $813. From Kahr Arms.

**THOMPSON TA5**

**Caliber:** .45 ACP. **Barrel:** 10.5 inches. **Weight:** 80.9 ounces. **Grips:** Walnut. **Sights:** Blade front, open adjustable rear. **Features:** Semi-auto, blowback, blued finish, 10/50/100-shot drum or 30-shot stick. **MSRP:** $1,237. From Kahr Arms.

**USELTON IA COMMANDER 1911**

**Caliber:** .38 Super, 9mm, .45 ACP. **Barrel:** 3.5 inches, 4.25 inches, 5 inches. **Weight:** 19-24 ounces. **Grips:** G10 black with Uselton medallion. **Sights:** Fiber optic front, adjustable rear. **Features:** Single-action, integrated Aluminum, stainless steel or Uselton Ceramic Armor Coat finish, 8-shot mag capacity. **MSRP:** $3,699-3,899.

**WILSON COMBAT BILL WILSON CARRY**

**Caliber:** .45 ACP. **Barrel:** 4 inches. **Weight:** 35 ounces. **Grips:** G10 starburst. **Sights:** Fiber-optic front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 7-shot mag capacity. **MSRP:** $3,205.

**WILSON COMBAT CLASSIC**

**Caliber:** .38 Super, 9mm, .40, .45 ACP, 10mm. **Barrel:** 5 inches. **Weight:** 38-46.6 ounces. **Grips:** Cocobolo. **Sights:** Ramp front, Lo-Mount adjustable rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $3,030.

000224
ER_1096

# Handguns: Autoloaders



### WILSON COMBAT CQB

**Caliber:** .38 Super, 9mm, .40, .45 ACP, 10mm. **Barrel:** 4 inches, 5 inches. **Weight:** 36.6-40.4 ounces. **Grips:** G10 Starburst or diagonal. **Sights:** Fiber-optic front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $2,865.

### WILSON COMBAT PROTECTOR

**Caliber:** .38 Super, 9mm, .40, .45 ACP, 10mm. **Barrel:** 5 inches. **Weight:** 38 ounces. **Grips:** G10 Starburst. **Sights:** Fiber-optic front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $2,920.

### WILSON COMBAT HUNTER

**Caliber:** 10mm, .460 Rowland. **Barrel:** 5.5 inches. **Weight:** 39.7 ounces. **Grips:** Crimson Trace Lasergrips. **Sights:** Ramp front, Lo-Mount adjustable rear. **Features:** Single-action, Armor-Tuff finish, 7-shot mag capacity. **MSRP:** $4,100.

### WILSON COMBAT SENTINEL

**Caliber:** 9mm. **Barrel:** 3.6 inches. **Weight:** 31.7 ounces. **Grips:** G10 slim-line or Starburst. **Sights:** Fiber-optic front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $3,310.

### WILSON COMBAT MS. SENTINEL

**Caliber:** 9mm. **Barrel:** 3.6 inches. **Weight:** 26.8 ounces. **Grips:** Cocobolo. **Sights:** Fiber-optic front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $3,875.

### WILSON COMBAT SPEC-OPS 9

**Caliber:** 9mm. **Barrel:** 4.5 inches. **Weight:** 26.6 ounces. **Grips:** Starburst. **Sights:** Dovetail fiber-optic front, spec-ops low-profile rear. **Features:** Single-action, Armor-Tuff finish, 16-shot mag capacity. **MSRP:** $2,285.

### WILSON COMBAT PROFESSIONAL

**Caliber:** .38 Super, 9mm, .45 ACP. **Barrel:** 4 inches. **Weight:** 36.4-44.8 ounces. **Grips:** G10 Starburst. **Sights:** Fiber-optic or trilium front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $2,920.

### WILSON COMBAT SUPER SENTINEL

**Caliber:** .38 Super. **Barrel:** 3.6 inches. **Weight:** 25.2 ounces. **Grips:** G10 Slimline. **Sights:** Fiber-optic battlesights. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $3,875.

000225

ER_1097



**WILSON COMBAT TACTICAL ELITE**

**Caliber:** .38 Super, 9mm, .40, .45 ACP. **Barrel:** 5 inches. **Weight:** 39.8 ounces. **Grips:** G10 Starburst. **Sights:** Fiber-optic front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $3,650.

**WITNESS ELITE**

**Caliber:** .38 Super, 9mm, .40, .45 ACP, 10mm. **Barrel:** 4.5 inches, 4.75 inches, 5.25 inches. **Weight:** 39-44 ounces. **Grips:** Aluminum, wood, rubber. **Sights:** Interchangeable front with adjustable rear, fully adjustable. **Features:** Single-action, or double-action/single-action, stainless, two-tone finish, 10/15/18-shot mag capacity. **MSRP:** $640-1,879. From European American Armory.

**WILSON COMBAT TACTICAL SUPERGRADE**

**Caliber:** .38 Super, 9mm, .40, .45 ACP, 10mm. **Barrel:** 5 inches. **Weight:** 36.6-45 ounces. **Grips:** G10 Starburst. **Sights:** Tritium front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $5,045.

**WITNESS POLYMER**

**Caliber:** .38 Super, 9mm, .40, .45 ACP, 10mm. **Barrel:** 3.6 inches, 4.5 inches. **Weight:** 26-33 ounces. **Grips:** Polymer, rubber. **Sights:** Low-profile, adjustable. **Features:** Double-action/single-action blued, Wonder stainless, two-tone finish, 8/10/12/15/18-shot mag capacity. **MSRP:** $525-635. From European American Armory.

**WILSON COMBAT ULTRALIGHT CARRY**

**Caliber:** .38 Super, 9mm, .45 ACP. **Barrel:** 5 inches. **Weight:** 32.8-40.5 ounces. **Grips:** G10 Starburst. **Sights:** Tritium front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $3,650.

**WITNESS STEEL**

**Caliber:** .38 Super, 9mm, .40, .45 ACP, 10mm. **Barrel:** 3.6 inches, 4.5 inches. **Weight:** 26-33 ounces. **Grips:** Polymer, rubber. **Sights:** Low-profile, adjustable. **Features:** Double-action/single-action blued, Wonder stainless, two-tone finish, 8/10/12/15/18-shot mag capacity. **MSRP:** $557-691. From European American Armory.

**WILSON COMBAT X-TAC**

**Caliber:** .45 ACP. **Barrel:** 5 inches. **Weight:** 38.1-46.2 ounces. **Grips:** G10 Starburst. **Sights:** Fiber-optic front, battlesight rear. **Features:** Single-action, Armor-Tuff finish, 8-shot mag capacity. **MSRP:** $2,760.

**WITNESS HUNTER**

**Caliber:** .45 ACP, 10mm. **Barrel:** 6 inches. **Weight:** 41 ounces. **Grips:** Polymer. **Sights:** Dovetail front, low-profile heavy-duty adjustable rear. **Features:** Single-action, blued finish, 10/15-shot mag capacity. **MSRP:** $1,007. From European American Armory.

# EXHIBIT 33



MAGAZINES:

PERSONAL DEFENSE WORLD / COMBAT HANDGUNS / CONCEALED CARRY / ANNUALS

# The Evolution of GLOCK Pistols

FOUR GENERATIONS OF GLOCK DESIGNS HAVE FOREVER CHANGED THE WORLD OF FIREARMS.

By **ROBERT A. SADOWSKI**



1 of 10

**The Evolution of GLOCK Pistols**
"There are four distinct generations of Glocks, and, at a glance, even the casual observer can
over the past three decades."



0 Comment(s)



**TRENDING**



**Albuquerque Shooting: CCW Good Guy Kills Man Terrorizing Family**



**Best Comments on Video of Man Who Sawed AR-15 in Half**



**Pocket Battle: Scores & Rankings of 5 Popular .380 Pistols**



**The Taurus Raging Bull Revolver Kicks the .44 Magnum Up a Notch**

Glock completely changed the way the world viewed pistols. Today, several major firearm manufacturers copy the basic Glock pistol design of a polymer frame and a striker firing system.

Gaston Glock ran a small manufacturing business out of his garage, producing knives and other small items for the military. He had no experience building firearms, but what he did have was determination and vision. He spoke with firearms experts to understand the pros and cons of the current pistol designs. Not having any preconceived notions of how to design or manufacture a pistol, Glock had pure creativity at his disposal with no limitations. He and his team created a pistol with 34 components and a unique Safe Action trigger system never before seen. The pistol made full use of high-tech polymers in the frame, magazine and other components. The slide was machined from round bar stock steel and given a blocky look. Metal components were given a surface-hardening treatment that resists scratches and corrosion. It had a magazine capacity of 17 rounds, parts between pistols were easily interchangeable, and the pistol could be field-stripped without tools in seconds. The Glock 17 was then introduced to the world.

As Glocks were adopted by militaries and LE agencies around the globe, Glock continued to refine its series of pistols by using feedback from troops on the ground and police who carried the Glock on duty, day in and day out. Those changes and suggestions are noted in the succeeding generations of Glocks.

There are four distinct generations of Glocks, and, at a glance, even the casual observer can see how this pistol evolved over the past three decades. Perhaps only the knowledgeable collector can

note the slight variations within generations. Here's a look at how Glock pistols have evolved over the years.

LIVING SPACES
Mid-Century style under $700

$395

### Gen1: 1982-1988



GLOCK 17 Gen1

The first generation of Glocks debuted with the G17 in 1982, chambered in 9mm. Gen1 Glocks featured a pebble-finished frame without horizontal grooves on the front- and backstraps. The G17 was purchased by numerous militaries around the world, and it was presented and demonstrated to police chiefs across the U.S. Rare G17 Gen1 cutaways were used to demonstrate the features of the then-new G17, particularly the Safe Action mechanism. The LE world at that time used revolvers. A semi-automatic pistol, let alone a lightweight polymer-framed model with no manual thumb safety, was a new breed indeed.

**RELATED STORY: Stealth Nine – The Single-Stack GLOCK 43 Pistol**

In Europe, G17s were shipped in small plastic containers with two magazines, a cleaning rod and slots to hold 18 rounds of ammunition. The ATF requested the cartridge slots be removed for the U.S. market, and Glock obliged. Shooters immediately tried— and failed—to wear out the pistols by shooting thousands of

rounds through them. The media touted the Glock as being immune to detection by metal detectors. These initial thoughts were soon dismissed. As shooters learned, the soft-shooting 9mm G17 was lightweight, accurate and reliable. There was also plenty of steel in the firearm's construction so it could never sneak past a metal detector.

Glocks were dropped from helicopters, frozen in ice, dunked in mud and buried in sand, and after all the torture tests the Glocks performed flawlessly. Police chiefs liked the pistol but were in need of a more compact pistol for plainclothes officers and detectives, and the Glock 19 was produced by shortening the grip and magazine. Competitive shooters began to demand a Glock pistol of their own, so a longer barrel and slide assembly was mated to the G17 frame and called the Glock 17L. This model also had a lighter trigger pull and an extended magazine catch. The Glock 18 was introduced as a select-fire variant for LE/military use only.

## Gen2: 1988-1997



GLOCK 17 Gen2

Gen2 pistols are notable for their textured front- and backstraps. Glock also introduced more caliber choices. The .40 was gaining popularity with LE agencies by this time, so the company

introduced the full-sized Glock 22 and the compact Glock 23 in
that caliber. The Glock 24 was similar to the G17L but chambered
in .40 S&W. The G31 and G32, full-sized and compact,
respectively, were chambered in .357 SIG.

**RELATED STORY: Perfect Nines – 9 Reliable GLOCK Pistols
Chambered in 9mm**

Ported and compensated models were also offered. The "C" suffix
added to model numbers indicated a compensated model with
slots cut into the barrel and a cutout in the top of the slide. These
features helped reduce muzzle rise and recoil by dispersing
burning gases upward through the slots. Models with
compensated barrels included nearly all of the previously built
variants.

In 1990, Glocks were given big-bore firepower in the 10mm Auto
and .45 ACP in the Glock 20 and Glock 21, respectively. The G21 in
.45 ACP immediately became popular with civilians and
LE/military shooters in the U.S. This wasn't a surprise, as the .45
ACP is America's handgun cartridge.

In Gen2 models, the pistol was modified with an integrated recoil
spring assembly.

**Gen3: 1995-2010**



GLOCK 17 Gen3

The third update to the Glock line of pistols brought about even more new models and alterations to the frame. The first Gen3 pistols were transitional and had new finger grooves molded into the frontstrap, along with thumb rests. Then Glock began to transition its Gen3 models by adding a forward accessory rail. These transitional models included the G19C, G20, G20C, G21, G21C, G26, G27, G28, G29, G30, G33, G36 and G39.

Glock also introduced Short Frame (SF) variants for some models. For these Short Frame pistols, the trigger reach and heel were shortened to better accommodate shooters with small hands. The SF models include the big-bore 10mm G20 SF and the .45 ACP G21 SF.

**RELATED STORY: Massad Ayoob – You Got A GLOCK. Now What?**

Next, Glock produced a proprietary caliber with Speer and called the new round the .45 GAP. The acronym GAP stands for "Glock Automatic Pistol." The cartridge was designed to provide power equal to the .45 ACP, yet it was slightly shorter so it would fit in a compact pistol. Also during the Gen3 period, Glock started to produce subcompact models in all calibers: the G26 (9mm), G27

(.40), G29 (10mm), G30 (.45 ACP), G33 (.357 SIG) and G39 (.45 GAP).

A notable departure for Glock at this time was the Glock 36 in .45 ACP. This pistol uses a single-stack magazine and was designed as a highly compact "slim-line" version of the G30 pistol. The G36 has a 6+1 capacity compared to the G30's 10+1, but the G36 is 1.1 inches thick while the G30 is 1.27 inches wide.

**Gen4: 2010-Present**



GLOCK 17 Gen4

Early in 2010, Glock introduced its Gen4 pistols, which kept the recessed thumb rests, finger grooves and accessory rail of the previous generation but now featured frame texturing slightly less aggressive than the previous generation's. Gen4 models also come with interchangeable backstraps, a reversible magazine catch, a dual recoil spring assembly and a new trigger system. Gen4 models are easy to identify because of the "Gen4" roll-marked after the model number on the left side of the slide.

**RELATED STORY: Glock 43 – An Ultra-Slim, Easy-To-Conceal 9mm**

Four backstraps, two with extended beavertails, are included with all Gen4 models. The basic frame—without a backstrap insert installed—is smaller than previous generations and is well suited for shooters with smaller hands. The reversible magazine catch can be swapped out to accommodate both right- and left-handed shooters. The magazines for Gen4 models are also built to accommodate the new magazine catch. Previous-generation magazines, however, are compatible with Gen4 models. The dual recoil spring assembly is designed to help reduce felt recoil.

Some noteworthy models that were recently introduced in the Gen4 era include the G30S, the G41 Gen4, the G42 and the G43. The G30S is a hybrid Glock that combines the frame of a G30 SF with the slim slide of a G36 to create a compact concealed-carry pistol that packs 10+1 rounds of .45 ACP firepower. The G42 addresses the popularity of the .380 ACP cartridge for concealed carry. While not explicitly a Gen4, the G42 features subdued grip texturing, a reversible magazine catch and a slight frame extension—like a mini beavertail—that protects the web of the shooter's hand. The G42 also employs a locked-breech system, which is unusual for a .380 ACP pistol, as most use a blowback system.



GLOCK's Gen4 autopistols, including this 9mm G17, possess decades of refinements that only enhance their renowned accuracy and reliability.

The G41 Gen4 is a competition-sized pistol with a 5.31-inch barrel chambered in the fight-stopping .45 ACP. The dual recoil spring assembly helps reduce the felt recoil in the G41 Gen4, and the interchangeable backstraps offer operators a high degree of customization. The white-dot front sight and white-outlined rear sight offer fast target acquisitions, and the wraparound frame texturing provides added control.

The G43 is Glock's most recent variant, a single-stack pistol chambered in 9mm and designed specifically for concealed carry. With a capacity of 6+1 rounds, an overall length of 6.26 inches and an unloaded weight of 17.95 ounces, the G43 may be small in stature but offers all the legendary Glock safety features and reliability. For everyday carry, it is ultra-concealable, comfortable to carry and offers plenty of 9mm firepower.

**RELATED STORY: 3 GLOCK Subcompact & Full-Size Pistols For Self-Defense**

Finally, Glock has also recently introduced its Modular Optic System (MOS) Configuration pistols, which feature slides that come with mounting plates to accept a variety of popular miniature reflex sights. These models, including the G34 Gen4, G35 Gen4, G41 Gen4 and the new G40 Gen4 in 10mm, are perfect for hunting, self-defense and competition, offering quick target acquisitions and power.

Glock has shown itself to be an innovative firearms company that has changed the paradigm of pistol design and manufacture forever. Over the past three decades, the company has listened to its users and refined its pistols so they truly aspire to perfection.

For more information, visit http://us.glock.com or call 770-432-1202.

# UP NEXT

  



# 17 New Concealed Carry Holsters

Whether you want leather or Kydex, IWB or multi-role positioning, there's a new holster here...

**by** Personal Defense World / Nov 25, 2015

---

**0 Comments**

Sort by  Newest

Add a comment...

Facebook Comments plug-in

**A T H L O N   O U T D O O R S   N E T W O R K**



# EXHIBIT 34



HARRIS OUTDOOR GROUP PRESENTS #129

# THE COMPLETE BOOK OF

# HANDGUNS

2013

BY MASSAD AYOOB

HOME DEFENSE
Castle Doctrine Law Clarified

Defensive Handgun Drills

Split Second TACTICAL RELOADS

CARACAL F 9X19MM

S&W M340 M&P .357MAG

AYOOB'S FAVORITE AUTOPISTOLS & REVOLVERS

Glock 21 Gen4 .45 ACP

Ruger LCR .22 LR

Colt NM Gold Cup .45 ACP

6 GUNFIGHTING MYTHS
Life & Death LESSONS

Concealed Carry Tactics

J-FRAME SNUBBY GUIDE

GUN TESTS
Ruger LCR .22 LR
Springfield XDS .45 ACP
Sig Sauer P229 .357 SIG
Colt NM Gold Cup .45 ACP
Kahr CM9 9x19mm MORE!

$11.95

74470 02063 9

29>

Display Until April 29, 2013

# FINDING THE RIGHT GLOCK

## Finding the optimum autopistol that will satisfy your needs!



Available in the United States for more than a quarter of a century now, the Glock pistol dominates market here. There are many good reasons why, and one of them is its versatility. Let's look at the broad array of Glocks presently available. One or the other will probably serve your particular needs a bit better than the rest.

## SIZE

The very first Glock, the G17, established itself as a "service pistol" par excellence. That length, in turn, became the "standard size" Glock: a 4.5-inch barrel with slide of commensurate length, and a full-length grip-frame housing a full-length magazine.

That Glock 17, now in its fourth generation of design advancement, is chambered for the 9x19 cartridge, also known as 9mm NATO, 9mm Luger, and 9mm Parabellum. Safe to carry fully loaded with a round in the chamber, it holds 17 more in its standard magazine.

In 1990, the same Glock format was introduced chambered for the then-new .40 S&W cartridge. Known as the Glock 22, this pistol is believed to be in use by more American police departments than any other. Its standard magazine capacity is 15 rounds.

Next, Glock chambered the same gun for the .357 SIG cartridge, and called it the Glock 31. That bottlenecked round shares overall length and case head dimensions with the .40, so by simply interchanging the barrels the shooter can change his Glock .357 to .40, or vice versa. G31 magazines will work with .40, and G22 magazines will work with .357 SIG cartridges.

With one caveat, the Glock 37 pistol in caliber .45 GAP is the same size as the pistols listed above. That one difference is slide thickness: on the G37, the slide is wider, sufficiently so that it comes standard with the oversize slide-stop lever that is merely optional on the other standard size service models. A G37 magazine is designed to hold ten rounds of .45 GAP.

## STANDARD COMPACTS

"Standard compacts" sounds like a contradiction, but is used here intentionally to describe the frame size of the standard models made shorter at muzzle and butt. The first of these, going back to the late 1980s, was the Glock 19. Take the G17, shorten the barrel by half

*The five configurations of standard size Glocks, shown here in 9mm. From top: longslide G17L, Tactical/Practical G34, standard size G17, compact G19, subcompact "baby Glock" G26.*

EX B 000015

000240
ER_1112

the line. The differences are found in size and power level.

While I know many people who carry full size Glocks concealed year round, and my friend and ace instructor Tom Givens wears a 5.3-inch Glock 35 holstered inside his waistband daily, the compacts and subcompacts are the ones generally seen as the "concealment guns." Consider the Glock range of "compacts" described above.

The Glock 19 has won many a match for famed instructor "Super Dave" Harrington of Team Panteao, even though it's not perceived as a "match gun." On the NYPD, where officers have a choice of three different 16-shot 9mm pistols for uniform carry, an estimated 20,000 of the city's estimated 35,000 sworn personnel carry the Glock 19. The lightest of the city-approved duty guns, it is compact enough for plainclothes carry in an investigative assignment or off duty, yet substantial enough for uniform duty wear. Its .40 caliber twin, the Glock 23, is standard issue for FBI agents (who have the option of the service-size G22 if they prefer). The G23 is also standard issue for all divisions of the Boston Police Department, and its versatility in both uniformed and plainclothes roles is one reason why.

Glock's subcompact pistols are famous for being remarkably accurate for their size. It is not uncommon to see one outshoot its full-size counterpart in the same caliber. In addition to the mechanics, there is the matter of ergonomics and overall "shootability." Several times in recent years, at GSSF (Glock Sport Shooting Foundation) matches, the overall top shot has tallied that "Matchmeister" score with a subcompact 9mm Glock 26. Mike Ross and Bryan Dover come to mind.

"Well, heck," some might say. "Those guys are so good they could outshoot everybody else with anything." Um…it's not just that. I'm told that on those days, both men shot those winning scores in the Subcompact division. They were also shooting their bigger 9mm Glocks in the Master Stock division. They beat everyone, including themselves, who was using the bigger guns. That says something pretty impressive, not just about Dover and Ross, but about the little Glock 26 pistol.

That said, it was the longer barreled Glock 34 (his signature pistol) that Bob Vogel used to shoot his way to the World Championship of the International Defensive Pistol Association last year. As noted earlier, that's the single most popular handgun, not just the most





Pistol, 2 magazines, 7 interchangeable low profile sights, lockable hard plastic case and owner's manual
9mm | 10+Mag | 23.45oz | 6.58"L x 5.09"H 1.14"W | 4"Barrel
Made In USA | Polymer Frame | High Carbon Steel Slide

**Available Options:**
Dark Earth (above), Pink, or Matte Black.
Slide with or without Bill of Rights Engraving

RETAIL
$399

**AMERICAN TACTICAL**
**800-290-0065**
www.AmericanTactical.us
/AmericanTactical

## Finding The Right Glock

popular Glock, at the IDPA Nationals every year. The long sight radius is very forgiving in terms of accuracy, and because the front part of their slides are cut away to make them lighter, the Tactical/Practical Glocks are not clunky or muzzle-heavy in feel. In fact, swinging a Glock 35 is a little like waving a wand compared to some of the old-style all-steel pistols it has superseded.

### CALIBER QUESTION

Caliber will also be a huge part of the answer to the question, "Which Glock should I buy?" The new shooter in particular is well served with a 9mm, due to both its mild recoil and its relatively low cost compared to the other available calibers. With careful ammunition selection, the 9mm is a sound choice today for defensive purposes…and, of course it has room on board for a bit more ammunition, gun size for gun size. The lighter recoil also makes it the caliber of choice for some types of competition. The .45 caliber always inspires confidence in a police or defensive pistol, and its larger diameter tears bigger holes if the bullet's hollow nose plugs on heavy clothing in cold weather environments. Glocks chambered for the standard 45 Auto round give higher capacity than most of the competition in the big G21 or the compact G30, and for those with smaller hands the standard-frame Glocks in .45 GAP deliver essentially the same level of stopping power. .45 ACP won't exceed .45 GAP in power unless you go to a +P load.

If the debate between 9mm and .45 causes as much angst in the shooter as it has in many law enforcement agencies, the shooter can follow the police path and compromise on the .40, which Glock offers in all sizes.

An increasing number of police departments have gone with the powerful .357 SIG cartridge, such as the Tennessee Highway Patrol, which issues the Glock 31. With 125-grain hollow points, this high-velocity round has earned an excellent reputation for "stopping power," and for tactical barricade penetration. Its velocity also gives it a flat trajectory for long shots.

Glock has been known to produce other calibers for markets outside the United States. The Glock in caliber 9x21 is popular in Italy, where private citizens are forbidden to own military caliber guns. One South American nation reportedly permits its citizens to carry only .32 or smaller caliber handguns; a Glock in .30 Luger would be ideal there. Glock produces compact and subcompact



*The Glock Tactical/Practical, here in a 9mm G34 configuration.*

.380s as well, though they're not imported into the U.S.

There are .22 LR conversions units available, affording inexpensive practice with the Glock. The one from Advantage Arms gets uniformly good reviews. This writer would like to see Glock bring out their own rimfire for their next product, which in the logical line of company product numbering, would be the fortieth. If the Glock 22 is a .40, it seems only fair that the Glock 40 should be a .22.

### TRIGGERS

Determined to be "double-action-only" by the Bureau of Alcohol, Tobacco, Firearms and Explosives, Glock's Safe Action trigger is available in multiple formats. The standard is the 5.5-pound with standard trigger return spring, designed to give an overall pull of that weight. The shooter will experience a two-stage pull, rather like an old Springfield or Mauser bolt-action rifle trigger. The first stage is a relatively long, light take-up, followed by a shorter completing movement with more resistance. Glock shooters find it easy to "ride the link," allowing the trigger to return forward from the last shot only until the sear engagement is felt, and then repeating the press.

Some police departments, such as Miami PD and the San Bernardino County Sheriff's Department, have over the years seen fit to install heavier connectors in their issue Glocks. This would be the 8-pound. Butch Barton, who won more Gunny Challenge Glock matches than anyone else, long favored this set-up in his Glocks because he felt it gave him a crisper release. The 8-pound connector has not become widely popular elsewhere, however.

On the other end of the scale is the 3.5/4.5-pound connector, which debuted with the G17L match pistol. Now known by the 4.5 pound designation, it registers that weight when the trigger is pulled from the center, where most of us place the index finger, and can go down to 3.5

pounds due to leverage when weighed at the bottom, or toe, of the trigger. Very popular among competitive shooters, it is sternly warned against by Glock for "duty pistols" or self-defense guns, unless used in conjunction with a New York style trigger return spring unit.

Twenty-some years ago, at the behest of the New York Police Department, Glock created the New York Trigger, now known as NY-1. This device replaces the standard trigger return spring and gives a firm resistance to the still-two-stage trigger from the very beginning of the pull. When mated with the 5.5-pound connector, the NY-1 brings pull weight up into the 7- to 8-pound range. A Mid-western state police agency pioneered the practice of mating the 3.5-pound connector with the NY-1, which gave a very smooth and uniform pull in the 6-pound weight range. This combination has been Glock approved for duty/defense guns across the board for several years now. For NYPD, Glock also developed a "New York Plus" module, now known as the NY-2, which with the standard 5.5-pound connector brings pull weight up into the 11- to 12-pound range. To my knowledge, it is used only by NYPD and the New York State Parole Board.

This writer recommends following Glock's guidelines and only going with the 3.5/4.5-pound total pull in a competition gun. Some wonder why that system is standard in the Tactical/Practical guns; they need to look at the Glock website (glock.com) and observe that those pistols are listed under the Sport Shooting and Enthusiast categories, and not under Police, Military, or Personal Defense. It is Glock's policy to ship G34s and G35s ordered by police departments with the standard 5.5-pound trigger system, and it is worth noting that when the Kentucky State Police adopted the Glock 35, they ordered them with NY-1 triggers.

### FINAL NOTES

The most popular police handgun in America, the Glock is also hugely popular for action pistol competition and home and personal defense, and in 10mm or .357 SIG can be a very useful outdoorsman's sidearm, too. There's pretty much a Glock for everyone, but it's up to the shooter to identify his or her needs, and then determine which page to mark in the Glock catalog. To learn more, call 770-432-1202 or visit glock.com.

EX_B_000017

# EXHIBIT 35

# THE BASICS
# OF PERSONAL
# PROTECTION
# IN THE HOME

Produced by the Education & Training Division
A Publication of the National Rifle Association of America



000244



**NRA**™

First Edition—September 2000
©2000 The National Rifle Association of America

International Standard Book Number (ISBN): ISBN-10: 0-935998-99-3
ISBN-13: 978-0-935998-99-3

All rights reserved. Printed in the United States of America. This book may not be reprinted or reproduced in whole or in part by mechanical means, photocopying, electronic reproduction, scanning, or any other means without prior expressed written permission. For information, write: Training Department, Education & Training Division, National Rifle Association of America, 11250 Waples Mill Road, Fairfax, VA 22030.

NR40830ES26828 (3-13 Revised)

000345

# CHAPTER 20

# SELECTING
# A FIREARM FOR
# PERSONAL PROTECTION

Choosing to own a handgun for personal protection requires careful consideration of a number of factors. The selection of a specific firearm and ammunition for self-defense can be just as critical, and should entail the same comprehensive deliberation.

A firearm is a tool for delivering energy at a distance. This energy can be used to do various tasks—to harvest game, punch a hole through a paper target, or, in the case of a defensive arm, stop a criminal attack.

## GUN FIT

One of the most important factors contributing to a shooter's ability to shoot quickly and accurately is gun fit. *Gun fit* refers to how comfortably and naturally the firearm fits the hand—how well the firearm's grip size, grip angle, location of controls, length, size and other characteristics fit a particular shooter. Related to gun fit is *gun ergonomics*, a term that relates to the convenience and efficiency of the positioning of controls and gripping surfaces. Gun fit is highly individual: for example, guns that are suited for those with large, fleshy hands may not fit those having small, bony hands, and vice versa.

Good gun fit allows you to



*Fig. 111. Good gun fit is critical to fast, accurate defensive shooting. Photos A and B show proper hand and trigger finger placement, made possible through proper gun fit, while C shows the gap between the trigger finger and frame that should exist when the gun fits the hand and fingers correctly.*

183

maintain a consistent grip, positions your trigger finger in the proper location on the trigger, and facilitates your assumption of a stable shooting position. Before you purchase a gun, you should test-fire a number of different models to determine which fits you best. Guidance on gun fit can be provided by NRA Certified Instructors.

Test-firing a variety of handguns also will give you the opportunity to experience different action mechanisms. While there are a variety of handgun types, including single- and double-action revolvers, single-action, double-action and double-action-only semi-automatics, derringers and even single-shots, the novice defensive shooter will be best served by either a double-action revolver or a double-action semi-automatic.

## REVOLVER OR SEMI-AUTOMATIC?

Among firearm instructors, gun writers and other authorities, both revolvers and semi-autos have their passionate adherents. Each type has strengths and limitations.

The *double-action revolver* often is recommended for new shooters because of its simplicity of operation and reliability. Once its cylinder is loaded, it is fired simply by pulling the trigger; no safety levers need be disengaged. Because the revolver does not depend upon the recoil generated by the cartridge for operation, it is capable of handling a wide variety of loadings in a particular

chambering. Moreover, the revolver's mechanism confers at least a theoretical reliability edge.

The main drawback to the revolver as a defensive arm is its limited ammunition capacity. Most defensive center-fire revolvers have a cylinder capacity of only 5 or 6 rounds—considerably less than the magazine capacity of most semi-automatic pistols. The revolver is also slow to reload, even with speedloaders (devices which allow the quick, simultaneous insertion of all the rounds into the cylinder). Additionally, each shot with the revolver must be fired using a long, relatively heavy trigger pull that some shooters find detrimental to accuracy.

The *semi-automatic pistol* (sometimes called a *self-loader*) has, in recent years, largely superseded the revolver as the handgun of choice for law enforcement officers and other armed professionals. Semi-autos have always had wide popularity among civilian shooters.

The popularity of semi-automatic arms stems from several factors. First, they generally have considerably greater cartridge capacity than revolvers of similar size, allowing more shots to be fired before reloading is necessary. When reloading is required, the semi-automatic can be reloaded with a full magazine much more quickly than a revolver's cylinder can be filled, even with speedloaders. Also, although the initial shot from a typical double-action semi-automatic is fired using a long and heavy trigger pull similar to that of a double-action revolver each subsequent shot is fired by a short, light, single-action pull, which generally considered to contribute to accuracy. (This advantage is



Fig. 112. A typical double-action revolver, showing some of the major features and components.



Fig. 113. A typical semi-automatic pistol, showing some of the major features and components.

000247

ER_1119

negated on double-action-only semi-automatics, in which every shot is fired in double-action mode.) Lastly, the semi-auto generally is narrower in width than the revolver—a factor when concealment or cramped gun storage space is a concern.

Semi-automatics have several limitations, however. They are more ammunition-sensitive than revolvers, as they require cartridges within a certain power range to ensure that their recoil-operated mechanisms function properly. Also, their rapidly-moving parts make them somewhat more jam-prone than revolvers (although the reliability of today's semi-autos generally is excellent). Semi-automatic mechanisms usually include safety levers, decocking levers and/or slide release levers, making them initially less intuitive to operate. Furthermore, on virtually all semi-automatics, the slide must be manually retracted and released to chamber a round. The stiffness of the recoil springs on many semi-autos makes these pistols difficult to use by those with low hand and arm strength, arthritis or other physical limitations. Such individuals also may find it difficult to hold the semi-automatic pistol rigidly enough to ensure reliable operation.

## CARTRIDGE SELECTION

For either type of firearm, there is a wide range of cartridges to choose from. The effectiveness of a self-defense firearm is related, to some extent, to the amount of energy it can deliver. This energy is usually expressed in terms of a measure called *kinetic energy* or *muzzle energy*, which is calculated using both bullet weight and bullet velocity, and is expressed in foot-pounds. Different cartridges are capable



*Fig. 114. These photographs reflect the difference between a cartridge generating a low level of recoil and flash (above) and a cartridge producing considerable recoil and flash. Note the height of muzzle flip in the photo at right; this would make fast, accurate follow-up shots difficult to perform.*

of generating different levels of kinetic energy, and thus vary in their ability to stop an assailant. Cartridge characteristics also influence the ability of the shooter to place shots precisely and rapidly on the target and to handle recoil.

As a general rule, you should select the most powerful cartridge that you can handle effectively—that is, one that does not produce flinching or excessive recoil, and allows you to apply follow-up shots quickly and accurately. This is determined primarily by test-firing handguns chambered for different cartridges. If possible, try handguns of different weights and sizes in the same chambering. If you find it difficult to handle the recoil generated by the .38 Special cartridge in a small, lightweight revolver, you might more easily control a heavier, bigger gun chambered for the same cartridge.

As a broad generalization, most firearm authorities recommend a minimum of 9 mm Parabellum (also known as 9 mm Para, 9 mm Luger, or 9x19 mm) for semi-automatic pistols, and .38 Special for revolvers. However, there are some shooters whose recoil sensitivity or lack of hand strength do not permit them to handle even these rather moderate-power cartridges. Such individuals should not feel themselves hopelessly undergunned with a pistol or revolver in .38 S&W, .380 Auto, .32 Auto, .25 Auto or even .22 Long Rifle. With proper bullet placement, even such low-powered rounds have proven effective for self-defense.

More detailed information on cartridge selection will be presented in Chapter 21: Selecting Ammunition for Personal Protection.

## ADDITIONAL FACTORS

In addition to gun fit and chambering, other factors may influence handgun selection. *Gun size* is significant if the firearm may also be used for concealed carry purposes or if firearm storage space is minimal. *Safety features* are always of concern, particularly when the gun is used or stored in an environment in which there are children or other persons unauthorized to handle firearms. *Manufacturer's reputation* and *price* usually also play a part in any gun's purchase. An NRA Certified Instructor can assist the prospective gun owner in evaluating these factors.

000248

ER_1120

# EXHIBIT 36

000249
ER_1121

# GUN LAW HISTORY IN THE UNITED STATES AND SECOND AMENDMENT RIGHTS

Robert J. Spitzer[*]

## I

### INTRODUCTION

In its important and controversial 2008 decision on the meaning of the Second Amendment, *District of Columbia v. Heller*,[1] the Supreme Court ruled that average citizens have a constitutional right to possess handguns for personal self-protection in the home.[2] Yet in establishing this right, the Court also made clear that the right was by no means unlimited, and that it was subject to an array of legal restrictions, including: "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[3] The Court also said that certain types of especially powerful weapons might be subject to regulation,[4] along with allowing laws regarding the safe storage of firearms.[5] Further, the Court referred repeatedly to gun laws that had existed earlier in American history as a justification for allowing similar contemporary laws,[6] even though the court, by its own admission, did not undertake its own "exhaustive historical analysis" of past laws.[7]

In so ruling, the Court brought to the fore and attached legal import to the history of gun laws. This development, when added to the desire to know our own history better, underscores the value of the study of gun laws in America. In recent years, new and important research and writing has chipped away at old

---

Copyright © 2017 by Robert J. Spitzer.

This article is also available online at http://lcp.law.duke.edu/.

[*] Robert J. Spitzer (Ph.D., Cornell University, 1980) is Distinguished Service Professor and Chair of the Political Science Department at SUNY Cortland. He is the author of fifteen books, including five on gun policy, most recently GUNS ACROSS AMERICA (Oxford University Press 2015).

1. District of Columbia v. Heller, 554 U.S. 570 (2008).

2. *Id.* at 628–30, 635–36.

3. *Id.* at 626–27.

4. *See id.* at 623, 627 (citing United States v. Miller, 307 U.S. 174, 178 (1939)) (distinguishing validity of ban on short-barreled shotguns and noting that weapons protected were those used at time of ratification).

5. *See id.* at 632 (excluding gun-storage laws from scope of decision).

6. *See id.* at 626–27, 629 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever and for whatever purpose.") (citation omitted).

7. *Id.* at 626.

myths to present a more accurate and pertinent sense of our gun past.[8] Researchers and authors including Saul Cornell, Alexander DeConde, Craig Whitney, and Adam Winkler have all published important work making clear that gun laws are by no means a contemporary phenomenon.[9] Yet even now, far too few understand or appreciate the fact that though gun possession is as old as America, so too are gun laws. But there's more: gun laws were not only ubiquitous, numbering in the thousands, but also spanned every conceivable category of regulation, from gun acquisition, sale, possession, transport, and use, including deprivation of use through outright confiscation, to hunting and recreational regulations, to registration and express gun bans. For example, the contemporary raging dispute over the regulation of some semi-automatic weapons that began in late 1980s was actually presaged seven decades earlier, when at least seven states banned such weapons entirely—a fact that seems to have been unknown to modern analysts until now. A vast newly compiled dataset of historical gun laws reveals that the first gun grabbers (as contemporary gun rights advocates like to label gun control proponents) were not Chablis-drinking liberals of the 1960s, but rum-guzzling pioneers dating to the 1600s.

This historical examination is especially relevant to the modern gun debate because, at its core, that debate is typically framed as a fierce, zero-sum struggle between supporters of stronger gun laws versus supporters of gun rights (who, of course, largely oppose stronger gun laws—or so it is said). The zero-sum quality of this struggle posits that a victory for one side is a loss for the other, and vice versa. Yet history tells a very different story—that, for the first 300 years of America's existence, gun laws and gun rights went hand-in-hand. It is only in recent decades, as the gun debate has become more politicized and more ideological that this relationship has been reframed as a zero-sum struggle.

The plethora of early gun laws herein described establish their prolific existence, but also validate the argument that gun rules and gun rights are by no means at odds. If the Supreme Court was indeed serious in saying that the provenance of gun regulations is relevant to the evaluation of contemporary laws, then this examination advances the Court's stated objective. The common

---

8. SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006); THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON DISTRICT OF COLUMBIA V. HELLER (Saul Cornell & Nathan Kozuskanich eds., 2013); CRAIG R. WHITNEY, LIVING WITH GUNS: A LIBERAL'S CASE FOR THE SECOND AMENDMENT (2012); ADAM WINKLER, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (2011).

9. CORNELL, *supra* note 8; ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA: THE STRUGGLE FOR CONTROL (2001); WHITNEY, *supra* note 8; WINKLER, *supra* note 8. More than any other single scholar or writer, historian Saul Cornell has been most responsible for excavating the legal and social realities of the laws and practices related to guns in early America. In addition to many articles, Cornell has published a number of books on the subject including, WHOSE RIGHT TO BEAR ARMS DID THE SECOND AMENDMENT PROTECT? (2000), A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006), and THE SECOND AMENDMENT ON TRIAL, *supra* note 8. The first important serious treatment of early gun laws and history is LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF A NATIONAL DILEMMA (1975).

notions that gun laws are largely a function of modern, industrial (or post-industrial) America, that gun laws are incompatible with American history and its practices or values, and that gun laws fundamentally collide with American legal traditions or individual rights, are all patently false. Following this introduction in part I, part II establishes that gun laws are as old as the nation. Part III summarizes the different categories into which early gun laws are categorized, and the frequency distributions within each category divided into time periods from 1607 to 1934. Part IV examines illustrative laws within each category and considers their nature and consequences. Part V offers a brief conclusion.

Above and beyond the general ubiquity of gun regulations early in the country's history, the range of those regulations is punctuated by the most dramatic of those laws discussed in parts III and IV: measures that called for gun confiscation for myriad reasons including military necessity, failure to swear allegiance to the government, improper firearms storage, ownership of proscribed weapons, hunting law violations, and failure to pay taxes on guns. One may argue for or against the propriety of such measures, but one may no longer argue that they are the sole province of modern gun control advocates. Further, in the seventeenth century no less than in the twenty-first, an abiding concern underlying many, if not most, of these regulations is the protection of public safety by the government.

## II

### GUN LAWS ARE AS OLD AS THE NATION

The first formal legislative body created by European settlers in North America was convened in the Virginia colony on July 30, 1619, twelve years after the colony's establishment.[10] The first General Assembly of Virginia met in Jamestown where it deliberated for five days and enacted a series of measures to govern the fledgling colony.[11] Among its more than thirty enactments in those few days was a gun control law, which said "[t]hat no man do sell or give any Indians any piece, shot, or powder, or any other arms offensive or defensive, upon pain of being held a traitor to the colony and of being hanged as soon as the fact is proved, without all redemption."[12]

If a death sentence for providing Native Americans with firearms and ammunition seems a little draconian even by the standards of the day, it punctuated the degree of tension, suspicion, and confrontation that existed

---

10. *First Legislative Assembly in America*, HISTORY.COM (2010), http://www.history.com/this-day-in-history/first-legislative-assembly-in-america [https://perma.cc/3T2G-W3DH] (last visited Dec. 21, 2016).

11. *Laws Enacted By The First General Assembly of Virginia*, *in* COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION 283 (Donald S. Lutz ed., 1998) (quoting 1 JOURNALS OF THE HOUSE OF BURGESSES OF VIRGINIA, 9–14 (H.R. McIlwaine & John P. Kennedy eds., 1905)).

12. *Id.* at 287.

between the settlers and the indigenous population.[13] Other colonies adopted similar measures, although they were of limited effectiveness—not only because of the difficulty of monitoring arms trading in early America, but because such trading was highly profitable, was fed by traders from other nations, including the French and the Dutch, and because many Native Americans allied themselves with settlers against various foes.[14] Far from being an anomaly, this early gun law was just the beginning of gun regulations in early America.

## III

## THE ARC OF AMERICAN GUN LAWS

America's early governmental preoccupation with gun possession, storage, and regulation was tied to the overarching concern for public safety, even as it intruded into citizens' private gun ownership and habits. Symptomatic of this is the fact that colonial and state governments enacted over 600 laws pertaining specifically to militia regulation and related militia activities alone.[15] Yet militia-related laws hardly constituted the extent of gun regulation in America.

A recently researched and compiled listing of colonial and state gun laws spanning from America's founding up to 1934 (the year the first significant national gun law, the National Firearms Act, was enacted[16]), has recently become available.[17] It is by far the most comprehensive compilation to date. This far-reaching compilation process, conducted by lawyer and researcher Mark Anthony Frassetto, has become possible thanks to the ever-growing digitization of state law archives and other electronic sources of historical information about law, including HeinOnline Session Laws Library and the Yale Law School's Avalon Project, and also some digitized state session law archives. Aside from key-word electronic searches of these sources, Frassetto also consulted secondary sources to produce this prodigious list.[18]

The result is a compilation of nearly one thousand gun laws of every variety—with some exceptions, this list does not include militia laws, hunting regulations, laws pertaining to gunpowder storage, and laws against weapons firing.[19] Following Frassetto's method of organization, these laws are organized by category and summarized in Table 1. Within those categories, they are arrayed

---

13. This precarious dynamic is well chronicled in NATHANIEL PHILBRICK, MAYFLOWER: A STORY OF COURAGE, COMMUNITY AND WAR (2006).

14. KENNETT & ANDERSON, *supra* note 9, at 51–56.

15. Kevin M. Sweeney, *Firearms, Militias, and the Second Amendment, in* THE SECOND AMENDMENT ON TRIAL, *supra* note 8, at 310–11.

16. National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872 (2012)).

17. Mark Anthony Frassetto, Firearms and Weapons Legislation Up To The Early Twentieth Century (Jan. 15, 2013) (unpublished manuscript), https://ssrn.com/abstract=2200991 [https://perma.cc/YEY9-KEN8] . Unless otherwise noted, the citations to colonial and state gun laws found here are taken from this compilation.

18. *Id.*

19. *Id.*

by state alphabetically within four historical periods: 1607–1789 (the colonial and pre-modern-Constitution period); 1790–1867 (the pre-Fourteenth Amendment period); 1868–1899 (the post-Fourteenth Amendment period); and 1900–1934 (the twentieth century). Despite the admirable thoroughness of Frassetto's electronic database searches, he notes that his list cannot be considered definitive, owing to multiple spellings of common words and other glitches inherent in the nature of such searches.[20] Thus, his total list of laws is an underestimate of the actual universe of gun statutes—indeed, this article discusses a few early laws from Massachusetts in the 1600s that were not a part of Frassetto's list.[21]

**Table 1**

NUMBERS OF GUN LAWS IN THE STATES, AND NUMBERS OF STATE GUN LAWS, BY CATEGORIES, 1607–1934[22]

| LAW TYPE | 1607–1790 | 1791–1867 | 1868–1899 | 1900–1934 |
|---|---|---|---|---|
| Ban | 0 | 0 | 7 | 0 |
| Number of states | 0 | 0 | 5 | 0 |
| | | | | |
| Brandishing | 2 | 4 | 14 | 7 |
| Number of states | 2 | 3 | 13 | 7 |
| | | | | |
| Carry restriction | 5 | 31 | 48 | 21 |
| Number of states | 4 | 19 | 28 | 18 |
| | | | | |
| Dangerous weapons | 1 | 4 | 9 | 53 |
| Number of states | 1 | 4 | 8 | 35 |
| | | | | |
| Dueling | 3 | 7 | 3 | 0 |
| Number of states | 2 | 7 | 3 | 0 |
| | | | | |

20.  *Id.* at 2.

21.  I also conducted my own spot check of a few of the laws on Frassetto's list that are not included in this article, and found them to be, taken on the whole, accurate and correct.

22.  Source: Frassetto, *supra* note 17. Though the table is labeled "State" gun laws, it also includes laws enacted when the states were colonies, and some local/municipal laws. The full category titles of gun laws from Frassetto's paper are: Bans on Handguns/Total Bans on Firearms; Brandishing; Carrying Weapons; Dangerous or Unusual Weapons; Dueling; Felons, Foreigners and Others Deemed Dangerous By the State; Firing Weapons; Hunting; Manufacturing, Inspection and Sale of Gunpowder and Firearms; Militia Regulation; Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible; Registration and Taxation; Race and Slavery Based Firearms Restrictions; Sensitive Areas and Sensitive Times; Sentence Enhancement for Use of Weapons; Storage.

| | | | | |
|---|---|---|---|---|
| Felons, foreigners, etc. | 11 | 2 | 1 | 26 |
| Number of states | 5 | 2 | 1 | 19 |
| | | | | |
| Firing weapons | 19 | 17 | 19 | 22 |
| Number of states | 9 | 14 | 17 | 20 |
| | | | | |
| Hunting | 11 | 8 | 24 | 58 |
| Number of states | 8 | 5 | 21 | 43 |
| | | | | |
| Manufacturing, inspection | 2 | 11 | 11 | 22 |
| Number of states | 2 | 10 | 9 | 17 |
| | | | | |
| Militias | 23 | 15 | 2 | 0 |
| Number of states | 11 | 15 | 2 | 0 |
| | | | | |
| Minors, etc. | 0 | 2 | 15 | 21 |
| Number of states | 0 | 2 | 15 | 19 |
| | | | | |
| Registration, taxation | 3 | 8 | 12 | 18 |
| Number of states | 2 | 6 | 11 | 15 |
| | | | | |
| Race/slavery[23] | 5 | 18 | 0 | 0 |
| Number of states | 5 | 11 | 0 | 0 |
| | | | | |
| Sensitive areas, etc. | 11 | 23 | 30 | 35 |
| Number of states | 7 | 17 | 20 | 26 |
| | | | | |
| Sentencing enhancement | 3 | 3 | 5 | 12 |
| Number of states | 3 | 3 | 5 | 10 |
| | | | | |
| Storage | 2 | 7 | 2 | 0 |
| Number of states | 1 | 6 | 2 | 0 |

---

23. The small number of laws pertaining to slaves or race-based restrictions pertaining to guns is not meant to suggest that the legal regime in the pre–Civil War South was somehow not uniformly harsh, but rather reflects the fact that express statutory restrictions were not necessary in all places, given the South's uniformly oppressive system of slavery.

The types of gun laws span about every conceivable category. The two most common and prolific types of laws regulated hunting and militias—in fact, Frassetto noted in his compilation that he excluded from his list most hunting and militia laws, gunpowder storage laws, and laws against the firing of weapons, because there were simply too many of them. Those categories and some of those laws, however, are represented in the list provided here. Thousands of gun laws existed from the country's founding up to 1934.[24] The data presented here represents a subset of these thousands of laws. Notwithstanding Frassetto's exclusions, his full list includes over 800 laws.[25] The version of his list presented here is somewhat shorter, as it excludes state constitutional provisions, weapons laws that did not specifically mention firearms, and British laws from the early colonial period that Frassetto included. Thus, the list presented here includes about 760 laws.[26] These include colonial laws, laws of territories that later became states, and of course state laws. Generally speaking, most laws established jurisdiction-wide regulations, although some of the laws were more narrowly drawn to include only densely populated areas, such as cities and towns, or on occasion specifically named cities or counties. Each type of law warrants detailed attention.

Before examining these laws, one other question presents itself: were any of these laws challenged in court? If so, were these challenges based on claims of federal or state right to bear arms–type provisions? If so, what were the outcomes?

A perusal of nineteenth century litigation in state courts reveals that at least one type of gun law was subject to court challenge: those restricting concealed or open gun carrying. The outcomes of such challenges were summarized by a 1905 Kansas state court decision this way: "It has . . . been generally held that the Legislatures can regulate the mode of carrying deadly weapons, provided they are not such as are ordinarily used in civilized warfare [i.e. in a military context]. To this view," the court continued, "there is a notable exception in the early case of *Bliss v. Commonwealth,* 2 Litt. (Ky.) 90, 13 Am. Dec. 251 . . . . While this decision has frequently been referred to by the courts of other states, it has never been followed."[27] A Washington State court from 1907 offered the same verdict:

> Nearly all the states have enacted laws prohibiting the carrying of concealed weapons, and the validity of such laws has often been assailed, because denying to the citizen the right to bear arms; but we are not aware that such a contention has ever prevailed, except in the courts of the state of Kentucky [a reference to *Bliss*].[28]

---

24.   *See* Frassetto, *supra* note 17 (compiling over 800 gun laws excluding the majority of the most common gun laws including hunting and militia laws, gunpowder storage laws, and laws against the firing of weapons).

25.   *See id.*

26.   A full summary list of the laws is available at ROBERT J. SPITZER, GUNS ACROSS AMERICA: RECONCILING GUN RULES AND RIGHTS 185–208 (2015).

27.   City of Salina v. Blaksley, 83 P. 619, 620 (Kan. 1905) (citing Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822)).

28.   State v. Gohl, 90 P. 259, 260 (Wash. 1907); *see also* District of Columbia v. Heller, 554 U.S. 570 (2008) (explaining that nineteenth-century courts typically upheld prohibitions on carrying a concealed

The *Bliss* case was the outlier in this state case law, although in one other case, *Nunn v. State*, the Georgia state court struck down a provision of a state gun carrying law that included restrictions on both concealed carry and open carry.[29] The court struck down only the open carry provision—the man convicted of violating this provision was apparently carrying a handgun openly, yet the law failed to list handguns among those weapons not to be openly carried, while it did list them among those not to be sold or carried concealed.[30]

The conclusions offered by state courts that restrictions on gun carrying were invariably upheld when challenged is punctuated by the fact that, as late as 1981, only two states of the union had loose, "shall issue" carry laws (meaning that the government is obligated to issue a carry license upon completion of proper paperwork, unless the applicant is a felon, mentally unbalanced, or a part of some other category of person prohibited from owning a gun), and one state had no system of permitting for gun carrying.[31] Nineteen states barred concealed gun carrying entirely, and twenty-eight states had "may issue" laws, where states have great discretion as to whether to issue carry permits.[32]

## IV

## CATEGORIES OF EARLY GUN LAWS

### A. Gun Bans

A handful of laws established outright, categorical bans that criminalized the sale or exchange of firearms.[33] All were enacted in the post–Civil War era. Six of the seven state bans—in Arkansas,[34] Kansas,[35] Texas,[36] and three in Tennessee[37]—were of pistols. The seventh, from Wyoming, banned all firearms—both handguns and long guns—from "any city, town, or village."[38] Arkansas also banned any sale or transfer of pistols, except for those in military use.[39]

---

weapon).

29.  Nunn v. State, 1 Ga. 243 (1846).

30.  *Id.* at 246–47.

31.  *Concealed Weapons Laws in America from 1981 to Today*, LAW CENTER TO PREVENT GUN VIOLENCE, at http://smartgunlaws.org/wp-content/uploads/2012/05/ccw-factsheet.pdf [https://perma.cc/5ZYV-HYSS].

32.  SPITZER, *supra* note 26, at 113.

33.  In some subsequent categories to be discussed, gun confiscation was sometimes the penalty for violations of law.

34.  Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at ARK. CODE ANN. ch. 48 § 1498 (1894)).

35.  Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at KAN. GEN. STAT. § 1003 (1901)).

36.  Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24).

37.  Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231; Act of June 11, 1870, ch. XIII, § 1, 1870 Tenn. Pub. Acts 28, 28; Act of Dec. 1, 1869, ch. XXII, § 2, 1870 Tenn. Pub. Acts 23, 23–24.

38.  Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352.

39.  Act of Apr. 1, 1881, ch. XCVI, 1881 Ark. Acts 191 (codified at ARK. CODE ANN. ch. 48 § 1498

Subsequent categories of gun laws also include specific bans on particular types of weapons, like automatic weapons, and on weapons accessories, like silencers. These laws, and a few to come, make clear that gun banning—while not common—was not the sole province of 1960s anti-gun liberals.

## B. Brandishing Laws

States also enacted brandishing laws, designed to criminalize the threatening use of the weapons named in these laws.[40] The prohibited behaviors were typically described as "exhibit[ing] any of said deadly weapons in a rude, angry or threatening manner,"[41] or with similar language. Some laws in the later 1800s also identified the prohibited behavior as "draw[ing] or threaten[ing] to use" such weapons.[42] These laws also generally included exemptions for the use of such weapons in personal self-defense or for military purposes.

## C. Gun Carry Restrictions

Carry restriction laws were widely enacted, spanning the entire historical period under examination. As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels."[43] Massachusetts followed in 1750.[44] In the late 1700s, North Carolina[45] and Virginia[46] passed similar laws.[47] In the 1800s, as interpersonal violence and gun carrying spread, thirty-eight states joined the list;[48] five more did so in the early

---

(1894)).

40.  Generally, these laws covered pistols along with specific, named knives used for interpersonal violence, such as dirks, sword canes, stilettos, and Bowie knives, and weapons like a "slung shot," which was a hand weapon made up of a piece of metal or other weight attached to a strap or flexible handle.

41.  Act of Sept. 30, 1867, § 1, 1867 Ariz. Sess. Laws 21, 21.

42.  Act of Mar. 13, 1875, ch. XVII, § 1, 1875 Ind. Acts 62, 62 (Spec. Sess.).

43.  Robert J. Spitzer, *Stand Your Ground Makes No Sense*, N.Y. TIMES (May 4, 2015), http://www.nytimes.com/2015/05/04/opinion/stand-your-ground-makes-no-sense.html [https://perma.cc/Z7NY-84UL] (quoting *An Act Against Wearing Swords, (1686)*, *in* THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY, 289 (1758)).

44.  Act of Feb. 14, 1750, ch. 17, § 1, 1750 Mass. Acts 544, 545.

45.  FRANCOIS XAVIER MARTIN, A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60–61 (1792).

46.  A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 33 (Richmond, Augustine Davis 1794).

47.  *See* Spitzer, *supra* note 43 (discussing these early laws).

48.  Laws from 1800–1867: Alabama: An Act of Feb. 1, 1839, no. 77, § 1, 1838 Ala. Laws 67; Arkansas: ARK. REV. STAT. div. VIII, ch. XLIV, art. I, § 13 (1837); California: Act of Apr. 16, 1850, ch. 99, div. Eleventh, § 127, 1850 Cal. Stat. 229, 245; Colorado: Act of Aug. 14, 1862, 1862 Colo. Sess. Laws 56; Delaware: DEL. REV. CODE tit. fifteenth, § 13 (1852); District of Columbia: D.C. CODE REV. § 141–16 (1857); Georgia: Act of Dec. 25, 1837, 1837 Ga. Laws 90; Indiana: Act of Jan. 14, 1820, ch. XXIII, 1820 Ind. Acts 39; Kentucky: Act of Feb. 3, 1813, ch. 89, §1, 1812 Ky. Acts 100, 100–01; Louisiana: Act of Mar. 25, 1813, 1813 La. Acts 172, 172–73; Maine: ME. STAT. REV. tit. twelfth, ch. 169, § 16 (1840); Montana: Act of Jan. 11, 1865, 1864 Mont. Laws 355; New Mexico: Act of Jan. 14, 1853, 1852 N.M. Laws 67; Ohio: Act of Mar. 18, 1859, 1859 Ohio Laws 56; Oregon: OR. REV. STAT. ch. XVI, § 17 (1853); Pennsylvania: Act of Apr. 8, 1851, no. 239, § 4, 1851 Pa. Laws 381, 382; Tennessee: Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15, 15–16; Wisconsin: WIS. STAT. REV. tit. XXVII, ch. 176, §18 (1858). Laws from 1868–1899: Alaska: FRED F. BARKER, COMPILATION OF THE ACTS OF CONGRESS AND TREATIES RELATING

1900s.[49] Laws in the eighteenth century did not typically identify weapons concealment as criminal per se, but did restrict more general carrying of firearms, usually if done in crowded places, or groups of armed people. Among the earliest laws criminalizing the carrying of concealed weapons was that of Kentucky in 1813.[50] As with the brandishing laws, concealed carry laws normally targeted pistols as well as various knives, the chief feature of which was that they had long, thin blades that were favorites in interpersonal fights. Louisiana enacted a similar law that same year.[51] A particularly sharp comment on the intent behind such laws was expressed in Tennessee's 1837 law, which referred to "[e]ach and every person so degrading himself" by carrying pistols or other named weapons.[52] The preamble of Georgia's 1837 law began: "AN ACT to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons."[53] Alabama's 1839 concealed carry law reflected similar antipathy to the practice it was prohibiting: "AN ACT To suppress the evil practice of carrying weapons secretly."[54] Concealed carry laws generally made exceptions for travelers passing through an area while armed.

These laws were enacted in most states of the union and all across the country, including territories. In nineteenth-century laws, the main emphasis was on prohibiting concealed carry, whereas early twentieth century laws generally

TO ALASKA FROM MARCH 30, 1867 TO MARCH 3, 1905, S. DOC. NO. 59-142 (1906); Arizona: Act of Mar. 18, 1889, no. 13, 1889 Ariz. Sess. Laws 16; Florida: Act of May 31, 1887, ch. 3777, no. 97, § 16 1887 Fla. Laws 181, 186; Illinois: Act of Apr. 16, 1881, 1881 Ill. Laws 73 (codified in 38 ILL. COMP. STAT. §54(d) (1882)); Kansas: KAN. STAT. ANN. ch. 19, art. 3, § 68 (1901); Maryland: Act of Feb. 26, 1872, ch. 42, 1872 Md. Laws 56; Michigan: Act of May 31, 1887, no. 129, 1887 Mich. Pub. Acts 144; Minnesota: MINN. STAT. ch. CIV, § 17 (1881) (as amended through 1878); Mississippi: Act of Feb. 28, 1878, ch. XLVI, § 1, 1878 Miss. Laws 175, 175; Missouri: Act of Mar. 3, 1873, art. III, § 15, 1873 Mo. Laws 322, 328; NEB. STAT. REV. pt. III, ch. V, § 25 (1881); New York: Act of Mar. 27, 1891, chap. 105, § 209, 1891 N.Y. Laws 127, 177; North Dakota: N.D. REV. CODE § 7313, N.D. PENAL CODE § 457 (1895); Oklahoma: Penal Code of the Territory of Oklahoma, ch. 25, art. 38, § 20, 1890 Okla. Sess. Laws 412, 476; Rhode Island: Act of May 3, 1893, ch. 1180, 1893 R.I. Pub. Laws 231; South Carolina: Act of Dec. 24, 1880, no. 362, § 1, 1880 S.C. Acts 448; South Dakota: S.D. REV. CODE, PENAL, ch. XXXVIII, § 457 (1883); Texas: Act of Aug. 12, 1870, ch. XLVI, 1870 Tex. Gen. Laws 63; Washington: WASH. REV. CODE ch. LXXIII, § 929 (1881); West Virginia: W. VA. CODE ch. CXLVIII, § 7 (1870); Wyoming: WYO. STAT. ch. LII, § 1 (1876).

49.    Connecticut: Act of June 2, 1923, ch. 252, 1923 Conn. Pub. Acts 3707 (codified in II CONN. GEN. STAT. tit. 59, § 6219 (1930)); Hawaii: Act of Mar. 19, 1913, no. 22, 1913 Haw. Sess. Laws 25; Idaho: Act of Feb. 17, 1909, H.R. 62, 1909 Idaho Sess. Laws 6; Iowa: Act of Apr. 16, 1929, ch. 57, § 30, 1929 Iowa Acts 81, 90; Nebraska: Act of Mar. 27, 1901, ch. 16, § 129-LV, 1901 Neb. Laws 71, 141 (codified at NEB. REV. STAT. part I, ch. 14, art. I, § XXV (1901)).

50.    This Kentucky law was struck down as a violation of the Kentucky state constitution in Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822). The court's decision did not involve or touch on the federal Constitution's Second Amendment, but instead was based on Kentucky's more expansive right-to-bear-arms-type provision. See id. at 90–92. In addition, this ruling was an anomaly in that concealed carry laws were widely held as constitutional when challenged in other states. See ROBERT J. SPITZER, GUN CONTROL, 96–99 (2009) (noting that the Bliss case was an exception to the prevailing trend of upholding state gun carry restrictions).

51.    Act of Mar. 25th, 1813, 1812 La. Acts 172.

52.    Tennessee: Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15.

53.    Act of Dec. 25, 1837, 1837 Ga. Laws 90. This was the law that was challenged in Nunn v. State, discussed supra in part III.

54.    An Act of Feb. 1, 1839, no. 77, 1838 Ala. Laws 67.

applied to all carrying, whether concealed or open. Aside from hunting and militia laws, they were among the most common and widely accepted gun regulations to be found in our post-1789 history. These laws therefore pose an especially stark contrast with the contemporary American political movement—dating to the early 1980s—spreading the legality of concealed carry.[55]

Many southern states were among those seeking to curtail gun carrying, as well as the enactment of other laws pertaining to criminal uses of guns, which is attributable to the fact that "the Antebellum South was the most violent region in the new nation."[56] After the Civil War, the ravaged South again witnessed violence at rates greater than the rest of the country.[57] Thus, states with greater violence, in the form of greater gun violence, turned in part to stronger gun laws as a remedy.

These historical concealed carry laws also recognized what modern gun control advocates stress: that, among all firearms, handguns pose a unique danger to public safety. Even though there are twice as many long guns as handguns in America, and long guns are generally easier to obtain, about eighty percent of all gun crimes are committed with handguns because of their ease of use, concealability, and lethality.[58] Little stretch of the imagination is required to infer that the same trend existed in the nineteenth century as well.

Before considering other types of gun laws, it should be noted that concealed and open carry restrictions were common in the American western frontier during the nineteenth century in the so-called "Wild West." The truth of life in the Old West, and the actual role of guns in it, is known, but not well known. Axiomatic expressions such as "the guns that won the West"[59] and "arm[s] that opened the West and tamed the wild land"[60] still too often typify what in actuality is a romanticized and wildly exaggerated assessment of the importance of guns in the settling of the West.[61] Indeed, some have gone so far as to claim that "the American experiment was made possible by the gun."[62] But these characterizations ignore the central role of homesteaders, ranchers, miners,

---

55.  ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL, 68–70 (6th ed., Paradigm Publishers 2015) (1995).

56.  Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1716 (2012) (citing RANDOLPH ROTH, AMERICAN HOMICIDE (2009); ERIC H. MONKKONEN, MURDER IN NEW YORK CITY (2001); Joshua Stein, *Privatizing Violence: A Transformation in the Jurisprudence of Assault*, 30 LAW & HIST. REV. 423, 445 (2012)); *see generally* DICKSON D. BRUCE, JR., VIOLENCE AND CULTURE IN THE ANTEBELLUM SOUTH (1979).

57.  ROTH, *supra* note 56, at 180–249.

58.  SPITZER, *supra* note 55, at 54–55.

59.  JAMES WYCOFF, FAMOUS GUNS THAT WON THE WEST (1968).

60.  MARTIN RYWELL, THE GUN THAT SHAPED AMERICAN DESTINY (1957).

61.  RICHARD SHENKMAN, LEGENDS, LIES, AND CHERISHED MYTHS OF AMERICAN HISTORY 112 (1988).

62.  WYCOFF, *supra* note 59, at 5–6; *see also* RYWELL, *supra* note 60, at 4 (1957); JAMES B. TREFETHEN, AMERICANS AND THEIR GUNS: THE NATIONAL RIFLE ASSOCIATION STORY THROUGH NEARLY A CENTURY OF SERVICE TO THE NATION (James E. Serven ed., 1967); HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 3 (1952).

tradesmen, businessmen, and other settlers across the western plains. The "taming" of the West was in fact an agricultural and commercial movement, attributable primarily to ranchers and farmers, not gun-slinging cowboys.[63] In fact, the six-shooter and rifle played relatively minor roles in the activities of all these groups—even the cowboys.[64] According to historian Richard Shenkman:

> The truth is many more people have died in Hollywood westerns than ever died on the real frontier . . . . In the real Dodge City, for instance, there were just five killings in 1878, the most homicidal year . . . . In the most violent year in Deadwood, South Dakota, only four people were killed. In the worst year in Tombstone, home of the shoot-out at the OK Corral, only five people were killed. The only reason the OK Corral shoot-out even became famous was that town boosters deliberately overplayed the drama to attract new settlers.[65]

Even in the most violence-prone western towns, vigilantism and lawlessness were only briefly tolerated. In his sweeping history of the West, historian Ray Allen Billington noted that local businesspeople and other leaders quickly pushed for town incorporation in order to establish local police forces, which were supported by taxes levied against local bars, gambling establishments, and houses of prostitution.[66] The prohibitions against carrying guns analyzed here were enforced, and there were few homicides.[67] The western-style shoot-outs glorified in countless books and movies were literally "unheard of."[68] In the most violent cow towns of the old West—Abilene, Caldwell, Dodge City, Ellsworth, and Wichita—a total of forty-five killings were recorded between 1870 and 1885, and only six of these killings were from six-shooters; sixteen killings were by police.[69] As cowboy experts Joe B. Frantz and Julian E. Choate observed, "the six-shooter has been credited with use entirely disproportionate with the facts."[70]

Even western outlaws illustrate the extent to which myth replaced fact with respect to guns and lawlessness. Many studies of the famed western outlaws demonstrate that "they were few, inconspicuous, and largely the invention of newspaper correspondents and fiction writers."[71] Moreover, "the western marshall [was] an unglamorous character who spent his time arresting drunks or rounding up stray dogs and almost never engaging in gun battles."[72] Most of the killing that took place on the frontier involved the wars between the U.S. Cavalry

63. LEWIS ATHERTON, THE CATTLE KINGS, xi, 31–42, 241–62 (1961).

64. PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 353–55 (2016).

65. RICHARD SHENKMAN, LEGENDS, LIES, AND CHERISHED MYTHS OF AMERICAN HISTORY 112 (1988); see also ROBERT R. DYKSTRA, THE CATTLE TOWNS 112–48 (1968) (detailing the exaggerated nature of frontier West violence).

66. RAY ALLEN BILLINGTON, WESTWARD EXPANSION 587 (6th ed. abr. 1974).

67. JOE B. FRANTZ & JULIAN ERNEST CHOATE JR., THE AMERICAN COWBOY: THE MYTH AND THE REALITY 78 and passim (1955).

68. BILLINGTON, supra note 66, at 587.

69. Id.

70. FRANTZ & CHOATE JR., supra note 67, at 78.

71. BILLINGTON, supra note 66, at 587.

72. Id.; see also FRANK RICHARD PRASSAL, THE WESTERN PEACE OFFICER: A LEGACY OF LAW AND ORDER 22 (1972), and the numerous works cited by BILLINGTON, supra note 66.

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-7, Page 63 of 273

and those Native Americans who rebelled against harsh and duplicitous treatment at the hands of whites.[73]

## D. Restrictions On Dangerous Or Unusual Weapons

States moved to enact laws restricting or barring certain dangerous or unusual weapons—also a subject that has contemporary reverberations. Such laws in the country's early decades were aimed in part at pistols and offensive knives, like most concealed carry laws, but also at the practice of rigging firearms to be fired with a string or similar method to discharge a weapon without an actual finger on the firearm trigger. Referred to as "gun traps," the earliest such law was enacted by New Jersey in 1771.[74] Some laws later referred to such weapons as "spring guns,"[75] "trap guns,"[76] and "infernal machines."[77]

The bulk of the laws that identified certain weapons as dangerous or unusual, however, appeared in the early 1900s, when most states moved aggressively to outlaw machine guns (usually meaning fully automatic weapons), sawed-off shotguns, pistols, weapons and mechanisms that allowed firearms to be fired a certain number of times rapidly without reloading, silencers, and air guns (which propels projectiles with compressed air rather than gun powder). The first state to enact an anti–machine gun law was West Virginia in 1925.[78] A number of states enacted anti–machine gun laws in 1927 alone—a year in which a concerted national push unfolded to regulate these and other gangster-type weapons. In all, at least twenty-eight states enacted anti–machine gun laws during this period.[79]

---

73. RICHARD W. STEWART, AMERICAN MILITARY HISTORY VOL. 1: THE UNITED STATES ARMY AND THE FORGING OF A NATION 321–40 (2005); W. EUGENE HOLLON, FRONTIER VIOLENCE: ANOTHER LOOK 124–45 (1974). Hollon notes that "of all the myths that refuse to die, the hardiest concerns the extent of the unmitigated bloodletting that occurred in the Western frontier during the closing decades of the nineteenth century." *Id.* at x.

74. Act of Dec. 21, 1771, ch. DXL, § 10, 1771 N.J. Laws 343, 346.

75. Act of Apr. 21, 1915, ch. 133, part II, §§17(c), 18, 1915 N.H. Laws 173, 180–81.

76. Act of Feb. 25, 1931, no. 58, 1931 S.C. Acts 78, 78.

77. *E.g.*, Act of Mar. 14, 1901, ch. 96, 1901 Utah Laws 97, 97.

78. Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24.

79. Act effective July 29, 1927, ch. 552, 1927 Cal. Stat. 938; Act of Feb. 25, 1931, ch. 249, 37 Del. Laws 813; Act of Apr. 27, 1933, no. 120, 1933 Haw. Sess. Laws 117; Act of July 2, 1931, 1931 Ill. Laws 452; Act of Mar. 27, 1927, ch. 156, 1927 Ind. Acts 469; Act of Apr. 19, ch. 234, 1927 Iowa Acts 201; Act of Nov. 28, 1933, ch. 62, 1933 Kan. Sess. Laws 76 (Spec. Sess.); Act of July 7, 1932, no. 80, 1932 La. Acts 336; Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231; Act of June 1, 1929, H.R. no. 498, 1929 Mo. Laws 170; Act of Apr. 29, 1929, ch. 190, 1929 Neb. Laws 673; Act of Mar. 19, 1927, ch. 95, 1927 N.J. Laws 180; Act of Apr. 15, 1931, ch. 435, 1931 N.Y. Laws 1033; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 488, 489; Act of Apr. 25, 1929, no. 329, 1929 Pa. Laws 777; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206 §§ 1–5, 1933 S.D. Sess. Laws 245; Act of Oct. 25, 1933, ch. 82, 1933 Tex. Gen. & Spec. Laws 219; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137; Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335; Act of June 5, 1925, 1925 W. Va. Acts 24 (Extraordinary Sess.); Act of May 28, 1929, ch. 132, 1929 Wis. Sess. Laws 157.

Texas, for example, defined machine guns in 1933 as those from which more than five bullets were automatically discharged "from a magazine by a single functioning of the firing device."[80]

The lesson here is significant both for its historical context and for the contemporary debate over the regulation of new or exotic gun technologies. In these instances, new laws were enacted not when these weapons were invented, but when they began to circulate widely in society. So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I.[81] But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted.

### E. Semi-Automatic Gun Restrictions

Of particular relevance to the modern gun debate is the fact that at least seven, and as many as ten, state laws specifically restricted semi-automatic weapons—weapons that fire a round with each pull of the trigger without manual reloading[82]—anticipating by seven decades the semi-automatic assault weapons ban debates, and related efforts to restrict large capacity bullet magazines, from the 1990s to the present.

States with laws in this category typically combined fully automatic and semi-automatic weapons under a single definitional category.[83] A 1927 Rhode Island measure defined the prohibited "machine gun" to include "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[84] To compare, a 1927 Massachusetts law said: "Any gun or small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired . . . shall be deemed a machine gun . . . ."[85] Michigan's 1927 law prohibited machine guns or any other firearm if they fired more than sixteen times without reloading.[86] Minnesota's 1933 law outlawed "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure."[87] It went on to penalize the modification of weapons that were altered to accommodate such extra firing capacity.[88] Fully automatic .22 caliber "light sporting rifles" were

---

80.  1933 Tex. Gen. & Spec. Laws 219, 219.

81.  NRA-ILA, *Fully-Automatic Firearms*, NRAILA.ORG, (July 29, 1999), https://www.nraila.org/articles/19990729/fully-automatic-firearms [https://perma.cc/NT68-ZEF6].

82.  *See* Table 2.

83.  *See* Table 2, laws of Mass., Mich., S.D., and Va.

84.  1927 R.I. Pub. Laws 256, 256.

85.  1927 Mass. Acts 413, 413–14.

86.  Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888.

87.  Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232.

88.  *Id.*

also considered machine guns under the law, but .22 caliber semi-automatic "light sporting rifles" were exempted.[89] Ohio also barred both fully automatic and semi-automatic weapons in a 1933 law, incorporating under the banned category any gun that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading."[90] The law defined semi-automatic weapons as those that fired one shot with each pull of the trigger.[91] South Dakota barred machine guns by defining them as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine . . . ."[92] Like several other states, Virginia outlawed weapons

> of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading.[93]

Aside from these seven states, another three included language that was ambiguous as to whether they extended prohibitions to semi-automatic as well as fully automatic weapons. Illinois enacted a 1931 law that prohibited "machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices."[94] Louisiana's 1932 anti–machine gun law,[95] and South Carolina's 1934 law,[96] both defined machine guns in the same way using identical language, including the eight cartridge standard. In the case of these three laws, the word "automatically" would seem to refer to fully automatic firing, but when that wording is married with "discharging more than eight cartridges successively without reloading," it would seem to encompass semi-automatic firing as well.

Table 2 summarizes the key portions of the laws from these ten states. The lesson of the previous part also applies here: new technologies bred new restrictions. And who would have guessed that the fierce controversy over regulating semi-automatic assault weapons in the 1990s and 2000s was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s.

---

89.  *Id.*
90.  Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189.
91.  *Id.*
92.  Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245.
93.  Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.
94.  Act of July 2, 1931, 1931 Ill. Laws 452, 452.
95.  Act of July 7, 1932, no. 80, 1932 La. Acts 336.
96.  Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288.

**Table 2**
STATE LAWS BARRING
SEMI-AUTOMATIC WEAPONS, 1927–1934[97]

| STATE AND YEAR | PROVISION OF LAW |
|---|---|
| Massachusetts 1927 | "rapid fire and operated by a mechanism" |
| Michigan 1927 | "any machine gun or firearm which can be fired more than sixteen times without reloading" |
| Minnesota 1933 | "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure." |
| Ohio 1933 | "any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading." |
| Rhode Island 1927 | "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading." |
| South Dakota 1933 | "a weapon of any description . . . from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine." |
| Virginia 1933 | "a weapon of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading." |

97.    Source: Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413, 413; Act of June 2, 1927, No. 372, 1927 Mich. Pub. Acts 887, 888; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, § 1, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, § 1, 1934 Va. Acts 137, 137; Act of July 2, 1931, § 1, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, § 1, 1932 La. Acts 336, 337; Act of Mar. 2, 1934, no. 731, § 1, 1934 S.C. Acts 1288, 1288.

| AMBIGUOUS STATE LAWS | |
|---|---|
| Illinois 1931 | "machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices." |
| Louisiana 1932 | "machine rifles, machine guns and sub machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device." |
| South Carolina 1934 | "machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device." |

## F. Dueling Prohibitions

A well-known category of gun laws with ties to American history is the prohibition against dueling. Prominent public figures from early American history, including Alexander Hamilton and Andrew Jackson, found themselves in highly publicized duels.[98] Hamilton's longstanding political feud with fellow New York politician Aaron Burr ended when the two men dueled in New Jersey in 1804.[99] Hamilton died from his wounds, and Burr's political career never recovered.[100] Jackson engaged in several duels, and was even injured during one

---

98.  DON C. SEITZ, FAMOUS AMERICAN DUELS (1929).

99.  Burr was vice president at the time; New York barred dueling, so they traveled to the neighboring state. LIN-MANUEL MIRANDA, *"Blow Us All Away," "Your Obedient Servant," "The World Was Wide Enough,"* on HAMILTON: AN AMERICAN MUSICAL, ACT II, (Atlantic Records 2015).

100.  RON CHERNOW, ALEXANDER HAMILTON 704–05, 717–22 (2004).

in 1806.[101] Though not barred in every state, the practice declined in the North after the Hamilton–Burr duel, but persisted in the South until the mid-nineteenth century.[102]

## G. Felons, Foreigners, Others Considered Dangerous

Early gun laws aimed at preventing felons, foreigners, or others deemed dangerous from owning firearms focused on Native Americans, with at least five colonies enacting such laws[103]—including the 1619 Virginia law cited earlier.[104] The Massachusetts colony enacted a law in 1637 that required named individuals who expressed "opinions & revelations" that "seduced & led into dangerous errors many of the people" of New England to turn in all "guns, pistols, swords, powder, shot, & match," and it further barred them from "buy[ing] or borrow[ing]" any of the same until such time as the local court said otherwise.[105] If those disarmed admitted to their "seditious libel," they could have their weapons restored.[106] In the 1770s, Pennsylvania enacted a law to bar or strip guns from those who refused to swear loyalty to the new American government.[107] In fact, ten of the thirteen states had laws allowing the impressment—that is, taking—of privately held firearms during the Revolutionary War.[108] Massachusetts also enacted such a law in 1776, although it does not appear in Frassetto's list.[109] By the early 1900s, as anti-immigrant sentiment spread, many states enacted laws aimed at keeping guns from non-citizens, as well as the young, those who were inebriated, felons and other criminals, and non-state residents.

## H. Firing Location Restrictions

Concerns over the inherent harm and risk attendant to the firing of weapons near others spawned a steady stream of laws prohibiting such acts from the 1600s

---

101.   SPITZER, *supra* note 26.

102.   ROTH, *supra* note 56, at 181.

103.   Act of May 9, 1723, 1723 Conn. Pub. Acts 292; Act of Mar. 31, 1639, 1639 N.J. Laws 18 *reprinted in* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (Edmund Bailey O'Callaghan, ed., 1868); Act of Feb. 23, 1645, 1645 N.Y. Laws 47 *reprinted in* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (Edmund Bailey O'Callaghan ed., 1868); Pennsylvania Act of Oct. 22, 1763 *reprinted in* VI THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 319 (James T. Mitchell & Henry Flanders eds., 1899); Virginia Act of Feb. 24, 1631, Act. XLVI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (William Waller Henning ed., 1823).

104.   *The Laws Enacted by the First General Assembly of Virginia*, *supra* note 11.

105.   I RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 211–12 (Nathaniel B. Shurtleff ed., 1853). This law was not among those appearing in Frassetto's list. *See* Frassetto, *supra* note 17.

106.   RECORDS OF THE GOVERNOR, *supra* note 105, at 212.

107.   Act of July 19, 1776, ch. DCCXXIX, IX THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 11 (1903).

108.   WINKLER, *supra* note 8, at 113.

109.   Saul Cornell & Nathan DeDino, *A Well Regulated Right*, 73 FORDHAM L. REV. 487, 507 (2004). The Massachusetts law is Act of March 14, 1776, ch. VII, 1776 Mass. Acts 31–36. *See* Frassetto, *supra* note 17.

through the early 1900s. Early such laws prohibited not only the firing of firearms in or near towns, but firing after dark, on Sundays, or near roads.[110] Early laws also punished firing that wasted gunpowder, or that occurred while under the influence of alcohol.[111] A North Carolina law from 1774 barred hunting by firelight at night, citing this concern in its preamble: "WHEREAS many Persons under Pretence of Hunting for Deer in the Night, by Fire Light, kill Horses and Cattle, to the Prejudice of the Owners thereof."[112] In the 1800s and 1900s, such laws were focused almost exclusively on firing in, around, or near towns or other populated areas or events.

I. Hunting Restrictions

Hunting laws are significant for the extent to which early ones reflect contemporary concerns. Though one imagines the America of the seventeenth to the nineteenth centuries as a nation little concerned—or not needing to be concerned—about matters related to wildlife management, safe hunting practices, or the like, these concerns are expressed early in American legislative histories, for example in the legislative history for the North Carolina night-time hunting law just quoted. Early hunting laws were aimed at those who hunted on private lands or in preserves, those who hunted certain types of game, most notably water fowl—often tied to prohibitions against hunting of such game from canoes, skiffs, or other water craft—and even the common deer.[113] For example, it comes as something of a revelation to note that Pennsylvania established a deer hunting season, penalizing out-of-season hunting, as early as 1721,[114] and North Carolina as early as 1768.[115] The penalty for violation of the North Carolina law was a fine of five pounds and "forfeiture of his gun."[116] Hunting even in this early period also sometimes required a license.[117] Similarly, laws in the 1800s also restricted what was by then termed "fire-hunting," hunting by firelight at night, poaching on private lands, and the use of certain restricted weapons, such as a "punt gun" or "swivel gun," defined as a smooth bored gun mounted on a swivel that fires a charge of shot to bring down water fowl, or any weapon not fired from the shoulder.[118] Measures were also enacted to protect certain game, to require

---

110.   Act of Oct. 1672, 1672 Conn. Pub. Acts 3; Act of Aug. 27, 1746, 1746 Mass. Acts 208; Act of Oct. 14, 1713, 1713 Mass. Acts 291; Act of Mar. 3, 1642, Act XXXV, 1642 Va. Acts 261.

111.   Though a 1655 Virginia law specifically exempted drunken firing at weddings and funerals! Act of March 10, 1655, Act XII, 1655 Va. Acts 401.

112.   This quote is from North Carolina's 1777 version of this law, Act of May 8, 1777, ch. XXI, 1777 N.C. Sess. Laws, 33, 33.

113.   9 Del. Laws 263; Act of Jan. 8, 1857, 1856 N.C. Sess. Laws 22; Act of April 1, 1853, ch 161, 1852 Va. Acts 133.

114.   Act of Aug. 26, 1721, ch. 3, 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI.

115.   Act of Dec. 5, 1768, ch. 13, 1768 N.C. Sess. Laws 168.

116.   Id. § 2, at 168–69.

117.   Act of Mar. 30, 1882, 1882 Md. Laws 257; Act of Aug. 26, 1721, ch. 3, 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI reprinted in III Mitchell & Flanders, supra note 103 at 254.

118.   14 Del. Laws 401; Act of Nov. 14, 1828, 1828 Fla. Laws 48, 75; Act of Sept. 21, 1882, 1880 Ga. Laws 142, 142; Act of Jan. 8, 1856, 1856 N.C. Sess. Laws 22, 22; Act of Apr. 20, 1874, 1874 Ohio Laws

licensing, and bar fishing "with any kind of gun."[119] In the twentieth century, in addition to the types of laws already mentioned, states barred hunting with silencers, from aircraft, by under-age persons, or with certain kinds of weapons—still including swivel guns, but now including automatic weapons.[120]

## J. Gun Manufacture, Inspection, Sale Restrictions

Gun laws also dealt broadly with manufacturing, inspection, and sale of weapons. Many of the laws in this category pertained to the manufacture, sale, transport, and storage of gunpowder. Gunpowder matters were of great concern because early firearms operated with the addition of loose gunpowder to serve as the igniting or explosive force to propel a projectile, so the two were inextricably linked.[121] But beyond the safety concerns about explosions or fires resulting from the mishandling of gunpowder, safety issues also led to other early regulations. In 1814, for example, Massachusetts required that all musket and pistol barrels manufactured in the state be first tested or "proved" to insure that they could withstand the firing process without rupturing.[122] Moreover, the law provided for a "person appointed according to the provisions of this act"—in other words, a state inspector—to oversee or conduct the testing.[123] This continued a long tradition in Massachusetts of giving local officials the power to survey, inspect, and even confiscate arms as needed. As early as 1642, "surveyors of arms" were empowered in colonial law to demand the delivery of gun powder and firearms from individuals in order for these items to be used in "times of danger."[124] New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site.[125] Twentieth century laws extended safety regulations pertaining to gunpowder and other explosives; one state, South Carolina, prohibited the use of explosives to kill fish (hardly a sporting enterprise).[126]

---

147, 148; 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI *reprinted in* III Mitchell & Flanders, *supra* note 103 at 254; Virginia Act of Mar. 2, 1642, Act. XI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 248, 248 (William Waller Henning, ed., 1823).

119.   Act of Dec. 23, 1878, no. 602, 1878 S.C. Acts 724, 724.

120.   Act of Apr. 4, 1931, ch. 97, 1931 Colo. Sess. Laws 399, 399–400; Act of Mar. 29, 1927, 1927 Del. Laws 516, 516; Act of Apr. 27, 1911, ch. 165, 1911 Del. Laws 322, 324; Act of May 10, 1901, 1901 Ill. Laws 212, 213; Act of Mar. 5, 1883, ch. CV, 1883 Kan. Sess. Laws 159, 159; Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359, 386.

121.   Act of May 29, 1771, 1771 Mass. Acts 597; Act of Nov. 23, 1715, no. 234, 1715 Mass. Acts 311; Act of Feb. 28, 1786, 1786 N.H. Laws 383.

122.   Act of Feb. 28, 1814, ch. CXCII, 1814 Mass. Acts 464, 464–65

123.   *Id*.

124.   RECORDS OF THE GOVERNOR, *supra* note 105, at 26. *See also* RECORDS OF THE GOVERNOR, *supra* note 105, at 31, 73–74, 84 for similar references. This law was not among those appearing in Frassetto's list. *See* Frassetto, *supra* note 17.

125.   Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274, 274–76.

126.   Act of Feb. 16, 1903, no. 82, 1903 S.C. Acts 124, 124–25.

## K. Firearms Sales

At least eight states regulated, barred, or licensed firearms sales. For example, Florida (1927),[127] Georgia (1902),[128] and North Carolina (1905)[129] gave localities the power to license, regulate, or even bar the commercial sale of firearms. In a 1917 law, New Hampshire required the licensing of gun dealers, requiring them to record the name, address, date of sale, amount paid, and date of the purchaser's permit for all who made gun purchases.[130] In turn, this information was passed to the local city or town clerk or county office, and "[t]he records thus filed shall at all times be open to the inspection of the police departments, or other public authorities."[131] New Jersey prohibited pawn brokers from selling or in any manner transferring any firearms.[132] New York established a registration system for all handgun sales—part of the 1911 law known as the Sullivan Law—which required gun owners to obtain a permit for ownership.[133] In a 1925 law, West Virginia barred the "public display" of any firearms for sale or rent, or ammunition. Gun dealers were also to be licensed, and were required to record the name, address, age "and general appearance of the purchaser," as well as all identifying information about the gun, which was then to be immediately reported to the superintendent of the local department of public safety.[134]

## L. Militia Laws

The militia laws that appear on this list represent one category of early gun laws that have been carefully studied elsewhere.[135] Not surprisingly, the laws here replicate what is now well known about the early-American militia system. Early laws confirmed the power of state governments to impress or take the firearms of citizens if needed. Militia-eligible men were typically required to obtain and maintain in working order the necessary combat-worthy firearm, at their own expense, along with the necessary accoutrements of powder, shot, and the like.[136] In Virginia in the early 1600s, men were required to bring their firearms to church for fear of Indian attacks.[137] In some states, laws stipulated when, where, and under what circumstances guns were to be loaded or unloaded.[138] In Maryland,

---

127.   Act of June 6, 1927, ch. 12548, § 19(13), 1927 Fla. Laws 206, 212.

128.   Act of Dec. 18, 1902, part III, tit. I, no. 192, § 16, 1902 Ga. Laws 427, 434–35.

129.   Act of Mar. 6, 1905, ch. 188, § 6, 1905 N.C. Sess. Laws 545, 547.

130.   Act of Apr. 19, 1917, ch. 185, 1917 N.H. Laws 727, 727–30.

131.   *Id.* § 3, at 728.

132.   Act of Mar. 30, 1927, ch. 321, § 1, 1927 N.J. Laws 742, 742.

133.   Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 442, 444–45.

134.   Act of June 5, 1925, ch. 3, § 7(b), 1925 W. Va. Acts 24, 32 (Extraordinary Sess.).

135.   CORNELL, *supra* note 8; JOHN K. MAHON, THE AMERICAN MILITIA: DECADE OF DECISION 1789–1800 (1960); JOHN K. MAHON, HISTORY OF THE MILITIA AND THE NATIONAL GUARD (1983); H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS: HOW THE SECOND AMENDMENT FELL SILENT (2002).

136.   The Uniform Militia Act of 1792, 1 U.S. Stat. 271.

137.   Virginia Act of Feb. 24, 1631, Act LI, *reprinted in* I Henning, *supra* note 103, at 174.

138.   Act of Mar. 16, 1877, 1877 Mo. Laws 298, 306; Act of Mar. 21, 1835, ch. 423, art. XI, 1835 Mo. Laws 512, 537; Act to Regulate the Militia, 1844 R.I. Pub. Laws 1, 16.

privates or non-commissioned officers who used their muskets for hunting were fined, according to a 1799 law.[139] These laws disappeared with the end of the old militia system in the mid-1800s.

## M. Gun Access By Minors And Irresponsible Others

Numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s, becoming more common in the early 1900s. Some states added other barred categories, including convicts or those of poor moral character, those inebriated, and people of unsound mind.[140] In 1907, the then-territory of Arizona barred

> any constable or other peace officer . . . while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm, or while so intoxicated to strike any person, or to strike any person with a pistol, gun or other firearm . . . .[141]

## N. Arms And Ammunition Trafficking

Arms and ammunition trafficking was also a concern as early as the seventeenth century, just as it is today. Various registration or taxation schemes sought to address this concern. For example, a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals.[142] A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also "of arms and munitions."[143] Twenty years later, Virginia required that "all ammunition, powder and arms, other than for private use shall be delivered up" to the government.[144] In the 1800s, three southern states imposed taxes on personally held firearms. Georgia in 1866 levied a tax of "one dollar a piece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation . . . ."[145] In 1867, Mississippi levied a tax of between $5 and $15

> upon every gun and pistol which may be in the possession of any person . . . which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain [to seize property for money owed] and seize such gun or pistol, and sell the same for cash . . . .[146]

139.   A Supplement to the Act, Entitled, An Act to Regulate and Discipline the Militia of this State, ch. 100, § 30, 1798 Md. Laws 69, 75.

140.   Act of Mar. 5, 1907, ch. 16, 1907 Ariz. Sess. Laws 15; Act of Feb. 4, 1881, ch. 3285, 1881 Fla. Laws 87; Cook County Ordinance chap. 53 of Chicago (Ill.) Code of 1911.

141.   Act of Mar. 5, 1907, ch. 16, § 1, 1907 Ariz. Sess. Laws 15, 15–16.

142.   Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Gunds in New Netherland by Private Persons, 1652 N.Y. Laws 128.

143.   Virginia Act of Feb. 27, 1631, Act LVI, *reprinted in* I Henning, *supra* note 103, at 174–75.

144.   Articles at the Surrender of the Countrie of Virginia, Mar. 22, 1651, *reprinted in* I Henning, *supra*, note 103 at 365.

145.   Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27, 27–28.

146.   Act of Feb. 7, 1867, ch. CCXLIX, § 1, 1867 Miss. Laws 327, 327.

In 1856 and 1858, North Carolina enacted taxes on pistols and other weapons "used or worn about the person."[147] An 1851 Rhode Island law taxed anyone who owned or kept a pistol or rifle shooting gallery in certain locations;[148] Louisiana and Mississippi did the same in 1870[149] and 1886, respectively.[150] Alabama imposed a tax on firearms dealers in 1898.[151] That same year, Florida required a license for anyone owning "a Winchester or repeating rifle," and further required the licensee to "give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the county commissioners."[152] Hawaii licensed firearms for sporting purposes in 1870,[153] as did Wyoming in 1899,[154] and Georgia imposed a pistol dealers' tax in 1894.[155] Nebraska granted to city mayors the power to issue licenses to carry concealed weapons, adding mayoral discretion to "revoke any and all such licenses at his pleasure."[156]

O. Registration And Taxation

Registration and taxation laws were enacted with greater frequency beginning in the twentieth century. At least twelve states imposed various gun sales or dealer registration, regulation, taxation, or gun registration schemes.[157] The earliest applicable to purchasers of all firearms, was enacted in Michigan in 1913;[158] New York's 1911 Sullivan law applied to handguns only.[159] Michigan also mandated in 1927 that all pistols be presented by their owners "for safety inspection" to local officials, if they lived in an incorporated city or village. [160] Perhaps most remarkable was this sweeping law, enacted by Montana in 1918, titled "An Act providing for the registration of all fire arms and weapons and regulating the sale thereof":

---

147.   Act of Feb. 16, 1859, ch. 25, sched. A, § 27(15), 1858 N.C. Sess. Laws 28, 35–36; Act of Feb. 2, 1857, ch. 34, § 23(4), 1856 N.C. Sess. Laws 28, 34.

148.   Act of Jan. 20, 1851, § 2, 1851 R.I. Pub. Laws 9, 9.

149.   Act of Mar. 16, 1870, no. 68, § 3, sixth, 1870 La. Acts 126, 127.

150.   Act of Mar. 18, 1886, ch. II, § 1, 1886 Miss. Laws 12, 19.

151.   Act of Feb, 23, 1899, no. 903, § 16, sixty-seventh, 1898 Ala. Acts 164, 190.

152.   Act of June 2, 1893, ch. 4147, 1898 Fla. Laws 71, 71–72.

153.   Act of July 18, 1870, ch. XX, 1870 Haw. Sess. Laws 26, 26.

154.   Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

155.   1893–1894 Treasurer's Report, 1894 Ga. Laws 325, 326.

156.   LINCOLN REV. ORD. ch. XIV, art. XVI, § 6 (Neb. 1895).

157.   Act of June 19, 1931, ch. 1098, § 1, § 9, 1931 Cal. Stat. 2316, 2316–19; Act of June 2, 1923, ch. 252, 1923 Conn. Pub. Acts 3707; Act of Apr. 7, 1909, ch. 271, 25 Del. Laws 577; Ga. General Tax Act, no. 260, § 2, ninety-third, 1921 Ga. Laws 38, 65; Act of Jan. 9, 1934, act 26, 1933 Haw. Sess. Laws 35 (Spec. Sess.); Act of July 2, 1931, 1931 Ill. Laws 452; Act of May 7, 1913, ch. 250, 1913 Mich. Pub. Acts 472; MISS. CODE ch. 114, § 3887 (1906) (published in 1906 Miss. Laws 346, 367 (Spec. Sess.)); Act of Feb. 20, 1918, ch. 2, 1918 Mont. Laws 6 (Extraordinary Sess.); Act of Mar. 10, 1919, ch. 197, 1919 N.C. Sess. Laws 397; Act of Mar. 26, 1923, no. 11, § 11, 1923 S.C. Acts 12, 19–20; Act of Feb. 18, 1933, ch. 101, 1933 Wyo. Sess. Laws 117.

158.   Act of May 7, 1913, No. 250, 1913 Mich. Pub. Acts 472.

159.   Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 442.

160.   Act of June 2, 1927, no. 372, § 9, 1927 Mich. Pub. Acts 887, 891.

> Within thirty days from the passage and approval of this Act, every person within the State of Montana, who owns or has in his possession any fire arms or weapons, shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered.
>
> . . . .For the purpose of this Act a fire arm or weapon shall be deemed to be any revolver, pistol, shot gun, rifle, dirk, dagger, or sword.[161]

The remarkable sweep of this statewide gun registration scheme is exceeded only by its early provenance.

## P. Right To Bear Arms

In all of the nearly one thousand statutes examined in this analysis, only one referred to the right to bear arms—and it managed to misquote the Second Amendment; it is "the right *of* the people" not "the right *to* the people." In 1868, Oregon enacted "An Act To Protect The Owners Of Firearms":

> Whereas, the constitution of the United States, in article second of amendments to the constitution, declares that "the right to the people to keep and bear arms shall not be infringed;" and the constitution for the state of Oregon, in article first, section twenty-seven, declares that "the people shall have the right to bear arms for the defense of themselves and the state;" therefore, . . . .
>
> Section 1. Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defense, the following firearms, to wit: Either or any one of the following named guns and one revolving pistol: a rifle, shot-gun (double or single barrel), yager [a heavy, muzzle-loading hunting rifle], or musket . . . .
>
> Section 2. No officer, civil or military, or other person, shall take from or demand of the owner any fire-arms mentioned in this act, except where the services of the owner are also required to keep the peace or defend the state.[162]

Even in this articulation of a specified right to guns, the law extends that right to "any one of the following,"[163] limiting citizens' gun rights both as to numbers of guns to be owned, and to the specified types. Here, indeed, is a "well-regulated right."[164]

## Q. Race And Slavery

The history of firearms regulations pertaining to race and slavery is surprising only in the relatively small number of written state restrictions. Yet that is not to suggest that the antebellum slavery regime was somehow less than uniformly oppressive. Two competing values shaped the relationship between slavery and guns. First, many sought to maintain some discretion regarding the arming of slaves. Early in the country's history, slave owners found it not only useful, but

---

161. Ch. 2, 1918 Mont. Laws 6–9.

162. Act of Oct. 24, 1868, 1868 Or. Laws 18, 18–19.

163. *Id.* at 18.

164. Cornell & DeDino, *supra* note 109.

necessary, to arm slaves in early conflicts with Native Americans. For example, during the bloody Yamasee War (1715–1717) in South Carolina, nearly half of the colonist militia forces deployed were slaves.[165] Later on, the practice of enrolling slaves or indentured servants in local militias was largely abandoned, especially as such forces were used to monitor the slave population.[166] In addition, individual slave owners also often wished to arm their slaves when hunting or traveling.[167] The second, opposing value was the overriding fear of slave rebellions. With so much of the population of the South composed of people in bondage, whites lived in constant fear of violent uprisings.[168] Part of the pathology of control extended to deterring and catching runaway slaves.[169] Finally, gun prohibitions often extended to free blacks as well, although some laws distinguished between those in bondage versus those who were free. For example, Virginia enacted a law in 1806 that permitted "every negro or mulatto" to own guns, as long as they were not slaves.[170] Most of the laws listed here either penalize slaves for gun hunting or gun carrying without their owners' authorization or presence. Others barred slave gun carrying entirely, or barred guns to free blacks or those of mixed race.

## R. Time And Place Restrictions

Probably the most common type of gun law in America today is that which restricts the use of firearms in sensitive areas and times. One would be hard-pressed to find a city, town, or village in the contemporary United States that does not have a law against the discharge of firearms within its jurisdiction. Indeed, such laws existed early in our history, some of which fell into previous categories. Early such laws barred firearms carrying and discharges in named or generic public places, communal gatherings, schools, entertainments, on Sundays, or election day, as well as laws enacted in the late 1700s and 1800s to bar firearms discharges in cemeteries (clearly a source of significant mischief), on or at trains or other public conveyances, near roads, churches, bridges, homes or other buildings, or state parks.[171]

---

165.    JERRY COOPER, THE RISE OF THE NATIONAL GUARD 3 (1997); John Shy, *A New Look at the Colonial Militia*, 20 WM. & MARY Q. 175, 175–85 (1963) *reprinted in* A PEOPLE NUMEROUS AND ARMED: REFLECTIONS ON THE MILITARY STRUGGLE FOR AMERICAN INDEPENDENCE 31–38 (rev. ed. 1990).

166.    Paul Finkelman, *The Living Constitution and the Second Amendment*, 37 CARDOZO L. REV. 623, 644 (2015).

167.    1 Del. Laws 104; 9 Del. Laws 552 (1843); Act of Oct. 1, 1804, 1804 Ind. Acts 107, 108; Act of Feb. 8, 1798, ch. LIV, 1798 Ky. Acts 105, 106; Act of Nov. 27, 1729, 1715–1755 N.C. Sess. Laws 35, 36.

168.    Finkelman, *supra* note 166, at 644–45.

169.    For more on early laws and practices regarding free blacks, slaves, and guns, see CORNELL, *supra* note 8, at 28–29; KENNETT & ANDERSON, *supra* note 9, at 49–51; WINKLER, *supra* note 8, at 115–16.

170.    WINKLER, *supra* note 8, at 116.

171.    Act of Sept. 30, 1867, 1867 Ariz. Sess. Laws 21, 21-22; Act of Oct. 1672, 1672–1714 Conn. Pub. Acts; 3 Del. Laws 326; 10 Del. Laws 9; Act of May 24, 1895, no. 436, 1895 Mich. Local Acts 591, 596; Act of Oct. 14, 1713, 1713 Mass. Acts 291; Act of June 28, 1823, ch. XXXIV, 1823 N.H. Laws 72, 73 Act of Dec. 31, 1665, 1665 N.Y. Laws 205; Act of Feb. 9, 1750, ch. CCCLXXXVIII, 1745-1759 Pa. Laws 208; Act

### S. Crime And Guns

The idea that those who commit crimes with guns should suffer a greater punishment is an old idea, but not one widely found during the period under study here. In 1783, Connecticut enacted a law that called for the death penalty for those who committed a burglary or robbery with a gun because it was seen to "clearly indicate their violent intentions."[172] By comparison, commission of the same crimes without a gun resulted in a whipping and jail time.[173] A 1788 Ohio (Northwest Territory) law increased the penalty and jail time for anyone convicted of breaking and entering with a dangerous weapon, including firearms.[174] Several states provided for enhanced sentences for crimes committed with firearms in the 1800s.[175] In the 1900s, extended sentences were meted out to those who used explosives or guns while committing crimes—sometimes machine guns or pistols were stipulated.[176]

### T. Storage Regulations

The final category of gun regulation pertains to storage regulations. Many early laws imposed storage restrictions on gunpowder, but similar rules sometimes extended to firearms as well. For example, Massachusetts enacted a 1782 law specifying that any loaded firearms "found in any Dwelling House, Out House, Stable, Barn, Store, Ware House, Shop, or other Building . . . shall be liable to be seized" by the "Firewards" of the town. If the storage was found to be improper by a court, the firearms were to "be adjudged forfeit, and be sold at public Auction."[177] Armories and gun houses were subject to regular inspection by the terms of an 1859 Connecticut law.[178] In 1919, Massachusetts passed a law to authorize the issuance of warrants for any complaint alleging that someone was keeping "an unreasonable number of rifles, shot guns, pistols, revolvers or other dangerous weapons, or that an unnecessary quantity of ammunition, is kept

---

of Dec. 24, 1774, ch. DCCCIII, 1759-1776 Pa. Laws 421; Act of Feb. 28, 1740, no. 692, 1731-43 S.C. Acts 162[i], 174; Act of Mar. 13, 1871, ch. VI, 1871 Tex. Spec. Laws 11, 14; Act of Aug. 12, 1870, ch. XLVI, 1870 Tex. Gen. Laws 63; Virginia Act of Mar. 10, 1655, Act XII, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 401, 401-02 (William Waller Henning ed., 1823); Virginia Act of Mar. 2, 1642, Act. XI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 248, 248 (William Waller Henning, ed., 1823); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 33 (Augustine Davis ed., 1794).

172.    Act of Oct. 9, 1783, 1783 Conn. Pub. Acts 633, 633.

173.    *Id.*

174.    Act of Sept. 6, 1788, ch. 2, 1788 Ohio Laws 6, 8.

175.    Act of Oct. 9, 1783, 1783 Conn. Acts 633; Florida Act of Aug. 6, 1888, chap. 1637; Act of Sept. 6, 1788, ch. II, 1788-1801 Ohio Laws 8; Act of Dec. 2, 1869, 1869 Wash. Sess. Laws 198, 203.

176.    Act of Apr. 3, 1907, ch. 151, 1907 Colo. Sess. Laws 334; Act of June 22, 1911, ch. 98, 1911 Conn. Pub. Acts 1357; Act of May 15, 1905, ch. 5411, 1905 Fla. Laws 87; Act of July 2, 1931, 1931 Ill. Laws 452; Act of Mar. 8, 1929, ch. 55, 1929 Ind. Acts 139.

177.    1782 Mass. Acts 119, ch. 46, § 1.

178.    Act of June 24, 1859, ch. LXXXII, § 7, 1859 Conn. Pub. Acts 61, 62.

or concealed for any unlawful purpose in a particular house or place . . . ."[179] If a court concluded that the possession was not justified, it could order the weapons and ammunition forfeited.[180]

## V

## Conclusion: Firearms Laws Are As American As Gun Ownership

Early gun laws were comprehensive, ubiquitous, and extensive. Taken together, they covered every conceivable dimension of gun acquisition, sale, possession, transport, and use, including deprivation of use through outright confiscation—not merely for the commission of serious crimes, but even for violation of hunting regulations. Given that the dark fear of contemporary gun rights enthusiasts is government confiscation of firearms, it bears noting that this survey of early gun laws included measures that invoked gun confiscation for a wide range of reasons or offenses including: military necessity; failure to swear a loyalty oath to the government; improper storage of firearms; improper possession of weapons legal to own under certain circumstances, including, but not limited to, possession of specific, named types of prohibited firearms—especially handguns and machine guns; violations of certain hunting laws; and failure to pay a gun tax.

Another category of gun regulation, remarkable in its own right, is the prohibition of semi-automatic weapons in up to ten states, summarized in Table 2. This important statutory prohibition, unknown until now, also has contemporary reverberations as precedent for the assault weapons ban debates in the 1990s and 2000s.[181]

In all of this lawmaking, there is, with the rarest exceptions, no suggestion that these laws infringed on anything related to any "right to bear arms"— remembering that the Second Amendment did not apply to the states until the Supreme Court so extended it in 2010[182]—be it the U.S. Constitution's Second Amendment or the various state constitutions' right-to-bear-arms-type provisions. Many state laws predated the modern state and federal constitutions, but there is no indication that subsequent state laws were somehow inhibited or stymied after the adoption of right to bear arms provisions, aside from facing occasional court challenges.[183] Many of these laws did, however, include two types of exemptions: those related to militia or military activities; and instances when individuals used firearms for justifiable personal self-defense. As Saul Cornell has noted, "the common-law right of individual self-defense"[184] was not only well

---

179. Act of May 22, 1919, ch. 179, § 1, 1919 Mass. Acts 139, 139.

180. *Id.*

181. *See* Spitzer, *supra* note 26, at ch. 3 (analyzing the contemporary dispute over regulating semi-automatic assault weapons).

182. McDonald v. City of Chicago, 561 U.S. 742 (2010).

183. Spitzer, *supra* note 55, at 91, 91–136.

184. Cornell, *supra* note 8, at 21.

established long before codification of the right to bear arms in American constitutions; it existed independent of that right.[185]

Taken together, these sixteen—sometimes overlapping—categories of gun laws span a wide range. Some encompass anachronistic practices—like slavery, dueling, and old-style militias—that nevertheless reflect the scope of government power over the kinds of persons who could carry guns, the circumstances of gun carrying, criminal gun behavior, and military or defense exigencies. Others reflect the most basic efforts to improve safety, including laws that criminalized menacing behavior with guns (such as brandishing), the firing of weapons in populated areas, hunting laws, some of the laws related to manufacturing and inspection pertaining to firearms, laws restricting firearms access to minors, criminals, and those mentally incompetent, laws restricting firearms in sensitive areas or places, sentence enhancement laws, and storage laws.

Finally, some of the gun law categories represented more sophisticated, ambitious, or seemingly modern approaches to gun regulation. Dangerous weapons barred outright by laws enacted in the 1920s and early 1930s included automatic weapons like submachine guns. Congress moved to restrict access to such weapons nationwide in 1934.[186] Yet state laws also barred silencers, air guns, trap guns, and even semi-automatic weapons and the early equivalent of large capacity bullet magazines. While standards varied, some states barred weapons or mechanisms that could fire more than five, seven, eight, sixteen, or eighteen bullets without reloading. The concerns then were akin to those that motivated Congress to enact the Assault Weapons ban of 1994[187]: excessive firepower in the hands of civilians, and the related question of public safety. Beyond these laws are those that are essentially off the agenda in the contemporary political environment: registration and licensing laws, and significant, categorical gun bans.

Taking most of these gun law categories together, one overarching concern straddles them: the conviction that handguns represented a uniquely dangerous threat to societal interpersonal safety. Even though these laws were enacted long before the government or private researchers began to collect systematic data on gun violence, the carrying of pistols was seen as an activity largely confined to those who contemplated or committed crimes or other forms of interpersonal violence, and that therefore pistol carrying should be subject to stricter rules and standards, including in many instances prohibition. While gun control proponents continue to make the same arguments in modern America, those arguments carried more weight in the America of the 1600s through the early 1900s than they do today. The relationship between citizens and their governments with

---

185.   Cornell, *supra* note 56, at 1703, 1707; *see also* SPITZER, *supra* note 26, at ch. 4; Nathan Kozuskanich, *Originalism in a Digital Age*, in THE SECOND AMENDMENT ON TRIAL, *supra* note 8, at 289–309.

186.   National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872 (2012)).

187.   SPITZER, *supra* note 55, at 149–55.

respect to guns contemplates a regulatory regime that bears little resemblance to the modern gun rights narrative of the past. Yes, there was lawlessness, rebellion, and rugged individualism. But the context was that of a governing framework where the state confined and defined lawful use of force by individuals.

Gun laws are as old as the country; more to the point, the *idea* of gun laws and regulation is as old as the country. The prevailing gun law movement in America in the last three decades toward the relaxing of gun restrictions—for example, the reduction of gun sale inspections, the shielding of manufacturers and dealers from criminal and civil liability, the rise of unregulated internet gun and ammunition sales—as well as the spread of concealed carry laws, the open carry movement, and most recently of "stand your ground" laws are not a return to the past. They are a refutation of America's past, and a determined march away from America's gun regulation tradition. And these changes have nothing to do with improving safety or security in society, but everything to do with politics.

# EXHIBIT 37

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-7, Page 81 of 273

11/30/22, 3:12 PM   Case 3:17-cv-01017-BEN-JLB   Document 132-6   The legal history of bans on firearms and Bowie knives before 1900   Filed 12/01/22   PageID.17471   Page 83 of 223

Reason's Annual Webathon is underway! Donate today to see your name here.

Reason is supported by:
**Max Pinigin**

Donate

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▼

SECOND AMENDMENT

## The legal history of bans on firearms and Bowie knives before 1900

DAVID KOPEL | 11.20.2022 12:55 PM

Bowie knives are back in constitutional law news these days, after a very long absence. The U.S. Supreme Court's *Bruen* decision instructs lower courts to look to U.S. legal history to see what sorts of restrictions on Second Amendment rights are consistent with the mainstream American legal tradition. According to the Court, the legal history of the Founding Era is the most important, the late nineteenth century much less so, and the twentieth century too late to create a tradition that contradicts the text of the Second Amendment.

Post-*Bruen*, some gun control advocates have been looking to Bowie knife laws as analogical justifications for bans on common modern rifles and magazines. In a separate post, *Bowie knife statutes 1837-1899*, I provide a state-by-state survey of all state Bowie knife laws through 1899. This post examines constitutional case law on Bowie knives, the history of such knives, and the history of pre-1900 bans on types of firearms.

As described below, valid pre-1900 precedents on firearms prohibitions are non-existent. *Bruen* suggests that "dramatic technological changes may require a more nuanced approach" in drawing historical analogies to justify modern arms controls. Accordingly, there has been renewed interest in Bowie knives, which are said to be a new technology that appeared in the early 19th century. In the Fourth Circuit, Maryland Attorney General Frosh is defending a Maryland ban on many common rifles. In his recently-filed supplemental brief in *Bianchi v. Frosh*, Bowie knife laws are an important part of his argument, including with a citation to my article *Knives and the Second Amendment*, 47 U. Michigan J. of Law Reform 175 (2013) (with Clayton Cramer and Joseph Olson).

At a previous stage in the case, I coauthored an amicus brief in support of the plaintiffs' cert. petition, *Bianchi v. Frosh.* No. 21-902. The brief was on behalf of Professors of Second Amendment Law (including VC's Randy Barnett), Cato Institute, John Locke Foundation, Center to Keep and Bear Arms (Mountain States Legal Foundation), and Independence Institute. The week after *Bruen*, the Supreme Court granted cert., vacated the decision below (the Fourth Circuit upholding the ban), and remanded for consideration in light of *Bruen*.

This post proceeds as follows:

- Part I summarizes *Bruen*'s rules for reasoning from historical analogies.
- Part II summarizes the pre-1900 American history of firearms bans. Four states enacted some sort of prohibitory law on particular types of firearms.
- Part III explains Bowie knives, and the infamous 1837 murder on the floor of the Arkansas legislature that may have spurred legislative action in several states.
- Part IV examines the three major state supreme court cases involving Bowie knives:
  - In Georgia, *Nunn v. State* (1844) held that a statute banning Bowie knives and handguns violated the Second Amendment.
  - In Tennessee, *Aymette v. State* (1840) upheld a ban on concealed carry of Bowie knives as not violating the state constitution. The court stated that the right to keep arms was individual, but the right to bear arms was only for military service, such as the militia. Mistakenly, the court said that a Bowie knife would be of no use to a militia. To the contrary, many militias used Bowie knives, before and after 1840.
  - *Cockrum v. State* (1859) applied the Texas Constitution and the Second Amendment and stated, "The right to carry a bowie-knife for lawful defense is secured, and must be admitted." However, enhanced sentencing for use of a Bowie knife in murder was constitutional.

The other post, _Bowie knife statutes 1837-1899_, excerpts and analyzes state 19th-century Bowie knife statutes. With very rare exceptions, states that chose to regulate Bowie knives treated them the same as other, older, types of fighting knives, namely dirks and/or daggers. As described in this post, "Bowie knives" were briefly considered to be a new type of arm, but they were not. Bowie knife laws turned into general laws about large knives, and so in statutes, "Bowie knife" was joined by other well-known fighting knives.

The knife category of Bowie knives plus dirks and/or daggers was frequently regulated at the same level as handguns. That is, prohibitions were rarities. The mainstream approach for handguns and knives was non-prohibitory for peaceable adults, such as laws forbidding concealed carry (while allowing open carry), prohibiting sales to minors, or specially punishing misuse.

Whatever 19th century handgun laws teach about permissible limits on the right to arms, the Bowie knife laws go no further. Because Bowie knives are so often _in pari materia_ with 19th-century handgun regulations that they add little if anything to the very thin base of historical precedents for prohibitions on common arms.

The legal history of Bowie knives reinforces the U.S. Supreme Court's history-based holdings about permissible handgun regulation. Bowie knives were not some extraordinary category for which regulation was more severe than was typical for handgun control.

### I. Rules from _Bruen_

Further analysis of the material in this Part is in my article _Restoring the right to bear arms: New York State Rifle and Pistol Association v. Bruen_, 2021-22 Cato Supreme Court Review (Trevor Burrus ed., 2022).

_Bruen_ affirmed that text, history, and tradition is the correct methodology in Second Amendment cases, not interest balancing:

> … _Heller_ and _McDonald_ do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

142 S. Ct. 2111, 2126-27 (2022). Courts may not engage in interest balancing, nor may they defer to legislative interest balancing:

> The Second Amendment "is the very _product_ of an interest balancing by the people" and it "surely elevates above all other interests the right of law-abiding, responsible citizens to use arms" for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.

_Id._ at 2131 (quoting _Heller_).

Thus, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." _Id._ at 2129-30.

Judges do not bear the burden of becoming legal history researchers. As with anything else that the government must prove, the government must present persuasive legal history to the court. "Courts are thus entitled to decide a case based on the historical record compiled by the parties." _Id._ at 2130 n.5.

Sometimes, the government and its allies will win because there are many historic laws that are twins of modern ones—such as prohibiting reckless discharge of a firearm in populated areas. Additionally, the government can prove its case by "analogical reasoning." This means "a well-established and representative historical _analogue_, not a historical _twin_. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." _Id._ at 2133.

"[A]nalogical reasoning under the Second Amendment is neither a regulatory straightjacket nor a regulatory blank check." _Id._ "[C]ourts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted.'" _Id._ (quoting _Drummond v. Robinson_, 9 F.4th 217, 226 (3d Cir. 2021)).

If a historical arms control law is both "established" and "representative," the next step is to determine whether the modern gun control and the alleged historical analogue are "relevantly similar." _Bruen_ does not purport to "exhaustively" define how judges may consider similarity. Instead, _Bruen_ suggests that _Heller_ and _McDonald_ point to "at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."

"How" means: "whether modern and historical regulations impose a comparable burden on the right of armed self-defense."

"Why" means: "whether that burden is comparably justified." The second metric prevents historic, burdensome laws that were enacted for one purpose from being used as a pretext to impose burdens for other purposes. _Id._ at 2132-33.

How to deal with technological or societal changes? Per Justice Thomas:

> While the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach. The regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868. Fortunately, the Founders created a Constitution—and a Second Amendment—"intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." Although its meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated.

*Id.* at 2132 (quoting *McCulloch v. Maryland*). Some social problems have been around for a long time. Whether previous generations addressed a problem with restrictions on Second Amendment rights is an important question:

> [W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Id.* at 2131.

Legal tradition is based on many places over many years. A few harsh laws in a few places do not negate the mainstream. For example, in *Bruen* the following were, cumulatively, insufficient to negate the general American tradition of a right to carry arms:

- A statute in the short-lived colony of East Jersey (half of present New Jersey) against frontiersmen ("planters") carrying handguns. The statute was in effect for "[a]t most eight years."
- An 1871 Texas ban against carrying handguns under most circumstances.
- In the latter nineteenth century, five western territories with statutes against handgun carrying in cities, or more broadly.
- Four colonial or Early Republic statutes that supposedly prohibited arms carrying. They actually did not, but the Court assumed *arguendo* that the description of the statutes in the amicus briefs of the anti-gun lobbies was accurate.

In general, "late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154.

Broad state restrictions on peaceable carry did become more common in the 20th century, most famously with the 1911 New York "Sullivan Act" at issue in *Bruen*. But, "[a]s with . . . late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 2154 n.28.

According to *Bruen*, states may require licenses for bearing arms in public. Issuance must be based on narrow and objective criteria. The licensing systems may not have "lengthy wait times . . . or exorbitant fees." *Id.* at 2138 n.9.

## II. Firearms bans in the U.S. before 1900

Attorneys General who must defend recent state bans on various types of common firearms have a challenging task. There were very few bans of particular types of firearms during the nineteenth century, and all of them are plainly unconstitutional under modern doctrine.

### A. Georgia ban on handguns, Bowie knives, and other arms

The only firearms ban statute before the Civil War was enacted by Georgia. It outlawed possession, sale, open carry, and concealed carry of the vast majority of handguns. The statute also banned Bowie knives and certain other arms. In *Nunn v. State*, the Georgia Supreme Court held the statute entirely unconstitutional because of the Second Amendment, except as to concealed carry. *Nunn* is the historic case that is most extolled by the U.S. Supreme Court's *Heller* opinion. The case is discussed further in Part IV.

### B. Tennessee ban on many handguns

After the end of Reconstruction, the white supremacist legislature of Tennessee in 1879 banned the sale "of belt or pocket pistols, or revolvers, or any other kind of pistol, except army or navy pistols"—that is, large handguns of the sort carried by military officers, artillerymen, etc. These big and well-made guns were already possessed in quantity by former Confederate soldiers. The army & navy handguns were more expensive than smaller pistols. The ban was upheld because it would help reduce the concealed carrying of handguns. *State v. Burgoyne*, 75 Tenn. (7 Lea) 173 (1881).

### C. Arkansas ban on many handguns, and Bowie knives

Arkansas followed suit with a similar law in 1881. That law also forbade the sale of Bowie knives, dirks (another type of knife), sword-canes (a sword concealed in a walking stick), or metal knuckles. In a prosecution for the sale of a pocket pistol, the Arkansas Supreme Court rejected a constitutional defense. The statute was "leveled at the pernicious habit of wearing such dangerous or deadly weapons as are easily concealed about the person. It

000282
ER_1154

does not abridge the constitutional right of citizens to keep and bear arms for the common defense; for it in no wise restrains the use or sale of such arms as are useful in warfare." *Dabbs v. State*, 39 Ark. 353, 357 (1885).

The right to arms provision of the Tennessee Constitution, as adopted in 1870 and still in effect, states, "the citizens of this State have a right to keep and to bear arms for their common defense; but the Legislature shall have power, by law, to regulate the wearing of arms with a view to prevent crime." The 1868 Arkansas Constitution right to arms, also still in effect, states, "The citizens of this State shall have the right to keep and bear arms for their common defence."

In both states, the "common defense" language was interpreted by the courts as protecting an individual right of everyone, but only for militia-type arms. Such arms included the general types of handguns used in the U.S. military. When Congress was drafting the future Second Amendment, there was a proposal in the Senate to add similar "common defence" language. The Senate rejected the proposal. Senate Journal, 1st Cong., 1st Sess. 77 (Sept. 9, 1789).

Whatever the merits of the state courts' interpretations of the state constitutions, the Tennessee and Arkansas statutes are unconstitutional under the Second Amendment. The U.S. Supreme Court in *Heller* repudiated the notion that the Second Amendment is only for military-type arms. Dick Heller's 9-shot .22 caliber revolver was certainly not a military-type handgun.

## D. Florida licensing law for repeating rifles and handguns

The closest historic analogue to present bans on semiautomatic rifles is an 1893 Florida statute that required owners of Winchesters and other repeating rifles to apply for a license from the board of county commissioners. In 1901 the law was extended to also include handguns. As amended, "Whoever shall carry around with, or have in his manual possession, in any county in this State, any pistol, Winchester rifle, or other repeating rifle, without having a license from the county commissioners of the respective counties of this State," should be fined up to $100 or imprisoned up to 30 days.

The county commissioners could issue a two-year license only if the applicant posted a bond of $100. The commissioners were required to record "the maker of the firearm so licensed to be carried, and the caliber and number of the same." *Revised General Laws of Florida*, § 7202-03 (1927); 1893 Fla. Laws ch. 4147; 1901 Fla. Laws ch. 4928.

The bond of $100 was exorbitant. It was equivalent to over $3,400 today. (Fed. Reserve Bank of Minneapolis, Consumer Price Index 1800-. 2022 = 884.6. 1893 = 27. 1901 = 25. Avg. = 26.)

A 1909 case involved Giocomo Russo's petition for a writ of mandamus against county commissioners who had refused his application for a handgun carry license. Based on his name, Russo may have been an Italian immigrant. At the time, Italians were sometimes considered to be in a separate racial category. When Russo applied, the county commissioners said that they only issued licenses to applicants whom they knew personally, and they did not think the applicant needed to carry a handgun. Russo argued that the licensing statute was unconstitutional.

The Florida Supreme Court denied Russo's petition for a writ of mandamus. According to the Court, there were two possibilities: 1. If the statute is constitutional, then mandamus to the county commissioners would be incorrect, because they acted within their legal discretion. 2. If the statute is unconstitutional, then mandamus would be improper, because a writ of mandamus cannot order an official to carry out an unconstitutional statute. Either way, Russo was not entitled to a writ of mandamus. Pursuant to the doctrine of constitutional avoidance, the Court declined to opine on the statute's constitutionality. *State v. Parker*, 57 Fla. 170, 49 So. 124 (1909).

Decades later, a case arose as to whether a handgun in an automobile glove-box fit within the statutory language, "on his person or in his manual possession." By 5-2, the Florida Supreme Court held that it did not; no license was necessary to carry a handgun or repeating rifle in an automobile. *Watson v. Stone*, 148 Fla. 516, 4 So. 2d 700 (1941). A four Justice majority granted the defendant's petition for habeas corpus because of the rule of lenity: in case of ambiguity criminal statutes should be construed narrowly.

Justice Rivers H. Buford concurred in with the 4-Justice majority opinion. His opinion went straight to the core problem with the statute.

Born in 1878, Buford had worked from ages 10 to 21 in Florida logging and lumber camps. In 1899, at the suggestion of a federal judge who owned a logging camp, Buford began the study of law. He was admitted to the Florida bar the next year. In 1901, he was elected to the Florida House of Representatives. Later, he was appointed county prosecuting attorney, elected state's attorney for the 9th district, and elected state attorney general. He was appointed to the Florida Supreme Court in 1925. 3 *History of Florida: Past and Present* 156 (1923); Florida Supreme Court, Justice Rivers Henderson Buford. As of 1923, "His principal diversion is hunting." *History of Florida* at 156.

The Florida Constitution of 1885 had provided: "The right of the people to bear arms in defence of themselves and the lawful authority of the State, shall not be infringed, but the Legislature may prescribe the manner in which they may be borne."

Concurring, Justice Buford wrote that the statute should be held to violate the Florida Constitution and the Second Amendment:

000283
ER_1155

I concur in the judgment discharging the relator because I think that Section 5100, R.G.S., § 7202, C.G.L., is unconstitutional because it offends against the Second Amendment to the Constitution of the United States and Section 20 of the Declaration of Rights of the Constitution of Florida.

Proceedings in habeas corpus will lie for the discharge of one who is held in custody under a charge based on an unconstitutional statute. [citations omitted]

The statute, supra, does not attempt to prescribe the manner in which arms may be borne but definitely infringes on the right of the citizen to bear arms as guaranteed to him under Section 20 of the Declaration of Rights of the Florida Constitution.

He explained the history of the exorbitant licensing laws of 1893 and 1901:

I know something of the history of this legislation. The original Act of 1893 was passed when there was a great influx of negro laborers in this State drawn here for the purpose of working in turpentine and lumber camps. The same condition existed when the Act was amended in 1901 and the Act was passed for the purpose of disarming the negro laborers and to thereby reduce the unlawful homicides that were prevalent in turpentine and saw-mill camps and to give the white citizens in sparsely settled areas a better feeling of security. The statute was never intended to be applied to the white population and in practice has never been so applied. We have no statistics available, but it is a safe guess to assume that more than 80% of the white men living in the rural sections of Florida have violated this statute. It is also a safe guess to say that not more than 5% of the men in Florida who own pistols and repeating rifles have ever applied to the Board of County Commissioners for a permit to have the same in their possession and there had never been, within my knowledge, any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested.

*Watson*, 4 So.2d at 703.

Justice Buford had described some of the changed societal conditions underlying the 1893 and 1901 enactments. There may have been additional factors involved. Repeating rifles had been around for decades and had been widely available and affordable for many consumers since the 1860s. By the 1880s, manufacturing improvements had made such rifles affordable to many black people. They were using such rifles to drive off lynch mobs, such as in famous 1892 incidents in Paducah, Kentucky, and Jacksonville Florida. In Jacksonville,

[W]hen a white man, having been killed by a negro, and threats of lynching the prisoner from the Duval County Jail being made, a large concourse, or mob of negroes, assembled around the jail and defied and denied the sheriff of the county ingress to the building. This mob, refusing to disburse upon the reading of the riot act by the sheriff, he called for assistance from the militia to aid him in enforcing the laws.

Report of the Adjutant-General for the Biennial Period Ending December 31, 1892, at 18, in [Florida] *Journal of the Senate* (1893); Nicholas J. Johnson, *Negroes and Gun: The Black Tradition of Arms* 110-12 (2014).

In sum, the 19th century history of firearms bans is not helpful for modern litigants seeking to justify prohibitions on semiautomatic rifles. The only pre-1900 statutory precedent for such a law is Florida in 1893, and it is a dubious precedent. Before that, there were three prior sales prohibitions that covered many or most handguns. One of these was held to violate the Second Amendment, and the other two are plainly unconstitutional under *Heller*.

Accordingly, renewed attention attention is being given to precedents involving Bowie knives, which we will examine next.

### III. Bowie knives and Arkansas toothpicks

#### A. What is a Bowie knife?

Cites for some of the material in Part III.A & B are available in my Michigan *Knives and the Second Amendment* article. This part is supplemented by information from emails with Mark Zalesky, publisher of *Knife Magazine*.

Starting in 1837, several southern states enacted laws about Bowie knives. Some of these statutes also applied to the "Arkansas toothpick." Later, many other states adopted Bowie knife laws.

The term "Bowie knife" originated after frontiersman Col. Jim Bowie used one at a famous "Sandbar Fight" on the lower Mississippi River near Natchez, Mississippi,on September 19, 1827.

The knife had been made by Rezin Bowie, Jim's brother. According to Rezin, the knife was intended for bear hunting. He stated, "The length of the knife was nine and a quarter inches, its width one and a half inches, single-edged, and blade not curved." Nothing about the knife was novel.

The initial and subsequent media coverage of the Sandbar Fight was often highly inaccurate. As "Bowie knife" entered the American vocabulary and then the British, manufacturers began labeling all sorts of large knives as "Bowie knives." Some of these were straight (like Rezin's) and other had curved blades. Rezin's knife was single-edged, but some "Bowie knives" were double-edged. Rezin's knife did not have a clip point, but some so-called "Bowie knives" did. Likewise, some had crossguards (to protect the user's hand), and others did not. "Bowie knife" more a sloppy marketing term than a description of a particular type of knife—just as some people today say "Coke" to mean many kinds of carbonated beverages. (The

000284
ER_1156

difference is that true "Coke" products, manufactured by the Coca-Cola company, do exist; there never was a true Bowie knife.) Manufacturers slapped the "Bowie knife" label on a wide variety of large knives that were highly suitable for hunting and self-defense. In words of knife historian Norm Flayderman, "there is no one specific knife that can be exactingly described as a Bowie knife." Norm Flayderman, *The Bowie Knife: Unsheathing an American Legend* 490 (2004).

The knife photo in this post is a 1850s knife manufactured in England and marketed as a "Bowie knife." It's a good match for what 20th century movies and television called as a "Bowie knife." There are many modern imitations, none of which are like the knife at the Sandbar Fight; nor are they the type that Rezin and Jim Bowie later ordered from custom cutlers. Visit today's websites of knife sellers, search for "Bowie knife," and you will find a quite a disparate variety.

From the beginning, laws about "Bowie knives" have been plagued by vagueness. For example, a Tennessee statute against concealed carry applied to "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick . . . ." 22 Tenn. Gen. Assemb. Acts 200, ch. 137.

When Stephen Hayes was prosecuted for concealed carry, the witnesses disagreed about whether his knife was a Bowie knife. Some said that it was too small and slim to be a Bowie knife, and would properly be called a "Mexican pirate-knife." The jury found Haynes innocent of wearing a Bowie knife but guilty on a second charge "of wearing a knife in shape or size resembling a bowie-knife." Note the disjunctive "form, shape *or* size." On appeal, the Tennessee Supreme Court agreed that the legislature could not declare "war against the name of the knife" alone. A strict application of the letter of the law could result in injustices: "for a small pocket-knife, which is innocuous, may be made to resemble in form and shape a bowie-knife or Arkansas tooth-pick" and would thus be illegal. The Tennessee Supreme Court held that the statute must be construed "within the spirit and meaning of the law" and relied on the judge and jury to make this decision as a matter of fact. *Haynes v. State*, 24 Tenn. (5 Hum.) 120 (1844).

**B. What is an Arkansas toothpick?**

As for "Arkansas Toothpick," Flayderman say that it was mainly another marketing term for "Bowie knife." Flayderman at 265-74. However, he notes that some Mississippi tax receipts, and some other writings, expressly distinguish an "Arkansas Toothpick" from a "Bowie knife."

Mark Zalesky, publisher of *Knife Magazine*, explained in Nov. 10 and 19 emails to me: "The idea of the 'Arkansas toothpick' being a large dagger seems to stem from Raymond Thorp's 1948 book *Bowie Knife* (Thorp actually did some good research, but much of the book is complete nonsense); *The Iron Mistress* novel and movie in 1951/52; and the subsequent interest in Bowie, Crockett, the Alamo etc. during the 1950s and early 1960s. You are dealing with a definition that has changed over the years." But as of 1840, "Most evidence supports the idea that 'Arkansas toothpick' was originally a 'frontier brag' of sorts, a casual nickname for any variety of bowie knife but particularly types that were popular in Arkansas."



Here is a drawing of what late 20th century Americans, based on contemporary movies and television, thought to be an Arkansas toothpick. It is sharpened on both edges (unlike the sandbar fight knife), with a triangular blade up to eighteen inches long.

The late 20th century idea of an Arkansas toothpick. By Rhonda Thorne Cramer. ( Rhonda L. Thorne Cramer)

**C. The crime in the Arkansas legislature**

The sandbar fight had taken place in 1827. Jim Bowie died on March 6, 1836, as one of the defenders of the Alamo. In 1840, he would become the namesake of Bowie County, the northeasternmost county in Texas. According to Zalesky, "we first see the term 'Bowie knife' beginning to come into use in 1835 and by mid-1836 it was everywhere. It is clear that such knives existed before the term for them became popular."

Perhaps the first legislation about Bowie knives, from Mississippi and Alabama in mid-1837, was about a continuing problem of criminal misuse. Legislative attention to the topic was surely intensified by an infamous crime in late 1837, which may have helped lead to the enactment of several laws in succeeding weeks. My frequent coauthor, historian Clayton Cramer, explains:

000285
ER_1157

> Two members of the Arkansas House of Representatives turned from insults to Bowie knives during debate as to which state official should authorize payment of bounties on wolves. Speaker of the House John Wilson was president of the Real Estate Bank. Representative J. J. Anthony sarcastically suggested that instead of having judges sign the wolf bounty warrants, some *really* important official should do so, such as the president of the Real Estate Bank.
>
> Speaker Wilson took offense and immediately confronted Anthony, at which point both men drew concealed Bowie knives. Anthony struck the first blows, and nearly severed Wilson's arm. Anthony then threw down his knife (or threw it at Wilson), then threw a chair at Wilson. In response, Wilson buried his Bowie knife to the hilt in Anthony's chest (or abdomen, depending on the account), killing him. "Anthony fell, exclaiming, 'I'm a dead man,' and immediately expired."Judge William F. Pope, *Early Days in Arkansas* 225 (Dunbar H. Pope ed., 1895); "The Murder in Arkansas," 54 *Niles' National Register* 258 (June 23, 1838). "The Speaker himself fell to the floor, weak from loss of blood. But on hands and knees he crawled to his dead opponent, withdrew his Bowie, wiped it clean on Anthony's coat, replaced it in its sheath, and fainted." Raymond W. Thorp, *Bowie Knife* 4 (1991). While Wilson was expelled from the House, he was acquitted at trial, causing "the most intense indignation through the entire State." Pope, at 225-26; Thorp at 1-5; "General Assembly," *Arkansas State Gazette*, Dec. 12, 1837, at 2 (expulsion two days later); "The trial of John Wilson . . . ," (Milledgeville, Ga.) *Southern Recorder*, March 6, 1838; "The Murder in Arkansas," *Niles' National Register, supra.*.

## IV. Cases on Bowie knives

In the nineteenth century, there were three major state supreme court constitutional cases on Bowie knives. The results of all three are consistent:

- Georgia: Prohibiting the sale of Bowie knives violates the Second Amendment. Prohibiting concealed carry does not.
- Tennessee: Prohibiting concealed carry of Bowie knives does not violate the state constitution.
- Texas: The state constitution and the Second Amendment guarantee the right to own and carry Bowie knives, but extra punishment for a crime committed with a Bowie knife is constitutional.

### A. *Nunn v. State*

Between 1800 and the beginning of the Civil War in 1861, there was one law enacted against particular types of firearms. The Georgia Supreme Court held it unconstitutional as a violation of the Second Amendment. *Nunn v. State*, 1 Ga. 243 (1846). The U.S. Supreme Court's 2008 *Heller* case extols *Nunn* because the "opinion perfectly captured the way in which the operative clause of the Second Amendment furthers the purpose announced in the prefatory clause." *District of Columbia v. Heller*, 554 U.S. 570, 612 (2008).

Shortly after the infamous crime in the Arkansas legislature, an 1837 Georgia statute declared:

> that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere any . . . Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.

*Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837,* pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

*Glossary*:

"Dirk": Originally, a Scottish fighting knife with one cutting edge. Harold L. Peterson, *Daggers & Fighting Knives of the Western World* 60 (1968). According to Zalesky, "Dirks in America were small stabbing weapons, usually small daggers but sometimes single edged." Many 19th century laws forbade concealed carry of "dirks" and/or "daggers."

"Sword-cane": a sword concealed in a walking stick.

"Horse pistols": the only type of handgun not banned in Georgia. These were large handguns, usually sold in a pair, along with a double holster that was meant to be draped over a saddle. They were too large for practical carry by a person who was walking.

Although section 1 of the act was prohibitory, Section 4 contained an exception allowing open carry of some of the aforesaid arms, not including handguns: "*Provided, also,* that no person or persons, shall be found guilty of violating the before recited act, who shall openly wear, externally, Bowie Knives, Dirks, Tooth Picks, Spears, and which shall be exposed plainly to view…" The same section also allowed vendors to sell inventory they already owned, through the next year.

000286
ER_1158

At the time, there was no right to arms in the Georgia Constitution. In 1846, the Georgia Supreme Court held the statute unconstitutional for *all* the enumerated arms, not just for handguns. The Court explained that the Second Amendment protected an inherent right, and nothing in the Georgia Constitution had ever authorized the state government to violate the right. For all the weapons, including handguns, the ban on concealed carry was upheld. The ban on handgun open carry was unconstitutional.

*Nunn* was among the many antebellum state court decisions holding that a right enumerated in the U.S. Bill of Rights was protected against state infringement. *See* Jason Mazzone, *The Bill of Rights in Early State Courts*, 92 Minn. L. Rev. 1 (2007); Akhil Reed Amar, *The Bill of Rights* 145-56 (1998) (discussing "the Barron contrarians").

## B. *Aymette v. State*

In 1837, Tennessee prohibited concealed carry of Bowie knives and Arkansas toothpicks. 22 Tenn. Gen. Assemb. Acts 200, ch. 137 (1838). An 1838 bill to add pistols to the concealed carry ban was rejected. Tennessee Legislature, *Daily Republican Banner* (Nashville), Jan. 13, 1838, at 2. The Tennessee Supreme Court upheld the concealed carry ban in a famous 1840 case. *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840).

The Tennessee Constitution's right to arms at the time was "the free white men of this State have a right to keep and to bear arms for their common defence." The racial exclusion to the original 1796 Constitution had been added in 1834. As noted above, the U.S. Senate had rejected inserting a "common defence" clause into the proposed Second Amendment.

According to the Tennessee Court, the right to *keep* arms was an individual right. But the right to *bear* arms was only for service in a militia. The right to bear arms "does not mean for *private defence*, but being armed, they may as a body, rise up to defend their just rights, and compel their rulers to respect the laws." The legislature could forbid arms that are "not usual in civilized warfare, or would not contribute to the common defence." *Aymette* at 157-59. According to the Court, Bowie knives "are efficient only in the hands of the robber and the assassin. These weapons would be useless in war. They could not be employed advantageously in the common defence of the citizens. The right to keep and bear them is not, therefore, secured by the constitution." *Id.* at 158.

The *Aymette* court was very wrong on the facts. In 1836, the people of Texas had used Bowie knives to "rise up to defend their just rights," in their War of Independence from Mexico. The Texans won the war at the Battle of San Jacinto on April 21, 1836, when they stormed the Mexican breastworks, and used their Bowie knives to rout and put to flight the army of Mexican dictator Santa Ana. Kopel et al., *Knives*, at 189-90.

During the Civil War, Tennessee, Mississippi, and Alabama had to enact legislation to ameliorate the Bowie knife shortage that their laws had caused. The Tennessee legislature suspended the Bowie knife law for the duration. *See* Kopel, *Bowie knife statutes 1837-1899*. The militia of neighboring Mississippi often carried Bowie knives. Benson J. Lossing, 1 *Pictorial History of the Civil War in the United States of America* 479 n.2, 541 n.2 (1866) So did other soldiers, from every part of the nation. Flayderman at 125–68.

According to the U.S. Supreme Court in *Heller*, *Aymette* "erroneously, and contrary to virtually all other authorities," read the right to keep and bear arms as limited to the overthrow of a tyrannical government. *Heller*, 554 U.S. at 613. *Heller* held that the Second Amendment right to arms is not limited to the types of arms used by militia.

## C. *Cockrum v. State*

After winning independence in 1836, the Republic of Texas joined the United States in 1845. A Texas state statute provided that a person convicted of manslaughter with a Bowie knife or dagger would be considered guilty of murder. For murder convictions in general, Texas law gave the jury discretion to impose a sentence of solitary confinement for life. In *Cockrum*, the judge had erroneously taken away the jury's discretion, and instructed them to impose solitary for life. Accordingly, a new trial was necessary. *Cockrum v. State*, 24 Tex. 394 (1859).

The *Cockrum* court rejected the defense attorney's argument that enhanced punishment for a crime with a Bowie knife violated the Texas Constitution right to arms and the Second Amendment. "The right to carry a bowie-knife for lawful defense is secured, and must be admitted," wrote the court. *Id.* at 402. But the right to own and carry a Bowie knife for lawful self-defense did not preclude enhanced punishment for using the weapon in a crime. *Id.* at 403.

The court explained why Bowie knife crime was appropriate for enhanced sentencing:

> It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. The bowie-knife differs from these in its device and design; it is the instrument of almost certain death.

*Id.* at 402–03 (emphasis added).

The Texas legislature had not infringed an iota on the right to possess and carry Bowie knives; but as be described in the companion article, *Bowie knife statutes 1837-1899*, a few other Southern legislatures enacted taxes discouraging Bowie knife possession by the poor.  In the antebellum era, not everyone could afford a firearm, but almost anyone could afford a large knife. As defense counsel in *Cockrum* had pointed out:

> A bowie-knife or dagger, as defined in the code, is an ordinary weapon, one of the cheapest character, accessible even to the poorest citizen. A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.

24 Tex. at 395-96. The Texas Supreme Court did not disagree with defense counsel's argument here. The court simply thought that extra punishment for violent criminals did not infringe the rights of peaceable poor people, or of anyone else.

In sum, two of the three antebellum right to arms cases involving Bowie knives stated that keeping and bearing such arms is a constitutional right. The *Aymette* decision to the contrary, but it was based on the double error that the right to arms is for militia-type arms only, and that a Bowie knife is not such an arm.

As *Cockrum* illustrates, Bowie knife laws were not really about Bowie knives per se. Such laws amounted to generic laws about large knives, including very old-fashioned types such as butcher knives.

The discussion of Bowie knife statutes continues in *Bowie knife statutes 1837-1899*. In short, Bowie knives were quickly assimilated to lawmaking about old-fashioned knives, such as dirks and daggers. Often, these knives were regulated the same as handguns. Sales bans were rare, with Tennessee joined only by Arkansas, in 1881. The norm in other states was limits on concealed carry and sales to minors, and penalties for misuse.

To get the Volokh Conspiracy Daily e-mail, please sign up here.

| Email Address | Subscribe |
|---|---|

---

***NEXT:*** **Bowie knife statutes 1837-1899**

---

**DAVID KOPEL** is research director at the Independence Institute.

SECOND AMENDMENT    GUN CONTROL    CONCEALED CARRY    RIGHT TO CARRY

MEDIA CONTACT & REPRINT REQUESTS

Show Comments (60)

**RECOMMENDED**

**Lame-Duck Congress Should Reject the Extended Child Tax Credit**

**Twitter Quits Crusade Against COVID-19 'Misinformation'**

**Russian Dissenters Fleeing Putin Often Face Abusive Immigration Detention Upon Arrival in the US**

**NYC Mayor Adams' Involuntary Hospitalization Plan For Homeless Faces Legal Pushback**

**Kansas Judge Blocks Law Telemedicine Abortion Prescription Ban**

# EXHIBIT 38

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-7, Page 91 of 273

11/30/22, 8:31 PM    Case 8:17-cv-01017-BEN-JLB    Document 132 Bowie knife statutes 1837-1899    Filed 12/06/22    PageID.17481    Page 93 of
223

Reason's Annual Webathon is underway! Donate today to see your name here.

Reason is supported by:
**Carl and Amy Singmaster**

Donate

# The Volokh Conspiracy

Mostly law professors | Sometimes contrarian | Often libertarian | Always independent

About The Volokh Conspiracy ▾

SECOND AMENDMENT

## Bowie knife statutes 1837-1899

Bowies were regulated like other knives; knives were sometimes regulated like handguns

DAVID KOPEL | 11.20.2022 12:53 PM

This post describes and analyzes nineteenth century state statutes on Bowie knives. It is a companion to my post _The legal history of bans on firearms and Bowie knives before 1900_, which described case law.

As detailed in that article, the term "Bowie knife" because popular for knife marketing in America and Great Britain after Jim Bowie used a traditional knife at a famous "sandbar fight" on the lower Mississippi River in 1827. Statutes specifically regulating the "Bowie knife" began with Mississippi in 1837, and continued for the rest of the century.

Among the 220 state or territorial statutes with the words "Bowie knife" or "Bowie knives" only 5 were just about Bowie knives (along with their close relative, the Arkansas toothpick). Almost always, Bowie knives were regulated the same as other well-known knives that were well-suited for fighting against humans and animals–namely "dirks" or "daggers." That same regulatory category frequently also included "sword-canes." About 98% of statutes on "Bowie knives" treated them the same as other blade arms. Bowie knives did not set any precedent for a uniquely high level of control. They were regulated the same as a butcher's knife.

Bowie knives and many others were often regulated like handguns. Both types of arms are concealable, effective for defense, and easy to misuse for offense.

For Bowie knives, handguns, and other arms, a few states prohibited sales. The very large majority, however, respected the right to keep and bear arms, including Bowie knives. These states allowed open carry while some of them forbade _concealed_ carry. In the 19th century, legislatures tended to prefer that people carry openly; today, legislatures tend to favor concealed carry. Based on history and precedent, legislatures may regulate the mode of carry, as the the U.S. Supreme Court affirmed in _New York State Rifle and Pistol Association v. Bruen_, 142 S. Ct. 2111 (2022).

Besides regulating the mode of carry, many states restricted sales to minors. They also enacted special laws against misuse of arms.

Of the 220 state or territorial statutes cited in this post, 114 come from just 5 states: Mississippi, Alabama, Georgia, Virginia, and North Carolina. This is partly because these were the only states whose personal property tax statutes specifically included "Bowie knife" in their lists of taxable arms, along with other knives, such as "dirks."

**Glossary**

_Bowie knife_. This was marketing and newspaper term for old or new knives suitable for fighting, hunting, and utility. There was no common feature that distinguished a "Bowie knife" from older knives. For example, a "Bowie knife" could have a blade sharpened on only one edge, or on two edges. It could be straight or curved. It might or might not have a handguard. There was no particular length. _The legal history of bans on firearms and Bowie knives before 1900_.

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-7, Page 92 of 273

11/30/22, 2:15 PM    Case 3:17-cv-01017-BEN-JLB    Document 132-6    Filed 11/08/22    PageID.17482    Page 94 of 223
Bowie Knife Statutes, 1837-1899

*Dirk.* Originally, a Scottish fighting knife with one cutting edge. Harold L. Peterson, *Daggers & Fighting Knives of the Western World* 60 (1968). According to a Nov. 19, 2022, email to me from Mark Zalesky, publisher of *Knife Magazine*, "Dirks in America were small stabbing weapons, usually small daggers but sometimes single edged." Many 19th century laws forbade concealed carry of "dirks" and/or "daggers." The statutory formula of "bowie knife + (dirk and/or dagger)" covered fixed-blade knives well-suited for defense or offense. The category does not include pocket knives.

*Sword-cane.* A sword concealed in a walking stick. Necessarily with a slender blade.

*Slungshot.* A slungshot is a rope looped on both ends, with a lead weight or other small, dense item at one end. It helps sailors accurately cast mooring lines and other ropes. A slungshot rope that is shortened to forearm length and spun rapidly is an effective blunt force weapon.

*Colt.* Similar to a slungshot. 1 *Shorter Oxford English Dictionary* 444 ("4. A short piece of weighted rope used as a weapon").

*Knucks, knuckles.* Linked rings or a bar, often made of metal, with finger holes. They make the fist a more potent weapon.

*Revolver.* A handgun in which the ammunition is held in a rotating cylinder.

*Pistol.* Often a generic term for handguns. Sometimes used to indicate non-revolvers, as in a law covering "pistols or revolvers."

**Methodology**

I started with the Appendix to Clayton E. Cramer, <u>*Concealed Weapon Laws of Early Republic: Dueling, Southern Violence, and Moral Reform*</u> (1999), plus the Appendix to Maryland Attorney General Brian Frosh's Fourth Circuit <u>supplemental brief</u> in *Bianchi v. Frosh*. The brief argues that 19th century laws about Bowie knives provide a historical analogy to justify the Maryland legislature's ban on many common modern rifles.

Then I searched the HeinOnline Sessions Law Library for occurrences of "bowie" within 5 words of "knife." After that, the same search, but with "knives." In some state databases, I searched for "bowie." Finally, I read the <u>Declaration of Robert Spitzer</u>, which is Exhibit E of the California Attorney General's <u>Supplemental Brief in Response to the Court's Order of September, 26, 2022</u>, *Duncan v. Bonta*, No. 17-cv-1017-BEN-JLB (S.D. Cal. Nov. 10, 2022). The case involves a challenge to a California statute to confiscate magazines over 10 rounds.

Reviewing the Spitzer Declaration led to finding three laws I had missed: an 1871 D.C. ordinance, an 1893 Rhode Island statute, and another enactment of a Montana anti-dueling statute. Spitzer also lists 16 municipal ordinances about Bowie knives in the 19th century, which are summarized below, after the state-by-state presentation.

*Citations:* Some session laws cites below exceed the information required by the Blue Book. I follow the convention of calling each separate enactment in annual session laws a "chapter." That is, "chap. 68" was the 68th law enacted by the state legislature that year. The official state session laws sometimes use other words, such as "Act 68" or "No. 68." Not all session laws provide a number for the bills enacted in a given session.

This post is part of a law review article I am writing, so it has not been cite-checked by journal editors; citations might have typos or similar errors. *Nemo sine vitiis est* (no one is without faults).

**Mississippi** (1837).

The first "Bowie knife" law was enacted by Mississippi on May 13, 1837. The statute punished three types of misuse of certain arms: "any rifle, shot gun, sword cane, pistol, dirk, dirk knife, bowie knife, or any other deadly weapon."

It was forbidden to use such arms in a fight in a city, town, or other public place. It became illegal to "exhibit the same in a rude, angry, and threatening manner, not in necessary self defence." Finally, if one of the arms were used in a duel and caused a death, the duelist would liable for the debts owed by the deceased. 1837 Miss. L. pp. 291-92. All these provisions were enacted by some other states.

Another Bowie knife law was also signed on May 13 by Governor Charles Lynch. The state legislature's incorporation of the town of Sharon empowered the local government to pass laws "whereby . . . the retailing and vending of ardent spirits, gambling, and every species of vice and immorality may be suppressed, together with the total inhibition of the odious and savage practice of wearing dirks, bowie knives, or pistols." 1837 Miss. L. p. 294. Similar language appeared in the incorporation of towns in 1839 and 1840. 1839 Miss. L. chap. 168, p. 385 (Emery); 1840 Miss. L. chap. 111, p. 181 (Hernando).

Starting in 1841, the state annual property tax included "one dollar on each and every Bowie Knife." 1841 Miss. Chap. 1, p. 52; 1844 Miss. chapter 1, p. 58. The tax was cut to fifty cents in 1850. 1850 Miss. chap. 1, p. 43. But then raised back to a dollar, and extended to each "Arkansas tooth-pick, sword cane, duelling or pocket pistol." 1854 Miss. Chap. 1, p. 50. In the next legislature, pocket pistols were removed from the tax. 1856-57 Miss. L. chap. 1, p. 36 ("each bowie knife, dirk knife, or sword cane").

for before, when tax collectors were allowed to confiscate arms from people who could not pay the property tax.

After the Confederacy surrendered, the legislature was still controlled by Confederates, and an arms licensing law for the former slaves was enacted.

> [N]o freeman, free negro or mulatto, not in the military service of the United States Government, and not licensed so to do by the board of police of his or her county, shall keep or carry fire-arms of any kind, or any ammunition, dirk or bowie knife, and on conviction thereof, in the county court, shall be punished by fine, not exceeding ten dollars, and pay the costs of such proceedings, and all such arms or ammunition shall be forfeited to the informer, and it shall be the duty of every civil and military officer to arrest any freedman, free negro or mulatto found with any such arms or ammunition, and cause him or her to be committed for trial in default of bail.

1865 Miss. L. chap. 23, pp. 165-66. As detailed in Justice Alito's opinion and Justice Thomas's concurrence _McDonald v. Chicago_, laws such as these prompted Congress to pass the Second Freedmen's Bureau Bill, the Civil Rights Act, and the Fourteenth Amendment, all with the express intent of protecting the Second Amendment rights of the freedmen. 561 U.S. 742 (2010).

After the war, handguns and knives were again subject to the state property tax. The Auditor of Public Accounts had to "furnish each clerk of the board of supervisors" with a list of taxable property owned by each person. This included "pistols, dirks, bowie-knives, sword-canes, watches, jewelry, and gold and silver plate."1871 Miss. L. chap. 33; 1871 Miss. L. pp. 819-20; 1876 Miss. L. chap. 104, pp. 131, 134; 1878 Miss. L. chap. 3, pp. 27, 29; 1880 Miss. L. chap. 6, p. 21; 1892 Miss. L. chap. 74, pp. 194, 198; 1894 Miss. L. chap. 32, p. 27; 1897 Miss. L. ch. 10, p. 10.

Concealed carry was outlawed for "any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description." There was an exception for persons "threatened with, or having good and sufficient reason to apprehend an attack." Also excepted were travelers, but not "a tramp." Sales to minors or to intoxicated persons were outlawed. A father who permitted a son under 16 to carry concealed was criminally liable. Students at "any university, college, or school" could not carry concealed. 1878 Miss. L. chap. 46, p. 175-76.

The forbidden items for concealed carry were expanded in 1896: "any bowie knife, dirk knife, butcher knife, pistol, brass or metalic knuckles, sling shot, sword or other deadly weapon of like kind or description." 1896 Miss. L. chap. 104, pp. 109-10. Two years later, the legislature corrected the spelling of "metallic," and provided that the jury "may return a verdict that there shall be no imprisonment," in which case the judge would impose a fine. 1898 Miss. L. chap. 68, p. 86.

**Alabama** (1837).

The legislature imposed a $100 per knife tax on the sale, or transfer, or import of any "Bowie-Knives or Arkansaw Tooth-picks," or "any knife or weapon that shall in form, shape or size, resemble" them. The $100 tax was equivalent to about $2,600 dollars today. (Fed. Reserve Bank of Minneapolis, Consumer Price Index 1800-; 2022 = 884.6. 1837 =  34.)

Additionally, if any person carrying one "shall cut or stab another with such knife, by reason of which he dies, it shall be adjudged murder, and the offender shall suffer the same as if the killing had been by malice aforethought." _Acts Passed at the Called Session of the General Assembly of the State of Alabama_, chap. 11, p. 7 (Tuscaloosa: Ferguson & Eaton, 1837) (June 30, 1837).

Then in 1839 Alabama outlawed concealed carry of "any species of fire arms, or any bowie knife, Arkansaw tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon." _Acts Passed at the Annual Session of the General Assembly of the State of Alabama_, chap. 77, pp. 67-68 (Tuscaloosa: Hale & Eaton, 1838 [1839]) (Feb. 1, 1839).

According to the U.S. Supreme Court's analysis of the historical record, concealed carry bans are constitutionally unproblematic, as long as open carry is allowed. Or vice versa. The American legal tradition of the right to arms allows the legislature to regulate the mode of carry. _New York State Rifle and Pistol Association v. Bruen_, 142 S. Ct. 2111 (2022).

The exorbitant $100 transfer tax was replaced with something less abnormal. The annual state taxes on personal property included $2 on "every bowie knife or revolving pistol." 1851-52 Ala. chap. 1, p. 3. Even that amount was hefty for a poor person. As the defense counsel in a 1859 Texas case had pointed out, a person who could not afford a firearm could buy a common butcher knife (which fell within the expansive definition of "Bowie knife") for 50 cents. _Cockrum v. State_, 24 Tex. 394 (1859). As described next, the cost of manufacturing a high quality Bowie knife was a little less than $3, which approximately implies a retail price around $6. Whether a knife cost 50 cents or 6 dollars, an annual $2 tax likely had an effect in discouraging ownership, as the tax was so high in relation to the knife's value. In just a few years, the cumulative annual taxes on the knife would far exceed the knife's cost.

The legislature having aggressively taxed Bowie knives, there were not enough of them in Alabama when the Civil War began in 1861. The legislature belatedly recognized that the militia was underarmed. In military crisis, the legislature appropriated funds for the state armory at Mobile to manufacture Bowie knives:

> Whereas there is a threatened invasion of our State by those endeavoring to subjugate us; and whereas there is a great scarcity of arms, and the public safety requires weapons to be placed in the hands of our military, therefore
>
> . . . [S]ix thousand dollars . . . is hereby appropriated . . . to purchase one thousand Bowie-knife shaped pikes [similar to a spear], and one thousand Bowie knives for the use of the 48th regiment, Alabama militia.

The Governor was authorized to draw further on the treasury, as he saw appropriate, "to cause arms of a similar, with such improvements as he may direct, to be manufactured for any other regiment or battalion of militia, or other troops." 1861 Ala. L. chap. 22, pp. 214-15 (Nov. 27, 1861).

If the legislatures starting in 1837 had not suppressed the people's acquisition of militia-type knives, then the 1861 wartime legislature might not have been forced to divert scarce funds to manufacture Bowie knives for the militia. The men and youth of Alabama militia could have just armed themselves in the ordinary course of affairs, buying large knives for themselves for all legitimate uses.

The legislature had appropriated $6,000 to buy 2,000 Bowie knives. This works out to $3 manufacturing cost per knife, not counting the cost of the wooden shaft for the pikes, which was perhaps more expensive than the handle of a knife.

A little later, a wartime tax of 5% on net profits was imposed on many businesses, including "establishments for manufacturing or repairing shoes, harness, hats, carrigos [horse-drawn carriages], wagons, guns, pistols, pikes, bowie knives." 1862 Ala. chap. 1, p. 8.

An 1881 concealed carry ban applied to "a bowie knife, or any other knife, or instrument of like kind or description, or a pistol, or fire arms of any other kind or description, or any air gun." "[E]vidence, that the defendant has good reason to apprehend an attack may be admitted in the mitigation of the punishment, or in justification of the offense."

Throughout the 19th century, and all over the United States, grand and petit juries often refused to enforce concealed carry laws against defendants who had been acting peaceably. The statute attempted to address the problem: "grand juries . . . shall have no discretion as to finding indictments for a violation of this, act . . . if the evidence justifies it, it shall be their duty to find and present the indictment." To make the law extra-tough, "the fines under this act shall be collected in money only" (rather than allowing payment by surrender of produce, livestock, personal chattels, etc.). 1880-81 Ala. L. chap. 44, pp. 38-39.

The state property tax continued, with variations on the tax amount and what arms were subject to taxation. Shortly after the end of the Civil War, the unreconstructed white supremacist legislature enacted a harsh tax, designed to disarm poor people of any color. It was $2 on "all pistols or revolvers" possessed by "private persons not regular dealers holding them for sale." For "all bowie-knives, or knives of the like description," the tax was $3. If the tax were not paid, the county assessor could seize the arms. To recover the arms, the owner had to pay the tax plus a 50% penalty. After 10 days, the assessor could sell the arms at auction. 1865-66 Ala. chap. 1, p. 7 (Feb. 22, 1866); 1866-67 Ala. L. chap. 260, p. 263.

Later, the arms seizure provisions were removed, and the tax reduced to levels for other common household goods. "All dirks and bowie knives, sword canes, pistols, on their value, three-fourths of one percent; and fowling pieces and guns, on their value, at the rate of seventy-five cents on the one hundred dollars." 1874-75 Ala. chap. 1, p. 6.

State law provided that county assessors could require a person to disclose under oath the taxable property he owned, by answering questions such as "What is the value of your household and kitchen furniture, taxable library, jewelry, silverware, plate, pianos and other musical instruments, paintings, clocks, watches, gold chains, pistols, guns, dirks and bowie-knives . . ." The tax rate was 3/4 of 1% of the value. 1875-76 Ala. chap. 2, p. 46; 1876-77 Ala. L. chap. 2, p. 4.

The tax was cut in 1882 to 55 cents on the dollar for "silverware, ornaments and articles of taste, pianos and other musical instruments, paintings, clocks, gold Furniture, and silver watches, and gold safety chains; all wagons or other vehicles; all mechanical tools and farming implements; all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and-jennets, and race horses; all hogs, sheep and goats." Ala. chap. 61, p. 71. Then it was raised to 60 cents on each 100 dollars of value, for inter alia, "all dirks and bowie knives, swords, canes, pistols and guns; all cattle, horses, mules, studs, jacks and jennets and race horses; all hogs, sheep and goats." 1884 Ala. L. chap. 1, p. 6.

Separately, the legislature imposed occupational taxes. At the time, state sales taxes were rare, and the occupational tax levels sometimes approximated the amount that a vendor might have collected in sales taxes. "For dealers in pistols, bowie knives and dirk knives, whether the principal stock in trade or not, twenty-five dollars." 1874 Ala. L. ch. 1, p. 41. See also 1875-76 Ala. chap. 1, p. 82 ($50); 1886 Ala. L. chap. 4, p. 36 (adding "pistol cartridges"); 1892 Ala. L. chap.  95, p. 183 ($300, "provided that any cartridges whether called rifle or pistol cartridges or by any other name that can be used in a pistol shall be deemed pistol cartridges within the meaning of this section"). Finally, in 1898, the license for pistol, bowie, and dirk sellers become $100. Separately, there was a $5 tax for wholesale dealers in pistol and rifle cartridges, raised to $10 for dealers in towns of 20,000 or more. The wholesale license also authorized retail sales. 1898 Ala. chap. 9036, p. 190.

regulate pistols or Shooting galleries, the game of quoits, and all kind and description of games of chance played in a public place; . . . and dealers in pistols, bowie-knives and shotguns or fire arms, and knives of like kind or description") (unusually broad, not repeated for other charters); 1888 Ala. L. chap. 550, p. 965 (Faunsdale); 1890 Ala. chap. 357, p. 764 (Uniontown); 1890 Ala. L. chap. 573, p. 1317 (Decatur) (to license dealers in "pistols, or pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $100.00."); 1892 Ala. L. chap. 140, p. 292 (Demopolis) (same as Decatur); 1894 Ala. L. chap. 345, p. 616 (Columbia) (same); 1894-95 Ala. chap. 521, p. 1081 (Tuskaloosa) (to license and collect an annual tax on "gun shops or gun repair shops" and "dealers in pistols or pistol cartridges or bowie knives or dirk knives."); 1896 Ala. chap. 62, p. 71 (Uniontown) ("to license . . . dealers in pistols, bowie knives, dirk knives or brass knuckles"); 1898-99 Ala. chap. 549, p. 1046 (Fayette) (maximum dealer license fee shall not exceed "Pistols, pistol cartridges, bowie knives, dirk knives, whether principal stock in trade or not, $50.00"); 1898 Ala. chap. 566, p. 1102 (Uniontown) (same as previous Uniontown charter); 1898 Ala. 704, p. 1457 (Uniontown) (same).

**Georgia** (1837).

As described in the companion post, *The legal history of bans on firearms and Bowie knives before 1900*, the legislature in 1837 declared:

> that it shall not be lawful for any merchant or vender of wares or merchandize in this State, or any other person or persons whatever, to sell, or to offer to sell, or to keep or to have about their persons, or elsewhere any . . . Bowie or any other kinds of knives, manufactured and sold for the purpose of wearing or carrying the same as arms of offence or defence; pistols, dirks, sword-canes, spears, &c., shall also be contemplated in this act, save such pistols as are known and used as horseman's pistols.

*Acts of the General Assembly of the State of Georgia Passed in Milledgeville at an Annual Session in November and December, 1837*, pp. 90-91 (Milledgeville: P. L. Robinson, 1838) (Dec. 25, 1837).

The Georgia Supreme Court held all of the law to violate the Second Amendment, except a section outlawing concealed carry. *Nunn v. State*, 1 Ga. 243 (1846).

After the November 1860 election of Abraham Lincoln, with a secession crisis in progress, the Georgia legislature forbade "any person other than the owner" to give "any slave or free person of color, any gun, pistol, bowie knife, slung shot, sword cane, or other weapon used for purpose of offence or defence." The act was not be construed to prevent "owners or overseers from furnishing a slave with a gun for the purpose of killing birds, &c., about the plantation of such owner or overseer." 1860 Ga. L. chap. 64, pp. 56-57.

An 1870 statute forbade open or concealed carry of "any dirk, bowie-knife, pistol or revolver, or any kind of deadly weapon" at "any court of justice, or any general election ground or precinct, or any other public gathering," except for militia musters. 1870 Ga. L. chap. 285, p. 421; 1879 Ga. L. chap. 266, p. 64 (creating law enforcement officer exception).

The old 1837 statute against concealed carry was updated in 1882 to eliminate the exception for "horsemen's pistol." Thus, concealed carry remained illegal with "any pistol, dirk, sword in a cane, spear, Bowie-knife, or any other kind of knives manufactured and sold for the purpose of offense and defense." 1882-83 Ga. L. chap. 94, pp. 48-49. Any "kind of metal knucks" was added in 1898. 1898 Ga. L. chap. 103, p. 60.

Furnishing "any minor" with "any pistol, dirk, bowie knife or sword cane" was outlawed in 1876. 1876 Ga. L. chap. 128 (O. no. 63), p. 112.

A $25 occupational tax was enacted in 1882 for "all dealers in pistols, revolvers, dirk or Bowie knives." 1882-833 Ga. L. chap. 18, p. 37. The tax was later raised to $100, adding dealers of "pistol or revolver cartridges." 1884-85 Ga. L. chap. 52, p. 23; 1886 Ga. L. chap. 54, p. 17. Then the tax was reduced to $25. 1888 Ga. L. chap. 123, p. 22. But raised back to $100 in 1890. 1890 Ga. L. chap. 131, p. 38. In 1892, "metal knucks" were added, and the ammunition expanded to "shooting cartridges." 1892 Ga. L. chap. 133. p. 25. The tax was cut to $25 in 1894. 1894 Ga. L. chap. 151, p. 21; 1896 Ga. L. chap. 132, p. 25; 1898 Ga. L. p. 25 (changing ammunition to "shooting cartridges, pistol or rifle cartridges").

The state property tax statute required taxpayers to disclose all sorts of personal and business property, including by answering, "What is the value of your guns, pistols, bowie knives and such articles."1884 Ga. L. chap. 457, p. 30; 1886 Ga. L. chap. 101, pp. 26, 28; 1888 Ga. L. chap. 103, p. 261; 1889 Ga. L. chap. 640, p. 993. The same question was included in the municipal charter for the town of Jessup. 1888 Ga. L. chap. 103, p. 261. And in the new charter for Cedartown. 1889 Ga. L. chap. 640, p. 993.

**South Carolina** (1838).

The legislature received a "petition of sundry citizens of York, praying the passage of a law to prevent the wearing of Bowie Knives, and to exempt managers of elections from militia duty." A member "presented the presentment of the Grand Jury of Union District, in relation to carrying Bowie knives, and retailing spirituous liquors." The knife and liquor issues were referred to the Judiciary Committee. 1838 S.C. L. (Journal to the Proceedings), pp. 29, 31.

The legislature did not act any law with the words "bowie knife" in 1838, or in the 19th century.

Like Georgia, Tennessee enacted Bowie knife legislation just a few weeks after a nationally infamous crime. In December, two members of the Arkansas House of Representatives had fought with Bowie knives on the floor of House, and one had killed the other. *See* *The legal history of bans on firearms and Bowie knives before 1900*.

In January 1838, the Tennessee legislature statute forbade sale or transfer of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape or size resemble a Bowie knife or any Arkansas tooth pick."

Further, if a person "shall maliciously draw or attempt to draw" such a concealed knife "for the purpose of sticking, cutting, awing, or intimidating any other person," the person would be guilty of a felony. Whether the carrying was open or concealed, if a person in "sudden rencounter, shall cut or stab another person with such knife or weapon, whether death ensues or not, such person so stabbing or cutting shall be guilty of a felony." Civil officers who arrested and prosecuted a defendant under the act would receive a $50 per case bonus; the Attorney General would receive $20 for the same, to be paid by the defendant. *Acts Passed at the First Session of the Twenty-Second General Assembly of the State of Tennessee: 1837-8*, chap. 137, pp. 200-201 (Nashville: S. Nye & Co., 1838) (Jan. 21, 1838).

The concealed carry ban was upheld against a state constitution challenge. *Aymette v. State*, 21 Tenn. (2 Hum.) 154 (1840). The court said that the right to arms was an individual right to keep militia-type arms, and a Bowie knife would be of no use to a militia. *The legal history of bans on firearms and Bowie knives before 1900*.

The 1838 law against drawing a Bowie knife applied even against crime victims who had drawn in self-defense, such as when Richard Day drew a knife against a violent home invader. The state supreme court noted that laws against selling and carrying Bowie knives were "generally disregarded in our cities and towns." *Day v. State*, 37 Tenn. (5 Sneed.) 496 (1857). Likewise, a post-Reconstruction statute, described in *The legal history of bans on firearms and Bowie knives before 1900*, allowed carrying only of Army or Navy type pistols. When a person's "life had been threatened within the previous hour by a dangerous and violent man, who was in the wrong," the victim carried a concealed pistol that was not an Army or Navy type. The conviction was upheld, citing *Day v. State. Coffee v. State*, 72 Tenn. (4 Lea.) 245 (1880)

The legislature in 1856 forbade selling, loaning, or giving any minor "a pistol, bowie-knife, dirk, or Arkansas tooth-pick, or hunter's knife." The act "shall not be construed so as to prevent the sale, loan, or gift to any minor of a gun for hunting." 1855-56 Tenn. L. chap. 81, p. 92.

In October 1861, after Tennessee had seceded from the Union, all the laws against importing, selling, or carrying "pistols, Bowie knives, or other weapons" were suspended for the duration of the war. 1861 Tenn. L. chap. 23, pp. 16-17.

In 1869, the legislature forbade carrying any "pistol, dirk, bowie-knife, Arkansas tooth-pick," any weapon resembling a bowie knife or Arkansas toothpick, "or other deadly or dangerous weapon" while "attending any election" or at "any fair, race course, or public assembly of the people." 1869-70 Tenn. L. chap. 22, pp. 23-24.

**Virginia** (1838).

A few weeks after the Arkansas legislative crime, Virginia made it illegal to "habitually or generally" carry concealed "any pistol, dirk, bowie knife, or any other weapon of the like kind." If a habitual concealed carrier was prosecuted for murder or felony, and the weapon had been removed from concealment within a half hour of the infliction of the wound, the court had to formally note the fact. Even if the defendant were acquitted or discharged, he could be prosecuted within a year for the unlawful carry. Or alternatively, in the original prosecution, a jury that acquitted for the alleged violent felony still had to consider whether the defendant was a habitual carrier, drew within the half-hour period, and if so, convict the defendant of the concealed carry misdemeanor. *Acts of the General Assembly of Virginia, Passed at the Session of 1838*, chap. 101, pp. 76-77 (Richmond: Thomas Ritchie, 1838) (Feb. 3, 1838).

The law was simplified in 1847 to simply provide a fine for habitual concealed carry by "[a]ny free person," with "one moiety of the recovery to the person who shall voluntarily cause a prosecution for the same." 1847 Va. L. p. 110; 1870 Va. L. chap. 349, p. 510.

An 1881 statute forbade concealed carry, even if not habitual, of "any pistol, dirk, bowie-knife, razor, slung-shot, or any weapon of the like kind."1881 Va. L. chap. 219, p. 233; 1883-84 Va. L. chap. 144, p. 180 (1884); 1896 Va. L. chap. 745, p. 826 (allowing "the hustings judge of any husting court" to issue one-year concealed carry permits).

Whether or not concealed, carrying "any gun pistol, bowie-knife, dagger, or other dangerous weapon to a place of public worship" during a religious meeting was forbidden in 1869. So was carrying "any weapon on Sunday, at any place other than his own premises, except for good and sufficient cause." 1875 Va. L. chap. 124, p. 102; 1877 Va. L. chap. 7, p. 305.

After the Civil War, the state property tax law included in the list of taxable items of personal property: "The aggregate value of all rifles, muskets, and other fire-arms, bowie-knives, dirks, and all weapons of a similar kind." There was an exception for arms issued by the state "to members of

The legislature in 1890 forbade selling "to minors under sixteen years of age" any "cigarettes or tobacco in any form, or pistols, dirks, or bowie knives." 1889-90 Va. L. chap. 152, p. 118; 1893-94 Va. L. chap. 366, pp. 425-26.

**Florida** (1838).

Two months after the Arkansas homicide, the Florida legislature supplemented an 1835 statute against concealed carry in general. The new statute provided that any person who wants to "vend dirks, pocket pistols, sword canes, or bowie knives" must pay an annual $200 tax. Any individual who wants to carry one openly must pay a $10 tax. The county treasurer must give the individual a receipt showing that the open carry tax has been paid. 1838 Fla. Laws ch. 24, p. 36 (Feb. 10, 1838).

After the Civil War, a new Black Code forbade "any negro, mulatto, or other person of color, to own, use or keep in his possession or under his control, any Bowie-knife, dirk, sword, fire-arms or ammunition of any kind, unless he first obtain a license to do so from the Judge of Probate of the county." The applicant needed  "the recommendation of two respectable citizens of the county, certifying to the peaceful and orderly character of the applicant." A person who informed about a violation could keep the arms. Violators of the statute "shall be sentenced to stand in the pillory for one hour, or be whipped, not exceeding thirty-nine stripes, or both, at the discretion of the jury." 1865 Fla. L. chap 1466, p. 25.

There were no published Florida statutory compilations from 1840 until 1881. By then, the 1838 tax law ($200 annually for vendors; $10 for open carry), had been replaced with a $50 occupational license tax for vendors. 1 *Digest of the Laws of the State of Florida, from the Year One Thousand Eight Hundred and Twenty-Two, to the Eleventh Day of March, One Thousand Eight Hundred and Eighty-One Inclusive* 873 (James F. McClellan, comp.) (1881) (Fla. chap. 174, § 24, item 14). The merchant license tax was raised to $100 in 1889 for vendors of "pistols, bowie knives, or dirk knives." Additionally, The "merchant, store-keeper, or dealer" could not sell the items "to minors."1889 Fla. chap. 3847, p. 6 (2d reg. sess.); 1891 Fla. L. chap. 4010, p. 9 (3d regular sess.). The tax was cut to $10 in 1893, but extended to cover sellers of "pistols, Springfield rifles [the standard U.S. Army rifle], repeating rifles, bowie knives or dirk knives." 1893 Fla. L. chap. 4115, p. 18 (4th regular sess.); 1895 Fla. L. chap 4322, p. 13 (5th regular sess.).

**North Carolina** (1846).

An 1846 statute forbade "any slave" to receive "any sword, dirk, bowie-knife, gun, musket, or fire-arms of any description whatsoever, or any other deadly weapons of offence, or any lead, leaden balls, shot, powder, gun cotton, gun flints, gun caps, or other material used for shooting." There were exceptions if "a slave" with "written permission" from a "manager" were picking up items for the manager, or if the items were "to be carried in the presence of such manager." 1846 N.C. L. chap. 42.

The state property tax laws covered Bowie knives and other arms. The arms were tax-exempt if the owner did not use or carry them:

> on all pistols (except such as shall be used exclusively for mustering, and also those kept in shops and stores for sale) one dollar each; on all bowie knives, one dollar each; and dirks and sword canes, fifty cents each; (except such as shall be kept in shops and stores for Sale) Provided, however, that only such pistols, bowie knives, dirks, and sword canes, as are used, worn or carried about the person of the owner . .

1850 N.C. L. chap. 121, p. 243. *See also* 1856-57 N.C. L. chap. 34, p. 34 (raising the tax on dirks and sword canes to 65 cents); 1866 N.C. L. chap. 21, § 11, pp. 33-34 (one dollar on "every dirk bowie-knife, pistol, sword-cane, dirk-cane and rifle cane (except for arms used for mustering and police duty) used or worn about the person of any one during the year"; tax did not "apply to arms used or worn previous to the ratification of this act").

The Black Code continued to treat Bowie knives like firearms, in the arms licensing law for free people of color. "If any free negro shall wear or carry about his person, or keep in his house, any shot-gun, musket, rifle, pistol, sword, dagger, or bowie-knife," he shall be guilty of a misdemeanor, unless he had been issued a one-year license from the court of pleas and quarter-sessions. 1856 N.C. L. chap. 107, § 66, p. 577. When the Civil War drew near, the legislature repealed the licensing law, and forbade "any free negro" to "wear or carry about his person or keep in his house any shot gun, musket, rifle, pistol, sword, sword cane, dagger, bowie knife, powder or shot." 1860-61 N.C. L. chap. 34. p. 68 (Feb. 23, 1861).

An 1877 private act banned concealed carry in Alleghany County, under terms similar to what would be enacted statewide in 1879. 1877 N.C. L. ch. 54, pp. 162-63. The statewide statute outlawed concealed carry of "any pistol, bowie knife, dirk, dagger, slingshot, loaded cane, brass, iron or metallic knuckles or other deadly weapon of like like kind," "except when upon his own premises." 1879 N.C. L. chap. 127, p. 231.

An 1893 statute made it illegal to "in any way dispose of to a minor any pistol or pistol cartridge, brass knucks, bowie-knife, dirk, loaded cane, or sling-shot." 1893 N.C. L. chap. 514, pp. 468-69. A loaded cane had a hollowed section filled with lead. It was a powerful impact weapon.

As the legislature revised municipal charters, it specified what sorts of arms-related taxes the municipality could impose. There was much variation, and sometimes the legislature set maximums. In chronological order: Wilmington: to tax "every pistol gallery . . . on all pistols, dirks, bowie-knives or sword-canes, if worn about the person at any time during the year." 1860 N.C. L. chap. 180, pp. 219-20. Charlotte: $50 on "every pistol, bowie-

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-7, Page 98 of 273

11/30/2... Case 3:17-cv-01017-BEN-JLB   Document 132-6   Filed 12/05/22   PageID.17488   Page 100 of 223
Bowie Knife Statutes 1837-1899

Lincolnton: $5 for worn weapons. 1870 N.C. L. chap. 32, p. 73. Lumberton: can tax "pistols, dirks, bowie knives or sword canes" as seen fit. 1873 N.C. L. chap. 7, p. 279; 1883 chap. 89, p. 791 (Lumberton recharter); Asheville: anyone "selling pistols, bowie knives, dirks, slung shot, brass knuckles or other like deadly weapons, in addition to all other taxes, a license tax not exceeding fifty dollars." 1883 N.C. L. chap. 111, p. 872. Waynesville: like Asheville, but $40. 1885 N.C. L. chap. 127, p. 1097. Reidsville: $25 "On every pistol, bowie-knife, dirk, sword-cane, or other deadly weapon, except carried by officers in the discharge of their duties." 1887 N.C. L. chap. 58, § 50, p. 885. Rockingham: to tax pistols, dirks, bowie knives, or sword canes. 1887 N.C. L. chap. 101, p. 988. Hickory: $50 on sellers; "sling-shots" replaces "slung shot." 1889 N.C. L. chap. 238, p. 956. Marion: $25 on every "pistol, bowie-knife, dirk, sword-cane or other deadly weapon, except carried by officers in discharge of their duties." 1889 N.C. L. chap. 183, § 27, p. 836. Mount Airy: $10 on open carry of "a pistol, bowie-knife, dirk, sword-cane or other deadly weapon, except guns, shot-guns, and rifles for shooting game." Wadesborough: "on all pistols, dirks, bowie-knives, or sword-canes." 1891 N.C. L. chap. 26, p. 705. Columbus: same. 1891 N.C. L. chap. 101, p. 902. Buncombe: same. 1891 N.C. L. chap. 327, p. 1423. Asheville: $500 on vendors selling "pistols, bowie-knives, dirks, slung-shots, brass or metallic knuckles, or other deadly weapons of like character." 1895 N.C. L. chap. 352, p. 611. Morven: "on all pistols, dirks, bowie knives, or sword canes." 1897 N.C. L. chap. 71, pp. 115-16. Lilesville: same. 1897 N.C. L. chap. 130, p. 237. Mount Airy: $75 on "every vendor or dealer in pistols and other deadly weapons." 1897 N.C. L. ch. 90, p. 154. Salisbury: same $500 as Asheville. 1899 N.C. L. chap. 186, p. 503. Monroe: Same, but $100. 1899 N.C. L. chap. 352, p. 968. Manly: tax "on all pistols, dirks, bowie knives or sword canes." 1899 N.C. L. chap. 260, p. 766.

**Washington territory** (1854).

Similar to 1837 Mississippi, the Washington Territory provided a criminal penalty for, "Every person who shall, in a rude, angry, or threatening manner, in a crowd of two or more persons, exhibit any pistol, bowie knife, or other dangerous weapon . . ." 1854 Wash. L. chap. 2, p. 80; 1859 Wash. L. chap. 2, p. 109; 1862 Wash. L. chap. 2, p. 284; 1869 Wash. L. chap. 2, pp. 203-04; 1873 Wash. L. chap. 2, p. 168.

**California** (1855).

California adopted a more elaborate version of the 1837 Mississippi law that if a person killed another in a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword or other dangerous weapon," the duelist would have to pay the decedent's debts. The duelist would also be liable to the decedent's family for liquidated damages. 1855 Cal. L. chap. 127, pp. 152-53.

**Louisiana** (1855).

The legislature banned concealed carry of "pistols, bowie knife, dirk, or any other dangerous weapon." 1855 La. L. chap. 120, p. 148; 1898 La. L. ch. 112, p. 159 (same).

During Reconstruction, when election violence was a major problem, the legislature forbade carry of "any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed weapon" within a half-mile of a polling place when the polls were open, or within a half-mile of a voter registration site on registration days. 1870 La. L. chap. 100, p. 159; 1873 La. L. chap. 98, p. 27.

Giving a person "under age of twenty-one years" any "any pistol, dirk, bowie-knife or any other dangerous weapon, which may be carried concealed to any person" was forbidden. 1890 La. L. chap. 46, p. 39.

**New Hampshire** (1856).

Like all of the Northeast, New Hampshire in mid-century had no interest in Bowie knife laws. But Bowie knives did appear in a legislative resolution that considered Bowie knives and revolvers to be effective for legitimate defense.

On May 19, 1856, U.S. Sen. Charles Sumner (R-Mass.) delivered one of the most famous speeches in the history of the Senate, "The Crime Against Kansas." Among the crimes he described, pro-slavery settlers in the Kansas Territory were trying to make Kansas a slave territory, by attacking and disarming anti-slavery settlers, in violation of the Second Amendment. Sumner turned his fire on South Carolina Democrat Andrew Butler:

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-7, Page 99 of 273

11/30/2022 Case 3:17-cv-01017-BEN-JLB    Document 132-6 Bowie knife statutes, 1837-1899 Filed 12/05/22 PageID.17489    Page 101 of 223

> Next comes the Remedy of Folly . . . from the senator from South Carolina, who . . . thus far stands alone in its support. . . . This proposition, nakedly expressed, is that the people of Kansas should be deprived of their arms.
>
> . . .
>
> Really, sir, has it come to this ? The rifle has ever been the companion of the pioneer, and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence than now in Kansas, and at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached. And yet, such is the madness of the hour, that, in defiance of the solemn guaranty, embodied in the Amendments of the Constitution, that "the right of the people to keep and bear arms shall not be infringed," the people of Kansas have been arraigned for keeping and bearing them, and the senator from South Carolina has had the face to say openly, on this floor, that they should be disarmed — of course, that the fanatics of Slavery, his allies and constituents, may meet no impediment. Sir, the senator is venerable . . . but neither his years, nor his position, past or present, can give respectability to the demand he has made, or save him from indignant condemnation, when, to compass the wretched purposes of a wretched cause, he thus proposes to trample on one of the plainest provisions of constitutional liberty.

That wasn't even close to the worst that Sumner said about Brooks in "The Crime Against Kansas." Most notably, he compared Butler to Don Quixote:

> The senator from South Carolina has read many books of chivalry, and believes himself a chivalrous knight, with sentiments of honor and courage. Of course he has chosen a mistress to whom he has made his vows, and who, though ugly to others, is always lovely to him ; though polluted in the sight of the world, is chaste in his sight; — I mean the harlot Slavery.

Three days later, Butler's nephew, U.S. Rep. Preston Brooks (D-S.C.) snuck up behind Sumner while he working at his desk on the Senate floor and assaulted him with a cane. He nearly killed Sumner, who never fully recovered. The assault was widely applauded in the South. The attack symbolized a broader problem: In the slave states, the law and the mobs suppressed any criticism of slavery, lest it inspire slave revolt. Even in free states, even in free-thinking Boston, abolitionist speakers were attacked by mobs.

In response, the New Hampshire legislature on July 12 passed a resolution "in relation to the late acts of violence and bloodshed by the Slave Power in the Territory of Kansas, and at the National Capital." As one section of the resolution observed, it was becoming difficult for people to speak out against slavery unless they were armed for self-defense.

> Resolved, That the recent unmanly and murderous assaults which have disgraced the national capital, are but the single outbursts of that fierce spirit of determined domination which has revealed itself so fully on a larger field, and which manifests itself at every point of contact between freedom and slavery, and which, if it shall be promptly met and subdued, will render any free expression of opinion, any independence of personal action by prominent men of the free States in relation to the great national issue now pending, imprudent and perilous, unless it shall be understood that it is to be backed up by the bowie-knife and the revolver.

1856 N.H. chap. 1870, pp. 1781-82.

Despised as Bowie knives and revolvers were by some slave state legislatures, New Hampshire recognized that the First Amendment is backed up by the Second Amendment, as a last resort.

**Texas** (1856).

If a person used a "bowie knife" or "dagger" in manslaughter, the offense "shall nevertheless be deemed murder, and punished accordingly." A "bowie knife" or "dagger" were defined as "any knife intended to be worn upon the person, which is capable of inflicting death, and not commonly known as a pocket knife." Tex. Penal Code arts. 611-12 (enacted Aug. 28, 1856) in 1 *A Digest of the General Statute Laws of the State of Texas: to Which Are Subjoined the Repealed Laws of the Republic and State of Texas* (Williamson S. Oldham & George W. White, comp.) 458 (1859). *See also* art. 493 (doubling penalty for assault with intent to murder, if perpetrated with "a bowie knife, or dagger"); 1871 Tex. L. chap. 26, p. 20 (adding doubling if perpetrator "in disguise").

The Texas Supreme Court upheld the law in *Cockrum v. State*, 24 Tex. 394 (1859). Under the Second Amendment and the Texas Constitution right to arms and the Second Amendment. "The right to carry a bowie-knife for lawful defense is secured, and must be admitted." *Id.* at 402. However, extra punishment for a crime with a Bowie knife did not violate the right to arms. Discussed further in *The legal history of bans on firearms and Bowie knives before 1900*.

In the chaotic years after the Civil War, the legislature prohibited carrying "any gun, pistol, bowie-knife or other dangerous weapon, concealed or unconcealed," within a half mile of a polling place while the polls are open. 1870 Tex. L. chap. 73, p. 139; 1873 Tex. L. chap. 19, pp. 29-30; 1876 Tex.

Then came the most repressive anti-carry law enacted by an American state until then. It did not apply to long guns. It did apply to "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." Both open and concealed carry were forbidden. The exceptions were "immediate and pressing" self-defense, or in a person's home or business, or travelers with arms in their baggage. Another section of the bill banned all firearms, plus the arms previously listed, from many places, including churches, all public assemblies, and even "a ball room, social party, or social gathering." The Act did not apply in any county proclaimed by the Governor "as a frontier county, and liable to incursions of hostile Indians." 1871 Tex. L. chap. 34, pp. 25-26; 1887 Tex. L chap. 9, p. 7 (amending); 1889 Tex. L. chap. 37, p. 33; 1897 Tex. L. chap. 25, p. 24.

In 1889, written consent of a parent, guardian, "or someone standing in lieu thereof" was required to give or sell to a minor a pistol, "bowie knife or any other knife manufactured or sold for the purpose of offense of defense," and various other weapons. The statute did not apply to long guns. 1887 Tex. L. chap. 155, pp. 221-22.

**New Mexico** (1858).

The territory's first Bowie knife law outlawed giving "to any slave any sword, dirk, bowie-knife, gun, pistol or other fire arms, or any other kind of deadly weapon of offence, or any ammunition of any kind suitable for fire arms." 1856 N.M. L. chap. 26, p. 68. Slavery in New Mexico was usually in the form of peonage. The Comanche and Ute Indians, among others, brought captives from other tribes to the territory and sold them to buyers of all races. *See* Andrés Reséndez, *The Other Slavery: The Uncovered Story of Indian Enslavement in America* (2016).

Concealed and open carry were prohibited in 1859. The scope was expansive:

> any class of pistols whatever, bowie knife (cuchillo de cinto), Arkansas toothpick, Spanish dagger, slung-shot, or any other deadly weapon, of whatever class or description they may be, no matter by what name they may be known or called,

1859 N.M. L. pp. 94-96; 1864-65 N.M. L. chap. 61, pp. 407-08 (miscited in the Spitzer declaration as 1853). Territorial statues were published bilingually. The arms list in Spanish: "ninguna pistola de cualesquiera clase que sea, ni bowie knife (cachillo de cinto) Arkansas toothpick, daga española, huracana, ó cualesquiera otra arma mortífera de cualesquiera clase ó descripcion."

New Mexico was part of a pattern: legislative enthusiasm for Bowie knife laws was greatest in slave states. After slavery was abolished by the 13th Amendment in December 1865, the most oppressive Bowie knife controls and gun controls were enacted in areas where slavery had been abolished by federal action, rather than by choice of the legislature before the Civil War.

An 1887 statute forbade almost all carry of Bowie knives and other arms. It applied to defined "deadly weapons":

> all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards [small, thin daggers], butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes: as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted . . .

A person carrying a deadly weapon was not allowed to "insult or assault another." Nor to unlawfully "draw, flourish, or discharge" a firearm, "except in the lawful defense of himself, his family or his property."

The law forbade carrying "either concealed or otherwise, on or about the settlements of this territory." The statute defined a "settlement" as anyplace within 300 yards of any inhabited house. The exceptions to the the carry ban were:

> except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family, or property, the same being then and there threatened with danger

Travelers could ride armed through a settlement. If they stopped, they had to disarm within 15 minutes, and not resume until eve of departure. Hotels, boarding houses, saloons, and similar establishments had to post bilingual copies of the Act.

Law enforcement officers "may carry weapons . . . when the same may be necessary, but it shall be for the court or the jury to decide whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished. . ." 1886-87 N.M. L. chap. 30, pp. 55-58.

**Ohio** (1859).

Without limiting open carry, the legislature prohibited concealed carry of "a pistol, bowie knife, dirk, or any other dangerous weapon." The jury must acquit if it is proven that the defendant was "engaged in pursuit of any lawful business, calling, or employment, and the circumstances in which he

"If any person, other than the parent or guardian, shall sell, give, or loan any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt [similar to a slungshot], cane-gun, or other deadly weapon which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars." 1859 Ky. L. chap. 33, p. 245.

In 1891, an occupational license tax was enacted: "To sell pistols," $25. "To sell bowie-knives, dirks, brass-knucks or slung-shots," $50. 1885  Ky. L. chap. 1233, p. 154; 1891 Ky. L. chap. 103, p. 346 (Nov. 11, 1892); 1891-92 Ky. L. chap. 217, p. 1001 (June 9, 1893).

**Indiana** (1859).

Except for travelers, no concealed carry of "any dirk, pistol, bowie-knife, dagger, sword in cane, or any other dangerous or deadly weapon." Open carry of such weapons was unlawful, if "with the intent or avowed purpose of injuring his fellow man." 1859 Ind. L. chap. 78, p. 129; 1881 Ind. L. chap. 37, p. 191.

It was forbidden in 1875 to give any person "under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person." Or to give such person pistol ammunition. 1875 Ind. L. chap. 40, p. 59.

**Nevada** (1861).

If a person fought a duel with "a rifle, shot-gun, pistol, bowie-knife, dirk, small-sword, back-sword, or other dangerous weapon," and killed his opponent or anyone else, the killing was murder in the first degree. 1861 Nev. L. p. 61.

**Idaho territory** (1863).

Like Nevada. 1863 Ida. L. chap. 3, p. 441; 1864 Ida. L. chap. 3, pp. 303-04.

**Montana territory** (1864).

No concealed carry "within any city, town, or village" of "any pistol, bowie-knife, dagger, or other deadly weapon." 1864-65 Mont. L. p. 335. Duelists who kill using "a rifle, shot-gun, pistol, bowie-knife, dirk, small sword, back-sword, or other dangerous weapon" are guilty of murder. 1879 Mont. Laws p. 359; 1887 Mont. L. p. 505.

**Colorado territory** (1867).

No concealed carry "within any city, town or village" of "any pistol, bowie-knife, dagger or other deadly weapon." 1867 Colo. L. chap. 22, p. 229; 1876 Colo. L. chap. 24, p. 304; 1881 Colo. L. p. 74 (post-statehood); 1885 Colo. L. p. 170; 1891 Colo. L. p. 129 ("any pistol, revolver, derringer, bowie-knife, razor, dagger, sling-shot or other deadly weapon").

**Arizona territory** (1867).

Split from the New Mexico Territory in 1863, the new Arizona Territory did not copy New Mexico's 1859 comprehensive carry ban. Instead, the laws targeted misuse. Anyone "who shall in the presence of two or more persons, draw or exhibit" any "dirk, dirk knife, bowie knife, pistol, gun, or other deadly weapon," "in a rude, angry or threatening manner, not in necessary self defence" was guilty of a crime. So was anyone "who shall in any manner unlawfully use the same in any fight or quarrel." 1867 Ariz. L. p. 21; 1875 Ariz L. p. 101.

Carrying "maliciously or with design therewith, to intimidate or injure his fellow-man," was specifically forbidden for everyone "in the Counties of Apache and Graham, over the age of ten years." The arms were "any dirk, dirk-knife, bowie-knife, pistol, rifle, shot-gun, or fire-arms of any kind." 1883 Ariz. L. chap. 19, pp. 21-22.

Reenacting the statute against drawing a gun in a threatening manner, the 1883 legislature added a proviso against persons "over the age of ten and under the age of seventeen years" carrying concealed or unconcealed "any dirk, dirk-knife, bowie-knife, slung-shot, brass-knuckles, or pistol" in any city, village, or town. 1883 Ariz. L. chap. 36, pp. 65-66. Concealed carry of those same arms in a city, village, or town was forbidden for everyone in 1887. 1887 Ariz. L. chap. 11, p. 726. And then everywhere in 1893, for "any pistol or other firearm, dirk, dagger, slung-shot, sword cane, spear, brass knuckles, or other knuckles of metal, bowie knife or any kind of knife or weapon except a pocket-knife not manufactured and used for the purpose of offense and defense." 1893 Ariz. chap. 2, p. 3.

In 1889 Arizona enacted an open carry ban in "any settlement town village or city," for any "firearm, dirk, dagger, slung shot, sword-cane, spear, brass knuckles, bowie knife, or any other kind of a knife manufactured and sold for the purposes of offense or defense." Arriving travelers could carry for the first half hour, or on the way out of town. Hotels had to post notices about the no carry rule. Carry was also forbidden at public events, and even at some private social gatherings. 1889 Ariz. chap. 13, pp. 30-31.

The legislature's revision of the municipal charter of Bloomington allowed the town "To regulate or prohibit" concealed carry of "any pistol, or colt, or slung-shot, or cross knuckles, or knuckles of brass, lead or other metal, or bowie-knife, dirk-knife, dirk or dagger or any other dangerous or deadly weapon." 1867 Ill. L. p. 650.

Only a "father, guardian or employer" or their agent could give a minor "any pistol, revolver, derringer, bowie knife, dirk or other deadly weapon of like character." 1881 Ill. L. p. 73.

**Kansas** (1868).

No carrying of "a pistol, bowie-knife, dirk or other deadly weapon" by any "person who is not engaged in any legitimate business, any person under the influence of intoxicating drink, and any person who has ever borne arms against the government of the United States." 1868 Kan. L. p. 378.

No furnishing of "any pistol, revolver or toy pistol, by which cartridges or caps may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or other dangerous weapons to any minor, or to any person of notoriously unsound mind" "Any minor who shall have in his possession any pistol, revolver or toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a misdemeanor." 1883 Kan. L. chap. 55, p. 159.

**West Virginia** (1868).

An 1868 statute copied Virginia's law against "habitually" carrying a concealed "pistol, dirk, bowie knife, or weapon of the like kind." *Code of West Virginia Comprising Legislation to the Year 1870*, chap. 148, p. 692. Justices of the Peace had a duty to enforce the statute W.V. Acts of 1872-73, chap. 226, p. 709, in *Constitution and Schedule Adopted in Convention at Charleston, April 9th, 1872* (Charleston, W.V.: John W. Gentry, 1874).

Then in 1882, West Virginia adopted a law similar to the Texas carry ban of 1871. Without restricting carry of long guns, it broadly outlawed carrying pistols, Bowie knives, and numerous other arms. Among the exceptions were that the person had "good cause to believe he was in danger of death or great bodily harm." Additionally, there was a prohibition on selling or furnishing such arms to a person under 21. 1882 W.V. L. chap. 135, pp. 421-22.

**Maryland** (1870).

Any person who was arrested in Baltimore, brought to the station house, and found to be carrying "any pistol, dirk, bowie knife," various other weapons, "or any other deadly weapon whatsoever" would be fined 3 to 10 dollars. 1870 Md. L. chap. 473, p. 892. Reenactments, changes in the fine amount: 1874 Md. L. chap. 178; 1884 Md. L. chap. 187; 1890 Md. L. chap. 534; 1898 Md. L. p. 533.

It became illegal in 1872 in Annapolis to carry concealed "any pistol, dirk-knife, bowie-knife, sling-shot, billy, razor, brass, iron, or other metal knuckles, or any other deadly weapon." 1872 Md. L. chap. 42, pp. 56-57.

A ban on carrying "with the intent of injuring any person," was enacted in 1886 for "any pistol, dirk-knife, bowie-knife, slung-shot, billy, sand-club, metal knuckles, razor or any other dangerous of deadly weapon of any kind whatsoever, (penknives excepted)." 1886 Md. L. chap. 375, p. 602.

**District of Columbia** (1871).

The Legislative Assembly of the District of Columbia prohibited concealed carry of "any deadly or dangerous weapons, such as daggers, air-guns, pistols, bowie-knives, dirk-knives, or dirks, razors, razor-blades, sword-canes, slung-shots, or brass or other metal knuckles." 1 *The Compiled Statutes in Force in the District of Columbia, including the Acts of the Second Session of the Fiftieth Congress, 1887-89* (William Stone Albert & Benjamin G. Lovejoy, comps.) 178, § 119 (1894) (citing Leg. Assem., July 20, 1871). Hat tip to Prof. Spitzer for this.

In 1892, Congress enacted a similar statute for D.C., with additional provisions. It prohibited concealed carry of the same weapons as 1871, plus "blackjacks." A concealed carry permit valid up to one month could be issued by any Judge of Police Court, with "proof of the necessity," and a bond.

Open carry was lawful, except "with intent to unlawfully use." The statute was not to be construed to prevent anyone "from keeping or carrying about his place of business, dwelling house, or premises" the listed arms, or from taking them to and from a repair place.

Giving a deadly weapon to a minor was forbidden. Vendors had to be licensed by Commissioners of the District of Columbia. The license itself was "without fee," but the licensee could be required to post a bond. Sellers had to keep a written list of purchasers, which was subject to police inspection. Weekly sales reports to the police were required. 27 Stat. chap. 159, pp. 116-17 (July 13, 1892).

**Nebraska** (1873).

No concealed carry of weapons "such as a pistol, bowie-knife, dirk, or any other dangerous weapon." As in Ohio, there was a "prudent man"

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-7, Page 103 of 273

11/30/2022, 8:53 PM Case 3:17-cv-01017-BEN-JLB   Document 132-6   Bowie Knife Statutes 1837-1899   PageID.17493   Page 105 of 223

A revised municipal charter for Lincoln made it unlawful in the city to carry "any concealed pistol, revolver, dirk, bowie knife, billy, sling-shot, metal knuckles, or other dangerous or deadly weapons of any kind." The city's police were authorized to arrest without a warrant a person found "in the act of carrying" concealed "and detain him." 1895 Neb. L. pp. 209-10.

**Missouri** (1874).

Concealed carry was forbidden in many locations:

> [A]ny church or place where people have assembled for religious worship, or into any school-room, or into any place where people may be assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court-room during the sitting of court, or into any other public assemblage of persons met for other than militia drill or meetings, called under the militia law of this state, having concealed about his person any kind of fire-arms, bowie-knife, dirk, dagger, slung-shot, or other deadly weapon…

1874 Mo. L. p. 43; 1875 Mo. L. pp. 50-51. This was similar to the 1873 Texas statute, but unlike Texas, it applied only to concealed carry.

Like states from 1837 Mississippi onward, Missouri forbade the exhibit of "any kind of firearms, bowie knife, dirk, dagger, slung shot or other deadly weapon, in a rude, angry or threatening manner, not in the necessary defence of his person, family or property." 1877 Mo. L. p. 240.

The exhibiting statute and the concealed carry statute were combined in 1885. The new law also forbade carrying the listed weapons when intoxicated or under the influence. Providing one of the arms to a minor "without the consent of the parent or guardian" was outlawed. 1885 Mo. L. p. 140.

**Arkansas** (1874).

Antebellum Arkansas had legislation against concealed carry, but not specifically about Bowie knives.

The 1874 election was the first in which former Arkansas Confederates were allowed to vote. They elected huge Democratic majorities and ended Reconstruction. In 1875, the new state legislature banned the open or concealed carry of "any pistol of any kind whatever, or any dirk, butcher or Bowie knife, or sword or spear in a cane, brass or metal knucks, or razor, as a weapon." 1874-75 Ark. L. pp. 156-57 (Feb. 16, 1875).

The next year, the state supreme court heard a case of a man who had been convicted of carrying a concealed pocket pistol. In *Fife v. State*, the Arkansas court quoted with approval a recent Tennessee case stating that the state constitution right to arms covered

> Such, then, as are found to make up the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties, as well as of the State. Under this head, with a knowledge of the habits of our people, and of the arms in the use of which a soldier should be trained, we hold that the rifle, of all descriptions, the shot gun, the musket and repeater, are such arms, and that, under the Constitution, the right to keep such arms cannot be infringed or forbidden by the Legislature.

The Arkansas court continued: "The learned judge might well have added to his list of war arms, the sword, though not such as are concealed in a cane." The pocket pistol not being a war arm, the defendant's conviction was upheld. *Fife v. State*, 31 Ark. 455 (1876). Needless to say, *Fife's* protection of "the rifle of all descriptions" makes *Fife* and the 1875 statute poor precedents for today's efforts to outlaw common rifles.

Two years later, a conviction for concealed carry of "a large army size pistol" was reversed. "[T]o prohibit the citizen from wearing or carrying a war arm . . . [was] an unwarranted restriction upon [the defendant's] constitutional right to keep and bear arms. . . . If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Wilson v. State*, 33 Ark. 557 (1878).

The legislature responded in 1881 with a new statute against the sale or carry of "any dirk or bowie knife, or a sword, or a spear in a cane, brass or metal knucks, razor, or any pistol of any kind whatever, except such pistols as are used in the army or navy." 1881 Ark. Acts chap. 96, pp. 191-92.

As discussed in my companion post, *The legal history of bans on firearms and Bowie knives before 1900*, the 1881 Arkansas statute might arguably have been consistent with the state constitution, but it is contrary to modern Second Amendment doctrine.

**Wisconsin** (1874).

Some municipal charters enacted or amended by the Wisconsin legislature included provisions authorizing localities to regulate or prohibit concealed carry "of any pistol or colt, or slung shot, or cross knuckles, or knuckles of lead, brass or other metal, or bowie knife, dirk knife, or dirk or dagger, or any other dangerous or deadly weapon." 1874 Wisc. L. chap. 4, p. 184 (Milwaukee); 1875 Wisc. L. chap. 262, p. 471 (Green Bay); 1876 Wisc. L. chap. 4, p. 218 (Platteville); 1876 Wisc. L. Chap. 313, p. 737 (Racine); 1877 Wisc. L. chap. 5, p. 367 (New London); 1878 Wisc. L. chap. 112, pp. 119-20 (Beaver Dam); 1882 Wisc. L. chap. 92, p. 309 (Lancaster); 1882 Wisc. L. chap. 169, p. 524 (Green Bay); 1883 Wisc. L. chap. 183, p. 713 (Oshkosh);

159, p. 753 (Shawano); 1885 Wisc. L. chap. 227, p. 1109 (Whitewater); 1887 Wisc. L. chap. 124, p. 336 (Sheboygan); 1887 Wisc. L. chap. 161, p. 684 (Clintonville); 1887 Wisc. L. chap. 162, p. 754 (La Crosse); 1887 Wisc. L. chap. 409, p. 1308 (Berlin); 1891 Wisc. L. chap. 123, p. 699 (Menasha); 1891 Wisc. L. chap. 23, p. 61 (Sparta); 1891 Wisc. L. chap. 40, p. 186 (Racine).

**Wyoming** (1882).

As in other states, it was unlawful to "exhibit any kind of fire arms, bowie knife, dirk, dagger, slung shot or other deadly weapon in a rude, angry or threatening manner not necessary to the defense of his person, family or property." 1882 Wyo. chap. 81, p. 174; 1884 Wyo. chap.  67, p. 114.

**Oklahoma territory** (1890).

Oklahoma had a confusing statute, although what matters for present purposes is that the law applied to "any pistol, revolver, bowie knife, dirk, dagger, slung-shot, sword cane, spear, metal knuckles, or any other kind of knife or instrument manufactured or sold for the purpose of defense." Section 1 forbade anyone to "carry concealed on or about his person, or saddle bags" the aforesaid arms, which do not include long guns. Section 2 made it illegal "to carry upon or about his person any pistol, revolver, bowie knife, dirk knife, loaded cane, billy, metal knuckles, or any other offensive or defensive weapon." Unlike section 1, section 2 applied to carry in general, not just concealed carry. Whereas the residual term of section 1 was anything "manufactured or sold for the purpose of defense," the section 2 residual was "any other offensive or defensive weapon." What the difference was is unclear. Section 3 banned sales of the aforesaid items to minors. The statute affirmed the legality of carrying long guns for certain purposes, such as hunting or repair. 1890 Okla. L. chap. 25, p. 495; 1893 Okla. L. chap. 25, p. 503.

**Iowa** (1887).

There was no state legislation on Bowie knives in the 19th century, notwithstanding the California Attorney General's claim in a brief that "Iowa banned their possession, along with the possession of other 'dangerous or deadly weapon[s],' in 1887. See id., Ex. E at 24." <u>Defendant's Supplemental Brief in Response to the Court's Order of September, 26, 2022</u>, *Duncan v. Bonta*, at 41-42, Case No. 17-cv-1017-BEN-JLB (S.D. Cal. Nov. 10, 2022). The brief's cite is <u>Declaration of Robert Spitzer</u>, p. 24, electronic page no. 163 of 230, reproducing without comment an 1887 Council Bluffs municipal ordinance making it illegal to "carry under his clothes or concealed about his person, or found in his possession, any pistol or firearms" and many other weapons, including Bowie knives. The California Attorney General reads "or found in his possession" as a ban on possession in the home. In context, the more appropriate reading would be for concealed carrying that did not involve wearing the weapon, for example, carrying in a bag. If the Council Bluffs government really meant something as monumental as outlawing all firearms in the home, the ordinance would be a very oblique way of saying so.

**Michigan** (1891).

A charter revision allowed the town of Saginaw to make and enforce laws against concealed carry of "any pistol, revolver, bowie knife, dirk, slung shot, billie, sand bag [a small bag with a handle; used as an impact weapon], false knuckles [same as metal knuckles, but could be made of something else], or other dangerous weapon." 1891 Mich. L. chap. 257, p. 409; 1897 Mich. L. chap. 465, p. 1030.

**Vermont** (1891).

No possession "while a member of and in attendance upon any school," of "any firearms, dirk knife, bowie knife, dagger or other dangerous or deadly weapon."  1891 Vt. L. chap. 85, p. 95.

**Rhode Island** (1893).

No concealed carry of "any dirk, bowie knife, butcher knife, dagger, razor, sword in cane, air gun, billy [club], brass or metal knuckles, slung shot, pistol or fire arm of any description, or other weapon of like kind of description." 1893 R.I. L. chap. 1180, p. 231. Hat tip to Prof. Spitzer's Declaration for this; Hein Online has the session law book, but it returns a null search result for "bowie."

**Local ordinances on Bowie knives**

As described above, state legislative enactments of municipal charters sometimes authorized a municipality to regulate Bowie knives, usually by taxation of dealers or owners, or by prohibition of concealed carry. Additionally, there were Bowie knife laws that were simply enacted by municipalities, without any need for state action. Here is a list of such laws, taken from the <u>Declaration of Robert Spitzer</u>, above. The cities are in alphabetical order by state. The year is often the year of publication of municipal code, and not necessarily the date of enactment. All the ordinances covered Bowie knives and various other weapons.

Against concealed carry: Fresno, California (1896); Georgetown, Colorado (1877); Boise City, Idaho (1894); Danville, Illinois (1883); Sioux City, Iowa (1882); Leavenworth, Kansas (1863); Saint Paul, Minnesota (1871); Fairfield, Nebraska (1899); Jersey City, New Jersey (1871) (and no carrying of

Against hostile display: Independence, Kansas (1887).

Against carry with intent to do bodily harm: Syracuse, New York (1885).

Extra punishment if carried by someone who breached the peace or attempted to do so: Little Rock, Arkansas (1871); Denver, Colorado (1886).

No sales or loans to minors by a "junk-shop keeper or pawnbroker . . . without the written consent of the parent or guardian of such minor." Fresno, California (1896).

**Conclusion**

As of 1899, there were 46 States in the Union; of these, 32 had at some point enacted a statute containing the words "bowie knife" or variant. (This figure includes enactments by territories that had achieved statehood by 1899.) At the end of the 19th century, no state prohibited possession of Bowie knives. Two states, Tennessee and Arkansas, prohibited sales. The most extreme tax statutes, such as Alabama's $100 transfer tax from 1837, had been repealed.

Only a very few statutes had ever attempted to regulate the peaceable possession or carrying of Bowie knives more stringently than handguns or other fighting knives, such as dirks and daggers. Of those, only the 1838 Tennessee sales ban was still on the books by the end of the century. The overwhelming majority of state statutes that addressed Bowie knives treated them exactly the same as comparable knives; many treated such knives like handguns. As with handguns, the states were nearly unanimous in rejecting bans on adult possession or acquisition of Bowie knives. Likewise, only a few jurisdictions forbade the open carry of Bowie knives, and in those that did, open carry of handguns was also outlawed.The much more common approach was to legislate against concealed carry, criminal misuse, or sales to minors. In a few states, taxes on knives and handguns were sometimes different.

In the Supreme Court's *Heller* and *Bruen* decisions, the few laws that banned acquisition or open carry of handguns laws of the 19th century were treated as eccentricities that did not establish a national tradition. The history of Bowie knife laws is no stronger in terms of creating historical precedents for bans on owning, acquiring, or carrying common knives. It would be implausible to claim that the 19th century laws on Bowie knives or handguns can be stretched by analogy to justify 21st century bans on common firearms or magazines.

To get the Volokh Conspiracy Daily e-mail, please sign up here.

| Email Address | | Subscribe |

---

***NEXT:*** <u>Today in Supreme Court History: November 20, 1910</u>

---

<u>DAVID KOPEL</u> is research director at the Independence Institute.

<u>SECOND AMENDMENT</u>   <u>CONCEALED CARRY</u>   <u>RIGHT TO CARRY</u>   <u>JIM CROW</u>

🔲 🐦 🔴 ✉️ 🖨️ 🔗   MEDIA CONTACT & REPRINT REQUESTS

💬 Show Comments (2)

---

***RECOMMENDED***

<u>Bearing Arms in "Sensitive Places"</u>

<u>Preliminary injunction against New York bans on licensed carry</u>

<u>Second Amendment Rights of Young People</u>

<u>Second Amendment professors brief in Supreme Court right to bear arms case</u>

<u>A survey of legislation on Second Amendment issues in 2015</u>

# EXHIBIT 39

**78 Alb. L. Rev. 849**

Albany Law Review
2014-2015

Symposium: A Loaded Debate: The Right to Keep and Bear Arms in the Twenty-First
Century
Article

David B. Kopel [a1]

Copyright (c) 2015 Albany Law School; David B. Kopel

# *849 THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE PROHIBITIONS

## I. INTRODUCTION

In recent years, the prohibition of firearms magazines has become an important topic of law and policy debate. This article details the history of magazines and of magazine prohibition. The article then applies the historical facts to the methodologies of leading cases that have looked to history to analyze the constitutionality of gun control laws.

Because ten rounds is an oft-proposed figure for magazine bans, Part II of the article provides the story of such magazines from the sixteenth century onward. Although some people think that multi-shot guns did not appear until Samuel Colt invented the revolver in the 1830s, multi-shot guns predate Colonel Colt by over two centuries. [1]

Especially because the Supreme Court's decision in *District of Columbia v. Heller* [2] considers whether arms are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes," [3] the article also pays attention to whether and when particular guns and their magazines achieved mass-market success in the United States. The first time a rifle with more than ten rounds of ammunition did so was in 1866, [4] and the first time a *850 handgun did so was in 1935. [5]

The detailed history of various firearms and their magazines stops in 1979--a year which is somewhat ancient in terms of the current gun control debate. Back in 1979,

**000306**
**ER_1178**

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

revolvers still far outsold semiautomatic handguns. [6] No one was trying to ban so-called assault weapons, [7] although such guns were already well established in the market. [8]

For the post-1979 period, Part II briefly explains how technological improvements in recent decades have fostered the continuing popularity of magazines holding more than ten rounds

Part III of the article describes the history of magazine prohibition in the United States. Such prohibitions are of recent vintage, with an important exception: during prohibition, Michigan, Rhode Island, and the District of Columbia banned some arms that could hold more than a certain number of rounds; Ohio required a special license for such guns. [9] The Michigan and Rhode Island bans were repealed decades ago; the Ohio licensing law was repealed in 2014, having previously been modified and interpreted so that it banned no magazines. [10] The District of Columbia ban, however, remains in force today, with some revisions. [11]

The Supreme Court's Second Amendment decisions in *District of Columbia v. Heller* and *McDonald v. Chicago* [12] paid careful **\*851** attention to history . Several post- *Heller* lower court opinions in Second Amendment cases have also examined history as part of their consideration of the constitutionality of gun control statutes. Part IV of this article examines the legality of magazine bans according to the various historical standards that courts have employed.

## II. THE HISTORY OF MAGAZINES HOLDING MORE THAN TEN ROUNDS

In *District of Columbia v. Heller*, the Supreme Court ruled that the District of Columbia's handgun ban was unconstitutional partly because handguns are in "common use." [13] The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." [14]

Magazines of more than ten rounds are older than the United States. [15] Box magazines date from 1862. [16] In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified. [17] Handgun magazines of more than ten rounds would become popular in the 1930s. [18]

### A. Why Consumers Have Always Sought to Avoid Having to Reload During Defensive Gun Use

When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm. The Second Amendment, of course, guarantees the right to an *operable* firearm. [19] As the *Heller* Court explained, the Council of the District of Columbia could not require that lawfully-possessed guns be kept in an inoperable status (locked or disassembled) in the home, because doing so negates their utility with respect to "the core lawful purpose of self-defense." [20]

When the defender is reloading, the defender is especially vulnerable to attack. When ammunition is low but not exhausted (e.g., two or three rounds remaining), that may be insufficient to **\*852** deter or control the threat, especially if the threat is posed by more than one criminal. If the victim is attacked by a gang of four large people, and a few shots cause the attackers to pause, the victim needs enough reserve ammunition in the firearm to make the attackers worry that even if they rush the victim all at once, the victim will have enough ammunition to knock each attacker down. When guns are fired defensively, it is unusual for a single hit to immediately disable an attacker.

Accordingly, from the outset of firearms manufacturing, one constant goal has been to design firearms able to fire more rounds without reloading.

To this end, manufacturers have experimented with various designs of firearms and magazines for centuries. While not all of these experiments were successful in terms of mass sales, they indicated the directions where firearms development was proceeding. The first experiments to gain widespread commercial success in the United States came around the middle of the nineteenth century.

### B. Magazines of Greater than Ten Rounds are More than Four Hundred Years Old

The first known firearm that was able to fire more than ten rounds without reloading was a sixteen-shooter created around 1580, using "superposed" loads (each round stacked on top of the other). [21] Multi-shot guns continued to develop in the next two centuries, with such guns first issued to the British army in 1658. [22] One early design was the eleven-round "Defence Gun," patented in 1718 by lawyer

and inventor James Puckle.[23] It used eleven preloaded cylinders; each pull of the trigger fired one cylinder.[24]

As with First Amendment technology (such as televisions or websites), the Second Amendment is not limited to the technology that existed in 1791.[25] The *Heller* Court properly described such an asserted limit as "bordering on the frivolous."[26] But even if *Heller* **\*853** had created such a rule, magazines of more than ten rounds are older than the Second Amendment.

At the time that the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a twenty-two-shot magazine capacity.[27] Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition.[28] At the time, air guns were ballistically equal to powder guns in terms of bullet size and velocity.[29] The .46 and .49 caliber Girandoni rifles were invented around 1779 for use in European armies and were employed by elite units.[30] One shot could penetrate a one-inch thick wood plank or take down an elk.[31]

### C. The Nineteenth Century Saw Broad Commercial Success for Magazines Holding More than Ten Rounds

Firearm technology progressed rapidly in the 1800s. Manufacturers were constantly attempting to produce reliable firearms with greater ammunition capacities for consumers. One notable step came in 1821 with the introduction of the Jennings multi-shot flintlock rifle, which, borrowing the superposed projectile design from centuries before, could fire twelve shots before reloading.[32]

Around the same time, pistol technology also advanced to permit more than ten shots being fired without reloading. "Pepperbox" **\*854** pistols began to be produced in America in the 1830s.[33] These pistols had multiple barrels that would fire sequentially.[34] While the most common configurations were five or six shots,[35] some models had twelve independently-firing barrels,[36] and there were even models with eighteen or twenty-four independently-firing barrels.[37] Pepperboxes were commercially successful and it took a number of years for Samuel Colt's revolvers (also invented in the 1830s) to surpass them in the marketplace.[38]

The 1830s through the 1850s saw a number of different firearm designs intended to increase ammunition capacity. In 1838, the Bennett and Haviland Rifle was invented; it was a rifle version of the pepperbox, with twelve individual chambers that were manually rotated after each shot. [39] This would bring a new chamber, preloaded with powder and shot, into the breach, ready to be fired. [40] Alexander Hall and Colonel Parry W. Porter each created rifles with capacities greater than ten in the 1850s. [41] Hall's design had a fifteen-shot rotating cylinder (similar to a revolver), while Porter's design used a thirty-eight-shot canister magazine. [42]

The great breakthrough, however, began with a collaboration of Daniel Wesson (of Smith and Wesson) and Oliver Winchester. They produced the first metallic cartridge--containing the gunpowder, primer, and ammunition in a metallic case similar to modern ammunition. [43] Furthermore, they invented a firearms mechanism that was well suited to the new metallic cartridge: the lever **\*855** action. [44] Their company, the Volcanic Repeating Arms Company, introduced the lever action rifle in 1855. [45] This rifle had up to a thirty-round tubular magazine under the barrel that was operated by manipulating a lever on the bottom of the stock. [46] The lever-action allowed a shooter to quickly expel spent cartridges and ready the firearm for additional shots. [47] An 1859 advertisement bragged that the guns could be loaded and fire thirty shots in less than a minute. [48] In 1862, the Volcanic evolved into the sixteen-round Henry lever action rifle, lauded for its defensive utility. [49]

The Henry rifle further evolved into the Winchester repeating rifle, and the market for these firearms greatly expanded with the first gun produced under the Winchester name. [50] Winchester touted the Model 1866 for defense against "sudden attack either from robbers or Indians." [51] According to advertising, the M1866 "can . . . be fired thirty times a minute," [52] or with seventeen in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds." [53] The gun was a particularly big seller in the American West. [54] There were over 170,000 Model 1866s produced. [55]

Next came the Winchester M1873, "[t]he gun that won the West." [56] The Winchester M1873 and then the M1892 were lever actions holding ten to eleven rounds in tubular magazines. [57] There were over 720,000 copies of the Winchester 1873 made from 1873 to **\*856** 1919. [58] Over a million of the M1892 were

manufactured from 1892 to 1941. [59] The Italian company Uberti, which specializes in high-quality reproductions of western firearms, produces reproductions of all of the above Winchesters today. [60] Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a fifteen-round capacity. [61]

Manufactured in Maine, the Evans Repeating Rifle came on the market in 1873. [62] The innovative rotary helical magazine in the buttstock held thirty-four rounds. [63] It was commercially successful for a while, although not at Winchester's or Colt's levels. Over 12,000 copies were produced. [64]

Meanwhile, the first handgun to use a detachable box magazine was the ten-round Jarre harmonica pistol, patented in 1862. [65] In the 1890s, the box magazine would become common for handguns. [66]

Pin-fire revolvers with capacities of up to twenty or twenty-one entered the market in the 1850s; [67] they were produced for the next half-century, but were significantly more popular in Europe than in America. [68] For revolvers with other firing mechanisms, there were some models with more than seventeen rounds. [69] The twenty-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity. [70] Chain pistols did not win much market share, perhaps in part because the large **\*857** dangling chain was such an impediment to carrying the gun. [71]

The semiautomatic firearm and its detachable box magazine were invented before the turn of the century. It was the latest success in the centuries-old effort to improve the reliability and capacity of multi-shot guns.

In 1896, Germany's Mauser introduced the C96 "broomhandle" pistol, which remained in production until the late 1930s, selling nearly a million to civilians worldwide. [72] The most common configuration was in ten-round capacity, but there were a variety of models with capacities as low as six or as high as twenty. [73] The latter was the Cone Hammer pistol, with twenty-round box magazine. [74]

The Luger semiautomatic pistol was brought to the market in 1899 (although it is commonly known as the "1900"). [75] Through many variants, it was very popular for both civilians and the military markets, and remained in production for nearly

a century. [76] The most common magazines were seven or eight rounds, but there was also a thirty-two-round drum magazine. [77]

### D. Manufacturers in the Twentieth Century Continued the Trend of Increasing Ammunition Capacity and Reliability for Civilian Firearms.

The twentieth century saw improvements on the designs pioneered in the 1800s and expanding popularity for firearms with more than ten rounds.

**\*858** Since the late 1890s, the Savage Arms Company has been one of the classic American firearms manufacturers. [78] In 1911, the company introduced their bolt-action Model 1911, a twenty-shot repeater with a tubular magazine in .22 short caliber. [79] The rifle was popular for boys and for shooting galleries. [80]

By the 1930s, American manufacturers such as Remington, Marlin, and Winchester were producing many tubular magazine rifles in .22 caliber. [81] These firearms are classic rifles for "plinking" (casual target shooting), especially popular for young people. Based on firearms catalogues from 1936 to 1971, there are over twenty such firearms models from major American manufacturers with magazines of sixteen to thirty rounds in one or more of the calibers. [82]

In 1927, the Auto Ordinance Company introduced their **\*859** semiautomatic rifle that used thirty-round magazines. [83] These rifles are still in production today. [84]

The M-1 carbine was invented for the citizen solider of World War II. [85] Thereafter, the M-1 carbine became and has remained a popular rifle for civilians in America. [86] The U.S. government's Civilian Marksmanship Program, created by Congress, put nearly a quarter million of these guns into the hands of law-abiding American citizens starting in 1963, at steeply-discounted prices. [87] Partly using surplus government parts, the Plainfield Machine Company, Iver Johnson, and more than a dozen other companies cumulatively manufactured over 200,000 for the civilian market, starting in the late 1950s. [88] The standard magazines are fifteen and thirty rounds. [89]

The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds. [90] The AR-15 was brought to the market in 1963, with a **\*860** then-standard magazine of twenty;

the thirty-round standard magazine was developed a few years later. [91] The 1994 Supreme Court case *Staples v. United States* [92] described the AR-15 as "the civilian version of the military's M-16 rifle," and noted that many parts are interchangeable between the two guns. [93] The crucial distinction, explained the Court, is that the AR-15 is like all other semiautomatic firearms in that it can fire "only one shot with each pull of the trigger." [94] The Court pointed out that semiautomatic firearms "traditionally have been widely accepted as lawful possessions." [95] So legally speaking, the semiautomatic AR-15 is the opposite of the M-16 machine gun: "[C]ertain categories of guns--no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation--. . . have the same quasi-suspect character we attributed to owning hand grenades . . . . But . . . guns falling outside those categories traditionally have been widely accepted as lawful possessions . . . ." [96]

By 1969, the AR-15 faced competition from the Armalite-180 (twenty-round optional magazine), the J&R 68 carbine (thirty rounds), and the Eagle Apache carbine (thirty rounds). [97]

Springfield Armory brought out the M1A semiautomatic rifle in 1974, with a twenty-round detachable box magazine. [98] The next year, the Ruger Mini-14 rifle was introduced, with manufacturer-supplied standard five, ten, or twenty-round detachable magazines. [99] Both the M1A and the Mini-14 are very popular to this day. [100]

 *861 By 1979, all of the above guns were challenged in the American market by high-quality European imports such as the Belgian FN-FAL Competition rifle (optional twenty-round magazine), the German Heckler & Koch HK-91 and HK-93 rifles (twenty rounds), the Swiss SIG AMT rifle (twenty rounds), and the Finnish Valmet M-71S rifle (thirty rounds). [101]

Citizen firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. In 1935, Browning introduced the Hi-Power pistol. [102] This handgun was sold with a thirteen-round detachable magazine and is still in production. [103]

In Europe, more so than in America, Browning had to compete against the Spanish Gabilondo twenty-round Plus Ultra, introduced in 1925. [104] Spain's Arostegui,

Eulogio brought out the Azul--a semiautomatic with standard magazines of ten, twenty and thirty-- in 1935. [105]

Browning's first notable American competition came with the 1964 introduction of the Plainfield Machine Company's "Enforcer," a pistol version of the M1 carbine with a thirty-round magazine. [106]

A tremendous commercial success was the Beretta model 92, a nine millimeter pistol with a sixteen-round magazine, which entered the market in 1976. [107] In various configurations (currently the Beretta 92F) the Beretta is one of the most popular of all modern handguns. [108] Browning introduced another popular handgun in 1977, the fourteen-round BDA (Browning Double Action). [109] Also coming on the market at this time were European handguns such as Austria's L.E.S. P-18 (eighteen rounds) and **862** Germany's Heckler & Koch VP 70Z (also eighteen rounds). [110]

### E. Magazines After 1979

We end this story in 1979, when Jimmy Carter was President, [111] the Bee Gees bestrode the AM radio Top 40, [112] Gaston Glock was manufacturing curtain rods in his garage, [113] Americans were watching *Love Boat* on broadcast television, [114] and people on the cutting edge of technology were adopting VisiCalc, the first spreadsheet program, run from huge floppy discs. [115]

Long before 1979, magazines of more than ten rounds had been well established in the mainstream of American gun ownership. Indeed, they had been so established before almost everyone alive in 1979 was born.

After 1979, technological improvements continued to foster the popularity of magazines holding more than ten rounds. First of all, there were improvements across the board in manufacturing, so that magazine springs became more reliable, particularly for magazines holding up to thirty rounds. This greatly reduced the risk of a misfeed. Reliability was also enhanced by improvements in shaping the magazines' "lips"--the angled wings at the top of the magazine which guide the next round of ammunition into the firing chamber. [116]

Magazines of all sizes benefited from increasing use of plastic polymers in manufacturing. [117] Today, many magazine walls are **863** made from plastic, rather than metal. Closer tolerances in manufacturing, lower costs, and increased durability have all improved magazine quality and reliability.

Likewise, the vast majority of magazines today have a removable baseplate (also known as a "foot plate"). [118] Removal of the baseplate allows the magazine to be disassembled for cleaning (e.g., removal of gunpowder residue) or repair (e.g., replacing a worn-out spring). [119] The existence of a removable baseplate also makes it possible for consumers to add after-market extenders to a magazine. [120] These extenders may simply increase the grip length (to better fit a particular consumer's hands), and they may also increase capacity by one, two, or three rounds. [121] Thus, a consumer with a ten-round factory magazine can add a two-rounder extender to create a twelve-round magazine.

Most importantly, the double-stack magazine was perfected. In some box magazines, the ammunition is contained in a single column. [122] In the double-stack magazine, there are two columns of ammunition, side-by-side and touching. [123] When the gun is used, the magazine will first reload a round from column A, then a round from column B, then from column A, and so on. [124]

The practical effect is this: for a handgun, a single stack magazine of seventeen rounds would stick out far below the bottom of the grip, making the gun unwieldy for carrying and holstering. With a double-stack configuration, a seventeen-round magazine can fit inside a standard full-sized handgun grip. The practical limitation of grip size (the size of the human hand) means that relatively larger capacity magazines are possible for relatively smaller cartridges. Thus, a double-stack magazine for the midsize nine millimeter round might hold up to twenty or twenty-one rounds, whereas a double-stack for the thicker .45 ACP cartridge would hold **864** no more than fifteen.

### III. THE HISTORY OF AMMUNITION CAPACITY BANS

An important factor in the consideration of the constitutionality of firearms laws is whether they are traditional and longstanding. For example, the *Heller* Court pointed out that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." [125] The handgun ban was contrasted with "longstanding" guns controls, such as those prohibiting gun

possession by felons or the mentally ill. [126] Following *Heller*, the Tenth Circuit has explained that Second Amendment cases must consider "the rarity of state enactments in determining whether they are constitutionally permissible." [127]

At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity. This was not because all guns were single-shot. As detailed above, multi-shot guns predate the Second Amendment by about two hundred years, and Lewis and Clark carried a powerful twenty-two-round gun on their famous expedition. [128]

The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. In 1927, Michigan prohibited "any machine gun or firearm which can be fired more than sixteen times without reloading." [129] Also in 1927, Rhode Island banned "any weapon which shoots more than twelve shots semi-automatically without re-loading." [130]

The Michigan ban was repealed in 1959. [131] That same year, the **\*865** Rhode Island law was changed to fourteen shots, and .22 caliber rimfire guns were excluded. [132] The Rhode Island ammunition capacity law was fully repealed in 1975. [133]

The two statutes applied only to firearms, with Rhode Island only for semiautomatics. Neither statute covered a magazine that was not inserted in a firearm.

In 1933, Ohio began requiring a special permit for the possession or sale of a semiautomatic firearm with an ammunition capacity of greater than eighteen rounds. [134] In 1971, during a recodification of the state criminal code, an exemption for .22 caliber was added, and for other calibers the limit was raised to thirty-two or more rounds. [135]

Significantly, the Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. [136] (Of course purchase was allowed if one has the special permit.) [137] With or without the permit, one could buy a sixty-round magazine in Ohio. [138] The licensing law was fully repealed in 2014. [139]

**\*866**  The only longstanding statute banning magazines is found in the District of Columbia. In 1932, Congress passed a District of Columbia law prohibiting the possession of a firearm that "shoots automatically or semiautomatically more than twelve shots without reloading." [140]  In contrast, when Congress enacted the National Firearms Act of 1934 to impose stringent regulations on machine guns, it chose to impose no restrictions on magazines. [141]  When the District of Columbia achieved home rule in 1975, [142] the district council did not choose to repeal the law but instead promptly enacted the bans on handguns and on self-defense with any gun in the home, [143] which were later ruled unconstitutional by the Supreme Court in *Heller*. [144]  The District of Columbia interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns. [145]  The District stands alone in its historical restriction of magazines.

The only widespread restriction on magazine capacity came in 1994 when Congress enacted a ban on new magazines holding more than ten rounds. [146]  The law was in effect until 2004, at which point Congress allowed it to sunset. [147]  The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others. The final report, issued in 2004, concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury . . . ." [148]  Further, **\*867** "the ban has not yet reduced the use of [such magazines] in crime . . . ." [149]  Doctor Koper noted also that state-level firearm bans have not had an impact on crime. [150]

In the modern era, only a few states have enacted magazine restrictions, starting with New Jersey's 1990 ban on magazines over fifteen rounds. [151]  That ban applies only to detachable box magazines for semiautomatic firearms. [152]  A couple years later, Hawaii banned handgun magazines over twenty rounds, and later reduced that to ten. [153]  Maryland in 1994 banned the sale or manufacture of magazines over twenty rounds; the ban did not affect possession, loans, acquisition, or importation. [154]  The Maryland limit was reduced to ten in 2013. [155]

In 1999 California banned the sale of magazines over ten rounds but allowed grandfathered possession, and New York did the same in 2000. [156]  (Currently, large capacity magazine bans in Colorado, Connecticut, and Massachusetts also

have grandfather provisions, while New Jersey, the District of Columbia, and Hawaii do not.) [157] In 2013 New York removed grandfathering and reduced the limit to seven. [158] The seven-round limit was suspended shortly thereafter, since there are no seven-round magazines available for many guns. [159] Instead, the legislature forbade owners of ten-round magazines to load more than seven rounds. [160] This restriction was **\*868** declared to violate the Second Amendment in a federal district court decision. [161] New York City outlaws rifle or shotgun magazines holding more than five rounds. [162]

Also in 2013, Colorado enacted a ban on magazines over fifteen rounds, [163] and Connecticut did the same for magazines over ten. [164] Both statutes allowed current owners to retain possession. [165]

Finally, one state has followed Ohio's former approach of magazine licensing, rather than prohibition. In 1994, Massachusetts began requiring that possession and additional acquisitions of magazines over ten rounds be allowed only for citizens who have a "Class A" firearms license--which most Massachusetts gun owners have. [166]

## IV. WHAT DOES THE HISTORY MEAN?

Given the history above, what does modern legal doctrine say about the permissibility of outlawing magazines, as in the so-called SAFE Act's ban on possession of magazines of more than ten rounds and loading more than seven rounds in a magazine, or New York City's ban on long gun magazines of more than five rounds? What about bans in other states of more than ten rounds (Maryland, Connecticut, the District of Columbia, California, and Hawaii for handguns only) or more than fifteen rounds (New Jersey and Colorado)?

This Part analyzes these questions in light of Second Amendment **\*869** precedents from the *Heller* Court and from subsequent cases that have relied at least in part on history and tradition in judging Second Amendment cases.

### A. The Crucial Years: 1789-1791 and 1866-1868

For original meaning of the Second Amendment, the most important times are when the Second Amendment was created and when the Fourteenth Amendment

was created, since a core purpose of the latter amendment was to make the individual's Second Amendment right enforceable against state and local government. [167] Congress sent the Second Amendment to the states for ratification in 1789, and ratification was completed in 1791. [168] The Fourteenth Amendment was passed by Congress in 1866, and ratification by the states was completed in 1868. [169]

1. Magazines in 1789-1791 and 1866-1868

As of 1789 to 1791, multi-shot magazines had existed for two centuries, and a variety of models had come and gone. [170] The state-of-the-art gun between 1789 and 1791 was the twenty- or twenty-two-shot Girandoni air rifle, powerful enough to take down an elk with a single shot. [171]

By the time that the Fourteenth Amendment was introduced in Congress, firearms with magazines of over ten or fifteen rounds had been around for decades. [172] The best of these was the sixteen-shot Henry Rifle, introduced in 1861 with a fifteen-round magazine. [173] The Henry Rifle was commercially successful, but Winchester Model 1866, with its seventeen-round magazine, was massively successful. [174] So by the time ratification of the Fourteenth Amendment was completed in 1868, it was solidly established that firearms with seventeen-round magazines were in common use.

*870 2. Magazine Prohibitions in 1789-1791 and 1866-1868

From the colonial period to the dawn of American independence on July 4, 1776, and through the ratification of the Fourteenth Amendment, there were no prohibitions on magazines. Indeed, the first magazine prohibition did not appear until the alcohol prohibition era in 1927. [175] Thus, the historical evidence of the key periods for original meaning strongly suggests that magazine bans are unconstitutional.

B. "Typically Possessed by Law-Abiding Citizens for Lawful Purposes" or "Dangerous and Unusual"?

The Supreme Court's *Heller* decision distinguished two broad types of arms. Some arms, such as handguns, are "typically possessed by law-abiding citizens for lawful purposes." [176] These arms are also described by the Court as being "in common

use." [177] In contrast, some other arms are "dangerous and unusual." [178] Examples provided by the Court were short-barreled shotguns or machine guns. [179] The common, typical, arms possessed by law-abiding citizens are protected by the Second Amendment; the "dangerous and unusual" arms are not protected. [180] By definition, "unusual" arms are not "in common use" or "typically possessed by law-abiding citizens for lawful purposes." [181]

The *Heller* Court did not expressly mandate that historical analysis be used when deciding whether an arm is typical or common or "dangerous and unusual." The *Heller* Court approvingly quoted the 1939 Supreme Court decision *United States v. Miller*, [182] which had described the original meaning of the Second Amendment as protecting individually-owned firearms that were "in common use at the time." [183] The *Miller* Court's 1939 decision did not extend Second Amendment protection to sawed-off **\*871** shotguns; [184] as *Heller* explained *Miller*, the *Miller* principle was that sawed-off shotguns are dangerous and unusual. [185]

To be precise, *Miller* did not formally rule that short shotguns are *not* Second Amendment arms; the Court simply reversed and remanded the district court's decision granting criminal defendant Miller's motion to quash his indictment. [186] The Supreme Court said that the suitability of sawed-off shotguns as Second Amendment arms was not a fact that was subject to "judicial notice." [187] Presumably the federal district court in Arkansas could have taken up the remanded case and then received evidence regarding what sawed-off shotguns are used for and how common they are. But Miller and his co-defendant Frank Layton had disappeared long before the case was decided by the Supreme Court. [188]

Regardless, subsequent courts, including the court in *Heller*, read *Miller* as affirmatively stating that sawed-off shotguns are not protected by the Second Amendment. [189]

Even though *Heller*'s "common" or "typical" versus "dangerous and unusual" dichotomy seems primarily concerned with contemporary uses of a given type of arm, history can still be useful. As detailed in Part II, magazines of more than ten rounds have been very commonly possessed in the United States since 1862. [190] Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds that has existed since the mid-nineteenth

century. We have more than a century and a half of history showing such magazines to be owned by many millions of law-abiding Americans. [191]

Thus, a court which today ruled that such magazines are "dangerous and unusual" would seem to have some burden of explaining how such magazines, after a century and a half of being **\*872** "in common use" and "typically possessed by law-abiding citizens for lawful purposes," became "dangerous and unusual" in the twenty-first century.

This is not possible. Today, magazines of more than ten rounds are more common than ever before. [192] They comprise about forty-seven percent of magazines currently possessed by Americans today. [193] The AR-15 rifle (introduced in 1963) is the most popular rifle in American history, with sales of several million; [194] its standard magazines are twenty or thirty rounds. [195]

### C. "Longstanding" Controls Versus "Few Laws in the History of Our Nation"

Just as *Heller* distinguishes types of arms (common or typical versus dangerous and unusual), *Heller* distinguishes types of arms-control laws. One type of arms controls are "longstanding," and these are "presumptively lawful." [196] Examples listed by *Heller* are bans on gun possession "by felons and the mentally ill," bans on carrying guns "in sensitive places such as schools and government buildings," and "conditions and qualifications on the commercial sale of arms." [197]

The *Heller* Court highlighted the unusual nature of the District of Columbia anti-gun laws:

> Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down. In *Nunn v. State*, the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). In *Andrews v. State*, the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," violated **\*873** the state constitutional provision (which the court equated with the Second Amendment). That

was so even though the statute did not restrict the carrying of long guns. [198]

What was the history that led the Court to declare the handgun prohibition to be "unusual"--that is, to be the opposite of a traditional gun control that was presumptively constitutional? The District of Columbia handgun ban was enacted in 1975 and took effect in 1976. [199] Chicago enacted a similar ban in 1982, and a half-dozen Chicago suburbs followed suit during the 1980s. [200] In 1837, the Georgia legislature had enacted a handgun ban, but that was ruled unconstitutional on Second Amendment grounds by the unanimous Georgia Supreme Court in 1846. [201] In 1982 and 2005, San Francisco enacted handgun bans, but they were both ruled unlawful because of their plain violation of the California state preemption statute, which forbids localities to outlaw firearms which are permitted under state law. [202]

These are the facts under which the Supreme Court declared handgun bans to be suspiciously rare in America's history--at the other end of the spectrum from the presumptively constitutional "longstanding" controls.

The 1975 District of Columbia handgun ban was thirty-three years old when the Supreme Court decided *Heller* in 2008. This suggests that thirty-three years is not sufficient for a gun control to be considered "longstanding." As detailed in Part III, the first of today's magazine bans was enacted by New Jersey in 1990, at fifteen rounds. [203] The first state-level ten-round ban did not take effect until California passed such **\*874** a law in 2000. [204] These statutes, and other post-1990 magazine bans, would not qualify as "longstanding."

Previously, three states and the District of Columbia had enacted some magazine restrictions during the alcohol prohibition era. [205] The District of Columbia ban, with modifications, is still in effect. [206] The Michigan and Rhode Island bans were repealed long ago. [207] The Ohio special licensing statute allowed the free purchase of any magazine, but required a permit to insert a magazine of thirty-two rounds or more into a firearm; the permit requirement was repealed in 2014. [208] It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms.

000322
**ER_1194**

Several post- *Heller* lower courts have conducted in-depth examinations of the history of particular gun control laws. The next Part examines each of those cases and then applies their methodology to the historical facts of bans on magazines of more than five, seven, ten, and fifteen rounds.

### D. Lower-Court Decisions Applying History

1. *Ezell v. City of Chicago*

After *McDonald v. City of Chicago* made it clear that the Second Amendment applies to municipal governments, the Chicago City Council relegalized handgun possession and outlawed all target ranges within city limits. [209] Assessing the constitutionality of the ban, the Seventh Circuit used a two-step test, similar to analysis that is sometimes used in First Amendment cases: (1) Is the activity or item within the scope of the Second Amendment, as historically understood? If the answer is "no," then the restrictive law does not violate the Second Amendment. [210] (2) If the answer to the first question is "yes," then the court will apply some form of the heightened scrutiny. The intensity of the scrutiny will depend on how close the restriction comes to affecting the core right of armed self-defense. [211]

**\*875** So the *Ezell* court began the step-one analysis by considering whether target practice was historically considered part of the Second Amendment right. [212] Chicago had argued to the contrary, listing some eighteenth- and nineteenth-century state statutes and municipal ordinances restricting firearms discharge within city limits. [213] The Seventh Circuit found almost all of the listed ordinances to be irrelevant. [214] Many of them did not ban firearms discharge but simply required a permit. [215] Others were plainly concerned with fire prevention, an issue that would not be a problem at a properly-designed modern range. [216] Thus:

> Only two--a Baltimore statute from 1826 and an Ohio statute from 1831-- flatly prohibited the discharge of firearms based on concerns unrelated to fire suppression, in contrast to the other regulatory laws we have mentioned. This falls far short of establishing that target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States. [217]

So according to the Seventh Circuit, the historical example of repressive laws in one state and one city are insufficient to support the inference that the repressed activity is outside the scope of the Second Amendment. [218] The historical basis of restrictions that would affect magazines over fifteen rounds is nearly as thin: two states with statutes enacted in 1927, and later repealed, plus the District of Columbia's 1932 law. [219] As for imposing a ban for guns with magazines of more than ten rounds (or seven or five), there is *no* historical basis. Thus, under the *Ezell* analysis, bans on magazines infringe the Second Amendment right as it was historically understood, and such bans must be analyzed under heightened scrutiny.

2. *United States v. Rene E.*

In 2009, the First Circuit heard a Second Amendment challenge **\*876** to a federal statute that restricted, but did not ban, handgun possession by juveniles. [220] The federal statute was enacted in 1994, [221] and so of course was not "longstanding." [222] The First Circuit looked at the history of state laws restricting juvenile handgun possession, to see if they were longstanding. [223]

The First Circuit found state or local restrictions on handgun transfers to juveniles and judicial decisions upholding such restrictions from Georgia (1911 case), Tennessee (1878 case), [224] Pennsylvania (1881 case), [225] Indiana (1884 case), [226] Kentucky (1888 case), [227] Alabama (1858 case), [228] Illinois (1917 case upholding a Chicago ordinance), [229] Kansas (1883 case allowing tort liability for transfer), and Minnesota (1918 case allowing tort liability for transfer). [230]

Thus, the First Circuit was able to point to six state statutes, all of them enacted well over a century previously. [231] They were buttressed by one municipal ordinance and two cases allowing tort liability, both of these being nearly a century old. [232]

The history of magazine restrictions is considerably weaker than that of the juvenile handgun statutes analyzed in *Rene E.* There were six statutes on juveniles, all of which were enacted before 1890, and one of which predated the Civil War. [233] This is much more than the pair of state statutes on magazines dating from the late 1920s.

The *Rene E.* case does not attempt to quantify how many state statutes are necessary for a gun control to be longstanding; however, we can say that magazine restrictions fall well short of the historical foundation that the First Circuit relied on to uphold juvenile handgun restrictions. While *Rene E.* and *Ezell* both used history, the particular way that they used it was different. For *Rene E.*, history was mixed in **\*877** with substantive analysis of the modern federal statute, which the First Circuit praised for its "narrow scope" and "important exceptions." [234]

For *Ezell*, history was just the first step. *Ezell* used history to determine that the range ban was not presumptively lawful; once that question was answered, *Ezell* proceeded to analyze the ban under heightened scrutiny. [235]

3. *Heller II*

*a. Majority Opinion*

In the 2008 case *District of Columbia v. Heller*, the Supreme Court ruled that two District of Columbia ordinances violated the Second Amendment: the handgun ban and the ban on the requirement that any firearm in the home be kept locked or disassembled and thus unusable for self-defense. [236] Further, the District of Columbia required a permit to carry a gun anywhere (even from room to room in one's home) [237] and permits were never granted; the Court ordered that plaintiff Dick Heller be granted a permit. [238]

The Council of the District of Columbia responded by repealing all three of the unconstitutional ordinances and enacting the most severe gun control system in the United States. [239] Dick Heller and several other plaintiffs challenged the new ordinances in the case known as *Heller II*. [240]

Using the two-step test, the District of Columbia Circuit majority first examined whether any of the challenged provisions were "longstanding." [241] If so, then the provision would be held as not violating the Second Amendment right, with no further analysis needed. [242]

Regarding handgun registration, the majority identified statutes from New York (1911), Illinois (1881), Georgia (1910), Oregon **\*878** (1917), and Michigan (1927). [243] In addition, some jurisdictions required handgun buyers to provide information about themselves to retailers, but did not require that the retailer

000325
ER_1197

deliver the information to the government: California (1917), Territory of Hawaii (1927), and the District of Columbia (1932). [244] So "[i]n sum, the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the nation by population." [245]

The requirement that the government be provided with some basic information about persons acquiring handguns, in a manner that was "self-evidently de minimis" was therefore constitutional. [246] Seven states, with laws originating between 1881 and 1927, were apparently sufficiently numerous and "diverse" to qualify as "longstanding."

However, although de minimis registration of handguns was longstanding, many of the new District of Columbia requirements went beyond traditional de minimis systems. [247] Further, "[t]hese early registration requirements, however, applied with only a few exceptions solely to handguns--that is, pistols and revolvers-- and not to long guns. Consequently, we hold the basic registration requirements are constitutional only as applied to handguns. With respect to long guns they are novel, not historic." [248] So the case was remanded to the district court for further fact-finding, since the District of Columbia government had provided the court with almost no information about whether the novel requirements passed heightened scrutiny by being narrowly tailored. [249]

The case had come to the District of Columbia Circuit following cross motions for summary judgment. [250] While the circuit court decided that the novel registration requirements needed a more complete factual record, the panel also decided that the record contained enough information for a ruling on the merits of the District's ban on various semiautomatic rifles, which the district council labeled "assault weapons," and on the District's ban on **\*879** magazines holding more than ten rounds. [251]

The District of Columbia Circuit majority stated "[w]e are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity." [252] In a footnote, the majority cited the 1927 Michigan magazine statute and the 1932 District of Columbia ordinance detailed in Part III of this article. [253] There is no reason to think that the majority's determination on this point would change if the 1927 Rhode Island statute had also been cited.

000326
ER_1198

Importantly, the majority did not suggest that the magazine bans enacted in 1990 or thereafter had any relevance to whether magazine bans are "longstanding."

Accordingly, the majority proceeded to analyze the rifle and magazine bans. The majority provided two paragraphs of explanation of why the rifle ban passed intermediate scrutiny and one paragraph on why the magazine ban did so. [254]

Discussion of whether intermediate scrutiny was the correct standard, or whether magazine bans pass intermediate scrutiny, is beyond the scope of this article. However, it does seem to appear that the District of Columbia Circuit would have acted more prudently by remanding the case for fact-finding in the district court. To support the ban, the panel majority could only point to legislative testimony by a gun-prohibition lobbyist and by the District of Columbia police chief, plus a Department of Justice report on the 1994 to 2004 federal ban on such magazines. [255] Notably, the panel majority did not address the report's finding that a ten-year nationwide ban had led to no discernible reduction in homicides, injuries, or the number of shots fired in crimes. [256]

### b. Dissent

A forceful dissent by Judge Brett Kavanaugh critiqued the majority's application of intermediate scrutiny. [257] He argued that **\*880** the majority's approach was necessarily incorrect, because its logic on banning semiautomatic rifles would allow a ban on all semiautomatic handguns--which constitute the vast majority of handguns produced today. [258]

More fundamentally, he argued that *Heller* does not tell courts to use tiered scrutiny to assess gun control laws. [259] Rather, *Heller* looks to history and tradition. [260] So gun controls that are well-grounded in history and tradition are constitutional; gun control laws which are not so grounded are unconstitutional. [261]

Using the standard of history and tradition, Judge Kavanaugh argued that the entire District of Columbia registration scheme was unconstitutional. [262] Regarding de minimis handgun registration, the statutes cited by the majority were mostly record-keeping requirements for gun dealers, not centralized information collection by the government. [263] The novel and much more onerous requirements

of the District of Columbia registration system for all guns had no basis in history and tradition. [264] For all firearms, any registration system beyond dealer record-keeping requirements was unconstitutional. [265]

Judge Kavanaugh examined the history of semiautomatic rifles and found them to be in common use for over a century and thus protected by the Second Amendment from prohibition. [266] He did not have similar information on magazines and thus urged that the magazine issue be remanded for fact-finding. [267] In light of the evidence on magazines that has been presented subsequent to the 2011 *Heller II* decision, Judge Kavanaugh's methodology **\*881** straightforwardly leads to the conclusion that the District of Columbia magazine ban is unconstitutional. [268] The *Heller II* majority rightly recognized that magazine bans are not "longstanding," [269] and this article has demonstrated that magazines of more than ten rounds have been a common part of the American tradition of firearms ownership since before the ratification of the Fourteenth Amendment in 1868.

4. *Silvester v. Harris*

Another decision carefully employing historical analysis is *Silvester v. Harris*, [270] from the United States District Court for the Eastern District of California.

A California statute requires that firearms purchasers wait ten days before they can take their gun home from the store. [271] In California, background checks on firearms buyers are sometimes completed within minutes and sometimes can take a week or longer. [272] Senior District Judge Anthony Ishii (appointed to the federal court in 1997 by President Clinton) [273] ruled the waiting period unconstitutional, to the extent that the waiting period lasted longer than the time required to complete the background check on a given buyer. [274]

Like the Seventh Circuit in *Ezell*, Judge Ishii looked to 1791 and 1868 as the crucial periods. [275]

California Attorney General Kamala Harris had directed the court to a book arguing that between 1790 and 1840 many Americans might have to travel for several days in order to buy a gun, so there was a de facto waiting period between the time a person decided to buy a gun and when a person could take possession

**000328**
**ER_1200**

of the gun. [276] Judge Ishii held this irrelevant; the court's job was to consider the legality of government regulations that **\*882** might impede the exercise of a constitutional right and the book provided no evidence that government-imposed waiting periods for firearm purchases existed between 1790 and 1840. [277]

Another book explained that the first waiting period law was proposed in 1923-- a one-day waiting period for handguns. [278] The law was adopted in California and eventually by eight other states. [279] This too was irrelevant, ruled the court, because it had nothing to do with 1791 or 1868. [280]

The court explained that "[i]t is Defendant's burden to show that the 10-day waiting period either falls outside the scope of Second Amendment protections as historically understood or fits within one of several categories of longstanding regulations that are presumptively lawful." [281]

The complete absence of evidence of waiting periods in 1791 and 1868 eliminated the first possibility. [282] What about the question of whether waiting periods were "longstanding regulations that are presumptively lawful"? The answer to this question is not confined to 1791 and 1868.

The court explained that "the concept of a 'longstanding and presumptively lawful regulation' is that the regulation has long been accepted and is rooted in history." [283] California's 1923 statute did not come close. Besides that, the California wait was only one day and only for retail handguns. [284] Not until 1975 was the number of days extended to double digits and not until 1991 to long guns. [285] Consistent with the unusual nature of waiting periods, only ten states and the District of Columbia today have a waiting period for at least some firearms. [286]

Thus, the court concluded that the plaintiffs' challenge had passed step one of the two-step test, [287] and the court proceeded to apply heightened scrutiny. [288] The court stated that it did not have to decide whether to use strict or intermediate scrutiny. [289] The **\*883** waiting period statute failed intermediate scrutiny, as applied to persons who already possessed a firearm (based on state registration data), and who passed the background check when purchasing an additional firearm. [290] Therefore, *a fortiori*, the statute would fail strict scrutiny. The court gave the state legislature 180 days to revise the statute so as to eliminate the post-background-check waiting period for persons who already have a gun. [291] The

plaintiffs had not challenged the waiting period as applied to first-time gun buyers, nor as to persons who had not yet passed the background check. [292]

## V. CONCLUSION

Rifle magazines holding more than ten or fifteen rounds have been common in the United States since the mid-nineteenth century. [293] Handgun magazines over ten rounds have been common since 1935, and handgun magazines over fifteen have been common since the mid-1960s. [294]

Magazine prohibition has historically been rare. There is *no* historical basis for a magazine limit of ten rounds or lower. As for prohibitions with higher limits, there are only two examples, both of them from 1927, the outer edge of what courts have considered to be examples of state statutes that may be considered "longstanding": Michigan (enacted 1927, repealed 1959), Rhode Island (enacted 1927, loosened 1959, repealed 1975). [295] Ohio formerly required a special permit to actually insert a magazine above a certain size into a firearm but never banned sales. [296] (The original limit was eighteen rounds or more and later was thirty-two rounds or more.) [297] As is often the case, the District of Columbia is the *sui generis* outlier, with its 1932 restriction still in effect today, with some modifications. [298]

Of all the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being **\*884** "longstanding" or part of American history and tradition. To the contrary, ammunition capacity limits are far outside the norm of the traditional exercise and regulation of Second Amendment rights. Not until California in 1999 did any state set a magazine limit as low as ten. [299]

What does this mean for modern legal analysis? Under judicial methods which hew closely to history and tradition, the historical absence (of limits of ten or less) or the extreme rarity (limits of fifteen or less) would be sufficient for any such modern limit to be ruled unconstitutional. Owning such magazines is very long-established manner in which the right to arms has historically been exercised in America.

Other courts perform a two-step test. Challengers to magazine limit laws should always pass step one, since magazine limits are not "longstanding."

As for step two--review under some form of heightened scrutiny--the Supreme Court taught in *Heller* that when the "severe restriction" of a "ban" has support from "[f]ew laws in the history of our Nation," the law's constitutionality is very doubtful. This was true for the prohibition of handguns, and it is also true for the prohibition of magazines holding more than five, seven, ten, or fifteen rounds.

## Footnotes

a1    Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law. Research Director, Independence Institute, Denver, Colorado. Associate Policy Analyst, Cato Institute, Washington, D.C. Professor Kopel is the author of fifteen books and over ninety scholarly journal articles, including the first law school textbook on the Second Amendment. *See generally* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2012). Professor Kopel's website is http://www.davekopel.org. The author would like to thank Joseph Greenlee and Noah Rauscher for research assistance.

1    *See* Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008).

2    District of Columbia v. Heller, 554 U.S. 570 (2008).

3    *Id.* at 624-25, 627.

4    *See infra* notes 50-55 and accompanying text.

5    *See infra* notes 102-03 and accompanying text.

6    The U.S. manufacturing figures were compiled by the Bureau of Alcohol, Tobacco & Firearms. Although they were public documents, they were not made widely available in the 1970s. The following are the full-year production data by U.S. manufacturers. The figures do not include production for sale to the military. 1973: 452,232 pistols, 1,170,966 revolvers; 1974: 399,011 pistols, 1,495,861 revolvers; 1975: 455,267 pistols, 1,425,833 revolvers; 1976: 468,638 pistols, 1,425,407 revolvers; 1977: 440,387 pistols, 1,423,984 revolvers; 1978: 499,257 pistols, 1,458,013 revolvers; 1979: 637,067 pistols, 1,531,362 revolvers; 1980: 785,105 pistols, 1,586,149 revolvers. *Statistical Tabulation of Firearms Manufactured in the United States--and Firearms Exported--as Reported Yearly by Bureau of Alcohol, Tobacco and Firearms on ATF Form 4483-A*, AM. FIREARMS INDUSTRY (Nov. 1981) at 28-29.

7    *See* David B. Kopel, *The Great Gun Control War of the Twentieth Century--and Its Lessons for Gun Laws Today*, 39 FORDHAM URB. L.J. 1527, 1578-79 (2012) (beginning of "assault weapon" issue in the mid- and late 1980s); L. Ingram, *Restricting of Assault-Type Guns Okd by Assembly Unit*, L.A. TIMES, Apr. 9, 1985, at 3.

8    Below, this article describes many models of semi-automatic rifles introduced since 1927. *See infra* notes 82-101 and accompanying text. All of them have been labeled an "assault weapon" by one or more proposed bills. *See, e.g.*, LEGAL CMTY. AGAINST VIOLENCE, BANNING ASSAULT WEAPONS--A LEGAL PRIMER FOR STATE AND LOCAL ACTION 59-60 (2004), *available at* http://smartgunlaws.org/wp-content/uploads/2012/05/Banning_Assault_Weapons_A_Legal_Primer_8.05_entire.pdf (proposing a model assault weapons law).

9    *See infra* notes 129-30, 134, 140 and accompanying text.

10    *See infra* notes 131-33, 135-39 and accompanying text.

11  *See infra* notes 140-45 and accompanying text.

12  McDonald v. City of Chi., 561 U.S. 742 (2010).

13  District of Columbia v. Heller, 554 U.S. 570, 627-29 (2008).

14  *Id.* at 625.

15  *See infra* notes 21-24 and accompanying text.

16  *See infra* note 65 and accompanying text.

17  *See infra* notes 43-55, 172-73 and accompanying text.

18  *See infra* notes 102-03 and accompanying text.

19  *See Heller,* 554 U.S. at 630, 635 (declaring the District of Columbia's requirement that all firearms in the home be "rendered and kept inoperable at all times" as unconstitutional).

20  *Id.*

21  *See* LEWIS WINANT, FIREARMS CURIOSA 168-70 (2009); *A 16-Shot Wheel Lock,* AMERICA'S 1ST FREEDOM (June 2014), http:// www.nrapublications.org/index.php/17739/a-16-shot-wheel-lock/ (NRA member magazine).

22  Cramer & Olson, *supra* note 1, at 716.

23  *Id.* at 716 & n.94.

24  *See id.* at 716-17; *This Day in History: May 15, 1718,* HISTORY, http://www.historychannel.com.au/classroom/ day-in-history/600/defence-rapid-fire-gun-patented (last visited Feb. 21, 2015).

25  *Heller,* 544 U.S. at 582.

26  *Id.* ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (citations omitted)).

27  JIM SUPICA ET AL., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

28  JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 94 (2012).

29  JOHN L. PLASTER, THE HISTORY OF SNIPING AND SHARPSHOOTING 69-70 (2008)..

30  *See* SUPICA ET AL., *supra* note 27, at 31.

31  *Id.* The Lewis and Clark gun is on display at the National Rifle Association's Sporting Arms Museum in Springfield, Missouri. Mark Yost, *The Story of Guns in America,* WALL ST. J., Sept. 3, 2014, at D5.

32  NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 683 (9th ed. 2007) [hereinafter FLAYDERMAN'S GUIDE]. According to James S. Hutchins, historian emeritus at the National Museum of American History, Smithsonian Institution, Mr. Flayderman has been a "revered expert in antique American arms and a vast range of other Americana for half a century...." James S. Hutchins, *Foreword* to NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING THE AMERICAN LEGEND 7 (2004). Mr. Flayderman has been appointed as historical consultant to the U.S. Army Museum, U.S. Marine Corps Museum, and the State of Connecticut's historic weapons collections. Andrea

Valluzzo, *E. Norman Flayderman; 84; Antique Arms Expert*, ANTIQUES & ARTS WKLY. (July 2, 2013), http://test.antiquesandthearts.com/node/185567#.VMvRAGjF8YM.

33    JACK DUNLAP, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS 16 (1964).

34    LEWIS WINANT, PEPPERBOX FIREARMS 7 (1952).

35    *See, e.g. , Pocektsize Allen and Thurber Pepperbox Revolver*, ANTIQUE ARMS, http://aaawt.com/html/firearms/f102.html (last visited Feb. 21, 2015).

36    DOE RUN LEAD COMPANY'S MUSEUM, CATALOGUE OF CONTENTS 66 (1912).

37    DUNLAP, *supra* note 33, at 148-49, 167 (describing three European eighteen-shot models and one twenty-four-shot model); SUPICA ET AL., *supra* note 27, at 33 (describing the Marietta eighteen-shot model); WINANT, *supra* note 21, at 249-50 (describing a twenty-four-shot pepperbox).

38    WINANT, *supra* note 34, at 28.

39    FLAYDERMAN'S GUIDE, *supra* note 32, at 711.

40    *See id.*

41    *Id.* at 713, 716.

42    *Id.* The Porter Rifle was said to be able to fire up to sixty shots per minute. Mary Moran, *P.W. Porter, Inventor of the Porter Rifle*, DEAD MEMPHIS TALKING (April 18, 2014), http://deadmemphistalking.blogspot.com/2014/04/pw-porter-inventor-of-porter-rifle.html (reprinting an article from New York Post). About 1250 of these guns were produced. S.P. Fjestad, *What's It Worth? The Porter Rifle*, FIELD & STREAM, http://www.fieldandstream.com/articles/guns/rifles/2009/01/whats-it-worth-porter-rifle (last visited Feb. 21, 2015).

43    *See* FLAYDERMAN'S GUIDE, *supra* note 32, at 303 ("The self-contained cartridge was a special type, the hollowed out conical bullet containing the powder, and backed by the primer."); HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 26-27 (1952).

44    *See Smith & Wesson History*, SMITH & WESSON, http://www.smith-wesson.com/webapp/wcs/stores/servlet/Category4_750001_750051_757941_-1_757938_ 757812_image (last visited Feb. 21, 2015).

45    FLAYDERMAN'S GUIDE, *supra* note 32, at 304.

46    *Id.* at 303; WILLIAMSON, *supra* note 43, at 13.

47    WILLIAMSON, *supra* note 43, at 25. Oliver Winchester had an ownership interest in Volcanic and acquired the company in 1857. FLAYDERMAN'S GUIDE, *supra* note 32, at 300.

48    WILLIAMSON, *supra* note 43, at 25.

49    *See Id.*, at 28-31; Joseph Bilby, *The Guns of 1864*, AM. RIFLEMAN ((May 5, 2014), http://www.americanrifleman.org/articles/2014/5/5/the-guns-of-1864/. About 14,000 Henry rifles were sold in 1860-66. FLAYDERMAN'S GUIDE, *supra* note 32, at 305. The Henry Rifle is still in production today. *See About Henry Repeating*, HENRY, http://www.henryrifles.com/about-henry-repeating/ (last visited Feb. 21, 2015).

50    *See* WILLIAMSON, *supra* note 43 , at 49.

51    R.L. WILSON, WINCHESTER: AN AMERICAN LEGEND 32 (1991).

52    WILLIAMSON, *supra* note 43 , at 49.

53   LOUIS A. GARAVAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 1866-1894, at 128 (1985). The Winchester Model 1866 was produced until 1898. FLAYDERMAN'S GUIDE, *supra* note 32, at 306.

54   WILSON, *supra* note 51, at 34.

55   FLAYDERMAN'S GUIDE, *supra* note 32, at 306.

56   *Model 1873 Short Rifle* , WINCHESTER REPEATING ARMS, http:// www.winchesterguns.com/products/catalog/detail.asp?family=027C&mid=534200 (last visited Feb. 21, 2015).

57   *Id.*

58   FLAYDERMAN'S GUIDE, *supra* note 32 , at 307. The Model 1873 was Pa Cartwright's gun on the 1959 to 1973 television series *Bonanza*. SUPICA ET AL., *supra* note 27, at 108.

59   FLAYDERMAN'S GUIDE, *supra* note 32 , at 311. The Model 1892 was John Wayne's gun in many movies. SUPICA ET AL., *supra* note 27, at 109.

60   2014 STANDARD CATALOG OF FIREARMS: THE COLLECTOR'S PRICE & REFERENCE GUIDE, 1237 (Jerry Lee ed., 2013). The 1995 edition of this annually-published guide was relied on by the court in *Kirkland v. District of Columbia*, 70 F.3d 629, 635 n.3 (D.C. Cir. 1995).

61   The original Colt held up to fifteen rounds in calibers of .32-.20, .38-.40, and .44-.40. FLAYDERMAN'S GUIDE, *supra* note 32, at 122. Uberti currently produces a modern replica of the Colt Lightning, medium frame model, of which 89,000 were produced between 1884 and 1902. *Id.*

62   *Id.* at 694.

63   DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS293-95 (rev. ed. 1997); FLAYDERMAN'S GUIDE, *supra* note 32 , at 694. A later iteration of the rifle held twenty-five or twenty-eight rounds in the buttstock. DEMERITT, *supra,* at 301. The American Society of Arms Collectors endorses the Demeritt book as "the definitive work for historians and collectors" of Maine guns. DEMERITT, *supra*, at vi.

64   FLAYDERMAN'S GUIDE, *supra* note 32 , at 694.

65   WINANT, *supra* note 21, at 244-45. The magazine stuck out horizontally from the side of the firing chamber, making the handgun difficult to carry in a holster, which perhaps explains why the gun never had mass success. SUPICA ET AL., *supra* note 27, at 33.

66   *See infra* notes 72-77 and accompanying text.

67   SUPICA ET AL., *supra* note 27, at 48-49; WINANT, *supra* note 21, at 67-70.

68   SUPICA ET AL., *supra* note 27, at 49.

69   *See, e.g.*, WINANT, *supra* note 21, at 62-63, 207-08.

70   *Id.* at  204, 206.

71   *See id.* at 205.

72   JOHN W. BREATHED, JR. & JOSEPH J. SCHROEDER, JR., SYSTEM MAUSER, A PICTORIAL HISTORY OF THE MODEL 1896 SELF-LOADING PISTOL 272 (1967) (production of 1,150,000, of which "almost a million" were sold on the commercial, non-military market); *see* John Elliot, *A Sweeping History of the Mauser C96 Broomhandle Pistol*, GUNS.COM (Jan. 26, 2012), http://www.guns.com/2012/01/26/a-sweeping-history-of-the-mauser-c96-broomhandle-pistol/.

73   2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 708-09.

74   *Id.*; BREATHED & SCHROEDER, *supra* note 72, at 23, 30-31, 38-39, 54-55. At least between 1896 and 1905,
     Mauser's direct sales to the United States were small. *Id.* at 266-67.Spain's Astra brought out its own versions of
     the Mauser, with several models having twenty-round magazines starting in 1928. *Id.* at 208. But these do not
     appear to have had much distribution in the United States. *Id.* at 266-67.

75   *See* 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 650.

76   Among the many models was the 1906 American Eagle. *Id.* at 653. George Luger's invention was licensed to many
     companies, including Mauser (Germany) and Vickers (England). *Id.* at 657-58. The gun was never manufactured
     under Luger's own name. *See id.* at 650-62.

77   JEAN-NOËL MOURET, PISTOLS AND REVOLVERS 126-27 (1993); SUPICA ET AL., *supra* note 27, at 86.

78   *See Savage Arms History,* SAVAGE ARMS, http:// www.savagearms.com/history/ (last visited Feb. 21, 2015).

79   JIM PERKINS, AMERICAN BOYS' RIFLES 1890-1945, at 191 (1976).

80   *Id.* Similarly, the Remington Model 12B Gallery Special was introduced in 1910, with an optional extended
     magazine that held twenty-five .22 shorts. ROY MARCOT, REMINGTON, "AMERICA'S OLDEST GUN
     MAKER" 149 (James W. Bequette & Joel J. Hutchcroft eds. 1998).

81   *See, e.g.*, 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 687-88, 870, 1343.

82   Models listed in the 1936 *Shooter's Bible* include; Remington Model 34 bolt action, Remington Model 121 slide
     action, Remington Model 341 bolt action, Stevens No. 71 slide action, Savage Model 5 bolt action, Stevens
     Model 76 semiauto, Stevens-Springfield Model 86 bolt action, Winchester Model 62 slide action, and Winchester
     Model 61 slide action. STOGER ARMS CORP., SHOOTER'S BIBLE, 1936, at 108-09, 112, 123-24, 126-27,
     140 (photo. reprint 1974).
     Some additional models include: Stevens Model 87 bolt action, Remington 550 semiauto, Mossberg Model 46B
     bolt action, Mossberg Model 46M bolt action, Winchester Model 74 semiautomatic, Marlin 39 A lever action,
     and Marlin Model 81 DL bolt action. BOB BROWNELL, 2 THE GUNSMITHS MART, 1949-1950, at 212,
     214, 216, 218, 221 (2011) (reprinting article from *Hunting & Fishing*, Oct. 1948).
     The 1959 annual edition of the *Shooter's Bible* adds the semiautomatic Savage Model 6 to the above list.
     STOGER ARMS CORP., SHOOTER'S BIBLE, 1959, at 103 (1959). For some of the models previously
     mentioned, see *id.* at 80, 87, 91, 101.
     Histories of Savage and Stevens firearms include the following not listed above: Stevens No. 66 bolt action,
     Stevens Model 46 bolt action, Model 1914 slide action, Savage Model 29 slide action, Savage Model 29 G
     slide action. JAY KIMMEL, SAVAGE AND STEVENS ARMS COLLECTOR'S HISTORY 35 (1990); BILL
     WEST, SAVAGE AND STEVENS ARMS, at 11--12, 13--8, 14--44, 15--10, 16--10 (1971). Savage purchased
     Stevens in 1920. *Savage Arms History*, s upra note 78.
     For use of the *Shooter's Bible* by the courts, see United States v. Olson, No. 94-30387, 1995 U.S. App. LEXIS
     36973, at *1-2 (9th Cir. Dec. 15, 1995) (stating that the book was properly used as a source for a Bureau of
     Alcohol, Tobacco, and Firearms agent's expert opinion); United States v. Fisher, 353 F.2d 396, 399 (5th Cir.
     1965) (Gewin, J., dissenting) (considering information in the book to determine whether the evidence relied on
     by the trial court was sufficient to justify the trial court's holding); Potter v. United States, 167 Ct. Cl. 28, 48 n.1
     (Ct. Cl. 1964) (citing the book for the history of Gabilondo firearms); United States v. Precise Imports Corp.,
     458 F.2d 1376, 1377 (C.C.P.A. 1972) (reviewing the record produced at the trial court, which included pages
     from the 1967 edition of the book).

83   2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 84; *T1-C*, THOMPSON, www.auto-
     ordnance.com//firearms/thompson-t1-c.asp (last visited Feb. 21, 2015).

84   *See T1-C*, *supra* note 83.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                                    30

85   *See* BRUCE N. CANFIELD, BRUCE CANFIELD'S COMPLETE GUIDE TO THE M1 GARAND AND THE M1 CARBINE 163 (1999).

86   *See id.* at 163, 279 (noting high desirability and demand for the firearm after the war ended); *see also* Joseph P. Tartaro, *The Great Assault Weapon Hoax*, 20 U. DAYTON L. REV. 619, 622 (1995) ("[T]he M1 carbine [is] beloved by millions of war veterans, collectors, and recreational shooters.").

87   CANFIELD, *supra* note 85, at 163; LARRY L. RUTH, 2 WAR BABY! COMES HOME: THE U.S. CALIBER .30 CARBINE 575 (R. Blake Stevens ed., 1993); *About the CMP*, CIV. MARKSMANSHIP PROGRAM, http://thecmp.org/about/ (last visited Feb. 21, 2015).

88   *See* CANFIELD, *supra* note 85, at 163, 279 (noting the large quantity of surplus carbine parts and that firms created commercial carbines using these parts in the 1950s and 1960s. The largest producers were Plainfield's 112,000 from 1962 to 1978 and Iver Johnson's 96,700 from 1978 to 1992. *Post WWII Commercially Manufactured M1 Carbines (U.S.A.): Iver Johnson Arms*, M1CARBINESINC.COM, http://www.m1carbinesinc.com/carbine_ij.html (last visited Feb. 21, 2015); *Post WWII Commercially Manufactured M1 Carbines (U.S.A.): Plainfield Machine Co., Inc.*, M1CARBINESINC.COM., http://www.m1carbinesinc.com/carbine_plainfield.html (last visited Feb. 21, 2015). The U.S. Government sold 240,000 of its own surplus in 1963 into the Civilian Marksmanship Program. CANFIELD, *supra* note 85, at 163. Thereafter, the program (then known as "DCM"--Director of Civilian Marksmanship) sold M1s to Americans from the supply of World War II M1 carbines that had been exported to allied nations and subsequently returned to the United States when the allied nation switched to a newer type of rifle. *See* RUTH, *supra* note 87, at 575, 723. As of 2014, the Civilian Marksmanship Program's supply of carbines for sale has been exhausted. *M1 Carbine*, CIV. MARKSMANSHIP PROGRAM, http:// www.thecmp.org/Sales/carbine.htm (last visited Feb. 21, 2015).

89   RUTH, *supra* note 87, at 575.

90   *See* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 12, 809 (2012) (noting the wide range of uses for the gun and its popularity). The "AR" stands for "ArmaLite Rifle." *Modern Sporting Rifle Facts*, NAT'L SHOOTING SPORTS FOUND., http://www.nssf.org/msr/facts.cfm (last visited Feb. 21, 2015). ArmaLite did the initial design work on the AR-15 before selling the rights to Colt's. ARMALITE, INC., A HISTORICAL REVIEW OF ARMALITE 3 (Jan. 4, 2010), *available at* http:// www.armalite.com/images/Library% 5CHistory.pdf.

91   PATRICK SWEENEY, THE GUN DIGEST BOOK OF THE AR-15, at 104 (2005). About this time, the Cetme-Sport semiauto rifle with an optional twenty-round detachable box mag magazine came on the market. GUN DIGEST 1968, at 335 (John T. Amber ed., 22nd Anniversary Deluxe ed. 1967).

92   Staples v. United States, 511 U.S. 600 (1994).

93   *Id.* at 603.

94   *Id.* at 602 n.1, 603.

95   *See id.* at 612.

96   *See id.* at 611-12.

97   *See* GUN DIGEST 1970, at 294 (John T. Amber ed., 24th Anniversary Deluxe ed. 1969).

98   *See* 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 1102 (noting the twenty-round box magazine); *M1A Series*, SPRINGFIELD ARMORY, http:// www.springfield-armory.com/m1a-series/ (last visited Feb. 21, 2015).

99   2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 1173.

000336

100  *See* M1A Scout, *What is an M1A Rifle*, M1A RIFLES (July 2, 2009), http://www.m1arifles.com/tag/m14/; Shawn Skipper, *8 Things You Might Not Know About the Ruger Mini-14*, DAILY CALLER (June 3, 2014), http://dailycaller.com/2014/06/03/8-things-you-might-not-know-about-the-ruger-mini-14/. Another gun introduced in 1976 also used magazines larger than fifteen. The Bingham company (from Norcross, Georgia) brought out the PPS 50 and AK-22, .22 caliber rifles with detachable magazines of fifty or twenty-nine rounds. 2 014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 163. The PPS-50 is currently manufactured by Mitchell's Mausers. *See PPS-50/22*, MITCHELL'S MOUSERS, http://www.mauser.org/pps-50-22/ (last visited Feb. 21, 2015). That the gun is still in production four decades later is impressive, but the PPS-50 never became an all-American favorite as did the M1, AR-15, M1A and the Mini-14.

101  GUN DIGEST 1980, at 319-21 (Ken Warner ed., 34th Anniversary Deluxe ed. 1979). Also on the market were the Commando Arms carbine (five, fifteen, thirty or ninety rounds), and the Wilkinson Terry carbine (thirty-one rounds). *Id.* at 319, 322.

102  2 014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 182.

103  *Id.* at 432-33.

104  *See id.* at 465.

105  *Id.* at 72; BREATHED & SCHROEDER, *supra* note 74, at 216-17.

106  *See* GUN DIGEST 1965, at 229 (John T. Amber eds., 19th Anniversary Deluxe ed. 1964).

107  2 014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 121.

108  *Id.* at 122. In 1985 the M9 version of this pistol became the standard U.S. military issue sidearm. *Id.* at 124.

109  *Id.* at 184.

110  *See* GUN DIGEST 1980, *supra* note 101, at 297-98. L.E.S. was the American partner of Austria's Steyr. The following courts have relied on one of the annual issues of GUN DIGEST: Sturm, Ruger & Co. v. Arcadia Mach. & Tool, Inc., No. CV 85-8459 MRP, 1988 U.S. Dist. LEXIS 16451, at *3-4 (C.D. Cal. Nov. 4, 1988); A. Uberti & C. v. Leonardo, 892 P.2d 1354, 1364 (Ariz. 1995) (discussing how the inclusion of the defendant's guns in the *Gun Digest* established that defendant had sufficient minimum contacts with the state to satisfy personal jurisdiction); Couplin v. State, 378 A.2d 197, 202 n.2 (Md. Ct. Spec. App. 1977); Citizens for a Safer Cmty. v. City of Rochester, 627 N.Y.S.2d 193, 203 n.5 (Sup. Ct. 1994).

111  JULIAN E. ZELIZER, JIMMY CARTER 3 (2010).

112  *See* DAVID N. MEYER, THE BEE GEES: THE BIOGRAPHY 213-14 (2013).

113  PAUL M. BARRETT, GLOCK: THE RISE OF AMERICA'S GUN 13-16 (2012).

114  GAVIN MACLEOD & MARK DAGOSTINO, THIS IS YOUR CAPTAIN SPEAKING: MY FANTASTIC VOYAGE THROUGH HOLLYWOOD, FAITH & LIFE 138-39 (2013).

115  *See, e.g.*, BOB DENTON, THE PC PIONEERS 97-100 (2d ed. 2014); ROBERT E. WILLIAMS & BRUCE J. TAYLOR, THE POWER OF: VISICALC (1981) (advising how to properly use the VisiCalc system and providing practice exercises on the system).

116  *See generally* David Tong, *The Care, Feeding and Reliability of Semi-Automatic Pistols*, CHUCKHAWKS.COM, http://www.chuckhawks.com/care_ reliability_autopistols.htm (last visited Feb. 21, 2015).

000337
ER_1209

117 *See, e.g.*, Tim Lau, *AR15/M16 Magazine Drop Test: Plastic Vs. Aluminum*, MODERN SERVICE WEAPONS, (Dec. 9, 2012), http:// modernserviceweapons.com/?p=1072 (comparing the performance of plastic and aluminum magazines).

118 Michael Shain, Expert Report and Opinion at 5-6, Cooke v. Hickenlooper, No. 13-cv-01300-MSK-MJW (D. Colo. Aug. 1, 2013), available at http://coloradoguncase.org/Shain-report.pdf. Kopel is counsel for the Colorado Sheriffs who are the plaintiffs in this case, which is currently on appeal to the Tenth Circuit.

119 *See* Mike Wood, *3 Simple Keys to Cleaning Your Pistol Magazines*, POLICEONE.COM, July 11, 2014, http:// www.policeone.com/Officer-Safety/articles/7358758-3-simple-keys-to-cleaning-your-pistol-magazines/.

120 Michael Shain, Expert Report and Opinion at 5-7, *Cooke*, No. 13-cv-01300-MSK-MJW.

121 *See, e.g.*, *Magazine Adapters*, TOP GUN SUPPLY, http:// www.topgunsupply.com/gun-accessories-for-sale/ magazine-adapters.html (last visited Feb. 19, 2014) (selling magazine adapters that increase capacity and/or increase grip length).

122 *Magazines, Clips, and Speedloaders*, FIREARMS ADVANTAGE, http:// www.firearmsadvantage.com/ magazines_clips_speedloaders.html (last visited Feb. 21, 2015).

123 *Id.*

124 *Id.*

125 District of Columbia v. Heller, 554 U.S. 570, 629 (2008).

126 *Id.* at 626, 629.

127 Kerr v. Hickenlooper, 744 F.3d 1156, 1178 (10th Cir. 2014).

128 *See supra* notes 21-31 and accompanying text.

129 Act of June 2, 1927, No. 373, § 3, 1927 Mich . Public Acts 887, 888 (repealed 1959) ("It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading ...."). In 1931, the provision was consolidated into section 224 of the Michigan Code.

130 Act of Apr. 22, 1927, ch. 1052, §§ 1, 4, 1927 R.I. Acts & Resolves 256, 256-57 (amended 1959).

131 Under the 1959 revision: "Any person who shall manufacture, sell, offer for sale or possess any machine gun or firearm which shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger ... shall be guilty of a felony...." Act of July 16, 1959, No. 175, sec. 1, § 224, 1959 Mich. Pub. Acts 249, 250. Michigan's current statute on machine guns contains very similar language. *See* MICH. COMP. LAWS SERV. § 750.224 (LexisNexis 2014) ("A person shall not manufacture, sell, offer for sale or possess... [a] machine gun or firearm that shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger.").

132 Firearms Act, ch. 75, secs. 11-47-2, -8, 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975).

133 This was accomplished by changing the Firearms Act's definition of "Machine gun" to mirror the federal definition:
[A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

Firearms Act, ch. 278, sec. 1, § 11-47-2, 1975 R.I Pub. Laws 738, 738-39, 742 (amended 1989). Rhode Island's definition of machine gun was changed again in 1989. Act of July 10, 1989, ch. 542, sec. 7, § 11-47-2, 1989 R.I. Pub. Laws. 1371, 1375-76 (codified at R.I. GEN. LAWS ANN. § 11-47-2 (West 2014)).

134    Act of Apr. 8, 1933, No. 166, sec. 1, §§ 12819-3, -4, 1933 Ohio Laws 189, 189 (amended 1972).

135    Act of Dec. 22, 1972, No. 511, sec. 1, § 2923.11, 1972 Ohio Laws 1866, 1963; OHIO REV. CODE ANN. § 2923.11 (LexisNexis 2014).

136    *Ohio: Disclaimer*, BUDSGUNSHOP.COM (July. 11, 2014), http:// www.budsgunshop.com/catalog/feeds/ state_reg/ohio_restrictions.pdf.

137    OHIO REV. CODE ANN. § 2923.17.

138    *See, e.g., Surefire 60-Round High-Capacity Magazine MAG5-60*,    GANDER MTN., http:// www.gandermountain.com/modperl/product/details.cgi? pdesc=SureFire-60-Round-High-Capacity-Magazine-MAG5-60&i=447625 (last visited Feb. 21, 2015) (allowing online customers to arrange for pick-up of a SureFire 60-Round High-Capacity Magazine at any of nine Ohio stores).

139    H.R. 234, 2013-2014 Leg., 130th Sess. § 2 (Ohio 2014) (enacted) (repealing relevant definition statute, and taking effect Mar. 23, 2015).

140    Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

141    National Firearms Act, Pub. L. 73-474, 48 Stat. 1236 (1934).

142    *D.C. Home Rule*, COUNCIL D.C., http://dccouncil.us/pages/dc-home-rule (last visited Feb. 21, 2015).

143    *See* Firearms Control Regulations Act of 1975, No. 1-142, § 201, 23 D.C. Reg. 1091, 1097 (July 23, 1976).

144    *See supra* notes 13-14, 19-20 and accompanying text.

145    *See* VIVIAN S. CHU, DC GUN LAWS AND PROPOSED AMENDMENTS 5-6 (2011) (("Prior to Heller, the DC Code's definition of 'machine gun' included 'any firearm, which shoots, is designed to shoot or can be readily converted to shoot... semiautomatically, more than 12 shots without manual reloading.' By virtue of this broad definition, any semiautomatic weapon that could shoot more than 12 shots without manual reloading, whether pistol, rifle, or shotgun, was deemed a 'machine gun,' and prohibited from being registered. It appears that under the District's old definition, registration of a pistol was largely limited to revolvers." (quoting D.C. Code § 7-2501.01(10) (LexisNexis 2008))).

146    Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 110103(a)-(b), 108 Stat. 1796, 1998-99.

147    § 110105, 108 Stat. at 2000.

148    CHRISTOPHER S. KOPER ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994-2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

149    *Id.* at 2.

150    *Id.* at 81 n.95.

151    Act of May 30, 1990, ch. 32, §§ 2C:39-1(y), -3(j), 1990 N.J. Laws 217, 221, 235 (codified at N.J. STAT. ANN. § 2C:39-1(y), -3(j) (West 2014)).

152    § 2C:39-1(y). There is an exemption for certain competitive target shooters. *Id.* § 2C:39-3(j).

153  Act of June 29, 1992, ch. 286, sec. 3. § 134-8, 1992 Haw. Sess. Laws 740, 742 (codified at HAW. REV. STAT. ANN. § 134-8 (LexisNexis 2014)).

154  Act of May 26, 1994, ch. 456, § 36H-5, 1994 Md. Laws 2119, 2165 (amended 2013).

155  *See* Firearm Safety Act of 2013, ch. 427, § 4-305, 2013 Md. Laws 4195, 4210 (codified at MD. CODE. ANN., CRIM. LAW § 4-305 (LexisNexis 2014)).

156  *See* Act of July 19, 1999, ch. 129, sec. 3, § 12020(a)(2), (c)(25), 1999 Cal. Stat. 1781, 1785, 1793 (repealed 2012); Act of Aug. 8, 2000, ch. 189, sec. 11, § 265.02(8), 2000 N.Y. Laws 2788, 2793 (amended 2013).

157  *Large Capacity Ammunition Magazines Policy Summary*, L. CENTER TO PREVENT GUN VIOLENCE (May 31, 2013), http://smartgunlaws.org/large-capacity-ammunition-magazines-policy-summary/; *see supra* notes 158, 165 and accompanying text.

158  Act of Jan. 15, 2013, ch. 1, secs. 38, 46-a, §§ 265.00.23, 265.36, 2013 N.Y. Laws 1, 16, 19 (codified at N.Y. PENAL LAW § 265.36 (McKinney 2014)).

159  Freeman Klopott, *Cuomo's 7-Bullet Limit to Be Suspended Indefinitely, Skelos Says*, BLOOMBERG (Mar. 24, 2013), http:// www.bloomberg.com/news/2013-03-25/cuomo-s-7-bullet-limit-to-be-suspended-indefinitely-skelos-says.html.

160  PENAL §§ 265.36-.37; OFFICE OF DIV. COUNSEL, GUIDE TO THE NEW YORK SAFE ACT FOR MEMBERS OF THE DIVISION OF STATE POLICE 7, 9 (2013), *available at* http://www.nypdcea.org/pdfs/NYSP_Safe_Act_Field_Guide.pdf.

161  N.Y. State Rifle & Pistol Ass'n v. Cuomo, 990 F. Supp. 2d 349, 372-73 (W.D.N.Y. 2013).

162  N.Y.C., N.Y., ADMIN. CODE § 10-306(b) (2015).

163  Act of Mar. 20, 2013, ch. 48, sec. 1, §§ 18-12-301(2)(a)(I), - 302(1), 2013 Colo. Sess. Laws 144, 144-45 (codified at COLO. REV. STAT. § 18-12-302(1) (2014)).

164  Act of April 4, 2013, P.A. 13-3, § 23, 2013 Conn. Acts 47, 66 (Reg. Sess.) (codified at CONN. GEN. STAT. ANN. § 53-202w (West 2015)).

165  COLO. REV. STAT. § 18-12-302(2) (permitting a person to maintain possession of a banned magazine if he/she owned it prior to the effective date of the law and maintained "continuous possession" thereafter); CONN GEN. STAT. §§ 53-202w(e)(4), 53-202x(a)(1) (permitting a person to maintain possession of a banned magazine if he/she possessed it prior to the effective date of the law and declared it to the government).

166  MASS. GEN. LAWS ANN. ch. 140 §§ 121, 131(a) (West 2014) (allowing possession and acquisition of magazines manufactured before Sept. 1994 by anyone with a Class A license); Matt Carroll, *Snapshot: Gun Licenses Per 1,000, 2012*, BOSTON.COM, (Jan. 24, 2013), http:// www.boston.com/yourtown/specials/snapshot/massachusetts_snapshot_gun_licenses_ 2012 (showing the prevalence of Class A licenses in Massachusetts). A 2014 bill enacted in Massachusetts eliminated the lower category of "Class B" firearms licenses, so presumably all licensed firearms owners in Massachusetts will be able to acquire magazines of more than ten rounds, albeit only magazines manufactured before 1995. Act of Aug. 11, 2014, ch. 284, 2014 Mass. Acts, *available at* https://malegislature.gov/Laws/SessionLaws/Acts/2014/Chapter284.

167  *See, e.g.*, Ezell v. City of Chi., 651 F.3d 684, 702-03 (7th Cir. 2011).

168  JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 90, at 218.

169  *Id.* at 299.

170  *See supra* Part II.B.

000340
ER_1212

171  *See supra* notes 27-31 and accompanying text.

172  *See supra* notes 32-35 and accompanying text..

173  RICHARD C. RATTENBURY, A LEGACY IN ARMS: AMERICAN FIREARM MANUFACTURE, DESIGN, AND ARTISTRY, 1800-1900, at 135 (2014); *see supra* note 49 and accompanying text.

174  CLIFFORD R. CADWELL, GUNS OF THE LINCOLN COUNTY WAR 50 (2009); RATTENBURY, *supra* note 173, at 136; *supra* notes 55-55 and accompanying text.

175  *See supra* notes 129-30 and accompanying text; *s ee also* Act of June 2, 1927, No. 372, § 3, 1927 Mich . Public Acts 887, 888-89 (repealed 1959) (regulating the possession of and carrying of certain firearms that were capable of firing sixteen shots without reloading).

176  *See id.* at 625, 629 (majority opinion).

177  *Id.* at 627 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)).

178  *Heller,* 554 U.S. at 627.

179  *See id.* at 625, 627.

180  *See id.* at 627.

181  *See id.*

182  *Id.* (quoting *Miller*, 307 U.S. at 179).

183  *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179) (internal quotation marks omitted).

184  *Miller*, 307 U.S. at 178.

185  *Heller*, 554 U.S. at 625.

186  *Miller,* 307 U.S. at 177, 183.

187  *Id.* at 178. "Judicial notice" is when courts rely on facts that are not in the record of the case, but which are indisputably true. FED. R. EVID. 201. For example, they may be a subject of common knowledge (e.g., that in Arkansas, the sun is never visible in the sky at midnight) or can be ascertained from indisputable sources (e.g., that a particular section of the Code of Federal Regulations contains certain language). *See id.*

188  Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U J.L. & LIBERTY 48, 65-68 (2008). *The Peculiar Story of* United States v. Miller was cited by the Court in *Heller*. *Heller*, 554 U.S. at 623.

189  *Heller,* 554 U.S. at 621-22.

190  *See supra* Part II.

191  *See supra* Part II.

192  *See* Fyock v. City of Sunnyvale, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722, at *13 (N.D. Cal. Mar. 5, 2014) (agreeing with and incorporating affidavit from plaintiffs' expert that "whatever the actual number of such magazines in United States consumers' hands is, it is in the tens-of-millions, even under the most conservative estimates.").

193  *Id.* ("Plaintiffs cite statistics showing that magazines having a capacity to accept more than ten rounds make up approximately 47 percent of all magazines owned.").

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

194  PATRICK SWEENEY, THE GUN DIGEST BOOK OF THE AR-15, at 14 (2005); *see* Meghan Lisson, *Run on Guns: AR-15s Sales Soar*, CNBC (Apr. 25, 2013), http://www.cnbc.com/id/100673826.

195  SWEENEY, *supra* note 194, at 99.

196  District of Columbia v. Heller, 554 U.S. 570, 626, 627 n.26 (2008).

197  *Id.* at 626-27.

198  *Id.* at 629 (citations omitted) (citing Nunn v. State, 1 Ga. 243, 251 (1846); Andrews v. State, 50 Tenn. 165, 187 (1871)); *see also Heller*, 554 U.S. at 629 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional ...." (quoting State v. Reid, 1 Ala. 612, 616-17 (1840)) (internal quotation marks omitted)).

199  Edward D. Jones, III, *The District of Columbia's "Firearms Control Regulations Act of 1975": The Toughest Handgun Control Law in the United States--Or Is It?*, 455 ANNALS AM. ACAD. POL. & SOC. SCI. 138, 139 (1981).

200  *See* McDonald v. City of Chi., 561 U.S. 742, 749 (2010); Steve Chapman, *Chicago's Pointless Handgun Ban: City Gun Ordinances Proved to Be a Failure*, CHI. TRIB., Mar. 4, 2010, at C21.

201  *Nunn*, 1 Ga. at 246, 251. The *Heller* Court cited this case with approval. *Heller*, 554 U.S. at 612.

202  Fiscal v. City & Cnty. of S.F., 70 Cal. Rptr. 3d 324, 326, 341-42 (Ct. App. 2008); Doe v. City & Cnty. of S.F., 186 Cal Rptr. 380, 381 (Ct. App. 1982).

203  *See supra* note 151-52 and accompanying text.

204  *See supra* note 156 and accompanying text.

205  *See supra* notes 129-30, 134, 140 and accompanying text.

206  *See supra* notes 140-45 and accompanying text.

207  *See supra* notes 131, 133 and accompanying text.

208  *See supra* notes 135-39 and accompanying text.

209  Ezell v. City of Chi., 651 F.3d 684, 690-91 (7th Cir. 2011).

210  *Id.* at 702-03.

211  *Id.* at 703.

212  *Id.* at 704.

213  *Id.* at 705-06.

214  *Id.*

215  *Id.* at 705.

216  *Id.* at 706.

217  *Id.* (quoting District of Columbia v. Heller, 554 U.S. 570, 632 (2008)); *see also Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law... that contradicts the overwhelming weight of other evidence....").

218  *See Ezell*, 652 F.3d at 706.

219  *See supra* notes 131, 133, 140 and accompanying text.

220  18 U.S.C. § 922(x)(2)-(3) (2013); United States v. Rene E., 583 F.3d 8, 16 (1st Cir. 2009).

221  *Rene E.*, 583 F.3d at 12.

222  *Id.*

223  *Id.* at 14-15.

224  State v. Callicutt, 69 Tenn. 714, 716-17 (1878).

225  McMillan v. Steele, 119 A. 721, 722 (Pa. 1923).

226  State v. Allen, 94 Ind. 441, 441 (1884).

227  Tankersly v. Commonwealth, 9 S.W. 702, 703 (Ky. 1888).

228  Coleman v. State, 32 Ala. 581, 582-83 (1858).

229  Biffer v. Chicago, 116 N.E. 182, 184 (Ill. 1917).

230  Schmidt v. Capital Candy Co., 166 N.W. 502, 503-04 (Minn. 1918).

231  United States v. Rene E., 583 F.3d 8, 14-15 (1st Cir. 2009).

232  *Id.*

233  *Id.*

234  *Id.* at 11-16 ("[T]his law, with its narrow scope and its exceptions, does not offend the Second Amendment."). Exceptions include farm and ranch work as well as target shooting or other activities under parental supervision. 18 U.S.C. § 922(x)(3)(A)(i)-(ii) (2013).

235  Ezell v. City of Chi., 651 F.3d 684, 706 (7th Cir. 2011).

236  District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

237  *Id.* at 574-75.

238  *Id.* at 635.

239  *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1248-49 (D.C. Cir. 2011).

240  *Id.* at 1247.

241  *Id.* at 1252-53.

242  *See id.* at 1252.

243  *Id.* at 1253-54.

244  *See id.* at 1254.

245  *Id.* The court listed seven states that today have handgun registration laws. *Id.* at n.*.

246  *Id.* at 1254-55.

247  *Id.* at 1255.

248  *Id.*

249  *See id.* at 1247.

250  *See id.*

251  *Id.* at 1246, 1260, 1264.

252  *Id.* at 1260.

253  *Id.* at 1260 n.*.

254  *Id.* at 1262-64.

255  *Id.* at 1263-64.

256  KOPER EL AL., *supra* note 148, at 92.

257  *Heller II,* 670 F.3d at 1285 (Kavanaugh, J., dissenting) ("A ban on a class of arms is not an 'incidental' regulation. It is equivalent to a ban on a category of speech. Such restrictions on core enumerated constitutional protections are *not* subjected to mere intermediate scrutiny review. The majority opinion here is in uncharted territory in suggesting that intermediate scrutiny can apply to an outright ban on possession of a class of weapons that have not traditionally been banned.").

258  *Id.* at 1285-86.

259  *See id.* at 1282.

260  *Id.* ("*Heller* was resolved in favor of categoricalism--with the categories defined by text, history, and tradition--and against balancing tests such as strict or intermediate scrutiny or reasonableness.").

261  *See id.*

262  *Id.* at 1286.

263  *See id.* at 1292-93.

264  *Id.* at 1294.

265  *See id.*

266  *See id.* at 1287 (citing JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 90, at 11).

267  *Heller II,* 670 F.3d at 1296 n.20 (Kavanaugh, J., dissenting) ("The D.C. ban on magazines of more than 10 rounds requires analysis in the first instance by the District Court. In order to apply *Heller's* test to this prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use. The parties here did not brief that question in much detail. Evidence presented to the District Court on the history and prevalence of magazines of more than 10 rounds would be helpful to the proper disposition of that issue under the *Heller* test. Therefore, I would remand to the District Court for analysis of that issue.").

268  *See* Lindsay Colvin, Note, *History, Heller, and High-Capacity Magazines: What Is the Proper Standard of Review for Second Amendment Challenges?,* 41 FORDHAM URB. L.J. 1041, 1075-80 (2014).

269  *Heller II,* 670 F.3d at 1260.

270  Silvester v. Harris, No. 1:11-CV-2137 AWI SAB, 2014 U.S. Dist. LEXIS 118284 (E.D. Cal. Aug. 25, 2014).

271  CAL. PENAL CODE §§ 26815(a) , 27540(a)  (West 2014).

272  *Silvester,* 2014 U.S. Dist. LEXIS 118284, at *82.

273  *Chief District Court Judge Anthony W. Ishii*, U.S. DIST. COURT: E. DIST. OF CAL., http://www.caed.uscourts.gov/caed/staticOther/page_630.htm (last visited Feb. 21, 2015).

274  *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *101-02.

275  *Compare id.* at *30, *with* Ezell v. City of Chi., 651 F.3d 684, 702-03 (7th Cir. 2011).

276  *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *8-9.

277  *See id.* at *9-10, *78.

278  *Id.* at *11.

279  *Id.*

280  *Id.* at *11-12.

281  *Id.* at *75.

282  *Id.* at *75-76.

283  *Id.* at *78 (citations omitted).

284  *Id.* at *79.

285  *Id.*

286  *Id.* at *30.

287  *Id.* at *75-76.

288  *Id.* at *80.

289  *Id.*

290  *Id.* at *90-91, 96-97.

291  *Id.* at *101-03.

292  *See id.* at *23-25.

293  *See supra* notes 43-64 and accompanying text.

294  *See supra* notes 102-06 and accompanying text.

295  *See supra* notes 130, 132-33 and accompanying text.

296  *See supra* notes 136-39 and accompanying text.

297  *See supra* notes 134-35 and accompanying text.

298  *See supra* notes 140-45 and accompanying text.

299  *See supra* note 156 and accompanying text.

78 ALBLR 849

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 40

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| **Document Title:** | **Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003** |
| **Author(s):** | **Christopher S. Koper** |
| **Document No.:** | **204431** |
| **Date Received:** | **July 2004** |
| **Award Number:** | **98-IJ-CX-0039** |

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# An Updated Assessment of the Federal Assault Weapons Ban:  Impacts on Gun Markets and Gun Violence, 1994-2003

## Report to the National Institute of Justice, United States Department of Justice

By

**Christopher S. Koper**
(Principal Investigator)

With

Daniel J. Woods and Jeffrey A. Roth

**June 2004**

Jerry Lee Center of Criminology
University of Pennsylvania
3814 Walnut Street
Philadelphia, PA 19104



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 1. IMPACTS OF THE FEDERAL ASSAULT WEAPONS BAN, 1994-2003: KEY FINDINGS AND CONCLUSIONS

This overview presents key findings and conclusions from a study sponsored by the National Institute of Justice to investigate the effects of the federal assault weapons ban. This study updates prior reports to the National Institute of Justice and the U.S. Congress on the assault weapons legislation.

### The Ban Attempts to Limit the Use of Guns with Military Style Features and Large Ammunition Capacities

- Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 imposed a 10-year ban on the "manufacture, transfer, and possession" of certain semiautomatic firearms designated as assault weapons (AWs). The ban is directed at semiautomatic firearms having features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense (examples include flash hiders, folding rifle stocks, and threaded barrels for attaching silencers). The law bans 18 models and variations by name, as well as revolving cylinder shotguns. It also has a "features test" provision banning other semiautomatics having two or more military-style features. In sum, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified 118 models and variations that are prohibited by the law. A number of the banned guns are foreign semiautomatic rifles that have been banned from importation into the U.S. since 1989.

- The ban also prohibits most ammunition feeding devices holding more than 10 rounds of ammunition (referred to as large capacity magazines, or LCMs). An LCM is arguably the most functionally important feature of most AWs, many of which have magazines holding 30 or more rounds. The LCM ban's reach is broader than that of the AW ban because many non-banned semiautomatics accept LCMs. Approximately 18% of civilian-owned firearms and 21% of civilian-owned handguns were equipped with LCMs as of 1994.

- The ban exempts AWs and LCMs manufactured before September 13, 1994. At that time, there were upwards of 1.5 million privately owned AWs in the U.S. and nearly 25 million guns equipped with LCMs. Gun industry sources estimated that there were 25 million pre-ban LCMs available in the U.S. as of 1995. An additional 4.7 million pre-ban LCMs were imported into the country from 1995 through 2000, with the largest number in 1999.

- Arguably, the AW-LCM ban is intended to reduce gunshot victimizations by limiting the national stock of semiautomatic firearms with large ammunition capacities – which enable shooters to discharge many shots rapidly – and other features conducive to criminal uses. The AW provision targets a relatively small number of weapons based on features that have little to do with the weapons'

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

1

operation, and removing those features is sufficient to make the weapons legal. The LCM provision limits the ammunition capacity of non-banned firearms.

**The Banned Guns and Magazines Were Used in Up to A Quarter of Gun Crimes Prior to the Ban**

- AWs were used in only a small fraction of gun crimes prior to the ban: about 2% according to most studies and no more than 8%. Most of the AWs used in crime are assault pistols rather than assault rifles.

- LCMs are used in crime much more often than AWs and accounted for 14% to 26% of guns used in crime prior to the ban.

- AWs and other guns equipped with LCMs tend to account for a higher share of guns used in murders of police and mass public shootings, though such incidents are very rare.

**The Ban's Success in Reducing Criminal Use of the Banned Guns and Magazines Has Been Mixed**

- Following implementation of the ban, the share of gun crimes involving AWs declined by 17% to 72% across the localities examined for this study (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), based on data covering all or portions of the 1995-2003 post-ban period. This is consistent with patterns found in national data on guns recovered by police and reported to ATF.

- The decline in the use of AWs has been due primarily to a reduction in the use of assault pistols (APs), which are used in crime more commonly than assault rifles (ARs). There has not been a clear decline in the use of ARs, though assessments are complicated by the rarity of crimes with these weapons and by substitution of post-ban rifles that are very similar to the banned AR models.

- However, the decline in AW use was offset throughout at least the late 1990s by steady or rising use of other guns equipped with LCMs in jurisdictions studied (Baltimore, Milwaukee, Louisville, and Anchorage). The failure to reduce LCM use has likely been due to the immense stock of exempted pre-ban magazines, which has been enhanced by recent imports.

**It is Premature to Make Definitive Assessments of the Ban's Impact on Gun Crime**

- Because the ban has not yet reduced the use of LCMs in crime, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. However, the ban's exemption of millions of pre-ban AWs and LCMs ensured that the effects

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.                                                    2

of the law would occur only gradually. Those effects are still unfolding and may not be fully felt for several years into the future, particularly if foreign, pre-ban LCMs continue to be imported into the U.S. in large numbers.

**The Ban's Reauthorization or Expiration Could Affect Gunshot Victimizations, But Predictions are Tenuous**

- Should it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement. AWs were rarely used in gun crimes even before the ban. LCMs are involved in a more substantial share of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability of offenders to fire more than ten shots (the current magazine capacity limit) without reloading.

- Nonetheless, reducing criminal use of AWs and especially LCMs could have non-trivial effects on gunshot victimizations. The few available studies suggest that attacks with semiautomatics – including AWs and other semiautomatics equipped with LCMs – result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms. Further, a study of handgun attacks in one city found that 3% of the gunfire incidents resulted in more than 10 shots fired, and those attacks produced almost 5% of the gunshot victims.

- Restricting the flow of LCMs into the country from abroad may be necessary to achieve desired effects from the ban, particularly in the near future. Whether mandating further design changes in the outward features of semiautomatic weapons (such as removing all military-style features) will produce measurable benefits beyond those of restricting ammunition capacity is unknown. Past experience also suggests that Congressional discussion of broadening the AW ban to new models or features would raise prices and production of the weapons under discussion.

- If the ban is lifted, gun and magazine manufacturers may reintroduce AW models and LCMs, perhaps in substantial numbers. In addition, pre-ban AWs may lose value and novelty, prompting some of their owners to sell them in undocumented secondhand markets where they can more easily reach high-risk users, such as criminals, terrorists, and other potential mass murderers. Any resulting increase in crimes with AWs and LCMs might increase gunshot victimizations for the reasons noted above, though this effect could be difficult to measure.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

3

**000351**
**ER_1223**

### 3. CRIMINAL USE OF ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES BEFORE THE BAN

During the 1980s and early 1990s, AWs and other semiautomatic firearms equipped with LCMs were involved in a number of highly publicized mass murder incidents that raised public concern about the accessibility of high powered, military-style weaponry and other guns capable of discharging high numbers of bullets in a short period of time (Cox Newspapers, 1989; Kleck, 1997, pp.124-126,144; Lenett, 1995). In one of the worst mass murders ever committed in the U.S., for example, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California MacDonald's restaurant on July 18, 1984 using an Uzi carbine, a shotgun, and another semiautomatic handgun. On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, and a number of other firearms, killed 7 persons and wounded 15 others at his former workplace in Louisville, Kentucky before taking his own life. Another particularly notorious incident that precipitated much of the recent debate over AWs occurred on January 17, 1989 when Patrick Purdy used a civilian version of the AK-47 military rifle to open fire on a schoolyard in Stockton, California, killing 5 children and wounding 29 persons.

There were additional high profile incidents in which offenders using semiautomatic handguns with LCMs killed and wounded large numbers of persons. Armed with two handguns having LCMs (and reportedly a supply of extra LCMs), a rifle, and a shotgun, George Hennard killed 22 people and wounded another 23 in Killeen, Texas in October 1991. In a December 1993 incident, a gunman named Colin Ferguson, armed with a handgun and LCMs, opened fire on commuters on a Long Island train, killing 5 and wounding 17.

Indeed, AWs or other semiautomatics with LCMs were involved in 6, or 40%, of 15 mass shooting incidents occurring between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded (Kleck, 1997, pp.124-126, 144). Early studies of AWs, though sometimes based on limited and potentially unrepresentative data, also suggested that AWs recovered by police were often associated with drug trafficking and organized crime (Cox Newspapers, 1989; also see Roth and Koper, 1997, Chapter 5), fueling a perception that AWs were guns of choice among drug dealers and other particularly violent groups. All of this intensified concern over AWs and other semiautomatics with large ammunition capacities and helped spur the passage of AW bans in California, New Jersey, Connecticut, and Hawaii between 1989 and 1993, as well as the 1989 federal import ban on selected semiautomatic rifles. Maryland also passed AW legislation in 1994, just a few months prior to the passage of the 1994 federal AW ban.[9]

Looking at the nation's gun crime problem more broadly, however, AWs and LCMs were used in only a minority of gun crimes prior to the 1994 federal ban, and AWs were used in a particularly small percentage of gun crimes.

[9] A number of localities around the nation also passed AW bans during this period.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

14

### 3.1.  Criminal Use of Assault Weapons

Numerous studies have examined the use of AWs in crime prior to the federal ban.  The definition of AWs varied across the studies and did not always correspond exactly to that of the 1994 law (in part because a number of the studies were done prior to 1994).  In general, however, the studies appeared to focus on various semiautomatics with detachable magazines and military-style features.  According to these accounts, AWs typically accounted for up to 8% of guns used in crime, depending on the specific AW definition and data source used (e.g., see Beck et al., 1993; Hargarten et al., 1996; Hutson et al., 1994; 1995; McGonigal et al., 1993; New York State Division of Criminal Justice Services, 1994; Roth and Koper, 1997, Chapters 2, 5, 6; Zawitz, 1995).  A compilation of 38 sources indicated that AWs accounted for 2% of crime guns on average (Kleck, 1997, pp.112, 141-143).[10]

Similarly, the most common AWs prohibited by the 1994 federal ban accounted for between 1% and 6% of guns used in crime according to most of several national and local data sources examined for this and our prior study (see Chapter 6 and Roth and Koper, 1997, Chapters 5, 6):

- Baltimore (all guns recovered by police, 1992-1993):  2%
- Miami (all guns recovered by police, 1990-1993):  3%
- Milwaukee (guns recovered in murder investigations, 1991-1993):  6%
- Boston (all guns recovered by police, 1991-1993):  2%
- St. Louis (all guns recovered by police, 1991-1993):  1%
- Anchorage, Alaska (guns used in serious crimes, 1987-1993):  4%
- National (guns recovered by police and reported to ATF, 1992-1993):  5%[11]
- National (gun thefts reported to police, 1992-Aug. 1994):  2%
- National (guns used in murders of police, 1992-1994):  7-9%[12]
- National (guns used in mass murders of 4 or more persons, 1992-1994):  4-13%[13]

Although each of the sources cited above has limitations, the estimates consistently show that AWs are used in a small fraction of gun crimes.  Even the highest

---

[10] The source in question contains a total of 48 estimates, but our focus is on those that examined all AWs (including pistols, rifles, and shotguns) as opposed to just assault rifles.

[11] For reasons discussed in Chapter 6, the national ATF estimate likely overestimates the use of AWs in crime.  Nonetheless, the ATF estimate lies within the range of other presented estimates.

[12] The minimum estimate is based on AW cases as a percentage of all gun murders of police.  The maximum estimate is based on AW cases as a percentage of cases for which at least the gun manufacturer was known.  Note that AWs accounted for as many as 16% of gun murders of police in 1994 (Roth and Koper, 1997, Chapter 6; also see Adler et al., 1995).

[13] These statistics are based on a sample of 28 cases found through newspaper reports (Roth and Koper, 1997, Appendix A).  One case involved an AW, accounting for 3.6% of all cases and 12.5% of cases in which at least the type of gun (including whether the gun was a handgun, rifle, or shotgun and whether the gun was a semiautomatic) was known.  Also see the earlier discussion of AWs and mass shootings at the beginning of this chapter.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

15

estimates, which correspond to particularly rare events such mass murders and police murders, are no higher than 13%. Note also that the majority of AWs used in crime are assault pistols (APs) rather than assault rifles (ARs). Among AWs reported by police to ATF during 1992 and 1993, for example, APs outnumbered ARs by a ratio of 3 to 1 (see Chapter 6).

The relative rarity of AW use in crime can be attributed to a number of factors. Many AWs are long guns, which are used in crime much less often than handguns. Moreover, a number of the banned AWs are foreign weapons that were banned from importation into the U.S. in 1989. Also, AWs are more expensive (see Table 2-1) and more difficult to conceal than the types of handguns that are used most frequently in crime.

### 3.1.1. A Note on Survey Studies and Assault Weapons

The studies and statistics discussed above were based primarily on police information. Some survey studies have given a different impression, suggesting substantial levels of AW ownership among criminals and otherwise high-risk juvenile and adult populations, particularly urban gang members (Knox et al., 1994; Sheley and Wright, 1993a). A general problem with these studies, however, is that respondents themselves had to define terms like "military-style" and "assault rifle." Consequently, the figures from these studies may lack comparability within those from studies with police data. Further, the figures reported in some studies prompt concerns about exaggeration of AW ownership (perhaps linked to publicity over the AW issue during the early 1990s when a number of these studies were conducted), particularly among juvenile offenders, who have reported ownership levels as high as 35% just for ARs (Sheley and Wright, 1993a).[14]

Even so, most survey evidence on the actual use of AWs suggests that offenders rarely use AWs in crime. In a 1991 national survey of adult state prisoners, for example, 8% of the inmates reported possessing a "military-type" firearm at some point in the past (Beck et al., 1993, p. 19). Yet only 2% of offenders who used a firearm during their conviction offense reported using an AW for that offense (calculated from pp. 18, 33), a figure consistent with the police statistics cited above. Similarly, while 10% of adult inmates and 20% of juvenile inmates in a Virginia survey reported having owned an AR, none of the adult inmates and only 1% of the juvenile inmates reported having carried them at crime scenes (reported in Zawitz, 1995, p. 6). In contrast, 4% to 20% of inmates surveyed in eight jails across rural and urban areas of Illinois and Iowa reported having used an AR in committing crimes (Knox et al., 1994, p. 17). Nevertheless, even assuming the accuracy and honesty of the respondents' reports, it is not clear what

---

[14] As one example of possible exaggeration of AW ownership, a survey of incarcerated juveniles in New Mexico found that 6% reported having used a "military-style rifle" against others and 2.6% reported that someone else used a rifle against them. However, less than 1% of guns recovered in a sample of juvenile firearms cases were "military" style guns (New Mexico Criminal Justice Statistical Analysis Center, 1998, pp. 17-19; also see Ruddell and Mays, 2003).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.                    16

weapons they were counting as ARs, what percentage of their crimes were committed with ARs, or what share of all gun crimes in their respective jurisdictions were linked to their AR uses. Hence, while some surveys suggest that ownership and, to a lesser extent, use of AWs may be fairly common among certain subsets of offenders, the overwhelming weight of evidence from gun recovery and survey studies indicates that AWs are used in a small percentage of gun crimes overall.

### 3.1.2. Are Assault Weapons More Attractive to Criminal Users Than Other Gun Users?

Although AWs are used in a small percentage of gun crimes, some have argued that AWs are more likely to be used in crime than other guns, i.e., that AWs are more attractive to criminal than lawful gun users due to the weapons' military-style features and their particularly large ammunition magazines. Such arguments are based on data implying that AWs are more common among crime guns than among the general stock of civilian firearms. According to some estimates generated prior to the federal ban, AWs accounted for less than one percent of firearms owned by civilians but up to 11% of guns used in crime, based on firearms reported by police to ATF between 1986 and 1993 (e.g., see Cox Newspapers, 1989; Lennett, 1995). However, these estimates were problematic in a number of respects. As discussed in Chapter 6, ATF statistics are not necessarily representative of the types of guns most commonly recovered by police, and ATF statistics from the late 1980s and early 1990s in particular tended to overstate the prevalence of AWs among crime guns. Further, estimating the percentage of civilian weapons that are AWs is difficult because gun production data are not reported by model, and one must also make assumptions about the rate of attrition among the stock of civilian firearms.

Our own more recent assessment indicates that AWs accounted for about 2.5% of guns produced from 1989 through 1993 (see Chapter 5). Relative to previous estimates, this may signify that AWs accounted for a growing share of civilian firearms in the years just before the ban, though the previous estimates likely did not correspond to the exact list of weapons banned in 1994 and thus may not be entirely comparable to our estimate. At any rate, the 2.5% figure is comparable to most of the AW crime gun estimates listed above; hence, it is not clear that AWs are used disproportionately in most crimes, though AWs still seem to account for a somewhat disproportionate share of guns used in murders and other serious crimes.

Perhaps the best evidence of a criminal preference for AWs comes from a study of young adult handgun buyers in California that found buyers with minor criminal histories (i.e., arrests or misdemeanor convictions that did not disqualify them from purchasing firearms) were more than twice as likely to purchase APs than were buyers with no criminal history (4.6% to 2%, respectively) (Wintemute et al., 1998a). Those with more serious criminal histories were even more likely to purchase APs: 6.6% of those who had been charged with a gun offense bought APs, as did 10% of those who had been charged with two or more serious violent offenses. AP purchasers were also more likely to be arrested subsequent to their purchases than were other gun purchasers.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

17

Among gun buyers with prior charges for violence, for instance, AP buyers were more than twice as likely as other handgun buyers to be charged with any new offense and three times as likely to be charged with a new violent or gun offense. To our knowledge, there have been no comparable studies contrasting AR buyers with other rifle buyers.

### 3.2. Criminal Use of Large Capacity Magazines

Relative to the AW issue, criminal use of LCMs has received relatively little attention. Yet the overall use of guns with LCMs, which is based on the combined use of AWs and non-banned guns with LCMs, is much greater than the use of AWs alone. Based on data examined for this and a few prior studies, guns with LCMs were used in roughly 14% to 26% of most gun crimes prior to the ban (see Chapter 8; Adler et al., 1995; Koper, 2001; New York Division of Criminal Justice Services, 1994).

- Baltimore (all guns recovered by police, 1993): 14%
- Milwaukee (guns recovered in murder investigations, 1991-1993): 21%
- Anchorage, Alaska (handguns used in serious crimes, 1992-1993): 26%
- New York City (guns recovered in murder investigations, 1993): 16-25%[15]
- Washington, DC (guns recovered from juveniles, 1991-1993): 16%[16]
- National (guns used in murders of police, 1994): 31%-41%[17]

Although based on a small number of studies, this range is generally consistent with national survey estimates indicating approximately 18% of all civilian-owned guns and 21% of civilian-owned handguns were equipped with LCMs as of 1994 (Cook and Ludwig, 1996, p. 17). The exception is that LCMs may have been used disproportionately in murders of police, though such incidents are very rare.

As with AWs and crime guns in general, most crime guns equipped with LCMs are handguns. Two handgun models manufactured with LCMs prior to the ban (the Glock 17 and Ruger P89) were among the 10 crime gun models most frequently recovered by law enforcement and reported to ATF during 1994 (ATF, 1995).

---

[15] The minimum estimate is based on cases in which discharged firearms were recovered, while the maximum estimate is based on cases in which recovered firearms were positively linked to the case with ballistics evidence (New York Division of Criminal Justice Services, 1994).
[16] Note that Washington, DC prohibits semiautomatic firearms accepting magazines with more than 12 rounds (and handguns in general).
[17] The estimates are based on the sum of cases involving AWs or other guns sold with LCMs (Adler et al., 1995, p.4). The minimum estimate is based on AW-LCM cases as a percentage of all gun murders of police. The maximum estimate is based on AW-LCM cases as a percentage of cases in which the gun model was known.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.                                                                18

### 3.3. Summary

In sum, AWs and LCMs were used in up to a quarter of gun crimes prior to the 1994 AW-LCM ban.  By most estimates, AWs were used in less than 6% of gun crimes even before the ban.  Some may have perceived their use to be more widespread, however, due to the use of AWs in particularly rare and highly publicized crimes such as mass shootings (and, to a lesser extent, murders of police), survey reports suggesting high levels of AW ownership among some groups of offenders, and evidence that some AWs are more attractive to criminal than lawful gun buyers.

In contrast, guns equipped with LCMs – of which AWs are a subset – are used in roughly 14% to 26% of gun crimes.  Accordingly, the LCM ban has greater potential for affecting gun crime.  However, it is not clear how often the ability to fire more than 10 shots without reloading (the current magazine capacity limit) affects the outcomes of gun attacks (see Chapter 9).  All of this suggests that the ban's impact on gun violence is likely to be small.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

000357
ER_1229

## 7. MARKET INDICATORS FOR LARGE CAPACITY MAGAZINES: PRICES AND IMPORTATION

The previous chapters examined the AW-LCM ban's impact on the availability and criminal use of AWs. In this chapter and the next, we consider the impact of the ban's much broader prohibition on LCMs made for numerous banned and non-banned firearms. We begin by studying market indicators. Our earlier study of LCM prices for a few gun models revealed that prices rose substantially during 1994 and into 1995 (Roth and Koper, 1997, Chapter 4). Prices of some LCMs remained high into 1996, while others returned to pre-ban levels or oscillated more unpredictably. The price increases may have reduced LCM use at least temporarily in the short-term aftermath of the ban, but we could not confirm this in our prior investigation.

### 7.1. Price Trends for Large Capacity Magazines

For this study, we sought to approximate longer term trends in the prices at which users could purchase banned LCMs throughout the country. To that end, we analyzed quarterly data on the prices of LCMs advertised by eleven gun and magazine distributors in *Shotgun News*, a national gun industry publication, from April 1992 to December 1998.[63] Those prices are available to any gun dealer, and primary market retailers generally re-sell within 15% of the distributors' prices.[64] The distributors were chosen during the course of the first AW study (Roth and Koper, 1997) based on the frequency with which they advertised during the April 1992 to June 1996 period. For each quarterly period, project staff coded prices for one issue from a randomly selected month. We generally used the first issue of each selected month based on a preliminary, informal assessment suggesting that the selected distributors advertised more frequently in those issues. In a few instances, first-of-month issues were unavailable to us or provided too few observations, so we substituted other issues.[65] Also, we were unable to obtain *Shotgun News* issues for the last two quarters of 1996. However, we aggregated the data annually to study price trends, and the omission of those quarters did not appear to affect the results (this is explained further below).

We ascertained trends in LCM prices by conducting hedonic price analyses,

---

[63] The *Blue Book of Gun Values*, which served as the data source for the AW price analysis, does not contain ammunition magazine prices.

[64] According to gun market experts, retail prices track wholesale prices quite closely (Cook et al., 1995, p. 71). Retail prices to eligible purchasers generally exceed wholesale (or original-purchase) prices by 3% to 5% in the large chain stores, by about 15% in independent dealerships, and by about 10% at gun shows (where overhead costs are lower).

[65] The decision to focus on first-of-month issues was made prior to data collection for price analysis update. For the earlier study (Roth and Koper, 1997), project staff coded data for one or more randomly selected issues of every month of the April 1992 to June 1996 period. For this analysis, we utilized data from only the first-of-month issues selected at random during the prior study. If multiple first-of-month issues were available for a given quarter, we selected one at random or based on the number of recorded advertisements. If no first-of-month issue was available for a given quarter, we selected another issue at random from among those coded during the first study.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

61

similar to those described in the AW price analysis (Chapter 5), in which we regressed inflation-adjusted LCM prices (logged) on several predictors: magazine capacity (logged), gun make (for which the LCM was made), year of the advertisement, and distributor. We cannot account fully for the meaning of significant distributor effects. They may represent unmeasured quality differentials in the merchandise of different distributors, or they may represent other differences in stock volume or selling or service practices between the distributors.[66] We included the distributor indicators when they proved to be significant predictors of advertised price. In addition, we focused on LCMs made for several of the most common LCM-compatible handguns and rifles, rather than try to model the differences in LCM prices between the several hundred miscellaneous makes and models of firearms that were captured in the data. Finally, for both the handgun and rifle models, we created and tested seasonal indicator variables to determine if their incorporation would affect the coefficient for 1996 (the year with winter/spring data only), but they proved to be statistically insignificant and are not shown in the results below.[67]

### 7.1.1. Large Capacity Magazines for Handguns

The handgun LCM analysis tracks the prices of LCMs made for Intratec and Cobray (i.e., SWD) APs and non-banned semiautomatic pistols made by Smith and Wesson, Glock, Sturm Ruger, Sig-Sauer, Taurus, and Beretta (each of the manufacturers in the former group produces numerous models capable of accepting LCMs). In general, LCMs with greater magazine capacities commanded higher prices, and there were significant price differentials between LCMs made for different guns and sold by different distributors (see Table 7-1). Not surprisingly, LCMs made for Glock handguns were most expensive, followed by those made for Beretta and Sig-Sauer firearms.

Turning to the time trend indicators (see Table 7-1 and Figure 7-1), prices for these magazines increased nearly 50% from 1993 to 1994, and they rose another 56% in 1995. Prices declined somewhat, though not steadily, from 1996 to 1998. Nevertheless, prices in 1998 remained 22% higher than prices in 1994 and nearly 80% higher than those in 1993.

---

[66] For example, one possible difference between the distributors may have been the extent to which they sold magazines made of different materials (e.g., steel, aluminum, etc.) or generic magazines manufactured by companies other than the companies manufacturing the firearms for which the magazines were made. For example, there were indications in the data that 3% of the handgun LCMs and 10% of the AR-15 and Mini-14 rifle LCMs used in the analyses (described below) were generic magazines. We did not control for these characteristic, however, because such information was often unclear from the advertisements and was not recorded consistently by coders.

[67] Project staff coded all LCM advertisements by the selected distributors. Therefore, the data are inherently weighted. However, the weights are based on the frequency with which the different LCMs were advertised (i.e., the LCMs that were advertised most frequently have the greatest weight in the models) rather than by production volume.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

62

**Table 7-1.  Regression of Handgun and Rifle Large Capacity Magazine Prices on Annual Time Indicators, 1992-1998, Controlling for Gun Makes/Models and Distributors**

| | Handgun LCMs (n=1,277) | | Rifle LCMs (n=674) | |
|---|---|---|---|---|
| | Estimate | T value | Estimate | T value |
| Constant | -1.79 | -12.74*** | -4.10 | -19.12*** |
| 1992 | -0.19 | -2.11** | -0.48 | -4.20*** |
| 1993 | -0.38 | -6.00*** | -0.55 | -6.14*** |
| 1995 | 0.44 | 6.88*** | -0.25 | -2.64*** |
| 1996 | 0.29 | 4.05*** | -0.12 | -0.93 |
| 1997 | 0.36 | 6.33*** | -0.31 | -3.68*** |
| 1998 | 0.20 | 3.51*** | -0.44 | -5.19*** |
| Rounds (logged) | 0.26 | 5.73*** | 0.84 | 15.08*** |
| Cobray | -0.36 | -4.15*** | | |
| Glock | 0.41 | 8.15*** | | |
| Intratec | -0.40 | -4.18*** | | |
| Ruger | -0.42 | -7.79*** | | |
| Smith&Wesson | -0.08 | -1.71* | | |
| Sig-Sauer | 0 | -0.09 | | |
| Taurus | -0.31 | -6.10*** | | |
| AK-type | | | -0.25 | -3.15*** |
| Colt AR-15 | | | 0.14 | 1.68* |
| Ruger Mini-14 | | | -0.08 | -0.92 |
| Distributor 1 | -0.72 | -16.38*** | -0.35 | -5.15*** |
| Distributor 2 | -0.15 | -0.97 | -0.83 | -5.24*** |
| Distributor 3 | -0.16 | -3.93*** | 0.19 | 2.69*** |
| Distributor 4 | -0.55 | -5.72*** | 0.16 | 0.80 |
| Distributor 5 | -0.07 | -1.79* | -0.18 | -2.65*** |
| Distributor 6 | -0.53 | -1.23 | -0.12 | -0.32 |
| Distributor 7 | -1.59 | -3.70*** | -0.10 | -0.91 |
| Distributor 8 | | | 0.14 | 0.70 |
| Distributor 9 | -0.91 | -12.52*** | -0.48 | -4.00*** |
| F statistic | 58.76 | | 21.22 | |
| (p value) | <.0001 | | <.0001 | |
| Adj. R-square | 0.51 | | 0.38 | |

Year indicators are interpreted relative to 1994, and distributors are interpreted relative to distributor 10.
Handgun makes are relative to Beretta and rifle models are relative to SKS.
* Statistically significant at p<=.10.
** Statistically significant at p<=.05.
*** Statistically significant at p<=.01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

63

**Figure 7-1. Annual Price Trends for Large Capacity Magazines, 1992-1998**



Based on 1,277 sampled ads for LCMs fitting models of 8 handgun makers and 674 sampled ads for LCMs fitting 4 rifle model groups.

### 7.1.2. Large Capacity Magazines for Rifles

We approximated trends in the prices of LCMs for rifles by modeling the prices of LCMs manufactured for AR-15, Mini-14, SKS,[68] and AK-type rifle models (including various non-banned AK-type models). As in the handgun LCM model, larger LCMs drew higher prices, and there were several significant model and distributor effects. AR-15 magazines tended to have the highest prices, and magazines for AK-type models had the lowest prices (Table 7-1).

Like their handgun counterparts, prices for rifle LCMs increased over 40% from 1993 to 1994, as the ban was debated and implemented (see Table 7-1 and Figure 7-1). However, prices declined over 20% in 1995. Following a rebound in 1996, prices moved downward again during 1997 and 1998. Prices in 1998 were over one third lower than the peak prices of 1994 and were comparable to pre-ban prices in 1992 and 1993.

---

[68] The SKS is a very popular imported rifle (there are Russian and Chinese versions) that was not covered by either the 1989 AR import ban or the 1994 AW ban. However, importation of SKS rifles from China was discontinued in 1994 due to trade restrictions.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

64

## 7.2. Post-Ban Importation of Large Capacity Magazines

ATF does not collect (or at least does not publicize) statistics on production of LCMs. Therefore, we cannot clearly document pre-ban production trends. Nevertheless, it seems likely that gun and magazine manufacturers boosted their production of LCMs during the debate over the ban, just as AW makers increased production of AWs. Regardless, gun industry sources estimated that there were 25 million LCMs available as of 1995 (including aftermarket items for repairing magazines or converting them to LCMs) (Gun Tests, 1995, p. 30).

Moreover, the supply of LCMs continued to grow even after the ban due to importation of foreign LCMs that were manufactured prior to the ban (and thus grandfathered by the LCM legislation), according to ATF importation data.[69] As shown in Table 7-2, nearly 4.8 million LCMs were imported for commercial sale (as opposed to law enforcement uses) from 1994 through 2000, with the largest number (nearly 3.7 million) arriving in 1999.[70] During this period, furthermore, importers received permission to import a total of 47.2 million LCMs; consequently, an additional 42 million LCMs may have arrived after 2000 or still be on the way, based on just those approved through 2000.[71, 72]

To put this in perspective, gun owners in the U.S. possessed 25 million firearms that were equipped with magazines holding 10 or more rounds as of 1994 (Cook and Ludwig, 1996, p. 17). Therefore, the 4.7 million LCMs imported in the U.S. from 1994 through 2000 could conceivably replenish 19% of the LCMs that were owned at the time of the ban. The 47.2 million approved during this period could supply nearly 2 additional LCMs for all guns that were so equipped as of 1994.

## 7.3. Summary and Interpretations

Prices of LCMs for handguns rose significantly around the time of the ban and, despite some decline from their peak levels in 1995, remained significantly higher than pre-ban prices through at least 1998. The increase in LCM prices for rifles proved to be more temporary, with prices returning to roughly pre-ban levels by 1998.[73]

---

[69] To import LCMs into the country, importers must certify that the magazines were made prior to the ban. (The law requires companies to mark post-ban LCMs with serial numbers.) As a practical matter, however, it is hard for U.S. authorities to know for certain whether imported LCMs were produced prior to the ban.

[70] The data do not distinguish between handgun and rifle magazines or the specific models for which the LCMs were made. But note that roughly two-thirds of the LCMs imported from 1994 through 2000 had capacities between 11 and 19 rounds, a range that covers almost all handgun LCMs as well as many rifle LCMs. It seems most likely that the remaining LCMs (those with capacities of 20 or more rounds) were primarily for rifles.

[71] The statistics in Table 7-2 do not include belt devices used for machine guns.

[72] A caveat to the number of approved LCMs is that importers may overstate the number of LCMs they have available to give themselves leeway to import additional LCMs, should they become available.

[73] A caveat is that we did not examine prices of smaller magazines, so the price trends described here may not have been entirely unique to LCMs. Yet it seems likely that these trends reflect the unique impact of the ban on the market for LCMs.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

65

**Table 7-2.  Large Capacity Magazines Imported into the United States or Approved For Importation for Commercial Sale, 1994-2000**

| Year | Imported | Approved |
|------|----------|----------|
| 1994 | 67,063 | 77,666 |
| 1995 | 3,776 | 2,066,228 |
| 1996 | 280,425 | 2,795,173 |
| 1997 | 99,972 | 1,889,773 |
| 1998 | 337,172 | 20,814,574 |
| 1999 | 3,663,619 | 13,291,593 |
| 2000 | 346,416 | 6,272,876 |
| *Total* | *4,798,443* | *47,207,883* |

Source:  Firearms and Explosives Imports Branch, Bureau of Alcohol, Tobacco, Firearms, and Explosives. Counts do not include "links" (belt devices) or imports for law enforcement purposes.


The drop in rifle LCM prices between 1994 and 1998 may have due to the simultaneous importation of approximately 788,400 grandfathered LCMs, most of which appear to have been rifle magazines (based on the fact that nearly two-thirds had capacities over 19 rounds), as well as the availability of U.S. military surplus LCMs that fit rifles like the AR-15 and Mini-14.  We can also speculate that demand for LCMs is not as great among rifle consumers, who are less likely to acquire their guns for defensive or criminal purposes.

The pre-ban supply of handgun LCMs may have been more constricted than the supply of rifle LCMs for at least a few years following the ban, based on prices from 1994 to 1998.  Although there were an estimated 25 million LCMs available in the U.S. as of 1995, some major handgun manufacturers (including Ruger, Sig Sauer, and Glock) had or were close to running out of new LCMs by that time (Gun Tests, 1995, p. 30).  Yet the frequency of advertisements for handgun LCMs during 1997 and 1998, as well as the drop in prices from their 1995 peak, suggests that the supply had not become particularly low.  In 1998, for example, the selected distributors posted a combined total of 92 LCM ads per issue (some of which may have been for the same make, model, and capacity combinations) for just the handguns that we incorporated into our model.[74]  Perhaps the

---

[74] Project staff found substantially more advertisements per issue for 1997 and 1998 than for earlier years. For the LCMs studied in the handgun analysis, staff recorded an average of 412 LCM advertisements per year (103 per issue) during 1997 and 1998.  For 1992-1996, staff recorded an average of about 100 ads per year (25 per issue) for the same LCMs.  A similar but smaller differential existed in the volume of ads for the LCMs used in the rifle analysis.  The increase in LCM ads over time may reflect changes in supply and

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

66

demand for enhanced firepower among handgun consumers, who are more likely to acquire guns for crime or defense against crime, was also a factor (and perhaps a large one) putting a premium on handgun LCMs.

Although we might hypothesize that high prices depressed use of handguns with LCMs for at least a few years after the ban, a qualification to this prediction is that LCM use may be less sensitive to prices than is use of AWs because LCMs are much less expensive than the firearms they complement and therefore account for a smaller fraction of users' income (e.g., see Friedman, 1962). To illustrate, TEC-9 APs typically cost $260 at retail during 1992 and 1993, while LCMs for the TEC-9, ranging in capacity from 30 to 36 rounds, averaged $16.50 in *Shotgun News* advertisements (and probably $19 or less at retail) during the same period. So, for example, a doubling of both gun and LCM prices would have a much greater impact on purchases of TEC-9 pistols than purchases of LCMs for the TEC-9. Users willing and able to pay for a gun that accepts an LCM are most likely willing and able to pay for an LCM to use with the gun.

Moreover, the LCM supply was enhanced considerably by a surge in LCM imports that occurred after the period of our price analysis. During 1999 and 2000, an additional 4 million grandfathered LCMs were imported into the U.S., over two-thirds of which had capacities of 11-19 rounds, a range that covers almost all handgun LCMs (as well as many rifle LCMs). This may have driven prices down further after 1998.

In sum, market indicators yield conflicting signs on the availability of LCMs. It is perhaps too early to expect a reduction in crimes with LCMs, considering that tens of millions of grandfathered LCMs were available at the time of the ban, an additional 4.8 million – enough to replenish one-fifth of those owned by civilians – were imported from 1994 through 2000, and that the elasticity of demand for LCMs may be more limited than that of firearms. And if the additional 42 million foreign LCMs approved for importation become available, there may not be a reduction in crimes with LCMs anytime in the near future.

---

demand for LCMs during the study period, as well as product shifts by distributors and perhaps changes in ad formats (e.g., ads during the early period may have been more likely to list magazines by handgun model without listing the exact capacity of each magazine, in which case coders would have been more likely to miss some LCMs during the early period). Because the data collection effort for the early period was part of a larger effort that involved coding prices in *Shotgun News* for LCMs and numerous banned and non-banned firearms, it is also possible that coders were more likely to miss LCM ads during that period due to random factors like fatigue or time constraints.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.   67

## 9. THE CONSEQUENCES OF CRIMES WITH ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES

One of the primary considerations motivating passage of the ban on AWs and LCMs was a concern over the perceived dangerousness of these guns and magazines. In principal, semiautomatic weapons with LCMs enable offenders to fire high numbers of shots rapidly, thereby potentially increasing both the number of person wounded per gunfire incident (including both intended targets and innocent bystanders) and the number of gunshot victims suffering multiple wounds, both of which would increase deaths and injuries from gun violence. Ban advocates also argued that the banned AWs possessed additional features conducive to criminal applications.

The findings of the previous chapters suggest that it is premature to make definitive assessments of the ban's impact on gun violence. Although criminal use of AWs has declined since the ban, this reduction was offset through at least the late 1990s by steady or rising use of other guns equipped with LCMs. As argued previously, the LCM ban has greater potential for reducing gun deaths and injuries than does the AW ban. Guns with LCMs – of which AWs are only a subset – were used in up to 25% of gun crimes before the ban, whereas AWs were used in no more than 8% (Chapter 3). Furthermore, an LCM is arguably the most important feature of an AW. Hence, use of guns with LCMs is probably more consequential than use of guns with other military-style features, such as flash hiders, folding rifle stocks, threaded barrels for attaching a silencers, and so on.[94]

This is not to say that reducing use of AWs will have no effect on gun crime; a decline in the use of AWs does imply fewer crimes with guns having particularly large magazines (20 or more rounds) and other military-style features that could facilitate some crimes. However, it seems that any such effects would be outweighed, or at least

---

[94] While it is conceivable that changing features of AWs other than their magazines might prevent some gunshot victimizations, available data provide little if any empirical basis for judging the likely size of such effects. Speculatively, some of the most beneficial weapon redesigns may be the removal of folding stocks and pistol grips from rifles. It is plausible that some offenders who cannot obtain rifles with folding stocks (which make the guns more concealable) might switch to handguns, which are more concealable but generally cause less severe wounds (e.g. see DiMaio, 1985). However, such substitution patterns cannot be predicted with certainty. Police gun databases rarely have information sufficiently detailed to make assessments of changes over time in the use of weapons with specific features like folding stocks. Based on informal assessments, there was no consistent pattern in post-ban use of rifles (as a share of crime guns) in the local databases examined in the prior chapters (also see the specific comments on LCM rifles in the previous chapters).

Pistol grips enhance the ability of shooters to maintain control of a rifle during rapid, "spray and pray" firing (e.g., see Violence Policy Center, 2003). (Heat shrouds and forward handgrips on APs serve the same function.) While this feature may prove useful in military contexts (e.g., firefights among groups at 100 meters or less – see data of the U.S. Army's Operations Research Office as cited in Violence Policy Center, 2003), it is unknown whether civilian attacks with semiautomatic rifles having pistol grips claim more victims per attack than do those with other semiautomatic rifles. At any rate, most post-ban AR-type rifles still have pistol grips. Further, the ban does not count a stock thumbhole grip, which serves the same function as a pistol grip (e.g., see the illustration of LCMM rifles in Chapter 2), as an AR feature.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

80

obscured, by the wider effects of LCM use, which themselves are likely to be small at best, as we argue below.[95]

Because offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns.[96]  But by forcing AW and LCM offenders to substitute non-AWs with small magazines, the ban might reduce the number of shots fired per gun attack, thereby reducing both victims shot per gunfire incident and gunshot victims sustaining multiple wounds.  In the following sections, we consider the evidence linking high-capacity semiautomatics and AWs to gun violence and briefly examine recent trends in lethal and injurious gun violence.

### 9.1.  The Spread of Semiautomatic Weaponry and Trends in Lethal and Injurious Gun Violence Prior to the Ban

Nationally, semiautomatic handguns grew from 28% of handgun production in 1973 to 80% in 1993 (Zawitz, 1995, p. 3).  Most of this growth occurred from the late 1980s onward, during which time the gun industry also increased marketing and production of semiautomatics with LCMs (Wintemute, 1996).  Likewise, semiautomatics grew as a percentage of crime guns (Koper, 1995; 1997), implying an increase in the average firing rate and ammunition capacity of guns used in crime.[97]

---

[95] On a related note, a few studies suggest that state-level AW bans have not reduced crime (Koper and Roth, 2001a; Lott, 2003).  This could be construed as evidence that the federal AW ban will not reduce gunshot victimizations without reducing LCM use because the state bans tested in those studies, as written at the time, either lacked LCM bans or had LCM provisions that were less restrictive than that of the federal ban.  (New Jersey's 1990 AW ban prohibited magazines holding more than 15 rounds.  AP bans passed by Maryland and Hawaii prohibited magazines holding more than 20 rounds and pistol magazines holding more than 10 rounds, respectively, but these provisions did not take effect until just a few months prior to the federal ban.)  However, it is hard to draw definitive conclusions from these studies for a number of reasons, perhaps the most salient of which are the following:  there is little evidence on how state AW bans affect the availability and use of AWs (the impact of these laws is likely undermined to some degree by the influx of AWs from other states, a problem that was probably more pronounced prior to the federal ban when the state laws were most relevant); studies have not always examined the effects of these laws on gun homicides and shootings, the crimes that are arguably most likely to be affected by AW bans (see discussion in the main text); and the state AW bans that were passed prior to the federal ban (those in California, New Jersey, Hawaii, Connecticut, and Maryland) were in effect for only three months to five years (two years or less in most cases) before the imposition of the federal ban, after which they became largely redundant with the federal legislation and their effects more difficult to predict and estimate.

[96] One might hypothesize that the firepower provided by AWs and other semiautomatics with LCMs emboldens some offenders to engage in aggressive behaviors that prompt more shooting incidents.  On the other hand, these weapons might also prevent some acts of violence by intimidating adversaries, thus discouraging attacks or resistance.  We suspect that firepower does influence perceptions, considering that many police departments have upgraded their weaponry in recent years – often adopting semiautomatics with LCMs – because their officers felt outgunned by offenders.  However, hypotheses about gun types and offender behavior are very speculative, and, pending additional research on such issues, it seems prudent to focus on indicators with stronger theoretical and empirical foundations.

[97] Revolvers, the most common type of non-semiautomatic handgun, typically hold only 5 or 6 rounds (and sometimes up to 9).  Semiautomatic pistols, in contrast, hold ammunition in detachable magazines that, prior to the ban, typically held 5 to 17 bullets and sometimes upwards of 30 (Murtz et al., 1994).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

81

The impact of this trend is debatable.  Although the gun homicide rate rose considerably during the late 1980s and early 1990s (Bureau of Justice Statistics, 1994, p. 13), the percentage of violent gun crimes resulting in death was declining (see Figure 9-1 and the related discussion in section 9.3).  Similarly, the percentage of victims killed or wounded in handgun discharge incidents declined from 27% during the 1979-1987 period to 25% for the 1987-1992 period (calculated from Rand, 1990, p. 5; 1994, p. 2) as semiautomatics were becoming more common crime weapons.[98]  On the other hand, an increasing percentage of gunshot victims died from 1992 to 1995 according to hospital data (Cherry et al., 1998), a trend that could have been caused in part by a higher number of gunshot victims with multiple wounds (also see McGonigal et al., 1993).  Most notably, the case fatality rate for assaultive gunshot cases involving 15 to 24-year-old males rose from 15.9% in late 1993 to 17.5% in early 1995 (p. 56).

## Figure 9-1. Percentage of Violent Gun Crimes Resulting in Death (National), 1982-2002



Based on gun homicides, gun robberies, and gun assaults reported in the Uniform Crime Reports and Supplemental Homicide Reports.

---

[98]  A related point is that there was a general upward trend in the average number of shots fired by offenders in gunfights with New York City police from the late 1980s through 1992 (calculated from Goehl, 1993, p. 51).  However, the average was no higher during this time than during many years of the early 1980s and 1970s.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

82

Some researchers have inferred links between the growing use of semiautomatics in crime and the rise of both gun homicides and bystander shootings in a number of cities during the late 1980s and early 1990s (Block and Block, 1993; McGonigal et al., 1993; Sherman et al., 1989; Webster et al., 1992). A study in Washington, DC, for example, reported increases in wounds per gunshot victim and gunshot patient mortality during the 1980s that coincided with a reported increase in the percentage of crime guns that were semiautomatics (Webster et al., 1992).

Nevertheless, changes in offender behavior, coupled with other changes in crime guns (e.g., growing use of large caliber handguns – see Caruso et al., 1999; Koper, 1995; 1997; Wintemute, 1996), may have been key factors driving such trends. Washington, DC, for example, was experiencing an exploding crack epidemic at the time of the aforementioned study, and this may have raised the percentage of gun attacks in which offenders had a clear intention to injure or kill their victims. Moreover, studies that attempted to make more explicit links between the use of semiautomatic firearms and trends in lethal gun violence via time series analysis failed to produce convincing evidence of such links (Koper, 1995; 1997). However, none of the preceding research related specific trends in the use of AWs or LCMs to trends in lethal gun violence.

## 9.2. Shots Fired in Gun Attacks and the Effects of Weaponry on Attack Outcomes

The evidence most directly relevant to the potential of the AW-LCM ban to reduce gun deaths and injuries comes from studies examining shots fired in gun attacks and/or the outcomes of attacks involving different types of guns. Unfortunately, such evidence is very sparse.

As a general point, the faster firing rate and larger ammunition capacities of semiautomatics, especially those equipped with LCMs, have the potential to affect the outcomes of many gun attacks because gun offenders are not particularly good shooters. Offenders wounded their victims in no more than 29% of gunfire incidents according to national, pre-ban estimates (computed from Rand, 1994, p. 2; also see estimates presented later in this chapter). Similarly, a study of handgun assaults in one city revealed a 31% hit rate per shot, based on the sum totals of all shots fired and wounds inflicted (Reedy and Koper, 2003, p. 154). Other studies have yielded hit rates per shot ranging from 8% in gunfights with police (Goehl, 1993, p. 8) to 50% in mass murders (Kleck, 1997, p. 144). Even police officers, who are presumably certified and regularly re-certified as proficient marksman and who are almost certainly better shooters than are average gun offenders, hit their targets with only 22% to 39% of their shots (Kleck, 1991, p. 163; Goehl, 1993). Therefore, the ability to deliver more shots rapidly should raise the likelihood that offenders hit their targets, not to mention innocent bystanders.[99]

---

[99] However, some argue that this capability is offset to some degree by the effects of recoil on shooter aim, the limited number of shots fired in most criminal attacks (see below), and the fact that criminals using non-semiautomatics or semiautomatics with small magazines usually have the time and ability to deliver multiple shots if desired (Kleck, 1991, pp. 78-79).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

83

A few studies have compared attacks with semiautomatics, sometimes specifically those with LCMs (including AWs), to other gun assaults in terms of shots fired, persons hit, and wounds inflicted (see Tables 9-1 and 9-2). The most comprehensive of these studies examined police reports of attacks with semiautomatic pistols and revolvers in Jersey City, New Jersey from 1992 through 1996 (Reedy and Koper, 2003), finding that use of pistols resulted in more shots fired and higher numbers of gunshot victims (Table 9-1), though not more gunshot wounds per victim (Table 9-2).[100] Results implied there would have been 9.4% fewer gunshot victims overall had semiautomatics not been used in any of the attacks. Similarly, studies of gun murders in Philadelphia (see McGonigal et al., 1993 in Table 9-1) and a number of smaller cities in Pennsylvania, Ohio, and Iowa (see Richmond et al., 2003 in Table 9-2) found that attacks with semiautomatics resulted in more shots fired and gunshot wounds per victim. An exception is that the differential in shots fired between pistol and revolver cases in Philadelphia during 1990 did not exist for cases that occurred in 1985, when semiautomatics and revolvers had been fired an average of 1.6 and 1.9 times, respectively. It is not clear whether the increase in shots fired for pistol cases from 1985 to 1990 was due to changes in offender behavior, changes in the design or quality of pistols (especially an increase in the use of models with LCMs – see Wintemute, 1996), the larger sample for 1990, or other factors.

---

[100] But unlike other studies that have examined wounds per victim (see Table 9-2), this study relied on police reports of wounds inflicted rather than medical reports, which are likely to be more accurate.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

84

Table 9-1. Shots Fired and Victims Hit in Gunfire Attacks By Type of Gun and Magazine

| Data Source | Measure | Outcome |
|---|---|---|
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Shots Fired | Avg. = 3.2 – 3.7 (n=165 pistol cases) *<br><br>Avg. = 2.3 – 2.6 (n=71 revolver cases) * |
| Gun homicides with semiautomatic pistols and revolvers, Philadelphia, 1985 and 1990 [b] | Shots Fired | Avg. = 1.6 (n=21 pistol cases, 1985)<br>Avg. = 1.9 (n=57 revolver cases, 1985)<br><br>Avg. = 2.7 (n=95 pistol cases, 1990)<br>Avg. = 2.1 (n=108 revolver cases, 1990) |
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Victims Hit | Avg. = 1.15 (n=95 pistol cases) *<br><br>Avg. = 1.0 (n=40 revolver cases) * |
| Mass shootings with AWs, semiautomatics having LCMs, or other guns, 6+ dead or 12+ shot, United States, 1984-1993 [c] | Victims Hit | Avg. = 29 (n=6 AW/LCM cases)<br><br>Avg. = 13 (n=9 non-AW/LCM cases) |
| Self-reported gunfire attacks by state prisoners with AWs, other semiautomatics, and non-semiautomatic firearms, United States, 1997 or earlier [d] | % of Attacks With Victims Hit | 19.5% (n=72 AW or machine gun cases)<br><br>22.3% (n=419 non-AW, semiautomatic cases)<br><br>23.3% (n=608 non-AW, non-semiautomatic cases) |

a. Reedy and Koper (2003)
b. McGonigal et al. (1993)
c. Figures calculated by Koper and Roth (2001a) based on data presented by Kleck (1997, p. 144)
d. Calculated from Harlow (2001, p. 11).  (Sample sizes are based on unpublished information provided by the author of the survey report.)
* Pistol/revolver differences statistically significant at p<.05 (only Reedy and Koper [2003] and Harlow [2001] tested for statistically significant differences).  The shots fired ranges in Reedy and Koper are based on minimum and maximum estimates.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 9-2. Gunshot Wounds Per Victim By Type of Gun and Magazine**

| Data Source | Measure | Outcome |
|---|---|---|
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Gunshot Wounds | Avg. = 1.4 (n=107 pistol victims)<br><br>Avg. = 1.5 (n=40 revolver victims) |
| Gun homicides with semiautomatic pistols and revolvers, Iowa City (IA), Youngstown (OH), and Bethlehem (PA), 1994-1998 [b] | Gunshot Wounds | Avg. = 4.5 total (n=212 pistol victims)*<br>Avg. = 2.9 entry<br><br>Avg. = 2.0 total (n=63 revolver victims)*<br>Avg. = 1.5 entry |
| Gun homicides with assault weapons (AWs), guns having large capacity magazines (LCMs), and other firearms, Milwaukee, 1992-1995 [c] | Gunshot Wounds | Avg. = 3.23 (n=30 LCM victims) **<br>Avg. = 3.14 (n=7 AW victims)<br><br>Avg. = 2.08 (n=102 non-AW/LCM victims)** |

a. Reedy and Koper (2003)
b. Richmond et al. (2003)
c. Roth and Koper (1997, Chapter 6)
* Pistol/revolver differences statistically significant at $p<.01$.
** The basic comparison between LCM victims and non-AW/LCM victims was moderately significant ($p<.10$) with a one-tailed test. Regression results (with a slightly modified sample) revealed a difference significant at $p=.05$ (two-tailed test). Note that the non-LCM group included a few cases involving non-banned LCMs (.22 caliber attached tubular devices).

Also, a national survey of state prisoners found that, contrary to expectations, offenders who reported firing on victims with AWs and other semiautomatics were no more likely to report having killed or injured victims than were other gun offenders who reported firing on victims (Table 9-1). However, the measurement of guns used and attack outcomes were arguably less precise in this study, which was based on offender self-reports, than in other studies utilizing police and medical reports.[101]

Attacks with AWs or other guns with LCMs may be particularly lethal and injurious, based on very limited evidence. In mass shooting incidents (defined as those in which at least 6 persons were killed or at least 12 were wounded) that occurred during the decade preceding the ban, offenders using AWs and other semiautomatics with LCMs (sometimes in addition to other guns) claimed an average of 29 victims in comparison to an average of 13 victims for other cases (Table 9-1). (But also see the study discussed in the preceding paragraph in regards to victims hit in AW cases.)

Further, a study of Milwaukee homicide victims from 1992 through 1995 revealed that those killed with AWs were shot 3.14 times on average, while those killed with any

---

[101] See the discussion of self-reports and AW use in Chapter 3.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

86

gun having an LCM were shot 3.23 times on average (Table 9-2). In contrast, victims shot with guns having small magazines had only 2.1 wounds on average. If such a wound differential can be generalized to other gun attacks – if, that is, both fatal and non-fatal LCM gunshot victims are generally hit one or more extra times – then LCM use could have a considerable effect on the number of gunshot victims who die. To illustrate, the fatality rate among gunshot victims in Jersey City during the 1990s was 63% higher for those shot twice than for those shot once (26% to 16%) (Koper and Roth, 2001a; 2001b). Likewise, fatality rates are 61% higher for patients with multiple chest wounds than for patients with a single chest wound (49% to 30.5%), based on a Washington, DC study (Webster et al., 1992, p. 696).

Similar conclusions can also be inferred indirectly from the types of crimes involving LCM guns. To illustrate, handguns associated with gunshot victimizations in Baltimore (see the description of the Baltimore gun and magazine data in the preceding chapter) are 20% to 50% more likely to have LCMs than are handguns associated with other violent crimes, controlling for weapon caliber (Table 9-3). This difference may be due to higher numbers of shots and hits in crimes committed with LCMs, although it is also possible that offenders using LCMs are more likely to fire on victims. But controlling for gunfire, guns used in shootings are 17% to 26% more likely to have LCMs than guns used in gunfire cases resulting in no wounded victims (perhaps reflecting higher numbers of shots fired and victims hit in LCM cases), and guns linked to murders are 8% to 17% more likely to have LCMs than guns linked to non-fatal gunshot victimizations (perhaps indicating higher numbers of shots fired and wounds per victim in LCM cases).[102] These differences are not all statistically significant, but the pattern is consistent. And as discussed in Chapter 3, AWs account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.

---

[102] Cases with and without gunfire and gunshot victims were approximated based on offense codes contained in the gun seizure data (some gunfire cases not resulting in wounded victims may not have been identified as such, and it is possible that some homicides were not committed with the guns recovered during the investigations). In order to control for caliber effects, we focused on 9mm and .38 caliber handguns. Over 80% of the LCM handguns linked to violent crimes were 9mm handguns. Since all (or virtually all) 9mm handguns are semiautomatics, we also selected .38 caliber guns, which are close to 9mm in size and consist almost entirely of revolvers and derringers.

 The disproportionate involvement of LCM handguns in injury and death cases is greatest in the comparisons including both 9mm and .38 caliber handguns. This may reflect a greater differential in average ammunition capacity between LCM handguns and revolvers/derringers than between LCM handguns and other semiautomatics. The differential in fatal and non-fatal gunshot victims may also be due to caliber effects; 9mm is generally a more powerful caliber than .38 based on measures like kinetic energy or relative stopping power (e.g., see DiMaio, 1985, p. 140; Warner 1995, p. 223; Wintemute, 1996, p. 1751).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

87

**Table 9-3.  Probabilities That Handguns Associated With Murders, Non-Fatal Shootings, and Other Violent Crimes Were Equipped With Large Capacity Magazines in Baltimore, 1993-2000**

| Handgun Sample | % With LCM | % Difference (#2 Relative to #1) |
|---|---|---|
| **A.  Handguns Used in Violent Crimes With and Without Gunshot Injury** | | |
| 1)  9mm and .38:  violence, no gunshot victims | 23.21% | |
| 2)  9mm and .38:  violence with gunshot victims | 34.87% | 50%* |
| 1)  9mm:  violence, no gunshot victims | 52.92% | |
| 2)  9mm:  violence with gunshot victims | 63.24% | 20%* |
| **B.  Handguns Used in Gunfire Cases With and Without Gunshot Injury** | | |
| 1)  9mm and .38:  gunfire, no gunshot victims | 27.66% | |
| 2)  9mm and .38:  gunfire with gunshot victims | 34.87% | 26% |
| 1)  9mm:  gunfire, no gunshot victims | 54.17% | |
| 2)  9mm:  gunfire with gunshot victims | 63.24% | 17% |
| **C.  Handguns Used in Fatal Versus Non-Fatal Gunshot Victimizations** | | |
| 1)  9mm and .38:  non-fatal gunshot victims | 32.58% | |
| 2)  9mm and .38:  homicides | 38.18% | 17% |
| 1)  9mm:  non-fatal gunshot victims | 61.14% | |
| 2)  9mm:  homicides | 66.04% | 8% |

* Statistically significant difference at p<.01 (chi-square).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

88

The findings of the preceding studies are subject to numerous caveats. There were few if any attempts to control for characteristics of the actors or situations that might have influenced weapon choices and/or attack outcomes.[103] Weapons data were typically missing for substantial percentages of cases. Further, many of the comparisons in the tables were not tested for statistical significance (see the notes to Tables 9-1 and 9-2).[104]

Tentatively, nonetheless, the evidence suggests more often than not that attacks with semiautomatics, particularly those equipped with LCMs, result in more shots fired, leading to both more injuries and injuries of greater severity. Perhaps the faster firing rate and larger ammunition capacities afforded by these weapons prompt some offenders to fire more frequently (i.e., encouraging what some police and military persons refer to as a "spray and pray" mentality). But this still begs the question of whether a 10-round limit on magazine capacity will affect the outcomes of enough gun attacks to measurably reduce gun injuries and deaths.

---

[103] In terms of offender characteristics, recall from Chapter 3 that AP buyers are more likely than other gun buyers to have criminal histories and commit subsequent crimes. This does not seem to apply, however, to the broader class of semiautomatic users: handgun buyers with and without criminal histories tend to buy pistols in virtually the same proportions (Wintemute et al., 1998b), and youthful gun offenders using pistols and revolvers have very comparable criminal histories (Sheley and Wright, 1993b, p. 381). Further, semiautomatic users, including many of those using AWs, show no greater propensity to shoot at victims than do other gun offenders (Harlow, 2001, p. 11; Reedy and Koper, 2003). Other potential confounders to the comparisons in Tables 9-1 and 9-2 might include shooter age and skill, the nature of the circumstances (e.g., whether the shooting was an execution-style shooting), the health of the victim(s), the type of location (e.g., indoor or outdoor location), the distance between the shooter and intended victim(s), the presence of multiple persons who could have been shot intentionally or accidentally (as bystanders), and (in the mass shooting incidents) the use of multiple firearms.

[104] Tables 9-1 and 9-2 present the strongest evidence from the available studies. However, there are additional findings from these studies and others that, while weaker, are relevant. Based on gun model information available for a subset of cases in the Jersey City study, there were 12 gunfire cases involving guns manufactured with LCMs before the ban (7 of which resulted in wounded victims) and 94 gunfire cases involving revolvers or semiautomatic models without LCMs. Comparisons of these cases produced results similar to those of the main analysis: shot fired estimates ranged from 2.83 to 3.25 for the LCM cases and 2.22 to 2.6 for the non-LCM cases; 1.14 victims were wounded on average in the LCM gunshot cases and 1.06 in the non-LCM gunshot cases; and LCM gunshot victims had 1.14 wound on average, which, contrary to expectations, was less than the 1.47 average for other gunshot victims.

The compilation of mass shooting incidents cited in Table 9-1 had tentative shots fired estimates for 3 of the AW-LCM cases and 4 of the other cases. The AW-LCM cases averaged 93 shots per incident, a figure two and a half times greater than the 36.5 shot average for the other cases.

Finally, another study of firearm mass murders found that the average number of victims killed (tallies did not include others wounded) was 6 in AW cases and 4.5 in other cases (Roth and Koper, 1997, Appendix A). Only 2 of the 52 cases studied clearly involved AWs (or very similar guns). However, the make and model of the firearm were available for only eight cases, so additional incidents may have involved LCMs; in fact, at least 35% of the cases involved unidentified semiautomatics. (For those cases in which at least the gun type and firing action were known, semiautomatics outnumbered non-semiautomatics by 6 to 1, perhaps suggesting that semiautomatics are used disproportionally in mass murders.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

89

### 9.2.1. Will a 10-Round Magazine Limit Reduce Gunshot Victimizations?

Specific data on shots fired in gun attacks are quite fragmentary and often inferred indirectly, but they suggest that relatively few attacks involve more than 10 shots fired.[105] Based on national data compiled by the FBI, for example, there were only about 19 gun murder incidents a year involving four or more victims from 1976 through 1995 (for a total of 375) (Fox and Levin, 1998, p. 435) and only about one a year involving six or more victims from 1976 through 1992 (for a total of 17) (Kleck, 1997, p. 126). Similarly, gun murder victims are shot two to three times on average according to a number of sources (see Table 9-2 and Koper and Roth, 2001a), and a study at a Washington, DC trauma center reported that only 8% of all gunshot victims treated from 1988 through 1990 had five or more wounds (Webster et al., 1992, p. 696).

However, counts of victims hit or wounds inflicted provide only a lower bound estimate of the number of shots fired in an attack, which could be considerably higher in light of the low hit rates in gunfire incidents (see above).[106] The few available studies on shots fired show that assailants fire less than four shots on average (see sources in Table 9-1 and Goehl, 1993), a number well within the 10-round magazine limit imposed by the AW-LCM ban, but these studies have not usually presented the full distribution of shots fired for all cases, so it is usually unclear how many cases, if any, involved more than 10 shots.

An exception is the aforementioned study of handgun murders and assaults in Jersey City (Reedy and Koper, 2003). Focusing on cases for which at least the type of handgun (semiautomatic, revolver, derringer) could be determined, 2.5% of the gunfire cases involved more than 10 shots.[107] These incidents – all of which involved pistols – had a 100% injury rate and accounted for 4.7% of all gunshot victims in the sample (see Figure 9-2). Offenders fired a total of 83 shots in these cases, wounding 7 victims, only 1 of whom was wounded more than once. Overall, therefore, attackers fired over 8 shots

---

[105] Although the focus of the discussion is on attacks with more than 10 shots fired, a gun user with a post-ban 10-round magazine can attain a firing capacity of 11 shots with many semiautomatics by loading one bullet into the chamber before loading the magazine.

[106] As a dramatic example, consider the heavily publicized case of Amadou Diallo, who was shot to death by four New York City police officers just a few years ago. The officers in this case fired upon Diallo 41 times but hit him with only 19 shots (a 46% hit rate), despite his being confined in a vestibule. Two of the officers reportedly fired until they had emptied their 16-round magazines, a reaction that may not be uncommon in such high-stress situations. In official statistics, this case will appear as having only one victim.

[107] The shots fired estimates were based on reported gunshot injuries, physical evidence (for example, shell casings found at the scene), and the accounts of witnesses and actors. The 2.5% figure is based on minimum estimates of shots fired. Using maximum estimates, 3% of the gunfire incidents involved more than 10 shots (Reedy and Koper, 2003, p. 154).

A caveat to these figures is that the federal LCM ban was in effect for much of the study period (which spanned January 1992 to November 1996), and a New Jersey ban on magazines with more than 15 rounds predated the study period. It is thus conceivable that these laws reduced attacks with LCM guns and attacks with more than 10 shots fired, though it seems unlikely that the federal ban had any such effect (see the analyses of LCM use presented in the previous chapter). Approximately 1% of the gunfire incidents involved more than 15 shots.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

90

for every wound inflicted, suggesting that perhaps fewer persons would have been wounded had the offenders not been able to fire as often.[108]

---

**Figure 9-2. Attacks With More Than 10 Shots Fired**

**Jersey City Handgun Attacks, 1992-1996**

- **2.5% - 3% of gunfire incidents involved 11+ shots**
  - **3.6% - 4.2% of semiauto pistol attacks**
- **100% injury rate**
- **Produced 4.7% of all gunshot wound victims**
- **8.3 shots per gunshot wound**

---

Based on data reported by Reedy and Koper (2003). Injury statistics based on the 2.5% of cases involving 11+ shots by minimum estimate.

Caution is warranted in generalizing from these results because they are based on a very small number of incidents (6) from one sample in one city. Further, it is not known if the offenders in these cases had LCMs (gun model and magazine information was very limited); they may have emptied small magazines, reloaded, and continued firing. But subject to these caveats, the findings suggest that the ability to deliver more than 10 shots without reloading may be instrumental in a small but non-trivial percentage of gunshot victimizations.

On the other hand, the Jersey City study also implies that eliminating AWs and LCMs might only reduce gunshot victimizations by up to 5%. And even this estimate is probably overly optimistic because the LCM ban cannot be expected to prevent all incidents with more than 10 shots. Consequently, any effects from the ban (should it be extended) are likely to be smaller and perhaps quite difficult to detect with standard statistical methods (see Koper and Roth, 2001a), especially in the near future, if recent patterns of LCM use continue.

### 9.3. Post-Ban Trends in Lethal and Injurious Gun Violence

Having established some basis for believing the AW-LCM ban could have at least a small effect on lethal and injurious gun violence, is there any evidence of such an effect to date? Gun homicides plummeted from approximately 16,300 in 1994 to 10,100 in 1999, a reduction of about 38% (see the Federal Bureau of Investigation's *Uniform Crime*

---

[108] These figures are based on a supplemental analysis not contained in the published study. We thank Darin Reedy for this analysis.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.    91

*Reports*).  Likewise, non-fatal, assaultive gunshot injuries treated in hospitals nationwide declined one-third, from about 68,400 to under 46,400, between 1994 and 1998 (Gotsch et al., 2001, pp. 23-24).  Experts believe numerous factors contributed to the recent drop in these and other crimes, including changing drug markets, a strong economy, better policing, and higher incarceration rates, among others (Blumstein and Wallman, 2000).  Attributing the decline in gun murders and shootings to the AW-LCM ban is problematic, however, considering that crimes with LCMs appear to have been steady or rising since the ban.  For this reason, we do not undertake a rigorous investigation of the ban's effects on gun violence.[109]

But a more casual assessment shows that gun crimes since the ban have been no less likely to cause death or injury than those before the ban, contrary to what we might expect if crimes with AWs and LCMs had both declined.  For instance, the percentage of violent gun crimes resulting in death has been very stable since 1990 according to national statistics on crimes reported to police (see Figure 9-1 in section 9.1).[110]  In fact, the percentage of gun crimes resulting in death during 2001 and 2002 (2.94%) was slightly higher than that during 1992 and 1993 (2.9%).

Similarly, neither medical nor criminological data sources have shown any post-ban reduction in the percentage of crime-related gunshot victims who die.  If anything, this percentage has been higher since the ban, a pattern that could be linked in part to more multiple wound victimizations stemming from elevated levels of LCM use.  According to medical examiners' reports and hospitalization estimates, about 20% of gunshot victims died nationwide in 1993 (Gotsch et al., 2001).  This figure rose to 23% in 1996, before declining to 21% in 1998 (Figure 9-3).[111]  Estimates derived from the Uniform Crime Reports and the Bureau of Justice Statistics' annual National Crime Victimization Survey follow a similar pattern from 1992 to 1999 (although the ratio of fatal to non-fatal cases is much higher in these data than that in the medical data) and also show a considerable increase in the percentage of gunshot victims who died in 2000 and 2001 (Figure 9-3).[112]  Of course, changes in offender behavior or other changes in crime

---

[109]  In our prior study (Koper and Roth 2001a; Roth and Koper, 1997, Chapter 6), we estimated that gun murders were about 7% lower than expected in 1995 (the first year after the ban), adjusting for pre-existing trends.  However, the very limited post-ban data available for that study precluded a definitive judgment as to whether this drop was statistically meaningful (see especially Koper and Roth, 2001a).  Furthermore, that analysis was based on the assumption that crimes with both AWs and LCMs had dropped in the short-term aftermath of the ban, an assumption called into question by the findings of this study.  It is now more difficult to credit the ban with any of the drop in gun murders in 1995 or anytime since.  We did not update the gun murder analysis because interpreting the results would be unavoidably ambiguous.  Such an investigation will be more productive after demonstrating that the ban has reduced crimes with both AWs and LCMs.

[110]  The decline in this figure during the 1980s was likely due in part to changes in police reporting of aggravated assaults in recent decades (Blumstein, 2000).  The ratio of gun murders to gun robberies rose during the 1980s, then declined and remained relatively flat during the 1990s.

[111]  Combining homicide data from 1999 with non-fatal gunshot estimates for 2000 suggests that about 20% of gunshot victimizations resulted in death during 1999 and 2000 (Simon et al., 2002).

[112]  The SHR/NCVS estimates should be interpreted cautiously because the NCVS appears to undercount non-fatal gunshot wound cases by as much as two-thirds relative to police data, most likely because it fails to represent adequately the types of people most likely to be victims of serious crime (i.e., young urban males who engage in deviant lifestyles) (Cook, 1985).  Indeed, the rate of death among gunshot victims

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

92

weaponry (such as an increase in shootings with large caliber handguns) may have influenced these trends. Yet is worth noting that multiple wound shootings were elevated over pre-ban levels during 1995 and 1996 in four of five localities examined during our first AW study, though most of the differences were not statistically significant (Table 9-4, panels B through E).

Another potential indicator of ban effects is the percentage of gunfire incidents resulting in fatal or non-fatal gunshot victimizations. If attacks with AWs and LCMs result in more shots fired and victims hit than attacks with other guns and magazines, we might expect a decline in crimes with AWs and LCMs to reduce the share of gunfire incidents resulting in victims wounded or killed. Measured nationally with UCR and NCVS data, this indicator was relatively stable at around 30% from 1992 to 1997, before rising to about 40% from 1998 through 2000 (Figure 9-4).[113] Along similar lines, multiple victim gun homicides remained at relatively high levels through at least 1998, based on the national average of victims killed per gun murder incident (Table 9-4, panel A).[114]

---

appears much higher in the SHR/NCVS series than in data compiled from medical examiners and hospitals (see the CDC series in Figure 9-3). But if these biases are relatively consistent over time, the data may still provide useful insights into trends over time.

[113] The NCVS estimates are based on a compilation of 1992-2002 data recently produced by the Inter-University Consortium for Political and Social Research (ICPSR study 3691). In 2002, only 9% of non-fatal gunfire incidents resulted in gunshot victimizations. This implies a hit rate for 2002 that was below pre-ban levels, even after incorporating gun homicide cases into the estimate. However, the 2002 NCVS estimate deviates quite substantially from earlier years, for which the average hit rate in non-fatal gunfire incidents was 24% (and the estimate for 2001 was 20%). Therefore, we did not include the 2002 data in our analysis. We used two-year averages in Figures 9-3 and 9-4 because the annual NCVS estimates are based on very small samples of gunfire incidents. The 2002 sample was especially small, so it seems prudent to wait for more data to become available before drawing conclusions about hit rates since 2001.
[114] We thank David Huffer for this analysis.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

93

Figure 9-3. Percentage of Gunshot Victimizations Resulting in Death (National), 1992-2001



SHR/NCVS series based on two-year averages from the Supplemental Homicide Reports and National Crime Victimization Survey.  CDC series based on homicide and hospitalization data from the Centers for Disease Control (reported by Gotsch et al. 2001).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

94

**Table 9-4. Short-Term, Post-Ban Changes in the Lethality and Injuriousness of Gun Violence: National and Local Indicators, 1994-1998** [a]

| Measure and Location | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| A. Victims Per Gun Homicide Incident (National) | Jan. 1986-Sept. 1994 1.05 (N=106,668) | Oct. 1994-Dec. 1998 1.06 (N=47,511) | 1%** |
| B. Wounds per Gun Homicide Victim: Milwaukee County | Jan. 1992-Aug. 1994 2.28 (N=282) | Sept. 1994-Dec. 1995 2.52 (N=136) | 11% |
| C. Wounds Per Gun Homicide Victim: Seattle (King County) | Jan. 1992-Aug. 1994 2.08 (N=184) | Sept. 1994-Jun. 1996 2.46 (N=91) | 18% |
| D. Wounds Per Gunshot Victim: Jersey City (NJ) | Jan. 1992-Aug. 94 1.42 (N=125) | Sept. 1994-Jun. 1996 1.39 (N=137) | -2% |
| E. % of Gun Homicide Victims With Multiple Wounds: San Diego County | Jan. 1992-Aug. 1994 41% (N=445) | Sept. 1994-Jun. 1996 43% (N=223) | 5% |
| F. % of Non-Fatal Gunshot Victims With Multiple Wounds: Boston | Jan. 1992-Aug. 1994 18% (N=584) | Sept. 1994-Dec. 1995 24% (N=244) | 33%* |

a. National victims per incident figures based on unpublished update of analysis reported in Roth and Koper (1997, Chapter 5). Gunshot wound data are taken from Roth and Koper (1997, Chapter 6) and Koper and Roth (2001a). Wound data are based on medical examiners' reports (Milwaukee, Seattle, San Diego), hospitalization data (Boston), and police reports (Jersey City).
* Chi-square p level < .1.
** T-test p level < .01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

95

If anything, therefore, gun attacks appear to have been more lethal and injurious since the ban. Perhaps elevated LCM use has contributed to this pattern. But if this is true, then the reverse would also be true – a reduction in crimes with LCMs, should the ban be extended, would reduce injuries and deaths from gun violence.

**Figure 9-4. Percentage of Gunfire Cases Resulting in Gunshot Victimizations (National), 1992-2001**



Based on two-year averages from the Supplemental Homicide Reports and National Crime Victimization Survey.

### 9.4. Summary

Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are used in crime much more frequently than AWs. Therefore, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs.

However, the grandfathering provision of the AW-LCM ban guaranteed that the effects of this law would occur only gradually over time. Those effects are still unfolding and may not be fully felt for several years into the future, particularly if foreign, pre-ban LCMs continue to be imported into the U.S. in large numbers. It is thus premature to make definitive assessments of the ban's impact on gun violence.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Having said this, the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement. AWs were used in no more than 8% of gun crimes even before the ban. Guns with LCMs are used in up to a quarter of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability to fire more than 10 shots (the current limit on magazine capacity) without reloading.

Nonetheless, reducing crimes with AWs and especially LCMs could have non-trivial effects on gunshot victimizations. As a general matter, hit rates tend to be low in gunfire incidents, so having more shots to fire rapidly can increase the likelihood that offenders hit their targets, and perhaps bystanders as well. While not entirely consistent, the few available studies contrasting attacks with different types of guns and magazines generally suggest that attacks with semiautomatics – including AWs and other semiautomatics with LCMs – result in more shots fired, persons wounded, and wounds per victim than do other gun attacks. Further, a study of handgun attacks in one city found that about 3% of gunfire incidents involved more than 10 shots fired, and those cases accounted for nearly 5% of gunshot victims. However, the evidence on these matters is too limited (both in volume and quality) to make firm projections of the ban's impact, should it be reauthorized.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# EXHIBIT 41

United States Senate Judiciary Committee

Full Committee Hearing

"What Should America Do About Gun Violence?"

January 30, 2013
10:00 AM
Hart Senate Office Building, Room 216

# Written Testimony of David B. Kopel

Research Director, Independence Institute, Golden, Colorado.

Associate Policy Analyst, Cato Institute, Washington, D.C.[1]

Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law. www.davekopel.org.

1

"[W]e cannot clearly credit the [1994 'assault weapons'] ban with any of the nation's recent drop in gun violence."—U.S. Department of Justice 2004 study.[2]

"Passing a law like the assault weapons ban is a purely symbolic move in that direction [to disarm the citizenry]. . . . [T]hat change in mentality starts with the symbolic yielding of certain types of weapons. The real steps, like the banning of handguns, will never occur unless this one is taken first. . . ."—Charles Krauthammer[3]

"The ['assault'] weapons' menacing looks, coupled with the public's confusion over fully automatic machine guns versus semi-automatic assault weapons—anything that looks like a machine gun is assumed to be a machine gun—can only increase the chance of public support for restrictions on these weapons."—Josh Sugarmann, Founder, Violence Policy Center[4]

# The Political Attack on Firearms Ownership

On December 14, 2012, a deranged and hate-filled mass-murderer first killed his own mother and then snuffed out 26 additional lives at Sandy Hook Elementary School in Newtown, Connecticut. It was one of the worst mass murders at school since 1927, when a defeated school board candidate set off explosives at an elementary school in Bath Township, Michigan, killing 38 children and five adults. The horrific crime at Sandy Hook tore the heart out of the nation. It filled every life-loving American—every parent, grandparent, aunt, and uncle—with anger, dread, and anguish.

In the aftermath of this crime, many Americans are exploring ways to responsibly and realistically reduce the possibility of another such attack, such as by better-addressing mental illness,[5] training people how to more-effectively respond to "active shooters,"[6] and allowing teachers and other responsible adults to carry concealed handguns in schools—something already successfully implemented in Utah and parts of Texas, Ohio, and Colorado.[7]

Unfortunately, others are promoting repressive laws which would have done nothing to prevent Sandy Hook, and would do nothing to prevent the inevitable copycat crimes that may take place in the near future. The demands for symbolic but useless anti-gun laws are accompanied by an aggressive culture war against dissenters. A *Des Moines Register* journalist declared that well-known defenders of gun rights should be dragged behind pickup trucks, that the Second Amendment should be repealed, that the National Rifle Association (NRA) should be declared a "terrorist organization," and that membership in the NRA should be outlawed.[8] A writer for the *Huffington Post* declared that anyone who believes guns may

2

legitimately be owned for self-defense—or that the Second Amendment protects that right—is a "menace" and "a danger to your children."[9]

Unfortunately, such mean-spirited and unjust demonization and scapegoating of law-abiding American gun owners has become a central feature of the political campaign to ban or restrict semi-automatic guns and the magazines that go with them. Even worse, the Newtown murders are being politically exploited

Prohibitionists use the false and inflammatory labels of "assault weapon" and "high-capacity magazine" to mischaracterize ordinary firearms and their standard accessories.

The AR-15 rifle has for years been the most popular, best-selling firearm in the United States. Millions of law-abiding Americans own AR-15s and similar guns. In an article for *Slate*, Justin Peters estimates that there may be nearly four million AR-15 rifles in the country—and that's just one brand of rifle.[10] Contrary to media claims, these ordinary citizens are not psychopaths intent on mass murder. Rather, Americans own so-called "assault weapons" for all the legitimate reasons that they own any type of firearm: lawful defense of self and others, hunting, and target practice. They do not own these firearms to "assault" anyone. To the contrary, rifles such as the AR-15, and standard capacity magazines of 11-19 rounds (for handguns) and up to 30 rounds (for rifles) are commonly used by rank and file police officers, because such firearms and magazines are often the best choice for the lawful protection of self and others.

That is why the police choose them so often. At Sen. Feinstein's press conference introducing her new prohibition bill, Rev. Hale, of the National Cathedral, asserted that the guns and magazines are useful only for mass murder. This is a mean-spirited insult to the many police officers who have chosen these very same guns and magazines as the best tools for the most noble purpose of all: the defense of innocent life.

# What Is An "Assault Weapon?"

Gun prohibition advocates have been pushing the "assault weapon" issue for a quarter century. Their political successes on the matter have always depended on public confusion. The guns are *not* machine guns. They do *not* fire automatically. They fire only one bullet each time the trigger is pressed, just like every other ordinary firearm. They are *not* more powerful than other firearms; to the contrary, their ammunition is typically intermediate in power, less powerful than guns and ammunition made for big game hunting.

### The difference between automatic and semi-automatic

For an automatic firearm (commonly called a "machine gun"), if the shooter presses the trigger and holds it, the gun will fire continuously, automatically, until the ammunition runs out.[11] Ever since the National

3

Firearms Act of 1934, automatics have been very strictly regulated by federal law: Every person who wishes to possess one must pay a $200 federal transfer tax, must be fingerprinted and photographed, and must complete a months-long registration process with the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (BATFE). In addition, the transferee must be granted written permission by local law enforcement, via ATF Form 4. Once registered, the gun may not be taken out of state without advance written permission from BATFE.

Since 1986, the manufacture of new automatics for sale to persons other than government agents has been forbidden by federal law.[12] As a result, automatics in U.S. are rare (there are about a hundred thousand legally registered ones), and expensive, with the least expensive ones costing nearly ten thousand dollars.

The automatic firearm was invented in 1883 by Hiram Maxim. The early Maxim Guns were heavy and bulky, and required a two-man crew to operate. In 1943, a new type of automatic was invented, the "assault rifle." The assault rifle is light enough for a soldier to carry for long periods of time. Soon, the assault rifle became the ubiquitous infantry weapon. Examples include the U.S. Army M-16, the Soviet AK-47, and the Swiss militia SIG SG 550. The AK-47 (and its various updates, such as the AK-74 and AKM) can be found all over the Third World, but there are only a few hundred in the United States, mostly belonging to firearms museums and wealthy collectors.

The precise definition of "assault rifle" is supplied by the Defense Intelligence Agency.[13] If you use the term "assault rifle," persons who are knowledgeable about firearms will know precisely what kinds of guns you are talking about. The definition of "assault rifle" has never changed, because the definition describes a particular type of thing in the real world—just like the definitions of "apricot" or "Minnesota."

In contrast, the definition of "assault weapon" has never been stable. The phrase is merely an epithet. It has been applied to things which are not even firearms (namely, air guns). It has been applied to double-barreled shotguns, to single-shot guns (guns whose ammunition capacity is only a single round), and to many other sorts of ordinary handguns, shotguns, and rifles.

The first "assault weapon" ban in the United States, in California in 1989, was created by legislative staffers thumbing through a picture book of guns, and deciding which guns looked bad. The result was an incoherent law which, among other things, outlawed certain firearms that do not exist, since the staffers just copied the typographical errors from the book, or associated a model by one manufacturer with another manufacturer whose name appeared on the same page.

Over the last quarter century, the definition has always kept shifting. One recent version is Sen. Dianne Feinstein's new bill. Another is the pair of bills defeated in the January 2013 lame duck session of the Illinois legislature

which would have outlawed most handguns (and many long guns as well) by dubbing them "assault weapons."

While the definitions of what to ban keep changing, a few things remain consistent: The definitions do *not* cover automatic firearms, such as assault rifles. The definitions do *not* ban guns based on how fast they fire, or how powerful they are. Instead, the definitions are based on the name of a gun, or on whether a firearm has certain superficial accessories (such as a bayonet lug, or a grip in the "wrong" place).

Most, but not all, of the guns which have been labeled "assault weapons" are semi-automatics. Many people think that a gun which is "semi-automatic" must be essentially the same as an automatic. This is incorrect.

Semi-automatic firearms were invented in the 1890s, and have been common in the United States ever since. Today, about three-quarters of new handguns are semi-automatics. A large share of rifles and shotguns are also semi-automatics. Among the most popular semi-automatic firearms in the United States today are the Colt 1911 pistol (named for the year it was invented, and still considered one of the best self-defense handguns), the Ruger 10/22 rifle (which fires the low-powered .22 Long Rifle cartridge, popular for small game hunting or for target shooting at distances less than a hundred yards), the Remington 1100 shotgun (very popular for bird hunting and home defense), and the AR-15 rifle (popular for hunting game no larger than deer, for target shooting, and for defense). All of these guns were invented in the mid-1960s or earlier. All of them have, at various times, been characterized as "assault weapons."

Unlike an automatic firearm, a semi-automatic fires only one round of ammunition when the trigger is pressed. (A "round" is one unit of ammunition. For a rifle or handgun, a round has one bullet. For a shotgun, a single round contains several pellets.)

In some other countries, a semi-automatic is usually called a "self-loading" gun. This accurately describes what makes the gun "semi"-automatic. When the gun is fired, the bullet (or shot pellets) travel from the firing chamber, down the barrel, and out the muzzle. Left behind in the firing chamber is the now empty case or shell that contained the bullets (or pellets) and the gunpowder.

In a semi-automatic, some of the energy from firing is used to eject the empty shell from the firing chamber, and then load a fresh round of ammunition into the firing chamber. Then, the gun is ready to shoot again, when the user is ready to press the trigger.

In some other types of firearms, the user must perform some action in order to eject the empty shell and load the next round. This could be moving a bolt back and forth (bolt action rifles), moving a lever down and then up (lever action rifles), or pulling and then pushing a pump or slide (pump action and slide action rifles and shotguns). A revolver (the second-most popular

000388
ER_1260

type of handgun) does not require the user to take any additional action in order to fire the next round.[14]

The semi-automatic has two principle advantages over lever action, bolt action, slide action, and pump action guns. First, many hunters prefer it because the semi-automatic mechanism allows a faster second shot. The difference may be less than a second, but for a hunter, this can make all the difference.

Second, and more importantly, the semi-automatic's use of gunpowder energy to eject the empty case and then to load the next round substantially reduces how much recoil is felt by the shooter. This makes the gun much more comfortable to shoot, especially for beginners, or for persons without substantial upper body strength and bulk.

The reduced recoil also make the gun easier to keep on target for the next shot, which is important for hunting and target shooting, and extremely important for self-defense.

Semi-automatics also have their disadvantages. They are much more prone to misfeeds and jams than are simpler, older types of firearms, such as revolvers or lever action.

Contrary to the hype of anti-gun advocates and less-responsible journalists, there is no rate of fire difference between a so-called "assault" semi-automatic gun and any other semi-automatic gun.

**How fast does a semi-automatic fire?**

Here is a report on the test-firing of a new rifle:

*187 shots were fired in three minutes and thirty seconds and one full fifteen shot magazine was fired in only 10.8 seconds.*

Does that sound like a machine gun? A "semi-automatic assault weapon"? Actually it is an 1862 test report of the then-new lever-action Henry rifle, manufactured by Winchester. If you have ever seen a Henry rifle, it was probably in the hands of someone at a cowboy re-enactment, using historic firearms from 150 years ago.

The Winchester Henry is a lever-action, meaning that after each shot, the user must pull out a lever, and then push it back in, in order to eject the empty shell casing, and then load a new round into the firing chamber.

The lever-action Winchester is not an automatic. It is not a semi-automatic. It was invented decades before either of those types of firearms. And yet that old-fashioned Henry lever action rifle can fire one bullet per second.

By comparison, the murderer at Sandy Hook fired 150 shots over a 20 minute period, before the police arrived. In other words, a rate of fewer than 8 shots per minute. This is a rate of fire far slower than the capabilities of a lever-action Henry Rifle from 1862, or a semi-automatic AR-15 rifle from

6

2010. Indeed, his rate of fire could have been far exceeded by a competent person using very old technology, such as a break-open double-barreled shotgun.

**Are semi-automatics more powerful than other guns?**

The power of a firearm is measured by the kinetic energy it delivers. Kinetic energy is based on the mass (the weight) of the projectile, and its velocity.[15] So a heavier bullet will deliver more kinetic energy than a lighter one. A faster bullet will deliver more kinetic energy than a slower bullet.[16]

How much kinetic energy a gun will deliver has nothing to do with whether it is a semi-automatic, a lever action, a bolt action, a revolver, or whatever. What matter is, first of all, the weight of the bullet, how much gunpowder is in the particular round of ammunition, and the length of the barrel.[17]

None of this has anything to do with whether the gun is or is not a semi-automatic. Manufacturers typically produce the same gun in several different calibers, sometimes in more than a dozen calibers.

Regarding the rifles which some people call "assault weapons," they tend to be intermediate in power, as far as rifles go. Consider the AR-15 rifle in its most common caliber, the .223. The bullet is only a little bit wider than the puny .22 bullet, but it is longer, and thus heavier.

Using typical ammunition, an AR-15 in .223 would have 1,395 foot-pounds of kinetic energy.[18] That's more than a tiny rifle cartridge like the .17 Remington, which might carry 801 foot-pounds of kinetic energy. In contrast, a big-game cartridge, like the .444 Marlin, might have 3,040.[19] This is why rifles like the AR-15 are suitable and often used for hunting small to medium animals (such as rabbits or deer), but are not suitable for the largest animals, such as elk or moose.[20]

Many (but not all) of the ever-changing group of guns which are labeled "assault weapons" use detachable magazines (a box with an internal spring) to hold their ammunition. But this is a characteristic shared by many other firearms, including many non-semiautomatic rifles (particularly, bolt-actions), and by the large majority of handguns. Whatever the merits of restricting magazine size (and we will discuss this below), the size of the magazine depends on the size the magazine. If you want to control magazine size, there is no point in banning certain guns which can take detachable magazines, while not banning other guns which also take detachable magazines.

**Bans by name**

Rather than banning guns on rate of fire, or firepower, the various legislative attempts to define an "assault weapon" have taken two approaches: banning guns by name, and banning guns by whether they have certain superficial features.

7

After a quarter century of legislative attempts to define "assault weapon," the flagship bill for prohibitionists, by Senator Dianne Feinstein, still relies on banning 157 guns by name. This in itself demonstrates that "assault weapons" prohibitions are not about guns which are actually more dangerous than other guns.

After all, if a named gun really has physical characteristics which make it more dangerous than other guns, then legislators ought to be able to describe those characteristics, and ban guns (regardless of name) which have the supposedly dangerous characteristics.

Banning guns by name violates the Constitution's prohibition on Bills of Attainder. It is a form of legislative punishment, singling out certain politically disfavored companies for a prohibition on their products.

### Bans by features

An alternative approach to defining "assault weapon" has been to prohibit guns which have one or more items from a list of external features. These features have nothing to do with a gun's rate of fire, its ammunition capacity, or its firepower. Below are various items from Senator Feinstein's 1994 and/or 2013 bills.

*Bayonet lugs*. A bayonet lug gives a gun a military appearance. But to say the least, it has nothing to do with any real-world issue. Drive-by bayonetings are not a problem in this country.

*Attachments for rocket launchers and grenade launchers*. Since nobody makes guns for the civilian market that have such features, these bans would affect nothing. Putting the words "grenade launcher" and "rocket launcher" into the bill gives readily-gulled media the opportunity to ask indignantly "How can anyone support guns made to shoot grenades!?!" Besides that, grenades and rockets are subject to extremely severe controls, and essentially impossible for civilians to acquire.

*Folding or telescoping stocks*. Telescoping stocks are extremely popular because they allow shooters to adjust the gun to their own size and build, to the clothing they're wearing, or to their shooting position. Folding stocks make a rifle or shotgun much easier to carry in a backpack while hunting or camping. Even with a folding stock, the gun is still far larger, and less concealable, than a handgun.

*Grips*. The Feinstein bills outlaw any long gun that has a grip, or anything which can function as a grip. Of course, all guns have grips—or they couldn't be held in the hand to fire at all. While this means that some bills would presumptively ban nearly all semi-autos, the likely intent is to ban pistol-style grips. This reflects the fact that gun prohibitionists learn much of what

8

they know about guns by watching movies made by other gun prohibitionists, such as the "Rambo" series by Sylvester Stallone. So they think that the purpose of a "pistol grip" is to enable somebody to "spray fire" a gun. And, of course, the prohibitionists imagine that semiautomatic rifles *are* exactly the same as the machine guns in the Rambo movies.

In truth, a grip helps a responsible shooter stabilize the rifle while holding the stock against his shoulder. It is particularly useful in hunting, where the shooter will not have sandbags or a benchrest, or perhaps anything else on which to rest the forward part of the rifle. Accurate hunting is humane hunting. And should a long gun be needed for self-defense, accuracy can save the victim's life.

The gun prohibition lobbies, though, oppose firearms accuracy. On the January 16, 2013, PBS Newshour, Josh Horwitz (an employee of the Coalition to Stop Gun Violence) said that grips should be banned because they prevent "muzzle rise" and thereby allow the shooter to stay on target.

Well, yes, a grip helps stabilize the gun so that a second shot (whether at a deer or a violent attacker) will go where the first shot went. Horowitz was essentially saying that guns which are easy to fire accurately should be banned.

This is backwards. It is like claiming that history books which are especially accurate should be banned, while less-accurate books could still be allowed.

Guns which are more accurate are better for all the constitutionally-protected uses of firearms, including self-defense, hunting, and target shooting. To single them out for prohibition is flagrantly unconstitutional.

*Barrel covers.* For long guns that do not have a forward grip, the user may stabilize the by holding the barrel with her non-dominant hand. A barrel cover or shroud protects the user's hand. When a gun is fired repeatedly, the barrel can get very hot. This is not an issue in deer hunting (where no more than a few shots will be fired in a day), but it is a problem in some other kinds of hunting, and it is a particular problem in target shooting, where dozens of shots will be fired in a single session.

*Threaded barrel for safety attachments.* Threading at the end of a gun barrel can be used to attach muzzle brakes or sound suppressors.

When a round is fired though a gun barrel, the recoil from the shot will move the barrel off target, especially for a second, follow-up shot. Muzzle brakes reduce recoil and keep the gun on target. It is very difficult to see how something which makes a gun more accurate makes it so "bad" that it must be banned.

A threaded barrel can also be used to attach as sound suppressor. Suppressors are legal in the United States; buying one requires the same very severe process as buying a machine gun. They are sometimes,

9

inaccurately, called "silencers." They typically reduce a gunshot's noise by about 15-20 decibels, which still leaves the gun four times louder than a chainsaw.

But people who only know about firearms by watching movies imagine that a gun with a "silencer" is nearly silent, and is only used by professional assassins. In real life, sound suppressors are used by lots of people who want to protect their hearing, or to reduce the noise heard by neighbors of a shooting range. Many firearms instructors choose suppressors in order to help new shooters avoid the "flinch" that many novices display because of a gun's loudness.

The bans on guns with grips, folding stocks, barrel covers, or threads focus exclusively on the relatively minor ways in which a feature might help a criminal, and completely ignore the feature's utility for legitimate sports and self-defense. The reason that manufacturers include these features on firearms is because millions of law-abiding firearms owners choose them for entirely legitimate purposes.

### Sen. Dianne Feinstein's 2013 Legislation

Sen. Feinstein attempts to reassure gun owners by also including an appendix of guns which she is not banning. In 1994, she exempted 670 "recreational" firearms. In 2013, the exempted guns list grows to over 2,200. Notably, not a single handgun appears on either of Sen. Feinstein's lists. The basis for a gun being exempted is because it is, supposedly, suitable for recreational uses. This ignores the holding of *District of Columbia v. Heller* that self-defense is the core of the Second Amendment.

The exemption list is meaningless. It is inflated by naming certain models repeatedly. For example, the Remington 870 pump action shotgun appears 16 different times, in its various configurations. Besides that, none of the exempted guns are covered by the bill's ban on guns by name or by feature.

Regarding grandfathered guns, Sen. Feinstein makes them non-transferable, thus imposing a slow-motion form of uncompensated confiscation.

Grandfathering with slow-motion confiscation may be a way-station to immediate confiscation, when political circumstances allow. As Sen. Feinstein told CBS 60 Minutes in 1995, "If it were up to me, I would tell Mr. and Mrs. America to turn them in—turn them all in."[21]

### Would a ban do any good?

Connecticut banned so-called "assault weapons" in 1993, and the ban is still on the books. The Bushmaster rifle used by the Sandy Hook murderer was not an "assault weapon" under Connecticut law. Nor was it an "assault weapon" under the 1994-2004 Feinstein ban.[22] The new Feinstein ban would cover that particular model of Bushmaster. But it would allow Bushmaster (or any other company) to manufacture other semi-automatic rifles, using a

10

different name, which fire just as fast, and which fire equally powerful bullets.

To reiterate, the Sandy Hook murderer's rate of fire (150 shots in 20 minutes) could be duplicated by any firearm produced in the last century and a half.

We do not have to speculate about whether "assault weapon" bans do any good. A Department of Justice study commissioned by the Clinton administration found that they do not.

In order to pass the 1994 federal ban, proponents had to accept two related provisions. First, the ban would sunset after 10 years. Second, the Department of Justice would have to commission a study of the ban's effectiveness. The study would then provide Congress with information to help decide whether to renew the ban.

The Justice Department of Attorney General Janet Reno chose the Urban Institute to conduct the required study. The Urban Institute is well-respected and long-established progressive think tank in Washington. The study found the Feinstein ban to be a complete failure. There was no evidence that lives were saved, no evidence that criminals fired fewer shots during gun fights, no evidence of any good accomplished. Given the evidence from the researchers selected by the Clinton-Reno Department of Justice, it was not surprising that Congress chose not to renew the 1994 ban.

The final report was published by the U.S. Department of Justice's research arm, the National Institute of Justice, in 2004, based on data through 2003. The authors were Christopher S. Koper, Daniel J. Woods, and Jeffrey A. Roth.[23] The 2004 final report replaced two preliminary papers by Roth and Koper, one of which was published in 1997, and the other in 1999.[24]

The 2004 final report concludes: "we cannot clearly credit the ban with any of the nation's recent drop in gun violence. . . . Should it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement."

As the paper noted, "assault weapons" "were used in only a small fraction of gun crimes prior to the ban: about 2% according to most studies and no more than 8%." Most of those that were used in crime were pistols, not rifles.

Recall that "assault weapons" are arbitrarily categorized guns that are functionally equivalent to other guns. Thus, criminals, to the degree that the ban affects them at all, can and did easily substitute other guns for so-called "assault weapons."

Regarding the ban's impacts on crime, the 2004 paper concludes that "the share of crimes involving" so-called "assault weapons" declined, due "primarily to a reduction in the use of assault pistols," but that this decline "was offset throughout at least the late 1990s by steady or rising use of other guns equipped with" magazines holding more than ten rounds. In other words, as anyone with common sense could have predicted, criminals easily

11

substituted some guns for others. (Magazines are discussed in the next section.)

Unfortunately, Senator Feinstein's website is somewhat inaccurate in claiming that the 1994 ban was helpful. The Senator's web page on "assault weapons" lists five sources that allegedly show the "effectiveness" of the 1994 ban. However, four of those sources pertain, not to changes in crime rates, but to changes in weapon and magazine use. Such trends do not show that the 1994 ban was effective. Instead, they show, among other things, that the ban took place in a period of declining crime rates. Crime was declining before the imposition of the ban, and it continued to decline after the ban was lifted. The shift in gun use in crime also shows that criminals can easily replace "assault" semi-automatic guns with other, functionally equivalent semi-automatic guns.[25]

The four cited sources show that if you make it illegal to manufacture a gun with a certain name, then firearms companies will make guns with different names. Then, guns with the "bad" names will become a smaller fraction of the total U.S. gun supply. Some of the guns in the legal pool of guns are eventually acquired by criminals. (The principal means are thefts, and "straw purchases," in which a confederate who does not have a criminal record purchases a firearm on behalf of a convicted criminal. Straw purchases are federal felonies.) So over time, criminals have fewer guns with the "bad" name, and more guns with other names. Changing the names of the guns that criminals use does not make anyone any safer.

For the fifth source, the website makes the following claim:

> In a Department of Justice study, Jeffrey Roth and Christopher Koper find that the 1994 Assault Weapons Ban was responsible for a 6.7 percent decrease in total gun murders, holding all other factors equal. . . .
> Original source (page 2): Jeffrey A. Roth & Christopher S. Koper, "Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994," The Urban Institute (March 1997).

Attentive readers will notice that Roth and Koper are two of the authors of the 2004 study discussed above. So why does the website cite the 1997 study by these researchers, but not their 1999 study or (regarding this point) their 2004 study? The later studies repudiated the preliminary guess in the 1997 study.

Here is what the 1997 study actually said:

> Our best estimate is that the ban contributed to a 6.7 percent decrease in total gun murders between 1994 and 1995, beyond what would have been expected in view of ongoing crime, demographic, and economic trends. However, with only one year of post-ban data, we cannot rule out

12

the possibility that this decrease reflects chance year-to-year variation rather than a true effect of the ban.[26]

So initially, the researchers mistook a "year-to-year variation"—actually part of a long-term decline in crime rates—for the effects of the "assault weapons ban." They corrected this error in their subsequent reports—a fact that Senator Feinstein's website does not acknowledge.

What about state-level "assault weapons bans?" Remember that Connecticut has had such a ban since 1993. The Newtown murders are a vivid illustration that such bans do not save lives.

Economist John Lott examined data for the five states with "assault weapon" bans in his 2003 book, *The Bias Against Guns.* Controlling for sociological variables, and testing the five states with bans against the other 45 states, he found no evidence of a reduction in crime. To the contrary, the bans were associated with increased crime in some categories.[27] Whether the adverse effect Lott reports is a phantom of statistical analyses or random factors, or whether it is the result of criminals feeling relatively empowered due to state governments cracking down on law-abiding gun owners, the state-level data do not support the claim that "assault weapons" bans reduced crime rates.

It is ridiculous to claim that banning some semi-automatic guns, while leaving other, functionally equivalent semi-automatic guns legal, will reduce violent crime. It is analogous to banning knives with black handles, but not knives with brown handles, and expecting that to reduce knife-related crime.

Regarding mass murders in particular, *Mother Jones* examined 62 mass shootings since 1982, finding that 35 of the total 142 guns used were designated as "assault weapons."[28] To take one example not involving an "assault weapon," in 1991 a man murdered 22 people at a Texas cafeteria using a pair of ordinary semi-automatic pistols, not an "assault weapon." He reloaded the gun multiple times.[29] Tragically, in order to comply with laws against concealed carry, Suzanna Hupp had locked her own handgun in her vehicle before entering the cafeteria, rendering her defenseless as the attacker murdered her parents and many others.[30]

Obviously criminals need not limit themselves to semi-automatic guns. Consider first the potential lethality of shotguns. The Winchester Model 12 pump action shotgun (defined as a "recreational" firearm by the 1994 federal "assault weapons" ban) can fire six 00 buckshot shells, each shell containing twelve .33 caliber pellets, in three seconds. Each of the pellets is larger in diameter than the bullet fired by an AKS (a semiautomatic look-alike of an AK-47 rifle). In other words, the Winchester Model 12 pump action shotgun can in three seconds unleash seventy-two separate projectiles, each single one capable of causing injury or death. The Remington Model 1100 shotgun (a common semiautomatic duck-hunting gun, also defined as a "recreational" firearm under the 1994 ban) can unleash the same seventy-two projectiles in

13

2.5 seconds. In contrast, an AKS would take about a minute to fire forty aimed shots (or perhaps twice that many without aiming).[31] Notably, a pump-action shotgun is extremely easy to reload without lowering the gun from firing position, and each additionally loaded shell can be fired immediately. When mass murderers target victims in tightly-packed venues, a "recreational" shotgun could be particularly deadly.

### The purpose of gun bans is to ban guns

The only true utility of a ban on "assault weapons" is to condition the public to bans on more guns. For example, Douglas Anthony Cooper advocates a ban on "assault" semi-automatics and "high-capacity" magazines, though he grants such legislation makes little or no difference. His solution is to ban all semi-automatic rifles and all pump-action shotguns, writing that pump-action shotguns "are in some ways *more* useful than many often-banned weapons, if you intend to shoot a huge number of people, quickly."[32]

In the 1996 op-ed quoted above, Charles Krauthammer calls for government to "disarm its citizenry," and he sees the "assault weapons ban" as meaningful only as a step in that direction. Krauthammer argues, "The claim of the advocates that banning these 19 types of 'assault weapons' will reduce the crime rate is laughable. There are dozens of other weapons, the functional equivalent of these 'assault weapons,' that were left off the list and are perfect substitutes for anyone bent on mayhem." Nevertheless, Krauthammer sees the ban as useful insofar as it leads to "real steps, like the banning of handguns," down the road.[33]

Although writer Christian Chung does not offer a detailed plan on the legislation he would eventually like to see in place, he refers to Feinstein's newly proposed "assault weapons ban" as "only the start" of much more extensive legislation. One of Chung's complaints is that the "assault weapons ban" arbitrarily outlaws some semi-automatic guns because of some "cosmetic addition" while leaving functionally equivalent guns legal.[34]

Writing for the *Atlantic*, senior editor Robert Wright similarly complains about the "assault weapons ban," arguing that "the assault weapons issue is a red herring." As he points out, "there's no clear and simple definition of an assault weapon, and this fact has in the past led to incoherent regulation." What is Wright's preferred legislation? He advocates legislation to accomplish the following: "It's illegal to sell or possess a firearm—rifle or pistol—that can hold more than six bullets. And it's illegal to sell or possess a firearm with a detachable magazine."[35] In other words, Wright wants to outlaw the overwhelming majority of semi-automatic guns.

14

# Magazines

Nationally, anti-gun advocates are calling for a ban on magazines holding more than 10 rounds. New York Governor Andrew Cuomo has gone even further, with a ban on anything holding more than seven.[36] These bans are unconstitutional, and harmful to public safety.

A magazine is the part of the firearm where ammunition is stored. Sometimes the magazine is part of the firearm itself, as in tube magazines underneath barrels. This is typical for shotguns.

For rifles and handguns, the typical magazine is detachable. A detachable magazine is a rectangular or curved box, made of metal or plastic. At the bottom of the magazine is a spring, which helps push a fresh round of ammunition into the firing chamber, after the empty shell from the previous round has been ejected. Some people use the word "clip," but this is incorrect.

The type or model of gun does not determine what size magazine can be used. Any gun that uses a detachable magazine can accommodate a detachable magazine of any size.

As detailed above, the 1994 Feinstein ban was predicated on the theory that "recreational" firearm use is legitimate, and other firearms use is not. The ban did in fact impede recreational firearms use. More importantly, the ban is plain a violation of *Heller*, which affirms the right of defensive gun ownership.

For target shooting competitions, there are many events which *require* the use of magazines holding more than 10 rounds. For hunting, about half the states limit the magazine size that a hunter can carry in the field, but about half the states do not.

In some scenarios, such as deer hunting, it is quite true that a hunter will rarely get off more than two shots at a particular animal. But in other situations, particularly pest control, the use of 11 to 30 round magazines is quite typical, because the hunter will be firing multiple shots. These include the hunting of packs of feral wild hogs (which are quite strong, and are often difficult to put down with a single shot), prairie dogs, and coyotes.

More generally, the rifle that might shoot only one or two shots at a deer might be needed for self-defense against a bear, or against human attackers. In 2012, Arizona repealed its limitations on magazine capacity for hunters precisely because of the need for self-defense against unexpected encounters with smuggling gangs in the southern part of the state. It is well-established that drug traffickers and human traffickers often use the same wild and lonely lands that hunters do.

For the firearms that are most often chosen for self-defense, asserting that any magazine over 10 (or seven) rounds is "high capacity" is incorrect. The term "high-capacity magazine" might have a legitimate meaning when it refers to a magazine that extends far beyond that intended for the gun's optimal operation. For example, although a semi-automatic handgun can

15

accept a 30-round magazine, such a magazine extends far beneath the gun grip, and it is therefore impractical to use with a concealed-carry permit, to take one example. For a handgun, a 30-round magazine may be a "high-capacity magazine."

The persons who have the most need for actual high-capacity magazines are persons who would have great difficulty changing a magazine—such as elderly persons, persons with handicaps, persons with Parkinson's disease, and so on. For a healthy person, changing a magazine takes only a second or two. How is this accomplished? Typically a gun's magazine-release button is near the trigger. To change a magazine, the person holding the gun presses the magazine-release button with a thumb or finger. The magazine instantly drops to the floor. While pushing the magazine-release button with one hand, the other hand grabs a fresh magazine (which might be carried in a special holster on a belt) and bringing it towards the gun. The moment the old magazine drops out, a fresh one is inserted.[37]

Although changing magazines is quick, persons being attacked by violent criminals will typically prefer not to spend even two seconds in a magazine change. This is why semi-automatic handguns often come factory-standard with a magazine of 11 to 19 rounds. For example, Rep. Gabrielle Giffords has said that she owns a 9mm Glock handgun. The most popular Glocks in this caliber come standard with 15 or 17 round magazines.[38]

For most other manufacturers as well, handgun magazines with a capacity of 11 to 19 rounds are factory standard. A ban on magazines with a capacity of more than 10 rounds means a ban on the most common and most useful magazines purchased for purposes of recreational target practice and self-defense.

One thing that proves the obvious usefulness of standard capacity magazines is the fact that most police officers use them. An officer typically carries a semi-automatic handgun on a belt holster as his primary sidearm. The magazine capacity is typically in the 11-19 range.

Likewise, the long gun that is carried in police patrol cars is quite often an AR-15 rifle with a 30-round magazine.[39]

True, a police officer is much more likely than other civilians to find him- or herself in a confrontation with violent criminals. Nevertheless, every civilian faces some risk of such a confrontation, and every law-abiding citizen has a moral right to own the best tools of self-defense should such a confrontation come to pass. Although different guns work better for different individuals in different circumstances, in many contexts the officer's advice is equally sound for non-police civilians who own a gun for self-defense.

Why might someone "need" a factory-standard fifteen-round magazine for a common 9 mm handgun? Beyond the fact that government should recognize and protect people's rights, not dictate to free Americans what they "need" to own, standard-capacity magazines can be extremely useful for self-defense. This is true in a variety of circumstances, such as if a defender faces multiple

16

attackers, an attacker is wearing heavy clothing or body armor, an attacker is turbo-charged by methamphetamine or cocaine, an attacker poses an active threat from behind cover, or a home invader cuts the lights to the home before entering at night. Especially because, in stressful circumstances, police as well as non-police civilians often miss when firing a handgun even at close range, having the extra rounds can be crucially important in some defensive contexts.

Consider the advantages a criminal has over his intended victims. The criminal often takes time to carefully prepare an attack; the victim is caught off-guard. The criminal has the element of surprise; the victim is the one surprised. The criminal can adapt his plans, as by selecting different weaponry; the victim must respond with what's at hand at the moment of attack. A criminal can, for instance, substitute a shotgun or a bag full of revolvers for a semi-automatic gun. A criminal can pack multiple magazines if he uses a semi-automatic gun. The intended victim, on the other hand, usually will have on hand at most a single defensive gun, carrying (if it is a semi-automatic) a single magazine. Thus, what legislation such as a ban on "high-capacity" magazines does is give the criminal a greater advantage over his intended victims.

**Would a magazine ban do any good?**

Recall that in 2004 the National Institute of Justice study found that the 1994-2004 ban on the manufacture or import of such magazines had no discernible benefit. As the authors noted, the existing supply of such magazines was so vast that criminals apparently had no trouble obtaining magazines of whatever size they wished.[40]

Since the September 2004 expiration of the ban on new magazines, the supply has grown vaster still. In other words, we know that the pre-1994 supply of magazines was so large that nine years of prohibition had no effect. The much larger supply of magazines as of 2013 means that the already-demonstrated period of nine years of futility would be far longer.

No one can say if a ban on new magazines would ever do any good. But we can be rather certain that a ban would be ineffectual for at least fifteen years, and perhaps many more. Preventing the next Newtown is something that requires solutions which will start working this year—and not futile laws which, in the best case scenario, might possibly begin to have their first benefits around 2030.

It is entirely possible to speculate what might happen if criminals did not have magazines with 11 or more rounds, just as one can speculate about what might happen if all criminals could not obtain stolen cars, or if criminals could not obtain guns, or if all criminals were left-handed. But there is no particular reason to think that any of these scenarios might ever come true.[41]

A national ban on the millions of currently owned "high capacity" magazines would require a heavy-handed police state to enforce. The new

17

Cuomo ban in New York will be enforceable only if the state's motto of "The Empire State" is changed to "The Police State."

It would be possible to outlaw the legal transfer of grandfathered magazines, but this would not remove "high-capacity" magazines from the black market.

Regarding "shootout" scenarios, the types of criminals most likely to get into shootouts with the police or with other criminals are precisely the types of criminals expert at acting on the black market. Although gun prohibitionists often link "assault weapons" to gang violence associated with the illegal drug trade,[42] they miss the irony of their argument. They are, in effect, claiming that gangs operating the black market in drugs will somehow be restricted from acquiring "high capacity" magazines by legislation limiting the manufacture and sale of such magazines. In short, their argument—at least as it pertains to career criminals—is ludicrous. If gangsters can obtain all the cocaine they want, despite a century of severely-enforced prohibition, they are going to be able to get 15 round magazines.

Besides that, magazines are not very difficult to build. Anyone with moderate machine shop skills can build a small metal box and put a spring in it. Building magazines is vastly easier than building guns, and we know that tribespeople in Ghana (who do not have access to high-quality machine shops) produce a hundred thousand working copies of the AK-47 per year.[43]

Moreover, 3-D printing technology has *already* produced "printed" plastic magazines.[44] It's not very hard—just a box in a particular shape, along with a spring. For manufacturing actual firearms, 3-D printing is currently just a hypothetical; a firearm needs to be strong enough to withstand (over the course of its use) many thousands of gunpowder explosions in the firing chamber. But for a mere magazine, the current strength of printed plastics is sufficient.

We can limit the discussion, then, to mass murders in which the perpetrator targets victims randomly, often seeking the global infamy the mass media so readily provide them. Of course some such people could still illegally purchase a "high capacity magazine" on the black market. Given that 36 percent of American high school seniors illegally acquire and consume marijuana,[45] it is unrealistic to think that someone intent on mass mayhem would be unable to find his magazine of choice on the black market.

Besides that, the truly high-capacity magazines (e.g., a 100 round drum), are very prone to malfunction. For example, during the mass murder at the movie theater in Aurora, the murderer's 100-round magazine malfunctioned, causing the killer to cease using the gun with the magazine.[46] Had the killer had numerous, smaller magazines, he would have been able to fire more rounds from that particular gun. Hundred round magazines are novelty items, and are not standard for self-defense by civilians or police.

Advocates of the ban on standard capacity magazines assert that while the attacker is changing the magazine, one of the victims can tackle him.

There are three known instances where something this may have happened: in Springfield, Oregon, in 1998; in Tucson, Arizona, in 2011;[47] and the Long Island Railroad in 1991.

Far more commonly, however, the victims are fleeing, and are not close enough to the shooter to tackle him during a two-second interval. At Newtown, the murderer changed magazines many times, firing only a portion of the rounds in each magazine.[48] At the 1991 murders at the Luby's Texas cafeteria (24 dead), the perpetrator changed magazines multiple times. In the Virginia Tech murders, the perpetrator changed magazines 17 times.[49]

The *Heller* decision teaches us that one does not decide on the constitutionality of banning something simply by looking at instances of misuse. Handguns are used in thousands of homicides annually, and in several hundred thousand other gun crimes. A ban on handguns (imagining it would be effective) would have orders of magnitude greater benefits than a ban on magazines holding more than 10 rounds (imagining that too to be effective).

*Heller*, however, reminds us that the Second Amendment has already done the cost-benefit analysis. The Framers were quite familiar with gun crime, and with lawful defensive gun use. The arms and accessories protected by the Second Amendment are those which are commonly used by law-abiding citizens for legitimate purposes, especially self-defense. In today's America, this certainly includes handguns and rifles with magazines that prohibitionists would consider "large."

## International Comparisons

Some Americans, including Howard Dean, the former chair of the Democratic National Committee, have advocated the mass confiscation of firearms. Their model is the confiscations that took place in the past quarter-century in Great Britain.

This dystopian situation in Great Britain actually shows the perils of repressive anti-gun laws:

- A woman in Great Britain is three times more likely to be raped than an American woman.

- In the United States, only about 13% of home burglaries take place when the occupants are home, but in Great Britain, about 59% do. American burglars report that they avoid occupied homes because of the risk of getting shot. English burglars prefer occupied homes, because there will be wallets and purses with cash, which does not have to be fenced at a discount. British criminals have little risk of confronting a victim who possesses a firearm. Even the small percentage of British homes which have a lawfully-owned gun would

19

not be able to unlock the gun from one safe, and then unlock the ammunition from another safe, in time to use the gun against a home invader. It should hardly be surprising, then, that Britain has a much higher rate of home invasion burglaries than does the United States.[50]

- Overall, the violent crime rate in England and Wales is far above the American rate. (Using the standard definition for the four most common major violent crimes: homicide, rape, robbery, and aggravated assault.)

- According to the United Nations (not exactly a "pro-gun" organization), Scotland is the most violent nation in the developed world.[51]

In the early 20th century, the Great Britain had virtually no gun control, virtually no gun control. Today, it has a plethora of both.

What went wrong? Various minor and ineffectual gun controls were enacted in the late nineteenth and early twentieth centuries; proposals for more extensive controls ran into strenuous opposition in Parliament from MPs who still believed in natural rights. The advocacy for gun control was almost always accompanied by a bodyguard of lies, such as when the government, fearful of a workers rebellion, pushed through the Firearms Act of 1920. The government falsely told the public that gun crimes were rapidly increasing, and hid the law's true motive (political control) from the public, presenting the law as a mere anti-crime measure.[52] In practice, the law eliminated the right of British subjects to be armed, and turned it into a privilege. The Firearms Act also began a decades-long process of eliminating the public's duty to protect their society and right to protect themselves. By the late 20th century, Great Britain had one of the lowest rates of gun ownership in the Western World. Only 4% of British households would admit gun ownership to a telephone pollster.[53]

In 1998, after a known pedophile used a handgun to murder kindergarten children in Dunblane, Scotland, the Parliament banned non-government possession of handguns. As a result the Gun Control Network (a prohibition advocacy group) enthused that "present British controls over firearms are regarded as 'the gold standard' in many countries." According to GCN spokesperson Mrs. Gill Marshall-Andrews, "the fact that we have a gold standard is something to be proud of…."[54]

A July 2001 study from King's College London's Centre for Defence Studies found that handgun-related crime increased by nearly 40% in the two years following implementation of the handgun ban. The study also found that there had been "no direct link" between lawful possession of guns by licensed citizens and misuse of guns by criminals. According to the King's College report, although the 1998 handgun ban resulted in over 160,000 licensed handguns being withdrawn from personal possession, "the UK

20

000403

ER_1275

appears not to have succeeded in creating the gun free society for which many have wished. Gun related violence continues to rise and the streets of Britain…seem no more safe."[55]

A few weeks before the King's College study was released, Home Office figures showed that violent crime in Great Britain was rising at the second fastest rate in the world, well above the U.S. rate, and on par with crime-ridden South Africa.[56] In February 2001, it was reported that 26 percent of persons living in England and Wales had been victims of crime in 1999.[57] Home Secretary Jack Straw admitted, "levels of victimisation are higher than in most comparable countries for most categories of crime." On May 4, 2001, *The Telegraph* disclosed that the risk of a citizen being assaulted was "higher in Britain than almost anywhere else in the industrialized world, including America."[58]

As King's College observed, with passage of the Firearms Act of 1997, "it was confidently assumed that the new legislation effectively banning handguns would have the direct effect of reducing certain types of violent crime by reducing access to weapons."[59] The news media promised that the "world's toughest laws will help to keep weapons off the streets."[60]

Yet faster than British gun-owners could surrender their previously-registered handguns for destruction, guns began flooding into Great Britain from the international black market (especially from eastern Europe and China), driven by the demands of the country's rapidly developing criminal gun culture.[61]

It is true that there are far fewer gun deaths in Great Britain than in the United States. Most of the difference is due to different methods of suicide; guns being scarce in Great Britain, suicides are perpetrated with other methods.

The one major criminal justice statistic in which Great Britain appears to be doing better than the U.S. is the homicide rate, with the U.S. rate at a little more than 4, and the England and Wales rate at 1.4. However, the U.S. rate is based on initial reports of homicides, and includes lawful self-defense killings (about 10-15% of the total); the England and Wales rate is based only on final dispositions, so that an unsolved murder, or a murder which is pleaded down to a lesser offense, is not counted a homicide. In addition, multiple murders are counted as only a single homicide for Scottish statistics.[62]

But let's assume that the entire difference is the homicide rates between the U.S. and Great Britain is due to gun control. The advocates of British-style controls in America ought to acknowledge the fearsome price that gun control has exacted on the British people: an astronomical rate of rape, of home invasions, and of violent crime in general.

**Registration**

An important difference between Great Britain and the United States is that in Great Britain, many people complied with gun confiscation because their guns were already registered.

The evidence is overwhelming that Americans will not comply with gun confiscation programs; a recent Rasmussen poll showed that 65 percent of American gun owners would not obey government orders to surrender their guns.

Nor will Americans obey laws which retroactively require them to register their guns. During the first phase of the "assault weapon" hoax, several states and cities passed bans, and allowed grandfathered owners to keep the guns legally by registering the guns. The non-compliance rates for retroactive registration were always at least 90%, and frequently much higher than that.[63]

Americans are quite aware that gun registration can be a tool for gun confiscation. That is why Congress has enacted three separate laws (1941, 1986, and 1993) to prohibit federal gun registration. Congress first acted in 1941 because Congress saw how Hitler and Stalin had been using gun registration for confiscation.[64] Since then, registration lists have been used in many countries, and in New York City, for confiscation. Indeed, even if we look only at registration laws enacted by democratic nations, in most countries gun registration lists have eventually been used for the confiscation of many firearms.

Congress cannot expand or contract the judicially-declared scope of a constitutional right;[65] but Congress can, under section 5 of the Fourteenth Amendment, enact "prophylactic" measures to prevent state and local governments from endangering civil rights,[66] provided that these laws are "congruent and proportional" to the problem that Congress is addressing.[67] Congress should use this power to prohibit all state and local registration of guns and gun owners, and to require the destruction of any existing records.

Persons who are advocating gun confiscation are irresponsible in the extreme. Confiscation would endanger the lives of law enforcement officers who were ordered to carry it out. We should remember that the political dispute between the American Colonies and Great Britain turned into a shooting war precisely at the moment when the British attempted house-to-house gun confiscation.[68]

Mass prohibitions of guns or gun accessories invite a repetition of the catastrophe of alcohol prohibition. Just as alcohol prohibition in the 1920s and drug prohibition in modern times have spawned vast increases in state power, and vast infringements on the Bill of Rights, another national war against the millions of Americans who are determined to possess a product which is very important to them is almost certain to cause tremendous additional erosion of constitutional freedom and traditional liberty. Legal and customary protections unreasonable search and seizure, against invasion of

privacy, against selective enforcement, and against harsh and punitive statutes would all suffer.[69]

# What Can be Done?

### Acknowledging success

Regarding firearms crime in general (and not just the highly-publicized mass homicides), we should start by acknowledging the success of policies of the last three decades. Since 1980, the U.S. homicide rate has fallen by over half, from more than 10 victims per 100,000 population annually, to under 5 today.[70]

Homicide, as horrifying as it is, did not make the top fifteen causes of death for 2011, according to preliminary data published by the Centers for Disease Control.[71] Of the 2,512,873 total deaths for that year, the large majority were caused by health-related problems. The fifth leading cause of death was accidents, at 122,777 deaths. Suicide made the top ten with 38,285 deaths.

Appropriately, the media tend to report homicides much more frequently and emphatically than they report deaths from other causes. The problem is that the uncritical consumer of media might develop a skewed perspective of the actual risks he or she faces.

In 2011, homicides numbered 15,953, or 0.63 percent of all deaths. Of those, 11,101 were caused by "discharge of firearms"—or nearly 70 percent of all homicides.

The vast majority of these were from handguns, which shotguns in second place. The FBI reports that in 2011, 13 percent of homicides were committed with "knives or cutting instruments," while nearly 6 percent were committed with "personal weapons" such "hands, fists, feet, etc."[72]

Most of the guns which are inaccurately called "assault weapons" are rifles. All types of rifles combined comprise only about two percent of homicide weapons—far less than "blunt instruments" such as hammers, clubs, and so on.

As for accidents in 2011, 34,676 deaths were caused by "motor vehicle accidents"; 33,554 deaths by "accidental poisoning and exposure to noxious substances"; 26,631 deaths by falls; 3,555 deaths by "accidental drowning and submersion"; and 851 deaths by "accidental discharge of firearms."[73]

Regarding violent crime in general, violent crime has been on a 20-year decline, so that today Americans are safer from violent crime than at any time since the early 1960s.[74]

The news is even better for young people. According to Bureau of Justice Statistics (part of the U.S. Department of Justice), "From 1994 to 2010, the overall rate of serious violent crime against youth declined by 77%."[75]

These successes have taken place during a period when American gun ownership has soared. In 1964, when crime was about the same as it is now,

23

per capita gun ownership was only .45, less than 1 gun per 2 Americans. In 1982, there were about .77 guns per capita. (About 3 guns per 4 Americans). By 1994, that had risen to .91 (9 guns per 10 Americans). Today, there are slightly more guns in America than Americans. We have increased from 232 million guns in 1982 to over 308 million in 2010.[76]

The causes of crime fluctuations are many. They include (among other things) changes in illegal drug activity and government enforcement thereof, changes in police tactics, changes in incarceration rates, changes in the average age of the population (which in the U.S. has been increasing), and changes in reporting (which can mask real changes in underlying crime trends).

It would not be accurate to say that increased gun ownership, and the spread of laws allowing the licensed carry of handguns is the only cause of progress that has been made in recent decades. We can say with certainty that "more guns" is not associated with "more crime." If anything, just the opposite is true.

### Armed defenders

Sandy Hook Elementary School was a pretend "gun free zone": responsible adults were legally prohibited from effectively protecting the children in their care, while an armed criminal was could not be prevented from entering.

What did finally stop the murderer? He killed himself just before being confronted by men carrying guns, guns that no doubt included "assault weapons" with "high-capacity magazines." As the Associated Press reports, the murderer "shot himself in the head just as he heard police drawing near to the classroom where he was slaughtering helpless children."[77]

The Newtown murders took place in a state with a ban on "assault weapons," and with a strict system of gun owner licensing and registration—one of the most restrictive in the nation. Not even the most restrictive laws (short of complete prohibition of all legal gun ownership) can remedy the problems of an absent, divorced, and detached father, and a custodial mother who is so recklessly irresponsible that even while she tells people in town about her plans to have her son committed to a mental institution, she leaves her registered guns readily accessible to him.

Armed guards are generally successfully at deterring the robbery of diamond stores and banks, and they equally legitimate for preventing the murder of children, who are far more valuable than diamonds or greenbacks.

There are at least 10 cases in which armed persons have stopped incipient mass murder: Pearl High School in Mississippi; Sullivan Central High School in Tennessee; Appalachian School of Law in Virginia; a middle school dance in Edinboro, Pa.; Players Bar and Grill in Nevada; a Shoney's restaurant in Alabama; Trolley Square Mall in Salt Lake City; New Life Church in

24

Colorado; Clackamas Mall in Oregon (three days before Sandy Hook); Mayan Palace Theater in San Antonio (three days after Sandy Hook).

Sometimes the hero was an armed school guard (Sullivan Central High). Sometimes it was an off-duty police officer or mall security guard (Trolley Square, Mayan Theater, Clackamas Mall and the Appalachian Law School, where two law students, one of them a police officer and the other a former sheriff's deputy, had guns in their cars). Or a restaurant owner (Edinboro). Or a church volunteer guard with a concealed carry permit (Colorado). Or a diner with a concealed carry permit (Alabama and Nevada). At Pearl High School, it was the vice principal who had a gun in his car and stopped a 16-year-old, who had killed his mother and two students, before he could drive away, perhaps headed for the junior high.

For schools, Utah provides a model. In Utah, if a law-abiding adult passes a fingerprint-based check and a safety training class, then he or she is issued a permit to carry a concealed handgun throughout the state. Thus, teachers may carry at school. Several Texas school districts also encourage armed teachers. Connecticut, however, is similar to most of the other 40 other states that generally allow law-abiding adults to carry in public places: It limits where guns may be carried, and no civilian, not even teachers and principals, may carry at school.

Anti-gun ideologues invent all sorts of fantasy scenarios about the harms that could be caused by armed teachers. But the Utah law has been in effect since 1995, and Texas since 2008, with not a single problem.

Gun prohibitionists also insist that armed teachers or even armed school guards won't make a difference. But in the real world, they have — even at Columbine, where the armed "school resource officer" (a sheriff's deputy, in this case) was in the parking lot when the first shots were fired. The officer twice fired long-distance shots and drove the killers off the school patio, saving the lives of wounded students there. Unfortunately, however, the officer failed to pursue the killers into the building—perhaps due to a now-abandoned law enforcement doctrine of waiting for the SWAT team to solve serious problems.

Whatever should be done in the long run, the long gun will be much too late to stop the next copycat sociopath who attacks a school (or a mall or movie theater). More concealed carry laws like the ones in Utah and Texas are the best way to save lives right now. Teachers who are already licensed to carry a gun everywhere else in the state should not be prevented from protecting the children in their care.

**Doing something effective**

While armed defense is a necessity, in the short run, to thwart copycat killers, long-term solutions are also necessary.

A very large proportion of mass murders—and about one-sixth of "ordinary" murders—are mentally ill. Better care, treatment, and stronger

000408

ER_1280

laws for civil commitment could prevent many of these crimes. Of course any involuntary commitment must respect the Constitution which, as applied by the U.S. Supreme Court, requires proof by "clear and convincing evidence" that the individual is a danger to himself or others in order for the person to be committed. Better mental health treatment is expensive in the short run, but pays for itself in the long run, through reduced criminal justice and imprisonment costs, not to mention reduced costs to victims.[78]

Although "universal background checks" are, at the highest level of generality, a popular idea, one should pay attention to the details. Every "background check" bill introduced in Congress in the last several years has come from Michael Bloomberg's gun prohibition lobby, and has included a gun registration component. For the reasons detailed above, gun registration is anathema to the Second Amendment.

Consider, for example, the misnamed "Fix Gun Checks Act," from the previous Congress, S. 436 (sponsored by Sen. Schumer). Here is what the bill actually would have done:

- Create a national firearms registry.
- Make it a federal felony to temporarily allow someone to use or hold's one's firearm in the following circumstances:
  - While a friend visits your home.
  - While taking a friend target shooting on your property, or on public lands where target shooting is allowed.
  - While instructing students in a firearms safety class.
- Current law bans gun possession if there has been a formal determination that a person's mental illness makes him a danger to himself or others. S. 436 would abolish the requirement for a fair determination and a finding of dangerousness Instead, S. 436 would ban gun possession by anyone who has ever been ordered to receive counseling for any mental problem. This would include:
  - A college student who was ordered to get counseling because the school administration was retaliating against him for criticizing the administration.
  - An adult who when in fifth grade was ordered to receive counseling for stuttering, for attention deficit disorder, or for mathematics disorder.
  - A person who was once ordered to receive counseling for homosexuality, cross-dressing, or for belonging to some other sexual minority.
  - A women who was raped in an elevator, and who has therefore developed a phobia about elevators.
- S. 436 rejects the constitutional standards of due process and fair trial. S. 436 allows for the prohibition of gun ownership based on an arrest, rather than a conviction. Thus, S. 436 would make it gun possession a

26

**000409**

**ER_1281**

felony for a person who was once arrested for marijuana possession, and was later found innocent because a police officer mistook tobacco for marijuana.

- Among the reasons that S. 436 was unconstitutional was because it:
  - Strips a person of a fundamental constitutional right because of an arrest, rather than a conviction.
  - Is purportedly based on the congressional power "to regulate Commerce . . . among the several States"—but its transfer bans apply solely to transfers that are not commerce, and are not interstate.
  - Violates the scope of gun control laws approved by the Supreme Court in *District of Columbia v. Heller*. The Heller Court approved of some "laws imposing conditions and qualifications on the commercial sale of arms." Yet S. 436 attempted to control non-retail "transfers" that are not even "commercial" or "sales"— such as letting a friend use a gun while target shooting.
  - Is unconstitutionally "overbroad" because rather than banning gun possession by persons who have been determined to pose a threat to themselves or others (current laws) bans gun possession by anyone who has been ordered to get counseling even for non-dangerous mental problems (such as nicotine dependence, or lack of interest in sex).
  - Violates the Fifth Amendment requirement of due process of law, because it imposes gun bans without due process—such as a mere arrest, or the mere order by a school employee or work supervisor that a person receive counseling. Regardless of whether that employee or supervisor offered the person a fair hearing, and regardless of whether the counselor eventually determined that the person had no mental problem at all.
  - Violates the equal protection of the laws guarantee which is implicit in the Fifth Amendment, because it bans possession for categories of persons who cannot rationally be classified as more dangerous than other persons. The victims of S. 436's unfair gun bans would include homosexuals and other sexual minorities, persons who have a phobia about elevators or diseases, and many other persons who are ordered into counseling for reasons that have nothing to do with dangerousness.

Today, the media are reporting that a backroom deal is being worked out in the Senate on "universal background checks." Senators who sincerely follow their oath to protect the United States Constitution would not support a bill which has a title of "Universal Background Checks," but which contains any of the poisonous anti-constitutional provisions of last session's Bloomberg "background checks" bill.

27

Moreover, without universal gun registration, mandated background checks on purely private sales (e.g., friends in a hunting club selling guns to each other) are impossible to enforce. Universal gun registration is impossible in practice, and would lead to massive resistance. When Canada tried to impose universal gun registration, the result was a complete fiasco. The registration system cost a hundred times more than promised. Non-compliance (by Canadians, who are much more compliant with government than Americans) was at least fifty percent. And the registration system proved almost entirely useless in crime solving or crime prevention. In 2012, the Canadian government repealed the registration law, and ordered all the registration records destroyed.

Obviously, criminals who are selling guns to each (which is completely illegal, and already subject to severe mandatory sentences) are not going to comply with a background check mandate. It will be irrelevant to them.

Ordinary law-abiding citizens who selling guns to each other might be happy to take the gun into a firearm store for a voluntary check, provided that the check is not subject to a special fee, that there is no registration, and that the check is convenient and expeditious. Changing statutes and regulations so that gun stores can carry out voluntary checks for private sellers is the most that can be expected, realistically. President Obama's order that the Bureau of Alcohol, Tobacco, Firearms and Explosives provide instructions to dealers on how to facilitate voluntary checks is a good idea. In light of this order, there is no need for Congress to enact additional legislation to impose a futile and unenforceable mandate.

"Doing something" is the slogan for politicians who seek merely to exploit terrible crimes for self-serving purposes. "Doing something effective" is the approach of people who want to save lives and protect the public, especially children.

The lives of Americans, especially schoolchildren, depend on the choice that elected officials make between these two alternatives.

---

[1] Some of this testimony is based on a Policy Analysis which Kopel and co-author Ari Armstrong are writing for the Cato Institute. The published Cato version will include more complete endnotes, which were impossible to provide for this testimony, given the very short time available.

[2] Christopher S. Koper, Daniel J. Woods, and Jeffrey A. Roth, "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003: Report to the National Institute of Justice, United States Department of Justice," University of Pennsylvania, June 2004, http://www.sas.upenn.edu/jerrylee/research/aw_final2004.pdf.

[3] Charles Krauthammer, "Disingenuous Debate on Repeal of Assault Weapons Ban," *Chicago Tribune*, April 8, 1996, http://articles.chicagotribune.com/1996-04-08/news/9604080024_1_assault-weapons-ban-gun-control-crime-rate.

[4] Josh Sugarmann, "Conclusion," *Assault Weapons and Accessories in America*, Violence Policy Center, 1988, http://www.vpc.org/studies/awaconc.htm.

28

[5] See, for example, David Kopel, "Guns, Mental Illness and Newtown," *Wall Street Journal*, December 17, 2012, http://online.wsj.com/article/SB10001424127887323723104578185271857424036.html.

[6] See Ari Armstrong, "Civilian Responses to Active Shooters," *Free Colorado*, July 21, 2012, http://ariarmstrong.com/2012/07/civilian-responses-to-active-attackers; *Active Shooter Survival* (DirectMeasures, 2012), Survival Edge Series, Disc 1, http://www.directmeasures.com/buy-ACT-LastResort.htm.

[7] Alexander Abad-Santos, "This Is What Teachers Learning to Shoot Guns Look Like," *Atlantic Wire*, December 28, 2012, http://www.theatlanticwire.com/national/2012/12/post-newtown-teacher-gun-training-classes/60409; Angela K. Brown, "Texas Town Allows Teachers to Carry Concealed Guns," Associated Press, December 20, 2012, http://www.usatoday.com/story/news/nation/2012/12/20/texas-town-teachers-guns/1781663; Cathy Lynn Grossman and Greg Toppo, "Trainer for Gun-Toting Teachers: 'Make it Hard to Kill a Kid,'" *USA Today*, December 28, 2012, http://www.usatoday.com/story/news/nation/2012/12/27/gun-classes-teachers-utah-ohio-shooting/1793773; Michelle Malkin, "The Gift of Self-Empowerment," December 26, 2012, http://michellemalkin.com/2012/12/26/the-gift-of-self-empowerment.

[8] Tim Graham, "Des Moines Register Publishes Gun-Ban Column Advocating Deadly Violence against NRA, GOP Leaders," *Fox News*, January 2, 2013, http://www.foxnews.com/opinion/2013/01/02/liberal-ex-columnist-death-threats-published-in-des-moines-register.

[9] Douglas Anthony Cooper, "A Proven Way to End the Gun Slaughter: Will We Fight for It?", *Huff Post Politics*, December 26, 2012, http://www.huffingtonpost.com/douglas-anthony-cooper/proven-way-end-slaughter_b_2341815.html.

[10] Justin Peters, "How Many Assault Weapons Are There In America? How Much Would It Cost the Government To Buy Them Back?", *Slate*, December 20, 2012, http://www.slate.com/blogs/crime/2012/12/20/assault_rifle_stats_how_many_assault_rifles_are_there_in_america.html.

[11] Some machine guns are or may be set to fire a certain number of rounds with one pull of the trigger.

[12] "Fully-Automatic Firearms," NRA–ILA, July 29, 1999, http://www.nraila.org/news-issues/fact-sheets/1999/fully-automatic-firearms.aspx; "National Firearms Act (NFA)— Machine Guns," http://www.atf.gov/firearms/faq/national-firearms-act-machine-guns.html, accessed January 3, 2013.

[13] See David B. Kopel, *Guns: Who Should Have Them* (New York: Prometheus Books, 1995), p. 162; *Defense Intelligence Agency, Small Arms Identification and Operation Guide— Eurasian Communist Countries* (Washington, D.C.: Government Printing Office, 1988), p. 105.

[14] However, the energy which is used to turn the cylinder of the revolver (bringing the next round into place, ready to fire) comes from the user pulling the trigger. (The trigger is mechanically linked to the cylinder, and a trigger pull performs the "double action" of cocking the hammer and firing a round.) Thus, the revolver does not use gunpowder energy in order to load the next round. So even though a revolver is comparable to a semi-automatic handgun in that each pull of the trigger chambers and fires one round, a revolver is a not a semi-automatic.

[15] The formula is: KE= ½ MV². Or in words: one-half of mass times the square of the velocity.

[16] Rifles have longer barrels than handguns, and rifle cartridges generally burn more gunpowder. Thus, a bullet shot from a rifle spends more time traveling through the barrel than does a bullet shot from a handgun. As a result, the rifle bullet receives a longer, more powerful push from the expanding cloud of gunpowder in the barrel. So rifles generally deliver more kinetic energy than do handguns. (As for shotguns, the mass of shot pellets is much heavier than any single rifle or handgun bullet, so shotguns have very high kinetic

energy at short ranges. But their kinetic energy drops rapidly, because the round pellets rapidly lose speed due to air friction. Rifle and handgun bullets are far more aerodynamic than are shotgun pellets.)

[17] If the gun's caliber is .17, that means the gun's barrel is 17/100 of an inch wide, and can accommodate a bullet which is very slightly smaller than that. So a .38 caliber bullet is bigger than a .17 caliber bullet, and a .45 caliber bullet is bigger than either of them. (Calibers can also be expressed metrically. 9mm is nearly the same as .357, which is slightly smaller than .38).

The bullet's size depends on its width (caliber) and on its length. So one .45 caliber bullet might be longer, and hence heavier, than another .45 caliber bullet.

For any particular gun in any particular caliber, there are a variety of rounds available, some of which have more gunpowder than others. More gunpowder makes the bullet fly straighter for longer distances (especially important in many types of hunting or target shooting); less gunpowder reduces recoil, and makes the gun more comfortable to shoot and more controllable for many people.

[18] Measured at the muzzle. Kinetic energy begins declining as soon as the bullet leaves the barrel, because air friction progressively reduces velocity.

[19] For details, see David B. Kopel, *Guns: Who Should Have Them* (New York: Prometheus Books, 1995), pp. 168–70.

[20] The assertion that so-called "assault weapons" are "high-velocity" is true only in the trivial sense that most guns which are called "assault weapons" are rifles, and rifles are generally higher velocity than handguns or shotguns.

As for the handguns which are sometimes dubbed "assault weapons," they are necessarily lower velocity, with less powerful bullets, than the most powerful handguns. The most powerful handgun calibers, such as .44 magnum or .454 Casull (often carried by hikers for self-defense against bears) have so much gunpowder that the relatively delicate mechanisms of a semi-automatic handgun cannot handle them. These heavy-duty calibers are available only for revolvers.

[21] Quoted in Randy E. Barnett and Don B. Kates, "Under Fire: The New Consensus on the Second Amendment," *Emory Law Journal*, vol. 45, 1996, reproduced at http://www.bu.edu/rbarnett/underfire.htm#Document0zzFN_B535. Feinstein's quote is from an interview with Lesley Stahl on *60 Minutes* in February 1995.

[22] Jacob Sullum, "How Do We Know an 'Assault Weapon' Ban Would Not Have Stopped Adam Lanza? Because It Didn't," *Reason*, December 17, 2012, http://reason.com/blog/2012/12/17/how-do-we-know-an-assault-weapon-ban-wou.

[23] Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth, "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003: Report to the National Institute of Justice, United States Department of Justice," University of Pennsylvania, June 2004, http://www.sas.upenn.edu/jerrylee/research/aw_final2004.pdf.

[24] Jeffrey A. Roth & Christopher S. Koper, "Impacts of the 1994 Assault Weapons Ban: 1994–96," National Institute of Justice Research in Brief, U.S. Department of Justice, March 1999, https://www.ncjrs.gov/pdffiles1/173405.pdf.

[25] "Stopping the Spread of Deadly Assault Weapons," http://www.feinstein.senate.gov/public/index.cfm/assault-weapons, accessed January 2, 2013. For another reply to Feinstein's claims, see Gregory J. Markle, "A Short Analysis of Senator Feinstein's 'Proof' of the Efficacy of the 1994 Assault Weapons Ban," December 29, 2012, http://pc3c.org/files/feinstein_fisking.pdf.

[26] Jeffrey A. Roth & Christopher S. Koper, "Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report," Urban Institute, March 13, 1997, http://www.sas.upenn.edu/jerrylee/research/aw_final1997.pdf.

[27] John Lott, *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control Is Wrong* (Washington, D.C.: Regnery Publishing, 2003), p. 214.

Looking at the raw crime data, Lott observes:

> The comparison group here is the forty-five states that did not adopt a ban. For both murder and robbery rates, the states adopting assault weapons bans were experiencing a relatively faster drop in violent crimes prior to the ban and a relatively faster increase in violent crimes after it. For rapes and aggravated assaults, the trends before and after the law seem essentially unchanged.

Based on the crime data, Lott concludes that it is "hard to argue that . . . banning assault weapons produced any noticeable benefit in terms of lower crime rates."   In statistical analyses that seek to control for other possible factors in the fluctuations of crime rates, Lott finds that, if anything, the state-level "assault weapons" bans had an adverse effect on crime rates:

> Presumably if assault weapons are to be used in any particular crimes, they will be used for murder and robbery, but the data appears more supportive of an adverse effect of an assault weapons ban on murder and robbery rates . . . , with both crime rates rising after the passage of the bans. . . . Murder and robbery rates started off relatively high in the states that eventually adopted a ban, but the gap disappears by the time the ban is adopted. Only after instituting the ban do crime rates head back up. There is a very statistically significant change in murder and rape rate trends before and after the adoption of the ban. . . . It is very difficult to observe any systematic impact of the ban on rape and aggravated assault rates.

[28] Mark Follman, Gavin Aronsen, and Deanna Pan, "A Guide to Mass Shootings in America," *Mother Jones*, December 15, 2012, http://www.motherjones.com/politics/2012/07/mass-shootings-map; see also Mark Follman, Gavin Aronsen, and Deanna Pan, "US Mass Shootings, 1982–2012: Data from Mother Jones' Investigation," *Mother Jones*, December 28, 2012, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data.

[29] Thomas C. Hayes, "Gunman Kills 22 and Himself in Texas Cafeteria," *New York Times*, October 17, 1991, http://www.nytimes.com/1991/10/17/us/gunman-kills-22-and-himself-in-texas-cafeteria.html.

[30] "About Suzanna," http://www.suzannahupp.com/?page_id=2, accessed January 13, 2013.

[31] Most of the text in this paragraph is adapted from David B. Kopel, *Guns: Who Should Have Them* (New York: Prometheus Books, 1995), p. 164. That book in turn cites William R. Magrath, "An Open Letter to American Politicians," *Police Marksman*, May–June 1989, p. 19; Edward Ezell, *The AK-47 Story* (Mechanicsburg, PA: Stackpole Books, 1986); Kent Jenkins Jr., "Calls for Ban Boost Assault Rifle Sales," *Washington Post*, March 6, 1989, p. B1; and "Assault Weapon Import Control Act of 1989," 1989: Hearings on H.R. 1154 before Subcommittee on Trade of the House Committee on Ways and Means, 101st Cong., 1st Sess. (1989).

[32] Douglas Anthony Cooper, "A Proven Way to End the Gun Slaughter: Will We Fight for It?", *Huff Post Politics*, December 26, 2012, http://www.huffingtonpost.com/douglas-anthony-cooper/proven-way-end-slaughter_b_2341815.html.

[33] Charles Krauthammer, "Disingenuous Debate on Repeal of Assault Weapons Ban," *Chicago Tribune*, April 8, 1996, http://articles.chicagotribune.com/1996-04-08/news/9604080024_1_assault-weapons-ban-gun-control-crime-rate.

[34] Christian Chung, "Dianne Feinstein New Assault Weapons Ban Doesn't Go Far Enough: It's Only the Start," *Policymic*, December 29, 2012, http://www.policymic.com/articles/21639/dianne-feinstein-new-assault-weapons-ban-doesn-t-go-far-enough-it-s-only-the-start.

[35] Robert Wright, "A Gun Control Law That Would Actually Work," *Atlantic*, December 17, 2012, http://www.theatlantic.com/national/archive/2012/12/a-gun-control-law-that-would-actually-work/266342.

[36] The "features" on semi-automatic shotguns under the ban are similar to the features list for rifles, with one important addition. Feinstein outlaws any semi-auto shotgun that has "A fixed magazine with the capacity to accept more than 5 rounds." This bans a wide variety of home defense shotguns. It also means that if you use a magazine extender to turn your 5-round Remington 1100 into a 7-round gun, you are now an instant felon.

[37] See Clayton E. Cramer, "High-Capacity-Magazine Bans," *National Review*, December 19, 2012, http://www.nationalreview.com/articles/336006/high-capacity-magazine-bans-clayton-e-cramer. (If the final round from the last magazine has been fired, the first round from the new magazine must be chambered before the gun will fire. Chambering a round involves "racking" the gun by manually operating the gun's slide mechanism, a process that typically takes fractions of a second.)

[38] The G17 (standard), G19 (compact), and G34 (competition). Optional magazines of 19 or 33 rounds are available. The subcompact G26 comes with a 10 round magazine, with 12, 15, 17, 19, and 33 round magazines available.

For a 9mm handgun standard-sized handgun, the 15 or 17 round magazine is "normal capacity," not "high capacity," whereas a 10-round magazine is "restricted capacity." The Glock 30 SF, a larger .45 caliber, comes standard with a 10-round magazine, with factory options of 9 and 13 rounds. Because the bullets are larger (.45 inch vs. 9 mm, which is about .35 inch), fewer can fit in a given space—hence, the smaller magazine capacity. Other Glock .45 handguns come standard with larger or smaller magazines, depending on the size of the gun. "Glock 19 Gen4," http://us.glock.com/products/model/g19gen4; "Glock 30 SF," http://us.glock.com/products/model/g30sf; "Glock 21 Gen4," http://us.glock.com/products/model/g21gen4; "Glock 36," http://us.glock.com/products/model/g36; each accessed January 3, 2013.

[39] A "high-capacity" magazine on his hip, and often he carries a pump-action shotgun or "assault" rifle (or both) in his trunk. A look at a forum thread at Officer.com, "What Gun Does Your Department Use" (see http://forums.officer.com/t138759), offers an insightful look at typical police weaponry—the list includes Glocks with 17-round magazines and AR-15 semi-automatic rifles.

Regarding magazine capacity, one veteran from a municipal police department in Texas advises:

> I would not carry a duty gun that carries fewer than 12 rounds in the magazine. One of the great advantages offered by semi-automatic handguns is the increased carrying capacity. Most manufacturers have increased the capacity of .45 pistols to at least 12 rounds, so this would be the minimum I would be comfortable with

"What is the Best Pistol for Police Officers?", *Spartan Cops*, March 30, 2009, http://www.spartancops.com/pistol-police-officers; "About," Spartan Cops, http://www.spartancops.com/about. Nashville Police can now carry their personal AR-15s in their vehicles while on duty. http://tnne.ws/ULB0HY.

[40] What about magazines? "The failure to reduce LCM use has likely been due to the immense stock of exempted pre-ban magazines, which has been enhanced by recent imports," the 2004 paper speculates. The paper notes that "millions" of "assault weapons" and "large-capacity magazines" were "manufactured prior to the ban's effective date."

[41] Still, if one wants to speculate, Koper, Woods, and Roth do so in an articulate fashion. Their 2004 report states:

> [S]emiautomatic weapons with LCMs [large-capacity magazines] enable offenders to fire high numbers of shots rapidly, thereby potentially increasing both the number of persons wounded per gunfire incident (including both intended targets and innocent bystanders) and the number of gunshot victims suffering multiple wounds, both of which would increase deaths and injuries from gun violence.

Because of this, the paper's writers speculate, "the LCM ban has greater potential for reducing gun deaths and injuries than does the AW [assault weapons] ban." They continue:

> [A] ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement. . . . Guns with LCMs are used in up to a quarter of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability to fire more than 10 shots (the current limit on magazine capacity) without reloading.

> Nonetheless, reducing crimes with . . . LCMs could have non-trivial effects on gunshot victimizations. As a general matter, hit rates tend to be low in gunfire incidents, so having more shots to fire rapidly can increase the likelihood that offenders hit their targets, and perhaps bystanders as well. While not entirely consistent, the few available studies contrasting attacks with different types of guns and magazines generally suggest that attacks with semiautomatics—including AWs and other semiautomatics with LCMs—result in more shots fired, persons wounded, and wounds per victim than do other gun attacks.

The authors of the 2004 report, then, believe that a ban on magazines holding more than ten rounds likely would not reduce the number of crimes committed, but that such a ban might reduce the harm of certain types of rare crimes (presumably mass murders with many rounds fired and "shootouts"). The authors do not (and do not claim to) present convincing evidence that their hypothesis is correct; they present their claim as reasonable speculation.

However, a careful reading of the paragraphs cited above reveals one of the major flaws of the writers' argument. The writers claim that "attacks with semiautomatics"—whether or not they are used with "large capacity" magazines—result in greater harm. There are good reasons to think that, even if criminals could somehow be restricted to using ten-round magazines—and obviously they cannot—they could typically cause the same level of harm, and sometimes more harm.

The general problem with the claims of those who wish to ban magazines holding more than ten rounds is that such advocates fail to account for the adaptability of criminals. Such advocates assume they can hold "all other things equal," when clearly criminals thrive on adapting their plans in order to surprise and overwhelm their intended victims.

[42] Josh Sugarmann, "Drug Traffickers, Paramilitary Groups . . . ," *Assault Weapons and Accessories in America*, Violence Policy Center, 1988, http://www.vpc.org/studies/awadrug.htm.

[43] David B. Kopel, Paul Gallant & Joanne D. Eisen, "The Arms Trade Treaty: Zimbabwe, the Democratic Republic of the Congo, and the Prospects for Arms Embargoes on Human Rights Violators," 114 *Penn State Law Review* 891, at note 46 (2010).

[44] http://defcad.org/

[45] "Third of High School Seniors Take Marijuana," *News Medical*, December, 22, 2012, http://www.news-medical.net/news/20121222/Third-of-high-school-seniors-take-marijuana.aspx.

[46] Alicia A. Caldwell, "James Holmes' Gun Jammed During Aurora Attack, Official Says," *Associated Press*, July 22, 2012, http://www.huffingtonpost.com/2012/07/22/james-holmes-gun-jammed-aurora-colorado-dark-knight-shooting_n_1692690.html.

000416

ER_1288

[47] An additional fact about this case is that, had the Arizona murderer not been tackled by bystanders, he would have faced armed opposition moments later. Joe Zamudio, another man who helped restrain the murderer, said the following during an MSNBC interview:

> I carry a gun, so I felt like I was a little bit more prepared to do some good than maybe somebody else would have been. . . . As I came out of the door of the Walgreens . . . I saw several individuals wrestling with him, and I came running. . . . I saw another individual holding the firearm, and I kind of assumed he was the shooter, so I grabbed his wrists, and . . . told him to drop it, and forced him to drop the gun on the ground. When he did that, everybody said, no, it's this guy . . . and I proceeded to help hold that man down. . . . When I came through the door, I had my hand on the butt of my pistol, and I clicked the safety off. I was ready to kill him. But I didn't have to do that, and I was very blessed I didn't have to go to that place. Luckily, they'd already begun the solution, so all I had to do is help. If they hadn't grabbed him, and he'd have been still moving, I would have shot him.

We were unable to locate the video on the MSNBC web page. It is reproduced at http://youtu.be/y-3GTwalrGY.

In return for this profoundly courageous act of heroism in which Zamudio ran toward gunfire, William Saletan libeled Zamudio in an article for Slate, wrongly claiming he "nearly shot the wrong man." William Saletan, "Friendly Firearms," *Slate*, January 11, 2011, http://www.slate.com/articles/health_and_science/human_nature/2011/01/friendly_firearms.html.

Obviously in the brief seconds of the incident, Zamudio considered the possibility that the man holding the gun might be the perpetrator of the crime—and then Zamudio acted with restraint, appropriately disarmed the man holding the gun, and helped restrain the perpetrator. Although police in Arizona likely are more responsible with their firearms than are police in New York, the recent incident in which New York police shot nine bystanders illustrates that Zamudio did the other man holding the gun—and everyone else in the crowd—a profound favor by forcing him to drop it.) "NYPD: 9 Shooting Bystander Victims Hit By Police Gunfire," *Associated Press*, August 25, 2012, http://www.foxnews.com/us/2012/08/25/nypd-shooting-bystander-victims-hit-by-police-gunfire.

[48] Philip Caulfield, "Sandy Hook Elementary School Shooter Adam Lanza Wore Earplugs, Rapidly Changed Clips, Shot Up Cars in Parking Lot: Report," New York *Daily News*, January 7, 2013, http://www.nydailynews.com/news/national/lanza-wore-earplugs-shot-cars-article-1.1234747.

[49] Will Grant, "Active Shooter Response: Lessons for Experts," *Blackwater*, January 6, 2013, http://blackwaterusa.com/active-shooter-response-lessons-from-experts.

Even if they resorted to revolvers, criminals could impose mass casualties. Recall that Robert Wright, a senior editor at the Atlantic, wants to ban all detachable magazines and all guns "that can hold more than six bullets." In other words, he wants to ban the large majority of guns in existence. (Like Cooper, Wright totally ignores the use of guns in self-defense.) Even if we assume that criminals could not still purchase their weapons of choice on the black market—an assumption that is obviously false—Wright's analysis of the likely results is faulty.

Wright tries to hold "other things equal" that cannot be held equal. Wright uses the example of the Newtown murders, noting that the criminal carried a rifle and two handguns and that he shot about twelve rounds before reaching the students. Wright supposes, "At that point, as he headed for the classrooms, he'd have six more rapid-fire bullets left, after which he'd have to reload his guns bullet by bullet." Robert Wright, "A Gun Control Law That Would Actually Work," *Atlantic*, December 17, 2012,

34

http://www.theatlantic.com/national/archive/2012/12/a-gun-control-law-that-would-actually-work/266342.

Wright ignores several obvious facts here. A criminal limited to six-round guns likely would choose larger-caliber guns and target each round more carefully. More significantly in a mass-murder scenario, a criminal would by no means be limited to three guns; he could easily carry many revolvers (or six-round semiautomatics). Like semi-automatics, double-action revolvers fire one round with each pull of the trigger.

For more on the effective firing rates of revolvers and other types of guns, see David B. Kopel, *Guns: Who Should Have Them* (New York: Prometheus Books, 1995), pp. 164–165 (The finger must accomplish more of the mechanical work with a double-action revolver.) Revolvers typically are extremely reliable, and often they are less expensive than other types of guns. Even a gun ban that banned most guns in existence—a far more ambitious proposal than legislation pertaining to the manufacture and sale of new "high capacity" magazines—would do nothing to curb black market sales, and it would have little or no impact on criminals' ability to commit violent atrocities.)

[50] David B. Kopel, "Lawyers, Guns, and Burglars," 43 *Arizona Law Review* 345 (2001).

[51] "Scotland Worst for Violence – UN," *BBC News*, Sept. 18, 2005 ("Scotland has been named the most violent country in the developed world by a United Nations Report.").

[52] Joyce Malcolm, *Guns and Violence: The English Experience* 141-142 (2002); Joseph Edward Olson & Clayton Cramer, "Gun Control: Political Fears Trump Crime Control," 61 *Maine Law Review* 57-81 (2009), http://ssrn.com/abstract=1083528.

[53] David B. Kopel & Joseph P. Olson, "All the Way Down the Slippery Slope: Gun Prohibition in England, and Some Lessons for America," 22 Hamline Law Review 399 (1999).

[54] House of Commons, Home Affairs – Second Report – Controls over Firearms, Session 1999-2000,          Apr.          6,          2000,          at          ¶22, http://www.publications.parliament.uk/pa/cm199900/cmselect/cmhaff/95/9502.htm.

[55] Illegal Firearms in the United Kingdom, Centre for Defence Studies, King's College London, Jul. 2, 2001, Working Paper 4.

[56] Nick Paton Walsh, "UK Matches Africa in Crime Surge," *The Guardian*, Jun. 3, 2001.

[57] Sean O'Neill, "A Quarter of English are Victims of Crime," *The Telegraph*, Feb. 23, 2001.

[58] Philip Johnston, "Britain Leads the World on Risk of Being Assaulted," *The Telegraph*, May 4, 2001

[59] Illegal Firearms, Working Paper 1, at 7.

[60] Philip Johnston, "World's Toughest Laws Will Help to Keep Weapons off the Streets," *The Telegraph*, Nov. 2, 1996.

[61] *Illegal Firearms*, Working Paper 4, at 15.

[62] See Joyce Malcolm, *Guns and Violence: The English Experience* 228-31 (2002); Patsy Richards, Homicide Statistics, Research Paper 99/56, House of Commons Library Social and General Statistics Section, May 27, 1999, at 9. See also Statistics Release, Homicides in Scotland in 2001 – Statistics Published: A Scottish Executive National Statistics Publication, Nov. 28, 2002, http://www.scotland.gov.uk/stats/bulletins/00205-00.asp (visited May 16, 2006), at Note 2 ("A single case of homicide is counted for each act of murder or culpable homicide irrespective of the number of perpetrators or victims.")

[63] David B. Kopel, *Guns: Who Should Have Them?* (Prometheus Books, 1995).

[64] Stephen P. Halbrook, "Congress Interprets the Second Amendment: Declarations by a Co-Equal Branch on the Individual Right to Keep and Bear Arms," 61 Tenn. L. Rev. 597 (1994).

[65] City of Boerne v. Flores, 521 U.S. 507 (1997).

[66] Katzenbach v. Morgan, 384 U.S. 641 (1966).

[67] *E.g.*, Board of Trustees of Univ. of Alabama v. Garrett (2001); Nevada Dept. of Human Resources v. Hibbs (2003),

[68] David B. Kopel, "How the British Gun Control Program Precipitated the American Revolution," 38 *Charleston Law Review* 283 (2012), http://ssrn.com/abstract=1967702.

35

[69]. For more detailed analysis of the civil rights implications of gun prohibition laws, *see*, *e.g.*, David B. Kopel, *Peril or Protection? The Risks and Benefits of Handgun Prohibition*, 12 ST. LOUIS U. PUB. L. REV. 285, 319-23 (1993).

[70] "Estimated Crime in United States—Total," U.S. Department of Justice, Uniform Crime Reporting Statistics, http://www.ucrdatatool.gov/Search/Crime/State/RunCrimeStatebyState.cfm, accessed January 4, 2013.

[71] Donna L. Hoyert and Jiaquan Xu, "Deaths: Preliminary Data for 2011," *National Vital Statistics Reports*, vol. 61, no. 6, October 10, 2012, p. 28, http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_06.pdf.

[72] "Murder, by State, Types of Weapons, 2011," *Crime in the United States 2011*, Table 7, http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2011/crime-in-the-u.s.-2011/tables/expanded-homicide-data-table-7.

[73] Donna L. Hoyert and Jiaquan Xu, "Deaths: Preliminary Data for 2011," *National Vital Statistics Reports*, vol. 61, no. 6, October 10, 2012, pp. 41–42, http://www.cdc.gov/nchs/data/nvsr/nvsr61/nvsr61_06.pdf.

[74] For example, the homicide rate in 1962 and 1963 was 4.6 deaths per 100,000 population. In 1964 it was 4.8

[75] Nicole White & Janet L. Lauritsen, Violent Crime Against Youth, 1994–2010, Bureau of Justice Statistics, NCJ 240106 (Dec. 2012), http://www.bjs.gov/content/pub/pdf/vcav9410.pdf.

[76] Nicholas J. Johnson, David B. Kopel, Michael P. O'Shea & George Moscary, *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (Aspen Publishers 2012), online chapter 12, forthcoming at http://firearmsregulation.org.

[77] Matt Apuzzo and Pat Eaton-Robb, "Conn. Gunman Had Hundreds of Rounds of Ammunition," Associated Press, December 17, 2012, http://bigstory.ap.org/article/agents-visit-conn-gun-shops-after-school-massacre.

[78] Clayton E. Cramer, *My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill* (2012).

36

# CERTIFICATE OF SERVICE
## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**EXHIBITS 32-41 TO THE DECLARATION OF ANNA M. BARVIR IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

CERTIFICATE OF SERVICE

17cv1017

**ER_1292**

C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., <br><br>                  Plaintiffs, <br><br>        v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of the State of California, <br><br>                  Defendant. | Case No:  17-cv-1017-BEN-JLB <br><br> **DECLARATION OF CLAYTON CRAMER IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF; EXHIBIT 42** |

1
DECLARATION OF CLAYTON CRAMER

**ER_1293**

# TABLE OF AUTHORITIES

"The Insanity Defense' and Diminished Capacity,"
https://www.law.cornell.edu/background/insane/insanity.html..............................25

22 Killed In Hotel Fire In San Francisco, [Santa Cruz, Cal.] Santa Cruz Sentinel,
Mar. 29, 1944, 1. ..................................................................................................20

3 Teamsters Charged in San Juan Hotel Fire, Chicago Tribune, Feb. 4, 1988,.........6, 22

A Decade On, Childers Remembers Hostel Fire Tragedy, Brisbane [Australia]
Times, Jun. 23, 2010 ............................................................................................22

A Triple Murder at Sleepy Hollow, Wilmington [N.C.] Journal, Jan. 14, 1870, 1 .......10

A Triple Murder, [Plymouth, Ind.] Marshall County Republican, Feb. 16, 1865, 1 .......9

*A War in Wyoming*, [Maysville, Ky.] Evening Bulletin, Apr. 13, 1892, 1. .....................3

Annie Sciacca, "It was a bloodbath": Orinda Halloween shooting investigation
reveals gang connections, San Jose Mercury-News, Nov. 17, 2019. ........................6

*Attempt Made To Wreck Soo Locks*, EAST OREGONIAN, May 16, 1917, 1. ....................2

Bernard E. Harcourt, From the Asylum to the Prison: Rethinking the Incarceration
Revolution, 84 *Texas Law Review* 1766-75 (2006). .................................................30

Black Hand Kills Four By Dynamite, Bluefield [W.Va.] Evening Leader, May 17,
1909, 1..................................................................................................................14

Bomb Batters Wall Street; 31 Slain, 125 Hurt, The Sun and the New York Herald,
Sep. 17, 1920, 1. ...................................................................................................16

Bomb Survivors Tell Of Explosion, [Washington, D.C.] Evening Star, Jan. 12,
1930, 1 .................................................................................................................18

Bomb Wrecks Farmers Home Killing Three, [Salem, Ore.] Capital Journal, Nov.
19, 1920, 1............................................................................................................16

Boy Admits Fire Fatal To 95, Miami News, January 16, 1962, 1. ................................21

Burns Lodging House When Refused Room; 27 Homeless Men Died, [New York,
N.Y.] Evening World, Dec. 3, 1913, 1...................................................................20

Candace Sutton, Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears, [U.K.] Daily Mail, Sep. 8, 2014...............................................22

Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database ...............................................................................................30

Christine Sarteschi. (2015). Severe Mental Illness, Somatic Delusions, and Attempted Mass Murder. Journal Of Forensic Sciences. 61. 10.1111/1556-4029.12876............................................................................................................33

Clayton E. Cramer, Ethical Problems of Mass Murder Coverage in the Mass Media, 9:1 Journal of Mass Media Ethics 26-42 (Winter, 1993-94). ....................................7

Clayton E. Cramer, Mental Illness and the Second Amendment. 46 Connecticut Law Review 1301-6 (May 2014):(...........................................................................29

Clayton E. Cramer, My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill (2012) ...........................................29

Criminal Justice Research Center, *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797,* https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england ....................................................................................3

Day of Joy is One of Sorrow, [Valley City, N.D.] Weekly Times-Record, January 1, 1914, 6...........................................................................................................24

Drowned Her Six Children, Adams County News [Ritzville, Wash.] Feb. 27, 1901, 4 ....................................................................................................................8

Dynamite Kills Five In Spite Act, New-York Tribune, Nov. 16, 1914, 1....................15

Dynamite Trial Opens Today in 'Frisco; 10 Were Killed by Bomb, Bemidji [Minn.] Daily Pioneer, Jan. 3, 1917, 1;.......................................................15

Eight Are Killed In Blasted Homes, [Washington, D.C.] Evening Star, May 06, 1925, 1 ...........................................................................................................16

Elisabeth Dias with Jim Down, The Horror Upstairs, Time, Jul. 1, 2013 ...................22

Fate Saves Scores in Blast When Maniac's Plot Kills 43, [Washington, D.C.] Evening Star, May 19, 1927, 1.........................................................................17

iii

TABLE OF AUTHORITIES

FBI, Jack Gilbert Graham, https://www.fbi.gov/history/famous-cases/jack-gilbert-graham, .................................................................................................19

FBI, *Serial Murder: Multidisciplinary Perspectives for Investigators* 8 (2008), ............1

Five Killed, 11 Hurt As Explosion Razes 35th St. Tenement, New York Times, Oct. 9, 1927, 1. ...............................................................................................17

Flowers And Flowers, Murders In The United States, 30-1 ...........................................19

Flowers and Flowers, Murders in the United States, 56-7 ...............................................19

Four Killed In Bomb Explosion In Tenement District Of New York, [Douglas, Ariz.] Douglas Daily Dispatch, Oct. 09, 1927, 1; ......................................................17

Four People Wounded, Palestine [Tex.] Daily Herald, Feb. 4, 1909, 2 ........................3

From California and Oregon, [Washington, D.C.] Evening Star, Mar. 21, 1860, 2 ......26

Gift Package Bomb Kills Woman; 5 Hurt, [Washington, D.C.] Evening Star, Jan. 01, 1930, 1; ...........................................................................................18

He was a Rejected Lover, St. Paul Globe, Feb. 17, 1889, 1. .........................................10

Horrid Murder! At An Early Hour On Wednesday Morning Last, The Inhabitants Of This Town Were Alarmed With The Dreadful Information… 1 (1806). ..............8

Ill-Fated Plane Wrecked By Bomb US Prober Says, Indianapolis Times, Oct. 14, 1933, 1. ...............................................................................................19

Indian revenge, Muscatine [Iowa] Weekly Journal, Jan. 27, 1860, 1. ............................9

Jean Isaac Rael and Virginia C. Armat, Madness In The Streets: How Psychiatry And The Law Abandoned The Mentally Ill (1990) ....................................................29

Jos. Veltman, Do Workers Want War? [letter to the editor] [Chicago, Ill.] The Day Book, Jan. 17, 1916, 23. ....................................................................................4

Jury Verdict Not Guilty, Liberty [Tex.] Vindicator, Feb. 11, 1910, 1. ............................3

Killed Her Children, Cottonwood [Ida.] Report, Mar. 1, 1901, 1. ...................................8

Laurel Thatcher Ulrich, A Midwife's Tale: The Life of Martha Ballard, Based on her Diary, 1785-1812 291-307 (1990),; .......................................................................8

iv

TABLE OF AUTHORITIES

**ER_1296**

Laurie Goodstein and William Glaberson, The Well-Marked Roads to Homicidal Rage, New York Times, Apr. 10, 2000 ................................................................31

Makiko Inoue, Motoko Rich and Hikari Hida, 24 Dead in Suspected Arson at Office Building in Japan, N.Y. Times, Dec. 16, 2021, ..............................................22

Maniac Shot Many People, Barre [Vt.] Daily Times, Jun. 20, 1913, 1 ........................10

Maniac Veteran Kills His Family, New Britain Herald, Jun. 23, 1930, 9. ...................31

Maniacal Unknown in Attempt to Exterminate Whole Family, Bisbee [Ariz.] Daily Review, Apr. 6, 1922, 1. ..............................................................................................5

Michigan State Prison, Biennial Report of the Board of Control and Officers of the State House of Correction and Branch Prison of State Prison in Upper Peninsula… 22, 41, 65 (1916) ....................................................................................................4

Murders Whole Family and Then Kills Self, [Pendleton, Ore.] East Oregonian, Feb. 22, 1909, 8. ...................................................................................................32

Mystery Explosion Is Fatal To Six -Bodies Taken From Debris Of Two-Story, Brownsville Herald, Jan. 31, 1928, 1...............................................................18

National Fire Protection Association, Preliminary Report NFPA Fire Analysis Department Wincrest Nursing Home, 1, 4,............................................................23

Nelson Kempsky, A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings, October, 1989, 19....................33

Nevada Mining Boss Besieged in His Office, Kalispell Bee, Jan. 09, 1903, 1 ...............3

Ore Miner Charged Eight-Seven Cents for Month's Labor, Omaha Daily Bee, Feb. 12, 1914, 1...........................................................................................24

Our Lady of the Angels School fire ..............................................................................21

Plot to Kill Their Wives, [Maysville, Ky.] Evening Bulletin, Mar. 26, 1896, 1 ..........12

Preparedness Day Bombing, https://en.wikipedia.org/wiki/Preparedness_Day_Bombing#Later_ investigations...................................................................................................15

Principal Events of General and Local Interest During the Year 1857, Lewiston [Penn.] Gazette, Jan. 21, 1858, 1...................................................................5

R. Barri Flowers and H. Loraine Flowers, Murders in the United States: Crimes, Killers and Victims of the Twentieth Century 59 (2001). ...........................................6

R.W. Bligh, comp., New York Herald Almanac: Financial, Commercial and Political Register 1874 87 (1874). .........................................................................4

Ralph Blumenthal, Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911, New York Times, Mar. 26, 1990. .......................................................................................................................22

Randolph Roth and Cornelia Hughes Dayton, comp., Homicide among Adults in Colonial and Revolutionary New England, 1630-1797,...................................6

Renewal of Mob Attacks Resulting in 3 Deaths and 13 Injured on Second Day of Lawlessness Causes Governor to Act, GREAT FALLS [MONT.] DAILY TRIBUNE, Aug. 7, 1920, at 1. ..........................................................................................2

Robert J. Ursano, Carol S. Fullerton, Lars Weisaeth, Beverley Raphael, ed., TEXTBOOK OF DISASTER PSYCHIATRY 204 (2nd ed. 2017). ............................2

Seven Detectives and Three Miners Dead, Seattle Star, Jul. 26, 1912, 1. ...................14

Shelby Lin Erdman and Greg Botelho, Timeline: A killer's rampage through a California college town, CNN, May 27, 2014, ..........................................................11

Some Facts About Clayhole, [Lancaster, Ky.] Central Record, Jul. 20, 1922, 1 ...........3

Steven P. Segal, Civil Commitment Law, Mental Health Services, and US Homicide Rates, Social Psychiatry and Psychiatric Epidemiology, November 10, 2011 ........31

Strike Breakers Taken to Mines at Point of Pistols, Omaha Daily Bee, Jan. 11, 1914, 1 ..............................................................................................................24

Tenement House Fire, [Maysville, Ky.] Evening Bulletin, Nov. 2, 1903, 4. ...............20

Terrorism and Death Dominate Colorado, Saint Paul Globe, Jun. 7, 1904, 1. ..............14

Trial of Abel Clements, [Edinburgh, Scotland] Caledonian Mercury, Aug. 25, 1806, 4. .....................................................................................................................7

Trial, Confession, and Execution of Robert M'Conaghy for the Murder of Mrs. Brown and her Five Children 6-7, 9-10 (1841). ...................................................13

Trio Held In Wreck Accused Of Murder, [Washington, D.C.] Evening Star, Mar. 10, 1935, 1. ................................................................................................12

TABLE OF AUTHORITIES

*Triple Murder, Suicide Apparent*, [Parsons, Kansas] Parsons Sun, Apr. 04, 1953, 7. ................................................................................32

*Tulsa Race Riots*, https://www.history.com/topics/roaring-twenties/tulsa-race-massacre, ........................................................................21

U.S. Secret Service, *Mass Attacks in Public Spaces – 2019*, 6 (August, 2020) ..............1

*Villisca Ax Murders to Be Discussed in Mass Meeting*, Omaha Daily Bee, Jul. 6, 1917, 1. ......................................................................23

Washington Standard [Olympia, Wash.], Mar. 1, 1901, 3 ...............................................8

*Whole Family Murdered*, [St. Genevieve, Mo.] Fair Play, Oct. 20. 1900, 1. ................13

*Woman Indicted in Chicago Blaze*, New York Times, Feb. 4, 1976 ...........................23

*Woman Shot. Tots Choked*, Brownsville Herald, May 20, 1931, 1 .............................11

*Woman to Face Murder Charge*, Waxahachie [Tex.] Daily Light, Feb. 8, 1909, 1 ........3

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

vii
TABLE OF AUTHORITIES

17cv1017

1        I, Clayton Cramer, declare as follows:

2  **I.    Purpose**

3        1.      This Expert Declaration and Report identifies one gross error of fact in

4  DEFENDANT'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S

5  ORDER OF SEPTEMBER 26, 2022.  The claim: "From the colonial period into the

6  early 20th century, mass murder occurred in the United States, but typically as a group

7  activity, because technological limitations impaired the ability of a single person to

8  commit mass murder."

9        2.      Even without Large Capacity Magazines (LCMs), mass murder was

10  common and often individual in nature.

11  **II.   My Current Research Project**

12        **A. Defining Mass Murder**

13        3.      Since 2019, I have been researching the history of mass murder in the

14  United States.  The definition of mass murder does not have a universal definition.

15  The FBI's definition of mass murder is four or more dead (including the killer) in one

16  event, in one location.[1]  Other agencies, such as the U.S. Secret Service use the term

17  "mass attacks" in which "three or more people are harmed."[2]

18        4.      For purposes of my research, I have adapted the Secret Service and FBI

19  definitions to include at least two murder victims committed in multiple locations

20  within 24 hours and the Secret Service's "three or more harmed."  The suicide or

21  lawful killing of the mass murderer or murderers is not included in the total dead.

22        5.      I have excluded multiday mass murders committed in riots, such as the

23  New York City Draft Riots of 1863, and many of the race riots of the 20th century

24  because they were not in one location.  Determining when these murders took place

25  _____

26

27        [1] FBI, *Serial Murder: Multidisciplinary Perspectives for Investigators* 8 (2008),
distinguishing mass murder from serial murderers. "Generally, mass murder was
described as a number of murders (four or more) occurring during the same incident,

28  with no distinctive time period between the murders."
        [2] U.S. Secret Service, *Mass Attacks in Public Spaces – 2019*, 6 (August, 2020).

1

DECLARATION OF CLAYTON CRAMER

precludes easy classification. I also have excluded crimes such as the Colorado cannibalism murders in 1874, because it is unclear over what period the victims were murdered.

6.      There are deaths that might qualify as mass murder, but which have circumstances that might also qualify as lawful self-defense and are thus not included.[3] There are mass murders which appear to be gang-related; I have excluded many of those because determining if they were defensive in nature or not requires confidence in the integrity of the participants, who often have reason to lie.

7.      Obviously, mass murder does not include acts of war.  Mass murders committed by governments as official policy are outside the legal definition of murder. Other horrifying mass killings outside our definition include those performed by non-state actors with the acquiescence, assistance, or encouragement of local, regional, or national governments.  Example: the Armenian genocide in Turkey during and immediately following World War I. Also excluded are governmentally supported acts of mass murder committed outside the rules of land warfare. The bombing of the Soo Locks on the Great Lakes shortly after U.S. entry into World War I, which would otherwise meet the criteria of mass murder, smells suspiciously like German sabotage and I therefore excluded it.[4] This also excludes one of the earliest American mass murders: ten murdered by Lenape Indians at a school in 1764 Greencastle, Pennsylvania,[5] as well as the many thousands (at least) killed in various Indian wars (such as the hundreds killed during the Dakota War of 1862).

8.      I have excluded *most* mass murders of Indians by Indians because most were outside the civil society of America, and the records of such crimes are thus

_____

[3] *Renewal of Mob Attacks Resulting in 3 Deaths and 13 Injured on Second Day of Lawlessness Causes Governor to Act*, GREAT FALLS [MONT.] DAILY TRIBUNE, Aug. 7, 1920, at 1.
[4] *Attempt Made To Wreck Soo Locks,* EAST OREGONIAN, May 16, 1917, 1.
[5] Robert J. Ursano, Carol S. Fullerton, Lars Weisaeth, Beverley Raphael, ed., TEXTBOOK OF DISASTER PSYCHIATRY 204 (2nd ed. 2017).

2

DECLARATION OF CLAYTON CRAMER

17cv1017

necessarily incomplete.  The Criminal Justice Research Center's data on Colonial and Revolutionary New England murders contains examples that meet this definition.[6]  I have included incidents where a mass murder (by white or Indian and regardless of the victim's race) was clearly *not* a part of warfare, such as those motivated by robbery or kidnapping with the goal of ransom.

9.     There are mass murders where the victim count includes people killed because a felony was taking place.  Because of the felony-murder rule, I have included people killed lawfully in the course of a felony as mass murder victims, such as happened in the Johnson County War.[7]  I have excluded incidents in which all the dead were felons.[8]

10.     There are incidents which might be best categorized as mutual combat, where armed groups attacked each other with great loss of life but determining who were the victims and who were the murderers is not easy from surviving news coverage, such as the struggle between Democratic and Republican campaign workers in Clayhole Voting Precinct in 1922.  The ensuing gunfight killed at least five people and wounded ten to thirteen others.[9]

11.     I have excluded a small number of cases where trial found the killer not guilty of what were clearly mass murders.  Example: Miss Verna Ware opened fire in the Gatesville courthouse in 1909, killing the man she accused of seducing her, two others not involved in the case and wounding a fourth.[10]

---

[6] Criminal Justice Research Center, *Homicide Among Adults in Colonial and Revolutionary New England, 1630-1797,* https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england.

[7] *A War in Wyoming*, [Maysville, Ky.] EVENING BULLETIN, Apr. 13, 1892, 1.

[8] *Nevada Mining Boss Besieged in His Office*, KALISPELL BEE, Jan. 09, 1903, 1

[9] *Some Facts About Clayhole*, [Lancaster, Ky.] CENTRAL RECORD, Jul. 20, 1922, 1.

[10] *Woman to Face Murder Charge*, WAXAHACHIE [Tex.] DAILY LIGHT, Feb. 8, 1909, 1; *Four People Wounded*, PALESTINE [Tex.] DAILY HERALD, Feb. 4, 1909, 2; *Jury Verdict Not Guilty*, LIBERTY [TEX.] VINDICATOR, Feb. 11, 1910, 1.

3

DECLARATION OF CLAYTON CRAMER

17cv1017

**B. Finding Mass Murders**

12.     How do you find historical mass murders?  The phrase "mass murder" is quite rare in historical documents.  Using the *ngram* tool in books.google.com for books published 1600-2000 shows essentially zero matches until 1952,[11] and many of the rare pre-1952 matches are actually abbreviations of Massachusetts such as "Mass. Murder" or "Mass., murder."[12]  The abbreviation "Mass." causes similar problems when searching the Library of Congress' collection of 1789-1963 newspapers for the words "mass" and "murder" within five words of each other.[13]  An additional problem is the use of the phrase to describe governmentally sanctioned and indeed government-operated warfare.[14]

13.     Searching the Library of Congress' *Chronicling America* collection of newspapers for the words "murders", "murdered", "killed", "slain", "dead" in association with numbers found a sea of matches, most of which needed to be read before discarding.  In many cases, similar or identical news stories appeared in multiple newspapers.  If the same facts appeared repeatedly, and there were hundreds of references to an event, I did not read every newspaper account of that event.

14.     There are several frustrating limitations of the *Chronicling America* collection:

---

[11] https://books.google.com/ngrams/graph?content=%27mass+murder%27&year_start=1600&year_end=2000&corpus=17&smoothing=3&share=&direct_url=t1%3B%2C%27%20mass%20murder%20%27%3B%2Cc0, last accessed June 12, 2018.

[12] Examples: Michigan State Prison, BIENNIAL REPORT OF THE BOARD OF CONTROL AND OFFICERS OF THE STATE HOUSE OF CORRECTION AND BRANCH PRISON OF STATE PRISON IN UPPER PENINSULA… 22, 41, 65 (1916),; R.W. Bligh, comp., NEW YORK HERALD ALMANAC: FINANCIAL, COMMERCIAL AND POLITICAL REGISTER 1874 87 (1874).

[13] https://chroniclingamerica.loc.gov/search/pages/results/?state=&dateFilterType=yearRange&date1=1789&date2=1963&language=&ortext=&andtext=&phrasetext=&proxtext=mass+murder&proxdistance=5&rows=20&searchType=advanced; Examples: *'Joe is a Good Boy,' Declares Ettor's Parents*, [Chicago, Ill.] THE DAY BOOK, Oct. 25, 1912; 14; *Queries Pour in on J. Frank Hickey*, [Chicago, Ill.] THE DAY BOOK, Dec. 4, 1912, 28; *Written Authority to Walk in Your Own Town*, [Chicago, Ill.] THE DAY BOOK, Feb. 5, 1912.

[14] Jos. Veltman, *Do Workers Want War?* [letter to the editor] [Chicago, Ill.] THE DAY BOOK, Jan. 17, 1916, 23.

4

DECLARATION OF CLAYTON CRAMER

17cv1017

i.   Copyright restrictions make post-1922 newspaper collections incomplete.

ii.   Many of these mass murders, in addition to appearing in many different newspapers, sometimes appear in only one or two newspapers, far removed from the crime, both geographically and temporally.  One example is a mass murder of three in Tamworth, N.H. in 1857 which appeared only in an 1858 summary of the previous year's events, which was published in Pennsylvania.[15]  This made it difficult to gather additional data on the crime.

iii.   Nineteenth century accounts often used the word "murders" rather far afield from its legal meaning, or in reference to general social problems such as alcohol.  This produced so many thousands of matches that I have often settled for detailed examination of the first 100 front page news stories.  Newspapers in the nineteenth century also published many foreign news accounts and fiction.  Limiting searches to the front pages thus reduced false positives which would have to be laboriously examined for location and fiction status. (If it didn't make the front page, it seems unlikely it could be either a specific crime, or something as shocking as a mass murder.)

15.   Defining a mass murder by the number of dead can understate mass murders, if either police or civilian intervention interrupts the murderer.  (There are some examples in my list of mass murders cut short, although not soon enough, by such actions.)  In addition, some of the events gathered here list crimes in which the immediate coverage includes persons wounded so seriously that the coverage describes them as "probably fatally."[16]  When considering the nature of medical and surgical care available until my lifetime, it seems a good guess that those described as "probably fatally" wounded can be properly included among the dead.

---

[15] *Principal Events of General and Local Interest During the Year 1857*, LEWISTON [PENN.] GAZETTE, Jan. 21, 1858, 1.
[16] *Maniacal Unknown in Attempt to Exterminate Whole Family*, BISBEE [ARIZ.] DAILY REVIEW, Apr. 6, 1922, 1.

5

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1304**

16.     Along with *Chronicling America*, I have made extensive use of the commercial site *Newspapers.com* and a few secondary sources.

17.     Another valuable source was the list of "Homicide among Adults in Colonial and Revolutionary New England, 1630-1797," compiled by Randolph Roth and Cornelia Hughes Dayton.[17]  While this is a list of *all* murders, not just mass murders, it provided an additional source of incidents.

**C. Group Activity**

18.     The State's claim is that earlier mass murders were "typically… a group activity, because technological limitations impaired the ability of a single person to commit mass murder."  The supposed distinction between modern individual mass murder and group mass murder of earlier centuries does not stand careful examination. Mass murder is *still* sometimes a group activity.  Such happened at Littleton, Colo. on Apr. 20, 1999[18] and the terrorist attacks of September 11, 2001.  Other recent group mass murders include one on Oct. 31, 2019, in Orinda, Cal. A conflict between gangs led to a shooting in which the murderers shot to death five people and "several others were injured."[19]  On Dec. 31, 1986, in San Juan, P.R. three Teamsters attempted to negotiate a better labor contract with their employer by setting a fire that murdered 97 people.[20]

19.     As this declaration later shows, individual mass murder is neither particularly modern not dependent on technological advances.

---

[17] Randolph Roth and Cornelia Hughes Dayton, comp., *Homicide among Adults in Colonial and Revolutionary New England, 1630-1797*, Oct. 2009, https://cjrc.osu.edu/research/interdisciplinary/hvd/united-states/colonial-revolutionary-new-england, last accessed June 12, 2018.
[18] R. Barri Flowers and H. Loraine Flowers, Murders in the United States: Crimes, Killers and Victims of the Twentieth Century 59 (2001).
[19] Annie Sciacca, *"It was a bloodbath": Orinda Halloween shooting investigation reveals gang connections*, San Jose Mercury-News, Nov. 17, 2019.
[20] *3 Teamsters Charged in San Juan Hotel Fire*, Chicago Tribune, Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

6

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1305**

**D. Data Limitations**

20.     It would be very useful to be able to extract data identifying which were group mass murders and which were individual.  When I started this project, this seemed an unnecessary detail and so I did not gather it.  While I cannot provide that level of detail on group vs. individual mass murders, I can say with confidence that the mass murders in my collection are primarily individual, although there are a number that are group.  How can I be so sure?  Family mass murders are very common both historically and in the present.  They are usually by either the father or mother.  I cannot immediately recall an intra-family mass murder carried out by more than one person.

21.     Before 1960, these intra-family mass murders are 741 of 1796 incidents; 2,784 out of 12,730 dead. (To avoid giving fame to the infamous, which produces Herostratic mass murders,[21] my synopses consistently exclude the murderer's name.)

22.     When gathering this data, I only recorded if a particular weapon was used rather than counting deaths by weapon.  In older news accounts, there is no breakdown of deaths by weapon.  In many cases, the state of forensic medicine would make it impossible to determine if the ax to the head or the subsequent knife to the throat was the fatal injury.  It would make little difference which cause a victim's death: the murderer's punishment would be the same.

23.     A few examples of individual mass murders:

Clarksburg, Va.: Nov. 10, 1805: Man murdered his wife and eight children.  While found guilty, there was substantial evidence of mental illness. Weapon: ax.[22]

---

[21] Clayton E. Cramer, *Ethical Problems of Mass Murder Coverage in the Mass Media*, 9:1 Journal of Mass Media Ethics 26-42 (Winter, 1993-94).
[22] *Trial of Abel Clements*, [Edinburgh, Scotland] Caledonian Mercury, Aug. 25, 1806, 4.

7

DECLARATION OF CLAYTON CRAMER

17cv1017

Hallowell, Me.: Jul. 9, 1806, James Purrington (or Purrinton), murdered his wife and seven of his eight children with an axe or knife before killing himself with a knife. The cause was unclear, but the murderer mentioned poverty in a suicide note. Weapon: ax.[23]

Uniontown, Wash. Feb. 25, 1901: A woman threw her six children down a 30 foot deep well, "then jumped into the well, and, the belief is, held their heads under water until all were drowned."[24] "She is violently insane.  The woman's husband died a year ago, and she has been supported by the county and charity of neighbors."[25]  Reporter interview supports evidence of insanity: "[S]he gave him incoherent reasons for slaying her little ones…. [s]he had read of the Chinese war and the terrible atrocities committed in the Orient, and had warning that the Chinese were coming today to burn her house and slay her children… Mr. Rustemeyer… was well acquainted with the family…  He said… Mrs. Wurzer was never considered just right in her mind, and thinks she should have been restrained of her liberty long ago." Weapon: drowning.[26]

24.     Through 1960, there were 797 non-firearm mass murders: 3,781 dead: an average of 4.74 dead per incident; 840 exclusively firearms mass murders, 3,653 dead: an average of 4.35 dead per incident.  Nonetheless, firearms mass murders were not rare, even with "primitive" technology:

---

[23] Laurel Thatcher Ulrich, A MIDWIFE'S TALE: THE LIFE OF MARTHA BALLARD, BASED ON HER DIARY, 1785-1812 291-307 (1990),; HORRID MURDER! AT AN EARLY HOUR ON WEDNESDAY MORNING LAST, THE INHABITANTS OF THIS TOWN WERE ALARMED WITH THE DREADFUL INFORMATION… 1 (1806).

[24] *Drowned Her Six Children*, ADAMS COUNTY NEWS [Ritzville, Wash.] Feb. 27, 1901, 4.

[25] WASHINGTON STANDARD [Olympia, Wash.], Mar. 1, 1901, 3.

[26] *Killed Her Children*, COTTONWOOD [Ida.] REPORT, Mar. 1, 1901, 1.

8

DECLARATION OF CLAYTON CRAMER

**Swan River, Minn. Terr. (1860)**

Early 1860 or late 1859: A very complex incident.  One Chippewa warrior ("A") murdered another Chippewa ("B").  A few days later, B's squaw ("C") saw A, and shot him.  A's brother ("D") shot C.  C's brother ("E") shot D.

Category: public

Suicide: no

Cause: revenge

Weapon: firearm[27]

**Coldwater, Mich. (1865)**

Jan. 30, 1865: Young man becomes engaged to a woman in Lorain Co., Ohio.  This is a problem, because his wife in Coldwater, Mich., is about to give birth, so he returns home, where his wife lives with the young man's parents.  In the midst of giving birth, the young man murdered his wife.  When the young man's father and mother showed up, he shot them to death.  (Other accounts identify the town as Woodstock, and that the murder of his wife and unborn child followed the murder of his parents.)  His behavior after arrest, as newspaper coverage described, "suggests the charitable conjecture that the man is insane."  He confessed the crime and signed autographs for the crowd around the jail that described himself as "murderer of his wife, father and mother."  He invited his friends in Lorain County to visit him in jail "where they would find him 'playing checkers with his nose, on the jail windows.'"

Category: family

Suicide: no

Cause: mental illness

---

[27] *Indian revenge*, MUSCATINE [Iowa] WEEKLY JOURNAL, Jan. 27, 1860, 1.

9

1    Weapon: firearm[28]

2

3    **Sleepy Hollow, N.Y. (1870)**

4        Jan. 1, 1870: Farmer murdered his wife, and two of his neighbors, father

5    and son, who appear to have visited the murderer's wife in his absence.  The

6    murderer had a reputation for being too fond of rum.

7    Category: public

8    Suicide: no

9    Cause: jealousy?

10    Weapon: firearm[29]

11

12    **Glenville, Minn. (1889)**

13        Feb. 15, 1889: Murderer, relative of the victims, shot to death, "Mary

14    Chemeieck, aged six, and her sister Rose, aged eleven…"  Apparently, his niece,

15    Rose, had spurned his advances.  He then murdered their mother with a shotgun

16    and committed suicide.

17    Suicide: yes

18    Cause: unknown

19    Weapon: pistol, shotgun[30]

20

21    25.    A mass murder that is not part of the database shows how "primitive"

22    firearms technology is not a barrier to school mass murder.  A former teacher showed

23    up at a Bremen, Germany, Catholic school "armed with six loaded revolvers."  He

24    killed one teacher, two children, "three children were gravely injured and three other

25    ―――――――――――――

26

27    [28] *A Triple Murder*, [Plymouth, Ind.] MARSHALL COUNTY REPUBLICAN, Feb. 16, 1865, 1.

28    [29] *A Triple Murder at Sleepy Hollow*, WILMINGTON [N.C.] JOURNAL, Jan. 14, 1870, 1.

[30] *He was a Rejected Lover*, ST. PAUL GLOBE, Feb. 17, 1889, 1.

children were slightly wounded." The article described him as "demented."[31] Depending on whether they were they were 5-shot, 6-shot, or 9-shot revolvers (all still common today) he could have fired 30, 36, or 54 shots without reloading. Of course, reloading a revolver with speedloaders can be done by a skilled shooter in a second or two at most.

26.     Firearms become more common weapons by the 1920s. Axes and hatchets declined as wood stoves became less common. While I have not categorized the poison mass murders as precisely as I might do if I were starting from scratch, "illuminating gas" and "Rough on Rats" (both commonly used to wipe out your spouse and children) declined as automobile exhaust poisoning rose.

27.     This should be no surprise; mass murderers use what is available. This May 20, 1931, Mattoon, Ill. incident catches this improvisational nature well. A former employee of her late husband attempted to burn to death the woman and her two daughters with whom he had recently moved to Illinois. They escaped the burning house. He then shot to death the mother, attempted to strangle the daughters, then shot them and beat them to death with an automobile starter crank. Weapons: firearm, strangle, blunt.[32] Even today's gun mass murders are not as narrowly focused as the popular imagination sees them.

28.     May 24, 2014, Isla Vista, Cal.: College student, upset about his sex life (or rather its absence) stabbed to death his three roommates, shot three women at a sorority (two of whom died), shot another student, injured two bicyclists by ramming them with his car, and shot and wounded four pedestrians

Category: public

Suicide: yes

Cause: mental illness

---

[31] *Maniac Shot Many People*, Barre [Vt.] Daily Times, Jun. 20, 1913, 1.
[32] *Woman Shot. Tots Choked,* Brownsville Herald, May 20, 1931, 1.

11

DECLARATION OF CLAYTON CRAMER

17cv1017

Weapon: knife, pistol, automobile[33]

29.     For the following table, some of these weapon types require explanation.

UNKNOWN means the weapon type was not identified in the article.

AIRCRAFT is for murders committed with an airplane (not all of which took place on Sep. 11, 2001).  (Bombing of planes is in the EXPLOSIVE weapon type.)

TRAIN involves intentional derailment of trains to cause loss of life.  The motivation for most of these crimes in uncertain.  One was insurance fraud; authorities alleged "that the men entered into the plot to get rid of their wives and at the same time to collect damages from the railroad company."  One of the murderers collected $500 from the railroad for injuries to his wife.[34]  Another, on Dec. 27, 1934: Police charged three men with the intentional derailment of a train, in the hopes that one of the train crew would lose his job, so that one of the three would get that job.  The crash killed three employees and injured 16 passengers.[35]

Incident count by weapon type for mass murders before 1960 where only one weapon type was used:

| | |
|---|---|
| UNKNOWN | 862 |
| AX | 646 |
| HATCHET | 135 |
| KNIFE | 588 |
| OTHERSHARP | 215 |
| BLUNT | 868 |
| EXPLOSIVE | 299 |
| POISON | 286 |
| STRANGLE | 109 |

[33] Shelby Lin Erdman and Greg Botelho, *Timeline: A killer's rampage through a California college town*, CNN, May 27, 2014, https://www.cnn.com/2014/05/24/us/california-rampage-timeline/, last accessed November 27, 2018.
[34] *Plot to Kill Their Wives*, [Maysville, Ky.] EVENING BULLETIN, Mar. 26, 1896, 1.
[35] *Trio Held In Wreck Accused Of Murder*, [Washington, D.C.] EVENING STAR, Mar. 10, 1935, 1.

12

DECLARATION OF CLAYTON CRAMER

| | |
|---|---|
| DROWN | 139 |
| ARSON | 708 |
| HANG | 284 |
| OTHER | 157 |
| PERSONAL | 21 |
| FIREARM_UNKNOWN | 2571 |
| SHOTGUN | 504 |
| RIFLE | 570 |
| PISTOL | 933 |
| MACHINE_GUN | 61 |
| AIRCRAFT | |
| TRAIN | 76 |

30.   When grouped by incidents where *only* non-firearms were used, 3,809 died.  For firearms *only* mass murders, 2,068 died.

31.   Many mass murders involve multiple weapons.  Robert McConaughy, May 30, 1840, murdered his mother-in-law and her five children.  Cause: robbery. Weapon: strangulation; stone; axe; rifle; knife.  He confessed after the first hanging failed.[36]

**III.   Killing People Without Modern Firearms Technology**

32.   How do you kill lots of people without modern firearms technology?

**A. Explosives**

33.   One popular method was explosives.

**Sells, Ark. (1900)**

Oct. 15, 1900: "[F]ather, mother, and four young children blown to atoms" by dynamite explosion.  "It is believed that a dispute over a homestead claim prompted the outrage."

Category: family non-resident

---

[36] *Trial, Confession, and Execution of Robert M'Conaghy for the Murder of Mrs. Brown and her Five Children* 6-7, 9-10 (1841).

1  Suicide: no

2  Cause: greed

3  Weapon: explosives[37]

4

5  **Cripple Creek, Colo. (1904)**

6      Jun. 5, 1904: Someone set off a bomb under a train station platform where

7  non-union men were waiting for a train during a strike.  Twelve died "and a

8  score or more injured..."  Subsequently, "Forty shots were fired in a crowd in the

9  street.  Two men were killed and at least six persons wounded."  One of the dead

10  "by blow from revolver."  Then the National Guard troops showed up and

11  attempted to restore order.

12  Category: public

13  Suicide: no

14  Cause: labor

15  Weapon: explosives, firearm, blunt [38]

16

17  **Mullins, W.Va. (1909)**

18      5/16/1909: The Black Hand used dynamite to blow up an Italian boarding

19  house.  One of the victims broke faith with the Black Hand.  The explosion

20  killed four and injured three.

21  Category: residential

22  Suicide: no

23  Cause: gang

24  Weapon: explosives[39]

25

26

27  [37] *Whole Family Murdered*, [St. Genevieve, Mo.] FAIR PLAY, Oct. 20. 1900, 1.

28  [38] *Terrorism and Death Dominate Colorado*, SAINT PAUL GLOBE, Jun. 7, 1904, 1.
[39] *Black Hand Kills Four By Dynamite*, BLUEFIELD [W.Va.] EVENING LEADER, May 17, 1909, 1.

14

DECLARATION OF CLAYTON CRAMER

**Mudlow, W.Va. (1912)**

7/26/1912: Striking miners dynamited a machine gun operated by agents of the Baldwin detective agency, killing three miners and seven detectives.

Category: public

Suicide: no

Cause: labor

Weapon: explosives[40]

**Superior, Penn. (1914)**

11/15/1914: Someone blew up the Kanaza general store, which was also the Kanaza residence, with two separate dynamite bombs, killing Kanaza's three children and two other men.  Five others suffered injuries.  Mr. Kanaza believed the motive was revenge for a lawsuit.

Category: family

Suicide: no

Cause: revenge

Weapon: explosives[41]

**San Francisco, Cal. (1916)**

Feb. 1916: Someone set off a dynamite bomb, killing ten, during the "Preparedness Day Parade," in preparation for World War I.  While the identity of the murderers is uncertain (California Governor Culbert Olson many years later pardoned those originally convicted as evidence of perjury at the trial accumulated), circumstances suggests that it was the work of anarchists, hostile to U.S. involvement in the war.

---

[40] *Seven Detectives and Three Miners Dead*, SEATTLE STAR, Jul. 26, 1912, 1.
[41] *Dynamite Kills Five In Spite Act*, NEW-YORK TRIBUNE, Nov. 16, 1914, 1.

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1314**

Category: public

Suicide: no

Cause: terrorism

Weapon: dynamite[42]


**New York, N.Y. (1920)**

09/16/1920: Anarchists set off a bomb in Wall Street, killing 31 and injuring 125 others.

Category: public

Suicide: No

Cause: terrorism

Weapon: TNT[43]


**Germantown, Md. (1920)**

11/18/1920: Two neighbors had a longstanding feud.  On Election Day, one shot the other in the neck.  The farmer shot in the neck took revenge with 50 pounds of dynamite, killing his neighbor, the housekeeper and her two children.

Category: family non-resident

Suicide: no

Cause: revenge

Weapon: explosives[44]

---

[42] *Dynamite Trial Opens Today in 'Frisco; 10 Were Killed by Bomb*, BEMIDJI [Minn.] DAILY PIONEER, Jan. 3, 1917, 1; *Preparedness Day Bombing*, https://en.wikipedia.org/wiki/Preparedness_Day_Bombing#Later_investigations.

[43] *Bomb Batters Wall Street; 31 Slain, 125 Hurt*, THE SUN AND THE NEW YORK HERALD, Sep. 17, 1920, 1.

[44] *Bomb Wrecks Farmers Home Killing Three*, [Salem, Ore.] CAPITAL JOURNAL, Nov. 19, 1920, 1.

16

DECLARATION OF CLAYTON CRAMER

17cv1017

**Pittsburgh, Penn. (1925)**

05/Jun. 1925: Two bombs destroyed three buildings, killing eight people immediately, and fatally injuring two others.  One of the buildings housed a grocer who had been the victim of extortion threats by a Black Hand society.

Category: residential

Suicide: no

Cause: extortion

Weapon: explosive[45]

**Bath, Michigan (1927)**

May 18, 1927: Treasurer of the local school board was angered by his property tax increase to pay for a new school building that he had opposed.  He placed a dynamite bomb in the basement of the school, by which method he murdered 37 children and six adults as well as seriously injuring 44 others.  Only a wiring mistake prevented other charges from taking down the rest of the building which would endangered 150 more students.  The murderer had already beaten his wife to death at their home before blowing up their house.  He blew himself up in his car in front of the school 30 minutes after the school explosion.

Category: public

Suicide: yes

Cause: revenge

Weapon: explosive, blunt object[46]

---

[45] *Eight Are Killed In Blasted Homes*, [Washington, D.C.] EVENING STAR, May 06, 1925, 1.
[46] *Fate Saves Scores in Blast When Maniac's Plot Kills 43*, [Washington, D.C.] EVENING STAR, May 19, 1927, 1.

17

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1316**

**New York, N.Y. (1927)**

Oct. 8, 1927: Someone set off a dynamite bomb demolishing a four-story apartment building, killing five and injuring eleven.  Why did police assume a dynamite bomb?  "Finding of 20-Pound Unexploded Bomb Leads Police to Suspect Infernal Machine."

Category: public

Suicide: no

Cause: unknown

Weapon: explosive[47]

**Newton, Mass. (1928)**

01/31/1928: Someone used dynamite to destroy a building containing "extensive liquor making apparatus in the basement."  Six people died.

Category: private

Suicide: no

Cause: gang?

Weapon: explosive[48]

**Seat Pleasant, Md. (1930)**

01/01/1930: A belated and misdelivered Christmas gift was dynamite and exploded as the family unwrapped it.  The explosion killed an expectant mother and two siblings, her mother, and injured two other siblings.  The family was new to the community with no known enemies.

Category: family non-resident

---

[47] *Four Killed In Bomb Explosion In Tenement District Of New York*, [Douglas, Ariz.] DOUGLAS DAILY DISPATCH, Oct. 09, 1927, 1; *Five Killed, 11 Hurt As Explosion Razes 35th St. Tenement*, NEW YORK TIMES, Oct. 9, 1927, 1.
[48] *Mystery Explosion Is Fatal To Six -Bodies Taken From Debris Of Two-Story*, BROWNSVILLE HERALD, Jan. 31, 1928, 1.

18

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1317**

1    Suicide: no

2    Cause: unknown

3    Weapon: explosives[49]

4

5    **Chesterton, Ind. (1933)**

6        10/10/1933: A bomb explosion in the cargo compartment aboard a United

7    Airlines flight ripped the plane apart, killing seven people.  Motive remained

8    uncertain.

9    Category: public

10   Suicide: no

11   Cause: unknown

12   Weapon: explosive[50]

13

14   **Denver, Colo. (1955)**

15       11/1/1955: The 23-year-old son of passenger Daisie E. King eventually

16   confessed that he placed a 25-stick dynamite bomb in her luggage, blowing up

17   her airliner, killing 44 people.  The murderer had taken out life insurance

18   policies on his mother and was expecting to receive a "substantial inheritance"

19   upon her death.

20   Category: public

21   Suicide: no

22   Cause: greed

23

24

25   —————————————

26

27   [49] *Gift Package Bomb Kills Woman; 5 Hurt*, [Washington, D.C.] EVENING STAR, Jan. 01, 1930, 1; *Bomb Survivors Tell Of Explosion*, [Washington, D.C.] EVENING STAR, Jan. 12, 1930, 1.

28   [50] *Ill-Fated Plane Wrecked By Bomb US Prober Says*, INDIANAPOLIS TIMES, Oct. 14, 1933, 1.

19

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1318**

Weapon: explosives[51]

Since 1960, this technology, despite attempts to regulates explosives, remain a big dead per incident killer.  Using fertilizer, a  murderer on Apr. 20, 1995, set off a truck bomb in front of the Oklahoma City Federal Building killing 168 people and injuring hundreds more.

Category: public

Suicide: no

Cause: terrorism

Weapon: explosives[52]


**B. Arson**

33.    Arson is also a common and very low technology method to cause lots of suffering.


**New York, N.Y. (1903)**

11/1/1903: Police and coroner believed that a tenement building fire that killed 26 people was "of incendiary origin."

Category: residential

Suicide: no

Cause: unknown

Weapon: arson[53]

---

[51] Flowers And Flowers, MURDERS IN THE UNITED STATES, 30-1; FBI, *Jack Gilbert Graham*, https://www.fbi.gov/history/famous-cases/jack-gilbert-graham, last accessed October 5, 2022.

[52] Flowers and Flowers, MURDERS IN THE UNITED STATES, 56-7.

[53] *Tenement House Fire*, [Maysville, Ky.] EVENING BULLETIN, Nov. 2, 1903, 4.

20

DECLARATION OF CLAYTON CRAMER

17cv1017

**Boston, Mass. (1913)**

Feb. 3/1913: A lodging house refused a man a room "for want of 15 cents." He lit the structure on fire, killing 27 lodgers in a dangerously renovated structure.

Category: residential

Suicide: no

Cause: revenge

Weapon: arson[54]

**San Francisco, Cal. (1944)**

03/27/1944: Over a period of four hours, five San Francisco skid row hotels "burst into flames" following a previous weekend of 11 fires in Oakland hotels. The New Amsterdam Hotel fire killed 22 and injured 27. "Authorities noted an odor of kerosene or gasoline." One tenant, 33, showed injuries from the fire and was held in the "hospital psychopathic ward."

Category: public

Suicide: no

Cause: mental illness

Weapon: arson[55]

**Tulsa, Okla. (1921)**

05/01/1921: The police arrested a young black man for what later appears to have been an accidental touching of a white female elevator operator. Rumors spread that police charged him with sexual assault. A lynch mob

---

[54] *Burns Lodging House When Refused Room; 27 Homeless Men Died*, [New York, N.Y.] EVENING WORLD, Dec. 3, 1913, 1.
[55] *22 Killed In Hotel Fire In San Francisco*, [Santa Cruz, Cal.] SANTA CRUZ SENTINEL, Mar. 29, 1944, 1.

21

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1320**

arrived at the county jail.  The sheriff and deputies prevented seizure of the young man.  A group of armed black men offered to help the sheriff defend the jail.  This display of arms by black men inflamed white public sentiment leading to the destruction of Greenwood, the black section of Tulsa.  More than one thousand homes were burned and *at least* 36 dead.  Newspapers and public officials removed news accounts and official records about the riot from files. The Tulsa Race Riot Commission in 2001 "concluded that between 100 and 300 people were killed and more than 8,000 people made homeless over those 18 hours in 1921," with many bodies buried in unmarked mass graves.

Category: public

Suicide: no

Cause: racism

Weapon: firearms, arson, unknown?[56]

**Chicago, Ill. (1958)**

Dec. 1, 1958: Our Lady of the Angels school burned, killing 95.[57]  Several years later, a 13-year-old confessed while on a lie detector that he had started the fire: "because he hated school, rebelled at the authority of teachers, liked to hear the sound of fire sirens and to watch fire engines race along the street."[58]

34.     After 1960, of course, there have been several arson mass murders with equal or larger death counts, and this remains a common method of mass murder in other nations. In Australia, an arsonist burned the Childers, Queensland's Palace

---

[56] *Tulsa Race Riots*, https://www.history.com/topics/roaring-twenties/tulsa-race-massacre, last accessed July 5, 2021.
[57] Our Lady of the Angels School fire, https://en.wikipedia.org/wiki/Our_Lady_of_the_Angels_School_fire
[58] *Boy Admits Fire Fatal To 95*, MIAMI NEWS, January 16, 1962, 1.

22

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1321**

1   Backpackers Hostel in 2000, killing 15.[59]  The 2011 Quakers Hill Nursing Home fire

2   killed eleven, set by a nurse after police questioned him about drug abuse.[60]  Japan had

3   several arson mass murders in late 2021, killing 24, 17, and 33 in separate incidents.[61]

4   These required no advanced firearms technology or even firearms.  The previously

5   mentioned San Juan, P.R. arson mass murder killed 97.[62]   The March 25, 1990,

6   Happyland Social Club fire killed 87 people, leaving three survivors.  Angry at his

7   girlfriend, the murderer used $1 of gasoline and a match to set fire to her place of

8   employment.[63]

9

10   **New Orleans, La. (1973)**

11       Jun. 24/1973: The murderer took revenge for being expelled from the

12   UpStairs Lounge, a gay bar.  He walked down the street and bought a bottle of

13   cigarette lighter fluid, killing 33 people.[64]

14

15

16

17

18

19

20

21   [59] *A Decade On, Childers Remembers Hostel Fire Tragedy,* BRISBANE [Australia] TIMES, Jun. 23, 2010.

22   [60] Candace Sutton, *Man Who Murdered 11 People in Nursing Home Fire 'Frothed At The Mouth' From Drugs And 'Put Nails In Tyres And Poured Paint' Over Boss's Car, Inquest Hears*, [U.K.] DAILY MAIL, Sep. 8, 2014.

24   [61] Makiko Inoue, Motoko Rich and Hikari Hida, *24 Dead in Suspected Arson at Office Building in Japan*, N.Y. TIMES, Dec. 16, 2021, https://www.nytimes.com/2021/12/16/world/asia/japan-fire-osaka.html, last accessed November 21, 2022.

25   [62] *3 Teamsters Charged in San Juan Hotel Fire*, CHICAGO TRIBUNE, Feb. 4, 1988, https://www.chicagotribune.com/news/ct-xpm-1988-02-04-8803270617-story.html, last accessed November 24, 2018.

27   [63] Ralph Blumenthal, *Fire in the Bronx; 87 Die in Blaze at Illegal Club; Police Arrest Ejected Patron; Worst New York Fire Since 1911*, NEW YORK TIMES, Mar. 26, 1990.

28   [64] Elisabeth Dias with Jim Down, *The Horror Upstairs,* TIME, Jul. 1, 2013.

23
DECLARATION OF CLAYTON CRAMER

17cv1017

**Chicago, Ill. (1976)**

01/30/1976: An employee of Wincrest Nursing Home with a mental illness problem (pyromania) started a fire in a clothing wardrobe, which killed 22 residents.  The employee was charged with arson.[65]

**E. Brutal Misuse of Tools**

35.    **Villisca, Ia. (1912)**

Sep. 9, 1912: It appears that a business competitor and member of the Iowa State Senate murdered Joseph Moore, his wife Sarah, their four children and two visiting children "with an ax."  An "itinerant minister" was charged.  The Iowa Attorney-General "sought to commit" the minister "to an insane asylum, a step that would bar the prosecution of any other person suspected of the crime."  Relatives of the victims claimed that the Attorney-General blamed the wrong person; in response, the Iowa legislature passed a law prohibiting public discussion of the crime.  This led to an "injunction against J.N. Wilkerson, a detective, whose four years' investigation of the murders cast suspicion on a prominent state senator."  The public meeting by Villisca residents took place in Omaha, Neb., instead.

Category: greed

Suicide: no.

Cause: greed

Weapon: ax[66]

---

[65] National Fire Protection Association, *Preliminary Report NFPA Fire Analysis Department Wincrest Nursing Home*, 1, 4, https://oac.cdlib.org/view?docId=hb9v19p0sd&doc.view=frames&chunk.id=div00008&toc.id=0, last accessed November 27, 2022; *Woman Indicted in Chicago Blaze*, NEW YORK TIMES, Feb. 4, 1976.
[66] *Villisca Ax Murders to Be Discussed in Mass Meeting*, OMAHA DAILY BEE, Jul. 6, 1917, 1.

24

DECLARATION OF CLAYTON CRAMER

**F. Panic**

36.    **Calumet, Mich. (1913)**

Dec. 24, 1913: A man shouted, "Fire! Fire!  Everybody rush!" in the Italian Hall where striking miners and their families were meeting for a Christmas party.  (There was no fire.)  As the crowd attempted to exit the hall through an inadequate exit, seventy-four people (mostly children) were trampled to death.[67]  One account ascribed the false claim to "a drunken" man,[68] but considering the murder of strikebreakers in Calumet a few weeks before in the middle of a fierce labor dispute,[69] this seems unlikely as the cause.

Category: public

Suicide: no

Cause: labor

Weapon: mouth[70]

**Causes**

37.    The focus of the State on the *method* of mass murder might be better spent on solving the problem by solving underlying causes.

38.    The following table shows the proximate cause of all mass murders in my database before 1960.  (After 1960, the data is not yet complete.)  A breakdown of these abbreviations:

- **Rob** is a mass murder performed as part of a robbery or to eliminate witnesses to the robbery.

---

[67] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.
[68] *Day of Joy is One of Sorrow*, [Valley City, N.D.] WEEKLY TIMES-RECORD, January 1, 1914, 6.
[69] *Strike Breakers Taken to Mines at Point of Pistols*, OMAHA DAILY BEE, Jan. 11, 1914, 1 (based on U.S. Dept. of Labor report).
[70] *Ore Miner Charged Eight-Seven Cents for Month's Labor*, OMAHA DAILY BEE, Feb. 12, 1914, 1.

- **MI** (Severe mental illness, primarily psychoses and other illnesses that cut off the sufferer from reality) includes all crimes where either contemporary accounts describe the murderer as insane, or where the nature of the crime makes other explanations implausible (this is necessarily a judgment call, on which my experience with mentally ill relatives and friends informs my opinion). The legal definition of mental illness is much narrower than the medical definition. Through most of U.S. history, the McNaughton Rule (sometimes spelled M'Naughten) defined legal insanity as: "at the time of committing the act, the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if he did know it, that he did not know what he was doing was wrong."[71]  A person who did not know he was doing wrong, was insane.
  Persons who are medically mentally ill sometimes know that they are doing wrong and try to escape arrest and conviction (perhaps because the "aliens," or the CIA or KGB "agents" that they have just murdered are still after them).  Such persons are legally sane, while in any conventional sense, they are as "mad as hatters."

- **MI?** are persons whose sanity seems questionable but for which contemporary accounts are less than persuasive.

- **PPD** (Postpartum Depression): Tragically, many of these mentally ill or possibly mentally ill incidents are mass murders by mothers with recently born babies.  In cases where the murders are by recent mothers and where news accounts provide no other explanation, I have categorized these as **postpartum depression**.  Some news accounts identified the mother as 'temporarily insane" with no previous history of mental illness. In a few cases the news accounts report on previous mental illness hospitalizations associated with previous births.

- Many cases I have listed as "**PPD?**" because this is a plausible explanation when no other seems more likely.

---

[71] *The insanity defense and Diminished Capacity*, https://www.law.cornell.edu/background/insane/insanity.html

26

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1325**

- **Resist** is a criminal resisting arrest.

- **Unknown** describes a very large number of crimes where either the motivation is unclear or the newspaper coverage is silent; this also includes some mass murders where the inability to identify the murderer makes cause impossible to determine.

- **Religion** is mass murders committed as part of religious persecution.  (And yes, in America!)

- **Racism** is its frequent cousin.  In some cases, these include revenge or retribution against Indians for crimes not, or at least not clearly committed by the victims.

- **Politics** are murders committed to advance a political cause.

- **Terror** are mass murders committed to cause mass fear for purposes of political change outside elections.  Example: 9/11.

- **Revenge** are mass murders committed to take revenge for real or perceived injuries by the murderer, his family, or acquaintances.

- **Ind** are crimes between Indians and settlers that are not official acts of war, but that might have been seen that way by the murderers.  I have classified all attacks against peaceful travelers, settlers, and Indians in this cause.  (In some cases, the killers openly admitted that the victims were "peaceful," but were supplying guns to less friendly tribes.) [72]

- **Financial** is a strange subclass of family murders committed, usually by a parent concerned their family is about to become impoverished, who then "protect" them from that suffering by mass murder.  In some cases, this seems to be a form of mental illness: at least one example involved a mass murderer who was in no danger of impoverishment.

---

[72] *From California and Oregon*, [Washington, D.C.] EVENING STAR, Mar. 21, 1860, 2.

27

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1326**

- **Labor** are crimes committed during labor disputes, sometimes against strikebreakers, sometimes against labor unionists.

- **Quarrel** are incidents that start out as some relatively minor dispute before escalating into disproportionate response.

- **Cult** refers to mass murders committed by oddball religious cults; I was surprised how widespread these were in the early 20th century (the Church of the Sacrifice slaughtered entire families, often with the family's own ax).

- **Rape** are mass murders committed to eliminate witnesses to a rape.

- **Greed** are mass murders carried out to obtain wealth other than by robbery, often by inheritance from the deceased.

- **Divorce** is an alternative form of **Revenge**; divorce has been or is in the process and someone is seeking retribution.  This includes separated spouses attempting reconciliation.

- **Adultery**: a variant of **Revenge**.

- **Jealousy**: should be obvious.

- **Intoxication** are crimes attributed to alcohol or drug-induced stupidity.  The strong overlap between **mental illness** and **substance abuse** (one often causing the other) makes some of these hard to distinguish, especially 150 years after the crime.

- **Bullying** is a recent category, and one that I suspect reflects some deeper mental illness; I was bullied as a child, had access to low-grade explosives (nerds have peculiar hobbies), and never even *thought* of mass murder (or even low-intensity revenge).

- **Stalker**: someone did not get their attentions rewarded as they saw fit.

- **Witnesses**: Eliminating witnesses to some crime other than rape or robbery.

28

DECLARATION OF CLAYTON CRAMER

17cv1017

**ER_1327**

1
2
- **Lynch**: extralegal murders (and a surprising number had multiple victims).  These are always group mass murders.

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| incidents by cause before 1960 | |
|---|---|
| **Cause** | **incidents** |
| ADULTERY | 3 |
| BULLYING | 2 |
| CULT | 10 |
| CULT? | 3 |
| DIVORCE | 73 |
| DRUG | 3 |
| EXTORTION | 6 |
| FINANCIAL | 51 |
| GANG | 33 |
| GREED | 43 |
| IND | 24 |
| INTOX | 53 |
| JEALOUSY | 37 |
| LABOR | 46 |
| LYNCH | 93 |
| MI | 211 |
| MI? | 97 |
| OTHER | 25 |
| POLITICS | 21 |
| PPD | 17 |
| PPD? | 58 |
| PRISON BREAK | 17 |
| QUAR | 176 |
| RACISM | 20 |
| RAPE | 18 |
| RELIGION | 3 |
| RESIST | 37 |
| REVENGE | 109 |
| REVENGE? | 1 |
| ROB | 153 |

29
DECLARATION OF CLAYTON CRAMER

17cv1017

| incidents by cause before 1960 | |
|---|---|
| **Cause** | **incidents** |
| SLAVERY | 1 |
| STALKER | 2 |
| TERROR | 19 |
| UNKNOWN | 447 |
| WITNESSES | 4 |

39.   Plotting the cause without UNKNOWN shows the high frequency causes:



40.   It should surprise no one that mental illness and likely mental illness are a high frequency category.  While most mentally ill people are primarily a hazard to themselves, severely mentally ill people are overrepresented in murder and other violent crimes.[73]  Deinstitutionalization of the mentally ill starting with New York in 1964 and California in 1969 played significant roles in increased homelessness and violent crime rates.[74]

---

[73] See Clayton E. Cramer, *Mental Illness and the Second Amendment*. 46 Connecticut Law Review 1301-6 (May 2014):(collecting studies).

[74] See Clayton E. Cramer, MY BROTHER RON: A PERSONAL AND SOCIAL HISTORY OF THE DEINSTITUTIONALIZATION OF THE MENTALLY ILL (2012) and Jean Isaac Rael and Virginia C. Armat, MADNESS IN THE STREETS: HOW PSYCHIATRY AND THE LAW ABANDONED THE MENTALLY ILL (1990) for how beautiful abstract theories and fanaticism created the tragic urban landscape of modern America.

41.     Professor Bernard E. Harcourt points out that the rise in murder rates in the 1960s, and their decline in the 1990s correlated with the change in the percentage of the population that was institutionalized: those who were confined to either a mental hospital or prison.  According to Harcourt, sociologists examining the expansion of imprisonment in the 1990s, the so-called "incarceration revolution," missed the even more important component of institutionalization: mental hospitals.  When adding mental hospital inmates to prisoners, Harcourt found an astonishingly strong negative correlation between the institutionalization rate, and the murder rate: -0.78.  Harcourt found that even when adjusting for changes in unemployment and the changing fraction of the population that was at their peak violent crime ages, the negative correlation remained strong, and did a better job of predicting both the 1960s rise and the 1990s decline in murder rates than other models.[75]

42.     Steven P. Segal of the University of California, Berkeley studied state-to-state variations in murder rates and mental health care, controlling for socioeconomic, demographic, and geographic data. He concluded that "[l]ess access to psychiatric inpatient-beds and more poorly rated mental health systems were associated with increases in the homicide rates of 1.08 and 0.26 per 100,000, respectively." (Since the national average homicide rate was 7.4 per 100,000 people for 2020,[76] more access to beds is clearly quite important in reducing homicide rates; "poorly rated mental health systems" matter, but not as dramatically.)

43.     Segal observed an even greater difference from the variation in involuntary civil commitment (ICC) laws. "Broader ICC-criteria were associated with

---

[75] Bernard E. Harcourt, *From the Asylum to the Prison: Rethinking the Incarceration Revolution*, 84 *Texas Law Review* 1766-75 (2006).
[76] Centers for Disease Control and Prevention, National Center for Health Statistics. National Vital Statistics System, Mortality 1999-2020 on CDC WONDER Online Database, released in 2021. Data are from the Multiple Cause of Death Files, 1999-2020, as compiled from data provided by the 57 vital statistics jurisdictions through the Vital Statistics Cooperative Program. Accessed at http://wonder.cdc.gov/ucd-icd10.html on Nov 3, 2022 12:51:23 PM

DECLARATION OF CLAYTON CRAMER

17cv1017

1.42 less homicides per 100,000" or bit more than one-fourth of the national homicide rate. In short, states where involuntary commitment of the mentally ill was relatively easy had significantly fewer murders than states where it was very hard.[77]

44.    A 2000 *New York Times* examination of mass murderers concluded:

The Times' study found that many of the rampage killers… suffered from severe psychosis, were known by people in their circles as being noticeably ill and needing help, and received insufficient or inconsistent treatment from a mental health system that seemed incapable of helping these especially intractable patients.

Only a small percentage of mentally ill people are violent, and many advocates bristle at any link between mental illness and violence out of concern that it will further stigmatize an already mistreated population. However, the Times investigation of this particular style of violence -- public rampage killings -- turned up an extremely high association between violence and mental illness. Forty-seven of the killers had a history of mental health problems before they killed; 20 had been hospitalized for psychiatric problems; 42 had been seen by mental health professionals. [78]

45.    A few representative cases from the period before 1960:

**New Haven, Conn. (1930)**

Jun. 21, 1930: The father had been involuntarily committed to a mental hospital.  He escaped, threw his four children and wife from a 400-foot cliff, then jumped.

Category: family

Suicide: yes

---

[77] Steven P. Segal, *Civil Commitment Law, Mental Health Services, and US Homicide Rates*, SOCIAL PSYCHIATRY AND PSYCHIATRIC EPIDEMIOLOGY, November 10, 2011, https://web.archive.org/web/20170323153646/http://kendras-law.org/national-studies/commitmenthomiciderates.pdf, last accessed August 19, 2022.
[78] Laurie Goodstein and William Glaberson, *The Well-Marked Roads to Homicidal Rage*, NEW YORK TIMES, Apr. 10, 2000.

DECLARATION OF CLAYTON CRAMER

17cv1017

1    Cause: mental illness

2    Weapon: other[79]

3

4    **New York, N.Y. (1953)**

5         Apr. 01, 1953: A college professor, 52, under psychiatric care, strangled

6    his wife and their two children, then stabbed himself to death.

7    Category: family

8    Suicide: yes

9    Cause: mental illness

10    Weapon: strangled[80]

11

12    **Eleva, Wisc. (1909)**

13         Feb. 2. 1909: The father stabbed to death his four children, then "stabbed

14    himself and then jumped from the barn loft with a rope around his neck.  At the

15    same time he hurled a fire brand into the stable, firing the barn."

16    Category: family

17    Suicide: Yes.

18    Cause: ¨[Father] was recently released from an insane asylum."

19    Weapon: knife[81]

20

21    **Summary**

22       46.    Mass murder is not particularly new, nor is historical mass murder a

23    peculiarly group activity.  Almost everything can be, and has been, used to commit

24    mass murder in America.  The mass murder at Cleveland School in 1989 that started

25

---

26

27

28

[79] *Maniac Veteran Kills His Family*, NEW BRITAIN HERALD, Jun. 23, 1930, 9.
[80] *Triple Murder, Suicide Apparent*, [Parsons, Kansas] PARSONS SUN, Apr. 04, 1953, 7.
[81] *Murders Whole Family and Then Kills Self,* [Pendleton, Ore.] EAST OREGONIAN, Feb. 22, 1909, 8.

33

DECLARATION OF CLAYTON CRAMER

California's legislative focus on LCMs involved a mentally ill drifter with a history of involuntary commitment and a spotty record of outpatient treatment.  As the California Dept. of Justice's official report observed:

> In an ideal world, ample resources would have been available to detect his problems, identify them as potentially dangerous and likely to result in his life being uselessly wasted, and to provide for a type of intervention with a reasonable prospect of making a difference. However, in a world in which government spending has to recognize realistic limits set by the public, such resources will never be plentifully available.[82]

47.    This is an especially painful paragraph for me.  My smarter, older brother's spiral down into schizophrenia resulted in brushes with the law but never with such a horrible ending.  It was still a life wasted by California's confused and irrational mental health policy.  Has more than 20 years of LCM laws, defenses of those laws, prison sentences for offenders, and dealing with other mass murders (not all with guns) *really* been cheaper than providing mental health care?

48.    The focus of the State on the *method* of mass murder might be better spent on solving the underlying *causes*.  This abstract closes with a chilling sentence:

> A case of an attempted mass shooting at a large psychiatric hospital in the United States by a 30-year-old male with severe mental illness, somatic delusions, and exceptional access to healthcare professionals is reported. Six persons were shot, one died at the scene, and the shooter was then killed by the police. Data were gathered from court documents and media accounts. An analysis of the shooter's psychiatric history, his interactions with healthcare professionals, and communications prior to the shooting suggest a rare form of mass murder, a random attack by a documented psychotic and delusional individual suffering with somatic delusions. Despite his being psychotic, the killer planned the attack and made a direct threat 1 month prior to the shootings. **This case highlights problems with the healthcare system, indicating that it**

---

[82] Nelson Kempsky, *A Report to Attorney-General John K. Van de Kamp on Patrick Edward Purdy and the Cleveland School Killings*, October, 1989, 19, https://schoolshooters.info/sites/default/files/Purdy%20-%20official%20report.pdf, last accessed November 26, 2022.

34
DECLARATION OF CLAYTON CRAMER

17cv1017

**might be ill equipped to appropriately deal with severe mental illness.[83] [emphasis added]**

49.     Confronting the extent which a shortage of mental health services and the difficult nature of involuntary mental health commitment in much of America would be a more effective strategy.  A severely mentally ill person without an LCM could follow in the footsteps of previous generations and use less regulated weapons: ax, hatchet, knife, poison, trail derailment.

**Background and Qualifications**

50.     A copy of my *curriculum vitae* is attached to this Declaration as Exhibit 42.

51.     I attended Sonoma State University where I received a Bachelor of Arts and Masters Degree in History. My Master's Thesis was "Concealed Weapon Laws of the Early Republic".

52.     I was awarded First Place by the Association for Education in Journalism and Mass Communication Ethics Prize for my article "Ethical Problems of Mass Murder Coverage in the Mass Media," *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

53.     I am currently employed as an Adjunct Professor College of Western Idaho, Nampa, teaching Western Civilization I and U.S. History I.

54.     My publication "Why Footnotes Matter: Checking Arming America's Claims," *Plagiary* 1(11):1-31 (2006) revealed the falsehoods presented in Michael A. Bellesiles's book "Arming America: The Origins of a National Gun Culture" (New York: Alfred A. Knopf, Inc., 2000), including significant discrepancies in American history and citations and quotes that did not match the historical record. Bellesiles'

---

[83] Christine Sarteschi. (2015). *Severe Mental Illness, Somatic Delusions, and Attempted Mass Murder*. JOURNAL OF FORENSIC SCIENCES. 61. 10.1111/1556-4029.12876.

35

DECLARATION OF CLAYTON CRAMER

1  book contained quotations taken out of context, which completely reversed the
2  author's original intent. Dates were altered and statutory text was changed to
3  completely reverse the meaning of the law. The sheer volume of these errors, and their
4  consistent direction, would seem to preclude honest error. Emory University conducted
5  an investigation that strongly criticized Bellesiles' ethical standards; Bellesiles
6  resigned from his tenured position at Emory. Columbia University initially awarded
7  Bellesiles the Bancroft prize for his book "Arming America", but revoked the award
8  after my research proved that the book was fraudulent.

9         55.     My publications include:

10 ·     *Lock, Stock, and Barrel: The Origins of America Gun Culture*, Praeger Press,
11 2018;

12 ·     *Social Conservatism in An Age of Revolution: Legislating Christian Morality in*
13 *Revolutionary America*, CreateSpace, 2016;

14 ·     *Historical Evidence Concerning Climate Change: Archaeological and Historical*
15 *Evidence That Man Is Not the Cause*, CreateSpace, 2016;

16 ·     *My Brother Ron: A Personal and Social History of the Deinstitutionalization of*
17 *the Mentally Ill*, CreateSpace, 2012;

18 ·     "What Did 'Bear Arms' Mean in the Second Amendment?" *Georgetown Journal*
19 *of Law and Public Policy*, 6:2 [2008]. Co-authored with Joseph Edward Olson;

20 ·     *Armed America: The Remarkable Story of How and Why Guns Became as*
21 *American as Apple Pie*, Nelson Current, 2006;

22 ·     *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and*
23 *Moral Reform*, Praeger Press, 1999;

24 ·     *Black Demographic Data, 1790-1860: A Sourcebook*, Greenwood Press, 1997;

25 ·     *Firing Back: Defending Your Right to Keep and Bear Arms*, Krause Publishing,
26 1995;

27 ·     *For The Defense of Themselves and the State: The Original Intent and Judicial*
28 *Interpretation of the Right to Keep and Bear Arms*, Praeger Press, 1994;

DECLARATION OF CLAYTON CRAMER

1 ·    *By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine*,

2 Editor, Library Research Associates, Inc., 1990

3        56.    I was retained at a rate of $75/hour to prepare this declaration.

4        57.    My compensation is not in any way dependent on the outcome of this or

5 any related proceeding, or on the substance of my opinion.

6

7        I declare under penalty of perjury that the foregoing is true and correct. Executed

8 within the United States on December 1, 2022.

9

10

11     _____

12     Clayton Cramer
       Declarant

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 42

# Clayton E. Cramer

36 Sunburst Road
Horseshoe Bend, ID 83629
(208) 793-3044
clayton@claytoncramer.com
http://www.claytoncramer.com

**EDUCATION:**

| | |
|---|---|
| | Sonoma State University, Rohnert Park, California |
| June, 1998 | M.A. in History |
| | *Master's Thesis*: "Concealed Weapon Laws of the Early Republic" |
| June, 1994 | B.A. in History |
| | *Honors*: *cum laude* and With Distinction |

**AWARDS:**

| | |
|---|---|
| 1993 | Association for Education in Journalism and Mass Communication Ethics Prize |
| | First Place, Undergraduate Division |

**TEACHING EXPERIENCE:**

| | |
|---|---|
| Fall, 2017 – present | **Adjunct Faculty:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2014 – Spring, 2017 | Recovering from stroke |
| Spring, 2010 – Spring, 2014 | **Adjunct Faculty:** College of Western Idaho, Nampa, teaching **Western Civilization I**, **U.S. History I**. |
| Fall, 2009 – Summer 2010 | **Adjunct Faculty:** ITT Technical Institute, Boise, teaching **State and Local Government** and **Introduction to Computers**. |
| Fall, 2003 | **Adjunct Faculty:** Boise State University, teaching **U.S. Constitutional History** and at George Fox University (Boise Center), teaching **America and the World**. |

1996          **Teaching Assistant:** Assisted Professor Peter Mellini in his course "Twentieth Century World."  I graded quizzes, exams, and answered weekly written questions from students.  I also prepared and lectured about the rise of totalitarianism in the period between the world wars.


**BOOKS:**

*Lock, Stock, and Barrel: The Origins of America Gun Culture*
Praeger Press, 2018

*Social Conservatism in An Age of Revolution: Legislating Christian Morality in Revolutionary America*
CreateSpace, 2016

*Historical Evidence Concerning Climate Change: Archaeological and Historical Evidence That Man Is Not the Cause*
CreateSpace, 2016

*My Brother Ron: A Personal and Social History of the Deinstitutionalization of the Mentally Ill*
CreateSpace, 2012

*Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie*
Nelson Current, 2006

*Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform*
Praeger Press, 1999

*Black Demographic Data, 1790-1860: A Sourcebook*
Greenwood Press, 1997

*Firing Back: Defending Your Right to Keep and Bear Arms*
Krause Publishing, 1995

*For The Defense of Themselves and the State: The Original Intent and Judicial Interpretation of the Right to Keep and Bear Arms*
Praeger Press, 1994

*By The Dim and Flaring Lamps: The Civil War Diary of Samuel McIlvaine,* editor
Library Research Associates, Inc., 1990

## SELECTED PUBLICATIONS:

"Bellesiles' Arming America Redux: Does the Gunning of America Rewrite American History to Suit Modern Sensibilities?" *Southern Illinois University Law Journal* Spring 2017 Forthcoming "

"Assault Weapon Bans: Can They Survive Rational Basis Scrutiny?" *University of Akron ConLawNow* 8:1, article 1.

Co-authored with David B. Kopel and Joseph Olson, "Knives and the Second Amendment," *University of Michigan Journal of Legal Reform*, 47:1 167-215 (2013).

"Mental Illness and the Second Amendment," 46 Conn. Law Review 4:1301 (2014).

Co-authored with David B. Kopel, "State Court Standards of Review for the Right to Keep and Bear Arms," 50 *Santa Clara Law Review* 101-208 (2010).

Co-authored with David B. Kopel, "The Keystone of the Second Amendment: Quakers, the Pennsylvania Constitution, and the Questionable Scholarship of Nathan Kozuskanich," 19 *Widener Law Journal* 277-320 (2010).

Co-authored with Nicholas J. Johnson and George A. Mocsary, "'This Right is Not Allowed by Governments that are Afraid of the People': The Public Meaning of the Second Amendment When the Fourteenth Amendment was Ratified," 17 *George Mason Law Review* 3:823-862 (2010).

Co-authored with Don B. Kates, "Second Amendment Limitations and Criminological Considerations," 61 *Hastings Law Journal* 1339-1370 (2009).

Co-authored with Joseph Edward Olson, "Gun Control: Political Fears Trump Crime Control," *Maine Law Review*, 61:1 [2009] 57-81

Co-authored with Joseph Edward Olson, "What Did "Bear Arms" Mean in the Second Amendment?" *Georgetown Journal of Law & Public Policy*, 6:2 [2008]

Co-authored with Joseph Edward Olson, "Pistols, Crime, and Public Safety in Early America." *Willamette Law Review*, 44, [2008]

"Why Footnotes Matter: Checking *Arming America*'s Claims." *Plagiary* 2006 1 (11): 1-31 [29 September 2006]

"Michael Bellesiles and Guns in the Early Republic."  *Ideas on Liberty* 52:9 [September, 2002] 17-22.

"The Peaceable Kingdom?" *Books & Culture: A Christian Review*, July/August 2002, 29.

"Confiscating Guns From America's Past." *Ideas on Liberty* 51:1 [January, 2001] 23-27.

"Disarming Errors." *National Review*, October 9, 2000, 54-55.

"An American Coup d'Etat?" *History Today* [November, 1995].

"A Tale of Three Cities: The Right to Bear Arms in State Supreme Courts." *Temple Law Review* 68:3 [Fall, 1995] 1178-1241.  Co-authored with David Kopel and Scott Hattrup.

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws." *Tennessee Law Review* 62:3 [Spring, 1995] 679-757.

"The Racist Roots of Gun Control." *Kansas Journal of Law & Public Policy* 4:2 [Winter, 1995] 17-25.

"Ethical Problems of Mass Murder Coverage in the Mass Media." *Journal of Mass Media Ethics* 9:1 [Winter, 1993-94] 26-42.

A comprehensive list of popular magazine articles would run to many pages; for a complete list see http://www.claytoncramer.com/popular/popularmagazines.htm .

## CONFERENCES & EXPERT TESTIMONY:

Ohio State Senate Judiciary Committee, March 22, 1995.

Michigan House of Representatives Judiciary Committee, December 5, 1995

American Society of Criminology, San Diego, Cal., November, 1997.  "Fear And Loathing In Whitehall: Bolshevism And The Firearms Act Of 1920."

American Society of Criminology, Chicago, Ill., November, 2002. "The Duty to be Armed in Colonial America."

Assisted in research and writing of Respondent's Brief and Academics for the Second Amendment and Claremont Institute amicus briefs for *D.C.* v. *Heller* (2008).

Panelist on "Up in Arms: The Second Amendment in the Modern Republic" University of Connecticut School of Law, November 15, 2013.

## WORKS CITED IN COURT DECISIONS:

"'Shall Issue': The New Wave of Concealed Handgun Permit Laws," cited in *Pagel* v. *Franscell*, 57 P.3d 1226, 1234 (Wyo. 2002); Moody v. ARC of Howard County, Inc., Civil No. JKB-09-3228 (D.Md. 2011).

"'This Right is Not Allowed by Governments that are Afraid of the People':" cited in *McDonald* v. *Chicago* (2010); *Ezell* v. *City of Chicago* (7th Cir. 2011).

"Second Amendment Limitations and Criminological Considerations" cited in *U.S.* v. *Yancey,* 09-1138 (7th Cir. 2010); *U.S.* v. *Chester,* 628 F.3d 673 (4th Cir. 2010); *U.S.* v. *Skoien,* 587 F.3d 803 (7th Cir. 2009).

"What Did 'Bear Arms' Mean in the Second Amendment?", cited in *D.C.* v. *Heller* (2008).  In addition, significant parts of Justice Scalia's opinion are derived from amicus briefs that I helped to research and write.

*For the Defense of Themselves and the State,* cited in *Mosby* v. *Devine*, 851 A.2d 1031, 1052 (RI 2004) (Flanders, J., dissenting); *U.S.* v. *Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999); *State* v. *Sieyes* 225 P. 3d 995 (Wash. 2010).

"A Tale of Three Cities," cited in *State* v. *Mendoza*, 920 P.2d 357, 360 n. 4 (Hawaii 1996).

*Concealed Weapon Laws of the Early Republic*, cited in *Senna* v. *Florimont*, 958 A.2d 427, 433 (N.J. 2008).

"Mental Illness and the Second Amendment," cited in *In Rec EC* (N.J.App. 2015).

A comprehensive and up to date list can be found at http://claytoncramer.com/scholarly/journals.htm#citations.

**LANGUAGES:**

Very basic reading competence in German.

**OTHER SKILLS:**

I have 35 years of experience as a computer software engineer, including embedded telecommunications equipment development, web page creation and maintenance. I also have an unusually detailed knowledge of the physical sciences (for an historian), a deep interest in the history of science and technology, and how both influence society.

**CERTIFICATE OF SERVICE**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DECLARATION OF CLAYTON CRAMER IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF; EXHIBIT 42**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

CERTIFICATE OF SERVICE

17cv1017

**ER_1344**