No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant*.

—————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge

—————————

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 7 of 17**

—————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

1  C.D. Michel – SBN 144258
   Sean A. Brady – SBN 262007
2  Anna M. Barvir – SBN 268728
   Matthew D. Cubeiro – SBN 291519
3  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
   Telephone: (562) 216-4444
5  Facsimile: (562) 216-4445
   Email: abarvir@michellawyers.com
6
7  Attorneys for Plaintiffs

8

9           IN THE UNITED STATES DISTRICT COURT

10       FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11  VIRGINIA DUNCAN, et al.,            Case No:  17-cv-1017-BEN-JLB

12                     Plaintiffs,      **DECLARATION OF GARY KLECK
                                        IN SUPPORT OF PLAINTIFFS'**
13           v.                         **SUPPLEMENTAL BRIEF;
                                        EXHIBIT 43**
14  XAVIER BECERRA, in his official
15  capacity as Attorney General of the
    State of California,
16
17                     Defendant.

18

19

20

21

22

23

24

25

26

27

28

                                1
                DECLARATION OF GARY KLECK
                                                        17cv1017

**ER_1346**

1   I, Gary Kleck, declare as follows:

2   **Introduction**

3       1.    I am Dr. Gary Kleck, Emeritus Professor of Criminology & Criminal

4   Justice at Florida State University. Counsel for plaintiffs have asked me to offer a

5   rebuttal opinion regarding the supplemental reports filed by Lucy Allen and Louis

6   Klarevas. This report sets forth my qualifications, opinions, and scholarly foundation

7   for those opinions.

8   **Background & Qualifications**

9       2.    I am an emeritus Professor of Criminology and Criminal Justice at

10  Florida State University. I received my doctorate in Sociology from the University

11  of Illinois in 1979, where I received the University of Illinois Foundation Fellowship

12  in Sociology. I was, at the time of my retirement in May 2016, the David J. Bordua

13  Professor of Criminology at Florida State University, where I served on the faculty

14  from 1978 to 2016. My research has focused on the impact of firearms and gun

15  control on violence, and I have been called "the dominant social scientist in the field

16  of guns and crime." (William J. Vizzard, *Shots in the Dark: The Policy, Politics, and*

17  *Symbolism of Gun Control* , 2003, p. 183).

18      3.    I have published the most comprehensive reviews of evidence

19  concerning guns and violence in the scholarly literature, which informs and serves as

20  part of the basis of my opinions. I am the author of *Point Blank: Guns and Violence*

21  *in America*, which won the 1993 Michael J. Hindelang Award of the American

22  Society of Criminology, awarded to the book of the previous several years which

23  "made the most outstanding contribution to criminology." I also authored *Targeting*

24  *Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997)

25  and *Armed* (2001) - books that likewise addressed the topic of guns and violence.

26      4.    I have also published scholarly research articles in virtually all the

27  leading professional journals in my field. Specifically, my articles have been

28  published in the *American Sociological Review*, *American Journal of Sociology*,

2

DECLARATION OF GARY KLECK

*Social Forces*, *Social Problems*, *Criminology*, *Journal of Criminal Law and Criminology*, *Law & Society Review*, *Journal of Research in Crime and Delinquency*, *Journal of Quantitative Criminology*, *Law & Contemporary Problems*, *Law and Human Behavior, Law & Policy Quarterly*, *Violence and Victims*, *Journal of the American Medical Association*, and other scholarly journals.

5. I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a member of the U.S. Sentencing Commission's Drugs—Violence Task Force, and as a member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

6. Finally, I have taught doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on research design and causal inference, statistical techniques, and survey research methodology.

7. My current curriculum vitae, which includes a full list of my qualifications and publications, is attached hereto as **Exhibit 43.**

**Legal Cases in Which I Have Served as an Expert Witness**

8. In the past ten years, I have been deposed and/or testified at trial in the following matters:

*Heller v. District of Columbia*, D.D.C. (deposed July 2, 2013).

*Cook et al. v. Hickenlooper*, D. Colo. (deposed and testified Mar. or April 2013).

*Wilson v. Cook County* (deposed Sept. 16, 2013).

*Kolbe v. O'Malley*, D. Md. (deposed Jan. 2, 2014).

*Barbra Schlifer Commemorative Clinic v. HMQ Canada* ("Cross-examined" [Canadian term for deposed] Feb. 24, 2014).

1    *Friedman v. City of Highland Park* (deposed May or June 2014).

2    *Tracy Rifle and Pistol v. Harris*, E.D. Cal. (deposed Nov. 2, 2016).

3    *Flanagan v. Becerra*, U.S. District Court, Central District of
4         California.  Deposed July 25, 2017.

5    *Worman v. Baker*, U.S. District Court for the District of
6         Massachusetts.  Deposed October 25, 2017.

7    *Duncan v. Becerra*, U.S. District Court, Southern District of
8         California.  Deposed January 3, 2018.

9    *MSI v. Hogan*, U.S. District Court, District of Maryland.  Deposed
         May 18, 2018.
10

11   *Association Of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Grewel
         et al*., United States District Court  District Of New Jersey.
12        Deposed 8-2-18.  Trial testimony 8-17-18.

13   *Rupp v. Becerra*., U. S. District Court, Central District of California.
14        Deposed 12-12-18.

15   *NRA v. Swearingen*, United States District Court for the Northern
16        District of Florida, Deposed via Zoom 8-13-20.

17   *Maryland Shall Issue v. Anne Arundel County*.  United States District
         Court for Maryland.  Deposed via Zoom on 9-29-22.
18

19   **Compensation**

20        9.    I am being compensated for my time in this case at an hourly rate of

21   $400 per hour. My compensation is not contingent on the results of my analysis or

22   the substance of my testimony.

23   **I.    Response to Supplemental Report of Lucy Allen**

24        A.    *Allen's Claims About the Use of Large-capacity Magazines in Mass
25              Shootings*

26        10.   Less than 2% of gun crimes known to the police involve offenders

27   firing over 10 rounds (Reedy and Koper 2xxx). Since ordinary crimes almost never

28   involve over 10 rounds fired, the rationale for banning large-capacity magazines

1    (LCMs) is focused almost entirely on mass shootings (commonly defined as

2    incidents in which 4 or more victims are killed), since they do involve many rounds

3    fired.  Lucy Allen's defense of the LCM ban is consequently based on two claims

4    about LCM use in mass shootings: (1) a large share of mass shootings involve use of

5    LCMs, (and the related proposition that mass shooters prefer LCMs over smaller

6    magazines), and that (2) use of LCMs in mass shootings causes a higher casualty

7    count.

8        11.    What share of mass shootings (4+ dead) *actually* involve the use of

9    large-capacity magazines (LCMs), defined herein as those with over 10-round

10   capacity?  Allen uses a miscellaneous set of four largely overlapping sources of data

11   to defend her assertion that LCMs are frequently used in mass shootings, concluding

12   that 60% involve an LCM.  Unfortunately, what all four of her datasets have in

13   common is that they all cover only a small minority of all mass shootings, and the

14   few incidents they do cover are clearly unrepresentative of the full set of mass

15   shootings.

16       12.    The most comprehensive compilation of mass shooting incidents is

17   contained in the Gun Violence Archive (GVA), publicly available at

18   https://www.gunviolencearchive.org/.  Significantly, Allen ignored this widely used

19   data source – available since 2013 - in favor of her four radically incomplete

20   compilations.  The earliest GVA figures are for 2013, and the most recent complete

21   year covered is 2021.

22       13.    The most comprehensive source on mass shootings involving LCMs

23   can be found on the Violence Policy Center (VPC) website, available at

24   https://vpc.org/fact_sht/VPCshootinglist.pdf.  VPC advocates bans on LCM, and its

25   staff searches hundreds of news sources for stories reporting LCM use in mass

26   shootings.  If even a single news story reports use of a magazine holding over 10

27   rounds, it is included in the VPC database.  Any given individual news source might

28   omit mention of LCM use from their account of a mass shooting that involved one,

5

DECLARATION OF GARY KLECK

17cv1017

but in order for an LCM-involved mass shooting to be missed in the VPC search, mention of LCM involvement would have to be omitted from every single news source searched – even those with editorial policies favoring bans on LCMs.  Such an occurrence is highly unlikely, so it is correspondingly unlikely that the VPC database excludes any significant number of LCM-involved mass shootings.

14.    I compiled counts from these two comprehensive sources to create the following table.  It shows how often LCMs are involved in *all* mass shootings (4+ dead in a single incident), as distinct from Allen's tiny, arbitrarily selected subset of mass shootings.

Table 1 – Prevalence of LCM Use in All Mass Shootings, 2013-2021

| Year | Mass Shootings | LCM-involved Mass Shootings |
|------|----------------|------------------------------|
| 2013 | 25 | 2 |
| 2014 | 20 | 0 |
| 2015 | 26 | 4 |
| 2016 | 25 | 4 |
| 2017 | 24 | 4 |
| 2018 | 22 | 3 |
| 2019 | 31 | 4 |
| 2020 | 21 | 0 |
| 2021 | 28 | 5 |
| 2013-2021 | 222 | 26 |

15.    Thus, when one examines the full set of *all* mass shootings instead of the tiny, arbitrarily selected subset examined by Allen, one finds that only **11.7%** of all mass shootings (4+ dead) in the U.S. involve LCMs – a far cry from Allen's claimed 60% (Allen, p. 19).  It would be more accurate to say that mass shooters *rarely* use LCMs.

16.    Further, in terms of absolute frequency, it would also be fair to say that mass shootings in which an LCM was known to have been used are freakishly rare, occurring an average of just 2.9 times per year in the entire United States in 2013-

6

DECLARATION OF GARY KLECK

1    2021 (26/9 years=2.9).  Specifically regarding California, while it is a big state, it

2    still claims only about 12% of the U.S. population, so one could expect **0.35** LCM-

3    involved mass shootings in a typical year in California (12% of 2.9=0.35), or about 1

4    every 3 years.  Thus, the benefit of even a California LCM ban that somehow

5    managed to completely eliminate LCM-involved mass shootings would be close to

6    nonexistent.

7         B.    *Does Mass Shooter Use of LCMs Cause a Higher Casualty Count?*

8         17.    Allen correctly notes that mass shooters who used LCMs inflicted more

9    casualties than those who did not, but leaves the impression that LCM use must have

10   somehow *caused* the higher casualty count. She does not mention the obvious

11   alternative explanation for this statistical association—that shooters more intent on

12   hurting many people would prepare to do so by acquiring LCMs and bringing them

13   to the scene of their crime. That is, lethality of intent determines both the choice of

14   weaponry and ammunition and the outcome of the crime. If this completely accounts

15   for the association, it means that the association is spurious, i.e. non-causal. That is,

16   it means the LCM use has no effect of its own on the number of casualties inflicted.

17        18.    This alternative explanation entails two component assertions:

18        (1)    Greater lethality of offender intent causes shooters to fire more rounds

19               and inflict more casualties.

20        (2)    Greater lethality of intent makes it more likely that mass shooters will

21               use weaponry they believe is suited to their deadly intentions.

22   Regarding assertion (1), it is scarcely credible that the outcomes of mass shootings

23   are not even slightly affected by what the shooters intended. While the

24   correspondence between intent and outcome is not perfect, it surely is strong.  To my

25   knowledge, no proponent of LCM bans or scholarly student of LCM effects,

26   including Allen, has ever denied this assertion. Thus, assertion (1) is widely

27   accepted.

28

7

DECLARATION OF GARY KLECK

17cv1017

19.     Likewise, to my knowledge, no proponent of LCM bans or scholarly student of LCM effects has ever denied that many mass shooters commonly plan their attacks well in advance, and that this planning includes obtaining firearms and ammunition. News accounts of mass shootings routinely describe the perpetrators of mass shootings planning their attacks weeks or months in advance, acquiring guns and magazines that they later use to kill and injure. Assertion (2) is completely consistent with all evidence about mass shootings known to me or included in Allen's report.

20.     Therefore, the association between (a) LCM use and (b) the numbers of rounds fired and victims hurt in mass shootings, is at least partly (and possibly entirely) spurious (not causal), and is instead attributable to the common effects of (c) shooter lethality of intent on both (a) and (b). If propositions (1) and (2) are correct, the only way to support the claim that the association between (a) and (b) is *not* entirely spurious (and thus is at least partly causal in nature) is to measure and control for (c). Allen has not done this, nor has anyone else, to my knowledge. Thus, Allen has made no affirmative case for the claim that the association between (a) and (b) is even partially causal, or the position that LCM use has any causal effect on the number of casualties in mass shootings.

C.     *Allen does not Provide Any Reason Why LCM Use Would Affect the Number Killed or Wounded in a Mass Shooting*

21.     Allen fails to provide even a speculative explanation of *why* use of LCMs would increase the number of people killed or wounded in mass shootings – even though such an hypothesized effect is the main rationale for banning LCMs. Allen's implied position that LCM use actually affects the number of casualties might have been strengthened if she had cited details of actual mass shootings that indicate that LCMs were necessary for firing many rounds and inflicting many casualties, or that fewer rounds would have been fired and fewer casualties inflicted, had the shooter lacked LCMs.  For example, she might have tried to cite substantial

8

DECLARATION OF GARY KLECK

1    numbers of shootings in which the offender used an LCM, but had only one gun and

2    one magazine, since, in such a situation, bystanders would have a better chance of

3    tackling the shooter while he was reloading, and potential victims would have

4    additional time to escape while the shooter was reloading. Allen did not do this. To

5    my knowledge, she could not do this because there are no such known cases.

6      22.  All mass shooters use multiple guns or multiple magazines and

7    therefore could, even if they did not have LCMs, fire many rounds without

8    significant interruption, by either firing additional guns once the first one was

9    emptied or by quickly changing magazines, something that takes only about 3-4

10   seconds (Kleck 2016). Allen neither acknowledges nor denies this, and

11   consequently fails to provide any explanation as to *why* LCM use would cause a

12   mass shooter to kill or wound more people. She appears to believe that merely

13   citing the crude statistical association between LCM use and casualty county is

14   sufficient to establish a case for cause-and- effect. However, as even beginning

15   statistics students know, correlation is not causation. This is especially true in this

16   case because close examination of how mass shootings occur does not reveals any

17   causal mechanism by which LCM use by U.S. mass shooters could increase the

18   number of people they killed or wounded.

19     23.  Advocates of LCM bans have hypothesized two possible mechanisms

20   by which preventing LCM use by a mass shooter might decrease the casualty count,

21   both based on the fact that shooters confined to smaller capacity magazines would

22   have to reload more often. First, more pauses to reload implies that bystanders

23   would have more opportunities to tackle the shooter and stop him before he hurt

24   more victims. Second, the time the shooter devoted to reloading would give

25   prospective victims additional time to escape or hide.

26     24.  Regarding the first possibility, there have been no mass shootings in the

27   U.S. in the past 30 years in which the shooter was tackled while he was reloading.

28   All cases purported to involve such a scenario turn out to be incidents in which the

9

DECLARATION OF GARY KLECK

1   shooter was tackled while struggling with a jam or a defective magazine (Kleck
2   2016).  Since a ban on larger capacity magazines would not increase the frequency
3   of gun jamming or use of defective magazines in mass shootings, this kind of
4   opportunity for bystander intervention would not be increased by an LCM ban.  For
5   example, the incident most frequently cited by LCM ban advocates to support the
6   claim of bystander intervention while the shooter was reloading is the Arizona
7   shooting involving an attack on Representative Gabriel Giffords in 2011.  Some
8   bystanders claimed that the shooter was reloading when he was tackled, but
9   subsequent police investigation found that one of the magazines was defective
10  because its spring was broken.  As far as can be determined from eye witness
11  testimony, the shooter was struggling with this defective magazine when he was
12  tackled, rather than reloading.

13      25.   The second mechanism by which additional reloading might reduce the
14  casualty count is that it purportedly provides additional time for victims to escape or
15  hide.  To be sure, all mass shootings involve pauses between shots, whether because
16  the shooter was choosing his next victim, was reloading, or for other reasons.  The
17  key issue is whether the additional reloads *add* to these pauses to an extent that
18  results in the shooter attacking fewer victims.  The plausibility of the speculation
19  that reloads provide *additional* opportunity for victim evasion is dependent on just
20  how much time it takes to reload a semiautomatic firearm, and how this compares
21  with the length of the other pauses in shooting that occur when the offender is not
22  reloading.

23      26.   Analysis of mass shootings in which it was possible to determine the
24  offender's rate of fire reveals that mass shooters using semiautomatic guns fire at
25  relatively slow rates, invariably less rapid than the rate of which the weapons are
26  capable (3 or more rounds per second) (Kleck 2016) .  Reloading a detachable
27  magazine takes ordinary shooters only about 3-4 seconds, and mass shooters who
28  rehearse their crimes by practicing rapid reloads could probably do still better.  The

1   average interval between shots in mass shootings, however, is well over 3-4 seconds
2   (see Table 3 in Kleck 2016).  This means that pauses in shooting due to reloading
3   are actually shorter in duration than the pauses between shots that mass shooters
4   routinely take whether or not they are reloading.  Thus, it is implausible that
5   inducing mass shooters to reload more often provides any additional time sufficient
6   for more victims to escape or hide.

7        27.   In sum, there is no known mechanism by which bans on LCMs could
8   reduce the casualty count in mass shootings, and thus no empirical support for the
9   benefits that Allen claims would accrue from such a ban.

10       D.   *Allen's Claims About the Number of Rounds Fired in Defensive Gun*
11            *Uses*

12       28.   Allen asserts that very few defensive gun uses (DGUs) involve over 10
13  rounds being fired, implying that LCMs are unneeded for defensive purposes.  As a
14  preliminary logical note, it is important to point out that the data used by Allen could
15  not tell her anything about incidents in which victims *needed* an LCM to carry out
16  effective self-defense, but did not have one.  Thus, as far as Allen knows, there
17  could have been thousands of crime incidents in which crime victims needed to fire
18  more than 10 rounds and would have benefited from use of an LCM but not possess
19  one.

20       29.   In any case, Allen's claims about DGUs have no reliable foundation in
21  evidence.  She cites data from the "Armed Citizen" column of the National Rifle
22  Association's (NRA) magazine, *American Rifleman*, and concludes that "it is rare
23  for a person, when using a firearm in self-defense, to fire more than ten rounds." She
24  does not confine this conclusion to persons whose defensive gun use (DGU) was
25  reported in the *American Rifleman*, but clearly intends it to apply to Americans in
26  general. The NRA's database of "armed citizen" stories is not a representative
27  sample of DGUs, nor does the NRA even claim it to be so. Indeed, Allen herself
28  does not claim that the NRA sample is representative.  She acknowledges the

11

DECLARATION OF GARY KLECK

17cv1017

1   possibility of bias in selecting cases "in favor of stories that put use of guns in self-

2   defense in the best possible light." Therefore, there is no formal basis for

3   generalizing the results of any analysis of this sample to any larger population of

4   DGUs.

5         30.    The utility of the NRA sample is, however, even worse than merely

6   being unrepresentative of DGUs in a general way. More specifically, there is strong

7   reason to believe that the sample will largely exclude DGU incidents in which the

8   defender fired more than 10 rounds. NRA staff nonrandomly select these incidents

9   from news media-reported cases of DGU, most of them submitted by readers of the

10   "Armed Citizen" feature of *American Rifleman*.  Based on the content of these

11   stories published in the magazine, it is clear that they are selected to convey the

12   impression that DGU is an extremely legitimate and effective activity, engaged in by

13   responsible law-abiding persons, for clearly legally justifiable purposes, carried out

14   in clearly lawful ways. The reality of the full array of DGUs is considerably more

15   diverse, but the NRA has a political agenda to portray DGU in as positive a light as

16   possible.

17         31.    Thus, Allen is quite right to note that the selection practices of NRA

18   staff are likely to favor inclusion of DGU stories that put DGU "in the best possible

19   light." She does not, however, appear to understand how this bias would work

20   regarding stories in which defenders fired large numbers of rounds. It could not

21   serve the NRA's purposes to disseminate accounts of DGUs in which the defenders

22   appeared to use excessive force, indiscriminately firing arguably excessive numbers

23   of rounds at their adversaries. The more seemingly excessive the defender's use of

24   force appears to be, the less likely it is that his actions would appear to a reader to be

25   justifiable. Likewise, the NRA is unlikely to want to disseminate stories in which

26   effective self-defense was difficult and dangerous, requiring the firing of large

27   numbers of rounds to protect the defender. Instead, NRA staff would better serve

28   their political ends by selecting stories of DGUs in which the defenders used the

1  minimum amount of force needed to defend themselves, firing the fewest rounds
2  needed to serve that purpose. This would bias the sample of selected DGUs in the
3  direction of excluding cases in which many rounds were fired.

4       32.    Even though the NRA sample is not representative of DGUs in general,
5  Allen's analysis of the NRA sample does nevertheless establish one thing: DGUs in
6  which more than 10 rounds are fired *do* occur. Her analysis of the NRA sample
7  identified two incidents in which over 10 rounds were fired, a frequency that Allen
8  characterizes as "rare." This is indeed rare in absolute terms, but then so are mass
9  shootings in which LCMs are used, typically occurring less than three times a year
10 in the entire U.S.  (see Table 1 herein).  Indeed, detailed examination of the way
11 mass shootings actually occur indicates that the number of incidents in which use of
12 LCMs increased the number of victims killed or injured in a typical year may well
13 be *zero* (Kleck 2016).

14      33.    It is therefore worth considering the implications if 0.3% of all DGUs
15 involved over 10 rounds being fired, as Allen's results indicate. The numerous
16 national surveys that have specifically asked about DGUs have consistently
17 indicated 0.5-3.5 million DGUs per year, averaging about 2.2 million DGUs a year
18 (Kleck 2021).  (Gun control advocates have speculated that these surveys
19 overestimate the frequency of DGUs, but nearly all known sources of error in
20 surveys tend to contribute to *under*estimation -  Kleck 2018).

21      34.    If 0.3% of DGUs involved over 10 rounds fired, this would imply there
22 are about 6,600 such DGUs per year (0.003x2,200,000=6,600). Thus, the percentage
23 of DGUs in which over 10 rounds were fired does not have to be very large in order
24 for it to imply a number of DGU incidents many times the number of mass shootings
25 with LCM use, or crimes in which LCM use increased the harm inflicted on victims.
26 In short, Allen's own results from her "Armed Citizen" analysis, taken at face value,
27 imply that *there are far more DGUs each year in which the defender fires over 10*
28 *rounds than there are mass shootings involving LCM use.*

13

DECLARATION OF GARY KLECK

E.   *Allen's Analysis of DGUs Reported in the News*

35.    DGUs reported in news outlets are no more likely to be representative of all DGUs than the "Armed Citizen" sample. News outlets rarely find out about crimes on their own—they find out about crimes from the police. DGUs that victims are willing to report to the police, like the NRA-selected DGUs, are likely to be especially legitimate and justified.  Conversely, defenders are less likely to report their DGUs to the police if their actions are likely to appear to the police as involving excessive force or indiscriminate firing of a gun. This means that incidents in which defenders fired over 10 rounds are likely to be rare among DGUs reported to the police and consequently covered by news outlets, even if they were common among all DGUs.

36.    Allen uncovered 4,800 news stories of DGUs over a span of six years, but needlessly sampled just 200 of the stories for analysis. Her sample was selected randomly and may well be approximately representative of the full set of DGU *news stories*, but since the set of DGUs reported in the news is itself likely to be an unrepresentative sample of all DGUs, Allen's sampling procedures cannot produce a representative sample of DGUs. She therefore has no basis for generalizing the results of this analysis to the entire population of DGUs.

37.    To summarize, Lucy Allen's own results indicate the Americans use guns for defense and fire over 10 rounds thousands of times a year.  Further, the best available evidence indicates that, contrary to Allen's claims, (1) mass shootings rarely involve LCMs, and (2) LCM use does not cause a larger number of victims to be killed or wounded.

## II.   Response to Supplemental Report of Louis Klarevas

A.   *Klarevas' Claims About the Magnitude of the Threat of Mass Shootings*

38.    As he did in his first expert report (Klarevas 2017), Klarevas makes the extraordinary claim that "gun massacres presently pose the deadliest threat to the

14

DECLARATION OF GARY KLECK

17cv1017

**ER_1359**

1    safety and security of American society, and the problem is growing," adding that "I
2    continue to stand by the opinions and conclusions expressed in my 2018 Report"
3    (Klarevas 2022, p. 3),   The claim is as absurd now as it was then.

4         39.    Klarevas documented 113 "gun massacres" (which he defines as
5    incidents involving 6 or more dead), in which 1,009 people were killed, over the
6    period from 1968 through September 2017. This is a period of 49 and ¾ years, so his
7    own figures imply that an average of 20.3 Americans have been killed in "gun
8    massacres" per year (1009/49.75=20.28). To put this number in perspective, 17,250
9    Americans were killed in criminal homicides of all types in 2016 (FBI 2017). Thus,
10   only 1/10th of 1% of all murder victims are killed in "gun massacres."

11        40.    Alternatively, we can state the seriousness of the threat to the safety of
12   Americans by computing the fraction who will be killed in a "gun massacre" in a
13   given year.  Since there were about 323,127,513 Americans in 2016, the annual
14   average of 20.3 deaths implies that the probability of an American dying in a "gun
15   massacre" is about 0.000000063, or 0.0063 per 100,000 population—about 1 in 15.9
16   million.  As a point of comparison, defense expert Lucy Allen has calculated that the
17   rate of Americans dying because they were struck by lightning is 0.09 per 100,000
18   population (Allen 2017, p. 16).  Thus, the risk of an American being killed in a "gun
19   massacre" is less than 1/14th of the risk of being killed by a bolt of lightning—itself a
20   freakishly rare event. However horrific individual mass shootings may be, it is
21   absurd to describe their threat to the safety of Americans as "the greatest threat … to
22   the … safety of American society in the present era." This sort of overheated
23   rhetoric is appropriate to propagandists, not to serious scholars.

24        B.    *Klarevas' Claims About the Frequency of LCM Use in Mass Shootings*

25        41.    Like Lucy Allen, Louis Klarevas attempts to make the case that a large
26   share of mass shootings involve LCM use. His principle tactic to advance this claim
27   is to restrict his analyses to only the rarest kinds of mass shootings, those with a
28   huge number (10 or more) of fatalities (Klarevas 2022).  This represents his most

15

DECLARATION OF GARY KLECK

17cv1017

**ER_1360**

1   significant change from his initial expert report (Klarevas 2017)  He has changed the

2   cut-off of the minimum number of number of deaths for a mass shooting to be

3   included in his analysis from 6 to 10, making his conclusions even more trivial than

4   before because they pertain only to an even more freakishly rare subset ("double-

5   digit fatality" incidents) of a subset of violent crimes that was already freakishly rare

6   to begin with.  He shows that 23 of 30 of these extreme cases involved LCMs (his

7   Table 1), or 77% - an even higher share than the 48% share (53 of 111) he obtained

8   when he used a fatalities cut-off of six or more.  Of course, Klarevas could have

9   gone even further and analyzed only cases with over 50 deaths, since he then would

10  have been able to report that *100%* of this set involved LCM use.  There was just

11  one such incident and it did indeed involve LCM use (the Las Vegas shootings

12  included in his Table 1).  Such an "analysis" of a single cased would be perceived by

13  most scholars as pointless, but it is only marginally more pointless than analyzing

14  the most extreme 30 cases.

15      42.    Over the entire history of the United States, Klarevas was able to

16  identify just 30 mass shootings with 10 or more deaths – well under one per year

17  over that entire history.  Even over the most recent 10 years, when such incidents

18  became relatively more common, the average was just 1.6 per year.  In light of how

19  extremely rare these incidents are, the share of them that involved LCM use is trivial

20  and irrelevant to policy-making.

21      43.    This shift in the cut-off number of deaths Klarevas uses to define the set

22  of shootings to analyze also has another subtle effect.  It allows him to make a claim

23  that there is an upward trend in mass shootings that could not be sustained if he used

24  the cut-off of four deaths commonly used by other scholars.  If one uses the

25  conventional definition of four+ fatalities, there has been no trend in recent years.

26  Table 1 included in this report provides counts of such shootings for 2013-2021 (all

27  of the years for which complete data are available), based on the most

28  comprehensive source available, and it shows there have been only slight

16

DECLARATION OF GARY KLECK

1    fluctuations in the past decade around an average of 25 incidents per year.  Indeed, if

2    one were selective enough to focus only on the trends from 2015 to 2018, or from

3    2020 to 2021, one could even make it seem like there has been a *downward* trend in

4    mass shootings.  Taking the data as a whole, however, there has been no upward

5    trend in mass shootings.

6       44.    It was only when Klarevas limited his focus to "double-digit fatality

7    incidents" that the data would fit his claim of an increasing frequency of mass

8    shootings (Klarevas 2022, pp. 7-8).  Unfortunately, the more Klarevas' claims are

9    confined to increasingly tiny subsets of shooting incidents, the less relevant they

10   become to the likely benefits of a ban on LCMs.  As previously noted, in a typical

11   year California experiences *zero* "double-digit fatality incidents," with or without

12   LCMs used, and thus there are zero such shootings that could be prevented by an

13   LCM ban.

14      C.    *Klarevas' Claims About Long-0term Historical Trends in Mass*

15          *Shootings*

16      45.    Not satisfied with addressing recent trends in mass shootings, Klarevas

17   claims to have established trends going back to 1776, using the Newspaper Archive

18   (Klarevas 2022, pp. 3-6).  He describes this as a source that contains articles from

19   "local and major metropolitan newspapers dating back to 1607" (p. 4, fn. 6).  This is

20   a misleadingly incomplete description.  This archive includes *a few* local newspapers

21   going back that far.  Prior to the 20th century most of the nation was not covered by

22   these few local newspapers, so correspondingly few mass murders would be covered

23   by these sources.

24      46.    This not only results in a gross undercount of mass shootings, but it also

25   gives a misleading impression of trends over time.  Since the share of the population

26   covered by newspapers included in this archive increased over time, the share of

27   mass shootings covered in archive newspaper stories would also increase, even if

28   there was no actual increase in the national number of mass shootings.  Thus, the

17

DECLARATION OF GARY KLECK

17cv1017

**ER_1362**

1   appearance of increasing mass shooting prevalence in Klarevas' Table 1 is at least
2   partly just a reflection of historical increases in the share of the nation's events that
3   were covered by newspapers.  Consequently, Klarevas had no reliable information
4   on trends in mass shootings for any part of the nation's history up until this increase
5   in newspaper coverage levelled off sometime in the late 20th century.  His data can
6   tell us nothing about trends in mass shooting frequency for earlier periods..

7       47.     The scope of Klarevas' claims about historical trends is also extremely
8   constricted by the arbitrary limits he placed on what kinds of mass shootings he was
9   willing to count.  Those familiar with the history of firearm massacres of native
10  Americans in the 18th and 19th centuries might wonder why they do not show up in
11  Klarevas's data.  His footnote 6 explains why: "Incidents of large-scale, inter-group
12  violence such as mob violence, rioting, combat or battle skirmishes, and attacks
13  initiated by authorities acting in their official capacity were excluded."  If these were
14  incidents in which large numbers of people were killed with firearms, what is the
15  justification for not defining them as mass shootings?  If nearly all the mass
16  shootings in these earlier periods fell into these excluded categories, Klarevas'
17  arbitrary definitional decisions had the effect of magically making it seem that mass
18  shootings are exclusively a product of very recent times - the impression clearly left
19  by his Table 1 and Figure 1.  The nation's extensive earlier history of mass shootings
20  simply vanishes.  This definitional maneuver, however, was necessary if Klarevas
21  was to create the impression that mass shootings became frequent only when LCM-
22  equipped firearms became common.  Earlier mass shootings may have differed from
23  our contemporary stereotypes of what a mass shooting is, but the relevant historical
24  reality is that Americans were able to carry out hundreds of mass shootings before
25  the late 20th century without benefit of LCM use (for example, see Brown 1970 for
26  examples of massacres of native Americans), just as is true today (see my Table 1).

27      48.     An even fundamental problem with Klarevas' analysis lies in the
28  narrow focus on mass murders committed *with firearms*.  Virtually all of the mass

18

DECLARATION OF GARY KLECK

1    murders with very high fatality counts in the U.S. have been committed by means

2    *other than shooting* (Duwe 2007).  Most prominently, the 9-11 mass murders of

3    nearly 3,000 Americans were committed by crashing airliners.  More commonly,

4    virtually all mass murders with very high fatality counts have been committed using

5    arson, or occasionally with explosives (Duwe 2007).  Only two mass murders with

6    over 32 dead in the 20th century were committed with firearms (Klarevas 2022,

7    Table 1), while all others were committed with non-firearms methods, most

8    commonly arson (Duwe 2007).  The obvious point is that it is not even necessary to

9    use firearms to murder large numbers of people, never mind firearms equipped with

10   LCMs.

11       D.    *Klarevas' Hinted Claim that LCM Use <u>Causes</u> Higher Fatality Counts*

12       49.    Klarevas does not explicitly state that LCM use by mass shooters

13   *causes* higher numbers of fatalities or woundings; rather he just leads readers up that

14   conclusion by presenting crude bivariate correlations between LCM use and casualty

15   counts (e.g., his p. 7 statement that "100 percent of mass shootings resulting in more

16   than 14 deaths involved LCMs holding more than 10 bullets"), without stating any

17   disclaimers that the correlations may be entirely spurious, i.e. not causal in nature.

18   His problem is the same one that afflicted Lucy Allen – he did nothing to rule out

19   the possibility that both the higher casualty counts and the shooter's choice to use

20   LCMs could be due to the common effect of offender lethality.  That is, aggressors

21   determined to kill larger numbers of victims are more likely to actually do so

22   (lethality of intent affects fatality counts), and are also more likely to acquire and use

23   LCMs in their crime (lethality of intent affects weapon choice).  Klarevas did not

24   control for *any* potentially confounding variables, including offender lethality, so he

25   had no legitimate foundation for concluding – or hinting to readers – that LCM use

26   caused higher casualty counts. And if there is no causal effect of LCM use on

27   casualty counts, there is no logical basis for believing that reducing LCM

28   availability and use will cause a reduction in mass shooting casualties.

50.     Further, like Lucy Allen, Klarevas can offer no coherent explanation of
*why* LCM use would increase casualty counts.  Three 10-round magazines of the sort
left legally available after LCMs are banned contain exactly as many rounds as a 30-
round magazine of the type prohibited by LCM bans. Therefore, LCM use does not
affect how many rounds a mass shooter can acquire or fire in an attack.  Reloading
creates a pause in firing that bystanders theoretically might use to tackle the shooter
and stop the killing, but there are no known cases of this actually happening in the
U.S. in the past 30 years.  Likewise, reloading does not slow the shooters rate of fire,
which might have allowed more prospective victims to escape or hide (Kleck 2016).
So how does use of an LCM by a mass shooter increase how many people he hurts?
Conversely, how would preventing LCM use through a law banning LCMs decrease
the number hurt?  Klarevas does not say.

E.     *Klarevas' Claims About Trends in LCM Availability*

51.     Another new element in Klarevas' Supplemental Declaration is his
attempt to document trends in "the availability of LCMs in the U.S. civilian firearm
marketplace" (Klarevas 2022, pp.7-9).  He uses data from *Gun Digest*, an annual
catalog of firearms that were available for sale new (i.e., not used) at the time of
publication.  His discussion of this analysis is misleading because of his slippery use
of the phrase "number of firearms."  From context, it can be determined that
Klarevas' numbers do not in fact pertain to numbers of firearms, but rather to
numbers of firearms *models*.  This distinction is critical because *Gun Digest* does not
report any figures on numbers of firearms equipped with LCMs – it merely lists
models of guns (e.g., the "Accu-tek Model HC-380SS Auto Pistol") and notes the
size of magazine with which they come equipped.  In short, Klarevas did not
actually have any data on how many firearms came factory equipped with LCMs.
For all he could tell from the *Gun Digest* catalog, there may have been very few of
the models that were equipped with LCMs manufactured and sold in a given year
(regardless of how many *models* of that type there were), and huge numbers of guns

20

DECLARATION OF GARY KLECK

17cv1017

manufactured and sold that were not so equipped.  In sum, Klarevas did not have any data that actually measure the availability of LCMs or trends in that availability.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on December 1, 2022.

Gary Kleck

21

DECLARATION OF GARY KLECK

17cv1017

**ER_1366**

**References**

Allen, 2017. *Expert Report of Lucy P. Allen in Duncan v. Becerra.*

Allen, 2022. *Supplemental Report of Dr. Lucy P. Allen in Duncan v. Becerra*

Brown, Dee. 1970. *Bury My Heart at Wounded Knee: An Indian History of the American West.* NY: Holt, Rinehart and Winston.

Duwe, Grant. 2007. *Mass Murder in the United States: A History.* NY: McFarland & Company.

Federal Bureau of Investigation (FBI) 2017. Crime in the United States, 2016. Washington, D,C,: U.S. Government Printing Office.

Klarevas, Louis. 2017. Expert Report of Dr. Louis Klarevas. United States District Court for the Southern District of California.

Klarevas, Louis. 2022. Supplemental Declaration of Louis Klarevas. United States District Court for the Southern District of California.

Kleck, Gary. 2016. "Large-capacity magazines and the casualty counts in mass shootings." *Justice Research and Policy* 17(1):28-47.

Kleck, Gary. 2018 "Response errors in survey estimates of defensive gun use." *Crime & Delinquency* 64(9):1119-1142.

Kleck, Gary. 2021. "What do CDC's surveys say about the prevalence of defensive gun use?" American Journal of Criminal Justice 46:401-421.

Reedy, D. C., and Christopher S. Koper, 2003. "Impact of Handgun Types on Gun Assault Outcomes, *Injury Prevention* 9:151-155.

# EXHIBIT 43

CURRICULUM VITAE

GARY KLECK

(Updated May 27, 2021)

PERSONAL

| | |
|---|---|
| Place of Birth: | Lombard, Illinois |
| Date of Birth: | March 2, 1951 |
| Address: | College of Criminology and Criminal Justice<br>The Florida State University<br>112 S. Copeland Street<br>Tallahassee, FL 32306-1273 |
| | Tallahassee, Florida 32306-1127 |
| Telephone Number: | Home: (850) 559-0922 |
| e-mail Address: | gkleck@fsu.edu |
| website: | http://criminology.fsu.edu/faculty-and-staff/college-faculty/gary-kleck/ |

CURRENT POSITION

David J. Bordua Emeritus Professor of Criminology, Florida State University

COURTESY APPOINTMENT

Courtesy Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

American Society of Criminology

Academy of Criminal Justice Sciences

EDUCATION

| | |
|---|---|
| A.B. | 1973 - University of Illinois, with High Honors and with Distinction in Sociology |
| A.M. | 1975 - University of Illinois at Urbana, in Sociology |

**ER_1369**

Ph.D.        1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of Criminology, for the book that made "the most outstanding contribution to criminology"  (for Point Blank: Guns and Violence in America).

Awarded Named Professorship, Florida State University, 2012.

Nominated for University Teaching Award, Florida State University, 2014.

Paper of the Year awarded by Criminal Justice Review for "Does Gun Control Reduce Crime?," Volume 4, pp. 488-513 (2016).

TEACHING POSITIONS

| | |
|---|---|
| Fall, 1991 to May 2016 | Professor, College of Criminology and Criminal Justice, Florida State University |
| Fall, 1984 to Spring, 1991 | Associate Professor, School of Criminology, Florida State University. |
| Fall, 1979 to Spring, 1984 | Assistant Professor, School of Criminology, Florida State University. |
| Fall, 1978 to Spring, 1979 | Instructor, School of Criminology, Florida State University. |

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and Causal Inference.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S. Homicide Trends from 1947 to 1976.  Department of Sociology, University of Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991, 2005   Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American Society of Criminology.  Republished in 2005 in paperback by Transaction Publishers.

Reviewed in Contemporary Sociology, American Journal of Sociology, Social Forces, Journal of Criminal Law and Criminology, The Criminologist, The Public Interest, Criminal Law Forum, Social Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and Law Enforcement, Newsletter of Public Policy Currents, Commonweal, Choice, and others.

1997   Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997   The Great American Gun Debate: Essays on Firearms and Violence (with Don B. Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001   (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.: Prometheus Books.

Selected to Choice: Current Reviews for Academic Libraries' 39th annual "Outstanding Academic Title List," awarded for "excellence in scholarship and presentation, the significance of their contribution to their field, and their value as an important treatment of their topic."  Awarded to less than one percent of books.

2017   (with Brion Sever) Punishment and Crime: The Limits of Punitive Crime Control. NY: Routledge.

RESEARCH MONOGRAPH

1979   Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforcement Commission, Springfield, Illinois.

ARTICLES IN PEER-REVIEWED JOURNALS

1979  "Capital punishment, gun ownership, and homicide." American Journal of Sociology 84(4):882-910.

1981  "Racial discrimination in criminal sentencing: A critical evaluation of the evidence with additional evidence on the death penalty." American Sociological Review 46(6):783-804.

1982  "On the use of self-report data to determine the class distribution of criminal behavior." American Sociological Review 47(3):427-33.

1983  (with David Bordua) "The factual foundation for certain key assumptions of gun control." Law and Policy Quarterly 5(3):271-298.

1985  "Life support for ailing hypotheses: modes of summarizing the evidence on racial discrimination in criminal sentencing." Law and Human Behavior 9(3):271-285.

1986  "Evidence that 'Saturday Night Specials' not very important for crime." Sociology and Social Research 70(4):303-307.

1987  "American's foreign wars and the legitimation of domestic violence." Sociological Inquiry 57(3):237-250.

1988  "Crime control through the private use of armed force." Social Problems 35(1):1-21.

1988  "Miscounting suicides." Suicide and Life-Threatening Behavior 18(3):219-236.

1990  (with Susan Sayles) "Rape and resistance." Social Problems 37(2):149-162.

1991  (with Karen McElrath) "The effects of weaponry on human violence." Social Forces 69(3):669-92.

1993  (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery." Journal of Quantitative Criminology 9(1):55-82.

1993  (with E. Britt Patterson) "The impact of gun control and gun ownership levels on violence rates." Journal of Quantitative Criminology 9(3):249-287.

1993  "Bad data and the 'Evil Empire': interpreting poll data on gun control." Violence and Victims 8(4):367-376.

1995  "Guns and violence: an interpretive review of the field." Social Pathology 1(1):12-47.

1995    "Using speculation to meet evidence."  Journal of Quantitative Criminology 11(4):411-424.

1995    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."  Journal of Criminal Law & Criminology 86(1):150-187.

1996    "Crime, culture conflict and sources of support for gun control: a multi-level application of the General Social Surveys."  American Behavioral Scientist 39(4):387-404.

1996    (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

1996    (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding." Law & Society Review 30(2):393-397.

1997    (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the defensive gun use estimate down."  Journal of Criminal Law and Criminology 87(4):1446-1461.

1997    (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful vigilante imagery vs. reality: results from the National Self-Defense Survey." Journal of Criminal Justice 26(3):251-258.

1998    (with Marc Gertz) "Carrying guns for protection: results from the National Self-Defense Survey." Journal of Research in Crime and Delinquency 35(2):193-224.

1998    "What are the risks and benefits of keeping a gun in the home?"  Journal of the American Medical Association 280(5):473-475.

1998    (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of habitual offenders." Criminology 36(3):481-511.

1999    (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Social Problems 46(2):275-293.

1999    "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals."  St. Louis University Public Law Review 18(1):23-45.

2001    "Can owning a gun really triple the owner's chances of being murdered?" Homicide Studies 5:64-77.

2002    (with Theodore Chiricos) "Unemployment and property crime: a target-specific assessment of  opportunity and motivation as mediating factors."

Criminology 40(3):649-680.

2004    "Measures of gun ownership levels for macro-level crime and violence research." Journal of Research in Crime and Delinquency 41(1):3-36.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crimes." Criminology 42(4):861-909.

2005    (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general deterrence research." Criminology 43(3):623-660.

2006    (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently used in research in criminology and criminal justice?" Journal of Criminal Justice 34(2):147-152.

2007    "Are police officers more likely to kill African-American suspects?" Psychological Reports 100(1):31-34.

2007    (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2000-2005." Journal of Criminal Justice Education 18(3):385-405.

2008    (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime victimization and divorce." International Review of Victimology 15(1):1-17.

2009    "Mass shootings in schools: the worst possible case for gun control."  American Behavioral Scientist 52:1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking and the overinterpretation of gun tracing data." UCLA Law Review 56(5):1233-1294.

2009    (with Tomislav Kovandzic)  "City-level characteristics and individual handgun ownership: effects of collective security and homicide." Journal of Contemporary Criminal Justice 25(1):45-66.

2009    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Journal of Criminal Justice 37(5):496-504.

2011    (with James C. Barnes)  "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Journal of Criminal Justice Education 22(1):43-66.

2011    (with Tomislav Kovandzic, Mark Saber, and Will Hauser).  "The effect of perceived risk and victimization on plans to purchase a gun for self-protection." Journal of  Criminal Justice 39(4):312-319.

2013    (with Will Hauser)  "Guns and fear: a one-way street?"  Crime and Delinquency
        59:271-291.

2013    "Gun control after Heller and McDonald: what cannot be done and what ought to
        be done."  Fordham Urban Law Journal 39(5):1383-1420.

2013    (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment
        risks: is there a "collective wisdom?"  Crime and Delinquency 59(7):1006-1035.

2013     (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of
        gun prevalence on homicide rates: A local average treatment effect
        approach."  Journal of Quantitative Criminology 28(4):477-541.

2014    (with Jongyeon Tark) "Resisting rape: the effects of victim self-protection on
        rape completion and injury."  Violence Against Women 23(3): 270-292.

2014    (with J. C. Barnes) "Do more police generate more crime deterrence?"
        Crime and Delinquency 60(5):716-738.

2015    "The impact of gun ownership rates on crime rates:  a methodological review
        of the evidence." Journal of  Criminal Justice 43(1):40-48.

2016    (with Tomislav Kovandzic and Jon Bellows)  "Does gun control reduce violent
        crime?"  Criminal Justice Review 41:488-513.

2016    "Objective risks and individual perceptions of those risks."  Criminology &
        Public Policy 15:767-775.

2016    (with Dylan Jackson)  "What kind of joblessness affects crime?  A national
        case-control study of serious property crime."  Journal of Quantitative
        Criminology 32:489-513.

2016    "Large-capacity magazines and the casualty counts in mass shootings: the
        plausibility of linkages."  Justice Research and Policy 17:28-47.

2017    (with Will Hauser)  "The impact of police strength and arrest productivity on fear
        of crime and subjective assessments of the police."  American Journal of Criminal
        Justice 42:86-111.

2017    (with Dylan Jackson)  "Does crime cause punitiveness?"  Crime & Delinquency.
        63(12):1572-1599.

2017    (with Bethany Mims)  "Article productivity among the faculty of criminology and
        criminal justice doctoral programs, 2010-2014."  Journal of Criminal Justice
        Education 28(4):467-487.

2018   (with Moonki Hong) "The short-term deterrent effect of executions: an analysis of daily homicide counts." <u>Crime & Delinquency</u> 64(7):939-970.

2018   "Response errors in survey estimates of defensive gun use." <u>Crime & Delinquency</u> 64(9):1119-1142.

2019   "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence." <u>Social Science Quarterly</u> 100(3):936-950.

2019   "Regulating guns among young adults." <u>American Journal of Criminal Justice</u> 44:689-704.

2021   "What do CDC's surveys say about the prevalence of defensive gun use?" <u>American Journal of Criminal Justice</u> 46:401-421.

2021   "The continuing vitality of bad research on guns and violence: a comment on Fridel." <u>Justice Quarterly</u> 38(5):916-924.

2021   "Compliance with universal background check gun laws." <u>Journal of Crime and Justice</u> (published online 9-2-20).

2021   Tomislav Kovandzic and Kleck.  "The impact of firearm levels on homicide rates: the effects of controlling for cultural differences in cross-national research." <u>American Journal of Criminal Justice</u> (published online 1-4-21).

2021   "The cross-national association of gun ownership rates and suicide rates: an analysis of 192 nations." <u>Archives of Suicide Research</u> (published online 5-12-21).

OTHER PUBLISHED ARTICLES

1985   "Policy lessons from recent gun control research." <u>Law and Contemporary Problems</u> 49(1):35-62.

1992   "Assault weapons aren't the problem." <u>New York Times</u> September 1, 1992, p. A15.  Invited Op-Ed page article.

1993   "The incidence of violence among young people." <u>The Public Perspective</u> 4:3-6.  Invited article.

1994   "Guns and self-protection." <u>Journal of the Medical Association of Georgia</u> 83:42. Invited editorial.

1998   "Using speculation to meet evidence: reply to Alba and Messner." <u>Journal on Firearms and Public Policy</u> 9:13-49.

1998    "Has the gun deterrence hypothesis been discredited?" <u>Journal on Firearms and Public Policy</u> 10:65-75.

1999    "There are no lessons to be learned from Littleton." <u>Criminal Justice Ethics</u> 18(1):2, 61-63.  Invited commentary.

1999    "Risks and benefits of gun ownership - reply." <u>Journal of the American Medical Association</u> 282(2):136-136.

1999    "The misfire that wounded Colt's." <u>New York Times</u> October 23, 1999.  Invited Op-Ed page article.

1999    "Degrading scientific standards to get the defensive gun use estimate down." <u>Journal on Firearms and Public Policy</u> 11:77-137.

2000    "Guns aren't ready to be smart." <u>New York Times</u> March 11, 2000.  Invited Op-Ed page article.

2000    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: using interrupted time series designs to evaluate social policy impact." <u>Journal on Firearms and Public Policy</u> 12:197-247.

2001    "School lesson: armed self-defense works." <u>Wall Street Journal</u> March 27, 2001. Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper and Roth." <u>Journal of Quantitative Criminology</u> 17:75-80.

2001    "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement." <u>Journal on Firearms and Public Policy</u> 13:1-43.

2002    "Research agenda on guns, violence, and gun control." <u>Journal on Firearms and Public Policy</u> 14:51-72.

2006    "Off target." <u>New York Sun</u> January 5, 2006.  Invited opinion article.

2009    "How not to study the effect of gun levels on violence rates." <u>Journal on Firearms and Public Policy</u> 21:65-93.

2011    "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes." <u>Wall Street Journal</u> January 15, 2011.  Invited opinion article.

2011    "The myth of big-time gun trafficking." <u>Wall Street Journal</u> May 21, 2011. Invited opinion article.

2015    "Defensive gun ownership is not a myth: why my critics still have it wrong."
        Politico Magazine, February 17, 2015.  Online at Politico.Com.

2021    "The futility of non-response responses: a reply to Fridel."  Justice Quarterly (in
        press).

## BOOK CHAPTERS

1984    (with David Bordua)  "The assumptions of gun control."  Pp. 23-48 in
        Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambridge,
        Mass.: Ballinger.

        (Also appeared in Federal Regulation of Firearms, report prepared by the
        Congressional Research Service, Library of Congress, for the Committee on
        the Judiciary, United States Senate, 1982).

1984    "The relationship between gun ownership levels and rates of violence in the U.S."
        Pp. 99-135 in Kates, above.

1984    "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in
        Kates, above.

1996    "Racial discrimination in criminal sentencing."  Pp. 339-344 in Crime and
        Society, Volume III – Readings: Criminal Justice, edited by George Bridges,
        Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine
        Forge Press.

1996    "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in
        Under Fire: Gun Buy-Backs, Exchanges and Amnesty Programs, edited by
        Martha R. Plotkin.  Washington, D.C.: Police Executive Research Forum.

2000    "Firearms and crime."  Pp. 230-234 in the Encyclopedia of Criminology and
        Deviant Behavior, edited by Clifton D. Bryant.  Philadelphia: Taylor
        & Francis, Inc.

2001    (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in
        What is Crime?: Controversy over the Nature of Crime and What to Do About It,
        edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and
        Littlefield.

2003    "Constricted rationality and the limits of general deterrence."  Chapter 13 in
        Punishment and Social Control: Enlarged Second Edition, edited by Thomas G.
        Blomberg.  New York: Aldine de Gruyter.

2004    "The great American gun debate: what research has to say."  Pp. 470-487 in The
        Criminal Justice System: Politics and Policies, 9th edition, edited by George F.
        Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

2008    "Gun control." Article in The Encyclopedia of Social Problems, edited by Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009    "Guns and crime." Invited chapter. Pp. 85-92 in 21st Century Criminology: A Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence, homicide rates and causality: A GMM approach to endogeneity bias."  Chapter 6, pp. 76-92 in The Sage Handbook of Criminological Research Methods, edited by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks, CA: Sage.

2012    (with Kelly Roberts) "What survey modes are most effective in eliciting self-reports of criminal or delinquent behavior?"  Pp. 415-439 in Handbook of Survey Methodology for the Social Sciences, edited by Lior Gideon.  NY: Springer.

2013    "An overview of gun control policy in the United States." Pp. 562-579 in The Criminal Justice System, 10th edition. Edited by George F. Cole and Marc G. Gertz. Wadsworth.

2014    "Deterrence: actual vs. perceived risk of punishment.  Article in Encyclopedia of Criminology and Criminal Justice.  Berlin: Springer Verlag.

2019    "The effect of firearms on suicide."  Pp. 309-329 in Gun Studies: Interdisciplinary Approaches to Politics, Policy, and Practice, edited by Jennifer Carlson, Kristin Goss, and Harel Shapira. NY: Routledge.

2019    "Gun control."  Pp. 153-166 in The Handbook of Social Control, edited by Mattieu Deflem.  Hoboken, NJ: Wiley-Blackwell.

2021    "Research on guns and crime."  Chapter in The Encyclopedia of Research Methods and Statistical Techniques in Criminology and Criminal Justice, edited by J. C. Barnes and David R. Forde for Wiley Blackwell.


BOOK REVIEWS

1978    Review of Murder in Space City: A Cultural Analysis of Houston Homicide Patterns, by Henry Lundsgaarde.  Contemporary Sociology 7:291-293.

1984    Review of Under the Gun, by James Wright et al. Contemporary Sociology 13:294-296.

1984    Review of Social Control, ed. by Jack Gibbs.  Social Forces 63: 579-581.

1985   Review of <u>Armed and Considered Dangerous</u>, by James Wright and Peter Rossi, <u>Social Forces</u> 66:1139-1140.

1988   Review of <u>The Citizen's Guide to Gun Control</u>, by Franklin Zimring and Gordon Hawkins, <u>Contemporary Sociology</u> 17:363-364.

1989   Review of <u>Sociological Justice</u>, by Donald Black, <u>Contemporary Sociology</u> 19:261-3.

1991   Review of <u>Equal Justice and the Death Penalty</u>, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  <u>Contemporary Sociology</u> 20:598-9.

1999   Review of <u>Crime is Not the Problem</u>, by Franklin E. Zimring and Gordon Hawkins.  <u>American Journal of Sociology</u> 104(5):1543-1544.

2001   Review of <u>Gun Violence: the Real Costs</u>, by Philip J. Cook and Jens Ludwig. <u>Criminal Law Bulletin</u> 37(5):544-547.

2010   Review of  <u>Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates</u>, by J. D. Monroe. <u>Criminal Justice Review</u> 35(1):118-120.


LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987   "Accidental firearm fatalities."  <u>American Journal of Public Health</u> 77:513.

1992   "Suicide in the home in relation to gun ownership." <u>The New England Journal of Medicine</u> 327:1878.

1993   "Gun ownership and crime."  <u>Canadian Medical Association Journal</u> 149:1773-1774.

1999   "Risks and benefits of gun ownership." <u>Journal of the American Medical Association</u> 282:136.

2000   (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates." <u>Journal of the American Medical Association</u> 284:2718-2719.

2001   "Violence, drugs, guns (and Switzerland)."  <u>Scientific American</u> 284(2):12.

2002   "Doubts about undercounts of gun accident deaths." <u>Injury Prevention Online</u> (September 19, 2002). Published online at <u>http://ip.bmjjournals.com/cgi/eletters</u> /8/3/252.

2005   "Firearms, violence, and self-protection."  <u>Science</u> 309:1674. September 9, 2005.

**ER_1380**

UNPUBLISHED REPORT

1987   <u>Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare</u>. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

RESEARCH FUNDING

1994   "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1997   "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between actual and perceived punishment levels.

PRESENTED PAPERS

1976   "Firearms, homicide, and the death penalty:  a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979   "The assumptions of gun control."  Presented at the annual meetings of the American Sociological Association, New York City.

1981   "Lethality comparisons between handguns and weapons which might be substituted in assault if handguns were prohibited."  Presented at the annual meetings of the American Society of Criminology, Washington, D.C.

1982   "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial discrimination."  Presented at the annual meetings of the American Society of Criminology, Toronto.

1984   "Policy lessons from recent gun control research."  Presented at the Duke University Law School Conference on Gun Control.

1985   "Policy lessons from recent gun control research." Presented at the annual meetings of the American Society of Criminology, San Diego.

1986   "Miscounting suicides."  Presented at the annual meetings of the American Sociological Association, Chicago.

1987   (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects."  Presented at the annual meetings of the American Society of Criminology, Montreal.

1988    "Suicide, guns and gun control."  Presented at the annual meetings of the Popular
        Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the annual meetings of
        the American Society of Criminology, Chicago.

1989    (with Karen McElrath)  "The impact of weaponry on human violence."
        Presented at the annual meetings of the American Sociological Association, San
        Francisco.

1989    (with Britt Patterson)  "The impact of gun control and gun ownership levels on
        city violence rates."  Presented at the annual meetings of the American Society
        of Criminology, Reno.

1990    "Guns and violence: a summary of the field."  Presented at the annual meetings
        of the American Political Science Association, Washington, D.C.

1991    "Victim resistance and weapons effects in robbery."  Presented at the annual
        meetings of the American Society of Criminology, San Francisco.

1991    "News media bias in covering gun control issues."  Presented at
        the annual meetings of the American Society of Criminology, San Francisco.

1992    "Interrupted time series designs: time for a re-evaluation."  Presented at the
        annual meetings of the American Society of Criminology, New Orleans.

1993    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using
        interrupted time series designs to evaluate social policy impact." Presented at the
        annual meetings of the American Society of Criminology, Phoenix.

1993    "Crime, culture conflict and support for gun laws: a multi-level application of the
        General Social Surveys."  Presented at the annual meetings of the
        American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-
        defense with a gun."   Presented at the annual meetings of the American Society
        of Criminology, Miami.

1995    (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban
        drug use levels and crime rates."  Presented at the annual meetings of
        the American Society of Criminology, Boston.

1996    (with Michael Hogan) "A national case-control study of homicide offending and
        gun ownership." Presented at the annual meetings of the American Society of
        Criminology, Chicago.

1997    "Evaluating the Brady Act and increasing the utility of BATF tracing data." Presented at the annual meetings of the Homicide Research Working Group, Shepherdstown, West Virginia.

1997    "Crime, collective security, and gun ownership: a multi-level application of the General Social Surveys."  Presented at the annual meetings of the American Society of Criminology, San Diego.

1998    (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of deterrence-based crime control policy."  Presented at the annual meetings of the American Society of Criminology, Washington, D.C.

1998    "Measuring macro-level gun ownership levels." Presented at the annual meetings of the American Society of Criminology, Washington, D.C.

1999    "Can owning a gun really triple the owner's chances of being murdered?" Presented at the annual meetings of the American Society of Criminology, Toronto.

2000    "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement."  Presented at the annual meetings of the American Society of Criminology, San Francisco.

2001    (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime rates."  Presented at the annual meetings of the American Society of Criminology, Atlanta.

2001    "Measures of gun ownership levels for macro-level violence research."  Presented at the annual meetings of the American Society of Criminology, Atlanta.

2002    "The effects of gun ownership levels and gun control laws on urban crime rates." Presented at the annual meetings of the American Society of Criminology, Chicago.

2003    (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends on who has them." Presented at the annual meetings of the American Society of Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence." Presented at the annual meetings of the American Society of Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in the community influence whether individuals own guns?"  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the outcomes of crime."  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "The impact of self-protection on rape completion and injury."  Presented at the annual meetings of the American Society of Criminology, Nashville.

2004    (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as psychological coercion." Presented at the annual meetings of the American Society of Criminology, Nashville.

2005    (with Jongyeon Tark) "Who resists crime?" Presented at the annual meetings of the American Society of Criminology, Toronto.

2005    (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at the annual meetings of the American Society of Criminology, Toronto.

2006    (with Shun-Yang Kevin Wang) "Organized gun trafficking, 'crime guns,' and crime rates."  Presented at the annual meetings of the American Society of Criminology, Los Angeles.

2006    "Are police officers more likely to kill black suspects?"  Presented at the annual meetings of the American Society of Criminology, Los Angeles.

2007    (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented at the annual meetings of the American Society of Criminology, Atlanta.

2007    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?" Presented at the annual meetings of the American Society of Criminology, Atlanta.

2008    (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: Is there a "collective wisdom?"  Presented at the annual meetings of the American Society of Criminology,  St. Louis.

2008    "The myth of big-time gun trafficking."  Presented at <u>UCLA Law Review</u> Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the annual meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the annual meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments."  Presented at the annual meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal victimization, and prospective gun ownership."  Presented at the annual meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011    (with Shun-young Wang) "The impact of job quality and career commitment on delinquency: conditional or universal?"  Presented at the annual meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011    (with Moonki Hong) "The short-term deterrent effect of executions on homicides in the United States, 1984-1998."  Presented at the annual meetings of the American Society of Criminology, November 16, 2011, Washington, D.C.

2011    (with Kelly Roberts)  "Which survey modes are most effective in getting people to admit illegal behaviors?"  Presented at the annual meetings of the American Society of Criminology, November 17, 2011, Washington, D.C.

2011    (with Will Hauser)  "Pick on someone your own size: do health, fitness, and size influence victim selection?" Presented at the annual meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2011    (with Tomislav Kovandzic) "Is the macro-level crime/punishment association spurious?"  Presented at the annual meetings of the American Society of Criminology, November 18, 2011, Washington, D.C.

2012    (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual meetings of the American Society of Criminology, November 15, 2012, Chicago, IL.

2013    (with Will Hauser) "Confidence in the police and fear of crime: Do police force

size and productivity matter?"  Presented at the annual meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2013.   (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual meetings of the American Society of Criminology, November 22, 2013, Atlanta, GA.

2014   (with Dylan Jackson) "Does Crime Cause Punitiveness?"  Presented at the annual meetings of the American Society of Criminology, November 20, 2014, San Francisco, CA.

2015   "The effect of large capacity magazines on the casualty counts in mass shootings."  Presented at the annual meetings of the American Society of Criminology, November 18, 2015, Washington, D.C.

2015   (with Bethany Mims) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Presented at the annual meetings of the American Society of Criminology, November 20, 2015, Washington, D.C.

2016   "Firearms and the lethality of suicide methods."  Presented at the annual meetings of the American Society of Criminology, November 16, 2016, New Orleans, L.A.

2017   "Macro-level research on the effect of firearms prevalence on suicide rates: a systematic review and new evidence."  Presented at the annual meetings of the American Society of Criminology, November 15, 2017, Philadelphia, PA.

2018   "Interstate gun movement is almost entirely due to migration, not gun trafficking." Presented at the annual meetings of the American Society of Criminology, November 16,  2018, Atlanta, GA.

2019   "What do CDC's surveys say about the prevalence of defensive gun use?" Presented at the annual meetings of the American Society of Criminology, November 13, 2019, San Francisco, CA.

2020   "Compliance with universal background check requirements."  Accepted to be presented at the annual meetings of the American Society of Criminology which were to be held in Washington, D.C., November 18-21, 2020 but were cancelled due to Covid-19 issues.

2021   "Do mass shooters favor using large-capacity magazines?"  Presented in poster form at the Annual Meeting of the American  Society of Criminology in Chicago, Illinois, November of 2021.

CHAIR

1983    Chair, session on Race and Crime.  annual meetings of the American Society of Criminology, Denver.

1989    Co-chair (with Merry Morash), roundtable session on problems in analyzing the National Crime Surveys.  annual meetings of the American Society of Criminology, Reno.

1994    Chair, session on Interrupted Time Series Designs. annual meetings of the American Society of Criminology, New Orleans.

1993    Chair, session on Guns, Gun Control, and Violence. annual meetings of the American Society of Criminology, Phoenix.

1995    Chair, session on International Drug Enforcement. annual meetings of the American Society of Criminology, Boston.

1999    Chair, Author-Meets-Critics session, More Guns, Less Crime.  annual meetings of the American Society of Criminology, Toronto.

2000    Chair, session on Defensive Weapon and Gun Use.  annual meetings of the American Society of Criminology, San Francisco.

2002    Chair, session on the Causes of Gun Crime. annual  meetings of the American Society of Criminology, Chicago.

2004    Chair, session on Protecting the Victim.  annual meetings of the American Society of Criminology, Nashville.

DISCUSSANT

1981    Session on Gun Control Legislation, annual meetings of the American Society of Criminology, Washington, D.C.

1984    Session on Criminal Sentencing, annual meetings of the American Society of Criminology, Cincinnati.

1986    Session on Sentencing, annual meetings of the American Society of Criminology, Atlanta.

1988    Session on Gun Ownership and Self-protection, annual meetings of the Popular Culture Association, Montreal.

1991    Session on Gun Control, annual meetings of the American Statistical Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, annual meetings of the American Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, annual meetings of the American Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-American and Latino Youth, by Deanna Wilkinson.  annual meetings of the American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime & Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown MD, June 4, 2007.

2009    Session on Guns and Crime, at the DeVoe Moore Center Symposium On The Economics of Crime, March 26-28, 2009.

2010    Panel discussion of news media coverage of high profile crimes
        Held at the Florida Supreme Court On September 24-25, 2012, sponsored by the Florida Bar Association as part of their 2012 Reporters' Workshop.

PROFESSIONAL SERVICE

Editorial consultant -
        American Sociological Review
        American Journal of Sociology
        Social Forces
        Social Problems
        Law and Society Review
        Journal of Research in Crime and Delinquency
        Social Science Research
        Criminology
        Journal of Quantitative Criminology
        Justice Quarterly
        Journal of Criminal Justice
        Violence and Victims
        Violence Against Women
        Journal of the American Medical Association
        New England Journal of Medicine
        American Journal of Public Health
        Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene Carte Student Paper Committee, American Society of Criminology, 1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami, November, 1994.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of Justice Quarterly, 2007.

Outside reviewer of Dr. J. Pete Blair for promotion to Full Professor in the School of Criminal Justice at Texas State University, San Marcos, 2014.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to 2016.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology,  Fall, 1987.

Member, Recruitment Committee, School of Criminology,  Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology,  Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to 2000.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-2008t.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-2008.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

**ER_1390**

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-2010.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-?.

Member, University Promotion and Tenure Committee, Fall, 2003 to ?.

Member of University Graduate Policy Committee, Fall 2003 to 2011.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2015.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006

Served as major professor on Area Paper by Christopher Rosbough, completed in 2012.

Served as member of dissertation committee of Kristen Lavin, dissertation completed in 2012.

Served as member of dissertation committee of Elizabeth Stupi, dissertation completed in 2013.

Served as outside member on two dissertation committees in 2014-2015: Brian Meehan in the Department of Economics and Adam Weinstein in the English Department.  Both dissertations were completed.

Served as major professor on Area Paper on legalization of marijuana for Pedro Juan Matos Silva, Spring 2015.  Paper completed.

Served as major professor for doctoral students, Moonki Hong who defended his dissertation on April 14, 2016.

PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,   Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, June 29, 1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 16-17, 2002, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice

Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment,"  New York City, March 9, 2012.

Invited panelist, community forum on "Students, Safety & the Second Amendment," sponsored by the <u>Tallahassee Democrat</u>.

Invited address at University of West Florida, Department of Justice Studies, titled "Guns, Self-Defense, and the Public Interest," April 12, 2013.

Member, National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-related Violence, May 2013.

Invited address at Davidson College, Davidson, NC, April 18, 2014.  Invited by the Department of Philosophy.

Public lecture, "Do Guns Cause Homicide?," Center for the Study of Liberal Democracy, University of Wisconsin-Madison, December 5, 2018.

OTHER ITEMS
    Listed in:
        Marquis Who's Who
        Marquis Who's Who in the South and Southwest
        Who's Who of Emerging Leaders in America
        Contemporary Authors
        Directory of American Scholars
        Writer's Directory

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008.  Podcast distributed

through National Public Radio.  Further details are available at
http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in <u>Florida State University Research in Review</u>, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

Named one of "25 Top Criminal Justice Professors" in the U.S. by Forensics Colleges website (http://www.forensicscolleges.com/), 2014.

**CERTIFICATE OF SERVICE**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DECLARATION OF GARY KLECK IN SUPPORT OF PLAINTIFFS'**
**SUPPLEMENTAL BRIEF; EXHIBIT 43**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

CERTIFICATE OF SERVICE

17cv1017

C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>              Plaintiffs,<br><br>       v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>              Defendant. | Case No:  17-cv-1017-BEN-JLB<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFFS' SUPPLEMENTAL BRIEF** |

1

REQUEST FOR JUDICIAL NOTICE

17cv1017

**REQUEST FOR JUDICIAL NOTICE**

Under Federal Rule of Evidence 201, Plaintiffs Virginia Duncan, Patrick Lovette, David Marguglio, and California Rifle and Pistol Association, Incorporated, respectfully request that the Court take judicial notice of the following documents in support of Plaintiffs' motion for summary judgment:

1. **Excerpts of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 110103(a)-(b), 108 Stat. 1796.** A true and correct copy of this document is attached as **Exhibit 11**. Exhibit 11 is a public record of the United States Congress that was accessed on or about March 5, 2018, from Congress.gov, the official website for U.S. federal legislative information (https://www.congress.gov/103/bills/hr3355/BILLS-103hr3355enr.pdf).

2. **Colo. Rev. Stat. §§ 18-12-301–302.** A true and correct copy of this document is attached as **Exhibit 12**. Exhibit 12 is a public record of the Colorado Legislature that was accessed on or about March 5, 2018, from Westlaw, a fully searchable online legal database.

3. **Conn. Gen. Stat. § 53-202w.** A true and correct copy of this document is attached as **Exhibit 13**. Exhibit 13 is a public record of the Connecticut Legislature that was accessed on or about March 5, 2018, from Westlaw, a fully searchable online legal database.

4. **D.C. Code § 7-2506.01(b).** A true and correct copy of this document is attached as **Exhibit 14**. Exhibit 14 is a public record of the Federal Legislature that was accessed on or about March 5, 2018, from Westlaw, a fully searchable online legal database.

5. **Haw. Rev. Stat. § 134-8(c).** A true and correct copy of this document is attached as **Exhibit 15**. Exhibit 15 is a public record of the Hawaii Legislature that was accessed on or about March 5, 2018, from Westlaw, a fully searchable online legal database.

**ER_1398**

6. **Md. Code, Crim. Law § 4-305(b).** A true and correct copy of this document is attached as **Exhibit 16**. Exhibit 16 is a public record of the Maryland Legislature that was accessed on or about March 5, 2018, from Westlaw, a fully searchable online legal database.

7. **Mass. Gen. Laws ch. 140, §§ 121, 131(a).** A true and correct copy of this document is attached as **Exhibit 17**. Exhibit 17 is a public record of the Massachusetts Legislature that was accessed on or about March 5, 2018, from Westlaw, a fully searchable online legal database.

8. **N.J. Stat. § 2C:39-1y, -3j, -9h.** A true and correct copy of this document is attached as **Exhibit 18**. Exhibit 18 is a public record of the New Jersey Legislature that was accessed on or about March 5, 2018, from Westlaw, a fully searchable online legal database.

9. **N.Y. Penal Law §§ 265.00, 265.36.** A true and correct copy of this document is attached as **Exhibit 19**. Exhibit 19 is a public record of the New York Legislature that was accessed on or about March 5, 2018, from Westlaw, a fully searchable online legal database.

10. **Vt. Stat. Ann. tit. 13, § 402.** A true and correct copy of this document is attached as **Exhibit 20**. Exhibit 20 is a public record of the Vermont Legislature that was accessed on or about November 30, 2022, from Lexis, a fully searchable online legal database.

11. **Del. Code Ann. tit. 11, § 1469(a).** A true and correct copy of this document is attached as **Exhibit 21**. Exhibit 21 is a public record of the Delaware Legislature that was accessed on or about November 30, 2022, from Lexis, a fully searchable online legal database.

12. **2022 Oregon Ballot Measure 114, Sec. 11.** A true and correct copy of this document is attached as **Exhibit 22**. Exhibit 22 is a public record of the Oregon Secretary of State that was accessed on or about November 30, 2022, from

1   https://sos.oregon.gov/admin/Documents/irr/2022/017text.pdf, the official website of

2   the Oregon Secretary of State.

3       Under the Federal Rules of Evidence, at any stage of the proceedings, the Court

4   may take judicial notice of any fact "that is not subject to reasonable dispute because

5   it ... is generally known within the trial court's territorial jurisdiction," or "can be

6   accurately and readily determined from sources whose accuracy cannot be reasonably

7   questioned." Fed. Rules Evid. 201(b), (d). A court shall take judicial notice of such a

8   fact if requested by a party and supplied with the necessary information. Fed. R. Evid.

9   201(d).

10      Judicial notice is proper because the documents for which this request is made

11  are "capable of accurate and ready determination by resort to sources who accuracy

12  cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Indeed, "[l]egislative

13  history is properly a subject of judicial notice." *Anderson v. Holder*, 673 F.3d 1089,

14  1094 n.1 (9th Cir. 2012). And "a federal court must take judicial notice of state

15  statutes 'without plea or proof.'" *Getty Petroleum Mktg., Inc. v. Capital Terminal Co.*,

16  391 F.3d 312, 323 (1st Cir. 2004) (citing *Lamar v. Micou*, 114 U.S. 218, 223 (1885)).

17      Here, the accuracy of all the public records subject to Plaintiffs' Request for

18  Judicial Notice, consisting of enacted state and federal legislation and legislative

19  history, cannot reasonably be questioned. The Court should thus judicial notice of

20  these records.

21  Dated: December 1, 2022                **MICHEL & ASSOCIATES, P.C.**

22

23                                           *s/ Anna M. Barvir*
                                            Anna M. Barvir
24                                          Email: abarvir@michellawyers.com
                                            Attorneys for Plaintiffs
25

26

27

28

                                    4
                        REQUEST FOR JUDICIAL NOTICE

                                                                            17cv1017

**ER_1400**

**EXHIBITS**

**TABLE OF CONTENTS**

| Exhibit | Description | Page |
|---------|-------------|------|
| 11 | Excerpts of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 110103(a)-(b), 108 Stat. 1796 | 000001 |
| 12 | Colo. Rev. Stat. §§ 18-12-301–302 | 000029 |
| 13 | Conn. Gen. Stat. § 53-202w | 000032 |
| 14 | D.C. Code § 7-2506.01(b) | 000036 |
| 15 | Haw. Rev. Stat. § 134-8(c) | 000039 |
| 16 | Md. Code, Crim. Law § 4-305(b) | 000042 |
| 17 | Mass. Gen. Laws ch. 140, §§ 121, 131(a) | 000045 |
| 18 | N.J. Stat. § 2C:39-1y, -3j, -9h | 000058 |
| 19 | N.Y. Penal Law §§ 265.00, 265.36 | 000067 |
| 20 | Vt. Stat. Ann. tit. 13, § 402 | 000090 |
| 21 | Del. Code Ann. tit. 11, § 1469(a) | 000095 |
| 22 | 2022 Oregon Ballot Measure 114, Sec. 11 | 000100 |

ER_1401

# EXHIBIT 11

H. R. 3355

# One Hundred Third Congress
## of the
## United States of America

### AT THE SECOND SESSION

*Begun and held at the City of Washington on Tuesday,*
*the twenty-fifth day of January, one thousand nine hundred and ninety-four*

## An Act

To control and prevent crime.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "Violent Crime Control and Law Enforcement Act of 1994".

**SEC. 2. TABLE OF CONTENTS.**

The following is the table of contents for this Act:

Sec. 1.  Short title.
Sec. 2.  Table of contents.

TITLE I—PUBLIC SAFETY AND POLICING

Sec. 10001.  Short title.
Sec. 10002.  Purposes.
Sec. 10003.  Community policing; "Cops on the Beat".

TITLE II—PRISONS

Subtitle A—Violent Offender Incarceration and Truth in Sentencing Incentive Grants

Sec. 20101.  Grants for correctional facilities.
Sec. 20102.  Truth in sentencing incentive grants.
Sec. 20103.  Violent offender incarceration grants.
Sec. 20104.  Matching requirement.
Sec. 20105.  Rules and regulations.
Sec. 20106.  Technical assistance and training.
Sec. 20107.  Evaluation.
Sec. 20108.  Definitions.
Sec. 20109.  Authorization of appropriations.

Subtitle B—Punishment for Young Offenders

Sec. 20201.  Certain punishment for young offenders.

Subtitle C—Alien Incarceration

Sec. 20301.  Incarceration of undocumented criminal aliens.

Subtitle D—Miscellaneous Provisions

Sec. 20401.  Prisoner's place of imprisonment.
Sec. 20402.  Prison impact assessments.
Sec. 20403.  Sentences to account for costs to the Government of imprisonment, release, and probation.
Sec. 20404.  Application to prisoners to which prior law applies.
Sec. 20405.  Crediting of "good time".
Sec. 20406.  Task force on prison construction standardization and techniques.
Sec. 20407.  Efficiency in law enforcement and corrections.
Sec. 20408.  Amendments to the Department of Education Organization Act and the National Literacy Act of 1991.
Sec. 20409.  Appropriate remedies for prison overcrowding.
Sec. 20410.  Congressional approval of any expansion at Lorton and congressional hearings on future needs.

000002

ER_1403

H. R. 3355—201

# TITLE X—DRUNK DRIVING PROVISIONS

**SEC. 100001. SHORT TITLE.**

This title may be cited as the "Drunk Driving Child Protection Act of 1994".

**SEC. 100002. STATE LAWS APPLIED IN AREAS OF FEDERAL JURISDICTION.**

Section 13(b) of title 18, United States Code, is amended—

(1) by striking "For purposes" and inserting "(1) Subject to paragraph (2) and for purposes"; and

(2) by adding at the end the following new paragraph:

"(2)(A) In addition to any term of imprisonment provided for operating a motor vehicle under the influence of a drug or alcohol imposed under the law of a State, territory, possession, or district, the punishment for such an offense under this section shall include an additional term of imprisonment of not more than 1 year, or if serious bodily injury of a minor is caused, not more than 5 years, or if death of a minor is caused, not more than 10 years, and an additional fine of not more than $1,000, or both, if—

"(i) a minor (other than the offender) was present in the motor vehicle when the offense was committed; and

"(ii) the law of the State, territory, possession, or district in which the offense occurred does not provide an additional term of imprisonment under the circumstances described in clause (i).

"(B) For the purposes of subparagraph (A), the term 'minor' means a person less than 18 years of age.".

**SEC. 100003. DRIVING WHILE INTOXICATED PROSECUTION PROGRAM.**

Section 501(b) of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3751) is amended—

(1) by striking "and" at the end of paragraph (20);

(2) by striking the period at the end of paragraph (21) and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(22) programs for the prosecution of driving while intoxicated charges and the enforcement of other laws relating to alcohol use and the operation of motor vehicles.".

# TITLE XI—FIREARMS

## Subtitle A—Assault Weapons

**SEC. 110101. SHORT TITLE.**

This subtitle may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

**SEC. 110102. RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS.**

(a) RESTRICTION.—Section 922 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

H. R. 3355—202

"(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed under Federal law on the date of the enactment of this subsection.

"(3) Paragraph (1) shall not apply to—

"(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

"(B) any firearm that—

"(i) is manually operated by bolt, pump, lever, or slide action;

"(ii) has been rendered permanently inoperable; or

"(iii) is an antique firearm;

"(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

"(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine. The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this subsection is in effect.

"(4) Paragraph (1) shall not apply to—

"(A) the manufacture for, transfer to, or possession by the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State, or a transfer to or possession by a law enforcement officer employed by such an entity for purposes of law enforcement (whether on or off duty);

"(B) the transfer to a licensee under title I of the Atomic Energy Act of 1954 for purposes of establishing and maintaining an on-site physical protection system and security organization required by Federal law, or possession by an employee or contractor of such licensee on-site for such purposes or off-site for purposes of licensee-authorized training or transportation of nuclear materials;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) DEFINITION OF SEMIAUTOMATIC ASSAULT WEAPON.—Section 921(a) of title 18, United States Code, is amended by adding at the end the following new paragraph:

"(30) The term 'semiautomatic assault weapon' means—

"(A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as—

"(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

"(ii) Action Arms Israeli Military Industries UZI and Galil;

"(iii) Beretta Ar70 (SC–70);

"(iv) Colt AR–15;

"(v) Fabrique National FN/FAL, FN/LAR, and FNC;

H. R. 3355—203

"(vi) SWD M–10, M–11, M–11/9, and M–12;
"(vii) Steyr AUG;
"(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and
"(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;
"(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—
"(i) a folding or telescoping stock;
"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
"(iii) a bayonet mount;
"(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and
"(v) a grenade launcher;
"(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—
"(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;
"(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;
"(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;
"(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and
"(v) a semiautomatic version of an automatic firearm; and
"(D) a semiautomatic shotgun that has at least 2 of—
"(i) a folding or telescoping stock;
"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;
"(iii) a fixed magazine capacity in excess of 5 rounds; and
"(iv) an ability to accept a detachable magazine.".

(c) PENALTIES.—
(1) VIOLATION OF SECTION 922(v).—Section 924(a)(1)(B) of such title is amended by striking "or (q) of section 922" and inserting "(r), or (v) of section 922".
(2) USE OR POSSESSION DURING CRIME OF VIOLENCE OR DRUG TRAFFICKING CRIME.—Section 924(c)(1) of such title is amended in the first sentence by inserting ", or semiautomatic assault weapon," after "short-barreled shotgun,".

(d) IDENTIFICATION MARKINGS FOR SEMIAUTOMATIC ASSAULT WEAPONS.—Section 923(i) of such title is amended by adding at the end the following: "The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured.".

**SEC. 110103. BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES.**

(a) PROHIBITION.—Section 922 of title 18, United States Code, as amended by section 110102(a), is amended by adding at the end the following new subsection:

H. R. 3355—204

"(w)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

"(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on or before the date of the enactment of this subsection.

"(3) This subsection shall not apply to—

"(A) the manufacture for, transfer to, or possession by the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State, or a transfer to or possession by a law enforcement officer employed by such an entity for purposes of law enforcement (whether on or off duty);

"(B) the transfer to a licensee under title I of the Atomic Energy Act of 1954 for purposes of establishing and maintaining an on-site physical protection system and security organization required by Federal law, or possession by an employee or contractor of such licensee on-site for such purposes or off-site for purposes of licensee-authorized training or transportation of nuclear materials;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

"(4) If a person charged with violating paragraph (1) asserts that paragraph (1) does not apply to such person because of paragraph (2) or (3), the Government shall have the burden of proof to show that such paragraph (1) applies to such person. The lack of a serial number as described in section 923(i) of title 18, United States Code, shall be a presumption that the large capacity ammunition feeding device is not subject to the prohibition of possession in paragraph (1).".

(b) DEFINITION OF LARGE CAPACITY AMMUNITION FEEDING DEVICE.—Section 921(a) of title 18, United States Code, as amended by section 110102(b), is amended by adding at the end the following new paragraph:

"(31) The term 'large capacity ammunition feeding device'—

"(A) means a magazine, belt, drum, feed strip, or similar device manufactured after the date of enactment of the Violent Crime Control and Law Enforcement Act of 1994 that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; but

"(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.".

(c) PENALTY.—Section 924(a)(1)(B) of title 18, United States Code, as amended by section 110102(c)(1), is amended by striking "or (v)" and inserting "(v), or (w)".

(d) IDENTIFICATION MARKINGS FOR LARGE CAPACITY AMMUNITION FEEDING DEVICES.—Section 923(i) of title 18, United States Code, as amended by section 110102(d) of this Act, is amended by adding at the end the following: "A large capacity ammunition

H. R. 3355—205

feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.''.

**SEC. 110104. STUDY BY ATTORNEY GENERAL.**

(a) STUDY.—The Attorney General shall investigate and study the effect of this subtitle and the amendments made by this subtitle, and in particular shall determine their impact, if any, on violent and drug trafficking crime. The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment of this Act.

(b) REPORT.—Not later than 30 months after the date of enactment of this Act, the Attorney General shall prepare and submit to the Congress a report setting forth in detail the findings and determinations made in the study under subsection (a).

**SEC. 110105. EFFECTIVE DATE.**

This subtitle and the amendments made by this subtitle—

(1) shall take effect on the date of the enactment of this Act; and

(2) are repealed effective as of the date that is 10 years after that date.

**SEC. 110106. APPENDIX A TO SECTION 922 OF TITLE 18.**

Section 922 of title 18, United States Code, is amended by adding at the end the following appendix:

### "APPENDIX A

#### Centerfire Rifles—Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle
Browning BAR Mark II Safari Magnum Rifle
Browning High-Power Rifle
Heckler & Koch Model 300 Rifle
Iver Johnson M–1 Carbine
Iver Johnson 50th Anniversary M–1 Carbine
Marlin Model 9 Camp Carbine
Marlin Model 45 Carbine
Remington Nylon 66 Auto-Loading Rifle
Remington Model 7400 Auto Rifle
Remington Model 7400 Rifle
Remington Model 7400 Special Purpose Auto Rifle
Ruger Mini-14 Autoloading Rifle (w/o folding stock)
Ruger Mini Thirty Rifle

#### Centerfire Rifles—Lever & Slide

Browning Model 81 BLR Lever-Action Rifle
Browning Model 81 Long Action BLR
Browning Model 1886 Lever-Action Carbine
Browning Model 1886 High Grade Carbine
Cimarron 1860 Henry Replica
Cimarron 1866 Winchester Replicas
Cimarron 1873 Short Rifle
Cimarron 1873 Sporting Rifle
Cimarron 1873 30″ Express Rifle
Dixie Engraved 1873 Rifle
E.M.F. 1866 Yellowboy Lever Actions
E.M.F. 1860 Henry Rifle
E.M.F. Model 73 Lever-Action Rifle
Marlin Model 336CS Lever-Action Carbine
Marlin Model 30AS Lever-Action Carbine
Marlin Model 444SS Lever-Action Sporter
Marlin Model 1894S Lever-Action Carbine

H. R. 3355—206

Marlin Model 1894CS Carbine
Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action
Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rilfe
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

**Centerfire Rifles—Bolt Action**

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle
KDF K15 American Bolt-Action Rifle
Krico Model 600 Bolt-Action Rifle

H. R. 3355—207

Krico Model 700 Bolt-Action Rifles
Mauser Model 66 Bolt-Action Rifle
Mauser Model 99 Bolt-Action Rifle
McMillan Signature Classic Sporter
McMillan Signature Super Varminter
McMillan Signature Alaskan
McMillan Signature Titanium Mountain Rifle
McMillan Classic Stainless Sporter
McMillan Talon Safari Rifle
McMillan Talon Sporter Rifle
Midland 1500S Survivor Rifle
Navy Arms TU–33/40 Carbine
Parker-Hale Model 81 Classic Rifle
Parker-Hale Model 81 Classic African Rifle
Parker-Hale Model 1000 Rifle
Parker-Hale Model 1100M African Magnum
Parker-Hale Model 1100 Lightweight Rifle
Parker-Hale Model 1200 Super Rifle
Parker-Hale Model 1200 Super Clip Rifle
Parker-Hale Model 1300C Scout Rifle
Parker-Hale Model 2100 Midland Rifle
Parker-Hale Model 2700 Lightweight Rifle
Parker-Hale Model 2800 Midland Rifle
Remington Model Seven Bolt-Action Rifle
Remington Model Seven Youth Rifle
Remington Model Seven Custom KS
Remington Model Seven Custom MS Rifle
Remington 700 ADL Bolt-Action Rifle
Remington 700 BDL Bolt-Action Rifle
Remington 700 BDL Varmint Special
Remington 700 BDL European Bolt-Action Rifle
Remington 700 Varmint Synthetic Rifle
Remington 700 BDL SS Rifle
Remington 700 Stainless Synthetic Rifle
Remington 700 MTRSS Rifle
Remington 700 BDL Left Hand
Remington 700 Camo Synthetic Rifle
Remington 700 Safari
Remington 700 Mountain Rifle
Remington 700 Custom KS Mountain Rifle
Remington 700 Classic Rifle
Ruger M77 Mark II Rifle
Ruger M77 Mark II Magnum Rifle
Ruger M77RL Ultra Light
Ruger M77 Mark II All-Weather Stainless Rifle
Ruger M77 RSI International Carbine
Ruger M77 Mark II Express Rifle
Ruger M77VT Target Rifle
Sako Hunter Rifle
Sako Fiberclass Sporter
Sako Safari Grade Bolt Action
Sako Hunter Left-Hand Rifle
Sako Classic Bolt Action
Sako Hunter LS Rifle
Sako Deluxe Lightweight
Sako Super Deluxe Sporter
Sako Mannlicher-Style Carbine
Sako Varmint Heavy Barrel
Sako TRG–S Bolt-Action Rifle
Sauer 90 Bolt-Action Rifle
Savage 110G Bolt-Action Rifle
Savage 110CY Youth/Ladies Rifle
Savage 110WLE One of One Thousand Limited Edition Rifle
Savage 110GXP3 Bolt-Action Rifle
Savage 110F Bolt-Action Rifle
Savage 110FXP3 Bolt-Action Rifle
Savage 110GV Varmint Rifle
Savage 112FV Varmint Rifle
Savage Model 112FVS Varmint Rifle
Savage Model 112BV Heavy Barrel Varmint Rifle
Savage 116FSS Bolt-Action Rifle
Savage Model 116FSK Kodiak Rifle

H. R. 3355—208

Savage 110FP Police Rifle
Steyr-Mannlicher Sporter Models SL, L, M, S, S/T
Steyr-Mannlicher Luxus Model L, M, S
Steyr-Mannlicher Model M Professional Rifle
Tikka Bolt-Action Rifle
Tikka Premium Grade Rifles
Tikka Varmint/Continental Rifle
Tikka Whitetail/Battue Rifle
Ultra Light Arms Model 20 Rifle
Ultra Light Arms Model 28, Model 40 Rifles
Voere VEC 91 Lightning Bolt-Action Rifle
Voere Model 2165 Bolt-Action Rifle
Voere Model 2155, 2150 Bolt-Action Rifles
Weatherby Mark V Deluxe Bolt-Action Rifle
Weatherby Lasermark V Rifle
Weatherby Mark V Crown Custom Rifles
Weatherby Mark V Sporter Rifle
Weatherby Mark V Safari Grade Custom Rifles
Weatherby Weathermark Rifle
Weatherby Weathermark Alaskan Rifle
Weatherby Classicmark No. 1 Rifle
Weatherby Weatherguard Alaskan Rifle
Weatherby Vanguard VGX Deluxe Rifle
Weatherby Vanguard Classic Rifle
Weatherby Vanguard Classic No. 1 Rifle
Weatherby Vanguard Weatherguard Rifle
Wichita Classic Rifle
Wichita Varmint Rifle
Winchester Model 70 Sporter
Winchester Model 70 Sporter WinTuff
Winchester Model 70 SM Sporter
Winchester Model 70 Stainless Rifle
Winchester Model 70 Varmint
Winchester Model 70 Synthetic Heavy Varmint Rifle
Winchester Model 70 DBM Rifle
Winchester Model 70 DBM–S Rifle
Winchester Model 70 Featherweight
Winchester Model 70 Featherweight WinTuff
Winchester Model 70 Featherweight Classic
Winchester Model 70 Lightweight Rifle
Winchester Ranger Rifle
Winchester Model 70 Super Express Magnum
Winchester Model 70 Super Grade
Winchester Model 70 Custom Sharpshooter
Winchester Model 70 Custom Sporting Sharpshooter Rifle

**Centerfire Rifles—Single Shot**

Armsport 1866 Sharps Rifle, Carbine
Brown Model One Single Shot Rifle
Browning Model 1885 Single Shot Rifle
Dakota Single Shot Rifle
Desert Industries G–90 Single Shot Rifle
Harrington & Richardson Ultra Varmint Rifle
Model 1885 High Wall Rifle
Navy Arms Rolling Block Buffalo Rifle
Navy Arms #2 Creedmoor Rifle
Navy Arms Sharps Cavalry Carbine
Navy Arms Sharps Plains Rifle
New England Firearms Handi-Rifle
Red Willow Armory Ballard No. 5 Pacific
Red Willow Armory Ballard No. 1.5 Hunting Rifle
Red Willow Armory Ballard No. 8 Union Hill Rifle
Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable

H. R. 3355—209

C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

### Drillings, Combination Guns, Double Rifles

Beretta Express SSO O/U Double Rifles
Beretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifle
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling
Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

### Rimfire Rifles—Autoloaders

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle
Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle
Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR–7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

### Rimfire Rifles—Lever & Slide Action

Browning BL–22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM–321 Pump Rifle
Rossi Model 62 SA Pump Rifle

H. R. 3355—210

Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles—Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher Rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle
Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM–452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60–J–ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Espronceda IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT–22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU–KKW Training Rifle
Navy Arms TU–33/40 Carbine
Navy Arms TU–KKW Sniper Trainer
Norinco JW–27 Bolt-Action Rifle
Norinco JW–15 Bolt-Action Rifle
Remington 541–T
Remington 40–XR Rimfire Custom Sporter
Remington 541–T HB Bolt-Action Rifle
Remington 581–S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light Arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

### Competition Rifles—Centerfire & Rimfire

Anschutz 64–MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Intermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle
Anschutz 1910 Super Match II
Anschutz 54.18MS Silhouette Rifle
Anschutz Super Match 54 Target Model 2013
Anschutz Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP–1 ISU Standard Rifle

H. R. 3355—211

E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86–SR Specialty Rifle
McMillan M–86 Sniper Rifle
McMillan Combo M–87/M–88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M–89 Sniper Rifle
McMillan National Match Rifle
McMillan Long Range Rifle
Parker-Hale M–87 Target Rifle
Parker-Hale M–85 Sniper Rifle
Remington 40–XB Rangemaster Target Centerfire
Remington 40–XR KS Rimfire Position Rifle
Remington 40–XBBR KS
Remington 40–XC KS National Match Course Rifle
Sako TRG–21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG–UIT Rifle
Steyr-Mannlicher SSG P–I Rifle
Steyr-Mannlicher SSG P–III Rifle
Steyr-Mannlicher SSG P–IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

**Shotguns—Autoloaders**

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A–303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun
Browning BSA 10 Stalker Auto Shotgun
Browning A–500R Auto Shotgun
Browning A–500G Auto Shotgun
Browning A–500G Sporting Clays
Browning Auto-5 Light 12 and 20
Browning Auto-5 Stalker
Browning Auto-5 Magnum 20
Browning Auto-5 Magnum 12
Churchill Turkey Automatic Shotgun
Cosmi Automatic Shotgun
Maverick Model 60 Auto Shotgun
Mossberg Model 5500 Shotgun
Mossberg Model 9200 Regal Semi-Auto Shotgun
Mossberg Model 9200 USST Auto Shotgun
Mossberg Model 9200 Camo Shotgun
Mossberg Model 6000 Auto Shotgun
Remington Model 1100 Shotgun
Remington 11–87 Premier Shotgun
Remington 11–87 Sporting Clays
Remington 11–87 Premier Skeet

H. R. 3355—212

Remington 11–87 Premier Trap
Remington 11–87 Special Purpose Magnum
Remington 11–87 SPS–T Camo Auto Shotgun
Remington 11–87 Special Purpose Deer Gun
Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun
Remington 11–87 SPS-Deer Shotgun
Remington 11–87 Special Purpose Synthetic Camo
Remington SP–10 Magnum-Camo Auto Shotgun
Remington SP–10 Magnum Auto Shotgun
Remington SP–10 Magnum Turkey Combo
Remington 1100 LT–20 Auto
Remington 1100 Special Field
Remington 1100 20-Gauge Deer Gun
Remington 1100 LT–20 Tournament Skeet
Winchester Model 1400 Semi-Auto Shotgun

## Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS Pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586–VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun
Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS–BG-Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun
Remington 879 SPS Special Purpose Magnum
Remington 870 SPS–T Camo Pump Shotgun
Remington 870 Special Field
Remington 870 Express Turkey
Remington 870 High Grades
Remington 870 Express
Remington Model 870 Express Youth Gun
Winchester Model 12 Pump Shotgun
Winchester Model 42 High Grade Shotgun
Winchester Model 1300 Walnut Pump
Winchester Model 1300 Slug Hunter Deer Gun
Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun
Winchester Model 1300 Turkey Gun
Winchester Model 1300 Ranger Pump Gun

## Shotguns—Over/Unders

American Arms/Franchi Falconet 2000 O/U
American Arms Silver I O/U
American Arms Silver II Shotgun
American Arms Silver Skeet O/U
American Arms/Franchi Sporting 2000 O/U
American Arms Silver Sporting O/U
American Arms Silver Trap O/U

H. R. 3355—213

American Arms WS/OU 12, TS/OU 12 Shotguns
American Arms WT/OU 10 Shotgun
Armsport 2700 O/U Goose Gun
Armsport 2700 Series O/U
Armsport 2900 Tri-Barrel Shotgun
Baby Bretton Over/Under Shotgun
Beretta Model 686 Ultralight O/U
Beretta ASE 90 Competition O/U Shotgun
Beretta Over/Under Field Shotguns
Beretta Onyx Hunter Sport O/U Shotgun
Beretta Model SO5, SO6, SO9 Shotguns
Beretta Sporting Clay Shotguns
Beretta 687EL Sporting O/U
Beretta 682 Super Sporting O/U
Beretta Series 682 Competition Over/Unders
Browning Citori O/U Shotgun
Browning Superlight Citori Over/Under
Browning Lightning Sporting Clays
Browning Micro Citori Lightning
Browning Citori Plus Trap Combo
Browning Citori Plus Trap Gun
Browning Citori O/U Skeet Models
Browning Citori O/U Trap Models
Browning Special Sporting Clays
Browning Citori GTI Sporting Clays
Browning 325 Sporting Clays
Chapuis Over/Under Shotgun
Centurion Over/Under Shotgun
Connecticut Valley Classics Classic Sporter O/U
Connecticut Valley Classics Classic Field Waterfowler
Charles Daly Field Grade O/U
Charles Daly Lux Over/Under
E.A.A./Sabatti Sporting Clays Pro-Gold O/U
E.A.A/Sabatti Falcon-Mon Over/Under
Kassnar Grade I O/U Shotgun
Krieghoff K–80 Sporting Clays O/U
Krieghoff K–80 Skeet Shotgun
Krieghoff K–80 International Skeet
Krieghoff K–80 Four-Barrel Skeet Set
Krieghoff K–80/RT Shotguns
Krieghoff K–80 O/U Trap Shotgun
Laurona Silhouette 300 Sporting Clays
Laurona Silhouette 300 Trap
Laurona Super Model Over/Unders
Ljutic LM–6 Deluxe O/U Shotgun
Marocchi Conquista Over/Under Shotgun
Marocchi Avanza O/U Shotgun
Merkel Model 200E O/U Shotgun
Merkel Model 200E Skeet, Trap Over/Unders
Merkel Model 203E, 303E Over/Under Shotguns
Perazzi Mirage Special Sporting O/U
Perazzi Mirage Special Four-Gauge Skeet
Perazzi Sporting Classic O/U
Perazzi MX7 Over/Under Shotguns
Perazzi Mirage Special Skeet Over/Under
Perazzi MX8/MX8 Special Trap, Skeet
Perazzi MX8/20 Over/Under Shotgun
Perazzi MX9 Single Over/Under Shotguns
Perazzi MX12 Hunting Over/Under
Perazzi MX28, MX410 Game O/U Shotguns
Perazzi MX20 Hunting Over/Under
Piotti Boss Over/Under Shotgun
Remington Peerless Over/Under Shotgun
Ruger Red Label O/U Shotgun
Ruger Sporting Clays O/U Shotgun
San Marco 12-Ga. Wildflower Shotgun
San Marco Field Special O/U Shotgun
San Marco 10-Ga. O/U Shotgun
SKB Model 505 Deluxe Over/Under Shotgun
SKB Model 685 Over/Under Shotgun
SKB Model 885 Over/Under Trap, Skeet, Sporting Clays
Stoeger/IGA Condor I O/U Shotgun

H. R. 3355—214

Stoeger/IGA ERA 2000 Over/Under Shotgun
Techni-Mec Model 610 Over/Under
Tikka Model 412S Field Grade Over/Under
Weatherby Athena Grade IV O/U Shotguns
Weatherby Athena Grade V Classic Field O/U
Weatherby Orion O/U Shotguns
Weatherby II, III Classic Field O/Us
Weatherby Orion II Classic Sporting Clays O/U
Weatherby Orion II Sporting Clays O/U
Winchester Model 1001 O/U Shotgun
Winchester Model 1001 Sporting Clays O/U
Pietro Zanoletti Model 2000 Field O/U

### Shotguns—Side by Sides

American Arms Brittany Shotgun
American Arms Gentry Double Shotgun
American Arms Derby Side-by-Side
American Arms Grulla #2 Double Shotgun
American Arms WS/SS 10
American Arms TS/SS 10 Double Shotgun
American Arms TS/SS 12 Side-by-Side
Arrieta Sidelock Double Shotguns
Armsport 1050 Series Double Shotguns
Arizaga Model 31 Double Shotgun
AYA Boxlock Shotguns
AYA Sidelock Double Shotguns
Beretta Model 452 Sidelock Shotgun
Beretta Side-by-Side Field Shotguns
Crucelegui Hermanos Model 150 Double
Chapuis Side-by-Side Shotgun
E.A.A./Sabatti Saba-Mon Double Shotgun
Charles Daly Model Dss Double
Ferlib Model F VII Double Shotgun
Auguste Francotte Boxlock Shotgun
Auguste Francotte Sidelock Shotgun
Garbi Model 100 Double
Garbi Model 101 Side-by-Side
Garbi Model 103A, B Side-by-Side
Garbi Model 200 Side-by-Side
Bill Hanus Birdgun Doubles
Hatfield Uplander Shotgun
Merkel Model 8, 47E Side-by-Side Shotguns
Merkel Model 47LSC Sporting Clays Double
Merkel Model 47S, 147S Side-by-Sides
Parker Reproductions Side-by-Side
Piotti King No. 1 Side-by-Side
Piotti Lunik Side-by-Side
Piotti King Extra Side-by-Side
Piotti Piuma Side-by-Side
Precision Sports Model 600 Series Doubles
Rizzini Boxlock Side-by-Side
Rizzini Sidelock Side-by-Side
Stoeger/IGA Uplander Side-by-Side Shotgun
Ugartechea 10-Ga. Magnum Shotgun

### Shotguns—Bolt Actions & Single Shots

Armsport Single Barrel Shotgun
Browning BT–99 Competition Trap Special
Browning BT–99 Plus Trap Gun
Browning BT–99 Plus Micro
Browning Recoilless Trap Shotgun
Browning Micro Recoilless Trap Shotgun
Desert Industries Big Twenty Shotgun
Harrington & Richardson Topper Model 098
Harrington & Richardson Topper Classic Youth Shotgun
Harrington & Richardson N.W.T.F. Turkey Mag
Harrington & Richardson Topper Deluxe Model 098
Krieghoff KS–5 Trap Gun
Krieghoff KS–5 Special
Krieghoff K–80 Single Barrel Trap Gun
Ljutic Mono Gun Single Barrel

H. R. 3355—215

Ljutic LTX Super Deluxe Mono Gun
Ljutic Recoilless Space Gun Shotgun
Marlin Model 55 Goose Gun Bolt Action
New England Firearms Turkey and Goose Gun
New England Firearms N.W.T.F. Shotgun
New England Firearms Tracker Slug Gun
New England Firearms Standard Pardner
New England Firearms Survival Gun
Perazzi TM1 Special Single Trap
Remington 90–T Super Single Shotgun
Snake Charmer II Shotgun
Stoeger/IGA Reuna Single Barrel Shotgun
Thompson/Center TCR '87 Hunter Shotgun.".

## Subtitle B—Youth Handgun Safety

### SEC. 110201. PROHIBITION OF THE POSSESSION OF A HANDGUN OR AMMUNITION BY, OR THE PRIVATE TRANSFER OF A HANDGUN OR AMMUNITION TO, A JUVENILE.

(a) OFFENSE.—Section 922 of title 18, United States Code, as amended by section 110103(a), is amended by adding at the end the following new subsection:

"(x)(1) It shall be unlawful for a person to sell, deliver, or otherwise transfer to a person who the transferor knows or has reasonable cause to believe is a juvenile—

"(A) a handgun; or

"(B) ammunition that is suitable for use only in a handgun.

"(2) It shall be unlawful for any person who is a juvenile to knowingly possess—

"(A) a handgun; or

"(B) ammunition that is suitable for use only in a handgun.

"(3) This subsection does not apply to—

"(A) a temporary transfer of a handgun or ammunition to a juvenile or to the possession or use of a handgun or ammunition by a juvenile if the handgun and ammunition are possessed and used by the juvenile—

"(i) in the course of employment, in the course of ranching or farming related to activities at the residence of the juvenile (or on property used for ranching or farming at which the juvenile, with the permission of the property owner or lessee, is performing activities related to the operation of the farm or ranch), target practice, hunting, or a course of instruction in the safe and lawful use of a handgun;

"(ii) with the prior written consent of the juvenile's parent or guardian who is not prohibited by Federal, State, or local law from possessing a firearm, except—

"(I) during transportation by the juvenile of an unloaded handgun in a locked container directly from the place of transfer to a place at which an activity described in clause (i) is to take place and transportation by the juvenile of that handgun, unloaded and in a locked container, directly from the place at which such an activity took place to the transferor; or

"(II) with respect to ranching or farming activities as described in clause (i), a juvenile may possess and use a handgun or ammunition with the prior written approval of the juvenile's parent or legal guardian and at the direction of an adult who is not prohibited

H. R. 3355—216

by Federal, State or local law from possessing a fire-arm;

"(iii) the juvenile has the prior written consent in the juvenile's possession at all times when a handgun is in the possession of the juvenile; and

"(iv) in accordance with State and local law;

"(B) a juvenile who is a member of the Armed Forces of the United States or the National Guard who possesses or is armed with a handgun in the line of duty;

"(C) a transfer by inheritance of title (but not possession) of a handgun or ammunition to a juvenile; or

"(D) the possession of a handgun or ammunition by a juvenile taken in defense of the juvenile or other persons against an intruder into the residence of the juvenile or a residence in which the juvenile is an invited guest.

"(4) A handgun or ammunition, the possession of which is transferred to a juvenile in circumstances in which the transferor is not in violation of this subsection shall not be subject to permanent confiscation by the Government if its possession by the juvenile subsequently becomes unlawful because of the conduct of the juvenile, but shall be returned to the lawful owner when such handgun or ammunition is no longer required by the Government for the purposes of investigation or prosecution.

"(5) For purposes of this subsection, the term 'juvenile' means a person who is less than 18 years of age.

"(6)(A) In a prosecution of a violation of this subsection, the court shall require the presence of a juvenile defendant's parent or legal guardian at all proceedings.

"(B) The court may use the contempt power to enforce subparagraph (A).

"(C) The court may excuse attendance of a parent or legal guardian of a juvenile defendant at a proceeding in a prosecution of a violation of this subsection for good cause shown.".

(b) PENALTIES.—Section 924(a) of title 18, United States Code, is amended—

(1) in paragraph (1) by striking "paragraph (2) or (3) of"; and

(2) by adding at the end the following new paragraph:

"(5)(A)(i) A juvenile who violates section 922(x) shall be fined under this title, imprisoned not more than 1 year, or both, except that a juvenile described in clause (ii) shall be sentenced to probation on appropriate conditions and shall not be incarcerated unless the juvenile fails to comply with a condition of probation.

"(ii) A juvenile is described in this clause if—

"(I) the offense of which the juvenile is charged is possession of a handgun or ammunition in violation of section 922(x)(2); and

"(II) the juvenile has not been convicted in any court of an offense (including an offense under section 922(x) or a similar State law, but not including any other offense consisting of conduct that if engaged in by an adult would not constitute an offense) or adjudicated as a juvenile delinquent for conduct that if engaged in by an adult would constitute an offense.

"(B) A person other than a juvenile who knowingly violates section 922(x)—

"(i) shall be fined under this title, imprisoned not more than 1 year, or both; and

H. R. 3355—217

"(ii) if the person sold, delivered, or otherwise transferred a handgun or ammunition to a juvenile knowing or having reasonable cause to know that the juvenile intended to carry or otherwise possess or discharge or otherwise use the handgun or ammunition in the commission of a crime of violence, shall be fined under this title, imprisoned not more than 10 years, or both.".

(c) TECHNICAL AMENDMENT OF JUVENILE DELINQUENCY PROVISIONS IN TITLE 18, UNITED STATES CODE.—

(1) SECTION 5031.—Section 5031 of title 18, United States Code, is amended by inserting "or a violation by such a person of section 922(x)" before the period at the end.

(2) SECTION 5032.—Section 5032 of title 18, United States Code, is amended—

(A) in the first undesignated paragraph by inserting "or (x)" after "922(p)"; and

(B) in the fourth undesignated paragraph by inserting "or section 922(x) of this title," before "criminal prosecution on the basis".

(d) TECHNICAL AMENDMENT OF THE JUVENILE JUSTICE AND DELINQUENCY PREVENTION ACT OF 1974.—Section 223(a)(12)(A) of the Juvenile Justice and Delinquency Prevention Act of 1974 (42 U.S.C. 5633(a)(12)(A)) is amended by striking "which do not constitute violations of valid court orders" and inserting "(other than an offense that constitutes a violation of a valid court order or a violation of section 922(x) of title 18, United States Code, or a similar State law)."

(e) MODEL LAW.—The Attorney General, acting through the Director of the National Institute for Juvenile Justice and Delinquency Prevention, shall—

(1) evaluate existing and proposed juvenile handgun legislation in each State;

(2) develop model juvenile handgun legislation that is constitutional and enforceable;

(3) prepare and disseminate to State authorities the findings made as the result of the evaluation; and

(4) report to Congress by December 31, 1995, findings and recommendations concerning the need or appropriateness of further action by the Federal Government.

## Subtitle C—Licensure

### SEC. 110301. FIREARMS LICENSURE AND REGISTRATION TO REQUIRE A PHOTOGRAPH AND FINGERPRINTS.

(a) FIREARMS LICENSURE.—Section 923(a) of title 18, United States Code, is amended in the second sentence by inserting "and shall include a photograph and fingerprints of the applicant" before the period.

(b) REGISTRATION.—Section 5802 of the Internal Revenue Code of 1986 is amended by inserting after the first sentence the following: "An individual required to register under this section shall include a photograph and fingerprints of the individual with the initial application.".

H. R. 3355—218

### SEC. 110302. COMPLIANCE WITH STATE AND LOCAL LAW AS A CONDITION TO LICENSE.

Section 923(d)(1) of title 18, United States Code, is amended—
(1) by striking "and" at the end of subparagraph (D);
(2) by striking the period at the end of subparagraph (E) and inserting "; and"; and
(3) by adding at the end the following new subparagraph:
"(F) the applicant certifies that—
"(i) the business to be conducted under the license is not prohibited by State or local law in the place where the licensed premise is located;
"(ii)(I) within 30 days after the application is approved the business will comply with the requirements of State and local law applicable to the conduct of the business; and
"(II) the business will not be conducted under the license until the requirements of State and local law applicable to the business have been met; and
"(iii) that the applicant has sent or delivered a form to be prescribed by the Secretary, to the chief law enforcement officer of the locality in which the premises are located, which indicates that the applicant intends to apply for a Federal firearms license.".

### SEC. 110303. ACTION ON FIREARMS LICENSE APPLICATION.

Section 923(d)(2) of title 18, United States Code, is amended by striking "forty-five-day" and inserting "60-day".

### SEC. 110304. INSPECTION OF FIREARMS LICENSEES' INVENTORY AND RECORDS.

Section 923(g)(1)(B)(ii) of title 18, United States Code, is amended to read as follows:
"(ii) for ensuring compliance with the record keeping requirements of this chapter—
"(I) not more than once during any 12-month period; or
"(II) at any time with respect to records relating to a firearm involved in a criminal investigation that is traced to the licensee.".

### SEC. 110305. REPORTS OF THEFT OR LOSS OF FIREARMS.

Section 923(g) of title 18, United States Code, is amended by adding at the end the following new paragraph:
"(6) Each licensee shall report the theft or loss of a firearm from the licensee's inventory or collection, within 48 hours after the theft or loss is discovered, to the Secretary and to the appropriate local authorities.".

### SEC. 110306. RESPONSES TO REQUESTS FOR INFORMATION.

Section 923(g) of title 18, United States Code, as amended by section 110405, is amended by adding at the end the following new paragraph:
"(7) Each licensee shall respond immediately to, and in no event later than 24 hours after the receipt of, a request by the Secretary for information contained in the records required to be kept by this chapter as may be required for determining the disposition of 1 or more firearms in the course of a bona fide criminal investigation. The requested information

H. R. 3355—219

shall be provided orally or in writing, as the Secretary may require. The Secretary shall implement a system whereby the licensee can positively identify and establish that an individual requesting information via telephone is employed by and authorized by the agency to request such information.".

**SEC. 110307. NOTIFICATION OF NAMES AND ADDRESSES OF FIREARMS LICENSEES.**

Section 923 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(l) The Secretary of the Treasury shall notify the chief law enforcement officer in the appropriate State and local jurisdictions of the names and addresses of all persons in the State to whom a firearms license is issued.".

## Subtitle D—Domestic Violence

**SEC. 110401. PROHIBITION AGAINST DISPOSAL OF FIREARMS TO, OR RECEIPT OF FIREARMS BY, PERSONS WHO HAVE COMMITTED DOMESTIC ABUSE.**

(a) INTIMATE PARTNER DEFINED.—Section 921(a) of title 18, United States Code, as amended by section 110103(b), is amended by inserting at the end the following new paragraph:

"(32) The term 'intimate partner' means, with respect to a person, the spouse of the person, a former spouse of the person, an individual who is a parent of a child of the person, and an individual who cohabitates or has cohabited with the person.".

(b) PROHIBITION AGAINST DISPOSAL OF FIREARMS.—Section 922(d) of title 18, United States Code, is amended—

(1) by striking "or" at the end of paragraph (6);

(2) by striking the period at the end of paragraph (7) and inserting "; or"; and

(3) by inserting after paragraph (7) the following new paragraph:

"(8) is subject to a court order that restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child, except that this paragraph shall only apply to a court order that—

"(A) was issued after a hearing of which such person received actual notice, and at which such person had the opportunity to participate; and

"(B)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

"(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury.".

(c) PROHIBITION AGAINST RECEIPT OF FIREARMS.—Section 922(g) of title 18, United States Code, is amended—

(1) by striking "or" at the end of paragraph (6);

(2) by inserting "or" at the end of paragraph (7); and

(3) by inserting after paragraph (7) the following:

H. R. 3355—220

"(8) who is subject to a court order that—
"(A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
"(B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
"(C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or
"(ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury,".

(d) STORAGE OF FIREARMS.—Section 926(a) of title 18, United States Code, is amended—
(1) by striking "and" at the end of paragraph (1);
(2) by striking the period at the end of paragraph (2) and inserting "; and"; and
(3) by inserting after paragraph (2) the following:
"(3) regulations providing for effective receipt and secure storage of firearms relinquished by or seized from persons described in subsection (d)(8) or (g)(8) of section 922.".

(e) RETURN OF FIREARMS.—Section 924(d)(1) of title 18, United States Code, is amended by striking "the seized" and inserting "or lapse of or court termination of the restraining order to which he is subject, the seized or relinquished".

## Subtitle E—Gun Crime Penalties

### SEC. 110501. ENHANCED PENALTY FOR USE OF A SEMIAUTOMATIC FIREARM DURING A CRIME OF VIOLENCE OR A DRUG TRAFFICKING CRIME.

(a) AMENDMENT TO SENTENCING GUIDELINES.—Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall amend its sentencing guidelines to provide an appropriate enhancement of the punishment for a crime of violence (as defined in section 924(c)(3) of title 18, United States Code) or a drug trafficking crime (as defined in section 924(c)(2) of title 18, United States Code) if a semiautomatic firearm is involved.

(b) SEMIAUTOMATIC FIREARM.—In subsection (a), "semiautomatic firearm" means any repeating firearm that utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round and that requires a separate pull of the trigger to fire each cartridge.

### SEC. 110502. ENHANCED PENALTY FOR SECOND OFFENSE OF USING AN EXPLOSIVE TO COMMIT A FELONY.

Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall promulgate amendments to the sentencing guidelines to appropriately enhance penalties in a case in which a defendant convicted

H. R. 3355—221

under section 844(h) of title 18, United States Code, has previously been convicted under that section.

## SEC. 110503. SMUGGLING FIREARMS IN AID OF DRUG TRAFFICKING.

Section 924 of title 18, United States Code, as amended by section 60013, is amended by adding at the end the following new subsection:

"(j) A person who, with intent to engage in or to promote conduct that—

"(1) is punishable under the Controlled Substances Act (21 U.S.C. 801 et seq.), the Controlled Substances Import and Export Act (21 U.S.C. 951 et seq.), or the Maritime Drug Law Enforcement Act (46 U.S.C. App. 1901 et seq.);

"(2) violates any law of a State relating to any controlled substance (as defined in section 102 of the Controlled Substances Act, 21 U.S.C. 802); or

"(3) constitutes a crime of violence (as defined in subsection (c)(3),

smuggles or knowingly brings into the United States a firearm, or attempts to do so, shall be imprisoned not more than 10 years, fined under this title, or both.".

## SEC. 110504. THEFT OF FIREARMS AND EXPLOSIVES.

(a) FIREARMS.—Section 924 of title 18, United States Code, as amended by section 110203(a), is amended by adding at the end the following new subsection:

"(k) A person who steals any firearm which is moving as, or is a part of, or which has moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both.".

(b) EXPLOSIVES.—Section 844 of title 18, United States Code, is amended by adding at the end the following new subsection:

"(k) A person who steals any explosives materials which are moving as, or are a part of, or which have moved in, interstate or foreign commerce shall be imprisoned for not more than 10 years, fined under this title, or both.".

## SEC. 110505. REVOCATION OF SUPERVISED RELEASE AFTER IMPRIS-ONMENT.

Section 3583 of title 18, United States Code, is amended—

(1) in subsection (d) by striking "possess illegal controlled substances" and inserting "unlawfully possess a controlled substance";

(2) in subsection (e)—

(A) by striking "person" each place such term appears in such subsection and inserting "defendant"; and

(B) by amending paragraph (3) to read as follows:

"(3) revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation or supervised release, finds by a preponderance of the evidence that the defendant violated a condition of supervised release, except that a defendant whose term is revoked under this paragraph may not be required to serve more than 5 years in prison if the offense that resulted in

H. R. 3355—222

the term of supervised release is a class A felony, more than 3 years in prison if such offense is a class B felony, more than 2 years in prison if such offense is a class C or D felony, or more than one year in any other case; or''; and

(3) by striking subsection (g) and inserting the following:

''(g) MANDATORY REVOCATION FOR POSSESSION OF CONTROLLED SUBSTANCE OR FIREARM OR FOR REFUSAL TO COMPLY WITH DRUG TESTING.—If the defendant—

"(1) possesses a controlled substance in violation of the condition set forth in subsection (d);

"(2) possesses a firearm, as such term is defined in section 921 of this title, in violation of Federal law, or otherwise violates a condition of supervised release prohibiting the defendant from possessing a firearm; or

"(3) refuses to comply with drug testing imposed as a condition of supervised release;

the court shall revoke the term of supervised release and require the defendant to serve a term of imprisonment not to exceed the maximum term of imprisonment authorized under subsection (e)(3).

''(h) SUPERVISED RELEASE FOLLOWING REVOCATION.—When a term of supervised release is revoked and the defendant is required to serve a term of imprisonment that is less than the maximum term of imprisonment authorized under subsection (e)(3), the court may include a requirement that the defendant be placed on a term of supervised release after imprisonment. The length of such a term of supervised release shall not exceed the term of supervised release authorized by statute for the offense that resulted in the original term of supervised release, less any term of imprisonment that was imposed upon revocation of supervised release.

''(i) DELAYED REVOCATION.—The power of the court to revoke a term of supervised release for violation of a condition of supervised release, and to order the defendant to serve a term of imprisonment and, subject to the limitations in subsection (h), a further term of supervised release, extends beyond the expiration of the term of supervised release for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation.''.

## SEC. 110506. REVOCATION OF PROBATION.

(a) IN GENERAL.—Section 3565(a) of title 18, United States Code, is amended—

(1) in paragraph (2) by striking "impose any other sentence that was available under subchapter A at the time of the initial sentencing" and inserting "resentence the defendant under subchapter A"; and

(2) by striking the last sentence.

(b) MANDATORY REVOCATION.—Section 3565(b) of title 18, United States Code, is amended to read as follows:

''(b) MANDATORY REVOCATION FOR POSSESSION OF CONTROLLED SUBSTANCE OR FIREARM OR REFUSAL TO COMPLY WITH DRUG TESTING.—If the defendant—

"(1) possesses a controlled substance in violation of the condition set forth in section 3563(a)(3);

"(2) possesses a firearm, as such term is defined in section 921 of this title, in violation of Federal law, or otherwise violates

H. R. 3355—223

a condition of probation prohibiting the defendant from possessing a firearm; or

"(3) refuses to comply with drug testing, thereby violating the condition imposed by section 3563(a)(4),

the court shall revoke the sentence of probation and resentence the defendant under subchapter A to a sentence that includes a term of imprisonment.".

**SEC. 110507. INCREASED PENALTY FOR KNOWINGLY MAKING FALSE, MATERIAL STATEMENT IN CONNECTION WITH THE ACQUISITION OF A FIREARM FROM A LICENSED DEALER.**

Section 924(a) of title 18, United States Code, is amended—

(1) in subsection (a)(1)(B) by striking "(a)(6),"; and

(2) in subsection (a)(2) by inserting "(a)(6)," after "subsections".

**SEC. 110508. POSSESSION OF EXPLOSIVES BY FELONS AND OTHERS.**

Section 842(i) of title 18, United States Code, is amended by inserting "or possess" after "to receive".

**SEC. 110509. SUMMARY DESTRUCTION OF EXPLOSIVES SUBJECT TO FORFEITURE.**

Section 844(c) of title 18, United States Code, is amended—

(1) by inserting "(1)" after "(c)"; and

(2) by adding at the end the following new paragraphs:

"(2) Notwithstanding paragraph (1), in the case of the seizure of any explosive materials for any offense for which the materials would be subject to forfeiture in which it would be impracticable or unsafe to remove the materials to a place of storage or would be unsafe to store them, the seizing officer may destroy the explosive materials forthwith. Any destruction under this paragraph shall be in the presence of at least 1 credible witness. The seizing officer shall make a report of the seizure and take samples as the Secretary may by regulation prescribe.

"(3) Within 60 days after any destruction made pursuant to paragraph (2), the owner of (including any person having an interest in) the property so destroyed may make application to the Secretary for reimbursement of the value of the property. If the claimant establishes to the satisfaction of the Secretary that—

"(A) the property has not been used or involved in a violation of law; or

"(B) any unlawful involvement or use of the property was without the claimant's knowledge, consent, or willful blindness,

the Secretary shall make an allowance to the claimant not exceeding the value of the property destroyed.".

**SEC. 110510. ELIMINATION OF OUTMODED LANGUAGE RELATING TO PAROLE.**

(a) SECTION 924(e)(1) OF TITLE 18.—Section 924(e)(1) of title 18, United States Code, is amended by striking ", and such person shall not be eligible for parole with respect to the sentence imposed under this subsection".

(b) SECTION 924(c)(1) OF TITLE 18.—Section 924(c)(1) of title 18, United States Code, is amended by striking "No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed under this subsection.".

H. R. 3355—224

### SEC. 110511. PROHIBITION AGAINST TRANSACTIONS INVOLVING STOLEN FIREARMS WHICH HAVE MOVED IN INTERSTATE OR FOREIGN COMMERCE.

Section 922(j) of title 18, United States Code, is amended to read as follows:

"(j) It shall be unlawful for any person to receive, possess, conceal, store, barter, sell, or dispose of any stolen firearm or stolen ammunition, or pledge or accept as security for a loan any stolen firearm or stolen ammunition, which is moving as, which is a part of, which constitutes, or which has been shipped or transported in, interstate or foreign commerce, either before or after it was stolen, knowing or having reasonable cause to believe that the firearm or ammunition was stolen.".

### SEC. 110512. USING A FIREARM IN THE COMMISSION OF COUNTERFEITING OR FORGERY.

Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall amend its sentencing guidelines to provide an appropriate enhancement of the punishment for a defendant convicted of a felony under chapter 25 of title 18, United States Code, if the defendant used or carried a firearm (as defined in section 921(a)(3) of title 18, United States Code) during and in relation to the felony.

### SEC. 110513. ENHANCED PENALTIES FOR FIREARMS POSSESSION BY VIOLENT FELONS AND SERIOUS DRUG OFFENDERS.

Pursuant to its authority under section 994 of title 28, United States Code, the United States Sentencing Commission shall amend its sentencing guidelines to—

(1) appropriately enhance penalties in cases in which a defendant convicted under section 922(g) of title 18, United States Code, has 1 prior conviction by any court referred to in section 922(g)(1) of title 18 for a violent felony (as defined in section 924(e)(2)(B) of that title) or a serious drug offense (as defined in section 924(e)(2)(A) of that title); and

(2) appropriately enhance penalties in cases in which such a defendant has 2 prior convictions for a violent felony (as so defined) or a serious drug offense (as so defined).

### SEC. 110514. RECEIPT OF FIREARMS BY NONRESIDENT.

Section 922(a) of title 18, United States Code, is amended—

(1) by striking "and" at the end of paragraph (7);

(2) by striking the period at the end of paragraph (8) and inserting "; and"; and

(3) by adding at the end the following new paragraph:

"(9) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, who does not reside in any State to receive any firearms unless such receipt is for lawful sporting purposes.".

### SEC. 110515. THEFT OF FIREARMS OR EXPLOSIVES FROM LICENSEE.

(a) FIREARMS.—Section 924 of title 18, United States Code, as amended by section 110504(a), is amended by adding at the end the following new subsection:

"(l) A person who steals any firearm from a licensed importer, licensed manufacturer, licensed dealer, or licensed collector shall be fined under this title, imprisoned not more than 10 years, or both.".

H. R. 3355—225

(b) EXPLOSIVES.—Section 844 of title 18, United States Code, as amended by section 110204(b), is amended by adding at the end the following new subsection:

"(l) A person who steals any explosive material from a licensed importer, licensed manufacturer, or licensed dealer, or from any permittee shall be fined under this title, imprisoned not more than 10 years, or both.".

### SEC. 110516. DISPOSING OF EXPLOSIVES TO PROHIBITED PERSONS.

Section 842(d) of title 18, United States Code, is amended by striking "licensee" and inserting "person".

### SEC. 110517. INCREASED PENALTY FOR INTERSTATE GUN TRAFFICKING.

Section 924 of title 18, United States Code, as amended by section 110515(a), is amended by adding at the end the following new subsection:

"(m) A person who, with the intent to engage in conduct that constitutes a violation of section 922(a)(1)(A), travels from any State or foreign country into any other State and acquires, or attempts to acquire, a firearm in such other State in furtherance of such purpose shall be imprisoned for not more than 10 years.".

### SEC. 110518. FIREARMS AND EXPLOSIVES CONSPIRACY.

(a) FIREARMS.—Section 924 of title 18, United States Code, as amended by section 110517(a), is amended by adding at the end the following new subsection:

"(n) A person who conspires to commit an offense under subsection (c) shall be imprisoned for not more than 20 years, fined under this title, or both; and if the firearm is a machinegun or destructive device, or is equipped with a firearm silencer or muffler, shall be imprisoned for any term of years or life.".

(b) EXPLOSIVES.—Section 844 of title 18, United States Code, as amended by section 110515(b), is amended by adding at the end the following new subsection:

"(m) A person who conspires to commit an offense under subsection (h) shall be imprisoned for any term of years not exceeding 20, fined under this title, or both.

### SEC. 110519. DEFINITION OF ARMOR PIERCING AMMUNITION.

Section 921(a)(17) of title 18, United States Code, is amended by revising subparagraph (B) and adding a new subparagraph (C) to read as follows:

"(B) The term 'armor piercing ammunition' means—

"(i) a projectile or projectile core which may be used in a handgun and which is constructed entirely (excluding the presence of traces of other substances) from one or a combination of tungsten alloys, steel, iron, brass, bronze, beryllium copper, or depleted uranium; or

"(ii) a full jacketed projectile larger than .22 caliber designed and intended for use in a handgun and whose jacket has a weight of more than 25 percent of the total weight of the projectile.

"(C) The term 'armor piercing ammunition' does not include shotgun shot required by Federal or State environmental or game regulations for hunting purposes, a frangible projectile designed for target shooting, a projectile which the Secretary finds is primarily intended to be used for sporting purposes,

H. R. 3355—226

or any other projectile or projectile core which the Secretary finds is intended to be used for industrial purposes, including a charge used in an oil and gas well perforating device.''.

# TITLE XII—TERRORISM

### SEC. 120001. EXTENSION OF THE STATUTE OF LIMITATION FOR CERTAIN TERRORISM OFFENSES.

(a) IN GENERAL.—Chapter 213 of title 18, United States Code, is amended by inserting after section 3285 the following new section:

## "§ 3286. Extension of statute of limitation for certain terrorism offenses

"Notwithstanding section 3282, no person shall be prosecuted, tried, or punished for any offense involving a violation of section 32 (aircraft destruction), section 36 (airport violence), section 112 (assaults upon diplomats), section 351 (crimes against Congressmen or Cabinet officers), section 1116 (crimes against diplomats), section 1203 (hostage taking), section 1361 (willful injury to government property), section 1751 (crimes against the President), section 2280 (maritime violence), section 2281 (maritime platform violence), section 2331 (terrorist acts abroad against United States nationals), section 2339 (use of weapons of mass destruction), or section 2340A (torture) of this title or section 46502, 46504, 46505, or 46506 of title 49, unless the indictment is found or the information is instituted within 8 years after the offense was committed.''.

(b) APPLICATION OF AMENDMENT.—The amendment made by subsection (a) shall not apply to any offense committed more than 5 years prior to the date of enactment of this Act.

(c) TECHNICAL AMENDMENT.—The chapter analysis for chapter 213 of title 18, United States Code, is amended by inserting after the item relating to section 3285 the following new item:

"3286. Extension of statute of limitation for certain terrorism offenses.''.

### SEC. 120002. JURISDICTION OVER CRIMES AGAINST UNITED STATES NATIONALS ON CERTAIN FOREIGN SHIPS.

Section 7 of title 18, United States Code (relating to the special maritime and territorial jurisdiction of the United States), is amended by inserting at the end thereof the following new paragraph:

"(8) To the extent permitted by international law, any foreign vessel during a voyage having a scheduled departure from or arrival in the United States with respect to an offense committed by or against a national of the United States.''.

### SEC. 120003. COUNTERFEITING UNITED STATES CURRENCY ABROAD.

(a) IN GENERAL.—Chapter 25 of title 18, United States Code, is amended by adding before section 471 the following new section:

## "§ 470. Counterfeit acts committed outside the United States

"A person who, outside the United States, engages in the act of—

"(1) making, dealing, or possessing any counterfeit obligation or other security of the United States; or

"(2) making, dealing, or possessing any plate, stone, or other thing, or any part thereof, used to counterfeit such obligation or security,

# EXHIBIT 12

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 87 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17749   Page 35 of
118
§ 18-12-301. Definitions, CO ST § 18-12-301

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Colorado Revised Statutes Annotated
   Title 18. Criminal Code (Refs & Annos)
      Article 12. Offenses Relating to Firearms and Weapons (Refs & Annos)
         Part 3. Large-Capacity Ammunition Magazines

C.R.S.A. § 18-12-301

§ 18-12-301. Definitions

Effective: July 1, 2013
Currentness

As used in this part 3, unless the context otherwise requires:

(1) "Bureau" means the Colorado bureau of investigation created and existing pursuant to section 24-33.5-401, C.R.S.

(2)(a) "Large-capacity magazine" means:

(I) A fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition;

(II) A fixed, tubular shotgun magazine that holds more than twenty-eight inches of shotgun shells, including any extension device that is attached to the magazine and holds additional shotgun shells; or

(III) A nontubular, detachable magazine, box, drum, feed strip, or similar device that is capable of accepting more than eight shotgun shells when combined with a fixed magazine.

(b) "Large-capacity magazine" does not mean:

(I) A feeding device that has been permanently altered so that it cannot accommodate more than fifteen rounds of ammunition;

(II) An attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition; or

(III) A tubular magazine that is contained in a lever-action firearm.

**Credits**
Added by Laws 2013, Ch. 48, § 1, eff. July 1, 2013.

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 88 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17750   Page 36 of
118
§ 18-12-301. Definitions, CO ST § 18-12-301

C. R. S. A. § 18-12-301, CO ST § 18-12-301

Current through Ch. 2 of the Second Regular Session of the 71st General Assembly (2018)

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 13

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 90 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17752   Page 38 of 118
§ 53-202w. Large capacity magazines. Definitions. Sale, transfer..., CT ST § 53-202w

---

Connecticut General Statutes Annotated
  Title 53. Crimes (Refs & Annos)
    Chapter 943. Offenses Against Public Peace and Safety

C.G.S.A. § 53-202w

§ 53-202w. Large capacity magazines. Definitions. Sale, transfer or possession prohibited. Exceptions

Effective: June 18, 2013
Currentness

(a) As used in this section and section 53-202x:

(1) "Large capacity magazine" means any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is contained in a lever-action firearm, or (D) a magazine that is permanently inoperable;

(2) "Lawfully possesses", with respect to a large capacity magazine, means that a person has (A) actual and lawful possession of the large capacity magazine, (B) constructive possession of the large capacity magazine pursuant to a lawful purchase of a firearm that contains a large capacity magazine that was transacted prior to or on April 4, 2013, regardless of whether the firearm was delivered to the purchaser prior to or on April 4, 2013, which lawful purchase is evidenced by a writing sufficient to indicate that (i) a contract for sale was made between the parties prior to or on April 4, 2013, for the purchase of the firearm, or (ii) full or partial payment for the firearm was made by the purchaser to the seller of the firearm prior to or on April 4, 2013, or (C) actual possession under subparagraph (A) of this subdivision, or constructive possession under subparagraph (B) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes; and

(3) "Licensed gun dealer" means a person who has a federal firearms license and a permit to sell firearms pursuant to section 29-28.

(b) Except as provided in this section, on and after April 5, 2013, any person who, within this state, distributes, imports into this state, keeps for sale, offers or exposes for sale, or purchases a large capacity magazine shall be guilty of a class D felony. On and after April 5, 2013, any person who, within this state, transfers a large capacity magazine, except as provided in subsection (f) of this section, shall be guilty of a class D felony.

(c) Except as provided in this section and section 53-202x: (1) Any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained prior to April 5, 2013, shall commit an infraction and be fined not more than ninety dollars for a first offense and shall be guilty of a class D felony for any subsequent offense, and (2) any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained on or after April 5, 2013, shall be guilty of a class D felony.

(d) A large capacity magazine may be possessed, purchased or imported by:

000033
ER_1434

§ 53-202w. Large capacity magazines. Definitions. Sale, transfer..., CT ST § 53-202w

(1) The Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States;

(2) A sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty;

(3) A member of the military or naval forces of this state or of the United States;

(4) A nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility;

(5) Any person who is sworn and acts as a policeman on behalf of an armored car service pursuant to section 29-20 in the discharge of such person's official duties; or

(6) Any person, firm or corporation engaged in the business of manufacturing large capacity magazines in this state that manufactures, purchases, tests or transports large capacity magazines in this state for sale within this state to persons specified in subdivisions (1) to (5), inclusive, of this subsection or for sale outside this state, or a federally-licensed firearm manufacturer engaged in the business of manufacturing firearms or large capacity magazines in this state that manufactures, purchases, tests or transports firearms or large capacity magazines in this state for sale within this state to persons specified in subdivisions (1) to (5), inclusive, of this subsection or for sale outside this state.

(e) A large capacity magazine may be possessed by:

(1) A licensed gun dealer;

(2) A gunsmith who is in a licensed gun dealer's employ, who possesses such large capacity magazine for the purpose of servicing or repairing a lawfully possessed large capacity magazine;

(3) A person, firm, corporation or federally-licensed firearm manufacturer described in subdivision (6) of subsection (d) of this section that possesses a large capacity magazine that is lawfully possessed by another person for the purpose of servicing or repairing the large capacity magazine;

000034

ER_1435

§ 53-202w. Large capacity magazines. Definitions. Sale, transfer..., CT ST § 53-202w

(4) Any person who has declared possession of the magazine pursuant to section 53-202x; or

(5) Any person who is the executor or administrator of an estate that includes a large capacity magazine, or the trustee of a trust that includes a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 53-202x, which is disposed of as authorized by the Probate Court, if the disposition is otherwise permitted by this section and section 53-202x.

(f) Subsection (b) of this section shall not prohibit:

(1) The transfer of a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 53-202x, by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary;

(2) The transfer of a large capacity magazine to a police department or the Department of Emergency Services and Public Protection;

(3) The transfer of a large capacity magazine to a licensed gun dealer in accordance with section 53-202x; or

(4) The transfer of a large capacity magazine prior to October 1, 2013, from a licensed gun dealer, pawnbroker licensed under section 21-40, or consignment shop operator, as defined in section 21-39a, to any person who (A) possessed the large capacity magazine prior to or on April 4, 2013, (B) placed a firearm that such person legally possessed, with the large capacity magazine included or attached, in the possession of such dealer, pawnbroker or operator prior to or on April 4, 2013, pursuant to an agreement between such person and such dealer, pawnbroker or operator for the sale of the firearm to a third person, and (C) is eligible to possess the firearm on the date of such transfer.

(g) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection (h) of section 29-33.

**Credits**
(2013, P.A. 13-3, § 23, eff. April 4, 2013; 2013, P.A. 13-220, § 1, eff. June 18, 2013.)

Notes of Decisions (3)

C. G. S. A. § 53-202w, CT ST § 53-202w
The statutes and Constitution are current through the 2018 Supplement to the General Statutes of Connecticut, Revision of 1958.

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 14

§ 7-2506.01. Persons permitted to possess ammunition., DC CODE § 7-2506.01

---

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedPrior Version Held Unconstitutional as Applied by Herrington v. U.S., D.C., Nov. 04, 2010

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

> West's District of Columbia Code Annotated 2001 Edition
>  Division I. Government of District.
>   Title 7. Human Health Care and Safety. (Refs & Annos)
>    Subtitle J. Public Safety.
>     Chapter 25. Firearms Control.
>      Unit A. Firearms Control Regulations.
>       Subchapter VI. Possession of Ammunition.

DC ST § 7-2506.01
Formerly cited as DC ST 1981 §6-2361

§ 7-2506.01. Persons permitted to possess ammunition.

Effective: April 27, 2013
Currentness

(a) No person shall possess ammunition in the District of Columbia unless:

(1) He is a licensed dealer pursuant to subchapter IV of this unit;

(2) He is an officer, agent, or employee of the District of Columbia or the United States of America, on duty and acting within the scope of his duties when possessing such ammunition;

(3) He is the holder of the valid registration certificate for a firearm pursuant to subchapter II of this chapter; except, that no such person shall possess one or more restricted pistol bullets; or

(4) He holds an ammunition collector's certificate on September 24, 1976; or

(5) He temporarily possesses ammunition while participating in a firearms training and safety class conducted by a firearms instructor.

(b) No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

---

§ 7-2506.01. Persons permitted to possess ammunition., DC CODE § 7-2506.01

**Credits**

(Sept. 24, 1976, D.C. Law 1-85, title VI, § 601, 23 DCR 2464; Mar. 16, 1978, D.C. Law 2-62, § 2, 24 DCR 5780; Aug. 2, 1983, D.C. Law 5-19, § 4, 30 DCR 3328; Mar. 31, 2009, D.C. Law 17-372, § 3(n), 56 DCR 1365; Sept. 26, 2012, D.C. Law 19-170, § 2(n), 59 DCR 5691; Apr. 27, 2013, D.C. Law 19-295, § 2(c), 60 DCR 2623.)

Notes of Decisions (51)

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2018 Thomson Reuters

DC CODE § 7-2506.01

Current through February 20, 2018

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 15

§ 134-8. Ownership, etc., of automatic firearms, silencers, etc., ..., HI ST § 134-8

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-8

§ 134-8. Ownership, etc., of automatic firearms, silencers, etc., prohibited; penalties

Currentness

(a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134-4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; cannons; mufflers, silencers, or devices for deadening or muffling the sound of discharged firearms; hand grenades, dynamite, blasting caps, bombs, or bombshells, or other explosives; or any type of ammunition or any projectile component thereof coated with teflon or any other similar coating designed primarily to enhance its capability to penetrate metal or pierce protective armor; and any type of ammunition or any projectile component thereof designed or intended to explode or segment upon impact with its target.

(b) Any person who installs, removes, or alters a firearm part with the intent to convert the firearm to an automatic firearm shall be deemed to have manufactured an automatic firearm in violation of subsection (a).

(c) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of detachable ammunition magazines with a capacity in excess of ten rounds which are designed for or capable of use with a pistol is prohibited. This subsection shall not apply to magazines originally designed to accept more than ten rounds of ammunition which have been modified to accept no more than ten rounds and which are not capable of being readily restored to a capacity of more than ten rounds.

(d) Any person violating subsection (a) or (b) shall be guilty of a class C felony and shall be imprisoned for a term of five years without probation. Any person violating subsection (c) shall be guilty of a misdemeanor except when a detachable magazine prohibited under this section is possessed while inserted into a pistol in which case the person shall be guilty of a class C felony.

**Credits**
Laws 1988, ch. 275, § 2; Laws 1989, ch. 261, § 6; Laws 1989, ch. 263, § 4; Laws 1992, ch. 286, §§ 3, 4.

Notes of Decisions (13)

H R S § 134-8, HI ST § 134-8
Current through Act 3 (End) of the 2017 1st Special Session, pending text revision by the revisor of statutes.

000040

**§ 134-8. Ownership, etc., of automatic firearms, silencers, etc..., HI ST § 134-8**

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

000041

ER_1442

# EXHIBIT 16

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 100 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17762   Page 48 of
118
§ 4-305. Detachable magazines--Prohibited, MD CRIM LAW § 4-305

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedValidity Called into Doubt by Kolbe v. Hogan, 4th Cir.(Md.), Feb. 04, 2016

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

West's Annotated Code of Maryland
   Criminal Law (Refs & Annos)
      Title 4. Weapon Crimes
         Subtitle 3. Assault Weapons and Detachable Magazines (Refs & Annos)

MD Code, Criminal Law, § 4-305
Formerly cited as MD CODE Art. 27, § 36H-5

§ 4-305. Detachable magazines--Prohibited

Effective: October 1, 2013
Currentness

**Scope**

(a) This section does not apply to:

(1) a .22 caliber rifle with a tubular magazine; or

(2) a law enforcement officer or a person who retired in good standing from service with a law enforcement agency of the United States, the State, or any law enforcement agency in the State.

**Prohibited**

(b) A person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm.

**Credits**
Added by Acts 2002, c. 26, § 2, eff. Oct. 1, 2002. Amended by Acts 2013, c. 427, § 1, eff. Oct. 1, 2013.

**Formerly** Art. 27, § 36H-5.

**Editors' Notes**

**LEGISLATIVE NOTES**

Revisor's Note (Acts 2002, c. 26):

This section is new language derived without substantive change from former Art. 27, § 36H-5(b).

The former reference to "any type of" firearm is deleted as surplusage.

**§ 4-305. Detachable magazines--Prohibited, MD CRIM LAW § 4-305**

Defined term: "Person" § 1-101

Notes of Decisions (8)

MD Code, Criminal Law, § 4-305, MD CRIM LAW § 4-305
Current through Chapters 1 to 4 from the 2018 Regular Session of the General Assembly

---

**End of Document**  © 2018 Thomson Reuters. No claim to original U.S. Government Works.

000044

ER_1445

# EXHIBIT 17

§ 121. Firearms sales; definitions; antique firearms; application of..., MA ST 140 § 121

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedPrior Version Held Unconstitutional by Com. v. Beal, Mass., May 24, 2016

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XX. Public Safety and Good Order (Ch. 133-148a)
      Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 121

§ 121. Firearms sales; definitions; antique firearms; application of law; exceptions

Effective: February 1, 2018
Currentness

As used in sections 122 to 131Q, inclusive, the following words shall, unless the context clearly requires otherwise, have
the following meanings:--

"Ammunition", cartridges or cartridge cases, primers (igniter), bullets or propellant powder designed for use in any
firearm, rifle or shotgun. The term "ammunition" shall also mean tear gas cartridges.

"Assault weapon", shall have the same meaning as a semiautomatic assault weapon as defined in the federal Public Safety
and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(30) as appearing in such section on September
13, 1994, and shall include, but not be limited to, any of the weapons, or copies or duplicates of the weapons, of any
caliber, known as: (i) Avtomat Kalashnikov (AK) (all models); (ii) Action Arms Israeli Military Industries UZI and
Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M-10,
M-11, M-11/9 and M-12; (vi) Steyr AUG; (vii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (viii) revolving cylinder
shotguns, such as, or similar to, the Street Sweeper and Striker 12; provided, however, that the term assault weapon
shall not include: (i) any of the weapons, or replicas or duplicates of such weapons, specified in appendix A to 18 U.S.C.
section 922 as appearing in such appendix on September 13, 1994, as such weapons were manufactured on October 1,
1993; (ii) any weapon that is operated by manual bolt, pump, lever or slide action; (iii) any weapon that has been rendered
permanently inoperable or otherwise rendered permanently unable to be designated a semiautomatic assault weapon;
(iv) any weapon that was manufactured prior to the year 1899; (v) any weapon that is an antique or relic, theatrical
prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon
and cannot be readily modified through a combination of available parts into an operable assault weapon; (vi) any
semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition; or (vii)
any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.

<[ Definition of "Bump stock" inserted following definition of "Assault weapon" in first paragraph
by 2017, 110, Sec. 18 effective February 1, 2018 applicable as provided by 2017, 110, Sec. 53.]>

"Bump stock", any device for a weapon that increases the rate of fire achievable with such weapon by using energy from
the recoil of the weapon to generate a reciprocating action that facilitates repeated activation of the trigger.

"Conviction", a finding or verdict of guilt or a plea of guilty, whether or not final sentence is imposed.

000046
ER_1447

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 104 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17766   Page 52 of
§ 121. Firearms sales; definitions; antique firearms; application of..., MA ST 140 § 121
118

"Deceptive weapon device", any device that is intended to convey the presence of a rifle, shotgun or firearm that is used in the commission of a violent crime, as defined in this section, and which presents an objective threat of immediate death or serious bodily harm to a person of reasonable and average sensibility.

"Firearm", a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured; provided, however, that the term firearm shall not include any weapon that is: (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette-lighters or cigarette-packages; or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk- through metal detectors.

"Gunsmith", any person who engages in the business of repairing, altering, cleaning, polishing, engraving, blueing or performing any mechanical operation on any firearm, rifle, shotgun or machine gun.

"Imitation firearm", any weapon which is designed, manufactured or altered in such a way as to render it incapable of discharging a shot or bullet.

"Large capacity feeding device", (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber ammunition.

"Large capacity weapon", any firearm, rifle or shotgun: (i) that is semiautomatic with a fixed large capacity feeding device; (ii) that is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device; (iii) that employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm; or (iv) that is an assault weapon. The term "large capacity weapon" shall be a secondary designation and shall apply to a weapon in addition to its primary designation as a firearm, rifle or shotgun and shall not include: (i) any weapon that was manufactured in or prior to the year 1899; (ii) any weapon that operates by manual bolt, pump, lever or slide action; (iii) any weapon that is a single-shot weapon; (iv) any weapon that has been modified so as to render it permanently inoperable or otherwise rendered permanently unable to be designated a large capacity weapon; or (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable large capacity weapon.

"Length of barrel" or "barrel length", that portion of a firearm, rifle, shotgun or machine gun through which a shot or bullet is driven, guided or stabilized and shall include the chamber.

"Licensing authority", the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them.

<[ Definition of "Machine gun" in first paragraph effective until
February 1, 2018. For text effective February 1, 2018, see below.]>

"Machine gun", a weapon of any description, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged by one continuous activation of the trigger, including a submachine gun.

000047
ER_1448

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 105 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17767   Page 53 of 118
§ 121. Firearms sales; definitions; antique firearms; application of..., MA ST 140 § 121

<[ Definition of "Machine gun" in first paragraph as amended by 2017, 110, Sec. 20 effective February 1, 2018 applicable as provided by 2017, 110, Sec. 53. For text effective until February 1, 2018, see above.]>

"Machine gun", a weapon of any description, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged by one continuous activation of the trigger, including a submachine gun; provided, however, that "machine gun" shall include bump stocks and trigger cranks.

"Purchase" and "sale" shall include exchange; the word "purchaser" shall include exchanger; and the verbs "sell" and "purchase", in their different forms and tenses, shall include the verb exchange in its appropriate form and tense.

"Rifle", a weapon having a rifled bore with a barrel length equal to or greater than 16 inches and capable of discharging a shot or bullet for each pull of the trigger.

"Sawed-off shotgun", any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon as modified has one or more barrels less than 18 inches in length or as modified has an overall length of less than 26 inches.

"Semiautomatic", capable of utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round, and requiring a separate pull of the trigger to fire each cartridge.

"Shotgun", a weapon having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length equal to or greater than 26 inches, and capable of discharging a shot or bullet for each pull of the trigger.

<[ Definition of "Trigger crank" inserted following definition of "Shotgun" in first paragraph by 2017, 110, Sec. 19 effective February 1, 2018 applicable as provided by 2017, 110, Sec. 53.]>

"Trigger crank", any device to be attached to a weapon that repeatedly activates the trigger of the weapon through the use of a lever or other part that is turned in a circular motion; provided, however, that "trigger crank" shall not include any weapon initially designed and manufactured to fire through the use of a crank or lever.

"Violent crime", shall mean any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile delinquency involving the use or possession of a deadly weapon that would be punishable by imprisonment for such term if committed by an adult, that: (i) has as an element the use, attempted use or threatened use of physical force or a deadly weapon against the person of another; (ii) is burglary, extortion, arson or kidnapping; (iii) involves the use of explosives; or (iv) otherwise involves conduct that presents a serious risk of physical injury to another.

"Weapon", any rifle, shotgun or firearm.

Where the local licensing authority has the power to issue licenses or cards under this chapter, but no such licensing authority exists, any resident or applicant may apply for such license or firearm identification card directly to the colonel of state police and said colonel shall for this purpose be the licensing authority.

The provisions of sections 122 to 129D, inclusive, and sections 131, 131A, 131B and 131E shall not apply to:

(A) any firearm, rifle or shotgun manufactured in or prior to the year 1899;

000048

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17768   Page 54 of
118
§ 121. Firearms sales; definitions; antique firearms; application of..., MA ST 140 § 121

(B) any replica of any firearm, rifle or shotgun described in clause (A) if such replica: (i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition; or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; and

(C) manufacturers or wholesalers of firearms, rifles, shotguns or machine guns.

**Credits**
Amended by St.1934, c. 359, § 1; St.1957, c. 688, § 4; St.1959, c. 296, § 1; St.1960, c. 186; St.1968, c. 737, § 1; St.1969, c. 799, § 1; St.1971, c. 456, § 1; St.1973, c. 892, § 1; St.1983, c. 516, § 1; St.1984, c. 116, § 1; St.1989, c. 433; St.1990, c. 511, § 1; St.1996, c. 151, §§ 300, 301; St.1998, c. 180, § 8; St.1999, c. 1, § 1; St.2004, c. 150, §§ 1 to 3, eff. Sept. 13, 2004; St.2014, c. 284, §§ 19, eff. Jan. 1, 2015; St.2014, c. 284, §§ 20, 21, eff. Aug. 13, 2014; St.2017, c. 110, §§ 18 to 20, eff. Feb. 1, 2018.

Notes of Decisions (97)

M.G.L.A. 140 § 121, MA ST 140 § 121
Current through the 2017 1st Annual Session

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

§ 131. Licenses to carry firearms; Class A and B; conditions...   MA ST 140 § 131

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedPrior Version Held Unconstitutional by Fletcher v. Haas, D.Mass., Mar. 30, 2012

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

Massachusetts General Laws Annotated
  Part I. Administration of the Government (Ch. 1-182)
    Title XX. Public Safety and Good Order (Ch. 133-148a)
      Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 131

§ 131. Licenses to carry firearms; Class A and B; conditions and restrictions

Effective: February 1, 2018 to December 31, 2020
Currentness

All licenses to carry firearms shall be designated Class A or Class B, and the issuance and possession of any such license shall be subject to the following conditions and restrictions:

(a) A Class A license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper; and (ii) rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper. A violation of a restriction imposed by the licensing authority under the provisions of this paragraph shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that the provisions of section 10 of chapter 269 shall not apply to such violation.

The colonel of state police may, after an investigation, grant a Class A license to a club or facility with an on-site shooting range or gallery, which club is incorporated under the laws of the commonwealth for the possession, storage and use of large capacity weapons, ammunition therefor and large capacity feeding devices for use with such weapons on the premises of such club; provided, however, that not less than one shareholder of such club shall be qualified and suitable to be issued such license; and provided further, that such large capacity weapons and ammunition feeding devices may be used under such Class A club license only by such members that possess a valid firearm identification card issued under section 129B or a valid Class A or Class B license to carry firearms, or by such other persons that the club permits while under the direct supervision of a certified firearms safety instructor or club member who, in the case of a large capacity firearm, possesses a valid Class A license to carry firearms or, in the case of a large capacity rifle or shotgun, possesses a valid Class A or Class B license to carry firearms. Such club shall not permit shooting at targets that depict human figures, human effigies, human silhouettes or any human images thereof, except by public safety personnel performing in line with their official duties.

No large capacity weapon or large capacity feeding device shall be removed from the premises except for the purposes of: (i) transferring such firearm or feeding device to a licensed dealer; (ii) transporting such firearm or feeding device to a licensed gunsmith for repair; (iii) target, trap or skeet shooting on the premises of another club incorporated under the laws of the commonwealth and for transporting thereto; (iv) attending an exhibition or educational project or event that is sponsored by, conducted under the supervision of or approved by a public law enforcement agency or a nationally or state recognized entity that promotes proficiency in ~~~~~~~~ about semiautomatic weapons and for transporting

000050

ER_1451

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17770   Page 56 of
118
§ 131. Licenses to carry firearms; Class A and B; conditions..., MA ST 140 § 131

thereto and therefrom; (v) hunting in accordance with the provisions of chapter 131; or (vi) surrendering such firearm or feeding device under the provisions of section 129D. Any large capacity weapon or large capacity feeding device kept on the premises of a lawfully incorporated shooting club shall, when not in use, be secured in a locked container, and shall be unloaded during any lawful transport. The clerk or other corporate officer of such club shall annually file a report with the colonel of state police and the commissioner of the department of criminal justice information services listing all large capacity weapons and large capacity feeding devices owned or possessed under such license. The colonel of state police or his designee, shall have the right to inspect all firearms owned or possessed by such club upon request during regular business hours and said colonel may revoke or suspend a club license for a violation of any provision of this chapter or chapter 269 relative to the ownership, use or possession of large capacity weapons or large capacity feeding devices.

(b) A Class B license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) non-large capacity firearms and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper; provided, however, that a Class B license shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place; and provided further, that a Class B license shall not entitle the holder thereof to possess a large capacity firearm, except under a Class A club license issued under this section or under the direct supervision of a holder of a valid Class A license at an incorporated shooting club or licensed shooting range; and (ii) rifles and shotguns, including large capacity rifles and shotguns, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as he deems proper. A violation of a restriction provided under this paragraph, or a restriction imposed by the licensing authority under the provisions of this paragraph, shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that the provisions of section 10 of chapter 269 shall not apply to such violation.

A Class B license shall not be a valid license for the purpose of complying with any provision under this chapter governing the purchase, sale, lease, rental or transfer of any weapon or ammunition feeding device if such weapon is a large capacity firearm or if such ammunition feeding device is a large capacity feeding device for use with a large capacity firearm, both as defined in section 121.

(c) Either a Class A or Class B license shall be valid for the purpose of owning, possessing, purchasing and transferring non-large capacity rifles and shotguns, and for purchasing and possessing chemical mace, pepper spray or other similarly propelled liquid, gas or powder designed to temporarily incapacitate, consistent with the entitlements conferred by a firearm identification card issued under section 129B.

(d) Any person residing or having a place of business within the jurisdiction of the licensing authority or any law enforcement officer employed by the licensing authority or any person residing in an area of exclusive federal jurisdiction located within a city or town may submit to the licensing authority or the colonel of state police, an application for a Class A license to carry firearms, or renewal of the same, which the licensing authority or the colonel may issue if it appears that the applicant is not a prohibited person, as set forth in this section, to be issued a license and has good reason to fear injury to the applicant or the applicant's property or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section.

A prohibited person shall be a person who:

(i) has, in a court of the commonwealth, been convicted or adjudicated a youthful offender or delinquent child, both as defined in section 52 of chapter 119, for the commission of (A) a felony; (B) a misdemeanor punishable by imprisonment

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 109 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17771   Page 57 of
118
§ 131. Licenses to carry firearms; Class A and B; conditions..., MA ST 140 § 131

for more than 2 years ; (C) a violent crime as defined in section 121; (D) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; (E) a violation of any law regulating the use, possession or sale of a controlled substance as defined in section 1 of chapter 94C including, but not limited to, a violation of said chapter 94C; or (F) a misdemeanor crime of domestic violence as defined in 18 U.S.C. 921(a)(33);

(ii) has, in any other state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (A) a felony; (B) a misdemeanor punishable by imprisonment for more than 2 years; (C) a violent crime as defined in section 121; (D) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; (E) a violation of any law regulating the use, possession or sale of a controlled substance as defined in said section 1 of said chapter 94C including, but not limited to, a violation of said chapter 94C; or (F) a misdemeanor crime of domestic violence as defined in 18 U.S.C. 921(a)(33);

(iii) is or has been (A) committed to a hospital or institution for mental illness, alcohol or substance abuse, except a commitment pursuant to sections 35 or 36C of chapter 123, unless after 5 years from the date of the confinement, the applicant submits with the application an affidavit of a licensed physician or clinical psychologist attesting that such physician or psychologist is familiar with the applicant's mental illness, alcohol or substance abuse and that in the physician's or psychologist's opinion, the applicant is not disabled by a mental illness, alcohol or substance abuse in a manner that shall prevent the applicant from possessing a firearm, rifle or shotgun; (B) committed by a court order to a hospital or institution for mental illness, unless the applicant was granted a petition for relief of the court order pursuant to said section 36C of said chapter 123 and submits a copy of the court order with the application; (C) subject to an order of the probate court appointing a guardian or conservator for a incapacitated person on the grounds that the applicant lacks the mental capacity to contract or manage the applicant's affairs, unless the applicant was granted a petition for relief of the order of the probate court pursuant to section 56C of chapter 215 and submits a copy of the order of the probate court with the application; or (D) found to be a person with an alcohol use disorder or substance use disorder or both and committed pursuant to said section 35 of said chapter 123, unless the applicant was granted a petition for relief of the court order pursuant to said section 35 and submits a copy of the court order with the application;

(iv) is younger than 21 years of age at the time of the application;

(v) is an alien who does not maintain lawful permanent residency;

(vi) is currently subject to: (A) an order for suspension or surrender issued pursuant to sections 3B or 3C of chapter 209A or a similar order issued by another jurisdiction; or (B) a permanent or temporary protection order issued pursuant to said chapter 209A or a similar order issued by another jurisdiction, including any order described in 18 U.S.C. 922(g)(8);

(vii) is currently the subject of an outstanding arrest warrant in any state or federal jurisdiction;

(viii) has been discharged from the armed forces of the United States under dishonorable conditions;

(ix) is a fugitive from justice; or

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 110 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17772   Page 58 of
§ 131. Licenses to carry firearms; Class A and B; conditions,... MA ST 140 § 131
118

(x) having been a citizen of the United States, has renounced that citizenship.

The licensing authority may deny the application or renewal of a license to carry, or suspend or revoke a license issued under this section if, in a reasonable exercise of discretion, the licensing authority determines that the applicant or licensee is unsuitable to be issued or to continue to hold a license to carry. A determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety; or (ii) existing factors that suggest that, if issued a license, the applicant or licensee may create a risk to public safety. Upon denial of an application or renewal of a license based on a determination of unsuitability, the licensing authority shall notify the applicant in writing setting forth the specific reasons for the determination in accordance with paragraph (e). Upon revoking or suspending a license based on a determination of unsuitability, the licensing authority shall notify the holder of a license in writing setting forth the specific reasons for the determination in accordance with paragraph (f). The determination of unsuitability shall be subject to judicial review under said paragraph (f).

(e) Within seven days of the receipt of a completed application for a license to carry or possess firearms, or renewal of same, the licensing authority shall forward one copy of the application and one copy of the applicant's fingerprints to the colonel of state police, who shall within 30 days advise the licensing authority, in writing, of any disqualifying criminal record of the applicant arising from within or without the commonwealth and whether there is reason to believe that the applicant is disqualified for any of the foregoing reasons from possessing a license to carry or possess firearms. In searching for any disqualifying history of the applicant, the colonel shall utilize, or cause to be utilized, files maintained by the department of probation and statewide and nationwide criminal justice, warrant and protection order information systems and files including, but not limited to, the National Instant Criminal Background Check System. The colonel shall inquire of the commissioner of the department of mental health relative to whether the applicant is disqualified from being so licensed. If the information available to the colonel does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law, he shall certify such fact, in writing, to the licensing authority within said 30 day period.

The licensing authority may also make inquiries concerning the applicant to: (i) the commissioner of the department of criminal justice information services relative to any disqualifying condition and records of purchases, sales, rentals, leases and transfers of weapons or ammunition concerning the applicant; (ii) the commissioner of probation relative to any record contained within the department of probation or the statewide domestic violence record keeping system concerning the applicant; and (iii) the commissioner of the department of mental health relative to whether the applicant is a suitable person to possess firearms or is not a suitable person to possess firearms. The director or commissioner to whom the licensing authority makes such inquiry shall provide prompt and full cooperation for that purpose in any investigation of the applicant.

The licensing authority shall, within 40 days from the date of application, either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing; provided, however, that no such license shall be issued unless the colonel has certified, in writing, that the information available to him does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law.

The licensing authority shall provide to the applicant a receipt indicating that it received the application. The receipt shall be provided to the applicant within 7 days by mail if the application was received by mail or immediately if the application was made in person; provided, however, that the receipt shall include the applicant's name and address; current license number and license expiration date, if any; the date the licensing authority received the application; the name, address and telephone number of the licensing authority; the agent of the licensing authority that received the application; the type of application; and whether the application is for a new license or a renewal of an existing license.

**000053**

**ER_1454**

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 111 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17773   Page 59 of
118
§ 131. Licenses to carry firearms; Class A and B; conditions,...MA ST 140 § 131

The licensing authority shall keep a copy of the receipt for not less than 1 year and shall furnish a copy to the applicant if requested by the applicant.

(f) A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed. A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license. Any revocation or suspension of a license shall be in writing and shall state the reasons therefor. Upon revocation or suspension, the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D. No appeal or post-judgment motion shall operate to stay such revocation or suspension. Notices of revocation and suspension shall be forwarded to the commissioner of the department of criminal justice information services and the commissioner of probation and shall be included in the criminal justice information system. A revoked or suspended license may be reinstated only upon the termination of all disqualifying conditions, if any.

Any applicant or holder aggrieved by a denial, revocation, suspension or restriction placed on a license, unless a hearing has previously been held pursuant to chapter 209A, may, within either 90 days after receiving notice of the denial, revocation or suspension or within 90 days after the expiration of the time limit during which the licensing authority shall respond to the applicant or, in the case of a restriction, any time after a restriction is placed on the license pursuant to this section, file a petition to obtain judicial review in the district court having jurisdiction in the city or town in which the applicant filed the application or in which the license was issued. If after a hearing a justice of the court finds that there was no reasonable ground for denying, suspending, revoking or restricting the license and that the petitioner is not prohibited by law from possessing a license, the justice may order a license to be issued or reinstated to the petitioner or may order the licensing authority to remove certain restrictions placed on the license.

(g) A license shall be in a standard form provided by the executive director of the criminal history systems board in a size and shape equivalent to that of a license to operate motor vehicles issued by the registry of motor vehicles pursuant to section 8 of chapter 90 and shall contain a license number which shall clearly indicate whether such number identifies a Class A or Class B license, the name, address, photograph, fingerprint, place and date of birth, height, weight, hair color, eye color and signature of the licensee. Such license shall be marked "License to Carry Firearms" and shall clearly indicate whether the license is Class A or Class B. The application for such license shall be made in a standard form provided by the executive director of the criminal history systems board, which form shall require the applicant to affirmatively state under the pains and penalties of perjury that such applicant is not disqualified on any of the grounds enumerated above from being issued such license.

(h) Any person who knowingly files an application containing false information shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a house of correction, or by both such fine and imprisonment.

(i) A license to carry or possess firearms shall be valid, unless revoked or suspended, for a period of not more than 6 years from the date of issue and shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years nor more than 6 years from the date of issue; provided, however, that, if the licensee applied for renewal before the license expired, the license shall remain valid after its expiration date for all lawful purposes until the application for renewal is approved or denied. If a licensee is on active duty with the armed forces of the United States on the expiration date of the license, the license shall remain valid until the licensee is released from active duty and for a period not less than 180 days following the release; provided, however, that, if the licensee applied for renewal prior to the end of that period, the license shall remain valid after its expiration date for all lawful purposes until the application for renewal is

000054
ER_1455

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 112 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17774   Page 60 of
§ 131. Licenses to carry firearms; Class A and B; conditions,... MA ST 140 § 131
118

approved or denied. An application for renewal of a Class B license filed before the license has expired shall not extend the license beyond the stated expiration date; provided, that the Class B license shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years nor more than 6 years from the date of issue. Any renewal thereof shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years but not more than 6 years from the effective date of such license. Any license issued to an applicant born on February 29 shall expire on March 1. The fee for the application shall be $100, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $25 of the fee; $50 of the fee shall be deposited into the general fund of the commonwealth and not less than $50,000 of the funds deposited into the General Fund shall be allocated to the Firearm Licensing Review Board, established in section 130B, for its operations and that any funds not expended by said board for its operations shall revert back to the General Fund; and $25 of the fee shall be deposited in the Firearms Fingerprint Identity Verification Trust Fund. For active and retired law enforcement officials, or local, state, or federal government entities acting on their behalf, the fee for the application shall be set at $25, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $12.50 of the fee, and $12.50 of the fee shall be deposited into the general fund of the commonwealth. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit such portion of the license application fee into the Firearms Record Keeping Fund quarterly, not later than January 1, April 1, July 1 and October 1 of each year. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit quarterly such portion of the license application fee as is to be deposited into the General Fund, not later than January 1, April 1, July 1 and October 1 of each year. For the purposes of section 10 of chapter 269, an expired license to carry firearms shall be deemed to be valid for a period not to exceed 90 days beyond the stated date of expiration, unless such license to carry firearms has been revoked.

Any person over the age of 70 and any law enforcement officer applying for a license to carry firearms through his employing agency shall be exempt from the requirement of paying a renewal fee for a Class A or Class B license to carry.

(j)(1) No license shall be required for the carrying or possession of a firearm known as a detonator and commonly used on vehicles as a signaling and marking device, when carried or possessed for such signaling or marking purposes.

(2) No license to carry shall be required for the possession of an unloaded large capacity rifle or shotgun or an unloaded feeding device therefor by a veteran's organization chartered by the Congress of the United States, chartered by the commonwealth or recognized as a nonprofit tax-exempt organization by the Internal Revenue Service, or by the members of any such organization when on official parade duty or during ceremonial occasions. For purposes of this subparagraph, an "unloaded large capacity rifle or shotgun" and an "unloaded feeding device therefor" shall include any large capacity rifle, shotgun or feeding device therefor loaded with a blank cartridge or blank cartridges, so-called, which contain no projectile within such blank or blanks or within the bore or chamber of such large capacity rifle or shotgun.

(k) Whoever knowingly issues a license in violation of this section shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a jail or house of correction, or by both such fine and imprisonment.

(l) The executive director of the criminal history systems board shall send electronically or by first class mail to the holder of each such license to carry firearms, a notice of the expiration of such license not less than 90 days prior to such expiration and shall enclose therein a form for the renewal of such license. The form for renewal shall include an affidavit in which the applicant shall verify that the applicant has not lost any firearms or had any firearms stolen from the applicant since the date of the applicant's last renewal or issuance. The taking of fingerprints shall not be required in issuing the renewal of a license if the renewal applicant's fingerprints are on file with the department of the state

000055

**ER_1456**

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17775   Page 61 of
118
§ 131. Licenses to carry firearms; Class A and B; conditions..., MA ST 140 § 131

police. Any licensee shall notify, in writing, the licensing authority who issued said license, the chief of police into whose jurisdiction the licensee moves and the executive director of the criminal history systems board of any change of address. Such notification shall be made by certified mail within 30 days of its occurrence. Failure to so notify shall be cause for revocation or suspension of said license. The commissioner of criminal justice information services shall provide electronic notice of expiration only upon the request of a cardholder. A request for electronic notice of expiration shall be forwarded to the department on a form furnished by the commissioner. Any electronic address maintained by the department for the purpose of providing electronic notice of expiration shall be considered a firearms record and shall not be disclosed except as provided in section 10 of chapter 66.

(m) Notwithstanding the provisions of section 10 of chapter 269, any person in possession of a firearm, rifle or shotgun whose license issued under this section is invalid for the sole reason that it has expired, not including licenses that remain valid under paragraph (i) because the licensee applied for renewal before the license expired, but who shall not be disqualified from renewal upon application therefor pursuant to this section, shall be subject to a civil fine of not less than $100 nor more than $5,000 and the provisions of section 10 of chapter 269 shall not apply; provided, however, that the exemption from the provisions of said section 10 of said chapter 269 provided herein shall not apply if: (i) such license has been revoked or suspended, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; (ii) revocation or suspension of such license is pending, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; or (iii) an application for renewal of such license has been denied. Any law enforcement officer who discovers a person to be in possession of a firearm, rifle or shotgun after such person's license has expired, meaning after 90 days beyond the stated expiration date on the license, has been revoked or suspended, solely for failure to give notice of a change of address, shall confiscate such firearm, rifle or shotgun and the expired or suspended license then in possession and such officer, shall forward such license to the licensing authority by whom it was issued as soon as practicable. The officer shall, at the time of confiscation, provide to the person whose firearm, rifle or shotgun has been confiscated, a written inventory and receipt for all firearms, rifles or shotguns confiscated and the officer and his employer shall exercise due care in the handling, holding and storage of these items. Any confiscated weapon shall be returned to the owner upon the renewal or reinstatement of such expired or suspended license within one year of such confiscation or may be otherwise disposed of in accordance with the provisions of section 129D. The provisions of this paragraph shall not apply if such person has a valid license to carry firearms issued under section 131F.

(n) Upon issuance of a license to carry or possess firearms under this section, the licensing authority shall forward a copy of such approved application and license to the executive director of the criminal history systems board, who shall inform the licensing authority forthwith of the existence of any disqualifying condition discovered or occurring subsequent to the issuance of a license under this section.

(*o*) No person shall be issued a license to carry or possess a machine gun in the commonwealth, except that a licensing authority or the colonel of state police may issue a machine gun license to:

(i) a firearm instructor certified by the municipal police training committee for the sole purpose of firearm instruction to police personnel;

(ii) a bona fide collector of firearms upon application or upon application for renewal of such license.

<[ Second sentence of paragraph (o) added by 2017, 110, Sec. 21 effective
February 1, 2018 applicable as provided by 2017, 110, Sec. 53.]>

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 114 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17776   Page 62 of
118
§ 131. Licenses to carry firearms; Class A and B; conditions..., MA ST 140 § 131

Clauses (i) and (ii) of this paragraph shall not apply to bump stocks and trigger cranks.

(p) The executive director of the criminal history systems board shall promulgate regulations in accordance with chapter 30A to establish criteria for persons who shall be classified as bona fide collectors of firearms.

(q) Nothing in this section shall authorize the purchase, possession or transfer of any weapon, ammunition or feeding device that is, or in such manner that is, prohibited by state or federal law.

(r) The secretary of the executive office of public safety or his designee may promulgate regulations to carry out the purposes of this section.

**Credits**
Amended by St.1936, c. 302; St.1951, c. 201; St.1953, c. 319, § 20; St.1953, c. 454; St.1957, c. 688, § 15; St.1959, c. 296, § 6; St.1960, c. 293; St.1969, c. 799, § 11; St.1972, c. 415; St.1973, c. 138; St.1973, c. 892, § 7; St.1974, c. 312; St.1974, c. 649, § 1; St.1975, c. 4, § 1; St.1975, c. 113, § 1; St.1984, c. 420, § 2; St.1986, c. 481, § 2; St.1987, c. 465, § 33; St.1994, c. 24, § 3; St.1996, c. 151, §§ 325 to 329; St.1996, c. 200, § 28; St.1998, c. 180, § 41; St.1998, c. 358, §§ 6 to 9; St.2002, c. 196, § 22; St.2002, c. 513, § 2; St.2003, c. 26, § 429, eff. July 1, 2003; St.2003, c. 46, § 103, eff. July 31, 2003; St.2004, c. 150, §§ 10 to 16, eff. Sept. 13, 2004; St.2008, c. 224, eff. Oct. 29, 2008; St.2010, c. 256, § 97, eff. Nov. 4, 2010; St.2010, c. 466, § 3, eff. April 14, 2011; St.2011, c. 9, §§ 16, 17, eff. April 11, 2011; St.2014, c. 284, §§ 48, 50, 51, 53, 56, 57, eff. Jan. 1, 2015; St.2014, c. 284, § 55, eff. Aug. 13, 2014; St.2017, c. 110, § 21, eff. Feb. 1, 2018.

Notes of Decisions (174)

M.G.L.A. 140 § 131, MA ST 140 § 131
Current through the 2017 1st Annual Session

---

**End of Document**　　　　　　　　　　　　© 2018 Thomson Reuters. No claim to original U.S. Government Works.

**000057**

**ER_1458**

# EXHIBIT 18

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 116 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17778   Page 64 of
2C:39-1. Definitions, NJ ST 2C:39-1                                         118

New Jersey Statutes Annotated
  Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 2. Definition of Specific Offenses
      Part 5. Offenses Against Public Order, Health and Decency
        Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

This section has been updated. Click here for the updated version.

N.J.S.A. 2C:39-1

2C:39-1. Definitions

Effective: December 23, 2002 to January 15, 2018

Definitions. The following definitions apply to this chapter and to chapter 58:

a. "Antique firearm" means any rifle or shotgun and "antique cannon" means a destructive device defined in paragraph (3) of subsection c. of this section, if the rifle, shotgun or destructive device, as the case may be, is incapable of being fired or discharged, or which does not fire fixed ammunition, regardless of date of manufacture, or was manufactured before 1898 for which cartridge ammunition is not commercially available, and is possessed as a curiosity or ornament or for its historical significance or value.

b. "Deface" means to remove, deface, cover, alter or destroy the name of the maker, model designation, manufacturer's serial number or any other distinguishing identification mark or number on any firearm.

c. "Destructive device" means any device, instrument or object designed to explode or produce uncontrolled combustion, including (1) any explosive or incendiary bomb, mine or grenade; (2) any rocket having a propellant charge of more than four ounces or any missile having an explosive or incendiary charge of more than one-quarter of an ounce; (3) any weapon capable of firing a projectile of a caliber greater than 60 caliber, except a shotgun or shotgun ammunition generally recognized as suitable for sporting purposes; (4) any Molotov cocktail or other device consisting of a breakable container containing flammable liquid and having a wick or similar device capable of being ignited. The term does not include any device manufactured for the purpose of illumination, distress signaling, line- throwing, safety or similar purposes.

d. "Dispose of" means to give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer, or otherwise transfer possession.

e. "Explosive" means any chemical compound or mixture that is commonly used or is possessed for the purpose of producing an explosion and which contains any oxidizing and combustible materials or other ingredients in such proportions, quantities or packing that an ignition by fire, by friction, by concussion or by detonation of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects. The term shall not include small arms ammunition, or explosives in the form prescribed by the official United States Pharmacopoeia.

000059

ER_1460

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 117 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17779   Page 65 of
118
2C:39-1. Definitions, NJ ST 2C:39-1

Sterling MK-6, MK-7 and SAR types

Steyr A.U.G. semi-automatic firearms

USAS 12 semi-automatic type shotgun

Uzi type semi-automatic firearms

Valmet M62, M71S, M76, or M78 type semi-automatic firearms

Weaver Arm Nighthawk.

(2) Any firearm manufactured under any designation which is substantially identical to any of the firearms listed above.

(3) A semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock.

(4) A semi-automatic rifle with a fixed magazine capacity exceeding 15 rounds.

(5) A part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person.

x. "Semi-automatic" means a firearm which fires a single projectile for each single pull of the trigger and is self-reloading or automatically chambers a round, cartridge, or bullet.

y. "Large capacity ammunition magazine" means a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm.

z. "Pistol grip" means a well-defined handle, similar to that found on a handgun, that protrudes conspicuously beneath the action of the weapon, and which permits the shotgun to be held and fired with one hand.

aa. "Antique handgun" means a handgun manufactured before 1898, or a replica thereof, which is recognized as being historical in nature or of historical significance and either (1) utilizes a match, friction, flint, or percussion ignition, or which utilizes a pin-fire cartridge in which the pin is part of the cartridge or (2) does not fire fixed ammunition or for which cartridge ammunition is not commercially available.

bb. "Trigger lock" means a commercially available device approved by the Superintendent of State Police which is operated with a key or combination lock that prevents a firearm from being discharged while the device is attached to the firearm. It may include, but need not be limited to, devices that obstruct the barrel or cylinder of the firearm, as well as devices that immobilize the trigger.

000060

ER_1461

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 118 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17780   Page 66 of
2C:39-3. Prohibited weapons and devices, NJ ST 2C:39-3   118

---

New Jersey Statutes Annotated
  Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 2. Definition of Specific Offenses
      Part 5. Offenses Against Public Order, Health and Decency
        Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

This section has been updated. Click here for the updated version.

N.J.S.A. 2C:39-3

2C:39-3. Prohibited weapons and devices

Effective: September 3, 2003 to January 15, 2018

Prohibited Weapons and Devices.

**a. Destructive devices.** Any person who knowingly has in his possession any destructive device is guilty of a crime of the third degree.

**b. Sawed-off shotguns.** Any person who knowingly has in his possession any sawed-off shotgun is guilty of a crime of the third degree.

**c. Silencers.** Any person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree.

**d. Defaced firearms.** Any person who knowingly has in his possession any firearm which has been defaced, except an antique firearm or an antique handgun, is guilty of a crime of the fourth degree.

**e. Certain weapons.** Any person who knowingly has in his possession any gravity knife, switchblade knife, dagger, dirk, stiletto, billy, blackjack, metal knuckle, sandclub, slingshot, cestus or similar leather band studded with metal filings or razor blades imbedded in wood, ballistic knife, without any explainable lawful purpose, is guilty of a crime of the fourth degree.

**f. Dum-dum or body armor penetrating bullets.** (1) Any person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum bullet, or (2) any person, other than a collector of firearms or ammunition as curios or relics as defined in Title 18, United States Code, section 921 (a) (13) and has in his possession a valid Collector of Curios and Relics License issued by the Bureau of Alcohol, Tobacco and Firearms, who knowingly has in his possession any body armor breaching or penetrating ammunition, which means: (a) ammunition primarily designed for use in a handgun, and (b) which is comprised of a bullet whose core or jacket, if the jacket is thicker than .025 of an inch, is made of tungsten carbide, or hard bronze, or other material which is harder than a rating of 72 or greater on the Rockwell B. Hardness Scale, and (c) is therefore capable of breaching or penetrating body armor, is guilty of a crime of the fourth degree. For purposes of this section, a collector may possess not more than three examples of each distinctive variation of the ammunition described above. A distinctive variation includes a different head stamp, composition, design, or color.

---

000061

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 119 of 299

Case 3:17-cv-01017-BEN-JLB  Document 132-9  Filed 12/01/22  PageID.17781  Page 67 of
2C:39-3. Prohibited weapons and devices, NJ ST 2C:39-3  118

**g. Exceptions.** (1) Nothing in subsection a., b., c. , d., e., f., j. or k. of this section shall apply to any member of the Armed Forces of the United States or the National Guard, or except as otherwise provided, to any law enforcement officer while actually on duty or traveling to or from an authorized place of duty, provided that his possession of the prohibited weapon or device has been duly authorized under the applicable laws, regulations or military or law enforcement orders. Nothing in subsection h. of this section shall apply to any law enforcement officer who is exempted from the provisions of that subsection by the Attorney General. Nothing in this section shall apply to the possession of any weapon or device by a law enforcement officer who has confiscated, seized or otherwise taken possession of said weapon or device as evidence of the commission of a crime or because he believed it to be possessed illegally by the person from whom it was taken, provided that said law enforcement officer promptly notifies his superiors of his possession of such prohibited weapon or device.

(2) a. Nothing in subsection f. (1) shall be construed to prevent a person from keeping such ammunition at his dwelling, premises or other land owned or possessed by him, or from carrying such ammunition from the place of purchase to said dwelling or land, nor shall subsection f. (1) be construed to prevent any licensed retail or wholesale firearms dealer from possessing such ammunition at its licensed premises, provided that the seller of any such ammunition shall maintain a record of the name, age and place of residence of any purchaser who is not a licensed dealer, together with the date of sale and quantity of ammunition sold.

b. Nothing in subsection f. (1) shall be construed to prevent a designated employee or designated licensed agent for a nuclear power plant under the license of the Nuclear Regulatory Commission from possessing hollow nose ammunition while in the actual performance of his official duties, if the federal licensee certifies that the designated employee or designated licensed agent is assigned to perform site protection, guard, armed response or armed escort duties and is appropriately trained and qualified, as prescribed by federal regulation, to perform those duties.

(3) Nothing in paragraph (2) of subsection f. or in subsection j. shall be construed to prevent any licensed retail or wholesale firearms dealer from possessing that ammunition or large capacity ammunition magazine at its licensed premises for sale or disposition to another licensed dealer, the Armed Forces of the United States or the National Guard, or to a law enforcement agency, provided that the seller maintains a record of any sale or disposition to a law enforcement agency. The record shall include the name of the purchasing agency, together with written authorization of the chief of police or highest ranking official of the agency, the name and rank of the purchasing law enforcement officer, if applicable, and the date, time and amount of ammunition sold or otherwise disposed. A copy of this record shall be forwarded by the seller to the Superintendent of the Division of State Police within 48 hours of the sale or disposition.

(4) Nothing in subsection a. of this section shall be construed to apply to antique cannons as exempted in subsection d. of N.J.S.2C:39-6.

(5) Nothing in subsection c. of this section shall be construed to apply to any person who is specifically identified in a special deer management permit issued by the Division of Fish and Wildlife to utilize a firearm silencer as part of an alternative deer control method implemented in accordance with a special deer management permit issued pursuant to section 4 of P.L.2000, c. 46 (C.23:4-42.6), while the person is in the actual performance of the permitted alternative deer control method and while going to and from the place where the permitted alternative deer control method is being utilized. This exception shall not, however, otherwise apply to any person to authorize the purchase or possession of a firearm silencer.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.          2

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 120 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17782   Page 68 of
2C:39-3. Prohibited weapons and devices, NJ ST 2C:39-3        118

h. **Stun guns.** Any person who knowingly has in his possession any stun gun is guilty of a crime of the fourth degree.

i. Nothing in subsection e. of this section shall be construed to prevent any guard in the employ of a private security company, who is licensed to carry a firearm, from the possession of a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course approved by the Police Training Commission in the use of a nightstick.

j. Any person who knowingly has in his possession a large capacity ammunition magazine is guilty of a crime of the fourth degree unless the person has registered an assault firearm pursuant to section 11 of P.L.1990, c. 32 (C.2C:58-12) and the magazine is maintained and used in connection with participation in competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the United States Department of the Army.

k. **Handcuffs.** Any person who knowingly has in his possession handcuffs as defined in P.L.1991, c. 437 (C.2C:39-9.2), under circumstances not manifestly appropriate for such lawful uses as handcuffs may have, is guilty of a disorderly persons offense. A law enforcement officer shall confiscate handcuffs possessed in violation of the law.

**Credits**

L.1978, c. 95, § 2C:39-3, eff. Sept. 1, 1979. Amended by L.1979, c. 179, § 2, eff. Sept. 1, 1979; L.1983, c. 58, § 1, eff. Feb. 7, 1983; L.1983, c. 479, § 2, eff. Jan. 12, 1984; L.1985, c. 360, § 2, eff. Nov. 12, 1985; L.1987, c. 228, § 2, eff. July 30, 1987; L.1989, c. 11, § 1, eff. Feb. 1, 1989; L.1990, c. 32, § 10, eff. May 30, 1990; L.1991, c. 437, § 1, eff. Jan. 18, 1992; L.1999, c. 233, § 2, eff. Jan. 1, 2000; L.2000, c. 46, § 5, eff. June 30, 2000; L.2003, c. 168, § 1, eff. Sept. 3, 2003.

**Editors' Notes**

### SENATE LAW, PUBLIC SAFETY AND DEFENSE COMMITTEE STATEMENT

**Senate, No. 650--L.1989, c. 11**

Senate 650 permits a guard who is licensed to carry a firearm and is employed by a private security company to lawfully carry a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course.

The bill requires that a training course, approved by the Police Training Commission, in the use of a nightstick must be completed before a private security guard licensed to carry a firearm is authorized to carry a nightstick while in the performance of his official duties.

This bill was pre-filed for introduction in the 1988 session pending technical review. As reported, the bill includes the changes required by technical review which has been performed.

N. J. S. A. 2C:39-3, NJ ST 2C:39-3
Current with 2017 laws and resolutions through L.2017, c. 323, 325-332, 334-372, 379-380 and J.R. No. 24

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 121 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17783   Page 69 of
2C:39-9. Manufacture, transport, disposition and defacement af..., NJ ST 2C:39-9
118

New Jersey Statutes Annotated
  Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 2. Definition of Specific Offenses
      Part 5. Offenses Against Public Order, Health and Decency
        Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

This section has been updated. Click here for the updated version.

N.J.S.A. 2C:39-9

2C:39-9. Manufacture, transport, disposition and defacement
of weapons and dangerous instruments and appliances

Effective: November 1, 2013 to January 15, 2018

Manufacture, Transport, Disposition and Defacement of Weapons and Dangerous Instruments and Appliances. a.
Machine guns. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of any
machine gun without being registered or licensed to do so as provided in chapter 58 is guilty of a crime of the third degree.

b. Sawed-off shotguns. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of
any sawed-off shotgun is guilty of a crime of the third degree.

c. Firearm silencers. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of
any firearm silencer is guilty of a crime of the fourth degree.

d. Weapons. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of any
weapon, including gravity knives, switchblade knives, ballistic knives, daggers, dirks, stilettos, billies, blackjacks, metal
knuckles, sandclubs, slingshots, cesti or similar leather bands studded with metal filings, or, except as otherwise provided
in subsection i. of this section, in the case of firearms if he is not licensed or registered to do so as provided in chapter 58,
is guilty of a crime of the fourth degree. Any person who manufactures, causes to be manufactured, transports, ships,
sells or disposes of any weapon or other device which projects, releases or emits tear gas or other substances intended to
produce temporary physical discomfort or permanent injury through being vaporized or otherwise dispensed in the air,
which is intended to be used for any purpose other than for authorized military or law enforcement purposes by duly
authorized military or law enforcement personnel or the device is for the purpose of personal self-defense, is pocket-sized
and contains not more than three-quarters of an ounce of chemical substance not ordinarily capable of lethal use or of
inflicting serious bodily injury, or other than to be used by any person permitted to possess such weapon or device under
the provisions of subsection d. of N.J.S. 2C:39-5, which is intended for use by financial and other business institutions
as part of an integrated security system, placed at fixed locations, for the protection of money and property, by the duly
authorized personnel of those institutions, is guilty of a crime of the fourth degree.

e. Defaced firearms. Any person who defaces any firearm is guilty of a crime of the third degree. Any person who
knowingly buys, receives, disposes of or conceals a defaced firearm, except an antique firearm or an antique handgun,
is guilty of a crime of the fourth degree.

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 122 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17784   Page 70 of
2C:39-9. Manufacture, transport, disposition and defacement of..., NJ ST 2C:39-9                 118

f. (1) Any person who manufactures, causes to be manufactured, transports, ships, sells, or disposes of any bullet, which is primarily designed for use in a handgun, and which is comprised of a bullet whose core or jacket, if the jacket is thicker than .025 of an inch, is made of tungsten carbide, or hard bronze, or other material which is harder than a rating of 72 or greater on the Rockwell B. Hardness Scale, and is therefore capable of breaching or penetrating body armor and which is intended to be used for any purpose other than for authorized military or law enforcement purposes by duly authorized military or law enforcement personnel, is guilty of a crime of the fourth degree.

(2) Nothing in this subsection shall be construed to prevent a licensed collector of ammunition as defined in paragraph (2) of subsection f. of N.J.S.2C:39-3 from transporting the bullets defined in paragraph (1) of this subsection from (a) any licensed retail or wholesale firearms dealer's place of business to the collector's dwelling, premises, or other land owned or possessed by him, or (b) to or from the collector's dwelling, premises or other land owned or possessed by him to any gun show for the purposes of display, sale, trade, or transfer between collectors, or (c) to or from the collector's dwelling, premises or other land owned or possessed by him to any rifle or pistol club organized in accordance with the rules prescribed by the National Board for the Promotion of Rifle Practice; provided that the club has filed a copy of its charter with the superintendent of the State Police and annually submits a list of its members to the superintendent, and provided further that the ammunition being transported shall be carried not loaded in any firearm and contained in a closed and fastened case, gun box, or locked in the trunk of the automobile in which it is being transported, and the course of travel shall include only such deviations as are reasonably necessary under the circumstances.

g. Assault firearms. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of an assault firearm without being registered or licensed to do so pursuant to N.J.S.2C:58-1 et seq. is guilty of a crime of the third degree.

h. Large capacity ammunition magazines. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of a large capacity ammunition magazine which is intended to be used for any purpose other than for authorized military or law enforcement purposes by duly authorized military or law enforcement personnel is guilty of a crime of the fourth degree.

i. Transporting firearms into this State for an unlawful sale or transfer. Any person who knowingly transports, ships or otherwise brings into this State any firearm for the purpose of unlawfully selling, transferring, giving, assigning or otherwise disposing of that firearm to another individual is guilty of a crime of the second degree. Any motor vehicle used by a person to transport, ship, or otherwise bring a firearm into this State for unlawful sale or transfer shall be subject to forfeiture in accordance with the provisions of N.J.S.2C:64-1 et seq.; provided however, this forfeiture provision shall not apply to innocent owners, nor shall it affect the rights of a holder of a valid lien.

The temporary transfer of a firearm shall not constitute a violation of this subsection if [1] that firearm is transferred:

(1) while hunting or target shooting in accordance with the provisions of section 1 of P.L.1992, c. 74 (C.2C:58-3.1);

(2) for shooting competitions sponsored by a licensed dealer, law enforcement agency, legally recognized military organization, or a rifle or pistol club which has filed a copy of its charter with the superintendent in accordance with the provisions of section 1 of P.L.1992, c. 74 (C.2C:58-3.1); or

**000065**

**ER_1466**

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 123 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17785   Page 71 of
2C:39-9. Manufacture, transport, disposition and defacement af..., NJ ST 2C:39-9
118

(3) for participation in a training course conducted by a certified instructor in accordance with the provisions of section 1 of P.L.1997, c. 375 (C.2C:58-3.2).

The transfer of any firearm that uses air or carbon dioxide to expel a projectile; or the transfer of an antique firearm shall not constitute a violation of this subsection.

**Credits**

L.1978, c. 95, § 2C:39-9, eff. Sept. 1, 1979. Amended by L.1979, c. 179, § 7, eff. Sept. 1, 1979; L.1980, c. 108, § 1, eff. Sept. 11, 1980; L.1981, c. 480, § 2, eff. Jan. 12, 1982; L.1983, c. 58, § 2, eff. Feb. 7, 1983; L.1987, c. 228, § 3, eff. July 30, 1987; L.1990, c. 32, § 3, eff. May 30, 1990; L.1999, c. 233, § 3, eff. Jan. 1, 2000; L.2007, c. 298, § 1, eff. April 1, 2008; L.2013, c. 111, § 1, eff. Nov. 1, 2013.

Footnotes

1      So in original.

N. J. S. A. 2C:39-9, NJ ST 2C:39-9

Current with 2017 laws and resolutions through L.2017, c. 323, 325-332, 334-372, 379-380 and J.R. No. 24

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 19

§ 265.00 Definitions, NY PENAL § 265.00

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedNegative Treatment Reconsidered by New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, 2nd Cir.(Conn.), Oct.
19, 2015

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

McKinney's Consolidated Laws of New York Annotated
  Penal Law (Refs & Annos)
    Chapter 40. Of the Consolidated Laws (Refs & Annos)
      Part Three. Specific Offenses
        Title P. Offenses Against Public Safety
          Article 265. Firearms and Other Dangerous Weapons (Refs & Annos)

McKinney's Penal Law § 265.00

§ 265.00 Definitions

Effective: July 5, 2013
Currentness

As used in this article and in article four hundred, the following terms shall mean and include:

1. "Machine-gun" means a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun.

2. "Firearm silencer" means any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol or other firearms to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearms.

3. "Firearm" means (a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length; or (d) any weapon made from a shotgun or rifle whether by alteration, modification, or otherwise if such weapon as altered, modified, or otherwise has an overall length of less than twenty-six inches; or (e) an assault weapon. For the purpose of this subdivision the length of the barrel on a shotgun or rifle shall be determined by measuring the distance between the muzzle and the face of the bolt, breech, or breechlock when closed and when the shotgun or rifle is cocked; the overall length of a weapon made from a shotgun or rifle is the distance between the extreme ends of the weapon measured along a line parallel to the center line of the bore. Firearm does not include an antique firearm.

4. "Switchblade knife" means any knife which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife.

5. "Gravity knife" means any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device.

000068
ER_1469

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 126 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17788   Page 74 of
118
§ 265.00 Definitions, NY PENAL § 265.00

5-a. "Pilum ballistic knife" means any knife which has a blade which can be projected from the handle by hand pressure applied to a button, lever, spring or other device in the handle of the knife.

5-b. "Metal knuckle knife" means a weapon that, when closed, cannot function as a set of plastic knuckles or metal knuckles, nor as a knife and when open, can function as both a set of plastic knuckles or metal knuckles as well as a knife.

5-c. "Automatic knife" includes a stiletto, a switchblade knife, a gravity knife, a cane sword, a pilum ballistic knife, and a metal knuckle knife.

6. "Dispose of" means to dispose of, give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer and otherwise dispose of.

7. "Deface" means to remove, deface, cover, alter or destroy the manufacturer's serial number or any other distinguishing number or identification mark.

8. "Gunsmith" means any person, firm, partnership, corporation or company who engages in the business of repairing, altering, assembling, manufacturing, cleaning, polishing, engraving or trueing, or who performs any mechanical operation on, any firearm, large capacity ammunition feeding device or machine-gun.

9. "Dealer in firearms" means any person, firm, partnership, corporation or company who engages in the business of purchasing, selling, keeping for sale, loaning, leasing, or in any manner disposing of, any assault weapon, large capacity ammunition feeding device, pistol or revolver.

10. "Licensing officer" means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01 of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance.

11. "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

12. "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

13. "Cane Sword" means a cane or swagger stick having concealed within it a blade that may be used as a sword or stiletto.

000069
ER_1470

§ 265.00 Definitions, NY PENAL § 265.00

14. [See also subd. 14 below] "Chuka stick" means any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking or choking. These devices are also known as nunchakus and centrifugal force sticks.

14. [See also subd. 14 above] "Antique firearm" means:

Any unloaded muzzle loading pistol or revolver with a matchlock, flintlock, percussion cap, or similar type of ignition system, or a pistol or revolver which uses fixed cartridges which are no longer available in the ordinary channels of commercial trade.

15. "Loaded firearm" means any firearm loaded with ammunition or any firearm which is possessed by one who, at the same time, possesses a quantity of ammunition which may be used to discharge such firearm.

15-a. "Electronic dart gun" means any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical shock to such person by means of a dart or projectile.

15-b. "Kung Fu star" means a disc-like object with sharpened points on the circumference thereof and is designed for use primarily as a weapon to be thrown.

15-c. "Electronic stun gun" means any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person.

16. "Certified not suitable to possess a self-defense spray device, a rifle or shotgun" means that the director or physician in charge of any hospital or institution for mental illness, public or private, has certified to the superintendent of state police or to any organized police department of a county, city, town or village of this state, that a person who has been judicially adjudicated incompetent, or who has been confined to such institution for mental illness pursuant to judicial authority, is not suitable to possess a self-defense spray device, as defined in section 265.20 of this article, or a rifle or shotgun.

17. "Serious offense" means (a) any of the following offenses defined in the former penal law as in force and effect immediately prior to September first, nineteen hundred sixty-seven: illegally using, carrying or possessing a pistol or other dangerous weapon; making or possessing burglar's instruments; buying or receiving stolen property; unlawful entry of a building; aiding escape from prison; that kind of disorderly conduct defined in subdivisions six and eight of section seven hundred twenty-two of such former penal law; violations of sections four hundred eighty-three, four hundred eighty-three-b, four hundred eighty-four-h and article one hundred six of such former penal law; that kind of criminal sexual act or rape which was designated as a misdemeanor; violation of section seventeen hundred forty-seven-d and seventeen hundred forty-seven-e of such former penal law; any violation of any provision of article thirty-three of the public health law relating to narcotic drugs which was defined as a misdemeanor by section seventeen hundred fifty-one-a of such former penal law, and any violation of any provision of article thirty-three-A of the public health law relating to depressant and stimulant drugs which was defined as a misdemeanor by section seventeen hundred forty-seven-b of such former penal law.

**000070**
**ER_1471**

§ 265.00 Definitions, NY PENAL § 265.00

(b) [As amended by L.1999, c. 635, § 11. See, also, par. (b) below.] any of the following offenses defined in the penal law: illegally using, carrying or possessing a pistol or other dangerous weapon; possession of burglar's tools; criminal possession of stolen property in the third degree; escape in the third degree; jostling; fraudulent accosting; endangering the welfare of a child; the offenses defined in article two hundred thirty-five; issuing abortional articles; permitting prostitution; promoting prostitution in the third degree; stalking in the fourth degree; stalking in the third degree; the offenses defined in article one hundred thirty; the offenses defined in article two hundred twenty.

(b) [As amended by L.1999, c. 635, § 15. See, also, par. (b) above.] any of the following offenses defined in the penal law: illegally using, carrying or possessing a pistol or other dangerous weapon; possession of burglar's tools; criminal possession of stolen property in the third degree; escape in the third degree; jostling; fraudulent accosting; endangering the welfare of a child; the offenses defined in article two hundred thirty-five; issuing abortional articles; permitting prostitution; promoting prostitution in the third degree; stalking in the third degree; stalking in the fourth degree; the offenses defined in article one hundred thirty; the offenses defined in article two hundred twenty.

18. "Armor piercing ammunition" means any ammunition capable of being used in pistols or revolvers containing a projectile or projectile core, or a projectile or projectile core for use in such ammunition, that is constructed entirely (excluding the presence of traces of other substances) from one or a combination of any of the following: tungsten alloys, steel, iron, brass, bronze, beryllium copper, or uranium.

19. "Duly authorized instructor" means (a) a duly commissioned officer of the United States army, navy, marine corps or coast guard, or of the national guard of the state of New York; or (b) a duly qualified adult citizen of the United States who has been granted a certificate as an instructor in small arms practice issued by the United States army, navy or marine corps, or by the adjutant general of this state, or by the national rifle association of America, a not-for-profit corporation duly organized under the laws of this state; or (c) by a person duly qualified and designated by the department of environmental conservation under paragraph d of subdivision six of section 11-0713 of the environmental conservation law as its agent in the giving of instruction and the making of certifications of qualification in responsible hunting practices.

20. "Disguised gun" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive and is designed and intended to appear to be something other than a gun.

21. "Semiautomatic" means any repeating rifle, shotgun or pistol, regardless of barrel or overall length, which utilizes a portion of the energy of a firing cartridge or shell to extract the fired cartridge case or spent shell and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge or shell.

22. "Assault weapon" means

(a) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the following characteristics:

(i) a folding or telescoping stock;

000071
ER_1472

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a thumbhole stock;

(iv) a second handgrip or a protruding grip that can be held by the non-trigger hand;

(v) a bayonet mount;

(vi) a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator;

(vii) a grenade launcher; or

(b) a semiautomatic shotgun that has at least one of the following characteristics:

(i) a folding or telescoping stock;

(ii) a thumbhole stock;

(iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;

(iv) a fixed magazine capacity in excess of seven rounds;

(v) an ability to accept a detachable magazine; or

(c) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following characteristics:

(i) a folding or telescoping stock;

(ii) a thumbhole stock;

(iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;

(iv) capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip;

**000072**

**ER_1473**

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 130 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17792   Page 78 of
118
§ 265.00 Definitions, NY PENAL § 265.00

(v) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(vi) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned;

(vii) a manufactured weight of fifty ounces or more when the pistol is unloaded; or

(viii) a semiautomatic version of an automatic rifle, shotgun or firearm;

(d) a revolving cylinder shotgun;

(e) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined in subparagraph (v) of paragraph (e) of subdivision twenty-two of section 265.00 of this chapter as added by chapter one hundred eighty-nine of the laws of two thousand and otherwise lawfully possessed pursuant to such chapter of the laws of two thousand prior to September fourteenth, nineteen hundred ninety-four;

(f) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined in paragraph (a), (b) or (c) of this subdivision, possessed prior to the date of enactment of the chapter of the laws of two thousand thirteen which added this paragraph;

(g) provided, however, that such term does not include:

(i) any rifle, shotgun or pistol that (A) is manually operated by bolt, pump, lever or slide action; (B) has been rendered permanently inoperable; or (C) is an antique firearm as defined in 18 U.S.C. 921(a)(16);

(ii) a semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition;

(iii) a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine; or

(iv) a rifle, shotgun or pistol, or a replica or a duplicate thereof, specified in Appendix A to 18 U.S.C. 922 as such weapon was manufactured on October first, nineteen hundred ninety-three. The mere fact that a weapon is not listed in Appendix A shall not be construed to mean that such weapon is an assault weapon;

(v) any weapon validly registered pursuant to subdivision sixteen-a of section 400.00 of this chapter. Such weapons shall be subject to the provisions of paragraph (h) of this subdivision;

(vi) any firearm, rifle, or shotgun that was manufactured at least fifty years prior to the current date, but not including replicas thereof that is validly registered pursuant to subdivision sixteen-a of section 400.00 of this chapter;

**000073**

**ER_1474**

§ 265.00 Definitions, NY PENAL § 265.00

(h) Any weapon defined in paragraph (e) or (f) of this subdivision and any large capacity ammunition feeding device that was legally possessed by an individual prior to the enactment of the chapter of the laws of two thousand thirteen which added this paragraph, may only be sold to, exchanged with or disposed of to a purchaser authorized to possess such weapons or to an individual or entity outside of the state provided that any such transfer to an individual or entity outside of the state must be reported to the entity wherein the weapon is registered within seventy-two hours of such transfer. An individual who transfers any such weapon or large capacity ammunition device to an individual inside New York state or without complying with the provisions of this paragraph shall be guilty of a class A misdemeanor unless such large capacity ammunition feeding device, the possession of which is made illegal by the chapter of the laws of two thousand thirteen which added this paragraph, is transferred within one year of the effective date of the chapter of the laws of two thousand thirteen which added this paragraph.

23. "Large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device, that (a) has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition, or (b) [Suspended and not effective, pursuant to L.2013, c. 57, pt. FF, § 4, eff. March 29, 2013, deemed eff. Jan. 15, 2013.] contains more than seven rounds of ammunition, or (c) [Suspended and not effective, pursuant to L.2013, c. 57, pt. FF, § 4, eff. March 29, 2013, deemed eff. Jan. 15, 2013.] is obtained after the effective date of the chapter of the laws of two thousand thirteen which amended this subdivision and has a capacity of, or that can be readily restored or converted to accept, more than seven rounds of ammunition; provided, however, that such term does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition or a feeding device that is a curio or relic. A feeding device that is a curio or relic is defined as a device that (i) was manufactured at least fifty years prior to the current date, (ii) is only capable of being used exclusively in a firearm, rifle, or shotgun that was manufactured at least fifty years prior to the current date, but not including replicas thereof, (iii) is possessed by an individual who is not prohibited by state or federal law from possessing a firearm and (iv) is registered with the division of state police pursuant to subdivision sixteen-a of section 400.00 of this chapter, except such feeding devices transferred into the state may be registered at any time, provided they are registered within thirty days of their transfer into the state. Notwithstanding paragraph (h) of subdivision twenty-two of this section, such feeding devices may be transferred provided that such transfer shall be subject to the provisions of section 400.03 of this chapter including the check required to be conducted pursuant to such section.

24. "Seller of ammunition" means any person, firm, partnership, corporation or company who engages in the business of purchasing, selling or keeping ammunition.

25. "Qualified retired New York or federal law enforcement officer" means an individual who is a retired police officer as police officer is defined in subdivision thirty-four of section 1.20 of the criminal procedure law, a retired peace officer as peace officer is defined in section 2.10 of the criminal procedure law or a retired federal law enforcement officer as federal law enforcement officer is defined in section 2.15 of the criminal procedure law, who: (a) separated from service in good standing from a public agency located in New York state in which such person served as either a police officer, peace officer or federal law enforcement officer; and (b) before such separation, was authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and had statutory powers of arrest, pursuant to their official duties, under the criminal procedure law; and (c) (i) before such separation, served as either a police officer, peace officer or federal law enforcement officer for five years or more and at the time of separation, is such an officer; or (ii) separated from service with such agency, after completing any applicable probationary period of such service, due to a service-connected disability, as determined by such agency at or before the time of separation; and (d)(i) has not been found by a qualified medical professional employed by such agency to be unqualified for reasons relating to mental health; or (ii) has not entered into an agreement with such agency from which the individual is separating from service in which that individual acknowledges he or she is not qualified

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 132 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17794   Page 80 of
118
§ 265.00 Definitions, NY PENAL § 265.00

for reasons relating to mental health; and (e) is not otherwise prohibited by New York or federal law from possessing any firearm.

**Credits**

(L.1965, c. 1030. Amended L.1967, c. 791, § 46; L.1969, c. 123, § 1; L.1972, c. 588, § 1; L.1972, c. 605, § 1; L.1974, c. 179, § 1; L.1974, c. 462, § 1; L.1974, c. 986, §§ 1, 2; L.1974, c. 1041, § 1; L.1976, c. 217, § 1; L.1982, c. 492, § 1; L.1985, c. 61, § 1; L.1986, c. 328, § 2; L.1986, c. 646, § 1; L.1988, c. 264, § 1; L.1990, c. 264, § 1; L.1995, c. 219, § 2; L.1996, c. 354, § 2; L.1997, c. 446, § 2, eff. Aug. 25, 1997; L.1998, c. 378, § 1, eff. Nov. 1, 1998; L.1999, c. 210, § 1, eff. Nov. 1, 1999; L.1999, c. 635, §§ 11, 15, eff. Dec. 1, 1999; L.2000, c. 189, §§ 8 to 10, eff. Nov. 1, 2000; L.2003, c. 264, § 33, eff. Nov. 1, 2003; L.2007, c. 510, § 3, eff. Feb. 11, 2008; L.2008, c. 257, § 3, eff. Nov. 1, 2008; L.2010, c. 232, §§ 2, 3, eff. July 30, 2010; L.2013, c. 1, § 37, eff. Jan. 15, 2013; L.2013, c. 1, § 38; L.2013, c. 1, § 39, eff. March 16, 2013; L.2013, c. 98, § 1, eff. July 5, 2013.)

**Editors' Notes**

### VALIDITY

<For validity of this section, see New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, 990 F.Supp.2d 349, 351 (W.D.N.Y. Dec. 31, 2013) and N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242 (2d Cir. 2015), cert. denied sub nom. Shew v. Malloy, 136 S. Ct. 2486, 195 L. Ed. 2d 822 (2016)>

### PRACTICE COMMENTARIES

*by William C. Donnino*

**History**

**Second Amendment**

**Definitions**

**Firearm and loaded firearm**

**Antique firearm**

**Assault weapon**

**Automatic knife**

**Billy**

**Chuka stick**

**Electronic dart gun**

**Electronic stun gun**

**Gravity knife**

**Kung Fu star**

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 133 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17795   Page 81 of 118
§ 265.00 Definitions, NY PENAL § 265.00

Large capacity ammunition feeding device

Penal Law § 265.00(22)(h)

Penal Law § 265.02(8)

Penal Law § 265.10

Penal Law § 265.11

Penal Law § 265.36 and § 265.37

Machine-gun

Metal knuckles

Metal knuckle knife

Pilum ballistic knife

Rifle or shotgun

## History

In 1963, as a result of years of study and the recommendations of the Joint Legislative Committee on Firearms and Ammunition, the provisions of the former Penal Law dealing with weapons were revised. L.1963, c. 136; former Penal Law §§ 1896-1904. That revision placed in one section the definitions of most of the substantive crimes [*see* former Penal Law § 1897, "Possession of weapons and dangerous instruments and appliances"].

In 1967, the current Penal Law took effect and carried forward, almost verbatim, the weapon provisions of the former Penal Law, placing the major provisions primarily in Penal Law former § 265.05. In 1974, the then-existing Penal Law § 265.05 was restructured by dividing the various crimes defined in that one section into five sections, currently Penal Law § 265.01 through Penal Law § 265.05, in a degree structure which was generally in accord with the structure of other Penal Law statutes. L.1974, c. 1041.

There were a substantial number of amendments thereafter, most of which added new crimes, and that history is set forth in the comments to the applicable amendment.

## Second Amendment

The Second Amendment to the Federal Constitution provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

In *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court held that the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." Thereafter, the Supreme Court applied the Second Amendment to the states. *McDonald v. City of Chicago*, 561 U.S. 742, 786, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010).

§ 265.00 Definitions, NY PENAL § 265.00

In *Heller's* view, "the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Heller,* 554 U.S. at 628.

Thus, the protected weapons are those which were in "common use" at the time of the amendment for lawful purposes, such as self-defense and defense of one's home. *Id.* at 624-27. That reference to weapons in "common use" at the time of the amendment was not intended to necessarily exclude from the amendment's protection weapons presently in common use for lawful purposes, given the Court's holding that the amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. *See Caetano v. Massachusetts,* 577 U.S. ___, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016).

The amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short barreled shotguns" [*Id.* at 625], machineguns [*Id.* at 624] and a M-16 rifle. *Id.* at 627. Nor does the amendment support "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller,* 554 U.S. at 626.

With respect to regulatory laws, the Court expressly declined to provide an "exhaustive" list of "lawful regulatory measures," but the Court did explain that the Second Amendment does not interdict "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* 626-27 and n.26; *McDonald v. City of Chicago,* 561 U.S. at 786, *supra* (emphasizing the *Heller* limitations of the Second Amendment with respect the ability to carry any weapon in any manner for whatever purpose and with respect to regulatory measures).

Then, in *Caetano v. Massachusetts,* 577 U.S. ___, *supra,* the Court, in a per curiam opinion, rejected the three reasons that the Massachusetts court had given for upholding a state ban on the possession of stun guns and remanded the case for further consideration. The Supreme Court began by reiterating that *Heller* held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Thus, the state court's first reason, that stun guns "were not in common use at the time of the Second Amendment's enactment" was inconsistent with that holding. Next, the state court had reasoned that stun guns meet the historical exception of prohibiting the carrying of dangerous and "unusual" weapons; but when the state equated "unusual" with the stun gun not in common use at the time of the amendment's enactment, the Supreme Court found that it did no more than reiterate its first erroneous reason. As for its third reason, that stun guns are not readily adaptable to use in the military, the Supreme Court stated that "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected.' "

New York has a statute which parallels the Second Amendment. Civil Rights Law § 4 states: "A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms cannot be infringed."

To date, that statute has not been interpreted to negate any of New York's statutory restrictions on the possession of firearms. *See Moore v. Gallup,* 267 A.D. 64, 45 N.Y.S.2d 63 (3d Dept. 1943), *affirmed without opinion* 293 N.Y. 846, 59 N.E.2d 439 (1944), *but remittitur amended* 294 N.Y. 699, 60 N.E.2d 847 (1945) to state that the Court had held that the New York statutes relating to a license to carry a concealed pistol were not repugnant to the provisions of the Fourteenth Amendment.

Since *Heller,* New York has continued to uphold its statutory scheme which prohibits the possession of a firearm without an appropriate license. In *People v. Hughes,* 22 N.Y.3d 44, 978 N.Y.S.2d 97, 1 N.E.3d 298 (2013), the Court of Appeals held that a conviction of "criminal possession of a weapon in the second degree"

§ 265.00 Definitions, NY PENAL § 265.00

and "criminal possession of a weapon in the third degree," predicated on the defendant's having been previously convicted of a crime, did not violate the Second Amendment. *See also Schulz v. State of N.Y. Exec.*, 134 A.D.3d 52, 53, 19 N.Y.S.3d 92 (3d Dept. 2015), *appeal dismissed upon the ground that no substantial constitutional question is directly involved* 26 N.Y.3d 1139, 27 N.Y.S.3d 502, 47 N.E.3d 782 (2016); *People v. Perkins,* 62 A.D.3d 1160, 1161, 880 N.Y.S.2d 209 (3d Dept. 2009) ("Unlike the statute at issue in *Heller*, Penal Law article 265 does not effect a complete ban on handguns and is, therefore, not a 'severe restriction' improperly infringing upon defendant's Second Amendment rights. Moreover, in our view, New York's licensing requirement remains an acceptable means of regulating the possession of firearms ... and will not contravene *Heller* so long as it is not enforced in an arbitrary and capricious manner"); *People v. Ferguson*, 21 Misc.3d 1120(A), 873 N.Y.S.2d 513 (Criminal Court, Queens County, 2008) ("... *Heller*, is distinguishable from the case at bar for several reasons. Firstly, at the time of his arrest, defendant was not in his home, but was in an airport. Secondly, the requirement that handguns be licensed in the State of New York is not tantamount to a total ban and, therefore, is not a 'severe restriction' as was the case in *Heller*. Lastly, the Court identified certain presumptively lawful regulatory measures which would survive a constitutional challenge including the carrying of firearms in 'sensitive places.' Licensing is an acceptable regulatory measure and an airport falls within the scope of a 'sensitive place.' ").

In an extensive opinion, including a detailed recitation of the history of New York's regulation of firearms, the Second Circuit Court of Appeals held that the Second Amendment was not violated by New York's statutory requirement that a person who wants to "have and carry concealed [a hand gun], without regard to employment or place of possession" must show that "proper cause" exists for the issuance of a license to do so [Penal Law § 400.00(2)(f)]. *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012).

### Definitions

The definitions in Penal Law § 265.00 describe the various types of weapons which are regulated by this article, as well as certain terms utilized in the article regulating the licensing of firearms [Penal Law article 400]. Some of those definitions are discussed here; others are discussed in the sections dealing with the crimes in which they are used. The principal weapon regulated by this article is a firearm and thus it is discussed first, with the remaining terms thereafter in alphabetical order.

### Firearm and Loaded Firearm

By definition, a "firearm" is limited to: a pistol, revolver, the so-called "sawed-off" shotgun or rifle, and an "assault weapon" [Penal Law § 265.00(3)]. The vast array of other types of rifles and shotguns are not included within that definition and thus are not a subject of the statutes which utilize the term "firearm" to define a crime. A "rifle" and a "shotgun" are separately-defined terms [Penal Law § 265.00(11) & (12)] and there are statutes which define crimes which pertain separately and solely to them.

The statutory definition of "firearm" does not require that the firearm be loaded. A separate term and definition are provided for a "loaded firearm" [Penal Law § 265.00(15)]. In addition to the common understanding that a firearm is loaded when it contains ammunition, by the statutory definition, a firearm is loaded when there is simultaneous possession of the firearm and ammunition, irrespective of whether the ammunition is in the firearm.

The statutory definition of "firearm" also does not specify that the firearm need be operable. By contrast, the definition of "loaded firearm" does require ammunition "which may be used to discharge" the firearm [Penal Law § 265.00(15)], and the definition of a "machine gun," does require that the weapon, "loaded or unloaded," be one "from which a number of shots or bullets may be rapidly or automatically discharged from

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 136 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17798   Page 84 of
§ 265.00 Definitions, NY PENAL § 265.00                                     118

a magazine with one continuous pull of the trigger...." *Compare* Penal Law § 10.00(12), defining a "deadly weapon" to mean a "loaded weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged...."; *People v. Shaffer*, 66 N.Y.2d 663, 495 N.Y.S.2d 965, 486 N.E.2d 823 (1985) (the "People failed to establish that the gun ... was a 'deadly weapon' ... that is, both operable and loaded with live ammunition").

However, inherent to the common understanding of what constitutes a firearm and key to its danger is its operability. Hence, to establish that the weapon in issue is a "firearm" the courts have required proof of its operability, that is, that it is capable of discharging ammunition. *See People v. Longshore*, 86 N.Y.2d 851, 852, 633 N.Y.S.2d 475, 657 N.E.2d 496 (1995) ("Although the statute is silent on the point, it is now accepted that to establish criminal possession of a handgun the People must prove that the weapon is operable," and *Longshore* applied that same requirement of operability to a rifle or shotgun).

A firearm that is found in a disassembled condition but is operable when assembled is an operable firearm without any further proof that the defendant was personally capable of rendering the disassembled firearm operable. *People v. Lugo*, 161 A.D.2d 122, 554 N.Y.S.2d 849 (1st Dept. 1990). *See also People v. Cavines*, 70 N.Y.2d 882, 883, 524 N.Y.S.2d 178, 518 N.E.2d 1170 (1987) ("... the fact that the gun malfunctioned [during the commission of a crime], standing alone, does not defeat the overwhelming inference that immediately prior to the pulling of the trigger, the gun was capable of discharging the ammunition, particularly in view of the uncontradicted evidence that when subsequently test-fired, the gun and the bullets were found to be operable").

In addition to the firearm being operable, the ammunition of a loaded firearm must be "live," that is, capable of being discharged by the firearm. Penal Law § 265.00(15). *See People v. Johnson*, 56 A.D.3d 1191, 867 N.Y.S.2d 319 (4th Dept. 2008); *People v. Daniels*, 77 A.D.2d 745, 430 N.Y.S.2d 881 (3d Dept. 1980); *People v. Thomas*, 70 A.D.2d 570, 417 N.Y.S.2d 66 (1st Dept. 1979).

A "firearm" that is not operable may be the subject of a charge of attempted criminal possession of a weapon. *People v. Saunders*, 85 N.Y.2d 339, 624 N.Y.S.2d 568, 648 N.E.2d 1331 (1995).

Neither "pistol" nor "revolver" is defined by statute. They both, however, refer to a handgun. *See* Random House Webster's Unabridged Dictionary (1999) definition of "handgun" ("any firearm that can be held and fired with one hand; a revolver or a pistol"); definition of "pistol" ("a short firearm intended to be held and fired with one hand") and definition of "revolver" ("a handgun having a revolving chambered cylinder for holding a number of cartridges, which may be discharged in succession without reloading").

"Sawed-off" shotgun or rifle was first defined solely as a firearm of a "size which may be concealed upon the person." That inherently imprecise definition proved inadequate. *See People v. Cortez*, 110 Misc.2d 652, 442 N.Y.S.2d 873 (Supreme Court, N.Y. County, 1981). The definition was amended in 1982 [c. 492] and that definition appeared to require that the shotgun or rifle have a barrel "and" an overall length of the specified measurement in order to be classified as a sawed-off shotgun or rifle, and that a weapon made from a shotgun or rifle would be so classified only if its overall length was less than that specified in the definition. *People v. Santiago*, 133 Misc.2d 161, 506 N.Y.S.2d 136 (Supreme Court, N.Y. County, 1986) was of the view that the Legislature intended that a shotgun or rifle, or a weapon made from either of them, should be classified as a "sawed-off" weapon depending upon the length of the barrel "or" overall length, and recommended clarifying legislation. *See also People v. Crivillaro*, 142 Misc.2d 527, 538 N.Y.S.2d 152 (Supreme Court, Bronx County, 1989). In 1988, the Legislature amended the definition to specify that a shotgun or rifle may be deemed a sawed-off weapon if the barrel length alone is less than the specified number of inches (18 for a shotgun, 16 for a rifle), and that any weapon made from a shotgun or rifle may be deemed a sawed-off weapon if the overall length is less than 26 inches [Penal Law § 265.00(3)(b), (c), and (d)]. L.1988, c. 264.

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 137 of 299

Case 3:17-cv-01017-BEN-JLB    Document 132-9    Filed 12/01/22    PageID.17799    Page 85 of 118
§ 265.00 Definitions, NY PENAL § 265.00

An "assault weapon," which is separately defined in Penal Law § 265.00(22), was added to the definition of "firearm" in 2000 [c. 189]. By amending the definition of "firearm" to include an "assault weapon," the "assault weapon" became the subject of such crimes as: "criminal possession of a weapon" in the fourth degree [Penal Law § 265.01(1), (3)], third degree [Penal Law § 265.02(1), (3), (5)], and second degree [Penal Law § 265.03]; "criminal sale of a firearm" in the second degree [Penal Law § 265.12] and first degree [Penal Law § 265.13]; "criminal sale of a firearm" with the aid of a minor [Penal Law § 265.14] and to a minor [Penal Law § 265.16]; and a couple of crimes defined in Penal Law § 265.10(3) and (6).

In addition to including an "assault weapon" in the definitions of crimes that use the term "firearm," the legislation added some crimes which specifically name an "assault weapon." The first of the amended crimes was "criminal possession of a weapon in the third degree," a felony. It was amended to include a subdivision to prohibit the possession of an assault weapon [Penal Law § 265.02(7)], irrespective of whether it is loaded and irrespective of where the possession takes place. The second of the amended crimes was "manufacture, transport, disposition and defacement of weapons ..." [Penal Law § 265.10]. It was amended to forbid anyone to manufacture, transport, or dispose of any "assault weapon" [Penal Law § 265.10(1), (2) and (3) (first sentence)].

An "antique firearm," which is separately defined in Penal Law § 265.00(14), is expressly excluded from the definition of "firearm."

### Antique Firearm

As noted in the discussion of the definition of "firearm," an "antique firearm" is expressly excluded from the definition of "firearm" [Penal Law § 265.00(3)]. *See also* Penal Law § 265.00(22)(g)(i) exempting "antique firearm," as defined by Federal law, from the definition of "assault rifle." As a result of the exclusion of "antique firearm," as defined by the instant statute, from the definition of "firearm," any proscription related to an "antique firearm" requires a specific reference to that term. *See, e.g.* Penal Law § 265.01(4), making it a crime to possess an "antique firearm."

The term "antique firearm" is separately defined by New York law to mean any "unloaded muzzle loading pistol or revolver with a matchlock, flintlock, percussion cap, or similar type of ignition system, or a pistol or revolver which uses fixed cartridges which are no longer available in the ordinary channels of commercial trade" [Penal Law § 265.00(14)]. It is critical to note that the definition requires that the defined weapon be "unloaded" in order for it to qualify as an "antique firearm"; a weapon which met the structural definition of an "antique firearm" but was loaded would constitute a "firearm" and be subject to the laws applicable thereto. *See People v. Wedgewood*, 106 A.D.2d 674, 483 N.Y.S.2d 440 (2d Dept. 1984)*; People v. Mott*, 112 Misc.2d 833; 447 N.Y.S.2d 632 (Supreme Court, N.Y. County, 1982).

In adding the definition of "antique firearm" in 1974 [c. 986] and excluding it from the definition of "firearm," the Legislature intended that "hobbyists would be permitted to collect ... trade, buy and sell these antique firearms without being subject to the requirements of licensing." *People v. Mott,* 112 Misc.2d at 835, *supra,* quoting the Legislative Memorandum. In 2011, however, the Legislature changed its mind by amending the crime of "criminal possession of a firearm in the fourth degree" [Penal Law § 265.01(4)] to include as a crime, the possession of an "antique firearm." [L.2011 c. 357]. The Legislative Memorandum to the companion bill (Assembly 8456) stated that "[m]odern muzzle loading rifles are essentially a modern single shot rifle. They look and operate very much like a sporting rifle and allow accurate shots at distances up to 200 yards ... [and] can be reloaded in seconds...." There is authority to issue a license to have, possess, collect and carry "antique pistols," as that term is separately defined in Penal Law § 400.00(2)(g).

§ 265.00 Definitions, NY PENAL § 265.00

### Assault Weapon

An "assault weapon" was added to the definition of "firearm" in 2000 [Penal Law § 265.00(3)] and at the same time, was separately defined [Penal Law § 265.00(22)]. L.2000, c. 189. In 2013, the NY SAFE Act amended and significantly revised the definition.

A principal difference between the former and present definition is that the former definition required the requisite firearm to have two military style features or characteristics, while the current definition requires only one. Thus, as the Governor explained: "Under the stricter definitions, semi-automatic pistols [see subdivision 22(c) and (f)] and rifles [see subdivision 22(a) and (f)] with detachable magazines and one military style feature will be considered assault weapons. Semi-automatic shotguns [see subdivision 22(b) and (f)] with one military style feature will also be considered assault weapons." Governor's Press Release, "Governor Cuomo Signs NY Safe Act in Rochester," January 16, 2013. Also included as an assault weapon is a "revolving cylinder shotgun" [subdivision 22(d)].

The definition contains eight paragraphs (a) to (h), several of which define different types of weapon which can be classified as an assault weapon; they are:

   (a) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the listed characteristics;

   (b) a semiautomatic shotgun that has at least one of the listed characteristics;

   (c) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the listed characteristics;

   (d) a revolving cylinder shotgun;

   (e) semiautomatic rifle, shotgun or pistol defined in the former Penal Law § 265.00(22)(e)(v) of the L.2000, c. 189 which had been lawfully possessed, pursuant to laws of 2000, c. 189, prior to September fourteenth, nineteen hundred ninety-four.

The term "semiautomatic" is separately defined in subdivision 21 of the instant section which in lay terms includes any repeating rifle, shotgun or pistol which, although requiring a separate pull of the trigger to fire each round, has the capacity of being fired to extract the spent shell and automatically load a cartridge.

There is a grandfathering provision, paragraphs (f) and (g), exempting certain weapons from the definition.

Assault weapons defined in subdivision (22)(e) or (f), possessed before January 16, 2013, had to be registered by April 15, 2014 [Penal Law § 400.00(16-a)]; except a weapon defined in subdivision (22)(g)(vi) "transferred into the state may be registered at any time, provided such weapons are registered within thirty days of their transfer into the state." Once having registered, the registrant must "recertify" every five years thereafter or suffer revocation of the registration [Penal Law § 400.00(16-a)].

Owners of a grandfathered assault weapon or large capacity ammunition feeding device may only transfer same to a purchaser authorized to possess same or to an individual or entity outside of the state [subdivision 22(h)]. Governor's Press Release, supra. An individual who transfers a grandfathered weapon or large capacity ammunition device to an individual inside New York State or without complying with the other provisions of

**000081**
**ER_1482**

the statute [subdivision 22(h)], shall, except for a large capacity ammunition device transferred within one year of the effective date of the NY SAFE Act, be guilty of a class A misdemeanor [subdivision 22(h)].

### Automatic knife

In 2007, legislation was passed to support and promote the establishment of a "cutlery and knife museum" in the Hudson Valley. L.2007, c. 510. As a result, the museum and its employees would need an exemption from the crime of possession of certain knives. Thus, the term "automatic knife" was created and defined to include a "stiletto, a switchblade knife, a gravity knife, a cane sword, a pilum ballistic knife, and a metal knuckle knife" [Penal Law § 265.00(5-c)], and an exemption from criminal liability was provided for the possession or ownership of automatic knives by a cutlery and knife museum, established pursuant to Education Law § 216-c, or by any employee of the museum when acting in furtherance of the business of the museum [Penal Law § 265.20(d)].

### Billy

There is no statutory definition of "billy." However, in *People v. Ocasio*, 28 N.Y.3d 178, 43 N.Y.S.3d 228, 65 N.E.3d 1263 (2016), the Court described a "billy" as "a cylindrical or rounded, rigid, club or baton with a handle grip which, from its appearance and inherent characteristics, is designed to be used as a striking weapon and not for other lawful purposes." The Court further explained that it matters not whether the "billy" is comprised of wood, metal, or other synthetic material, or that the billy is collapsible or extendible.

### Chuka stick

The "chuka stick" definition [Penal Law § 265.00(14)] was added by L.1974, c. 179. In urging the Governor to approve the legislation, the sponsor of the bill wrote: "The chuka stick is an instrument that may be purchased or easily assembled from two pieces of wood and a piece of thong, cord or chain. With a minimum amount of practice, this instrument may be effectively used as a garrote, bludgeon, thrusting or striking device. The chuka stick is designed primarily as a weapon and has no purpose other than to maim or, in some instances, kill." Letter of Assemblyman Richard C. Ross to the Counsel to the Governor, Governor's Bill Jacket for the L.1974, c. 179.

### Electronic dart gun

The "electronic dart gun" definition [Penal Law § 265.00(15-a)] was added in 1976. L.1976, c. 217. In urging the Governor to approve the legislation, the sponsor of the bill wrote: "There are a number of these devices being manufactured, the most popular of which is called a 'Taser Public Defender.' It is designed to look like a flashlight which can shoot two barbed darts a distance of 15 to 18 feet and deliver a 50,000 volt jolt of electricity effective through an inch of clothing. While the effect of the charge is to stun, knock out or paralyze a person and is temporary, it causes great pain and may well be lethal to a person in poor health." Letter of Senator John D. Caemmerer to the Counsel to the Governor, Governor's Bill Jacket for the L.1976, c. 217.

### Electronic stun gun

In 1990, the Legislature added the definition of an "electronic stun gun" [Penal Law § 265.00(15-c)]. L.1990, c. 264. That definition is like the definition of an "electronic dart gun." Penal Law § 265.00(15-a). A principal difference is that the "electronic dart gun" requires that the electrical shock be passed by means of a dart

§ 265.00 Definitions, NY PENAL § 265.00

or projectile. The Governor, who recommended the legislation, indicated that the "availability and use" of a weapon "which passes a high voltage electrical shock to a person by means of direct contact or without resort to a projectile" poses the same threat as an electronic dart gun. 1990 Governor's Approval Memorandum 31. Accordingly, for both weapons, possession per se is a crime. Penal Law §§ 265.01(1); 265.02(1).

There is a difference of judicial opinion on whether, in a prosecution for possession of an "electronic stun gun," the People are required to prove that the defendant knew it was an "electronic stun gun." *Compare People v. Small*, 157 Misc.2d 673, 598 N.Y.S.2d 431 (Supreme Court, New York County, 1993)(knowledge required) *with People v. Voltaire*, 18 Misc.3d 408, 413 n.1, 852 N.Y.S.2d 649 (Criminal Court, Kings County, 2007) (disagreeing with *Small* in a case in which the court decided that the defendant need not know that the knife possessed was a gravity knife) *and People v. Parrilla*, 27 N.Y.3d 400, 33 N.Y.S.3d 842, 53 N.E.3d 719 (2016) (in a prosecution for possession of a "gravity knife," the People must prove that the defendant possessed a "knife," but not that he or she knew that it met the definition of a "gravity knife").

### Gravity knife

The definition of "gravity knife" [Penal Law § 265.00(5)] requires that the knife's blade lock in place automatically; thus, a "butterfly knife," which requires manual locking is not a gravity knife. *People v. Zuniga*, 303 A.D.2d 773, 759 N.Y.S.2d 86 (2d Dept. 2003). A local accusatory instrument which charges a defendant with possession of a gravity knife is jurisdictionally defective when it includes only a "conclusory statement that an object recovered from a defendant is a gravity knife," without any explanation of how the object meets the statutory definition. *People v. Dreyden*, 15 N.Y.3d 100, 104, 905 N.Y.S.2d 542, 931 N.E.2d 526, 528 (2010).

In a prosecution for possession of a "gravity knife," the People must prove that the defendant possessed a "knife," but not that he or she knew that it met the definition of a "gravity knife." *People v. Parrilla*, 27 N.Y.3d 400, 33 N.Y.S.3d 842, 53 N.E.3d 719 (2016). The Appellate Divisions have held that the People are required to prove that the "gravity knife" is operable [*People v. Smith*, 309 A.D.2d 608, 765 N.Y.S.2d 777 (1st Dept. 2003); *People v. Perez*, 123 A.D.2d 721, 506 N.Y.S.2d 961 (2d Dept. 1986)].

### Kung Fu star

In 1982, the possession of a "Kung Fu star" [Penal Law § 265.00(15-b)] with intent to use it unlawfully against another was made a crime. L.1982, c. 840. In 1985, the manufacturing and transporting of a Kung Fu star was made a crime [Penal Law § 265.10]. L.1985, c. 61. In 1988, in recognition that Kung Fu stars may not be manufactured and, in the words of the Legislative Memorandum, that they "serve no legitimate purpose other than as a weapon," the statute was again amended to make the per se possession of a Kung Fu star a crime [Penal Law § 265.01(2)]. L.1988, c. 220.

### Large capacity ammunition feeding device

The concept of a "large capacity ammunition feeding device" [Penal Law § 265.00(23)] (hereinafter "large feeding device") was introduced in 2000 [c. 189] and significantly amended in 2013 by the NY SAFE Act. [L.2013, c. 1, as amended by L.2013, c. 57]. Prior to the amendment, the definition excluded a large feeding device manufactured after September 30, 1994. That limitation was repealed; thus, those large feeding devices are included in the revised definition of a "large feeding device." According to the Legislative Memorandum, the reason for doing so was "because it was impossible to tell the difference between magazines manufactured before or after [September 30, 1994]."

000083

ER_1484

§ 265.00 Definitions, NY PENAL § 265.00

Under the revised definition, a large feeding device is one that "(a) has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition; provided, however, that such term does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition or a large feeding device that is a curio or relic."

The two alternate definitions initially enacted as subdivisions (b) and (c) were in a convoluted way repealed. The import of those alternate subdivisions was to have the definition of a device ultimately limited to one that had a capacity of seven rounds. But, after enactment, it was noted that the smallest manufactured device normally had a capacity of ten rounds. Kaplan and Hakim, "New York Governor Favors Easing Newly Passed Gun Law," New York Times, March 20, 2013 (http://www.nytimes.com/2013/03/21/nyregion/cuomo-seeks-to-ease-a-newly-passed-gun-restriction.html). Thus, before subdivisions (b) and (c) took effect, the NY SAFE Act was itself amended to declare that "the effective date of the amendments adding paragraphs (b) and (c) to such subdivision shall be suspended and not effective." L.2013, c. 57 § 4. There is no provision lifting the "suspension" and making the amendments effective on a future date. As a result, that unique Penal Law language of "suspended and not effective" would appear to have the practical effect of repealing each of those subdivisions and was probably utilized for whatever perceived advantage there was in being able to say the provisions were suspended, rather than repealed. The repeal of subdivision (c) did not, however, appear to affect the "provided, however" language recited above which existed in the law prior to the addition of subdivision (c) and had chronologically followed the repealed language of subdivision (c).

The crimes for which the definition of a large feeding device is utilized include Penal Law § 265.00(22)(h), § 265.10, § 265.11, § 265.02(8), § 265.36, and § 265.37. The import of those statutes is as follows:

### Penal Law § 265.00(22)(h)

A large feeding device that was legally possessed prior to the enactment date of the NY SAFE Act, January 15, 2013, may be transferred to a person authorized to possess same or to an individual or entity outside of New York, provided that such a transfer must be reported, within 72 hours, to the entity with whom the weapon is registered. A person who transfers a device to an individual inside New York state or without otherwise complying with the law's transfer requirements is guilty of a class A misdemeanor, unless the device, the possession of which is made illegal by the NY SAFE Act, was transferred before January 15, 2014 [Penal Law § 265.00(22)(h)].

### Penal Law § 265.02(8)

Prior to, and after, the NY SAFE Act, a provision of the statute defining "criminal possession of a weapon in the third degree," makes it a class D felony when a "person possesses a large capacity ammunition feeding device" [Penal Law § 265.02(8)]. The NY SAFE ACT, however, amended that subdivision to specify that "[f]or purposes of this subdivision," a large feeding device shall "not" include either of the following two feeding devices:

[i] a feeding device lawfully possessed by such person before January 15, 2013 (the effective date of chapter one of the laws of 2013 "which amended this subdivision"), "that has a capacity of, or that can be readily restored or converted to accept more than seven but less than eleven rounds of ammunition." Parenthetically, this exclusion from liability for this felony became covered by the generic definition of a large feeding device when that definition was amended to specify that a large feeding device is one that "has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition." [L.2013, c. 57 § 4; Penal Law § 265.00(23)].

[ii] a feeding device "that was manufactured before September [13, 1994], that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition." The exclusion from liability for this felony is in recognition that prior to the NY SAFE Act, it was lawful to possess a feeding device manufactured before September 13, 1994. Notably, however, this exclusion from liability for this felony does not also require that the possessor lawfully possessed the feeding device prior to the effective date of the NY SAFE Act.

### Penal Law § 265.10

As part of the 2000 laws [c. 189], Penal Law § 265.10 ("manufacture, transport, disposition and defacement of weapons and dangerous instruments and appliances") was amended (1) to forbid the to manufacture, transport, or disposal of a "large capacity ammunition feeding device" [Penal Law § 265.10(1), (2) and (3) (first sentence)]; (2) to add a prohibition for the buying, receiving or disposing of a "large capacity ammunition feeding device" which has been defaced for a criminal purpose, which parallels the existing prohibition as it relates to a firearm [Penal Law § 265.10(3) (second sentence)]; and (3) to add a prohibition for "wilfully" defacing a "large capacity ammunition feeding device," which parallels the existing prohibition for wilfully defacing a firearm [Penal Law § 265.10(6)].

### Penal Law § 265.11

Also, as part of the 2000 laws [c. 189], Penal Law § 265.11 ("criminal sale of a firearm in the third degree") was amended to prohibit a person who is "not authorized" to possess a "firearm" from "unlawfully" selling or otherwise disposing of any firearm or "large capacity ammunition feeding device." By contrast, one of the amendments to the crime of "manufacture, transport, disposition and defacement of weapons and dangerous instruments and appliances" made it a crime to "dispose of" [defined in Penal Law § 265.00(6)] a "large capacity ammunition feeding device" [Penal Law § 265.10(3) (sentence one)], without also requiring that the actor not be authorized to possess a firearm. Thus, unless exempted by Penal Law § 265.20, a person who "disposes of" such device (and does so, for example, by a sale of the device) commits a crime, irrespective of whether that person is authorized or not authorized to possess a "firearm."

### Penal Law § 265.36 and § 265.37

The NY SAFE Act added two non-felony offenses, apparently intending to include liability for a feeding device subject to the exceptions to the felony, though arguably not completely fulfilling that intent.

The first added offense was "unlawful possession of a large capacity ammunition feeding device" [Penal Law § 265.36], a class A misdemeanor. The statute makes it "unlawful for a person to knowingly possess a large capacity ammunition feeding device manufactured before September [13, 1994] and if such person lawfully possessed such large capacity feeding device before [January 15, 2013], that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition." Penal Law § 265.36.

A safeguard for those who once lawfully possessed such feeding device is a provision excluding from liability for this crime a person "who has a reasonable belief that such device ... may lawfully be possessed," and who, within 30 days of being notified by law enforcement or a licensing official that possession is unlawful, "surrenders or lawfully disposes of" the feeding device. Once so notified, there exists a reasonable, rebuttable presumption that the possessor knows that the feeding device cannot be lawfully possessed.

The second added offense was "unlawful possession of certain ammunition feeding devices" [Penal Law § 265.37]. This statute makes it "unlawful for a person to knowingly possess an ammunition feeding device where

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 143 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17805   Page 91 of
118
§ 265.00 Definitions, NY PENAL § 265.00

such device contains more than seven rounds of ammunition." L.2013, c. 57. *But see New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 248 (2d Cir. 2015) ("New York's seven-round load limit does not survive intermediate scrutiny in the absence of requisite record evidence and a substantial relationship between the statutory provision and important state safety interests"; accordingly, that provision is unconstitutional). However, there is an exemption from liability for Penal Law sections 265.01, 265.02, 265.03, 265.04, 265.05, 265.10, 265.11, 265.12, 265.13, 265.15 and 270.05 for the "possession and use" at certain specified "indoor or outdoor" firing ranges of a "magazine, belt, feed strip or similar device" that contains more than seven rounds of ammunition, albeit in a feeding device that does not have the capacity of more than ten rounds of ammunition [Penal Law § 265.20(7-f)].

Instead of placing the sentencing provisions applicable to this offense in the Penal Law articles dealing with sentences, the NY SAFE Act, unfortunately, as too many other statutes have done, further complicated the sentencing laws by setting forth the governing sentences for this offense in the statute defining the crime. If the large feeding device is "possessed within the home of the possessor," a first offense is a violation, "subject to" a fine of $250; "each subsequent offense" is a class B misdemeanor, "subject to" a fine of $250 and a term of imprisonment "up to three months." If the large feeding device is not possessed within the home of the possessor, a first offense is a class B misdemeanor, "subject to" a fine of $250 and a term of imprisonment "up to six months"; "each subsequent offense" is a class A misdemeanor. For the class A misdemeanor, no sentence is specified, and thus the normal sentence options will apply. For the specified sentences, it appears that the amount of the fine is the stated amount, there being no language indicating that the fine is "up to" the stated amount; on the other hand, the jail sentences utilize the "up to" language, making them discretionary within that range, which may therefore be from one day up to the stated period. What is mysterious about this type of specified sentences, which are placed outside the sentencing statutes, is whether they exclude any other option in the sentencing statutes which would normally be included in the stated classification.

### Machine-gun

A "machine-gun" is not included in the definition of a "firearm." Unlike the definition of a firearm, rifle or shotgun, the requirement of operability of a machine-gun appears subsumed in its definition, which requires that it be a weapon, "loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger...." [Penal Law § 265.00(1)]. *See People v. Woods*, 202 Misc. 562, 564, 114 N.Y.S.2d 611, 613 (N.Y. Magis. Ct. 1952) (purported machine gun was missing two parts and was thus not capable of firing more than one shot at a time and was therefore not a "machine gun").

To an extent, the definition is expanded in the definition of the crime of "criminal possession of a weapon in the third degree" which prohibits the possession of a machine-gun or any other weapon "simulating a machine-gun and which is adaptable for such use." Penal Law § 265.02(2). *See People v. Excell*, 254 A.D.2d 369, 680 N.Y.S.2d 259 (2d Dept. 1998) (the court rejected the claim that because a "Uzi cannot be easily converted into a machine gun," it was thus not adaptable for such use because there was no such statutory qualification).

### Metal knuckles

There is no statutory definition of "metal knuckles." However, in *People v. Aragon*, 28 N.Y.3d 125, 42 N.Y.S.3d 646, 65 N.E.3d 675 (2016), the Court described "metal knuckles" as a "metal object with multiple holes, through which an individual places his or her fingers so that a metal bar rests atop the individual's knuckles. That object is used as a weapon to cause increased pain when the person wearing it hits someone with a fist."

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 144 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17806   Page 92 of
§ 265.00 Definitions, NY PENAL § 265.00                                                118

### Metal knuckle knife

In 1995, the Legislature added to the list of defined weapons the "metal knuckle knife" [Penal Law § 265.00(5-b)], and then added that weapon to the list of items which constitute a deadly weapon [Penal Law § 10.00(12)], to the list of items the possession or manufacture of which is per se a crime [Penal Law §§ 265.01(1), 265.10(1)], and to the list of items whose presence in an automobile or in a stolen vehicle may give rise to a presumption of possession of that weapon by everyone in the automobile or stolen vehicle [Penal Law § 265.15]. L.1995, c. 219. A "metal knuckle knife" can function as both a set of metal knuckles (possession of which is also a per se crime) and a knife. In the words of the Legislative Memorandum, the "possession and manufacture of weapons such as the metal knuckle knife serve only one purpose, ... to maim or take human life. Police searches of shops in the City of New York have discovered this particular weapon. ... In order to protect society, these weapons must be included within the definition of 'deadly weapons' found in the Penal Law."

In 2008, the definition of "deadly weapon" in Penal Law § 10.00(12) and the instant definition of "metal knuckle knife" were each amended to include "plastic knuckles" because the Legislature determined that "plastic knuckles have just as much impact as the brass knuckles and are just as deadly." Legislative Memorandum. L.2008, c. 257. Also, a number of statutes which prohibit the possession, manufacture and transportation of various deadly weapons were amended to include a prohibition on the possession of "plastic knuckles" [Penal Law §§ 265.01(1); 265.10(1) and (2)].

### Pilum ballistic knife

The "pilum ballistic knife" definition [Penal Law § 265.00(5-a)] was added in 1986. L.1986, c. 328. One advertisement for the knife described it as approximately nine-and-one-half inches long, with a four-and-a-half inch blade. When a button inside the knife handle is pushed, a powerful spring inside the handle can eject the blade, propelling it to a distance of up to 30 feet with considerable force.

### Rifle or shotgun

A sawed-off rifle or shotgun, that is, one with a barrel or overall length less than that prescribed in the statute defining a "firearm" [Penal Law § 265.00(3)], and a rifle or shotgun which qualifies as an "assault weapon" are, for the purposes of this article, a "firearm" and therefore subject to the prohibitions related thereto.

Otherwise, a rifle and a shotgun, as those terms are defined [Penal Law § 265.00(11) and (12)], are not included in the definition of "firearm," and any prohibition related to either requires the specific use of the term "rifle" or "shotgun." *See, e.g.* Penal Law § 265.01(4). In addition to meeting the terms of the definition, a rifle or shotgun must also be operable, that is, capable of discharging ammunition. *People v. Longshore*, 86 N.Y.2d 851, 633 N.Y.S.2d 475, 657 N.E.2d 496 (1995).

Notes of Decisions (132)

McKinney's Penal Law § 265.00, NY PENAL § 265.00
Current through L.2018, chapter 1.

---

**End of Document**                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

---

**000087**
**ER_1488**

§ 265.36 Unlawful possession of a large capacity ammunition..., NY PENAL § 265.36

🚩 KeyCite Red Flag - Severe Negative Treatment
Unconstitutional or PreemptedHeld Unconstitutional by New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, W.D.N.Y., Dec. 31, 2013

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

| McKinney's Consolidated Laws of New York Annotated |
| Penal Law (Refs & Annos) |
| Chapter 40. Of the Consolidated Laws (Refs & Annos) |
| Part Three. Specific Offenses |
| Title P. Offenses Against Public Safety |
| Article 265. Firearms and Other Dangerous Weapons (Refs & Annos) |

McKinney's Penal Law § 265.36

§ 265.36 Unlawful possession of a large capacity ammunition feeding device

Effective: March 16, 2013
Currentness

It shall be unlawful for a person to knowingly possess a large capacity ammunition feeding device manufactured before September thirteenth, nineteen hundred ninety-four, and if such person lawfully possessed such large capacity feeding device before the effective date of the chapter of the laws of two thousand thirteen which added this section, that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition.

An individual who has a reasonable belief that such device is of such a character that it may lawfully be possessed and who surrenders or lawfully disposes of such device within thirty days of being notified by law enforcement or county licensing officials that such possession is unlawful shall not be guilty of this offense. It shall be a rebuttable presumption that such person knows that such large capacity ammunition feeding device may not be lawfully possessed if he or she has been contacted by law enforcement or county licensing officials and informed that such device may not be lawfully possessed.

Unlawful possession of a large capacity ammunition feeding device is a class A misdemeanor.

**Credits**
(Added L.2013, c. 1, § 46-a, eff. March 16, 2013.)

**Editors' Notes**

VALIDITY

<For validity of this section, see New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, 990 F.Supp.2d 349, 351 (W.D.N.Y. Dec. 31, 2013) and N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242 (2d Cir. 2015), cert. denied sub nom. Shew v. Malloy, 136 S. Ct. 2486, 195 L. Ed. 2d 822 (2016)>

PRACTICE COMMENTARIES

by William C. Donnino

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-8, Page 146 of 299

Case 3:17-cv-01017-BEN-JLB   Document 132-9   Filed 12/01/22   PageID.17808   Page 94 of
118
§ 265.36 Unlawful possession of a large capacity ammunition..., NY PENAL § 265.36

*See* Practice Commentary to Penal Law § 265.00 with respect to the definition of "large capacity ammunition feeding device."

Notes of Decisions (2)

McKinney's Penal Law § 265.36, NY PENAL § 265.36
Current through L.2018, chapter 1.

---

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

000089
ER_1490

# EXHIBIT 20

## 13 V.S.A. § 4021

Current through the end of the 2021 (Adj. Sess.), including legislative updates through October 31, 2022

*Vermont Statutes Annotated > Title 13 Crimes and Criminal Procedure (Pts. 1 — 5) > Part 1. Crimes (Chs. 1 — 87) > Chapter 85. Weapons (Subchs. 1 — 2) > Subchapter 1. Generally (§§ 4001 — 4023)*

## § 4021. Large capacity ammunition feeding devices

**(a)** A person shall not manufacture, possess, transfer, offer for sale, purchase, or receive or import into this State a large capacity ammunition feeding device. As used in this subsection, "import" does not include the transportation back into this State of a large capacity ammunition feeding device by the same person who transported the device out of State if the person possessed the device on or before the effective date of this section.

**(b)** A person who violates this section shall be imprisoned for not more than one year or fined not more than $500.00, or both.

**(c)**

**(1)** The prohibition on possession of large capacity ammunition feeding devices established by subsection (a) of this section shall not apply to a large capacity ammunition feeding device lawfully possessed on or before the effective date of this section.

**(2)** The prohibition on possession, transfer, sale, and purchase of large capacity ammunition feeding devices established by subsection (a) of this section shall not apply to a large capacity ammunition feeding device lawfully possessed by a licensed dealer as defined in subdivision 4019(a)(4) of this title prior to April 11, 2018 and transferred by the dealer on or before October 1, 2018.

**(d)**

**(1)** This section shall not apply to any large capacity ammunition feeding device:

**(A)** manufactured for, transferred to, or possessed by the United States or a department or agency of the United States, or by any state or by a department, agency, or political subdivision of a state;

**(B)** transferred to or possessed by a federal law enforcement officer or a law enforcement officer certified as a law enforcement officer by the Vermont Criminal Justice Council pursuant to *20 V.S.A. § 2358*, for legitimate law enforcement purposes, whether the officer is on or off duty;

**(C)** transferred to a licensee under Title I of the Atomic Energy Act of 1954 for purposes of establishing and maintaining an on-site physical protection system and security organization required by federal law, or possessed by an employee or

13 V.S.A. § 4021

contractor of such a licensee on-site for these purposes, or off-site for purposes of licensee-authorized training or transportation of nuclear materials;

**(D)**  possessed by an individual who is retired from service with a law enforcement agency after having been transferred to the individual by the agency upon his or her retirement, provided that the individual is not otherwise prohibited from receiving ammunition;

**(E)**  manufactured, imported, transferred, or possessed by a manufacturer or importer licensed under 18 U.S.C. chapter 44:

**(i)**  for the purposes of testing or experimentation authorized by the U.S. Attorney General, or for product development;

**(ii)**  for repair and return to the person from whom it was received; or

**(iii)**  for transfer in foreign or domestic commerce for delivery and possession outside the State of Vermont; or

**(F)**  transported by a resident of another state into this State for the exclusive purpose of use in an organized shooting competition sponsored by an entity registered with the Secretary of State if the device is lawfully possessed under the laws of another state.

**(2)**  This section shall not apply to a licensed dealer as defined in subdivision 4019(a)(4) of this title for the sole purpose of transferring or selling a large capacity ammunition feeding device to a person to whom this section does not apply under subdivision (1) of this subsection (d).

**(e)**

**(1)**  As used in this section, "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept:

**(A)**  more than 10 rounds of ammunition for a long gun; or

**(B)**  more than 15 rounds of ammunition for a hand gun.

**(2)**  The term "large capacity ammunition feeding device" shall not include:

**(A)**  an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition;

**(B)**  a large capacity ammunition feeding device that is manufactured or sold solely for use by a lever action or bolt action long gun or by an antique firearm as defined in subdivisions 4017(d)(2)(A) and (B) of this title; or

**(C)**  a large capacity ammunition feeding device that is manufactured or sold solely for use with a firearm that is determined to be a curio or relic by the Bureau of Alcohol, Tobacco, Firearms and Explosives. As used in this subdivision, "curio or relic" means a firearm that is of special interest to collectors by reason of some quality other than its association with firearms intended for sporting use or as offensive or defensive weapons.

13 V.S.A. § 4021

## History

Added *2017, No. 94* (Adj. Sess.), § 8, eff. April 11, 2018; amended *2017, No. 94* (Adj. Sess.), § 11, eff. July 1, 2019; *2021, No. 87* (Adj. Sess.), § 5, eff. July 1, 2022.

Annotations

**History**

**Revision note**

**—2020.**

In subdiv. (d)(1)(B), substituted "Vermont Criminal Justice Council" for "Vermont Criminal Justice Training Council" in accordance with *2019, No. 166* (Adj. Sess.), § 2(b).

**—2018.**

In subdiv. (c)(2), substituted "April 11, 2018" for "the effective date of this act".

**Amendments**

**—2021 (Adj. Sess.).**

Subsec. (a): Substituted "does not include" for "shall not include."

Subdiv. (d)(1)(F): Added.

**—2017 (Adj. Sess.).**

Subdiv. (d)(1)(F): Repealed.

**ANNOTATIONS**

**Constitutionality.**

Large-capacity magazine ban satisfies the reasonable-regulation test used in connection with Article 16 of the Vermont Constitution because the statute has a valid purpose of reducing the lethality of mass shootings, the legislature was within its authority in concluding that the regulation promotes this purpose, and the statute leaves ample means for Vermonters to exercise their right to bear arms in self-defense. *State v. Misch, 2021 VT 10, 214 Vt. 309, 256 A.3d 519, 2021 Vt. LEXIS 17 (2021)*.

## Research References & Practice Aids

**Hierarchy Notes:**

13 V.S.A. § 4021

*13 V.S.A. Pt. 1, Ch. 85*

Vermont Statutes Annotated
Copyright © 2022 All rights reserved.

---

End of Document

# EXHIBIT 21

## 11 Del. C. § 1469

This document is current through 83 Del. Laws, c. 517.

*Delaware Code Annotated > Title 11 Crimes and Criminal Procedure (Pts. I — VII) > Part I*
*Delaware Criminal Code (Chs. 1 — 15) > Chapter 5 Specific Offenses (Subchs. I — VII) >*
*Subchapter VII Offenses Against Public Health, Order and Decency (Subpts. A — F) > Subpart E*
*Offenses Involving Deadly Weapons and Dangerous Instruments (§§ 1441 — 1469A)*

## Notice

This section has more than one version with varying effective dates.

## § 1469. Large-capacity magazines prohibited; class E felony; class B misdemeanor; or civil violation [Effective until Jan. 1, 2024].

(a) Except as otherwise provided in subsections (c) through (e) of this section, it is unlawful for a person to manufacture, sell, offer for sale, purchase, receive, transfer, or possess a large-capacity magazine.

(b)

(1) A violation of this section which is a first offense which only involves possession of a large capacity magazine is a civil penalty of $100.

(2) A second violation of this section which only involves possession of a large capacity magazine is a class B misdemeanor.

(3) All other violations of this section, including a subsequent offense involving only possession of a large capacity magazine are a class E felony.

(4) A large-capacity magazine is subject to forfeiture for a violation of this section.

(5) The Superior Court has exclusive jurisdiction over violations under subsections (b)(2) and (b)(3) of this section.

(c) This section does not apply to any of the following:

(1) Personnel of the United States government or a unit of that government who are acting within the scope of official business.

(2) Members of the armed forces of the United States or of the National Guard who are acting within the scope of official business.

(3) A law-enforcement officer.

(4) A qualified retired law-enforcement officer.

11 Del. C. § 1469

**(5)** An individual who holds a valid concealed carry permit issued by the Superior Court under § 1441 of this title.

**(6)** A licensed firearms dealer that sells a large-capacity magazine to another licensed firearms dealer or to an individual exempt under paragraphs (c)(1) through (5) of this section.

**(7)** A large-capacity magazine that a person has rendered permanently inoperable or has permanently modified to accept 17 rounds of ammunition or less.

**(d)**

**(1)** The Secretary of the Department of Safety and Homeland Security ("Secretary") shall establish and administer a compensation program for residents of this State to allow a resident in possession of a large-capacity magazine on August 29, 2022, to relinquish the large-capacity magazine to the Department of Safety and Homeland Security ("Department") or a participating local law-enforcement agency in exchange for a monetary payment established under this subsection.

**(2)** The Secretary shall adopt rules to implement the compensation program, including the following:

**a.** That the compensation program be implemented between June 30, 2022, and June 30, 2023, at locations throughout this State. The Department shall coordinate with local law-enforcement agencies in implementing the program.

**b.** That the compensation program allows a resident to relinquish a large-capacity magazine to the Department, or a local law-enforcement agency participating in the program, in exchange for a compensation in the amount of the market rate for each large-capacity magazine.

**c.** That establishes the method for providing the monetary payment and reimbursing a participating law-enforcement agency for payments made to residents under the compensation program.

**d.** That the compensation program is subject to the availability of funds appropriated for this specific purpose by the General Assembly. This subsection does not create a right or entitlement in a resident to receive a monetary payment under the compensation program.

**(3)** The Secretary shall submit a report to the General Assembly by December 29, 2023, providing the results of the compensation program, including the number of large-capacity magazines relinquished to law-enforcement agencies, by county, and the total amount expended under the program.

**(e)** This section does not apply to any of the following:

**(1)** A person who manufactures a large-capacity magazine, if the person manufactures the large-capacity magazine with the intent to sell the large-capacity magazine, or offer the large-capacity magazine for sale, to a person outside of this State.

Page 2 of 4

11 Del. C. § 1469

**(2)** A person who ships or transports a large-capacity magazine for a person under paragraph (e)(1) of this section.

## History

*83 Del. Laws, c. 331*, § 1; *83 Del. Laws, c. 348*, § 1.

Annotations

## Notes

**Revisor's note.**

Section 2 of *83 Del. Laws, c. 331*, provided: "The sum of $45,000 is appropriated from the General Fund in Fiscal Year 2023 for the purpose of providing compensation for the purchase of large-capacity magazines by the Department of Safety and Homeland Security under Section 1 of this act."

Section 3 of *83 Del. Laws, c. 331*, provided: "If any provision of this act or the application of this act to any person or circumstance is held invalid, the provisions of this act are severable if the invalidity does not affect the other provisions or applications of the act which can be given effect without the invalid provision or application."

Section 4 of *83 Del. Laws, c. 331*, provided: "This act is to be known as the "Delaware Large-Capacity Magazine Prohibition Act of 2022.""

Section 5 of *83 Del. Laws, c. 331*, provided: "This act takes effect 60 days after its enactment into law." The act was signed by the Governor on June 30, 2022, and became effective Aug. 29, 2022.

Section 6 of *83 Del. Laws, c. 331*, provided: "Section *§ 1466(d) of Title 11*, as contained in Section 1 of this act, expires on January 1, 2024."

Section 2 of *83 Del. Laws, c. 348*, provided: "If Senate Substitute No. 1 for Senate Bill No. 6 of the 151st General Assembly ("Senate Substitute No. 1 for Senate Bill No. 6) is enacted into law, section 1 of this act takes effect on the day Senate Substitute No. 1 for Senate Bill No. 6 takes effect." Senate Substitute No. 1 for Senate Bill 6, signed into law as *83 Del. Laws, c. 331*, took effect on Aug. 29, 2002.

**Effect of amendments.**

83 Del. Laws, c. 348, effective Aug. 29, 2022, substituted "through (e)" for "and (d)" in (a); and added (e).

Page 3 of 4

11 Del. C. § 1469

Delaware Code Annotated
Copyright © 2022 All rights reserved.

**End of Document**

# EXHIBIT 22

RECEIVED
Jul 4, 2021 9:30am
Elections Division

<u>PREAMBLE</u>

 Whereas the People of the State of Oregon have seen a sharp increase in gun sales, gun violence, and raised fear in
Oregonians of armed intimidation, it is imperative to enhance public health and safety in all communities; and
 Whereas the gun violence in Oregon and the United States, resulting in horrific deaths and devastating injuries due to
mass shootings,  homicides and suicides is unacceptable at any level, and the availability of firearms, including
semiautomatic assault rifles and pistols with accompanying large-capacity ammunition magazines, pose a grave and
immediate risk to the health, safety and well-being of the citizens of this State, particularly our youth; and
 Whereas Oregon currently has no permit requirements for purchasing a semiautomatic assault firearm or any other type
of weapon and studies have shown that permits-to-purchase reduce firearm-related injuries and death and studies further
have shown that firearm ownership or access to firearms triples the risk of suicide and doubles the risk of homicide when
compared to someone who does not have access, this measure will require that anyone purchasing a firearm must first
complete a safety training course, successfully pass a full background check and, only then, will an individual be granted a
permit-to-purchase a firearm, so that firearms are kept out of dangerous hands; and
 Whereas large-capacity magazines are often associated with semiautomatic assault rifles, and can also be used with many
semiautomatic firearms including shotguns and pistols, and estimates suggest that nearly 40% of crime guns used in serious
violent crimes, including attacks on law enforcement officers, are equipped with large-capacity magazines; and
 Whereas firearms equipped with large-capacity magazines increase casualties by allowing a shooter to continue firing for
longer periods of time before reloading, thus explaining their use in all 10 of the deadliest mass shootings  since 2009, and
in mass shooting events from 2009 to 2018 where the use of large-capacity magazines caused twice as many deaths and 14
times as many injuries, including the 2015 shooting at Umpqua Community College in Roseburg, Oregon in which 10 people
were killed and 7 more were injured; and
 Whereas restrictions on high-capacity magazines during the 10-year federal ban from 1994-2004 and the ban in over nine
(9) states and the District of Columbia have been found to reduce the number of fatalities and injuries in shooting
incidents, this measure will enhance the safety of residents, particularly children, of this state by prohibiting the
manufacture, sale, or transfer of large-capacity ammunition magazines and regulate the use of such magazines that are
currently owned;
 Now, therefore:

Be It Enacted by the People of the State of Oregon

 <u>SECTION 1.</u> **Sections 2 to 11 of this 2022 Act are added to and made a part of ORS 166.210 to 166.490.**

 <u>SECTION 2.</u> **The People of the State of Oregon find and declare that regulation of sale, purchase and otherwise transferring
of all firearms and restriction of the manufacture, import, sale, purchase, transfer, use and possession of ammunition
magazines to those that hold no more than 10 rounds will promote the public health and safety of the residents of this
state and this Act shall be known as the Reduction of Gun Violence Act.**

<u>DEFINTIONS</u>

 <u>SECTION 3.</u>  **Definitions. As used in sections 3 to 10 of this 2022 Act:**
 **(1) "Criminal background check"  has the same meaning given to this term in ORS 166.432(1)(a) to (e).**
 **(2) "Department" means the Department of State Police.**
 **(3) "Gun dealer" means a person engaged in the business, as defined in 18 U.S.C. 921, of selling, leasing or otherwise
transferring a firearm, whether the person is a retail dealer, pawnbroker or otherwise.**
 **(4) "Permit" or "permit-to-purchase" mean an authorization issued to a person to purchase or acquire a firearm,
provided all other requirements at the time of purchase or acquisition are met.**
 **(5) "Permit Agent" means a county sheriff or police chief with jurisdiction over the residence of the person making an
application for a permit-to-purchase, or their designees.**
 **(6) "Transfer" has the meaning given that term in ORS 166.435(1)(a).**
 **(7) "Transferor" means a person who is not a gun dealer or licensed as a manufacturer or importer under 18 U.S.C.  923**

PAGE - 1      New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter in [struck through and bracketed] is intended
to be omitted.

and who intends to deliver a firearm to a transferee.

PERMIT-TO-PURCHASE PROCESS

**SECTION 4.**

**(1)(a) A person may apply for a permit-to-purchase a firearm or firearms under this section to the police chief or county sheriff with jurisdiction over the residence of the person making the application, or their designees, hereinafter referred to as "permit agent".**

**(b) A person is qualified to be issued a permit-to-purchase under this section if the person:**

**(A) Is not prohibited from purchasing or acquiring  a firearm under state or federal law, including but not limited to successfully completing a criminal background check as described under paragraph (e) of this subsection;**

**(B) Is not the subject of an order described in ORS 166.525 to 166.543;**

**(C) Does not present reasonable grounds for a permit agent to conclude that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence;**

**(D) Provides proof of completion of a firearm safety course as defined in subsection (8) of this section; and**

**(E) Pays the fee described in paragraph (b) of subsection (3) of this section.**

**(c) An application for a permit under this section must state the applicant's legal name, current address and telephone number, date and place of birth, physical description, and any additional information determined necessary by department rules. The application must be signed by the applicant in front of the permit agent.**

**(d) The permit agent shall verify the applicant's identity with a government-issued form of identification bearing a photograph of the applicant.**

**(e) The applicant must submit to fingerprinting and photographing by the permit agent. The permit agent shall fingerprint and photograph the applicant and shall conduct any investigation necessary to determine whether the applicant meets the qualifications described in paragraph (b) of this section. The permit agent shall request the department to conduct a criminal background check, including but not limited to a fingerprint identification, through the Federal Bureau of Investigation. The Federal Bureau of Investigation shall return the fingerprint cards used to conduct the criminal background check and may not keep any record of the fingerprints. Upon completion of the criminal background check and determination of whether the permit applicant is qualified or disqualified from purchasing or otherwise acquiring a firearm the department shall report the results, including the outcome of the fingerprint-based criminal background check, to the permit agent.**

**(2)(a) If during the background check, the department determines that:**

**(A) A purchaser is prohibited from possessing a firearm under ORS 166.250 (1)(c), the department shall report the attempted application for a permit, the purchaser's name and any other personally identifiable information to all federal, state and local law enforcement agencies and district attorneys that have jurisdiction over the location or locations where the attempted application for a permit was made and where the permit applicant resides;**

**(B) Based on the judgment of conviction, the permit applicant is prohibited from possessing a firearm as a condition of probation or that the permit applicant is currently on post-prison supervision or parole, the department shall report the attempted application for a permit to the permit applicant's supervising officer and  the  district  attorney  of  the  county in which  the conviction occurred.**

**(C)  The permit applicant is prohibited from possessing a firearm due to a court order described in ORS 166.255 (1)(a), the department shall report the attempted application for a permit to the court that issued the order.**

**(D) The permit applicant is under the jurisdiction of the Psychiatric Security Review Board, the department shall report the attempted application for a permit to the board.**

**(b) Reports required by paragraphs (A) to (D) of subsection (2)(a) shall be made within 24 hours after the determination is made, unless a report would compromise an ongoing investigation, in which case the report may be delayed as long as necessary to avoid compromising the investigation.**

**(c) On or before January 31 of each year, beginning in 2024, the department shall annually publish a report indicating for each county the number of applications made to any permit agent, the number of permits-to-purchase issued and the number of permits-to-purchase denied and the reasons for denial. The department may, by rule, include any additional**

PAGE - 2      New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

information that it determines would be helpful to ensuring the permit-to-purchase process is being administered in a consistent and equitable manner.

(3)(a) Within 30 days of receiving an application for a permit under this section, if the permit agent has verified the applicant's identity and determined that the applicant has met each of the qualifications described in paragraph (1)(b) of this section, the permit agent shall issue the permit-to-purchase.

(b) The permit agent may charge a reasonable fee reflecting the actual cost of the process but shall not exceed $65, including the cost of fingerprinting, photographing and obtaining a criminal background check.

(4)(a) The department shall develop:

(A) A standardized application form for a permit under this section; and

(B) A form in quadruplicate for use by permit agents in issuing permits under this section.

(b) The issuing permit agent shall maintain a copy of each permit issued under this section.

(c) The person named in a permit shall:

(A) Maintain a copy of the permit as long as the permit is valid.

(B) Present a copy of the permit to the gun dealer or transferor of a firearm when required under ORS 166.412, 166.435, 166.436 or 166.438.

(5)(a) The permit agent shall report the issuance of a permit under this section to the department, and shall provide to the department a copy of the permit and any information necessary for the department to maintain an electronic searchable database of all permits issued under this section. A permit agent revoking a permit shall report the revocation to the department at the time that notice of the revocation has been sent to the permit holder.

(b) The department shall maintain the electronic database described in paragraph (a) of this subsection by ensuring that new permits are added to the database, renewed permits are assigned a new expiration date, and expired or revoked permits are marked expired or revoked but retained in the database.

(6)(a) A permit-to-purchase issued under this section does not create any right of the permit holder to receive a firearm.

(b) A permit-to-purchase issued under this section is not a limit on the number of firearms the permit holder may purchase or acquire during the time period when the permit is valid.

(7)(a) A permit-to-purchase issued under this section is valid for five years from the date of issuance, unless revoked.

(b) A person may renew an unexpired permit issued under this section by repeating the procedures set forth in subsection (1) of this section, except:

(A) A full finger print set does not need to be taken again if the original set has been retained by the permit agent or is otherwise available;  and

(B) The training course does not need to be completed, provided the course previously taken fully complies with each of the requirements set forth in subsection 8 of this section.

(c)The permit agent may charge a reasonable fee for renewal of the permit, reflecting the actual cost of the process but shall not exceed $50, including the cost of obtaining a criminal background check and photographing.

(8) As used in this section, "proof of completion of a firearm safety course" means the following:

(a) Proof of completion of any firearms training course or class available to the general public that is offered by law enforcement, a community college, or a private or public institution or organization or firearms training school utilizing instructors certified by a law enforcement agency, and that includes the components set forth in paragraph (c) of this subsection; or

(b) Proof of completion of any law enforcement firearms training course or class that is offered for security guards, investigators, reserve law enforcement officers, or any other law enforcement officers, and that includes the components set forth in paragraph (c) of this subsection;

(c) A firearms training course or class required for issuance of a permit-to-purchase must include:

(A) Review of federal and state laws in place at the time of the class and other safe practices related to ownership, purchase, transfer, use and transportation of firearms;

(B) Review of federal and state safe storage laws in place at the time of the class and other safe practices related to safe storage, including reporting lost and stolen guns;

PAGE - 3        New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

(C) Prevention of abuse or misuse of firearms, including the impact of homicide and suicide on families, communities and the country as a whole; and

(D) In-person demonstration of the applicant's ability to lock, load, unload, fire and store a firearm before an instructor certified by a law enforcement agency. This requirement may be met separately from the other course requirements in subpargagraphs (A), (B) and (C) of paragraph (c), which may be completed in an on-line course, provided the on-line course has been conducted by a trainer certified by law enforcement.

(d) Proof of successful completion of a training course in order to meet the requirements for a concealed handgun license issued under ORS 166.291 and 166.292 may be submitted for a permit as a substitute for the requirements in paragraph (c) of this subsection, provided the completed course included each of the components set forth in paragraph (c) of this subsection.

(9) The department may adopt rules to carry out the provisions of this section.


**PERMIT-TO-PURCHASE DUE PROCESS APPEAL**


  SECTION 5. (1)  If the application for the permit-to-purchase is denied, the permit agent shall set forth in writing the reasons for the denial. The denial shall be placed in the mail to the applicant by certified mail, restricted delivery, within 30 days after the application was made. If no decision is issued within 30 days, the person may seek review under the procedures in subsection (5) of this section.

(2) Notwithstanding subsections (1) to (3) of section 4 of this 2022 Act, and subject to review as provided in subsection (5) of this section, a permit agent may deny a permit-to-purchase if the permit agent has reasonable grounds to believe that the applicant has been or is reasonably likely to be a danger to self or others, or to the community at large, as a result of the applicant's mental or psychological state or as demonstrated by the applicant's past pattern of behavior involving unlawful violence or threats of unlawful violence.

(3)(a) Any act or condition that would prevent the issuance of a permit-to-purchase is cause for revoking a permit-to-purchase.

(b) A permit agent may revoke a permit by serving upon the permittee a notice of revocation. The notice must contain the grounds for the revocation and must be served either personally or by certified mail, restricted delivery. The notice and return of service shall be included in the file of the permit holder. The revocation is effective upon the permit holder's receipt of the notice.

(4) Any peace officer or corrections officer may seize a permit-to-purchase and return it to the issuing permit agent if the permit is held by a person who has been arrested or cited for a crime that can or would otherwise disqualify the person from being issued a permit. The issuing permit agent shall hold the permit for 30 days. If the person is not charged with a crime within the 30 days, the permit agent shall return the permit unless the permit agent revokes the permit as provided in subsection (3) of this section.

(5) A person denied a permit-to-purchase or whose permit is revoked or not renewed may petition the circuit court in the petitioner's county of residence to review the denial, nonrenewal or revocation. The petition must be filed within 30 days after the receipt of the notice of denial or revocation.

(6) The judgment affirming or overturning the permit agent's decision shall be based on whether the petitioner meets the criteria that are used for issuance of a permit-to-purchase and, if the petitioner was denied a permit, whether the permit agent has reasonable grounds for denial under subsection (2) of this section. Whenever the petitioner has been previously sentenced for a crime under ORS 161.610 (Enhanced penalty for use of firearm during commission of felony) or for a crime of violence for which the person could have received a sentence of more than 10 years, the court shall grant relief only if the court finds that relief should be granted in the interest of justice.

(7) Notwithstanding the provisions of ORS 9.320 (Necessity for employment of attorney), a party that is not a natural person, the state or any city, county, district or other political subdivision or public corporation in this state, without appearance by attorney, may appear as a party to an action under this section.

(8) Petitions filed under this section shall be heard and disposed of within 15 judicial days of filing or as soon as practicable thereafter.

(9) Filing fees for actions shall be as for any civil action filed in the court. If the petitioner prevails, the amount of the filing fee shall be paid by the respondent to the petitioner and may be incorporated into the court order.

(10) Initial appeals of petitions shall be heard de novo.


PAGE - 4      New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

**(11)** Any party to a judgment under this section may appeal to the Court of Appeals in the same manner as for any other civil action.

**(12)** If the governmental entity files an appeal under this section and does not prevail, it shall be ordered to pay the attorney fees for the prevailing party.

<u>**REQUIRES PERMITS FOR LICENSED DEALER SALES**</u>

<u>SECTION 6.</u> ORS 166.412 is amended to read:

(1) As used in this section:

(a) "Antique firearm" has the meaning given that term in 18 U.S.C. 921;

(b) "Department" means the Department of State Police;

(c) "Firearm" has the meaning given that term in ORS 166.210, except that it does not include an antique firearm;

(d) "Firearms transaction record" means the firearms transaction record required by 18 U.S.C. 921 to 929;

(e) "Firearms transaction thumbprint form" means a form provided by the department under subsection (11) of this section;

(f) "Gun dealer" means a person engaged in the business, as defined in 18 U.S.C. 921, of selling, leasing or otherwise transferring a firearm, whether the person is a retail dealer, pawnbroker or otherwise; and

(g) "Purchaser" means a person who buys, leases or otherwise receives a firearm from a gun dealer.

(2) Except as provided in subsection[s (3)(c) and] (12) of this section, a gun dealer shall comply with the following before a firearm is delivered to a purchaser:

(a) The purchaser shall present to the gun dealer current identification meeting the requirements of subsection (4) of this section **and a valid permit issued under section 4 of this 2022 Act**.

(b) The gun dealer shall complete the firearms transaction record and obtain the signature of the purchaser on the record.

(c) The gun dealer shall obtain the thumbprints of the purchaser on the firearms transaction thumbprint form and attach the form to the gun dealer's copy of the firearms transaction record to be filed with that copy.

(d) The gun dealer shall**,** [request] by telephone **or computer, verify that the purchaser has a valid permit-to-purchase a firearm issued under section 4 of this 2022 Act and request** that the department conduct a criminal history record check on the purchaser and shall provide the following information to the department:

(A) The federal firearms license number of the gun dealer;

(B) The business name of the gun dealer;

(C) The place of transfer;

(D) The name of the person making the transfer;

(E) The make, model, caliber and manufacturer's number of the firearm being transferred;

(F) The name and date of birth of the purchaser;

(G) The Social Security number of the purchaser if the purchaser voluntarily provides this number to the gun dealer; and

(H) The type, issuer and identification number of the identification presented by the purchaser.

(e) The gun dealer shall receive a unique approval number for the transfer from the department and record the approval number on the firearms transaction record and on the firearms transaction thumbprint form.

(f) The gun dealer may destroy the firearms transaction thumbprint form five years after the completion of the firearms transaction thumbprint form.

(3)(a) Upon receipt of a request of the gun dealer for a criminal history record check, the department shall immediately, during the gun dealer's telephone call or by return call:

(A) Determine, from criminal records and other information available to it, whether the purchaser is disqualified under ORS 166.470 from completing the purchase; and

(B) Notify the gun dealer when a purchaser is disqualified from completing the transfer or provide the gun dealer with a unique approval number indicating that the purchaser is qualified to complete the transfer.

(b) If the department is unable to determine if the purchaser is qualified or disqualified from completing the transfer within 30 minutes, the department shall notify the gun dealer and provide the gun dealer with an estimate of the time when the

PAGE - 5      New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [~~struck through~~ and bracketed] is intended to be omitted.

department will provide the requested information.

(c) **The dealer may not transfer the firearm unless the dealer receives a unique approval number from the department and, within 48 hours of completing the transfer, the dealer shall notify the state that the transfer to the permit holder was completed**. [If the department fails to provide a unique approval number to a gun dealer or to notify the gun dealer that the purchaser is disqualified under paragraph (a) of this subsection before the close of the gun dealer's next business day following the request by the gun dealer for a criminal history record check, the gun dealer may deliver the firearm to the purchaser.]

(4)(a) Identification required of the purchaser under subsection (2) of this section shall include one piece of current identification bearing a photograph and the date of birth of the purchaser that:

(A) Is issued under the authority of the United States Government, a state, a political subdivision of a state, a foreign government, a political subdivision of a foreign government, an international governmental organization or an international quasi-governmental organization; and

(B) Is intended to be used for identification of an individual or is commonly accepted for the purpose of identification of an individual.

(b) If the identification presented by the purchaser under paragraph (a) of this subsection does not include the current address of the purchaser, the purchaser shall present a second piece of current identification that contains the current address of the purchaser. The Superintendent of

State Police may specify by rule the type of identification that may be presented under this paragraph.

(c) The department may require that the gun dealer verify the identification of the purchaser if that identity is in question by sending the thumbprints of the purchaser to the department.

(5) The department shall establish a telephone number that shall be operational seven days a week between the hours of 8 a.m. and 10 p.m. for the purpose of responding to inquiries from gun dealers for a criminal history record check under this section.

(6) No public employee, official or agency shall be held criminally or civilly liable for performing the investigations required by this section provided the employee, official or agency acts in good faith and without malice.

(7)(a) The department may retain a record of the information obtained during a request for a criminal history record check for no more than five years, **except for the information provided to the dealer under subsection (2)(d) of this section, sufficient to reflect each firearm purchased by a permit holder, which must be attached to the electronic record of the permit stored by the department.  The department may develop a system for removal of the information in subsection (2)(d)(E) of this section, upon proof of sale or transfer of the firearm to another permit holder and for recording of the information to reflect the transfer of ownership to the permit of the new owner.**

(b) The record of the information obtained during a request for a criminal history record check by a gun dealer is exempt from disclosure under public records law.

(c) If the department determines that a purchaser is prohibited from possessing a firearm under ORS 166.250 (1)(c), the department shall report the attempted transfer, the purchaser's name and any other personally identifiable information to all federal, state and local law enforcement agencies and district attorneys that have jurisdiction over the location or locations where the attempted transfer was made and where the purchaser resides.

(d) If the department determines that, based on the judgment of conviction, the purchaser is prohibited from possessing a firearm as a condition of probation or that the purchaser is currently on post-prison supervision or parole, the department shall report the attempted transfer to the purchaser's supervising officer and the district attorney of the county in which the conviction occurred.

(e) If the department determines that the purchaser is prohibited from possessing a firearm due to a court order described in ORS 166.255 (1)(a), the department shall report the attempted transfer to the court that issued the order.

(f) If the department determines that the purchaser is under the jurisdiction of the Psychiatric Security Review Board, the department shall report the attempted transfer to the board.

(g) Reports required by paragraphs (c) to (f) of this subsection shall be made within 24 hours after the determination is made, unless a report would compromise an ongoing investigation, in which case the report may be delayed as long as necessary to avoid compromising the investigation.

(h) On or before January 31 of each year, a law enforcement agency or a prosecuting attorney's office that received a report pursuant to paragraph (c) of this subsection during the previous calendar year shall inform the department of any action that was taken concerning the report and the outcome of the action.

PAGE - 6        New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

(i) The department shall annually publish a written report, based on any information received under paragraph (h) of this subsection, detailing the following information for the previous year:

(A) The number of purchasers whom the department determined were prohibited from possessing a firearm under ORS 166.250 (1)(c), arranged by category of prohibition;

(B) The number of reports made pursuant to paragraph (c) of this subsection;

(C) The number of investigations arising from the reports made pursuant to paragraph (c) of this subsection, the number of investigations concluded and the number of investigations referred for prosecution, all arranged by category of prohibition; and

(D) The number of criminal charges arising from the reports made pursuant to paragraph (c) of this subsection and the disposition of the charges, both arranged by category of prohibition.

(8) A law enforcement agency may inspect the records of a gun dealer relating to transfers of firearms with the consent of a gun dealer in the course of a reasonable inquiry during a criminal investigation or under the authority of a properly authorized subpoena or search warrant.

(9) When a firearm is delivered, it shall be unloaded.

(10) In accordance with applicable provisions of ORS chapter 183, the Superintendent of State Police may adopt rules necessary for:

(a) The design of the firearms transaction thumbprint form;

(b) The maintenance of a procedure to correct errors in the criminal records of the department;

(c) The provision of a security system to identify gun dealers that request a criminal history record check under subsection (2) of this section; and

(d) The creation and maintenance of a database of the business hours of gun dealers.

(11) The department shall publish the firearms transaction thumbprint form and shall furnish the form to gun dealers on application at cost.

(12) This section does not apply to transactions between persons licensed as dealers under 18 U.S.C 923.

(13)(a) If requested by a transferor who is not a gun dealer, a gun dealer may request a criminal background check pursuant to ORS 166.435 or 166.438 and may charge a reasonable fee for providing the service.

(b) A gun dealer that requests a criminal background check under this subsection is immune from civil liability for any use of the firearm by the recipient or transferee, provided that the gun dealer requests the criminal background check as described in this section **and also provided that the dealer verifies that the recipient has a valid permit-to-purchase the firearm and the dealer has received a unique approval number from the department indicating successful completion of the background check**.

**(14) Knowingly selling or delivering a firearm to a purchaser or transferee who does not have a valid permit-to-purchase a firearm in violation of subsection 2(d) of this section, or prior to receiving a unique approval number from the department based on the criminal background check in violation of subsection 3(c) of this section, is a Class A misdemeanor.**

**REQUIRES PERMITS FOR PRIVATE TRANSFERS**

**SECTION 7.** ORS 166.435 is amended to read:

(1) As used in this section:

(a) "Transfer" means the delivery of a firearm from a transferor to a transferee, including, but not limited to, the sale, gift, loan or lease of the firearm. "Transfer" does not include the temporary provision of a firearm to a transferee if the transferor has no reason to believe the transferee is

prohibited from possessing a firearm or intends to use the firearm in the commission of a crime, and the provision occurs:

(A) At a shooting range, shooting gallery or other area designed for the purpose of target shooting, for use during target practice, a firearms safety or training course or class or a similar lawful activity;

(B) For the purpose of hunting, trapping or target shooting, during the time in which the transferee is engaged in activities related to hunting, trapping or target shooting;

(C) Under circumstances in which the transferee and the firearm are in the presence of the transferor;

(D) To a transferee who is in the business of repairing firearms, for the time during which the firearm is being repaired;

PAGE - 7       New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

(E) To a transferee who is in the business of making or repairing custom accessories for firearms, for the time during which the accessories are being made or repaired; or

(F) For the purpose of preventing imminent death or serious physical injury, and the provision lasts only as long as is necessary to prevent the death or serious physical injury.

(b) "Transferee" means a person who is not a gun dealer or licensed as a manufacturer or importer under 18 U.S.C. 923 and who intends to receive a firearm from a transferor.

(c) "Transferor" means a person who is not a gun dealer or licensed as a manufacturer or importer under 18 U.S.C. 923 and who intends to deliver a firearm to a transferee.

(2) Except as provided in ORS 166.436 and 166.438 and subsection (4) of this section, a transferor may not transfer a firearm to a transferee unless the transfer is completed through a gun dealer as described in subsection (3) of this section.

(3)(a) A transferor may transfer a firearm to a transferee only as provided in this section. Except as provided in paragraph (b) of this subsection, prior to the transfer both the transferor and the transferee must appear in person before a gun dealer, with the firearm **and a valid permit-to-purchase issued to the transferee under section 4 of this 2022 Act**, and request that the gun dealer perform a criminal background check on the transferee.

(b) If the transferor and the transferee reside over 40 miles from each other, the transferor may ship or deliver the firearm to a gun dealer located near the transferee or a gun dealer designated by the transferee, and the transferor need not appear before the gun dealer in person.

(c) A gun dealer who agrees to complete a transfer of a firearm under this section shall request a criminal history record check on the transferee as described in ORS 166.412 and shall comply with all requirements of federal law.

(d) If, upon completion of a criminal background check, the gun dealer:

(A) Receives a unique approval number from the Department of State Police indicating that the transferee is qualified to complete the transfer, the gun dealer shall notify the transferor, enter the firearm into the gun dealer's inventory and transfer the firearm to the transferee.

(B) Receives notification that the transferee is prohibited by state or federal law from possessing or receiving the firearm **or that the department is unable to determine if the transferee is qualified or disqualified from completing the transfer**, the gun dealer shall notify the transferor and neither the transferor nor the gun dealer shall transfer the firearm to the transferee. If the transferor shipped or delivered the firearm to the gun dealer pursuant to paragraph (b) of this subsection, the gun dealer shall comply with federal law when returning the firearm to the transferor.

(e) A gun dealer may charge a reasonable fee for facilitating a firearm transfer pursuant to this section.

(4) The requirements of subsections (2) and (3) of this section do not apply to:

(a) The transfer of a firearm by or to a law enforcement agency, or by or to a law enforcement officer, private security professional or member of the Armed Forces of the United States, while that person is acting within the scope of official duties.

(b) The transfer of a firearm as part of a firearm turn-in or buyback event, in which a law enforcement agency receives or purchases firearms from members of the public.

(c) The transfer of a firearm to:

(A) A transferor's spouse or domestic partner;

(B) A transferor's parent or stepparent;

(C) A transferor's child or stepchild;

(D) A transferor's sibling;

(E) A transferor's grandparent;

(F) A transferor's grandchild;

(G) A transferor's aunt or uncle;

(H) A transferor's first cousin;

(I) A transferor's niece or nephew; or

(J) The spouse or domestic partner of a person specified in subparagraphs (B) to (I) of this paragraph.

(d) The transfer of a firearm that occurs because of the death of the firearm owner, provided that:

(A) The transfer is conducted or facilitated by a personal representative, as defined in ORS 111.005, or a trustee of a trust created in a will; and

PAGE - 8     New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter in [~~struck through~~ and bracketed] is intended to be omitted.

(B) The transferee is related to the deceased firearm owner in a manner specified in paragraph (c) of this subsection.

(5)(a) A transferor who fails to comply with the requirements of this section commits a Class A misdemeanor.

(b) Notwithstanding paragraph (a) of this subsection, a transferor who fails to comply with the requirements of this section commits a Class B felony if the transferor has a previous conviction under this section at the time of the offense.

### REQUIRES PERMITS FOR ALL TRANSFERS AT GUN SHOWS

**SECTION 8.** ORS 166.436 is amended to read:

(1) The Department of State Police shall make the telephone number established under ORS 166.412 (5) available for requests for criminal background checks under this section from persons who are not gun dealers and who are transferring firearms at gun shows.

(2) Prior to transferring a firearm at a gun show, a transferor who is not a gun dealer [may request] **shall** by telephone **verify that the transferee has a valid permit-to-purchase a firearm under section 4 of this 2022 Act and request** that the department conduct a criminal background check on the recipient upon providing the following information to the department:

(a) The name , address and telephone number of the transferor;

(b) The make , model, caliber and manufacturer's number of the firearm being transferred;

(c) The name, date of birth , race, sex and address of the recipient ;

(d) The Social Security number of the recipient if the recipient voluntarily provides that number ;

(e) The address of the place where the transfer is occurring; and

(f) The type, issuer and identification number of a current piece of

identification bearing a recent photograph of the recipient presented by the recipient. The identification presented by the recipient must meet the requirements of ORS 166.412 (4)( a).

(3)(a) Upon receipt of a request for a criminal background check under this section, the department shall immediately, during the telephone call or by return call:

(A) Determine from criminal records and other information available to it whether the recipient is disqualified under ORS 166.470 from completing the transfer or is otherwise prohibited by state or federal law from possessing a firearm; and

(B) Notify the transferor when a recipient is disqualified from completing the transfer or provide the transferor with a unique approval number indicating that the recipient is qualified to complete the transfer. The unique approval number is a permit valid for 24 hours for the requested transfer. If the firearm is not transferred from the transferor to the recipient within 24 hours after receipt of the unique approval number, a new request must be made by the transferor.

(b) If the department is unable to determine whether the recipient is qualified for or disqualified from completing the transfer within 30 minutes of receiving the request , the department shall notify the transferor and provide the transferor with an estimate of the time when the department will provide the requested information.

**(c) The transferor may not transfer the firearm unless the transferor receives a unique approval number from the department and, within 48 hours of the completed transfer, the transferor shall notify the state that the transfer to the permit holder was completed.**

(4) A public employee or public agency incurs no criminal or civil liability for performing the criminal background checks required by this section, provided the employee or agency acts in good faith and without malice.

(5)(a) The department may retain a record of the information obtained during a request for a criminal background check under this section for the period of time provided in ORS 166.412 (7), **as amended by this 2022 Act**.

(b) The record of the information obtained during a request for a criminal background check under this section is exempt from disclosure under public records law.

(c) If the department determines that a recipient is prohibited from possessing a firearm under ORS 166.250 (l)(c), the department shall report the attempted transfer, the recipient's name and any other personally identifiable information to all federal, state and local law enforcement agencies and district attorneys that have jurisdiction over the location or locations where the attempted transfer was made and where the recipient resides.

PAGE - 9       New sections are in **boldfaced** type. Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

(d) If the department determines that, based on the judgment of conviction, the recipient is prohibited from possessing a firearm as a condition of probation or that the recipient is currently on post-prison supervision or parole, the department shall report the attempted transfer to the recipient's supervising officer and the district attorney of the county in which the conviction occurred.

(e) If the department determines that the recipient is prohibited from possessing a firearm due to a court order described in ORS 166.255 (1)(a), the department shall report the attempted transfer to the court that issued the order.

(f) If the department determines that the recipient is under the jurisdiction of the Psychiatric Security Review Board, the department shall report the attempted transfer to the board.

(g) Reports required by paragraphs (c) to (f) of this subsection shall be made within 24 hours after the determination is made, unless a report would compromise an ongoing investigation, in which case the report may be delayed as long as necessary to avoid compromising the investigation.

(h) On or before January 31 of each year, a law enforcement agency or a prosecuting attorney's office that received a report pursuant to paragraph (c) of this subsection during the previous calendar year shall inform the department of any action that was taken concerning the report and the outcome of the action.

(i) The department shall annually publish a written report, based on any information received under paragraph (h) of this subsection, detailing the following information for the previous year:

(A) The number of recipients whom the department determined were prohibited from possessing a firearm under ORS 166.250 (1)(c), arranged by category of prohibition;

(B) The number of reports made pursuant to paragraph (c) of this subsection;

(C) The number of investigations arising from the reports made pursuant to paragraph (c) of this subsection, the number of investigations concluded and the number of investigations referred for prosecution, all arranged by category of prohibition; and

(D) The number of criminal charges arising from the reports made pursuant to paragraph (c) of this subsection and the disposition of the charges, both arranged by category of prohibition.

(6) The recipient of the firearm must be present when the transferor requests a criminal back-ground check under this section.

(7)(a) Except as otherwise provided in paragraph (b) of this subsection, a transferor who receives notification under this section that the recipient is qualified to complete the transfer of a firearm, has the recipient fill out the form required by ORS 166.438 (1)(a) and retains the form as required by ORS 166.438 (2) is immune from civil liability for any use of the firearm from the time of the transfer unless the transferor knows, or reasonably should know, that the recipient is likely to commit an unlawful act involving the firearm.

(b) The immunity provided by paragraph (a) of this subsection does not apply:

(A) If the transferor knows, or reasonably should know, that the recipient of the firearm intends to deliver the firearm to a third person who the transferor knows, or reasonably should know, may not lawfully possess the firearm; or

(B) In any product liability civil action under ORS 30.900 to 30.920.

**REQUIRES PERMITS FOR ALL TRANSFERS AT GUN SHOWS (2015 Amendment)**

**SECTION 9.** ORS 166.438 is amended to read:

(1) A transferor who is not a gun dealer may not transfer a firearm at a gun show unless the transferor:

 **(a)(A) Verifies with the department that the recipient has a valid permit-to-purchase  issued under section 4 of this 2022 Act;**

([A]**B**) Requests a criminal background check under ORS 166.436 prior to completing the transfer;

([B]**C**) Receives a unique approval number from the department indicating that the recipient is qualified to complete the transfer; and

([C]**D**) Has the recipient complete the form described in ORS 166.441; or

(b) Completes the transfer through a gun dealer.

(2) The transferor shall retain the completed form referred to in subsection (1) of this section for at least five years and shall make the completed form available to law enforcement agencies for the purpose of criminal investigations.

(3) A person who organizes a gun show shall post in a prominent place at the gun show a notice explaining the requirements of subsections (1) and (2) of this section. The person shall provide the form required by subsection (1) of this section to any person transferring a firearm at the gun show.

PAGE - 10      New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [struck through and bracketed] is intended to be omitted.

(4) Subsection (1) of this section does not apply if the transferee is licensed as a dealer under 18 U.S.C. 923.

(5)(a) Failure to comply with the requirements of subsection (1), (2) or (3) of this section is a Class A misdemeanor.

(b) Notwithstanding paragraph (a) of this subsection, failure to comply with the requirements of subsection (1), (2) or (3) of this section is a Class C felony if the person has two or more previous convictions under this section **at the time of the offense.**

(6) It is an affirmative defense to a charge of violating subsection (1) or (3) of this section that the person did not know, or reasonably could not know, that more than 25 firearms were at the site and available for transfer.

**SECTION 10.** **The amendments to ORS 166.412, 166.435, 166.436 and 166.438 by sections 3 to 9 of this 2022 Act apply to firearm transfers conducted on or after the effective date of this 2022 Act.**

**PROHIBITIONS/EXCEPTIONS TO LARGE-CAPACITY MAGAZINES**

**SECTION 11.** **(1) As used in this section:**

**(a) "Armed Forces of the United States" has the meaning given that term in ORS 348.282.**

**(b) "Detachable magazine" means an ammunition feeding device that can be loaded or unloaded while detached from a firearm and readily inserted in a firearm;**

**(c) "Fixed magazine" means an ammunition feeding device contained in or permanently attached to a firearm in such a manner that the device cannot be removed without disassembly of the firearm action;**

**(d) "Large-capacity magazine" means a fixed or detachable magazine, belt, drum, feed strip, helical feeding device, or similar device, including any such device joined or coupled with another in any manner, or a kit with such parts, that has an overall capacity of, or that can be readily restored, changed, or converted to accept, more than 10 rounds of ammunition and allows a shooter to keep firing without having to pause to reload, but does not include any of the following:**

**(A) An ammunition feeding device that has been permanently altered so that it is not capable, now or in the future, of accepting more than 10 rounds of ammunition;**

**(B) An attached tubular device designed to accept, and capable of operating only with 0.22 caliber rimfire ammunition; or**

**(C) A tubular ammunition feeding device that is contained in a lever-action firearm.**

**(e) "Loaded" has the meaning given that term in ORS 166.360;**

**(f) "Person" means any natural person, corporation, partnership, fire or association.**

**(2) Notwithstanding ORS 166.250 to 166.470, and except as expressly provided in subsections (3) to (5) of this section, a person commits the crime of unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of large-capacity magazines if the person manufactures, imports, possesses, uses, purchases, sells or otherwise transfers any large-capacity magazine in Oregon on or after the effective date of this 2022 Act.**

**(3) Subsection (2) of the section does not apply during the first 180 days following the effective date of this 2022 Act, with respect to:**

**(a) A licensed gun dealer that within 180 days of the effective date of this 2022 Act:**

**(A) Transfers or sells the large-capacity magazines in the gun dealer's inventory to a non-resident gun dealer or other transferee outside of this state;**

**(B) Purchases or acquires temporary custody from an owner of any large-capacity magazine for permanent removal from this state within 180 days of the effective date of this 2022 Act;**

**(C) Permanently alters any large-capacity magazine in the gun dealer's inventory or custody so that it is not capable, upon alteration or in the future, of accepting more than 10 rounds of ammunition or permanently alter the magazine so it is no longer a; or**

**(D) Permanently disposes of the large-capacity magazines in the gun dealer's custody or inventory.**

**(b) A firearms manufacturer, properly licensed under federal, state and local law, that is a party to a contract, in existence and binding on the effective date of this 2022 Act, with an entity outside of this state, for the manufacture of large-capacity magazines, provided that:**

**(A) All manufacturing is completed no later than 180 days after the effective date of this 2022 Act; and**

**(B) The entity outside of Oregon receiving the large-capacity magazines is made aware in writing on or before the delivery of the ammunition devices of the restrictions pertaining to large-capacity magazines in this state as set forth in this 2022 Act.**

**(4) Subsection (2) of the section does not apply at any time to:**

PAGE - 11      New sections are in **boldfaced** type.  Matter in amended sections in **boldfaced** type is new; matter [~~struck through~~ and bracketed] is intended to be omitted.

(a) A firearms manufacturer properly licensed under federal, state and local law that manufactures large-capacity magazines, provided:

(A) The manufacturing is for exclusive sale or transfer to the Armed Forces of the United States or a law enforcement agency and solely for authorized use by that entity related to the official duties of the entity; and

(B) Any large-capacity magazine, permitted to be manufactured under paragraph (a)(A) of this subsection after the effective date of this 2022 Act, shall include a permanent stamp or marking indicating that the large-capacity magazine was manufactured or assembled after the effective date of this 2022 Act. The stamp or marking must be legibly and conspicuously engraved or cast upon the outer surface of the large-capacity magazine. The department may promulgate such rules as may be necessary for the implementation of this section, including but not limited to rules requiring such large-capacity magazine be stamped with information indicating the limitation for use only by military and law enforcement or such other identification to distinguish clearly large-capacity magazines manufactured after the effective date of this 2022 Act.  Except as provided in paragraph (3)(b) of this section, no large-capacity magazines without such stamp may be manufactured in this state after the effective date of this Act.

(b) A licensed gun dealer that sells or otherwise transfers large-capacity magazines to the Armed Forces of the United States or a law enforcement agency solely for authorized use by that entity, provided the large-capacity magazines have been engraved as provided in paragraph (a)(B) of this subsection.

(c) Any government officer, agent or employee, member of the Armed Forces of the United States or peace officer, as that term is defined in ORS 133.005, that is authorized to acquire, possess or use a large-capacity magazine provided that any acquisition, possession or use is related directly to activities within the scope of that person's official duties.

(5) As of the effective date of this 2022 Act, it shall be an affirmative defense, as provided in ORS 166.055, to the unlawful possession, use and transfer of a large-capacity magazine in this state by any person, provided that:

(a) The large-capacity magazine was owned by the person before the effective date of this 2022 Act and maintained in the person's control or possession; or

(b) The possession of a large-capacity magazine was obtained by a person who, on or after the effective date of this section, acquired possession of the large-capacity magazine by operation of law upon the death of a former owner who was in legal possession of the large-capacity magazine; and

(c) In addition to either (a) or (b) of this subsection the owner has not maintained the large-capacity magazine in a manner other than:

(A) On property owned or immediately controlled by the registered owner;

(B) On the premises of a gun dealer or gunsmith licensed under 18 U.S.C. 923 for the purpose of lawful service or repair;

(C) While engaging in the legal use of the large-capacity magazine, at a public or private shooting range or shooting gallery or for recreational activities such as hunting, to the extent permitted under state law; or

(D) While participating in firearms competition or exhibition, display or educational project about firearms sponsored, conducted by, approved or under the auspices of a law enforcement agency or a national or state-recognized entity that fosters proficiency in firearms use or promotes firearms education; and

(E) While transporting any large-capacity magazines in a vehicle to one of the locations authorized in paragraphs (c)(A) to (D) of this subsection, the large-capacity magazine is not inserted into the firearm and is locked in a separate container.

(d) The person has permanently and voluntarily relinquished the large-capacity magazine to law enforcement or to a buyback or turn-in program approved by law enforcement, prior to commencement of prosecution by arrest, citation or a formal charge.

(6) Unlawful manufacture, importation, possession, use, purchase, sale or otherwise transferring of a large-capacity magazine is a class A misdemeanor.

 **SECTION 12.** If any provision of this 2022 Act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of this Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable. The people hereby declare that they would have adopted this Chapter, notwithstanding the unconstitutionality, invalidity and ineffectiveness of any one of its articles, sections, subsections, sentences or clauses.

 **SECTION 13.**  The provisions of this 2022 Act apply to all actions taken on or after the effective date of this 2022 Act, unless expressly stated otherwise herein. This 2022 Act may be known and cited as the Reduction of Gun Violence Act.

RECEIVED
MAY 4, 2021 9:00am
Elections Division

**000112**
**ER_1513**

**CERTIFICATE OF SERVICE**
**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT**
**OF PLAINTIFFS' SUPPLEMENTAL BRIEF**

on the following parties by electronically filing the foregoing on December 1, 2022, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Kevin J. Kelly
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
kevin.kelly@doj.ca.gov


I declare under penalty of perjury that the foregoing is true and correct. Executed on December 1, 2022, at Long Beach, CA.

Laura Palmerin

CERTIFICATE OF SERVICE

17cv1017

**ER_1514**

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
    300 South Spring Street, Suite 1702
5   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6177
6   Fax:  (916) 731-2144
    E-mail:  Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
8  *State of California*

9           IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                      CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          Case No.   17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**
    **CHRISTOPHER WADDELL, and**          **SUPPLEMENTAL**
15  **CALIFORNIA RIFLE & PISTOL**         **DECLARATION OF LUCY P.**
    **ASSOCIATION, INC., a California**   **ALLEN**
16  **corporation,**
                                          Courtroom:    5A
17                         Plaintiffs,    Judge:        Hon. Roger T. Benitez
                                          Action Filed: May 17, 2017
18          **v.**

19
    **ROB BONTA, in his official capacity as**
20  **Attorney General of the State of**
    **California; and DOES 1-10,**
21
                           Defendants.
22

23

24

25

26

27

28

### SUPPLEMENTAL DECLARATION OF LUCY ALLEN

I, Lucy P. Allen, declare under penalty of perjury under the laws of the United States that the information in this declaration is true:

1. I previously submitted a declaration in connection to the Attorney General's Opposition to Plaintiffs' Motion for Preliminary Injunction, which was filed with this Court on June 5, 2017 (the "2017 Declaration"), and an expert report filed with this Court on April 9, 2018 (the "2018 Report).[1] I make this supplemental declaration providing additional data and analysis in connection to Defendants' Supplemental Brief in Response to the Court's Order of September 26, 2022.

2. I am a Managing Director of NERA Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice and Chair of NERA's Product Liability and Mass Torts Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.

3. In my over 25 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving economics and statistics. I have been qualified as an expert and testified in court on various economic and statistical issues relating to the flow of guns into the criminal market. I have testified at trials in Federal and State Courts, before the New York City Council Public Safety Committee, the American Arbitration Association and the Judicial Arbitration Mediation Service, as well as in depositions.

---

[1] My 2018 Report was marked as Exhibit 1 to the Declaration of John Echeverria and filed in this matter at Docket Number 53-4.

4.     I have an A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers. My resume with recent publications and testifying experience is included as Exhibit A.

5.     This declaration reports the results of my analyses with respect to the following issues: (a) the number of rounds of ammunition fired by individuals using a gun in self-defense; and (b) the outcomes when large-capacity magazines are used in public mass shootings, including the associated number of casualties.

**OPINIONS**

**A.     Number of Rounds Fired by Individuals in Self-Defense**

6.     Plaintiffs claim the "large-capacity magazines" covered by California Penal Code section 32310 (which are magazines capable of holding more than ten rounds) are commonly used for lawful purposes, including for self-defense.[2]

7.     The number of rounds commonly needed by individuals to defend themselves cannot be practically or ethically determined with controlled scientific experiments and there is no source that systematically tracks or maintains data on the number of rounds fired by individuals in self-defense. Due to these limitations, I have analyzed available data sources to estimate the number of rounds fired by individuals to defend themselves. In particular, I have analyzed data from the NRA Institute for Legislative Action, as well as my own study of news reports on incidents of self-defense with a firearm. In all, I have analyzed almost 1,000 incidents of self-defense

---

[2] See, for example, Complaint for Declaratory and Injunctive Relief, filed May 17, 2017, ¶¶2, 47.

2

with a firearm and found that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

8.      The NRA maintains a database of "Armed Citizen" stories describing private citizens who have successfully defended themselves, or others, using a firearm ("NRA Armed Citizen database"). According to the NRA, the "Armed Citizen" stories "highlight accounts of law-abiding gun owners in America using their Second Amendment rights to defend self, home and family."[3] Although the methodology used to compile the NRA Armed Citizen database of stories is not explicitly detailed by the NRA, the NRA Armed Citizen database is a useful data source in this matter for at least three reasons. First, the Armed Citizen database was the largest collection of accounts of citizen self-defense compiled by others that I was able to find.[4] Second, the incidents listed in the Armed Citizen database highlight the very conduct that Plaintiffs claim the California law impedes (*i.e.*, the use of firearms by law-abiding citizens for self-defense).[5] Third, the Armed Citizen database is compiled by an entity that actively opposes restrictions on magazine capacity and restrictions on the possession and use of firearms in general.[6] In light of the positions taken by the entity compiling the data, I would expect that any selection bias would be in favor of stories that put use of guns in self-defense in the best possible light and

---

[3] NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017.

[4] Note that in 2020, after the time my research was conducted, The Heritage Foundation began an online database of its own sample of defensive gun use incidents (https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us).

[5] Complaint for Injunctive and Declaratory Relief, May 17, 2017, ¶47.

[6] See, for example, NRA Civil Rights Defense Fund website, http://www.nradefensefund.org/current-litigation.aspx, accessed October 12, 2018.

might highlight the apparent need of guns and/or multiple rounds in self-defense incidents.

9. My team and I performed an analysis of incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017.[7] For each incident, the city/county, state, venue (whether the incident occurred on the street, in the home, or elsewhere) and the number of shots fired were tabulated.[8] The information was gathered for each incident from both the NRA synopsis and, where available, an additional news story. An additional news story was found for over 95% of the incidents in the NRA Armed Citizen database.

10. According to this analysis of incidents in the NRA Armed Citizen database, it is rare for a person, when using firearms in self-defense, to fire more than ten rounds. Out of 736 incidents, there were two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets.[9] Defenders fired 2.2 shots on average.[10] In 18.2% of incidents, the defender did not fire any shots.

---

[7] My collection and coding of the NRA Armed Citizen stories was last performed in mid-2017.

[8] The following incidents were excluded from the analysis: (1) duplicate incidents, (2) wild animal attacks, and (3) one incident where the supposed victim later pleaded guilty to covering up a murder. When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

[9] Note that the only two incidents with more than 10 bullets fired were added to the NRA Armed Citizen database in 2016 and 2017 after an earlier analysis that I had conducted of the database had been submitted to and cited by the Court in *Kolbe v. O'Malley*, Case No. CCB-13-2841 (Dkt. 79).

[10] Note that the analysis is focused on shots fired when using a gun in self-
(continued...)

4

1   These incidents highlight the fact that in many instances defenders are able to defend
2   themselves without firing any shots. For example, according to one of the incidents
3   in the NRA Armed Citizen Database:

4
5       "A man entered a Shell station in New Orleans, La. and attempted to rob a
6       cashier, by claiming he was carrying a gun. The cashier responded by
7       retrieving a gun and leveling it at the thief, prompting the criminal to flee. (The
8       Times Picayune, New Orleans, La. 09/02/15)"[11]

9       11.    For incidents occurring in the home (56% of total), defenders fired an
10  average of 2.1 shots, and fired no shots in 16.1% of incidents. For incidents occurring
11  outside the home (44%) of total, defenders fired an average of 2.2 shots, and fired no
12  shots in 20.9% of incidents.[12] The table below summarizes these findings:

13
14
15
16
17
18
19
20  _____

21  defense and therefore the average includes instances when no shots are fired. If one
    calculates the average excluding incidents of self-defense with a gun without firing
22  shots, the average is still low, 2.6 shots when at least one shot is fired.
23      [11] "Gas station clerk scares off robber," NRA-ILA Armed Citizen, September
    9, 2015.
24      [12] A separate study of incidents in the NRA Armed Citizen database for an
25  earlier period (the five-year period from 1997 through 2001) found similar results.
    Specifically, this study found that, on average, 2.2 shots were fired by defenders
26  and that in 28% of incidents of armed citizens defending themselves the individuals
    fired no shots at all. See, Claude Werner, "The Armed Citizen – A Five Year
27  Analysis," http://gunssaveslives.net/self-defense/analysis-of-five-years-of-armed-
    encounters-with-data-tables, accessed January 10, 2014.
28

**Number of Shots Fired in Self-Defense**
**Based on NRA Armed Citizen Incidents in the United States**
**January 2011 - May 2017**

| | Shots Fired by Individual in Self-Defense | | |
| | Overall | Incidents in Home | Outside the Home |
| --- | --- | --- | --- |
| Average Shots Fired | 2.2 | 2.1 | 2.2 |
| Number of Incidents with No Shots Fired | 134 | 66 | 68 |
| Percent of Incidents with No Shots Fired | 18.2% | 16.1% | 20.9% |
| Number of Incidents with >10 Shots Fired | 2 | 2 | 0 |
| Percent of Incidents with >10 Shots Fired | 0.3% | 0.5% | 0.0% |

**Notes and Sources:**
Data from NRA Armed Citizen database covering 736 incidents (of which 411 were in the home) from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks, and one incident where the supposed victim later pleaded guilty to covering up a murder.

12.     We also performed the same analysis of the NRA Armed Citizen database limited to incidents that occurred in California. According to this analysis, defenders in California fired 2.0 shots on average. Out of 47 incidents, there were no incidents in which the defender was reported to have fired more than 10 bullets. In 27.7% of incidents, the defender did not fire any shots, and simply threatened the offender with a gun. For incidents occurring in the home (60% of total), defenders fired an average of 1.9 shots, and fired no shots in 32.1% of incidents. For incidents occurring outside the home (40% of total), defenders fired an average of 2.2 shots and fired no shots in 21.1% of incidents. The table below summarizes these findings for California:

6

**Number of Shots Fired in Self-Defense**
**Based on NRA Armed Citizen Incidents in California**
**January 2011 - May 2017**

| | Shots Fired by Individual in Self-Defense | | |
| --- | --- | --- | --- |
| | Overall | Incidents in Home | Outside the Home |
| Average Shots Fired | 2.0 | 1.9 | 2.2 |
| Number of Incidents with No Shots Fired | 13 | 9 | 4 |
| Percent of Incidents with No Shots Fired | 27.7% | 32.1% | 21.05% |
| Number of Incidents with >10 Shots Fired | 0 | 0 | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% | 0.0% | 0.0% |

**Notes and Sources:**
Data from NRA Armed Citizen database covering 47 incidents In California (of which 28 were in the home) from January 2011 through May 2017. Excludes repeat stories, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

13.    In addition to our analysis of incidents in the NRA Armed Citizen database, we performed a systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, focusing on the same types of incidents as the NRA stories and covering the same time period.[13]

14.    To identify relevant news stories to include in our analysis, we performed a comprehensive search of published news stories using Factiva, an online news reporting service and archive owned by Dow Jones, Inc. that aggregates news content from nearly 33,000 sources.[14] The search was designed to return stories about

_____

[13] This analysis was initially conducted to research issues regarding self-defense in the home, which was a focus before the 2022 *New York State Rifle & Pistol Association v. Bruen* Supreme Court decision. The analysis of the NRA Armed Citizen incidents described above indicates that the number of shots fired in self-defense outside the home is similar to those inside the home.

[14] Factiva is often used for academic research. For example, a search for the

(continued...)

7

1  the types of incidents that are the focus of the NRA Armed Citizen database and that

2  Plaintiffs claim the California law impedes – in particular, the use of firearms for

3  self-defense.[15] The search identified all stories that contained the following keywords

4  in the headline or lead paragraph: one or more words from "gun," "shot," "shoot,"

5

6  "fire," or "arm" (including variations on these keywords, such as "shooting" or

7  "armed"), plus one or more words from "broke in," "break in," "broken into,"

8  "breaking into," "burglar," "intruder," or "invader" (including variations on these

9  keywords) and one or more words from "home," "apartment," or "property"

10  (including variations on these keywords).[16] The search criteria match approximately

11  90% of the NRA stories on self-defense with a firearm in the home, and an analysis

12  of the 10% of stories that are not returned by the search shows that the typical number

13

14  of shots fired in these incidents was no different than in other incidents.[17] The search

15  covered the same period used in our analysis of incidents in the NRA Armed Citizen

16

17  _____

18  term "Factiva" on Google Scholar yields over 28,000 results. As another example, a
    search on Westlaw yields at least 83 expert reports that conducted news searches
19  using Factiva.

20  [15] NRA Institute for Legislative Action, Armed Citizens,
    https://www.nraila.org/gun-laws/armed-citizen/, accessed May 28, 2017. See, also,
21  Complaint for Declaratory and Injunctive Relief, filed May 17, 2017, ¶47.

22  [16] The precise search string used was: (gun* or shot* or shoot* or fire* or
    arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar*
23  or intrud* or inva*) and (home* or "apartment" or "property"). An asterisk denotes
    a wildcard, meaning the search includes words which have any letters in place of
24  the asterisk. For example, a search for shoot* would return results including
    "shoots," "shooter" and "shooting." The search excluded duplicate stories classified
25  as "similar" on Factiva.

26  [17] The analysis and search would have used criteria to match actual incidents
    involving Plaintiffs or California residents, but, based on the Complaint for
27  Injunctive and Declaratory Relief, Plaintiffs have not identified any incidents of the
    type they claim the California law will impede.
28

8

database (January 2011 to May 2017). The region for the Factiva search was set to "United States." The search returned approximately 35,000 stories for the period January 2011 to May 2017.[18]

15.    Using a random number generator, a random sample of 200 stories was selected for each calendar year, yielding 1,400 stories in total.[19] These 1,400 stories were reviewed to identify those stories that were relevant to the analysis, *i.e.*, incidents of self-defense with a firearm in or near the home. This methodology yielded a random selection of 200 news stories describing incidents of self-defense with a firearm in the home out of a population of approximately 4,800 relevant stories.[20] Thus, we found that out of the over 70 million news stories aggregated by Factiva between January 2011 and May 2017, approximately 4,800 news stories were on incidents of self-defense with a firearm in the home. We analyzed a random selection of 200 of these stories.

-----

[18] The effect of using alternative keywords was considered. For example, removing the second category ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and including incidents in which the assailant was already inside the home and/or was known to the victim was considered. *A priori*, there was no reason to believe that a larger number of shots would be used in these incidents and based on an analysis of the NRA stories we found that the number of shots fired in incidents when defending against someone already in the home was not different than those with an intruder.

[19] The random numbers were generated by sampling with replacement.

[20] The approximately 4,800 relevant news stories were estimated by calculating the proportion of relevant news stories from the 200 randomly selected stories each year and applying that proportion to the number of results returned by the search for each year of the analysis. For example, in 2017, 33 out of 200 (17%) randomly selected news stories involved incidents of self-defense with a firearm in the home. Applying that proportion to the 1,595 results from the Factiva search in 2017 yields 263 relevant news stories in 2017. This process was repeated every year to arrive at a total of 4,841 relevant news stories from 2011-2017.

16.    For each news story, the city/county, state and number of shots fired were tabulated. When tabulating the number of shots fired, we used the same methodology as we used to analyze stories in the NRA Armed Citizen database.[21] We then identified other stories describing the same incident on Factiva based on the date, location and other identifying information, and recorded the number of times that each incident was covered by Factiva news stories.

17.    To determine the average number of shots fired per *incident*, we first determined the average number of shots fired per *story* and then analyzed the number of stories per incident. According to our study of a random selection from approximately 4,800 relevant stories on Factiva describing incidents of self-defense with a firearm in the home, the average number of shots fired per story was 2.61. This is not a measure of the average shots fired *per incident*, however, because the number of stories covering an incident varies, and the variation is not independent of the number of shots fired. We found that there was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering an incident.[22] We found that on average the more shots fired in a

---

[21] When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

[22] Based on a linear regression of the number of news stories as a function of the number of shots fired, the results were statistically significant at the 1% level (more stringent than the 5% level commonly used by academics and accepted by courts. See, for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980).)

10

defensive gun use incident, the greater the number of stories covering an incident. For example, as shown in the table below, we found that incidents in Factiva news stories with zero shots fired were covered on average by 1.8 news stories, while incidents with six or more shots fired were covered on average by 10.4 different news stories.

**Average Number of News Stories by Number of Shots Fired
In Factiva Stories on Incidents of Self-Defense with a Firearm
January 2011 - May 2017**

| Number of Shots Fired By Defender | Average Number of News Stories |
|---|---|
| 0 | 1.8 |
| 1 to 2 | 2.8 |
| 3 to 5 | 3.8 |
| 6 or more | 10.4 |

**Notes and Sources:**
Based on news stories describing defensive gun use in a random selection of Factiva stories between 2011 and May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 16.

18.   After adjusting for this disparity in news coverage, we find that the average number of shots fired per incident covered is 2.34.[23] Note that this

---

[23] The adjustment reflects the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home. The formula used for the adjustment is:

$$\frac{\sum_{i=1}^{n}\left(Shots\ Fired_i \times \frac{R_i}{C_i}\right)}{\sum_{i=1}^{n}\left(\frac{R_i}{C_i}\right)}$$

where:

11                                                                (continued…)

adjustment does not take into account the fact that some defensive gun use incidents may not be picked up by *any* news story. Given the observed relationship that there are more news stories when there are more shots fired, one would expect that the incidents that are not written about would on average have fewer shots than those with news stories. Therefore, the expectation is that these results, even after the adjustment, are biased upward (*i.e.*, estimating too high an average number of shots and underestimating the percent of incidents in which no shots were fired).

19.    As shown in the table below, according to the study of Factiva news stories, in 11.6% of incidents the defender did not fire any shots, and simply threatened the offender with a gun. In 97.3% of incidents the defender fired 5 or fewer shots. There were no incidents where the defender was reported to have fired more than 10 bullets.

---

$n$ = random selection of news stories on incidents of self-defense with a firearm in the home
$R_i$ = number of search results on Factiva in the calendar year of incident $i$
$C_i$ = number of news stories covering incident $i$

Supplemental Declaration of Lucy P. Allen
(17-cv-1017-BEN-JLB)

**ER_1527**

### Number of Shots Fired in Self-Defense in the Home Based on Random Selection of News Stories in Factiva January 2011 - May 2017

| | |
|---|---|
| Estimated population of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with ≤5 Shots Fired | 195 |
| Percent of Incidents with ≤5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

**Notes and Sources:**
Based on news stories describing defensive gun use in a random selection of Factiva stories between 2011 and May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 16. Number of incidents probability-weighted as per footnote 18.

20.    In sum, an analysis of incidents in the NRA Armed Citizen database, as well as our own study of a random sample from approximately 4,800 news stories describing incidents of self-defense with a firearm, indicates that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

13

**B.     Public Mass Shootings**

21.    We analyzed the use of large-capacity magazines in public mass shootings using four sources for identifying public mass shootings: Mother Jones,[24] the Citizens Crime Commission of New York City,[25] the Washington Post[26] and the Violence Project.[27, 28] The analysis focused on public mass shootings because it is my understanding that the state of California is concerned about public mass shootings and enacted the challenged law, in part, to address the problem of public mass shootings.

---

[24] "US Mass Shootings, 1982-2022: Data From Mother Jones' Investigation," Mother Jones, updated October 14, 2022, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data.

[25] "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update. Additional details on the mass shootings were obtained from an earlier source by the Citizens Crime Commission. "Mass Shooting Incidents in America (1984-2012)," Citizens Crime Commission of New York City, http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[26] "The terrible numbers that grow with each mass shooting," The Washington Post, updated May 12, 2021.

[27] "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[28] When I began research in 2013 on mass shootings, I found Mother Jones and Citizens Crime Commission to maintain the most comprehensive lists of relevant mass shootings. More recently, two additional sources, the Washington Post and The Violence Project, have compiled lists of public mass shootings. The Violence Project began work on its mass shootings database in September 2017 and its database first went online in November 2019, while the Washington Post first published its mass shootings database in February 14, 2018. There is substantial overlap between the mass shootings in all four sources. For example, the Mother Jones data contains 93% of the mass shootings in the Citizens Crime Commission data for the years covered by both data sources, 1984 to 2016, while the Washington Post contains 94% of the mass shootings in The Violence Project data for the years covered by both data sources, 1966 to 2019.

14

22.    The type of incident considered a mass shooting is generally consistent across the four sources. In particular, all four sources consider an event a mass shooting if four or more people were killed in a public place in one incident, and exclude incidents involving other criminal activity such as a robbery.[29]

---

[29] Citizen Crime Commission describes a mass shooting as "four or more victims killed" in "a public place" that were "unrelated to another crime (e.g., robbery, domestic violence)." Citizen Crime notes that its sources include "news reports and lists created by government entities and advocacy groups." "Mayhem Multiplied: Mass Shooters and Assault Weapons," Citizens Crime Commission of New York City, February 2018 update.

Mother Jones describes a mass shooting as "indiscriminate rampages in public places resulting in four or more victims killed by the attacker," excluding "shootings stemming from more conventionally motivated crimes such as armed robbery or gang violence." Although in January 2013 Mother Jones changed its definition of mass shooting to include instances when three or more people were killed, for this declaration we only analyzed mass shootings where four or more were killed to be consistent with the definition of the other three sources. "A Guide to Mass Shootings in America," Mother Jones, updated October 14, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. See also, "What Exactly is a Mass Shooting," Mother Jones, August 24, 2012. http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting.

The Washington Post source describes a mass shooting as "four or more people were killed, usually by a lone shooter" excluding "shootings tied to robberies that went awry" and "domestic shootings that took place exclusively in private homes." A The Washington Post notes that its sources include "Grant Duwe, author of 'Mass Murder in the United States: A History,' Mother Jones and Washington Post research," as well as "Violence Policy Center, Gun Violence Archive; FBI 2014 Study of Active Shooter Incidents; published reports." "The terrible numbers that grow with each mass shooting,"
The Washington Post, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

The Violence Project indicates that it uses the Congressional Research Service definition of a mass shooting: "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or

(continued…)

15

23.    Each of the four sources contains data on mass shootings covering different time periods. The Mother Jones data covers 112 mass shootings from 1982 to October 13, 2022,[30] the Citizens Crime Commission data covers 80 mass shootings from 1984 to February 2018,[31] the Washington Post data covers 185 mass shootings from 1966 to May 12, 2021,[32] and The Violence Project data covers 182 mass shootings from 1966 to May 14, 2022.[33, 34]

---

other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)." The Violence Project notes that its sources include "Primary Sources: Written journals / manifestos / suicide notes etc., Social media and blog posts, Audio and video recordings, Interview transcripts, Personal correspondence with perpetrators" as well as "Secondary Sources (all publicly available): Media (television, newspapers, magazines), Documentary films, Biographies, Monographs, Peer-reviewed journal articles, Court transcripts, Law Enforcement records, Medical records, School records, Autopsy reports." "Mass Shooter Database," The Violence Project, https://www.theviolenceproject.org/methodology/, accessed January 17, 2020.

[30] "A Guide to Mass Shootings in America," Mother Jones, updated October 14, 2022, http://www.motherjones.com/politics/2012/07/mass-shootings-map. Excludes mass shootings where only three people were killed. Note this analysis of the Mother Jones data may not match other analyses because Mother Jones periodically updates its historical data.

[31] "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, February 2018 update.

[32] "The terrible numbers that grow with each mass shooting," *The Washington Post*, updated May 12, 2021, https://www.washingtonpost.com/graphics/2018/national/mass-shootings-in-america/.

[33] "Mass Shooter Database," *The Violence Project* https://www.theviolenceproject.org/mass-shooter-database/, updated May 14, 2022.

[34] Note that I have updated this mass shooting analysis to include more recent incidents, as well as more recently available details. In my 2017 declaration in *Virginia Duncan et al. v. California Attorney General*, I included data on mass shootings through April 2017. In my 2018 declaration in *Rupp v. California Attorney General*, I updated the analysis to include data on mass shootings through

(continued…)

16

24.     Note that the two more recently compiled sources of mass shootings, the Washington Post and The Violence Project, include additional mass shootings that were not covered by either Mother Jones or Citizens Crime Commission.  In general, we found that these additional mass shootings were less covered by the media and involved fewer fatalities and/or injuries than the ones previously identified by Mother Jones or Citizens Crime Commission. For example, using the mass shooting data for the period 1982 through 2019, we found that the median number of news stories for a mass shooting included in Mother Jones and/or Citizen Crime Commission was 317, while the median for the additional mass shootings identified in the Washington Post and/or The Violence Project was 28.[35] In addition, we found an average of 21 fatalities or injuries for a mass shooting included in Mother Jones and/or Citizen Crime Commission, while only 6 fatalities or injuries for the additional mass shootings identified in the Washington Post and/or The Violence Project.

---

September 2018. The analyses in both of these declarations included mass shootings only from Mother Jones and the Citizen Crime Commission. In my 2020 declaration in *James Miller et al. v. California Attorney General*, I updated the analysis to include mass shootings through December 2019 and added mass shootings from two more sources, the Washington Post and the Violence Project. The number of mass shootings, as well as some details about the shootings, are not identical across these declarations for three main reasons. First, I have updated the analysis to include more recent incidents as well as more recently available details. Second, starting in 2020, I added two more sources (Washington Post and Violence Project), which include additional mass shootings and details not included in the initial sources. Third, even though Mother Jones included instances when three or more people were killed, for my declarations and reports starting in 2020, I only included mass shootings where four or more were killed to be consistent with the definition of the other three sources.

[35] The search was conducted over all published news stories on Factiva. The search was based on the shooter's name and the location of the incident over the period from one week prior to three months following each mass shooting.

17

25.     We combined the data from the four sources for the period 1982 through 2019, and searched news stories on each mass shooting to obtain additional details on the types of weapons used as well as data on shots fired where available. We identified, based on this publicly available information, which mass shootings involved the use of large-capacity magazines. See attached Exhibit B for a summary of the combined data based on Mother Jones, Citizens Crime Commission, the Washington Post, the Violence Project, and news reports.

**1.     Use of large-capacity magazines in public mass shootings**

26.     Based on the data through 2019, we found that large-capacity magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in public mass shootings. Magazine capacity is known in 105 out of the 161 mass shootings (or 65%) considered in this analysis. Out of the 105 mass shootings with known magazine capacity, 63 (or 60%) involved large-capacity magazines. Even assuming the mass shootings with unknown magazine capacity *all* did not involve large-capacity magazines, 63 out of 161 mass shootings or 39% of mass shootings involved large capacity magazines. (See table below.)

27.     Based on our analysis of the public mass shootings data through 2019, casualties were higher in the mass shootings that involved weapons with large-capacity magazines than in other mass shootings. In particular, we found an average number of fatalities or injuries of 27 per mass shooting with a large-capacity magazine versus 9 for those without. Focusing on just fatalities, we found an average number of fatalities of 10 per mass shooting with a large-capacity magazine versus 6 for those without. (See table below.)

Supplemental Declaration of Lucy P. Allen
(17-cv-1017-BEN-JLB)

**ER_1533**

**Numbers of Fatalities and Injuries in Public Mass Shootings**
**January 1982 - December 2019**

| Weapon Used | # of Incidents | Average # of | | |
| --- | --- | --- | --- | --- |
| | | Fatalities | Injuries | Total |
| LCM | 63 | 10 | 17 | 27 |
| Non-LCM | 42 | 6 | 3 | 9 |
| Unknown | 56 | 5 | 3 | 7 |

**Notes and Sources:**
Casualty figures exclude the shooter. LCM classification and casualties based on
review of stories from Factiva/Google searches.

28.     In addition to the analysis using data through 2019 discussed above, we
analyzed more recent mass shootings, including from January 2020 through October
2022.[36] Based on our analysis of this more recent data, we found similar results. In
particular, we found casualties were higher in the mass shootings that involved
weapons with large-capacity magazines than in other mass shootings. The table
below summarizes these results using data for the period 1982 through October 2022.

---

[36] Note, however, that the Citizens Crime Commission data was last updated
in February 2018 and the Washington Post was last updated in May 2021.

19

**Numbers of Fatalities and Injuries in Public Mass Shootings
January 1982 - October 2022**

| Weapon Used | # of Incidents | Average # of | | |
| --- | --- | --- | --- | --- |
| | | Fatalities | Injuries | Total |
| LCM | 73 | 10 | 16 | 25 |
| Non-LCM | 42 | 6 | 3 | 9 |
| Unknown | 64 | 5 | 3 | 7 |

**Notes and Sources:**
Casualty figures exclude the shooter. LCM classification and casualties based on review of stories from Factiva/Google searches.

29.     Our results are consistent with those of other studies that have analyzed mass shootings. Note that although the other studies are based on alternate sets of mass shootings, including covering different years and defining mass shootings somewhat differently, the results are similar in finding that fatalities and injuries are larger in mass shootings in which large capacity magazines are involved. A 2019 academic article published in the *American Journal of Public Health* by Klarevas et al. found that "[a]ttacks involving LCMs resulted in a 62% higher mean average death toll."[37] This study found an average number of fatalities of 11.8 per mass shooting with a large-capacity magazine versus 7.3 for those without. The results in this study were based on 69 mass shootings between 1990 and 2017.[38] An analysis

---

[37] Louis Klarevas, Andrew Conner, and David Hemenway, "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings, 1990–2017," *American Journal of Public Health* (2019).

[38] The Klarevas et al. study defines mass shootings as "intentional crimes of gun violence with 6 or more victims shot to death, not including the perpetrators" and, unlike my analysis, does not exclude incidents in private places or incidents involving other criminal activity such as robbery.

20

of the mass shootings detailed in a 2016 article by Gary Kleck yielded similar results (21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without).[39] The Kleck study covered 88 mass shooting incidents between 1994 and 2013.[40] In a 2018 study, Koper et al. found that mass shootings involving assault weapons and large-capacity magazines resulted in an average of 13.7 victims versus 5.2 for other cases.[41] The Koper et al. study covered

---

[39] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[40] The Kleck study defines a mass shooting as "one in which more than six people were shot, either fatally or nonfatally, in a single incident." See, Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

[41] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," *Journal of Urban Health* (2018).

21

145 mass shootings between 2009 and 2015.[42] The table below summarizes their results.

| Comparison of Studies on the Use of Large-Capacity Magazines in Mass Shootings | | | | | | |
|---|---|---|---|---|---|---|
| Source | Criteria | | Time Period | # of Incidents | Avg. # of Fatalities + Injuries / Fatalities | |
| | # Victims | Other Criteria | | | With LCM | Without LCM |
| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| Allen (2020)[1] | at least 4 killed[2] | Includes shootings "in a public place in one incident, and exclude[s] incidents involving other criminal activity such as a robbery" | 1982-2019 | 161 | 27 / 10 | 9 / 6 |
| Kleck et al. (2016)[3] | at least 6 shot | Excludes "spree shootings" and includes shootings in both "public" and "private" places | 1994-2013 | 88 | 21 / n/a | 8 / n/a |
| Klarevas et al. (2019)[4] | at least 6 killed[2] | Includes "intentional crimes of gun violence" | 1990-2017 | 69 | n/a / 12 | n/a / 7 |
| Koper et al. (2018)[5] | at least 4 killed[2] | Includes shootings in both public and private places | 2009-2015 | 145 | 14 / n/a | 5 / n/a |

**Notes and Sources:**

[1] Declaration of Lucy P. Allen in Support of Defendants' Opposition to Motion for Preliminary Injunction in *James Miller et al. v. Xavier Becerra et al.,* dated January 23, 2020.

[2] Excluding shooter.

[3] Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 Justice Research and Policy 28 (2016).

[4] Klarevas et al., "The Effect of Large-Capacity Magazine Bans on High-Fatality Mass Shootings 1990-2017," American Journal of Public Health (2019).

[5] Koper et al., "Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources," Journal of Urban Health (2018). Note that the Koper et al study includes shootings involving both LCM and assault weapons.

### 2. Number of rounds fired in public mass shootings with large-capacity magazines

30.    In addition, the data indicates that it is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings. Of the 63 mass shootings we analyzed through 2019 that are known to have involved a large-capacity magazine, there are 43 in which the number of shots

---

[42] The Koper et al. study defined mass shooting as "incidents in which four or more people were murdered with a firearm, not including the death of the shooter if applicable and irrespective of the number of additional victims shot but not killed."

fired is known. Shooters fired more than ten rounds in 40 of the 43 incidents, and the average number of shots fired was 103.

31.      Updating this analysis to include the 179 mass shootings through October 2022 yields similar results. In particular, of the 73 mass shootings we analyzed through 2022 that are known to have involved a large-capacity magazine, there are 49 in which the number of shots fired is known. Shooters fired more than ten rounds in 46 of the 49 incidents, and the average number of shots fired was 102.

### 3.      Percent of mass shooters' guns legally obtained

32.      The data on public mass shootings indicates that the majority of guns used in these mass shootings were obtained legally.[43] Of the 161 mass shootings analyzed through 2019, there are 100 where it can be determined whether the gun was obtained legally. According to the data, shooters in 77% of mass shootings obtained their guns legally (77 of the 100 mass shootings) and 79% of the guns used in these 100 mass shootings were obtained legally (184 of the 234 guns). (Note that even if one assumes that *all* of the mass shootings where it is not known were assumed to be illegally obtained, then one would find 48% of the mass shootings and 61% of the guns were obtained legally.) Updating this analysis to use the 179 mass shootings through 2022 yields similar results.[44]

---

[43] The determination of whether guns were obtained legally is based on Mother Jones and Washington Post reporting.

[44] In particular, the 77% and 79% become 79% and 80% when updating the analysis to include mass shootings through 2022. The 48% and 61% become 50% and 62%.

23

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 10, 2022, at New York, New York.

_____
Lucy Allen

## INDEX OF EXHIBITS

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of Lucy P. Allen | 1-7 |
| B | Public Mass Shootings Data, 1982 – October 2022 | 8-17 |

# EXHIBIT A



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Exhibit A

## LUCY P. ALLEN
## MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present   **National Economic Research Associates, Inc.**
<u>Managing Director</u>. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
<u>Senior Vice President (2003-2016)</u>.
<u>Vice President (1999-2003)</u>.
<u>Senior Consultant (1994-1999)</u>.

1992-1993   **Council of Economic Advisers, Executive Office of the President**
<u>Staff Economist</u>.  Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*.  Working Group member of the President's National Health Care Reform Task Force.

1986-1988
1983-1984   **Ayers, Whitmore & Company (General Management Consultants)**
<u>Senior Associate</u>.   Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.

1

Lucy P. Allen

Marketing plan to increase international market share for major accounting firm.

Summer 1985     **WNET/Channel Thirteen, Strategic Planning Department**
<u>Associate</u>. Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support.

1981-1983     **Arthur Andersen & Company**
<u>Consultant</u>. Designed, programmed and installed management information systems. Participated in redesign/conversion of New York State's accounting system. Developed municipal bond fund management system, successfully marketed to brokers. Participated in President's Private Sector Survey on Cost Control (Grace Commission). Designed customized tracking and accounting system for shipping company.

## Teaching
1989- 1992     <u>**Teaching Fellow**</u>**, Yale University**
Honors Econometrics
Intermediate Microeconomics
Competitive Strategies
Probability and Game Theory
Marketing Strategy
Economic Analysis

## Publications

"Snapshot of Recent Trends in Asbestos Litigation: 2022 Update," (co-author), NERA Report, 2022.

"Snapshot of Recent Trends in Asbestos Litigation: 2021 Update," (co-author), NERA Report, 2021.

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2020 Update," (co-author), NERA Report, 2020.

"Snapshot of Recent Trends in Asbestos Litigation: 2019 Update," (co-author), NERA Report, 2019.

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

Lucy P. Allen

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

 "Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

 "Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

3

Exhibit A_Allen
Page 3

Lucy P. Allen

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

## Depositions & Testimony (4 years)

Declaration before the United States District Court, Eastern District of Washington at Yakima, in *Brumback et al. v. Ferguson et al.,* 2022.

Trial Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.*, 2022.

Supplemental Declaration before the United States District Court, Southern District of California, in *James Miller et al. v. California Attorney General et al.*, 2022.

Declaration before the United States District Court, Northern District of Texas, Dallas Division, in *Samir Ali Cherif Benouis v. Match Group, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Eastern District of Virginia, in *Plymouth County Retirement System, et al. v. Evolent Health, Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the Northern District of Georgia, in *Public Employees' Retirement System of Mississippi v. Mohawk Industries, Inc., et al,* 2022.

Deposition Testimony before the United States District Court for the Southern District of New York, in *SEC v. AT&T, Inc. et al.*, 2022.

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2022.

Deposition Testimony before the United States District Court for the District of Pennsylvania, in *Allegheny County Employees, et al. v. Energy Transfer LP., et al.,* 2022.

Deposition Testimony before the United States District Court, District of Tennessee, in *St. Clair County Employees' Retirement System v. Smith & Acadia Healthcare Company, Inc., et al.*, 2022.

Deposition Testimony before the United States District Court, District of Colorado, in *Cipriano Correa, et al. v. Liberty Oilfield Services Inc., et al.*, 2022.

4

Lucy P. Allen

Deposition Testimony before the Superior Court of New Jersey, Hudson County, in *Oklahoma Firefighters Pension and Retirement System vs. Newell Brands Inc., et al.,* 2021.

Deposition Testimony before the Superior Court of New Jersey, Middlesex County, in *Dana Transport, Inc. et al., vs. PNC Bank et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of North Carolina, in *Cheyenne Jones and Sara J. Gast v. Coca-Cola Consolidated Inc., et al.,* 2021.

Testimony and Deposition Testimony before the Court of Chancery of the State of Delaware in *Bardy Diagnostics Inc. v. Hill-Rom, Inc. et al.,* 2021.

Deposition Testimony before the United States Bankruptcy Court, Southern District of Texas, Houston Division, in *Natixis Funding Corporation v. Genon Mid-Atlantic, LLC,* 2021.

Testimony and Deposition Testimony before the United States District Court, Southern District of California, in *James Miller et al. v. Xavier Becerra et al.,* 2021.

Deposition Testimony before the Court of Chancery of the State of Delaware in *Arkansas Teacher Retirement System v. Alon USA Energy, Inc., et al.,* 2021.

Deposition Testimony before the United States District Court, Western District of Oklahoma, in *Kathleen J. Myers v. Administrative Committee, Seventy Seven Energy, Inc. Retirement & Savings Plan, et al.,* 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America, et al.,* 2020.

Deposition Testimony before the Supreme Court of the State of New York, County of New York, in *MUFG Union Bank, N.A. (f/k/a Union Bank, N.A.) v. Axos Bank (f/k/a Bank of Internet USA), et al.,* 2020.

Declaration before the United States District Court for the Northern District of Georgia, in *Sunil Amin et al. v. Mercedes-Benz USA, LLC and Daimler AG*, 2020.

Deposition Testimony before the United States District Court, Western District of Washington at Seattle, in *In re Zillow Group, Inc. Securities Litigation*, 2020.

Declaration before the United States District Court for the Southern District of California in *James Miller et al. v. Xavier Becerra et al.*, 2020.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Zwick Partners LP and Aparna Rao v. Quorum Health Corporation,* 2019.

5

Lucy P. Allen

Testimony and Declaration before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2019.

Declaration before the United States District Court Western District of Oklahoma in *In re: Samsung Top-Load Washing Machine Marketing, Sales Practices and Products Liability Litigation*, 2019.

Testimony before the United States District Court, Southern District of New York, in *Chicago Bridge & Iron Company N.V. Securities Litigation*, 2019.

Deposition Testimony before the United States District Court, Middle District of Florida, in *Jacob J. Beckel v. Fagron Holdings USA, LLC et al.*, 2019.

Deposition Testimony before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc*., 2018.

Deposition Testimony before the United States District Court, Middle District of Tennessee, in *Nikki Bollinger Grae v. Corrections Corporation of America et al.*, 2018.

Deposition Testimony before the District Court for the State of Nevada in *Dan Schmidt v. Liberator Medical Holdings, Inc., et al.*, 2018.

Deposition Testimony before the United States District Court, Northern District of Illinois, Eastern Division, in *In re the Allstate Corporation Securities Litigation,* 2018.

Deposition Testimony before the United States District Court, Central District of California, Southern Division, in *Steven Rupp et al. v. Xavier Becerra et al.*, 2018.

Declaration before the Superior Court of the State of Vermont in *Vermont Federation of Sportsmen's Club et al. v. Matthew Birmingham et al.,* 2018.

Testimony before the American Arbitration Association in *Arctic Glacier U.S.A, Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Deposition Testimony before the United States District Court, Southern District of New York, in *Marvin Pearlstein v. Blackberry Limited et al.*, 2018.

Deposition Testimony before the United States District Court, Eastern District of Texas, in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Deposition Testimony before the United States District Court, Southern District of Iowa, in *Mahaska Bottling Company, Inc., et al. v. PepsiCo, Inc. and Bottling Group, LLC*, 2018.

6

Exhibit A_Allen
Page 6

Lucy P. Allen

Testimony, Deposition Testimony and Declaration before the United States District Court, District of New Jersey, in *Association of New Jersey Rifle & Pistol Clubs, Inc. et al. v. Gurbir Grewal et al.,* 2018.

Deposition Testimony before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Deposition Testimony and Declarations before the United States District Court, Southern District of New York, in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Deposition Testimony before the United States District Court, Southern District of California, in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

7

Exhibit A_Allen
Page 7

# EXHIBIT B

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

*18 mass shootings since Allen (2020):*

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Raleigh spree shooting | Hedingham, NC | 10/13/22 | MJ | - | 5 | 2 | 7 | - | - | 2 |
| 2. Highland Park July 4 parade shooting | Highland Park, IL | 7/4/22 | MJ | Yes | 7 | 48 | 55 | 83 [ba] | Yes | 1 |
| 3. Tulsa medical center shooting | Tulsa, OK | 6/1/22 | MJ | - | 4 | 9 [bb] | 13 [bb] | 37 [bc] | Yes | 2 |
| 4. Robb Elementary School massacre | Uvalde, TX | 5/24/22 | MJ | Yes | 21 | 17 | 38 | 315 [bd] | - | 1 [be] |
| 5. Buffalo supermarket massacre | Buffalo, NY | 5/14/22 | MJ/VP | Yes | 10 | 3 | 13 | 60 [bf] | Yes | 1 |
| 6. Sacramento County church shooting | Sacramento, CA | 2/28/22 | MJ | Yes | 4 | 0 | 4 | - | Yes [bg] | 1 |
| 7. Oxford High School shooting | Oxford, MI | 11/30/21 | MJ/VP | Yes | 4 | 7 | 11 | 30 [bh] | Yes [bi] | 1 |
| 8. San Jose VTA shooting | San Jose, CA | 5/26/21 | MJ/VP | Yes | 9 | 0 | 9 | 39 [bj] | Yes [bk] | 3 |
| 9. Canterbury Mobile Home Park shooting | Colorado Springs, CO | 5/9/21 | WaPo | Yes | 6 | 0 | 6 | 17 [bl] | - | 1 |
| 10. FedEx warehouse shooting | Indianapolis, IN | 4/15/21 | MJ/VP/WaPo | Yes | 8 | 7 | 15 | - | Yes | 2 [bm] |
| 11. Orange office complex shooting | Orange, CA | 3/31/21 | MJ/VP/WaPo | - | 4 | 1 | 5 | - | - | 1 |
| 12. Essex Royal Farms shooting | Baltimore County, MD | 3/28/21 | WaPo | - | 4 | 1 | 5 | - | Yes [bn] | 1 |
| 13. King Soopers supermarket shooting | Boulder, CO | 3/22/21 | MJ/VP | Yes | 10 | 0 | 10 | - | Yes | 2 |
| 14. Atlanta massage parlor shootings | Atlanta, GA | 3/16/21 | MJ/VP/WaPo | Yes | 8 | 1 | 9 | - | Yes [bo] | 1 |
| 15. Hyde Park shooting | Chicago, IL | 1/9/21 | WaPo | - | 5 | 2 | 7 | - | - | 1 |
| 16. Englewood block party shooting | Chicago, IL | 7/4/20 | WaPo | - | 4 | 4 | 8 | - | - | - |
| 17. Springfield convenience store shooting | Springfield, MO | 3/15/20 | MJ/VP/WaPo | - | 4 | 2 | 6 | - | Yes [bp] | 2 |
| 18. Molson Coors shooting | Milwaukee, WI | 2/26/20 | MJ/VP/WaPo | - | 5 | 0 | 5 | 12 [bq] | - | 2 [br] |

*161 mass shootings in Allen (2020):*

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| 19. Jersey City Kosher Supermarket | Jersey City, NJ | 12/10/19 | MJ/VP/WaPo | - | 4 | 3 | 7 | - | Yes | 5 |
| 20. Football-watching party | Fresno, CA | 11/17/19 | WaPo | - | 4 | 6 | 10 | - | - | 2 |
| 21. Halloween Party | Orinda, CA | 11/1/19 | WaPo | - | 5 | 0 | 5 | - | - | 1 |
| 22. Tequila KC bar | Kansas City, KS | 10/6/19 | WaPo | - | 4 | 5 | 9 | - | No | 2 |
| 23. Midland-Odessa Highways | Odessa, TX | 8/31/19 | MJ/VP/WaPo | - | 7 | 25 | 32 | - | No | 1 |
| 24. Dayton | Dayton, OH | 8/4/19 | MJ/VP/WaPo | Yes | 9 | 27 | 36 | 41 [f] | Yes | 1/2 |
| 25. El Paso Walmart | El Paso, TX | 8/3/19 | MJ/VP/WaPo | Yes | 22 | 26 | 48 | - | Yes | 1 |

Page 1 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 26. Casa Grande Senior Mobile Estates | Santa Maria, CA | 6/19/19 | WaPo | | 4 | 0 | 4 | - | | |
| 27. Virginia Beach Municipal Center | Virginia Beach, VA | 5/31/19 | MJ/VP/WaPo | Yes | 12 | 4 | 16 | - | Yes | 2 |
| 28. Henry Pratt Co. | Aurora, IL | 2/15/19 | MJ/VP/WaPo | - | 5 | 6 | 11 | - | No | 1 |
| 29. SunTrust Bank | Sebring, FL | 1/23/19 | MJ/VP/WaPo | - | 5 | 0 | 5 | - | Yes | 1 |
| 30. Borderline Bar & Grill | Thousand Oaks, CA | 11/7/18 | MJ/VP/WaPo | Yes | 12 | 1 | 13 | 50 [g] | Yes | 1 |
| 31. Tree of Life Synagogue | Pittsburgh, PA | 10/27/18 | MJ/VP/WaPo | - | 11 | 6 | 17 | - | Yes | 4 |
| 32. T&T Trucking | Bakersfield, CA | 9/12/18 | MJ/VP/WaPo | No | 5 | 0 | 5 | - | - | 1 |
| 33. Capital Gazette | Annapolis, MD | 6/28/18 | MJ/VP/WaPo | - | 5 | 2 | 7 | - | Yes | 1 |
| 34. Santa Fe High School | Santa Fe, TX | 5/18/18 | MJ/VP/WaPo | No | 10 | 13 | 23 | - | - | 2 |
| 35. Waffle House | Nashville, TN | 4/22/18 | MJ/VP/WaPo | - | 4 | 4 | 8 | - | Yes | 1 |
| 36. Detroit | Detroit, MI | 2/26/18 | VP | - | 4 | 0 | 4 | - | - | |
| 37. Stoneman Douglas HS | Parkland, FL | 2/14/18 | CC/MJ/VP/WaPo | Yes | 17 | 17 | 34 | - | Yes | 1 |
| 38. Pennsylvania Carwash | Melcroft, PA | 1/28/18 | MJ/VP/WaPo | - | 4 | 1 | 5 | - | - | 3 [h] |
| 39. Rancho Tehama | Rancho Tehama, CA | 11/14/17 | MJ/VP/WaPo | Yes | 4 | 10 | 14 | 30 [i] | No | 2 |
| 40. Texas First Baptist Church | Sutherland Springs, TX | 11/5/17 | CC/MJ/VP/WaPo | Yes | 26 | 20 | 46 | 450 [j] | Yes | 1 |
| 41. Las Vegas Strip | Las Vegas, NV | 10/1/17 | CC/MJ/VP/WaPo | Yes | 58 | 422 | 480 | 1100 [k] | Yes | 23 |
| 42. Taos and Rio Arriba counties | Abiquiu, NM | 6/15/17 | WaPo | No | 5 | 0 | 5 | - | - | 1 |
| 43. Fiamma Workplace | Orlando, FL | 6/5/17 | CC/MJ/VP/WaPo | No | 5 | 0 | 5 | - | - | 1 |
| 44. Marathon Savings Bank | Rothschild, WI | 3/22/17 | VP/WaPo | - | 4 | 0 | 4 | - | - | 2 |
| 45. Club 66 | Yazoo City, MS | 2/6/17 | VP/WaPo | - | 4 | 0 | 4 | - | - | 1 |
| 46. Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/17 | CC/MJ/VP/WaPo | No | 5 | 6 | 11 | 15 [l] | Yes | 1 |
| 47. Cascade Mall | Burlington, WA | 9/23/16 | CC/MJ/VP/WaPo | | 5 | 0 | 5 | - | - | 1 |
| 48. Dallas Police | Dallas, TX | 7/7/16 | CC/MJ/VP/WaPo | Yes | 5 | 11 | 16 | - | Yes | 3 |
| 49. Walgreens Parking Lot | Las Vegas, NV | 6/29/16 | WaPo | - | 4 | 0 | 4 | - | - | 1 |
| 50. Orlando Nightclub | Orlando, FL | 6/12/16 | CC/MJ/VP/WaPo | Yes | 49 | 53 | 102 | 110 [m] | Yes | 2 |
| 51. Franklin Avenue Cookout | Wilkinsburg, PA | 3/9/16 | VP/WaPo | Yes | 6 | 3 | 9 | 48 [n] | No | 2 |
| 52. Kalamazoo | Kalamazoo County, MI | 2/20/16 | MJ/VP/WaPo | Yes | 6 | 2 | 8 | - | Yes | 1 |
| 53. San Bernardino | San Bernardino, CA | 12/2/15 | CC/MJ/VP/WaPo | Yes | 14 | 22 | 36 | 150 [o] | Yes | 4 |

Page 2 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| | Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 54. | Tennessee Colony campsite | Anderson County, TX | 11/15/15 | VP/WaPo | - | 6 | 0 | 6 | - | - | 1 |
| 55. | Umpqua Community College | Roseburg, OR | 10/1/15 | CC/MJ/VP/WaPo | - | 9 | 9 | 18 | - | Yes | 6 |
| 56. | Chattanooga Military Center | Chattanooga, TN | 7/16/15 | CC/MJ/VP/WaPo | Yes | 5 | 2 | 7 | - | Yes | 3 |
| 57. | Charleston Church | Charleston, SC | 6/17/15 | CC/MJ/VP/WaPo | Yes | 9 | 3 | 12 | - | Yes | 1 |
| 58. | Marysville High School | Marysville, WA | 10/24/14 | CC/MJ/VP/WaPo | Yes | 4 | 1 | 5 | - | No | 1 |
| 59. | Isla Vista | Santa Barbara, CA | 5/23/14 | MJ/VP/WaPo | No | 6 | 13 | 19 | 50 [p] | Yes | 3 |
| 60. | Alturas Tribal | Alturas, CA | 2/20/14 | MJ/VP/WaPo | - | 4 | 2 | 6 | - | - | 2 |
| 61. | Washington Navy Yard | Washington, D.C. | 9/16/13 | CC/MJ/VP/WaPo | No | 12 | 8 | 20 | - | Yes | 2 |
| 62. | Hialeah | Hialeah, FL | 7/26/13 | CC/MJ/VP/WaPo | Yes | 6 | 0 | 6 | 10 [q] | Yes | 1 |
| 63. | Santa Monica | Santa Monica, CA | 6/7/13 | CC/MJ/VP/WaPo | Yes | 5 | 3 | 8 | 70 [r] | Yes | 2 |
| 64. | Federal Way | Federal Way, WA | 4/21/13 | MJ/VP/WaPo | - | 4 | 0 | 4 | - | Yes | 2 |
| 65. | Upstate New York | Herkimer County, NY | 3/13/13 | MJ/VP/WaPo | - | 4 | 2 | 6 | - | Yes | 1 |
| 66. | Newtown School | Newtown, CT | 12/14/12 | CC/MJ/VP/WaPo | Yes | 27 | 2 | 29 | 154 | No | 4/3 |
| 67. | Accent Signage Systems | Minneapolis, MN | 9/27/12 | CC/MJ/VP/WaPo | Yes | 6 | 2 | 8 | 46 | Yes | 1 |
| 68. | Sikh Temple | Oak Creek, WI | 8/5/12 | CC/MJ/VP/WaPo | Yes | 6 | 4 | 10 | - | Yes | 1 |
| 69. | Aurora Movie Theater | Aurora, CO | 7/20/12 | CC/MJ/VP/WaPo | Yes | 12 | 70 | 82 | 80 | Yes | 4 |
| 70. | Seattle Café | Seattle, WA | 5/30/12 | CC/MJ/VP/WaPo | No | 5 | 1 | 6 | - | Yes | 2 |
| 71. | Oikos University | Oakland, CA | 4/2/12 | CC/MJ/VP/WaPo | No | 7 | 3 | 10 | - | Yes | 1 |
| 72. | Su Jung Health Sauna | Norcross, GA | 2/22/12 | MJ/WaPo | - | 4 | 0 | 4 | - | Yes | 1 |
| 73. | Seal Beach | Seal Beach, CA | 10/14/11 | CC/MJ/VP/WaPo | No | 8 | 1 | 9 | - | Yes | 3 |
| 74. | IHOP | Carson City, NV | 9/6/11 | CC/MJ/VP/WaPo | Yes | 4 | 7 | 11 | - | Yes | 3 |
| 75. | Akron | Akron, OH | 8/7/11 | VP | No | 7 | 2 | 9 | 21 [s] | - | - |
| 76. | Forum Roller World | Grand Prairie, TX | 7/23/11 | WaPo | - | 5 | 4 | 9 | - | - | 1 |
| 77. | Grand Rapids | Grand Rapids, MI | 7/7/11 | CC | Yes | 7 | 2 | 9 | 10 | - | 1 |
| 78. | Family law practice | Yuma, AZ | 6/2/11 | WaPo | - | 5 | 1 | 6 | - | - | 1 |
| 79. | Tucson | Tucson, AZ | 1/8/11 | CC/MJ/VP/WaPo | Yes | 6 | 13 | 19 | 33 | Yes | 1 |
| 80. | Jackson | Jackson, KY | 9/11/10 | VP | No | 5 | 0 | 5 | 12 [t] | - | - |
| 81. | City Grill | Buffalo, NY | 8/14/10 | VP/WaPo | - | 4 | 4 | 8 | 10 [u] | - | 1 |

Page 3 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| | Case | Location | Date | Source | Large Capacity Mag.?[x] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 82. | Hartford Beer Distributor | Manchester, CT | 8/3/10 | CC/MJ/VP/WaPo | Yes | 8 | 2 | 10 | 11 | Yes | 2 |
| 83. | Yoyito Café | Hialeah, FL | 6/6/10 | CC/VP/WaPo | No | 4 | 3 | 7 | 9 [v] | - | - |
| 84. | Hot Spot Café | Los Angeles, CA | 4/3/10 | VP/WaPo | - | 4 | 2 | 6 | 50 [w] | - | 1 |
| 85. | Coffee Shop Police | Parkland, WA | 11/29/09 | CC/MJ/VP/WaPo | No | 4 | 0 | 4 | - | No | 2 |
| 86. | Fort Hood | Fort Hood, TX | 11/5/09 | CC/MJ/VP/WaPo | Yes | 13 | 32 | 45 | 214 | Yes | 1 |
| 87. | Worth Street | Mount Airy, NC | 11/1/09 | VP/WaPo | - | 4 | 0 | 4 | 16 [x] | No | 1 |
| 88. | Binghamton | Binghamton, NY | 4/3/09 | CC/MJ/VP/WaPo | Yes | 13 | 4 | 17 | 99 | Yes | 2 |
| 89. | Carthage Nursing Home | Carthage, NC | 3/29/09 | CC/MJ/VP/WaPo | No | 8 | 2 | 10 | - | Yes | 2 |
| 90. | Skagit County | Alger, WA | 9/2/08 | VP/WaPo | - | 6 | 4 | 10 | - | No | 2 |
| 91. | Atlantis Plastics | Henderson, KY | 6/25/08 | CC/MJ/VP/WaPo | No | 5 | 1 | 6 | - | Yes | 1 |
| 92. | Black Road Auto | Santa Maria, CA | 3/18/08 | VP/WaPo | - | 4 | 0 | 4 | 17 [y] | - | 1 |
| 93. | Northern Illinois University | DeKalb, IL | 2/14/08 | CC/MJ/VP/WaPo | Yes | 5 | 21 | 26 | 54 | Yes | 4 |
| 94. | Kirkwood City Council | Kirkwood, MO | 2/7/08 | VP/WaPo | No | 6 | 1 | 7 | - | No | 2 |
| 95. | Youth With a Mission and New Life Church | Colorado Springs, CO | 12/9/07 | VP/WaPo | Yes | 4 | 5 | 9 | 25 [z] | - | 3 |
| 96. | Westroads Mall | Omaha, NE | 12/5/07 | CC/MJ/VP/WaPo | Yes | 8 | 5 | 13 | 14 | No | 1 |
| 97. | Crandon | Crandon, WI | 10/7/07 | CC/MJ/WaPo | Yes | 6 | 1 | 7 | 30 [aa] | Yes | 1 |
| 98. | Virginia Tech | Blacksburg, VA | 4/16/07 | CC/MJ/VP/WaPo | Yes | 32 | 17 | 49 | 176 | Yes | 2 |
| 99. | Trolley Square | Salt Lake City, UT | 2/12/07 | CC/MJ/VP/WaPo | No | 5 | 4 | 9 | - | No | 2 |
| 100. | Amish School | Lancaster County, PA | 10/2/06 | CC/MJ/VP/WaPo | No | 5 | 5 | 10 | - | Yes | 3 |
| 101. | The Ministry of Jesus Christ | Baton Rouge, LA | 5/21/06 | VP/WaPo | - | 5 | 1 | 6 | - | - | 1 |
| 102. | Capitol Hill | Seattle, WA | 3/25/06 | CC/MJ/VP/WaPo | Yes | 6 | 2 | 8 | - | Yes | 4 |
| 103. | Goleta Postal | Goleta, CA | 1/30/06 | CC/MJ/VP/WaPo | Yes | 7 | 0 | 7 | - | Yes | 1 |
| 104. | Sash Assembly of God | Sash, TX | 8/29/05 | VP/WaPo | - | 4 | 0 | 4 | - | - | 2 |
| 105. | Red Lake | Red Lake, MN | 3/21/05 | CC/MJ/VP/WaPo | No | 9 | 7 | 16 | - | No | 3 |
| 106. | Living Church of God | Brookfield, WI | 3/12/05 | CC/MJ/VP/WaPo | Yes | 7 | 4 | 11 | - | Yes | 1 |
| 107. | Fulton County Courthouse | Atlanta, GA | 3/11/05 | VP/WaPo | - | 4 | 0 | 4 | - | No | 1 |
| 108. | Damageplan Show | Columbus, OH | 12/8/04 | CC/VP/WaPo | No | 4 | 3 | 7 | 15 [ab] | Yes | 1 |
| 109. | Hunting Camp | Meteor, WI | 11/21/04 | CC/VP/WaPo | Yes | 6 | 2 | 8 | 20 | - | 1 |

Page 4 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|------|----------|------|--------|--------------------------|---------------|-------------|--------------------------------|----------------|------------------------------|------------------------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 110. ConAgra Foods Plant | Kansas City, KS | 7/3/04 | VP/WaPo | - | 6 | 1 | 7 | 10 [ac] | - | 2 |
| 111. Stateline Tavern | Oldtown, ID | 10/24/03 | VP/WaPo | Yes | 4 | 0 | 4 | 14 [ad] | - | 1 |
| 112. Windy City Warehouse | Chicago, IL | 8/27/03 | CC/VP/WaPo | No | 6 | 0 | 6 | - | - | - |
| 113. Lockheed Martin | Meridian, MS | 7/8/03 | CC/MJ/VP/WaPo | - | 6 | 8 | 14 | - | Yes | 5 |
| 114. Labor Ready | Huntsville, AL | 2/25/03 | VP/WaPo | - | 4 | 1 | 5 | - | - | 1 |
| 115. Bertrand Products | South Bend, IN | 3/22/02 | VP/WaPo | - | 4 | 2 | 6 | - | - | 2 |
| 116. Burns International Security | Sacramento, CA | 9/10/01 | VP/WaPo | Yes | 5 | 2 | 7 | 200 [ae] | - | 2 |
| 117. Bookcliff RV Park | Rifle, CO | 7/3/01 | VP/WaPo | No | 4 | 3 | 7 | 6 [af] | - | 1 |
| 118. Navistar | Melrose Park, IL | 2/5/01 | CC/MJ/VP/WaPo | Yes | 4 | 4 | 8 | - | Yes | 4 |
| 119. Houston | Houston, TX | 1/9/01 | VP | - | 4 | 0 | 4 | - | - | - |
| 120. Wakefield | Wakefield, MA | 12/26/00 | CC/MJ/VP/WaPo | Yes | 7 | 0 | 7 | 37 | Yes | 3 |
| 121. Mount Lebanon | Pittsburgh, PA | 4/28/00 | VP/WaPo | No | 5 | 1 | 6 | - | Yes | 1 |
| 122. Mi-T-Fine Car Wash | Irving, TX | 3/20/00 | VP/WaPo | - | 5 | 1 | 6 | - | - | - |
| 123. Hotel | Tampa, FL | 12/30/99 | CC/MJ/VP/WaPo | No | 5 | 3 | 8 | - | Yes | 2 |
| 124. Xerox | Honolulu, HI | 11/2/99 | CC/MJ/VP/WaPo | Yes | 7 | 0 | 7 | 28 | Yes | 1 |
| 125. Wedgwood Baptist Church | Fort Worth, TX | 9/15/99 | CC/MJ/VP/WaPo | Yes | 7 | 7 | 14 | 30 | Yes | 2 |
| 126. Atlanta Day Trading | Atlanta, GA | 7/29/99 | MJ/VP/WaPo | - | 9 | 13 | 22 | - | Yes | 4 |
| 127. Albertson's Supermarket | Las Vegas, NV | 6/3/99 | VP/WaPo | - | 4 | 1 | 5 | - | - | 1 |
| 128. Columbine High School | Littleton, CO | 4/20/99 | CC/MJ/VP/WaPo | Yes | 13 | 23 | 36 | 188 | No | 4 |
| 129. New St. John Fellowship Baptist Church | Gonzalez, LA | 3/10/99 | VP/WaPo | - | 4 | 4 | 8 | - | - | 1 |
| 130. Thurston High School | Springfield, OR | 5/21/98 | CC/MJ/VP/WaPo | Yes | 4 | 25 | 29 | 50 | No | 3 |
| 131. Westside Middle School | Jonesboro, AR | 3/24/98 | CC/MJ/VP/WaPo | Yes | 5 | 10 | 15 | 26 | No | 9/10 |
| 132. Connecticut Lottery | Newington, CT | 3/6/98 | VP/WaPo | Yes | 4 | 0 | 4 | 5 | Yes | 1 |
| 133. Caltrans Maintenance Yard | Orange, CA | 12/18/97 | CC/MJ/VP/WaPo | Yes | 4 | 2 | 6 | 144 | Yes | 1 |
| 134. Erie Manufacturing | Bartow, FL | 12/3/97 | VP | - | 4 | 0 | 4 | 12 [ag] | - | - |
| 135. R.E. Phelon Company | Aiken, SC | 9/15/97 | CC/MJ/VP/WaPo | No | 4 | 3 | 7 | - | No | 1 |
| 136. News and Sentinel | Colebrook, NH | 8/20/97 | VP/WaPo | - | 4 | 4 | 8 | - | - | 2 |
| 137. Fire Station | Jackson, MS | 4/25/96 | VP/WaPo | - | 5 | 3 | 8 | - | - | 3 |

Page 5 of 10

Exhibit B_Allen
Page 12

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 138. Fort Lauderdale | Fort Lauderdale, FL | 2/9/96 | CC/MJ/VP/WaPo | No | 5 | 1 | 6 | 14 [ah] | Yes | 2 |
| 139. Little Chester Shoes | New York, NY | 12/19/95 | VP/WaPo | Yes | 5 | 3 | 8 | - | - | 1 |
| 140. Piper Technical Center | Los Angeles, CA | 7/19/95 | CC/VP/WaPo | Yes | 4 | 0 | 4 | - | - | 1 |
| 141. Walter Rossler Company | Corpus Christi, TX | 4/3/95 | CC/MJ/VP/WaPo | No | 5 | 0 | 5 | - | Yes | 2 |
| 142. Puppy creek | Hoke County, NC | 12/31/94 | VP | - | 5 | 1 | 6 | - | - | 1 |
| 143. Air Force Base | Fairchild Base, WA | 6/20/94 | CC/MJ/VP/WaPo | Yes | 4 | 23 | 27 | 50 [ai] | Yes | 1 |
| 144. Chuck E. Cheese | Aurora, CO | 12/14/93 | CC/MJ/VP/WaPo | No | 4 | 1 | 5 | - | - | 1 |
| 145. Long Island Railroad | Garden City, NY | 12/7/93 | CC/MJ/VP/WaPo | Yes | 6 | 19 | 25 | 30 | Yes | 1 |
| 146. Unemployment Office | Oxnard, CA | 12/2/93 | VP/WaPo | - | 4 | 4 | 8 | - | - | 1 |
| 147. Family Fitness Club | El Cajon, CA | 10/14/93 | VP/WaPo | - | 4 | 0 | 4 | - | Yes | 1 |
| 148. Luigi's Restaurant | Fayetteville, NC | 8/6/93 | CC/MJ/VP/WaPo | No | 4 | 8 | 12 | - | Yes | 3 |
| 149. Washington County Bar | Jackson, MS | 7/8/93 | WaPo | - | 5 | 0 | 5 | - | - | 1 |
| 150. 101 California Street | San Francisco, CA | 7/1/93 | CC/MJ/VP/WaPo | Yes | 8 | 6 | 14 | 75 | No | 3 |
| 151. Card club | Paso Robles, CA | 11/8/92 | VP/WaPo | - | 6 | 1 | 7 | - | - | 1 |
| 152. Watkins Glen | Watkins Glen, NY | 10/15/92 | CC/MJ/VP/WaPo | No | 4 | 0 | 4 | - | Yes | 1 |
| 153. Lindhurst High School | Olivehurst, CA | 5/1/92 | CC/MJ/VP/WaPo | No | 4 | 10 | 14 | - | Yes | 2 |
| 154. Phoenix | Phoenix, AZ | 3/15/92 | VP | - | 4 | 0 | 4 | - | - | 1 |
| 155. Royal Oak Postal | Royal Oak, MI | 11/14/91 | CC/MJ/VP/WaPo | Yes | 4 | 4 | 8 | - | Yes | 1 |
| 156. Restaurant | Harrodsburg, KY | 11/10/91 | VP/WaPo | No | 4 | 0 | 4 | 6 [aj] | No | 1 |
| 157. University of Iowa | Iowa City, IA | 11/1/91 | CC/MJ/VP/WaPo | No | 5 | 1 | 6 | - | Yes | 1 |
| 158. Luby's Cafeteria | Killeen, TX | 10/16/91 | CC/MJ/VP/WaPo | Yes | 23 | 20 | 43 | 100 | Yes | 2 |
| 159. Post office | Ridgewood, NJ | 10/10/91 | VP/WaPo | Yes | 4 | 0 | 4 | - | - | 2 |
| 160. GMAC | Jacksonville, FL | 6/18/90 | CC/MJ/VP/WaPo | Yes | 9 | 4 | 13 | 14 | Yes | 2 |
| 161. Standard Gravure Corporation | Louisville, KY | 9/14/89 | CC/MJ/VP/WaPo | Yes | 8 | 12 | 20 | 21 | Yes | 5 |
| 162. Stockton Schoolyard | Stockton, CA | 1/17/89 | CC/MJ/VP/WaPo | Yes | 5 | 29 | 34 | 106 | Yes | 2 |
| 163. Montefiore School | Chicago, IL | 9/22/88 | VP/WaPo | No | 4 | 2 | 6 | - | - | 1 |
| 164. Old Salisbury Road | Winston-Salem, NC | 7/17/88 | VP | - | 4 | 5 | 9 | - | - | 1 |
| 165. ESL | Sunnyvale, CA | 2/16/88 | CC/MJ/VP/WaPo | No | 7 | 4 | 11 | - | Yes | 7 |

Page 6 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|------|----------|------|--------|------|------|------|------|------|------|------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 166. Shopping Centers | Palm Bay, FL | 4/23/87 | CC/MJ/VP/WaPo | Yes | 6 | 14 | 20 | 40 [ak] | Yes | 3 |
| 167. United States Postal Service | Edmond, OK | 8/20/86 | CC/MJ/VP/WaPo | No | 14 | 6 | 20 | - | Yes | 3 |
| 168. Anchor Glass Container Corporation | South Connellsville, PA | 3/16/85 | VP/WaPo | No | 4 | 1 | 5 | - | - | 1 |
| 169. Other Place Lounge | Hot Springs, AR | 7/24/84 | VP/WaPo | No | 4 | 1 | 5 | - | - | 1 |
| 170. San Ysidro McDonald's | San Ysidro, CA | 7/18/84 | CC/MJ/VP/WaPo | Yes | 21 | 19 | 40 | 257 | Yes | 3 |
| 171. Dallas Nightclub | Dallas, TX | 6/29/84 | CC/MJ/VP/WaPo | Yes | 6 | 1 | 7 | - | No | 1 |
| 172. Alaska Mining Town | Manley Hot Springs, AK | 5/17/84 | VP/WaPo | No | 7 | 0 | 7 | - | - | 1 |
| 173. College Station | Collge Station, TX | 10/11/83 | VP | - | 6 | 0 | 6 | - | - | - |
| 174. Alaska Back-County | McCarthy, AK | 3/1/83 | VP/WaPo | - | 6 | 2 | 8 | - | - | 2 |
| 175. Upper West Side Hotel | New York, NY | 2/3/83 | VP | No | 4 | 1 | 5 | - | - | 1 |
| 176. The Investor | Noyes Island, AK | 9/6/82 | WaPo | - | 8 | 0 | 8 | - | - | 1 |
| 177. Welding Shop | Miami, FL | 8/20/82 | MJ/VP/WaPo | No | 8 | 3 | 11 | - | Yes | 1 |
| 178. Western Transfer Co. | Grand Prairie, TX | 8/9/82 | VP/WaPo | - | 6 | 4 | 10 | - | - | 3 |
| 179. Russian Jack Springs Park | Anchorage, AK | 5/3/82 | VP/WaPo | - | 4 | 0 | 4 | - | No | 1 |
| | | | | LCM Avg. (1982-2019): | 10 | 17 | 27 | 103 | | |
| | | | | Non-LCM Avg. (1982-2019): | 6 | 3 | 9 | 16 | | |
| | | | | LCM Avg. (1982-Oct. 2022): | 10 | 16 | 25 | 102 | | |
| | | | | Non-LCM Avg. (1982-Oct. 2022): | 6 | 3 | 9 | 16 | | |

**Notes and Sources:**

Public Mass Shootings from Mother Jones ("US Mass Shootings, 1982-2022: Data from Mother Jones' Investigation," updated October 14, 2022). MJ indicates a mass shooting identified by Mother Jones.

The Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," February 2018 update, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017). CC indicates a mass shooting identified by Citizens Crime Commission of New York City data.

The Washington Post ("The Terrible Numbers That Grow With Each Mass Shooting,", updated May 12, 2021). WaPo indicates a mass shooting identified by The Washington Post.

The Violence Project ("Mass Shooter Database," updated May 14, 2022). VP indicates a mass shooting identified by the Violence Project.

[a] Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition. Stories from Factiva and Google searches reviewed to determine whether an LCM was involved.

[b] Offender(s) are not included in counts of fatalities and injuries. Stories from Factiva and Google searches reviewed to determine number of fatalities and injuries.

Page 7 of 10

Exhibit B_Allen
Page 14

**ER_1556**

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|------|----------|------|--------|------|------|------|------|------|------|------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

[c] Offender(s) are not included in counts of fatalities and injuries. Stories from Factiva and Google searches reviewed to determine number of fatalities and injuries.

[d] Except where noted, all data on shots fired obtained from CC.

[e] The determination of whether guns were obtained legally was based on Mother Jones and Washington Post reporting.

[ba] "'This is the norm in our country': Highland Park Mayor speaks to Senate committee about gun violence," *CBS Chicago* , July 20, 2022.

[bb] MJ reported "fewer than 10" injuries for this incident.

[bc] "Update: Man among those killed held door to allow others to escape, Tulsa police chief says," *TulsaWorld* , June 2, 2022.

[bd] "The gunman in Uvalde carried more ammunition into Robb Elementary School than a U.S. soldier carries into combat," *CBS News* , May 27, 2022.

[be] "Uvalde gunman legally bought AR rifles days before shooting, law enforcement says," *The Texas Tribune* , May 25, 2022.

[bf] "Buffalo shooting suspect says his motive was to prevent 'eliminating the white race'," *NPR* , June 16, 2022.

[bg] "Sacramento Church Mass Shooting Follows Disturbing Trend of Domestic Violence, Mass Shooting Connection; Rise of Ghost Guns," *Everytown* , March 7, 2022.

[bh] "Oxford High School shooter fired 30 rounds, had 18 more when arrested, sheriff says," *Fox2Detroit* , December 1, 2021.

[bi] "Father of suspected Oxford High School shooter bought gun 4 days before shooting," *Fox 2 Detroit* , December 1, 2021.

[bj] "VTA shooter fired 39 rounds during attack; carried 32 high-capacity magazines," *KTVU Fox 2* , May 27, 2021.

[bk] "Sam Cassidy legally owned guns used in San Jose VTA shooting: Sheriff," *Kron4* , May 28, 2021.

[bl] "Colorado Springs shooter who killed 6 at party had "displayed power and control issues," police say," *The Denver Post* , May 11, 2021.

[bm] "Indianapolis FedEx Shooter Who Killed 4 Sikhs Was Not Racially Motivated, Police Say," *NPR* , July 28, 2021.

[bn] "Police Investigate Three Separate Fatal Shooting Incidents In Baltimore County," *Baltimore County Government Website* , March 29, 2021.

[bo] "Atlanta Shooting Suspect Bought Gun on Day of Rampage," *Courthouse News* , March 26, 2021.

[bp] "Search warrant reveals new information in Springfield Kum & Go shooting," *Springfield News-Leader* , April 8, 2020.

[bq] "'There was no warning this was going to happen,' Miller shooting witnesses told investigators," *WISN 12 News* , November 24, 2020.

[br] "Milwaukee Miller brewery shooting: Six Molson Coors workers, including shooter, dead in rampage," *Milwaukee Journal Sentinel* , February 26, 2020.

Page 8 of 10

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

[f] "The Dayton gunman killed 9 people by firing 41 shots in 30 seconds. A high-capacity rifle helped enable that speed," *CNN*, August 5, 2019.

[g] "Authorities Describe 'Confusion And Chaos' At Borderline Bar Shooting In California," *NPR*, November 28, 2018.

[h] "Suspect in quadruple killing at car wash dies," CNN, January 30, 2018.

[i] "California gunman fired 30 rounds at elementary school, left when he couldn't get inside," *ABC News*, November 15, 2017.

[j] "Be quiet! It's him!' Survivors say shooter walked pew by pew looking for people to shoot," *CNN*, November 9, 2017.

[k] "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review Journal*, November 22, 2017

[l] "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond," *Washington Post*, January 9, 2017.

[m] ""We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando," *The Telegraph*, June 13, 2016.

[n] "Two men charged with homicide in connection with Wilkinsburg backyard ambush," *Pittsburgh's Action News*, June 24, 2016.

[o] "San Bernardino Suspects Left Trail of Clues, but No Clear Motive," *New York Times*, December 3, 2015.

[p] "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage," *Los Angeles Times*, June 4, 2014.

[q] "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage," *NBC News*, July 28, 2013.

[r] "Police Call Santa Monica Gunman 'Ready for Battle,'" *New York Times*, June 8, 2013.

[s] "Questions linger in slayings; investigation continues in rampage as community searches for answers on why gunman shot eight people," *The Beacon Journal*, August 14, 2011.

[t] "Kentucky Tragedy: Man Kills Wife, Five Others, in Rampage Over Cold Eggs, Say Cops," *CBS News*, September 13, 2010.

[u] "Ex-gang member guilty of shooting 5 in deadly 17-second rampage," *NBC*, April 1, 2011.

[v] "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead," *Sun-Sentinel*, June 7, 2010.

[w] "Man convicted of killing 4 at Los Angeles restaurant," *Associated Press*, March 15, 2016.

[x] "4 Victims In Mount Airy Shooting Related, Police Say," *WXII 12 News*, November 2, 2009.

[y] "Arrested suspect might have warned of Santa Maria shooting", *Associated Press*, March 20, 2008.

[z] "Profile: New information released on Matthew Murray, gunman in church-related shootings in Colorado; Larry Bourbannais, wounded in one of the shootings, discusses his experience," *NBC News*, December 11

Exhibit B_Allen
Page 16

**Exhibit B**
**Public Mass Shootings Data**
**1982 – October 2022**

| Case | Location | Date | Source | Large Capacity Mag.?[a] | Fatalities[b] | Injuries[c] | Total Fatalities & Injuries[c] | Shots Fired[d] | Gun(s) Obtained Legally?[e] | Offender(s)' Number of Guns |
|------|----------|------|--------|------|------|------|------|------|------|------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

aa  "Small Town Grieves for 6, and the Killer," *Los Angeles Times* , October 9, 2007.

ab  "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," *New York Times* , January 15, 2005.

ac  "Sixth person dies of injuries from shooting at Kansas meatpacking plant," *Associated Press* , July 3, 2004.

ad  "Four Killed In Oldtown Shooting," *The Miner* , October 30, 2003.

ae  "Sacramento shooter unscathed before killing self, autopsy shows," *Associated Press* , September 14, 2001.

af  "Gunman kills 3, wounds 4 in Rifle rampage; mental patient is arrested," *The Denver Post* , April 2, 2015.

ag  "Unfinished business," *Dateline NBC* , December 21, 2006.

ah  "5 Beach Workers in Florida are Slain by Ex-Colleague," *New York Times* , February 10, 1996.

ai  "Man Bent On Revenge Kills 4, Hurts 23 -- Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," *The Seattle Times* , June 21, 1994.

aj  "Man Killed Estranged Wife, Three Others as They Drove to Dinner," *Associated Press* , November 11, 1991.

ak  "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," *Chicago Tribune* , April 25, 1987.

Page 10 of 10

Exhibit B_Allen
Page 17

**ER_1559**

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6   Fax: (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                       CIVIL DIVISION

12

| | |
|---|---|
| 13  **VIRGINIA DUNCAN, RICHARD** | Case No. 17-cv-1017-BEN-JLB |
| 14  **LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO,** | |
| **CHRISTOPHER WADDELL, and** | **DECLARATION OF DENNIS** |
| 15  **CALIFORNIA RIFLE & PISTOL** | **BARON** |
| **ASSOCIATION, INC., a California** | |
| 16  **corporation,** | Courtroom:    5A |
| | Judge:         Hon. Roger T. Benitez |
| 17                            Plaintiffs, | Action Filed:  May 17, 2017 |
| 18        **v.** | |
| 19 | |
| 20  **ROB BONTA, in his official capacity as** | |
| **Attorney General of the State of** | |
| 21  **California; and DOES 1-10,** | |
| 22                            Defendants. | |

23

24

25

26

27

28

### DECLARATION OF DENNIS BARON

I, Dennis Baron, declare under penalty of perjury that the following is true and correct:

1.     I have been retained by the State of California to provide expert opinion and testimony regarding Corpus Linguistics research.  I am being compensated at a rate of $350 per hour.

2.     I have evaluated the historical use of the terms *arms* and *accoutrements* in order to show that large-capacity magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

### BACKGROUND AND QUALIFICATIONS

3.     I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and

1   law. I have also published books on language reform, on usage, and on gender in
2   language.

3       4.    Most relevant for this report, I published two books on language and
4   law: *The English-Only Question: An Official Language for Americans?* (Yale Univ.
5   Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free*
6   *Speech* (Cambridge Univ. Press, January 2023). In addition, I served as lead author
7   on what came to be called "the Linguists Brief" in *District of Columbia v. Heller*
8   (2008), a brief cited both by J. Scalia in his opinion in the case, and by J. Stevens in
9   his dissent. I was a co-author on another brief by professors of linguistics and
10   corpus linguistics, in *New York State Rifle and Pistol Ass'n. v. Bruen* (No. 20-843,
11   2022), which J. Breyer cited in his dissent. In that dissent, J. Breyer also quoted
12   directly from my essay "Corpus evidence and the meaning of 'bear arms'"
13   (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical
14   meaning and the Second Amendment at the Federalist Society at the Univ. of
15   Chicago Law School, at the Neubauer Symposium on Historical Semantics at the
16   Univ. of Chicago, at Brigham Young Univ. Law School, at Stanford University,
17   and at the conference "*Heller* after Ten Years" at Hastings College of Law. I've
18   also written opinion essays on historical meaning and the Second Amendment for
19   the *Washington Post* and the *Los Angeles Times*. And I have submitted a
20   declaration on behalf of the State of Rhode Island in *Ocean State Tactical, LLC, et*
21   *al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.). In the
22   past twenty years I have been an expert consultant in perhaps a dozen cases
23   involving document interpretation.

24       5.    My forthcoming essay, "Look It Up in Your *Funk and Wagnalls*: How
25   Courts Define the Words of the Law," an analysis of how courts incorporate
26   information from dictionaries and digitized corpora as they ascertain legal meaning,
27   will appear in the next issue of the academic journal of the Dictionary Society of
28   North America, *Dictionaries*.

6. This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large digitized corpora consisting of many millions of words.

## OPINIONS

### I.  SUMMARY OF CONCLUSIONS

7. Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements*. Nor does *arms* refer to *parts* of weapons, for example the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets. Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition; arms and accoutrements;* or *arms, ammunition, and accoutrements*. A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier or militia member's kit, or equipment. For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term *accoutrements* occurs alone, as *in the accoutrements of a soldier*, it may include both arms and accessories. But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories. And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

8. Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks). And they often specified, separately, the

1    different accessories that officers and the rank and file soldiers were also required
2    to have.

3    **II.  THEORY AND METHODOLOGY**

4       9.    Corpus linguistics as a field developed in the late 1960s, when scholars
5    began using computer programs to analyze large bodies of digitized text. Initial
6    work in corpus linguistics did not typically involve legal issues. Literary scholars
7    developed computerized concordances to the works of Shakespeare, Milton, and
8    other major English writers. Scholars plotted the frequency of words and phrases in
9    order to develop a picture of an author's style, and to determine authorship of a
10    particular work when the provenance was in doubt. Soon, in addition to solving
11    literary mysteries, the methodologies developed by corpus linguists were
12    successfully applied in a number of criminal cases in the US and in England
13    involving, for example, the authorship of a ransom note or an email.

14       10.    Lexicographers, who began compiling large analog databases of text in
15    the late 19th century, began to digitize their libraries of paper data and to add to that
16    material, assembling computerized databases of historical and contemporary text
17    and, more recently, of spoken language as well, in order to arrive at more precise
18    definitions of the multiple senses of words and phrases.

19       11.    As a graduate student at the Univ. of Michigan in 1970, I coded analog
20    texts from the *Oxford English Dictionary* files to help build the computerized
21    database for the Dictionary of Early Modern English, the period from 1500–1800
22    that is particularly relevant to the language of the Founding Era. Today, major
23    dictionaries like the *Oxford English Dictionary* and the Merriam-Webster suite of
24    dictionaries rely on public databases of oral and written language, as well as their
25    own proprietary databases, in order to revise older definitions and to track the
26    spread of new words and meanings. The great dictionary makers of Europe use
27    similar databases in their own work.

28

12.   Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a subset of Corpus Linguistics. LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as Original Public Meaning (OPM)—in statutes and in the Constitution. The promise of LCL attracted jurists as well as scholars with a specific interest in language and law. In *Muscarello v. United States* (524 US 125 1998), a case which held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or truck, can be deemed to be within the scope of the statutory phrase 'carries a firearm,'" J. Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to clarify the meaning of the words *carry*, *vehicle*, and *weapon*. In her dissent, J. Ginsburg expressed skepticism that either dictionary evidence, or Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question. Her critique did not deter courts from performing other computerized data searches to determine legal meaning. In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute (*United States v. Costello*, 2012). Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean 'provide shelter' as well as the narrower sense, 'hide someone from the authorities.' But in the context of the Immigration Act, *harbor* appears alongside other terms involving secret, illegal activity, and so even though, using more rigorous parameter's showed that Posner's Google search may have been flawed, his understanding of the word *in context* seems clearly to be correct.

13.   More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, published "Judging Ordinary Meaning" (*Yale Law Journal* 127), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity. Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary*, as well, allowing a more precise interpretation of historical text data.

14.   In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by J. Alito in his concurrence in *Facebook v. Duguid* (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

15.   Several large databases have come online in the past few years that facilitate LCL research. They have proved invaluable to me in compiling this report. Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), covering the years 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth

1   century, the Corpus of Historical American English (COHA), which was initially

2   developed at BYU as well but is now independent of that institution, currently

3   contains 475 million words of text from 1820–2020. The size of these databases

4   continues to grow as more works are digitized, coded, and added to the corpora.

5   16.   Critics of LCL have complained that databases like COFEA and COEME

6   contain only texts written by "elites," whose language may differ from that of

7   "ordinary people" who do not write at all, or who for various reasons do not write

8   texts likely to be included in the available corpora. It is certainly the case that many

9   printed books and periodicals, along with documents like the Constitution, its

10  amendments, and state and federal statutes, tend to be written by educated

11  specialists and professional writers, and although ordinary people are expected to

12  understand the language of the Constitution, the Declaration of Independence, and

13  other founding documents, as well as the laws that govern the nation, such texts

14  typically require specialized knowledge. A reading-difficulty formula like the

15  commonly-used Flesch-Kincaid scale suggests that the Declaration of

16  Independence and the Constitution require a fifteenth-grade reading level, while

17  according to one comprehensive study, *Adult Literacy in America* (US Department

18  of Education, 1993), the average American today tends to have a seventh-grade

19  reading level.

20  17.   In order to counter any "elite" bias that may be found in databases like

21  COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases

22  covering the period 1750–1900, focusing for this report on the Founding Era and on

23  the period of Reconstruction after the passage of the Fourteenth Amendment. Print

24  technology remained relatively static between the 1450s, when printing presses first

25  appeared in Europe, and the early 19th century, when the Industrial Revolution

26  drastically changed print technology. The first printing press was adapted by

27  Gutenberg from the design of the traditional wine press, and printing was a slow

28  and labor intensive process. As a result, newspapers in the founding era were small,

7

averaging four to eight pages. Publication was less frequent as well. Papers tended to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the Founding Era and later, during Reconstruction, provided average Americans with their principal access to all the critical events and documents of their time, along with coverage of local and international news. Even though newspaper subscribers tended to be "elites," newspaper content was widely shared by word-of-mouth: ultimately, most Americans in the Founding Era, including those who would be classified as illiterate or poorly educated by today's standards, got their news from newspapers.

18.   The invention of the steam engine in the 19th century, along with growth of paper mills that facilitated the production from wood pulp of large and inexpensive rolls of newsprint, led to a revolution in print technology. This led to an explosion in the size of newspapers and the frequency of their publication, to the point where, at their height, papers in big cities were publishing several editions a day. This growth in newspapers, along with a substantial increase in periodical and book production, paralleled a growth in literacy in the US and Europe that tracked the industrial revolution and the subsequent rise in universal public education. By the end of the Civil War, there were more readers than ever, and they demanded more reading material.

19.   As for the question of "elites," as the principal means of communicating news and information, the newspapers of the 18th and 19th centuries embodied much of the language of the "ordinary people" who read them. Newspapers also provide researchers with more data for the 19th century than a corpus like COHA, which covers the same period but tends to focus on literary and specialized texts rather than material for the general reader.

20.   Since the 1960s, database compilers have been able to track contemporary spoken English more successfully, though for obvious reasons, none of the databases for the Founding Era and for the post-Civil War period cover the

spoken language of Americans. Although scholars can reconstruct some of that oral language, we are always doing so through the lens of print versions purporting to represent or comment on ordinary speech.

21.   The newspaper databases I have examined are Readex Historical American Newspapers; Chronicling America (newspapers digitized by the Library of Congress); the British Newspaper Archive (digitized by the British Library); and two private subscription services, newspapers.com and newspaperarchive.com. For this report, newspapers.com provides the most-complete picture of the language of the Founding Era newspapers as well as the ordinary language of the later 19th century.

22.   All the databases contain some duplicates. COFEA and COEME digitize multiple editions of the same work; and the newspaper databases contain a number of duplicate stories because, particularly in the period of newspaper growth during the 19th century—in an age before the wire services and syndication appeared, and before the larger papers began to set up news bureaus in key areas around the country and around the world—newspapers routinely printed each other's stories, sometimes acknowledging their source and sometimes not. Still, the databases often offer more insight into the meaning of words and phrases than simply going to a dictionary. Jurists from Learned Hand to Felix Frankfurter to Frank Easterbrook and Richard Posner have warned their colleagues not to make a fortress of the dictionary. The corpora are by necessity incomplete. LCL doesn't replace dictionary look-ups, but it does provide an important supplement to them.

### III.   THE MEANING OF ARMS AND ACCOUTREMENTS IN THE DATABASES

23.   I was asked to look at the meaning of *arms* and *accoutrements*, along with the phrase *arms* and *accoutrements,* current in the Founding Era and during the period immediately following the adoption of the Fourteenth Amendment, focusing on whether the word *accoutrements* may be considered analogous to the present-day use of the term *magazine* in reference to firearms.

9

24.   In the eighteenth and nineteenth centuries, *magazine* was a word that meant 'storehouse, depot.' A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits. The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the nineteenth century, and the term was relatively rare until the 1920s. Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms*.

25.   The data on *accoutrements* suggest that the analogous LCMs are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military. *Cartridges, cartridge boxes* and later, *magazines*, are not arms in and of themselves.

26.   The *Oxford English Dictionary* (OED), the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement*; the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

27.   *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxes, and other formal attire). But the military sense of *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers. The example given to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here

10

1   Wellington, recognized by all as a consummate soldier who would soon defeat
2   Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms*
3   and *accoutrements*.

4       28.   The term *accoutrement-maker*, though not defined separately by the
5   *OED*, is illustrated with examples referring to a manufacturer of military
6   accessories rather than arms; and the term *accoutrement shop* has this 1831
7   example where guns and accoutrements are differentiated: "The crowd was so great
8   in the Rue de Richelieu, . . . especially about the gunsmiths and accoutrement shops
9   in the vicinity of the Palais Royal." [*United Service Jrnl*. i. 325]

10       29.   The *OED* definitions are instructive. But in order to determine more
11   specifically what the term *accoutrements* refers to, I consulted two digitized
12   historical databases, or corpora. A COFEA database search for the occurrence
13   *accoutrements* within 6 words of *arms* returned 873 hits (including a small number
14   of duplicates). A similar search of COEME returned 126 hits, the earliest from
15   1656. I determined that the two search terms, *arms* and *accoutrements*, often appear
16   together as a single phrase, *arms and accoutrements*, typically in military contexts
17   having to do with an army or militia unit. *Accoutrements* often occurs in a list
18   alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition*,
19   though when *ammunition* is not listed separately, the term *accoutrements* will
20   generally include *ammunition*. *Accoutrements* sometimes occurs in a list alongside
21   *clothing*, suggesting it may not always include uniforms (this finding informs the
22   *OED* definition: military equipment other than arms and uniforms). But
23   occasionally, *accoutrements* may include items classified as part of a uniform
24   (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where
25   the term usually refers to clothing associated with particular professions or
26   activities). In sum, in the vast majority of examples, *accoutrements* functions as a
27   catch-all term for military equipment *separate* from, and not including, *arms*.

28

30.   But English usage is never simple. As linguists often say, "all grammars leak"—which is to say, there are always a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation: it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military
> *accoutrements*, such as paper-caps, paper-belts, wooden swords,
> &c. were beating up for recruits in Parliament-street, Boston. [*The
> American jest book*: Part I[-II], 1789; emphasis added; here military
> accoutrements includes toy swords.]

31.   This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that arms may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements
> provided by the militia law.

32.   But besides a handful of exceptions, in literally hundreds and hundreds of cases, *arms* and *accoutrements* are treated as separate items of military gear. Here are some typical examples from the Founding Era:

> **1776**: Fire arms and accoutrements
>
> **1780**: arms, ammunition, accoutrements, drums and fifes in
> possession of the respective regiments.
>
> **1795**: you will march . . . with arms and accoutrements in good order.
> If any volunteer should want arms and ammunition, bring them
> forward, and they shall be supplied as well as possible. [COEME;
> the other examples are from COFEA]
>
> **1798**: To hold his powder and his ball, his gun, accoutrements

12

1     and all . . . [This example rhymes because it's from a poem,

2     indicating that the idiomatic phrase arms and accoutrements has

3     become part of the general language available not just to military

4     specialists but also to poets and novelists.]

5     33.   A second COFEA search, for *accoutrements* alone, returned 1,235 hits.

6 COEME yields 771 hits. These searches add a number of non-military contexts,

7 where accoutrements refers to religious gear (robes, mitres, and so on) as well as

8 other sorts of fancy or special clothing. These non-military examples do not

9 reference weapons, ammunition, or other military equipment.

10     34.   I supplemented my COFEA search with a search of the newspaper

11 database, newspapers.com, for the Founding Era period, 1750–1800. The

12 newspaper databases do not permit the kind of collocate searches that COFEA,

13 COEME, and COHA allow. Entering two search terms returns results in which

14 either one or both terms occur on the same page, though not necessarily in the same

15 sentence, or even in the same article, and not necessarily as linked terms. There are

16 1,392 hits for *accoutrements*. There are 692 matches for the exact phrases *arms and*

17 *accoutrements*.

18     35.   Here's a mid-18th century British example from the newspapers.com

19 corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:

20     36.   This Militia shall receive their Arms, Accoutrements, and

21     Ammunition from the Ordnance. *Derby Mercury*, 1756.

22     37.   Similarly, there's this "ploughshares into swords" example of a

23 Cambridge University library to be converted to a military barracks:

24     [T]he new Building intended for a publick Library . . . may be

25     converted into a Barrack, and be supplied with Provisions, Arms,

26     and Accoutrements, at the Expence of the University. 1756

27     38.   A search of the Readex database of America's Historical Newspapers

28 returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. This early

1 example from the colonial period appeared in the **Boston Evening Post** in 1750. It

2 distinguishes *arms* from uniforms, accoutrements, and other military equipment:

3     All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely

4     Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions,

5     and all other Things necessary for a Gentleman Ranger.

6     39.   This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that

7 arms and accoutrements are distinct categories in the new nation as well:

8     The militia . . . must be considered as the palladium of our security . . . .

9     The formation and discipline of the militia of the continent should be

10     absolutely uniform; and that the same species of arms, accoutrements, and

11     military apparatus, should be introduced in every part of the United States.

12     40.   The text of a bill in Congress to establish a uniform militia appeared in

13 the *New York Journal*, in 1790. It confirms the Founding-Era sense that *arms*,

14 *ammunition*, and *accoutrements* make up distinct and separate elements of a

15 soldier's kit:

16     There shall be appointed an adjutant general for each state . . . whose duty

17     it shall be to . . . report[] the actual situation of their arms, accoutrements,

18     and ammunition. . . Every non-commissioned officer or private . . . for

19     appearing at such meeting or rendezvous without his arms, ammunition, or

20     accoutrements, as directed by this act, shall pay the sum of twenty-five

21     cents.

22     41.   And this cite from 1868 clearly distinguishes what counts as arms, and

23 what counts, separately, as accoutrements:

24     At Watertown Arsenal, Massachusetts . . . the following Arms, &c., will

25     be sold:10,699 rifled and smooth-bore Muskets . . . ; 261 Carbines . . . ; 305

26     Sabres . . . ; lot of cavalry accoutrements, consisting of Bayonet Scabbards,

27     Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c."

28     42.   The newspaper data parallels that of COFEA: the phrase *arms and*

*accoutrements* is almost always military. The phrase sometimes occurs alongside *ammunition* as a separate list item. *Accoutrements*, when it appears alone, is a more general term, used both for military and other gear, though in non-military contexts it is more directed toward clothing rather than 'equipment' (priests' robes, ministerial garb, fancy ball gowns, badges of office), as is also indicated in the *OED* citations. In non-military contexts, *accoutrements* carries the suggestion of ceremonial gear, and less commonly, nonmilitary tools of the trade.

43.   It's clear that *arms and accoutrements* was, during the 18th and 19th centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and battery* or *breaking and entering*. Such pairs take on the characteristics of a formula, and often appear in the same order (this order may be dictated by logical succession of events, or it may be random). *Eggs and bacon* is rarer than *bacon and eggs*. And it would be unusual to find *battery and assault*. Such ordered pairs are called "irreversible binomials," though there's nothing but custom (as in *salt and pepper*) and sometimes logic (as in breaking and entering) to prevent anyone from reversing the order.

44.   The word *accoutrements* typically occurs in a list after *arms* (more rarely, it may occur before *arms* as well), and it is typically a separate category from *arms* (though not always, as the above examples show).

45.   There are over 47,000 citations in newspapers.com for *arms* or *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms and accoutrements*. Examining a selection of the 15,799 citations of the phrase confirms that both in England and the US, *arms* and *accoutrements* are separate categories. Here is one example from Gloucestershire, in England, dated 1868:

[A] letter was received from the Home Secretary, pointing out the danger

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

**ER_1575**

1    of permitting an accumulation of arms and accoutrements to take place in
2    prisons, and requesting, if there were any arms or munitions of war stored
3    in the prison, that they should be removed to the nearest military depot.

4    46.   A similar cite from Iowa in 1868: "Persons having in their possession any
5    arms, accoutrements or ammunition belonging to the State, are requested to return
6    the same at once to the Adjutant General, as proper places have been provided by
7    the State for the safe keeping of all such property."

8    47.   And this, from Stroudsburg, PA, also 1868: "More than half of the
9    Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements,
10   and probably made their way to the gold regions of Colorado and Montana."

11   48.   The circa-1868 data confirmed the Founding Era data that *accoutrements*
12   is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the
13   terms refer to separate categories of equipment.

14   49.   One final note on *accoutrements*. The U.S. Supreme Court's recent
15   decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843,
16   2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the
17   North Carolina Supreme Court affirming Huntley's conviction for carrying a
18   shotgun illegally "to the terror of the people," as forbidden by the Statute of
19   Northampton in 1328. In that decision, the Court states, A gun is an 'unusual
20   weapon,' wherewith to be armed and clad. No man amongst us carries it about with
21   him, as one of his everyday accoutrements—as a part of his dress.

22   50.   In the citation above, *accoutrements* does not refer to weaponry, but to
23   the more general category of 'everyday attire, or clothing.' It may be normal to
24   wear a shirt, or a belt, or shoes, but it's not normal, the Court is saying, to wear a
25   gun in North Carolina in 1843. It's legal—the Court agrees—to carry a gun for any
26   lawful purpose, "either of business or amusement"—but it's not *normal* or typical
27   to do so. In affirming Huntley's conviction, the Court noted that his purpose in
28   carrying a shotgun was not a legal one.

16

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)
**ER_1576**

## IV. SOME HISTORICAL NOTES ON THE USE OF THE WORD MAGAZINE

51.   Since the technology of arms and ammunition was changing by the mid-nineteenth century, I also searched for new uses of the term magazine in relation to *arms* and *accoutrements*. With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term *magazine* starts to appear in the sense 'ammunition container' (replacing the earlier *cartridge box* or *cartridge case*). According to the *OED*, in the 18th and early 19th centuries, magazine referred generally to 'a storehouse,' and in military contexts it referred specifically to a storehouse for gunpowder. (The sense of 'storehouse' also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of 'depot, warehouse,' is cognate with the French word *magasin*, 'a shop or store').

52.   Although most uses of the word *magazine* still refer to printed periodicals, during the 19th century, one sense of the term *magazine* narrows, referring more and more to an 'ammunition container,' a primary sense of the word in reference to firearms today. The *OED* defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

53.   COFEA and COEME do not cover the period past 1800. COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s. Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses. Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. *Magazines* meaning 'devices for holding bullets' form only a very small subset of these citations. It took some thirty to forty years for the 'bullet holder'

17

1  sense of the word *magazine* to become more common, and even then, text
2  references to ammunition magazines often appear, not in general discourse, but in
3  legislation restricting their size or use.

4      54.   Most militia laws and regulations from the Founding Era specify
5  minimum requirements for soldiers' weapons, ammunition, and accoutrements.
6  Most laws regulating weapons in the mid-19th century restrict or ban specific kinds
7  of weapons, often enumerating them, sometimes in terms we find colorful today but
8  which were common at the time (Arkansas toothpicks, Bowie knives, slung shots,
9  swords in canes, pistols capable of being concealed in a pocket). Occasionally these
10 laws further identified such weapons as those used by "brawlers," thieves, robbers,
11 or others bent on illegal activities. Other weapons restrictions follow the English
12 tradition of limiting possession of weapons by social class, nationality, or race.

13     55.   Although militia laws do specify weapons and other required
14 accoutrements or pieces of military equipment, including horses for the officers,
15 those laws that prohibit certain kinds of weapons during the two critical periods
16 (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one
17 exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles,
18 except by the owner thereof on his removal to reside out of this province, or any
19 gun barrels, gun locks, or bayonets, be carried out of his province, without the leave
20 of the council of safety for the time being." [1776 Md. Laws 146].

21     56.   I surveyed the gun regulations in the Duke Historical Database from the
22 early medieval period through 1885 to see what terminology was used. None of the
23 laws that prohibit weapons, aside from the Maryland statute above, specifies a gun
24 part or ammunition case or accoutrements of any kind. Although many present a list
25 of banned or prohibited weapons—usually without defining them [the assumption
26 is that the reader knows what they refer to], none of the laws mention cartridge
27 boxes, bullets, barrels, or other parts of any weapons.

28

57.   Later, however, in the decades after the introduction of *magazines* as 'carriers or holders of bullets,' laws and regulations against their nonmilitary use started to appear. Here's a 1919 Maine law banning guns with loaded magazines: No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.

58.   Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states. Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

59.   A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

60.   Finally, the Federal Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms: "(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition."

61.   The Act also provides a specific definition of "machine gun": "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

19

## V.   CONCLUSION

62.   In effect, then, *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms. In non-military contexts this does not apply: the *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

63.   But there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

64.   In addition, 'bullet holders,' whether they are called *cartridge cases*, *magazines*, or simply, *machine guns*, both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

65.   To repeat, there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November ⟶7, 2022, at Champaign , IL.

Dennis Baron

20

Declaration of Dennis Baron
(17-cv-1017-BEN-JLB)

**ER_1580**

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6     Fax: (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9                IN THE UNITED STATES DISTRICT COURT

10              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                         CIVIL DIVISION

12

| | |
|---|---|
| 13 **VIRGINIA DUNCAN, RICHARD** | Case No. **3:17-cv-1017-BEN-JLB** |
| **LEWIS, PATRICK LOVETTE,** | |
| 14 **DAVID MARGUGLIO,** | **DECLARATION OF RYAN BUSSE** |
| **CHRISTOPHER WADDELL, and** | |
| 15 **CALIFORNIA RIFLE & PISTOL** | Courtroom:    5A |
| **ASSOCIATION, INC., a California** | Judge:        Hon. Roger T. Benitez |
| 16 **corporation,** | Action Filed:  May 17, 2017 |
| 17                     Plaintiffs, | |
| 18         **v.** | |
| 19 | |
| 20 **ROB BONTA, in his official capacity as** | |
| **Attorney General of the State of** | |
| 21 **California; and DOES 1-10,** | |
| 22                     Defendants. | |

23

24

25

26

27

28

---

## DECLARATION OF RYAN BUSSE

I, Ryan Busse, declare under penalty of perjury that the following is true and correct:

1.      I am a former senior executive in the firearms industry and the author of *Gunfight:  My Battle Against the Industry that Radicalized America* (New York: PublicAffairs, 2021).  I make this declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of August 29, 2022.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.      I have been retained by the California Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $150 per hour.

## BACKGROUND AND QUALIFICATIONS

4.      I was raised with firearms as an integral part of my life.  I began shooting with various guns as a young boy and continued to regularly use and study guns throughout my life (I am now 52).  After graduating college, I entered the firearms industry in 1992.  I became a sales executive in the firearms industry in 1995, and I spent more than 25 years in this role.  While in the industry, I developed innovative sales teams, maintained relationships with the largest national retailers, and was responsible for worldwide sales of millions of firearms.  I built a dealer-direct sales network that included more than 2500 firearms dealers including locations in all 50 states, and I regularly visited these dealers.  In my job, I also studied and built sales programs that relied on understanding the technical nature of most firearms available in the U.S. market, including AR-platform and other types of rifles.  During my career I played an integral role in building one of the largest firearms companies in the United States, Kimber, and I was nominated by shooting industry leadership many times for the SHOT Business "Shooting Industry Person

of the Year" Award.[1]  I served in an executive sales capacity as Vice President of Sales until August 2020.  While in the industry I served as an advisor to the United States Senate Sportsmen's Caucus, and as the board chairman for Backcountry Hunters & Anglers, a national wildlife conservation and hunting organization.

5.      I left the firearms industry because I was concerned about what I believed to be irresponsible and dangerous marketing and sales practices.  Since I left, I have served as an advisor to the 2020 Biden presidential campaign, I have testified twice before the U.S. Congress about the firearms industry and gun policy (before the House Committee on Oversight and Reform[2] and the Joint Economic Committee[3], respectively), I have been called to testify in closed-door briefings at the U.S. Senate, and I currently serve as a Senior Advisor to Giffords.  I remain a proud and active gun owner, outdoorsman, and advocate for responsible gun ownership.  I have provided expert witness testimony in *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.).

## OPINIONS

6.   When I first started my work in the gun industry neither AR-15s nor large-capacity magazines (those capable of holding more than 10 rounds) were common. There was an unspoken agreement in the industry that tactical guns and gun paraphernalia—and virtually all large capacity magazines were considered tactical at this time—would not be displayed at trade shows or used at industry-sponsored shooting events. Individuals who brought such rifles to shooting events were asked not to return. This remained true as late as 2007. It was not until very

---

[1] SHOT Business is a trade publication of the shooting and firearms industry, and "Person of the Year" was the highest award given to an individual in the firearms industry.

[2] See https://bit.ly/3CVDQc4.

[3] See https://bit.ly/3My2gLJ. .

1  recently that the gun industry began to push AR-15s leading to their popularization

2  today.

3         7.     Despite the recent popularization of large-capacity magazines, it is

4  important to note that I am not aware of a single existing firearm that requires a

5  high-capacity magazine to function as designed. By this, I mean that all firearms

6  that can accept a large-capacity magazine can also accept a magazine that holds 10

7  or fewer rounds and function precisely as intended. This is true even of AR-style

8  rifles. Although many AR-style rifles are sold with a 30-round magazine, the

9  manufacturers all offer the optional purchase of 10-round or even lower-capacity

10  magazines. There are many pistols (such at the very popular Model 1911—which

11  was the accepted sidearm of the U.S. Military for decades and is still one of the

12  most widely sold guns in the United States) that are built for magazines of eight

13  rounds or less. While larger 10-plus round magazines exist for the 1911 and other

14  similar pistols, a smaller magazine (standard seven or eight round) are considered

15  preferable by almost all consumers because the physical size/profile of the shorter

16  magazine is easier to carry, shoot and conceal. Still today, the 1911 and other

17  similar guns which are built to function with sub-10 round magazines are built by

18  many gun companies (Smith and Wesson, Ruger, Kimber, Springfield, Rock Island,

19  Dan Wesson, and many other companies build and sell these 1911 pistols) and they

20  are sold in high volumes by most retailers in the United States. These guns are still

21  considered extremely effective self-defense firearms by many of the leading

22  firearms trainers in the country.

23         8.   Today there are also many handguns that can accept a magazine within

24  15–20-plus rounds, but these handguns can accept and fully function with a

25  magazine that holds 10 or fewer rounds. Firearm manufacturers have been

26  providing these lower capacity magazines for years and can easily modify a "high

27  capacity" magazine into one that will accept only 10 rounds but still function just

28

as designed in a firearm. In 1994, Congress enacted the Violence Crime Control and Law Enforcement Act that prohibited the possession of "large capacity ammunition feeding devices" defined as any magazine capable of accepting more than ten rounds of ammunition. California enacted a ban on the sale of large capacity magazines in 2000 and that law is still on the books today. Since that enactment, and still today, firearms manufacturers build and sell dozens of gun models and magazines that are compliant with that California law. I am not aware of any assertion that these guns, built for and sold in California, are incapable of functioning as designed.

9.   Because a large capacity magazine is not a required component for a firearm to operate, it can and should be characterized as a firearms accessory. There is a massive market for magazines that far surpasses that of the market for firearms themselves in terms of numeric sales. There are companies, such as Magpul, that entirely specialize in firearms accessories including large capacity magazines. In fact, most firearms manufacturers do not consider the magazines as integral enough to build their own magazines for their own guns. In almost all cases even the largest gun manufacturers contract with "accessory makers" who build magazines and then supply them to the gun manufacturer who then sells the magazines with the guns but also as an "add-on" accessory. Based on my experience, these magazines are a large profit center for the gun industry and sales of these magazines are treated as a category separate from gun sales throughout the sales chain. For example, I am aware of compensation programs from gun manufacturers that offer increased payment for magazines as opposed to guns, and retailers often incentivize their employees to push a buyer to purchase additional magazines because it is known that consumers view the purchase of magazines as separate from the gun and they are therefore viewed as "add-on sales" for retailers. These magazines are almost always manufactured by third party companies (not the manufacturer of the firearm). The degree to which a magazine is viewed as an accessory by firearms

4

1    retailers is reinforced by the fact that when manufacturers add additional magazines
2    to the gun at the time of sale as an incentive to encourage consumers to purchase
3    the gun, the practice often upsets the retailers who view this as taking away an
4    accessory sale they could have made.

5        10. In my experience, magazines are often used as marketing tactics to
6    increase sales. Many gun buyers are encouraged to buy extra magazines of various
7    sizes and they are encouraged to build an excess supply of more magazines than are
8    needed even though these accessories basically never wear out. While it is possible
9    for someone who shoots high volumes to eventually wear out a magazine, these
10   shooters are exceptionally rare. Additionally, when a magazine begins to wear out
11   you can purchase a new spring tune-up kit for the magazine and thereby refurbish
12   the magazine.

13       11. It is also important to note that even the ability of guns to accept an
14   external magazine is not as ubiquitous as one would be led to believe. Fixed
15   magazine firearms are and have long been extremely prevalent. The majority of
16   hunting rifles have a fixed internal magazine, all revolvers hold ammunition in what
17   is in essence a circular fixed magazine, almost all shotguns are built with fixed
18   magazines or without any magazine at all, some tactical rifles, and most tactical
19   shotguns are built with, and function with fixed magazines.

20       12. Lastly, many widely available guns including all AR-15 style rifles
21   accept all other AR-15 magazines. In other words, the magazine is a universal
22   accessory much like tires that fit many brands of cars. This is true of AR-15
23   magazines regardless of capacity or size (a 10 round AR-15 magazine will function
24   in all other AR-15 style firearms). It is also true of the 1911 style pistol which is
25   one of the most popular self-defense guns in history. This century-old design is still
26   a leading seller and its standard specifications call for a seven or eight round
27   magazines. Dozens of the largest manufacturers in the world currently offer 1911
28   pistol models and magazines from each are interchangeable between all of these

5

1   others. This interchangeability of magazines as accessories is illustrated by the fact

2   that third party manufacturers who produce magazines for multiple gun companies

3   will sometimes mistakenly ship a magazine from "company A" to "company B"

4   because the only difference is the marking (there is no functional difference). I have

5   personally witnessed this on multiple occasions.

6       13.     Based on my experience, a large-capacity magazine is not necessary to

7   use a firearm effectively for self-defense or other sporting purpose, like hunting.

8       Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the

9   laws of the United States of America that the foregoing is true and correct.

10      Executed on November 9, 2022, at Kalispell, Montana.

11

12

13   _____

14                   Ryan Busse

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta, in his*
    *official capacity as Attorney General of the*
8   *State of California*

9                IN THE UNITED STATES DISTRICT COURT

10           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                        CIVIL DIVISION

12

13

14   **VIRGINIA DUNCAN, RICHARD**          17-cv-1017-BEN-JLB
     **LEWIS, PATRICK LOVETTE,**
15   **DAVID MARGUGLIO,**                  **DECLARATION OF SAUL**
     **CHRISTOPHER WADDELL, and**          **CORNELL**
16   **CALIFORNIA RIFLE & PISTOL**
     **ASSOCIATION, INC., a California**   Courtroom:    5A
17   **corporation,**                      Judge:        Hon. Roger T. Benitez
                                           Action Filed: May 17, 2017
18                            Plaintiffs,

19
         **v.**
20

21   **ROB BONTA, in his official capacity as**
     **Attorney General of the State of**
22   **California; and DOES 1-10,**

23                            Defendants.

24

25

26

27

28

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

**ER_1588**

# DECLARATION OF SAUL CORNELL

I, Saul Cornell, declare under penalty of perjury that the following is true and correct:

1.      I have been asked to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding era understood the right to bear arms, as well as the understanding of the right to bear arms held at the time of the ratification of the Fourteenth Amendment to the United States Constitution.  In *New York State Rifle & Pistol Ass'n Inc. v. Bruen*, the U.S. Supreme Court underscored that text, history, and tradition are the foundation of modern Second Amendment jurisprudence.  This modality of constitutional analysis requires that courts analyze history and evaluate the connections between modern gun laws and earlier approaches to firearms regulation in the American past.  My report explores these issues in some detail.  Finally, I have been asked to evaluate the statute at issue in this case, particularly regarding its connection to the tradition of firearms regulation in American legal history.

2.      This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.      I am the Paul and Diane Guenther Chair in American History at Fordham University.  The Guenther Chair is one of three endowed chairs in the history department at Fordham and the only one in American history.  In addition to teaching constitutional history at Fordham University to undergraduates and graduate students, I teach constitutional law at Fordham Law School.  I have been a Senior Visiting research scholar on the faculty of Yale Law School, the University of Connecticut Law School, and Benjamin Cardozo Law School.  I have given invited lectures, presented papers at faculty workshops, and participated in

conferences on the topic of the Second Amendment and the history of gun
regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA
Law School, the University of Pennsylvania Law School, Columbia Law School,
Duke Law School, Pembroke College Oxford, Robinson College, Cambridge,
Leiden University, and McGill University.[1]

4.      My writings on the Second Amendment and gun regulation have been
widely cited by state and federal courts, including the majority and dissenting
opinions in *Bruen*.[2] My scholarship on this topic has appeared in leading law
reviews and top peer-reviewed legal history journals. I authored the chapter on the
right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-
authored the chapter in *The Cambridge History of Law in America* on the Founding
era and the Marshall Court, the period that includes the adoption of the Constitution
and the Second Amendment.[3] Thus, my expertise not only includes the history of
gun regulation and the right to keep and bear arms, but also extends to American
legal and constitutional history broadly defined.  I have provided expert witness
testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No.
14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo.
D. Ct., Boulder Cnty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller
v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG
(S.D. Cal.), 34 F.4th 704 (9th Cir. 2022); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D.
Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-
cv-01537-BEN-JLB (S.D. Cal.).

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly
presentations, *see* Exhibit 1.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE
U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber
eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the
Early Federal System*, *in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544
(Christopher Tomlins & Michael Grossberg eds., 2008).

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**RETENTION AND COMPENSATION**

5.     I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports; $750 per hour for depositions and court appearances; and an additional $100 per hour for travel time.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

**BASIS FOR OPINION AND MATERIALS CONSIDERED**

6.     The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit, my review of the local ordinances at issue in this lawsuit, my education, expertise, and research in the field of legal history. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

**SUMMARY OF OPINIONS**

7.     Understanding text, history, and tradition require a sophisticated grasp of historical context.  One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment.

8.     It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights claims.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4]  Each of the new states, either by

---

[4] William B. Stoebuck, *Reception of English Common Law in the American Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal*
(continued…)

1  statute or judicial decision, adopted multiple aspects of the common law, focusing

2  primarily on those features of English law that had been in effect in the English

3  colonies for generations.[5]  No legal principle was more important to the common

4  law than the concept of the peace.[6]  As one early American justice of the peace

5  manual noted:  "the term peace, denotes the condition of the body politic in which

6  no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading

7  source of early American views about English law, opined that the common law

8  "hath ever had a special care and regard for the conservation of the peace; for peace

9  is the very end and foundation of civil society."[8]

10        9.      In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of

11  Blackstone's authority as a guide to how early Americans understood their

12  inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous

13  terms that there was a "well established historical tradition of prohibiting the

14  carrying of dangerous and unusual weapons."[9]  The dominant understanding of

15  the Second Amendment and its state constitutional analogues at the time of their

16  _____

17  *Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

18  [5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

20  [6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH 105-109, 227-228 (University of North Carolina Press, 2009).

21  [7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

22  [8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

23  [9] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms.  The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1713 (2012).  It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016).

1   adoption in the Founding period forged an indissoluble link between the right to

2   keep and bear arms with the goal of preserving the peace.[10]

3          10.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined

4   with the scope they were thought to have when the people adopted them."[11]

5   Included in this right was the most basic right of all: the right of the people to

6   regulate their own internal police.  Although modern lawyers and jurists are

7   accustomed to thinking of state police power, the Founding generation viewed this

8   concept as a right, not a power.[12]  The first state constitutions clearly articulated

9   such a right — including it alongside rights more familiar to modern Americans,

10  most notably, the right to bear arms.[13]  Pennsylvania's Constitution framed this

11  estimable right succinctly: "That the people of this State have the sole, exclusive

12  and inherent right of governing and regulating the internal police of the same."[14]

---

13     [10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF

14  LIBERTY (1775).  The modern terminology to describe this concept is "ordered
    liberty."  *See Palko v. Connecticut*, 302 U.S, 319, 325 (1937).  For a more recent

15  elaboration of the concept, JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED
    LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press,

16  2013), 44-45.  On Justice Cardozo and the ideal of ordered liberty, see *Palko v.
    Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty:*

17  *Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell,
    *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569,

18  576-77 (2017).

    [11] *Heller*, 554 U.S. at 634–35; William J. Novak*, Common Regulation: Legal*

19  *Origins of State Power in America,* 45 HASTINGS L.J. 1061, 1081–83 (1994);
    Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the*

20  *Constitution,* 20 J. POL'Y HIST. 47 (2008).

21     [12] On the transformation of the Founding era's ideas about a "police right"
    into the more familiar concept of "police power," see generally Aaron T. Knapp,

22  *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015)*.  See also*
    MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS

23  OF AMERICAN GOVERNMENT (2005), 82-87; Christopher Tomlins, *Necessities of
    State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

24     [13]PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV
    (1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF

25  RIGHTS, art. V (1777).

26     [14] Modern style police forces did not emerge until the middle of the next
    century, and although these early police forces were modeled on military style

27  organizations, they did not routinely carry firearms until after the Civil War, see Scott
    W. Phillips, *A Historical Examination of Police Firearms*, 94 THE POLICE

28  JOURNAL 122 (2021).

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

Thus, if Justice Scalia's rule applies to the scope of the right to bear arms, it must also apply to the scope of the right of the people to regulate their internal police. The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point.

11.    In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased. Indeed, the individual states exercised their police powers to address longstanding issues and novel problems created by firearms in American society.  In particular, the states regulated and when appropriate prohibited categories of weapons deemed to be dangerous *or* unusual.

## I.    THE HISTORICAL INQUIRY REQUIRED BY *BRUEN*, *MCDONALD*, AND *HELLER*

12.    The United States Supreme Court's decisions in *Heller*, *McDonald*[15], and *Bruen* have directed courts to look to text and history for guideposts in evaluating the scope of permissible firearms regulation under the Second Amendment.  In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[16]  Legal texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts.[17]

13.    Following the mandates set out in *Heller, McDonald* and more recently in *Bruen*, history provides essential guideposts in evaluating the scope of

---

[15] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

[16] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

[17] *See* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

6

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

**ER_1594**

permissible regulation under the Second Amendment.[18]  Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[19]  The Court acknowledged that when novel problems created by firearms are at issue the analysis must reflect this fact: "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."[20]  *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment.

14.    In particular, *Bruen* suggests three key contextually dependent inquiries[21] courts must conduct to analyze the history of regulation and try and infer what the absence of a regulatory tradition means as a matter of law:

- When a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment;

- Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional; and

- If some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

15.    A mechanistic strategy of digital searching for historical gun laws would be incapable of answering those historical inquiries.  Instead, a historian seeking to

---

[18] *Bruen*, 142 S. Ct. at 2127.
[19] *Id*. at 2133.
[20] *Id*. at 2132.
[21] *Id*. at 2131.

answer those inquires would need to holistically research and analyze how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, respond to the societal ills created by those changes.

16.     In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[22] Indeed, such research is still ongoing: new materials continue to emerge; and in the months since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[23]

17.     Justice Kavanaugh underscored a key holding of *Heller* in his *Bruen* concurrence: "Like most rights, the right secured by the Second Amendment is not unlimited. From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." Crucially, the Court further noted that "we do think that *Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense."[24]

18.     One overarching principle regarding firearms regulation does emerge from this period and it reflects not only the common law assumptions familiar to the Founding generation, but it is hard-wired into the Second

---

[22] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

[23] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[24] *Bruen*, 142 S. Ct. at 2132–33.

8

1    Amendment itself.  As Justice Scalia noted in *Heller*, and Justice Thomas reiterated

2    in *Bruen*, the original Second Amendment was a result of interest balancing

3    undertaken by the people themselves in framing the federal Constitution and the

4    Bill of Rights.  Thus, from its outset the Second Amendment recognizes both the

5    right to keep and bear arms and the right of the people to regulate arms to promote

6    the goals of preserving a free state. An exclusive focus on rights and a

7    disparagement of regulation is thus antithetical to the plain meaning of the text of

8    the Second Amendment.  Although rights and regulation are often cast as

9    antithetical in the modern gun debate, the Founding generation saw the two goals as

10   complimentary.  Comparing the language of the Constitution's first two

11   amendments and their different structures and word choice makes this point crystal

12   clear.  The First Amendment prohibits "abridging" the rights it protects. In standard

13   American English in the Founding era, to "abridge" meant to "reduce."  Thus, the

14   First Amendment prohibits a diminishment of the rights it protects.  The Second

15   Amendment's language employs a very different term, requiring that the right to

16   bear arms not be "infringed."[25]  In Founding-era American English, the word

17   "infringement" meant to "violate" or "destroy."  In short, when read with the

18   Founding era's interpretive assumptions and legal definitions in mind, the two

19   Amendments set up radically different frameworks for evaluating the rights they

20   enshrined in constitutional text.  Members of the Founding generation would have

21   understood that the legislature could regulate the *conduct* protected by the Second

22   Amendment and comparable state arms bearing provisions as long such regulations

23   did not destroy the underlying *right*.

24   _____

25   [25] The distinction emerges clearly in a discussion of natural law and the law
     of nations in an influential treatise on international law much esteemed by the
26   Founding generation:  "Princes who infringe the law of nations, commit as great a
     crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE
     PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was
27   among those included in the list of important texts Congress needed to procure, *see*
     Report on Books for Congress, [23 January] 1783," *Founders Online,* National
28   Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

9

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

**ER_1597**

19.     John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.[26]

20.     Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[27]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[28]  Samuel Johnson's *Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[29]  Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[30]   And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[31]

21.     Regulation, including robust laws, were not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[32]  As one

---

[26] *Liberty,* A NEW LAW DICTIONARY (1792) *See  also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[27] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[28] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

[29] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[30] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[31] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

[32] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001)

(continued…)

10

1    patriotic revolutionary era orator observed, almost a decade after the adoption of the

2    Constitution:  "True liberty consists, not in having *no government*, not in a

3    *destitution of all law*, but in our having an equal voice in the formation and

4    execution of the laws, according as they effect [*sic*] our persons and property."[33]

5    By allowing individuals to participate in politics and enact laws aimed at promoting

6    the health, safety, and well-being of the people, liberty flourished.[34]

7       22.    The key insight derived from taking the Founding era conception of

8    rights seriously and applying the original understanding of the Founding era's

9    conception of liberty is the recognition that regulation and liberty were not

10    antithetical to one another.  The inclusion of rights guarantees in constitutional texts

11    was not meant to place them beyond the scope of legislative control.  "The point of

12    retaining natural rights," originalist scholar Jud Campbell reminds us "was not to

13    make certain aspects of natural liberty immune from governmental regulation.

14    Rather, retained natural rights were aspects of natural liberty that could be restricted

15    only with just cause and only with consent of the body politic."[35]  Rather than limit

16    rights, regulation was the essential means of preserving rights, including self-

17    (discussing how the early modern language of rights incorporated aspects of natural
rights and other philosophical traditions); Joseph Postell, *Regulation During the*
18    *American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL.
THOUGHT 80 (2016) (examining the importance of regulation to Founding political
19    and constitutional thought).

20    [33] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on
the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text
21    available in the Evans Early American Imprint Collection) (emphasis in original).

22    [34] *See* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998), 17-36
(examining neo-Roman theories of free citizens and how it impacted the
23    development of political theory in England); THE NATURE OF RIGHTS AT THE
AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007), 125-27, 139-43
24    (discussing how the Founding generation approached rights, including the
republican model of protecting rights by representation).

25

26    [35] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L.
REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half
27    Cocked: The Persistence of Anachronism and Presentism in the Academic Debate
Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206
28    (2016) (noting that the Second Amendment was not understood in terms of the
simple dichotomies that have shaped modern debate over the right to bear arms).

defense.[36]  In fact, without robust regulation of arms, it would have been impossible to implement the Second Amendment and its state analogues.  Mustering the militia required keeping track of who had weapons and included the authority to inspect those weapons and fine individuals who failed to store them safely and keep them in good working order.[37]  The individual states also  imposed loyalty oaths, disarming those who refused to take such oaths.  No state imposed a similar oath as pre-requisite to the exercise of First Amendment-type liberties.  Thus, some forms of prior restraint, impermissible in the case of expressive freedoms protected by the First Amendment or comparable state provisions, were understood by the Founding generation to be perfectly consistent with the constitutional right to keep and bear arms.[38]

23.    In keeping with the clear public meaning of the Second Amendment's text and comparable state provisions, early American governments enacted laws to preserve the rights of law-abiding citizens to keep and bear arms and promote the equally vital goals of promoting public safety.  As long as such laws did not destroy the right of self-defense, the individual states enjoyed broad latitude to regulate arms.[39]

---

[36] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-shifting, and it renders Justice Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds totally anachronistic.  This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf [https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[37] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[38] Saul Cornell,  *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[39] Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

12

## II. FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

24.     Guns have been regulated from the dawn of American history.[40]  At the time *Heller* was decided, there was little scholarship on the history of gun regulation and a paucity of quality scholarship on early American gun culture.[41]  Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen'*s framework.[42]

25.     The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to preserve the peace.[43]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[44]  To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government.  In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[45]

---

[40] Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[41] *Id.*

[42] Ruben & Miller, *supra* note 22, at 1.

[43] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[44] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[45] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

13

26. *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to sell novels, movies, and guns themselves.[46]  Unfortunately, many of these myths continue to cloud legal discussions of American gun policy and Second Amendment jurisprudence.[47]

27. Although it is hard for many modern Americans to grasp, there was no comparable societal ill to the modern gun violence problem for Americans to solve in the era of the Second Amendment.  A combination of factors, including the nature of firearms technology and the realities of living life in small, face-to-face, and mostly homogenous rural communities that typified many parts of early America, militated against the development of such a problem.  In contrast to modern America, homicide was not the problem that government firearm policy needed to address at the time of the Second Amendment.[48]

28. The surviving data from New England is particularly rich and has allowed scholars to formulate a much better understanding of the dynamics of early American gun policy and relate it to early American gun culture.[49]  Levels of gun violence among those of white European ancestry in the era of the Second Amendment were relatively low compared to modern America.  These low levels of

---

[46] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 198-201 (2016).

[47] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN TWENTIETH-CENTURY AMERICA 10-16 (1993); JOAN BURBICK, GUN SHOW NATION: GUN CULTURE AND AMERICAN DEMOCRACY xvi-xxii (2006).

[48] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[49] It is important to recognize that there were profound regional differences in early America. See JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF AMERICAN CULTURE 170–176 (1988).  These differences also had important consequences for the evolution of American law.  *See generally* David Thomas Konig, *Regionalism in Early American Law, in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

---

14

1  violence among persons of European ancestry contrasted with the high levels of

2  violence involving the tribal populations of the region.  The data presented in

3  Figure 1 is based on the pioneering research of Ohio-State historian Randolph Roth.

4  It captures one of the essential facts necessary to understand what fears motivated

5  American gun policy in the era of the Second Amendment.  The pressing problem

6  Americans faced at the time of the Second Amendment was that citizens were

7  reluctant to purchase military style weapons which were relatively expensive and

8  had little utility in a rural society.  Americans were far better armed than their

9  British ancestors, but the guns most Americans owned and desired were those most

10 useful for life in an agrarian society: fowling pieces and light hunting muskets.[50]

11 Killing pests and hunting birds were the main concern of farmers, and their choice

12 of firearm reflected these basic facts of life.  Nobody bayoneted turkeys, and pistols

13 were of limited utility for anyone outside of a small elite group of wealthy,

14 powerful, and influential men who needed these weapons if they were forced to

15 face an opponent on the field of honor in a duel, as the tragic fate of Alexander

16 Hamilton so vividly illustrates.[51]

17     29.     Limits in Founding-era firearms technology also militated against the

18 use of guns as effective tools of interpersonal violence in this period.  Eighteenth-

19 century muzzle-loading weapons, especially muskets, took too long to load and

20 were therefore seldom used to commit crimes.  Nor was keeping guns loaded a

21 viable option because the black powder used in these weapons was not only

22 corrosive, but it attracted moisture like a sponge.  Indeed, the iconic image of rifles

23 and muskets hung over the mantle place in early American homes was not primarily

24 _____

25 [50] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, in A RIGHT TO BEAR ARMS?: THE

26 CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

27 [51] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

28

1  a function of aesthetics or the potent symbolism of the hearth, as many today

2  assume.  As historian Roth notes: "black powder's hygroscopic, it absorbs water, it

3  corrodes your barrel, you can't keep it loaded.  Why do they always show the gun

4  over the fireplace?  Because that's the warmest, driest place in the house."[52]

5  Similar problems also limited the utility of muzzle-loading pistols as practical tools

6  for self-defense or criminal offenses.  Indeed, at the time of the Second

7  Amendment, over 90% of the weapons owned by Americans were long guns, not

8  pistols.[53]

9

10  **Figure 1**

11



Figure 2.3  Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

21      30.    As Roth's data makes clear, there was not a serious homicide problem

22  looming over debates about the Second Amendment.  Nor were guns the primary

23  weapon of choice for those with evil intent during this period.[54]  The problem the

24  Founding generation faced was that Americans were reluctant to purchase the type

25   

26      [52] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

27      [53] Sweeney, *supra* note 50.

28      [54] HAAG, *supra* note 46.

1  of weapons needed to effectively arm their militias.  When the U.S. government

2  surveyed the state of the militia's preparedness shortly after Jefferson took office in

3  1800, the problem had not been solved.  Although Massachusetts boasted above

4  80% of its militia armed with military quality weapons, many of the southern states

5  lagged far behind, with Virginia and North Carolina hovering at about less than half

6  the militia properly armed.[55]

7      31.   Government policy, both at the state and federal level, responded to

8  these realities by requiring a subset of white citizens, those capable of bearing arms,

9  to acquire at their own expense a military quality musket and participate in

10  mandatory training and other martial activities.[56]  Gun policy in the Founding era

11  reflected these realities, and accordingly, one must approach any analogies drawn

12  from this period's regulations with some caution when applying them to a modern

13  heterogeneous industrial society capable of producing a bewildering assortment of

14  firearms whose lethality would have been almost unimaginable to the Founding

15  generation.[57]  Put another way, laws created for a society without much of a gun

16  violence problem enacted at a time of relative gun scarcity, at least in terms of

17  militia weapons, have limited value in illuminating the challenges Americans face

18  today.

19      32.   The other aspect of gun policy that needs to be acknowledged is the

20  active role the federal government took in encouraging the manufacturing of

21  military arms.  The American firearms industry in its infancy was largely dependent

22  on government contracts and subsidies.  Thus, government had a vested interest in

23  determining what types of weapons would be produced.[58]  Government regulation

24  _____

25  [55] Sweeney, *supra* note 50.

25  [56] SAUL CORNELL, A WELL REGULATED MILITIA: THE FOUNDING FATHERS
26  AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006) at 68-70.

27  [57] Darrell A. H. Miller & Jennifer Tucker, *Common Use, Lineage, and
   Lethality*, 55 U.C. DAVIS L. REV. 2495 (2022).

28  [58] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun*
   (continued…)

17

of the firearms industry also included the authority to inspect the manufactures of weapons and impose safety standards on the industry.[59]  Some states opted to tax some common weapons to discourage their proliferation.[60]

33.    The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[61]  The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[62]  The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints common items in many homes also transformed American gun culture.[63]  These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common.  The culmination of this gradual evolution in both firearms and ammunition technology was the development of Samuel Colt's pistols

_____

*Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

[59] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.")

[60] 1858-1859 N.C. Sess. Laws 34-36, Pub. Laws, An Act Entitled Revenue, chap. 25, § 27, pt. 15. ("The following subjects shall be annually listed, and be taxed the amounts specified: . . . Every dirk, bowie-knife, pistol, sword-cane, dirk-cane and rifle cane, used or worn about the person of any one at any time during the year, one dollar and twenty-five cents. Arms used for mustering shall be exempt from taxation."); *see also* 1866 Ga. Law 27, An Act to authorize the Justices of the Inferior Courts of Camden, Glynn and Effingham counties to levy a special tax for county purposes, and to regulate the same.

[61] Cornell, *supra* note 3 at 745.

[62] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).

[63] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY (Eric Foner ed., 1990).

18

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

**ER_1606**

1   around the time of the Mexican-American War.[64]  Economic transformation was

2   accompanied by a host of profound social changes that gave rise to America's first

3   gun violence crisis.  As cheaper, more dependable, and easily concealable handguns

4   proliferated in large numbers, Americans, particularly southerners, began sporting

5   them with alarming regularity.  The change in behavior was most noticeable in the

6   case of handguns. [65]

7       34.   The response of states to the emergence of new firearms that

8   threatened the peace was regulation. In short, when confronted by  changes in

9   technology, consumer behavior, and faced with novel threats to public safety, the

10  individual states enacted laws to address these problems.  In every instance apart

11  from a few outlier cases in the Slave South, courts upheld such limits on the

12  unfettered exercise a right to keep and bear arms.  The primary limit identified by

13  courts in evaluating such laws was the threshold question about abridgement: did

14  the law negate the ability to act in self-defense.[66]  In keeping with the clear

15  imperative hard-wired into the Second Amendment, states singled out weapons that

16  posed a particular danger for regulation or prohibition.  Responding in this fashion

17  was entirely consistent with Founding-era conceptions of ordered liberty, the

18  Second Amendment and comparable state arms bearing provisions.

19      35.   Not all guns were treated equally by the law in early America. Some

20  guns were given heightened constitutional protection and others were treated as

21  ordinary property subject to the full force of state police power authority.[67]  The

22  fact that some weapons were treated in the same fashion as other forms of property

---

23    [64] WILLIAM N. HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND (1st
24  ed. 1996) at 23.

    [65] Cornell, *supra* note 9, at 1716.

25    [66] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell,
26  *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law
    in Context*, 125 YALE L.J. F. 121, 128 (2015).

27    [67] Saul Cornell, *History and Tradition or Fantasy and Fiction: Which
    Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?*, 49
28  HASTINGS CONST. L.Q. 145 (2022).

19

did not mean government authority over them was unlimited any more than it implied that people's homes, chattels, or other forms of property were somehow not protected by law. Property rights in early America were highly venerated, but they were always subject to forms of regulation by the people themselves acting through their legislatures. Regulating guns and gun powder were basic exercises of the sovereignty of the people. The decision of legislatures to determine which dangerous weapons were exempted from the full protection of the constitutional right to keep and bear arms flowed inexorably out of the police power enjoyed by states, localities, and in some limited situations the Federal government when regulating land or property under its jurisdiction.

### III. TECHNOLOGY, MARKETING, CONSUMER BEHAVIOR, AND REGULATION: THE AMERICAN PARADIGM OF GUN REGULATION EMERGES

36. Political scientist Robert Spitzer's overview of the history of firearms regulation underscores the dynamic governing this important tradition: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[68] States and localities have regulated gunpowder and arms since the earliest days of the American Republic. The statutes at issue in this case fit squarely within this long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present.[69] The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

37. The claim that firearms capable of firing more than ten rounds without reloading "are nothing new" ignores the history of firearms technology, production, and use. In 1791, virtually all firearms were single-shot, muzzle-loading black

---

[68] *Supra* note 39.
[69] *Supra* note 40.

20

1 powder weapons.  At that time, guns capable of firing more than a single round
2 could best be described as exotic.

3     38.    For example, the Girondoni rifle was a commercial failure.  There are
4 no mentions of the Girondoni rifle in the thousands of documents collected in *The*
5 *Founders Archive Online*, or the hundreds of thousands of documents amassed in
6 the *BYU Corpora of Founding Era English.* Given these deafening silences in the
7 historical record it strains credulity to argue that ordinary Americans at the time of
8 the Second Amendment were thinking about such weapons as the Bill of Rights
9 was framed.

10 **IV.  THE POLICE POWER AND FIREARMS REGULATION**

11     39.    The 1776 Pennsylvania Constitution, the first revolutionary
12 constitution to assert a right to bear arms, preceded the assertion of this right by
13 affirming a more basic rights claim:  "That the people of this State have the sole,
14 exclusive and inherent right of governing and regulating the internal police of the
15 same."[70]  The phrase "internal police" had already become common, particularly in
16 laws establishing towns and defining the scope of their legislative authority enjoyed
17 by representative bodies to craft laws to promote public health and safety.[71]  By the
18 early nineteenth century, the term "police" was a fixture in American law.[72]  Thus,
19 an 1832 American encyclopedia confidently asserted that police, "in the common

---

[70] PA. CONST. OF 1776, Ch. I, art iii.

[71] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[72] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

1   acceptation of the word, in the U. States and England, is applied to the municipal

2   rules, institutions and officers provided for maintaining order, cleanliness &c."[73]

3   The Founding era's conception of a basic police right located in legislatures was

4   transmuted during the Marshall Court's era into the judicial doctrine of the police

5   power and would become a fixture in American law.

6       40.    The power to regulate firearms and gunpowder has always been

7   central to the police power and historically was shared among states, municipalities,

8   and the federal government when it was legislating conduct on federal land and in

9   buildings.[74]  The adoption of the Constitution and the Bill of Rights did not deprive

10  states of their police powers.  Indeed, if it had, the Constitution would not have

11  been ratified and there would be no Second Amendment today. Ratification was

12  only possible because Federalists offered Anti-Federalists strong assurances that

13  nothing about the new government threatened the traditional scope of the individual

14  state's police power authority, including the authority to regulate guns and gun

15  powder.[75]

16      41.    Federalists and Anti-Federalists bitterly disagreed over many legal

17  issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-

18  Federalist, emphatically declared that "it ought to be left to the state governments to

19  provide for the protection and defence [sic]of the citizen against the hand of private

20  violence, and the wrongs done or attempted by individuals to each other."[76]

21  Federalist Tench Coxe concurred, asserting that "[t]he states will regulate and

22  administer the criminal law, exclusively of Congress."  States, he assured the

23  American people during ratification, would continue to legislate on all matters

---

24      [73] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

25      [74] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE
    AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

26      [75] SAUL CORNELL, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE
27  DISSENTING TRADITION IN AMERICA, 1788-1828 139 (1999).

        [76] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE
28  ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

22

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

**ER_1610**

related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[77]  State police power authority was at its pinnacle in matters relating to guns or gun powder.[78]  Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[79]  New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> it shall and may be lawful for the mayor or recorder, or any two Alderman of the said city, upon application made by any inhabitant or inhabitants of the said city, and upon his or their making oath of reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[80]

42.     The power to regulate firearms and gunpowder was therefore at the very core of the police power and inheres in both states and local municipalities. The application of the police power to firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland.*[81]  This was so even though gunpowder was essential to the operation of firearms at that

---

[77] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[78] CORNELL, THE POLICE POWER, *supra* note 36.

[79] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

[80] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City, LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE 191-2 (Thomas Greenleaf, ed., 1792).

[81] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

23

1   time and gun powder regulations necessarily affected the ability of gun owners to

2   use firearms for self-defense, even inside the home.

3       43.     A slow process of judicializing this concept of police, transforming the

4   Founding era's idea of a "police right" into a judicially enforceable concept of the

5   "police power" occurred beginning with the Marshall Court and continuing with the

6   Taney Court.[82]

7       44.     Nor was Chief Justice John Marshall unique in highlighting the

8   centrality of this idea to American law.[83] The ubiquity of the police power

9   framework for evaluating the constitutionality of legislation regarding firearms

10  reflected the centrality of this approach to nearly every question of municipal

11  legislation touching health or public safety in early America.[84]  Massachusetts

12  Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era

13  elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a

14  decision that became a foundational text for lawyers, judges, and legislators looking

15  for guidance on the meaning and scope of the police power.  Shaw described the

16  police power in the following manner:

17

18      [82] Eras of Supreme Court history are typically defined by the tenure of the
19  Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief
    overview, *see* "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL
20  SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-
    court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-
21  court-1801-1835/. The Taney Court period covered the years 1836-1864. See "The
    Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct.
22  5, 2022), https://supremecourthistory.org/history-of-the-courts/history-of-the-
    courts/history-of-the-courts-the-taney-court-1836-1864/.

23      [83] In the extensive notes he added as editor of the 12th edition of James Kent's
24  classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that
    regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES
25  KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes,
    Jr., ed. 12 ed. 1873).

26      [84] FREUND, *supra* note 72, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S
27  WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996) at 65-
    66; Christopher Tomlins, *To Improve the State and Condition of Man: The Power
28  to Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005);
    DUBBER, *supra* note 12, at 82-87.

[T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise.  There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[85]

45.    In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures.  Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[86]  A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have reason to suppose to be concealed or kept, contrary to the rules and regulations which shall be established in such town, according to the provisions of this Act, first having obtained a search warrant therefore according to law.[87]

46.    No jurisdiction enumerated the full contours of the police power they possessed in a single text or in a single statute or ordinance.  Rather, it was well understood that the exercise of this power would need to adapt to changing

---

[85] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[86] CORNELL, THE POLICE POWER, *supra* note 36.

[87] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5.

25

circumstances and new challenges as they emerged.  This conception of law was familiar to most early American lawyers and judges who had been schooled in common law modes of thinking and analysis.[88]  Throughout the long sweep of Anglo-American legal history, government applications of the police power were marked by flexibility, allowing local communities to adapt to changing circumstances and craft appropriate legislation to deal with the shifting challenges they faced.[89]  This vision of the police power was articulated forcefully by the Supreme Court in the License Cases when Justice McClean wrote this about the scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under the changing exigencies of society. In the progress of population, of wealth, and of civilization, new and vicious indulgences spring up, which require restraints that can only be imposed by new legislative power. When this power shall be exerted, how far it shall be carried, and where it shall cease, must mainly depend upon the evil to be remedied.[90]

47.    One of the most important early American gun-related cases discussed in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power jurisprudence was used by antebellum judges to adjudicate claims about gun rights and the right of the people to regulate.[91]  The case is a classic example of antebellum police power jurisprudence.  The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns.  "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by

---

[88] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN AMERICA, 1790-1900: LEGAL THOUGHT BEFORE MODERNISM 147-148 (2013).

[89] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[90] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

[91] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

26

1  the safety of the people and the advancement of public morals."[92]  In the court's

2  view, the regulation of arms was at the very core of state police power.[93]  The

3  judicial determination was straight forward:  was the challenged law a legitimate

4  exercise of the police power or not?

5  **V.  RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO**

6  **REGULATE FIREARMS (1863-1877)**

7      48.  Founding-era constitutions treated the right of the people to regulate

8  their internal police separately from the equally important right of the people to

9  bear arms.  These two rights were separate in the Founding era but were mutually

10  reinforcing: both rights were exercised in a manner that furthered the goal of

11  ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation

12  of the connection between these two formerly distinct rights, fusing the two

13  together as one single constitutional principle.  This change reflected two profound

14  transformations in American politics and law between 1776 and 1868.  First, the

15  judicial concept of police power gradually usurped the older notion of a police right

16  grounded in the idea of popular sovereignty.  As a result, state constitutions no

17  longer included positive affirmations of a police right.  Secondly, the constitutional

18  "mischief to be remedied" had changed as well.[94]  Constitution writers in the era of

19  _____

20      [92] *Id.* at 616.

21      [93] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky.
    (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate
    claims about the scope of state power to regulate arms.  For a useful discussion of
22  *Bliss* in terms of the police power, *see* FREUND, *supra* note 72, at 91.

23      [94] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng.
    Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by
24  an understanding of the state of the common law prior to its enactment and the
    mischief that the common law had failed to address and that new legislation had
    intended to remedy — continued to shape Anglo-American views of statutory
25  construction, and legal interpretation more generally, well into the nineteenth
    century.  For Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8,
26  at *61.  The relevance of common law modes of statutory construction to
    interpreting antebellum law, including the mischief rule, is clearly articulated in 1
27  ZEPHANIAH SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New
    Haven, S. Converse 1822).  For a modern scholarly discussion of the rule, *see*
28  Samuel L. Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

the American Revolution feared powerful standing armies and sought to entrench civilian control of the military.  By contrast, constitution writers in the era of the Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart Kings using their standing army to oppress American colonists.  In place of these ancient fears, a new apprehension stalked Americans:  the proliferation of especially dangerous weapons and the societal harms they caused.[95]

49.    The new language state constitutions employed to describe the right to bear arms enacted during Reconstruction responded to these changed circumstances by adopting a new formulation of the venerable right codified in 1776, linking the right to bear arms inextricably with the states broad police power to regulate conduct to promote health and public safety.[96] For example, the 1868 Texas Constitution included new language that underscored the indissoluble connection that Anglo-American law had long recognized between the right to keep and bear arms and regulation of guns.  "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe."[97]  Nor was Texas an outlier in this regard.  Sixteen state constitutions adopted during this period employed similarly expansive language.[98]  Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms.  Thus,

---

[95] *See McDonald*, 561 U.S. at 767–68

[96] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. DAVIS L. REV. 65 (2022).

[97] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, *see* IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[98] Cornell, *supra* note 96, at 75–76.

28

1  millions of Americans were living under constitutional regimes that acknowledged
2  that the individual states' police power authority over firearms was at its apogee
3  when regulating guns.[99]

4      50.    This expansion of regulation was entirely consistent with the
5  Fourteenth Amendment's emphasis on the protection of rights and the need to
6  regulate conduct that threatened the hard-won freedoms of recently free people of
7  the South and their Republican allies.  The goals of Reconstruction were therefore
8  intimately tied to the passage and enforcement of racially neutral gun regulations.[100]

9      51.    Reconstruction ushered in profound changes in American law, but it
10  did not fundamentally alter the antebellum legal view that a states' police powers
11  were rooted in the people's right to make laws to protect the peace and promote
12  public safety.  Nor did Reconstruction challenge the notion that these powers were
13  at their zenith when dealing with guns and gun powder.  In fact, the Republicans
14  who wrote the Fourteenth Amendment were among the most ardent champions of
15  an expansive view of state police power.  As heirs to the antebellum Whig vision of
16  a well-regulated society, Reconstruction-era Republicans used government power
17  aggressively to protect the rights of recently freed slaves and promote their vision
18  of ordered liberty.[101]

19      52.    Indeed, the passage of the Fourteenth Amendment was premised on the
20  notion that the individual states would not cede their police power authority to the
21  federal government.  The author of Section One of the Fourteenth Amendment,
22  John Bingham, reassured voters that the states would continue to bear the primary

23  _____

24      [99] *Id.*

25      [100] Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study*, 55 U.C. DAVIS L. REV. 2603 (2022).

26      [101] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42
27  HARV. J. ON LEGIS. 187, 205 (2005); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to Police and the History of American Governance*
28  53 BUFFALO L. REV. 1215 (2005-2006).

29

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

**ER_1617**

1  responsibility for "local administration and personal security."[102]  As long as state

2  and local laws were racially neutral and favored no person over any other, the

3  people themselves, acting through their representatives, were free to enact

4  reasonable measures necessary to promote public safety and further the common

5  good. [103]

6      53.    It would be difficult to understate the impact of this new paradigm for

7  gun regulation on post-Civil War legislation.  Across the nation legislatures took

8  advantage of the new formulation of the right to bear arms included in state

9  constitutions and enacted a staggering range of new laws to regulate arms.  Indeed,

10 the number of laws enacted skyrocketed, increasing by over four hundred percent

11 from antebellum levels.[104] Not only did the number of laws increase, but the

12 number of states and localities passing such laws also expanded.[105]

13     54.    Henry Campbell Black, the author of *Black's Law Dictionary*,

14 described the police power as "inalienable" and echoed the view of a long line of

15 jurists who noted that the scope of the power was not easily defined and the

16 determination of its limits was best left to courts on a case-by-case basis.[106]  Indeed,

17 even the most ardent critics of the police power, such as conservative legal scholar

18 Christopher G. Tiedeman, acknowledged that "police power of the State extends to

---

[102] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043, 1058 (2010).

[103] For a discussion of how the courts wrestled with the meaning of the Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE 173-4 (1998).

[104] *See* Spitzer, *supra* note 40, at 59–61 tbl. 1.

[105] *Id.*

[106] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

30

1   the protection of the lives, limbs, health, comfort and quiet of all persons, and the

2   protection of all property within the State."[107]

3        55.    In keeping with the larger goals of Reconstruction, Republicans sought

4   to protect the rights of African Americans to bear arms but were equally insistent on

5   enacting strong racially neutral regulations aimed at public safety.  Violence

6   directed against African Americans, particularly the campaign of terror orchestrated

7   by white supremacist para-military groups prompted Republican dominated

8   legislatures in the Reconstruction South to pass a range of racially neutral gun

9   regulations.[108]  The racially neutral gun laws enacted by Republicans were in part a

10   reaction to the discriminatory black codes passed by neo-confederate legislatures

11   earlier in Reconstruction.  The Black Codes violated the Second Amendment, but

12   the wave of firearms legislation passed by Republican controlled state legislatures

13   in the South were consciously crafted to honor the Second Amendment and protect

14   individuals from gun violence.[109]

15        56.    The laws enacted during Reconstruction underscore the fact that robust

16   regulation of firearms during Reconstruction was not a novel application of the

17   police power, but an expansion and continuation of antebellum practices.

18   Moreover, these efforts illustrated a point beyond dispute: the flexibility inherent in

19   police power regulations of guns.  American states had regulated arms since the

20

21

---

22   [107] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

23

24   [108] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

25

26   [109] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment, and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187, 205

27   (2005) (discussing Republican use of federal power to further their aims, including

28   to enforce the Fourteenth Amendment).

dawn of the republic and Reconstruction simply renewed America's commitment to the idea of well-regulated liberty.

## VI. LARGE-CAPACITY MAGAZINES, THE POLICE POWER, AND THE LATEST FACE OF TERROR

57.     Another major inflection point in the history of firearms regulation emerged in the context of the debate on assault weapons and large-capacity magazines, which were closely connected to the rise of mass shootings in the last decades of the twentieth century.[110]  California began restricting large-capacity magazines in 2000.[111]  Proposals to ban large-capacity magazines are part of a larger national movement to deal with the carnage caused by high capacity, high velocity weapons. The effort to ban such weapons and accessories parallels earlier efforts to deal with machine guns and semi-automatic weapons during the 1920s.[112]

58.     Legislative efforts to ban these weapons fit squarely within the long Anglo-American tradition of limiting public access to weapons capable of provoking terror.  During America's first gun violence crisis in the Jacksonian era, states targeted pistols that were easily concealed, and in the New Deal era, states singled out gangster weapons such as the notorious Thompson sub-machine gun (or "Tommy Gun"), treating these weapons as sufficiently dangerous or unusual to warrant extensive regulation, or prohibition.  The same imperatives and constitutional logic guided both regulatory regimes.[113]

59.     The history of the AR-15 illustrates that the earlier dynamic governing firearms regulation established in the nineteenth-century continues to shape

---

[110] Allen Rostron, *Style, Substance, and the Right to Keep and Bear Assault Weapons*, 40 CAMPBELL L. REV. 301 (2018); Jaclyn Schildkraut et.al., *Mass Shootings, Legislative Responses, and Public Policy: An Endless Cycle of Inaction*, 68 EMORY L.J. 1043 (2020).

[111] 1999 Cal. Stat. 1781, §§ 3, 3.5 (S.B. 23) (now codified at Cal. Penal Code § 32310(a)).

[112] Spitzer, *supra* note 40.

[113] *Id.*

32

1  American public policy and law.  Regulation of firearms follows a well-worn path.

2  Technological innovation is only part of this equation.  In addition, weapons must

3  also achieve sufficient market penetration to create a potential for criminal abuse.

4  At this point legislatures attempt to find a means to address the problem posed by

5  these weapons without trenching on constitutionally protected liberties.[114]

6    60. Understanding the marketing strategies tying these weapons to the

7  military makes clear that efforts to regulate these weapons by using these same

8  features is hardly cosmetic.  Moreover, focusing exclusively on technology and

9  ignoring the social history of these weapons, their popularity and potential for

10 abuse, misses an important point about the history of firearms technology and

11 government regulation.  The history and tradition of arms regulation has always

12 recognized that weapons that had the ability to inspire *terrorem populi* is a

13 legitimate justification for regulation.  The perpetrator of the Sandy Hook

14 Elementary Mass Shooting used a Bushmaster AR-15-type weapon that was

15 marketed with a slogan that traded on hyper-aggressive forms of toxic masculinity:

16 "Consider Your Man Card Reissued."[115]

17   61. There is little disputing the fact that, despite protestations by gun

18 rights advocates and industry executives that these weapons are merely "sporting

19 rifles," the marketing campaigns used to sell these tells a different story.  The

20 success of these weapons commercially was inextricably linked to marketing

21 strategies that tied these weapons to their origins in the military. These sales

22 strategies deliberately evoked images of military assault capabilities.[116] The

---

[114] *Id.*

[115] ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA 128-135 (Boston: Northeastern Univ. Press 2001); Cornell and DeDino, *supra* note 39.

[116]  Mark Berman & Todd C. Frankel, *Companies made more than $1B selling powerful guns to civilians, report says House oversight committee accused gun manufacturers of "manipulative marketing campaigns" and profiting off violence*, WASHINGTON POST (July 27, 2022, 7:19 PM), https://www.washingtonpost.com/national-security/2022/07/27/companies-made-more-than-1b-selling-powerful-guns-civilians-report-says/.

1  advertisement from two popular arms manufacturers pictured below are illustrative

2  of these campaigns.[117]  Ruger explicitly employs the term "Tactical Rifle" and Sig

3  Sauer's choice of imagery unambiguously links its weapons to images of military

4  close quarter combat.





62.     In the case of large-capacity magazines, the example of the Newtown

massacre is instructive.  Bushmaster developed an advertising campaign that

included product placement in violent video games targeting young men.  The

_____

[117] CAROLYN MALONEY, SUPPLEMENTAL MEMORANDUM: THE COMMITTEE'S INVESTIGATION INTO GUN INDUSTRY PRACTICES AND PROFITS (JUL. 27, 2022), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2022.07.27%20Supplemental%20MEMO%20for%20the%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%20FC%20Gun%20Manufacturer%20Hearing.pdf.

34

image below shows a used magazine retrieved from the floor of Sandy Hook Elementary School and a similar magazine from a popular violent video game.[118]



63.   *Bruen* did not address these technology-focused arguments.  The New York law in question singled out handguns, not large-capacity magazines.  From the perspective of text, history, and tradition, the key legal fact is that that these weapons are perceived by important segments of the public as weapons capable of provoking a terror.[119]  Firearms manufacturers created a type of  weapon that could receive high capacity magazines and marketed their products with a clear demographic in mind, stressing characteristics and cultural associations that tied them to war and then used these associations to effectively market them.  The fact

_____

[118]  Rick Rojas, Karen Zraick and Troy Closson, *Sandy Hook Families Settle with Gunmaker for 73 Million Dollars*, NEW YORK TIMES, published Feb. 15, 2022, updated Feb. 17, 2022, https://www.nytimes.com/2022/02/15/nyregion/sandy-hook-families-settlement.html.

[119] Mass shootings have been rendered more deadly by the proliferation of assault weapons, *see* John Donahue III & Theodora Boulouta, *The Assault Weapon Ban Saved Lives*, STANFORD LAW SCHOOL BLOGS (Oct. 15, 2019), https://law.stanford.edu/2019/10/15/the-assault-weapon-ban-saved-lives/.  For the most recent assessment of the impact of assault weapons on the American gun violence problem, *see* Christopher S. Koper et. al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. URB. HEALTH 313 (2018).

35

1  that a successful marketing strategy earned gun companies significant profits is a

2  fact that contradicts the claims of gun rights advocates these magazines are no

3  different than other magazines available to consumers.  If that were true, then gun

4  companies would have abandoned these marketing strategies long ago and replaced

5  them with something more effective.  It would be illogical and run counter to the

6  most basic principles of Anglo-American law to argue that people themselves are

7  powerless to regulate these magazines to mitigate the threats they pose to peace and

8  public safety.  The appeal of these magazines and their contribution to gun violence

9  are two sides of the same coin.[120]  A government's ability to address the negative

10  effects of these weapons is well within the scope of its police powers, as historically

11  understood.

12  **VII. BRUEN'S FRAMEWORK AND MODERN LARGE-CAPACITY MAGAZINES**

13      64.    The power to regulate and in some cases prohibit dangerous or unusual

14  weapons has always been central to the police power authority of states and

15  localities.  At different moments in American history communities have deemed

16  categories of weapons to be especially dangerous and have regulated them, and

17  when it appeared necessary enacted bans on some types of weapons.  Such

18  determinations were not made based on technological features in isolation but

19  reflected the ancient common law tradition of singling out weapons capable of

20  producing a terror.  Such weapons undermined the peace and the constitutional

21  imperative embedded in the text of the Second Amendment to protect the security

22  of a free state.  Defining exactly which category of weapons have fallen outside of

---

23  [120] Polly Mosendz, *Why Gunmakers Would Rather Sell AR-15s Than*
24  *Handguns*, BLOOMBERG (June 20, 2018, 3:00 AM),
     https://www.bloomberg.com/news/articles/2018-06-20/why-gunmakers-would-
25  rather-sell-ar-15s-than-handguns; John J. Donohue, *The Swerve to "Guns*
     *Everywhere": A Legal and Empirical Evaluation*, 83 Law & Contemp. Problems
26  117 (2020); Christopher S. Koper, *Assessing The Potential to Reduce Deaths And*
     *Injuries From Mass Shootings Through Restrictions on Assault Weapon and Other*
27  *High-Capacity Semiautomatic 19 Firearms,* CRIMINOLOGY & PUBLIC POLICY 147
     (2020); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on*
28  *Public Mass Shootings,* 22 APPLIED ECON. LETTERS 281 (2014).

Declaration of Saul Cornell (17-cv-1017-BEN-JLB)

**ER_1624**

1    the scope of constitutional protection has shifted over time as society has addressed

2    new developments in firearms technology, evolving societal norms, and other

3    changes.  In short, social, and economic transformation were always accompanied

4    by legal transformation.  Put another way, as times change, the law changes with

5    them.

6    //

7    //

8    //

1

2          Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws

3   of the United States of America that the foregoing is true and correct.

4          Executed on November 10, 2022, at Redding, Connecticut.

5

6

7                                          *Saul Cornell*
                                    _____
8                                          Saul Cornell

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|:---:|:---:|:---:|
| 1 | Curriculum Vitae of Saul Cornell | 1-15 |

# EXHIBIT 1

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
441 East Fordham Road ✳ Bronx, NY 10458 ✳ 203 826-6608 (c) ✳ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2020 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

| Fellowships and Grants |
|---|

- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment
- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

| Prizes and Awards |
|---|

- 2006 Langum Prize in Legal History 2006
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 <u>Choice</u> Outstanding Academic Book

| Book Publications |
|---|

<u>The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution</u>
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

<u>The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller</u>
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

<u>Visions of America: A History of the United States</u> [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

<u>"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control</u> (Oxford University Press, 2006) (paperback edition  2008)

<u>Whose Right to Bear Arms Did the Second Amendment Protect?</u> (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

<u>The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828</u>  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, <u>Retrieving the American Past:  Documents and Essays on American History,</u> (Pearson, 1994-2008)

### <u>Scholarly Articles, Book Chapters, and  Essays:</u>

"History and Tradition or Fantasy and Fiction: Which Version of the Past  Will the Supreme Court Choose in NYSRPA  v. Bruen?," 49 *Hastings Constitutional  Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928,"
 55  <u>University  of California, Davis Law Review</u>  (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment:  Making Sense of the Historical Record," 40 <u>Yale Law & Policy Review Inter Alia</u> 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55  <u>University of California, Davis Law Review Online</u> (2021): 65-90.

Exhibit 1_Cornell
Page 2

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the Future of Second Amendment Jurisprudence after Heller," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and

Keeping the Peace," 80 Law and Contemporary Problems (2017): 11-54

"Half Cocked': The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment," 107 Northwestern Journal of Criminal Law 107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward 92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History," American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae 84 (2015): 1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in the History of Constitutional Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82 (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities" Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  A merican Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment"  Albany Government Law  Review  2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique,"  Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion,"  Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review  (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and Policy Review  (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," Northern Kentucky Law Review (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in The Limits of Freedom in A Democratic Society (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in American Law Ways and Folkways (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," Constitutional Commentary (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in Government Proscribed:  The Bill of Rights (University of Virginia Press, 1998): 175-208

Exhibit 1_Cornell
Page 4

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. Beyond the Great Story" American Quarterly (1998): 349-357

"The Anti-Federalists," in  The Blackwell Companion to American Thought, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in The Blackwell Companion to American Thought, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," American Studies (1995): 57-80

"Canon Wars II:  The Return of the Founders,"  Reviews in American History 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," Law and History Review (1994): 1-28

"Early American History in a Post-Modern Age," William and Mary Quarterly 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," Reviews in American History 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in New York in the Age of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," Journal of American History (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," Northwestern University Law Review (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of the Ratification of the Federal Constitution," The Pennsylvania Magazine of History and Biography (1988): 103-130

### Book Reviews:

- Journal of American History
- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

### Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review

Exhibit 1_Cornell
Page 5

- Stanford Law Review
- Yale Law Journal

### Book Manuscript Reviewer:

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

### Invited Lectures:

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment,"
Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium,
November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns
in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth
Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the
Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History,"
Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to
the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the
Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment,"
Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell
College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists"
Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture,
Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition,"  Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting,  Cambridge, England (2016)

"Second Amendment Historicism and Philosophy"  The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America:  Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR ,  Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History,"  American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment"  Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy,  Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment" "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University  (2003)

"A New Paradigm for the Second Amendment?"  Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux,  France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment,"  Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association,  (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH  St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's Original Meanings, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

Exhibit 1_Cornell
Page 9

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders,"  NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022

- Cherry-picked history and ideology-driven outcomes: Bruen's originalist distortions*,"* SCOTUSblog (Jun. 27, 2022, 5:05 PM),

- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18, 2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*"* *Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated," *The Atlantic Online* December 17, 2015
- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]

- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR)  March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR)  Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World*  February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS  May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

---

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council,  Society of Historians of the Early American Republic  (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic,  Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science,  Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004,  2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

---

## Court Citations, Amicus Briefs and Expert Witness Reports

### US Supreme Court:

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen,</u> 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

N.Y. State Rifle & Pistol Ass'n v. Bruen, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

McDonald v. City of Chicago, Ill., 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

McDonald v. City of Chicago, Ill., 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

D.C. v. Heller, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

### State Courts:

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

### Amicus Briefs:

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii* N O . 12-17808 (9th Cir. 2020) [2nd Amendment]
Amicus Brief, *Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]
Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]
Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]
Amicus Brief, *Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]
Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]
Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court, 2010) [14th Amendment]
Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Exhibit 1_Cornell
Page 14

**ER_1642**

Amicus Brief, *Silvera* v. *Lockyer*, case on appeal( 9th Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

### **Expert Witness Reports**

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).

*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).

*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).

*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).

*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).

*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).

*Worth v. Harrington,* 21-cv-1348 (D. Minn.).

Exhibit 1_Cornell
Page 15