No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant*.

———————————

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge

———————————

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 10 of 17**

———————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
    300 South Spring Street, Suite 1702
5   Los Angeles, CA  90013-1230
    Telephone:  (213) 269-6177
6   Fax:  (916) 731-2144
    E-mail:  Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
8  *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                       CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**      17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**              **DECLARATION OF MICHAEL**
    **CHRISTOPHER WADDELL, and**      **VORENBERG**
15  **CALIFORNIA RIFLE & PISTOL**
    **ASSOCIATION, INC., a California** Courtroom:    5A
16  **corporation,**                  Judge:        Hon. Roger T. Benitez
                                      Action Filed: May 17, 2017
17                      Plaintiffs,

18       v.

19

20  **ROB BONTA, in his official capacity as**
    **Attorney General of the State of**
21  **California; and DOES 1-10,**

22                      Defendants.

23

24

25

26

27

28

                               1

## DECLARATION OF MICHAEL VORENBERG

I, Michael Vorenberg, declare under penalty of perjury that the following is true and correct:

1.    I am an associate professor of history at Brown University.  I make this declaration in support of Defendants' Supplemental Brief in Response to the Court's Order of September 26, 2022.

2.    This declaration is based on my own personal knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.    I received my A.B. from Harvard University in 1986, and my Ph.D. in history from Harvard in 1995.  After receiving my Ph.D., I began a postdoctoral fellowship at the W.E.B. Du Bois Institute at Harvard, and then served as an assistant professor of History at the State University of New York at Buffalo.  I joined the faculty at Brown University in 1999, and have taught history there ever since.

4.    I have concentrated my research on the history of the U.S. Civil War and Reconstruction.  My first book, *Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment*, was published by Cambridge University Press in 2001.  The book was a Finalist for the Gilder Lehrman Lincoln Prize.  I am also the author of *The Emancipation Proclamation: A Brief History with Documents*, published by Bedford/St. Martin's in 2010.  I am the author of a number of articles and essays on Reconstruction and the law.  These include: "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Southern Illinois University Press, 2018); Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary Relevance of*

1

1  *the Thirteenth Amendment* (Columbia University Press, 2010); "Reconstruction as a

2  Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions*

3  *in the History of Postbellum America* (Oxford University Press, 2006); and

4  "Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (Dec.

5  2005), 416-26. I have provided expert witness testimony in *Miller v. Bonta*, No.

6  3:19-cv-01537-BEN-JLB (S.D. Cal.).

7       5.      My curriculum vitae is attached as Exhibit A.

8       6.      I have been retained by the California Department of Justice to serve

9  as an expert witness in this case. I am being compensated at a rate of $250 per

10 hour.

**OPINIONS**

12 **I.   SUMMARY**

13      7.      This declaration provides results of an investigation into the existence,

14 usage, and regulation of high-capacity firearms (guns capable of firing more than

15 10 rounds without re-loading) during the Reconstruction period of U.S. History

16 (1863-1877), with special focus on the period during Reconstruction when the

17 Fourteenth Amendment to the U.S. Constitution was created, ratified, and enforced

18 (1866-1876). The result of the investigation can be summarized as follows: There

19 were high-capacity firearms during Reconstruction, and all of them, including those

20 that could easily be carried by a single individual, were regarded in all the states at

21 the time as weapons suitable only for law enforcement officers, not for ordinary

22 citizens. With very few exceptions, almost all of which were in the Western

23 Territories, high-capacity firearms during the era were understood to be weapons of

24 war or anti-insurrection, not weapons of individual self-defense.

25      8.      Evidence for these assertions does not necessarily take the form of

26 statutes or court decisions, and that is entirely unsurprising: explicit legal text

27 prohibiting civilian possession of the most dangerous weapons of war was not

28 commonly the means by which such weapons were regulated in the United States

2

1  during the Civil War and Reconstruction.[1]  Rather, prohibitions existed in the

2  policies and practices of the U.S. army and its auxiliary or allied units, such as the

3  state-wide militias that operated as law enforcement bodies during Reconstruction.

4  No statutes or court opinions can be found during the period that banned civilian

5  possession of artillery pieces, hundreds of which existed unused after the Civil War,

6  but of course the absence of such express prohibitions cannot be read as evidence

7  that civilians were allowed to possess such pieces.  Rather, policy and practice

8  dictated that only the U.S. army and its allied military units could possess such

9  weapons.  High-capacity firearms, which like artillery pieces were created as

10 weapons of war, were regulated in the same way, through policy and practice

11 limiting possession of such firearms to the U.S. army and its allied military units.

12 Unlike artillery pieces, however, high-capacity firearms during Reconstruction did

13 come to be regarded by their manufacturers as having a potential market among

14 U.S. civilians.

15      9.     However, efforts to create a market for high-capacity firearms in the

16 United States during Reconstruction failed miserably.  Americans who were not

17 part of legal law enforcement bodies rarely bought high-capacity firearms.  One

18 reason why these firearms failed to sell was the regulatory climate surrounding

19 them.  U.S. and pro-Union state authorities sometimes seized shipments of such

20 weapons on the assumption that they were intended for use by insurrectionary

21 groups.  Because of the negligible demand for such weapons, owners of gun shops

22 rarely stocked them.  The primary, almost exclusive buyers of high-capacity

23 weapons during Reconstruction were a small number of U.S. army units and state

24 law enforcement bodies.  Manufacturers of high-capacity firearms during

25 Reconstruction thus looked outside the United States for buyers.  The Winchester

26 Repeating Rifle Company, the only company to produce such weapons during post-

27

28 [1] In contrast, state and local laws did regulate other types of weapons, such as concealable weapons associated with criminal use, during this period.

3

1   Civil War Reconstruction, stayed afloat during Reconstruction only by selling high-

2   capacity firearms to foreign armies.

3        10.    During Reconstruction, high-capacity firearms did not circulate widely

4   among the civilian population; thus there was no need for legislative efforts to

5   regulate them among civilians.  Instead, during Reconstruction, high-capacity

6   firearms were possessed almost exclusively by the U.S. army and related military

7   units, and they were regulated by the policies and practices of the army and these

8   related military units.

9   **II.    SCOPE**

10       **A.    Time Period Covered**

11       11.    The time period covered by this declaration is Reconstruction,

12   typically defined as 1863-1877.  This is the time period assigned to Reconstruction

13   in the most commonly used study of the period, Eric Foner's *Reconstruction*.[2]  The

14   start point of 1863 correlates to the Emancipation Proclamation, the final version of

15   which was signed by President Abraham Lincoln on January 1, 1863.  The endpoint

16   correlates to March 1877, when a new president, the Republican Rutherford B.

17   Hayes, was inaugurated after a months-long contested election; and Hayes, once in

18   office, oversaw the removal of all remaining U.S. troops in southern states that had

19   been part of the Confederate States of America, the rebellious entity that had fought

20   the United States during the Civil War of 1861-1865.  Within the general period of

21   Reconstruction, the more narrow time period examined in this declaration is 1866-

22   1876.  This is the period covering events relevant to the relationship between the

23   Fourteenth Amendment and firearms during the greater period of Reconstruction.

24   Such events include (in chronological order):  the passage by the U.S. Congress of

25   the Civil Rights Act of 1866 and the new Freedman's Bureau Act (the initial

26   Freedman's Bureau Act, passed in March 1865, was for one year only); the passage

27
28   [2] Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877*
     (New York: Harper and Row, 1988), xxvii.

1    of the Fourteenth Amendment by Congress in 1866; the passage by Congress of the

2    Reconstruction Act of 1867 (sometimes referred to as the "Military Reconstruction

3    Act"); the adoption of the Fourteenth Amendment by state ratification in 1868; the

4    enforcement of the Fourteenth Amendment by U.S. Statutes adopted in 1870-71;

5    and the first interpretation of the Fourteenth Amendment's relation to the Second

6    Amendment by the U.S. Supreme Court, in *U.S. v. Cruikshank* of 1876 (92 U.S.

7    542).  This declaration also mentions the opinion in *Presser v. Illinois* (116 U.S.

8    252 (1886)), even though it came well after Reconstruction, because the events that

9    led to the case occurred in early 1879, very soon after the end of Reconstruction.

10              **B.    Geographical Focus**

11        12.    This declaration covers the geographic area of the entire United States,

12   both its states and territories, during Reconstruction.  However, its particular

13   regional focus is on the southern states that had declared themselves seceded in

14   1860-61 and had joined together into the Confederacy by April 1861.  These states

15   collectively represented the region during 1866-1876 where there was the most

16   frequent use of firearms, mainly because of armed conflict either between

17   contending factions within these states or between the U.S. army and insurgents in

18   these states.  Even more specifically, this was the only region outside of the

19   Western Territories where Henry Rifles and Winchester Repeating Rifles were

20   used.  As will be explained later, these are the weapons examined most closely in

21   this declaration (see IV. Historical Background and Terminology).  In the Western

22   Territories during Reconstruction, these weapons were used primarily by the U.S.

23   army against Native Americans in the so-called "Indian Wars" that extended from

24   the 1860s to the 1890s.  Some civilian U.S. citizens in the Western Territories

25   during this period also possessed these weapons.  However, as with all firearms in

26   the region at the time, it is difficult to determine how common possession of Henry

27   Rifles and Winchester Repeating Rifles was in the Western Territories in the

28   Reconstruction period.  Also, laws in these territories in this period were in flux, so

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1    it is difficult to know whether possession by civilian U.S. citizens there was lawful.

2    Whatever the laws were at any given moment in this region during Reconstruction,

3    the number of non-army U.S. citizens in the Western Territories was always

4    negligible.

5    **III.    RESEARCH MATERIALS AND METHODOLOGY**

6         13.    Research materials included standard scholarly works on firearms and

7    U.S. history for the period of Reconstruction—roughly twenty scholarly books and

8    thirty scholarly articles.  Materials also included newspaper and magazine articles

9    contemporary to the period studied.  Hundreds of these are accessible and were

10   accessed via commonly used databases by scholars, such as Chronicling America,

11   Pro-Quest Historical Newspapers, and the Hathi Trust. U.S. government documents

12   and documents from U.S. states and territories were accessed via the Hein Online

13   database or the Nexis Uni database (a version of the better-known Lexis Nexis legal

14   database).

15        14.    All of these documents, whether contemporary to the period studied or

16   produced by scholars after that period, were searched for information regarding

17   firearms—especially Henry Rifles and Winchester Repeating Rifles—with special

18   attention to the presence, use, and regulation of these firearms during the

19   Reconstruction era (1863-1877).

20        15.    In all my research, I gave more weight to evidence that attested to

21   firearms being owned and/or used than to evidence that manufacturers of the

22   firearms or other sellers were trying to get people to buy and use them.

23   Advertisements for the firearms are not evidence of possession.  However, if

24   advertising material provided testimony of the firearms being owned or used, I

25   treated that testimony as legitimate evidence, albeit evidence that might have been

26   embellished, even invented, for the sake of sales.

27

28

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**IV.   HISTORICAL BACKGROUND AND TERMINOLOGY**

     **A.   Firearm Capacity at or near the Founding**

16.   Weapons capable of holding more than ten rounds did exist by the time that the Second Amendment was adopted in 1791, but only in very small numbers, and almost exclusively in Europe.  Those that might have existed in the U.S. at the time were made to order by individual gunsmiths for individual customers.  These bespoke weapons were extraordinarily rare in the United States surrounding the period of the adoption of the Second Amendment.

17.   One of these rare guns was the "Cookson" or "Hill" model, based on the "Lorenzoni system" established in Europe in the 1600s.  Only one gun of this type definitively existed in early America; it was an 11-shot rifle mentioned in an account of 1722 from Boston.  Even if others of this type existed in British North America, they would not have been well known.  According to one expert, the slightest defect in these weapons would lead to an explosion, so they required perfect construction by "fine craftsmen."  Thus, only "wealthy sportsmen" could afford them.[3]

18.   Another rare high-capacity gun of the era was the Girardoni (or Girandoni) air rifle, which could hold at least 20 rounds.  The Girardoni was manufactured exclusively in Europe.  Most of the guns manufactured were custom-ordered in the late 1700s by the Austrian army, which used the weapons with some success.  To maintain a military advantage, the Austrians demanded that the guns be manufactured in secret.[4]  No Girardoni is known to have appeared in America prior to 1800.  There were about 30-40 guns on the Lewis and Clark expedition of 1804-1806, including a single Girardoni. Expedition leaders used it not for self-defense or hunting but for one purpose only: to impress Native Americans with

---

[3] Harold L. Peterson, *Arms and Armor in Colonial America (New York: Bramhall House*, 1956), 215-17.
[4] W. H. B. Smith, *Gas, Air and Spring Guns of the World* (Harrisburg, Penn.: Military Service Publishing Company, 1957). 30.

                                                            (continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2102**

1   white Americans' advanced technology.[5]  Its presence on the expedition is not

2   evidence that the gun was well-known to Americans of the period, much less to

3   Americans at the time of the Second Amendment's adoption more than ten years

4   earlier.

5       19.  The final example of a high-capacity gun of the era was the "Belton,"

6   though this gun held fewer than ten rounds. Joseph Belton, who traveled between

7   Philadelphia and England, owned a nine-shot repeating gun.  It had almost certainly

8   been produced in England in 1758.  In 1777, during the American Revolution,

9   Belton demonstrated the gun to seven Americans known for their military or

10  technical expertise.  They supported his petition to the Continental Congress of an

11  order of 100 similar weapons to be delivered by Belton.  Congress soon canceled

12  the order because of the extraordinary expense Belton demanded.  An expert on the

13  "Belton" gun has come to the conclusion that of the 100 guns initially ordered,

14  "none was ever made."[6]

15      **B.    The Henry Rifle and the Winchester Repeating Rifle**

16      20.    For the purposes of this declaration, a high-capacity firearm is defined

17  as a firearm that can hold more than 10 rounds.  The magazine holding the rounds

18  can either be integral to the gun or external to it.  The gun itself can be carried by a

19  single person.  Finally, the gun must have the potential for common usage:  it has to

20  be mass-manufactured or have the potential to be mass-manufactured, thus

21  excluding experimental weapons that were never widely adopted.

22

23  _____

24      [5] Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla.: Arthur H. Clark, 2012), 94; S. K. Wier, "The Firearms of the Lewis and Clark Expedition" (2010),

25  http://www.westernexplorers.us/Firearms_of_Lewis_and_Clark.pdf (accessed Nov. 7, 2022).

26      [6] Robert Held, *The Belton Systems, 1758 and 1784-86: America's First Repeating Firearms* (Lincoln, R.I.: Andrew Mowbray, 1986), 33-39 (quote at 39). The prototype gun from 1758 that is believed to have been Belton's is preserved at

27  the National Museum of American History; see

28  https://americanhistory.si.edu/collections/search/object/nmah_440031 (accessed Nov. 7, 2022).

21.     Within these specifications, there were only two high-capacity firearms in the entire world that were produced during Reconstruction: the Henry Rifle and the Winchester Repeating Rifle.  I note the exclusion here of the Gatling Gun.  That weapon was indeed a high-capacity firearm produced during Reconstruction, but it could not be carried by a single person, as it was massive in size and nearly 200 pounds in weight.

22.     The Henry Rifle and the Winchester Repeating Rifle were nearly the same weapon.  Manufacturing of the Henry began soon after the weapon was patented, in 1860.  In 1866, the Winchester Repeating Rifle was established in New Haven, Connecticut.  Its owner, Oliver Winchester, hired the inventor of the Henry, who designed a slightly modified version of the Henry Rifle.  The new model was dubbed a Winchester Repeating Model.  Because it was released in 1866, it was sometimes called the "Winchester 66."  In 1873, a new model of Winchester was released, the "Winchester 73."  The rifle was nearly the same as the "Winchester 66" but used a slightly different type of ammunition.  All of these rifles, the Henry and the two models of the Winchester, had the following features: they held fifteen rounds in a chamber fixed within a stock just below the rifle barrel; they used a lever below the trigger to eject spent shells and load new rounds; and they were easily reloaded.  The Winchester was easier to reload than the Henry—it had a "gate" on the side near the trigger that allowed the user to feed rounds into the gun during lulls in firing or after all the rounds in the chamber were spent).  Advertisements for Henrys and Winchesters claimed that the weapons could fire two rounds per second (this rate might have been exaggerated—some of the same ads made the false claim that the guns held eighteen rounds, not fifteen—but all agreed that the rifle could fire at a rate at least as fast as any existing rifle).

23.     There were other individual-use weapons during the Reconstruction era that could fire multiple shots in rapid sequence, but none had a higher capacity than ten rounds.  Some sidearms, most notably six-shot revolvers, could fire rounds

9

in rapid sequence.  But no sidearm held more than ten rounds.  Certain rifles beside the Henry and Winchester could fire multiple rounds rapidly, but none held more than ten rounds. These included the Spencer Rifle (4-round capacity) and the Sharps Rifle (7-round capacity).  The U.S. army and the Confederate army approved the adoption of the Spencer and Sharps rifles.  These weapons were known either by their company name or by the generic term "repeaters" or "repeating rifles."  Henrys and Winchesters were also repeating rifles, but because they were in a class of their own, due to their high capacity, they were generally known only as Henrys or as Winchesters.  In the language of the day, they did not fall into the generic category of "repeaters" or "repeating rifles" (thus a very well-armed individual of the period might be described as having "a revolver, a repeater, and a Winchester"—three distinct categories).

24.    This declaration occasionally uses the term "Henry-Winchester."  Although the Winchester Repeating Rifle effectively replaced the Henry Rifle, Henry Rifles continued to be used long after Winchesters began to be produced.  At certain times and places during Reconstruction, both types of weapons might be found in possession of a single, armed group.  For such situations, the phrase "Henry Rifles and/or Winchester Repeating Rifles" would be appropriate, but seeing how cumbersome that phrase is, it has been shortened in this declaration to "Henry-Winchester" or "Henry-Winchesters."

## C.    The Henry Rifle and the American Civil War

25.    Production and sales numbers reveal that Henry Rifles and their successors, Winchester Repeating Rifles, were uncommon during the Civil War and Reconstruction compared to other rifles.[7]  Until 1866, manufacturers of Henrys and

---

[7] Unless otherwise noted, this declaration relies on two sources for numbers of Henry Rifles and Winchester Repeating Rifles manufactured and sold:  Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); and John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955).

(continued…)

1   Winchesters concentrated their marketing efforts within the United States on trying

2   to persuade the U.S. army and pro-Union state militias to adopt the high-capacity

3   rifles as standard weapons for soldiers.[8]  The U.S. War Department never adopted

4   Henry-Winchesters.  The army's chief of ordnance, General James Ripley, reported

5   early in the war that these rifles, along with lower-capacity rifles were "too

6   complicated, too heavy, and too costly . . . and apt to waste ammunition."[9]  The

7   ordinance department never changed its position on Henry-Winchesters.  During

8   the Civil War, the U.S. army opted instead for single-shot rifles and, in some

9   instances, low-capacity "repeaters" (rifles that held magazines of two to seven

10  rounds).  The U.S. army did allow individual commanders of army units or allied

11  units to buy Henry-Winchesters for their soldiers.  For example, of the 900 Henry

12  rifles sold during 1862, 300 went to Kentucky's pro-Union state militia.[10]  Although

13  some military units that purchased Henry Rifles were able to do so using funds

14  allotted to them by state governments, most of the soldiers and officers who

15  purchased the weapons used their own money.  By the end of the Civil War in

16  1865, U.S. soldiers had purchased about 8,500 Henry Rifles; most of those had

17  been bought with the soldiers' own money.  By contrast, the U.S. government had

18  purchased nearly 107,000 Spencer single-shot rifles for use by the army.[11]

19      26.     Meanwhile during the Civil War, the Confederate War Department

20  also never adopted Henry Rifles.  Whether that was by choice is unclear. Oliver

21  Winchester, who had the greatest control of the company that made Henrys,

22  declared that he did not want the weapons sold to Confederates.  His policy may

23  have been due to pure loyalty to the Union cause or to fear that he would be

---

24      [8] Haag, *The Gunning of America*, 65-81.  During the Civil War, the pro-
25  Union border states of Kentucky and Missouri had state-wide militias that were
    authorized by state governments to fight for the Union.

26      [9] Haag, *The Gunning of America*, 70.

27      [10] Haag, *The Gunning of America*, 76.

28      [11] Haag, *The Gunning of America*, 81.

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2106**

1   charged with treason by the U.S. government if he facilitated gun sales to the

2   rebels.  Some Confederate soldiers were able to acquire Henrys by theft or by using

3   agents who purchased them in the North and smuggled them to the South.[12]  Most

4   Confederates knew about the weapon.  A widely-circulated story told of a

5   Confederate soldier who called the gun "that damned Yankee rifle that can be

6   loaded on Sunday and fired all week."  One of the soldiers in Robert E. Lee's Army

7   of Northern Virginia regretted that "we never did secure the Winchester."[13]  Some

8   Confederate soldiers did manage to obtain Henry-Winchesters, either by smuggling

9   or, more commonly, by confiscating them from captured Union soldiers.  In late

10  1862, for example, a number of pro-Union Kentucky soldiers who had just acquired

11  Henry Rifles were overrun by pro-Confederate Kentuckians and Tennesseans.  As

12  many as 300 Henry rifles ended up in Confederate hands as a result.[14]  These

13  weapons probably did not stay with the southerners for very long.  By June 1865,

14  all of the major Confederate armies had surrendered.  Typically, surrender required

15  all Confederate soldiers to "stack arms."  If they had sidearms, they could keep

16  them, but any rifles had to be relinquished.  Confederate veterans would thus have

17  been prohibited from having Henry-Winchesters.  At least some ex-Confederate

18  soldiers ended up with Henry-Winchesters, however, though not legally.  If they

19  failed to turn in their rifles, they were in violation of the "parole" agreement that

20  protected them from imprisonment after surrender.  Some ex-Confederates

21  managed to get Henry-Winchesters by stealing them from U.S. army depots.

22  Others bought them from smugglers who had gotten the weapons in Mexico and

23  then carried them across the border to Texas.  Henry-Winchesters were easier to

---

24  [12] Haag, *The Gunning of America*, 65.  For evidence that U.S. authorities

25  would have regarded the sale of Henrys to Confederates as treasonous, and thus that
    Winchester had good reason to avoid such sales, see Haag, *The Gunning of*

26  *America*, 90.

27  [13] Harold F. Williamson, *Winchester: The Gun That Won the West*
    (Washington, D.C.: Combat Forces Press, 1952), 38.

28  [14] Haag, *The Gunning of America*, 76.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2107**

1    find in Mexico than in the U.S. in 1864-1867.  They had been sold by the thousands

2    to the Juaristas, the rebel force that would ultimately wrest Mexico from

3    Maximilian, the self-proclaimed "Emperor" installed in Mexico City by Napoleon

4    III of France.

5         27.    Not only the Juaristas but other non-U.S., non-Confederate armies

6    possessed Henry-Winchesters.  Indeed, foreign armies were the main market for

7    Henry-Winchester manufacturers during Reconstruction.  Had it not been for the

8    war in Mexico, along with the Franco-Prussian War and the various armed conflicts

9    between the Russian and Ottoman empires—all wars involving thousands of

10   Henry-Winchesters—the manufacturers of these weapons would likely have gone

11   bankrupt.[15]

12        28.    In the United States by 1866, Henry-Winchesters did exist, to be sure,

13   but in much smaller numbers than in foreign countries.  U.S. veterans of the Civil

14   War could possess Henry rifles.  Beginning in May 1865, U.S. army volunteers

15   began mustering out in significant numbers.  The non-regular U.S. army (that is, the

16   volunteer force), nearly a million strong by April 1865, would fall well below

17   100,000 by the end of the year.  Unlike ex-Confederate soldiers, ex-U.S. soldiers

18   could keep their rifles upon discharge.  This meant that U.S. soldiers at the time

19   who had Henry rifles might continue to possess them once they re-entered civilian

20   life. However, the number of such U.S. veterans who kept their Henrys was small,

21   perhaps 7,500,[16] and those that opted to keep them paid dearly.  The U.S. army did

22   not simply give weapons away for free to discharging soldiers who had acquired

23   _____
          [15] Haag, *The Gunning of America*, 109-42.

24        [16] The figure of 7,500 Henrys kept by pro-Union soldiers after the war is
     reached in the following way. 8,500 had been purchased by or for U.S. soldiers. See
25   Haag, *The Gunning of America*, 81.  Of these, roughly 2,000 were purchased for
     soldiers (based on a count of regiments known to have bought the rifles with public
26   funds).  Thus 6,500 Henrys were privately owned by soldiers.  Of the roughly 2,000
     Henrys purchased for soldiers, 808 were known to have been bought by the soldiers
27   at the end of the war.  See 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance
     Stores," *U.S. Congressional Serial Set* (1871), pp. 167-172.  Thus, a generous
28   estimate of how many U.S. veterans had Henrys after the war is 7,500.

1    them at no cost from their military units.  Rather, soldiers wanting to keep their

2    weapons had to buy them at market value.  A Spencer carbine (a short-barreled,

3    repeating rifle, and one of the most popular weapons among U.S. soldiers), would

4    cost a discharging soldier about $10 (roughly $175 in 2022 dollars).  A Henry

5    would cost at least $30 (roughly $525 in 2022 dollars).  A private in the U.S. army

6    typically made $13 per month.  If he had a Spencer that he wanted to buy, he would

7    have to pay less than one month's wages—not a bad deal for a perfectly sound and

8    popular rifle.  If he wanted to buy a Henry, though, that would cost him more than

9    two months' wages, and there would be little to persuade him that the difference in

10   price corresponded to the difference in value.  The result was that very few Henrys

11   were purchased by discharged U.S. soldiers.  According to a U.S. army report, 808

12   Henrys were purchased by discharging Civil War soldiers, compared to 8,289

13   Spencer Carbines.[17] Henrys that were not purchased went to the U.S. War

14   Department's ordnance department, which did not sell them.

15        29.    By the end of the Civil War in 1865, very few combatants had used

16   Henry Rifles, and fewer still had kept them once they were discharged.  The result

17   was that only a small number of Henrys were in circulation in the United States

18   immediately after the war—perhaps 10,000, and this in a country of roughly 35

19   million people.[18]  Those veterans who possessed the guns understood that they were

20   weapons of war—they had used them as such—rather than weapons of individual

21   self-defense.  Maybe veterans kept them as souvenirs, maybe as commodities to be

22   _____

     [17] General Orders, No. 101, May 30, 1865, *The War of the Rebellion*

23   (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43;
     42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," *U.S. Congressional*

24   *Serial Set* (1871), pp. 167-172.

     [18] 11,000 Henry Rifles were produced between 1861 and 1865; see Parsons,

25   *The First Winchester*, 48.  Assuming that all were sold—a generous assumption—
     then 2,500 were sold to civilians and 8,500 to U.S. soldiers (the 8,500 figure comes

26   from note 12 above).  Of the 8,500 U.S. soldiers who had Henrys, 7,500 kept them
     after the war; see note 12 above.  Thus 10,000 Henrys were in circulation after the

27   war (again, a generous estimate).  The U.S. census of 1860 reported just over 31
     million Americans; the census of 1870 reported just over 38 million.  Thus 35

28   million is given as an estimate of the population of the United States in 1865.

1    sold at a later date, maybe as novelties to be displayed at local shooting contests or

2    social gatherings (rifle clubs and shooting galleries were common in the North).

3    Maybe they planned to travel to or through the Western Territories, where Henrys

4    were gaining a reputation as good weapons against hostile Native Americans or

5    roaming bands of criminals, known as "highwaymen" or "road agents."  Regardless

6    of why a U.S. veteran might have kept a Henry, he would have understood that it

7    was an uncommon weapon, and one not intended for individual self-defense.  It was

8    strictly a weapon of war.

9    **D.    State Secession, State Readmission, State Redemption**

10       30.    Reconstruction was a time period (1863-1877) but also a process.  The

11   process was described by President Abraham Lincoln in his last public speech

12   (April 11, 1865) as getting "the seceded States, so called," which were "out of their

13   proper practical relation with the Union," back into their "proper practical relation"

14   with the Union.[19]  To better understand this process, one must understand the

15   meaning of key terms used during the Reconstruction period: state secession, state

16   readmission, and state redemption.

17       **1.    State Secession**

18       31.    Lincoln used the phrase "seceded States, so called" because he did not

19   accept the constitutionality of state secession.  All eleven states of the Confederacy

20   had declared themselves "seceded" from the Union by May 20, 1861.  The

21   governments of all of these states regarded state secession, by which they meant a

22   breaking-off from the Union, as constitutional.  The Lincoln administration rejected

23   this interpretation and declared instead that the "so-called" seceded states had

24   remained in the Union but had had their governments overtaken by disloyal,

25   insurrectionary groups.  Reconstruction, therefore, would be complete when all of

26   the "so-called" seceded states had governments that were loyal to the Union.  The

27   _____

[19] Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick,
28   N.J.: Rutgers University Press, 1953), 8:403-4.

15

1    presidential administrations of the Reconstruction era that followed Lincoln's

2    (Andrew Johnson's and Ulysses S. Grant's) adopted this understanding of

3    secession.  So, too, did all the Reconstruction-era Congresses, though a minority of

4    Congressmen took a somewhat different view, claiming that secession was indeed

5    unconstitutional but that the states in question had indeed broken off from the

6    Union and therefore could be treated as territories.  This declaration does not delve

7    into the question of the constitutionality of secession.  It simply notes that U.S.

8    lawmakers of the Reconstruction era generally regarded secession as

9    unconstitutional and a form of insurrection.

10                    **2.    State Readmission**

11            32.    There were competing views among U.S. lawmakers during

12   Reconstruction as to when a "so-called" seceded state could be deemed

13   "readmitted" to the Union.  The dominant view among U.S. lawmakers was that a

14   state was deemed readmitted when Congress agreed to seat Representatives and

15   Senators from that state. This meaning of state readmission is used in this

16   declaration. In justifying federal intervention into "so-called" seceded states and the

17   imposition of qualifications on states for readmission, national law makers relied on

18   two constitutional principles: 1) "war powers"; and 2) the "guarantee clause"—the

19   clause of the U.S. Constitution declaring that "The United States shall guarantee to

20   every State in this Union a Republican Form of Government" (U.S.C., Art. IV, Sec.

21   4).  This declaration does not delve into the question of the legitimacy and scope of

22   these constitutional principles.  It simply notes that these were the principles of the

23   time used to justify federal policy towards the "so-called" seceded states during

24   Reconstruction.

25                    **3.    State Redemption**

26            33.    Between 1866 and 1871, all of the "so-called" seceded states were

27   readmitted to the Union.  At the point of readmission, each state had a government

28   that was loyal to the Union and controlled by a political party affiliated with the

1    national Republican Party, which for all the years of Reconstruction was the Party
2    in control of the U.S. government.  In 1866-68, the last years of the administration
3    of Andrew Johnson, he renounced the Republican Party and declared himself a
4    Democrat, which he had been prior to the Civil War, but the U.S. government as a
5    whole was still Republican.  The Republicans in Congress beginning in December
6    1866 had a two-thirds majority that allowed them to override Johnson's vetoes; and
7    beginning in March 1867, with the Reconstruction Act, they effectively took
8    control of the "Commander-in-Chief" powers typically vested in the Executive
9    branch. In each state after readmission there was internal conflict.  Part of that
10   conflict involved efforts by Democrats, many of whom were former Confederates
11   or Confederate-sympathizers, to take control of the state government from
12   Republicans.  By 1877, the Democrats had taken control of the governments of all
13   the states of the former Confederacy.  At the point when Democrats took control of
14   a state, they declared the state "redeemed" and began rolling back reforms instituted
15   by prior Republican state authorities.  In this declaration, state redemption means
16   the period when Democrats declared a state "redeemed" and began instituting
17   reactionary measures.

18       **E.    Militias**

19       34.    Militias have a long history in the United States, and they have been
20   studied extensively by scholars investigating the Second Amendment, especially for
21   the period of Colonial America and the Early Republic.  Militias existed during
22   Reconstruction, but the militias of that period were fundamentally different from
23   the militias of the earlier periods.

24       35.    By the time that the Civil War broke out in 1861, well-organized state
25   militias such as had existed in the Early Republic technically existed but were
26   practically defunct, except in frontier states like Missouri and Texas.  Militias by
27   1861 essentially existed as volunteer local groups authorized by state governments
28   but were only lightly controlled by those governments.  Such militias were used, to

1    be sure.  Local militias in Virginia in 1859, for example, had worked together with

2    a unit of the U.S. army commanded by Robert E. Lee to put down the effort by

3    John Brown to seize the U.S. armory at Harpers Ferry and distribute arms to

4    enslaved Black Americans in the region.

5          36.    The fact that state militias did technically exist by 1861 became very

6    important once the Civil War broke out.  The power under the U.S. Constitution for

7    a President to call up state militias is what Abraham Lincoln invoked at the start of

8    the war when he authorized up to 75,000 men to come together to put down the

9    insurrection in the southern states.  The Confederate States of America, which

10    adopted a constitution quite similar to the U.S. Constitution, invoked this same

11    authority when calling up its national army.

12          37.    Although soldiers had been called to national armies in their role as

13    state militiamen, the armed units that formed the basis of national armies during the

14    Civil War were not state-based militia units but rather state-formed regiments

15    approved as national army units by the U.S. War Department (hence only in rare

16    instances would a regiment be a replica of a local militia unit).  Nonetheless, the

17    national armies continued to be managed at times by laws designed in the pre-war

18    era to manage state militias.  In July 1862, for example, the United States passed a

19    Militia Act that standardized the terms of membership in state-wide militias even

20    though state-wide militias had grown defunct in the North prior to the war; only in

21    this way—by legislating via the old state militia system—did the U.S. War

22    Department have the authority to manage the personnel of the national army.  The

23    July 1862 Act significantly declared that Black Americans could not be denied

24    admission to state militias.  That was a pivotal development, as most state militias

25    prior to the war (all of them in the South, most of those in the North), had denied

26    membership to Black Americans.

27          38.    When the Civil War ended in mid-1865, state militias, which had been

28    given new life by the war, thrived, but not everywhere.  In the North, they fell again

into disuse, though they would begin to appear again with strength in the late 1870s and 1880s.  In the border states of Missouri and Kentucky, which had remained loyal to the Union despite being slave states, state militias continued to be important, as guerrillas caused disturbances in the states long after the Civil War was over.  In the states of the former Confederacy after the war, the state militias had the most visible—and notorious—presence.  Invoking newly passed discriminatory state laws ("Black Codes"), or simply acting on their own discretion, southern state militias, which excluded all Black Americans, harassed, assaulted, and even killed Black Americans and pro-Union whites.  These militias were composed mostly of former Confederate soldiers, many of whom wore their Confederate uniforms while in action.  These militias were regarded by U.S. lawmakers as pernicious and unlawful.  Leaving aside the obvious illegality of the many acts committed by these militias, they were in violation of U.S. law simply by wearing Confederate uniforms.[20]

39.    In March 1867, the U.S. Congress abolished all southern state militias, with some exceptions.  Exempted were the border states, the four slave states that had never seceded, though Kentucky and Missouri were the only border states with state militias, and both states would disband their militias by 1868.  Also exempted were two states that had joined the Confederacy:  Arkansas and Tennessee.[21] Arkansas was exempted because it had proven itself to President Johnson as a genuinely loyal state.  It had established a loyal state government, led by Governor Powell Clayton, that conformed to the guidelines that Abraham Lincoln had laid

---

[20] James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, *Opinions of the Attorney Genera*l, 11:208-9. For these immediate post-war southern militias, see William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67.

[21] 14 U.S. Statutes 487, Chap 170, Sec. 6 (Approved March 2, 1867); James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 112.

(continued…)

1   out in December 1863 and that Johnson had affirmed soon after taking office.

2   Arkansas in 1868 created a state militia that U.S. authorities regarded as a

3   legitimate armed organization loyal to the United States.[22]  Tennessee was

4   exempted because it, too, had established a loyal state government, led by Governor

5   William ("Parson") Brownlow.  It had gone one step further.  It had ratified the

6   Fourteenth Amendment, passed by Congress in mid-1866, thus becoming the first

7   southern state to do so and, as a result, becoming the first formerly seceded state to

8   be formally readmitted to the Union.  With Brownlow's urging, Tennessee in 1866

9   had created a state militia, the "Tennessee State Guard."  This organization was

10  composed of both white and black members; it was well-armed (with Enfield

11  single-shot rifles, not with Henrys or Winchesters); and it drilled regularly.  Former

12  Confederates in the state despised the force.[23]

13      40.     After Congress in 1867 abolished all but the exempted southern state

14  militias, some of the newly created pro-Union governments in the non-exempted

15  southern states created new state militias that were expressly tasked with subduing

16  insurrection and anti-black activities.  Such states included Louisiana, North

17  Carolina, South Carolina, and Texas.  Loyal state governments in Alabama and

18  Florida proclaimed an intention to organize such new state militias, but they never

19  followed through.  A loyal government in Mississippi in 1870 went so far as to

20  organize such a state militia, but the force was never used.  The state militias of the

21  South that did exist and saw action, those in Arkansas, Louisiana, North Carolina,

22  Tennessee, South Carolina, and Texas, were wholly new innovations (though Texas

23  made the dubious claim that the pre-war Texas Rangers was a predecessor

24  organization).  The new, post-1867 southern state militias were under the direct

25  _____

26  [22] Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," *Arkansas Historical Quarterly*, 64 (Winter 2005), 356-58.

27  [23] Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119.

28

control of the state (the Governor and/or state adjutant general), as opposed to merely authorized by the governor.  They drilled and paraded regularly.  They were paid and armed by the state, with the arms kept in state-maintained, state-guarded armories or arsenals.  Finally, all of the militias allowed if not encouraged Black American men to join, though some, like North Carolina's, segregated white companies from black companies.  The high number of Black Americans in the southern state militias led some people at the time as well as some early historians to call these organizations "Negro Militias."  This declaration does not use that label.  Pre-Civil War state militias in the South, in contrast to these wholly new post-war organizations, were unpaid, self-armed, and all-white.[24]

41.   Two of the new southern state militias, those of Louisiana and South Carolina, are particularly relevant to the subject of this declaration.  As will be discussed below, the state militias of Louisiana and South Carolina—and only those state militias—were armed with Winchester Repeating Rifles.

42.   The composition of and membership requirements of the new state militias indicate much about attitudes toward firearms regulation among law makers of the time.  The inclusion of Black Americans in the militias was part of a larger understanding among Republicans in the era of the Fourteenth Amendment that regulations restricting blacks from possessing firearms were no longer to be regarded as constitutional.[25]  The new militias did more than include blacks.  They excluded some whites, specifically those who were regarded as still supporting the

_____

[24] Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33; Otis A. Singletary, "The Texas Militia During Reconstruction," *Southwestern Historical Quarterly*, 60 (July 1956), 25-28; Allan Robert Purcell, "The History of the Texas Militia, 1835-1903" (Ph.D. diss., University of Texas, Austin, 1981), 221-27.

[25] Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, "'This Right is Not Allowed by Governments That Are Afraid of the People': The Public Meaning of the Second Amendment when the Fourteenth Amendment was Ratified," *George Mason Law Review*, 17 (2010), 823-863, esp. 852-863.

(continued…)

1  Confederate cause.[26]  Thus, the new state militias that began forming in 1868, the

2  same year as the adoption of the Fourteenth Amendment, indicated that lawmakers

3  understood that Black Americans' security required not simply the absence of

4  regulations denying them arms but the presence of regulations denying arms to

5  those who were known to support insurrection against the United States and

6  violence against blacks.

7        **F.**    **The U.S. Army During Reconstruction**

8      43.    The U.S. army began occupying parts of the South as soon as the Civil

9  War broke out and would not end its occupation until 1877, the end of

10  Reconstruction, when it removed its last units from Florida, Louisiana, and South

11  Carolina.  During the war, the U.S. army had exclusive police powers in the

12  occupied South until or unless local policing institutions—courts and

13  constabularies—were deemed loyal to the United States.  At that point, the U.S.

14  army cooperated with local police institutions to "keep the peace."  Yet U.S.

15  commanders retained the power, which they had had since the start of the war, to

16  declare martial law in an area, thus suspending the civil institutions there.  This

17  arrangement carried over from the Civil War into the early years of post-war

18  Reconstruction.  Until April 1866, U.S. troops had unrestrained power to operate

19  within state boundaries to keep the peace.  As part of that power, they could use

20  troops as police and hold their own courts that could try civilians.[27]

21      44.    The army also was willing to use this power in states that had never

22  declared themselves seceded.  The army had overseen arrests and prosecutions of

23  alleged traitors in Indiana in 1864, actions that were ultimately deemed

24  unconstitutional in the U.S. Supreme Court's post-war *Milligan* opinion. In June

25  1866, the army had intervened in New York and Vermont to capture Irish

26  nationalists known as Fenians who had fought against British troops in Canada and

27              —————————

28     [26] Singletary, *Negro Militia and Reconstruction*, 23-24.
   [27] Sefton, *The U.S. Army and Reconstruction*, 5-106.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2117**

1   then crossed over to the United States.  (Neither Henrys nor Winchesters were used

2   in the conflicts between the Fenians and Canadian troops.)  General-in-Chief

3   Ulysses S. Grant ordered General George Meade to inform the New York and

4   Vermont governors that they should call out volunteer militia units to capture the

5   Fenians.[28]

6        45.    The federal-state structure of armed enforcement that took place

7   during the 1866 Fenian crisis was the model that U.S. authorities had in mind for

8   the South once the southern states began creating pro-Union state militias.  The

9   hope was that the southern states would end up like New York and Vermont during

10  the Fenian crisis:  they would develop and sustain new, pro-Republican state

11  militias that would be the primary armed force in the states, with the U.S. army

12  playing only an ancillary role.

13       46.    This plan for U.S. army-southern state militia cooperation nearly came

14  apart beginning in April 1866. In that month, President Andrew Johnson

15  proclaimed that a state of "cessation of hostilities" existed in all the southern states

16  but Texas (in August 1866 he would proclaim that in Texas, too, there was a

17  "cessation of hostilities").  Johnson thus effectively removed "war powers" as a

18  constitutional justification for the army's presence in the South.  His move was part

19  of his general turn against the Republican program of Reconstruction.  Also in

20  April 1866, he vetoed the Civil Rights Act of 1866, a veto that Congress overrode.

21  Two months earlier, he had vetoed the act renewing the Freedman's Bureau.

22  Eventually, Congress passed a new act for the Bureau, which Johnson again vetoed

23  but Congress overrode.  Both the Civil Rights Act and the Freedman's Bureau Act

24  established, among other things, that the army would continue to have policing

25  powers in the southern states.  Those powers were to be used specifically to put

26  down insurrectionaries who threatened to undermine the civil rights of Black

27  _____
28  [28] W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71.

23

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2118**

1    Americans or in any way jeopardize pro-Union citizens and institutions. The Civil

2    Rights Act contained a military provision that empowered the army to act reactively

3    or preemptively against any actual or anticipated insurrectionary threat.[29] Even

4    though Congress was able to sustain this military provision as well as the rest of the

5    Civil Rights Act of 1866 against Johnson's veto, the military provision was

6    jeopardized by Johnson's declaration of a "cessation of hostilities." The declaration

7    signaled that Johnson might not sustain the army in its duties specified by

8    Congressional measures like the Civil Rights Act. Also in April 1866, the U.S.

9    Supreme Court announced that it was ruling in favor of the plaintiff in the *Milligan*

10   case (the actual opinion was not issued until January 1867). That case was

11   narrowly about the power of the army to try civilians in areas where civil courts

12   were operative; more broadly it was about the power of the army to have any

13   authority at all to occupy an area ostensibly at peace.

14       47.    U.S. Republican authorities moved quickly to protect their power to

15   occupy the formerly rebel South. Secretary of War Stanton prepared an order that

16   invoked the military provision of the Civil Rights Act of 1866 to justify continued

17   military occupation of the South. This was a novel move, as it allowed military

18   occupation in the absence of "war powers." The Civil Rights Act was justified not

19   by "war powers" but by the Thirteenth Amendment abolishing slavery. A small

20   number of Republicans, most notably Representative John Bingham, thought the

21   Civil Rights Act needed more justification than that. For this reason, among others,

22   Bingham pressed for a new constitutional amendment, which ultimately emerged as

23   the Fourteenth Amendment. The resolution for the amendment was passed by

24   Congress a few months after the Civil Rights Act and sent to the states for

25

26   _____

27   [29] Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88.

28

1    ratification.  Congress would ultimately declare that the Civil Rights Act of 1866

2    was authorized by the Fourteenth as well as the Thirteenth Amendments.

3          48.    The military provision of the Civil Rights Act of 1866 was not enough

4    to put U.S. military occupation of the South on sure footing.  The President still

5    controlled the army in his capacity as commander-in-chief.  Congress thus began to

6    wrest control of the army from President Johnson.  First, it passed the

7    Reconstruction Act of 1867, which formalized military occupation and required

8    southern states to ratify the Fourteenth Amendment in order to be readmitted to the

9    Union.  Then Congress passed measures (most notably the Tenure of Office Act)

10   that shifted aspects of army control from the President to Congress.  Then it

11   impeached Johnson, though Johnson was ultimately acquitted by the Senate.  In the

12   meantime, the army and the U.S. Attorney General opted to take the narrowest

13   possible reading of the Milligan decision, such that the only power deemed out of

14   the army's hands in occupied areas was the power to try civilians if civilian courts

15   were operative.  By 1868, then, the year of the Fourteenth Amendment's adoption,

16   the U.S. army had secured for itself a place in the southern states as a legitimate

17   occupying force in the South.  It would affirm this status with the acts of 1870 and

18   1871 enforcing the Fourteenth Amendment as well as the Fifteenth Amendment,

19   which had been adopted in 1870.  The last of these enforcement acts, the so-called

20   "KKK Act," was aimed directly at breaking up the Ku Klux Klan and similar

21   insurrectionary, paramilitary organizations that terrorized Black Americans and

22   pro-Union whites ("terror" was one of the most commonly used words of the time

23   to describe the Klan's intent toward Black Americans).

24         49.    The reason to understand this sequence of events is to appreciate the

25   army's distinctive, unprecedented role in the era of the Fourteenth Amendment.  It

26   did not operate under martial law.  It had the power to declare martial law, but in

27   practice, it avoided using that power.  Instead, it looked to pro-Republican state

28   governors to declare martial law if martial law was deemed necessary (and such

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1    gubernatorial declarations were extraordinarily rare during Reconstruction).

2    Furthermore, in the wake of *Milligan*, it yielded to the states the judicial power it

3    had wielded prior to 1866. States' attorneys and state courts were to be the main

4    sites of judicial action, though the U.S. Attorney General reserved the power to

5    remove cases to federal courts if they involved matters relating to civil and political

6    rights covered by national legislation (to help centralize federal judicial activity in

7    the South, the Department of Justice was created in 1870). During the era of the

8    Fourteenth Amendment, then, the main role of the U.S. army was to act as an

9    ancillary police force to the state militias or other local and state policing

10   operations. In this capacity, the army worked with states to detect and arrest

11   insurrectionaries and civil-rights violators. Although sometimes those arrested

12   would stand trial in a federal court—this happened most famously in the South

13   Carolina Ku Klux Klan trials of 1871-72—the army and agents of the Department

14   of Justice looked to the state courts to be the primary judicial institutions of locales.

15   As an example: President Ulysses S. Grant in 1871, in his capacity as commander-

16   in-chief of the U.S. army, ordered all insurrectionaries in South Carolina to turn in

17   their firearms to legitimate authorities. If insurrectionaries were found who had not

18   turned in their weapons, they could be arrested and denied habeas corpus rights

19   under Grant's order.[30] However, prosecutions and trials of such insurrectionaries

20   going forward would be conducted by state authorities, if those authorities were

21   known to be loyal to the United States. In its capacity as an ancillary police force

22   to state militias, with both armed organizations committed to subduing

23   insurrectionaries and civil-rights violators, the U.S. army sought to prevent

24   weapons from reaching unlawful insurgent groups. Army officers relied on their

25   ──────────────

26   [30] Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, pp. 4086-87 (March 24, 1871), 4089-90 (Oct. 12,

27   1871), 4090-92 (Oct. 17, 1871), 4092-93 (Nov. 3, 1871; this proclamation revoked suspension of habeas corpus in Marion County, South Carolina), 4093-4095 (Nov.

28   10, 1871).

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2121**

1   own intelligence operators as well as private intelligence agencies like the

2   Pinkertons to learn of arms shipments.  By the terms of the Civil Rights Act of

3   1866 and the Enforcement Acts of 1870, the U.S. army and related military units

4   were authorized to act preemptively to prevent insurrectionaries from making

5   armed assaults on loyal Unionists.  The seizure of weapons intended for

6   insurrectionaries thus represented a lawful use of military authority under the

7   Fourteenth Amendment.[31]

8          50.    As a result, any southern person or combination of persons considering

9   having Henry or Winchester rifles shipped to them faced the prospect that the U.S.

10   army or state militia might keep the shipment from reaching them and that, even if

11   the shipment did reach them, the policing forces could arrest them and confiscate

12   the weapons.

13   **V.    FINDINGS:  HIGH-CAPACITY FIREARMS DURING RECONSTRUCTION**

14   **A.    Overview:  Henry Rifles and Winchester Repeating Rifles**
15   **During Reconstruction**

16          51.    An oft-cited scholar in legal debates over firearms contends that "the

17   Winchester Model 1866 . . . became a huge commercial success.  So by the time the

18   Fourteenth Amendment was ratified in 1868, rifles holding more than 10 rounds

19   were common in America."  The first part of this statement is true: the "Winchester

20   66" did become a commercial success.  The author neglects to mention, however,

21   that prior to the end of Reconstruction, that commercial success was due almost

22   entirely to sales to foreign armies.  Thus it does not follow that the success of the

23   company during Reconstruction is evidence of the presence of Winchesters in the

24   United States.  Indeed, the author's second statement, that "rifles holding more than

25

26

27   _____
       [31] No U.S. court ever denied the constitutionality of such seizures of weapons
       or the legislation that authorized the seizures. See Vorenberg, "The 1866 Civil
       Rights Act and the Beginning of Military Reconstruction."

28                                                                (continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2122**

1  10 rounds were common in America" at the time of the Fourteenth Amendment, is

2  false.[32]

3      52.    Rifles holding more than 10 rounds made up a tiny fraction of all

4  firearms in the United States during Reconstruction.  Furthermore, as will be

5  discussed in more detail below, possession of such rifles—legal possession, that

6  is—was limited almost exclusively to U.S. soldiers and civilian law enforcement

7  officers.

8  **B.**    **Henrys and Winchesters in the Reconstruction-Era West**

9      53.    One of the places that Henrys and Winchesters could be found during

10  Reconstruction was in the West, though the weapons did not proliferate there at the

11  time at anything like the scale invented by novelists and film-makers of the late

12  nineteenth and twentieth centuries.

13      54.    With the passage of the Homestead Act (1862), the end of the Civil

14  War (1865), the completion of the first transcontinental railroad (1869), and the

15  discovery of gold in the Black Hills of Dakota Territory, the appeal of traveling to

16  ───────────────

17  [32] David Kopel, "The History of Magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post*, May 29, 2014,

18  https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/

19  (accessed September 22, 2022).  Kopel's contention also appears on page 4 of his co-authored Amicus Brief in a federal case from California, *Fyock v. City of*

20  *Sunnyvale*, Case No. 14-15408 (9th Cir. 2015).  See David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional

21  Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.).  For the number of Henrys

22  and Winchesters manufactured 1861-1877, as well as the number of these rifles shipped to foreign armies, see John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123.

23  To understand the scale of these numbers, one should contrast them to the production and sales of other rifles of the era.  For example, according to Parsons,

24  the total number of Henrys and Winchesters manufactured in 1861-1877 was 164,466 (this includes the 56,000 shipped to foreign armies), whereas in the same

25  period, 845,713 Springfield "trap-door" single-shot rifles were manufactured. See "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms,"

26  http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3; some of the data in this report is aggregated and printed at the Springfield Armory U.S. National Park

27  Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoor-production-serial-numbers.htm.

28                     (continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1   or through the Western Territories increased.  Because law enforcement was

2   minimal in the region, and also because the U.S. army could offer travelers and

3   settlers little protection—they were too consumed during the era with subduing

4   Native Americans—Americans came to regard self-defense as particularly

5   important in the region.  The Winchester company tried to capitalize on the

6   situation by touting the benefits of its rifle.  The "Winchester 73" model in

7   particular was aimed at Westerners or potential Westerners.  The company

8   emphasized that the speed and high capacity of the rifle allowed a single person to

9   hold off a band of outlaws or hostile Native Americans.[33]  The marketing campaign

10  was aimed especially at Americans hoping to travel to the Western Territories.  The

11  campaign had minimal success.

12      55.   Many travelers to the West carried firearms, to be sure, but a very

13  small number of those arms were Henrys or Winchesters.  Most of the accounts of

14  privately held Winchesters during Reconstruction that I found in the research for

15  this declaration did come from the Western Territories, but there were fewer than

16  fifteen such accounts that were not expressly fictional.  Two such accounts became

17  legendary, mainly because the manufacturers of the Henry-Winchesters used them

18  to advertise their rifles.  One account was of two former U.S. soldiers who were

19  part of a mining operation in the Rocky Mountains and used their Henry Rifles to

20  defeat some raiding Blackfoot Indians.  Another was of a private guard hired by

21  Wells Fargo to accompany a cash shipment to the West; he was attacked by robbers

22  near Nevada City and used his Henry Rifle to kill them all.  It might be noted that

23

24      [33] See, for example, the ad printed over three issues in the *Wyoming Leader*
     (March 16, April 21, May 8, 1868, always p. 4).  Ads for Winchesters that said

25  nothing of their possible purposes appeared occasionally in newspapers published
     in the in Western Territories; see for example, a gun dealer's ad for "Sharps and

26  Winchester Rifles" as specialties: *Bismarck Tri-Weekly Tribune* (Dakota Territory),
     June 29, 1877, p. 4.  On the post-Reconstruction invention of the myth of

27  Winchesters proliferating in the Reconstruction-era West, see Haag, *The Gunning
     of America*, 179-202, 353-68.

28                                                     (continued…)

1   these stories, assuming they are true, did not involve individual self-defense by

2   ordinary civilians.  They involved defense of economic enterprises by trained

3   gunmen.[34]  Less oft-told incidents involving Henrys and Winchesters from the

4   Western Territories involved brutal violence between thuggish combatants.  There

5   was no heroic road warrior or "Indian fighter" in these tales, and thus they were not

6   likely to build appeal for the rifles.  Particularly gruesome were the murder-by-

7   Winchester accounts stemming from the Horrell-Higgins feud in New Mexico

8   Territory near the Texas border.[35]

9      56.   Because some Henrys and Winchesters found their way to the Western

10  Territories, and because some of the U.S. army operations against Native

11  Americans took place in Western *states* as well as the Western Territories, Henrys

12  and Winchesters may have ended up in the Western states during Reconstruction

13  (these included California, Colorado, Nevada, and Oregon).  However, I found no

14  significant evidence of Henrys or Winchesters in the Western states.[36]

15     57.   The Winchester company hoped that West-bound Americans' desire to

16  hunt, and not just their wish for protection, would fuel sales of their weapon.  The

17  great bison hunts on the Plains were famous by the late 1860s, and the Winchester

18  company tried to capitalize on the craze.  Its marketing effort failed. Bison-hunters

19  preferred other models.  It did not help that the most famous Western hunter of the

20

21

22     [34] Williamson, *Winchester*, 42-44.

23     [35] C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49.

24     [36] Exceptions to this statement about the absence of Henry-Winchesters in
25  western states are the state armories in these states. Reports from these armories
    sometimes mention the rifles. For example, the armory in the state penitentiary at
26  Salem, Oregon in 1868 had 13 Henry rifles and zero Winchesters, compared to
    hundreds of other firearms. Because this was a penitentiary armory, the Henrys that
27  were there necessarily were for use by law enforcement officers, not individuals
    seeking self-defense. "Penitentiary Report" to Legislative Assembly, September
28  1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95.

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2125**

1   time, Buffalo Bill Cody, did not use a Winchester.  His famous gun, which he

2   dubbed "Lucretia Borgia," was a single-shot Springfield.

3       58.    The Winchester company had only marginally more success trying to

4   sell its guns elsewhere to hunters and "sportsmen," a term used to describe not only

5   hunters but competitive target-shooters.  The only place where Winchesters caught

6   on for hunting was in Africa, where American and European "big game" hunters

7   wanted to shoot large animals with as many rounds as possible, in as fast a time as

8   possible, in order to avoid being killed by the prey.[37]  Target-shooters demanded

9   accuracy of their guns, and potential buyers worried that a rifle built for capacity

10  and speed would lose something in accuracy.  To assuage such concerns, a

11  Winchester model that began selling in early 1877 (the "Winchester 76") came with

12  the option of a "set trigger," such that the shooter could set the trigger by moving it

13  very slightly forward, at which point only a tiny bit of pull would set off the shot.

14  The "set trigger" type of Winchester was more popular at shooting contests than

15  earlier Winchesters, but it still was not as popular as other rifles, especially

16  Remingtons and Springfields.  One reason why was its price.  The "set trigger"

17  version of the Winchester was typically $10 more than the "standard trigger"

18  models, which already were on the expensive side ("standard trigger" Winchesters

19  were typically 20-30% more expensive than Remingtons and Springfields).

20      59.    Meanwhile, U.S. army units in the West rarely possessed Winchesters

21  during Reconstruction.  The army had continued its Civil War-era policy of non-

22  adoption of Winchesters.  Yet soldiers in the West did understand the weapons'

23  lethality, in part because they had seen it first-hand in their skirmishes and battles

24  with the Sioux and their allies on the Plains.  U.S. soldiers in the West at first

25

26  [37] My research uncovered fewer than ten accounts of African big-game
    hunting that appeared in U.S. publications during Reconstruction. As an example,
27  see "Lovejoy," "Letter from Africa," *Fayette County Herald* (Washington, Ohio),
    Dec. 21, 1871, p.2 (by "accounts" I mean supposedly true accounts; there were
28  even more accounts that were expressly fictional).

1   assumed that the Natives were getting the weapons legally from traders who were

2   operating with the approval of the U.S. Bureau of Indian Affairs.  That assumption

3   fueled long-standing hostility of the U.S. army toward the Bureau.  The main

4   newspaper of the armed services of the time, the *Army and Navy Journal*, published

5   a satirical piece in 1867 pretending to be a Native American expressing gratitude to

6   the Bureau for allowing tribes to acquire single-shot guns and suggesting that the

7   Bureau might now "give us Spencer or Henry rifles."[38]

8        60.    In fact, the Sioux and their allies did not get their Henrys (or

9   Winchesters) from the Bureau.  Many of the weapons had been seized from

10  American emigrants and settlers whom the Natives had attacked.  Many also had

11  been robbed from shippers heading to or through the Western Territories.

12       61.    Here it is important to understand that no matter who might want a

13  Henry-Winchester, they were dependent on a successful shipping operation.  The

14  weapons were manufactured in New Haven, Connecticut and shipped around the

15  country to U.S. ordnance depots, state arsenals, private gun stores, and, in rare

16  cases, individuals (individual mail-order did not become common until the 1890s,

17  and the first mail-order guns were shipped by Sears in the early 1900s).[39]  There

18  was no U.S. parcel post until 1913; all shipping was done by private companies like

19  Wells Fargo.  These companies divided up regions of the country, a legal

20  monopolistic practice, in order to maximize profits.  In practical terms, this meant

21  that shipping costs were high, so buyers would be reluctant to ship goods that could

22  be lost.  Loss was a very real possibility when it came to shipping weapons to

23  hostile areas.  Shipping companies might use armed guards—some, as we have

24  seen, armed with Henrys or Winchesters—but the guards stood little chance against

25  an enemy that outnumbered them and was armed with the same type of guns.  The

26  cost of the risk was passed from the manufacturers and "jobbers" who arranged for

27       [38] *Army and Navy Journal*, June 1, 1867, p. 350.

28       [39] Williamson, *Winchester*, 178.

32

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2127**

1  sales to the consumers.  The risk-induced increase in cost was a disincentive to

2  prospective individual or gun-store buyers in the West.  This was one more factor

3  providing a disincentive not only to potential private buyers but to the U.S. army to

4  adopt Henry-Winchesters.

5        62.    Whatever the root causes of the minimal proliferation of Winchesters

6  among non-Natives of the West, the result was that Natives were more likely to use

7  Winchesters than anyone else in the region.  The most heavily armed Americans of

8  the region, those of the U.S. cavalry units assigned to the Western Territories, used

9  for the most part their army-issued single-shot Springfield rifles.  Meanwhile, as a

10  U.S. Colonel noted, Winchesters and lower-capacity repeating rifles in the late

11  1860s transformed "the Plains Indian from an insignificant, scarcely dangerous

12  adversary into as magnificent a soldier as the world can show."[40]

13        63.    The truth of that observation was borne out at the Battle of Little Big

14  Horn in 1876.  Famously, the U.S. army commanded by George Custer was wiped

15  out by the Plains Indians.  Most of Custer's troops carried single-shot Springfield

16  rifles.  The Native Americans carried a variety of weapons, many of which were

17  Winchesters.[41]  One of Custer's underlings, Marcus Reno, wrote after the battle that

18  "the Indians had Winchester rifles and the column [of U.S. cavalry] made a large

19  target for them and they were pumping bullets into it.[42]  Weaponry was not the sole

20  reason for Custer's defeat that day at the Little Big Horn.  Still, it is worth noting

21  that "the gun that won the West" was in the hands of Native Americans, not U.S.

22  soldiers, at the most famous battle in the West of all time.

23

24        [40] Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power*
    (New Haven, Conn.: Yale University Press, 2019), 299. In the northwest part of the

25  Western Territories, the Nez Perce also were fond of Winchesters. Chief Joseph
    usually kept one close at hand. See Jerome A. Greene, *Nez Perce Summer, 1877:*

26  *The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42,
    310-12.

27        [41] Hämäläinen, *Lakota America*, 340.

28        [42] Haag, *The Gunning of America*, 176-77.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2128**

64.     Humiliated by Custer's defeat, the U.S. army in the West still did not choose to adopt Winchesters after Little Big Horn.  However, an increasing number of regiments in the West did act on their own to use ordnance funds to buy Winchesters.  Although the army did not officially adopt the Winchester, it did all it could to keep the weapon, along with lower-capacity repeating rifles, out of the hands of the Plains Indians.  Right away after Custer's defeat the army banned traders from trading any types of guns to any types of Natives, friendly or hostile.  U.S. officers sought to arrest traders who had been selling Winchesters to Plains Indians against government policy.[43]  Meanwhile, American civilians in the Western Territories demanded that Canadian authorities also intervene to keep Winchesters from Native Americans, specifically the Blackfoot.[44]

65.     It is impossible to know all the reasons why the U.S. army did not adopt Henrys or Winchesters before or even soon after Little Big Horn, but one reason was the same one that had lingered on Americans' minds ever since the Henry Rifle was introduced in the early 1860s:  the fear that the weapon was as dangerous to its user as it was to its intended target.  The stories that manufacturers had helped circulate early on from the West about the power of the rifle to allow one person to defeat many failed to muster much enthusiasm for the weapon.  It did not help that some assessments from experts were negative.  At a showcase of firearms in Switzerland soon after the Civil War, a judge rendered the verdict that the rifle seemed delicate and unnecessarily lethal—"more wonderful than practical."[45]  Back in the U.S., skeptics worried that the rifle would fail at a crucial moment or explode.  When it came to Henrys and Winchesters, argued a writer for the *New York Herald*, the most widely circulating newspaper in the country, the "dangers are too many."[46]

---

[43] *Chicago Daily Tribune*, July 23, 1876, p. 4.

[44] *Chicago Daily Tribune*, April 15, 1878, p. 4.
[45] Haag, *The Gunning of America*, 70.
[46] "Breech-Loading Arms," *New York Herald*, Oct. 12, 1866, p. 4.

34

### C.   Henrys and Winchesters in the Reconstruction-Era North

66.     The North was the region in the United States where Henrys and Winchesters were hardest to find, either because they were deemed too dangerous or because northerners already felt themselves well-armed.  Recall that hundreds of thousands of U.S. soldiers had returned home from the Civil War with rifles in hand, almost all of the weapons Spencers or Sharps or Enfield, rarely Henrys.

67.     The near-absence of Henry-Winchester rifles in the North became clear during the "Great Strike" of 1877.  The "Great Strike" began as a local labor action in West Virginia and turned into a massive strike stretching from Philadelphia to Chicago.  Mob violence was prevalent.  In this months-long episode, during which thousands of Americans were injured and hundreds were killed, there were only two incidents that I found involving Henrys or Winchesters.  In Chicago during the rioting, a U.S. soldier fired a Henry rifle in response to civilians pelting his regiment with rocks.  He may purposefully have avoided shooting anyone—no one was hit.  But the sound of the shot went a long way toward quieting the crowd.  The soldier in question was from a regiment that had been assigned to the Western Territories but transferred temporarily to Chicago to put down the unrest.  That explained why he had a Henry.  His regiment likely acquired Henrys to fight Plains Indians; now he used the weapon—albeit sparingly—to subdue strikers.[47]  In Jackson County, Kansas, just north of Topeka, railroad managers armed forty employees with Winchester rifles, ordering them to scare off the local strikers.  To give the gang the veneer of a legitimate posse, the managers arranged for the local sheriff to deputize the gunmen.  Violence ensued when the "posse" confronted the strikers, and at least one of the strikers was killed, though not necessarily by a Winchester.[48]

---

[47] Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52.

[48] "A Tough Customer," *St. Louis Globe-Democrat*, Oct. 1, 1877, p. 4.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2130**

68.     In general, however, Henrys and Winchesters were rare to find among northerners during Reconstruction.  They were sometimes mentioned in ads displayed in northern publications aimed at hunters and target-shooters.  If the ads were any indication of the target audience, the hoped-for buyers of the rifles were elites—not the types who showed up during the mobbing of the Great Strike of 1877—and they were interested in peaceful shooting contests, not fending off potential violent attackers.[49]  Reports from state adjutant generals in the North sometimes show Henrys and Winchesters in arsenal inventories, but these guns were always far outnumbered by the more popular rifles of the era in the region— Sharps, Spencers and Springfields.

69.     Beginning in about the mid-1870s, northerners became more interested in owning Winchesters and modern rifles in general, not for purposes of self-defense but for purposes of collective defense of their communities and states.  This was the period when National Guard units came into being, beginning in the northern states.  They were in effect state militias.  The engine that drove their creation was not a fear of tyranny or of insurrection but a nationalistic fervor fueled in particular by the nation's Centennial, which began to be celebrated in the early 1870s even before the major exhibitions and commemorations of 1876.[50]  With the rise of this movement came a perceived business opportunity for the Winchester company, which began placing ads for their rifles in northern newspapers,

---

[49] See, for example, an ad for many types of guns, including "Henry's Sporting Rifle," in Wilkes' *Spirit of the Times: The American Gentleman's Newspaper*, March 24, 1866, p. 59 (the ad was reprinted in the same weekly publication irregularly through June 16, 1866).

[50] Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. Hannah's dissertation is crucial for countering the assumption, now rejected by historians, that the rise of the National Guard movement in the northern states was a reaction to events in the South of the 1870s or to the Great Strike of 1877. See also, Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

magazines, and gun catalogs.  The greatest number of ads appeared in western Pennsylvania.[51]  The ads seem to have had some effect.  A newspaper published in northwestern Pennsylvania reported in October 1877 that "Winchester rifles are becoming quite fashionable in this section, and are rapidly displacing the old double-barreled rifles. . . . The Remington rifle is highly spoken of by those who have used it, but it is not a repeater, or 'stem-winder,' and so the Winchester is ahead."[52]

70.    The rise of National Guard units in northern states in the late 1870s inspired private armed companies to form, drill, and parade.  One of these groups was the Lehr und Wehr Verein of Chicago, Illinois, led by the Socialist activist Henry Presser.  Presser's company paraded one day in the spring of 1879.  They carried rifles—not Winchesters but Springfields.  Socialist sympathizers nearby joined with the group, and Presser was arrested and tried for organizing a private militia.  His case ended up in the Supreme Court, which ruled in the *Presser* case in 1886 that the armed company's actions were indeed unlawful.

### D.    Henrys and Winchesters in the Reconstruction-Era South

71.    In the South during Reconstruction, high-capacity firearms proliferated far more than in any other region of the country.  The reason for this proliferation is clear: Winchester Repeating Rifles were the preferred weapon of two large state militias, those of Louisiana and South Carolina, that were organized to put down insurrection against state and national authority as well as terrorism against Black Americans.

72.    The story of the South Carolina state militia getting armed with Winchesters begins with the inauguration of Robert K. Scott as the state's governor in 1868.  Scott, a white man, was a pro-Reconstruction Republican.  He had been

---

[51] See, for example, *James Bown and Son's Illustrated Catalogue and Price List*, 29th annual ed. (Pittsburgh, Penn., 1877), 33.

[52] *The Forest Republican* (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4.

37

1    born in Pennsylvania, he grew up in Ohio, and he became a high-ranking officer in

2    the U.S. army during the Civil War.  After the war, he was an officer in the

3    Freedman's Bureau.  As Governor of South Carolina, he endorsed and helped

4    arrange the creation of a pro-Republican state militia open to Black Americans and

5    pro-Republican whites.

6            73.    The state act creating the state militia was adopted in 1868.  The

7    militia was always a work-in-progress, so it is impossible to know exactly how

8    many men served in it at any given time.  A reasonable estimate is that 1000 men

9    were in the militia by 1869.  Scott hoped that the force would grow eventually to

10   6000.  Although the militia was open to pro-Republican whites, most of the

11   members were Black Americans.  The state did not have enough arms to supply the

12   men.  In the summer of 1869, the state's adjutant general traveled to Washington,

13   D.C. to arrange with the U.S. War Department for an allotment of funds to pay for

14   arms for the state militia.  This arrangement was a restoration of a policy that had

15   long been in place but had often fallen into disuse:  the U.S. War Department would

16   pay each state an annual allotment to sustain its state militia. With the funds that the

17   South Carolina adjutant general received in mid-1869, he helped arrange the

18   purchase of hundreds of guns, both Winchesters and Springfields.[53]

19           74.    By August 1869, Winchesters had begun to arrive in South Carolina,

20   earmarked for members of the state militia.  In the middle of that month, a company

21   of Black American state militiamen armed with Winchesters appeared at a wharf in

22   Charleston.  The occasion was the arrival of a white baseball team from Savannah,

23   which was scheduled to play a white team in Charleston.  A few days earlier, the

24   team had made the same trip.  But when it arrived, Black American civilians had

25   decided to disrupt the match as a form of protest.  They showed up on the streets,

26

27   _____

     [53] Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina*
     (Columbia: University of South Carolina Press, 1996), 75; Singletary, *Negro
28   Militia and Reconstruction*, 20-21.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1   got in the way of the white players as they made their way to the field, and hurled

2   insults.  The team turned around and headed back to Savannah.  This time, on

3   August 15, the Mayor of Charleston was prepared to make sure that things went

4   smoothly—though not in a way that whites in the city would approve of.  He had

5   given the order for the company of black state militiamen to arrive at the wharf and

6   escort the Savannah baseball team to the playing fields. The game took place. But

7   white Democrats in the city as well as the rest of the state (and throughout the

8   whole of the former Confederacy) were furious.[54]  Meanwhile, Black Americans

9   throughout the state celebrated the role that members of their race would play in the

10  keeping of the peace.

11       75.    From late 1869 to early 1871, companies of black state militiamen

12  armed with Winchesters appeared regularly across South Carolina.  At first,

13  Governor Scott was thrilled with the organization.  On March 29, 1870, he

14  delivered a speech that extolled the Black-American dominated militia as the best

15  way to ensure that peace would return to the state and that future elections would be

16  fairly held.  He particularly recommended that state militias be armed with

17  Winchesters.  He had seen first-hand how these weapons intimidated potentially

18  violent protesters even without being fired.  His neighboring state of Georgia

19  should have such a militia staffed with blacks and armed with Winchesters, Scott

20  advised. "I tell you the Winchester rifle is the best law that you can have there," he

21  declared.  Georgia, one of the states that had had its pro-Democrat, anti-black

22  militia dissolved by Congress in 1867, never did create a new militia.  Scott knew

23  that it wouldn't.  His speech was meant to announce not only to South Carolina but

24  to neighboring states that the old ways of the Confederacy were gone for good.

25  Members of the opposition to Scott and the Republicans in South Carolina became

26

27       [54] *Washington Evening Star*, Aug. 16, 1869, p. 1.

28
                                                    (continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2134**

1  furious.  Many called him "Winchester Scott" and bewailed "Scott's Winchester
2  Rifle tactics."[55]

3       76.    During the election season of 1870, Scott decided that he had erred.
4  Opposition papers regularly reprinted his "Winchester" speech and attacked Scott
5  as a tyrant trying to stir up a race war.  Much more troubling was the fact that state
6  chapters of the Ku Klux Klan began plotting a response to Scott's speech and the
7  existence of the militia.

8       77.    The Klan had decided to meet Winchesters with Winchesters.  They
9  sent agents to the North to buy crates of Winchesters and ship them to South
10  Carolina in crates with false labels ("Agricultural Implements" said one; "Dry
11  Goods" said another).  The state militia and the U.S. army were able to intercept
12  some of the crates, but others arrived at their destination.  The Klan and auxiliary
13  white supremacist groups distributed the weapons to Scott's opponents in towns
14  across the state.[56]  Violence broke out across the state.  That was a regular
15  occurrence during election season, but this time the lethality was more severe than
16  usual.  Both sides had Winchesters.

17       78.    With the help of the intervention of the U.S. army and his own state
18  militia, Scott was able to win re-election in 1870.  Almost immediately he tried to
19  draw down the violence in the state by attempting to remove Winchesters from the
20  population.  Aided by U.S. army units, his administration attempted to confiscate as
21  many Winchesters as they could from insurrectionary groups like the Klan.  Then
22  he asked those state militiamen who were holding onto their Winchesters instead of
23  storing them in state arsenals to turn the weapons in.  Some Winchesters did end up
24  coming back into state arsenals, either by way of confiscation from Klansmen or
25  voluntary submissions by militiamen.  But most of the Winchesters stayed in
26  circulation.  Scott suspended the state militia.

27       [55] See, for example, *Charleston News*, Oct. 17, 1870, p. 2.
28       [56] Zuczek, *State of Rebellion*, 79-80.

40

79.     In early 1874, South Carolina was again the site of violent uprisings from insurrectionists, and the pro-Republican government responded by re-forming the state militia.  The adjutant general of the state reported that he barely had any guns for the men.  In fact, a report he had issued the year before declared that there were 627 Winchesters in state arsenals.  Probably the official was worried that widespread arming of Black Americans and white Republicans with Winchesters would create a mini-civil war like the one in 1870.[57]  The re-activated state militia was poorly organized and poorly armed.  For armed support between 1874 and 1876, the Republican administration of the state relied mostly on the U.S. army.

80.     Then, in 1876, came the final battles between pro-Republican, U.S.-authorized armed men (the U.S. army units and state militia) and the insurrectionary opposition forces, the "Red Shirts."  Of the many reasons that the opposition forces could be categorized as insurrectionary, perhaps the most obvious was that they regularly stole weapons, including Winchesters, from state arsenals.[58]  When the voting in 1876 was over, the two sides in the struggle each declared victory.  Two governors then existed, and since no one was going to accept a resolution of the crisis by law, the state was in political chaos, with armed groups on each side ready to go to battle.  When companies of armed men marched for their respective candidates, plenty of them carried Winchesters.  Only some of those Winchesters had been obtained legally.  Those carried by the "Red Shirts" had almost certainly been stolen from state depots.

81.     The Louisiana state militia was created in 1870.  The story of how Louisiana state militiamen ended up armed with Winchesters starts before the organization was created.  In 1868, the New Orleans metropolitan police force was re-organized under Republican leadership.  It now used "Metropolitans" as its nickname.  Its members included Black Americans as well as whites of varying

---

[57] Zuczek, *State of Rebellion*, 140-41.

[58] Zuczek, *State of Rebellion*, 171.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2136**

1   ethnicities, the city being one of the most ethnically diverse in the country.  The
2   number of Metropolitans in 1868 was small—perhaps just over 100—but by 1870
3   that number was close to 700.  During its earliest years, from 1868 to 1870, the
4   Metropolitans' superintendent, A. S. Badger, armed many of the men with
5   Winchesters.  In 1870, Governor Henry Warmoth engineered the creation of the
6   state militia.  Warmoth envisioned a state militia that would be composed of 2,500
7   Black Americans and 2,500 white former Confederates.  The Confederates, in
8   theory, would be loyal to the United States and thus supportive of Reconstruction
9   programs created by Republicans.  Anyone could see that the two sides of this force
10  would not fit together easily.  To help foster something approaching unity across
11  the state militia, Warmoth appointed James Longstreet, a former Confederate
12  General, as head of the state militia.  As part of the act creating the state militia, the
13  New Orleans Metropolitans were incorporated into the state militia.  The
14  Metropolitans after 1870 were thus both an urban police force and a company of
15  state militiamen.  In this latter role, they were authorized to operate outside of city
16  limits.  The Metropolitans were the best-trained unit in the state militia.  Because
17  many of their number carried Winchesters, they were also the best armed.[59]

18      82.     Between 1870 and 1874, politics in Louisiana was multifaceted and
19  ever-shifting.  Warmoth regularly changed his political stances, outside blocs
20  suddenly gained inside influence, and through it all, pro-Democratic factions,
21  supported by armed "White Leagues," tried to resurrect the Old South on the soil of
22  Louisiana.  In 1872, William Kellogg won the governorship.  Kellogg was a
23  Republican, one more radical than Warmoth and more in line with the Republicans
24  in the U.S. Congress. Warmoth in 1872 had sided with John McEnery, a former

25

26

27      [59] Dennis C. Rousey, *Policing the Southern City: New Orleans, 1805-1889*
28  (Baton Rouge: Louisiana State University Press, 1996), 130-31; Singletary, *Negro Militia and Reconstruction*, 69-70.

1    Confederate, an anti-Reconstruction Democrat, and a leading voice for state

2    redemption.

3         83.    The state militia, composed of a group loyal to the Warmoth-McEnery

4    faction and a group loyal to Kellogg, was rendered ineffective after 1872 by its lack

5    of cohesion.  Individual units within the state militia were nonetheless important, as

6    they were the only legitimate state-level armed forces.  Of these units, the

7    Metropolitans remained the most effective and best armed, as they still carried

8    Winchesters, whereas most of the other units did not.  In politics, whoever

9    controlled the Winchester-armed Metropolitans would always have an advantage

10   because, as Governor Scott of South Carolina had said in 1870, "the Winchester

11   rifle is the best law that you can have."  By late April 1873, William Kellogg, the

12   newly elected Governor, had established control of the Metropolitans.

13   Unfortunately, he had established that control too late to use the Metropolitans to

14   help avert the worst racial massacre that the state had ever seen, probably the worst

15   racial massacre of Reconstruction: the Colfax Massacre of April 13, 1873.

16        84.    The tragedy of the Colfax Massacre has been the subject of much

17   historical study, but never from the perspective of a Winchester Repeating Rifle.

18   The combatants at Colfax, in Grant Parish, about 200 miles northwest of New

19   Orleans, consisted of one legitimate armed force and one illegitimate one.  The

20   legitimate armed force was a unit of the state militia led by William Ward, a Black

21   American who had fought for the U.S. during the Civil War.  More than 100 of

22   Ward's men, perhaps more than 150, would be murdered at Colfax.  The

23   illegitimate armed force was a "posse" deputized by two local men, one who

24   claimed to be a judge and one who claimed to be a sheriff.  In fact, as all in the

25   "posse" knew, the so-called judge and so-called sheriff had held those positions

26   under the former governor, not under the current governor, who had denied them

27   commissions that would have kept them in office.  The claim of the "judge" and

28   "sheriff" was that the former governor had in fact won the 1872 election and thus

1   that they held their positions legitimately.  (Election-result denial is not a new

2   phenomenon; it was rampant in the South during Reconstruction.)  Years later,

3   when the Colfax episode came before the U.S. Supreme Court in the form of the

4   *Cruikshank* case, Justice Bradley, author of the controlling opinion, declared that

5   leaders of the so-called posse were private citizens, not state officers.  Bradley was

6   technically right.  But at the time of the Colfax Massacre, the lead murderers had

7   donned masks of state-legitimated authority.  Neither the legitimate nor the

8   illegitimate side at Colfax carried Winchesters.  But if William Ward had had his

9   way, his side would have had them.

10          85.     Two days before the massacre, Ward had left Colfax for New Orleans.

11  He knew that violence might erupt in Colfax, and he wanted to persuade Governor

12  Kellogg to send military support.  Almost certainly, Ward was going to ask Kellogg

13  to send the Winchester-armed Metropolitans.  Ward never made it to New Orleans.

14  Even if he had, the Metropolitans could not have made it to Colfax in time to stop

15  the massacre.  They might not have been willing to go—it would be another ten

16  days beyond the massacre before their loyalty to Kellogg was cemented.  The

17  important point amid all these hypotheticals is this:  William Ward believed that a

18  cadre carrying Winchesters was the best chance his men had.

19          86.     By October 1873, the Metropolitans had pledged their loyalty to

20  Kellogg, and Kellogg had helped secure for them and other state militia units

21  hundreds of new Winchesters.  Kellogg dispatched the Metropolitans to Grant

22  Parish, the site of the Colfax Massacre, to reestablish control of the area for the

23  Republicans.  They and their Winchesters arrived at the end of the month—more

24  than 25 weeks after William Ward had hoped they would come.[60]

25          87.     The power of the Metropolitans, along with their Winchesters, would

26  soon stripped away.  Opponents of Kellogg gained control of the Metropolitans'

27  _____

28  [60] *New Orleans Republican*, June 13, 1873, p. 1; *Ouachita Telegraph*,
    October 24, 1873, p 1.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2139**

1   Board by early 1864. They reduced the numbers of the force and limited their

2   geographical range to New Orleans and its outskirts. If violence broke out in a

3   rural area like Grant Parish, there would be nothing that the Metropolitans could do

4   about it. Then, on September 14, 1874, came the final blow: the Battle of Liberty

5   Place, fought in the heart of New Orleans. Thousands of White Leaguers launched

6   a coordinated attack on the city. Some of them may have been carrying

7   Winchesters, but none of the reports from that day mentioned Winchesters in their

8   hands. The Metropolitans had Winchesters, of course, but they were outnumbered

9   more than 10 to 1 and easily overwhelmed. After the White Leaguers had

10  demonstrated their superior force, Governor Kellogg knew that he might soon be

11  removed, so he engineered a compromise that kept him in office. Part of the deal

12  was the disbandment of the state militia. Thus ended the prospect of a reign-by-

13  Winchester Republican regime in Louisiana.[61]

14      88.    In the brief time that Winchesters were in the hands of southern state

15  militias, the rifles showed that they could do much to intimidate the forces of white

16  supremacy and insurrection. But there was a dark flip side to the positive quality of

17  this particular high-capacity firearm.

18      89.    Those opposed to the state militias and to Reconstruction in general

19  used the presence of Winchesters in state militias as fodder to attack all

20  Republicans and especially Black Americans. At a rally in April 1870, a Georgia

21  Black-American leader, Simeon Beard, pleaded for more guns so blacks could have

22  their own militia rather than relying on the U.S. army. "We don't want soldiers; we

23  want the power to raise a militia; we want guns put in our hands, and we will see

24  whether we cannot protect ourselves. Give us this, and we will give you the State

25  of Georgia evermore." In response, a redeemer newspaper editor mocked Black

26  Americans like Beard who clamored "lustily for arms," including "Winchester

27

28      [61] Rousey, *Policing the Southern City*, 155-56.

45

1   rifles."  The redeemer editor then brought up the South Carolina experiment with

2   Winchester-armed state militias as evidence that the lives of ordinary white people

3   were in grave danger:  "There are thousands of white people in this State who have

4   no arms at all, not even a pistol, while there is not one negro in three who does not

5   own some sort of firearm.  They are armed now-fully armed. It is the white people

6   who need arms, not the negroes."[62]

7        90.    The Winchester was as much a symbolic weapon as a real one in the

8   battles between Republicans and Redeemers in the Reconstruction-era southern

9   states.  Republicans saw the gun as the emblem of power—the sign that the cause

10   of Reconstruction had a strong, locally controlled force behind it.  The Redeemers

11   saw the gun as evidence of the Republicans' tyranny and barbarity. In Texas,

12   Democrats opposed to Reconstruction howled that there must be "no money, no

13   Winchester rifles and ammunition" for Republicans—this despite the fact that

14   Republicans in the state had never suggested arming themselves with

15   Winchesters.[63]

16        91.    In terms of real as opposed to imagined Winchesters, even though the

17   weapons in Louisiana and South Carolina were housed under guarded armories,

18   they could still end up in the hands of insurrectionaries or criminals.  In Louisiana,

19   as in all the states of Reconstruction, there were internal, often violent conflicts

20   over the control of the state government.  By various means, from outright theft to

21   the legitimate winning of a state election, the opposition to a Republican

22   government in a state like Louisiana could gain access to Winchesters.  Once these

23   weapons were in the hands of insurrectionary groups, they could end up with

24   anyone, including an outlaw with no particular political persuasion.  That is

25   probably how a Winchester ended up among a large cache of arms held by the

26

27   [62] *Georgia Weekly Telegraph and Georgia Journal & Messenger*, April 5, 1870, pp. 4, 8.

28   [63] *The Weekly Democratic Statesman* (Austin, Texas), August 24, 1871, p. 2.

46

1    husband-wife team known as the Guillorys, a pair of marauding thieves who went

2    on a rampage near Opelousas, Louisiana in the late summer of 1873.  When a posse

3    caught up with them, it easily dispatched the couple, killing the husband and

4    seriously wounding the wife.[64]

5        92.    By 1874, all of the state militias had been disbanded.  Redeemers—

6    those in each state wanting state redemption from Reconstruction—had been

7    against the state militias from the start and were glad to see them go.  By the end of

8    Reconstruction, all of the southern states had reverted to their pre-1867 militia

9    system, 1867 being the year that the U.S. Congress abolished all southern militias

10   except those in Arkansas and Tennessee.[65]  Under the renewed militia system,

11   volunteer militias could form on their own with the explicit or implicit approval of

12   state governors.  Because most of the southern state governments after 1874 were

13   ruled by pro-redemption Democrats, most of the militias that formed after 1874

14   were of the sort that would have been considered insurrectionary by pro-

15   Reconstruction Republicans in the states as well as by the Congressional

16   Republicans who had abolished such militias in 1867.

17       93.    The three states that were not controlled by Redeemers after 1874 were

18   Florida, Louisiana, and South Carolina.  In Louisiana and South Carolina, the 1876

19   state elections were disputed (so, too, quite famously, was the national election of

20   ───────────────
         [64] "Another Battle," *The Opelousas Journal*, Aug. 29, 1873, p. 3.  A side note
21   to the episode:  No one in the posse had a Winchester, and the Guillorys in the
     exchange of gunfire opted not to use their Winchester, only their low-capacity rifles
22   and shotguns.

         [65] The Texas Rangers claimed to be a state militia loyal to the U.S. right up
23   until it was disbanded in 1877, but by 1874, if not earlier, the group was clearly on
     the side of the Democrats in the state.  A number of Democrats in 1877 pleaded
24   with the state government not to disband the Rangers.  One wealthy Democrat in
     1877 even offered the state government a voluntary donation of Winchesters for the
25   state militia (the militia had not used Winchesters prior to that point).  The state
     government rejected the offer and disbanded the militia. See Robert M. Utley, *Lone
26   Star Justice: The First Century of the Texas Rangers* (New York: Oxford
     University Press, 2002), 169-70; Walter Prescott Webb, *The Texas Rangers: A
27   Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press,
     1965), 292-93.

28                                                                    (continued…)
─────────────────────────────────────────
                                    47

1  1876).  In both states, as a result, the two contending sides, pro-redemption

2  Democrats and pro-Reconstruction Republicans, claimed victory and claimed that

3  their gubernatorial candidate was the legitimate governor of the state.  In each of

4  these states, therefore, there were two governors.  Meanwhile, in Florida, there was

5  no dispute over the governor's office, but there was conflict nonetheless because

6  the electoral board of the state was controlled by pro-Reconstruction Republicans

7  while the rest of the state government was controlled by pro-redemption

8  Democrats.[66]  As a result of the internal conflicts within Florida, Louisiana, and

9  South Carolina, the U.S. army dispatched troops to the capitals of each state.  The

10  troops were intended to "keep the peace" in all the states, to ensure that the pro-

11  Reconstruction Republican governors of Louisiana and South Carolina were

12  accepted as the only legitimate governors of the states, and to protect the Florida

13  electoral board from being disbanded by pro-redemption Democrats.

14      94.      The circumstances described above had important consequences for

15  who came to possess Henrys and Winchesters by the end of Reconstruction.  In

16  Louisiana and South Carolina prior to 1874, these high-capacity firearms were

17  possessed and regulated by pro-Reconstruction Republicans, who possessed them

18  specifically for the purpose of state defense against armed insurrectionaries allied

19  with pro-redemption Democrats.  Once pro-redemption Democrats in these states

20  after 1874 claimed that their "governor" was the only legitimate governor of the

21  state—a position supported by most whites in each state—the "governor" in

22  question used his alleged authority to distribute Winchesters held in state armories

23  to pro-redemption volunteer militia groups.  In Louisiana, the pro-redemption

24  groups known as White Leaguers in 1876-77 marched through the streets of New

25  Orleans demanding that their "governor," Francis T. Nicholls, be recognized as the

26

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
     [66] Jerrell H. Shofner, "Florida Courts and the Disputed Election of 1876,"
     *Florida Historical Quarterly*, 48 (July 1969), 26-46.

28                                                                    (continued…)

1    sole governor of the state.  At least 500 of the White Leaguers, but probably

2    hundreds more, carried Winchester rifles.[67]  According to a Black American who

3    later testified about events in New Orleans at the time, some of the White Leaguers

4    not only paraded with their Winchesters but also wore their old Confederate

5    uniforms.[68]  The U.S. army regarded these marchers as insurrectionaries.

6         95.    A similar situation played out in South Carolina, though there, the pro-

7    redemption Democrats were known as Red Shirts.  Beginning in 1874 and

8    continuing through 1876, South Carolina Red Shirts created volunteer militias that

9    obtained Winchesters from pro-redemption authorities in the state government.

10   There were many Winchesters to be had in that state, as the pro-Reconstruction

11   Governor Robert "Winchester" Scott back in 1869-1870 had purportedly ordered

12   thousands of them.  The exact number that Scott had acquired remains in dispute.[69]

13   Whatever the number was, it seems that only a few hundred ended up in the hands

14   of Red Shirts in the 1874-76 period, though that was still a few hundred more than

15   Republicans of the era thought was legal.[70]

16        96.    Despite these developments, the total number of Henrys and

17   Winchesters in the southern states during Reconstruction remained small relative to

18   firearms in general in the country—no more than 8,000, I would estimate.[71]

19        [67] *Chicago Daily Inter Ocean*, January 12, 1877, p. 1; *New Orleans*

20   *Republican*, March 13, 1877, p. 2.

         [68] Testimony of William Murrell, *Report and Testimony of the Select*
21   *Committee to Investigate the Causes of the Removal of the Negroes from the*
     *Southern States to the Northern States* (Washington, D.C.: Government Printing
22   Office, 1880), pt. 2, p. 521.

23        [69] During the U.S. Congressional investigations into Klan activities,
     investigators tried to ascertain how many Winchesters had actually arrived in South
24   Carolina for Scott's militia; they failed to learn what the number was, though one
     witness did confirm that the Winchesters that did arrive there were intended for the
25   state militia, including the Black Americans among them. See 42nd  Cong., 2nd sess.,
     "Affairs in Insurrectionary States," vol. 3 (South Carolina), *U.S. Congressional*
26   *Serial Set* (1871), p. 467; and ibid., vol. 4 (South Carolina,), p. 767.

27        [70] Zuczek, *State of Rebellion*, 140-41, 170-71 (some of the Winchesters were
     referred to as "militia guns"; see ibid., 171).

28        [71] This estimate is based on the assumption that all 6,000 Winchesters that
                                                              (continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2144**

1   Equally important, almost all of these high-capacity firearms were in the hands of

2   law enforcement officers, either U.S. soldiers, pro-Reconstruction militias, or pro-

3   Redemption militias. These last set of armed bodies were illegitimate, to be sure—

4   chapters of the KKK were among them—but, importantly, even they regarded it

5   essential to claim that it was their status as militiamen, and only that status, that

6   legitimated their possession of high-capacity firearms.

7       97.   With only a few exceptions (fewer than five), all reliable reports in

8   which Henrys or Winchesters were mentioned in accessible records from the

9   Reconstruction South indicate that they were regarded solely as firearms for

10  legitimate law enforcement officers.[72] An example of an exception comes from

11  Marianna, Florida in September 1869. There, a group of about twenty-five Black

12  Americans, including women and children, were having a barbecue. From the

13  woods nearby an unseen assailant fired "thirteen or fourteen shots in rapid

14  succession," killing and wounding many of the party. The U.S. officer who later

15  reported on the episode assumed that the assailant had used a Henry rifle because of

16  the speed and volume of the shots fired. He wrote to his superior asking for a

17  "first-class detective" to be sent to the town to investigate who the perpetrator or

18  perpetrators might be. "If detectives can't be furnished," he added, "a few Henry

19  rifles would have an excellent moral effect here."[73]

20      98.   At least some state-level law enforcement officials outside of

21  Louisiana and South Carolina ended up with Henrys or Winchesters. A pro-

_____

Governor Scott ordered for the South Carolina state militia were delivered (the exact number delivered is unknown, and most likely it is lower). When this number is combined with the roughly 1,000 Winchesters used to arm the Metropolitans in Louisiana over a six-year period, along with perhaps another 1,000 stolen from U.S. army depots, the sum is 8,000.

[72] This declaration does not accept as evidence second- or third-hand rumors of Henrys or Winchesters being present, though even such rumors prior to 1870 were infrequent.

[73] J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), *U.S. Congressional Serial Set* (1871), pp. 289-90.

(continued…)

50

1   Republican jailer in a sheriff's office in Alabama was able to use a Winchester to
2   fend off attacking Klansmen in January 1871.[74]  In 1873, a dozen men in
3   southwestern Texas deputized to fight Native Americans near the Mexican border
4   were successful in subduing the Natives and, in reward, were presented by the state
5   legislature with Winchester rifles (they had not used Winchesters to fight the
6   Natives, though the Natives that they fought might well have used Winchesters).[75]
7   The most revealing example comes from 1875 Mississippi, in the testimony of
8   Sheriff John Milton Brown of Coahoma.  Brown was the first Black American
9   sheriff anywhere in Mississippi.  He reported that Black Americans in his region
10  had no guns and implied that they had been ordered to turn in their arms to the
11  white insurrectionaries who controlled most of the state.  Brown, though, had not
12  turned in any weapons because he believed that his position as sheriff allowed him
13  to keep his weapons.  As he told an investigator, he had "one Henry rifle" and he
14  thought that he "was justified in having that, because I was sheriff."[76]

15      99.    Americans have long disputed and no doubt will continue to dispute
16  the meaning, implications, and correctness of the U.S. Supreme Court's two earliest
17  "Second Amendment" opinions, which were offered during or soon after
18  Reconstruction:  *U.S. v. Cruikshank* and *Presser v. Illinois*.[77]  But one issue
19  regarding those cases is beyond dispute: they did not involve high-capacity
20  firearms.  There were no Henrys or Winchesters at Colfax on the tragic day of the
21  massacre there in 1873.  There were none in the hands of the military companies

22

23  [74] 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama), *U.S. Congressional Serial Set* (1871), pp. 414-15.
24  [75] *Texas Session Laws*, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26.
25  [76] 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of
26  Migration of Negroes from Southern to Northern States," *U.S. Congressional Serial Set* (1879-88), 357.
27  [77] *U.S. v. Cruikshank*, 92 U.S. 542 (1875); *Presser v. Illinois*, 116 U.S. 252
28  (1886).

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2146**

1    that marched on that spring day in Chicago in 1879—the episode that would lead to

2    the 1886 *Presser* decision (Presser's men carried single-shot Remington rifles).[78]

3    On the question of whether the law could treat high-capacity firearms differently

4    from other types of weapons, the Reconstruction-era Justices had nothing to say.

5    But the land they lived in, the land they ruled over, was one where high-capacity

6    firearms were held only by a select few, almost all of whom were U.S. soldiers or

7    civilian law enforcement officers sworn to uphold the U.S. government.  These

8    gunmen held their distinctive weapons not to defend themselves as individuals from

9    imagined foes but to defend their state and country against all-too-real criminals

10   and insurrectionaries.

11       100.   Many of these gunmen were Black Americans, specifically the Black

12   American men who made up the largest contingents of southern state militias.

13   Serving in these militias was one of many ways that Black Americans demonstrated

14   their gun-bearing rights.  Other ways that this right was demonstrated are well

15   known to scholars:  Black Americans helped make sure that the U.S. government

16   and state authorities overturned white supremacist efforts to ban blacks from

17   militias, deny them access to firearms, or seize their firearms (these efforts had been

18   embodied in the southern state Black Codes of 1865-67, which were overturned by

19   the Civil Rights Act of 1866 and the Fourteenth Amendment of 1868).  It is worth

20   noting, though, that a Black American who carried a Winchester for a state militia

21   was different from the much larger population of Black Americans who did not

22   belong to state militias.  The Winchester-toting black militiaman held his gun only

23   with the authorization of and regulation by the state government.  He did not own

24   his gun.  It belonged to the state.  It was supposed to be in an armory, not at a

25   private home, when not in militia-use.  Hypothetically, if Black Americans wanted

26   Henrys or Winchesters at their homes, they might lawfully have been allowed to

27   

28       [78] "The Reds," *Chicago Daily Tribune*, March 23, 1879, p. 7.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2147**

1   have them there.  But this hypothetical scenario is irrelevant.  Southern Black

2   Americans for the most part lacked the means to buy Winchesters.  Mostly rural

3   workers, their wages were notoriously low—sometimes only in the form of shares

4   of crops—and they would not be inclined to spend $30 to $40 on a gun that would

5   represent perhaps 3 to 6 months wages.  There was no necessity for them to do so:

6   perfectly adequate guns for individual self-defense, even some "repeaters," would

7   have been in their price range.

8        101.   The Fourteenth Amendment assured Black Americans that they could

9   possess firearms for self-defense but did not assure them that they could possess

10   any firearms they wanted, including high-capacity rifles.  This same principle of the

11   Amendment held equally true for whites.

12        102.   Americans in the Reconstruction-era South understood perhaps better

13   than anyone that Henrys and Winchesters were weapons for organized military use

14   that did not belong in the general population.  Except for a small number of

15   insurrectionary militias, like the Ku Klux Klan, the enemies of the Republican state

16   administrations in Louisiana and South Carolina that armed their state militias with

17   high-capacity firearms did not respond by trying to obtain the same weapons for

18   themselves.  Rather, they responded by demanding the removal of the weapons and

19   the organizations that carried them.  When these opposition factions came into

20   power in 1877, they disbanded the state militias and warehoused the Winchesters.

21   To be sure, they maintained laws that allowed citizens to possess firearms for their

22   individual self-defense, but they did not view high-capacity firearms as appropriate

23   for such a purpose.

24        103.   My examination of statutes and state-level court opinions from the

25   Reconstruction-era South revealed that firearms were sometimes mentioned as

26   weapons of individual self-defense, but in such instances, the types of firearms

27

28

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1  mentioned were, with one exception, low-capacity firearms such as pistols,

2  revolvers, muskets, and rifles.[79]

3      104.  The one potential exception comes from a Tennessee state court

4  opinion of 1871, *Andrews v. State*.  The court in *Andrews* ruled that among the

5  weapons a citizen might possess were rifles "of all descriptions," including "the

6  shot gun, the musket, and repeater."[80]  This opinion has been cited by at least one

7  scholar as evidence that high-capacity firearms were understood to be possible

8  weapons of individual self-defense.[81]  Yet, a "repeater" at the time of the *Andrews*

9  opinion (1871), and during the whole of Reconstruction, would have been

10  understood to be a low-capacity repeating rifle, such as a Spencer or Sharps, neither

11  of which could hold more than ten rounds.  The parlance of the day put Henrys and

12  Winchesters in a separate category from "repeaters."  Again and again during

13  Reconstruction, from the Western Territories to the northern and southern states,

14  when a cache of firearms was described, Henrys and Winchesters, though obviously

15  repeating rifles, were always listed separately from "repeaters."  Furthermore, the

16  firearms mentioned in Judge Thomas J. Freeman's majority opinion in *Andrews*—

17  shotguns, muskets, repeaters—were mentioned exclusively in terms of what a

18  person might possess in his role as a member of the militia.  The chief judge of the

19  court, Alfred O. P. Nicholson, joined in that opinion.  There was one judge on the

20  court, though, who believed that the Andrews opinion should go further—that it

21  should allow individuals to possess any weapon, regardless of what the militias in

22  the state did or did not possess.  That judge, Thomas A. R. Nelson, expressed his

23

24      [79] The survey that I conducted was of all state statutes and state-level cases in the period 1863-1877 from the South relating to regulation of weapons. A list of

25  state-level cases from all states appears at https://guncite.com/court/state/ (accessed September 25, 2022).

26      [80] *Andrews v. State*, 50 Tenn. (3 Heisk.) 179 (1871).

27      [81] See, for example, Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998).

28                                                                    (continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2149**

1    view in a concurring opinion, which he alone signed.  The opinion did not mention

2    Henrys or Winchesters as weapons that he thought that any individual might

3    possess.[82]

4        105.   Even more revealing evidence for Reconstruction-era officials

5    believing that high-capacity firearms should be regulated comes from Louisiana.

6    Of the states that had militias that carried Henrys or Winchesters, Louisiana was the

7    only one that left behind a readily accessible record of how these high-capacity

8    firearms were to be managed by state authorities.  All arms for the state militia were

9    overseen by the state adjutant general, James Longstreet.  A former Confederate

10   General who joined the Louisiana Republican Party after the Civil War—a move

11   that forever marked him as a turncoat by his former Confederate comrades—

12   Longstreet well understood the ongoing insurrectionary intentions of former

13   Confederates in his state and elsewhere.  He thought it crucial to ensure that such

14   men did not end up with Winchesters, and that they be incited as little as possible

15   by the sight of Winchesters being carried in public by their organized enemies,

16   Black-American militiamen foremost among them.  For these reasons, he took

17   extraordinary precautions concerning the Winchesters that were held in the New

18   Orleans armory.  His orders for the armory began with typical provisions such as

19   putting guards around the building and making sure that all guns inside were racked

20   when not in authorized use.  Then, in the last provision of his orders, he turned

21   specifically to Winchesters.  They were not to "be taken to pieces, or any part of

22   [them] removed . . . unless authorized by the Division Commander."  The

23   Winchesters were also not to be used for "parade or drill upon the streets or public

24   highways" without the Division Commander's authority.  Such restrictions were

25   not put on the other weapons in the arsenal; they were only for the Winchesters.[83]

26       [82] *Andrews v. State*, 50 Tenn. (3 Heisk.) 193-200 (1871).

27       [83] Adjutant General James Longstreet, General Orders No. 16, New Orleans,
     July 19, 1870, in *Annual Report of the Adjutant General of the State of Louisiana*,
28   for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39.

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2150**

## VI. CONCLUSION. RECONSTRUCTION AND TODAY: CONTINUITY AND CHANGE

106.   How does the situation surrounding high-capacity firearms today compare to the Reconstruction era?  High-capacity firearms are still being sold under the name Winchester, by companies such as Browning, but the Winchester Repeating Rifle Company ceased to exist long ago.  Of course, high-capacity firearms can be found under plenty of other names today.  But whereas today the owners of such firearms might be civilians, in the Reconstruction era they would be almost exclusively soldiers or law enforcement officers.  There were civilians during Reconstruction who owned high-capacity rifles, to be sure.  Yet almost all such civilians were "frontiersmen" of the Western Territories, and the population of the Western Territories was tiny compared to the population of the United States as a whole.  Furthermore, Henrys and Winchesters, the only high-capacity firearms of the era, were not the preferred firearms of the "frontiersmen" of the region.

107.   By far the largest population possessing Henrys and Winchesters during Reconstruction were members of state-wide militias.  These organizations no longer exist under their Reconstruction name of "state militias."  They evolved into the National Guard, a term first used in place of "state militias" in the North in the 1880s but ultimately applied to all state-level forces that were auxiliary to the U.S. army, including those in the South. National Guard units today are not analogues to the Reconstruction-era state militias; they are direct descendants.[84] And they operate in exactly the same way.  They are under the command of state governors but can be used as auxiliary forces of the U.S. army—that is, they can be "federalized."[85]  Membership in the National Guard, like membership in the

---

[84] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97.

[85] The statutory language that enabled Abraham Lincoln to call up state militias in 1861, which was then invoked occasionally during Reconstruction to

(continued…)

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

**ER_2151**

1  Reconstruction-era state militias, is regulated.  National Guard units, like
2  Reconstruction-era state militias, are expected to have proficiency with the weapons
3  they use and to have unfailing allegiance to the recognized governments of their
4  state and nation.  Their access to high-capacity firearms is regulated.  Such weapons
5  are typically kept under guard in a central location, such as an armory, and
6  dispensed to their users only for purposes of drilling, training, or actual use on those
7  occasions when National Guard units are called out.  Beside today's National
8  Guard, other users of high-capacity firearms at present include civilian law
9  enforcement officers.  As this declaration has shown, the analogs of such officials
10 during the Reconstruction era—urban policemen, sheriffs, or U.S. marshals—also
11 were known on occasion to carry high-capacity firearms.

12      108.   What is distinctly different today compared to Reconstruction is the
13 ownership of high-capacity firearms by Americans who have no connection to the
14 military or law enforcement.  If such owners along with their weapons were
15 transported by a time machine back to the Reconstruction-era South, they would
16 find themselves suspected of being outlaws by law enforcement officers.  If they
17 then gathered together into organized companies, they would be considered
18 insurrectionary militias, which is precisely how the Ku Klux Klan was regarded
19 during Reconstruction by the U.S. army, the state militias, and other legitimate,
20 pro-Union law enforcement officials.

21

22

23 federalize state militias, now resides in the statute that enables the President to
   federalize the National Guard; see 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A
24 Stat. 15; Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006, 119 Stat.
   3440).  One of the reasons for the rise in significance of the National Guard after
25 Reconstruction was the federal "Posse Comitatus Act" of 1878, which prohibited
   the direct intervention of the U.S. army into states except in extraordinary
26 circumstances.  After that legislation, the National Guard units were needed not so
   much as auxiliaries to the U.S. army as substitutes for them.  On the "Posse
27 Comitatus Act" see Gautham Rao, "The Federal "Posse Comitatus" Doctrine:
   Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," *Law*
28 *and History Review*, 26 (Spring, 2008), 1-56.

57

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

1      Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the

2   laws of the United States of America that the foregoing is true and correct.

3      Executed on November 10, 2022, at Providence, Rhode Island.

4

5

6

7   _____

8   Michael Vorenberg

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Michael Vorenberg (17-cv-1017-BEN-JLB)

## INDEX OF EXHIBIT

| Exhibit | Description | Page No. |
|---------|-------------|----------|
| A | Curriculum Vitae of Michael Vorenberg | 1-10 |



# EXHIBIT A

## <u>CURRICULUM VITAE</u>

**Michael Vorenberg**
Associate Professor of History
Brown University

**<u>Education</u>**   Ph.D. in History, Harvard University, November 1995 (American History)
A.M. in History, Harvard University, March 1990 (American History)
A.B. in History, Harvard University, June 1986, *summa cum laude* (Ancient History)

**<u>Professional Appointments</u>**

Associate Professor of History (with tenure), Brown University, 2004-
Vartan Gregorian Assistant Professor, Brown University, 2002-2004
Assistant Professor, History Department, Brown University, 1999-
Assistant Professor, History Department, SUNY at Buffalo, 1996-99
Post-Doctoral Fellow, W.E.B. Du Bois Center, Harvard University, 1995-96
Lecturer, History and Literature Program, Harvard University, 1995-96

**<u>Scholarship</u>**

**Books**
*Lincoln's Peace: The Elusive End of the American Civil War* (forthcoming
with Alfred A. Knopf).
*The Emancipation Proclamation: A Brief History with Documents* (Bedford/St.
Martin's, 2010).
*Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth
Amendment*.  Cambridge: Cambridge University Press, 2001.
(Paperback edition, 2004.)

**Chapters in Books**
"The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian
Samito, ed., *The Greatest and and the Grandest Act: The Civil Rights Act of 1866
from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University
Press, 2018), 60-88.
"The Thirteenth Amendment," in *1865: America Makes War and Peace* in *Lincoln's
Final Year* (Carbondale, Ill.: Southern Illinois University Press, 2015), 7-21.
"Liberté, Égalité, and Lincoln: French Readings of an American President," in Richard
Carwardine and Jay Sexton, eds., *The Global Lincoln* (New York: Oxford
University Press, 2011), 95-106.
"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," in
Alexander Tsesis, ed., *The Promises of Liberty: The History and Contemporary
Relevance of the Thirteenth Amendment* (New York: Columbia University Press,
2010).

"Did Emancipation Create American Citizens?: Abraham Lincoln's View" (in Russian), in Victoria Zhuravleva, ed., *Abraham Lincoln: Lessons of History and the Contemporary World* (Moscow: Russian State University for the Humanities Press, 2010).

"Abraham Lincoln's 'Fellow Citizens'—Before and After Emancipation," in William A. Blair and Karen Fisher Younger, eds., *Lincoln's Proclamation: Emancipation Reconsidered* (Chapel Hill: University of North Carolina Press, 2009), 151-169.

"The Thirteenth Amendment Enacted," in Harold Holzer and Sara Vaughn Gabbard, eds., *Lincoln and Freedom: Slavery, Emancipation, and The Thirteenth Amendment* (Carbondale, Ill.: Southern Illinois University Press, 2007).

"After Emancipation: Abraham Lincoln's Black Dream," in John Y. Simon, Harold Holzer, and Dawn Vogel, eds., *Lincoln Revisited* (New York: Fordham University Press, 2007)

"Slavery Reparations in Theory and Practice: Lincoln's Approach," in Brian Dirck, ed., *Lincoln Emancipated: The President and the Politics of Race* (DeKalb: Northern Illinois Univ. Press, 2007).

"Reconstruction as a Constitutional Crisis," in Thomas J. Brown, ed., *Reconstructions: New Directions in the History of Postbellum America* (New York: Oxford University Press, 2006).

"The World Will Forever Applaud: Emancipation," in Aaron Sheehan-Dean, ed., *The Struggle for a Vast Future: The American Civil War* (Oxford, UK: Osprey, 2006).

"Emancipating the Constitution: Francis Lieber and the Theory of Amendment," in Charles R. Mack and Henry H. Lesesne, eds., *Francis Lieber and the Culture of the Mind* (Columbia: Univ. of South Carolina Press, 2005).

"The Chase Court (1864-1873): Cautious Reconstruction," in Christopher Tomlins, ed., *The United States Supreme Court: ThePursuit of Justice* (Boston: Houghton Mifflin, 2005).

"Bringing the Constitution Back In: Amendment, Innovation, and Popular Democracy during the Civil War Era," in Meg Jacobs, William Novak, and Julian Zelizer, eds., *The Democratic Experiment: The Promise of American Political History* (Princeton: Princeton University Press, 2003).

"The King's Cure: Abraham Lincoln and the End of Slavery," in Charles Hubbard, ed., *Lincoln Reshapes the Presidency* (Mercer, Penn.: Mercer Univ. Press, 2004).

"Rutherford B. Hayes," in Alan Brinkley and Davis Dyer, eds., *TheReader's Companion to the American Presidency*.  Boston: Houghton Mifflin, 2000.

"Abraham Lincoln and the Politics of Black Colonization," in Thomas F. Schwartz, ed., *"For a Vast Future Also": Essays from the Journal of the Abraham Lincoln Association*.  New York: Fordham University Press, 1999. (Reprint of article listed below.)

Michael Vorenberg c.v., page 2

### Refereed Journal Articles

"Spielberg's *Lincoln*: The Great Emancipator Returns," *Journal of the Civil War Era*, 3 (December 2013), 549-72.

"Imagining a Different Reconstruction Constitution," *Civil War History*, 51 (December 2005), 416-26.

"'The Deformed Child': Slavery and the Election of 1864." *Civil War History*, 47 (September 2001), 240-257.

"Abraham Lincoln and the Politics of Black Colonization." *Journal of the Abraham Lincoln Association*, 14 (Summer 1993): 23-46.

### Non-Refereed Journal Articles

"Emancipation—Then What?," *New York Times*, "Disunion" Blog, January 15, 2013, http://opinionator.blogs.nytimes.com/2013/01/15/emancipation-then-what/?_php=true&_type=blogs&_r=0

"Hearts of Blackness: Reconsidering the Abolitionists—Again," *Reviews in American History*, 32 (March 2004), 33-40.

"The Battle Over Gettysburg: What Lincoln Would Have Said about September 11, 2001." *Brown Alumni Magazine*, 103 (Jan./Feb. 2003), 27.

"Recovered Memory of the Civil War," *Reviews in American History*, 29 (Dec. 2001), 550-58.

### Invited Lectures

"A Righteous Peace: Abraham Lincoln, the Civil War, and the End of Slavery," The Humanities Forum, Providence College, Oct. 18, 2019.

"How Wars End--or Don't: The Civil War as a Case Study," Henry E. Huntington Society of Fellows Lecture, May 8, 2019.

"Lincoln's Peace: The Struggle to End the American Civil War," Occidental College (Billington Lecture), Feb. 21, 2019.

"The Fate of Slavery after Emancipation," The Great Lectures Series (as OAH Distinguished Lecturer), New York City, October 14, 2017.

"Abraham Lincoln, the Thirteenth Amendment, and the Struggle for American Peace and Freedom," University of Saint Mary Annual Lincoln Lecture, Topeka, Kansas, February 20, 2017.

"The 14th Amendment as an Act of War," Boston College, Clough Center, Newton, Massachusetts, September 20, 2016.

"Born in the USA—So What?" Worcester Polytechnic Institute, Constitution Day University Speaker, Worcester, Massachusetts, September 19, 2016.

"The Slave Power on the Gallows: The Deeper Meaning of the Execution of Henry Wirz, Confederate Commandant," University of California, Berkeley, Legal History Workshop, March 29, 2016.

Salmon P. Chase Symposium on the Thirteenth Amendment (participant), Georgetown Law Center, Dec. 4-5, 2015, Washington, DC.

"The Last Surrender: Looking for the End of the Civil War," presented at The Lincoln Forum, Gettysburg, Pennsylvania, November 17, 2015.

Michael Vorenberg c.v., page 3

"Voting Rights and the Meaning of Freedom: The View from the Civil War Era," Annual Lincoln Legacy Lecture, University of Illinois at Springfield, October 15, 2015.

"Final Freedom: The Civil War, the Abolition of Slavery, and the Thirteenth Amendment," Roger Williams University, October 6, 2015.

"Lincoln and the Jews, Freedom and Discrimination," Brown Hillel Alumni Association, New York City, May 17, 2015.

"When Should History Say That Slavery Ended in the United States?," Center for Slavery and Justice, Brown University, May 8th, 2015.

"Lincoln, the Constitution, and the Civil War," Community College of Rhode Island, April 29, 2015.

"Judgment at Washington: Henry Wirz, Lew Wallace, and the End of the Civil War," Annual Symposium of Capitol Historical Society, Washington, DC, May 2, 2014.

"Emancipation, Lincoln, and the Thirteenth Amendment," Dole Forum, Dole Institute of Politics, University of Kansas, Lawrence, Kansas, November 21, 2013.

"Spielberg's Lincoln and the Relation between Film and History," Department of History, Loyola University, Chicago, Illinois, November 13, 2013.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Newberry Library Colloquium, Chicago, Illinois, November 6, 2013.

"Reconstruction and the Origins of Civil Rights," National Endowment for the Humanities Summer Institute on Civil Rights History, Harvard University, Cambridge, Massachusetts, July 1, 2013.

"The Origins and Process of Emancipation," Emancipation at 150 Symposium, Boston College Clough Center, Newton, Massachusetts, April 23, 2013.

"Emancipation—Then What?  Citizenship?"  Emancipation Proclamation Symposium, University of Michigan, October 26, 2012.

"Blood, Allegiance, Belief: The Meanings of Citizenship in the Civil War Era," University of Michigan Law School, January 31, 2012.

"American by War: The People and Their Nations during the Civil War," Phillips Andover Academy, Andover, MA, Nov. 17, 2011.

"Birthright and the Myth of Liberal Citizenship," JANUS Forum, Brown University, Nov. 15, 2011.

"American by War: The People and Their Nations during the Civil War," Western Kentucky University, Bowling Green, KY, Oct. 12, 2011.

"The Elections of 1860 and 2010 and the Politics of Citizenship," Colby College Symposium on the American Civil War Sesquicentennial, Waterville, Maine, November 10, 2010.

"Americans Debate Citizenship—Then and Now," Brown Club of England, October 12, 2010, London.

"War Powers, *Ex Parte Merryman*, and the Relevance of the American Civil War," American Bar Association Workshop for High School Teachers, Washington, D.C., June 19, 2010

"Originalism and the Meanings of Freedom," Georgetown Law School, Washington, D.C., March 30, 2010.

"Abraham Lincoln, Politician," Rotary Club of Rhode Island, Warwick, R.I., November 6, 2008.

"Lincoln the Citizen," Abraham Lincoln Symposium, National Archives, Washington, D.C., September 20, 2008.

"Emancipation and its Meaning in Current Scholarship," National Endowment for the Humanities Summer Institute on "Slavery and Emancipation," Philadelphia, Pennsylvania, July 28, 2008.

"Lincoln the Citizen–Or Lincoln the Anti-Citizen?," Abraham Lincoln Symposium, Springfield, Illinois, February 12, 2008.

"The Tangled History of Civil Rights and Citizenship in the Civil War Era," University of Virginia School of Law, November 2007.

"Civil Liberties and Civil Rights: The Civil War Era," American Bar Association, Chicago, May 2006.

"Race, the Supreme Court, and the Retreat from Reconstruction," Boston College School of Law, April 2007.

"Forever Free: The Meanings of Emancipation in Lincoln's Time and Ours," St. Louis University, December 7, 2006.

"Slavery Reparations in Historical Context," Connecticut College, New London, Connecticut, March 2, 2006.

"Abraham Lincoln, The Civil War and the Conflicting Legacies of Emancipation," presented as part of the "Forever Free" series, Providence Public Library, Providence, R.I., January 26, 2006.

"Abraham Lincoln, War Powers, and the Impact of the Civil War on the U.S. Constitution," presented at symposium on "War Powers and the Constitution," Dickinson College, Dickinson, Penn., October 3, 2005.

"Reconsidering Law, the Constitution, and Citizenship," presented at "New Directions in Reconstruction" symposium, Beaufort, S.C., April 15-18, 2004.

"Abraham Lincoln, Slavery, and Modern Legacies," Public History Series, University of Las Vegas, Nevada, February 12, 2004.

"Oaths, African Americans, and Citizenship," University of Nevada at Las Vegas Law School, February 12, 2004.

"Reconsidering the Era of the Oath: African Americans Before Union Military Courts during the American Civil War," presented to the Law and  History symposium, Northwestern University Law School, Chicago, Ill., November 3, 2003.

"Racial and Written Constitutions in Nineteenth-Century America," presented to the workshop of the Department of History, Boston College, Newton, Massachusetts, March 2003.

"Abraham Lincoln, Abolition, and the Impact of the Civil War on the Cult of the Constitution," presented at the Social Law Library, Suffolk University, Boston, Massachusetts, February 2002.

"Francis Lieber, Constitutional Amendments, and the Problem of Citizenship," presented at The Francis Lieber Symposium, University of South Carolina, Columbia, S.C., November 2001.

"How Black Freedom Changed the Constitution," presented at the "Writing the Civil War" symposium, Atlanta History Center, Atlanta, Georgia, September 2001.

Michael Vorenberg c.v., page 5

"From a Covenant with Death to a Covenant with Life: The Constitution's Transformation during the American Civil War," presented as the Annual Constitutional Anniversary Lecture, National Archives, Washington, D.C., September 2001.

"New Perspectives on Abraham Lincoln, Emancipation, and the Civil War," presented to the Civil War Round Table of Rhode Island, Cranston, Rhode Island, June 2001.

"Historical Roots of the Modern Civil Rights Movement: The Constitution," presented at the Civil Rights Summer Institute, Harvard University, Cambridge, Massachusetts, June 2001.

"Race, Law, and the Invention of the State Action Doctrine in the Late Nineteenth Century," presented at the Columbia University Law School, New York City, April 2001.

"A King's Cure, a King's Style: Lincoln, Leadership, and the Thirteenth Amendment," presented at the "Abraham Lincoln and the Legacy of the Presidency" conference, Lincoln Memorial University, Harrogate, Tennessee, April 2001.

"The Tangled Tale of Civil War Emancipation," presented at the University of Richmond, Richmond, Virginia, March 2001.

"The King's Cure: Abraham Lincoln, the Thirteenth Amendment, and the Fate of Slavery," presented at the Abraham Lincoln Institute of the Mid-Atlantic, Washington, D.C., March 2001.

"Race, the Supreme Court, and the Retreat from Reconstruction," presented at the Boston College School of Law, Newton, Mass., April 2000.

**Papers Read or Discussed**

"Prisoners of Freedom, Prisoners of War: An Untold Story of Black Incarceration--And How it Might be Told," Brown Legal History Workshop, Oct. 28, 2019.

"Bearer of a Cup of Mercy: Lew Wallace's American Empire," Henry E. Huntington Library, Research Fellows Meeting, Feb. 6, 2019.

"Anti-Imperialism and the Elusive End of the American Civil War," presented at the "Remaking North American Sovereignty" Conference, Banff, Alberta, Canada, July 31, 2015.

"The Election of 1864: Emancipation Promised, Emancipation Deferred," presented at The Annual Meeting of the Organization of American Historians, Atlanta, Georgia, April 11, 2014.

"The Appomattox Effect: Struggling to Find the End of the American Civil War," Department of History, Northwestern University, Evanston, Ill., Nov. 15, 2013.

"Birth, Blood, and Belief: Allegiance and the American Civil War," presented at the Elizabeth Clark Legal History Workshop Series, Boston University School of Law, Nov. 16, 2011.

"French Readings of Lincoln's Role in the Creation of American Citizenship," presented at the conference on European Readings of Abraham Lincoln, His Times and Legacy, American University of Paris, Paris, France, October 18, 2009.

Michael Vorenberg c.v., page 6

"Was Lincoln's Constitution Color-Blind?," presented at the Abraham Lincoln Bicentennial Symposium, Harvard University, Cambridge, Mass., April 24, 2009.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," presented at conference on Slavery, Abolition, and Human Rights: Interdisciplinary Perspectives on the Thirteenth Amendment, April 17, 2009

"Did Emancipation Create American Citizens?—Abraham Lincoln's View," presented at the conference on Abraham Lincoln: Issues of Democracy and Unity, Russian State University, Moscow, Feb. 8, 2009.

"The Racial and Written Constitutions of Nineteenth-Century America," Cogut Center for the Humanities, Brown University, Nov. 4, 2008.

"Civil War Era State-Building: The Human Cost," Boston University Political History Workshop, March 19, 2008.

"Citizenship and the Thirteenth Amendment: Understanding the Deafening Silence," annual meeting of the *Law and Society Association*, Montreal, May 30, 2008.

"Claiming Citizenship: Black and White Southerners Make Their Cases During the Civil War," presented at the annual meeting of the *Southern Historical Association*, Memphis, November 2004.

"Imagining a Different Reconstruction Constitution," presented at the annual meeting of the Social Science History Association, Baltimore, November 2003.

"West of Reconstruction: Resolving Mexican-American Property and Citizenship in the Civil War Era," presented at the annual meeting of the *American Historical Association*, San Francisco, California, January 2002.

"The Limits of Free Soil: The Resolution of Mexican Land Claims during the American Civil War," presented at the annual meeting of the *Organization of American Historians*, St. Louis, Missouri, April 2000.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Nineteenth-Century America," presented at the annual meeting of the *American Society for Legal History*, Toronto, Ontario, October 1999.

"Law, Politics, and the Making of California Free Soil during the American Civil War," presented at the annual meeting of the *Western History Association*, Portland, Oregon, October 1999.

"Land Law in the Era of Free Soil: The Case of New Almaden," *American Society for Environmental History*, Tucson, Arizona, April 1999.

"Written Constitutions, Racial Constitutions, and Constitutional Permanence in Antebellum America," presented at the annual meeting of the *Society for Historians of the Early American Republic*, Harpers Ferry, W.V., July 1998.

"The Constitution in African-American Culture: Freedom Celebrations and the Thirteenth Amendment," presented to the *W.E.B. Du Bois Institute*, Harvard University, Cambridge, Massachusetts, April 1996.

"Civil War Emancipation and the Sources of Constitutional Freedom," presented at the annual meeting of the *Organization of American Historians*, Washington, D.C., April 1995.

Michael Vorenberg c.v., page 7

"The Origins and Original Meanings of the Thirteenth Amendment," presented at the annual meeting of the *American Society for Legal History*, Washington, D.C., October 1994.

"Civil War Emancipation in Theory and Practice: Debates on Slavery and Race in the Border States, 1862-1865," presented at the *Southern Labor Studies Conference*, Birmingham, Alabama, October 1993.

## Service

### University

Anna S. K. Brown Library advisory committee, member, 2016-present.

Co-Organizer (with Faiz Ahmed, Rebecca Nedostup, Emily Owens), Brown Legal History Workshop, 2015-present.

Political Theory Project, Advisory Board, 2010-2019

Organizer and Presenter, "Abraham Lincoln for the 21st Century: A Symposium honoring the Abraham Lincoln Bicentennial," John Hay Library, Brown University, Feb. 27-28, 2009.  Plenary lecture by Benjamin Jealous, president of NAACP, and six symposium participants.  Funding secured from Rhode Island Foundation, Rhode Island Lincoln Bicentennial Commission, Brown Provost, Brown Dean of Faculty, History Department, Africana Studies Department

### Profession

Program Committee, Society of Civil War Historians, 2022 annual conference, 2020-present.

Cromwell Prize Committee, American Society for Legal Historians, 2014-2017.

Board of Editors, *Law and History Review*, 2004-2013 (reappointed 2009).

Advisory Committee, United States Abraham Lincoln Bicentennial Commission, 2002-10.

Board of Advisors, Lincoln Prize, Gettysburg Institute (2000-present).

Co-Chair, Local Arrangements Committee, Annual Meeting of the Society for Historians of the Early American Republic, Providence, Rhode Island, Summer 2004.

Referee for National Endowment for the Humanities Scholarly Editions, 2002; Summer Grants, 2001-2003.

Committee Member, Local Arrangements Committee, Annual Meeting of the American Society for Environmental History, to be held in Providence, Rhode Island, Spring 2003.

Referee for article manuscripts submitted to the *Journal of American History*, *Law and History Review*, *Law and Social Inquiry*, *Journal of the Civil War Era*, and *Civil War History*.

Referee for book manuscripts submitted to Houghton Mifflin, Harvard University Press, Oxford University Press, New York University Press, University of Chicago Press, University of Illinois Press, and University of North Carolina Press.

Advisory Editor for *Proteus* (special issue devoted to the American Civil War, Fall 2000).

Michael Vorenberg c.v., page 8

**Community**

Lecture on American Citizenship and Exclusion, Center for Reconciliation, Providence, R.I., July 2018.

Instructor in co-taught course at the Rhode Island Adult Correctional Institute (ACI) through the Brown University BELLS program, 2013.

Lecture on Reconstruction-Era Constitutional Amendments, Barrington, RI, Open Classroom, April 4, 2013.

Lecture on 150th Anniversary of the Emancipation Proclamation, Wheeler School, Providence, Rhode Island, January 17, 2013.

Rhode Island Civil War Sesquicentennial Commission, 2011- .

Rhode Island Abraham Lincoln Bicentennial Commission (appointed by Governor), 2005-2009.

Lecturer on the Brown Steering Committee on Slavery and Justice, The Wheeler School, Providence, Rhode Island, November 2006.

Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., April 2006.

Seminar leader for National Endowment for the Humanities "Teaching American History" initiative at Rhode Island Historical Society, Providence, R.I., September 2005.

Seminar leader for National Endowment for the Humanities "We the People" initiative at Deerfield Historical Society, Deerfield, Mass., March 2005.

Advisor to the Burrillville, Rhode Island, School Department, on securing and administering a "Teaching American History" grant from the United States Department of Education, 2001-2002.

**Academic Honors and Fellowships**

Ray Allen Billington Professor, Occidental College/Henry E. Huntington Library, 2018-19.

Pembroke Center for the Study of Women and Gender Fellowship, Brown University, 2016-17.

National Endowment for the Humanities Long-Term Fellowship, Massachusetts Historical Society, Boston, Massachusetts, 2014.

National Endowment for the Humanities Long-Term Fellowship, Newberry Library, Chicago, Illinois, 2013.

Finalist, CIES Fulbright Fellowship for University of Rome III (2010-11 competition)

Cogut Center for the Humanities Fellowship, Brown University, Fall 2008.

William McLoughlin Prize for Teaching in the Social Sciences, Brown University, 2007.

Karen Romer Prize for Undergraduate Advising, Brown University, 2007.

History News Network (HNN) "Top Young Historian," 2005 (1 of 12 named in the U.S.).

Vartan Gregorian Assistant Professorship, Brown University, 2002-2004.

Finalist, Lincoln Prize, 2002 (for *Final Freedom*).

American Council of Learned Societies/Andrew W. Mellon Fellowship, 2002-03.

Kate B. and Hall J. Peterson Fellowship, American Antiquarian Society, 2002-03.

Salomon Research Award, Brown University, 2002-2003.

National Endowment for the Humanities Summer Stipend, 2001.

Julian Park Fund Fellowship, SUNY at Buffalo, 1998.

Michael Vorenberg c.v., page 9

Research Development Fund Fellowship, SUNY at Buffalo, 1997.
Harold K. Gross Prize for Best Dissertation at Harvard in History, 1996.
Delancey Jay Prize for Best Dissertation at Harvard on Human Liberties, 1996.
W.E.B. Du Bois Fellowship, Harvard University, 1995.
Whiting Fellowship in the Humanities, 1994.
Bowdoin Prize for Best Essay at Harvard in the Humanities, 1993.
Indiana Historical Society Graduate Fellowship, 1993.
W. M. Keck Fellowship, Henry E. Huntington Library, 1993.
Everett M. Dirksen Congressional Research Fellowship, 1993.
Mark DeWolfe Howe Fellowship, Harvard Law School, 1993.
Charles Warren Center Research Fellowship, Harvard History Dept., 1991-2.
Derek Bok Award for Distinction in Teaching at Harvard, 1991.
Philip Washburn Prize for Best Senior Thesis at Harvard in History, 1986.

Michael Vorenberg c.v., page 10

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 73 of 270

1   XAVIER BECERRA
    Attorney General of California
2   State Bar No. 118517
    MARK R. BECKINGTON
3   Supervising Deputy Attorney General
    State Bar No. 126009
4   ANTHONY P. O'BRIEN
    Deputy Attorney General
5   State Bar No. 232650
    JOHN D. ECHEVERRIA
6   Deputy Attorney General
    State Bar No. 268843
7     300 South Spring Street, Suite 1702
      Los Angeles, CA  90013
8     Telephone: (213) 269-6249
      Fax: (213) 897-5775
9     E-mail: John.Echeverria@doj.ca.gov
    *Attorneys for Defendant Attorney General*
10  *Xavier Becerra*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15  **VIRGINIA DUNCAN, et al.,**          17-cv-1017-BEN-JLB

16                          Plaintiffs,   **DECLARATION OF BLAKE
                                          GRAHAM IN OPPOSITION TO**
17           v.                           **PLAINTIFFS' MOTION FOR
                                          SUMMARY JUDGMENT OR,**
18                                        **ALTERNATIVELY, PARTIAL
    **XAVIER BECERRA, in his official**   SUMMARY JUDGMENT**
19  **capacity as Attorney General of the
    State of California; and DOES 1-10,**  Date:        April 30, 2018
20                                         Time:        10:30 a.m.
                            Defendants.    Courtroom:   5A
21                                         Judge:       Hon. Roger T. Benitez
                                           Action Filed: May 17, 2017
22

23

24

25

26

27

28

    Declaration of Blake Graham in Support of Defendant's Opposition to Plaintiffs' Motion for
    Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 74 of 270

## DECLARATION OF BLAKE GRAHAM

I, BLAKE GRAHAM, declare:

    1.   I am a Special Agent Supervisor for the California Department of Justice, Bureau of Firearms. I make this declaration of my own personal knowledge and experience and, if called as a witness, I could and would testify competently to the truth of the matters set forth herein.

### BACKGROUND AND QUALIFICATIONS

    2.   I received a Bachelor of Science degree in May 1992 in Criminal Justice at the California State University Sacramento. My coursework included forensics, corrections, and a number of classes in criminal justice-related topics.

    3.   Since 1994, I have worked as either an investigator for the California Department of Alcoholic and Beverage Control (ABC), or as a Special Agent for the California Department of Justice (DOJ). My job responsibilities in all of these positions have increasingly required the recovery, investigation, and identification of firearms, the ammunition used for those firearms, and the magazines used for feeding ammunition for such firearms.

    4.   My work as an investigator for ABC between 1994 and 1999 included the recovery of firearms, magazines and ammunition.

    5.   Between 1999 and 2002, I worked as a Special Agent for DOJ, and was assigned to the Violence Suppression Program in the Bureau of Narcotics Enforcement. In this job, I investigated violent crimes and various violations occurring at California gun shows. As a gun show enforcement agent, I attended gun shows in the San Francisco Bay Area to monitor, and if necessary, seize, firearms, ammunition, and magazines sold illegally to felons, parolees, and probationers.

1

ER_2167

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 75 of 270

6.     From October 2002 to the present, I have been a Special Agent and Special Agent Supervisor, for the DOJ's Bureau of Firearms (BOF).  In this capacity, I am assigned to recover firearms from prohibited individuals, monitor gun shows for illegal activities, conduct surveillance on gun dealers suspected of illegal activity, and investigate illegal trafficking of firearms, manufacturing of assault weapons, machine guns, and illegal possession of various magazines and ammunition.

7.     Since 2008, I have been responsible for reviewing handguns that are submitted by manufacturers for inclusion in California's roster of handguns certified for sale.  A copy of the roster can be found on the DOJ website: http://certguns.doj.ca.gov/.

8.     In my career I have attended at least 40 gun shows and have become very knowledgeable on current laws pertaining to the sales of firearms, ammunition, and ammunition containers—including large-capacity magazines (LCMs)—in the State of California.

9.     I have been trained and qualified to carry several different types of firearms, including:  Glock Model 17 (9 mm semi-automatic pistol), multiple Glock .40 caliber semi automatic pistols, Heckler & Koch MP5 (9 mm submachine gun), Smith & Wesson, Model 60 (.38 Special revolver), multiple .45 caliber semi-automatic pistols, and a Colt, Model M4 (5.56 mm machine gun).  I have access to other Department-owned handguns, shotguns, submachine guns, machine guns, rifles, shotguns and 40 mm "less lethal" launchers.

10.    Throughout my career, I have conducted training programs in the identification and handling of firearms.  I have also trained other Special Agents of BOF on assault weapons and firearms identification.   I also have given firearms identification classes to members of the Sacramento and San Joaquin County District Attorney's offices.

2

ER_2168

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 76 of 270

1    11.   I have also completed at least 15 firearms training courses since 1994.
2    These courses included the assembly and use of specific firearms, cartridge
3    composition (bullet, the propellant, and the casing), common calibers used by
4    law enforcement, and training on rifle and handgun ammunition.  I have been
5    certified as a California Peace Officer Standards and Training (POST) approved
6    Firearms Instructor/Rangemaster since 2002.

7    12.   During the course of my career and training I have become proficient in
8    the use and disassembly of various revolvers, pistols, submachine guns, shotguns,
9    and rifles.  I have made or assisted in the arrest of at least thirty persons for
10   violations involving illegal weapons possession.  In the course of my employment I
11   have participated in excess of thirty search warrants which involved the illegal
12   possession of firearms.

13   13.   I have been qualified as an expert witness regarding the use of firearms in
14   14 cases in both federal and state court since 2007.

## FINDINGS

### I.   USE OF LARGE-CAPACITY MAGAZINES IN MASS SHOOTINGS.

14.   Through the course of my work, I am familiar with the use of LCMs.

15.   LCMs are ammunition feeding devices that can hold more than ten
rounds, and sometimes up to 100 rounds, of ammunition.

16.   LCMs allow semi-automatic weapons to fire more than 10 rounds
without the need for a shooter to reload the weapon.

17.   Because LCMs enable a shooter to fire repeatedly without needing to
reload, they significantly increase a shooter's ability to kill and injure large
numbers of people quickly.

18.   Because magazines carrying more than 10 rounds at a time allow for
uninterrupted shooting, such LCMs have been the preferred ammunition feeding
devices in several mass shootings in California and elsewhere.

3

Declaration of Blake Graham in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

ER_2169

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 77 of 270

1    19.   To the best of my knowledge, all of the shootings listed below

2  involved persons who shot and wounded and/or killed one or more persons,

3  including peace officers, while using LCMs.

4         a.   On January 17, 1989, Patrick Purdy, shot and killed 5 and wounded

5  32 others at the Cleveland Elementary School in Stockton, California.  He used an

6  AK-47 style rifle and LCMs in the shooting.

7         b.   On February 28, 1997, Larry Phillips and Emil Matasareanu, armed

8  with multiple assault weapons and LCMs, wounded 20 people, including law

9  enforcement officers, while robbing the Bank of America in North Hollywood,

10  California.

11        c.   On January 9, 2005, Andres Raya used a LCM and illegal assault

12  weapon to shoot and kill Police Sgt. Howard Stevenson in Ceres, California.

13        d.   On June 15, 2008, Marco Topete used an assault rifle and LCM

14  to shoot and kill Yolo County Sheriff's Deputy Tony Diaz after a traffic stop

15  near Dunnigan, California.

16        e.   On November 5, 2009, Nidal Hasan used a semi-automatic pistol

17  and LCMs to shoot and kill 13 and wounded over 30 others at the Fort Hood

18  Army base in Fort Hood, Texas.

19        f.   On February 25, 2010, Ricky Liles, used multiple weapons and

20  LCMs to shoot and kill two law enforcement officers and wounded one other in

21  Minkler, California.

22        g.   January 8, 2011, Jared Loughner used a handgun with a LCM to

23  shoot and kill 6 people and wounded 13 others in Tucson, Arizona.  He was

24  subdued while trying to reload his weapon.

25        h.   On July 20, 2012, James Holmes used an assault weapon and LCMs

26  to kill 12 people and wound 70 others in a movie theater in Aurora, Colorado.

27

28

4

Declaration of Blake Graham in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 78 of 270

1          i.     On December 14, 2012, Adam Lanza used LCMs and multiple

2 firearms to kill 20 children and six adults at Sandy Hook Elementary School in

3 Newtown, Connecticut.

4          j.     On June 7, 2013, John Zawarhi—who was previously denied

5 purchase of a firearm by DOJ—used a home-built AR-15 rifle and LCMs to kill his

6 father and brother at their family home, and then kill and wound others at the Santa

7 Monica, California Community College.

8          k.    On December 2, 2015, Syed Farook and his wife, Tashfeen Malik,

9 used assault weapons and LCMs in killing 14 people and wounding 22 others at the

10 Inland Regional Center in San Bernardino, California.

11         l.     On June 12, 2016, Omar Mateen used an assault rifle and LCMs to

12 shoot and kill 49 people and wound 53 others inside a nightclub in Orlando,

13 Florida.

14         m.   On July 7, 2016, Micah Johnson used an assault rifle and a LCM to

15 shoot and kill five police officers and wound nine others in Dallas, Texas.

16         n.    On July 17, 2016, Gavin Long used an assault rifle and LCMs to

17 shoot and kill three police officers and wound three other officers in Baton Rouge,

18 Louisiana.

19         o.    On October 1, 2017, Stephen Paddock used assault rifles and LCMs

20 to fire over 1,000 rounds on concertgoers at an outdoor music festival in Las Vegas,

21 Nevada, killing 58 people and wounding more than 500 others.  To date, this is the

22 deadliest mass shooting in U.S. history.

23 **II.   LEGISLATION LIMITING LARGE CAPACITY MAGAZINES.**

24     20.  I am also aware of the state and federal laws banning the sale and

25 possession of LCMs, and the effect of these laws on the availability of such

26 magazines in California.

27     21.  From 1994 to 2004, the federal assault weapons ban controlled the

28 manufacture and sales of LCMs in the United States.  During this 10-year window,

5

Declaration of Blake Graham in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

**ER_2171**

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 79 of 270

1   new LCMs were only able to be sold to law enforcement and the military.  Over

2   time, LCMs were removed from public access due to incidental seizure during

3   everyday law enforcement investigations in all 50 states.

4        22.   In 1999, the California Legislature passed Senate Bill No. 23, which

5   restricted the sales, transfer and manufacture of LCMs on a state level.  This bill,

6   which, at the time did not prohibit possession of LCMs, eventually became codified

7   as California Penal Code section 32310.

8        23.   For nearly two decades, since 2000, when California's LCM restrictions

9   went into effect, magazine manufacturers have been producing compliant

10  magazines for sale in California that hold no more than 10 rounds of ammunition,

11  which are widely available in the state and compatible with most, if not all,

12  semiautomatic firearms.

13  III.  REASONS FOR CALIFORNIA'S PROHIBITION ON POSSESSION OF LARGE-
        CAPACITY MAGAZINES.

14

15       24.   Once the Federal restrictions were lifted in late 2004, LCMs became

16  available in states outside California.  This has created in increase in the amount of

17  illegal importation of LCMs in California.

18       25.   Since at least 2002, Agents from the DOJ Bureau of Firearms have

19  conducted investigations in which California residents would travel outside

20  California and purchase or acquire LCMs and then return to California with

21  these illegally imported LCMs.

22       26.   In such cases, these same subjects would also acquire ammunition

23  and firearms that would be smuggled back into California at the same time.

24       27.   Many times these California residents were already prohibited from

25  acquiring, owning and possessing firearms, ammunition and ammunition

26  feeding devices.  Sometimes the traffickers would not be firearms-prohibited

27

28

6

Declaration of Blake Graham in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

ER_2172

1   but they would ultimately still break the law and smuggle back firearms and
2   LCMs despite facing the potential of felony charges should they be caught.

3   28.   The prohibition on sales, but not possession, of LCMs, has also
4   created a market for LCM repair kits.  At numerous California gun shows, prior
5   to 2014, I saw subjects purchase disassembled LCMs being sold as large-
6   capacity magazine repair kits.  Often the repair kits were for weapons that were
7   not even sold prior to the year 2000.

8   29.   Because of the availability of the "repair kits," Special Agents with
9   the Bureau of Firearms could see California residents were either illegally
10  importing LCM or purchasing these repair kits and assembling them into LCMs
11  in violation of Penal Code Section 32310.

12  30.   On October 11, 2013 Governor Brown signed Assembly Bill No. 48,
13  which made it a misdemeanor to knowingly manufacture, import, keep for sale,
14  offer or expose for sale, or give, lend, buy, or receive any LCM conversion kit that
15  is capable of converting an ammunition feeding device into a large-capacity
16  magazine.  The bill also made it a misdemeanor or a felony to buy or receive a
17  large-capacity magazine.  This new law in essence outlawed "repair kits" and the
18  issues associated with them.  Much of AB 48 was codified as Section 32310,
19  subdivisions (a) and (b).

20  31.   Even with the passage of AB 48, BOF Agents do not have the ability
21  to identify whether the LCMs at issue were legally purchased, or are the
22  product of an illegal transfer.  Also, the presence of large numbers of LCMs in
23  the state—even if lawfully owned by law-abiding citizens—increases the
24  potential for criminal theft or illegal trafficking of such magazines.

25  32.   Because of these challenges in identifying legally possessed
26  magazines, as well as use of LCMs in mass shootings that have occurred both in
27  and outside of California for several years, the people of California enacted
28  Proposition 63 in November 2016 to amend Section 32310 to prohibit the

7

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 80 of 270

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-11, Page 81 of 270

1   possession large-capacity magazines.  The State's laws prohibiting possession of

2   large capacity magazines through Proposition 63 ensures the restriction on the use

3   of such magazines in the State.

4         Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the

5   foregoing is true and correct.

6

7   Executed on:  April 5, 2018

8

9

10   BLAKE GRAHAM

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

8

**ER_2174**

1   XAVIER BECERRA
    Attorney General of California
2   State Bar No. 118517
    MARK R. BECKINGTON
3   Supervising Deputy Attorney General
    State Bar No. 126009
4   ANTHONY P. O'BRIEN
    Deputy Attorney General
5   State Bar No. 232650
    JOHN D. ECHEVERRIA
6   Deputy Attorney General
    State Bar No. 268843
7      300 South Spring Street, Suite 1702
       Los Angeles, CA  90013
8      Telephone:  (213) 269-6249
       Fax:  (213) 897-5775
9      E-mail:  John.Echeverria@doj.ca.gov
    *Attorneys for Defendant Attorney General*
10  *Xavier Becerra*

11            IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

| 16 | **VIRGINIA DUNCAN, et al.,** | 17-cv-1017-BEN-JLB |
|----|------------------------------|--------------------|
| 17 | Plaintiffs, | |
| 18 | v. | **DECLARATION OF KEN JAMES IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT** |
| 19 | | |
| 20 | **XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,** | |
| 21 | | |
| 22 | Defendants. | Date:          April 30, 2018<br>Time:          10:30 a.m. |
| 23 | | Courtroom:   5A<br>Judge:        Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

24

25

26

27

28

Decl. of Ken James in Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively,
Partial Summary Judgment (17-cv-1017-BEN-JLB)

# DECLARATION OF KEN JAMES

I, KEN JAMES, declare:

1.    I am a retired law enforcement officer retiring from the Emeryville, California Police Department on June 30, 2015 after forty years of service. I served the last seventeen years of my career as the Chief of Police of the department. During my career I held a wide variety of assignments, including patrol officer, K-9 officer, and general assignment investigator. I rose through the ranks in the Department and served as a patrol and investigations sergeant, Captain of both the Patrol and Professional Services Divisions prior to my appointment as Chief. During my career I investigated and supervised the investigations of various gun related crimes.

2.    I served as the Chair of the California Police Chief's Association's Firearms Committee. The California Police Chiefs Association represents the municipal Chiefs, and their seconds in command, of 332 cities who provide public safety services for over twenty-six million Californians. The Association promotes and advances the science and art of police administration and crime prevention, to develop and disseminate professional administrative practices, and to encourage the adherence of all police officers to high professional standards of conduct in strict compliance with the Law Enforcement Officer's Code of Ethics.

3.    The Association's Firearms Committee is responsible for the formulation and review of the Association's positions on gun violence prevention, including developing and advocating for legislation to reduce and/or prevent gun violence. The Association adopted its initial position paper in 1995 and has updated and revised its position three times since. The initial paper identified six areas, including limiting magazine capacity, that would significantly impact gun violence in California.

1

Decl. of Ken James in Opposition to Plaintiffs' Motion for Summary Judgment or,
Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

ER_2176

1    4.    I also serve as a committee member of the International Association of

2  Chiefs of Police's (IACP) Firearm Committee. The IACP represents over 15,000

3  professional law enforcement administrators worldwide and promotes the best

4  professionals policing practices.  The Firearms Committee advises the IACP's

5  Board of Directors and Executive Board on national firearms issues.

6    5.    The information stated in this declaration is based on my knowledge,

7  training, education, and experience.

8    6.    In my opinion, the existence of high capacity magazines only serves to

9  enhance the killing and injuring potential of a firearm.  I have attended debriefings

10  of several high profile mass shootings, including Columbine, Sandy Hook, Aurora

11  Colorado, San Bernardino, Orlando Nightclub, and the Christopher Dorner

12  shootings in Southern California.  In each of these shootings high capacity

13  magazines were utilized allowing the shooter or shooters to move quickly through

14  an area dispensing a large number of bullets without slowing to reload, resulting in

15  mass casualties.  I have drawn from these reviews that casualties would have been

16  significantly reduced if a shooter needed to slow or stop to reload after ten shots.

17    7.    It is my opinion that possession and use of high capacity magazines by

18  individuals committing criminal acts pose a significant threat to law enforcement

19  personnel and the general public.  I have been involved with and/or supervised the

20  investigation of gun violence crimes in which high capacity magazines were used.

21  For example, in a drive-by shooting in the City of Emeryville, the investigation

22  revealed that in excess of forty casings from two different guns were found at the

23  scene.  The shooting resulted in the death of one individual, but fortunately, no

24  other injuries to individuals at the scene.  Witnesses told officers that the shooting

25  lasted only a matter of seconds.  The number of shots fired resulted in adjacent

26  occupied buildings being struck by stray bullets posing a significant threat to the

27  occupants of those buildings.

28

2

1     8.   Also, it is my opinion that the use of high capacity magazines is not
2 necessary for self-defense. In my professional capacity as a police chief, Chair of
3 the California Police Chiefs Association's Firearms Committee and member of the
4 IACP's Firearms Committee, I have read and viewed news accounts of incidents in
5 which individuals have defended themselves from a criminal attacks and perceived
6 criminal attacks by using a firearm. I have performed these reviews to determine
7 whether a large number of rounds was necessary in those incidents for the victims
8 to defend themselves. I am not aware that in any of the accounts the victims fired
9 in excess of ten shots in their defense.

10     9.   California's restrictions on the sale of high capacity magazines have been
11 in effect since 2000. Therefore, high capacity magazines have not been available
12 for sale in California for nearly two decades. Magazines holding ten rounds or less
13 have been available in the state since 2000.

14     10.  The California Police Chiefs Association, in their initial position paper
15 on gun violence written in 1995 and in subsequent updates, have identified limiting
16 magazine capacities as an appropriate and necessary measure to reduce gun
17 violence. The Association adopted its initial position paper in 1995 and has
18 updated and revised its position three times since. The initial paper identified six
19 areas, including limiting magazine capacity, that would significantly impact gun
20 violence in California. Attached hereto as Exhibit A is a true and correct copy of
21 the Association's position paper adopted in May of 2013. The Association
22 supported legislation that resulted in the current laws regulating magazine capacity.

23
24
25
26
27
28

3

Decl. of Ken James in Opposition to Plaintiffs' Motion for Summary Judgment or,
Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

ER_2178

1    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the
2    foregoing is true and correct.

3

4    Executed on: April 6, 2018

5

6                                          KEN JAMES

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                          4
         Decl. of Ken James in Opposition to Plaintiffs' Motion for Summary Judgment or,
               Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

# EXHIBIT A

**CALIFORNIA POLICE CHIEFS ASSOCIATION**
**POSITION PAPER**

May 31, 2013

**SUBJECT:**   GUN VIOLENCE AND THE REGULATION OF FIREARMS

**INTRODUCTION**

The California Police Chiefs Association has long recognized that gun violence is a threat to the safety and well-being of the communities we serve and the officers committed to the protection of those communities. The Association is dedicated to its leadership role in identifying and implementing strategies to reduce gun violence. The Association's position is that while the right to bear arms is clearly articulated under the Second Amendment, reasonable regulations of firearms protect those rights. It is entirely appropriate to take reasonable steps that ensure responsible ownership while removing firearms from those who are prohibited by law from possessing them or who are intent on threatening the safety of our communities.

California has some of the strictest firearms regulations in the nation. These regulations have served law-abiding Californians well and clearly have not interfered with firearms ownership by responsible Californians. However, regulations prove ineffective unless those who are intent on threatening the safety of our communities are arrested, prosecuted, and sentenced to the fullest extent possible. Additionally, California's regulations are undermined if the ability of our federal law enforcement partners to effectively perform their designed function is restricted.

We cannot escape the fact that many firearm-related deaths and injuries do not occur as a result of intentional criminal misconduct. Far too often, gun related deaths and injuries occur between family, friends, unintended victims, and children. Therefore, it is the Association's position that responsible ownership, which includes safe storage and handling of firearms, is imperative as a means of reducing these tragic incidents.

Gun violence is a complex issue with a multitude of causative factors that must be addressed if we are to be successful in reducing gun violence in our communities. These factors include:

- Examining mental health issues, including how to eliminate the ability of those who are mentally incompetent from purchasing or possessing a firearm.

- Straw Purchases: the purchase of a firearm by someone legally capable for an individual who is prohibited from purchasing or possessing a firearm.

1

- Armed and Prohibited Individuals:  prosecuting and proactively removing firearms and ammunition from individuals who are prohibited from owning and possessing them.

- Universal background checks:  It is estimated that over 40% of all firearm sales occur without background checks. Weapons acquired through such sales are finding their way into the hands of individuals who are prohibited from possessing them or who are intent on affecting the safety of our communities

- Ammunition –The Association recommends the addition of a registration component, similar to the Dealer Record of Sale (DROS), to track ammunition sales. This would assist in the investigation of crimes committed with a firearm, ammunition straw purchases, and purchases by those prohibited from owning or possessing firearms or ammunition.

  **Possession of armor piercing ammunition, which threatens the safety of police officers, should be made illegal.

- Concealed Weapons: the Association advocates that the ability to issue concealed weapons permits should remain at the discretion of the local chief or sheriff.

- High Capacity Magazines: Recognizing that justifiable reasons exist for limiting magazine capacity, we propose that no firearm magazine be lawfully possessed if it has a capacity of more than ten rounds of ammunition.

- The ability of the Federal Bureau of Alcohol, Tobacco, and Firearms (ATF) to track purchases and provide information to local law enforcement agencies across the country should be strengthened.

- Direct the Center for Disease Control (CDC) to conduct research for the purpose of determining the scope of the deaths and injuries which occur as a consequence of firearms.

**CONCLUSION**

The California Police Chiefs Association's position recognizes and supports the Second Amendment and the right of gun ownership provided to law abiding citizens. The Association also recognizes that delving into the mental health aspects of individuals associated with gun violence may conflict with currently enacted health and privacy laws, but if we are to have any impact on reducing gun violence, we must be a strong voice in addressing these issues that threaten the safety of our communities.

2

1   XAVIER BECERRA
    Attorney General of California
2   State Bar No. 118517
    MARK R. BECKINGTON
3   Supervising Deputy Attorney General
    State Bar No. 126009
4   ANTHONY P. O'BRIEN
    Deputy Attorney General
5   State Bar No. 232650
    JOHN D. ECHEVERRIA
6   Deputy Attorney General
    State Bar No. 268843
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013
8    Telephone: (213) 269-6249
     Fax: (213) 897-5775
9    E-mail: John.Echeverria@doj.ca.gov
    *Attorneys for Defendant Attorney General*
10  *Xavier Becerra*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **VIRGINIA DUNCAN, RICHARD**      17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
17  **DAVID MARGUGLIO,**              **DECLARATION OF JOHN D.**
    **CHRISTOPHER WADDELL, and**     **ECHEVERRIA IN SUPPORT OF**
18  **CALIFORNIA RIFLE & PISTOL**    **DEFENDANT'S OPPOSITION TO**
    **ASSOCIATION, INC., a California** **PLAINTIFFS' MOTION FOR**
    **corporation,**                  **SUMMARY JUDGMENT OR,**
19                                    **ALTERNATIVELY, PARTIAL**
                                      **SUMMARY JUDGMENT;**
20                       Plaintiffs,  **EXHIBITS 1-3**

21       v.                           Date:        April 30, 2018
                                      Time:        10:30 a.m.
22  **XAVIER BECERRA, in his official** Judge:      Hon. Roger T. Benitez
    **capacity as Attorney General of the** Courtroom: 5A
23  **State of California; and DOES 1-10,** Action Filed: May 17, 2017

24                       Defendant.

25

26

27

28

    Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
    Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

1      **DECLARATION OF JOHN D. ECHEVERRIA**

2   I, John D. Echeverria, declare:

3      1.     I am a Deputy Attorney General with the California Department of

4   Justice and serve as counsel to Defendant Xavier Becerra, Attorney General of the

5   State of California ("Defendant"), in the above-captioned matter.

6      2.     Except as otherwise stated, I have personal knowledge of the facts set

7   forth in this declaration, and if called upon as a witness I could testify competently

8   as to those facts. I make this declaration in support of Defendant's Opposition to

9   Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary

10   Judgment.

11      3.     On October 6, 2017, Defendant served Plaintiffs with the Expert

12   Report of Lucy P. Allen. A true and correct copy of the Expert Report of Lucy P.

13   Allen is attached as **Exhibit 1**.

14      4.     On November 3, 2017, Defendant served Plaintiffs with the Expert

15   Rebuttal Report of John J. Donohue. A true and correct copy of the Expert Rebuttal

16   Report of John J. Donohue is attached as **Exhibit 2**.

17      5.     On January 9, 2018, Defendant served Plaintiffs with the Revised

18   Expert Report of Dr. Louis J. Klarevas. A true and correct copy of the Revised

19   Expert Report of Dr. Louis J. Klarevas is attached as **Exhibit 3**.

20      6.     On October 6, 2017, Defendant served Plaintiffs with the Expert

21   Report of Christopher S. Koper. A true and correct copy of the Expert Report of

22   Christopher S. Koper is attached as **Exhibit 4**.

23      7.     On December 18, 2017, Defendant deposed Plaintiffs' expert, Stephen

24   Helsley. A true and correct copy of relevant excerpts of the Reporter's Transcript

25   of the Deposition of Stephen Helsley is attached as **Exhibit 5**.

26      8.     On December 19, 2017, Plaintiffs deposed Defendant's witness, Blake

27   Graham. A true and correct copy of relevant excerpts of the Reporter's Transcript

28   of the Deposition of Blake Graham is attached as **Exhibit 6**.

1

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

1      9.    On January 2, 2018, and continuing on January 4, 2018, Defendant

2   deposed Plaintiffs' expert, Carlisle Moody. A true and correct copy of relevant

3   excerpts of the Reporter's Transcript of the Deposition of Carlisle Moody is

4   attached as **Exhibit 7**.

5      10.   On January 3, 2018, Defendant deposed Plaintiffs' expert, Gary Kleck.

6   A true and correct copy of relevant excerpts of the Reporter's Transcript of the

7   Deposition of Gary Kleck is attached as **Exhibit 8**.

8      11.   On January 5, 2018, Plaintiffs deposed Defendant's expert,

9   Christopher S. Koper. A true and correct copy of relevant excerpts of the

10   Reporter's Transcript of the Deposition of Christopher S. Koper is attached as

11   **Exhibit 9**.

12      12.   On January 18, 2018, Plaintiffs deposed Defendant's expert, Lucy P.

13   Allen. A true and correct copy of relevant excerpts of the Reporter's Transcript of

14   the Deposition of Lucy P. Allen and Deposition Exhibit 7 are attached as **Exhibit**

15   **10**.

16      13.   On January 19, 2018, Plaintiffs deposed Defendant's expert, Louis

17   Klarevas. A true and correct copy of relevant excerpts of the Reporter's Transcript

18   of the Deposition of Louis Klarevas is attached as **Exhibit 11**.

19      14.   A true and correct copy of Dep't of the Treasury, Bureau of Alcohol,

20   Tobacco, and Firearms (ATF), *Recommendation on the Importability of Certain*

21   *Semiautomatic Rifles* (1989) is attached as **Exhibit 12**.

22      15.   A true and correct copy of Dep't of the Treasury, Bureau of Alcohol,

23   Tobacco, and Firearms (ATF), *Study on the Sporting Suitability of Modified*

24   *Semiautomatic Assault Rifles* (1998) is attached as **Exhibit 13**.

25      16.   A true and correct copy of Sen. Bill No. 1446, 3d Reading Analysis,

26   Mar. 28, 2016 (2015-2016 Reg. Sess.) (Cal. 2016) is attached as **Exhibit 14**.

27      17.   A true and correct copy of Prepared Testimony by Laurence H. Tribe,

28   *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting*

2

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

1   *the Second Amendment: Hearing Before the Subcomm. on the Constitution, Civil*

2   *Rights and Human Rights, S. Comm. on the Judiciary* (Feb. 12, 2013) is attached as

3   **Exhibit 15.**

4       18.   A true and correct copy of Mark Follman, et al., *U.S. Mass Shootings,*

5   *1982-2018: Data from Mother Jones' Investigation* (Mother Jones, 2018), *available*

6   *at* https://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-

7   full-data/, is attached as **Exhibit 16.**  This data was accessed and downloaded as an

8   Microsoft Excel file on April 9, 2018.  The columns of the spreadsheet have been

9   expanded for readability.

10       19.   A true and correct copy of Mayors Against Illegal Guns, *Analysis of*

11   *Recent Mass Shootings* (2013) is attached as **Exhibit 17.**

12       20.   A true and correct copy of the Declaration of Professor Daniel Webster

13   in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for

14   Preliminary Injunction (June 5, 2017) (Dkt. No. 15) is attached as **Exhibit 18.**

15       21.   A true and correct copy of Larry Buchanan, et al., *Nine Rounds a*

16   *Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster*, N.Y. Times,

17   Oct. 5 2017, *available at*

18   https://www.nytimes.com/interactive/2017/10/02/us/vegas-guns.html, is attached as

19   **Exhibit 19.**

20       22.   A true and correct copy of Violence Policy Center, *High-Capacity*

21   *Ammunition Magazines are the Common Thread Running Through Most Mass*

22   *Shootings in the United States* (2018), *available at*

23   www.vpc.org/fact_sht/VPCshootinglist.pdf, is attached as **Exhibit 20.**

24       23.   A true and correct copy of Alex Yablon, *Bans on High-Capacity*

25   *Magazines, Not Assault Rifles, Most Likely to Limit Shooting Carnage*, The Trace,

26   June 13, 2016, *available at* https://www.thetrace.org/2016/06/high-capacity-

27   magazines-orlando-shooting/, is attached as **Exhibit 21.**

28

3

1        24.    A true and correct copy of State of Connecticut, Division of Criminal

2    Justice, *Report of the State's Attorney for the Judicial District of Danbury on the*

3    *Shootings at Sandy Hook Elementary School* (2013) is attached as **Exhibit 22**.

4        25.    A true and correct copy of Mark Follman, *More Guns, More Mass*

5    *Shootings—Coincidence?*, Mother Jones, Dec. 15, 2012, *available at*

6    https://www.motherjones.com/politics/2012/09/mass-shootings-investigation/, is

7    attached as **Exhibit 23**.

8        26.    A true and correct copy of relevant excerpts from Louis Klarevas,

9    Rampage Nation:  Securing America from Mass Shootings (2016) is attached as

10    **Exhibit 24**.

11        27.    A true and correct copy of relevant excerpts from Robert J. Spitzer,

12    *Gun Law History in the United States and Second Amendment Rights*, 80 Law &

13    Contemporary Problems 55 (2017), *available at*

14    http://scholarship.law.duke.edu/lcp/vol80/iss2/3, is attached as **Exhibit 25**.

15        28.    A true and correct copy of H.R. Rep. No. 103-489 (1994), 1994 WL

16    168883, *reprinted in* 1994 U.S.C.C.A.N. 1820, is attached as **Exhibit 26**.

17        29.    A true and correct copy of The Safety for All Act of 2016, 2016 Cal.

18    Legis. Serv. Proposition 63 (West), is attached as **Exhibit 27**.

19        30.    A true and correct copy of Sandy Hook Advisory Comm'n, *Final*

20    *Report of the Sandy Hook Advisory Commission* (2015) is attached as **Exhibit 28**.

21        31.    A true and correct copy of *LAPD Chief Backs Ban on Some Ammo*

22    *Magazines*, NBC So. Cal., Mar. 2, 2011, *available at*

23    https://www.nbclosangeles.com/news/local/beck-lapd-ammunition-ban-nra-

24    117261943.html, is attached as **Exhibit 29**.

25        32.    A true and correct copy of C. S. Koper & D. C. Reedy, *Impact of*

26    *Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults*

27    *Involving Semiautomatic Pistols and Revolvers*, 9 Injury Prevention 151 (2003) is

28    attached as **Exhibit 30**.

4

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

ER_2187

1      33.    A true and correct copy of Brady Center to Prevent Gun Violence,
2  Assault Weapons: 'Mass Produced Mayhem' (2008) is attached as **Exhibit 31**.
3      34.    A true and correct copy of the Testimony of Brian J. Siebel, Senior
4  Attorney, Brady Center to Prevent Gun Violence, Before the Council of the District
5  of Columbia (Oct. 1, 2008) is attached as **Exhibit 32**.
6      35.    A true and correct copy of Christopher S. Koper et al., *Gunshot*
7  *Victimisations Resulting from High-Volume Gunfire Incidents in*
8  *Minneapolis: Findings and Policy Implications*, Injury Prevention, Feb. 24, 2018,
9  http://injuryprevention.bmj.com/content/early/2018/02/24/injuryprev-2017-042635,
10 is attached as **Exhibit 33**.
11     36.    A true and correct copy of Nat. Law Enforcement P'ship to Prevent
12 Gun Violence, Protecting Communities from Assault Weapons and High-capacity
13 Ammunition Magazines (2017) is attached as **Exhibit 34**.
14     37.    A true and correct copy of the Declaration of San Francisco Police
15 Department Officer Joseph Emanuel in Support of Plantiff's Ex Parte Application
16 for Order to Show Cause Re: Preliminary Injunction, *People v. Badger Mountain*
17 *Supply, et al.*, No. CGC-17-557010 (S.F. Super. Feb. 21, 2017), is attached as
18 **Exhibit 35**.  This declaration was submitted as Appendix B to the brief of Amici
19 Curiae City and County of San Francisco, the City of Los Angeles, and the City of
20 Sunnyvale in *Duncan v. Becerra*, 9th Cir. No. 17-56081 (9th Cir. Oct. 19, 2017)
21 (ECF No. 29).
22     38.    A true and correct copy of the Declaration of Detective Michael
23 Mersereau of the Los Angeles Police Department in Support of Amici Curiae the
24 City and County of San Francisco, the City of Los Angeles, and the City of
25 Sunnyvale, *Duncan v. Becerra*, 9th Cir. No. 17-56081 (9th Cir. Oct. 19, 2017), is
26 attached as **Exhibit 36**.  This declaration was submitted as Appendix K to the brief
27 of Amici Curiae City and County of San Francisco, the City of Los Angeles, and
28

5

1  the City of Sunnyvale in *Duncan v. Becerra*, 9th Cir. No. 17-56081 (9th Cir. Oct.
2  19, 2017) (ECF No. 29).

3      39.    A true and correct copy of Mark Follman, et al., *A Guide to Mass*
4  *Shootings in America*, Mother Jones (last updated Mar. 10, 2018, 9:00 AM),
5  *available at* https://www.motherjones.com/politics/2012/07/mass-shootings-map/,
6  is attached as **Exhibit 37**.

7      40.    A true and correct copy of David S. Fallis & James V. Grimaldi, *Va.*
8  *Data Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan.
9  23, 2011, *available at* http://www.washingtonpost.com/wp-
10 dyn/content/article/2011/01/22/AR2011012203452.html, is attached as **Exhibit 38**.

11     41.    A true and correct copy of David S. Fallis, *Data Indicate Drop in*
12 *High-Capacity Magazines During Federal Gun Ban*, Wash. Post, Jan. 10, 2013,
13 *available at* https://www.washingtonpost.com/investigations/data-point-to-drop-in-
14 high-capacity-magazines-during-federal-gun-ban/2013/01/10/d56d3bb6-4b91-
15 11e2-a6a6-aabac85e8036_story.html?utm_term=.a7d9831fe6dd, is attached as
16 **Exhibit 39**.

17     42.    A true and correct copy of relevant excerpts from Gary Kleck, Point
18 Blank: Guns and Violence in America (1991) is attached as **Exhibit 40**.

19     43.    A true and correct copy of Claude Werner, *The Armed Citizen -*
20 *Analysis of Five Years of Armed Encounters*, GunsSaveLives.com (Mar. 12, 2012),
21 *available at* http://gunssavelives.net/self-defense/analysis-of-five-years-of-armed-
22 encounters-with-data-tables/, is attached as **Exhibit 41**.

23     44.    A true and correct copy of California Voter Information Guide,
24 Firearms. Ammunition Sales. Initiative Statute. California Proposition 63 (2016),
25 *available at* http://repository.uchastings.edu/ca_ballot_props/1356, is attached as
26 **Exhibit 42**.

27     45.    A true and correct copy of Larry Buchanan, et al., *How They Got Their*
28 *Guns*, N.Y. Times, Nov. 5, 2017), *available at*

6

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

ER_2189

1  https://www.nytimes.com/interactive/2015/10/03/us/how-mass-shooters-got-their-
2  guns.html, is attached as **Exhibit 43**.
3      I declare under penalty of perjury under the laws of the United States of
4  America that the foregoing is true and correct.
5      Executed on April 9, 2018, at Los Angeles, California.
6
7                          /s/ John D. Echeverria
8                          John D. Echeverria
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

                                    7

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

**EXHIBITS**
**TABLE OF CONTENTS**

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 1 | Expert Report of Lucy P. Allen | 00001-00033 |
| 2 | Expert Rebuttal Report of John J. Donohue | 00034-00072 |
| 3 | Revised Expert Report of Louis J. Klarevas | 00073-00120 |
| 4 | Expert Report of Christopher S. Koper | 00121-00433 |
| 5 | Transcript of Deposition of Stephen Helsley (Excerpts) | 00434-00456 |
| 6 | Transcript of Deposition of Blake Graham, (Excerpts) | 00457-00463 |
| 7 | Transcript of Deposition of Carlisle Moody (Excerpts) | 00464-00480 |
| 8 | Transcript of Deposition of Gary Kleck (Excerpts) | 00481-00492 |
| 9 | Transcript of Deposition of Christopher S. Koper (Excerpts) | 00493-00501 |
| 10 | Transcript of Deposition of Lucy P. Allen (Excerpts & Ex. 7) | 00502-00518 |
| 11 | Transcript of Deposition of Louis J. Klarevas (Excerpts) | 00519-00533 |
| 12 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF), *Recommendation on the Importability of Certain Semiautomatic Rifles* (1989) | 00534-00553 |
| 13 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF), *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (1998) | 00554-00680 |
| 14 | Sen. Bill No. 1446, 3d Reading Analysis, Mar. 28, 2016 (2015-2016 Reg. Sess.) (Cal. 2016) | 00681-00684 |

8

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

ER_2191

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 15 | Prepared Testimony by Laurence H. Tribe, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment: Hearing Before the Subcomm. on the Constitution, Civil Rights and Human Rights, S. Comm. on the Judiciary* (Feb. 12, 2013) Rights, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment* (2013). | 00685-00721 |
| 16 | Mark Follman, et al., *U.S. Mass Shootings, 1982-2018: Data from Mother Jones' Investigation* (Mother Jones, 2018) | 00722-00736 |
| 17 | Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (2013) | 00737-00772 |
| 18 | Declaration of Professor Daniel Webster in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for Preliminary Injunction (June 5, 2017) (Dkt. No. 15) | 00773-00792 |
| 19 | Larry Buchanan, et al., *Nine Rounds a Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster*, N.Y. Times, Oct. 5 2017 | 00793-00797 |
| 20 | Violence Policy Center, *High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States* (2018) | 00798-00807 |
| 21 | Alex Yablon, *Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Shooting Carnage*, The Trace, June 13, 2016 | 00808-00811 |
| 22 | State of Connecticut, Division of Criminal Justice, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School* (2013) | 00812-00860 |

9

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 23 | Mark Follman, *More Guns, More Mass Shootings—Coincidence?*, Mother Jones, Dec. 15, 2012 | 00861-00867 |
| 24 | Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016) (Excerpts) | 00868-00898 |
| 25 | Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) | 00899-00904 |
| 26 | H.R. Rep. No. 103-489 (1994) | 00905-00981 |
| 27 | The Safety for All Act of 2016, 2016 Cal. Legis. Serv. Proposition 63 (West) | 00982-01011 |
| 28 | Sandy Hook Advisory Comm'n, *Final Report of the Sandy Hook Advisory Commission* (2015) | 01012-01289 |
| 29 | *LAPD Chief Backs Ban on Some Ammo Magazines*, NBC So. Cal., Mar. 2, 2011 | 01290-01294 |
| 30 | C. S. Koper & D. C. Reedy, *Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers*, 9 Injury Prevention 151 (2003) | 01295-01300 |
| 31 | Brady Center to Prevent Gun Violence, Assault Weapons: 'Mass Produced Mayhem' (2008) | 01301-01364 |
| 32 | Testimony of Brian J. Siebel, Senior Attorney, Brady Center to Prevent Gun Violence, Before the Council of the District of Columbia (Oct. 1, 2008) | 01365-01372 |
| 33 | Christopher S. Koper et al., *Gunshot Victimisations Resulting from High-Volume Gunfire Incidents in Minneapolis: Findings and Policy Implications*, Injury Prevention, Feb. 24, 2018 | 01373-01377 |

10

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 34 | Nat. Law Enforcement P'ship to Prevent Gun Violence, Protecting Communities from Assault Weapons and High-capacity Ammunition Magazines (2017) | 01378-01382 |
| 35 | Declaration of San Francisco Police Department Officer Joseph Emanuel in Support of Plantiff's Ex Parte Application for Order to Show Cause Re: Preliminary Injunction, *People v. Badger Mountain Supply, et al.*, No. CGC-17-557010 (S.F. Super. Feb. 21, 2017) | 01383-01402 |
| 36 | Declaration of Detective Michael Mersereau of the Los Angeles Police Department in Support of Amici Curiae the City and County of San Francisco, the City of Los Angeles, and the City of Sunnyvale, *Duncan v. Becerra*, 9th Cir. No. 17-56081 (9th Cir. Oct. 19, 2017) | 01403-01412 |
| 37 | Mark Follman, et al., *A Guide to Mass Shootings in America*, Mother Jones (last updated Mar. 10, 2018, 9:00 AM) | 01413-01417 |
| 38 | David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23, 2011 | 01418-01422 |
| 39 | David S. Fallis, *Data Indicate Drop in High-Capacity Magazines During Federal Gun Ban*, Wash. Post, Jan. 10, 2013 | 01423-01427 |
| 40 | Gary Kleck, Point Blank: Guns and Violence in America (1991) (Excerpts) | 01428-01437 |
| 41 | Claude Werner, *The Armed Citizen - Analysis of Five Years of Armed Encounters*, GunsSaveLives.com (Mar. 12, 2012) | 001438-01445 |

11

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 42 | California Voter Information Guide, Firearms. Ammunition Sales. Initiative Statute. California Proposition 63 (2016) | 01446-01469 |
| 43 | Larry Buchanan, et al., *How They Got Their Guns*, N.Y. Times, Nov. 5, 2017) | 01470-01478 |

12

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

XAVIER BECERRA
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney General
NELSON R. RICHARDS
ANTHONY P. O'BRIEN
Deputy Attorneys General
ALEXANDRA ROBERT GORDON
Deputy Attorney General
 State Bar No. 207650
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-5509
 Fax: (415) 703-5480
 E-mail: Alexandra.RobertGordon@doj.ca.gov
*Attorneys for Defendant*
*Attorney General Xavier Becerra*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10, <br><br> Defendants. | 17-cv-1017-BEN-JLB <br><br> **EXPERT REPORT OF LUCY P. ALLEN** <br><br> Judge: Hon. Roger T. Benitez <br> Action Filed: May 17, 2017 |

Exhibit 1
Page 00002

## TABLE OF CONTENTS

I.   Scope of Assignment ....................................................................................1

II.  Qualifications and Remuneration .................................................................1
     A. Qualifications................................................................................................1
     B. Remuneration................................................................................................2

III. Materials Considered ....................................................................................2

IV.  Findings.........................................................................................................5
     A. Number of rounds fired by individuals in self-defense ................................5
     B. Mass shootings............................................................................................13
        1. Use of large-capacity magazines in mass shootings.............................13
        2. Casualties in mass shootings with large-capacity magazine guns compared
           with other mass shootings...................................................................14
        3. Percent of mass shooters' guns legally obtained .................................15
     C. Rate in California that victims use a firearm in self-defense in the home ..................15

## I.   SCOPE OF ASSIGNMENT

1.   I have been asked by the Office of the Attorney General of California to address the following issues: (a) the number of rounds of ammunition fired by individuals using a gun in self-defense; (b) weapons used in mass shootings; and (c) the rate at which firearms are used in California for self-defense in a home.

## II.   QUALIFICATIONS AND REMUNERATION

### A. Qualifications

2.   I am a Managing Director of NERA Economic Consulting ("NERA"), a member of NERA's Securities and Finance Practice and Chair of NERA's Product Liability and Mass Torts Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide.

3.   In my over 20 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving economic and statistical analysis. I have been qualified as an expert and testified in court on various economic and statistical issues relating to the flow of guns into the criminal market. I have testified at trials in Federal District Court, before the New York City Council Public Safety Committee, the American Arbitration Association and the Judicial Arbitration Mediation Service, as well as in depositions.

4.   I have an A.B. from Stanford University, an M.B.A. from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers. My resume with recent publications and testifying experience is included as Appendix A.

1
Exhibit 1
Page 00004

**B. Remuneration**

5.     NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $850 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## III.   MATERIALS CONSIDERED

6.   In preparing this report, I considered the following materials:

a)   Complaint for Declaratory and Injunctive Relief, dated May 17, 2017 ("Complaint");

b)   Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Preliminary Injunction, dated May 26, 2017;

c)   Attorney General's Opposition to Plaintiffs' Motion for Preliminary Injunction, dated June 5, 2017;

d)   Plaintiffs' Objections to Defendant's Evidence in Support of Opposition to Motion for Preliminary Injunction, dated June 9, 2017;

e)   Order Granting Preliminary Injunction, dated June 29, 2017;

f)   Declaration of Massad Ayoob in Support of Plaintiffs' Motion for Preliminary Injunction, dated May 26, 2017;

g)   Declaration of Stephen Helsley in Support of Plaintiffs' Motion for Preliminary Injunction, dated May 26, 2017;

h)   Declaration of Gary Kleck in Support of Plaintiffs' Motion for Preliminary Injunction, dated May 26, 2017;

i)   Supplemental Declaration of Gary Kleck in Support of Plaintiffs' Motion for Preliminary Injunction, dated June 9, 2017;

j)   Declaration of Professor John J. Donohue in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for Preliminary Injunction, dated June 5, 2017;

k) Declaration of Professor Blake Graham in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for Preliminary Injunction, dated June 5, 2017;

l) Declaration of Professor Daniel W. Webster in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for Preliminary Injunction, dated June 5, 2017;

m) NRA Institute for Legislative Action, Armed Citizen Stories, https://www.nraila.org/gun-laws/armed-citizen.aspx, last accessed May 28, 2017, and supporting news stories for the incidents obtained through Factiva and Google searches;

n) Claude Werner, "The Armed Citizen – A Five Year Analysis," http://gunssaveslives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables, accessed January 10, 2014;

o) News stories on incidents of self-defense with a firearm in the home from Factiva between January 2011 and May 2017;

p) Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302;

q) Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980);

r) Mother Jones: "US Mass Shootings, 1982-2017: Data From Mother Jones' Investigation," updated October 2, 2017, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data, accessed October 2, 2017; "A Guide to Mass Shootings in America," updated October 2, 2017, http://www.motherjones.com/politics/2012/07/mass-shootings-map, accessed October 2, 2017; "What Exactly is a Mass Shooting," *Mother Jones*, August 14, 2012, http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting. Additional details for the mass shootings obtained through Factiva and Google searches;

s) Citizens Crime Commission of New York City: "Mayhem Multiplied: Mass Shooters and Assault Weapons," 2016, http://www.nycrimecommission.org/pdfs/CCC-MayhemMultiplied-June2016.pdf; "Mass Shooting Incidents in America (1984-2012)," http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017. Additional details for the mass shootings obtained through Factiva and Google searches;

t) Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016);

u) "Analysis of Recent Mass Shootings," *Mayors Against Illegal Guns*, September 2013;

v) "Crime in California 2016," *California Department of Justice: Criminal Justice Statistics Center*;

w) "Firearm Violence, 1993-2011," *U.S. Department of Justice: Bureau of Justice Statistics*, May 2013;

x) Federal Emergency Management Agency (FEMA): U.S. Fire Administration, *Residential and nonresidential building fire and fire loss estimates by property use and cause (2003-2015)*, https://www.usfa.fema.gov/data/statistics/, accessed September 28, 2017;

y) U.S. Census Bureau, *State Population Totals Tables: 2010-2016*, https://www.census.gov/data/tables/2016/demo/popest/state-total.html, accessed September 28, 2017;

z) Centers for Disease Control and Prevention (CDC): National Center for Health Statistics, *Injury Mortality: United States*, https://data.cdc.gov/NCHS/NCHS-Injury-Mortality-United-States/nt65-c7a7, accessed September 28, 2017;

aa) National Weather Service, *How Dangerous is Lightning?* http://www.lightningsafety.noaa.gov/odds.shtml, accessed September 28, 2017.

## IV.  FINDINGS

### A. Number of rounds fired by individuals in self-defense

7.     Plaintiffs claim the banned "large-capacity magazines" (which are magazines capable of holding more than ten rounds) are commonly used in the home for self-defense. In particular, the Complaint claims, "There is little dispute that magazines having a capacity over 10 rounds are popular for self-defense purposes. [...] Each available round is an additional opportunity to end a threat. That is precisely why millions of Americans choose magazines over ten rounds for self-defense, including in the home."[1]

8.     Analysis of data from the NRA Institute for Legislative Action, as well as my own study of news reports on incidents of self-defense with a firearm, indicates that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds. The NRA maintains a database of "Armed Citizen" stories describing private citizens who have successfully defended themselves, or others, using a firearm ("NRA Armed Citizen database"). According to the NRA, the "Armed Citizen" stories "highlight accounts of law-abiding gun owners in America using their Second Amendment rights to defend self, home and family."[2] Although the methodology used to compile the NRA Armed Citizen database of stories is not explicitly detailed by the NRA, and the database itself is not readily replicable, the NRA Armed Citizen database was the largest collection of accounts of citizen self-defense compiled by others that I was able to find. In light of the positions taken by the entity compiling the data, I would expect that any selection bias would be in favor of stories that put use of guns in self-defense in the best possible light. In addition to analyzing incidents in the NRA Armed Citizen database (2011 through May 2017), I performed my own systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, covering the same time period.

9.     My team and I performed an analysis of incidents in the NRA Armed Citizen database that occurred between January 2011 and May 2017. For each incident, the city/county, state, venue (whether the incident occurred on the street, in the home, or elsewhere) and the

---

[1]   Complaint at 47.

[2]   NRA Institute for Legislative Action, Armed Citizens, https://www.nraila.org/gun-laws/armed-citizen/, last accessed May 28, 2017.

number of shots fired were tabulated.[3] The information was gathered for each incident from both the NRA synopsis and, where available, an additional news story. An additional news story was found for over 95% of the incidents in the NRA Armed Citizen database.

10.     According to this analysis of incidents in the NRA Armed Citizen database, defenders fired 2.2 shots on average. Out of 736 incidents, there were two incidents (0.3% of all incidents), in which the defender was reported to have fired more than 10 bullets. In 18.2% of incidents, the defender did not fire any shots, and simply threatened the offender with a gun. For incidents occurring in the home (56% of total), defenders fired an average of 2.1 shots, and fired no shots in 16.1% of incidents.[4] The table below summarizes these findings:

---

[3]     The following incidents were excluded from the analysis: (1) duplicate incidents, (2) wild animal attacks, and (3) one incident where the supposed victim later pleaded guilty to covering up a murder. When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

[4]     A separate study of incidents in the NRA Armed Citizen database for an earlier period (the five year period from 1997 through 2001) found similar results. Specifically, this study found that, on average, 2.2 shots were fired by defenders and that in 28% of incidents of armed citizens defending themselves the individuals fired no shots at all. *See* Claude Werner, "The Armed Citizen -- A Five Year Analysis," http://gunsaveslives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables, accessed January 10, 2014.

### Number of Shots Fired in Self-Defense
### Based on NRA Armed Citizen Incidents in the United States
### January 2011 - May 2017

| | Shots Fired by Individual in Self-Defense | |
| --- | --- | --- |
| | Overall | Incidents in Home |
| Average Number of Shots Fired | 2.2 | 2.1 |
| Number of Incidents with No Shots Fired | 134 | 66 |
| Percent of Incidents with No Shots Fired | 18.2% | 16.1% |
| Number of Incidents with >10 Shots Fired | 2 | 2 |
| Percent of Incidents with >10 Shots Fired | 0.3% | 0.5% |

**Notes and Sources:**
Data from NRA Armed Citizen database covering 736 incidents (of which 411 were in the home) from January 2011 through May 2017. Excludes duplicate incidents, wild animal attacks and one incident where the supposed victim later pleaded guilty to covering up a murder.

11.     We also performed the same analysis of the NRA Armed Citizen database limited to incidents that occurred in the state of California. According to this analysis, defenders in California fired 2.0 shots on average. Out of 47 incidents, there were no incidents in which the defender was reported to have fired more than 10 bullets. In 27.7% of incidents, the defender did not fire any shots, and simply threatened the offender with a gun. For incidents occurring in the home (60% of total), defenders fired an average of 1.9 shots, and fired no shots in 32.1% of incidents. The table below summarizes these findings for California:

### Number of Shots Fired in Self-Defense
### Based on NRA Armed Citizen Incidents in California
### January 2011 - May 2017

|  | Shots Fired by Individual in Self-Defense | |
|---|---|---|
|  | Overall | Incidents in Home |
| Average Number of Shots Fired | 2.0 | 1.9 |
| Number of Incidents with No Shots Fired | 13 | 9 |
| Percent of Incidents with No Shots Fired | 27.7% | 32.1% |
| Number of Incidents with >10 Shots Fired | 0 | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% | 0.0% |

**Notes and Sources:**
Data from NRA Armed Citizen database covering 47 incidents in California (of which 28 were in the home) January 2011 through May 2017. Excludes duplicate incidents and wild animal attacks.

12.     In addition to our analysis of incidents in the NRA Armed Citizen database, we performed a systematic, scientific study of news reports on incidents of self-defense with a firearm in the home, covering the same time period used in our analysis of the NRA Armed Citizen database.

13.     To identify relevant news stories to include in our analysis, we performed a comprehensive search of published news stories using Factiva, an online news reporting service and archive owned by Dow Jones, Inc. that aggregates news content from nearly 33,000 sources. The search covered the same period used in our analysis of incidents in the NRA Armed Citizen database (January 2011 to May 2017). The search identified all stories that contained the following keywords in the headline or lead paragraph: one or more words from "gun," "shot," "shoot," "fire," or "arm" (including variations on these keywords, such as "shooting" or "armed"), plus one or more words from "broke in," "break in," "broken into," "breaking into," "burglar," "intruder," or "invader" (including variations on these keywords) and one or more

words from "home," "apartment," or "property" (including variations on these keywords).[5] The region for the Factiva search was set to "United States." The search returned approximately 35,000 stories for the period January 2011 to May 2017.[6]

14.     Using a random number generator, a random sample of 200 stories was selected for each calendar year, yielding 1,400 stories in total.[7] These 1,400 stories were reviewed to identify those stories that were relevant to the analysis, *i.e.*, incidents of self-defense with a firearm in or near the home. This methodology yielded a random selection of 200 news stories describing incidents of self-defense with a firearm in the home out of a population of approximately 4,800 relevant stories. Thus, we found that out of the over 70 million news stories aggregated by Factiva between January 2011 and May 2017, approximately 4,800 news stories were on incidents of self-defense with a firearm in the home. We analyzed a random selection of 200 of these stories.

15.     For each news story, the city/county, state and number of shots fired were tabulated. When tabulating the number of shots fired, we used the same methodology as that used to analyze stories in the NRA Armed Citizen database.[8] We then identified other stories describing the same incident on Factiva based on the date, location and other identifying information, and recorded the number of times that each incident was covered by Factiva news stories.

16.     According to our study of a random selection from approximately 4,800 relevant stories on Factiva describing incidents of self-defense with a firearm in the home, the average number of shots fired per story was 2.61. This is not a measure of the average shots fired *per*

---

[5]    The precise search string used was: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"). An asterisk denotes a wildcard, meaning the search includes words which have any letters in place of the asterisk. For example, a search for shoot* would return results including "shoots," "shooter" and "shooting." The search excluded duplicate stories classified as "similar" on Factiva.

[6]    We compared a sample of stories in the NRA Armed Citizen database to the Factiva search and found that the Factiva search contained all of the NRA stories with the exception of those published by sources not tracked by Factiva.

[7]    The random numbers were generated by sampling with replacement.

[8]    When the exact number of shots fired was not specified, we used the average for the most relevant incidents with known number of shots. For example, if the story stated that "shots were fired" this would indicate that at least two shots were fired and thus we used the average number of shots fired in all incidents in which two or more shots were fired and the number of shots was specified.

*incident*, however, because the number of stories covering an incident varies, and the variation is not independent of the number of shots fired. We found that there was a statistically significant relationship between the number of shots fired in an incident and the number of news stories covering an incident.[9] We found that on average the more shots fired in a defensive gun use incident, the greater the number of stories covering an incident. For example, as shown in the table below, we found that incidents in Factiva news stories with zero shots fired were covered on average by 1.8 news stories, while incidents with six or more shots fired were covered on average by 10.4 different news stories.

### Average Number of News Stories by Number of Shots Fired In Factiva Stories on Incidents of Self-Defense with a Firearm January 2011 - May 2017

| Number of Shots Fired By Defender | Average Number of News Stories |
|---|---|
| 0 | 1.8 |
| 1 to 2 | 2.8 |
| 3 to 5 | 3.8 |
| 6 or more | 10.4 |

Notes and Sources:
Based on news stories describing defensive gun use in a random selection of Factiva stories between 2011 and May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 8.

---

[9] Based on a linear regression of the number of news stories as a function of the number of shots fired, the results were statistically significant at the 1% level (more stringent than the 5% level commonly used by academics and accepted by courts. *See* for example, Freedman, David A., and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Fisher, Franklin M., "Multiple Regression in Legal Proceedings," 80 *Columbia Law Review* 702 (1980).)

Exhibit 1
Page 00013

ER_2207

17.     After adjusting for this disparity in news coverage, we find that the average number of shots fired per incident covered is 2.34.[10] Note that this adjustment does not take into account the fact that some defensive gun use incidents may not be picked up by *any* news story. Given the observed relationship that there are more news stories when there are more shots fired, one would expect that the incidents that are not written about would on average have fewer shots than those with news stories. Therefore, the expectation is that these results, even after the adjustment, are biased upward (*i.e.*, estimating too high an average number of shots and underestimating the percent of incidents in which no shots were fired).

18.     As shown in the table below, according to the study of Factiva news stories, in 11.6% of incidents the defender did not fire any shots, and simply threatened the offender with a gun. In 97.3% of incidents the defender fired 5 or fewer shots. There were no incidents where the defender was reported to have fired more than 10 bullets.

---

[10]  The adjustment reflects the probability that a news story on a particular incident would be selected at random from the total population of news stories on incidents of self-defense with a firearm in the home. The formula used for the adjustment is:

$$\frac{\sum_{i=1}^{n}\left(Shots\ Fired_i \times \frac{R_i}{C_i}\right)}{\sum_{i=1}^{n}\left(\frac{R_i}{C_i}\right)}$$

where:

$n$ = random selection of news stories on incidents of self-defense with a firearm in the home
$R_i$ = number of search results on Factiva in the calendar year of incident $i$
$C_i$ = number of news stories covering incident $i$

### Number of Shots Fired in Self-Defense in the Home Based on Random Selection of News Stories in Factiva January 2011 – May 2017

| | |
|---|---|
| Estimated population of news reports in Factiva on self-defense with a firearm in the home | 4,841 |
| Random selection of news reports | 200 |
| Average Number of Shots Fired | 2.34 |
| Median Number of Shots Fired | 2.03 |
| Number of Incidents with No Shots Fired | 23 |
| Percent of Incidents with No Shots Fired | 11.6% |
| Number of Incidents with ≤5 Shots Fired | 195 |
| Percent of Incidents with ≤5 Shots Fired | 97.3% |
| Number of Incidents with >10 Shots Fired | 0 |
| Percent of Incidents with >10 Shots Fired | 0.0% |

**Notes and Sources:**
Based on news stories describing defensive gun use in a random selection of Factiva stories between 2011 and May 2017 using the search string: (gun* or shot* or shoot* or fire* or arm*) and ("broke in" or "break in" or "broken into" or "breaking into" or burglar* or intrud* or inva*) and (home* or "apartment" or "property"), with region set to "United States" and excluding duplicate stories classified as "similar" on Factiva. Methodology for tabulation of shots fired as per footnote 8. Number of incidents probability-weighted as per footnote 10.

19.     In sum, an analysis of incidents in the NRA Armed Citizen database, as well as our own study of a random sample from approximately 4,800 news stories describing incidents of self-defense with a firearm, indicates that it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds.

### B. Mass shootings

#### 1. Use of large-capacity magazines in mass shootings

20.     We analyzed two sources detailing historical mass shootings: 1) Mother Jones, "US Mass Shootings, 1982-2017: Data From Mother Jones' Investigation,"[11] and 2) the Citizens Crime Commission of New York City, "Mayhem Multiplied: Mass Shooters and Assault Weapons"[12] and "Mass Shooting Incidents in America (1984-2012)."[13]

21.     The definition of a mass shooting and the period covered differed somewhat for each of the sources. The Mother Jones data that we analyzed covers 91 mass shootings from 1982 to October 2017. Mother Jones includes mass shootings in which a shooter killed four or more people in one incident in a public place and excludes crimes involving armed robbery or gang violence.[14] Starting in January 2013, Mother Jones changed its definition of a mass shooting to include instances when a shooter killed three or more people, consistent with a change in the federal definition of a mass shooting.[15] The Citizens Crime Commission data that we analyzed covers 73 mass shootings from 1984 to June 2016. Citizens Crime Commission includes mass shootings in which a shooter killed four or more people in a public place and was unrelated to another crime (such as robbery or domestic violence).[16] We combined the data from

---

[11]  "US Mass Shootings, 1982-2017: Data From Mother Jones' Investigation," *Mother Jones*, updated October 2, 2017,  http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data, accessed October 2, 2017.

[12]  "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, 2016.

[13]  "Mass Shooting Incidents in America (1984-2012)," *Citizens Crime Commission of New York City*, http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[14]  "A Guide to Mass Shootings in America," *Mother Jones*, updated October 2, 2017, http://www.motherjones.com/politics/2012/07/mass-shootings-map. *See* also, "What Exactly is a Mass Shooting," *Mother Jones*, August 14, 2012. http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting.

[15]  "A Guide to Mass Shootings in America," *Mother Jones*, updated October 2, 2017, http://www.motherjones.com/politics/2012/07/mass-shootings-map. Note this analysis of the Mother Jones data may not match other analyses because Mother Jones periodically updates its historical data.

    The Mother Jones data includes three incidents involving two shooters (Columbine High School, San Bernardino and Westside Middle School).

[16]  Note that the Citizens Crime Commission data are obtained from two sources. The first source covers 72 mass shootings from 1984 to 2016, in which a shooter killed four or more people in a public place and was unrelated

both sources and searched news stories on each mass shooting to obtain data on shots fired where available.[17] See attached Appendix B for a summary of the combined data.

22.    Based on the combined data we found that large-capacity magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in mass shootings. Magazine capacity is known in 83 out of the 96 mass shootings (86%) considered in this analysis. We found that large-capacity magazines were used in the majority of mass shootings since 1982 regardless of how mass shootings with unknown magazine capacity are treated. In particular, out of 83 mass shootings with known magazine capacity, 54 involved large-capacity magazines or 65% of mass shootings with known magazine capacity. Even assuming the mass shootings with unknown magazine capacity *all* did not involve large-capacity magazines, the majority of mass shootings involved large capacity magazines (*i.e.*, 54 out of 96 mass shootings or 56%).

23.    The combined data on mass shootings indicates that it is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings. In particular, in mass shootings that involved use of large-capacity magazine guns, the average number of shots fired was 72.[18]

### 2. Casualties in mass shootings with large-capacity magazine guns compared with other mass shootings

24.    Based on our analysis of the combined mass shootings data in the past 35 years, casualties were higher in the mass shootings that involved large-capacity magazine guns than in

---

to another crime (such as robbery or domestic violence). *See* "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, 2016.

The second source covers 33 mass shootings from 1984 to 2012, in which a shooter killed four or more people and the gun used by the shooter had a magazine capacity greater than ten. All but one of the mass shooting incidents in the second source are covered by the first, but the combination of the two sources provides additional detail, such as the number of shots fired. *See* "Mass Shooting Incidents in America (1984-2012)," *Citizens Crime Commission of New York City*, http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[17]  The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report and thus, any information or statistics on this mass shooting are preliminary.

[18]  There were 36 mass shootings in which the magazine used was known to be a large capacity magazine and the number of shots fired were known. The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report. Details on the number of shots fired are still preliminary and thus are not included in this analysis. (News stories indicate hundreds of shots were fired.)

17-cv-1017-BEN-JLB

14

Exhibit 1
Page 00017

ER_2211

other mass shootings. In particular, we found an average number of fatalities or injuries of 30 per mass shooting with a large-capacity magazine versus 9 for those without.[19]

### 3. Percent of mass shooters' guns legally obtained

25.     The combined data on mass shootings indicates that the majority of guns used in mass shootings were obtained legally.[20] According to the data, shooters in at least 71% of mass shootings in the past 35 years obtained their guns legally (at least 68 of the 96 mass shootings) and at least 76% of the guns used in these 96 mass shootings were obtained legally (at least 170 of the 224 guns).[21]

### C. Rate in California that victims use a firearm in self-defense in the home

26.     Plaintiffs claim the banned large-capacity magazines are commonly used in the home for self-defense.[22] We estimated how common it is in California for a person in their home to defend themselves with a gun against an armed robber.

27.     Using California-specific crime data collected by the California Department of Justice,[23] we estimated the number of residential robberies committed with a firearm. This estimate was based on the average annual rate for the six-year period between 2011-2016 using

---

[19]  An analysis of the mass shootings detailed in an article by Plaintiffs' expert Gary Kleck yielded similar results (21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without). The article covered 88 mass shooting incidents between 1994 and 2013. *See* Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

A 2013 study by Mayors Against Illegal Guns found that when mass shootings involved assault weapons or high capacity magazines, the number of deaths was higher. The study was based on data from the FBI and media reports covering the period January 2009 through January 2013. The study found that mass shootings where assault weapons or high-capacity magazines were used resulted in an average of 14.4 people shot and 7.8 deaths versus other mass shootings that resulted in 5.7 people shot and 4.8 deaths. *See* "Analysis of Recent Mass Shootings," *Mayors Against Illegal Guns*, September 2013.

[20]  The determination of whether guns were obtained legally is based on Mother Jones reporting.

[21]  Mother Jones did not indicate whether the guns were obtained legally for 10% of mass shootings (9 out of the 91 mass shootings covered by Mother Jones).

[22]  Complaint at 47.

[23]  "Crime in California 2016," *California Department of Justice: Criminal Justice Statistics Center*.

California annual data on the number of residential robberies adjusted for the percentage of robberies committed with a firearm in California.

28.     To this California estimate, the national rate from the Bureau of Justice Statistics at which victims in nonfatal violent crimes used a firearm in self-defense was applied to determine an annual rate that victims use a firearm in self-defense in a residential robbery perpetrated with a firearm.[24] We estimated an annual rate of 0.03 instances per 100,000 persons in California in which a victim used a firearm in self-defense in a residential robbery perpetrated with a firearm (0.3 incidents per million people or less than one in a million).

29.     The chart below illustrates how this rate compares with annual rates of other events: residential fires, suicide with a firearm and being struck by lightning.



**Annual Rates per 100,000 Population**

Notes and Sources:
[1] Data for U.S. in 2010-2015 from FEMA, https://www.usfa.fema.gov/data/statistics, accessed Sep. 28, 2017, and U.S. Census Bureau, https://www.census.gov/data/tables/2016/demo/ popest/state-total.html, accessed Sep. 28, 2017.
[2] Data for U.S. in 1999-2015 from the CDC, https://data.cdc.gov/NCHS/NCHS-Injury-Mortality-United-States/nt65-c7a7, accessed Sep. 28, 2017.
[3] Based on U.S. averages for 2007-2016 from the National Weather Service, http://www.lightningsafety.noaa.gov/odds.shtml, accessed Sep. 28, 2017.
[4] Based on data from the Crime in California 2016 Report for 2011-2016 and Bureau of Justice Statistics 2013 Study.

---

[24]     This rate is obtained from "Firearm Violence, 1993-2011," *U.S. Department of Justice: Bureau of Justice Statistics*, May 2013, p. 12, Table 11.

The chart shows that the annual rate of a person being struck by lightning is around one in a million. The rate in California of a victim using a firearm in self-defense in an armed residential robbery is three times less than being struck by lightning. Further, the chart shows when comparing a person in California's odds of using a firearm in self-defense in an armed residential robbery to other risks, the person is over 200 times more likely to commit suicide with a firearm, and almost 4,000 times more likely to have a fire in their home.

Respectfully submitted,

Lucy P. Allen
October 6, 2017
New York, NY

Exhibit 1
Page 00020

# NERA
ECONOMIC CONSULTING

**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

## Appendix A

## MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

| | |
|---|---|
| 1994-Present | **National Economic Research Associates, Inc.**<br>Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.<br>Senior Vice President (2003-2016).<br>Vice President (1999-2003).<br>Senior Consultant (1994-1999). |
| 1992-1993 | **Council of Economic Advisers, Executive Office of the President**<br>Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force. |
| 1986-1988<br>1983-1984 | **Ayers, Whitmore & Company (General Management Consultants)**<br>Senior Associate. Formulated marketing, organization, and overall business strategies including:<br>Plan to improve profitability of chemical process equipment manufacturer.<br>Merger analysis and integration plan of two equipment manufacturers.<br>Evaluation of Korean competition to a U.S. manufacturer.<br>Diagnostic survey for auto parts manufacturer on growth obstacles.<br>Marketing plan to increase international market share for major accounting firm. |

17-cv-1017-BEN-JLB

Exhibit 1
Page 00021

Lucy P. Allen

| Summer 1985 | **WNET/Channel Thirteen, Strategic Planning Department** |
| | Associate. Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support. |

| 1981-1983 | **Arthur Andersen & Company** |
| | Consultant. Designed, programmed and installed management information systems. Participated in redesign/conversion of New York State's accounting system. Developed municipal bond fund management system, successfully marketed to brokers. Participated in President's Private Sector Survey on Cost Control (Grace Commission). Designed customized tracking and accounting system for shipping company. |

## Teaching

| 1989-1992 | **Teaching Fellow, Yale University** |
| | Honors Econometrics |
| | Intermediate Microeconomics |
| | Competitive Strategies |
| | Probability and Game Theory |
| | Marketing Strategy |
| | Economic Analysis |

## Publications, Speeches and Conference Papers

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Economic Dimension and Societal Costs and Benefits of Banning Asbestos," presented at the World Health Organization, Regional Office for Europe conference, Assessing the Economic Costs of the Health Impacts of Environmental and Occupational Factors: The Economic Dimension of Asbestos, Bonn, Germany, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

Participant in panel on "Expert Reports and Depositions" at PLI Expert Witness 2014, hosted by the Practising Law Institute, New York, New York, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

Lucy P. Allen

"High Frequency Trading --A Primer in 1,800,000 Milliseconds" before the Litigation Group at Morrison Foerster, New York, New York, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

 "Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

Participant in panel at The Implications of Matrixx, hosted by NERA Economic Consulting, New York, New York, 2011.

"2011 & Beyond–Predicting Mass Tort Litigation: with a Focus on Pharmaceutical Torts" presented at Emerging Insurance Coverage and Allocation Issues, hosted by Perrin Conferences, New York, New York, 2011.

Presented recent trends in settlements, predicting settlement amounts, and the use of economic analysis at mediation in the "Settlement Trends & Tactics" panel at Securities Litigation & Enforcement: Current Developments & Strategies, hosted by the New York City Bar, New York, New York, 2010.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"GM and Chrysler Bankruptcies: Potential Impact on Other Asbestos Defendants" presented at Asbestos Litigation Conference: A Comprehensive National Overview and Outlook, hosted by Perrin Conferences, San Francisco, California, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"Emerging Economies and Product Recall -- Are the Claims Coming?" presented at The International Reinsurance Summit 2008, Hamilton, Bermuda, 2008.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

17-cv-1017-BEN-JLB

Exhibit 1
Page 00023

ER_2217

Lucy P. Allen

"Recent Trends in Securities Litigation" presented at Strategies, Calculations & Insurance in Complex Business Litigation, hosted by the Directors Roundtable, New York, New York, 2008.

"The Current Landscape" presented at Mealey's Product Recall Liability Conference: Made in China and Beyond, Washington, DC, 2007.

"China Product Recalls: What's at Stake and What's Next" presented at China Product Recalls, sponsored by National Economic Research Associates, New York, New York, 2007.

"Damages and Loss Causation in Shareholder Class Actions after Dura" presented at Securities Litigation: Emerging Trends in Enforcement and Winning Litigation Strategies hosted by the International Quality & Productivity Center, New York, New York, 2006.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Recent Trends in Securities Class Action Litigation," presented at The Class Action Litigation Summit Program Class Action in the Securities Industry, Washington, D.C., 2003.

"Product Liability Claims Estimation – Four Steps, Four Myths" presented at Standard & Poor's Seminar, New York, New York, 2001.

"How Bad Can It Be? The Economics of Damages and Settlements in Shareholder Class Actions," Balancing Disclosure and Litigation Risks for Public Companies (Or Soon-To-Be Public Companies) Seminar, sponsored by Alston & Bird LLP and RR Donnelley Financial, Nashville, Tennessee, 2000.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

"Adverse Selection in the Market for Used Construction Equipment," presented at the NBER Conference on Research in Income and Wealth, Federal Reserve Board, June 1992.

Exhibit 1
Page 00024

Lucy P. Allen

## Expert Reports, Depositions & Testimony (4 years)

Deposition Testimony and Expert Report before the United States District Court for the Western District of Texas, Austin Division in *City of Pontiac General Employees' Retirement System v. Dell, Inc., et al,*. 2017.

Deposition Testimony and Expert Report before the United States District Court for the Southern District of Texas, Houston Division in *In re Willbros Group, Inc. Securities Litigation,* 2017.

Declaration before the United States District Court Eastern District of California in *William Wiese, et al. v. Xavier Becerra, et al.* and *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2017.

Deposition Testimony and Expert Report before the United States District Court for the Southern District of Texas, Houston Division in *In re Cobalt International Energy Inc. Securities Litigation.,* 2017.

Testimony, Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *DEKA Investment GmbH, et al. v. Santander Consumer USA Holdings, Inc., et al.*, 2017.

Deposition Testimony before the Superior Court of the State of North Carolina for Mecklenburg County in *Next Advisor, Inc. v. LendingTree, Inc.*, 2017

Deposition Testimony and Expert Report before the Supreme Court of the State of New York, County of New York in *Iroquois Master Fund Ltd., et al. v. Hyperdynamics Corporation,* 2016.

Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *The Archdiocese of Milwaukee Supporting Fund, Inc., et al. v. Halliburton Company, et al.*, 2016.

Expert Report before the United States District Court for the Northern District of Georgia, Atlanta Division, in *In re Suntrust Banks, Inc. ERISA Litigation,* 2016.

Deposition Testimony and Expert Report before the Superior Court of New Jersey, Union County, in *Syngenta Crop Protection, Inc. v. Insurance Company of North America et al.,* 2015.

Declaration before the United States District Court Northern District of Georgia, in *John Noble, et al. v. Premiere Global Services, Inc., et al.,* 2015.

Deposition Testimony and Expert Report before the United States District Court Central District of California, in *Amanda Sateriale, et al. v. RJ Reynolds Tobacco Co. et al.,* 2015.

17-cv-1017-BEN-JLB

Exhibit 1
Page 00025

Lucy P. Allen

Rebuttal Report and Expert Report in the United States of America before the Securities and Exchange Commission in *Houston American Energy Corp., et al.*, 2014.

Testimony, Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *The Archdiocese of Milwaukee Supporting Fund, Inc., et al. v. Halliburton Company, et al.*, 2014.

Deposition Testimony and Expert Report before the United States District Court for the Eastern District of Pennsylvania in *Power Restoration International, Inc. v. PepsiCo, Inc., Bottling Group, LLC, and Frito-Lay Trading Company (Europe), Gmbh*, 2014.

Deposition Testimony and Expert Reports before the United States District Court Southern District of New York in *In re Lower Manhattan Disaster Site Litigation*, 2014.

Deposition Testimony and Expert Report before the United States District Court Southern District of Florida in *Atul Kumar Sood, et al. v. Catalyst Pharmaceutical Partners Inc., et al.*, 2014.

Declaration before the Superior Court of Gwinnett County State of Georgia in *City of Riviera Beach General Employees Retirement System, et al. v. Aaron's Inc., et al., Norfolk County Retirement System, et al. v. Aaron's Inc., et al.*, 2014.

Deposition Testimony, Surrebuttal Report and Expert Report before the United States District Court Middle District of Tennessee Nashville Division in *Garden City Employees' Retirement System and Central States, Southeast and Southwest Areas Pension Fund, et al. v. Psychiatric Solutions, Inc., et al.*, 2014.

Declaration before the United States District Court Northern District of California San Jose Division in *Fyock, et al. v. The City of Sunnyvale, et al.*, 2014.

Deposition Testimony and Expert Report before the United States District Court for the District of Maryland (Northern Division) in *Kolbe, et al. v. O'Malley, et al.*, 2014.

Declaration before the United States District Court Northern District of California in *San Francisco Veteran Police Officers Association, et al. v. The City and County of San Francisco, et al.*, 2014.

Testimony and Declaration before the United States Bankruptcy Court Southern District of New York in *In re Residential Capital, LLC, et al.*, 2013.

Deposition Testimony and Expert Report before the United States District Court for the Eastern District of Michigan Southern Division in *Timothy Hennigan, Aaron McHenry, and Christopher Cocks, et al. v. General Electric Company*, 2013.

Declaration before the United States District Court for the Western District of New York in *New York State Rifle and Pistol Association, Inc., et al. v. Cuomo, et al.*, 2013.

Exhibit 1
Page 00026

Lucy P. Allen

Expert Report before the United States District Court for the District of New Jersey in *Charles Stanziale, Jr. v. PepsiCo, Inc., et al.*, 2013.

Deposition Testimony before the United States District Court for the Southern District of New York, *In re Winstar Communications Securities Litigation*, 2013.

Supplemental Report before the United States District Court for the District of New Jersey in *Howmedica Osteonics Corp. v. Zimmer, Inc., et al.*, 2013.

Expert Report before the United States District Court of New Jersey in *Boris Goldenberg, et al. v. Indel, Inc., et al.*, 2013.

Deposition Testimony and Expert Report before the United States Court of Federal Claims in *Starr International Company, Inc. v. the United States of America*, 2013.

Expert Report before the Circuit Court for the County of Fairfax in *John DeGroote as liquidating trustee for and on behalf of the BearingPoint, Inc. Liquidating Trust v. F. Edwin Harbach, et al.*, 2013.

17-cv-1017-BEN-JLB

Exhibit 1
Page 00027

ER_2221

## Appendix B
## Combined Mass Shootings Data
## 1982 – October 2017

| Case | Location | Date | Source | Large Cap. Mag.? [a] | Fatalities [b] | Injuries [b] | Total Fatalities & Injuries [b] | Shots Fired | Gun(s) Obtained Legally? [c] | Offenders' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 1. Las Vegas Strip d | Las Vegas, NV | 10/1/2017 | MJ | Yes | 59 d | 527 d | 586 d | - d | Yes d | 23 d |
| 2. San Francisco UPS | San Francisco, CA | 6/14/2017 | MJ | Yes | 3 | 2 | 5 | - | No | 2 |
| 3. Pennsylvania Supermarket | Tunkhannock, PA | 6/7/2017 | MJ | No | 3 | 0 | 3 | 59 e | - | 2 |
| 4. Fianna Workplace | Orlando, FL | 6/5/2017 | MJ | - | 5 | 0 | 5 | - | - | 1 |
| 5. Ohio Nursing Home | Kirkersville, OH | 5/12/2017 | MJ | - | 3 | 0 | 3 | - | - | 2 |
| 6. Fresno Downtown | Fresno, CA | 4/18/2017 | MJ | No | 3 | 0 | 3 | - | - | 1 |
| 7. Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/2017 | MJ | - | 5 | 6 | 11 | 16 f | Yes | 1 |
| 8. Cascade Mall | Burlington, WA | 9/23/2016 | MJ | - | 5 | 0 | 5 | 15 g | - | 1 |
| 9. Baton Rouge Police | Baton Rouge, LA | 7/17/2016 | MJ | Yes | 3 | 3 | 6 | - | - | 3 |
| 10. Dallas Police | Dallas, TX | 7/7/2016 | MJ | Yes | 5 | 11 | 16 | 43 h | Yes | 3 |
| 11. Orlando Nightclub | Orlando, FL | 6/12/2016 | MJ/CC | Yes | 49/50 | 53 | 102/103 | 110 i | Yes | 2 |
| 12. Excel Industries | Hesston, KS | 2/25/2016 | MJ | Yes | 3 | 14 | 17 | - | Yes | 2 |
| 13. Kalamazoo | Kalamazoo County, MI | 2/20/2016 | MJ | - | 6 | 2 | 8 | - | Yes | 1 |
| 14. San Bernardino | San Bernardino, CA | 12/2/2015 | MJ/CC | Yes | 14/16 | 21 | 35/37 | 150 j | Yes | 4 |
| 15. Planned Parenthood Clinic | Colorado Springs, CO | 11/27/2015 | MJ | - | 3 | 9 | 12 | - | - | 1 |
| 16. Colorado Springs | Colorado Springs, CO | 10/31/2015 | MJ | Yes | 3 | 0 | 3 | - | Yes | 3 |
| 17. Umpqua Community College | Roseburg, OR | 10/1/2015 | MJ/CC | Yes | 9/10 | 9 | 18/19 | - | Yes | 6 |
| 18. Chattanooga Military Center | Chattanooga, TN | 7/16/2015 | MJ/CC | Yes | 5/6 | 2/3 | 7/9 | - | Yes | 3 |
| 19. Charleston Church | Charleston, SC | 6/17/2015 | MJ/CC | Yes | 9 | 1 | 10 | - | Yes | 1 |
| 20. Trestle Trail Bridge | Menasha, WI | 6/11/2015 | MJ | - | 3 | 1 | 4 | - | Yes | 2 |
| 21. Marysville High School | Marysville, WA | 10/24/2014 | MJ/CC | Yes | 5 | 1 | 6 | - | Stolen | 1 |
| 22. Isla Vista | Santa Barbara, CA | 5/23/2014 | MJ | Yes | 6 | 13 | 19 | 50 k | Yes | 3 |
| 23. Fort Hood | Fort Hood, TX | 4/3/2014 | MJ | - | 3 | 12 | 15 | - | Yes | 1 |
| 24. Alturas Tribal | Alturas, CA | 2/20/2014 | MJ | - | 4 | 2 | 6 | - | - | 2 |
| 25. Washington Navy Yard | Washington, D.C. | 9/16/2013 | MJ/CC | No | 12/13 | 8/7 | 20 | - | Yes | 2 |

## Appendix B
## Combined Mass Shootings Data
## 1982 – October 2017

| Case | Location | Date | Source | Large Cap. Mag.?[a] | Fatalities[b] | Injuries[b] | Total Fatalities & Injuries[b] | Shots Fired | Gun(s) Obtained Legally?[c] | Offenders' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 26. Hialeah | Hialeah, FL | 7/26/2013 | MJ/CC | Yes | 7 | 0 | 7 | 10 [1] | Yes | 1 |
| 27. Santa Monica | Santa Monica, CA | 6/7/2013 | MJ/CC | Yes | 6 | 3/4 | 9/10 | 70 m | Yes | 2 |
| 28. Federal Way | Federal Way, WA | 4/21/2013 | MJ | - | 5 | 0 | 5 | - | Yes | 2 |
| 29. Upstate New York | Herkimer County, NY | 3/13/2013 | MJ | - | 5 | 2 | 7 | - | Yes | 1 |
| 30. Newtown School | Newtown, CT | 12/14/2012 | MJ/CC | Yes | 28 | 2 | 30 | 154 | Stolen | 4/3 |
| 31. Accent Signage Systems | Minneapolis, MN | 9/27/2012 | MJ/CC | Yes | 7 | 1/2 | 8/9 | 46 | Yes | 1 |
| 32. Sikh Temple | Oak Creek, WI | 8/5/2012 | MJ/CC | Yes | 7 | 3 | 10 | - | Yes | 1 |
| 33. Aurora Movie Theater | Aurora, CO | 7/20/2012 | MJ/CC | Yes | 12 | 70 | 82 | 80 | Yes | 4 |
| 34. Seattle Café | Seattle, WA | 5/30/2012 | MJ/CC | No | 6 | 1 | 7 | - | Yes | 2 |
| 35. Oikos University | Oakland, CA | 4/2/2012 | MJ/CC | No | 7 | 3 | 10 | - | Yes | 1 |
| 36. Su Jung Health Sauna | Norcross, GA | 2/22/2012 | MJ | - | 5 | 0 | 5 | - | Yes | 1 |
| 37. Seal Beach | Seal Beach, CA | 10/14/2011 | MJ/CC | No | 8 | 1 | 9 | - | Yes | 3 |
| 38. IHOP | Carson City, NV | 9/6/2011 | MJ/CC | Yes | 5 | 7 | 12 | - | Yes | 3 |
| 39. Grand Rapids | Grand Rapids, MI | 7/7/2011 | CC | Yes | 8 | 2 | 10 | 10 | - | 1 |
| 40. Tucson | Tucson, AZ | 1/8/2011 | MJ/CC | Yes | 6 | 13 | 19 | 33 | Yes | 1 |
| 41. Hartford Beer Distributor | Manchester, CT | 8/3/2010 | MJ/CC | Yes | 9 | 2 | 11 | 11 | Yes | 2 |
| 42. Yoyito Café | Hialeah, FL | 6/6/2010 | CC | No | 5 | 3 | 8 | 9 [n] | - | - |
| 43. Coffee Shop Police | Parkland, WA | 11/29/2009 | MJ/CC | No | 4/5 | 1/0 | 5 | - | Stolen | 1 |
| 44. Fort Hood | Fort Hood, TX | 11/5/2009 | MJ/CC | Yes | 13 | 30/32 | 43/45 | 214 | Yes | 1 |
| 45. Binghamton | Binghamton, NY | 4/3/2009 | MJ/CC | Yes | 14 | 4 | 18 | 99 | Yes | 2 |
| 46. Carthage Nursing Home | Carthage, NC | 3/29/2009 | MJ/CC | No | 8 | 3/2 | 11/10 | - | Yes | 2 |
| 47. Atlantis Plastics | Henderson, KY | 6/25/2008 | MJ/CC | No | 6 | 1 | 7 | - | Yes | 1 |
| 48. Northern Illinois University | DeKalb, IL | 2/14/2008 | MJ/CC | Yes | 5/6 | 21 | 26/27 | 54 | Yes | 4 |
| 49. Kirkwood City Council | Kirkwood, MO | 2/7/2008 | MJ/CC | No | 6 | 2 | 8 | - | Stolen | 2 |
| 50. Westroads Mall | Omaha, NE | 12/5/2007 | MJ/CC | Yes | 9 | 4/5 | 13/14 | 14 | Stolen | 1 |

## Appendix B
## Combined Mass Shootings Data
## 1982 – October 2017

| Case | Location | Date | Source | Large Cap. Mag.?[a] | Fatalities[b] | Injuries | Total Fatalities & Injuries[b] | Shots Fired | Gun(s) Obtained Legally?[c] | Offenders' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 51. Crandon | Crandon, WI | 10/7/2007 | MJ/CC | Yes | 6/7 | 1 | 7/8 | 30 [o] | Yes | 1 |
| 52. Virginia Tech | Blacksburg, VA | 4/16/2007 | MJ/CC | Yes | 32/33 | 23/17 | 55/50 | 176 | Yes | 2 |
| 53. Trolley Square | Salt Lake City, UT | 2/12/2007 | MJ/CC | No | 6 | 4 | 10 | - | No | 2 |
| 54. Amish School | Lancaster County, PA | 10/2/2006 | MJ/CC | No | 6 | 5 | 11 | - | Yes | 3 |
| 55. Capitol Hill | Seattle, WA | 3/25/2006 | MJ/CC | Yes | 7 | 2 | 9 | - | Yes | 4 |
| 56. Goleta Postal | Goleta, CA | 1/30/2006 | MJ/CC | Yes | 8 | 0 | 8 | - | Yes | 1 |
| 57. Red Lake | Red Lake, MN | 3/21/2005 | MJ/CC | No | 10 | 5/6 | 15/16 | - | Stolen | 3 |
| 58. Living Church of God | Brookfield, WI | 3/12/2005 | MJ/CC | Yes | 7/8 | 4 | 11/12 | - | Yes | 1 |
| 59. Damageplan Show | Columbus, OH | 12/8/2004 | MJ/CC | No | 5 | 7/3 | 12/8 | 15 [p] | Yes | 1 |
| 60. Hunting Camp | Meteor, WI | 11/21/2004 | CC | Yes | 6 | 3 | 9 | 20 | - | 1 |
| 61. Windy City Warehouse | Chicago, IL | 8/27/2003 | CC | No | 7 | 0 | 7 | - | - | 1 |
| 62. Lockheed Martin | Meridian, MS | 7/8/2003 | MJ/CC | Yes | 7 | 8 | 15 | - | Yes | 5 |
| 63. Navistar | Melrose Park, IL | 2/5/2001 | MJ/CC | Yes | 5 | 4 | 9 | - | Yes | 4 |
| 64. Wakefield | Wakefield, MA | 12/26/2000 | MJ/CC | Yes | 7 | 0 | 7 | 37 | Yes | 3 |
| 65. Hotel | Tampa, FL | 12/30/1999 | MJ/CC | No | 5 | 3 | 8 | - | Yes | 2 |
| 66. Xerox | Honolulu, HI | 11/2/1999 | MJ/CC | Yes | 7 | 0 | 7 | 28 | Yes | 1 |
| 67. Wedgwood Baptist Church | Fort Worth, TX | 9/15/1999 | MJ/CC | Yes* | 8 | 7 | 15 | 30 | Yes | 2 |
| 68. Atlanta Day Trading | Atlanta, GA | 7/29/1999 | MJ | - | 9 | 13 | 22 | - | Yes | 4 |
| 69. Columbine High School | Littleton, CO | 4/20/1999 | MJ/CC | Yes | 13/15 | 24 | 37/39 | 188 | No | 4 |
| 70. Thurston High School | Springfield, OR | 5/21/1998 | MJ/CC | Yes | 4 | 25 | 29 | 50 | No | 3 |
| 71. Westside Middle School | Jonesboro, AR | 3/24/1998 | MJ/CC | Yes | 5 | 10 | 15 | 26 | Stolen | 9/10 |
| 72. Connecticut Lottery | Newington, CT | 3/6/1998 | MJ/CC | Yes | 5 | 1/0 | 6/5 | 5 | Yes | 1 |
| 73. Caltrans Maintenance Yard | Orange, CA | 12/18/1997 | MJ/CC | Yes | 5 | 2 | 7 | 144 | Yes | 1 |
| 74. R.E. Phelon Company | Aiken, SC | 9/15/1997 | MJ/CC | No | 4 | 3 | 7 | - | No | 1 |
| 75. Fort Lauderdale | Fort Lauderdale, FL | 2/9/1996 | MJ/CC | No | 6 | 1 | 7 | 14 [q] | Yes | 2 |

17-cv-1017-BEN-JLB

Page 3 of 5

Exhibit 1
Page 00030

ER_2224

## Appendix B
## Combined Mass Shootings Data
## 1982 – October 2017

| Case | Location | Date | Source | Large Cap. Mag.?[a] | Fatalities[b] | Injuries[b] | Total Fatalities & Injuries[b] | Shots Fired | Gun(s) Obtained Legally?[c] | Offenders' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 76. Piper Technical Center | Los Angeles, CA | 7/19/1995 | CC | Yes | 4 | 0 | 4 | - | - | - |
| 77. Walter Rossler Company | Corpus Christi, TX | 4/3/1995 | MJ/CC | No | 6 | 0 | 6 | - | Yes | 2 |
| 78. Air Force Base | Fairchild Base, WA | 6/20/1994 | MJ/CC | Yes | 5/6 | 23 | 28/29 | 50 [r] | Yes | 1 |
| 79. Chuck E. Cheese | Aurora, CO | 12/14/1993 | MJ/CC | No | 4 | 1 | 5 | - | - | 1 |
| 80. Long Island Railroad | Garden City, NY | 12/7/1993 | MJ/CC | Yes | 6 | 19 | 25 | 30 | Yes | 1 |
| 81. Luigi's Restaurant | Fayetteville, NC | 8/6/1993 | MJ/CC | No | 4 | 8 | 12 | - | Yes | 3 |
| 82. 101 California Street | San Francisco, CA | 7/1/1993 | MJ/CC | Yes | 9 | 6 | 15 | 75 | No | 3 |
| 83. Watkins Glen | Watkins Glen, NY | 10/15/1992 | MJ/CC | No | 5 | 0 | 5 | - | Yes | 1 |
| 84. Lindhurst High School | Olivehurst, CA | 5/1/1992 | MJ/CC | No | 4 | 10 | 14 | - | Yes | 2 |
| 85. Royal Oak Postal | Royal Oak, MI | 11/14/1991 | MJ/CC | No | 5 | 5/4 | 10/9 | - | Yes | 1 |
| 86. University of Iowa | Iowa City, IA | 11/1/1991 | MJ/CC | No | 6 | 1 | 7 | - | Yes | 1 |
| 87. Luby's Cafeteria | Killeen, TX | 10/16/1991 | MJ/CC | Yes | 24 | 20 | 44 | 100 | Yes | 2 |
| 88. GMAC | Jacksonville, FL | 6/18/1990 | MJ/CC | Yes | 10 | 4 | 14 | 14 | Yes | 2 |
| 89. Standard Gravure Corporation | Louisville, KY | 9/14/1989 | MJ/CC | Yes | 9 | 12 | 21 | 21 | Yes | 5 |
| 90. Stockton Schoolyard | Stockton, CA | 1/17/1989 | MJ/CC | Yes | 6 | 29/30 | 35/36 | 106 | Yes | 2 |
| 91. ESL | Sunnyvale, CA | 2/16/1988 | MJ/CC | No | 7 | 4 | 11 | - | Yes | 7 |
| 92. Shopping Centers | Palm Bay, FL | 4/23/1987 | MJ/CC | Yes | 6 | 14/10 | 20/16 | 40 [s] | Yes | 3 |
| 93. United States Postal Service | Edmond, OK | 8/20/1986 | MJ/CC | No | 15 | 6 | 21 | - | Yes | 3 |
| 94. San Ysidro McDonald's | San Ysidro, CA | 7/18/1984 | MJ/CC | Yes | 22 | 19 | 41 | 257 | Yes | 3 |
| 95. Dallas Nightclub | Dallas, TX | 6/29/1984 | MJ/CC | Yes | 6 | 1 | 7 | - | No | 1 |
| 96. Welding Shop | Miami, FL | 8/20/1982 | MJ | No | 8 | 3 | 11 | - | Yes | 1 |
| | Large Capacity Magazine Average | | | | 10.3 | 20.0 | 30.2 | 71.5 | | |
| | Non-Large Capacity Magazine Average | | | | 6.3 | 2.9 | 9.2 | 22.6 | | |

Page 4 of 5

Exhibit 1
Page 00031

# Appendix B
## Combined Mass Shootings Data
### 1982 – October 2017

| Case | Location | Date | Source | Large Cap. Mag.?[a] | Fatalities[b] | Injuries[b] | Total Fatalities & Injuries[b] | Shots Fired | Gun(s) Obtained Legally?[c] | Offenders' Number of Guns |
|------|----------|------|--------|---------------------|---------------|-------------|-------------------------------|-------------|-----------------------------|---------------------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

Notes and Sources:

Data from Mother Jones ("US Mass Shootings, 1982-2017: Data from Mother Jones' Investigation," accessed June 1, 2017) and the Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," 2016, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017). MJ indicates Mother Jones data. CC indicates Citizens Crime Commission of New York City data. If sources differ on data, "/" is added between values. In these instances, values from MJ are listed first. Except where noted, all data on shots fired obtained from CC.

[a] Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition.

[b] Offender(s) included in counts of fatalities and injuries.

[c] The determination of whether guns were obtained legally is based on Mother Jones reporting.

[d] The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report and thus, any information and statistics on this mass shooting are preliminary.

[e] Shots fired from: "Killer in Supermarket Shooting Posted Chilling Videos Online, Lauding Columbine Massacre," Washington Post, June 9, 2017.

[f] Shots fired from: "Hate Crime is Suspected After Gunman Kills 3 White Men in Downtown Fresno," Los Angeles Times, April 19, 2017.

[g] Shots fired from: "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond," Washington Post, January 9, 2017.

[h] Shots fired from: "Baton Rouge Cop Killer Left Note, Fired At Least 43 Rounds," CNN, July 9, 2017.

[i] Shots fired from: "We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando," The Telegraph, June 13, 2016.

[j] Shots fired from: "San Bernardino Suspects Left Trail of Clues, but No Clear Motive," New York Times, December 3, 2015.

[k] Shots fired from: "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage," Los Angeles Times, June 4, 2014.

[l] Shots fired from: "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage," NBC News, July 28, 2013.

[m] Shots fired from: "Police Call Santa Monica Gunman Ready for Battle,'" New York Times, June 8, 2013.

[n] Shots fired from: "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead," Sun-Sentinel, June 7, 2010.

[o] Shots fired from: "Small Town Grieves for 6, and the Killer," Los Angeles Times, October 9, 2007.

[p] Shots fired from: "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," New York Times, January 15, 2005.

[q] Shots fired from: "5 Beach Workers in Florida are Slain by Ex-Colleague," New York Times, February 10, 1996.

[r] Shots fired from: "Man Dead On Revenge Kills 4, Hurts 23 – Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," The Seattle Times, June 21, 1994.

[s] Shots fired from: "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," Chicago Tribune, April 25, 1987.

17-cv-1017-BEN-JLB                    Page 5 of 5

Exhibit 1
Page 00032

ER_2226

## DECLARATION OF SERVICE BY E-MAIL and U.S. Mail

Case Name:  **Duncan, Virginia et al v. Xavier Becerra**
No.:        **17-cv-1017-BEN-JLB**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On October 6, 2017, I served the attached **EXPERT REPORT OF LUCY P. ALLEN** by transmitting a true copy via electronic mail. In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, addressed as follows:

C. D. Michel
Michel & Associates, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
**E-mail Address:**
CMichel@michellawyers.com

Anna Barvir
Michel & Associates, P.C.
180 East Ocean Blvd., Suite 200
Long Beach CA 90802-4079
**E-mail Address:**
abarvir@michellawyers.com

Erin E. Murphy
Kirkland & Ellis LLP
655 15th Street N.W.
Washington D.C. 20005
**E-mail Address:**
erin.murphy@kirkland.com

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on October 6, 2017, at Sacramento, California.

_____
Chris McCartney
Declarant

_____
Signature

SA2017107272
12838755.docx

Exhibit 1
Page 00033

**ER_2227**

1  XAVIER BECERRA
   Attorney General of California
2  TAMAR PACHTER
   Supervising Deputy Attorney General
3  NELSON R. RICHARDS
   ANTHONY P. O'BRIEN
4  Deputy Attorneys General
   ALEXANDRA ROBERT GORDON
5  Deputy Attorney General
   State Bar No. 207650
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5509
    Fax: (415) 703-5480
8   E-mail:
    Alexandra.RobertGordon@doj.ca.gov
9  *Attorneys for Defendant*
   *Attorney General Xavier Becerra*
10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15 | **VIRGINIA DUNCAN, et al.,** | 17-cv-1017-BEN-JLB

16 |                              Plaintiffs, |

17 |        v. | **EXPERT REBUTTAL REPORT**
18 |           | **OF JOHN J. DONOHUE**

19 | **XAVIER BECERRA, in his official** |
20 | **capacity as Attorney General of the** | Judge:  Hon. Roger T. Benitez
    | **State of California, et al.,** | Action Filed:  May 17, 2017
21 |                              Defendants. |

22

23

24

25

26

27

28

EXPERT REBUTTAL REPORT OF JOHN J. DONOHUE  (17-cv-1017-BEN-JLB)

Exhibit 2
Page 00035

### Expert Rebuttal Report of John J. Donohue

*Duncan v. Becerra*, United States District Court (S.D. Cal.),
Case No.: 17CV1017 BEN JLB
November 2, 2017

### BACKGROUND AND QUALIFICATIONS

1. I, John J. Donohue, am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School. After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986. I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School. I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallen (Switzerland), and Renmin University (Beijing).

2. For a number of years, I have been teaching a course at Stanford on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, and St. Gallen University School of Law in Switzerland. I have consistently taught courses on law and statistics for two decades.

3. I am a Research Associate of the National Bureau of Economic Research and a member of the American Academy of Arts and Sciences. I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01, and served as the co-editor (handling empirical articles) of the *American Law and Economics Review* for six years. I have also served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies.

4. I am also a member of the Committee on Law and Justice of the National Research Council ("NRC"), which "reviews, synthesizes, and proposes research related to crime,

1

Exhibit 2
Page 00036

law enforcement, and the administration of justice, and provides an intellectual resource for federal agencies and private groups."[1]

5. My research and writing uses empirical analysis to determine the impact of law and public policy in a wide range of areas, and I have written extensively about the relationship between rates of violent crime and firearms regulation. My complete credentials and list of publications are stated in my curriculum vitae, a true and correct copy of which is attached as Exhibit A.

6. The following lists all of the cases in which I have testified as an expert in the past 4 years. I filed an expert declaration in each of two cases involving a National Rifle Association ("NRA") challenge to city restrictions on the possession of large-capacity magazines:

> *Fyock v. City of Sunnyvale*, United States District Court (N.D. Cal.), Case No. 4:13-cv-05807-PJH, January 2014.
> *San Francisco Veteran Police Officers Association v. City and County of San Francisco*, United States District Court (N.D. Cal.), Case No. C 13-05351 WHA, January 2014.

7. I also filed an expert declaration in a case involving a challenge by the NRA to Maryland's restrictions on assault weapons and large-capacity magazines:

> *Tardy v. O'Malley* (currently listed as *Kolbe v. Hogan*), United States District Court (District of Maryland), Case 1:13-cv-02841-CCB, February 2014.

In all these cases, the relevant gun regulations have (ultimately) been sustained in the relevant federal appellate courts.

8. In addition to filing an earlier expert declaration in this case, I also filed (on June 1, 2017) an expert declaration in a case involving a challenge by the NRA to California's restrictions on carrying of weapons in public:

> *Flanagan v. Becerra*, United States District Court (C.D. Cal.), Case No. 2:16-cv-06164-JAK-AS.

9. I am being compensated at my government rate of $425 per hour.

---

[1] See http://www7.national-academies.org/claj/ online for more information about the NRC.

2

Exhibit 2
Page 00037

## SUBSTANTIVE CONCLUSIONS

10. The events in Las Vegas on October 1, 2017, have underscored—yet again—the wisdom of the efforts of the California legislature, with the overwhelming support of the voters of the state, "to aid in the shaping and application of those wise restraints that make men free" by banning from our state the large-capacity magazines (LCMs)[2] that were a key element enabling the extent of the carnage in that horrific mass shooting.[3] It is my opinion that if, rather than allowing the federal ban on these devices to lapse in 2004, the country had moved to the more complete ban that California has finally adopted, tragedies like the one in Las Vegas would have been far less deadly and damaging to countless individuals who have been maimed and injured throughout the United States and perhaps the world.[4] It is also my opinion that Section 32310's ban on possession of LCMs would decrease the mayhem from at least some mass killings in California, by making it incrementally harder for those bent on mass destruction to implement their criminal designs.

### Response to Curcuruto Report

11. In opposition to the ban on LCMs, plaintiffs offer two additional expert reports. The first report is from James Curcuruto of the National Shooting Sports Foundation.

12. Mr. Curcuruto provides irrelevant information, opining as his main conclusion that "There are at least one hundred million magazines of a capacity of more than ten rounds in possession of American citizens" (Curcuruto Report at 3), only to concede later that he really does not know but "it is safe to say whatever the actual number of such magazines

---

[2] LCMs are defined as ammunition-feeding devices with the capacity to hold more than 10 rounds of ammunition.

[3] The quote is from John MacArthur Maguire and is enshrined at the Harvard Law School library. See https://asklib.law.harvard.edu/friendly.php?slug=faq/115309 (last visited Nov. 1, 2017).

[4] The horrendous mass killing in Norway by Anders Breivik, endangered by the restrictive gun laws of Europe, was salvaged by his ability to procure ten 30-round high-capacity magazines from the United States. Stephanie Condon, "Norway Massacre Spurs Call for New U.S. Gun Laws," CBS News, July 28, 2011, *available at* https://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/ (last visited Nov. 1, 2017).

3

Exhibit 2
Page 00038

in United States consumers' hands is, it is in the tens-of-millions." (Curcuruto Report at 4.)

13. While Mr. Curcuruto offers his wildly varying estimates of the number of high-capacity magazines in the United States, his undifferentiated national speculations offer no insight into how many of these magazines are possessed in rural areas throughout the United States. As a result, his figures would have little relevance to the appropriate regulatory regime for a state with large urban population centers like California. Mr. Curcuruto does not discuss the stock of high-capacity magazines in California, which of course will be far lower on a per capita basis because it has been unlawful to add to this stock for decades.

14. National surveys such as the General Social Survey (GSS) and research by the Pew Research Center and the National Behavioral Risk Factor Surveillance System consistently find a persistent decline in household gun ownership over the past several decades. A March 2013 report from the Pew Research Center states:

> The Pew Research Center has tracked gun ownership since 1993, and our surveys largely confirm the General Social Survey trend. In our December 1993 survey, 45% reported having a gun in their household; in early 1994, the GSS found 44% saying they had a gun in their home. A January 2013 Pew Research Center survey found 33% saying they had a gun, rifle or pistol in their home, as did 34% in the 2012 wave of the General Social Survey.[5]

15. Because this reliable social science data shows that the number of households that own guns has likely dropped in recent decades, and certainly has not grown, the robust gun sales in recent years cannot be attributed to increasingly broad gun ownership. Instead, these sales predominantly represent purchases of guns by members of households that previously owned guns, as well as purchases in anticipation that certain gun bans will be enacted with grandfather clauses that will generate profits from the higher prices that follow when the supply of certain weapons or LCMs is restricted.

---

[5] Pew Research Center, *Why Own a Gun? Protection is Now Top Reason*, Section 3: Gun Ownership Trends and Demographics, March 12, 2013, *available at* http://www.people-press.org/2013/03/12/section-3-gun-ownership-trends-and-demographics (last visited on November 2, 2017).

4

Exhibit 2
Page 00039

16. I am not aware of any current social science research providing an estimate for the number of American households that own LCMs or for the number of LCMs in private hands in America. It is reasonable to assume, however, that consumer demand for LCMs is similar to demand for firearms generally.

17. If that is the case, then LCM ownership by household is also likely to be concentrated, with increased numbers of LCMs held by a declining share of households. This would be consistent with a January 2013 New York Times/CBS News nationwide poll of 1,110 adults showing that nearly two-thirds of Americans favored a ban on LCMs.[6] This is roughly the percentage of California voters who cast their ballots to rid the state of these devices.

18. Thus, Mr. Curcuruto's unsubstantiated claims about the number of LCMs in private hands should not be confused with broad possession across America, but merely proliferation in the hands of a stable or dwindling number of households. Indeed, plaintiff's other expert, Stephen Helsley, makes this point when he states: "My associates who have such pistols [that accept LCMs] also have a considerable number of spare magazines for them. In my case, I have one 19-round and eight 17-round magazines for my Glock." (Helsley Report at 5.)

19. Moreover, it is unclear what relevance the stock of high-capacity magazines could make to determinations about what can be lawfully banned. Had the federal ban on these magazines not been lifted in 2004, the stock would have been dramatically lower than it is today, and since the 1994 federal ban was lawful, efforts by the gun industry to flood the market with these magazines in its wake can hardly be thought to deprive state governments of the ability to regulate in ways that were available to them prior to 1994.

### Response to Helsley Report

---

[6] Jennifer Steinhauer, *Pro-Gun Lawmakers Are Open to Limits on Size of Magazines*, N.Y. Times, Feb. 18, 2013, *available at* http://www.nytimes.com/2013/02/19/us/politics/lawmakers-look-at-ban-on-high-capacity-gun-magazines.html?_r=1& (last visited November 2, 2017).

5

Exhibit 2
Page 00040

ER_2233

20. The second expert report submitted for the plaintiffs is from Stephen Helsley. Noting
    that for the past 24 years, he was a state liaison for and then consultant to the National
    Rifle Association, Helsley states that soldiers during war and "on duty, uniformed police
    officers" often use guns equipped with high-capacity magazines. Without
    acknowledging that the risks faced by soldiers and police are vastly different from those
    faced by civilians, Helsley then states the following:

    > The home-owner and the concealed weapon permit holder want a pistol that
    > can hold significantly more cartridges than a revolver for the same reason a law
    > enforcement office or soldier wants one—to increase his or her chances of staying
    > alive. For virtuous citizens buy their guns to protect themselves from the same
    > criminals that police carry guns to protect the citizens, the public, and themselves.
    > (Helsley Report at 5).

21. But private individuals have completely different needs than police officers. The former
    only need to scare off criminals (or hold them off until the police arrive). The police
    need to effectuate arrests. Thus, while having the criminal run away is a desired outcome
    for the average citizen, this is a bad outcome for a police officer, which is why an
    extended gun battle is extremely rare for law-abiding citizens and far more common for
    the police. Accordingly, Helsley's effort to look to officer-involved shootings to make
    judgments about the needs of average citizens widely misses the mark. (Helsley Report
    at 7).

22. In opposing the ban on high-capacity magazines, Helsley's claims that "Gunfights
    frequently involve a lot of 'missing.'" (Helsley Report at 7.) He then combines that with
    the fact that the average citizen is not well-trained and is under stress when threatened to
    argue that more bullets should be sprayed by law-abiding citizens because some of their
    bullets will likely hit "barriers such as vehicles or walls." (Helsley Report at 7.) But all
    of these factors actually provide strong support for a ban on LCMs rather than an
    argument against such a ban. Helsley doesn't consider that bullets fired by a modern
    weapon with an LCM will easily penetrate walls, threatening family members or
    occupants in attached dwellings. This point was dramatically underscored when a
    hapless concealed carry permit holder attending a gun safety class inadvertently fired his
    weapon, which discharged a bullet that easily penetrated the classroom wall, striking and

6

Exhibit 2
Page 00041

killing the owner of the gun store who was working in the next room.[7]  Encouraging untrained, stressed individuals to spray bullets from a high-capacity magazine is a recipe for generating similar unwelcome outcomes that will put family members and neighbors at considerable risk.

23. If high-capacity magazines had been completely barred from the civilian market, many lives would have been saved as the destructive capacity of mass shooters would have been appropriately restricted.  The *New York Times* video of the recent Las Vegas shooting shows how the Las Vegas concert attendees would use the pauses in firing when the shooter's high-capacity magazines were spent to flee the deadly venue before more shots were fired.[8]  If Stephen Paddock had been limited to using only 10-round magazines during his deadly rampage, potentially hundreds of victims at the concert could have been spared.

24. A prescient December 2016 editorial in the *Las Vegas Sun* noted the danger presented— and the lack of practical use for—LCMs:

> By overwhelmingly supporting universal background checks for firearms purchases, Clark County voters made it abundantly clear last month that they were concerned about gun violence.
>
> Now, it's time for Las Vegas-area lawmakers to go a step further to protect Nevadans and push to ban the sale of high-capacity magazines in the state.

---

[7] Peter Holley, *Ohio gun store owner accidentally killed by student during firearm-safety class*, *Washington Post*, June 19, 2016, *available at* https://www.washingtonpost.com/news/morning-mix/wp/2016/06/19/ohio-gun-store-owner-accidentally-killed-by-student-during-firearm-safety-class/?utm_term=.ed4c232d20ad (last visited Nov. 1, 2016).

Another example of how doors and walls do not stop bullets from modern handguns occurred on September 13, 2015, when "39-year-old Mike Lee Dickey was babysitting an 8-year-old Casa Grande, Arizona boy.  According to police, at about 2 a.m., Dickey was in the bathroom removing his .45-caliber handgun from the waistband of his pants when he unintentionally discharged the gun. The bullet passed through two doors and struck the 8-year-old in his arm while he lay sleeping in a nearby bedroom. The boy was flown to a hospital in Phoenix for treatment." *8-year-old boy unintentionally shot by babysitter*, Ohh Shoot, Sept. 13, 2016, *available at* http://ohhshoot.blogspot.com/2015/09/8-year-old-boy-unintentionally-shot-by.html (last visited Nov. 1, 2017).

[8] Malachy Browne, et al., *10 Minutes. 12 Gunfire Bursts. 30 Videos. Mapping the Las Vegas Massacre*, N.Y. TimesVideo, Oct. 21, 2017, *available at* https://www.nytimes.com/video/us/100000005473328/las-vegas-shooting-timeline-12-bursts.html (last visited Nov. 1, 2017).

7

Exhibit 2
Page 00042

Eight states and the District of Columbia already have imposed such prohibitions, and with good reason. There's simply no legitimate civilian use for magazines that hold dozens upon dozens of rounds of ammunition.

Don't believe us? Fine, then listen to Clark County Sheriff Joe Lombardo.

"I'm a very avid hunter, I was in the military myself, and there's no need to have a high-capacity magazine for any practical reason," Lombardo said during a recent interview with the Sun.

To the contrary, the dangers posed by such magazines are obvious. Lombardo says the time it takes for suspects to change magazines gives potential victims an opportunity to escape and law enforcement officials an opportunity to safely fire back. That being the case, the fewer times a shooter has to switch out magazines, the fewer the chances for people to get away and authorities to get a protected shot.[9]

25. Sheriff Lombardo's views were similarly endorsed in the testimony of United States Attorney (District of Colorado) John Walsh before the Senate Judiciary Committee on February 27, 2013, in which he noted:

From the point of view of most law enforcement professionals, a perspective I share as a long-time federal prosecutor and sitting United States Attorney, shutting off the flow of military-style assault weapons and high-capacity magazines is a top public safety priority. [...]

One of the most disturbing aspects of the recent mass shootings our Nation has endured is the ability of a shooter to inflict massive numbers of fatalities in a matter of minutes due to the use of high-capacity magazines. High-capacity magazines were defined in the 1994 ban as magazines capable of holding more than 10 rounds, and this is a definition the Department endorses. The devastating impact of such magazines is not limited to their use in military-style assault rifles; they have also been used with horrific results in recent mass shootings involving handguns. The 2007 mass shooting at Virginia Tech involved a shooter using handguns with high-capacity magazines. Similarly, recent mass shootings in Tucson, Arizona; Oak Creek, Wisconsin; and Fort Hood, Texas all involved handguns with magazines holding more than 10 rounds. As evidenced by these events, a high capacity magazine can turn any weapon into a tool of mass violence. Forcing an individual bent on inflicting large numbers of casualties to stop and reload creates the opportunity to reduce the possible death toll in two ways: first, by affording a chance for law enforcement or bystanders to intervene during a pause to reload; and second, by giving bystanders and potential victims an opportunity to seek cover or escape when there is an interruption in the firing.

---

[9] *High-capacity magazine ban a must for Nevadans' safety*, Las Vegas Sun, Dec. 11, 2016, *available at* https://lasvegassun.com/news/2016/dec/11/high-capacity-magazine-ban-a-must-for-nevadans-saf/(last visited Nov. 1, 2017).

8

Exhibit 2
Page 00043

This is not just theoretical: In the mass shooting in Tucson, for example, 9-year old Christina-Taylor Green was killed by the 13th shot from a 30-round high-capacity magazine. The shooter was later subdued as he was trying to reload his handgun after those 30 shots. The outcome might have been different if the perpetrator had been forced to reload after firing only 10 times.

Furthermore, high-capacity magazines are not required for defending one's home or deterring further action by a criminal. The majority of shootings in self-defense occur at close range, within a distance of three yards. In such a scenario, and at such close ranges, a 10-round magazine is sufficient to subdue a criminal or potential assailant. Nor are high-capacity magazines required for hunting or sport shooting. Like military-style assault weapons, high-capacity magazines should be reserved for war, and for law enforcement officers protecting the public. The continued commercial sale of high-capacity magazines serves only to provide those determined to produce a high body count with the opportunity and the means to inflict maximum damage. Indeed, there is evidence suggesting that when the previous ban was in effect, it reduced the number of high-capacity magazines seized by the police, as well as the lethality of incidents.[10][The citation is from Walsh's statement.][11]

Respectfully submitted,

*John J. Donohue III*

---

[10] See, David S. Fallis and James V. Grimaldi, *In Virginia, high-yield clip seizures rise,* Washington Post, Jan. 23, 2011, *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html (last visited Nov. 1, 2017).
[11] Statement of John F. Walsh before the United States Senate Committee on the Judiciary, https://www.judiciary.senate.gov/imo/media/doc/2-27-13WalshTestimony.pdf (last visited Nov. 1, 2017).

9

Exhibit 2
Page 00044

# Exhibit A

Exhibit 2
Page 00045

# JOHN J. DONOHUE III

Stanford Law School
Stanford, CA 94305
Phone: 650 721 6339
E-mail: donohue@law.stanford.edu
Web pages:
http://works.bepress.com/john_donohue/
https://law.stanford.edu/directory/john-j-donohue-iii/

## EMPLOYMENT

**Full-time Positions**

- Stanford Law School, C. Wendell and Edith M. Carlsmith Professor of Law, September 2010 to the present.
- Yale Law School, Leighton Homer Surbeck Professor of Law, July 2004 to August 2010.
- Stanford Law School, Professor of Law, September 1995 to June 2004.
  - William H. Neukom Professor of Law, February 2002 – June 2004.
  - John A. Wilson Distinguished Faculty Scholar, March 1997 – January 2002.
  - Academic Associate Dean for Research, since July 2001 – July 2003.
  - Stanford University Fellow, September 2001 – May 2003.
- Northwestern University School of Law:
  - Class of 1967 James B. Haddad Professor of Law, September 1994-August 1995
  - Harry B. Reese Teaching Professor, 1994-1995
  - Professor of Law, May 1991-September 1994
  - Associate Professor, May 1989-May 1991
  - Assistant Professor, September 1986-May 1989.
- Research Fellow, American Bar Foundation, September 1986-August 1995.
- Associate Attorney, Covington & Burling, Washington, D.C., October 1978-July 1981 (including last six months as Attorney, Neighborhood Legal Services)
- Law Clerk to Chief Justice T. Emmet Clarie, U.S. District Court, Hartford, Connecticut, September 1977-August 1978.

**Temporary Appointments**

- Visiting Professor, Bocconi University, Milan, Italy, October- November 2012, April 2014, and June 2015.
- 2011 Faculty Scholar in Residence, University of Denver Sturm College of Law, April 21-22, 2011.
- Visiting Fellow, The Milton Friedman Institute for Research in Economics, University of Chicago, October 2009
- Schmidheiny Visiting Professor of Law and Economics, St. Gallen University, November – December, 2007.
- Visiting Lecturer in Law and Economics, Gerzensee Study Center, Switzerland, June 2007.
- Visiting Professor, Tel Aviv University School of Law, May 2007.
- Herbert Smith Visitor to the Law Faculty, University of Cambridge, England, February 2006.
- Visiting Professor, Harvard Law School, January 2003.

1

Exhibit 2
Page 00046

- Fellow, Center for Advanced Studies in the Behavioral Sciences, Stanford, California, Academic year 2000-01.
- Visiting Professor, Yale Law School, Fall, 1999.
- Professor, Center for the Study of American Law in China, Renmin University Law School, Beijing, July 1998.
- Visiting Professor of Law and Economics, University of Virginia, January 1997.
- Lecturer, Toin University School of Law, Yokohama, Japan, May-June 1996.
- Cornell Law School, Distinguished Visiting Fellow in Law and Economics, April 8-12, 1996 and September 25-29, 2000
- Visiting Professor, University of Chicago Law School, January 1992-June 1992.
- Visiting Professor of Law and Economics, University of Virginia Law School, January 1990-May 1990.
- Fellow, Yale Law School Program in Civil Liability, July 1985-August 1986.
- Private Practice (part-time), New Haven, Connecticut, September 1981-August 1986.
- Instructor in Economics, Yale College, September 1983-August 1985.
- Summer Associate, Donovan Leisure Newton & Irvine, New York, Summer 1982.
- Summer Associate, Perkins, Coie, Stone, Olsen & Williams, Seattle, Washington, Summer 1976.
- Research Assistant, Prof. Laurence Lynn, Kennedy School of Government, Harvard University, Summer 1975.
- LSAT Tutor, Stanley Kaplan Education Center, Boston, Massachusetts; Research Assistant, Prof. Philip Heymann, Harvard Law School; Research Assistant, Prof. Gordon Chase, Harvard School of Public Health. (During Law School).

## EDUCATION
### Yale University, 1981-1986

- University Fellow in Economics; M.A. 1982, M. Phil. 1984, Ph.D. 1986.
  - Dissertation: "A Continuous-Time Stochastic Model of Job Mobility: A Comparison of Male-Female Hazard Rates of Young Workers." Awarded with Distinction by Yale.
  - Winner of the Michael E. Borus Award for best social science dissertation in the last three years making substantial use of the National Longitudinal Surveys--awarded by the Center for Human Research at Ohio State University on October 24, 1988.

- National Research Service Award, National Institute of Health.
- Member, Graduate Executive Committee; Graduate Affiliate, Jonathan Edwards College.

### Harvard Law School, 1974-1977 (J.D.)

- Graduated Cum Laude.

- Activities:  Law Clerk (Volunteer) for Judge John Forte, Appellate Division of the District Court of Central Middlesex; Civil Rights, Civil Liberties Law Review; Intra-mural Athletics; Clinical Placement (Third Year): (a) First Semester: Massachusetts Advocacy Center; (b) Second Semester: Massachusetts Attorney General's Office--Civil Rights and Consumer Protection Divisions.  Drafted comments for the Massachusetts Attorney General on the proposed U.S. Department of Justice settlement of its case against Bechtel Corporation's adherence to the Arab Boycott of Israeli companies.

2

Exhibit 2
Page 00047

**Hamilton College, 1970-1974 (B.A.)**

- Departmental Honors in both Economics and Mathematics
  - Phi Beta Kappa (Junior Year)
- Graduated fourth in class with the following academic awards:

  - Brockway Prize
  - Edwin Huntington Memorial Mathematical Scholarship
  - Fayerweather Prize Scholarship
  - Oren Root Prize Scholarship in Mathematics

- President, Root-Jessup Public Affairs Council.

## PUBLICATIONS

**Books and Edited Volumes:**

- Law and Economics of Discrimination, Edward Elgar Publishing, 2013.
- Employment Discrimination: Law and Theory, Foundation Press, 2005, 2009 (2d edition) (with George Rutherglen).
- Economics of Labor and Employment Law: Volumes I and II, Edward Elgar Publishing, 2007. http://www.e-elgar.co.uk/bookentry_main.lasso?id=4070
- Foundations of Employment Discrimination Law, Foundation Press, 2003 (2d edition).
- Foundations of Employment Discrimination Law, Oxford University Press, 1997 (initial edition).

**Book Chapters:**

- "Drug Prohibitions and Its Alternatives." Chapter 2 in Cook, Philip J., Stephen Machin, Olivier Marie, and Giovanni Mastrobuoni, eds, *Lessons from the Economics of Crime: What Reduces Offending?* MIT Press. 45-66 (2013).

- "The Death Penalty," Chapter in Encyclopedia of Law and Economics, Spring (2013).

- "Rethinking America's Illegal Drug Policy," in Philip J. Cook, Jens Ludwig, and Justin McCrary, eds, Controlling Crime: Strategies and Tradeoffs (2011), pp.215-289 (with Benjamin Ewing and David Peloquin).

- "Assessing the Relative Benefits of Incarceration: The Overall Change Over the Previous Decades and the Benefits on the Margin," in Steven Raphael and Michael Stoll, eds., "Do Prisons Make Us Safer? The Benefits and Costs of the Prison Boom," pp. 269-341 (2009).

- "Does Greater Managerial Freedom to Sacrifice Profits Lead to Higher Social Welfare?" In Bruce Hay, Robert Stavins, and Richard Vietor, eds., Environmental Protection and the Social Responsibility of Firms: Perspectives from Law, Economics, and Business (2005).

- "The Evolution of Employment Discrimination Law in the 1990s: A Preliminary Empirical Evaluation" (with Peter Siegelman), in Laura Beth Nielsen and Robert L. Nelson, eds., Handbook of Employment Discrimination Research (2005).

3

Exhibit 2
Page 00048

- "Divining the Impact of Concealed Carry Laws," in Jens Ludwig and Philip Cook, Evaluating Gun Policy: Effects on Crime and Violence (Washington D.C.: Brookings, 2003).

Articles:

- "Right-to-Carry Laws and Violent Crime: A Comprehensive Assessment Using Panel Data and a State-Level Synthetic Controls Analysis" NBER Working Paper w23510, www.nber.org/papers/w23510, June 2017 (with Abhay Aneja, and Kyle Weber).

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," 117 Columbia Law Review 1297 (2017). http://columbialawreview.org/content/comey-trump-and-the-puzzling-pattern-of-crime-in-2015-and-beyond/.

- "Did Jeff Sessions forget wanting to execute pot dealers?" The Conversation, January 23, 2017 (with Max Schoening), https://theconversation.com/did-jeff-sessions-forget-wanting-to-execute-pot-dealers-71694
    - o Reprinted in Huffington Post, http://www.huffingtonpost.com/the-conversation-us/did-jeff-sessions-forget_b_14344218.html
    - o Reprinted in Salon, http://www.salon.com/2017/01/30/jeff-sessions-forgetting-he-once-wanted-to-execute-pot-dealers/#comments

- "Jeff Sessions, The Grim Reaper of Alabama," The New York Times, January 9, 2017 (with Max Schoening), http://www.nytimes.com/2017/01/08/opinion/jeff-sessions-the-grim-reaper-of-alabama.html

- "Testing the Immunity of the Firearm Industry to Tort Litigation," JAMA Intern Med. Published online November 14, 2016. http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2582991 (with David Studdert and Michelle Mello).

- "Empirical Analysis and the Fate of Capital Punishment," 11 Duke Journal of Constitutional Law and Public Policy 51-106 (2016). Available at: http://scholarship.law.duke.edu/djclpp/vol11/iss1/3

- "Firearms on College Campuses: Research Evidence and Policy Implications," Johns Hopkins Bloomberg School of Public Health, (October 15, 2016)(with Daniel Webster et al). http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/_pdfs/GunsOnCampus.pdf

- "Be skeptical about claims of benefits of concealed carry permits." Sacramento Bee, (October 6, 2016), http://www.sacbee.com/opinion/op-ed/soapbox/article106329677.html

- "The Death Penalty Does Not Add Up to Smart Justice," California State Treasurer Intersections (September 2016),http://treasurer.ca.gov/newsletter/2016/201609/conversation.asp

4

Exhibit 2
Page 00049

ER_2242

- "Reducing civilian firepower would boost police and community safety, Stanford expert says," Stanford News (July 2016), http://news.stanford.edu/2016/07/15/reducing-civilian-firepower-boost-police-community-safety/review/

- "Domestic Violence and Effectively Terminating the Gun Rights of the Dangerous," Legal Aggregate – Stanford Law School (June 2016), https://law.stanford.edu/2016/06/28/domestic-violence-and-effectively-terminating-the-gun-rights-of-the-dangerous/

- "4 Gun Control Steps U.S. Needs Now," CNN.com (June 2016), http://www.cnn.com/2016/06/23/opinions/gun-control-donohue/index.html

- "The Demise of the Death Penalty in Connecticut, " Legal Aggregate - Stanford Law School (June 2016), https://law.stanford.edu/2016/06/07/the-demise-of-the-death-penalty-in-connecticut/

- "Empirical Evaluation of Law:  The Dream and the Nightmare," 17 American Law and Economics Review 313 2015.

- "Capital Punishment Does not Deter Homicides," Casetext, August 30, 2015, https://casetext.com/posts/capital-punishment-does-not-deter-homicides

- "There's no evidence that death penalty is a deterrent against crime," The Conversation, August 8, 2015. http://theconversation.com/theres-no-evidence-that-death-penalty-is-a-deterrent-against-crime-43227

- "Glossip v. Gross: Examining Death Penalty Data for Clarity," Stanford Lawyer, June 29, 2015. http://stanfordlawyer.law.stanford.edu/2015/06/glossip-v-gross-examining-death-penalty-data-for-clarity/

- "How US Gun Control Compares to the Rest of the World," The Conversation, June 24, 2015. http://theconversation.com/how-us-gun-control-compares-to-the-rest-of-the-world-43590
    - Reprinted in slightly modified form under the title "Ban guns, end shootings? How evidence stacks up around the world," in CNN.com on August 27, 2015 http://www.cnn.com/2015/08/27/opinions/us-guns-evidence/

- "The 10 day period is reasonable," San Francisco Daily Journal, September 3, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty System Since 1973:  Are There Unlawful Racial, Gender, and Geographic Disparities?" 11 Journal of Empirical Legal Studies 637 (2014).

- "The Impact of Right to Carry Laws and the NRC Report:  The Latest Lessons for the Empirical Evaluation of Law and Policy," NBER Working Paper 18294. Revised November 2014 (with Abhay Aneja and Alexandria Zhang), http://www.nber.org/papers/w18294

- "Do Police Reduce Crime? A Reexamination of a Natural Experiment," in Yun-Chien Chang, ed., Empirical Legal Analysis: Assessing the Performance of Legal Institutions, London: Routledge, Chapt. 5, pp. 125-143, 2014 (with Daniel E. Ho & Patrick Leahy)

5

Exhibit 2
Page 00050

- "Reflections on the Newtown Shooting One Year Later," Stanford Lawyer, December 5, 2013. http://stanfordlawyer.law.stanford.edu/2013/12/reflections-on-the-newtown-shooting-one-year-later/

- Outlier Nation: Homicides, Incarceration, Guns and Gun Culture, TAR 9 (Verona, Italy: 2013).

- "Gun lunacy rides high in America," Special to CNN, September 13, 2013. http://www.cnn.com/2013/09/13/opinion/donohue-gun-control/index.html?iref=allsearch

- "Why the NRA fights background checks," Special to CNN, Wed April 10, 2013. http://www.cnn.com/2013/04/10/opinion/donohue-background-checks/index.html

- "Substance vs. Sideshows in the More Guns, Less Crime Debate: A Comment on Moody, Lott, and Marvell" (with Abhay Aneja, and Alexandria Zhang) ECON JOURNAL WATCH 10(1) January 2013: 32-39

- "More Guns, Less Crime Thesis," Guns in American Society: An Encyclopedia of History, Politics, Culture, and the Law (volume 2:G-Q, at page 585) (2012).

- "Jury Nullification in Modified Comparative Negligence Regimes," 79 The University of Chicago Law Review 945 (2012)(with Eli K. Best).

- "What Can Be Done to Stem Gun Violence?" San Francisco Chronicle, December 21, 2012.   http://www.sfgate.com/opinion/article/What-can-be-done-to-stem-gun-violence-4139575.php#ixzz2G4qlkJJ2

- "When Will America Wake Up to Gun Violence?" CNN opinion, July 21, 2012. Posted to: http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/.

- "Time To Kill The Death Penalty?" The California Progress Report, June 28, 2012.

- "Assessing Post-ADA Employment: Some Econometric Evidence and Policy Considerations." Journal of Empirical Legal Studies Vol. 8: No. 3, September 2011, pp. 477-503 (with Michael Ashley Stein, Christopher L. Griffin, Jr. and Sascha Becker).

- "The Impact of Right-to-Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," Am Law Econ Rev (Fall 2011) 13 (2): 565-631 (with Abhay Aneja and Alex Zhang).  See January 2014 Revision released as an NBER working paper above.

- "Punishment is a Cost, Not a Benefit," Review of Mark A. R. Kleiman's "When Brute Force Fails: How to Have Less Crime and Less Punishment," XLVII Journal of Economic Literature (March 2010), 168-172.

- "The Politics of Judicial Opposition: Comment," Journal of Institutional and Theoretical Economics, 166(1), 108—114 (2010).

- "Introduction to the Death Penalty Symposium," 11 American Law and Economics Review. v (Fall 2009) (with Steve Shavell).

- "Estimating the Impact of the Death Penalty on Murder." 11 American Law and Economics Review 249 (Fall 2009) (with Justin Wolfers).

6

Exhibit 2
Page 00051

- "The Impact of the Death Penalty on Murder," Criminology & Public Policy (November 2009, Volume 8, Issue 4) at pp. 795-801.

- "The Impact of Legalized Abortion on Teen Childbearing," 11 American Law and Economics Review 24 (2009) (with Jeff Grogger and Steven Levitt).

- "More Guns, Less Crime Fails Again:  The Latest Evidence from 1977-2006," 6 Econ Journal Watch 218-233 (May 2009)(with Ian Ayres).

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell," 6 Econ Journal Watch 35-59 (January 2009)(with Ian Ayres).

- "Measurement Error, Legalized Abortion, and the Decline in Crime: A Response to Foote and Goetz," The Quarterly Journal of Economics (2008) 123 (1): 425-440 (with Steven Levitt). http://qje.oxfordjournals.org/content/123/1/425.abstract

- "AntiDiscrimination Law," in Steven Durlauf and Lawrence Bloom, eds., The New Palgrave Dictionary of Economics, 2d Edition, 2008.

- "Murder in Decline in the 1990s: Why the U.S. and N.Y.C. Were Not That Special," Punishment and Society  10: 333 (2008) at http://pun.sagepub.com

- "Understanding the 1990s Crime Drops in the U.S. and Canada," Canadian Journal of Criminology and Criminal Justice, Vol 49, No. 4, p. 552 (October 2007).

- "The Law and Economics of Antidiscrimination Law," A. M. Polinsky and Steven Shavell, eds.,  Handbook of Law and Economics, Volume 2 (2007), Pages 1387-1472.

- "Economic Models of Crime and Punishment," Social Research, Vol. 74: No. 2, Summer 2007, pp. 379-412.

- "Rethink the War on Drugs," Yale Law Reports, Summer 2007, pp. 46-47.

- "More Cops," Brookings Policy Brief #158, March 2007 (with Jens Ludwig), http://www.brookings.edu/papers/2007/03crime_john-j--donohue-iii.aspx.

- "Studying Labor Market Institutions in the Lab: Minimum Wages, Employment Protection, and Workfare: Comment," Journal of Theoretical and Institutional Economics, 163(1), 46—51 (March 2007).

- "The Impact of Damage Caps on Malpractice Claims:  Randomization Inference with Difference-in-Differences," (with Daniel Ho), 4 Journal of Empirical Legal Studies 69 (2007).

- "The Discretion of Judges and Corporate Executives:  An Insider's View of the Disney Case," The Economists' Voice: Vol. 3: No. 8, Article 4.  Available at: http://www.bepress.com/ev/vol3/iss8/art4

- "The Knicks Boldly Go Where Companies Have Not," The New York Times, July 2, 2006 Sunday (with Ian Ayres).

- "The Death Penalty:  No Evidence of Deterrence," The Economists' Voice, (with Justin Wolfers) (April 2006), http://bpp.wharton.upenn.edu/jwolfers/Press/DeathPenalty(BEPress).pdf.
  - Reprinted in Stiglitz, Edlin, and DeLong (eds), The Economists' Voice: Top Economists Take on Today's Problems (2008).

- "The Costs of Wrongful-Discharge Laws," 88 Review of Economics and Statistics (with David Autor and Stewart Schwab)(2006), pp. 211-31.

7

Exhibit 2
Page 00052

**ER_2245**

- "Security, Democracy, and Restraint," 1 Opening Argument 4 (February 2006).
  - Reprinted in Loch Johnson and James Wirtz, Intelligence and National Security: An Anthology 406-407 (2d ed. 2008).

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," 58 Stanford Law Review 791 (2005) (with Justin Wolfers).

  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).
  - Reprinted in Robert Cooter and Francesco Parisi, eds., Foundations of Law and Economics, Edward Elgar Publishing (2010)

- "Does Terrorism Increase Crime?  A Cautionary Tale," (with Daniel Ho), 2005.

- "Fighting Crime:  An Economist's View," 7 The Milken Institute Review 46 (2005).
  - Reprinted in Kurt Finsterbusch, ed., Social Problems (McGraw-Hill, 2006).

- "Guns, Crime, and the Impact of State Right-to-Carry Laws," 73 Fordham Law Review 623 (2004).

- "Clinton and Bush's Report Cards on Crime Reduction: The Data Show Bush Policies Are Undermining Clinton Gains", The Economists' Voice: Vol. 1: No. 1, Article 4. 2004, http://www.bepress.com/ev/vol1/iss1/art4

- "The Employment Consequences of Wrongful-Discharge Laws: Large, Small, or None at All?" American Economic Review:  Papers and Proceedings May, 2004 (with David Autor and Stewart Schwab).

- "Further Evidence that Legalized Abortion Lowered Crime:  A Reply To Joyce," 39 Journal of Human Resources 29 (Winter 2004)(with Steven Levitt).

- "The Final Bullet in the Body of the More Guns, Less Crime Hypothesis," Criminology & Public Policy (July 2003, Volume 2, Issue 3) at pp. 397-410.

- "Shooting Down the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1193 (2003)(with Ian Ayres).

- "The Latest Misfires in Support of the 'More Guns, Less Crime' Hypothesis," 55 Stanford Law Review 1371 (2003)(with Ian Ayres).

- "Can Guns, Or Gun Violence, Be Controlled?" (Reviewing James Jacobs, Can Gun Control Work?), The American Prospect (December 16, 2002), p. 35.

- "The Search for Truth:  In Appreciation of James J. Heckman," 27 Law and Social Inquiry 23 (2002).

- "The Schooling of Southern Blacks:  The Roles of Social Activism and Private Philanthropy, 1910-1960," Quarterly Journal of Economics (Feb. 2002), (with James Heckman and Petra Todd), pp. 225 – 268.
  - Reprinted in Legal Decisionmaking section of the American Bar Foundation Anthology, ABF Press (2007).
  - Reprinted in American Bar Foundation, Anaylyzing Law's Reach: Empirical Research on Law and Society (2008)

- "The Impact of Race on Policing and Arrests," Journal of Law and Economics, vol. XLIV October 2001)(with Steven Levitt), pp. 367 – 394.

- "The Impact of Legalized Abortion on Crime," Quarterly Journal of Economics (Vol. CXVI, Issue 2, May 2001)(with Steven Levitt) pp. 379-420.

8

Exhibit 2
Page 00053

ER_2246

- Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).
- Reprinted in Robert Cooter and Francesco Parisi, eds., Recent Developments in Law And Economics, Edward Elgar Publishing (2010).

• "Understanding the Reasons for and Impact of Legislatively Mandated Benefits for Selected Workers," 53 Stanford Law Review 897 (2001).
  - Reprinted in Michael Zimmer, Charles Sullivan et al, Cases and Materials on Employment Discrimination (6th edition)(2003).

• "Nondiscretionary Concealed Weapons Law: A Case Study of Statistics, Standards of Proof, and Public Policy," American Law and Economics Review 436 (1999)(with Ian Ayres).
  - Reprinted in Steven Levitt and Thomas Miles, eds., The Economics of Criminal Law, Edward Elgar Publishing (2008).

• "Why We Should Discount the Views of Those Who Discount Discounting," 108 Yale Law Journal 1901 (1999).

• "Understanding  The Time Path of Crime," 88 Journal of Criminal Law and Criminology 1423 (1998).

• "Discrimination in Employment," The New Palgrave Dictionary of Law and Economics (1998).
  - Excerpted in Lynne Dallas, Law and Public Policy: A Socio-Economic Approach (2003).

• "The Legal Response to Discrimination: Does Law Matter?" in Bryant Garth, Austin Sarat, eds., How Does Law Matter? Pp. 45 – 75 (Northwestern University Press, 1998).

• "Some Thoughts on Law and Economics and the Theory of the Second Best," 73 Chicago-Kent Law Review 257 (1998).

• "Allocating Resources Among Prisons and Social Programs in the Battle Against Crime," 27 Journal of Legal Studies 1 (1998) (with Peter Siegelman).
  - Excerpted in Sanford Kadish & Stephen Schulhofer, Criminal Law and Its Processes (8th ed. 2007),

• "Guns, Violence, and the Efficiency of Illegal Markets," 88 American Economic Review 463 (May 1998)(with Steve Levitt).

• "Did Miranda Diminish Police Effectiveness?" 50 Stanford Law Review 1147 (1998).

• "Some Thoughts on Affirmative Action," 75 Washington University Law Quarterly 1590 (1997).

• "Executive Compensation," 3 Stanford Journal of Law, Business & Finance 1 (1997).

• "Some Perspective on Crime and Criminal Justice Policy," Lawrence Friedman and George Fisher, eds., The Crime Conundrum: Essays on Criminal Justice 45 (1997).

• "The Selection of Employment Discrimination Disputes for Litigation: Using Business Cycle Effects to Test the Priest/Klein Hypothesis," 24 Journal of Legal Studies 427 (1995) (with Peter Siegelman).

• "Employment Discrimination Law in Perspective: Three Concepts of Equality," 92 Michigan Law Review 2583 (1994).

• Reprinted in Frank Ravitch, Janis McDonald, and Pamela Sumners, Employment Discrimination Law (2004).
  - Translated into Chinese and published in Peking University Law Review (2007).

9

Exhibit 2
Page 00054

ER_2247

- "The Effects of Joint and Several Liability on Settlement Rates:  Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," 23 Journal of Legal Studies 543 (1994).

- "Liberal Law and Economics," (reviewing Rethinking the Progressive Agenda by Susan Rose-Ackerman), 13 Journal of Policy Analysis and Management 192 (1994).

- Review of Richard Epstein's Forbidden Grounds: The Case Against Employment Discrimination Laws, 31 Journal of Economic Literature 1477 (1994).

- "Law and Macroeconomics:  Employment Discrimination Over the Business Cycle," 66 University of S. Calif. L. Rev. 709 (1993) (with Peter Siegelman).

- "Advocacy Versus Analysis in Assessing Employment Discrimination Law," 44 Stanford Law Review 1583 (1992).
  - Reprinted in Christopher McCrudden, Anti-Discrimination Law (2003).

- Excerpted in Professors Michael J. Zimmer, Charles A. Sullivan, & Rebecca Hanner White, Cases and Materials on Employment Discrimination (Seventh Edition 2008).

- "The Changing Nature of Employment Discrimination Litigation," 43 Stanford Law Review 983 (1991) (with Peter Siegelman).

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," 54 Law and Contemporary Problems 195 (1991).

- "Re-Evaluating Federal Civil Rights Policy," 79 Georgetown Law Journal 1713 (1991) (with James Heckman).

- "Opting for the British Rule; Or, If Posner and Shavell Can't Remember the Coase Theorem, Who Will?" 104 Harvard Law Review 1093 (1991).
  - Reprinted in Saul Levmore, Foundations of Tort Law 160 (1994).

- "Continuous versus Episodic Change:  The Impact of Civil Rights Policy on the Economic Status of Blacks," 29 Journal of Economic Literature 1603 (December 1991) (with James Heckman).
  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

- "The Impact of Federal Civil Rights Policy on the Economic Status of Blacks," 14 Harvard Journal of Law and Public Policy 41 (1991).

- "Studying the Iceberg From Its Tip:  A Comparison of Published and Unpublished Employment Discrimination Cases," 24 Law and Society Review 1133 (1990) (with Peter Siegelman).

- "Prohibiting Sex Discrimination in the Workplace:  An Economic Perspective," 56 University of Chicago Law Review 1337 (1989).

- "The Law & Economics of Tort Law:  The Profound Revolution," 102 Harvard Law Review 1047 (1989).

- "Using Market Incentives to Promote Auto Occupant Safety," 7 Yale Law and Policy Review 449 (1989).

- "Diverting the Coasean River: Incentive Schemes to Reduce Unemployment Spells," 99 Yale Law Journal 549 (1989).
  - Winner of the 1989 Scholarly Paper Competition, Association of American Law Schools.

- "Reply to Professors Ellickson and Stigler," 99 Yale Law Journal 635 (1989).

10

Exhibit 2
Page 00055

- "Law and Economics: The Road Not Taken," 22 Law and Society Review 903 (1988).

- "Further Thoughts on Employment Discrimination Legislation: A Reply to Judge Posner," 136 U. Pa. L. Rev. 523 (1987).

- "Judge Bork, Anti-Trust Law, and the Bending of 'Original Intent'," Chicago Tribune, sec.1, pg. 15, July 22, 1987.

- "Posner's Third Symphony: Thinking about the Unthinkable," 39 Stanford Law Review 791 (1987)(with Ian Ayres).

- "Determinants of Job Turnover of Young Men and Women in the U.S.--A Hazard Rate Analysis," in Schultz, T.P., ed., Research in Population Economics, vol.6, Greenwich, Conn.: JAI Press (1987).

- "A Comparison of Male-Female Hazard Rates of Young Workers, 1968-1971," Working Paper #48, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Hazard Rates of Young Male and Female Workers--Recent Developments," Working Paper #51, Center for Studies in Law, Economics and Public Policy; Yale Law School (1986).

- "Is Title VII Efficient?" 134 U. Pa. L. Rev. 1411 (1986).
  - Reprinted in Paul Burstein, ed., Equal Employment Opportunity, Aldine De Gruyter, New York (1994).

- "Section I Cases," Sherman's Summations, Vol.3, No.2, Sherman Act Committee of the A.B.A. Antitrust Section, Fall, 1982, at 49.

- "An Evaluation of the Constitutionality of S. 114, The Proposed Federal Death Penalty Statute," Hearings before the U.S. Senate Judiciary Committee, April 27, 1981, at 151.

- "Godfrey v. Georgia: Creative Federalism, the Eighth Amendment, and the Evolving Law of Death," 30 Catholic University Law Review 13 (1980).

- "Criminal Code Revision--Contempt of Court and Related Offenses," Hearings before the Subcommittee on Criminal Justice of the House Judiciary Committee, July 18, 1979, at 1087.

**Blog Posts:**

- "Orlando to Las Vegas: Guns, Law, and Mass Shootings in the U.S.," Stanford Law School Legal Aggregate Blog, October 3, 2017, https://law.stanford.edu/2017/10/03/orlando-to-las-vegas-guns-and-law/.

- "Moore v. Texas and the Pathologies that Still Mar Capital Punishment in the U.S.," March 29, 2017, https://law.stanford.edu/2017/03/29/moore-v-texas-and-the-pathologies-that-mar-capital-punishment-in-the-u-s/

- "Trump and Gun Policy," Stanford Law School Legal Aggregate Blog, November 12, 2016, http://stanford.io/2eoWnna

- "Facts Do Not Support Claim That Guns Make Us Safer" Stanford Law School Legal Aggregate Blog, October 12, 2015, https://law.stanford.edu/2015/10/12/professor-john-donohue-facts-do-not-support-claim-that-guns-make-us-safer/

- "When will America wake up to gun violence?" CNN.com, July 20, 2012, http://www.cnn.com/2012/07/20/opinion/donohue-gun-control/index.html

11

Exhibit 2
Page 00056

- "It Takes Laws to Control the Bad Guys," The New York Times -- Room For Debate: http://www.nytimes.com/roomfordebate/2011/01/11/more-guns-less-crime (January 11, 2011).

- "Have "Woman-Protective" Studies Resolved the Abortion Debate? Don't Bet on It," http://balkin.blogspot.com/2008/09/have-woman-protective-studies-resolved.html (September 2008).

- "Dodging the Death Penalty Bullet On Child Rape," http://balkin.blogspot.com/2008/07/dodging-death-penalty-bullet-on-child.html (July 2008).

- "Why I'd Stick With Yale Clerks-- Some Econometric Ruminations," http://balkin.blogspot.com/2008/04/why-id-stick-with-yale-clerks-some.html (April 2008).

## WORKSHOPS AND ADDRESSES

- Panelist, "Public Carry: Defending Against Efforts to Expand Carry Laws," **National Gun Violence Prevention Meeting**, Washington, D.C., October 18, 2017

- "Keynote Presentation: Right-to-Carry Laws and Violent Crime," Second Amendment Litigation & Jurisprudence Conference, **The Law Center to Prevent Gun Violence**, October 16, 2017.

- "The Latest Evidence on Abortion Legalization and Crime," Conference on Empirical Legal Studies, Cornell University, October 13, 2017.

- "Comey, Trump, and the Puzzling Pattern of Crime in 2015 and Beyond," **University of Texas School of Law and Economics Seminar**, April 24, 2017, Faculty Workshop, **UC Davis School of Law**, April 10, 2017; Law and Social Science Seminar, **Texas A&M University School of Law**, March 6, 2017; Quantlaw, **University of Arizona Law School**, February 17, 2017.

- Debate with Kent Scheidegger on Capital Punishment, Philosophy of Punishment Seminar, JFK **University School of Law**, March 18, 2017.

- "The Evidence on Guns and Gun Laws," Federal Bar Council Program on Guns and Gun Laws -- Rancho Mirage, California, February 23, 2017.

- "Guns, Crime and Race in America," Stanford's Center for Population Health Sciences, **Stanford Medical School**, October 17, 2016.

- "Evaluating the Death Penalty," Forum on California Propositions 62 and 66, **Stanford Law School**, September 14, 2016.

- "Empirical Analysis and the Fate of Capital Punishment," Colloquium, Presley Center for Crime and Justice Studies, **University of California, Riverside**, October 24, 2016.

- "Gun Violence and Mental Illness," Department of Psychiatry, **Stanford University**, August 25, 2016.

- "The Battle Over Gun Policy in America," Physicians and Social Responsibility" seminar; **Stanford Medical School**, October 3, 2016; **Bioethics Committee of the San Mateo County Medical Association**, April 27, 2016; **The League of Women Voters of Palo Alto**, April 19, 2016; Human Rights and Health Seminar, **Stanford**

12

Exhibit 2
Page 00057

ER_2250

University, April 12, 2016; Bechtel International Center, Stanford University, February 23, 2016; Stanford in Government Seminar, Haas Center, Stanford University, February 2, 2016.

- American Economic Association Continuing Education Course "The Economics of Crime" (with Jens Ludwig), AEA Annual Meeting, San Francisco, January 5-7, 2016.

- "Race and Arbitrariness in the Connecticut Death Penalty," University of Connecticut School of Law, Nov. 20, 2015.

- "Connecticut v. Santiago and the Demise of the Connecticut Death Penalty," Faculty Workshop, Stanford Law School, August 19, 2015.

- "Do Handguns Make Us Safer? A State-Level Synthetic Controls Analysis of Right-to-Carry Laws," Second Amendment Conference, Covington and Burling, New York, May 14, 2015; NBER Summer Institute, Cambridge, MA, July 23, 2015; Faculty Workshop, Stanford Law School, November 11, 2015.

- "U.S. Criminal Justice Under Siege : Will Becker or Beccaria Prevail?" Faculty Seminar, Bocconi University School of Law, Milan, Italy, June 18, 2015.

- "Can You Believe Econometric Evaluations of Law, Policy, and Medicine?" Stanford Law School, Legal Theory Workshop, March 1, 2007; Faculty Workshop, Tel Aviv University School of Law, May 14, 2007; Faculty Workshop, University of Haifa Law School, May 16, 2007; Law and Economics Workshop, Georgetown Law School, September 19, 2007; Law and Economics Workshop, St. Gallen Law School, Switzerland, November 29, 2007; and Yale Law School, February 25, 2008; Law and Economics Workshop, Swiss Institute of Technology, Zurich, Switzerland, May 21, 2008; Faculty Workshop, University of Virginia Law School, October 24, 2008; Plenary Session, Latin American and Caribbean Law and Economics Association, Universitat Pompeu Fabra (Barcelona), June 15, 2009; Google, Milan, Italy, June 8, 2015.

- Commentator: ""Throw Away the Jail or Throw Away The Key? The Effect of Punishment on Recidivism and Social Cost,"" by Miguel F. P. de Figueiredo, American Law and Economics Association Meetings, Columbia Law School, May 15, 2015.

- "Broken Windows, Stop and Frisk, and Ferguson," 2015 Justice Collaboratory Conference: Policing Post-Ferguson, Yale Law School, April 17, 2015.

- "Assessing the Development and Future of Empirical Legal Studies," Stanford Law School course on Modern American Legal Thought, February 25, 2015.

- Commentator: "Payday Lending Restrictions and Crimes in the Neighborhood," by Yilan Xu, 9th Annual Conference on Empirical Legal Studies, Boalt Hall, Berkeley, CA, November 7, 2014.

- "An Empirical Evaluation of the Connecticut Death Penalty Since 1973: Are There Unconstitutional Race, Gender and Geographic Disparities?" Faculty Workshop, Economics Department, Rice University, Houston, TX, Feb. 18, 2014; Law and Economics Workshop, University of Virginia Law School, September 11, 2014; Faculty Colloquium, University of San Diego School of Law, October 3, 2014.

- "What's Happening to the Death Penalty? A Look at the Battle in Connecticut," Hamilton College, Clinton, New York, June 6, 2014.

13

Exhibit 2
Page 00058

- Panel Member, Research Methods Workshop, Conference for Junior Researchers on Law and Society, **Stanford Law School**, May 15, 2014.

- "Logit v. OLS: A Matter of Life and Death," Annual Meeting of the American Law and Economics Association, **University of Chicago**, May 9, 2014.

- "Guns: Law, Policy, Econometrics," Second Amendment Litigation and Jurisprudence Conference, **Jenner & Block**, Chicago, May 8, 2014.

- "The Impact of Antidiscrimination Law: The View 50 Years after the Civil Rights Act of 1964," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Concealed Carry and Stand Your Ground Law," **Renaissance Weekend**, Liguna Niguel, CA, Feb. 15, 2014.

- "Reducing Gun Violence," Forum on Gun Violence Reduction, Mountainview City Hall, Mountainview, CA, Feb. 8, 2014.

- "Gun Policy Debate," C-SPAN. National Cable Satellite Corporation, Jan. 16, 2014. <http://www.c-span.org/video/?317256-1/GunPoli>.

- "Trial and Decision in the Connecticut Death Penalty Litigation," Faculty Workshop, Stanford Law School, November 20, 2013.

- "Rethinking America's Illegal Drug Policy," Law and Economics Workshop, **Harvard Law School**, April 20, 2010; NBER Conference, "Economical Crime Control," **Boalt Hall**, Berkeley, CA, January 16, 2010; NBER Summer Institute Pre-Conference "Economical Crime Control," July 23, 2009; **Whitney Center** Lecture Series, Hamden, CT, October 5, 2009; Law and Economics Workshop, **University of Chicago Law School**, October 13, 2009; Seminar for Spanish Law Professors, **Harvard Law School**, October 23, 2009; The Criminal Law Society, **Stanford Law School**, March 31, 2011, **University of Denver Sturm College of Law**, April 21, 2011; Law and Economics Workshop, **Boalt Hall**, Berkeley, CA, October 17, 2011; Shaking the Foundations Conference, **Stanford Law School**, November 2, 2013.

- "The Challenge to the Connecticut Death Penalty," **Yale Law School**, Death Penalty Clinic, November 5, 2007; Graduate Student Seminar, November 11, 2009; Stanford Program in International Legal Studies Seminar, **Stanford Law School**, Nov. 11, 2010; Faculty Workshop, **Stanford Law School**, June 8, 2011; Faculty workshop, **Duke Law School**, April 13, 2012; Program on Public Policy, **Stanford University**, May 2, 2012; Annual Meeting of the American Law and Economics Association, **Vanderbilt Law School**, Nashville, TN, May 18, 2013; Faculty Workshop, **University of Arizona Law School**, October 17, 2013; 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 26, 2013.

- Commentator: "How to Lie with Rape Statistics" by Corey Rayburn Yung, 8th Annual Conference on Empirical Legal Studies, **University of Pennsylvania Law School**, October 2013.

- "An Empirical Look at Gun Violence in the U.S." **University of Arizona Law School**, October 17, 2013

- Discussant, "Sex Offender Registration and Plea Bargaining," **NBER Labor Summer Institute**, Cambridge, MA, July 25, 2013.

- "What Works in the War Against Crime?" **Renaissance Weekend**, Jackson Hole, Wyoming, July 5, 2013.

14

Exhibit 2
Page 00059

ER_2252

- Seminar Presentation, "Statistics and the Streets – Curbing Crime, Realities of the Death Penalty, and Successes in Public Safety," Renaissance Weekend, Jackson Hole, Wyoming, July 5, 2013.

- Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) – "Stemming Gun Violence," Renaissance Weekend, Jackson Hole, Wyoming, July 5, 2013.

- "Can Laws Reduce Crime?" Safe Oakland Speakers Series, Holy Names University, Oakland, CA, May 1, 2013, http://www.ustream.tv/channel/safe-oakland-speaker-series

- Presentation on "The Death Penalty in America" on a panel on "human rights and criminal justice systems in the world," Science for Peace conference at Bocconi University in Milan, Italy, November 15, 2012. http://www.fondazioneveronesi.it/scienceforpeace2012/

- Seminar Presentation, "America's Criminal Justice System," Renaissance Weekend, Santa Monica, CA., Feb. 19, 2012.

- "Statistical Inference, Regression Analysis and Common Mistakes in Empirical Research," SPILS Fellow's Workshop, Stanford Law School, February 2, 2012.

- "New Evidence in the 'More Guns, Less Crime' Debate: A Synthetic Controls Approach," Conference on Empirical Legal Studies, Northwestern Law School, November 4, 2011.

- "Drug Legalization and its Alternatives," Lessons from the Economics of Crime: What Works in Reducing Offending? CESifo Venice Summer Institute Workshop, July 22 , 2011.

- "Incapacitating Addictions: Drug Policy and American Criminal Justice," in Rethinking the War on Drugs through the US-Mexico Prism," Yale Center for the Study of Globalization, May 12, 2011.

- Plenary Session: Flashes of Genius (Glimpses of Extra-ordinarily Novel Thinking) -- "Has Legalized Abortion Reduced Crime?" Renaissance Weekend, Liguna Niguel, CA., Feb. 18, 2011.

- "An Evidence-Based Look at the More Guns, Less Crime Theory (after Tucson)" The American Constitution Society for Law and Policy (ACS), Stanford Law School, January 25, 2011; Renaissance Weekend, Liguna Niguel, CA., Feb. 19, 2011; "Faculty Forum" at the External Relations Office, Stanford Law School, April 5, 2011.

- "Empirical Evaluation of Law: The Dream and the Nightmare," SPILS Fellows Lecture, Stanford Law School, January 15, 2015; Legal Studies Workshop, Stanford Law School, Feb. 7, 2011; Renaissance Weekend, Liguna Niguel, CA., Feb. 20, 2011; University of Denver Sturm College of Law, April 22, 2011; Presidential Address, Annual Meeting of the American Law and Economics Association, Columbia University, May 20, 2011.

- Death Sentencing in Connecticut," American Society of Criminology Annual Meeting, San Francisco, Nov. 17, 2010.

- "The Impact of Right to Carry Laws and the NRC Report: Lessons for the Empirical Evaluation of Law and Policy," Conference on Empirical Legal Studies, Yale Law School, Nov. 6, 2010.

- Comment on Bushway and Gelbach, "Testing for Racial Discrimination in Bail Setting Using Nonparametric Estimation of a Parametric Model," Conference on Empirical Legal Studies, Yale Law School, Nov. 6, 2010.

15

Exhibit 2
Page 00060

ER_2253

- Commentator, "A Test of Racial Bias in Capital Sentencing," NBER Political Economy Program Meeting, April 23, 2010.

- "The (Lack of a) Deterrent Effect of Capital Punishment," Faculty Workshop, **University of Chicago Economics Department**, October 21, 2009.

- Keynote Address, "The Evolution of Econometric Evaluation of Crime and Deterrence,"1st Paris& Bonn Workshop on Law and Economics: The Empirics of Crime and Deterrence, **University of Paris Ouest Nanterre,** September 24, 2009.

- Comment on Cook, Ludwig, and Samaha, "Gun Control after *Heller*: Litigating Against Regulation," NBER Regulation and Litigation Conference, **The Boulders,** Carefree, Arizona, September 11, 2009.

- "Impact of the Death Penalty on Murder in the US," Faculty Workshop, Law School, **Universitat Pompeu Fabra (Barcelona),** June 18, 2009.

- Comment on Joanna Shepherd's "The Politics of Judicial Opposition," Journal of Institutional and Theoretical Economics Conference, **Kloster Eberbach, Germany,** June 12, 2009.

- "The Great American Crime Drop of the '90s: Some Thoughts on Abortion Legalization, Guns, Prisons, and the Death Penalty," Hamilton College, Clinton, NY, June 5, 2009.

- "The Impact of the ADA on the Employment and Earnings of the Disabled," **American Law and Economics Association Meetings,** University of San Diego, May 15, 2009.

- "Crime and Punishment in the United States," **Eastern State Penitentiary,** Yale Alumni Event, Philadelphia, PA, April 26, 2009.

- "Measuring Culpability in Death Penalty Cases," Conference on Applications of Economic Analysis in Law, **Fuqua School of Business, Duke University,** April 18, 2009.

- "Autopsy of a Financial Crisis," Workshop on New International Rules and Bodies for Regulating Financial Markets, **State University of Milan,** March 23, 2009.

- "Yet Another Refutation of the More Guns, Less Crime Hypothesis – With Some Help From Moody and Marvell, Law and Economics Workshop, **NYU Law School,** March 10, 2009.

- Intelligence-Squared Debate: "Guns Reduce Crime," **Rockefeller University,** New York, October 28, 2008.

- "The D.C. Handgun Controls: Did the Supreme Court's Decision Make the City Safer?" Debate, **The Contemporary Club of Albemarle,** Charlottesville, VA, October 23, 2008.

- "Evaluating the Empirical Claims of the Woman-Protective Anti-Abortion Movement," Panel on The Facts of the Matter: Science, Public Health, and Counseling, Yale Conference on the Future of Sexual and Reproductive Rights, **Yale Law School,** October 11, 2008.

- "Empirical Evaluation of Gun Policy," **Harvard Law School,** October 9, 2008.

- "Assessing the Relative Benefits of Incarceration: The Overall Change Over the Previous Decades and the Benefits on the Margin," **Russell Sage Foundation,** New York, May 3, 2007; Law and Economics Workshop, **Tel Aviv University School of Law,** May 28, 2008.

- Death Penalty Debate with Orin Kerr, Bloggingheads, April 11, 2008.

16

Exhibit 2
Page 00061

- "Evaluating Connecticut's Death Penalty Regime," Faculty Public Interest Conversation, **Yale Law School**, April 9, 2008.

- "The Death Penalty in Connecticut and the United States," **The Whitney Center**, Hamden, CT, November 5, 2007; Seminar on Advanced Criminal Law:  Criminal Sentencing and the Death Penalty, **Fordham Law School**, April 8, 2008; Law and Economics Workshop, **Swiss Institute of Technology**, Zurich, Switzerland, May 20, 2008.

- Radio Interview, "The Death of Capital Punishment?" Morning Edition: Where We Live, WNPR, Connecticut, March 10, 2008.

- Comment on Thomas Dee's "Born to Be Mild: Motorcycle Helmets and Traffic Safety," **American Economics Association Meetings**, New Orleans, Louisiana, January 4, 2008.

- "The Empirical Revolution in Law and Policy: Jubilation and Tribulation," **Keynote Address, Conference on Empirical Legal Studies, NYU Law School**, November 9, 2007.

- "The Optimal Rate of Incarceration," **Harvard Law School**, October 26, 2007.

- "Empirical Evaluation of Law:  The Impact on U.S Crime Rates of Incarceration, the Death Penalty, Guns, and Abortion," Law and Economics Workshop, **St. Gallen Law School**, Switzerland, June 25, 2007.

- Comment on Eric Baumer's "A Comprehensive Assessment of the Contemporary Crime Trends Puzzle," Committee on Law and Justice Workshop on Understanding Crime Trends, **National Academy of Sciences**, Washington, D.C., April 25, 2007.

- Comment on Bernard Harcourt, Third Annual Criminal Justice Roundtable Conferemce, Yale Law School, "Rethinking the Incarceration Revolution Part II: State Level Analysis," April 14, 2006.

- "Corporate Governance In America:  The Disney Case," **Catholic University Law School**, Milan, Italy, March 19, 2007.

- "The U.S Tort System," (Latin American) Linkages Program, **Yale University**, February 13, 2007.

- Panel Member, "Guns and Violence in the U.S.," **Yale University, International Center**, January 24, 2007.

- "Economic Models of Crime and Punishment," Punishment:  The U.S. Record:  A Social   Research Conference at **The New School**, New York City, Nov. 30, 2006

- Comment on Baldus et al, "Equal Justice and the Death Penalty:  The Experience fo the United States Armed Forces, Conference on Empirical Legal Studies, **University of   Texas Law, School**, Austin, Texas, October 27, 2006.

- "Empirical Evaluation of Law:  The Promise and the Peril," **Harvard Law School**, October 26, 2006.

- "Estimating the Impact of the Death Penalty on Murder," Law and Economics Workshop, **Harvard Law School**, September 12, 2006; Conference on Empirical Legal Studies, **University of Texas Law School**, October 28, 2006; Joint Workshop, Maryland Population Research Center and School of Public Policy, **University of Maryland**, March 9, 2007.

- "Why Are Auto Fatalities Dropping so Sharply?" **Faculty Workshop, Wharton**, Philadelphia, PA, April 19, 2006.

- "The Law of Racial Profiling," Law and Economic Perspectives on Profiling Workshop, **Northwestern University Department of Economics**, April 7, 2006.

17

Exhibit 2
Page 00062

- "Landmines and Goldmines: Why It's Hard to Find Truth and Easy To Peddle Falsehood in Empirical Evaluation of Law and Policy," Rosenthal Lectures, Northwestern University School of Law, April 4-6, 2006.

- "The Impact of Legalized Abortion on Crime," American Enterprise Institute, March 28, 2006.

- "The Impact of Damage Caps on Malpractice Claims: Randomization Inference with Difference-in-Differences,"Conference on Medical Malpractice, The Rand Corporation, March 11, 2006.

- "Powerful Evidence the Death Penalty Deters?" Leighton Homer Surbeck Chair Lecture, Yale Law School, March 7, 2006.

- "Uses and Abuses of Empirical Evidence in the Death Penalty Debate," Faculty Workshop, University of Connecticut Law School, October 18, 2005; Faculty Workshop, UCLA Law School, February 3, 2006; Law and Economics Workshop, Stanford Law School, February 16, 2006; ; Law Faculty, University of Cambridge, Cambridge, England, February 28, 2006; University of Illinois College of Law, Law and Economics Workshop, March 2, 2006; Faculty Workshop, Florida State University Law School, March 30, 2006; ALEA, Berkeley, CA May 6, 2006; University of Chicago Law School, Law and Economics Workshop, May 9, 2006.

- "Is Gun Control Illiberal?" Federalist Society Debate with Dan Kahan at Yale Law School,  January 31, 2006.

- "Witness to Deception: An Insider's Look at the Disney Trial," 2005-2006 Distinguished Lecture, Boston University School of Law, November 10, 2005; Center for the Study of Corporate Law, Yale Law School, November 3, 2005; Law Offices of Herbert Smith, London, England, February 23, 2006; Law Faculty, University of Cambridge, Cambridge, England, February 27, 2006.

- "Understanding the Surprising Fall in Crime in the 1990s," Rotary Club, Orange, CT, August 5, 2005; Faculty Workshop, Yale School of Management, September 21, 2005.

- Panel Member, "The Board's Role in Corporate Strategy," The Yale Global Governance Forum, Yale School of Management, September 8, 2005.

- "Crime and Abortion," Museo de la Cuidad de Mexico, Mexico City, October 20, 2003.

- "Allocating Resources towards Social Problems and Away From Incarceration as a Means of Reducing Crime," MacArthur Foundation Research Network on Adolescent Development and Juvenile Justice, San Francisco, CA, February 28, 2003.

- "Shooting Down the More Guns, Less Crime Hypothesis," Stanford Law School, Law and Economics Seminar, January 28, 2003; Faculty Workshop, Center for the Study of Law and Society, Boalt Hall, University of California, Berkeley, Feb. 24, 2003; Development Workshop, Stanford Law School, April 25, 2003; Faculty Workshop, Stanford Law School, July 2, 2003; Law and Public Affairs Program Workshop, Princeton University, September 29, 2003; Stanford Alumni Weekend, Stanford University, October 17, 2003; Faculty Workshop, CIDE, Mexico City, October 20, 2003.

- "The Impact of Legalized Abortion on Teen Childbearing," NBER Labor Summer Institute, Cambridge, MA, July 30, 2002.

- "Do Concealed Handgun Laws Reduce Crime?" Faculty Workshop, Stanford Law School, October 4, 2000; First-Year Orientation, Stanford Law School, September 5, 2001; Faculty Workshop, Harvard Law School, April 26, 2002; Faculty Workshop, Columbia Law School, April 29, 2002.

- "The Evolution of Employment Discrimination Law in the 1990s: An Empirical Investigation," Fellows Workshop, American Bar Foundation, February 11, 2002.

18

Exhibit 2
Page 00063

ER_2256

- "The Role of Discounting in Evaluating Social Programs Impacting on Future Generations: Comment on Arrow and Revesz," Colloquium on Distributive Justice, **Stanford Law School**, Oct. 18, 2001.

- "The Impact of Wrongful Discharge Laws," **NBER Labor Summer Institute**, Cambridge, MA, July 30, 2001; Labor and Employment Seminar, NYU Law School, October 16, 2001; Faculty Workshop, **Stanford Law School**, September 18, 2002; **Yale Law School**, January, 2004.

- "Racial Profiling: Defining the Problem, Understanding the Cause, Finding the Solution," **American Society of Criminology Conference**, San Francisco, CA, November 15, 2000.

- "Institutional Architecture for Building Private Markets," Conference on "Latin America and The New Economy" at **Diego Portales University** in Santiago, Chile, October 26, 2000.

- "The History and Current Status of Employment Discrimination Law in the United States," Unicapital School of Law, (Centro Universitario Capital), Sao Paulo, Brazil, March 10, 2000.

- "Corporate Governance in Developing Countries: Opportunities and Dangers," Conference on Neoliberal Policies for Development: Analysis and Criticism," University of Sao Paulo Law School, March 13, 2000

- "Legalized Abortion and Crime," Law and Economics Workshop, **University of Pennsylvania Law School**, September 21, 1999; Faculty Workshop, Yale Law School, September 27, 1999; **John Jay College of Criminal Justice**, October 7, 1999; Faculty Workshop, **Quinnipiac Law School**, October 13, 1999; Faculty Workshop, **University of Connecticut Law School**, October 19, 1999; **University of Virginia Law School**, October 25, 1999; Faculty Workshop, Baruch College, November 9, 1999; MacArthur Foundation Social Interactions and Economic Inequality Network Meeting, **Brookings Institution**, December 4, 1999; Faculty Workshop, **NYU Law School**, January 21, 2000; Faculty Workshop, **University of San Diego Law School**, February 18, 2000; Public Economics Workshop, Department of Economics, **Stanford University**, April 28, 2000; Law and Economics Workshop, **University of California at Berkeley Law School**, September 18, 2000; Faculty Workshop, **Cornell Law School**, September 26, 2000; OB-GYN Grand Rounds, **Stanford Medical School**, October 2, 2000; **Center for Advanced Studies in the Behavioral Sciences**, October 11, 2000; Faculty Workshop, **Graduate School of Business**, February 5, 2002.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 23, 1999.

- "Exploring the Link Between Legalization of Abortion in the 1970s and Falling Crime in the 1990s," Law and Economics Workshop, **Harvard Law School**, March 16, 1999; Law and Economics Workshop, **University of Chicago Law School**, April 27, 1999; Faculty Workshop, **Stanford Law School**, June 30, 1999.

- "Is the Increasing Reliance on Incarceration a Cost-Effective Strategy of Fighting Crime?" Faculty Workshop, **University of Wisconsin School of Social Science**, February 19, 1999.

- "What Do We Know About Options Compensation?" Institutional Investors Forum, **Stanford Law School**, May 29, 1998.

- Commentator on Orlando Patterson's presentation on "The Ordeal of Integration," **Stanford Economics Department**, May 20, 1998.

- "Understanding The Time Path of Crime," Presentation at Conference on <u>Why is Crime Decreasing?</u> **Northwestern University School of Law**, March 28, 1998; Faculty Workshop, **Stanford Law School**, September 16, 1998; Faculty Workshop, **University of Michigan Law School**, February 18, 1999.

- Commentator, Conference on Public and Private Penalties, the **University of Chicago Law School**, Dec. 13-14, 1997.

19

Exhibit 2
Page 00064

ER_2257

- "Some Thoughts on Affirmative Action," Presentation at a conference on <u>Rethinking Equality in the Global Society</u>, **Washington University School of Law**, November 10, 1997.

- Commentator on Chris Jencks' Presentation on Welfare Policy, **Stanford Economics Department**, October 8, 1997.

- "The Impact of Race on Policing, Arrest Patterns, and Crime," Faculty Workshop, **Stanford Law School**, September 10, 1997; Law and Economics Workshop, **University of Southern California Law School**, October 23, 1997; Law and Economics Workshop, **Columbia University Law School**, November 24, 1997; Law and Economics Workshop, Haas School of Business, **University of California at Berkeley**, February 19, 1998; Annual Meeting of the American Law and Economics Association, **University of California at Berkeley**, May 8, 1998; Conference on the Economics of Law Enforcement, **Harvard Law School**, October 17, 1998.

- "Crime in America: Understanding Trends, Evaluating Policy," **Stanford Sierra Camp**, August 1997.

- "Executive Compensation: What Do We Know?" TIAA-CREF Committees on Corporate Governance and Social Responsibility, Center for Economic Policy Research, **Stanford University**, June 27, 1997; NASDAQ Director's Day, **Stanford University**, June 30, 1997.

- Panel Chair, Criminal Law (Theory), Criminal Law (Empirical), and Labor/Discrimination/Family Law, American Law and Economics Association, **University of Toronto Law School**, May 9-10, 1997.

- Commentator, "Diversity in Law School Hiring," **Stanford Law School**, February 25, 1997.

- Keynote Speaker, "The Optimal Rate of Crime," 11th Annual Conference, **The Oklahoma Academy for State Goals**, Tulsa, Oklahoma, May 7, 1996.

- Panel member, Session on Executive Compensation, Director's College, **Stanford Law School**, March 28-29, 1996.

- "The Power of Law: Can Law Make a Difference in Improving the Position of Women and Minorities in the Labor Market?" The Fellows of the **American Bar Foundation**, Baltimore, Maryland, February 3, 1996.

- "Public Action, Private Choice and Philanthropy: Understanding the Sources of Improvement in Black Schooling Quality in Georgia, 1911-1960," **Stanford Faculty Workshop**, January 24, 1996; Faculty Workshop, **University of Virginia Law School**, January 22, 1997; **National Bureau of Economic Research**, Cambridge, Massachusetts, Labor Studies Conference, April 3, 1998.

- Commentator, "The Effect of Increased Incarceration on Crime," Meetings of the **American Economics Association**, San Francisco, January 6, 1996.

- Commentator, Symposium on Labor Law, **University of Texas Law School**, November 10-11, 1995.

- Panel Member, Symposium on Criminal Justice, **Stanford Law School**, October 6-7, 1995.

- Commentator, "The Litigious Plaintiff Hypothesis," Industrial and Labor Relations Conference, **Cornell University**, May 19, 1995.

- Commentator on Keith Hylton's, "Fee Shifting and Predictability of Law," Faculty Workshop, **Northwestern University School of Law**, February 27, 1995.

- "The Selection of Employment Discrimination Disputes for Litigation: Using Business Cycle Effects to Test the Priest/Klein Hypothesis," **Stanford University**, Law and Economics Seminars, October 31, 1994.

20

Exhibit 2
Page 00065

- "Is the United States at the Optimal Rate of Crime?" Faculty Workshop, **Indiana University School of Law,** Indianapolis, November 18, 1993; Faculty Workshop, **Northwestern University School of Law,** April 18, 1994; Law and Economics Workshop, **Stanford Law School,** April 28, 1994; Meetings of the American Law and Economics Association, **Stanford Law School,** May 13, 1994; **American Bar Foundation,** September 7, 1994; Faculty Workshop, **DePaul Law School,** September 21, 1994; Law and Economics Workshop, **University of Chicago Law School,** October 11, 1994; Faculty Seminar, **Stanford Law School,** October 31, 1994; Law and Economics Luncheon, **Stanford Law School,** November 1, 1994; Faculty Seminar Workshop, **University of Illinois College of Law,** Champaign, November 22, 1994; Law and Economics Workshop, **Harvard Law School,** November 29, 1994; School Alumni Luncheon, Chicago Club, December 13, 1994; **Northwestern Law School;** Law and Economics Workshop, **Yale Law School,** February 1, 1996; Faculty Workshop, **Cornell Law School,** April 10, 1996; Faculty Workshop, **Tokyo University Law School,** June 4, 1996; Panel on "The Economics of Crime," **Western Economics Association** Meeting, San Francisco, July 1, 1996.

- "The Broad Path of Law and Economics," Chair Ceremony, **Northwestern University School of Law,** September 30, 1994.

- Commentator on Paul Robinson's "A Failure of Moral Conviction," **Northwestern University School of Law,** September 20, 1994.

- "The Do's of Diversity, The Don'ts of Discrimination," Kellogg School of Business, **Northwestern University,** May 17, 1994.

- "Does Law Matter in the Realm of Discrimination?" **Law and Society Summer Institute,** Pala Mesa Lodge, Fallbrook, California, June 25, 1993.

- Commentator, "The Double Minority: Race and Sex Interactions in the Job Market," Society for the Advancement of Socio-Economics, **New School for Social Research,** March 28, 1994.

- "The Effects of Joint and Several Liability on Settlement Rates: Mathematical Symmetries and Meta-Issues in the Analysis of Rational Litigant Behavior," Economic Analysis of Civil Procedure, **University of Virginia School of Law,** March 26, 1993.

- Debate with Richard Epstein on Employment Discrimination Law, **Chicago Federalist Society,** February 23, 1993.

- Panel Chair, "Optimal Sanctions and Legal Rules in Tort and Criminal Law," Meetings of Annual Association of Law and Economics, **Yale Law School,** May 15, 1992.

- Panel Member, "The Law and Economics of Employment at Will," **The Institute For Humane Studies,** Fairfax, Virginia, March 27, 1992.

- "The Efficacy of Title VII," Debate with Professor Richard Epstein, **University of Chicago Law School,** February 26, 1992.

- Moderator, "Using Testers to Demonstrate Racial Discrimination," **University of Chicago Law School,** February 13, 1992.

- "Law & Macroeconomics: The Effect of the Business Cycle on Employment Discrimination Litigation," Law and Society Workshop, **Indiana University,** November 6, 1991; Faculty Workshop, **University of North Carolina Law School,** Chapel Hill, November 8, 1991; Faculty Workshop, **Northwestern University School of Law,** December 11, 1991; Law and

21

Exhibit 2
Page 00066

- Economics Conference, **Duquesne Law School**, March 14, 1992; **University of Chicago Law School**, April 2, 1992.

- Panel Chair and Commentator, "New Perspectives on Law and Economics," **Society for the Advancement of Socioeconomics**, Stockholm, June 17, 1991; **Law and Society Meetings**, Amsterdam, June 29, 1991.

- Panel Chair, "Regulation of International Capital Markets," **Law and Society Meetings**, Amsterdam, June 27, 1991.

- Panel Chair, "The Law and Economics of Discrimination," American Association of Law and Economics, **University of Illinois Law School**, May 24, 1991.

- "The Economics of Employment Discrimination Law," **Industrial Relations Research Association**, Chicago, Illinois, March 4, 1991.

- "Does Current Employment Discrimination Law Help or Hinder Minority Economic Empowerment?" Debate with Professor Richard Epstein, The Federalist Society, **Northwestern Law School**, February 26, 1991.

- Panel Member, "The Law and Economics of Employment Discrimination," AALS Annual Meeting, Washington, D.C., January 6, 1991.

- "Re-Evaluating Federal Civil Rights Policy," Conference on the Law and Economics of Racial Discrimination in Employment, **Georgetown University Law Center**, November 30, 1990.

- "Opting for the British Rule," Faculty Seminar, **Northwestern Law School**, September 11, 1990; Faculty Seminar, **University of Virginia Law School**, September 14, 1990; Law and Economics Seminar, **University of Michigan Law School**, October 18, 1990; Faculty Workshop, **NYU Law School**, November 14, 1990; Faculty Workshop, **University of Florida Law School**, March 18, 1991.

- "The Effects of Fee Shifting on the Settlement Rate: Theoretical Observations on Costs, Conflicts, and Contingency Fees," at the **Yale Law School Conference** "Modern Civil Procedure: Issues in Controversy," June 16, 1990.

- "Studying the Iceberg From Its Tip?: An Analysis of the Differences Between Published and Unpublished Employment Discrimination Cases," Law and Society Meetings, Berkeley, California, May 31, 1990.

- Panel Discussion on Tort Reform, **University of Pennsylvania Law School**, April 27, 1990.

- Panel Discussion of "The Role of Government in Closing the Socio-Economic Gap for Minorities," at the Federalist Society National Symposium on "The Future of Civil Rights Law," **Stanford Law School**, March 16, 1990.

- "Continuous versus Episodic Change: The Impact of Affirmative Action and Civil Rights Policy on the Economic Status of Blacks," **University of Virginia Economics Department**, February 15, 1990; **Princeton University Department of Economics**, February 21, 1990 (with James Heckman); Law & Economics Workshop, **University of Toronto Law School**, October 8, 1991.

- "Sex Discrimination in the Workplace: An Economic Perspective," Fellows Seminar, **American Bar Foundation**, October 16, 1989.

- "The Changing Nature of Employment Discrimination Litigation," Law and Economics Workshop, **Columbia Law School**, March 23, 1989; Faculty Seminar, **University of Virginia Law School**, March 24, 1989; Law and Economics Workshop, **University of Chicago**, April 25, 1989; **Law & Society Meeting**, Madison, Wisconsin,

22

Exhibit 2
Page 00067

**ER_2260**

June 8, 1989; Labor Economics Workshop, **University of Illinois**, Chicago, November 1, 1989; Law & Economics Workshop, **University of Pennsylvania Law School**, November 9, 1989; Law and Economics Seminar, **University of California at Berkeley**, October 4, 1990; Law and Social Science Workshop, **Northwestern University**, February 3, 1991; Law and Economics Seminar, **Stanford Law School**, March 21, 1991; Faculty Workshop, **Cornell Law School**, April 3, 1991; Visiting Committee, **Northwestern Law School**, April 5, 1991.

* "Law & Economics: The Third Phase," The Association of General Counsel, **Northwestern University School of Law**, October 14, 1988.

* "Employment Discrimination Litigation," **Northwestern Law School** Alumni Monthly Loop Luncheon. **Chicago Bar Association**, May 31, 1988.

* "The Morality of the Death Penalty." A debate with Ernest Van Den Haag. **Northwestern University School of Law**, April 19, 1988.

* "Models of Deregulation of International Capital Markets." A presentation with David Van Zandt, Faculty Seminar, **Northwestern University School of Law**, April 1, 1988; Visiting Committee, May 5, 1988.

* "Is Title VII Efficient?" A debate with Judge Richard Posner, Faculty Seminar, **Northwestern University School of Law**, November 20, 1987.

* "The Senate's Role in Confirming Supreme Court Nominees: The Historical Record," **Northwestern University School of Law**, September 22, 1987.

* "Diverting the Coasean River: Incentive Schemes to Reduce Unemployment Spells," Yale Law School Civil Liability Workshop, March 30, 1987; Faculty Seminar, **Northwestern University School of Law**, March 18, 1987; **University of Southern California Law Center**, May 1, 1987; and Seminar in Law and Politics, Department of Political Science, **Northwestern University**, May 8, 1987; Labor Workshop, Department of Economics, **Northwestern University**, October 27, 1987; AALS Annual Meeting, New Orleans, January 7, 1989.

* "Women in the Labor Market--Are Things Getting Better or Worse?" **Hamilton College**, February 23, 1987.

* "The Changing Relative Quit Rates of Young Male and Female Workers," **Hamilton-Colgate Joint Faculty Economics Seminar**, February 23, 1987.

* "Living on Borrowed Money and Time--U.S. Fiscal Policy and the Prospect of Explosive Public Debt," **Orange Rotary Club**, February 22, 1985.

* "Capital Punishment in the Eighties," **Hamilton College**, April 6, 1981.

* "Terms and Conditions of Sale Under the Uniform Commercial Code," Executive Sales Conference, **National Machine Tool Builders' Association**, May 12, 1980.

## PROFESSIONAL ACTIVITIES

* Member, Committee on Law and Justice, National Research Council, October 2011 – present.

* Fellow of the Society for Empirical Legal Studies, 2015 - present.

* Co-Editor (with Steven Shavell), _American Law and Economics Review_, May 2006 – August 2012.

* President, American Law and Economics Association, May 2011 – May 2012.

23

Exhibit 2
Page 00068

- Co-President, Society for Empirical Legal Studies, November 2011 - August 2012. Member, Board of Directors from November 2011 - November 2014.

- Testified before the Connecticut Legislature in Support of Senate Bill 1035 and House Bill 6425 (A Bill to Eliminate the Death Penalty), March 7, 2011; Testified again before the Connecticut Judiciary Committee on March 14, 2012.

- Member of the Special Committee on ALI Young Scholars Medal, October 2009 – February 2011.

- Vice-President/President Elect, American Law and Economics Association, June 2010 – May 2011.

- Secretary-Treasurer, American Law and Economics Association, June 2009 – May 2010.

- Board of Advisors, Yale Law School Center for the Study of Corporate Law, July 2004 – August 2010.

- Evaluated the Connecticut death penalty system: "Capital Punishment in Connecticut, 1973-2007: A Comprehensive Evaluation from 4600 murders to One Execution," http://works.bepress.com/john_donohue/137/

- Member, Panel on Methods for Assessing Discrimination, National Academy of Sciences, September 2001 – June 2004. Resulting Publication: National Research Council, Measuring Racial Discrimination (2004), http://www.nap.edu/catalog/10887.html

- Member, National Science Foundation Review Panel, Law and Social Sciences, September, 1999 – April 2001.

- Editorial Board, Journal of Empirical Legal Studies, July 2003 – present.

- Editorial Board, International Review of Law and Economics, October 1999 – present.

- Editorial Board, Law and Social Inquiry, February 2000 – present.

- Board of Editors, American Law and Economics Review, August 1998 – April 2013.

- Consultant, Planning Meeting on Measuring the Crime Control Effectiveness of Criminal Justice Sanctions, National Academy of Sciences, Washington, D.C., June 11, 1998

- Member, Board of Directors, American Law and Economics Association, June 1994-May 1997. Member, ALEA Nominating Committee, July 1995-May 1996. Member, Program Committee, July 1996-May 1998 and July 2000 – May 2002.

- Statistical Consultant, 7th Circuit Court of Appeals Settlement Conference Project (December, 1994).

- Testified before U.S. Senate Labor Committee on evaluating the Job Corps, October 4, 1994.

- Assisted the American Bar Association Standing Committee on the Federal Judiciary in evaluating the qualifications of Ruth Bader Ginsburg (June 1993) and David Souter (June, 1990).

- Chair, AALS Section on Law and Economics, January 1990-January 1991.

- Economic Consultant to Federal Courts Study Committee. Analyzing the role of the federal courts and projected caseload for Judge Richard Posner's subcommittee. February 1989-March 1990.

- Member, 1990 AALS Scholarly Papers Committee.

24

Exhibit 2
Page 00069

ER_2262

- Member, Advisory Board, Corporate Counsel Center, Northwestern University School of Law. Since December 1987.

- Associate Editor, Law and Social Inquiry. Summer 1987-December 1989.

- Interviewed Administrative Law Judge candidates for U.S. Office of Personnel Management. Chicago, Illinois. May 23, 1988.

- Member, Congressman Bruce Morrison's Military Academy Selection Committee. Fall 1983.

- 1982 Candidate for Democratic Nomination, Connecticut State Senate, 14th District (Milford, Orange, West Haven).

**PRO BONO LEGAL WORK**

- Death Penalty case: Heath v. Alabama. Fall 1986-Fall 1989.

- Wrote brief opposing death sentence in Navy spy case. Court ruled in favor of defendant on September 13, 1985.

- Staff Attorney, Neighborhood Legal Services, January-July 1981.

- Appealed sentence of death for Georgia defendant to the United States Supreme Court. Sentence vacated on May 27, 1980. Baker v. Georgia.

- Court-appointed representation of indigent criminal defendant in District of Columbia Superior Court, February-July 1980.

**RESEARCH GRANTS**

- Stanford University Research Fund, January 1997 and January 1998.

- The National Science Foundation (project with James Heckman), December 1992; (project with Steve Levitt), July 1997.

- Fund for Labor Relations Studies, University of Michigan Law School, March 1988.

**BAR ADMISSIONS**

- Connecticut - October 1977; District of Columbia - March 1978 (Currently Inactive Status); United States Supreme Court - November 1980; U.S. District Court for the District of Connecticut – February 14, 1978.

**PROFESSIONAL and HONORARY ASSOCIATIONS**

- American Academy of Arts and Sciences (since April 2009).

- Research Associate, National Bureau of Economic Research (since October 1996) – in Law and Economics and Labor Studies.

- American Law Institute (since September 29, 2010).

- Member, Fellows of the Society for Empirical Legal Studies (since October 2015).

- American Bar Association

- American Economic Association

25

Exhibit 2
Page 00070

**ER_2263**

- American Law and Economics Association

**PERSONAL**
- Born: January 30, 1953.

26

Exhibit 2
Page 00071

ER_2264

## DECLARATION OF SERVICE BY E-MAIL and U.S. Mail

Case Name:   **Duncan, Virginia et al v. Xavier Becerra**

No.:          **17-cv-1017-BEN-JLB**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On November 3, 2017, I served the attached **EXPERT REBUTTAL REPORT OF JOHN J. DONOHUE** by transmitting a true copy via electronic mail. In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, addressed as follows:

C. D. Michel
Michel & Associates, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
**E-mail Address:**
CMichel@michellawyers.com

Anna Barvir
Michel & Associates, P.C.
180 East Ocean Blvd., Suite 200
Long Beach CA 90802-4079
**E-mail Address:**
abarvir@michellawyers.com

Erin E. Murphy
Kirkland & Ellis LLP
655 15th Street N.W.
Washington D.C. 20005
**E-mail Address:**
erin.murphy@kirkland.com

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on November 3, 2017, at Sacramento, California.

| N. Newlin | | |
| --- | --- | --- |
| Declarant | | Signature |

SA2017107272
POS.docx

Exhibit 2
Page 00072

1   XAVIER BECERRA
    Attorney General of California
2   TAMAR PACHTER
    Supervising Deputy Attorney General
3   NELSON R. RICHARDS
    ANTHONY P. O'BRIEN
4   Deputy Attorneys General
    ALEXANDRA ROBERT GORDON
5   Deputy Attorney General
    State Bar No. 207650
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5509
    Fax: (415) 703-5480
8   E-mail:
    Alexandra.RobertGordon@doj.ca.gov
9   *Attorneys for Defendant*
    *Attorney General Xavier Becerra*

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16   **VIRGINIA DUNCAN, et al.,**          17-cv-1017-BEN-JLB

17                          Plaintiffs,

18                              v.          **REVISED EXPERT REPORT OF
                                            DR. LOUIS KLAREVAS**
19   **XAVIER BECERRA, in his official
     capacity as Attorney General of the**  Judge: Hon. Roger T. Benitez
20   **State of California, et al.,**        Action Filed: May 17, 2017

21                          Defendants.

22

23

24

25

26

27

28

1

1        **EXPERT REPORT OF DR. LOUIS KLAREVAS**

2   **I.   ASSIGNMENT**

3        I was retained by counsel for the Defendant Xavier Becerra, in his official

4   capacity as Attorney General of California, for the purposes of providing an expert

5   opinion on large-capacity magazines and mass shootings.

6   **II.   QUALIFICATIONS AND BACKGROUND**

7        I am a security policy analyst and, currently, Associate Lecturer of Global

8   Affairs at the University of Massachusetts–Boston.  I am also the author of

9   *Rampage Nation: Securing America from Mass Shootings* (Prometheus 2016), one

10  of the most comprehensive studies on gun massacres in the United States.

11        I am a political scientist by training, with a B.A. from the University of

12  Pennsylvania and a Ph.D. from American University.  My most recent research

13  examines the nexus between American public safety and large-scale gun violence.

14        During the course of my nearly 20-year career as an academic, I have served

15  on the faculties of the George Washington University, the City University of New

16  York, and New York University.  At New York University, I founded and

17  coordinated the graduate concentration in Transnational Security.  I have also

18  served as a Defense Analysis Research Fellow at the London School of Economics

19  and Political Science and as United States Senior Fulbright Scholar in Security

20  Studies at the University of Macedonia.

21        In addition to having made well over 100 media and public speaking

22  appearances, I am the author or co-author of more than 20 scholarly articles and

23  over 70 commentary pieces.  My most recent research project (undertaken in

24  collaboration with Prof. David Hemenway of Harvard University) assesses the

25  effectiveness of restrictions on large-capacity magazines in reducing gun

26  massacres.

27        Last year, I served on a team of experts, coordinated through Johns Hopkins

28  University, tasked with examining the implications of allowing guns on college

2

1  campuses.  Furthermore, I was one of 32 experts surveyed by the *New York Times*
2  for a review of proposals aimed at curbing gun violence in the United States.[1]

3      Besides the present case, I have been retained by the California Attorney
4  General's office in *Wiese v. Becerra*, Case Number 2:17-cv-00903-WBS-KJN,
5  Eastern District of California, Sacramento Division.  *Wiese* is similar to the present
6  case in that it also involves a challenge against California's regulation of large-
7  capacity magazines.  Earlier this year, I served as an expert for the State of
8  Colorado, as it defended a legal challenge to its ban on large-capacity magazines in
9  *Rocky Mountain Gun Owners, et al. v. Hickenlooper*, Case Number 2013CV33879,
10  District Court, City and County of Denver, Colorado.  This is the only time that I
11  have testified or been deposed in a legal proceeding in the past five years.  I have
12  also provided consultative services to the United States Institute of Peace and the
13  Federal Bureau of Investigation.

14      A more detailed list of my credentials and professional experiences can be
15  found in my curriculum vitae, which is attached as Appendix A.

16  **III.  RETENTION AND COMPENSATION**

17      **I** am being compensated for my time in this case on an hourly basis at a rate of
18  $300 per hour.  My compensation is not contingent on the results of my analysis or
19  the substance of my testimony.

20  **IV.  BASIS FOR OPINION AND MATERIAL CONSIDERED**

21      My opinion is based on the pleadings filed in this case, including the Court's
22  Order of June 29, 2017, granting a temporary injunction, as well as the materials
23  discussed in this report, including the resources cited in the footnotes and the data
24  presented in Appendix B.

25

26  [1] Quoctrung Bui and Margaret Sanger-Katz, "How to Prevent Gun Deaths? Where
27  Experts and the Public Agree," *New York Times*, January 10, 2017, *available at*
    https://www.nytimes.com/interactive/2017/01/10/upshot/How-to-Prevent-Gun-
28  Deaths-The-Views-of-Experts-and-the-Public.html (last accessed October 4, 2017).

3

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00076

## V.   OPINION

It is my professional opinion, based upon my extensive review and analysis of data from the past five decades, that: (1) gun massacres presently pose the deadliest threat to the safety and security of American society, and the problem is growing; (2) gun massacres involving large-capacity magazines, on average, have resulted in a greater loss of life than similar incidents that did not involve large-capacity magazines; and (3) jurisdictions where bans on the possession of large-capacity magazines were in effect experienced fewer gun massacres, per capita, than jurisdictions where such bans were not in effect.  As a result, restrictions on LCMs have the potential to significantly reduce the number of lives lost in mass shootings.[2]

### A.   Gun Massacres Are a Growing Threat to Public Safety

In 1984, an individual armed with, among other firearms, an Uzi assault weapon walked into a McDonald's restaurant in San Ysidro, California, and murdered 21 people, making it the deadliest mass shooting in American history at the time.  It was a tragic marker that was short-lived, as the United States experienced several deadlier shootings in the years that followed:  23 people killed in a gun rampage in Killeen, Texas, in 1991; 32 people killed in a gun rampage at

---

[2] In my book *Rampage Nation*, I defined a mass shooting as "any violent attack that results in four or more individuals incurring gunshot wounds."  I then differentiated between three different categories of mass shooting: (1) Nonfatal are those mass shootings in which no one dies; (2) Fatal are those mass shootings in which at least one victim dies; and (3) High-Fatality are those mass shootings in which six or more victims die.  Throughout my book and in this report, I use the terms "high-fatality mass shooting" and "gun massacre" interchangeably.  Of the three categories of mass shooting, gun massacres are the deadliest, resulting in the highest fatality tolls per individual incidents.  Given that gun massacres are the most lethal and most disturbing, my original dataset in *Rampage Nation* focused on and surveyed all known gun massacres in the United States from 1966-2015.  Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 47-48 (Prometheus 2016).

4

1   Virginia Tech in Blacksburg, Virginia, in 2007; 27 people killed, including 20 first-
2   graders, in a gun rampage in Newtown, Connecticut, in 2012; 49 people killed in a
3   gun rampage in Orlando, Florida.  This year, the United States reached a new
4   milestone when a gunman attacked a crowd of concert-attendees in Las Vegas,
5   Nevada, murdering an unprecedented 58 people in a single shooting.  All six
6   massacres had one factor in common: the perpetrator used a semiautomatic firearm
7   armed with an ammunition-feeding device holding more than 10 bullets.[3]  Such
8   ammunition-feeding devices are frequently referred to as large-capacity magazines
9   (LCMs).[4]

10          In the past decade, gun massacres—like the Newtown, Orlando, Las Vegas,
11   and Sutherland Springs rampages—have been the deadliest individual acts of
12   violence in the United States.  In fact, every single intentional act of violence in the
13   past decade that has claimed ten or more lives has been a mass shooting (*see* App.
14   B, tbl. 1), making gun attacks the greatest and most credible threat to the security
15   and safety of American society in the present era.

16          In preparation for my book *Rampage Nation*, I assembled 50 years of data
17   capturing all known gun massacres in the United States.[5]  Since 1968, there have

18   _____

19   [3] App. B, tbl. 2.

20   [4] Magazines can come in a variety of capacities, including but not limited to 5, 8,
21   10, 15, 17, 20, 30, 40, 50, and even 100 rounds.  The definition of "large-capacity
     magazine" varies by state.  For instance, California and Connecticut define them as
22   ammunition-feeding devices holding more than 10 bullets, whereas Colorado and
23   New Jersey define them as ammunition-feeding devices holding more than 15
     bullets.  *See* Law Center to Prevent Gun Violence, *Large Capacity Magazines*,
24   *available at* http://smartgunlaws.org/gun-laws/policy-areas/classes-of-
     weapons/large-capacity-magazines (last accessed October 4, 2017).  For purposes
25   of this report, unless otherwise stated, LCMs will hereinafter refer to magazines
26   with a capacity greater than 10 rounds.

27   [5] My book, which was published in 2016, covered the 50-year period of 1966-2015.
28   In preparation of this report, I have updated the dataset of gun massacres to cover

5

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00078

ER_2270

1   been a total of 114 gun massacres, resulting in the loss of a combined 1,035 lives.

2   *See* App. B, tbl. 2 & figs. 1-2.  The data show that the past decade (2008-2017) has

3   been the worst on record, accounting for nearly one-third of all gun massacre

4   incidents from the past five decades (37 out of 114) and over 40 percent of all

5   deaths lost in such high-fatality mass shootings (428 out of 1,035).[6]  In fact, this

6   past year (2017) is the deadliest year of the past 50 years, with 100 people dying in

7   gun massacres.[7]  In other words, mass shootings pose a grave threat to the United

8   States, and the threat is growing.

9   **B.    The Use of LCMs Is a Major Factor in the Rise of Gun**
   **Massacre Violence**

10

11       A review of the data from the past 50 years indicates that gun massacres have

12   grown in terms of frequency and lethality.  The data also point to another striking

13   pattern: the use of LCMs in the commission of gun massacres has risen in vast

14   proportions.  *See* App. B, tbl. 2 & figs. 3-4.

15       A comparison of the ten-year period of 1968-1977 with the most recent

16   decade of 2008-2017 shows that the number of gun massacres involving LCMs has

17   increased eight-fold, from three to 24.  Even more disturbing, the number of deaths

18   attributable to LCM-involving gun massacres has jumped over 17-fold between the

19   same two ten-year periods, from 19 to 330.  Indeed, the 24 LCM-involving gun

20   massacres from the past decade account for 45 percent of all LCM-involving gun

21   massacres since 1968, and the 330 deaths attributable to the 24 incidents of the past

22   decade account for 55 percent of all deaths resulting from LCM-involving gun

23   massacres since 1968.  To present the data in another manner, between 1968-1977,

24   only 17 percent of gun massacres involved LCMs, and those shootings accounted

25   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

    the 50-year period from 1968 to 2017.

26  [6] App. B, tbl. 2 & figs. 1-2.

27  [7] *Id.*

28

6

1    for only 16 percent of all gun massacre fatalities from that decade. By contrast,

2    between 2008-2017, 65 percent of gun massacres involved LCMs, and those

3    shootings accounted for 77 percent of all gun massacre fatalities from that decade.

4    These are gigantic increases of 282 percent and 381 percent, respectively.[8]

5        LCMs provide multiple advantages to active shooters. Offensively, LCMs

6    increase kill potential. Basically, the more bullets a gunman can fire at a target, the

7    more potential wounds he can inflict. Furthermore, the more bullets that strike a

8    victim, the higher the odds that that person will die. There are two forces that allow

9    LCMs to increase kill potential: rapid-fire capability and multiple-impact

10   capability.

11       When inserted into either a semiautomatic or fully-automatic weapon, an

12   LCM facilitates the ability of an active shooter to fire a large number of rounds at

13   an extremely quick rate. This phenomenon—rapid-fire capability—comes in handy

14   when a target is in a gunman's line of sight for only a few seconds. For example,

15   rapid-fire capability allows a decent shooter to fire three rounds per second with a

16   semiautomatic firearm and ten rounds per second with an automatic firearm. That

17   results in numerous chances to hit a target in a very short window of opportunity.

18       LCMs also facilitate the ability of a shooter to strike a human target with

19   more than one round. This phenomenon—multiple-impact capability—increases

20   the chances that the victim, when struck by multiple rounds, will die. At least two

21   separate studies have found that, when compared to the fatality rates of gunshot

22   wound victims who were hit by only a single bullet, the fatality rates of those

23   victims hit by more than one bullet were over 60 percent higher.[9] The implication

24   

25   [8] App. B, tbl. 2 & figs. 3-4.

26   [9] Daniel W. Webster, et al., "Epidemiologic Changes in Gunshot Wounds in
     Washington, DC, 1983-1990," 127 *Archives of Surgery* 694-698 (June 1992); and

27   Christopher S. Koper & Jeffrey A. Roth, The Impact of the 1994 Federal Assault
     Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome

28

1   is straightforward: being able to strike human targets with more than one bullet

2   increases the shooter's chances of killing his victims. In essence, LCMs are force

3   multipliers when it comes to kill potential—and the evidence from gun massacres

4   supports this commonsense conclusion.

5        Of the 114 gun massacres since 1968, 53 involved LCMs, resulting in a

6   cumulative 600 deaths. *See* App. B, tbl. 2 & fig. 5. The average death toll for the

7   53 gun massacres involving LCMs is 11.32 fatalities per shooting.[10] By contrast,

8   the average death toll for the 61 incidents for which there is no evidence of LCM

9   usage is 7.13 fatalities per shooting.[11] In other words, the use of LCMs in

10  massacres resulted in a 59 percent increase in fatalities per incident.[12] In the past

---

Measures and Some Lessons for Policy Evaluation, 17 *Journal of Quantitative Criminology* 33-74 (March 2001); *see also*, Angela Sauaia, et al., Fatality and Severity of Firearm Injuries in a Denver Trauma Center, 2000-2013, 315 *J. of the Am. Med. Ass'n* 2465-2467 (June 14, 2015).

[10] App. B, tbl. 2 & fig. 5.

[11] *Id.* T-tests confirm that the differences in death tolls by LCM status are statistically significant ($p < .01$ level). The difference remained statistically significant ($p < .01$ level) regardless of whether non-LCM incidents were limited to only those that did not involve LCMs or also included incidents for which the LCM status was unknown.

[12] The standard methodology is to attribute all deaths in LCM-involving mass shootings to the use of LCMs and to treat cases for which the status of LCM usage is unknown as incidents not involving LCMs. *See* Gary Kleck, Large-Capacity Magazines and the Casualty Counts in Mass Shootings, 17 *Justice Research & Policy* 28-47 (June 2016). Therefore, the calculation of the 11.32 mean average is determined by dividing the total number of gun massacres involving LCMs (53) into the total number of deaths resulting from those incidents (600). App. B, tbl. 2 & fig. 5. However, some of the people murdered in five of the 53 LCM-involving gun massacres were shot and killed by firearms that were not LCM-capable. When these five shootings are adjusted to reflect only deaths that were the result of LCM-capable firearms—San Ysidro (19 out of 21 deaths), Littleton (5 out of 13 deaths), Kirkwood (5 out of 6 deaths), Aurora (10 out of 12 deaths), and Newtown (26 out of 27 deaths)—the cumulative death toll decreases to 586. This adjustment drops the average death toll per LCM-involving incident to 11.06 fatalities, which in turn

8

1    decade, the difference is even more pronounced: 7.54 versus 13.75 deaths per

2    incident.[13] This is a 82 percent increase in the average death toll, attributed to the

3    use of LCMs. Moreover, since 1968, LCMs have been used in 74 percent of all

4    gun massacres with 10 or more deaths, as well as in 100 percent of all gun

5    massacres with 20 or more deaths—establishing a relationship between LCMs and

6    the deadliest gun massacres.[14]

7         In addition to the offensive advantage that LCMs provide, there is the

8    advantage of extended cover. During an active shooting, perpetrators are either

9    firing their guns or not firing their guns. While pulling the trigger, it is extremely

10   difficult for those in harm's way to take successful defensive maneuvers. But if

11   gunmen run out of bullets, there is a lull in the shootings. This precious down-time

12   affords those in the line of fire with a chance to flee, hide, or fight back.

13         There are countless examples of individuals fleeing or taking cover while

14   active shooters paused to reload. For instance, in 2012, nine first-graders at Sandy

15   Hook Elementary School in Newtown, Connecticut, literally pushed their attacker

16   aside as he was swapping out magazines, allowing them to escape from their

17

---

18   results in a 55-percent increase (as opposed to a 59-percent increase) in deaths per

19   incident attributed to the use of LCMs. The revised fatality attributions are based
on my review of official government documents and autopsy reports pertaining to

20   the three respective mass shootings. Furthermore, the calculation of the 7.13 mean

21   average is determined by dividing the number of incidents for which the status of
LCM usage was either none or unknown (61) into the total number of deaths

22   resulting from those incidents (435). However, removing the nine cases wherein

23   the status of LCM usage is unknown from the set of 61 total cases results in 52
incidents and 373 cumulative fatalities. This adjustment decreases the average

24   death toll per non-LCM-involving incident to 7.17 fatalities, which in turn results in

25   a 58 percent increase (as opposed to a 59 percent increase) in deaths per incident
attributed to the use of LCMs. App. B, tbl. 2 & fig. 5.

26   [13] App. B, tbl. 2 & figs. 1-5.

27   [14] App. B, tbl. 2.

28

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00082

**ER_2274**

1    classroom and dash to safety.[15]  There is also the possibility that someone will rush
2    a rampage gunman and try to tackle him (or at the very least try to wrestle his
3    weapon away from him) while he pauses to reload.[16]  In recent history, there have
4    been numerous instances of active shooters being physically confronted by
5    unarmed civilians while reloading, bringing their gun attacks to an abrupt end.  The
6    following list is just a sampling of examples.[17]

7

8    [15] *See* Klarevas, *Rampage Nation*, *supra* note 2, at 22.

9    [16] The longer a shooter can fire without interruption, the longer he can keep
10   potential defenders at bay.  The longer potential defenders are kept from physically
11   confronting a gunman, the more opportunity there is for the shooter to inflict
     damage.

12   [17] *See* Rich Schapiro, "LIRR Massacre 20 Years Ago: 'I Was Lucky,' Says Hero
13   Who Stopped Murderer," *New York Daily News*, December 7, 2013, *available at*
14   http://www.nydailynews.com/new-york/nyc-crime/lirr-massacre-20-years-lucky-
     hero-stopped-murderer-article-1.1540846 (last accessed October 4, 2017); *see also*
15   Eric Schmitt, "Gunman Shoots at White House from Sidewalk," *New York Times*,
16   October 30, 1994, *available at* http://www.nytimes.com/1994/10/30/us/gunman-
     shoots-at-white-house-from-sidewalk.html (last accessed October 4, 2017); *see also*
17   Timothy Egan, "Oregon Student Held in 3 Killings; One Dead, 23 Hurt at His
18   School," *New York Times*, May 22, 1998, *available at* http://www.nytimes.com/
     1998/05/22/us/shootings-school-overview-oregon-student-held-3-killings-one-
19   dead-23-hurt-his.html (last accessed October 4, 2017); *see also* Ken Ritter, "Trial
20   Begins in Las Vegas Casino Gunfire Case, *San Diego Union-Tribune*, July 7, 2009,
     *available at* http://www.sandiegouniontribune.com/sdut-us-casino-shooting-trial-
21   070709-2009jul07-story.html (last accessed October 4, 2017); *see also* "Capitol
22   Gunfire Suspect Tried Reloading," *Huntsville Item*, January 22, 2010, *available at*
     http://www.itemonline.com/news/local_news/report-capitol-gunfire-suspect-tried-
23   reloading/article_7f321cc6-170e-578c-928f-fbc702f1228a.html (last accessed
     October 4, 2017); *see also* Adam Nagourney, "A Single, Terrifying Moment: Shots
24   Fired, a Scuffle and Some Luck," *New York Times*, January 9, 2011, *available at*
25   http://www.nytimes.com/2011/01/10/us/10reconstruct.html (last accessed October
     4, 2017); *see also* Joe Kemp, "Student Hailed Hero for Tackling Gunman Who
26   Opened Fire in Seattle Pacific University, Killing One," *New York Daily News*,
27   June 6, 2014, *available at* http://www.nydailynews.com/news/crime/student-hailed-
     hero-tackling-gunman-opened-fire-seattle-pacific-university-killing-article-
28   1.1819485 (last accessed October 4, 2017).

                                        10
EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00083

ER_2275

### Examples of Active Shooters Who Were Physically Confronted While Reloading

| Date | Perpetrator | Target | Location |
|------|-------------|--------|----------|
| December 7, 1993 | Colin Ferguson | Long Island Rail Road | Garden City, NY |
| October 29, 1994 | Francisco Duran | White House | Washington, DC |
| May 21, 1998 | Kipland Kinkel | Thurston High School | Springfield, OR |
| July 6, 2007 | Steven Zegrean | New York-New York Casino | Las Vegas, NV |
| January 21, 2010 | Fausto Cardenas | Texas State Capitol | Austin, TX |
| January 8, 2011 | Jared Loughner | Rep. Gabrielle Giffords Event | Tucson, AZ |
| June 5, 2014 | Aaron Ybarra | Seattle Pacific University | Seattle, WA |

### C.   Restrictions on LCMs Result in Fewer Gun Massacres

In light of the growing threat posed by rampage violence, legislatures have enacted measures in an effort to reduce the carnage of mass shootings.  Prominent among these measures are restrictions on LCMs.  There are at least two rationales for restricting magazine capacity.  First, because LCMs, on average, produce higher death tolls in gun massacres, limiting magazine capacity aims to reduce the loss of life attributable to the increased kill potential of LCMs.  Second, because LCMs allow rampage gunmen to fire more bullets without interruption, resulting in fewer opportunities for potential victims to take life-saving measures, limiting magazine capacity aims to create conditions which force mass shooters to pause in order to reload fresh magazines.  This, in turn, provides authorities and civilians with precious seconds that can be exploited to escape, seek cover, or take other defensive measures, including attacking the gunmen.

In 1994, the United States enacted the Federal Assault Weapons Ban (AWB). Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as

11

1    former 18 U.S.C. § 922(v), (w)(1) (1994)).  The law, which was in effect for only a

2    ten-year period before sun-setting, regulated certain firearms and their components.

3    Among its provisions, the AWB prohibited the manufacture, sale, transfer, or

4    possession of *new* magazines with a capacity greater than 10 rounds.  *Id*.[18]  With

5    regard to the frequency and lethality of gun massacres, the AWB clearly had a

6    positive impact in reducing the number and carnage of such shootings.

7         In the 10-year period prior to the AWB (September 13, 1984-September 12,

8    1994), there were a total of eight gun massacres involving magazines with a

9    capacity greater than 10 rounds.  *See* App. B, tbl. 2 & fig. 6.  These eight gun

10   massacres claimed a combined 73 lives.  During the 10-year period the AWB was

11   in effect (September 13, 1994-September 12, 2004), there were six gun massacres

12   involving magazines with a capacity greater than 10 rounds.  These six gun

13   massacres claimed a combined 50 lives.  In the ten-year period immediately

14   following the expiration of the AWB (September 13, 2004-September 12, 2014),

15   there were 24 gun massacres involving magazines with a capacity greater than 10

16   rounds.  These 24 gun massacres claimed a combined 230 lives.[19]

17        In terms of incidents, the AWB ushered in a period marked by a 25-percent

18   decrease in the number of gun massacres involving magazines with a capacity

19   greater than 10 rounds.  In contrast, the decade following the ban was marked by a

20   300-percent increase in the number of gun massacres involving magazines with a

21   capacity greater than 10 rounds.  In terms of fatalities, the AWB ushered in a period

22   marked by a 32 percent decrease in the cumulative number of lives lost in gun

23   massacres involving magazines with a capacity greater than 10 rounds.  In contrast,

24

25   [18] Magazines lawfully in circulation prior to the AWB's date of effect (September

26   13, 1994) were exempted (i.e., grandfathered) from the ban.  Former 18 U.S.C.
     § 922 (v)(2) (1994).

27   [19] App. B, tbl. 2 & fig. 6.

28

1    the decade following the ban was marked by a 360 percent increase in the

2    cumulative number of lives lost in gun massacres involving magazines with a

3    capacity greater than 10 rounds.[20]

4          Since 1990, several states have also enacted restrictions on LCMs,

5    predominantly in an effort to reduce the loss of life in mass shootings.[21]  On March

6    30, 1990, New Jersey became the first state to regulate LCMs.  Seven states and the

7    District of Columbia have since followed suit: Hawaii (July 1, 1992), Maryland

8    (June 1, 1994), Massachusetts (July 23, 1998), California (January 1, 2000), New

9    York (November 1, 2000), Washington, D.C. (March 31, 2009), Connecticut (April

10   4, 2013), and Colorado (July 1, 2013).[22]

11

12   [20] *Id.*  In terms of all gun massacres, regardless of whether or not the shootings
     involved LCMs, patterns in the same directions were noted. For instance, the period
13   of the AWB was marked by a 37 percent decrease in gun massacre incidents and a
     43 percent decrease in gun massacre deaths, when compared to the 10-year period
14   immediately preceding the AWB.  By contrast, the 10-year period immediately
15   following the AWB was marked by a 183 percent increase in gun massacre
     incidents and a 239 percent increase in gun massacre deaths, when compared to the
16   decade of the AWB.  *See* Klarevas, *Rampage Nation*, *supra* note 2, at 242.

17   [21] For a review of state laws that regulate LCMs, *see* Law Center to Prevent Gun
18   Violence, Large Capacity Magazines, *supra* note 1. States differ on the
     ammunition-capacity threshold of LCMs.  California, Connecticut, Hawaii,
19   Maryland, Massachusetts, New York, and Washington, D.C., define LCMs as
20   ammunition feeding devices holding more than 10 bullets, whereas Colorado and
     New Jersey define LCMs as ammunition feeding devices holding more than 15
21   bullets.  States also differ on whether to exempt LCMs that were in circulation or
22   owned prior to their respective bans going into effect—a practice known as
     "grandfathering."  Colorado, Connecticut, Maryland Massachusetts grandfather
23   pre-ban LCMs.  Hawaii, New Jersey, New York, and Washington, D.C., do not
24   grandfather pre-ban LCMs.  Pursuant to a preliminary injunction issued by the
     court in the current matter, California is prohibited from enforcing a law that would
25   prohibit LCMs that were legally possessed prior to January 1, 2000.  If the
26   injunction is lifted, California would join Hawaii, New Jersey, New York, and
     Washington, D.C. in not grandfathering previously-owned LCMs. *Id.*
27
     [22] Through a referendum on Proposition 63 (November 8, 2016), California voters
28

13

1      In the field of epidemiology, a common method for assessing the impact of

2  laws and policies is to measure the rate of onset of new cases of a problem,

3  comparing the rate when and where the laws and policies were in effect against the

4  rate when and where the laws and policies were not in effect.  This measure, known

5  as the incidence rate, allows public health experts and criminologists to identify

6  discernable differences, per capita, over a period of time.  Relevant to the present

7  case, calculating incidence rates across jurisdictions, in a manner that accounts for

8  whether or not LCM bans were in effect during the period of observation, allows

9  for the assessment of the effectiveness of such bans.  In addition, fatality rates—the

10  number of deaths, per capita, that result from particular activities across different

11  jurisdictions—also provide insights into the impact of LCM bans on gun

12  massacres.[23]

13      Since 1990, when the first LCM ban took effect in New Jersey, there have

14  been 69 gun massacres in the United States.[24]  Calculating gun massacre incidence

15  rates for the time-period 1990-2017, across jurisdictions with and without bans on

16  the possession of LCMs, reveals that the enactment of an LCM ban resulted in an

---

decided to enhance their existing regulations on LCMs by prohibiting the ownership of all ammunition magazines with a capacity greater than 10 bullets, including any previously "grandfathered" LCMs.  The relevant California statutes can be found at Cal. Penal Code §§ 16740, 32310-32450.  The particular provisions that are the subject of the current litigation are codified at Cal. Penal Code §§ 32310, 32390.  California's new LCM ban was set to take effect on July 1, 2017, although the State is temporarily enjoined from enforcing it pursuant to a ruling in the current case.

[23] For purposes of this report, incidence and fatality (i.e., mortality) rates are calculated in accordance with the methodological principles established by the Centers for Disease Control and Prevention.  *See* Centers for Disease Control and Prevention, *An Introduction to Applied Epidemiology and Biostatistics* (2012).

[24] App. B, tbl. 2.  There were no LCM bans in effect prior to 1990.  Therefore, a priori, 1990 is the logical starting point for an analysis of the impact of LCM bans.

14

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00087

ER_2279

1   79 percent difference, with ban states experiencing a far lower rate of incidence.

2   *See* App. B, tbl. 3.[25]  Even if the examination is limited to the last 13 years (2005-

3   2017), which covers the years when the nationwide AWB was no longer in effect,

4   the difference in incidence rates is still 56 percent, with LCM-ban states again

5   experiencing far fewer gun massacres per capita.[26]

6        It should be noted that the aforementioned incidence rates pertain to all gun

7   massacres, regardless of the weaponry they involved.  When calculations go a step

8   further and are limited to gun massacres involving LCMs, the difference is even

9   more pronounced.  *See* App. B, tbl. 3.  In terms of incidence rates, for the time-

10   period since 1990, the benefit for jurisdictions that regulated LCMs was a 105

11   percent difference, when compared to jurisdictions that did not regulate LCMs.[27]

12   Again, even if the examination is limited to post-federal AWB era, the difference in

13   incidence rates for LCM-involving gun massacres was 88 percent, again with

14   LCM-ban states experiencing far fewer attacks involving LCMs.[28]

15        In terms of fatality rates, the patterns are similar.  *See* App. B, tbl. 4.  From

16   1990-2017, the difference in rates was 101 percent, with jurisdictions that had LCM

17   bans in effect experiencing drastically fewer deaths per capita than those areas

18   which did not regulate LCMs.  Even after the federal AWB expired, drastically

19   cutting the number of areas restricting LCMs, states with LCM bans experienced

20   fewer gun massacre deaths per capita, marked by a 74 percent difference in fatality

21

22   [25] For purposes of coding, between September 13, 1994, and September 12, 2004,
     the federal AWB was in effect.  During that ten-year period, all 50 states and the
23   District of Columbia were under legal conditions that banned the possession of
24   certain prohibited LCMs.  As such, the entire country is coded as being under a
     LCM ban during the decade the AWB was in effect.
25   [26] App. B, tbl. 3.
26   [27] *Id.*
27   [28] *Id.*
28

15

1    rates.  Limiting analysis to only those gun massacres that involved LCMs indicates

2    that the difference in gun massacre fatality rates for LCM-ban jurisdictions was

3    even greater when compared to the fatality rates for jurisdictions that opted not to

4    regulate LCMs.  In terms of LCM-involving gun massacres, the differences in

5    fatality rates between the two categories of jurisdictions were 126 percent and 106

6    percent for the time-periods 1990-2017 and 2005-2017, respectively, in both

7    instances to the benefit of states that regulated LCMs.[29]

8          Basically, all of the above epidemiological calculations lead to the same

9    conclusion: when LCM bans are in effect, per capita, fewer gun massacres occur

10    and fewer people die in such high-fatality mass shootings.

11          The intent underlying most LCM bans is to restrict the circulation of LCMs.

12    The reasoning is that, if there are fewer LCMs in circulation within their

13    jurisdictions, then gunmen will be forced to use firearms with lower ammunition-

14    capacities, resulting in attacks that do not kill enough victims to rise to the level of

15    a gun massacre (six or more victims being shot to death in a mass shooting).[30]

16    Moreover, even if gunmen opt to use semiautomatic firearms equipped with

17    magazines, bans should still result in fewer opportunities to acquire and utilize

18    LCMs prohibited by law to perpetrate gun massacres.  The epidemiological data

19    clearly lend support to both of these premises, in turn furthering the argument that

20    bans on the possession of LCMs enhance public safety.

21

22

23

    [29] App. B, tbl. 4.

24

25    [30] For instance, a gunman armed with a six-shot revolver can, in theory, kill six
people without having to reload.  However, to kill more people, that same gunman

26    would require a way to fire additional ammunition, and the most efficient way to do
so is to utilize a firearm armed with a LCM.  Restricting the ability of gunmen to

27    deliver large capacities of ammunition without interruption can result in fewer lives

28    lost in shootings.

16

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00089

ER_2281

1      While imposing constraints on LCMs will not result in the prevention of all

2  future mass shootings, the data suggest that denying rampage gunmen access to

3  LCMs will result in a significant number of lives being saved.

4

5                       Respectfully Submitted,

6

7

8

9

10                   Louis Klarevas, Ph.D.
                          January 5, 2018

11                   Queens, NY

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

EXPERT REPORT OF DR. LOUIS KLAREVAS (17-cv-1017-BEN-JLB)

Exhibit 3
Page 00090

**Appendix A**

**Curriculum Vitae of Dr. Louis Klarevas**

Exhibit 3
Page 00091

**Louis J. Klarevas**

**Education**

Ph.D.   International Relations, 1999
        School of International Service
        American University

B.A.    Political Science, *Cum Laude*, 1989
        School of Arts and Sciences
        University of Pennsylvania

**Current Position**

Associate Lecturer, Department of Global Affairs, University of Massachusetts – Boston, 2015-

**Representation**

Trident Media Group
41 Madison Avenue
New York, NY 10010

**Professional Experience**

Expert Witness for State of California, *Duncan v. Becerra*, United States District Court for Southern District of California, Case Number 3:17-cv-1017-BEN, 2017

Expert Witness for State of California, *Wiese v. Becerra*, United States District Court for Eastern District of California, Case Number 2:17-cv-00903-WBS-KJN, 2017

Expert Witness for State of Colorado, *Rocky Mountain Gun Owners v. Hickenlooper*, District Court for County and City of Denver, Colorado, Case Number 2013CV33879, 2016-2017

Member, Guns on Campus Assessment Group, Johns Hopkins University Center for Gun Policy and Research, 2016

Consultant, National Joint Terrorism Task Force, Federal Bureau of Investigation, 2015

Senior Fulbright Scholar (Security Studies), Department of European and International Studies, University of Macedonia, Thessaloniki, Greece, 2012

Clinical Assistant Professor, Center for Global Affairs, New York University, 2006-2011

Founder and Coordinator, Graduate Transnational Security Program, Center for Global Affairs, New York University, 2009-2011

Exhibit 3
Page 00092

**ER_2284**

Faculty Affiliate, A. S. Onassis Program in Hellenic Studies, New York University, 2007-2011

Consultant, Academy for International Conflict Management and Peacebuilding, United States Institute of Peace, Washington, D.C., 2008-2009

Assistant Professor of Political Science, City University of New York – College of Staten Island, 2003-2006

Adjunct Professor, Center for Global Affairs, New York University, 2004-2006

Consultant, United States Institute of Peace, Washington, DC, 2005

Associate Fellow, European Institute, London School of Economics and Political Science, 2003-2004

Defense Analysis Research Fellow, London School of Economics and Political Science, 2002-2003

Visiting Assistant Professor of Political Science and International Affairs, George Washington University, Washington, D.C., 1999-2002

Adjunct Professor of Political Science, George Washington University, Washington, D.C., 1998-1999

Research Associate, United States Institute of Peace, Washington, D.C., 1992-1998

Adjunct Professor of International Relations, School of International Service, American University, Washington, D.C., 1994

Faculty Advisor, National Youth Leadership Forum, Washington, D.C., 1992

Dean's Scholar, School of International Service, American University, Washington, D.C., 1989-1992

**Courses Taught**

American Government and Politics (undergraduate)
Counter-Terrorism and Homeland Security (graduate)
European-Atlantic Relations (undergraduate)
International Political Economy (graduate and undergraduate)
International Politics in a Post-Cold War Era (graduate)
International Relations (undergraduate)
International Security (graduate)
Machinery and Politics of American Foreign Policy (graduate)
Role of the United States in World Affairs (graduate)
Security Policy (graduate)
Theories of International Politics (graduate)
Transnational Security (graduate)
Transnational Terrorism (graduate, undergraduate, and senior seminar)
United States Foreign Policy (graduate and undergraduate)

Exhibit 3
Page 00093

**Books**

*Rampage Nation: Securing America from Mass Shootings* (2016)
http://www.penguinrandomhouse.com/books/252353/rampage-nation-by-louis-klarevas

**Scholarship**

*Firearms on College Campuses: Research Evidence and Policy Implications*, report prepared by the Johns Hopkins University Center for Gun Policy and Research for the Association of American Universities, October 2016 (co-authored with Daniel W. Webster, John J. Donohue, et al.)

"No Relief in Sight: Barring *Bivens* Suits in Torture Cases," *Presidential Studies Quarterly*, June 2013

"Trends in Terrorism Since 9/11," *Georgetown Journal of International Affairs*, Winter/Spring 2011

"The Death Penalty Should Be Decided Only Under a Specific Guideline," in Christine Watkins, ed., *The Ethics of Capital Punishment* (Cengage/Gale Publishers, 2011)

*Saving Lives in the 'Convoy of Joy': Lessons for Peace-Keeping from UNPROFOR*, United States Institute of Peace Case Study, 2009

"Casualties, Polls and the Iraq War," *International Security*, Fall 2006

"The CIA Leak Case Indicting Vice President Cheney's Chief of Staff," *Presidential Studies Quarterly*, June 2006

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," *Diplomatic History*, June 2006

"Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West," *Mediterranean Quarterly*, Summer 2005

"W Version 2.0: Foreign Policy in the Second Bush Term," *The Fletcher Forum of World Affairs*, Summer 2005

"Can You Sue the White House? Opening the Door for Separation of Powers Immunity in *Cheney v. District Court*," *Presidential Studies Quarterly*, December 2004

"Political Realism: A Culprit for the 9/11 Attacks," *Harvard International Review*, Fall 2004

*Greeks Bearing Consensus: An Outline for Increasing Greece's Soft Power in the West*, Hellenic Observatory Discussion Paper 18, London School of Economics, November 2004

*Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup*, Hellenic Observatory Discussion Paper 15, London School of Economics, February 2004

3

Exhibit 3
Page 00094

"Media Impact," in Mark Rozell, ed., *The Media and American Politics: An Introduction* (Lanham, MD: Rowman & Littlefield, 2003)

"The Surrender of Alleged War Criminals to International Tribunals: Examining the Constitutionality of Extradition via Congressional-Executive Agreement," *UCLA Journal of International Law and Foreign Affairs*, Fall/Winter 2003

"The Constitutionality of Congressional-Executive Agreements: Insights from Two Recent Cases," *Presidential Studies Quarterly*, June 2003

"The 'Essential Domino' of Military Operations: American Public Opinion and the Use of Force," *International Studies Perspectives*, November 2002

"The Polls–Trends: The United States Peace Operation in Somalia," *Public Opinion Quarterly*, Winter 2001

*American Public Opinion on Peace Operations: The Cases of Somalia, Rwanda, and Haiti,* University of Michigan Dissertation Services, 1999

"Turkey's Right v. Might Dilemma in Cyprus: Reviewing the Implications of *Loizidou v. Turkey,*" *Mediterranean Quarterly*, Spring 1999

"An Outline of a Plan Toward a Comprehensive Settlement of the Greek-Turkish Dispute," in Vangelis Calotychos, ed., *Cyprus and Its People: Nation, Identity, and Experience in an Unimaginable Community, 1955-1997*, Boulder, CO: Westview Press, 1998 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Robert L. Pfaltzgraff and Dimitris Keridis, eds., *Security in Southeastern Europe and the U.S.-Greek–Relationship*, London: Brassey's, 1997 (co-authored with Theodore A. Couloumbis)

"Prospects for Greek-Turkish Reconciliation in a Changing International Setting," in Tozun Bahcheli, Theodore A. Couloumbis, and Patricia Carley, eds., *Greek-Turkish Relations and U.S. Foreign Policy: Cyprus, the Aegean, and Regional Stability*, Washington, D.C.: U.S. Institute of Peace, 1997 (co-authored with Theodore A. Couloumbis)

"Structuration Theory in International Relations," *Swords & Ploughshares*, Spring 1992

**Book Reviews**

Review of James Edward Miller's *The United States and the Making of Modern Greece: History and Power, 1950-1974, Presidential Studies Quarterly*, June 2012

"The Life-Cycle of Regimes: Oran Young's *International Cooperation,*" *Millennium*, Winter 1990 (co-authored with Nanette S. Levinson)

4

Exhibit 3
Page 00095

ER_2287

**Commentaries and Correspondence**

"The Texas Shooting Again Reveals Inadequate Mental-Health Help in the U.S. Military," *New York Daily News*, November 7, 2017

"Why Mass Shootings Are Getting Worse," *New York Daily News*, October 2, 2017

"London and the Mainstreaming of Vehicular Terrorism," *The Atlantic*, June 4, 2017 (co-authored with Colin P. Clarke)

"Almost Every Fatal Terrorist Attack in America since 9/1 Has Involved Guns," *Vice*, December 4, 2015

"Firearms Have Killed 82 of the 86 Victims of Post-9/11 Domestic Terrorism," *The Trace*, June 30, 2015

"International Law and the 2012 Presidential Elections," Vitoria Institute Website, March 24, 2012

"Al Qaeda Without Bin Laden," CBS News *Opinion*, May 2, 2011

"Fuel, But Not the Spark," *Zocalo Public Square*, February 16, 2011

"After Tucson, Emotions Run High," *New York Times*, January 12, 2011 (correspondence)

"WikiLeaks, the Web, and the Need to Rethink the Espionage Act," *The Atlantic*, November 9, 2010

"N.Y. Can Lead the Nation in Fighting Child Sex Trafficking," *New York Daily News*, April 21, 2009 (co-authored with Ana Burdsall-Morse)

"Deprogramming Jihadis," *New York Times Magazine*, November 23, 2008 (correspondence)

"Food: An Issue of National Security," *Forbes* (Forbes.com), October 25, 2008

"Crack Down on Handguns – They're a Tool of Terror, Too," *New York Daily News*, October 25, 2007

"An Invaluable Opportunity for Greece To Increase Its Standing and Influence on the World Stage," *Kathimerini* (Greece), January 13, 2005

"Not a Divorce," *Survival*, Winter 2003-2004

"How Many War Deaths Can We Take?" *Newsday*, November 7, 2003

"Death Be Not Proud," *The New Republic*, October 27, 2003 (correspondence)

"Down But Not Out," London School of Economics Iraq War Website, April 2003

"Four Half-Truths and a War," *American Reporter*, April 6, 2003

"The Greek Bridge between Old and New Europe," *National Herald*, February 15-16, 2003

5

Exhibit 3
Page 00096

ER_2288

"Debunking a Widely-Believed Greek Conspiracy Theory," *National Herald*, September 21-22, 2002

"Debunking of Elaborate Media Conspiracies an Important Trend," *Kathimerini* (Greece), September 21, 2002 [Not Related to September 21-22, 2002, *National Herald* Piece with Similar Title]

"Cold Turkey," *Washington Times*, March 16, 1998

"Make Greece and Turkey Behave," *International Herald Tribune*, January 3, 1998

"If This Alliance Is to Survive . . .," *Washington Post*, January 2, 1998

"Defuse Standoff on Cyprus," *Defense News*, January 27-February 2, 1997

"Ukraine Holds Nuclear Edge," *Defense News*, August 2-8, 1993


**Commentaries for *Foreign Policy* – http://www.foreignpolicy.com**

"The White House's Benghazi Problem," September 20, 2012

"Greeks Don't Want a Grexit," June 14, 2012

"The Earthquake in Greece," May 7, 2012

"The Idiot Jihadist Next Door," December 1, 2011

"Locked Up Abroad," October 4, 2011


**Commentaries for *The New Republic* – http://www.tnr.com/users/louis-klarevas**

"What the U.N. Can Do To Stop Getting Attacked by Terrorists," September 2, 2011

"Is It Completely Nuts That the British Police Don't Carry Guns? Maybe Not," August 13, 2011

"How Obama Could Have Stayed the Execution of Humberto Leal Garcia," July 13, 2011

"After Osama bin Laden: Will His Death Hasten Al Qaeda's Demise?" May 2, 2011

"Libya's Stranger Soldiers: How To Go After Qaddafi's Mercenaries," February 28, 2011

"Closing the Gap: How To Reform U.S. Gun Laws To Prevent Another Tucson," January 13, 2011

"Easy Target," June 13, 2010

Exhibit 3
Page 00097

**Commentaries Written for *The Huffington Post* – http://www.huffingtonpost.com/louis-klarevas**

"Improving the Justice System Following the Deaths of Michael Brown and Eric Garner," December 4, 2014

"American Greengemony: How the U.S. Can Help Ukraine and the E.U. Break Free from Russia's Energy Stranglehold," March 6, 2014

"Guns Don't Kill People, Dogs Kill People," October 17, 2013

"Romney the Liberal Internationalist?" October 23, 2012

"Romney's Unrealistic Foreign Policy Vision: National Security Funded by Money Growing Trees," October 10, 2012

"Do the Wrong Thing: Why Penn State Failed as an Institution," November 14, 2011

"Holding Egypt's Military to Its Pledge of Democratic Reform," February 11, 2011

"The Coming Twivolutions? Social Media in the Recent Uprisings in Tunisia and Egypt," January 31, 2011

"Scholarship Slavery: Does St. John's 'Dean of Mean' Represent a New Face of Human Trafficking?" October 6, 2010

"Misunderstanding Terrorism, Misrepresenting Islam," September 21, 2010

"Bombing on the Analysis of the Times Square Bomb Plot," May 5, 2010

"Do the Hutaree Militia Members Pose a Terrorist Threat?" May 4, 2010

"Addressing Mexico's Gun Violence One Extradition at a Time," March 29, 2010

"Terrorism in Texas: Why the Austin Plane Crash Is an Act of Terror," February 19, 2010

"Securing American Primacy by Tackling Climate Change: Toward a National Strategy of Greengemony," December 15, 2009

"Traffickers Without Borders: A 'Journey' into the Life of a Child Victimized by Sex Trafficking," November 17, 2009

"Beyond a Lingering Doubt: It's Time for a New Standard on Capital Punishment," November 9, 2009

"It's the Guns Stupid: Why Handguns Remain One of the Biggest Threats to Homeland Security," November 7, 2009

"Obama Wins the 2009 Nobel Promise Prize," October 9, 2009

7

Exhibit 3
Page 00098

**Legal Analyses Written for *Writ* – http://writ.news.findlaw.com/contributors.html#klarevas**

"Human Trafficking and the Child Protection Compact Act of 2009," *Writ* (FindLaw.com), July 15, 2009 (co-authored with Christine Buckley)

"Can the Justice Department Prosecute Reporters Who Publish Leaked Classified Information? Interpreting the Espionage Act," *Writ* (FindLaw.com), June 9, 2006

"Will the Precedent Set by the Indictment in a Pentagon Leak Case Spell Trouble for Those Who Leaked Valerie Plame's Identity to the Press?" *Writ* (FindLaw.com), August 15, 2005

"Jailing Judith Miller: Why the Media Shouldn't Be So Quick to Defend Her, and Why a Number of These Defenses Are Troubling," *Writ* (FindLaw.com), July 8, 2005

"The Supreme Court Dismisses the Controversial Consular Rights Case: A Blessing in Disguise for International Law Advocates?" *Writ* (FindLaw.com), June 6, 2005 (co-authored with Howard S. Schiffman)

"The Decision Dismissing the Lawsuit against Vice President Dick Cheney," *Writ* (FindLaw.com), May 17, 2005

"The Supreme Court Considers the Rights of Foreign Citizens Arrested in the United States," *Writ* (FindLaw.com), March 21, 2005 (co-authored with Howard S. Schiffman)

**Columns Written (in Greek) for *To Vima* Newspaper (Athens)**

"Time to Pay," August 2003

"Does Turkey Have an Ulterior Motive?" July 2003

"Will They Make Up?" June 2003

"Don't Take the Bait," May 2003

"If the Cheers Turn to Jeers," April 2003

"The Power of a Niche Identity," April 2003

"If You Can't Beat Them, Join Them," April 2003

"Show Me the Euros," March 2003

8

Exhibit 3
Page 00099

ER_2291

**Presentations and Addresses**

**In addition to the presentations listed below, I have made close to one hundred media appearances, book events, and educational presentations (beyond lectures for my own classes)**

"Protecting the Homeland: Tracking Patterns and Trends in Domestic Terrorism," address delivered to the annual meeting of the National Joint Terrorism Task Force, June 2015

"Sovereign Accountability: Creating a Better World by Going after Bad Political Leaders," address delivered to the Daniel H. Inouye Asia-Pacific Center for Security Studies, November 2013

"Game Theory and Political Theater," address delivered at the School of Drama, State Theater of Northern Greece, May 2012

"Holding Heads of State Accountable for Gross Human Rights Abuses and Acts of Aggression," presentation delivered at the Michael and Kitty Dukakis Center for Public and Humanitarian Service, American College of Thessaloniki, May 2012

Chairperson, Cultural Enrichment Seminar, Fulbright Foundation – Southern Europe, April 2012

Participant, Roundtable on "Did the Intertubes Topple Hosni?" Zócalo Public Square, February 2011

Chairperson, Panel on Democracy and Terrorism, annual meeting of the International Security Studies Section of the International Studies Association, October 2010

"Trends in Terrorism Within the American Homeland Since 9/11," paper to be presented at the annual meeting of the International Security Studies Section of the International Studies Association, October 2010

Panelist, "In and Of the World," Panel on Global Affairs in the 21st Century, Center for Global Affairs, New York University, March 2010

Moderator, "Primacy, Perils, and Players: What Does the Future Hold for American Security?" Panel of Faculty Symposium on Global Challenges Facing the Obama Administration, Center for Global Affairs, New York University, March 2009

"Europe's Broken Border: The Problem of Illegal Immigration, Smuggling and Trafficking via Greece and the Implications for Western Security," presentation delivered at the Center for Global Affairs, New York University, February 2009

"The Dangers of Democratization: Implications for Southeast Europe," address delivered at the University of Athens, Athens, Greece, May 2008

Participant, "U.S. National Intelligence: The Iran National Intelligence Estimate," Council on Foreign Relations, New York, April 2008

Moderator, First Friday Lunch Series, "Intelligence in the Post-9/11 World: An Off-the-Record Conversation with Dr. Joseph Helman (U.S. Senior National Intelligence Service)," Center for Global Affairs, New York University, March 2008

9

Exhibit 3
Page 00100

ER_2292

Participant, "U.S. National Intelligence: Progress and Challenges," Council on Foreign Relations, New York, March 2008

Moderator, First Friday Lunch Series, "Public Diplomacy: The Steel Backbone of America's Soft Power: An Off-the-Record Conversation with Dr. Judith Baroody (U.S. Department of State)," Center for Global Affairs, New York University, October 2007

"The Problems and Challenges of Democratization: Implications for Latin America," presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Third Conference on the International Relations of South America (IBERAM III), Buenos Aires, Argentina, September 2007

"The Importance of Higher Education to the Hellenic-American Community," keynote address to the annual Pan-Icarian Youth Convention, New York, May 2007

Moderator, First Friday Lunch Series, Panel Spotlighting Graduate Theses and Capstone Projects, Center for Global Affairs, New York University, April 2007

Convener, U.S. Department of State Foreign Officials Delegation Working Group on the Kurds and Turkey, March 2007

"Soft Power and International Law in a Globalizing Latin America," round-table presentation delivered at the Argentinean Center for the Study of Strategic and International Relations Twelfth Conference of Students and Graduates of International Relations in the Southern Cone (CONOSUR XII), Buenos Aires, Argentina, November 2006

Moderator, First Friday Lunch Series, "From Berkeley to Baghdad to the Beltway: An Off-the-Record Conversation with Dr. Catherine Dale (U.S. Department of Defense)," Center for Global Affairs, New York University, November 2006

Chairperson, Roundtable on Presidential Privilege and Power Reconsidered in a Post-9/11 Era, American Political Science Association Annual Meeting, September 2006

"Constitutional Controversies," round-table presentation delivered at City University of New York-College of Staten Island, September 2005

"The Future of the Cyprus Conflict," address to be delivered at City University of New York College of Staten Island, April 2005

"The 2004 Election and the Future of American Foreign Policy," address delivered at City University of New York College of Staten Island, December 2004

"One Culprit for the 9/11 Attacks: Political Realism," address delivered at City University of New York-College of Staten Island, September 2004

"Were the Eagle and the Phoenix Birds of a Feather? The United States and the 1967 Greek Coup," address delivered at London School of Economics, November 2003

10

Exhibit 3
Page 00101

"Beware of Europeans Bearing Gifts? Cypriot Accession to the EU and the Prospects for Peace," address delivered at Conference on Mediterranean Stability, Security, and Cooperation, Austrian Defense Ministry, Vienna, Austria, October 2003

Co-Chair, Panel on Ideational and Strategic Aspects of Greek International Relations, London School of Economics Symposium on Modern Greece, London, June 2003

"Greece between Old and New Europe," address delivered at London School of Economics, June 2003

Co-Chair, Panel on International Regimes and Genocide, International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"American Cooperation with International Tribunals," paper presented at the International Association of Genocide Scholars Annual Meeting, Galway, Ireland, June 2003

"Is the Unipolar Moment Fading?" address delivered at London School of Economics, May 2003

"Cyprus, Turkey, and the European Union," address delivered at London School of Economics, February 2003

"Bridging the Greek-Turkish Divide," address delivered at Northwestern University, May 1998

"The CNN Effect: Fact or Fiction?" address delivered at Catholic University, April 1998

"The Current Political Situation in Cyprus," address delivered at AMIDEAST, July 1997

"Making the Peace Happen in Cyprus," presentation delivered at the U.S. Institute of Peace in July 1997

"The CNN Effect: The Impact of the Media during Diplomatic Crises and Complex Emergencies," a series of presentations delivered in Cyprus (including at Ledra Palace), May 1997

"Are Policy-Makers Misreading the Public? American Public Opinion on the United Nations," paper presented at the International Studies Association Annual Meeting, Toronto, Canada, March 1997 (with Shoon Murray)

"The Political and Diplomatic Consequences of Greece's Recent National Elections," presentation delivered at the National Foreign Affairs Training Center, Arlington, VA, September 1996

"Prospects for Greek-Turkish Reconciliation," presentation delivered at the U.S. Institute of Peace Conference on Greek-Turkish Relations, Washington, D.C., June, 1996 (with Theodore A. Couloumbis)

"Greek-Turkish Reconciliation," paper presented at the Karamanlis Foundation and Fletcher School of Diplomacy Joint Conference on The Greek-U.S. Relationship and the Future of Southeastern Europe, Washington, D.C., May, 1996 (with Theodore A. Couloumbis)

Exhibit 3
Page 00102

"The Path toward Peace in the Eastern Mediterranean and the Balkans in the Post-Cold War Era," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996 (with Theodore A. Couloumbis)

"Peace Operations: The View from the Public," paper presented at the International Studies Association Annual Meeting, San Diego, CA, March, 1996

Chairperson, Roundtable on Peace Operations, International Security Section of the International Studies Association Annual Meeting, Rosslyn, VA, October, 1995

"Chaos and Complexity in International Politics: Epistemological Implications," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994

"At What Cost? American Mass Public Opinion and the Use of Force Abroad," paper presented at the International Studies Association Annual Meeting, Washington, D.C., March, 1994 (with Daniel B. O'Connor)

"American Mass Public Opinion and the Use of Force Abroad," presentation delivered at the United States Institute of Peace, Washington, D.C., February, 1994 (with Daniel B. O'Connor)

"For a Good Cause: American Mass Public Opinion and the Use of Force Abroad," paper presented at the Annual Meeting of the Foreign Policy Analysis/Midwest Section of the International Studies Association, Chicago, IL, October, 1993 (with Daniel B. O'Connor)

"American International Narcotics Control Policy: A Critical Evaluation," presentation delivered at the American University Drug Policy Forum, Washington, D.C., November, 1991

"American National Security in the Post-Cold War Era: Social Defense, the War on Drugs, and the Department of Justice," paper presented at the Association of Professional Schools of International Affairs Conference, Denver, CO, February, 1991

**Referee for Grant Organizations, Peer-Reviewed Journals, and Book Publishers**

National Science Foundation, Division of Social and Economic Sciences

*American Political Science Review*

*Comparative Political Studies*

*Journal of Public and International Affairs*

*Millennium*

*Political Behavior*

*Presidential Studies Quarterly*

Brill Publishers

12

Exhibit 3
Page 00103

ER_2295

**Service to University, Profession, and Community**

Expert Witness for State of California, 2017

Expert Witness for State of Colorado, 2016-2017

Member, Guns on Campus Assessment Group, Johns Hopkins University and Association of American Universities, 2016

Member, Fulbright Selection Committee, Fulbright Foundation, Athens, Greece, 2012

Founder and Coordinator, Graduate Transnational Security Studies, Center for Global Affairs, New York University, 2009-2011

Faculty Advisor, Global Affairs Graduate Society, New York University, 2009-2011

Organizer, Annual Faculty Symposium, Center for Global Affairs, New York University, 2009

Member, Faculty Search Committees, Center for Global Affairs, New York University, 2007-2009

Member, Graduate Program Director Search Committee, Center for Global Affairs, New York University, 2008-2009

Developer, Transnational Security Studies, Center for Global Affairs, New York University, 2007-2009

Participant, Council on Foreign Relations Special Series on National Intelligence, New York, 2008

Member, Graduate Certificate Curriculum Committee, Center for Global Affairs, New York University, 2008

Member, Faculty Affairs Committee, New York University, 2006-2008

Member, Curriculum Review Committee, Center for Global Affairs, New York University, 2006-2008

Member, Overseas Study Committee, Center for Global Affairs, New York University, 2006-2007

Participant, New York Academic Delegation to Israel, Sponsored by American-Israel Friendship League, 2006

Member, Science, Letters, and Society Curriculum Committee, City University of New York-College of Staten Island, 2006

Member, Graduate Studies Committee, City University of New York-College of Staten Island, 2005-2006

Member, Summer Research Grant Selection Committee, City University of New York-College of Staten Island, 2005

13

Exhibit 3
Page 00104

Director, College of Staten Island Association, 2004-2005

Member of Investment Committee, College of Staten Island Association, 2004-2005

Member of Insurance Committee, College of Staten Island Association, 2004-2005

Member, International Studies Advisory Committee, City University of New York-College of Staten Island, 2004-2006

Faculty Advisor, Pi Sigma Alpha National Political Science Honor Society, City University of New York-College of Staten Island, 2004-2006

Participant, World on Wednesday Seminar Series, City University of New York-College of Staten Island, 2004-2005

Participant, American Democracy Project, City University of New York-College of Staten Island, 2004

Participant, Philosophy Forum, City University of New York-College of Staten Island, 2004

Department Liaison, Commencement, City University of New York-College of Staten Island, 2004

Member of Scholarship Committee, Foundation of Pan-Icarian Brotherhood, 2003-2005, 2009

Scholarship Chairman, Foundation of Pan-Icarian Brotherhood, 2001-2003

Faculty Advisor to the Kosmos Hellenic Society of the George Washington University, 2001-2002

Member of University of Pennsylvania's Alumni Application Screening Committee, 2000-2002

Participant in U.S. Department of State's International Speakers Program, 1997

Participant in Yale University's United Nations Project, 1996-1997

Member of Editorial Advisory Board, *Journal of Public and International Affairs*, Woodrow Wilson School of Public and International Affairs, Princeton University, 1991-1993

Voting Graduate Student Member, School of International Service Rank and Tenure Committee, American University, 1990-1992

Member of School of International Service Graduate Student Council, American University, 1990-1992

Teaching Assistant for the Several Courses (World Politics, Beyond Sovereignty, Between Peace and War, Soviet-American Security Relations, and Organizational Theory) at School of International Service Graduate Student Council, American University, 1989-1992

Representative for American University at the Annual Meeting of the Association of Professional Schools of International Affairs, Denver, Colorado, 1991

14

Exhibit 3
Page 00105

ER_2297

**Associations and Organizations (Past and Present)**

Academy of Political Science

American Political Science Association

Anderson Society of American University

Carnegie Council Global Ethics Network

International Political Science Association

International Studies Association

Museum of Modern Art

New York Screenwriters Collective

Pan-Icarian Brotherhood

Pi Sigma Alpha

Sigma Nu Fraternity

Social Science Research Network

United States Department of State Alumni Network

United States Institute of Peace Alumni Association

University of Pennsylvania Alumni Association

**Honors and Awards**

Senior Fulbright Fellowship, 2012

Professional Staff Congress Research Grantee, City University of New York, 2004-2005

Research Assistance Award (Two Times), City University of New York-College of Staten Island, 2004

Summer Research Fellowship, City University of New York-College of Staten Island, 2004

European Institute Associate Fellowship, London School of Economics, 2003-2004

Hellenic Observatory Defense Analysis Research Fellowship, London School of Economics, 2003

United States Institute of Peace Certificate of Meritorious Service, 1996

15

Exhibit 3
Page 00106

National Science Foundation Dissertation Research Grant, 1995 (declined)

Alexander George Award for Best Graduate Student Paper, Runner-Up, Foreign Policy Analysis Section, International Studies Association, 1994

Dean's Scholar Fellowship, School of International Service, American University, 1989-1992

Graduate Research and Teaching Assistantship, School of International Service, American University, 1989-1992

American Hellenic Educational Progressive Association (AHEPA) College Scholarship, 1986

Political Science Student of the Year, Wilkes-Barre Area School District, 1986

16

Exhibit 3
Page 00107

**Appendix B**

**Tables and Figures in Support of Expert Report Submitted by Dr. Louis Klarevas**

Exhibit 3
Page 00108

## Appendix B – Table 1

### The 10 Deadliest Intentional Acts of Violence of the Past Decade, 2008-2017

|    | Deaths | Incident Type | Date | Perpetrator | City | State |
|----|--------|---------------|------|-------------|------|-------|
| 1  | 58 | Mass Shooting | 10/1/2017 | Stephen Paddock | Las Vegas | NV |
| 2  | 49 | Mass Shooting | 6/12/2016 | Omar Mateen | Orlando | FL |
| 3  | 27 | Mass Shooting | 12/14/2012 | Adam Lanza | Newtown | CT |
| 4  | 26 | Mass Shooting | 11/5/2017 | Devin Kelley | Sutherland Springs | TX |
| 5  | 14 | Mass Shooting | 12/2/2015 | Syed Rizwan Farook and Tashfeen Malik | San Bernardino | CA |
| 6  | 13 | Mass Shooting | 4/3/2009 | Jiverly Wong | Binghamton | NY |
| 7  | 13 | Mass Shooting | 11/5/2009 | Nidal Hasan | Fort Hood | TX |
| 8  | 12 | Mass Shooting | 7/20/2012 | James Holmes | Aurora | CO |
| 9  | 12 | Mass Shooting | 9/16/2013 | Aaron Alexis | Washington | DC |
| 10 | 10 | Mass Shooting | 3/10/2009 | Michael McLendon | Kinston, Samson, and Geneva | AL |

1

Exhibit 3
Page 00109

ER_2301

## Appendix B – Table 2

## Gun Massacres in the United States, 1968-2017

|   | Date | City | State | Perpetrator(s) | LCM | Deaths |
|---|------|------|-------|----------------|-----|--------|
| 1 | 3/16/1968 | Ironwood | MI | Eric Pearson | N | 7 |
| 2 | 6/25/1968 | Good Hart | MI | Undetermined | N | 6 |
| 3 | 12/19/1968 | Napa | CA | Charles Bray | N | 6 |
| 4 | 9/3/1971 | Phoenix | AZ | John Freeman | N | 7 |
| 5 | 6/21/1972 | Cherry Hill | NJ | Edwin Grace | Y | 6 |
| 6 | 1/7/1973 | New Orleans | LA | Mark Essex | N | 7 |
| 7 | 6/21/1973 | Palos Hills | IL | William Workman | N | 7 |
| 8 | 4/22/1973 | Los Angeles | CA | William Bonner | N | 7 |
| 9 | 6/9/1973 | Boston | MA | George O'Leary | N | 6 |
| 10 | 11/4/1973 | Cleveland | OH | Cyril Rovansek | N | 7 |
| 11 | 2/18/1974 | Fayette | MS | Frankie Lias | N | 7 |
| 12 | 11/13/1974 | Amityville | NY | Ronald DeFeo | N | 6 |
| 13 | 3/30/1975 | Hamilton | OH | James Ruppert | N | 11 |
| 14 | 10/19/1975 | Sutherland | NE | Erwin Simants | N | 6 |
| 15 | 3/12/1976 | Trevose | PA | George Geschwendt | N | 6 |
| 16 | 7/12/1976 | Fullerton | CA | Edward Allaway | Y | 7 |
| 17 | 7/23/1977 | Klamath Falls | OR | DeWitt Henry | Y | 6 |
| 18 | 8/26/1977 | Hackettstown | NJ | Emile Benoist | N | 6 |
| 19 | 7/16/1978 | Oklahoma City | OK | Harold Stafford, Roger Stafford, and Verna Stafford | N | 6 |
| 20 | 1/3/1981 | Delmar | IA | Gene Gilbert | N | 6 |
| 21 | 1/7/1981 | Richmond | VA | Artie Ray Cherry, Michael Finazzo, and Tyler Frndak | N | 6 |
| 22 | 5/2/1981 | Clinton | MD | Ronald Ellis | N | 6 |
| 23 | 8/21/1981 | Indianapolis | IN | King Bell | N | 6 |
| 24 | 2/17/1982 | Farwell | MI | Robert Haggart | N | 7 |
| 25 | 8/9/1982 | Grand Prairie | TX | John Parish | N | 6 |
| 26 | 8/20/1982 | Miami | FL | Carl Brown | N | 8 |
| 27 | 9/7/1982 | Craig | AK | Undetermined | N | 8 |
| 28 | 9/25/1982 | Wilkes-Barre | PA | George Banks | Y | 13 |
| 29 | 2/18/1983 | Seattle | WA | Kwan Fai Mak and Benjamin Ng | N | 13 |
| 30 | 3/3/1983 | McCarthy | AK | Louis Hastings | N | 6 |
| 31 | 10/11/1983 | College Station and Hempstead | TX | Eliseo Morono | N | 6 |
| 32 | 4/15/1984 | Brooklyn | NY | Christopher Thomas | N | 10 |
| 33 | 5/19/1984 | Manley Hot Springs | AK | Michael Silka | N | 8 |
| 34 | 6/29/1984 | Dallas | TX | Abdelkrim Belachheb | Y | 6 |
| 35 | 7/18/1984 | San Ysidro | CA | James Huberty | Y | 21 |
| 36 | 10/18/1984 | Evansville | IN | James Day | N | 6 |
| 37 | 8/20/1986 | Edmond | OK | Patrick Sherrill | N | 14 |
| 38 | 12/8/1986 | Oakland | CA | Rita Lewis and David Welch | Y | 6 |
| 39 | 2/5/1987 | Flint | MI | Terry Morris | N | 6 |
| 40 | 4/23/1987 | Palm Bay | FL | William Cruse | Y | 6 |
| 41 | 7/12/1987 | Tacoma | WA | Daniel Lynam | N | 7 |
| 42 | 9/25/1987 | Elkland | MO | James Schnick | N | 7 |
| 43 | 12/30/1987 | Algona | IA | Robert Dreesman | N | 6 |
| 44 | 2/16/1988 | Sunnyvale | CA | Richard Farley | N | 7 |
| 45 | 9/14/1989 | Louisville | KY | Joseph Wesbecker | Y | 8 |
| 46 | 6/18/1990 | Jacksonville | FL | James Pough | Y | 9 |
| 47 | 1/26/1991 | Chimayo | NM | Ricky Abeyta | N | 7 |
| 48 | 8/9/1991 | Waddell | AZ | Jonathan Doody and Alessandro Garcia | N | 9 |
| 49 | 10/16/1991 | Killeen | TX | George Hennard | Y | 23 |
| 50 | 11/7/1992 | Morro Bay and Paso Robles | CA | Lynwood Drake | N | 6 |
| 51 | 1/8/1993 | Palatine | IL | James Degorski and Juan Luna | N | 7 |
| 52 | 5/16/1993 | Fresno | CA | Allen Heflin and Johnnie Malarkey | Y | 7 |
| 53 | 7/1/1993 | San Francisco | CA | Gian Luigi Ferri | Y | 8 |
| 54 | 12/7/1993 | Garden City | NY | Colin Ferguson | Y | 6 |
| 55 | 4/20/1999 | Littleton | CO | Eric Harris and Dylan Klebold | Y | 13 |
| 56 | 7/12/1999 | Atlanta | GA | Cyrano Marks | U | 6 |
| 57 | 7/29/1999 | Atlanta | GA | Mark Barton | Y | 9 |
| 58 | 9/15/1999 | Fort Worth | TX | Larry Ashbrook | Y | 7 |
| 59 | 11/2/1999 | Honolulu | HI | Byran Koji Uyesugi | Y | 7 |
| 60 | 12/26/2000 | Wakefield | MA | Michael McDermott | Y | 7 |

2

Exhibit 3
Page 00110

## Appendix B – Table 2 (Cont.)

## Gun Massacres in the United States, 1968-2017

| | Date | City | State | Perpetrator(s) | LCM | Deaths |
|---|---|---|---|---|---|---|
| 61 | 12/28/2000 | Philadelphia | PA | Shihean Black, Dawud Faruqi, Khalid Faruqi, and Bruce Veney | Y | 7 |
| 62 | 8/26/2002 | Rutledge | AL | Westley Harris | N | 6 |
| 63 | 1/15/2003 | Edinburg | TX | Humberto Garza, Robert Garza, Rodolfo Medrano, and Juan Ramirez | U | 6 |
| 64 | 7/8/2003 | Meridian | MS | Douglas Williams | N | 6 |
| 65 | 8/27/2003 | Chicago | IL | Salvador Tapia | N | 6 |
| 66 | 3/12/2004 | Fresno | CA | Marcus Wesson and Sebhrenah Wesson | N | 9 |
| 67 | 11/21/2004 | Birchwood | WI | Chai Soua Vang | Y | 6 |
| 68 | 3/12/2005 | Brookfield | WI | Terry Ratzmann | Y | 7 |
| 69 | 3/21/2005 | Red Lake | MN | Jeffrey Weise | Y | 9 |
| 70 | 1/30/2006 | Goleta | CA | Jennifer San Marco | Y | 7 |
| 71 | 3/25/2006 | Seattle | WA | Kyle Huff | Y | 6 |
| 72 | 6/1/2006 | Indianapolis | IN | James Stewart and Desmond Turner | Y | 7 |
| 73 | 12/16/2006 | Kansas City | KS | Hersel Isadore | N | 6 |
| 74 | 4/16/2007 | Blacksburg | VA | Seung Hui Cho | Y | 32 |
| 75 | 10/7/2007 | Crandon | WI | Tyler Peterson | Y | 6 |
| 76 | 12/5/2007 | Omaha | NE | Robert Hawkins | Y | 8 |
| 77 | 12/24/2007 | Carnation | WA | Michele Anderson and Joseph McEnroe | U | 6 |
| 78 | 2/7/2008 | Kirkwood | MO | Charles Lee Thornton | Y | 6 |
| 79 | 9/2/2008 | Alger | WA | Isaac Zamora | U | 6 |
| 80 | 12/24/2008 | Covina | CA | Bruce Pardo | Y | 8 |
| 81 | 1/27/2009 | Los Angeles | CA | Ervin Lupoe | N | 6 |
| 82 | 3/10/2009 | Kinston, Samson, and Geneva | AL | Michael McLendon | Y | 10 |
| 83 | 3/29/2009 | Carthage | NC | Robert Stewart | N | 8 |
| 84 | 4/3/2009 | Binghamton | NY | Jiverly Wong | Y | 13 |
| 85 | 11/5/2009 | Fort Hood | TX | Nidal Hasan | Y | 13 |
| 86 | 1/19/2010 | Appomattox | VA | Christopher Speight | Y | 8 |
| 87 | 8/3/2010 | Manchester | CT | Omar Thornton | Y | 8 |
| 88 | 1/8/2011 | Tucson | AZ | Jared Loughner | Y | 6 |
| 89 | 7/7/2011 | Grand Rapids | MI | Rodrick Dantzler | Y | 7 |
| 90 | 8/7/2011 | Copley Township | OH | Michael Hance | N | 7 |
| 91 | 10/12/2011 | Seal Beach | CA | Scott Dekraai | N | 8 |
| 92 | 12/25/2011 | Grapevine | TX | Aziz Yazdanpanah | N | 6 |
| 93 | 4/2/2012 | Oakland | CA | One Goh | N | 7 |
| 94 | 7/20/2012 | Aurora | CO | James Holmes | Y | 12 |
| 95 | 8/5/2012 | Oak Creek | WI | Wade Page | Y | 6 |
| 96 | 9/27/2012 | Minneapolis | MN | Andrew Engeldinger | Y | 6 |
| 97 | 12/14/2012 | Newtown | CT | Adam Lanza | Y | 27 |
| 98 | 7/26/2013 | Hialeah | FL | Pedro Vargas | Y | 6 |
| 99 | 9/16/2013 | Washington | DC | Aaron Alexis | N | 12 |
| 100 | 7/9/2014 | Spring | TX | Ronald Lee Haskell | Y | 6 |
| 101 | 9/18/2014 | Bell | FL | Don Spirit | U | 7 |
| 102 | 2/26/2015 | Tyrone | MO | Joseph Jesse Aldridge | U | 7 |
| 103 | 5/17/2015 | Waco | TX | Unidentified | Y | 9 |
| 104 | 6/17/2015 | Charleston | SC | Dylann Storm Roof | Y | 9 |
| 105 | 8/8/2015 | Houston | TX | David Conley | U | 8 |
| 106 | 10/1/2015 | Roseburg | OR | Christopher Harper-Mercer | Y | 9 |
| 107 | 12/2/2015 | San Bernardino | CA | Syed Rizwan Farook and Tashfeen Malik | Y | 14 |
| 108 | 2/21/2016 | Kalamazoo | MI | Jason Dalton | Y | 6 |
| 109 | 4/22/2016 | Piketon | OH | Undetermined | U | 8 |
| 110 | 6/12/2016 | Orlando | FL | Omar Mateen | Y | 49 |
| 111 | 5/27/2017 | Brookhaven | MS | Corey Godbolt | U | 8 |
| 112 | 9/10/2017 | Plano | TX | Spencer Hight | Y | 8 |
| 113 | 10/1/2017 | Las Vegas | NV | Stephen Paddock | Y | 58 |
| 114 | 11/5/2017 | Sutherland Springs | TX | Devin Kelley | Y | 26 |

Note:   The incidents highlighted in gray represent the 20 gun massacres that occurred at a time when and place where a ban on certain LCMs was in effect. Incidents marked as LCM-positive involved fatalities resulting from a firearm armed with least one magazine capable of holding more than 10 bullets.
Y=Yes / N=No / U=Undetermined.

3

Exhibit 3
Page 00111

### Appendix B – Table 3

### Gun Massacre Incidence Rates by Whether or Not LCM Bans Were in Effect

#### 1990-2017 (All Incidents N=69)

|                     | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---------------------|----------------------|-------------------|-----------------------|
| Incidence Rate      | .327                 | .142              | 79%                   |
| Number of Incidents | 49                   | 20                |                       |

#### 2005-2017 (All Incidents N=47)

|                     | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---------------------|----------------------|-------------------|-----------------------|
| Incidence Rate      | .171                 | .096              | 56%                   |
| Number of Incidents | 39                   | 8                 |                       |

#### 1990-2017 (Incidents Only Involving LCMs N=44)

|                     | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---------------------|----------------------|-------------------|-----------------------|
| Incidence Rate      | .227                 | .071              | 105%                  |
| Number of Incidents | 34                   | 10                |                       |

#### 2005-2017 (Incidents Only Involving LCMs N=32)

|                     | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---------------------|----------------------|-------------------|-----------------------|
| Incidence Rate      | .123                 | .048              | 88%                   |
| Number of Incidents | 28                   | 4                 |                       |

Note:   Incidence rates are calculated per one million people. All population data used to calculate incidence rates in this table are drawn from United States Census Bureau, "Population and Housing Unit Estimates Tables," https://www.census.gov/programs-surveys/popest/data/tables.html (last accessed January 4, 2018). The percentage difference refers to percentage difference between the two incidence rates—the rate for the jurisdictions where an LCM ban was in effect and the rate for the jurisdictions where an LCM ban was not in effect. All percentage differences were calculated using the Calculator Soup online percentage difference calculator. As the Calculator Soup website states, "Percentage difference equals the absolute value of the change in value, divided by the average of the 2 numbers, all multiplied by 100." The calculator and formula are available at the following website: https://www.calculatorsoup.com/calculators/algebra/percent-difference-calculator.php (last accessed January 4, 2018).

4

Exhibit 3
Page 00112

**Appendix B – Table 4**

**Gun Massacre Fatality Rates by Whether or Not LCM Bans Were in Effect**

**1990-2017 (Fatalities in All Incidents N=699)**

|  | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Fatality Rate | 3.58 | 1.17 | 101% |
| Number of Fatalities | 535 | 164 | |

**2005-2017 (Fatalities in All Incidents N=522)**

|  | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Fatality Rate | 1.96 | 0.90 | 74% |
| Number of Fatalities | 447 | 75 | |

**1990-2017 (Fatalities in Incidents Only Involving LCMs N=521)**

|  | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Fatality Rate | 2.87 | 0.65 | 126% |
| Number of Fatalities | 429 | 92 | |

**2005-2017 (Fatalities in Incidents Only Involving LCMs N=412)**

|  | No LCM Ban in Effect | LCM Ban in Effect | Percentage Difference |
|---|---|---|---|
| Fatality Rate | 1.62 | 0.50 | 106% |
| Number of Fatalities | 370 | 42 | |

Note: Fatality rates are calculated per one million people. All population data used to calculate fatality rates in this table are drawn from United States Census Bureau, "Population and Housing Unit Estimates Tables," https://www.census.gov/programs-surveys/popest/data/tables.html (last accessed January 4, 2018). The percentage difference refers to percentage difference between the two fatality rates—the rate for the jurisdictions where an LCM ban was in effect and the rate for the jurisdictions where an LCM ban was not in effect. All percentage differences were calculated using the Calculator Soup online percentage difference calculator. As the Calculator Soup website states, "Percentage difference equals the absolute value of the change in value, divided by the average of the 2 numbers, all multiplied by 100." The calculator and formula are available at the following website: https://www.calculatorsoup.com/calculators/algebra/percent-difference-calculator.php (last accessed January 4, 2018).

Exhibit 3
Page 00113



Appendix B – Figure 1

Gun Massacre Incidents by Decade, 1968-2017

Exhibit 3
Page 00114

ER_2306



Appendix B – Figure 2

Gun Massacre Deaths by Decade, 1968-2017

Exhibit 3
Page 00115

7

**ER_2307**




Appendix B – Figure 3

Gun Massacre Incidents Involving LCMs by Decade, 1968-2017

Exhibit 3
Page 00116

**ER_2308**

**Appendix B – Figure 4**

**Gun Massacre Deaths from Incidents Involving LCMs by Decade, 1968-2017**



Exhibit 3
Page 00117

9

**ER_2309**

**Appendix B – Figure 5**

**Gun Massacre Incidents and Deaths by Magazine Capacity, 1968-2017**



| | LCMs | No LCMs | Unknown LCMs | Total |
|---|---|---|---|---|
| Incidents | 53 | 52 | 9 | 114 |
| Deaths | 600 | 373 | 62 | 1035 |

Exhibit 3
Page 00118

10

**ER_2310**

Appendix B – Figure 6

LCM-Involving Gun Massacre Incidents and Deaths by Decade Before, During, and After the Federal Assault Weapons Ban



Note: The Federal Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.

Exhibit 3
Page 00119

11

**ER_2311**

<u>**DECLARATION OF SERVICE BY E-MAIL and U.S. Mail**</u>

Case Name:   **Duncan, Virginia et al v. Xavier Becerra**
No.:         **17-cv-1017-BEN-JLB**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On <u>January 9, 2018</u>, I served the attached

**REVISED EXPERT REPORT OF DR. LOUIS KLAREVAS**

by transmitting a true copy via electronic mail. In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, addressed as follows:

C. D. Michel
Anna Barvir
Michel & Associates, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
**E-mail Address:**
CMichel@michellawyers.com
abarvir@michellawyers.com

Erin E. Murphy
Kirkland & Ellis LLP
655 15th Street N.W.
Washington D.C. 20005
**E-mail Address:**
erin.murphy@kirkland.com

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on January 9, 2018, at San Francisco, California.

| N. Newlin | /s/ N. Newlin |
|-----------|---------------|
| Declarant | Signature |

SA2017107272
21065538.docx

Exhibit 3
Page 00120

1  XAVIER BECERRA
   Attorney General of California
2  TAMAR PACHTER
   Supervising Deputy Attorney General
3  NELSON R. RICHARDS
   ANTHONY P. O'BRIEN
4  Deputy Attorneys General
   ALEXANDRA ROBERT GORDON
5  Deputy Attorney General
   State Bar No. 207650
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA 94102-7004
7    Telephone: (415) 703-5509
     Fax: (415) 703-5480
8    E-mail:
     Alexandra.RobertGordon@doj.ca.gov
9  Attorneys for Defendant
   Attorney General Xavier Becerra
10

11           IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **VIRGINIA DUNCAN, et al.,**          17-cv-1017-BEN-JLB

                         Plaintiffs,
17
                                         **EXPERT REPORT OF**
18            v.                         **DR. CHRISTOPHER S. KOPER**

19  **XAVIER BECERRA, in his official**   Judge: Hon. Roger T. Benitez
    **capacity as Attorney General of the**  Action Filed: May 17, 2017
20  **State of California, et al.,**

21                       Defendants.

22

23

24

25

26

27

28

      EXPERT REPORT OF DR. CHRISTOPHER S. KOPER  (17-cv-1017-BEN-JLB)

                                                  Exhibit 4
                                                  Page 00122

                        ER_2313

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXPERT REPORT OF DR. CHRISTOPHER S. KOPER

### I.   ASSIGNMENT

I was retained by counsel for Defendant California Attorney General Xavier Becerra for the purpose of preparing an expert report on the potential efficacy of California's new ban on possession of large capacity ammunition magazines.

### II.   QUALIFICATIONS AND BACKGROUND

I am an Associate Professor for the Department of Criminology, Law and Society at George Mason University, in Fairfax, Virginia and the principal fellow of George Mason's Center for Evidence-Based Crime Policy. I have been studying firearms issues since 1994. My primary areas of focus are firearms policy and policing issues. My credentials, experience, and background are stated in my curriculum vitae, a true and correct copy of which is attached as Exhibit A.

In 1997, my colleague Jeffrey Roth and I conducted a study on the impact of Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 (hereinafter the "federal assault weapons ban" or the "federal ban"), for the United States Department of Justice and the United States Congress.[1] I updated the original 1997 study in 2004[2] and briefly revisited the issue again by re-examining my 2004 report in 2013.[3] To my knowledge, these are the most comprehensive studies to have examined the efficacy of the federal ban on assault weapons and ammunition feeding devices holding more than ten rounds of ammunition

---

[1] Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report* (1997), attached hereto as Exhibit B (hereinafter, "*Impact Evaluation*").

[2] Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004), attached hereto as Exhibit C (hereinafter, "*Updated Assessment of the Federal Assault Weapons Ban*").

[3] Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994- 2004: Key Findings and Implications*, ch. 12, 157-171, in Reducing Gun Violence in America: Informing Policy with Evidence (Daniel S. Webster & Jon S. Vernick eds. 2013), attached hereto as Exhibit D (hereinafter "*America's Experience with the Federal Assault Weapons Ban*").

1   (hereinafter referred to as "large-capacity magazines" or "LCMs").[4]  My 1997

2   study was based on limited data, especially with regard to the criminal use of large-

3   capacity magazines.  As a result, my conclusions on the impact of the federal ban

4   are most accurately and completely set forth in my 2004 and 2013 reports.

5        This report summarizes some of the key findings of those studies regarding the

6   federal ban and its impact on crime prevention and public safety.  I also discuss the

7   results of a new research study I directed that investigated current levels of criminal

8   activity with high capacity semiautomatic weapons as measured in several local and

9   national data sources.[5]  Based upon my findings, I then provide some opinions on

10  the potential impact and efficacy of prohibitions and restrictions on large-capacity

11  magazines, like those contained in California Penal Code section 32310

12  (hereinafter, "Section 32310").

13        As discussed below, it is my considered opinion that California's LCM ban

14  has the potential to prevent and limit shootings, particularly those involving high

15  numbers of shots and victims, and thus likely to advance California's interests in

16  protecting its populace from the dangers of such shootings.

17  **III.  RETENTION AND COMPENSATION**

18        I am being compensated for my time on this case on an hourly basis at a rate

19  of $150 per hour.  My compensation is not contingent on the results of my analysis

20  or the substance of my testimony.

21

22  [4] As discussed below, there have been some additional academic and non-academic studies that have examined more limited aspects of the ban's effects.

23  [5] Christopher S. Koper et al., *Criminal Use of Assault Weapons and High Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*,

24  Journal of Urban Health (October 2, 2017) DOI 10.1007/s11524-017-0205-7, *available at* http://em.rdcu.be/wf/click?upn=KP7O1RED-2BlD0F9LDqGVeSCt

25  PCwMbqH-2BMWBUHgPpsN5I-3D_aLASUID13T0TZ55mA5wcKyxiF1pNAQ-

26  2FS0QcxHHbBP65v2wnicdu8DEAbXOHNYJipa4WGEmYqVQvkFcdtrFEsYjZA uWYuv7oZRi5azzY-2B5kRSTavg1BTwrdRnUNdQZVTcHVKQjHpPzJRCNju

27  QtSjVJuN-2F-2BNTasWPxQOVBf1pq1NLGA3TvS1NOwbCbQHSILbi3GA hoVkr0iwOIrRLgL8INPZXWLjKU6PJ-2F84jalWCxLaJiY74BdpLrwOkfJQ3Cvy-

28  2F04YQt1UhIlsfJNdtP7DBeGw-3D-3D (last visited Oct. 5, 2017).

2

**IV.  BASES FOR OPINION AND MATERIAL COVERED**

The opinions I provide in this expert report are based solely on the findings of the materials cited in the footnotes and text, as well as the materials attached as exhibits to this report.

**V.  OPINION**

**A.  Summary of Findings**

Based on my research, I found, among other things, that assault pistols are used disproportionately in crime in general, and that assault weapons more broadly were disproportionately used in murder and other serious crimes in some jurisdictions for which there was data.  I also found that assault weapons and other firearms with large capacity magazines are used in a higher share of mass public shootings and killings of law enforcement officers.

The evidence also suggests that gun attacks with semiautomatics—especially assault weapons and other guns equipped with large capacity magazines—tend to result in more shots fired, more persons wounded, and more wounds per victim, than do gun attacks with other firearms.  There is evidence that victims who receive more than one gunshot wound are substantially more likely to die than victims who receive only one wound.  Thus, it appears that crimes committed with these weapons are likely to result in more injuries, and more lethal injuries, than crimes committed with other firearms.

In addition, there is some evidence to suggest that assault weapons are more attractive to criminals, due to the weapons' military-style features and particularly large magazines.  Based on these and other findings in my studies discussed below, it is my considered opinion that California's recently enacted ban on large capacity magazines, which is in some ways stronger than the federal ban that I studied, is likely to advance California's interest in protecting public safety.  Specifically, it has the potential to: (1) reduce the number of crimes committed with firearms with large capacity magazines; (2) reduce the number of shots fired in gun crimes; (3)

3

1    reduce the number of gunshot victims in such crimes; (4) reduce the number of

2    wounds per gunshot victim; (5) reduce the lethality of gunshot injuries when they

3    do occur; and (6) reduce the substantial societal costs that flow from shootings.

4    **B.    Criminal Uses and Dangers of Large-Capacity Magazines**

5        Large-capacity magazines allow semiautomatic weapons to fire more than 10

6    rounds without the need for a shooter to reload the weapon.[6]  Large-capacity

7    magazines come in a variety of sizes, including but not limited to 17-round

8    magazines, 25- or 30-round magazines, and drums with the capacity to accept up to

9    100 rounds.

10       The ability to accept a detachable magazine, including a large-capacity

11   magazine, is a common feature of guns typically defined as assault weapons.[7]  In

12   addition, LCMs are frequently used with guns that fall outside of the definition of

13   an assault weapon.

14       LCMs are particularly dangerous because they facilitate the rapid firing of

15   high numbers of rounds.  This increased firing capacity thereby potentially

16   increases injuries and deaths from gun violence.  *See* Updated Assessment of the

17   Federal Assault Weapons Ban at 97 (noting that "studies ... suggest that attacks

18   with semiautomatics—including [assault weapons] and other semiautomatics with

19   LCMs—result in more shots fired, persons wounded, and wounds per victim than

20   do other gun attacks").

21    

22   [6] A semiautomatic weapon is a gun that fires one bullet for each pull of the trigger
     and, after each round of ammunition is fired, automatically loads the next round and
23   cocks itself for the next shot, thereby permitting a faster rate of fire relative to non-
     automatic firearms.  Semiautomatics are not to be confused with fully automatic
24   weapons (*i.e.*, machine guns), which fire continuously so long as the trigger is
     depressed.  Fully automatic weapons have been illegal to own in the United States
25   without a federal permit since 1934.  *See Updated Assessment of the Federal
     Assault Weapons Ban*, at 4 n.1.

26   [7] Although the precise definition used by various federal, state, and local statutes
     has varied, the term "assault weapons" generally includes semiautomatic pistols,
27   rifles, and shotguns with military features conducive to military and potential
     criminal applications but unnecessary in shooting sports or for self-defense.

28

4

---

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00126

**ER_2317**

1      As such, semiautomatics equipped with LCMs have frequently been employed

2  in highly publicized mass shootings, and are disproportionately used in the murders

3  of law enforcement officers, crimes for which weapons with greater firepower

4  would seem particularly useful. *See Updated Assessment of the Federal Assault*

5  *Weapons Ban* at 14-19, 87.

6      During the 1980s and early 1990s, semiautomatic firearms equipped with

7  LCMs were involved in a number of highly publicized mass murder incidents that

8  first raised public concerns and fears about the accessibility of high powered,

9  military-style weaponry and other guns capable of discharging high numbers of

10  rounds in a short period of time. For example:

- On July 18, 1984, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California McDonald's restaurant, using an Uzi carbine, a shotgun, and another semiautomatic handgun, and equipped with a 25-round LCM;

- On January 17, 1989, Patrick Purdy used a civilian version of the AK-47 military rifle and a 75-round LCM to open fire in a Stockton, California schoolyard, killing five children and wounding 29 other persons;

- On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, a number of other firearms, and multiple 30-round magazines, killed seven and wounded 15 people at his former workplace in Louisville, Kentucky;

- On October 16, 1991, George Hennard, armed with two semiautomatic handguns with LCMs (and reportedly a supply of extra LCMs), killed 22 people and wounded another 23 in Killeen, Texas;

- On July 1, 1993, Gian Luigi Ferri, armed with two Intratec TEC-DC9 assault pistols and 40- to 50-round magazines, killed nine and wounded six at the law offices of Pettit & Martin in San Francisco, California; and

- On December 7, 1993, Colin Ferguson, armed with a handgun and multiple LCMs, opened fire on commuters on a Long Island Rail Road train, killing 6 and wounding 19.

5

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00127

ER_2318

1    *See Updated Assessment of the Federal Assault Weapons Ban* at 14.[8]

2        More recently, in the years since the expiration of the federal ban in 2004,

3    there has been another well-publicized series of mass shooting incidents involving

4    previously banned assault weapons and/or LCMs.  Some of the more notorious of

5    these incidents include:

6    • On April 16, 2007, Seung-Hui Cho, armed with a handgun and multiple
7      LCMs, killed 33 (including himself) and wounded 23 on the campus of
    Virginia Tech in Blacksburg, Virginia;
8

9    • On January 8, 2011, Jared Loughner, armed with a handgun and multiple
  LCMs, killed 6 and wounded 13, including Congresswoman Gabrielle
10     Giffords, in Tucson, Arizona;

11   • On July 20, 2012, James Holmes, armed with a Smith & Wesson M&P 15
12     assault rifle, 100-round LCMs, and other firearms, killed 12 and wounded 58
    in a movie theater in Aurora, Colorado;
13

14   • On December 14, 2012, Adam Lanza, armed with a Bushmaster AR-15-style
  assault rifle, two handguns, and multiple LCMs, killed 26 (20 of whom were
15     young children) and wounded 2 at Sandy Hook Elementary School in
16     Newtown, Connecticut;

17   • On December 2, 2015, Syed Rizwan Farook and Tashfeen Malik, armed with
18     2 AR-15 style rifles, semiautomatic handguns, and LCMs, killed 14 and
    injured 21 at a workplace party in San Bernardino, California; and

19

20

21

22   [8] Additional details regarding these incidents were obtained from: Violence Policy
Center, *Mass Shootings in the United States Involving High-Capacity Ammunition*
23   *Magazines, available at* http://www.vpc.org/fact_sht/VPCshootinglist.pdf
(hereinafter, "Violence Policy Center Report"); Mark Follman, Gavin Aronsen &
24   Deanna Pan, *US Mass Shootings, 1982-2012: Data from Mother Jones'*
*Investigation,* updated Feb. 27, 2013, *available at* http://www.motherjones.com/
25   politics/2012/12/mass-shootings-mother-jones-full-data (hereinafter, "Follman,
Aronsen & Pan 2013"); and Mark Follman, Gavin Aronsen & Jaeah Lee, *More*
26   *Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines,*
Feb. 27, 2013, *available at* http://www.motherjones.com/politics/2013/02/assault-
27   weapons-highcapacity-magazines-mass-shootings-feinstein (hereinafter, "Pollman,
Aronsen & Lee 2013").

28

6

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00128

**ER_2319**

1     • On June 12, 2016, Omar Mateen, armed with a Sig Sauer MCX rifle, a Glock
2       17 semiautomatic handgun, and LCMs, killed 49 and injured 53 in a nightclub
3       in Orlando, Florida.[9]

4     There is evidence to suggest that the particularly large ammunition capacities

5 of assault weapons, along with their military-style features, are more attractive to

6 criminals than lawful users.  *See Updated Assessment of the Federal Assault*

7 *Weapons Ban* at 17-18.  The available evidence also suggests that large-capacity

8 magazines, along with assault weapons, pose particular dangers by their large and

9 disproportionate involvement in two aspects of crime and violence:  mass shootings

10 and murders of police.  *See Updated Assessment of the Federal Assault Weapons*

11 *Ban* at 14- 19, 87.

12     With respect to mass shootings, the available evidence before the federal

13 assault weapons ban was enacted in 1994 and after its expiration in 2004 both

14 support this conclusion.  Prior to the federal ban, assault weapons or other

15 semiautomatics with LCMs were involved in 6, or 40%, of 15 mass shooting

16 incidents occurring between 1984 and 1993 in which 6 or more persons were killed

17 or a total of 12 or more were wounded.  See *Updated Assessment of the Federal*

18 *Assault Weapons Ban* at 14.[10]

19     More recently, a *Mother Jones* media investigation and compilation of 62

20 public mass shooting incidents that involved the death of four or more people, over

21 the period 1982-2012, showed that, of the cases where magazine capacity could be

22 determined, 31 of 36 cases, or 86%, involved a large-capacity magazine.  Including

23

24 [9] For details on these incidents, see Marc Follman et al., *US Mass Shootings, 1982-*
25 *2017: Data from Mother Jones' Investigation*, Mother Jones (June 14, 2017)
    *available at* http://www.motherjones.com/politics/2012/12/mass-shootings-mother-
26 jones-full-data/.
    [10] These figures are based on tabulations conducted by my research team and me
27 using data reported in Gary Kleck, *Targeting Guns: Firearms and Their Control*
    (1997) at 124-26.
28

1   all cases, including those where magazine capacity could not be determined, exactly

2   half of the cases (31 of 62) are known to have involved an LCM.[11]

3      LCMs, because they can be and are used both with assault weapons and guns

4   that fall outside the definition of an assault weapon, appear to present even greater

5   dangers to crime and violence than assault weapons alone.

6      Prior to the federal assault weapons ban, for example, guns with LCMs were

7   used in roughly 13-26% of most gun crimes (as opposed to somewhere between

8   about 1% and 8% for assault weapons alone). *See Updated Assessment of the*

9   *Federal Assault Weapons Ban* at 15, 18-19; *see also America's Experience with the*

10   *Federal Assault Weapons Ban* at 161-62. More recent data discussed below

11   suggest that guns with LCMs now represent an even higher share of guns used in

12   crime.

13      It also appears that guns with LCMs have been used disproportionately in

14   murders of police. Specifically, data from prior to the federal ban indicated that

15   LCMs were used in 31% to 41% of gun murders of police in contrast to their use in

16   13-26% of gun crimes overall. *See Updated Assessment of the Federal Assault*

17   *Weapons Ban* at 18; *see also America's Experience with the Federal Assault*

18   *Weapons Ban* at 162. More recent data discussed below also show a similar pattern

19   of guns with LCMs being more common among weapons used in gun murders of

20   police.

21      In addition, the available evidence suggests that gun attacks with

22   semiautomatics—including both assault weapons and guns equipped with LCMs—

23   tend to result in more shots fired, more persons wounded, and more wounds

24   inflicted per victim than do attacks with other firearms. *See Updated Assessment of*

25

26

27

28

[11] This investigation and compilation of data on mass shootings was done by reporters at *Mother Jones* magazine. *See* Follman, Aronsen & Pan 2013; *see also* Follman Aronsen & Lee 2013; Mark Follman, Gavin Aronsen & Deanna Pan, *A Guide to Mass Shootings in America* (updated Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2012/07/mass-shootings-map.

8

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00130

ER_2321

1    *the Federal Assault Weapons Ban* at 97; *see also America's Experience with the*
2    *Federal Assault Weapons Ban* at 166-67.

3          For example, in mass shooting incidents that resulted in at least 6 deaths or at
4    least 12 total gunshot victims from 1984 through 1993, offenders who clearly
5    possessed assault weapons or other semiautomatics with LCMs wounded or killed
6    an average of 29 victims in comparison to an average of 13 victims wounded or
7    killed by other offenders. *See Updated Assessment of the Federal Assault Weapons*
8    *Ban* at 85-86; *see also America's Experience with the Federal Assault Weapons*
9    *Ban* at 167.

10         Working under my direction, Luke Dillon, a graduate student at George
11   Mason University, recently analyzed the *Mother Jones* data from 1982 through
12   2012 for his Master's thesis, and compared the number of deaths and fatalities of
13   the 62 mass shootings identified therein to determine how the presence of assault
14   weapons and LCMs impacted the outcome.[12]  With respect to LCMs, Mr. Dillon
15   compared cases where an LCM was known to have been used (or at least possessed
16   by the shooter) against cases where either an LCM was not used or not known to
17   have been used.  He found that the LCM cases (which included assault weapons)
18   had significantly higher numbers of fatalities and casualties:  an average of 10.19
19   fatalities in LCM cases compared to 6.35 fatalities in non-LCM/unknown cases.
20   Mr. Dillon also found an average of 12.39 people were shot but not killed in public
21   mass shootings involving LCMs, compared to just 3.55 people shot in the non-
22   LCM/unknown LCM shootings.  These findings reflect a total victim differential of
23   22.58 killed or wounded in the LCM cases compared to 9.9 in the non-

24

25

26   _____
27   [12] *See* Luke Dillon, Mass Shootings in the United States: An Exploratory Study of
     the Trends from 1982 to 2012 (2013) (unpublished M.A. thesis, George Mason
28   University, Department of Criminology, Law and Society).

9

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)
Exhibit 4
Page 00131

1   LCM/unknown LCM cases.[13]  All of these differences were statistically significant
2   and not a result of mere chance.

3          Similarly, a study of handguns attacks in Jersey City, New Jersey during the
4   1990s found that the average number of victims wounded in gunfire incidents
5   involving semiautomatic pistols was 15% higher than in those involving revolvers.
6   The study further found that attackers using semiautomatics to fire more than ten
7   shots were responsible for nearly 5% of all gunshot victims and that 100% of these
8   incidents involved injury to at least one victim.  *See Updated Assessment of the*
9   *Federal Assault Weapons Ban* at 84-86, 90-91; *see also America's Experience with*
10  *the Federal Assault Weapons Ban* at 167.[14]

11         Similar evidence comes from other local studies.  Between 1992 and 1995,
12  gun homicide victims in Milwaukee who were killed by guns with LCMs had 55%
13  more gunshot wounds than those victims killed by non-LCM firearms.  Further, a
14  study of gun homicides in Iowa City (IA), Youngstown (OH), and Bethlehem (PA)
15  from 1994 through 1998 found gun homicide victims killed by pistols averaged 4.5
16  gunshot wounds as compared to 2 gunshot wounds for those killed by revolvers.
17  *See Updated Assessment of the Federal Assault Weapons Ban* at 86.

18         And, in an analysis I conducted of guns recovered by police in Baltimore, I
19  also found LCMs to be associated with gun crimes that resulted in more lethal and
20  injurious outcomes.  For instance, I found, among other things, that guns used in
21  shootings that resulted in gunshot victimizations were 17% to 26% more likely to

22
23  [13] The patterns were also very similar when comparing the LCM cases against just
     those cases in which it was clear that an LCM was not used (though this was a very
     small number).
24
25  [14] Note that these data were collected in the 1990s during the years of the federal
     LCM ban and in a city that was also subject to state-level LCM restrictions on
26  magazines holding more than 15 rounds.  Hence, these findings may not generalize
     well to other locations and the current timeframe.  More specifically, given recent
     increases in the use of firearms with LCMs as discussed below, the Jersey City
27  results may understate the current share of gunshot victimizations resulting from
     incidents with more than 10 shots fired.
28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00132

1    have LCMs than guns used in gunfire cases with no wounded victims, and guns

2    linked to murders were 8% to 17% more likely to have LCMs than guns linked to

3    non-fatal gunshot victimizations. *See Updated Assessment of the Federal Assault*

4    *Weapons Ban* at 87.

5        In short, while tentative, the available evidence suggests more often than not

6    that attacks with semiautomatics, particularly those equipped with LCMs, result in

7    more shots fired, leading both to more injuries and injuries of greater severity.

8    Such attacks also appear to result in more wounds per victim. This is significant

9    because gunshot victims who are shot more than once are more than 60% more

10   likely to die than victims who receive only one gunshot wound. *See Updated*

11   *Assessment of the Federal Assault Weapons Ban* at 87 (citing studies showing 63%

12   increase and 61% increase, respectively, in fatality rates among gunshot victims

13   suffering more than one wound).

14       In addition, diminishing the number of victims of shootings by even a small

15   percentage can result in significant cost savings because of the significant social

16   costs of shootings, as discussed herein.

17   **C.    Effects of the 1994 Federal Assault Weapons Ban**

18       **1.    Provisions of the Federal Assault Weapons Ban**

19       Enacted on September 13, 1994—in the wake of many of the mass shootings

20   described above—the federal assault weapons ban imposed prohibitions and

21   restrictions on the manufacture, transfer, and possession of both certain

22   semiautomatic firearms designated as assault weapons and certain LCMs. Pub. L.

23   No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (codified as former

24   18 U.S.C. § 922(v), (w)(1) (1994).

25       The federal assault weapons ban was to expire after ten years, unless renewed

26   by Congress. Pub. L. No. 103-322, tit. XI, § 110105(2). Congress did not renew

27

28

11

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00133

**ER_2324**

1    the ban, and thus, by its own terms, the federal ban expired on September 13,

2    2004.[15]

3          **a.    Banned Assault Weapons and Features**

4          As noted, the federal assault weapons ban imposed a ten-year ban on the

5    manufacture, transfer, or possession of what the statute defined as "semiautomatic

6    assault weapons." The federal ban was not a prohibition on all semiautomatic

7    firearms; rather, it was directed against those semiautomatics having features that

8    are useful in military and criminal applications but that are unnecessary in shooting

9    sports or for self-defense.

10         Banned firearms were identified under the federal law in two ways: (i) by

11   specific make and model; and (ii) by enumerating certain military-style features and

12   generally prohibiting those semiautomatic firearms having two or more of those

13   features.

14         First, the federal ban specifically prohibited 18 models and variations of

15   semiautomatic guns by name (*e.g.*, the Intratec TEC-9 pistol and the Colt AR-15

16   rifle), as well as revolving cylinder shotguns. This list also included a number of

17   foreign rifles that the federal government had banned from importation into the

18   country beginning in 1989 (*e.g.*, the Avtomat Kalashnikov models). And, indeed,

19   several of the guns banned by name were civilian copies of military weapons and

20   accepted ammunition magazines made for those military weapons. A list of the

21   weapons banned by name in the 1994 law is set forth in Table 2-1 of the *Updated*

22   *Assessment of the Federal Assault Weapons Ban* at 5.

23         Second, the federal assault weapons ban contained a "features test" provision

24   that generally prohibited other semiautomatic guns having two or more military-

25   _____

26   [15] I understand that California prohibited assault weapons in 1989, before the
federal ban, but grandfathered most existing assault weapons; and that California
prohibited large-capacity magazines in 2000 but grandfathered existing LCMs. I
27   am not aware of any specific studies of the effects of these California laws on gun
markets or gun violence.
28

1   style features.  Examples of such features include pistol grips on rifles, flash

2   suppressors, folding rifle stocks, threaded barrels for attaching silencers, and the

3   ability to accept detachable magazines.  This "features test" of the federal ban is

4   described more fully in Table 2-2 of the *Updated Assessment of the Federal Assault*

5   *Weapons Ban* at 6, and in Table 12-1 of *America's Experience with the Federal*

6   *Assault Weapons Ban* at 160.

### b.   Banned Large-Capacity Magazines

8       The federal ban also prohibited most ammunition feeding devices holding

9   more than ten rounds of ammunition (which I have referred to herein as "large-

10  capacity magazines" or "LCMs").   The federal ban on LCMs extended to LCMs or

11  similar devices that had the capacity to accept more than ten rounds of ammunition,

12  or that could be "readily restored or converted or to accept" more than ten rounds of

13  ammunition.[16]

### c.   Exemptions and Limitations to the Federal Ban

15      The 1994 federal assault weapons ban contained several important exemptions

16  that limited its potential impact, especially in the short-term.  *See Updated*

17  *Assessment of the Federal Assault Weapons Ban* at 10-11.

18      First, assault weapons and LCMs manufactured before the effective date of the

19  ban were "grandfathered" in and thus legal to own and transfer.  Estimates suggest

20  that there may have been upward of 1.5 million assault weapons and 25-50 million

21  LCMs thus exempted from the federal ban.  Moreover, an additional 4.8 million

22  pre-ban LCMs were imported into the country from 1994 through 2000 under the

23  grandfathering exemption.  Importers were also authorized to import another 42

24  million pre-ban LCMs, which may have arrived after 2000.  *See Updated*

---

[16] Technically, the ban prohibited any magazine, belt, drum, feed strip, or similar device that had the capacity to accept more than 10 rounds of ammunition, or which could be readily converted or restored to accept more than 10 rounds of ammunition.  The ban exempted attached tubular devices capable of operating only with 22 caliber rimfire (*i.e.*, low velocity) ammunition.

13

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00135

ER_2326

1    *Assessment of the Federal Assault Weapons Ban* at 10; *see also America's*

2    *Experience with the Federal Assault Weapons Ban* at 160-61.

3        Furthermore, although the 1994 law banned "copies or duplicates" of the

4    named firearms banned by make and model, federal authorities emphasized exact

5    copies in enforcing this provision. Similarly, the federal ban did not apply to a

6    semiautomatic weapon possessing only one military-style feature listed in the ban's

7    features test provision.[17] Thus, many civilian rifles patterned after military

8    weapons were legal under the ban with only slight modifications. *See Updated*

9    *Assessment of the Federal Assault Weapons Ban* at 10-11.[18]

10       **D.   Impact of the Federal Assault Weapons Ban**

11       This section of my report discusses the empirical evidence of the impact of the

12   federal assault weapons ban. I understand that the Plaintiffs in this litigation

13   contend that California's prohibition on the possession of LCMs will not have an

14   effect on crime or gunshot victimization because criminal users of firearms will not

15   comply with California's ban. In my opinion, that contention misunderstands the

16   effect of possession bans. The issue is not only whether criminals will be unwilling

17   to comply with such laws, though this could be an important consideration

18   depending on the severity of penalties for possession or use. The issue is also how

19   possession bans affect the availability of weapons for offenders. Examining the

20

21   [17] It should be noted, however, that any firearms imported into the country must still meet the "sporting purposes test" established under the federal Gun Control
22   Act of 1968. In 1989, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") determined that foreign semiautomatic rifles having any one of
23   a number of named military features (including those listed in the features test of the 1994 federal assault weapons ban) fail the sporting purposes test and cannot be
24   imported into the country. In 1998, the ability to accept an LCM made for a military rifle was added to the list of disqualifying features. Consequently, it was
25   possible for foreign rifles to pass the features test of the federal assault weapons ban, but not meet the sporting purposes test for imports. *See Updated Assessment*
26   *of the Federal Assault Weapons Ban* at 10 n.7.

     [18] Examples of some of these modified, legal versions of banned guns that
27   manufacturers produced in an effort to evade the ban are listed in Table 2-1 of the *Updated Assessment of the Federal Assault Weapons Ban* at 5.

28

14

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)
Exhibit 4
Page 00136

1    effects of the federal ban on LCMs could cast some light on how a state or local

2    prohibition on possession of LCMs may diminish their availability for offenders. It

3    is difficult, however, to assess trends in LCM use because of limited information.

4    *See infra* at 20. For that reason, this section discusses the impacts of the federal ban

5    both on LCM use, for which information is limited, and on ownership and use of

6    assault weapons, for which there is more information.

7        **1.    Assault Weapons**

8       Prior to the federal ban, the best estimates are that there were approximately

9    1.5 million privately owned assault weapons in the United States (less than 1% of

10    the total civilian gun stock). *See America's Experience with the Federal Assault*

11    *Weapons Ban* at 160-61; *see also Updated Assessment of the Federal Assault*

12    *Weapons Ban* at 10.

13       Although there was a surge in production of assault weapon-type firearms as

14    Congress debated the ban in 1994, the federal ban's restriction of new assault

15    weapon supply helped drive up the prices for many assault weapons (notably

16    assault pistols) and appeared to make them less accessible and affordable to

17    criminal users. *See America's Experience with the Federal Assault Weapons Ban* at

18    162-63; *see also Updated Assessment of the Federal Assault Weapons Ban* at 25-

19    38.

20       Analyses that my research team and I conducted of several national and local

21    databases on guns recovered by law enforcement indicated that crimes with assault

22    weapons declined after the federal assault weapons ban was enacted in 1994.

23       In particular, across six major cities (Baltimore, Miami, Milwaukee, Boston,

24    St. Louis, and Anchorage), the share of gun crimes involving assault weapons

25    declined by 17% to 72%, based on data covering all or portions of the 1995-2003

26    post-ban period. *See Updated Assessment of the Federal Assault Weapons Ban* at

27    2, 46-60; *see also America's Experience with the Federal Assault Weapons Ban* at

28    163.

15

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00137

**ER_2328**

1    This analysis of local data is consistent with patterns found in the national data

2    on guns recovered by law enforcement agencies around the country and reported to

3    the ATF for investigative gun tracing.[19]  Specifically, although the interpretation is

4    complicated by changes in tracing practices that occurred during this time, the

5    national gun tracing data suggests that use of assault weapons in crime declined

6    with the onset of the 1994 federal assault weapons ban, as the percentage of gun

7    traces for assault weapons fell 70% between 1992-93 and 2001-02 (from 5.4% to

8    1.6%).  And, notably, this downward trend did not begin until 1994, the year the

9    federal ban was enacted.  *See Updated Assessment of the Federal Assault Weapons*

10   *Ban* at 2, 39-46, 51-52; *see also America's Experience with the Federal Assault*

11   *Weapons Ban* at 163.[20]

12   In short, the analysis that my research team and I conducted indicates that the

13   criminal use of assault weapons declined after the federal assault weapons ban was

14   enacted in 1994, independently of trends in gun crime.  *See Updated Assessment of*

15   *the Federal Assault Weapons Ban* at 51-52; *see also America's Experience with the*

16   *Federal Assault Weapons Ban* at 163.

17   This decline in crimes with assault weapons was due primarily to a reduction

18   in the use of assault pistols.  Assessment of trends in the use of assault rifles was

19   complicated by the rarity of crimes with such rifles and by the substitution in some

20   cases of post-ban rifles that were very similar to the banned models.  In general,

21   however, the decline in assault weapon use was only partially offset by substitution

22

23   [19] A gun trace is an investigation that typically tracks a gun from its manufacture to
its first point of sale by a licensed dealer. It is undertaken by the ATF, upon request
24   by a law enforcement agency.  The trace is generally initiated when the requesting
law enforcement agency provides ATF with a trace request including identifying
25   information about the firearm, such as make, model and serial number.  For a full
discussion of the use of ATF gun tracing data, see section 6.2 of *Updated*
26   *Assessment of the Federal Assault Weapons Ban* at 40-46.

[20] These findings are consistent with other tracing analyses conducted by ATF and
27   the Brady Center to Prevent Gun Violence.  *See Updated Assessment of the Federal*
*Assault Weapons Ban* at 44 n.43.

28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)
Exhibit 4
Page 00138

1    of post-ban assault weapon-type models.  Even counting the post-ban models as

2    assault weapons, the share of crime guns that were assault weapons fell 24% to

3    60% across most of the local jurisdictions studied.  Patterns in the local data

4    sources also suggested that crimes with assault weapons were becoming

5    increasingly rare as the years passed.  *See Updated Assessment of the Federal*

6    *Assault Weapons Ban* at 46-52; *see also America's Experience with the Federal*

7    *Assault Weapons Ban* at 163-64.

8         Thus, while developing a national estimate of the number of assault weapons

9    crimes prevented by the federal ban is complicated by the range of estimates of

10   assault weapon use and changes therein derived from different data sources,

11   tentatively, it appears that the federal ban prevented a few thousand crimes with

12   assault weapons annually.  For example, using 2% as the best estimate of the share

13   of gun crimes involving assault weapons prior to the ban, and 40% as a reasonable

14   estimate of the post-ban drop in this figure, implies that almost 2,900 murders,

15   robberies, and assaults with assault weapons were prevented in 2002.  *See Updated*

16   *Assessment of the Federal Assault Weapons Ban* at 52 n.61.[21]  If this tentative

17   conclusion is correct, then contrary to Plaintiffs' contention, prohibitions like the

18   federal ban do have an impact on criminal users of guns.

19        **2.    Large-Capacity Magazines**

20        Assessing trends in LCM use is much more difficult because there was, and is,

21   no national data source on crimes with LCMs, and few local jurisdictions maintain

22   this sort of information.

23        It was possible, nonetheless, to examine trends in the use of guns with LCMs

24   in four jurisdictions:  Baltimore, Milwaukee, Anchorage, and Louisville.  In all four

25

26   [21] While it seems likely that some or all of these crimes happened regardless, as
     perpetrators merely substituted some other gun for the assault weapon, it also seems
27   likely that the number of victims per shooting incident, and the number of wounds
     inflicted per victim, was diminished in some of those instances.

28

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00139

ER_2330

1    jurisdictions, the overall share of crime guns equipped with LCMs rose or remained
2    steady through at least the late 1990s. This failure to reduce overall LCM use for at
3    least several years after the federal ban was likely due to the immense stock of
4    exempted pre-ban magazines, which, as noted, was enhanced by post-ban imports.
5    *See Updated Assessment of the Federal Assault Weapons Ban* at 68-79; *see also*
6    *America's Experience with the Federal Assault Weapons Ban* at 164.

7         My studies did show that crimes with LCMs may have been decreasing by the
8    early 2000s, but the available data in the four cities I investigated were too limited
9    and inconsistent to draw any clear overall conclusions in this regard. *See America's*
10   *Experience with the Federal Assault Weapons Ban* at 164; *Updated Assessment of*
11   *the Federal Assault Weapons Ban* at 68-79.

12        However, a later investigation by *The Washington Post* of LCM use in
13   Virginia, analyzing data maintained by the Virginia State Police as to guns
14   recovered in crimes by local law enforcement officers across the state, suggests that
15   the ban may have had a more substantial impact on the supply of LCMs to criminal
16   users by the time it expired in 2004. In Virginia, the share of recovered guns with
17   LCMs generally varied between 13% and 16% from 1994 through 2000 but fell to
18   9% by 2004. Following expiration of the federal ban in 2004, the share of Virginia
19   crime guns with an LCM rose to 20% by 2010. *See America's Experience with the*
20   *Federal Assault Weapons Ban* at 165.[22] These data suggest that the federal ban

21   [22] The results of *The Washington Post's* original investigation (which are what are
22   conveyed in *America's Experience with the Federal Assault Weapons Ban* at 165)
     are reported in David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in*
23   *Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23, 2011, *available*
     *at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/
24   AR2011012203452.html, and attached as Exhibit E to this report. In early 2013,
     *The Washington Post* updated this analysis, and slightly revised the figures it
25   reported by identifying and excluding from its counts more than 1,000 .22-caliber
     rifles with large-capacity tubular magazines, which were not subject to the federal
26   ban (and which are similarly not subject to California's ban on large-capacity
     magazines). *See* David S. Fallis, *Data Indicate Drop in High-Capacity Magazines*
27   *During Federal Gun Ban*, Wash. Post, Jan. 10, 2013, *available at*
     https://www.washingtonpost.com/investigations/data-point-to-drop-in-high-
28   capacity-magazines-during-federal-gun-ban/2013/01/10/d56d3bb6-4b91-11e2-
                                                                    (continued...)

                                           18

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00140

ER_2331

1    may have been reducing the use of LCMs in gun crime by the time it expired in

2    2004, and that it could have had a stronger impact had it remained in effect.

3         **3.    Summary of Results of the Federal Assault Weapons Ban**

4         The federal ban's exemption of millions of pre-ban assault weapons and

5    LCMs meant that the effects of the law would occur only gradually—and that those

6    effects were still unfolding when the ban expired in 2004. Nevertheless, while the

7    ban did not appear to have a measurable effect on overall gun crime during the

8    limited time it was in effect, as just discussed, my studies and others do appear to

9    show a significant impact on the number of gun crimes involving assault weapons

10   and a possibly significant impact (based on *The Washington Post's* analysis of

11   Virginia data, see Fallis, *supra*, at Exhibits E & F) on those crimes involving

12   LCMs.[23]

13        Moreover, as set forth in my 2013 book chapter, there is evidence that, had the

14   federal ban remained in effect longer (or were it renewed), it could conceivably

15   have yielded significant additional societal benefits as well, potentially preventing

16   hundreds of gunshot victimizations annually and producing millions of dollars of

17   (…continued)

18   a6a6-aabac85e8036_story.html?utm_term=.44aa13f8e442, and attached as Exhibit F to this report. This updated data is reported above.

19   [23] In our initial 1997 study on the impact of the federal assault weapons ban, Jeffrey
20   Roth and I also estimated that gun murders were about 7% lower than expected in
     1995 (the first year after the ban), adjusting for pre-existing trends. *See Impact*
     *Evaluation* at 6, 79-85. However, the very limited post-ban data available for that
21   study precluded a definitive judgment as to whether this drop was statistically
     meaningful. My later findings on LCM use made it difficult to credit the ban with
22   this effect, however, and I did not update it for the 2004 report. *See Updated*
     *Assessment of the Federal Assault Weapons Ban* at 92 n.109. Other national
23   studies of trends in gun violence have failed to find an effect of the federal ban on
     gun murders (which is consistent with my conclusions in the 2004 report but must
24   also be interpreted in light of the ban's limitations and delayed effects as discussed
     above), though they also suggest that the ban may have reduced fatalities and
25   injuries from public mass shootings. Mark Gius, *An Examination of the Effects of*
     *Concealed Weapons Laws and Assault Weapons Bans on State-Level Murder*
26   *Rates*, 21 Applied Econ. Letters 265, 265-267 (Nov. 26, 2013) (hereinafter, "Gius
     2013"); Mark Gius, *The Impact of State and Federal Assault Weapons Bans on*
27   *Public Mass Shootings*, 22 Applied Econ. Letters 281, 281-84 (Aug. 1, 2014)
     (hereinafter, "Gius 2014").

28

1    cost savings per year in medical care alone.  Indeed, reducing shootings by even a

2    very small margin could produce substantial long term savings for society,

3    especially as the shootings prevented accrue over many years.  *See America's*

4    *Experience with the Federal Assault Weapons Ban* at 166-67; *see also Updated*

5    *Assessment of the Federal Assault Weapons Ban* at 100 n.118.  Some studies have

6    shown that the lifetime medical costs for gunshot injuries are about $28,894

7    (adjusted for inflation).  Thus, even a 1% reduction in gunshot victimizations at the

8    national level would result in roughly $18,781,100 in lifetime medical costs savings

9    from the shootings prevented each year.  *See America's Experience with the*

10   *Federal Assault Weapons Ban* at 166-67; *see also Updated Assessment of the*

11   *Federal Assault Weapons Ban* at 100 n.18.

12       The cost savings potentially could be substantially higher if one looks beyond

13   just medical costs.  For example, some estimates suggest that the full societal costs

14   of gun violence—including medical, criminal justice, and other government and

15   private costs (both tangible and intangible)— could be as high as $1 million per

16   shooting.  Based on those estimates, even a 1% decrease in shootings nationally

17   could result in roughly $650 million in cost savings to society from shootings

18   prevented each year.  *See America's Experience with the Federal Assault Weapons*

19   *Ban* at 166-67.

20   **E.    More Recent Research on Criminal Use of Large Capacity**

21       **Magazines**

22       To provide an updated examination of the assault weapons and LCM issue,

23   my colleagues and I recently investigated current levels of criminal activity with

24   assault weapons and other high capacity semiautomatic firearms in the United

25   States using several local and national data sources.[24]  I focus here on the results

26   pertaining to the use of guns with LCMs overall.  Sources for this portion of the

27   _____
     [24] See Koper et al., *supra* note 5.

28

                                        20

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00142

1    analysis included guns recovered by police in eight large cities (Hartford, CT;
2    Syracuse, NY; Baltimore, MD; Richmond, VA; Minneapolis, MN; Milwaukee, WI;
3    Kansas City, MO; and Seattle, WA), guns used in murders of police throughout the
4    nation, and guns used in firearm mass murder incidents in which at least four
5    people were murdered with a firearm (irrespective of the number of additional
6    victims shot but not killed).  The use of guns with LCMs was measured precisely
7    for the Syracuse, Baltimore, and Richmond analyses, which were based on data
8    sources having an indicator for magazine capacity, and some of the mass murder
9    incidents. For other analyses, use of guns with LCMs was approximated based on
10   recoveries of semiautomatic firearm models that are commonly manufactured and
11   sold with LCMs.  I refer to these guns collectively as LCM firearms.

12        In short, the findings of this study reinforce many of the points made above
13   based on my earlier research.  In the police databases, which covered varying time
14   periods from 2008 through 2014, LCM firearms generally accounted for 22-36% of
15   crime guns, with some estimates upwards of 40% for cases involving shootings.[25]
16   Although these estimates may overstate LCM use somewhat (since some estimates
17   were based on measurement of LCM compatible firearms that may not all have
18   been equipped with LCMs), they suggest that LCMs are used in a substantial share
19   of gun crimes.  Consistent with prior research, we also found that LCM firearms are
20   more heavily represented among guns used in murders of police and mass murders.
21   For the period of 2009 through 2013, LCM firearms constituted 41% of guns used
22   in murders of police, with annual estimates ranging from 35% to 48%. Further, our
23   analysis of a sample of 145 mass murders that occurred from 2009 through 2015
24   suggested that LCM firearms were involved in as many as 57% of these incidents

25   _____
     [25] An exception is that crime guns were least likely to be equipped with LCMs in
26   Syracuse (14.6%). This may be attributable to New York State LCM restrictions
     that have been in effect since the early 2000s, but our study did not address this
27   question.

28

1  based on cases for which a definitive determination could be made (as a caveat,

2  precise data on the guns and magazines used were not available for most cases).

3  The identified LCM cases typically occurred in public locations (80%) and resulted

4  in more than twice as many people shot on average as did other incidents—a

5  statistically significant difference that is not likely due to chance (13.7 victims on

6  average for LCM cases versus 5.2 for other cases).

7      Our study also revealed that LCM firearms have grown substantially as a share

8  of guns used in crime since the expiration of the federal LCM ban. This conclusion

9  is based on guns used in murders of police nationally (2003-2013) as well as guns

10  recovered by police in Baltimore (2004-2014), Richmond (2003-2009), and

11  Minneapolis (2006-2014).[26] For these data sources and time frames, the percentage

12  of guns that were LCM firearms increased (in relative terms) by 33-49% in the

13  Baltimore, Minneapolis, and national data, and by 112% in the Richmond data.[27]

14      This upward trend in criminal use of LCM firearms implies possible increases

15  in the level of gunfire and injury per gun attack since the expiration of the federal

16  LCM ban. Consistent with this inference, national data that we compiled from the

17  federal Centers for Disease Control and Prevention and the Federal Bureau of

18  Investigation show that gun homicides and assault-related non-fatal shootings rose

19  by about 29% relative to the level of overall reported violent gun crimes

20  (homicides, assaults, and robberies) between 2003-2005 and 2010-2012.[28]

21

22  [26] Note that Maryland restricted LCMs with more than 20 rounds throughout this period and extended these restrictions to LCMs with more than 10 rounds in 2013.

23  [27] For example, the share of guns used in police murders that were LCM firearms

24  rose from 30.4% for the 2003-2007 period to 40.6% for the 2009-2013 period (a relative increase of 33.6%). In the Richmond data, LCM firearms increased from

25  10.4% of guns recovered by police for the 2003-2004 period to 22% for the 2008-2009 period (a relative increase of 111.5%).

26  [28] See Koper et al., *supra* note 5. This trend was driven by assault-weapon-related

27  non-fatal shootings, which have been trending upward since the early 2000s and recently reached their highest rates since 1995. *See* Katherine A. Fowler et al.,

28  *Firearm Injuries in the United States*, 79 Preventive Med. 5, 5-14 (Oct. 2015).

22

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00144

ER_2335

1  Although the correlation of these trends does not prove causation, they suggest the
2  possibility that greater use of LCM firearms has contributed to higher levels of
3  shootings in recent years.

4  **VI.  SECTION 32310 -- CALIFORNIA'S LARGE-CAPACITY MAGAZINE PROHIBITION**
5
6     **A.   The LCM Ban**

7     On July 1, 2016, the State of California enacted Senate Bill No. 1446 (2015-
8  2016 Reg. Sess.), which prohibited the possession of LCMs (defined under Section
9  16740 as "a feeding device with the capacity to accept more than 10 rounds")
10  beginning on July 1, 2017.  Cal. Stats. 2016, ch. 58 (SB 1446) § 1.  SB 1446, which
11  went into effect on January 1, 2017, amended Section 32310 to state that, beginning
12  on July 1, 2017, any person possessing an LCM, with exemptions not relevant here,
13  would be guilty of an infraction punishable by a fine starting at $100 for the first
14  offense.  Cal. Stats. 2016, ch. 58 (S.B. 1446) § 1 (amending Section 32310 to add a
15  new subdivision (c).).  The law also provided that anyone possessing an LCM may,
16  prior to July 1, 2017, dispose of the magazine by any of the following means: (1)
17  removing it from the state; (1) selling it to a licensed firearms dealer; (3) destroying
18  it; or (4) surrendering it to a law enforcement agency for destruction.  Cal. Stats.
19  2016, ch. 58 (S.B. 1446) § 1 (amending Section 32310 to add a new subdivision
20  (d)).  The Senate Bill Analysis noted that the amendments were necessary because
21  the prior version of the law, which did not prohibition possession of LCMs, was
22  "very difficult to enforce."  Sen. Bill No. 1446, 3d reading Mar. 28, 2016 (2015-
23  2016 Reg. Sess.) (Cal. 2016)).

24     On November 8, 2016, California voters passed Proposition 63, the "Safety for
25  All Act of 2016."  Prop. 63, § 1, as approved by voters (Gen. Elec. Nov. 8, 2016)).
26  The measure included several provisions—including amendments to Section
27  32310—intended to close "loopholes that leave communities throughout the state
28  vulnerable to gun violence and mass shootings."  Prop. 63, § 2, ¶ 5.  The

23

1  amendments to Section 32310 largely mirror the same amendments made under

2  SB 1446. Both provisions prohibit the possession of LCMs on or after July 1,

3  2017, and list options for the disposal of LCMs before that date. Prop. 63 also

4  increased the potential consequence for violations of the possession ban, from an

5  infraction to an infraction or a misdemeanor. Prop. 63, § 6.1. References to

6  Section 32310 in this brief are to the statute as amended by Proposition 63.

7  **B.   The Potential Impact and Efficacy of California's Ban on Possession of LCMs**

8

9  California's ban on possession was only recently passed, and I have not

10 undertaken any study or analysis of this law. Nevertheless, it is my considered

11 opinion that, based on the similarities of Section 32310 to the federal ban, the

12 impacts of the federal ban and the ways in which Section 32310 address some of

13 the weaknesses of the federal ban, Section 32310 is likely to advance California's

14 interest in protecting public safety.[29]

15

16 [29] A few studies of state-level assault weapon and LCM bans have examined the
   effects of these laws on gun violence and other crimes. In those studies that have
17 examined gun homicides and other shootings (the crimes that are logically most
   likely to be affected by LCM bans), evidence has been mixed. Although states with
18 assault weapon and LCM laws tend to have lower gun murder rates, this association
   is not statistically significant when controlling for other social and policy factors.
19 However, other evidence from these studies suggests these laws may produce
   statistically significant reductions in fatalities from public mass shootings. *See*
20 Gius 2013 at 265-67; *see also* Gius 2014 at 281-84; Eric W. Fleegler et al., *Firearm
   legislation and firearm-related fatalities in the United States*, 173 JAMA Internal
21 Med. 732, 732-40 (2013); Christopher S. Koper & Jeffrey A. Roth, *The Impact of
   the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: an Assessment
22 of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 Journal
   of Quantitative Criminology 33-74 (2001); *see also Updated Assessment of the
23 Federal Assault Weapons Ban* at 81 n.95. Nonetheless, it is difficult to draw
   definitive conclusions from these studies for several reasons including the
24 following. For one, there is little evidence on how state LCM bans affect the
   availability and use of LCMs over time. Further, studies have not generally
25 accounted for important differences in state assault weapons laws—most notably,
   whether they include LCM bans—and changes in these provisions over time.
26 Perhaps most importantly, to the best of my knowledge, there have not been any
   studies examining the effects of LCM laws that ban LCMs without grandfathering,
27 as done by the new California statute. Hence, these studies have limited value in
   assessing the potential effectiveness of California's new law.

28

24

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4

Page 00146

1    California's LCM ban is more robust than the expired federal ban, and may be

2    more effective more quickly due to its elimination of grandfathering for previously

3    owned LCMs.  While the LCM ban was arguably the most important feature of the

4    1994 federal ban (given that LCMs are the key feature contributing to an assault

5    weapon's firepower, and that the reach of the LCM ban was much greater than the

6    assault weapons ban as many semiautomatic guns that were not banned could still

7    accept LCMs), my studies as to the effects of the federal ban indicated that the

8    LCM ban was likely not as efficacious in reducing the use of these magazines in

9    crime as it otherwise might have been because of the large number of pre-ban

10   LCMs which were exempted from the ban.  *The Washington Post*'s investigation of

11   recovered guns with LCMs in Virginia, which showed an increasing decline in the

12   number of recovered guns with LCMs the longer the ban was in effect, similarly

13   suggests that the grandfathering of pre-ban LCMs delayed the full impact of the

14   federal ban.  See Fallis, *supra*, attached as Exhs. E & F.  In my opinion, eliminating

15   the grandfathering of pre-ban LCMs, as done by California's new law, would have

16   improved the efficacy of the federal ban.

17       In my opinion, based on the data and information contained in this report and

18   the sources referred to herein, a complete ban on the possession of LCMs has the

19   potential to:  (1) reduce the number of crimes committed with LCMs; (2) reduce the

20   number of shots fired in gun crimes; (3) reduce the number of gunshot victims in

21   such crimes; (4) reduce the number of wounds per gunshot victim; (5) reduce the

22   lethality of gunshot injuries when they do occur; and (6) reduce the substantial

23   societal costs that flow from shootings.

24       Through Section 32310 (c) and (d), California has enacted a ban on the

25   possession of LCMs.  Like federal restrictions on fully automatic weapons and

26   armor piercing ammunition, I believe this measure has the potential to help prevent

27   the use and spread of particularly dangerous weaponry, and is a reasonable and

28

25

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00147

**ER_2338**

1   well-constructed measure that is likely to advance California's interest in protecting
2   its citizens and its police force.

3                                    Respectfully Submitted,

4
5   *Christopher S. Koper*
6   Dr. Christopher S. Koper
    October 5, 2017
7   Ashburn, Virginia

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

26

EXPERT REPORT OF DR. CHRISTOPHER S. KOPER (17-cv-1017-BEN-JLB)

Exhibit 4
Page 00148

**ER_2339**

## DECLARATION OF SERVICE BY E-MAIL and U.S. Mail

Case Name:  **Duncan, Virginia et al v. Xavier Becerra**
No.:        **17-cv-1017-BEN-JLB**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On <u>October 6, 2017</u>, I served the attached **EXPERT REPORT OF DR. CHRISTOPHER S. KOPER** by transmitting a true copy via electronic mail. In addition, I placed a true copy thereof enclosed in a sealed envelope, in the internal mail system of the Office of the Attorney General, addressed as follows:

C. D. Michel
Michel & Associates, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
**E-mail Address:**
CMichel@michellawyers.com

Anna Barvir
Michel & Associates, P.C.
180 East Ocean Blvd., Suite 200
Long Beach CA 90802-4079
**E-mail Address:**
abarvir@michellawyers.com

Erin E. Murphy
Kirkland & Ellis LLP
655 15th Street N.W.
Washington D.C. 20005
**E-mail Address:**
erin.murphy@kirkland.com

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on October 6, 2017, at Sacramento, California.

| | |
|---|---|
| Chris McCartney | |
| Declarant | Signature |

SA2017107272
12840553.docx

Exhibit 4
Page 00149

**ER_2340**

# Exhibit A

Exhibit 4
Page 00150

**CHRISTOPHER S. KOPER**
**Associate Professor**
**Department of Criminology, Law and Society**
**George Mason University**
**4400 University Drive, MS 6D12**
**Fairfax, VA 22030**
**(703) 993-4982**
**ckoper2@gmu.edu**

### Education

| | |
|---|---|
| 1995 | Ph.D., Criminology and Criminal Justice, University of Maryland |
| 1992 | M.A., Criminology and Criminal Justice, University of Maryland |
| 1988 | B.A. (Summa cum Laude), Criminal Justice, University of Maryland |

### Career Brief

Dr. Christopher S. Koper is an Associate Professor in the Department of Criminology, Law and Society at George Mason University and the Principal Fellow of George Mason's Center for Evidence-Based Crime Policy. Dr. Koper holds a Ph.D. in criminology and criminal justice from the University of Maryland and has nearly 30 years of experiencing conducting criminological research at George Mason, the Police Executive Research Forum, the University of Pennsylvania, the Urban Institute, the RAND Corporation, the Police Foundation, and other organizations. He has written and published extensively on issues related to firearms, policing, federal crime prevention efforts, research methods, and other topics. Dr. Koper has served as a lead or senior-level investigator for numerous projects funded by the U.S. Department of Justice, including Congressionally-mandated assessments of the 1994 federal assault weapons ban and the federal Community Oriented Policing Services (COPS) program. He is the co-creator of the Evidence-Based Policing Matrix, a tool used by local and national organizations including the federal Bureau of Justice Assistance and the National Policing Improvement Agency of the United Kingdom to visualize research results on police effectiveness and translate those results for practitioners and policymakers. Dr. Koper's work on the methods of patrolling crime hot spots (often referred to as the "Koper curve" principle) is also used by numerous police agencies in the United States and abroad.

### Professional Background

| | |
|---|---|
| Associate Professor: | Department of Criminology, Law and Society, George Mason University (Aug. 2011-present) |
| | Interim Graduate Director /Associate Chair (Jan.-Jun. 2016) |
| Director of Research: | Police Executive Research Forum (May 2010-Aug. 2011) |
| Deputy Director of Research: | Police Executive Research Forum (Dec. 2007 – May 2010) |
| Behavioral / Social Scientist: | RAND Corporation (2007) |

Exhibit 4
Page 00151

ER_2342

| Senior Research Associate: | Jerry Lee Center of Criminology, University of Pennsylvania (2001 – 2006) |
| Research Associate: | The Urban Institute (1997 – 2001) |
| Faculty Research Scientist: | Department of Criminology and Criminal Justice, University of Maryland (1997) |
| Research Scientist: | Crime Control Institute (1994-1997) |
| Graduate Assistant: | Department of Criminology and Criminal Justice, University of Maryland: (1989-1994) |
| Social Science Program Specialist (Graduate Intern): | National Institute of Justice, U.S. Department of Justice (1990) |
| Consultant: | Police Foundation (1988-1989) |

## Peer-Reviewed Articles

Koper, Christopher S. William D. Johnson, Jordan L. Nichols, Ambrozine Ayers, and Natalie Mullins. 2017. "Criminal Use of Assault Weapons and High Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources." Forthcoming in the *Journal of Urban Health.*

Willis, James J., Christopher Koper, and Cynthia Lum. 2017. "The Adaptation of License Plate Readers for Investigative Purposes: Police Technology and Innovation Re-Invention." *Justice Quarterly,* DOI 10.1080/07418825.2017.1329936. Published online May 29.

Lum, Cynthia, Christopher S. Koper, and James Willis. 2017. "Understanding the Limits of Technology's Impact on Police Effectiveness." *Police Quarterly* 20(2): 135-163.

Koper, Christopher S., Daniel J. Woods, and Daniel Isom. 2016. "Evaluating a Police-Led Community Initiative to Reduce Gun Violence in St. Louis." *Police Quarterly* 19(2): 115-149.

Koper, Christopher S., Cynthia Lum, and Julie Hibdon. 2015. "The Uses and Impacts of Mobile Computing Technology in Hot Spots Policing." *Evaluation Review* 39(6): 587-624.

Koper, Christopher S., Jeffery Egge, and Cynthia Lum. 2015. "Institutionalizing Place-Based Approaches: Opening 'Cases' on Gun Crime Hot Spots." *Policing: A Journal of Policy and Practice* 9(3): 242-254.

Koper, Christopher S., Cynthia Lum, and James J. Willis. 2014. "Optimizing the Use of Technology in Policing: Results and Implications from a Multi-Site Study of the Social, Organizational, and Behavioral Aspects of Implementing Police Technologies." *Policing: A Journal of Policy and Practice* 8(2): 212-221.

Exhibit 4
Page 00152

Koper, Christopher S. 2014. "Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Gun Trafficking and Criminal Gun Use." *Journal of Quantitative Criminology* 30(2): 285-315.

Koper, Christopher S. 2014. "Assessing the Practice of Hot Spots Policing: Survey Results from a National Convenience Sample of Local Police Agencies." *Journal of Contemporary Criminal Justice* 30(2): 123-146.

Koper, Christopher S., Thomas M. Guterbock, Daniel J. Woods, Bruce G. Taylor, and Timothy J. Carter. 2013. "The Effects of Local Immigration Enforcement on Crime and Disorder: A Case Study of Prince William County, Virginia." *Criminology and Public Policy* 12(2): 237-276.

Koper, Christopher S., Bruce G. Taylor, and Daniel J. Woods. 2013. "A Randomized Test of Initial and Residual Deterrence from Directed Patrol and Use of License Plate Readers at Crime Hot Spots." *Journal of Experimental Criminology* 9(2): 213-244.

Koper, Christopher S., Daniel J. Woods, and Bruce E. Kubu. 2013. "Gun Violence Prevention Practices among Local Police in the United States." *Policing: An International Journal of Police Strategies and Management* 36(3): 577-603.

Koper, Christopher S. and Evan Mayo-Wilson. 2012. "Police Strategies to Reduce Illegal Possession and Carrying of Firearms: Effects on Gun Crime." *Campbell Systematic Reviews* 2012:11, DOI: 10.4073/csr.2012.11. http://www.campbellcollaboration.org/reviews_crime_justice/index.php.

Lum, Cynthia, Cody W. Telep, Christopher S. Koper, and Julie Grieco. 2012. "Receptivity to Research in Policing." *Justice Research and Policy* 14(1): 61-95.

Taylor, Bruce, Christopher S. Koper, and Daniel Woods. 2012. "Combating Auto Theft in Arizona: A Randomized Experiment with License Plate Recognition Technology." *Criminal Justice Review* 37(1): 24-50.

Lum, Cynthia, Julie Hibdon, Breanne Cave, Christopher S. Koper, and Linda Merola. 2011. "License Plate Reader (LPR) Police Patrols in Crime Hot Spots: An Experimental Evaluation in Two Adjacent Jurisdictions. *Journal of Experimental Criminology* 7:321-345.

Taylor, Bruce, Christopher S. Koper, and Daniel J. Woods. 2011. "A Randomized Control Trial of Different Policing Strategies at Hot Spots of Violent Crime." *Journal of Experimental Criminology* 7:149-181.

Lum, Cynthia, Christopher S. Koper, and Cody W. Telep. 2011. "The Evidence-Based Policing Matrix." *Journal of Experimental Criminology* 7(1): 3-26.

Wiebe, Douglas J., Robert T. Krafty, Christopher S. Koper, Michael L. Nance, Michael R. Elliott, and Charles C. Branas. 2009. "Homicide and Geographic Access to Gun Dealers in the United States." *BMC Public Health* 9: 199-208.

Weiner, Janet, Douglas J. Wiebe, Therese S. Richmond, Kristen Beam, Alan L. Berman, Charles C. Branas, Rose A. Cheney, Tamera Coyne-Beasley, John Firman, Martin Fishbein, Stephen Hargarten, David

3

Exhibit 4
Page 00153

ER_2344

Hemenway, Robert Jeffcoat, David Kennedy, Christopher S. Koper, and other members of the National Research Collaborative on Firearm Violence. 2007. "Reducing Firearm Violence: A Research Agenda." *Injury Prevention* 13:80-84.

Koper, Christopher S. and Evan Mayo-Wilson. 2006. "Police Crackdowns on Illegal Gun Carrying: A Systematic Review of Their Impacts on Gun Crime." *Journal of Experimental Criminology* 2(2): 227-261.

Koper, Christopher S. 2005. "Purchase of Multiple Firearms as a Risk Factor for Criminal Gun Use: Implications for Gun Policy and Enforcement." *Criminology and Public Policy* 4:749-778.

Pierce, Glenn L., Anthony A. Braga, Raymond R. Hyatt, Jr., and Christopher S. Koper. 2004. "Characteristics and Dynamics of Illegal Firearms Markets: Implications for a Supply-Side Enforcement Strategy." *Justice Quarterly* 21:391-422.

Reedy, Darin R. and Christopher S. Koper. 2003. "The Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Attacks Involving Semiautomatic Pistols and Revolvers." *Injury Prevention* 9:151-155.

Koper, Christopher S. 2002. "Federal Legislation and Gun Markets: How Much Have Recent Reforms of the Federal Firearms Licensing System Reduced Criminal Gun Suppliers?" *Criminology and Public Policy* 1:151-178.

Koper, Christopher S. and Jeffrey A. Roth. 2002. "The Impact of the 1994 Federal Assault Weapons Ban on Gun Markets: An Assessment of Short-Term Primary and Secondary Market Effects." *Journal of Quantitative Criminology* 18:239-266.

Koper, Christopher S. and Jeffrey A. Roth. 2001. "The Impact of the 1994 Federal Assault Weapons Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation." *Journal of Quantitative Criminology* 17:33-74.

Koper, Christopher S. and Jeffrey A. Roth. 2001. "A Priori Assertions Versus Empirical Inquiry: A Reply to Kleck." *Journal of Quantitative Criminology* 17:81-88.

Simpson, Sally S. and Christopher S. Koper. 1997. "The Changing of the Guard: Top Management Team Characteristics, Organizational Strain, and Antitrust Offending." *Journal of Quantitative Criminology* 13:373-404.

Reprinted in *Corporate Crime* (2007), edited by Sally Simpson and Carole Gibbs. United Kingdom: Ashgate Publishing Limited.

Gottfredson, Denise G. and Christopher S. Koper. 1997. "Race and Sex Differences in the Measurement of Risk for Delinquency and Drug Use." *Journal of Quantitative Criminology* 13:325-347.

Koper, Christopher S. and Peter Reuter. 1996. "Suppressing Illegal Gun Markets: Lessons from Drug Enforcement." *Law and Contemporary Problems* 59:119-146.

Reprinted in *The Economics of Corruption and Illegal Markets* (1999), edited by Gianluca

Exhibit 4
Page 00154

Fiorentini and Stefano Zamagni. United Kingdom: Edward Elgar Publishing Ltd.

Gottfredson, Denise G. and Christopher S. Koper. 1996. "Race and Sex Differences in the Prediction of Drug Use." *Journal of Consulting and Clinical Psychology* 64:305-313.

Koper, Christopher S. 1995. "Just Enough Police Presence: Reducing Crime and Disorderly Behavior by Optimizing Patrol Time in Crime Hot Spots." *Justice Quarterly* 12:649-672.

Simpson, Sally S. and Christopher S. Koper. 1992. "Deterring Corporate Crime." *Criminology* 30:347-375.

Uchida, Craig D., Laure W. Brooks, and Christopher S. Koper. 1990. "Danger to Police in Domestic Encounters: Assaults on Baltimore County Police, 1984-1986." *Criminal Justice Policy Review* 2:3S7-371.

**Books**

Lum, Cynthia and Christopher S. Koper. 2017. *Evidence-Based Policing: Translating Research into Practice*. Oxford, UK: Oxford University Press.

**Book Chapters and Essays**

Koper, Christopher S. 2016. "Advancing Research and Accountability on Police Use of Deadly Force." Editorial introduction. *Criminology and Public Policy* 15(1): 187-191.

Lum, Cynthia and Christopher S. Koper. 2014. "Evidence-Based Policing." Pp. 1,426-1,437 (Vol. 3) in the *Encyclopedia of Criminology and Criminal Justice,* editors-in-chief Gerben Bruinsma and David Weisburd. New York: Springer-Verlag.

Reprinted in *Critical Issues in Policing* (7th edition, 2015), edited by Roger G. Dunham and Geoffrey P. Alpert. Long Grove, IL: Waveland Press.

Koper, Christopher S. 2013. "America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications." Pp. 157-171 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis*, edited by Daniel W. Webster and Jon S. Vernick. Baltimore, MD: Johns Hopkins University Press.

Lum, Cynthia and Christopher S. Koper. 2013. "Evidence-Based Policing." Pp. 154-158 in the *Encyclopedia of Community Policing and Problem Solving*, edited by Ken Peak. Thousand Oaks, CA: Sage.

Lum, Cynthia and Christopher S. Koper. 2011. "Is Crime Prevention Relevant to Counter-Terrorism?" Pp. 129-150 in *Criminologists on Terrorism and Homeland Security*, edited by Brian Forst, Jack R. Greene, and James P. Lynch.  Cambridge, United Kingdom: Cambridge University Press.

Gottfredson, Denise G., Miriam D. Bernstein, and Christopher S. Koper. 1996. "Delinquency." Pp. 259-288 in *Handbook of Adolescent Health Risk Behavior*, edited by Ralph DiClemente, William Hansen, and Lynn Ponton. New York: Plenum Publishing.

Exhibit 4
Page 00155

**ER_2346**

**Research Publications and Reports for Government Agencies and Other Funders**

Koper, Christopher S. and Cynthia Lum. 2017. "Place-Based Policing." In Nicholas Fyfe (ed.), *Policing 2026: Evidence Review*. Report commissioned for Police Scotland / Scottish Police Authority. Dundee, Scotland: Scottish Institute for Policing Research. http://www.sipr.ac.uk/downloads/Policing_2026_Evidence_Review.pdf

Lum, Cynthia, Christopher S. Koper, James J. Willis, Stephen Happeny, Heather Vovak, and Jordan Nichols. 2016. *The Rapid Diffusion of License Plate Readers in U.S. Law Enforcement Agencies: A National Survey*. Report to the National Institute of Justice. Fairfax, VA: Center for Evidence-Based Crime Policy, George Mason University.

Lum, Cynthia, Christopher S. Koper, Charlotte Gill, Julie Hibdon, Cody Telep, and Laurie Robinson. 2016. *An Evidence-Assessment of the Recommendations of the President's Task Force for 21st Century Policing: Implementation and Research Priorities*. Alexandria, VA: International Association of Chiefs of Police. http://cebcp.org/wp-content/evidence-based-policing/IACP-GMU-Evidence-Assessment-Task-Force-FINAL.pdf

   Results also appear in summary translational form in *Starting with What Works: Using Evidence-Based Strategies to Improve Community and Police Relations*. Alexandria, VA: International Association of Chiefs of Police. http://www.theiacp.org/Portals/0/documents/ICPR/StartingwithWhatWorksBrochureWeb.pdf

Merola, Linda, M., Cynthia Lum, Christopher S. Koper, and Amber Scherer. 2016. *Body Worn Cameras and the Courts: A National Survey of State Prosecutors*. Report for the Laura and John Arnold Foundation. Fairfax, VA: Center for Evidence-Based Crime Policy, George Mason University.

Lum, Cynthia, Ajima Olaghere, Christopher S. Koper, and Xiaoyun Wu. 2016. *Project Safe Neighborhoods Youth Violence and Homicide Prevention Initiative in Washington, D.C.: Outcome Evaluation Report for the U.S. Attorney's Office, Washington, D.C.* Fairfax, VA: Center for Evidence-Based Crime Policy, George Mason University.

Koper, Christopher S., Cynthia Lum, James J. Willis, Daniel J. Woods, and Julie Hibdon. 2015. *Realizing the Potential of Technology in Policing: A Multi-Site Study of the Social, Organizational, and Behavioral Aspects of Implementing Policing Technologies*. Report to the National Institute of Justice, U.S. Department of Justice. Fairfax, VA: Center for Evidence-Based Crime Policy (George Mason University) and Police Executive Research Forum. http://cebcp.org/wp-content/technology/ImpactTechnologyFinalReport.pdf

Lum, Cynthia, Christopher S. Koper, Linda Merola, Amber Scherer, and Amanda Reioux. 2015. *Existing and Ongoing Body Worn Camera Research: Knowledge Gaps and Opportunities*. Report to the Laura and John Arnold Foundation. Fairfax, VA: Center for Evidence-Based Crime Policy, George Mason University. http://cebcp.org/wp-content/technology/BodyWornCameraResearch.pdf

Davis, Robert C., Mary E. Lombardo, Daniel J. Woods, Christopher Koper, and Carl Hawkins. 2013. *Civilian Staff in Policing: An Assessment of the 2009 Byrne Civilian Hiring Program*. Report to the National Institute of Justice, U.S. Department of Justice. Washington, DC: Police Executive

Exhibit 4
Page 00156

Research Forum. https://www.ncjrs.gov/pdffiles1/nij/grants/246952.pdf

Koper, Christopher S., Daniel J. Woods, and Bruce E. Kubu. 2012. *Gun Enforcement and Gun Violence Prevention Practices among Local Law Enforcement Agencies: A Research and Policy Brief.* Report prepared for the Police Executive Research Forum and the Joyce Foundation.

Taylor, Bruce, Christopher S. Koper, and Daniel Woods. 2011. *Combating Auto Theft in Arizona: A Randomized Experiment with License Plate Recognition Technology.* Final report to the National Institute of Justice, U.S. Department of Justice. Washington, D.C.: Police Executive Research Forum. https://www.ncjrs.gov/pdffiles1/nij/grants/248635.pdf

Roth, Jeffrey A., Christopher S. Koper, and Reagan M. Daly. 2011. *Explaining the "Whys" Behind Juvenile Crime Trends: A Review of Research on Community Characteristics, Developmental and Cultural Factors, and Public Policies and Programs.* Report to the Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Philadelphia: University of Pennsylvania.

Appears in modified form (and with other contributions) in *Understanding the "Whys" Behind Juvenile Crime Trends*. Philadelphia: University of Pennsylvania. https://www.ncjrs.gov/pdffiles1/ojjdp/grants/248954.pdf

Koper, Christopher S., Reagan M. Daly, and Jeffrey A. Roth. 2011. *The Impact of Policing and Other Criminal and Juvenile Justice Trends on Juvenile Violence in Large Cities, 1994-2000.* Report to the Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Philadelphia: University of Pennsylvania. https://www.ncjrs.gov/pdffiles1/ojjdp/grants/249260.pdf

Koper, Christopher S., Reagan M. Daly, and Jeffrey A. Roth. 2011. *Changes in Community Characteristics and Juvenile Violence during the 1990s: An Examination of Large Counties.* Report to the Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice. Philadelphia: University of Pennsylvania. https://www.ncjrs.gov/pdffiles1/ojjdp/grants/249259.pdf

Police Executive Research Forum. 2011. *Review of Use of Force in the Albuquerque Police Department*. Washington, DC. (Contributor).

Guterbock, Thomas M., Christopher S. Koper, Milton Vickerman, Bruce Taylor, Karen E. Walker, and Timothy Carter. 2010. *Evaluation Study of Prince William County's Illegal Immigration Enforcement Policy: Final Report 2010.* Report to the Prince William County (Virginia) Police Department. Charlottesville, VA: Center for Survey Research (University of Virginia) and Police Executive Research Forum. http://www.pwcgov.org/government/bocs/Documents/13188.pdf

Koper, Christopher S. and Evan Mayo-Wilson. 2010. *Police Strategies to Reduce Illegal Possession and Carrying of Firearms: Effects on Gun Crime.* Report to the Campbell Collaboration Crime and Justice Group and the National Policing Improvement Agency of the United Kingdom. Washington, D.C.: Police Executive Research Forum and Department of Social Policy and Social Work, Oxford University.

Taylor, Bruce, Christopher S. Koper, and Daniel Woods. 2010. *A Randomized Control Trial of Different Policing Strategies at Hot Spots of Violent Crime.* Report to the Jacksonville, FL Sheriff's Office.

7

Exhibit 4
Page 00157

ER_2348

(Funded by the Bureau of Justice Assistance, U.S. Department of Justice). Washington, D.C.: Police Executive Research Forum.

Koper, Christopher, Debra Hoffmaster, Andrea Luna, Shannon McFadden, and Daniel Woods. 2010. *Developing a St. Louis Model for Reducing Gun Violence: A Report from the Police Executive Research Forum to the St. Louis Metropolitan Police Department.* (Funded by the Bureau of Justice Assistance, U.S. Department of Justice.) Washington, D.C.: Police Executive Research Forum.

Koper, Christopher S., Bruce G. Taylor, and Bruce E. Kubu. 2009. *Law Enforcement Technology Needs Assessment: Future Technologies to Address the Operational Needs of Law Enforcement.* Washington, D.C.: Police Executive Research Forum in partnership with the Lockheed Martin Corporation.
http://www.policeforum.org/upload/Lockheed%20Martin%20Report%20Final%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_483310947_612009144154.pdf

Portions also appear as Koper, Christopher S. 2008. *Technology and Law Enforcement: An Overview of Applications, Impacts, and Needs.* Discussion paper prepared for the Law Enforcement Future Technologies Workshop sponsored by the Police Executive Research Forum and the Lockheed Martin Corporation. Suffolk, Virginia.

Taylor, Bruce, Daniel Woods, Bruce Kubu, Christopher Koper, Bill Tegeler, Jason Cheney, Mary Martinez, James Cronin, and Kristin Kappelman. 2009. *Comparing Safety Outcomes in Police Use-of-Force Cases for Law Enforcement Agencies that Have Deployed Conducted Energy Devices and a Matched Comparison Group that Have Not: A Quasi-Experimental Evaluation.* Report to the National Institute of Justice, U.S. Department of Justice. Washington, D.C.: Police Executive Research Forum. https://www.ncjrs.gov/pdffiles1/nij/grants/237965.pdf

Guterbock, Thomas M., Bruce Taylor, Karen Walker, Christopher S., Koper, Milton Vickerman, Timothy Carter, and Abdoulaye Diop. 2009. *Evaluation Study of Prince William County Police Immigration Enforcement Policy: Interim Report 2009.* Report to the Prince William County (Virginia) Police Department. Charlottesville, Virginia: Center for Survey Research (University of Virginia) in collaboration with the Police Executive Research Forum and James Madison University.

Ridgeway, Greg, Nelson Lim, Brian Gifford, Christopher Koper, Carl Matthies, Sara Hajiamiri, and Alexis Huynh. 2008. *Strategies for Improving Officer Recruitment for the San Diego Police Department.* Research report. Santa Monica: RAND Corporation.
http://www.rand.org/pubs/monographs/2008/RAND_MG724.pdf

Koper, Christopher S. 2007. *Crime Gun Risk Factors: Buyer, Seller, Firearm, and Transaction Characteristics Associated with Criminal Gun Use and Trafficking.* Report to the National Institute of Justice. Philadelphia: Jerry Lee Center of Criminology, University of Pennsylvania. www.ncjrs.gov/pdffiles1/nij/grants/221074.pdf

Sullivan, Thomas, Michael Scheiern, and Christopher Koper. 2007. *Detainee Threat Assessment.* Briefing document prepared for Task Force 134, Multi-National Force—Iraq. Santa Monica: RAND Corporation.

Exhibit 4
Page 00158

Koper, Christopher S. 2004. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003.* Report to the National Institute of Justice. Philadelphia: Jerry Lee Center of Criminology, University of Pennsylvania. www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf

Koper, Christopher S. 2004. *Hiring and Keeping Police Officers.* Research-for-Practice Brief. Washington, D.C.: U.S. Department of Justice. www.ncjrs.gov/pdffiles1/nij/202289.pdf

Koper, Christopher S., Ed Poole, and Lawrence W. Sherman. 2004. *A Randomized Experiment to Reduce Sales Tax Delinquency Among Pennsylvania Businesses: Are Threats Best?* Presentation slides and analysis prepared for the Fair Share Project of the Fels Institute of Government and the Pennsylvania Department of Revenue. Philadelphia: Fels Institute of Government and Jerry Lee Center of Criminology, University of Pennsylvania.

Pierce, Glenn L., Anthony A. Braga, Christopher Koper, Jack McDevitt, David Carlson, Jeffrey Roth, Alan Saiz, Raymond Hyatt. 2003. *The Characteristics and Dynamics of Crime Gun Markets: Implications for Supply-Side Focused Enforcement Strategies.* Report to the National Institute of Justice. Boston: College of Criminal Justice, Northeastern University. www.ncjrs.gov/pdffiles1/nij/grants/208079.pdf

Koper, Christopher S., Gretchen E. Moore, and Jeffrey A. Roth. 2002. *Putting 100,000 Officers on the Street: A Survey-Based Assessment of the Federal COPS Program.* Report to the National Institute of Justice. Washington, D.C.: The Urban Institute. www.ncjrs.gov/pdffiles1/nij/grants/200521.pdf

Koper, Christopher S. and Jeffrey A. Roth. 2002. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets, 1994-2000.* Interim report to the National Institute of Justice. Washington, D.C.: The Urban Institute.

Koper, Christopher S., Edward R. Maguire, and Gretchen E. Moore. 2001. *Hiring and Retention Issues in Police Agencies: Readings on the Determinants of Police Strength, Hiring and Retention of Officers, and the Federal COPS Program.* Report to the National Institute of Justice. Washington, D.C.: The Urban Institute. www.urban.org/Uploadedpdf/410380_Hiring-and-Retention.pdf

Koper, Christopher S. and Jeffrey A. Roth. 2000. "Putting 100,000 Officers on the Street: Progress as of 1998 and Preliminary Projections Through 2003." Pp. 149-178 in Roth, Jeffrey A., Joseph F. Ryan, and others. *National Evaluation of the COPS Program -- Title I of the 1994 Crime Act.* Research Report. Washington, D.C.: U.S. Department of Justice. www.ncjrs.gov/pdffiles1/nij/183643.pdf

Roth, Jeffrey A., Christopher S. Koper, Ruth White, and Elizabeth A. Langston. 2000. "Using COPS Resources," Pp. 101-148 in Roth, Jeffrey A., Joseph F. Ryan, and others. *National Evaluation of the COPS Program -- Title I of the 1994 Crime Act.* Research Report. Washington, D.C.: U.S. Department of Justice. www.ncjrs.gov/pdffiles1/nij/183643.pdf

Roth, Jeffrey A. and Christopher S. Koper. 1999. *Impacts of the 1994 Assault Weapons Ban: 1994-1996.* Research-in-Brief. Washington, D.C.: U.S. Department of Justice. www.ncjrs.gov/pdffiles1/173405.pdf

9

Exhibit 4
Page 00159

Koper, Christopher S., Jeffrey A. Roth, and Edward Maguire. 1998. "New Officers in Communities: From Expenditure to Deployment." Pp. 5-2 to 5-24 in Roth, Jeffrey A., Joseph F. Ryan and others. *National Evaluation of Title I of the 1994 Crime Act (COPS)*. Interim report to the National Institute of Justice. Washington, D.C.: The Urban Institute.

Langston, Elizabeth A., Christopher S. Koper, and Jeffrey A. Roth. 1998. "Using COPS Resources." Pp. 4-1 to 4-46 in Roth, Jeffrey A., Joseph F. Ryan, and others. *National Evaluation of Title I of the 1994 Crime Act (COPS)*. Interim report to the National Institute of Justice. Washington, D.C.: The Urban Institute.

Koper, Christopher S. 1997. *Gun Density Versus Gun Type: Did the Availability of More, or More Lethal, Guns Drive Up the Dallas Homicide Rate, 1980-1992?* Report to the National Institute of Justice. Washington, D.C.: Crime Control Institute. www.ncjrs.gov/pdffiles1/nij/grants/187106.pdf

Roth, Jeffrey A. and Christopher S. Koper. 1997. *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*. Report to the National Institute of Justice. Washington, D.C.: The Urban Institute. http://www.urban.org/UploadedPDF/aw_final.pdf

Harrell, Adele V., Shannon E. Cavanagh, Michele A. Harmon, Christopher S. Koper, and Sanjeev Sridharan. 1997. *Impact of the Children at Risk Program (Volumes 1 and 2)*. Report to the National Institute of Justice. Washington, D.C.: The Urban Institute.

Koper, Christopher S. 1993. *The Maryland Project: Community-Oriented Policing and Drug Prevention in Edgewood, Maryland*. Report to the Maryland Governor's Drug and Alcohol Abuse Commission. Special Topics on Substance Abuse, Report 93-3. College Park, MD: Center for Substance Abuse Research.

**Translational Publications and Tools**
Additional publications and works for practitioner, policymaker, and general audiences

Lum, Cynthia, Christopher S. Koper, and Cody W. Telep. *The Evidence-Based Policing Matrix*. Online interactive tool available at: http://cebcp.org/evidence-based-policing/the-matrix/. Fairfax, VA: Center for Evidence-Based Crime Policy, George Mason University. Updated annually.

Lum, Cynthia, Christopher S. Koper, William Johnson, Megan Stoltz, Xiaoyun Wu, and James Carr. 2017. "Measuring Police Proactivity." *The Police Chief* August 2017: 16-17.

Lum, Cynthia, Christopher S. Koper, and Daniel S. Nagin. 2017. "9 Ideas from Research on Improving Police Efforts to Control Crime." *The Police Chief* July 2017: 22-26.

Lum, Cynthia and Christopher S. Koper. 2016. "The Evidence-Based Policing Matrix." *Police Science: Australia and New Zealand Journal of Evidence-Based Policing* 1(2): 39.

Lum, Cynthia and Christopher S. Koper. 2016. "Looking Back and Forward: The Matrix and its Demonstration Projects." *Translational Criminology: The Magazine of the Center for Evidence-Based Crime Policy (George Mason University)* Spring 2016: 2-4.

10

Exhibit 4
Page 00160

Lum, Cynthia and Christopher S. Koper. 2015. "The Need for More Research on Technology." Testimony submitted to the President's Task Force on 21st Century Policing.

> Also appears (in modified form) as "Why 'More Research is Needed' on Police Technology is Not Simply an Academic Cliché." Blog for the Scottish Institute for Policing Research. https://blog.dundee.ac.uk/sipr/2015/03/why-more-research-is-needed-on-police-technology-is-not-simply-an-academic-cliche/

Koper, Christopher S., Cynthia Lum, and James J. Willis. 2014. "Realizing the Potential of Technology for Policing." *Translational Criminology: The Magazine of the Center for Evidence-Based Crime Policy (George Mason University)* Fall 2014: 9-10,17. http://cebcp.org/wp-content/TCmagazine/TC7-Fall2014

Koper, Christopher S., Bruce Taylor, and Jamie Roush. 2013. "What Works Best at Violent Crime Hot Spots? A Test of Directed Patrol and Problem-Solving Approaches in Jacksonville, Florida." *Police Chief* 80 (Oct.): 12-13. http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display&article_id=3138&issue_id=102013

Tate, Renee, Thomas Neale, Cynthia Lum, and Christopher Koper. 2013. "Case of Places." *Translational Criminology: The Magazine of the Center for Evidence-Based Crime Policy (George Mason University)* Fall 2013: 18-21. http://cebcp.org/wp-content/TCmagazine/TC5-Fall2013

Lum, Cynthia and Christopher S. Koper. 2013. "Evidence-Based Policing in Smaller Agencies: Challenges, Prospects, and Opportunities." *The Police Chief* 80 (April): 42-47. http://www.policechiefmagazine.org/magazine/index.cfm?fuseaction=display&article_id=2907&issue_id=42013

Lum, Cynthia and Christopher S. Koper. 2012. "Incorporating Research into Daily Police Practice: The Matrix Demonstration Project." *Translational Criminology: The Magazine of the Center for Evidence-Based Crime Policy (George Mason University)*. Fall 2012: 16-17. http://cebcp.org/wp-content/TCmagazine/TC3-Fall2012

Roush, Jamie and Christopher Koper. 2012. "From Research to Practice: How the Jacksonville, Florida Sheriff's Office Institutionalized Results from a Problem-Oriented, Hot Spots Experiment." *Translational Criminology: The Magazine of the Center for Evidence-Based Crime Policy (George Mason University)*. Winter 2012: 10-11. http://cebcp.org/wp-content/TCmagazine/TC2-Winter2012

Aden, Hassan with Christopher Koper. 2011. "The Challenges of Hot Spots Policing." *Translational Criminology: The Magazine of the Center for Evidence-Based Crime Policy (George Mason University)*. Summer 2011: 6-7. http://cebcp.org/wp-content/TCmagazine/TC1-Summer2011

Koper, Christopher S. 2011. "A Study Conducted by PERF and Mesa Police Shows that LPRs Result in More Arrests." Presentation summarized in *How Are Innovations in Technology Transforming Policing?* Pp. 28-31. Washington, DC: Police Executive Research Forum. http://policeforum.org/library/critical-issues-in-policing-series/Technology_web2.pdf

Exhibit 4
Page 00161

Police Executive Research Forum. 2010. *Guns and Crime: Breaking New Ground by Focusing on the Local Impact.* Washington, DC. (Contributor). http://policeforum.org/library/critical-issues-in-policing-series/GunsandCrime.pdf

Koper, Christopher S. 2008. *Policing Gun Violence: A Brief Overview.* Discussion paper prepared for the Police Executive Research Forum and the St. Louis Metropolitan Police Department.

> Appears in Koper, Christopher, et al. 2010. *Developing a St. Louis Model for Reducing Gun Violence: A Report from the Police Executive Research Forum to the St. Louis Metropolitan Police Department.* Washington, D.C.: Police Executive Research Forum.

> Also distributed as a discussion paper for the Midwest 2013 Summit to Combat Gun Violence held by the City of Minneapolis and the City of Milwaukee. Minneapolis, 2013. http://www.midwestinterstatecoalition.org/pages/resources/pdf/Koper%20Policing%20Gun%20Violence%20Review%202008.pdf

Police Executive Research Forum. 2008. *Violent Crime in America: What We Know About Hot Spots Enforcement.* Washington, DC. (Contributor). http://policeforum.org/library/critical-issues-in-policing-series/HotSpots_v4.pdf

> Also includes Koper, Christopher S. 2008. "PERF's Homicide Gunshot Survey." Presentation summarized in *Violent Crime in America: What We Know About Hot Spots Enforcement,* pp. 25-27. Washington, DC: Police Executive Research Forum. http://policeforum.org/library/critical-issues-in-policing-series/HotSpots_v4.pdf

Koper, Christopher S. 2004. "Disassembling the Assault-Gun Ban." Editorial. *The Baltimore Sun*: September 13.

Koper, Christopher S. 1995. "Reducing Gun Violence: A Research Program in Progress." Presentation summarized in *What To Do About Crime: The Annual Conference on Criminal Justice Research and Evaluation—Conference Proceedings*, pp. 58-60. Washington, D.C.: U.S. Department of Justice.

**Other Publications, Reports, and Working Papers**

Lum, Cynthia, Christopher S. Koper, and Daniel Nagin. 2017. *Methodological Issues in Detecting Cost Benefits of the Use of License Plate Readers (LPRs) in Investigations.* Discussion paper for the New York University Policing Project, Cost-Benefit Analysis Lab and Conference. New York City: February 2017.

Koper, Christopher S. 2007. *Assessments of Corporate Culture and Prosecutorial Decisions by U.S. Attorneys: A Draft Research Proposal.* Concept paper prepared for the LRN-RAND Corporation Center for Corporate Ethics, Law, and Governance.

Koper, Christopher S. 2003. *Police Strategies for Reducing Illegal Possession and Carrying of Firearms: A Systematic Review Protocol Prepared for the Campbell Collaboration.* Published by the Campbell Collaboration Crime and Justice Group. http://campbellcollaboration.org/lib

Exhibit 4
Page 00162

**ER_2353**

Koper, Christopher S. 2002. *Testing the Generalizability of the Concealed Carry Hypothesis: Did Liberalized Gun Carrying Laws Reduce Urban Violence, 1986-1998?* Working Paper. Philadelphia: Jerry Lee Center of Criminology, University of Pennsylvania.

Koper, Christopher S. 2002. *Gun Types Used in Crime and Trends in the Lethality of Gun Violence: Evidence from Two Cities.* Working Paper. Philadelphia: Jerry Lee Center of Criminology, University of Pennsylvania.

Koper, Christopher S. 1995. *Gun Lethality and Homicide: Gun Types Used By Criminals and the Lethality of Gun Violence in Kansas City, Missouri, 1985-1993.* Ph.D. Dissertation. College Park, MD: Department of Criminal Justice and Criminology, University of Maryland. (Published by University Microfilms, Inc.: Ann Arbor, Michigan.)

Koper, Christopher S. 1995. Review essay on *The Politics of Gun Control* by Robert J. Spitzer. *The Criminologist* 20:32-33.

Koper, Christopher S. 1992. *The Deterrent Effects of Police Patrol Presence upon Criminal and Disorderly Behavior at Hot Spots of Crime.* M.A. Thesis. College Park, MD: Department of Criminology and Criminal Justice, University of Maryland.

Koper, Christopher S. 1989. *Quality Leadership and Community-Oriented Policing in Madison: A Progress Report on the EPD (Experimental Police District).* Report prepared for the Police Foundation (Washington, D.C.).

> Portions reprinted in *Community Policing in Madison: Quality from the Inside Out* (1993). Report to the National Institute of Justice, U.S. Department of Justice by Mary Ann Wycoff and Wesley G. Skogan. Washington, D.C.: Police Foundation.

Koper, Christopher S. 1989. *The Creation of Neighborhood-Oriented Policing in Houston: A Progress Report.* Report prepared for the Police Foundation (Washington, D.C.).

Koper, Christopher S. 1989. *External Resources for Police.* Report prepared for the Police Foundation (Washington, D.C.).

### Funded Research

Selected projects as a principal or senior-level investigator

Principal Investigator (with Cynthia Lum, PI). "The Proactive Policing Lab." $348,111 grant from the Laura and John Arnold Foundation. Awarded 2016.

Principal Investigator (with Cynthia Lum, PI). "Creating a Blueprint Document to Guide Implementation of the President's Task Force on 21st Century Policing Report." $168,821 subcontract from the Laura and John Arnold Foundation and the International Association of Chiefs of Police to George Mason University. Awarded 2015.

Principal Investigator (with Cynthia Lum, PI): "A Systematic Development of a Research Agenda for Body Worn Camera Research." $174,552 grant from the Laura and John Arnold Foundation. Awarded 2015.

Exhibit 4
Page 00163

Principal Investigator (with Cynthia Lum, PI): Extension of "The Evidence-Based Policing Matrix Demonstration Project." $499,999 extension grant from the Bureau of Justice Assistance (U.S. Department of Justice) to George Mason University. Awarded 2014.

Principal investigator (with Cynthia Lum, PI): "Evaluating the Crime Control and Cost-Benefit Effectiveness of License Plate Recognition (LPR) Technology in Patrol and Investigations." $553,713 grant from the National Institute of Justice (U.S. Department of Justice) to George Mason University. Awarded 2013.

Principal investigator (with Cynthia Lum, PI). "Violent Gun and Gang Crime Reduction Program (Project Safe Neighborhoods), Fiscal Year 2013." $29,997 research partner subcontract from the U.S. Attorney's Office (District of Columbia) funded through the Bureau of Justice Assistance (U.S. Department of Justice). Awarded 2013.

Principal Investigator (with Cynthia Lum, PI): "The Evidence-Based Policing Matrix Demonstration Project." $749,237 grant from the Bureau of Justice Assistance (U.S. Department of Justice) to George Mason University. Awarded 2011.

Principal Investigator: "Realizing the Potential of Technology for Policing: A Multi-Site Study of the Social, Organizational, and Behavioral Aspects of Implementing Policing Technologies." $592,151 grant from the National Institute of Justice (U.S. Department of Justice) to the Police Executive Research Forum and George Mason University (subcontractor). Awarded 2010.

Principal Investigator (2009-Aug. 2011) and consultant (Aug. 2011-Dec. 2013): "Hiring of Civilian Staff in Policing: An Assessment of the 2009 Byrne Program." $549,878 grant from the National Institute of Justice (U.S. Department of Justice) to the Police Executive Research Forum. Awarded 2009.

Principal Investigator (Jan. 2011-Aug. 2011): "Community Policing Self-Assessment Tool Short Form, COPS Hiring Recovery Program Administration." $85,444 subcontract from ICF International and the Office of Community Oriented Policing Services (U.S. Department of Justice) to the Police Executive Research Forum. Awarded 2011.

Principal Investigator: "National Study of Gun Enforcement and Gun Violence Prevention Practices Among Local Law Enforcement Agencies." $70,400 grant from the Joyce Foundation to the Police Executive Research Forum. Awarded 2010.

Principal Investigator: "Development of the Community Policing Self-Assessment Tool Short Form." $53,907 subcontract from ICF International and the Office of Community Oriented Policing Services (U.S. Department of Justice) to the Police Executive Research Forum. Awarded 2010.

Principal Investigator: "A Systematic Review of Research on Police Strategies to Reduce Illegal Gun Carrying." $15,600 subcontract from George Mason University and the National Policing Improvement Agency of the United Kingdom to the Police Executive Research Forum. Awarded 2010.

Co-Principal Investigator (2005-2010): "Understanding and Monitoring the 'Whys' Behind Juvenile Crime Trends." $2,249,290 grant from the Office of Juvenile Justice and Delinquency Prevention (U.S. Department of Justice) to the University of Pennsylvania (with subcontracts to the Police Executive

Exhibit 4
Page 00164

Research Forum, 2009-2010). Initial and continuation awards, 2001-2005.

Principal Investigator: "Police Interventions to Reduce Gun Violence: A National Examination." Supported through $200,000 in funding from the Motorola Foundation to the Police Executive Research Forum. Awarded 2009.

Principal Investigator: "The Varieties and Effectiveness of Hot Spots Policing: Results from a National Survey of Police Agencies and a Re-Assessment of Prior Research." Supported through $80,000 in funding from the Motorola Foundation to the Police Executive Research Forum. Awarded 2008.

Co-Principal Investigator: "Assessment of Technology Needs in Law Enforcement." $185,866 contract from the Lockheed Martin Corporation to the Police Executive Research Forum. Awarded 2008.

Co-Principal Investigator (for research partner subcontract): "An Evaluation of the Jacksonville Data Driven Reduction of Street Violence Project." $650,008 grant from the Bureau of Justice Assistance (U.S. Department of Justice) to the Jacksonville, FL Sheriff's Office and the Police Executive Research Forum (subcontractor). Awarded 2007.

Co-Principal Investigator: "A Randomized Experiment Assessing License Plate Recognition Technology in Mesa, Arizona." $474,765 grant from the National Institute of Justice (U.S. Department of Justice) to the Police Executive Research Forum. Awarded 2007.

Evaluation Director (for research partner subcontract): "Developing a St. Louis Model for Reducing Gun Violence." $500,000 grant from the Bureau of Justice Assistance (U.S. Department of Justice) to the St. Louis Metropolitan Police Department and the Police Executive Research Forum (subcontractor). Awarded 2007.

Co-Principal Investigator: "Evaluation Study of the Prince William County Police Immigration Enforcement Policy." $282,129 contract from the Prince William County Police Department to the University of Virginia and the Police Executive Research Forum (subcontractor). Awarded 2008.

Principal Investigator: "Crime Gun Risk Factors: The Impact of Dealer, Firearm, Transaction, and Buyer Characteristics on the Likelihood of Gun Use in Crime." $103,514 grant from the U.S. Department of Justice to the University of Pennsylvania. Awarded 2004.

Principal Investigator: "A Reassessment of the Federal Assault Weapons Ban." $38,915 grant from the U.S. Department of Justice to the University of Pennsylvania. Awarded 2003.

Co-Principal Investigator: "Pennsylvania Fair Share Tax Project." $100,000 grant from the Jerry Lee Foundation to the University of Pennsylvania. Awarded 2003.

Principal Investigator: "The Impact of Dealer and Firearm Characteristics on the Likelihood of Gun Use in Crime." $60,000 grant from the Smith Richardson Foundation to the University of Pennsylvania. Awarded 2001.

Principal Investigator: "Police Hiring and Retention Study." $250,000 grant from the U.S. Department of Justice to the Urban Institute. Awarded 1999.

Exhibit 4
Page 00165

Co-Principal Investigator: "Analysis of Title XI Effects." $301,826 grant from the U.S. Department of Justice to the Urban Institute. Awarded 1998.

Co-Principal Investigator: "Illegal Firearms Markets." $499,990 grant from the U.S. Department of Justice to Northeastern University and the Urban Institute (subcontractor). Awarded 1997.

Co-Principal Investigator (director of national survey and evaluation task leader), 1997-2001: "Evaluation of Title I of the 1994 Crime Act." $3,356,156 grant from the U.S. Department of Justice to the Urban Institute.

Co-Principal Investigator: "Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994." $150,000 grant from the U.S. Department of Justice to the Urban Institute (subcontract later awarded to the Crime Control Institute). Awarded 1995.

Principal Investigator: "Gun Density versus Gun Type: Did More, or More Lethal, Guns Drive Up the Dallas Homicide Rate, 1978-1992?" $49,714 grant from the U.S. Department of Justice to the Crime Control Institute. Awarded 1994.

**Selected Presentations**

Invited presentations, lectures, and policy briefings

"Assessing the State of Research on Police Body-Worn Cameras." Symposium on Body-Worn Cameras: Building a Secure and Manageable Program for Law Enforcement (sponsored by the Major Cities Chiefs Association, the International Association of Chiefs of Police, the Police Foundation, and SafeGov). Washington, DC, 2016. Video: http://www.policefoundation.org/2016-body-worn-camera-symposium/

Lectures for the Contemporary Issues in Criminology series of the Osher Lifelong Learning Institute, George Mason University.
- "Hot Spots Policing." Fall 2016.
- "Gun Crime and Gun Policy." Fall 2015.

"Evidence Based Policing Strategies." Missouri Attorney General's Urban Crime Summit. University of Missouri, Kansas City, 2013.

"Putting Hot Spots Research into Practice." 6th International Conference on Evidence-Based Policing. Cambridge University, United Kingdom, 2013. Video: http://www.crim.cam.ac.uk/events/conferences/ebp/2013/

"America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications." Summit on Reducing Gun Violence in America: Informing Policy with Evidence and Analysis. Johns Hopkins University, 2013. Video: C-SPAN (http://www.c-spanvideo.org/clip/4304369) and the Johns Hopkins University Bloomberg School of Public Health (http://www.jhsph.edu/events/gun-policy-summit/video-archive).

"Assessing Police Efforts to Reduce Gun Crime: Results from a National Survey."
- Federal Government Accountability Office's Homeland Security and Justice speaker series.

16

Exhibit 4
Page 00166

Washington, D.C., 2013.
- Firearms Committee of the International Association of Chiefs of Police, 2012

"Police Strategies for Reducing Gun Violence." 2013 Summit to Combat Gun Violence hosted by the City of Minneapolis and the City of Milwaukee. Minneapolis, 2013.

"A Randomized Trial Comparing Directed Patrol and Problem-Solving at Violent Crime Hot Spots"
- 4th International Conference on Evidence-Based Policing. Cambridge University, United Kingdom, 2011
- 12th Annual Jerry Lee Symposium on Criminology and Public Policy. Washington, D.C. (held in the U.S. Senate Russell Office Building), 2011
- Annual Symposium of the Center for Evidence-Based Crime Policy, George Mason University. Fairfax, VA, 2010

"Evaluation Study of Prince William County's Illegal Immigration Enforcement Policy"
- Prince William County, Virginia Board of County Supervisors, November 16, 2010 (co-presented with Thomas Guterbock)
- Briefings for senior staff of the Prince William County Police Department and Prince William County Government, October-November 2010 (co-presented with Thomas Guterbock)

"Police Strategies for Reducing Gun Violence." Congressional briefing on "Evidence-Based Policy: What We Know, What We Need to Know," organized by the Center for Evidence-Based Crime Policy, George Mason University. Washington, D.C. (U.S. Capitol Visitors' Center), 2009.  Video: http://cebcp.org/outreach-symposia-and-briefings/evidence-based-crime-policy/

"Hot Spots Policing: A Review of the Evidence." 2nd International Conference on Evidence-Based Policing (sponsored by the National Policing Improvement Agency of the United Kingdom and Cambridge University). Cambridge University, United Kingdom, 2009.

"Assessments of Corporate Culture and Prosecutorial Decisions by U.S. Attorneys." Presentation to the advisory board of the LRN-RAND Center for Corporate Ethics, Law, and Governance. New York, 2007.

"Risk Factors for Crime Involvement of Guns Sold in Maryland." Center for Injury Research and Policy, Johns Hopkins School of Public Health. Baltimore, 2007

"Police Strategies for Reducing Illegal Possession and Carrying of Firearms"
- Annual Jerry Lee Crime Prevention Symposium. Washington, D.C. (U.S. Senate Dirksen Office Building), 2005
- Firearm and Injury Center at Penn (FICAP) Forum Series. University of Pennsylvania, Philadelphia, 2005

"The Impacts of the 1994 Federal Assault Weapons Ban on Gun Markets and Gun Violence"
- Briefings for the Associate Attorney General of the United States and other staff of the U.S. Department of Justice and the U.S. Department of the Treasury. Washington, D.C., 1997
- National Research Council, Committee to Improve Research Information and Data on Firearms. Washington, D.C., 2002
- Firearm and Injury Center at Penn (FICAP) Forum Series. Philadelphia, 2003

Exhibit 4
Page 00167

- Jerry Lee Center of Criminology (University of Pennsylvania) Colloquium. Philadelphia, 2001

"Federal Legislation and Gun Markets: An Assessment of Recent Initiatives Affecting Licensed Firearms Dealers." Jerry Lee Center of Criminology (University of Pennsylvania) Colloquium. Philadelphia, 2003.

"Juvenile Gun Acquisition." Philadelphia Interdisciplinary Youth Fatality Review Team (A Project of the Philadelphia Departments of Public Health and Human Services). Philadelphia, 2002.

"A National Study of Hiring and Retention Issues in Police Agencies." Briefing for staff of the Office of Community Oriented Policing Services (U.S. Department of Justice) and the National Institute of Justice (U.S Department of Justice). Washington, D.C., 2001.

"COPS and the Level, Style, and Organization of American Policing: Findings of the National Evaluation"
- Press briefing sponsored by the Urban Institute. Washington, D.C., September 2000
- Briefings for staff of the Office of Community Oriented Policing Services (U.S. Department of Justice) and the National Institute of Justice (U.S. Department of Justice). Washington, D.C., 1998 and 1999

Other conference presentations
(Summary list)

- Annual meeting of the American Society of Criminology (1991-2001, 2003-2006, 2008-2016)
- Annual Stockholm Criminology Symposium (2006, 2010, 2014)
- Annual meeting of the Police Executive Research Forum (2008-2009)
- 14th World Congress of Criminology (2005)
- Annual meeting of the Academy of Criminal Justice Sciences (1995, 1997, 1999-2001, 2012)
- U.S. Department of Justice Annual Conference on Criminal Justice Research and Evaluation (1995-1997, 1999, 2002)
- U.S. Department of Justice National Conference on Community Policing (1998)
- National Institute of Justice (U.S. Department of Justice) Firearms Cluster Conference (1996)

Workshops and other events

Speaker: 2017 Symposium on Evidence-Based Crime Policy held by the Center for Evidence-Based Crime Policy. George Mason University, Arlington, VA, 2017.

Professional training sessions on evidence-based policing (co-taught with Cynthia Lum)
- National Institute of Justice LEADS (Law Enforcement Advancing Data and Science) Scholars Program (June 2017)
- New York City Police Department (June 2017)
- Hollywood, FL Police Department (March 2016)
- Sheboygan, WI Police Department (June 2015)
- Milwaukee Police Department (and other nearby agencies) (April 2014)
- Las Vegas Police Department (December 2013)

Invited speaker and participant: Violent Crime Strategy Executive Session held by the Police Foundation and Major City Chiefs Police Association. Washington, DC, 2016.

18

Exhibit 4
Page 00168

Speaker and session organizer: 2014 Symposium on Challenges in Evidence-Based Crime Policy held by the Center for Evidence-Based Crime Policy and the Inter-American Development Bank. George Mason University, Arlington, VA, 2014.

Co-organizer and speaker: Seminar on Evidence-Based Policing Leadership Training for Supervisors held by the Center for Evidence-Based Crime Policy and the Center for Justice Leadership and Management. George Mason University, Arlington, VA, 2014. Video: http://www.youtube.com/playlist?list=PLoaqclcHgvlin4vK1bM7DMXPBmeWX69IT.

Co-organizer, speaker, and session leader: Center for Evidence-Based Crime Policy's Evidence-Based Policing Workshop. George Mason University, Fairfax, VA, 2012. Presentation materials: http://cebcp.org/cebcp-symposium-2012/. Video: http://www.youtube.com/playlist?list=PL4E509820FD3010E9&feature=plcp

Organizer and speaker: Congressional briefing on "Reducing Gun Violence: Lessons from Research and Practice." Sponsored by the Center for Evidence-Based Crime Policy, George Mason University. Washington, D.C. (Rayburn Building of the U.S. House of Representatives), 2012. Video: http://cebcp.org/outreach-symposia-and-briefings/reducing-gun-violence/

Speaker and session leader: Center for Evidence-Based Crime Policy's Evidence-Based Policing Workshop. George Mason University, Fairfax, VA, 2011. Presentation slides and video: http://cebcp.org/evidence-based-policing/evidence-based-policing-workshop/

Speaker: Police Executive Research Forum symposium, "How are Innovations in Technology Transforming Policing?" (Critical Issues in Policing Series). Washington, D.C., 2011

Co-organizer, speaker, and session leader: Police Executive Research Forum and Lockheed Martin Law Enforcement Future Technologies Workshop. Suffolk, Virginia, 2008.

Speaker: Police Executive Research Forum symposium on "Hot Spots" (2008 Critical Issues in Policing Series). Washington, D.C., 2008.

Speaker and participant: Firearm Injury Center at Penn (FICAP, University of Pennsylvania) Workshop on Existing and Innovative Methods in the Study of Gun Violence. Bryn Mawr, Pennsylvania, 2003

**Academic Teaching**

Courses taught

CRIM 781: Justice Program Evaluation (George Mason University)
CRIM 490 (special topics): Firearms Law, Policy, and Politics (George Mason University)
CRIM 491/492: Undergraduate Honors Seminar (George Mason University)
CRIM 797: Professionalization Seminar (co-taught by all CLS faculty at George Mason University)

2016 International Graduate Summer School for Policing Scholarship, hosted by the Scottish Institute for Policing Research and George Mason University with the University of St. Andrews (co-taught with other

19

Exhibit 4
Page 00169

ER_2360

faculty from the United States and Scotland)

Dissertation and thesis committees (completed)

- M.A. committee (chair) for William Johnson (Department of Criminology, Law and Society, George Mason University, 2017)
- M.A. committee for Jordan Nichols (Department of Criminology, Law and Society, George Mason University, 2016)
- Ph.D. committee for Heather Vovak (Department of Criminology, Law and Society, George Mason University, 2016)
- Ph.D committee for Julie Grieco (Department of Criminology, Law and Society, George Mason University, 2016)
- Ph.D. committee for Marthinus Koen (Department of Criminology, Law and Society, George Mason University, 2016)
- M.A. committee for Ronald Zimmerman (Department of Criminology, Law and Society, George Mason University, 2016)
- M.A. committee for Xiaoyun Wu (Department of Criminology, Law and Society, George Mason University, 2015)
- M.A. committee (chair) for Luke Dillon (Department of Criminology, Law and Society, George Mason University, 2013)
- Ph.D. committee for Cody Telep (Department of Criminology, Law and Society, George Mason University, 2013)
- M.A. committee for Josh Conroy (Department of Criminology, Law and Society, George Mason University, 2013)
- M.A. committee for Sarah Merrill (Department of Criminology, Law and Society, George Mason University, 2013)
- Ph.D. committee for Jeffrey Monroe (Department of Criminal Justice, Temple University, 2004)
- M.A. committee for Darin Reedy (Department of Criminology and Criminal Justice, University of Maryland, 2001)
- M.A. committee for Kevin Strom (Department of Criminology and Criminal Justice, University of Maryland, 1997)

**Professional Service**

Editorships

- Associate editor, *Journal of Experimental Criminology* (fall 2016-present)
- Co-editor of *Translational Criminology* briefs series (in progress for Springer-Verlag)
- Editorial advisory board member, *Cambridge Journal of Evidence-Based Policing*
- Editorial committee member for *Epidemiologic Reviews*, 2016 theme issue on Gun Violence: Risk, Consequences, and Prevention (Oxford Journals, editor-in-chief Michel A. Ibrahim)
- Area editor for police strategies and practices, *Encyclopedia of Criminology and Criminal Justice* (Springer Verlag, Gerben Bruinsma and David Weisburd, editors-in-chief). Published 2014.
- Topic editor for *Criminology and Public Policy*, Feb. 2016 issue on police use of deadly force

Reviews of manuscripts, reports, and proposals

- *Journal of Experimental Criminology* (2004, 2009, 2011, 2012, 2015-2017)

20

Exhibit 4
Page 00170

- *Journal of Quantitative Criminology* (2001-2005, 2009, 2011, 2013-2015, 2017)
- *Police Quarterly* (2002-2004, 2011, 2016-2017)
- *Criminology* (2006, 2010, 2015, 2017)
- *American Journal of Preventive Medicine* (2017)
- *University of Tasmania Law Review* (2017)
- Laura and John Arnold Foundation (2016)
- *Justice Quarterly* (2008, 2016)
- *Policing: A Journal of Policy and Practice* (2013-2016)
- *Epidemiologic Reviews* (2015)
- *Justice Research and Policy* (2012, 2016)
- *Policing: An International Journal of Police Strategies and Management* (2013, 2015)
- *Victims and Offenders* (2015)
- *Criminology and Public Policy* (2005, 2013-2015)
- *Journal of Urban Health* (2015)
- *Evaluation Review* (2014)
- *Journal of Criminal Law and Criminology* (2014)
- *Journal of Policy Analysis and Management* (2014)
- *Injury Prevention* (2004-2005, 2014)
- *Australian and New Zealand Journal of Criminology* (2013)
- *Police Practice and Research* (2013)
- National Institute of Justice, U.S. Department of Justice (2001, 2013)
- *Sociological Quarterly* (2012)
- Oxford University Publishing (2011, 2013)
- *Homicide Studies* (2008)
- Population Reference Bureau (1994)

Other professional affiliations, service, and consulting

- Principal Fellow, Center for Evidence-Based Crime Policy, George Mason University
- Member, American Society of Criminology (ASC)
  - Program committee member for 2016-2017 conferences
  - Award selection committee member for 2002 conference
- Member, ASC Division of Experimental Criminology
  - Executive Counselor, 2013-2015
- Member, ASC Division of Policing
  - Executive Counselor (Nov. 2016-present)
- Member of the Research Advisory Board of the Police Foundation (2012-2015) and current consultant
- Former Delphi process participant to develop international reporting guidelines for randomized trials for the CONSORT Statement for Social and Psychological Interventions
- Consultant to the New York State Office of the Attorney General
- Consultant to the Connecticut Office of the Attorney General
- Consultant to the Maryland Office of the Attorney General
- Consultant to the Office of the City Attorney of the City of San Francisco (California)
- Consultant to the Office of the City Attorney of the City of Sunnyvale (California)
- Consultant to the Police Executive Research Forum (2011-2014)
- Contributor to the Crime and Justice Group of the Campbell Collaboration
- Former Associate of the Jerry Lee Center of Criminology, University of Pennsylvania

21

Exhibit 4
Page 00171

ER_2362

- Former Associate of the Firearm and Injury Center at Penn, University of Pennsylvania Health System
- Participant in the National Research Collaborative on Firearm Violence convened by the Firearm and Injury Center at Penn (2005)
- Participant in National Institute of Justice (U.S. Department of Justice) focus group on identity theft research (2005)
- Participant in annual fellowship fundraiser for the American Society of Criminology (1993-2006, 2012-2015)
- Member of the Advisory Committee for the National Criminal History Improvement Program State Firearms Research Project of the Justice Research and Statistics Association (1996)

**Selected Honors and Awards**

Fellow of the Academy of Experimental Criminology (2013)

Excellence in Law Enforcement Research Bronze Award from the International Association of Chiefs of Police, 2012 (for co-authorship of *Evaluation Study of Prince William County's Illegal Immigration Enforcement Policy*)

Scholar-in-Residence of the Firearm and Injury Center at Penn (University of Pennsylvania Health System), 2004 – 2006

Smith Richardson Foundation Public Policy Research Fellowship, 2001

Graduate Assistant Award, Department of Criminology and Criminal Justice, University of Maryland, 1989-1994

Honors, Ph.D. Theory Comprehensive Examination, Department of Criminology and Criminal Justice, University of Maryland, 1993

Summa cum Laude, University of Maryland, 1988

Peter P. Lejins Award for Top Graduate in Criminal Justice, Department of Criminology and Criminal Justice, University of Maryland, 1988

Exhibit 4
Page 00172

ER_2363