No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
_____

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant*.
_____

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge
_____

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 11 of 17**
_____

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

# Exhibit B

Exhibit 4
Page 00173

# IMPACT EVALUATION OF THE PUBLIC SAFETY AND RECREATIONAL FIREARMS USE PROTECTION ACT OF 1994

## *Final Report*



**THE URBAN INSTITUTE**
2100 M STREET, N.W.
WASHINGTON, DC  20037

March 13, 1997

Jeffrey A. Roth and
Christopher S. Koper

with William Adams, Sonja
Johnson, John Marcotte, John
McGready, Andrew Scott,
Maria Valera, and Douglas
Wissoker

Exhibit 4
Page 00174

Supported under award #95-IJ-CX-0111 from the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice. Points of view in this document are those of the author(s) and do not necessarily represent the official position of the U.S. Department of Justice.

Exhibit 4
Page 00175

# Acknowledgments

Researchers traditionally acknowledge assistance from others in completing a study. However, we received far more than traditional amounts of help. A host of people who cared about the questions we were asking generously donated their expertise, data, and time.

Our greatest debts are owed to our advisors, Bill Bridgewater and Judy Bonderman. Bill, as executive director of the National Alliance of Stocking Gun Dealers, and his wife Carole, editor of the *Alliance Voice*, shared with us a vast knowledge of guns and gun markets. As adjunct law professor at Catholic University and an occasional legal advisor to Handgun Control, Inc., Judy taught us much about the relevant laws. Both helped us frame the questions we asked. While Bill and Judy made successful careers as advocates of quite different perspectives on gun policy, they both respected the integrity of our work as disinterested researchers. Sadly, Bill passed away before our work was completed. We hope he would agree that we learned what he tried to teach us.

We also received substantial help from staff at the Bureau of Alcohol, Tobacco and Firearms. Ed Owen continued our education about firearms in the late stages of the project. He, Joe Vince, and Jerry Nunziato provided technical information and critically reviewed an early draft of this report. Willie Brownlee, Gerry Crispino, Jeff Heckel, David Krieghbaum, Tristan Moreland, Valerie Parks, and Lia Vannett all shared data and insights.

We are grateful to the following researchers and organizations who generously shared their data with us: Tom Marvell, of Justec Research; Scott Decker, Richard Rosenthal, and Richard Rabe of Washington University; David Kennedy and Anthony Braga of Harvard University; Glenn Pierce of Northeastern University; Stephen Hargarten, M.D., and Mallory O'Brien of the Medical College of Wisconsin; Weldon Kennedy, Loretta Behm, and Monte McKee of the Federal Bureau of Investigation; Denise Griffin of the National Conference of State Legislatures; Kristen Rand of the Violence Policy Center; Donald T. Reay, M.D., Chief Medical Examiner, King County, Washington; Michael Buerger of the Jersey City Police Department; Beth Hume and Maxine Shuster of the Massachusetts Department of Public Health; Yvonne Williams, Office of the Medical Examiner, County of San Diego; and Rebecca Knox of Handgun Control, Inc.

We appreciate the fine work of our Urban Institute colleagues who contributed to this report: Bill Adams, John Marcotte, John McGready, Maria Valera, and Doug Wissoker. We also appreciate research assistance by Sonja Johnson, Andrew Scott, Jason Greenberg, Kristen Mantei, Robert Moore, Rick Poulson, Veronica Puryear, and Claudia Vitale. We are grateful for O. Jay Arwood's expert work in producing this complex document. Finally, we appreciate the advice and encouragement of Lois Felson Mock, our National Institute of Justice grant monitor, and the thorough and helpful comments by anonymous reviewers inside and outside NIJ.

Any remaining errors or omissions are the responsibility of the authors. **Opinions expressed herein are those of the authors and not necessarily those of The Urban Institute, its trustees, or its sponsors.**

i

Exhibit 4
Page 00176

ER_2368

# Table of Contents

1. Overview _____ 1
  1.1. Primary-Market Effects......................................................................................... 2
    1.1.1. Prices and Production.................................................................................. 2
      1.1.1.1. Findings ............................................................................................. 2
      1.1.1.2. Recommendations............................................................................. 3
  1.2. Secondary-Market Effects................................................................................... 4
    1.2.1. Findings...................................................................................................... 4
    1.2.2. Recommendations ...................................................................................... 4
  1.3. Effects on Assault Weapon Use in Crime........................................................... 4
    1.3.1. Findings...................................................................................................... 4
    1.3.2. Recommendations ...................................................................................... 5
  1.4. Consequences of Assault Weapon Use................................................................ 6
    1.4.1. Findings...................................................................................................... 6
2. Background For The Impact Assessment _____ 8
  2.1. The Legislation.................................................................................................... 8
  2.2. Context for the Assault Weapons Ban................................................................10
  2.3. Assault Weapons and Crime...............................................................................12
  2.4. Markets for Assault Weapons and Other Firearms.............................................14
3. Analysis Plan _____ 18
  3.1. Potential Ban Effects..........................................................................................18
  3.2. General Design Strategy.....................................................................................20
    3.2.1. Threats to Validity and Use of Comparison Groups..................................21
4. Gun and Magazine Market Effects _____ 24
  4.1. Findings Of Price Analysis.................................................................................24
    4.1.1. Collection of Price Data.............................................................................24
    4.1.2. Analysis.....................................................................................................25
      4.1.2.1. Gun Prices........................................................................................26
    4.1.3. Magazine Prices.........................................................................................38
    4.1.4. Summary of Large-Capacity Magazine Price Trends ................................47
  4.2. Production Trends...............................................................................................47
  4.3. Unintended Consequences: Gun Thefts and "Leakage".....................................50
    4.3.1. Introduction...............................................................................................50
    4.3.2. Data and Analysis Strategy........................................................................52
    4.3.3. Trends in Stolen Assault Weapons.............................................................52
    4.3.4. Trends in Thefts of Non-Banned Semiautomatic Handguns Capable of Accepting Large-capacity Magazines.......56
5. Utilization Effects _____ 58
  5.1. BATF National Firearm Trace Data....................................................................58
    5.1.1. Introduction:  Data and Limitations...........................................................58
    5.1.2. Trends in Total Trace Requests..................................................................59
    5.1.3. Total Assault Weapon Traces.....................................................................67
    5.1.4. Analysis of  Select Assault Weapons.........................................................68
    5.1.5. Assault Weapon Traces for Violent Crimes and Drug-Related Crimes ......65
    5.1.6. Conclusions on National Trends in the Use of Assault Weapons ...............67
    5.1.7. The Prevalence of Assault Weapons Among Crime Guns ..........................69
    5.1.8. Crime Types Associated with Assault Weapons.........................................70
  5.2. Assault Weapon Utilization:  Local Police Data Sources...................................71
    5.2.1. Introduction and Data Collection Effort.....................................................71
    5.2.2. Assault Weapons in St. Louis and Boston..................................................72
    5.2.3. Assault Weapons and Crime.......................................................................75
    5.2.4. Unbanned Handguns Capable of Accepting Large-capacity Magazines.....75
6. Potential Consequences of Assault Weapon Use _____ 79
  6.1. Trends in State-Level Gun Homicide Rates........................................................79

Exhibit 4
Page 00177

6.1.1. Data ........................................................................................................................................80
6.1.2. Research Design.......................................................................................................................81
6.2. Assault Weapons, Large-Capacity Magazines, and Multiple Victim/Mass Murders .......................85
6.2.1. Trends in Multiple-Victim Gun Homicides..............................................................................85
6.3. Consequences of Title XI:  Multiple Wound Gun Homicides...............................................................87
6.3.1. Wounds per Incident:  Milwaukee, Seattle, and Jersey City. ...................................................88
6.3.2. Proportion of Cases With Multiple Wounds:  San Diego and Boston.......................................91
6.3.3. Assault Weapons, Large-Capacity Magazines, and Multiple Wound Cases:
        Milwaukee...........................................................................................................................96
6.3.4. Conclusions .............................................................................................................................97
6.4. Law Enforcement Officers Killed in Action .......................................................................................97
6.4.1. Introduction and Data ..............................................................................................................98
6.4.2. Assault Weapons and Homicides of Police Officers ................................................................98
**7. References** _____  **101**

**APPENDIX A:** Assault Weapons and Mass Murder

iii

Exhibit 4
Page 00178

## List of Tables

Table 2-1. Description of firearms banned in Title XI ............................................................. 13

Table 3-1. Banned weapons and examples of unbanned comparison weapons .......................... 22

Table 4-1. Regression of SWD handgun prices on time indicators, controlling for product characteristics and distributors .......................................................... 28

Table 4-2. Regression of Lorcin and Davis handgun prices on time indicators, controlling for product characteristics and distributors .......................................................... 34

Table 4-3. Regression of Colt AR15 group prices on time indicators, controlling for product characteristics and distributors .......................................................... 32

Table 4-4. Regression of Ruger Mini-14 and Maadi rifle prices on time indicators, controlling for product characteristics and distributors .......................................................... 34

Table 4-5. Regression of Ruger Mini-14, Maadi, and SKS rifle prices on time indicators, controlling for product characteristics and distributors .......................................................... 37

Table 4-6. Regression of Uzi large-capacity magazine prices on time indicators, controlling for product characteristics and distributors .......................................................... 40

Table 4-7. Regression of Glock large-capacity handgun magazine prices on time indicators, controlling for product characteristics and distributors .......................................................... 42

Table 4-8. Regression of Colt AR15 group large-capacity magazine prices on time indicators, controlling for product characteristics and distributors .......................................................... 44

Table 4-9. Regression of Ruger Mini-14 large-capacity magazine prices on time indicators, controlling for product characteristics and distributors .......................................................... 46

Table 4-10. Production trends for banned assault weapons and comparison guns ..................... 48

Table 4-11. Pre-ban (Jan. 1992-Aug. 1994) to post-ban (Sept. 1994-May 1996) changes in counts of stolen assault weapons and unbanned semiautomatic handguns capable of accepting large-capacity magazines .......................................................... 52

Table 4-12. Pre-ban (Jan. 1992-Aug. 1994) to post-ban (Sept. 1994-May 1996) changes in ratios of stolen assault weapons and unbanned semiautomatic handguns capable of accepting large-capacity magazines .......................................................... 52

Table 5-1. Total traces, January-May 1996 .......................................................... 66

Table 5-2. National trends in gun crime, 1993–95 .......................................................... 66

Table 5-3. Gun confiscations/traces, January 1993–May 1996 .......................................................... 67

Table 5-4. Assault weapons traces, January 1993–May 1996 .......................................................... 69

Table 5-5. Traces for select assault weapons,† January 1993–May 1996 .......................................................... 71

Table 5-6. Traces for select assault weapons,† January 1993–May 1996 (violent and drug-related crimes) .......................................................... 67

Table 5-7. Assault pistol traces, ban states (CA, NJ, CT, and HI), January 1993–May 1996 .......................................................... 69

Table 5-8. Assault weapon trace requests to BATF by crime type .......................................................... 71

Table 5-9. Summary data on guns confiscated in St. Louis, January 1992 – December 1995 .......................................................... 72

Table 5-10. Summary data on guns confiscated in Boston, January 1992 – August 1996 .......................................................... 74

Table 6-1. Estimated Coefficients and Changes in Gun Murder Rates from Title XI Interventions .......................................................... 82

Table 6-2. Years for which gun-related homicide data are not available .......................................................... 83

Table 6-3. Gunshot wounds per gun homicide victim, Milwaukee, Seattle, and Jersey City .......................................................... 88

Table 6-4. Proportion of gunshot victims receiving multiple wounds, San Diego and Boston .......................................................... 93

Table 6-5. Gunshot wounds per gun homicide victim: Assault weapon and large-capacity magazine cases, Milwaukee .......................................................... 96

Table 6-6. Murders of police officers with assault weapons .......................................................... 98

iv

Exhibit 4
Page 00179

ER_2371

## List of Figures

Figure 3-1. Logic model for *Public Safety and Recreational Firearms Use Protection Act* impact study . . . 19

Figure 4-1. Semi-annual price trends for SWD group handguns . . . 29

Figure 4-2. Semi-annual price trends for handguns commonly used in crime . . . 31

Figure 4-3. Quarterly price trends for Colt AR-15 and related rifles . . . 33

Figure 4-4. Quarterly price trends for comparison semiautomatic rifles . . . 35

Figure 4-5. Quarterly price trends for comparison semiautomatic rifles . . . 38

Figure 4-6. Semi-annual price trends for Uzi large-capacity magazines . . . 41

Figure 4-7. Yearly price trends for Glock large-capacity handgun magazines . . . 43

Figure 4-8. Quarterly price trends for Colt AR15 large-capacity magazines . . . 45

Figure 4-9. Quarterly price trends for Ruger Mini-14 large-capacity magazines . . . 47

Figure 4-10. Annual production data, Colt and Olympic Arms AR-15 type
(years with complete data only) . . . 49

Figure 4-11. Annual production data, SWD group (missing data in some early years) . . . 49

Figure 4-12. Annual production data, small-caliber semiautomatic pistols . . . 50

Figure 4-13. Stolen assault weapons count, January 1992–May 1996 . . . 54

Figure 4-14. Assault weapons as a proportion of stolen semiautomatic and automatic guns,
January 1992–June 1996 . . . 55

Figure 4-15. Stolen unbanned large-capacity semiautomatic handgun counts, January 1992–May 1996 . . . 57

Figure 4-16. Thefts of unbanned large-capacity semiautomatic handguns as a proportion of all semiautomatic handguns,
January 1992–June 1996 . . . 57

Figure 5-1. National ATF trace data:  Traces for select assault weapons, January 1993–
May 1996 . . . 64

Figure 5-2. National ATF trace data:  Traces for select assault weapons (violent crimes) . . . 66

Figure 5-3. National ATF trace data:  traces for select assault weapons (drug crimes) . . . 66

Figure 5-4. Relative changes in total and assault weapon traces . . . 68

Figure 5-5. National ATF trace data:  Assault weapons as a proportion of all traces . . . 70

Figure 5-6. Assault weapons as a proportion of all confiscated guns, St. Louis, 1992–95 . . . 73

Figure 5-7. Assault weapons as a proportion of all confiscated guns by quarter, Boston, January 1992–August 1996 . . . 75

Figure 5-8. Unbanned large-capacity handguns as a proportion of all confiscated handguns,  St. Louis, 1992–95 . . . 77

Figure 5-9. Unbanned large-capacity semiautomatic handguns as a proportion of all confiscated handguns, Boston,
January 1992–August 1996 . . . 77

Figure 6-1. Victims per gun homicide incident, 1980–95 . . . 86

Figure 6-2. Gunshot wounds per gun homicide victim by month, Milwaukee County, January 1992–December 1995 . . . 89

Figure 6-3. Gunshot wounds per gun homicide victim by month, King County (Seattle), January 1992–June 1996 . . . 90

Figure 6-4. Gunshot wounds per gun homicide victim by quarter, Jersey City, January 1992–May 1996 . . . 90

Figure 6-5. Proportion of gunshot homicides with multiple wounds by month, San Diego County, January 1992–June
1996 . . . 91

Figure 6-6. Proportion of fatal gunshot wound cases with multiple wounds by quarter, Boston . . . 94

Figure 6-7. Proportion of non-fatal gunshot wound cases with multiple wounds by month, Boston, January 1992–
December 1995 . . . 95

Figure 6-8. Proportion of gunshot wound victims with multiple wounds by month, Boston,
January 1992–December 1995 . . . 95

v

Exhibit 4
Page 00180

ER_2372

# 1.   OVERVIEW

Title XI of the Violent Crime Control and Law Enforcement Act of 1994 (the Crime Control Act) took effect on September 13, 1994. Subtitle A banned the manufacture, transfer, and possession of designated semiautomatic assault weapons. It also banned "large-capacity" magazines, which were defined as ammunition feeding devices designed to hold more than 10 rounds. Finally, it required a study of the effects of these bans, with particular emphasis on violent and drug trafficking crime, to be conducted within 30 months following the effective date of the bans. To satisfy the study requirement, the National Institute of Justice (NIJ) awarded a grant to The Urban Institute for an impact evaluation of Subtitle A. This report contains the study findings.

In defining assault weapons, Subtitle A banned 8 named categories of rifles and handguns. It also banned *exact copies* of the named guns, revolving cylinder shotguns, and guns with detachable magazines that were manufactured with certain features such as flash suppressors and folding rifle stocks. The ban specifically exempted *grandfathered* assault weapons and magazines that had been manufactured before the ban took effect. Implicitly, the ban exempts all other guns; several of these, which we treated as *legal substitutes,* closely resemble the banned guns but are not classified as exact copies.

Among other characteristics, ban proponents cited the capacity of these weapons, most of which had been originally designed for military use, to fire many bullets rapidly. While this capacity had been demonstrated in several highly publicized mass murders in the decade before 1994, ban supporters argued that it was largely irrelevant for hunting, competitive shooting, and self-defense. Therefore, it was argued, the ban could prevent violent crimes with only a small burden on law-abiding gun owners. Some of our own analyses added evidence that assault weapons are disproportionately involved in murders with multiple victims, multiple wounds per victim, and police officers as victims.

To reduce levels of these crimes, the law must increase the scarcity of the banned weapons. Scarcity would be reflected in higher prices not only in the *primary markets* where licensed dealers create records of sales to legally eligible purchasers, but also in *secondary markets* that lack such records. Although most secondary-market transfers are legal, minors, convicted felons, and other ineligible purchasers may purchase guns in them (usually at highly inflated prices) without creating records. In theory, higher prices in secondary markets would discourage criminal use of assault weapons, thereby reducing levels of the violent crimes in which assault weapons are disproportionately used.

For these reasons, our analysis considered potential ban effects on gun markets, on assault weapon use in crime, and on lethal consequences of assault weapon use. However, the statutory schedule for this study constrained our findings to short-run effects, which are not necessarily a reliable guide to long-term effects. The timing also limited the power of our statistical analyses to detect worthwhile ban effects that may have occurred. Most fundamentally, because the banned guns and magazines were never used in more than a fraction of all gun murders, even the maximum theoretically achievable preventive effect of the ban on gun murders is almost certainly too small to detect statistically with only one year of post-ban crime data.

With these cautions in mind, our analysis suggests that the primary-market prices of the banned guns and magazines rose by upwards of 50 percent during 1993 and 1994, while the ban was being debated, as gun distributors, dealers, and collectors speculated that the banned weapons would become expensive collectors' items. However, production of the banned guns also surged, so that more than an extra year's normal supply of assault weapons and legal substitutes was manufactured during 1994. After the ban took effect, primary-market prices of the banned guns and most large-capacity magazines fell to nearly pre-ban levels and remained there at

1

Exhibit 4
Page 00181

least through mid-1996, reflecting both the oversupply of grandfathered guns and the variety of legal substitutes that emerged around the time of the ban.

Even though the expected quick profits failed to materialize, we found no strong evidence to date that licensed dealers have increased "off the books" sales of assault weapons in secondary markets and concealed them with false stolen gun reports. Stolen gun reports for assault weapons did increase slightly after the ban took effect, but by less than reported thefts of unbanned large-capacity semiautomatic handguns, which began rising well before the ban.

The lack of an increase in stolen gun reports suggests that so far, the large stock of grandfathered assault weapons has remained largely in dealers' and collectors' inventories instead of leaking into the secondary markets through which criminals tend to obtain guns. In turn, this speculative stockpiling of assault weapons by law-abiding dealers and owners apparently reduced the flow of assault weapons to criminals, at least temporarily. Between 1994 and 1995, the criminal use of assault weapons, as measured by law enforcement agency requests for BATF traces of guns associated with crimes, fell by 20 percent, compared to an 11 percent decrease for all guns. BATF trace requests are an imperfect measure because they reflect only a small percentage of guns used in crime. However, we found similar trends in data on all guns recovered in crime in two cities. We also found similar decreases in trace requests concerning guns associated with violent and drug crimes.

At best, the assault weapons ban can have only a limited effect on total gun murders, because the banned weapons and magazines were never involved in more than a modest fraction of all gun murders. Our best estimate is that the ban contributed to a 6.7 percent decrease in total gun murders between 1994 and 1995, beyond what would have been expected in view of ongoing crime, demographic, and economic trends. However, with only one year of post-ban data, we cannot rule out the possibility that this decrease reflects chance year-to-year variation rather than a true effect of the ban. Nor can we rule out effects of other features of the 1994 Crime Act or a host of state and local initiatives that took place simultaneously. Further, any short-run preventive effect observable at this time may ebb in the near future as the stock of grandfathered assault weapons and legal substitute guns leaks to secondary markets, then increase as the stock of large-capacity magazines gradually dwindles.

We were unable to detect any reduction to date in two types of gun murders that are thought to be closely associated with assault weapons, those with multiple victims in a single incident and those producing multiple bullet wounds per victim. We did find a reduction in killings of police officers since mid-1995. However, the available data are partial and preliminary, and the trends may have been influenced by law enforcement agency policies regarding bullet-proof vests.

The following pages explain these findings in more detail, and recommend future research to update and refine our results at this early post-ban stage.

## 1.1. PRIMARY-MARKET EFFECTS

### 1.1.1. Prices and Production

#### 1.1.1.1. Findings

We found clear peaks in legal-market prices of the banned weapons and magazines around the effective date of the ban, based on display ads in the nationally distributed periodical Shotgun News between 1992 and mid-1996. For example, a price index of banned SWD semiautomatic pistols rose by about 47 percent during the year preceding the ban, then fell by about 20 percent the following year, to a level where it remains. Meanwhile, the

2

Exhibit 4
Page 00182

prices of non-banned Davis and Lorcin semiautomatic pistols remained virtually constant over the entire period. Similarly, a price index for banned AR-15 rifles, exact copies, and legal substitutes at least doubled in the year preceding the ban, then fell after the ban nearly to 1992 levels, where they have remained. Prices of unbanned semiautomatic rifles (e.g., the Ruger Mini-14, Maadi, and SKS) behaved similarly to AR-15 prices, presumably due to pre-ban speculation that these guns would be included in the final version of the Crime Act.

Like assault weapon prices, large-capacity magazine prices generally doubled within the year preceding the ban. However, trends diverged after the ban depending on what gun the magazine was made for. For example, magazines for non-banned Glock handguns held their new high levels, while magazines for banned Uzi and unbanned Mini-14 weapons fell substantially from their peaks. AR-15 large-capacity magazine prices also fell to 1993 levels shortly after the ban took effect, but returned to their 1994 peak in mid-1996. We believe that demand for grandfathered Glock and AR-15 magazines was sustained or revived by continuing sales of legal guns that accept them.

Production of the banned assault weapons surged in the months leading up to the ban. Data limitations preclude precise and comprehensive counts. However, we estimate that the annual production of five categories of assault weapons (AR-15s and models by Intratec, SWD, AA Arms, and Calico) and legal substitutes rose by more than 120 percent, from an estimated 1989–93 annual average of 91,000 guns to about 204,000 in 1994 — more than an extra year's supply. In contrast, production of non-banned Lorcin and Davis pistols, which are among the guns most frequently seized by police, fell by about 35 percent, from a 1989–93 annual average of 283,000 to 184,000 in 1994.

Our interpretation of these trends is that the pre-ban price and production increases reflected speculation that grandfathered weapons and magazines in the banned categories would become profitable collectors' items after the ban took effect. Instead, however, assault weapon prices fell sharply within months after the ban took effect, apparently under the combined weight of the extra year's supply of grandfathered guns, along with legal substitute guns that entered the distribution chain around the time of the ban. While large-capacity magazine prices for several banned assault weapons followed similar trends, those for unbanned Glock pistols sustained their peaks, and those for the widely-copied AR-15 rifle rebounded at least temporarily to peak levels in 1996, after an immediate post-ban fall.

### *1.1.1.2. Recommendations*

To establish our findings about legal-market effects more definitively, we have short-term (i.e., 12-month) and long-term research recommendations for consideration by NIJ. In the short term, we recommend entering and analyzing large-capacity magazine price data that we have already coded but not entered, in order to study how the prices and legal status of guns affect the prices of large-capacity magazines as economic complements. We also recommend updating our price and production analyses for both the banned firearms and large-capacity magazines, to learn about retention of the apparent ban effects we identified. For the long term, we recommend that NIJ and BATF cooperate in establishing and maintaining time-series data on prices and production of assault weapons, legal substitutes, other guns commonly used in crime, and the respective large and small capacity magazines; like similar statistical series currently maintained for illegal drugs, we believe such a price and production series would be a valuable instrument for monitoring effects of policy changes and other influences on markets for weapons that are commonly used in violent and drug trafficking crime.

Exhibit 4
Page 00183

## 1.2.   SECONDARY-MARKET EFFECTS

### 1.2.1.   Findings

In addition to the retail markets discussed above, there are secondary gun markets in which gun transfers are made without formal record keeping requirements. Secondary market transfers are by and large legal transactions. However, prohibited gun purchasers such as minors, felons, and fugitives tend to acquire most of their guns through secondary markets and pay premiums of 3 to 5 times the legal-market prices in order to avoid eligibility checks, sales records, and the 5-day waiting period required by the Brady Act. We were unable to observe secondary-market prices and quantities directly. Anecdotally, however, the channels through which guns "leak" from legal to secondary markets include gun thieves, unscrupulous licensed dealers who sell guns on the streets and in gun shows more or less exclusively to prohibited purchasers (who may resell the guns), as well as "storefront" dealers who sell occasionally in secondary markets, reporting the missing inventories to BATF inspectors as "stolen or lost." Since two of these channels may lead to theft reports to the FBI's National Crime Information Center (NCIC), we tested for an increase in reported assault weapon thefts after the ban.

To this point, there has been only a slight increase in assault weapon thefts as a share of all stolen semiautomatic weapons. Thus, there does not appear to have been much leakage of assault weapons from legal to secondary markets.

In order to assess the effects of the large-capacity magazine ban on secondary markets, we examined thefts of Glock and Ruger handgun models that accept these magazines. Thefts of these guns continued to increase after the ban, despite the magazine ban, which presumably made the guns less attractive. Yet we also did not find strong evidence of an increase in thefts of these guns relative to what would have been predicted based on pre-ban trends. This implies that dealers have not been leaking the guns to illegitimate users on a large scale.

### 1.2.2.   Recommendations

To monitor possible future leakage of the large existing stock of assault weapons into secondary markets, we recommend updating our analyses of trends in stolen gun reports. We also recommend that BATF and NCIC encourage reporting agencies to ascertain and record the magazines with which guns were stolen. Also, because stolen gun reports are deleted from NCIC files when the guns are recovered, we recommend that analyses be conducted on periodic downloads of the database in order to analyze time from theft to recovery. For strategic purposes, it would also be useful to compare dealer patterns of assault weapon theft reports with patterns of occurrence in BATF traces of guns recovered in crime.

## 1.3.   EFFECTS ON ASSAULT WEAPON USE IN CRIME

### 1.3.1.   Findings

Requests for BATF traces of assault weapons recovered in crime by law enforcement agencies throughout the country declined 20 percent in 1995, the first calendar year after the ban took effect. Some of this decrease may reflect an overall decrease in gun crimes; total trace requests dropped 11 percent in 1995 and gun murders dropped 12 percent. Nevertheless, these trends suggest an 8–9 percent additional decrease due to substitution of other guns for the banned assault weapons in 1995 gun crimes. We were unable to find similar assault pistol reductions in states with pre-existing assault pistol bans. Nationwide decreases related to violent and drug crimes were at least as great as that in total trace requests in percentage terms, although these categories were quite small

in number. The decrease we observed was evidently not a spurious result of a spurt of assault-weapon tracing around the effective date of the ban, because there were fewer assault weapon traces in 1995 than in 1993.

Trace requests for assault weapons rose by 7 percent in the first half of 1996, suggesting that the 1995 effect we observed may be temporary. However, data limitations have prevented us from attributing this rebound to changes in overall crime patterns, leakage of grandfathered assault weapons to secondary markets, changes in trace request practices, or other causes. Data from two cities not subject to a pre-existing state bans suggested that assault weapon use, while rare in those cities both before and after the ban, also tapered off during late 1995 and into 1996.

With our local data sources, we also examined confiscations of selected unbanned handguns capable of accepting large-capacity magazines. Criminal use of these guns relative to other guns remained stable or was higher during the post-ban period, though data from one of these cities were indicative of a recent plateau. However, we were unable to acquire data on the magazines with which these guns were equipped. Further, trends in confiscations of our selected models may not be indicative of trends for other unbanned large-capacity handguns. It is therefore difficult to make any definitive statements about the use of large-capacity magazines in crime since the ban. Nevertheless, the contrasting trends for these guns and assault weapons provide some tentative hints of short-term substitution of non-banned large-capacity semiautomatic handguns for the banned assault weapons.

### *1.3.2. Recommendations*

Although BATF trace request data provide the only national trends related to assault weapon use, our findings based on them are subject to limitations. Law enforcement agencies request traces on only a fraction of confiscated guns that probably does not represent the entire population. Therefore, we recommend further study of available data on all guns recovered in crime in selected cities that either were or were not under state assault weapon bans when the Federal ban took effect. Beyond that, we recommend analyzing BATF trace data already in-house to compare trends for specific banned assault weapon models with trends for non-banned models that are close substitutes. Most strongly, we also recommend updating our trend analysis, to see if the early 1996 rebound in BATF trace requests for assault weapons continued throughout the year and to relate any change to 1996 trends in gun crime and overall trace requests.

From a broader and longer-term perspective, we share others' concerns about the adequacy of BATF trace data, the only available national data, as a basis for assessing the effects of firearms policies and other influences on the use of assault weapons and other guns in violent and drug trafficking crime. Therefore, we commend recent BATF efforts to encourage local law enforcement agencies to request traces on more of the guns they seize from criminals. As a complement, however, we recommend short-term research on departmental policies and officers' decisions that affect the probability that a specific gun recovered in crime will be submitted for tracing.

Unfortunately, we have been unable to this point to assemble much information regarding trends in the criminal use of large-capacity magazines or guns capable of accepting these magazines. This gap is especially salient for the following reasons: the large-capacity magazine is perhaps the most functionally important distinguishing feature of assault weapons; the magazine ban affected more gun models than did the more visible bans on designated assault weapons; and based on 1993 BATF trace requests, non-banned semiautomatic weapons accepting large-capacity magazines were used in more crimes than were the banned assault weapons. For these reasons, we recommend that BATF and state/local law enforcement agencies encourage concerted efforts to record the magazines with which confiscated firearms are equipped — information that frequently goes unrecorded under present practice — and we recommend further research on trends, at both the national and local levels, on the

Exhibit 4
Page 00185

criminal use of guns equipped with large-capacity magazines. Finally, to support this research and a variety of strategic objectives for reducing the consequences of violent and drug trafficking crime, consideration should be given to studying the costs and benefits of legislative and administrative measures that would encourage recording, tracing, and analyzing magazines recovered in crimes, with or without guns.

## 1.4.   CONSEQUENCES OF ASSAULT WEAPON USE

### *1.4.1.   Findings*

A central argument for special regulation of assault weapons and large-capacity magazines is that the rapid-fire/multi-shot capabilities they make available to gun offenders increase the expected number of deaths per criminal use, because an intended victim may receive more wounds, and more people can be wounded, in a short period of time. Therefore, we examined trends in three consequences of gun use: gun murders, victims per gun homicide incident, and wounds per gunshot victim.

Our ability to discern ban effects on these consequences is constrained by a number of facts. The potential size of ban effects is limited because the banned weapons and magazines were used in only a minority of gun crimes — based on limited evidence, we estimate that 25% of gun homicides are committed with guns equipped with large-capacity magazines, of which assault weapons are a subset. Further, the power to discern small effects statistically is limited because post-ban data are available for only one full calendar year. Also, a large stock still exists of grandfathered magazines as well as grandfathered and legal-substitute guns with assault weapon characteristics.

Our best estimate of the impact of the ban on state level gun homicide rates is that it caused a reduction of 6.7% in gun murders in 1995 relative to a projection of recent trends. However, the evidence is not strong enough for us to conclude that there was any meaningful effect (i.e., that the effect was different from zero). Note also that a true decrease of 6.7% in the gun murder rate attributable to the ban would imply a reduction of 27% in the use of assault weapons and large-capacity guns and no effective substitution of other guns. While we do not yet have an estimate of large-capacity magazine use in 1995, our nationwide assessment of assault weapon utilization suggested only an 8 to 20 percent drop in assault weapon use in 1995.

Using a variety of national and local data sources, we found no statistical evidence of post-ban decreases in either the number of victims per gun homicide incident, the number of gunshot wounds per victim, or the proportion of gunshot victims with multiple wounds. Nor did we find assault weapons to be overrepresented in a sample of mass murders involving guns (see Appendix A).

The absence of stronger ban effects may be attributable to the relative rarity with which the banned weapons are used in violent crimes. At the same time, our chosen measures reflect only a few of the possible manifestations of the rapid-fire/multi-shot characteristics thought to make assault weapons and large-capacity magazines particularly dangerous. For example, we might have found the use of assault weapons and large-capacity magazines to be more consequential in an analysis of the number of victims receiving any wound (fatal or non-fatal), in broader samples of firearm discharge incidents. Moreover, our comparisons did not control for characteristics of incidents and offenders that may affect the choice of weapon, the consequences of weapon use, or both.

**Recommendations:** First, we recommend further study of the impact measures examined in this investigation. Relatively little time has passed since the implementation of the ban. This weakens the ability of statistical tests — particularly those in our time-series analyses — to discern meaningful impacts. Moreover, the

6

Exhibit 4
Page 00186

ER_2378

ban's effects on the gun market are still unfolding. Hence, the long term consequences of the ban may differ substantially from the short term consequences which have been the subject of this investigation.

Therefore, we recommend updating the state-level analysis of gun murder rates as more data become available. Similarly, investigations of trends in wounds per gunshot victim could be expanded to include longer post ban periods, larger numbers of jurisdictions, and, wherever possible, data on both fatal and non-fatal victims. Examination of numbers of total wounded victims in both fatal and non-fatal gunshot incidents may also be useful. In some jurisdictions, it may also be possible to link trends in the types of guns seized by police to trends in specific weapon-related consequence measures.

Second, we recommend further research on the role of assault weapons and large-capacity magazines in murders of police officers. Our analysis of police murders has shown that the fraction of police murders involving assault weapons is higher than that for civilian murders. This suggests that gun murders of police should be more sensitive to the ban than gun murders in general. Yet, further research, considering such factors as numbers of shots fired, wounds inflicted, and offender characteristics, is necessary for a greater understanding of the role of the banned weaponry in these murders.

Along similar lines, we strongly recommend in-depth, incident-based research on the situational dynamics of both fatal and non-fatal gun assaults to gain greater understanding of the roles of banned and other weapons in intentional deaths and injuries. A goal of this research should be to determine the extent to which assault weapons and guns equipped with large-capacity magazines are used in homicides and assaults and to compare the fatality rates of attacks with these weapons to those with other firearms. A second goal should be to determine the extent to which the properties of the banned weapons influence the outcomes of criminal gun attacks after controlling for important characteristics of the situations and the actors. In other words, how many homicides and non-fatal gunshot wound cases involving assault weapons or large-capacity magazines would not occur if the offenders were forced to substitute other firearms and/or small capacity magazines? In what percentage of gun attacks, for instance, does the ability to fire more than 10 rounds without reloading influence the number of gunshot wound victims or determine the difference between a fatal and non-fatal attack? In this study, we found some weak evidence that victims killed with guns having large-capacity magazines tend to have more bullet wounds than victims killed with other firearms, and that mass murders with assault weapons tend to involve more victims than those with other firearms. However, our results were based on simple comparisons; much more comprehensive research should be pursued in this area.

Future research on the dynamics of criminal shootings, including various measures of the number of shots fired and wounds inflicted, would provide information on possible effects of the assault weapon and magazine ban that we were unable to estimate, as well as useful information on violent gun crime generally. Such research requires linking medical and law enforcement data sets on victim wounds, forensic examinations of recovered firearms and magazines, and police incident reports.

7

Exhibit 4
Page 00187

ER_2379

## 2.   BACKGROUND FOR THE IMPACT ASSESSMENT

Title XI of the Violent Crime Control and Law Enforcement Act of 1994 (the Crime Control Act), took effect on its enactment date, September 13, 1994. Subtitle A, which is itself known as the Public Safety and Recreational Firearms Use Protection Act, contains three provisions related to "semiautomatic assault weapons." Section 110102 (the assault weapons ban) made unlawful the manufacture, transfer, or possession of such weapons under 18:922 of the United States Code. Section 110103 (the magazine ban) made unlawful the transfer or possession of "large-capacity ammunition feeding devices": detachable magazines that accept more than 10 rounds[1] and can be attached to semi- or automatic firearms. Section 110104 (the evaluation requirement) required the Attorney General to study the effect of these prohibitions and "in particular...their impact, if any, on violent and drug trafficking crime." The evaluation requirement specified a time period for the study: an 18-month period beginning 12 months after the enactment date of the Act. It also required the Attorney General to report the study results to Congress 30 months after enactment of the Crime Control Act — March 13, 1997. The National Institute of Justice awarded a grant to the Urban Institute to conduct the mandated study, and this report contains the findings.

This chapter first explains the legislation in additional detail, then discusses what is already known about the role of the banned weapons in crime, and finally explains certain relevant features of firearms markets.

### 2.1.   THE LEGISLATION

Effective on its enactment date, September 13, 1994, Section 110102 of Title XI banned the manufacture, transfer, and possession of "semiautomatic assault weapons." It defined the banned items defined in four ways:

1) <u>Named guns</u>: specific rifles and handguns, available from ten importers and manufacturers: Norinco, Mitchell, and Poly Technologies (all models, popularly known as AKs); Israeli Military Industries UZI and Galil models, imported by Action Arms; Beretta Ar 70 (also known as SC-70); Colt AR-15; Fabrique National FN/FAL, FN/LAR, FN/FNC), SWD M-10, M-11, M-11/9, and M-12; Steyr AUG; and INTRATEC TEC-9, TEC-DC9, and TEC-22;

2) <u>Exact copies</u>: "Copies or duplicates of the [named guns] in any caliber";

3) <u>Revolving cylinder shotguns</u>: Large-capacity shotguns, with the Street Sweeper and Striker 12 named as examples; and

4) <u>Features-test guns</u>: semiautomatic weapons capable of accepting detachable magazines and having at least two named features.[2]

Several provisions of the ban require further explanation because they affected our approach to this study. First, the ban <u>exempted</u> several categories of guns: a long list of specific models specified in Appendix A to Sec.

---

[1] Or "that can be readily restored or converted to accept."

[2] For rifles, the named features were: a folding or telescoping stock; a pistol grip that protrudes below the firing action; a bayonet mount; a flash suppressor or threaded barrel designed to accommodate one; a grenade launcher. For pistols, the features were a magazine outside the pistol grip; a threaded barrel (capable of accepting a barrel extender, flash suppresser, forward handgrip, or silencer); a heat shroud that encircles the barrel; a weight of more than 50 ounces unloaded; and a semiautomatic version of an automatic firearm. For shotguns, named features included the folding or telescoping stock, protruding pistol grip, fixed magazine capacity over 5 rounds, and ability to accept a detachable magazine.

8

Exhibit 4
Page 00188

110102; bolt- or pump-action, inoperable, and antique guns; semiautomatic rifles and shotguns that cannot hold more than 5 rounds; and firearms belonging to a unit of government, a nuclear materials security organization, a retired law enforcement officer, or an authorized weapons tester.

Second, the prohibitions exempted weapons and magazines that met the definitional criteria but were legally owned (by manufacturers, distributors, retailers, or consumers) on the effective date of the Act. Such "grandfathered" guns may legally be sold, resold, and transferred indefinitely. Estimates of their numbers are imprecise. However, a 1992 report by the American Medical Association reported an estimate of 1 million semiautomatic assault weapons manufactured for civilian use, plus 1.5 million semiautomatic M-1 rifles sold as military surplus (AMA Council, 1992). To distinguish grandfathered guns from exempt guns that might be stolen or diverted to illegal markets, the ban required the serial numbers of guns in the banned categories to clearly indicate their dates of manufacture.

Third, the ban on exact copies of the named guns did not prohibit the manufacture, sale, or transfer of legal substitutes, most of which first appeared around or after the effective date of the ban. Legal substitutes differ from banned exact copies by lacking certain named features or by incorporating minimal design modifications such as slight reductions of pistol barrel length, thumbholes drilled in a rifle stock, or the like. Manufacturers named some legal substitutes by adding a designation such as "Sporter," "AB," (After Ban), or "PCR" (Politically Correct Rifle) to the name of the corresponding banned weapon.

Section 110103 of Title XI banned large-capacity magazines, i.e., magazines that accept ten or more rounds of ammunition. Its effective date, exemptions, and grandfathering provisions correspond to those governing firearms under Section 110102. This provision exempts attached tubular devices capable of operating only with .22 caliber rimfire ammunition.

Section 110104 required the study that is the subject of this report: a study of the effect of the ban, citing impacts on violent crime and drug trafficking in particular. It also specified the time period of the study: to begin 12 months after enactment, to be conducted over an 18-month period, and to be reported to Congress after 30 months. Finally, Title XI included a "sunset provision" for the ban, repealing it 10 years after its effective date.

Subtitles B and C of Title XI are relevant to this study because they took effect at the same time, and so special efforts are needed to distinguish their effects from those effects of the assault weapon and magazine bans in Subtitle A. With certain exemptions, Subtitle B bans the sale, delivery, or transfer of handguns to juveniles less than 18 years old. This juvenile handgun possession ban applies, of course, to assault pistols and to other semiautomatic handguns that are frequently recovered in crimes. Subtitle C requires applicants for new and renewal Federal Firearms Licenses — the Federal dealers' licenses — to submit a photograph and fingerprints with their applications and to certify that their businesses will comply with all state and local laws pertinent to their business operations. These subtitles gave force of law to practices that BATF had begun early in 1994, to require the fingerprints and photographs, and to cooperate with local law enforcement agencies in investigations of Federal Firearms Licensees' (FFLs) compliance with local sales tax, zoning, and other administrative requirements. These BATF practices are believed to have contributed to an 11 percent reduction in licensees (from 281,447 to 250,833) between January and the effective date of the Crime Act, and a subsequent 50 percent reduction to about 124,286 by December 1996 (U.S. Department of Treasury, 1997). These practices and subtitles were intended to discourage license applications and renewals by the subset of licensees least likely to comply with laws governing sales to felons, juveniles, and other prohibited purchasers.

Exhibit 4
Page 00189

## 2.2.   CONTEXT FOR THE ASSAULT WEAPONS BAN

At least three considerations appear to have motivated the Subtitle A bans on assault weapons and large-capacity magazines: arguments over particularly dangerous consequences of their use, highly publicized incidents that drew public attention to the widespread availability of military-style weapons, and the disproportionate use of the banned weapons in crime.

The argument over dangerous consequences is that the ban targets a large array of semiautomatic weapons capable of accepting large-capacity magazines (i.e., magazines holding more than 10 rounds). Semiautomatic firearms permit a somewhat more rapid rate of fire than do non-semiautomatics. When combined with large-capacity magazines, semiautomatic firearms enable gun offenders to fire more times and at a faster rate, thereby increasing the probability that offenders hit one or more victims at least once.

There is very little empirical evidence, however, on the direct role of ammunition capacity in determining the outcomes of criminal gun attacks (see Koper 1995). The limited data which do exist suggest that criminal gun attacks involve three or fewer shots on average (Kleck 1991, pp.78-79; McGonigal et al. 1993, p.534). Further, there is no evidence comparing the fatality rate of attacks perpetrated with guns having large-capacity magazines to those involving guns without large-capacity magazines (indeed, there is no evidence comparing the fatality rate of attacks with semiautomatics to those with other firearms). But in the absence of substantial data on the dynamics of criminal shootings (including the number of shots fired and wounds inflicted per incident), it seems plausible that offenders using semiautomatics, especially assault weapons and other guns capable of accepting large-capacity magazines, have the ability to wound more persons, whether they be intended targets or innocent bystanders (see Sherman et al. 1989). This possibility encouraged us to attempt to estimate the effect of the ban on both the number of murder victims per incident and the number of wounds per murder victim.

The potential of assault weapons to kill multiple victims quickly was realized in several dramatic public murder incidents that occurred in the decade preceding the ban and involved assault weapons or other semiautomatic firearms with large-capacity magazines (e.g., see Cox Newspapers 1989; Lenett 1995). In one of the worst mass murders ever committed in the United States, for example, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California, McDonald's on July 18, 1984, using an Uzi handgun and a shotgun. On September 14, 1989, Joseph T. Wesbecker killed seven persons and wounded thirteen others at his former workplace in Louisville, Kentucky before taking his own life. Wesbecker was armed with an AK-47 rifle, two MAC-11 handguns, and a number of other firearms. One of the most infamous assault weapon cases occurred on January 17, 1989, when Patrick Edward Purdy used an AK-47 to open fire on a schoolyard in Stockton, California, killing 5 children.

There were additional high profile incidents in which offenders using semiautomatic handguns with large-capacity magazines killed large numbers of persons. In October of 1991, a gunman armed with a Glock 17, a Ruger P89 (both the Glock and Ruger models are semiautomatic handguns capable of accepting magazines with more than 10 rounds), and several large-capacity magazines killed 23 people and wounded another 19 in Killeen, Texas. In a December 1993 incident, six people were killed and another 20 were wounded on a Long Island commuter train by a gunman equipped with a semiautomatic pistol and large-capacity magazines.

These events have been cited as jarring the public consciousness, highlighting the public accessibility of weapons generally associated with military use, and demonstrating the apparent danger to public health posed by semiautomatic weapons with large-capacity magazines. These considerations, along with the claim that large-capacity magazines were unnecessary for hunting or sporting purposes, reportedly galvanized public support for the initiative to ban these magazines (Lenett, 1995).

Exhibit 4
Page 00190

Debate over assault weapons raged for several years prior to the passage of the 1994 Crime Act. Throughout that time, different studies, news reports, policy debates, and legal regulations employed varying definitions of assault weapons. Yet, in general terms, the firearms targeted in these debates and those ultimately prohibited by the federal government's ban consist of various semiautomatic pistols, rifles, and shotguns, most of which accept detachable ammunition magazines and have military-style features. Mechanically, the most important features of these guns are their semiautomatic firing mechanisms and the ability to accept detachable magazines, particularly large-capacity magazines. However, these traits do not distinguish them from many other semiautomatic weapons used for hunting and target shooting. Therefore, some have argued that assault weapons differ only cosmetically from other semiautomatic firearms (Kleck 1991; Cox Newspapers 1989).

Nonetheless, proponents of assault weapons legislation argued that these weapons are too inaccurate to have much hunting or sporting value. Furthermore, they argued that various features of these weapons, such as folding stocks and shrouds surrounding their barrels, have no hunting or sporting value and serve to make these weapons more concealable and practical for criminal use (Cox Newspapers 1989). To the extent that these features facilitated criminal use of long guns or handguns with large-capacity magazines, one could hypothesize that there would be an increase in the deadliness of gun violence. Proponents also claimed that some of these weapons, such as Uzi carbines and pistols, could be converted rather easily to fully automatic firing.[3]

To buttress these arguments, proponents of assault weapons legislation pointed out that assault weapons are used disproportionately in crime. According to estimates generated prior to the federal ban, assault weapons represented less than one percent of the over 200 million privately-owned guns in the United States; yet they were reported to account for 8% of all firearms trace requests submitted to BATF from 1986 to 1993 (Lenett 1995; also see Zawitz 1995). Moreover, these guns were perceived to be especially attractive to offenders involved in drug dealing and organized crime, as evidenced by the relatively high representation of these weapons among BATF gun trace requests for these crimes. To illustrate, a late 1980s study of BATF trace requests reported that nearly 30% of the guns tied to organized crime cases were assault weapons, and 12.4% of gun traces tied to narcotics crimes involved these guns (Cox Newspapers 1989, p.4).

Further, most assault weapons combine semiautomatic firing capability with the ability to accept large-capacity magazines and higher stopping power (i.e., the ability to inflict more serious wounds).[4] Thus, assault weapons would appear to be a particularly lethal group of firearms. However, this is also true of many non-banned semiautomatic firearms. Moreover, there have been no studies comparing the fatality rate of attacks with assault weapons to those committed with other firearms.

---

[3] Fully automatic firearms, which shoot continuously as long as the trigger is held down, have been illegal to own in the U.S. without a federal permit since 1934. BATF has the responsibility of determining whether particular firearm models are too easily convertible to fully automatic firing. Earlier versions of the SWD M series assault pistols made by RPB Industries were met with BATF disapproval for this reason during the early 1980s.

[4] Determinants of firearm stopping power include the velocity, size, shape, and jacketing of projectiles fired from a gun. Notwithstanding various complexities, the works of various forensic, medical, and criminological researchers suggest we can roughly categorize different types of guns as inflicting more or less lethal wounds (see review in Koper 1995). At perhaps the most general level, we can classify shotguns, centerfire (high-veolocity) rifles, magnum handguns, and other large caliber handguns (generally, those larger than .32 caliber) as more lethal firearms and small caliber handguns and .22 caliber rimfire (low velocity) rifles as less lethal firearms. Most assault weapons are either high velocity rifles, large caliber handguns, or shotguns.

11

Exhibit 4
Page 00191

ER_2383

Nonetheless, the involvement of assault weapons in a number of mass murder incidents such as those discussed above provided an important impetus to the movement to ban assault weapons. Commenting on Patrick Purdy's murder of five children with an AK-47 rifle in Stockton, California in 1989, one observer noted, "The crime was to raise renewed outcries against the availability of exotic military-style weapons in our society. This time police forces joined forces with those who have traditionally opposed the widespread ownership of guns" (Cox Newspapers 1989, p.i). Later that year, California became the first state in the nation to enact an assault weapons ban, and the federal government enacted a ban on the importation of several foreign military-style rifles.

## 2.3.   ASSAULT WEAPONS AND CRIME

Table 2-1 describes the named guns banned by Subtitle A in terms of their design, price, pre-ban legal status, and examples of legal substitutes for the banned guns. The table also reports counts of BATF trace requests — law enforcement agency requests for BATF to trace the recorded purchase history of a gun. Trace counts are commonly used to compare the relative frequencies of gun model uses in crime, although they are subject to biases discussed in the next chapter. Together, the named guns and legal substitutes accounted for 3,493 trace requests in 1993, the last full pre-ban year. This represented about 6.3 percent of all 55,089 traces requested that year.

Of the nine types of banned weapons shown in Table 2-1, five are foreign-made: AKs, UZI/ Galil, Beretta Ar-70, FN models, and the Steyr AUG. Together they accounted for only 394 BATF trace requests in 1993, and 281 of those concerned Uzis. There are at least three reasons for these low frequencies. First, imports of all of them had been banned under the 1989 assault weapon importation ban. Second, the Blue Book prices of the UZI, FN models, and Steyr AUG were all high relative to the prices of guns typically used in crime. Third, the FN and Steyr models lack the concealability that is often desired in criminal uses.

Among the four domestically produced banned categories, two handgun types were the most frequently submitted for tracing, with 1,377 requests for TEC models and exact copies, and 878 traces of SWD's M-series. Table 2-1 also reports 581 trace requests for Colt AR-15 rifles, 99 for other manufacturers' exact copies of the AR-15, and a handful of trace requests for Street Sweepers and Berettas.

Exhibit 4
Page 00192

Table 2-1.   Description of firearms banned in Title XI

| Name of firearm | Description | 1993 Blue Book price | Pre-ban Federal legal status | 1993 trace request count | Examples of legal substitutes |
|---|---|---|---|---|---|
| Avtomat Kalashnikov (AK) | Chinese, Russian, other foreign and domestic: .223 or 7.62x39mm cal., semi-auto Kalashnikov rifle, 5, 10*, or 30* shot mag., may be supplied with bayonet. | $550 (plus 10-15% for folding stock models) | Imports banned in 1989 | 87 | Norinco NHM 90/91 |
| UZI, Galil | Israeli: 9mm, .41, or .45 cal. semi-auto carbine, mini-carbine, or pistol. Magazine capacity of 16, 20, or 25, depending on model and type (10 or 20 on pistols). | $550-$1050 (UZI)   $875-$1150 (Galil) | Imports banned in 1989 | 281 UZI   12 Galil | |
| Beretta Ar-70 | Italian: .222 or .223 cal., semi-auto paramilitary design rifle, 5, 8, or 30 shot mag. | $1050 | Imports banned in 1989 | 1 | |
| Colt AR-15 | Domestic: .Primarily 223 cal. paramilitary rifle or carbine, 5-shot magazine, often comes with two 5-shot detachable mags. Exact copies by DPMS, Eagle, Olympic, and others. | $825-$1325 | Legal (civilian version of military M-16) | 581 Colt   99 Other manufacturers | Colt Sporter, Match H-Bar, Target.   Olympic PCR Models. |
| FN/FAL, FN/LAR, FNC | Belgian design: .308 Winchester cal., semi-auto rifle or .223 Remington combat carbine with 30-shot mag.  Rifle comes with flash hider, 4-position fire selector on automatic models.  Manufacturing discontinued in 1988. | $1100-$2500 | Imports banned in 1989 | 9 | L1A1 Sporter (FN, Century) |
| SWD M-10, M-11, M-11/9, M-12 | Domestic: 9mm paramilitary semi-auto pistol, fires from closed bolt, 32-shot mag. Also available in fully automatic variation. | $215 | Legal | 878 | Cobray PM-11, PM12   Kimel AP-9, Mini AP-9 |
| Steyr AUG | Austrian: .223 Remington/5.56mm cal., semi-auto paramilitary design rifle. | $2500 | Imports banned in 1989 | 4 | |
| TEC-9, TEC*DC-9, TEC-22 | Domestic: 9mm semi-auto paramilitary design pistol, 10** or 32** shot mag.; .22 LR semi-auto paramilitary design pistol, 30-shot mag. | $145-$295 | Legal | 1202 Intratec   175 Exact copies | TEC-AB |
| Revolving Cylinder Shotguns | Domestic: 12 gauge, 12-shot rotary mag., paramilitary configuration, double action. | $525*** | Legal | 64 SWD Street Sweepers | |

   * The 30-shot magazine was banned by the 1994 Crime Act, and the 10-shot magazine was introduced as a result.
   ** The 32-shot magazine was banned by the 1994 Crime Act, and the 10-shot magazine was introduced as a result.
   *** Street Sweeper
Source: *Blue Book of Gun Values*, 17th Edition, by S.P. Fjestad, 1996.

Although the banned weapons are more likely than most guns to be used in crime, they are so rare that only 5 models appeared among the BATF National Tracing Center list of the 50 most frequently traced guns in 1993:  the SWD M-11/9 (659 trace requests, ranked 8), the TEC-9 (602 requests, ranked 9), the Colt AR-15 (581 requests, ranked 11), the TEC-DC9 (397 requests, ranked 21), and the TEC-22 (203, ranked 48).  In addition, the list named eight unbanned guns that accept banned large-capacity magazines:  the Glock 17 pistol (509 requests, ranked 13), the Ruger P85 pistol (403 requests, ranked 20), the Ruger P89 pistol (361 requests, ranked 24), the

Exhibit 4
Page 00193

ER_2385

Glock 19 pistol (339 requests, ranked 28), the Taurus PT92 (282 requests, ranked 31), the Beretta/FI Industries Model 92 pistol (270 requests, ranked 33), the Beretta Model 92 (264 requests, ranked 34), and the Ruger Mini-14 rifle (255 requests, ranked 36).

In contrast, the list of ten most frequently traced guns is dominated by inexpensive small-caliber semiautomatic handguns not subject to the ban. These included the Raven P-25 (1,674 requests, ranked 1), the Davis P380 (1,539 requests, ranked 2), the Lorcin L-380 (1,163 requests, ranked 3), the Jennings J-22 (714 requests, ranked 6), and the Lorcin L-25 (691 requests, ranked 7). Other guns among the 1993 top ten list were: the Norinco SKS, a Chinese-made semi-automatic rifle (786 requests, ranked 4); the Mossberg 500 .12-gauge shotgun (742 requests, ranked 5), and the Smith & Wesson .38 caliber revolver (596 requests, ranked 10). None of these are subject to the assault weapon ban.

The relative infrequency of BATF trace requests for assault weapons is consistent with other findings summarized in Koper (1995). During the two years preceding the 1989 import ban, the percentage of traces involving assault weapons reportedly increased from 5.5 to 10.5 percent for all crimes (Cox Newspapers, n.d., p.4), and was 12.4 percent for drug crimes. Because law enforcement agencies are thought to request BATF traces more frequently in organized crime and drug crime cases, many criminal researchers (including ourselves) believe that raw trace request statistics overstate the criminal use of assault weapons in crime. Based on more representative samples, Kleck (1991) reports that assault weapons comprised 3.6 percent or less of guns confiscated from most of the Florida agencies he surveyed, with only one agency reporting as high as 8 percent. Similarly, Hutson et al. (1994) report that assault weapons were involved in less than one percent of 1991 Los Angeles drive-by shootings with juvenile victims. Based on his reanalysis of 1993 New York City data, Koper (1995) concluded that assault weapons were involved in only 4 percent of the 271 homicides in which discharged guns were recovered and 6.5 percent of the 169 homicides in which ballistics evidence positively linked a recovered gun to the crime.

Koper (1995) also summarizes findings which suggest that criminal self-reporting of assault weapon ownership or use may have become "trendy" in recent years, especially among young offenders. The percentages of offenders who reported ever using weapons in categories that may have included assault weapons was generally around 4 percent in studies conducted during the 1980s, but rose to the 20- to 30-percent range in surveys of youth reported since 1993, when publicity about such weapons was high (see, e.g., Knox et al., 1994; Sheley and Wright, 1993).

## 2.4.  MARKETS FOR ASSAULT WEAPONS AND OTHER FIREARMS

Predicting effects of the bans on assault weapons and large-capacity magazines requires some basic knowledge of firearms markets. The Federal Bureau of Alcohol, Tobacco and Firearms (BATF) licenses persons to sell or repair firearms, or accept them as a pawnbroker under the Gun Control Act of 1968. Cook et al. (1995, p.73) summarized the relevant characteristics of a Federal firearms licensee (FFL) as follows. Licenses are issued for three years renewable, and they allow Federal Firearm licensees to buy guns mail-order across state lines without a background check or a waiting period. Starting well before the 1994 Crime Act, applicants had to state that they were at least 21 years old and provide a Social Security number, proposed business name and location, and hours of operation. Since the 1968 Omnibus Crime Control and Safe Streets Act, FFL applicants have had to state that they were not felons, fugitives, illegal immigrants, or substance abusers, and that they had never renounced their American citizenship, been committed to a mental institution, or dishonorably discharged from the military.

The Gun Control Act of 1968 made these same categories of persons ineligible to purchase a gun from a licensee and required would-be purchasers to sign statements that they were not ineligible purchasers. The 1968

Exhibit 4
Page 00194

ER_2386

Act also requires FFLs to retain the records of each sale and a running log of acquisitions and dispositions of all guns that come into their possession. In 1993, the Brady Handgun Violence Prevention Act added several more requirements on handgun sales by FFLs; the focus on handguns reflected their disproportionate involvement in crime. Under the Brady Act, licensed dealers[5] became required to obtain a photo ID from each would-be handgun purchaser, to verify that the ID described the purchaser, to notify the chief law enforcement officer (CLEO) of the purchaser's home of the attempt to purchase, and to wait five business days before completing the sale, allowing the CLEO to verify eligibility and notify the seller if the purchaser is ineligible. The Brady Act also raised the fee for the most common license, Type 1 (retail), from $10.00 per year to $200.00 for the first three years and $90.00 for each three-year renewal.

Subtitle C of Title XI which took effect simultaneously with the 1994 assault weapons ban strengthened the requirements on FFLs and their customers in several ways, including the following. To facilitate fingerprint-based criminal history checks and to deter applicants who feared such checks, Subtitle C required FFL applicants to submit fingerprints and photographs; this ratified BATF practice that had begun in early 1994. To make FFLs more visible to local authorities, Subtitle C required applicants to certify that within 30 days they would comply with applicable local laws and required the Secretary of the Treasury to notify state and local authorities of the names and addresses of all new licensees. To help local law enforcement agencies recover stolen guns and to discourage licensees from retroactively classifying firearms they had sold without following Federally required procedures as "stolen," Subtitle C introduced requirements for FFLs to report the theft or loss of a firearm to BATF and to local authorities within 48 hours.

Assault weapons and other firearms are sold in primary and secondary markets whose structure was described by Cook et al. (1995). Primary markets include transactions by FFLs. At the wholesale level, licensed importers and distributors purchase firearms directly from manufacturers and advertise them through catalogs and display ads in nationally distributed publications such as *Shotgun News*. Under the law, purchasers may include walk-ins who reside in the distributor's state and FFLs from anywhere who can order guns by telephone, fax, or mail. Primary-market retailers include both large discount stores and smaller-volume independent firearms specialists who offer advice, gun service, sometimes shooting ranges, and other professional services of interest to gun enthusiasts. Some 25,000 independent dealers are organized as the National Alliance of Stocking Gun Dealers. At both the wholesale and retail level, primary-market sellers are legally required to verify that the purchaser is eligible under Federal laws, to maintain records of sales for possible future use in BATF traces of guns used in crime, and, since the effective date of the Crime Act, to report thefts of guns to BATF.

Cook et al. (1995, p.68) also designated "secondary markets," in which non-licensed persons sell or give firearms to others. Sellers other than FFLs include collectors or hobbyists who typically resell used guns through classified ads in newspapers or "consumer classified sheets," through newsletters oriented toward gun enthusiasts, or through word of mouth to family and friends. The secondary market also includes gun shows, "street sales", and gifts or sales to family, friends, or acquaintances. Secondary transfers are not subject to the record-keeping requirements placed on FFLs.

Gun prices in the primary markets are widely publicized, and barriers to entry are few, so that the market for legal purchasers is fairly competitive. For new guns, distributors' catalogs and publications such as *Shotgun News* disseminate wholesale prices. Prices of used guns are reported annually in a *Blue Book* catalog (Fjestad, 1996). Based on interviews with gun market experts, Cook et al. (1995, p.71) report that retail prices track

---

[5] The Brady Act exempted sellers in states that already had similar requirements to verify the eligibility of would-be gun purchasers.

Exhibit 4
Page 00195

wholesale prices quite closely. They estimate that retail prices to eligible purchasers generally exceed wholesale (or original-purchase) prices by 3–5 percent in the large chain stores, by about 15 percent in independent dealerships, and by about 10 percent at gun shows because overhead costs are lower.

In contrast, purchasers who wish to avoid creating a record of the transaction and ineligible purchasers, including convicted felons who lack convincing false identification and wish to avoid the Brady Act eligibility check or waiting period, must buy assault weapons and other guns in the secondary markets, which are much less perfect. Prices for banned guns with accurate and complete descriptions are rarely advertised, for obvious reasons. Sellers do not supply catalogues and reference books that would help an untrained buyer sort out the bewildering array of model designations, serial numbers, and detachable features that distinguish legal from illegal guns. And competition is limited because sellers who are wary of possible undercover purchases by law enforcement agencies prefer to limit "off-the-books" sales either to persons known or personally referred to them, or to settings such as gun shows and streets away from home, where they themselves can remain anonymous.

In general, ineligible purchasers face premium prices some 3 to 5 times legal retail prices.[6] Moreover, geographic differentials persist that make interstate arbitrage, or trafficking, profitable from "loose regulation" states to "tight regulation" states. Among the banned assault weapons, for example, Cook et al. (1995, p.72, note 56) report TEC-9s with an advertised 1991 price of $200 in the Ohio legal retail market selling for $500 on the streets of Philadelphia. By 1995, they report a legal North Carolina price of $300 compared to a street price of $1,000 in New York City. In 1992 interviews with Roth (1992), local and state police officers reported even higher premiums in secondary submarkets in which ineligible purchasers bartered drugs for guns: prices in terms of the street value of drugs reportedly exceeded street cash prices by a factor of about 5.

The attraction that the higher premiums hold for FFLs as sellers has been noted by both researchers and market participants. Cook et al. (1995, p.72) note that licensed dealers willing to sell to ineligible purchasers or without Federal paperwork offer buyers the combined advantages of the primary and secondary markets: "they have the ability to choose any new gun in the catalog, but without the paperwork, delays, fees, and restrictions on who can buy." Their data raise the possibility that up to 78 percent of FFLs in the Raleigh/Durham/Chapel Hill area of North Carolina may operate primarily or exclusively in secondary markets, since 40 percent had not given BATF a business name on their application, and an additional 38 percent provided "business" numbers that turned out to be home numbers (Cook et al., 1995:75). They note the consistency of their findings with a national estimate by the Violence Policy Center (1992 — More Gun Dealers than Gas Stations) that 80 percent of dealers nationwide do not have storefront retail firearms businesses. Jacobs and Potter (1995, p.106) note that because resource constraints have restricted BATF inspections to storefronts, dealers without storefronts may operate without regard to the Brady Act requirements, or presumably to other requirements as well.

The opportunities for FFLs, whether operating from storefronts or not, to sell firearms in both the primary and secondary markets, were colorfully described in the 1993 statement of the National Alliance of Stocking Gun Dealers (NASGD) to the House and Senate Judiciary Committees regarding Subtitle C. After noting the substantial price premium for selling guns directly felons to and others on the street, the statement continues:

> Should you feel a little queasy about the late night hours and the face-to-face negotiations with the street folk, then you can become a "gun-show cowboy." Simply drive by your friendly "distributor"..., load up 250 handguns, and hit the weekend circuit of gun shows...If you choose

---

[6] There are exceptions. Guns fired in crimes may sell at substantial discounts on the street because ballistic "fingerprints" may incriminate the subsequent owner. Drug addicts who find and steal guns during burglaries may sell or trade them for drugs at prices far below market.

16

Exhibit 4
Page 00196

to do the "cash and carry" routine then you will command higher prices than those who insist on selling lawfully with all the attendant ID and paperwork. However, since you will most probably be selling at gun shows in states other than where you are licensed, it is unlawful for you to sell and deliver on the spot, so you will not want to identify yourself either. Attendees (purchasers) at gun shows include the entire spectrum of the criminal element — felons, gangs who don't have their own armorers, underage youth, buyers for underage youth, multistate gun runners and such...Though the gun show cowboy won't achieve quite as high a profit as the street seller, he can sell in very high volume and easily earn the same dollar amount and feel a lot safer. (NASGD, 1993:2-3).

Pierce et al. (1995) made an initial effort to investigate the extent and distribution of FFLs' transactions in secondary submarkets through which firearms flow to criminal uses. Using the automated Firearms Tracing System (FTS) recently developed by BATF's National Tracing Center, they explored several covariates of the distribution of traces in which a given FFL holder is named. They reported the highest mean number of traces for dealers in Maryland, Vermont, and Virginia. Other cross-tabulations indicated that currently active dealers operating at the addresses previously used by out-of-business dealers were more likely than average to be named in traces, which suggests that dealers who are active in secondary markets tend to reapply for licenses under new names. Finally, they reported a very high concentration of dealers in trace requests. While 91.6 percent of the dealers in the FTS database had never been named in a trace, 2,133 dealers, 0.8 percent of the total, had been named in 10 or more traces. Together, they were named in 65.7 percent of all traces conducted. An even smaller handful of 145 dealers' names surfaced in 30,850 traces — 25.5 percent of the entire trace database. These findings indicated that the channels through which guns flow from FFLs to criminal users are more heavily concentrated than previously recognized.

The channels described above through which firearms flow from licensed dealers (FFLs) and eligible purchasers to ineligible purchasers vary in terms of visibility.[7] In primary markets, ineligible purchasers may buy guns from FFLs using fake identification themselves or using "straw purchasers" (eligible buyers acting as agents for ineligible buyers, unbeknownst to the FFL). In Cook and Leitzel's (1996) terminology, these are "formal" transactions that create official records, but the records do not identify the actual consumer.

We use the term "leakage" to designate channels through which guns flow from legal primary and secondary markets to ineligible purchasers. No leakage channel creates valid sales records; however, at least since 1994, all are likely to generate stolen gun reports to BATF. Ineligible purchasers may buy guns informally (i.e., without paperwork) from unethical FFLs at gun shows or through "street" or "back door" sales. To prevent informal sales from creating discrepancies between actual inventories and the acquisition/disposition records, the FFL may report them as stolen. Such transactions are indistinguishable from actual thefts, the other leakage channel.

Guns may also leak from eligible non-FFL gun owners to ineligible owners through direct sales on the street or at gun shows, or through thefts. While non-FFL owners are not required to record sales or transfers of their guns, they may also wish to report a gun that they sell to an ineligible purchaser as stolen if they suspect it may be recovered in a future crime. Therefore, leakage in secondary markets may also be reflected in theft reports.

---

[7] While the law presumes ineligible purchasers to be more likely than eligible purchasers to use guns during crimes, eligible purchasers have, in fact, committed viable crimes with large-capacity firearms.

17

Exhibit 4
Page 00197

ER_2389

# 3.    ANALYSIS PLAN

Subtitle A of Title XI banned the manufacture, transfer, and possession of assault weapons and large-capacity magazines. We hypothesized that the ban would produce direct effects in the primary markets for these weapons, that related indirect effects in secondary markets would reduce the frequency of their criminal use, and that the decrease in use would reduce such consequences as gun homicides, especially incidents involving multiple victims, multiple wounds, and killings of law enforcement officers. In this chapter, we explain our general strategy testing these hypotheses.

## 3.1.   POTENTIAL BAN EFFECTS

Figure 3-1 displays the ban effects that we hypothesized and the measures that we used to test those effects. As shown there, we anticipated potential effects on primary and secondary markets for the banned guns and magazines, potential reductions in their use in crime, and subsequent reductions in the consequences of criminal use. Although the available measures of any single effect are problematic, the problems differ by measure. Therefore, our approach was to conduct several small studies, each subject to different error sources, and then to integrate the findings of the separate studies.

As shown in Figure 3-1, the **market effects** of interest included indicators of price, production, and "leakage" between primary and secondary markets. If the Subtitle A bans are to be effective in reducing criminal uses of the banned weapons and magazines, they must increase the prices of those items. Our **price** indicators were collected for banned guns, selected legal substitutes, large-capacity magazines, and, as comparison groups, comparable guns that should not have been directly affected by the ban. The data were the nationally advertised prices of distributors who ran display ads in *Shotgun News* continuously from January 1992 through mid-1996. Because these distributors sell guns simultaneously at the wholesale and retail levels, and because primary-market retail margins are small, we believe these prices offer a useful index of primary-market prices. We used hedonic price analysis to study trends. Annual **production** data were obtained from the Violence Policy Research Project, an organization that compiles BATF manufacturing data. We lacked post-ban data because release of the production statistics is delayed two years by law. Also, we had to make certain approximations because production statistics are not reported for specific models. Therefore, findings from our tabular analyses of production are less complete and more tentative than those about price. Finally, as discussed in Section 3.2, we defined **"leakage"** as the transfer of firearms to ineligible purchasers from licensed dealers and eligible purchasers. Because we argued there that leakage is likely to generate theft reports (either because the guns were transferred by theft or because a false theft report was used to conceal a sale to an ineligible purchaser), we measured leakage using counts of stolen gun reports to the FBI's National Crime Information Center (NCIC).

Our primary indicator of assault weapon **use in crime** is the volume of requests for BATF traces of guns recovered in crime. **Trace request** data have the advantage of providing a national picture, and they allow us to focus on two of the Congressional priorities for this study, violent crime and drug trafficking crime. They require special caution in interpretation, however, since trace requests are a small and unrepresentative sample of guns recovered in crime. We believe that our tabular analyses provide a defensible estimate of the short-term effects of Title XI on criminal use of the banned weapons. We attempted to supplement the national analysis with analyses of **local trends in recovered assault weapons** in representative samples of recovered guns from a number of law enforcement agencies, but could obtain the necessary data for only a few cities.

Exhibit 4
Page 00198

**Figure 3-1.   Logic model for *Public Safety and Recreational Firearms Use Protection Act* impact study**



Finally, as shown in Figure 3-1, we used four indicators of the **consequences** of criminal use of assault weapons and semiautomatic weapons with large-capacity magazines: total gun murders by state, victims per criminal event involving gun murder, entry wounds per gunshot wound victim, and law enforcement officers killed in action. While these indicators all have logical relationships to use of the banned items, all have difficulties. Total gun murders is an insensitive indicator because attacks with assault weapons and other semiautomatics with large-capacity magazines account for only a fraction of all murders. Other consequences such as victims per event and wounds per victim are more specific to the banned weapons and magazines, as supporters argued during the ban debates, and assault weapons are more disproportionately used in killings of law enforcement officers than in other murders. However, available databases for measuring those impacts are difficult to analyze because they contain such small numbers of cases. And, for all the indicators, the existence of only one full post-ban year in available data may make the estimates too imprecise to discern short-run impacts even if they are large enough to be of policy interest. As a result, our findings about ban effects on consequences are especially tentative.

We anticipated that market effects during the short-term period allowed for this study would be heavily influenced by expectations. Enactment of the ban was preceded by extensive publicity and debate, which afforded time for manufacturers, distributors, retailers, and collectors to speculate that the firearms being considered for ban coverage would eventually become expensive collectors' items. Analogous experience from 1989 seemed instructive, because that year saw both a Federal ban on importation of assault rifles and a California ban analogous to Title XI. During the three months leading up to the importation ban, import license requests for assault rifles, which had numbered 40,000 in 1987 and 44,000 in 1988, swelled 10-fold to an annual rate of 456,000 (AMA Council, 1992). It is not clear how rapidly the import surge flowed through the distribution chain from importers to consumers in the primary and secondary markets. Yet six months later, during the period leading up to a California ban and sentence enhancement, several police agencies reported sharp <u>decreases</u> in criminal use of assault rifles. At the time, observers attributed this seeming paradox to advance publicity that may have left the misimpression that the ban took effect when enacted, judicial anticipation of the enhancements in setting bond and imposing sentence, tips to police from law-abiding gun dealers sensitive to the criminal gun use that motivated the ban, and owners' reluctance to risk confiscation for misuse of their assault weapons, which had become more valuable in anticipation of the ban (Mathews, 1989). However, it is equally plausible that the speculative price increases for the banned weapons in formal markets at least temporarily bid assault weapons

Exhibit 4
Page 00199

away from ineligible purchasers who would more probably have used them in crimes (Cook and Leitzel, 1996).[8]
Whether these short-run conditions would hold for the long run would depend on the extent to which grandfathered
guns in the banned categories leaked into secondary markets over time through gun shows, "back door" sales, and
thefts.

   Therefore, our objectives became to estimate ban-related effects on price, supply responses, and leakage
from formal to informal markets; to estimate how these market effects influenced criminal assault weapon use;
and to estimate trends in the consequences of that use. In accordance with the statutory study requirement, we
placed special emphasis on the use of assault weapons in violent crime and drug trafficking crime wherever
available data permitted.

## 3.2.  GENERAL DESIGN STRATEGY

   Our general design strategies are to test whether the assault weapon and magazine bans interrupted trends
over time in the outcome measures listed above. A variety of techniques exist for this general problem. They
differ in terms of desirable qualities such as statistical power, robustness against various threats to the validity of
findings, and precision; unfortunately, the techniques with more desirable properties are generally more
demanding in terms of data requirements. Because of different data constraints, we employed a variety of
methods, including various forms of time series and multiple regression analysis (i.e., pooled, cross-sectional time
series analysis, hedonic price analysis, and Box-Jenkins interrupted time series models), simple before and after
comparisons, and graphical displays. As a result, our conclusions about some measures are stronger than about
others.

   Because we anticipated these circumstances, our approach to the Congressional mandate was to conduct a
number of small-scale analyses of more-or-less readily available data, then to synthesize the results into our best
judgment concerning the impacts of Title XI.[9] We carried out three kinds of analyses of market effects:

- Hedonic price analyses of 1992–96 primary-market price trends for banned semiautomatic firearms,
  comparable unbanned firearms, and large-capacity magazines, using national distributors' prices;

- Tabular analyses of gun production data through 1994, the latest available year;

- Pre-ban/post-ban comparisons and time series analyses of 1992–96 trends in "leakage" to illegal markets,
  as measured by guns reported stolen to FBI/NCIC.

We carried out two kinds of analyses of assault weapon use:

- Graphical and tabular analyses of 1992–96 trends in requests for BATF traces of assault weapons
  recovered in crime, in both absolute terms and as a percentage of all requests;

---

[8] While unbanned, widely available, inexpensive semiautomatic pistols made by Lorcin, Davis, and other
manufacturers are good (and perhaps superior) substitutes for the banned assault weapons in most criminal uses, they are not
substitutes for speculative purposes.

[9] During the project, we abandoned early plans for several additional impact studies that we had contemplated. It
proved impossible to analyze trends in enforcement of the ban because of the small numbers of matters referred to U.S.
Attorneys and cases filed in U.S. District Court. We were forced to abandon plans to measure secondary-market prices of
banned weapons from classified advertisements for two reasons: back issues of consumer classifieds proved unavailable, and
the ads describe the weapons too imprecisely for consistent classification. Finally, we dropped plans to analyze multi-city
assault weapon use data from the gun module of the Drug Use Forecasting (DUF) program for two reasons. Data exist only for
the post-ban period, and we had concerns about the validity of respondents' reports of assault weapon ownership and use.

Exhibit 4
Page 00200

- Pre-ban/post-ban comparisons and time series analyses of 1992–96 trends in counts of guns recovered in crime by selected local law enforcement agencies.

We carried out the following analyses of the consequences of using assault weapons and semiautomatics with large-capacity magazines in crime:

- An analysis of state-level time-series data on gun murders which controls for potential influences of legal, demographic, and criminological importance;

- Pre-ban/post-ban comparisons and time series analyses of 1980–95 trends in victims per gun-homicide incident as measured nationally from Supplementary Homicide Reports;

- Descriptive analysis of the use of assault weapons in mass murders in the U.S. from 1992-present (see Appendix A);

- Graphical analyses and pre-ban/post-ban comparisons of 1992–96 trends in the number of wounds per gunshot victim using medical data from medical examiners and one hospital emergency department in selected cities, following Webster et al. (1992) and McGonigal et al. (1993);

- A tabular analysis of 1992–96 trends in law enforcement officers killed in action (LEOKA) with assault weapons.

### *3.2.1.   Threats to Validity and Use of Comparison Groups*

The validity of the techniques we applied depends on comparisons of trends between meaningful treatment and comparison groups, and we used two approaches to defining comparison groups. In general, to estimate ban effects on markets and uses, we compared trends between types of guns and magazines that were differentially affected by the ban. To estimate effects on the consequences of assault weapon use, we used pre-existing state-level bans on assault weapons and juvenile handgun possession to define comparison groups, because we assumed that such laws would attenuate the effects of the Federal ban.[10]

Table 3-1 describes our general classification scheme for types of guns affected by the ban and the corresponding comparison groups.[11] The comparisons are not always precise, and, as later chapters will make clear, they differ from measure to measure depending on the gun descriptors used in available databases.

---

[10] Although in theory, comparisons of markets and uses could be made simultaneously by weapon and jurisdiction, the disaggregation often leaves too little data for meaningful analysis.

[11] To be considered a potential comparison gun, we had to have at least anecdotal evidence that it had appeal beyond the community of sportsmen and collectors and/or evidence that it was among the 50 guns most commonly submitted for BATF traces. Without that constraint, it would have been unreasonable to consider it as being functionally similar to any banned gun, and data on prices and uses would have involved numbers too small to analyze. The trade-off is that the comparison guns may well have been subject to indirect substitution effects from the ban.

21

Exhibit 4
Page 00201

Table 3-1.    Banned weapons and examples of unbanned comparison weapons

| *Banned weapon* | *Examples of Comparison weapon* |
|---|---|
| Named Domestic Assault Pistols | |
| -SWD M-10, M-11, M-11/9, M-12, exact copies under other names, legal substitutes<br>-TEC-9, TEC-DC9,TEC-22, exact copies by AA Arms, legal substitutes | -Lorcin, Davis semiautomatic pistols (less expensive)<br>-Glock, Ruger semiautomatic pistols (more expensive) |
| Named Domestic Assault Rifles | |
| -Colt AR-15, exact copies and legal substitutes | -Ruger Mini-14 (unbanned domestic)<br>-Maadi (legal import) |
| Named Foreign Assault Weapons | |
| -UZI carbines and pistols<br>-AK models | -SKS (recently restricted, widely available import) |
| "Features Test" Guns | |
| Calico Light Weapons pistols and rifles<br>Feather rifles | See pistols and rifles above. |
| Rare Banned Weapons | |
| Beretta Ar-70, FN models, Steyr AUG, revolving cylinder shotguns | No comparisons defined. |

Of the banned weapons named in Table 3-1, the named domestic assault pistols are of greatest interest because they are more widely used in crime than rifles. We used two categories of pistols as comparison groups: the cheap small-caliber pistols by Lorcin and Davis that are among the most widely used guns in crime, and the more expensive Glock and Ruger pistols. The Glock and Ruger models took on additional significance by serving as indicators of non-banned handguns capable of accepting large-capacity magazines. For the AR-15 family of assault rifles, we used the Ruger Mini-14, SKS, and/or Maadi rifles in various comparisons. All are legally and widely available.

We performed relatively few comparative analyses of named foreign assault weapons, the UZI, Galil, and AK weapons, because the 1989 import ban limited their availability during our observation period, and their legal status was unchanged by the Title XI ban. Nevertheless, because these guns remain in criminal use, we performed price analyses for their large-capacity magazines, which are also widely available from foreign military surplus. The SKS semiautomatic rifle, which was imported from China and Russia in fairly large numbers[12] until recently, served as an unbanned comparison weapon for the banned foreign rifles. We carried out no analyses concerning the rarest assault weapons shown in Table 3-1.

Because few available databases relate the consequences of assault weapon use to the make and model of weapon, most of our analyses of consequences are based on treatment and comparison jurisdictions defined in terms of their legal environments. Four states — California, Connecticut, Hawaii, and New Jersey — already

---

[12] Although a 1994 ban on Chinese imports of many goods including firearms nominally covered SKS rifles, large numbers continued to enter the country under Craig Amendment exemptions for goods already "on the water" at the time of the import ban.

22

Exhibit 4
Page 00202

ER_2394

banned assault weapons before the Federal ban was enacted. Although state bans can be circumvented by interstate traffickers, we hypothesized that their existence would reduce the effects of the Federal ban in their respective states.

The following chapters report findings of the analyses described here. Each chapter also explains in detail the tailoring of this general analysis plan to data constraints associated with each comparison.

Exhibit 4
Page 00203

**ER_2395**

# 4.   GUN AND MAGAZINE MARKET EFFECTS

The discussion of gun markets in Chapter 2 led us to several hypotheses. First, assuming that the primary and secondary markets were in equilibrium before Congress took up serious discussion of a ban on assault weapons and large-capacity magazines, we hypothesized that the opening of debate would stimulate speculative demand for the banned guns and magazines, leading to price increases in primary markets well in advance of the effective date of the ban. Second, we hypothesized that for the makes and models of assault weapons whose prices increased, quantities produced would also increase before the ban took effect. These "grandfathered guns" were exempted from the ban.

Having been advised by a gun market expert[13] that legal substitutes for many of the banned weapons appeared in primary markets around the effective date of the ban, it seemed doubtful that the speculative pre-ban price increases could hold under the combined weight of stockpiled grandfathered guns and the flows of new legal substitute models. Therefore, our third hypothesis was that the post-ban prices of banned guns and their legal substitutes would return to their pre-debate equilibrium levels.

We presumed that assault weapons and large-capacity magazines are economic complements, so that, like bread and butter, an increase in the supply of either one should decrease its price and increase the price of the other. Therefore, our fourth hypothesis was that, for the oversupplied assault weapons and legal substitutes whose prices fell from their speculative peaks, their magazine prices[14] should rise over time, as the stock of grandfathered magazines dwindled.

Finally, we believed that for banned makes and models whose prices experienced a speculative price bubble around the time of the ban and then returned to pre-ban levels, speculative demand would fall eventually in both primary and secondary markets as expectations receded for a price "rebound" in primary markets. In contrast, demand by ineligible purchasers intending to use the banned weapons in crime should be relatively unaffected. Therefore, at least in the short run, relative prices should rise in secondary markets, where such "crime demand" is concentrated. We could not directly observe secondary-market prices. However, a price rise in secondary relative to primary markets should cause increased "leakage" to secondary markets, reflected in rising theft reports of assault weapons during post-ban periods of low prices in primary markets.

The following sections report the methods we used to test these hypotheses about market effects of the ban, and our findings.

## 4.1.   FINDINGS OF PRICE ANALYSIS

### 4.1.1.   Collection of Price Data

To test our hypotheses about price trends, we sought to approximate the prices at which the banned items could be legally purchased throughout the country. After considering available data sources, we decided that monthly data would be sufficient and that the distributors' prices advertised in national publications would offer a

---

[13] William R. Bridgewater, personal communication, September 1995.

[14] Magazines are make and model-specific, so that in general a magazine made for a specific rifle will not fit other rifles. However, a magazine made for a banned assault rifle like the Colt AR-15 will fit an exact copy like the Olympic Arms AR-15 and a legal substitute like the Colt AR-15 Sporter, which has the same receiver.

24

Exhibit 4
Page 00204

suitable index. Those prices are available to any FFL, and, as discussed in Chapter 2, primary-market FFLs generally re-sell within 15 percent of the distributors' price.

To collect the necessary data, we developed two forms. The first was designed to collect data on base price and accessorized price on 47 makes and models of guns. These included all guns named in Subtitle A along with selected legal substitutes and functional substitutes (e.g., low-capacity semiautomatic pistols that are commonly used in crimes). The second form recorded make, model, capacity, and price of any advertised large-capacity magazines. Both forms also recorded the distributors' names and, for verification purposes, a citation to the location of the advertisements.

We selected twelve gun and magazine distributors that had display ads on a monthly basis in *Shotgun News* throughout the entire period from April 1992 through June 1996. This period was selected to permit observation of rumored "Clinton election" price effects (i.e., increased speculative demand based on concern over possible new gun controls under a Democratic administration) as well as the entire period of debate over Subtitle XI and as long a post-ban period as possible. Display ad prices were coded on a monthly basis throughout the period except immediately around the ban, from August 1994 to October 1994, when prices were coded on a weekly basis to maximize statistical power during the period when we expected the largest price variances. The Shotgun News issue to be coded for each month was selected randomly, to avoid any biases that might have occurred if a particular part of the month was coded throughout the period. The number of advertised-price observations for any given gun varied from month to month over the period, as distributors chose to feature different makes and models. The number of price observations for a given make and model bears an unknown relationship to the number of transactions occurring at that price. The advertised prices should be considered approximations for at least three reasons. Advertised prices simultaneously represent wholesale prices to retail dealers and retail prices to "convenience dealers" who hold licenses primarily to receive guns for personal use by mail from out-of-state sources. There is anecdotal evidence of discounts from advertised prices for purchases in large quantities or by long-time friends of the distributors. Finally, the ads did not permit us to accurately record such price-relevant features as finish, included gun cases, and included magazines.

### *4.1.2.  Analysis*

Price trends for a number of firearms and large-capacity magazines were analyzed using hedonic price analysis (Berndt 1990, pp.102-149; also see Chow 1967). This form of analysis examines changes over time in the price of a product while controlling for changes over time in the characteristics (i.e., quality) of the product. Hedonic analysis employs a model of the form:

$$Y = a + b * X + c_1 * T_1 + \ldots c_n * T_n + e$$

where Y is the logarithmic price of the product, X represents one or more quality characteristics affecting the price of the product, $T_1$ through $T_n$ are dummy variables for the time periods of interest, a is an intercept term, and e is an error term with standard properties. The coefficients $c_1$ through $c_n$ provide quality-adjusted estimates of changes over time in the price of the product.

In the analysis that follows, all price data were first divided by quarterly values of the gross domestic product price deflator as provided in *Economic Indicators* (August 1996). This quantity was then logged. In all models, we have omitted the time dummy for the period when the ban went into effect. Thus, the time coefficients are interpreted relative to the prices at the time of ban implementation. Because the outcome variable is logged, the coefficients on the time period indicators can be interpreted as multiplier effects (we illustrate this in more

Exhibit 4
Page 00205

**ER_2397**

detail below). Whenever possible, we examined quarterly price trends. In a number of instances, however, sample size considerations required us to use semi-annual or annual periods.

Our quality variables correspond to factors such as manufacturer, model, distributor, and, in some cases, weapon caliber. In addition, some of the models include an indicator variable denoting whether the firearm had special features or enhancements or was a special edition of any sort.[15] We have used these variables as proxy variables for quality characteristics in the absence of more detailed measures of weapon characteristics. Further, we cannot fully account for the meaning of significant distributor effects. Distributor effects may represent unmeasured quality differentials in the merchandise of different distributors, or they may represent other differences in stock volume or selling or service practices between the distributors.[16] Nevertheless, we included distributor because it was often a significant predictor of price. Thus, our models provide price trends after controlling for the mix of products and distributors advertised during each time period. Finally, the models presented below are parsimonious models in which we have retained only those quality indicators which proved meaningful in preliminary analyses.[17]

### 4.1.2.1.   Gun Prices

For the analysis of firearm prices, we chose groups of weapons based on both theoretical importance and data availability (a number of the guns included on our coding form appeared infrequently in the ads examined by project staff). We examined price trends in banned assault pistols and compared them to price trends for unbanned semiautomatic handguns commonly used in crime. In addition, we analyzed the price trend for the banned AR-15 assault rifle and its variations and compared it to trends for a number of similar semiautomatic rifles not subject to the ban.

Our findings for handguns were consistent with our hypotheses. For the banned SWD group of assault pistols, the average advertised price peaked at the time the ban took effect, having risen from 68 percent of the peak a year earlier; within a year, the mean price fell to about 79 percent of peak. In contrast, advertised prices of unbanned Davis and Lorcin semiautomatic pistols commonly used in crime were essentially constant over the entire period.

Rifle price trends were only partially consistent with our hypotheses. For semiautomatic rifles, prices of both the banned AR-15 family of assault rifles and a comparison group of unbanned semiautomatic rifles showed evidence of speculative peaks around the time the ban took effect, followed by a decrease to approximately pre-speculation levels.

We interpret these findings as evidence of substantial speculative pre-ban demand for guns that were expected to be banned as assault weapons, while the underlying primary market for guns more commonly used in crime remained stable. While no plausible definition of assault weapon was ever likely to include the Davis and

---

[15] We note, however, that recording special features of the weapons was a secondary priority in the data collection effort; for this reason, and because the ads do not follow a consistent format, this information may not have been recorded as consistently as other data elements.

[16] We have heard speculations but have no evidence that distributors' prices for a given quantity of a specific gun may be inversely related to the rigor of their verification of purchasers' eligibility.

[17] We eliminated control variables that had t values less than one in absolute value. This generally improved the standard errors for the coefficients of interest (i.e., the coefficients for the time period indicators).

Exhibit 4
Page 00206

Lorcin pistols, Lenett (1995) describes considerable uncertainty during the Crime Act debate over precisely which rifles were to be covered.

   *Assault pistols*:  The analysis of assault pistol prices focused on the family of SWD M10/M11/M11-9/M12 weapons.[18] [19]   Our coders did not find enough ads for these weapons to conduct a quarterly price trend analysis; therefore, we examined semi-annual prices.  Results are shown in Table 4-1.  In general, the M10, M11, and M11/9 models were significantly more expensive than the M12 model and the new PM11 and PM12 models. Models with the Cobray trademark name had lower prices, while weapons made in .380 caliber commanded higher prices.  Finally, two distributors selling these weapons had significantly lower prices than did the other distributors.

---

[18] Over the years, this class of weapons has been manufactured under a number of different names (i.e., Military Armaments Corp., RPB Industries, Cobray, SWD, and FMJ).

[19] Initially, we had also wished to analyze the prices of banned Intratec weapons and their copies.  However, project staff found few ads for these guns among the chosen distributors, particularly in the years prior to the ban's implementation.

Exhibit 4
Page 00207

ER_2399

Table 4-1.  Regression of SWD handgun prices on time indicators, controlling for product characteristics and distributors

| Analysis of Variance | | | | | |
|---|---|---|---|---|---|
| Source | DF | Sum of squares | Mean square | F value | Prob>F |
| Model | 16 | 16.26086 | 1.01630 | 13.376 | 0.0001 |
| Error | 132 | 10.02900 | 0.07598 | | |
| C Total | 148 | 26.28986 | | | |

| | | | | | |
|---|---|---|---|---|---|
| Root MSE | | 0.27564 | | R–square | 0.6185 |
| Dep Mean | | 0.87282 | | Adj R–square | 0.5723 |

| Parameter Estimates | | | | | |
|---|---|---|---|---|---|
| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>|T| |
| INTERCEP | 1 | 1.00876 | 0.073205 | 13.78 | 0.0001 |
| T1 | 1 | -0.17097 | 0.130798 | -1.307 | 0.1935 |
| T2 | 1 | -0.29236 | 0.109943 | -2.659 | 0.0088 |
| T3 | 1 | -0.26949 | 0.078477 | -3.434 | 0.0008 |
| T4 | 1 | -0.38309 | 0.086909 | -4.408 | 0.0001 |
| T5 | 1 | -0.1881 | 0.12957 | -1.452 | 0.1489 |
| T7 | 1 | -0.04368 | 0.076185 | -0.573 | 0.5674 |
| T8 | 1 | -0.23376 | 0.108602 | -2.152 | 0.0332 |
| T9 | 1 | 0.108787 | 0.205848 | 0.528 | 0.5981 |
| CAL380 | 1 | 0.200609 | 0.06946 | 2.888 | 0.0045 |
| DIST 3 | 1 | -0.26216 | 0.128954 | -2.033 | 0.0441 |
| DIST 5 | 1 | 0.331378 | 0.224065 | 1.479 | 0.1415 |
| DIST 6 | 1 | -0.18987 | 0.059367 | -3.198 | 0.0017 |
| COBRAY | 1 | -0.18832 | 0.053756 | -3.503 | 0.0006 |
| M10 | 1 | 0.771313 | 0.131932 | 5.846 | 0.0001 |
| M11 | 1 | 0.308675 | 0.057351 | 5.382 | 0.0001 |
| M119 | 1 | 0.110174 | 0.077347 | 1.424 | 0.1567 |

The coefficients for the time indicator variables provide quality-adjusted price trends. The time indicator t6 has been omitted from the equation.[20] This indicator corresponds to the period of July 1994 through December 1994 which encompasses the ban implementation date of September 13, 1994. The coefficients on the time dummy variables are all negative and most are significant, indicating that prices for these weapons were at their highest during the six month period when the ban took effect. To interpret the time variables, we exponentiate the coefficients (i.e., take their antilogs). To illustrate, the coefficient for the first time period (January 1992 through June 1992) is -0.170966.[21] Exponentiating this coefficient yields approximately 0.84, indicating that the average price of these weapons at time 1 (January 1992 through June 1992) was 84 percent of the average price at time 6

---

[20] In this and all other price analyses, time dummies are defined to omit the time period that includes the effective date of the ban. This restricts the coefficient to 0 and exp(0) = 1. Therefore, the effective date is the reference period for prices in all other periods.

[21] Data collection began with April 1992 issues of Shotgun News. Consequently, the first data point is based on data for April through June of 1992 rather than a full six-month period.

Exhibit 4
Page 00208

ER_2400

(July 1994 through December 1994). Conversely, the average quality-adjusted price of these firearms was 17 percent less during the January 1992-June 1992 period than during the July 1994-December 1994 period.

Figure 4-1.    Semi-annual price trends for SWD group handguns



The time effects are displayed graphically in Figure 4-1 (sample sizes are shown for each time period).[22] During the semi-annual periods prior to the ban's implementation, prices of these weapons ranged from 68 to 83 percent of their price during the period of the ban's implementation. Prices peaked when the ban became effective in the latter part of 1994 and remained high through the first half of 1995. In the second half of 1995, however, the prices dropped off dramatically, falling to levels comparable to the pre-ban period. Prices may have rebounded again during the first half of 1996, but the apparent "rebound" was based on only two advertisements and should be treated very cautiously. If one assumes that wholesale markets were in equilibrium before debates about the ban started, then these data reflect a ban-related, speculative peak of up to 47 percent in price, followed by a decline of about 20 percent. Parenthetically, we note that contrary to some anecdotes, we found no evidence of speculation related to the 1992 election.

_Comparison handguns_: For comparison, we also examined price trends for a number of unbanned semiautomatic handgun models: the Davis P32 and P380 and the Lorcin L25 and L380. By a number of accounts, these models are among the guns most frequently used in crime (BATF 1995; Kennedy et al. 1996; Wintemute 1994, Chapter 2 _supra_). Because of small sample size, this model was estimated using semi-annual data spanning from 1992 through 1995. Referring to Table 4-2, two of the handgun models were significantly less expensive than the others, and one distributor offered statistically significant discounts for these guns.

---

[22] Sample sizes are defined in terms of number of price observations available during the period. The number of transactions that took place at each recorded price is, of course, unavailable to us.

Table 4-2.  Regression of Lorcin and Davis handgun prices on time indicators, controlling for product characteristics and distributors

| Analysis of Variance | | | | | |
|---|---|---|---|---|---|
| Source | DF | Sum of squares | Mean square | F value | Prob>F |
| Model | 11 | 3.60246 | 0.32750 | 30.678 | 0.0001 |
| Error | 81 | 0.86469 | 0.01068 | | |
| C Total | 92 | 4.46716 | | | |

| | | | | | |
|---|---|---|---|---|---|
| Root MSE | | 0.10332 | | R–square | 0.8064 |
| Dep Mean | | -0.60396 | | Adj R–square | 0.7801 |
| C.V. | | -17.10713 | | | |

| Parameter Estimates | | | | | |
|---|---|---|---|---|---|
| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>|T| |
| INTERCEP | 1 | -0.44243 | 0.034043 | -12.996 | 0.0001 |
| T1 | 1 | -0.03004 | 0.069877 | -0.43 | 0.6684 |
| T2 | 1 | 0.014817 | 0.040258 | 0.368 | 0.7138 |
| T3 | 1 | -0.0198 | 0.037239 | -0.532 | 0.5964 |
| T4 | 1 | -0.00259 | 0.082314 | -0.031 | 0.975 |
| T5 | 1 | -0.03162 | 0.048582 | -0.651 | 0.517 |
| T7 | 1 | -0.02753 | 0.048576 | -0.567 | 0.5724 |
| T8 | 1 | -0.05041 | 0.082314 | -0.612 | 0.542 |
| P32 | 1 | -0.22559 | 0.033404 | -6.753 | 0.0001 |
| L25 | 1 | -0.55562 | 0.034119 | -16.285 | 0.0001 |
| DIST 2 | 1 | -0.06434 | 0.030256 | -2.127 | 0.0365 |
| DIST 6 | 1 | -0.05723 | 0.042414 | -1.349 | 0.181 |

The time period coefficients indicate that prices for these weapons were unaffected by the assault weapons ban.  Most of the time dummies have negative signs, but their t score values are very small, indicating that prices during these periods did not differ meaningfully from those at the time when the ban was implemented. This is underscored graphically in Figure 4-2.

Exhibit 4
Page 00210

ER_2402

Figure 4-2.    Semi-annual price trends for handguns commonly used in crime



Jan-Jun 92 quarter contains data for April through June only; no 1996 observations

*Assault rifles*: To investigate the ban's effect on assault rifle prices, we examined quarterly price trends for the Colt AR15 family, which includes the AR15 as well as Colt's Sporter, H-Bar, and Target models.[23] Referring to Table 4-3, the AR15 model was more expensive than other models. Further, guns which had special features/enhancements or a special designation of some sort had somewhat higher prices. Models in 7.62mm caliber were lower in price than other models, though this effect was not quite statistically significant. Finally, one distributor stood out as having lower prices than other distributors.

---

[23] A number of other manufacturers also made exact copies of the Colt AR15 (e.g., Essential Arms, Olympic Arms, and SGW Enterprises). We included a number of these copies on our price coding form before the ban and legal substitutes thereafter, but we did not find advertisements for these non-Colt versions in *Shotgun News*.

31                                          Exhibit 4
                                       Page 00211

**ER_2403**

**Table 4-3.** Regression of Colt AR15 group prices on time indicators, controlling for product characteristics and distributors

### Analysis of Variance

| Source | DF | Sum of squares | Mean square | F value | Prob>F |
|--------|-----|----------------|-------------|---------|--------|
| Model | 23 | 21.67729 | 0.94249 | 18.161 | 0.0001 |
| Error | 235 | 12.19537 | 0.05190 | | |
| C Total | 258 | 33.87266 | | | |

| | | | | |
|---|---|---|---|---|
| Root MSE | 0.22781 | | R−square | 0.6400 |
| Dep Mean | 2.13335 | | Adj R−square | 0.6047 |
| C.V. | 10.67826 | | | |

### Parameter Estimates

| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>|T| |
|----------|-----|--------------------|----------------|------------------------|----------|
| INTERCEP | 1 | 2.714668 | 0.066599 | 40.762 | 0.0001 |
| Q1 | 1 | -0.52079 | 0.107749 | -4.833 | 0.0001 |
| Q2 | 1 | -0.62023 | 0.149137 | -4.159 | 0.0001 |
| Q3 | 1 | -0.62368 | 0.116786 | -5.34 | 0.0001 |
| Q4 | 1 | -0.58506 | 0.083154 | -7.036 | 0.0001 |
| Q5 | 1 | -1.54569 | 0.150793 | -10.25 | 0.0001 |
| Q6 | 1 | -0.60339 | 0.095035 | -6.349 | 0.0001 |
| Q7 | 1 | -0.68488 | 0.084707 | -8.085 | 0.0001 |
| Q8 | 1 | -0.25158 | 0.14673 | -1.715 | 0.0877 |
| Q9 | 1 | -0.14066 | 0.087217 | -1.613 | 0.1081 |
| Q11 | 1 | 0.143282 | 0.148951 | 0.962 | 0.3371 |
| Q12 | 1 | 0.059189 | 0.082263 | 0.72 | 0.4725 |
| Q13 | 1 | -0.18904 | 0.07715 | -2.45 | 0.015 |
| Q14 | 1 | -0.3144 | 0.075984 | -4.138 | 0.0001 |
| Q15 | 1 | -0.46528 | 0.069595 | -6.686 | 0.0001 |
| Q16 | 1 | -0.33741 | 0.079461 | -4.246 | 0.0001 |
| Q17 | 1 | -0.40788 | 0.093078 | -4.382 | 0.0001 |
| DIST 5 | 1 | -0.16586 | 0.044717 | -3.709 | 0.0003 |
| SPORTERL | 1 | -0.26691 | 0.042783 | -6.239 | 0.0001 |
| SPORTERC | 1 | -0.27709 | 0.057987 | -4.778 | 0.0001 |
| MATCH H-BAR | 1 | -0.28594 | 0.041454 | -6.898 | 0.0001 |
| TARGET | 1 | -0.30664 | 0.05565 | -5.51 | 0.0001 |
| FEATURE | 1 | 0.1039 | 0.040315 | 2.577 | 0.0106 |
| CAL762 | 1 | -0.14924 | 0.092373 | -1.616 | 0.1075 |

Turning to the quarterly indicator variables, the omitted period is quarter ten (July 1994 through September 1994). Most of the quarterly dummy variables have coefficients which are negative and significant, indicating that prices rose significantly at the time of the ban's implementation. Indeed, prices during the 1992–93 period were 41 to 79 percent lower than those at the time of the ban. The prices then began rising during 1994 and peaked during the quarter after the ban's implementation (however, prices during the latter period were not significantly different from those when the ban went into effect). These data reflect price increase of 69 to 100 percent over typical quarters during the 1992–93 period, and a 376 percent increase over the lowest price quarter during that period.

Exhibit 4
Page 00212

**ER_2404**

Quality-adjusted prices began to fall significantly during the second quarter of 1995. During the first two quarters of 1996, prices were 29 to 33 percent less than at the time of the ban.[24] These trends are illustrated in Figure 4-3.[25]

**Figure 4-3.   Quarterly price trends for Colt AR-15 and related rifles**



*Other Semiautomatic Rifles*:  A comparison price series was constructed for a small number of semiautomatic rifles not prohibited by the ban. The rifles selected for this analysis, the Ruger Mini-14 and Maadi rifles are arguably useful substitutes for the banned rifles for many purposes. The Mini-14 is a semiautomatic rifle which is relatively common among guns submitted to ATF for tracing.[26] The Maadi is an Egyptian semiautomatic rifle which is loosely patterned after the AK-47, but it is a legal gun, according to BATF experts.

---

[24] Colt has discontinued its AR15 models, but the company has continued to make post-ban, modified versions of other weapons in the AR15 family (e.g., the Sporter). We considered the possibility that the AR15 model would follow a different pre/post ban trend from the other Colt models. Based on the number of available observations, we estimated a yearly model for the AR15. Yearly prices for the AR15 followed the same basic pattern as did the entire AR15 group. Relative to 1994, prices for the AR15 were 57 percent lower in 1993 ($p<.01$), 39 percent lower in 1995 ($p=.02$), and 37 percent lower in 1996 ($p=.06$). In addition, we estimated a model containing dummy variables for the AR15 and the post-ban period and an interaction term between these dummy variables (no other time period dummies were included in the model). The interaction term was very small and insignificant, leading us to include that the price differential between the AR15 model and the other Colt models remained constant throughout the period under study.

[25] Because some quarterly estimates were based on very small numbers of advertisements, the exact values of the quarterly coefficients should be treated cautiously. Nevertheless, a semi-annual model produced the same pattern of results.

[26] Based upon figures provided by ATF, the Mini-14 ranked as the 23rd most common firearm submitted to ATF for tracing in 1992 and the 36th most common firearm submitted in 1993. The Ruger Mini-14 was also featured as a common assault weapon in an early study of assault weapons published by *Cox Newspapers* (1989). However, the Crime Act specifically exempts Mini-14's without folding stocks from assault weapons status.

Exhibit 4
Page 00213

**ER_2405**

Further, the Maadi rifle has not been affected by import restrictions as have a number of other potential substitute rifles.

Table 4-4 and Figure 4-4 present trends for prices of these rifles (N=156) measured on a quarterly basis. The Ruger Mini-14 was significantly more expensive than was the Maadi, and a number of distributors had substantially lower or higher prices for these weapons. Guns having some sort of special feature or classification were somewhat less expensive than were other weapons.

**Table 4-4.** Regression of Ruger Mini-14 and Maadi rifle prices on time indicators, controlling for product characteristics and distributors

| | | | Analysis of Variance | | |
|---|---|---|---|---|---|
| Source | DF | Sum of squares | Mean square | F value | Prob>F |
| Model | 23 | 15.72251 | 0.68359 | 12.468 | 0.0001 |
| Error | 132 | 7.23741 | 0.05483 | | |
| C Total | 155 | 22.95993 | | | |

| | | | | | |
|---|---|---|---|---|---|
| Root MSE | | 0.23416 | | R-square | 0.6848 |
| Dep Mean | | 1.11132 | | Adj R-square | 0.6299 |
| C.V. | | 21.06999 | | | |

**Parameter Estimates**

| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>\|T\| |
|---|---|---|---|---|---|
| INTERCEP | 1 | 1.348039 | 0.096025 | 14.038 | 0.0001 |
| Q1 | 1 | -0.49339 | 0.150985 | -3.268 | 0.0014 |
| Q2 | 1 | -0.28143 | 0.170394 | -1.652 | 0.101 |
| Q3 | 1 | -0.26618 | 0.145198 | -1.833 | 0.069 |
| Q4 | 1 | -0.49586 | 0.1189 | -4.17 | 0.0001 |
| Q5 | 1 | -0.60429 | 0.149813 | -4.034 | 0.0001 |
| Q6 | 1 | -0.45337 | 0.12651 | -3.584 | 0.0005 |
| Q7 | 1 | -0.50108 | 0.123093 | -4.071 | 0.0001 |
| Q8 | 1 | -0.08801 | 0.166538 | -0.528 | 0.598 |
| Q9 | 1 | -0.07736 | 0.131103 | -0.59 | 0.5561 |
| Q11 | 1 | 0.06801 | 0.139693 | 0.487 | 0.6272 |
| Q12 | 1 | -0.26056 | 0.114103 | -2.284 | 0.024 |
| Q13 | 1 | -0.55108 | 0.128193 | -4.299 | 0.0001 |
| Q14 | 1 | -0.5565 | 0.137519 | -4.047 | 0.0001 |
| Q15 | 1 | -0.61763 | 0.120067 | -5.144 | 0.0001 |
| Q16 | 1 | -0.64124 | 0.119303 | -5.375 | 0.0001 |
| Q17 | 1 | -0.73806 | 0.123765 | -5.963 | 0.0001 |
| RUGER | 1 | 0.672197 | 0.055061 | 12.208 | 0.0001 |
| DIST 2 | 1 | -0.17779 | 0.079666 | -2.232 | 0.0273 |
| DIST 3 | 1 | -0.08717 | 0.054575 | -1.597 | 0.1126 |
| DIST 4 | 1 | -1.66399 | 0.242712 | -6.856 | 0.0001 |
| DIST 5 | 1 | -0.19243 | 0.0727 | -2.647 | 0.0091 |
| DIST 7 | 1 | 0.235402 | 0.131826 | 1.786 | 0.0764 |
| FEATURES | 1 | -0.08813 | 0.047131 | -1.87 | 0.0637 |

Exhibit 4
Page 00214

**ER_2406**

Figure 4-4.   Quarterly price trends for comparison semiautomatic rifles



The temporal price trends for these weapons mirror those found for the AR15 family rifles. Relative to the period of the ban's implementation, prices were significantly lower during periods before and after the ban's implementation. During 1992 and 1993, prices ranged from 23 to 45 percent lower than during the reference period. Prices were at their highest during 1994, with the peak occurring during the quarter following the ban's effective date, reflecting an increase of 82 percent from the 1992–93 low point to the immediate post-ban period. However, prices for the first, second, and fourth quarters of 1994 were not discernibly different from those during the third quarter. Prices began to fall significantly in 1995, and by the second quarter of 1996, prices were approximately 52 percent lower than during the quarter when the ban took effect.[27]

*Alternative Comparison for Semiautomatic Rifles*: As a final test of price trends for potential substitute semiautomatic rifles, we added the SKS rifle to the semiautomatic rifles model. The SKS rifle is imported (there are Russian and Chinese versions) and is occasionally mistaken for an AK-47. The SKS was not covered by either the 1989 import ban or the Crime Act. We initially excluded it as a comparison semiautomatic rifle because importation was nominally restricted in 1994 as part of U.S. trade sanctions directed against China. However, SKS rifles have continued to enter the U.S. under the Craig Amendment exemption for goods already "on the water" when the trade sanctions were imposed. We added it to subsequent analysis because it has been relatively

---

[27] Because some of the quarterly periods yielded few observations, we also estimated a semi-annual model for these gun prices. The results of this model paralleled those of the quarterly model; prices were at their highest during the latter half of 1994 and were significantly lower throughout 1992, 1993, 1995, and early 1996.

Exhibit 4
Page 00215

**ER_2407**

common among gun traces submitted to BATF[28] and because our coders found over 550 ads for SKS rifles, making that gun the most frequently advertised weapon in *Shotgun News* from among those guns chosen for the analysis.

Results from a quarterly price trend model for 698 SKS, Ruger Mini-14, and Maadi AK-type advertisements are presented in Table 4-5 and Figure 4-5. Again, the results indicate that prices were highest during 1994 and peaked during the quarter of the ban's implementation (quarter ten). Prices during the 1992–93 period were generally 32 to 25 percent less than they were during the quarter of the ban's implementation. Following the ban, however, prices fell rather quickly, and by 1996 they were approximately 35 percent less than they had been at the time of the ban.

---

[28] Figures provided to us by BATF show that the SKS was the 10th most common firearm traced in 1992 and the 4th most common in 1993.

36

Exhibit 4
Page 00216

Table 4-5.    Regression of Ruger Mini-14, Maadi, and SKS rifle prices on time indicators, controlling for product characteristics and distributors

| | | | Analysis of Variance | | |
|---|---|---|---|---|---|
| Source | DF | Sum of squares | Mean square | F value | Prob>F |
| Model | 19 | 145.53206 | 7.65958 | 105.960 | 0.0001 |
| Error | 678 | 49.01094 | 0.07229 | | |
| C Total | 697 | 194.54300 | | | |

| | | | | |
|---|---|---|---|---|
| Root MSE | 0.26886 | | R–square | 0.7481 |
| Dep Mean | 0.32139 | | Adj R–square | 0.7410 |
| C.V. | 83.65546 | | | |

Parameter Estimates

| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>\|T\| |
|---|---|---|---|---|---|
| INTERCEP | 1 | 0.320571 | 0.037047 | 8.653 | 0.0001 |
| Q1 | 1 | -0.29288 | 0.056985 | -5.14 | 0.0001 |
| Q2 | 1 | -0.36758 | 0.060234 | -6.103 | 0.0001 |
| Q3 | 1 | -0.32732 | 0.057937 | -5.65 | 0.0001 |
| Q4 | 1 | -0.37657 | 0.056037 | -6.72 | 0.0001 |
| Q5 | 1 | -0.33581 | 0.08099 | -4.146 | 0.0001 |
| Q6 | 1 | -0.32629 | 0.051373 | -6.351 | 0.0001 |
| Q7 | 1 | -0.39266 | 0.052767 | -7.441 | 0.0001 |
| Q8 | 1 | -0.15306 | 0.060298 | -2.538 | 0.0114 |
| Q9 | 1 | -0.13647 | 0.056349 | -2.422 | 0.0157 |
| Q11 | 1 | -0.09587 | 0.056591 | -1.694 | 0.0907 |
| Q12 | 1 | -0.25553 | 0.047168 | -5.417 | 0.0001 |
| Q13 | 1 | -0.32473 | 0.053753 | -6.041 | 0.0001 |
| Q14 | 1 | -0.457 | 0.054492 | -8.387 | 0.0001 |
| Q15 | 1 | -0.32702 | 0.06053 | -5.403 | 0.0001 |
| Q16 | 1 | -0.43303 | 0.052708 | -8.216 | 0.0001 |
| Q17 | 1 | -0.42588 | 0.068581 | -6.21 | 0.0001 |
| MAADI | 1 | 0.855348 | 0.032324 | 26.462 | 0.0001 |
| RUGER | 1 | 1.363013 | 0.036904 | 36.934 | 0.0001 |
| FEATURES | 1 | 0.093431 | 0.02203 | 4.241 | 0.0001 |

Exhibit 4
Page 00217

ER_2409

**Figure 4-5.   Quarterly price trends for comparison semiautomatic rifles**



### 4.1.3.  Magazine Prices

Since the Crime Act permanently capped the stock of large-capacity magazines at the number produced before September 13, 1994, our long-run expectations about price trends for the banned magazines depend on whether or not the ban prevented increases in the supply of "compatible" guns that accept the magazine. For compatible guns whose supply continued to increase — such as the unbanned Ruger Mini-14 rifle and Glock pistols and the AR-15 family of rifles, for which legal substitutes emerged — we expect a gradual long-run increase in the price of the large-capacity magazines. Only for compatible guns such as Uzi models, whose supply was capped because legal substitutes did not emerge, do we expect stable or declining long-run magazine prices as the operational stock of banned guns gradually declines.

In the short run, which is all we can observe at this time, we expect at least three confounding factors to divert large-capacity magazine prices from these trends. First, as with the banned guns, speculative demand for the banned magazines may have caused prices to rise and then fall around the time of the ban.  Second, because guns and magazines are economic complements, their prices may be likely to move in opposite directions.  Third, for banned guns such as the AR-15 and Uzi models, which are mechanically identical to military weapons, there are military surplus supplies that we believe are huge relative to civilian demand.  For these reasons, short-run price trends are a poor guide to long-run price trends for large-capacity magazines.

With these reservations in mind, we examined price trends for large-capacity magazines (i.e., magazines holding more than 10 rounds) manufactured for use with banned firearms and compared them to trends for large-capacity magazines made for unbanned semiautomatic weapons. Selection of firearm models was based on both theoretical relevance and available sample sizes.  To improve the generalizeability of the results, we attempted to

Exhibit 4
Page 00218

**ER_2410**

analyze magazine prices for both handguns and long guns and for both banned and non-banned weapons. The methodology for the magazine price analysis was essentially the same as that used in the firearm price analysis.[29] As in the firearm price analysis, our quality control variables consisted primarily of indicator variables corresponding to manufacturers and distributors. An additional key variable for the magazine analysis was the number of rounds held by the magazine (logged).[30]

*Assault weapon handgun magazines—Uzi*: Our analysis of large-capacity magazines prices for assault weapons focused upon the 9mm Uzi handgun.[31] Though importation of the Uzi handgun had been discontinued in 1993 (Fjestad 1996, p.1049), our coders found ads for Uzi magazines (N=117) more frequently than for other assault weapon handguns.[32] Even so, the number of observations was as low as 1-2 for some quarterly periods, and we therefore grouped the data into semi-annual time periods. There is no legal substitute for the banned Uzis that accepts the same magazine.

Regression results for Uzi magazine prices are presented in Table 4-6 and price trends are displayed in Figure 4-6. Controlling for the number of rounds held by the magazine, semi-annual prices during the January 1992 through June 1994 period ranged from approximately 52 to 62 percent of their value during the latter half of 1994. Prices peaked in the first half of 1995, rising another 56 percent, to a tripling of their 1992–94 lowest prices. Prices began to fall in the latter half of 1995 and the first half of 1996, but they did not differ significantly from prices during the latter half of 1994.

---

[29] Project staff recorded information on all advertisements for magazines holding more than 10 rounds which appeared in the selected issues of *Shotgun News*. However, the volume of collected data required us to pursue a data reduction strategy. Based on informal inspection of the hardcopy data, therefore, we chose a group of magazines which appeared relatively more frequently and which had relevance as a banned weapon or legal substitute.

[30] Other potentially important characteristics are whether the magazine was new or used and the type of metal from which the magazine was made. Ads often did not state whether magazines were new or used, and our research staff did not record this information. Our working assumption is that the magazines were new or in good working condition. If an ad featured the same magazine manufactured with different types of metals, we used the base price magazine. If the coding form indicated that the advertisement featured only magazines made from special materials (e.g., stainless steel), we made note of this characteristic. There were very few such cases, and preliminary analyses using an indicator variable for the presence of a special metal showed the variable to have no impact in any of the models discussed in the main text.

[31] The Uzi was previously manufactured and imported to the U.S. in both carbine and handgun versions, but the carbine versions were banned from importation in 1989.

[32] The relative frequency of Uzi magazine advertisements is probably due to the fact that the Uzi is a military weapon. Firearms experts have informed us that good quality, military surplus magazines are commonly available and are often sold cheaply.

Exhibit 4
Page 00219

Table 4-6.    Regression of Uzi large-capacity magazine prices on time indicators, controlling for product characteristics and distributors

| Analysis of Variance | | | | | |
|---|---|---|---|---|---|
| Source | DF | Sum of squares | Mean square | F value | Prob>F |
| Model | 9 | 12.80484 | 1.42276 | 9.670 | 0.0001 |
| Error | 107 | 15.74298 | 0.14713 | | |
| C Total | 116 | 28.54782 | | | |

|  | | | | |
|---|---|---|---|---|
| Root MSE | 0.38358 | | R–square | 0.4485 |
| Dep Mean | -1.65739 | | Adj R–square | 0.4022 |
| C.V. | -23.14337 | | | |

Parameter Estimates

| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>|T| |
|---|---|---|---|---|---|
| INTERCEP | 1 | -3.835055 | 0.54716949 | -7.009 | 0.0001 |
| ROUNDS | 1 | 0.729783 | 0.15350538 | 4.754 | 0.0001 |
| T1 | 1 | -0.661263 | 0.19914123 | -3.321 | 0.0012 |
| T2 | 1 | -0.525479 | 0.17560540 | -2.992 | 0.0034 |
| T3 | 1 | -0.536934 | 0.13325422 | -4.029 | 0.0001 |
| T4 | 1 | -0.515880 | 0.12659037 | -4.075 | 0.0001 |
| T5 | 1 | -0.474834 | 0.12970256 | -3.661 | 0.0004 |
| T7 | 1 | 0.447430 | 0.16646042 | 2.688 | 0.0083 |
| T8 | 1 | -0.027967 | 0.16286070 | -0.172 | 0.8640 |
| T9 | 1 | -0.137577 | 0.18908164 | -0.728 | 0.4684 |

Exhibit 4
Page 00220

Figure 4-6.   Semi-annual price trends for Uzi large-capacity magazines



Data for Jan 92-Jun 92 correspond to Apr 92-Jun 92.

*Other Handgun Magazines*:  To provide price trends for large-capacity magazines manufactured for non-banned handguns, we examined large-capacity magazines for Glock 9mm handguns.  Prior to the Crime Act, Glock sold several handgun models with large-capacity magazines.  The most common, the Glock 17, was among the ten firearm models submitted most frequently to ATF for tracing in 1994 (BATF 1995a).  Guns currently manufactured by Glock are capable of accepting Glock's pre-ban large-capacity magazines, but the supply is limited to magazines made before the ban.

Project staff found 74 advertisements for Glock magazines, but the large majority of these ads were placed after the ban (only nine ads were pre-ban) and there were no ads for 1992.  It was therefore necessary to group the advertisements into yearly periods rather than quarterly or semi-annual periods.  Regression results and price trends for 1993 through 1996 are shown in Table 4-7 and Figure 4-7 respectively.  In general, magazines with greater numbers of rounds were more expensive.  In addition, a number of distributors had higher prices for these magazines, and magazines for one particular model were more expensive at a moderate level of statistical significance.[33]

---

[33] For the model dummy variables, the excluded category included magazines for which no model was indicated.

Exhibit 4
Page 00221

ER_2413

**Table 4-7. Regression of Glock large-capacity handgun magazine prices on time indicators, controlling for product characteristics and distributors**

| | | | Analysis of Variance | | |
|---|---|---|---|---|---|
| Source | DF | Sum of squares | Mean square | F value | Prob>F |
| Model | 10 | 29.85755 | 2.98575 | 28.020 | 0.0001 |
| Error | 91 | 9.69680 | 0.10656 | | |
| C Total | 101 | 39.55434 | | | |

| | | | | |
|---|---|---|---|---|
| Root MSE | 0.32643 | | R–square | 0.7548 |
| Dep Mean | -0.86656 | | Adj R–square | 0.7279 |
| C.V. | -37.66991 | | | |

Parameter Estimates

| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>|T| |
|---|---|---|---|---|---|
| INTERCEP | 1 | -3.37422 | 0.56384 | -5.984 | 0.0001 |
| ROUNDS | 1 | 0.618327 | 0.197724 | 3.127 | 0.0024 |
| Y93 | 1 | -0.95884 | 0.17246 | -5.56 | 0.0001 |
| Y95 | 1 | 0.064606 | 0.108817 | 0.594 | 0.5542 |
| Y96 | 1 | 0.2227 | 0.143595 | 1.551 | 0.1244 |
| DIST 10 | 1 | 0.529244 | 0.279526 | 1.893 | 0.0615 |
| DIST 12 | 1 | 0.601322 | 0.162505 | 3.7 | 0.0004 |
| DIST 3 | 1 | 0.37606 | 0.17071 | 2.203 | 0.0301 |
| DIST 5 | 1 | 0.980483 | 0.101626 | 9.648 | 0.0001 |
| M17 | 1 | 0.198804 | 0.108878 | 1.826 | 0.0711 |
| M19 | 1 | 0.169323 | 0.112614 | 1.504 | 0.1362 |

Exhibit 4
Page 00222

ER_2414

**Figure 4-7.    Yearly price trends for Glock large-capacity handgun magazines**



Most importantly, prices for large-capacity Glock magazines were 62 percent lower in 1993 than they were in 1994. Prices remained high through 1995, and they increased another 25 percent in 1996 (relative to 1994), though this increase was not statistically significant by conventional standards.

*Assault rifle magazines — AR15 Family*:  Pre-ban large-capacity magazines manufactured by Colt for their AR15's and related rifles can be utilized with the post-ban, modified versions of these rifles.  Consequently, we expected that there would be a continuing demand for these magazines.

Project staff recorded 364 ads for large-capacity magazines (.223 caliber) made to fit the AR15 and related rifles.  Results from our analysis of quarterly price trends for these magazines are shown in Table 4-8 and Figure 4-8.  Magazines having larger ammunition capacities were more expensive as were those magazines for which Colt was listed explicitly as the manufacturer.[34]  In addition, prices tended to differ significantly between distributors.

During the quarters of 1992 and 1993, prices were anywhere from 33 to 56 percent lower than during the third quarter of 1994.  Prices rose further during the last quarter of 1994 and remained high through the first three quarters of 1995.  In the last quarter of 1995 and the first quarter of 1996, prices fell though they remained higher than their pre-ban levels.  Prices then rebounded in the second quarter of 1996, reaching a peak value comparable to the last quarter of 1995 (prices were approximately 29 percent higher than during the quarter when the ban took effect).  Gun market experts have suggested to us that these short-run fluctuations reflect intermittent availability of military surplus M-16 magazines, which are compatible with the AR-15 family of rifles.

---

[34] Though firearms usually require magazines made by the same manufacturer, a number of manufacturers other than Colt make magazines which can fit Colt rifles.

Exhibit 4
Page 00223

**ER_2415**

**Table 4-8.**   Regression of Colt AR15 group large-capacity magazine prices on time indicators, controlling for product characteristics and distributors

**Analysis of Variance**

| Source | DF | Sum of squares | Mean square | F value | Prob>F |
|--------|-----|------|------|------|------|
| Model | 26 | 122.28012 | 4.70308 | 33.836 | 0.0001 |
| Error | 337 | 46.84153 | 0.13900 | | |
| C Total | 363 | 169.12165 | | | |

| | | | | |
|------|------|------|------|------|
| Root MSE | 0.37282 | | R–square | 0.7230 |
| Dep Mean | -1.65183 | | Adj R–square | 0.7017 |
| C.V. | -22.57021 | | | |

**Parameter Estimates**

| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>\|T\| |
|----------|-----|------|------|------|------|
| INTERCEP | 1 | -5.34744 | 0.194896 | -27.437 | 0.0001 |
| ROUNDS | 1 | 1.025757 | 0.046243 | 22.182 | 0.0001 |
| CLT | 1 | 0.184123 | 0.063507 | 2.899 | 0.004 |
| DIST 2 | 1 | 0.385288 | 0.283893 | 1.357 | 0.1756 |
| DIST 3 | 1 | 0.10778 | 0.078807 | 1.368 | 0.1723 |
| DIST 4 | 1 | -0.40188 | 0.129797 | -3.096 | 0.0021 |
| DIST 5 | 1 | 0.134623 | 0.068759 | 1.958 | 0.0511 |
| DIST 7 | 1 | -0.41214 | 0.13435 | -3.068 | 0.0023 |
| DIST 10 | 1 | 0.137861 | 0.080196 | 1.719 | 0.0865 |
| DIST 11 | 1 | -0.36298 | 0.168942 | -2.149 | 0.0324 |
| DIST 12 | 1 | 0.215247 | 0.085722 | 2.511 | 0.0125 |
| Q1 | 1 | -0.82099 | 0.158248 | -5.188 | 0.0001 |
| Q2 | 1 | -0.39767 | 0.115668 | -3.438 | 0.0007 |
| Q3 | 1 | -0.68998 | 0.181038 | -3.811 | 0.0002 |
| Q4 | 1 | -0.55199 | 0.137727 | -4.008 | 0.0001 |
| Q5 | 1 | -0.61893 | 0.115858 | -5.342 | 0.0001 |
| Q6 | 1 | -0.52304 | 0.093025 | -5.623 | 0.0001 |
| Q7 | 1 | -0.54396 | 0.107619 | -5.055 | 0.0001 |
| Q8 | 1 | -0.38921 | 0.102709 | -3.789 | 0.0002 |
| Q9 | 1 | -0.17713 | 0.104247 | -1.699 | 0.0902 |
| Q11 | 1 | 0.229259 | 0.11575 | 1.981 | 0.0484 |
| Q12 | 1 | 0.13716 | 0.107928 | 1.271 | 0.2047 |
| Q13 | 1 | 0.115077 | 0.099774 | 1.153 | 0.2496 |
| Q14 | 1 | -0.05869 | 0.106556 | -0.551 | 0.5821 |
| Q15 | 1 | -0.32639 | 0.107409 | -3.039 | 0.0026 |
| Q16 | 1 | -0.21758 | 0.109759 | -1.982 | 0.0482 |
| Q17 | 1 | 0.252132 | 0.117683 | 2.142 | 0.0329 |

Exhibit 4
Page 00224

**ER_2416**

**Figure 4-8.  Quarterly price trends for Colt AR15 large-capacity magazines**



*Comparison Semiautomatic Rifle Magazines — Ruger Mini-14*:  Quarterly price regression results for large-capacity magazines made for the Ruger Mini-14 rifle are shown in Table 4-9.  Magazines with the Ruger name and larger magazines were more expensive than other magazines.[35]  Further, prices differed significantly among distributors.

---

[35] A number of manufacturers besides Ruger made large-capacity magazines to fit the Mini-14.

Exhibit 4
Page 00225

**ER_2417**

**Table 4-9.** Regression of Ruger Mini-14 large-capacity magazine prices on time indicators, controlling for product characteristics and distributors

| | | | **Analysis of Variance** | | |
|---|---|---|---|---|---|
| **Source** | **DF** | **Sum of squares** | **Mean square** | **F value** | **Prob>F** |
| Model | 26 | 64.39474 | 2.4672 | 34.029 | 0.0001 |
| Error | 303 | 22.05342 | 0.07278 | | |
| C Total | 329 | 86.44816 | | | |

| | | | | | |
|---|---|---|---|---|---|
| | Root MSE | 0.26978 | | R–square | 0.7449 |
| | Dep Mean | -1.72827 | | Adj R–square | 0.7230 |
| | C.V. | -15.61009 | | | |

**Parameter Estimates**

| Variable | DF | Parameter estimate | Standard error | T for H0 parameter = 0 | Prob>\|T\| |
|---|---|---|---|---|---|
| INTERCEP | 1 | -4.41607 | 0.145547 | -30.341 | 0.0001 |
| ROUNDS | 1 | 0.836435 | 0.036639 | 22.829 | 0.0001 |
| RUG | 1 | 0.264903 | 0.061061 | 4.338 | 0.0001 |
| DIST 2 | 1 | -0.3889 | 0.17264 | -2.253 | 0.025 |
| DIST 3 | 1 | -0.13012 | 0.072105 | -1.805 | 0.0721 |
| DIST 4 | 1 | -0.57328 | 0.126483 | -4.532 | 0.0001 |
| DIST 5 | 1 | -0.40885 | 0.066235 | -6.173 | 0.0001 |
| DIST 7 | 1 | -0.5319 | 0.278193 | -1.912 | 0.0568 |
| DIST 10 | 1 | -0.26988 | 0.074589 | -3.618 | 0.0003 |
| DIST 11 | 1 | -0.1793 | 0.164002 | -1.093 | 0.2751 |
| DIST 12 | 1 | 0.324892 | 0.094116 | 3.452 | 0.0006 |
| Q1 | 1 | -0.29169 | 0.178205 | -1.637 | 0.1027 |
| Q2 | 1 | -0.27167 | 0.08733 | -3.111 | 0.002 |
| Q3 | 1 | -0.40486 | 0.122507 | -3.305 | 0.0011 |
| Q4 | 1 | -0.425 | 0.082811 | -5.132 | 0.0001 |
| Q5 | 1 | -0.44577 | 0.073027 | -6.104 | 0.0001 |
| Q6 | 1 | -0.30726 | 0.070368 | -4.366 | 0.0001 |
| Q7 | 1 | -0.33086 | 0.069189 | -4.782 | 0.0001 |
| Q8 | 1 | -0.34428 | 0.074365 | -4.63 | 0.0001 |
| Q9 | 1 | -0.29213 | 0.078927 | -3.701 | 0.0003 |
| Q11 | 1 | 0.071176 | 0.074263 | 0.958 | 0.3386 |
| Q12 | 1 | 0.013922 | 0.07447 | 0.187 | 0.8518 |
| Q13 | 1 | -0.11436 | 0.073432 | -1.557 | 0.1204 |
| Q14 | 1 | -0.1658 | 0.075341 | -2.201 | 0.0285 |
| Q15 | 1 | -0.26924 | 0.081055 | -3.322 | 0.001 |
| Q16 | 1 | -0.37783 | 0.084169 | -4.489 | 0.0001 |
| Q17 | 1 | -0.34628 | 0.111216 | -3.114 | 0.002 |

The quarterly indicators in Table 4-9 and the graphic illustration in Figure 4-9 show that quarterly prices prior to the ban were 64 to 76 percent of their level at the time of the ban. By late 1995, prices of these magazines were falling significantly, and by 1996 they had fallen to levels comparable to pre-ban prices.

Exhibit 4
Page 00226

**ER_2418**

**Figure 4-9.    Quarterly price trends for Ruger Mini-14 large-capacity magazines**



#### *4.1.4.   Summary of Large-Capacity Magazine Price Trends*

In summary, short-run price trends for four examples of banned large-capacity magazines appeared to depend on the legal status of the guns they fit, speculative demand for the guns and magazines, and the availability of military surplus magazines. All four magazine prices rose substantially during the period of debate over the ban, reflecting anticipatory demand. However, their price trends diverged substantially after that point. For a banned assault pistol (the 9mm Uzi) for which no legal substitute emerged, the post-ban magazine price fell to a level between its peak and its pre-speculation level and remained there. For a banned rifle (Colt AR-15) for which legal substitutes emerged and the gun price fell sharply after the ban, post-ban magazine prices fluctuated dramatically, apparently because of variations in the availability of military surplus M-16 magazines. For unbanned Glock pistols, whose supply continued to grow, the post-ban magazine price continued to rise throughout the post-ban period, though at a slower rate than during the pre-ban speculation; this is consistent with the expected long-term price trend. Finally, prices for large-capacity Ruger Mini-14 magazines appear to have followed speculative trends similar to those for the rifles themselves.

### 4.2.   PRODUCTION TRENDS

Analyses reported in Section 4.1 found substantial pre-ban price increases for two major categories of assault weapons that were examined:  SWD and related handguns (+47 percent), the AR-15 assault rifle family (+69 percent to +100 percent, at minimum). A comparison group of unbanned semiautomatic rifles including the domestically produced Ruger Mini-14 showed a pre-ban price increase of 82 percent. But strikingly, a comparison group of inexpensive Davis and Lorcin semiautomatic handguns showed no discernible price change during the 4-year period that included the effective date of the ban.

In the introduction to this chapter, we hypothesized that weapons whose prices increased during the pre-ban period would also show increases in production. To test that hypothesis, we were able to obtain annual

Exhibit 4
Page 00227

production data from the Violence Policy Center for three of the four weapon categories above: the SWD, AR-15, and Davis/Lorcin groups.[36]  The data extend through 1994, the year of the ban and the last year for which production data are available.

The production data for these three groups are shown in Figure 4-10, Figure 4-11, and Figure 4-12, and they strongly support the hypothesis that pre-ban price speculation was associated with increases in production. As shown there, the SWD and AR-15 groups show substantial increases in production in 1993 and 1994, the years when prices were increasing in advance of the ban.  Production increases of similar magnitude appear for two other categories of banned assault weapons that could not be included in the price analysis:  the Intratec/AA Arms group, and Calico and Feather Industries rifles, which are banned by the features test.[37]  In contrast, the Davis/Lorcin handgun group showed decreased production relative to both 1993 and their 1989–93 average.

Table 4-10 summarizes production data for five typical groups of banned assault weapons and the Lorcin/Davis comparison group of small-caliber semiautomatic pistols.  For each weapon type, the table reports 1994 production, average 1989–93 production, and the ratio of 1994 production to the average over the period.  On average, 1994 assault weapon production exceeded the 1989–93 average by a ratio of 2.233 during the nine months before the ban took effect.  In contrast, 1994 production for the Lorcin/Davis comparison group was only 65.2 percent of the 1989–93 average.

Table 4-10.   Production trends for banned assault weapons and comparison guns

| Firearm type | (1)<br>1994 production | (2)<br>1989–93 average production | (3)<br>Ratio [(1)/(2)] | (4)<br>"Excess" production [(1)-(2)] |
|---|---|---|---|---|
| AR-15 group | 66,042 | 38,511 | 1.714 | 27,531 |
| Intratec 9mm, 22 | 102,682 | 33,578 | 3.058 | 69,104 |
| SWD family (all) & MAC (all) | 14,380 | 10,508 | 1.368 | 3,872 |
| AA Arms | 17,280 | 6,561 | 2.633 | 10,719 |
| Calico 9mm, 22 | 3,194 | 1,979 | 1.613 | 1,215 |
| Lorcin, Davis | 184,139 | 282,603 | 0.652 | |
| Assault Weapon Total* | 203,578 | 91,137 | 2.233 | 112,441 |

*Assault weapon total excludes Lorcin/Davis group

Table 4-10 also displays "excess" production, the difference between 1994 production and 1989–93 average production.  Excess 1994 production for the five assault weapon types shown in the table was approximately 112,000, which were added to the stock of grandfathered assault weapons eligible for resale after the ban took effect.

---

[36] BATF production data for rifles are not disaggregated by model or caliber.  While we could be confident that nearly all Colt's rifles belong to the AR-15 family and could therefore use Colt's rifle production data as an index of AR-15 production, Sturm, Ruger produces too many rifles besides the Mini-14 for us to have a reliable index of Mini-14 production.

[37] It may be of interest that the Intratec, SWD, and Calico/Feather groups, but not the AR-15 group, also had production peaks in 1989, the year of the assault weapon import ban.

Exhibit 4
Page 00228

**ER_2420**

**Figure 4-10.   Annual production data, Colt and Olympic Arms AR-15 type (years with complete data only)**



Eagle, Bushmaster, DPMS, SGW, Essential Arms not included

**Figure 4-11.   Annual production data, SWD group (missing data in some early years)**



SWD Group includes SWD, RPB, Wayne Daniel, FMJ, and Cobray

49

Exhibit 4
Page 00229

**ER_2421**

**Figure 4-12.   Annual production data, small-caliber semiautomatic pistols**



Lorcin, Davis 22, 25, 32, 380's included

## 4.3.   UNINTENDED CONSEQUENCES: GUN THEFTS AND "LEAKAGE"

### *4.3.1.   Introduction*

As a final consideration of the ban's impact on gun markets, we investigated trends in stolen firearms. Given the boom in production of the banned weapons prior to the assault weapon ban, there would appear to be a substantial stockpile of banned weapons, some of which may "leak" from gun dealers and carriers into the hands of criminals and other violence-prone individuals after the ban through a combination of recorded transfers, unrecorded transfers, and thefts.

Indeed, we hypothesized that the Crime Act might have the unintended consequence of increasing reported thefts of the banned weapons for two reasons. Short-term price increases in primary markets might temporarily keep assault weapons from entering the sales distribution channels to criminals, who might be tempted to steal them instead. In addition, dealers who had paid high speculative prices for grandfathered assault weapons around the time of the of the ban but then suffered the post-ban price decline prices might be encouraged to sell their to ineligible purchases and then report the weapons as stolen to BATF, who in turn would enter them into the Federal Bureau of Investigation's national database on stolen firearms. Our tests of these hypotheses had to recognize that any observed rise in assault weapon thefts could be due, at least in part, to new theft reporting requirements established for firearm dealers by Subtitle C of Title XI. In the sections below, we describe the tests and findings.

### *4.3.2.  Data and Analysis Strategy*

Since 1967, the Federal Bureau of Investigation has stored law enforcement agency reports of stolen and recovered guns in a database maintained by the National Crime Information Center (NCIC). This database contains records on guns which have been reported stolen to participating agencies. It also includes a relatively small number of guns which have been recovered by law enforcement agencies but which have not been reported stolen to the FBI. The latter category of guns accounts for about 6 percent of the guns in the database, and we removed them from our analysis. Weapons which are stolen and later recovered are removed from the database by the NCIC. Thus, the file contains only guns which have been stolen and not recovered. Among other items, the database contains entries for the following:  the date the gun was reported stolen ; the weapon type, make, model, caliber, and serial number of the gun; and the agency to which the weapon owner reported the theft.

For our analysis, we utilized data on guns stolen between January 1992 and May 1996. Our analysis of assault weapon thefts focused upon our select group of domestic assault weapons. Unfortunately, weapon model is missing for the majority of the records in the file. Therefore we used the following operational definitions to approximate thefts of assault weapons and other guns:[38]

1)     Colt AR15 group:  all .223 caliber firearms made by Colt, Eagle, Olympic/SGW, Essential Arms, Bushmaster, and Sendra.

2)     Intratec group:  all 9mm and .22 caliber semiautomatic weapons made by Intratec and all 9mm semiautomatic handguns made by AA Arms.

3)     SWD group:  all 9mm, .380, and .45 caliber semiautomatic weapons made by SWD,  Ingram, Military Armaments Corp., and RPB Industries.

4)     Features test group:  all semiautomatic handguns and rifles made by Calico and all 9mm and .22 caliber semiautomatic rifles made by Feather.

5)     Non-banned large-capacity handguns:  Based on the relative frequency of the Glock 17 and Ruger P89 among guns traced by BATF (see Chapter 2), we used Glock and Ruger 9mm semiautomatic handguns to operationalize this count.

### *4.3.3.  Trends in Stolen Assault Weapons*

Statistics in Table 4-11 show that the number of assault weapons reported stolen per month was higher during the post-ban period than during the pre-ban period. These figures combine all of the assault weapons in our select group. As is shown in

---

[38] We arrived at these operational definitions by examining the varieties of gun types, makes, models, and calibers contained in the *Blue Book of Gun Values* (Fjestad 1996). The largest approximation error is probably that Group 2 includes the Protect .22, which is not banned and does not accept large-capacity magazines.

51

Exhibit 4
Page 00231

ER_2423

Figure 4-13, this post-ban increase continued an upward trend which began before the assault weapon ban. Interpreting the raw numbers of assault weapons thefts is problematic even with time series methods, however, because the Subtitle C theft reporting requirement for FFL's may have caused an artificial increase in reported thefts. The monthly average of total reported gun thefts did increase from approximately 11,602 for the January 1992 through August 1994 period to 12,806 during the September 1994 through May 1996 period, although we did not make systematic attempts to explain the increase.

**Table 4-11.**   Pre-ban (Jan. 1992–Aug. 1994) to post-ban (Sept. 1994-May 1996) changes in counts of stolen assault weapons and unbanned semiautomatic handguns capable of accepting large-capacity magazines

| *Stolen gun type* | *Pre-ban monthly mean* | *Post-ban monthly mean* |
|---|---|---|
| Assault weapons | 2,334 | 2,642 |
| Unbanned large-capacity semiautomatic handguns | 235 | 343 |

**Table 4-12.**   Pre-ban (Jan. 1992–Aug. 1994) to post-ban (Sept. 1994-May 1996) changes in ratios of stolen assault weapons and unbanned semiautomatic handguns capable of accepting large-capacity magazines

| | | *Pre-ban* | *Post-ban* | *Change* |
|---|---|---|---|---|
| Ratio: | Assault weapons ÷ automatic and semiautomatic guns | .449 | .463 | +3% |
| Ratio: | Unbanned large-capacity semiautomatic handguns ÷ All semiautomatic handguns | .054 | .073 | +35% |

To control for possible confounding effects of the Subtitle C reporting requirement, we examined assault weapon thefts as a proportion of all reported thefts of semiautomatic and automatic weapons. A post-ban increase in this proportion would suggest a rise in assault weapon thefts which occurred independently of any Subtitle C effect. We used semiautomatic and automatic weapons as our baseline rather than all reported thefts in order to control for changes in the composition of the gun stock; semiautomatic firearms, of which assault weapons are a subset, have grown dramatically since the late 1980s as a share of the firearms market. Relatedly, some law enforcement personnel have suggested to us that gun theft victims are more likely to report thefts of recently purchased firearms because it is easier for victims to assemble information necessary for a theft report (such as serial numbers) when dealing with a newer firearm. Finally, expressing assault weapons as a proportion of semiautomatic/automatic weaponry may correct potential bias stemming from the NCIC's removal of recovered weapons from their data system. Some evidence suggests that semiautomatic handguns tend to move more quickly from retail sale to crime than do other firearms (Kennedy et al. 1996). If this process works the same way for the time from theft to use in crime and recovery by police, then assault weapons and other semiautomatic firearms may tend to drop out of the system at a faster rate than other firearms.

Exhibit 4
Page 00232

ER_2424

Figures in Table 4-12 reveal that between 1992 and 1996 automatic and semiautomatic assault weapon thefts increased only very slightly (about 3%) as a proportion of thefts of rapid fire weapons. A contingency table chi-square test indicated that this was a statistically significant increase (p<.01).[39] However, an interrupted time series analysis of monthly trends (see Figure 4-14) failed to provide any strong evidence that the ban caused a change in the proportion of semiautomatic/automatic firearm thefts involving assault weapons.[40] Either way, the relative Increase in assault weapon thefts appears to have been very modest.

---

[39] The proportion of semiautomatic/automatic gun thefts accounted for by assault weapons is strikingly large in light of the generally low prevalence of these guns among confiscated and traced weapons. Due to the manner in which we approximated assault weapon thefts, our figures probably overstate assault weapon thefts to some degree. In addition, BATF agents have suggested to us that assault weapon thefts may be more likely to be reported to NCIC than thefts of other firearms due to owners' insurance claims on assault weapons and owners' concerns about how stolen assault weapons may be used.

Errors in the data submitted by law enforcement agencies may also be relevant. The NCIC uses character and numeric codes to identify manufacturers, weapon types, and calibers. To assess coding error in the data, we ran a number of crude reliability tests with guns made by selected manufacturers. To illustrate, if a particular handgun manufacturer makes only semiautomatic handguns, one can examine all guns made by that company which appear in the database and determine what percentage were coded as weapon types other than semiautomatic handguns. If 5% of the guns produced by this manufacturer have other weapon type codes, then the manufacturer and/or weapon type must be incorrect for that 5% of cases.

We chose guns made by Davis Industries and Intratec for our tests. Davis Industries makes only derringers and semiautomatic pistols (Fjestad 1996, pp.412-413). Davis derringers are made in .22, .25, .32, .38, and 9mm calibers. The company's semiautomatic pistols are produced in calibers .32 and .380. Of the several thousand guns in the data coded as Davis Industries firearms, about 10% were coded as weapon types other than derringers or semiautomatic handguns (most of these were coded as revolvers). Virtually 100% of the Davis Industries derringers had calibers in the proper range, as did 95% of the semiautomatic handguns.

Intratec, a prominent maker of assault weapons, makes derringers in .38 caliber and produces semiautomatic handguns in .22, .25, .380, .40, .45, and 9mm calibers (Fjestad 1996, pp.577-579). Approximately 89% of the several thousand guns coded as Intratecs were coded as semiautomatic handguns or derringers. Nearly 100% of the Intratec semiautomatic handguns had caliber codes in the proper range, while 97% of the derringers had the proper caliber.

In light of the various coding errors which are present in the NCIC data, we constructed our counts of assault weapons and semiautomatic/automatic guns using a broad array of weapon type codes corresponding to various semiautomatic and fully automatic weapon types. The analyses described above seem to indicate that errors in the numerator and denominator of our assault weapon measure are roughly proportional. Finally, our analysis assumes that any biases in the data resulting from the various issues discussed above have remained relatively constant from the pre-ban to post-ban periods.

[40] Due to ambiguity regarding the form of the ban's hypothesized impact on assault weapon thefts, we tested a number of impact models (see McCleary and Hay 1980). The temporary increase in assault weapon prices which occurred around the time of the ban may have raised the incentive for criminals to steal assault weapons, thereby creating an abrupt, temporary impact on thefts of assault weapons. However, an abrupt temporary impact was inconsistent with the data.

The eventual fall in assault weapon prices, on the other hand, could have increased the incentive for dealers to "leak" the guns to illegitimate buyers. The gradual decline of assault weapon prices documented in the price analysis would suggest a gradual, permanent impact on assault weapon thefts. However, an abrupt, permanent impact also seems plausible. Further, abrupt, permanent impact models are less demanding on the data and sometimes provide a better fit and more accurate results even when the true form of the impact is not of this type (see McDowall et al. 1996). In this case, a gradual, permanent impact model yielded insignificant results and provided a worse fit to the data than did an abrupt, permanent impact model.

Assessment of the abrupt, permanent impact model was complicated by the presence of an outlier observation corresponding to March 1993, during which time there was an unusually low proportion of thefts involving assault weapons (see Figure 4-14). We therefore estimated models with and without this observation. In the first model, we retained the outlier observation and logged the data series. This model suggested that the ban produced a moderately significant (p<.10) positive impact on the proportion of semiautomatic/automatic gun thefts that involved assault weapons. (After adding the intervention component, this model did not require any autoregressive or moving average parameters for the noise component). When the outlier observation was removed, however, the model failed to yield evidence of an impact from the ban. (The noise

Exhibit 4
Page 00233

component for this model included a fourth order autoregressive subset model [see SAS Institute 1993] in which all parameters except the fourth were set to zero).

54

Exhibit 4
Page 00234

ER_2426

**Figure 4-13.   Stolen assault weapons count, January 1992–May 1996**



**Figure 4-14.   Assault weapons as a proportion of stolen semiautomatic and automatic guns, January 1992–June 1996**



Exhibit 4
Page 00235

Additional analyses (not shown) revealed that the assault weapon trends were driven entirely by assault pistols. Thefts of the AR15 group weapons, for example, were rather few in number both before and after the ban, and they decreased both in numbers and as a proportion of stolen weapons during the post-ban months.

### 4.3.4.   Trends in Thefts of Non-Banned Semiautomatic Handguns Capable of Accepting Large-capacity Magazines

In another set of analyses, we investigated whether the ban affected thefts of non-banned semiautomatic handguns capable of handling banned, large-capacity magazines. A number of effects seem plausible. If the magazine ban has been effective in decreasing the availability of large-capacity magazines, one might hypothesize a decrease in offenders' demand for handguns capable of accepting these magazines and a decrease in thefts of these weapons from primary-market dealers and eligible owners. Alternatively, if a similar decrease in the demand for these guns drove down their prices in the primary market, it might increase the incentive for dealers to leak the guns to the illegal market and report the guns as stolen or missing. However, recent years' Blue Book values for Glock pistols suggest that their primary-market prices have been quite stable, when adjusted for inflation. Therefore, if these magazines are still widely available in secondary markets, some offenders might desire to substitute unbanned large-capacity handguns for banned assault weapons. In that case, we might also expect to see a rise in thefts of these guns.

Average monthly thefts of these weapons were higher in the months following the ban (Table 4-11). Moreover, thefts of these guns increased by about a third during the post ban period as a fraction of all semiautomatic handgun thefts (Table 4-12). However, Figure 4-15 and Figure 4-16 show that thefts of these guns were trending upwards in both numbers and as a proportion of semiautomatic handgun thefts both before and after the ban. A time series analysis did not provide conclusive evidence that handguns accepting large-capacity magazines increased significantly after the ban as a fraction of semiautomatic handgun thefts.[41] (We did not employ contingency table chi-square tests due to the clear upward trend in this variable.) At any rate, the Crime Act does not appear to have decreased criminal demand for these guns, as approximated by theft reports.

---

[41] We tested a variety of potential impact forms for this time series, though we considered an abrupt, permanent impact or a gradual, permanent impact to be most plausible in light of the steadily increasing prices for Glock magazines documented in the price analysis. A model with an abrupt, permanent intervention component and a first order autoregressive process for the noise component provided an adequate fit to the data. However, this model yielded an impact estimate virtually identical to the change in the proportion measure shown in Table 4-12 (an increase of approximately one third). In light of the clear pre-ban upward trend in this measure shown in Figure 4-16, we find this effect to be implausible and suspect that the data series is too short to provide a rigorous test of the ban's impact using this methodology.

We ran a crude alternative test in which we regressed the proportion measure on a time trend and a pre-ban/post-ban indicator variable. The time trend variable was significant, while the post ban variable suggested a positive, but statistically insignificant, increase of about 7% in the proportion measure.

Exhibit 4
Page 00236

ER_2428

Figure 4-15.   Stolen unbanned large-capacity semiautomatic handgun counts, January 1992–May 1996



Figure 4-16.   Thefts of unbanned large-capacity semiautomatic handguns as a proportion of all semiautomatic handguns, January 1992–June 1996



Exhibit 4
Page 00237

**ER_2429**

# 5.  UTILIZATION EFFECTS

## 5.1.  BATF NATIONAL FIREARM TRACE DATA

### *5.1.1.  Introduction: Data and Limitations*

To provide national level estimates of the use of assault weapons, we obtained data on firearm trace requests submitted to the U.S. Bureau of Alcohol, Tobacco and Firearms (BATF) by Federal, State, and local law enforcement personnel throughout the nation from January 1993 through May 1996. BATF maintains a firearm tracing center in West Virginia. Upon request, personnel at this center can trace firearms to their last point of recorded sale in a primary market. BATF makes this service available to police departments throughout the country to assist in criminal investigations.

The assault weapon trace file provided by BATF contains the make, model, and caliber of all models subject to the assault weapons ban (the designations are discussed in more detail below). Further, the file includes the month and year when BATF received the request, the state from which the request originated, and type of crime with which the firearm was associated. Our data for total traces consist of aggregate counts of traces broken down by month, year, state, weapon type,[42] and offense.

BATF trace data are the only available national-level sample of guns used in crime. Nevertheless, BATF trace data have significant limitations for research purposes. As Zawitz (1995, p.4) has noted, trace requests represent an unknown fraction of all guns used in crime. In terms of general limitations, BATF cannot trace military surplus weapons, imported guns without the importer name, stolen guns, or guns without a legible serial number (Zawitz 1995, p.4). Tracing guns manufactured before 1968 is also difficult because FFL's were not required to keep records of their transactions prior to that time. BATF does not generally trace guns having a manufacturing date more than six years old (such guns are likely to be many transfers removed from the original retail purchaser), though BATF can and does trace these guns in response to special requests.

Moreover, trace data are based on requests from law enforcement agencies; yet not all guns used in crime are seized by authorities, and agencies, particularly local ones, do not submit all guns they seize for tracing. Consequently, firearms submitted to BATF for tracing may not be a representative sample of firearms used in crime. Previous studies of trace data have suggested that only about 10 percent of gun crimes and 2 percent of violent crimes result in trace requests to BATF (Cox Newspapers 1989, p.3; Kleck 1991, p.75).[43]

The vast majority of weapons submitted to BATF for tracing are associated with weapons offenses, drug offenses, or violent crimes. In 1994, 72% of traces were for weapons offenses, 12% were for drug-related offenses, 12% were for the combined violent crimes of homicide, assault, and robbery, and 2% were for burglary

---

[42] The weapon categories consist of revolver, pistol, derringer, rifle, shotgun, combination rifle/shotgun, and a few other miscellaneous categories.

[43] A prior study of BATF trace data by *Cox Newspapers* (1989) suggested that police are more likely to request gun traces for organized crime and drug trafficking. Further, the study indicated that these were the types of crimes with which assault weapons were most likely to be associated. Nearly 30 percent of the gun traces tied to organized crime were for assault weapons as defined by the Cox study (their definition did not match that in the 1994 Crime Act), and 12.4 percent of gun traces for drug crimes involved these guns. In contrast, assault weapons accounted for only 8 percent of gun trace requests for assaults and homicides.

Exhibit 4
Page 00238

(BATF 1995a, p.43). The high representation of weapons offenses was probably due to the fact that 57% of the trace requests were made by BATF field offices (BATF 1995a, p.45).

Because of the predominance of weapons offenses, BATF trace data might not appear to be a good indicator of guns used in violent and/or drug-related crime. However, the fact that a gun was not seized in association with a specific violent crime does not rule out the possibility that it had been used or would have been used in violent crime. Substantial percentages of adult and juvenile offenders carry firearms on a regular basis for protection and to be prepared for criminal opportunities (Sheley and Wright 1993; Wright and Rossi 1986). In Kansas City, Missouri, for example, about 60% of the guns seized as a result of regular police enforcement activity in high crime beats in 1992 were seized in conjunction with pedestrian checks, car checks, and other traffic violations (Shaw 1994, p.263).[44] Moreover, drug offenders tend to be disproportionately involved in violence and illegal gun traffic (National Institute of Justice 1995; Sheley and Wright 1993). Thus, guns seized in association with weapons offenses and violent offenses — in addition to those seized for drug-related crimes — may serve as a good indicator of guns possessed by drug offenders.

Despite their limitations, guns confiscated by law enforcement agencies are a reasonable index of guns used in violent and drug-related crime, and they are the best available indicator of changes over time in the types of guns used in crime and possessed and/or carried by criminal and otherwise deviant or high risk persons. BATF trace data are the only such national sample.

Yet, another important limitation to national trace data is that the process by which state and local law enforcement agencies decide to submit guns for tracing is largely unknown, and there are undoubtedly important sources of variation between agencies in different states and localities (and perhaps regions). For instance, a state or local agency may be less likely to need the tracing services of BATF if its state or city maintains its own firearms registration system. Knowledge of BATF's tracing capabilities and participation in federal/state/local law enforcement task forces are some additional factors that can affect an agency's tracing practices. Further, these conditions will vary over time; for example, BATF has been actively trying to spread this knowledge and encourage trace requests since 1994. For all of these reasons, BATF trace data should be interpreted cautiously.

Finally, prior studies have suggested that assault weapons are more likely than other guns to be submitted for tracing.[45] However, this generalization may no longer be valid, for, as is discussed below, police appear to be requesting traces for increasing proportions of confiscated firearms.

### 5.1.2.   *Trends in Total Trace Requests*

Table 5-1 presents yearly changes in trace requests for all firearms for 1993 through early 1996. Total traces grew 57 percent from 1993 to 1994, decreased 11 percent from 1994 to 1995, and then increased 56 percent from 1995 to 1996. In contrast, Table 5-2 indicates that gun crimes declined throughout the 1993–95 period (national gun crime figures are not yet available for 1996). The increase in gun trace requests that occurred in 1994 was not attributable to an increase in gun crime and thus appears to have reflected a change in police trace request behavior and/or BATF initiatives. The large growth in traces in early 1996 also seems to be unrelated to gun crime (national gun crime figures for 1996 are not yet available, but we are not aware of any data suggesting

---

[44] This calculation excludes guns seized by special crime hot spots patrols which were proactively targeting guns. Thus, the figure reflects normal police activity.

[45] Prior estimates have indicated that approximately 5 to 11 percent of trace requests are for assault weapons (*Cox Newspapers* 1989; Lenett 1995; Zawitz 1995), though these estimates have not all been based on the 1994 Crime Act definition of assault weapons.

Exhibit 4
Page 00239

that gun crime has increased over 50 percent since 1995). On the other hand, the decline in trace requests in 1994 mirrored the decline in gun crime, particularly gun homicides (the most accurately measured gun crime category), suggesting that tracing practices were fairly stable from 1994 to 1995.

**Table 5-1.**    Total traces, January 1993–May 1996

| Year | Total | Monthly average | Percent change from previous year |
|------|-------|-----------------|-----------------------------------|
| 1993 | 55,089 | 4,591 | N/A |
| 1994 | 86,216 | 7,185 | + 57 |
| 1995 | 76,924 | 6,410 | – 11 |
| 1996 (Jan.-May) | 54,254 | 10,851 | +56* |

* Change is expressed relative to January through May of 1995.

**Table 5-2.**    National trends in gun crime, 1993–95

| Year | Offense | Number | Percent change from previous year |
|------|---------|--------|-----------------------------------|
| 1993 | Gun murders | 16,136 | N/A |
| 1994 | Gun murders | 15,463 | – 4 |
| 1995 | Gun murders | 13,673 | – 12 |
| 1993 | Gun robberies | 279,737 | N/A |
| 1994 | Gun robberies | 257,428 | – 8 |
| 1995 | Gun robberies | 238,023 | – 8 |
| 1993 | Gun aggrav. assaults | 284,910 | N/A |
| 1994 | Gun aggrav. assaults | 268,788 | – 6 |
| 1995 | Gun aggrav. assaults | 251,712 | – 6 |

Sources: FBI Uniform Crime Reports, *Crime in the United States* (1996, pp.18, 26-29, 31-32; 1995, pp.18, 26-29, 31; 1994, pp.27-29, 31-32).

As a comparison to national trends, Table 5-3 presents gun confiscation figures for the cities of Boston and St. Louis, two cities for which we have data on all confiscated firearms.[46] The Boston data are consistent with national trends in gun violence in that they show decreases in gun seizures for each year.[47] In St. Louis, gun confiscations increased slightly in 1994, but in 1995, they decreased by an amount comparable to the nationwide

---

[46] These Boston data were provided to us by the Boston Police Department via researchers at Harvard University. The St. Louis data are from the St. Louis Police Department and were provided by researchers at the University of Missouri, St. Louis.

[47] The sharp decrease in gun confiscations from 1995 to 1996 may be due in part to recent youth gun violence initiatives being undertaken by the Boston Police Department in collaboration with a number of other agencies and researchers from Harvard University (Kennedy et al. 1996; Kennedy 1996).

Exhibit 4
Page 00240

decreases in gun murders and gun robberies. Of course, trends in Boston and St. Louis may not be indicative of those in the rest of the nation. Nevertheless, the contrast between the Boston and St. Louis figures and the national tracing figures provide further evidence that changes in national gun traces in 1994 and early 1996 were driven largely by police practices and BATF initiatives rather than changes in gun crime.

Table 5-3.    Gun confiscations/traces, January 1993–May 1996

| Year | Total | Monthly average | Percent change from previous year |
|------|-------|-----------------|-----------------------------------|
| **Gun confiscations/traces for Boston, MA, January 1993–May 1996** | | | |
| 1993 | 866 | 72 | N/A |
| 1994 | 762 | 64 | - 12% |
| 1995 | 712 | 59 | - 7% |
| 1996 (Jan.-May) | 241 | 48 | - 28%* |
| **Gun confiscations in St. Louis, MO, 1993–95** | | | |
| 1993 | 3,544 | 295 | N/A |
| 1994 | 3.729 | 311 | 5% |
| 1995 | 3,349 | 279 | -10% |

*Change is expressed relative to January-May of 1995.

In sum, the changes in national trace requests which occurred in 1994 and early 1996 appear to have stemmed from BATF initiatives. Although we have little documentation of these changes, our consultations with BATF agents have suggested that the surge in trace requests from 1993 to 1994 was due largely to internal BATF initiatives that now require agents to submit all confiscated firearms for tracing. In addition, BATF has made efforts to encourage more police departments to submit trace requests and to encourage police departments to request traces for greater fractions of their confiscated weapons. One example is BATF's national juvenile firearms tracing initiative launched in late 1993 (BATF 1995b, p.21). Greater cooperation between BATF and local agencies (through, for example, special task forces) has also resulted in more trace requests according to BATF officials, and a few states and localities have recently reached 100 percent tracing. Beginning in the fall of 1995, moreover, agents from the tracing center began visiting BATF's field divisions to inform federal, state, and local law enforcement personnel about the tracing center's services and capabilities, including the implementation of computerized on-line tracing services. This would appear to be a major factor behind the growth in trace requests from 1995 to 1996.

For the 1994–95 period, however, tracing practices seem to have remained steady. The decline in traces in 1995 matched a real decrease in gun crimes. These developments have important ramifications for the analysis of assault weapon traces.[48]

_____

[48] We made limited efforts to further disentangle federal and state/local trends by obtaining annual data on traces from a number of states broken down by requesting agency. We examined trace requests from a number of cities where, according to informal judgments by BATF agents, cooperative efforts between local law enforcement agencies and BATF had resulted in the submission of trace requests for a relatively high percentage of confiscated firearms over an extended period. We anticipated that trace requests from BATF field offices in these locations would show substantial increases from 1993 to

### *5.1.3.   Total Assault Weapon Traces*

During the period from January 1993 through May 1996, BATF received 12,701 trace requests for assault weapons. This count covers specific makes and models listed in the 1994 Crime Act, exact copies of those makes and models, and other firearms failing the Crime Act's features test for assault weapons.[49] The requests include all states, Washington, D.C., Puerto Rico, and Guam.[50]

Table 5-4 shows the number, monthly averages, and percentage changes of assault weapon traces for each year. Assault weapon traces increased 9 percent from 1993 to 1994, declined 20 percent from 1994 to 1995, and then increased 7 percent from 1995 to 1996. While one cannot entirely dismiss the possibility that the use of assault weapons rose in 1994 and 1996, it seems likely that these increases were due partially or entirely to the general increase in police trace requests which occurred during those years. Yet assault weapon traces increased by amounts much smaller than did total traces in 1994 and 1996, a finding which supports the conjecture that police have been more consistently diligent over time in requesting traces for confiscated assault weapons.[51]

---

1994, and that requests from the local law enforcement agencies would rise from 1995 to 1996. However, the figures from these locations did not reveal any clearly interpretable patterns. Any patterns which might have existed may be obscured by the fact that local agencies may submit traces directly to the tracing center or submit them indirectly through local ATF field offices. In 1994, for example, 17% of trace requests were from outside (i.e., non-BATF) agencies directly, while 26% were from outside agencies through BATF offices (BATF 1995, p.45). Our judgment is that analyzing trace requests according to submitting agency will not necessarily illuminate the ambiguities in interpreting trace request trends without extensive research into both the processes by which guns are selected for tracing and submitted by local agencies and BATF field offices and the impact of special BATF/local initiatives on these processes.

[49] The guns designated as "features test" guns consist of makes and models that fail the features test based on manufacturer specifications. The file does not generally include guns which were legal as manufactured but were later modified in ways which made them illegal. (Firearms which are traced by BATF are not actually sent to BATF for inspection). Further, firearms are often manufactured and sold with various options, and the legal/illegal status of some models is contingent upon the particular features with which the gun was manufactured. For example, a Franchi Spas 12 shotgun may or may not be an assault weapon depending upon the size of its ammunition magazine (prior to the ban, the gun was sold with 5 shot and 8 shot tube magazines - see Fjestad [1996, p.471]). Unfortunately, this level of detail is not available in the BATF data. Potential assault weapon models like the Franchi Spas 12 were included in the assault weapon file, but, as is discussed later in the text, we did not utilize them in all analyses.

[50] It should be noted that the firearm make and model designations in BATF trace data are made by the law enforcement officers who submit the requests. Undoubtedly, there exists some level of error in these designations, though we do not have any data with which to estimate the error rate.

[51] The 1996 assault weapon traces include 89 observations identified as "duplicate traces." Although these trace requests can sometimes represent instances in which the same gun was used in multiple crimes, they usually represent instances in which, for various administrative reasons, a particular trace request was entered into the computer system more than once. Unfortunately, it is not possible to identify duplicate trace requests for years prior to 1996. In order to treat data from all years in a consistent manner, we therefore retained all of the 1996 trace requests for the analysis. Consequently, the total and assault weapon trace numbers presented in this report overstate the true numbers of trace requests. Our analysis of the trace data rests on the assumption that the rate of duplicate tracing has remained relatively constant over the 1993–96 period.

Exhibit 4
Page 00242

**Table 5-4.   Assault weapons traces, January 1993–May 1996**

| Year | Total | Monthly average | Percent change from previous Year |
|------|-------|-----------------|-----------------------------------|
| 1993 | 3,748 | 312 | N/A |
| 1994 | 4,077 | 340 | + 9% |
| 1995 | 3,268 | 272 | - 20% |
| 1996 (Jan.-May) | 1,608 | 322 | + 7%* |

*Change is expressed relative to January through May of 1995.

Traces for assault weapons dropped more markedly from 1994 to 1995 (20 percent) than did overall traces (11 percent). In a t-test of 1994 and 1995 monthly means, the drop in assault weapon traces was statistically significant (p=.01, two-tailed test), while the drop in total traces was not (p=.22, two-tailed test). Moreover, the drop in assault weapon traces was substantially greater than the declines in gun murder (12 percent), gun robbery (8 percent), and gun assault (6 percent) for the same period. This suggests that criminal use of assault weapons decreased from 1994 to 1995, both in absolute terms and relative to crime trends generally. In addition, utilization of assault weapons in crime was less in 1995 than in 1993.

### 5.1.4.   Analysis of Select Assault Weapons

As noted in Chapter 2, many of the foreign makes and models banned by Title XI were banned from importation prior to the passage of that legislation. Thus, any recent decrease in the use of those weapons cannot be attributed unambiguously to the effects of the Crime Act. For this reason, we concentrated our analyses below on a select group of domestic assault weapons whose availability was not affected by legislation or regulations predating the 1994 Crime Act. These guns include the AR15 family (including the various non-Colt copies), the Intratec family (including the AA Arms AP-9), and the SWD handgun family.

In addition, we selected a small number of firearm models which, as manufactured, fail the features test of the assault weapons legislation. These weapons had to meet three selection criteria: 1) the weapon had to be in production at the time of the Crime Act (if the weapon was a foreign weapon, its importation could not have been discontinued prior to the Crime Act);[52] 2) there had to be 30 or more trace requests for assault weapons made by that manufacturer during the period January 1993 through April 1994; and 3) the weapon had to have an unambiguous assault weapon designation as it was manufactured prior to the ban (i.e., its status could not be conditional on optional features).[53] These criteria ensured that we would capture the most prevalent assault weapons that were still being sold in primary markets just prior to the effective date of Title XI. We used January 1993 through April 1994 as the selection period in order to minimize effects on the gun market which may have resulted from the passage of the assault weapons legislation by the U.S. House of Representatives in May of 1994.

---

[52] Heckler and Koch, for example, manufactured a number of rifle and handgun models which were relatively common among assault weapon traces (i.e., the HK91, HK93, HK94, and SP89). However, these models were all discontinued between 1991 and 1993 (Fjestad 1996, p.531).

[53] BATF officials assisted us in these designations. The only weapon which passed the first two criteria but not the third was the Franchi Spas 12 shotgun. The assault weapon trace file contained 53 trace requests for this model prior to May 1994.

Exhibit 4
Page 00243

The features test weapons selected for the analysis were: Calico M950 and M110 model handguns; Calico M100, M900, and M951 model rifles; and Feather AT9 and AT22 model rifles.

This select group of assault weapons accounted for 82 percent of assault weapon traces submitted to BATF during the study period. Yearly trends in trace requests for these weapons (see Table 5-5) were virtually identical to those for all assault weapons. Most importantly, average monthly traces were 20 percent lower in 1995 than in 1994 (p=.01, two-tailed test). Figure 5-1 displays the trend in monthly traces for these firearms.

**Figure 5-1.    National ATF trace data: Traces for select assault weapons, January 1993–May 1996**



Includes AR15 group, Intratec group, SWD handgun group, and selected Calico and Feather models

**Table 5-5.    Traces for select assault weapons,[†] January 1993–May 1996**

| Year | Total | Monthly average | Percent change from previous year |
|------|-------|-----------------|-----------------------------------|
| 1993 | 3,040 | 253 | N/A |
| 1994 | 3,358 | 280 | + 10% |
| 1995 | 2,673 | 223 | - 20% |
| 1996 (Jan.-May) | 1,323 | 265 | + 8%* |

*Change is expressed relative to January through May of 1995.

[†]Includes traces for AR15 group, Intratec group, SWD handgun group, and selected Calico and Feather models.

Exhibit 4
Page 00244

**ER_2436**

### 5.1.5.   *Assault Weapon Traces for Violent Crimes and Drug-Related Crimes*

To fulfill Title XI's mandate to assess the effects of the ban on violent and drug-related crime, we also analyzed assault weapon traces associated with violent crimes (murder, assault, and robbery) and drug-related crimes. We used our select group of assault weapons for this analysis. Yearly trends for these traces are presented in Table 5-6. Monthly trends are graphed in Figure 5-2 and Figure 5-3. A striking feature of these numbers is their small magnitude. On average, the monthly number of assault weapon traces associated with violent crimes across the entire nation ranged from approximately 30 in 1995 to 44 in 1996. For drug crimes, the monthly averages ranged from 34 in 1995 to 50 in 1994.

Exhibit 4
Page 00245

Figure 5-2.    National ATF trace data:  Traces for select assault weapons (violent crimes)



Includes AR15 group, Intratec group, SWD handgun group, and selected Calico and Feather models.

Figure 5-3.    National ATF trace data:  traces for select assault weapons (drug crimes)



Includes AR15 group, Intratec group, SWD handgun group, and selected Calico and Feather models.

66

Exhibit 4
Page 00246

**Table 5-6.     Traces for select assault weapons,[†] January 1993–May 1996 (violent and drug-related crimes)**

**Violent Crimes:**

| Year | Total | Monthly average | Percent change from previous year |
|------|-------|-----------------|-----------------------------------|
| 1993 | 513 | 43 | N/A |
| 1994 | 428 | 36 | - 17% |
| 1995 | 354 | 30 | - 17% |
| 1996 (Jan.-May) | 222 | 44 | + 35%* |

**Drug-Related Crimes:**

| Year | Total | Monthly average | Percent change from previous year |
|------|-------|-----------------|-----------------------------------|
| 1993 | 498 | 42 | N/A |
| 1994 | 595 | 50 | + 19% |
| 1995 | 403 | 34 | - 32% |
| 1996 (Jan.-May) | 217 | 43 | + 24%* |

*Change is expressed relative to January through May of 1995.

[†]Includes AR15 group, Intratec group, SWD handgun group, and selected Calico and Feather models.

Traces for assault weapons associated with violent crimes dropped 17 percent in both 1994 and 1995. Both decreases were greater than the decreases which occurred for violent gun crimes in each of those years. However, assault weapon traces for violent crime rebounded 35 percent in 1996 to a level comparable with that in 1993.

Assault weapon traces for drug crimes followed patterns similar to those for all assault weapons. Assault weapon traces increased 19 percent from 1993 to 1994, decreased 32 percent from 1994 to 1995, and then increased 24 percent from 1995 to 1996. The yearly fluctuations of these traces were greater than those for all assault weapons, but the drug trace numbers may be relatively more unstable due to the small number of weapons under consideration.

### 5.1.6.   Conclusions on National Trends in the Use of Assault Weapons

National-level data suggest that the use of assault weapons, as measured by trace requests to BATF, declined in 1995 in the wake of the Crime Act. The 20 percent decrease in assault weapon trace requests from 1994 to 1995 was greater than occurred overall, and it was greater than the 6 to 12 percent national drop in violent gun crime. This is demonstrated graphically in Figure 5-4. Assault weapon traces for violent crimes and drug-related crimes also decreased in 1995 by amounts comparable to or greater than the overall drop in assault weapon

Exhibit 4
Page 00247

**ER_2439**

traces. Further, there were approximately 13 percent fewer assault weapon trace requests in 1995 than during the pre-ban year of 1993.[54]

**Figure 5-4.    Relative changes in total and assault weapon traces**



(1994 = 100)

Another indication that this was an effect from the ban is that assault weapon traces declined less in 1995 in states which had their own bans prior to the Federal legislation. Table 5-7 presents combined yearly traces for our select assault pistol group in the four states with assault weapon bans: California, New Jersey, Connecticut, and Hawaii. In general, assault weapon traces in these states followed the same pattern as did the national figures. The increases in 1994 and 1996 were larger than the national increases which occurred during those years, but the 1995 decrease was smaller than the national assault weapon decrease. Further, the decline in these ban states was consistent in magnitude with the national drop in gun crime.[55]

---

[54] The data also do not show any obvious substitution of non-banned long guns for assault weapons. Trace requests for shotguns decreased 10 percent in 1995. Total rifle traces increased 3.5 percent in 1995, but our select group of assault weapon rifles (AR15 group and selected Calico and Feather models) also increased 3 percent. Thus, banned and non-banned rifles did not follow divergent trends. With currently available data, we have not been able to assess whether the assault weapon ban led to displacement to other categories of weapons, such as non-banned semiautomatic handguns capable of carrying pre-ban large-capacity magazines.

[55] We chose to examine only assault weapon pistols because assault rifles are rarely used in crime and Hawaii's assault weapons legislation covers only handguns. Maryland passed an assault pistol ban in 1994, but the legislation was passed only a few months prior to the Federal ban, so we did not include Maryland as a ban state.

All of the assault pistol ban states outlawed one or more of the handguns in our select group of assault pistols. However, the coverage of these state laws varied, and our select assault pistols were not banned in all of these states. We therefore conducted a supplemental analysis focusing on the Intratec TEC-9 series and the M10/M11 series made by SWD and others. As far as we can determine, these guns were covered by all of the state assault pistol bans. Trace requests for TEC-9's,

Exhibit 4
Page 00248

Table 5-7.    Assault pistol traces, ban states (CA, NJ, CT, and HI), January 1993–May 1996

| Year | Total | Monthly mean | Percent change from previous year |
|------|-------|--------------|-----------------------------------|
| 1993 | 204 | 17 | N/A |
| 1994 | 228 | 19 | +12% |
| 1995 | 210 | 18 | - 8% |
| 1996 (Jan.-May) | 106 | 21 | +15% |

*Change is expressed relative to January through May of 1995.

Nationally, traces for assault weapons rebounded in 1996 to a level higher than that of 1993 but lower than that of 1994. This could represent leakage into illegal channels from the stockpile of legal, grandfathered assault weapons manufactured prior to the implementation of Title XI. Production of assault weapons increased considerably in 1994, and prices of these weapons fell to pre-ban levels in late 1995 and early 1996 (see Chapter 3). Over the next few years, it is possible that more, rather than fewer, of the grandfathered weapons will make their way into the hands of criminals through secondary markets.

On the other hand, the increase for 1996 may be an artifact of recent BATF initiatives to increase trace requests from local police. The rebound in assault weapon traces might also reflect an as yet undocumented rebound in gun crime in 1996. Unfortunately, we cannot disentangle these possibilities with data available at this time, and it is not yet clear whether the 1995 decrease in our indicator of assault weapon use was temporary or permanent.[56]

### 5.1.7.   The Prevalence of Assault Weapons Among Crime Guns

As is shown in Figure 5-5, assault weapon traces decreased as a proportion of all traces throughout the entire study period. While Title XI may have contributed to this trend, it is apparent that the trend began before implementation of Title XI, and, to a large degree, must reflect the disproportionate growth in trace requests for non-assault weapons rather than a continual decline in the prevalence of assault weapons.

---

M10's, and M11's from the ban states rose 1% from 1993 to 1994, decreased 6% from 1994 to 1995, and remained steady from 1995 to early 1996. The 6% drop in 1995 seems to confirm that assault weapon trace requests dropped in the ban states after implementation of the federal law but by smaller percentages than assault weapon trace requests nationwide.

[56] In light of the substantial instrumentation problems with these data and the threat which such problems pose to quasi-experimental time series designs (Campbell and Stanley 1963, pp.40-41), we elected not to pursue more sophisticated methods, such as an interrupted time series analysis, with these data.

Exhibit 4
Page 00249

**ER_2441**

**Figure 5-5.   National ATF trace data:  Assault weapons as a proportion of all traces**



Despite this problem with interpreting trends in the prevalence of assault weapon traces, the 1996 trace figures arguably provide the best available estimate of the prevalence of assault weapons among crime guns. Firearm tracing should now be more complete and less biased than at any time previously.  For January through May of 1996, assault weapons accounted for 3 percent of all trace requests.  Our group of select domestic assault weapons represented 2.5 percent of all traces.  Traces for the select assault weapon group accounted for 2.6 percent of traces for guns associated with violent crimes and 3.5 percent of traces for guns associated with drug crimes. This is consistent with previous research indicating that assault weapons are more likely to be associated with drug crimes than with violent crime (Cox Newspapers 1989; Kleck 1991).  At the same time, these numbers reinforce the conclusion that assault weapons are rare among crime guns.

### *5.1.8.   Crime Types Associated with Assault Weapons*

Table 5-8 displays the types of offenses with which assault weapons were associated.  For each year, approximately two-thirds of assault weapons were tied to weapons offenses.  Drug offenses were the next most common, accounting for 16 to 18 percent of assault weapon traces for each year.  Violent offenses ranged from 13 to 17 percent of assault weapon traces.  For comparison, the percentage of total traces associated with drug offenses varied between 12 and 13 percent during this period.  Violent offenses accounted for 12 to 16 percent of total traces.  Hence, assault weapons were more likely to be associated with drug offenses than were other traces.

Exhibit 4
Page 00250

ER_2442

Table 5-8.   Assault weapon trace requests to BATF by crime type

| Offense type* | 1993 (N=3,725) | 1994 (N=4,048) | 1995 (N=3,226) | 1996 (Jan–May) (N=1,500) |
|---|---|---|---|---|
| Murder/Homicide | .097 | .069 | .063 | .072 |
| Aggravated assaults | .048 | .040 | .051 | .076 |
| Robbery | .027 | .018 | .020 | .022 |
| Drug abuse violations | .167 | .182 | .161 | .174 |
| Weapons; carrying, possessing, etc. | .647 | .665 | .661 | .581 |
| Other offenses | .015 | .025 | .046 | .075 |

*Offense type could not be determined for 1 percent of assault weapon traces in 1993, 1994, and 1995. Offense type could not be determined for 7 percent of assault weapon traces in 1996.

## 5.2.   ASSAULT WEAPON UTILIZATION:  LOCAL POLICE DATA SOURCES

### 5.2.1.   Introduction and Data Collection Effort.

Because of our concerns over the validity of national BATF trace data for measuring the distribution of guns used in crime, we attempted to collect and analyze data from a number of police departments around the country.  We sought to acquire data on all firearms confiscated in these jurisdictions, rather than just firearms for which BATF trace requests were made.  Analyzing all guns confiscated in a jurisdiction provides a more complete and less biased picture of weapons used in crime than does analysis of guns selected for BATF traces.  The disadvantage of using local agency gun seizure data is that trends in any given jurisdiction may not be indicative of those elsewhere in the nation.  Of course, local agency data are still subject to general limitations regarding police gun confiscation data which were raised in the last section (i.e., not all guns confiscated by police are used in violent or drug-related crime and not all guns used in crime are seized by police).

Unfortunately, the attempt to collect local gun data fell short of our expectations.  Our intention was to collect data from cities in states both with and without their own assault weapon bans.  Further, we concentrated our data collection effort on cities in states which had relatively high rates of gun violence.  To this end, we contacted several police departments around the country.  However, most of the departments that we contacted either did not have their property records computerized or had only computerized their records a few months prior to the implementation of the Crime Act, thus precluding the collection of meaningful pre-ban baseline data.[57]

Ultimately, we obtained data from two cities, St. Louis and Boston, neither of which is subject to a State assault weapon ban.  From St. Louis, we acquired a database on all firearms confiscated by police from 1992 through 1995 (N=13,863).  Our Boston data consist of monthly counts of various categories of firearms confiscated by Boston police from 1992 through August of 1996 (total confiscations numbered 3,840 for this period).  For both locations, we examined trends in confiscations of our select domestic assault weapon group (i.e., the AR15, Intratec, and SWD families and selected Calico and Feather models).  In addition, we approximated trends in confiscations of semiautomatic handguns capable of accepting large-capacity magazines by analyzing confiscations of selected Glock and Ruger pistols.

---

[57] Time, cost, and personnel considerations limited our ability to implement on-site data collection efforts.

Exhibit 4
Page 00251

The patterns we discovered were relatively consistent in both cities. Assault weapon confiscations were rare both before and after the ban. In both cities, the data were suggestive of a decrease in assault weapon confiscations after the ban. As a fraction of all confiscated guns, assault weapons decreased roughly 25% in these cities. Thus, these data sources provide some confirmation of our inferences regarding assault weapon trends from the national trace data. Further, we were able to examine the crimes with which assault weapons were associated in St. Louis and found that, as in the national data, assault weapons are overrepresented in drug offenses but not in violent offenses. Finally, confiscations of non-banned semiautomatic handguns capable of accepting large-capacity magazines increased or remained stable after the ban as a fraction of all confiscated handguns in both St. Louis and Boston.[58]

### *5.2.2. Assault Weapons in St. Louis and Boston*

St. Louis police confiscated 180 weapons in the select assault weapon group between 1992 and 1995.[59] The vast majority of these weapons were from the Intratec and SWD assault pistol groups. Average monthly confiscations of assault weapons dropped from 4 to 3 after the ban's implementation (see Table 5-9). Total gun seizures also dropped during the post-ban months. In order to control for the general downward trend in gun confiscations, we examined assault weapons as a fraction of all confiscated guns. Prior to the ban, assault weapons accounted for about 1.4% of all guns. After the ban they decreased to 1% of confiscated guns, a relative decrease of approximately 29%. A contingency table chi-square test indicated that this was a statistically meaningful drop (p=.05). In addition, assault weapons represented a lower fraction of all guns confiscated during 1995 (.009) than

Table 5-9.    Summary data on guns confiscated in St. Louis, January 1992 – December 1995

| | Pre-ban (Jan. '92–Aug. '94) | Post-ban (Sept. '94–Dec. '95) | Change |
|---|---|---|---|
| Total guns confiscated | | | |
| Total | 9,372 | 4,491 | |
| Monthly mean | 293 | 281 | -4% |
| Assault guns | | | |
| Total | 134 | 46 | |
| Monthly mean | 4 | 3 | -25% |
| Proportion of confiscated guns | .014 | .010 | -29% |
| Large-capacity handguns (Ruger and Glock) | | | |
| Total | 118 | 93 | |
| Monthly mean | 4 | 6 | +50% |
| Proportion of all handguns | .018 | .031 | +72% |

---

[58] As stated above, analyses of local data sources have the limitation that they are not necessarily indicative of those elsewhere in the nation. We cannot address the various local conditions which may have impacted recent gun trends in the selected cities. However, we should note that youth gun violence initiatives sponsored by the National Institute of Justice have been ongoing in each city during recent years. It is not clear at this time what impact, if any, these initiatives have had upon the gun trends that are the subjects of our investigation.

[59] The St. Louis data contain a few SWD streetsweeper shotguns in addition to SWD assault pistols.

Exhibit 4
Page 00252

**ER_2444**

during 1993 (.018), the last full calendar year prior to the passage and implementation of the ban. A monthly trend
line for assault weapons as a fraction of all guns is shown in Figure 5-6.[60] [61]

**Figure 5-6.** Assault weapons as a proportion of all confiscated guns, St. Louis, 1992–95



Includes AR15 group, Intratec group, SWD group, and selected Calico and Feather models.

A similar picture emerged from Boston. From 1992 through August of 1996, Boston police seized only
74 of these weapons. As in St. Louis, the vast majority were Intratec and SWD assault pistols. Table 5-10 shows

---

[60] We also estimated interrupted time series models to test the post intervention change in the monthly trend for the
assault weapons proportion measure. As in the NCIC analysis reported in Section 4.3 (p.50) we considered various models of
impact. An abrupt, temporary impact model might seem appropriate, for example, based on the price trends presented in
Section 4.1 (p.24). Both abrupt, permanent and gradual, permanent impacts are also plausible and seem to better match the
pattern displayed in the St. Louis data. At any rate, these analyses failed to confirm that there was a significant change in
assault weapons as a fraction of all guns. (The best fitting model was an abrupt, permanent impact model with an
autoregressive parameter at the third lag).

However, we have emphasized the chi-square proportions test because the monthly series is rather short (N=48) for
interrupted time series analysis (McCleary and Hay 1980) and because the monthly trend line provides no strong indication that
the post ban drop was due to a preexisting trend.

[61] Average monthly confiscations of long guns (rifles and shotguns) increased somewhat from 88 in the pre-ban
months to 92 after the ban. As a proportion of all confiscated guns, long guns rose from .299 before the ban to .326 after the
ban. Thus, the decrease in assault weapons may have been offset by an increase in the use of long guns. However, we did not
have the opportunity to investigate the circumstances under which long guns were seized. The post-ban increase could have
been due, for example, to an increase in the proportion of confiscated guns turned in voluntarily by citizens. In addition, the
ramifications of a long gun substitution effect are somewhat unclear. If, for instance, the substituted long guns were .22 caliber,
rimfire (i.e., low velocity) rifles (and in addition did not accept large-capacity magazines), then a substitution effect would be
less likely to have demonstrably negative consequences. If, on the other hand, offenders substituted shotguns for assault
weapons, there could be negative consequences for gun violence mortality.

Exhibit 4
Page 00253

**ER_2445**

the respective numbers of total firearms and assault weapons seized before and after the Crime Act.  The average number of assault  weapons seized per month dropped from approximately 2 before the ban to about 1 after the ban, but total gun seizures were also falling.  As a fraction of all guns, assault weapons decreased from .021 before the ban to .016 after the ban, a relative decrease of about 24%.  A contingency table chi-square test indicated that this change was not statistically meaningful (p=.38), but the numbers provide some weak indication that assault weapons were dropping at a faster rate than were other guns.  Quarterly trends for the proportions variable shown in Figure 5-7 suggest that assault weapons were relatively high as a proportion of confiscated guns during the quarters immediately following the ban, but then dropped off notably starting in the latter part of 1995.[62] [63]

Table 5-10.   Summary data on guns confiscated in Boston, January 1992 – August 1996

|  | *Pre-ban*<br>*Jan. '92–Aug. '94* | *Post-ban*<br>*(Sept. '94–Aug. '96)* | *Change* |
|---|---|---|---|
| Total guns confiscated |  |  |  |
| Total | 2,567 | 1,273 |  |
| Monthly mean | 80 | 53 | -34% |
| Assault guns |  |  |  |
| Total | 53 | 21 |  |
| Monthly mean | 2 | 1 | -50% |
| Proportion of confiscated guns | .021 | .016 | -24% |
| Large-capacity handguns (Ruger and Glock) |  |  |  |
| Total | 28 | 17 |  |
| Monthly mean | 1 | 1 | 0% |
| Proportion of all handguns | .015 | .016 | +7% |

---

[62] We did not estimate time series models with the Boston data due to the rarity with which assault weapons were confiscated during the study period.

[63] In other analyses, we found that long guns decreased as a proportion of gun confiscations throughout the period, suggesting that there was not substitution of long guns for assault weapons in Boston.

Exhibit 4
Page 00254

ER_2446

Figure 5-7.   Assault weapons as a proportion of all confiscated guns by quarter, Boston, January 1992–August 1996



### 5.2.3.   *Assault Weapons and Crime*

Using the data from St. Louis, we were able to investigate the types of crimes with which assault weapons were associated. Approximately 12% of the assault weapons seized in St. Louis during the study period were associated with the violent crimes of homicide, aggravated assault, and robbery. Overall, about 12% of all confiscated guns were associated with these crimes. Hence, assault weapons do not appear to be used disproportionately in violent crime relative to other guns in these data, a finding consistent with our conclusions about national BATF trace data (see previous section). Overall, assault weapons accounted for about 1% of guns associated with homicides, aggravated assaults, and robberies.

However, 27% of the assault weapons seized in St. Louis were associated with drug offenses. This figure is notably higher than the 17% of all confiscated guns associated with drug charges.[64] This finding is also consistent with our national trace data analysis showing assault weapons to be more heavily represented among drug offenders relative to other firearms. Nevertheless, only 2% of guns associated with drug crimes were assault weapons.

### 5.2.4.   *Unbanned Handguns Capable of Accepting Large-capacity Magazines*

We could not directly measure criminal use of pre-ban large-capacity magazines. Therefore, in order to approximate pre-ban and post-ban trends, we examined confiscations of a number of Glock and Ruger handgun models which can accept large-capacity magazines. These guns are not banned by the Crime Act, but they can

---

[64] Some of the guns associated with drug charges were also tied to weapons charges.

Exhibit 4
Page 00255

accept banned large-capacity magazines. We selected Glock and Ruger models because they are relatively common in BATF trace data (BATF 1995a, p.35). A caveat to the analysis is that we were not able to obtain data on the magazines recovered with these guns. Consequently, we cannot say whether Glock and Ruger pistols confiscated after the ban were equipped with pre-ban large-capacity magazines. It is also possible that trends corresponding to Glocks and Rugers are not indicative of trends for other unbanned, large-capacity handguns.

As was discussed in Chapter 4 (see the NCIC stolen gun analysis), the hypothesized effects of the ban on this group of weapons is ambiguous. If large-capacity handgun magazines have become less available since the ban as intended (indeed, recall that the magazine price analysis in Chapter 4 indicated that prices of large-capacity magazines for Glock remained at high levels through our last measurement period in the spring of 1996), one might hypothesize that offenders would find large-capacity handguns like Glocks and Rugers to be less desirable, particularly in light of their high prices relative to other handguns. If, on the other hand, large-capacity magazines for these unbanned handguns are still widely available, offenders seeking high-quality rapid-fire capability might substitute them for the banned assault weapons.

With the St. Louis data, we investigated trends in confiscations of all Glock handguns and Ruger P85 and P89 models. Police confiscated 118 of these handguns during the pre-ban months and 93 during the post-ban months (see Table 5-9). The monthly average increased from approximately 4 in the pre-ban months to 6 in the post-ban period. As a fraction of all confiscated handguns, moreover, the Glock and Ruger models rose from .018 before the ban to .031 after the ban, a relative increase of 72%. (These handguns also increased from .037 to .065 — a 76% change — as a fraction of all semiautomatic handguns; thus, the upward trend for these guns was not simply a result of a general increase in the use of semiautomatic handguns). However, Figure 5-8 shows that these handguns were trending upward as a fraction of all handguns well before the ban was implemented. (For this reason, we did not conduct contingency table chi-square tests for the pre-ban and post-ban proportions). Visually, it appears that the ban may have caused this trend to level off. Nevertheless, an interrupted time series analysis failed to provide evidence of a ban effect on the proportion of handguns which were unbanned large-capacity semiautomatics.[65]

---

[65] In preliminary analysis, we found that the noise component of this time series was substantially affected by a modest outlier value at the last data point. We were able to estimate a better fitting model with more stable parameters with the outlier removed. After removing this data point (N=47), the final noise component consisted of a moving average parameter at the third lag, autoregressive parameters at lags two and four, and a seasonal autoregressive parameter at the twelfth lag. As in the time series analyses reported elsewhere, we examined a variety of impact models. The most appropriate impact model for the data was an abrupt, permanent impact. The impact parameter was positive (.006) but statistically insignificant (t value=1.13).

Exhibit 4
Page 00256

**Figure 5-8.  Unbanned large-capacity handguns as a proportion of all confiscated handguns, St. Louis, 1992–95**



**Figure 5-9.    Unbanned large-capacity semiautomatic handguns as a proportion of all confiscated handguns, Boston, January 1992–August 1996**



The data we acquired from Boston included counts for two specific unbanned, large-capacity handgun models, the Glock 17 and Ruger P85.  Police in Boston confiscated 28 of these guns from January 1992 through August of 1994 and 17 from September 1994 through August 1996 (see Table 5-10).  As a proportion of all

Exhibit 4
Page 00257

**ER_2449**

confiscated handguns, these models increased slightly from .015 before the ban to .016 after the ban. However, a contingency table chi-square test indicated that this difference was not statistically meaningful (p=.83).[66] The quarterly trend for the proportion measure is displayed in Figure 5-8. The pattern does not suggest any meaningful trends over time.[67]

In sum, the data from St. Louis and Boston do not warrant any strong conclusions one way or the other with respect to the use of large-capacity magazines, as crudely approximated by confiscations of a few relatively popular unbanned handgun models which accept such magazines. The ban on large-capacity magazines does not seem to have discouraged the use of these guns. At the same time, the assault weapon ban has not caused a clear substitution of these weapons for the banned large-capacity firearms.

---

[66] We did not attempt any time series analyses with these data due to the rarity with which these guns were confiscated in Boston.

[67] A caveat to this analysis is that the Ruger P85 was discontinued in 1992 and replaced with a new version called the P89 (Fjestad 1996, p.996). The P89 was one of the ten most frequently traced guns nationally in 1994 (BATF 1995a, p.35). Unfortunately, we did not acquire data on confiscations of P89's in Boston (the P89 was included in our St. Louis figures). Had we been able to examine P89's in Boston, we may have found a greater increase in the use of unbanned, large-capacity handguns after the ban. Accordingly, the most prudent conclusion from the Boston data may be that there are no signs of a decrease in the use of unbanned, large-capacity handguns.

78

Exhibit 4
Page 00258

ER_2450

# 6.    POTENTIAL CONSEQUENCES OF ASSAULT WEAPON USE

The Congressional mandate for this study required us to study how the Subtitle A bans on assault weapons and large-capacity magazines affected two consequences of using those weapons: specifically, violent and drug-related crime. Among violent crimes, we devoted most attention to gun murders, because it is the best measured. However, the total gun murder rate is an insensitive indicator of ban effects, because only a fraction of gun murders involve large-capacity magazines, and only about 25 percent of those murders involve the banned assault weapons. Therefore, we carried out supplementary analyses of certain categories of gun murders that more commonly involve the banned guns and magazines: events that involve multiple gun murder victims, gun murders involving multiple wounds, and killings of law enforcement officers. Unlike the BATF trace data analyzed in Chapter 5, available data sources did not permit us to categorize these events on the basis of relationship to drugs.

## 6.1.    TRENDS IN STATE-LEVEL GUN HOMICIDE RATES

To estimate the impact of the Subtitle A bans on gun homicide rates, we estimated multivariate regression models using data from all states with reasonably consistent Supplementary Homicide Reporting over the sixteen-year period 1980 through 1995. We closely followed the approach used by Marvell and Moody (1995) to analyze the impact of enhanced prison sentences for felony gun use. Marvell and Moody generously provided their database, which we updated to cover the post-ban period.

Any effort to estimate how the ban affected the gun murder rate must confront a fundamental problem, that the maximum achievable preventive effect of the ban is almost certainly too small to detect statistically. Although our statistical model succeeded in explaining 92 percent of the variation in State murder rates over the observation period, a post hoc power analysis revealed that it lacks the statistical power to detect a preventive effect smaller than about 17 percent of all gun murders under conventional standards of statistical reliability.[68] A reduction that large would amount to preventing at least 2.4 murders for every one committed with an assault weapon before the ban, or, alternatively, preventing two-thirds of all gun murders committed with large-capacity magazines — obviously impossible feats given the availability of substitutes for the banned weapons.[69] While there are substantially smaller reductions that would benefit society by more than the cost of the ban, they would be impossible to detect in a statistical sense, at least until the U.S. accumulates more years of post-ban data.

Within this overall constraint, our strategy was to begin with a "first-approximation" estimate of the ban effect on murders, then to produce a series of re-estimates intended to rule out alternative explanations of the estimated effect. Based on these efforts, our best estimate of the short-run effect is that the ban produced a 6.7 percent reduction in gun murders in 1995. However, we caution that for the reasons just explained, we cannot statistically rule out the possibility that no effect occurred. Also, we expect any short-run 1995 preventive effect on gun murders to ebb, then flow, in future years, as the stock of grandfathered assault weapons makes its way to offenders patronizing secondary markets, while the stock of large-capacity magazines dwindles over time.

The following sections first describe our data set, then explain our analyses.

---

[68] By conventional standards, we mean statistical power of 0.8 to detect a change, with .05 probability of a Type 1 error.

[69] Moreover, no evidence exists on the lethality effect of limiting magazine capacity.

Exhibit 4
Page 00259

**ER_2451**

### *6.1.1.  Data*

Data for gun homicides are available for the entire 1980–95 period of the study.  We obtained data from "Crime in the United States" Uniform Crime Reports for the years 1994 and 1995, and from Marvell and Moody for the years 1980 through 1993. (Marvell and Moody used "Crime in the United States" Uniform Crime Reports for years 1991 to 1993, and unpublished data from the FBI for the earlier years.)

Since the fraction of homicides for which weapon use was reported by states varied from state to state and even year to year over the period, it was necessary to adjust and filter the data.  To address this reporting problem, we adopted Marvell and Moody's (1995) approach to compile what they call a "usable" data series, consisting of observations (each year for each state) for which homicide weapon-use reporting is at least 75 percent complete (See Marvell and Moody, 1995).[70]  On this basis we had to eliminate a certain portion of the gun homicide data (see Table 6-2)  For each observation that met this requirement, the number of gun homicides was multiplied by a correction factor defined as the ratio of the FBI estimate for the total number of reported homicides in the state to the number of homicides for which the state reported weapon data.

We used Marvell and Moody's rule of retaining states in the analysis only if they had data for seven or more consecutive years[71] and added the additional requirement that states must have had gun homicide data for the post-intervention year, 1995.  (This additional requirement caused us to eliminate four states entirely from the analysis: Delaware, Kansas, Nebraska, and New Mexico.)  In addition, Marvell and Moody made allowances for otherwise adequate seven-year series that contained a single year of data that did not meet the above requirements.  Provided the reporting rate was at least 50 percent and the corrected figure did not "depart greatly"[72] from surrounding years, the state was not dropped from the analysis.  (These are: Louisiana 1987, South Carolina 1991, Tennessee 1991, and Wyoming 1982.)  A further allowance was, that if the reporting rate was below 50 percent, or if the adjusted number did depart from surrounding years, the percentage of gun homicides was revised as the average of that for the four surrounding years.  (These are: Alaska 1984, Arizona 1989, Idaho 1991, Iowa,1987, Kentucky 1983, Maryland 1987, Minnesota 1990, North Dakota 1991, Texas 1982, and Vermont, 1993.)  In the end, "usable data" remained for 42 states for the analysis (see Table 6-2).

To allow us to account for intervening influences on gun homicide rates, we gathered data for several time-varying control variables that proved statistically significant in Marvell and Moody's analysis.  Two economic variables (state per capita personal income and state employment rate) and two age structure variables were included.  State per capita personal income was available from the Bureau of Economic Analysis for all years; we obtained data for 1991–95 directly from the Department of Commerce, while Marvell and Moody provided us the data for earlier years.  State employment rates were available from the Bureau of Labor Statistics, Department of Labor for 1994 and 1995 and from the Bureau of Economic Analysis (via Marvell and Moody) for year 1980–93.  Data on the age structures of state populations were available from the Bureau of the Census

---

[70] An alternative approach would have been to use mortality data available from the National Center for Health Statistics through 1992, then to append NCR data for the subsequent years.  We were concerned about possible artifactual effects of combining medical examiners' and police data into a single time series, but recommend this approach for future replication.

[71] However, we departed from Marvell and Moody by including observations for years that followed a gap in a series of "usable" data and were therefore not part of a seven-year string.  The state was treated as a missing observation during the gap.

[72] According to Marvell and Moody, a single year of data does not "depart greatly" from surrounding years if either the percentage of gun murders falls within the percentages for the prior and following years, or if it is within three percentage points of the average of the four closest years.

80

Exhibit 4
Page 00260

ER_2452

unadjusted estimates of total resident population of each state as of July 1 of each year. (We obtained these data directly for years 1994–95, while Marvell and Moody generously provided us with the data for earlier years).

### *6.1.2. Research Design*

As a first approximation for estimating effects of the assault weapon ban, we specified Model 1 as loglinear in state gun homicide rate (adjusted as described above) and a series of regressors.[73]  The regressors were:

- A third-degree polynomial trend in the logarithm of time;

- A dummy variable for each state;

- State per-capita income and employment rates for each year (logged);

- Proportions of the population aged 15-17 and 18-24 (logged);

- D95, a 1995 dummy variable, which represented ban effects in this first-approximation model; and

- PREBAN, a dummy variable set to represent states with assault weapon bans during their pre-ban years.

We represented time with the polynomial trend instead of a series of year dummies for two reasons. First, by reducing the number of time parameters to estimate from 15 to 3, we improved statistical efficiency. Second, during sensitivity analyses after Model 1 was fit, we discovered that it produced more conservative estimates of ban effects than a model using time dummies (that model implicitly compares 1995 levels to 1994 levels instead of to the projected trend for 1995), because the estimated trend began decreasing at an increasing rate in the most recent years. We included the economic and demographic explanatory variables because Marvell and Moody (1995) had found them to be significant influences on state-level homicide rates using the same data set. PREBAN was included so that for states with their own assault weapon bans, the D95 coefficient would reflect differences between 1995 and only those earlier years in which the state's gun ban was in place.

As shown in Table 6-1, Model 1 estimated a 9.0 percent reduction in gun murder rates in the year following the Crime Act, based on a statistically significant estimated coefficient for the 1995 dummy variable.[74] This estimated coefficient, of course, reflects the combined effect of a package of interventions that occurred nearly simultaneously with the Subtitle A bans on assault weapons and large-capacity magazines. These include: the Subtitle B ban on juvenile handgun possession and the new Subtitle C FFL application and reporting requirements, other Crime Act provisions, the Brady Act, and a variety of State and local initiatives.

We reasoned that if the Model 1 estimate truly reflected assault weapon ban effects, then by disaggregating the states we would find a larger reduction in gun murders in the states without pre-existing assault weapon bans than in the four states with such bans prior to 1994 (California, Connecticut, Hawaii, and New Jersey). To test this hypothesis, we estimated Model 2, in which D95 was replaced by two interaction terms that indicated whether or not a State ban was in place in 1995. As shown in Table 6-1, disaggregating the states using

---

[73] We weighted the regression by state population to adjust for heteroskedasticity and to avoid giving undue weight to small states.

[74] In our sensitivity analyses of models in which the polynomial time trend was replaced with year dummies, the corresponding Model 1 estimated reduction was 11.2 percent, and the estimated coefficient was statistically significant at the .05 level. Similarly, for alternatives to Models 2-4, the estimated ban effects were 2 to 3 percent larger than those shown in Table 6-1 and were statistically significant at the .05 level.

81

Exhibit 4
Page 00261

ER_2453

Model 2 did produce a larger estimated ban effect, a statistically significant reduction of 10.3 percent in the states without their own bans.

**Table 6-1.   Estimated Coefficients and Changes in Gun Murder Rates from Title XI Interventions**

| Model | Subgroup for 1995 impact | Coefficient | Percent change | test statistic |
|-------|--------------------------|-------------|----------------|----------------|
| 1 | All Usable (N = 42) | -0.094 + | -9.0% | -1.67 |
| 2 | States without AW ban (N = 38) | -0.108 + | -10.3 | -1.88 |
|   | States with AW ban (N = 4) | -0.001 | -0.1 | -0.01 |
| 3 | States without AW or JW ban (N = 22) | -0.102 | -9.7 | -1.56 |
|   | States without AW, with JW ban (N = 16) | -0.115 | -10.9 | -1.64 |
|   | States with AW, without JW ban (N = 2) | -0.076 | -7.3 | -0.41 |
|   | States with AW and JW ban (N = 2) | 0.044 | 4.5 | 0.39 |
| 4 | California and New York excluded: States without AW or JW ban (N = 22) | -0.103 | -9.8 | -1.58 |
|   | States without AW, with JW ban (N = 15) | -0.069 | -6.7 | -0.95 |
|   | States with AW, without JW ban (N = 2) | -0.079 | -7.6 | -0.43 |
|   | States with AW and JW ban (N = 1) | 0.056 | 5.8 | 0.30 |

+ Statistically significant at 10-percent level

To isolate the hypothesized Subtitle A bans from the Subtitle B ban on juvenile handgun possession, we estimated Model 3, in which D95 was used in four interaction terms with dummy variables indicating whether a state had its own assault weapon ban, juvenile handgun possession ban, both, or neither at the time of the Crime Act.[75] We also added a term, PREJBAN, which represented states with juvenile bans during their pre-ban years, for reasons analogous to the inclusion of PREBAN. The estimates of most interest are those for the 38 states without their own assault weapon bans. Among those, the estimated ban effect was slightly larger in states that

---

[75] A more restrictive alternative to Model 3 is based on the assumption that the impacts for states without assault weapon bans and the impacts for states without juvenile handgun possession bans are additive. A model estimate under this assumption yielded very similar point estimates and slightly smaller standard errors than Model 3. We preferred the more flexible Model 3 for two reasons. First, the less restrictive model helps us interpret the estimates clearly in light of some of the legislative changes that occurred in late 1994. Model 3 allows the reader to assess the consequences of the assault weapon ban under each set of conditions that existed at the time the ban was implemented. Second, because a juvenile handgun possession ban a fortiori prohibits the most crime-prone segment of the population from possessing the assault weapons most widely used in crime, we hesitated to impose an additivity assumption.

Exhibit 4
Page 00262

**ER_2454**

already had a juvenile handgun possession ban than in those that did not. We interpret the former estimate as a better estimate of the assault weapon ban effect because the State juvenile ban attenuates any confounding effects of the Federal juvenile ban. In any event, however, the estimates are not widely different, and they imply a reduction in the 10 to 11 percent range.

We were also concerned that our estimates might be distorted by the effects of relevant State and local initiatives. Therefore, we reestimated Model 3 excluding 1995 data for California and New York. We filtered out these two because combined they account for nearly one-fourth of all U.S. murders and because they were experiencing potentially relevant local interventions at the time of the ban: California's "three strikes" law and New York City's "Bratton era" in policing, coming on the heels of several years of aggressive order maintenance in that city's subway system.

The estimation results with California and New York omitted appear as Model 4 in Table 6-1. While dropping these states leaves three of the estimated coefficients largely unaffected, it has a substantial effect on New York's category, states with a juvenile handgun possession ban but no assault weapon ban. The estimated ban effect in this category drops from a nearly significant 10.9 percent reduction to a clearly insignificant 6.7 percent reduction, which we take as our best estimate.

To conclude our study of state-level gun homicide rates, we performed an auxiliary analysis. We were concerned that our Model 4 estimate of 1995 ban effects could be biased by failure to control for the additional requirements on FFL applicants that were imposed administratively by BATF in early 1994 and included statutorily in Subtitle C of Title XI, which took effect simultaneously with the assault weapon ban. These requirements were intended to discourage new and renewal applications by scofflaw dealers who planned to sell guns primarily to ineligible purchasers presumed to be disproportionately criminal. Indeed, they succeeded in decreasing the number of FFLs by some 37 percent during 1994 and 1995, from about 280,000 to about 180,000 (U.S. Department of Treasury, 1997). We were concerned that if the FFLs who left the formal market during that period were disproportionately large suppliers of guns to criminals, then failure to control for their disappearance could cause us to impute any resulting decrease in gun murder rates mistakenly to the Subtitle A ban.

Unfortunately, we could use only the 1989–95 subset of our database to test this possibility, because we could not obtain state-level FFL counts for years before 1989. Therefore, we modified Model 4 by replacing the time trend polynomial with year dummies. We then estimated the modified Model 4 both with and without a logged FFL count and an interaction term between the logged count and a 1994–95 dummy variable. Although the estimated coefficient on the interaction term was significantly negative, the estimated 1995 ban effect was essentially unchanged.

Table 6-2.    Years for which gun-related homicide data are not available

|  | Gun homicide data 1980–95 |
|---|---|
| Alabama | ✓ |
| Alaska | ✓ |
| Arizona | ✓ |
| Arkansas | ✓ |
| California | ✓ |
| Colorado | ✓ |
| Connecticut | ✓ |

Exhibit 4
Page 00263

| | *Gun homicide data 1980–95* |
|---|---|
| Delaware | No usable data |
| District of Columbia | No usable data |
| Florida | 1988–91 |
| Georgia | 1980–81 |
| Hawaii | ✓ |
| Idaho | ✓ |
| Illinois | No usable data |
| Indiana | 1989–1991 |
| Iowa | 1991–1993 |
| Kansas | No usable data |
| Kentucky | 1987-89; 1994 |
| Louisiana | 1990–91 |
| Maine | 1990–92 |
| Maryland | ✓ |
| Massachusetts | 1988–90 |
| Michigan | ✓ |
| Minnesota | ✓ |
| Mississippi | No usable data |
| Missouri | ✓ |
| Montana | No usable data |
| Nebraska | No usable data |
| Nevada | ✓ |
| New Hampshire | ✓ |
| New Jersey | ✓ |
| New Mexico | No usable data |
| New York | ✓ |
| North Carolina | ✓ |
| North Dakota | 1994 |
| Ohio | ✓ |
| Oklahoma | ✓ |
| Oregon | ✓ |

Exhibit 4
Page 00264

ER_2456

| | Gun homicide data 1980–95 |
|---|---|
| Pennsylvania | ✓ |
| Rhode Island | ✓ |
| South Carolina | ✓ |
| South Dakota | No usable data |
| Tennessee | ✓ |
| Texas | ✓ |
| Utah | ✓ |
| Vermont | 1980-83 |
| Virginia | ✓ |
| Washington | ✓ |
| West Virginia | ✓ |
| Wisconsin | ✓ |
| Wyoming | ✓ |

✓ indicates usable data are available for all years (1980–95) in the period

## 6.2.   ASSAULT WEAPONS, LARGE-CAPACITY MAGAZINES, AND MULTIPLE VICTIM/MASS MURDERS

### 6.2.1.   Trends in Multiple-Victim Gun Homicides

The use of assault weapons and other firearms with large-capacity magazines is hypothesized to facilitate a greater number of shots fired per incident, thus increasing the probability that one or more victims are hit in any given gun attack. Accordingly, one might expect there to be on average a higher number of victims per gun homicide incident for cases involving assault weapons or other firearms with large-capacity magazines. To the extent that the Crime Act brought about a permanent or temporary decrease in the use of these weapons (a result tentatively but not conclusively demonstrated for assault weapons in Chapter 5), we can hypothesize that the number of victims per gun homicide incident may have also declined.

We investigated this hypothesis using data from the Federal Bureau of Investigation's Supplemental Homicide Reports (SHR) for the years 1980 through 1995. We constructed a monthly database containing the number of gun homicide incidents and victims throughout the nation.[76] The SHR does not contain information

---

[76] The SHR is compiled annually by the FBI based on homicide incident reports submitted voluntarily by law enforcement agencies throughout the country (see the FBI's *Uniform Crime Reports* for more information about reporting to the Uniform Crime Reports and the Supplemental Homicide Reports). Though the SHR contains data on the vast majority of homicides in the nation, not all agencies report homicide incident data to the SHR, and those agencies which do report may fail to report data for some of the homicides in their jurisdiction. In this application, it is not clear how any potential bias from

Exhibit 4
Page 00265

**ER_2457**

about the makes, models, and magazine capacities of firearms used in homicides. Consequently, these results rely on indirect, inferred links between expected changes in the use of banned weapons and trends in the victim per incident measure.

From 1980 through August of 1994 (the pre-ban period), there were 184,528 gun homicide incidents reported to the SHR. These cases involved 192,848 victims, for an average of 1.045 victims per gun homicide incident. For the post-ban months of September 1994 through December 1995, there were 18,720 victims killed in 17,797 incidents, for an average of 1.052 victims per incident. Thus, victims per incident increased very slightly (less than 1 percent) after the Crime Act. A graph of monthly means presented in Figure 6-1 suggests that this increase predated the assault weapon ban. Nevertheless, an interrupted time series analysis also failed to produce any evidence that the ban reduced the number of victims per gun homicide incident.[77]

**Figure 6-1.   Victims per gun homicide incident, 1980–95**



Considering the rarity with which assault weapons are used in violent crime (for example, assault weapons are estimated to be involved in 1 to 7 percent of gun homicides),[78] this result is not unexpected. At the same time, an important qualifier is that the data available for this study have not produced much evidence regarding pre-ban/post-ban trends in the use of large-capacity magazines in gun crime. In the next section, we offer a tentative estimate, based on one city, that approximately 20 to 25 percent of gun homicides are committed

---

missing cases would operate. That is, we are unaware of any data indicating whether reported and non-reported cases might differ with respect to the number of victims killed.

[77] We tested the data under different theories of impact suggested by the findings on assault weapon utilization reported in Chapter 5, but failed to find evidence of a beneficial ban effect. If anything, our time series analysis suggested that the post-ban increase in victims per gun murder incident was a meaningful change.

[78] See discussion in Chapters 2 (p.8) and 5 (p.58) and in Section 6.3 (p.87) of this chapter.

Exhibit 4
Page 00266

**ER_2458**

with gun equipped with large-capacity magazines banned by the Crime Act.[79]  Hence, trends in the use of large-capacity magazines would seem to have more potential to produce measurable effects on gun homicides.  It is not yet clear as to whether the use of large-capacity magazines has been substantially affected by the Crime Act.

Despite these ambiguities, we can at least say that this examination of SHR data produced no evidence of short term decreases in the lethality of gun violence as measured by the mean number of victims killed in gun homicide incidents.[80]

## 6.3.    CONSEQUENCES OF TITLE XI:  MULTIPLE WOUND GUN HOMICIDES

To provide another measure of the consequences of the assault weapon/large-capacity magazine ban on the lethality of gun violence, we analyzed trends in the mean number of gunshot wounds per victim of gun homicides in a number of sites.  In one jurisdiction, we were able to examine trends in multiple wound non-fatal gunshot cases.  The logic of these analyses stems from the hypothesis that offenders with assault weapons or other large-capacity firearms can fire more times and at a more rapid rate, thereby increasing both the probability that they hit one or more victims and the likelihood that they inflict multiple wounds on their victims.  One manifestation of this phenomenon could be a higher number of gunshot wounds for victims of gun homicides committed with assault weapons and other large-capacity firearms.  To the extent that Title XI decreased the use of assault weapons and large-capacity magazines, we hypothesize a decrease in the average number of wounds per gun murder victim.

To test this hypothesis, we collected data from police and medical sources on gunshot murders (justifiable homicides were excluded) in Milwaukee County, Seattle and King County, Jersey City (New Jersey), Boston, and San Diego County.  Selection of the cities was based on both data availability and theoretical relevance.  Jersey City and San Diego were chosen as comparison series for the other cities because New Jersey and California had their own assault weapons bans prior to the Federal ban.  The New Jersey and California laws did not ban all large-capacity magazines, but they did ban several weapons capable of accepting large-capacity magazines.  Thus, we hypothesized that any reduction in gunshot wounds per gun homicide victim due to the Federal ban might be smaller in magnitude in Jersey City and San Diego.

The data from Seattle and San Diego were collected from the respective medical examiners' offices of those counties.[81]  The Milwaukee data were collected from both medical and police sources by researchers at the Medical College of Wisconsin.  The Jersey City data were collected from the Jersey City Police Department. Finally, the Boston data were provided by the Massachusetts Department of Public Health.  From each of these sources, we were able to collect data spanning from January 1992 through at least the end of 1995.  In some cities we were able to obtain data on the actual number of gunshot wounds inflicted upon victims, while in other cities we were able to classify cases only as single wound or multiple wound cases.  Depending on data available, we analyzed pre-ban and post-ban data in each city for either the mean number of wounds per victim or the proportion

---

[79] A New York study estimated this figure to be between 16 percent and 25 percent (New York State Division of Criminal Justice Services 1994, p.7).

[80] See Appendix A for an investigation of assault weapon use in mass murders.

[81] The Seattle data were collected for this project by researchers at the Harborview Injury Prevention and Research Center in Seattle.  The San Diego County Medical Examiner's Office provided data from San Diego.

Exhibit 4
Page 00267

**ER_2459**

of victims with multiple wounds.  We concluded this investigation with an examination of the mean number of gunshot wounds for victims killed with assault weapons and other firearms with large-capacity magazines, based on data from one city.

### 6.3.1.  *Wounds per Incident:  Milwaukee, Seattle, and Jersey City*

From the Milwaukee, Seattle, and Jersey City data, we were able to ascertain the number of gunshot wounds suffered by gun murder victims.  Relevant data comparing pre-ban and post-ban cases are displayed in Table 6-3.  The average number of gunshot wounds per victim did not decrease in any of these three cities.  Gunshot wounds per victim actually increased in all these cities, but these increases were not statistically significant.[82] [83]

Table 6-3.    Gunshot wounds per gun homicide victim, Milwaukee, Seattle, and Jersey City

|  | Cases | Average | Standard deviation | T value | P level |
|---|---|---|---|---|---|
| **Milwaukee County (N = 418)** | | | | | |
| Pre-ban:  January '92 - August '94 | 282 | 2.28 | 2.34 | | |
| Post-ban:  September '94 - December '95 | 136 | 2.52 | 2.90 | | |
| *Difference* | | + 0.24 | | 0.85* | .40 |
| | | | | | |
| **Seattle and King County (N = 275)** | | | | | |
| Pre-ban:  January '92 - August '94 | 184 | 2.08 | 1.78 | | |
| Post-ban: September '94 - June '96 | 91 | 2.46 | 2.22 | | |
| *Difference* | | + 0.38 | | 1.44* | .15 |
| | | | | | |
| **Jersey City (N =44)** | | | | | |
| Pre-ban:  January '92 - August '94 | 24 | 1.58 | 1.56 | | |
| Post-ban: September '94 - May '96 | 20 | 1.60 | 1.79 | | |
| *Difference* | | + 0.02 | | 0.03 | .97 |

* T values were computed using formula for populations having unequal variances

[82] Our comparisons of pre-ban and post-ban cases throughout this section are based on the assumption that the cases in each sample are independent.  Technically, this assumption may be violated by incidents involving multiple victims and/or common offenders.  Violation of this assumption has the practical consequence of making test statistics larger, thus making it more likely that differences will appear significant.  Since the observed effects in these analyses are insignificant and usually in the wrong direction, it does not appear that violation of the independence assumption is a meaningful threat to our inferences.

[83] We also ran tests comparing only cases from 1993 (the last full year prior to passage and implementation of Title XI) and 1995 (the first full year following implementation of Title XI).  These tests also failed to yield evidence of a post-ban reduction in the number of wounds per case.

Exhibit 4
Page 00268

**ER_2460**

Time trends in the monthly average of wounds per victim for Milwaukee and Seattle are displayed in Figure 6-2 and Figure 6-3. Figure 6-4 presents quarterly time trends for Jersey City. None of the graphs provide strong visual evidence of trends or changes in trends associated with the implementation of Title XI, but the Milwaukee and Seattle graphs are somewhat suggestive of upward pre-ban trends that may have been affected by the ban. We made limited efforts to estimate interrupted time series models (McCleary and Hay 1980) for these two series. The Milwaukee model provided no evidence of a ban effect,[84] and the efforts to model the Seattle data were inconclusive.[85] Because the ban produced no effects in Milwaukee or Seattle, it was not necessary to draw inferences about Jersey City as a comparison site.

**Figure 6-2.    Gunshot wounds per gun homicide victim by month, Milwaukee County, January 1992–December 1995**



---

[84] We tested the Milwaukee data under various theories of impact but failed to find evidence of an effect from the ban.

[85] The Seattle data produced an autocorrelation function (see McCleary and Hay 1980) that was uninterpretable, perhaps as a result of the small number of gun murders per month in Seattle. Aggregating the data into larger time periods (such as quarters) would have made the series substantially shorter than the 40-50 observations commonly accepted as a minimum number of observations necessary for Box-Jenkins (i.e., ARIMA) modeling techniques (e.g., see McCleary and Hay 1980, p.20).

Exhibit 4
Page 00269

**ER_2461**

**Figure 6-3.    Gunshot wounds per gun homicide victim by month, King County (Seattle), January 1992–June 1996**



**Figure 6-4.    Gunshot wounds per gun homicide victim by quarter, Jersey City, January 1992–May 1996**



Exhibit 4
Page 00270

**ER_2462**

### *6.3.2.   Proportion of Cases With Multiple Wounds:  San Diego and Boston*

The data from San Diego and Boston identified cases only as being single or multiple wound cases.  We examined the proportions of pre-ban and post-ban cases involving multiple wounds and utilized contingency tables with chi-square tests to determine whether pre-ban and post-ban cases differed significantly.[86]

The proportion of San Diego County's gun homicide victims sustaining multiple wounds increased very slightly after the ban (see Table 6-4), thus providing no evidence of a ban impact.  Nor do there appear to have been any significant temporal trends before or after the ban (see Figure 6-5).

**Figure 6-5.   Proportion of gunshot homicides with multiple wounds by month, San Diego County, January 1992–June 1996**



The Boston data require further explanation and qualification.  The data were taken from the Weapon-Related Injury Surveillance System (WRISS) of the Massachusetts Department of Public Health (MDPH).  WRISS tracks gunshot and stabbing cases treated in acute care hospital emergency departments throughout the state.[87] These data have the unique advantage of providing trends for non-fatal victimizations, but they represent a biased sample of gunshot homicide cases because gun homicide victims found dead at the scene are not tracked by WRISS.[88]  Since multiple wound victims can be expected to have a greater chance of dying at the scene, WRISS

---

[86] Monthly and quarterly averages in the fraction of cases involving multiple wounds did not appear to follow discernible time trends for any of these series (see Figure 6-5 through Figure 6-8).  Therefore, we did not analyze the data using time series methods.

[87] For a discussion of error rates in the determination of wound counts by hospital staff, see Randall (1993).

[88] The MDPH also maintains a database on all homicide victims, but this database does not contain single/multiple wound designations and data for 1995 are not complete as of this writing.

Exhibit 4
Page 00271

data are likely to underestimate the fraction of gun homicide victims with multiple wounds. While it is possible that this bias has remained constant over time, the gun homicide trends should be treated cautiously.

92

Exhibit 4
Page 00272

Table 6-4.    Proportion of gunshot victims receiving multiple wounds, San Diego and Boston

| | Cases | Proportion with multiple wounds | Standard deviation |
|---|---|---|---|
| **San Diego homicides (N = 668)** | | | |
| Pre-ban:  January '92 - August '94 | 445 | .41 | .49 |
| Post-ban: September '94 - June '96 | 223 | .43 | .50 |
| *Difference* | | .02 | |
| $\xi^2 = 0.177$ | | | |
| *P level = .674* | | | |
| **Boston Gun homicides (N = 53)** | | | |
| Pre-ban:  January '92 - August '94 | 32 | .50 | .50 |
| Post-ban: September '94 - December '95 | 21 | .38 | .50 |
| *Difference* | | -.12 | |
| $\xi^2 = 0.725$ | | | |
| *P level = .39* | | | |
| **Boston non-fatal gunshot victims (N = 762)** | | | |
| Pre-ban:  January '92 - August '94 | 518 | .18 | .39 |
| Post-ban: September '94 - December '95 | 244 | .24 | .43 |
| *Difference* | | .06 | |
| $\xi^2 = 3.048$ | | | |
| *P level = .08* | | | |
| **Boston total gunshot victims (N = 815)** | | | |
| Pre-ban:  January '92 - August '94 | 550 | .20 | .40 |
| Post-ban: September '94 - December '95 | 265 | .27 | .44 |
| *Difference* | | .07 | |
| $\xi^2 = 4.506$ | | | |
| *P level = .03* | | | |

Exhibit 4
Page 00273

**ER_2465**

An additional concern with WRISS data is that system compliance is not 100 percent. Based on figures provided by MDPH, yearly hospital reporting rates in Boston during the study period were as follows: 63 percent for 1992; 69 percent for 1993; 75 percent for 1994; and 79 percent for 1995. It is thus possible that gunshot cases treated in non-reporting hospitals differ significantly from those treated in reporting hospitals with respect to single/multiple wound status. For all of these reasons, the Boston data should be interpreted cautiously. Overall, the WRISS captured 18 to 33 percent of Boston's gun homicides for the years 1992–94.

Pre-ban/post-ban comparisons for fatal, non-fatal, and total gunshot cases from WRISS are presented in Table 6-4. The proportion of multiple wound cases decreased only for gun homicides. This decrease was not statistically significant, but the sample sizes were very small and thus the statistical power of the test is rather low. Nonetheless, the non-fatal wound data, which are arguably less biased than the fatal wound data, show statistically meaningful increases in the proportion of cases with multiple wounds.[89] Figure 6-6 through Figure 6-8 present monthly or quarterly trends for each series. These trends fail to provide any visual evidence of a post-ban reduction in the proportion of multiple wound gunshot cases.[90] Thus, overall, the Boston data appear inconclusive.

Figure 6-6.   Proportion of fatal gunshot wound cases with multiple wounds by quarter, Boston



_____

[89] Further, the decrease for homicide cases could have been due to an increase in the proportion of multiple wound victims who died at the scene and were not recorded in the WRISS.

[90] As with the Milwaukee and Seattle data, we also ran supplemental tests with the San Diego and Boston data using only cases from 1993 and 1995. These comparisons also failed to produce evidence of post-ban reductions in the proportion of gunshot cases with multiple wounds.

Exhibit 4
Page 00274

**ER_2466**

Figure 6-7.   Proportion of non-fatal gunshot wound cases with multiple wounds by month, Boston, January 1992–December 1995



Figure 6-8.   Proportion of gunshot wound victims with multiple wounds by month, Boston, January 1992–December 1995



95

Exhibit 4
Page 00275

### 6.3.3.   Assault Weapons, Large-Capacity Magazines, and Multiple Wound Cases: Milwaukee

Most of the data sources used in this investigation contain little or no detailed information regarding weapon makes and models. Consequently, the validity of the previous analyses rest on indirect, inferred links between multiple wound gun homicides and expected changes in the use of assault weapons and large-capacity magazines.

However, we were able to make more explicit links between the banned weapons and gunshot wound counts by performing a cross-sectional analysis with the data from Milwaukee. Complete weapon make and model data were obtained for 149 guns associated with the 418 gun murders which occurred in Milwaukee County from 1992 through 1995. Eight of these firearms, or 5.4 percent, were assault weapons named in Title XI or copies of firearms named in Title XI (all of the assault weapons were handguns).[91] Table 6-5 shows the mean number of wounds for gun homicide victims killed with assault weapons and other guns. Note that in Table 6-5 we screened out two cases in which the victim appeared to have been shot with multiple firearms. One of these cases involved an assault weapon. The results in Table 6-5 indicate that victims killed with assault weapons were shot a little over three times on average, while victims killed with other firearms were shot slightly over two times on average. This difference was not statistically significant, but the small number of cases involving assault weapons makes the test rather weak.

Table 6-5.    Gunshot wounds per gun homicide victim: Assault weapon and large-capacity magazine cases, Milwaukee

| | Cases | Average | Standard deviation | T value | P level |
|---|---|---|---|---|---|
| **Assault weapons v. other firearms (N = 147)** | | | | | |
| Assault weapons | 7 | 3.14 | 3.08 | | |
| Other firearms | 140 | 2.21 | 2.87 | | |
| *Difference* | | 0.93 | | 0.83 | .41 |
| | | | | | |
| **Firearms with banned large-capacity magazines v. other firearms (N = 132)** | | | | | |
| Large-capacity firearms | 30 | 3.23 | 4.29 | | |
| Other firearms | 102 | 2.08 | 2.48 | | |
| *Difference* | | 1.15 | | 1.41* | .17 |

*T values were computed using formula for populations having unequal variances.

We also conducted a more general examination of cases involving any firearm with a large-capacity magazine. There were 132 cases in which a victim was killed with a firearm for which make, model, and magazine capacity could be determined (the magazine capacity variable corresponds to the magazine actually recovered with the firearm). This analysis also excluded cases in which the victim was shot with more than one firearm. In 30 of these cases (23 percent), the victim was killed with a firearm carrying a large-capacity magazine

---

[91] It is possible that other firearms in the database were assault weapons according to the features test of Title XI, but we did not have the opportunity to fully assess this issue.

Exhibit 4
Page 00276

**ER_2468**

banned by Title XI. As is shown in the bottom of Table 6-5, offenders killed with guns having banned large-capacity magazines received over three wounds on average. In contrast, persons killed with firearms having non-banned magazines received an average of two wounds. Despite the relatively small number of large magazine cases, the t statistic is moderately large and could be considered statistically meaningful with a one-tailed test.[92] In addition, we constructed a regression model in which wound counts were regressed upon magazine capacity and the number of perpetrators involved in the incident.[93] The large-capacity magazine coefficient was 1.24 with a two-tailed p level equal to 0.05 (however, the equation explained only 3 percent of the variance in wound counts). These admittedly crude comparisons support the hypothesis that large-capacity magazines are linked to higher numbers of shots fired and wounds inflicted.

### 6.3.4.  *Conclusions*

Our multi-site analysis of gunshot wounds inflicted in fatal and non-fatal gunshot cases failed to produce evidence of a post-ban reduction in the average number of gunshot wounds per case or in the proportion of cases involving multiple wounds. These results are perhaps to be expected. Available data from national gun trace requests to BATF (see Chapter 5), Milwaukee (this chapter), and other cities (see Chapters 2 and 5) indicate that assault weapons account for only 1 to 7 percent of all guns used in violent crime. Likewise, our analysis of guns used in homicides in Milwaukee suggests that a substantial majority of gun homicides (approximately three-quarters) are not committed with guns having large-capacity magazines. Further, victims killed with large-capacity magazines in Milwaukee were shot three times on average, a number well below the ten-round capacity permitted for post-ban magazines. This does not tell us the actual number of shots fired in these cases, but other limited evidence also suggests that most gun attacks involve three or fewer shots (Kleck 1991; McGonigal et al. 1993). Finally, a faster rate of fire is arguably an important lethality characteristic of semiautomatics which may influence the number of wounds inflicted in gun attacks; yet one would not expect the Crime Act to have had an impact on overall use of semiautomatics, of which assault weapons were a minority even before the ban.

On the other hand, the analysis of Milwaukee gun homicides did produce some weak evidence that homicide victims killed with guns having large-capacity magazines tended to have more bullet wounds than did victims killed with other firearms. This may suggest that large-capacity magazines facilitate higher numbers of shots fired per incident, perhaps by encouraging gun offenders to fire more shots (a phenomenon we have heard some police officers refer to as a "spray and pray" mentality). If so, the gradual attrition of the stock of pre-ban large-capacity magazines could have important preventive effects on the lethality of gun violence. However, our analysis of wounds inflicted in banned and non-banned magazine cases was crude and did not control for potentially important characteristics of the incidents, victims, and offenders. We believe that such incident-based analyses would yield important information about the role of specific firearm characteristics in lethal and non-lethal gun violence and provide further guidance by which to assess this aspect of the Crime Act legislation.

---

[92] Note that two cases involving attached tubular .22 caliber large-capacity magazines were included in the non-banned magazine group because these magazines are exempted by Title XI. In one of these cases, the victim sustained 13 wounds. In a second comparison, these cases were removed from the analysis entirely. The results were essentially the same; the two-tailed p level for the comparison decreased to .13.

[93] The regression model (N=138) included cases in which the victim was shot with more than one gun. Separate variables were included for the number of victims and the use of more than one firearm. Both variables proved insignificant, but the perpetrator variable had a somewhat larger t statistic and was retained for the model discussed in the main text.

Exhibit 4
Page 00277

**ER_2469**

## 6.4.  LAW ENFORCEMENT OFFICERS KILLED IN ACTION

### 6.4.1.  Introduction and Data

As a final measure of consequences stemming from the assault weapons ban, we examined firearm homicides of police officers. Assault weapons and other high capacity firearms offer substantial firepower to offenders and may be especially attractive to very dangerous offenders. Further, the firepower offered by these weapons may facilitate successful gun battles with police. We hypothesized that these weapons might turn up more frequently in police homicides than in other gun homicides, and that the Crime Act might eventually decrease their use in these crimes.

To investigate this issue, we obtained data from the Federal Bureau of Investigation (FBI) on all gun murders of police officers from January 1992 through May 1996.[94] The data include the date of the incident, the state in which the incident occurred, the agency to which the officer belonged, and the make, model, and caliber of the firearm reportedly used in the murder. During this period, 276 police officers were killed by offenders using firearms. Gun murders of police peaked in 1994 (see Table 6-6). Data for 1995 and early 1996 suggest a decline in gun murders of police. However, any drop in gun murders of police could be due to more officers using bullet-proof vests, changes in policing tactics for drug markets, or other factors unrelated to the assault weapons ban. Moreover, the 1995 and 1996 data we received are preliminary and thus perhaps incomplete. For these reasons, we concentrated on the use of assault weapons in police homicides and did not attempt to judge whether the assault weapon ban has caused a decline in gun murders of police.

Table 6-6.  Murders of police officers with assault weapons

| Year | Total gun murders of police officers | Officers killed with assault weapons | Proportion of victims killed with assault weapons (minimum estimate) | Proportion of victims killed with assault weapons for cases in which gun make is known |
|------|------|------|------|------|
| 1992 | 54 | 0 | 0% | 0% |
| 1993 | 67 | 4 | 6% | 8% |
| 1994 | 76 | 9 | 12% | 16% |
| 1995* | 61 | 7 | 11% | 16% |
| 1996* (Jan–May) | 18 | 0 | 0% | 0% |
| *Data for 1995 and 1996 are preliminary | | | | |

Even this more limited task was complicated by the fact that complete data on the make, model, and caliber of the murder weapon were not reported for a substantial proportion of these cases. The number of cases by year for which at least the gun make is known are 43 (80%) for 1992, 49 (73%) for 1993, 58 (76%) for 1994, 44 (72%) for 1995, and 10 (56%) for 1996.

### 6.4.2.  Assault Weapons and Homicides of Police Officers

We focused our investigation on all makes and models named in Title XI and their exact copies. We also included our selected features test guns (Calico and Feather models), although we did not make a systematic

---

[94] These data are compiled annually by the FBI based on reports submitted by law enforcement agencies throughout the country.

98

Exhibit 4
Page 00278

ER_2470

assessment of all guns which may have failed the features test of the Crime Act as produced by their manufacturers.[95] Using these criteria, our estimate is that 20 officers were murdered by offenders using assault weapons during this period. (In some of these cases, it appears that the same weapon was used to murder more than one officer.) Of these cases, 3 involved Intratec models, 6 were committed with weapons in the SWD family, 3 involved AR15's or exact AR15 copies, 2 cases involved Uzi's, and 6 cases identified AK-47's as the murder weapons.[96][97] These cases accounted for about 7% of all gun murders of police during this period. This 7% figure serves as a minimum estimate of assault weapon use in police gun murders. A more accurate estimate was obtained by focusing on those cases for which, at a minimum, the gun make was reported. Overall, 10% of these cases involved assault weapons, a figure higher than that for gun murders of civilians.[98]

All of the assault weapon cases took place from 1993 through 1995 (see Table 6-6). For those three years, murders with assault weapons ranged from 6% of the cases in 1993 to 12% in 1994. Among those cases for which firearm make was reported, assault weapons accounted for 8% in 1993 and 16% in both 1994 and 1995. All of these cases occurred prior to June 1995. From that point through May of 1996, there were no additional deaths of police officers attributed to assault weapons. This is perhaps another indication of the temporary or permanent decrease in the availability of these weapons which was suggested in Chapter 5.

In sum, police officers are rarely murdered with assault weapons. Yet the fraction of police gun murders perpetrated with assault weapons is higher than that for civilian gun murders. Assault weapons accounted for about 10% of police gun murders from 1992 through May of 1996 when considering only those cases for which the gun make could be ascertained. Whether the higher representation of assault weapons among police murders is due to characteristics of the weapons, characteristics of the offenders who are drawn to assault weapons, or some

---

[95] With the available data, it is not possible for us to determine whether otherwise legal guns were modified so as to make them assault weapons.

[96] There is a discrepancy between our data and those provided elsewhere with respect to a November 1994 incident in which two FBI agents and a Washington, D.C. police officer were killed. In a study of police murders from January 1994 through September 1995, Adler et al. (1995) reported that the offender in this case used a TEC9 assault pistol. The FBI data identify the weapon as an M11. (The data actually identify the gun as a Smith and Wesson M11. However, Smith and Wesson does not make a model M11. We counted the weapon as an SWD M11.)

In addition, Adler et al. identified one additional pre-ban incident in which an officer was killed with a weapon which may have failed the features test (a Springfield M1A). We are not aware of any other cases in our data which would qualify as assault weapon cases based on the features test, but we did not undertake an in-depth examination of this issue. There were no cases involving our select features test guns (Calico and Feather models).

[97] The weapon identifications in these data were made by the police departments reporting the incidents, and there is likely to be some degree of error in the firearm model designations. In particular, officers may not always accurately distinguish banned assault weapons from legal substitutes or look-alike variations. We note the issue here due to the prominence of AK-47's among guns used in police homicides. There are numerous AK-47 copies and look-alikes, and firearm experts have informed us that legal guns such as the SKS rifle and the Norinco NHM-90/91 (a modified, legal version of the AK-47) are sometimes, and perhaps commonly, mistakenly identified as AK-47's.

[98] In consultation with BATF officials, we developed a list of manufacturers who produced models listed in the Crime Act and exact copies of those firearms. We were thus able to determine whether all of the identified makes in the FBI file were assault weapons.

Exhibit 4
Page 00279

combination of both is unclear. However, there have been no recorded murders of police with assault weapons since the early part of 1995.[99]

These findings have important ramifications for future research on the impact of the assault weapons ban. The relatively high use of assault weapons in murders of police suggests that police gun murders should be more sensitive to the effects of the ban than gun murders of civilians. That is, if the disproportionate representation of assault weapons among gun homicides of police is attributable to the objective properties of these firearms (i.e., the greater lethality of these firearms), then a decrease in the availability of these guns should cause a notable reduction of police gun murders because other weapons will not be effective substitutes in gun battles with police. At this point, however, it is not clear whether the high representation of assault weapons among police murder cases is due to the greater stopping power of assault weapons (most assault weapons are high velocity rifles or high velocity handguns and thus inflict more serious wounds), their rate of fire and ability to accept large-capacity magazines, some combination of these weapon characteristics, or simply the traits of offenders who prefer assault weapons. A variety of non-banned weapons may serve as adequate substitutes for offenders who engage in armed confrontations with police.

As more data become available, we encourage the study of trends in police gun murders before and after the Crime Act. Furthermore, we believe that research on these issues would be strengthened by the systematic recording of the magazines with which police murder weapons were equipped and the numbers of shots fired and wounds inflicted in these incidents.

---

[99] We did not examine police murders committed with firearms capable of accepting large-capacity magazines because the available data do not enable us to determine whether any guns used after the ban were actually equipped with pre-ban large-capacity magazines, nor do the data indicate the number of shots fired in these incidents. Moreover, in recent years many police departments have adopted large-capacity semiautomatic handguns as their standard firearm. Since about 14% of police officers murdered with guns are killed with their own firearms (FBI 1994, p.4), this could create an apparent increase in police murders with large-capacity firearms. (We did not acquire data on whether the officers were killed with their own firearms.) For a discussion of large-capacity firearms used in killings of police from January 1994 through September 30, 1995, see Adler et al. (1995).

Exhibit 4
Page 00280

ER_2472

# 7.  REFERENCES

Adler, W.C., F.M. Bielke, D.J. Doi, and J.F. Kennedy, *Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns With High Capacity Magazines.* Washington, D.C.: Handgun Control, Inc., 1995.

American Medical Association Council on Scientific Affairs. "Assault Weapons as a Public Health Hazard in the United States." *Journal of the American Medical Association,* 267:22 (1992): 3067-3070.

Berndt, Ernst R. *The Practice of Econometrics: Classic and Contemporary.* Reading, Mass: Addison Wesley, 1990.

Black, D.A. and D.S. Nagin. *Do 'Right-to-Carry' Laws Deter Violent Crime?.* Draft. Heinz School of Public Policy, Carnegie-Mellon University, 1996.

Box, G.E.P. and G.C. Tiao. "Intervention Analysis with Applications to Economic and Environmental Problems." *Journal of the American Statistical Association,* 70 (1975): 70-79.

Bureau of Alcohol, Tobacco and Firearms. *The National Tracing Center 1994 Year End Report.* Washington, D.C.: U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, 1995(a).

Bureau of Alcohol, Tobacco and Firearms. *1994 Firearms Enforcement Investigative Report.* Washington, D.C.: U.S. Department of the Treasury, U.S. Bureau of Alcohol, Tobacco and Firearms, 1995(b).

Bureau of Alcohol, Tobacco, and Firearms. *Report and Recommendation of the BATF Working Group on the Importability of Certain Semiautomatic Rifles.* Washington, D.C.: U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, 1989.

Bureau of Justice Statistics. *Murder Cases in 33 Large Urban Counties in the United States, 1988.* BJS Special Report. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, 1993.

California Attorney General's Office. *Assault Weapons: Background Paper.* Sacramento: California Attorney General's Office, February 1989.

Campbell, Donald T. and Julian C. Stanley. *Experimental and Quasi-Experimental Designs for Research.* Boston: Houghton Mifflin Company, 1963.

Chinn, M.D. "Beware of Econometricians Bearing Estimates: Policy Analysis in a 'Unit Root' World." *Journal of Policy Analysis and Management,* 10:4 (1991): 546-567.

Chow, Gregory. "Technological Change and the Demand for Computers." *The American Economic Review,* 57 (1967): 1117-1130.

Cook, P.J. and J.A. Leitzel. *Perversity, Futility, Jeopardy: An Economic Analysis of the Attack on Gun Control.* Durham, NC: Sanford Institute of Public Policy, Duke University, 1996.

Cook, P.J., S. Molliconi, and T.B. Cole. Regulating Gun Markets. *Journal of Criminal Law and Criminology,* 86:1 (1995): 59-92.

Cox Newspapers. *Firepower: Assault Weapons in America.* Washington, D.C.: Cox Enterprises, 1989.

Dietz, P. "Mass, serial, and sensational homicides." *Bulletin of the New York Academy of Medicine,* 62 (1986): 477-491.

DiMaio, V.J.M. *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques.* New York: Elsevier, 1985.

Fackler, M.L. *Declaration of Martin L. Fackler, Amicus Curiae Brief, Castillo vs. City of Los Angeles.* California Court of Appeals, 1st Appellate District, Division 5, 1989.

Exhibit 4
Page 00281

**ER_2473**

Federal Bureau of Investigation. *Killed in the Line of Duty: A Study of Selected Felonious Killings of Law Enforcement Officers.* Washington, D.C.: U.S. Department of Justice, Federal Bureau of Investigation, Uniform Crime Reporting Section, 1992.

Federal Bureau of Investigation. *Law Enforcement Officers Killed and Assaulted, 1993.* Washington, D.C.: U.S. Department of Justice, Federal Bureau of Investigation, 1994.

Fjestad, S.J. *Blue Book of Gun Values.* 17th ed., Kennedy et al., eds. Minneapolis: Blue Book Publications, 1996.

Handgun Control, Inc. *The Assault Weapons Ban: Questions & Answers.* Washington, D.C.: Handgun Control, Inc., (n.d.).

Holmes, Ronald M. and Stephen T. Holmes. *Murder in America.* Thousand Oaks, CA: Sage Publications, 1994.

Hutson, H.R., D. Anglin and M.J. Pratts, Jr. "Adolescents and Children Injured or Killed in Drive-By Shootings in Lost Angeles." *The New England Journal of Medicine,* 330 (1994): 324-327.

Jacobs, J.B. and K.A. Potter. "Keeping Guns Out of the 'Wrong' Hands: The Brady Law and the Limits of Regulation." *Journal of Criminal Law and Criminology,* 86:1 (1995): 93-120.

Kennedy, D. "Juvenile Gun Violence in Boston: Gun Markets, Juvenile Offenders, and Use Reduction." Presentation at the annual meeting of the American Society of Criminology, Chicago, 1996.

Kennedy, D.M., A.M. Piehl, and A.A. Braga. "Youth Gun Violence in Boston: Gun Markets, Serious Youth Offenders, and a Use Reduction Strategy." *Law and Contemporary Problems,* (Forthcoming).

Kleck, G. *Point Blank: Guns and Violence in America.* New York: Aldine De Gruyter, 1991.

Knox, G.W., J.G. Houston, J.A. Laskey, T.F. McCurrie, E.D. Tromanhauser, and D.L. Laske. *Gangs and Guns.* Chicago: National Gang Crime Research Center, 1994.

Koper, C.S. *Gun Lethality and Homicide: Gun Types Used by Criminals and the Lethality of Gun Violence in Kansas City, Missouri, 1985–1993.* Ann Arbor, MI: University Microforms Inc., 1995.

Lenett, M.G. "Taking a Bite Out of Violent Crime." *University of Dayton Law Review,* 20 (1995): 573-617.

Loftin, C., D. McDowall, B. Wiersma, and T.J. Cottey. "Effects of Restrictive Licensing of Handguns on Homicide and Suicide in the District of Columbia." *New England Journal of Medicine,* 325 (December 1991): 1615-1620.

Lott, J.R. and D.B. Mustard. *Crime, Deterrence, and Right-to-Carry Concealed Handguns.* Chicago, IL: University of Chicago Law School, (Draft) 1996.

Marvell, T.B. and C.E. Moody. "The Impact of Enhanced Prison Terms for Felonies Committed with Guns." *Criminology,* 33:2 (1995): 247-282.

Mastro, Timothy D., Dwip Kitayaporn, Bruce G. Weniger, et. al. "Estimating the Number of HIV-Infected Drug Users in Bangkok: A Capture-Recapture Method." *American Journal of Public Health,* 84 (1994): 1094-1099.

Mathews, J. "Unholstering the Gun Ban." *Washington Post,* December 31, 1989.

McCleary, R. and R.A. Hay. *Applied Time Series Analysis for the Social Sciences.* Beverly Hills, CA: Sage, 1980.

McDowall, D. *Firearm Availability and Homicide Rates in Detroit, 1951–1986.* Social Forces, 1991.

McDowall, David, Colin Loftin, and Brian Wiersema. "Using Quasi-Experiments to Evaluate Firearm Laws: Comment on Britt et al.'s Reassessment of the D.C. Gun Law." *Law and Society Review,* 30 (1996): 381-391.

McGonigal, M., J.Cole, C.W. Schwab, D.R. Kauder, M.F. Rotondo, and P.B. Angood. "Urban Firearm Deaths: A Five Year Perspective." *The Journal of Trauma,* 35 (1993): 532-537.

Exhibit 4
Page 00282

National Alliance of Stocking Gun Dealers. "Discussion of Federal Firearms License." Statement presented to House and Senate Judiciary Committee. Havelock, NC: National Alliance of Stocking Gun Dealers, May 15, 1993.

National Institute of Justice. "Arrestees and Guns: Monitoring the Illegal Firearms Market." *Research Preview*. Washington, DC: U.S. Department of Justice, National Institute of Justice, 1995(a).

Neugebauer, Richard and Janet Wittes. "Annotation: Voluntary and Involuntary Capture-Recapture Samples - Problems in the Estimation of Hidden and Elusive Populations." *American Journal of Public Health*, 84 (1994): 1068-1069.

New York City Division of Criminal Justices Services. *Assault Weapons and Homicide in New York City*. Public Policy Report. Albany, NY: New York State Division of Criminal Justice Services, 1994.

Pierce, G.L., L. Briggs, and D.A. Carlson. *The Identification of Patterns in Firearms Trafficking: Implications for Enforcement Strategy*. Washington, D.C.: U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, Office of Enforcement, December 1995.

Randall, T. "Clinicians' Forensic Interpretations of Fatal Gunshot Wounds Often Miss the Mark." *Journal of the American Medical Association*, 269 (1993): 2058-2061.

Reiss, A.J., Jr., and J.A. Roth, eds. *Understanding and Preventing Violence Volume 1*. Washington, D.C.: National Academy Press, 1993.

Roth, J.A. *Youth Gun Violence: A Research Application Review*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice, Draft submitted June 1993.

SAS Institute. *SAS/ETS User's Guide, Version 6 (2nd ed.)*. Cary, NC: SAS Institute, 1993.

Shaw, James Wilford. *Community Policing Against Crime: Violence and Firearms*. PhD. Dissertation. College Park, MD: University of Maryland, Department of Criminology and Criminal Justice, 1994.

Sheley, Joseph F. and James D. Wright. "Gun Acquisition and Possession in Selected Juvenile Samples." *NIJ Research in Brief*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice, 1993.

Sherman, Lawrence W., Leslie Steele, Deborah Laufersweiler, Nancy Hoffer, and Sherry A. Julian. "Stray Bullets and 'Mushrooms' : Random Shootings of Bystanders in Four Cities, 1977–1988." *Journal of Quantitative Criminology*, 5 (1989): 297-316.

U.S. Department of Treasury. *A Progress Report: Gun Dealer Licensing and Illegal Gun Trafficking*. Washington, D.C.: U.S. Department of Treasury, Undersecretary for Enforcement, January 1997.

Webster, D.W., H.R. Champion, P.S. Gainer, and L. Sykes. "Epidemiologic Changes in Gunshot Wounds in Washington, D.C., 1983–1990." *Archives of Surgery*, 127 (1992): 694-698.

Wintemute, Garen J. *Ring of Fire: The Handgun Makers of Southern California*. Sacramento, CA: Violence Prevention Research Program, 1994.

Wright, James D. and Peter H. Rossi. *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*. New York: Aldine De Gruyter, 1986.

Zawitz, Marianne W. *Guns Used in Crime*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics (NCJ-148201), 1995.

Exhibit 4
Page 00283

**ER_2475**

# Appendix A
# Assault Weapons and Mass Murder

## INTRODUCTION: MASS MURDERS AS AN IMPACT MEASURE

As another indicator of ban effects on the consequences of assault weapon use, we attempted to analyze pre- and post-ban trends in mass murders, which we defined as the killing of four or more victims at one time and place by a lone offender. Although we lacked advance information on the proportion of mass murders involving assault weapons, we had two reasons for believing that assault weapons were more prevalent in mass murders than in events involving smaller numbers of victims:

1) A weapon lethality/facilitation hypothesis, that assault weapon characteristics, especially high magazine capacities, would enable a rational but intent killer to shoot more people more rapidly with an assault weapon than with many other firearms.

2) A selection hypothesis, that certain deranged killers might tend to select assault weapons to act out "commando" fantasies (e.g., see Holmes and Holmes 1994, pp.86-87).

In addition, we believed that newspaper reports of mass murders might carry more detail than reports of other murders, and that these reports might provide insights into the situational dynamics of mass murders involving assault weapons.

Our attempt to construct and analyze a 1992--96 trend line in mass murders using Nexis searches of U.S. news sources foundered, for two primary reasons. First, apparent variations in reporting or indexing practices forced us to alter our search parameters over the period, and so all three kinds of variation introduce validity problems into the trends. Second, newspaper accounts were surprisingly imprecise about the type of weapon involved. In some cases, the offender had not yet been apprehended and thus the make and model of the weapon was probably unknown. In other instances, there was apparent inattention or confusion regarding the make, model, and features. Finally, some offenders were armed with multiple weapons when they committed their crimes or when they were captured, and it was unclear to the reporter which weapon accounted for which death(s).[1]

Nevertheless, our mass murder analysis produced several interesting, though tentative, findings. First, SHR and news media sources both appear to undercount mass murders under our definition, and our capture-recapture analysis suggests that their true number may exceed the count based on either source by something like 50 percent. Second, contrary to our expectations, only 2 — 3.8 percent — of the 52 mass murders we gleaned from the Nexis search unambiguously involved assault weapons. This is about the same percentage as for other murders. Third, media accounts lend some tenuous support to the notion that assault weapons are more deadly than other weapons in mass murder events, as measured by victims per incident.

Our search methodology and the findings above are explained more fully in the following sections, which conclude with recommendations for further related research.

---

[1] It is also not unusual for news accounts to use imprecise terms like "assault rifle" when describing a military-style firearm. However, we did not encounter any such cases in our particular sample.

A-1

Exhibit 4
Page 00284

## DEFINING MASS MURDERS AND SAMPLE SELECTION

In general terms, a mass murder is the killing of a number of people at one time and place. The time requirement in particular sets mass murders apart from serial murders, which take place over a very long timeframe. We focused our analysis upon mass murders committed with firearms, and we chose four victims for our operational definition of mass murder.[2] In addition, we focused upon cases in which the murders were committed by one offender. We selected the victim and offender criteria based on practicality and because they arguably fit better with the weapon lethality/weapon facilitation argument. If assault weapons do contribute to mass murder, we hypothesized that they will enable a single offender to murder greater numbers of people at one time. Thus, we selected a subset of mass murders for which we felt assault weapons might plausibly play a greater role.

Project staff conducted Nexis searches for multiple-victim firearm murder stories appearing in U.S. news sources from 1992 through the early summer of 1996. Fifty-two stories meeting our firearm mass murder criteria were found. A breakdown of these cases by year is shown in the bottom row of table A-1.[3] Cases ranged from a low of 3 in 1994 and 1996 to a high of 20 in 1995. We urge caution in the interpretation of these numbers. Although project staff did examine well over a thousand firearm murder stories, we do not claim to have found all firearm mass murders occurring during this time. Rather, these cases should be treated as a possibly unrepresentative sample of firearm mass murders. Further, we do not recommend using these numbers as trend indicators. We refined our search parameters several times during the course of the research, and we cannot speak to issues regarding changes in journalistic practices (or Nexis coverage) which may have occurred during this period and affected our results. This portion of the evaluation was more exploratory in nature, and the primary goal was to assess the prevalence of assault weapons among a sample of recent mass murder incidents.

Table A-1.    Mass murder newspaper reports, by weapon type and year of event

|  | 1992 | 1993 | 1994 | 1995 | 1996 | Total |
|---|---|---|---|---|---|---|
| **Semiautomatics** | | | | | | |
| Handgun | 4 | 3 | 1 | 7 | 1 | 16 |
| Rifle | 0 | 0 | 0 | 2 | 0 | 2 |
| | | | | | | |
| **Generic weapon types** | | | | | | |
| Revolver | 0 | 0 | 0 | 1 | 0 | 1 |
| Other non-semiautomatic handgun | 0 | 0 | 0 | 0 | 0 | 0 |
| Handgun, type unknown | 2 | 2 | 0 | 1 | 0 | 5 |
| Non-semiautomatic rifle | 0 | 0 | 0 | 1 | 0 | 1 |
| Rifle, type unknown | 1 | 1 | 0 | 0 | 0 | 2 |
| Non-semiautomatic shotgun | 0 | 0 | 0 | 1 | 0 | 1 |
| Shotgun, type unknown | 2 | 3 | 0 | 1 | 0 | 6 |
| Unknown firearm | 5 | 2 | 2 | 6 | 2 | 17 |

---

[2] As Holmes and Holmes (1994, pp.71-73) have noted, most scholars set the victim criterion for mass murder at three or four victims.

[3] Table A-1 excludes 1 of the 52 for which we were unable to ascertain the date of the mass murder.

A-2

Exhibit 4
Page 00285

ER_2477

| Total cases | 14 | 11 | 3 | 20 | 3 | 51 |
|---|---|---|---|---|---|---|

## ESTIMATING TOTAL FIREARM MASS MURDERS: A METHODOLOGICAL NOTE

Our investigation of multiple/mass murders utilized both the SHR and news media as data sources. Both of these sources have limitations for this task. Though the SHR is widely accepted as an accurate source of homicide data, not all agencies in the country report homicides to the SHR, and agencies that do report to the SHR program may not report all of their homicides. Likewise, some mass murders may not be reported accurately in media sources, or the stories may differ in their accessibility depending on where they occurred and the publication(s) which carried the story. Family-related mass murders, for example, seem less likely to be reported in national sources (Dietz 1986), although the availability of national electronic searches through services such as Nexis would seem to lessen this problem.[4] Our experience suggests that both sources underestimate the number of true mass murders.

Capture-recapture methods (e.g., see Mastro et al. 1994; Neugebauer and Wittes 1994) offer one potential way of improving estimation of mass murders. Capture-recapture methods enable one to estimate the true size of a population based on the number of overlapping subjects found in random samples drawn from the population. Mastro et al. (1994), for example, have used this methodology to estimate the number of HIV-infected drug users in the population of a foreign city. Similarly, researchers in the biological sciences have used this methodology to estimate the size of different wildlife populations.

Given two samples from a population, the size of the population can be estimated as:

$$N = n1 * n2 / m$$

where N is the population estimate, n1 is the size of the first sample, n2 is the size of the second sample, and m is the amount of overlap in the samples (i.e., the number of subjects which turned up in the first sample and that were subsequently recaptured in the second sample). Neugebauer and Wittes (1994, p.1068) point out that this estimate is biased but that the "bias is small when the capture and recapture sizes are large." The reliability of the estimate depends on four assumptions (Mastro et al. 1994, pp.1096-1097). First, the population must be closed (in our case, this is not a problem because our samples are drawn from the same geographic area and time period). Second, the capture sources must be independent (if more than two sources are used, log-linear modeling can be used to account for dependence between the sources, and the assumption of independence is not necessary). Third, members of the population must have an equal probability of being captured. Finally, the matching procedure must be accurate — all matches must be identified and there can be no false matches.

As mentioned previously, our work with the SHR and media sources suggests that both sources underestimate the true number of firearm mass murders occurring in the nation. That being the case, we offer a tentative illustration of how capture-recapture methods might be used to estimate the true number of mass murders occurring in the nation based on the SHR and media source numbers. We add a number of qualifiers

---

[4] In our experience, one factor making mass murder cases more difficult to locate is that many of these stories are not labeled with dramatic terms such as "mass murder" or "massacre." Despite the rarity and tragedy of these events, they are often described in commonplace terms (headlines may simply state something like, "Gunman shoots five persons during robbery"). Thus, it becomes necessary to develop Nexis search parameters broad enough to capture various sorts of multiple-victim incidents. This, in turn, requires one to examine a much greater number of stories.

A-3

Exhibit 4
Page 00286

ER_2478

throughout this exercise. To begin with, the SHR and media sources might not seem independent because, generally speaking, news organizations are reliant upon police for information about crime. Once a homicide is discovered, on the other hand, the reporting apparatuses for the SHR and news organizations are distinct.

With that caveat in mind, we used the year 1992 for this demonstration. For that year, we identified all cases from both sources in which one offender killed four or more persons using a firearm. The SHR search turned up 15 cases, and the Nexis search yielded 14 cases.

Next, we attempted to match these cases. Tentatively, we determined that nine cases were common to both sources (see Table A-2). Our estimate for the number of incidents during 1992 in which one offender killed four or more persons using a firearm(s) thus becomes:

$$N = (15 * 14)/9 = 23.$$

Table A-2.   1992 HR/Nexis comparisons

| NEXIS | SHR | NEXIS & SHR |
|---|---|---|
| 14 | 15 | 9 |

| NEXIS ONLY | | NUMBER OF VICTIMS |
|---|---|---|
| 2/16/92 | Mobile, AL | 4 |
| 5/1/92 | Yuba County, CA | 4 |
| 6/15/92 | Inglewood, CA | 5 |
| 9/13/92 | Harris County, TX | 4 |
| 11/13/92 | Spring Branch, TX | 5 |

| FBI ONLY | | NUMBER OF VICTIMS |
|---|---|---|
| 8/92 | Dade, FL | 4 |
| 9/92 | Chicago, IL | 4 |
| 5/92 | Detroit, MI | 4 |
| 3/92 | New York, NY | 4 |
| 1/92 | Burleigh, ND | 4 |
| 7/92 | Houston, TX | 4 |

| NEXIS & FBI | | NUMBER OF VICTIMS |
|---|---|---|
| 2/12/92 | Seattle, WA | 4 |
| 3/21/92 | Sullivan, MO | 6 |
| 3/26/92 | Queens, NY | 5 |
| 7/23/92 | Fairmont, WV | 4 |
| 10/4/92 | Dallas, TX | 4 |
| 10/15/92 | Schuyler County | 4 |
| 11/1/92 | Rancho Santa Fe, CA | 4 |
| 12/13/92 | King County, WA | 4 |
| 12/24/92 | Prince William County, VA | 4 |

A number of cautionary notes are required. Obviously, our sample sizes are quite small, but, apparently, so is the population which we are trying to estimate. In addition, our matches between the sources were based on matching the town (determined from the police department's name), month of occurrence, number of victims, and number of offenders. In a more thorough investigation, one would wish to make the matches more carefully. If,

A-4

Exhibit 4
Page 00287

for instance, the victims were not all immediately killed, one may find a news story referring to the initial number of deaths, and that count might not match the final count appearing in the SHR. Moreover, we have focused on cases in which one offender committed the murders. However, the SHR might list two or more offenders if there were other accomplices who did not do the shooting. Finally, there could be ambiguity regarding the exact location of the SHR cases because we used the police department name to match the locations with the Nexis cases (city or town name does not appear in the file). We did not investigate these issues extensively, but they would seem to be manageable problems.

Another issue is whether each incident's probability of being captured is the same for each sample. Our tentative judgment is that this is not the case, or at least it does not appear to have been true for our sample. Referring to Table A-2, it seems that the SHR-only cases were more likely to appear in urban areas, whereas the Nexis-only cases appear to have taken place in more rural areas. We can speculate that rural police departments are somewhat less likely to participate in the SHR, and that cases in rural areas are thus less likely to be reported to the SHR. In contrast, the greater number of murders and violent acts which occur in urban areas may have the effect of making any given incident less newsworthy, even if that incident is a mass murder. A mass murder taking place among family members in an urban jurisdiction, for instance, might get less prominent coverage in news sources and might therefore be more difficult to locate in a national electronic space.

But even if we accept these biases as real, we can at least estimate the direction of the bias in the capture-recapture estimate. Biases such as those discussed above have the effect of lessening the overlap between our sources. Therefore, they decrease the denominator of the capture-recapture equation and bias the population estimate upwards. With this in mind, our 1992 estimate of 23 cases should be seen as an upper estimate of the number of these incidents for that year.

In this section, we have provided a very rough illustration of how capture-recapture models might be utilized to more accurately estimate the number of mass murders in the U.S. or any portion of the U.S. If additional homicide sources were added such as the U.S. Public Health Service's Mortality Detail Files, moreover, researchers could model any dependencies between the sources. With further research into past years and ahead into future years, researchers could build time series to track mass murders and firearm mass murders over time. This may be a worthwhile venture because though these events are only a small fraction of all homicides, they are arguably events which have a disproportionately negative impact on citizens' perceptions of safety.

### *Firearms Used in Mass Murders*

Table A-1 displays information about the weapons used in our sample of mass murders. One of the major goals behind the Nexis search was to obtain more detailed information on the weapons used in firearm mass murders. Yet a substantial proportion of the articles said nothing about the firearm(s) used in the crime or identified the gun(s) with generic terms such as "handgun," "rifle," or "shotgun." Overall, 18 stories identified the murder weapon(s) as a semiautomatic weapon, and 16 of these guns were semiautomatic handguns. Only eight stories named the make and model of the murder weapon.

Despite the general lack of detailed weapon information, our operating assumption was that, due to their notoriety, assault weapons would draw more attention in media sources. That is, we assumed that reporters would explicitly identify any assault weapons that were involved in the incident and that unidentified weapons were most likely not assault weapons. This assumption is most reasonable for cases in which the offender was apprehended. Overall, 37 cases (71 percent) were solved and another 6 (11.5 percent) had known suspects.

Exhibit 4
Page 00288

Of the total 52 cases in our sample, 2, or 3.8 percent, involved assault weapons as the murder weapon. If we focus on just the 37 solved cases, assault weapons were involved in 5.4 percent (both assault weapon cases were solved). One of the assault weapon cases took place in 1993 and the other took place in 1995 after the ban's implementation. The accounts of those cases are as follows:

Case 1 (July 3, 1993, San Francisco, California). A 55-year-old man bearing a grudge against his former attorneys for a lawsuit in which he lost 1 million dollars killed 8 persons, wounded 6 others, and then killed himself during a 15-minute rampage in which he fired 50-100 rounds. The offender was armed with two TEC-9 assault pistols, a .45 caliber semiautomatic pistol, and hundreds of rounds of ammunition.[5]

Case 2 (June 20, 1995, Spokane, Washington). A military man assigned to Fairchild Air Force Base entered the base hospital with an AK-47 assault rifle and opened fire, killing 4 and wounding 19. The gunman was killed by a military police officer. At the time of the story, no motive for the killing had been discovered.

In addition, our search uncovered two other cases in which the offender possessed an assault weapon but did not use it in the crime. In one of these cases, the additional weapon was identified only as a "Chinese assault rifle," so there is the possibility that the gun was an SKS rifle or other firearm that was not an assault weapon by the criteria of Title XI.

## LETHALITY OF ASSAULT WEAPONS USED IN MASS MURDERS

Although assault weapons appeared rarely in our sample of firearm mass murder cases, there are some indications that mass murders involving assault weapons are more deadly than other mass murders with guns. The two unambiguous assault weapon cases in our sample involved a mean of 6 victims, a number 1.5 higher than the 4.5 victims killed on average in the other cases. Further, each assault weapon case involved a substantial number of other victims who were wounded but not killed. Other notorious mass murders committed with assault weapons also claimed particularly high numbers of victims (Cox Newspapers 1989). The numbers of victims in these cases suggests that the ability of the murder weapons to accept large-capacity magazines was probably an important factor. We offer this observation cautiously, however, for several reasons besides the small number of cases in our sample. We did not make detailed assessments of the actors or circumstances involved in these incidents. Relevant questions, for example, might include whether the offender had a set number of intended targets (and, relatedly, the relationship between the offender and victims), the number of different guns used, whether the offender had the victims trapped at the time of the murders, and the amount of time the offender had to commit the crime.

In order to refine our comparison somewhat further, we examined the number of victims in assault weapon and non-assault weapon cases after removing 19 family-related cases from consideration. This did not change the results; the average number of victims in assault weapon cases was still approximately 1.5 higher than that of non-assault weapon cases.

---

[5] The story indicated that the offender had modified the firearms to make them fire more rapidly than they would have otherwise. Presumably, this means that he converted the guns to fully automatic fire, but this is not entirely clear from the article.

Exhibit 4
Page 00289

## RECOMMENDATIONS FOR FURTHER RELATED RESEARCH

There are a number of related questions that could be pursued in future research. One concerns a more explicit examination of the role of large-capacity magazines in mass murder, particularly for incidents involving non-assault weapon firearms. Based on our experience, this information is rarely offered in media sources and would require contacting police departments which investigated mass murder incidents. Another issue concerns non-fatal victims. This was not an express focus of our research, but if the assault weapon/large-capacity semiautomatic hypothesis has validity, we can hypothesize that shootings involving these weapons will involve more total victims. Along similar lines, Sherman and his colleagues (1989) documented a rise in bystander shootings in a number of cities during the 1980s and speculated that the spread of semiautomatic weaponry was a factor in this development. Due to time and resource limitations, we did not pursue the issue of bystander shootings for this study, but further research might shed light on whether assault weapons and large-capacity magazines have been a factor in any such rise.

A-7

Exhibit 4
Page 00290

# Exhibit C

Exhibit 4
Page 00291

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| **Document Title:** | **Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003** |
| **Author(s):** | **Christopher S. Koper** |
| **Document No.:** | **204431** |
| **Date Received:** | **July 2004** |
| **Award Number:** | **98-IJ-CX-0039** |

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Exhibit 4
Page 00292

# An Updated Assessment of the Federal Assault Weapons Ban:  Impacts on Gun Markets and Gun Violence, 1994-2003

## Report to the National Institute of Justice, United States Department of Justice

By

**Christopher S. Koper**
(Principal Investigator)

With

Daniel J. Woods and Jeffrey A. Roth

**June 2004**

Jerry Lee Center of Criminology
University of Pennsylvania
3814 Walnut Street
Philadelphia, PA 19104



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Exhibit 4
Page 00293

**TABLE OF CONTENTS**

| | |
|---|---|
| Preface | i |
| Acknowledgments | ii |
| | |
| 1. Impacts of the Federal Assault Weapons Ban, 1994-2003: Key Findings and Conclusions | 1 |
| 2. Provisions of the Assault Weapons Ban | 4 |
|     2.1. Assault Weapons | 4 |
|     2.2. Large Capacity Magazines | 6 |
|     2.3. Foreign Rifles Capable of Accepting Large Capacity Magazines for Military Rifles | 8 |
|     2.4. Ban Exemptions | 10 |
|     2.5. Summary | 11 |
| 3. Criminal Use of Assault Weapons and Large Capacity Magazines Before the Ban | 14 |
|     3.1. Criminal Use of Assault Weapons | 15 |
|     3.2. Criminal Use of Large Capacity Magazines | 18 |
|     3.3. Summary | 19 |
| 4. Overview of Study Design, Hypotheses, and Prior Findings | 20 |
|     4.1. Logical Framework for Research on the Ban | 20 |
|     4.2. Hypothesized Market Effects | 21 |
|     4.3. Prior Research on the Ban's Effects | 23 |
| 5. Market Indicators for Assault Weapons: Prices and Production | 25 |
|     5.1. Price Trends for Assault Weapons and Other Firearms | 25 |
|     5.2. Production Trends for Assault Weapons and Other Firearms | 33 |
|     5.3. Summary and Interpretations | 36 |
| 6. Criminal Use of Assault Weapons After the Ban | 39 |
|     6.1. Measuring Criminal Use of Assault Weapons: A Methodological Note | 39 |
|     6.2. National Analysis of Guns Reported By Police to the Federal Bureau of Alcohol, Tobacco, and Firearms | 40 |
|     6.3. Local Analyses of Guns Recovered By Police | 46 |
|     6.4. Summary | 51 |
| 7. Market Indicators for Large Capacity Magazines: Prices and Importation | 61 |
|     7.1. Price Trends for Large Capacity Magazines | 61 |
|     7.2. Post-Ban Importation of Large Capacity Magazines | 65 |
|     7.3. Summary and Interpretations | 65 |

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Exhibit 4
Page 00294

**TABLE OF CONTENTS (CONTINUED)**

| | |
|---|---|
| 8. Criminal Use of Large Capacity Magazines After the Ban | 68 |
| 8.1. Baltimore | 69 |
| 8.2. Anchorage | 73 |
| 8.3. Milwaukee | 75 |
| 8.4. Louisville | 77 |
| 8.5. Summary | 78 |
| 9. The Consequences of Crimes With Assault Weapons and Large Capacity Magazines | 80 |
| 9.1. The Spread of Semiautomatic Weaponry and Trends in Lethal and Injurious Gun Violence Prior to the Ban | 81 |
| 9.2. Shots Fired in Gun Attacks and the Effects of Weaponry on Attack Outcomes | 83 |
| 9.3. Post-Ban Trends in Lethal and Injurious Gun Violence | 91 |
| 9.4. Summary | 96 |
| 10. Looking to the Future: Research Recommendations and Speculation About the Possible Consequences of Reauthorizing, Modifying, or Lifting the Assault Weapons Ban | 98 |
| 10.1. Research Recommendations and Data Requirements | 98 |
| 10.2. Potential Consequences of Reauthorizing, Modifying, or Lifting the Assault Weapons Ban | 100 |
| References | 102 |

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Exhibit 4
Page 00295

## PREFACE

Gun violence continues to be one of America's most serious crime problems. In 2000, over 10,000 persons were murdered with firearms and almost 49,000 more were shot in the course of over 340,000 assaults and robberies with guns (see the Federal Bureau of Investigation's annual *Uniform Crime Reports* and Simon et al., 2002). The total costs of gun violence in the United States – including medical, criminal justice, and other government and private costs – are on the order of at least $6 to $12 billion per year and, by more controversial estimates, could be as high as $80 billion per year (Cook and Ludwig, 2000).

However, there has been good news in recent years. Police statistics and national victimization surveys show that since the early 1990s, gun crime has plummeted to some of the lowest levels in decades (see the *Uniform Crime Reports* and Rennison, 2001). Have gun controls contributed to this decline, and, if so, which ones?

During the last decade, the federal government has undertaken a number of initiatives to suppress gun crime. These include, among others, the establishment of a national background check system for gun buyers (through the Brady Act), reforms of the licensing system for firearms dealers, a ban on juvenile handgun possession, and Project Safe Neighborhoods, a collaborative effort between U.S. Attorneys and local authorities to attack local gun crime problems and enhance punishment for gun offenders.

Perhaps the most controversial of these federal initiatives was the ban on semiautomatic assault weapons and large capacity ammunition magazines enacted as Title XI, Subtitle A of the *Violent Crime Control and Law Enforcement Act of 1994*. This law prohibits a relatively small group of weapons considered by ban advocates to be particularly dangerous and attractive for criminal purposes. In this report, we investigate the ban's impacts on gun crime through the late 1990s and beyond. This study updates a prior report on the short-term effects of the ban (1994-1996) that members of this research team prepared for the U.S. Department of Justice and the U.S. Congress (Roth and Koper, 1997; 1999).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

i

Exhibit 4
Page 00296

**ACKNOWLEDGMENTS**

This research was supported by National Institute of Justice (U.S. Department of Justice) grants 2003-IJ-CX-1029 to the University of Pennsylvania and 98-IJ-CX-0039 to the Urban Institute. The Jerry Lee Center of Criminology, University of Pennsylvania provided additional support. The views expressed are those of the author. They do not reflect official positions of the United States Department of Justice and should not be attributed to the trustees of the University of Pennsylvania, the Urban Institute, or any of the other persons or organizations listed below.

The author wishes to thank several people and organizations that assisted this effort in numerous ways. Daniel Woods assisted with data analysis. Jeffrey Roth, who directed our first study of the assault weapons ban, provided advice and editorial input. Additional research assistance was provided by the following former employees of the Urban Institute: Gretchen Moore, David Huffer, Erica Dinger, Darin Reedy, Kate Bunting, Katie Gorie, and Michele Waul. The following persons and organizations provided databases, information, or other resources utilized for this report: Glenn Pierce (Northeastern University), Pamela Shaw and Edward Koch (Baltimore Police Department), Robert Shem (Alaska State Police), Bill McGill and Mallory O'Brien (currently or formerly of the Firearm Injury Center, Medical College of Wisconsin), Rick Ruddell (California State University, Chico), Scott Doyle (Kentucky State Police), Terrence Austin and Joe Vince (currently or formerly of the Bureau of Alcohol, Tobacco, Firearms, and Explosives), Carlos Alvarez and Alan Lynn (Metro-Dade Police Department), Charles Branas (Firearm and Injury Center, University of Pennsylvania), Caroline Harlow (Bureau of Justice Statistics), and Rebecca Knox (Brady Center to Prevent Handgun Violence). Robert Burrows (Bureau of Alcohol, Tobacco, Firearms, and Explosives) and Wain Roberts (Wain Roberts Firearms) shared technical expertise on firearms. Anonymous reviewers for the National Institute of Justice provided thorough and helpful comments on earlier versions of this report, as did Terrence Austin and Robert Burrows of the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Finally, I thank Lois Mock, our National Institute of Justice grant monitor, for her advice and encouragement throughout all of the research that my colleagues and I have conducted on the assault weapons ban.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

ii

Exhibit 4
Page 00297

ER_2489

## 1. IMPACTS OF THE FEDERAL ASSAULT WEAPONS BAN, 1994-2003: KEY FINDINGS AND CONCLUSIONS

This overview presents key findings and conclusions from a study sponsored by the National Institute of Justice to investigate the effects of the federal assault weapons ban. This study updates prior reports to the National Institute of Justice and the U.S. Congress on the assault weapons legislation.

### The Ban Attempts to Limit the Use of Guns with Military Style Features and Large Ammunition Capacities

- Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 imposed a 10-year ban on the "manufacture, transfer, and possession" of certain semiautomatic firearms designated as assault weapons (AWs). The ban is directed at semiautomatic firearms having features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense (examples include flash hiders, folding rifle stocks, and threaded barrels for attaching silencers). The law bans 18 models and variations by name, as well as revolving cylinder shotguns. It also has a "features test" provision banning other semiautomatics having two or more military-style features. In sum, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified 118 models and variations that are prohibited by the law. A number of the banned guns are foreign semiautomatic rifles that have been banned from importation into the U.S. since 1989.

- The ban also prohibits most ammunition feeding devices holding more than 10 rounds of ammunition (referred to as large capacity magazines, or LCMs). An LCM is arguably the most functionally important feature of most AWs, many of which have magazines holding 30 or more rounds. The LCM ban's reach is broader than that of the AW ban because many non-banned semiautomatics accept LCMs. Approximately 18% of civilian-owned firearms and 21% of civilian-owned handguns were equipped with LCMs as of 1994.

- The ban exempts AWs and LCMs manufactured before September 13, 1994. At that time, there were upwards of 1.5 million privately owned AWs in the U.S. and nearly 25 million guns equipped with LCMs. Gun industry sources estimated that there were 25 million pre-ban LCMs available in the U.S. as of 1995. An additional 4.7 million pre-ban LCMs were imported into the country from 1995 through 2000, with the largest number in 1999.

- Arguably, the AW-LCM ban is intended to reduce gunshot victimizations by limiting the national stock of semiautomatic firearms with large ammunition capacities – which enable shooters to discharge many shots rapidly – and other features conducive to criminal uses. The AW provision targets a relatively small number of weapons based on features that have little to do with the weapons'

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

1

Exhibit 4
Page 00298

operation, and removing those features is sufficient to make the weapons legal. The LCM provision limits the ammunition capacity of non-banned firearms.

**The Banned Guns and Magazines Were Used in Up to A Quarter of Gun Crimes Prior to the Ban**

- AWs were used in only a small fraction of gun crimes prior to the ban: about 2% according to most studies and no more than 8%. Most of the AWs used in crime are assault pistols rather than assault rifles.

- LCMs are used in crime much more often than AWs and accounted for 14% to 26% of guns used in crime prior to the ban.

- AWs and other guns equipped with LCMs tend to account for a higher share of guns used in murders of police and mass public shootings, though such incidents are very rare.

**The Ban's Success in Reducing Criminal Use of the Banned Guns and Magazines Has Been Mixed**

- Following implementation of the ban, the share of gun crimes involving AWs declined by 17% to 72% across the localities examined for this study (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), based on data covering all or portions of the 1995-2003 post-ban period. This is consistent with patterns found in national data on guns recovered by police and reported to ATF.

- The decline in the use of AWs has been due primarily to a reduction in the use of assault pistols (APs), which are used in crime more commonly than assault rifles (ARs). There has not been a clear decline in the use of ARs, though assessments are complicated by the rarity of crimes with these weapons and by substitution of post-ban rifles that are very similar to the banned AR models.

- However, the decline in AW use was offset throughout at least the late 1990s by steady or rising use of other guns equipped with LCMs in jurisdictions studied (Baltimore, Milwaukee, Louisville, and Anchorage). The failure to reduce LCM use has likely been due to the immense stock of exempted pre-ban magazines, which has been enhanced by recent imports.

**It is Premature to Make Definitive Assessments of the Ban's Impact on Gun Crime**

- Because the ban has not yet reduced the use of LCMs in crime, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. However, the ban's exemption of millions of pre-ban AWs and LCMs ensured that the effects

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

2

Exhibit 4
Page 00299

ER_2491

of the law would occur only gradually. Those effects are still unfolding and may not be fully felt for several years into the future, particularly if foreign, pre-ban LCMs continue to be imported into the U.S. in large numbers.

**The Ban's Reauthorization or Expiration Could Affect Gunshot Victimizations, But Predictions are Tenuous**

- Should it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement. AWs were rarely used in gun crimes even before the ban. LCMs are involved in a more substantial share of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability of offenders to fire more than ten shots (the current magazine capacity limit) without reloading.

- Nonetheless, reducing criminal use of AWs and especially LCMs could have non-trivial effects on gunshot victimizations. The few available studies suggest that attacks with semiautomatics – including AWs and other semiautomatics equipped with LCMs – result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms. Further, a study of handgun attacks in one city found that 3% of the gunfire incidents resulted in more than 10 shots fired, and those attacks produced almost 5% of the gunshot victims.

- Restricting the flow of LCMs into the country from abroad may be necessary to achieve desired effects from the ban, particularly in the near future. Whether mandating further design changes in the outward features of semiautomatic weapons (such as removing all military-style features) will produce measurable benefits beyond those of restricting ammunition capacity is unknown. Past experience also suggests that Congressional discussion of broadening the AW ban to new models or features would raise prices and production of the weapons under discussion.

- If the ban is lifted, gun and magazine manufacturers may reintroduce AW models and LCMs, perhaps in substantial numbers. In addition, pre-ban AWs may lose value and novelty, prompting some of their owners to sell them in undocumented secondhand markets where they can more easily reach high-risk users, such as criminals, terrorists, and other potential mass murderers. Any resulting increase in crimes with AWs and LCMs might increase gunshot victimizations for the reasons noted above, though this effect could be difficult to measure.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

3

Exhibit 4
Page 00300

## 2. PROVISIONS OF THE ASSAULT WEAPONS BAN

### 2.1. Assault Weapons

Enacted on September 13, 1994, Title XI, Subtitle A of the *Violent Crime Control and Law Enforcement Act of 1994* imposes a 10-year ban on the "manufacture, transfer, and possession" of certain semiautomatic firearms designated as assault weapons (AWs).[1] The AW ban is not a prohibition on all semiautomatics. Rather, it is directed at semiautomatics having features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense. Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept ammunition magazines holding large numbers of bullets.[2] Indeed, several of the banned guns (e.g., the AR-15 and Avtomat Kalashnikov models) are civilian copies of military weapons and accept ammunition magazines made for those military weapons.

As summarized in Table 2-1, the law specifically prohibits nine narrowly defined groups of pistols, rifles, and shotguns. A number of the weapons are foreign rifles that the federal government has banned from importation into the U.S. since 1989. Exact copies of the named AWs are also banned, regardless of their manufacturer. In addition, the ban contains a generic "features test" provision that generally prohibits other semiautomatic firearms having two or more military-style features, as described in Table 2-2. In sum, the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified 118 model and caliber variations that meet the AW criteria established by the ban.[3]

Figures 2-1 and 2-2 illustrate a few prominent AWs and their features. Figure 2-1 displays the Intratec TEC-9 assault pistol, the AW most frequently used in crime (e.g., see Roth and Koper 1997, Chapter 2). Figure 2-2 depicts the AK-47 assault rifle, a weapon of Soviet design. There are many variations of the AK-47 produced around the world, not all of which have the full complement of features illustrated in Figure 2-2.

---

[1] A semiautomatic weapon fires one bullet for each squeeze of the trigger. After each shot, the gun automatically loads the next bullet and cocks itself for the next shot, thereby permitting a somewhat faster rate of fire relative to non-automatic firearms. Semiautomatics are not to be confused with fully automatic weapons (i.e., machine guns), which fire continuously as long as the trigger is held down. Fully automatic weapons have been illegal to own in the United States without a federal permit since 1934.

[2] Ban advocates stress the importance of pistol grips on rifles and heat shrouds or forward handgrips on pistols, which in combination with large ammunition magazines enable shooters to discharge high numbers of bullets rapidly (in a "spray fire" fashion) while maintaining control of the firearm (Violence Policy Center, 2003). Ban opponents, on the other hand, argue that AW features also serve legitimate purposes for lawful gun users (e.g., see Kopel, 1995).

[3] This is based on AWs identified by ATF's Firearms Technology Branch as of December 1997.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

4

Exhibit 4
Page 00301

ER_2493

Table 2-1.  Firearms Banned by the Federal Assault Weapons Ban

| Firearm | Description | 1993 Blue Book Price | Pre-Ban Federal Legal Status | Examples of Legal Substitutes |
|---|---|---|---|---|
| Avtomat Kalashnikov (AK) (by Norinco, Mitchell, Poly Technologies) | Chinese, Russian, other foreign and domestic; .223 or 7.62x39mm caliber; semiauto. rifle; 5, 10, or 30 shot magazine, may be supplied with bayonet | $550 (generic import); add 10-15% for folding stock models | Imports banned in 1989. | Norinco NHM 90/91 [1] |
| Uzi, Galil | Israeli; 9mm, .41, or .45 caliber semiauto. carbine, mini-carbine, or pistol. Magazine capacity of 16, 20, or 25, depending on model and type (10 or 20 on pistols). | $550-$1050 (Uzi) $875-$1150 (Galil) | Imports banned in 1989 | Uzi Sporter [2] |
| Beretta AR-70 | Italian: .222 or .223 caliber semiauto. paramilitary design rifle; 5, 8, or 30 shot magazine. | $1050 | Imports banned in 1989. | |
| Colt AR-15 | Domestic: primarily .223 caliber paramilitary rifle or carbine; 5 shot magazines, often comes with two 5-shot detachable magazines. Exact copies by DPMS, Eagle, Olympic, and others. | $825-$1325 | Legal (civilian version of military M-16) | Colt Sporter, Match H-Bar, Target models |
| Fabrique National FN/FAL, FN/LAR, FNC | Belgian design: .308 caliber semiauto. rifle or .223 combat carbine with 30 shot magazine. Rifle comes with flash hider, 4 position fire selector on automatic models. Discontinued in 1988. | $1100-$2500 | Imports banned in 1989. | L1A1 Sporter (FN, Century) [2] |
| Steyr AUG | Austrian: .223/5.56mm caliber semiauto. paramilitary design rifle. | $2500 | Imports banned in 1989 | |
| SWD M-10, 11, 11/9, 12 | Domestic: 9mm, .380, or .45 caliber paramilitary design semiauto. pistol; 32 shot magazine. Also available in semiauto. carbine and fully automatic variations. | $215 (M-11/9) | Legal | Cobray PM11, 12 |
| TEC-9, DC9, 22 | Domestic: 9mm caliber semiauto. paramilitary design pistol, 10 or 32 shot magazine, .22 caliber semiauto. paramilitary design pistol, 30 shot magazine. | $145-$295 | Legal | TEC-AB |
| Revolving Cylinder Shotguns | Domestic: 12 gauge, 12 shot rotary magazine; paramilitary configuration | $525 (Street Sweeper) | Legal | |

[1] Imports were halted in 1994 under the federal embargo on the importation of firearms from China.
[2] Imports banned by federal executive order, April 1998.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

5

Exhibit 4
Page 00302

**Table 2-2.  Features Test of the Federal Assault Weapons Ban**

| Weapon Category | Military-Style Features (Two or more qualify a firearm as an assault weapon) |
|---|---|
| Semiautomatic pistols accepting detachable magazines: | 1) ammunition magazine that attaches outside the pistol grip<br>2) threaded barrel capable of accepting a barrel extender, flash hider, forward handgrip, or silencer<br>3) heat shroud attached to or encircling the barrel<br>4) weight of more than 50 ounces unloaded<br>5) semiautomatic version of a fully automatic weapon |
| Semiautomatic rifles accepting detachable magazines: | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) bayonet mount<br>4) flash hider or threaded barrel designed to accommodate one<br>5) grenade launcher |
| Semiautomatic shotguns: | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) fixed magazine capacity over 5 rounds<br>4) ability to accept a detachable ammunition magazine |

## 2.2.  Large Capacity Magazines

In addition, the ban prohibits most ammunition feeding devices holding more than 10 rounds of ammunition (referred to hereafter as large capacity magazines, or LCMs).[4]  Most notably, this limits the capacity of detachable ammunition magazines for semiautomatic firearms.  Though often overlooked in media coverage of the law, this provision impacted a larger share of the gun market than did the ban on AWs.  Approximately 40 percent of the semiautomatic handgun models and a majority of the semiautomatic rifle models being manufactured and advertised prior to the ban were sold with LCMs or had a variation that was sold with an LCM (calculated from Murtz et al., 1994).  Still others could accept LCMs made for other firearms and/or by other manufacturers.  A national survey of gun owners found that 18% of all civilian-owned firearms and 21% of civilian-owned handguns were equipped with magazines having 10 or more rounds as of 1994 (Cook and Ludwig, 1996, p. 17).  The AW provision did not affect most LCM-compatible guns, but the LCM provision limited the capacities of their magazines to 10 rounds.

---

[4]  Technically, the ban prohibits any magazine, belt, drum, feed strip, or similar device that has the capacity to accept more than 10 rounds or ammunition, or which can be readily converted or restored to accept more than 10 rounds of ammunition.  The ban exempts attached tubular devices capable of operating only with .22 caliber rimfire (i.e., low velocity) ammunition.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

6

Exhibit 4
Page 00303

**Figure 2-1.  Features of Assault Weapons:
The Intratec TEC-9 Assault Pistol**



**Threaded Barrel**
Designed to accommodate a silencer

**Barrel Shroud**
Cools the barrel of the weapon so it will
not overheat during rapid firing.  Allows
the shooter to grasp the barrel area during
rapid fire without incurring serious burns.

**Large Capacity Magazine Outside Pistol Grip**
Characteristic of an assault weapon, not a
sporting handgun.

Adapted from exhibit of the Center to Prevent Handgun Violence.

As discussed in later chapters, an LCM is perhaps the most functionally important feature of many AWs.  This point is underscored by the AW ban's exemptions for semiautomatic rifles that cannot accept a detachable magazine that holds more than five rounds of ammunition and semiautomatic shotguns that cannot hold more than five rounds in a fixed or detachable magazine.  As noted by the U.S. House of Representatives, most prohibited AWs came equipped with magazines holding 30 rounds and could accept magazines holding as many as 50 or 100 rounds (U.S. Department of the Treasury, 1998, p. 14).  Also, a 1998 federal executive order (discussed below) banned further importation of foreign semiautomatic rifles capable of accepting LCMs made for military rifles.  Accordingly, the magazine ban plays an important role in the logic and interpretations of the analyses presented here.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

7

Exhibit 4
Page 00304

ER_2496

**Figure 2-2.  Features of Assault Weapons:
The AK-47 Assault Rifle**



**Flash Suppressor**
Reduces the flash from the barrel
of the weapon, allowing the
shooter to remain concealed when
shooting at night.

**Barrel Mount**
Designed to
accommodate a
bayonet, serves no
sporting purpose.

**Folding Stock**
Sacrifices accuracy for
concealability and mobility
in combat situations.

**Large Capacity
Detachable Magazine**
Permits shooter to fire dozens
of rounds of ammunition
without reloading.

**Pistol Grip**
Allows the weapon to be
"spray fired" from the hip.
Also helps stabilize the
weapon during rapid fire.

Adapted from exhibit of the Center to Prevent Handgun Violence.

## 2.3. Foreign Rifles Accepting Large Capacity Military Magazines

In April of 1998, the Clinton administration broadened the range of the AW ban
by prohibiting importation of an additional 58 foreign semiautomatic rifles that were still
legal under the 1994 law but that can accept LCMs made for military assault rifles like
the AK-47 (U.S. Department of the Treasury, 1998).[5]  Figure 2-3 illustrates a few such
rifles (hereafter, LCMM rifles) patterned after the banned AK-47 pictured in Figure 2-2.
The LCMM rifles in Figure 2-3 do not possess the military-style features incorporated
into the AK-47 (such as pistol grips, flash suppressors, and bayonet mounts), but they
accept LCMs made for AK-47s.[6]

---

[5]  In the civilian context, AWs are semiautomatic firearms.  Many semiautomatic AWs are patterned after
military firearms, but the military versions are capable of semiautomatic and fully automatic fire.
[6]  Importation of some LCMM rifles, including a number of guns patterned after the AK-47, was halted in
1994 due to trade sanctions against China (U.S. Department of the Treasury, 1998).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

8

Exhibit 4
Page 00305

ER_2497



Figure 2-3. Foreign Semiautomatic Rifles Capable of Accepting Large Capacity Military Magazines: AK47 Copies Banned by Executive Order in 1998

ARM

WUM 1

MISR

MAK90

Taken from U.S. Department of the Treasury (1998)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

9

Exhibit 4
Page 00306

### 2.4. Ban Exemptions

#### 2.4.1. Guns and Magazines Manufactured Prior to the Ban

The ban contains important exemptions. AWs and LCMs manufactured before the effective date of the ban are "grandfathered" and thus legal to own and transfer. Around 1990, there were an estimated 1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock) (Cox Newspapers, 1989, p. 1; American Medical Association Council on Scientific Affairs, 1992), though those counts probably did not correspond exactly to the weapons prohibited by the 1994 ban. The leading domestic AW producers manufactured approximately half a million AWs from 1989 through 1993, representing roughly 2.5% of all guns manufactured in the U.S. during that time (see Chapter 5).

We are not aware of any precise estimates of the pre-ban stock of LCMs, but gun owners in the U.S. possessed an estimated 25 million guns that were equipped with LCMs or 10-round magazines in 1994 (Cook and Ludwig, 1996, p. 17), and gun industry sources estimated that, including aftermarket items for repairing and extending magazines, there were at least 25 million LCMs available in the United States as of 1995 (Gun Tests, 1995, p. 30). As discussed in Chapter 7, moreover, an additional 4.8 million pre-ban LCMs were imported into the U.S. from 1994 through 2000 under the grandfathering exemption.

#### 2.4.2. Semiautomatics With Fewer or No Military Features

Although the law bans "copies or duplicates" of the named gun makes and models, federal authorities have emphasized exact copies. Relatively cosmetic changes, such as removing a flash hider or bayonet mount, are sufficient to transform a banned weapon into a legal substitute, and a number of manufacturers now produce modified, legal versions of some of the banned guns (examples are listed in Table 2-1). In general, the AW ban does not apply to semiautomatics possessing no more than one military-style feature listed under the ban's features test provision.[7] For instance, prior to going out of business, Intratec, makers of the banned TEC-9 featured in Figure 2-1, manufactured an AB-10 ("after ban") model that does not have a threaded barrel or a barrel shroud but is identical to the TEC-9 in other respects, including the ability to accept an ammunition magazine outside the pistol grip (Figure 2-4). As shown in the illustration, the AB-10 accepts grandfathered, 32-round magazines made for the TEC-9, but post-ban magazines produced for the AB-10 must be limited to 10 rounds.

---

[7] Note, however, that firearms imported into the country must still meet the "sporting purposes test" established under the federal Gun Control Act of 1968. In 1989, ATF determined that foreign semiautomatic rifles having any one of a number of named military features (including those listed in the features test of the 1994 AW ban) fail the sporting purposes test and cannot be imported into the country. In 1998, the ability to accept an LCM made for a military rifle was added to the list of disqualifying features. Consequently, it is possible for foreign rifles to pass the features test of the federal AW ban but not meet the sporting purposes test for imports (U.S. Department of the Treasury, 1998).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

10

Exhibit 4
Page 00307

ER_2499

Another example is the Colt Match Target H-Bar rifle (Figure 2-5), which is a legalized version of the banned AR-15 (see Table 2-1). AR-15 type rifles are civilian weapons patterned after the U.S. military's M-16 rifle and were the assault rifles most commonly used in crime before the ban (Roth and Koper, 1997, Chapter 2). The post-ban version shown in Figure 2-5 (one of several legalized variations on the AR-15) is essentially identical to pre-ban versions of the AR-15 but does not have accessories like a flash hider, threaded barrel, or bayonet lug. The one remaining military feature on the post-ban gun is the pistol grip. This and other post-ban AR-15 type rifles can accept LCMs made for the banned AR15, as well as those made for the U.S. military's M-16. However, post-ban magazines manufactured for these guns must hold fewer than 11 rounds.

The LCMM rifles discussed above constituted another group of legalized AW-type weapons until 1998, when their importation was prohibited by executive order. Finally, the ban includes an appendix that exempts by name several hundred models of rifles and shotguns commonly used in hunting and recreation, 86 of which are semiautomatics. While the exempted semiautomatics generally lack the military-style features common to AWs, many take detachable magazines, and some have the ability to accept LCMs.[8]

## 2.5. Summary

In the broadest sense, the AW-LCM ban is intended to limit crimes with semiautomatic firearms having large ammunition capacities -- which enable shooters to discharge high numbers of shots rapidly -- and other features conducive to criminal applications. The gun ban provision targets a relatively small number of weapons based on outward features or accessories that have little to do with the weapons' operation. Removing some or all of these features is sufficient to make the weapons legal. In other respects (e.g., type of firing mechanism, ammunition fired, and the ability to accept a detachable magazine), AWs do not differ from other legal semiautomatic weapons. The LCM provision of the law limits the ammunition capacity of non-banned firearms.

---

[8] Legislators inserted a number of amendments during the drafting process to broaden the consensus behind the bill (Lennett 1995). Among changes that occurred during drafting were: dropping a requirement to register post-ban sales of the grandfathered guns, dropping a ban on "substantial substitutes" as well as "exact copies" of the banned weapons, shortening the list of named makes and models covered by the ban, adding the appendix list of exempted weapons, and mandating the first impact study of the ban that is discussed below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

11

Exhibit 4
Page 00308

Figure 2-4. Post-Ban, Modified Versions of Assault Weapons:
The Intratec AB ("After Ban") Model (See Featured Firearm)



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 2-5. Post-Ban, Modified Versions of Assault Weapons:**
**The Colt Match Target HBAR Model**



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

13

Exhibit 4
Page 00310

ER_2502

## 3. CRIMINAL USE OF ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES BEFORE THE BAN

During the 1980s and early 1990s, AWs and other semiautomatic firearms equipped with LCMs were involved in a number of highly publicized mass murder incidents that raised public concern about the accessibility of high powered, military-style weaponry and other guns capable of discharging high numbers of bullets in a short period of time (Cox Newspapers, 1989; Kleck, 1997, pp.124-126,144; Lenett, 1995). In one of the worst mass murders ever committed in the U.S., for example, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California McDonald's restaurant on July 18, 1984 using an Uzi carbine, a shotgun, and another semiautomatic handgun. On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, and a number of other firearms, killed 7 persons and wounded 15 others at his former workplace in Louisville, Kentucky before taking his own life. Another particularly notorious incident that precipitated much of the recent debate over AWs occurred on January 17, 1989 when Patrick Purdy used a civilian version of the AK-47 military rifle to open fire on a schoolyard in Stockton, California, killing 5 children and wounding 29 persons.

There were additional high profile incidents in which offenders using semiautomatic handguns with LCMs killed and wounded large numbers of persons. Armed with two handguns having LCMs (and reportedly a supply of extra LCMs), a rifle, and a shotgun, George Hennard killed 22 people and wounded another 23 in Killeen, Texas in October 1991. In a December 1993 incident, a gunman named Colin Ferguson, armed with a handgun and LCMs, opened fire on commuters on a Long Island train, killing 5 and wounding 17.

Indeed, AWs or other semiautomatics with LCMs were involved in 6, or 40%, of 15 mass shooting incidents occurring between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded (Kleck, 1997, pp.124-126, 144). Early studies of AWs, though sometimes based on limited and potentially unrepresentative data, also suggested that AWs recovered by police were often associated with drug trafficking and organized crime (Cox Newspapers, 1989; also see Roth and Koper, 1997, Chapter 5), fueling a perception that AWs were guns of choice among drug dealers and other particularly violent groups. All of this intensified concern over AWs and other semiautomatics with large ammunition capacities and helped spur the passage of AW bans in California, New Jersey, Connecticut, and Hawaii between 1989 and 1993, as well as the 1989 federal import ban on selected semiautomatic rifles. Maryland also passed AW legislation in 1994, just a few months prior to the passage of the 1994 federal AW ban.[9]

Looking at the nation's gun crime problem more broadly, however, AWs and LCMs were used in only a minority of gun crimes prior to the 1994 federal ban, and AWs were used in a particularly small percentage of gun crimes.

---

[9] A number of localities around the nation also passed AW bans during this period.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

14

Exhibit 4
Page 00311

ER_2503

### 3.1. Criminal Use of Assault Weapons

Numerous studies have examined the use of AWs in crime prior to the federal ban. The definition of AWs varied across the studies and did not always correspond exactly to that of the 1994 law (in part because a number of the studies were done prior to 1994). In general, however, the studies appeared to focus on various semiautomatics with detachable magazines and military-style features. According to these accounts, AWs typically accounted for up to 8% of guns used in crime, depending on the specific AW definition and data source used (e.g., see Beck et al., 1993; Hargarten et al., 1996; Hutson et al., 1994; 1995; McGonigal et al., 1993; New York State Division of Criminal Justice Services, 1994; Roth and Koper, 1997, Chapters 2, 5, 6; Zawitz, 1995). A compilation of 38 sources indicated that AWs accounted for 2% of crime guns on average (Kleck, 1997, pp.112, 141-143).[10]

Similarly, the most common AWs prohibited by the 1994 federal ban accounted for between 1% and 6% of guns used in crime according to most of several national and local data sources examined for this and our prior study (see Chapter 6 and Roth and Koper, 1997, Chapters 5, 6):

- Baltimore (all guns recovered by police, 1992-1993): 2%
- Miami (all guns recovered by police, 1990-1993): 3%
- Milwaukee (guns recovered in murder investigations, 1991-1993): 6%
- Boston (all guns recovered by police, 1991-1993): 2%
- St. Louis (all guns recovered by police, 1991-1993): 1%
- Anchorage, Alaska (guns used in serious crimes, 1987-1993): 4%
- National (guns recovered by police and reported to ATF, 1992-1993): 5%[11]
- National (gun thefts reported to police, 1992-Aug. 1994): 2%
- National (guns used in murders of police, 1992-1994): 7-9%[12]
- National (guns used in mass murders of 4 or more persons, 1992-1994): 4-13%[13]

Although each of the sources cited above has limitations, the estimates consistently show that AWs are used in a small fraction of gun crimes. Even the highest

---

[10] The source in question contains a total of 48 estimates, but our focus is on those that examined all AWs (including pistols, rifles, and shotguns) as opposed to just assault rifles.

[11] For reasons discussed in Chapter 6, the national ATF estimate likely overestimates the use of AWs in crime. Nonetheless, the ATF estimate lies within the range of other presented estimates.

[12] The minimum estimate is based on AW cases as a percentage of all gun murders of police. The maximum estimate is based on AW cases as a percentage of cases for which at least the gun manufacturer was known. Note that AWs accounted for as many as 16% of gun murders of police in 1994 (Roth and Koper, 1997, Chapter 6; also see Adler et al., 1995).

[13] These statistics are based on a sample of 28 cases found through newspaper reports (Roth and Koper, 1997, Appendix A). One case involved an AW, accounting for 3.6% of all cases and 12.5% of cases in which at least the type of gun (including whether the gun was a handgun, rifle, or shotgun and whether the gun was a semiautomatic) was known. Also see the earlier discussion of AWs and mass shootings at the beginning of this chapter.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

15

Exhibit 4
Page 00312

ER_2504

estimates, which correspond to particularly rare events such mass murders and police murders, are no higher than 13%. Note also that the majority of AWs used in crime are assault pistols (APs) rather than assault rifles (ARs). Among AWs reported by police to ATF during 1992 and 1993, for example, APs outnumbered ARs by a ratio of 3 to 1 (see Chapter 6).

The relative rarity of AW use in crime can be attributed to a number of factors. Many AWs are long guns, which are used in crime much less often than handguns. Moreover, a number of the banned AWs are foreign weapons that were banned from importation into the U.S. in 1989. Also, AWs are more expensive (see Table 2-1) and more difficult to conceal than the types of handguns that are used most frequently in crime.

### 3.1.1. A Note on Survey Studies and Assault Weapons

The studies and statistics discussed above were based primarily on police information. Some survey studies have given a different impression, suggesting substantial levels of AW ownership among criminals and otherwise high-risk juvenile and adult populations, particularly urban gang members (Knox et al., 1994; Sheley and Wright, 1993a). A general problem with these studies, however, is that respondents themselves had to define terms like "military-style" and "assault rifle." Consequently, the figures from these studies may lack comparability with those from studies with police data. Further, the figures reported in some studies prompt concerns about exaggeration of AW ownership (perhaps linked to publicity over the AW issue during the early 1990s when a number of these studies were conducted), particularly among juvenile offenders, who have reported ownership levels as high as 35% just for ARs (Sheley and Wright, 1993a).[14]

Even so, most survey evidence on the actual use of AWs suggests that offenders rarely use AWs in crime. In a 1991 national survey of adult state prisoners, for example, 8% of the inmates reported possessing a "military-type" firearm at some point in the past (Beck et al., 1993, p. 19). Yet only 2% of offenders who used a firearm during their conviction offense reported using an AW for that offense (calculated from pp. 18, 33), a figure consistent with the police statistics cited above. Similarly, while 10% of adult inmates and 20% of juvenile inmates in a Virginia survey reported having owned an AR, none of the adult inmates and only 1% of the juvenile inmates reported having carried them at crime scenes (reported in Zawitz, 1995, p. 6). In contrast, 4% to 20% of inmates surveyed in eight jails across rural and urban areas of Illinois and Iowa reported having used an AR in committing crimes (Knox et al., 1994, p. 17). Nevertheless, even assuming the accuracy and honesty of the respondents' reports, it is not clear what

---

[14] As one example of possible exaggeration of AW ownership, a survey of incarcerated juveniles in New Mexico found that 6% reported having used a "military-style rifle" against others and 2.6% reported that someone else used such a rifle against them. However, less than 1% of guns recovered in a sample of juvenile firearms cases were "military" style guns (New Mexico Criminal Justice Statistical Analysis Center, 1998, pp. 17-19; also see Ruddell and Mays, 2003).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

16

Exhibit 4
Page 00313

weapons they were counting as ARs, what percentage of their crimes were committed with ARs, or what share of all gun crimes in their respective jurisdictions were linked to their AR uses. Hence, while some surveys suggest that ownership and, to a lesser extent, use of AWs may be fairly common among certain subsets of offenders, the overwhelming weight of evidence from gun recovery and survey studies indicates that AWs are used in a small percentage of gun crimes overall.

### 3.1.2. Are Assault Weapons More Attractive to Criminal Users Than Other Gun Users?

Although AWs are used in a small percentage of gun crimes, some have argued that AWs are more likely to be used in crime than other guns, i.e., that AWs are more attractive to criminal than lawful gun users due to the weapons' military-style features and their particularly large ammunition magazines. Such arguments are based on data implying that AWs are more common among crime guns than among the general stock of civilian firearms. According to some estimates generated prior to the federal ban, AWs accounted for less than one percent of firearms owned by civilians but up to 11% of guns used in crime, based on firearms reported by police to ATF between 1986 and 1993 (e.g., see Cox Newspapers, 1989; Lennett, 1995). However, these estimates were problematic in a number of respects. As discussed in Chapter 6, ATF statistics are not necessarily representative of the types of guns most commonly recovered by police, and ATF statistics from the late 1980s and early 1990s in particular tended to overstate the prevalence of AWs among crime guns. Further, estimating the percentage of civilian weapons that are AWs is difficult because gun production data are not reported by model, and one must also make assumptions about the rate of attrition among the stock of civilian firearms.

Our own more recent assessment indicates that AWs accounted for about 2.5% of guns produced from 1989 through 1993 (see Chapter 5). Relative to previous estimates, this may signify that AWs accounted for a growing share of civilian firearms in the years just before the ban, though the previous estimates likely did not correspond to the exact list of weapons banned in 1994 and thus may not be entirely comparable to our estimate. At any rate, the 2.5% figure is comparable to most of the AW crime gun estimates listed above; hence, it is not clear that AWs are used disproportionately in most crimes, though AWs still seem to account for a somewhat disproportionate share of guns used in murders and other serious crimes.

Perhaps the best evidence of a criminal preference for AWs comes from a study of young adult handgun buyers in California that found buyers with minor criminal histories (i.e., arrests or misdemeanor convictions that did not disqualify them from purchasing firearms) were more than twice as likely to purchase APs than were buyers with no criminal history (4.6% to 2%, respectively) (Wintemute et al., 1998a). Those with more serious criminal histories were even more likely to purchase APs: 6.6% of those who had been charged with a gun offense bought APs, as did 10% of those who had been charged with two or more serious violent offenses. AP purchasers were also more likely to be arrested subsequent to their purchases than were other gun purchasers.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

17

Exhibit 4
Page 00314

Among gun buyers with prior charges for violence, for instance, AP buyers were more than twice as likely as other handgun buyers to be charged with any new offense and three times as likely to be charged with a new violent or gun offense. To our knowledge, there have been no comparable studies contrasting AR buyers with other rifle buyers.

### 3.2. Criminal Use of Large Capacity Magazines

Relative to the AW issue, criminal use of LCMs has received relatively little attention. Yet the overall use of guns with LCMs, which is based on the combined use of AWs and non-banned guns with LCMs, is much greater than the use of AWs alone. Based on data examined for this and a few prior studies, guns with LCMs were used in roughly 14% to 26% of most gun crimes prior to the ban (see Chapter 8; Adler et al., 1995; Koper, 2001; New York Division of Criminal Justice Services, 1994).

- Baltimore (all guns recovered by police, 1993): 14%
- Milwaukee (guns recovered in murder investigations, 1991-1993): 21%
- Anchorage, Alaska (handguns used in serious crimes, 1992-1993): 26%
- New York City (guns recovered in murder investigations, 1993): 16-25%[15]
- Washington, DC (guns recovered from juveniles, 1991-1993): 16%[16]
- National (guns used in murders of police, 1994): 31%-41%[17]

Although based on a small number of studies, this range is generally consistent with national survey estimates indicating approximately 18% of all civilian-owned guns and 21% of civilian-owned handguns were equipped with LCMs as of 1994 (Cook and Ludwig, 1996, p. 17). The exception is that LCMs may have been used disproportionately in murders of police, though such incidents are very rare.

As with AWs and crime guns in general, most crime guns equipped with LCMs are handguns. Two handgun models manufactured with LCMs prior to the ban (the Glock 17 and Ruger P89) were among the 10 crime gun models most frequently recovered by law enforcement and reported to ATF during 1994 (ATF, 1995).

---

[15] The minimum estimate is based on cases in which discharged firearms were recovered, while the maximum estimate is based on cases in which recovered firearms were positively linked to the case with ballistics evidence (New York Division of Criminal Justice Services, 1994).

[16] Note that Washington, DC prohibits semiautomatic firearms accepting magazines with more than 12 rounds (and handguns in general).

[17] The estimates are based on the sum of cases involving AWs or other guns sold with LCMs (Adler et al., 1995, p.4). The minimum estimate is based on AW-LCM cases as a percentage of all gun murders of police. The maximum estimate is based on AW-LCM cases as a percentage of cases in which the gun model was known.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

18

Exhibit 4
Page 00315

ER_2507

### 3.3. Summary

In sum, AWs and LCMs were used in up to a quarter of gun crimes prior to the 1994 AW-LCM ban. By most estimates, AWs were used in less than 6% of gun crimes even before the ban. Some may have perceived their use to be more widespread, however, due to the use of AWs in particularly rare and highly publicized crimes such as mass shootings (and, to a lesser extent, murders of police), survey reports suggesting high levels of AW ownership among some groups of offenders, and evidence that some AWs are more attractive to criminal than lawful gun buyers.

In contrast, guns equipped with LCMs -- of which AWs are a subset – are used in roughly 14% to 26% of gun crimes. Accordingly, the LCM ban has greater potential for affecting gun crime. However, it is not clear how often the ability to fire more than 10 shots without reloading (the current magazine capacity limit) affects the outcomes of gun attacks (see Chapter 9). All of this suggests that the ban's impact on gun violence is likely to be small.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 4. OVERVIEW OF STUDY DESIGN, HYPOTHESES, AND PRIOR FINDINGS

Section 110104 of the AW-LCM ban directed the Attorney General of the United States to study the ban's impact and report the results to Congress within 30 months of the ban's enactment, a provision which was presumably motivated by a sunset provision in the legislation (section 110105) that will lift the ban in September 2004 unless Congress renews the ban. In accordance with the study requirement, the National Institute of Justice (NIJ) awarded a grant to the Urban Institute to study the ban's short-term (i.e., 1994-1996) effects. The results of that study are available in a number of reports, briefs, and articles written by members of this research team (Koper and Roth, 2001a; 2001b; 2002a; Roth and Koper, 1997; 1999).[18] In order to understand the ban's longer-term effects, NIJ provided additional funding to extend the AW research. In 2002, we delivered an interim report to NIJ based on data extending through at least the late 1990s (Koper and Roth, 2002b). This report is based largely on the 2002 interim report, but with various new and updated analyses extending as far as 2003. It is thus a compilation of analyses conducted between 1998 and 2003. The study periods vary somewhat across the analyses, depending on data availability and the time at which the data were collected.

### 4.1. Logical Framework for Research on the Ban

An important rationale for the AW-LCM ban is that AWs and other guns equipped with LCMs are particularly dangerous weapons because they facilitate the rapid firing of high numbers of shots, thereby potentially increasing injuries and deaths from gun violence. Although AWs and LCMs were used in only a modest share of gun crimes before the ban, it is conceivable that a decrease in their use might reduce fatal and non-fatal gunshot victimizations, even if it does not reduce the overall rate of gun crime. (In Chapter 9, we consider in more detail whether forcing offenders to substitute other guns and smaller magazines can reduce gun deaths and injuries.)

It is not clear how quickly such effects might occur, however, because the ban exempted the millions of AWs and LCMs that were manufactured prior to the ban's effective date in September 1994. This was particularly a concern for our first study, which was based on data extending through mid-1996, a period potentially too short to observe any meaningful effects. Consequently, investigation of the ban's effects on gun markets – and, most importantly, how they have affected criminal use of AWs and LCMs – has played a central role in this research. The general logic of our studies, illustrated in Figure 4-1, has been to first assess the law's impact on the availability of AWs and LCMs, examining price and production (or importation) indices in legal markets and relating them to trends in criminal use of AWs and LCMs. In turn, we can relate these market patterns to trends in the types of gun crimes most likely to be affected by changes in the use of AWs and LCMs. However, we cannot make definitive assessments of the

---

[18] The report to Congress was the Roth and Koper (1997) report.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

20

Exhibit 4
Page 00317

ban's impact on gun violence until it is clear that the ban has indeed reduced criminal use of AWs and LCMs.

**Figure 4-1. Logic Model for Research on the Assault Weapons Ban**



## 4.2. Hypothesized Market Effects

### 4.2.1. A General Description of Gun Markets

Firearms are distributed in markets commonly referred to as primary and secondary markets. Illicit gun transactions occur in both markets. Primary markets include wholesale and retail transactions by federally-licensed gun dealers, referred to as federal firearm licensees. Licensed dealers are required to, among things, follow federal and state background procedures to verify the eligibility of purchasers, observe any legally required waiting period prior to making transfers, and maintain records of gun acquisitions and dispositions (though records are not required for sales of ammunition magazines).

Despite these restrictions, survey data suggest that as many as 21% of adult gun offenders obtained guns from licensed dealers in the years prior to the ban (Harlow, 2001, p. 6; also see Wright and Rossi, 1986, pp. 183,185). In more recent years, this figure has declined to 14% (Harlow, 2001, p. 6), due likely to the Brady Act, which established a national background check system for purchases from licensed dealers, and reforms of the federal firearms licensing system that have greatly reduced the number of licensed gun dealers (see ATF, 2000; Koper, 2002). Some would-be gun offenders may be legally eligible buyers at the time of their acquisitions, while others may seek out corrupt dealers or use other fraudulent or criminal means to acquire guns from retail dealers (such as recruiting a legally entitled buyer to act as a "straw purchaser" who buys a gun on behalf of a prohibited buyer).

Secondary markets encompass second-hand gun transactions made by non-licensed individuals.[19] Secondary market participants are prohibited from knowingly transferring guns to ineligible purchasers (e.g., convicted felons and drug abusers). However, secondary transfers are not subject to the federal record-keeping and background check requirements placed on licensed dealers, thus making the secondary

---

[19] Persons who make only occasional sales of firearms are not required to obtain a federal firearms license (ATF, 2000, p. 11).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

21

Exhibit 4
Page 00318

market almost entirely unregulated and, accordingly, a better source of guns for criminal users.[20]  In the secondary market, ineligible buyers may obtain guns from a wide variety of legitimate or illegitimate gun owners: relatives, friends, fences, drug dealers, drug addicts, persons selling at gun shows, or other strangers (e.g., see Wright and Rossi, 1986; Sheley and Wright, 1993a).  Of course, ineligible purchasers may also steal guns from licensed gun dealers and private gun owners.

Secondary market prices are generally lower than primary market prices (because the products are used), though the former may vary substantially across a range of gun models, places, circumstances, and actors.  For example, street prices of AWs and other guns can be 3 to 6 times higher than legal retail prices in jurisdictions with strict gun controls and lower levels of gun ownership (Cook et al., 1995, p. 72).  Nonetheless, experts note that primary and secondary market prices correspond to one another, in that relatively expensive guns in the primary market are also relatively expensive in the secondary market.  Moreover, in any given locality, trends in secondary market prices can be expected to track those in the primary market because a rise in primary market prices for new weapons will increase demand for used weapons and therefore increase secondary market prices (Cook et al., 1995, p. 71).

### 4.2.2.  The AW-LCM Ban and Gun Markets

In the long term, we can expect prices of the banned guns and magazines to gradually rise as supplies dwindle.  As prices rise, more would-be criminal users of AWs and LCMs will be unable or unwilling to pay the higher prices.  Others will be discouraged by the increasing non-monetary costs (i.e., search time) of obtaining the weapons.  In addition, rising legal market prices will undermine the incentive for some persons to sell AWs and LCMs to prohibited buyers for higher premiums, thereby bidding some of the weapons away from the channels through which they would otherwise reach criminal users.  Finally, some would-be AW and LCM users may become less willing to risk confiscation of their AWs and LCMs as the value of the weapons increases.  Therefore, we expect that over time diminishing stocks and rising prices will lead to a reduction in criminal use of AWs and LCMs.[21]

---

[20] Some states require that secondary market participants notify authorities about their transactions.  Even in these states, however, it is not clear how well these laws are enforced.
[21] We would expect these reductions to be apparent shortly after the price increases (an expectation that, as discussed below, was confirmed in our earlier study) because a sizeable share of guns used in crime are used within one to three years of purchase.  Based on analyses of guns recovered by police in 17 cities, ATF (1997, p. 8) estimates that guns less than 3 years old (as measured by the date of first retail sale) comprise between 22% and 43% of guns seized from persons under age 18, between 30% and 54% of guns seized from persons ages 18 to 24, and between 25% and 46% of guns seized from persons over 24.  In addition, guns that are one year old or less comprise the largest share of relatively new crime guns (i.e., crime guns less than three years old) (Pierce et al., 1998, p. 11).  Similar data are not available for secondary market transactions, but such data would shorten the estimated time from acquisition to criminal use.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

22

Exhibit 4
Page 00319

However, the expected timing of the market processes is uncertain. We can anticipate that AW and LCM prices will remain relatively stable for as long as the supply of grandfathered weapons is adequate to meet demand. If, in anticipation of the ban, gun manufacturers overestimated the demand for AWs and LCMs and produced too many of them, prices might even fall before eventually rising. Market responses can be complicated further by the continuing production of legal AW substitute models by some gun manufacturers. If potential AW buyers are content with an adequate supply of legal AW-type weapons having fewer military features, it will take longer for the grandfathered AW supply to constrict and for prices to rise. Similarly, predicting LCM price trends is complicated by the overhang of military surplus magazines that can fit civilian weapons (e.g., military M-16 rifle magazines that can be used with AR-15 type rifles) and by the market in reconditioned magazines. The "aftermarket" in gun accessories and magazine extenders that can be used to convert legal guns and magazines into banned ones introduces further complexity to the issue.

## 4.3. Prior Research on the Ban's Effects

To summarize the findings of our prior study, Congressional debate over the ban triggered pre-ban speculative price increases of upwards of 50% for AWs during 1994, as gun distributors, dealers, and collectors anticipated that the weapons would become valuable collectors' items. Analysis of national and local data on guns recovered by police showed reductions in criminal use of AWs during 1995 and 1996, suggesting that rising prices made the weapons less accessible to criminal users in the short-term aftermath of the ban.

However, the speculative increase in AW prices also prompted a pre-ban boost in AW production; in 1994, AW manufacturers produced more than twice their average volume for the 1989-1993 period. The oversupply of grandfathered AWs, the availability of the AW-type legal substitute models mentioned earlier, and the steady supply of other non-banned semiautomatics appeared to have saturated the legal market, causing advertised prices of AWs to fall to nearly pre-speculation levels by late 1995 or early 1996. This combination of excess supply and reduced prices implied that criminal use of AWs might rise again for some period around 1996, as the large stock of AWs would begin flowing from dealers' and speculators' gun cases to the secondary markets where ineligible purchasers may obtain guns more easily.

We were not able to gather much specific data about market trends for LCMs. However, available data did reveal speculative, pre-ban price increases for LCMs that were comparable to those for AWs (prices for some LCMs continued to climb into 1996), leading us to speculate – incorrectly, as this study will show (see Chapter 8) – that there was some reduction in LCM use after the ban.[22]

---

[22] To our knowledge, there have been two other studies of changes in AW and LCM use during the post-ban period. One study reported a drop in police recoveries of AWs in Baltimore during the first half of 1995 (Weil and Knox, 1995), while the other found no decline in recoveries of AWs or LCMs in Milwaukee homicide cases as of 1996 (Hargarten et al., 2000). Updated analyses for both of these cities

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

23

Exhibit 4
Page 00320

ER_2512

Determining whether the reduction in AW use (and perhaps LCM use) following the ban had an impact on gun violence was more difficult. The gun murder rate dropped more in 1995 (the first year following the ban) than would have been expected based on preexisting trends, but the short post-ban follow-up period available for the analysis precluded a definitive assessment as to whether the reduction was statistically meaningful (see especially Koper and Roth, 2001a). The reduction was also larger than would be expected from the AW-LCM ban, suggesting that other factors were at work in accelerating the decline. Using a number of national and local data sources, we also examined trends in measures of victims per gun murder incident and wounds per gunshot victim, based on the hypothesis that these measures might be more sensitive to variations in the use of AWs and LCMs. These analyses revealed no ban effects, thus failing to show confirming evidence of the mechanism through which the ban was hypothesized to affect the gun murder rate. However, newly available data presented in subsequent chapters suggest these assessments may have been premature, because any benefits from the decline in AW use were likely offset by steady or rising use of other guns equipped with LCMs, a trend that was not apparent at the time of our earlier study.

We cautioned that the short-term patterns observed in the first study might not provide a reliable guide to longer-term trends and that additional follow-up was warranted. Two key issues to be addressed were whether there had been a rebound in AW use since the 1995-1996 period and, if so, whether that rebound had yet given way to a long-term reduction in AW use. Another key issue was to seek more definitive evidence on short and long-term trends in the availability and criminal use of LCMs. These issues are critical to assessing the effectiveness of the AW-LCM ban, but they also have broader implications for other important policy concerns, namely, the establishment of reasonable timeframes for sunset and evaluation provisions in legislation. In other words, how long is long enough in evaluating policy and setting policy expiration dates?

are presented in Chapters 6 and 8.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

24

Exhibit 4
Page 00321

## 5. MARKET INDICATORS FOR ASSAULT WEAPONS: PRICES AND PRODUCTION

This chapter assesses the ban's impact on the availability of AWs in primary and secondary markets, as measured by trends in AW prices and post-ban production of legal AW substitute models. Understanding these trends is important because they influence the flow of grandfathered weapons to criminals and the availability of non-banned weapons that are close substitutes for banned ones. In the next chapter, we assess the impact of these trends on criminal use of AWs, as approximated by statistics on gun seizures by police. (Subsequent chapters present similar analyses for LCMs.)

Following our previous methods, we compare trends for AWs to trends for various non-banned firearms. The AW analyses generally focus on the most common AWs formerly produced in the U.S., including Intratec and SWD-type APs and AR-15-type ARs produced by Colt and others. In addition, we selected a small number of domestic pistol and rifle models made by Calico and Feather Industries that fail the features test provision of the AW legislation and that were relatively common among crime guns reported by law enforcement agencies to ATF prior to the ban (see Roth and Koper, 1997, Chapter 5). Together, this group of weapons represented over 80% of AWs used in crime and reported to ATF from 1993 through 1996, and the availability of these guns was not affected by legislation or regulations predating the AW-LCM ban.[23] We also examine substitution of legalized, post-ban versions of these weapons, including the Intratec AB-10 and Sport-22, FMJ's PM models (substitutes for the SWD group), Colt Sporters, Calico Liberty models, and others. We generally did not conduct comparative analyses of named foreign AWs (the Uzi, Galil, and AK weapons) because the 1989 federal import ban had already limited their availability, and their legal status was essentially unchanged by the 1994 ban.

The exact gun models and time periods covered vary across the analyses (based on data availability and the time at which data were collected). The details of each analysis are described in the following sections.

### 5.1. Price Trends for Assault Weapons and Other Firearms

To approximate trends in the prices at which AWs could be purchased throughout the 1990s, we collected annual price data for several APs, ARs, and non-banned comparison firearms from the *Blue Book of Gun Values* (Fjestad, 1990-1999). The *Blue Book* provides national average prices for an extensive list of new and used firearms based on information collected at gun shows and input provided by networks of dealers

---

[23] The Intratec group includes weapons made by AA Arms. The SWD group contains related models made by Military Armaments Corporation/Ingram and RPB Industries. The AR-15 group contains models made by Colt and copies made by Bushmaster, Olympic Arms, Eagle Arms, SGW Enterprises, Essential Arms, DPMS, and Sendra.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

25

Exhibit 4
Page 00322

ER_2514

and collectors. The *Blue Book* is utilized widely in the gun industry, though prices in any given locality may differ notably from the averages appearing in the *Blue Book*.

To assess time trends in gun prices, we conducted hedonic price analyses (Berndt, 1990) in which the gun prices were regressed upon a series of year and model indicators. The coefficients for the year indicators show annual changes in the prices of the guns relative to 1994 (the year the ban went into effect), controlling for time-stable differences in the prices of various gun models. Since manufacturers' suggested retail prices (MSRP) were not available for banned AWs during post-ban years, we utilized prices for AWs in 100% condition for all years.[24]  For non-banned firearms, we used MSRP.[25]  For all models, we divided the gun prices by annual values of the gross domestic product price deflator provided in the December 2001 and 2000 issues of *Economic Indicators* and logged these adjusted prices.

Each model presented below is based on data pooled across a number of firearm models and years, so that observation $P_{jt}$ represents the price of gun model j during year t. We weighted each observation, $P_{jt}$, based on cumulative estimates of the production of model j from 1985 or 1986 (depending on data availability) through year t using data provided by gun manufacturers to ATF and published by the Violence Policy Center (1999).[26, 27]

---

[24] Project staff also collected prices of weapons in 80% condition. However, the levels and annual changes of the 80% prices were very highly correlated (0.86 to 0.99) with those of the 100% condition prices. Therefore, we limited the analysis to the 100% prices.
[25] We utilized prices for the base model of each AW and comparison firearm (in contrast to model variations with special features or accessories).
[26] The regression models are based on equal numbers of observations for each gun model. Hence, unweighted regressions would give equal weight to each gun model. This does not seem appropriate, however, because some guns are produced in much larger numbers than are other guns. Weighting the regression models by production estimates should therefore give us a better sense of what one could "typically" expect to pay for a generic gun in each study category (e.g., a generic assault pistol).
[27] Several of the selected weapons began production in 1985 or later. In other cases, available production data extended back to only the mid-1980s. Published production figures for handguns are broken down by type (semiautomatic, revolver) and caliber and thus provide perfect or very good approximations of production for the handgun models examined in this study. Rifle production data, however, are not disaggregated by gun type, caliber, or model. For the ARs under study, the production counts should be reasonable approximations of AR production because most of the rifles made by the companies in question prior to the ban were ARs. The rifles used in the comparison (i.e., non-banned) rifle analysis are made by companies (Sturm Ruger, Remington, and Marlin) that produce numerous semiautomatic and non-semiautomatic rifle models. However, the overall rifle production counts for these companies should provide some indication of differences in the availability of the comparison rifles relative to one another. Because production data were available through only 1997 at the time this particular analysis was conducted (Violence Policy Center, 1999), we used cumulative production through 1997 to weight the 1998 and 1999 observations for the comparison handgun and comparison rifle models. This was not a consideration for AWs since their production ceased in 1994 (note that the AW production figures for 1994 may include some post-ban legal substitute models manufactured after September 13, 1994). Nonetheless, weighting had very little effect on the inferences from either of the comparison gun models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

26

Exhibit 4
Page 00323

### 5.1.1.  Assault Pistol Prices

The analysis of AP prices focuses on the Intratec TEC-9/DC-9, TEC-22, SWD M-11/9, and Calico M950 models.  Regression results are shown in Table 5-1, while Figure 5-1 graphically depicts the annual trend in prices for the period 1990 through 1999.  None of the yearly coefficients in Table 5-1 is statistically significant, thus indicating that average annual AP prices did not change during the 1990s after adjusting for inflation.  Although the model is based on a modest number of observations (n=40) that may limit its statistical power (i.e., its ability to detect real effects), the size of the yearly coefficients confirm that prices changed very little from year to year.   The largest yearly coefficient is for 1990, and it indicates that AP prices were only 4% higher in 1990 than in 1994.[28]

This stands in contrast to our earlier finding (Roth and Koper, 1997, Chapter 4) that prices for SWD APs may have risen by as much as 47% around the time of the ban.  However, the earlier analyses were based on semi-annual or quarterly analyses advertised by gun distributors and were intended to capture short-term fluctuations in price that assumed greater importance in the context of the first AW study, which could examine only short-term ban outcomes.  *Blue Book* editions released close in time to the ban (e.g., 1995) also cautioned that prices for some AWs were volatile at that time.  This study emphasizes longer-term price trends, which appear to have been more stable.[29]

---

[28]  To interpret the coefficient of each indicator variable in terms of a percentage change in the dependent variable, we exponentiate the coefficient, subtract 1 from the exponentiated value, and multiply the difference by 100.

[29]  Although the earlier analysis of AP prices focused on the greatest variations observed in semi-annual prices, the results also provide indications that longer-term trends were more stable.  Prices in 1993, for example, averaged roughly 73% of the peak prices reached at the time the ban was implemented (i.e., late 1994), while prices in early 1994 and late 1995 averaged about 83% and 79% of the peak prices, respectively.  Hence, price variation was much more modest after removing the peak periods around the time of the ban's implementation (i.e., late 1994 and early 1995).  The wider range of APs used in the current study may also be responsible for some of the differences between the results of this analysis and the prior study.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

27

Exhibit 4
Page 00324

**Table 5-1.  Regression of Assault Pistol and Comparison Handgun Prices on Annual Time Indicators, 1990-1999, Controlling for Gun Model**

|  | Assault Pistols (n=40) | | Comparison Handguns (n=38) | |
|---|---|---|---|---|
|  | Estimate | T Value | Estimate | T Value |
| Constant | 1.56 | 26.94[***] | -0.21 | -6.81[***] |
| 1990 | 0.04 | 1.07 | 0.12 | 2.07[**] |
| 1991 | 0.01 | 0.30 | 0.09 | 1.79[*] |
| 1992 | -0.01 | -0.32 | 0.05 | 1.30 |
| 1993 | -0.03 | -1.09 | 0.02 | 0.48 |
| 1995 | 0.01 | 0.22 | -0.02 | -0.48 |
| 1996 | -0.01 | -0.45 | -0.09 | -2.69[***] |
| 1997 | -0.03 | -1.13 | -0.11 | -3.26[***] |
| 1998 | 0.00 | -0.10 | -0.07 | -1.99[*] |
| 1999 | -0.02 | -0.58 | -0.14 | -4.02[***] |
| Tec-9 | -0.67 | -11.95[***] |  |  |
| Tec-22 | -0.89 | -15.59[***] |  |  |
| SWD | -0.64 | -11.49[***] |  |  |
| Davis P32 |  |  | 0.09 | 3.63[***] |
| Davis P380 |  |  | 0.20 | 8.20[***] |
| Lorcin L380 |  |  | 0.29 | 11.35[***] |
|  |  |  |  |  |
| F value | 27.79 |  | 16.24 |  |
| (p value) | <.01 |  | <.01 |  |
| Adj. R-square | 0.89 |  | 0.83 |  |

Time indicators are interpreted relative to 1994.  Assault pistol model indicators are interpreted relative to Calico 9mm.  Comparison handgun models are interpreted relative to Lorcin .25 caliber.
* Statistically significant at p<=.10.
** Statistically significant at p<=.05.
*** Statistically significant at p<=.01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 5-1. Annual Price Trends for Assault Pistols and SNS Handguns, 1990-1999**



Assault pistol prices based on TEC9, TEC22, SWD M11/9, and Calico M950.  SNS prices based on Davis P32 and P380 and
Lorcin L25 and L380.

*5.1.2.  Comparison Handgun Prices*

For comparison, Table 5-1 and Figure 5-1 illustrate price trends for a number of
non-banned, cheaply priced, and readily concealable semiautomatic handgun models: the
Davis P32 and P380 and the Lorcin L25 and L380.  Such guns are often referred to as
Saturday night specials (SNS).  By a number of accounts, SNS-type guns, and Davis and
Lorcin models in particular, are among the guns most frequently used in crime (ATF,
1995; 1997; Kennedy et al., 1996; Wintemute, 1994).  Although the differences between
APs and SNS handguns (particularly the fact that most SNS handguns do not have
LCMs) suggest they are likely to be used by gun consumers with different levels of
firearms experience and sophistication, the SNS guns are arguably a good comparison
group for APs because both groups of guns are particularly sensitive to criminal demand.
Like AP buyers, SNS buyers are more likely than other gun buyers to have criminal
histories and to be charged with new offenses, particularly violent or firearm offenses,
subsequent to their purchases (Wintemute et al., 1998b).

Prices of SNS handguns dropped notably throughout the 1990s.  Prices for SNS
handguns were 13% higher in 1990 than in 1994.  Prices then dropped another 13% from
1994 to 1999.  This suggests that although AP prices remained generally stable
throughout the 1990s, they increased relative to prices of other guns commonly used in
crime.  We say more about this below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

*5.1.3. Assault Rifle Prices*

To assess trends in prices of ARs, we examined prices for several Colt and Olympic rifle models in the AR-15 class, as well as Calico models M900 and M951 and Feather models AT9 and AT22.[30]  Because rifle production data are not disaggregated by weapon type (semiautomatic, bolt action, etc.), caliber, or model, the regressions could only be weighted using overall rifle production counts for each company.  For this reason, we calculated the average price of the ARs made by each company for each year and modeled the trends in these average prices over time, weighting by each company's total rifle production.[31]

Results shown in Table 5-2 and Figure 5-2 demonstrate that AR prices rose significantly during 1994 and 1995 before falling back to pre-ban levels in 1996 and remaining there through 1999.  Prices rose 16% from 1993 to 1994 and then increased another 13% in 1995 (representing an increase of nearly one third over the 1993 level).  Yet by 1996, prices had fallen to levels virtually identical to those before 1994.  These patterns are consistent with those we found earlier for the 1992-1996 period (Roth and Koper, 1997, Chapter 4), though the annual price fluctuations shown here were not as dramatic as the quarterly changes shown in the earlier study.

Note, however, that these patterns were not uniform across all of the AR categories.  The results of the model were driven largely by the patterns for Colt rifles, which are much more numerous than the other brands.  Olympic rifles increased in price throughout the time period, while prices for most Calico and Feather rifles tended to fall throughout the 1990s without necessarily exhibiting spikes around the time of the ban.

---

[30]  Specifically, we tracked prices for the Match Target Lightweight (R6530), Target Government Model (R6551), Competition H-Bar (R6700), and Match Target H-Bar (R6601) models by Colt and the Ultramatch, Service Match, Multimatch M1-1, AR15, and CAR15 models by Olympic Arms.  Each of these models has a modified, post-ban version.  We utilized prices for the pre-ban configurations during post-ban years.
[31]  Prices for the different models made by a given manufacturer tended to follow comparable trends, thus strengthening the argument for averaging prices.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

30

Exhibit 4
Page 00327

**Table 5-2.  Regression of Assault Rifle and Comparison Semiautomatic Rifle Prices on Annual Time Indicators, 1991-1999, Controlling for Gun Make**

|  | Assault Rifles (n=36) | | Comparison Rifles (n=27) | |
|---|---|---|---|---|
|  | Estimate | T value | Estimate | T value |
| Constant | 1.31 | 21.15*** | 1.40 | 76.75*** |
| 1991 | -0.12 | -1.98* | -0.01 | -0.21 |
| 1992 | -0.13 | -2.26** | 0.01 | 0.30 |
| 1993 | -0.15 | -2.78** | 0 | -0.13 |
| 1995 | 0.12 | 2.47** | 0.03 | 1.08 |
| 1996 | -0.11 | -2.27** | 0.04 | 1.69 |
| 1997 | -0.11 | -2.23** | 0.03 | 1.46 |
| 1998 | -0.12 | -2.47** | 0.02 | 0.91 |
| 1999 | -0.14 | -2.71** | 0.03 | 1.21 |
| Colt (AR-15 type) | 1.07 | 19.93*** |  |  |
| Olympic (AR-15 type) | 1.14 | 16.08*** |  |  |
| Calico | 0.43 | 5.53*** |  |  |
| Ruger |  |  | 0.26 | 20.07*** |
| Remington |  |  | 0.29 | 21.69*** |
| F statistic | 50.52 |  | 63.62 |  |
| (p value) | <.01 |  | <.01 |  |
| Adj. R-square | 0.94 |  | 0.96 |  |

Time indicators interpreted relative to 1994.  Assault rifle makes interpreted relative to Feather.
Comparison rifle makes interpreted relative to Marlin.
* Statistically significant at p<=.10.
** Statistically significant at p<=.05.
*** Statistically significant at p<=.01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 5-2. Annual Price Trends for Assault Rifles and Comparison Semiautomatic Rifles, 1991-1999**



Assault rifle prices based on Colt and Olympic AR-type, Calico, and Feather models. Comparison rifle prices based on selected Remington, Marlin, and Sturm Ruger models.

### 5.1.4. Comparison Semiautomatic Rifles.

The analysis of comparison rifle prices includes the Remington 7400, Marlin Model 9, and Sturm Ruger Mini-14 and Mini-30 models (the Ruger model prices were averaged for each year). The AW legislation exempted each of these semiautomatic rifles by name, though the exemption does not apply to Mini-14 models with folding stocks (a feature included in the ban's features test). The Ruger models are of particular interest since they are among only four exempted guns that can accept LCMs made for military rifles (U.S. Department of the Treasury, 1998, p. 23), though Ruger produced LCMs only for the Mini-14 model and substituted a 5-round magazine for this gun in 1989 (Fjestad, 2002, pp. 1361-1362). The Marlin model was also manufactured with an LCM prior to 1990 (Fjestad, 2002, p. 917). The Remington model is manufactured with a detachable 4-round magazine.

Prices for these guns remained steady throughout the decade (see Table 5-2 and Figure 5-2). The largest change was a 4% increase (non-significant) in prices in 1996 relative to prices in 1994. Therefore, the rifle price spikes in 1994 and 1995 were specific to assault rifles. However, the steady annual price trends may mask short-term fluctuations that we found

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

32

Exhibit 4
Page 00329

previously (Roth and Koper, 1997, Chapter 4) for some non-banned semiautomatic rifles (including the Ruger Mini-14) during 1994 and early 1995.[32]

## 5.2.  Production Trends for Assault Weapons and Other Firearms

To more fully assess the ban's effects on gun markets, examination of pre and post-ban trends in production of AWs and legal AW substitutes is a useful complement to studying price trends. Our earlier work revealed a spike in AW production during 1994 as the ban was being debated. Post-ban production of legal AW substitutes should reveal additional information about the reaction of gun markets to the ban. If production of these models has fallen off dramatically, it may suggest that the market for AWs has been temporarily saturated and/or that consumers of AWs favor the original AW models that have more military-style features. Stable or rising production levels, on the other hand, may indicate substantial consumer demand for AW substitutes, which would suggest that consumers consider the legal substitute models to be as desirable as the banned models.

### 5.2.1.  Production of Assault Pistols and Other Handguns

Figure 5-3 presents production trends for a number of domestic AP manufacturers from 1985 through 2001 (the most recent year available for data on individual manufacturers).[33]  After rising in the early 1990s and surging notably to a peak in 1994, production by these companies dropped off dramatically, falling 80% from 1993-1994 to 1996-1997 and falling another 35% by 1999-2000 (Table 5-3).[34]  Makers of Intratec and SWD-type APs continued manufacturing modified versions of their APs for at least a few years following the ban, but at much lower volumes than that at which they produced APs just prior to the ban. Companies like AA Arms and Calico produced very few or no AP-type pistols from 1995 onward, and Intratec — producers of the APs most frequently used in crime — went out of business after 1999.

However, the pattern of rising and then falling production was not entirely unique to APs. Table 5-3 shows that production of all handguns and production of SNS-type pistols both declined sharply in the mid to late 1990s following a peak in 1993.  Nonetheless, the trends —

---

[32] We attributed those short-term fluctuations to pre-ban uncertainty regarding which semiautomatic rifles would be prohibited by the ban.  Also note that the prior findings were based on a different set of comparison semiautomatic rifles that included a number of foreign rifles. We concentrated on domestically produced rifles for this updated analysis in order to make more explicit links between rifle price and production trends (data for the latter are available only for domestic firearms).

[33] Production figures for individual manufacturers through 2000 have been compiled by the Violence Policy Center (2002). Year 2001 data are available from ATF via the Internet (see www.atf.treas.gov). National gun production totals through 1998 are also available from ATF (2000, p. A-3).

[34] The assault pistol production figures used here and in the price analysis include 9mm and .22 caliber pistols made by Intratec, 9mm pistols manufactured by AA Arms, all non-.22 caliber pistols manufactured by S.W. Daniels, Wayne Daniels, and Military Armaments Corporation (which together constitute the SWD group), and .22 and 9mm pistols manufactured by Calico.  Intratec produces a few non-AW models in .22 and 9mm calibers, so the Intratec figures will overstate production of assault pistols and their legal substitutes to some degree.  The comparison, SNS production figures are based on all handguns produced by Lorcin Engineering and Davis Industries.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

33

Exhibit 4
Page 00330

ER_2522

both peak and decline – were more dramatic for APs than for other handguns. Production of APs rose 69% from 1990-1991 to 1993-1994, while SNS production and overall handgun production each increased 47%. From 1993-1994 to 1996-1997, production of AP-type handguns, SNS models, and all handguns declined 80%, 66%, and 47%, respectively. Further, production of AP-type handguns continued to decline at a faster rate than that of other handguns through the end of the decade.[35]

**Figure 5-3. Assault Pistol Production, 1985-2001**



---

[35] Lorcin, a prominent SNS brand that we examined for the price and production analyses, went out of business after 1998. Unlike the situation in the AP market (where, to our knowledge, former AP makers have not been replaced on any large scale), the SNS market appears to have compensated somewhat to offset the loss of Lorcin. The SNS change from 1996-1997 to 1999-2000 is based on examination of a larger group of SNS-type makers, including Lorcin, Davis, Bryco, Phoenix Arms, and Hi-Point. Production among this group declined by 22% from 1996-1997 to 1999-2000, a decline greater than that for total handgun production but less than that for AP-type production.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

34

Exhibit 4
Page 00331

**Table 5-3. Production Trends for Assault Weapons and Other Firearms, 1990-2000\***

| Firearm Category | % Change 1990/91 to 1993/94 | % Change 1993/94 to 1996/97 | % Change 1996/97 to 1999/2000 |
|---|---|---|---|
| Total Handguns | 47% | -47% | -10% |
|    Assault Pistols (or Post-Ban Models) | 69% | -80% | -35% |
|    SNS Handguns | 47% | -66% | -22% |
| Total Rifles | 22% | 8% | 18% |
|    Assault Rifles (or Post-Ban Models) | 81% | -51% | 156% |
|    Comparison Rifles | 15% | 13% | -16% |

\* Total handgun and rifle figures include all production by U.S. manufacturers. Assault pistols include Intratec group, SWD group, and Calico models. SNS figures are based on Lorcin Engineering and Davis Industries for changes up through 1996-1997. Because Lorcin went out of business after 1998, the SNS change from 1996-1997 to 1999-2000 is based on a larger group of SNS makers including Lorcin, Davis, Bryco, Phoenix Arms, and Hi-Point. Assault rifles include AR-15 type models by Colt and others. Comparison rifles include Sturm Ruger, Remington, and Marlin.

### 5.2.2. Production of Assault Rifles and Other Rifles

As shown in Figure 5-4, production of AR-15 type rifles surged during the early 1990s, reaching a peak in 1994.[36] AR production during the early 1990s rose almost 4 times faster than total rifle production and over 5 times faster than production of the comparison rifles examined in the price analysis (Table 5-3). Yet, by 1996 and 1997, production of legalized AR-type rifles had fallen by 51%, as production of other rifles continued increasing. AR production trends reversed again during the late 1990s, however, rising over 150%.[37] Total rifle production increased much more modestly during this time (18%), while production of the comparison rifles declined.

---

[36] Note again that the AR and legalized AR production figures are approximations based on all rifles produced by the companies in question (rifle production data are not available by type, caliber, or model), but it appears that most rifles made by these companies during the study period were AR-type rifles. Also, the figures for the comparison rifle companies (Ruger, Marlin, and Remington) are based on all rifles produced by these companies (the price analysis focused on selected semiautomatic models).

[37] There was also a notable shift in market shares among AR makers, as Bushmaster overtook Colt as the leading producer of AR-15 type rifles (Figure 5-4).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

35

Exhibit 4
Page 00332

ER_2524



Figure 5-4. Assault Rifle Production, 1986-2001 (AR-15 Type)

Other: Olympic, Eagle/Armalite, DPMS, Essential Arms, Sendra.

### 5.3. Summary and Interpretations

Below, we offer some interpretations of the patterns found in the price and production analyses, keeping in mind that these analyses were largely descriptive, so causal inferences must be made cautiously. As documented in our earlier study, Congressional debate over the AW-LCM ban triggered speculative price increases for AWs in the months leading up to the ban's enactment. This study's examination of longer-term, annual price trends suggests that this speculative effect was very brief (and perhaps quite variable across jurisdictions) for APs but persisted through 1995 for ARs. This implies that speculators and sophisticated gun collectors (who we suspect played a large role in driving price trends) have more interest in ARs, which tend to be higher in quality and price than APs.

Responding to the speculative price growth, AW manufacturers boosted their production of AWs in 1994. Although total handgun and rifle production were increasing during the early 1990s, the rise in AW production was steeper, and there was a production peak unique to AWs in 1994 (production of other handguns peaked in 1993). It seems that this boost in the supply of grandfathered AWs was sufficient to satisfy speculative demand, thereby restoring national average AP prices to pre-ban levels within a year of the ban and doing the same for AR prices by 1996. AW prices remained stable through the late 1990s, and production of legalized AW-type weapons dropped off

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

36

Exhibit 4
Page 00333

substantially, at least through 1998. This suggests that the supply of grandfathered AWs was sufficient to meet demand through the late 1990s.

However, prices of APs rose relative to other handguns commonly used in crime during the 1990s. Handgun prices and production declined in general during the late 1990s, implying a decrease in demand for APs and other handguns that probably stemmed from the nation's declining crime rates.[38] But the AW ban's restriction of the AP supply, combined with the interest of speculators and collectors in these guns, may have prevented AP prices from falling as did prices for other handguns. The market patterns also suggest that consumers of APs are not as easily satisfied by legalized APs with fewer military-style features; despite the increasing value of APs (in relative terms), post-ban production of legalized APs declined faster than did production of other handguns, and some AP makers went out of business.

Prices of ARs, on the other hand, remained steady during the late 1990s (after the speculative price bubble of 1994-1995) both in absolute terms and relative to other rifles. The failure of AR prices to rise in at least relative terms, as occurred for APs, and the temporary drop in production of AR-type rifles after the ban may signify that the AR market was saturated relative to the AP market for a least a number of years following the ban. However, demand for AR-type rifles later rebounded, as evidenced by the resurgence in production of legalized, AR-type rifles in the late 1990s. In fact, more of these guns were produced in 1999 than in 1994. Unlike AP users, therefore, rifle users appear to be readily substituting the legalized AR-type rifles for the banned ARs, which may be another factor that has kept prices of the latter rifles from rising. All of this suggests that rifle owners, who have a lower prevalence of criminal users than do handgun owners, can more easily substitute rifles with fewer or no military features for the hunting and other sporting purposes that predominate among rifle consumers.

Another relevant factor may have been a surge in the supply of foreign semiautomatic rifles that can accept LCMs for military weapons (the LCMM rifles discussed in Chapter 2) during the early 1990s. Examples of LCMM rifles include legalized versions of banned AK-47, FN-FAL, and Uzi rifles. Importation of LCMM rifles rose from 19,147 in 1991 to 191, 341 in 1993, a nine-fold increase (Department of the Treasury, 1998, p. 34). Due to an embargo on the importation of firearms from China (where many legalized AK-type rifles are produced), imports of LCMM rifles dropped

---

[38] It seems likely that the rise and fall of handgun production was linked to the rising crime rates of the late 1980s and early 1990s and the falling crime rates of the mid and late 1990s. Self-defense and fear of crime are important motivations for handgun ownership among the general population (e.g., Cook and Ludwig, 1996; McDowall and Loftin, 1983), and the concealability and price of handguns make them the firearms of choice for criminal offenders. It is likely that the peak in 1993 was also linked to the Congressional debate and passage of the Brady Act, which established a background check system for gun purchases from retail dealers. It is widely recognized in the gun industry that the consideration of new gun control legislation tends to increase gun sales.

The decline in production was more pronounced for SNS handguns, whose sales are likely to be particularly sensitive to crime trends. Criminal offenders make disproportionate use of these guns. We can also speculate that they are prominent among guns purchased by low-income citizens desiring guns for protection. In contrast, the poor quality and reliability of these guns make them less popular among more knowledgeable and affluent gun buyers.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

37

Exhibit 4
Page 00334

back down to 21,261 in 1994. Importation of all foreign LCMM rifles was ended by federal executive order in 1998.

ATF has reported that criminal use of LCMM rifles increased more quickly during the early 1990s than did that of other military-style rifles (U.S. Department of the Treasury, 1998, p. 33; also see Chapter 6). Accordingly, it is possible that the availability of LCMM rifles also helped to depress the prices of domestic ARs and discourage the production of legalized ARs during the 1990s, particularly if criminal users of rifles place a premium on the ability to accept LCMs. It is noteworthy, moreover, that the rebound in domestic production of legalized ARs came on the heels of the 1998 ban on LCMM rifles, perhaps suggesting the LCMM ban increased demand for domestic rifles accepting LCMs.

In sum, this examination of the AW ban's impact on gun prices and production suggests that there has likely been a sustained reduction in criminal use of APs since the ban but not necessarily ARs. Since most AWs used in crime are APs, this should result in an overall decline in AW use. In the following chapter, we examine the accuracy of this prediction.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

38

Exhibit 4
Page 00335

## 6. CRIMINAL USE OF ASSAULT WEAPONS AFTER THE BAN

### 6.1. Measuring Criminal Use of Assault Weapons: A Methodological Note

In this chapter, we examine trends in the use of AWs using a number of national and local data sources on guns recovered by law enforcement agencies (we focus on the domestic AW models discussed at the beginning of the previous chapter). Such data provide the best available indicator of changes over time in the types (and especially the specific makes and models) of guns used in violent crime and possessed and/or carried by criminal and otherwise deviant or high-risk persons. The majority of firearms recovered by police are tied to weapon possession and carrying offenses, while the remainder are linked primarily to violent crimes and narcotics offenses (e.g., see ATF, 1976; 1977; 1997; Brill, 1977). In general, up to a quarter of guns confiscated by police are associated with violent offenses or shots fired incidents (calculated from ATF, 1977, pp. 96-98; 1997; Brill, 1977, pp. 24,71; Shaw, 1994, pp. 63, 65; also see data presented later in this chapter). Other confiscated guns may be found by officers, turned in voluntarily by citizens, or seized by officers for temporary safekeeping in situations that have the potential for violence (e.g., domestic disputes).

Because not all recovered guns are linked to violent crime investigations, we present analyses based on all gun recoveries and gun recoveries linked to violent crimes where appropriate (some of the data sources are based exclusively, or nearly so, on guns linked to violent crimes). However, the fact that a seized gun is not clearly linked to a violent crime does not rule out the possibility that it had been or would have been used in a violent crime. Many offenders carry firearms on a regular basis for protection and to be prepared for criminal opportunities (Sheley and Wright, 1993a; Wright and Rossi, 1986). In addition, many confiscated guns are taken from persons involved in drugs, a group involved disproportionately in violence and illegal gun trafficking (National Institute of Justice, 1995; Sheley and Wright, 1993a). In some instances, criminal users, including those fleeing crime scenes, may have even possessed discarded guns found by patrol officers. For all these reasons, guns recovered by police should serve as a good approximation of the types of guns used in violent crime, even though many are not clearly linked to such crimes.

Two additional caveats should be noted with respect to tracking the use of AWs. First, we can only identify AWs based on banned makes and models. The databases do not contain information about the specific features of firearms, thus precluding any assessment of non-banned gun models that were altered after purchase in ways making them illegal. In this respect, our numbers may understate the use of AWs, but we know of no data source with which to evaluate the commonality of such alterations. Second, one cannot always distinguish pre-ban versions of AWs from post-ban, legalized versions of the same weapons based on weapon make and model information (this occurs when the post-ban version of an AW has the same name as the pre-ban version), a factor which may have caused us to overstate the use of AWs after the ban. This was more of a problem for our assessment of ARs, as will be discussed below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Finally, we generally emphasize trends in the percentage of crime guns that are AWs in order to control for overall trends in gun violence and gun recoveries. Because gun violence was declining throughout the 1990s, we expected the number of AW recoveries to drop independently of the ban's impact.

## 6.2. National Analysis of Guns Reported By Police to the Federal Bureau of Alcohol, Tobacco, and Firearms

### 6.2.1. An Introduction to Gun Tracing Data

In this section, we examine national trends in AW use based on firearm trace requests submitted to ATF by federal, state, and local law enforcement personnel throughout the nation. A gun trace is an investigation that typically tracks a gun from its manufacture to its first point of sale by a licensed dealer. Upon request, ATF traces guns seized by law enforcement as a service to federal, state, and local agencies. In order to initiate a trace on a firearm, the requesting law enforcement agency provides information about the firearm, such as make, model, and serial number.

Although ATF tracing data provide the only available national sample of the types of guns used in crime and otherwise possessed or carried by criminal and high-risk groups, they do have limitations for research purposes. Gun tracing is voluntary, and police in most jurisdictions do not submit trace requests for all, or in some cases any, guns they seize. Crime and tracing data for 1994, for example, suggest that law enforcement agencies requested traces for 27% of gun homicides but only 1% of gun robberies and gun assaults known to police during that year (calculated from ATF, 1995 and Federal Bureau of Investigation, 1995, pp. 13, 18, 26, 29, 31, 32).

The processes by which state and local law enforcement agencies decide to submit guns for tracing are largely unknown, and there are undoubtedly important sources of variation between agencies in different states and localities. For example, agencies may be less likely to submit trace requests in states that maintain their own registers of gun dealers' sales. Knowledge of ATF's tracing capabilities and procedures,[39] as well as participation in federal/state/local law enforcement task forces, are some of the other factors that may affect an agency's tracing practices. Further, these factors are likely to vary over time, a point that is reinforced below.

Therefore, firearms submitted to ATF for tracing may not be representative of the

---

[39] To illustrate, ATF cannot (or does not) trace military surplus weapons, imported guns without the importer name (generally, pre-1968 guns), stolen guns, or guns without a legible serial number (Zawitz 1995). Tracing guns manufactured before 1968 is also difficult because licensed dealers were not required to keep records of their transactions prior to that time. Throughout much of the 1990s, ATF did not generally trace guns older than 5-10 years without special investigative reasons (Kennedy et al., 1996, p. 171). Our data are based on trace requests rather than successful traces, but knowledge of the preceding operational guidelines might have influenced which guns law enforcement agencies chose to trace in some instances.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

40

Exhibit 4
Page 00337

ER_2529

types of firearms typically seized by police.  In general, not much is known about the nature of potential bias in tracing data.  In prior studies, however, AWs tended to be more common in tracing data than in more representative samples of guns confiscated by police (Kleck, 1997, pp. 112, 141).  This suggests that police have been more likely historically to initiate traces for seized AWs than for other seized guns.  Although comparisons across studies are complicated by varying definitions of AWs used in different analyses, studies of guns confiscated by police or used in particular types of crimes generally suggest that AWs accounted for up to 6% of crime guns and about 2% on average prior to the federal AW ban (see Chapter 3 and Kleck, 1997, p. 141), whereas studies of pre-ban tracing data indicated that 8% of traced guns, and sometimes as many as 11%, were AWs  (Cox Newspapers, 1989; Lenett, 1995; Zawitz, 1995).

Changes over time in the tracing practices of law enforcement agencies present additional complexities in analyzing tracing data.  Due to improvements in the tracing process, ATF promotional efforts, and special initiatives like the Youth Crime Gun Interdiction Initiative (see ATF, 1997; 1999 and more recent reports available via the Internet at www.atf.treas.gov),[40] the utilization of tracing grew substantially throughout the 1990s in jurisdictions that chose to participate (also see ATF, 2000; Roth and Koper, 1997).  To illustrate, trace requests to ATF rose from roughly 42,300 in 1991 to 229,500 in 2002 (see Table 6-1 in the next section), an increase of 443%.  This growth reflects changes in tracing practices (i.e., changes in the number of agencies submitting trace requests and/or changes in the percentage of recovered guns for which participating agencies requested traces) rather than changes in gun crime; gun homicides, for example, were falling throughout the 1990s (see Table 6-1 in the next section) and were a third lower in 2002 than in 1991.

Therefore, an increase in trace requests for AWs does not necessarily signal a real increase in the use of AWs.  Further, examining trends in the percentage of trace requests associated with AWs is also problematic.  Because law enforcement agencies were more likely to request traces for AWs than for other guns in years past, we can expect the growth rate in tracing for non-AWs to exceed the growth rate in traces for AWs as gun tracing becomes more comprehensive.  Consequently, AWs are likely to decline over time as a share of trace requests due simply to reporting effects, except perhaps during periods when AWs figure prominently in public discourse on crime.[41]

---

[40]  As part of this initiative, police in a few dozen large cities are submitting trace requests to ATF for all guns that they confiscate.  The initiative began with 17 cities in 1996 and has since spread to 55 major urban jurisdictions.

[41]  To illustrate, assume that a hypothetical police agency recovers 100 guns a year, 2 of which are AWs, and that the agency has a selective tracing policy that results in the submission of trace requests for 20 of the guns, including 1 of the recovered AWs.  Under this scenario, the department would be almost three times as likely to request traces for AWs as for other guns.  If the department adopted a policy to request traces on all guns (and again recovered 2 AWs and 98 other guns), AW traces would double and traces of other guns would increase by more than 400%.  Moreover, AWs would decline from 5% of traced guns to 2% of traced guns due simply to the change in tracing policy.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

41

Exhibit 4
Page 00338

ER_2530

*6.2.2. Traces of Assault Weapons, 1990-2002*

Figure 6-1 illustrates the share of all traces that were for AWs from 1990 through 2002. A more detailed assessment of annual changes in traces for AWs and other guns is presented in Table 6-1. Changes in gun murders are also shown in Table 6-1 to emphasize the differences in trends for tracing and gun crime. Below, we summarize key points from the analysis. Due to the instrumentation problems inherent in tracing data, statistical tests are not presented.[42]

### Figure 6-1. Police Recoveries of Assault Weapons Reported to ATF (National), 1990-2002



As % of Traced Guns (N=1,658,975)

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

---

[42] Nearly 30% of the tracing records lack specific gun model designations (the crucial elements for conducting a trace are the gun make and serial number). For the makes and types of guns likely to be AWs, however, the missing model rate was slightly under 10%. Further, we were able to identify some of the latter weapons as AWs with reasonable confidence based on the makes, types, and calibers alone. Nevertheless, we conducted a supplemental analysis using only those records for which the gun model was identified. The results of that analysis were substantively very similar to those presented below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

42

Exhibit 4
Page 00339

ER_2531

**Table 6-1.  Annual Percentage Changes in Gun Murders and Police Requests to ATF for Traces of Assault Weapons and Other Firearms, 1991-2002 (Number of Traces in Parentheses)**

| Year | Gun Murders (1) | All Traces (2) | AW Traces* (3) | AP Traces (4) | AR Traces (5) | AW and AW Substitute Traces (6) | Violent Crime Traces (7) | AW Violent Crime Traces (8) | LCMM Rifle Traces** (9) |
|------|-----|-----|-----|-----|-----|-----|-----|-----|-----|
| 1991 | 9% | 14% (42281) | 14% (2378) | 24% (1775) | -6% (603) | 14% (2378) | 19% (6394) | 20% (344) | -- |
| 1992 | -1% | 6% (44992) | 1% (2398) | 4% (1838) | -7% (560) | 1% (2398) | 3% (6558) | 7% (367) | -- |
| 1993 | 5% | 20% (54189) | 25% (2994) | 20% (2199) | 42% (795) | 25% (2994) | 26% (8248) | 41% (516) | 252% (183) |
| 1994 | -4% | 53% (82791) | 11% (3337) | 23% (2706) | -21% (631) | 11% (3337) | 22% (10083) | -18% (424) | 223% (592) |
| 1995 | -10% | -6% (77503) | -19% (2730) | -24% (2051) | 8% (679) | -18% (2747) | 23% (12439) | -15% (362) | -10% (530) |
| 1996 | -9% | 66% (128653) | 12% (3059) | 13% (2309) | 10% (750) | 17% (3214) | 67% (20816) | 27% (459) | 40% (743) |
| 1997 | -7% | 42% (183225) | 31% (4019) | 31% (3017) | 34% (1002) | 36% (4362) | 11% (23147) | 13% (519) | 24% (925) |
| 1998 | -11% | 5% (192115) | 0% (4014) | -9% (2751) | 26% (1263) | 7% (4681) | 3% (23844) | -22% (404) | 33% (1227) |
| 1999 | -8% | -2% (188296) | -11% (3581) | -12% (2414) | -8% (1167) | -6% (4406) | 3% (24663) | 0% (404) | -18% (1003) |
| 2000 | 1% | -3% (182961) | -11% (3196) | -16% (2027) | 0% (1169) | -6% (4143) | -13% (21465) | -25% (305) | -14% (859) |
| 2001 | -1% | 18% (215282) | 1% (3238) | 5% (2138) | -6% (1100) | 3% (4273) | 20% (25822) | 6% (322) | -3% (833) |
| 2002 | 6% | 7% (229525) | 19% (3839) | 4% (2214) | 48% (4765) | 12% (4765) | 20% (30985) | 65% (531) | 4% (865) |

* Based on Intratec group, SWD group, AR-15 group, and Calico and Feather models.
** Foreign semiautomatic rifles accepting large capacity military magazines (banned by executive order in 1998).  (Data are not shown for 1991 and 1992 because very few of these guns were traced in those years.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

43

Exhibit 4
Page 00340

ER_2532

### 6.2.2.1. *Assault Weapons as a Percentage of Crime Gun Traces*

As shown in Figure 6-1, AWs declined from 5.4% of crime gun traces in 1992-1993 to 1.6% in 2001-2002, a decline of 70%. Although this downward trend could be attributable in large part to changes in tracing practices, it is noteworthy that it did not begin until 1994 (the year of the ban); during the pre-ban years, 1990 to 1993, AWs accounted for a steady share of traces despite a 46% increase in total tracing volume. It is also remarkable that about 3,200 AWs were traced in both 2000 and 2001, which is virtually identical to the average number traced during 1993 and 1994 (3,166) even though total traces increased more than 190% during the same period (Table 6-1, columns 2 and 3).[43]

### 6.2.2.2. *Annual Changes in Traces for Assault Weapons and Other Guns*

Throughout most of the post-ban period (particularly 1995 to 2001), AW traces either increased less or declined more than total traces (Table 6-1, columns 2 and 3), a pattern that is also consistent with a decline in the use of AWs relative to other guns, though it too may be distorted by changes in tracing practices. This pattern was largely consistent whether analyzing all traces or only traces associated with violent crimes (columns 7 and 8).[44]

The years when total traces declined or were relatively flat are arguably the most informative in the series because they appear to have been less affected by changes in tracing practices. For example, there was a 6% decline in total trace requests from 1994 to 1995 (the years featured in our earlier study) that coincided with a 10% drop in gun murders (Table 6-1, column 1). Therefore, it seems tracing practices were relatively stable (or, conversely, reporting effects were relatively small) from 1994 to 1995. The 19% reduction in AW traces during this same period implies that AW use was declining faster than that of other guns. Furthermore, there were fewer AW traces in 1995 than in 1993, the year prior to the ban. The fact that this occurred during a period when the AW issue was very prominent (and hence police might have been expected to trace more of the AWs they recovered) arguably strengthens the causal inference of a ban effect.[45]

Total traces also declined slightly (2%-3%) in 1999 and 2000. In each of those years, the decline was greater for AWs (11%). Thus, in years when tracing declined overall, AW traces fell 3 to 6 times faster than did total traces. Put another way, AWs fell between 9% and 13% as a percentage of all traces in each of these years.

The general pattern of AW traces increasing less or declining more than those of

---

[43] These general findings are consistent with those of other tracing analyses conducted by ATF (2003 Congressional Q&A memo provided to the author) and the Brady Center to Prevent Gun Violence (2004).

[44] A caveat is that requests without specific crime type information are often grouped with weapons offenses (ATF, 1999). Therefore, traces associated with violent crimes are likely understated to some degree.

[45] This inference is also supported by our earlier finding that trace requests for AWs declined by only 8% in states that had their own AW bans prior to the federal ban (Roth and Koper, 1997, Chapter 5).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

44

Exhibit 4
Page 00341

other crime guns was clearly apparent for APs but less consistent for ARs (Table 6-1, columns 4 and 5). For example, AR traces went up 26% in 1998 while total traces went up only 5% and AP traces declined 9%. In 2000, total and AP traces fell 3% and 16%, respectively, but AR traces remained flat. This is consistent with predictions derived from the price and production analyses described above. But note that the post-ban AR counts could be overstated because the data do not distinguish pre-ban from post-ban versions of some popular AR-15 type rifles like the Colt Sporter and Bushmaster XM-15. (Also note that the percentage of traces for ARs did fall from 1.4% in 1992-1993 to 0.6% in 2001-2002.)

More generally, the use of post-ban AW-type weapons (including both legalized APs and ARs) has not been widespread enough to completely offset the apparent decline in the use of banned AWs. Combined traces for banned AWs and AW substitutes (Table 6-1, column 6) also followed the pattern of increasing less or declining more than did total traces throughout most of the period, though the differences were not as pronounced as those between AWs and total traces. In 1999 and 2000, for example, AWs traces dropped 11%, while combined traces for AWs and legal substitutes declined only 6%. Still, the latter figure was greater than the 2%-3% drop for total traces.

Finally, traces of the LCMM rifles banned by executive order in 1998 were generally rising to that point, reaching levels as high as those for AR-15 type rifles (Table 6-1, column 9). Since 1998, however, the number of traces for LCMM rifles has fallen substantially. Despite a 4% increase from 2001 to 2002, the number of LCMM traces in 2002 (865) was 30% lower than the peak number traced in 1998 (1,227). Tentatively, this suggests that the 1998 extension of the ban has been effective in curtailing weapons that offenders may have been substituting for the ARs banned in 1994.

### 6.2.2.3. Did Use of Assault Weapons Rebound in 2002?

In 2002, tracing volume increased 7%, which closely matched the 6% increase in gun murders for that year. In contrast to the general pattern, AW traces increased by 19%, suggesting a possible rebound in AW use independent of changes in tracing practices, a development that we have predicted elsewhere (Roth and Koper, 1997) based on the boom in AW production leading up to the ban. The disproportionate growth in AW traces was due to ARs, however, so it could partially reflect increasing use of post-ban AR-type rifles (see the discussion above).

Moreover, this pattern could be illusory. With data from the most recent years, it was possible to run a supplementary analysis screening out traces of older weapons (not shown). Focusing on just those guns recovered and traced in the same year for 2000 through 2002 revealed that recoveries of AWs declined in 2001, more so for ARs (16%) than for APs (9%), while total traces increased 1%.[46] Traces for APs and ARs then

---

[46] The tracing database indicates when guns were recovered and when they were traced. However, the recovery dates were missing for 30% of the records overall and were particularly problematic for years prior to 1998. For this reason, the main analysis is based on request dates. The auxiliary analysis for 2000-

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

45

Exhibit 4
Page 00342

ER_2534

increased in 2002 (1% and 6%, respectively) but by less than total traces (8%). Therefore, the disproportionate growth in AR traces in 2002 shown in Table 6-1 may have been due to tracing of older AWs by newly participating police agencies.

### 6.2.2.4. *Summary of the ATF Gun Tracing Analysis*

Complexities arising from recent changes in the use of gun tracing by law enforcement warrant caution in the interpretation of ATF gun tracing data. Notwithstanding, the data suggest that use of AWs in crime, though relatively rare from the start, has been declining. The percentage of gun traces that were for AWs plummeted 70% between 1992-1993 and 2001-2002 (from 5.4% to 1.6%), and this trend did not begin until the year of the AW ban. On a year-to-year basis, AW traces generally increased less or declined by more than other gun traces. Moreover, in years when tracing volume declined – that is, years when changes in reporting practices were least likely to distort the data – traces of AWs fell 3 to 6 times faster than gun traces in general. The drop in AW use seemed most apparent for APs and LCMM rifles (banned in 1998). Inferences were less clear for domestic ARs, but assessment of those guns is complicated by the possible substitution of post-ban legal variations.

### 6.3. Local Analyses of Guns Recovered By Police

Due to concerns over the validity of national ATF tracing data for investigating the types of guns used in crime, we sought to confirm the preceding findings using local data on guns recovered by police. To this end, we examined data from half a dozen localities and time periods.

- All guns recovered by the Baltimore Police Department from 1992 to 2000 (N=33,933)
- All guns recovered by the Metro-Dade Police Department (Miami and Dade County, Florida) from 1990 to 2000 (N=39,456)
- All guns recovered by the St. Louis Police Department from 1992 to 2003 (N=34,143)
- All guns recovered by the Boston Police Department (as approximated by trace requests submitted by the Department to ATF) from 1991 to 1993 and 2000 to 2002 (N=4,617)[47]

---

2002 focuses on guns both recovered and traced in the same year because it is likely that some guns recovered in 2002 had not yet been traced by the spring of 2003 when this database was created. Using only guns recovered and traced in the same year should mitigate this bias.

[47] The Boston Police Department has been tracing guns comprehensively since 1991 (Kennedy et al., 1996). However, we encountered difficulties in identifying Boston Police Department traces for several years in the mid-1990s. For this reason, we chose to contrast the 1991 to 1993 period with the 2000 to 2002 period.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

46

Exhibit 4
Page 00343

ER_2535

- Guns recovered during murder investigations in Milwaukee County from 1991 to 1998 (N=592)[48]
- Guns linked to serious crimes in Anchorage and other parts of Alaska and submitted to state firearm examiners for evidentiary testing from 1987 to 2000 (N=900)[49]

The selection of these particular locations and samples reflects data availability.[50] The locations were not selected randomly, and some of the samples are small for conducting trend analysis of relatively rare events (i.e., AW recoveries). Accordingly, we must use caution in generalizing the results to other places. However, the data sources reflect a wide geographic range and cover post-ban periods extending through at least the latter 1990s (and typically through the year 2000 or beyond). To the extent that the results are similar across these jurisdictions, therefore, we can have more confidence that they reflect national patterns.

In each jurisdiction, we examined pre-post changes in recoveries of AWs (focusing on the domestic AW group defined earlier) and substitution of post-ban AW models for the banned models. Where possible, we conducted separate analyses of all AW recoveries and those linked specifically to violent crimes.[51] We also differentiated between AP and AR trends using the larger databases from Baltimore, Miami, and St. Louis. But since most of these databases do not extend more than two years beyond 1998, we do not present analyses specifically for LCMM rifles.

Key summary results are summarized in Table 6-2, while more detailed results from each site appear at the end of the chapter in Tables 6-3 through 6-6 and Figures 6-2 through 6-6.[52] The number of AW recoveries declined by 28% to 82% across these

---

[48] The data are described in reports from the Medical College of Wisconsin (Hargarten et al., 1996; 2000) and include guns used in the murders and other guns recovered at the crime scenes. Guns are recovered in approximately one-third of Milwaukee homicide cases.

[49] The data include guns submitted by federal, state, and local agencies throughout the state. Roughly half come from the Anchorage area. Guns submitted by police to the state lab are most typically guns that were used in major crimes against persons (e.g. murder, attempted murder, assault, robbery).

[50] We contacted at least 20 police departments and crime labs in the course of our data search, focusing much of our attention on police departments participating in ATF's Youth Crime Gun Interdiction Initiative (YCGII) (ATF, 1997; 1999). Departments participating in the YCGII submit data to ATF on all guns that they recover. Though the YCGII did not begin until 1996 (well after the implementation of the AW ban), we suspected that these departments would be among those most likely to have electronically-stored gun data potentially extending back in time to before the ban. Unfortunately, most of these departments either did not have their gun data in electronic format or could not provide data for other reasons (e.g., resource constraints). In the course of our first AW study (Roth and Koper, 1997), we contacted many other police departments that also did not have adequate data for the study.

[51] All of the Milwaukee and Anchorage analyses were limited to guns involved in murders or other serious crimes. Despite evidence of a decline, AW recoveries linked to violence were too rare in Boston to conduct valid test statistics.

[52] We omitted guns recovered in 1994 from both the pre and post-ban counts because the speculative price increases for AWs that occurred in 1994 (see previous section and Roth and Koper, 1997, Chapter 4) raise questions about the precise timing of the ban's impact on AW use during that year, thereby clouding the designation of the intervention point. This is particularly a concern for the Baltimore analysis due to a

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

47

Exhibit 4
Page 00344

locations and time periods, but the discussion below focuses on changes in AWs as a share of crime guns in order to control for general trends in gun crime and gun seizures. Prior to the ban, AWs ranged from about 1% of guns linked to violent crimes in St. Louis to nearly 6% of guns recovered in Milwaukee murder cases.[53]

AWs dropped as share of crime guns in all jurisdictions after the ban. Reductions ranged from a low of 17% in Milwaukee (based on guns linked to homicides) to a high of 72% in Boston (based on all crime guns) but were generally between 32% and 40%.[54, 55] A decline in the use of AWs relative to other guns was generally apparent whether examining all AW recoveries or just those linked to violent crimes.[56] An exception was in St. Louis, where

---

state AP ban that took effect a few months prior to the federal AW ban.

[53] These figures should be treated as approximations of the prevalence of AWs. On the one hand, the numbers may understate the prevalence of AWs to a small degree because they are based on only the domestic AW group defined earlier. Based on analysis of national ATF gun tracing data, we estimated previously that the domestic AW group accounts for 82% of AWs used in crime (Roth and Koper, 1997, Chapter 5). To further test the reliability of this assessment, we investigated the prevalence of all banned AW models among guns recovered in Baltimore using an ATF list of all guns defined as AWs under the 1994 Crime Act criteria (118 model and caliber combinations). We chose the Baltimore database because it provides a complete inventory of guns recovered by police in that city during the study period and, having been maintained by crime lab personnel, is particularly thorough with regard to make and model identifications. Though there was some ambiguity in classifying a small number of AK-type semiautomatic rifles (there are many civilian variations of the AK-47 rifle, some of which were legal under the 1994 legislation), our examination suggested that the domestic AW group accounted for approximately 90% of the AWs recovered in Baltimore. (In addition, including all AWs had virtually no effect on the pre-post changes in AW use in Baltimore.) But as discussed previously, the counts could also overstate AW use to some degree because imprecision in the identification of gun models in some data sources may have resulted in some legalized firearms being counted as banned AWs.

[54] The AW counts for Miami also include Interdynamics KG9 and KG99 models. These models were produced during the early 1980s and were forerunners to the Intratec models (ATF restricted the KG9 during the early 1980s because it could be converted too easily to fully automatic fire). These weapons were very rare or non-existent in most of the local data sources, but they were more common in Miami, where Interdynamics was formerly based. Including these guns increased the AW count in Miami by about 9% but did not affect pre-post changes in AW recoveries.

[55] State AW legislation passed in Maryland and Massachusetts could have had some impact on AW trends in Baltimore and Boston, respectively. Maryland implemented an AP ban, similar in coverage to the federal AW ban, in June 1994 (Maryland has also required background checks for retail sales of a broader list of state-defined AWs since 1989), and Massachusetts implemented additional legislation on federally-defined AWs in late 1998. The timing and scope of these laws make them largely redundant with the federal ban, so they should not unduly complicate inferences from the analysis. However, Maryland forbids additional transfers of grandfathered APs, and Massachusetts has imposed additional requirements for possession and transfer of LCMs and guns accepting LCMs. Both states also have enhanced penalties for certain crimes involving APs, LCMs, and/or guns accepting LCMs. Hence, the ban on AWs was arguably strengthened in Baltimore and Boston, relative to the other jurisdictions under study. This does not appear to have affected trends in AW use in Baltimore, which were very similar to those found in the other study sites. However, use of AWs and combined use of AWs and post-ban AW substitutes declined more in Boston than in any other study site. Although the trends in Boston could reflect ongoing, post-2000 reductions in use of AWs and similar weapons (Boston was one of the only study sites from which we obtained post-2000 data), it is possible that the Massachusetts legislation was also a contributing factor.

[56] There may be some inconsistency across jurisdictions in the identification of guns associated with violent crimes. In Miami, for example, 28% of the guns had an offense code equal to "other/not listed," and this percentage was notably higher for the later years of the data series.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

48

Exhibit 4
Page 00345

ER_2537

**Table 6-2. Pre-Post Changes in Assault Weapons As a Share of Recovered Crime Guns For Selected Localities and Time Periods: Summary Results (Total Number of Assault Weapons for Pre and Post Periods in Parentheses)** [a]

| Locality and Time Period | AWs | AWs (Linked to Violence) | APs | ARs | AWs and Post-Ban Substitutes |
|---|---|---|---|---|---|
| Baltimore (all recoveries) pre=1992-1993, post=1995-2000 | -34%*** (425) | -41%** (75) | -35%*** (383) | -24% (42) | -29%*** (444) |
| Miami-Dade (all recoveries) pre=1990-1993, post=1995-2000 | -32%*** (733) | -39%*** (101) | -40%*** (611) | 37%* (115) | -30%*** (746) |
| St. Louis (all recoveries) pre=1992-1993, post=1995-2003 | -32%*** (306) | 1% (28) | -34%*** (274) | 10% (32) | -24%** (328) |
| Boston (all recoveries) pre=1991-1993, post=2000-2002 | -72%*** (71) | N/A | N/A | N/A | -60%*** (76) |
| Milwaukee (recoveries in murder cases) pre=1991-1993, post=1995-1998 | N/A | -17% (28) | N/A | N/A | 2% (31) |
| Anchorage, AK (recoveries in serious crimes) pre=1987-1993, post=1995-2000 | N/A | -40% (24) | N/A | N/A | -40% (24) |

a. Based on Intratec group, SWD group, AR-15 group, and Calico and Feather models. See the text for additional details about each sample and Tables 6-3 through 6-6 for more detailed results from each locality.
* Statistically significant change at chi-square p level < .1
** Statistically significant change at chi-square p level < .05
*** Statistically significant change at chi-square p level < .01

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

AWs declined as share of all guns but not of guns linked to violent crimes, though the latter test was based on rather small samples.

These reductions were not due to any obvious pre-ban trends (see Figures 6-2 through 6-6 at the end of the chapter). On the contrary, AW recoveries reached a peak in most of these jurisdictions during 1993 or 1994 (Boston, which is not shown in the graphs due to missing years, was an exception). We tested changes in AW prevalence using simple chi-square tests since there were no observable pre-existing time trends in the data. Due to the small number of AWs in some of these samples, these changes were not all statistically significant. Nonetheless, the uniformity of the results is highly suggestive, especially when one considers the consistency of these results with those found in the national ATF tracing analysis.

The changes in Tables 6-2 through 6-6 reflect the average decline in recoveries of AWs during the post-ban period in each locality. However, some of these figures may understate reductions to date. In several of the localities, the prevalence of AWs among crime guns was at, or close to, its lowest mark during the most recent year analyzed (see Figures 6-2 through 6-6 at the end of the chapter), suggesting that AW use continues to decline. In Miami, for example, AWs accounted for 1.7% of crime guns for the whole 1995 to 2000 period but had fallen to 1% by 2000. Further, the largest AW decline was recorded in Boston, one of two cities for which data extended beyond the year 2000 (however, this was not the case in St. Louis, the other locality with post-2000 data).

Breakouts of APs and ARs in Baltimore, Miami, and St. Louis show that the decline in AW recoveries was due largely to APs, which accounted for the majority of AWs in these and almost all of the other localities (the exception was Anchorage, where crimes with rifles were more common, as a share of gun crimes, than in the other sites). Pre-post changes in recoveries of the domestic AR group weapons, which accounted for less than 1% of crime guns in Baltimore, Miami, and St. Louis, were inconsistent. AR recoveries declined after the ban in Baltimore but increased in St. Louis and Miami. As discussed previously, however, the AR figures may partly reflect the substitution of post-ban, legalized versions of these rifles, thus overstating post-ban use of the banned configurations. Further, trends for these particular rifles may not be indicative of those for the full range of banned rifles, including the various foreign rifles banned by the 1994 law and the import restrictions of 1989 and 1998 (e.g., see the ATF gun tracing analysis of LCMM rifles).[57]

---

[57] As discussed in the last chapter, our research design focused on common AWs that were likely to be most affected by the 1994 ban as opposed to earlier regulations (namely, the 1989 import ban) or other events (e.g., company closings or model discontinuations prior to 1994). However, an auxiliary analysis with the Baltimore data revealed a statistically meaningful drop in recoveries of all ARs covered by the 1994 legislation (not including the LCMM rifles) that was larger than that found for just the domestic group ARs discussed in the text. Similarly, an expanded AR analysis in Miami showed that total AR recoveries declined after the ban, in contrast to the increase found for the domestic group ARs. (Even after expanding the analysis, ARs still accounted for no more than 0.64% of crime guns before the ban in both locations. As with the domestic AR group, there are complexities in identifying banned versus non-banned versions of some of the other ARs, so these numbers are approximations.) Consequently, a more nuanced view of AR trends may be that AR use is declining overall, but this decline may be due largely to the 1989 import

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

50

Exhibit 4
Page 00347

ER_2539

Finally, the overall decline in AW use was only partially offset by substitution of the post-ban legalized models. Even if the post-ban models are counted as AWs, the share of crime guns that were AWs still fell 24% to 60% across most jurisdictions. The exception was Milwaukee where recoveries of a few post-ban models negated the drop in banned models in a small sample of guns recovered during murder investigations.[58]

### 6.4. Summary

Consistent with predictions derived from the analysis of market indicators in Chapter 5, analyses of national ATF gun tracing data and local databases on guns recovered by police in several localities have been largely consistent in showing that criminal use of AWs, while accounting for no more than 6% of gun crimes even before the ban, declined after 1994, independently of trends in gun crime. In various places and times from the late 1990s through 2003, AWs typically fell by one-third or more as a share of guns used in crime.[59, 60] Some of the most recent, post-2000 data suggest

---

restrictions that predated the AW ban. It is not yet clear that there has been a decline in the most common ARs prohibited exclusively by the 1994 ban.

[58] This was not true when focusing on just those guns that were used in the incident as opposed to all guns recovered during the investigations. However, the samples of AWs identified as murder weapons were too small for valid statistical tests of pre-post changes.

[59] These findings are also supported by prior research in which we found that reported thefts of AWs declined 7% in absolute terms and 14% as a fraction of stolen guns in the early period following the ban (i.e., late 1994 through early 1996) (Koper and Roth, 2002a, p. 21). We conducted that analysis to account for the possibility that an increase in thefts of AWs might have offset the effect of rising AW prices on the availability of AWs to criminals. Because crimes with AWs appear to have declined after the ban, the theft analysis is not as central to the arguments in this paper.

[60] National surveys of state prisoners conducted by the federal Bureau of Justice Statistics show an increase from 1991 to 1997 in the percentage of prisoners who reported having used an AW (Beck et al., 1993; Harlow, 2001). The 1991 survey (discussed in Chapter 3) found that 2% of violent gun offenders had carried or used an AW in the offense for which they were sentenced (calculated from Beck et al. 1993, pp. 18,33). The comparable figure from the 1997 survey was nearly 7% (Harlow, 2001, pp.3, 7).

Although these figures appear contrary to the patterns shown by gun recovery data, there are ambiguities in the survey findings that warrant caution in such an interpretation. First, the definition of an AW (and most likely the respondents' interpretation of this term) was broader in the 1997 survey. For the 1991 survey, respondents were asked about prior ownership and use of a "...military-type weapon, such as an Uzi, AK-47, AR-15, or M-16" (Beck et al., 1993, p. 18), all of which are ARs or have AR variations. The 1997 survey project defined AWs to "...include the Uzi, TEC-9, and the MAC-10 for handguns, the AR-15 and AK-47 for rifles, and the 'Street Sweeper' for shotguns" (Harlow, 2001, p. 2). (Survey codebooks available from the Inter-University Consortium for Political and Social Research also show that the 1997 survey provided more detail and elaboration about AWs and their features than did the 1991 survey, including separate definitions of APs, ARs, and assault shotguns.)

A second consideration is that many of the respondents in the 1997 survey were probably reporting criminal activity prior to or just around the time of the ban. Violent offenders participating in the survey, for example, had been incarcerated nearly six years on average at the time they were interviewed (Bureau of Justice Statistics, 2000, p. 55). Consequently, the increase in reported AW use may reflect an upward trend in the use of AWs from the early to mid 1990s, as well as a growing recognition of these weapons (and a greater tendency to report owning or using them) stemming from publicity about the AW issue during the early 1990s.

Finally, we might view the 1997 estimate skeptically because it is somewhat higher than that from most other sources. Nevertheless, it is within the range of estimates discussed earlier and could reflect a

---

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

51

Exhibit 4
Page 00348

ER_2540

reductions as high as 70%.[61]  This trend has been driven primarily by a decline in the use of APs, which account for a majority of AWs used in crime.  AR trends have been more varied and complicated by the substitution of post-ban guns that are very similar to some banned ARs.  More generally, however, the substitution of post-ban AW-type models with fewer military features has only partially offset the decline in banned AWs.

These findings raise questions as to the whereabouts of surplus AWs, particularly APs, produced just prior to the ban.  Presumably, many are in the hands of collectors and speculators holding them for their novelty and value.[62]  Even criminal possessors may be more sensitive to the value of their AWs and less likely to use them for risk of losing them to police.

Finally, it is worth noting the ban has not completely eliminated the use of AWs, and, despite large relative reductions, the share of gun crimes involving AWs is similar to that before the ban.  Based on year 2000 or more recent data, the most common AWs continue to be used in up to 1.7% of gun crimes.

---

somewhat higher use of AWs among the subset of offenders who are most active and/or dangerous; recall that the highest estimate of AW use among the sources examined in this chapter came from a sample of guns recovered during murder investigations in Milwaukee (also see the discussion of offender surveys and AWs in Chapter 3).

[61] Developing a national estimate of the number of AW crimes prevented by the ban is complicated by the range of estimates of AW use and changes therein derived from different data sources.  Tentatively, nonetheless, it appears the ban prevents a few thousand crimes with AWs annually.  For example, using 2% as the best estimate of the share of gun crimes involving AWs prior to the ban (see Chapter 3) and 40% as a reasonable estimate of the post-ban drop in this figure implies that almost 2,900 murders, robberies, and assaults with AWs were prevented in 2002 (this assumes that 1.2% of the roughly 358,000 gun murders, gun robberies, and gun assaults reported to police in 2002 [see the *Uniform Crime Reports*] involved AWs but that 2% would have involved AWs had the ban not been in effect).  Even if this estimate is accurate, however, it does not mean the ban prevented 2,900 gun crimes in 2002; indeed, the preceding calculation assumes that offenders prevented from using AWs committed their crimes using other guns.  Whether forcing such weapon substitution can reduce the number of persons wounded or killed in gun crimes is considered in more detail in Chapter 9.

[62] The 1997 national survey of state prisoners discussed in footnote 60 found that nearly 49% of AW offenders obtained their gun from a "street" or illegal source, in contrast to 36% to 42% for other gun users (Harlow, 2001, p. 9).  This could be another sign that AWs have become harder to acquire since the ban, but the data cannot be used to make an assessment over time.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

52

Exhibit 4
Page 00349

**Table 6-3.  Trends in Police Recoveries of Domestic Assault Weapons in Baltimore, 1992-2000** [a]

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **A.  All Recoveries** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2000 | |
| | | | |
| Total AWs | 135 | 290 | |
| Annual Mean | 67.5 | 48.33 | -28% |
| AW's as % of Guns | 1.88% | 1.25% | -34%** |
| | | | |
| APs | 123 | 260 | |
| Annual Mean | 61.5 | 43.33 | -30% |
| APs as % of Guns | 1.71% | 1.12% | -35%** |
| | | | |
| ARs | 12 | 30 | |
| Annual Mean | 6 | 5 | -17% |
| ARs as % of Guns | 0.17% | 0.13% | -24% |
| | | | |
| Total AWs and Substitutes | 135 | 309 | |
| Annual Mean | 67.5 | 51.5 | -24% |
| AWs/Subs as % of Guns | 1.88% | 1.33% | -29%** |
| | | | |
| **B.  Recoveries Linked to Violent Crimes** [b] | | | |
| | | | |
| Total AWs | 28 | 47 | |
| Annual Mean | 14 | 7.83 | -44% |
| AWs as % of Violent Crime Guns | 2.1% | 1.24% | -41%* |

a.  Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b.  Murders, assaults, and robberies
* Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance).
** Chi-square p level < .01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.



**Figure 6-2. Police Recoveries of Assault Weapons in Baltimore, 1992-2000**

As % of Recovered Guns (N=33,933)

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

54

Exhibit 4
Page 00351

**Table 6-4. Trends in Police Recoveries of Domestic Assault Weapons in Miami (Metro-Dade), 1990-2000** [a]

|  | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **A.  All Recoveries** | Jan. 1990-Dec. 1993 | Jan. 1995-Dec. 2000 |  |
|  |  |  |  |
| Total AWs | 403 | 330 |  |
| Annual Mean | 100.75 | 55 | -45% |
| AW's as % of Guns | 2.53% | 1.71% | -32%*** |
|  |  |  |  |
| APs | 355 | 256 |  |
| Annual Mean | 88.75 | 42.67 | -52% |
| APs as % of Guns | 2.23% | 1.33% | -40%*** |
|  |  |  |  |
| ARs | 43 | 72 |  |
| Annual Mean | 10.75 | 12 | 12% |
| ARs as % of Guns | 0.27% | 0.37% | 37%* |
|  |  |  |  |
| Total AWs and Substitutes | 403 | 343 |  |
| Annual Mean | 100.75 | 57.17 | -43% |
| AWs/Subs as % of Guns | 2.53% | 1.78% | -30%*** |
|  |  |  |  |
| **B.  Recoveries Linked to Violent Crimes** [b] |  |  |  |
|  |  |  |  |
| Total AWs | 69 | 32 |  |
| Annual Mean | 17.25 | 5.33 | -69% |
| AWs as % of Violent Crime Guns | 2.28% | 1.39% | -39%** |

a. Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b. Murders, assaults, and robberies
* Chi-square p level < .1 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
** Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
*** Chi-square p level <.01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.



Figure 6-3. Police Recoveries of Assault Weapons in Miami (Metro-Dade), 1990-2000

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

56

Exhibit 4
Page 00353

**Table 6-5.  Trends in Police Recoveries of Domestic Assault Weapons in St. Louis, 1992-2003** [a]

| | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **A.  All Recoveries** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2003 | |
| | | | |
| Total AWs | 94 | 212 | |
| Annual Mean | 47 | 23.56 | -50% |
| AW's as % of Guns | 1.33% | 0.91% | -32%** |
| | | | |
| APs | 87 | 187 | |
| Annual Mean | 43.5 | 20.78 | -52% |
| APs as % of Guns | 1.23% | 0.81% | -34%** |
| | | | |
| ARs | 7 | 25 | |
| Annual Mean | 3.5 | 2.78 | -21% |
| ARs as % of Guns | 0.1% | 0.11% | 10% |
| | | | |
| Total AWs and Substitutes | 94 | 234 | |
| Annual Mean | 47 | 26 | -45% |
| AWs/Subs as % of Guns | 1.33% | 1.01% | -24%* |
| | | | |
| **B.  Recoveries Linked to Violent Crimes** [b] | | | |
| | | | |
| Total AWs | 8 | 20 | |
| Annual Mean | 4 | 2.2 | -45% |
| AWs as % of Violent Crime Guns | 0.8% | 0.81% | 1% |

a.  Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b.  Murders, assaults, and robberies
* Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
** Chi-square p level <.01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

57

Exhibit 4
Page 00354

### Figure 6-4. Police Recoveries of Assault Weapons in St. Louis, 1992-2003



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Table 6-6.  Trends in Police Recoveries of Domestic Assault Weapons in Boston, Milwaukee, and Anchorage (Alaska) [a]

|  | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **Boston** | Jan. 1991-Dec. 1993 | Jan. 2000-Dec. 2002 |  |
| (All Gun Traces) |  |  |  |
| AWs | 60 | 11 |  |
| Annual Mean | 20 | 3.7 | -82% |
| AWs as % of Guns | 2.16% | 0.6% | -72%* |
|  |  |  |  |
| AWs and Substitutes | 60 | 16 |  |
| Annual Mean | 20 | 5.3 | -74% |
| AWs/Subs as % of Guns | 2.16% | 0.87% | -60%* |
|  |  |  |  |
| **Milwaukee** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 |  |
| (Guns Recovered in Murder Cases) |  |  |  |
| AWs | 15 | 13 |  |
| Annual Mean | 5 | 3.25 | -35% |
| AWs as % of Guns | 5.91% | 4.91% | -17% |
|  |  |  |  |
| AWs and Substitutes | 15 | 16 |  |
| Annual Mean | 5 | 4 | -20% |
| AWs/Subs as % of Guns | 5.91% | 6.04% | 2% |
|  |  |  |  |
| **Anchorage** | Jan. 1987-Dec. 1993 | Jan. 1995-Dec. 2000 |  |
| (Guns Tested for Evidence) |  |  |  |
| AWs | 16 | 8 |  |
| Annual Mean | 2.29 | 1.33 | -42% |
| AW's as % of Guns | 3.57% | 2.13% | -40% |
|  |  |  |  |
| AWs and Substitutes | N/A | N/A |  |

a. Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
* Chi-square p level < .01 (changes in percentages of guns that were AWs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### Figure 6-5. Assault Weapons Recovered in Milwaukee County Murder Cases, 1991-1998



As % of Guns Recovered in Murder Cases (N=592)

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

### Figure 6-6. Police Recoveries of Assault Weapons in Anchorage (Alaska), 1987-2000



As % of Guns Submitted for Evidentiary Testing (N=900)

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

60

Exhibit 4
Page 00357

## 7. MARKET INDICATORS FOR LARGE CAPACITY MAGAZINES: PRICES AND IMPORTATION

The previous chapters examined the AW-LCM ban's impact on the availability and criminal use of AWs. In this chapter and the next, we consider the impact of the ban's much broader prohibition on LCMs made for numerous banned and non-banned firearms. We begin by studying market indicators. Our earlier study of LCM prices for a few gun models revealed that prices rose substantially during 1994 and into 1995 (Roth and Koper, 1997, Chapter 4). Prices of some LCMs remained high into 1996, while others returned to pre-ban levels or oscillated more unpredictably. The price increases may have reduced LCM use at least temporarily in the short-term aftermath of the ban, but we could not confirm this in our prior investigation.

### 7.1. Price Trends for Large Capacity Magazines

For this study, we sought to approximate longer term trends in the prices at which users could purchase banned LCMs throughout the country. To that end, we analyzed quarterly data on the prices of LCMs advertised by eleven gun and magazine distributors in *Shotgun News*, a national gun industry publication, from April 1992 to December 1998.[63] Those prices are available to any gun dealer, and primary market retailers generally re-sell within 15% of the distributors' prices.[64] The distributors were chosen during the course of the first AW study (Roth and Koper, 1997) based on the frequency with which they advertised during the April 1992 to June 1996 period. For each quarterly period, project staff coded prices for one issue from a randomly selected month. We generally used the first issue of each selected month based on a preliminary, informal assessment suggesting that the selected distributors advertised more frequently in those issues. In a few instances, first-of-month issues were unavailable to us or provided too few observations, so we substituted other issues.[65] Also, we were unable to obtain *Shotgun News* issues for the last two quarters of 1996. However, we aggregated the data annually to study price trends, and the omission of those quarters did not appear to affect the results (this is explained further below).

We ascertained trends in LCM prices by conducting hedonic price analyses,

---

[63] The *Blue Book of Gun Values*, which served as the data source for the AW price analysis, does not contain ammunition magazine prices.

[64] According to gun market experts, retail prices track wholesale prices quite closely (Cook et al., 1995, p. 71). Retail prices to eligible purchasers generally exceed wholesale (or original-purchase) prices by 3% to 5% in the large chain stores, by about 15% in independent dealerships, and by about 10% at gun shows (where overhead costs are lower).

[65] The decision to focus on first-of-month issues was made prior to data collection for price analysis update. For the earlier study (Roth and Koper, 1997), project staff coded data for one or more randomly selected issues of every month of the April 1992 to June 1996 period. For this analysis, we utilized data from only the first-of-month issues selected at random during the prior study. If multiple first-of-month issues were available for a given quarter, we selected one at random or based on the number of recorded advertisements. If no first-of-month issue was available for a given quarter, we selected another issue at random from among those coded during the first study.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

61

Exhibit 4
Page 00358

similar to those described in the AW price analysis (Chapter 5), in which we regressed inflation-adjusted LCM prices (logged) on several predictors: magazine capacity (logged), gun make (for which the LCM was made), year of the advertisement, and distributor. We cannot account fully for the meaning of significant distributor effects. They may represent unmeasured quality differentials in the merchandise of different distributors, or they may represent other differences in stock volume or selling or service practices between the distributors.[66] We included the distributor indicators when they proved to be significant predictors of advertised price. In addition, we focused on LCMs made for several of the most common LCM-compatible handguns and rifles, rather than try to model the differences in LCM prices between the several hundred miscellaneous makes and models of firearms that were captured in the data. Finally, for both the handgun and rifle models, we created and tested seasonal indicator variables to determine if their incorporation would affect the coefficient for 1996 (the year with winter/spring data only), but they proved to be statistically insignificant and are not shown in the results below.[67]

### 7.1.1. Large Capacity Magazines for Handguns

The handgun LCM analysis tracks the prices of LCMs made for Intratec and Cobray (i.e., SWD) APs and non-banned semiautomatic pistols made by Smith and Wesson, Glock, Sturm Ruger, Sig-Sauer, Taurus, and Beretta (each of the manufacturers in the former group produces numerous models capable of accepting LCMs). In general, LCMs with greater magazine capacities commanded higher prices, and there were significant price differentials between LCMs made for different guns and sold by different distributors (see Table 7-1). Not surprisingly, LCMs made for Glock handguns were most expensive, followed by those made for Beretta and Sig-Sauer firearms.

Turning to the time trend indicators (see Table 7-1 and Figure 7-1), prices for these magazines increased nearly 50% from 1993 to 1994, and they rose another 56% in 1995. Prices declined somewhat, though not steadily, from 1996 to 1998. Nevertheless, prices in 1998 remained 22% higher than prices in 1994 and nearly 80% higher than those in 1993.

---

[66] For example, one possible difference between the distributors may have been the extent to which they sold magazines made of different materials (e.g., steel, aluminum, etc.) or generic magazines manufactured by companies other than the companies manufacturing the firearms for which the magazines were made. For example, there were indications in the data that 3% of the handgun LCMs and 10% of the AR-15 and Mini-14 rifle LCMs used in the analyses (described below) were generic magazines. We did not control for these characteristic, however, because such information was often unclear from the advertisements and was not recorded consistently by coders.

[67] Project staff coded all LCM advertisements by the selected distributors. Therefore, the data are inherently weighted. However, the weights are based on the frequency with which the different LCMs were advertised (i.e., the LCMs that were advertised most frequently have the greatest weight in the models) rather than by production volume.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

62

Exhibit 4
Page 00359

**Table 7-1. Regression of Handgun and Rifle Large Capacity Magazine Prices on Annual Time Indicators, 1992-1998, Controlling for Gun Makes/Models and Distributors**

| | Handgun LCMs (n=1,277) | | Rifle LCMs (n=674) | |
|---|---|---|---|---|
| | Estimate | T value | Estimate | T value |
| Constant | -1.79 | -12.74*** | -4.10 | -19.12*** |
| 1992 | -0.19 | -2.11** | -0.48 | -4.20*** |
| 1993 | -0.38 | -6.00*** | -0.55 | -6.14*** |
| 1995 | 0.44 | 6.88*** | -0.25 | -2.64*** |
| 1996 | 0.29 | 4.05*** | -0.12 | -0.93 |
| 1997 | 0.36 | 6.33*** | -0.31 | -3.68*** |
| 1998 | 0.20 | 3.51*** | -0.44 | -5.19*** |
| Rounds (logged) | 0.26 | 5.73*** | 0.84 | 15.08*** |
| Cobray | -0.36 | -4.15*** | | |
| Glock | 0.41 | 8.15*** | | |
| Intratec | -0.40 | -4.18*** | | |
| Ruger | -0.42 | -7.79*** | | |
| Smith&Wesson | -0.08 | -1.71* | | |
| Sig-Sauer | 0 | -0.09 | | |
| Taurus | -0.31 | -6.10*** | | |
| AK-type | | | -0.25 | -3.15*** |
| Colt AR-15 | | | 0.14 | 1.68* |
| Ruger Mini-14 | | | -0.08 | -0.92 |
| Distributor 1 | -0.72 | -16.38*** | -0.35 | -5.15*** |
| Distributor 2 | -0.15 | -0.97 | -0.83 | -5.24*** |
| Distributor 3 | -0.16 | -3.93*** | 0.19 | 2.69*** |
| Distributor 4 | -0.55 | -5.72*** | 0.16 | 0.80 |
| Distributor 5 | -0.07 | -1.79* | -0.18 | -2.65*** |
| Distributor 6 | -0.53 | -1.23 | -0.12 | -0.32 |
| Distributor 7 | -1.59 | -3.70*** | -0.10 | -0.91 |
| Distributor 8 | | | 0.14 | 0.70 |
| Distributor 9 | -0.91 | -12.52*** | -0.48 | -4.00*** |
| F statistic | 58.76 | | 21.22 | |
| (p value) | <.0001 | | <.0001 | |
| Adj. R-square | 0.51 | | 0.38 | |

Year indicators are interpreted relative to 1994, and distributors are interpreted relative to distributor 10.
Handgun makes are relative to Beretta and rifle models are relative to SKS.
* Statistically significant at p<=.10.
** Statistically significant at p<=.05.
*** Statistically significant at p<=.01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

63

Exhibit 4
Page 00360

ER_2552

## Figure 7-1. Annual Price Trends for Large Capacity Magazines, 1992-1998



Based on 1,277 sampled ads for LCMs fitting models of 8 handgun makers and 674 sampled ads for LCMs fitting 4 rifle model groups.

### 7.1.2. Large Capacity Magazines for Rifles

We approximated trends in the prices of LCMs for rifles by modeling the prices of LCMs manufactured for AR-15, Mini-14, SKS,[68] and AK-type rifle models (including various non-banned AK-type models).  As in the handgun LCM model, larger LCMs drew higher prices, and there were several significant model and distributor effects.  AR-15 magazines tended to have the highest prices, and magazines for AK-type models had the lowest prices (Table 7-1).

Like their handgun counterparts, prices for rifle LCMs increased over 40% from 1993 to 1994, as the ban was debated and implemented (see Table 7-1 and Figure 7-1).  However, prices declined over 20% in 1995.  Following a rebound in 1996, prices moved downward again during 1997 and 1998.  Prices in 1998 were over one third lower than the peak prices of 1994 and were comparable to pre-ban prices in 1992 and 1993.

---

[68] The SKS is a very popular imported rifle (there are Russian and Chinese versions) that was not covered by either the 1989 AR import ban or the 1994 AW ban. However, importation of SKS rifles from China was discontinued in 1994 due to trade restrictions.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

64

Exhibit 4
Page 00361

## 7.2. Post-Ban Importation of Large Capacity Magazines

ATF does not collect (or at least does not publicize) statistics on production of LCMs. Therefore, we cannot clearly document pre-ban production trends. Nevertheless, it seems likely that gun and magazine manufacturers boosted their production of LCMs during the debate over the ban, just as AW makers increased production of AWs. Regardless, gun industry sources estimated that there were 25 million LCMs available as of 1995 (including aftermarket items for repairing magazines or converting them to LCMs) (Gun Tests, 1995, p. 30).

Moreover, the supply of LCMs continued to grow even after the ban due to importation of foreign LCMs that were manufactured prior to the ban (and thus grandfathered by the LCM legislation), according to ATF importation data.[69] As shown in Table 7-2, nearly 4.8 million LCMs were imported for commercial sale (as opposed to law enforcement uses) from 1994 through 2000, with the largest number (nearly 3.7 million) arriving in 1999.[70] During this period, furthermore, importers received permission to import a total of 47.2 million LCMs; consequently, an additional 42 million LCMs may have arrived after 2000 or still be on the way, based on just those approved through 2000.[71, 72]

To put this in perspective, gun owners in the U.S. possessed 25 million firearms that were equipped with magazines holding 10 or more rounds as of 1994 (Cook and Ludwig, 1996, p. 17). Therefore, the 4.7 million LCMs in the U.S. from 1994 through 2000 could conceivably replenish 19% of the LCMs that were owned at the time of the ban. The 47.2 million approved during this period could supply nearly 2 additional LCMs for all guns that were so equipped as of 1994.

## 7.3. Summary and Interpretations

Prices of LCMs for handguns rose significantly around the time of the ban and, despite some decline from their peak levels in 1995, remained significantly higher than pre-ban prices through at least 1998. The increase in LCM prices for rifles proved to be more temporary, with prices returning to roughly pre-ban levels by 1998.[73]

---

[69] To import LCMs into the country, importers must certify that the magazines were made prior to the ban. (The law requires companies to mark post-ban LCMs with serial numbers.) As a practical matter, however, it is hard for U.S. authorities to know for certain whether imported LCMs were produced prior to the ban.
[70] The data do not distinguish between handgun and rifle magazines or the specific models for which the LCMs were made. But note that roughly two-thirds of the LCMs imported from 1994 through 2000 had capacities between 11 and 19 rounds, a range that covers almost all handgun LCMs as well as many rifle LCMs. It seems most likely that the remaining LCMs (those with capacities of 20 or more rounds) were primarily for rifles.
[71] The statistics in Table 7-2 do not include belt devices used for machine guns.
[72] A caveat to the number of approved LCMs is that importers may overstate the number of LCMs they have available to give themselves leeway to import additional LCMs, should they become available.
[73] A caveat is that we did not examine prices of smaller magazines, so the price trends described here may not have been entirely unique to LCMs. Yet it seems likely that these trends reflect the unique impact of the ban on the market for LCMs.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

65

Exhibit 4
Page 00362

ER_2554

**Table 7-2. Large Capacity Magazines Imported into the United States or Approved For Importation for Commercial Sale, 1994-2000**

| Year | Imported | Approved |
|------|----------|----------|
| 1994 | 67,063 | 77,666 |
| 1995 | 3,776 | 2,066,228 |
| 1996 | 280,425 | 2,795,173 |
| 1997 | 99,972 | 1,889,773 |
| 1998 | 337,172 | 20,814,574 |
| 1999 | 3,663,619 | 13,291,593 |
| 2000 | 346,416 | 6,272,876 |
| *Total* | *4,798,443* | *47,207,883* |

Source: Firearms and Explosives Imports Branch, Bureau of Alcohol, Tobacco, Firearms, and Explosives. Counts do not include "links" (belt devices) or imports for law enforcement purposes.

The drop in rifle LCM prices between 1994 and 1998 may have due to the simultaneous importation of approximately 788,400 grandfathered LCMs, most of which appear to have been rifle magazines (based on the fact that nearly two-thirds had capacities over 19 rounds), as well as the availability of U.S. military surplus LCMs that fit rifles like the AR-15 and Mini-14. We can also speculate that demand for LCMs is not as great among rifle consumers, who are less likely to acquire their guns for defensive or criminal purposes.

The pre-ban supply of handgun LCMs may have been more constricted than the supply of rifle LCMs for at least a few years following the ban, based on prices from 1994 to 1998. Although there were an estimated 25 million LCMs available in the U.S. as of 1995, some major handgun manufacturers (including Ruger, Sig Sauer, and Glock) had or were close to running out of new LCMs by that time (Gun Tests, 1995, p. 30). Yet the frequency of advertisements for handgun LCMs during 1997 and 1998, as well as the drop in prices from their 1995 peak, suggests that the supply had not become particularly low. In 1998, for example, the selected distributors posted a combined total of 92 LCM ads per issue (some of which may have been for the same make, model, and capacity combinations) for just the handguns that we incorporated into our model.[74] Perhaps the

---

[74] Project staff found substantially more advertisements per issue for 1997 and 1998 than for earlier years. For the LCMs studied in the handgun analysis, staff recorded an average of 412 LCM advertisements per year (103 per issue) during 1997 and 1998. For 1992-1996, staff recorded an average of about 100 ads per year (25 per issue) for the same LCMs. A similar but smaller differential existed in the volume of ads for the LCMs used in the rifle analysis. The increase in LCM ads over time may reflect changes in supply and

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

66

Exhibit 4
Page 00363

ER_2555

demand for enhanced firepower among handgun consumers, who are more likely to acquire guns for crime or defense against crime, was also a factor (and perhaps a large one) putting a premium on handgun LCMs.

Although we might hypothesize that high prices depressed use of handguns with LCMs for at least a few years after the ban, a qualification to this prediction is that LCM use may be less sensitive to prices than is use of AWs because LCMs are much less expensive than the firearms they complement and therefore account for a smaller fraction of users' income (e.g., see Friedman, 1962). To illustrate, TEC-9 APs typically cost $260 at retail during 1992 and 1993, while LCMs for the TEC-9, ranging in capacity from 30 to 36 rounds, averaged $16.50 in *Shotgun News* advertisements (and probably $19 or less at retail) during the same period. So, for example, a doubling of both gun and LCM prices would likely have a much greater impact on purchases of TEC-9 pistols than purchases of LCMs for the TEC-9. Users willing and able to pay for a gun that accepts an LCM are most likely willing and able to pay for an LCM to use with the gun.

Moreover, the LCM supply was enhanced considerably by a surge in LCM imports that occurred after the period of our price analysis. During 1999 and 2000, an additional 4 million grandfathered LCMs were imported into the U.S., over two-thirds of which had capacities of 11-19 rounds, a range that covers almost all handgun LCMs (as well as many rifle LCMs). This may have driven prices down further after 1998.

In sum, market indicators yield conflicting signs on the availability of LCMs. It is perhaps too early to expect a reduction in crimes with LCMs, considering that tens of millions of grandfathered LCMs were available at the time of the ban, an additional 4.8 million – enough to replenish one-fifth of those owned by civilians – were imported from 1994 through 2000, and that the elasticity of demand for LCMs may be more limited than that of firearms. And if the additional 42 million foreign LCMs approved for importation become available, there may not be a reduction in crimes with LCMs anytime in the near future.

---

demand for LCMs during the study period, as well as product shifts by distributors and perhaps changes in ad formats (e.g., ads during the early period may have been more likely to list magazines by handgun model without listing the exact capacity of each magazine, in which case coders would have been more likely to miss some LCMs during the early period). Because the data collection effort for the early period was part of a larger effort that involved coding prices in *Shotgun News* for LCMs and numerous banned and non-banned firearms, it is also possible that coders were more likely to miss LCM ads during that period due to random factors like fatigue or time constraints.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

67

Exhibit 4
Page 00364

## 8. CRIMINAL USE OF LARGE CAPACITY MAGAZINES AFTER THE BAN

Assessing trends in criminal use of LCMs is difficult. There is no national data source on crime guns equipped with LCMs (ATF national tracing data do not include information about magazines recovered with traced firearms), and, based on our contacts with numerous police departments over the course of this study and the first AW study, it seems that even those police departments that maintain electronic databases on recovered firearms do not typically record the capacity of the magazines with which the guns are equipped.[75,76] Indeed, we were unable to acquire sufficient data to examine LCM use for the first AW study (Roth and Koper, 1997).

For the current study, we obtained four data sources with which to investigate trends in criminal use of LCMs. Three of the databases utilized in the AW analysis – those from Baltimore, Milwaukee, and Anchorage – contained information about the magazines recovered with the guns (see the descriptions of these databases in Chapter 6). Using updated versions of these databases, we examined all LCM recoveries in Baltimore from 1993 through 2003, recoveries of LCMs in Milwaukee murder cases from 1991 to 2001, and recoveries of LCMs linked to serious crimes in Anchorage (and other parts of Alaska) from 1992 through 2002.[77] In addition, we studied records of guns and magazines submitted to the Jefferson Regional Forensics Lab in Louisville, Kentucky from 1996 through 2000. This lab of the Kentucky State Police services law enforcement agencies throughout roughly half of Kentucky, but most guns submitted to the lab are from the Louisville area. Guns examined at the lab are most typically those associated with serious crimes such as murders, robberies, and assaults.

The LCM analyses and findings were not as uniform across locations as were those for AWs. Therefore, we discuss each site separately. As in the AW analysis, we emphasize changes in the percentage of guns equipped with LCMs to control for overall trends in gun crime and gun recoveries. Because gun crime was falling during the latter 1990s, we anticipated that the number of guns recovered with LCMs might decline independently of the ban's impact. (Hereafter, we refer to guns equipped with LCMs as LCM guns.)

---

[75] For the pre-ban period, one can usually infer magazine capacity based on the firearm model. For post-ban recoveries, this is more problematic because gun models capable of accepting LCMs may have been equipped with grandfathered LCMs or with post-ban magazines designed to fit the same gun but holding fewer rounds.

[76] As for the AW analysis in Chapter 6, we utilize police data to examine trends in criminal use of LCMs. The reader is referred to the general discussion of police gun seizure data in Chapter 6.

[77] Findings presented in our 2002 interim report (Koper and Roth, 2002b) indicated that LCM use had not declined as of the late 1990s. Therefore, we sought to update the LCM analyses where possible for this version of the report.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 8.1. Baltimore

In Baltimore, about 14% of guns recovered by police were LCM guns in 1993. This figure remained relatively stable for a few years after the ban but had dropped notably by 2002 and 2003 (Figure 8-1). For the entire post-ban period (1995-2003), recoveries of LCM guns were down 8% relative to those of guns with smaller magazines (Table 8-1, panel A), a change of borderline statistical significance. Focusing on the most recent years, however, LCM gun recoveries were 24% lower in 2002 and 2003 than during the year prior to the ban, a difference that was clearly significant (Table 8-1, panel B).[78,79,80] This change was attributable to a 36% drop in LCM handguns (Table 8-1, panel C). LCM rifles actually increased 36% as a share of crime guns, although they still accounted for no more than 3% in 2002 and 2003 (Table 8-1, panel D).[81]

Yet there was no decline in recoveries of LCM guns used in violent crimes (i.e., murders, shootings, robberies, and other assaults). After the ban, the percentage of violent crime guns with LCMs generally oscillated in a range consistent with the pre-ban level (14%) and hit peaks of roughly 16% to 17% in 1996 and 2003 (Figure 8-1).[82] Whether comparing the pre-ban period to the entire post-ban period (1995-2003) or the most recent years (2002-2003), there was no meaningful decline in LCM recoveries linked to violent crimes (Table 8-2, panels A and B).[83] Neither violent uses of LCM

---

[78] Data on handgun magazines were also available for 1992. An auxiliary analysis of those data did not change the substantive inferences described in the text.

[79] The Maryland AP ban enacted in June 1994 also prohibited ammunition magazines holding over 20 rounds and did not permit additional sales or transfers of such magazines manufactured prior to the ban. This ban, as well as the Maryland and federal bans on AWs that account for many of the guns with magazines over 20 rounds, may have contributed to the downward trend in LCMs in Baltimore, but only 2% of the guns recovered in Baltimore from 1993 to 2000 were equipped with such magazines.

[80] All comparisons of 1993 to 2002-2003 in the Baltimore data are based on information from the months of January through November of each year. At the time we received these data, information was not yet available for December 2003, and preliminary analysis revealed that guns with LCMs were somewhat less likely to be recovered in December than in other months for years prior to 2003. Nevertheless, utilizing the December data for 1993 and 2002 did not change the substantive inferences. We did not remove December data from the comparisons of 1993 and the full post-ban period because those comparisons seemed less likely to be influenced by the absence of one month of data.

[81] This increase may have been due largely to a general increase in rifle seizures. LCM rifles actually dropped as a percentage of all rifle recoveries from 1993 to 2002-2003, suggesting that recoveries of LCM rifles were increasing less than recoveries of other rifles.

[82] For 1996, 45% of all records and 24% of records linked to violent crimes had missing data for magazine capacity (due to temporary changes in operational procedures in the Baltimore crime lab). For other years, missing data rates were no more than 6%. Based on those cases for which data were available, the share of guns with LCMs in 1996 was comparable to that in other years, particularly when examining all gun recoveries. At any rate, the analyses focusing on 1993, 2002, and 2003 reinforce the findings of those that include the 1996 data.

[83] The ammunition capacity code in the Baltimore data usually reflected the full capacity of the magazine and weapon, but sometimes reflected the capacity of the magazine only. (For instance, a semiautomatic with a 10-round magazine and the ability to accept one additional round in the chamber might have been coded as having a capacity of 10 or 11.) Informal assessment suggested that capacity was more likely to reflect the exact capacity of the magazine in the early years of the database and more likely to reflect the full capacity of the gun and magazine in later years. For the main main presented in the text and tables, guns were counted as having LCMs if the coded capacity was greater than 11 rounds. This ensured that LCMs were not overestimated, but it potentially understated LCM prevalence, particularly for the earlier

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

handguns or LCM rifles had declined appreciably by 2002-2003 (Table 8-2, panels C and D). Hence, the general decline in LCM recoveries may reflect differences in the availability and use of LCMs among less serious offenders, changes in police practices,[84] or other factors.

**Figure 8-1. Police Recoveries of Guns Equipped With Large Capacity Magazines in Baltimore, 1993-2003**



years. However, coding the guns as LCM weapons based on a threshold of 10 (i.e., a coded capacity over 10 rounds) in 1993 and a threshold of 11 (i.e., a coded capacity over 11 rounds) for 2002-2003 did not change the inferences of the violent crime analysis. Further, this coding increased the pre-ban prevalence of LCMs by very little (about 4% in relative terms).

[84] During the late 1990s, for example, Baltimore police put greater emphasis on detecting illegal gun carrying (this statement is based on prior research and interviews the author has done in Baltimore as well as the discussion in Center to Prevent Handgun Violence, 1998). One can hypothesize that this effort reduced the fraction of recovered guns with LCMs because illegal gun carriers are probably more likely to carry smaller, more concealable handguns that are less likely to have LCMs.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

70

Exhibit 4
Page 00367

ER_2559

**Table 8-1.  Trends in All Police Recoveries of Firearms Equipped With Large Capacity Magazines, Baltimore, 1993-2003**

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **A.  All LCM Guns** | Jan.-Dec. 1993 | Jan. 1995-Nov. 2003 | |
| Total | 473 | 3703 | |
| Annual Mean | 473 | 445.86 [a] | -6% |
| LCM Guns as % of All Guns | 13.51% | 12.38% | -8%* |
| **B.  All LCM Guns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 430 | 626 | |
| Annual Mean | 430 | 313 | -27% |
| LCM Guns as % of All Guns | 13.47% | 10.3% | -24%*** |
| **C.  LCM Handguns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 359 | 440 | |
| Annual Mean | 359 | 220 | -39% |
| LCM Handguns as % of All Guns | 11.25% | 7.24% | -36%*** |
| **D.  LCM Rifles** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| LCM Rifles | 71 | 183 | |
| Annual Mean | 71 | 91.5 | 29% |
| LCM Rifles as % of All Guns | 2.22% | 3.01% | 36%** |

a.  Annual average calculated without 1996 and 2003 (to correct for missing months or missing magazine data).
* Chi-square p level < .10 (changes in percentages of guns equipped with LCMs were tested for statistical significance)
** Chi-square p level <.05 (changes in percentages of guns equipped with LCMs were tested for statistical significance)
** Chi-square p level < .01 (changes in percentages of guns equipped with LCMs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

71

Exhibit 4
Page 00368

ER_2560

**Table 8-2.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Violent Crime Cases, Baltimore, 1993-2003**

| | Pre-Ban Period | Post-Ban Period | Change [a] |
|---|---|---|---|
| **A.  All LCM Guns** | Jan.-Dec. 1993 | Jan. 1995-Nov. 2003 | |
| Total | 87 | 711 | |
| Annual Mean | 87 | 81.86 [b] | -6% |
| LCM Guns as % of All Guns | 14.01% | 14.44% | 3% |
| **B.  All LCM Guns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 79 | 104 | |
| Annual Mean | 79 | 52 | -34% |
| LCM Guns as % of All Guns | 13.96% | 13.65% | -2% |
| **C.  LCM Handguns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 62 | 81 | |
| Annual Mean | 62 | 40.5 | -35% |
| LCM Handguns as % of All Guns | 10.95% | 10.63% | -3% |
| **D.  LCM Rifles** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| LCM Rifles | 17 | 23 | |
| Annual Mean | 17 | 11.5 | -32% |
| LCM Rifles as % of All Guns | 3% | 3.02% | 1% |

a.  Changes in the percentages of guns with LCMs were statistically insignificant in chi-square tests.
b.  Annual average calculated without 1996 and 2003 (to correct for missing months or missing magazine data).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

72

Exhibit 4
Page 00369

## 8.2. Anchorage

In the Alaska database, magazine capacity was recorded only for guns recovered during the post-ban years, 1995 through 2002. However, we estimated pre-ban use of LCM handguns by identifying handgun models inspected during 1992 and 1993 that were manufactured with LCMs prior to the ban.[85] This permitted an assessment of pre-post changes in the use of LCM handguns.

As shown in Figure 8-2 (also see Table 8-3, panel A), LCM guns rose from 14.5% of crime guns in 1995-1996 to 24% in 2000-2001 (we present two-year averages because the sample are relatively small, particularly for the most recent years) and averaged about 20% for the entire post-ban period. LCM handguns drove much of this trend, but LCM rifles also increased from about 3% of crime guns in 1995-96 to 11% in 2000-2001.

**Figure 8-2. Police Recoveries of Guns Equipped With Large Capacity Magazines in Anchorage (Alaska), 1995-2002**



As % of Guns Submitted for Evidentiary Testing (N=405)

Two year averages.

---

[85] To make these determinations, we consulted gun catalogs such as the *Blue Book of Gun Values* and *Guns Illustrated*.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

73

Exhibit 4
Page 00370

ER_2562

**Table 8-3.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Violent Crime Cases, Anchorage (Alaska), 1992-2002 [a]**

|  | Pre-Ban Period | Post-Ban Period | Change [b] |
|---|---|---|---|
| **A.  All LCM Guns** | N/A | Jan. 1995-Dec. 2002 | |
| Total | | 80 | |
| Annual Mean | | 10 | N/A |
| LCM Guns as % of All Guns | | 19.75% | N/A |
| **B.  LCM Handguns** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2002 | |
| Total | 17 | 57 | |
| Annual Mean | 8.5 | 7.13 | -16% |
| LCM Handguns as % All Handguns | 26.15% | 22.35% | -15% |
| **C.  LCM Handguns** | Jan. 1992-Dec. 1993 | Jan. 2001-Dec. 2002 | |
| Total | 17 | 10 | |
| Annual Mean | 8.5 | 5 | -41% |
| LCM Handguns as % of All Handguns | 26.15% | 19.23% | -26% |

a.  Based on guns submitted to State Police for evidentiary testing.
b.  Changes in the percentages of guns equipped with LCMs were statistically insignificant in chi-square tests.

Investigation of pre-post changes for handguns revealed an inconsistent pattern (Figure 8-3).  LCM handguns dropped initially after the ban, declining from 26% of handguns in 1992-1993 to 18% in 1995-1996.  However, they rebounded after 1996, reaching a peak of 30% of handguns in 1999-2000 before declining to 19% in 2001-2002.

For the entire post-ban period, the share of handguns with LCMs was about 15% lower than in the pre-ban period (Table 8-3, panel B).  By the two most recent post-ban years (2001-2002), LCM use had dropped 26% from the pre-ban years (Table 8-3, panel C).  These changes were not statistically significant, but the samples of LCM handguns were rather small for rigorous statistical testing.  Even so, it seems premature to conclude

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

that there has been a lasting reduction in LCM use in Alaska.  LCM use in 2001-2002 was somewhat higher than that immediately following the ban in 1995-1996, after which there was a substantial rebound.  Considering the inconsistency of post-ban patterns, further follow-up seems warranted before making definitive conclusions about LCM use in Alaska.

**Figure 8-3. Police Recoveries of Handguns Equipped With Large Capacity Magazines in Anchorage (Alaska), 1992-2002**



As % of Handguns Submitted for Evidentiary Testing (N=319)

Two-year averages.  Data for 1994 excluded.

### 8.3.  Milwaukee

LCM guns accounted for 21% of guns recovered in Milwaukee murder investigations from 1991 to 1993 (Table 8-4, panel A).  Following the ban, this figure rose until reaching a plateau of over 36% in 1997 and 1998 (Figure 8-4).  On average, the share of guns with LCMs grew 55% from 1991-1993 to 1995-1998, a trend that was driven by LCM handguns (Table 8-4, panels A and B).[86]  LCM rifles held steady at between 4% and 5% of the guns (Table 8-4, panel C).

We also analyzed a preliminary database on 48 guns used in murders during 2000 and 2001 (unlike the 1991-1998 database, this database did not include information on other guns recovered during the murder investigations).  About 11% of these guns were LCM guns, as compared to 19% of guns used in murders from 1991 to 1993 (analyses not shown).  However, nearly a quarter of the 2000-2001 records were missing information on magazine capacity.[87]  Examination of the types and models of guns with

---

[86]  LCM guns also increased as share of guns that were used in the murders (the full sample results discussed in the text include all guns recovered during the investigations).
[87]  Magazine capacity was missing for less than 4% of the records in earlier years.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

75

Exhibit 4
Page 00372

unidentified magazines suggested that as many as 17% of guns used in murders during 2000 and 2001 may have been LCM guns (based on all those that either had LCMs, were models sold with LCMs prior to the ban, or were unidentified semiautomatics).  While this still suggests a drop in LCM use from the peak levels of the late 1990s (26% of guns used in murders from 1995 to 1998 had LCMs), it is not clear that LCM use has declined significantly below pre-ban levels.

**Table 8-4.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Murder Cases, Milwaukee County, 1991-1998**

|  | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **A.  All LCM Guns** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 |  |
| Total | 51 | 83 |  |
| Annual Mean | 17 | 20.75 | 22% |
| LCM Guns as % of All Guns | 20.9% | 32.42% | 55%* |
| **B.  LCM Handguns** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 |  |
| Total | 40 | 71 |  |
| Annual Mean | 13.33 | 17.75 | 33% |
| LCM Handguns as % of All Guns | 16.39% | 27.73% | 69%* |
| **C.  LCM Rifles** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 |  |
| Total | 11 | 12 |  |
| Annual Mean | 3.67 | 3 | -18% |
| LCM Rifles as % of All Guns | 4.51% | 4.69% | 4% |

* Chi-square p level < .01 (changes in percentages of guns equipped with LCMs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 8-4. Recoveries of Guns Equipped With Large Capacity Magazines in Milwaukee County Murder Cases, 1991-1998**

As % of Guns Recovered in Murder Cases (N=571)



## 8.4. Louisville

The Louisville LCM data are all post-ban (1996-2000), so we cannot make pre-post comparisons. Nonetheless, the share of crime guns with LCMs in Louisville (24%) was within the range of that observed in the other cities during this period. And similar to post-ban trends in the other sites, LCM recoveries peaked in 1997 before leveling off and remaining steady through the year 2000 (Figure 8-5). LCM rifles dropped 21% as a share of crime guns between 1996 and 2000 (analyses not shown), but there were few in the database, and they never accounted for more than 6.2% of guns in any year.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

77

Exhibit 4
Page 00374

**ER_2566**

**Figure 8-5. Police Recoveries of Guns Equipped With Large Capacity Magazines in Louisville (Kentucky), 1996-2000**



As % of Guns Submitted for Evidentiary Testing (N=681)

Year 2000 data are not for the full year.

## 8.5. Summary

Despite a doubling of handgun LCM prices between 1993 and 1995 and a 40% increase in rifle LCM prices from 1993 to 1994, criminal use of LCMs was rising or steady through at least the latter 1990s, based on police recovery data from four jurisdictions studied in this chapter. These findings are also consistent with an earlier study finding no decline in seizures of LCM guns from juveniles in Washington, DC in the year after the ban (Koper, 2001).[88] Post-2000 data, though more limited and inconsistent, suggest that LCM use may be dropping from peak levels of the late 1990s but provide no definitive evidence of a drop below pre-ban levels.[89] These trends have been driven primarily by LCM handguns, which are used in crime roughly three times as

---

[88] From 1991 to 1993, 16.4% of guns recovered from juveniles in Washington, DC had LCMs (14.2% had LCMs in 1993). In 1995, this percentage increased to 17.1%. We did not present these findings in this chapter because the data were limited to guns recovered from juveniles, the post-ban data series was very short, and the gun markets supplying DC and Baltimore are likely to have much overlap (Maryland is a leading supplier of guns to DC -- see ATF, 1997; 1999).

[89] We reran selected key analyses with the Baltimore, Milwaukee, and Louisville data after excluding .22 caliber guns, some of which could have been equipped with attached tubular magazines that are exempted from the LCM ban, and obtained results consistent with those reported in the text. It was possible to identify these exempted magazines in the Anchorage data. When they were removed from Anchorage's LCM count, the general pattern in use of banned LCMs was similar to that presented in the main 1995-2002 analysis: guns with banned LCMs rose, reaching a peak of 21% of crime guns in 1999-2000, before declining slightly to 19% in 2001-2002.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

78

Exhibit 4
Page 00375

often as LCM rifles.  Nonetheless, there has been no consistent reduction in the use of LCM rifles either.

The observed patterns are likely due to several factors:  a hangover from pre-ban growth in the production and marketing of LCM guns (Cook and Ludwig, 1997, pp. 5-6; Wintemute, 1996);[90] the low cost of LCMs relative to the firearms they complement, which seems to make LCM use less sensitive to prices than is firearm use;[91] the utility that gun users, particularly handgun users, attach to LCMs; a plentiful supply of grandfathered LCMs, likely enhanced by a pre-ban surge in production (though this has not been documented) and the importation of millions of foreign LCMs since the ban;[92] thefts of LCM firearms (see Roth and Koper, 1997, Chapter 4); or some combination of these factors.[93]  However, it is worth noting that our analysis did not reveal an upswing in use of LCM guns following the surge of LCM importation in 1999 (see the previous chapter).  It remains to be seen whether recent imports will have a demonstrable effect on patterns of LCM use.

Finally, we must be cautious in generalizing these results to the nation because they are based on a small number of non-randomly selected jurisdictions.  Nonetheless, the consistent failure to find clear evidence of a pre-post drop in LCM use across these geographically diverse locations strengthens the inference that the findings are indicative of a national pattern.

---

[90] To illustrate this trend, 38% of handguns acquired by gun owners during 1993 and 1994 were equipped with magazines holding 10 or more rounds, whereas only 14% of handguns acquired before 1993 were so equipped (Cook and Ludwig, 1997, pp. 5-6).

[91] Although elevated post-ban prices did not suppress use of LCMs, a more subtle point is that LCM use rose in most of these locations between 1995 and 1998, as LCM prices were falling from their peak levels of 1994-1995.  Therefore, LCM use may have some sensitivity to price trends.

[92] However, we do not have the necessary data to determine if LCMs used in crime after the ban were acquired before or after the ban.

[93] In light of these considerations, it is conceivable that the ban slowed the rate of growth in LCM use, accelerated it temporarily (due to a pre-ban production boom), or had no effect.  We do not have the data necessary to examine this issue rigorously.  Moreover, the issue might be regarded as somewhat superfluous; the more critical point would seem to be that nearly a decade after the ban, LCM use has still not declined demonstrably below pre-ban levels.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

79

Exhibit 4
Page 00376

## 9. THE CONSEQUENCES OF CRIMES WITH ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES

One of the primary considerations motivating passage of the ban on AWs and LCMs was a concern over the perceived dangerousness of these guns and magazines. In principal, semiautomatic weapons with LCMs enable offenders to fire high numbers of shots rapidly, thereby potentially increasing both the number of person wounded per gunfire incident (including both intended targets and innocent bystanders) and the number of gunshot victims suffering multiple wounds, both of which would increase deaths and injuries from gun violence. Ban advocates also argued that the banned AWs possessed additional features conducive to criminal applications.

The findings of the previous chapters suggest that it is premature to make definitive assessments of the ban's impact on gun violence. Although criminal use of AWs has declined since the ban, this reduction was offset through at least the late 1990s by steady or rising use of other guns equipped with LCMs. As argued previously, the LCM ban has greater potential for reducing gun deaths and injuries than does the AW ban. Guns with LCMs – of which AWs are only a subset – were used in up to 25% of gun crimes before the ban, whereas AWs were used in no more than 8% (Chapter 3). Furthermore, an LCM is arguably the most important feature of an AW. Hence, use of guns with LCMs is probably more consequential than use of guns with other military-style features, such as flash hiders, folding rifle stocks, threaded barrels for attaching a silencers, and so on.[94]

This is not to say that reducing use of AWs will have no effect on gun crime; a decline in the use of AWs does imply fewer crimes with guns having particularly large magazines (20 or more rounds) and other military-style features that could facilitate some crimes. However, it seems that any such effects would be outweighed, or at least

---

[94] While it is conceivable that changing features of AWs other than their magazines might prevent some gunshot victimizations, available data provide little if any empirical basis for judging the likely size of such effects. Speculatively, some of the most beneficial weapon redesigns may be the removal of folding stocks and pistol grips from rifles. It is plausible that some offenders who cannot obtain rifles with folding stocks (which make the guns more concealable) might switch to handguns, which are more concealable but generally cause less severe wounds (e.g. see DiMaio, 1985). However, such substitution patterns cannot be predicted with certainty. Police gun databases rarely have information sufficiently detailed to make assessments of changes over time in the use of weapons with specific features like folding stocks. Based on informal assessments, there was no consistent pattern in post-ban use of rifles (as a share of crime guns) in the local databases examined in the prior chapters (also see the specific comments on LCM rifles in the previous chapters).

Pistol grips enhance the ability of shooters to maintain control of a rifle during rapid, "spray and pray" firing (e.g., see Violence Policy Center, 2003). (Heat shrouds and forward handgrips on APs serve the same function.) While this feature may prove useful in military contexts (e.g., firefights among groups at 100 meters or less – see data of the U.S. Army's Operations Research Office as cited in Violence Policy Center, 2003), it is unknown whether civilian attacks with semiautomatic rifles having pistol grips claim more victims per attack than do those with other semiautomatic rifles. At any rate, most post-ban AR-type rifles still have pistol grips. Further, the ban does not count a stock thumbhole grip, which serves the same function as a pistol grip (e.g., see the illustration of LCMM rifles in Chapter 2), as an AR feature.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

80

Exhibit 4
Page 00377

obscured, by the wider effects of LCM use, which themselves are likely to be small at best, as we argue below.[95]

Because offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns.[96] But by forcing AW and LCM offenders to substitute non-AWs with small magazines, the ban might reduce the number of shots fired per gun attack, thereby reducing both victims shot per gunfire incident and gunshot victims sustaining multiple wounds. In the following sections, we consider the evidence linking high-capacity semiautomatics and AWs to gun violence and briefly examine recent trends in lethal and injurious gun violence.

### 9.1. The Spread of Semiautomatic Weaponry and Trends in Lethal and Injurious Gun Violence Prior to the Ban

Nationally, semiautomatic handguns grew from 28% of handgun production in 1973 to 80% in 1993 (Zawitz, 1995, p. 3). Most of this growth occurred from the late 1980s onward, during which time the gun industry also increased marketing and production of semiautomatics with LCMs (Wintemute, 1996). Likewise, semiautomatics grew as a percentage of crime guns (Koper, 1995; 1997), implying an increase in the average firing rate and ammunition capacity of guns used in crime.[97]

---

[95] On a related note, a few studies suggest that state-level AW bans have not reduced crime (Koper and Roth, 2001a; Lott, 2003). This could be construed as evidence that the federal AW ban will not reduce gunshot victimizations without reducing LCM use because the state bans tested in those studies, as written at the time, either lacked LCM bans or had LCM provisions that were less restrictive than that of the federal ban. (New Jersey's 1990 AW ban prohibited magazines holding more than 15 rounds. AP bans passed by Maryland and Hawaii prohibited magazines holding more than 20 rounds and pistol magazines holding more than 10 rounds, respectively, but these provisions did not take effect until just a few months prior to the federal ban.) However, it is hard to draw definitive conclusions from these studies for a number of reasons, perhaps the most salient of which are the following: there is little evidence on how state AW bans affect the availability and use of AWs (the impact of these laws is likely undermined to some degree by the influx of AWs from other states, a problem that was probably more pronounced prior to the federal ban when the state laws were most relevant); studies have not always examined the effects of these laws on gun homicides and shootings, the crimes that are arguably most likely to be affected by AW bans (see discussion in the main text); and the state AW bans that were passed prior to the federal ban (those in California, New Jersey, Hawaii, Connecticut, and Maryland) were in effect for only three months to five years (two years or less in most cases) before the imposition of the federal ban, after which they became largely redundant with the federal legislation and their effects more difficult to predict and estimate.

[96] One might hypothesize that the firepower provided by AWs and other semiautomatics with LCMs emboldens some offenders to engage in aggressive behaviors that prompt more shooting incidents. On the other hand, these weapons might also prevent some acts of violence by intimidating adversaries, thus discouraging attacks or resistance. We suspect that firepower does influence perceptions, considering that many police departments have upgraded their weaponry in recent years – often adopting semiautomatics with LCMs – because their officers felt outgunned by offenders. However, hypotheses about gun types and offender behavior are very speculative, and, pending additional research on such issues, it seems prudent to focus on indicators with stronger theoretical and empirical foundations.

[97] Revolvers, the most common type of non-semiautomatic handgun, typically hold only 5 or 6 rounds (and sometimes up to 9). Semiautomatic pistols, in contrast, hold ammunition in detachable magazines that, prior to the ban, typically held 5 to 17 bullets and sometimes upwards of 30 (Murtz et al., 1994).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

81

Exhibit 4
Page 00378

The impact of this trend is debatable. Although the gun homicide rate rose considerably during the late 1980s and early 1990s (Bureau of Justice Statistics, 1994, p. 13), the percentage of violent gun crimes resulting in death was declining (see Figure 9-1 and the related discussion in section 9.3). Similarly, the percentage of victims killed or wounded in handgun discharge incidents declined from 27% during the 1979-1987 period to 25% for the 1987-1992 period (calculated from Rand, 1990, p. 5; 1994, p. 2) as semiautomatics were becoming more common crime weapons.[98] On the other hand, an increasing percentage of gunshot victims died from 1992 to 1995 according to hospital data (Cherry et al., 1998), a trend that could have been caused in part by a higher number of gunshot victims with multiple wounds (also see McGonigal et al., 1993). Most notably, the case fatality rate for assaultive gunshot cases involving 15 to 24-year-old males rose from 15.9% in late 1993 to 17.5% in early 1995 (p. 56).

### Figure 9-1. Percentage of Violent Gun Crimes Resulting in Death (National), 1982-2002



Based on gun homicides, gun robberies, and gun assaults reported in the Uniform Crime Reports and Supplemental Homicide Reports.

---

[98] A related point is that there was a general upward trend in the average number of shots fired by offenders in gunfights with New York City police from the late 1980s through 1992 (calculated from Goehl, 1993, p. 51). However, the average was no higher during this time than during many years of the early 1980s and 1970s.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

82

Exhibit 4
Page 00379

Some researchers have inferred links between the growing use of semiautomatics in crime and the rise of both gun homicides and bystander shootings in a number of cities during the late 1980s and early 1990s (Block and Block, 1993; McGonigal et al., 1993; Sherman et al., 1989; Webster et al., 1992). A study in Washington, DC, for example, reported increases in wounds per gunshot victim and gunshot patient mortality during the 1980s that coincided with a reported increase in the percentage of crime guns that were semiautomatics (Webster et al., 1992).

Nevertheless, changes in offender behavior, coupled with other changes in crime guns (e.g., growing use of large caliber handguns – see Caruso et al., 1999; Koper, 1995; 1997; Wintemute, 1996), may have been key factors driving such trends. Washington, DC, for example, was experiencing an exploding crack epidemic at the time of the aforementioned study, and this may have raised the percentage of gun attacks in which offenders had a clear intention to injure or kill their victims. Moreover, studies that attempted to make more explicit links between the use of semiautomatic firearms and trends in lethal gun violence via time series analysis failed to produce convincing evidence of such links (Koper, 1995; 1997). However, none of the preceding research related specific trends in the use of AWs or LCMs to trends in lethal gun violence.

## 9.2. Shots Fired in Gun Attacks and the Effects of Weaponry on Attack Outcomes

The evidence most directly relevant to the potential of the AW-LCM ban to reduce gun deaths and injuries comes from studies examining shots fired in gun attacks and/or the outcomes of attacks involving different types of guns. Unfortunately, such evidence is very sparse.

As a general point, the faster firing rate and larger ammunition capacities of semiautomatics, especially those equipped with LCMs, have the potential to affect the outcomes of many gun attacks because gun offenders are not particularly good shooters. Offenders wounded their victims in no more than 29% of gunfire incidents according to national, pre-ban estimates (computed from Rand, 1994, p. 2; also see estimates presented later in this chapter). Similarly, a study of handgun assaults in one city revealed a 31% hit rate per shot, based on the sum totals of all shots fired and wounds inflicted (Reedy and Koper, 2003, p. 154). Other studies have yielded hit rates per shot ranging from 8% in gunfights with police (Goehl, 1993, p. 8) to 50% in mass murders (Kleck, 1997, p. 144). Even police officers, who are presumably certified and regularly re-certified as proficient marksman and who are almost certainly better shooters than are average gun offenders, hit their targets with only 22% to 39% of their shots (Kleck, 1991, p. 163; Goehl, 1993). Therefore, the ability to deliver more shots rapidly should raise the likelihood that offenders hit their targets, not to mention innocent bystanders.[99]

---

[99] However, some argue that this capability is offset to some degree by the effects of recoil on shooter aim, the limited number of shots fired in most criminal attacks (see below), and the fact that criminals using non-semiautomatics or semiautomatics with small magazines usually have the time and ability to deliver multiple shots if desired (Kleck, 1991, pp. 78-79).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

83

Exhibit 4
Page 00380

A few studies have compared attacks with semiautomatics, sometimes specifically those with LCMs (including AWs), to other gun assaults in terms of shots fired, persons hit, and wounds inflicted (see Tables 9-1 and 9-2). The most comprehensive of these studies examined police reports of attacks with semiautomatic pistols and revolvers in Jersey City, New Jersey from 1992 through 1996 (Reedy and Koper, 2003), finding that use of pistols resulted in more shots fired and higher numbers of gunshot victims (Table 9-1), though not more gunshot wounds per victim (Table 9-2).[100] Results implied there would have been 9.4% fewer gunshot victims overall had semiautomatics not been used in any of the attacks. Similarly, studies of gun murders in Philadelphia (see McGonigal et al., 1993 in Table 9-1) and a number of smaller cities in Pennsylvania, Ohio, and Iowa (see Richmond et al., 2003 in Table 9-2) found that attacks with semiautomatics resulted in more shots fired and gunshot wounds per victim. An exception is that the differential in shots fired between pistol and revolver cases in Philadelphia during 1990 did not exist for cases that occurred in 1985, when semiautomatics and revolvers had been fired an average of 1.6 and 1.9 times, respectively. It is not clear whether the increase in shots fired for pistol cases from 1985 to 1990 was due to changes in offender behavior, changes in the design or quality of pistols (especially an increase in the use of models with LCMs – see Wintemute, 1996), the larger sample for 1990, or other factors.

---

[100] But unlike other studies that have examined wounds per victim (see Table 9-2), this study relied on police reports of wounds inflicted rather than medical reports, which are likely to be more accurate.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

84

Exhibit 4
Page 00381

**Table 9-1. Shots Fired and Victims Hit in Gunfire Attacks By Type of Gun and Magazine**

| Data Source | Measure | Outcome |
|---|---|---|
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Shots Fired | Avg. = 3.2 – 3.7 (n=165 pistol cases) *<br><br>Avg. = 2.3 – 2.6 (n=71 revolver cases) * |
| Gun homicides with semiautomatic pistols and revolvers, Philadelphia, 1985 and 1990 [b] | Shots Fired | Avg. = 1.6 (n=21 pistol cases, 1985)<br>Avg. = 1.9 (n=57 revolver cases, 1985)<br><br>Avg. = 2.7 (n=95 pistol cases, 1990)<br>Avg. = 2.1 (n=108 revolver cases, 1990) |
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Victims Hit | Avg. = 1.15 (n=95 pistol cases) *<br><br>Avg. = 1.0 (n=40 revolver cases) * |
| Mass shootings with AWs, semiautomatics having LCMs, or other guns, 6+ dead or 12+ shot, United States, 1984-1993 [c] | Victims Hit | Avg. = 29 (n=6 AW/LCM cases)<br><br>Avg. = 13 (n=9 non-AW/LCM cases) |
| Self-reported gunfire attacks by state prisoners with AWs, other semiautomatics, and non-semiautomatic firearms, United States, 1997 or earlier [d] | % of Attacks With Victims Hit | 19.5% (n=72 AW or machine gun cases)<br><br>22.3% (n=419 non-AW, semiautomatic cases)<br><br>23.3% (n=608 non-AW, non-semiautomatic cases) |

a. Reedy and Koper (2003)
b. McGonigal et al. (1993)
c. Figures calculated by Koper and Roth (2001a) based on data presented by Kleck (1997, p. 144)
d. Calculated from Harlow (2001, p. 11).  (Sample sizes are based on unpublished information provided by the author of the survey report.)
* Pistol/revolver differences statistically significant at p<.05 (only Reedy and Koper [2003] and Harlow [2001] tested for statistically significant differences).  The shots fired ranges in Reedy and Koper are based on minimum and maximum estimates.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

85

Exhibit 4
Page 00382

**Table 9-2.  Gunshot Wounds Per Victim By Type of Gun and Magazine**

| Data Source | Measure | Outcome |
|---|---|---|
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Gunshot Wounds | Avg. = 1.4 (n=107 pistol victims)<br><br>Avg. = 1.5 (n=40 revolver victims) |
| Gun homicides with semiautomatic pistols and revolvers, Iowa City (IA), Youngstown (OH), and Bethlehem (PA), 1994-1998 [b] | Gunshot Wounds | Avg. = 4.5 total (n=212 pistol victims)*<br>Avg. = 2.9 entry<br><br>Avg. = 2.0 total (n=63 revolver victims)*<br>Avg. = 1.5 entry |
| Gun homicides with assault weapons (AWs), guns having large capacity magazines (LCMs), and other firearms, Milwaukee, 1992-1995 [c] | Gunshot Wounds | Avg. = 3.23 (n=30 LCM victims) **<br>Avg. = 3.14 (n=7 AW victims)<br><br>Avg. = 2.08 (n=102 non-AW/LCM victims)** |

a. Reedy and Koper (2003)
b. Richmond et al. (2003)
c. Roth and Koper (1997, Chapter 6)
* Pistol/revolver differences statistically significant at $p < .01$.
** The basic comparison between LCM victims and non-AW/LCM victims was moderately significant ($p < .10$) with a one-tailed test.  Regression results (with a slightly modified sample) revealed a difference significant at $p = .05$ (two-tailed test).  Note that the non-LCM group included a few cases involving non-banned LCMs (.22 caliber attached tubular devices).

Also, a national survey of state prisoners found that, contrary to expectations, offenders who reported firing on victims with AWs and other semiautomatics were no more likely to report having killed or injured victims than were other gun offenders who reported firing on victims (Table 9-1).  However, the measurement of guns used and attack outcomes were arguably less precise in this study, which was based on offender self-reports, than in other studies utilizing police and medical reports.[101]

Attacks with AWs or other guns with LCMs may be particularly lethal and injurious, based on very limited evidence.  In mass shooting incidents (defined as those in which at least 6 persons were killed or at least 12 were wounded) that occurred during the decade preceding the ban, offenders using AWs and other semiautomatics with LCMs (sometimes in addition to other guns) claimed an average of 29 victims in comparison to an average of 13 victims for other cases (Table 9-1).  (But also see the study discussed in the preceding paragraph in regards to victims hit in AW cases.)

Further, a study of Milwaukee homicide victims from 1992 through 1995 revealed that those killed with AWs were shot 3.14 times on average, while those killed with any

---

[101] See the discussion of self-reports and AW use in Chapter 3.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

gun having an LCM were shot 3.23 times on average (Table 9-2). In contrast, victims shot with guns having small magazines had only 2.1 wounds on average. If such a wound differential can be generalized to other gun attacks – if, that is, both fatal and non-fatal LCM gunshot victims are generally hit one or more extra times – then LCM use could have a considerable effect on the number of gunshot victims who die. To illustrate, the fatality rate among gunshot victims in Jersey City during the 1990s was 63% higher for those shot twice than for those shot once (26% to 16%) (Koper and Roth, 2001a; 2001b). Likewise, fatality rates are 61% higher for patients with multiple chest wounds than for patients with a single chest wound (49% to 30.5%), based on a Washington, DC study (Webster et al., 1992, p. 696).

Similar conclusions can also be inferred indirectly from the types of crimes involving LCM guns. To illustrate, handguns associated with gunshot victimizations in Baltimore (see the description of the Baltimore gun and magazine data in the preceding chapter) are 20% to 50% more likely to have LCMs than are handguns associated with other violent crimes, controlling for weapon caliber (Table 9-3). This difference may be due to higher numbers of shots and hits in crimes committed with LCMs, although it is also possible that offenders using LCMs are more likely to fire on victims. But controlling for gunfire, guns used in shootings are 17% to 26% more likely to have LCMs than guns used in gunfire cases resulting in no wounded victims (perhaps reflecting higher numbers of shots fired and victims hit in LCM cases), and guns linked to murders are 8% to 17% more likely to have LCMs than guns linked to non-fatal gunshot victimizations (perhaps indicating higher numbers of shots fired and wounds per victim in LCM cases).[102] These differences are not all statistically significant, but the pattern is consistent. And as discussed in Chapter 3, AWs account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.

---

[102] Cases with and without gunfire and gunshot victims were approximated based on offense codes contained in the gun seizure data (some gunfire cases not resulting in wounded victims may not have been identified as such, and it is possible that some homicides were not committed with the guns recovered during the investigations). In order to control for caliber effects, we focused on 9mm and .38 caliber handguns. Over 80% of the LCM handguns linked to violent crimes were 9mm handguns. Since all (or virtually all) 9mm handguns are semiautomatics, we also selected .38 caliber guns, which are close to 9mm in size and consist almost entirely of revolvers and derringers.

The disproportionate involvement of LCM handguns in injury and death cases is greatest in the comparisons including both 9mm and .38 caliber handguns. This may reflect a greater differential in average ammunition capacity between LCM handguns and revolvers/derringers than between LCM handguns and other semiautomatics. The differential in fatal and non-fatal gunshot victims may also be due to caliber effects; 9mm is generally a more powerful caliber than .38 based on measures like kinetic energy or relative stopping power (e.g., see DiMaio, 1985, p. 140; Warner 1995, p. 223; Wintemute, 1996, p. 1751).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

87

Exhibit 4
Page 00384

**Table 9-3. Probabilities That Handguns Associated With Murders, Non-Fatal Shootings, and Other Violent Crimes Were Equipped With Large Capacity Magazines in Baltimore, 1993-2000**

| Handgun Sample | % With LCM | % Difference (#2 Relative to #1) |
|---|---|---|
| **A.  Handguns Used in Violent Crimes With and Without Gunshot Injury** | | |
| 1)  9mm and .38:  violence, no gunshot victims | 23.21% | |
| 2)  9mm and .38:  violence with gunshot victims | 34.87% | 50%* |
| 1)  9mm:  violence, no gunshot victims | 52.92% | |
| 2)  9mm:  violence with gunshot victims | 63.24% | 20%* |
| **B.  Handguns Used in Gunfire Cases With and Without Gunshot Injury** | | |
| 1)  9mm and .38:  gunfire, no gunshot victims | 27.66% | |
| 2)  9mm and .38:  gunfire with gunshot victims | 34.87% | 26% |
| 1)  9mm:  gunfire, no gunshot victims | 54.17% | |
| 2)  9mm:  gunfire with gunshot victims | 63.24% | 17% |
| **C.  Handguns Used in Fatal Versus Non-Fatal Gunshot Victimizations** | | |
| 1)  9mm and .38:  non-fatal gunshot victims | 32.58% | |
| 2)  9mm and .38:  homicides | 38.18% | 17% |
| 1)  9mm:  non-fatal gunshot victims | 61.14% | |
| 2)  9mm:  homicides | 66.04% | 8% |

* Statistically significant difference at p<.01 (chi-square).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

88

Exhibit 4
Page 00385

The findings of the preceding studies are subject to numerous caveats. There were few if any attempts to control for characteristics of the actors or situations that might have influenced weapon choices and/or attack outcomes.[103] Weapons data were typically missing for substantial percentages of cases. Further, many of the comparisons in the tables were not tested for statistical significance (see the notes to Tables 9-1 and 9-2).[104]

Tentatively, nonetheless, the evidence suggests more often than not that attacks with semiautomatics, particularly those equipped with LCMs, result in more shots fired, leading to both more injuries and injuries of greater severity. Perhaps the faster firing rate and larger ammunition capacities afforded by these weapons prompt some offenders to fire more frequently (i.e., encouraging what some police and military persons refer to as a "spray and pray" mentality). But this still begs the question of whether a 10-round limit on magazine capacity will affect the outcomes of enough gun attacks to measurably reduce gun injuries and deaths.

---

[103] In terms of offender characteristics, recall from Chapter 3 that AP buyers are more likely than other gun buyers to have criminal histories and commit subsequent crimes. This does not seem to apply, however, to the broader class of semiautomatic users: handgun buyers with and without criminal histories tend to buy pistols in virtually the same proportions (Wintemute et al., 1998b), and youthful gun offenders using pistols and revolvers have very comparable criminal histories (Sheley and Wright, 1993b, p. 381). Further, semiautomatic users, including many of those using AWs, show no greater propensity to shoot at victims than do other gun offenders (Harlow, 2001, p. 11; Reedy and Koper, 2003). Other potential confounders to the comparisons in Tables 9-1 and 9-2 might include shooter age and skill, the nature of the circumstances (e.g., whether the shooting was an execution-style shooting), the health of the victim(s), the type of location (e.g., indoor or outdoor location), the distance between the shooter and intended victim(s), the presence of multiple persons who could have been shot intentionally or accidentally (as bystanders), and (in the mass shooting incidents) the use of multiple firearms.

[104] Tables 9-1 and 9-2 present the strongest evidence from the available studies. However, there are additional findings from these studies and others that, while weaker, are relevant. Based on gun model information available for a subset of cases in the Jersey City study, there were 12 gunfire cases involving guns manufactured with LCMs before the ban (7 of which resulted in wounded victims) and 94 gunfire cases involving revolvers or semiautomatic models without LCMs. Comparisons of these cases produced results similar to those of the main analysis: shot fired estimates ranged from 2.83 to 3.25 for the LCM cases and 2.22 to 2.6 for the non-LCM cases; 1.14 victims were wounded on average in the LCM gunshot cases and 1.06 in the non-LCM gunshot cases; and LCM gunshot victims had 1.14 wound on average, which, contrary to expectations, was less than the 1.47 average for other gunshot victims.

The compilation of mass shooting incidents cited in Table 9-1 had tentative shots fired estimates for 3 of the AW-LCM cases and 4 of the other cases. The AW-LCM cases averaged 93 shots per incident, a figure two and a half times greater than the 36.5 shot average for the other cases.

Finally, another study of firearm mass murders found that the average number of victims killed (tallies did not include others wounded) was 6 in AW cases and 4.5 in other cases (Roth and Koper, 1997, Appendix A). Only 2 of the 52 cases studied clearly involved AWs (or very similar guns). However, the make and model of the firearm were available for only eight cases, so additional incidents may have involved LCMs; in fact, at least 35% of the cases involved unidentified semiautomatics. (For those cases in which at least the gun type and firing action were known, semiautomatics outnumbered non-semiautomatics by 6 to 1, perhaps suggesting that semiautomatics are used disproportionately in mass murders.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

89

Exhibit 4
Page 00386

ER_2578

*9.2.1. Will a 10-Round Magazine Limit Reduce Gunshot Victimizations?*

Specific data on shots fired in gun attacks are quite fragmentary and often inferred indirectly, but they suggest that relatively few attacks involve more than 10 shots fired.[105] Based on national data compiled by the FBI, for example, there were only about 19 gun murder incidents a year involving four or more victims from 1976 through 1995 (for a total of 375) (Fox and Levin, 1998, p. 435) and only about one a year involving six or more victims from 1976 through 1992 (for a total of 17) (Kleck, 1997, p. 126). Similarly, gun murder victims are shot two to three times on average according to a number of sources (see Table 9-2 and Koper and Roth, 2001a), and a study at a Washington, DC trauma center reported that only 8% of all gunshot victims treated from 1988 through 1990 had five or more wounds (Webster et al., 1992, p. 696).

However, counts of victims hit or wounds inflicted provide only a lower bound estimate of the number of shots fired in an attack, which could be considerably higher in light of the low hit rates in gunfire incidents (see above).[106] The few available studies on shots fired show that assailants fire less than four shots on average (see sources in Table 9-1 and Goehl, 1993), a number well within the 10-round magazine limit imposed by the AW-LCM ban, but these studies have not usually presented the full distribution of shots fired for all cases, so it is usually unclear how many cases, if any, involved more than 10 shots.

An exception is the aforementioned study of handgun murders and assaults in Jersey City (Reedy and Koper, 2003). Focusing on cases for which at least the type of handgun (semiautomatic, revolver, derringer) could be determined, 2.5% of the gunfire cases involved more than 10 shots.[107] These incidents – all of which involved pistols – had a 100% injury rate and accounted for 4.7% of all gunshot victims in the sample (see Figure 9-2). Offenders fired a total of 83 shots in these cases, wounding 7 victims, only 1 of whom was wounded more than once. Overall, therefore, attackers fired over 8 shots

---

[105] Although the focus of the discussion is on attacks with more than 10 shots fired, a gun user with a post-ban 10-round magazine can attain a firing capacity of 11 shots with many semiautomatics by loading one bullet into the chamber before loading the magazine.

[106] As a dramatic example, consider the heavily publicized case of Amadou Diallo, who was shot to death by four New York City police officers just a few years ago. The officers in this case fired upon Diallo 41 times but hit him with only 19 shots (a 46% hit rate), despite his being confined in a vestibule. Two of the officers reportedly fired until they had emptied their 16-round magazines, a reaction that may not be uncommon in such high-stress situations. In official statistics, this case will appear as having only one victim.

[107] The shots fired estimates were based on reported gunshot injuries, physical evidence (for example, shell casings found at the scene), and the accounts of witnesses and actors. The 2.5% figure is based on minimum estimates of shots fired. Using maximum estimates, 3% of the gunfire incidents involved more than 10 shots (Reedy and Koper, 2003, p. 154).

A caveat to these figures is that the federal LCM ban was in effect for much of the study period (which spanned January 1992 to November 1996), and a New Jersey ban on magazines with more than 15 rounds predated the study period. It is thus conceivable that these laws reduced attacks with LCM guns and attacks with more than 10 shots fired, though it seems unlikely that the federal ban had any such effect (see the analyses of LCM use presented in the previous chapter). Approximately 1% of the gunfire incidents involved more than 15 shots.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

90

Exhibit 4
Page 00387

ER_2579

for every wound inflicted, suggesting that perhaps fewer persons would have been wounded had the offenders not been able to fire as often.[108]

---

**Figure 9-2. Attacks With More Than 10 Shots Fired**

**Jersey City Handgun Attacks, 1992-1996**

- **2.5% - 3% of gunfire incidents involved 11+ shots**
  - **3.6% - 4.2% of semiauto pistol attacks**
- **100% injury rate**
- **Produced 4.7% of all gunshot wound victims**
- **8.3 shots per gunshot wound**

---

Based on data reported by Reedy and Koper (2003). Injury statistics based on the 2.5% of cases involving 11+ shots by minimum estimate.

Caution is warranted in generalizing from these results because they are based on a very small number of incidents (6) from one sample in one city. Further, it is not known if the offenders in these cases had LCMs (gun model and magazine information was very limited); they may have emptied small magazines, reloaded, and continued firing. But subject to these caveats, the findings suggest that the ability to deliver more than 10 shots without reloading may be instrumental in a small but non-trivial percentage of gunshot victimizations.

On the other hand, the Jersey City study also implies that eliminating AWs and LCMs might only reduce gunshot victimizations by up to 5%. And even this estimate is probably overly optimistic because the LCM ban cannot be expected to prevent all incidents with more than 10 shots. Consequently, any effects from the ban (should it be extended) are likely to be smaller and perhaps quite difficult to detect with standard statistical methods (see Koper and Roth, 2001a), especially in the near future, if recent patterns of LCM use continue.

### 9.3. Post-Ban Trends in Lethal and Injurious Gun Violence

Having established some basis for believing the AW-LCM ban could have at least a small effect on lethal and injurious gun violence, is there any evidence of such an effect to date? Gun homicides plummeted from approximately 16,300 in 1994 to 10,100 in 1999, a reduction of about 38% (see the Federal Bureau of Investigation's *Uniform Crime*

---

[108] These figures are based on a supplemental analysis not contained in the published study. We thank Darin Reedy for this analysis.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

91

Exhibit 4
Page 00388

*Reports*).  Likewise, non-fatal, assaultive gunshot injuries treated in hospitals nationwide declined one-third, from about 68,400 to under 46,400, between 1994 and 1998 (Gotsch et al., 2001, pp. 23-24).  Experts believe numerous factors contributed to the recent drop in these and other crimes, including changing drug markets, a strong economy, better policing, and higher incarceration rates, among others (Blumstein and Wallman, 2000).  Attributing the decline in gun murders and shootings to the AW-LCM ban is problematic, however, considering that crimes with LCMs appear to have been steady or rising since the ban.  For this reason, we do not undertake a rigorous investigation of the ban's effects on gun violence.[109]

But a more casual assessment shows that gun crimes since the ban have been no less likely to cause death or injury than those before the ban, contrary to what we might expect if crimes with AWs and LCMs had both declined.  For instance, the percentage of violent gun crimes resulting in death has been very stable since 1990 according to national statistics on crimes reported to police (see Figure 9-1 in section 9.1).[110]  In fact, the percentage of gun crimes resulting in death during 2001 and 2002 (2.94%) was slightly higher than that during 1992 and 1993 (2.9%).

Similarly, neither medical nor criminological data sources have shown any post-ban reduction in the percentage of crime-related gunshot victims who die.  If anything, this percentage has been higher since the ban, a pattern that could be linked in part to more multiple wound victimizations stemming from elevated levels of LCM use.  According to medical examiners' reports and hospitalization estimates, about 20% of gunshot victims died nationwide in 1993 (Gotsch et al., 2001).  This figure rose to 23% in 1996, before declining to 21% in 1998 (Figure 9-3).[111]  Estimates derived from the Uniform Crime Reports and the Bureau of Justice Statistics' annual National Crime Victimization Survey follow a similar pattern from 1992 to 1999 (although the ratio of fatal to non-fatal cases is much higher in these data than that in the medical data) and also show a considerable increase in the percentage of gunshot victims who died in 2000 and 2001 (Figure 9-3).[112]  Of course, changes in offender behavior or other changes in crime

---

[109]  In our prior study (Koper and Roth 2001a; Roth and Koper, 1997, Chapter 6), we estimated that gun murders were about 7% lower than expected in 1995 (the first year after the ban), adjusting for pre-existing trends.  However, the very limited post-ban data available for that study precluded a definitive judgment as to whether this drop was statistically meaningful (see especially Koper and Roth, 2001a).  Furthermore, that analysis was based on the assumption that crimes with both AWs and LCMs had dropped in the short-term aftermath of the ban, an assumption called into question by the findings of this study.  It is now more difficult to credit the ban with any of the drop in gun murders in 1995 or anytime since.  We did not update the gun murder analysis because interpreting the results would be unavoidably ambiguous.  Such an investigation will be more productive after demonstrating that the ban has reduced crimes with both AWs and LCMs.

[110]  The decline in this figure during the 1980s was likely due in part to changes in police reporting of aggravated assaults in recent decades (Blumstein, 2000).  The ratio of gun murders to gun robberies rose during the 1980s, then declined and remained relatively flat during the 1990s.

[111]  Combining homicide data from 1999 with non-fatal gunshot estimates for 2000 suggests that about 20% of gunshot victimizations resulted in death during 1999 and 2000 (Simon et al., 2002).

[112]  The SHR/NCVS estimates should be interpreted cautiously because the NCVS appears to undercount non-fatal gunshot wound cases by as much as two-thirds relative to police data, most likely because it fails to represent adequately the types of people most likely to be victims of serious crime (i.e., young urban males who engage in deviant lifestyles) (Cook, 1985).  Indeed, the rate of death among gunshot victims

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

92

Exhibit 4
Page 00389

ER_2581

weaponry (such as an increase in shootings with large caliber handguns) may have influenced these trends.  Yet is worth noting that multiple wound shootings were elevated over pre-ban levels during 1995 and 1996 in four of five localities examined during our first AW study, though most of the differences were not statistically significant (Table 9-4, panels B through E).

Another potential indicator of ban effects is the percentage of gunfire incidents resulting in fatal or non-fatal gunshot victimizations.  If attacks with AWs and LCMs result in more shots fired and victims hit than attacks with other guns and magazines, we might expect a decline in crimes with AWs and LCMs to reduce the share of gunfire incidents resulting in victims wounded or killed.  Measured nationally with UCR and NCVS data, this indicator was relatively stable at around 30% from 1992 to 1997, before rising to about 40% from 1998 through 2000 (Figure 9-4).[113]  Along similar lines, multiple victim gun homicides remained at relatively high levels through at least 1998, based on the national average of victims killed per gun murder incident (Table 9-4, panel A).[114]

---

appears much higher in the SHR/NCVS series than in data compiled from medical examiners and hospitals (see the CDC series in Figure 9-3).  But if these biases are relatively consistent over time, the data may still provide useful insights into trends over time.

[113] The NCVS estimates are based on a compilation of 1992-2002 data recently produced by the Inter-University Consortium for Political and Social Research (ICPSR study 3691).  In 2002, only 9% of non-fatal gunfire incidents resulted in gunshot victimizations.  This implies a hit rate for 2002 that was below pre-ban levels, even after incorporating gun homicide cases into the estimate.  However, the 2002 NCVS estimate deviates quite substantially from earlier years, for which the average hit rate in non-fatal gunfire incidents was 24% (and the estimate for 2001 was 20%).  Therefore, we did not include the 2002 data in our analysis.  We used two-year averages in Figures 9-3 and 9-4 because the annual NCVS estimates are based on very small samples of gunfire incidents.  The 2002 sample was especially small, so it seems prudent to wait for more data to become available before drawing conclusions about hit rates since 2001.

[114] We thank David Huffer for this analysis.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

93

Exhibit 4
Page 00390

Figure 9-3. Percentage of Gunshot Victimizations Resulting in Death (National), 1992-2001

SHR/NCVS series based on two-year averages from the Supplemental Homicide Reports and National Crime Victimization Survey. CDC series based on homicide and hospitalization data from the Centers for Disease Control (reported by Gotsch et al. 2001).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

94

Exhibit 4
Page 00391

**Table 9-4. Short-Term, Post-Ban Changes in the Lethality and Injuriousness of Gun Violence: National and Local Indicators, 1994-1998** [a]

| Measure and Location | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| A. Victims Per Gun Homicide Incident (National) | Jan. 1986-Sept. 1994 1.05 (N=106,668) | Oct. 1994-Dec. 1998 1.06 (N=47,511) | 1%** |
| B. Wounds per Gun Homicide Victim: Milwaukee County | Jan. 1992-Aug. 1994 2.28 (N=282) | Sept. 1994-Dec. 1995 2.52 (N=136) | 11% |
| C. Wounds Per Gun Homicide Victim: Seattle (King County) | Jan. 1992-Aug. 1994 2.08 (N=184) | Sept. 1994-Jun. 1996 2.46 (N=91) | 18% |
| D. Wounds Per Gunshot Victim: Jersey City (NJ) | Jan. 1992-Aug. 94 1.42 (N=125) | Sept. 1994-Jun. 1996 1.39 (N=137) | -2% |
| E. % of Gun Homicide Victims With Multiple Wounds: San Diego County | Jan. 1992-Aug. 1994 41% (N=445) | Sept. 1994-Jun. 1996 43% (N=223) | 5% |
| F. % of Non-Fatal Gunshot Victims With Multiple Wounds: Boston | Jan. 1992-Aug. 1994 18% (N=584) | Sept. 1994-Dec. 1995 24% (N=244) | 33%* |

a. National victims per incident figures based on unpublished update of analysis reported in Roth and Koper (1997, Chapter 5). Gunshot wound data are taken from Roth and Koper (1997, Chapter 6) and Koper and Roth (2001a). Wound data are based on medical examiners' reports (Milwaukee, Seattle, San Diego), hospitalization data (Boston), and police reports (Jersey City).
* Chi-square p level < .1.
** T-test p level < .01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

If anything, therefore, gun attacks appear to have been more lethal and injurious since the ban. Perhaps elevated LCM use has contributed to this pattern. But if this is true, then the reverse would also be true – a reduction in crimes with LCMs, should the ban be extended, would reduce injuries and deaths from gun violence.

**Figure 9-4. Percentage of Gunfire Cases Resulting in Gunshot Victimizations (National), 1992-2001**



Based on two-year averages from the Supplemental Homicide Reports and National Crime Victimization Survey.

## 9.4. Summary

Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are used in crime much more frequently than AWs. Therefore, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs.

However, the grandfathering provision of the AW-LCM ban guaranteed that the effects of this law would occur only gradually over time. Those effects are still unfolding and may not be fully felt for several years into the future, particularly if foreign, pre-ban LCMs continue to be imported into the U.S. in large numbers. It is thus premature to make definitive assessments of the ban's impact on gun violence.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

96

Exhibit 4
Page 00393

Having said this, the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement. AWs were used in no more than 8% of gun crimes even before the ban. Guns with LCMs are used in up to a quarter of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability to fire more than 10 shots (the current limit on magazine capacity) without reloading.

Nonetheless, reducing crimes with AWs and especially LCMs could have non-trivial effects on gunshot victimizations. As a general matter, hit rates tend to be low in gunfire incidents, so having more shots to fire rapidly can increase the likelihood that offenders hit their targets, and perhaps bystanders as well. While not entirely consistent, the few available studies contrasting attacks with different types of guns and magazines generally suggest that attacks with semiautomatics – including AWs and other semiautomatics with LCMs – result in more shots fired, persons wounded, and wounds per victim than do other gun attacks. Further, a study of handgun attacks in one city found that about 3% of gunfire incidents involved more than 10 shots fired, and those cases accounted for nearly 5% of gunshot victims. However, the evidence on these matters is too limited (both in volume and quality) to make firm projections of the ban's impact, should it be reauthorized.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

97

Exhibit 4
Page 00394

ER_2586

## 10. LOOKING TO THE FUTURE: RESEARCH RECOMMENDATIONS AND SPECULATION ABOUT THE CONSEQUENCES OF REAUTHORIZING, MODIFYING, OR LIFTING THE ASSAULT WEAPONS BAN

In this chapter, we discuss future lines of inquiry that would be informative whether or not the AW-LCM ban is renewed in September 2004. We then offer some brief thoughts about the possible consequences of reauthorizing the ban, modifying it, or allowing it to expire.

### 10.1. Research Recommendations and Data Requirements

*10.1.1. An Agenda for Assault Weapons Research and Recommendations for Data Collection by Law Enforcement*

The effects of the AW-LCM ban have yet to be fully realized; therefore, we recommend continued study of trends in the availability and criminal use of AWs and LCMs. Even if the ban is lifted, longer-term study of crimes with AWs and LCMs will inform future assessment of the consequences of these policy shifts and improve understanding of the responses of gun markets to gun legislation more generally.[115]

Developing better data on crimes with LCMs is especially important. To this end, we urge police departments and their affiliated crime labs to record information about magazines recovered with crime guns. Further, we recommend that ATF integrate ammunition magazine data into its national gun tracing system and encourage reporting of magazine data by police departments that trace firearms.

As better data on LCM use become available, more research is warranted on the impacts of AW and LCM trends (which may go up or down depending on the ban's fate) on gun murders and shootings, as well as levels of death and injury per gun crime. Indicators of the latter, such as victims per gunfire incident and wounds per gunshot victim, are useful complementary outcome measures because they reflect the mechanisms through which use of AWs and LCMs is hypothesized to affect gun deaths and injuries.[116] Other potentially promising lines of inquiry might relate AW and LCM use to mass murders and murders of police, crimes that are very rare but appear more likely to involve AWs (and perhaps LCMs) and to disproportionately affect public perceptions.[117]

---

[115] Establishing time series data on primary and secondary market prices and production or importation of various guns and magazines of policy interest could provide benefits for policy researchers. Like similar statistical series maintained for illegal drugs, such price and production series would be valuable instruments for monitoring effects of policy changes and other influences on markets for various weapons.

[116] However, more research is needed on the full range of factors that cause variation in these indicators over time and between places.

[117] Studying these crimes poses a number of challenges, including modeling of rare events, establishing the reliability and validity of methods for measuring the frequency and characteristics of mass murders (such as through media searches; see Duwe, 2000, Roth and Koper, 1997, Appendix A), and controlling for factors like the use of bullet-proof vests by police.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

98

Exhibit 4
Page 00395

Finally, statistical studies relating AW and LCM use to trends in gun violence should include statistical power analysis to ensure that estimated models have sufficient ability to detect small effects, an issue that has been problematic in some of our prior time series research on the ban (Koper and Roth, 2001a) and is applicable more generally to the study of modest, incremental policy changes.

Research on aggregate trends should be complemented by more incident-based studies that contrast the dynamics and outcomes of attacks with different types of guns and magazines, while controlling for relevant characteristics of the actors and situations. Such studies would refine predictions of the change in gun deaths and injuries that would follow reductions in attacks with AWs and LCMs. For instance, how many homicides and injuries involving AWs and LCMs could be prevented if offenders were forced to substitute other guns and magazines? In what percentage of gun attacks does the ability to fire more than ten rounds without reloading affect the number of wounded victims or determine the difference between a fatal and non-fatal attack? Do other AW features (such as flash hiders and pistol grips on rifles) have demonstrable effects on the outcomes of gun attacks? Studies of gun attacks could draw upon police incident reports, forensic examinations of recovered guns and magazines, and medical and law enforcement data on wounded victims.

### 10.1.2. Studying the Implementation and Market Impacts of Gun Control

More broadly, this study reiterates the importance of examining the implementation of gun policies and the workings of gun markets, considerations that have been largely absent from prior research on gun control. Typical methods of evaluating gun policies involve statistical comparisons of total or gun crime rates between places and/or time periods with and without different gun control provisions. Without complimentary implementation and market measures, such studies have a "black box" quality and may lead to misleading conclusions. For example, a time series study of gun murder rates before and after the AW-LCM ban might find that the ban has not reduced gun murders. Yet the interpretation of such a finding would be ambiguous, absent market or implementation measures. Reducing attacks with AWs and LCMs may in fact have no more than a trivial impact on gun deaths and injuries, but any such impact cannot be realized or adequately assessed until the availability and use of the banned guns and magazines decline appreciably. Additionally, it may take many years for the effects of modest, incremental policy changes to be fully felt, a reality that both researchers and policy makers should heed. Similar implementation concerns apply to the evaluation of various gun control policies, ranging from gun bans to enhanced sentences for gun offenders.

Our studies of the AW ban have shown that the reaction of manufacturers, dealers, and consumers to gun control policies can have substantial effects on demand and supply for affected weapons both before and after a law's implementation. It is important to study these factors because they affect the timing and form of a law's impact

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

99

Exhibit 4
Page 00396

ER_2588

on the availability of weapons to criminals and, by extension, the law's impact on gun
violence.

## 10.2. Potential Consequences of Reauthorizing, Modifying, or Lifting the Assault Weapons Ban

### 10.2.1. Potential Consequences of Reauthorizing the Ban As Is

Should it be renewed, the ban might reduce gunshot victimizations. This effect is
likely to be small at best and possibly too small for reliable measurement. A 5%
reduction in gunshot victimizations is perhaps a reasonable upper bound estimate of the
ban's potential impact (based on the only available estimate of gunshot victimizations
resulting from attacks in which more than 10 shots were fired), but the actual impact is
likely to be smaller and may not be fully realized for many years into the future,
particularly if pre-ban LCMs continue to be imported into the U.S. from abroad. Just as
the restrictions imposed by the ban are modest – they are essentially limits on weapon
accessories like LCMs, flash hiders, threaded barrels, and the like – so too are the
potential benefits.[118] In time, the ban may be seen as an effective prevention measure
that stopped further spread of weaponry considered to be particularly dangerous (in a
manner similar to federal restrictions on fully automatic weapons). But that conclusion
will be contingent on further research validating the dangers of AWs and LCMs.

### 10.2.2. Potential Consequences of Modifying the Ban

We have not examined the specifics of legislative proposals to modify the AW
ban. However, we offer a few general comments about the possible consequences of
such efforts, particularly as they relate to expanding the range of the ban as some have
advocated (Halstead, 2003, pp. 11-12).

---

[118] But note that although the ban's impact on gunshot victimizations would be small in percentage terms
and unlikely to have much effect on the public's fear of crime, it could conceivably prevent hundreds of
gunshot victimizations annually and produce notable cost savings in medical care alone. To help place this
in perspective, there were about 10,200 gun homicides and 48,600 non-fatal, assault-related shootings in
2000 (see the FBI's *Uniform Crime Reports* for the gun homicide estimate and Simon et al. [2002] for the
estimate of non-fatal shootings). Reducing these crimes by 1% would have thus prevented 588 gunshot
victimizations in 2000 (we assume the ban did not actually produce such benefits because the reduction in
AW use as of 2000 was outweighed by steady or rising levels of LCM use). This may seem insubstantial
compared to the 342,000 murders, assaults, and robberies committed with guns in 2000 (see the *Uniform
Crime Reports*). Yet, gunshot victimizations are particularly costly crimes. Setting aside the less tangible
costs of lost lives and human suffering, the lifetime medical costs of assault-related gunshot injuries (fatal
and non-fatal) were estimated to be about $18,600 per injury in 1994 (Cook et al., 1999). Therefore, the
lifetime costs of 588 gun homicides and shootings would be nearly $11 million in 1994 dollars (the net
medical costs could be lower for reasons discussed by Cook and Ludwig [2000] but, on the other hand, this
estimate does not consider other governmental and private costs that Cook and Ludwig attribute to gun
violence). This implies that small reductions in gunshot victimizations sustained over many years could
produce considerable long-term savings for society. We do not wish to push this point too far, however,
considering the uncertainty regarding the ban's potential impact.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

100

Exhibit 4
Page 00397

Gun markets react strongly merely to debates over gun legislation. Indeed, debate over the AW ban's original passage triggered spikes upwards of 50% in gun distributors' advertised AW prices (Roth and Koper, 1997, Chapter 4). In turn, this prompted a surge in AW production in 1994 (Chapter 5). Therefore, it seems likely that discussion of broadening the AW ban to additional firearms would raise prices and production of the weapons under discussion. (Such market reactions may already be underway in response to existing proposals to expand the ban, but we have not investigated this issue.) Heightened production levels could saturate the market for the weapons in question, depressing prices and delaying desired reductions in crimes with the weapons, as appears to have happened with banned ARs.

Mandating further design changes in the outward features of semiautomatic weapons (e.g., banning weapons having any military-style features) may not produce benefits beyond those of the current ban. As noted throughout this report, the most important feature of military-style weapons may be their ability to accept LCMs, and this feature has been addressed by the LCM ban and the LCMM rifle ban. Whether changing other features of military-style firearms will produce measurable benefits is unknown.

Finally, curbing importation of pre-ban LCMs should help reduce crimes with LCMs and possibly gunshot victimizations. Crimes with LCMs may not decline substantially for quite some time if millions of LCMs continue to be imported into the U.S.

### 10.2.3. *Potential Consequences of Lifting the Ban*

If the ban is lifted, it is likely that gun and magazine manufacturers will reintroduce AW models and LCMs, perhaps in substantial numbers.[119] In addition, AWs grandfathered under the 1994 law may lose value and novelty, prompting some of their lawful owners to sell them in secondary markets, where they may reach criminal users. Any resulting increase in crimes with AWs and LCMs might increase gunshot victimizations, though this effect could be difficult to discern statistically.

It is also possible, and perhaps probable, that new AWs and LCMs will eventually be used to commit mass murder. Mass murders garner much media attention, particularly when they involve AWs (Duwe, 2000). The notoriety likely to accompany mass murders if committed with AWs and LCMs, especially after these guns and magazines have been deregulated, could have a considerable negative impact on public perceptions, an effect that would almost certainly be intensified if such crimes were committed by terrorists operating in the U.S.

---

[119] Note, however, that foreign semiautomatic rifles with military features, including the LCMM rifles and several rifles prohibited by the 1994 ban, would still be restricted by executive orders passed in 1989 and 1998. Those orders stem from the sporting purposes test of the Gun Control Act of 1968.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

101

Exhibit 4
Page 00398

## REFERENCES

Adler, W.C., Bielke, F.M., Doi, D.J., and Kennedy, J.F. (1995). *Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns With High Capacity Magazines*, Handgun Control, Inc., Washington, DC.

American Medical Association Council on Scientific Affairs. (1992). Assault weapons as a public health hazard in the United States. *JAMA* 267:3067-3070.

Berndt, E.R. (1990). *The Practice of Econometrics: Classic and Contemporary*, Addison Wesley, Reading, MA.

Beck, A., Gilliard, D., Greenfeld, L., Harlow, C., Hester, T., Jankowski, L., Snell, T., Stephan, J., and Morton, D. (1993). *Survey of State Prison Inmates, 1991* (NCJ-136949), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Block, C.R. and Block, R. (1993). *Street Gang Crime in Chicago* (NCJ-144782), National Institute of Justice, United States Department of Justice, Washington, DC.

Blumstein, A. (2000). Disaggregating the violence trends. In Blumstein, A. and Wallman, J. (eds.), *The Crime Drop in America*, Cambridge University Press, New York, pp. 13-44.

Blumstein, A. and Wallman, J. (eds.), (2000). *The Crime Drop in America*, Cambridge University Press, New York.

Brady Center to Prevent Gun Violence. (2004). *On Target: The Impact of the 1994 Federal Assault Weapons Act*, Washington, DC.

Brill, S. (1977). *Firearm Abuse: A Research and Policy Report,* Police Foundation, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1976). *Project Identification: A Study of Handguns Used in Crime,* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1977). *Concentrated Urban Enforcement (CUE),* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1995). *The National Tracing Center 1994 Yearend Report*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1997). *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 17 Communities*, United States Department of the Treasury, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Bureau of Alcohol, Tobacco, and Firearms. (1999). *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 27 Communities*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2000). *Commerce in Firearms in the United States*, United States Department of the Treasury, Washington, DC.

Bureau of Justice Statistics. (1994). *Firearms and Crimes of Violence: Selected Findings from National Statistical Series* (NCJ-146844), United States Department of Justice, Washington, DC.

Bureau of Justice Statistics. (2000). *Correctional Populations in the United States, 1997* (NCJ-177613), United States Department of Justice, Washington, DC.

Caruso, R.P., Jara, D.I. and Swan, K.G. (1999). Gunshot wounds: Bullet caliber is increasing. *The Journal of Trauma: Injury, Infection, and Critical Care* 46:462-465.

Center to Prevent Handgun Violence. (1998). *On the Front Line: Making Gun Interdiction Work,* Handgun Control, Inc., Washington, DC.

Cherry, D., Annest, J.L., Mercy, J.A., Kresnow, M., and Pollock, D.A. (1998). Trends in nonfatal and fatal firearm-related injury rates in the United States, 1985-1995. *Annals of Emergency Medicine* 32:51-59.

Cook, P.J. (1985). The case of the missing victims: Gunshot woundings in the National Crime Survey." *Journal of Quantitative Criminology* 1:91-102.

Cook, P.J., Lawrence, B.A., Ludwig, J., and Miller, T.R. (1999). The medical costs of gunshot injuries in the United States. *JAMA* 282:447-454.

Cook, P.J. and Ludwig, J. (1996). *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, Police Foundation, Washington, DC.

Cook, P.J. and Ludwig, J. (1997). *Guns in America: National Survey on Private Ownership and Use of Firearms* (NCJ-165476), National Institute of Justice, United States Department of Justice, Washington, DC.

Cook, P.J. and Ludwig, J. (2000). *Gun Violence: The Real Costs*. New York: Oxford University Press.

Cook, P.J., Molliconi, S., and Cole, T.B. (1995). Regulating gun markets. *Journal of Criminal Law and Criminology* 86:59-92.

Cox Newspapers. (1989). *Firepower: Assault Weapons in America*, Cox Enterprises, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

103

Exhibit 4
Page 00400

DiMaio, V.J.M. (1985). *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques,* Elsevier, New York.

Duwe, G. (2000). Body-count journalism: The presentation of mass murder in the news media. *Homicide Studies* 4:364-399.

Federal Bureau of Investigation, (1982-2003). *Crime in the United States*, United States Department of Justice, Washington, DC.

Fjestad, S.J. (1990-2002). *Blue Book of Gun Values* (11th-23rd eds.), Blue Book Publications, Minneapolis.

Fox, J.A. and Levin, J. (1998). Multiple homicide: Patterns of serial and mass murder. In Tonry, M. (ed.), *Crime and Justice, Vol. 23*, University of Chicago Press, Chicago, pp. 407-455.

Friedman, M. (1962). *Price Theory: A Provisional Text*, Aldine Publishing Company, Chicago.

Goehl, G. (1993). *1992 Firearms Discharge Assault Report,* Police Academy Firearms and Tactics Section, New York City Police Department, New York.

Gotsch, K.E., Annest, J.L., Mercy, J.A., and Ryan, G.W. (2001). Surveillance for fatal and nonfatal firearm-related injuries – United States, 1993-1998. *Morbidity and Mortality Weekly Report (MMWR) CDC Surveillance Summaries* 50(SS-2):1-34.

Gun Tests. (1995). Magazine rule change unlikely. March.

Halstead, T.J. (2003). *The Assault Weapons Ban: Legal Challenges and Legislative Issues*, Congressional Research Service, Washington, DC (distributed by Penny Hill Press, Derwood, MD).

Hargarten, S.W., Karlson, T.A., O'Brien, M., Hancock, J., and Quebbeman, E. (1996). Characteristics of firearms involved in fatalities. *JAMA* 275:42-45.

Hargarten, S.W., Kuhn, E.M., Nie, C.L., O'Brien, M.E., Withers, R.L., and Wintemute, G.J. (2000). Homicide gun characteristics before and after the 1994 crime bill. In Blackman, P.H., Leggett, V.L., Olson, B.L., and Jarvis, J.P. (eds.), *The Varieties of Homicide and Its Research: Proceedings of the 1999 Meeting of the Homicide Research Working Group*, FBI Academy, Federal Bureau of Investigation, U.S. Department of Justice, Quantico, VA.

Harlow, C.W. (2001). *Firearm Use By Offenders* (NCJ-189369, Revised Feb. 2002), Bureau of Justice Statistics, U.S. Department of Justice, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

104

Exhibit 4
Page 00401

ER_2593

Hutson, H.R., Anglin, D., and Pratts, M.J., Jr. (1994). Adolescents and children injured or killed in drive-by shootings in Los Angeles. *New England Journal of Medicine* 330:324-327.

Hutson, H.R., Anglin, D., Kyriacou, D.N., Hart, J., and Spears, K. (1995). The epidemic of gang-related homicides in Los Angeles County from 1979 through 1994. *JAMA* 274:1031-1036.

Kennedy, D.M., Piehl, A.M., and Braga, A.A. (1996). Youth violence in Boston: gun markets, serious youth offenders, and a use-reduction strategy. *Law and Contemporary Problems* 59:147-196.

Kleck, G. (1991). *Point Blank: Guns and Violence in America*. Aldine de Gruyter, New York.

Kleck, G. (1997). *Targeting Guns: Firearms and Their Control*. Aldine de Gruyter, New York.

Knox, G.W., Houston, J.G., Laskey, J.A., McCurrie, T.F., Tromanhauser, E.D., Laske, D.L. (1994). *Gangs and Guns: A Task Force Report from the National Gang Crime Research Center*, National Gang Crime Research Center, Chicago

Kopel, D.B. (1995). Assault weapons. In Kopel (ed.), *Guns: Who Should Have Them?* Prometheus Books, Amherst, NY, pp. 159-232.

Koper, C.S. (1995). *Gun Lethality and Homicide: Gun Types Used By Criminals and the Lethality of Gun Violence in Kansas City, Missouri, 1985-1993,* (Ph.D. Dissertation), Department of Criminology and Criminal Justice, University of Maryland, College Park.

Koper, C.S. (1997). *Gun Density Versus Gun Type: Did the Availability of More Guns or More Lethal Guns Drive Up the Dallas Homicide Rate, 1980-1992?* (Report NCJ-187106 to the National Institute of Justice), Crime Control Institute, Philadelphia.

Koper, C.S. (2001). *A Follow-Up Assessment of the 1994 Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, Presentation at the annual meeting of the American Society of Criminology, Atlanta.

Koper, C.S. (2002). Federal legislation and gun markets: How much have recent reforms of the federal firearms licensing system reduce criminal gun suppliers? *Criminology and Public Policy* 1:151-178.

Koper, C.S. and Roth, J.A. (2001a). The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *Journal of Quantitative Criminology* 17:33-74.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Koper, C.S. and Roth, J.A. (2001b). A priori assertions versus empirical inquiry: A reply to Kleck. *Journal of Quantitative Criminology* 17:81-88.

Koper, C.S. and Roth, J.A. (2002a).  The impact of the 1994 federal assault weapons ban on gun markets: An assessment of short-term primary and secondary market effects. *Journal of Quantitative Criminology* 18:239-266.

Koper, C.S and Roth, J.A. (2002b). *An Updated Assessment of the Federal Assault Weapons Ban:  Impacts on Gun Markets, 1994-2000* (Draft Report to the National Institute of Justice), Jerry Lee Center of Criminology, University of Pennsylvania, Philadelphia and The Urban Institute, Washington, DC.

Lennet, M.G. (1995). Taking a bite out of violent crime. *University of Daytona Law Review* 20:573-617.

Lott, J.R., Jr. (2003). *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control is Wrong*, Regnery Publishing, Washington, DC.

McDowall, D. and Loftin, C. (1983). Collective security and the demand for legal handguns. *American Journal of Sociology* 88:1146-1161.

McGonigal, M.D., Cole, J., Schwab, C.W., Kauder, D.R., Rotondo, M.F., and Angood, P.B. (1993). Urban firearm deaths: a five-year perspective. *The Journal of Trauma:* 35:532-537.

Murtz, H.A. and the Editors of Gun Digest. (1994). *Guns Illustrated 1994*, DBI Books, Northbrook, IL.

National Institute of Justice. (1995). *Arrestees and Guns: Monitoring the Illegal Firearms Market* (NCJ-184205), United States Department of Justice, Washington, DC.

New Mexico Criminal Justice Statistical Analysis Center. (1998). *Controlling New Mexico Juveniles' Possession of Firearms*, Institute for Social Research, University of New Mexico, Albuquerque.

New York State Division of Criminal Justice Services. (1994). *Assault Weapons and Homicide in New York City*, Albany, New York.

Pierce, G.L., Briggs, L.R., and Carlson, D.A. (1998). *National Report on Firearm Trace Analysis for 1996-1997*, Northeastern University, Boston.

Rand, M.R. (1990). *Handgun Crime Victims* (NCJ-123559), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Rand, M.R. (1994). *Guns and Crime* (NCJ-147003), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Reedy, D.C. and Koper, C.S. (2003). Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. *Injury Prevention* 9:151-155.

Rennison, C.M. (2001). *Criminal Victimization 2000: Changes 1999-2000 With Trends 1993-2000* (NCJ-187007), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Richmond, T.S, Branas, C.C, Cheney, R.A, and Schwab, C.W. (2004, under review). *The Case for Enhanced Data Collection of Handgun Type*, Firearm and Injury Center at Penn, University of Pennsylvania, Philadelphia.

Roth, J.A. and Koper, C.S. (1997). *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*, The Urban Institute, Washington, DC.

Roth, J.A. and Koper, C.S. (1999). *Impacts of the 1994 Assault Weapons Ban: 1994-96* (NCJ-173405), National Institute of Justice, United States Department of Justice, Washington, DC.

Ruddell, R. and Mays, G.L. (2003). Examining the arsenal of juvenile gunslingers: trends and policy implications. *Crime and Delinquency* 49:231-252.

Shaw, J.W. (1994). *Community Policing Against Crime: Violence and Firearms* (Ph.D. dissertation), Department of Criminology and Criminal Justice, University of Maryland, College Park.

Sheley, J.F. and Wright, J.D. (1993a). *Gun Acquisition and Possession in Selected Juvenile Samples* (NCJ-145326), National Institute of Justice, United States Department of Justice, Washington, DC.

Sheley, J.F. and Wright, J.D. (1993b). Motivations for gun possession and carrying among serious juvenile offenders. *Behavioral Sciences and the Law* 11:375-388.

Sherman, L.W., Steele, L., Laufersweiler, D., Hoffer, N., and Julian, S.A. (1989). Stray bullets and 'mushrooms': Random shootings of bystanders in four cities, 1977-1988. *Journal of Quantitative Criminology* 5:297-316.

Simon, T.R., Saltzman, L.E., Swahn, M.H., Mercy, J.A., Ingram, E.M., and Mahendra, R.R, Annest, J.L., and Holmgreen, P. (2002). Nonfatal physical assault-related injuries treated in hospital emergency departments – United States, 2000. *Morbidity and Mortality Weekly Report* 51:460-463.

United States Department of the Treasury. (1998). *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

107

Exhibit 4
Page 00404

Violence Policy Center. (1999). *Firearms Production in America* (1999 Edition), Washington, DC.

Violence Policy Center (2002). *Firearms Production in America* (2002 Edition), Washington, DC.

Violence Policy Center (2003). *Bullet Hoses: Semiautomatic Assault Weapons – What Are They? What's So Bad About Them?* Washington, DC.

Warner, K. (ed.). (1995). *Gun Digest 1995/49th Annual Edition,* DBI Books, Northbrook, IL.

Webster, D.W., Champion, H.R., Gainer, P.S., and Sykes, L. (1992). Epidemiologic changes in gunshot wounds in Washington, DC, 1983-1990. *Archives of Surgery* 127:694-8.

Weil, D.S. and Knox, R. (1995). *Estimating the Impact in Baltimore of the Maryland Ban on the Sale of Assault Pistols and High Capacity Magazines*, The Center to Prevent Handgun Violence, Washington, DC.

Wintemute, G.J. (1994). *Ring of Fire: The Handgun Makers of Southern California,* Violence Prevention Research Program, University of California, Davis.

Wintemute, G.J. (1996). The relationship between firearm design and firearm violence: Handguns in the 1990s." *JAMA* 275:1749-1753.

Wintemute, G.J., Wright, M.A., Parham, C.A., Drake, C.M., Beaumont, J.J. (1998a). Criminal activity and assault-type handguns: A study of young adults. *Annals of Emergency Medicine* 32.

Wintemute, G.J., Parham, C.A., Wright, M.A., Beaumont, J.J., and Drake, C.M. (1998b). Weapons of choice: Previous criminal history, later criminal activity, and firearm preference among legally authorized young adult purchasers of handguns. *The Journal of Trauma: Injury, Infection, and Critical Care* 44:155-160.

Wright, J.D. and Rossi, P.H. (1986). *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*, Aldine de Gruyter, New York.

Zawitz, M.W. (1995). *Guns Used in Crime* (NCJ-148201), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Exhibit D

Exhibit 4
Page 00406

# Reducing Gun Violence in America

*Informing Policy with Evidence and Analysis*

EDITED BY

Daniel W. Webster, ScD, MPH,
and Jon S. Vernick, JD, MPH

Center for Gun Policy and Research
Johns Hopkins Bloomberg School of Public Health

The Johns Hopkins University Press
*Baltimore*

Exhibit 4
Page 00407

© 2013 The Johns Hopkins University Press
All rights reserved. Published 2013
Printed in the United States of America on acid-free paper
9  8  7  6  5  4  3  2  1

The Johns Hopkins University Press
2715 North Charles Street
Baltimore, Maryland 21218-4363
www.press.jhu.edu

Library of Congress Control Number: 2013930408
A catalog record for this book is available from the British Library.

ISBN 13: 978-1-4214-1110-1 (pbk. : alk. paper)
ISBN 10: 1-4214-1110-5 (pbk. : alk. paper)
ISBN 13: 978-1-4214-1111-8 (electronic)
ISBN 10: 1-4214-1111-3 (electronic)

*Special discounts are available for bulk purchases of this book.
For more information, please contact Special Sales at 410-516-6936 or
specialsales@press.jhu.edu.*

The Johns Hopkins University Press uses environmentally friendly book
materials, including recycled text paper that is composed of at least 30
percent post-consumer waste, whenever possible.

Exhibit 4
Page 00408

12

# America's Experience with the Federal Assault Weapons Ban, 1994–2004

## Key Findings and Implications

Christopher S. Koper

In 1994, the federal government imposed a ten-year ban on military-style semi-automatic firearms and ammunition-feeding devices holding more than ten rounds of ammunition. This legislation, commonly known as the federal assault weapons ban, was intended in the broadest sense to reduce gunshot victimizations by limiting the national stock of semi-automatic firearms with large ammunition capacities and other features conducive to criminal uses. Reflecting America's general political divisions over the issue of gun control, the debate over the law was highly contentious. Ten years later, Congress allowed the ban to expire.

More recently, there have been growing calls for a reexamination of the assault weapons issue. This debate has been fueled by a series of mass shooting incidents involving previously banned firearms or magazines. Since 2007, for example, there have been at least 11 incidents in which offenders using

Christopher S. Koper, PhD, is an associate professor in the Department of Criminology, Law and Society at George Mason University and a senior fellow and co-director of the Research Program on Evidence-Based Policing at George Mason's Center for Evidence-Based Crime Policy.

Exhibit 4
Page 00409

158    *Christopher S. Koper*

assault weapons or other semi-automatics with magazines larger than 10 rounds have wounded or killed eight or more people (Violence Policy Center 2012). Some of the most notorious of these incidents have been a 2007 shooting on the college campus of Virginia Tech that left 33 dead and 17 wounded; a 2011 shooting in an Arizona parking lot that killed 6 and wounded 13, including Congresswoman Gabrielle Giffords; a 2012 shooting in an Aurora, Colorado, movie theatre that left 12 dead and 58 wounded; and, most recently, a shooting in a Newtown, Connecticut, elementary school that left 26 victims dead, 20 of whom were children (an additional victim was killed elsewhere).

To help inform the new dialogue on this issue, this essay examines America's experience with the 1994 assault weapons law. During the course of the ban, the National Institute of Justice (NIJ) funded a series of studies on the law's impacts for the U.S. Department of Justice and the U.S. Congress (Koper 2004; Koper and Roth 2001, 2002; Roth and Koper 1997, 1999). I present highlights from those studies, with an emphasis on findings from the final evaluation reported in 2004 (Koper 2004). These studies sought to assess the law's impacts on (1) the availability of assault weapons (AWs) and large-capacity magazines (LCMs) as measured by price and production (or importation) indices in legal markets; (2) trends in criminal uses of AWs and LCMs; and (3) trends in the types of gun crimes that seemed most likely to be affected by changes in the use of AWs and LCMs. (The latter two issues are emphasized in this summary.) Finally, the research team examined studies of gun attacks more generally in order to estimate the ban's potential to produce longer-term reductions in shootings.

In summary, the ban had mixed effects in reducing crimes with the banned weaponry because of various exemptions and loopholes in the legislation. The ban did not appear to affect gun crime during the time it was in effect, but some evidence suggests it may have modestly reduced gunshot victimizations had it remained in place for a longer period. The ban's most important provision was arguably its prohibition on ammunition magazines holding more than 10 rounds. Policymakers considering a new version of the ban might particularly focus on this aspect of the previous legislation and reconsider the exemptions and loopholes that undermined the effectiveness of the original ban.

Exhibit 4
Page 00410

ER_2602

*America's Experience with the Federal Assault Weapons Ban, 1994–2004*    159

### Provisions of the Assault Weapons Ban

Enacted on September 13, 1994, Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 imposed a ten-year ban on the "manufacture, transfer, and possession" of certain semi-automatic firearms designated as assault weapons. The AW ban did not prohibit all semi-automatics; rather, it was directed at semi-automatics having features that appear to be useful in military and criminal applications but unnecessary in shooting sports or self-defense. Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept ammunition magazines holding large numbers of bullets. The law specifically prohibited 18 models and variations by name (e.g., the Intratec TEC-9 pistol and the Colt AR-15 rifle), as well as revolving cylinder shotguns (see Koper 2004, 5). This list included a number of foreign rifles that the federal government had banned from importation into the country beginning in 1989 (e.g., Avtomat Kalashnikov models). In addition, the ban contained a generic "features test" provision that generally prohibited other semi-automatic firearms having two or more military-style features, as described in Table 12.1. In total, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) identified 118 model and caliber variations that met the AW criteria established by the ban.

The law also banned "copies or duplicates" of the named gun makes and models, but federal authorities emphasized exact copies. Relatively cosmetic changes, such as removing a flash hider or bayonet mount, were thus sufficient to transform a banned weapon into a legal substitute. In this sense, the law is perhaps best understood not as a gun ban but as a law that restricted weapon accessories. A number of gun manufacturers began producing modified, legal versions of some of the banned guns, though not all of these substitute weapons proved as popular as the banned versions.[1] In other respects (e.g., type of firing mechanism, ammunition fired, and the ability to accept a detachable magazine), the banned AWs did not differ from other legal semi-automatic weapons.

The other major component of the assault weapons legislation was a ban on most ammunition-feeding devices holding more than 10 rounds of ammunition (referred to as large-capacity magazines).[2] The LCM ban was arguably the most important part of the assault weapons law for two reasons. First, an LCM is the most functionally important feature of an AW-type firearm. As noted by the U.S. House of Representatives, most prohibited AWs came equipped with magazines holding 30 rounds and could accept magazines holding as

Exhibit 4
Page 00411

160    *Christopher S. Koper*

*Table 12.1*   Features test of the federal assault weapons ban

| Weapon category | Military-style features (2 or more qualified a firearm as an assault weapon) |
|---|---|
| Semi-automatic pistols accepting detachable magazines | 1) ammunition magazine that attaches outside the pistol grip<br>2) threaded barrel capable of accepting a barrel extender, flash hider, forward handgrip, or silencer<br>3) heat shroud attached to or encircling the barrel<br>4) weight of more than 50 ounces unloaded<br>5) semiautomatic version of a fully automatic weapon |
| Semi-automatic rifles accepting detachable magazines | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) bayonet mount<br>4) flash hider or a threaded barrel designed to accommodate one<br>5) grenade launcher |
| Semi-automatic shotguns | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) fixed magazine capacity over 5 rounds<br>4) ability to accept a detachable ammunition magazine |

many as 50 or 100 rounds (United States Department of the Treasury 1998, 14). Removing LCMs from these weapons thus greatly limits their firepower.

Second, the reach of the LCM ban was much broader than that of the AW ban because many semi-automatics that were not banned by the AW provision could accept LCMs. Approximately 40 percent of the semi-automatic handgun models and a majority of the semi-automatic rifle models that were being manufactured and advertised prior to the ban were sold with LCMs or had a variation that was sold with an LCM (calculated from Murtz and the Editors of Gun Digest 1994). Still others could accept LCMs made for other firearms and/or by other manufacturers. A national survey of gun owners in 1994 found that 18% of all civilian-owned firearms and 21% of civilian-owned handguns were equipped with magazines having 10 or more rounds (Cook and Ludwig 1996, 17). The AW provision did not affect most LCM-compatible guns, but the LCM provision limited the capacities of their magazines to 10 rounds.

The AW ban also contained important exemptions. AWs and LCMs manufactured before the effective date of the ban were "grandfathered" and thus legal to own and transfer. Though not precise, estimates suggest there were

Exhibit 4
Page 00412

*America's Experience with the Federal Assault Weapons Ban, 1994–2004*   161

upward of 1.5 million privately owned AWs in the United States when the ban took effect (American Medical Association Council on Scientific Affairs 1992; Cox Newspapers 1989, 1; Koper 2004, 10). Gun owners in America possessed an estimated 25 million guns that were equipped with LCMs or 10-round magazines in 1994 (Cook and Ludwig 1996, 17), and gun industry sources estimated that, including aftermarket items for repairing and extending magazines, there were at least 25 million LCMs available in the United States as of 1995 (Gun Tests 1995, 30). Moreover, an additional 4.8 million pre-ban LCMs were imported into the country from 1994 through 2000 under the grandfathering exemption, with the largest number arriving in 1999. During this same period, importers were also authorized to import another 42 million pre-ban LCMs that may have arrived after 2000.

### Criminal Use of Assault Weapons and Large-Capacity Magazines Prior to the Ban

During the 1980s and early 1990s, AWs and other semi-automatic firearms equipped with LCMs were involved in a number of highly publicized mass shootings that raised public concern about the accessibility of high-powered, military-style weaponry and other guns capable of rapidly discharging high numbers of bullets (Cox Newspapers 1989; Kleck 1997, 124–126, 144; Lenett 1995; Violence Policy Center 2012). Perhaps most notably, AWs or other semi-automatics with LCMs were used in 6, or 40%, of 15 particularly severe mass shooting incidents between 1984 and 1993 that resulted in at least 6 deaths or at least 12 killed or wounded (Kleck, 1997, 124–126, 144). Early studies of AWs, though sometimes based on limited and potentially unrepresentative data, also suggested that AWs recovered by police were often associated with drug trafficking and organized crime (Cox Newspapers 1989, 4; also see Roth and Koper 1997, chap. 5), fueling a perception that AWs were guns of choice among drug dealers and other particularly violent groups. These events intensified concern over AWs and other semi-automatics with LCMs and helped spur the 1989 federal import ban on selected semi-automatic rifles (implemented by executive order) and the passage of the 1994 federal AW ban (the states of California, New Jersey, Connecticut, Hawaii, and Maryland also passed AW legislation between 1989 and 1994).

Looking at the nation's gun crime problem more broadly, numerous studies of AW-type weapons conducted prior to the federal ban found that AWs

Exhibit 4
Page 00413

162    *Christopher S. Koper*

typically accounted for up to 8% of guns used in crime, depending on the specific AW definition and data source used (e.g., see Beck et al. 1993; Hargarten et al. 1996; Hutson, Anglin, and Pratts 1994; Hutson et al. 1995; McGonigal et al. 1993; New York State Division of Criminal Justice Services 1994; Roth and Koper 1997, chap. 2; Zawitz 1995). A compilation of 38 sources indicated that AWs accounted for about 2% of crime guns on average (Kleck 1997, 112, 141–143). Similarly, the most common AWs prohibited by the 1994 federal ban accounted for between 1% and 6% of guns used in crime according to most of several national and local data sources examined for the NIJ-funded studies summarized here (Koper 2004, 15).

As with crime guns in general, the majority of AWs used in crime were assault pistols rather than assault rifles. Among AWs reported by police to ATF during 1992 and 1993, for example, assault pistols outnumbered assault rifles by a ratio of three to one.

The relative rarity of AW use in crime can be attributed to a number of factors. Many of these models are long guns, which are used in crime much less often than handguns. Also, as noted, a number of the rifles named in the 1994 law were banned from importation into the United States in 1989. Further, AWs in general are more expensive and more difficult to conceal than the types of handguns that are used most frequently in crime.

Criminal use of guns equipped with LCMs had not been studied as extensively as criminal use of AWs at the time of the ban. However, the overall use of guns with LCMs, which is based on the combined use of AWs and non-banned guns with LCMs, is much greater than the use of AWs alone. Based on data examined for this and a few prior studies, guns with LCMs were used in roughly 13% to 26% of most gun crimes prior to the ban, though they appeared to be used in 31% to 41% of gun murders of police (see summary in Koper 2004, 18; also see Adler et al. 1995; Fallis 2011; New York Division of Criminal Justice Services 1994).

### The Ban's Effects on Crimes with Assault Weapons and Large-Capacity Magazines

Although there was a surge in production of AW-type weapons as Congress debated the ban in 1994, the law's restriction of the new AW supply and the interest of collectors and speculators in these weapons helped to drive prices higher for many AWs (notably assault pistols) through the end of the 1990s

Exhibit 4
Page 00414

*America's Experience with the Federal Assault Weapons Ban, 1994–2004*   163

*Table 12.2*   Assault weapons as a percentage of guns recovered by police

| City | Pre-ban | Post-ban | % change |
|------|---------|----------|----------|
| Baltimore, MD | 1.88% (1992–1993) | 1.25% (1995–2000) | −34% |
| Boston, MA | 2.16% (1991–1993) | 0.6% (2000–2002) | −72% |
| Miami, FL | 2.53% (1990–1993) | 1.71% (1995–2000) | −32% |
| St. Louis, MO | 1.33% (1992–1993) | 0.91% (1995–2003) | −32% |
| Anchorage, AK | 3.57% (1987–1993) | 2.13% (1995–2000) | −40% |
| Milwaukee, WI | 5.91% (1991–1993) | 4.91% (1995–1998) | −17% |

*Note:* Figures for Baltimore, Boston, Miami, and St. Louis are based on all recovered guns. Figures for Anchorage and Milwaukee are based on, respectively, guns tested for evidence and guns recovered in murder cases. Changes in Baltimore, Boston, Miami, and St. Louis were statistically significant at $p < .05$. See Koper (2004) for further details about the data and analyses.

and appeared to make them less accessible and/or affordable to criminal users.[3] Analyses of several national and local databases on guns recovered by police indicated that crimes with AWs declined following the ban.

To illustrate, the share of gun crimes involving the most commonly used AWs declined by 17% to 72% across six major cities examined for this study (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), based on data covering all or portions of the 1995–2003 post-ban period (Table 12.2). (The number of AW recoveries also declined by 28% to 82% across these locations and time periods; the discussion here focuses on changes in AWs as a share of crime guns in order to control for general trends in gun crime and gun seizures.) Similar patterns were found in a national analysis of recovered guns reported by law enforcement agencies around the country to ATF for investigative gun tracing.[4] The percentage of gun traces that were for AWs fell 70% between 1992–1993 and 2001–2002 (from 5.4% to 1.6%), though the interpretation of these data was complicated by changes that occurred during this time in gun tracing practices (see Koper 2004 for further discussion).

The decline in crimes with AWs was due primarily to a reduction in the use of assault pistols. Assessment of trends in the use of assault rifles was complicated by the rarity of crimes with such rifles and by the substitution in some cases of post-ban rifles that were very similar to the banned models. In general, however, the decline in AW use was only partially offset by substitution of post-ban AW-type models. Even counting the post-ban models as AWs, the share of crime guns that were AWs fell 24% to 60% across most of the local

Exhibit 4
Page 00415

164    *Christopher S. Koper*

jurisdictions studied. Patterns in the local data sources also suggested that crimes with AWs were becoming increasingly rare as the years passed.

The decline in crimes with AWs appeared to have been offset throughout at least the late 1990s by steady or rising use of other semi-automatics equipped with LCMs. Assessing trends in LCM use was difficult because there is no national data source on crimes with LCMs and few contacted jurisdictions maintained such information. It was possible, nonetheless, to examine trends in the use of guns with LCMs in four jurisdictions: Baltimore, Milwaukee, Anchorage, and Louisville (KY). Across the different samples analyzed from these cities (some databases included all recovered guns and some included only guns associated with particular crimes), the share of guns with an LCM generally varied from 14% to 26% prior to the ban. In all four jurisdictions, the share of crime guns equipped with LCMs rose or remained steady through the late 1990s (Table 12.3). These trends were driven primarily by handguns with LCMs, which were used in crime roughly three times as often as rifles with LCMs (though crimes with rifles having LCMs also showed no general decline). Generalizing from such a small number of jurisdictions must be done very cautiously, but the consistency of the findings across these geographically diverse locations strengthens the inference that they reflected a national pattern.

Failure to reduce LCM use for at least several years after the ban was likely because of the immense stock of exempted pre-ban magazines, which, as noted, was enhanced by post-ban imports. The trend in crimes with LCMs may have been changing by the early 2000s, but the available data were too limited and inconsistent to draw clear inferences (post-2000 data were available for only two of the four study sites).

*Table 12.3*   Guns with large-capacity magazines as a percentage of guns recovered by police (selected years)

| City | Pre-ban | Late 1990s | Early 2000s |
|------|---------|------------|-------------|
| Baltimore, MD | 14.0% (1993) | 15.5% (1998) | 15.7% (2003) |
| Anchorage, AK | 26.2% (1992–1993) | 30.0% (1999–2000) | 19.2% (2001–2002) |
| Milwaukee, WI | 22.4% (1993) | 36.4% (1998) | N/A |
| Louisville, KY | N/A | 20.9 (1996) | 19.0% (2000) |

*Note:* Figures for Baltimore and Milwaukee are based on, respectively, guns associated with violent crimes and with murders. Figures for Anchorage and Louisville are based on guns submitted for evidentiary testing. The Anchorage figures are based on handguns only. See Koper (2004) for further details about the data and analyses.

Exhibit 4
Page 00416

*America's Experience with the Federal Assault Weapons Ban, 1994–2004*    165

A later media investigation of LCM use in Richmond, Virginia, suggests that the ban may have had a more substantial impact on the supply of LCMs to criminal users by the time it expired in 2004. In that city, the share of recovered guns with LCMs generally varied between 18% and 20% from 1994 through 2000 but fell to 10% by 2004 (Fallis 2011). It is not clear whether the Richmond results represented a wider national or even regional trend. (The data from this study also show that after the ban was lifted, the share of Richmond crime guns with an LCM rose to 22% by 2008.)

## The Ban's Impacts on Gun Violence

Because offenders could substitute non-banned guns and small magazines for banned AWs and LCMs, there was not a clear rationale for expecting the ban to reduce assaults and robberies with guns. But by forcing this weapon substitution, it was conceivable that the ban would reduce the number and severity of shooting deaths and injuries by reducing the number of shots fired in gun attacks (thus reducing the number of victims per gunfire incident and the share of gunshot victims sustaining multiple wounds). Based on this logic, the research team examined several indicators of trends in the lethality and injuriousness of gun violence for different portions of the 1995–2002 post-ban period. These included national-level analyses of gun murders, the percentage of violent gun crimes resulting in death, the share of gunfire cases resulting in wounded victims, the percentage of gunshot victimizations resulting in death, and the average number of victims per gun homicide incident. For selected localities, the team also examined trends in wounds per gunshot victim or the percentage of gunshot victims sustaining multiple wounds.

On balance, these analyses showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years (see Koper 2004, Koper and Roth 2001, and Roth and Koper 1997). Nationally, for example, the percentage of violent gun crimes resulting in death (based on gun homicides, gun assaults, and gun robberies reported to the Uniform Crime Reports) was the same for the period 2001–2002 (2.9%) as it was for the immediate pre-ban period 1992–1993 (Koper 2004, 82, 92). Accordingly, it was difficult to credit the ban with contributing to the general decline in gun crime and gun homicide that occurred during the 1990s.

However, the ban's exemption of millions of pre-ban AWs and LCMs meant that the effects of the law would occur only gradually. Those effects were still

Exhibit 4
Page 00417

166   *Christopher S. Koper*

unfolding when the ban was lifted and may not have been fully realized until
several years beyond that, particularly if importation of foreign, pre-ban
LCMs had continued in large numbers. In light of this, it was impossible to
make definitive assessments of the ban's impact on gun violence.

It was also difficult to judge the ban's effects on the more specific problem
of mass shootings. The research team attempted to assess changes in mass
shootings during the first few years of the ban, but this effort was hampered
by the difficulty of counting these incidents (results can be sensitive to the
definitions and data sources used) and identifying the specific types of guns
and magazines used in them (Roth and Koper 1997, app. A). There is no na-
tional data source that provides detailed information on the types of guns
and magazines used in shooting incidents or that provides full counts of vic-
tims killed and wounded in these attacks. Studying mass shootings in partic-
ular poses a number of challenges with regard to defining these events, estab-
lishing the validity and reliability of methods for measuring their frequency
and characteristics (particularly if done through media searches, as is often
necessary), and modeling their trends, as they are particularly rare events
(e.g., see Duwe 2000; Roth and Koper 1997, app. A).

Nonetheless, the issue of mass shootings continues to be a catalyst to the
debate surrounding AW legislation. A recent media compilation of 62 mass
shooting incidents that involved the death of four or more people over the
period 1982–2012, for instance, suggests that 25% of the guns used in these at-
tacks were AW-type weapons (these were not precisely defined) and another
48% were other types of semi-automatic handguns (Follman, Aronsen, and
Pan 2012). Continuing improvements in media search tools and greater atten-
tion to the types of guns and magazines used in multiple-victim attacks may
improve prospects for examining this issue more rigorously in future studies.

## Assessing the Potential Long-Term Effects of Banning
## Assault Weapons and Large-Capacity Magazines

Although available evidence is too limited to make firm projections, it sug-
gests that the ban may have reduced shootings slightly had it remained in
place long enough to substantially reduce crimes with both LCMs and AWs.
A small number of studies suggest that gun attacks with semi-automatics—
including AWs and other guns equipped with LCMs—tend to result in more
shots fired, more persons wounded, and more wounds inflicted per victim

Exhibit 4
Page 00418

*America's Experience with the Federal Assault Weapons Ban, 1994–2004*     167

than do attacks with other firearms (see reviews in Koper 2004; Koper and Roth 2001; also see McGonigal et al. 1993; Richmond et al. 2003; Reedy and Koper 2003; Roth and Koper 1997). For example, in mass shooting incidents that resulted in at least 6 deaths or at least 12 total gunshot victims from 1984 through 1993, offenders who clearly possessed AWs or other semi-automatics with LCMs (sometimes in addition to other guns) wounded or killed an average of 29 victims in comparison to an average of 13 victims wounded or killed by other offenders (see Koper and Roth's [2001] analysis of data compiled by Kleck [1997, 144]).

Similarly, a study of handgun attacks in Jersey City, New Jersey, during the 1990s found that the average number of victims wounded in gunfire incidents involving semi-automatic pistols was in general 15% higher than in those involving revolvers (Reedy and Koper 2003). The study also found that attackers using semi-automatics to fire more than 10 shots were responsible for nearly 5% of the gunshot victims in the sample. Used as a tentative guide, this implies that the LCM ban could have eventually produced a small reduction in shootings overall, perhaps up to 5%, even if some gun attackers had the foresight to carry more than one small magazine (or more than one firearm) and the time and poise to reload during an attack.

Effects of this magnitude might be difficult to measure reliably, but they could nonetheless yield significant societal benefits. Consider that in 2010 there were 11,078 gun homicides in the United States and another 53,738 non-fatal assault-related shootings according to the federal Centers for Disease Control and Prevention (see the CDC's web-based injury statistics query and reporting system at http://www.cdc.gov/injury/wisqars/index.html). At these levels, reducing shootings by just 1% (arguably a reasonable ballpark estimate for the long-term impact of substantially reducing AW and LCM use) would amount to preventing about 650 shootings annually. The lifetime medical costs of assault-related gunshot injuries (fatal and nonfatal) were estimated to be about $18,600 per injury in 1994 (Cook et al. 1999). Adjusting for inflation, this amounts to $28,894 in today's dollars. Moreover, some estimates suggest that the full societal costs of gun violence—including medical, criminal justice, and other government and private costs (both tangible and intangible)—could be as high as $1 million per shooting (Cook and Ludwig 2000). Hence, reducing shootings by even a very small margin could produce substantial long-term savings for society, especially as the shootings prevented accrue over many years.

Exhibit 4
Page 00419

168    *Christopher S. Koper*

### Lessons and Implications from the 1994 Ban

Studies of America's previous assault weapons ban provide a number of lessons that can inform future policymaking. A new law similar to the old ban will have little impact on most gun crimes, but it may prevent some shootings, particularly those involving high numbers of shots and victims. It may thus help to reduce the number and severity of mass shooting incidents as well as produce a small reduction in shootings overall.

The most important feature of the previous ban was the prohibition on large-capacity ammunition magazines. A large magazine is arguably the most critical feature of an assault weapon, and restrictions on magazines have the potential to affect many more gun crimes than do those on military-style weapons. Restrictions focused on magazine capacity may also have a greater chance of gaining sufficient public and political support for passage than would new restrictions on assault weapons, though current polling suggests that both measures are supported by three-quarters of non-gun owners and nearly half of gun owners (Barry et al., in this volume). To enhance the potential impact of magazine restrictions, policymakers might also consider limiting magazine capacity to fewer than 10 rounds for all or selected weapons (for example, lower limits might be set for magazines made for semi-automatic rifles).[5] It is unknown whether further restrictions on the outward features of semi-automatic weapons, such as banning weapons having any military-style features, will produce measurable benefits beyond those of restricting magazine capacity.

Policymakers must also consider the implications of any grandfathering provisions in new legislation. Assessing the political and practical difficulties of registering all assault weapons and large magazines or establishing turn-in or buyback programs for them is beyond the scope of this essay. Policymakers should note, however, that it may take many years to attain substantial reductions in crimes with banned weapons and/or magazines if a new law exempts the existing stock (which has likely grown considerably since the time of the original ban). Policies regarding exemptions must also explicitly address the status of imported guns and magazines.

Past experience further suggests that public debate on reinstating the ban or crafting a new one will raise prices and production of the guns and magazines likely to be affected. This could temporarily saturate the market for the guns and magazines in question (particularly if close substitutes emerge) and delay desired reductions in crimes with some categories of the banned weap-

Exhibit 4
Page 00420

ER_2612

onry (this appeared to happen with assault rifles that were banned by the 1994 law and may have contributed as well to the observed trends in use of large magazines).

A new ban on assault weapons and/or large-capacity magazines will certainly not be a panacea for America's gun violence problem nor will it stop all mass shootings. However, it is one modest measure that, like federal restrictions on fully automatic weapons and armor-piercing ammunition, can help to prevent the further spread of particularly dangerous weaponry.

NOTES

1. In general, the AW ban did not apply to semi-automatics possessing no more than one military-style feature listed under the ban's features test provision. Note, however, that firearms imported into the country still had to meet the "sporting purposes test" established under the federal Gun Control Act of 1968. In 1989, ATF determined that foreign semi-automatic rifles having any one of a number of named military features (including those listed in the features test of the 1994 AW ban) fail the sporting purposes test and cannot be imported into the country. In 1998, the ability to accept an LCM made for a military rifle was added to the list of disqualifying features. Consequently, it was possible for foreign rifles to pass the features test of the federal AW ban but not meet the sporting purposes test for imports (U.S. Department of the Treasury 1998).

2. Technically, the ban prohibited any magazine, belt, drum, feed strip, or similar device that has the capacity to accept more than 10 rounds of ammunition or which can be readily converted or restored to accept more than 10 rounds of ammunition. The ban exempted attached tubular devices capable of operating only with .22 caliber rimfire (i.e., low velocity) ammunition.

3. See Koper (2004), Koper and Roth (2002), and Roth and Koper (1997) for more extensive discussions of the ban's impacts on prices and production of AWs, non-banned firearms, and LCMs.

4. A gun trace is an investigation into the sales history of a firearm (e.g., see ATF 2000).

5. To support the formulation and evaluation of policy in this area, there are also a number of research needs worth noting. For one, it is important to develop better data on crimes with guns having LCMs. Policymakers should thus encourage police agencies to record information about magazines recovered with crime guns. Likewise, ATF should consider integrating ammunition magazine data into its national gun tracing system and encourage reporting of magazine data by police agencies that trace firearms. Second, there is a need for more studies that contrast the outcomes of attacks with different types of guns and magazines. Such studies would help to refine predictions of the change in gun deaths and injuries that would follow reductions in attacks with firearms having large-capacity magazines.

Exhibit 4
Page 00421

ER_2613

170     *Christopher S. Koper*

REFERENCES

Adler, Wendy, C., Frederick M. Bielke, David J. Doi, and John F. Kennedy. (1995). *Cops under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns with High Capacity Magazines.* Washington, DC: Handgun Control, Inc.

American Medical Association Council on Scientific Affairs. 1992. "Assault Weapons as a Public Health Hazard in the United States." *JAMA* 267:3067–3070.

Beck, Allen, Darrell Gilliard, Lawrence Greenfeld, Caroline Harlow, Thomas Hester, Louis Jankowski, Tracy Snell, James Stephan, and Danielle Morton. 1993. *Survey of State Prison Inmates, 1991.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Bureau of Alcohol, Tobacco, and Firearms (ATF). (2000). *Commerce in Firearms in the United States.* Washington, DC: United States Department of the Treasury.

Cook, Philip J., Bruce A. Lawrence, Jens Ludwig, and Ted R. Miller. 1999. "The Medical Costs of Gunshot Injuries in the United States." *JAMA* 282:447–454.

Cook, Philip J., and Jens Ludwig. 1996. *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use.* Washington, DC: Police Foundation.

Cook, Philip J., and Jens Ludwig. 2000. *Gun Violence: The Real Costs.* New York: Oxford University Press.

Cox Newspapers. 1989. *Firepower: Assault Weapons in America.* Washington, DC: Cox Enterprises.

Duwe, Grant. 2000. "Body-Count Journalism: The Presentation of Mass Murder in the News Media." *Homicide Studies* 4:364–399.

Fallis, David. 2011. "VA Data Show Drop in Criminal Firepower During Assault Gun Ban." *Washington Post*, January 23.

Follman, Mark, Gavin Aronsen, and Deanna Pan. 2012. "A Guide to Mass Shootings in America." *Mother Jones*, Dec. 15. http://www.motherjones.com/politics/2012/07/mass-shootings-map.

Gun Tests. 1995. "Magazine Rule Change Unlikely." March.

Hargarten, Stephen W., Trudy A. Karlson, Mallory O'Brien, Jerry Hancock, and Edward Quebbeman. 1996. "Characteristics of Firearms Involved in Fatalities." *JAMA* 275:42–45.

Hutson, H. Range, Deirdre Anglin, Demetrios N. Kyriacou, Joel Hart, and Kelvin Spears. 1995. "The Epidemic of Gang-Related Homicides in Los Angeles County from 1979 through 1994." *JAMA* 274:1031–1036.

Hutson, H. Range, Deirdre Anglin, and Michael J. Pratts, Jr. 1994. "Adolescents and Children Injured or Killed in Drive-By Shootings in Los Angeles." *New England Journal of Medicine* 330:324–327.

Kleck, Gary. (1997). *Targeting Guns: Firearms and Their Control.* New York: Aldine de Gruyter.

Koper, Christopher S. 2004. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994–2003.* Report to the National Institute of Justice, U.S. Department of Justice. Jerry Lee Center of Criminology, University of Pennsylvania, Philadelphia, PA.

Koper, Christopher S., and Jeffrey A. Roth. 2001. "The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple

Exhibit 4
Page 00422

ER_2614

Outcome Measures and Some Lessons for Policy Evaluation." *Journal of Quanti-tative Criminology* 17:33–74.

Koper, Christopher S., and Jeffrey A. Roth. 2002. "The Impact of the 1994 Federal Assault Weapons Ban on Gun Markets: An Assessment of Short-Term Primary and Secondary Market Effects." *Journal of Quantitative Criminology* 18:239–266.

Lenett, Michael G. 1995. "'Taking a Bite Out of Violent Crime." *University of Daytona Law Review* 20:573–617.

McGonigal, Michael D., John Cole, C. William Schwab, Donald R. Kauder, Michael F. Rotondo, and Peter B. Angood. 1993. "Urban Firearm Deaths: A Five-Year Perspec-tive." *Journal of Trauma:* 35:532–537.

Murtz, H.A., and the Editors of Gun Digest. 1994. *Guns Illustrated 1994.* Northbrook, IL: DBI Books.

New York State Division of Criminal Justice Services. 1994. *Assault Weapons and Homicide in New York City.* Albany, NY.

Reedy, Darin C., and Christopher S. Koper. 2003. "Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pis-tols and Revolvers." *Injury Prevention* 9:151–155.

Richmond, Therese S., Charles C. Branas, Rose A. Cheney, and C. William Schwab. 2003. *The Case for Enhanced Data Collection of Handgun Type.* Firearm and In-jury Center at Penn, University of Pennsylvania, Philadelphia, PA.

Roth, Jeffrey A., and Christopher S. Koper. 1997. *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994.* Washington, DC: The Urban Institute.

Roth, Jeffrey A., and Christopher S. Koper. 1999. *Impacts of the 1994 Assault Weapons Ban: 1994–96.* Washington, DC: National Institute of Justice, U.S. Department of Justice.

United States Department of the Treasury. (1998). *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles.* Washington, DC.

Violence Policy Center (2012). *Mass Shootings in the United States Involving High-Capacity Ammunition Magazines.* Washington, DC.

Zawitz, Marianne W. 1995. *Guns Used in Crime.* Washington, DC: Bureau of Justice Statistics, U.S. Department of Justice.

Exhibit 4
Page 00423

ER_2615

# Exhibit E

Exhibit 4
Page 00424

Va. data show drop in criminal firepower during assault gun ban

Advertisement

CORRECTION TO THIS ARTICLE
An earlier version of this story incorrectly reported the limit on the capacity of gun magazines in Maryland. The limit is 20.
This version has been corrected.

# Va. data show drop in criminal firepower during assault gun ban

By David S. Fallis and James V. Grimaldi
Washington Post Staff Writers
Sunday, January 23, 2011; 9:17 AM

The number of guns with high-capacity magazines seized by Virginia police dropped during a decade-long federal prohibition on assault weapons, but the rate has rebounded sharply since the ban was lifted in late 2004, according to a Washington Post analysis.

More than 15,000 guns equipped with high-capacity magazines - defined under the lapsed federal law as holding 11 or more bullets - have been seized by Virginia police in a wide range of investigations since 1993, the data show.

The role of high-capacity magazines in gun crime was thrust into the national spotlight two weeks ago when 22-year-old Jared Lee Loughner allegedly opened fire with a semiautomatic handgun outside a Tucson grocery store, killing six and wounding 13, including Rep. Gabrielle Giffords (D-Ariz.). Authorities say Loughner used a legally purchased 9mm Glock 19 handgun with a 31-round clip and was tackled while changing magazines.

Of the seized Virginia weapons, 2,000 had magazines with a capacity of 30 or more bullets. Some states still limit magazine capacity. California, for example, limits them to 10 and Maryland to 20.

Last year in Virginia, guns with high-capacity magazines amounted to 22 percent of the weapons recovered and reported by police. In 2004, when the ban expired, the rate had reached a low of 10 percent. In each year since then, the rate has gone up.

"Maybe the federal ban was finally starting to make a dent in the market by the time it ended," said Christopher Koper, head of research at the Police Executive Research Forum, who studied the assault weapons ban for the National Institute of Justice, the research arm of the Justice Department.

Congress is considering legislation to reinstitute the assault weapon ban's prohibition on high-capacity magazines, a measure strongly opposed by gun rights advocates.

The analysis of the Virginia records, obtained under the state's public information law, provides a rare window into the firepower of guns used in crimes. The Bureau of Alcohol, Tobacco, Firearms and Explosives, which traces guns for local police agencies and regulates the firearms industry, does not track magazine sizes. Academic researchers said they were unaware of any other comprehensive study of firearms magazines.

The pattern in Virginia "may be a pivotal piece of evidence" that the assault weapons ban eventually had an impact on the proliferation of high-capacity magazines on the streets, said Garen Wintemute, head of the Violence Prevention Research Program at the University of California at Davis.

"Many people, me included, were skeptical about the chances that the magazine ban would make a difference back in 1994," Wintemute said. "But what I am seeing here is that after a few years' lag time the prevalence of high-capacity magazines was declining. The increase since the ban's repeal is quite striking."

Guns with high-capacity magazines have appeared in Virginia crimes ranging from the mundane to the murderous. The Post found that 200 guns with high-capacity magazines figured in Virginia homicides, including these incidents:

- In Richmond in 2003, Michael Antoine Wilson, 21, used his semiautomatic rifle with its 30-round magazine to shoot his 17-year-old girlfriend to death in front of children and relatives. Then he went to a nearby convenience

Exhibit 4
Page 00425

ER_2617

Va. data show drop in criminal firepower during assault gun ban

store, killed two workers and stole a van before turning the gun on himself.

- In Roanoke in 2004, Marcus Jerome Nance, 22, used his legally purchased 9mm Glock 17 handgun with a high-capacity magazine to spray 33 bullets into a crowd that had gathered outside a Roanoke gas station after a nightclub closing, killing one and wounding two.

- In Newport News last year, Antonio Johnson, 34, began shooting at police during a traffic stop with a 9mm semiautomatic handgun outfitted with a 15-round magazine. "Subject shot police officer and then killed himself with weapon," state records say.

In the Arizona shootings, Loughner allegedly used a Glock 19 that he had legally purchased at a Tucson sporting goods store in November. The gun's capacity allowed Loughner to squeeze off more than 30 shots without reloading, authorities said.

The federal assault weapons ban from late 1994 through late 2004 prohibited the manufacturing of magazines capable of holding more than 10 rounds. But the act permitted the sale of magazines manufactured before the ban.

The federal prohibition was spurred by a mass killing in 1989 in Stockton, Calif., where Patrick Edward Purdy, 24, a mentally unbalanced drug addict, fired 110 shots from an AK-47 into a schoolyard, killing five children and wounding 29 others and a teacher. He used a 75-round rotary clip and a 35-round banana clip, one of four he was carrying.

**New legislative interest**

Rep. Carolyn McCarthy (N.Y.) and 57 other Democrats proposed legislation last week to ban the sale or transfer of high-capacity magazines, no matter when they were manufactured. McCarthy's husband and five others were killed in 1993 on the Long Island Rail Road by a gunman armed with a semiautomatic pistol and four 15-round magazines. He fired 30 shots before being subdued while changing magazines.

The bill's prospects are considered slim in the Republican-controlled House. In the Senate, the National Rifle Association says it has a solid 50-senator pro-gun block that could delay any legislation.

The NRA has announced its opposition to proposals that limit magazine capacity.

"These magazines are standard equipment for self-defense handguns and other firearms owned by tens of millions of Americans," according to a statement on its politics Web page, and in a letter circulating to members of Congress. "Law-abiding private citizens choose them for many reasons, including the same reason police officers do: to improve their odds in defensive situations."

The firearms industry also opposes the proposal. "The tragedy in Tucson was not about firearms, ammunition or magazine capacity," said Ted Novin, a spokesman for the National Shooting Sports Foundation, a gun industry group. "It was about the actions of a madman. Period."

The analysis by The Post is possible because of a little-known database of guns seized in Virginia. The database, called the Criminal Firearms Clearinghouse, has information on more than 100,000 firearms recovered by more than 200 local police departments since 1993. A federal law in 2003, known as the Tiahrt Amendment after the congressman who sponsored it, banned the release of federal data on guns recovered in crimes.

Last year, The Post mined the database to pierce the secrecy imposed by Congress on federal gun-tracing records. The analysis found that a fraction of licensed dealers in Virginia sell most of guns later seized by police. The vast majority of the guns in the database were confiscated because of illegal-possession charges. But thousands were swept up in the wake of assaults, robberies and shootings.

Two months before the ban expired in September 2004, Marcus Nance bought an extended magazine and a 9mm Glock 17 handgun at a Roanoke gun store. Three nights later, down the street from the store, Nance opened fire on a crowded parking lot after arguing and fighting with people in the crowd.

Exhibit 4
Page 00426

Va. data show drop in criminal firepower during assault gun ban

A police officer called to investigate a disturbance heard shots and saw Nance holding a gun at arm's length and firing "randomly into the mass of people" before shooting several rounds into the air.

A police car's dashboard camera recorded the jackhammer sound of gunfire. In a car parked nearby, police found a Glock gun box and two boxes of ammunition, one of them partially empty.

Police went to the gun shop and confirmed that Nance had bought the handgun ($555), a laser sight ($380) and two extended magazines ($135), paying cash in an entirely legal transaction. Police noted: "The magazines in question were manufactured before 1994 and not considered prohibited."

Nance, who said he had been attacked by members of the crowd and shot in self-defense, was convicted of second-degree murder and is in prison.

## The 2004 study

Koper's 108-page 2004 study for the National Institute of Justice found the ban on assault weapons had mixed results.

"Assault weapons were rarely used in gun crimes even before the ban," he said in the report. But he also concluded that the prohibition on high-capacity magazines might have affected public safety, because such magazines allow shooters to inflict more damage.

"Tentatively I was able to show that guns associated with large-capacity magazines tended to be associated with more serious crimes, more serious outcomes," he said.

Some gun rights activists argue that a ban on high-capacity magazines would violate the Second Amendment right to bear arms. One prominent gun rights activist who takes a less absolute position is Robert A. Levy, chairman of the Cato Institute. He is also the lawyer who brought the case that overturned D.C.'s handgun ban.

But Levy said the government would need to prove that such a ban was effective.

"The burden is on the government, not on the individual to show that the regulation isn't unduly intrusive," Levy said.

Colin Goddard, a lobbyist for the Brady Campaign to Prevent Gun Violence and a victim of the 2007 Virginia Tech shootings, said the high-capacity ban could save lives. The Virginia Tech shooter, Seung Hui Cho, used several 15-round magazines to fire 174 shots and kill 32 people in the worst gun-related mass murder by an individual in U.S. history.

"When you double and triple the amount of the clip size, you don't double or triple the number of deer you kill, you double and triple the amount of innocent people who are killed in shootings like this," said Goddard, 25, who was shot four times by Cho.

Bradley A. Buckles, ATF director from 1999 to 2004, said bureau officials advised Congress to focus on high-capacity magazines, which were "completely unregulated" and had almost no sporting purpose.

"The whole thing with magazine capacity came out of ATF," Buckles said. "It wasn't so much guns, but it was firepower. What made them more deadly than a hunting rifle was the fact that you could have a 20-round, 30-round clip, when most hunting rifles wouldn't have more than five rounds."

Buckles said lawmakers should have extended the ban on high-capacity magazines in 2004. Banning them now, he said, just puts everyone back at square one.

"There are so many millions of them out there, it probably wouldn't make any immediate difference over the course of 20 years," Buckles said. "It is not a short-term solution to anything."

**fallisd@washpost.com grimaldij@washpost.com**

Exhibit 4
Page 00427

Va. data show drop in criminal firepower during assault-gun ban

*Research editor Alice Crites and staff writer Sari Horwitz contributed to this story.*

© 2011 The Washington Post Company

Exhibit 4
Page 00428

**ER_2620**

# Exhibit F

Exhibit 4
Page 00429

Data indicate drop in high-capacity magazines during federal gun ban - https://www.washingtonpost.com/investigations/data-indicate-drop-in-hi...

## The Washington Post

**Investigations**

# Data indicate drop in high-capacity magazines during federal gun ban

By David S. Fallis  January 10, 2013

During the 10-year federal ban on assault weapons, the percentage of firearms equipped with high-capacity magazines seized by police agencies in Virginia dropped, only to rise sharply once the restrictions were lifted in 2004, according to an analysis by The Washington Post.

The White House is leading a push to reinstate a national ban on large-capacity magazines and assault weapons after a gunman armed with an AR-15 and 30-round magazines killed 20 children and seven adults in Connecticut. Vice President Biden has been holding advisory meetings to hammer out a course of action that will address the issue of the larger magazines, which under the lapsed federal ban were those that held 11 or more rounds of ammunition.

In Virginia, The Post found that the rate at which police recovered firearms with high-capacity magazines — mostly handguns and, to a smaller extent, rifles — began to drop around 1998, four years into the ban. It hit a low of 9 percent of the total number of guns recovered the year the ban expired, 2004.

The next year, the rate began to climb and continued to rise in subsequent years, reaching 20 percent in 2010, according to the analysis of a little-known Virginia database of guns recovered by police. In the period The Post studied, police in Virginia recovered more than 100,000 firearms, more than 14,000 of which had high-capacity magazines.

## Researchers see impact

To some researchers, the snapshot in Virginia suggests that the federal ban may have started to curb the widespread availability of the larger magazines.

"I was skeptical that the ban would be effective, and I was wrong," said Garen Wintemute, head of the Violence Prevention Research Program at the University of California at Davis School of Medicine. The database analysis offers "about as clear an

1 of 4

Exhibit 4
Page 00430  6/1/17, 12:24 PM

Data indicate Case in Bill W-coy-a-00 the za-EGEN e du The fed De document 153-5 https filed cy-04/08/18 onp Page in Investigations Page p 31-7 of irop-in-hi... 349

example as we could ask for of evidence that the ban was working."

The analysis is based on an examination of the Criminal Firearms Clearinghouse, a database obtained from state police under Virginia's public information law. The data, which were first studied by The Post in 2011, offer a rare glimpse into the size of the magazines of guns seized during criminal investigations. The Bureau of Alcohol, Tobacco, Firearms and Explosives, which traces guns and regulates the industry, tracks details about the guns seized after crimes but not the magazine size.

The initial Post analysis was prompted by a mass shooting in Tucson. Jared Lee Loughner — armed with a legally purchased 9mm semiautomatic handgun and a 33-round magazine — opened fire outside a grocery store, killing six people and wounding 13, including Rep. Gabrielle Giffords (D-Ariz.).

In the following two years, a succession of mass shootings has occurred, including several in which the gunmen reportedly had high-capacity magazines.

At the Dec. 14 shooting in Newtown, Conn., the gunman was reported to have been armed with two handguns, an AR-15 rifle and numerous 30-round magazines. He killed himself at the scene. The guns were legally purchased by his mother.

The federal ban that expired in 2004 prohibited the manufacture of magazines capable of holding more than 10 rounds. But the law permitted the sale of magazines manufactured before the ban. By some estimates, 25 million of the large-capacity magazines were still on the market in 1995.

Many semiautomatic rifles and semiautomatic handguns accept magazines of various sizes. Larger magazines increase a gun's firepower, enabling more shots before reloading.

The Virginia database analyzed by The Post lists about three-quarters of guns recovered by police, missing the rest because some agencies failed to report their recoveries to the state. The database contains details about more than 100,000 guns recovered by 200 police departments in a wide range of investigations from 1993 through August 2010, when The Post last obtained it.

In recent weeks, The Post conducted additional analysis into the type of guns confiscated with large-capacity magazines. The guns included Glock and TEC-9 handguns and Bushmaster rifles. Most had magazines ranging from 11 to 30 rounds.

Of 14,478 guns equipped with large-capacity magazines that were confiscated by police, more than 87 percent — 12,664 — were classified as semiautomatic pistols. The remainder were mostly semiautomatic rifles.

The Post also identified and excluded from the counts more than 1,000 .22-caliber rifles with large-capacity tubular magazines, which were not subject to the ban.

In Virginia, handguns outfitted with large-capacity magazines saw the biggest fluctuation during and after the ban.

Exhibit 4
Page 00431 6/1/17, 12:24 PM

In 1997, three years into the ban, police across the state reported seizing 944 handguns with large-capacity magazines. In 2004, the year the ban ended, they confiscated 452. In 2009, the last full year for which data were available, the number had rebounded to 986 handguns, analysis showed.

Of these, the single biggest group were handguns equipped with 15-round magazines, accounting overall for 4,270 firearms over the 18 years.

## Effect hard to measure

Nationwide, researchers who studied the federal ban had difficulty determining its effect, in part because weapons and magazines manufactured before the ban could still be sold and in part because most criminals do not use assault weapons.

Christopher Koper, who studied the ban's effect for the National Institute of Justice, the research arm of the Justice Department, noted in a 2004 report that the "success in reducing criminal use of the banned guns and magazines has been mixed."

He found that gun crimes involving assault weapons declined between 17 and 72 percent in the six cities covered in the study — Anchorage, Baltimore, Boston, Miami, Milwaukee and St. Louis. But he said he found no decline in crimes committed with other guns with large-capacity magazines, most likely "due to the immense stock of exempted pre-ban magazines."

Koper's study tracked guns through 2003. He said that The Post's findings, which looked at magazine capacity of guns recovered in Virginia before and after 2003, suggests that "maybe the federal ban was finally starting to make a dent in the market by the time it ended."

Koper, now an associate professor of criminology at George Mason University, also noted the ban on high-capacity magazines might improve public safety because larger magazines enable shooters to inflict more damage.

The use of high-capacity magazines is a contentious point in the gun debate.

"Anyone who's thought seriously about armed self-defense knows why honest Americans — private citizens and police alike — choose magazines that hold more than 10 rounds. Quite simply, they improve good people's odds in defensive situations," Chris W. Cox, the executive director of the National Rifle Association's legislative institute wrote in a piece posted online. He called the ban a "dismal failure."

The federal prohibition on high-capacity magazines and assault weapons was spurred in part by the 1989 mass killing in Stockton, Calif. Patrick Edward Purdy, a mentally unbalanced drug addict, fired 110 rounds from an AK-47 into a schoolyard, killing five children and wounding 29 others and a teacher. Purdy used a 75-round drum magazine and a 35-round banana clip, one of four he carried.

Some states still limit magazine size. Maryland limits the size to 20 rounds; California limits it to 10. Connecticut, the location

Exhibit 4

Page 00432

6/1/17, 12:24 PM

Data indicate...gle-High-Capacity-Magazine-Used-in-Federal-Gun-...-53-5 https://www.washingtonpost.com/investigations/age-3119-to-drop-in-hi...
349

of Sandy Hook Elementary School, does not.

After Giffords's shooting, Rep. Carolyn McCarthy (N.Y.) and other Democrats proposed legislation to ban the sale or transfer of high-capacity magazines. McCarthy's husband and five others were killed in 1993 on the Long Island Rail Road by a gunman armed with a semiautomatic pistol and four 15-round magazines. He fired 30 shots before being subdued as he swapped magazines.

In the wake of the Newtown shooting, President Obama and lawmakers urged that a ban on assault weapons and high-capacity magazines be made permanent.

The NRA and the National Shooting Sports Foundation, a gun industry group, have historically opposed any restrictions on magazine capacity. The NRA did not respond to requests for comment, and the sports foundation declined to comment.

David S. Fallis is the Deputy Editor for the Washington Post's Investigations Unit. 🐦 Follow @DavidSFallis

Exhibit 4
Page 00433 6/1/17, 12:24 PM

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA


VIRGINIA DUNCAN, et al.,

        Plaintiffs,

                    Case No.: 17-cv-1017-BEN-JLB

vs.

XAVIER BECERRA, in his official
capacity as Attorney General of the
State of California; and DOES 1-10,

        Defendants.

_____


DEPOSITION OF STEPHEN HELSLEY

Monday, December 18, 2017

9:56 a.m.


1300 I Street

Sacramento, California


REPORTED BY:

Kimberly A. Barrette

CSR No. 6671

Stephen Helsley
December 18, 2017

```
 1    APPEARANCES:

 2

 3              For Plaintiffs:

 4

 5                  MICHEL & ASSOCIATES, PC
                    SEAN A. BRADY, ESQ.
 6                  180 East Ocean Boulevard, Suite 200
                    Long Beach, California  90802-4079
 7                  562.216.4444
                    sbrady@michellawyers.com
 8

 9

10

11              For Defendant:

12

13                  STATE OF CALIFORNIA, DEPARTMENT OF JUSTICE
                    OFFICE OF THE ATTORNEY GENERAL
14                  JOHN D. ECHEVERRIA, Deputy Attorney General
                    300 South Spring Street, Suite 1702
15                  Los Angeles, California  90013
                    213.269.6249
16                  john.echeverria@doj.ca.gov

17

18

19

20

21

22

23

24

25
```

ER_2627

Stephen Helsley
December 18, 2017

```
1    fact that you were involved in the enactment of the

2    Assault Weapons Control Act?

3            MR. BRADY:  Objection, calls for speculation,

4    misstates testimony, beyond the scope of what the expert

5    was called to testify about, irrelevant.

6            BY MR. ECHEVERRIA:  Q.  You can answer.

7       A.   No.

8       Q.   How long did you serve as a state liaison for

9    the National Rifle Association?

10      A.   Seven years.

11      Q.   Were you the only state liaison for the

12   National Rifle Association in California during that

13   time?

14      A.   There was another one stationed here, but his

15   assignment was the northwest.  So he had no role in

16   California, but he was housed in the same space that I

17   was in.

18      Q.   Understood.  But you were the only California

19   state liaison for the National Rifle Association?

20      A.   Correct.

21      Q.   And what were the years of that position?

22      A.   '93 to 2000.

23      Q.   And what were your duties and responsibilities

24   as the state liaison for the California for the National

25   Rifle Association?
```

Exhibit 5   73
Page 00437

Stephen Helsley
December 18, 2017

```
 1          A.    I was to represent the interests of the
 2     association in state and local affairs primarily for
 3     legislation, media.
 4          Q.    Were you a lobbyist for the National Rifle
 5     Association at that time?
 6          A.    Yes.
 7          Q.    So you would contact members of the California
 8     legislature and lobby on behalf of the National Rifle
 9     Association in connection with potential firearms
10     legislation?
11          A.    Yes.
12          Q.    During your time as the state liaison for the
13     National Rifle Association, did you ever advocate in
14     support of any gun control measures?
15               MR. BRADY:  Objection --
16               THE WITNESS:  Advocate --
17               MR. BRADY:  Sorry.  Objection, vague and
18     ambiguous.
19               THE WITNESS:  For --
20               BY MR. ECHEVERRIA:  Q.  Let me rephrase the
21     question.
22               When you were the state liaison for the
23     National Rifle Association, did you ever lobby any
24     members of the legislature in support of any gun control
25     measures?
```

Stephen Helsley
December 18, 2017

```
 1              MR. BRADY:  Objection, vague and ambiguous.

 2              BY MR. ECHEVERRIA:  Q.  You can answer.

 3       A.    Not gun control, no.

 4       Q.    So you opposed gun control measures when you

 5  were the state liaison for the National Rifle

 6  Association?

 7              MR. BRADY:  Objection, misstates testimony,

 8  vague and ambiguous.

 9              THE WITNESS:  Correct.

10              BY MR. ECHEVERRIA:  Q.  Okay.  Were you

11  compensated for your work as the state liaison for the

12  National Rifle Association?

13       A.    I was.

14       Q.    Did you receive a salary from the National

15  Rifle Association?

16       A.    Yes.

17       Q.    Did your salary change during the 17 years

18  that you served as the state liaison?

19       A.    Seven years.

20       Q.    Apparently my math is faulty, thank you.  Is

21  years, 1993 to 2000?

22       A.    I don't recall if there were cost of living

23  pay increases or not, but for the most part my salary was

24  the same for all seven years.

25       Q.    Okay.  And what was that salary?
```

Stephen Helsley
December 18, 2017

1          MR. BRADY:  Objection on privacy grounds,

2     beyond the scope of what the expert was called to testify

3     about.  You can answer if you want.

4          THE WITNESS:  I think it was about 75 to

5     80,000 a year.

6          BY MR. ECHEVERRIA:  Q.  Did you receive any

7     other benefits from the National Rifle Association in

8     connection with your service as the state liaison?

9          MR. BRADY:  Objection on privacy grounds,

10    beyond the scope of what the expert is called to testify

11    about, irrelevant.  You can answer if you wish.

12          BY MR. ECHEVERRIA:  Q.  You can answer.

13    A.    It had a 401(k) plan, a retirement plan.

14    Q.    So it would be your estimate that over the

15    course of your seven years as the state liaison, you

16    earned approximately 560,000?

17          MR. BRADY:  Objection, calls for speculation,

18    beyond the scope of what the expert was called to testify

19    about, misstates the testimony, irrelevant.

20          BY MR. ECHEVERRIA:  Q.  You can answer.

21    A.    I'll rely on your math.

22    Q.    Okay.  And that would be in addition to

23    retirement benefits that the National Rifle Association

24    provided to you?

25          MR. BRADY:  Objection, misstates testimony,

Steven Helsley
December 18, 2017

```
 1    calls for speculation, beyond the scope of what the

 2    expert was called to testify about, irrelevant.

 3              BY MR. ECHEVERRIA:  Q.  You can answer the

 4    question.

 5         A.   Correct.

 6         Q.   After your discussion with Ms. Froman, when

 7    were you -- or what other discussions did you have with

 8    the National Rifle Association before becoming the state

 9    liaison?

10              MR. BRADY:  Objection, vague and ambiguous, to

11    the extent it calls for private communications that are

12    protected.

13              BY MR. ECHEVERRIA:  Q.  You may answer.

14         A.   I was contacted, I believe, by Patrick

15    O'Malley.  I don't recall what his title was.  And they

16    arranged for me to fly back to Washington, D.C. to meet

17    with various NRA officials.

18         Q.   And did you attend just that one meeting with

19    various NRA officials before being offered the position

20    of state liaison?

21         A.   Yes.

22         Q.   When did they offer you the job of becoming

23    the state liaison?

24         A.   I believe I traveled back there in January and

25    about a week after I was there, they offered me the
```

Exhibit 5   77
Page 00441

Case 3:17-cv-01017-BEN-JLB  Document 53-5  Filed 04/09/18  PageID.6163  Page 328 of

Stephen Helsley
December 18, 2017

1    position.

2         Q.   Did you accept the offer on the spot?

3         A.   I did.

4         Q.   Why did you accept the offer?

5         A.   Well, I believed in what the mission was.  I

6    was caught a little off balance because I had been

7    planning to go to Moscow to work and -- but I guess the

8    best answer is that I just believed in what I would be

9    doing.

10        Q.   Do you recall being deposed in the Parker

11   versus State action?

12        A.   I do.

13        Q.   Do you recall testifying during that

14   deposition that the National Rifle Association made you,

15   quote, unquote "an offer I couldn't refuse"?

16        A.   I don't recall that, but it sounds right.

17             MR. ECHEVERRIA:  Okay.  I'm going to mark as

18   Exhibit 7 excerpts from the deposition transcript in that

19   case.

20             (Exhibit 7 was marked.)

21             BY MR. ECHEVERRIA:  Q.  Do you see the cover

22   page for Exhibit 7, Mr. Helsley?

23        A.   I do.

24        Q.   Have you seen this cover page before?

25        A.   I don't recall seeing it before.

Steven Helsley
December 18, 2017

```
 1        Q.    Did you review the deposition transcript in
 2   Parker versus California before?
 3        A.    I'm sure I did.
 4        Q.    Okay.   So this is an excerpt from the
 5   deposition transcript which was, as you can imagine,
 6   fairly lengthy.
 7             And this is an excerpt that has pages two
 8   through five and then 42 through 44, and I'm going to
 9   refer you to page 43 of the deposition transcript on
10   lines four to five.
11             Do you see the testimony quote, "and they made
12   me an offer I couldn't refuse" unquote?
13        A.    Yes.
14        Q.    Is that your -- does that refresh your
15   recollection as having testified that the National Rifle
16   Association made you an offer you couldn't refuse?
17        A.    Well, I'm sure that's correct and whether I
18   can remember it or not, I -- it reflects my perspective
19   on it.
20        Q.    So sitting here today, can you testify that
21   the National Rifle Association made you an offer you
22   couldn't refuse when you accepted the position of state
23   liaison?
24             MR. BRADY:   Objection, confusing, misstates
25   testimony, vague and ambiguous.
```

Stephen Helsley
December 18, 2017

```
 1              BY MR. ECHEVERRIA:  Q.  You can answer the

 2      question to the extent you understand my question.

 3          A.   Yes.

 4          Q.   Okay.  And what was your -- what do you mean

 5      by "an offer I couldn't refuse"?

 6          A.   Well, when I went back there to meet with

 7      them, I really had no idea what a lobbyist did.

 8              The only political activity that I'd been

 9      involved with at DOJ was entirely different than what was

10      being proposed.  And so once I understood what the

11      position was, what I'd be required to do, then I agreed

12      to do it.

13          Q.   When the National Rifle Association made you

14      an offer of employment, did they offer you a salary at

15      that time?

16          A.   There was a preliminary offer.  I believe

17      there was some back and forth on benefits and the salary

18      itself.  That's the best I can recall.

19          Q.   Okay.  So from 1993 to 2000 you were the state

20      liaison for the National Rifle Association, correct?

21          A.   Yes.

22          Q.   And you are aware of Senate Bill 23 which we

23      discussed earlier this morning, correct?

24          A.   Yes.

25          Q.   And what is your understanding of what Senate
```

```
 1    Bill 23 intended to do?
 2              MR. BRADY:  Objection, calls for a legal
 3    conclusion.
 4              BY MR. ECHEVERRIA:  Q.  You can answer.
 5         A.   Well, Senate Bill 23 was an outgrowth of
 6    Assembly Bill 23, I believe, from Senator Perata.
 7              And Perata, in his dealings with me, and I
 8    dealt with him extensively, was convinced that he could
 9    right all the wrongs in the Roberti-Roos Act the way that
10    it was drafted and he wanted to impose further
11    restrictions.
12         Q.   And Senate Bill 23 proposed restrictions on
13    the manufacture and sale of large capacity magazines,
14    correct?
15         A.   Yes.  That was one of the things in the bill.
16         Q.   Right.  And you were the state liaison of the
17    National Rifle Association when Senate Bill 23 was
18    working its way through the legislature, is that correct?
19         A.   Yes.
20         Q.   Did you lobby any members of the legislature
21    in opposition to Senate Bill 23?
22         A.   All that were opposed.
23         Q.   You lobbied all the legislators that were
24    opposed to that bill?
25         A.   Yes.
```

Stephen Helsley
December 18, 2017

```
 1          Q.    Then in the year 2000 you ceased being the

 2    state liaison for the National Rifle Association, is that

 3    correct?

 4          A.    Correct.

 5          Q.    Did someone replace you?

 6          A.    Yes.

 7          Q.    Why did you stop being the state liaison for

 8    the National Rifle Association?

 9          A.    When I was hired, I told Jim Baker, who was

10    then the head of the Institute for Legislative Action,

11    which is where I was employed, that I would work for five

12    years; my belief being that after you've done something

13    for five years, you -- you're not growing.

14                And so I was at the seven-year mark and I

15    said, Jim, I did my five and I want to go do something

16    else.

17          Q.    It was about time for a change?

18          A.    Yeah.

19          Q.    And what was -- what was the position that you

20    assumed after stopping as the state liaison?

21          A.    Well, I did and have done a variety of things.

22    A lot of it was photography, writing, consulting on this

23    and that.

24                And in my current day job, to the degree that

25    I have a day job, is I'm the historian for the firm of
```

Stephen Helsley
December 18, 2017

```
 1     John Rigby & Company in London and that consumes most of

 2     my work time.

 3         Q.   All right.  And then after you ceased being

 4     the state liaison for the National Rifle Association, did

 5     you become a consultant for the National Rifle

 6     Association?

 7         A.   Yes.

 8         Q.   And how long did you serve as consultant for

 9     the National Rifle Association?

10         A.   I have since then.  So it's been 24 years.

11         Q.   So from 2000 to today you have served as a

12     consultant to the National Rifle Association?

13         A.   Yes.

14         Q.   And what are your duties and responsibilities

15     as a consultant for the NRA?

16         A.   There are no specific duties.  Requests will

17     be made that I review this or go do that, but there's no

18     -- there's no job description.

19         Q.   Does the NRA compensate you for your

20     consulting services?

21         A.   Yes.

22         Q.   Do you charge the National Rifle Association a

23     certain amount of money per hour for your work or what is

24     the payment arrangement that you've established for the

25     NRA for your consulting services?
```

Steven Helsley
December 18, 2017

```
 1        A.   I'm just paid by the month.

 2        Q.   Do you get paid every month?

 3        A.   Yes.

 4        Q.   So it's like a retainer?

 5        A.   Yes.

 6        Q.   And has that amount of money stayed constant

 7   from 2000 until today or has it increased?

 8        A.   No.

 9        Q.   Has the monthly payment increased since 2000?

10        A.   No.

11        Q.   Has it decreased?

12        A.   Yes.

13        Q.   What was the monthly payment amount when you

14   became the consultant for the NRA in 2000, to the best of

15   your recollection?

16        A.   4,120 a month.

17        Q.   And when did you begin receiving that monthly

18   payment?

19        A.   Right after I left being employed as an

20   employee.

21        Q.   And that was when in 2000?

22        A.   I believe March.

23        Q.   Okay.  And when did your monthly payment

24   decrease?

25        A.   I think about 2008 or 9.  I'd have to look at
```

Exhibit 5    84
Page 00448

Stephen Helsley
December 18, 2017

1    the check stubs, but about 2008 or 9.

2        Q.    Okay.  So from March 2000 until somewhere

3    around 2008 or 9 you were receiving $4,120 per month?

4        A.    Correct.

5        Q.    And based on my math, that would equate to

6    about 50,000 per year, correct?

7        A.    Approximately.

8        Q.    Okay.  And what was your monthly benefit fixed

9    at when it was decreased?

10       A.    3,300 a month.

11       Q.    Did the National Rifle Association provide any

12   explanation as to why your monthly benefit would

13   decrease?

14       A.    No.

15       Q.    And for how long did you receive a monthly

16   payment of $3,300 for your consulting services from the

17   NRA?

18       A.    Until now.

19       Q.    Okay.  And based on my math, that would equate

20   to approximately a $40,000 yearly payment from the

21   National Rifle Association for your consulting services?

22       A.    Correct.

23       Q.    Is the National Rifle Association compensating

24   for your work in connection with this case?

25       A.    No.

Stephen Helsley
December 18, 2017

1        Q.    But you are still being compensated as a

2    consultant at the amount of 3,300 per month, is that

3    correct?

4        A.    My contract expires this month.  I have not

5    received word if it will be renewed or not.

6        Q.    But if the National Rifle Association offers

7    to continue your contract, would you be inclined to

8    accept that offer?

9        A.    Yes.

10        Q.    So you still want to work for the National

11    Rifle Association as a consultant?

12        A.    Yes.

13        Q.    Would the National Rifle Association be

14    pleased if the Plaintiffs prevail in this case?

15            MR. BRADY:  Objection, calls for speculation.

16            BY MR. ECHEVERRIA:  Q.  You can answer that

17    question.

18        A.    I assume so.

19        Q.    Okay.  So if we can go back to your expert

20    report which has been marked as Exhibit 3, you state in

21    paragraph four that you have coauthored five books on

22    firearms and have authored or co-authored more than 50

23    firearm-related articles for U.S. and Russian journals.

24            Do you see that?

25        A.    Yes.

Stephen Helsley
December 18, 2017

```
  1              (The record was read as requested.)

  2              BY MR. ECHEVERRIA:   Q.   Can you answer that

  3    question?

  4              MR. BRADY:   Objection, confusing, vague and

  5    ambiguous.

  6              THE WITNESS:   I'm struggling with the

  7    construction of the question.

  8              BY MR. ECHEVERRIA:   Q.   Sure.   So when you use

  9    the phrase, scholarly foundation for your opinions, what

 10    is the scholarly foundation that you're referring to

 11    concerning your second opinion that large capacity

 12    magazines have utility for self-defense?

 13         A.   The scholarly foundation is all of the reading

 14    that I've done, some writing -- not a lot, but a lot of

 15    reading and talking to peace officers or other people who

 16    have been involved in shootings and learning what was

 17    involved in those events.

 18         Q.   Okay.   Is it your understanding that

 19    conversations with peace officers and other types of

 20    research that you just described, is it your

 21    understanding that that would qualify as scholarship?

 22              MR. BRADY:   Objection, misstates testimony,

 23    vague and ambiguous.

 24              THE WITNESS:   Well, your question is what I

 25    meant and that's what I mean.
```

```
 1    concealed weapon permit holder want a pistol that can

 2    hold significantly more cartridges than a revolver for

 3    the same reason a law enforcement office" -- it says

 4    office -- "or soldier wants one, to increase his or her

 5    chances of staying alive," is that correct?

 6         A.    Correct.

 7         Q.    What is the meaning of the phrase

 8    significantly more?

 9         A.    Well, there's sort of a break point between a

10    revolver and with your -- now there's some of them with

11    seven-round capacities.  But basically you want to have

12    all the cartridges you can have when you're being

13    threatened.

14         Q.    Isn't another benefit of a magazine, even if

15    it holds no more than 10 rounds, that it can reload the

16    firearm faster than a revolver can be reloaded?

17         A.    Theoretically, yes.  It's a matter of

18    training.

19              There are some people that are very quick with

20    a revolver, but it's harder to be quick with a revolver

21    than it is with a semi-auto pistol with a detachable

22    magazine.

23         Q.    Okay.  And you write, "for virtuous citizens

24    buy their guns to protect themselves from the same

25    criminals that police carry guns to protect the citizens,
```

Stephen Helsley
December 18, 2017

```
1              THE WITNESS:  If they think they are to
2       protect themselves, yes.
3              BY MR. ECHEVERRIA:  Q.  And you are aware that
4       the purchase of large capacity magazines has been illegal
5       in the State of California since 2000?
6          A.  I'm aware of that.
7          Q.  And that's with exception to those large
8       capacity magazines that were grandfathered in under the
9       statute, correct?
10             MR. BRADY:  Objection, calls for a legal
11      conclusion.
12             THE WITNESS:  Correct.
13             BY MR. ECHEVERRIA:  Q.  So from the year 2000
14      to the present, have Californians been unable to defend
15      themselves with firearms that have magazine capacities of
16      10 rounds or fewer?
17             MR. BRADY:  Objection, argumentative, calls
18      for speculation, vague and ambiguous.
19             THE WITNESS:  Some may have.
20             BY MR. ECHEVERRIA:  Q.  Do you know of any
21      examples in which a Californian has been unable to
22      successfully defend themselves with a firearm that did
23      not have a large capacity magazine?
24         A.  I do not.
25         Q.  And you base your -- well, strike that.  In
```

```
 1              MR. BRADY:  Objection, calls for speculation,

 2    beyond the scope of what the witness is called to testify

 3    about, vague and ambiguous.

 4              THE WITNESS:  Well, I know that I read about

 5    them frequently.

 6              I don't know that all of them are reported

 7    and, of course, I'd only read about the ones that occur

 8    in the range of where the Sacramento Bee records, but

 9    they are certainly not an uncommon event.

10              BY MR. ECHEVERRIA:  Q.  And you go on to

11    discuss off duty police officers and private law abiding

12    citizens, correct?

13         A.   Yes.

14         Q.   You state that "Off-duty officers and private

15    law abiding citizens are unlikely to have much, if any,

16    spare ammunition on their person or elsewhere readily

17    accessible," correct?

18         A.   Correct.

19         Q.   And what is the basis of your statement that

20    they are unlikely to do so?

21         A.   Well, for instance, if it's at night and

22    someone hears something they believe is a threat, in my

23    own case, for instance, if -- if I think somebody is

24    breaking in my house, I'm getting out of bed, I have my

25    boxer shorts on, I've got a flashlight in one hand and
```

Stephen Helsley
December 18, 2017

1      the Glock in the other hand and I really don't have any

2      place to put that spare magazine.

3          Q.   Have you been a victim of a home invasion?

4          A.   No, no.

5          Q.   So the situation you just described has never

6      happened to you?

7          A.   I have heard things that caused me alarm that

8      I responded to.

9               There was nobody breaking into the house, but

10     when I responded, I thought there was.

11         Q.   Okay.  And you state that "For off-duty

12     officers and private law abiding citizens, the ability to

13     have a pistol already loaded with a significant amount of

14     ammunition is all the more important," correct?

15         A.   That's my belief.

16         Q.   What is your definition of the word

17     significant in that sense?

18         A.   You mean significant number of rounds?

19         Q.   Yes.

20         A.   Well, to me personally it's as many as I can

21     have, but I've chosen to have the Glock with 20 rounds.

22         Q.   So 20 rounds is a significant amount of

23     ammunition in your opinion?

24         A.   I'd rather have 40, but 20 is a good start.

25         Q.   Would you rather have 50?

Stephen Helsley
December 18, 2017

```
 1          A.    I think that anybody who has been in a gun
 2    fight would come away saying you can't have too many
 3    rounds and so I am a believer.
 4               If when I got up at night I had somewhere to
 5    carry all that in my boxer shorts, I'd take two or three
 6    magazines along.
 7          Q.    You would take two or three large capacity
 8    magazines?
 9          A.    Yes.
10          Q.    Do you have an opinion on whether there is any
11    permissible limit on magazine size that would be
12    acceptable to you?
13          A.    Well, there is a practical limit, I suppose,
14    to what will function.
15               The spring has to be able to push the rounds
16    up to a point to feed and so the practical limit is -- in
17    terms of high caps for handguns is in the 20-round range,
18    although there is a 32, 33-round magazine for a Glock.
19               The only restriction that I would see is
20    reliable functioning.
21          Q.    And is there a practical limit in your opinion
22    as to the magazine size for a rifle?
23          A.    Again, the same thing.  Functioning.
24          Q.    And can you provide a number as to what the
25    practical limit would be for a rifle?
```

## In the Matter Of:

## DUNCAN vs BECERRA

17-cv-1017-BEN-JLB

## BLAKE GRAHAM

*December 19, 2017*

**ESQUIRE**
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
*EsquireSolutions.com*

Exhibit 6
Page 00458

BLAKE GRAHAM                                    December 19, 2017
DUNCAN vs BECERRA                                                1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   VIRGINIA DUNCAN, RICHARD LEWIS,
     PATRICK LOVETTE, DAVID MARGUGLIO,
 5   CHRISTOPHER WADDELL, CALIFORNIA
     RIFLE & PISTOL ASSOCIATION, INC.,
 6   a California corporation,

 7          Plaintiffs,

 8       vs.                    CASE NO. 17-cv-1017-BEN-JLB

 9   XAVIER BECERRA, in his official
     capacity as Attorney General of the
10   State of California; and DOES 1-10,

11          Defendants.
     ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
12

13

14

15

16                 DEPOSITION OF

17                 BLAKE GRAHAM

18

19

20             December 19, 2017

21               10:05 a.m.

22

23             1300 I Street
                 Suite 1700
24           Sacramento, California

25   JENNIFER SCHUMACHER, CSR No. 9763
```



800.211.DEPO (3376)
EsquireSolutions.com
Exhibit 6
Page 00459

BLAKE GRAHAM                                          December 19, 2017
DUNCAN vs BECERRA                                                    2

```
 1                    APPEARANCES OF COUNSEL

 2

 3     For the Plaintiffs VIRGINIA DUNCAN, RICHARD LEWIS, et
       al.:
 4
            MICHEL & ASSOCIATES
 5          BY:  SEAN A. BRADY, Esq.
            180 E. Ocean Boulevard, Suite 200
 6          Long Beach, California 90802
            (562) 216-4444
 7          Sbrady@michellawyers.com

 8
       For the Defendant XAVIER BECERRA:
 9
            STATE OF CALIFORNIA
10          OFFICE OF THE ATTORNEY GENERAL
            BY:  ANTHONY P. O'BRIEN, Esq.
11          1300 I Street
            Sacramento, California 94244
12          (916) 210-6002
            Anthony.obrien@doj.ca.gov
13

14     Also Present:

15          STATE OF CALIFORNIA
            OFFICE OF THE ATTORNEY GENERAL
16          CIVIL LAW DIVISION
            BY:  ROBERT D. WILSON, Esq.
17          P.O. Box 160487
            Sacramento, California 95816
18          (916) 227-4003
            Robert.wilson@doj.ca.gov
19                            --oOo--

20

21

22

23

24

25
```



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 6
Page 00460

BLAKE GRAHAM                                    December 19, 2017
DUNCAN vs BECERRA                                              5

```
 1              DEPOSITION OF BLAKE GRAHAM

 2                   December 19, 2017

 3                       --oOo--

 4                   BLAKE GRAHAM,

 5   having been first duly sworn, testified as follows:

 6

 7                    EXAMINATION

 8   BY MR. BRADY:

 9      Q.   Good morning.  Could you state your name for

10   the record, please.

11      A.   Blake Graham, G-r-a-h-a-m.

12      Q.   And do you know why you are here today,

13   Mr. Graham?

14      A.   Yes.

15      Q.   And why is that?

16      A.   To give a deposition.

17      Q.   And do you know what case you are here to give

18   a deposition in?

19      A.   Duncan v Becerra.

20      Q.   Do you know the nature of this case?

21      A.   This case deals with large capacity magazines

22   and the -- I guess, the legality of the law at this

23   point.

24      Q.   So speaking of large capacity magazines, I'm

25   sure -- do you mind if we use the terminology LCM so we
```



BLAKE GRAHAM                                    December 19, 2017
DUNCAN vs BECERRA                                            60

```
 1   Topete case is the one you're most familiar with out of

 2   this list that you provided, or that you were most

 3   involved with?

 4       A.   Yeah, I think that's fair.

 5       Q.   What is your basis for saying that an LCM

 6   significantly increased Topete's ability to kill and

 7   injure large numbers of people quickly?

 8       A.   Well, as I recall, he fired 17 rounds at the

 9   deputy, so there's -- when he was firing at the deputy,

10   because of the placement of Topete and the vehicle

11   Topete had been driving, I believe he had his young

12   child in his own car, and his own child was actually

13   exposed to his actual bullets that he was firing out of

14   the assault weapon as well.  So that ties into the

15   ability of somebody with a large cap mag and a

16   semiautomatic weapon to potentially injure multiple

17   people.

18       Q.   Isn't it possible he could have done the

19   identical damage with two ten-round magazines?

20            MR. O'BRIEN:  Objection.  Calls for

21   speculation.

22            THE WITNESS:  Possibility, I don't know.  All I

23   can say it was -- from what I recall, it was pretty much

24   a single stream of 17 rounds.  I don't remember a pause

25   when I listened to the audio, or maybe it's audio or
```



800.211.DEPO (3376)
EsquireSolutions.com
Exhibit 6
Page 00462

**ER_2652**

BLAKE GRAHAM                                          December 19, 2017.
DUNCAN vs BECERRA                                                      61

```
 1   dash cam, I forget which it was.  But the deputy is dead
 2   because this particular guy had an assault weapon and a
 3   large cap mag, and it was loaded.  It wasn't even fully
 4   loaded, it just had 17 rounds, and he fired everything
 5   in it, as I recall.
 6   BY MR. BRADY:
 7       Q.  Do they know what rounds, which number -- in
 8   other words -- strike that.
 9           Is it known whether rounds from the first ten
10   shots hit the deputy?
11           MR. O'BRIEN:  Objection.  Calls for
12   speculation.
13           THE WITNESS:  I don't recall which -- that may
14   be available in the transcripts of that particular case.
15   I don't recall, but there was some discussion about him
16   only being hit one time out of all those rounds.  But I
17   don't remember if they identified, you know, if it was
18   round 1 through 17, I don't recall.
19   BY MR. BRADY:
20       Q.  It could have been round 1 through 10, though,
21   correct?
22       A.  It's possible, but I don't remember.  That
23   wasn't why I was involved in the case.  It was more
24   about the weapon itself.
25       Q.  If it was round 1 through 10, then wouldn't the
```

