No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant*.
_____

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge
_____

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 12 of 17**
_____

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

Atkinson-Baker Court Reporters
www.depo.com

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   -------------------------:

 4   VIRGINIA DUNCAN, et al.,  :

 5                  Plaintiff, :Case No.

 6   v.                        :17-cv-1017-BEN-JLB

 7   XAVIER BECERRA, in his    :

 8   official capacity as      :

 9   Attorney General of the   :

10   State of California, et    :

11   al.,                      :

12              Defendants.:

13   -------------------------:

14        Deposition of CARLISLE MOODY taken at the

15   offices of Kirkland & Ellis, LLP, 655 Fifteenth

16   Street, NW, Washington, DC on Tuesday, January 2,

17   2018, beginning at 10:00 a.m. before Sydney R.

18   Crawford, a Notary Public in and for the District of

19   Columbia.

20
     ATKINSON-BAKER, INC. COURT REPORTERS
21   (800) 288-3376
     www.depo.com
22   REPORTED BY:  Sydney R. Crawford
```

1

Carlisle Moody
January 2, 2018

Exhibit 7
Page 00465

**ER_2655**

Atkinson-Baker Court Reporters
www.depo.com

```
 1    APPEARANCES:

 2         .

 3    ON BEHALF OF THE PLAINTIFF:

 4         ANNA M. BARVIR, ESQUIRE

 5         Michel & Associates

 6         180 East Ocean Boulevard

 7         Suite 200

 8         Long Beach, California 90802

 9

10

11    ON BEHALF OF THE DEFENDANT:

12         ALEXANDRA ROBERT GORDON, ESQUIRE

13         Deputy Attorney General

14         455 Golden Gate Avenue

15         Suite 1100

16         San Francisco, California 94102

17

18

19

20

21

22
```

2

Carlisle Moody
January 2, 2018

Exhibit 7
Page 00466

**ER_2656**

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    P R O C E E D I N G S

 2                              *    *    *

 3    WHEREUPON,

 4                        CARLISLE MOODY

 5         called as a witness, having been first duly

 6    sworn to tell the truth, the whole truth, and

 7    nothing but the truth, was examined and testified as

 8    follows:

 9

10              EXAMINATION BY COUNSEL FOR THE DEFENDANT

11    BY MS. GORDON:

12         Q.   Good morning, Professor Moody.  Do you

13    prefer Professor Moody or Dr. Moody?

14         A.   Either one.

15         Q.   Either one?

16         A.   Professor is what I hear most of at the

17    school, so let's go with that.

18         Q.   I'm Alexandra Robert Gordon, and I

19    represent the defendant, Attorney General Xavier

20    Becerra in this matter.  We haven't met before

21    today; correct?

22         A.   Correct.
```

4

Carlisle Moody
January 2, 2018

Exhibit 7
Page 00467

ER_2657

Atkinson-Baker Court Reporters
www.depo.com

1  number?

2      A.   Yes.  Yes.

3      Q.   And what is -- what is a P value?

4      A.   P value is that number, .05.  In other

5  words, if you're two standard deviations away from

6  the mean, the P value is .05, which simply means

7  that there's less than, there's a 5 percent chance.

8  Only a 5 percent chance that the number would be

9  that far away from the mean and still actually be

10  zero.

11      Q.   Okay.  So can you infer -- let's say you

12  have a P value greater than .05.  Can you infer an

13  absence of causation from that?

14      A.   It is indicative of no causation.

15      Q.   Is it possible that something could have a

16  real world effect, though, and not be statistically

17  significant?

18      A.   Yes.

19      Q.   Okay.  Does the size of sample, sample

20  size of data affect the calculation of statistical

21  significance?

22      A.   Uh-hum.  Yes, it does.

Carlisle Moody
January 2, 2018

Exhibit 7
Page 00468

Atkinson-Baker Court Reporters
www.depo.com

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   -------------------------:

 4   VIRGINIA DUNCAN, et al.,  :

 5                 Plaintiff, :Case No.

 6   v.                       :17-cv-1017-BEN-JLB

 7   XAVIER BECERRA, in his   :

 8   official capacity as     :

 9   Attorney General of the  :

10   State of California, et   :

11   al.,                     :

12              Defendants.:

13   -------------------------:

14      The Continued Deposition of CARLISLE MOODY taken

15   at the offices of Kirkland & Ellis, LLP, 655

16   Fifteenth Street, NW, Washington, DC on Thursday,

17   January 4, 2018, beginning at 9:00 a.m. before

18   Sydney R. Crawford, a Notary Public in and for the

19   District of Columbia.

20   ATKINSON-BAKER, INC. COURT REPORTERS
     (800) 288-3376
21   www.depo.com
     REPORTED BY:  Sydney R. Crawford
22   FILE NO: AC000EE
```

148

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00469

**ER_2659**

Atkinson-Baker Court Reporters
www.depo.com

```
1    APPEARANCES:

2

3    ON BEHALF OF THE PLAINTIFF:

4         ANNA M. BARVIR, ESQUIRE

5         Michel & Associates

6         180 East Ocean Boulevard

7         Suite 200

8         Long Beach, California 90802

9

10

11   ON BEHALF OF THE DEFENDANT:

12        ALEXANDRA ROBERT GORDON, ESQUIRE

13        Deputy Attorney General

14        455 Golden Gate Avenue

15        Suite 1100

16        San Francisco, California 94102

17

18

19

20

21

22
```

149

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00470

**ER_2660**

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    P R O C E E D I N G S

 2                          *    *    *

 3    WHEREUPON,

 4                      CARLISLE MOODY

 5       called as a witness, having been first duly

 6    sworn to tell the truth, the whole truth, and

 7    nothing but the truth, was examined and testified as

 8    follows:

 9

10            EXAMINATION BY COUNSEL FOR THE DEFENDANT

11    BY MS. GORDON:

12       Q.   We are resuming the deposition of

13    Dr. Carlisle Moody.

14            Doctor Moody, since there's been sort of a

15    break, do you need me to go over the basic

16    admonitions or housekeeping rules, or do you

17    remember them?

18       A.   I remember them.

19       Q.   The most important would be to ask you, is

20    there any reason why you can't give truthful and

21    accurate testimony today?

22       A.   No.
```

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00471

Atkinson-Baker Court Reporters
www.depo.com

```
 1              (Exhibit No. 12 was marked for

 2              identification.)

 3   BY MS. GORDON:

 4       Q.    Is this the paper that we've been talking

 5   about, about your sort of study on large capacity

 6   magazines?

 7       A.    Yes.

 8       Q.    Okay.  I understand that, you know, you

 9   feel that we're not talking about this, and we're

10   going to move off of this momentarily, but could you

11   please go to page 6, and do you see where it says

12   "Summary and Conclusion," Roman numeral III?

13       A.    Yes.

14       Q.    Could you just read the first full

15   sentence, please?

16       A.    Repeat, please.

17       Q.    The first sentence.  It starts, "Firearms

18   fitted with large capacity magazines."

19       A.    "Firearms fitted with large capacity

20   magazines can be used to cause death and injury in

21   public shooting incidents, and can also result in

22   more rounds fired and more homicides in general than
```

194

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00472

ER_2662

Atkinson-Baker Court Reporters
www.depo.com

 1 | similar firearms with smaller magazines."

 2 |     Q.   Okay.  And just in the interest of

 3 | fairness and completeness, you do go on in that

 4 | paragraph to include other ways that people can

 5 | wreak havoc as well; right?

 6 |     A.   Yes.

 7 |     Q.   Okay.  But I'm just curious, do you agree

 8 | with the first -- that sentence that -- that you

 9 | just read?

10 |     A.   Yes.  Yes.

11 |     Q.   And what was the basis for that statement?

12 | How did you arrive at that conclusion?

13 |     A.   Just theoretically.

14 |     Q.   Theoretically.

15 |     A.   Theoretically, if you have more rounds in

16 | a single place, you might be able to do a better job

17 | of creating mayhem.

18 |     Q.   Did you -- so this is -- this is dated

19 | February 2015.  So you would have written this

20 | before you did your expert report in Colorado;

21 | correct?

22 |     A.   Correct.

195

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00473

Atkinson-Baker Court Reporters
www.depo.com

```
 1   articles about these things, and I've been doing
 2   statistical analyses of these problems for a while.
 3        Q.   No.  Of course.  But you didn't do a
 4   statistical analysis --
 5        A.   No.  Not here.
 6        Q.   -- for that question?
 7        A.   No.  This is just an aspect of these
 8   things that I was asked to investigate, and so I
 9   said okay, why not, I'll do it.
10        Q.   Okay.  So I'm also sort of wondering since
11   you're a rebuttal expert, that opinion, what in
12   Koper and Klarevas does that rebut?
13        A.   If you're -- I don't know -- I'm not --
14   that's not clear to me.  I don't know.  I was asked
15   to do it and I did it.
16        Q.   I understand.  And so do you -- but do you
17   read anything, and I think you have the reports if
18   you want to review them, do you read anything in the
19   Koper or Klarevas reports as saying, you know, we
20   know that large capacity magazines that were
21   grandfathered have been used in mass shootings in
22   California?
```

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00474

**ER_2664**

Atkinson-Baker Court Reporters
www.depo.com

```
 1        A.   No.

 2        Q.   Opinion -- opinion 3.  So top of page 3.

   You say, "Bans on such magazines have no effect on

 4   violent crime."  And you say, "As illustrated by the

 5   results of the Washington Post study of firearms

 6   recovered by Virginia law enforcement."  So what --

 7   what data did you use to come to that conclusion?

 8        A.   Virginia Clearinghouse, Virginia -- I

 9   can't remember what it's called, but it's

10   essentially a clearinghouse where -- for criminal

11   weapons, weapons taken from criminals at the -- at

12   the time that they are under arrest -- were sent to

13   a place called a clearinghouse, where they were --

14   data on those weapons was kept by the state police.

15            And this relatively unique data set was

16   revealed by the Washington Post, they seemed to hear

17   about it and got ahold of it and made it public.

18        Q.   And is that data set limited to Virginia?

19        A.   Yes.  It is.

20        Q.   So you were relying on Virginia specific

21   data to come up with -- as a basis of this opinion;

22   correct?
```

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00475

Atkinson-Baker Court Reporters
www.depo.com

1    levels.

2        Q.   And did you?

3        A.   No.   Essentially the same answer.

4        Q.   Essentially the same answer.   Okay.

5    Great.   All right.   Thank you.   I think now I

6    understand sort of the relationship between this and

7    how this basically works, more or less.   All right.

8             So let's look at I believe we are now on

9    page 6 of your report, and it's number 2,

10   "California's Violent Crime Rate."

11            So I don't want this to sound rude, but

12   I'm wondering sort of why you are offering an

13   opinion on the relationship between the acquisition

14   ban and California's violent crime rate.

15       A.   I believe I was asked at one point to do

16   that.   Why not.   And I said okay, fine.

17       Q.   Okay.   But is this meant to rebut opinions

18   that you found in Klarevas --

19       A.   Not directly, no.

20       Q.   Indirectly?

21       A.   Well, I mean I wonder whether an LCM ban

22   might have an effect on violent crime.

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00476

**ER_2666**

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.    Okay.

 2        A.    If violent criminals use large capacity

 3   magazines.

 4        Q.    Okay.  But is there something in either of

 5   their reports, Dr. Koper or Dr. Klarevas that you

 6   read as making -- as offering an opinion about the

 7   violent crime rate, the large --

 8        A.    No.

 9              MS. BARVIR:  Objection.  Asked and

10   answered.

11              (Off the record.)

12   BY MS. GORDON:

13        Q.    So, first of all, I just want to make sure

14   I understand what you mean by "violent crime."  What

15   does that include?

16        A.    Murder rate, robbery and assault.

17        Q.    Including, I guess, gun assault as well?

18        A.    Yes.

19        Q.    Okay.  So it's not limited to only crimes

20   with large capacity magazines?

21        A.    No.

22        Q.    Okay.  So, I mean, that's going to include
```

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00477

Atkinson-Baker Court Reporters
www.depo.com

 1   research I did in this case presented in my report.

 2       Q.   Okay.  What -- which research precisely

 3   that you did for this case presented?

 4       A.   Reading.  Reading all the reports, trying

 5   to get, you know, some idea where these LCMs came

 6   from, and whether they were likely to be somebody

 7   who's three at the time in the year 2000 would

 8   probably not store up a, not get an LCM as a present

 9   from grandma and store it up until he shoots

10   somebody in 2012.

11       Q.   I should -- I should not hope not, yeah.

12            Have you looked at mass shootings that

13   occurred nationally during the federal assault

14   weapon ban?

15       A.   No.

16       Q.   So you don't know which mass shootings

17   occurred using grandfathered weapons; right, during

18   the assault weapon ban?

19       A.   No.

20       Q.   But you are aware that there were a

21   significant number of grandfathered weapons during

22   the federal assault weapon ban; correct?

351

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00478

Atkinson-Baker Court Reporters
www.depo.com

```
1        A.   I -- I -- I do not have that data.  I
2    don't recall that data.
3        Q.   Okay.  So --
4        A.   I have no reason to disbelieve you.
5        Q.   Okay.  But so, then, just to be clear, the
6    data about how many grandfathered LCMs there were
7    during the assault weapons ban is not a factor in
8    any of the analysis that you've done?
9        A.   No.
10       Q.   Okay.  Is it possible that a stolen large
11   capacity magazine that was legally possessed within
12   California could be taken to another jurisdiction
13   and used in a mass shooting?
14       A.   It's possible, I suppose.
15       Q.   And so would that constitute a danger
16   created by a legally-possessed large capacity
17   magazine?
18       A.   What's a danger?  I mean, did this person
19   actually shoot somebody with it?
20       Q.   Yes.
21       A.   Oh, then it is a danger.
22       Q.   It's a hypothetical.  I'm not saying that
```

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00479

ER_2669

Atkinson-Baker Court Reporters
www.depo.com

```
 1   that happened.

 2        A.   The mere fact that it's stolen does not

 3   constitute a danger, it's the -- it's the reason for

 4   the use after it's stolen that constitutes the

 5   danger.

 6        Q.   Okay.  So let's move on to your section C.

 7   Right.  So, again, this is also work that you did

 8   originally for the Weise case; correct?

 9        A.   No.

10        Q.   You didn't present information in the

11   Weise case?

12        A.   I did.  Oh, no.  Originally, it was -- it

13   was the research paper that --

14        Q.   The SSRN?

15        A.   The SSRN paper, yes.

16        Q.   Oh, okay.  So that's back in 2015 --

17        A.   Yes.  And I just -- this is just a -- yes.

18   That was back in 2015 and this is a reanalysis of

19   the same data.

20        Q.   So -- of the same data.  Did you add to

21   the data?

22        A.   No.
```

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00480

Atkinson-Baker Court Reporters
www.depo.com

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3    -------------------------:

 4    VIRGINIA DUNCAN, et al.,  :

 5                    Plaintiff, :Case No.

 6    v.                        :17-cv-1017-BEN-JLB

 7    XAVIER BECERRA, in his    :

 8    official capacity as      :

 9    Attorney General of the   :

10    State of California, et   :

11    al.,                      :

12                    Defendants.:

13    -------------------------:

14          Deposition of GARY KLECK taken at the

15    offices of Kirkland & Ellis, LLP, 655 Fifteenth

16    Street, NW, Washington, DC on Wednesday, January 3,

17    2018, beginning at 9:00 a.m. before Sydney R.

18    Crawford, a Notary Public in and for the District of

19    Columbia.

20    ATKINSON-BAKER, INC. COURT REPORTERS
      (800) 288-3376
21    www.depo.com
      REPORTED BY:  Sydney R. Crawford
22    FILE NO: AB0D9A1
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4         ANNA M. BARVIR, ESQUIRE

 5         Michel & Associates

 6         180 East Ocean Boulevard

 7         Suite 200

 8         Long Beach, California 90802

 9

10

11   ON BEHALF OF THE DEFENDANT:

12         JOSE ZELIDON-ZEPEDA, ESQUIRE

13         Deputy Attorney General

14         455 Golden Gate Avenue

15         Suite 11000

16         San Francisco, California 94102

17

18

19

20

21

22
```

2

Gary Kleck
January 3, 2018

Exhibit 8
Page 00483

**ER_2672**

Atkinson-Baker Court Reporters
www.depo.com

```
 1               P R O C E E D I N G S

 2                        *    *    *

 3   WHEREUPON,

 4                    GARY KLECK

 5       called as a witness, having been first duly

 6   sworn to tell the truth, the whole truth, and

 7   nothing but the truth, was examined and testified as

 8   follows:

 9

10           EXAMINATION BY COUNSEL FOR THE DEFENDANT

11   BY MR. ZELIDON-ZEPEDA:

12       Q.   Good morning.

13       A.   Good morning.

14       Q.   My name is Jose Zelidon-Zepeda.  I'm a

15   Deputy Attorney General for the State of California.

16   You understand that you're here for your deposition

17   in a case called Duncan versus Becerra.

18       A.   Okay.

19           MR. ZELIDON-ZEPEDA:  Could counsel please

20   identify themselves for the record?

21           MS. BARVIR:  Anna Barvir, B-A-R-V-I-R,

22   counsel for the plaintiffs.
```

4

Gary Kleck
January 3, 2018

Exhibit 8
Page 00484

**ER_2673**

Atkinson-Baker Court Reporters
www.depo.com

1    the fraction that will involve large capacity

2    magazines.   That much is true, something that both

3    advocates and opponents agree on.

4         Q.   And then the opposite is true as well;

5    right?

6              MS. BARVIR:   Objection.   Form.   Vague and

7    ambiguous.   Go ahead and answer.

8              THE WITNESS:   What opposite?   I mean

9    the -- the opposite that it's frequent, that are

10   frequently involved?

11   BY MR. ZELIDON-ZEPEDA:

12        Q.   No. the opposite of if you define the --

13   if you define gun massacres in terms of a -- a lower

14   number of individuals who are dead, obviously that's

15   going to impact the percentage, and it goes that --

16        A.   Yes.   Sorry.   Go ahead.

17        Q.   No.   No.   I was done.

18        A.   Yes.   The lower -- the lower your

19   criterion, your cutoff for what constitutes a mass

20   shooting, the less likely it is large capacity

21   magazines will be involved.

22             Because the one thing that advocates of

163

Gary Kleck
January 3, 2018

Exhibit 8
Page 00485

**ER_2674**

Atkinson-Baker Court Reporters
www.depo.com

```
 1    bans on large capacity magazines are correct about
 2    is the statistical point that large capacity
 3    magazines are more likely to show up -- not likely,
 4    but relatively more likely to show up in cases with
 5    larger numbers of victims.
 6         Q.   Do you think large capacity magazine have
 7    an impact on crimes other than mass massacres?
 8              MS. BARVIR:  Object to the form.  Vague
 9    and ambiguous.  Go ahead.
10    BY MR. ZELIDON-ZEPEDA:
11         Q.   You know, let me reframe my question.
12              Do you think that LCM use has an impact in
13    crimes other than gun massacres?
14         A.   I know of no affirmative evidence to
15    suggest that's the case, that there is such an
16    effect.
17         Q.   Have you affirmatively researched that
18    issue?
19         A.   No.  No.  That's not been a focus of any
20    of my research.  Others, however, have kind of
21    indirectly approached it by looking at whether bans
22    on large capacity magazines affect other kinds of
```

164

Gary Kleck
January 3, 2018

Exhibit 8
Page 00486

**ER_2675**

```
 1              Do you see that?
 2        A.   Are you referring to page 17 at the top
 3   few lines?
 4        Q.   Yeah, the second paragraph, the --
 5        A.   Oh, the second paragraph.
 6        Q.   Yes.  And if you need some time to look at
 7   it, because I know it's sort of interrelated, please
 8   go ahead and take some time.
 9        A.   No, I don't need any additional time.  I
10   mean, pointing out, I'm basically saying what I just
11   said, that there's another reading of what he was
12   intending, which is not, you know, the point that he
13   was actually making, that is to say I cite
14   Christopher Koper, who accurately notes that large
15   capacity magazines allow people to fire more rounds
16   without reloading, which is true.
17              Whereas Klarevas was making a distinct
18   point saying that while you had the gun loaded with
19   a large capacity magazine, you could fire more
20   rapidly than if you had a smaller capacity magazine
21   with the gun, which is not true at all and it's not
22   a claim that any other expert makes.
```

177

Gary Kleck
January 3, 2018

Exhibit 8
Page 00487

Atkinson-Baker Court Reporters
www.depo.com

1      Q.   But if in fact that's not what Klarevas

2   was claiming, then your statement is false.

3      A.   Well, your -- you're pro -- you're posing

4   a false hypothetical.  I mean, there's no doubt that

5   he was not making the point about, you know, you

6   don't have to reload so often because he makes that

7   point separately.

8           And so there's -- aside from that, once we

9   can rule that out, there are no other readings that

10  would reasonably impose on what Klarevas said that

11  are accurate.  I mean, none at all.  I mean, if he

12  were here today he would not be able to rephrase it

13  in a way that makes it into an accurate statement,

14  unless he was simply making the same point twice,

15  and that's rather dishonest to make, as if you have

16  two points to make, when in fact you only have one

17  point to make, the point that you don't have to

18  reload so often with a large capacity magazine.

19     Q.   So it sounds, and I might have missed it

20  because there was a flurry of words, but it sounds

21  like you agree with the argument that LCMs allow

22  certain weapons to fire more than 10 rounds without

Gary Kleck
January 3, 2018

Exhibit 8
Page 00488

ER_2677

Atkinson-Baker Court Reporters
www.depo.com

```
 1    requiring the shooter to reload the weapon.
 2        A.    I do.
 3        Q.    And is it fair to say that you also agree
 4    that victims who suffer multiple gunshot wounds are
 5    more likely to die than those who suffer a single
 6    wound?
 7        A.    I do.
 8        Q.    Going back to the previous point, ibid.
 9    You stated that if Dr. Klarevas were to try to
10    explain what he meant regarding the -- the
11    facilitate firing comment, and reconcile that with a
12    later point that you say is a separate and distinct
13    point regarding firing multiple rounds, that that
14    would be, the word you used was "dishonest" or
15    something; is that correct?
16        A.    No.  What I said was dishonest was making
17    one point, but presenting it as if it's two separate
18    points.  As if you're creating a dishonest
19    impression of increasing the strength of your
20    argument.  Two valid points would be better than
21    just one valid point, but those are not two distinct
22    points.  He was -- or not two distinct valid points.
```

179

Gary Kleck
January 3, 2018

Exhibit 8
Page 00489

**ER_2678**

Atkinson-Baker Court Reporters
www.depo.com

```
 1   offender, and to shoot all let's say four offenders,
 2   you'd obviously need a correspondingly larger number
 3   of rounds.
 4        Q.   Are you aware of any research that yields
 5   these numbers regarding the rate at which defensive
 6   gun requires the use of 10 or more bullets?
 7        A.   To my knowledge no one has studied the
 8   issue.  Me or anyone else.
 9        Q.   So what is your basis for saying that this
10   is a scenario that's likely?
11        A.   Well, there are two solid reasons.  Number
12   one, we know that crime, violent crimes in which
13   victims face multiple offenders are commonplace, and
14   we know that from the National Crime Victimization
15   survey.
16           And number two, we know that it requires
17   considerably more than one round to shoot any one
18   offender.  We know that from two sources of
19   information -- well, really that's basically all one
20   source of information or one category of
21   information, which is how good police officers are
22   in their marksmanship in real world combat
```

309

Gary Kleck
January 3, 2018

Exhibit 8
Page 00490

**ER_2679**

Atkinson-Baker Court Reporters
www.depo.com

```
 1        Q.   On page 10 of your rebuttal report, you

 2   state that shooters more intent on hurting many

 3   people would prepare to do so by acquiring LCMs?

 4        A.   Yes.

 5        Q.   Why is that?

 6        A.   Because of the belief, accurate or not,

 7   that they can conflict more harm if they can fire

 8   large numbers of rounds without reloading.

 9        Q.   Did you perform any type of analysis in

10   order to derive this conclusion, or was this just a

11   common sense analysis or conclusion?

12        A.   Well, it's both common sense and sometimes

13   where there are surviving shooters they say

14   something to that effect.  In fact, I believe, one

15   of the defendants' experts quoted a defender as

16   saying he went to the gun dealer and told the gun

17   dealer that he wanted, you know, the deadliest

18   equipment that would allow him to shoot the largest

19   number of rounds, et cetera, et cetera.  So he was

20   in effect -- he wasn't admitting to an intent to

21   commit a mass murder, but he was saying that, yeah,

22   there's a connection between my desire to fire many
```

323

Gary Kleck
January 3, 2018

Exhibit 8
Page 00491

ER_2680

Atkinson-Baker Court Reporters
www.depo.com

1  rounds and my desire to get a large capacity

2  magazine.

3      Q.   So isn't this like saying that having an

4  LCM enables an offender to cause more harm?

5      A.   No.   It only says that this is something

6  that offenders believe.

7      Q.   Okay.  Do you think it's an accurate or

8  inaccurate belief?

9      A.   It's inaccurate.

10     Q.   Is that because, as you discussed earlier,

11 an offender can just go ahead and not get a large

12 capacity magazine, but get the same amount of

13 bullets through smaller magazines?

14     A.   Right.  They can do everything that that

15 mass shooter might want to do if they had 10-round

16 magazines rather than 30-round magazines.  There's a

17 difference between hypothetical potential and the

18 reality of actual mass shootings, and the typical

19 mass shooter doesn't really, he's not done a study

20 of how mass shootings actually occur.

21         All he knows is yeah, I might be able to

22 fire many rounds with a large capacity magazine

324

Gary Kleck
January 3, 2018

Exhibit 8
Page 00492

**ER_2681**

Page 1

1           UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3     ------------------------------x

4     VIRGINIA DUNCAN, et al.,

5               Plaintiffs,

6          v.                    Case No.

7     XAVIER BECERRA, in his        17-cv-1017-BEN-JLB

8     official capacity as Attorney

9     General of the State of

10    California,

11              Defendant.

12    ------------------------------x

13

14

15       DEPOSITION OF CHRISTOPHER S. KOPER, PH.D.

16               Washington, D.C.

17            Friday, January 5, 2018

18

19

20

21    Reported by:

22    Michele E. Eddy, CRR, RPR, CLR

23    JOB NO. 135559

24

25

Exhibit 9
Page 00494

**ER_2682**

Page 2

1

2

3

4                    Friday, January 5, 2018

5                         9:55 A.M.

6

7

8            Deposition of CHRISTOPHER S. KOPER,

9    PH.D., held at the offices of Kirkland & Ellis

10   LLP, 655 Fifteenth Street, Northwest, Washington,

11   D.C., pursuant to notice, before Michele E.

12   Eddy, a Registered Professional Reporter,

13   Certified Realtime Reporter, and Notary Public

14   of the state of Maryland, Commonwealth of

15   Virginia, and the District of Columbia.

16

17

18

19

20

21

22

23

24

25

Exhibit 9
Page 00495

**ER_2683**

Page 3

1    APPEARANCES:

2    MICHEL & ASSOCIATES

3    Attorneys for Plaintiffs

4    180 E. Ocean Boulevard, Suite 200

5    Long Beach, California  90802

6    BY:  ANNA BARVIR, ESQUIRE

7

8    STATE OF CALIFORNIA DEPARTMENT OF JUSTICE

9    Attorneys for Defendants

10   455 Golden Gate Avenue

11   San Francisco, CA 94102

12   BY:  JOSE ZELIDON-ZEPEDA, ESQUIRE

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit 9
Page 00496

ER_2684

Page 4

```
 1                    P R O C E E D I N G S
 2                     Washington, D.C.
 3                     January 5, 2018
 4                          - - -
 5               CHRISTOPHER S. KOPER, Ph.D.,
 6         having been duly sworn, testified as follows:
 7               MS. BARVIR:  Good morning.  We're
 8         here for the deposition of Dr. Christopher
 9         Koper.
10                       EXAMINATION
11     BY MS. BARVIR:
12         Q     Could you state your name, your
13     title, and your business address for the
14     record, please.
15         A     Christopher Shawn Koper.  I'm an
16     associate professor at George Mason University
17     in Fairfax, Virginia.
18         Q     And just -- do you prefer if I call
19     you Dr. Koper or Professor Koper?  Which works
20     for you?
21         A     Either one.  Either is fine.
22         Q     My name is Anna Barvir.  I'm an
23     attorney for the plaintiffs in this matter
24     captioned Duncan v. Becerra.
25               What is your understanding of what
```

Page 154

1    cases.

2        Q     What evidence, if any, do you have

3    that the presence of an LCM in a mass shooting

4    actually impacts the rate of fire, the amount

5    of time between shots in a mass shooting?

6              MR. ZELIDON-ZEPEDA:  Objection.

7    Compound.

8        A     There is -- and I suppose it's cited

9    in here.  I would have to look for it.  But I

10   know that there was -- in some of my writings,

11   we -- I or my colleagues have shown, at least

12   for some cases where data were available, that

13   the number of shots fired in cases involving

14   LCMs was higher -- substantially higher than in

15   other cases.  Then there's also the victim

16   counts.  The number of people shot and killed

17   in those cases that involve high-capacity

18   semiautomatics tends to be substantially larger

19   than in other mass shooting incidents.

20       Q     Right.  That suggests a higher number

21   of shots fired, right.  But what about the rate

22   of fire, like how much time is -- it takes

23   between shots in a mass shooting incident?

24       A     Well, the problem there is that you

25   have to know exactly -- to make clear

Exhibit 9
Page 00498

**ER_2686**

Page 166

1    might be more likelihood of some retaliation

2    against the shooter or just generally slowing

3    down their rate of fire.

4        Q     What evidence do you have that that

5    actually happens in mass shooting events?

6        A     We largely infer it from the

7    statistics, from the results of the events.

8    It's also with reference to the broader

9    literature on weaponry effects on violent crime

10   outcomes.  There's been a good deal of research

11   looking at the impact that different weapons

12   have on the outcomes of attacks, and it

13   generally suggests that the type of weapon used

14   is important to determining the outcome even

15   independent of offender characteristics or

16   intent.

17       Q     Did you talk about those studies in

18   your expert report?

19       A     No, we haven't gotten into those.

20       Q     So can you say to a reasonable degree

21   of scientific probability that large-capacity

22   magazines are outcome determinative in how many

23   people are shot in a mass public shooting?

24       A     Well, what we can say in some of

25   these cases is that there have been statistical

Exhibit 9
Page 00499

Page 167

1    tests of the differences in number of victims

2    across the two sets of cases and oftentimes

3    showing -- sometimes the differences are

4    examined in statistical tests, sometimes not.

5             In some of my recent work, we

6    actually did do a statistical test, and we

7    found that in those cases where a high-capacity

8    magazine was used, it was a statistically

9    significant difference with higher numbers of

10   victims in the LCM cases.

11            So we know that there is a

12   difference, and the question becomes what is

13   the mechanism of that, what is theoretically

14   the most likely mechanism.  I think many would

15   judge it as being the weaponry having an impact

16   on the outcome.

17       Q    Is this research in your 2017 report?

18       A    Yes.  Although I have -- I and others

19   have done comparisons of different types of

20   mass shootings as well.  So you don't have to

21   rely just on mine, but other people have done

22   that, too.

23       Q    Could you direct me to any of those

24   other people's sources?

25       A    First of all, there are some

Exhibit 9
Page 00500

**ER_2688**

Page 168

1    different places throughout this report where I

2    have compared different subsets of attacks with

3    different types of weaponry.  I talked about

4    the work that -- some earlier comparisons that

5    I did that are contained in the 2004 report

6    based on looking at some mass shootings.

7    There's the work of Luke Dillon, who was a

8    master's student at George Mason who looked at

9    this issue.

10            I've seen in some different reports

11   that people have produced that they have

12   documented differences in number of people shot

13   in cases involving high-capacity versus other

14   weapons.  Again, there's my 2017.  So I've seen

15   that in some different places.  I've seen that

16   in some other academic work, I think, too, at

17   least as demonstrated differences in number of

18   people shot for assault weapon versus other

19   types of cases.

20       Q    On page 5 at the top, I'm just

21   bringing us back to the sentence we read

22   earlier about "semiautomatics equipped with

23   LCMs have frequently been employed in highly

24   publicized mass shootings and are

25   disproportionately used in the murders of law

Exhibit 9
Page 00501

**In the Matter Of:**

VIRGINIA DUNCAN vs XAVIER BECERRA

17-cv-1017-BEN-JLB

**LUCY P. ALLEN**

*January 18, 2018*

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 10
Page 00503

LUCY P. ALLEN                                           January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                                      1

1

2              UNITED STATES DISTRICT COURT

3           SOUTHERN DISTRICT OF CALIFORNIA

4    -------------------------------------------x

5    VIRGINIA DUNCAN, et al.,

6                         Plaintiffs,

7           -against-    No. 17-cv-1017-BEN-JLB

8    XAVIER BECERRA, in his official capacity as

9    Attorney General of the State of California,

10                        Defendant.

11   -------------------------------------------x

12

13

14

15           DEPOSITION OF LUCY P. ALLEN

16              New York, New York

17           Thursday, January 18, 2018

18

19

20

21

22

23
     Reported by:
24   Aydil M. Torres, CSR
     JOB NO. J1035413
25



LUCY P. ALLEN                                    January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                              2

 1

 2

 3              January 18, 2018

 4              9:53 a.m.

 5

 6

 7          Deposition of LUCY P. ALLEN,

 8   held at the offices of Esquire

 9   Deposition Solutions, LLC, 1384

10   Broadway, New York, New York,

11   pursuant to Notice, before Aydil M.

12   Torres, a Notary Public of the

13   State of New York.

14

15

16

17

18

19

20

21

22

23

24

25



ER_2692

LUCY P. ALLEN                                          January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                                    3

```
 1

 2

 3

 4    A P P E A R A N C E S:

 5

 6        MICHEL & ASSOCIATES, P.C.

 7        Attorneys for Plaintiffs

 8            180 East Ocean Boulevard, Suite 200

 9            Long Beach, California 90802

10        BY:  ANNA M. BARVIR, ESQ.

11             NICHOLAS W. STADMILLER, ESQ.

12

13

14        STATE OF CALIFORNIA

15        DEPARTMENT OF JUSTICE

16        OFFICE OF THE ATTORNEY GENERAL

17        Attorneys for Defendant

18            300 South Spring Street, Suite 1702

19            Los Angeles, California 90013

20        BY:  JOHN D. ECHEVERRIA, ESQ.

21

22

23

24

25
```



LUCY P. ALLEN                                      January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                              4

```
 1
 2                   S T I P U L A T I O N S
 3
 4          IT IS HEREBY STIPULATED AND AGREED
 5    by and between the attorneys for the
 6    respective parties herein, that filing,
 7    sealing and the same are hereby waived.
 8            IT IS FURTHER STIPULATED AND AGREED
 9    that all objections, except as to the form
10    of the question, shall be reserved to the
11    time of the trial.
12            IT IS FURTHER STIPULATED AND AGREED
13    that the within deposition may be sworn to
14    and signed before any officer authorized to
15    administer an oath, with the same force
16    and effect as if signed and sworn to before
17    the Court.
18
19
20
21
22
23
24
25
```



LUCY P. ALLEN                                        January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                              5

1

2    L U C Y    P.    A L L E N,

3                   the witness herein, having been

4                   first duly sworn by a Notary Public

5                   of the State of New York, was

6                   examined and testified as follows:

7                        THE REPORTER:  Please state

8               your name for the record.

9                        THE WITNESS:  Lucy Allen.

10              A-L-L-E-N.

11                       THE REPORTER:  Will you

12              please state your address for the

13              record.

14                       THE WITNESS:  1166 Avenue of

15              the Americas, New York, New York.

16              That's my work address.

17   EXAMINATION BY

18   MS. BARVIR:

19        Q.   Could you state your name, title,

20   and business address once more for the record

21   for me, please?

22        A.   Lucy Allen, managing director, 1166

23   Avenue of the Americas, New York, New York,

24   NERA Economic Consulting.

25        Q.   Thank you.  So NERA, N-E-R-A, if I



LUCY P. ALLEN                                    January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                            24

1                    Lucy P. Allen
2    report, is it your opinion, as an expert,
3    that large-capacity magazines are not often
4    used in self-defense in the home?
5         A.   I wouldn't say I've addressed that
6    specific question, no.
7         Q.   And based on your findings, as you
8    summarize them in this report -- excuse me --
9    is it your opinion as an expert that these
10   large capacity magazines are often used in
11   mass shootings?
12        A.   I think I show data that a large
13   percentage of mass shootings involve large
14   capacity magazines, and that the number of
15   fatalities and injuries are higher in mass
16   shootings that involve large capacity
17   magazines, than those that do not involve
18   large capacity magazines.
19        Q.   Okay.  Have you ever been asked
20   before to determine a number of rounds of
21   ammunition that are fired in self-defense in
22   the home, in another legal case?
23        A.   I have been asked to determine
24   rates that are similar to this, so I believe,
25   for example, I was asked to determine the



LUCY P. ALLEN                                    January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                            214

1                     Lucy P. Allen

2    that occur in a public place or primarily

3    occur in a public place.

4         Q.   So do you know how many mass

5    shooting there would be per year if the

6    definitions were not limited to public

7    places?

8         A.   If you used a completely different

9    -- you use just a large -- like more than

10   three people being killed anywhere?

11        Q.   Uh-huh.

12        A.   I don't know the answer to that.

13        Q.   How about if you use the definition

14   that didn't limit the event to where four or

15   more people were killed and not connected

16   with another crime?

17        A.   I don't know the answer.

18        Q.   Do you know for sure whether the

19   Mother Jones and Citizens Crime Commission

20   data sets you use include every public mass

21   shooting event not connected to another crime

22   that occurred in the 36-year period that was

23   studied?

24        A.   Is your question, do they include

25   everything that would meet their definition



LUCY P. ALLEN                                    January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                            215

```
 1              Lucy P. Allen
 2   or are you trying to change the definition?
 3        Q.   That would meet their definition.
 4   Are you certain that they've included every
 5   single incident of mass shooting that meets
 6   their definition within that 36-year period?
 7        A.   I am not certain that they have
 8   included everything.  I have looked at the
 9   mass shootings that Dr. Kleck says that they
10   failed to include, and I found that the vast
11   majority of them did not meet the
12   definitions, but I have not done anything
13   else to determine whether -- to find other
14   mass shootings that they may have excluded.
15   I don't believe I recall anything in regard
16   to that.
17        Q.   So you don't know what percentage
18   of shootings with four or more people killed
19   were covered by those two sources; do you?
20        A.   I'm not aware of other mass
21   shootings that meet their definition, which
22   is a -- in general is what I understand to be
23   the common -- a common definition of mass
24   shooting that are not included, you know,
25   with the exception of one incident, I
```



LUCY P. ALLEN                                    January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                          216

```
 1                    Lucy P. Allen
 2    believe.
 3         Q.   So you assume they cover all of
 4    them but you're not certain?
 5         A.   I have not assumed that.  I have --
 6    I have looked to see what other sources there
 7    are of mass shootings, and I have found that
 8    these are -- and I have not found that other
 9    sources include mass shootings that they have
10    -- I have found that their analysis is
11    comprehensive and systemic with, you know,
12    the minor exception here and there of one
13    that I'm not sure why they included or one
14    that I'm not sure why they excluded.  So I
15    have some, you know, some minor exceptions I
16    have found that both of them have a
17    systematic and comprehensive approach.
18         Q.   Are you familiar with the "Gun
19    Violence Archive"?
20         A.   I'm aware that Dr. Kleck mentioned
21    it and I looked at the data that Dr. Kleck
22    said that Mother Jones had in a biased way or
23    mistakenly excluded, and I found that he was
24    incorrect, and that -- so that is my
25    familiarity with it, is looking into the
```



LUCY P. ALLEN                                           January 18, 2018
VIRGINIA DUNCAN vs XAVIER BECERRA                                    285

```
 1                    Lucy P. Allen

 2           Ms. Allen.

 3                    THE WITNESS:  Thank you.

 4                    (Whereupon, a discussion was

 5           held off the record at this time.)

 6                    MS. BARVIR:  We are back on

 7           record.  We are opening the record

 8           again just to introduce as

 9           Plaintiff's 7, I believe, the

10           updated pages of Lucy Allen's

11           expert report in this matter that

12           showed the new numbers with the Las

13           Vegas incident.

14                    THE WITNESS:  Correct.

15                    (Plaintiff's Exhibit 7,
                      Updated Pages, marked for
16                    identification, as of this
                      date.)
17                    -oOo-
                      (Whereupon, the examination
18           of LUCY P. ALLEN was adjourned at
             5:39 p.m.)

19

20                    LUCY P. ALLEN

21   Subscribed and sworn to

22   before me this       day

23   of             , 2010.

24

25   NOTARY PUBLIC
```





both sources and searched news stories on each mass shooting to obtain data on shots fired where available.[17] See attached Appendix B for a summary of the combined data.

22.     Based on the combined data we found that large-capacity magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in mass shootings. Magazine capacity is known in 83 out of the 96 mass shootings (86%) considered in this analysis. We found that large-capacity magazines were used in the majority of mass shootings since 1982 regardless of how mass shootings with unknown magazine capacity are treated. In particular, out of 83 mass shootings with known magazine capacity, 54 involved large-capacity magazines or 65% of mass shootings with known magazine capacity. Even assuming the mass shootings with unknown magazine capacity *all* did not involve large-capacity magazines, the majority of mass shootings involved large capacity magazines (*i.e.*, 54 out of 96 mass shootings or 56%).

23.     The combined data on mass shootings indicates that it is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings. In particular, in mass shootings that involved use of large-capacity magazine guns, the average number of shots fired was 99.[18]

### 2. Casualties in mass shootings with large-capacity magazine guns compared with other mass shootings

24.     Based on our analysis of the combined mass shootings data in the past 35 years, casualties were higher in the mass shootings that involved large-capacity magazine guns than in

---

to another crime (such as robbery or domestic violence). *See* "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, 2016.

The second source covers 33 mass shootings from 1984 to 2012, in which a shooter killed four or more people and the gun used by the shooter had a magazine capacity greater than ten. All but one of the mass shooting incidents in the second source are covered by the first, but the combination of the two sources provides additional detail, such as the number of shots fired. *See* "Mass Shooting Incidents in America (1984-2012)," *Citizens Crime Commission of New York City*, http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[17]   The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report, so numbers for this shooting have been updated based on Mother Jones data accessed January 17, 2018.

[18]   There were 36 mass shootings in which the magazine used was known to be a large capacity magazine and the number of shots fired were known. The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report. Details on the Las Vegas shooting are updated based on Mother Jones data accessed January 17, 2018 and "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review Journal*, November 22, 2017.

other mass shootings. In particular, we found an average number of fatalities or injuries of 31 per mass shooting with a large-capacity magazine versus 9 for those without.[19]

### 3. Percent of mass shooters' guns legally obtained

25.     The combined data on mass shootings indicates that the majority of guns used in mass shootings were obtained legally.[20] According to the data, shooters in at least 71% of mass shootings in the past 35 years obtained their guns legally (at least 68 of the 96 mass shootings) and at least 76% of the guns used in these 96 mass shootings were obtained legally (at least 170 of the 224 guns).[21]

### C. Rate in California that victims use a firearm in self-defense in the home

26.     Plaintiffs claim the banned large-capacity magazines are commonly used in the home for self-defense.[22] We estimated how common it is in California for a person in their home to defend themselves with a gun against an armed robber.

27.     Using California-specific crime data collected by the California Department of Justice,[23] we estimated the number of residential robberies committed with a firearm. This estimate was based on the average annual rate for the six-year period between 2011-2016 using

---

[19]  An analysis of the mass shootings detailed in an article by Plaintiffs' expert Gary Kleck yielded similar results (21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without). The article covered 88 mass shooting incidents between 1994 and 2013. *See* Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

A 2013 study by Mayors Against Illegal Guns found that when mass shootings involved assault weapons or high capacity magazines, the number of deaths was higher. The study was based on data from the FBI and media reports covering the period January 2009 through January 2013. The study found that mass shootings where assault weapons or high-capacity magazines were used resulted in an average of 14.4 people shot and 7.8 deaths versus other mass shootings that resulted in 5.7 people shot and 4.8 deaths. *See* "Analysis of Recent Mass Shootings," *Mayors Against Illegal Guns*, September 2013.

[20]  The determination of whether guns were obtained legally is based on Mother Jones reporting.

[21]  Mother Jones did not indicate whether the guns were obtained legally for 10% of mass shootings (9 out of the 91 mass shootings covered by Mother Jones).

[22]  Complaint at 47.

[23]  "Crime in California 2016," *California Department of Justice: Criminal Justice Statistics Center*.

Exhibit 10
Page 00515

**ER_2702**

**Appendix B**
**Combined Mass Shootings Data**
**1982 – October 2017**

| Case (1) | Location (2) | Date (3) | Source (4) | Large Cap. Mag.?ᵃ (5) | Fatalities ᵇ (6) | Injuries ᵇ (7) | Total Fatalities & Injuries ᵇ (8) | Shots Fired (9) | Gun(s) Obtained Legally?ᶜ (10) | Offenders' Number of Guns (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. Las Vegas Strip | Las Vegas, NV | 10/1/2017 | MJ | Yes | 58ᵈ | 546ᵈ | 604ᵈ | 1,100ᵈ | Yesᵈ | 23ᵈ |
| 2. San Francisco UPS | San Francisco, CA | 6/14/2017 | MJ | Yes | 3 | 2 | 5 | . | No | 2 |
| 3. Pennsylvania Supermarket | Tunkhamock, PA | 6/7/2017 | MJ | No | 3 | 0 | 3 | 59ᵉ | . | 2 |
| 4. Fiamma Workplace | Orlando, FL | 6/5/2017 | MJ | . | 5 | 0 | 5 | . | . | 1 |
| 5. Ohio Nursing Home | Kirkersville, OH | 5/12/2017 | MJ | . | 3 | 0 | 3 | . | . | 2 |
| 6. Fresno Downtown | Fresno, CA | 4/18/2017 | MJ | No | 3 | 0 | 3 | . | . | 1 |
| 7. Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/2017 | MJ | . | 5 | 6 | 11 | 16ᶠ | Yes | 1 |
| 8. Cascade Mall | Burlington, WA | 9/23/2016 | MJ | . | 5 | 0 | 5 | 15ᵍ | . | 1 |
| 9. Baton Rouge Police | Baton Rouge, LA | 7/17/2016 | MJ | Yes | 3 | 3 | 6 | 43ʰ | . | 3 |
| 10. Dallas Police | Dallas, TX | 7/7/2016 | MJ | Yes | 5 | 11 | 16 | . | Yes | 3 |
| 11. Orlando Nightclub | Orlando, FL | 6/12/2016 | MJ/CC | Yes | 49/50 | 53 | 102/103 | 110ⁱ | Yes | 2 |
| 12. Excel Industries | Hesston, KS | 2/25/2016 | MJ | Yes | 3 | 14 | 17 | . | Yes | 2 |
| 13. Kalamazoo | Kalamazoo County, MI | 2/20/2016 | MJ | . | 6 | 2 | 8 | . | Yes | 1 |
| 14. San Bernardino | San Bernardino, CA | 12/2/2015 | MJ/CC | Yes | 14/16 | 21 | 35/37 | 150ʲ | Yes | 4 |
| 15. Planned Parenthood Clinic | Colorado Springs, CO | 11/27/2015 | MJ | . | 3 | 9 | 12 | . | . | 1 |
| 16. Colorado Springs | Colorado Springs, CO | 10/31/2015 | MJ | Yes | 3 | 0 | 3 | . | Yes | 3 |
| 17. Umpqua Community College | Roseburg, OR | 10/1/2015 | MJ/CC | Yes | 9/10 | 9 | 18/19 | . | Yes | 6 |
| 18. Chattanooga Military Center | Chattanooga, TN | 7/16/2015 | MJ/CC | Yes | 5/6 | 2/3 | 7/9 | . | Yes | 3 |
| 19. Charleston Church | Charleston, SC | 6/17/2015 | MJ/CC | Yes | 9 | 1 | 10 | . | Yes | 1 |
| 20. Trestle Trail Bridge | Menasha, WI | 6/11/2015 | MJ | . | 3 | 1 | 4 | . | Yes | 2 |
| 21. Marysville High School | Marysville, WA | 10/24/2014 | MJ/CC | Yes | 5 | 1 | 6 | . | Stolen | 1 |
| 22. Isla Vista | Santa Barbara, CA | 5/23/2014 | MJ | Yes | 6 | 13 | 19 | 50ᵏ | Yes | 3 |
| 23. Fort Hood | Fort Hood, TX | 4/3/2014 | MJ | . | 3 | 12 | 15 | . | Yes | 1 |
| 24. Alturas Tribal | Alturas, CA | 2/20/2014 | MJ | . | 4 | 2 | 6 | . | . | 2 |
| 25. Washington Navy Yard | Washington, D.C. | 9/16/2013 | MJ/CC | No | 12/13 | 8/7 | 20 | - | Yes | 2 |

Page 1 of 5

Exhibit 10
Page 00516

17-cv-1017-BEN-JLB

## Appendix B
## Combined Mass Shootings Data
## 1982 – October 2017

| Case (1) | Location (2) | Date (3) | Source (4) | Large Cap. Mag.?[a] (5) | Fatalities[b] (6) | Injuries[b] (7) | Total Fatalities & Injuries[b] (8) | Shots Fired (9) | Gun(s) Obtained Legally?[c] (10) | Offenders' Number of Guns (11) |
|---|---|---|---|---|---|---|---|---|---|---|
| 76. Piper Technical Center | Los Angeles, CA | 7/19/1995 | CC | Yes | 4 | 0 | 4 | - | - | - |
| 77. Walter Rossler Company | Corpus Christi, TX | 4/3/1995 | MJ/CC | No | 6 | 0 | 6 | - | Yes | 2 |
| 78. Air Force Base | Fairchild Base, WA | 6/20/1994 | MJ/CC | Yes | 5/6 | 23 | 28/29 | 50[r] | Yes | 1 |
| 79. Chuck E. Cheese | Aurora, CO | 12/14/1993 | MJ/CC | No | 4 | 1 | 5 | - | - | 1 |
| 80. Long Island Railroad | Garden City, NY | 12/7/1993 | MJ/CC | Yes | 6 | 19 | 25 | 30 | Yes | 1 |
| 81. Luigi's Restaurant | Fayetteville, NC | 8/6/1993 | MJ/CC | No | 4 | 8 | 12 | - | Yes | 3 |
| 82. 101 California Street | San Francisco, CA | 7/1/1993 | MJ/CC | Yes | 9 | 6 | 15 | 75 | No | 3 |
| 83. Watkins Glen | Watkins Glen, NY | 10/15/1992 | MJ/CC | No | 5 | 0 | 5 | - | Yes | 1 |
| 84. Lindhurst High School | Olivehurst, CA | 5/1/1992 | MJ/CC | No | 4 | 10 | 14 | - | Yes | 2 |
| 85. Royal Oak Postal | Royal Oak, MI | 11/14/1991 | MJ/CC | No | 5 | 54 | 109 | - | Yes | 1 |
| 86. University of Iowa | Iowa City, IA | 11/1/1991 | MJ/CC | No | 6 | 1 | 7 | - | Yes | 1 |
| 87. Luby's Cafeteria | Killeen, TX | 10/16/1991 | MJ/CC | Yes | 24 | 20 | 44 | 100 | Yes | 2 |
| 88. GMAC | Jacksonville, FL | 6/18/1990 | MJ/CC | Yes | 10 | 4 | 14 | 14 | Yes | 2 |
| 89. Standard Gravure Corporation | Louisville, KY | 9/14/1989 | MJ/CC | Yes | 9 | 12 | 21 | 21 | Yes | 5 |
| 90. Stockton Schoolyard | Stockton, CA | 1/17/1989 | MJ/CC | Yes | 6 | 29/30 | 35/36 | 106 | Yes | 2 |
| 91. ESL | Sunnyvale, CA | 2/16/1988 | MJ/CC | No | 7 | 4 | 11 | - | Yes | 7 |
| 92. Shopping Centers | Palm Bay, FL | 4/23/1987 | MJ/CC | Yes | 6 | 14/10 | 20/16 | 40[s] | Yes | 3 |
| 93. United States Postal Service | Edmond, OK | 8/20/1986 | MJ/CC | No | 15 | 6 | 21 | - | Yes | 3 |
| 94. San Ysidro McDonald's | San Ysidro, CA | 7/18/1984 | MJ/CC | Yes | 22 | 19 | 41 | 257 | Yes | 3 |
| 95. Dallas Nightclub | Dallas, TX | 6/29/1984 | MJ/CC | Yes | 6 | 1 | 7 | - | No | 1 |
| 96. Welding Shop | Miami, FL | 8/20/1982 | MJ | No | 8 | 3 | 11 | - | Yes | 1 |
| Large Capacity Magazine Average | | | | | 10.2 | 20.3 | 30.6 | 99.3 | | |
| Non-Large Capacity Magazine Average | | | | | 6.3 | 2.9 | 9.2 | 22.6 | | |

Exhibit 10
Page 00517

ER_2704

# Appendix B
## Combined Mass Shootings Data
### 1982 – October 2017

| Case | Location | Date | Source | Large Cap. Mag.?[a] | Fatalities[b] | Injuries[b] | Total Fatalities & Injuries[b] | Shots Fired | Gun(s) Obtained Legally?[c] | Offenders' Number of Guns |
|------|----------|------|--------|--------------------|---------------|-------------|-------------------------------|-------------|----------------------------|---------------------------|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |

### Notes and Sources:

Data from Mother Jones ("US Mass Shootings, 1982-2017: Data from Mother Jones' Investigation," accessed June 1, 2017) and the Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," 2016, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017).

MJ indicates Mother Jones data. CC indicates Citizens Crime Commission of New York City data. If sources differ on data, "/" is added between values. In these instances, values from MJ are listed first. Except where noted, all data on shots fired obtained from CC.

[a] Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition.

[b] Offender(s) included in counts of fatalities and injuries.

[c] The determination of whether guns were obtained legally is based on Mother Jones reporting.

[d] The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report, so numbers for this shooting have been updated based on Mother Jones data accessed January 17, 2018. Shots fired from: "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review Journal*, November 22, 2017.

[e] Shots fired from: "Killer in Supermarket Shooting Posted Chilling Videos Online, Lauding Columbine Massacre," *Washington Post*, June 9, 2017.

[f] Shots fired from: "Hate Crime is Suspected After Gunman Kills 3 White Men in Downtown Fresno," *Los Angeles Times*, April 19, 2017.

[g] Shots fired from: "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond," *Washington Post*, January 9, 2017.

[h] Shots fired from: "Baton Rouge Cop Killer Left Note, Fired At Least 43 Rounds," CNN, July 9, 2017.

[i] Shots fired from: "We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando," *The Telegraph*, June 13, 2016.

[j] Shots fired from: "San Bernardino Suspects Left Trail of Clues, but No Clear Motive," *New York Times*, December 3, 2015.

[k] Shots fired from: "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage," *Los Angeles Times*, June 4, 2014.

[l] Shots fired from: "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage," *NBC News*, July 28, 2013.

[m] Shots fired from: "Police Call Santa Monica Gunman 'Ready for Battle,'" *New York Times*, June 8, 2013.

[n] Shots fired from: "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead," *Sun-Sentinel*, June 7, 2010.

[o] Shots fired from: "Small Town Grieves for 6, and the Killer," *Los Angeles Times*, October 9, 2007.

[p] Shots fired from: "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," *New York Times*, January 15, 2005.

[q] Shots fired from: "5 Beach Workers in Florida are Slain by Ex-Colleague," *New York Times*, February 10, 1996.

[r] Shots fired from: "Man Bent On Revenge Kills 4, Hurts 23 -- Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," *The Seattle Times*, June 21, 1994.

[s] Shots fired from: "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," *Chicago Tribune*, April 25, 1987.

**In the Matter Of:**

DUNCAN vs BECERRA

17-cv-1017-BEN-JLB

**LOUIS KLAREVAS**

*January 19, 2018*

ESQUIRE

DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 11

LOUIS KLAREVAS                                January 19, 2018
DUNCAN vs BECERRA                                           1

```
 1
 2            UNITED STATES DISTRICT COURT
 3         SOUTHERN DISTRICT OF CALIFORNIA
 4    -------------------------------------------x
 5   VIRGINIA DUNCAN, et al.,
 6                         Plaintiffs,
 7          -against-   No. 17-cv-1017-BEN-JLB
 8   XAVIER BECERRA, in his official capacity as
 9   Attorney General of the State of California,
10                         Defendant.
11    -------------------------------------------x
12
13
14
15         DEPOSITION OF LOUIS KLAREVAS
16              New York, New York
17            Friday, January 19, 2018
18
19
20
21
22
23   Reported by:
     Aydil M. Torres, CSR
24   JOB NO. J1035515
25
```



LOUIS KLAREVAS                                      January 19, 2018
DUNCAN vs BECERRA                                                 2

 1

 2

 3          January 19, 2018

 4          10:04 a.m.

 5

 6

 7          Deposition of LOUIS

 8    KLAREVAS, held at the offices of

 9    Esquire Deposition Solutions, LLC,

10    1384 Broadway, New York, New York,

11    pursuant to Notice, before Aydil M.

12    Torres, a Notary Public of the

13    State of New York.

14

15

16

17

18

19

20

21

22

23

24

25



ER_2708

LOUIS KLAREVAS                                          January 19, 2018
DUNCAN vs BECERRA                                                      3

```
 1

 2    A P P E A R A N C E S:

 3

 4       MICHEL & ASSOCIATES, P.C.

 5       Attorneys for Plaintiffs

 6            180 East Ocean Boulevard, Suite 200

 7            Long Beach, California 90802

 8       BY:  NICHOLAS W. STADMILLER, ESQ.

 9             ANNA M. BARVIR, ESQ.

10

11

12

13       STATE OF CALIFORNIA

14       DEPARTMENT OF JUSTICE

15       OFFICE OF THE ATTORNEY GENERAL

16       Attorneys for Defendant

17            300 South Spring Street, Suite 1702

18            Los Angeles, California 90013

19       BY:  JOSE A. ZELIDON-ZEPEDA, ESQ.

20

21

22

23

24

25
```



LOUIS KLAREVAS                                    January 19, 2018
DUNCAN vs BECERRA                                              4

1

2

3             S T I P U L A T I O N S

4

5          IT IS HEREBY STIPULATED AND AGREED

6    by and between the attorneys for the

7    respective parties herein, that filing,

8    sealing and the same are hereby waived.

9          IT IS FURTHER STIPULATED AND AGREED

10   that all objections, except as to the form

11   of the question, shall be reserved to the

12   time of the trial.

13         IT IS FURTHER STIPULATED AND AGREED

14   that the within deposition may be sworn to

15   and signed before any officer authorized to

16   administer an oath, with the same force

17   and effect as if signed and sworn to before

18   the Court.

19

20

21

22

23

24

25



LOUIS KLAREVAS                                    January 19, 2018
DUNCAN vs BECERRA                                              5

```
 1
 2   L O U I S   K L A R E V A S,
 3              the witness herein, having been
 4              first duly sworn by a Notary Public
 5              of the State of New York, was
 6              examined and testified as follows:
 7                    THE REPORTER:  Please state
 8              your name for the record.
 9                    THE WITNESS:  Louis,
10              L-O-U-I-S, Klarevas,
11              K-L-A-R-E-V-A-S.
12                    THE REPORTER:  Please state
13              your business address for the
14              record.
15                    THE WITNESS:  69-12 62nd
16              Road, Middle Village, Queens, New
17              York.  Sorry, Middle Village, New
18              York 11379.
19                    MR. STADMILLER:  So we are
20              all taking notes on how to
21              pronounce it but you've just
22              clarified that, Klarevas.
23                    THE WITNESS:  Yeah, it's a
24              long "E" and then try to imagine
25              the "A"s are, like, Klarevas.
```



LOUIS KLAREVAS                                    January 19, 2018
DUNCAN vs BECERRA                                              227

```
 1              Louis Klarevas
 2   those opportunities.
 3        Q.   Have you expressed any opinion that
 4   the children in the Sandy Hook school
 5   shooting incident escaped while the shooter
 6   was changing magazines?
 7        A.   That is correct, they did.
 8        Q.   And what is that based on?
 9        A.   It's based on my review of the
10   witness statements that the children gave to
11   police officers immediately following the
12   Sandy Hook massacre.  These were the
13   statements of the actual children who fled.
14        Q.   Now, even assuming -- if what you
15   are saying is true, does that indicate that
16   the magazine change in question did provide
17   additional time for victims to escape, beyond
18   the time that elapsed between the shots when
19   the shooter was not firing?
20        A.   It -- it -- it did provide the time
21   necessary.
22        Q.   How do you make that determination?
23        A.   Well, we know that he was firing --
24   well, first of all we -- we -- I make that
25   determination based on what the witness
```



LOUIS KLAREVAS                                          January 19, 2018
DUNCAN vs BECERRA                                                    228

```
 1                    Louis Klarevas
 2   statements say.  The students said, you know,
 3   that when he was changing out his magazines,
 4   one of the student recognized this as an
 5   opportunity, he yelled for the other
 6   students, and they all ran.  And in -- I
 7   believe in one of the witness statements, one
 8   of the students actually even pushed him,
 9   physically pushed him aside, or grazed by him
10   and bumped him, and then all the other
11   students ran out.  Additional students ran
12   out behind that student.
13        Q.   Would you agree with the statement
14   that
15   "the best available information indicates
16   that mass shooters generally fire their
17   weapons slowly and deliberately with
18   substantial intervals between shots?
19        A.   I disagree with that statement,
20   because we know based on audio and video
21   recordings that, in general, when mass
22   shooters undertake their attacks, they tend
23   to fire in a different kind of pattern, which
24   is burst of fires at a very rapid pace,
25   usually two to three rounds per second, if
```



LOUIS KLAREVAS                                    January 19, 2018
DUNCAN vs BECERRA                                              229

```
 1                Louis Klarevas
 2    you're using a semiautomatic firearm,
 3    followed by, if they're continuing their
 4    shooting, long pauses, and then again bursts.
 5    That assumes, of course, that someone is
 6    going to fire more than one magazine's worth
 7    of bullets.
 8         Q.   Okay.  Would you agree with the
 9    statement that "shooters can easily change
10    detachable magazines in approximately two to
11    four seconds, depending on experience"?
12         A.   I would qualify that.  I mean,
13    competitive shooters probably shoot at a rate
14    of, you know, magazine changes of around 3 or
15    4 seconds.  Based on what we know from mass
16    shooters and, you know, the evidence that I
17    have seen, which would be looking again at
18    video and audio tape, usually it's a little
19    bit longer.  I mean, these are high stress
20    situations, you have shooters that are under
21    duress.  A good example would be one that I
22    cited in my exhibits.  It's the audio
23    recording of a very recent active shooting
24    involving --
25         Q.   The list --
```



LOUIS KLAREVAS                                    January 19, 2018
DUNCAN vs BECERRA                                            230

```
 1              Louis Klarevas
 2       A.   Sorry, yeah, I will do the things.
 3  Exhibit 6.  It would be the very last link,
 4  because they're presented chronologically.
 5  It is a link to a recording that the active
 6  shooter actually live fed this onto a site
 7  called Parascope and while he was attacking
 8  Douglas County Sheriff Deputies outside of
 9  Denver, Colorado, and this is a military
10  veteran.  It took him approximately ten
11  seconds to change magazines and you can hear
12  that.  So the idea that somehow -- and also
13  we know the Las Vegas shooter, his shortest
14  interval of pause between firing burst of
15  rounds onto the concert attendants attendees
16  was, I believe, 25 seconds.  So the idea that
17  it takes two to four seconds is really maybe
18  theoretical, but it's really something you
19  perhaps see in competitive shooting.  It's
20  not something that we see, in terms of active
21  shooters.
22       Q.   In terms of active shooters, do you
23  have any opinion on what the average time for
24  them to change a magazine attachment would
25  be?
```



800.211.DEPO (3376)
EsquireSolutions.com
Exhibit 11
Page 00529

LOUIS KLAREVAS                                        January 19, 2018
DUNCAN vs BECERRA                                                  293

 1                    Louis Klarevas
 2       Q.   Did those play any part in the
 3  basis for your opinions for your expert
 4  report?
 5       A.   Well, that is something I state
 6  explicitly in my expert report.
 7       Q.   Okay.  And did you say that --
 8  okay.
 9            You further state "Imagine how many
10  lives would have been spared if the Las Vegas
11  strip shooter had to pause firing in order to
12  reload after 10 rounds."
13       A.   Yes.
14       Q.   Do you have any estimate as to how
15  many lives would have been spared if he had
16  to reload after 10 rounds?
17       A.   I have not put together an
18  estimate.  I'm still confident in the
19  statement because we know that in between
20  bursts of gun fire, his shortest time span
21  was 25 seconds.  So just taking that
22  across-the-board, if every time he had to
23  reload and it takes him 25 seconds or he had
24  to switch guns and it took him 25 seconds,
25  that would have been -- to shoot 90 rounds,



LOUIS KLAREVAS                                    January 19, 2018
DUNCAN vs BECERRA                                             294

```
 1                    Louis Klarevas
 2    like he did, now take that, instead of having
 3    -- which what I believe were 11 pauses, take
 4    that and multiply that by 10 or by -- or by.
 5         Q.   20?
 6         A.   No, no, by ten-fold, because it's
 7    instead of 100 rounds, you are dividing it by
 8    10.  You are looking at upwards of -- I said
 9    11 -- 110 pauses, each 25 seconds.  That's a
10    lot of time for people to flee.
11         Q.   Okay.  Just to confirm, you haven't
12    started to perform any sort of analysis on
13    that.  It's more of a statement that lives
14    could have been spared, as you just
15    explained?
16         A.   Actually, I think I just did, kind
17    of off the cuff, an analysis for you.  If you
18    do 110 times 25, you get an idea of how many
19    --
20         Q.   That would be your best estimate?
21         A.   That would be a really long time
22    that would be -- yeah, that -- that would be,
23    like, over 2,000 seconds, I believe.  So
24    that's more time not shooting than shooting.
25    That's a lot of time for people to get out of
```



LOUIS KLAREVAS                                          January 19, 2018
DUNCAN vs BECERRA                                                    295

```
 1                    Louis Klarevas
 2    the way.  And there were, obviously, a lot of
 3    survivors.  We're talking about tens of
 4    thousands of people who were in the line of
 5    fire.  Some of them who panicked and tried
 6    to, you know, many of them who stayed because
 7    they were afraid of -- of -- of the gun fire,
 8    but then when there were pauses, you see in
 9    the video evidence image, they ran.  Imagine
10    if we could have created 100 more
11    opportunities for them to run.  Not to
12    mentions that in the initial gun burst,
13    instead of shooting 90 rounds, he would have
14    shot just 10.
15        Q.   Did the fact that he had multiple
16    guns set up which we already talked about,
17    contribute at all into your statement?
18        A.   Well, it certainly leads you to
19    believe that if someone can have multiple
20    guns, as opposed to one gun, it requires that
21    person to switch and get that gun, and if you
22    are shooting from a sniper position, you
23    know, you will have to get up, you are on
24    your belly, for example, on that hotel room
25    firing your rifle, you're going to have to
```



                         Louis Klarevas

1

2    get up, get rid of that gun that you just

3    used, go grab your other gun that's got a

4    fresh magazine in it, come back, set it up,

5    shoot again, which could explain, in part,

6    why it took him a minimum of 25 seconds

7    between the bursts of fire.  So when you have

8    more guns, it could in theory create even

9    longer pauses.  So, again, another advantage

10   to an active shooter of having large capacity

11   magazine is that doesn't have to stop to

12   reload, doesn't have to stop to switch guns.

13   At most, you know, would stop much more

14   infrequently, would stop with less frequency

15   to switch out one large capacity magazine for

16   another.  So it definitely provides

17   advantages to the active shooter and

18   disadvantages to those in the line of fire.

19        Q.   So could -- so could reviving the

20   assault weapons ban be a contributing factor

21   in causing less gun massacres?

22        A.   Could it result in less gun

23   massacres?  Sure.  Particularly because I

24   think that the most effective part of the

25   assault weapons ban was the ban on large





**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

JUL 06 1989

MEMORANDUM T0:   Director

FROM:   Associate Director (Compliance Operations)

SUBJECT:   Report and Recommendation on the
Importability of Certain Semiautomatic Rifles

The working group has completed its evaluation of the semiautomatic rifles whose importation was suspended pending a determination as to whether these weapons are, as required by 18 U.S.C. § 925(d)(3), of a type "generally recognized as particularly suitable for or readily adaptable to sporting purposes".

Attached for your review and approval is the report and recommendation on the importability of these rifles.

*Daniel R. Black*
Daniel Black

Attachment

Approved: *Stephen E. Higgins 7/6/89*

Disapprove: _____

### REPORT AND RECOMMENDATION OF THE ATF WORKING GROUP ON THE IMPORTABILITY OF CERTAIN SEMIAUTOMATIC RIFLES

### SUSPENSION OF ASSAULT-TYPE RIFLE IMPORTATIONS

On March 14, 1989, ATF announced that it was suspending, effective immediately, the importation of several makes of assault-type rifles, pending a decision as to whether these weapons meet the statutory test that they are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The announcement stated that ATF would not approve, until further notice, the importation of AKS-type weapons, Uzi carbines, FN/FAL-type weapons, FN/FNC-type weapons and Steyr Aug semiautomatic weapons. On April 5, 1989, the suspension was expanded to include all similar assault-type rifles.

For purposes of this suspension, assault-type rifles were rifles which generally met the following criteria:

        a.  military appearance

        b.  large magazine capacity

        c.  semiautomatic version of a machinegun

Based on these criteria, ATF suspended action on pending applications and suspended outstanding permits covering certain firearms listed in Attachment 1. These included both centerfire and .22 rimfire caliber firearms. At that time, ATF indicated that the reexamination of these weapons would take approximately 90 days.

This ATF working group was established to conduct the reevaluation of the importability of these semiautomatic rifles. This report represents the findings and recommendations of the working group.

### BACKGROUND

Section 925(d)(3) of Title 18, United States Code, as amended, provides in pertinent part that:

        The Secretary shall authorize a firearm. . .to be imported or
        brought into the United States . . if the firearm . .

                (3) is of a type that does not fall within the definition
                of a firearm as defined in section 5845(a) of the
                Internal Revenue Code of 1954 and is generally
                recognized as particularly suitable for or readily

Exhibit 12
Page 00536

**ER_2721**

> adaptable to sporting purposes, excluding surplus
> military firearms. . .

This provision was originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, and was also contained in Title I of the Gun Control Act of 1968, which amended Title IV later that year. According to the Senate Report on Title IV, this provision was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167.

Moreover, there is legislative history which indicates that Congress intended the standard to allow the importation of traditional sporting rifles, while excluding military-type rifles. The Senate Report on the Gun Control Act observed that the importation standards ". . . are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms." S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968). Significantly, the rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.[1]

An explanation of the effect of this section by one of the sponsors of the bill specifically stated that military firearms would not meet the "sporting purposes" test for importation. The mere fact that a military firearm may be used in a sporting event does not make it importable as a sporting firearm[2].

There is a reference in the Senate Report on Title IV which notes that the importation prohibition ". . . would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes, or for personal protection." S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2112, 2167. However, this language is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting since firearms particularly suitable for those purposes can obviously be used for other purposes such as recreational shooting and personal protection.

The determination of a weapon's suitability for sporting purposes "rest[s] directly with the Secretary of the Treasury." 114 Cong. Rec. 27465 (1968) (Statement of Sen. Murphy). While the legislative history suggests that the term "sporting purposes" refers to the traditional sports of target shooting, trap and skeet shooting, and hunting, the statute itself provides no criteria beyond the "generally recognized" language of section 925(d)(3). S. Rep. No. 1097, 90th Cong. 2d Sess. 80, 1968 U.S. Code Cong. and Admin. News 2167. The Senate Report on the Gun Control Act stated:

> The difficulty of defining weapons characteristics to meet this target [of eliminating importation of weapons used in crime] without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00537

Following enactment of the Gun Control Act in 1968, the Secretary established a Firearms Evaluation Panel to provide guidelines for implementation of the "sporting purposes" test of section 925(d)(3). This panel was composed of representatives from the military, law enforcement, and the firearms industry. The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction. An evaluation sheet (ATF Form 4590) was developed thereafter by ATF and put into use for evaluating handguns pursuant to section 925(d)(3). Attachment 2.

The 1968 Firearms Evaluation Panel did not propose criteria for evaluating rifles and shotguns under section 925(d)(3). Other than surplus military firearms which Congress addressed separately, long guns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes. Thus, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns. Until recently, all rifles and shotguns were approved for importation so long as they were not otherwise excluded by section 925(d)(3). Only rifles and shotguns covered by the National Firearms Act (NFA), 26 U.S.C. S 5845(a) (for example, machineguns and short-barreled rifles and short-barreled shotguns), and surplus military rifles and shotguns had been denied importation.

The Firearms Evaluation Panel did briefly comment on whether a model BM59 Beretta, 7.62mm NATO Caliber Sporter Version Rifle was suitable for sporting purposes. Minutes of the Firearms Advisory Panel, December 10, 1968. Attachment 3. It was the consensus of the Panel that this rifle did have a particular use in target shooting and hunting. Accordingly, it was recommended that importation of the Beretta BM59, together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle, be authorized for importation. (The Beretta BM59 and the Cetme, the predecessor to the HK91, are two of the rifles whose importation has been suspended. The SIG-AMT is no longer being produced.) However, the Panel recommended that importation of these weapons should include the restriction that they not possess combination flash suppressors/grenade launchers.

The working group found the Panel's consideration of these rifles to be superficial and unpersuasive. The vast majority of the work of the 1968 Panel was devoted to handguns and the establishment of the factoring criteria for the importation of handguns. Indeed, we found compelling evidence that these rifles are not generally recognized as particularly suitable for sporting purposes.

The first time that ATF looked beyond the restrictions on NFA and surplus military rifles and shotguns and undertook a meaningful analysis under the "sporting purposes" test was in 1984. At that time, ATF was faced with a new breed of imported shotgun. It was clear that the historical assumption that all shotguns were sporting was no longer viable. Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes. This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control. When the importer was asked to provide evidence of sporting purposes for the weapon, ATF was provided information that the weapon was suitable for police/combat style competitions. ATF determined that this type of competition did not constitute "sporting purposes" under the statute, and that this shotgun was not suitable for traditional sporting purposes, such as hunting, and trap and skeet shooting. Accordingly, importation was denied. Attachment 4.

Page 4

Exhibit 12
Page 00538

**ER_2723**

Thereafter, in 1986, the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). After examination and testing of the weapon, ATF found that it was a semiautomatic version of a selective fire military-type assault shotgun. In this case, ATF determined that, due to its weight, size, bulk, designed magazine capacity, configuration, and other factors, the USAS-12 was not particularly suitable for or readily adaptable to sporting purposes. Again, ATF refused to recognize police/combat competitions as a sporting purpose under section 925(d)(3). The shotgun was reviewed on the basis of its suitability for traditional shotgun sports of hunting, and trap and skeet shooting and its importation was denied. Attachment 5. This decision was upheld by the United States District Court in Gilbert Equipment Company, Inc. v. Higgins, 709 F. Supp. 1071 (S.D. Ala. 1989). The case is currently on appeal to the Eleventh Circuit.

These two cases involving shotguns represent ATF's first thorough examination of the suitability of certain combat-type weapons for sporting purposes. In these cases ATF adopted an interpretation of sporting as being limited to certain traditional sports and not simply any lawful activity in which the weapons might be employed.

## ANALYSIS

A. Defining the type of weapon under review.

As noted above, section 925(d)(3) expressly provides that the Secretary shall authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for sporting purposes. The legislative history also makes it clear that the Secretary shall scrutinize types of firearms in exercising his authority under section 925(d). Specifically, in its explanation of section 925(d)(3), the Senate Report on the Gun Control Act stated:

> This subsection gives the Secretary authority to permit the importation of ammunition and certain types of firearms--(1) those imported for scientific or research purposes or for use in competition or training under chapter 401 of title 10 of the United States Code; (2) an unserviceable firearm other than a machinegun; (3) those firearms not coming within the purview of the National Firearms Act (26 U.S.C. 5801, et seq.) and suitable for sporting purposes (in the case of surplus military weapons this type is limited to shotguns and rifles) and those taken out of the United States. (Emphasis added.)

S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

In light of the statutory mandate that types of firearms be scrutinized, the working group first attempted to determine whether the semiautomatic rifles suspended from importation fall within a type of firearm.

The working group determined that the semiautomatic rifles in question are generally semiautomatic versions of true selective fire military assault rifles.[3] As a class or type of firearm they are often referred to as "assault rifles," "assault-type rifles," "military style rifles," or "paramilitary rifles."[4] Since we are only concerned with semiautomatic rifles, it is somewhat of a misnomer to refer to these weapons as "assault rifles." True assault rifles are selective fire

weapons that will fire in a fully automatic mode.[5] For the purposes of this paper, it was necessary to settle on one term that best describes the weapons under consideration, and we will refer to these weapons as "semiautomatic assault rifles." They represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle. The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK47, is a weapon designed for killing or disabling the enemy and, as described below, has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles.[6] These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. These features and characteristics are as follows:

1. Military Configuration.

    a. Ability to accept a detachable magazine. Virtually all modern military firearms are designed to accept large, detachable magazines.[7] This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity. In addition, some States have a limit on the magazine capacity allowed for hunting, usually 8 rounds or less.[8] That a firearm is designed and sold with a large capacity magazine, e.g., 20-30 rounds, is a factor to be considered in determining whether a firearm is a semiautomatic assault rifle.

    b. Folding/telescoping stocks. Many military firearms incorporate folding or telescoping stocks.[9] The main advantage of this item is portability, especially for airborne troops. These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock. With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking. However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

    c. Pistol grips. The vast majority of military firearms employ a well-defined pistol grip that protrudes conspicuously beneath the action of the weapon.[10] In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon. Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire. On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or competitive target competitions.

    d. Ability to accept a bayonet. A bayonet has distinct military purposes.[11] First, it has a psychological affect on the enemy. Second, it enables soldiers to fight in close quarters

Exhibit 12
Page 00540

with a knife attached to their rifles. We know of no traditional sporting application for a bayonet.

e.  Flash suppressor. A flash suppressor generally serves one or two functions. First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night. A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired fully automatic.[12] From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash. Those flash suppressors which also serve to dampen "muzzle climb" have a limited benefit in sporting uses by allowing the shooter to reacquire the target for a second shot. However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result. There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb. In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

f.  Bipods. The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.[13] The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired fully automatic. Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability. However, traditional sporting rifles do not come equipped with bipods, nor are they specifically designed to accommodate them. Instead, bipods for sporting firearms are generally designed to attach to a detachable "sling swivel mount" or simply clamp onto the firearm.

g.  Grenade launcher. Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.[14] Such launchers are generally of two types. The first type is a flash suppressor designed to function as a grenade launcher. The second type attaches to the barrel of the rifle either by screws or clamps. We are not aware of any particular sporting use for grenade launchers.

h.  Night sights. Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.[15] Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally illegal to hunt at night.

2. Whether the weapon is a semiautomatic version of a machinegun.

   The vast majority of modern military firearms are selective fire, i.e., they can shoot either fully automatic or semiautomatic. Since machineguns are prohibited from importation (except for law enforcement use) the manufacturers of such weapons have developed semiautomatic versions of these firearms.[16]

3. Whether the rifle is chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.

Page 7

Exhibit 12
Page 00541

**ER_2726**

Modern military assault rifles and submachineguns are generally chambered to accept a centerfire cartridge case of 2.25 inches or less.[17] On the other hand, while many traditional sporting rifles will fire a cartridge of 2.25 inches or less, such firearms usually do not have the other military features outlined in Items 1a-h.

These features and characteristics are not usually found on traditional sporting firearms.[18] This is not to say that a particular rifle having one or more of the listed features should necessarily be classified as a semiautomatic assault rifle. Indeed, many traditional sporting firearms are . semiautomatic or have detachable magazines. Thus, the criteria must be viewed in total to determine whether the overall configuration places the rifle fairly within the semiautomatic assault rifle category.

Using these criteria, we determined that, on balance, all of the firearms on the original suspension list are properly included in the semiautomatic assault rifle category, with the exception of the .22 rimfire caliber rifles and the Valmet Hunter. While the .22 rimfire caliber rifles bear a striking resemblance to the true assault rifle, these rifles employ, by and large, conventional .22 rimfire caliber semiautomatic mechanisms.[19] Moreover, they are not semiautomatic versions of a machinegun and contain only a few of the other relevant characteristics. Further, the working group determined that, in general, .22 caliber rifles are generally recognized as suitable for small game hunting. The Valmet Hunter, while based on the operating mechanism of the AK47 assault rifle, has been substantially changed so that it is now akin to a traditional sporting rifle and does not properly fall within the semiautomatic assault rifle category. More specifically, its receiver has been modified and its pistol grips, bayonet, and flash suppressor have been removed. The trigger mechanism has been moved to the rear of the modified receiver to facilitate its use with a traditional sporting stock. Also, its military-style sights have been replaced with traditional sporting-style sights. See Attachment 6.

B. Scope of "Sporting Purposes".

The second step of our process was to determine the scope of "sporting purposes" as used in the statute. This is a critical aspect of the process. The broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake. Under this interpretation, any rifle could meet the "sporting purposes" test. A narrower interpretation which focuses on the traditional sports of hunting and organized marksmanship competition would result in a more selective importation process.[20]

To determine the proper interpretation, we consulted the statute itself, its legislative history, applicable case law, the work of the original Firearms Evaluation Panel, and prior interpretations by ATF. In terms of the statute itself, the structure of the importation provisions would suggest a somewhat narrow interpretation. In this regard, firearms are prohibited from importation (section 922(1)) with certain specific exceptions (section 925(d)(3)). A broad interpretation which permits virtually any firearm to be imported because someone may wish to use it in some lawful shooting activity would render the statute meaningless.

As discussed earlier, the legislative history suggests a narrow meaning and indicates that the term "sporting purposes" refers to the traditional sports of target shooting, skeet and trap shooting, and hunting. Moreover, the history discussed earlier strongly suggests that Congress intended the provision to allow the importation of traditional sporting type rifles while excluding military type rifles. There is nothing in its history to indicate that it was intended to recognize every conceivable

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00542

**ER_2727**

type of activity or competition which might employ a firearm. To the contrary, the history indicates that mere use in some competition would not make the rifle a sporting rifle.

Finally, the 1968 Firearms Evaluation Panel specifically addressed at least one informal shooting activity and determined that it was not a legitimate sporting purpose under the statute. The panel addressed what is commonly referred to as "plinking" (shooting at randomly selected targets such as bottles and cans). It was the Panel's view that "while many persons participated in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . ."
See Attachment 3.

Based on the above, the working group determined that the term "sporting purpose" should properly be given a narrow reading. It was determined that while hunting has been a recognized rifle sport for centuries, and competitive target shooting is a recognized rifle sport, the so-called activity of plinking is not a recognized sport. Moreover, we believe that reference to sporting purposes was intended also to stand in contrast to military and law enforcement applications. Consequently, the working group does not

believe that police/combat-type competitions should be treated as sporting activities. This position is supported by the court's decision in <u>Gilbert Equipment Company, Inc., v Higgins</u>, 709 F. Supp. 1071 (S.D. Ala. 1989) and is consistent with prior interpretations of ATF as noted on pages 4 and 5 in discussing the Striker-12 shotgun and USAS-12 shotgun.

C. <u>Suitability</u>.

The final step in our review involved an evaluation of whether semiautomatic assault rifles are a type of rifle <u>generally recognized as particularly suitable for or readily adaptable to</u> the traditional sporting applications discussed above.

The criminal misuse of semiautomatic assault rifles is a matter of significant public concern and was an important factor in the decision to suspend their importation. Nevertheless, the working group did not consider criminal misuse as a factor in its analysis of the importability of this type of rifle. Instead, the working group confined its analysis to the question of whether this type of rifle meets the test provided in section 925(d)(3).

Rather than criminal misuse, our comprehensive examination of this issue focused on the legal analysis and technical assessment of these firearms discussed earlier. In addition, the working group used the information gathered under Items 1-7 outlined in the next section in determining whether this type of firearm is generally recognized as particularly suitable for sporting purposes. These items take into account technical and marketing data, expert opinions, the recommended uses of the firearms, and data on the actual uses for which the weapons are employed in this country.

In evaluating these firearms, we believe that all rifles which are fairly typed as semiautomatic assault rifles should be treated the same. Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability.[21] Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00543

**ER_2728**

This is consistent with the approach taken with respect to handguns since 1968. Although certain handguns may be used or recommended for sporting purposes, they may fall within the type of easily concealable handguns barred from importation by the administrative factoring criteria used by ATF to determine the importability of handguns. Furthermore, a pistol specifically designed for target shooting, but lacking a safety as required by the factoring criteria, would be a type of handgun prohibited from importation as not particularly suitable for sporting purposes for this reason. Finally, just as ATF allows handguns to be modified so as to meet the factoring criteria, a semiautomatic assault rifle could be modified into a sporting configuration and be importable, as was done in the case of the Valmet Hunter referred to earlier.

D. Evaluation of Information from Outside Sources

As part of our comprehensive analysis as to whether semiautomatic assault rifles meet the statutory criteria for importation, the following sources of information were also considered:

1. How has the weapon been advertised, marketed and categorized by the manufacturer and/or importer?

2. How has the use of the rifle been described by firearms technical writers?

3. What is the rifle's reported use by importers?

4. Do hunting guides recommend the rifle?

5. Do editors of hunting magazines recommend the rifle?

6. Is the rifle used in target shooting competitions?

7. Do State game commissions allow the use of the rifle to hunt?

Items 1-6 focus upon how the rifles are marketed, advertised, and recommended for use. Item 7 addresses the legal restrictions pertaining to the use of the weapons for sporting purposes.

The working group reviewed the advertising and marketing literature concerning each of the weapons (Item 1) and reviewed evaluations of the firearms by technical writers (Item 2). In addition, the working group solicited information from the importers of the weapons and other knowledgeable sources (Items 3-6).

Questionnaires were drafted and sent out to licensed hunting guides, State game and fish commissions, local hunting associations, competitive shooting groups, and hunting/shooting magazine editors to determine the extent to which the weapons are used for sporting purposes or recommended for such use. The working group believed that the actual uses of the weapons for sporting purposes would be a factor to be considered in determining whether this type of rifle meets the sporting purposes test.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00544

**ER_2729**

The review of advertising and marketing literature indicates that these rifles are not generally marketed for hunting or competitive shooting. The review of the technical evaluations revealed that these rifles are not regarded as suitable for these sporting activities.22

To the extent that the technical evaluations made recommendations with respect to the use of the rifles suspended from importation, the majority recommended them for law enforcement or military use or for activities such as collecting, plinking, home and self-defense, and combat target shooting. Only 5 of over 50 evaluations reviewed contained recommendations for the use of these firearms for hunting purposes.

The importers were asked to submit information concerning the sporting uses of the semiautomatic rifles they import. Thirty-nine importers were asked to submit this information and 19 responded. In general, their comments were conclusory and stated that their weapons could be used for sporting purposes. A small number of importers, e.g., Gun South, Inc., and Heckler & Koch, Inc., provided more specific data showing the sporting uses made of their firearms by their customers.

Of 3 hunting associations to whom questionnaires were sent, 2 responded. They stated that they place no restrictions on the use of semiautomatic rifles by their members, on the minimum caliber of ammunition used to hunt large game, or on the number of rounds allowed in semiautomatic rifle magazines. However, over 1,800 hunting guides were sent questionnaires and, of these, 706 responded. Over 73 percent of those responding indicated that their patrons used either bolt or lever action rifles for hunting. Only 10 of the 706 guides indicated that their patrons had used any of the rifles whose importation had been temporarily suspended.

Of the 20 hunting/shooting editors to whom questionnaires were sent, 14 responded. Nine of the fourteen editors recommended semiautomatic rifles for use in hunting large game, including 5 who recommended use of any of the rifles subject to the temporary suspension. Eleven of the fourteen editors recommended semiautomatic rifles for target competitions, including 7 who recommended semiautomatic assault rifles for such use.

The recommendations of editors were contradictory. One editor pointed out that what made the assault rifle successful as a military weapon made the semiautomatic version totally unfit for any other use. On the other hand, another editor stated that semiautomatic rifles had certain advantages over conventional sporting rifles especially for the physically disabled and left-handed shooters. While this may be true, there appears to be no advantage to using a semiautomatic assault rifle as opposed to a semiautomatic sporting rifle.

A total of 54 competitive shooting groups were sent a questionnaire and 53 groups responded (some of the responses were from unsolicited groups). Fifty of these groups indicated that they sponsor high power rifle competition events. While none of the groups prohibited the use of the semiautomatic assault rifles in their competitions, none stated that any of the rifles covered by the temporary suspension were used in a specific event.

Finally, the information gathered under Item 7 reveals that most of these weapons could legally be used in most States for most hunting purposes.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00545

The working group reviewed all of the information gathered under Items 1-6 and determined that while these weapons may legally be used for sporting purposes in most States, the evidence was compelling that, as a type of firearm, the semiautomatic assault rifle is not generally recognized as particularly suitable for sporting purposes. The working group found persuasive the technical and expert evaluations of these firearms which generally did not recommend them as particularly suitable for sporting purposes. The group was also impressed by the comments of the hunting guides which showed that these rifles were not widely used for hunting purposes. The comments of the hunting guides are consistent with the opinion of the technical experts who generally do not recommend the rifles for hunting purposes.

The opinions of the editors were fairly divided with respect to the sporting uses of these rifles. The importers generally recommended their own weapons for such uses. The competitive shooting groups indicated that the rifles could be used in certain shooting events. Thus, while there was some evidence that these rifles could be used for hunting and target shooting, there was no evidence of any widespread use for such purposes. The mere fact that they are not generally prohibited from use for sporting purposes does not mean that the rifles meet the test for importation.

## CONCLUSIONS

The working group has dealt with a complex issue, the resolution of which has required the group to take into account interpretations of law, technical assessments of firearms and their physical characteristics, marketing data, the assessment of data compiled from responses to questionnaires and, finally, Bureau expertise with respect to firearms. We fully recognize that particular findings as well as the results will be controversial.

From the cross section of representation within ATF, we have brought to bear our technical, legal, and administrative expertise to resolve the issues in what we believe to be a fair manner, taking into consideration all points of view. While some of the issues were difficult to resolve, in the end we believe that the ultimate conclusion is clear and compelling. These semiautomatic assault rifles were designed and intended to be particularly suitable for combat rather than sporting applications. While these weapons can be used, and indeed may be used by some, for hunting and target shooting, we believe it is clear that they are not generally recognized as particularly suitable for these purposes.

The purpose of section 925(d)(3) was to make a limited exception to the general prohibition on the importation of firearms, to preserve the sportsman's right to sporting firearms. This decision will in no way preclude the importation of true sporting firearms. It will only prevent the importation of military-style firearms which, although popular among some gun owners for collection, self-defense, combat competitions, or plinking, simply cannot be fairly characterized as sporting rifles.

Therefore, it is the finding of the working group that the semiautomatic assault rifle is not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes and that importation of these rifles should not be authorized under 18 U.S.C. § 925(d)(3).

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00546

**ER_2731**

Based on our evaluation, we recommend that the firearms listed on Attachment 7 not be authorized for importation. For the reasons discussed in this report, we recommend that the firearms listed on Attachment 8 be authorized for importation. These are the .22 rimfire caliber rifles and the Valmet Hunter which we do not believe are properly included in the category of semiautomatic assault rifles. Attachment 9 is a compilation of the responses from the questionnaires. Attachment 10 combines the criteria for identifying semiautomatic assault rifles and the items considered in assessing suitability. Attachments 11 and 12 contain the data compiled for each of the criteria listed in Attachment 10. Finally, Attachment 13 contains the source materials used in locating persons and organizations who were sent questionnaires.

### NOTES

1. Paul Wahl, ed., <u>Gun Trader's Guide</u>, 13th Edition, (South Hackensack, NJ. 1987), 155-162.

2. Although a firearm might be recognized as "suitable" for use in traditional sports, it would not meet the statutory criteria unless it were recognized as <u>particularly</u> suitable for such use. Indeed, Senator Dodd made clear that the intent of the legislation was to" [regulate] the importation of firearms by excluding surplus military handguns; and rifles and shotguns that are not <u>truly</u> suitable for sporting purposes." 114 Cong. Rec. 13325 (1968) (Statement of Sen. Dodd) [emphasis added].

   Similarly, it is apparent that the drafters of the legislation did not intend for "sports" to include every conceivable type of activity or competition which might employ a firearm; otherwise a "sporting purpose" could be advanced for every firearm sought to be imported. For example, in response to Sen. Hansen's question concerning the meaning of "sporting purposes" in the bill which became section 925(d), Senators Dodd and Hansen engaged in the following colloquy:

   > Mr. HANSEN. Would the Olympic shooting competition be a "sporting purpose? "
   >
   > Mr. DODD. I would think so.
   >
   > Mr. HANSEN. What about trap and skeet shooting?
   >
   > Mr. DODD. I would think so. I would think trap and skeet shooting would certainly be a sporting activity.
   >
   > Mr. HANSEN. Would the Camp Perry national matches be considered a "sporting purpose?"
   >
   > Mr. DODD. Yes: that would not [sic] fall in that arena. It should be described as a sporting purpose.
   >
   > Mr. HANSEN. I understand the only difference is in the type of firearms used at Camp Perry which includes a wide variety of military types as well as commercial.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles   Exhibit 12
Page 00547

Would all of these firearms be classified as weapons constituting a "sporting purpose?"

Mr. DODD. No. I would not say so. I think when we get into that, we definitely get into military type of weapon for use in matches like these at Camp Perry; but I do not think it is generally described as a sporting weapon. It is a military weapon. I assume they have certain types of competition in which they use these military weapons as they would in an otherwise completely sporting event. I do not think that fact would change the nature of the weapon from a military to a sporting one.

Mr. HANSEN. Is it not true that military weapons are used in Olympic competition also?

Mr. DODD. I do not know. Perhaps the Senator can tell me. I am not well informed on that.

Mr. HANSEN. It is my understanding that they are. Would the Senator be inclined to modify his response if
I say that is true? (27461)

Mr. DODD. It is not that I doubt the Senator's word. Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon. It is a military weapon used in a special sporting event. I think the Senator would agree with that. I do not know how else we could describe it.

Mr. HANSEN. If I understand the Senator correctly, he said that despite the fact that a military weapon may be used in a sporting event it did not, by that action become a sporting rifle Is that correct?

Mr. DODD. That would seem right to me ….. As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons…... I think the Senator and I know what a genuine sporting gun is.

114 Cong. Rec. 27461-62 (1968).(Emphasis added.)

3.  Ken Warner, ed., Gun Digest 1989, (Northbrook, Il. 1988), pp. 293-300; William S. Jarrett, ed., Shooter's Bible, No. 80, (Hackensack, NJ. 1988), pp. 345-363; Edward Clinton Ezell, Small Arms of the World, (Harrisburg, Pa. 1983), p. 844; Pete Dickey, "The Military Look-Alikes," American Rifleman, (April 1980), p. 31. Also, see generally, Ian V. Hogg, ed., Jane's Infantry Weapons, 1987-88, (New York 1987); Jack Lewis, ed., The Gun Digest Book of Assault Weapons, (Northbrook, Il. 1986).

4.  Art Blatt, "Tomorrow's State-of-the-Art Sporting Rifle," Guns & Ammo, (July 1981), p. 48; Jarrett, pp. 345-363; Warner, pp. 293-300.

5.  Daniel D. Musgrave and Thomas B.Nelson, The World's Assault Rifles, (Virginia, 1967), p. 1.

6.  See generally, Angus Laidlaw, ed., Paul Wahl's Big _Gun Catalog/1, (Bogota, NJ. 1988); Musgrave and Nelson; Hogg; Jarrett; and Warner.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles

Exhibit 12
Page 00548

7. Ibid.

8. Arizona, 5 rounds; Colorado, 6 rounds; Michigan 6 rounds; New Hampshire, 5 rounds; New York, 6 rounds; North Carolina, 6 rounds; North Dakota, 8 rounds; Oregon, 5 rounds; Pennsylvania, semiautomatic rifles prohibited; Vermont, 6 rounds.

9. See generally, Hogg; Musgrave and Nelson; Ezell; Warner; Jarrett; Laidlaw; and Lewis.

10. Ibid.

11. Ibid.

12. Ibid.

13. Ibid.

14. Ibid.

15. Ibid.

16. Ezell, p. 844; Dickey, p. 31.

17. Musgrave and Nelson, pp. 11-29; and, see generally, Hogg; and Ezell.

18. Ezell, pp.844-866; and, see generally, Warner; Jarrett; and Laidlaw.

19. See, for example, Walter Rickell, "The Plinker's AK GunsMagazine, (July 1986) p. 21; John Lachuk, "Bantam Battle Rifles," Guns & Ammo, (January 1987), p. 37; John Lachuk, ".22 Erma Carbine," Guns & Ammo, (May 1968), p. 58; JackLewis, "Something New: The AK in Twenty-Two," Gun World, (July 1985), p. 32; Roger Combs, "A Most Unique Carbine," Gun World, (December 1985). p. 28; Garry James, "Mitchell Arms AK-22," Guns & Ammo, (November 1985), p. 72.

20. See note 2, colloquy between Senators Dodd and Hansen.

21. Ibid.

22. See generally, bibliography.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles  Exhibit 12
Page 00549

BIBLIOGRAPHY

"Armalite AR-180 Rifle," American Rifleman, (February 1981), 65-66.

"Beretta AR. 70 Rifle," American Rifleman, (March 1988), 64-66.

Blatt, Art. "Beretta M-70/Sport Rifle," Guns & Ammo, (December 1983), 64-65.

Blatt, Art. "Tomorrow's Sporting Rifles," Guns & Ammo, (July 1981), 48-57, 78, 79.

Bruce, Robert. "The AUG Assault System," Guns Magazine, (September 1986), 37-39, 42,43,
    57-61.

Clapp, Wiley. "Great To-Do With the Daewoo," The Gun Digest Book of Assault Weapons,
    (1986), 82-87.

Combs, Roger. "A Most Unique Carbine," Gun World, (December 1985), 28-31, 47.

Combs, Roger. "Galil 7.62mm Nato Rifle", Gun World, (October 1985), 32-36.

Combs, Roger. "The Avtomat Kalashnikov Goes .22," The Gun Digest Book of Assault Weapons,
    (1986), 182-195.

Combs, Roger. "The Uniquely Unique F-11," The Gun Digest Book of Assault Weapons, (1988),
    188-195.

"Cooking and Heckling with H & K's HK94A3," Gun World, (August 1984), 18-20.

Davis, Russ. "Have Your AK and Shoot it, Too," Guns Magazine, (February 1987), 39, 62-64.

Dickey, Pete. "The Military Look-Alikes," American Rifleman, (April 1980), 30-31, 76.

Egolf, Dick. "Heckler & Koch's Super Semi-Auto," American Rifleman, (June 1985), 29-32,
    65-67.

Ezell, Edward Clinton. Small Arms of the World. Harrisburg: Stackpole Books, 1983.

"FN FNC Rifle," American Rifleman,(January 1988), 58-60.

Ferguson, Tom. "A Hard Look at The AR-180", The Gun Digest Book of Assault Weapons,
    (1986), 121-127.

French, Howard. "H & K's 9mm Paracarbine," Guns & Ammo, (November 1983), 42-44.

Grennell, Dean A. "The Mitchell AK-47," Gun World, (September 1986), 40-41.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles.   Exhibit 12
Page 00550

**ER_2735**

"Heckler & Koch 91," American Rifleman. (October 1981), 56-58.

"Heckler & Koch Model 94 Carbine," American Rifleman, (February 1988), 46-48.

Hogg, Ian V., ed. Janes' Infantry Weapons. 1987-1988. New York: Jane's Publishing Company, 1987.

Hunnicutt, Robert W. "The Bullpups Have Arrived", American Rifleman, (March 1987), 30-35, 70-71.

James, Frank W. "The Springfield Armory SAR-3, " Special Weapons and Tactics, (July 1989), 42-46.

James, Garry. "Austrailian LlAlA Rifle," Guns & Ammo, (December 1987).

James, Garry. "Chinese AK-47 .223," Guns & Ammo, (August 1986), 84-86.

James, Garry. "Mitchell Arms AK-22," Guns & Ammo, (November 1985), 72-73, 97.

James, Garry. "Mitchell Heavy Barrel AK-47," Guns & Ammo, (November 1986), 83-84.

James, Garry. "PTK Chinese M-14S Rifle," American Rifleman, (July 1988), 81-82.

James, Garry. "The SAR-48 Rifle, Springfield Armory Reproduces a Classic," Guns & Ammo, (August 1985), 64-66.

Jarrett, William S., ed. Shooter's Bible. No. 80. Hackensack: Stoeger Publishing Company, 1988.

Kapelsohn, Emanuel. "Steyr's Space-Age AUG," The Gun Digest Book of Assault Weapons, (1986), 45-49.

Karwan, Chuck. "The Fetching Famas," Gun World, (October 1988), 18-21, 78.

Karwan, Chuck. "The Rugged Rifles of Springfield Armory," Gun World, (March 1989), 72-76.

Karwan, Chuck. "ilalmet's Assault Family," The Gun Digest Book of Assault Weapons, (1986), 70-75.

Lachuk, John. ".22 Erma Carbine," Guns & Ammo, (May 1968), 58-60.

Lachuk, John. "Bantam Battle Rifles," Guns & Ammo, (January 1987), 36-39, 75-76.

Laidlaw, Angus, ed. Paul Wahl's Big Gun Catalog/l. Bogatao Paul Wahl Corporation, 1988.

Lewis, Jack, ed. The Gun Digest Book of Assault Weapons. Northbrook: DBI Books, Inc., 1986.

Lewis, Jack. "A Family Affair," The Gun Digest Book of Assault Weapons, (1986), 76-81.

Lewis, Jack. "EMF's Look-Alike AP-74," The Gun Digest Book of Assault Weapons, (1986), 166-171.

Lewis, Jack. "Something New: The AK in Twenty-Two," Gun World, (July 1985), 32-35.

Lewis, Jack. "Springfield's S.A.R. 48," The Gun Digit Book of Assault Weapons, (1968), 88-93.

Lewis, Jack. "The Why and How of Rimfires," The Gun Digest Book of Assault Weapons, (1986), 160-171.

Mason, James D. "The Maadi in America," Guns Magazine, (January 1983), 33-35, 78.

Musgrave, Daniel D. and Nelson, Thomas B. The World's Assault Rifles. Washington, DC: Goetz Company, 1967.

O'Meara, Robert. "The Guns of Israel," Guns Magazine, (January 1989), 33-35, 51.

Paige, Alan. "The AK-47 As A Bullpup?" Firepower, (January 1989), 48-53.

Rees, Clair. "Valmet M71-S," Guns & Ammo, (October 1976), 86, 137.

Rickell, Walter. "The Plinker's AK," Guns Magazine, (July 1986), 21.

Roberts, J.B. "Bernosky Wins His Fourth," American Rifleman, (Oct. 1980), 49-51.

Sanow, Ed. "National Match AK-47/S," Firepower, (January 1989), 66-71.

Shults, Jim. "The Mean Machine," Gun World, (April 1982), 26-28.

"Springfield Armory S.A.R. 48," American Rifleman, (March 1986), 57-58.

Steele, Kevin E. "Beretta BM-59," Guns Magazine, (January 1983), 14.

Steele, Kevin E. "Sporting Firearms Update," Guns Magazine, (Feburary 1980), 52-55, 79, 84-85.

"Steyr-AUG: The Terrible Toy," Gun World, (December 1984), 32-35.

Swenson, Thomas J. "The Incredible Uzi," Guns & Ammo, (Jaunary 1982), 32-36, 76.Tappan, Mel. "Survive: Survival Rifles-Part 2, " Guns & Ammo, (August 1978), 68, 96-97.

Traister, John. "AK Rifle: Chinese AKS or Type 56S," American Rifleman, (May 1988), 50-51.

"UZI Semi-Automatic .45 Carbine," American Rifleman, (January 1986), 59.

"Uzi Semi-Automatic Carbine," American Rifleman, (August 1981), 55-57.

Report and Recommendation on the Importability of Certain Semiautomatic Rifles    Exhibit 12
Page 00552

"Valmet M78 Rifle," American Rifleman, (April 1988), 64-66.

Wahl, Paul, ed. Gun Trader's Guide, 13th Edition. South Hackensack: Stoeger Publishing Company, 1987.

Warner, Ken, ed. Gun Digest 1989. Northbrook: DBI Books, Inc., 1988.

Wood, J.B. "Beretta's AR70 Sporter," Guns Magazine, (March 1986), 38-39, 65-66.

Woods, Jim. "Firepower From the Far East-Daewoo," Guns Magazine, (February 1986), 28-29, 60-61.

Zwirz, Bob. "Valmet's Military Look," Gun World, (September 1988), 28-30.

---

NOTE: This information was extracted from the document titled, **"Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles",** published in a memorandum to the Director, Stephen E. Higgins from the Associate Director, Daniel R. Black and approved on July 6, 1989.

---

Exhibit 12
Page 00553

**ER_2738**





# Department of The Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles

# April 1998

Exhibit 13
Page 00555

TABLE OF CONTENTS

Page

1.  Executive Summary…………………………………………………………   1

2.  Background……………………………………………………………….   4

3.  Defining the Type of Weapon Under Review……………………………   16

4.  Scope of "Sporting Purposes"…………………………………………   16

5.  Method of Study………………………………………………………...   19

6.  Suitability for Sporting Purposes………………………………………   21

7.  Determination…………………………………………………………...   36

8.  Exhibits:

     White House Memorandum:  Importation of Modified Semiautomatic Assault-type Rifles

     Study Rifle Models

     Study Rifles

     ATF Form 4590, Factoring Criteria for Weapons

     Military Configuration

     Memorandum to File From First Meeting of Firearms Advisory Panel

     State Fish and Game Commission Review

9.  Appendix:  Summary of Externally Gathered Information

Exhibit 13
Page 00556

ER_2740

1

<u>EXECUTIVE SUMMARY</u>

On November 14, 1997, the President and the Secretary of the Treasury ordered a review of the importation of certain modified versions of semiautomatic assault rifles into the United States.[1]  The decision to conduct this review stemmed in part from concerns expressed by members of Congress and others that the rifles being imported were essentially the same as semiautomatic assault rifles previously determined to be nonimportable in a 1989 decision by the Bureau of Alcohol, Tobacco and Firearms (ATF).  The decision also stemmed from the fact that nearly 10 years had passed since the last comprehensive review of the importation of rifles, and many new rifles had been developed during this time.

Under 18 U.S.C. section 925(d)(3), the Secretary shall approve applications for importation only when the firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes (the "sporting purposes test").   In 1989, ATF denied applications to import a series of semiautomatic versions of automatic-fire military assault rifles.  When ATF examined these semiautomatic assault rifles, it found that the rifles, while no longer machineguns, still had a military configuration that was designed for killing and disabling the enemy and that distinguished the rifles from traditional sporting rifles.  This distinctively military configuration served as the basis for ATF's finding that the rifles were not considered sporting rifles under the statute.

The military configuration identified by ATF incorporated eight physical features: ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights.  In 1989, ATF took the position that any of these military configuration features, other than the ability to accept a detachable magazine, would make a semiautomatic rifle not importable.

Subsequent to the 1989 decision, certain semiautomatic assault rifles that failed the 1989 sporting purposes test were modified to remove all of the military configuration features other than the ability to accept a detachable magazine.  Significantly, most of these modified rifles not only still had the ability to accept a detachable magazine but, more specifically, still had the ability to accept a detachable large capacity magazine that

---

[1]   The President and the Secretary directed that all pending and future applications for importation of these rifles not be acted upon until completion of the review.  They also ordered that outstanding permits for importation of the rifles be suspended for the duration of the review period.  The existence of applications to import 1 million new rifles and outstanding permits for nearly 600,000 other rifles threatened to defeat the purpose of the expedited review unless the Department of the Treasury deferred action on additional applications and temporarily suspended the outstanding permits.  (See exhibit 1 for a copy of the November 14, 1997, memorandum directing this review.)

The rifles that are the subject of this review are referred to in this report as "study rifles."

Exhibit 13
Page 00557

**ER_2741**

2

was originally designed and produced for the military assault rifles from which they were derived.  These magazines are referred to in this report as "large capacity military magazines."  Study rifles with the ability to accept such magazines are referred to in this report as "large capacity military magazine rifles," or "LCMM rifles."  It appears that only one study rifle, the VEPR caliber .308 (an AK47 variant), is not an LCMM rifle.  Based on the standard developed in 1989, these modified rifles were found to meet the sporting purposes test.  Accordingly, the study rifles were approved for import into the United States.

These modified rifles are the subject of the present review.  Like the rifles banned in 1989, the study rifles are semiautomatic rifles based on AK47, FN-FAL, HK91 and 93, Uzi, and SIG SG550 military assault rifles.  While there are at least 59 specific model designations of the study rifles, they all fall within the basic designs listed above.  There are at least 39 models based on the AK47 design, 8 on the FN-FAL design, 7 on the HK91 and 93 designs, 3 on the Uzi design, and 2 on the SIG SG550 design (see exhibit 2 for a list of the models).  Illustrations of some of the study rifles are included in exhibit 3 of this report.

This review takes another look at the entire matter to determine whether the modified rifles approved for importation since 1989 are generally recognized as particularly suitable for or readily adaptable to sporting purposes.[2]  We have explored the statutory history of the sporting purposes test and prior administrative and judicial interpretations; reexamined the basic tenets of the 1989 decision; analyzed the physical features of the study rifles, as well as information from a wide variety of sources relating to the rifles' use and suitability for sporting purposes; and assessed changes in law that might have bearing on the treatment of the rifles.

This review has led us to conclude that the basic finding of the 1989 decision remains valid and that military-style semiautomatic rifles are not importable under the sporting purposes standard.  Accordingly, we believe that the Department of the Treasury correctly has been denying the importation of rifles that had any of the distinctly military configuration features identified in 1989, other than the ability to accept a detachable magazine.  Our review, however, did result in a finding that the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.

Several important changes have occurred since 1989 that have led us to reevaluate the importance of this feature in the sporting purposes test.  Most significantly, by passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding

---

[2]   The study was carried out by a working group composed of ATF and Treasury representatives.  The working group's activities and findings were overseen by a steering committee composed of ATF and Treasury officials.

Exhibit 13
Page 00558

ER_2742

3

devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem.  Specifically, Congress found that these magazines served "combat-functional ends" and were attractive to criminals because they "make it possible to fire a large number of rounds without reloading, then to reload quickly when those rounds are spent."[3]  Moreover, we did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose.  Accordingly, we found that the ability to accept such a magazine is a critical factor in the sporting purposes test, which must be given the same weight as the other military configuration features identified in 1989.

In addition, the information we collected on the use and suitability of LCMM rifles for hunting and organized competitive target shooting demonstrated that the rifles are not especially suitable for sporting purposes.  Although our review of this information indicated that, with certain exceptions, the LCMM rifles sometimes are used for hunting, their actual use in hunting is limited.  There are even some general restrictions and prohibitions on the use of semiautomatic rifles for hunting game.  Similarly, although the LCMM rifles usually may be used, with certain exceptions, and sometimes are used for organized competitive target shooting, their suitability for this activity is limited.  In fact, there are some restrictions and prohibitions on their use.

Furthermore, the information we gathered demonstrated that the LCMM rifles are attractive to certain criminals.  We identified specific examples of the LCMM rifles' being used in violent crime and gun trafficking.  In addition, we found some disturbing trends involving the LCMM rifles, including a rapid and continuing increase in crime gun trace requests after 1991 and a rapid "time to crime."  Their ability to accept large capacity military magazines likely plays a role in their appeal to these criminals.

After weighing all the information collected, we found that the LCMM rifles are not generally recognized as particularly suitable for or readily adaptable to sporting purposes and are therefore not importable.  However, this decision will in no way preclude the importation of true sporting firearms.

---

[3]    H. Rep. No. 103-489, at 18-19.

Exhibit 13
Page 00559

ER_2743

4

BACKGROUND

Importation of Firearms Under the Gun Control Act

The Gun Control Act of 1968 (GCA)[4] generally prohibits the importation of firearms into the United States.[5]  However, the GCA creates four narrow categories of firearms that the Secretary of the Treasury shall authorize for importation.  The category that is relevant to this study is found at 18 U.S.C. section 925(d)(3).

> The Secretary shall authorize a firearm . . . to be imported or brought into the United States . . . if the firearm . . .
>
>> (3) is of a type that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and **is generally recognized as particularly suitable for or readily adaptable to sporting purposes**, excluding surplus military firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.  (Emphasis added)

This provision originally was enacted, in a slightly different form, by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968[6] and also was contained in Title I of the GCA, which amended Title IV later that year.

The GCA was enacted in large part "to assist law enforcement authorities in the States and their subdivisions in combating the increasing prevalence of crime in the United States."  However, the Senate Report to the act also made clear that Congress did not intend the GCA to place any undue or unnecessary restrictions or burdens on responsible, law-abiding citizens with respect to acquiring, possessing, transporting, or using firearms for lawful activities.[7]

---

[4]   Pub. L. No. 90-618.

[5]   18 U.S.C. section 922(l).

[6]   Pub. L. No. 90-351.

[7]   S. Rep. No. 1501, 90th Cong. 2d Sess. 22 (1968).

Exhibit 13
Page 00560

**ER_2744**

5

Consistent with this general approach, legislative history indicates that Congress intended the importation standard provided in section 925(d)(3) to exclude military-type weapons from importation to prevent such weapons from being used in crime, while allowing the importation of high-quality sporting rifles.  According to the Senate Report, section 925(d)(3) was intended to "curb the flow of surplus military weapons and other firearms being brought into the United States which are not particularly suitable for target shooting or hunting."[8]  The report goes on to explain that "[t]he importation of certain foreign-made and military surplus nonsporting firearms has an important bearing on the problem which this title is designed to alleviate [crime].  Thus, the import provisions of this title seem entirely justified."[9]  Indeed, during debate on the bill, Senator Dodd, the sponsor of the legislation, stated that "Title IV prohibits importation of arms which the Secretary determines are not suitable for . . . sport . . . .  The entire intent of the importation section is to get those kinds of weapons that are used by criminals and have no sporting purpose."[10]

The Senate Report, however, also makes it clear that the importation standards "are designed and intended to provide for the importation of quality made, sporting firearms, including . . . rifles such as those manufactured and imported by Browning and other such manufacturers and importers of firearms."[11]  (The rifles being imported by Browning at that time were semiautomatic and manually operated traditional sporting rifles of high quality.)  Similarly, the report states that the importation prohibition "would not interfere with the bringing in of currently produced firearms, such as rifles . . . of recognized quality which are used for hunting and for recreational purposes."[12]  The reference to recreational purposes is not inconsistent with the expressed purpose of restricting importation to firearms particularly suitable for target shooting or hunting, because firearms particularly suitable for these purposes also can be used for other purposes such as recreational shooting.

During debate on the bill, there was discussion about the meaning of the term "sporting purposes."  Senator Dodd stated:

> [h]ere again I would have to say that if a military weapon is used in a

---

[8]   S. Rep. No. 1501, 90th Cong. 2d Sess. 22 (1968).

[9]   S. Rep. No. 1501, 90th Cong. 2d Sess. 24 (1968).

[10]   114 Cong. Rec. S 5556, 5582, 5585 (1968).

[11]   S. Rep. No. 1501, 90th Cong. 2d. Sess. 38 (1968).

[12]   S. Rep. No. 1501, 90th Cong. 2d. Sess. 22 (1968).

Exhibit 13
Page 00561

ER_2745

6

special sporting event, it does not become a sporting weapon.  It is a
military weapon used in a special sporting event . . . .  As I said previously
the language says no firearms will be admitted into this country unless they
are genuine sporting weapons.[13]

Legislative history also shows that the determination of a weapon's suitability for sporting
purposes is the direct responsibility of the Secretary of the Treasury.  The Secretary was
given this discretion largely because Congress recognized that section 925(d)(3) was a
difficult provision to implement.  Immediately after discussing the large role cheap
imported .22 caliber revolvers were playing in crime, the Senate Report stated:

[t]he difficulty of defining weapons characteristics to meet this target
without discriminating against sporting quality firearms, was a major
reason why the Secretary of the Treasury has been given fairly broad
discretion in defining and administering the import prohibition.[14]

Indeed, Congress granted this discretion to the Secretary even though some expressed
concern with its breadth:

[t]he proposed import restrictions of Title IV would give the Secretary of
the Treasury unusually broad discretion to decide whether a particular type
of firearm is generally recognized as particularly suitable for, or readily
adaptable to, sporting purposes.  If this authority means anything, it
permits Federal officials to differ with the judgment of sportsmen expressed
through consumer preference in the marketplace . . . . [15]

Section 925(d)(3) provides that the Secretary shall authorize the importation of a firearm
if it is of a "type" that is generally recognized as particularly suitable for or readily
adaptable to sporting purposes.  The legislative history also makes it clear that the
Secretary shall scrutinize types of firearms in exercising his authority under section 925(d).
 Specifically, the Senate Report to the GCA states that section 925(d) "gives the

Secretary authority to permit the importation of ammunition and certain types of
firearms."[16]

---

[13]    114 Cong. Rec. 27461-462 (1968).

[14]    S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

[15]    S. Rep. No. 1097, 90th Cong. 2d Sess. 2155 (1968) (views of Senators Dirksen, Hruska, Thurmond, and
        Burdick).  In Gun South, Inc. v. Brady, F.2d 858, 863 (11th Cir. 1989), the court, based on legislative
        history, found that the GCA gives the Secretary "unusually broad discretion in applying section 925(d)(3)."

[16]    S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

Exhibit 13
Page 00562

7

The Senate Report to the GCA also recommended that the Secretary establish a council that would provide him with guidance and assistance in determining which firearms meet the criteria for importation into the United States.[17]  Accordingly, following the enactment of the GCA, the Secretary established the Firearms Evaluation Panel (FEP) (also known as the Firearms Advisory Panel) to provide guidelines for implementation of the "sporting purposes" test.  This panel was composed of representatives from the military, the law enforcement community, and the firearms industry.  At the initial meeting of the FEP, it was understood that the panel's role would be advisory only.[18]  The panel focused its attention on handguns and recommended the adoption of factoring criteria to evaluate the various types of handguns. These factoring criteria are based upon such considerations as overall length of the firearm, caliber, safety features, and frame construction.  ATF thereafter developed an evaluation sheet (ATF Form 4590) that was put into use for evaluating handguns pursuant to section 925(d)(3).  (See exhibit 4.)

The FEP did not propose criteria for evaluating rifles and shotguns under section 925(d)(3).  Other than surplus military firearms, which Congress addressed separately, the rifles and shotguns being imported prior to 1968 were generally conventional rifles and shotguns specifically intended for sporting purposes.  Therefore, in 1968, there was no cause to develop criteria for evaluating the sporting purposes of rifles and shotguns.

<u>1984 Application of the Sporting Purposes Test</u>

The first time that ATF undertook a meaningful analysis of rifles or shotguns under the sporting purposes test was in 1984.  At that time, ATF was faced with a new breed of imported shotgun, and it became clear that the historical assumption that all shotguns were sporting was no longer viable.  Specifically, ATF was asked to determine whether the Striker-12 shotgun was suitable for sporting purposes.  This shotgun is a military/law enforcement weapon initially designed and manufactured in South Africa for riot control.  When the importer was asked to submit evidence of the weapon's sporting purposes, it provided information that the weapon was suitable for police/combat-style competitions.  ATF determined that this type of competition did not constitute a sporting purpose

under the statute, and that the shotgun was not suitable for the traditional shotgun sports of hunting, and trap and skeet shooting.

---

[17]  S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).

[18]  <u>Gilbert Equipment Co. v. Higgins</u>, 709 F. Supp. 1071, 1083, n. 7 (S.D. Ala. 1989), <u>aff'd without op.</u>, 894 F.2d 412 (11th Cir. 1990).

Exhibit 13
Page 00563

ER_2747

8

### 1986 Firearms Owners Protection Act

On May 19, 1986, Congress passed the Firearms Owners Protection Act,[19] which amended section 925(d)(3) to provide that the Secretary "shall" (instead of "may") authorize the importation of a firearm that is of a type that is generally recognized as particularly suitable for or readily adaptable to sporting purposes. The Senate Report to the law stated "it is anticipated that in the vast majority of cases, [the substitution of 'shall' for 'may' in the authorization section] will not result in any change in current practices."[20] As the courts have found, "[r]egardless of the changes made [by the 1986 law], the firearm must meet the sporting purposes test and it remains the Secretary's obligation to determine whether specific firearms satisfy this test."[21]

### 1986 Application of the Sporting Purposes Test

In 1986, ATF again had to determine whether a shotgun met the sporting purposes test, when the Gilbert Equipment Company requested that the USAS-12 shotgun be classified as a sporting firearm under section 925(d)(3). Again, ATF refused to recognize police/combat-style competitions as a sporting purpose. After examining and testing the weapon, ATF determined its weight, size, bulk, designed magazine capacity, configuration, and other factors prevented it from being classified as particularly suitable for or readily adaptable to the traditional shotgun sports of hunting, and trap and skeet shooting. Accordingly, its importation was denied.

When this decision was challenged in Federal court, ATF argued, in part, that large magazine capacity and rapid reloading ability are military features. The court accepted this argument, finding "the overall appearance and design of the weapon (especially the detachable box magazine . . . ) is that of a combat weapon and not a sporting weapon."[22] In reaching this decision, the court was not persuaded by the importer's argument that box magazines can be lengthened or shortened depending on desired shell capacity.[23] The court also agreed with ATF's conclusion that police/combat-style competitions were not considered sporting purposes.

---

[19]  Pub. L. No. 99-308.

[20]  S. Rep. No. 98-583, 98th Cong. 1st Sess. 27 (1984).

[21]  Gilbert Equipment Co., 709 F. Supp. at 1083.

[22]  Id. at 1089.

[23]  Id. at 1087, n. 20 and 1089.

Exhibit 13
Page 00564

ER_2748

9

<u>1989 Report on the Importability of Semiautomatic Assault Rifles</u>

In 1989, after five children were killed in a California schoolyard by a gunman with a semiautomatic copy of an AK47, ATF decided to reexamine whether certain semiautomatic assault-type rifles met the sporting purposes test. This decision was reached after consultation with the Director of the Office of National Drug Control Policy. In March and April 1989, ATF announced that it was suspending the importation of certain "assault-type rifles." For the purposes of this suspension, assault-type rifles were those rifles that generally met the following criteria: (1) military appearance; (2) large magazine capacity; and (3) semiautomatic version of a machinegun. An ATF working group was established to reevaluate the importability of these assault-type rifles. On July 6, 1989, the group issued its <u>Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles</u> (hereinafter 1989 report).

In the 1989 report, the working group first discussed whether the assault-type rifles under review fell within a "type" of firearm for the purposes of section 925(d)(3). The working group concluded that most of the assault-type rifles under review represented "a distinctive type of rifle [which it called the "semiautomatic assault rifle"] distinguished by certain general characteristics which are common to the modern military assault rifle."[24] The working group explained that the modern military assault rifle is a weapon designed for killing or disabling the enemy and has characteristics designed to accomplish this purpose. Moreover, it found that these characteristics distinguish modern military assault rifles from traditional sporting rifles.

The characteristics of the modern military assault rifle that the working group identified were as follows: (1) military configuration (which included: ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights) (see exhibit 5 for a thorough discussion of each of these features); (2) ability to fire automatically (i.e., as a machinegun); and (3) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.[25] In regards to the ability to accept a detachable magazine, the working group explained that:

> [v]irtually all modern military firearms are designed to accept large, detachable magazines. This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload. Thus, large capacity magazines are indicative of military firearms. While detachable

---

[24]   1989 report at 6.

[25]   1989 report at 6.

Exhibit 13
Page 00565

**ER_2749**

10

magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.[26]

The working group emphasized that these characteristics had to be looked at as a whole to determine whether the overall configuration of each of the assault-type rifles under review placed the rifle fairly within the semiautomatic assault rifle type. The semiautomatic assault rifles shared all the above military assault rifle characteristics other than being machineguns.[27]

The working group also addressed the scope of the term "sporting purposes." It concluded that the term should be given a narrow interpretation that focuses on the traditional sports of hunting and organized competitive target shooting. The working group made this determination by looking to the statute, its legislative history, applicable case law, the work of the FEP, and prior interpretations by ATF. In addition, the working group found that the reference to sporting purposes was intended to stand in contrast to military and law enforcement applications. Consequently, it determined that police/combat-type competitions should not be treated as sporting activities.[28]

The working group then evaluated whether the semiautomatic assault rifle type of firearm is generally recognized as particularly suitable for or readily adaptable to traditional sporting applications. This examination took into account technical and marketing data, expert opinions, the recommended uses of the firearms, and information on the actual uses for which the weapons are employed in this country. The working group, however, did not consider criminal use as a factor in its analysis of the importability of this type of firearm.

After analyzing this information, the working group concluded that semiautomatic assault rifles are not a type of firearm generally recognized as particularly suitable for or readily adaptable to sporting purposes. Accordingly, the working group concluded that semi-automatic assault rifles should not be authorized for importation under section 925(d)(3). However, the working group found that some of the assault-type rifles under review (the Valmet Hunter and .22 rimfire caliber rifles), did not fall within the semiautomatic assault rifle type. In the case of the Valmet Hunter, the working group found that although it was based on the operating mechanism of the AK47 assault rifle, it had been substantially

---

[26]  1989 report at 6 (footnote omitted).

[27]  The semiautomatic assault rifles were semiautomatic versions of machineguns.

[28]  1989 report at 9-11.

Exhibit 13
Page 00566

ER_2750

changed so that it was similar to a traditional sporting rifle.[29]  Specifically, it did not have any of the military configuration features identified by the working group, except for the ability to accept a detachable magazine.

Following the 1989 study, ATF took the position that a semiautomatic rifle with any of the eight military configuration features identified in the 1989 report, other than the ability to accept a detachable magazine, failed the sporting purposes test and, therefore, was not importable.

<u>Gun South, Inc. v. Brady</u>

Concurrent with its work on the 1989 report, ATF was involved in litigation with Gun South, Inc. (GSI).  In October 1988 and February 1989, ATF had granted GSI permits to import AUG-SA rifles.  As mentioned previously, in March and April of 1989, ATF imposed a temporary suspension on the importation of rifles being reviewed in the 1989 study, which included the AUG-SA rifle.  GSI filed suit in Federal court, seeking to prohibit the Government from interfering with the delivery of firearms imported under permits issued prior to the temporary suspension.

The court of appeals found that the Government had the authority to suspend temporarily the importation of GSI's AUG-SA rifles because the GCA "impliedly authorizes" such action.[30]  In addition, the court rejected GSI's contention that the suspension was arbitrary and capricious because the AUG-SA rifle had not physically changed, explaining the argument "places too much emphasis on the rifle's structure for determining whether a firearm falls within the sporting purpose exception.  While the Bureau must consider the rifle's physical structure, the [GCA] requires the Bureau to equally consider the rifle's use."[31]  In addition, the court found that ATF adequately had considered sufficient evidence before imposing the temporary suspension, citing evidence ATF had considered

demonstrating that semiautomatic assault-type rifles were being used with increasing frequency in crime.[32]

---

[29]  This finding reflects the fact that the operating mechanism of the AK47 assault rifle is similar to the operating mechanism used in many traditional sporting rifles.

[30]  <u>Gun South, Inc. v. Brady</u>, 877 F.2d 858 (11th Cir. 1989). The court of appeals issued its ruling just days before the 1989 report was issued.  However, the report was complete before the ruling was issued.

[31]  <u>Id.</u>

[32]  <u>Id.</u>

Exhibit 13
Page 00567

ER_2751

12

Although GSI sued ATF on the temporary suspension of its import permits, once the 1989 report was issued, no one pursued a lawsuit challenging ATF's determination that the semiautomatic assault rifles banned from importation did not meet the sporting purposes test.[33]

Violent Crime Control and Law Enforcement Act of 1994

On September 13, 1994, Congress passed the Violent Crime Control and Law Enforcement Act of 1994,[34] which made it unlawful, with certain exceptions, to manufacture, transfer, or possess semiautomatic assault weapons as defined by the statute.[35]   The statute defined semiautomatic assault weapons to include 19 named models of firearms (or copies or duplicates of the firearms in any caliber);[36] semiauto-matic rifles that have the ability to accept detachable magazines and have at least two of five features specified in the law; semiautomatic pistols that have the ability to accept detachable magazines and have at least two of five features specified in the law; and semiautomatic shotguns that have at least two of four features specified in the law.[37]   However, Congress

---

[33]   After the 1989 report was issued, Mitchell Arms, Inc. asserted takings claims against the Government based upon the suspension and revocation of four permits allowing for the importation of semiautomatic assault rifles and ATF's temporary moratorium on import permits for other rifles.  The court found for the Government, holding the injury complained of was not redressable as a taking because Mitchell Arms did not hold a property interest within the meaning of the Just Compensation Clause of the Fifth Amendment.  Mitchell Arms v. United States, 26 Cl. Ct. 1 (1992), aff'd, 7 F.3d 212 (Fed. Cir. 1993), cert. denied, 511 U.S. 1106 (1994).

[34]   Pub. L. No. 103-22. Title XI, Subtitle A of this act may be cited as the "Public Safety and Recreational Firearms Use Protection Act."

[35]   18 U.S.C. section 922(v).

[36]   Chapter 18 U.S.C. section 921(a)(30)(A) states that the term "semiautomatic assault weapon" means "any of the firearms, or copies or duplicates of the firearms in any caliber, known as -," followed by a list of named firearms.  Even though section 921(a)(3) defines "firearm" as used in chapter 18 to mean, in part, "the frame or receiver of any such weapon," the use of "firearm" in section 921(a)(30)(A) has not been interpreted to mean a frame or receiver of any of the named weapons, except when the frame or receiver actually is incorporated in one of the named weapons.

Any other interpretation would be contrary to Congress' intent in enacting the assault weapon ban.  In the House Report to the assault weapon ban, Congress emphasized that the ban was to be interpreted narrowly.  For example, the report explained that the present bill was more tightly focused than earlier drafts which gave ATF authority to ban any weapon which "embodies the same configuration" as the named list of guns in section 921(a)(30)(A); instead, the present bill "contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons [beyond the listed weapons]."  H. Rep. 103-489 at 21.

[37]   18 U.S.C. section 921(a)(30).

Exhibit 13
Page 00568

ER_2752

13

exempted from the assault weapon ban any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition and any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.[38]

Although the 1994 law was not directly addressing the sporting purposes test in section 925(d)(3), section 925(d)(3) had a strong influence on the law's content.  The technical work of ATF's 1989 report was, to a large extent, incorporated into the 1994 law.  The House Report to the 1994 law explained that although the legal question of whether semiautomatic assault weapons met section 925(d)(3)'s sporting purposes test "is not directly posed by [the 1994 law], the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features."[39]  As in the 1989 study, Congress focused on the external features of firearms, rather than on their semiautomatic operating mechanism.

The 1994 law also made it unlawful to possess and transfer large capacity ammunition feeding devices manufactured after September 13, 1994.[40]  A large capacity ammunition feeding device was generally defined as a magazine, belt, drum, feed strip, or similar device that has the capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition.[41]

Congress passed these provisions of the 1994 law in response to the use of semiautomatic assault weapons and large capacity ammunition feeding devices in crime.  Congress had been presented with much evidence demonstrating that these weapons were "the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."[42]  The House Report to the 1994 law recounts numerous crimes that had occurred involving semiautomatic assault weapons and large capacity magazines that were originally designed and produced for military assault rifles.[43]

---

[38]   18 U.S.C. sections 922(v)(3)(C)&(D).

[39]   H. Rep. No. 103-489, at 17, n. 19.

[40]   18 U.S.C. section 922(w).

[41]   18 U.S.C. section 921(a)(31).

[42]   H. Rep. No. 103-489, at 13.

[43]   H. Rep. No. 103-489, at 14-15.

Exhibit 13
Page 00569

ER_2753

14

In enacting the semiautomatic assault weapon and large capacity ammunition feeding device bans, Congress emphasized that it was not preventing the possession of sporting firearms.  The House Report, for example, stated that the bill differed from earlier bills in that "it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns."[44]  In addition, Congress specifically exempted 661 long guns from the assault weapon ban which are "most commonly used in hunting and recreational sports."[45]

Both the 1994 law and its legislative history demonstrate that Congress recognized that ammunition capacity is a factor in determining whether a firearm is a sporting firearm.  For example, large capacity ammunition feeding devices were banned, while rifles and shotguns with small ammunition capacities were exempted from the assault weapon ban.  Moreover, the House Report specifically states that the ability to accept a large capacity magazine was a military configuration feature which was not "merely cosmetic," but "serve[d] specific, combat-functional ends."[46]  The House Report also explains that, while "[m]ost of the weapons covered by the [ban] come equipped with magazines that hold 30 rounds [and can be replaced with magazines that hold 50 or even 100 rounds], . . . [i]n contrast, hunting rifles and shotguns typically have much smaller magazine capabilities--from 3-5."[47]

Finally, it must be emphasized that the semiautomatic assault weapon ban of section 922(v) is distinct from the sporting purposes test governing imports of section 925(d)(3).  Clearly, any weapon banned under section 922(v) cannot be imported into the United States because its possession in the United States would be illegal.  However, it is possible that a weapon not defined as a semiautomatic assault weapon under section 922(v) still would not be importable under section 925(d)(3).  In order to be importable, the firearm must be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes regardless of its categorization under section 922(v).  The

Secretary's discretion under section 925(d)(3) remains intact for all weapons not banned by the 1994 statute.

The Present Review

Prior to the November 14, 1997, decision to conduct this review, certain members of

---

[44]  H. Rep. No. 103-489, at 21.

[45]  H. Rep. No. 103-489, at 20.  None of these 661 guns are study rifles.

[46]      H. Rep. No. 103-489, at 18.

[47]  H. Rep. No. 103-489, at 19 (footnote omitted).

Exhibit 13
Page 00570

ER_2754

15

Congress strongly urged that it was necessary to review the manner in which the Treasury Department is applying the sporting purposes test to the study rifles, in order to ensure that the present practice is consistent with section 925(d)(3) and current patterns of gun use.  The fact that it had been nearly 10 years since the last comprehensive review of the importation of rifles (with many new rifles being developed during this time) also contributed to the decision to conduct this review.

Exhibit 13
Page 00571

ER_2755

16

## DEFINING THE TYPE OF WEAPON UNDER REVIEW

Section 925 (d) (3) provides that the Secretary shall authorize the importation of a firearm if it is of a "type" that meets the sporting purposes test.  Given this statutory mandate, we had to determine whether the study rifles suspended from importation fell within one type of firearm.  Our review of the study rifles demonstrated that all were derived from semiautomatic assault rifles that failed to meet the sporting purposes test in 1989 but were later found to be importable when certain military features were removed.

Within this group, we determined that virtually all of the study rifles shared another important feature: The ability to accept a detachable large capacity magazine (e.g., more than 10 rounds) that was originally designed and produced for one of the following military assault rifles:  AK47, FN-FAL, HK91 or 93, SIG SG550, or Uzi.  (This is the only military configuration feature cited in the 1989 study that remains with any of the study rifles).

We determined that all of the study rifles that shared both of these characteristics fell within a type of firearm which, for the purposes of this report, we call "large capacity military magazine rifles" or "LCMM rifles."  It appears that only one study rifle, the VEPR caliber .308--which is based on the AK47 design--does not fall within this type because it does not have the ability to accept a large capacity military magazine.

## SCOPE OF "SPORTING PURPOSES"

As in the 1989 study, we had to determine the scope of "sporting purposes" as used in section 925(d)(3).  Looking to the statute, its legislative history, the work of the Firearms Evaluation Panel (see exhibit 6), and prior ATF interpretations, we determined sporting purposes should be given a narrow reading, incorporating only the traditional sports of hunting and organized competitive target shooting (rather than a broader interpretation that could include virtually any lawful activity or competition.)

In terms of the statute itself, the structure of the importation provisions suggests a somewhat narrow interpretation.  Firearms are prohibited from importation (section 922(l)), with four specific exceptions (section 925(d)).  A broad interpretation permitting a firearm to be imported because someone may wish to use it in some lawful shooting activity would render the general prohibition of section 922(l) meaningless.

Similarly, as discussed in the "Background" section, the legislative history of the GCA indicates that the term sporting purposes narrowly refers to the traditional sports of hunting and organized competitive target shooting.  There is nothing in the history to indicate that it was intended to recognize every conceivable type of activity or competition that might employ a firearm.

Exhibit 13
Page 00572

**ER_2756**

17

In addition, the FEP specifically addressed the informal shooting activity of "plinking" (shooting at randomly selected targets such as bottles and cans) and determined that it was not a legitimate sporting purpose under the statute.  The panel found that, "while many persons participate in this type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation. . . ."  (See exhibit 6.)

Finally, the 1989 report determined that the term sporting purposes should be given a narrow reading incorporating the traditional rifle sports of hunting and organized competitive target shooting.  In addition, the report determined that the statute's reference to sporting purposes was intended to stand in contrast with military and law enforcement applications.  This is consistent with ATF's interpretation in the context of the Striker-12 shotgun and the USAS-12 shotgun.  It is also supported by the court's decision in <u>Gilbert Equipment Co. v. Higgins</u>.

We received some comments urging us to find "practical shooting" is a sport for the purposes of section 925(d)(3).[48]  Further, we received information showing that practical shooting is gaining in popularity in the United States and is governed by an organization that has sponsored national events since 1989.  It also has an international organization.

While some may consider practical shooting a sport, by its very nature it is closer to police/combat-style competition and is not comparable to the more traditional types of sports, such as hunting and organized competitive target shooting.   Therefore, we are not convinced that practical shooting does, in fact, constitute a sporting purpose under section 925(d)(3).[49]   However, even if we were to assume for the sake of argument that practical shooting is a sport for the purposes of the statute, we still would have to decide whether a firearm that could be used in practical shooting meets the sporting purposes test.  In other words, it still would need to be determined whether the firearm is of a type that is generally recognized as particularly suitable for or readily adaptable to practical shooting and other sporting purposes.[50]  Moreover, the legislative history makes clear that the use of a military weapon in a practical shooting competition would not make that weapon

---

[48]   Practical shooting involves moving, identifying, and engaging multiple targets and delivering a num ber of shots rapidly.  In doing this, practical shooting participants test their defensive skills as they encounter props, including walls and barricades, with full or partial targets, "no-shoots," steel reaction targets, movers, and others to challenge them.

[49]   As noted earlier, ATF has taken the position that police/combat-style competitions do not constitute a "sporting purpose."  This position was upheld in <u>Gilbert Equipment Co.</u>, 709 F. Supp. at 1077.

[50]   Our findings on the use and suitability of the LCMM rifles in practical shooting competitions are contained in the "Suitability for Sporting Purposes" section of this report.

Exhibit 13
Page 00573

**ER_2757**

18

sporting: "if a military weapon is used in a special sporting event, it does not become a sporting weapon.  It is a military weapon used in a special sporting event."[51]  While none of the LCMM rifles are military weapons, they still retain the military feature of the ability to accept a large capacity military magazine.

---

[51]   114 Cong. Rec. 27461-462 (1968) (Sen. Dodd).

Exhibit 13
Page 00574

ER_2758

METHOD OF STUDY

As explained in the "Executive Summary" section of this report, the purpose of this study is to review whether modified semiautomatic assault rifles are properly importable under 18 U.S.C. section 925(d)(3). More specifically, we reexamined the conclusions of the 1989 report as applied today to determine whether we are correct to allow importation of the study rifles that have been modified by having certain military features removed. To determine whether such rifles are generally recognized as particularly suitable for or readily adaptable to sporting purposes, the Secretary must consider both the physical features of the rifles and the actual uses of the rifles.[52] Because it appears that all of the study rifles that have been imported to date have the ability to accept a large capacity military magazine,[53] all of the information collected on the study rifles' physical features and actual uses applies only to the LCMM rifles.

**Physical features**:

The discussion of the LCMM rifles' physical features are contained in the "Suitability for Sporting Purposes" section of this report.

**Use**:

We collected relevant information on the use of the LCMM rifles. Although the 1989 study did not consider the criminal use of firearms in its importability analysis, legislative history demonstrates and the courts have found that criminal use is a factor that can be considered in determining whether a firearm meets the requirements of section 925(d)(3).[54] Accordingly, we decided to consider the criminal use of the LCMM rifles in the present analysis.

The term "generally recognized" in section 925(d)(3) indicates that the Secretary should base his evaluation of whether a firearm is of a type that is particularly suitable for or readily adaptable to sporting purposes, in part, on a "community standard" of the firearm's use.[55] The community standard "may change over time even though the firearm remains the same. Thus, a changing pattern of use may significantly affect whether a firearm is generally recognized as particularly suitable for or readily adaptable to a sporting purpose."[56] Therefore, to assist the Secretary in determining whether the LCMM rifles presently are of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes, we gathered information from the relevant "community." The relevant community was defined as persons and groups who are

---

[52]   Gun South, Inc., 877 F.2d at 866.

[53]   The VEPR caliber .308 discussed on page 16 has not yet been imported.

[54]   114 Cong. Rec. S 5556, 5582, 5585 (1968)("[t]he entire intent of the importation section [of the sporting purposes test] is to get those kinds of weapons that are used by criminals and have no sporting purposes") (Sen. Dodd); Gun South, Inc., 877 F.2d at 866.

[55]   Gun South, Inc., 877 F.2d at 866.

[56]   Id.

Exhibit 13
Page 00575

ER_2759

knowledgeable about the uses of these firearms or have relevant information about whether these firearms are particularly suitable for sporting purposes. We identified more than 2,000 persons or groups we believed would be able to provide relevant, factual information on these issues. The individuals and groups were selected to obtain a broad range of perspectives on the issues. We conducted surveys to obtain specific information from hunting guides, editors of hunting and shooting magazines, organized competitive shooting groups, State game commissions, and law enforcement agencies and organizations. Additionally, we asked industry members, trade associations, and various interest and information groups to provide relevant information.[57] A detailed presentation of the surveys and responses is included as an appendix to this report.

We also reviewed numerous advertisements and publications, both those submitted by the editors of hunting and shooting magazines and those collected internally, in our search for material discussing the uses of the LCMM rifles. Further, we collected importation data, tracing data, and case studies.[58]

Our findings on use are contained in the "Suitability for Sporting Purposes" section of this report.

---

[57] **Hunting guides**: Guides were asked about specific types of firearms used by their clients. The guides were an easily definable group, versus the entire universe of hunters. We obtained the names of the hunting guides surveyed from the States.

**Editors of hunting and shooting magazines**: Editors were surveyed to determine whether they recommended the LCMM rifles for hunting or organized competitive target shooting and whether they had written any articles on the subject. The list of editors we surveyed was obtained from a directory of firearms-related organizations.

**Organized competitive shooting groups**: Organized groups were asked whether they sponsored competitive events with high-power semiautomatic rifles and whether the LCMM rifles were allowed in those competitions. We felt it was significant to query those who are involved with organized events rather than unofficial activities with no specific rules or guidelines. As with the editors above, the list of groups was obtained from a directory of firearms-related organizations.

**State game commissions**: State officials were surveyed to determine whether the use of the LCMM rifles was prohibited or restricted for hunting in each State.

**Law enforcement agencies and organizations**: Specific national organizations and a sampling of 26 police departments across the country were contacted about their knowledge of the LCMM rifles' use in crime. The national organizations were surveyed with the intent that they would gather input from the wide range of law enforcement agencies that they represent or that they would have access to national studies on the subject.

**Industry members and trade associations**: These groups were included because of their knowledge on the issue.

**Interest and information groups**: These organizations were included because of their wide range of perspectives on the issue.

[58] To assist us with our review of the crime-related information we collected, we obtained the services of Garen J. Wintemute, MD, M.P.H. Director of the Violence Prevention Research Program, University of California, Davis, and Anthony A. Braga, Ph.D., J.F.K. School of Government, Harvard University.

Exhibit 13
Page 00576

21

## SUITABILITY FOR SPORTING PURPOSES

The next step in our review was to evaluate whether the LCMM rifles, as a type, are generally recognized as particularly suitable for or readily adaptable to hunting and organized competitive target shooting.[59]   The standard applied in making this determination is high.  It requires more than a showing that the LCMM rifles may be used or even are sometimes used for hunting and organized competitive target shooting; if this were the standard, the statute would be meaningless.  Rather, the standard requires a showing that the LCMM rifles are especially suitable for use in hunting and organized competitive target shooting.

As discussed in the "Method of Study" section, we considered both the physical features of the LCMM rifles and the actual uses of the LCMM rifles in making this determination.

<u>Physical Features</u>

**The ability to accept a detachable large capacity magazine that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 or 93, SIG SG550, or Uzi.**

Although the LCMM rifles have been stripped of many of their military features, they all still have the ability to accept a detachable large capacity magazine that was originally designed and produced for one of the following military assault rifles: AK47, FN-FAL, HK91 and 93, SIG SG550, or Uzi; in other words, they still have a feature that was designed for killing or disabling an enemy.  As the 1989 report explains:

> Virtually all modern military firearms are designed to accept large, detachable magazines.  This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload.  Thus, large capacity magazines are indicative of military firearms.  While detachable magazines are not limited to military firearms, most traditional

---

[59]   One commenter suggests that the Secretary has been improperly applying the "readily adaptable to sporting purposes" provision of the statute.  Historically, the Secretary has considered the "particularly suitable for or readily adaptable to" provisions as one standard.  The broader interpretation urged by the commenter would make the standard virtually unenforceable.  If the Secretary allowed the importation of a firearm which is readily adaptable to sporting purposes, without requiring it actually to be adapted prior to importation, the Secretary would have no control over whether the adaptation actually would occur following the importation.

Exhibit 13
Page 00577

22

semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.[60]

Thus, the 1989 report found the ability to accept a detachable large capacity magazine originally designed and produced for a military assault rifle was a military, not a sporting, feature. Nevertheless, in 1989 it was decided that the ability to accept such a large capacity magazine, in the absence of other military configuration features, would not be viewed as disqualifying for the purposes of the sporting purposes test. However, several important developments, which are discussed below, have led us to reevaluate the weight that should be given to the ability to accept a detachable large capacity military magazine in the sporting purposes test.

Most significantly, we must reevaluate the significance of this military feature because of a major amendment that was made to the GCA since the 1989 report was issued. In 1994, as discussed in the "Background" section of this report, Congress passed a ban on large capacity ammunition feeding devices and semiautomatic assault weapons.[61] In enacting these bans, Congress made it clear that it was not preventing the possession of sporting firearms.[62] Although the 1994 law was not directly addressing the sporting purposes test, section 925(d)(3) had a strong influence on the law's content. As discussed previously, the technical work of ATF's 1989 report was, to a large extent, incorporated into the 1994 law.

Both the 1994 law and its legislative history demonstrate that Congress found that ammunition capacity is a factor in whether a firearm is a sporting firearm. For example, large capacity ammunition feeding devices were banned, while rifles and shotguns with small ammunition capacities were exempted from the assault weapon ban. In other words, Congress found magazine capacity to be such an important factor that a semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition will not be banned, even if it contains all five of the assault

---

[60]  1989 report at 6 (footnote omitted). This was not the first time that ATF considered magazine capacity to be a relevant factor in deciding whether a firearm met the sporting purposes test. See Gilbert Equipment Co., 709 F. Supp. at 1089 ("the overall appearance and design of the weapon (especially the detachable box magazine . . .) is that of a combat weapon and not a sporting weapon."

[61]  The ban on large capacity ammunition feeding devices does not include any such device manufactured on or before September 13, 1994. Accordingly, there are vast numbers of large capacity magazines originally designed and produced for military assault weapons that are legal to transfer and possess ("grandfathered" large capacity military magazines). Presently these grandfathered large capacity military magazines fit the LCMM rifles.

[62]  See, for example, H. Rep. No. 103-489, at 21.

Exhibit 13
Page 00578

**ER_2762**

23

weapon features listed in the law.  Moreover, unlike the assault weapon ban in which a detachable magazine and at least two physical features are required to ban a rifle, a large capacity magazine in and of itself is banned.

In addition, the House Report specifically states that the ability to accept a large capacity magazine is a military configuration characteristic that is not "merely cosmetic," but "serve[s] specific, combat-functional ends."[63]   The House Report also explains that large capacity magazines

> make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent.  Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds.  Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds.  Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. . . . In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities--from 3-5.[64]

Congress specifically exempted 661 long guns from the assault weapon ban that are "most commonly used in hunting and recreational sports."[65]   The vast majority of these long guns do not use large capacity magazines.  Although a small number of the exempted long guns have the ability to accept large capacity magazines, only four of these exempted long guns were designed to accept large capacity military magazines.[66]

The 1994 law also demonstrates Congress' concern about the role large capacity magazines and firearms with the ability to accept these large capacity magazines play in

---

[63]  H. Rep. No. 103-489, at 18.

[64]  H. Rep. No. 103-489, at 19 (footnote omitted).  The fact that 12 States place a limit on the magazine capacity allowed for hunting, usually 5 or 6 rounds, is consistent with this analysis.  (See exhibit 7).

[65]  H. Rep. 103-489, at 20.

[66]  These four firearms are the Iver Johnson M-1 carbine, the Iver Johnson 50th Anniversary M-1 carbine, the Ruger Mini-14 autoloading rifle (without folding stock), and the Ruger Mini Thirty rifle.  All of these weapons are manufactured in the United States and are not the subject of this study.  In this regard, it should also be noted that Congress can distinguish between domestic firearms and foreign firearms and impose different requirements on the importation of firearms.  For example, Congress may ban the importation of certain firearms although similar firearms may be produced domestically.  See, for example, B-West Imports v. United States, 75 F.3d 633 (Fed. Cir. 1996).

Exhibit 13
Page 00579

24

crime.  The House Report for the bill makes reference to numerous crimes involving these magazines and weapons, including the following:[67]

> The 1989 Stockton, California, schoolyard shooting in which a gunman with a semiautomatic copy of an AK47 and 75-round magazines fired 106 rounds in less than 2 minutes.  Five children were killed and twenty-nine adults and children were injured.

> The 1993 shooting in a San Francisco, California, office building in which a gunman using 2 TEC DC9 assault pistols with 50-round magazines killed 8 people and wounded 6 others.

> A 1993 shooting on the Long Island Railroad that killed 6 people and wounded  19 others.  The gunman had a Ruger semiautomatic pistol, which he reloaded several times with 15-round magazines, firing between 30 to 50 rounds before he was overpowered.

The House Report also includes testimony from a representative of a national police officers' organization, which reflects the congressional concern with criminals' access to firearms that can quickly expel large amounts of ammunition:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before [re]loading.  Now it is not at all unusual for a cop to look down the barrel of a TEC-9 with a 32 round clip.  The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and preservation.  The six-shot .38 caliber service revolver, standard law enforcement issue for years, is just no match against a criminal armed with a semiautomatic assault weapon.[68]

Accordingly, by passing the 1994 law, Congress signaled that firearms with the ability to accept detachable large capacity magazines are not particularly suitable for sporting purposes.  Although in 1989 we found the ability to accept a detachable large capacity military magazine was a military configuration feature, we must give it more weight, given this clear signal from Congress.

The passage of the 1994 ban on large capacity magazines has had another effect.  Under the 1994 ban, it generally is unlawful to transfer or possess a large capacity magazine

---

[67]  H. Rep. No. 103-489, at 15 (two of these examples involve handguns).

[68]  H. Rep. 103-489, at 13-14 (footnote omitted).

Exhibit 13
Page 00580

ER_2764

25

manufactured after September 13, 1994.  Therefore, if we require the LCMM rifles to be modified so that they do not accept a large capacity military magazine in order to be importable, a person will not be able to acquire a newly manufactured large capacity magazine to fit the modified rifle.  Thus, the modified rifle neither will be able to accept a grandfathered large capacity military magazine, nor can a new large capacity magazine be manufactured to fit it.  Accordingly, today, making the ability to accept a large capacity military magazine disqualifying for importation will prevent the importation of firearms which have the ability to expel large amounts of ammunition quickly without reloading.

This was not the case in 1989 or prior to the 1994 ban.

It is important to note that even though Congress reduced the supply of large capacity military magazines by passing the 1994 ban, there are still vast numbers of grandfathered large capacity military magazines available that can be legally possessed and transferred.  These magazines currently fit in the LCMM rifles.  Therefore, the 1994 law did not eliminate the need to take further measures to prevent firearms imported into the United States from having the ability to accept large capacity military magazines, a nonsporting factor.

Another impetus for reevaluating the existing standard is the development of modified weapons.  The 1989 report caused 43 different models of semiautomatic assault rifles to be banned from being imported into the United States.  The effect of that determination was that nearly all semiautomatic rifles with the ability to accept detachable large capacity military magazines were denied importation.  Accordingly, at the time, there was no need for the ability to accept such a magazine to be a determining factor in the sporting purposes test.  This is no longer the case.  As discussed earlier, manufacturers have modified the semiautomatic assault rifles disallowed from importation in 1989 by removing all of their military configuration features, except for the ability to accept a detachable magazine.  As a result, semiautomatic rifles with the ability to accept detachable large capacity military magazines (and therefore quickly expel large amounts of ammunition) legally have been entering the United States in significant numbers.  Accordingly, the development of these modified weapons necessitates reevaluating our existing standards.

Thus, in order to address Congress' concern with firearms that have the ability to expel large amounts of ammunition quickly, particularly in light of the resumption of these weapons coming into the United States, the ability to accept a detachable large capacity military magazine must be given greater weight in the sporting purposes analysis of the LCMM rifles than it presently receives.[69]

---

[69]   A firearm that can be easily modified to accept a detachable large capacity military magazine with only minor adjustments to the firearm or the magazine is considered to be a firearm with the ability to accept these magazines.  The ROMAK4 is an example of such a firearm:  With minor modifications to either the

Exhibit 13
Page 00581

ER_2765

26

**Derived from semiautomatic assault rifles that failed to meet the sporting purposes test in 1989 but were later found importable when certain military features were removed.**

All rifles that failed to meet the sporting purposes test in 1989 were found to represent a distinctive type of rifle distinguished by certain general characteristics that are common to the modern military assault rifle. Although the LCMM rifles are based on rifle designs excluded from importation under the 1989 standard, they all were approved for import when certain military features were removed. However, the LCMM rifles all still maintain some characteristics common to the modern military assault rifle. Because the outward appearance of most of the LCMM rifles continues to resemble the military assault rifles from which they are derived, we have examined the issue of outward appearance carefully. Some might prefer the rugged, utilitarian look of these rifles to more traditional sporting guns. Others might recoil from using these rifles for sport because of their nontraditional appearance. In the end, we concluded that appearance alone does not affect the LCMM rifles' suitability for sporting purposes. Available information leads us to believe that the determining factor for their use in crime is the ability to accept a detachable large capacity military magazine.

<u>Use</u>

In the 1989 study, ATF found that all rifles fairly typed as semiautomatic assault rifles should be treated the same. Accordingly, the report stated "[t]he fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability. Rather, all findings as to suitability of these rifles as a whole should govern each rifle within this type."[70] We adopt the same approach for the present study.

**Use for hunting:**

The information we collected on the actual use of the LCMM rifles for hunting medium or larger game suggests that, with certain exceptions, the LCMM rifles sometimes are used for hunting; however, their actual use in hunting is limited.[71] In fact, there are some

---

firearm or a large capacity magazine that was originally designed and produced for a semiautomatic assault rifle based on the AK47 design, the ROMAK4 has the ability to accept the magazine.

[70]   1989 report at 11.

[71]   We targeted the surveys toward the hunting of medium and larger game (e.g., turkey and deer) because the LCMM rifles chamber centerfire cartridges and therefore likely would be most suitable for hunting this type of game. We also learned that the LCMM rifles were used to shoot certain varmints (e.g., coyotes and groundhogs), which are generally considered to be pests, not game. Many commented that the LCMM

Exhibit 13
Page 00582

**ER_2766**

27

general restrictions and prohibitions on the use of any semiautomatic rifle for hunting game.  Almost half of the States place restrictions on the use of semiautomatic rifles in hunting, mostly involving magazine capacity (5-6 rounds) and what can be hunted with the rifles (see exhibit 7).

Of the 198 hunting guides who responded to our survey, only 26 stated that they had clients who used the LCMM rifles on hunting trips during the past 2 hunting seasons and only 10 indicated that they recommend the LCMM rifles for hunting.  In contrast, the vast majority of the guides (152) indicated that none of their clients used the LCMM rifles on hunting trips during the past 2 hunting seasons.  In addition, the hunting guides indicated that the most common semiautomatic rifles used by their clients were those made by Browning and Remington.[72]  We found significant the comments of the hunting guides indicating that the LCMM rifles were not widely used for hunting.

Of the 13 editors of hunting and shooting magazines who responded to our survey, only 2 stated that their publications recommend specific types of centerfire semiautomatic rifles for use in hunting medium or larger game.  These two respondents stated that they recommend all rifles that are safe and of appropriate caliber for hunting, including the LCMM rifles.  However, they did not recommend the LCMM rifles based on the Uzi design for hunting big game; these rifles use a 9mm cartridge, which is not an appropriate caliber for this type of game, according to the editors.  It is important to note that the LCMM rifles use different cartridges.  The LCMM rifles based on the FN-FAL, SIG SG550, and HK91 and 93 designs are chambered for either the .308 Winchester cartridge or the .223 Remington cartridge, depending on the specific model; the LCMM rifles based on the Uzi design are chambered for the 9mm Parabellum cartridge; and the majority of the LCMM rifles based on the AK47 design are chambered for the 7.62 x 39mm cartridge (some are chambered for the .223 Remington cartridge).

Of the five interest and information groups that responded to our survey, three supported the use of the LCMM rifles for hunting.  However, one of these groups stated that the

---

rifles were particularly useful on farms and ranches because of their ruggedness, utilitarian design, and reliability.

[72] According to a 1996 study conducted for the Fish and Wildlife Service, only 2 percent of big game hunters surveyed used licensed hunting guides.  Therefore, it should be noted that the information provided by the guides we surveyed may not be representative of all hunters.  However, we believe that the hunting guides' information is reliable and instructive because of their high degree of experience with and knowledge of hunting.

Exhibit 13
Page 00583

ER_2767

28

ammunition used by the LCMM rifle models based on the Uzi design were inadequate for shooting at long distances (i.e., more than 100 yards).

Out of the 70 published articles reviewed from various shooting magazines, only 5 contained relevant information. One of these five articles stated that, in the appropriate calibers, the LCMM rifles could make "excellent" hunting rifles. Two of the articles stated that the 7.62 x 39mm cartridge (used in LCMM rifles based on the AK47 design) could be an effective hunting cartridge. One of the articles that recommended the rifles also recommended modifications needed to improve their performance in hunting. None of the articles suggested that LCMM rifles based on the Uzi design were good hunting rifles. Thus, although the LCMM rifles could be used in hunting, the articles provided limited recommendations for their use as hunting weapons.

In their usage guides, ammunition manufacturers recommend the .308 and the 7.62 x 39mm cartridges (used in LCMM rifles based on the FN-FAL and HK 91 designs, and the AK47 design respectively) for medium game hunting. However, the usage guides do not identify the 9mm cartridge (used in the Uzi design rifles) as being suitable for hunting.

A majority of the importers who provided information said that the LCMM rifles they import are used for hunting deer and similar animals. However, they provided little evidence that the rifles were especially suitable for hunting these animals. Two of the importers who responded also provided input from citizens in the form of letters supporting this position. The letters show a wide variety of uses for the LCMM rifles, including deer hunting, plinking, target shooting, home defense, and competitive shooting.

Our review of all of this information indicates that while these rifles are used for hunting medium and larger game, as well as for shooting varmints, the evidence was not persuasive that there was widespread use for hunting. We did not find any evidence that the ability to accept a large capacity military magazine serves any hunting purpose. Traditional hunting rifles have much smaller magazine capabilities. Furthermore, the mere fact that the LCMM rifles are used for hunting does not mean that they are particularly suitable for hunting or meet the test for importation.

**Use for organized competitive target shooting**:

Of the 31 competitive shooting groups we surveyed that stated they have events using high-power semiautomatic rifles, 18 groups stated that they permit the use of the LCMM rifles for all competitions. However, 13 respondents stated that they restrict or prohibit the LCMM rifles for some competitions, and one group stated that it prohibits the LCMM

Exhibit 13
Page 00584

**ER_2768**

rifles for all competitions.  These restrictions and prohibitions generally were enacted for the following reasons:

1.    High-power rifle competitions generally require accuracy at ranges beyond the capabilities of the 9mm cartridge, which is used by the LCMM rifles based on the Uzi design.

2.    The models based on the AK47 design are limited to competitions of 200 yards or less because the 7.62 x 39mm cartridge, which is used by these models, generally has an effective range only between 300 and 500 yards.

3.    Certain matches require U.S. military service rifles, and none of the LCMM rifles fall into this category.

The LCMM rifles are permitted in all United States Practical Shooting Association (USPSA) rifle competitions.  The USPSA Practical Shooting Handbook, Glossary of Terms, states that "[y]ou can use any safe firearm meeting the minimum caliber (9mm/.38) and power factor (125PF) requirements."  The USPSA has stated that "rifles with designs based on the AR15, AK47, FN-FAL, HK91, HK93, and others are allowed and must be used to be competitive."  Moreover, we received some information indicating that the LCMM rifles actually are used in practical shooting competitions.[73]  However, we did not receive any information demonstrating that an LCMM rifle's ability to accept large capacity military magazines was necessary for its use in practical shooting competitions.

A couple of the interest groups recommended the LCMM rifles for organized competitive target shooting.

None of the 70 published articles read mentioned the use of the LCMM rifles in organized competitive target shooting.

All of the major ammunition manufacturers produce .308 Winchester ammunition  (which is used in the LCMM rifle models based on the HK 91 and FN-FAL designs) and .223 Remington ammunition (which is used in the HK 93, the SIG SG550, and some of the study rifle models based on the AK47 design) specifically for competitive shooting for rifles.  The major manufacturers and advertisers of 9mm ammunition (which is used in the LCMM rifles based on the Uzi design) identify it as being suitable for pistol target shooting and self-defense.

---

[73]    Merely because a rifle is used in a sporting competition, the rifle does not become a sporting rifle.  114 Cong. Rec. 27461-462 (1968).

Exhibit 13
Page 00585

30

A majority of the importers who provided information stated that the LCMM rifles they import are permitted in and suitable for organized competitive target shooting. Two of the importers who responded also provided input from citizens in the form of letters and petitions supporting this position. However, the importers provided little evidence that the rifles were especially suitable for organized competitive target shooting.

The information collected on the actual use of the LCMM rifles for organized competitive target shooting suggests that, with certain exceptions, the LCMM rifles usually may be used and sometimes are used for organized competitive target shooting; however, their suitability for this activity is limited. In fact, there are some restrictions and prohibitions on their use. The use of the rifles in competitive target shooting appears more widespread than for hunting and their use for practical shooting was the most significant. Although we are not convinced that practical shooting does in fact constitute a sporting purpose under section 925(d), we note that there was no information demonstrating that rifles with the ability to accept detachable large capacity military magazines were necessary for use in practical shooting. Once again, the presence of this military feature on LCMM rifles suggests that they are not generally recognized as particularly suitable for or readily adaptable to sporting purposes.

**Use in crime:**

To fully understand how the LCMM rifles are used, we also examined information available to us on their use in crime. Some disturbing trends can be identified, and it is clear the LCMM rifles are attractive to criminals.

The use of LCMM rifles in violent crime and firearms trafficking is reflected in the cases cited below. It should be noted that the vast majority of LCMM rifles imported during the period 1991-1997 were AK47 variants, which explains their prevalence in the cited cases.

North Philadelphia, Pennsylvania

From April 1995 to November 1996, a convicted felon used a straw purchaser to acquire at least 55 rifles, including a number of MAK90s. The rifles were then trafficked by the prohibited subject to individuals in areas known for their high crime rates. In one case, the rifles were sold from the parking lot of a local elementary school.
Oakland, California

On July 8, 1995, a 32-year-old Oakland police officer assisted a fellow officer with a vehicle stop in a residential area. As the first officer searched the rear compartment of the stopped vehicle, a subject from a nearby residence used a Norinco model NMH 90 to shoot the 32-year old officer in the back. The officer later died from the wound.

Exhibit 13
Page 00586

**ER_2770**

31

El Paso, Texas

On April 15, 1996, after receiving information from the National Tracing Center, ATF initiated an undercover investigation of a suspected firearms trafficker who had purchased 326 MAK90 semiautomatic rifles during a 6-month period.  The individual was found to be responsible for illegally diverting more than 1,000 firearms over the past several years.  One of the MAK90 rifles that the subject had purchased was recovered from the scene of a 1996 shootout in Guadalajara, Mexico, between suspected drug traffickers and Mexican authorities.  Another MAK90 was recovered in 1997 from the residence of a former Mexican drug kingpin following his arrest for drug-related activities.

Charlotte, North Carolina

On May 24, 1996, four armed subjects—one with a MAK90 rifle—carried out a home invasion robbery during which they killed the resident with a 9mm pistol.  All four suspects were arrested.

Dallas, Texas

In September 1997, an investigation was initiated on individuals distributing crack cocaine from a federally subsidized housing community.  During repeated undercover purchases of the narcotics, law enforcement officials noticed that the suspects had firearms in their possession.  A search warrant resulted in the seizure of crack cocaine, a shotgun, and a North China Industries model 320 rifle.

Chesterfield, Virginia

In November 1997, a MAK90 rifle was used to kill two individuals and wound three others at a party in Chesterfield, Virginia.

Orange, California

In December 1997, a man armed with an AKS 762 rifle and two other guns drove to where he was previously employed and opened fire on former coworkers, killing four and injuring three, including a police officer.

Baltimore, Maryland

In December 1997, a search warrant was served on a homicide suspect who was armed at the time with three pistols and a MAK90 rifle.

Exhibit 13
Page 00587

32

We also studied import and trace information to learn whether the LCMM rifles are used in crime.

Between 1991 and 1997, there were 425,114 LCMM rifles imported into the United States. This represents 7.6 percent of the approximately 5 million rifles imported during this period.  The breakdown of the specific variants of LCMM rifles imported follows:

| | |
|---|---|
| AK-47 variants: | 377,934 |
| FN-FAL variants: | 37,534 |
| HK variants: | 6,495 |
| Uzi variants: | 3,141 |
| SIG SG550 variants: | 10 |

During this same time period, ATF traced 632,802 firearms.[74]  This included 81,842 rifles of which approximately 3,176 were LCMM rifles.[75]  While this number is relatively low compared to the number of total traces, it must be viewed in light of the small number of LCMM rifles imported during this time period and the total number of rifles, both imported domestic, that were available in the United States.  A more significant trend is reflected in figure 1.

---

[74]   ATF traces crime guns recovered and submitted by law enforcement officials.  A crime gun is defined, for purposes of firearms tracing, as any firearm that is illegally possessed, used in a crime, or suspected by law enforcement of being used in a crime.  Trace information is used to establish links between criminals and firearms, to investigate illegal firearm trafficking, and to identify patterns of crime gun traces by jurisdiction.  A substantial number of firearms used in crime are not recovered by law enforcement agencies and therefore not traced.  In addition, not all recovered crime guns are traced.  Therefore, trace requests substantially underestimate the number of firearms involved in crimes, and trace numbers contain unknown statistical biases.  These problems are being reduced as more law enforcement agencies institute policies of comprehensive crime gun tracing.

[75]   The vast majority of LCMM rifles traced during this time period were AK47 variants.  Specifically, AK47 variants comprised 95.6 percent of the LCMM rifles traced.  This must be viewed within the context that 88 percent of the LCMM rifles imported during this period were AK47 variants.

Exhibit 13
Page 00588

33

Firearms Traces 1991-1997

| Year | Total Firearms Traced | Total Rifles Traced | Total Assault[76] Rifles Traced | Total LCMM Rifles Traced |
|---|---|---|---|---|
| 1991 | 42,442 | 6,196 | 656 | 7 |
| 1992 | 45,134 | 6,659 | 663 | 39 |
| 1993 | 54,945 | 7,690 | 852 | 182 |
| 1994 | 83,137 | 9,201 | 735 | 596 |
| 1995 | 76,847 | 9,988 | 717 | 528 |
| 1996 | 136,062 | 17,475 | 1,075 | 800 |
| 1997 | 194,235 | 24,633 | 1,518 | 1,024 |
| Cumulative Total | 632,802 | 81,842 | 6,216 | 3,176 |

Figure 1

The figures in this table show that between 1991 and 1994, trace requests involving LCMM rifles increased rapidly, from 7 to 596. During the same period, trace requests for assault rifles increased at a slower rate, from 656 to 735. The years 1991 to 1994 are significant because they cover a period between when the ban on the importation of semiautomatic assault rifles was imposed and before the September 13, 1994, ban on semiautomatic assault weapons was enacted. Thus, during the years leading up to the 1994 ban, traces of LCMM rifles were increasing much more rapidly than the traces of the rifles that had been the focus of the 1989 ban, as well as the rifles that were the focus of the 1994 congressional action.

We also compared patterns of importation with trace requests to assess the association of LCMM rifles with criminal involvement. The comparison shows that importation of LCMM rifles in the early 1990s was followed immediately by a rapid rise in the number of trace requests involving LCMM rifles. This is shown in figures 2 and 3.

---

[76] For purposes of this table, assault rifles include (1) semiautomatic assault rifles banned from importation in 1989 but still available domestically because they had been imported into the     United States prior to the ban, (2) domestically produced rifles that would not have qualified for importation after 1989, and (3) semiautomatic assault rifles that were banned in 1994.

Exhibit 13
Page 00589

ER_2773

34



Figure 2



Figure 3

Two aspects of the relationship between importation and trace request patterns are significant.  First, the rapid rise in traces following importation indicates that, at least in some cases, very little time elapsed between a particular LCMM rifle's importation and its recovery by law enforcement.  This time lapse is known as "time to crime."  A short time to crime can be an indicator of illegal trafficking.  Therefore, trace patterns suggest what the case examples show:  LCMM rifles have been associated with illegal trafficking.  Second, while LCMM rifles have not been imported in large numbers since 1994,[77] the number of trace requests for LCMM rifles continues to rise.  This reflects a sustained and

---

[77]     One reason is that there has been an embargo on the importation of firearms from China since May 1994.

Exhibit 13
Page 00590

ER_2774

35

continuing pattern of criminal association for LCMM rifles despite the fact that there were fewer new LCMM rifles available.[78]  Moreover, it is reasonable to conclude that if the importation of LCMM rifles resumes, the new rifles would contribute to the continuing rise in trace requests for them. [79]

All of the LCMM rifles have the ability to accept a detachable large capacity military magazine.  Thus, they all have the ability to expend large amounts of ammunition quickly.  In passing the 1994 ban on semiautomatic assault rifles and large capacity ammunition feeding devices, Congress found that weapons with this ability are attractive to criminals.[80]  Thus, we can infer that the LCMM rifles may be attractive to criminals because in some ways they remain akin to military assault rifles, particularly in their ability to accept a detachable large capacity military magazine.

---

[78]    The increase in trace requests also reflects the fact that law enforcement officials were making trace requests for all types of firearms much more frequently beginning in 1996.  There were 76,847 trace requests in 1995, 136,062 trace requests in 1996, and 194,235 trace requests in 1997.  Traces for assault rifles were increasing by approximately the same percentage as traces for LCMM rifles during these years.

[79]    In addition to looking at case studies and tracing and import information, we attempted to get information on the use of the LCMM rifles in crime by surveying national law enforcement agencies and organizations, as well as metropolitan police departments.  Twenty-three national law enforcement agencies and organizations were surveyed and five responded.  Three of the respondents stated they had no information.  The other two provided information that was either outdated or not specific enough to identify the LCMM rifles.

The 26 metropolitan police departments surveyed provided the following information:

17 departments had no information to provide.
5 departments stated that the LCMM rifles were viewed as crime guns.
1 department stated that the LCMM rifles were nonsporting.
2 departments stated that the LCMM rifles were used to hunt coyotes in their areas.
1 department stated that the LCMM rifles were used for silhouette target shooting.

[80]    H. Rep. No. 103-489, at 13, 18, 19.

Exhibit 13
Page 00591

**ER_2775**

36

<u>DETERMINATION</u>

In 1989, ATF determined that the type of rifle defined as a semiautomatic assault rifle was not generally recognized as particularly suitable for or readily adaptable to sporting purposes.  Accordingly, ATF found that semiautomatic assault rifles were not importable into the United States.  This finding was based, in large part, on ATF's determination that semiautomatic assault rifles contain certain general characteristics that are common to the modern military assault rifle.  These characteristics were designed for killing and disabling the enemy and distinguish the rifles from traditional sporting rifles.  One of these characteristics is a military configuration, which incorporates eight physical features: Ability to accept a detachable magazine, folding/telescoping stocks, separate pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights.  In 1989, ATF decided that any of these military configuration features, other than the ability to accept a detachable magazine, would make a semiautomatic assault rifle not importable.

Certain semiautomatic assault rifles that failed the 1989 sporting purposes test were modified to remove all of the military configuration features, except for the ability to accept a detachable magazine.  Significantly, most of these modified rifles not only still have the ability to accept a detachable magazine but, more specifically, still have the ability to accept a large capacity military magazine.  It appears that only one of the current study rifles, the VEPR caliber .308 (an AK47 variant), does not have the ability to accept a large capacity military magazine and, therefore, is not an LCMM rifle.  Based on the standard developed in 1989, these modified rifles were found not to fall within the semiautomatic assault rifle type and were found to meet the sporting purposes test.  Accordingly, these rifles were approved for import into the United States.

Members of Congress and others have expressed concerns that these modified semiautomatic assault rifles are essentially the same as the semiautomatic assault rifles determined to be not importable in 1989.  In response to such concerns, the present study reviewed the current application of the sporting purposes test to the study rifles to determine whether the statute is being applied correctly and to ensure that the current use of the study rifles is consistent with the statute's criteria for importability.

Our review took another look at the entire matter.  We reexamined the basic tenets of the 1989 study, conducted a new analysis of the physical features of the rifles, surveyed a wide variety of sources to acquire updated information relating to use and suitability, and assessed changes in law that might have bearing on the treatment of the study rifles.

This review has led us to conclude that the basic finding of the 1989 decision remains valid and that military-style semiautomatic rifles are not importable under the sporting purposes standard.  Accordingly, we believe that the Department of the Treasury correctly has been denying the importation of rifles that had any of the distinctly military

Exhibit 13
Page 00592

ER_2776

37

configuration features identified in 1989, other than the ability to accept a detachable magazine.  Our review, however, did result in a finding that the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989.

Several important changes have occurred since 1989 that have led us to reevaluate the importance of this feature in the sporting purposes test.  Most significantly, by passing the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting; rather, firearms with this ability have military purposes and are a crime problem.  The House Report to the 1994 law emphasizes that the ability to accept a large capacity magazine "serve[s] specific, combat-functional ends."[81]  Moreover, this ability plays a role in increasing a firearm's "capability for lethality," creating "more wounds, more serious, in more victims."[82]  Furthermore, the House Report noted semiautomatic assault weapons with this ability are the "weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder."[83]

Moreover, we did not find any evidence that the ability to accept a detachable large capacity military magazine serves any sporting purpose.  The House Report to the 1994 law notes that, while most of the weapons covered by the assault weapon ban come equipped with detachable large capacity magazines, hunting rifles and shotguns typically have much smaller magazine capabilities, from 3 to 5 rounds.[84]  Similarly, we found that a number of States limit magazine capacity for hunting to 5 to 6 rounds.  We simply found no information showing that the ability to accept a detachable large capacity military magazine has any purpose in hunting or organized competitive target shooting.

Accordingly, we find that the ability to accept a detachable large capacity military magazine is a critical factor in the sporting purposes test that must be given the same weight as the other military configuration features identified in 1989.

The information we collected on the use and suitability of the LCMM rifles for hunting and organized competitive target shooting demonstrated that the rifles are not especially suitable for sporting purposes.  Although our study found that the LCMM rifles, as a type, may sometimes be used for hunting, we found no evidence that they are commonly used for hunting.  In fact, some of the rifles are unsuitable for certain types of hunting.

---

[81]  H. Rep. No. 103-489, at 18.

[82]  H. Rep. No. 103-489, at 19.

[83]  H. Rep. No. 103-489, at 13.

[84]  H. Rep. No. 103-489, at 19 (footnote omitted).

Exhibit 13
Page 00593

ER_2777

38

The information we collected also demonstrated that although the LCMM rifles, as a type, may be used for organized competitive target shooting, their suitability for these competitions is limited.  There are even some restrictions or prohibitions on their use for certain types of competitions.   In addition, we believe that all rifles which are fairly typed as LCMM rifles should be treated the same.  Therefore, the fact that there may be some evidence that a particular rifle of this type is used or recommended for sporting purposes should not control its importability.  Rather, all findings as to suitability of LCMM rifles as a whole should govern each rifle within this type.  The findings as a whole simply did not satisfy the standard set forth in section 925(d)(3).

Finally, the information we gathered demonstrates that the LCMM rifles are attractive to certain criminals.  We find that the LCMM rifles' ability to accept a detachable large capacity military magazine likely plays a role in their appeal to these criminals.  In enacting the 1994 bans on semiautomatic assault weapons and large capacity ammunition feeding devices, Congress recognized the appeal large magazine capacity has to the criminal element.

Weighing all this information, the LCMM rifles, as a type, are not generally recognized as particularly suitable for or readily adaptable to sporting purposes.  As ATF found in conducting its 1989 study, although some of the issues we confronted were difficult to resolve, in the end we believe the ultimate conclusion is clear and compelling.  The ability of all of the LCMM rifles to accept a detachable large capacity military magazine gives them the capability to expel large amounts of ammunition quickly; this serves a function in combat and crime, but serves no sporting purpose.  Given the high standard set forth in section 925(d)(3) and the Secretary's discretion in applying the sporting purposes test, this conclusion was clear.

This decision will in no way preclude the importation of true sporting firearms.  It will prevent only the importation of firearms that cannot fairly be characterized as sporting rifles.

Individual importers with existing permits for, and applications to import involving, the LCMM rifles will be notified of this determination in writing.  Each of these importers will be given an opportunity to respond and present additional information and arguments.  Final action will be taken on permits and applications only after an affected importer has an opportunity to makes its case.

Exhibit 13
Page 00594

ER_2778

Exhibit

THE WHITE HOUSE

WASHINGTON

November 14, 1997

MEMORANDUM FOR THE SECRETARY OF THE TREASURY

SUBJECT:          Importation of Modified Semiautomatic
                  Assault-Type Rifles

The Gun Control Act of 1968 restricts the importation of
firearms unless they are determined to be particularly suitable
for or readily adaptable to sporting purposes.  In 1989, the
Department of the Treasury (the Department) conducted a review
of existing criteria for applying the statutory test based on
changing patterns of gun use.  As a result of that review,
43 assault-type rifles were specifically banned from impor-
tation.  However, manufacturers have modified many of those
weapons banned in 1989 to remove certain military features
without changing their essential operational mechanism.
Examples of such weapons are the Galil and the Uzi.

In recent weeks Members of Congress have strongly urged that it
is again necessary to review the manner in which the Department
is applying the sporting purposes test, in order to ensure that
the agency's practice is consistent with the statute and current
patterns of gun use.  A letter signed by 30 Senators strongly
urged that modified assault-type weapons are not properly
importable under the statute and that I should use my authority
to suspend temporarily their importation while the Department
conducts an intensive, expedited review.  A recent letter from
Senator Dianne Feinstein emphasized again that weapons of this
type are designed not for sporting purposes but for the com-
mission of crime.  In addition, 34 Members of the House of
Representatives signed a letter to Israeli Prime Minister
Binyamin Netanyahu requesting that he intervene to stop all
sales of Galils and Uzis into the United States.  These
concerns have caused the Government of Israel to announce
a temporary moratorium on the exportation of Galils and Uzis
so that the United States can review the importability of
these weapons under the Gun Control Act.

Exhibit 13
Page 00595

Exhibit 1

2

The number of weapons at issue underscores the potential threat to the public health and safety that necessitates immediate action. Firearms importers have obtained permits to import nearly 600,000 modified assault-type rifles. In addition, there are pending before the Department applications to import more than 1 million additional such weapons. The number of rifles covered by outstanding permits is comparable to that which existed in 1989 when the Bush Administration temporarily suspended import permits for assault-type rifles. The number of weapons for which permits for importation are being sought through pending applications is approximately 10 times greater than in 1989. The number of such firearms for which import applications have been filed has skyrocketed from 10,000 on October 9, 1997, to more than 1 million today.

My Administration is committed to enforcing the statutory restrictions on importation of firearms that do not meet the sporting purposes test. It is necessary that we ensure that the statute is being correctly applied and that the current use of these modified weapons is consistent with the statute's criteria for importability. This review should be conducted at once on an expedited basis. The review is directed to weapons such as the Uzi and Galil that failed to meet the sporting purposes test in 1989, but were later found importable when certain military features were removed. The results of this review should be applied to all pending and future applications.

The existence of outstanding permits for nearly 600,000 modified assault-type rifles threatens to defeat the purpose of the expedited review unless, as in 1989, the Department temporarily suspends such permits. Importers typically obtain authorization to import firearms in far greater numbers than are actually imported into the United States. However, gun importers could effectively negate the impact of any Department determination by simply importing weapons to the maximum amount allowed by their permits. The public health and safety require that the only firearms allowed into the United States are those that meet the criteria of the statute.

Accordingly, as we discussed, you will:

    1) Conduct an immediate expedited review not to exceed 120 days in length to determine whether modified semiautomatic assault-type rifles are properly importable under the statutory sporting purposes test. The results of this review will govern action on pending and future applications for import permits, which shall not be acted upon until the completion of this review.

Exhibit 13
Page 00596

**ER_2780**

Exhibit 1

3

2)   Suspend outstanding permits for importation of
modified semiautomatic assault-type rifles for the duration
of the 120-day review period.   The temporary suspension does
not constitute a permanent revocation of any license.   Permits
will be revoked only if and to the extent that you determine
that a particular weapon does not satisfy the statutory test
for importation, and only after an affected importer has an
opportunity to make its case to the Department.



Exhibit 13
Page 00597

ER_2781

Exhibit 2

<u>STUDY RIFLE MODELS</u>

**AK47 Variants:**

| | | | FN-FAL Variants: |
|---|---|---|---|
| MAK90* | SA2000 | Saiga rifle | L1A1 Sporter |
| 314* | ARM | Galil Sporter | FAL Sporter |
| 56V* | MISR | Haddar | FZSA |
| 89* | MISTR | Haddar II | SAR4800 |
| EXP56A* | SA85M | WUM 1 | X FAL |
| SLG74 | Mini PSL | WUM 2 | C3 |
| NHM90* | ROMAK 1 | SLR95 | C3A |
| NHM90-2* | ROMAK 2 | SLR96 | LAR Sporter |
| NHM91* | ROMAK 4 | SLR97 | |
| SA85M | Hunter rifle | SLG94 | |
| SA93 | 386S | SLG95 | |
| A93 | PS/K | SLG96 | |
| AKS 762 | VEPR caliber | | |
| VEPR | 7.62 x 39mm | | |
| caliber .308 | | | |

**HK Variants:**

| | Uzi Variants: | SIG SG550 Variants: |
|---|---|---|
| BT96 | Officers 9* | SG550-1 |
| Centurian 2000 | 320 carbine* | SG550-2 |
| SR9 | Uzi Sporter | |
| PSG1 | | |
| MSG90 | | |
| G3SA | | |
| SAR8 | | |

- These models were manufactured in China and have not been imported since the 1994 embargo on the importation of firearms from China.

Exhibit 13
Page 00598

**ER_2782**

Exhibit 3

### STUDY RIFLES

The study rifles are semiautomatic firearms based on the AK47, FN-FAL, HK 91 and 93, Uzi, and SIG SG550 designs.  Each of the study rifles is derived from a semiautomatic assault rifle. The following are some examples of specific study rifle models grouped by design type.  In each instance, a semiautomatic assault rifle is shown above the study rifles for comparison.

<u>AK47 Variants</u>



AK47 semiautomatic assault rifle

===============================================================



MISR                                        ARM

MAK90                                      WUM 1

Exhibit 13
Page 00599

**ER_2783**

Exhibit 3

__FN-FAL Variants__



FN-FAL semiautomatic assault rifle

===================================================================



L1A1 Sporter                                    SAR 4800

__HK 91 and 93 Variants__



HK91 semiautomatic assault rifle

===================================================================



SR9                                    SAR 8

Exhibit 13
Page 00600

**ER_2784**

Exhibit 3

Uzi Variants



Uzi semiautomatic assault rifle

===============================================================



320 carbine

SIG SG550 Variants

The following illustration depicts the configuration of a semiautomatic assault rifle based on the SIG SG550 design.  No illustrations of modified semiautomatic versions are available.



SIG SG550 semiautomatic assault rifle

Exhibit 13
Page 00601

Exhibit 4

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS

## FACTORING CRITERIA FOR WEAPONS

NOTE: The Bureau of Alcohol, Tobacco and Firearms reserves the right to preclude importation of any revolver or pistol which achieves an apparent qualifying score but does not adhere to the provisions of section 925(d)(3) of Amended Chapter 44, Title 18, U.S.C.

| PISTOL | | | | REVOLVER | | |
|---|---|---|---|---|---|---|
| **MODEL:** | | | | **MODEL:** | | |
| **PREREQUISITES**<br>1. The pistol must have a positive manually operated safety device.<br>2. The combined length and height must not be less than 10" with the height (right angle measurement to barrel without magazine or extension) being at least 4" and the length being at least 6" | | | | **PREREQUISITES**<br>1. Must pass safety test.<br>2. Must have overall frame (with conventional grips) length (not diagonal) of 4½" minimum.<br>3. Must have a barrel length of at least 3". | | |
| **INDIVIDUAL CHARACTERISTICS** | **POINT VALUE** | **POINT SUB-TOTAL** | | **INDIVIDUAL CHARACTERISTICS** | **POINT VALUE** | **POINT SUB-TOTAL** |
| OVERALL LENGTH | | | | BARREL LENGTH *(Muzzle to Cylinder Face)* | | |
| FOR EACH 1/4" OVER 6" | 1 | | | LESS THAN 4" | 0 | |
| FRAME CONSTRUCTION | | | | FOR EACH 1/4" OVER 4" | 1/2 | |
| INVESTMENT CAST OR FORGED STEEL | 15 | | | FRAME CONSTRUCTION | | |
| INVESTMENT CAST OR FORGED HTS ALLOY | 20 | | | INVESTMENT CAST OR FORGED STEEL | 15 | |
| WEAPON WEIGHT W/MAGAZINE *(Unloaded)* | | | | INVESTMENT CAST OR FORGED HTS ALLOY | 20 | |
| PER OUNCE | 1 | | | WEAPON WEIGHT *(Unloaded)* | | |
| CALIBER | | | | PER OUNCE | 1 | |
| .22 SHORT AND .25 AUTO | 0 | | | CALIBER | | |
| .22 LR AND 7.65mm TO .380 AUTO | 3 | | | .22 SHORT TO .25 ACP | 0 | |
| 9mm PARABELLUM AND OVER | 10 | | | .22 LR AND .30 TO .38 S&W | 3 | |
| SAFETY FEATURES | | | | .38 SPECIAL | 4 | |
| LOCKED BREECH MECHANISM | 5 | | | .357 MAG AND OVER | 5 | |
| LOADED CHAMBER INDICATOR | 5 | | | MISCELLANEOUS EQUIPMENT | | |
| GRIP SAFETY | 3 | | | ADJUSTABLE TARGET SIGHTS *(Drift or Click)* | 5 | |
| MAGAZINE SAFETY | 5 | | | TARGET GRIPS | 5 | |
| FIRING PIN BLOCK OR LOCK | 10 | | | TARGET HAMMER AND TARGET TRIGGER | 5 | |
| MISCELLANEOUS EQUIPMENT | | | | SAFETY TEST | | |
| EXTERNAL HAMMER | 2 | | | A Double Action Revolver must have a safety feature which automatically (or in a Single Action Revolver by manual operation) causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge. The safety device must withstand the impact of a weight equal to the weight of the revolver dropping from a distance of 36" in a line parallel to the barrel upon the rear of the hammer spur, a total of 5 times. | | |
| DOUBLE ACTION | 10 | | | | | |
| DRIFT ADJUSTABLE TARGET SIGHT | 5 | | | | | |
| CLICK ADJUSTABLE TARGET SIGHT | 10 | | | | | |
| TARGET GRIPS | 5 | | | | | |
| TARGET TRIGGER | 2 | | | | | |
| **SCORE ACHIEVED**<br>*(Qualifying score is 75 points)* | | | | **SCORE ACHIEVED**<br>*(Qualifying score is 45 points)* | | |

Exhibit 13
Page 00602

**ER_2786**

Exhibit 5

## MILITARY CONFIGURATION

1. <u>Ability to accept a detachable magazine</u>.  Virtually all modern military firearms are designed to accept large, detachable magazines.  This provides the soldier with a fairly large ammunition supply and the ability to rapidly reload.  Thus, large capacity magazines are indicative of military firearms.  While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity.  Additionally, some States have a limit on the magazine capacity allowed for hunting, usually five or six rounds.

2. <u>Folding/telescoping stock</u>.  Many military firearms incorporate folding or telescoping stocks.  The main advantage of this item is portability, especially for airborne troops.  These stocks allow the firearm to be fired from the folded position, yet it cannot be fired nearly as accurately as with an open stock.  With respect to possible sporting uses of this feature, the folding stock makes it easier to carry the firearm when hiking or backpacking.  However, its predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle.

3. <u>Pistol grips</u>. The vast majority of military firearms employ a well-defined separate pistol grip that protrudes conspicuously beneath the action of the weapon. In most cases, the "straight line design" of the military weapon dictates a grip of this type so that the shooter can hold and fire the weapon.  Further, a pistol grip can be an aid in one-handed firing of the weapon in a combat situation. Further, such grips were designed to assist in controlling machineguns during automatic fire.  On the other hand, the vast majority of sporting firearms employ a more traditional pistol grip built into the wrist of the stock of the firearm since one-handed shooting is not usually employed in hunting or organized competitive target competitions.

4. <u>Ability to accept a bayonet</u>.  A bayonet has distinct military purposes.  First, it has a psychological effect on the enemy.  Second, it enables soldiers to fight in close quarters with a knife attached to their rifles.  No traditional sporting use could be identified for a bayonet.

5. <u>Flash suppressor</u>.  A flash suppressor generally serves one or two functions.  First, in military firearms it disperses the muzzle flash when the firearm is fired to help conceal the shooter's position, especially at night.  A second purpose of some flash suppressors is to assist in controlling the "muzzle climb" of the rifle, particularly when fired as a fully automatic weapon.  From the standpoint of a traditional sporting firearm, there is no particular benefit in suppressing muzzle flash.  Flash suppressors that also serve to dampen muzzle climb have a limited benefit in sporting uses by allowing the shooter to reacquire

Exhibit 13
Page 00603

**ER_2787**

Exhibit 5

the target for a second shot.  However, the barrel of a sporting rifle can be modified by "magna-porting" to achieve the same result.  There are also muzzle attachments for sporting firearms to assist in the reduction of muzzle climb.  In the case of military-style weapons that have flash suppressors incorporated in their design, the mere removal of the flash suppressor may have an adverse impact on the accuracy of the firearm.

6.   <u>Bipods</u>.  The majority of military firearms have bipods as an integral part of the firearm or contain specific mounting points to which bipods may be attached.  The military utility of the bipod is primarily to provide stability and support for the weapon when fired from the prone position, especially when fired as a fully automatic weapon.  Bipods are available accessory items for sporting rifles and are used primarily in long-range shooting to enhance stability.  However, traditional sporting rifles generally do not come equipped with bipods, nor are they specifically designed to accommodate them.  Instead, bipods for sporting firearms are generally designed to attach to a detachable "slingswivel mount" or simply clamp onto the firearm.

7.   <u>Grenade launcher</u>.  Grenade launchers are incorporated in the majority of military firearms as a device to facilitate the launching of explosive grenades.  Such launchers are generally of two types.  The first type is a flash suppressor designed to function as a grenade launcher.  The second type attaches to the barrel of the rifle by either screws or clamps.  No traditional sporting application could be identified for a grenade launcher.

8.   <u>Night sights</u>.  Many military firearms are equipped with luminous sights to facilitate sight alignment and target acquisition in poor light or darkness.  Their uses are generally for military and law enforcement purposes and are not usually found on sporting firearms since it is generally not legal to hunt at night.

Exhibit 13
Page 00604

ER_2788

Exhibit 6

**[This document has been retyped for clarity.]**

MEMORANDUM TO FILE

FIREARMS ADVISORY PANEL

The initial meeting of the Firearms Advisory Panel was held in Room 3313, Internal Revenue Building, on December 10, 1968, with all panel members present.  Internal Revenue Service personnel in attendance at the meeting were the Director, Alcohol and Tobacco Tax Division, Harold Serr; Chief, Enforcement Branch, Thomas Casey; Chief, Operations Coordination Section, Cecil M. Wolfe, and Firearms Enforcement Officer, Paul Westenberger. Deputy Assistant Commissioner Compliance, Leon Green, visited the meeting several times during the day.

The Director convened the meeting at 10:00 a.m. by welcoming the members and outlining the need for such an advisory body.  He then introduced the Commissioner of Internal Revenue, Mr. Sheldon Cohen, to each panel member.

Mr. Cohen spoke to the panel for approximately fifteen minutes.  He thanked the members for their willingness to serve on the panel, explained the role of the panel and some of the background which led to the enactment of the Gun Control Act of 1968.  Commissioner Cohen explained to the panel members the conflict of interest provisions of regulations pertaining to persons employed by the Federal Government and requested that if any member had any personal interest in any matter that came under discussion or consideration, he should make such interest known and request to be excused during consideration of the matter.

Mr. Seer then explained to the panel the areas in which the Division would seek the advice of the panel and emphasized that the role of the panel would be advisory only, and that it was the responsibility of the Service to make final decisions.  He then turned the meeting over to the moderator, Mr. Wolfe.

Mr. Wolfe explained the responsibility of the Service under the import provisions of the Gun Control Act and under the Mutual Security Act.  The import provisions were read and discussed.

The panel was asked to assist in defining Asporting purposes≅ as used in the Act.  It was generally agreed that firearms designed and intended for hunting and all types of organized competitive target shooting would fall within the sporting purpose category.  A discussion was held on the so-called sport of Aplinking≅.  It was the consensus that, while many persons

Exhibit 13
Page 00605

**ER_2789**

Exhibit 6

participated in the type of activity and much ammunition was expended in such endeavors, it was primarily a pastime and could not be considered a sport for the purposes of importation since any firearm that could expel a projectile could be used for this purpose without having any characteristics generally associated with target guns.

The point system that had been developed by the Division and another point system formula suggested and furnished by the Southern Gun Distributors through Attorney Michael Desalle, was explained and demonstrated to the panel by Paul Westenberger.  Each panel member was given copies of the formulas and requested to study them and endeavor to develop a formula he believed would be equitable and could be applied to all firearms sought to be imported.

A model BM59 Beretta, 7.62 mm, NATO Caliber Sporter Version Rifle was presented to the panel and their advice sought as to their suitability for sporting purposes. It was the consensus that these rifles do have a particular use in target shooting and hunting.  Accordingly, it was recommended that importation of this rifle together with the SIG-AMT 7.62mm NATO Caliber Sporting Rifle and the Cetme 7.62mm NATO Caliber Sporting Rifle be authorized for importation.  Importation, however, should include the restriction that these weapons must not possess combination flash suppressors/grenade adaptors with outside diameters greater than 20mm (.22 mm is the universal grade adaptor size).

The subject of ammunition was next discussed.  Panel members agreed that incendiary and tracer small arms ammunition have no use for sporting purposes.  Accordingly, the Internal Revenue Service will not authorize these types of small arms ammunition importation.  All other conventional small arms ammunition for pistols, revolvers, rifles and shotguns will be authorized.

The meeting was adjourned at 4:00 p.m.

C.M. Wolfe

Exhibit 13
Page 00606

Exhibit 7

## STATE FISH AND GAME COMMISSION REVIEW

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Alabama | Not for turkey | |
| Alaska | | |
| Arizona | | Not more than five rounds |
| Arkansas | Not for turkey | |
| California | | |
| Colorado | | Not more than six rounds |
| Connecticut* | No rifles on public land | |
| Delaware | No rifles | |
| Florida | | Not more than five rounds |
| Georgia | Not for turkey | |
| Hawaii | | |
| Idaho | Not for turkey | |
| Illinois | Not for deer or turkey | |
| Indiana* | Not for deer or turkey | |
| Iowa | Not for deer or turkey | |
| | No restrictions on coyote or fox | |
| Kansas | | |
| Kentucky | | |
| Louisiana | Not for turkey | |
| Maine* | Not for turkey | |
| Maryland* | | |

Exhibit 13
Page 00607

**ER_2791**

Exhibit 7

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Massachusetts | Not for deer or turkey | |
| Michigan | Not for turkey | Not more than six rounds |
| Minnesota | | |
| Mississippi | Not for turkey | |
| Missouri | Not for turkey | Chamber and magazine not more than 11 rounds |
| Montana | | |
| Nebraska | | Not more than six rounds |
| Nevada | Not for turkey | |
| New Hampshire* | Not for turkey | Not more than five rounds |
| New Jersey | No rifles | |
| New Mexico | Not for turkey | |
| New York* | | Not more than six rounds |
| North Carolina | Not for turkey | |
| North Dakota | Not for turkey | |
| Ohio | Not for deer or turkey | |
| Oklahoma | | Not more than seven rounds for .22 caliber |
| Oregon* | | Not more than five rounds |
| Pennsylvania* | No semiautomatics | |

Exhibit 13
Page 00608

**ER_2792**

Exhibit 7

| STATE RESTRICTION | RIFLE RESTRICTION | MAGAZINE RESTRICTION |
|---|---|---|
| Rhode Island | Prohibited except for woodchuck in summer | |
| South Carolina | Not for turkey | |
| South Dakota | | Not more than five rounds |
| Tennessee | Not for turkey | |
| Texas | | |
| Utah | Not for turkey | |
| Vermont | | Not more than six rounds |
| Virginia* | | |
| Washington | Not for turkey | |
| West Virginia | | |
| Wisconsin | | |
| Wyoming | | |

*  Limited restrictions (e.g., specified areas, county restrictions, populated areas, time of day).

Exhibit 13
Page 00609

ER_2793



**DIRECTOR**

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary of the Treasury decided to conduct a review to determine whether modified semiautomatic assault rifles are properly importable under Federal law. Under 18 U.S.C. section 925(d)(3), firearms may be imported into the United States only if they are determined to be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The firearms in question are semiautomatic rifles based on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi designs.

As part of the review, the Bureau of Alcohol, Tobacco and Firearms (ATF) is interested in receiving information that shows whether any or all of the above types of semiautomatic rifles are particularly suitable for or readily adaptable to hunting or organized competitive target shooting. We are asking that you voluntarily complete the enclosed survey to assist us in gathering this information. We anticipate that the survey will take approximately 15 minutes to complete.

Responses must be received no later than January 9, 1998; those received after that date cannot be included in the review. Responses should be forwarded to the Bureau of Alcohol, Tobacco and Firearms, Department HG, P.O. Box 50860, Washington, DC 20091. We appreciate any information you care to provide.

Sincerely yours,

John W. Magaw
John W. Magaw
Director

Enclosure

Exhibit 13
Page 00610

**ER_2794**

OMB No. 1512-0542

# ATF SURVEY OF HUNTING GUIDES
# FOR RIFLE USAGE
### Page 1 of 2

*Please report only on those clients who **hunted medium game (for example, turkey) or larger game (for example, deer) with a rifle.***

*For the purposes of this survey, please count only individual clients and NOT the number of trips taken by a client. For example, if you took the same client on more than one trip, count the client only once.*

**1.** What is the approximate number of your clients who have ever used **manually operated rifles** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**2.** What is the approximate number of your clients who have ever used **semiautomatic rifles** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**3.** What is the approximate number of your clients who have ever used semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** during the past two hunting seasons of 1995 and 1996?

_____number of clients.

**4.** From your knowledge, for your clients who use **semiautomatic rifles**, please list the three most commonly used rifles.

| Make | Model | Caliber |
|------|-------|---------|
|      |       |         |
|      |       |         |
|      |       |         |

**5.** Do you **recommend** the use of any specific rifles by your clients?

_____Yes *(Continue to #6)*     _____No *(You are finished with the survey. Thank you.)*

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Exhibit 13
Page 00611

OMB No. 1512-0542

# ATF SURVEY OF HUNTING GUIDES
## FOR RIFLE USAGE
Page 2 of 2

**6.** If your answer to item 5 is "Yes", please identify the specific rifles you **recommend**.

| Make | Model | Caliber |
|------|-------|---------|
| | | |

**7.** Do you **recommend** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi**?

_____ Yes *(Continue to #8)*        _____ No *(You are finished with the survey. Thank you.)*

**8.** If your answer to item 7 is "Yes", please identify the specific rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** that you recommend.

| Make | Model | Caliber |
|------|-------|---------|
| | | |

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Exhibit 13
Page 00612

**ER_2796**

Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 1 | 28 | 0 | 0 | No | |
| A | 2 | 100 | 10 | 0 | Yes | No |
| A | 3 | 18 | 0 | 0 | No | |
| A | 4 | 120 | 40 | 0 | Yes | No |
| A | 5 | 12 | 0 | 0 | Yes | No |
| A | 6 | 80 | 40 | 0 | No | |
| A | 7 | 275 | 25 | 0 | No | |
| A | 8 | | | | | |
| A | 9 | 0 | 0 | 0 | | |
| A | 10 | 0 | | | | |
| A | 11 | 2 | 5 | 0 | Yes | Yes |
| A | 12 | 12 | 0 | 0 | Yes | No |
| A | 13 | 10 | 6 | 0 | No | No |
| A | 14 | 5 | 7 | 0 | No | |
| A | 15 | 0 | 0 | 0 | | |
| A | 16 | 20 | 0 | 0 | No | No |
| A | 17 | | | | | |
| A | 18 | 0 | 0 | 0 | No | |
| A | 19 | 17 | 6 | 0 | No | |
| A | 20 | 30 | 8 | 0 | No | |
| A | 21 | 117 | 7 | 0 | Yes | No |
| A | 22 | 160 | 0 | 0 | Yes | No |
| A | 23 | 23 | 1 | 0 | Yes | No |
| A | 24 | 100 | 5 | 0 | Yes | No |
| A | 25 | 210 | 10 | 0 | Yes | No |
| A | 26 | 12 | 4 | 1 | Yes | Yes |
| A | 27 | 24 | 3 | 0 | Yes | No |
| A | 28 | 20 | 15 | 0 | Yes | No |
| A | 29 | 4 | 0 | 0 | No | No |
| A | 30 | 4 | 0 | 0 | Yes | No |
| A | 31 | 100 | 5 | 0 | No | No |
| A | 32 | 1 | 0 | 0 | No | No |
| A | 33 | | | 0 | No | No |
| A | 34 | 142 | 1 | 0 | No | |
| A | 35 | 78 | 2 | 0 | Yes | No |
| A | 36 | 600 | 200 | | No | |
| A | 37 | 20 | 13 | 1 | No | |
| A | 38 | 45 | 15 | 0 | No | |
| A | 39 | 100 | 10 | 0 | No | |
| A | 40 | 80 | 6 | 2 | Yes | No |
| A | 41 | 250 | 25 | 0 | Yes | No |
| A | 42 | 4 | 0 | 0 | No | |
| A | 43 | 14 | 2 | 0 | No | No |
| A | 44 | 171 | 15 | 0 | Yes | No |
| A | 45 | 54 | 6 | 0 | Yes | No |
| A | 46 | 10 | 6 | 0 | No | |
| A | 47 | 0 | 0 | 0 | No | No |
| A | 48 | 24 | 0 | 0 | No | |
| A | 49 | 180 | 2 | 0 | Yes | No |
| A | 50 | | | | | |
| A | 51 | | | | | |

Exhibit 13
Page 00613

Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 52 | 24 | 16 | 0 | No | |
| A | 53 | 600 | 100 | 12 | No | |
| A | 54 | 18 | 6 | 0 | No | |
| A | 55 | 0 | 0 | 0 | No | |
| A | 56 | 0 | 0 | 0 | No | |
| A | 57 | 40 | 4 | 0 | No | |
| A | 58 | | | | | |
| A | 59 | 40 | 10 | 0 | No | No |
| A | 60 | 60 | 2 | 0 | No | No |
| A | 61 | 63 | 4 | 0 | Yes | No |
| A | 62 | 40 | 4 | 0 | No | |
| A | 63 | 8 | 0 | 0 | Yes | No |
| A | 64 | 27 | 1 | 0 | Yes | No |
| A | 65 | 50 | 9 | 0 | Yes | No |
| A | 66 | 35 | 2 | 0 | No | |
| A | 67 | 6 | 0 | 0 | Yes | No |
| A | 68 | 6 | 3 | | No | |
| A | 69 | 50 | 20 | 0 | No | |
| A | 70 | | 0 | 0 | Yes | No |
| A | 71 | 27 | 1 | 0 | Yes | |
| A | 72 | 85 | 0 | 0 | Yes | No |
| A | 73 | 56 | 24 | 0 | Yes | No |
| A | 74 | 25 | 25 | 0 | Yes | No |
| A | 75 | 100 | 20 | 0 | No | |
| A | 76 | 50 | 15 | 3 | No | |
| A | 77 | 15 | 4 | 0 | No | |
| A | 78 | 12 | 0 | 0 | Yes | No |
| A | 79 | 75 | 0 | 0 | No | |
| A | 80 | | | | | |
| A | 81 | 0 | 0 | 0 | No | |
| A | 82 | 0 | 0 | 0 | No | |
| A | 83 | 12 | 4 | 0 | No | No |
| A | 84 | 40 | 0 | 0 | Yes | No |
| A | 85 | 24 | 0 | 0 | No | |
| A | 86 | 17 | 0 | 0 | No | No |
| A | 87 | 16 | 3 | 0 | Yes | No |
| A | 88 | 45 | 10 | 0 | No | |
| A | 89 | 11 | 7 | 7 | Yes | Yes |
| A | 90 | 35 | 1 | 0 | Yes | No |
| A | 91 | 25 | 2 | 0 | Yes | No |
| A | 92 | 0 | 0 | 0 | | |
| A | 93 | 75 | 40 | 0 | Yes | No |
| A | 94 | 60 | 2 | 0 | Yes | No |
| A | 95 | 26 | 0 | 0 | No | |
| A | 96 | 20 | 0 | | No | No |
| A | 97 | 65 | 11 | 0 | Yes | No |
| A | 98 | 40 | 5 | 0 | Yes | No |
| A | 99 | 26 | 5 | 0 | No | |
| A | 100 | 13 | 2 | 0 | No | |
| A | 101 | | | | | |
| A | 102 | 45 | 6 | 0 | No | No |

Page 2 of 4

Exhibit 13
Page 00614

Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 103 | 120 | 4 | 0 | No | |
| A | 104 | | | | Yes | |
| A | 105 | 150 | 50 | 0 | No | No |
| A | 106 | 80 | 20 | 0 | Yes | No |
| A | 107 | 40 | 0 | 0 | No | No |
| A | 108 | 10 | 0 | 0 | No | |
| A | 109 | 160 | 40 | 0 | Yes | No |
| A | 110 | 10 | 10 | 0 | No | No |
| A | 111 | 6 | 0 | 0 | No | |
| A | 112 | | | | | |
| A | 113 | 150 | 150 | 100 | Yes | Yes |
| A | 114 | 50 | 25 | 0 | No | No |
| A | 115 | 19 | 0 | 0 | Yes | No |
| A | 116 | 80 | 3 | 0 | No | |
| A | 117 | 40 | 10 | 0 | Yes | No |
| A | 118 | | | | | |
| A | 119 | 50 | 0 | 0 | Yes | No |
| A | 120 | 0 | 0 | 0 | No | |
| A | 121 | 0 | 0 | 0 | | |
| A | 122 | 120 | 15 | 0 | Yes | No |
| A | 123 | 10 | 0 | 0 | Yes | No |
| A | 124 | 22 | 0 | 0 | Yes | No |
| A | 125 | 40 | 40 | 20 | No | |
| A | 126 | 50 | 10 | 0 | Yes | No |
| A | 127 | 60 | 20 | 0 | Yes | No |
| A | 128 | 14 | 0 | 0 | No | No |
| A | 129 | 13 | 16 | 4 | No | |
| A | 130 | 80 | 4 | 0 | Yes | No |
| A | 131 | 12 | 2 | 0 | Yes | No |
| A | 132 | | 4 | 0 | Yes | No |
| A | 133 | 50 | 26 | 7 | No | No |
| A | 134 | 12 | 0 | 0 | No | |
| A | 135 | 2 | 10 | 3 | No | |
| A | 136 | 2 | 1 | 1 | Yes | No |
| A | 137 | 28 | 0 | 0 | Yes | No |
| A | 138 | 45 | 10 | | No | |
| A | 139 | 46 | 59 | 0 | Yes | No |
| A | 140 | | | 0 | Yes | No |
| A | 141 | 40 | 10 | 0 | No | No |
| A | 142 | 70 | 20 | 0 | Yes | No |
| A | 143 | 50 | 3 | 0 | No | No |
| A | 144 | 60 | 6 | 0 | Yes | No |
| A | 145 | 140 | 0 | 0 | Yes | No |
| A | 146 | 20 | 4 | 1 | Yes | No |
| A | 147 | 10 | 1 | 0 | Yes | No |
| A | 148 | 0 | 0 | 0 | No | No |
| A | 149 | 37 | 0 | 0 | Yes | No |
| A | 150 | | | 0 | Yes | No |
| A | 151 | 6 | 10 | 0 | No | No |
| A | 152 | 110 | 5 | 0 | No | |
| A | 153 | 15 | 17 | | Yes | No |

Exhibit 13
Page 00615

Hunting Guides

| case | | Number of clients Using | | | Recommend | |
|---|---|---|---|---|---|---|
| | | Manual | Semiauto | AK47 et.al. | Any | AK47 et.al. |
| A | 154 | 18 | 4 | 0 | No | |
| A | 155 | 25 | 3 | 0 | Yes | No |
| A | 156 | 60 | 6 | 3 | No | |
| A | 157 | 20 | 0 | 0 | No | |
| A | 158 | 88 | 46 | 0 | No | No |
| A | 159 | 68 | 19 | 3 | Yes | Yes |
| A | 160 | 25 | 5 | 0 | No | |
| A | 161 | 15 | 0 | 0 | No | |
| A | 162 | 75 | 10 | 0 | No | |
| B | 1 | | | | No | |
| C | 1 | 25 | 0 | 0 | Yes | No |
| C | 2 | 55 | 10 | 6 | Yes | Yes |
| C | 3 | 60 | 30 | 0 | No | |
| C | 4 | 80 | 20 | 0 | No | |
| C | 5 | 10 | 0 | 0 | No | No |
| C | 6 | 25 | 6 | 0 | No | |
| C | 7 | 66 | 10 | 1 | No | |
| C | 8 | 24 | 0 | 0 | Yes | No |
| C | 9 | 10 | 15 | 15 | No | |
| C | 10 | 35 | 15 | 9 | Yes | Yes |
| C | 11 | | | 0 | No | |
| C | 12 | | | | | No |
| C | 13 | 25 | 10 | 0 | No | |
| C | 14 | 60 | 20 | 0 | Yes | No |
| C | 15 | 20 | 0 | 0 | Yes | No |
| C | 16 | 14 | 0 | 0 | No | |
| C | 17 | | 0 | 0 | Yes | No |
| C | 18 | 18 | 25 | 5 | Yes | Yes |
| C | 19 | 125 | 50 | 5 | Yes | No |
| C | 20 | 20 | 5 | 2 | No | |
| C | 21 | | 0 | 0 | Yes | No |
| C | 22 | 30 | 0 | 0 | No | No |
| C | 23 | 150 | 20 | 0 | Yes | No |
| C | 24 | 60 | 0 | 0 | No | |
| C | 25 | 16 | 7 | 6 | Yes | Yes |
| C | 26 | 300 | 650 | 400 | No | |
| C | 27 | 20 | 15 | 8 | Yes | Yes |
| C | 28 | 3 | 5 | 2 | No | |
| C | 29 | 45 | 6 | 0 | Yes | No |
| C | 30 | | | | No | |
| C | 31 | 30 | 0 | 0 | Yes | No |
| C | 32 | | | 0 | Yes | No |
| C | 33 | 35 | 4 | 0 | Yes | No |
| C | 34 | 25 | 5 | 0 | Yes | No |
| C | 35 | | | | Yes | No |

Exhibit 13
Page 00616

ER_2800

Hunting Guides

| | case | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| A | 1 | | | | |
| A | 2 | | | | |
| A | 3 | | | | |
| A | 4 | Browning | | BAR | 300 |
| A | 5 | | | | |
| A | 6 | Remington | | 742 | 30.06 |
| A | 7 | Browning | | BAR | 30.06, .270, 7MM, 300 Mag |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | Remington | | 740-7400 | 20, 30 |
| A | 12 | | | | |
| A | 13 | Remington | | 700 | 7 mm mag |
| A | 14 | Remington | | 7400 | 270 |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | Browning | | | 30.06 |
| A | 20 | Remington | | 742 | 30.06 |
| A | 21 | | | | |
| A | 22 | | | | |
| A | 23 | Browning | | ? | 300 mag |
| A | 24 | Remington | | | 30.06 |
| A | 25 | Remington | | | 30.06 |
| A | 26 | Browning | | BAR | 30.06 |
| A | 27 | Remington | | | 30.06 |
| A | 28 | | ? | ? | 06 |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | Browning | | automatics | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | Remington | | | .3006 |
| A | 35 | Browning | | | 7 mm |
| A | 36 | Browning | | | 30.06 |
| A | 37 | Browning | | BAR | 30.06 |
| A | 38 | Browning | | br | 7 mm, 300win, 30.06 |
| A | 39 | Remington | | 7600 | .270 win, .30-06, .280 rem |
| A | 40 | Browning | | Bar mark II | 300 win mag |
| A | 41 | Remington | | | |
| A | 42 | | | | |
| A | 43 | Remington | | 7600 | 243 - 7 mm mag |
| A | 44 | | | | 30.06, 300 winmag, .338, 270 |
| A | 45 | Browning | | BAR Automatic | 30.06 |

Exhibit 13
Page 00617

**ER_2801**

Hunting Guides

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| A | 46 | Browning | | BAR | 7 mm, 30.06 |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | Browning | | BAR | 7 mm mag/30.06 |
| A | 53 | Browning | | BAR | 30.06, 300 wm |
| A | 54 | Browning | | BAR | 30.06 |
| A | 55 | | | | |
| A | 56 | | | | |
| A | 57 | Browning | | semi-auto | 300 mag |
| A | 58 | | | | |
| A | 59 | | | | |
| A | 60 | | | | |
| A | 61 | Browning | | | 30.06 |
| A | 62 | Browning | | | 7 mm |
| A | 63 | Browning | | BAR | .270 - 300 win mag |
| A | 64 | Browning | | BAR | 30.06 |
| A | 65 | Browning | | semi-auto | .308 |
| A | 66 | Browning | | | |
| A | 67 | | | | |
| A | 68 | Remington | | 7400 | 30.06 |
| A | 69 | Browning | | | |
| A | 70 | | | | |
| A | 71 | Browning | | Not sure | |
| A | 72 | | | | |
| A | 73 | Browning | | BARR | 30.06 |
| A | 74 | Browning | | BAR | 300 |
| A | 75 | Remington | | 7400 old 752 | 270 and 30.06 |
| A | 76 | Browning | | BAR | 308, 30.06, 300win, 338 win |
| A | 77 | Remington | | | 308 |
| A | 78 | Browning | | | 300, 270, 30.06 |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | 30 caliber or bigger for elk |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | Browning | | | 30.06 and 7 mm |
| A | 88 | Browning | | BAR | 7 mm, .300, .270 |
| A | 89 | Other | Russian | SKS | 7.62 |
| A | 90 | Browning | | | 1 or 2 in over 50 years |
| A | 91 | Browning | | | 300 win mag |

Page 2 of 13

Exhibit 13
Page 00618

Hunting Guides

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | Browning | | BAR | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | Browning | | BAR | 300-06-270 |
| A | 98 | Browning | | | 300, 30.06 |
| A | 99 | Other | Savage | | 7 mm |
| A | 100 | Browning | | ? | 7 mm mag |
| A | 101 | | | | |
| A | 102 | Browning | Only 1 I recall | BAR | 30.06 |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | Browning | | BAR | 300 win mag |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | Browning | | | 30.06 |
| A | 110 | Remington | | 700 | 30.06, 270, 7 mm |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | Other | Weatherby | | 300 mag |
| A | 114 | Browning | | | 7 m mag |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | Browning | | | |
| A | 118 | | | | |
| A | 119 | | | | |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | Browning | | U/K | .338 mag |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | Remington | | 742 | 243, 30.06 |
| A | 127 | Winchester | | ? | 30.06 |
| A | 128 | Winchester | | | 270, 306 |
| A | 129 | Browning | | BAR | 7 mm and 243 |
| A | 130 | Browning | | | 30.06 |
| A | 131 | Browning | | BAR | .7 mm mag |
| A | 132 | Remington | | | 30.06 |
| A | 133 | | | AK 47 | 223 |
| A | 134 | | | | |
| A | 135 | Remington | | | 270 |
| A | 136 | Browning | | BAR | |
| A | 137 | | | | |

Exhibit 13
Page 00619

Hunting Guides

| | | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|---|
| A | 138 | Winchester | | | 30.06 |
| A | 139 | Browning | | BAR | 270, 7 mm |
| A | 140 | Browning | | | 7 mm |
| A | 141 | | | | |
| A | 142 | Browning | | | 7 mm mag |
| A | 143 | | | | |
| A | 144 | Browning | | | 30.06 |
| A | 145 | | | | |
| A | 146 | Browning | | BDL | 7mg |
| A | 147 | Browning | | BAR | 308 |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Remington | | | |
| A | 151 | Browning | | BAR | 308 |
| A | 152 | Remington | | | various 270 - 338 |
| A | 153 | Browning | | | 30 |
| A | 154 | Browning | | BAR | 7 mm mag |
| A | 155 | | | | 30.06 |
| A | 156 | Other | BAR | | |
| A | 157 | | | | |
| A | 158 | Remington | | 280 | 280 |
| A | 159 | Browning | | | 7 mm mag |
| A | 160 | Remington | | Semiauto | 30.06 |
| A | 161 | | | | |
| A | 162 | Browning | | | 30.06 |
| B | 1 | | | | .308, 30-06, .270 |
| C | 1 | | | | |
| C | 2 | Other | AK-47 | Antelope Hunter | 30 |
| C | 3 | Browning | | Auto | 30.06 |
| C | 4 | Browning | | Bar | 7mm |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | Browning | | | 30.06 |
| C | 8 | | | | |
| C | 9 | Other | FN-FAL | | 308 |
| C | 10 | Remington | | 742 | 30.06 |
| C | 11 | Browning | | | 306 |
| C | 12 | | | | |
| C | 13 | Remington | | | .06 - 7mm |
| C | 14 | Browning | | BAR | 7mm |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | | | | |
| C | 18 | Ruger | | Ranch Rifle | 223 |
| C | 19 | Other | AK47 | | |
| C | 20 | Browning | | BAR | 300 win mag |

Page 4 of 13

Exhibit 13
Page 00620

Hunting Guides

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| C | 21 | Other | Bolt-action or pump | | |
| C | 22 | | | | |
| C | 23 | Browning | | 30.06 |
| C | 24 | | | | |
| C | 25 | Other | AK47 | | 7.62-39 |
| C | 26 | Other | HK | 93 | .308 |
| C | 27 | Browning | | BAR | 7mm |
| C | 28 | Other | Norinco | SKS Type 56 | 7.62X39 |
| C | 29 | Browning | | BAR | 30.06 -.300 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | Browning | | | 3.06 - 7mm |
| C | 33 | Remington | | | 30.06 |
| C | 34 | Remington | | 741 | .270 - 30.06 |
| C | 35 | Remington | | | .270 |
| A | 1 | | | | |
| A | 2 | | | | |
| A | 3 | | | | |
| A | 4 | Remington | | 7400 | 30.06 |
| A | 5 | | | | |
| A | 6 | Browning | | | 30.06 |
| A | 7 | Remington | | 700 | 30.03, 270, 7 mm |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | Winchester | | 100 | 30 |
| A | 12 | | | | |
| A | 13 | Winchester | | 70 | 300 mag |
| A | 14 | Remington | | 7400 | 30.06 |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | Remington | | 7400 | 30.06 |
| A | 20 | Browning | | | 7 mm mag |
| A | 21 | | | | |
| A | 22 | | | | |
| A | 23 | | | | |
| A | 24 | Browning | | | 30.06 |
| A | 25 | Browning | | | 30.03 to 300 mag |
| A | 26 | Remington | | Fieldmaster | 30.06 |
| A | 27 | | | | |
| A | 28 | | | | |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | Remington | | automatics | |

Exhibit 13
Page 00621

**ER_2805**

Hunting Guides

| Q4. Three most commonly used rifles | | | | |
|---|---|---|---|---|
| A | 32 | | | |
| A | 33 | | | |
| A | 34 | | | |
| A | 35 | | | |
| A | 36 | Remington | | 270 - 30.06 |
| A | 37 | Remington | 7400 | 30.06 |
| A | 38 | | | |
| A | 39 | Browning | BAR | .270 win, 7 mm mag |
| A | 40 | Remington | 7400 | 30.06 |
| A | 41 | Browning | | |
| A | 42 | | | |
| A | 43 | Browning | BAR | 243 - 7 mm mag |
| A | 44 | | | |
| A | 45 | | | |
| A | 46 | Remington | 1100 | 12 gauge |
| A | 47 | | | |
| A | 48 | | | |
| A | 49 | | | |
| A | 50 | | | |
| A | 51 | | | |
| A | 52 | Remington | 7400 | 30.06 |
| A | 53 | Remington | 7400/742 | 30.06 |
| A | 54 | | | |
| A | 55 | | | |
| A | 56 | | | |
| A | 57 | Remington | semi-auto | 30.06 |
| A | 58 | | | |
| A | 59 | | | |
| A | 60 | | | |
| A | 61 | Other | Savage | 7 mm mag |
| A | 62 | Remington | | 30.06 |
| A | 63 | Remington | 742 | .270 - 30.06 |
| A | 64 | | | |
| A | 65 | Winchester | semi-auto | .308 |
| A | 66 | Remington | | |
| A | 67 | | | |
| A | 68 | Remington | 7400 | .308 |
| A | 69 | Remington | | |
| A | 70 | | | |
| A | 71 | Remington | 742 | 30.06 |
| A | 72 | | | |
| A | 73 | Remington | | 30.06 |
| A | 74 | Remington | ?600 | 30.06 |
| A | 75 | Browning | BAR | 270/338 and 30.06 |
| A | 76 | Other | AK-47 | 30 |
| A | 77 | Remington | | 30.06 |

Exhibit 13
Page 00622

Hunting Guides

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 78 | Remington | | ? | 300, 270, 30.06 |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | Remington | | | 30.06 |
| A | 88 | Remington | | 742, 7400 | 30.06, .270 |
| A | 89 | Other | Heckler-Koch | HK91 | 308 |
| A | 90 | Remington | | | |
| A | 91 | Remington | | | 30.06 |
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | | | | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | | | | |
| A | 98 | Remington | | 760 | .300, 30.06, 270 |
| A | 99 | Browning | | | 7 mm |
| A | 100 | Remington | | 742 | 30.06 |
| A | 101 | | | | |
| A | 102 | | | | |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | | | | |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | Winchester | | | 308 |
| A | 110 | | | | |
| A | 111 | | | | |
| A | 112 | | | | |
| A | 113 | Remington | | 700 | 7 mm mag |
| A | 114 | Remington | | 742 Wingmaster | 30.06 |
| A | 115 | | | | |
| A | 116 | | | | |
| A | 117 | Remington | | | |
| A | 118 | | | | |
| A | 119 | | | | |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |

Exhibit 13
Page 00623

ER_2807

Hunting Guides

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| A | 124 | | | |
| A | 125 | | | |
| A | 126 | Ruger | | 22 |
| A | 127 | Marlin | | ? | .308 |
| A | 128 | Remington | | | 7 m |
| A | 129 | | | |
| A | 130 | | | |
| A | 131 | Browning | | BAR | 30.06 |
| A | 132 | | | |
| A | 133 | Ruger | | Mini 14 | 223 |
| A | 134 | | | |
| A | 135 | Remington | | | 243 |
| A | 136 | Other | HK 91 | |
| A | 137 | | | |
| A | 138 | Browning | | | 308 |
| A | 139 | Remington | | 742 | 30.06 - 6 mm |
| A | 140 | Remington | | | 30.06 |
| A | 141 | | | |
| A | 142 | Browning | | | 300 win mag |
| A | 143 | | | |
| A | 144 | Browning | | | 7 mm mag |
| A | 145 | | | |
| A | 146 | Browning | | BDL | 300 |
| A | 147 | | | |
| A | 148 | | | |
| A | 149 | | | |
| A | 150 | Winchester | | |
| A | 151 | Remington | | 742 | 30.06 |
| A | 152 | Ruger | | | various 270 - 338 |
| A | 153 | Winchester | | | 30 |
| A | 154 | Browning | | BAR | 30.06 |
| A | 155 | | | |
| A | 156 | Other | AK-47 | |
| A | 157 | | | |
| A | 158 | Winchester | | | 338 |
| A | 159 | Remington | | | 30.06 |
| A | 160 | | | |
| A | 161 | | | |
| A | 162 | Remington | | 742 | 30.06, 270 |
| B | 1 | | | |
| C | 1 | | | |
| C | 2 | | | |
| C | 3 | Winchester | | Auto | 30.06 |
| C | 4 | Browning | | Bar | 338 |
| C | 5 | | | |
| C | 6 | | | |

Page 8 of 13

Exhibit 13
Page 00624

**ER_2808**

Hunting Guides

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| C | 7 | Remington | | 30.06 |
| C | 8 | | | |
| C | 9 | Other | Uzi | 9mm |
| C | 10 | Other | AK-47 | Hunter | 7.62x39 |
| C | 11 | Other | Weatherby | | 300 |
| C | 12 | | | |
| C | 13 | Winchester | | .06 - 7mm |
| C | 14 | Browning | | 300 |
| C | 15 | | | |
| C | 16 | | | |
| C | 17 | | | |
| C | 18 | Other | AK-47 | |
| C | 19 | SigArms | | 550-1 |
| C | 20 | Ruger | | Mini 14 | .223 |
| C | 21 | | | |
| C | 22 | | | |
| C | 23 | Remington | | 742 | 30.06 |
| C | 24 | | | |
| C | 25 | Other | MAK-90 | | 7.62-39 |
| C | 26 | Other | HK | 91 | 0.223 |
| C | 27 | Remington | | 7400 Series | 30.06 |
| C | 28 | Remington | | 7600 | 30.06 |
| C | 29 | Remington | | 742 | .308 - 3.06 |
| C | 30 | | | |
| C | 31 | | | |
| C | 32 | Remington | | 30.06 - 7mm |
| C | 33 | Browning | | 300 win |
| C | 34 | Browning | | .270 - 30.06 |
| C | 35 | Browning | | 300 |
| A | 1 | | | |
| A | 2 | | | |
| A | 3 | | | |
| A | 4 | Ruger | | Mini 14 | 223 |
| A | 5 | | | |
| A | 6 | Other | Savage | | 270 |
| A | 7 | | | |
| A | 8 | | | |
| A | 9 | | | |
| A | 10 | | | |
| A | 11 | | | |
| A | 12 | | | |
| A | 13 | Browning | | A-bolt | 270 |
| A | 14 | | | |
| A | 15 | | | |
| A | 16 | | | |
| A | 17 | | | |

Exhibit 13
Page 00625

**ER_2809**

Hunting Guides

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 18 | | | | |
| A | 19 | | | | |
| A | 20 | | | | |
| A | 21 | | | | |
| A | 22 | | | | |
| A | 23 | | | | |
| A | 24 | | | | |
| A | 25 | | | | |
| A | 26 | Other | China | SKS | 7.62x37 |
| A | 27 | | | | |
| A | 28 | | | | |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | | | | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | | | | |
| A | 35 | | | | |
| A | 36 | Winchester | | | 270 - 30.06 |
| A | 37 | | | | |
| A | 38 | | | | |
| A | 39 | | | | |
| A | 40 | Ruger | | | 44 mag |
| A | 41 | | | | |
| A | 42 | | | | |
| A | 43 | Ruger | | | 223 - 30.06 |
| A | 44 | | | | |
| A | 45 | | | | |
| A | 46 | | | | |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | | | | |
| A | 53 | Ruger | | Mini-14 | .223 |
| A | 54 | | | | |
| A | 55 | | | | |
| A | 56 | | | | |
| A | 57 | Ruger | | semi-auto | 35 cal |
| A | 58 | | | | |
| A | 59 | | | | |
| A | 60 | | | | |
| A | 61 | | | | |
| A | 62 | Ruger | | Mini 14 | 223 |
| A | 63 | | | | |

Page 10 of 13

Exhibit 13
Page 00626

**ER_2810**

Hunting Guides

| | | Q4. Three most commonly used rifles | | | |
|---|---|---|---|---|---|
| A | 64 | | | | |
| A | 65 | | | | |
| A | 66 | | | | |
| A | 67 | | | | |
| A | 68 | | | | |
| A | 69 | | | | |
| A | 70 | | | | |
| A | 71 | | | | |
| A | 72 | | | | |
| A | 73 | | | | |
| A | 74 | Browning | | BAR | 30.06 |
| A | 75 | | | | |
| A | 76 | Remington | | | 30.06, 270 |
| A | 77 | Browning | | | 300 |
| A | 78 | | | | |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | | | | |
| A | 88 | | | | |
| A | 89 | Other | Springfield Armory | FNG | 308 |
| A | 90 | | | | |
| A | 91 | | | | |
| A | 92 | | | | |
| A | 93 | | | | |
| A | 94 | | | | |
| A | 95 | | | | |
| A | 96 | | | | |
| A | 97 | | | | |
| A | 98 | | | | |
| A | 99 | | | | |
| A | 100 | | | | |
| A | 101 | | | | |
| A | 102 | | | | |
| A | 103 | | | | |
| A | 104 | | | | |
| A | 105 | | | | |
| A | 106 | | | | |
| A | 107 | | | | |
| A | 108 | | | | |
| A | 109 | | | | |

Exhibit 13
Page 00627

**ER_2811**

Hunting Guides

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| A | 110 | | | |
| A | 111 | | | |
| A | 112 | | | |
| A | 113 | Other | All | 30.06 |
| A | 114 | Remington | | 721 | 270 |
| A | 115 | | | |
| A | 116 | | | |
| A | 117 | | | |
| A | 118 | | | |
| A | 119 | | | |
| A | 120 | | | |
| A | 121 | | | |
| A | 122 | | | |
| A | 123 | | | |
| A | 124 | | | |
| A | 125 | | | |
| A | 126 | Browning | Remington | Shotguns | 12 gauge |
| A | 127 | Remington | | | .308 or 30.06 |
| A | 128 | Other | Savage | | 308 |
| A | 129 | | | |
| A | 130 | | | |
| A | 131 | | | |
| A | 132 | | | |
| A | 133 | Browning | | BAR | 7 mm |
| A | 134 | | | |
| A | 135 | Browning | | 742 | 30.06 |
| A | 136 | Other | AK 47 | | |
| A | 137 | | | |
| A | 138 | | | |
| A | 139 | Other | Weatherby | | 300 m |
| A | 140 | | | |
| A | 141 | | | |
| A | 142 | | | |
| A | 143 | | | |
| A | 144 | | | |
| A | 145 | | | |
| A | 146 | Ruger | | #1 | 7 mag |
| A | 147 | | | |
| A | 148 | | | |
| A | 149 | | | |
| A | 150 | Browning | | | |
| A | 151 | | | |
| A | 152 | Browning | | | various 270 - 338 |
| A | 153 | | | |
| A | 154 | Browning | | BAR | 8 mm mag |
| A | 155 | | | |

Page 12 of 13

Exhibit 13
Page 00628

Hunting Guides

| | | Q4. Three most commonly used rifles | | |
|---|---|---|---|---|
| A | 156 | Other | Uzi | | |
| A | 157 | | | | |
| A | 158 | Browning | | | 300 |
| A | 159 | | | | |
| A | 160 | | | | |
| A | 161 | | | | |
| A | 162 | | | | |
| B | 1 | | | | |
| C | 1 | | | | |
| C | 2 | | | | |
| C | 3 | Browning | | Auto | 270 |
| C | 4 | Browning | | Bar | 300 |
| C | 5 | | | | |
| C | 6 | | | | |
| C | 7 | | | | |
| C | 8 | | | | |
| C | 9 | Other | HK91 | | |
| C | 10 | Browning | | BAR | 30.06 |
| C | 11 | | | | |
| C | 12 | | | | |
| C | 13 | Browning | | | 300 |
| C | 14 | | | | |
| C | 15 | | | | |
| C | 16 | | | | |
| C | 17 | | | | |
| C | 18 | | | | |
| C | 19 | | | | |
| C | 20 | Other | AK47 | | 7.62 x 39 |
| C | 21 | | | | |
| C | 22 | | | | |
| C | 23 | Remington | | 742 | 308, 270 |
| C | 24 | | | | |
| C | 25 | | M1-A1 | | .223 |
| C | 26 | | | | |
| C | 27 | Winchester | Various | M1 Garand | 30.06 |
| C | 28 | | | | |
| C | 29 | | | M1A1 | 30.06 |
| C | 30 | | | | |
| C | 31 | | | | |
| C | 32 | | | | |
| C | 33 | | | | |
| C | 34 | | | | |
| C | 35 | | | | |

Exhibit 13
Page 00629

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 1 | | | | |
| A 2 | Ruger | | | 30.06 |
| A 3 ' | | | | |
| A 4 | Other | Weatherby | Mark V | 300 |
| A 5 | | | | 30.06 |
| A 6 | | | | |
| A 7 | | | | |
| A 8 | | | | |
| A 9 | | | | |
| A 10 | | | | |
| A 11 | | | | |
| A 12 | | | | |
| A 13 | | | | |
| A 14 | | | | |
| A 15 | | | | |
| A 16 | | | | |
| A 17 | | | | |
| A 18 | | | | |
| A 19 | | | | |
| A 20 | | | | |
| A 21 | Winchester | | | 30.06, .270 |
| A 22 | Remington | | 700 | 7 mm or larger |
| A 23 | Winchester | | 70 | 25 to 30 |
| A 24 | Remington | | 710 | 30.06 |
| A 25 | | Any make | Bolt action | Does not recommend |
| A 26 | Winchester | | 70 | 30.06 or larger |
| A 27 | Other | Weatherby | | 300 |
| A 28 | Other | bolt action | | 270 and up |
| A 29 | | | | |
| A 30 | | hunter's choice | | .270 |
| A 31 | | | | |
| A 32 | | | | |
| A 33 | | | | |
| A 34 | | | | |
| A 35 | Winchester | | 70 | 300 win mag |
| A 36 | | | | |
| A 37 | | | | |
| A 38 | | | | |
| A 39 | | | | |
| A 40 | Remington | | | 30.06 - 300 win mag |
| A 41 | | | | |
| A 42 | | | | |
| A 43 | | | | |
| A 44 | | | | 30.06, 300winmag, 338, 270 |
| A 45 | Browning | | Bolt Action | 25.06 - 328 |

Page 1 of 14

Exhibit 13
Page 00630

ER_2814

Hunting Guides

| case | | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| A | 46 | | | | |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | Other | Weatherby | | 300 mag |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | | | | |
| A | 53 | | | | |
| A | 54 | | | | |
| A | 55 | | | | |
| A | 56 | | | | |
| A | 57 | | | | |
| A | 58 | | | | |
| A | 59 | | | | |
| A | 60 | | | | |
| A | 61 | Remington | | Bolt Action | 300 mag |
| A | 62 | | | | |
| A | 63 | Other | bolt action repeating rifles | | 30.06 to .338 winmag |
| A | 64 | Winchester | | 70 | 338 |
| A | 65 | Remington | | bolt action | 308,25-06,243,7 mm mag,30.06,22-250,300 mag all |
| A | 66 | | | | |
| A | 67 | Ruger | | #1 | 7 mm, 30.06, 7 mm mag |
| A | 68 | | | | |
| A | 69 | | | | |
| A | 70 | Other | | Bolt Action | 30.06 |
| A | 71 | | | | 300 mag |
| A | 72 | Other | Any make | Any model | 7 mm, 270, 30.06, 25.06 |
| A | 73 | | | | |
| A | 74 | Browning | | BAR | 300 win mag |
| A | 75 | | | | |
| A | 76 | | | | |
| A | 77 | | | | |
| A | 78 | Browning | | Bolt action | |
| A | 79 | | | | |
| A | 80 | | | | |
| A | 81 | | | | |
| A | 82 | | | | |
| A | 83 | | | | |
| A | 84 | | | | |
| A | 85 | | | | |
| A | 86 | | | | |
| A | 87 | Remington | | 700 | 30.06, 7 mm, 270 |
| A | 88 | | | | |
| A | 89 | Other | Russian | SKS | 7.62 |
| A | 90 | Other | Weatherby | | 7 mm mag |

Exhibit 13
Page 00631

**ER_2815**

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 91 | Remington | | 700 | 7 mag |
| A 92 | | | | |
| A 93 | Winchester | | 70 | 300 mag |
| A 94 | Other | Any bolt action | | 270 or larger |
| A 95 | | | | |
| A 96 | | | | |
| A 97 | Other | Any bolt action | | 30 or larger, on semiauto same |
| A 98 | | | | |
| A 99 | | | | |
| A 100 | | | | |
| A 101 | | | | |
| A 102 | | | | |
| A 103 | | | | |
| A 104 | | | | |
| A 105 | | | | |
| A 106 | Other | Weatherby | | 300 magnum |
| A 107 | | | | |
| A 108 | | | | |
| A 109 | Remington | | 70 | 7 mm |
| A 110 | | | | |
| A 111 | | | | |
| A 112 | | | | |
| A 113 | | | | |
| A 114 | | | | |
| A 115 | | | | |
| A 116 | | | | |
| A 117 | | | | magnum |
| A 118 | | | | |
| A 119 | Remington | | 700 | 7 mm |
| A 120 | | | | |
| A 121 | | | | |
| A 122 | | | | |
| A 123 | | | | |
| A 124 | | | | |
| A 125 | | | | |
| A 126 | | | | 300 mag, 338 mag, 30.06 |
| A 127 | | | | |
| A 128 | | | | |
| A 129 | | | | |
| A 130 | Remington | | 700 | 7 mm magnum |
| A 131 | | | | |
| A 132 | Other | Weatherby | | 300 mag |
| A 133 | | | | |
| A 134 | | | | |
| A 135 | | | | |

Page 3 of 14

Exhibit 13
Page 00632

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 136 | | | | |
| A 137 | Remington | | 700 | 7 mm |
| A 138 | | | | |
| A 139 | Browning | | BAR | 7 m or 270 |
| A 140 | | | | |
| A 141 | | | | |
| A 142 | | | | 30.06 |
| A 143 | | | | |
| A 144 | Browning | | | from 7 mm mag to 338 mag for deer and elk |
| A 145 | Winchester | | | 30.06 |
| A 146 | Browning | | BDL | 7 mag |
| A 147 | Remington | | 700 BDL | 7 mm |
| A 148 | | | | |
| A 149 | | | | |
| A 150 | Browning | | Bolt action | |
| A 151 | | | | |
| A 152 | | | | |
| A 153 | Remington | | 700 | 30 |
| A 154 | | | | |
| A 155 | Other | Weatherby | | 300 |
| A 156 | | | | |
| A 157 | | | | |
| A 158 | | | | |
| A 159 | Browning | Ruger | | 243, 30.06, 7 mm mag, 340 weather, .338 |
| A 160 | | | | |
| A 161 | | | | |
| A 162 | | | | |
| B 1 | | | | 7.62 x 39 |
| C 1 | Other | Manually operated | | |
| C 2 | Ruger | | 77 | 300 |
| C 3 | | | | |
| C 4 | | | | |
| C 5 | | | | |
| C 6 | | | | |
| C 7 | | | | |
| C 8 | Remington | | 700 | 270 |
| C 9 | | | | |
| C 10 | Other | HK | 91 | .308 |
| C 11 | | | | |
| C 12 | | | | |
| C 13 | | | | |
| C 14 | Other | Bolt-action w/ belted mag | | Calibers, make and model mean nothing |
| C 15 | Other | Bolt-action | | 30.06-7mm |
| C 16 | | | | |
| C 17 | Other | Bolt-action | | |

Exhibit 13
Page 00633

Hunting Guides

| Q 6. Rifles recommended for clients ||||||
|---|---|---|---|---|---|
| case || Make | Other Make | Model | Caliber |
| C | 18 | Ruger | | Ranch Rifle | 223 |
| C | 19 | | | | .243 and larger |
| C | 20 | | | | |
| C | 21 | | | | |
| C | 22 | | | | |
| C | 23 | Other | Bolt-action | | 7mm  mag |
| C | 24 | | | | |
| C | 25 | Other | Savage | | 7mm mag |
| C | 26 | | | | |
| C | 27 | Winchester | | 70 | 30.06 |
| C | 28 | | | | |
| C | 29 | Winchester | | 70 | 30.06 - .338 |
| C | 30 | | | | |
| C | 31 | Winchester | | Manual, bolt | 300 |
| C | 32 | Remington | | All | 270 - 7mm |
| C | 33 | Winchester | | 70 | 30.06 - .300 win |
| C | 34 | Other | Bolt-action | | 270 or larger for elk and deer |
| C | 35 | Other | Bolt-action or semiautos | | .270 or larger |
| A | 1 | | | | |
| A | 2 | Remington | | | 7 mm |
| A | 3 | | | | |
| A | 4 | Winchester | | 70 | 300 |
| A | 5 | | | | |
| A | 6 | | | | |
| A | 7 | | | | |
| A | 8 | | | | |
| A | 9 | | | | |
| A | 10 | | | | |
| A | 11 | | | | |
| A | 12 | | | | |
| A | 13 | | | | |
| A | 14 | | | | |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | | | | |
| A | 20 | | | | |
| A | 21 | Remington | | 70 | 30.06 |
| A | 22 | Winchester | | 70 | 7 mm or larger |
| A | 23 | Remington | | 700 | 25 to 30 |
| A | 24 | Remington | | | 300 Mag |
| A | 25 | | | | |
| A | 26 | Browning | | A bolt | 30.06 or larger |
| A | 27 | | | | 300 win mag, 30.06 or 270 |

Page 5 of 14

Exhibit 13
Page 00634

ER_2818

Hunting Guides

| case | Make | Other Make | Model | Caliber |
|------|------|-----------|-------|---------|
| A 28 | | | | |
| A 29 | | | | |
| A 30 | | hunter's choice | | .308 |
| A 31 | | | | |
| A 32 | | | | |
| A 33 | | | | |
| A 34 | | | | |
| A 35 | Remington | | 700 BDL | 7 mm |
| A 36 | | | | |
| A 37 | | | | |
| A 38 | | | | |
| A 39 | | | | |
| A 40 | Winchester | | | 30.06 - 300 win mag |
| A 41 | | | | |
| A 42 | | | | |
| A 43 | | | | |
| A 44 | | | | |
| A 45 | Remington | | Bolt Action | 25.06 - 328 |
| A 46 | | | | |
| A 47 | | | | |
| A 48 | | | | |
| A 49 | | | | |
| A 50 | | | | |
| A 51 | | | | |
| A 52 | | | | |
| A 53 | | | | |
| A 54 | | | | |
| A 55 | | | | |
| A 56 | | | | |
| A 57 | | | | |
| A 58 | | | | |
| A 59 | | | | |
| A 60 | | | | |
| A 61 | Other | Savage | Bolt Action | 7 mm mag |
| A 62 | | | | |
| A 63 | | | | |
| A 64 | Remington | | 700 | 300 win mag |
| A 65 | Other | Weatherby | | |
| A 66 | | | | |
| A 67 | Remington | | Bolt Action | 7 mm, 30.06, 7 mm mag |
| A 68 | | | | |
| A 69 | | | | |
| A 70 | | | Pump | 30.06 |
| A 71 | | | | 7 mm mag |
| A 72 | | | | |

Q 6. Rifles recommended for clients

Exhibit 13
Page 00635

ER_2819

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 73 | | | | |
| A 74 | Winchester | | 7C | 300 win mag |
| A 75 | | | | |
| A 76 | | | | |
| A 77 | | | | |
| A 78 | Remington | | Bolt Action | |
| A 79 | | | | |
| A 80 | | | | |
| A 81 | | | | |
| A 82 | | | | |
| A 83 | | | | |
| A 84 | | | | |
| A 85 | | | | |
| A 86 | | | | |
| A 87 | Browning | | | 308, 7 mm, 30.06 |
| A 88 | | | | |
| A 89 | Other | Heckler-Koch | HK-91 | 308 |
| A 90 | | | | |
| A 91 | Winchester | | 70 | 300 mag |
| A 92 | | | | |
| A 93 | Browning | | Mark II | 300 mag, 280-270-25.06 |
| A 94 | | | | |
| A 95 | | | | |
| A 96 | | | | |
| A 97 | Other | Semi-auto | | 30 cal or larger |
| A 98 | | | | |
| A 99 | | | | |
| A 100 | | | | |
| A 101 | | | | |
| A 102 | | | | |
| A 103 | | | | |
| A 104 | | | | |
| A 105 | | | | |
| A 106 | Remington | | 700 | 300 win mag |
| A 107 | | | | |
| A 108 | | | | |
| A 109 | Winchester | | | 300 mag, 30.06 |
| A 110 | | | | |
| A 111 | | | | |
| A 112 | | | | |
| A 113 | | | | |
| A 114 | | | | |
| A 115 | | | | |
| A 116 | | | | |
| A 117 | | | | |

Page 7 of 14

Exhibit 13
Page 00636

**ER_2820**

Hunting Guides

| | case | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| | | | | Q 6. Rifles recommended for clients | |
| A | 118 | | | | |
| A | 119 | Other | Weatherby | | 300 |
| A | 120 | | | | |
| A | 121 | | | | |
| A | 122 | | | | |
| A | 123 | | | | |
| A | 124 | | | | |
| A | 125 | | | | |
| A | 126 | | | | |
| A | 127 | | | | |
| A | 128 | | | | |
| A | 129 | | | | |
| A | 130 | | | | |
| A | 131 | | | | |
| A | 132 | Other | Weatherby | | 700 mag |
| A | 133 | | | | |
| A | 134 | | | | |
| A | 135 | | | | |
| A | 136 | | | | |
| A | 137 | Other | Weatherby | | 300 |
| A | 138 | | | | |
| A | 139 | Remington | | 742 | 30.06 or 6 mm |
| A | 140 | | | | |
| A | 141 | | | | |
| A | 142 | | | | 7 mm recommended for deer and elk |
| A | 143 | | | | |
| A | 144 | Other | Weatherby | | from 7 mm mag to 338 for deer |
| A | 145 | Other | Weatherby | | 300 |
| A | 146 | Browning | | BDC | 300 |
| A | 147 | | | | |
| A | 148 | | | | |
| A | 149 | | | | |
| A | 150 | Winchester | | Bolt Action | |
| A | 151 | | | | |
| A | 152 | | | | |
| A | 153 | Remington | | 700 | 7 mm |
| A | 154 | | | | |
| A | 155 | Other | Weatherby | | 7 mm |
| A | 156 | | | | |
| A | 157 | | | | |
| A | 158 | | | | |
| A | 159 | Winchester | Remington | | 340 Weather - .338 mag |
| A | 160 | | | | |
| A | 161 | | | | |
| A | 162 | | | | |

Page 8 of 14

Exhibit 13
Page 00637

ER_2821

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| B 1 | | | | |
| C 1 | | | | |
| C 2 | Browning | | | 300 |
| C 3 | | | | |
| C 4 | | | | |
| C 5 | | | | |
| C 6 | | | | |
| C 7 | | | | |
| C 8 | Remington | | 700 | 280 |
| C 9 | | | | |
| C 10 | Winchester | | 70 | .270 |
| C 11 | | | | |
| C 12 | | | | |
| C 13 | | | | |
| C 14 | | | | |
| C 15 | | | | |
| C 16 | | | | |
| C 17 | Other | Pump | | |
| C 18 | Other | AK-47 | | |
| C 19 | | | | 6mm |
| C 20 | | | | |
| C 21 | | | | |
| C 22 | | | | |
| C 23 | Other | Bolt-action | | .30 |
| C 24 | | | | |
| C 25 | Other | Bolt-action | | 30.06 |
| C 26 | | | | |
| C 27 | Ruger | | 77 | .300 win mag |
| C 28 | | | | |
| C 29 | Remington | | 700 | 30.06-.338 |
| C 30 | | | | |
| C 31 | Remington | | Manual bolt | 300 |
| C 32 | Browning | | All | .270 - 7mm |
| C 33 | Ruger | | 77 | 30.06 - .300 win |
| C 34 | | | | |
| C 35 | | | | |
| A 1 | | | | |
| A 2 | Winchester | | | 375 |
| A 3 | | | | |
| A 4 | Winchester | | 70 | 270 |
| A 5 | | | | |
| A 6 | | | | |
| A 7 | | | | |
| A 8 | | | | |
| A 9 | | | | |

Exhibit 13
Page 00638

Hunting Guides

| case | | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| A | 10 | | | | |
| A | 11 | | | | |
| A | 12 | | | | |
| A | 13 | | | | |
| A | 14 | | | | |
| A | 15 | | | | |
| A | 16 | | | | |
| A | 17 | | | | |
| A | 18 | | | | |
| A | 19 | | | | |
| A | 20 | | | | |
| A | 21 | Remington | | 70 | .270 |
| A | 22 | | | | |
| A | 23 | Other | Any bolt action | 1-5 shotmag | 25 to 30 |
| A | 24 | Other | Weatherby | | 300 mag |
| A | 25 | | | | |
| A | 26 | | | | |
| A | 27 | | | | |
| A | 28 | | | | |
| A | 29 | | | | |
| A | 30 | | | | |
| A | 31 | | | | |
| A | 32 | | | | |
| A | 33 | | | | |
| A | 34 | | | | |
| A | 35 | | | | |
| A | 36 | | | | |
| A | 37 | | | | |
| A | 38 | | | | |
| A | 39 | | | | |
| A | 40 | Ruger | | | 30.06 - 300 win mag |
| A | 41 | | | | |
| A | 42 | | | | |
| A | 43 | | | | |
| A | 44 | | | | |
| A | 45 | Winchester | | Bolt Action | 25.06 - 328 |
| A | 46 | | | | |
| A | 47 | | | | |
| A | 48 | | | | |
| A | 49 | | | | |
| A | 50 | | | | |
| A | 51 | | | | |
| A | 52 | | | | |
| A | 53 | | | | |
| A | 54 | | | | |

Exhibit 13
Page 00639

ER_2823

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 55 | | | | |
| A 56 | | | | |
| A 57 | | | | |
| A 58 | | | | |
| A 59 | | | | |
| A 60 | | | | |
| A 61 | Other | Weatherby | Bolt Action | 338 mag |
| A 62 | | | | |
| A 63 | | | | |
| A 64 | Other | Weatherby Mark V | | 300 Wea Mag |
| A 65 | Winchester | Browning | | |
| A 66 | | | | |
| A 67 | Winchester | Bolt Action | | |
| A 68 | | | | |
| A 69 | | | | |
| A 70 | | | Bolt Action | 7 mm |
| A 71 | | | | |
| A 72 | | | | |
| A 73 | | | | |
| A 74 | Browning | | A Bolt | 300 win mag |
| A 75 | | | | |
| A 76 | | | | |
| A 77 | | | | |
| A 78 | | | | |
| A 79 | | | | |
| A 80 | | | | |
| A 81 | | | | |
| A 82 | | | | |
| A 83 | | | | |
| A 84 | | | | |
| A 85 | | | | |
| A 86 | | | | |
| A 87 | Other | Weatherby | | 300, 7 mm, 338 |
| A 88 | | | | |
| A 89 | Other | Springfield Armory | FNG | 308 |
| A 90 | | | | |
| A 91 | Ruger | | 77 | 300 mag |
| A 92 | | | | |
| A 93 | Ruger | | M77 | 270, 26-06, 300 mag |
| A 94 | | | | |
| A 95 | | | | |
| A 96 | | | | |
| A 97 | | | | |
| A 98 | | | | |
| A 99 | | | | |

Exhibit 13
Page 00640

ER_2824

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 100 | | | | |
| A 101 | | | | |
| A 102 | | | | |
| A 103 | | | | |
| A 104 | | | | |
| A 105 | | | | |
| A 106 | Browning | | 1895 | 45-70 govt |
| A 107 | | | | |
| A 108 | | | | |
| A 109 | | | | |
| A 110 | | | | |
| A 111 | | | | |
| A 112 | | | | |
| A 113 | | | | |
| A 114 | | | | |
| A 115 | | | | |
| A 116 | | | | |
| A 117 | | | | |
| A 118 | | | | |
| A 119 | Other | Savage | | 270 or 30.06 |
| A 120 | | | | |
| A 121 | | | | |
| A 122 | | | | |
| A 123 | | | | |
| A 124 | | | | |
| A 125 | | | | |
| A 126 | | | | |
| A 127 | | | | |
| A 128 | | | | |
| A 129 | | | | |
| A 130 | | | | |
| A 131 | | | | |
| A 132 | | | | |
| A 133 | | | | |
| A 134 | | | | |
| A 135 | | | | |
| A 136 | | | | |
| A 137 | | | | |
| A 138 | | | | |
| A 139 | | | | |
| A 140 | | | | |
| A 141 | | | | |
| A 142 | | | | 300 winmag recommended |
| A 143 | | | | |
| A 144 | Remington | Weatherby | | from 270 to 338 for deer and elk |

Page 12 of 14

Exhibit 13
Page 00641

Hunting Guides

| Q 6. Rifles recommended for clients | | | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| A 145 | Remington | | | 270 |
| A 146 | Ruger | | #1 | 7 mag |
| A 147 | | | | |
| A 148 | | | | |
| A 149 | | | | |
| A 150 | | | | All bolt action with a round nose point |
| A 151 | | | | |
| A 152 | | | | |
| A 153 | | | | |
| A 154 | | | | |
| A 155 | | | | |
| A 156 | | | | |
| A 157 | | | | |
| A 158 | | | | |
| A 159 | | | | 300mag,416Rigby,375mag,270 mag,500 nitroxpress |
| A 160 | | | | |
| A 161 | | | | |
| A 162 | | | | |
| B 1 | | | | |
| C 1 | | | | |
| C 2 | Other | Sako | | 300 |
| C 3 | | | | |
| C 4 | | | | |
| C 5 | | | | |
| C 6 | | | | |
| C 7 | | | | |
| C 8 | | | | |
| C 9 | | | | |
| C 10 | Winchester | | 100 | .308 |
| C 11 | | | | |
| C 12 | | | | |
| C 13 | | | | |
| C 14 | | | | |
| C 15 | | | | |
| C 16 | | | | |
| C 17 | Other | Weatherby | | 243 to 300 |
| C 18 | | | | |
| C 19 | | | | |
| C 20 | | | | |
| C 21 | | | | |
| C 22 | | | | |
| C 23 | | | | |
| C 24 | | | | |
| C 25 | | | | |
| C 26 | | | | |

Page 13 of 14

Exhibit 13
Page 00642

Hunting Guides

| | | Q 6. Rifles recommended for clients | | |
|---|---|---|---|---|
| case | Make | Other Make | Model | Caliber |
| C 27 | Springfield | | M Garard | 30.06 - 308 |
| C 28 | | | | |
| C 29 | Browning | | A bolt | 30.06 - .338 |
| C 30 | | | | |
| C 31 | | | | |
| C 32 | Ruger | | All | .270 - 7 mm |
| C 33 | Browning | | A bolt | 30.06 - 300 win |
| C 34 | | | | |
| C 35 | | | | |

Exhibit 13
Page 00643

**ER_2827**

Hunting Guides

| | case | Make | Other Make | Model | Caliber |
|---|---|---|---|---|---|
| colspan | | | Q 8. Recommended rifles based on AK47 et.al. | | |
| A | 26 | AK47 | | | 7.62x37 |
| A | 89 | Other | Russian | SKS | 7.62 |
| A | 113 | FN-FAL | | | |
| A | 159 | AK47 | | | |
| C | 2 | AK47 | | Antelope and Varmints and Target Shooters | 30 |
| C | 10 | AK47 | | | 7.62x39 |
| C | 18 | AK47 | | | |
| C | 25 | AK47 | | | 7.62 |
| C | 27 | FN-FAL | | | 308 |
| A | 26 | | SKS | | 7.62x37 |
| A | 89 | HK91 | | | 308 |
| A | 113 | | HK 99 | | |
| C | 2 | AK47 | | Antelope and Varmints and Target Shooters | 243 |
| C | 10 | HK91 | | | 308 |
| C | 25 | | MAK 90 | | 7.62 |
| C | 27 | | Century | L1A1 | 308 |
| A | 89 | Other | Springfield Armory | FNG | 308 |
| A | 113 | HK93 | | | |
| C | 10 | HK93 | | | 223 |
| C | 25 | | M-15 | | 223 |
| C | 27 | HK91 | And clones | | 308 |

Page 1 of 1

Exhibit 13
Page 00644

ER_2828

### Additional Comments by Hunting Guides

Additional comments:

(8) The respondent answered questions 1, 2, 3, and 5 with "None of your business." He then stated in question 4: "It's none of your business what kind, make, model or how many guns law abiding citizens of the U.S. own, prefer to shoot."

(9) The respondent wrote that he was no longer in business but that he had owned a waterfowl operation and upland bird operation (shotguns only). He added that assault rifles were not true sporting rifles and that they should be limited to use by the military and law enforcement agencies. However, he felt that true sporting weapons that can be modified into some "quasi-assault weapons" should not be restricted. He stated that he supported the effort to get military weapons off the streets but did not want the rights of true sportsmen to be affected.

(10) Although licensed, the respondent did not guide anyone during the past year.

(11) The respondent stated in question 6 that he recommends any legal caliber rifle that client is comfortable with and that is capable of killing the desired game.

(12) For question 6, the respondent replied that he didn't recommend any specific make or model, other than whatever his clients are most comfortable using so long as the weapons are legal for the particular game.

(15) The respondent stated that his organization was solely recreational wildlife watching and photography.

(17) The respondent did not answer the questions but informed us that it is illegal in Hawaii to hunt turkey with a rifle.

(23) The respondent stated that the study rifles were more suitable for militants than sportsmen. He added, "If they want to use these weapons let them go back to the service and use them to defend our country, not against it."

(25) The respondent stated that, in his 35 years of conducting big game hunts, he had never seen any of the study rifles used for hunting. He suggested that the rifles are made to kill people, not big game.

(26) The respondent recommended bolt-action rifles for his clients but stated that he doesn't demand that they use such rifles. The respondent recommended the study rifles in close-range situations in which there are multiple targets that may pose a danger to the hunter (e.g., coyotes, foxes, mountain lions, and bears).

(27) The respondent stated that he recommended the study rifles for hunting but not any specific make.

i

Exhibit 13
Page 00645

ER_2829

(32)   The respondent said that most of his clients are bow or pistol hunters. He said that there is little if any use for the study rifles in his outfitting service because it focuses on hunts of mountain lions and bighorn sheep.  However, he did recommend the study rifles on target ranges and in competitive shooting situations and cited his right to bear arms.

(35)   The respondent recommended bolt-action rifles for his clients.

(40)   The respondent stated that semiautomatic rifles (such as the AK47) and others are useful for predator hunting.

(41)   The respondent said that he recommended only ranges of calibers deemed suitable but not makes and models of specific rifles.

(44)   The respondent recommended the following calibers for hunting without any specific makes or models: 30.06, 300 Win mag, 338, and 270.

(47)   The respondent stated: "You are asking questions about certain makes of assault rifles, but you are going to end up going after ALL semiautomatic guns.  I've spent about 21 years HUNTING with shotguns and I've used semiautomatic models.  If you go down the list of times that new law didn't end up being a whole sloo [sic] of other laws I would be surprised. Maybe some face-to-face with these weapons would be a good thing for politicians.  If they see how they are used in 'the Real World' then they may make better amendments."

(49)   The respondent specifically recommended the study rifles only for grizzly bears or moose.

(50)   The respondent stated that his business involved waterfowl hunting, which uses only shotguns.

(51)   The respondent replied: "It is my opinion this is a one sided survey, and does not tell the real meaning and purpose of the survey.  And that is to ban all sporting arms in the future.  The way this survey is presented is out of line."

(53)   The respondent stated: "I recommend to all my hunters that they join the NRA, vote Republican, and buy a good semi-auto for personal defense."

(57)   The respondent stated that most of his clients use bolt-action rifles.  He suggested that semiautomatics are not as accurate as bolt-action rifles.

(58)   The respondent stated that the survey did not pertain to his waterfowl hunting business since only shotguns are used.  He added that he did not believe semiautomatics in general present any more threat to the public than other weapons or firearms.  However, he suggested that cheaply made assault-type rifles imported from China and other countries are inaccurate and not suitable for hunting.

(59)   The respondent stated that he had no knowledge of the semiautomatic rifles beyond 30.06 or similar calibers for hunting.  He added that he did not have a use for "automatic" weapons.

2

Exhibit 13
Page 00646

(64)   The respondent stated: "We need to look at weapons and determine what the designer's intent was for the weapon. We really don't need combat weapons in the hunting environment. I personally would refuse to guide for anyone carrying such a weapon."

(65)   The respondent recommended the following calibers for hunting: 7mm, 30.06, .308, .708, 25.06, .243, 22.250, and 300 mag. However, he stated that the study rifles are of no use to the sporting or hunting community whatsoever.

(71)   The respondent stated that he mainly hunts elk but did not recommend any additional information about specific firearms except for using 300 mag and 7 mm mag calibers.

(73)   The respondent recommended any bolt-action or semiautomatic in the 30 or 7mm calibers. However, he stated that he doesn't allow his clients to use any models based on assault rifles: "They are not needed for hunting. A good hunter does not have these."

(78)   The respondent recommended bolt-action rifles for hunting, particularly Browning and Remington.

(80)   Although the respondent stated that he does not conduct guides, he did not see a reason to allow any rifles other those manufactured specifically for hunting and sport shooting: "All assault rifles are for fighting war and killing humans."

(82)   The respondent stated that he used shotguns only.

(84)   The respondent said that he did not allow semiautomatic or automatic rifles in his business. He specifically recommended manually operated rifles.

(90)   The respondent stated that all the semiautomatics like AK47s are absolutely worthless and that he found no redeeming hunting value in any AK47 type of rifle. He further explained that the purpose of hunting is to use the minimum number of shells, not the maximum: "I have only known 1 [person] in 50 years to use an AK47. He shot the deer about 30 times. That wasn't hunting, it was murder." He suggested that he would be willing to testify in Congress against such weapons.

(92)   The respondent stated that he had been contacted in error, as he was not in the hunting guide business.

(98)   The respondent recommended any rifle that a client can shoot the best.

(101)  The respondent wrote a letter saying that his business was too new to provide us with useful information about client use; however, he stated that the Chinese AK47 does a proficient job on deer and similar sizes of game and may be the only rifle that some poor people could afford. He said that he is willing to testify to Congress about the outrageous price of certain weapons.

(102)  The respondent did not recommend rifles but recommended calibers .270, 30.06, .300, and 7mm.

3

Exhibit 13
Page 00647

ER_2831

(103)  The respondent stated that he had clients who used semiautomatic rifles, but he didn't know which makes or models.

(104)  The respondent recommended any legal weapons capable of killing game, "including the types mentioned under the 2nd amendment."

(105)  The respondent stated that the semiautomatic rifles used by his clients were Remingtons.

(112)  The respondent stated that he could not provide any useful information because his business was too new.

(113)  The respondent recommended whatever is available to knock down an elk. He recommended specific calibers: 30.06, 300, or 338.

(115)  The respondent questioned why anyone would use a semiautomatic firearm to hunt game: "Anyone using such horrible arms should be shot with one themselves.  Any big game animal does not have a chance with a rifle and now you say people can use semiautomatic rifles."

(116)  The respondent had had three clients who used semiautomatics with 30.06 and 270-caliber ammunition; however, he didn't know the makes or models.

(118)  The survey questions were not answered, but the respondent wrote: "This is a stupid survey.  No one contends they hunt much for big game with an AK47.  The debate is over the right to own one, which the 2nd amendment says we can."

(119)  The respondent recommended bolt-action rifles for hunting.

(121)  The respondent stated that he uses only shotguns in his operation.

(122)  The respondent recommended rifles with the calibers of .270 - 30.06 or larger to the .300 mag or .338 mag.  However, he said that anything other than a standard semiautomatic sporting rifle is illegal in Colorado, where his business is conducted.

(123)  The respondent, who is a bighorn sheep outfitter, stated that the semiautomatic rifles have no place in big game hunting.  He recommended basic hunting rifles with calibers of 270 or 30.06.

(124)  The respondent, who hunts mainly deer and elk, recommended calibers 270, 30.06, 300 mag, 7mm, 8mm, or 338.

(125)  The respondent said that his clients did use semiautomatics, but he didn't have any specific information about which ones.

(126)  The respondent stated that the study rifles should remain in one's home or on private property.  He would like to have some for personal use but would not recommend them for hunting.  He further expressed his displeasure with the Brady bill and stated that criminals need to be held accountable for their actions.

(127)  The respondent, who hunts mostly elk and deer, said that the AK47 is not powerful enough to hunt elk; however, it may be ideal for smaller game, like deer or antelope.  He recommended any rifles of 30.06 caliber or larger for hunting.

Exhibit 13
Page 00648

(131)   The respondent recommended bolt-action rifles for his clients with calibers .24, .25, 7 mm, or .30.  He cited his preference because of fewer moving parts, their ease to fix, and their lack of sensitivity to weather conditions in the field.  He added, however, that he had seen the study rifles used with good success.

(132)   The respondent stated that the study rifles are not worth anything in cold weather.

(133)   The respondent recommended handguns for hunting in calibers 41 or 44 mag.

(136)   The respondent did not recommend any rifles by make, but he did recommend a caliber of .308 or larger for elk.

(140)   The respondent recommended any good bolt or semiautomatic in 270 caliber and up.  He added: "I feel the government is too involved in our lives and seek too much control over the people of our country.  I am 65 yrs old and see more of our freedom lost every day.  I believe in our country but I have little faith in [organizations] like the A.T.F."

(145)   The responded stated: "Don't send these guns out west.  Thanks!"

(148)   The respondent did not hunt turkey or deer and had no additional information to provide.

(149)   The respondent said that he recommends specific rifles to his clients if they ask, usually 270 to 7mm caliber big game rifles.

(150)   The respondent recommended Winchester, Remington, or any other autoloading hunting rifle.

(152)   The respondent said that he recommended caliber sizes but not specific rifles.

(159)   The respondent recommended any gun with which a client can hit a target. He stated that the AK47 could be used for hunting and target shooting.

(174)   The respondent recommended bolt-action rifles to his clients.

(175)   The respondent said that most of his deer-hunting clients use bolt-action rifles, such as Rugers and Remingtons, in calibers of 30.06, 270, or 243. In his duck guide service, only shotguns are used.

(180)   The respondent wrote: "We agree people should not be allowed to have semiautomatics and automatics.  This does not mean that you silly bastards in Washington need to push complete or all gun control."

(182)   The respondent felt that the survey is biased because it didn't ask about hunting varmints.  He stated that many of the study rifles are suitable for such activity.

(184)   The respondent did not recommend single shots or automatics and only allows bolt action or pumps for use by his clients.

Exhibit 13
Page 00649

**ER_2833**

(188)   The respondent wrote that the study guns are good for small game hunting: "I have very good luck with them as they are small, easy to handle, fast-shooting and flat firing guns."

(192)   The respondent submitted a letter with the survey: "I do not recommend the use of semiautomatic weapons for hunting in my area. Most of these weapons are prone to be unreliable because the owner does not know how to properly care for them in adverse weather. The FN-FAL, HK91, HK93, and SIG SG550-1 are excellent and expensive weapons very much suited to competition shooting.

"Have you surveyed the criminal element on their choice of weapons? I suspect the criminal use of the six weapons you mentioned do law-abiding citizens compare a very small percentage to the same weapon used. I realize that even one wrongful death is too many but now can you justify the over 300,000 deaths per year from government supported tobacco?

"Gun control does not work - it never has and it never will. What we need are police that capture criminals and a court system with the fortitude to punish them for their crimes."

(198)   The respondent stated that this was his first year in and that it was mainly a bow-hunting business.

6

Exhibit 13
Page 00650

ER_2834

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

DIRECTOR

DEC 1 0 1997

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary of the Treasury decided to conduct a review to determine whether modified semiautomatic assault rifles are properly importable under Federal law.  Under 18 U.S.C. section 925(d)(3), firearms may be imported into the United States only if they are determined to be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The firearms in question are semiautomatic rifles based on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi designs.

As part of the review, the Bureau of Alcohol, Tobacco and Firearms (ATF) is interested in receiving information that shows whether any or all of the above types of semiautomatic rifles are particularly suitable for or readily adaptable to hunting or organized competitive target shooting.  We are asking that your organization voluntarily complete the enclosed survey to assist us in gathering this information.  We anticipate that the survey will take approximately 15 minutes to complete.

Responses must be received no later than 30 days following the date of this letter; those received after that date cannot be included in the review.  Responses should be forwarded to the Bureau of Alcohol, Tobacco and Firearms, Department HSE, P.O. Box 50860, Washington, DC 20091.  We appreciate any information you care to provide.

Sincerely yours,

John W. Magaw
Director

Enclosure

Exhibit 13
Page 00651

**ER_2835**

OMB No. 1512-0542

## ATF SURVEY OF HUNTING/SHOOTING EDITORS
## FOR RIFLE USAGE
Page 1 of 2

1.  Does your publication recommend specific types of centerfire semiautomatic rifles for use in **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)* _____No *(Skip to #3)*

2. If your answer to item 1 is "Yes", please identify the specific centerfire semiautomatic rifles you recommend.

| Make | Model | Caliber |
|------|-------|---------|
|      |       |         |
|      |       |         |
|      |       |         |

3. Does your publication recommend **against** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** for use in **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)* _____No *(Skip to #5)*

_____Yes, in certain circumstances.  Please explain _____

_____ *(Continue)*

4. If your answer to item 3 is "Yes" or "Yes, in certain circumstances", please identify the specific rifles that you recommend **against** using for **hunting medium game ( for example, turkey) or larger game (for example, deer)?**

| Make | Model | Caliber |
|------|-------|---------|
|      |       |         |
|      |       |         |
|      |       |         |

5. Does your publication recommend specific types of centerfire semiautomatic rifles for use in **high-power rifle competition**?

_____Yes *(Continue)* _____No *(Skip to #7)*

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Exhibit 13
Page 00652

OMB No. 1512-0542

## ATF SURVEY OF HUNTING/SHOOTING EDITORS
### FOR RIFLE USAGE
Page 2 of 2

**6.** If your answer to item 5 is "Yes", please identify the specific centerfire semiautomatic rifles you recommend.

Make                    Model                              Caliber

_____

_____

_____

**7.** Does your publication recommend **against** the use of any semiautomatic rifles whose design is based on the **AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi** for use in **high-power rifle competition**?

_____Yes *(Continue)* _____No *(Skip to #9)*

_____Yes, in certain circumstances. Please explain _____

_____ *(Continue)*

**8.** If your answer to item 7 is "Yes" or "Yes, in certain circumstances", please identify the specific rifles your publication recommends **against** using for **high-power rifle competition**.

Make                    Model                              Caliber

_____

_____

_____

**9.** Have you or any other author who contributes to your publication written any articles since 1989 concerning the use of semiautomatic rifles and their suitability for use in hunting or organized competitive shooting? *(Exclude Letters to the Editor.)*

_____Yes *(Continue)*          _____No *(You are finished with the survey. Thank you.)*

**10.** If your answer to item 9 is "Yes", please submit a copy of the applicable article(s). Any material you are able to provide will be very beneficial to our study. Please indicate the publication, issue date and page for each article.

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Exhibit 13
Page 00653

Editors

Comments:

2.  If your answer to item 1 is "Yes," please identify the specific centerfire rifles you recommend:

    (8)   Anything except Uzis.

    (9)   All study rifles except Uzi.

    (12)  See attached articles.

3.  Please explain circumstances to question 3: Does your publication recommend against the use of any semiautomatic rifles whose design is based on the AK 47, FN-FAL, HK91, HK93, SIG 550-1, or Uzi for use in hunting medium game (for example, turkey) or larger game (for example, deer)?

    (12)  When the caliber is inappropriate or illegal for the specific game species.

4.  Other rifle make recommendations in response to question 4: If your answer to item 3 is "Yes" or "Yes, in certain circumstances," please identify the specific rifles that you recommend against using for hunting medium game (for example, turkey) or larger game (for example, deer)?

    (12) See attached articles.

The following two items are for the responses to question 6: If your answer to item 5 is "Yes," please identify the specific centerfire semiautomatic rifles you recommend:

Model

    (5)  Springfield M1A and Colt AR-15.

Caliber

    (5)  7.62m (M1A) and .223 (Colt).

The following items are for questions 9 and 10 on articles written and the submission of these articles with the survey.

Article 1

    (8)   No articles enclosed.

    (9)   Semiautomatic Takes Tubb to HP Title.

    (10)  No articles attached.

Article 2

    (9)   AR-15 Spaceguns Invading Match.

Exhibit 13
Page 00654

**ER_2838**

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

DIRECTOR

DEC 1 0 1997

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary
of the Treasury decided to conduct a review to
determine whether modified semiautomatic assault rifles
are properly importable under Federal law.  Under
18 U.S.C. section 925(d)(3), firearms may be imported
into the United States only if they are determined to
be of a type generally recognized as particularly
suitable for or readily adaptable to sporting purposes.
The firearms in question are semiautomatic rifles based
on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi
designs.

As part of the review, the Bureau of Alcohol, Tobacco
and Firearms (ATF) is interested in receiving
information that shows whether any or all of the above
types of semiautomatic rifles are particularly suitable
for or readily adaptable to hunting or organized
competitive target shooting.  We are asking that your
organization voluntarily complete the enclosed survey
to assist us in gathering this information.  We
anticipate that the survey will take approximately
15 minutes to complete.

Responses must be received no later than 30 days
following the date of this letter; those received after
that date cannot be included in the review.  Responses
should be forwarded to the Bureau of Alcohol, Tobacco
and Firearms, Department FG, P.O. Box 50860,
Washington, DC 20091.  We appreciate any information
you care to provide.

Sincerely yours,

John W. Magaw
Director

Enclosure

Exhibit 13
Page 00655

**ER_2839**

OMB No. 1512-0542

# ATF SURVEY OF STATE FISH AND GAME COMMISSIONS
# FOR RIFLE USAGE
Page 1 of 2

State:_____

**1.** Do the laws in your state place any prohibitions or restrictions (other than seasonal) on the use of **high-power** rifles for **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*          _____No *(Skip to #2)*

**1a.** If "Yes", please cite law(s) and briefly describe the restrictions.

_____

_____

_____

_____

_____

_____

**2.** Do the laws in your state place any prohibitions or restrictions (other than seasonal) on the use of **semiautomatic** rifles for **hunting medium game (for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*          _____No *(Skip to #3)*

**2a.** If "Yes", please cite law(s) and briefly describe the restrictions.

_____

_____

_____

_____

_____

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Exhibit 13
Page 00656

OMB No. 1512-0542

## ATF SURVEY OF STATE FISH AND GAME COMMISSIONS
## FOR RIFLE USAGE
### Page 2 of 2

_____ *(Continue)*

**3.** What, if any, is the minimum caliber or cartridge dimensions that may be used for **hunting medium game (for example, turkey) or larger game (for example, deer)?**

Caliber: _____ **OR** Dimensions: _____

_____There is no minimum.

**4.** Does your commission or state collect any data on the types of rifles used in your state for **hunting medium game ( for example, turkey) or larger game (for example, deer)?**

_____Yes *(Continue)*        _____No (*You are finished with the survey. Thank you.*)

    **4a.** If "Yes", please provide hard copies of any such available data for the past two hunting seasons of 1995 and 1996. Any data that you provide will be most beneficial to our study.

    If you would like us to contact you regarding the data, please provide your name and phone number.

    Name:_____ Phone:_____

An agency may not conduct or sponsor, and a person is not required to respond to, the collection of information unless it displays a currently valid OMB control number.

Exhibit 13
Page 00657

Survey Fish and Game Commissions for Rifle Usage

| STATE | Restrictions | | Minimum Caliber or Cartridge | | |
|---|---|---|---|---|---|
| | Q1 | Q2 | Q3 | Q4 | Q5 |
| | HiPwr | Semiauto | Minimum Caliber | Minimum Cartridge | Collect Data |
| Alabama | Yes | Yes | Any center fire rifle | None | No |
| Alaska | Yes | No | No Centerfire for big game | | No |
| Arizona | No | Yes | .22 mag or larger | | No |
| Arkansas | Yes | No | None | None | No |
| California | No | No | See Question 1a | See Question 1a | No |
| Colorado | Yes | Yes | 0.24 | | No |
| Connecticut | Yes | Yes | | | |
| Delaware | Yes | Yes | | | |
| Florida | Yes | Yes | No rimfire for deer | | No |
| Georgia | Yes | No | .22 Centerfire or larger | | No |
| Hawaii | No | No | | | |
| Idaho | Yes | Yes | .22 rimfire | | No |
| Illinois | Yes | Yes | None | None | No |
| Indiana | Yes | Yes | None | | No |
| Iowa | Yes | Yes | not provided | | No |
| Kansas | Yes | Yes | .23 caliber or larger | | No |
| Kentucky | No | No | | | |
| Louisiana | Yes | No | .22 Centerfire | | No |
| Maine | Yes | No | .22 mag or larger | | No |
| Maryland | Yes | Yes | | | |
| Massachusetts | Yes | No | None | None | Yes |
| Michigan | Yes | Yes | .23 or larger | | No |
| Minnesota | Yes | No | 0.23 | 1.285" | No |
| Mississippi | Yes | No | None | None | No |
| Missouri | Yes | Yes | None | None | No |
| Montana | No | No | None | | No |
| Nebraska | No | No | | | |
| Nevada | No | No | | | No |
| New Hampshire | Yes | Yes | | above .22 rimfire | No |
| New Jersey | Yes | Yes | None | None | No |
| New Mexico | Yes | No | .24 centerfire or larger | | No |
| New York | Yes | Yes | Must be centerfire | | No |
| North Carolina | Yes | No | None | None | No |
| North Dakota | Yes | Yes | .22 Centerfire or larger | | No |
| Ohio | Yes | No | None | None | No |
| Oklahoma | Yes | Yes | .22 magnum | | No |
| Oregon | Yes | Yes | .22 or .24 or larger | | No |
| Pennsylvania | Yes | Yes | None | None | No |
| Rhode Island | Yes | Yes | | .229 maximum | No |
| South Carolina | Yes | No | Must be larger than .22 | | No |
| South Dakota | Yes | No | None | None | No |
| Tennessee | Yes | Yes | .24 or larger caliber | | No |
| Texas | Yes | No | None | None | No |
| Utah | Yes | No | | None | No |
| Vermont | Yes | No | | | No |
| Virginia | Yes | Yes | .23 caliber for deer | | No |
| Washington | Yes | Yes | .240 or larger for coyote | | No |
| West Virginia | No | No | | Any centerfire | No |
| Wisconsin | Yes | No | .22 caliber or larger | | No |
| Wyoming | Yes | No | | 23/100 bullet dia. | No |

Exhibit 13
Page 00658

ER_2842

## State Fish and Game Commissions

Restrictions for High Powered Rifles

1a. Please cite law(s) and briefly describe the restrictions.

__Alabama__
(19) No automatic weapons, no silenced weapons.

__Alaska__
(23) Bison hunters must use a caliber capable of firing a 200-grain bullet
     having 2,000 pounds of energy at 100 yards.

__Arkansas__
(11) No rifles for turkey.

__California__
(22) Centerfire for big game, 10 gauge or smaller for resident small game.

__Colorado__
(10) Semiautomatic rifle may not hold more than 6 rounds.

__Connecticut__
(39) Shotgun only on public lands.  Can use any type of rifle on private land.

__Delaware__
(40) No rifles - shotguns/muzzle loaders only.

__Florida__
(25) Machine guns and silencers not permitted for any hunting.

__Georgia__
(29) No hi-power rifles allowed for turkey hunting.

__Hawaii__
(49) Must have discharge of 1200 foot pounds.

__Idaho__
(30) No hi-power rifles allowed for hunting turkey.

__Illinois__
(12) Turkey or deer may not be hunted with rifle.  Deer may not be hunted with
     muzzle loading rifle.  No restriction on rifles for coyote, fox, and
     woodchuck, etc.

__Indiana__
(34) No hi-power rifles allowed for deer or turkey hunting.  Limited
     restrictions for specified areas.

__Iowa__
(26) Cannot use rifles for turkey or deer, only shotgun or bow and arrow.  No
     difference if public or private lands.  For coyote or fox, there is no
     restriction on rifles, magazine size, or caliber.

__Kansas__
(33) Must use ammunition specifically designed for hunting.

i

Exhibit 13
Page 00659

ER_2843

Louisiana
(6)  No rifles for turkey hunting.  Rifles for deer hunting must be no smaller than .22 centerfire.

Maine
(32) No hi-power rifles for turkey and water fowl.  Some limited restrictions for specific areas.

Maryland
(42) Some restrictions based on county.  They are allowed in western and southern Maryland.  Shotguns only in and around Baltimore and Washington, D.C.

Massachusetts
(14) Rifles not permitted for hunting deer and turkey.

Michigan
(27) No turkey hunting with hi-power rifle.  No night hunting with hi-power rifle.  Deer hunting with hi-power rifle allowed only in lower southern peninsula.  Limited restrictions for specific areas.

Minnesota
(13) Caliber must be at least .23.  Ammunition must have a case length of at least 1.285".  .30 caliber M1 carbine cartridge may not be used.

Mississippi
(15) Restricts turkey hunting to shotguns.  However quadriplegics may hunt turkey with a rifle.

Missouri
(5)  Rifles not permitted for turkey.  Self loading firearms for deer may not have a combined magazine + chamber capacity of more than 11 cartridges.

Nebraska
(43) Allowed and frequently used, but magazine capacity maximum is six rounds.

Nevada
(1)  Answer to #3 refers to NAS 501.150 and NAS 503.142.  Not for turkey.

New Hampshire
(7)  Magazine capacity no more than 5 rounds.  Prohibits full metal jacket bullets for hunting.  Prohibits deer hunting with rifles in certain towns.

New Jersey
(17) No rifles.

New Mexico
(31) No hi-power rifles allowed for hunting turkey.

New York
(24) No semiautomatics with a magazine capacity of greater than 6 rounds; machineguns and silencers not permitted for any hunting.  Limited restrictions for specific areas.

North Carolina
(20) Centerfire rifles not permitted for turkey hunting.

2

Exhibit 13
Page 00660

North Dakota
(28) No hi-power rifles for turkey hunting.

Ohio
(3)  Prohibits high power rifles for turkey, deer and migratory birds.  High
     power rifles can be used on all other legal game animals.

Oklahoma
(8)  Centerfire rifles only for large game.  Magazines for .22 centerfire rifles
     may not hold more than 7 rounds.

Oregon
(2)  OAR 635-65-700(1) must be .24 caliber or larger center fire rifle, no full
     automatic; OAR 635-65-700(2) hunters shall only use centerfire rifle .22
     caliber; OAR-65-700(5) no military or full jacket bullets in original or
     altered form.  Limited restrictions for specific areas.

Pennsylvania
(16) Rifles not permitted in Philadelphia & Pittsburgh areas.

Rhode Island
(44) .22 center fire during the summer for woodchucks.

South Carolina
(18) No rifle for turkey, rifle for deer must be larger than .22 caliber

South Dakota
(50) Magazine not more than five rounds.

Tennessee
(37) No hi-power rifles allowed for turkey hunting.

Texas
(21) Rimfire ammunition not permitted for hunting deer, antelope, and bighorn
     sheep; machine guns and silencers not permitted for hunting any game
     animals.

Utah
(9)  No rifles for turkey hunting.

Vermont
(47) Turkey size less than 10 gauge.  Deer/moose/beer, no restriction on
     caliber.

Virginia
(48) 23 caliber or larger for deer and bear.  No restrictions for turkey.  No
     magazine restrictions, shotgun limited to 3 shells.  Restrictions vary from
     county to county - approximately 90 different rifle restrictions in the
     State of Virginia based on the county restrictions.  Sawed-off firearms are
     illegal to own unless with a permit, if barrel less than 16 inches for
     rifle, and 18 inches for shotgun.

Washington
(46) Hunting turkey limited to shotguns.  Small game limited to shotguns.

3

Exhibit 13
Page 00661

<u>Wisconsin</u>
(36) No .22 rimfire rifles for deer hunting.

<u>Wyoming</u>
(4)  Big game and trophy animals, firearm must have a bore diameter of at least
     23/100 of an inch.


Restrictions for Semiautomatic Rifles

2a. Please cite law(s) and briefly describe the restrictions.

<u>Alabama</u>
(19) Turkey may not be hunted with a centerfire rifle or rimfire rifle.
     Semiautomatic rifles of proper caliber are legal for all types of hunting.
     No restrictions on magazine capacity, except wildlife management areas
     where centerfire rifles are restricted to 10 round max.

<u>Arizona</u>
(38) Magazine cannot hold more than 5 rounds.

<u>Colorado</u>
(10) Semiautomatic rifle may not hold more than 6 rounds.

<u>Connecticut</u>
(39) Shotgun only on public lands.  Any type of rifle can be used on private
     land.

<u>Delaware</u>
(40) No rifles - shotguns/muzzle loaders only.

<u>Florida</u>
(25) No semiautomatic centerfire rifles having a magazine capacity greater than
     5 rounds.

<u>Idaho</u>
(30) No hi-power rifles (including semiautomatic) allowed for turkey hunting.

<u>Illinois</u>
(12) See #1.

<u>Indiana</u>
(34) No hi-power rifles allowed for turkey hunting.

<u>Iowa</u>
(26) Cannot use rifles for turkey or deer, only shotgun or bow and arrow.  No
     difference in public or private land.  For coyote or fox, there is no
     restriction on rifle, magazine size, or caliber.

<u>Kansas</u>
(33) Must use ammunition specifically designed for hunting.

4

Exhibit 13
Page 00662

ER_2846

<u>Maryland</u>
(42) Some restrictions.  Based on county.  Shotguns only in and around Baltimore and Washington, D.C.

<u>Michigan</u>
(27) Unlawful to hunt with semiautomatic rifles capable of holding more than 6 rounds in magazine and barrel.  Rimfire (.22 cal) rifles excluded from restrictions.

<u>Missouri</u>
(5)  Combined magazine + chamber capacity may not be more than 11 cartridges.

<u>New Hampshire</u>
(7)  Turkey may not be hunted with rifles.  Rifles may not have magazine capacity of more than 5 cartridges.

<u>New Jersey</u>
(17) No rifles.

<u>New York</u>
(24) No semiautomatics with a magazine capacity of greater than 6 rounds.

<u>North Dakota</u>
(28) No hi-power rifles (including semiautomatics) may be used for hunting turkey.

<u>Oklahoma</u>
(8)  See #1.

<u>Oregon</u>
(2)  OAR 635-65-700(1) and (2) limits magazine capacity to no more than 5 cartridges.

<u>Pennsylvania</u>
(16) Semiautomatic rifles are not lawful for hunting in Pennsylvania.

<u>Rhode Island</u>
(44) Cannot use semiautomatic during the winter, only during the summer months for woodchucks (during daylight from April 1 to September 30).

<u>Tennessee</u>
(37) No hi-power rifles, including semiautomatics, allowed for turkey hunting.

<u>Vermont</u>
(47) Semiautomatic 5 rounds or less.

<u>Virginia</u>
(48) Semiautomatics are legal wherever rifles can be used.  23 caliber or larger for deer and bear.  No restrictions for turkey.  No magazine restrictions, shotgun limited to 3 shells.  Restrictions vary from county to county - approximately 90 different rifle restrictions in the State of Virginia based on the county restrictions.  Sawed-off firearms are illegal to own unless with a permit, if barrel less than 16 inches for rifle, and 18 inches for shotgun.  Striker 12 - drums holds 12 or more rounds and is illegal.

5

Exhibit 13
Page 00663

**ER_2847**

<u>Washington</u>
(46) Cannot use fully automatic for hunting.

<u>West Virginia</u>
(45) Cannot use fully automatic firearms for hunting.

6

Exhibit 13
Page 00664

ER_2848

## Comments Provided by Law Enforcement Agencies

(1)   No research.

(2)   No research.

(3)   NOBLE and others forwarded information to a U.S. Senator on circumstances concerning police officers killed or injured by these weapons.  No data was provided.

(4)   No research.

(7)   The organization stated: "Most of the data available on guns and crime does not provide the detail needed to identify the types of guns listed. . . . We have conducted several surveys that refer to assault rifles generically, including the Survey of Inmates in State Correctional Facilities 1991, Survey of Inmates in Local Jails 1995, and the Survey of Adults on Probation 1995.  The data on assault weapons has not been analyzed in the recently released Survey of Adults on Probation 1995 or in the yet to be released Survey of Inmates in Local Jails 1995.

"Our report Guns Used in Crime includes the results of an analysis of the stolen data from the FBI's National Crime Information Center database.  Our analysis was limited to general categories of guns and calibers of handguns.  The recent evaluation of the assault weapons ban funded by the National Institute of Justice analyzed a more recent set of the same data with an emphasis on assault weapons.  The results of this evaluation were reported in Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994."

"BJS [Bureau of Justice Statistics] supports the Firearms Research Information System (FARIS). . . .  This database contains firearms-related information from surveys, research, evaluations, and statistical reports. . . .  We queried this database for any research on assault weapons.  The results of the query include both the reports listed above, as well as several others.  Please note that in BJS's report Guns Used in Crime refers to the report Assault Weapons and Homicide in New York City prepared by one of our grantees.  While the data are from 1993, the report provides interesting insights into the use of assault weapons and homicide.  Another source of data on assault weapons and crime is the FBI's Law Enforcement Officers Killed and Assaulted series, which records the type of gun used in killings of police officers.  Several of the reports listed in the FARIS query used these data, including Cop Killers: Assault Weapons Attacks on America's Police, and Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns with High Capacity Magazines."

(9)   Guns in America: National Survey on Private Ownership and Use of Firearms (May 1997) states: The 1994 NSPOF (National Survey of Private Ownership of Firearms) estimates for the total number of privately owned firearms is 192 million: 65 million handguns, 70 million rifles, 49 million shotguns, and 8 million other long guns.

Exhibit 13
Page 00665

**DEPARTMENT OF THE TREASURY**
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
WASHINGTON, D.C. 20226

**DIRECTOR**

DEC 1 0 1997

O:F:S:DMS
3310

Dear Sir or Madam:

On November 14, 1997, the President and the Secretary of the Treasury decided to conduct a review to determine whether modified semiautomatic assault rifles are properly importable under Federal law. Under 18 U.S.C. section 925(d)(3), firearms may be imported into the United States only if they are determined to be of a type generally recognized as particularly suitable for or readily adaptable to sporting purposes. The firearms in question are semiautomatic rifles based on the AK47, FN-FAL, HK91, HK93, SIG SG550-1, and Uzi designs.

As part of the review, the Bureau of Alcohol, Tobacco and Firearms (ATF) is interested in receiving information that shows whether any or all of the above types of semiautomatic rifles are particularly suitable for or readily adaptable to hunting or organized competitive target shooting.

Although ATF is not required to seek public comment on this study, the agency would appreciate any factual, relevant information concerning the sporting use suitability of the rifles in question.

Your voluntary response must be received no later than 30 days from the date of this letter; those received after that date cannot be included in the review. Please forward your responses to the Bureau of Alcohol, Tobacco and Firearms, Department TA, P.O. Box 50860, Washington, DC 20091.

Sincerely yours,

John W. Magaw
Director

Exhibit 13
Page 00666

**ER_2850**

**Comments Provided by Industry Members and Trade Associations**

(12)  The respondent felt that definitions and usage should be subject to rulemaking.  The respondent stated that limits on "sporting" use do not take into account firearms technology and its derivative uses among millions of disparate consumers.  Millions of gun owners currently engage in informal target competition.

The respondent stated that the firearms are suitable for sporting purposes and that ATF's practice of making "ad hoc" revisions to import criteria disrupts legitimate commerce.  The respondent recommends that all changes to criteria should be subject to rulemaking.

(19)  The respondent submitted a brochure and a statement supported by seven letters from FFL's who sell the SLR-95 and 97 and ROMAK 1 and 2.  The respondent and all the supporting letters attest to the suitability of these guns for hunting because (1) they are excellent for deer or varmint hunting; (2) they are used by many for target shooting; (3) their ammunition is readily available and affordable; and (4) they are excellent for young/new hunters because of low recoil, an inexpensive purchase price, durability, and light weight, as well as being designed only for semiautomatic fire.

(20)  One respondent submitted results of its independently conducted survey, which consisted of 30 questions.  The results of the survey suggest that 36 percent of those queried actually use AK47-type rifles for hunting or competition, 38 percent use L1A1-type rifles for hunting or competition, and 38 percent use G3-type rifles for hunting or competition.  Other uses include home defense, noncompetitive target shooting, and plinking.  Of those queried who do not currently own these types of rifles, 35 percent would use AK-type rifles for hunting or competition, 36 percent would use L1A1-type rifles for hunting or competition, and 37 percent would use G3-type rifles for hunting or competition.

(22)  The respondent claims that the majority of the study rifles' length and calibers can be used only for sporting purposes.  The respondent asserts that the only technical detail remaining after the 1989 decision that is similar to a military rifle is the locking system.  After 1989, the imported rifles have no physical features of military assault rifles.  All have features which can be found on any semiautomatic sporting/hunting rifle.

However, the respondent writes that the Uzi-type carbines are "not suitable for any kind of sporting events other than law enforcement and military competitions because the caliber and locking system do not allow precise shooting over long distances."

1

Exhibit 13
Page 00667

**ER_2851**

(23)   One respondent, who imports the SAR-8 and SAR-4800 that are chambered for .308 Winchester ammunition, states that neither rifle possesses any of the characteristics of either the 1989 determination or the 1994 law.  The respondent states that both are permitted in match rifle and other competitions.  The respondent states that only two questions should be considered to determine hunting suitability of a rifle: Whether the caliber is adequate to take one or more game species and whether the gun is safe and reliable.  The respondent states that there is no factual or legal basis to conclude that the rifles are not "particularly suitable" for sporting purposes.

(24)   The respondent writes:  "The particular firearms differ from other guns that are universally acceptable only in cosmetic ways. There is no functional difference between semiautomatic firearms based on the external features that have been keyed on in an attempt to implement the import restrictions of the 1994 Crime Bill.  As further attempts to differentiate functionally identical firearms by these features for the purposes of culling out those that might be politically suitable for an administrative import ban is wrong."

(25)   The respondent writes that the SLG95 was developed exclusively for hunting and competitive shooting.  The respondent points out that it is capable of single firing only and cannot be reassembled for use as an automatic weapon.  It is made for endurance and accuracy to 300 meters.

(26)   The respondent recommends AK47 variants specifically, but believes all study rifles are suitable or adaptable for sporting. The respondent states that a Galil-chambered .308/.223 with a two-position rear sight, adjustable front sight, or scope mount channel, are reliable, durable, accurate, and suitable for hunting and organized competitive shooting.  The respondent states that the Uzi, which chambers 9mm and 40 S&W, two-position rear sight, and an adjustable front sight is suitable for organized competitive target shooting.

(27)   The respondent states that the SIG-SG550-1, in its original configuration, never possessed assault rifle features.  The respondent states that is was built as a semiautomatic, not a fully automatic that was converted or modified to semiautomatic. It does have protruding pistol grip, and its ergonomics are geared toward its original design of goal-precision shooting. The respondent says that the name "Sniper" was a marketing decision, and it is extremely popular in .223 competitions.  Its price isolates the gun to the competitor/collector.

2

Exhibit 13
Page 00668

ER_2852

(28)   Letters from H&K users were submitted in support of their
continued importation and use as sporting arms.  Specifically,
the SR9 and PSG1 were said to be clearly suitable and utilized
daily for hunting and target shooting.  The respondent states
that sport is defined as "an active pastime, diversion,
recreation" and that the use of these is all the justification
needed to allow their importation. The PSG1 has been imported
since 1974, and the SR9 since 1990.  The semiautomatic feature
dates to turn of the century.

The respondent states that the cost would dissuade criminals from
using them.  The respondent refers to ATF's reports "Crime Gun
Analysis (17 Communities)" and "Trace Reports 1993-1996" to show
that the H&K SR9 and PSG1 are not used in crime.  In the 4-year
period covered by the reports, not one was traced.

(29)   The respondent faults the 1989 report both for not sufficiently
addressing the issue of ready adaptability, as well as for the
limited definition of sporting purposes.  The respondent states
that sport is defined as "that which diverts, and makes mirth;
pastime, diversion."  The respondent says that the NRA sponsors
many matches, and personally attests to the FN-FAL and HK91 as
being perfectly suitable for such matches.  The respondent states
that the rifles are also used for hunting deer, rabbits, and
varmints.  Further, the respondent remarks that the use of these
rifles in crime is minuscule.

### Importer/Individual Letters

On January 15, 1998, the study group received a second submission from
Heckler and Koch, dated January 14, 1998.  It transmitted 69 letters
from individuals who appeared to be answering an advertisement placed
in Shotgun News by Heckler and Koch.  The study group obtained a copy
of the advertisement, which requested that past and current owners of
certain H&K rifles provide written accounts of how they use or used
these firearms.  The advertisement stated that the firearms in
question, the SR9 and the PSG1, were used for sporting purposes such as
hunting, target shooting, competition, collecting, and informal
plinking.  The advertisement also referred to the 120-day study and the
temporary ban on importation, indicating that certain firearms may be
banned in the future.

Synopses of Letters:

1.   The writer used his SR9 to hunt deer (photo included).

2.   The writer used his SR9 to hunt deer (photo included).

3.   The writer used his SR9 for informal target shooting and plinking.

4.   The writer used his SR9 for target practice and recreation.

5.   The writer (a police officer) used SR9 to hunt.  Said that it's too
heavy and expensive for criminals.

3

Exhibit 13
Page 00669

6.   The writer used his SR9 for competition.

7.   The writer used H&K rifles such as these around the farm to control wild dog packs.

8.   The writer used his SR9 to hunt deer.

9.   The writer used his SR9 to hunt, participate in target practice, and compete.

10.  The writer used his H&K rifles for informal target shooting.

11.  The writer used his SR9 to hunt elk because it's rugged, and to shoot targets.

12.  The writer used his SR9 to target practice.

13.  The writer used his HK91 to hunt varmints and compete in military rifle matches.

14.  The writer does not use the firearms but is familiar with their use for target shooting, hunting, and competition.

15.  The writer uses HK firearms for DCM marksmanship competition.

16.  The writer used his HK93 for 100-yard club matches and NRA-high power rifle matches.

17.  The writer does not own the firearms but enjoys shooting sports and collecting.

18.  The writer used his HK91 to hunt deer, boar, and mountain goat and in high-power match competitions.

19.  The writer used his SR9 to shoot targets and for competitions.

20.  The writer used his HK91 to shoot varmints, hunt small and big game, and shoot long-range silhouettes.

21.  The writer used his SR8 to hunt deer, target shoot, and plink.

22.  The writer used his HK93 to shoot in club competitions.

23.  The writer used his SR9 to shoot targets because the recoil does not impact his arthritis.

24.  The writer (a police officer) does not own the firearm but never sees HKs used in crime.

25.  The writer used his HKs for target shooting, competition, and collection.

26.  The writer does not own the firearms but likes recreational target shooting.

27.  Writer does not own the firearms but states, "Don't ban."

4

Exhibit 13
Page 00670

28. The writer used his SR9 for hunting deer, varmints, and groundhogs; for target shooting; and for occasional competitions.

29. The writer used his SR9 to hunt deer because it's accurate, rugged, and reliable.

30. The writer used his SR9 to hunt deer and elk.

31. The writer used his SR9 to target shoot.

32. The writer used his SR9 to hunt deer and target shoot.

33. The writer used his HK91 to shoot military rifle 100-yard competitions.

34. The writer used his SR9 for hunting varmints and coyotes, for target shooting, and for competitions.

35. The writer used his SR9 to hunt deer and target shoot.

36. The writer (a former FBI employee) used his SR9 for hunting varmints and for precision and target shooting.

37. The writer used his HK for target shooting and competition.

38. The writer used his SR9 for informal target shooting and plinking and his HK91 for bowling pin matches, high-power rifle competitions, informal target shooting, and plinking.

39. The writer used his SR9 to plink and shoot targets, saying it's too heavy for hunting.

40. The writer has an HK91 as part of his military collection and indicates it may be used for hunting.

41. The writer used his SR9 to target shoot.

42. The writer used his SR9 to hunt deer and target shoot.

43. The writer does not own the firearms but says, "Don't ban."

44. The writer used his SR9 and HK93 for hunting deer, for target shooting, and for home defense.

45. The writer states, "Don't ban."

46. Writer states, "Don't ban."

47. Writer states, "Don't ban."

48. The writer owns an SR9; no use was reported.

49. Writer used his SR9 to compete in club matches and "backyard competitions."

50. The writer used his HK to hunt boar and antelope.

5

Exhibit 13
Page 00671

ER_2855

51.  The writer states, "Don't ban."

52.  The writer (a police officer) does not own the firearms but states that the are not used by criminals.

53.  The writer used his HK91 to hunt deer.

54.  The writer (a police trainer) says that the PSG1 is used for police sniping and competitive shooting because it's accurate.  He says that it's too heavy to hunt with and has attached an article on the PSG1.

55.  The writer used her two PSG1s for target shooting and fun.

56.  The writer used his SR9 and PSG1 to hunt and target shoot.

57.  The writer used his two PSG1s to hunt and target shoot.

58.  The writer provides an opinion that the SR9 is used to hunt and target shoot.

59.  The writer used his PSG1 for hunting deer and informal target shooting.

60.  The writer used his PSG1 to target shoot and plink.

61.  The writer states, "Don't ban."

62.  The writer used his HK91 to target shoot.

63.  The writer used his HK91 to target shoot.

64.  The writer (a U.S. deputy marshall) used his SR9 to shoot at the range.

65.  The writer used his SR9 to hunt deer and coyotes.

66.  The writer used his SR9 to competitively target shoot.

67.  The writer used his SR9 to hunt deer and bear.

68.  The writer uses military-type rifles like these for predator control on the farm.

69.  The writer used his SR9 to target shoot, plink, and compete in DCM matches.

6

Exhibit 13
Page 00672

**Comments Provided by Interest Groups**

(7)  Impact Evaluation of the Public Safety and Recreational Firearms
Use Protection Act of 1994, Final Report.  March 13, 1997.

(8)  Identical comments were received from five members of the JPFO.
They are against any form of gun control or restriction regardless
of the type of firearm.  References are made comparing gun control
to Nazi Germany.

(9)  The respondent contends that police/military-style competitions,
"plinking," and informal target shooting should be considered
sporting.  Note: The narrative was provided in addition to survey
that Century Arms put on the Internet.

The respondent questions ATF's definition of "sporting" purposes.
The respondent contends that neither the Bill of Rights nor the
Second Amendment places restrictions on firearms based on use.

(13)  Citing the 1989 report, the respondent states that the drafters of
the report determined what should be acceptable sports, thus
excluding "plinking."

The respondent states that appearance (e.g., military looking) is
not a factor in determining firearms' suitability for sporting
purposes.  It is their function or action that should determine a
gun's suitability.  Over 50 percent of those engaged in Practical
Rifle Shooting use Kalashnikov variants.  Further, citing U.S. vs.
Smith (1971), the "readily adaptable" determination would fit all
these firearms.

(14)  The respondent states that the vast majority of competitive
marksmen shoot either domestic or foreign service rifles.  Only 2-3
participants at any of 12 matches fire bolt-action match rifles.
If service rifles have been modified, they are permitted under NRA
rule 3.3.1.

The respondent says that attempts to ban these rifles "is a joke."

(15)  The respondent states that these firearms are used by men and women
alike throughout Nebraska.  All of the named firearms are used a
lot all over the State for hunting.  The AK47 has the same basic
power of a 30/30 Winchester.  All of these firearms function the
same as a Browning BAR or a Remington 7400.  Because of their
design features, they provide excellent performance.

(16)  The respondent states that the Bill of Rights does not show the
second amendment connected to "sporting purposes."  The respondent
says that all of the firearms in question are "service rifles," all
can be used in highpower rifle competition (some better than
others), but under no circumstances should "sporting use" be used
as a test to determine whether they can be sold to the American
public.  The respondent states that "sporting use" is a totally
bogus question.

1

Exhibit 13
Page 00673

ER_2857

(17)  The respondent's basic concern is that the scope of our survey is significantly too narrow (i.e., not responsive to the Presidential directive, too narrow to address the problem, and inadequate to the task). The respondent states, "We do not indicate that our determination will impact modifications made to skirt law. We rely on the opinions of the 'gun press.' At a minimum, the Bureau should deny importation of: any semiautomatic capable of accepting with a capacity of more than 10 rounds, and any semiautomatic rifle with a capacity to accept more rounds than permitted by the State with the lowest number of permitted rounds. Deny any semiautomatic that incorporates cosmetically altered 'rule-beating' characteristics. Deny any semiautomatic that can be converted by using parts available domestically to any of the 1994 banned guns/characteristics. Deny any semiautomatic manufactured by any entity controlled by a foreign government. OR manufactured by a foreign entity that also manufactures, assembles or exports assault-type weapons. Deny any semiautomatic that contains a part that is a material component of any assault type weapon made, assembled, or exported by the foreign entity which is the source of the firearm proposed to be imported."

"A material component of any assault type weapon, assembled or exported by the foreign entity, which is, the source of the firearms proposed to be imported. The gun press has fabricated 'sporting' events to justify these weapons. The manner in which we are proceeding is a serious disservice to the American people."

Attachments:  That Was Then, This is Now; Assault Weapons: Analysis, New Research, and Legislation; Assault Weapons and Accessories in America; and Cop Killers.  All authored by the Violence Policy Center.

(30)  The respondent states, "At least for handguns, and among young adult purchasers who have a prior criminal history, the purchase of an assault-type firearm is an independent risk factor for later criminal activity on the part of the purchaser."

NOTE:  The above study was for assault-type handguns used in criminal activity versus other handguns. The study involved only young adults, and caution should be used in extending these results to other adults and purchasers of rifles. However, the respondent states, it is plausible that findings for one class of firearms may pertain to another closely related class.

(31)  The 1996 National Survey of Fishing, Hunting and Wildlife-Associated Recreation.  The publication outlines 1996 expenditures for guide use and percentage of hunters using guides for both big game and small game hunting.

2

Exhibit 13
Page 00674

(32)   In a memo from the Center to Prevent Handgun Violence the sections are Legal Background, History of Bureau Application of the "Sporting Purposes" Test, The Modified Assault Rifles under Import Suspension Should Be Permanently Barred from Importation, [The Galils and Uzis Should Be Barred from Importation Because They Are Banned by the Federal Assault Weapon Statute, and All the Modified Assault Rifles Should Be Barred from Importation Because They Fail the Sporting Purposes Test].  The conclusion states:  "The modified assault rifles currently under suspended permits should be permanently barred from importation because they do not meet the sporting purposes test for importation under the Gun Control Act of 1968 and because certain of the rifles [Galils and Uzis] also are banned by the 1994 Federal assault weapon law."

3

Exhibit 13
Page 00675

ER_2859

## Comments Provided by Individuals

(10) The respondent does not recommend the Uzi, but he highly recommends the others for small game and varmints. He feels that the calibers of these are not the caliber of choice for medium or large game; however, he believes that the SIG and H&K are the best-built semiautomatics available.

He can not and will not defend the Uzi, referring to it as a "piece of junk."

The respondent feels that because of their expense and their being hard to find, the study rifles (excluding the Uzi) would not be weapons of choice for illegal activities.

(11) The respondent questions ATF's definition of "sporting" and "organized shooting." He feels that ATF's definition is too narrow and based on "political pressure."

The respondent feels that the firearms are especially suitable for competitive shooting and hunting and that the restrictions on caliber and number of cartridges should be left to the individual States. He has shot competitively for 25 years.

(18) The respondent specifically recommends the MAK90 for hunting because its shorter length makes for easier movement through covered areas, it allows for quicker follow-up shots, its open sights allow one to come up upon a target more quickly, and it provides a quicker determination of whether a clear shot exists through the brush than with telescopic sighting.

(21) The respondent states that the second amendment discusses "arms," not "sporting arms." The respondent further states that taxpayer money was spent on this survey and ATF has an agenda. A gun's original intent (military) has nothing to do with how it is used now. "The solution to today's crime is much the same as it always has been, proper enforcement of existing laws, not the imposition of new freedom-restricting laws on honest people."

Exhibit 13
Page 00676

ER_2860

## Information on Articles Reviewed

(1) Describes limited availability of Uzi Model B sporter with thumbhole stock.

(2) Describes rifle and makes political statement concerning 1989 ban.

(3) Describes Chinese copy of Uzi with thumbhole stock.

(4) Quality sporting firearms from Russia.

(5) Short descriptions of rifles and shotguns available.  Lead-in paragraph mentions hunting.  Does not specifically recommend any of the listed weapons for hunting.

(6) Geared to retail gun dealers, provides list of available products.  States L1A1 Sporter is pinpoint accurate and powerful enough for most North American big game hunting.

(7) Discusses the use of the rifle for hunting bear, sheep, and coyotes. Describes accuracy and ruggedness.  NOTE: The rifle is a pre-1989 ban assault rifle.

(8) Deals primarily with performance of the cartridge.  Makes statement that AK 47-type rifle is adequate for deer hunting at woods ranges.

(9) Discusses gun ownership in the United States.  Highlighted text (not by writers) includes the National Survey of Private Ownership of Firearms that was conducted by Chilton Research Services of Drexel Hill, Pennsylvania during November and December 1994: 70 million rifles are privately held, including 28 million semiautomatics.

(10) Discusses pre-1989 ban configuration.  Describes use in hunting, and makes the statement that "in the appropriate calibers, the military style autoloaders can indeed make excellent rifles, and that their ugly configuration probably gives them better handling qualities than more conventional sporters as the military discovered a long time ago."

(15) Not article - letter from Editor of Gun World magazine discussing "sport" and various competitions.  Note: Attached submitted by Century Arms.

(16) Letter addressed to "To Whom It May Concern" indicating HK91 (not mentioned but illustrated in photos) is suitable for hunting and accurate enough for competition.  Note: Submitted by Century Arms.

(17) Describes a competition developed to test a hunter's skill.  Does not mention any of the rifles at issue.

(18) Not on point - deals with AR 15.

(19) Describes function, makes political statement.

(20) Discusses function and disassembly of rifle.

(21) Not on point - deals with AR 15 rifle.

1

Exhibit 13
Page 00677

(22) Discusses competition started to show sporting use of rifles banned for sale in California.  Unknown if weapons in study were banned in California in 1990.

(23) Not on point - deals with national matches.

(24) Not on point - deals with various surplus military rifles.

(25) Deals with 7.62x39mm ammunition as suitable for deer hunting and mentions the use in SKS rifles, which is a military style semiautomatic but not a part of the study.

(26) Not on point - deals with reloading.

(27) Not on point - deals with reloading.

(28) Not on point - deals with AR15 rifles in competition.

(29) Not on point - deals with the SKS rifle.

(30) Not on point - deals with national matches.

(31) Not on point - deals with national matches.

(32) Not on point - deals with national matches.

(33) Not on point - deals with national matches at Camp Perry.

(34) Not on point - deals with national matches at Camp Perry.

(35) Not on point - deals with 1989 national matches at Camp Perry.

(36) Not on point - deals with Browning BAR sporting semiautomatic rifles.

(38) Not on point - deals with AR15, mentions rifle in caliber 7.62 x 39.

(39) Not on point - deals with bullet types.

(40) Not on point - deals with reloading.

(41) Discusses tracking in snow.  Rifles mentioned do not include any rifles in study.

(42) Deals with deer hunting in general.

(43) Deals with rifles for varmint hunting.  Does not mention rifles in study.

(44) Not on point - deals with hunting pronghorn antelope.

(45) Deals with various deer rifles.

(46) Not on point - deals with two Browning rifles' recoil reducing system.

(47) Not on point - deals with bolt-action rifles.

(48) Not on point - deals with ammunition.

Exhibit 13
Page 00678

(49) Deals with modifications to AR15 trigger for target shooting.

(50) Not on point - deals with M1 Garand as a target rifle.

(51) Not on point - deals with reloading.

(52) Deals with impact of banning semiautomatic rifles would have on competitors at Camp Perry.

(53) Deals with economic impact in areas near Camp Perry if semiautomatic rifles banned.  Reprint from Akron Beacon Journal.

(54) Deals with training new competitive shooters - mentions sporting use of assault rifles, i.e., AR15.

(55) Not on point - article about Nelson Shew.

(56) Not on point - deals with reloading.

(57) Not on point - deals with shooting the AR15.

(58) Not on point - article about AR15 as target rifle.

(59) Not on point - article about well known competitive shooter.

(67) Not on point - deals with reloading.

(68) Discusses semiautomatic versions of M14.

(69) Discusses gas operation.

(70) Discusses right adjustment on M1 and M1A rifles.

(71) Discusses M1A and AR15-type rifles modified to remove them from assault weapon definition, and their use in competition.

(72) Deals with AR15 type rifle.

(73) Not on point - deals with AR15.

(74) Not on point - deals with target rifle based on AR15/M16.

(75) Not on point - deals with SKS rifle.

(76) Not on point - deals with reloading 7.62x39mm cartridge.

(77) Not on point - deals with reloading.  Mentions 7.62x39mm.

(78) Not on point - deals with ammunition performance.

(79) Deals with .223 Remington caliber ammunition as a hunting cartridge.

(80) Describes M1A (semiautomatic copy of M14) as a target rifle.

(81) Not on point - deals with bullet design.

(82) Not on point - deals with ammunition performance.

3

Exhibit 13
Page 00679

ER_2863

### Information on Advertisements Reviewed

(11) Indicates rifles are rugged, reliable and accurate.

(12) Describes rifles, lists price.

(13) Sporting versions of AK 47 and FAL.

(14) Sporting version of AK 47, reliable, accurate.

(61) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(62) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(63) Catalog of ammunition - lists uses for 7.62x39mm ammunition.

(64) Catalog of ammunition - lists uses for 9mm ammunition.

(65) Catalog of ammunition - lists uses for 9mm ammunition.

(66) Catalog of ammunition - lists recommended uses for 9mm ammunition.

Exhibit 13
Page 00680

ER_2864

**SB 1446**

Page 1

SENATE THIRD READING
SB 1446 (Hancock)
As Amended  March 28, 2016
Majority vote

SENATE VOTE:  22-15

| Committee | Votes | Ayes | Noes |
|---|---|---|---|
| Public Safety | 5-2 | Jones-Sawyer, Lopez, Low, Quirk, Santiago | Melendez, Lackey |

**SUMMARY**: Prohibits the possession of large-capacity magazines, with specified exceptions. Specifically, **this bill**:

1) Makes it an infraction, commencing July 1, 2017, for any person who possesses a large-capacity magazine punishable as follows:

   a) A fine not to exceed $100 for the first offense;

   b) A fine not to exceed $250 for the second offense; and,

   c) A fine not to exceed $500 for the third or subsequent offense.

2) Requires a person who, prior to July 1, 2017, legally possesses a large-capacity magazine to dispose of that magazine by any of the following means:

   a) Remove the large-capacity magazine from the state;

   b) Prior to July 1, 2017, sell the large-capacity magazine to a licensed firearms dealer;

   c) Destroy the large-capacity magazine; or,

   d) Surrender the large-capacity magazine to a law enforcement agency for destruction.

3) Specifies the following exceptions:

   a) An individual who honorably retired from being a sworn peace officer, or an individual who honorably retired from being a sworn federal law enforcement officer, who was authorized to carry a firearm in the course and scope of that officer's duties;

   b) A federal, state, or local historical society, museum or institutional society, or museum or institutional collection, that is open to the public, provided that the large-capacity magazine is unloaded, properly housed within secured premises, and secured from unauthorized handling;

   c) A person who finds a large-capacity magazine, if the person is not prohibited from possessing firearms or ammunition, and possessed it no longer than necessary to deliver or transport it to the nearest law enforcement agency;

Exhibit 14
Page 00682

**SB 1446**
Page 2

d) A forensic laboratory, or an authorized agent or employee thereof in the course and scope of his or her authorized activities;

e) The receipt or disposition of a large-capacity magazine by a trustee of a trust, or an executor or administrator of an estate, including an estate that is subject to probate, that includes a large-capacity magazine; or,

f) A person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds 10 or fewer rounds of ammunition is compatible with that firearm and the person possesses the large-capacity magazine solely for use with that firearm.

**EXISTING LAW**:

1) Defines a "large-capacity magazine" as any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:

   a) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds;

   b) A .22 caliber tube ammunition feeding device; or,

   c) A tubular magazine that is contained in a lever-action firearm.

2) States, except as provided, commencing January 1, 2000, any person in California who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, or lends, any large-capacity magazine is punishable by imprisonment in the county jail for either a misdemeanor or a felony.

3) Provides the following exceptions to the prohibition against manufacturing or causing to be manufactured, importing into the state, keeping for sale, or offering or exposing for sale, or giving, or lending, any large-capacity magazine:

   a) Government agency charged with law enforcement;

   b) Sworn peace officer who is authorized to carry a firearm in the course and scope of that officer's duties ;

   c) Sale or purchase by a licensed person;

   d) Loan under specified circumstances;

   e) Importation by a person in legal possession prior to January 1, 2000;

   f) Delivery to a gun smith;

   g) Person with permit to sell to an out-of-state client;

   h) Entity that operates armored vehicle business;

   i) Manufacture for government agency or military;

Exhibit 14
Page 00683

SB 1446
Page 3

j)  Use as a prop; or,

k)  Holder of a special weapons permit for specified purposes.

4) Declares large-capacity magazines to be a nuisance.

5) Provides that the Attorney General, district attorney, or city attorney may bring an action to enjoin the manufacture of, importation of, keeping for sale of, offering or exposing for sale, giving, lending, or possession of, any item that constitutes a nuisance under any of the specified code sections, including the code section relating to large-capacity magazines.

6) States that the weapons listed in the specified code sections constituting a nuisance shall be subject to confiscation and summary destruction whenever found within California.

**FISCAL EFFECT**: Unknown. This bill is keyed non-fiscal by the Legislative Counsel.

**COMMENTS**: According to the author, "In 1999, the Legislature passed SB 23 (Perata) [Chapter 129, Statutes of 1999] which prohibited the possession of assault weapons, such as the AK-47 and created a generic definition of an assault weapon. As part of that legislation, the importation, manufacture and sale of large capacity ammunition magazines was strictly prohibited. However, the possession of high capacity magazines was not prohibited.

"Federal law also outlawed possession of high capacity magazines as part of the 1994 federal assault weapons ban but allowed current owners to keep them under a 'grandfathering' provision. The federal assault weapons ban was allowed to expire in 2004. Research has shown that, prior to the implementation of the federal assault weapons ban, these high capacity magazines were used in between 14 and 26% of guns used in crime.

"High capacity ammunition magazines are ammunition feeding devices that hold more than ten rounds of ammunition. These mega-magazines can hold upwards of 100 rounds of ammunition and allow a shooter to rapidly fire without reloading.

"High capacity magazines are not designed for hunting or target shooting. High capacity magazines are military designed devices. They are designed for one purpose only – to allow a shooter to fire a large number of bullets in a short period of time.

"This bill will make clear that possession of these 'mega-magazines' is also prohibited. Law enforcement officers have told us that, because the Penal Code currently fails to specifically prohibit possession, the law is very difficult to enforce. This needs to be fixed and this measure addresses that by prohibiting the possession."

**Analysis Prepared by**:   Stella Choe / PUB. S. / (916) 319-3744    FN: 0003530

Exhibit 14
Page 00684

**Proposals to Reduce Gun Violence:**
**Protecting Our Communities While Respecting the Second Amendment.**

Senate Judiciary Committee
Subcommittee on the Constitution, Civil Rights and Human Rights

February 12, 2013

Prepared Testimony by Laurence H. Tribe[*]

Mr. Chairman and members of the Committee:

I am honored and grateful for the invitation to testify before you today.  I know I am not alone in wanting us to do all we can, consistent with the Constitution, to reduce the awful specter of rampant gun violence and the far too frequent massacres of our children, our friends, and our fellow citizens.

Like all decent Americans, I felt a pang of unspeakable horror on December 14, when I learned that twenty first-grade children had been brutally slaughtered in their first-grade classroom in Newtown, Connecticut.  Those children, and the brave grown-ups who died at Adam Lanza's hands as they tried to save the young lives entrusted to their care, deserve every effort to translate our shared grief into shared national action.  That action must not be deterred by the defeatist argument that, because we will never solve this problem in its entirety, we might as well give up. Nor should it be deterred by distorted interpretations of the United States Constitution. As others have often reminded us about that great and enduring document, it is many things to many people, but one thing it is *not* is a suicide pact.

---

[*] Carl M. Loeb University Professor and Professor of Constitutional Law, Harvard Law School. The institutional affiliation is noted for identification purposes only.

1

Exhibit 15
Page 00686

While we debate the pending proposals to reduce gun violence through measures focused on gun safety as part of a holistic national response, it's crucial that we not permit any part of our Constitution to become a collateral casualty of our conversation. Proposals to disarm the American people, to leave firearms solely in the hands of the military and the police, have been decisively taken off the table – if they were ever truly *on* the table – by the Supreme Court's Second Amendment decisions in 2008 and 2010. "Slippery slope" arguments predicated on the unsettled state of the law prior to 2008 have been rendered irrelevant. The only proposals under serious consideration in this body are reasonable measures that would fully respect the basic rights of responsible citizens to use ordinary firearms for self-defense and other lawful purposes. They cannot lead to unacceptably extreme measures as long as the Supreme Court sits.

Having examined those proposals, having looked at the steps announced by the President under his power faithfully to execute the laws of the United States, and having studied the decisions of the Supreme Court and lower courts around the country, I am convinced that nothing under discussion in the Senate Judiciary Committee represents a threat to the Constitution or even comes close to violating the Second Amendment or the Constitution's structural limits either on congressional power or on executive authority.

Undoubtedly we should have a national debate about how best to reconcile the Second Amendment rights of every individual with the full range of proposals to reduce gun violence in America. As someone who has studied and taught constitutional law for four decades and argued dozens of cases in the Supreme Court and dozens more in the lower courts, I am obviously interested in engaging those questions.  In today's testimony, however, I will focus not on

Exhibit 15
Page 00687

**ER_2869**

competing theories of how the Second Amendment ought to have been interpreted but on the law as it stands. I am here not as an academic theorist but as a constitutional lawyer.  As a lawyer, I've won some and I've lost some, and I know a losing argument when I see it. And the argument that any of the proposals to reduce gun violence currently being considered here might be struck down as unconstitutional is decidedly a losing argument.

There is plenty of room for policy debate over the best steps to take to reduce gun violence, but we mustn't confuse those policy differences or the ideological and cultural divisions that underlie them with genuine constitutional doubts about whether any of those steps crosses the constitutional line. Everyone in this room knows that anything Congress or the President does in this field will confront opposition. And in a nation as litigious as ours, some of that opposition will no doubt find its way into the courts.  But there is no basis to suppose that the courts will or should rebuff any of the steps being debated here today.  They should not, and they will not.

What I hope to do this morning, setting all hyperbole aside and approaching the law on the books with a fair-minded eye, is explain why reforms such as those this committee is considering clearly pass constitutional muster.

3

Exhibit 15
Page 00688

ER_2870

### I. Introduction:

### Taking the Second Amendment Seriously, But Applying it Cautiously

I begin by reaffirming my agreement with the Supreme Court that the Second Amendment guarantees Americans the right as individuals to possess guns for reasonable self-defense.  Some of my friends and colleagues devoted to the cause of responsible firearms regulation evidently wish to relitigate this point.  They continue to insist that the best reading of the Second Amendment would secure gun rights only in connection with service in the state militia and not for individual possession and use.  For nearly a decade and a half, I have disagreed with them and have defended the individual rights view ultimately taken by the Supreme Court in 2008.  In October of 1999, for example, I joined a fellow constitutional law scholar in publishing an op-ed in *The New York Times* arguing that "bearing arms [is] a 'privilege' of each citizen."[1]  I continue to defend this position today.

That matters only insofar as it bears on my credibility as a witness in today's hearing. If I were among those who had *opposed* the individual rights interpretation adopted by the Supreme Court in *Heller*, some might wonder whether my conclusions about the regulations *Heller* permits Congress to adopt reflect wishful thinking rather than a realistic and sympathetic appraisal of what the Court that decided *Heller* would in fact permit. But there is no wishful thinking here. I am being a hard-headed realist in reading the *Heller* decision and extrapolating conclusions from the majority opinion.

---

[1] Laurence H. Tribe & Akhil Reed Amar, *Well Regulated Militias and More*, N.Y. TIMES, Oct. 28, 1999, at A25; 1 Laurence H. Tribe, *American Constitutional Law* 900–902 (3d ed. 2000).

4

Exhibit 15
Page 00689

Although many in the community advocating gun rights had long assumed that the individual rights interpretation governed the scope of the Second Amendment, it was not until the Supreme Court's 2008 ruling in *District of Columbia v. Heller*[2] that a majority of the Court's Justices agreed.  In so doing, the Court recognized that the core individual liberty protected by the amendment affords Americans the right to purchase and store operable firearms for self-defense in the home.  Two years later, in *McDonald v. City of Chicago*,[3] the Court extended the *Heller* ruling to cover restrictions imposed by state and local governments, making it unmistakably clear that the right at issue was not and is not simply a right of the state-organized militia against being overrun by federal authority.

Despite this fundamental affirmation, the *Heller* decision is exceedingly narrow in many important respects.  As Judge Brett Kavanaugh of the D.C. Circuit Court of Appeals recently put it, "It bears emphasis that *Heller*, while enormously significant jurisprudentially, was not revolutionary in terms of its immediate real-world effects on American gun regulation." "Indeed," he continued, "*Heller* largely preserved the status quo of gun regulation in the United States."[4]  To understand what he meant, it helps to look first to the Washington, DC ordinance implicated in the *Heller* case.  The District had in place one of the most restrictive firearms regulations in the nation; it essentially outlawed the possession of handguns in the home, where the need for self-defense is, as Justice Scalia wrote, "most acute."[5]  For the majority on the Court, a policy like the one the District had adopted, a policy on the outer edge of gun control's reach in the United States, was irreconcilable with the Second Amendment.

---

[2] 554 U.S. 570 (2008).
[3] 130 S.Ct. 3020 (2010).
[4] Heller v. Dist. of Columbia, 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).
[5] *Heller*, 544 U.S. at 628.

Exhibit 15
Page 00690

**ER_2872**

The *Heller* decision took great pains to emphasize its relative modesty.  It repeated the mantra that the Second Amendment right "is not unlimited"[6] and devoted an entire section to listing types of regulation – for example, limits on gun ownership "by felons and the mentally ill" and, most relevant to today's hearing, regulation of "dangerous and unusual weapons" – the constitutionality of which the Court had no intention of casting into doubt.[7]  The decision paused to note that, by specifically giving a constitutional green light to some regulatory efforts, the Court did not mean to signal that others were constitutionally dubious.[8]  Justice Scalia closed his opinion for the Court with an expression of solicitude for the regulatory goals that Washington, DC sought to advance and, more importantly, an invitation to pursue those goals with the "variety of tools" still available to the District and to other states and localities across the country even in *Heller*'s wake.[9]

Since that decision and its extension to state and local laws in 2010, the vast majority of federal and state courts to adjudicate Second Amendment claims have responsibly hewed to the cautious approach espoused by the Supreme Court in *Heller* and *McDonald*.  For example, in a ruling highly relevant to the topic of this hearing, the D.C. Circuit recently upheld the constitutionality of Washington D.C.'s assault weapons ban, which included a restriction on

---

[6] *Id.* at 595, 626.

[7] *Id.*  at 626 − 28.

[8] *Id.* at 627 n. 26. There is no doubt, for instance, that regulatory provisions targeting firearms and ammunitions *manufacturers* in addition to those who transfer, possess, carry, or use the resulting weapons are at least as easy to defend from Second Amendment challenge as are measures that do not take effect until the point of sale.

[9] *Id.* at 636.

6

Exhibit 15
Page 00691

high-capacity magazines, as well as gun registration requirements.[10]  The majority in the case, following the broad consensus that has emerged among federal and state judges,[11] evaluated the regulations against a standard of heightened judicial scrutiny while preserving both the option to adopt a more skeptical mode of review for restrictions on core self-defense firearm possession and the option to exempt other laws from Second Amendment review entirely when they do not enter the amendment's zone of protected conduct.[12]  In another notable decision staking out a similar approach, a panel of the Seventh Circuit Court of Appeals struck down Chicago's firing-range ban given the close nexus between regular firing practice and training and safe, responsible self-defense in the home.[13]  And state appellate courts from North Carolina to Wisconsin to California have joined with their federal brethren in upholding state restrictions on firearms ownership under this middle-of-the-road approach that molds the degree of judicial scrutiny to the extent of a law's burden on the core self-defense right secured by the Second Amendment.[14]

The central message of *Heller* and its lower-court progeny is thus to take the application of the Second Amendment seriously but also cautiously.  When necessary to vindicate the core right to self-defense respected by *Heller*, neither courts nor lawmakers should be shy about invoking the Second Amendment.  But because few public responsibilities are as important to

---

[10] Heller v. Dist. of Columbia, 670 F.3d 1244 (D.C. Cir. 2011).

[11] *See, e.g.*, Kachalsky v. County of Westchester, 701 F.3d 81, 93 − 94 (2d Cir. 2012); United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) cert. denied, 132 S. Ct. 1538 (U.S. 2012); United States v. Masciandaro, 638 F.3d 458, 469-70 (4th Cir. 2011) cert. denied, 132 S. Ct. 756 (U.S. 2011); United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010);

[12] *Heller*, 670 F.3d at 1256 − 58.

[13] The court applied what it called "not quite strict scrutiny" because the law's burden struck so close to the core Second Amendment right to self-defense in the home.  Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011).

[14] *See, e.g.*, Johnston v. State, 735 S.E.2d 859 (N.C. Ct. App. 2012); State v. Brown, 815 N.W.2d 407 (Ct. App. Wisc. 2012); People v. Ellison, 196 Cal. App. 4th 1342, 1347 (2011).

7

Exhibit 15
Page 00692

ER_2874

good governance as legislating to secure public safety, lawmakers and jurists should not casually give the amendment an expansive scope nor unduly scrutinize reasonable firearm regulations.  In the wake of the Newtown massacre and the push to propose sensible new rules about firearms, the Obama administration and many leaders in Congress have conducted themselves precisely along these lines.

## II. The Second Amendment Propriety of Recent Policy Proposals

### Limits on Large-Capacity Magazines

A core feature of the Assault Weapons Ban of 2013, introduced by Senator Dianne Feinstein, as well as the primary component of a freestanding bill championed by Senator Frank Lautenberg, is a ban on magazines capable of firing more than ten rounds of ammunition without reloading.[15]  Before moving into the weeds of the constitutional analysis, it would be useful to contrast such a high-capacity magazine restriction to the law *Heller* struck down.  *Heller* axed a local ordinance that adopted about as blunt an approach to restraining gun violence as possible: By its very design, the DC law espoused disagreement with the whole idea of law-abiding gun ownership for self-defense in the home.  A limit on large-capacity magazines, by contrast, is a regulation of an entirely different caliber.  It does not challenge the fundamental recognition that gun possession for self-defense is a right of every citizen; it merely seeks to reset the parameters of responsible ownership to advance the cause of public safety.   It operates with a scalpel rather than an ax. Even Robert Levy, the man who largely funded the challenge to DC's sweeping

---

[15] The Assault Weapons Ban of 2013 also prohibits firearms with fixed magazines capable of holding more than ten rounds of ammunition.

Exhibit 15
Page 00693

handgun ban in *Heller* and served as an attorney on the case, concedes that bans on both high-capacity magazines and assault weapons almost certainly do not infringe the Second Amendment rights he successfully fought to vindicate in court.[16]

By any reasonable reckoning, this crucial measure might not even trigger heightened Second Amendment review at the threshold stage that the *Heller* ruling requires courts to undertake. But even if the high-capacity magazine prohibition does require further analysis, it safely falls within a zone of regulations that do not unconstitutionally abridge Second Amendment rights.

Most constitutional challenges require lawyers and scholars to carry out two stages of analysis. First, we must assess whether a given government policy even *implicates* a given right in the first place. For example, in 1915, the Supreme Court entertained a First Amendment challenge to a filmmaker's punishment under an Ohio censorship law but, in a clear misjudgment the Court would later correct, decided that movies were not even a form of "speech" entitled to First Amendment protection.[17] More recently, in a ruling that may perhaps give pause to members of this committee (despite the distinct protections of the Constitution's Speech and Debate Clause), the Court concluded that votes by legislators are not a form of "speech" over which any public official can claim a personal First Amendment right.[18] Assuming that a law *does* implicate the right in question, the government must then proceed to justify the challenged

---

[16] Interview with Robert A. Levy by the Washington Post (Jan. 10, 2013), *transcript available at* http://articles.washingtonpost.com/2013-01-10/lifestyle/36272630_1_assault-weapons-high-capacity-magazines-military-style-guns.

[17] Mut. Film Corp. v. Indus. Comm'n of Ohio, 236 U.S. 230, 243 (1915).

[18] Nevada Comm'n on Ethics v. Carrigan, 131 S. Ct. 2343, 2350 (2011).

9

Exhibit 15
Page 00694

law so that the court hearing the challenge may evaluate, roughly speaking, whether the justification is strong enough to permit the law to stand or, alternatively, whether the measure goes too far and thus violates the Constitution.

I begin with this return to fundamentals because it never ceases to surprise me how often those engaged in legal debate talk past one another by conflating these distinct steps. In the Second Amendment context particularly, there is no excuse for making that mistake. For *Heller* itself makes it absolutely plain that not every gun regulation even triggers Second Amendment review.  In other words, sometimes governments may enact regulations addressing the manufacture, transfer, possession or use of firearms that categorically fall outside the Second Amendment's scope, freeing governments of any burden even to make detailed defenses of the provisions in question.   For example, the *Heller* opinion specifically named "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as illustrative examples of regulations that should not even receive further constitutional review.[19]  The importance of this point should not be underemphasized.  If too many entirely reasonable firearm regulations, like assault weapon bans and background checks, or rules about trafficking and straw purchases, are subjected to heightened Second Amendment review, it will become difficult if not impossible to separate those regulations categorically from the restrictions that *Heller* specifically approved without subjecting them to any "scrutiny" at all.

---

[19] Dist. of Columbia v. Heller, 554 U.S. 570, 626 - 27 (2008).

Exhibit 15
Page 00695

ER_2877

Beyond the examples appearing in the decision, *Heller* also identifies the three primary factors to consider in judging whether other types of regulation trip the Second Amendment's alarm.   First, the Court carefully frames the scope of the Second Amendment to cover *only* firearms "in common use at the time."[20]

Second, *Heller* recognized that "dangerous or unusual" weapons may be and have historically been heavily regulated or banned.[21]  It is not inconceivable – indeed, it seems quite likely – that the Court's pause to distinguish unusually dangerous weapons from widely possessed handguns had precisely the 1994 Assault Weapons Ban, which included a prohibition on high-capacity magazines, in mind.   At the very least, the *Heller* majority recognized that the government could keep machine guns —"M-16 rifles and the like"—out of the hands of civilians.[22] The Supreme Court thus emphatically rejected the extravagant, or as Justice Scalia characterized it, "startling" notion, still promoted by some, that the Second Amendment could fulfill its original purposes only if citizens were guaranteed a right to arm themselves to the teeth, matching in their private armories essentially the full array of weapons possessed by the United States Military.[23]

Third and finally, the Court emphasized the importance of a nexus to core self-defense needs.[24]  The majority in *Heller* had no trouble recognizing that handguns represented the

---

[20] *Id.* at 627.
[21] *Id.*
[22] *Id.*
[23] *Id.* at 624.
[24] *Id.* at 599 ("Justice Breyer's assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms . . . is profoundly mistaken.  He bases that assertion

11

Exhibit 15
Page 00696

ER_2878

"quintessential self-defense weapon," particularly in the home.[25]  Moreover, handguns were not categorically more dangerous than other types of firearms.  So Washington D.C.'s handgun ban clearly fell within the scope of the Second Amendment.

The clarity of *Heller*'s guidance on how to apply these threshold factors begins to dissipate, however, when they no longer align so strikingly in one direction.  To begin with, the Court left "dangerousness" undefined, and what the Court meant by that term is not entirely self-evident.  In an obvious sense, *all* firearms are dangerous; that is what makes them effective instruments of self-defense.  The *Heller* ruling, therefore, asks us to balance any *exceptional* dangerousness of particular firearm design features against the potential self-defense value of those features.  For example, even if home possession of machine guns for self-defense might, on rare occasion, deter criminal trespassers more than home possession of handguns, that benefit is simply not sufficient to overcome the substantial hazards to innocent bystanders and intentional targets, in particular the police.  *Heller* obviously does not contemplate asking the government to provide an intricately reasoned justification for banning machine guns; instead, it recognizes – and it surely authorizes Congress, and indeed all of us, to recognize – excessive dangerousness in the inherent design of the weapon[26] so as to cut off Second Amendment review at the threshold.

---

solely upon the prologue—but that can only show that self-defense had little to do with the right's *codification;* it was the *central component* of the right itself." (emphasis in original)).
[25] *Heller*, 544 U.S. at 629.
[26] Throughout this debate, opponents of restrictions on large-capacity magazines have repeatedly demanded empirical evidence showing a link between magazine capacity and gun violence. Studies in that mold certainly exist, and I discuss them later. *See, e.g.,* text accompanying notes 48 – 50.  But at this threshold stage of the Second Amendment inquiry, the *Heller* decision's meaning of dangerousness cannot be equivalent to an empirically demonstrated effect on public safety.  Rather, the standard is one that asks us to examine design features to assess whether the

12

Exhibit 15
Page 00697

All things considered, I conclude that reasonably restricting magazine size and availability does not implicate the core Second Amendment right as *Heller* conceived of it.   The reason is not the first factor, that of "common use," because, of course, large-capacity ammunition magazines and the firearms outfitted for them are, by any reasonable measure, in quite common use in the United States.   I note here just a few examples.   The standard Glock pistol, the firearm that one reporter called "America's handgun" in a recent book on the subject, comes equipped with a seventeen-round magazine.[27]   And America's most popular rifle, the AR-15 model,[28] typically comes with a thirty-round magazine and can accommodate magazines with even larger capacities.[29]

But to contend that the sizeable market presence of a particular firearm feature is sufficient in itself to trigger full Second Amendment scrutiny is to misrepresent the lesson of *Heller*.   The relative dangerousness and self-defense-serving capacity of a firearm or design

---

weapon poses an aggravated threat to safety as a common-sense matter.  First, if the former were the meaning of dangerousness, the threshold inquiry, which may lead courts to conclude that the Second Amendment does not even apply, would become indistinguishable from the more advanced stage of review, in which courts scrutinize a government's public safety rationale. Second, making empirical evidence of salutary public-safety impacts a prerequisite to gun regulation would defeat efforts to respond to new technologies and lethal features that pose a substantial threat to public safety.  The Second Amendment does not require that Americans afford the gun industry a "wait and see" grace period on the (in)famous theory that even a vicious dog deserves one free bite.

[27] Erin McCarthy, *Why the Glock Became America's Handgun,* POPULAR MECHANICS (Jan. 12, 2012, 6:30 AM), http://www.popularmechanics.com/technology/military/weapons/why-the-glock-became-americas-handgun

[28] Erica Goode, *Rifle Used in Killings, America's Most Popular, Highlights Regulation Debate*, N.Y. TIMES (Dec. 16, 2012), http://www.nytimes.com/2012/12/17/us/lanza-used-a-popular-ar-15-style-rifle-in-newtown.html?pagewanted=all.

[29] Steven Almasy, *Newton Shooter's Guns: What We Know*, CNN (Dec. 19, 2012, 10:11 AM), http://www.cnn.com/2012/12/18/us/connecticut-lanza-guns/index.html.

Exhibit 15
Page 00698

feature are also crucial considerations.  This approach makes complete sense.  The common use and possession of a given firearm feature is, at best, just one helpful indicator of whether restricting that feature will stymie or frustrate the exercise of the core Second Amendment protection of lawful self-defense to a constitutionally cognizable degree.  For instance, in the case of high-capacity magazines, significant market presence does not necessarily translate into heavy reliance by American gun owners on those magazines for self-defense.  Analysis of the modern development of the U.S. gun market demonstrates that the firearms industry, driven by an obvious profit motive, ushered in a revolution in the state of the market during the 1980s.  Manufacturers began to roll out increasing numbers of pistols with ever-larger-capacity magazines rather than revolvers, which take just six rounds of ammunition and had traditionally been the most popular firearm for personal self-defense.[30]  The frequent purchase of such large-capacity magazines, then, may not be attributable purely or even primarily to actual gun-owner preferences, much less to gun-owner needs.  Rather, guns equipped with or ready for large-capacity magazines may simply be the weapons most readily made available on the market.  And even if this market presence begins to influence more Americans to purchase firearms with high-capacity magazines because they fear attacks from criminals possessing guns outfitted with the same high-capacity magazines, nothing in *Heller* suggests that it is improper for the government to halt the escalation of this arms race in its tracks.  The one-way ratchet of ever more powerful firearms is not a constitutional inevitability. For unlike the doctrine of mutually assured destruction that some say maintained an uneasy peace during the nuclear arms buildup of the

---

[30] *See* DC Reedy & CS Koper, *Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers*, 9 INJURY PREVENTION 151, 151 (2002), *available at* http://injuryprevention.bmj.com/content/9/2/151.full#aff-1.
 VIOLENCE POLICY CENTER, BACKGROUNDER ON GLOCK 19 PISTOL AND AMMUNITION MAGAZINES USED IN ATTACK ON REPRESENTATIVE GABRIELLE GIFFORDS AND OTHERS 1 (2011), *available at* www.vpc.org/fact_sht/AZbackgrounder.pdf.

Exhibit 15
Page 00699

**ER_2881**

Cold War, the propagation of increasingly dangerous guns on American streets has already taken an all-too- violent toll.  In other words, tempering the trend toward more dangerous weapons actually *vindicates* the core Second Amendment right of self-defense and personal safety that *Heller* recognizes. In this context, as in many others, less is more.

But even looking beyond the market saturation of large-capacity magazines, this feature runs headlong into the other threshold obstacles that *Heller* requires Second Amendment claims to clear.   As experts in effective firearms regulation have preached for years and particularly fervently in recent weeks, higher-capacity magazines pose greater dangers to public safety.  By permitting shooters using semi-automatic weapons to continue firing more bullets without interruption, these magazines increase the potential lethality of armed killers.[31]  Though well-trained gun users can change magazines quickly, this interruption may, as we saw last year in the Arizona shooting of Rep. Gabby Giffords, afford time for heroic men or women to intervene and disarm the shooter.[32]  Moreover, this interruption gives our police a chance to return fire.[33]  And it may even provide time for reflection and rethinking before murder becomes massacre.

---

[31] BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, ASSAULT-STYLE WEAPONS: HIGH-CAPACITY MAGAZINES, http://www.bradycampaign.org/legislation/msassaultweapons/highcapacity (last visited Feb. 2, 2013).

[32] Ken Dolak & Justin Wealer, *Woman Wrestled Fresh Ammo Clip From Tucson Shooter as He Tried to Reload*, ABC NEWS (Jan. 9, 2011), http://abcnews.go.com/Politics/patricia-maisch-describes-stopping-gunman-reloading/story?id=12577933.

[33] I believe I can speak for many Americans when I thank Baltimore County Police Chief Jim Johnson for the illuminating insights he has publicly offered on the threats of high-capacity weapons not just to public safety in general but also law enforcement officer safety more specifically.  *See, e.g.*, John Quinones, *Baltimore Police Chief Wants to Ban High-Capacity Firepower*, ABC NEWS (Dec. 20, 2012), http://abcnews.go.com/US/baltimore-police-chief-ban-high-capacity-firepower/story?id=18030163

Exhibit 15
Page 00700

Against the evident dangerousness of high-capacity magazines as a design feature, we must evaluate the strength and plausibility of asserted self-defense interests. Critics of recent proposals to reestablish a limit on high-capacity magazines have argued that firing more than ten rounds without changing a magazine is necessary for effective self-defense. While I have no doubt that subscription to this perspective among some law-abiding gun owners is sincere, I doubt that it is well-founded. It's rhetorically effective to ask, "How many bullets do *you* want in your magazine when an intruder breaks into your home?" But the answer tells us little that is of relevance to the Second Amendment as *Heller* conceives that provision. I might want a magazine with twice as many bullets as any possible home intruder; I might want a machine gun too. But in the end that can't be the measure of what the Second Amendment says I have a *right* to own and deploy.

Despite the emotional resonance of this kind of appeal, incidents like burglaries and home invasions – even when they lead to the exchange of fire – are unlikely to *require* firing many shots. The NRA publishes a regular column featuring newspaper clippings of gun owners protecting themselves against intruder attacks, and an analysis of these reports over a five-year period demonstrated that in 50% of all cases, two or fewer shots were fired, and the average number of shots fired across the entire data sample was also about two.[34] Of course, this data comes from the episodes the NRA chooses to report, so selection bias is possible, meaning the

---

[34] Claude Verner performed the analysis of reporting over the period 1997 to 2001. The findings further show that when many shots were fired, a (presumably frightened) gun owner finished an entire magazine rather than firing the number of shots that necessarily had to be fired in light of the scenario. The analysis can be found reprinted with the author's permission at *Analysis of Five Years of Armed Encounters (With Data Tables)*, GunsSaveLives.net (March 12, 2012), http://gunssavelives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables/.

16

Exhibit 15
Page 00701

**ER_2883**

average number of shots fired per incident could be even lower.[35]   Even police officers traditionally found revolvers with six-bullet magazines sufficient for their own safety until more dangerous guns flooded the market.[36]   And we should not lose track of the bigger picture: studies show that self-defense in the home with firearms is rare.[37]   Additionally, firearms accidents are all too common: between 1965 and 2000, unintentional shootings accounted for the deaths of over 60,000 Americans.[38]   Firing more bullets quickly may compound their damage.

Another version of the critics' response is that in scary situations, like home invasions, gun owners may go through bullets too quickly in a fit of nervousness or panic.[39]   That may be true, but it also aggravates the downside hazard in cases of error,[40] so it is not at all clear that increased access to large-capacity magazines for shooters subject to fragile nerves represents a

---

[35] It seems likely, for example, that merely brandishing a weapon may often lead intruders to flee.  A non-exhaustive review of the NRA column reveals several examples of exactly this scenario, giving me the impression that the NRA's reporting is not demonstrably biased toward extreme scenarios or even those in which some shots are fired.   *See, e.g.*, Armed Citizen, NRA (March 2012), http://www.nrapublications.org/index.php/12492/armed-citizen-23/ ("[The resident] met the intruder at her bedroom door, pointed the gun at him and demanded he leave. The trespasser fled without hesitation.").

[36] *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. REV. 1443, 1489 (2009).

[37] A study of Atlanta police records, for example, found that victims of burglaries used guns in self-defense just 3% of the time.  For a description of the study and a rich discussion of self-defense uses for firearms, see DAVID HEMENWAY, PRIVATE GUNS, PUBLIC HEALTH 67 (2004). The study is A.L. Kellermann et al., *Weapon involvement in home invasion crises*, 273 J. OF THE AM. MED. ASSOC. 1759 (1995).

[38]  HEMENWAY, *supra* note 38, at 27 – 35.

[39] *See, e.g.*, Heller v. Dist. of Columbia, 670 F.3d 1244, 1261 (D.C. Cir. 2011); Emily Miller, *The High Capacity Magazine Myth*, WASHINGTON TIMES (Jan. 27, 2013), http://www.washingtontimes.com/news/2013/jan/27/the-high-capacity-magazine-myth/; Jacob Sullum, *The Threat Posed by Gun Magazine Limits*, REASON (Jan. 16, 2013), http://reason.com/archives/2013/01/16/the-threat-posed-by-gun-magazine-limits.

[40] *Heller*, 670 F.3d at 1263 - 64 ("[T]he tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." (internal quotations omitted)).

Exhibit 15
Page 00702

ER_2884

net gain for home security or public safety.  Finally, some critics of magazine-capacity limits have pointed out that, realistically, many gun owners have not received proper training and for that reason, may fire bullets indiscriminately; a larger magazine – so the thinking presumably goes – will increase the chances that at least one of their wayward shots will hit its mark.[41]  As the Supreme Court recognized in *Heller*, however, the Second Amendment protects only the right of "*responsible* citizens to use arms in defense of hearth and home."[42]  In other words, a dangerous firearms feature otherwise outside the Second Amendment's scope cannot become subject to heightened constitutional scrutiny because of the shortcomings of *irresponsible* gun owners.

To be sure, *some* gun owners may struggle to change magazines quickly not for lack of adequate training but rather by reason of disability or old age.[43]  Perhaps a ban on high-capacity magazines without any exception for the disabled or elderly might, for this reason, trigger heightened scrutiny of such a ban as applied specifically to those individuals.  But the possibility that a prohibition could raise constitutional questions in some subset of its applications does not mean that the prohibition is constitutionally vulnerable on its face.[44]  And it remains the case that

---

[41] *See, e.g.*, Stephen Hunder, *Why 33 rounds makes sense in a defensive weapon*, WASHINGTON POST (Feb. 6, 2011),
 http://www.washingtonpost.com/wp-dyn/content/article/2011/02/04/AR2011020407083.html
[42] Dist. of Columbia v. Heller, 554 U.S. 570, 635 (2008) (emphasis added).
[43] Yih Chau-Chang, *High-Capacity Magazines And Their Critical Role In Lawful Self-Defense*, THE EXAMINER (March 10, 2011), http://www.examiner.com/article/high-capacity-magazines-and-their-critical-role-lawful-self-defense
[44] The Supreme Court has exhibited an extreme reluctance to strike down laws on their face – meaning in all applications – when only some applications would fall afoul of a constitutional provision (with the exception of the First Amendment, as facially overbroad laws may chill protected free speech).  *See* RICHARD H. FALLON, DANIEL J. MELTZER & DAVID L. SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 162, 168 (6th ed. 2009).

18

Exhibit 15
Page 00703

ER_2885

large-capacity magazines are highly unlikely to be necessary to self-defense in the vast majority of home invasions or burglaries, even those that resort to the exchange of fire. The facial validity of a high-capacity magazine ban is therefore clear.

Despite the considerable market presence of high-capacity magazines, the danger they pose to public safety and the weakness of the self-defense justification for their possession means that two of the three threshold *Heller* factors point strongly against extending Second Amendment protection to high-capacity magazines.   The D.C. Circuit Court of Appeals, in a case challenging Washington D.C.'s restriction on magazines with more than ten rounds, recently struggled with this first stage of analysis and determined that the court did not have before it sufficient evidence to decide whether the Second Amendment even *reached* large-capacity magazines.[45]  However, the court went on to conclude that, even if it was proper to extend coverage of the amendment to large-capacity magazines, the government's interest in banning them was strong enough to do so without violating Second Amendment rights.[46]

Having now reviewed the best evidence and argumentation advanced by defenders of high-capacity magazine possession, I doubt that the Supreme Court would find it necessary to reach that second stage of review in dealing with a ban on high-capacity magazines and am quite confident that, in any event, the Court would agree with the ultimate conclusion that, even if the amendment applies, a ban on high-capacity magazines withstands Second Amendment scrutiny.

---

[45] *Heller*, 670 F.3d at 1261.
[46] *Id.* at 1263 − 64.

19

Exhibit 15
Page 00704

ER_2886

In explaining that conclusion, I emphasize that commonly advanced rejections of a legitimate government interest in banning high-capacity magazines are deeply misleading. Many opponents of reasonable firearms regulation insist that we tried banning large-capacity magazines in 1994: the results are in, they say, and we failed. One favorite trope is to cite to a 1997 Department of Justice study, which, according to the recent testimony of Wayne LaPierre, "proved that [the] ban had no impact on lowering crime."[47] But no one is even *arguing* that a ban on high-capacity magazines (or on assault weapons, for that matter) will necessarily decrease crime rates; highly lethal firearms will still be widely available on the market, and some criminals will use them, just as they do now.

What defenders of a ban on high-capacity magazines *do* argue is that such a ban will help prevent these criminals from killing or maiming as many people when they commit violent crimes. And that argument is solidly grounded. One study, for example, found that between 1984 and 1993, criminals using guns with high-capacity magazines or assault weapons as defined by the 1994 Assault Weapons Ban killed or injured an average of 29 victims, compared to the average 13 victims shot by criminals unequipped with large-capacity magazines.[48] Another study suggests that, since the lapse of the ban in 2004, high-capacity magazines have once again

---

[47] *See, e.g.*, *What Should America Do About Gun Violence?: Hearing Before the S. Judiciary Comm.*, 113th Cong. (2013) (prepared testimony of Wayne LaPierre, Executive Vice President and Chief Executive Officer of the National Rifle Association).

[48] This study considered all "mass shooting" incidents: those in which six or more were killed or twelve or more were wounded. For an explanation of this study, see Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, *in* REDUCING GUN VIOLENCE IN AMERICA 167 (Daniel W. Webster & Jon S. Vernick, eds., 2013). The study is Christopher S. Koper & Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 J. OF QUANTITATIVE CRIMINOLOGY 33 (2001).

Exhibit 15
Page 00705

become common in episodes of violent crime after the beginnings of a decline, which probably took place because the black market for these magazines had begun to dry up.[49]

Even more misleading is the suggestion that in 1997 we could (or even today that we can) draw meaningful conclusions from the absence of unmistakable evidence of a decrease in violence following the 1994 ban.  That legislation grandfathered or exempted many thousands of weapons already owned, and those could still be sold or transferred.[50]  In other words, the 1994 ban was crafted with long-term effects in mind; to measure its effects notwithstanding its untimely end is to misunderstand fundamentally how the legislation was designed to work.  It is therefore all the more telling that supporters of reasonable regulation can cite studies based upon identifiable trends emerging during the latter years of the ban, as well as evidence from both before and after the ban, showing that the legal availability of large-capacity magazines is indeed correlated with increased deaths and injuries caused by gun violence.  Considered alongside the dangerousness inherent in a large-capacity magazine as a design feature, this evidence provides the government with a sufficient basis to satisfy the Second Amendment under any plausible understanding of the Supreme Court's jurisprudence surrounding that amendment.

---

[49] *See* David S. Fallis and James V. Grimaldi, *Va. data show drop in criminal firepower during assault gun ban*, WASH. POST (Jan. 23, 2011), http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html (finding that in Richmond, Virginia, the percentage of guns with high-capacity magazines seized from criminals by police fell to a low of 10% by 2004, when the federal assault weapons ban expired, but has since rebounded to 22%).
[50] Koper, REDUCING GUN VIOLENCE IN AMERICA, *supra* note 49, at 165 – 66.

Exhibit 15
Page 00706

**ER_2888**

**Assault Weapons Ban**

By many accounts, the most important component of the newly proposed assault weapons ban is its prohibition on high-capacity magazines.[51]  But that does not mean that the remaining features of the proposal stand on weaker constitutional ground.   Far from it.  Application of *Heller*'s three threshold factors – dangerousness, commonness of use, and connection to core self-defense interests – demonstrates that the Second Amendment does not provide legal shelter to the features that trigger a firearm's prohibition under the ban.

Opponents of the legislation as well as some proponents of new firearms regulation have observed that some of the "military characteristics" that can lead to prohibition under the legislation[52] (and, by some accounts, under assault weapons bans in general[53]) are mostly cosmetic traits designed to make a gun *appear* dangerous and are not, in fact, intrinsically hazardous.  But Congress would surely be acting within its constitutional authority if it were to reject this characterization as self-serving or otherwise unreliable. For example, the Brady Campaign to Prevent Gun Violence insists that "[p]istol grips . . . help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position [and that] [b]arrel

---

[51] Tom Diaz, a researcher for the Violence Policy Center, has repeatedly called on lawmakers to focus their attention on a high-capacity magazine ban.  *E.g.*, Tom Diaz, *Ten Ways to Spot a Sell-Out on Gun Control*, FAIRLY CIVIL (Jan. 14, 2013, 2:26 PM), http://tomdiazgunsandgangs.com/2013/01/14/ten-ways-to-spot-a-sell-out-on-gun-control/ ("An effective law will focus on one prime feature—the ability to accept a high-capacity magazine.").

[52] *See, e.g.*, *What Should America Do About Gun Violence?: Hearing Before the S. Judiciary Comm.,* 113th Cong. (2013) (statement by Sen. Ted Cruz) ("Now, what the assault weapons ban instead targets are cosmetic features.").

[53] See, e.g., Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1295 (2009).

22

Exhibit 15
Page 00707

**ER_2889**

shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession."[54]  Moreover, even if the characterization of these features as cosmetic were accurate, it would make little difference as a constitutional matter.   In a recent televised interview, Justice Scalia explained the basis in history for exempting certain types of regulations from Second Amendment review.  Certain limitations on gun ownership are constitutionally permissible, he contended, "because there were some [regulations] that were acknowledged at the time [of the Founding]. For example, there was a tort called affrighting . . . if you carried around a really horrible weapon just to scare people, like a head ax or something. . . ."[55]  What the Justice evidently meant was that regulating weapons because they are chosen specifically for their intimidating appearance is constitutionally unproblematic because the very use of intimidation is unnecessarily disruptive to organized society.[56]

Even more important to the constitutionality of the assault weapons ban is the absence of any connection to the core Second Amendment right to defend oneself with a firearm.  At this committee's hearing on January 30, several witnesses criticized the assault weapons ban on policy grounds, but in my role as a constitutional lawyer listening intently for arguments relevant to the proposal's Second Amendment propriety, I was struck by the failure of anyone's

---

[54] Brady Campaign to Prevent Gun Violence, The Top 10 NRA Myths About Assault Weapons, http:// www.bradycampaign.org/issues/assaultweapons/nramyths/.

[55] Interview with Justice Antonin Scalia by Chris Wallace, FOX NEWS SUNDAY (July 29, 2012), *transcript available at* http://www.foxnews.com/on-air/fox-news-sunday/2012/07/29/justice-antonin-scalia-issues-facing-scotus-and-country#p//v/1760654457001.

[56] Justice Scalia's point about the tort of affrighting surfaces in the *Heller* decision itself: the majority opinion cited three illustrative examples of state courts entertaining such actions in the nineteenth century.  *See* Dist. of Columbia v. Heller, 554 U.S. 570, 627 (2008) (citing, e.g., State v. Lanier, 71 N.C. 288, 289 (1874) ("The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same. . . .")).

Exhibit 15
Page 00708

testimony to support these features as essential to self-defense.   In fact, I have searched in vain for any reasoned arguments that pistol grips, forward grips, telescoping stocks, grenade or rocket launchers, and barrel shrouds are indispensable or even contribute to self-defense.

Finally, it is relevant to ask how many assault weapons Americans currently own.  Data is hard to come by in large part because firearms manufacturers refuse to release data tracking their sales.[57]  What we do know is that the number of weapons that would qualify under either the proposed ban's so-called "characteristics test" or its explicit list of banned models is smaller than the number of guns with standard-issue high-capacity magazines.[58]  One reporter's painstaking analysis estimated that there are 3.75 million AR-15-style rifles owned in the U.S. today, and AR-15s are the most popular although not the exclusive type of qualifying assault weapon.[59]  The NRA's lobbying arm estimates that, depending upon the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S.[60]  Given that the Congressional Research Service recently found that, as of 2009, Americans own about 310 million guns,[61] the NRA's estimate would translate into approximately 7 million assault weapons owned today. Although 7 million is hardly a negligible figure, it still corresponds to quite a small portion of the

---

[57] Justin Peters, *How Many Assault Weapons Are There in America? How Much Would It Cost the Government To Buy Them Back?,* SLATE (Dec. 20, 2012), http://www.slate.com/blogs/crime/2012/12/20/assault_rifle_stats_how_many_assault_rifles_are_there_in_america.html.

[58] *See* Koper, REDUCING GUN VIOLENCE IN AMERICA, *supra* note 49, at 161 (explaining that the universe of large-capacity magazine equipped firearms is broader than the universe of weapons satisfying the criteria for categorization as an assault weapon).

[59] Peters, *supra* note 58.

[60] *Top Ten Frequently Asked Questions*, NRA-ILA, http://www.gunbanfacts.com/FAQ.aspx (last visited February 2, 2013).

[61] WILLIAM J. KROUSE, CONG. RES. SERV., RL32842, GUN CONTROL LEGISLATION 8 (2012).

Exhibit 15
Page 00709

ER_2891

overall gun market – hardly enough to justify calling such weapons "common" within the meaning of *Heller*.

But for the purposes of constitutional analysis, debating how to characterize the significance of assault weapons' market presence would be a waste of time. To make a difference to *Heller*'s threshold inquiry, which must take notice of the complete lack of any connection of assault-weapon features to self-defense as well as these features' dangerousness in both fact and appearance, the market presence of assault weapons would have to be overwhelmingly large (and even then, I doubt seriously the bottom line would change as a constitutional matter). And overwhelmingly large it assuredly is not.

**<u>Universal Registration and Background Checks</u>**

All responsible participants in the gun safety debate agree that some groups of people simply should not be allowed to own, keep, or carry guns. Those groups include children, dangerous felons, and those with serious mental illnesses that preclude safe gun ownership. When some observers casually compare the Second Amendment to the First, they forget this essential difference: Although freedom of speech sometimes comes at a price, and although speech can at times pose dangers, our constitutional system addresses those dangers by permitting government to impose carefully crafted limits on speech, not by limiting or licensing eligible speakers. The Constitution's strategy with respect to guns is entirely different. It addresses the dangers of guns in the wrong hands by permitting government to keep them out of

Exhibit 15
Page 00710

those hands in the first place, and, of course, by permitting government to regulate where and under what conditions people can bear those weapons in possible confrontation with others.

Accordingly, this Congress might be called upon to consider measures designed to minimize the risk that guns fall into the hands of such prohibited purchasers and owners. Measures dealing with straw purchases and trafficking are obviously important in that effort and are clearly constitutional. Rather than spending the committee's time on those measures, I will focus here on provisions that mandate universal registration requirements or a universal background check, closing the many notorious loopholes that characterize current laws on the subject. There is no serious doubt that requiring universal registration or a universal background check would comply with the Second Amendment.

It is important to recognize, at the outset, that prohibiting particular groups of people from owning or possessing guns is fully compatible with the Second Amendment. In the first place, such prohibitions are consistent with the original and traditional understanding of the Second Amendment. It was widely accepted at the time of the framing that not every person had a right to keep and bear arms; instead, the right was closely tied to the notion of responsible citizenship, and it has long been denied to criminals and others whose possession of guns would pose a severe danger to the public.[62] On this point, precedent aligns closely with history. The Supreme Court said in *District of Columbia v. Heller*: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the

---

[62] *See United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009).

Exhibit 15
Page 00711

ER_2893

mentally ill …"[63] The Court fortified this conclusion in *McDonald v. City of Chicago*, when it added: "We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill' … We repeat those assurances here."[64]

Once the constitutionality of prohibiting gun possession by some people is accepted, the constitutionality of a reasonable system of registration or background checks follows automatically. The most powerful argument for this inference is not a technical legal point; it is, instead, common sense. And, although it shouldn't be necessary to cite authority for the point, it's worth noting that as eminent an authority as Alexander Hamilton wrote in *The Federalist* that "[t]he rules of legal interpretation are rules of *common sense*," and that the "true test" of a "just application" of these rules is whether the resulting interpretation is "consistent with reason and common sense."[65]

Consider, then, whether the Constitution would be "consistent with reason and common sense" if it allowed prohibitions on firearms purchases by felons but disallowed background checks to determine whether a felon was the would-be purchaser of a firearm. As a matter of common sense, we all know that guns do not of their own accord stay out of the hands of prohibited purchasers. Nor are prohibited purchasers likely to confess their legal inability to buy guns when talking to gun dealers. The prohibitions, in short, do not enforce themselves. In order to be effective, in order to be meaningful, in order to be anything more than rules on paper, they

---

[63] 554 U.S. 570, 626 (2008).
[64] 130 S. Ct. 3020, 3047 (2010) (plurality opinion).
[65] *The Federalist* No. 83, at 495 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

Exhibit 15
Page 00712

**ER_2894**

must be comprehensive and must be carried into operation by the government. It contradicts common sense—it ignores the fact that "the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men"[66]—to say on the one hand that prohibiting felons from owning guns is constitutional, but to insist on the other hand that the background checks that seek to make those prohibitions effective are unconstitutional.

The Supreme Court's decisions in *District of Columbia v. Heller* and *McDonald v. City of Chicago* confirm the constitutionality of reasonable background check requirements. *Heller* expressly affirms that the Court was not calling into doubt "laws imposing conditions and qualifications on the commercial sale of arms."[67] The *McDonald* Court "repeat[ed] those assurances," observing that its holding "does not imperil every law regulating firearms."[68] The universal registration requirement or background check is simply a "condition[]" on the transfer of arms; it is therefore expressly within the zone of permissible regulation identified by *Heller* and *McDonald*.

Analogous Supreme Court doctrine points in the same direction. The right to vote, like the right to keep and bear arms, is a fundamental right of Americans.[69] But no serious legal scholar doubts that before letting a citizen cast his ballot, the government may require the citizen to register and may take steps to check whether he or she really is an eligible voter. And the

---

[66] *NFIB v. Sebelius*, 132 S. Ct. 2566, 2589 (2012) (opinion of Roberts, C.J.) (quoting *South Carolina v. United States*, 199 U.S. 437, 449 (1905)).

[67] 554 U.S. at 626–27.

[68] 130 S. Ct. at 3047 (plurality opinion).

[69] *Compare Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) (holding that the right to vote is fundamental), *with McDonald v. City of Chicago*, 130 S. Ct. 2020 (2010) (holding that the right to keep and bear arms is fundamental).

Exhibit 15
Page 00713

Supreme Court agrees; in *Crawford v. Marion County Election Board*, for example, it concluded that Indiana's voter ID law was a permissible means of ensuring that only eligible voters participate in an election.[70] Checking whether a voter is eligible before giving that voter a ballot is comparable to checking whether a purchaser is eligible before letting her acquire a gun. Just as the former is constitutional, so is the latter. And the argument is of course even stronger in the instance of firearms. For, unlike a ballot in the hands of an ineligible voter, which might in the end prove to make no difference to who wins or loses the election at issue, a gun in the hands of even one ineligible owner poses a deadly danger all by itself.

History reinforces common sense and case law in this regard. The Supreme Court in *Heller* and *McDonald* stressed the role of history in interpreting the scope of the Second Amendment; "longstanding" prohibitions upon gun ownership, the Court indicated, are presumptively exempt from Second Amendment scrutiny.[71] Lower courts have likewise noted that history plays an important, though not exclusive, role in determining the scope of permissible regulation under the Second Amendment.[72] Measures to keep guns out of the hands of prohibited owners – owners who could not safely be entrusted with control of a lethal weapon – have a strong historical pedigree. For example, many states have longstanding laws— sometimes, laws dating back a century or more—requiring sellers to keep registers of all firearm purchasers; the registers had to be open to peace officers.[73] The government could use thus use

---

[70] 553 U.S. 181 (2008) (plurality opinion).

[71] *See* 554 U.S. at 626–27; 130 S. Ct. at 3047 (plurality opinion).

[72] *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010).

[73] *See Heller*, 670 F.3d at 1253–54.

Exhibit 15
Page 00714

these registers to determine whether any of the purchasers had obtained weapons in violation of the law.

To be sure, modern computerized background checks differ from the more cumbersome historical enforcement measures known to hisory. But "a constitution [is] intended to endure for ages to come."[74] Just as the Second Amendment covers modern weapons, like handguns, that did not exist when the Bill of Rights was ratified in 1791, so too does it cover modern enforcement measures, like mandatory computerized background checks, that could not have been anticipated in 1791. Reasonable background checks fit into the long historical tradition to which registration requirements belong, and that is enough to sustain them without further ado under the tests established by the Supreme Court in *Heller* and *McDonald*.

In short, all relevant legal considerations—logic and common sense, directly applicable precedent, analogies to surrounding legal doctrines, and history and tradition—point to the same conclusion. The Second Amendment does not prohibit Congress from passing laws to carry into effect concededly constitutional prohibitions on firearm purchases. The universal background check, in particular, easily passes constitutional muster as a permissible regulation of the transfer of firearms.

This is not to say that all conceivable background check systems would comport with the Constitution. Suppose, for example, that Congress were to pass a law requiring handgun purchasers to undergo an extensive check on the purchasers themselves and all their family

---

[74] *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819).

Exhibit 15
Page 00715

members and housemates, a check that took years to complete. Such a scheme would plainly impose a very severe burden on the right to keep and bear arms for self-defense. The burden would be entirely disproportionate to the objective the government is seeking to pursue. Where a background check is taken to such lengths that it effectively destroys the right to keep and bear arms, rather than ensuring that the right is enjoyed only by those constitutionally entitled to it, the government has overstepped the lawful boundaries of its power.

Such concerns are entirely out of place here, however. Whether a particular background check scheme that Congress adopts would go too far obviously depends on the specific details of that scheme. But none of the proposals seriously under consideration at the present come remotely close to overstepping constitutional boundaries. The proposed background check frameworks, especially those that rely on checks conducted instantaneously through the National Instant Background Check System, impose a constitutionally insignificant burden upon law-abiding citizens. Indeed, an instant background check is much *less* onerous than the Voter ID law that the Supreme Court upheld in *Crawford v. Marion County Election Board*; it is also much less cumbersome than longstanding registration requirements and other conditions on sale[75] that are concededly constitutional. Ultimately, therefore, I see no merit to the constitutional objections to the background check proposals presently being seriously considered by Congress.

### III. The Consistency of the President's Measures with the Separation of Powers

---

[75] *See Heller*, 670 F.3d at 1253.

Exhibit 15
Page 00716

**ER_2898**

This January, President Obama announced twenty-three steps that his Administration would take to prevent gun violence.[76] The President has begun to implement these steps by using the executive powers vested in him by the Constitution and laws of the United States. Because the President adopted these measures by executive action, without specific congressional involvement, some have concluded that the President violated the separation of powers established by the Constitution. This claim is legally untenable; the President is acting well within his powers as head of the executive branch.

Some of the President's measures involve nothing beyond communicating with members of the public. Measure 23, for example, is to "[l]aunch a national dialogue … on mental health." There is plainly no constitutional problem with executive steps of this sort. The President obviously does not need congressional permission every time he decides to give a speech or publish a press release.

Another category of measures—and this covers the great majority of the actions that the President has committed to take—includes steps that will improve the enforcement of federal laws already on the books. Thus, the President has agreed to "[m]aximize enforcement efforts to prevent gun violence and prosecute gun crime."[77] He has likewise decided "to require federal law enforcement to trace guns recovered in criminal investigations."[78] These improvements to

---

[76] *See, e.g.*, Colleen Curtis, *President Obama Announces New Measures to Prevent Gun Violence*, Jan. 16, 2013, available at http://www.whitehouse.gov/blog/2013/01/16/president-obama-announces-new-measures-prevent-gun-violence.

[77] Measure 13.

[78] Measure 9.

Exhibit 15
Page 00717

**ER_2899**

federal law enforcement efforts plainly fall within the President's constitutional power—and constitutional responsibility—to "take Care that the Laws be faithfully executed."[79]

A third group of measures involves the making of rules and regulations under preexisting congressionally granted authority. For instance, step 21—"[f]inalize regulations clarifying essential health benefits and parity requirements within ACA exchanges"—simply carries into effect authority granted by the Patient Protection and Affordable Care Act.[80]

Step 11, "[n]ominate an ATF director," is equally clearly within the President's constitutional powers; the Constitution expressly states that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … Officers of the United States."[81] Likewise, the Constitution plainly authorizes the President's requests for information from executive branch officials, such as step 15, "direct[ing] the Attorney General to issue a report on the availability and most effective use of new gun safety technologies and challenge the private sector to develop innovative technologies"; Article II provides that the President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."[82]

Finally, and perhaps most controversially, some of the President's measures entail the issuance of interpretations of existing laws. To this class belongs, for instance, step 16, "[c]larify[ing] that the Affordable Care Act does not prohibit doctors asking their patients about

---

[79] U.S. Const. art. II, § 3.
[80] Patient Protection and Affordable Care Act of 2010, Pub. L. 111-148, § 1321(a).
[81] U.S. Const. art. II, § 2, cl. 2.
[82] U.S. Const. art. II, § 2, cl. 1.

33

Exhibit 15
Page 00718

ER_2900

guns in their homes." To be sure, the Article III judiciary must ultimately interpret laws when applying those laws in the context of concrete cases or controversies. But it is well established that the President also has the authority to interpret the law—and especially the power to announce legal interpretations concerning issues that have not yet been settled by the courts. In fact, the tradition of presidential clarifications of the law goes back to President George Washington's Neutrality Proclamation. The tradition also has a solid grounding in the text of the Constitution; it is based on the Constitution's vesting in the President of "the executive Power," and in its imposition on the President of the power and duty to "take Care that the Laws be faithfully executed."[83]

In sum, although some opponents of gun regulation might disagree with some of the President's executive actions as a matter of policy, those disagreements cannot plausibly be translated into constitutional objections. From a separation-of-powers perspective, the President has acted well within the bounds of his constitutionally assigned authority.

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

In closing, I note that I share the beliefs of many that the prevalence of guns in our country is by no means the only significant contributor to the tragedy at Newtown and to the many other gun-related massacres we have seen in recent months and recent years, or to the deaths of an average of over 30 Americans, nearly 5 of them children, *each and every day* as a result of gunfire homicides in less visible, and often virtually unnoticed, tragic incidents. [84]

---

[83] U.S. Const. art. II, §§ 1, 3.

[84] The Center for Disease Control reports that in 2010, 11,078 individuals in the U.S. died from firearm-related homicides. 1,773 of them were between the ages of 0 and 19. *See* CENTER FOR DISEASE CONTROL, NATIONAL CENTER FOR INJURY PREVENTION & CONTROL, *WISQARS*

34

Exhibit 15
Page 00719

ER_2901

Violence has many causes. Violent video games, for example, some of them simulating mass shootings, may well play a significant role in the inculcation of violent attitudes among children.[85] And mental illness plainly played a significant part in bringing about the massacre at Newtown. If our country is to reduce the incidence of similar unspeakable violence in the future, the widespread availability of high-powered guns to people who should not possess them and who have no constitutional right to do so is by no means the only phenomenon that our government, our society, and our families need to address.

But it is simply not true that the presence of other causes of gun violence means that we neither can nor should do anything significant about the prevalence, too often in the wrong hands, of high-powered guns and high-capacity magazines that turn those guns from means of self-defense into weapons of mass destruction. It is not true constitutionally, it is not true politically, and it is not true morally. We must do our best to address in a serious way *every* source of avoidable death by firearms that we can, and if we always point to other problems still waiting to be solved we will never get started.

The time to get started on sensible gun regulation is not now—it was weeks, months, years, even decades ago. The Second Amendment is not a barrier. We have already delayed too long, and our society has paid a terrible price. We should delay no longer.

---

*Fatal Injury Reports, National and Regional, 1999 – 2010*,
http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html (last visited Feb. 4, 2013).
[85] *See Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2767–71 (2011) (Breyer, J., dissenting).

35

Exhibit 15
Page 00720

ER_2902

Exhibit 15
Page 00721

**ER_2903**