No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant*.
_____

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge
_____

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 13 of 17**
_____

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

Mother Jones' Investigation: US Mass Shootings, 1982-2018

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 2 of 279

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Yountville veterans home shooting | Yountville, CA | 3/9/18 | 2018 | Army veteran Albert Cheung Wong, 36, stormed a veterans home where he was previously under care, exchanging gunfire with a sheriff's deputy and taking three women hostage, one of whom he'd previously threatened. After a standoff with law enforcement, he killed the three women and himself. | 3 | 0 | 3 | Workplace | Yes | Wong had served in Afghanistan and had a history of PTSD. | Yes | TBD | semiautomatic rifle; shotgun | | Asian | M | https://www.cnn.com/2018/03/10/us/california-veterans-home-shooting/index.html | https://www.cnn.com/2018/03/10/us/california-veterans-home-shooting/index.html | 38.392496 | -122.366528 | Mass |
| Stoneman Douglas High School shooting | Parkland, Florida | 2/14/18 | 2018 | Nikolas J. Cruz, 19, heavily armed with an AR-15, tactical gear, and "countless magazines" of ammo, attacked the high school as classes were ending for the day, killing at least 17 people and injuring many others. He was apprehended by authorities shortly after fleeing the campus. | 17 | 14 | 31 | School | Yes | Cruz had a long history of behavioral problems and had spent time in mental health clinics. | Yes | A Florida pawn shop | semiautomatic rifle | AR-15 | White | M | https://www.nytimes.com/2018/02/14/us/parkland-school-shooting.html; https://www.nytim | https://www.nytimes.com/2018/02/14/us/parkland-florida-shooting.html | | | Mass |
| Pennsylvania carwash shooting | Melcroft, PA | 1/28/18 | 2018 | Timothy O'Brien Smith, 28, wearing body armor and well-stocked with ammo, opened fire at a carwash early in the morning in this rural community, killing four people. A fifth victim, though not shot, suffered minor injuries. One of the deceased victims, 25-year-old Chelsie Cline, had been romantically involved with Smith and had broken off the relationship recently, according to her sister. Smith shot himself in the head and died later that night at the hospital. | 4 | 1 | 5 | Other | TBD | | TBD | TBD | semiautomatic rifle and semiautomatic handgun | | White | M | http://www.wpxi.com/news/top-stories/family-member-s-small-community-in-shock- | | | | Mass |
| Rancho Tehama shooting spree | Rancho Tehama, CA | 11/14/17 | 2017 | Kevin Janson Neal, 44, went on an approximately 45-minute shooting spree in the rural community of Rancho Tehama Reserve in Northern California, including shooting up an elementary school, before being killed by law enforcement officers. Neal had also killed his wife at home. | 5 | 10 | 15 | Other | TBD | | No | TBD | semiautomatic rifles | Two illegally modified rifles | White | M | https://www.nbcnews.com/news/us-news/california-mass-shooter-killed-wife-buried- | | | | Spree |
| Texas First Baptist Church massacre | Sutherland Springs, TX | 11/5/17 | 2017 | Devin Patrick Kelley, a 26-year-old ex-US Air Force airman, opened fire at the First Baptist Church in Sutherland Springs during Sunday morning services, killing at least 26 people and wounding and injuring 20 others. He left the church and fled in his vehicle after engaging in a gunfight with a local citizen; he soon crashed his vehicle and died from a self-inflicted gunshot wound. | 26 | 20 | 46 | Religious | Yes | Kelley had a history of domestic violence, including a court martial and conviction stemming from assaulting his wife and child; he also had a | Kelley passed federal criminal background checks; the US Air Force failed to provide information on his criminal history to the FBI | Purchased in April 2016 from an Academy Sports & Outdoors store in San Antonio | semiautomatic rifle and semiautomatic handguns | Ruger AR-556; Kelley also possessed semiautomatic handguns | White | M | https://www.washingtonpost.com/news/morning-mix/wp/2017/11/06/who-is-devin-patrick- | http://www.expressnews.com/news/local/article/Suspected-gunman-Devin-Patrick-Kelley- | 32.7801052 | -96.8000082 | Mass |
| Walmart shooting in suburban Denver | Thornton, CO | 11/1/17 | 2017 | Scott Allen Ostrem, 47, walked into a Walmart in a suburb north of Denver and fatally shot two men and a woman, then left the store and drove away. After an all-night manhunt, Ostrem, who had financial problems but no serious criminal history, was captured by police after being spotted near his apartment in Denver. | 3 | 0 | 3 | Other | Unclear | | TBD | | semiautomatic handgun | | White | M | https://www.nytimes.com/2017/11/01/us/thornton-colorado-walmart-shooting.html; http://ww | | 43.0605671 | -88.1064787 | Mass |
| Edgewood business park shooting | Edgewood, MD | 10/18/17 | 2017 | Radee Labeeb Prince, 37, fatally shot three people and wounded two others around 9am at Advance Granite Solutions, a home remodeling business where he worked near Baltimore. Hours later he shot and wounded a sixth person at a car dealership in Wilmington, Delaware. He was apprehended that evening following a manhunt by authorities. | 3 | 3 | 6 | Workplace | Unclear | | No | Unclear | handgun | .380-caliber; make unclear | Black | M | http://www.baltimoresun.com/news/maryland/harford/aegis/ph-ag-edgewood-shooting- | | | | Mass |

Exhibit 16
Page 00723

ER_2905

Mother Jones' Investigation: US Mass Shootings, 1982-2018.

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 3 of 279

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental illness | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Las Vegas Strip massacre | Las Vegas, NV | 10/1/17 | 2017 | Stephen Craig Paddock, 64, rained a barrage of rapid gunfire down on thousands of concertgoers on the Las Vegas Strip late on a Sunday night, firing from a corner suite on the 32nd floor of the Mandalay Bay Resort and Casino. Soon thereafter, he was found by law enforcement inside the hotel room, deceased from a self-inflicted gunshot wound. | 58 | 546 | 604 | Other | TBD | Perpetrator's history unclear. In 1969 Paddock's father was classified by the FBI as a dangerous psychopath with suicidal tendencies; psychopathy | Yes | Two gun shops in Nevada | 23 firearms, mostly rifles; including scopes, and two modified for "fully automatic" firing; two were mounted on tripods | AR-15-style and AK-47-style rifles and "a large cache of ammunition"; four Daniel Defense DDM4 rifles, three FN-15s and other | White | M | https://www.lvmpd.com/n-us/Document s/1_October-paddock_FIT_Report_01-18-2018_Fo | https://www.nytimes.com/2017/10/1/us/step hen-paddock-father-vegas.html; http://www | 32.693397 | -97.47067092 | Mass |
| San Francisco UPS shooting | San Francisco, CA | 6/14/17 | 2017 | Jimmy Lam, 38, fatally shot three coworkers and wounded two others inside a UPS facility in San Francisco. Lam killed himself as law enforcement officers responded to the scene. | 3 | 2 | 5 | Workplace | Yes | Lam had a history of domestic, work conflict | No | Unclear; the two firearm was stolen in Utah. A second handgun Lam had (also stolen) was unused in the attack. | two handguns | MAC-10-style "assault pistol"; 30-round magazine. An additional box of ammunition. | Asian | M | http://www.nbcbayarea.com/news/m/local/Acti ve-Shooter-Francisco-Police-428 | http://www.ktvu.com/news/kvu-local-news/26 1771610-story; http://witter.com/LauraG | | | Mass |
| Pennsylvania supermarket shooting | Tunkhannock, PA | 6/7/17 | 2017 | Randy Stair, a 24-year-old worker at Weis grocery fatally shot three of his fellow employees. He reportedly fired 59 rounds with a pair of shotguns before turning the gun on himself as another co-worker fled the scene for help and law enforcement responded. | 3 | 0 | 3 | Workplace | Unclear | | TBD | | shotguns | | White | M | http://www.pressconnects.com/story/news/l ocal/pennsylvania/2017/0 6/08/dead-murder-suicide- | | 35.047157 | -85.311819 | Mass |
| Florida awning manufacturer shooting | Orlando, Florida | 6/5/2017 | 2017 | John Robert Neumann, Jr., 45, a former employee of manufacturer Fiamma Inc. fatally shot five workers at the company, and then killed himself on the scene. He'd been fired from the company in April. The attack took place a week before the one-year anniversary of the Orlando nightclub massacre. | 5 | 0 | 5 | Workplace | Unclear | | TBD | | semiautomatic handgun | | | M | http://www.postandcourier.com/new s/multiple-people-dead-following-shooting-near-orlando- | | | | Mass |
| Rural Ohio nursing home shooting | Kirkersville, Ohio | 5/12/2017 | 2017 | Thomas Hartless, 43, shot and killed a former girlfriend and another employee of a nursing home, and then fatally shot the Kirkersville police chief responding to the scene. Hartless' former girlfriend had recently obtained a court protection order against Hartless. Investigators later found more than 60 firearms in the home of Hartless, who was also found dead at the scene of the attack. | 3 | 0 | 3 | Workplace | Yes | Hartless had a violent criminal history; his former girlfriend had recently submitted a letter in court recently stating that he had "a severe mental disorder." | TBD | | handgun, shotgun | | White | M | http://abc6onyour w.cbsnewsside.com s.com/news/lo cal/repor 64-t-of-cal/repor shooting-from-in-home-of-kirkersvil killer-in-e; http://ww ohio-nursing- | | 38.874981 | -76.99453 | Mass |
| Fresno downtown shooting | Fresno, California | 4/18/2017 | 2017 | Kori Ali Muhammad, 39, opened fire along a street in downtown Fresno, killing three people randomly in an alleged hate crime prior to being apprehended by police. Muhammad, who is black, killed three white victims and said he targeted them as being racially motivated; he also reportedly yelled "Allahu Akbar" at the time he was arrested, but authorities indicated they found no links to Islamist terrorism. | 3 | 0 | 3 | Other | Unclear | | Unknown | | handgun | .357 revolver | Black | M | http://www.dailymail.co.uk/news/article-4443722/Gunman-Fresno-shooting-speaks-jail.html; | | | | Mass |
| Fort Lauderdale airport shooting | Fort Lauderdale, Florida | 1/6/2017 | 2017 | Esteban Santiago, 26, flew from Alaska to Fort Lauderdale, where he opened fire in the baggage claim area of the airport, killing five and wounding six before police apprehended him. | 5 | 6 | 11 (dozens more were reportedly injured in the panic) | Airport | Yes | Among other signs, Santiago had gone to a FBI office in Anchorage and complained that his mind was being controlled by the CIA. | Yes | | semiautomatic handgun | Walther 9mm semi-automatic pistol | Latino | M | http://w.nytimes.com/20 17/01/07/us/esteb an-santiago-fort-lauderdale-airport-shooting-.html;_r | http://www.nytimes.com/20 17/01/07/us/esteb an-santiago-fort-lauderdal e-airport-shooting- | 37.3688301 | -122.0363496 | Mass |

Exhibit 16
Page 00724

ER_2906

Mother Jones' Investigation: US Mass Shootings, 1982-2018.

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental illness | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | Latitude | Longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cascade Mall shooting | Burlington, WA | 9/23/2016 | 2016 | Arcan Cetin, 20, killed a teen girl and three women in the cosmetics section of a Macy's department store at the Cascade Mall. A man was critically wounded in the shooting and taken to Harborview Medical Center in Seattle, where he died. Cetin was apprehended by police a few hours after the shooting while driving a car near his residence. | 5 | 0 | 5 | Other | Yes | According to the Cetin's stepfather he had "mental health issues"; court records showed that he suffered from anxiety and depression. | TBD | | Rifle | | | M | http://www.nytimes.com/20 16/09/25 /us/mall-shooting-washington-state.ht ml | http://www.nbcnews.com/news/us-news/arc an-cetin-accused-cascade-mall-shooter-charged- | 48.050824 | -122.176918 | Mass |
| Baton Rouge police shooting | Baton Rouge, LA | 7/17/2016 | 2016 | Gavin Long, a former Marine who served in Iraq, killed three police officers responding to a 911 call, and wounded three others. He was killed in a shoot-out with other officers responding to the scene. Prior to the attack, Long posted prolifically on social media, where he expressed admiration for the cop killer in Dallas 10 days prior. | 3 | 3 | 6 | Other | Yes | Unclear | Unknown | | Two semiautomatic rifles; one semiautomatic handgun | IWI Tavor SAR 5.56 caliber rifle, Springfield XD 9, 9mm | Black | M | http://time.com/4 411027/ baton-rouge-shooter-gavin-long/ ; http://www.nytimes.com/20 | | | | Spree |
| Dallas police shooting | Dallas, Texas | 7/7/2016 | 2016 | Micah Xavier Johnson, a 25-year-old Army veteran, targeted police at a peaceful Black Lives Matter protest, killing five officers and injuring nine others as well as two civilians. After a prolonged standoff in a downtown building, law enforcement killed Johnson using a robot-delivered bomb. | 5 | 11 | 16 | Other | Unclear | Unclear | Yes | online and or gun show | Semiautomatic rifle, semiautomatic handguns | Izhmash-Saiga 5.45mm (AK-style) semiautomatic rifle with large capacity magazines; Glock 9mm handgun, .25-caliber | Black | M | http://www.nytimes.com/20 16/07/11 /us/dallas-shooting-micah-johnson-police.ht ml?_r=0; | | 41.4123225 | -73.31142358 | Mass |
| Orlando nightclub massacre | Orlando, Florida | 6/12/2016 | 2016 | Omar Mateen, 29, attacked the Pulse nightclub in Orlando in the early morning hours of June 12. He was killed by law enforcement who raided the club after a prolonged standoff. | 49 | 53 | 102 | Other | Unclear | Unclear | Yes | Shooting center in Port St. Lucie, Florida | Semiautomatic rifle, semiautomatic handgun | Sig Sauer MCX rifle, Glock 17 9mm; high-capacity magazines (30 rounds) | Other | M | http://www.motherjones.com/politics/2016/0 6/assault-rifle-used-by-orlando-mass-shooter; | | 37.8043808 | -122.2708166 | Mass |
| Excel Industries mass shooting | Hesston, Kansas | 2/25/2016 | 2016 | Cedric L. Ford, who worked as a painter at a manufacturing company, shot victims from his car and at his workplace before being killed by police at the scene. Shortly before the rampage he had been served with a restraining order. | 3 | 14 | 17 | Workplace | Unclear | Unclear | Yes | | Semiautomatic rifle, semiautomatic handgun | Zastava Serbia AK-47-style rifle, Glock Model 22 .40-caliber handgun; high-capacity magazines | Black | M | http://www.nytimes.com/20 16/02/26 /us/shooting-at-plant-hesston-kansas.ht ml; https://w | | 31.2011305 | -97.77156996 | Mass |
| Kalamazoo shooting spree | Kalamazoo County, Michigan | 2/20/2016 | 2016 | Jason B. Dalton, a driver for Uber, apparently selected his victims randomly as he went on a rampage over several hours in three different locations, including five people he shot in the parking lot of a Cracker Barrel restaurant. He was "arrested without incident" at a downtown Kalamazoo bar about six hours after the rampage began. | 6 | 2 | 8 | Other | Unclear | Unclear | Yes | | Semiautomatic handgun | 9 mm handgun (ammo used unclear) | White | M | http://www.nytimes.com/20 16/02/22 /us/kalamazoo-michigan-random-shooting s.html; http://www | | 41.9294736 | -88.7503647 | Mass |
| San Bernardino mass shooting | San Bernardino, California | 12/2/2015 | 2015 | Syed Rizwan Farook left a Christmas party held at Inland Regional Center, later returning with Tashfeen Malik and the two opened fire, killing 14 and wounding 21, ten critically. The two were later killed by police as they fled in an SUV. | 14 | 21 | 35 | Workplace | Unclear | Unclear | Yes | The suspects purchased their handguns in the United States; the assault rifles were purchased | Two assault rifles and two semi-automatic pistols were used in the attack. Police found a remote controlled explosive | Two semiautomatic AR-15-style rifles—one a DPMS A-15, the other a Smith & Wesson M&P15, both with .223 calibre | Other | Male & Female | http://www.nytimes.com/mojo/ 2015/12/ san-bernardino-shooting and http://ww | | 35.6672015 | -97.42937037 | Mass |

Exhibit 16
Page 00725

Mother Jones' Investigation: US Mass Shootings, 1982-2018.

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental health | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Planned Parenthood clinic | Colorado Springs, Colorado | 11/27/2015 | 2015 | Robert Lewis Dear, 57, shot and killed a police officer and two citizens when he opened fire at a Planned Parenthood health clinic in Colorado Springs, Colorado. Nine others were wounded. Dear was arrested after an hours-long standoff with police. | 3 | 9 | 12 | Workplace | Unclear | The judge in the case has not publicly released Dear's medical and mental health records. As of April 5, 2016, Dear was undergoing a competency evaluation. Dear | Unknown | Unclear | Long gun | Reportedly an AK-47 style semiautomatic rifle and others. Authorities had not released details on Dear's weapons as | White | M | http://www.nytimes.com/2015/11/28/us/colorado-planned-parenthood-shooting.html and | | 47.61864486 | -117.6483587 | Mass |
| Colorado Springs shooting rampage | Colorado Springs, Colorado | 10/31/2015 | 2015 | Noah Harpham, 33, shot three people before dead in Colorado Springs before police killed him in a shootout. | 3 | 0 | 3 | Other | Unclear | Prior to the rampage, Harpham wrote an "incoherent" blog and rambled "nonsensically" in a YouTube video about mind control techniques and | Yes | Unclear | Two handguns and a rifle | AR-15 rifle, a 9 mm pistol, and a .357 revolver | White | M | http://www.motherjones.com/mojo/2015/11/open-carry-mass-shooting-colorado-springs | | 37.2295733 | -80.4139393 | Mass |
| Umpqua Community College shooting | Roseburg, Oregon | 10/1/2015 | 2015 | 26-year-old Chris Harper Mercer opened fire at Umpqua Community College in southwest Oregon. The gunman shot himself to death after being wounded in a shootout with police. | 9 | 9 | 18 | School | Unclear | Harper-Mercer's mother said in multiple online postings that he had Asperger's syndrome. Harper-Mercer graduated from the Switzer Learning Center, a school for | Yes | From the home he shared with his mother. All were legally obtained by either Harper/Mercer or family | Five pistols, one rifle, five magazines of ammunition | 9 mm Glock pistol, .40 caliber Smith & Wesson, .40 caliber Taurus pistol, .556 caliber Del-Ton; (ammo details unclear) | Other | Male | http://www.nytimes.com/2015/10/03/us/chris-harper-mercer-umpqua-community-college- | http://www.latimes.com/nation/nationnow/la-na-nn-chris-harper-mercer-oregon-shooting- | 35.345802 | -79.4170543 | Mass |
| Chattanooga military recruitment center | Chattanooga, Tennessee | 7/16/2015 | 2015 | Kuwaiti-born Mohammod Youssuf Abdulazeez, 24, a naturalized US citizen, opened fire at a Naval reserve center, and then drove to a military recruitment office where he shot and killed four Marines and a Navy service member, and wounded a police officer and another military service member. He was then fatally shot in an exchange of gunfire with law enforcement officers responding to the attack. | 5 | 2 | 7 | Military | Unclear | Abdulazeez "had suffered for years from depression and bipolar disorder," according to a representative of the family. (NYT, July 20 | Yes ("some of the weapons were purchased legally and some of them may not have been") | On the internet, via Armslist.com | 2 assault rifles; semiautomatic handgun | AK-47, AR-15, and 30-round magazines; 9mm handgun | Other | Male | http://www.reuters.com/article/2015/07/16/us-usa-shooting-tennessee-idUSKCN0PQ1 | | 26.1223084 | -80.1433786 | Mass |
| Charleston Church Shooting | Charleston, South Carolina | 6/17/2015 | 2015 | Dylann Storm Roof, 21, shot and killed 9 people after opening fire at the Emanuel AME Church in Charleston, South Carolina. According to a roommate, he had allegedly been "planning something like that for six months." | 9 | 1 | 10 | Religious | Unclear | | | Shooter's Choice gun store in West Columbia, South Carolina | Handgun | .45-caliber Glock (model 41, with 13-round capacity magazine) | White | Male | http://www.motherjones.com/politics/2015/06/dylann-roofs-attorney; http://www.newsweek.com/ | | 25.796491 | -80.226683 | Mass |
| Trestle Trail bridge shooting | Menasha, Wisconsin | 6/11/2015 | 2015 | Sergio Valencia del Toro, 27, who officials say was a random act, shot and killed three people including an 11-year-old girl before turning the gun on himself. | 3 | 1 | 4 | Other | Yes | While serving in the Air Force, he went to an emergency walk-in clinic because of concerns over his mood swings, and had either sought or been ordered to behavioral | Yes | Unclear | Two handguns | Details unclear, but after the shooting, police found eight guns in total in Valencia del Toro's home, including handguns, | Latino | M | http://fox6now.com/2015/06/11/released-menasha-police-issue-final-report-on-trestle- | | 39.9589 | -76.0806 | Mass |
| Marysville-Pilchuck High School shooting | Marysville, Washington | 10/24/2014 | 2014 | Jaylen Fryberg, 15, using a .40-caliber Berretta, shot five students at Marysville High School, including two of his cousins and friends, killing all but one. Fryberg arranged to meet them for lunch in the school cafeteria by text. Fryberg was reportedly well-liked at the school and there was not believed to be any ill-will between him and his victims. He committed suicide at the scene. | 5 | 1 | 6 | School | Unclear | Fryberg was well-liked and allegedly happy, but was also quite popular. According to a girl and had posted emotional social media messages. No definitive signs | No | Gun was his father's. | Handgun | Beretta .40-caliber handgun | Native American | Male | http://www.seattletimes.com/seattle-news/marysville-shooting-victim-dies-as- | http://www.newyorkrker.com/science/maria-konnikov/almost-link-mental-health-gun- | 38.5833862 | -90.406785 | Mass |

Exhibit 16
Page 00726

Mother Jones' Investigation: US Mass Shootings, 1982-2018

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental illness | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Isla Vista mass murder | Santa Barbara, California | 5/23/2014 | 2014 | Elliot Rodger, 22, shot three people to death in the college town of Isla Vista near the University of California, Santa Barbara. He also shot others as he drove around town, and injured others by striking them with his vehicle. He committed suicide by shooting himself in his car as police closed in. Prior to the rampage, Rodger stabbed three people to death in his apartment. | 6 | 13 | 19 | School | Yes | Rodger was never hospitalized due to mental illness, but had a long history of mental health issues dating back to his childhood, and received | Yes | | Three semi-automatic handguns and two hunting knives | Two Sig Sauer P226 semiautomatic pistols and Glock 34 pistol, and hundreds of rounds of ammo. A 6-inchand 8-inch "SRK" | White | M | http://www.sbsheriff.us/documents/ISLAVISTAINVESTIGATIVESUMMARY.pdf Also: http://www | | 41.2587317 | -95.9378732 | Mass |
| Fort Hood shooting 2 | Fort Hood, Texas | 4/3/2014 | 2014 | Army Specialist Ivan Lopez, 34, opened fire at the Fort Hood Army Post in Texas, killing three and wounding at least 12 others before shooting himself in the head after engaging with military police. Lt. Gen. Mark A. Milley told reporters that Lopez "had behavioral health and mental health" issues. | 3 | 12 | 15 | Military | Unclear | Lopez "had a long history of troubling behavior," according to the Washington Post, including a history of decieving others, problems in his | Yes | Local gun store in Killeen, Guns Galore | handgun | .45-caliber Smith & Wesson handgun | Latino | M | http://www.cnn.com/2014/04/02/us/fort-hood-shooting/ and https://www.washingtonpo | | 27.823713 | -97.41739794 | Mass |
| Alturas tribal shooting | Alturas, California | 2/20/2014 | 2014 | Cherie Lash Rhoades, 44, opened fire at the Cedarville Rancheria Tribal Office and Community Center, killing four and wounding two. After running out of ammunition, Rhoades grabbed a butcher knife and stabbed another person. | 4 | 2 | 6 | Other | Unknown | | Unknown | | Two handguns and a butcher knife | 9mm semi-automatic handgun | Native American | Female | http://w.sacbee.com/news/local/crime/article2603350.html; http://www.csmonitor.com/ | | 47.876346 | -95.0169401 | Spree |
| Washington Navy Yard shooting | Washington, D.C. | 9/16/2013 | 2013 | Aaron Alexis, 34, a military veteran and contractor from Texas, opened fire in the Navy installation, killing 12 people and wounding 8 before being shot dead by police. | 12 | 8 | 20 | Military | Yes | Had told Rhode Island police the prior month that he'd "heard voices"; had been undergoing mental health treatment with Veterans Affairs since August | Sharpshooters Small Arms Range | | Sawed-off shotgun, 2 boxes of shells; also a .45-caliber handgun taken from a security guard he shot at the scene. | Remington 870 Express 12-gauge shotgun; Beretta handgun | Black | Male | http://www.nytimes.com/2013/09/18/us/state-law-stopped-gunman-from-buying-rifle- | http://bigstory.ap.org/article/13-killed-washington-navy-yard-shooting-rampage | 39.754713 | -104.835869 | Mass |
| Hialeah apartment shooting | Hialeah, Florida | 7/26/2013 | 2013 | Pedro Vargas, 42, set fire to his apartment, killed six people in the complex, and held another two hostages at gunpoint before a SWAT team stormed the building and fatally shot him. | 7 | 0 | 7 | Other | Unclear | His mother told authorities her son had been acting strangely and needed a psychiatric evaluation. | Yes | Florida Gun Center | 9mm semi-automatic handgun | Glock 17 | Latino | Male | http://www.miamiherald.com/2013/07/27/v-print/3626078/a-look-at-the-victims-in-the- | http://www.miamiherald.com/2013/07/27/3539629/hialeah-killer-showed-signs-of.html | | | Mass |
| Santa Monica rampage | Santa Monica, California | 6/7/2013 | 2013 | John Zawahri, 23, armed with a homemade assault rifle and high-capacity magazines, killed his brother and father at home and then headed to Santa Monica College, where he was eventually killed by police. | 6 | 3 | 9 | Other | Yes | He was known as a solitary teen who regularly ditched class and had an interest in assault weapons; he had been admitted to UCLA's | Assembled a rifle out of component parts. | Assault rifle, high capacity magazines, antique handgun | .223-caliber semi-automatic assault rifle, about 40 high capacity magazines, "black powder" handgun (likely antique) | White | Male | http://www.cbsnews.com/8301-504083_162-57589327-504083/john-zawahri-suspecte | http://www.cbsnews.com/8301-504083_162-57589327-504083/john-zawahri- | 32.788387 | -79.933143 | Mass |
| Pinewood Village Apartment shooting | Federal Way, Washington | 4/21/2013 | 2013 | Dennis Clark III, 27, shot and killed his girlfriend in their shared apartment, and then shot two witnesses in the building's parking lot and a third victim in another apartment, before being killed by police. | 5 | 0 | 5 | Other | No | | Yes | Unknown | Semiautomatic handgun, shotgun | .40 caliber semi-automatic handgun, pistol grip shotgun | Black | Male | http://seattletimes.com/html/localnews/2020836119_federalwayshootingxml.html | | 42.8858503 | -87.8631362 | Mass |

Exhibit 16
Page 00727

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental health | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mohawk Valley shootings | Herkimer County, New York | 3/13/2013 | 2013 | Kurt Myers, 64, shot six people in neighboring towns, killing two in a barbershop and two at a car care business, before being killed by officers in a shootout after a nearly 19-hour standoff. | 5 | 2 | 7 | Other | No | | Yes | Frank's Guns in Marcy, NY | Shotgun | Unknown | White | Male | http://po ststar.co m/news/l ocal/stat e-and-regional/ cops-kill-suspect-in-deadly-mohawk-valley- | | 39.6021065 | -104.9877273 | Mass |
| | | | | | | | | | | | | | | | | | https://w ww.nysp news.co m/article _display. cfm?artic le_id=29 584 | | | | |
| Sandy Hook Elementary massacre | Newtown, Connecti cut | 12/14/2012 | 2012 | Adam Lanza, 20, shot his mother dead at their home then drove to Sandy Hook Elementary school. He forced his way inside and opened fire, killing 20 children and six adults before committing suicide. | 27 | 2 | 29 | Scho ol | Yes | Lanza had a history of serious mental health problems that were known to his family and others, as detailed in a post-massacre investigation by Connecticut | No | Stolen from mother | Two semiautomati c handguns, one rifle (assault), one shotgun (assault) | 10mm Glock, 9mm SIG Sauer P226 semiautomati c handguns; .223 Bushmaster XM15-E2S semiautomati c rifle; Izhmash | white | Male | http://us news.nb cnews.c om/_new s/2012/1 2/14/159 11025-authoritie s-id-gunman-who- | http://us news.nb cnews.c om/_new s/2012/1 2/14/159 11025-authoritie s-id-gunman-who- | 45.5719072 | -88.9028922 | Mass |
| Accent Signage Systems shooting | Minneap olis, Minnesot a | 9/27/2012 | 2012 | Andrew Engeldinger, 36, upon learning he was being fired, went on a shooting rampage, killing the business owner, three fellow employees, and a UPS driver. He then killed himself. | 7 | 1 | 8 | Wor kplac e | Yes | His family worried about his "paranoia and delusions" for at least two years prior, and tried to get him to seek treatment. | Yes | Unknown | One semiautomati c handgun | 9mm Glock semiautomati c handgun | white | Male | http://ww w.startrib une.com /local/17 1774461 .html?ref er=y | http://ww w.startrib une.com /local/17 1774461 .html?ref er=y | | | Mass |
| Sikh temple shooting | Oak Creek, Wisconsi n | 8/5/2012 | 2012 | U.S. Army veteran Wade Michael Page, 40, opened fire in a Sikh gurdwara before he died from a self-inflicted gunshot would during a shootout with police. | 7 | 3 | 10 | Relig ious | Yes | His Army friends once broke into his apartment, fearing he'd commit suicide in the '90s. A psychiatric nurse who lived downstairs from Page said it was "obvious" he | Yes | Unknown | One semiautomati c handgun | 9mm Springfield Armory XDM semiautomati c handgun | white | Male | http://ww w.jsonlin e.com/n ews/milw aukee/fri end-of-page-feared-what-he-might-do-426edm | http://ww w.jsonlin e.com/n ews/milw aukee/fri end-of-page-feared-what-he-might-do-426edm | 25.8670105 | -80.29146268 | Mass |
| Aurora theater shooting | Aurora, Colorado | 7/20/2012 | 2012 | James Holmes, 24, opened fire in a movie theater during the opening night of "The Dark Night Rises" and was later arrested outside. | 12 | 70 | 82 | Other | Yes | He saw at least three mental health professionals before dropping out of his university. | Yes | Gander Mountain stores in Thornton and Aurora, Colo.; Bass Pro Shop in Denver, Colo.; BulkAmmo.com | Two semiautomati c handguns, one rifle (assault), one shotgun | Two .40-caliber Glock semiautomati c handguns; .223-caliber Smith & Wesson M&P15 semiautomati c rifle; 12-gauge | white | Male | http://ww w.cbsne ws.com/ 8301-201_162-5749782 0/james-holmes-saw-three-mental- | http://ww w.cbsne ws.com/ 8301-201_162-5749782 0/james-holmes-saw-three-mental- | 44.0462362 | -123.0220289 | Spree |
| Seattle cafe shooting | Seattle, Washing ton | 5/20/2012 | 2012 | Ian Stawicki, 40, gunned down four patrons at a cafe, and another person during a carjacking nearby, then shot himself as police closed in. (He died later that day in a Seattle hospital.) | 6 | 1 | 7 | Other | Yes | His family said he was mentally ill | Yes | Bull's Eye Shooter Supply in Tacoma, Wash. | Two semiautomati c handguns | Two .45-caliber semiautomati c handguns | white | Male | http://us news.nb cnews.c om/_new s/2012/0 5/30/119 59312-six-killed-in-seattle shooting s- | http://us news.nb cnews.c om/_new s/2012/0 5/30/119 59312-six-killed-in-seattle shooting s- | 35.8209895 | -90.6682606 | Mass |
| Oikos University killings | Oakland, Californi a | 4/2/2012 | 2012 | One L. Goh, 43, a former student, opened fire in a nursing classroom. He fled the scene by car and was arrested nearby a few hours later. | 7 | 3 | 10 | Scho ol | Yes | A former instructor at Oikos described him as "mentally unstable" and "paranoid." | Yes | Bullseye in Castro Valley, Calif. | One semiautomati c handgun | .45-caliber semiautomati c handgun | Asian | Male | http://blo g.sfgate. com/egu i llermo/20 12/04/05 /somethi ng-still-doesnt-compute-in-the-one-goh- | http://ber keley.patc h.com/art icles/one -goh-showed-violent-tendencie s-before-the-oikos- | 40.7606467 | -111.89109 | Mass |

Exhibit 16
Page 00728

ER_2910

Mother Jones' Investigation: US Mass Shootings, 1982-2018

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Su Jung Health Sauna shooting | Norcross, Georgia | 2/21/2012 | 2012 | Jeong Soo Paek, 59, returned to a Korean spa from which he'd been kicked out after an altercation. He gunned down two of his sisters and their husbands before committing suicide. | 5 | 0 | 5 | Other | Yes | His sister worried about his homicidal tendencies; she said his mental health had been deteriorating and that he had threatened to commit suicide with his gun. | Yes | Unknown | One semiautomatic handgun | .45-caliber semiautomatic handgun | Asian | Male | http://www.gwinnettdailypost.com/news/2012/feb/23/police-id-4-victims-shooter-in-spa- | http://www.gwinnettdailypost.com/news/2012/feb/23/police-id-4-victims-shooter-in-spa- | 39.07868761 | -121.5475762 | Mass |
| Seal Beach shooting | Seal Beach, California | 10/12/2011 | 2011 | Scott Evans Dekraai, 42, opened fire inside a hair salon and was later arrested. | 8 | 1 | 9 | Other | Yes | He suffered from bipolar disorder, mood swings, and PTSD. | Yes | Unknown | Two semiautomatic handguns, one revolver | .45-caliber Heckler & Koch, 9mm Springfield semiautomatic handguns; .44 Magnum Smith & Wesson revolver | white | Male | http://t.com/2011/10/13/seal_beach_shooter_suffered_from_ptsd.php; http://blogs.ows | http://t.com/2011/10/13/seal_beach_shooter_suffered_from_ptsd.php | 41.6606893 | -91.5302214 | Mass |
| IHOP shooting | Carson City, Nevada | 9/6/2011 | 2011 | Eduardo Sencion, 32, opened fire at an International House of Pancakes restaurant and later died from a self-inflicted gunshot wound. | 5 | 7 | 12 | Other | Yes | He was diagnosed with paranoid schizophrenia as a teenager and feared demons were out to get him. | Purchased from an individual | Two rifles (both assault), one revolver | AK-47 Norinco Arms variant, AK-47 Romarm Cugir variant rifles; .38-caliber Colt revolver | Latino | Male | http://www.huffingtonpost.com/2011/11/03/eduardo-sencion-ihop-shooter_n_10736_77.html | http://www.huffingtonpost.com/2011/11/03/eduardo-sencion-ihop-shooter_n_10736_77.html | 37.9577016 | -121.2907796 | Mass |
| Tucson shooting | Tucson, Arizona | 1/8/2011 | 2011 | Jared Loughner, 22, opened fire outside a Safeway during a constituent meeting with Congresswoman Gabrielle Giffords (D-Ariz.) before he was subdued by bystanders and arrested. | 6 | 13 | 19 | Other | Yes | His symptoms pointed to various possible mental illness diagnoses, such as schizophrenia and delusional disorder. He also experimented | Yes | Sportsmans Warehouse in Tucson, Ariz. | One semiautomatic handgun | 9mm Glock 19 semiautomatic handgun | white | Male | http://www.time.com/time/magazine/article/0,9171,2042358,00.html; http://www.csmonitor.com/ | http://www.time.com/time/magazine/article/0,9171,2042358,00.html | | | Mass |
| Hartford Beer Distributor shooting | Manchester, Connecticut | 8/3/2010 | 2010 | Omar S. Thornton, 34, shot up his Hartford Beer Distributor workplace after facing disciplinary issues, then committed suicide. | 9 | 2 | 11 | Workplace | No | He apparently was driven over the edge by unaddressed, ongoing racism against him at work | Yes | Gun dealer in East Windsor, Conn. | Two semiautomatic handguns | Two 9mm Ruger SR9 semiautomatic handguns | black | Male | http://www.cbsnews.com/8301-504083_162-20012557-504083.html; http://www.nytime | http://www.cbsnews.com/8301-504083_162-20012557-504083.html | | | Mass |
| Coffee shop police killings | Parkland, Washington | 11/29/2009 | 2009 | Maurice Clemmons, 37, a felon who was out on bail for child-rape charges, entered a coffee shop on a Sunday morning and shot four police officers who had gone there to use their laptops before their shifts. Clemmons, who was wounded fleeing the scene, was later shot dead by a police officer in Seattle after a two-day manhunt. | 4 | 1 | 5 | Other | Yes | He had a history of erratic, bizarre behavior. He once asked his family to get naked for 5 minutes on Sunday; he said he thought the world would end and that he was | No | Stolen from an individual in Seattle. | One semiautomatic handgun | 9mm Glock semiautomatic handgun; .38-caliber Smith & Wesson revolver | black | Male | http://seattletimes.com/html/localnews/2010386617_webmannsought29.html; http://www.nytime | http://seattletimes.com/html/localnews/2010386617_webmannsought29.html | | | Mass |
| Fort Hood massacre | Fort Hood, Texas | 11/5/2009 | 2009 | Army psychiatrist Nidal Malik Hasan, 39, opened fire on an Army base in an attack linked to Islamist extremism. Hasan was injured during the attack and later arrested. | 13 | 30 | 43 | Military | Unclear | Medical officials at Walter Reed Army Medical Center and the Uniformed Services University of the Health Sciences raised concerns prior to the shooting | Yes | Guns Galore in Kileen, Texas | One semiautomatic handgun | FN Five-seven semiautomatic handgun | Other | Male | http://seattletimes.com/html/nationworld/2010232219_apusforthoodshooting.html; http://arti | http://w.npr.org/templates/story/story.php?storyId=1203135070 | 42.4894801 | -83.1446485 | Mass |

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 8 of 279

Exhibit 16
Page 00729

Mother Jones' Investigation: US Mass Shootings, 1982-2016.

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Binghamton shootings | Binghamton, New York | 4/3/2009 | 2009 | Jiverly Wong, 41, opened fire at an American Civic Association center for immigrants before committing suicide. | 14 | 4 | 18 | Other | Yes | He apparently harbored growing paranoia toward cops. He also sent a delusional letter to a local TV station right before the shooting. | Yes | Gander Mountain in Johnson City, N.Y. | Two semiautomatic handguns | 9mm Beretta, .45-caliber Springfield semiautomatic handguns | Asian | Male | http://www.nytime s.com/20 09/04/12 /nyregion /12bingh amton.ht ml?page wanted= all&_r=0; http://www.wral.c om/news | http://www.nytime s.com/20 09/04/12 /nyregion /12bingh amton.ht ml?page wanted= all&_r=1 & | | | Mass |
| Carthage nursing home shooting | Carthage, North Carolina | 3/29/2009 | 2009 | Robert Stewart, 45, opened fire at a nursing home where his estranged wife worked before he was shot and arrested by a police officer. | 8 | 3 | 11 | Other | Yes | His estranged wife told her workplace that her husband had an "unstable mental state or (was) mentally ill." | Yes | Local sporting goods stores and individuals | One revolver, one shotgun | Winchester 1300 pump-action shotgun; .357 Magnum revolver | white | Male | http://www.wral.c om/news /local/sto ry/98456 39/; http://www.wral.c om/news | | | | Mass |
| Atlantis Plastics shooting | Henderson, Kentucky | 6/25/2008 | 2008 | Disgruntled employee Wesley Neal Higdon, 25, shot up an Atlantis Plastics factory after he was escorted out of his workplace for an argument with a supervisor. Higdon shot the supervisor outside the factory before opening fire on coworkers inside. He then committed suicide. | 6 | 1 | 7 | Workplace | No | He called his girlfriend two hours before the shooting to say he was going to kill his boss. | Yes | Unknown | One semiautomatic handgun | .45-caliber Hi-Point semiautomatic handgun | white | Male | http://www.foxne ws.com/ story/0,2 933,371 242,00.h tml; http://www.msnbc .msn.co m/id/253 | http://www.foxne ws.com/ story/0,2 933,371 242,00.h tml | | | Spree |
| Northern Illinois University shooting | DeKalb, Illinois | 2/14/2008 | 2008 | Steven Kazmierczak, 27, opened fire in a lecture hall, then shot and killed himself before police arrived. | 5 | 21 | 26 | School | Yes | He had a long history of mental health struggles; after high school, his parents placed him at a psychiatric treatment center. He told friends he felt | Yes | Online and gun retailers in Champaign, Ill. | Three semiautomatic handguns, one shotgun | 9mm Glock 19, Hi-Point CF380, 9mm Kurz SIG Sauer P232 semiautomatic handguns; 12-gauge Remington Sportsman 48 sawed-off | white | Male | http://www.huffing tonpost.c om/jonat han-fast/stev e-kazmierc zak-the-sec_b_8 7031.ht | http://www.dbsne ws.com/ stories/2 008/02/1 6/nationa l/main38 40072.sh tml; http://www.esquir | 47.6229 | -122.3165 | Mass |
| Kirkwood City Council shooting | Kirkwood, Missouri | 2/7/2008 | 2008 | Charles "Cookie" Lee Thornton, 52, went on a rampage at the city hall before being shot and killed by police. | 6 | 2 | 8 | Other | Yes | He was known for histrionics and disruptions at city council meetings. His mounting debt was a stressor. | No | Taken in burglary and from fallen police officer | One semiautomatic handgun, one revolver | .40-caliber Smith & Wesson semiautomatic handgun; .44 Magnum Smith & Wesson Model 29 revolver | black | Male | http://www.stltoda y.com/ne ws/local/ crime-and-courts/ch arles-lee-cookie-thornton-behind- | http://www.stltoda y.com/ne ws/local/ crime-and-courts/ch arles-lee-cookie-thornton-behind- | | | Mass |
| Westroads Mall shooting | Omaha, Nebraska | 12/5/2007 | 2007 | Robert A. Hawkins, 19, opened fire inside Westroads Mall before committing suicide. | 9 | 4 | 13 | Other | Yes | He had been treated in the past for depression and ADHD. | No | Stolen from grandfather | One rifle (assault) | WASR-10 Century Arms semiautomatic rifle | white | Male | http://www.guardi an.co.uk/ world/20 07/dec/0 6/usa.us gunviole nce2; http://www.npr.or g/templa | http://www.guardi an.co.uk/ world/20 07/dec/0 6/usa.us gunviole nce2 | | | Spree |
| Crandon shooting | Crandon, Wisconsin | 10/7/2007 | 2007 | Off-duty sheriff's deputy Tyler Peterson, 20, opened fire inside an apartment after an argument at a homecoming party. He fled the scene and later committed suicide. | 6 | 1 | 7 | Other | Unclear | The families of victims filed a wrongful death lawsuit against the county arguing that the police department should have evaluated the gunman's | No | Issued by Forest County Sheriff's Department | One rifle (assault) | AR-15 SWAT semiautomatic rifle | white | Male | http://www.riverne wsonline .com/mai n.asp?S ectionID =6&Sub SectionI D=47&Ar ticleID=3 68; | http://www.riverne wsonline .com/mai n.asp?S ectionID =6&Sub SectionI D=47&Ar ticleID=3 68 | | | Mass |

Exhibit 16

Page 00730

**ER_2912**

Mother Jones' Investigation: US Mass Shootings, 1982-2018.

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Virginia Tech massacre | Blacksburg, Virginia | 4/16/2007 | 2007 | Virginia Tech student Seung-Hui Cho, 23, opened fire on his school's campus before committing suicide. | 32 | 23 | 55 | School | Yes | A district court ruled Cho was "an imminent danger" to himself and others as a result of mental illness two years earlier, and directed Cho to seek treatment. | Yes | Purchased variously online and from Roanoke Firearms in Roanoke, Va. | Two semiautomatic handguns | 9mm Glock 19, .22-caliber Walther P22 semiautomatic handguns | Asian | Male | http://www.nytime s.com/20 07/04/24 /us/24vir ginia.htm l; http://ww w.thesta ndard.co m.hk/ne | http://ab cnews.g o.com/U S/story?i d=30522 78&page =1 | 39.9622601 | -83.0007065 | Mass |
| Trolley Square shooting | Salt Lake City, Utah | 2/12/2007 | 2007 | Sulejman Talović, 18, rampaged through the shopping center until he was shot dead by police. | 6 | 4 | 10 | Other | Unclear | According to one relative, he was violent and had the mental capacity of a child. (But accounts from others did not indicate this about the shooter.) | Unknown | Purchased variously from Sportsman's Fast Cash in West Valley City, Utah and individuals | One revolver, one shotgun | Mossberg Maverick 88 field shotgun; .38-caliber Smith & Wesson M36 revolver | white | Male | http://ww w.desere tnews.co m/article/ 6600206 47/Ex-relative-calls-Talovic-vicious-troubled. | http://ww w.desere tnews.co m/article/ 6600206 47/Ex-relative-calls-Talovic-vicious-troubled. | 44.9772995 | -93.2654692 | Mass |
| Amish school shooting | Lancaster County, Pennsylvania | 10/2/2006 | 2006 | Charles Carl Roberts, 32, shot 10 young girls in a one-room schoolhouse in Bart Township, killing 5, before taking his own life. | 5 | 5 | 11 | School | No | He told his wife that he'd molested two young relatives 20 years ago. | Yes | Local stores in Nickel Mines, Penn. | One semiautomatic handgun, one rifle, one shotgun | Springfield semiautomatic handgun; .30-06 Ruger bolt-action rifle; 12-gauge Browning pump-action shotgun | white | Male | http://ne ws.googl w.cnn.co e.com/n ewspape rs?id=D8 oyAAAAI BAJ&sjid =YSUEA AAAIBAJ &pg=614 3,12601 | http://ww w.cnn.co m/2006/ US/10/0 3/amish. shooting/ index.ht ml | 40.7267682 | -73.6342955 | Mass |
| Capitol Hill massacre | Seattle, Washington | 3/25/2006 | 2006 | Kyle Aaron Huff, 28, opened fire at a rave afterparty in the Capitol Hill neighborhood of Seattle before committing suicide. | 7 | 2 | 9 | Other | No | Police were unable to find any record that he had been treated for mental illness or was on psychiatric medication. | Yes | Various sporting goods stores in Kalispell, Mont. | Two semiautomatic handguns, one rifle (assault), one shotgun | .40-caliber Ruger, one other semiautomatic rifle; Bushmaster XM15 E2S semiautomatic rifle; 12-gauge Winchester | white | Male | http://se attletime s.com/ht ml/local n ews/200 2892043 _shooter 27m.htm l; http://se attletime | http://se attletime s.com/ht ml/localn ews/200 2898900 _huff30 m.html | 41.7759324 | -72.5214755 | Mass |
| Goleta postal shootings | Goleta, California | 1/30/2006 | 2006 | Former postal worker Jennifer Sanmarco, 44, shot dead a former neighbor then drove to the mail processing plant where she used to work. Inside, she opened fire, killing six employees before committing suicide. | 8 | 0 | 8 | Workplace | Yes | She was placed on retirement disability for psychological reasons. Fellow employees described her behavior as increasingly bizarre. She believed the | Yes | Pawn shops in Grants and Gallup, N.M. | One semiautomatic handgun | 9mm Smith & Wesson 915 semiautomatic handgun | white | Female | http://ww w.msnbc .msn.co m/id/111 67920/ns /us_new s-crime_an d_courts /t/postal-killer- | http://ww w.msnbc .msn.co m/id/111 67920/ns /us_new s-crime_an d_courts /t/postal-killer- | | | Mass |
| Red Lake massacre | Red Lake, Minnesota | 3/21/2005 | 2005 | Jeffrey Weise, 16, murdered his grandfather, who was a police officer, and grandfather's girlfriend. Weise then drove his grandfather's squad car to Red Lake Senior High School and opened fire on the reservation campus, killing another seven people before committing suicide. | 10 | 5 | 15 | School | Yes | He voluntarily visited a a psychiatric ward. He was hospitalized at least once for suicidal tendencies and was taking Prozac. | No | Glock and Remington stolen from grandfather | Two semiautomatic handguns, one shotgun | .40-caliber Glock 23, .22-caliber Ruger semiautomatic handguns; 12-gauge Remington 870 shotgun | Native American | Male | http://ne ws.googl e.com/n ewspape rs?id=c4 dIAAAAI BAJ&sjid =_XEDA AAAIBAJ &pg=516 3,15272 | http://w w.cbsne ws.com/ stories/2 005/03/2 1/nationa l/main68 2915.sht ml?source =search _h_story | 35.0529931 | -78.8787058 | Mass |
| Living Church of God shooting | Brookfield, Wisconsin | 3/12/2005 | 2005 | Living Church of God member Terry Michael Ratzmann, 44, opened fire at a church meeting at a Sheraton hotel before committing suicide. | 7 | 4 | 11 | Religious | Yes | Neighbors said he suffered from depression and had a drinking problem. | Yes | Gun dealer in Waukesha, Wis. | One semiautomatic handgun | 9mm Beretta semiautomatic handgun | white | Male | http://ww w.cbsne ws.com/ 2100-201_162-679761. html; http://ww w.foxne ws.com/ story/0,2 | http://ww w.cbsne ws.com/ 2100-201_162-679761. html | 34.008617 | -118.494754 | Spree |

Exhibit 16
Page 00731

Mother Jones' Investigation: US Mass Shootings, 1982-2018

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Damageplan show shooting | Columbus, Ohio | 12/8/2004 | 2004 | Nathan Gale, 25, possibly upset about the breakup of Pantera, gunned down former Pantera guitarist Dimebag Darrell and three others at a Damageplan show before a police officer fatally shot Gale. | 5 | 7 | 12 | Other | Yes | He was discharged from the military because he was a paranoid schizophrenic. | Yes | Received as a gift from mother | One semiautomatic handgun | 9mm Beretta 92FS semiautomatic handgun | white | Male | http://www.cbsnews.com/2100-201_162-659983.html; http://www.knac.com/article.asp?Ar | http://www.cbsnews.com/2100-201_162-659983.html | 37.76721 | -87.5573742 | Mass |
| Lockheed Martin shooting | Meridian, Mississippi | 7/8/2003 | 2003 | Assembly line worker Douglas Williams, 48, opened fire at his Lockheed Martin workplace in a racially motivated attack before committing suicide. | 7 | 8 | 15 | Workplace | Yes | His cousin said he was concerned and "going through a lot of things." | Yes | Purchased from an individual | One semiautomatic handgun, two rifles, one derringer, one shotgun | .45-caliber Ruger P90 semiautomatic handgun; .22-caliber rifle with scope, .223-caliber Ruger Mini-14 rifle; 12-gauge Winchester | white | Male | http://usatoday30.usatoda y.com/news/nation/2003-07-08-miss-shooting-main_x.htm; | http://usatoday30.usatoda y.com/news/nation/2003-07-08-miss-shooting-main_x.htm | | | Mass |
| Navistar shooting | Melrose Park, Illinois | 2/5/2001 | 2001 | Fired employee William D. Baker, 66, opened fire at his former Navistar workplace before committing suicide. | 5 | 4 | 9 | Workplace | No | He had a criminal past, including a sexual assault conviction. | Yes | Some purchased from Pepper Sports in Glen Ellyn, Ill. | Two rifles, one revolver, one shotgun | SKS 1954R, 30-caliber Winchester rifles; 12-gauge Remington pump-action shotgun; .38-caliber revolver | black | Male | http://articles.chicagotribune.com/2001-02-07/news/0102070 122_1_n avistar-gun-law-hunting- | http://articles.chicagotribune.com/2001-02-07/news/0102070 122_1_n avistar-gun-law-hunting- | | | Mass |
| Wakefield massacre | Wakefield, Massachusetts | 12/26/2000 | 2000 | Michael McDermott, 42, opened fire on co-workers at Edgewater Technology and was later arrested. | 7 | 0 | 7 | Workplace | Yes | Psychiatrist guessed he had paranoid schizophrenia, but McDermott had researched how to fake a mental illness on the internet. Defense lawyer described history of | Yes | Unknown | One semiautomatic handgun, one rifle (assault), one shotgun | .32-caliber Retolaza semiautomatic handgun; AK-47 variant semiautomatic rifle; 12-gauge Winchester 1300 pump-action | white | Male | http://www.time.com/time/magazin e/article/0,9171,9 3313,00.html; http://articles.cnn.com/200 | http://articles.cnn.com/200 2-04/justice/ctv.mc dermott.t rial_1_mi chael-mcderm com/200 1?t-jury- | | | Mass |
| Hotel shooting | Tampa, Florida | 12/30/1999 | 1999 | Hotel employee Silvio Leyva, 36, gunned down four coworkers at the Radisson Bay Harbor Inn before killing a woman outside who refused to give him her car. He was arrested shortly after the shootings. | 5 | 3 | 8 | Workplace | Yes | His brother called him "unbalanced" and mentally ill. | Yes | One purchased from Big E's in Tampa, Fla. | One semiautomatic handgun, one revolver | 9mm Lorcin semiautomatic handgun; .38-caliber Charter Arms revolver | Latino | Male | http://www.sptime.com/News/123 000/new s_pf/Ta mpaBay/ A_year_l ater__th e_str.sht ml; | http://www.sptime.com/News/123 000/new s_pf/Ta mpaBay/ A_year_l ater__th e_str.sht ml | | | Spree |
| Xerox killings | Honolulu, Hawaii | 11/2/1999 | 1999 | Byran Koji Uyesugi, 40, a Xerox service technician, opened fire inside the building with a 9mm Glock. He fled and was later apprehended by police. | 7 | 0 | 7 | Workplace | Yes | A psychiatrist, testifying for the prosecution, said he suffered from schizophrenia. | Yes | Hunting Supplies of Hawaii (The Armory) in Honolulu, Hawaii | One semiautomatic handgun | 9mm Glock 17 semiautomatic handgun | Asian | Male | http://archives.starbulletin.com/2000/06/02/news/story2.html; http://www.cpc.w | http://archives.starbulletin.com/2000/06/02/news/story2.html | | | Spree |
| Wedgwood Baptist Church shooting | Fort Worth, Texas | 9/15/1999 | 1999 | Larry Gene Ashbrook, 47, opened fire inside the Wedgwood Baptist Church during a prayer rally before committing suicide. | 8 | 7 | 15 | Religious | Yes | His siblings decribed him as a paranoid schizophrenic. | Yes | Trader's Village flea market in Grand Prairie, Texas | Two semiautomatic handguns | .380-caliber, 9mm Ruger P85 semiautomatic handguns | white | Male | http://www.nytimes.com/19 99/09/20 /us/fort-worth-remembers-those-killed-at-church.h | http://www.nytimes.com/19 99/09/18 /us/deat h-in-a-church-the-overview-with-question- | 47.3129607 | -122.3393665 | Mass |

Exhibit 16
Page 00732

ER_2914

Mother Jones' Investigation: US Mass Shootings, 1982-2018.

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Atlanta day trading spree killings | Atlanta, Georgia | 7/29/1999 | 1999 | Day trader Mark O. Barton, 44, who had recently lost a substantial sum of money, went on a shooting spree through two day-trading firms. He started at the All-Tech Investment Group, where he worked, then went on to Momentum Securities. He fled and hours later, after being cornered by police outside a gas station, committed suicide. (Two days before the spree, he killed his wife and two children with a hammer.) | 9 | 13 | 22 | Workplace | Yes | In letters, he details his deep depression and downward spiral. | Yes | Glock purchased from gun store in Warner Robins, Ga. | Three semiautomatic handguns, one revolver | .45-caliber Colt 1911-A1, 9mm Glock 17, .25-caliber Raven Arms MP-25 semiautomatic handguns; .22-caliber Harrington & Richardson | white | Male | http://www.indepe ndent.co.uk/news/i-dont-plan-to-live-much-longer-just-long-enough- | http://www.indepe ndent.co.uk/news/i-dont-plan-to-live-much-longer-just-long-enough- | 37.7789601 | -122.419199 | Mass |
| Columbine High School massacre | Littleton, Colorado | 4/20/1999 | 1999 | Eric Harris, 18, and Dylan Klebold, 17, opened fire throughout Columbine High School before committing suicide. | 13 | 24 | 37 | School | Yes | Harris was an alleged psychopath; Klebold was depressed and suicidal. | No | Purchased variously at Tanner Gun Show in Denver, Colo. and from an individual | One semiautomatic handgun (assault), one rifle (assault), two shotguns | 9mm Intratec DC-9 semiautomatic handgun; 9mm Hi-Point 995 carbine rifle; 12-gauge sawed-off Savage Stevens 311D, 12- | white | Male | http://www.usatod ay.com/news/nation/2009-04-13-columbine-myths_N.htm; | http://www.slate.com/articl es/news _and_pol itics/ass essment/ 2004/04/ the_depr essive_a nd_the_ | | | Mass |
| Thurston High School shooting | Springfield, Oregon | 5/21/1998 | 1998 | After he was expelled for having a gun in his locker, Kipland P. Kinkel, 15, a freshman at Thurston High, went on a shooting spree, killing his parents at home and two students at school. Five classmates wrestled Kipland to the ground before he was arrested. | 4 | 25 | 29 | School | Yes | Doctors testified that he was a paranoid schizophrenic who suffered from hallucinations. | No | Purchased variously from friend and father, and stolen from father | Two semiautomatic handguns, one rifle | 9mm Glock, .22-caliber Ruger semiautomatic handguns, .22-caliber Ruger rifle | white | Male | http://www.katu.com/news/local/80 82147.html; http://www.pbs.org/wgbh/pages/frontline/sh | http://cnn.com/200 0-01-10/cri mel/revisi ted_1_ki p-kinkel-thurston-high-ans | 42.3810555 | -76.8705777 | Mass |
| Westside Middle School killings | Jonesboro, Arkansas | 3/24/1998 | 1998 | Mitchell Scott Johnson, 13, and Andrew Douglas Golden, 11, two juveniles, ambushed students and teachers as they left the school; they were apprehended by police at the scene. | 5 | 10 | 15 | School | No | Boys displayed unruly and aggressive behavior. They picked on kids and made threats about killing people. | No | Stolen from grandfather and father | Two semiautomatic handguns, two rifles, three revolvers, two derringers | FIE 380, .380-caliber Star semiautomatic handguns; .44 Magnum Ruger, .30-06 Remington 742, .30-caliber Universal M-1 carbine | white | Male | http://www.vpc.or g/studies /wgun98 0324.ht m | http://www.nytime s.com/19 98/03/29 /us/from-wild-talk-and-friendshi p-to-five-deaths-in-a- | 31.1171194 | -97.7277959 | Mass |
| Connecticut Lottery shooting | Newington, Connecticut | 3/6/1998 | 1998 | Lottery worker Matthew Beck, 35, gunned down four bosses over a salary dispute before committing suicide. | 5 | 1 | 6 | Workplace | Yes | He had been hospitalized for psychiatric reasons and had a history of depression | Yes | Unknown | One semiautomatic handgun | 9mm semiautomatic handgun | white | Male | http://www.nytime s.com/19 98/03/07 /nyregion /rampag e-connecticut-overview-ill-connecti | http://www.nytime s.com/20 00/04/11 /us/hole-in-gun-control-law-lets-mentally-through. | 41.487104 | -120.542237 | Mass |
| Caltrans maintenance yard shooting | Orange, California | 12/18/1997 | 1997 | Former Caltrans employee Arturo Reyes Torres, 41, opened fire at a maintenance yard after he was fired for allegedly selling government materials he'd stolen from work. He was shot dead by police. | 5 | 2 | 7 | Workplace | No | He was disgruntled after being fired. | Yes | B&B Gun Sales in Orange County, Calif. | One rifle (assault) | 7.62mm AK-47 Chinese variant semiautomatic rifle | Latino | Male | http://arti cles.lati mes.com /1997/de c/20/new s/mn-431; http://arti cles.lati mes.com /1997/de | http://arti cles.lati mes.com /1997/de c/20/new s/mn-431 | 43.045601 | -74.984891 | Spree |
| R.E. Phelon Company shooting | Aiken, South Carolina | 9/15/1997 | 1997 | Ex-con Hastings Arthur Wise, 43, opened fire at the R.E. Phelon Company in retaliation for being fired after an argument with a supervisor. He attempted suicide by ingesting insecticide, failed, and was executed by the state of South Carolina eight years later. | 4 | 3 | 7 | Workplace | No | An ex-con, he had been freed from prison, although he displayed violent tendencies. | No | Unknown | One semiautomatic handgun | 9mm semiautomatic handgun | black | Male | http://www.vpc.or g/studies /wgun97 0915.ht m; http://chr onicle.au gusta.co m/stories /1997/09 | http://chr onicle.au gusta.co m/stories /1997/09 /18/met_ 214833.s html | 39.709283 | -104.823488 | Mass |

Exhibit 16
Page 00733

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 12 of 279

Mother Jones' Investigation: US Mass Shootings, 1982-2018

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 13 of 279

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental health | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Fort Lauderdale revenge shooting | Fort Lauderdale, Florida | 2/9/1996 | 1996 | Fired city park employee Clifton McCree, 41, opened fire on former coworkers he called "racist devils" inside their municipal trailer in an act of revenge after failing a drug test. He then committed suicide. | 6 | 1 | 7 | Workplace | Yes | Co-workers complained about his threats and verbal abuse. His supervisors asked him to get a psychiatric evaluation. He lost his job, which relatives | Yes | Unknown | One semiautomatic handgun, one revolver | 9mm Glock semiautomatic handgun; .32-caliber revolver | black | Male | http://www.nytime s.com/19 96/02/11 /us/florid a-killer-said-victims-were-racists-police- | http://arti cles.sun-sentinel. com/199 6-02-11/news/ 9602110 026_1_b each-crew-maintena | 47.6038321 | -122.3300624 | Spree |
| Walter Rossler Company massacre | Corpus Christi, Texas | 4/3/1995 | 1995 | Disgruntled former metallurgist James Daniel Simpson, 28, opened fire throughout the Walter Rossler Company where he had worked before exiting the building and committing suicide. | 6 | 0 | 6 | Workplace | Yes | He was likely angry because he was given an assignment at work he didn't like. But acquaintances didn't know why he'd come back and kill. | Yes | Unknown | One semiautomatic handgun, one revolver | 9mm Ruger semiautomatic handgun; .32-caliber revolver | uncle ar | Male | http://we b.caller.c om/2000 /april03/ today/loc al_ne/41 27.html http://we b.caller.c om/2000 /april/03/ today/loc al_ne/41 27.html | | 33.9412127 | -84.2135309 | Mass |
| Air Force base shooting | Fairchild Air Force Base, Washington | 6/20/1994 | 1994 | Former airman Dean Allen Mellberg, 20, opened fire inside a hospital at the Fairchild Air Force Base before he was shot dead by a military police officer outside. | 5 | 23 | 28 | Military | Yes | He was repeatedly diagnosed with emotional problems during his two years of service. | | Gun dealer in Spokane, Wash. | One rifle (assault) | MAK-90 semiautomatic rifle | white | Male | http://arti cles.lati mes.com /1994-06-22/news/ mn-7137_1_ air-force; http://ww w.nytime s.com/19 | http://arti cles.lati mes.com /1994-06-22/news/ mn-7137_1_ air-force | 38.2542376 | -85.759407 | Mass |
| Chuck E. Cheese's killings | Aurora, Colorado | 12/14/1993 | 1993 | Nathan Dunlap, 19, a recently fired Chuck E. Cheese's employee, went on a rampage through his former workplace and was arrested the following day. He now awaits execution on death row. | 4 | 1 | 5 | Workplace | Unclear | While he was in prison awaiting trial, the started acting bizare by stripping naked and playing with his feces, apparently to avoid the death penalty. A state doctor testified | Unknown | Unknown | One semiautomatic handgun | .25-caliber handgun | black | Male | http://ww w.denver post.com /news/ci _202189 52/auror a-chuck-e-cheese-killers-appeal-cites- | http://ww w.5280.c om/blogs /digital/ magazine/20 08/12/pol itics-killing?p age=0,6 | 33.741176 | -118.1046356 | Mass |
| Long Island Rail Road massacre | Garden City, New York | 12/7/1993 | 1993 | Colin Ferguson, 35, opened fire on an eastbound Long Island Rail Road train as it approached a Garden City station. He was later arrested. | 6 | 19 | 25 | Other | Yes | Psychiatrists and others said he suffered from racial paranoia and was obsessed with nonexistent conspiracies. His landlord said he had "delusions of | Yes | Turner's Outdoorsm an in Signal Hill, Calif. | One semiautomatic handgun | 9mm Ruger P89 semiautomatic handgun | black | Male | http://ww w.nytime s.com/19 93/12/12 /nyregion /torment ed-life-special-report-long-slide- | http://ww w.nytime s.com/19 93/12/12 /nyregion /torment ed-life-special-report-long-slide- | 34.436283 | -119.8714406 | Spree |
| Luigi's shooting | Fayetteville, North Carolina | 8/6/1993 | 1993 | Army Sgt. Kenneth Junior French, 22, opened fire inside Luigi's Italian restaurant while ranting about gays in the military before he was shot and arrested by police. | 4 | 8 | 12 | Other | No | He had an abusive father, who committed suicide. | Yes | Unknown | One rifle, two shotguns | .22-caliber rifle; two 12-gauge shotguns | white | Male | http://arti cles.lati mes.com /1993-08-08/news/ mn-21847_1 _kills-army-french; http://ne | http://ne ws.googl e.com/n ewspape rs?id=0A hPAAAA IBAJ&sji d=jhUEA AAAIBAJ &pg=650 5,24825 | 32.376081 | -88.68978002 | Mass |
| 101 California Street shootings | San Francisco, California | 7/1/1993 | 1993 | Failed businessman Gian Luigi Ferri, 55, opened fire throughout an office building before he committed suicide inside as police pursued him. | 9 | 6 | 15 | Other | No | He was down on his luck because of failed business decisions. One acquaintance said, "He was the least likely guy you can imagine doing something like | No | Super Pawn and Pacific Tactical Weapons, both in Las Vegas, Nev. | Three semiautomatic handguns (two assault) | Two Intratec DC-9, .45-caliber Colt semiautomatic handguns | white | Male | http://arti cles.lati mes.com /1993-07-03/news/ mn-10731_1 _mortga ge-business /2; | http://arti cles.lati mes.com /1993-07-03/news/ mn-10731_1 _mortga ge-business | 41.9005865 | -87.8567277 | Mass |

Exhibit 16
Page 00734

ER_2916

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 14 of 279

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental health | Mental health details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Watkins Glen killings | Watkins Glen, New York | 10/15/1992 | 1992 | John T. Miller, 50, killed four child-support workers in a county office building before turning the gun on himself. Miller was upset about a court order garnishing his paycheck to cover overdue child-support payments. | 5 | 0 | 5 | Other | Yes | The day before the shooting, he told child-support collection office workers that he was considering suicide. He had been convicted of felonious assault for threatening to kill his ex-wife. | Yes | Mumford Sports in Litchfield, Ohio | One semiautomatic handgun | 9mm Llama semiautomatic handgun | white | Male | http://www.nytimes.com/1992/10/17/nyregion/shooting-followed-tougher-efforts-to-collect-child- | http://www.nytimes.com/1992/10/24/nyregion/watkins-glen-killings-called-planned.html | 42.506484 | -71.0728306 | Mass |
| Lindhurst High School shooting | Olivehurst, California | 5/1/1992 | 1992 | Former Lindhurst High School student Eric Houston, 20, angry about a poor grade and various personal failings, killed three students and a teacher at the school before surrendering to police after an eight-hour standoff. He was later sentenced to death. | 4 | 10 | 14 | School | Yes | He suffered violent physical abuse as a child. He claimed a teacher had sexually abused him, but the truth of that allegation was contested. | Yes | Local gun retailer | One rifle, one shotgun | .22-caliber sawed-off rifle; 12-gauge pump-action shotgun | white | Male | http://www.school shooters.info/PL/Subject-Houston_files/Nine%20Bref%20Sketches.pdf | http://www.school shooters.info/PL/Subject-Houston_files/Nine%20Bref%20Sketches.pdf | 30.3321838 | -81.655651 | Mass |
| Royal Oak postal shootings | Royal Oak, Michigan | 11/14/1991 | 1991 | Laid-off postal worker Thomas McIlvane, 31, opened fire at his former workplace before committing suicide. | 5 | 5 | 10 | Workplace | Yes | Police revoked his CCW permit after determining he was mentally unstable. | Yes | Local gun store | One rifle | .22-caliber Ruger sawed-off semiautomatic rifle | white | Male | http://www.nytimes.com/1991/11/15/us/ex-postal-worker-kills-3-and-wounds-6-in- | http://www.nytimes.com/1991/11/15/us/ex-postal-worker-kills-3-and-wounds-6-in- | 39.1637984 | -119.7674034 | Mass |
| University of Iowa shooting | Iowa City, Iowa | 11/1/1991 | 1991 | Former graduate student Gang Lu, 28, went on a rampage on campus and then committed suicide at the scene. | 6 | 1 | 7 | School | Unclear | He was described as darkly disturbed and isolated. | Yes | Fin & Feather in Iowa City, Iowa | One revolver | .38-caliber Taurus revolver | Asian | Male | http://www.nytimes.com/1991/11/03/us/gun-man-in-iowa-wrote-of-plans-in-five-letters.ht | http://www.nytimes.com/1991/11/03/us/gun-man-in-iowa-wrote-of-plans-in-five-letters.ht | 28.0331886 | -80.6429695 | Spree |
| Luby's massacre | Killeen, Texas | 10/16/1991 | 1991 | George Hennard, 35, drove his pickup truck into a Luby's cafeteria and opened fire before committing suicide. | 24 | 20 | 44 | Other | No | Acquaintances described him as troubled, unstable, combative, and misogynistic. He made convenience store employees "nervous." | Yes | Mike's Gun Shop in Henderson, Nev. | Two semiautomatic handguns | 9mm Glock 17, 9mm Ruger P89 semiautomatic handguns | white | Male | http://www.nytimes.com/1991/10/18/us/portrait-of-texas-killer-impatient-and-troubled. | http://www.nytimes.com/1991/10/20/weekinreview/ideas-trends-ad-23-texas-and-1-anti-gun-measure | 27.9477595 | -82.458444 | Mass |
| GMAC massacre | Jacksonville, Florida | 6/18/1990 | 1990 | James Edward Pough, 42, opened fire at a General Motors Acceptance Corporation office before committing suicide. (The day prior, Pough killed a pimp and prostitute and injured two others. Those victims are not included in the mass murder count.) | 10 | 4 | 14 | Other | No | Police speculated he had a "grudge" against the people he killed. | Yes | Unknown | One rifle, one revolver | .30-caliber Universal M1 carbine rifle; .38-caliber revolver | black | Male | http://www.nytimes.com/1990/06/19/us/florida-gunman-kills-8-and-wounds-6-in- | http://www.nytimes.com/1990/06/20/us/hazy-records-helped-florida-gunman-buy-arms.ht | 21.3255125 | -157.8473055 | Mass |
| Standard Gravure shooting | Louisville, Kentucky | 9/14/1989 | 1989 | Joseph T. Wesbecker, 47, gunned down eight people at his former workplace before committing suicide. | 9 | 12 | 21 | Workplace | Yes | Prior to the shooting, he had voluntarily checked into hospitals for mental problems at least twice and attempted suicide three times. | AK-47 purchased from Tilford's Gun Sales in Louisville, Ky. | Three semiautomatic handguns (two assault), one revolver | Two Intratec MAC-11, 9mm SIG Sauer semiautomatic handguns; AK-47 Chinese variant semiautomatic rifle; .38- | white | Male | http://nl.newsbank.com/nl-search/we/Archive?p_product=L-H&s_site=kentucky&p_multi=LH&p_ | http://www.nytimes.com/1989/09/16/us/disturbed-bed-past-of-killer-of-7-is-unravele d.html | 32.2217429 | -110.926479 | Mass |

Exhibit 16
Page 00735

Mother Jones' Investigation: US Mass Shootings, 1982-2018

| Case | Location | Date | Year | Summary | Fatalities | Injured | Total victims | Venue | Prior signs of mental health | Mental health - details | Weapons obtained legally | Where obtained | Type of weapons | Weapon details | Race | Gender | Sources | Mental Health Sources | latitude | longitude | Type |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Stockton schoolyard shooting | Stockton, California | 1/17/1989 | 1989 | Patrick Purdy, 26, an alcoholic with a police record, launched an assault at Cleveland Elementary School, where many young Southeast Asian immigrants were enrolled. Purdy killed himself with a shot to the head. | 6 | 29 | 35 | School | Yes | He told a mental health professional he was "struggling to resist actions on thoughts which are destructive in nature." He also suffered from alcoholism. | Yes | Sandy Trading Post in Sandy, Ore.; Hunter Loan and Jewelry Co. in Stockton, Calif. | One semiautomatic handgun, one rifle (assault) | 9mm Taurus semiautomatic handgun; AK-47 Chinese variant semiautomatic rifle | white | Male | http://www.record net.com/apps/pbc s.dll/artic le?AID=/ 2009011 8/A_NE WS/901 170304; http://ne | http://www.record net.com/apps/pbc s.dll/artic le?AID=/ 2009011 8/A_NE WS/901 170304 | 32.5520013 | -117.0430813 | Mass |
| ESL shooting | Sunnyvale, California | 2/16/1988 | 1988 | Former ESL Incorporated employee Richard Farley, 39, gunned down seven people at his former workplace, after stalking and harassing a coworker he was romantically interested in. He was later arrested and now sits on death row at San Quentin. | 7 | 4 | 11 | Workplace | Yes | He stalked and harassed his colleague Laura Black for four years until she was granted a temporary restraining order aginst him. Before he was fired for his | Yes | Various sporting goods and gun stores in Northern California | Two semiautomatic handguns, one rifle, two revolvers, two shotguns | .380 ACP Browning, 9mm Smith & Wesson semiautomatic handguns; Ruger M-77 .22-250 bolt-action rifle with scope; Mossberg 12- | white | Male | http://articles.lati mes.com/1988-02-18/news/mn-43514_1 _mr-farley-richard-farley- | http://bo oks.goog le.com/b ooks?id=JiQUkwB nzgYC&pg=PA44 &lpg=PA 44&dq=ri chard+fa rley+ESL | 47.155846 | -122.437031 | Mass |
| Shopping centers spree killings | Palm Bay, Florida | 4/23/1987 | 1987 | Retired librarian William Cruse, 59, was paranoid neighbors gossiped that he was gay. He drove to a Publix supermarket, killing two Florida Tech students en route before opening fire outside and killing a woman. He then drove to a Winn-Dixie supermarket and killed three more, including two police officers. Cruse was arrested after taking a hostage and died on death row in 2009. | 6 | 14 | 20 | Other | Yes | He suffered from paranoid delusions. A judge found that he suffered from "extreme mental illness." | Yes | Gun store in Norwood, Ohio; The Oaks Trading Post in Melbourne, Fla. | One rifle, one revolver, one shotgun | Sturm, Ruger Mini-14 semiautomatic rifle; 20-gauge Winchester pump-action shotgun; .357 Ruger Blackhawk revolver | white | Male | http://articles.lati mes.com/1987-04-25/news/mn-990_1_p alm-bay-police | (Suprem e Court of Florida Documen t) http://ww w.murde rpedia.or g/male.C /images/ | 33.7490987 | -84.3901849 | Spree |
| United States Postal Service shooting | Edmond, Oklahoma | 8/20/1986 | 1986 | Postal worker Patrick Sherrill, 44, opened fire at a post office before committing suicide. | 15 | 6 | 21 | Workplace | Unclear | He was worried he had inherited mental problems and rebuffed a pastor's suggestion he seek psychiatric counseling. His family members denied he had a history of mental | Issued by Oklahoma National Guard, where Sherrill served, for target competition | Three semiautomatic handguns | .22-caliber, two .45-caliber Colt Model 1911-A1 semiautomatic handguns | white | Male | http://news.goog le.com/n ewspape rs?id=d m8aAAA AIBAJ&s jid=pyoE AAAAIB AJ&pg=2 297,487 0051&dq | http://ne wsok.co m/sherrill-feared-mental-illness-rejected/ article/21 77416 | 42.0986867 | -75.9179738 | Mass |
| San Ysidro McDonald's massacre | San Ysidro, California | 7/18/1984 | 1984 | James Oliver Huberty, 41, opened fire in a McDonald's restaurant before he was shot dead by a police officer. | 22 | 19 | 41 | Other | Yes | The day before the shooting, he tried to make an appointment at a mental health clinic. | Yes | Unknown | One semiautomatic handgun, one rifle (assault), one shotgun | 9mm Browning P35 Hi-Power semiautomatic handgun; 9mm Israeli Military Industries Uzi Model A carbine semiautomatic | white | Male | http://www.utsand iego.com /san-ysidro-massacr e/; http://ww w.vpc.or g/studies /wgun84 | http://w w.nctime s.com/ne ws/local/ article_2 7009-54ce-98df-79a23ff8 d0d7.ht | 41.6856325 | -72.72983827 | Mass |
| Dallas nightclub shooting | Dallas, Texas | 6/29/1984 | 1984 | Abdelkrim Belachheb, 39, opened fire at an upscale nightclub after a woman rejected his advances. He was later arrested. | 6 | 1 | 7 | Other | Yes | During his last meal with his wife, he confessed he was depressed and had visited psychiatric hospitals in Belgium. | No | Hines Boulevard Pawn Shop in Dallas, Texas | One semiautomatic handgun | 9mm Smith & Wesson 459 semiautomatic handgun | white | Male | http://bo oks.goog le.com/b ooks?id=Hr3OBw P-bUC&pg =PA338& pg=PA38 &dq=Abd elkrim+B | http://bo oks.goog le.com/b ooks?id=Hr3OBw P-bUC&pg =PA67&l pg=PA67 &dq=%2 2hine+pa | 33.7877944 | -117.8531119 | Mass |
| Welding shop shooting | Miami, Florida | 8/20/1982 | 1982 | Junior high school teacher Carl Robert Brown, 51, opened fire inside a welding shop and was later shot dead by a witness as he fled the scene. | 8 | 3 | 11 | Other | Yes | His second wife left him because she refused to seek psychological help. He had become increasingly isolated. One former student said he was "off | Garcia Gun Center in Hialeah, Fla. | One shotgun | Mossberg 500 Persuader pump-action shotgun with pistol grip | white | Male | http://ww w.nytime s.com/19 82/08/21 /us/gun man-in-miami-kills-8-in-rampage .html; http://ww | http://ne ws.googl e.com/n ewspape rs?id=uu YLAAAA IBAJ&sji d=C1kD AAAAIB AJ&pg=4 879,143 | 33.5598586 | -81.721952 | Mass |

Exhibit 16
Page 00736

ER_2918

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 15 of 279



Exhibit 17
Page 00738



# ANALYSIS OF RECENT MASS SHOOTINGS

Mayors Against Illegal Guns conducted a comprehensive analysis of every mass shooting between January 2009 and September 2013 that was identifiable through FBI data and media reports. This report describes the **93 MASS SHOOTINGS — ALMOST TWO PER MONTH — THAT OCCURRED IN 35 STATES** in the nearly five-year period. Each description includes the location of the shooting, number of people killed and/or injured, and information on the shooter, gun(s), ammunition, and gun purchase, where available.

The FBI defines "mass shooting" as any incident where at least four people were murdered with a gun. Mayors Against Illegal Guns reviewed mass shootings in the FBI's Supplementary Homicide Reports from 2009-2011, the most recent data available, and searched the media for further details about these incidents as well as for mass shootings that occurred in 2012 and 2013.

This survey includes every shooting we identified in which at least four people were murdered with a gun. And the findings reveal a different portrait of mass shootings in America than conventional wisdom might suggest:

Exhibit 17
Page 00739

**ER_2920**



**Analysis of Recent MASS SHOOTINGS** 3



**TOTAL U.S. FIREARM HOMICIDES**

## Mass shootings

represent a small share of total U.S. firearm homicides. Less than one percent of gun murder victims recorded by the FBI in 2010 were killed in incidents with four or more victims.



**151% MORE SHOT**

**63% MORE KILLED**

## Assault weapons or high-capacity magazines

were used in at least 14 of the incidents (15%). These incidents resulted in an average of 14.4 total people shot — 151% more people shot than in other incidents (5.7) — and 7.8 deaths — 63% more deaths than in other incidents (4.8).

Exhibit 17
Page 00740

ER_2921

**4**            **Analysis of Recent MASS SHOOTINGS**            



### Domestic or family violence

There was a noteworthy connection between mass shooting incidents and domestic or family violence. In at least 53 of the cases (57%), the shooter killed a current or former spouse or intimate partner or other family member, and in at least 17 incidents the shooter had a prior domestic violence charge.

### Mental health

We did not find evidence that any of the shooters were prohibited from possessing guns by federal law because they had been adjudicated mentally ill or involuntarily committed for treatment. In 10 of the 93 incidents (11%), we found evidence that concerns about the mental health of the shooter had been brought to the attention of a medical practitioner, school official or legal authority prior to the shooting.

### Role of prohibited possessors

Certain categories of people, including felons, certain domestic abusers, and people adjudicated mentally ill are prohibited by federal law from possessing guns. We had sufficient evidence to judge whether the shooter was a prohibited gun possessor in 75 of the 93 incidents (81%). Of those 75 incidents, 32 (43%) involved a prohibited possessor, and 43 (57%) did not.

Exhibit 17
Page 00741



**Analysis of Recent MASS SHOOTINGS**                                        **5**



### "Gun-free" zones

Sixty-two of the 93 incidents (67%) took place wholly in private residences. Of the 31 incidents in public spaces, at least 17 took place wholly or in part where concealed guns could be lawfully carried. All told, no more than 14 of the shootings (15%) took place entirely in public spaces that were so-called "gun-free zones."

### Suicide

In 40 of the 93 incidents (43%), the shooter committed suicide during the incident.

### Law enforcement

In 13 of the 93 shootings (14%), law enforcement or military officers were targeted in the shooting or killed or injured responding to it.



### Workplace and school shootings

Four of the 93 shootings (4%) occurred at the shooter's current or former workplace. Four of the 93 shooting incidents (4%) took place in schools, including primary, secondary, and college campuses.

Exhibit 17
Page 00742

ER_2923

**6**          Analysis of Recent **MASS SHOOTINGS**          

# MASS SHOOTING INCIDENTS
# JANUARY 2009–SEPTEMBER 2013
## (in reverse chronological order)

**Washington, D.C., 9/16/2013:** The alleged shooter, who was a civilian contractor and former non-combat military, killed twelve and wounded three more in an attack on Building 197 at the Navy Yard.

- **SHOOTER NAME:** Aaron Alexis, 34
- **GUN DETAILS:** The shooter arrived with a shotgun and also obtained a handgun from one a security guard that he killed.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Two days before the incident the shooter passed a National Instant Criminal Background Check System (NICS) at the licensed gun dealer Sharpshooters in Lorton, VA, and purchased the shotgun.
- **PROHIBITING CRITERIA:** The shooter had been arrested at least three times including: in September 2010 in Fort Worth, Texas for shooting a firearm into a neighbor's apartment; in August 2008 in Dekalb County, Georgia for disorderly conduct; and in 2004 in Seattle, Washington for shooting out the tires of another man's vehicle. But court records do not indicate he was convicted in any of these cases, and this record did not prohibit him from buying guns. He had also received treatment for mental health conditions at two VA hospitals beginning in August, 2013 following an incident where he called Newport Rhode Island Police to report hearing voices. But these incidents did not rise to the level of prohibiting from buying guns. And during his military service he was reportedly cited on at least eight occasions for misconduct ranging from traffic tickets and showing up late for work to insubordination, extended absences from work, and disorderly conduct. On account of this the Navy sought to offer him a "general discharge" but he was ultimately honorably discharged through the early-enlisted transition program in January 2011.
- **NOT A GUN-FREE ZONE:** There were armed guards at the Washington Navy Yard, and the shooter was familiar with the premises, so he did not select it as a target on the presumption he would not faced armed resistance. In fact, the shooter reportedly used a gun that he took from a guard after killing him.

---

**Crab Orchard, TN, 9/11/2013:** Bennett and his girlfriend Moser killed a woman and three teenagers, apparently during an attempted robbery during a marijuana exchange. The victims' bodies were discovered in a car parked along the side of the road in the Renegade Mountain resort community near Crossville.

- **SHOOTER NAME:** Jacob Allen Bennett, 26 and Brittany Lina Yvonn Moser, 25
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Bennett was prohibited from possessing firearms. In 2010 he received a 6-year prison sentence for charges of theft, forgery, and possession of a handgun during a felony, but was paroled on March 4, 2013. The Cumberland County sheriff's office estimated they had previously arrested Bennett

Exhibit 17
Page 00743

 **Analysis of Recent MASS SHOOTINGS**                                                      **7**

five times.

- **NOT A GUN-FREE ZONE:** We could find no evidence that permit holders were prohibited from carrying guns in this area. In Tennessee, concealed weapons would be prohibited only if the county or municipality declared itself a gun-free zone.

---

## Oklahoma City, OK, 8/14/13: The shooter killed four of his relatives including an infant inside of their family home.

- **SHOOTER NAME:** Daniel Green, 40
- **GUN DETAILS:** .380 semiautomatic handgun
- **AMMO DETAILS:** A box of .380 handgun ammunition was found in the vehicle when the shooter was arrested.
- **GUN ACQUIRED:** One of the victims owned a .380 semiautomatic handgun and kept it hidden in the attic.
- **PROHIBITING CRITERIA:** Green's father told police in an affidavit that his son was schizophrenic, but there is no evidence that Green had been adjudicated mentally ill or had a criminal history that would prohibit gun ownership.

---

## Dallas, TX, 08/07/2013: The gunman shot and killed his girlfriend and her daughter, and injured two others; and then in a separate attack shot and killed his estranged wife and her daughter, and injured another two people. He also detonated an explosive but it did not harm anyone.

- **SHOOTER NAME:** Erbie Lee Bowser, 44
- **GUN DETAILS:** .380 pistol
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter's estranged wife had obtained a protective order against Bowser in February 2011, citing family violence, and he was later arrested for violating the order. The order seems to have expired in February 2012, but that would likely have been prohibiting while it was in place. A criminal conviction for domestic violence, which would also likely have been prohibiting, was expunged from his record after he completed a court program for veterans in the summer of 2012. Bowser was a veteran, but he had not served in combat — making him ineligible to enter the program. He apparently lied about his military history in order to enter the program.

---

## Clarksburg, WV, 07/26/2013: According to a criminal complaint, the shooter was trying to collect $10,000 two men owed him for drugs when one of them aimed a handgun at him. He stripped the man of the weapon and used it to kill them both; he then shot and killed a father-son newspaper delivery team that happened to be outside the house.

- **SHOOTER NAME:** Sidney Muller, 27
- **GUN DETAILS:** 9mm Beretta
- **AMMO DETAILS:** Unknown

Exhibit 17
Page 00744

**8**     <span style="color:darkred">Analysis of Recent **MASS SHOOTINGS**</span>     

- **GUN ACQUIRED:** Gun apparently belonged to one of the victims
- **PROHIBITING CRITERIA:** The shooter had been convicted previously for driving under the influence and had been arrested for driving with a suspended license, but was not criminally prohibited from possessing a gun. The shooter was also a veteran of the U.S. Marine Corps and his lawyers indicated he had scored four out of five in Post-Traumatic Stress Disorder testing and had been diagnosed as bipolar. He was reportedly in treatment at the local VA hospital. But there is no evidence his mental illness rose to the level of prohibiting him from possessing guns.

## Hialeah, FL, 7/16/13: The shooter killed the two managers of his building, a bystander across the street, and three more occupants before police killed him in a standoff.

- **SHOOTER NAME:** Pedro Alberto Vargas, 42
- **GUN DETAILS:** Glock 17 9mm semiautomatic pistol
- **AMMO DETAILS:** Hundreds of additional rounds were found in Vargas' apartment following the incident.
- **GUN ACQUIRED:** Vargas obtained a concealed weapons permit after completing a two-hour training and four-hour safety course in the fall of 2010 at the Florida Gun Center in Hialeah. In October 2010 he passed a background check and purchased a Glock 17, which was used in the shootings.
- **PROHIBITING CRITERIA:** The shooter had developed a pattern of anonymously harassing his former co-workers online, and was confronted about it three days before the shooting. But there is no evidence Vargas was prohibited from owning a gun.

## Santa Monica, CA, 6/7/13: The shooter killed his father and brother, burned down their house, and shot and wounded a passing driver who tried to intervene. He then carjacked another vehicle and made the driver transport him to Santa Monica College, firing at a city bus and police cruiser along the way, injuring three. Once on the college's campus, he shot and killed three people outside and fired 70 rounds at students in the library before he was shot and killed by police.

- **SHOOTER NAME:** John Zawahri, 23
- **GUN DETAILS:** The shooter was armed with a .223 caliber AR-15 assault rifle that did not have a serial number; this type of rifle is prohibited in California. A .44 caliber "black powder" revolver that had been converted to fire .45 caliber rounds and three 'Zip Guns,' which are illegal to possess, were also recovered.
- **AMMO DETAILS:** The shooter was carrying a duffel bag containing approximately 1,300 rounds of ammunition. He was armed with approximately forty 30-round .223 magazines, which are illegal to purchase, sell, or transfer in the state of California.
- **GUN ACQUIRED:** The assault rifle, high-capacity magazines, and several components to modify the firearms may have been shipped from outside California. The firearms were not registered to the shooter or to his family members.
- **PROHIBITING CRITERIA:** The shooter had a history of mental health issues and had previously been held for a short-term psychiatric evaluation, which would have prohibited him from accessing or possessing a firearm for five years, but the prohibition expired in 2011. The shooter had attempted to buy a firearm in 2011, but a letter from the Department of Justice discovered in his bedroom after the shooting indicated that he had not been eligible to purchase it at that time, likely because of this hospitalization.

Exhibit 17
Page 00745

 **MAYORS AGAINST ILLEGAL GUNS**   **Analysis of Recent MASS SHOOTINGS**                                           **9**

---

## Fernley, NV, 05/13/2013: On May 10th, the shooter killed a couple in their home and stole $3,500 in cash and jewelry. Three days later, he killed two more people and stole a firearm and their vehicle, and then shot and killed another person later that day.

- **SHOOTER NAME:** Jeremiah Bean, 25
- **GUN DETAILS:** NEF Co. Model R92 .22 caliber handgun. The shooter also stole a Smith & Wesson from one of his victims.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter had been previously convicted for felony charges of burglary and grand larceny, and finished his parole in December 2012. This criminal record likely prohibited him from possessing firearms.

---

## Waynesville, IN, 5/11/13: The alleged shooter killed four people in a home where methamphetamine was subsequently discovered, leading police to believe the crime was drug-related.

- **SHOOTER NAME:** Samuel Earl Sallee, 55
- **GUN DETAILS:** A Ruger 10/22 .22 caliber rifle was recovered.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The alleged shooter, who had been at the location of the homicides just hours before the bodies were discovered, was taken into custody two days after the shooting. He was prohibited from possessing firearms due to several prior felony convictions including for intimidation, drunk driving (on multiple occasions), receipt of stolen property, and battery. Although authorities delayed in charging the shooter with a crime while they tried to determine a motive for the homicides, they charged him with illegal firearm possession.

---

## Ottawa, KS, 04/28/2013: The shooter raped and killed a woman, as well as killing her 18-month old daughter and two men who were with her at a farm in eastern Kansas.

- **SHOOTER NAME:** Kyle Flack, 27
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In 2005 the shooter was convicted of attempted murder in the 2nd degree, having shot a man five times with a pistol, but he only served two years of a five-year sentence and was paroled in July 2009. He was required to register as a violent offender until 2024 and was prohibited from buying guns. His mother also sought mental health treatment on his behalf; her concerns were dismissed, but Flack ultimately submitted to a mental health evaluation.

---

## Manchester, IL, 4/24/13: The shooter broke into a home and killed the grandmother of his child and four of her family members including two young children, apparently related to a cus-

Exhibit 17
Page 00746

**ER_2927**

**10**          Analysis of Recent **MASS SHOOTINGS**          

tody dispute over his 3-year-old daughter. The shooter was subsequently killed in a gunfight with law enforcement.

- **SHOOTER NAME:** Rick Odell Smith, 43
- **GUN DETAILS:** All of the victims were killed with a Winchester 20-gauge pump-action shotgun. A .270 Bolt Action Winchester rifle and Ruger carbine rifle were also recovered.
- **PROHIBITING CRITERIA:** The shooter had been previously convicted for felony reckless homicide, which would likely have prohibited from possessing guns, along with drug possession and writing bad checks.

## Federal Way, WA, 4/21/13: The shooter killed his girlfriend inside the apartment they shared and then fatally shot two men in a nearby parking lot. When a neighbor called 911, the shooter broke down the man's door with a shotgun and killed him. He was subsequently shot and killed by police.

- **SHOOTER NAME:** Dennis Clark III, 27
- **GUN DETAILS:** .40 caliber semi-automatic handgun and a pistol grip Mossberg 500 pump shotgun. Federal Way Police report that Clark had a permit to carry a concealed weapon and was the registered owner of at least two firearms, including the handgun he used in the shooting.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Clark had no criminal convictions but in 2002 had used a BB gun to shoot a girl in the buttocks and back after she broke up with him, resulting in a fourth-degree assault charge that was dismissed. He was charged with misdemeanor criminal trespass in 2003. And in March 2009 he was charged with harming a police dog but the case was dismissed.

## Akron, OH, 4/18/13: The shooters killed four people inside a townhouse; the initial motive for the crime was reportedly robbery.

- **SHOOTER NAME:** Derrick Brantley, 21 and Deshanon Haywood, 21
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** One shooter, Brantley, was free on bond awaiting trial on felony charges of heroin trafficking. The other, Haywood, was paroled from prison in February 2012 after serving part of a two-year sentence for cocaine trafficking and heroin possession. He immediately violated his parole and was sentenced to 45 days of house arrest. Both were likely prohibited from possessing firearms by their criminal histories.

## Herkimer, NY, 04/13/2013: The shooter killed two people and critically wounded one at John's Barber Shop and then killed two more people at Gaffey's Fast Lube, a car care facility. He was killed by responding officers.

Exhibit 17
Page 00747

 **Analysis of Recent MASS SHOOTINGS** **11**

- **SHOOTER NAME:** Kurt Myers, 64
- **GUN DETAILS:** According to the police superintendent, Myers used a shotgun. Additional guns and ammunition were found by emergency crews after Myers set fire to the apartment.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no reason to believe Myers was prohibited him from possessing a gun. He was arrested in 1973 for drunk driving
- **NOT A GUN-FREE ZONE:** Gaffey's Fast Lube does not have a specific policy prohibiting guns  and allows permit holders to carry concealed weapons on the premises. John's Barbershop did not reopen following the shooting but the owner of a neighboring business did not recall the barbershop having any explicit firearm policy or ban, which would have been required to prohibit customers from carrying guns on the premises.

---

**Albuquerque, NM, 1/19/13:** The shooter killed his parents and three siblings in their home. He then loaded a van with guns and ammunition with the intent to kill his girlfriend's family and die in a shootout at Wal-Mart, according to court documents. Instead, he spent the next day with his girlfriend and her family and went to a church he regularly attended, where he was arrested for murder after speaking with the pastor.

- **SHOOTER NAME:** Nehemiah Griego, 15
- **GUN DETAILS:** AR-15 assault rifle, .22 rifle, and two shotguns
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The guns had been legally purchased by his parents.
- **PROHIBITING CRITERIA:** As a juvenile, the shooter was prohibited from purchasing firearms, but it was lawful for him to possess long guns like those used in the incident.

---

**Tulsa, OK, 1/7/13:** During a robbery the shooters bound the hands of four women in an apartment at the Fairmont Terrace complex and shot each one in the head. The 3-year-old son of one of the victims was in the apartment at the time of the incident but was unharmed.

- **SHOOTER NAME:** Cedric Dwayne Poore, 39 and James Stanford Poore, 32
- **GUN DETAILS:** .40 caliber pistol
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Both shooters had extensive criminal histories: Cedric Poore received a 35-year prison sentences in 1995 for armed robbery and James Poore received a 12-year sentence in 2000 for armed robbery with a firearm. Both were released in 2011, but likely remained prohibited from possessing firearms.

---

**Newtown, CT (Sandy Hook Elementary School), 12/14/12:** The shooter killed his

Exhibit 17
Page 00748

**12**   **Analysis of Recent MASS SHOOTINGS**   

mother in her home and then traveled to a nearby elementary school where he shot twenty-eight people, killing twenty-six of them, including twenty children, before killing himself.

- **SHOOTER NAME:** Adam Peter Lanza, 20
- **GUN DETAILS:** A Bushmaster .223 assault-style rifle was used in the attack at the elementary school. A 10mm Glock handgun, a 9mm SIG Sauer handgun, and a shotgun were also recovered at the crime scene.
- **AMMO DETAILS:** Lanza was carrying multiple high-capacity clips, reportedly enough ammunition to kill nearly every student at school.
- **GUN ACQUIRED:** The guns were legally registered to Lanza's mother, who he shot and killed earlier in the day and with whom he lived.
- **PROHIBITING CRITERIA:** Under Connecticut law, Lanza would have been prohibited from possessing handguns because he had not reached the legal age, 21. However, he would not have been prohibited from possessing a long gun like the Bushmaster rifle used in the shooting. Lanza's mental health was also scrutinized after the shooting, and while his social isolation had been noted, we did not find evidence that concerns had been brought to the attention of a public authority.

## Tule River Reservation, CA, 12/8/2012: The shooter killed his mother and two uncles in the travel trailer where they lived and injured his young son; he then shot his two daughters, one fatally, while fleeing with them from the police. The gunman died after a shootout with police in which he also shot himself in the head.

- **SHOOTER NAME:** Hector Celaya, 31
- **GUN DETAILS:** .38 caliber revolver
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Celaya had been imprisoned in 2008 for an assault and battery charge and was prohibited from having weapons as a condition of three years' probation. It is likely that this criminal record prohibited him from possessing firearms. He was subsequently arrested multiple times for driving while intoxicated, and was due in court in January 2013 to face a misdemeanor drug possession charge.

## Detroit, MI, 12/4/2012: Three adults and one minor were shot to death in a house on the east side of the city before a fire broke out, apparently set by the shooter. There are no reports of arrests or suspects.

- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The assailants are unknown.

## Northridge, CA, 12/02/2012: The shooter arrived at an unlicensed boarding house on Devonshire street, reportedly in search of his girlfriend, and after a dispute shot and killed four people

Exhibit 17
Page 00749

 **Analysis of Recent MASS SHOOTINGS**                                    **13**

outside.

- **SHOOTER NAME:** Ka Pasasouk, 31
- **GUN DETAILS:** semiautomatic handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was prohibited from possessing guns, having been convicted for car theft and felony robbery. While on probation in September 2012, he was arrested again for possession of methamphetamine. According to the district attorney, a prosecutor then released him on probation over the objection of probation officials, who believed he posed a threat to the safety of the community.
- **NOT A GUN-FREE ZONE:** Permit holders were not prohibited from carrying guns in this area.

---

**New Town, ND, 11/18/2012:** The shooter murdered a woman and her three grandchildren in their home on Fort Berthold Indian Reservation. When confronted by police he stabbed himself in the neck and died of his injuries.

- **SHOOTER NAME:** Kalcie Eagle, 21
- **GUN DETAILS:** .25-06 hunting rifle
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The rifle did not belong to the shooter; police speculated that it may have belonged to a family member.
- **PROHIBITING CRITERIA:** In March 2012, Eagle was arrested in a stolen pickup truck after a high-speed chase with police. He pled guilty to felony unauthorized use of a vehicle, and was sentenced to a year in jail, with more than three years of supervised probation and more than $45,000 in fines and restitution. Because of this offense, he was likely prohibited from possessing a firearm.

---

**Minneapolis, MN, 9/27/12:** The shooter killed six people and injured two at a signage business, from which he was fired earlier in the day, before killing himself.

- **SHOOTER NAME:** Andrew John Engeldinger, 36
- **GUN DETAILS:** Glock 9mm semiautomatic handgun
- **AMMO DETAILS:** Engeldinger fired at least 46 bullets during the shooting. At his home, police recovered packaging for 10,000 rounds of ammunition.
- **GUN ACQUIRED:** Engeldinger purchased the gun used in the shooting one year before at KGS Guns and Ammo in Minneapolis after passing a background check and obtaining a permit-to-purchase. Around the same time, Engeldinger purchased another, similar handgun that police recovered when searching his home.
- **PROHIBITING CRITERIA:** Engeldinger had a concealed carry permit and was not prohibited from possessing a gun. But his family suspected he had paranoid schizophrenia and two years before the shooting they reached out on his behalf to the National Alliance on Mental Illness. Engeldinger did not pursue treatment.
- **ONLINE CONNECTION:** According to Minneapolis Police, Engeldinger may have purchased some or all of his stockpiled ammunition online from out-of-state dealers.

Exhibit 17
Page 00750

**14**   Analysis of Recent **MASS SHOOTINGS**   

---

**Oak Creek, WI, 8/5/12:** The shooter killed six people at a Sikh temple and injured three others, including a responding police officer, before killing himself.

- **SHOOTER NAME:** Wade Michael Page, 40
- **GUN DETAILS:** 9mm semiautomatic handgun
- **AMMO DETAILS:** Page reportedly bought three 19-round magazines when he purchased the gun.
- **GUN ACQUIRED:** Page acquired the gun at a local gun shop a week before the shooting.
- **PROHIBITING CRITERIA:** Page was involved with the white supremacist movement but he does not appear to have been prohibited from purchasing a gun. He received a discharge from the army "under other than honorable conditions" and was demoted from sergeant to specialist, but this did not affect his access to firearms. Federal officials investigated Page's ties to supremacist groups more than once prior to the shooting, but did not collect enough evidence to open an investigation.
- **NOT A GUN-FREE ZONE:** Nothing restricted the possession of a firearm on the property. Wisconsin state law permits people to carry their guns in temples and other places of worship unless there is a sign or they have been personally notified that carrying firearms is prohibited by the property owner or occupant. Amardeep Kaleka, whose father founded the temple and was killed during the attack, confirmed that there was no such sign on the property.

---

**Aurora, Co, 7/20/12:** The shooter killed twelve and wounded fifty-eight in an attack on a suburban movie theater during a midnight screening of Batman.

- **SHOOTER NAME:** James Holmes, 24
- **GUN DETAILS:** Smith & Wesson AR-15 assault-style rifle, Remington 870 12-gauge shotgun, and two Glock .40 caliber handguns.
- **AMMO DETAILS:** Holmes had a 100-round drum magazine for the AR-15 and reportedly only ceased firing with it when it jammed.
- **GUN ACQUIRED:** Holmes acquired the guns at local gun shops.
- **PROHIBITING CRITERIA:** While a student at the University of Colorado, Holmes was treated by the school psychiatrist, who expressed concern about his behavior and referred him to the university Behavioral Evaluation and Threat Assessment (BETA) team. They took no further action and he was never adjudicated mentally ill.
- **ONLINE CONNECTION:** Holmes purchased over 6,000 rounds of ammunition online.

---

**Newton Falls, OH, 7/6/12:** The shooter killed his girlfriend, another couple, and their son in two separate shootings, before being cornered by the police and killing himself.

- **SHOOTER NAME:** Robert Brazzon, 55
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Brazzon had previously pled guilty to felony drug trafficking after police seized 47 guns from his home in 1999 (the guns were later returned to Brazzon's brother and son following a

Exhibit 17
Page 00751



**Analysis of Recent MASS SHOOTINGS**                                                    **15**

court petition). But due to Ohio laws that provide for the restoration of felons' firearm rights, it is unclear whether Brazzon was prohibited from possessing firearms at the time of the shooting.

## Tempe, AZ, 6/2/2012:
The shooter killed his wife and three children inside of their home, then drove the bodies to a location in the Vekol Valley desert, where he lit the car on fire and shot himself. His wife had filed for a divorce earlier in the year but he had not vacated their shared residence. He was also reportedly undergoing treatment for a brain tumor.

- **SHOOTER NAME:** James Butwin, 47
- **GUN DETAILS:** Two guns were recovered in the vehicle, and the caliber of the shells for one matched those found in the house where the murders took place.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that Butwin was prohibited from owning a gun.

## Seattle, WA, 5/20/12:
The shooter killed five people in a string of neighborhood shootings that began in a coffee shop, and later killed himself.

- **SHOOTER NAME:** Ian Lee Stawicki, 40
- **GUN DETAILS:** At least one Para-Ordnance .45 caliber handgun – some reports say he carried two.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Stawicki legally purchased the weapon used in the shooting in addition to two others.
- **PROHIBITING CRITERIA:** The shooter was a concealed carry permit holder but had a history of mental illness and arrests. He was twice charged with misdemeanor assault but both cases were dismissed when the victims — his girlfriend and brother — refused to testify. Before the shooting, Stawicki's family attempted to have his concealed carry permit revoked. Stawicki's family had become concerned that his mental health had worsened. However, his family was rebuffed by authorities, who said they had no legal basis to revoke Stawicki's permit on claims about Stawicki's behavior alone.

## Leivasy, WV, 5/19/2012:
The shooter killed a man after a dispute over a debt for drugs, as well as his girlfriend and their two children.

- **SHOOTER NAME:** James Roy Belknap, 27
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In 2007, Belknap pled guilty on charges of conspiracy to deliver cocaine and was sentenced to 5 years in prison. In exchange, prosecutors dismissed a grand jury indictment charging him with murder. He was therefore prohibited from possessing a gun.

Exhibit 17
Page 00752

**ER_2933**



**16**  **Analysis of Recent MASS SHOOTINGS**

---

## Port St. John, FL, 5/15/12: The shooter attacked her four children — ages 12 to 17 — in her home, killing them before shooting and killing herself. An autopsy indicated that she had a blood alcohol level of .16 at the time of the shooting — twice the legal limit.

- **SHOOTER NAME:** Tonya Thomas, 33
- **GUN DETAILS:** Taurus .38 caliber revolver
- **AMMO DETAILS:** She fired 18-hollow-point rounds during the incident, reloading the gun three times.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence she was prohibited from possessing a gun. The shooter was charged with misdemeanor battery in 2002 for striking the father of her children but it was later dropped.

---

## Gilbert, AZ, 5/2/12: The shooter, formerly a member of the U.S. Marine Corps and a founder and leader of a border militia group, shot and killed four people including his girlfriend, before killing himself. At the time of the incident he was running for the office of Pinal County Sheriff.

- **SHOOTER NAME:** Jason Todd ("J.T.") Ready, 39
- **GUN DETAILS:** At least two handguns and a shotgun were recovered from the scene. Six-armor piercing grenades, which may not legally be possessed by civilians, were also recovered.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that the shooter was prohibited from owning guns, even though he had a record of dangerous behavior. In 1992, he was arrested for damage to property and aggravated assault with a weapon and pled guilty to simple assault, a misdemeanor. He was court-martialed twice during his military service, the second resulting in a bad conduct discharge in 1996. In 2009, a woman filed an order of protection against him, but it was not active at the time of the shooting. Officers had also responded to multiple domestic violence calls from Ready's home. Indeed, his girlfriend went to police headquarters on February 28, 2012 to make a complaint and report two domestic violence incidents, but she did not go to court to file for an order of protection.

---

## Oakland, CA (Oikos University), 4/2/12: The shooter killed seven people at a Korean Christian college, where he had formerly been a student.

- **SHOOTER NAME:** One L. Goh, 43
- **GUN DETAILS:** .45 caliber handgun
- **AMMO DETAILS:** Goh was armed with four magazines of ammunition, holding 10 rounds each.
- **GUN ACQUIRED:** The gun was purchased legally in California two months before the shooting.
- **PROHIBITING CRITERIA:** None apparent, though Goh was expelled from the school for disciplinary problems.

---

## Norcross, GA, 2/20/12: The shooter returned to a Korean spa from which he'd been kicked out after an altercation, where he shot and killed two of his sisters and their husbands before commit-

Exhibit 17
Page 00753

 **MAYORS AGAINST ILLEGAL GUNS** | **Analysis of Recent MASS SHOOTINGS** | **17**

ting suicide.

- **SHOOTER NAME:** Jeong Soo Paek, 59
- **GUN DETAILS:** .45 caliber handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Police reported that he acquired the gun legally.
- **PROHIBITING CRITERIA:** Paek does not appear to have been prohibited, although he had allegedly served two months in jail for assaulting his sister six years earlier. In 2006 she applied for a temporary protection order and described his intention to harm himself or others with guns.
- **NOT A GUN-FREE ZONE:** We could find no indication that the property owner forbade possession of a firearm on their property.

---

### Villa Park, IL, 1/17/2012: The shooter killed his girlfriend, her two sons, and her niece while they slept. After leaving the scene of the crime he shot himself and died of his injuries.

- **SHOOTER NAME:** Cedric Anderson, 42
- **GUN DETAILS:** .357 Magnum handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Anderson has several drug-related offenses dating back to 1990, and in 2008 received probation for possessing a firearm without the required license. On December 29, 2011 was convicted of felony heroin possession, and was awaiting sentencing at the time of the massacre. He was therefore prohibited from possessing a gun.

---

### Grapevine, TX, 12/25/11: The shooter killed his estranged wife, two children, and three other family members as they opened their Christmas presents, before killing himself. The shooter's wife had filed for bankruptcy in August 2010 and reportedly separated from him during the proceedings, moving to the apartment complex where the shooting took place.

- **SHOOTER NAME:** Aziz Yazdanpanah, 56
- **GUN DETAILS:** 9mm and .40 caliber handguns
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The 9mm was purchased in 1996 and registered to the shooter.
- **PROHIBITING CRITERIA:** In 1996, the shooter pled guilty to one count of subscribing to a false income tax return, and was fined $1000 and placed on three years' probation. But police said the 9mm was legally registered to the shooter and there is no evidence that he was otherwise prohibited from purchasing a gun.

---

### Emington, IL, 12/16/2011: The shooter killed her boyfriend and her three children before taking her own life in the backyard of their home.

- **SHOOTER NAME:** Sara McMeen, 30

Exhibit 17
Page 00754

**ER_2935**

**18**   **Analysis of Recent MASS SHOOTINGS**   

- **GUN DETAILS:** Semi-automatic pistol
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from owning a gun. But she reportedly suffered from bipolar disorder and postpartum depression, and did not take any medication. She also had a family history of mental illness and violence. In 1971, McMeen's father shot and killed his wife with a 12-gauge shotgun. He was found not guilty by reason of insanity, and diagnosed with schizophrenia with suicidal and homicidal tendencies.

---

## Gargatha, VA, 12/15/11: The shooter killed two of his children, their mother, and the man she was living with before killing himself. The shooter was reportedly involved in a custody dispute with the woman at the time of her death.

- **SHOOTER NAME:** Esteban Quintero-Gonzales, 37
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

---

## Bay City, TX, 11/30/11: The shooter and his wife argued in their mobile home, and when she exited he shot her three times in the front yard, injuring her, before killing his four children aged 2 to 5 and then killing himself.

- **SHOOTER NAME:** Jose Avila-Alva, 24
- **GUN DETAILS:** .22 caliber revolver
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The handgun was reported stolen in 2010.
- **PROHIBITING CRITERIA:** The shooter was not a legal resident of the U.S., and had been deported to Mexico in 2006 for unlawful entry, which would have prohibited him from purchasing a gun. One week earlier, on November 22, 2011, the shooter's wife filed an assault report against him and was taken to a crisis center by police, but she did not press charges.

---

## Greensboro, NC, 11/20/2011: The shooter shot and injured a married man she had been having an affair with since 2008, injuring him. At some point that morning she also shot four children in her house, including her older son, a niece, a nephew, and a friend, and they all died of their injuries. She then picked up her son from a sleepover, shot and killed him, and turned the gun on herself.

- **SHOOTER NAME:** Mary Ann Holder
- **GUN DETAILS:** .38 caliber handgun

Exhibit 17
Page 00755

**ER_2936**

 **Analysis of Recent MASS SHOOTINGS** 19

- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun. The wife of the man the shooter was having an affair with sought a restraining order against her earlier in 2011; the shooter responded by requesting a restraining order against the man and his wife. Both orders had expired.

## Liberty, SC, 10/14/11: The shooter killed her ex-husband, two sons, and their step-grandmother. When investigators arrived, she told them one of her sons had committed the homicides and then killed himself, but this story was inconsistent with forensic evidence. Nine days after the shooting she was taken into custody and charged with four counts of homicide. She had reportedly taken out a $700,000 life insurance policy for her family members with herself named as the beneficiary.

- **SHOOTER NAME:** Susan Diane Hendricks, 48
- **GUN DETAILS:** .380 caliber handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In April 2006, Susan Hendricks shot and killed Doyle "O'Brian" Teaguein in her home after he had allegedly entered uninvited and threatened her. No charges were filed against Hendricks at the time, and the case was never closed. There is no evidence that she was prohibited from possessing a gun in 2011.

## Seal Beach, CA, 10/12/11: The shooter injured one and killed eight at a hair salon, including his ex-wife, before being taken into police custody.

- **SHOOTER NAME:** Scott Evans Dekraai, 41
- **GUN DETAILS:** Dekraai carried 3 handguns – a 9 mm Springfield, a Heckler & Koch .45, and a Smith & Wesson .44 Magnum – and used at least two in the shooting.
- **AMMO DETAILS:** News articles say Dekraai was carrying "extra ammunition" when the shooting began.
- **GUN ACQUIRED:** All three guns were purchased legally and registered in accordance with California law.
- **PROHIBITING CRITERIA:** Dekraai was subject to a restraining order that specifically prohibited him from possessing guns, but the order expired in 2008. Dekraai had been diagnosed with Post Traumatic Stress Disorder, and during a custody suit his ex-wife had filed court papers claiming that he was mentally unstable and had threatened to kill himself or someone else at least once.

## Laurel, IN, 9/26/11: The shooter killed a man, the man's estranged wife, their two children, and a neighbor. The male victim reportedly had sold the addictive pain-reliever Oxycontin to the shooter, and on the day of the murders they had argued over the price.

- **SHOOTER NAME:** David E. Ison, 46

Exhibit 17
Page 00756

**20**      **Analysis of Recent MASS SHOOTINGS**      

---

- GUN DETAILS: A .380 caliber handgun was used in the slayings. Another stolen .380 handgun and an AK-47 were recovered during the investigation.
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: The shooter had a lengthy criminal record, including a conviction for armed robbery, which would have prohibited him from possessing a gun, and at the time of the murders was on probation for 10 counts of burglary.

---

### Monongalia County, WV, 9/6/2011: The shooter killed five people and injured one before fleeing from the police and then killing himself.

- SHOOTER NAME: Shayne Riggleman, 22
- GUN DETAILS: A .30-.30 rifle was used. A second rifle and a .22 caliber pistol were also recovered.
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: In 2008, Riggleman was sentenced to 14 months in prison for armed robbery, an offense that would prohibit him from possessing firearms, though it is possible his rights were restored under West Virginia law. He had also been diagnosed with bipolar disorder and schizophrenia at Chestnut Ridge Hospital and his family had him committed on several occasions.

---

### Carson City, NV (IHOP Shooting), 9/6/2011: The shooter killed four people at an IHOP restaurant, including three National Guard members, before killing himself.

- SHOOTER NAME: Eduardo Sencion, 32
- GUN DETAILS: A Norinco Mak 90 assault rifle that had been illegally modified into a fully automatic machine gun. A Romarm/Cugir AK-47 type assault rifle and a Glock 26 semiautomatic handgun were also recovered.
- AMMO DETAILS: Police recovered 450 rounds of AK-47 ammunition from Sencion's van and "box upon box" of additional ammunition at his home.
- GUN ACQUIRED: Five years earlier, the gun had been sold by a private party in California to an unknown buyer.
- PROHIBITING CRITERIA: Sencion was taken into protective custody during a mental health commitment in April 2000 but no court order was involved and it remains unclear if a record of the incident was reported to the NICS database.
- NOT A GUN-FREE ZONE: IHOP allows individual franchises to determine their own firearm policies, and this franchise allows concealed carrying of firearms on the premises.

---

### Marion County, FL, 8/5/11: The shooter killed the mother of his child in her mother's home, his own 6-year-old sister, and two other acquaintances before setting the building on fire. Court records indicated he had smoked synthetic marijuana laced with cocaine prior to the murders. The gun was not immediately recovered.

Exhibit 17
Page 00757



**Analysis of Recent MASS SHOOTINGS**                                                                    **21**

- **SHOOTER NAME:** James Edward Bannister, 31
- **GUN DETAILS:** Believed to be a .38 caliber revolver
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that he had a prohibiting criminal record.

---

**Wheatland, WY, 7/30/11:** The shooter killed his three sons and his brother and shot and injured his wife before surrendering to police. His wife later reported he had become upset because he wanted to keep the curtains of their home drawn to prevent the neighbors from looking inside.

- **SHOOTER NAME:** Everett E. Conant III
- **GUN DETAILS:** Two semiautomatic handguns were used in the shooting. A shotgun and a rifle were also recovered.
- **AMMO DETAILS:** Police testified that about 50 rounds were fired during the incident.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The police reported that the shooter did not have a criminal record. There is no evidence to indicate he was prohibited from possessing a gun.

---

**Wagener, SC, 7/3/2011:** The shooter apparently went on a murder-suicide rampage, killing his wife, her twin sister, his mother-in-law, and his ex-girlfriend in two different residences before he was confronted by law enforcement and shot himself.

- **SHOOTER NAME:** Kenneth Myers, 47
- **GUN DETAILS:** A 20-gauge shotgun was used in the massacre. Myers owned numerous weapons including an SKS, AK-47, two 9 mm handguns, a .22 caliber revolver, and a .38 caliber snub-nose pistol.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that the shooter was prohibited from owning a gun. However, he reportedly had a history of violence, having threatened his mother-in-law with a rifle. In a suicide note, he blamed his wife's family for contributing to her drug problem.

---

**Grand Prairie, TX, 6/23/11:** The shooter killed his wife and four of her family members at his daughter's birthday party before killing himself.

- **SHOOTER NAME:** Tan Do, 35
- **GUN DETAILS:** Reported to be a handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Tan Do had a history of domestic violence. His wife had obtained a protective order against him but had withdrawn it earlier that year against the advice of a prosecutor.

Exhibit 17
Page 00758

**22**   Analysis of Recent MASS SHOOTINGS   

**Medford, NY, 6/9/11:** The shooter killed four people at a pharmacy, Haven Drugs, and stole thousands of hydrocodone pills before fleeing in a vehicle. During the trial he acknowledged that he and his wife were addicted to prescription medication.

- **SHOOTER NAME:** David Laffer
- **GUN DETAILS:** A .45 caliber handgun was used in the shooting. Several other legally registered guns were also recovered from the shooter's home.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The gun was legally registered to the shooter, and there is no evidence he was prohibited from possessing a gun. But five months before the shooting, Suffolk County Detective Kenneth Ripp investigated an identity theft claim made by the shooter's mother, who said the shooter had stolen her debit card. After questioning the shooter and his mother, Ripp advised the Suffolk County Pistol License Bureau that the shooter was dangerous and that his guns should be confiscated. Despite Ripp's report, the guns were not removed.
- **GUN-FREE ZONE:** We could find no evidence that Haven Drugs posted a sign or had a policy prohibiting the carrying of firearms. Current employees declined to comment.

**Yuma, AZ, 6/2/11:** In a series of separate shootings over a five-hour period, a gunman shot and killed his ex-wife, three of her friends, and her attorney, before killing himself.

- **SHOOTER NAME:** Carey H. Dyess, 73
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Dyess's ex-wife alleged there had been domestic abuse and a judge had issued an order of protection against him in 2006, but there is no evidence that he was a prohibited from possessing firearms at the time of the shooting.

**Ammon, ID, 5/11/11:** The shooter killed his two infant children, their mother, and her sister before setting fire to the house and shooting himself. He had separated from the victim several months before the incident, and in the week before the shooting he had sent her harassing text messages.

- **SHOOTER NAME:** Gaylin Leirmoe
- **GUN DETAILS:** .45 caliber handgun
- **AMMO DETAILS:** Eight shots were fired during the shooting.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In October 2009, the shooter was charged with misdemeanor battery for domestic violence with no traumatic injury after hitting his girlfriend — the woman he would ultimately kill — at her birthday celebration. The charges were later dismissed. There is no evidence that he was prohibited from possessing a gun.

Exhibit 17
Page 00759



**Analysis of Recent MASS SHOOTINGS**                                    **23**

---

## Oak Harbor, Ohio, 4/16/11: The shooter killed his wife and three children, age 1 to 4, before killing himself.

- **SHOOTER NAME:** Alan Atwater
- **GUN DETAILS:** .22 caliber rifle, shotgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter and his wife separately reported to friends that in the past he had held her against a wall and choked her. But there is no evidence he was prohibited from possessing a gun.

---

## Willowbrook, CA, 2/11/11: Two brothers, their uncle, and their cousin were shot and killed by an unknown assailant on the patio of their home.

- **SHOOTER NAME:** Unknown
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Witnesses reported that the shooting was loud and continuous. Police believe a semiautomatic weapon was used.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The assailant is unknown.

---

## Minot, ND 1/28/11: The shooter, a Somali national, killed the mother of his child at her home — and then her brother, her mother, and her mother's boyfriend at a nearby home. The murder weapon was never recovered.

- **SHOOTER NAME:** Omar Mohamed Kalmio, 28
- **GUN DETAILS:** Believed to be a handgun.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In 2006, Kalmio was convicted of second-degree assault with a dangerous weapon and sentenced to a year in prison, which offense prohibited him from legally possessing a firearm.

---

## Tucson, AZ, 1/8/11: The shooter attacked a constituent event hosted by Congresswoman Gabrielle Giffords, killing six and wounding fourteen, including Giffords, before he was subdued.

- **SHOOTER NAME:** Jared Loughner, 22
- **GUN DETAILS:** 9mm Glock 19 semiautomatic handgun
- **AMMO DETAILS:** 33-round magazine
- **GUN ACQUIRED:** Loughner passed a background check and purchased the Glock handgun at Sportsman's Warehouse in Tucson two months before the attack. Loughner also purchased a Harrington & Richardson shotgun in 2009; this gun was not used in the attack.

Exhibit 17
Page 00760

**ER_2941**

**24**    Analysis of Recent MASS SHOOTINGS    

- **PROHIBITING CRITERIA:** Loughner had a history of mental illness and drug use. He was rejected from Army enlistment in 2008 after failing a drug test and admitting to drug use on his U.S. Army medical history application form, which should have prohibited Loughner from buying a gun for at least one year. However, Loughner successfully purchased a Harrington & Richardson shotgun in 2009, within a year of his Army rejection. Loughner's purchase of the Glock 19 handgun in 2010 violated the plain intent of federal law, which prohibits someone considered an/to be "unlawful user of or addicted to any controlled substance" from purchasing a gun, but the purchase was still allowed under current enforcement practices. Loughner was also suspended from Pima Community College in 2010 for erratic behavior, and exhibited other signs of mental instability in posts to websites.
- **NOT A GUN-FREE ZONE:** It was lawful to carry a firearm in the area of the shooting. An armed bystander, Joe Zamudio, mistook someone else as the shooter and prepared to fire on him before he was stopped by other bystanders.

---

**Boston, MA, 09/28/10:** The shooter killed four and wounded one during a drug-related robbery.

- **SHOOTER NAME:** Edward Washington, 33, and Dwayne Moore, 35, were both charged in the killings. Washington was acquitted. In Moore's first trial, the jury deadlocked 11-1 in favor of his guilt, but he was later convicted in a retrial.
- **GUN DETAILS:** .40 caliber Iberia handgun and 9mm Cobray semiautomatic. The Cobray has not been recovered, but the weapon was identified based on recovered bullets and shell casings.
- **AMMO DETAILS:** 14 rounds fired
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooters were prohibited from possessing guns.
- **NOT A GUN-FREE ZONE:** Any person holding the appropriate license could lawfully carry a firearm in this area. As of 2012 there were an estimated 250,000 concealed weapons permit holders in Massachusetts, and neither state or local law prohibits them from carrying in the city of Boston.

---

**Riviera Beach, FL 9/27/10:** The shooter killed his estranged wife and four of his stepchildren in their home, injured one other, and then shot and killed himself.

- **SHOOTER NAME:** Patrick Dell, 41
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In May 2010, the shooter's wife obtained a restraining order, which was active at the time of the shooting and would have prohibited him from owning a gun. In December 2009, Dell has also been arrested on felony aggravated assault, and had been convicted of misdemeanor improper exhibition of a dangerous firearm. Police had responded to 34 calls from the household in the four years preceding the shooting. In April 2008, the shooter's wife had taken out another restraining order against Dell for abusive behavior.

---

**Jackson, KY, 9/10/10:** The shooter, reportedly enraged at how his wife prepared his eggs, fatally

Exhibit 17
Page 00761



**Analysis of Recent MASS SHOOTINGS**                                    **25**

shot her, his stepdaughter, and three neighbors. He killed himself when the police arrived.

- SHOOTER NAME: Stanley Neace, 47
- GUN DETAILS: Shotgun
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: There is no evidence the shooter was prohibited from possessing a gun.

## Chicago, IL, 9/2/10: The shooter murdered four individuals execution-style in a garage on South Kildare Avenue. Officials believe he was part of a drug-trafficking crew that had been involved in at least 10 other killings.

- SHOOTER NAME: Raul Segura-Rodriguez, 36
- GUN DETAILS: Unknown
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: While the shooter was reportedly an experienced criminal, there is no evidence of convictions that would have prohibited him from possessing a gun.

## Lake Havasu City, AZ, 8/29/10: The shooter killed his ex-girlfriend, her boyfriend, and three others while they were celebrating her boyfriend's birthday and took his own life later that night.

- SHOOTER NAME: Brian Diez, 26
- GUN DETAILS: Unknown
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: The gunman's girlfriend had taken out a restraining order against him earlier that year, which would likely prohibit him from purchasing or possessing a gun.

## Buffalo, NY, 8/14/10: The shooter opened fire on a group of people outside a bar, killing four and wounding four others.

- SHOOTER NAME: Riccardo McCray, 24
- GUN DETAILS: Unknown
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: McCray had been arrested earlier that year on felony drug charges and the previous year for having a loaded rifle in his car. If he was found guilty of either crime, he would have been prohibited from possessing firearms.
- NOT A GUN-FREE ZONE: We could find no indication that it was unlawful to carry a firearm in the area.

Exhibit 17
Page 00762

**ER_2943**

**26**     **Analysis of Recent MASS SHOOTINGS**          

There are an estimated 100,000 concealed weapon permit holders in New York and other than limiting a person's ability to carry when he is under the influence of drugs or alcohol, Buffalo does not add any additional requirements to state law.

## Lanham, MD, 8/6/10: The shooter killed two children, their mother, and their paternal aunt in the home where they resided. Police said the shooter was involved in drug trafficking and the victims owed him money.

- **SHOOTER NAME:** Darrell Lynn Bellard
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that he was prohibited from possessing a gun.

## Manchester, CT, 8/3/10: The shooter killed eight coworkers at a beer distributor and wounded two others before killing himself.

- **SHOOTER NAME:** Omar Thornton, 34
- **GUN DETAILS:** Two Ruger SR9 9mm handguns
- **AMMO DETAILS:** The shooter allegedly carried two extra magazines and two extra boxes of ammunition with him to the attack.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no indication that he was prohibited from possessing firearms and the guns he used were registered to him.

## Hialeah, FL, 6/6/10: The shooter killed four women, including his wife — who had just separated from him. He injured three others before shooting and killing himself. The shooting occurred in Yoyito-Cafe Restaurant, where the shooter's wife was employed as a waitress, and in the parking lot immediately outside.

- **SHOOTER NAME:** Gerardo Regalado, 38
- **GUN DETAILS:** .45 caliber handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The shooter had a concealed weapons permit.
- **PROHIBITING CRITERIA:** There is no evidence that the shooter was prohibited from owning a gun. However, relatives said the shooter had abused and terrorized women in the past, and had been imprisoned in Cuba for a particularly violent incident, but he did not have a criminal record in the United States.
- **NOT A GUN-FREE ZONE:** We could find no indication that guns were prohibited in this area. Guns are prohibited in Florida restaurants only in areas primarily devoted to the serving of alcohol.

Exhibit 17
Page 00763

**ER_2944**



**Analysis of Recent MASS SHOOTINGS**                                           **27**

---

## Chicago, IL, 4/14/10: The shooter who had converted to Islam in prison killed his family for not going along with his conversion, fatally shooting his mother, pregnant wife, infant son, and two nieces, and injuring one other.

- SHOOTER NAME: James A. Larry, 33
- GUN DETAILS: Shotgun
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: Larry was almost certainly prohibited from purchasing a gun, having recently served a prison term for a weapons charge. He had also recently pled no contest to misdemeanor battery against his wife.

---

## Los Angeles, CA, 4/3/10: The shooter killed four and injured two at a San Fernando Valley restaurant after a dispute with other patrons. He was indicted in a separate investigation for engaging in the business of dealing firearms without a license and possession of a firearm with an obliterated serial number, having sold firearms to an informant working for federal agents the previous year.

- SHOOTER NAME: Nerses Arthur Galstyan, 28
- GUN DETAILS: Unspecified handgun
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: There is no evidence the shooter was prohibited from possessing a gun.

---

## Washington, DC, 03/30/10: Three gunmen killed four and wounded five in retaliation for another murder.

- SHOOTER NAME: Nathaniel D. Simms, 26; Orlando Carter, 20, and unnamed 14-year-old juvenile.
- GUN DETAILS: An AK-47 assault rifle and 9mm and .45-caliber handguns
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: The adults were reported to have lengthy criminal histories, which prohibited them from purchasing guns, and the 14-year-old was too young to purchase or own a gun.
- 

---

## New Orleans, LA, 3/26/10: The shooter killed his ex-girlfriend, her sister, and two children.

- SHOOTER NAME: Damian Jordan, 22
- GUN DETAILS: Handgun
- AMMO DETAILS: Unknown

Exhibit 17
Page 00764

**ER_2945**

**28**  |  **Analysis of Recent MASS SHOOTINGS**  

- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Jordan was likely prohibited from possessing a gun due to a lengthy history of domestic abuse, though he had repeatedly pled down the crimes to simple battery.

---

**Appomattox, VA, 1/19/10:** The shooter killed eight family-members and acquaintances and fired at responding police officers – even forcing a helicopter to make an emergency landing – before surrendering. He wore a bulletproof vest during the attack.

- **SHOOTER NAME:** Christopher Speight, 39
- **GUN DETAILS:** High-powered rifle
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was a concealed carry permit holder and was not prohibited from possessing a gun.

---

**Bellville, TX, 1/16/10:** The shooter, angered after a household argument, fatally shot his mother, stepfather, sister, brother and niece.

- **SHOOTER NAME:** Maron Thomas, 20
- **GUN DETAILS:** Handgun and shotgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

---

**Madison, WI, 12/3/2009:** The shooter killed two women with whom he was involved in paternity cases, along with their daughters, before shooting himself in his car.

- **SHOOTER NAME:** Tyrone Adair, 38
- **GUN DETAILS:** Two handguns were found inside the vehicle where Adair died, one of which matched the caliber of the ammunition used in the murders.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Police report that Adair bought a 9mm gun that was advertised on Craigslist. This gun was likely transferred in a private sale.
- **PROHIBITING CRITERIA:** The shooter was prohibiting from possessing firearms due to an active restraining order involving a third woman. He had also been arrested in March 2009 after a domestic incident, but charges were not filed in that case.

---

**Lakewood, WA, 11/29/09:** The shooter killed four police officers in a Tacoma Coffee shop, eluding police for two days before being killed as he fled.

Exhibit 17
Page 00765

 **Analysis of Recent MASS SHOOTINGS**                                                      **29**

- **SHOOTER NAME:** Maurice Clemmons, 37
- **GUN DETAILS:** When he was killed, he was in possession of the handgun of one of the officers he had killed.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was prohibited from purchasing a firearm, having been charged with at least 13 felonies across two states. He had posted bail for raping a child just six days before the attack.
- **NOT A GUN-FREE ZONE:** The police officers were armed at the time of the shooting.

---

## Osage, KS, 11/28/09: The shooter killed his estranged wife, her grandmother, and his two daughters in their home.

- **SHOOTER NAME:** James Kahler, 46
- **GUN DETAILS:** Assault rifle
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Kahler was charged with a misdemeanor domestic violence assault in March 2009. If convicted, he would have been prohibited from purchasing a firearm.

---

## Jupiter, FL, 11/26/09: The shooter killed his two twin sisters, his aunt, and his cousin's daughter, and injured two other family members, during a Thanksgiving celebration. He eluded capture for over a month before authorities apprehended him.

- **SHOOTER NAME:** Paul Merhige, 40
- **GUN DETAILS:** He used at least two handguns during the shooting.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Purchased at least six guns (including a .22 caliber handgun and a .40 caliber semi-automatic handgun), a high-powered rifle with a scope, and ammunition from two gun stores in South Florida.
- **PROHIBITING CRITERIA:** The shooter was involuntarily committed to mental health facilities at least three times in the decade before the killing, which prohibited him under federal law from possessing guns. But his records were not submitted to the NICS database. His parents reportedly knew he had ceased taking prescribed psychotropic medication in the weeks leading up the shooting. In addition, his sister Carla Merhige had requested a restraining order against him in 2006, but later withdrew the request. The shooter was able to obtain a concealed weapons permit.

---

## Pearcy, AR, 11/12/09: Three shooters killed five people in their mobile homes and stole wheel rims, televisions, a handgun, and a vehicle. One of the shooters injured a police officer while he was being apprehended several days later.

- **SHOOTER NAME:** Samuel Conway, Marvin Lamar Stringer, and Jeremy Pickney
- **GUN DETAILS:** .22 and .25 caliber handguns

Exhibit 17
Page 00766

**30**   **Analysis of Recent MASS SHOOTINGS**



- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that the shooters were prohibited from possessing guns.

---

**Oklahoma City, OK, 11/9/2009:** The shooter or shooters killed four people in a house before setting the building on fire. Two of the victims were pregnant. The crime was premeditated by two conspirators, and related to drugs they sold for one of the victims. It is unclear whether just one or both of the conspirators were present for the shooting, but both were charged with six counts of murder. Tyner surrendered to authorities a week after the killings. Phillips was arrested in Tulsa in April 2010 after allegedly attempting to sell two guns stolen from a police sergeant's home.

- **SHOOTERS:** David Allen Tyner (pled guilty), 31 and Denny Edward Phillips (pled not guilty), 34
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Two types of bullet cases were recovered at the crime scene.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Phillips was prohibited due to a lengthy criminal history including multiple felony convictions. Phillips was convicted in 1996 for assault with a deadly weapon, and other crimes including a jail escape. He was also convicted in 2010 for possession of a firearm by a felon. He was also convicted of aggravated assault and battery. There is no indication that Tyner was prohibited, though he was reportedly a member of a prison gang.

---

**Fort Hood, TX, 11/5/09:** The shooter killed thirteen and wounded thirty soldiers during an attack at the Fort Hood army base.

- **SHOOTER NAME:** Nidal Malik Hasan, 39
- **GUN DETAILS:** A FN Five-seven handgun was used in the attack. A Smith and Wesson .357 revolver also recovered.
- **AMMO DETAILS:** Hasan fired at least 220 rounds of ammunition and had 200 rounds in his pocket when he was detained.
- **GUN ACQUIRED:** Purchased legally at a local gun shop, Guns Galore.
- **PROHIBITING CRITERIA:** The shooter had links with terrorist organizations, but being placed on a terror watch list does not prohibit purchase or possession of firearms under current law.

---

**Mount Airy, NC, 11/01/09:** The shooter killed four people outside a television store before eventually surrendering to the police.

- **SHOOTER NAME:** Marcos Chavez Gonzalez, 29
- **GUN DETAILS:** Assault rifle.
- **AMMO DETAILS:** Unknown

Exhibit 17
Page 00767

 **Analysis of Recent MASS SHOOTINGS**                                    **31**

- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was a prohibited purchaser, having been convicted of kidnapping a minor in 2002.
- **NOT A GUN-FREE ZONE:** It was lawful to carry a firearm in the area of the shooting.

## Lawrenceville, GA, 08/27/09: The shooter killed his girlfriend, his daughter, and two others in a domestic dispute.

- **SHOOTER NAME:** Richard Ringold, 44
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

## Kansas City, KS, 6/22/09: The shooter killed a woman with whom he had been romantically linked and three others at the house where she was staying. He had argued with the woman and followed her to the house.

- **SHOOTER NAME:** Adrian Burks
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was prohibited from possessing firearms. He had served 10 years in Kansas prisons for robbery, aggravated assault, and burglary. He also fatally shot a man in March 2009, but he was not charged in the incident, which his cousin later described as "self defense." In April 2009, he was charged with battery and a criminal threat against the sister of the man he killed and was ordered not to possess firearms.

## Middletown, MD, 04/19/09: The shooter killed his wife and three children in their home before committing suicide.

- **SHOOTER NAME:** Christopher Alan Wood, 34
- **GUN DETAILS:** .25-caliber handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.
- **GREEN HILL, AL, 4/7/2009:** The shooter killed his estranged wife, their teenage daughter, and two other relatives one day before his divorce proceedings were scheduled to take place. He then lit the house on fire and shot himself.
- **SHOOTER NAME:** Kevin Garner, 45

Exhibit 17
Page 00768

**32**   Analysis of Recent **MASS SHOOTINGS**   

- **GUN DETAILS:** handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from owning a gun. In divorce documents, however, his wife cited physical and emotional abuse.

---

## Graham, WA, 4/4/2009: After a dispute with his wife in which she told him she was ending their relationship, the shooter returned home and killed his five children. Police believe he then made an unsuccessful attempt to find his wife again and then killed himself in his car.

- **SHOOTER NAME:** James Harrison
- **GUN DETAILS:** Unspecified rifle
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence Harrison was prohibited from possessing a gun. Since 2001 the state had received five complaints about the shooter, including one for abuse in 2007 that stemmed from a slapping incident with one of his children. None of the complaints resulted in a domestic violence conviction. After the shooting, his wife said that she and her children had sustained years of abuse.

---

## Binghamton, NY, 4/3/09: The shooter killed fourteen and wounded four at the American Civic Association where he had been taking English classes before killing himself. He wore a bullet-proof vest during the attack.

- **SHOOTER NAME:** Jiverly A. Wong, 42
- **GUN DETAILS:** 9mm and .45 caliber Beretta handguns.
- **AMMO DETAILS:** Allegedly fired 98 rounds during the attack. At least one magazine with a 30-round capacity was recovered at the scene.
- **GUN ACQUIRED:** The guns were registered to his New York State pistol license.
- **PROHIBITING CRITERIA:** Wong was not prohibited from possessing a gun, and had a New York State concealed carry permit. People who knew Wong said he exhibited no outward signs of mental instability, although a letter he wrote that was delivered to a newspaper after the shooting indicated he was paranoid and suffering from mental illness.

---

## Carthage, NC, 3/29/09: The shooter opened fire at a nursing home where his estranged wife worked, killing eight and injuring three before he was shot and arrested by a police officer.

- **SHOOTER NAME:** Robert Stewart, 45
- **GUN DETAILS:** .357 Magnum handgun and Winchester 1300 shotgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The guns were acquired legally from a local sporting good store.

Exhibit 17
Page 00769

 **Analysis of Recent MASS SHOOTINGS**                                                    **33**

- PROHIBITING CRITERIA: There is no indication the Stewart was prohibited from possessing a gun.

## Santa Clara, CA, 3/29/09: The gunman killed five family members and wounded two in an apparent murder-suicide.

- SHOOTER NAME: Devan Kalathat, 45
- GUN DETAILS: Two .45 caliber pistols
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Purchased legally weeks before the incident.
- PROHIBITING CRITERIA: There is no indication that Kalathat was prohibited from possessing a gun.

## East Oakland, CA, 3/21/09: The shooter used a semiautomatic handgun to kill two police officers after they stopped his car and then fled on foot to an apartment where he killed two SWAT officers with an assault weapon and injured a third before being killed by police.

- SHOOTER NAME: Lovelle Mixon
- GUN DETAILS: 9mm semiautomatic handgun and SKS assault-style rifle
- AMMO DETAILS: Police said the assault weapon had a high-capacity magazine.
- GUN ACQUIRED: The shooter took part in a home invasion robbery in Modesto, CA, on February 21 2009 in which a rifle was reported stolen. Police did not comment on whether the stolen rifle was the one used in the shooting.
- PROHIBITING CRITERIA: The shooter had a lengthy criminal history, including a conviction for armed battery, which would have prohibited him from possessing a gun, and he was on parole for assault with a deadly weapon at the time of the shootings.
- GUN-FREE ZONE: Two of the victims were shot on a public roadway — the 7400 block of Macarthur Boulevard in East Oakland — where no state law would have prohibited a citizen with the appropriate permit to carry a gun. All of the police officers killed in the incident were armed.

## Raytown, MO, 3/16/09: The gunman shot and stabbed his former girlfriend, her boyfriend, and her two nephews, killing all four.

- SHOOTER NAME: Gevante Anderson, 26
- GUN DETAILS: Unknown
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: There is no evidence the shooter was prohibited from possessing a gun.

## Miami, FL, 3/15/09: At a birthday party, the shooter killed his estranged wife, her daughter, her daughter's boyfriend, and the boyfriend's grandmother. He then returned to his house where he set the building on fire and shot and killed himself.

Exhibit 17
Page 00770

**ER_2951**

**34**        **Analysis of Recent MASS SHOOTINGS**        

- **SHOOTER NAME:** Guillermo Lopez, 48
- **GUN DETAILS:** Semi-automatic handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

---

**Catawba, NC, 3/12/09:** The gunman shot and stabbed a woman and her three children in their home. He later killed himself and his girlfriend after a police chase in Utah.

- **SHOOTER NAME:** Chiew Chan Saevang, 38
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

---

**Geneva County, AL, 3/10/09:** The shooter killed ten, including four members of his family, before killing himself.

- **SHOOTER NAME:** Michael Kenneth McLendon, 28
- **GUN DETAILS:** Bushmaster AR-15, SKS rifle, shotgun, and .38 pistol
- **AMMO DETAILS:** Police recovered additional ammunition from his vehicle after the shooting.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter had no criminal record and there is no indication he was prohibited from possessing a gun.
- **NOT A GUN-FREE ZONE:** It was lawful to carry a firearm in the public intersection and gas station where two of the individuals were shot.

---

**Cleveland, OH, 3/05/09:** The shooter killed his new wife and four of her relatives before committing suicide.

- **SHOOTER NAME:** Davon Crawford, 33
- **GUN DETAILS:** At least one semiautomatic handgun.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Crawford was likely prohibited from possessing a gun. He was convicted of manslaughter in 1995 and pled guilty to felonious assault with a firearm in 2005, though Ohio enables felons to restore their gun rights so it is possible he was no longer prohibited.

---

**Brockport, NY, 02/14/2009:** The shooter killed a nurse in the Lakeside Memorial Hospital

Exhibit 17
Page 00771

**ER_2952**

 **Analysis of Recent MASS SHOOTINGS**                                                                    **35**

parking lot and a motorist who intervened, and wounded the motorist's girlfriend. The shooter had been fired from the hospital after the nurse filed a sexual harassment complaint against him. He then drove 50 miles and killed another nurse — who had filed a similar complaint against the shooter — and her husband in their home.

- **SHOOTER NAME:** Frank Garcia, 34
- **GUN DETAILS:** .40 caliber Glock handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that the shooter was prohibited from owning a gun. However, he had applied for concealed carry permits and been denied three times. In his 1995 application, he omitted information about his criminal record — including arrests for criminal possession of a weapon, assault, and harassment. In 2001 and 2006 he made further omissions, and was evaluated as lacking moral character. But in 2007 a judge reversed the denial and granted Garcia a concealed weapon permit.
- **GUN FREE ZONE:** We found no indication that permit holders were prohibited from carrying guns in this area at the time of the incident.

## Wilmington, CA, 1/27/09: The shooter killed his wife and their five children before killing himself.

- **SHOOTER NAME:** Ervin Lupoe, 40
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter did not have a criminal record and there is no indication he was prohibited from possessing a gun.

Exhibit 17
Page 00772

1   XAVIER BECERRA
    Attorney General of California
2   TAMAR PACHTER
    Supervising Deputy Attorney General
3   NELSON R. RICHARDS
    ANTHONY P. O'BRIEN
4   Deputy Attorneys General
    ALEXANDRA ROBERT GORDON
5   State Bar No. 207650
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA 94102-7004
     Telephone: (415) 703-5509
7    Fax: (415) 703-5480
     E-mail:
8    Alexandra.RobertGordon@doj.ca.gov
    *Attorneys for Defendant*
9   *Attorney General Xavier Becerra*

10

IN THE UNITED STATES DISTRICT COURT

11

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

12

13

14

| | |
|---|---|
| 15   **VIRGINIA DUNCAN, et al.,** | 17-cv-1017-BEN-JLB |
| 16               Plaintiffs, | **DECLARATION OF PROFESSOR DANIEL W. WEBSTER IN SUPPORT OF DEFENDANT XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 17                  **v.** | |
| 18 | |
| 19   **XAVIER BECERRA, in his official capacity as Attorney General of the State of California; et al.,** | |
| 20 | Date: June 13, 2017 |
| 21               Defendants. | Time: 10:00 a.m. |
| 22 | Dept: 5A<br>Judge:     Hon. Roger T. Benitez<br>Action Filed: May 17, 2017: |

23

24

25

26

27

28

1

Webster Decl. ISO Defendant's Opposition to PI (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00774

1     I, Daniel W. Webster, under penalty of perjury, declare and state:

2     1.    I am Professor of Health Policy and Management, Co-Director for

3 Research at the Center for the Prevention of Youth Violence, and Director of the

4 Johns Hopkins Center for Gun Policy and Research at the Johns Hopkins

5 Bloomberg School of Public Health. Additionally, I head the Johns Hopkins-

6 Baltimore Collaborative for Violence Reduction.

7     2.    I began my career in public safety research in 1985 as a Research

8 Associate at the University of Michigan's School of Public Health, and have

9 devoted most of my research since then on gun-related injuries and violence. I have

10 a Master of Public Health degree from the University of Michigan and a doctorate

11 in Health Policy and Management from the Johns Hopkins School of Public Health.

12 This graduate training included many advanced courses in epidemiology, research

13 methods, and statistical analysis.

14     3.    Immediately prior to joining the faculty at Johns Hopkins, I directed a

15 program on violence research at the Washington (D.C.) Hospital Center. I joined

16 the faculty of the Johns Hopkins School of Public Health in 1992, and since 2010

17 have been a tenured Professor of Health Policy and Management with a joint

18 appointment in the School of Education's Division of Public Safety Leadership. I

19 teach graduate courses on violence prevention. Previously, I taught courses in

20 research and evaluation methods at Johns Hopkins, direct the PhD program in

21 Health and Public Policy, and served on the steering committee of a pre- and post-

22 doctoral training program in violence prevention research funded by the National

23 Institutes of Health.

24     4.    I have directed numerous studies related to gun violence and its

25 prevention. I have published over 100 articles in scientific, peer-reviewed journals,

26 the vast majority of these addressed some aspect of violence and/or firearm injuries

27 and their prevention. I am the lead editor of a book entitled <u>Reducing Gun Violence</u>

28 <u>in America: Informing Policy with Evidence and Analysis</u> by Johns Hopkins

<div align="center">2</div>

Exhibit 18<br>Page 00775

1   University Press (2013), and am the lead author for two chapters and co-author on

2   three other chapters in this book. In addition, I recently served as special editor or

3   co-editor of three special issues on gun violence for top tier public health journals.

4   My curriculum vita, detailing these publications, is attached as Exhibit 1 to this

5   Declaration.

6        5.    The Johns Hopkins Center for Gun Policy and Research was

7   established to conduct rigorous research into gun policy questions, look objectively

8   at all available data, and analyze and report the results. Where the data and

9   research, considered objectively, support a particular policy, we say so. Where the

10  data and research do not support a particular policy, we say that as well. Our goal

11  is not to advance any particular policy or agenda, but to use data and research to

12  inform public policy decisions.

13       6.    I make this declaration on the basis of my training and expertise, the

14  research discussed below, and the work I have done in this case to date. I am being

15  compensated at $350/hour. In the past four years I have testified as an expert in the

16  following cases:

17        a. *Rocky Mountain Gun Owners v. Hickenlooper*, Denver District Court

18           case 13CV33879, Case matter 2013-EXAD-076563.

19        b. *Wrenn v. District of Columbia*, Civil Action No. 15-00162 (CKK)

20        c. *Heller v. District of Columbia*, Civil Action No. 08-01289 (D.D.C.)

21        d. *Norberg v. Badger Guns, Inc.*, No. 10 CV 020655 (Circuit Court of

22           Wisconsin, Milwaukee County)

23        e. *Lopez v. Badger Guns, Inc.*, No. 10 CV 018530 (Circuit Court of

24           Wisconsin, Milwaukee County, Civil Division)

25        f. *Cook v. Hickenlooper*, Civil Action No. 13-CV-1300-MSK-MJW (D.

26           Colo.)

27        g. *Kolbe v O'Malley*, No.: 1:13-cv-02841-CCB (D. Md.)

28

3

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00776

ER_2956

7.     There are data and good reasons to indicate that design and capabilities of firearms can potentially affect the likelihood that an intended target or by-stander at a shooting will be wounded as well as the severity of wounds resulting from criminal shootings. Particularly relevant is the capacity of a firearm's ammunition feeding device. In comparison to other magazines which feed ammunition to semi-automatic firearms, large capacity magazines (LCMs)—those that hold more than 10 rounds—increase the number of rounds that can be fired without the shooter having to take the time to reload.

8.     A firearm's ability to accept LCMs and effectively and rapidly fire a large number of rounds from LCMs are what distinguish what is commonly referred to as assault weapons from other firearms. There is evidence that these design features of assault weapons make them especially appealing to criminals and those who commit mass shootings. A study of handgun purchasers in California prior to that state's ban of assault weapons found that assault pistols were more likely to be purchased by individuals with criminal histories; the more serious the prior offenses, the higher the likelihood that the handgun purchased was an assault pistol. The share of handguns purchased which were assault pistols was 2% if the purchaser had no criminal history, 4.6% if the purchaser had a history of minor criminal offenses, 6.6% for those with a previous criminal gun charge, and 10% for those who had previously been charged with two or more serious violent offenses.[1] I conclude from this research that features of assault pistols, some of which are common to assault rifles, particularly the ability accept detachable LCMs, are attractive to criminals.

9.     Efforts to ban assault weapons and LCMs have followed their use in mass shootings in public places including some of the deadliest shootings in our

---

[1] Wintemute, Garen J., Mona A. Wright, Carrie A. Parham, Christiana M. Drake, and James J. Beaumont, Criminal activity and assault-style handguns: a study of young adults, Annals of Emergency Medicine 32:44-50 (1998).

4

Case 3:17-cv-01017-BEN-JLB Document 63-15 Filed 04/05/18 PageID.6577 Page 56 of 82

nation's history. Prior to the Federal ban of LCMs, these include the following high-profile mass shootings:

    a.  The 1984 shooting at a McDonald's restaurant in California that led to 21 deaths and 19 with nonfatal wounds.

    b.  A schoolyard shooting in Stockton, California in 1989 which killed five children and left 29 others with nonfatal wounds.

    c.  A 1989 workplace shooting in Louisville, Kentucky which left seven dead and 15 with nonfatal wounds.

    d.  A 1991 shooting at a diner in Killeen, Texas that left 23 dead and 27 more wounded.

    e.  A 1993 shooting of 25 people on a Long Island Railroad train, six who died.

    f.  A shooting on April 20, 1999 at Columbine High School in Littleton, Colorado in which assailants used an Intratec TEC-DC9 assault pistol with a LCM and other guns to murder 13 students and wound an additional 23.

    g.  A shooting in which 76 rounds were fired to wound 70 people at a crowded movie theatre in Aurora, Colorado on July 20, 2012 in which the assailant used a Smith & Wesson M&P15 assault rifle with a 100-round LCM. Twelve people lost their lives in this shooting.

10.    Among the mass shootings involving LCMS was the most deadly mass shooting in U.S. history at The Pulse nightclub in Orlando, Florida in 2016 in which the shooter used multiple 30-round magazines, some taped together to facilitate swift reloading. This shooting left 52 dead and another 50 people with gunshot wounds that they survived. It also includes a 2011 shooting in front of a supermarket in Tucson, Arizona that left six dead and 13 wounded including then U.S. Rep. Gabrielle Giffords who a suffered life-altering head wound. The Tucson

<div align="center">5</div>

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00778

**ER_2958**

1  shooter used a handgun with a LCM and was able to fire 31 rounds before being

2  restrained when attempting to reload.  The shooter in the mass murder of 20 young

3  children and six adults at Sandy Hook Elementary School in Newtown, Connecticut

4  and the shooter of 49 people, 32 who died, at Virginia Tech University also used

5  LCMs.

6       11.    When mass shootings occur in public, especially shootings that take

7  place in public places, the shooter often selects an assault weapon or another

8  firearm with a LCM.  Data on 15 public mass shootings in the U.S. from 1984 to

9  1993 collected by Gary Kleck revealed that six (40%) involved assault weapons or

10  other firearms equipped with LCMs. [2,3] A collection of data by Mother Jones

11  magazine on 62 mass shootings in public places by lone shooters from 1982

12  through 2012 found that 33 (53.2%) perpetrators used firearms or LCMs that were

13  or would have been banned by the federal ban of assault weapons and LCMs.[4]  A

14  report by Everytown for Gun Safety examined data on mass shooting involving

15  four or more gunshot victims from 2009 through August 31, 2016 using the FBI's

16  Uniform Crime Reports/ Supplemental Homicide Reports data and media

17  accounts.[5] This study did not limit the sample to shootings in public places

18  involving lone shooters and thus included a large share of incidents of domestic

19  violence or other scenarios in which a small number of people were targeted and,

20  therefore, large ammunition capacity becomes less relevant than in the context of a

21  mass shooting in a public place with a lot of people (e.g., school, workplace).

22  Fifteen of 133 (11%) shootings involved a firearm with a LCM.

---

[2] Kleck, Gary. Targeting Guns: Firearms and Their Control. New York: Aldine de Gruyter, pp. 124-126 (1997).

[3] Koper, 2004, p. 14.

[4] Mother Jones Magazine, US Mass Shootings, 1982-2012. Data from Mother Jones' Investigation, available at http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (2014).

[5] Everytown for Gun Safety. *Analysis of Recent Mass Shootings* https://everytownresearch.org/reports/mass-shootings-analysis/ Accessed January 30, 2017.

6

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00779

ER_2959

12.     Among all cases of mass shootings (4 or more victim fatalities)
identified by Everytown, use of an assault weapon or other firearm with a LCM is
associated with more people who are shot (on average, 13.3 vs. 5.2%) or killed (on
average, 7.5 vs. 5.1) when compared with incidents in which LCMs are not used.
In other words, the average number of persons shot when the shooter had a LCM or
assault weapon that likely included a LCM was 2.5 times higher and the number
killed 47% higher than when no LCM was used. Similarly, Professor Christopher
Koper's re-analysis of his student's data from Mother Jones magazine's study of
public mass murders with firearm revealed that mass shootings with assault
weapons, compared with mass shooting with other firearms, involved more
fatalities per incident (a mean of 10.4 vs. 7.4) and more victims with nonfatal
gunshot wounds (mean of 13.5 vs. 6.4).[6] Dillon (2013) also reported that,
compared with assaults carried out with firearms that did not have LCMs, mass
shootings in which firearms with LCMs were used had 60% more fatalities on
average (a mean of 10.19 vs. 6.35) and more than 3 times as many persons with
nonfatal gunshot wounds (12.39 vs. 3.55).  These findings are consistent with those
from a study of criminal shootings in Jersey City, NJ which found that, compared to
shootings with revolvers, shootings with semi-automatic pistols—which tend to
hold significantly more bullets than revolvers—had more shots fired and more
victims wounded.[7]

13.     Unfortunately, data to more definitively determine the connections
between ammunition capacity and gun violence outcomes—the number of shots

---

[6] Dillon, Luke, Mass Shootings in the United States: An Exploratory Study of
the Trends from 1982-2012, Thesis for Master of Arts in Criminology, Law and
Society, George Mason University, September 2013; Koper, Christopher S.,
Supplemental affidavit submitted as an expert witness in June, Shew et al. v. Daniel
P Malloy, et al. Civil Action No. 3:13-CV-00739-AVC. U.S. District Court, District
of Connecticut, January 6, 2014.
[7] Reedy, Darin C., and Christopher S. Koper, Impact of handgun types on
gun assault outcomes:  a comparison of gun assaults involving semiautomatic
pistols and revolvers, *Injury Prevention* 9:151-155 (2003).

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)
Exhibit 18
Page 00780

ER_2960

1      fired, the rate of fire, the number of victims, the number of wounds per victims,

2      lethality of woundings—have not been collected in any population. Gary Kleck,

3      Professor Emeritus from Florida State University, has a working paper that pieces

4      together various types of data in an attempt to discern whether there might be a

5      logical connection between ammunition capacity or LCM use and outcomes in

6      criminal violence.[8] Yet the data used by Kleck and the interpretations he makes of

7      the data are flawed. To determine the set of cases where it would be plausible that

8      involvement of LCM might be relevant to violence outcomes, Kleck searches for

9      cases in which *more than six victims have been shot.* His logic is that an ordinary

10      revolver can shoot six people without reloading and, thus, mass shootings with six

11      or fewer victims might have involved guns without LCMs. But because the rate at

12      which shooters hit their human targets is low[9], having more rounds available to

13      shoot within a short and presumably stressful interval could increase the odds of a

14      shooting leading to the wounding of one to five victims as well. Kleck then

15      identifies various online databases of cases involving shootings with six or more

16      victims where there is some information—from news media accounts—about

17      whether or not a LCM was used in the incident. Through this process, Kleck

18      identifies only 23 incidents in which more than six victims were shot at a single

19      time and place in the U.S. for a period 1994-2013 and *"were known to involve the*

20      *use of any magazines with capacities of ten rounds."* (page 14) He then takes a

21      two-year period (2013-2014) of such cases—699 in all—and compares it against a

22      list compiled by the Violence Policy Center for mass shootings in which a LCM

23      was used and identifies two such cases. He uses this small ratio (2/699) to argue

---

24      [8] Kleck, Gary. Large-Capacity Magazines and the Casualty Counts in Mass

25      Shootings: The Plausibility of Linkages. Working Paper, Social Science Research
Network abstract 2741098. March 6, 2016.
https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2741098

26      [9] About 1 in 5 shootings reported by victims in the National Crime

27      Victimization Survey result in a victim wounding. *Shotspotter* technology used to
identify gunfire in urban areas identifies many time more shooting incidents than

28      are reported to police or that result in woundings.

8

Exhibit 18
Page 00781

1   that LCMs are irrelevant to high-casualty shootings. Kleck acknowledges that

2   news reports of mass shootings may not always report whether or not a LCM was

3   used, but fails to acknowledge that the online databases he and others use to study

4   mass shootings actually *rarely record the capacity of the firearm's magazine.* This

5   careless method, that pretends as if there is a valid surveillance system for tracking

6   use of LCM use when ammunition capacity is rarely recorded, produces very

7   misleading estimates of the use of LCMs in mass shootings.

8       14.   Kleck also makes an argument ammunition capacity is only logically

9   relevant in incidents in which there is a high rate of fire over a short span of time.

10  This is because longer intervals in an incident provide opportunities for a shooter to

11  load another magazine or switch to another gun within a few seconds. The concept

12  is partly defensible, but his measure—seconds elapsing per shot fired—is fraught

13  with problems for large portion of the cases. For example, a shooter may fire 20

14  rounds in less than 10 seconds, wounding or killing many who do not have time to

15  escape or fight back, and then spend many minutes or hours "hunting" additional

16  victims. In such cases, a measure of seconds elapsed per shot fired is very

17  misleading if the goal is to ascertain situations in which a shooter has the ability to

18  and does fire a large number of rounds very quickly and uninterrupted. Also lost in

19  Kleck's analysis and consideration is the fact that there is no way to measure the

20  incidents where there was the potential for a large number of casualties in a

21  shooting but fewer occurred *due to the absence of a LCM.* That is, the impact of a

22  shooter having fewer bullets in an ammunition feeding device may have an

23  important effect on reducing the likelihood that a case hits the victim threshold for a

24  mass shooting that is captured in mass shooting tracking projects that Kleck uses in

25  his analyses.

26      15.   Studies of guns recovered by police and submitted for tracing to the

27  U.S. Bureau of Alcohol, Tobacco and Firearms (ATF) prior to the 1994 federal

28  assault weapon ban indicated that assault weapons accounted for between 1% to 8%

9

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00782

1    of such guns with the average of about 2%.[10]  Yet a study of murders of police

2    officers while on duty in 1994 found that assault weapons were used in 16% of the

3    murders and a firearm with a LCM was used to shoot 31% to 41% of the police

4    officers murdered.[11]  The Violence Policy Center examined data on law

5    enforcement officers murdered in the line of duty from the FBI for 1998-2001 and

6    found 19.4 % (41 of 211) had been shot with an assault weapon.[12]

7        16.     In contrast to the data indicating that assault weapons and LCMs

8    increase casualties from mass shootings, I am aware of no study or systematic data

9    that indicate that LCMs are necessary for personal defense more so than firearms

10   that do not have a LCM.  That is, I know of no data indicating that victims of

11   violent crime tend to need more than 10 rounds of ammunition in the rare instances

12   in which such persons use a firearm in self-defense or that persons equipped with

13   assault weapons or LCMs were more effective in protecting themselves than were

14   crime victims who used other types of firearms.  For example, data from Colorado

15   for the time period 2004-2013 indicate that citizens rarely, if ever, face situations in

16   which they are defending their home against criminals and require more than 15

17   rounds. In *Cooke v. Hickenlooper*, 54 of 55 Colorado Plaintiff Sheriffs responded to

18   Defendant's Interrogatories requiring that they supply information describing cases

19   in their respective jurisdictions for every home invasion or robbery in a home to

20   which their department responded during the ten-year period 2004-2013.  This

21   Interrogatory specifically asks for information on the circumstances, the number of

22   criminal perpetrators, whether the perpetrators were armed and fired shots, whether

23   victims were armed and used guns in self-defense, whether victims' guns had a

24

25           [10] Kleck, Gary. *Targeting Guns:  Firearms and Their Control*. New York: Aldine de Gruyter.  (1997), pp. 112, 141-143.)

26           [11] W.C. Adler, F.M. Bielke, D.J. Doi, and J.F. Kennedy. Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons and Guns with High-Capacity Magazines. Washington, DC: Handgun Control, Inc., 1995, p.4.

27           [12] Violence Policy Center, "Officer Down" Assault Weapons and the War on Law Enforcement, http://www.vpc.org/studies/officeone.htm (2003).

28

10

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00783

ER_2963

1    LCM, and the number of shots fired by the victims. A report of the data supplied

2    by Sheriffs completed by Dr. Jeffrey S. Zax shows that perpetrators discharged

3    firearms in home invasions or home robberies a total of 46 times during the 10-year

4    study period, a rate of six per year or 1.25 per million population per year.[13] During

5    this same time period, there were only two recorded instances in which a victim

6    displayed a firearm with a LCM and there were no home invasion crimes in which a

7    victim fired 16 or more rounds. Thus, Colorado residents who live in jurisdictions

8    served by the 55 counties served by Sheriffs face an incredibly low risk of home

9    invasion, an even smaller risk of a home invasion in which the criminal fires shots,

10   and even more rarely, if ever, use a LCM in a manner in which extended

11   ammunition capacity is relevant for their defense of themselves and their families.

12         17.     Some claim that bans of assault weapons and LCMs do not work;

13   however, this is not the conclusion of Christopher Koper, the respected researcher

14   who has studied the role of assault weapons and LCMs in criminal violence and

15   attempted to estimate the impact of the 1994 federal assault weapon ban. Koper

16   correctly identified a number of weaknesses in the federal assault weapons ban

17   which limited its impact, especially in the short-term. For example, the federal

18   assault weapons ban allowed "copycat" versions of the banned firearms to be

19   produced and sold following the ban as long as the new firearm model was not

20   identical to the banned gun. Another was that the federal ban "grandfathered"

21   currently owned assault weapons and LCMs, including allowing the ongoing sales

22   of those grandfathered assault weapons and LCMs. It is estimated that this

23   involved 1.5 million assault weapons and 25 million LCMs.[14] Similar to what I and

24   my colleagues observed when Maryland banned so-called "Saturday night special"

25

26   [13] Zax, Jeffrey S. Supplemental Report by Jeffrey S. Zax, Cooke, et al. V. Hickenlooper, September 13, 2013.

27   [14] Koper, Christopher S. *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003.* Philadelphia: University of Pennsylvania. (2004). Page 10

28

11

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00784

ER_2964

1    handguns,[15] there was a sharp increase in sales of the to-be-banned assault weapons

2    just prior to the ban going into effect. The same was likely true for LCMs that were

3    to be banned for sale.

4         18.   These factors would suggest that the positive effects of the federal ban

5    on LCMs and assault weapons on violence would be somewhat muted as well as

6    delayed. In other words, the full impact of the federal ban of LCMs and assault

7    weapons have on violence would be expected to be delayed and somewhat gradual

8    as pre-ban built-up stocks of LCMs and assault weapons would satisfy most of the

9    demand for some time after the ban went into effect.

10        19.   Koper's study of the effects of the federal ban of LCMs and assault

11   weapons in its early years indicated that there was a substantial decline in the

12   percentage of guns recovered by police that were assault weapons in six cities that

13   were studied with declines ranging from 17% in Milwaukee (5.91% to 4.91%) to

14   72% in Boston (2.16% to 0.60%).[16] Koper also examined pre-ban vs. post-ban

15   changes in the percentage of police-recovered firearms with LCMs in four selected

16   cities with available data (for the early years of the ban period) and saw no evidence

17   of a decline in LCM use in crime.[16] However, reporters from The Washington Post

18   obtained data from the Criminal Firearms Clearinghouse collected by the Virginia

19   State Police from 201 local law enforcement agencies across the state for the years

20   1993 through 2010, which included the ammunition capacity of the firearms

21   recovered by police. These data revealed that the percentage of police-recovered

22

23        [15] Webster, Daniel W., Jon S. Vernick, and Lisa M. Hepburn, Effects of Maryland's law banning Saturday night special handguns on homicides. American Journal of Epidemiology 155:406-412 (2002).

24        [16] Koper, Christopher S., America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications, pages 157-171 in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis, Daniel W. Webster and Jon S. Vernick, eds. Baltimore: Johns Hopkins University Press, at 163 (2013). Other pre-ban to post-ban changes in the percentage of police-recovered firearms that were assault weapons: -34% in Baltimore (1.88% to 1.25%), 32% in Miami, FL (2.53% to 1.71%), 32% in St. Louis (1.33% to 0.91%), and -40% in Anchorage, AK (3.57% to 2.13%).

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00785

**ER_2965**

1   firearms that had LCMs rose steadily from about 13% in 1993 (the last full pre-ban

2   year) until 1997 when firearms with LCMs accounted for nearly 18% of guns

3   recovered by police. This increase was followed by a sharp decline following 1997

4   until LCM-equipped guns accounted for 10% of police-recovered firearms in 2004,

5   the year the federal assault weapon ban expired. Particularly striking in these data

6   was the sharp increase in the share of police-recovered firearms with LCMs after

7   the federal ban expired in 2004. Firearms with LCMs rose from 10% in 2004 to

8   more than 14% in 2005, continuing to rise in subsequent years until LCM-equipped

9   guns accounted for 22% of all police-recovered firearms in Virginia.[17] This

10  temporal pattern in the percentage of police-recovered firearms equipped with

11  LCMs suggests that the pre-ban increased supply of LCMs likely brought about by

12  a combination of increased domestic sales just prior to the ban and post-ban

13  importation of LCMs (Koper 2004, pp. 65-67)[16] predictably increased their use in

14  crime for a number of years before the blocked sales of new LCMs squeezed

15  supply, making them less available for use in crime only several years into the post-

16  ban period. Expiration of the ban in 2004 provided a large supply of LCMs to meet

17  pent up demand.

18      20.     Though Koper has been relatively thorough in his examination of the

19  potential effects of the federal ban on assault weapons and LCMs on violent crime,

20  his analyses did not examine data for the full 10-year period the federal ban of

21  LCM and assault weapons was in effect because it was not available at the time he

22  completed his study. Excluding data from the last years when the ban was in effect,

23  based on temporal pattern of LCM use from data from Virginia police, likely

24  underestimated the LCM ban's effects on gun violence. Koper's analyses of

25  longitudinal data that ended between 2000 and 2003 depending on the analysis,

26  largely tested differences between pre-ban and post-ban means. An underlying

27  _____
    [17] Fallis, David, VA data show drop in criminal firepower during assault gun
28  ban, The Washington Post, January 23, 2011.

13

Webster Decl. ISO Defendant's Opposition to PI (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00786

ER_2966

1  assumption behind such comparisons and statistical tests is that the potential effects
2  of the assault weapons and LCM ban would be observed immediately and be
3  constant over the post-ban time period. In his published reports, Koper did not
4  formally test whether the federal assault weapons ban had a delayed or gradual
5  effect on violent crime. Such a delayed or gradual effect is an outcome that would
6  be more plausible than the immediate, constant change scenario that was tested, in
7  light of the market data Koper analyzed, the effects of permitting ongoing sales of
8  grandfathered assault weapons and LCMs, and trends in criminal use of LCMs in
9  Virginia. For these reasons, it is my view that Koper's research is likely to
10  understate potential long-term public safety benefits of the federal ban of assault
11  weapons and LCMs.

12    21.    Furthermore, as Koper has pointed out, only about 5% of those shot in
13  criminal shootings victimizations are shot in incidents in which more than 10
14  rounds were fired, suggesting an upper-bound for the potential impact of LCM bans
15  on gun violence. Because trends in overall gun violence are influenced by myriad
16  of factors, some of the potentially most important of which are very difficult to
17  measure (e.g., drug market dynamics, gang disputes, social norms surrounding
18  violence), it is possible that the federal ban of assault weapons and LCMs did
19  contribute to a proportionately small yet meaningful reduction in gun violence, but
20  available data and statistical models are unable to discern the effect. As Koper
21  points out, a one percent reduction in shootings in a nation with such high rates of
22  gun violence—undetectable in virtually any statistical analysis—translates to about
23  650 fewer shootings per year. (Koper 2013, p. 167.)[16]

24    22.    Due to the relative rarity of such events, especially during his study
25  period, Koper did not examine the potential impact of the federal assault weapon
26  and LCM ban on mass shootings in public places or the effects of the policy change
27  on the number of victims shot in such cases. Although no formal, sophisticated
28  analyses of the data on mass shootings in public places by lone shooters for the

14

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)
Exhibit 18
Page 00787

ER_2967

1  period 1982-2012 collected by Mother Jones magazine has been performed to my

2  knowledge, a temporal pattern can be discerned that is consistent with a

3  hypothesized protective effect of the federal assault weapon and LCM ban and a

4  harmful effect of the expiration of that ban.  Examining the data in Figure 1

5  (below), there is a noteworthy increase in the number of these incidents in the years

6  leading up to the 1994 federal ban, a leveling off during the ban, and an increase

7  following the expiration of the ban (from an annual average of 1.5 for 1995-2004 to

8  4.1 for 2005-2016).

9

10



Figure 1.  Incidents of mass shootings in public places by year
Mother Jones Magazine, 2017

21      23.    A more striking pattern is evident for the number of persons killed and

22  wounded in public mass shootings by lone shooters (Figure 2).  The mean number

23  of persons shot per year in these incidents during the pre-ban years (1982- 1994)

24  was 26.6, during the years the ban was in effect (1995-2004) it dipped to 21.1

25  (despite an upward pre-ban trajectory and the unusually large spike in 1999), and

26  more than doubled during the years since the ban has expired (66.1 in 2005-2016).

27  (Mother Jones Magazine 2017).  These temporal changes could be due to a myriad

28

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00788

of factors, but the pattern of findings suggests that the federal assault weapons and LCM ban could have had a protective effect against the type of shootings in which the unique features of assault weapons and LCMs were most relevant and that motivated calls for the ban.



Figure 2. Number of victims in mass shootings in public places by year
Mother Jones Magazine, 2017

24.     I performed a series of negative binomial regression analyses to test whether the pattern I observed in trends for mass shootings and victims shot in mass shootings were statistically significant and thus unlikely to be due to normal statistical fluctuation in the phenomena.  These regression analyses use the annual US population as a so-called offset variable, thereby eliminating the effect of a growing population during the 1982-2016 study period.  Simple regressions that tested for the effect of the 10-year federal ban of assault weapons and large capacity magazines indicated that the ban was associated with a statistically significant 62.6% reduction in the total number of victims shot in mass shootings during the ban (Incidence Rate Ratio, IRR = .374, p = 0.010) and a statistically significant

16

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00789

ER_2969

1   89.3% reduction in the number of victims shot in mass shootings in incidents

2   involving an assault weapon or other firearm with a LCM (IRR = .107, p = <.001).

3   When I included a linear trend term in the model to control for pre-ban trend in

4   mass shooting victimizations, the statistically significant associations between the

5   AW/LCM ban years and the other years were essentially unchanged (-59.9% for all

6   victims, IRR = .401, p = .017; -87.4% for all victims shot in mass shootings with an

7   AW or LCM, IRR = .126, p < .001). I also tested whether the effect of having the

8   federal AW/LCM ban grew over the years the ban was in effect. This is arguably a

9   better way to model the effect due to the fact that there were large increases in AW

10  and LCM bans just prior to the ban and that more potential sales of AWs and LCMs

11  were blocked with each year the ban was in effect. Again, I found that, even after

12  controlling for population growth and pre-ban trend, the AW/LCM ban was

13  associated with a 14.2% reduction in the rate of all mass shooting victimization for

14  each year the ban was in effect (IRR = .858, p =.012) and a 28.5% reduction in the

15  number of victims shot in public mass shootings where an AW or other firearm

16  with a LCM was used (IRR = .725, p <.001). These associations were statistically

17  significant.

18      25.     To date, there are no studies that have examined separately the effects

19  of an assault weapons ban, on the one hand, and a LCM ban, on the other hand,

20  likely because the two have usually been enacted together. It is my opinion that the

21  largest protective effect of these laws are due to restrictions on LCMs because

22  LCMs are used much more frequently than assault weapons.

23      26.     LCMs can increase the ability of criminals and those attempting to kill

24  or wound large numbers of innocent people to maximize casualties from their

25  attacks. When shootings result in mass casualties, those in which a firearm with a

26  LCM is used result in 2.5 times as many people shot and 47% as many killed than

27  is the case in mass shootings with other types of firearms. Based on the threat that

28  they pose to public safety as well as the fear generated by mass shootings, the state

17

Webster Decl. ISO Defendant's Opposition to PI  (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00790

ER_2970

1    of California's law restricting the maximum size of ammunition feeding devices to

2    10 seems prudent. Indeed, a lower limit could be justified. There is good reason to

3    believe that California's restriction in the capacity of ammunition feeding devices

4    for firearms would lead to modest reductions in gun violence. The federal LCM

5    ban appears to have led to a delayed decrease in the criminal use of LCMs and the

6    expiration of that law contributed to an increase in the use of LCMs in crime.

7    There is also data supporting the hypothesis that the federal ban and its expiration

8    were associated with changes in the number of people shot in mass shootings in

9    public places in a similar way.

18

Webster Decl. ISO Defendant's Opposition to PI (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00791

1     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

2     is true and correct.

3

4     Executed on: June 5, 2017               *Daniel W Webster*

5

6                                DANIEL W. WEBSTER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

Webster Decl. ISO Defendant's Opposition to PI   (17-cv-1017-BEN-JLB)

Exhibit 18
Page 00792

**U.S.**

# Nine Rounds a Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster

By **LARRY BUCHANAN**, **JON HUANG** and **ADAM PEARCE**   UPDATED OCT. 5, 2017

Authorities have not officially released details on the weapons a gunman used to kill 58 people and wound about 500 more late on Sunday in Las Vegas. But analysis of video posted on social media shows that the gunman, identified by the police as Stephen Paddock, 64, had rifles with rapid-fire capabilities.

An arsenal of firearms was recovered from Mr. Paddock's hotel room, said Sheriff Joseph Lombardo of the Las Vegas Metropolitan Police Department. At least one rifle in Mr. Paddock's suite had a "bump stock," a device used to retrofit a semiautomatic firearm to make it function like a fully automatic weapon, according to a law enforcement official who requested anonymity to divulge details of the investigation.

This video shows 15 seconds of the attack, with constant gunshots ringing out.

Exhibit 19
Page 00794

Nine Rounds a Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster - The New York Times

Source: @spacetrek9 on Twitter

Isolated, the pattern of gunshots looks like this.

**Las Vegas** About 90 shots in 10 seconds

Compare that with audio extracted from a video of the June 2016 Orlando nightclub shooting, in which 49 people were killed and 53 were wounded. The gunman, Omar Mateen, used at least two guns, including a semiautomatic AR-15-style assault rifle.

**Orlando nightclub** 24 shots in 9 seconds

Source: WESH 2 News

In contrast, a fully automatic weapon, like this pre-1986 Colt AR-15A2, sounds different. There are no variations in the firing rate like there was in the Las Vegas shooting.

**Fully automatic weapon** 98 shots in 7 seconds

Exhibit 19
Page 00795

**ER_2974**

Source: YouTube

## How did he fire so quickly?

The Las Vegas gunman modified at least one of his semiautomatic rifles to fire faster using a bump stock.

Slide Fire, a main manufacturer of bump-fire stocks, shows how the product works in the promotional video below.



Promotional video by Slide Fire

The device replaces a rifle's standard stock, which is the part held against the shoulder. It frees the weapon to slide back and forth rapidly because of recoil, with the stock bouncing, or "bumping," between the shooter's shoulder and trigger finger.

The shooter holds his or her trigger finger in place, while maintaining forward pressure on the barrel and backward pressure on the pistol grip while firing. This modification can be done legally and allows the user to fire at rates similar to those of automatic weapons.

Exhibit 19
Page 00796

**ER_2975**

Slide Fire, one of the main manufacturers of bump stocks, has posted a letter on its website from the Bureau of Alcohol, Tobacco, Firearms and Explosives, which says that the device "has no automatically functioning mechanical parts or springs and performs no automatic mechanical function." In the letter, the government confirmed that the bump stock is not regulated under the National Firearms Act.

_____

Additional reporting by C.J. Chivers and Thomas Gibbons-Neff. Note: Audio of firing was analyzed to estimate the number and timing of shots in the graphs above.

© 2018 The New York Times Company | Privacy | Terms of Service

Site Map | Help | Site Feedback

Exhibit 19
Page 00797

**ER_2976**



**Violence Policy Center**

1730 Rhode Island Avenue, NW   202.822.8200 voice
Suite 1014   202.822.8205 fax
Washington, DC 20036   www.vpc.org web

## High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States



*Columbine shooter armed with Intratec TEC-DC9 assault pistol equipped with high-capacity ammunition magazine*

**Since 1980, there have been at least 60 mass shootings (3 or more fatalities) where the shooter used high-capacity ammunition magazines. A total of 602 people were killed in these shootings and 1020 were wounded. This number is likely a significant undercount of actual incidents since there is no consistent collection or reporting of this data. Even in many high-profile shootings information on magazine capacity is not released or reported.**

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| First Baptist Church of Sutherland Springs<br>Sutherland Springs, Texas<br>November 5, 2017<br>Shooter: Devin Patrick Kelley | 27 dead (including the shooter), 20 injured | Sturm, Ruger AR-556 assault rifle | **15 30-round magazines** |

Exhibit 20
Page 00799

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Route 91 Harvest festival Las Vegas, Nevada October 1, 2017 Shooter: Stephen Paddock | 59 dead (including the shooter), 489 injured | Multiple AR-type assault rifles including 4 Daniel Defense assault rifles, 3 FN-15 assault rifles, 3 LMT assault rifles, and 2 POF assault rifles | **Multiple high-capacity ammunition magazines including 12 100-round magazines, 6 25-round magazines and 1 40-round magazine** |
| Cascade Mall Burlington, Washington September 23, 2016 Shooter: Arcan Cetin | 5 dead | Sturm, Ruger 10/22 rifle | **25-round magazine** |
| UPS distribution center San Francisco, California June 14, 2017 Shooter: Jimmy Lam | 4 dead (including shooter), 2 wounded | MasterPiece Arms MAC-10 assault pistol | **30-round magazine** |
| House party Mukilteo, Washington July 30, 2016 Shooter: Allen Christopher Ivanov | 3 dead, 1 wounded | Sturm Ruger AR-15 assault rifle | **30-round magazine** |
| Baton Rouge, Louisiana July 17, 2016 Shooter: Gavin Long | 3 law enforcement officers dead, 3 wounded | Tavor SAR assault rifle, Stag Arms M4 variant assault rifle, Springfield XD 9 mm semiautomatic pistol | **High-capacity ammunition magazines** |
| Dallas, Texas July 7, 2016 Shooter: Micah Johnson | 5 law enforcement officers dead, 9 officers and two citizens wounded | Saiga AK-74 assault rifle, Glock 19 Gen 4 and Fraser .25 semiautomatic pistols | **Multiple high-capacity ammunition magazines** |

2

Exhibit 20
Page 00800

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Pulse nightclub<br>Orlando, Florida<br>June 12, 2016<br>Shooter: Omar Mateen | 50 dead (including shooter), 53 wounded | Sig Sauer MCX assault rifle | **Multiple 30-round magazines, some taped together for faster reloading** |
| Excel Industries<br>Hesston, Kansas<br>February 25, 2016<br>Shooter: Cedric Ford | 4 dead (including shooter), 14 wounded | Zastava AK-variant assault rifle, Glock 22 semiautomatic pistol | **30-round magazine** |
| Kalamazoo Michigan<br>Multiple parking lots<br>February 20, 2016<br>Shooter: Jason Dalton | 6 dead, 2 wounded | Glock 19 semiautomatic pistol, Walther P99 9mm semiautomatic pistol | **Extended magazine** |
| Inland Regional Center<br>San Bernardino, California<br>December 2, 2015<br>Shooters: Syed Farook and Tashfeen Malik | 14 dead, 21 wounded | Smith&Wesson M&P assault rifle, DPMS A15 assault rifle | **4 30-round magazines** |
| Navy Operational Support Center and Marine Corps Reserve Center<br>Chattanooga, Tennessee<br>July 16, 2015<br>Shooter:  Muhammad Youssef Abdulazeez | 6 dead (including shooter), 2 wounded | AK-variant assault rifle, Saiga assault shotgun, handgun | **Multiple 30-round magazines** |
| Emanuel African Methodist Episcopal Church<br>Charleston, South Carolina<br>June 17, 2015<br>Shooter: Dylann Roof | 9 dead | Glock .45 Model 41 pistol | **13-round magazines** |
| Marysville-Pilchuck High School,<br>Marysville, Washington<br>October 24, 2014<br>Shooter: Jaylen Fryberg | 5 dead (including shooter) | Beretta .40 semiautomatic pistol | **High-capacity, number of rounds unstated** |

3

Exhibit 20
Page 00801

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Apartment complex<br>Hialeah, Florida<br>July 26, 2013<br>Shooter: Pedro Vargas | 6 dead | Glock 17 semiautomatic pistol | **17-round magazine** |
| Santa Monica, California<br>June 7, 2013<br>Shooter: John Zawahri | 6 dead, (including shooter) | AR-type assault rifle built from parts | **40 30-round magazines** |
| Sandy Hook Elementary School<br>Newtown, Connecticut<br>December 14, 2012<br>Shooter: Adam Lanza | 28 dead, (including shooter) | Bushmaster XM15 assault rifle, Glock 10mm pistol, 9mm Sig Sauer pistol | **30-round magazines** |
| Accent Signage Systems<br>Minneapolis, Minnesota<br>September 27, 2012<br>Shooter: Andrew Engeldinger | 7 dead (including shooter), 3 wounded | Springfield XDM semiautomatic pistol | **2 15-round magazines** |
| Sikh Temple<br>Oak Creek, Wisconsin<br>August 5, 2012<br>Shooter: Wade Michael Page | 7 dead (including shooter), 2 wounded | Glock 9mm semiautomatic pistol | **3 19-round magazines** |
| Café Racer<br>Seattle, Washington<br>May 30, 2012<br>Shooter: Ian Stawicki | 6 dead (including shooter) | Colt .45 semiautomatic pistol | **Extended magazine** |
| Century Aurora 16 movie theater<br>Aurora, Colorado<br>July 20, 2012<br>Shooter: James Holmes | 12 dead, 58 wounded | Smith & Wesson M&P15 assault rifle, .40 Glock pistol, Remington model 870 12 gauge shotgun | **100-round magazine** |
| IHOP<br>Carson City, Nevada<br>September 6, 2011<br>Shooter: Eduardo Sencion | 5 dead, (including shooter), 7 wounded | MAK-90 assault rifle (illegally converted to full-auto) | **20- and 30-round magazines** |
| Safeway parking lot<br>Tucson, Arizona<br>January 8, 2011<br>Shooter: Jared Loughner | 6 dead, 13 wounded | Glock 19 semiautomatic pistol | **Two 31-round magazines<br>Two 15-round magazines** |

4

Exhibit 20
Page 00802

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Shreveport, Louisiana<br>August 16, 2010<br>Shooter:  Marcus Donte Reed | 3 dead | Assault weapon | **30-round magazine** |
| Hartford Distributors<br>Manchester, Connecticut<br>August 3, 2010<br>Shooter:  Omar Thornton | 9 dead (including shooter), 2 wounded | Sturm, Ruger SR9 semiautomatic pistol | **17- and 15-round magazines** |
| ABB, Inc.<br>St. Louis, Missouri<br>January 7, 2010<br>Shooter:  Timothy Hendron | 4 dead (including shooter), 5 wounded | Romarm AK-47 assault rifle, Tristar 12 gauge shotgun, Hi-Point .40 pistol | **Two "banana-style" high- capacity magazines (capacity not stated)** |
| Fort Hood<br>Fort Hood, Texas<br>November 5, 2009<br>Shooter:  Nidal Hasan | 13 dead, 34 wounded | FN Five-seveN 5.7mm semiautomatic pistol | **30- and 20-round magazines** |
| LA Fitness Center<br>Collier, Pennsylvania<br>August 4, 2009<br>Shooter:  George Sodini | 4 dead (including shooter), 9 wounded | Two 9mm semiautomatic pistols, .45 pistol, .32 pistol | **30-round magazines** |
| American Civic Association<br>Binghamton, New York<br>April 3, 2009<br>Shooter:  Jiverly Wong | 14 dead (including shooter), 4 wounded | 9mm Beretta semiautomatic pistol, .45 handgun | **30-round magazine** |
| Oakland, California<br>March 21, 2009<br>Shooter: Lovelle Mixon | 4 dead | SKS assault rifle | **High-capacity magazine** |
| Alabama, multiple locations<br>March 10, 2009<br>Shooter:  Michael McLendon | 11 dead (including shooter) | SKS assault rifle, Bushmaster AR-15 assault rifle, .38 pistol | **High-capacity magazines taped together** |
| Walt Lou Trailer Park<br>Stafford, Virginia<br>May 5, 2008<br>Shooter:  Aaron Poseidon Jackson | 4 dead (including shooter) | WASR-10 assault rifle, Smith & Wesson .38 revolver | **30-round magazines** |
| Northern Illinois University<br>DeKalb, Illinois<br>February 14, 2008<br>Shooter:  Steven Phillip Kazmierczak | 6 dead (including shooter), 21 wounded | Glock19 9mm pistol, Hi-Point 380, Remington12 gauge Sportsman 48 shotgun | **33- and 15-round magazines** |

Exhibit 20
Page 00803

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Westroads Mall<br>Omaha, Nebraska<br>December 5, 2007<br>Shooter:  Robert Hawkins | 9 dead (including shooter), 5 wounded | WASR-10 assault rifle | **Two 30-round magazines taped together** |
| Virginia Tech<br>Blacksburg, Virginia<br>April 16, 2007<br>Shooter:  Seung-Hui Cho | 33 dead (including shooter), 17 wounded | Glock 19 semiautomatic pistol,<br>Walther P22 pistol | **15-round magazines** |
| Mail Processing Plant<br>Goleta, California<br>January 30, 2006<br>Shooter: Jennifer San Marco | 7 dead | Smith & Wesson 9mm model 915 semiautomatic pistol | **15-round magazine** |
| Living Church of God<br>Brookfield, Wisconsin<br>March 13, 2005<br>Shooter: Terry Ratzmann | 8 dead (including shooter) | Beretta 9mm semiautomatic pistol | **2 13-round magazines** |
| Hunting Camp<br>Birchwood, Wisconsin<br>November 21, 2004<br>Shooter:  Chai Vang | 6 dead, 3 wounded | SKS assault rifle | **20-round magazine** |
| Edgewater Technology Inc.<br>Wakefield, Massachusetts<br>December 26, 2000<br>Shooter:  Michael McDermott | 7 dead | AK-47 assault rifle, 12 gauge pump-action shotgun | **60-round, large-capacity feeding device** |
| Xerox<br>Honolulu, Hawaii<br>November 2, 1999<br>Shooter:  Byran Uyesugi | 7 dead | Glock 17 9mm semiautomatic pistol | **Three 15-round magazines** |
| Wedgewood Baptist Church<br>Fort Worth, Texas<br>September 15, 1999<br>Shooter:  Larry Gene Ashbrook | 8 dead (including shooter), 7 wounded | Sturm, Ruger P85 9mm semiautomatic pistol, .380 pistol | **Three 15-round magazines** |

6

Exhibit 20
Page 00804

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Columbine High School Littleton, Colorado April 20,1999 Shooters:  Eric Harris and Dylan Klebold | 15 dead (including shooters), 23 wounded | Intratec TEC-DC9 assault pistol, Hi-Point 9mm Carbine, Savage 67H pump-action shotgun, Savage 311-D 12-gauge shotgun | **High-capacity magazines (capacity unstated)** |
| Thurston High School Springfield, Oregon May 21,1998 Shooter:  Kip Kinkel | 4 dead, 22 wounded | 9mm Glock semiautomatic pistol, .22 Sturm Ruger rifle, .22 Sturm Ruger pistol | **50-round magazine** |
| Westside Middle School Jonesboro, Arkansas March 24, 1998 Shooters:  Andrew Golden and Mitchell Johnson | 5 dead, 10 wounded | M-1 rifle, Remington .30-06 rifle, various handguns | **15-round magazine** |
| Connecticut State Lottery Headquarters Newington, Connecticut March 6, 1998 Shooter:  Matthew Beck | 5 dead (including shooter) | Glock 9mm semiautomatic pistol | **19-round magazine** |
| Caltrans Maintenance Yard Orange, California December 18, 1997 Shooter:  Arturo Reyes Torres | 5 dead (including shooter), 2 wounded | AK-47 assault rifle | **Five 30-round magazines** |
| Piper Technical Center Los Angeles, California July, 19, 1995 Shooter: Willie Woods | 4 dead | Glock semiautomatic pistol | **19-round magazine** |
| DC Police Headquarters Washington, DC November 22, 1994 Shooter:  Bennie Lee Lawson | 4 dead (including shooter), 1 wounded | Cobray —11 assault pistol | **Extended magazine** |

7

Exhibit 20
Page 00805

ER_2983

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Fairchild Air Force Base hospital<br>Spokane, Washington<br>June 20, 1994<br>Shooter:  Dean Mellberg | 5 dead (including shooter), 23 wounded | MAK-90 assault rifle | **75-round drum magazine** |
| Long Island Railroad<br>Long Island, New York<br>December 7, 1993<br>Shooter:  Colin Ferguson | 6 dead, 19 wounded | Sturm, Ruger P-89 9mm semiautomatic pistol | **Four 15-round magazines** |
| Pettit & Martin Law Offices<br>San Francisco, California<br>July 1, 1993<br>Shooter:  Gian Luigi Ferri | 9 dead (including shooter), 6 wounded | Two Intratec TEC-DC9 assault pistols, .45 pistol | **40- to 50-round magazines** |
| Luby's Cafeteria<br>Killeen, Texas<br>October 16, 1991<br>Shooter:  George Hennard | 24 dead (including shooter), 20 wounded | Sturm, Ruger P-89 9mm semiautomatic pistol, Glock 9mm semiautomatic pistol | **17- and 15-round magazines** |
| General Motors Acceptance Corp.<br>Jacksonville, Florida<br>June 18, 1990<br>Shooter:  James Pough | 10 dead (including shooter), 4 wounded | M-1 rifle, .38 revolver | **30-round magazines** |
| Standard Gravure Corporation<br>Louisville, Kentucky<br>September 14, 1989<br>Shooter:  Joseph Wesbecker | 9 dead (including shooter), 12 wounded | AK-47 assault rifle, 2 MAC-11 assault pistols,.38 revolver, Sig Sauer 9mm pistol | **30-round magazines** |
| Cleveland Elementary School<br>Stockton, California<br>January 17, 1989<br>Shooter:  Patrick Purdy | 6 dead (including shooter), 30 wounded | AK-47 assault rifle, Taurus 9mm pistol, unidentified pistol | **75-round drum magazine** |
| Palm Bay shopping center<br>Palm Bay, Florida<br>April 23, 1987<br>Shooter:  William Cruse | 6 dead (including 2 police officers) | Sturm, Ruger Mini-14 assault rifle | **Five 30-round magazines** |
| McDonald's<br>San Ysidro, California<br>July 18, 1984<br>Shooter:  James Huberty | 22 dead (including shooter), 19 wounded | Uzi Carbine, Browning 9mm pistol, Winchester 1200 pump-action 12-gauge shotgun | **25-round magazine** |

Exhibit 20
Page 00806

**ER_2984**

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Ianni's Nightclub<br>Dallas, Texas<br>June 29, 1984<br>Shooter: Abdelkrim Belachheb | 6 dead, 1 wounded | Smith & Wesson 9mm semiautomatic pistol | **Two 14-round magazines** |
| Pennsylvania, multiple locations<br>September 25, 1982<br>Shooter: George Emil Banks | 13 dead, 1 wounded | AR-15 semiautomatic assault rifle | **30-round magazines** |
| Oregon Museum Tavern<br>Salem, Oregon<br>May 7, 1981<br>Shooter: Lawrence Moore | 4 dead, 19 wounded | Browning 9mm semiautomatic pistol | **Two 14-round magazines** |

9

Exhibit 20
Page 00807

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 83 of 279

Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Mass Shooti... Page 1 of 3
Case 3:17-cv-01017-BEN-JLB   Document 53-9   Filed 04/09/18   PageID.6554   Page 18 of 76

**Subscribe to The Trace's Newsletter**

× Close

## The Trace

March 22, 2018

· **Facebook**
· **Twitter**
· **Email**



*A 30 round magazine, left, and a 10 round magazine, right, below an AR-15.*

GUN POLICY

# Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Mass Shooting Carnage

**The Orlando shooting shows it's not what the gun looks like that matters — it's how many rounds it can fire without reloading.**

by **Alex Yablon**   ·  **@AlexYablon**   · June 13, 2016

The day after the deadliest mass shooting in U.S. history, likely Democratic presidential nominee Hillary Clinton addressed the fears the massacre evoked. Speaking at an event in Cleveland, Ohio, Clinton highlighted what she saw as crucial steps for stopping such terrorist attacks in the future. Along with more aggressive intelligence gathering and better resources for local law enforcement, Clinton focused on one of the weapons used by the shooter in Orlando, Florida: a military-style rifle similar to the AR-15.

"It's essential we stop terrorists from getting the tools they need to carry out attacks," Clinton said, receiving the speech's loudest applause when she made clear that was referring to "assault

Exhibit 21
Page 00809

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 84 of 279

Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Mass Shooti...   Page 2 of 3
Case 3:17-cv-01017-BEN-JLB   Document 53-9   Filed 04/09/18   PageID.6555   Page 19 of 76

weapons" like the AR-15. Calling them "weapons of war," she argued that "they have no place on our streets."

Clinton's broad condemnation suggests she might push to revive the federal ban on assault weapons, a law her husband signed in 1994. The ban was among the most controversial gun reform policies of the past 20 years, and calls to re-institute it have come after many high-profile shootings.

But many experts doubt the ban had any significant impact before it expired in 2004.

Today, many experts instead believe the most effective means to lessen the carnage in attacks like the one in Orlando is to ban high-capacity magazines. These devices feed semiautomatic firearms, including handguns, large amounts of ammunition, allowing shooters to fire for longer before reloading. While assault-style rifles like the AR-15 could increase the lethality of an attack in some situations, they say, it is high-capacity magazines that allow shooters to fire dozens of shots without stopping.

**Officials** from the Bureau of Alcohol, Tobacco, Firearms, and Explosives said the Orlando shooter used a Sig Sauer MCX semiautomatic rifle, which fires as quickly as its user can pull the trigger and can be equipped with detachable magazines that hold any number of rounds. The Orlando shooter used 30-round magazines, according to the ATF, which are illegal in a handful of states, but not in Florida. That almost certainly contributed to the high body count, since the shooter did not have to pause to reload as frequently as he would have with a smaller magazine.

The semiautomatic rifle used in the Orlando massacre resembles those used in past mass shootings in Aurora, Colorado; Newtown, Connecticut; Roseburg, Oregon; and San Bernardino, California.

Though assault weapons have become a potent symbol of mass shootings, bans of that style of gun are a "distraction," said Adam Winkler, a UCLA law professor and the author of *Gunfight*. For starters, he says, it didn't actually stop manufacturers from selling assault rifles. Because the 1994 ban defined weapons based on "cosmetic" features like pistol grips or collapsible stocks, gun makers evaded these restrictions by removing just enough design features so as to not trigger the ban. Meanwhile, the weapons remained semiautomatic and could still accept magazines of any size.

Winkler says he believes a ban on magazines that hold lots of ammunition would be a more effective strategy in limiting the carnage from a mass shooting. "It makes far more sense to focus on high-capacity magazines than assault rifles," he says. Winkler notes that it's not the style of a gun but "the size of a magazine [that's] associated with the amount of damage a weapon can cause." (The 1994 law included such a ban, but there was no restriction on the sale or possession of high-capacity magazines, and millions remained in circulation.)

This thinking has guided policies in eight states, which ban in some form high-capacity magazines. New York's SAFE Act, signed into law weeks after the 2012 shooting in Newtown, Connecticut, included bans on possession of any magazine capable of holding more than 10 rounds. Later in 2013, Colorado banned the sale of magazines that carry more than 15 rounds.

In California, some local and state lawmakers have called for new restrictions on high-capacity magazines. The state already outlaws sale of the magazines, but not possession. After the state

Exhibit 21
Page 00810

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 85 of 279

Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Mass Shooti...   Page 3 of 3
Case 3:17-cv-01017-BEN-JLB   Document 53-9   Filed 04/09/18   PageID.6556   Page 20 of 76

was rocked by the San Bernardino shootings in December, Lieutenant Governor Gavin Newsom began campaigning to expand a Los Angeles law banning possession statewide.

Restrictions on assault weapons and high-capacity magazines are supported by a small majority of Americans. A poll conducted by the Johns Hopkins Bloomberg School of Public Health in March 2015 found that 63 percent of all Americans favored assault weapon bans, and 60 percent favored banning the sale of high-capacity magazines.

Californians support restrictions on assault weapons and magazine capacities at similar levels to the rest of the country. A poll conducted soon after the San Bernardino shooting by the Field Corporation, a San Francisco-based public opinion research firm, found that 58 percent of the state's voters supported banning possession of large magazines and 56 percent supported a broad assault weapons ban that included all semiautomatic rifles that can accept detachable magazines.

Florida voters have not been polled on assault weapon or magazine capacity restrictions since March 2013, when the most recent high-profile mass shooting had occurred about 1,000 miles away in Connecticut. Quinnipiac University pollsters found that Florida voters were slightly in favor of the laws: 56 percent favored a national assault weapons ban, and 53 percent favored a ban on magazines that hold more than 10 rounds.

At least one expert suspects those views might change in the wake of the nation's worst mass shooting. Susan MacManus, a professor of political science at the University of South Florida who conducts the Sunshine State poll on political issues, says of assault weapon and magazine capacity restrictions, "I am sure that support levels would be higher after yesterday's shooting."

*[Photo: AP Photo/Charles Krupa]*

## Support Our Work

### Help us tell the story of America's gun violence crisis.

Donate Now



# Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012

## OFFICE OF THE STATE'S ATTORNEY
## JUDICIAL DISTRICT OF DANBURY
### Stephen J. Sedensky III, State's Attorney

### November 25, 2013

Exhibit 22
Page 00813

TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................1

INTRODUCTION  ...................................................................5

PURPOSE AND SCOPE OF REPORT ...................................................6

SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE ...........................9

SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION .............................16

SANDY HOOK ELEMENTARY SCHOOL - AUTOPSY INFORMATION ...........................23

36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE ....................24

36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION .........................24

36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION .......................27

SHOOTER – AUTOPSY INFORMATION.................................................27

INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS ........27

EVENTS AND BACKGROUND INFORMATION LEADING UP TO DEC. 14, 2012 ...........28

EVIDENCE EXAMINATION ........................................................35

MISCELLANEOUS INVESTIGATIVE LEADS .........................................38

DETERMINATIONS OF CRIMES COMMITTED ....................................40

CONCLUSION.................................................................43

ACKNOWLEDGEMENTS.........................................................44

Exhibit 22
Page 00814

**ER_2990**

<u>APPENDIX</u>[1]

Search Warrants

Honda Civic – 12/14/2012 ........................................................................A1

36 Yogananda Street - 12/14/2012 at 5:29 p.m ......................................A10

36 Yogananda Street - 12/14/2012 at 7:25 p.m ......................................A21

36 Yogananda Street - 12/15/2012 at 3:03 p.m ......................................A31

36 Yogananda Street - 12/16/2012 at 4:31 p.m ......................................A38

ATT telephone – 4/10/2013 at 10:43 a.m. .............................................A47

ATT telephone – 4/10/2013 at 10:47 a.m. .............................................A54

Verizon telephone – 4/10/2013 at 10:51 a.m. ........................................A61

Combat Arms – Nexon – 08/27/2013 at 9:46 a.m. .................................A68

World of Warcraft – Blizzard - 8/27/2013 at 9:50 a.m. ..........................A76

Time Line ........................................................................................................A84

SHES Floor Plan ..........................................................................................A116

SHES and Parking Lot Map ........................................................................A117

SHES Ballistics Diagram .............................................................................A118

SHES Exterior Description ...........................................................................A119

SHES Lobby, Hallway, Room 9 and Ballistics Description .......................A125

SHES Classroom 8 Ballistics Description ...................................................A134

SHES Classroom 10 Ballistics and Shooter Description ............................A136

SHES Weight – Guns and Ammunition .......................................................A141

---

[1] Because of its volume, the Appendix to this report is published as a separate document.  Some of the search warrants and reports contained in the Appendix have been redacted to meet court orders, exceptions to the Freedom of Information Act, protect the identity of witnesses, protect records of child abuse or personal identification information.

Exhibit 22
Page 00815

ER_2991

SHES Newtown Emergency Response Plan.................................................................A144

SHES Photographs...................................................................................................A165

Yogananda Scene Description ..................................................................................A180

Yogananda Digital Image Report .............................................................................A188

Yogananda Photographs ..........................................................................................A193

Yogananda Review of Electronic Evidence .............................................................A211

Yogananda - Book of Granny ...................................................................................A220

Yogananda GPS Routes ...........................................................................................A223

Lanza, Adam – Toxicology.......................................................................................A231

Exhibit 22
Page 00816

**ER_2992**

# <u>EXECUTIVE SUMMARY</u>

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut, on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

The State's Attorney for the Judicial District of Danbury is charged, pursuant to Article IV, Section 27 of the Constitution of the State of Connecticut and Connecticut General Statutes (C.G.S.) Sec. 51-276 *et seq.*, with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred.

Since December 14, 2012, the Connecticut State Police and the State's Attorney's Office have worked with the federal authorities sharing responsibilities for various aspects of this investigation. Numerous other municipal, state and federal agencies assisted in the investigation. The investigation materials reflect thousands of law enforcement and prosecutor hours. Apart from physical evidence, the materials consist of more than seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and returns, as well as evaluations of those items.

In the course of the investigation, both state and federal law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter. Although many times these "leads" would go nowhere, each one was evaluated and often required substantial law enforcement time to pursue. An abundance of caution was used during the investigation to ensure that all leads were looked into, despite the fact that more than 40 such "leads" proved, after investigation, to be unsubstantiated. Information that was substantiated and relevant was made part of the investigation.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report. While no report is statutorily required of the State's Attorney once an investigation is complete, it has been the practice of State's Attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the State's Attorney determines that some type of public statement is necessary. Given the gravity of the crimes committed on December 14, 2012, a report is in order.

On the morning of December 14, 2012, the shooter, age 20, heavily armed, went to Sandy Hook Elementary School (SHES) in Newtown, where he shot his way into the locked school building with a Bushmaster Model XM15-E2S rifle. He then shot and killed the principal and school psychologist as they were in the north hallway of the school responding to the noise of the shooter coming into the school. The shooter also shot and injured two other staff members who were also in the hallway.

Exhibit 22
Page 00817

The shooter then went into the main office, apparently did not see the staff who were hiding there, and returned to the hallway.

After leaving the main office, the shooter then went down the same hallway in which he had just killed two people and entered first grade classrooms 8 and 10, the order in which is unknown. While in those rooms he killed the two adults in each room, fifteen children in classroom 8 and five in classroom 10.  All of the killings were done with the Bushmaster rifle.

He then took his own life with a single shot from a Glock 20, 10 mm pistol in classroom 10.

Prior to going to the school, the shooter used a .22 caliber Savage Mark II rifle to shoot and kill his mother in her bed at the home where they lived at 36 Yogananda Street in Newtown.

The response to these crimes began unfolding at 9:35:39 a.m. when the first 911 call was received by the Newtown Police Department. With the receipt of that call, the dispatching and the arrival of the police, the law enforcement response to the shootings began. It was fewer than four minutes from the time the first 911 call was received until the first police officer arrived at the school. It was fewer than five minutes from the first 911 call, and one minute after the arrival of the first officer, that the shooter killed himself. It was fewer than six minutes from the time the first police officer arrived on SHES property to the time the first police officer entered the school building. In fewer than 11 minutes twenty first-grade pupils and six adults had lost their lives.

The following weapons were recovered in the course of this investigation: (1) a Bushmaster Model XM15-E2S semi-automatic rifle, found in the same classroom as the shooter's body. All of the 5.56 mm shell casings from the school that were tested were found to have been fired from this rifle. (2) a Glock 20, 10 mm semi-automatic pistol found near the shooter's body and determined to have been the source of the self-inflicted gunshot wound by which he took his own life. (3) a Sig Sauer P226, 9 mm semi-automatic pistol found on the shooter's person. There is no evidence this weapon had been fired. (4)  a Izhmash Saiga-12, 12 gauge semi-automatic shotgun found in the shooter's car in the parking lot outside the school, and which was secured in the vehicle's trunk by police responding to the scene. There is no evidence this weapon had been fired. (5) a Savage Mark II rifle found at 36 Yogananda Street on the floor of the master bedroom near the bed where the body of the shooter's mother was found. This rifle also was found to have fired the four bullets recovered during the autopsy of the shooter's mother.

All of the firearms were legally purchased by the shooter's mother. Additionally, ammunition of the types found had been purchased by the mother in the past, and there is no evidence that the ammunition was purchased by anyone else, including the shooter.

At the date of this writing, there is no evidence to suggest that anyone other than the shooter was aware of or involved in the planning and execution of the crimes that were committed on December 14, 2012, at Sandy Hook Elementary School and 36 Yogananda Street. From the time an unknown male was encountered by the Newtown police outside of the school during the initial response, until well after the staff and children had been evacuated, the thought that there may have been more than one shooter was a condition all responding law enforcement worked under as they cleared the school. Individuals located in the wooded areas surrounding the school

Exhibit 22
Page 00818

ER_2994

as the searches and evacuations were taking place were initially treated as suspect and handled accordingly (including being handcuffed) until their identity could be determined. The circumstances surrounding all of these individuals were fully investigated and revealed no additional shooters. DNA testing of evidence recovered from both the school and 36 Yogananda Street also revealed no potential accessories or co-conspirators.

It is the conclusion of this State's Attorney that the shooter acted alone and was solely criminally responsible for his actions of that day. Moreover, none of the evidence developed to date demonstrates probable cause to believe that any other person conspired with the shooter to commit these crimes or aided and abetted him in doing so.

Unless additional – and at this time unanticipated – evidence is developed, there will be no state criminal prosecution as result of these crimes. With the issuance of this report, the investigation is closed. Should additional reliable information related to the existence of accessories or co-conspirators come to the attention of the investigators, the investigation will be reopened.[2]

In the course of his rampage the shooter committed a number of crimes in violation of our Connecticut Penal Code.  The most significant are those where lives were taken and people were physically injured. In Sandy Hook Elementary School, the crime of Murder under Special Circumstances, in violation of C.G.S. Sec. 53a-54b, was committed twenty-six times and Attempted Murder under Special Circumstances in violation of C.G.S. Secs. 53a-49 and 53a-54b was committed twice as it relates to the two individuals who were shot by the shooter and survived. The crime of Murder in violation of C.G.S. Sec. 53a-54 was committed by the shooter in killing his mother.

The obvious question that remains is: "Why did the shooter murder twenty-seven people, including twenty children?" Unfortunately, that question may never be answered conclusively, despite the collection of extensive background information on the shooter through a multitude of interviews and other sources. The evidence clearly shows that the shooter planned his actions, including the taking of his own life, but there is no clear indication why he did so, or why he targeted Sandy Hook Elementary School.

It is known that the shooter had significant mental health issues that affected his ability to live a normal life and to interact with others, even those to whom he should have been close. As an adult he did not recognize or help himself deal with those issues. What contribution this made to the shootings, if any, is unknown as those mental health professionals who saw him did not see anything that would have predicted his future behavior. He had a familiarity with and access to firearms and ammunition and an obsession with mass murders, in particular the April 1999 shootings at Columbine High School in Colorado. Investigators however, have not discovered any evidence that the shooter voiced or gave any indication to others that he intended to commit such a crime himself.

---

[2] It should be noted that potentially important evidence, i.e., a computer hard drive recovered from the shooter's home, as of this date remains unreadable. Additional insight could be gained should efforts to recover data from the hard drive ever prove successful, which at this time appears highly improbable. It is because of this improbability, coupled with the current determination of no accessories or co-conspirators that the case is being closed.

Exhibit 22
Page 00819

ER_2995

This State's Attorney expresses his sincere sympathy and condolences to the victims of the incident of December 14, 2012, and to their families. He also expresses his appreciation for their continued patience and understanding during the course of the investigation and preparation of this report. He acknowledges and thanks law enforcement, which responded to Sandy Hook Elementary School in minutes and entered the building believing someone could be there ready to take *their* lives as well. He also acknowledges and thanks the staff of the Sandy Hook Elementary School who acted heroically.  The combination saved many children's lives.

This report would not have been possible if not for the assistance and cooperation of numerous agencies at the state, local and federal levels of government. The State's Attorney expresses his sincere gratitude and appreciation to all of these agencies and to all of the men and women who contributed so much to this investigation. The assistance of federal authorities has been invaluable. Particularly worthy of special note are the men and women of the Connecticut State Police, and in particular, the Western District Major Crime Squad.  The thoroughness and sensitivity with which they conducted their investigation is unmatched in my experience.

Exhibit 22
Page 00820

ER_2996

## **INTRODUCTION**

On the morning of December 14, 2012, Adam Lanza, the shooter,[3] age 20, went to Sandy Hook Elementary School (also SHES) in Newtown, Connecticut, where he shot his way into the building and killed twenty children and six adults and wounded two other adults, all with a Bushmaster Model XM15-E2S rifle. The shooter then took his own life with a single shot from a Glock 20, 10 mm handgun. From the time the doors of the school were locked at 9:30 a.m. until the time it is believed the shooter killed himself at 9:40:03, fewer than 11 minutes had elapsed.

Prior to going to the school, the shooter used a .22 caliber Savage Mark II rifle to shoot and kill his mother in her bed. This occurred at the home where they lived at 36 Yogananda Street, also in Newtown.

With these unprecedented horrific crimes came a responsibility for an investigation to determine what crimes were committed and, more importantly, if the shooter acted alone. Any person who aided and abetted the shooter or who conspired with him had to be held accountable.

Beginning on December 14, 2012, the Connecticut State Police and the State's Attorney's Office worked in cooperation with the federal authorities sharing responsibilities for various aspects of the case. The federal involvement has been invaluable. Though some evidence is still being examined, there is no indication in the investigation by either state or federal authorities to date that the shooter acted with anyone on December 14, 2012, or had co-conspirators or accessories who could be prosecuted.

In addition to physical evidence,[4] the investigation materials contain over seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and search warrant returns as well as evaluations of those items. Investigators interviewed individuals who were present at SHES on December 14, 2012, and witnessed the incident, among them students, staff members, parents of students and neighbors. Special attention and consideration was given to the interviewing of child witnesses, given their traumatic experience. Also interviewed were police officers and other first responders who were present at SHES during the course of the incident itself and in the course of the subsequent search, evacuation of the school and processing of the scenes.

Investigators attempted to obtain as much information about the shooter's life as possible in an effort to determine the reasons or motives for his actions on December 14, 2012. Interviews were conducted with members of the shooter's family, those who knew the shooter or his family throughout his life, as well as teachers and school personnel who had been involved with him and his family over his time in Newtown.

Efforts were made within the limits of privacy laws to gather information on medical consultations and/or treatments the shooter was involved with over the course of his years in Newtown. In doing so, investigators found no evidence to suggest the shooter had taken any

---

[3] Throughout the remainder of this report Adam Lanza will be referred to as "the shooter."

[4] Over 270 evidence designations were used, many grouping related items as one number.

Exhibit 22
Page 00821

medication that would affect his behavior or by any means to explain his actions on December 14, 2012.

An investigation of this magnitude requires careful planning and review. The interviews took substantial time, first to identify which individuals should be interviewed and then to conduct the actual interviews. Physical evidence had to be examined and forensically reviewed. This included ballistics, fingerprint and DNA analysis. Additionally, all of the information collected had to be reviewed and summarized in written statements that have since become a part of the investigation, reflecting thousands of dedicated law enforcement and prosecutor hours.

I had been working closely with the Connecticut State Police, who conducted the state investigation, and federal law enforcement officers since December 2012.   Once the investigation was delivered for my review, I took the time to read, digest, evaluate and summarize the material, mindful of the privacy interests involved and the approaching December 14, 2012, anniversary.

The federal authorities have stated that under federal law many of their reports and materials cannot become part of the public record due to rules regarding the dissemination of information obtained pursuant to grand jury subpoenas, sealed search warrants, and federal Freedom of Information law. Therefore, information obtained by federal authorities will not, for the most part, be incorporated into the Connecticut State Police criminal investigation file.

While the reports and materials will not be part of the state investigation record, such materials have been examined and considered by state law enforcement authorities. Based upon a review of all of the documentation, both state and federal, we are left confident at this time that the evidence developed to date does not reveal co-conspirators or accessories. Accordingly, as a result of the investigation to date, there will be no state criminal prosecution of anyone.

## PURPOSE AND SCOPE OF REPORT

The State's Attorney's Office for the Judicial District of Danbury is charged, pursuant to Article IV, Sec. 27 of the Connecticut State Constitution[5] and Connecticut General Statutes (C.G.S.) Sec. 51-276[6] *et seq.*, with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred. The investigation has been

---

[5] Connecticut Constitution Article 4, Sec. 27.  There shall be established within the executive department a division of criminal justice *which shall be in charge of the investigation and prosecution of all criminal matters.* Said division shall include the chief state's attorney, who shall be its administrative head, and the state's attorneys for each judicial district, which districts shall be established by law. The prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district.

[6] Sec. 51-276. Division established. There is hereby established the Division of Criminal Justice within the Executive Department, which shall be in charge of the investigation and prosecution of all criminal matters in the Superior Court. The Division of Criminal Justice shall be an agency within the Executive Department with all management rights except appointment of all state's attorneys.

Exhibit 22
Page 00822

tirelessly conducted by the Connecticut State Police (also CSP) with the assistance of multiple local, state and federal agencies, both in and out of Connecticut.

While no report is statutorily required of the State's Attorney once the investigation is complete, it has been the practice of state's attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the state's attorney determines that some type of public statement is necessary.[7] Given the gravity of the crimes committed on December 14, 2012, a report is in order.

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut,[8] on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

Many witnesses to this case have expressed great concern that their identities will be disclosed publicly and make them susceptible to threats or intimidation as a result of their cooperation or connection with the investigation.[9] This cooperation has been essential and greatly appreciated. As a result of the witnesses' concerns, this report will not identify lay witnesses, except where necessary.

Consistent with Public Act 13-311,[10] exceptions to the state Freedom of Information Act[11] and C.G.S. Sec. 17a-101k(a)[12] this report will not list the names of the twenty children killed in

---

[7] See for example: Statement of David I. Cohen, State's Attorney for the Judicial District of Stamford/Norwalk, in reference to the February 16, 2009, attack on Charla Nash by the Chimpanzee Named Travis, Issued December 7, 2009;  Statement of the State's Attorney for the Judicial District of Stamford-Norwalk Concerning the Fatal Fire on December 25, 2011, at 2267 Shippan Avenue, Stamford, Issued June 8, 2012; and Report of the State's Attorney for the Judicial District of Ansonia-Milford on the Murder of Shangyl Rasim on January 17, 2010, Issued May 24, 2010.

[8] Newtown, Connecticut is within the Judicial District of Danbury.

[9] In fact, some witnesses have had that occur to them.

[10] An Act Limiting the Disclosure of Certain Records of Law Enforcement Agencies and Establishing a Task Force Concerning Victim Privacy Under the Freedom of Information Act.

[11] See C.G.S. Sec. 1-210.

[12] Sec. 17a-101k. Registry of findings of abuse or neglect of children maintained by Commissioner of Children and Families. Notice of finding of abuse or neglect of child. Appeal of finding. Hearing procedure. Appeal after hearing. Confidentiality. Regulations. (a) The Commissioner of Children and Families shall maintain a registry of the commissioner's findings of abuse or neglect of children pursuant to section 17a-101g that conforms to the requirements of this section. The regulations adopted pursuant to subsection (i) of this section shall provide for the use of the registry on a twenty-four-hour daily basis to prevent or discover abuse of children and the establishment of a hearing process for any appeal by a person of the commissioner's determination that such person is responsible for the abuse or neglect of a child pursuant to subsection (b) of section 17a-101g. The information contained in the registry and any other information relative to child abuse, wherever located, shall be confidential, subject to such statutes and regulations governing their use and access as shall conform to the requirements of federal law or regulations. Any violation of this section or the regulations adopted by the commissioner under this section shall be punishable by a fine of not more than one thousand dollars or imprisonment for not more than one year.

7

Exhibit 22
Page 00823

ER_2999

Sandy Hook Elementary School, nor will it recite 911 calls made from within the school on that morning or describe information provided by witnesses who were in the classrooms or heard what was occurring in the classrooms.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report.

---

To conclude that *all* such information, including the basic facts of the incident itself is confidential would prohibit even the disclosure of the children being killed. Such an interpretation would be unworkable and is not taken here. It is concluded though that the C.G.S. Sec. 17a-101k(a) is applicable in the present case and will be applied in the manner described.

Exhibit 22
Page 00824

**ER_3000**

## SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE

**Incident**

On the morning of December 14, 2012, the shooter parked his 2010 Honda Civic next to a "No Parking" zone outside of Sandy Hook Elementary School in Newtown, Connecticut.[13] Shortly after 9:30 a.m. he approached the front entrance to the school.[14]   He was armed with a Bushmaster Model XM15-E2S rifle (also Bushmaster rifle), a Glock 20, 10 mm pistol and a Sig Sauer P226, 9 mm pistol and a large supply of ammunition.

The doors to the school were locked, as they customarily were at this time, the school day having already begun. The shooter proceeded to shoot his way into the school building through the plate glass window to the right of the front lobby doors.

The main office staff reported hearing noises and glass breaking at approximately 9:35 a.m. and saw the shooter, a white male with a hat and sunglasses, come into the school building with a rifle type gun. The shooter walked normally, did not say anything and appeared to be breathing normally. He was seen shooting the rifle down the hallway.

Just down the hallway from the main office, in the direction that the shooter was to be seen firing, a 9:30 a.m. Planning and Placement Team (PPT) meeting was being held in room 9, a conference room. It was attended by Principal Dawn Hochsprung and School Psychologist Mary Sherlach, together with a parent and other school staff. Shortly after the meeting started, the attendees heard loud banging. The principal and school psychologist then left the room followed shortly after by a staff member. After leaving the room, Mrs. Hochsprung yelled "Stay put!"

As the staff member left the room, the staff member heard gunshots and saw Mrs. Hochsprung and Mrs. Sherlach fall down in front of the staff member. The staff member felt a gunshot hit the staff member's leg. Once down, the staff member was struck again by additional gunfire, but laid still in the hallway. Not seeing anyone in the hallway, the staff member crawled back into room 9 and held the door shut. A call to 911 was made and in the ensuing moments the telephone in room 9 was also used to turn on the school wide intercom system. This appears to have been done inadvertently, but provided notice to other portions of the building.[15]

---

[13] On December 13, 2012, the student enrollment was 489.  Official attendance had not yet been recorded as of 9:30 a.m. on December 14, 2012. The staff for the school is 91, but on December 14, 2012, there were nine staff members absent.  The staffing was at 82 for the day.

[14] A more complete description of the school building and the front entrance starts on page A119 of the Appendix. For the purposes of this report, the front of SHES faces north.

[15] Intercom system could be accessed from nine phones located in seven rooms.  These telephones and rooms were three phones in the main office, the principal's office, the nurse's office (room 57), room 9 conference room, room 29, room 32 and room 60. The "All Call" which opens the intercom to the entire school was accessed by pressing "#0" from the telephones mentioned. The All Call-except quiet rooms was accessed by pressing "#1."

Exhibit 22
Page 00825

At the same time the shooter was firing in the hallway, another staff member was at the far east end of the hallway near classroom 1. The staff member was struck by a bullet in the foot and retreated into a classroom.

Both Dawn Hochsprung, age 47, and Mary Sherlach, age 56, died as a result of being shot. Both wounded staff members shot in the hallway were later evacuated to the hospital and survived.

After shooting and killing the two adults and wounding the two others, the shooter entered the main office. The office staff had taken shelter in the office. They heard sounds of the office door opening, footsteps walking inside the office and then back toward the office door. Staff members heard the door open a second time and then heard more gunfire from outside the office. They called 911.

Where the shooter specifically went next is unclear. The evidence and witness statements establish the shooter went down the hallway in an easterly direction ultimately entering first grade classrooms 8 and 10. The order is not definitively known. While in classrooms 8 and 10, the shooter shot and killed four adults and twenty children with the Bushmaster rifle. Twelve children survived, one from classroom 8 and eleven from classroom 10.

The shooter finally killed himself in classroom 10 with one gunshot to his head from a Glock 20, 10 mm pistol. This is believed to have occurred at 9:40:03.[16]

Classroom 8's substitute teacher was Lauren Rousseau, age 30, who was assisted by Rachel D'Avino, age 29, a behavioral therapist. Fifteen children were found by police. Fourteen who were deceased and one who was transported to Danbury Hospital and later pronounced dead. The two adults were found deceased close to the children. In all, seventeen people were killed in classroom 8. A sixteenth child survived and exited classroom 8 after the police arrived.

Classroom 10's teacher was Victoria Soto, age 27. Working with her was Anne Marie Murphy, age 52, a behavioral therapist. Five children were found, with Mrs. Murphy partially covering one child. Four of the five children were deceased. One of the five children was transported to the hospital and pronounced dead. Miss Soto was found deceased in the room near the north wall with a set of keys nearby. Nine children had run out of the room and survived. A police officer found two uninjured children in the class restroom.

In all, eighteen children and six adult school staff members were found deceased within the school. Two more children were pronounced dead at Danbury Hospital. Two other adult school staff members were injured and were treated at nearby hospitals and survived.

The two classrooms on either side of 8 and 10 were numbered 6 and 12. Classroom 6 was on the eastern side of classroom 8 and classroom 12 was on the western side of classroom 10. Staff and students hid in the class restrooms, locking the restroom doors from the inside.

---

[16] See the time line in the Appendix starting at page A84.

Exhibit 22
Page 00826

ER_3002

Throughout the rest of the school, staff and students hid themselves wherever they happened to be at the time they became aware of gunfire. The staff used various ways to keep the children calm, from reading to having them color or draw pictures. Those hiding in rooms closest to the shooter kept silent. Some people were able to escape out of the building prior to the police arrival and went to Sandy Hook center, nearby residences, or received rides from parents going to the school or from passersby.

One staff member heard a loud crashing noise and ran toward the front lobby. As the staff member got closer, bullet holes could be seen and gun powder smelled. Realizing what was going on, the staff member immediately called 911, turned and went back down the hall from where the staff member had come. During the incident, while staying on the line with the 911 operator, this staff member sent other staff to their rooms or had them stay in their rooms and this staff member went about locking doors. The staff member remained in the hallway on the telephone with the 911 operator until the police arrived.

**Response**

Upon the receipt of the first 911 call, law enforcement was immediately dispatched to the school. It was fewer than four minutes from the time the first 911 call was received until the first police officer arrived at SHES. It was fewer than five minutes from the time the first 911 call was received until the shooter killed himself. It was fewer than six minutes from the time the first police officer arrived on SHES property to the time the first police officer entered the school building.

Below is an abbreviated time line from the first 911 call received to the time the police entered the school building.[17]

> 9:35:39 -  First 911 call to Newtown Police Department is received.
>
> 9:36:06 -  Newtown Police Department dispatcher broadcasts that there is a shooting at Sandy Hook Elementary School.
>
> 9:37:38 -  Connecticut State Police are dispatched to SHES for active shooter.
>
> 9:38:50 -  CSP are informed that SHES is in lockdown.
>
> 9:39:00 -  First Newtown police officer arrives behind SHES on Crestwood Rd.
>
> 9:39:13 -  Two more Newtown officers arrive at SHES and park on the driveway near the ball field. Gunshots are heard in the background.

---

[17] See page A84 of the Appendix for full time line put together by the Connecticut State Police Western District Major Crime Squad. This time line was compiled from 911 calls, witness statements, police car cameras, police radio and police dispatch transmissions.

11

Exhibit 22
Page 00827

**ER_3003**

9:39:34 -   Newtown officer encounters unknown male running along the east side of SHES with something in his hand.

9:40:03 -   Last gunshot is heard. This is believed to be the final suicide shot from the shooter in classroom 10.

9:41:07 -   Information is relayed as to the location of the last known gunshots heard within SHES, the front of the building.

9:41:24 -   Newtown officer has unknown male prone on ground, starting information relay regarding possibly more than one shooter.

9:42:39 -   Newtown officer calls out the license plate of the shooter's car.

9:44:47 -   Newtown officers enter SHES.

9:46:23 -   CSP arrive at SHES.

9:46:48 -   CSP enter SHES.

As the gravity of the situation became known, local, state and federal agencies responded to the scene to assist.

From the time the unknown male was encountered by the Newtown police outside of SHES until after the staff and children were evacuated, all responding law enforcement operated under the belief that there may have been more than one shooter and acted accordingly.[18]

For example, K-9 units were brought in to search the area and officers were posted to act as lookouts to ensure the safety of those evacuating the school building. Some people were located in the areas surrounding the school as the searches and evacuations were taking place. Some of those individuals were treated initially as suspects and handled accordingly, including being handcuffed, until their identities and reason for being there could be determined.

Some of these detentions included:

1. The initial unknown male who turned out to be a parent with a cell telephone in his hand;
2. Two reporters located in the woods around SHES, who were held at gun point by Department of Energy and Environmental Protection (DEEP) police officers until their identities could be determined; and
3. A man from New York who was working in a nearby town and went to SHES after an application on his cell telephone alerted him to the situation at the school. He drove to the firehouse and went up to the school on foot. He was taken from the scene

---

[18] In fact, the possibility that there was more than one shooter remained a consideration beyond December 14, 2012. It was only after potential leads were investigated that investigators became confident that the shooter was not aided in any way by others and that no one knew of the shooter's plan prior to December 14, 2012.

12

Exhibit 22
Page 00828

ER_3004

of the school in handcuffs and later to Newtown Police Department. It was later determined that he did not have a connection to the shooting and had gone to SHES to see what was going on.

As noted above, on December 14, 2012, there was a concern that there may have been more than one shooter. This was based upon a number of factors:

1. The initial police encounter with the unknown male outside SHES;[19]
2. Reports by school personnel during the shooting on a 911 call of seeing someone running outside the school while the shooting was ongoing;
3. The location of two black zip up sweat jackets on the ground outside of the shooter's car;
4. The discovery of an Izhmash Saiga-12, 12 gauge shotgun and ammunition in the passenger compartment of the shooter's car. A police officer moved this shotgun and ammunition to the car's trunk for safety purposes;
5. Shell casings that were located outside of the school; and
6. The apparent sound of gunfire coming from outside of the school;

The subsequent investigation revealed there were no additional shooters based upon:

1. Searches of the area and examinations of local business security surveillance videos;
2. Persons detained revealed they were not connected to the shootings. In the case of the initial unknown male, he was identified as the parent of a student and had a cell telephone, rather than a weapon, in his hand;
3. Witness interviews which indicated that no witness saw anyone other than the shooter, with a firearm;
4. Witness interviews in which it was determined that a number of SHES staff had escaped from the school through a window and had been running outside the school building during the shootings;
5. The shotgun located in the shooter's car had been purchased by the shooter's mother previously;
6. The two sweat jackets were both C-Sport brand black zip up hooded sweat jackets with no size listed and were located immediately outside the shooter's car;[20] Both are believed to have been brought there by the shooter;[21]
7. The live shotgun shells (other than the one found on the shooter and the ones found in the shooter's car) that were located inside and outside of the school were in locations where first responders had been. Additionally, there were first responders who

---

[19] The man was later determined to be the parent of one of the school's children and the item in his hand was a cell telephone.

[20] See the Appendix at page A174.

[21] A parent who arrived at SHES as the shooting was taking place saw the shooter's car parked in front of the school with the passenger side door open and the two sweat jackets on the ground near the car. To the parent, the jackets looked like two black blankets on the ground.

13

Exhibit 22
Page 00829

ER_3005

reported missing live shotgun rounds. Moreover, the shells were found in locations where there had not been reported sightings of any non-law enforcement individuals;

8. There were no expended shotgun shells found in the actual crime scene nor were any expended 12 gauge shotgun pellets or slugs recovered;

9. The only expended casings located outside of the school building were 5.56 mm casings located just outside the school's front entrance, consistent with the shooter's entry into the school; and

10. The officer who heard what he believed to be outside gunfire was in a position to have heard the shooter's gunfire coming from window openings in the classroom in which the shooter was firing.

Stopping the active shooter was the first priority. Once that occurred, the location and treatment of the victims, the search for additional shooters, and the safe evacuation of the school were of primary importance.[22] The collection of evidence and the preservation and documentation of the crime scene, while important, came second.

Two command centers were set up, one at the firehouse on Riverside Road and the other at Newtown's Emergency Operations Center, located on the Newtown Fairfield Hills Campus.  In the week immediately after the shootings, services to victims' families and victims, as well as support to the investigators in the school were handled out of the firehouse. All other aspects of the investigation not related to the school itself were run out of the Emergency Operations Center.

Investigation responsibilities were handled as follows:[23]

**Connecticut State Police (CSP)**

**CSP-Western District Major Crime (WDMC)** squad was the lead CSP unit for the entire investigation and acted as the coordinating law enforcement agency for other agencies and units of the CSP.[24] The van unit processed the interior of SHES.

**CSP-Central District Major Crime (CDMC)** squad van unit processed the exterior of SHES, including the shooter's car, and established the temporary morgue[25] with the

---

[22] One of the difficulties encountered was the inability of state police radios to operate within SHES.

[23] This report does not include a listing of all of the law-enforcement and non-law enforcement service providers and their actions. In the days and weeks that followed the tragedy, local, state and federal agencies provided help to the Town of Newtown and its families through counseling, funeral protection, traffic control, handling bomb threats as well as many other services. Additionally, the CSP set up an invaluable law enforcement liaison program with the families of the deceased victims in which a state or local police officer was specifically assigned to the family of a deceased victim to provide communication and protection in the days and weeks that followed December 14th.

[24] WDMC Squad and Van, as the lead CSP unit, over the course of the week that followed was there for seven days processing the interior scene, the shooter and victims' personal effects, including assisting with the packing and removal of furniture from the immediate scene.

[25] The Department of Public Health provided and set up the portable tent used for the temporary morgue.

14

Exhibit 22
Page 00830

ER_3006

OCME to identify and document the decedents prior to their being moved to the OCME in Farmington.[26] CDMC also attended the autopsies at the OCME and did a secondary search of 36 Yogananda Street, as well as photographing doors and locks in SHES.

**Eastern District Major Crime (EDMC)** squad processed the scene at 36 Yogananda Street and were the investigators for the shooting of Nancy Lanza, the shooter's mother.

**CSP-Emergency Services Unit (ESU), Tactical Teams**, were assigned to both SHES and 36 Yogananda Street to handle the clearing of the scenes and rendering them safe.[27]

**CSP – Troop A, Southbury and CSP from other troops and units,** in addition to being first responders, worked to secure the scene and worked with WDMC and the OCME.

**Computer Crimes and Electronic Evidence Unit** handled the seizure and examination of additional electronic evidence from 36 Yogananda Street together with EDMC, CDMC and WDMC.

**CSP - Collision, Analysis and Reconstruction Squad (CARS)** was assigned to produce the sketch maps for both the interior and exterior of the school.

**CSP** - On December 14, 2012, virtually every aspect of the CSP was engaged in the response to SHES and 36 Yogananda Street. For example, included in the first responders were troopers and detectives, not only from Troop A in Southbury, but other troops and units as well, including the Statewide Narcotics Task Force.

**Department of Energy and Environmental Protection (DEEP)** provided first responders at SHES.

**Forensic Science Laboratory, Division of Scientific Services, Department of Emergency Services and Public Protection (DESPP)** examined items seized and collected from SHES and 36 Yogananda Street.

**Office of the Chief Medical Examiner (OCME)** was responsible for investigating the cause and manner of the deaths involved in this case and worked with the CSP in setting up the temporary morgue at SHES that was used to identify and document the deceased prior to their being moved to Farmington.

**Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)** in addition to responding to both scenes, worked on the firearms aspect of the investigation.

---

[26] WDMC and CDMC personnel were also assigned and paired with the FBI to conduct interviews and neighborhood canvasses as well as assist with the identification of victims, investigate a report of another shooter at a hospital, as well as prepare search warrants and attend autopsies.

[27] There were numerous law enforcement agencies that worked on the clearing of SHES and the protection of those who were doing the clearing.

Exhibit 22
Page 00831

**ER_3007**

**Federal Bureau of Investigation (FBI)** – in addition to responding to the scenes, handled interviewing of witnesses and investigation both at a local level and on a national level. The Tactical Team assisted with the clearing of the school. The Behavioral Analysis Unit (BAU), as part of the search warrant execution for 36 Yogananda Street, was provided with materials for review. They provided their expertise in the preparation of witness interviews. The Victim Assistance Unit worked with victims' families, victims and witnesses.

**United States Attorney's Office** was stationed at the Emergency Operations Center overseeing the investigation into the possible commission of federal crimes and the issuance of federal legal process, as well as coordinating the various federal agencies involved in assisting with the state investigation.

**United States Marshals Service, Technical Operations Group** provided technical and investigation assistance.

**United States Postal Service** looked for mail that may have been relevant to the investigation.

**Municipal Police Departments** from around the state assisted throughout the Town of Newtown, including being first responders at SHES, handling calls in town and the tremendous inflow of media and visitors to the Town in the weeks after December 14, 2012.

**Newtown Police Department** in addition to being first responders, worked to secure the scene and assisted WDMC.

**Office of the State's Attorney, Judicial District of Danbury (SAO)** – oversaw the state investigation, working with the Connecticut State Police.  Together with the assistance of the Office of the Chief State's Attorney, the SAO was stationed at the Emergency Operations Center starting December 14, 2012, and oversaw the legal issues and state aspect of the investigation including search warrant review, child witness issues, working with the federal authorities, etc.


## SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION

On the afternoon of December 14, 2012, the WDMC and CDMC van units began documenting the crime scene and collecting evidence. The units could not begin this process until the scene was declared safe. The scene processing took seven days.

The scene was thoroughly processed, with the WDMC van unit handling the interior of SHES and the CDMC van unit covering the exterior. This processing included extensive written documentation as well as taking videos and thousands of photographs and measurements. In addition to the recovery of evidence, bullet trajectories were analyzed and documented.

My description of the scene processing starts with the front entrance and moves into the school building itself. This does not necessarily reflect the actual order in which the crime scene was processed. Many descriptions come directly from the investigation reports but are not in quotation marks to ease reading.

Exhibit 22
Page 00832

**ER_3008**

The conditions of windows and doors were documented, but some may have been disturbed by police and emergency personnel during the emergency response and protective sweep of the building. Similarly, other items of evidence, such as shell casings, may not have been found in their original positions because, as mentioned previously, the first priority was to locate and neutralize any active shooter, followed by the location and treatment of the victims, the search for additional shooters and the safe evacuation of the school. Only then could evidence collection begin.

**Interior**

Sandy Hook Elementary School was[28] a one story brick public school building of approximately 66,000 square feet, built in 1954. The building was on Dickinson Drive off of Riverside Road in the Sandy Hook section of Newtown. The front of the building sat in a magnetic northeast direction, but will be considered north for the purposes of this report. See the diagram at page 19.

SHES was rectangular in shape with four hallways in the main building and portable classrooms attached to the rear (south) side which were accessed from the south side of the main building. Classrooms on the exterior walls had even numbers and interior classrooms had odd numbers.

-   **Main entrance**

The main entrance to the school was located next to the large glass window that the shooter shot out to enter the school. A patio area was just before the entrance doors. The entrance to the lobby consisted of two sets of locked full glass doors that opened outwardly using a pull handle. They were separated by a small vestibule. The doors were secured with an electronic locking mechanism.  The doors could be opened from the inside with a horizontal push bar across the middle of the door.

The broken area of the window that the shooter shot out measured approximately 35.33 inches wide and 42.5 inches high.[29]

The exterior of the main entrance door way had a call box, buzzer system with a video camera. The call box was installed in 2005.  The video camera did not record, but the video could be viewed live on three monitoring systems on the secretaries' desks in the main office, with no recording capabilities. The electronic unlocking of the front doors was done by using a "key button" on any of the three monitoring systems.

Glass shards were located just before and to the side of the outside entrance doors on the patio and plantings in the area and also on the floor in the lobby.[30] Eight expended brass colored 5.56

---

[28] SHES was demolished in October and November 2013.

[29] See the Appendix starting at page A168.

[30] See the Appendix at page A169 and A171.

Exhibit 22
Page 00833

**ER_3009**

mm bullet casings stamped with "S&B 60 5.56x45"[31] were located in the area outside the broken window and front entrance doors. These were seized.

The front entrance led into the school's lobby. The lobby measured approximately 28 feet north to south and 36 feet east to west. The southeast corner of the lobby allowed open access to the north hallway of the school. Sixteen brass colored expended 5.56 mm bullet casings were located on the floor within the lobby area and were seized. Furniture in the lobby area had holes consistent with having been struck by a bullet. There were eleven damaged areas consistent with bullet strikes in the lobby.

- **North Hallway**

The hallway on the north side of the building, where the shootings occurred, ran east to west and contained the lobby and main office, inside of which was the nurse's office. The hallway also contained rooms numbered 1-10, 11A-5 and 12. The bulk of the scene processing occurred in this area. See the diagram on page 19.

The ceiling as in the lobby was 8 feet high.  And the width of the hall was 8.5 feet. The even numbered rooms were on the north side of the hallway with classroom 12 being the western most classroom and classroom 2 being the eastern most. The odd numbered rooms were on the south side of the hallway with the main office being the western most room and classroom 1 being the eastern most. East of the main office was a closet labeled "11A-5 storage" and the east of the closet was a conference room identified as Room 9.

The doors in the hallway all locked from the outside with a key. The interior door handles had no locking mechanism. All of the doors opened outwardly toward the hallway. All doors were solid wood with a circular window in the upper half of the door.[32]

All classrooms in the north hallway had a restroom and a closet. The restrooms were uniformly designed, approximately 4 feet 7 inches by 3 feet 6 inches with a solid wood door. The door of each restroom opened inward and away from the toilet. Each restroom door had a knob push button lock on the inside handle and a key lock on the outside handle.[33] The conference room did not have a restroom.

Classrooms in the north hallway 12 and 10, 8 and 6, 6 and 4, and 3 and 5 respectively had an interior door that was shared by the two classrooms.

---

[31] The ammunition used by the shooter in the Bushmaster rifle has been described as .223 caliber, 5.56 mm NATO and 5.56 X 45.  All of these descriptions are for similar bullets (cartridges) that can be fired from the Bushmaster rifle. The ammunition that the shooter used in this case for the Bushmaster bore the stamp "S&B 60  5.56 X 45" on the base of the cartridges and will be referred to as a 5.56 mm round.  The distinction between a .223 cal. and a 5.56 mm is not relevant to this report.

[32] See the Appendix at page A178 for an example of classroom door locks.

[33] See the Appendix at page A177 for an example of restroom door locks.

18

Exhibit 22
Page 00834

**ER_3010**



19

Exhibit 22
Page 00835

ER_3011

The bodies of Mrs. Hochsprung and Mrs. Sherlach were located in the western-most area of the north hallway, near the lobby. One brass colored expended 5.56 mm casing was located and seized from the floor in the area of Mrs. Hochsprung and Mrs. Sherlach.[34] In addition to the 5.56 mm ballistics, one 10 mm shell casing was found in the north hallway and was later identified as having been fired from the Glock 20, 10 mm pistol found near the shooter.

- **Conference Room (Room 9)**

Conference room 9 was on the south side of the north hallway on the opposite side of the hallway and approximately 16 feet east of the door for classroom 12. The room had a telephone mounted in the center of the west wall.

- **Classroom 12**

Classroom 12 was located on the north side of the north hallway and was the first classroom east of the front lobby. The classroom door was located 23 feet east of the lobby. The window to the door was covered on the hallway side with dark colored paper that was there from a previous lockdown drill.

- **Classroom 10**

Classroom 10 was located on the north side of the north hallway and was the second classroom east of the front lobby. The hallway door was approximately 27 feet east of classroom 12. The window was not completely covered, but did have a decoration over part of the inside of the window.

The room measured 27 feet east to west and 30 feet north to south with carpeted floors and painted cinder block walls. There were large windows across the north wall, which provided a view into the front (north) parking lot. Fluorescent ceiling lights turned on automatically when the room was entered. As mentioned previously, there was a restroom in the room and a closet. This closet door had no lock. The door that provided access to classroom 12 was on the center of the west wall. This had a key lock on both sides and the door was unlocked. There was a telephone mounted on the south side of the east wall north of the closet. An Emergency Response Packet Plan was hanging on the south wall. The packet was above a map depicting the emergency evacuation route for this classroom.

The classroom door that opened into the north hallway could only be locked with a key from the outside (hallway side).  The door was unlocked with no signs of forced entry.

In the window area for classroom 10 there were no less than nine holes consistent with being bullet holes. Investigators conducted a trajectory analysis of the shots that went through the window area of classroom 10. No determination could be made as to whether the shots through the window area were intended for the outside of the building. In other words, it could not be determined whether the shooter, while in classroom 10, had intentionally fired at something or

---

[34] See the Appendix starting at page A130 for a description of the ballistics evidence from the north hallway.

20

Exhibit 22
Page 00836

**ER_3012**

someone outside of the building. There was no indication that any shots through the window area of classroom 10 came from outside of the school. All of the evidence indicates that shots went out of the window area of classroom 10 and into the parking area north of the school.

Classroom 10 evidence is further described below.

- **Classroom 8**

Classroom 8 was located on the north side of the north hallway and was the third classroom east of the front lobby, with its entrance door approximately 27 feet east of classroom 10. As with the others, its classroom door opened out into the hallway and could only be locked from the hallway side with a key. The window was not covered. The classroom door to the hallway was unlocked with no signs of forced entry.

The room dimensions and construction were similar to those of classrooms 10 and 12. There was also a restroom in this classroom. The closet door in classroom 8 had no locking device. There were also large glass windows across the north wall providing a view into the front (north) parking lot of the school. There was a wall telephone in the room on the south side of the east wall, north of the closet. An "Emergency Response Plan" packet was hanging on the south wall adjacent to the east side of the entrance door. This packet was above a map depicting the emergency evacuation route for the classroom.

The door that connected into classroom 6 was on the north side of the east wall, had key locks on both sides of the door.  The door was unlocked.

Ballistic evidence located in classroom 8 is described in the Appendix at page A134, which includes a total of twenty-four rounds of 5.56 mm ammunition found, of which ten rounds were in one PMAG 30 magazine, thirteen rounds were in another such magazine and one live round was on the floor. There was a third empty PMAG 30 magazine seized. There were a total of eighty expended 5.56 mm casings seized from classroom 8.

- **Classrooms 6 and 4**

Located on the floor of classroom 6 was one live round "Federal Tactical" 12 gauge shotgun slug shell (Exhibit 49). This shotgun shell was made of clear-like plastic and was different in color from the shotgun shell that was seized on the shooter's person. On the floor of classroom 4 was a blue colored 12 gauge slug shotgun shell with the word "Federal Premium Tactical Rifled slug" stamped on the side and "12 GA Made in USA stamped on the head of the shell (Exhibit 99). This shotgun shell was made of a blue colored plastic and also was different in color from the shotgun gun shell that was seized from the shooter's person.

As mentioned previously, the loose shotgun shells not found on the shooter were in locations where first responders had been and had reported missing shotgun shells. Additionally, there were no witness reports of any persons being seen with firearms other than first responders in those locations, there were no expended shotgun shell casings or projectiles recovered at the scene and the live shotgun shell on the shooter's person and those recovered from his car did not

Exhibit 22
Page 00837

match any of those recovered from the three locations.  No shotgun was recovered from the school. It is believed that these live shells were dropped by first responders.

- **Shooter**

Responding police officers found the shooter in classroom 10 northwest of the hallway entrance dead from a self-inflicted gunshot wound to the head.  He was wearing a pale green pocket vest over a black polo style short sleeve shirt over a black t-shirt. He had yellow colored earplugs in each ear. He was wearing black cargo pocket pants, black socks, black sneakers, a black canvas belt and black fingerless gloves on each hand. He had an empty camouflage drop holster that was affixed to his right thigh.

After all of the victims were removed from the school, the shooter's body was removed once all firearms and ballistic evidence were recovered from his person. The body was moved to the OCME on December 15, 2012.

- **Weapons on Shooter and Ammunition in Classroom 10**

The weapons on the shooter together with a description of items seized related to the shooting are contained in the Appendix starting at page A136. On the shooter's person was a loaded semi-automatic Sig Sauer P226, 9 mm pistol and additional ammunition. Located near the shooter was a partially loaded Glock 20, 10 mm semi-automatic pistol that appeared to be jammed.

A Bushmaster Model XM15-E2S rifle was located some distance away from the shooter. The rifle's shoulder strap was attached in the front but disconnected at the butt of the rifle. The disconnected rear portion was the result of a failed nut attachment. It is unknown if the nut failed while the rifle was being used or as the result of being dropped or thrown to the floor.

The Bushmaster rifle was found with the safety in the "fire" position. There was one live 5.56 mm round in the chamber and one PMAG 30 magazine in the magazine well. The magazine contained fourteen live 5.56 mm rounds of ammunition. The rifle did not appear to have malfunctioned when observed by the WDMC van unit, but a CSP-ESU report described the weapon as appearing to have jammed.  When tested later, the rifle functioned properly.

Two empty PMAG 30 magazines that were duct-taped together in a tactical configuration and one live 5.56 mm round were found near the rifle.

Officers found two-hundred-fifty-three live rounds on the shooter's body: one-hundred-sixteen 9 mm rounds, seventy-five rounds of 10 mm, sixty-one rounds of 5.56 mm and one 12 gauge shotgun shell. Officers also seized forty-six 5.56 mm live rounds. This consisted of fifteen from the rifle, one from the floor and thirty from the magazine under the body of the shooter, as well as thirteen 10 mm live rounds (nine from the Glock and four from the floor).  There were forty-nine expended 5.56 mm casings seized and one 10 mm casing from classroom 10. Total live rounds seized were three-hundred-twelve and total expended casings seized from classroom 10 were fifty.

Exhibit 22
Page 00838

**Exterior**

CDMC processed the exterior of SHES.

- **Shooter's Car**

The shooter's car was found parked in front of the school, west of the front entrance, next to a "No Parking" zone. It was a black 2010 Honda Civic with Connecticut registration 872YEO. The car was registered to his mother, Nancy Lanza, but had been purchased for him.

Recovered from the car was an Izhmash Saiga-12, 12 gauge shotgun with two magazines containing a total of twenty rounds of ammunition.[35] The shotgun and ammunition were originally seen in the passenger compartment of the car and were moved by police to the car's trunk for safekeeping during the initial response and evacuation.

- **Parking Lot**

There were a number of cars parked in the north parking lot of SHES. Three of these cars were struck by gunfire. None of the cars struck belonged to law enforcement. A total of five strikes to those three cars were identified as having come from classroom 10. It could not be determined whether these shots were intended to go outside of the classroom.

Also found in the north parking lot, was a shotgun shell that was dropped by a first responder.

**SANDY HOOK ELEMENTARY SCHOOL – AUTOPSY INFORMATION**

Deceased victims were removed from the school building to a large military-style tent located in the north parking lot, near the front of the school. The Office of the Chief Medical Examiner sought to make positive identification of the victims through photos, school records and personal and clothing descriptions.

On Saturday, December 15, 2012, all of the victims were transported to the OCME in Farmington for autopsies; autopsies were performed the same day. The cause of death for all of the victims was determined to have been gunshot wounds; the manner of death was determined to have been homicide.[36]

Evidence collected during the autopsies was turned over to CDMC and forwarded to the Division of Scientific Services for examination. The Evidence Examination section of this report contains a summary of the results.

---

[35] A search warrant was obtained for the car. The search warrant return originally reported the amount of ammunition as seventy rounds.  This was corrected to twenty rounds and the search warrant return was amended.

[36] Our law defines homicide as the killing of one human being by another human being.

Exhibit 22
Page 00839

**ER_3015**

## 36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE

### Incident

Sometime on the morning of December 14, 2012, before 9:30 a.m., the shooter shot and killed his mother, Nancy Lanza, in her bed at 36 Yogananda Street, Newtown. The weapon used was a .22 caliber Savage Mark II rifle. Someone in the area reported hearing "two or three" gunshots in the neighborhood between 8:00 a.m. and 9:00 a.m. That person thought them to be from hunters, though the person indicated the shots did "sound unusually close."

Between 9:30 a.m. and 10:00 a.m. there was a delivery made to the house. The delivery driver saw no one, did not see any vehicles in the driveway and the garage door was closed. A delivery slip was left and the driver continued on.

The mother was found by police dead in her bed when they entered the house. The rifle was found on the floor next to the bed.

### Response

Once it was determined that the shooter's car was registered to his mother at 36 Yogananda Street, Newtown, Connecticut, the Newtown police went to the house and evacuated the surrounding homes. The CSP-ESU came to the scene to clear the residence of potential hazards, such as booby traps or trip wires.

## 36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION

After the body of the shooter's mother was found and the scene declared safe, the process of obtaining search warrants for the house began, with the first warrant being reviewed and signed by a judge of the Superior Court at 5:29 p.m. on December 14, 2012, at the Emergency Operations Center.[37]

Additional search warrants were approved and issued as the search disclosed additional evidence. The investigation of the shooter's mother's killing and the scene processing was done by EDMC and the search for evidence at 36 Yogananda Street related to the shootings at SHES was investigated by both CDMC and WDMC. A list of the items seized from the home is contained in the search warrant returns in the Appendix, with some descriptions in the "Digital Image Report," starting at page A188 in the Appendix.[38]

---

[37] The Judicial Branch and the Honorable John F. Blawie are to be commended for their response to the SHES shootings. Judge Blawie was available at the Emergency Operations Center to review search warrants.

[38] A description of the home is also in the Appendix starting at page A181.

Exhibit 22
Page 00840

**ER_3016**

The weapon used to kill Nancy Lanza, the .22 cal. Savage Mark II rifle, was found near her bed and seized. In the chamber of the rifle was a spent .22 cal. shell casing and three live rounds were in the magazine. Three other spent .22 cal. shell casings were found in the room and seized.

The shooter's second floor bedroom windows were taped over with black trash bags. The second floor computer room also had its windows covered.  There, investigators found a computer hard drive that appeared to have been intentionally damaged. To date, because of the extensive damage, forensic experts have not yet been able to recover any information from that hard drive.

In a typical criminal case, the investigation would remain open when potentially important evidence was still being examined. Given the improbability of any information being recovered from the damaged hard drive, this outstanding piece of evidence is not preventing the closure of this case now. Should any relevant information related to the existence of any accessory or co-conspirator be obtained from the hard drive, the case will be reopened.

Investigators found a large number of firearms and related items in the home. All firearms involved in these incidents were legally purchased by the shooter's mother over the years. The home also contained many edged weapons, knives, swords, spears, etc.  A prescription bottle in the shooter's name for acetaminophen with codeine was found in the mother's bathroom, which was part of the master bedroom.

During the search of 36 Yogananda Street, a global positioning system (GPS) device was located in the shooter's room with various routes in the memory from April 25, 2012, through December 13, 2012.  Investigation revealed that the GPS was purchased for the shooter.

The routes taken indicate a number of trips from 36 Yogananda Street to the area of a local theater where a commercial version of the game "Dance Dance Revolution" is located.  Over that time period, trips were made that took the driver in the vicinity of some schools in Newtown, including SHES. On December 13, 2012, a trip was recorded from 2:09 p.m. to 2:32 p.m. starting and ending on Yogananda Street and driving in Sandy Hook, which is in the area of SHES, though the route does not indicate the shooter drove up to the school.

Numerous video games were located in the basement computer/gaming area.  The list of video games includes, but is not limited to:

| | |
|---|---|
| -"Left for Dead" | -"Grand Theft Auto" |
| -"Metal Gear Solid" | -"Shin Megami Tensei" |
| -"Dead Rising" | -"Dynasty Warriors" |
| -"Half Life" | -"Vice City" |
| -"Battlefield" | -"Team Fortress" |
| -"Call of Duty" | -"Doom" |

Exhibit 22
Page 00841

**ER_3017**

Other items found and noted for this report are:

- A Christmas check from the mother to the shooter to purchase a CZ 83 firearm;[39]
- A New York Times article from February 18, 2008, regarding the school shooting at Northern Illinois University;
- Three photographs of what appear to be a dead human, covered in blood and wrapped in plastic;
- The book *Amish Grace: How Forgiveness Transcended Tragedy*, Jossey-Bass, 2007, by Donald B. Kraybill, Steven Nolt and David Weaver-Zercher;[40] and
- Photocopied newspaper articles from 1891 pertaining to the shooting of school children

While the vast majority of persons interviewed had no explanation for the shooter's actions, a review of electronic evidence or digital media that appeared to belong to the shooter, revealed that the shooter had a preoccupation with mass shootings, in particular the Columbine shootings[41] and a strong interest in firearms. For example, there was a spreadsheet with mass murders over the years listing information about each shooting.

The review of the electronic evidence also found many things that are on a typical hard drive or memory card that would probably have no relevance to the investigation either because of creation date or subject matter.  That being said, the following selected topics or items were found within the digital evidence seized:

- Bookmarks pertaining to firearms, military, politics, mass murder, video games, music, books, Army Ranger, computers and programs, ammunition, candy, economic books
- Web page design folders
- Two videos showing suicide by gunshot
- Commercial movies depicting mass shootings
- The computer game titled "School Shooting" where the player controls a character who enters a school and shoots at students
- Screen shots (172) of the online game "Combat Arms"
- "Dance Dance Revolution" (DDR) game screen shots
- Videos of shooter playing DDR
- Images of the shooter holding a handgun to his head
- Images of the shooter holding a rifle to his head
- Five-second video (dramatization) depicting children being shot
- Images of shooter with a rifle, shotgun and numerous magazines in his pockets
- Documents on weapons and magazine capacity

---

[39] The return for the December 16, 2012, search warrant indicates that Exhibit #612 was a check for a "C183."  A closer inspection of the check makes it clear that "CZ83" is written.  A CZ 83 is a type of pistol.
The check reads "Christmas Day" in the check's date section.

[40] In October 2006 a gunman entered a one-room Amish school in Pennsylvania, killed five children and leaving others wounded.

[41] The Columbine High School shootings occurred in April 1999 at Columbine High School in Colorado.  Two shooters, in a planned attack, killed a number of students and a teacher and injured others.

26

Exhibit 22
Page 00842

ER_3018

- A document written showing the prerequisites for a mass murder spreadsheet
- A spreadsheet listing mass murders by name and information about the incident
- Materials regarding the topic of pedophilia and advocating for rights for pedophiles (not child pornography)[42]
- Large amount of materials relating to Columbine shootings and documents on mass murders
- Large amount of materials on firearms
- Comedy videos
- Music
- Images of hamsters
- Images of Lego creations

## 36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION

The OCME performed an autopsy on the body of Nancy Lanza, age 52, on December 16, 2012, at the OCME. The cause of death was determined to be multiple gunshots to the head. The manner of death was homicide.

## SHOOTER - AUTOPSY INFORMATION

The autopsy of the shooter was conducted on December 16, 2012, at the OCME. The shooter, age 20, was 72 inches tall and weighed 112 pounds. No drugs were found in the shooter's system. The cause of death was determined to be a gunshot wound to the head. The manner of death was suicide.

## INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS

The investigation sought to determine if the shooter was aided by or had conspired with anyone to commit these crimes. As detailed above, none of the persons found in the vicinity of SHES on December 14, 2012, played any role in the shootings. Most were attempting to escape the area; others were responding to the school after learning of the shootings. None had any association with the shooter.

Investigators then sought to determine if anyone had conspired with or aided the shooter before the shootings. To that end, investigators examined social contacts, writings, e-mails, internet blogs, telephone records and his general internet presence. One of the internet blogs on which the shooter posted focused on mass shootings and in particular the Columbine shootings. The shooter also exchanged e-mails with others who were interested in the topic of mass shootings. None of these communications, however, related to SHES or in any way suggested that the shooter intended to commit a mass shooting. Thus, the evidence as developed to date, does not demonstrate that any of those with whom he communicated conspired with the shooter or criminally aided and abetted him in committing the murders on December 14, 2012.

---

[42] No child pornography was seen on any of the digital media.

Exhibit 22
Page 00843

ER_3019

## EVENTS AND BACKGROUND INFORMATION LEADING UP TO DECEMBER 14, 2012

**Recent Background Information**

As of December 14, 2012, the shooter and his mother lived at 36 Yogananda Street. This had been the family home for years, although only the shooter and his mother had resided in the house for an extended time.

Both the shooter's and his mother's bedrooms were on the second floor; the mother occupied the master bedroom.

In November 2012, the mother sought to buy the shooter another computer or parts for a computer for the shooter to build one himself.  She was concerned about him and said that he hadn't gone anywhere in three months and would only communicate with her by e-mail, though they were living in the same house. The mother never expressed fear of the shooter, for her own safety or that of anyone else.

The mother said that she had plans to sell her home in Newtown and move to either Washington state or North Carolina.  She reportedly had told the shooter of this plan and he apparently stated that he wanted to move to Washington. The intention was for the shooter to go to a special school in Washington or get a computer job in North Carolina. In order to effectuate the move, the mother planned to purchase a recreational vehicle (RV) to facilitate the showing and sale of the house and the eventual move to another state. The RV would provide the shooter with a place to sleep as he would not sleep in a hotel.  In fact, during Hurricane Sandy in October 2012, with no power in the house, the shooter refused to leave the home and go to a hotel.

The mother wanted to buy the shooter a CZ 83 pistol for Christmas and had prepared a check for that purchase to give the shooter.

On December 10, 2012, the mother indicated to a friend that the shooter had bumped his head badly, there was some bleeding, but he was okay. This appeared to have occurred at 5:30 a.m. She then prepared for her trip to New Hampshire and cooked for the shooter before she left, leaving him his favorites.

During the week of December 10, 2012, the shooter's mother was out of town in New Hampshire.  She arrived home Thursday evening December 13, 2012, at approximately 10:00 p.m.

As mentioned above, the GPS found in the home, revealed that on Thursday, December 13, 2012, the device was used. It recorded a trip from and back to 36 Yogananda Street with a route in the Sandy Hook area of Newtown between 2:09 p.m. and 2:32 p.m.  The GPS did not report that the driver drove up to SHES. Presumably this was the shooter driving the black Honda Civic as this would have been the only car available to the shooter and it was reportedly his, having been purchased for him.

28

Exhibit 22
Page 00844

ER_3020

**General Background Information**

Investigators conducted many interviews with persons who knew the shooter and members of his family. As explained above, they did so principally to determine if anyone had conspired with the shooter or aided his crimes. But they also sought to ascertain what might have motivated him to murder children and their teachers and his mother.

The first question was whether the shooter had a reason specifically to target SHES or any student, teacher, or employee. No evidence suggests that he did. In fact, as best as can be determined, the shooter had no prior contact with anyone in the school that day. And, apart from having attended the school as a child, he appears to have had no continuing involvement with SHES.

More generally, those who knew the shooter describe him in contradictory ways. He was undoubtedly afflicted with mental health problems; yet despite a fascination with mass shootings and firearms, he displayed no aggressive or threatening tendencies. In some contexts he was viewed as having above-average intelligence; in others below-average. Some recalled that the shooter had been bullied; but others – including many teachers – saw nothing of the sort. With some people he could talk with them and be humorous; but many others saw the shooter as unemotional, distant, and remote.

What follows are some observations that investigators developed in attempting to determine the shooter's motive.

**Parents**

The shooter's mother and father Peter Lanza had been married to each other. They moved from New Hampshire to the Sandy Hook section of Newtown in 1998.  In addition to the shooter, they had another son Ryan Lanza, who was four years older than the shooter.[43]  In 2001 the shooter's parents separated. The children continued to reside with the mother.  The parents subsequently divorced. The father remarried in 2011; the mother never remarried.

After college, the brother moved out of state. He reached out to the shooter a few times but the shooter did not respond. As of December 14, 2012, the older brother had not had contact with the shooter since 2010. The brother believed that the shooter and his mother had a close relationship. After his older brother left for college, the shooter reportedly became interested in firearms and at one point considered joining the military.

Both the shooter's mother and father indicated that the shooter was bullied growing up. The father indicated that it was not excessive and concerned his social awkwardness and physical gait. As expanded upon in the Education and Mental Health section below, other witnesses did not recall the shooter being overtly bullied. Nonetheless, the shooter appears to have had few friends growing up.

---

[43] Both the shooter's father and brother cooperated fully with the investigation.

Exhibit 22
Page 00845

The shooter's father saw him regularly until he turned 18. They would go hiking, play video games and other activities. They went shooting twice. The shooter had a cell phone but never used it. Calls all went to voice mail. His father would just e-mail him when he wanted to reach him.

The shooter's relationship with his father deteriorated in the last quarter of 2010 and the father last saw the shooter in that year. After that the father would reach out to the shooter by mail or through e-mails regularly, asking him to join him at various places for different activities. The shooter stopped responding at some point prior to December 2012.

One witness who knew the shooter in 2011 and 2012 said that he rarely mentioned his father or his brother; though he would mention briefly something he did with his father or brother in the past.

While it appears that the shooter's mother did volunteer at SHES, it was when the shooter was a student.  There is no indication that she volunteered there in recent years.

The mother took care of all of the shooter's needs. The mother indicated that she did not work because of her son's condition. She worried about what would happen to the shooter if anything happened to her.

One witness indicated that the shooter did not have an emotional connection to his mother. Recently when his mother asked him if he would feel bad if anything happened to her, he replied, "No."  Others, however, have indicated that they thought the shooter was close to his mother and she was the only person to whom the shooter would talk.

A person who knew the shooter in 2011 and 2012 said the shooter described his relationship with his mother as strained because the shooter said her behavior was not rational.

The shooter was particular about the food that he ate and its arrangement on a plate in relation to other foods on the plate. Certain types of dishware could not be used for particular foods. The mother would shop for him and cook to the shooter's specifications, though sometimes he would cook for himself. Reportedly the shooter did not drink alcohol, take drugs, prescription or otherwise, and hated the thought of doing any of those things.

The mother did the shooter's laundry on a daily basis as the shooter often changed clothing during the day.  She was not allowed in the shooter's room, however, even to clean. No one was allowed in his room.

The shooter disliked birthdays, Christmas and holidays. He would not allow his mother to put up a Christmas tree. The mother explained it by saying that shooter had no emotions or feelings. The mother also got rid of a cat because the shooter did not want it in the house.

30

Exhibit 22
Page 00846

ER_3022

**People Outside the Family**

When the shooter had his hair cut, he did not like to be touched and did not like the sound of clippers, so they were not used much. He would sit with his hands in his lap and always look down, giving one word answers if the cutter tried to engage him in conversation.

Those who worked on the property at 36 Yogananda Street never entered the home. They spoke with the mother outside in the yard or at the bottom of driveway. They were instructed never to ring the doorbell and to make prior arrangements before using power equipment as her son had issues with loud noises. The shooter was observed at times coming and going from the residence.

There were a number of people who knew the mother over the years, some fairly well, who had never met the shooter – although were aware of his existence – and had never been inside her residence.

**Shooter's Interests**

Over the years his hobbies included building computers,[44] writing poetry and hiking. The shooter worked briefly at a computer repair shop.  When he was younger he played the saxophone. The shooter had a cell phone but never used it.

Shooting was a pastime in which the family engaged. Over the years the shooter enjoyed target shooting and would go to a range with his brother and mother. The mother had grown up with firearms and had a pistol permit. The shooter did not. Both the mother and the shooter took National Rifle Association (NRA) safety courses. The mother thought it was good to learn responsibility for guns. Both would shoot pistols and rifles at a local range and the shooter was described as quiet and polite.

He played video games often, both solo at home and online. They could be described as both violent and non-violent. One person described the shooter as spending the majority of his time playing non-violent video games all day, with his favorite at one point being "Super Mario Brothers."

Another said he used the computer to play games online and communicate. Sometimes the shooter would not respond to e-mails and be unavailable for a couple of weeks.  The shooter explained that he was "moping around." The shooter frequently formatted the hard drive of his computer as a way of "staying off the grid" and minimizing his internet trace.

Initially the shooter did not drive but he eventually got a driver's license and the Honda was purchased for him.  The shooter was issued a driver's license in July 2010.

The shooter liked to play a game called "Dance Dance Revolution" (DDR), which is a music video game in which the player stands on a platform, watches a video screen and moves his feet

---

[44] By all accounts the shooter was extremely computer savvy.

31

Exhibit 22
Page 00847

ER_3023

as directed by the video. A home version of this was seen and photographed in the shooter's home.[45] Several videos of him playing DDR were found on digital media taken from the home.

The GPS found in the home and reportedly belonging to the shooter indicated that he regularly went to the area of a theater that had a commercial version of the DDR game in the lobby. In 2011 and up until a month before December 14, 2012, the shooter went to the theater and played the game. He went most every Friday through Sunday and played the game for four to ten hours.

The shooter was specific about the clothes he wore. He typically wore the same clothing when at the theater: a grey hoodie and slacks. After a snowstorm in 2011 the shooter was not seen at the theater until about February 2012. At that time he seemed more anti-social and no longer played DDR with others.

An acquaintance of the shooter from 2011 to June 2012 said that the shooter and the acquaintance played DDR quite a bit. They would play the game and occasionally see a movie. They did not play first person shooter games at the theater.[46] The shooter had stamina for DDR and never appeared winded unless really exhausted.

The acquaintance said the shooter seemed to enjoy nature and mentioned the possibility of going hiking more than once. The shooter was capable of laughing, smiling and making jokes, though always in a dry fashion. The shooter never mentioned being bullied while growing up. Topics of conversation included world and current events, and included chimpanzee society and how they interacted.

In the course of their conversations, the shooter indicated that he had an interest in mass murders and serial killing. They never spent a lot of time discussing them, but it would be a topic of conversation.[47] There were no conversations about weapons or shooting at a gun range.

**Shooter – Education and Mental Health**

The following background information is compiled from a variety of sources and may at times appear to be inconsistent. This is a function of the differing perspectives of those interviewed. The information also varied based upon the time period during which the witness knew or associated with the shooter or his family.

The shooter went through the Newtown public school system, though part of seventh grade and part of eighth grade were done at St. Rose of Lima School in Newtown.

---

[45] See the Appendix at page A197.

[46] Online first person shooter games that the shooter did play as determined by a search of the digital media in the home, "Combat Arms" and "World of Warcraft" were played on the computer using a keyboard to control the player.

[47] The shooter also wrote about all of these topics. Other topics of discussion included human nature, perception, judgment, morality, lack of control, prejudice, empathy, suicide, mental illness, existential crisis, urban exploration of abandoned areas, hiking and cookies.

Exhibit 22
Page 00848

**ER_3024**

While the shooter did attend SHES from 1998 to 2003, the first through fifth grade, he was never assigned to the classrooms where the shootings occurred. The shooter went for walks with his family around and near SHES after he had gotten out of the school. The shooter indicated that he loved the school and liked to go there.

According to some, the shooter was more social when he first moved to Connecticut and was younger. He would attend play groups and parties. The early school years have him portrayed as a nice kid, though sort of withdrawn. He loved music and played saxophone.

As he got older his condition seemed to worsen, he became more of a loner. As the shooter got into the higher grades of middle school, he did not like noise and confusion and began to have issues when he had to walk to different classes. As a result, in high school, the shooter was home schooled for a period of time. Though not in a mainstream setting, he could sit through a quiet lecture. The mother drove the shooter where he needed to go.  He did not want to go to events with crowds.

He attended Newtown High School (NHS) with a combination of home schooling, tutoring and classes at NHS and Western Connecticut State University (WCSU). At NHS he was considered a special education student. Having enough credits, the shooter graduated from NHS in 2009. He continued to take classes at WCSU after high school graduation.

Various witnesses made the following observations about the shooter through his school years:

1. In the 2002-2003 school year, when the shooter was in the fifth grade, he was quiet, reluctant, very bright and had good ideas regarding creative writing. He wouldn't necessarily engage in conversation, but wouldn't ignore one. There was no recollection of him being bullied or teased.
2. The fifth grade was also the year that, related to a class project, the shooter produced the "Big Book of Granny" in which the main character has a gun in her cane and shoots people. The story includes violence against children. There is no indication this was ever handed in to the school.[48]
3. In the fifth grade the shooter indicated that he did not like sports, did not think highly of himself and believed that everyone else in the world deserved more than he did.
4. In intermediate school from 2002-2004 he was a quiet shy boy who participated in class and listened. He did not show enthusiasm, extreme happiness or extreme sadness. He was neutral.
5. In the fifth and sixth grades from 2003 to 2004 the shooter participated in concerts at school. He was not remembered by the teacher as having been bullied and the shooter had at least one friend.
6. A sixth grade teacher described the shooter as an average student with A's and B's; homework was never an issue. The shooter never made trouble or distracted others. He had friends and was friendly to others. He was a normal child with no oddities and there were no reports of bullying or teasing.

---

[48] See the Appendix starting at page A220.

Exhibit 22
Page 00849

7. In 2004 while at the intermediate school he was described as respectful and cooperated with others.

8. One person who remembered him from the middle school never saw the shooter bullied.

9. In seventh grade, a teacher described the shooter as intelligent but not normal, with anti-social issues. He was quiet, barely spoke and did not want to participate in anything. His writing assignments obsessed about battles, destruction and war, far more than others his age. The level of violence in the writing was disturbing. At the same time, when asked to write a poem, he was able to write a beautiful one and presented it in public.

10. In the ninth and tenth grades the shooter was reclusive, shutting himself in the bedroom and playing video games all day. In the upper classes the shooter compiled a journal instead of attending physical education.

11. In high school the shooter did not have good social skills. He did not show any signs of violence.

12. In high school the shooter would have "episodes"[49] and his mother would be called to the school. The episodes would last about fifteen minutes each. There were no signs of violence during any of these episodes and the shooter was more likely to be victimized than to act in violence against another.

13. In high school the shooter was not willing to talk much, hard to communicate with and had poor social skills. He often became withdrawn in a social environment. The shooter would have both inclusive class time and leave the class for specialized sessions.

14. At NHS the shooter was in the "Tech Club" in 2007–2008. He was remembered in a variety of ways including as a quiet person who was smart. He wore the same clothing repeatedly and might not speak to you, even if you were talking to him. He was not remembered to have been bullied or to have spoken about violence. The advisor looked out for him and tried to have him included wherever possible. He was also remembered for pulling his sleeves over his hand to touch something. He was not known to be a violent kid at all and never spoke of violence.

15. The shooter had a LAN party[50] at his home in 2008 with Tech Club members; no firearms were seen at the shooter's home.

16. In terms of video games, the shooter liked to play "Phantasy Star Online" (a role playing game), "Paper Mario," "Luigi's Mansion" and "Pikmin." He also liked Japanese animated films and television.

Over the years from the late 1990s and into the 2000s, the shooter had evaluations of various types, some of which were available to the investigators. In the late 1990s he was described as having speech and language needs. At that time he was also being followed medically for seizure activities. In preschool his conduct included repetitive behaviors, temper tantrums, smelling things that were not there, excessive hand washing and eating idiosyncrasies.

In 2005, the shooter was diagnosed with Asperger's Disorder and was described as presenting with significant social impairments and extreme anxiety. It was also noted that he lacked empathy and had very rigid thought processes. He had a literal interpretation of written and

---

[49] What these episodes were was unclear.

[50] This is a party where attendees eat pizza and play video games.

Exhibit 22
Page 00850

verbal material. In the school setting, the shooter had extreme anxiety and discomfort with changes, noise, and physical contact with others.

In 2006 the shooter had an overall IQ in the average range. He had no learning disability. Depending on the psychological test taken he could be average, below average or above average. Testing that required the touching of objects could not be done. It was reported that his school issues related to his identified emotional and/or Pervasive Developmental Disorder (PDD) spectrum behaviors. His high level of anxiety, Asperger's characteristics, Obsessive Compulsive Disorder (OCD) concerns and sensory issues all impacted his performance to a significant degree, limiting his participation in a general education curriculum. Tutoring, desensitization and medication were recommended. It was suggested that he would benefit by continuing to be eased into more regular classroom time and increasing exposure to routine events at school.

The shooter refused to take suggested medication and did not engage in suggested behavior therapies.

Over the years his mother consistently described the shooter as having Asperger's syndrome. She had a number of books in the home on the topic. She also described the shooter as being unable to make eye contact, sensitive to light and couldn't stand to be touched. Over time he had multiple daily rituals, an inability to touch door knobs,[51] repeated hand washing and obsessive clothes changing, to the point that his mother was frequently doing laundry.

In 2006, the shooter's mother noted that there were marked changes to the shooter's behavior around the seventh grade. Prior to that, he would ride his bike and do adventurous things such as climbing trees or climbing a mountain. He had stopped playing the saxophone. He had been in a school band but dropped out. He had withdrawn from playing soccer or baseball which he said he did not enjoy.

It is important to note that it is unknown, what contribution, if any, the shooter's mental health issues made to his attack on SHES. Those mental health professionals who saw him did not see anything that would have predicted his future behavior.

## EVIDENCE EXAMINATION

### Electronics

Examinations of the following seized items were done by the WDMC squad and the Computer Crimes and Electronic Evidence Laboratory of the Department of Emergency Services and Public Protection (DESPP).

Sony PlayStation 2: An older games history was found. Games located included "Dynasty Tactics," "Kingdom Hearts," "Kingdom Hearts 2," "Onimusha," "Dynasty Warriors," and "The Two Towers." The PlayStation 2 games could not be played with others over the internet.

---

[51] This included not opening doors for himself because he did not like touching the door handle or other metal objects, often going through a box of tissues a day to avoid the contact.

Exhibit 22
Page 00851

**ER_3027**

Xbox: A game history for the console and an indication of an Xbox Live user account were found. Games found in the gaming history included "Call of Duty 2: Big Red One," "Call of Duty: Finest Hour," "Dead or Alive 3," "Halo," "Halo 2," "Lego Star Wars," "MechAssault," "Mercenaries," "MGS2 Substance," "Panzer Dragoon ORTA," "PSO," "Shenmue II," "Spiderman," "Splinter Cell 2," "Splinter Cell-CT," "Star Wars Battlefront," "Star Wars Republic Commando," "Tenchu: Return from Darkness," "The Return of the King," and "Worms Forts Under Seige."

It was noted on both of the above items that the gaming history found may not be the complete history of those actually played. No evidence regarding the existence of any accessories or co-co-conspirators was found.

Xbox 360: Found to be damaged and inoperable.

**Firearms and Related Evidence**

Of the firearms seized in this case, five are directly involved, four from SHES and one from 36 Yogananda Street.

-   **History**

All of the firearms below and involved in these cases were legally purchased by the shooter's mother. Additionally, ammunition of the type used in these cases had been purchased by the shooter's mother in the past. There is no reason to believe the ammunition used here was purchased by anyone else. The evidence does not show any ammunition purchases by the shooter.

The shooter did not have a permit to carry a pistol, nor had he ever had one. His mother had a valid pistol permit.

A pistol is defined as "… any firearm having a barrel less than twelve inches."[52]  Both the Glock 20, 10 mm and the Sig Sauer P226, 9 mm qualify as pistols. They are firearms and their barrel lengths were less than 12 inches.

-   **Firearms, Recovered Bullets and Fragments**

Recovered from Shooter's Honda Civic Outside of SHES

Izhmash Saiga-12, 12 gauge, semiautomatic shotgun: The Izhmash Saiga-12 was found in the shooter's Honda Civic that was parked outside SHES. It was tested and found to be operable without malfunction. There was no physical evidence indicating this weapon had been fired at SHES, i.e., the bullets, bullet fragments and expended shell casings recovered at the scene and from the OCME could not have been fired from this weapon.

---

[52] C.G.S. Sec. 53a-3(18).

Exhibit 22
Page 00852

**ER_3028**

Recovered from Classroom 10, SHES

Bushmaster Model XM15-E2S semiautomatic rifle: The Bushmaster rifle was found in classroom 10. The Bushmaster was tested and found to be operable without malfunction. All of the 5.56 mm shell casings from SHES that were tested were found to have been fired from this rifle. All of the bullets and fragments, recovered from SHES and the OCME that were tested, with the exception of those mentioned immediately below, are consistent with having been fired from the Bushmaster rifle.[53] They could not have been fired from the Saiga-12, the Glock 20 or the Sig Sauer P226.

Glock 20, 10 mm, semiautomatic pistol: The Glock 20 was found in classroom 10 near the shooter's body. The Glock 20 was tested and found to be operable without malfunction. It was found to have fired both of the 10 mm shell casings recovered at SHES. It was consistent with having fired the bullet that was recovered from the ceiling of classroom 8 in a location along the trajectory of the suicide shot of the shooter in classroom 10. It could have fired the three bullet fragments recovered from classroom 10. The three fragments together weigh less than one bullet and are presumed to have been parts of the same one bullet. Though all lacked sufficient striate for a positive identification, all had polygonal rifling consistent with the Glock 20. They could not have been fired from the Saiga-12, the Bushmaster or the Sig Sauer P226.

Sig Sauer P226, 9 mm, semiautomatic pistol: The Sig Sauer P226 was found in classroom 10 on the shooter's person. The Sig Sauer P226 was tested and found to be operable without malfunction. There was no physical evidence found indicating that this weapon had been fired at SHES, i.e. casings, bullets and bullet fragments recovered at the scene and from the OCME could not have been fired from this weapon.

The total weight of the guns and ammunition from the shooter at SHES was 30.47 lbs.[54]

Recovered from 36 Yogananda Street, Newtown, CT

Savage Mark II, .22 cal. Long Rifle, bolt action: The Savage Mark II rifle was found on the floor of the master bedroom near the bed where the body of the shooter's mother was found. The rifle was found to be operable without malfunction. The rifle was found to have fired the .22 cal. casing recovered from the rifle's chamber and the three .22 cal. casings found in the master bedroom. The rifle also was found to have fired the four bullets recovered during the autopsy of the shooter's mother.

---

[53] "No positive identification could be made to any of the bullet evidence submissions noted … … in 5.56 mm caliber. The physical condition of the bullet jacket surfaces were severely damaged and corroded. They all lacked individual striated marks of sufficient agreement for the identification process. The test fires also exhibited a lack of individual striated marks on the bullet surface for comparison purposes. This condition can be caused by fouling in the barrel of the rifle and the ammunition itself. The Bushmaster rifle cannot be eliminated as having fired the 5.56 caliber bullet evidence examined," quoting from the 6/19/13 Forensic Science Laboratory report.

[54] See the Appendix at page A141.

Exhibit 22
Page 00853

**Other Testing**

In the course of the investigation swabbings to test for DNA were taken from various pieces of evidence in the case, both at Sandy Hook Elementary School and 36 Yogananda Street. The purpose was to determine if anyone else had actively been involved in the planning or carrying out of the shootings. These swabbings were tested and compared to known samples in the case and no potential accessories or co-conspirators were revealed by the testing.[55]

## MISCELLANEOUS INVESTIGATIVE LEADS

In the course of the investigation, law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter.  This applied to both state and federal law enforcement.  Information that was substantiated and relevant was made part of the investigation.  Other information, after investigation was not substantiated.

Typically someone would call the CSP and leave a message that they had information relevant to the shootings at Sandy Hook Elementary School.  In an abundance of caution, a detective was assigned to follow up on every "lead," regardless of its presumed validity.

Some of the more than forty unsubstantiated leads and information are described below because of their nature or mention in investigation documents.

1. In the December 14, 2012, 7:25 p.m. search warrant for 36 Yogananda Street, paragraphs 8 and 9 read as follows:

   8. That investigators determined that on 12/12/12, an individual logged onto a website called 4Chan.com and anonymously posted "I'm going to kill myself on Friday and it will make the news. be watching at 9:00 am."  That another anonymous individual asked "Where at?"  The first individual responded "I live in Connecticut, that's as much as I'll say."

   9. That additionally on 12/14/12, a concerned individual in Texas contacted the Hartford Police Department and reported that her son was playing a video game named 'Call of Duty' approximately 20 hours ago.  She continued that a gamer with the screen name [RaWr]i<3EmoGirls (hereinafter "User") stated; "next week or very soon there maybe a shooting at my school and other schools so if i die remember me plz if I don't get on for 3-5 not including weeks that means i died and im being 100 percent serious."  The User then stated: "something might go bad tomorrow this could possibly be my last moments alive.-." Finally, User stated, "as far as I know theres a list of ppl that are gunna get shot-. I hope I aint on it."

---

[55] Two of the items examined from outside the building of SHES, one from the shotgun in the shooter's car and a second from 36 Yogananda Street yielded DNA profiles consistent with the DNA profiles of two victims killed in SHES, one in each.  It is strongly believed that this resulted from an accidental transference as a result of the unique circumstances of this case.  There is no reason to believe that either victim would ever have come in contact with these items. The DESPP is conducting a separate protocol inquiry in an attempt to determine the reason that the DNA appears on the items.

Exhibit 22
Page 00854

ER_3030

Both of these leads were immediately investigated by federal law enforcement and found to have no validity and no relation to Newtown.[56]

2.  A December 14, 2012, search of the Stamford residence of Peter Lanza, the father of the shooter, was conducted with the FBI. Some illegal fireworks were seized and secured. After consultation with David I. Cohen, the State's Attorney for the Judicial District of Stamford/Norwalk, and based on all of the circumstances involved, this state's attorney has decided to exercise his discretion and not prosecute Mr. Lanza for possession of the fireworks, which are in no way related to the events of December 14, 2012.

3.  Dick's Sporting Goods – Police received a lead that the shooter had tried to buy ammunition at a Dick's Sporting Goods store. Store security surveillance videos were recovered and reviewed. None of the individuals depicted in the videos appear to be the shooter or connected to shooter.

4.  A person called the police indicating that the shooter had tried to rent a room from her and indicated he was having problems with his mother. This proved to be unsubstantiated after an investigation.

5.  Some callers indicated that they chatted with the shooter online in postings.  These postings were determined to be false.

6.  Numerous citizens in Newtown received calls on their telephones with messages left saying "I am [the shooter's name] and I am going to kill you." It was determined that these calls were made from out of state and the investigation is ongoing. Preliminary investigation results establish that the callers were not associated with the shooter.

7.  CSP investigated a lead that the shooter went to Newtown High School before going to SHES.  In the course of this investigation one parent refused to let her high school child be interviewed by police and related that a friend of the child had told the child they saw the shooter in the parking lot before the shooting. A review of Newtown High School video did not substantiate this claim.

8.  There were reports of the shooter being at SHES on December 12, 2012, that were investigated and found not to be substantiated.

9.  A report that a man claimed that while in Oklahoma a woman told him about the planned shooting before the shooting occurred.  Federal law enforcement investigated this and found that it could not be true.

---

[56] These search warrants were applied for with information that was available at the time.  Some of the information was later determined to be inaccurate.

Exhibit 22
Page 00855

**ER_3031**

## DETERMINATIONS OF CRIMES COMMITTED

In the course of his rampage the shooter committed a number of state crimes. The most significant are those where lives were taken and people were specifically injured.

At Sandy Hook Elementary School, the crime of Murder under Special Circumstances[57] in violation of C.G.S. Sec. 53a-54b was committed twenty-six times. Attempted Murder under Special Circumstances[58] in violation of C.G.S. Secs. 53a-49 and 53a-54b was committed twice as it relates to the two individuals who were shot and survived. These crimes reflect the killings of the children and adults, as well as those physically injured.[59]  The crime of Murder in violation of C.G.S. Sec. 53a-54a was committed by the shooter in killing his mother at 36 Yogananda Street.[60]

Also listed are other major crimes committed by the shooter on December 14, 2012.[61]

The major felonies[62] committed by the shooter in this case are:

- Murder with Special Circumstances
- Attempted Murder with Special Circumstances
- Assault in the First Degree[63]

---

[57] Sec. 53a-54b. Murder with special circumstances. A person is guilty of murder with special circumstances who is convicted of any of the following: (1)… … (7) murder of two or more persons at the same time or in the course of a single transaction; or (8) murder of a person under sixteen years of age.

[58] Sec. 53a-49. Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: … … (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

[59] Though state law as to who is a "victim" in a criminal case is very broad, only those victims mentioned above will be discussed. Connecticut defines a "victim of crime" as an individual who suffers direct or threatened physical, emotional or financial harm as a result of a crime and includes immediate family members of a minor, incompetent individual or homicide victim and a person designated by a homicide victim in accordance with section 1-56r.  See C.G.S. Sec. 1-1k.

[60] Sec. 53a-54a. Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

[61] The investigation has not discovered any evidence that Nancy Lanza was in any way aware of her son's plans.

[62] In any given situation, the facts giving rise to the commission of one crime will suffice to meet the elements of additional crimes.  Here the focus will be on the major crimes committed and not go into every possible felony justified by the evidence.

40

Exhibit 22
Page 00856

**ER_3032**

- Burglary in the First Degree[64]
- Risk of Injury to a Minor[65]
- Possession of a Weapon on School Grounds[66]
- Carrying a Pistol Without a Permit,[67]

The crimes listed above all require some type of mental state whether it is a specific intent, knowledge or a general intent to do the prohibited act.

The intent to kill for the crime of murder can be seen in the circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wounds inflicted and the events leading to and immediately following the deaths, as well as with the shooter intending the natural consequences of his voluntary acts.[68]

Here the intent is clear from the evidence that the shooter intentionally armed himself heavily, drove to SHES, parked in a manner out of direct sight of the front door, shot his way into the building and immediately killed those who confronted him as well as those in classrooms 8 and 10. The evidence found at his home on the digital media further support his intentions to kill, both at the school and with his mother. Further the manner in which he killed his mother reflects the shooter's intent to kill her.

---

[63] Sec. 53a-59. Assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument;… … or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm.

[64] Sec. 53a-101. Burglary in the first degree: Class B felony. (a) A person is guilty of burglary in the first degree when (1) such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with explosives or a deadly weapon or dangerous instrument, or (2) such person enters or remains unlawfully in a building with intent to commit a crime therein and, in the course of committing the offense, intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone, or …..

[65] Sec. 53-21. Injury or risk of injury to, or impairing morals of, children. Sale of children. (a) Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or … …, shall be guilty of a class C felony for a violation of subdivision (1) ….

[66] Sec. 53a-217b. Possession of a weapon on school grounds: Class D felony. (a) A person is guilty of possession of a weapon on school grounds when, knowing that such person is not licensed or privileged to do so, such person possesses a firearm or deadly weapon, as defined in section 53a-3, (1) in or on the real property comprising a public or private elementary or secondary school, or ….

[67] Sec. 29-35. Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28.

[68] State v. Otto, 305 Conn. 51, 66-67 (2012).

Exhibit 22
Page 00857

**ER_3033**

Murder with Special Circumstances is met both in the killing of the children and in the killing of more than one person at the same time.

In this case the shooter's mental status is no defense to his conduct as the evidence shows he knew his conduct to be against the law. He had the ability to control his behavior to obtain the results he wanted, including his own death. This evidence includes his possession of materials related to mass murders, his removal of the GPS from his car, his utilization of ear plugs, the damaging of the hard drive and waiting for his mother's return from New Hampshire.[69]

The existence of an extreme emotional disturbance for which there is a reasonable explanation or excuse is also not present in this case.[70]  It is clear that the shooter planned his crimes in advance and was under no extreme emotional disturbance for which there was a reasonable explanation or excuse.

---

[69] Sec. 53a-13. Lack of capacity due to mental disease or defect as affirmative defense. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

[70] Sec. 53a-54a. Murder. (a) A person is guilty of murder when, … …with intent to cause the death of another person, he causes the death of such person or or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

42

Exhibit 22
Page 00858

ER_3034

## CONCLUSION

With the issuance of this report, the investigation is closed.[71] If additional reliable information, related to the existence of others' involvement in the case, comes to the attention of the investigators, it is subject to being reopened. I do not anticipate that occurring. As of now, there will be no state prosecution of anyone as an accessory or co-conspirator.

Many people have asked why the shooter did what he did on December 14, 2012. Or, in the vernacular of the criminal justice system, "Did he have a motive to do what he did?" This investigation, with the substantial information available, does not establish a conclusive motive.

What we do know is that the shooter had significant mental health issues that, while not affecting the criminality of the shooter's mental state for the crimes or his criminal responsibility for them, did affect his ability to live a normal life and to interact with others, even those to whom he should have been close. Whether this contributed in any way is unknown. The shooter did not recognize or help himself deal with those issues. He had a familiarity with and access to firearms and ammunition and an obsession with mass murders, in particular the Columbine shootings.

There is no clear indication why Sandy Hook Elementary School was selected, other than perhaps its close proximity to the shooter's home.

What is clear is that on the morning of December 14, 2012, the shooter intentionally committed horrendous crimes, murdering 20 children and 6 adults in a matter of moments, with the ability and intention of killing even more. He committed these heinous acts after killing his own mother. The evidence indicates the shooter planned his actions, including the taking of his own life.

It is equally clear that law enforcement arrived at Sandy Hook Elementary School within minutes of the first shots being fired. They went into the school to save those inside with the knowledge that someone might be waiting to take *their* lives. It is also clear that the staff of Sandy Hook Elementary School acted heroically in trying to protect the children. The combination saved many children's lives.

November 25, 2013

Stephen J. Sedensky III
State's Attorney
Judicial District of Danbury

---

[71] There remain some outstanding reports, returns and an evidence examination evaluation to be filed.

Exhibit 22
Page 00859

## ACKNOWLEDGEMENTS

Over the course of the last eleven months many agencies, governmental and private, have come together to assist the victims' families, victims, first responders, others affected by the crimes, the Connecticut State Police and the State's Attorney's Office for the Judicial District of Danbury.

I wish to thank the below agencies, listed alphabetically, for their investigative work, cooperation and assistance in this investigation. Though I have tried to list all of the agencies that provided assistance to the investigation, I suspect some will be inadvertently left out.  For this I apologize.

- Connecticut State Police and in particular Western District Major Crime Squad[72]*
- Connecticut Intelligence Center (CTIC)
- Bureau of Alcohol, Tobacco, Firearms and Explosives
- Department of Emergency Services and Public Protection Forensic Science Laboratory
- Faculty of Finding Words-Connecticut, A ChildFirst State[73]
- Family & Children's Aid of Danbury[74]
- Federal Bureau of Investigation,[75] including Victim Services and Behavior Analysis units
- Gundersen Health System's National Child Protection Training Center
- Hoboken, New Jersey, Police Department
- Homeland Security
- Municipal police departments in Connecticut
- Newtown Police Department
- Office of the Chief Medical Examiner
- Office of the Chief State's Attorney[76]*
- State of Connecticut Judicial Branch
- United States Attorney's Office for the District of Connecticut*
- United States Drug Enforcement Agency
- United States Marshals Service

I would also like to thank the members of the Danbury State's Attorney's Office, in particular, Supervisory Assistant State's Attorney Warren Murray and Inspectors Donald Brown and John Mahoney for their assistance and support.

---

[72] The Western District Major Crime Squad under the leadership of Lt. David Delvecchia investigated this case with a thoroughness and sensitivity that is unmatched in my experience.

[73] Connecticut is a ChildFirst state whose one week program Finding Words Connecticut, Interviewing Children and Preparing for Court is funded by the Governor's Task Force on Justice for Abused Children.

[74] Family & Children's Aid of Danbury hosts the Multidisciplinary Investigation Team.

[75] This includes FBI agents across the country who sought out evidence and interviewed witnesses in many states.

[76] Chief State's Attorney Kevin T. Kane's counsel and assistance has been an invaluable asset to me and this case, together with the assistance of those in his office who worked on the case.

* I am grateful for the suggestions, editing and reviews of the drafts of this report provided by these organizations. Any errors that remain are mine.

Exhibit 22
Page 00860

**ER_3036**

# MotherJones

# More Guns, More Mass Shootings—Coincidence?

*The unthinkable massacre in Connecticut adds to what is now the worst year of mass shootings in modern US history.*

By Mark Follman | Wed Sep. 26, 2012 6:00 AM EDT

In the fierce debate that always follows the latest mass shooting, it's an argument you hear frequently from gun rights promoters: If only more people were armed, there would be a better chance of stopping these terrible events. This has plausibility problems—what are the odds that, say, a moviegoer with a pack of Twizzlers in one pocket and a Glock in the other would be mentally prepared, properly positioned, and skilled enough to take out a body-armored assailant in a smoke- and panic-filled theater? But whether you believe that would happen is ultimately a matter of theory and speculation. Instead, let's look at some facts gathered in a five-month investigation by *Mother Jones.*

In the wake of the massacres this year at a Colorado movie theater, a Sikh temple in Wisconsin, and Sandy Hook Elementary School in Connecticut, we set out to track mass shootings in the United States over the last 30 years. We identified and analyzed 62 of them [1], and one striking pattern in the data is this: In not a single case was the killing stopped by a civilian using a gun. And in other recent (but less lethal) rampages in which armed civilians attempted to intervene, those civilians not only failed to stop the shooter but also were gravely wounded or killed. Moreover, we found that the rate of mass shootings has increased in recent years—at a time when America has been flooded with millions of additional firearms and a barrage of new laws has made it easier than ever to carry them in public places, including bars, parks, and schools.



[1]

*MoJo's* map, timeline, and analysis of 30 years of mass shootings in America. [1]

America has long been heavily armed relative to other societies, and our arsenal keeps growing. A precise count isn't possible because most guns in the United States aren't registered and the government has scant ability to track them, thanks to a legislative landscape shaped by powerful pro-gun groups such as the National Rifle Association. But through a combination of national surveys and manufacturing and sales data, we know that the increase in firearms has far outpaced population growth. In 1995 there were an estimated 200 million guns in private hands. Today, there are around 300 million—about a 50 percent jump. The US population, now over 314 million, grew by about 20 percent in that period. At this rate, there will be a gun for every man, woman, and child before the decade ends.

Exhibit 23
Page 00862

More Guns, More Mass Shootings—Coincidence?



**Number of civilian firearms vs. US population (millions)**

■ Guns
■ Population

Mother Jones

There is no evidence indicating that arming Americans further will help prevent mass shootings or reduce the carnage, says Dr. Stephen Hargarten, a leading expert on emergency medicine and gun violence at the Medical College of Wisconsin. To the contrary, there appears to be a relationship between the proliferation of firearms and a rise in mass shootings: By our count, there have been two per year on average since 1982. Yet, 25 of the 62 cases we examined have occurred since 2006. In 2012 alone there have been seven mass shootings [2], and a record number of casualties, with more than 140 people injured and killed.

Armed civilians attempting to intervene are actually more likely to increase the bloodshed, says Hargarten, "given that civilian shooters are less likely to hit their targets than police in these circumstances." A chaotic scene in August at the Empire State Building put this starkly into perspective when New York City police officers trained in counterterrorism [3] confronted a gunman and wounded nine innocent bystanders in the process [4].

Surveys suggest America's guns may be concentrated in fewer hands today: Approximately 40 percent of households had them in the past decade, versus about 50 percent in the 1980s. But far more relevant is a recent barrage of laws that have rolled back gun restrictions throughout the country. In the past four years, across 37 states, the NRA and its political allies have pushed through 99 laws making guns easier to own, carry, and conceal from the government [5].

Among the more striking measures: Eight states now allow firearms in bars. Law-abiding Missourians can carry a gun while intoxicated and even fire it if "acting in self-defense." In Kansas, permit holders can carry concealed weapons inside K-12 schools, and Louisiana allows them in houses of worship. Virginia not only repealed a law requiring handgun vendors to submit sales records, but the state also ordered the destruction of all such previous records. More than two-thirds of these laws were passed by Republican-controlled statehouses, though often with bipartisan support.



The NRA surge: 99 recent laws rolling back gun regulations in 37 states. [5]

The laws have caused dramatic changes, including in the two states hit with the recent carnage. Colorado passed its concealed-carry measure in 2003, issuing 9,522 permits that year; by the end of last year the state had handed out a total of just under 120,000, according to data we obtained from the County Sheriffs of Colorado. In March of this year, the Colorado Supreme Court ruled that concealed weapons are legal on the state's college campuses. (It is now the fifth state explicitly allowing them [6].) If former neuroscience student James Holmes were still attending the University of Colorado today,

Exhibit 23
Page 00863

More Guns, More Mass Shootings—Coincidence?

the movie theater killer—who had no criminal history and obtained his weapons legally—could've gotten a permit to tote his pair of .40 caliber Glocks straight into the student union. Wisconsin's concealed-carry law went into effect just nine months before the Sikh temple shooting in suburban Milwaukee this August. During that time, the state issued a whopping 122,506 permits, according to data from Wisconsin's Department of Justice. The new law authorizes guns on college campuses, as well as in bars, state parks, and some government buildings.

And we're on our way to a situation where the most lax state permitting rules—say, Virginia's, where an online course now qualifies for firearms safety training and has drawn a flood of out-of-state applicants [7]—are in effect national law. Eighty percent of states now recognize handgun permits from at least some other states. And gun rights activists are pushing hard for a federal reciprocity bill [8]—passed in the House late last year, with GOP vice presidential candidate Paul Ryan among its most ardent supporters—that would essentially make any state's permits valid nationwide.



**Guns possessed by mass shooters***

- Semi-automatic handguns: **68**
- Assault weapons: **35**
- Revolvers: **20**
- Shotguns: **19**

*Includes multiple weapons. Assault weapons include machine pistols.



**How killers got their guns**

- Legally: **49**
- Illegally: **12**
- Unknown: **1**

Mother Jones

Indeed, the country's vast arsenal of handguns—at least 118 million of them as of 2010—is increasingly mobile, with 69 of the 99 new state laws making them easier to carry. A decade ago, seven states and the District of Columbia still prohibited concealed handguns; today, it's down to just Illinois and DC. (And Illinois recently passed an exception [9] cracking the door open to carrying). In the 62 mass shootings we analyzed, 54 of the killers had handguns—including in all 15 of the mass shootings since the surge of pro-gun laws began in 2009.

In a certain sense the law was on their side: nearly 80 percent of the killers in our investigation obtained their weapons legally.

We used a conservative set of criteria to build a comprehensive rundown of high-profile attacks in public places—at schools, workplaces, government buildings, shopping malls—though they represent only a small fraction of the nation's overall gun violence. The FBI defines a mass murderer [10] as someone who kills four or more people in a single incident, usually in one location. (As opposed to spree or serial killers, who strike multiple times.) We excluded cases involving armed robberies or gang violence; dropping the number of fatalities by just one, or including those motives, would add many [11], many [12] more [13] cases [14]. (More about our criteria here [15].)

There was one case in our data set in which an armed civilian played a role. Back in 1982, a man opened fire at a welding shop in Miami, killing eight and wounding three others before fleeing on a bicycle. A civilian who worked nearby pursued the assailant in a car, shooting and killing him a few blocks away (in addition to ramming him with the car). Florida authorities, led by then-state attorney Janet Reno, concluded that the vigilante had used force justifiably, and speculated that he may have prevented additional killings. But even if we were to count that case as a successful

Exhibit 23
Page 00864

armed intervention by a civilian, it would account for just 1.6 percent of the mass shootings in the last 30 years.

More broadly, attempts by armed civilians to stop shooting rampages are rare—and successful ones even rarer. There were two school shootings in the late 1990s, in Mississippi and Pennsylvania, in which bystanders with guns ultimately subdued the teen perpetrators, but in both cases it was after the shooting had subsided. Other cases led to tragic results. In 2005, as a rampage unfolded inside a shopping mall in Tacoma, Washington, a civilian named Brendan McKown confronted the assailant with a licensed handgun he was carrying. The assailant pumped several bullets into McKown and wounded six people before eventually surrendering to police after a hostage standoff. (A comatose McKown eventually recovered after weeks in the hospital.) In Tyler, Texas, that same year, a civilian named Mark Wilson fired his licensed handgun at a man on a rampage at the county courthouse. Wilson—who was a firearms instructor—was shot dead by the body-armored assailant, who wielded an AK-47. (None of these cases were included in our mass shootings data set because fewer than four victims died in each.)

Appeals to heroism on this subject abound. So does misleading information. Gun rights die-hards frequently [16] credit [17] the end of a rampage in 2002 at the Appalachian School of Law in Virginia to armed "students" who intervened—while failing to disclose that those students were also current and former law enforcement officers [18], and that the killer, according to police investigators, was out of bullets by the time they got to him. It's one of several cases commonly cited as examples of ordinary folks with guns stopping massacres that do not stand up to scrutiny [19].

How do law enforcement authorities view armed civilians getting involved? One week after the slaughter at the *Dark Knight* screening in July, the city of Houston—hardly a hotbed of gun control—released a new Department of Homeland Security-funded video instructing the public on how to react to such events [20]. The six-minute production foremost advises running away or otherwise hiding, and suggests fighting back only as a last resort. It makes no mention of civilians using firearms.



Law enforcement officials are the first to say that civilians should not be allowed to obtain particularly lethal weaponry, such as the AR-15 assault rifle and ultra-high-capacity, drum-style magazine used by Holmes to mow down Batman fans. The expiration of the Federal Assault Weapons Ban under President George W. Bush in 2004 [22] has not helped that cause: Seven killers since then have wielded assault weapons in mass shootings [1].

[21]

Screen shot: City of Houston video on mass shooters.

But while access to weapons is a crucial consideration for stemming the violence, stricter gun laws are no silver bullet. Another key factor is mental illness. A major *New York Times* [23] investigation [23] in 2000 examined 100 shooting

Exhibit 23
Page 00865

More Guns, More Mass Shootings—Coincidence?

rampages and found that at least half of the killers showed signs of serious mental health problems. Our own data reveals that the majority of mass shootings are murder-suicides: In the 62 cases we analyzed, 36 of the shooters killed themselves. Others may have committed "suicide by cop"—seven died in police shootouts. Still others simply waited, as Holmes did in the movie theater parking lot, to be apprehended by authorities.



**Drum-style magazine for assault rifles** Brownells.com [24]

Mental illness among the killers is no surprise, ranging from paranoid schizophrenia to suicidal depression. But while some states have improved their sharing of mental health records with federal authorities, millions of records reportedly are still missing from the FBI's database for criminal background checks [25].

Hargarten of the Medical College of Wisconsin argues that mass shootings need to be scrutinized as a public health emergency so that policy makers can better focus on controlling the epidemic of violence. It would be no different than if there were an outbreak of Ebola virus, he says—we'd be assembling the nation's foremost experts to stop it.

But real progress will require transcending hardened politics [26]. For decades gun rights promoters have framed measures aimed at public safety—background checks, waiting periods for purchases, tracking of firearms—as dire attacks on constitutional freedom. They've wielded the gun issue so successfully as a political weapon that Democrats hardly dare to touch it [27], while Republicans have gone to new extremes in their party platform [28] to enshrine gun rights. Political leaders have failed to advance the discussion "in a credible, thoughtful, evidence-driven way," says Hargarten.

In the meantime, the gun violence in malls and schools and religious venues [12] continues apace. As a superintendent told his community in suburban Cleveland this February, after a shooter at Chardon High School snuffed out the lives of three students and injured three others [29], "We're not just any old place, Chardon. This is every place. As you've seen in the past, this can happen anywhere."

*Additional research contributed by Deanna Pan and Gavin Aronsen.*

---

**Source URL:** http://www.motherjones.com/politics/2012/09/mass-shootings-investigation

**Links:**
[1] http://www.motherjones.com/politics/2012/07/mass-shootings-map
[2] http://www.motherjones.com/politics/2012/07/mass-shootings-map?page=2
[3] http://www.cnn.com/2012/08/27/us/new-york-empire-state-building-shooting/index.html
[4] http://www.nytimes.com/2012/08/26/nyregion/bystanders-shooting-wounds-caused-by-the-police.html
[5] http://www.motherjones.com/politics/2012/09/map-gun-laws-2009-2012

Exhibit 23
Page 00866

More Guns, More Mass Shootings—Coincidence?

[6] http://www.nytimes.com/2012/09/23/education/guns-on-campus-at-university-of-colorado-causes-unease.html?pagewanted=all

[7] http://www.foxnews.com/us/2012/09/03/online-classes-make-it-easy-for-non-virginia-gun-owners-to-get-permits/

[8] http://www.motherjones.com/politics/2011/11/concealed-guns-laws

[9] http://smartgunlaws.org/recent-developments-in-state-law-2009-2010/

[10] http://www.fbi.gov/stats-services/publications/serial-murder/serial-murder-1#two

[11] http://www.foxnews.com/story/0,2933,537004,00.html

[12] http://www.motherjones.com/politics/2012/07/mass-shooting-survivor

[13] http://www.nytimes.com/2010/01/21/us/21virginia.html

[14] http://www.jsonline.com/news/crime/multiple-victims-shot-near-brookfield-square-le7a3b4-175147441.html

[15] http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting

[16] http://johnrlott.tripod.com/postsbyday/7-4-03.html

[17] http://dailyanarchist.com/2012/07/31/auditing-shooting-rampage-statistics/

[18] http://www.cse.unsw.edu.au/%7Elambert/guns/appalachian/nd/tackle/gun/use/index.html

[19] http://www.motherjones.com/politics/2012/12/armed-civilians-do-not-stop-mass-shootings

[20] http://www.tylerpaper.com/article/20120729/NEWS01/120729768/0/FEATURES09

[21] http://www.youtube.com/watch?v=5VcSwejU2D0&amp;feature=youtu.be

[22] http://www.usatoday.com/news/washington/2004-09-12-weapons-ban_x.htm

[23] http://www.nytimes.com/2000/04/09/us/they-threaten-seethe-and-unhinge-then-kill-in-quantity.html?pagewanted=all&amp;src=pm

[24] http://www.brownells.com/.aspx/pid=23282/Product/AR-15-M16-90-ROUNDER-reg-MAGAZINE

[25] http://www.demandaplan.org/fatalgaps

[26] http://www.ethanzuckerman.com/blog/2012/08/14/what-would-it-take-to-start-a-gun-control-debate-in-the-us/

[27] http://www.cnn.com/2012/07/20/politics/gun-politics/index.html

[28] http://www.washingtonpost.com/politics/in-wake-of-mass-shootings-gop-platforms-calls-for-expanded-rights-for-gun-owners/2012/08/30/8a4881f0-f2ad-11e1-b74c-84ed55e0300b_story.html

[29] http://www.nytimes.com/2012/02/29/us/ohio-school-shooting-suspect-confesses-prosecutor-says.html?pagewanted=all

Exhibit 23
Page 00867

**ER_3042**



LOUIS KLAREVAS

RAMPAGE NATION

SECURING AMERICA FROM
**MASS SHOOTINGS**

Exhibit 24
Page 00869

teaches in the Department of Global Affairs at the University of Massachusetts–Boston. He also regularly serves as a consultant to the federal government on national-security matters. A frequent commentator on home-land security and foreign policy, he has appeared on numerous news programs, including CNN, ABC, NPR, and the BBC. In the past, he has taught at American University, George Washington University, City University of New York, and New York University. In addition, he has served as the Defense Analysis Research Fellow at the London School of Economics and a Senior Fulbright Scholar in Security Studies.

Exhibit 24
Page 00870

# CONTENTS

Preface                                                          9

Acknowledgments                                                 13

## PART 1: PROBLEM

Chapter One: Sandy Hook                                         17

Chapter Two: The Beginning of Wisdom                           31

Chapter Three: A Growing Threat                                 49

## PART 2: PROBE

Chapter Four: Unstable, Angry, Armed Men                       89

Chapter Five: No Place Is Safe                                 131

Chapter Six: Guns Kill, Some More Than Others                 183

## PART 3: PRESCRIPTION

Chapter Seven: Breaking the Trinity                           229

Chapter Eight: The Bad Man's Awe                              249

Chapter Nine: The New Normal                                  267

7

Exhibit 24
Page 00871

## THE REAL NUMBERS

It's easy to be dismissive of pundits and partisans, even ones with *PhD* after their names like John Lott. After all, they often take to the airwaves, the print media, and the blogosphere to impart a variety of assertions about rampage violence, usually with little consequence for being erroneous, biased, or intentionally deceptive. But there's one place where claims don't get a free pass: the courts. Under oath and subject to cross-examination, "experts" aren't afforded an escape from scrutiny during litigation. Case in point: the legal battle over the constitutionality of Colorado's recent ban on large-capacity magazines.

After a mentally disturbed man wielding an assault weapon armed with a 100-round magazine killed twelve and wounded an additional fifty-eight cinema patrons in Aurora, Colorado, the state legislature enacted tight restrictions on the sale, possession, and transfer of any magazines that held more than fifteen rounds of ammunition. The objective of the statute was to reduce the carnage of shooting sprees by limiting the number of bullets a semiautomatic weapon can fire in a single feed. In 2013, this law came under attack when a group of thirty plaintiffs—a combination of gun-rights organizations, firearms dealers, and individual gun owners—asked a federal court to strike it down, arguing that it violated the Second Amendment. At the crux of their case, the plaintiffs asserted that mass shootings are rare to begin with, so magazine restrictions are likely to have little to no positive impact on the casualty tolls of gun attacks. Believing that the ban would have a negligible impact on their rights to lawfully own large-capacity magazines.[7]

To help establish their claim, the plaintiffs in *Colorado Outfitters Association et al. v. Hickenlooper* put criminologist Gary Kleck on the stand to make a key point. "Mass shootings are extremely rare."[2]

Perhaps you'll recall the name from the previous chapter. Kleck was the first scholar to define and study mass shootings as a unique subset of gun violence. In the past decade, he has become one of the go-to scholars for the gun-rights movement, earning $350 an hour as an expert witness who testifies against certain gun-control measures.[73]

When Kleck conducted his initial study of mass shootings in 1997, he defined them as "incident[s] in which six or more victims

were shot dead with a gun, or twelve or more total were wounded."[74] He has since broadened his definition to "shooting[s] in which more than six people were shot, fatally or nonfatally, in a single incident."[75] While Kleck's conceptualization still maintains a fairly high casualty threshold—remember the emerging consensus is that mass shootings are acts of violence where four or more people are shot—he testified that in the nearly two decades between January 1994 and July 2013, there were only fifty-seven mass shootings in the United States. With fewer than three mass shootings per year, on average, Kleck concluded that any such attack was a "rare event."[76]

On cross-examination, Assistant Attorney General for Colorado Matthew Grove began with a simple question: "So if you missed a quarter of the data, that might be a problem, right?"[77] Kleck admitted it would. When the time came to discuss Kleck's analysis, Grove asked:

"You testified earlier that you considered *all* mass shooting incidents that met your criteria of seven or more killed or wounded, correct?"

Again, Kleck confirmed Grove's leading question, acknowledging that there were only fifty-seven such attacks in the twenty-year period he examined.[78] Grove then turned to the data set. Handling Kleck a binder full of exhibits, Grove had Kleck read through each document. Here's a sampling from the transcripts of how this played out:

Q. Please take a moment to read Exhibit 101. . . . This article is entitled, "Tech worker charged in seven deaths at Massachusetts firm." Correct?

A. That's correct.

Q. And in the second paragraph, it says, "Prosecutors accuse McDermott of acting with premeditation and without mercy when colleagues were shot repeatedly with a 12-gauge shotgun and an assault rifle fed with a 60-round magazine," correct?

A. Yes.

Q. And the next paragraph says, "The seven Edgewater Technology employees were shot a combined 90 times," correct?

A. Correct.

Q. This meets your criteria for inclusion in your report, correct?

A. It does.

Q. And it was not included in [your expert report], right?

A. Correct. . . .

Exhibit 24
Page 00872

ER_3046

## 70   PART I: PROBLEM

Q. Let's turn to Exhibit 102. . . . Title of this is, "Factory feud is cited in shooting in Indiana.' Do you need a moment to read this?'
A. Yes, please. Okay.
Q. So the very first sentence of this says, "The factory worker who killed a co-owner of the factory and wounded six others before fatally shooting himself was apparently angered over a dispute." So that's one dead, six wounded, correct?
A. That's correct.
Q. That meets your criteria?
A. Yes, it does.
Q. And you didn't include this in your report, did you?
A. No."

This painful cross-examination continued for approximately forty-five minutes; each time, Kleck confirmed that he had omitted the specific mass shooting from his inquiry.[80] When Grove was finished, he had successfully pointed out that, even under Kleck's high casualty threshold, there were at least twenty-nine mass shootings that the plaintiff's expert failed to report. As Kleck admitted on the stand, "Yes, it's about 50 percent of the ones I analyzed."[81] Earlier, Kleck had testified that investigations that overlooked a quarter of the cases were problematic. Grove had just established that Kleck's analysis—which disregarded at least a third of the data (twenty-nine out of eighty-six cases)—was flawed by his own standards.

Grove followed up by reminding Kleck that, in his official expert report submitted to the court, he asserted "all [mass] shooting incidents were examined."

Kleck backtracked on his claim: "Yes, I did say all. Had I been more precise, I would have said, all that I knew of, or all that I could discover, or words to that effect."

"'All' would suggest every one, though, right?"

"Well, to me, it suggested all that I knew about," Kleck replied in one final attempt to salvage his testimony. But it was too late.[82]

On June 26, 2014, the judge in the case issued a fifty-page ruling upholding Colorado's restrictions on large-capacity magazines. Kleck's name, let alone his claims, never appeared in the decision. Not even in passing. Meanwhile, the court expressly stated that it accepted the views of the state's expert witness, Jeffrey Zax, who offered testimony

## A GROWING THREAT   71

that at times directly contradicted Kleck. It was a signal. Like the pro-gun-rights lawsuit itself, the argument that mass shootings occur too infrequently to merit legislative action was dismissed.[83]

* * *

Testifying under oath, Gary Kleck was forced to acknowledge that mass shootings occur with greater frequency than his research confirmed. In fact, they take place more often than most Americans probably realize—at a higher rate of incidence than even many in the gun-control camp claim. The real numbers are actually quite disturbing.

When I started conducted research for this book, I decided to collect information on every known gun massacre that took place in the United States over the past fifty years. While it was a labor-intensive process that required a full year of searching through a variety of data sets and news banks, I came up with 111 attacks that resulted in six or more people—not including the perpetrator(s)—dying as a result of gunshot wounds (see table 3.2).[84] As these are the deadliest gun attacks of the past five decades, they are the most disconcerting, deserving special attention.

The statistics paint a troubling picture. Since 1966, gun massacres have claimed 904 lives (see figure 3.1). What's most alarming about these extreme acts of violence is that they're taking place with greater frequency, with the sharpest increase in deaths occurring in the past decade (see figure 3.2).[85] Specifically, over one-third (39 out of 111) of gun massacres during the past fifty years occurred in the past decade (2006-2015). That's a 160 percent increase from the previous decade, which only experienced fifteen high-fatality mass shootings (see figure 3.3). Equally disturbing, the total number of people killed in gun massacres in the past decade (349 out of 904) accounts for nearly 40 percent of all murders in such acts of violence during the same fifty-year span (see figure 3.4). This is a massive increase from the previous decade, when only 111 people died in such shootings. The past decade has clearly been the worst, exceeding the second worst (1976-1985) by way more than a third in terms of number of incidents and by more than double in terms of total deaths.[86] It's also the only decade to average roughly nine deaths per attack (see table 3.3).

Exhibit 24
Page 00873

ER_3047

**Table 3.2. Gun Massacres in the United States, 1966–2015.**

| | Date | City | State | Perpetrator(s) | Deaths |
|---|---|---|---|---|---|
| 1 | 8/1/1966 | Austin | TX | Charles Whitman | 14 |
| 2 | 8/26/1966 | New Haven | CT | Arthur Davis | 6 |
| 3 | 10/23/1967 | Lock Haven | PA | Leo Held | 6 |
| 4 | 3/16/1968 | Ironwood | MI | Eric Pearson | 7 |
| 5 | 6/25/1968 | Good Hart | MI | Undetermined | 6 |
| 6 | 12/19/1968 | Napa | CA | Charles Bray | 6 |
| 7 | 9/3/1971 | Phoenix | AZ | John Freeman | 7 |
| 8 | 6/21/1972 | Cherry Hill | NJ | Edwin Grace | 6 |
| 9 | 1/7/1973 | New Orleans | LA | Mark Essex | 7 |
| 10 | 6/21/1973 | Palos Hills | IL | William Workman | 7 |
| 11 | 4/22/1973 | Los Angeles | CA | William Bonner | 7 |
| 12 | 6/9/1973 | Boston | MA | George O'Leary | 6 |
| 13 | 11/4/1973 | Cleveland | OH | Cyril Rovansek | 7 |
| 14 | 2/18/1974 | Fayette | MS | Frankie Lias | 7 |
| 15 | 11/13/1974 | Amityville | NY | Ronald DeFeo | 6 |
| 16 | 3/30/1975 | Hamilton | OH | James Ruppert | 11 |
| 17 | 10/19/1975 | Sutherland | NE | Erwin Simants | 6 |
| 18 | 3/12/1976 | Trevose | PA | George Geschwendt | 6 |
| 19 | 7/12/1976 | Fullerton | CA | Edward Allaway | 7 |
| 20 | 7/23/1977 | Klamath Falls | OR | DeWitt Henry | 6 |
| 21 | 8/26/1977 | Hackettstown | NJ | Emile Benoist | 6 |
| 22 | 7/16/1978 | Oklahoma City | OK | Harold Stafford, Roger Stafford, and Verna Stafford | 6 |
| 23 | 1/3/1981 | Delmar | IA | Gene Gilbert | 6 |
| 24 | 1/7/1981 | Richmond | VA | Artie Ray Cherry, Michael Finazzo, and Tyler Fmdak | 6 |
| 25 | 5/2/1981 | Clinton | MD | Ronald Ellis | 6 |
| 26 | 8/21/1981 | Indianapolis | IN | King Bell | 6 |
| 27 | 2/17/1982 | Farwell | MI | Robert Haggart | 7 |
| 28 | 8/9/1982 | Grand Prairie | TX | John Parish | 6 |
| 29 | 8/20/1982 | Miami | FL | Carl Brown | 8 |
| 30 | 9/7/1982 | Craig | AK | Undetermined | 8 |
| 31 | 9/25/1982 | Wilkes-Barre | PA | George Banks | 13 |
| 32 | 2/18/1983 | Seattle | WA | Kwan Fai Mak and Benjamin Ng | 13 |
| 33 | 3/3/1983 | McCarthy | AK | Louis Hastings | 6 |
| 34 | 10/11/1983 | College Station and Hempstead | TX | Eliseo Moreno | 6 |
| 35 | 4/15/1984 | Brooklyn | NY | Christopher Thomas | 10 |
| 36 | 5/19/1984 | Manley Hot Springs | AK | Michael Silka | 8 |
| 37 | 6/29/1984 | Dallas | TX | Abdelkrim Belachheb | 6 |
| 38 | 7/18/1984 | San Ysidro | CA | James Huberty | 21 |
| 39 | 10/18/1984 | Evansville | IN | James Day | 6 |
| 40 | 8/20/1986 | Edmond | OK | Patrick Sherrill | 14 |
| 41 | 12/8/1986 | Oakland | CA | Rita Lewis and David Welch | 6 |
| 42 | 2/5/1987 | Flint | MI | Terry Morris | 6 |
| 43 | 4/23/1987 | Palm Bay | FL | William Cruse | 6 |
| 44 | 7/12/1987 | Tacoma | WA | Daniel Lynam | 7 |
| 45 | 9/25/1987 | Elkland | MO | James Schnick | 7 |
| 46 | 12/30/1987 | Algona | IA | Robert Dreesman | 6 |
| 47 | 2/16/1988 | Sunnyvale | CA | Richard Farley | 7 |
| 48 | 9/14/1989 | Louisville | KY | Joseph Wesbecker | 8 |
| 49 | 6/18/1990 | Jacksonville | FL | James Pough | 9 |
| 50 | 1/26/1991 | Chimayo | NM | Ricky Abeyta | 7 |
| 51 | 8/9/1991 | Waddell | AZ | Jonathan Doody and Alessandro Garcia | 9 |
| 52 | 10/16/1991 | Killeen | TX | George Hennard | 23 |
| 53 | 11/7/1992 | Morro Bay and Paso Robles | CA | Lynwood Drake | 6 |
| 54 | 1/8/1993 | Palatine | IL | James Degorski and Juan Luna | 7 |

| | | | | | |
|---|---|---|---|---|---|
| 55 | 5/16/1993 | Fresno | CA | Allen Heflin and Johnnie Malonkey | 7 |
| 56 | 7/1/1993 | San Francisco | CA | Gian Luigi Ferri | 8 |
| 57 | 12/7/1993 | Garden City | NY | Colin Ferguson | 6 |
| 58 | 4/20/1999 | Littleton | CO | Eric Harris and Dylan Klebold | 13 |
| 59 | 7/12/1999 | Atlanta | GA | Cyrano Marks | 6 |
| 60 | 7/29/1999 | Atlanta | GA | Mark Barton | 9 |
| 61 | 9/15/1999 | Fort Worth | TX | Larry Ashbrook | 7 |
| 62 | 11/2/1999 | Honolulu | HI | Byran Koji Uyesugi | 7 |
| 63 | 12/26/2000 | Wakefield | MA | Michael McDermott | 7 |
| 64 | 12/28/2000 | Philadelphia | PA | Shihean Black, Dawud Faruqi, Khalid Faruqi, and Bruce Veney | 7 |
| 65 | 8/26/2002 | Rutledge | AL | Westley Harris | 6 |
| 66 | 1/15/2003 | Edinburg | TX | Humberto Garza, Robert Garza, Rodolfo Medrano, and Juan Ramirez | 6 |
| 67 | 7/8/2003 | Meridian | MS | Douglas Williams | 6 |
| 68 | 8/27/2003 | Chicago | IL | Salvador Tapia | 6 |
| 69 | 3/12/2004 | Fresno | CA | Marcus Wesson and Sebhrenah Wesson | 9 |
| 70 | 11/21/2004 | Birchwood | WI | Chai Soua Vang | 6 |
| 71 | 3/12/2005 | Brookfield | WI | Terry Ratzmann | 7 |
| 72 | 3/21/2005 | Red Lake | MN | Jeffrey Weise | 9 |
| 73 | 1/30/2006 | Goleta | CA | Jennifer San Marco | 7 |
| 74 | 3/25/2006 | Seattle | WA | Kyle Huff | 6 |
| 75 | 6/1/2006 | Indianapolis | IN | James Stewart and Desmond Turner | 7 |
| 76 | 12/16/2006 | Kansas City | KS | Hersel Isadore | 6 |
| 77 | 4/16/2007 | Blacksburg | VA | Seung Hui Cho | 32 |
| 78 | 10/7/2007 | Crandon | WI | Tyler Peterson | 6 |
| 79 | 12/5/2007 | Omaha | NE | Robert Hawkins | 8 |
| 80 | 12/24/2007 | Carnation | WA | Michele Anderson and Joseph McEnroe | 6 |
| 81 | 2/7/2008 | Kirkwood | MO | Charles Lee Thornton | 6 |
| 82 | 9/2/2008 | Alger | WA | Isaac Zamora | 6 |
| 83 | 12/24/2008 | Covina | CA | Bruce Pardo | 8 |
| 84 | 1/27/2009 | Los Angeles | CA | Ervin Lupoe | 6 |
| 85 | 3/10/2009 | Kinston, Samson, and Geneva | AL | Michael McLendon | 10 |
| 86 | 3/29/2009 | Carthage | NC | Robert Stewart | 8 |
| 87 | 4/3/2009 | Binghamton | NY | Jiverly Wong | 13 |
| 88 | 11/5/2009 | Fort Hood | TX | Nidal Hasan | 13 |
| 89 | 1/19/2010 | Appomattox | VA | Christopher Speight | 8 |
| 90 | 8/3/2010 | Manchester | CT | Omar Thornton | 8 |
| 91 | 1/8/2011 | Tucson | AZ | Jared Loughner | 6 |
| 92 | 7/7/2011 | Grand Rapids | MI | Rodrick Dantzler | 7 |
| 93 | 8/7/2011 | Copley Township | OH | Michael Hance | 7 |
| 94 | 10/12/2011 | Seal Beach | CA | Scott Dekraai | 8 |
| 95 | 12/25/2011 | Grapevine | TX | Aziz Yazdanpanah | 6 |
| 96 | 4/2/2012 | Oakland | CA | One Goh | 7 |
| 97 | 7/20/2012 | Aurora | CO | James Holmes | 12 |
| 98 | 8/5/2012 | Oak Creek | WI | Wade Page | 6 |
| 99 | 9/27/2012 | Minneapolis | MN | Andrew Engeldinger | 6 |
| 100 | 12/14/2012 | Newtown | CT | Adam Lanza | 27 |
| 101 | 7/26/2013 | Hialeah | FL | Pedro Vargas | 6 |
| 102 | 9/16/2013 | Washington | DC | Aaron Alexis | 12 |
| 103 | 7/9/2014 | Spring | TX | Ronald Lee Haskell | 6 |
| 104 | 9/18/2014 | Bell | FL | Don Spirit | 7 |
| 105 | 2/26/2015 | Tyrone | MO | Joseph Jesse Aldridge | 7 |
| 106 | 5/17/2015 | Waco | TX | Undetermined | 9 |
| 107 | 6/17/2015 | Charleston | SC | Dylann Roof | 9 |
| 108 | 8/8/2015 | Houston | TX | David Conley | 8 |
| 109 | 10/1/2015 | Roseburg | OR | Christopher Harper-Mercer | 9 |
| 110 | 11/15/2015 | Palestine | TX | William Hudson | 6 |
| 111 | 12/2/2015 | San Bernardino | CA | Syed Rizwan Farook and Tashfeen Malik | 14 |

74   PART I: PROBLEM



Fig. 3.1. Cumulative Death Toll of Gun Massacres in the United States, 1966–2015. Source: Table 3.2.

| | 1966-1975 | 1976-1985 | 1986-1995 | 1996-2005 | 2006-2015 |
|---|---|---|---|---|---|
| Shootings | 17 | 22 | 18 | 15 | 39 |
| Deaths | 122 | 173 | 149 | 111 | 349 |

Fig. 3.2. Gun Massacres in the United States by Decade, 1966–2015. Source: Table 3.2.

A GROWING THREAT   75

Exhibit 24
Page 00875



Fig. 3.3. Annual Number of Gun Massacres in the United States, 1966–2015. Source: Table 3.2.



Fig. 3.4. Annual Death Toll of Gun Massacres in the United States, 1966–2015. Source: Table 3.2.

Exhibit 24
Page 00876

ER_3050

78   PART I: PROBLEM

**Table 3.3. Average Death Tolls of Gun Massacres in the United States by Ten-Year Period, 1966–2015.**

| Ten-Year Period | Average Death Toll Per Gun Massacre |
| --- | --- |
| 1966–1975 | 7.2 |
| 1976–1985 | 7.9 |
| 1986–1995 | 8.3 |
| 1996–2005 | 7.4 |
| 2006–2015 | 8.9 |

A breakdown of the data shows how this disturbing pattern came to be. Until 2015, there had never been a year with more than five gun massacres. In 2015, there were seven gun massacres. Moreover, the past decade has experienced more "five-plus-shooting-years" than any other decade (see figure 3.3). It's also the only decade with consecutive five-plus-shooting-years (2011 and 2012). When expanded to track four-plus-shooting-years, the past decade qualifies as the most disturbing ten-year-period, surpassing the next closest ten-year-period (1976–1985) by three additional years of four-plus gun massacres.

The past decade is also the only decade not to have had a year without a gun massacre. Every other decade under study had at least two years of reprieve from such heinous acts of gun violence—and the five-year period from 1994 to 1998 experienced no such shooting at all. In terms of lethality, the past decade again stands apart from the others. For instance, while there have been only five years that experienced fifty or more deaths as a result of gun massacres, four of those years were in the past decade (see figure 3.4). Indeed, 2015 is the deadliest year on record for murders resulting from gun massacres, with sixty-two combined fatalities. Furthermore, a comparison of the last two decades reveals an eight-fold increase in the number of double-digit fatality shootings (see table 3.4).

Between 1966 and 2015, the population of the United States has increased nearly 65 percent, from approximately 195 million people to over 320 million people. Yet even this demographic shift has failed to reverse the troubling trend in rampage violence, as evidenced by incidence rates, which assess the occurrence of attacks and fatalities

A GROWING THREAT   79

relative to the population in a given time. Over the past ten years, gun massacres have taken place at an unprecedented rate of one for roughly every eight million residents and deaths have been incurred at a rate that exceeds one fatality for every one million residents (see table 3.5). Even when accounting for population growth, the past decade still stands out as the worst ten-year period of the last fifty years, marked by a rising trajectory that doesn't bode well for the coming decade (see figure 3.5).

**Table 3.4. The Deadliest Mass Shootings in the United States, 1966–2015.**

| Death Toll | Date | Perpetrator(s) | City | State |
| --- | --- | --- | --- | --- |
| 32 | 4/16/2007 | Seung Hui Cho | Blacksburg | VA |
| 27 | 12/14/2014 | Adam Lanza | Newtown | CT |
| 23 | 10/16/1991 | George Hennard | Killeen | TX |
| 21 | 7/18/1984 | James Huberty | San Ysidro | CA |
| 14 | 8/1/1966 | Charles Whitman | Austin | TX |
| 14 | 8/20/1986 | Patrick Sherrill | Edmond | OK |
| 14 | 12/2/2015 | Syed Rizwan Farook and Tashfeen Malik | San Bernardino | CA |
| 13 | 9/25/1982 | George Banks | Wilkes-Barre | PA |
| 13 | 2/18/1983 | Kwan Fai Mak and Benjamin Ng | Seattle | WA |
| 13 | 4/20/1999 | Eric Harris and Dylan Klebold | Littleton | CO |
| 13 | 4/3/2009 | Jiverly Wong | Binghamton | NY |
| 13 | 11/5/2009 | Nidal Hasan | Fort Hood | TX |
| 12 | 7/20/2012 | James Holmes | Aurora | CO |
| 12 | 9/16/2013 | Aaron Alexis | Washington | DC |
| 11 | 3/30/1975 | James Ruppert | Hamilton | OH |
| 10 | 4/15/1994 | Christopher Thomas | Brooklyn | NY |
| 10 | 3/10/2009 | Michael McLendon | Kinston, Samson, and Geneva | AL |

At a time when modern emergency medicine can save the lives of most gunshot victims if they reach the hospital alive within the "golden hour," the death rate of mass casualty gun attacks should've gone down significantly in the past decade.[88] That this hasn't happened speaks to the danger mass shootings pose.

Exhibit 24
Page 00877
ER_3051

80 PART 1: PROBLEM

### Table 3.5. Ten-Year Incidence Rates for Gun-Massacre Attacks and Deaths, 1966–2015.

| Decade | Attack Rate | Death Rate |
|---|---|---|
| 1966–1975 | 0.08 | 0.59 |
| 1976–1985 | 0.10 | 0.76 |
| 1986–1995 | 0.07 | 0.59 |
| 1996–2005 | 0.05 | 0.39 |
| 2006–2015 | 0.13 | 1.12 |

Note: Rates are calculated using the mean population estimates for the United States (in millions) over the applicable ten-year periods.

Source: Attack and death tolls are drawn from table 3.2. Population data are drawn from United States Census Bureau, "Population Estimates," www.census.gov/popest/index.html (accessed May 3, 2016).

Above, I argued that high-fatality mass shootings are now in a distinct class. This becomes abundantly clear when gun massacres are compared to other common forms of homicide. The most recent decade of available data illustrates that, while most forms of homicide continue to decline, gun-massacre deaths are heading in the opposite trajectory (see figure 3.6). This presents a troubling mystery: Why are such deadly shooting sprees on the rise when most other homicides are on the wane? Equally baffling, this increase is occurring despite a steady decrease in gun-ownership rates (see figures 3.7 and 3.8).[89] Even if we allow for the fact that the absolute number of households with firearms has consistently held at around forty million over the last forty years, it is still fails to correlate with the upsurge in gun massacres.[90]

My data set, while unique, is limited by the exclusion of mass shootings that didn't result in at least six victims being murdered. Instances are that if the bar is lowered below a minimum of six deaths, the rate of occurrence is even more disturbing. Unfortunately, due in part to a funding prohibition enacted by Congress—at the urging of the National Rifle Association (NRA)—government agencies eschew research that would compile such data.[91] Frustrated by these restrictions, a group of social-media-savvy individuals launched a crowdsourcing experiment on Reddit to track every gun assault in the United States that resulted in four or more people being shot.[92]



Fig. 3.5. Ten-Year Incidence Rates for Gun-Massacre Attacks and Deaths, 1966–2015. Source: Table 3.5.

A GROWING THREAT 81

Exhibit 24
Page 00878

82   PART 1: PROBLEM









Fig. 3.6. Trends in Common Forms of Homicide, 2003–2012.

Note: The data represent the most recent decade of available data and indicate the cumulative number of such homicides per year. All data except for gun-massacre homicides are drawn from the Center for Disease Control WONDER Database (available at wonder.cdc.gov). Gun-massacre homicides are drawn from table 3.2.



Fig. 3.7. Comparison of Trends in Gun Massacres and Gun-Ownership Rates, 1966–2015.
Source: Table 3.2 and General Social Survey Data (1973–2014).

A GROWING THREAT   83

Exhibit 24
Page 00879

84                                                                                              PART I: PROBLEM



Fig. 3.8. Comparison of Trends in Gun-Massacre Deaths and Gun-Ownership Rates, 1966–2015.
Source: Table 3.2 and General Social Survey Data (1973–2014).

A GROWING THREAT          85

Table 3.6. Mass Shootings in the United States, 2013–2015.

| Number of Mass Shootings Resulting in | 2013 | 2014 | 2015 | Combined |
|---|---|---|---|---|
| 0 Deaths | 130 | 145 | 159 | 434 |
| 1 Death | 93 | 95 | 108 | 296 |
| 2 Deaths | 47 | 30 | 38 | 115 |
| 3 Deaths | 22 | 26 | 26 | 74 |
| 4 Deaths | 34 | 19 | 26 | 79 |
| 5 Deaths | 8 | 7 | 5 | 20 |
| 6 Deaths | 3 | 2 | 3 | 8 |
| 7 Deaths | 1 | 0 | 0 | 1 |
| 8 Deaths | 0 | 1 | 2 | 3 |
| 9 Deaths | 0 | 0 | 2 | 2 |
| 10 Deaths | 0 | 0 | 1 | 1 |
| 13 Deaths | 1 | 0 | ... | 1 |
| 16 Deaths | 0 | ... | 1 | 1 |
| Total Shootings | 339 | 325 | 371 | 1,035 |
| Total Deaths | 447 | 364 | 468 | 1,300 |

Note: The Mass Shooting Tracker defines mass shootings as any gun attack where four or more people, including the shooter(s), are shot. As a result, the death tolls in this table include gunmen, if they died during the perpetration of their crimes.

Source: www.massshootingtracker.org.

In its first year (2013), the Mass Shooting Tracker logged a total of 339 multiple-victim shootings (see table 3.6). This dropped by fourteen, to 325 incidents, the following year. By 2015, however, the total number of mass shootings had jumped to 371, surpassing the rate of one per day. A review of the three-year period indicates that 1,300 people lost their lives during the commission of these 1,035 gun attacks. That's an annual average of 433 fatalities—a far cry from the "18 lives a year" gun-rights activist Emily Miller tells us die on average in mass shootings in the United States. What's arguably most alarming is that, in all three years, the number of lethal incidents in the Mass Shooting Tracker's data set exceeds the number of nonlethal inci-

Exhibit 24
Page 00880

ER_3054

dents. Indeed, on an annual average, six in ten mass shootings result in at least one death, and three in ten result in multiple deaths.

\* \* \*

Remember John Fund? He's the conservative columnist who claimed that, for Americans, the odds of dying in a mass shooting are equal to those of being struck by lightning. Well, not so. According to the National Weather Service, an average of 267 people are struck by lightning in the United States every year.[25] That's far less than the 433 individuals who lose their lives annually in a mass shooting. In fact, in any given year, the odds of being struck by lightning are about one in 1.2 million, whereas the odds of dying in a multiple-victim gun attack are about one in 700,000. And those are the chances of dying in a mass shooting. If we expand this calculation to the number of people who are shot in a mass shooting every year—so as to make a true apples-to-apples comparison—the odds increase significantly.

Since we're putting mass shootings in a proper perspective, let's add one final comparison to what most Americans consider to be the gravest threat to their security: terrorism.[24] Certainly, given the way politicians in Washington are always carrying on about groups like al Qaeda and ISIS, you might think that you're more likely to be killed by a terrorist than by a rampage gunman. But the opposite is true. In the ten years immediately following 9/11, terrorists killed twenty-seven individuals in the United States.[25] That's the same number of people Adam Lanza killed in Newtown. In other words, what terrorists took a decade to accomplish, a single, well-armed individual on a gun rampage pulled off in one morning.[26]

The bottom line is that, no matter how you crunch the numbers, the outcome is consistently the same: in the past decade, no single incident of violence has killed more people in the United States than the mass shooting. Quite simply, the most credible violent threat to American society currently comes out of the barrel of a gun—and, unfortunately, the threat is growing.

# PART 2

# PROBE

Exhibit 24
Page 00881

## Table 6.1. Comparison of Firearm Capabilities.

| Firearm | Average Shooter | | | |
| --- | --- | --- | --- | --- |
| | Six-Shot Revolver | Semi-Auto Handgun (Ten-Round Magazine) | Semi-Auto Handgun (Thirty-Round Magazines) | Assault Rifle (One-Hundred-Round Drums) |
| Firing Rate | 1 Shot per Second | 2 Shots per Second | 2 Shots per Second | 2 Shots per Second |
| Reload Rate | 20 Seconds | 10 Seconds | 15 Seconds | 50 Seconds |
| Time Shooting | 18 Seconds | 20 Seconds | 40 Seconds | 20 Seconds |
| Time Not Shooting | 42 Seconds | 40 Seconds | 20 Seconds | 10 Seconds |
| Bullets Fired | 18 Rounds | 40 Rounds | 80 Rounds | 100 Rounds |

| Firearm | Expert Shooter | | | |
| --- | --- | --- | --- | --- |
| | Six-Shot Revolver | Semi-Auto Handgun (Ten-Round Magazines) | Semi-Auto Handgun (Thirty-Round Magazines) | Assault Rifle (One-Hundred-Round Drums) |
| Firing Rate | 1.5 Shots per Second | 3 Shots per Second | 3 Shots per Second | 3 Shots per Second |
| Reload Rate | 10 Seconds | 5 Seconds | 5 Seconds | 10 Seconds |
| Time Shooting | 20 Seconds | 25 Seconds | 40 Seconds | 50 Seconds |
| Time Not Shooting | 40 Seconds | 35 Seconds | 20 Seconds | 10 Seconds |
| Bullets Fired | 24 Rounds | 75 Rounds | 120 Rounds | 150 Rounds |

### THE AURORA THEATER MASSACRE ARSENAL

Following the Aurora theater massacre, the Colorado legislature enacted three sweeping gun-control bills that, among other things, banned the sale of ammunition magazines with a capacity larger than fifteen bullets. Avid Second Amendment advocates revolted against these laws. In a blunt attempt to punish two major proponents of these public-safety measures, the gun-rights movement organized a recall campaign. On September 10, 2013, State Senate President John Morse and State Senator Angela Giron—both Democrats—were removed from office and replaced by pro-gun Republicans.[106] State Senator Bernie Herpin was one of those who ascended to office in the wake of the recall, replacing Morse. In February 2014,

during a Senate committee hearing on a bill Herpin sponsored to repeal the ban on extended-capacity magazines, one of his Democratic colleagues questioned the utility of his proposal: "My understanding is that James Holmes bought his 100-round capacity magazine legally. So in fact, [the 2013 high-capacity magazine ban] would have stopped James Holmes from purchasing a 100-round magazine. I was wondering if you agree with me."[109] Herpin, in what was clearly a poorly thought-out response, replied: "As it turned out, because it jammed. If he had four, five, six 15-round magazines, there's no telling how much damage he could have done until a good guy with a gun showed up." Herpin was trying to suggest that the larger the capacity of the magazine, the more likely it is that the magazine might jam. But to the families of the victims, Herpin's suggestion that the public should put its faith in product defects as a means to ensure its safety came across as stupid and insensitive.

The AR-15 that James Holmes fired at the Century 16 multiplex did, in fact, jam. But not before it discharged sixty-five rounds. As we have already seen, one-hundred-round drums provide greater kill potential than smaller-capacity magazines. Had Holmes—at best, an average shooter by his own admission—been using thirty-round magazines, it would have provided theater patrons with approximately two additional ten-second windows to escape or to confront Holmes before he could have gotten off sixty-five shots.[108] And had he been using ten-round magazines, the shooting downtime would have increased to six ten-second windows—a full minute.

Contrary to the suggestion floated by Herpin, the one-hundred-round drum used by James Holmes played a critical role in making the Aurora theater massacre one of the highest-casualty mass shootings in American history.[109]

* * *

James Holmes's arsenal—particularly his polymer AR-15 assault rifle armed with a one-hundred-round drum—lends credence to the proposition that, as firearms become lighter and their ammunition capacities become larger, they become more lethal. But that's the

Exhibit 24
Page 00882

ER_3056

214   PART 2: PROBE

anecdotal takeaway from one gun massacre (albeit one that registered an extremely high casualty toll). What about the weapons used in other gun massacres?

If all firearms were equal, we would find that, on average, they produced similar outcomes, especially similar fatality tolls. In practice, however, that's not the case. After examining the firearms used in the 111 gun massacres in my data set, it's clear that there is a significant difference between attacks that involve semiautomatic weapons and those that do not. Those massacres where there was no evidence that the weapons used were semiautomatic firearms resulted, on average, in fewer deaths per attack. In fact, those high-fatality mass shootings accounted for 27 percent of the 111 incidents in my data set, but for only 23 percent of the 904 cumulative deaths resulting from those incidents (see table 6.2). On the other hand, gun massacres involving semiautomatic firearms produced, on average, higher death tolls. Semiautomatic firearm attacks accounted for 73 percent of all the incidents in my data set, but 77 percent of the fatalities resulting from those incidents. The conclusion is unambiguous: semiautomatic firearms, when used in mass shootings, increase the lethality of such attacks.[110]

Table 6.2. Percentage of Gun-Massacre Incidents and Cumulative Fatalities by Firearm Type.

| Gun Massacres between 1966 and 2015... | Percentage of All Incidents (N = 111) | Percentage of All Deaths (N = 904) | Difference (in Percentage) |
| --- | --- | --- | --- |
| ...Not Involving Semiautos | 27 | 23 | −4 |
| ...Involving Semiautos | 73 | 77 | +4 |
| ...Involving Assault Weapons | 25 | 29 | +4 |
| ...Involving LCMs | 47 | 55 | +8 |
| ...Involving Polymer Guns | 34 | 42 | +8 |
| ...Involving Assault Weapons + LCMs | 22 | 27 | +5 |
| ...Involving LCMs + Polymer Guns | 30 | 38 | +8 |
| ...Involving Polymer Assault Weapons + LCMs | 12 | 15 | +3 |

Note: There is no separate category for polymer assault weapons without extended-capacity magazines (ECMs) as nearly every gun massacre involving polymer assault weapons also involved ECMs.

GUNS KILL, SOME MORE THAN OTHERS   215

This finding is particularly troubling because, over the course of the past fifty years, semiautomatic firearms have become more prevalent in high-fatality mass shootings (see figure 6.1). Their use in gun massacres has consistently increased decade after decade. The shift is particularly drastic when the first ten-year period of the past fifty years is compared to the most recent ten-year period. During the period 1966–1975, semiautomatic firearms were involved in 47 percent of all gun massacres. Jump forward to the present and you'll see that they have been involved in 92 percent of all gun massacres that have occurred in the past ten years. A similar pattern exists in terms of deaths resulting from semiautomatic firearm use in high-fatality mass shootings (see figure 6.2). During the period 1966–1975, semiautomatic firearm massacres accounted for 48 percent of all gun-massacre fatalities. In the past ten years, they have accounted for 95 percent of fatalities. It's also worth noting that, forty to fifty years ago, the range in the average number of deaths per gun massacre between those involving semiautomatic weapons and those involving such weapons was relatively close: 7.1–7.3 (see figure 6.3). In the past decade, however, that difference has grown to its widest margin, with the former producing, on average, six fatalities per attack and the latter over nine deaths. In fact, in the past twenty years, the average death toll for incidents not involving semiautomatic firearms has bottomed out at six deaths—the minimum number of fatalities required for a shooting to meet the definition of a gun massacre.[111]

As discussed in chapter 3, gun massacres escalated extensively between the time periods 1966–1975 and 1976–1985. Afterward, they waned in both occurrence and lethality, reaching new lows in the 1990s, before spiking to unprecedented levels in the past ten years (see table 6.3). The use of semiautomatic firearms in such incidents has also grown to unprecedented levels of late.

Following the Aurora massacre, assault weapons seemed to bear the brunt of the blame. But, as I argued earlier in this chapter, polymer firearms and extended-capacity magazines are also considerably responsible for the increased bloodshed. A review of the data supports this assessment. In fact, the two factors that have correlated with the highest differential in death tolls are polymer guns and large-capacity magazines (see table 6.2). Assault weapons, on their own, were involved

Exhibit 24
Page 00883

ER_3057

216   PART 2: PROBE



Fig. 6.1. Number of Gun Massacres per Decade (Massacres Involving Semiautomatic Firearms versus Massacres Not Involving Semiautomatic Firearms).



Fig. 6.2. Number of Deaths Resulting From Gun Massacres per Decade (Massacres Involving Semiautomatic Firearms versus Massacres Not Involving Semiautomatic Firearms).

GUNS KILL, SOME MORE THAN OTHERS   217

Exhibit 24
Page 00884

218   PART 2: PROBE



| | 1966-1975 | 1976-1985 | 1986-1995 | 1996-2005 | 2006-2015 |
|---|---|---|---|---|---|
| ■ Non-Semiautomatic Firearms | 7.1 | 7.2 | 6.6 | 6 | 6 |
| ▨ Semiautomatic Firearms | 7.3 | 8.3 | 9.4 | 7.6 | 9.2 |

Fig. 6.3. Average Number of Deaths per Gun Massacre by Decade
(Massacres Involving Semiautomatic Firearms versus Massacres Not Involving Semiautomatic Firearms).

## Table 6.3. Gun-Massacre Incidents and Fatalities by Firearm Type.

GUNS KILL, SOME MORE THAN OTHERS   219

| | 1966–1975 | 1976–1985 | 1986–1995 | 1996–2005 | 2006–2015 | Total |
|---|---|---|---|---|---|---|
| **All Gun Massacres** | | | | | | |
| Incidents | 17 | 22 | 18 | 15 | 39 | 111 |
| Deaths | 122 | 173 | 149 | 111 | 349 | 904 |
| Average Death Toll | 7.2 | 7.9 | 8.3 | 7.4 | 8.9 | 8.1 |
| **Gun Massacres Not Involving Semiautomatics** | | | | | | |
| Incidents | 9 | 9 | 7 | 2 | 3 | 30 |
| Deaths | 64 | 65 | 46 | 18 | 30 | 205 |
| Average Death Toll | 7.1 | 7.2 | 6.6 | 6.0 | 6.8 | |
| **Gun Massacres Involving Semiautomatics** | | | | | | |
| Incidents | 8 | 13 | 13 | 13 | 36 | 81 |
| Deaths | 58 | 108 | 103 | 99 | 331 | 699 |
| Average Death Toll | 7.3 | 8.3 | 9.4 | 7.6 | 9.2 | 8.6 |
| **Gun Massacres Involving ECMs** | | | | | | |
| Incidents | 3 | 5 | 9 | 2 | 10 | 28 |
| Deaths | 26 | 58 | 44 | 26 | 110 | 264 |
| Average Death Toll | 8.7 | 9.7 | 7.3 | 8.7 | 11.0 | 9.4 |
| **Gun Massacres Involving Assault Weapons** | | | | | | |
| Incidents | 6 | 19 | 38 | 61 | 110 | 240 |
| Deaths | | | | | | |
| Average Death Toll | 6.0 | 9.5 | 7.3 | 8.7 | 11.0 | 10.0 |
| **Gun Massacres Involving Polymer Guns** | | | | | | |
| Incidents | 1 | 2 | 3 | 7 | 21 | 33 |
| Deaths | 6 | 19 | 38 | 52 | 226 | 341 |
| Average Death Toll | 6.0 | 9.5 | 12.7 | 8.7 | 10.8 | 10.3 |
| **Gun Massacres Involving Assault Weapons + ECMs** | | | | | | |
| Incidents | 1 | 2 | 3 | 2 | 7 | 13 |
| Deaths | 6 | 19 | 38 | 52 | 87 | 140 |
| Average Death Toll | 6.0 | 9.5 | 12.7 | 13.0 | 10.8 | 12.8 |

Note: There is no separate category for polymer assault weapons without extended-capacity magazines (ECMs), as every gun massacre involving polymer assault weapons also involved ECMs.

Exhibit 24
Page 00885

ER_3059

in only 25 percent of all gun massacres from the past fifty years, and those incidents accounted for 29 percent of all gun-massacre fatalities. The bigger impact results from using polymer guns and high-capacity magazines. The former were employed in 54 percent of all gun massacres, yet those attacks accounted for 42 percent of all gun-massacre fatalities. That's an 8 percent differential. The latter resulted in an identical percentage differential (47 percent of all massacres and 55 percent of all fatalities), although the larger overall tallies provide reason to find the use of extended-capacity magazines even more disconcerting than the use of polymer firearms.

One of the impressions that someone might form after hearing critics fault assault weapons like the AR-15 is that these potent firearms are used fairly often to perpetrate gun massacres. The data, however, do not support such a conclusion. On the contrary, assault weapons were used in only a quarter of the gun massacres from the past fifty years (see tables 6.2 and 6.3). Even in the past ten years, they were used in only ten attacks (again roughly 25 percent of all attacks in the past decade).

The same can be said for polymer guns and extended-capacity magazines. They, too, were involved in less than half of all gun massacres from the past fifty years (see tables 6.2 and 6.3). Nonetheless, unlike assault weapons, high-capacity magazines and polymer guns stand apart in their prevalence of late. Assault weapons have only been used in roughly one-fourth of all gun massacres since 2006. Extended-capacity magazines and polymer guns, on the other hand, have been used in about two-thirds of all such gun massacres. Indeed, a comparison with the earliest and most recent ten-year periods of my data set shows that, while the use of assault weapons increased by a factor of nearly three, the use of large-capacity magazines has increased by a factor of nearly twenty-one, and the use of polymer firearms has increased by a factor of twenty-five.

Another relationship worth investigating is the frequency and lethality of these three elements—assault weapons, extended-capacity magazines, and polymer firearms—when employed in combination. Again, across the entire fifty-year time frame, their use remains limited, but their impact lethal (see tables 6.2 and 6.3). This becomes indisputable when the different firearms are assessed by the average number of fatalities that result when they are involved in gun massacres (see figure 6.4). In general, the average death toll in gun massacres since 1966 has been 8.1. When gunmen don't shoot their victims with semiautomatic firearms, this average falls 17 percent to 6.8 deaths per incident.[19] The employment of semiautomatic firearms makes the average death toll per incident rise 5 percent to 8.6. The jumps are more profound when the shootings are broken down into those involving assault weapons, extended-capacity magazines, and polymer guns. Each of these elements result in, respectively, 16 percent, 17 percent, and 22 percent increases. The largest growth in average death toll, however, results when mass shooters attack with polymer assault weapons armed with extended-capacity magazines—all three elements in one. Those instances result in an average of 10.8 deaths per attack—a 35 percent increase from the 8.1 baseline.

When the comparisons are limited to just the past decade—when gun massacres almost always involved semiautomatic firearms—the most lethal outcome again results from attacks involving all three elements: polymer assault weapons armed with extended-capacity magazines. In the past ten years, the increase from the baseline average of number deaths per incident soars from 8.9 to 12.8 (see figure 6.4). That's an enormous 39 percent upsurge in the average number of fatalities when all three elements are involved in a gun massacre—and at a time when modern medicine has drastically reduced the likelihood of dying from gunshot wounds, no less.

One final question worth addressing: Do gun massacres employing more than one firearm or involving more than one perpetrator result in higher death tolls? It makes sense that if you have more weapons, you can produce more bloodshed. And the data support such a conclusion as it pertains to high-fatality mass shootings (see table 6.4). The average death toll when a perpetrator is armed with only a single weapon is 6.9 fatalities per incident (see table 6.5). That number jumps to 9.2 fatalities per incident when a gunman is armed with multiple firearms. That's higher than the average death toll for all 111 incidents in the data set but less than the average death toll resulting from incidents involving assault weapons, extended-capacity magazines, or polymer firearms (compare tables 6.3 and 6.5). A breakdown of the data clearly establishes that, while mass shootings involving two or more guns often

Exhibit 24
Page 00886

ER_3060



Fig. 6.4. Average Number of Fatalities per Gun Massacre by Firearm Type (1966–2015 Compared to 2006–2015). Note: There is no separate category for polymer assault weapons without extended-capacity magazines (ECMs) as every gun massacre involving polymer assault weapons also involved ECMs.

result in increased carnage, the impact is driven more by the use of enhanced weapons (especially polymer guns equipped with extended-capacity magazines) than by the use of multiple firearms.

Table 6.4. Percentage of Gun-Massacre Incidents and Cumulative Fatalities by Number of Firearms and Shooters.

| Gun Massacres between 1946 and 2015... | Percentage of All Incidents (N = 111) | Percentage of All Deaths (N = 941) | Difference (in Percentage) |
| --- | --- | --- | --- |
| ...Involving Only One Gun | 47 | 40 | -7 |
| ...Involving Multiple Guns | 53 | 60 | +7 |
| ...Involving Only One Shooter | 86 | 86 | 0 |
| ...Involving Multiple Shooters | 14 | 14 | 0 |

Unlike the sizable difference that results from using multiple weapons, gun massacres involving more than one shooter don't result in significantly more fatalities (see table 6.4). When gun massacres are perpetrated by more than one gunman, the increase in fatalities per incident increases only 2 percent—from 8.1 to 8.3 fatalities per incident (see table 6.6).[18] Even more surprising, massacres involving two gunmen have produced higher average death tolls than those involving three or more gunmen. The former have claimed an average of 9.1 lives per attack, whereas the latter have claimed 6.3 lives per attack. This suggests that the number of perpetrators, per se, doesn't significantly impact the extent of the bloodshed.

* * *

For those of you who are not data wonks, all of the statistics in the previous subsection might have left you a bit overwhelmed. The picture they paint is, nevertheless, pretty simple and straightforward. Most gun massacres involve semiautomatic firearms. The perpetrators of these murder sprees have not historically relied on assault rifles to pull off their attacks. Nor have they turned to polymer guns and large-capacity

Exhibit 24
Page 00887

ER_3061

**224   PART 2: PROBE**

### Table 6.5. Gun-Massacre Incidents and Fatalities by Number of Firearms.

| | Total |
|---|---|
| **All Gun Massacres** | |
| Incidents | 111 |
| Deaths | 904 |
| Average Death Toll | 8.1 |
| **Gun Massacres Involving Only One Gun** | |
| Incidents | 52 |
| Deaths | 359 |
| Average Death Toll | 6.9 |
| **Gun Massacres Involving Multiple Guns** | |
| Incidents | 59 |
| Deaths | 545 |
| Average Death Toll | 9.2 |
| **Gun Massacres Involving Multiple Guns But Not Involving Semi-Autos** | |
| Incidents | 13 |
| Deaths | 92 |
| Average Death Toll | 7.1 |
| **Gun Massacres Involving Multiple Guns and Semi-Autos** | |
| Incidents | 46 |
| Deaths | 453 |
| Average Death Toll | 9.8 |
| **Gun Massacres Involving Multiple Guns and Assault Weapons** | |
| Incidents | 20 |
| Deaths | 204 |
| Average Death Toll | 10.2 |
| **Gun Massacres Involving Multiple Guns and ECMs** | |
| Incidents | 30 |
| Deaths | 338 |
| Average Death Toll | 11.2 |
| **Gun Massacres Involving Multiple Guns and Polymer Guns** | |
| Incidents | 22 |
| Deaths | 257 |
| Average Death Toll | 11.7 |
| **Gun Massacres Involving Multiple Guns and Assault Weapons + ECMs** | |
| Incidents | 16 |
| Deaths | 180 |
| Average Death Toll | 11.3 |
| **Gun Massacres Involving Multiple Guns and ECMs + Polymer Guns** | |
| Incidents | 19 |
| Deaths | 236 |
| Average Death Toll | 12.4 |
| **Gun Massacres Involving Multiple Guns and Polymer Assault Weapons + ECMs** | |
| Incidents | 9 |
| Deaths | 108 |
| Average Death Toll | 17.0 |

Note: There is no separate category for polymer assault weapons without extended-capacity magazines (ECMs) as every gun massacre involving polymer assault weapons also involved ECMs.

**GUNS KILL, SOME MORE THAN OTHERS   225**

magazines. But—and this is a huge *but*—when they have utilized these types of guns, they have generated far greater bloodshed. The critical elements that seem to compound the carnage are, in particular, plastic weapons and large-scale ammunition-feeding devices. Assault weapons certainly contribute to the escalation of death tolls, but not quite as much as polymer guns and extended-capacity magazines do. That said, the most lethal outcomes tend to result, on average, when rampage gunmen use polymer assault weapons loaded with extended-capacity magazines. No doubt, James Holmes's decision to rely predominantly on a lightweight, ergonomically designed, high-capacity weapon made it extremely easy for him to achieve his self-professed goal of shooting "as many people as possible."[14] As it turned out, this amounted to upwards of seventy people in under three minutes.

### Table 6.6. Gun-Massacre Incidents and Fatalities by Number of Shooters.

| | Total |
|---|---|
| **All Gun Massacres** | |
| Incidents | 111 |
| Deaths | 904 |
| Average Death Toll | 8.1 |
| **Gun Massacres Involving Only One Shooter** | |
| Incidents | 96 |
| Deaths | 779 |
| Average Death Toll | 8.1 |
| **Gun Massacres Involving Multiple Shooters (Two or More Shooters)** | |
| Incidents | 15 |
| Deaths | 125 |
| Average Death Toll | 8.3 |
| **Gun Massacres Involving Exactly Two Shooters** | |
| Incidents | 10 |
| Deaths | 91 |
| Average Death Toll | 9.1 |
| **Gun Massacres Involving More Than Two Shooters** | |
| Incidents | 5 |
| Deaths | 34 |
| Average Death Toll | 6.8 |

Exhibit 24
Page 00888

ER_3062

## 238    PART 3: PRESCRIPTION

The above vignettes illustrate that there is a preferred way of reducing threats to public safety: denying weapons to potential perpetrators. By preventing high-risk individuals from acquiring dangerous weapons or by hindering them from employing such weapons, government can keep its citizens safe.

★ ★ ★

In a way, homeland security is akin to George Orwell's *Animal Farm*. All strategies proposed by the trinity of violence are equal, but some are more equal than others. It's not that dissuasion and defense aren't valuable. They are. After all, we still criminalize bombings and erect barricades in front of important structures. But laws, on their own, often fail to dissuade homicidal and suicidal individuals. And blast barriers can't be erected everywhere. There are just too many potential perpetrators and targets for these strategies to be effective on their own. In open societies where resources are limited, securing public safety depends primarily on a strategy of denial to break the trinity of violence.

★ ★ ★

The success of the United States in countering aviation attacks and bombings by restricting access to, and use of, weapons raises an important question: If the deprivation of weapons works in these areas, couldn't it also serve as an effective strategy in reducing gun violence?

### THE AMERICAN EXPERIENCE

The United States has been exemplary in safeguarding its citizenry from a host of deadly threats: accidents, environmental hazards, pandemics, hijackings, bombings, even weapons of mass destruction. Through successful regulation of hazardous products—almost all with little to no public controversy—the different levels of government all work hand in hand to keep us safe from a plethora of dangers.[?] But when it comes to protecting us from gun violence, the government's record has been abysmal.[?] In fact, the United States is

## BREAKING THE TRINITY    239

in a class all by itself. No other advanced, Western democracy experiences the magnitude of gun violence that presently afflicts American society.[28] This is particularly true when it comes to mass shootings.[29]

★ ★ ★

The United States does little to regulate firearms, especially at the federal level.[30] While it goes to great lengths to restrict access to WMDs and IEDs, the same can't be said for its efforts to keep firearms out of the hands of high-risk individuals. Indeed, the American experience with gun control nationwide is so limited that it can actually be chronicled in a few bullet points:

- The National Firearms Act of 1934: Heavily regulated machine guns, short-barrel rifles and shotguns, and silencers.
- The Federal Firearms Act of 1938: Established a federal licensing system to regulate manufacturers, importers, and dealers of firearms.
- The Omnibus Crime Control and Safe Streets Act of 1968: Prohibited anyone under twenty-one years of age from purchasing a handgun.
- The Gun Control Act of 1968: Required that all interstate firearms transfers or sales be made through a federally licensed firearms dealer and prohibited certain categories of people—felons (indicted or convicted), fugitives, drug abusers, mentally ill persons (as determined by adjudication), illegal aliens, dishonorably discharged servicemen, US-citizenship renouncers, and domestic abusers—from possessing firearms.[31]
- The Firearm Owners Protection Act of 1986: Barred the purchase or transfer of automatic weapons without government approval.
- The Undetectable Firearms Act of 1988: Required that all firearms have at least 3.7 oz. of metal that can be detected by a metal detector.
- The Gun-Free School Zones Act of 1990: Criminalized possession or discharge of a firearm in a school zone.
- The Brady Handgun Violence Prevention Act of 1993: Required

Exhibit 24
Page 00889

ER_3063

240    PART 3: PRESCRIPTION

that anyone attempting to purchase a firearm from a federally licensed dealer pass a background check.[32]

• The Federal Assault Weapons Ban of 1994: Banned the sale and possession of semiautomatic assault weapons and extended-capacity magazines not grandfathered prior to the enactment of the law.[33]

Of all of these measures, the National Firearms Act of 1934 and the Assault Weapons Ban of 1994 (AWB) were the only ones instituted primarily in an effort to reduce the carnage of mass shootings. The former was passed in response to a series of bloody gangland executions, including the infamous 1929 St. Valentine's Day massacre in Chicago.[34] While there are still machine guns in circulation, the National Firearm Act, in conjunction with the Firearm Owners Protection Act of 1986, sharply cut the availability of machine guns, which likely explains the complete elimination of massacres perpetrated with such automatic-fire weapons.

Like the National Firearms Act, the AWB was introduced following several high-profile mass shootings in the early 1990s: the Luby's restaurant, 101 California Street office complex, and Long Island Railroad train car massacres.[35] Signed into law by President Bill Clinton, the AWB went into effect on September 13, 1994. At the insistence of the gun-rights lobby, however, the bill contained a ten-year sunset provision. As Congress never renewed the ban, it automatically expired on September 13, 2004.

The decade the law was in effect nonetheless resulted in a unique experiment, allowing us to discern what impact, if any, the ban had on gun violence in general and mass shootings in particular. As to the former, the academic consensus seems to be that the AWB had a minimal impact on reducing violent crime.[36] This hardly comes as a surprise. After all, most crimes don't involve assault weapons. The real test should be: Did it succeed in its intended purpose of reducing rampage violence? The answer is a resounding yes.

Let's take a closer look.

The best way to assess the impact of something is to conduct what, in social science, we commonly refer to as a time-series analysis. Basically, that's a fancy name for a before-and-after test. Figures 7.1



Fig. 7.1. Gun Massacres Before, During, and After the Assault Weapons Ban of 1994.
Note: The lines in the graph demarcate the start and end points of the Assault Weapons Ban, which was in effect from September 13, 1994, through September 12, 2004. The data are drawn from Table 3.2.

BREAKING THE TRINITY    241

Exhibit 24
Page 00890

ER_3064





| | Decade Before AWB | Decade During AWB | Decade After AWB |
|---|---|---|---|
| ■ Incidents | 19 | 12 | 34 |
| ▨ Deaths | 155 | 89 | 302 |

Fig. 7.2. Gun Massacres by Decade Before, During, and After the Assault Weapons Ban of 1994.
Note: The Assault Weapons Ban was in effect from September 13, 1994, through September 12, 2004.
The data are drawn from Table 3.2.

242   PART 3: PRESCRIPTION

and 7.2 provide a look at the before-and-after pictures. In the decade prior to the enactment of the AWB, the United States experienced nineteen gun massacres that resulted in 155 cumulative deaths, for an average death toll of 8.2 fatalities per incident. During the ten-year period that the AWB was in effect, the numbers declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident.[57] What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.[58] Since 1966, the longest streaks without a gun massacre prior to era of the AWB were two instances of consecutive years (1969–1970 and 1979–1980).[59] Then, all of a sudden, from September 1994 to April 1999, the country experienced a long calm. As further evidence of the AWB's effectiveness, once it expired, rampages returned with a vengeance. In the ten years after the ban, the number of gun massacres nearly tripled to thirty-four incidents, sending the total number of deaths skyrocketing to 302, for an average of 8.9 fatalities per incident.[60] These numbers paint a clear picture: America's experiment, while short-lived, was also extremely successful.[61]

## ZEROING OUT GUN MASSACRES

The biggest takeaway from America's experience with a ban on assault weapons and extended-capacity magazines is that gun-control legislation can save lives. But is there a way to get to zero? Is there a way to eliminate gun massacres once and for all? For that, we have to look overseas for insights.

One of the biggest obstacles to successful gun control is the ability to transport firearms across open, contiguous borders. In the United States, it's a problem that allows guns to flow freely from states with lax laws into states with strict laws. A common complaint frequently leveled by elected officials in places like California, Illinois, Maryland, New York, and Massachusetts is that people just need to drive across a state line and they can readily obtain firearms that they can then easily—if perhaps illegally—bring back into their jurisdictions.[62] That

BREAKING THE TRINITY   243

Exhibit 24
Page 00891

**256 PART 3: PRESCRIPTION**

If history is a guide, then it seems likely that the attack on Sandy Hook is the start of the next major reform in gun safety. What is argu-ably the most disturbing shooting in American history kick-started a national dialogue on firearms and it prompted President Obama's Now Is the Time initiative for reducing the carnage of rampage vio-lence. What we don't know is what will be the subsequent tragedy likely jolts Congress out of its complacency. But sadly it will likely take another gun massacre on par with Newtown before change is effected.

As those who fought for automobile and gun safety in the past can attest, now might not be the time, but soon it will be.

## THE WAY FORWARD

Of all of the criticisms that President Obama's Now Is the Time agenda continues to face is that, considering it was a plan occasioned by the Newtown massacre, its implementation would likely have not stopped Adam Lanza's attack.[35] Recalling the three main com-ponents of the initiative—universal background checks, an assault weapons ban, and a crackdown on illegal gun trafficking and straw purchases—opponents note that none of these would've kept Lanza from getting his hands on firearms. For starters, the guns used in the attack were all legally acquired by his mother after she passed a background check. Moreover, while an assault weapons ban might stem the manufacture of certain military-style rifles in the future, the president's current proposal (like the 1994 ban) would grandfather older models already in circulation, meaning that the AR-15 used by Lanza would have been legal. And, as the AR-15 was not straw-purchased for him, tighter enforcement of gun-trafficking laws also would have not prevented the Sandy Hook slayings.

The Obama administration's plan is a good starting point—espe-cially for purposes of curbing gun violence in general. There are obviously scores of firearms that are employed by criminals that have been obtained without background checks or through illegal trans-actions.[36] In addition, while closing the gun-show loophole wouldn't have kept firearms out of Adam Lanza's hands, other rampage

**THE BAD MAN'S AWE 257**

gunmen like the Columbine killers, who exploited this loophole, would have been prevented from acquiring weapons.[37] Wanting to prevent another circumvention of the Brady Act is certainly a wise policy position. Furthermore, going forward, a ban on assault weapons—even one with gaping loopholes—is still likely to stem some of the bloodshed of rampage violence, as the 1994 AWB did. So, no matter how you see it, the president's proposals are, overall, solid ideas.

However, if the federal government is serious about addressing mass shootings, it must do more. That means instituting gun-safety measures that will go well beyond those that form the centerpiece of the Now Is the Time initiative. Toward this end, there are eight reforms that can be powerful forces in breaking the trinity of rampage violence through weapons deprivation.

1. *Banning and buying back all extended-capacity magazines.* Some gun-control advocates might envision an America where all assault weapons—and perhaps all polymer guns—are banned. Given that there's currently at least one gun in circulation for every American in the population, this is a pipe dream.[38] But there is one measure—controversial as it may be—that, if it were to be implemented, would sharply curtail rampage vio-lence: a ban on extended-capacity magazines. Recall from chapter 6, the factor most associated with high death tolls in gun massacres is the use of a magazine holding more than ten bullets. If such magazines were completely removed from cir-culation, the bloodshed would be drastically reduced. Nothing facilitates a shooter's ability to spray people with bullets more than being armed with a firearm equipped with twenty, thirty, and, in the case of James Holmes, one hundred bullets. No one needs that kind of capability. Not even for self-defense.[39]

   To do this, however, would entail more than just a ban on extended-capacity magazines. It would require a mandatory buy-back program, like Australia's, that would recoup maga-zines that were not retrofitted to a ten-round cap. Bans are sub-optimal if prohibited items are grandfathered, allowing those already possessed by lawful owners to remain in circulation. At

Exhibit 24
Page 00892
ER_3066

usatoday.com/story/news/nation/2013/12/03/fbi-mass-killing-data-inaccurate/3666803 (accessed December 16, 2014).

68. Jason Kissner, "The Sandy Hook School Massacre and FBI Data Anomalies," *Global Research Newsletter*, September 27, 2014, http://www.globalresearch.ca/the-sandy-hook-school-massacre-and-fbi-data-anomalies/5404658 (accessed April 30, 2015).

69. From 1976 to 2011, eighty-seven gun massacres resulting in the murder of four or more victims were cataloged in the SHR data sets. Of those, twenty-three were erroneous. That means only sixty-four of the high-fatality mass shootings in SHR data sets were verifiable. That's an error rate of 26 percent. But that speaks only to erroneous incidents entered into the system. There were also nineteen mass gun massacres I documented in table 3.2 that were omitted from the SHR data sets. When those missing incidents are accounted for, the error rate jumps to 49 percent. In other words, the accuracy rate for gun massacres in the SHR data sets is only 60 percent. Similarly, *USA Today*, in its own examination of mass killings since 2006, found that the SHR data sets had an accuracy rate of only 57 percent. Meghan Hoyer, "In FBI Murder Data, Mass Killings Often Go Missing," *USA Today*, September 10, 2014, http://www.usatoday.com/story/news/nation/2014/09/10/mass-killings-missing-data/12990815 (accessed December 16, 2014).

In all fairness, Fox has acknowledged the limitations of working with SHR data. Fox has introduced a few statistical corrections to the overall data set, but none of the techniques that he recommends for filling in the gaps can generate accurate numbers pertaining to gun massacres. James Alan Fox, "Missing Data Problems in the SHR: Imputing Offender and Relationship Characteristics," *Homicide Studies* 8 (August 2004): 214–54.

John Lott is certainly a polemic figure in the gun debate, often referred to as "discredited scholar" and even accused of unethical conduct. For more on the controversies surrounding Lott, see chapter 5. Also, see Evan DeFilippis and Devin Hughes, "Shooting Down the Gun Lobby's Favorite 'Academic': A Lott of Lies. *Armed with Reason*, December 1, 2014, http://www.armedwithreason.com/shooting-down-the-gun-lobbys-favorite-academic-a-lott-of-lies (accessed December 16, 2014).

The argument that an increase in gun ownership results in less crime is based predominantly on John Lott, *More Guns, Less Crime: Understanding Crime and Gun Control Laws*, 3rd ed. (Chicago: University of Chicago Press, 2000). Lott's report utilized the same fatality threshold as the Everytown report... a minimum of four victims shot to death. John R. Lott Jr., *The Myths about Mass Public Shootings: Analysis*, Report of the Crime Prevention Research Center,

October 9, 2014, p. 4, http://crimepreventionresearchcenter.org/wp-content/uploads/2014/10/CPRC-Mass-Shooting-Analysis-Bloomberg2.pdf (accessed October 27, 2014).

68. Ibid., p. 5.

69. Ibid., p. 19.

70. Beck also cites the research of criminologist Grant Duwe, who suggests that mass shootings might have actually decreased in the recent past. As the *Los Angeles Times* noted, "The 26 public shooting massacres between 2000 and 2009 were significantly down from the 43 cases he counted in the 1990s." Matt Pearce, "2012 Is Tragic, but Mass Shootings Not Increasing, Experts Say," *Los Angeles Times*, December 18, 2012, http://articles.latimes.com/2012/dec/18/nation/la-na-nn-mass-shootings-common-20121218 (accessed October 27, 2014). Unlike Fox, Duwe excluded certain mass shootings that were motivated by criminal enterprise or occurred in private, making his conclusions subject to some of the same limitations associated with the *Mother Jones* analysis.

71. "Findings of Fact, Conclusions of Law, and Order," *Colorado Outfitters Association et al. v. Hickenlooper*, Civil Action No. 13-cv-01300-MSK-MJW, US District Court for the District of Colorado, June 26, 2014, http://michellawyers.com/wp-content/uploads/2013/05/Cooke-v-Hickenlooper-Findings-of-Fact-Conclusions-of-Law-and-Order.pdf (accessed November 23, 2014).

72. "Reporter's Transcript: Trial to Court—Day Three," *Colorado Outfitters Association et al. v. Hickenlooper*, Civil Action No. 13-cv-01300-MSK-MJW, US District Court for the District of Colorado, April 2, 2014, p. 529, http://michellawyers.com/wp-content/uploads/2013/05/Cooke-v-Hickenlooper-Reporters-Transcript-Trial-to-Court-Day-Three.pdf (accessed November 23, 2014). Beck elaborated on his reasoning for opposing a ban on magazine capacity in a *Wall Street Journal* op-ed:

The availability of large-capacity magazines is certainly irrelevant to ordinary gun violence, which usually involves few or no shots fired, but it is even irrelevant to virtually all mass shootings, because the shooters either have multiple guns, making it easy to fire many rounds without reloading, or they have ample time and opportunity to reload because there is no one present willing to stop them while they reload. . . .

When there are willing interveners, it limits how much death and injury a shooter can inflict with the initial magazine; the smaller the magazine, the fewer the victims. Unfortunately, these conditions almost never prevail in mass shootings. . . .

Any restrictions that limit the availability of guns for criminal purposes

Exhibit 24
Page 00893

ER_3067

## 302 NOTES

Gary Kleck, "Mass Shootings Aren't the Real Gun Problem," *Wall Street Journal*, January 15, 2011, http://www.wsj.com/articles/SB10001424052748703959910455760 8193492180664 (accessed November 23, 2014).

Kleck has served as an expert witness in at least a few other gun rights cases: *Heller v. District of Columbia; Peoh v. Swanywula, San Francisco Veteran Police Officers Association v. San Francisco; Tardy v. O'Malley;* and *Shew v. Malloy.* See "Reporter's Transcript: Trial to Court—Day Three," pp. 582–83.

74. Gary Kleck, *Targeting Guns: Firearms and Their Control* (Hawthorne, NY: Aldine de Gruyter, 1997), pp. 184–35.

"Reporter's Transcript: Trial to Court—Day Three," p. 529.

Ibid.

Ibid., p. 580.

"Reporter's Transcript: Trial to Court—Day Five," *Colorado Outfitters Association et al. v. Hickenlooper,* Civil Action No. 13-c-01300-MSK-MJW, US District Court for the District of Colorado, April 4, 2014, p. 975 (emphasis added). https://www.michellawyers.com/wp-content/uploads/2013/05/Cooke-v-Hickenlooper-Reporters-Transcript-Trial-to-Court-Day-Five.pdf (accessed November 23, 2014).

Ibid., pp. 977–78.

The forty-two-minute time frame was reported in Megan Gallegos, "Data Disclosed in Gun Control Trial," *Courthouse News Service,* April 6, 2014, http://www.courthousenews.com/2014/04/06/66817.htm (accessed November 23, 2014).

"Reporter's Transcript: Trial to Court—Day Five," p. 993.

Ibid., p. 995.

"Findings of Fact, Conclusions of Law, and Order," p. 35. In fact, the judge's opinion upholding Colorado's law noted, "The General Assembly considered evidence that mass shootings occur with alarming frequency and often involve use of large-capacity magazines." Ibid., p. 92. In March 2016, the US Court of Appeals for the Tenth Circuit vacated the district court's ruling on the grounds that plaintiffs lacked standing to bring their legal action. The result was the amended lawsuit was dismissed. *Colorado Outfitters Association et al. v. Hickenlooper,* Nos. 14-1290 and 14-1292, March 22, 2016, https://www.ca10.uscourts.gov/print/14/14-1290.pdf (accessed April 17, 2016).

Because research funding was not available to me, I didn't have the resources to search out and catalog every mass shooting—at least four people shot in

## NOTES 303

a single incident—that occurred in the United States since 1966. Just tracking down the mass shootings where five people were shot to death would have likely more than doubled my data set. *USA Today* found a similar pattern. Between January 1, 2006, and June 30, 2015, the newspaper identified 39 mass shootings resulting in six or more deaths. Shifting the baseline to five or more deaths increased the data set by more than double (42 additional incidents), to 81 such mass shootings. When the newspaper included programs resulting in four or more deaths, the tally jumped by 180 incidents to 211 total mass shootings. The *USA Today* mass murder data set can be accessed at http://www.usatoday.com/story/news/nation/2013/09/16/mass-killing-data-map/2820425 (accessed December 13, 2015).

85. As figure 3.1 illustrates, there were three quasi-flatline periods when total deaths in gun massacres were accumulating at a rate of zero or close to zero (1966–1972, 1977–1980, and 1993–1998). The past decade, however, has exhibited no such pattern.

86. The ten-year period 1996–2005 was the decade with the least number of gun massacres as well as the least number of cumulative deaths resulting from such attacks. A possible explanation for this decline is offered in chapter 7.

87. By "five-plus-shooting-year," I mean a calendar year with five or more gun massacres. Similarly, by "four-plus-shooting-year," I mean a calendar year with four or more gun massacres.

88. Gary Fields and Cameron McWhirter, "In Medical Triumph, Homicides Fall Despite Soaring Gun Violence," *Wall Street Journal,* December 8, 2012, http://www.wsj.com/articles/SB10001424127887324712504578131360684277812 (accessed February 10, 2015).

89. Since 1973, the National Opinion Research Center at the University of Chicago has been surveying how many households have firearms. These gun-ownership rates are compiled roughly every two years by the General Social Survey. The data from 1973 to 2012 are available in Tom W. Smith, Faith Laken, and Jaesok Son, *Gun Ownership in the United States: Measurement Issues and Trends,* General Social Survey Methodological Report No. 123 (Chicago: National Opinion Research Center, 2014), http://publicdata.norc.org/s1000/gss/documents//MTRT/MR123%20Gun%20Ownership.pdf (accessed March 17, 2015). The data for 2014 are reported in "Gun Ownership among Americans at a Record Low, Survey Finds," *Chicago Tribune,* March 10, 2015, http://www.chicagotribune.com/news/local/breaking/chi-gun-ownership-record-low-20150310-story.html (accessed March 17, 2015).

90. Since 1973, when the General Social Survey began probing household gun-ownership rates, the number of households in the United States has nearly doubled from 68 million to 124 million. Yet the absolute number of armed

Exhibit 24
Page 00894

Case 3:17-cv-0101-BEN-JLB   Document 53-10   Filed 07/09/18   Page 166 of 428

## 304   NOTES

households has remained fairly constant at an average of 40 million[*]. The lowest number of households with guns was recorded in 1973 (approximately 35 million) and the highest number was recorded in 1989 (approximately 46 million). In 2014, the number of households in the United States with firearms is again roughly 40 million. Annual data on the number of households in the United States is drawn from "Number of Households in the U.S. from 1960 to 2015," Statista, http://www.statista.com/statistics/183635/number-of-households-in-the-us (accessed March 17, 2015). As the data only extends to 2013, the number of households in the United States in 2014 has been estimated to be 124 million, based on a projection from previous years. The absolute number of armed households was calculated by multiplying the number of households by the percentage of households that the General Social Survey found had guns at home.

91. Todd C. Frankel, "Why the CDC Still Isn't Researching Gun Violence, Despite the Ban Being Lifted Two Years Ago," *Washington Post*, January 14, 2015, http://www.washingtonpost.com/news/storyline/wp/2015/01/14/why-the-cdc-still-isnt-researching-gun-violence-despite-the-ban-being-lifted-two-years-ago (accessed February 10, 2015).

92. The list of incidents is available online at massshootingtracker.org as well as at sub-Reddit /r/GunsAreCool. Every incident listed in the Mass Shooting Tracker contains a link to a news media account that allows for verification of the shooting. The incidents—attacks involving four or more victims shot—include gunmen in the number of people shot. Therefore, an unknown portion of the incidents actually involved three innocent people being shot alongside the perpetrator, for a total of four killed or wounded by gunfire.

93. National Weather Service, "How Dangerous Is Lightning?" http://www.lightningsafety.noaa.gov/odds.htm (accessed February 18, 2015).

94. In a December 2015 CBS News / *New York Times* poll conducted in the immediate aftermath of the terrorist attack in San Bernardino, respondents identified terrorism as the most important problem facing the United States. In addition, 79 percent of respondents indicated that they felt there would likely be another terrorist attack on American soil within the next few months. Anthony Salvanto et al., "Poll: After San Bernardino Attacks, American Concern about Terror Threat Rises," CBS News, December 10, 2015, http://www.cbsnews.com/news/poll-after-san-bernardino-attacks-american-concern-about-terror-threat-rises (accessed December 13, 2015).

95. Klarevas, "Trends in Terrorism," p. 80.

96. In the past decade, there have been seven lethal terrorist attacks perpetrated by jihadists on American soil. These seven attacks resulted in a total of four... Klarevas, "Almost Every Fatal Terrorist Attack in America

## NOTES   305

Since 9/11 Has Involved Guns," *Vice*, December 4, 2015, http://www.vice.com/read/almost-every-fatal-terrorist-attack-in-america-since-911-has-involved-guns-123 (accessed December 15, 2015). At a time when Americans are particularly concerned about becoming the victim of an ISIS-inspired act of terrorism, it's valuable to identify the odds of that happening. Basically, in any given year, the odds of being killed in an act of jihadist terrorism on American soil are around one in eighty million, an astronomically lesser chance than being killed in a mass shooting on American soil, which has a likelihood of about one in 700,000. These odds were calculated by dividing the current estimated population of the United States (350 million people) by the average number of people killed in the United States annually in jihadist terrorist attacks (four people) and mass shootings (433 people).

## CHAPTER FOUR: UNSTABLE, ANGRY, ARMED MEN

1. Unless otherwise noted, all the information on the Virginia Tech massacre is drawn from Virginia Tech Review Panel, *Mass Shootings at Virginia Tech, April 16, 2007: Report of the Review Panel*, August 2007, http://www.washingtonpost.com/wp-srv/metro/documents/vatechreport.pdf (accessed May 2, 2015).

2. Ibid., p. 34.
3. Quoted in ibid., p. 35.
4. Quoted in ibid., p. 37.
5. Quoted in ibid., p. 42.
6. Quoted in ibid., p. 50.
7. Quoted in ibid., p. 50.
8. Quoted in ibid., p. 47.
9. Quoted in ibid., p. 48.
10. 18 USC § 922(g)(4).
11. Of the sixty-two occupants in the four classrooms Cho breached, only thirteen avoided being shot; ten of them as a result of jumping from the second-floor window and the other three presumably by playing dead.
12. Six more students were hurt as a result of jumping out of the windows in Professor's Librescu's classroom.
13. "Killer's Manifesto: You Forced Me into a Corner," CNN, April 18, 2007, http://edition.cnn.com/2007/US/04/18/vtech.shooting/index.html (accessed May 2, 2015).
14. Ibid. See also M. Alex Johnson, "Gunman Sent Package to NBC News," NBC News, April 19, 2007, http://www.nbcnews.com/id/18195425#.VdC-Mmxglp (accessed May 2, 2015).

Exhibit 24
Page 00895

## 344 NOTES

88 Ibid., p. 11. See also Paul Scarlata, "Shootout Polymer Police Pistols," *Guns Ammo Handguns*, September 24, 2010, http://www.handgunsmag.com/reviews/featured_handguns_polysh_092707 (accessed July 26, 2015).

89 Barrett, *Glock*, p. 86.

90 Ibid., p. 14.

91 Ibid., p. 265.

92 Scarlata, "Shootout"

93 Barrett, *Glock*, p. 82.

94 Ibid., pp. 56, 142–43.

95 Ibid., p. 192.

96 Ibid., p. 56.

95 Polymer has brought such distinct advantages to firearms that gun makers have begun manufacturing polymer revolvers. See Dick Metcalf, "Polymer evolution," *Shooting Times*, January 5, 2011, http://www.shootingtimes.com/ammo/handgun_reviews_st_polymrevo_901005 (accessed July 26, 2015).

96 Typically, .38-caliber revolvers hold five or six bullets in the cylinder.

97 Massad Ayoob, "Maximizing Semi-Auto Handgun Performance," *Daily Caller*, September 23, 2014, http://dailycaller.com/2014/09/23/massad-ayoob-maximizing-semi-auto-handgun-performance (accessed July 29, 2015). Ayoob makes an important point that, when calculating firing rates and reload times, we should not use best-case scenarios and world-record times. We should use reasonable, average times. As he notes, "World Champion Jerry Miculek is on record firing six shots from his .45 revolver, reloading with a moon clip, and firing six in an incredible 2.99 seconds overall. There is only one Jerry Miculek." Ibid.

98 This subsection has benefited from the thoughts of Kevin J. Ashton, including correspondence between us on his now-defunct blog. See Kevin Ashton, "The Physics of Mass Killing," January 24, 2013, archived at http://web.archive.org/web/20150110031240/http://kevinjashton.com/2013/01/24/the-physics-of-mass-killing (accessed July 29, 2015).

99 The details of the Tucson massacre are drawn from Gabrielle Giffords and Mark Kelly, *Enough: Our Fight to Keep America Safe from Gun Violence* (New York: Scribner, 2014), pp. 47–74.

100 Ibid.

101 "Mark Kelly Makes Case against High-Capacity Gun Magazines," ABC News, January 30, 2013, http://abcnews.go.com/Politics/video/mark-kelly-makes-case-high-capacity-gun-magazines-18356292 (accessed July 29, 2015).

103 Giffords and Kelly, *Enough*, p. 68.

## NOTES 345

104. Reload time is calculated at beginning the moment the final bullet is fired and ending the moment the first reload bullet is chambered and fired.

105. The calculations in this section are informed by Ayoob, "Maximizing Semi-Auto Handgun Performance." See also Jim Wilson, "The Revolver Speed Load," *American Rifleman*, February 10, 2012, http://www.americanrifleman.org/articles/2012/2/10/the-revolver-speed-load (accessed July 29, 2015); and Kenan Flasowski, "Semi-Automatic Handgun Reloading," *Shooting Illustrated*, October 25, 2012, http://www.shootingillustrated.com/articles/2012/10/25/semi-automatic-handgun-reloading (accessed July 29, 2015). For an article that suggests faster rates of fire than most firearms experts seem to endorse, see Brian Palmer, "How Many Times Can You Shoot a Handgun in Seven Minutes? More Than a Thousand," *Slate*, November 9, 2009, http://www.slate.com/articles/news_and_politics/explainer/2009/11/how_many_times_can_you_shoot_a_handgun_in_seven_minutes.html (accessed July 29, 2015).

106. Lynn Bartels, Kurtis Lee, and Joey Bunch, "Colorado Senate President John Morse, State Sen. Angela Giron Ousted," *Denver Post*, September 10, 2013, http://www.denverpost.com/breakingnews/ci_24066168/colorado-senate-president-john-morse-recalled-angela-giron (accessed July 31, 2015).

107. Eli Stokols, "Herpin Explains Why It Was a 'Good Thing' Holmes Had Large Ammo Magazine," KVDR, February 14, 2014, http://kdvr.com/2014/02/12/herpin-a-good-thing-that-james-holmes-had-100-round-magazine (accessed July 31, 2015). See also Kurtis Lee, "Sen. Bernie Herpin Says 'Maybe a Good Thing' Aurora Theater Gunman Had 100-Round Magazine," *Denver Post*, February 12, 2014, http://blogs.denverpost.com/thespot/2014/02/12/sen-bernie-herpin-says-maybe-a-good-thing-aurora-theater-gunman-100-round-magazine/105928 (accessed July 31, 2015). Herpin's repeal was defeated by the committee. Marc Stewart and Phil Tenser, "State Sen. Herpin That 'Maybe a Good Thing' That James Holmes Had a 100-Round Magazine," KMGH, February 12, 2014, http://www.thedenverchannel.com/news/politics/state-sen-herpin-suggests-it-was-maybe-a-good-thing-that-james-holmes-had-a-100-round-magazine (accessed July 31, 2015).

108. James Holmes discussed his shooting abilities in an interview with court-appointed psychiatrist Dr. William Reid. That conversation, which was videotaped, was played for the jury during Holmes's trial. See Jordan Steffan, "Aurora Theater Shooting Trial, the Latest from Day 22," *Denver Post*, June 1, 2015 http://www.denverpost.com/theater-shooting-trial/ci_28257922/aurora-theater-shooting-trial-latest-from-day-22 (accessed July 31, 2015).

109. Shortly after his gaffe, Herpin apologized to the victims' families: "There's nothing I can say to relieve their pain; I certainly didn't intend to add to their pain," Megan Schrader, "Republican Sen. Bernie Herpin Apologizes for

Exhibit 24
Page 00896

ER_3070

## 346   NOTES

"'Insensitive' Gun Remark," *Gazette*, February 14, 2014, http://gazette.com/republican-sen-bernie-herpin-apologizes-for-insensitive-gun-remark/article/1514605 (accessed July 31, 2015).

110. The use of the term *average* in this section is a reference to the mean average.

111. To the best of my knowledge, the impact of different types of firearms is rarely a topic of study. One notable exception is D. C. Reedy and C. S. Koper, "Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers," *Injury Prevention* 9 (June 2003): 151–55. The Reedy and Koper article, while insightful, examines all types of criminal gun attacks that took place in one municipality, Jersey City, New Jersey. As such, its findings do not really apply to mass shootings.

112. The use of only revolvers produces an identical average. The use of only rifles results in an average seven deaths per incident. And the use of only shotguns results in the lowest recorded average of 6.7 deaths per incident.

113. Out of the 111 gun massacres since 1966, ninety-six were perpetrated by only one gunman and fifteen were perpetrated by multiple gunmen. Of those fifteen incidents, ten involved two shooters, one involved three shooters, three involved four shooters, and one involved more than four shooters.

114. Quoted in Steffan, "Aurora Theater Shooting Trial, the Latest from Day 22."

## CHAPTER SEVEN: BREAKING THE TRINITY

1. The audio of Pacific Air Lines Flight 773's final transmission to Oakland Air Traffic Control is available at "Pacific Air Lines Flight 773 ATC Recording May 7, 1964," YouTube video, 0:55, posted by "sarvasitadude," March 29, 2013, https://www.youtube.com/watch?v=L1WYIAcuq4w (accessed December 11, 2015).

2. Civil Aeronautics Board, *Aircraft Accident Report: Pacific Air Lines, Inc., Fairchild F27, N2770R, Near San Ramon, California, May 7, 1964*, November 2, 1964, http://dotlibrary.specialcollection.net/Document?db=DOT-AIRPLANE ACCIDENTS&query=(select+773) (accessed December 11, 2015).

3. Ibid.

4. One of the principal investigators of the crash of Pacific Air Lines Flight 773, Darrol Davison, in a KTVU "Second Look" news segment discussed how, in 1964, security provisions didn't exist to prohibit guns from being brought aboard airplanes. The news segment is available at "Pacific Air Lines Flight 773," YouTube video, 7:07, posted by "Tom Bailey," September 20, 2012, https://www.youtube.com/watch?v=fpQo4TJh-8Q (accessed December 11, 2015).

## NOTES   347

5. Jane Engle, "U.S. Aviation Security Timeline," *Los Angeles Times*, June 19, 2011, http://articles.latimes.com/2011/jun/12/travel/la-tr-airline-safety-timeline-20110612 (accessed December 11, 2015); See also Bryan Gardiner, "Off with Your Shoes: A Brief History of Airport Security," *Wired*, June 14, 2013, http://www.wired.com/2013/06/ta_planehijacking (accessed December 11, 2015).

6. Gun owners recall that in 1968 regulations were changed to prohibit carrying a firearm aboard an airplane, requiring that the weapon be checked in cargo-hold luggage. See, for example, "When Did Carrying Become Forbidden on Airplane?" *High Road*, September 7, 2010, http://www.thehighroad.org/archive/index.php/t-540773.html (accessed December 11, 2015).

7. Civil Aeronautics Board, *Aircraft Accident Report*.

8. "Investigations: Death Wish," *Time*, November 6, 1964, http://content.time.com/time/magazine/article/0,9171,876574,00.html (accessed December 11, 2015).

9. Ibid.

10. Walter Turner, "Pilot Reported Calling: 'I've Been Shot,' Before Crash that Killed 44 on Coast," *New York Times*, May 6, 1964, http://www.nytimes.com/19?4/05/07/pilot-reported-calling-ive-been-shot-before-crash-that-killed-44-on-coast.html (accessed December 11, 2015).

11. Civil Aeronautics Board, *Aircraft Accident Report*.

12. "Investigations: Death Wish."

13. Civil Aeronautics Board, *Aircraft Accident Report*.

14. For an excellent introduction to strategy, including a review of how discussion, defense, and disarmament relate to each other, see Thomas C. Schelling, *Arms and Influence*, rev. ed. (New Haven, CT: Yale University Press, 2008).

15. Keith B. Payne, *Deterrence in the Second Nuclear Age* (Lexington: University of Kentucky Press, 1996), p. 66. See also Michael Howard, "Lessons of the Cold War," *Survival* 36 (Winter 1994–95): 166.

16. Tom Walsh, "How's the Air up There?" *Barre Montpelier Times Argus*, October 14, 2015, http://www.timesargus.com/article/20151014/OPINION02/151019749 (accessed December 11, 2015).

17. Larry Pratt, "Strange Priorities," *Gun Owners of America*, October 2001, http://www.gunowners.org/op0136.htm (accessed December 11, 2015).

18. "Packing Heat on Planes," Fox News, February 8, 2007, http://www.foxnews.com/story/2007/02/08/packing-heat-on-planes.html (accessed December 11, 2015); Joe Sharkey, "Owners Argue Merits of Firearms on Airplanes," *New York Times*, January 2, 2012, http://www.nytimes.com/2012/01/03/business/arguing-the-merits-of-guns-on-airplanes.html (accessed December 11, 2015); Robert Farago, "As a Pilot, I Don't Understand the Reason Why We Can't Have

Exhibit 24
Page 00897

ER_3071

## 48   NOTES

firearm and knives on Planes,'" Truth about Guns, February 1, 2012, http://www.truthaboutguns.com/2012/02/robert-farago/tsa-pilot-i-don%E2%80%99t-have-firearms-and-knives-on-planes-and-the-reason-why-we-can%E2%80%99t-have-firearms-and-knives-on-planes/ (accessed December 11, 2015); and Robert Farago, "U.S. Air Marshal Complete Disaster," Truth about Guns, August 18, 2015, http://www.truthaboutguns.com/2015/08/robert-farago/u-s-air-marshal-system-a-complete-disaster (accessed December 11, 2015).

26. Lou Michel and Dan Herbeck, American Terrorist: Timothy McVeigh and the Oklahoma City Bombing (New York: Harper, 2001).

27. John Mueller and Mark G. Stewart, Chasing Ghosts: The Policing of Terrorism (New York: Oxford University Press, 2016), pp. 98–100.

28. National Forensic Science Technology Center, "A Simplified Guide to Explosive Analysis: Principles of Explosives Analysis," A Simplified Guide to Forensic Science, 2013, http://www.forensicsciencesimplified.org/explosives/ (accessed December 11, 2015).

29. Louis Klarevas, "The Idiot Jihadist Next Door," Foreign Policy, December 1, 2011, http://foreignpolicy.com/2011/12/01/the-idiot-jihadists-next-door (accessed December 11, 2015).

Jena Winter, "Anatomy of a Bomb: An Inexpensive and Deadly Mismatch for Planes," Fox News, May 5, 2010, http://www.foxnews.com/us/2010/05/05/anatomy-bomb.html (accessed December 11, 2015); "Timeline—From Making a Car Bomb to Catching a Plane," Reuters, May 4, 2010, http://www.reuters.com/article/timesquare-investigation-idUSN0411707720100504 (accessed December 11, 2015); and Peter Grier, "Times Square Bomb: Did Pakistan Taliban Send Its 'C Team?'" Christian Science Monitor, May 10, 2010, http://www.csmonitor.com/USA/2010/0510/Times-Square-bomb-Did-Pakistan-Taliban-send-its-C-team (accessed December 11, 2015).

Louis Klarevas, "Bombing on the Analysis at the Times Square Bomb ..." http://www.huffingtonpost.com/louis-klarevas/bombing-on-the-analysis-o_b_565428.html (accessed December 11, 2015).

David Hemenway, While We Were Sleeping: Success Stories in Injury and Violence Prevention (Berkeley: University of California Press, 2009).

Daniel W. Webster and Jon S. Vernick, eds., Reducing Gun Violence in America: Informing Policy with Evidence and Analysis (Baltimore, MD: Johns Hopkins University Press, 2013), http://home.uchicago.edu/ludwig/papers/Impact%20 .pdf (accessed December 11, 2015).

Erin G. Richardson and David Hemenway, "Homicide, Suicide, and

## NOTES   349

Unintentional Firearm Fatality: Comparing the United States with Other High-Income Countries, 2003," Journal of Trauma 70 (January 2011): 238–43.

29. Sarah Kaplan, "American Exceptionalism and the 'Exceptionally American' Problem of Mass Shootings," Washington Post, August 27, 2015, https://www.washingtonpost.com/news/morning-mix/wp/2015/08/27/american-exceptionalism-and-the-exceptionally-american-problem-of-mass-shootings (accessed December 11, 2015).

30. David Hemenway, Private Guns, Public Health (Ann Arbor: University of Michigan Press, 2006).

31. The Gun Control Act of 1968 does not apply to "antique firearms" manufactured prior to 1899. For the statutory definition of "antique firearm," see 18 USC § 921(a)(16).

32. The Brady Handgun Violence Prevention Act of 1993 does not apply to "antique firearms" manufactured prior to 1899. For the statutory definition of "antique firearm," see 18 USC § 921(a)(16).

33. Hemenway, Private Guns, Public Health, pp. 209–12.

34. Bureau of Alcohol, Tobacco, Firearms, and Explosives, "National Firearms Act," ATF, November 9, 2015, https://www.atf.gov/rules-and-regulations/national-firearms-act (accessed December 11, 2015).

35. Bruce H. Kobayashi and Joseph E. Olson, "In Re: 101 California Street: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of 'Assault Weapons,'" Stanford Law and Policy Review 8 (Winter 1997): 41–51.

36. Christopher S. Koper, "America's Experience with the Federal Assault Weapons Ban, 1994–2004: Key Findings and Implications," in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis, ed. Daniel W. Webster and Jon S. Vernick (Baltimore, MD: Johns Hopkins University Press, 2013), pp. 157–71, http://home.uchicago.edu/ludwig/papers/Impact%20of%20Brady%20Act%20 2013.pdf (accessed December 11, 2015).

37. Out of the twelve gun massacres that occurred while the AWB was in effect, three involved assault weapons and six involved extended-capacity magazines. I have been unable to uncover any evidence that any of these instruments were illegal under the AWB. In fact, most were grandfathered, meaning that they were exempted by the ban because they were legally in circulation prior to the AWB's enactment.

38. When viewed in terms of full calendar years, the massacre-free period ran five consecutive years, from 1994 to 1998, although it must be noted that the AWB was not in effect for most of 1994. There were also no gun massacres in 2001. When 2001 is combined with the four-and-a-half-year period without a high-fatality mass shooting from September 13, 1994, through April 20, 1999, we see that over half of the decade that the AWB was in effect was massacre-free.

Exhibit 24
Page 00898

ER_3072

# GUN LAW HISTORY IN THE UNITED STATES AND SECOND AMENDMENT RIGHTS

ROBERT J. SPITZER[*]

## I

### INTRODUCTION

In its important and controversial 2008 decision on the meaning of the Second Amendment, *District of Columbia v. Heller*,[1] the Supreme Court ruled that average citizens have a constitutional right to possess handguns for personal self-protection in the home.[2] Yet in establishing this right, the Court also made clear that the right was by no means unlimited, and that it was subject to an array of legal restrictions, including: "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[3] The Court also said that certain types of especially powerful weapons might be subject to regulation,[4] along with allowing laws regarding the safe storage of firearms.[5] Further, the Court referred repeatedly to gun laws that had existed earlier in American history as a justification for allowing similar contemporary laws,[6] even though the court, by its own admission, did not undertake its own "exhaustive historical analysis" of past laws.[7]

In so ruling, the Court brought to the fore and attached legal import to the history of gun laws. This development, when added to the desire to know our own history better, underscores the value of the study of gun laws in America. In recent years, new and important research and writing has chipped away at old

---

Copyright © 2017 by Robert J. Spitzer.

This article is also available online at http://lcp.law.duke.edu/.

   [*] Robert J. Spitzer (Ph.D., Cornell University, 1980) is Distinguished Service Professor and Chair of the Political Science Department at SUNY Cortland. He is the author of fifteen books, including five on gun policy, most recently GUNS ACROSS AMERICA (Oxford University Press 2015).

   1. District of Columbia v. Heller, 554 U.S. 570 (2008).

   2. *Id.* at 628–30, 635–36.

   3. *Id.* at 626–27.

   4. *See id.* at 623, 627 (citing United States v. Miller, 307 U.S. 174, 178 (1939)) (distinguishing validity of ban on short-barreled shotguns and noting that weapons protected were those used at time of ratification).

   5. *See id.* at 632 (excluding gun-storage laws from scope of decision).

   6. *See id.* at 626–27, 629 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever and for whatever purpose.") (citation omitted).

   7. *Id.* at 626.

Exhibit 25
Page 00900

Texas, for example, defined machine guns in 1933 as those from which more than five bullets were automatically discharged "from a magazine by a single functioning of the firing device."[80]

The lesson here is significant both for its historical context and for the contemporary debate over the regulation of new or exotic gun technologies. In these instances, new laws were enacted not when these weapons were invented, but when they began to circulate widely in society. So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I.[81] But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted.

E. Semi-Automatic Gun Restrictions

Of particular relevance to the modern gun debate is the fact that at least seven, and as many as ten, state laws specifically restricted semi-automatic weapons—weapons that fire a round with each pull of the trigger without manual reloading[82]—anticipating by seven decades the semi-automatic assault weapons ban debates, and related efforts to restrict large capacity bullet magazines, from the 1990s to the present.

States with laws in this category typically combined fully automatic and semi-automatic weapons under a single definitional category.[83] A 1927 Rhode Island measure defined the prohibited "machine gun" to include "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[84] To compare, a 1927 Massachusetts law said: "Any gun or small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired . . . shall be deemed a machine gun . . . ."[85] Michigan's 1927 law prohibited machine guns or any other firearm if they fired more than sixteen times without reloading.[86] Minnesota's 1933 law outlawed "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure."[87] It went on to penalize the modification of weapons that were altered to accommodate such extra firing capacity.[88] Fully automatic .22 caliber "light sporting rifles" were

---

80. 1933 Tex. Gen. & Spec. Laws 219, 219.

81. NRA-ILA, *Fully-Automatic Firearms*, NRAILA.ORG, (July 29, 1999), https://www.nraila.org/articles/19990729/fully-automatic-firearms [https://perma.cc/NT68-ZEF6].

82. *See* Table 2.

83. *See* Table 2, laws of Mass., Mich., S.D., and Va.

84. 1927 R.I. Pub. Laws 256, 256.

85. 1927 Mass. Acts 413, 413–14.

86. Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888.

87. Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232.

88. *Id.*

Exhibit 25
Page 00901

ER_3074

also considered machine guns under the law, but .22 caliber semi-automatic "light sporting rifles" were exempted.[89] Ohio also barred both fully automatic and semi-automatic weapons in a 1933 law, incorporating under the banned category any gun that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading."[90] The law defined semi-automatic weapons as those that fired one shot with each pull of the trigger.[91] South Dakota barred machine guns by defining them as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine . . . ."[92] Like several other states, Virginia outlawed weapons

> of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading.[93]

Aside from these seven states, another three included language that was ambiguous as to whether they extended prohibitions to semi-automatic as well as fully automatic weapons. Illinois enacted a 1931 law that prohibited "machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices."[94] Louisiana's 1932 anti–machine gun law,[95] and South Carolina's 1934 law,[96] both defined machine guns in the same way using identical language, including the eight cartridge standard. In the case of these three laws, the word "automatically" would seem to refer to fully automatic firing, but when that wording is married with "discharging more than eight cartridges successively without reloading," it would seem to encompass semi-automatic firing as well.

Table 2 summarizes the key portions of the laws from these ten states. The lesson of the previous part also applies here: new technologies bred new restrictions. And who would have guessed that the fierce controversy over regulating semi-automatic assault weapons in the 1990s and 2000s was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s.

---

89.   *Id.*
90.   Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189.
91.   *Id.*
92.   Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245.
93.   Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.
94.   Act of July 2, 1931, 1931 Ill. Laws 452, 452.
95.   Act of July 7, 1932, no. 80, 1932 La. Acts 336.
96.   Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288.

Exhibit 25
Page 00902

ER_3075

**Table 2**
STATE LAWS BARRING
SEMI-AUTOMATIC WEAPONS, 1927–1934[97]

| STATE AND YEAR | PROVISION OF LAW |
|---|---|
| Massachusetts 1927 | "rapid fire and operated by a mechanism" |
| Michigan 1927 | "any machine gun or firearm which can be fired more than sixteen times without reloading" |
| Minnesota 1933 | "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure." |
| Ohio 1933 | "any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading." |
| Rhode Island 1927 | "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading." |
| South Dakota 1933 | "a weapon of any description . . . from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine." |
| Virginia 1933 | "a weapon of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading." |

97.   Source: Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413, 413; Act of June 2, 1927, No. 372, 1927 Mich. Pub. Acts 887, 888; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, § 1, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, § 1, 1934 Va. Acts 137, 137; Act of July 2, 1931, § 1, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, § 1, 1932 La. Acts 336, 337; Act of Mar. 2, 1934, no. 731, § 1, 1934 S.C. Acts 1288, 1288.

Exhibit 25
Page 00903

ER_3076

| AMBIGUOUS STATE LAWS | |
|---|---|
| Illinois 1931 | "machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices." |
| Louisiana 1932 | "machine rifles, machine guns and sub machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device." |
| South Carolina 1934 | "machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device." |

F. Dueling Prohibitions

A well-known category of gun laws with ties to American history is the prohibition against dueling. Prominent public figures from early American history, including Alexander Hamilton and Andrew Jackson, found themselves in highly publicized duels.[98] Hamilton's longstanding political feud with fellow New York politician Aaron Burr ended when the two men dueled in New Jersey in 1804.[99] Hamilton died from his wounds, and Burr's political career never recovered.[100] Jackson engaged in several duels, and was even injured during one

---

98.   DON C. SEITZ, FAMOUS AMERICAN DUELS (1929).

99.   Burr was vice president at the time; New York barred dueling, so they traveled to the neighboring state. LIN-MANUEL MIRANDA, *"Blow Us All Away," "Your Obedient Servant," "The World Was Wide Enough,"* on HAMILTON: AN AMERICAN MUSICAL, ACT II, (Atlantic Records 2015).

100.   RON CHERNOW, ALEXANDER HAMILTON 704–05, 717–22 (2004).

Exhibit 25
Page 00904

H.R. REP. 103-489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess.
1994, 1994 WL 168883, 1994 U.S.C.C.A.N. 1820 (Leg.Hist.)
, VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994

PUBLIC SAFETY AND RECREATIONAL FIREARMS USE PROTECTION ACT

DATES OF CONSIDERATION AND PASSAGE

House: November 3, 1993; March 23, April 14, 19, 20, 21, May 5, August 19, 21, 1994
Senate: November 3, 4, 5, 8, 9, 10, 11, 16, 17, 18, 19, 1993; May 19, August 22, 23, 24, 25, 1994
Cong. Record Vol. 139 (1993)
Cong. Record Vol. 140 (1994)
House Report (Judiciary Committee) No. 103–324,
Nov. 3, 1993 (To accompany H.R. 3355)
House Report (Judiciary Committee) No. 103–489,
May 2, 1994 (To accompany H.R. 4296)
House Conference Report No. 103–694,
Aug. 10, 1994 (To accompany H.R. 3355)
House Conference Report No. 103–711,
Aug. 21, 1994 (To accompany H.R. 3355)

RELATED REPORTS

House Report (Judiciary Committee) No. 103–45,
Mar. 29, 1993 (To accompany H.R. 829)
House Report (Judiciary Committee) No. 103–245,
Sept. 21, 1993 (To accompany H.R. 1385)
House Report (Judiciary Committee) No. 103–320,
Nov. 3, 1993 (To accompany H.R. 3350)
House Report (Judiciary Committee) No. 103–321,
Nov. 3, 1993 (To accompany H.R. 3351)
House Report (Judiciary Committee) No. 103–322,
Nov. 3, 1993 (To accompany H.R. 3353)
House Report (Judiciary Committee) No. 103–323,
Nov. 3, 1993 (To accompany H.R. 3354)
House Report (Judiciary Committee) No. 103–389,
Nov. 20, 1993 (To accompany H.R. 3098)
House Report (Judiciary Committee) No. 103–392,
Nov. 20, 1993 (To accompany H.R. 324)
House Report (Judiciary Committee) No. 103–395,
Nov. 20, 1993 (To accompany H.R. 1130)
House Report (Natural Resources Committee) No. 103-444,
Mar. 21, 1994 (To accompany H.R. 4034)
House Report (Judiciary Committee) No. 103–459,
Mar. 24, 1994 (To accompany H.R. 4033)
House Report (Judiciary Committee) No. 103–460,
Mar. 24, 1994 (To accompany H.R. 3979)
House Report (Judiciary Committee) No. 103–461,

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26    1
Page 00906

Mar. 25, 1994 (To accompany H.R. 1120)
House Report (Judiciary Committee) No. 103–462,
Mar. 25, 1994 (To accompany H.R. 3968)
House Report (Judiciary Committee) No. 103–463,
Mar. 25, 1994 (To accompany H.R. 3981)
House Report (Judiciary Committee) No. 103–464,
Mar. 25, 1994 (To accompany H.R. 4030)
House Report (Judiciary Committee) No. 103–465,
Mar. 25, 1994 (To accompany H.R. 4031)
House Report (Judiciary Committee) No. 103–466,
Mar. 25, 1994 (To accompany H.R. 4032)
House Report (Judiciary Committee) No. 103–468,
Mar. 25, 1994 (To accompany H.R. 665)
House Report (Judiciary Committee) No. 103–469,
Mar. 25, 1994 (To accompany H.R. 3993)
House Report (Judiciary Committee) No. 103–489,
May 2, 1994 (To accompany H.R. 4296)
House Report (Judiciary Committee) No. 103–138,
Sept. 10, 1994 (To accompany S. 11)

HOUSE REPORT NO. 103−489

May 2, 1994
[To accompany H.R. 4296]

The Committee on the Judiciary, to whom was referred the bill (H.R. 4296) to make unlawful the transfer or possession of assault weapons, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

## SEC. 2. RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS.

(a) Restriction.–Section 922 of title 18, United States Code, is amended by adding at the end the following:

"(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

"(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) Paragraph (1) shall not apply to–

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   2
Page 00907

ER_3079

"(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

"(B) any firearm that–

"(i) is manually operated by bolt, pump, lever, or slide action;

"(ii) has been rendered permanently inoperable; or

"(iii) is an antique firearm;

"(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

"(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.

The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.

"(4) Paragraph (1) shall not apply to–

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) Definition of Semiautomatic Assault Weapon.–Section 921(a) of such title is amended by adding at the end the following:

"(30) The term 'semiautomatic assault weapon' means–

"(A) any of the firearms, or copies or duplicates of the firearms, known as–

"(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

"(ii) Action Arms Israeli Military Industries UZI and Galil;

"(iii) Beretta Ar70 (SC–70);

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   3
Page 00908

"(iv) Colt AR–15;

"(v) Fabrique National FN/FAL, FN/LAR, and FNC;

"(vi) SWD M–10, M–11, M–11/9, and M–12;

"(vii) Steyr AUG;

"(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

"(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

"(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of–

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a bayonet mount;

"(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

"(v) a grenade launcher;

"(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of–

"(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

"(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

"(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

"(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

"(v) a semiautomatic version of an automatic firearm; and

"(D) a semiautomatic shotgun that has at least 2 of–

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a fixed magazine capacity in excess of 5 rounds; and

"(iv) an ability to accept a detachable magazine.".

(c) Penalties.–

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   4
Page 00909

(1) Violation of section 922(v).–Section 924(a)(1)(B) of such title is amended by striking "or (q) of section 922" and inserting "(r), or (v) of section 922".

(2) Use or possession during crime of violence or drug trafficking crime.–Section 924(c)(1) of such title is amended in the first sentence by inserting ", or semiautomatic assault weapon," after "short-barreled shotgun,".

(d) Identification Markings for Semiautomatic Assault Weapons.–Section 923(i) of such title is amended by adding at the end the following: "The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured.".

## SEC. 3. RECORDKEEPING REQUIREMENTS FOR TRANSFERS OF GRANDFATHERED FIREARMS.

(a) Offense.–Section 922 of title 18, United States Code, as amended by section 2(a) of this Act, is amended by adding at the end the following:

"(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

"(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

"(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.

"(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.

"(5) As used in this subsection, the term 'form 4473' means–

"(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or

"(B) any other form which–

"(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and

"(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).".

(b) Penalty.–Section 924(a) of such title is amended by adding at the end the following:

"(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.".

## SEC. 4. BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES.

(a) Prohibition.–Section 922 of title 18, United States Code, as amended by sections 2 and 3 of this Act, is amended by adding at the end the following:

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26    5
Page 00910

"(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

"(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) This subsection shall not apply to–

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) Definition of Large Capacity Ammunition Feeding Device.–Section 921(a) of such title, as amended by section 2(b) of this Act, is amended by adding at the end the following:

"(31) The term 'large capacity ammunition feeding device'–

"(A) means–

"(i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and

"(ii) any combination of parts from which a device described in clause (i) can be assembled; but

"(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.".

(c) Large Capacity Ammunition Feeding Devices Treated as Firearms.–Section 921(a)(3) of such title is amended in the first sentence by striking "or (D) any destructive device." and inserting "(D) any destructive device; or (E) any large capacity ammunition feeding device.".

(d) Penalty.–Section 924(a)(1)(B) of such title, as amended by section 2(c) of this Act, is amended by striking "or (v)" and inserting "(v), or (x)".

(e) Identification Markings for Large Capacity Ammunition Feeding Devices.–Section 923(i) of such title, as amended by section 2(d) of this Act, is amended by adding at the end the following: "A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   6
Page 00911

ER_3083

clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.".

## SEC. 5. STUDY BY ATTORNEY GENERAL.

(a) Study.–The Attorney General shall investigate and study the effect of this Act and the amendments made by this Act, and in particular shall determine their impact, if any, on violent and drug trafficking crime. The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment of this Act.

(b) Report.–Not later than 30 months after the date of enactment of this Act, the Attorney General shall prepare and submit to the Congress a report setting forth in detail the findings and determinations made in the study under subsection (a).

## SEC. 6. EFFECTIVE DATE.

This Act and the amendments made by this Act–

(1) shall take effect on the date of the enactment of this Act; and

(2) are repealed effective as of the date that is 10 years after that date.

## SEC. 7. APPENDIX A TO SECTION 922 OF TITLE 18.

Section 922 of title 18, United States Code, is amended by adding at the end the following appendix:

### "APPENDIX A

### Centerfire Rifles–Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle

Browning BAR Mark II Safari Magnum Rifle

Browning High-Power Rifle

Heckler & Koch Model 300 Rifle

Iver Johnson M-1 Carbine

Iver Johnson 50th Anniversary M-1 Carbine

Marlin Model 9 Camp Carbine

Marlin Model 45 Carbine

Remington Nylon 66 Auto-Loading Rifle

Remington Model 7400 Auto Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   7
Page 00912

ER_3084

Remington Model 7400 Rifle

Remington Model 7400 Special Purpose Auto Rifle

Ruger Mini-14 Autoloading Rifle (w/o folding stock)

Ruger Mini Thirty Rifle

**Centerfire Rifles–Lever & Slide**

Browning Model 81 BLR Lever-Action Rifle

Browning Model 81 Long Action BLR

Browning Model 1886 Lever-Action Carbine

Browning Model 1886 High Grade Carbine

Cimarron 1860 Henry Replica

Cimarron 1866 Winchester Replicas

Cimarron 1873 Short Rifle

Cimarron 1873 Sporting Rifle

Cimarron 1873 30" Express Rifle

Dixie Engraved 1873 Rifle

E.M.F. 1866 Yellowboy Lever Actions

E.M.F. 1860 Henry Rifle

E.M.F. Model 73 Lever-Actions Rifle

Marlin Model 336CS Lever-Action Carbine

Marlin Model 30AS Lever-Action Carbine

Marlin Model 444SS Lever-Action Sporter

Marlin Model 1894S Lever-Action Carbine

Marlin Model 1894CS Carbine

Marlin Model 1894CL Classic

Marlin Model 1895SS Lever-Action Rifle

Mitchell 1858 Henry Replica

Mitchell 1866 Winchester Replica

Mitchell 1873 Winchester Replica

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26  8
Page 00913

ER_3085

Navy Arms Military Henry Rifle

Navy Arms Henry Trapper

Navy Arms Iron Frame Henry

Navy Arms Henry Carbine

Navy Arms 1866 Yellowboy Rifle

Navy Arms 1873 Winchester-Style Rifle

Navy Arms 1873 Sporting Rifle

Remington 7600 Slide Action

Remington Model 7600 Special-Purpose Slide Action

Rossi M92 SRC Saddle-Ring Carbine

Rossi M92 SRS Short Carbine

Savage 99C Leber-Action Rifle

Uberti Henry Rifle

Uberti 1866 Sporting Rifle

Uberti 1873 Sporting Rifle

Winchester Model 94 Side Eject Lever-Action Rifle

Winchester Model 94 Trapper Side Eject

Winchester Model 94 Big Bore Side Eject

Winchester Model 94 Ranger Side Eject Lever-Action Rifle

Winchester Model 94 Wrangler Side Eject

**Centerfire Rifles–Bolt Action**

Alpine Bolt-Action Rifle

A-Square Caesar Bolt-Action Rifle

A-Square Hannibal Bolt-Action Rifle

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700D Bavarian Bolt-Action Rifle

Anschutz 1733D Mannlicher Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   9
Page 00914

ER_3086

Barret Model 90 Bolt-Action Rifle

Beeman/HW 60J Bolt-Action Rifle

Blaser R84 Bolt-Action Rifle

BRNO 537 Sporter Bolt-Action Rifle

BRNO ZKB 527 Fox Bolt-Action Rifle

BRNO ZKK 600, 601, 602 Bolt-Action Rifles

Browning A-Bolt Rifle

Browning A-Bolt Stainless Stalker

Browning A-Bolt Left Hand

Browning A-Bolt Short Action

Browning Euro-Bolt Rifle

Browning A-Bolt Gold Medallion

Browning A-Bolt Micro Medallion

Century Centurion 14 Sporter

Century Enfield Sporter #4

Century Swedish Sporter #38

Century Mauser 98 Sporter

Cooper Model 38 Centerfire Sporter

Dakota 22 Sporter Bolt-Action Rifle

Dakota 76 Classic Bolt-Action Rifle

Dakota 76 Short Action Rifles

Dakota 76 Safari Bolt-Action Rifle

Dakota 416 Rigby African

E.A.A./Sabatti Rover 870 Bolt-Action Rifle

Auguste Francotte Bolt-Action Rifles

Carl Gustaf 2000 Bolt-Action Rifle

Heym Magnum Express Series Rifle

Howa Lightning Bolt-Action Rifle

Howa Realtree Camo Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   10
Page 00915

Interarms Mark X Viscount Bolt-Action Rifle

Interarms Mini-Mark X Rifle

Interarms Mark X Whitworth Bolt-Action Rifle

Interarms Whitworth Express Rifle

Iver Johnson Model 5100A1 Long-Range Rifle

KDF K15 American Bolt-Action Rifle

Krico Model 600 Bolt-Action Rifle

Krico Model 700 Bolt-Action Rifle

Mauser Model 66 Bolt-Action Rifle

Mauser Model 99 Bolt-Action Rifle

McMillan Signature Classic Sporter

McMillan Signature Super Varminter

McMillan Signature Alaskan

McMillan Signature Titanium Mountain Rifle

McMillan Classic Stainless Sporter

McMillan Talon Safari Rifle

McMillan Talon Sporter Rifle

Midland 1500S Survivor Rifle

Navy Arms TU-33/40 Carbine

Parker-Hale Model 81 Classic Rifle

Parker-Hale Model 81 Classic African Rifle

Parker-Hale Model 1000 Rifle

Parker-Hale Model 1000M African Rifle

Parker-Hale Model 1100 Lightweight Rifle

Parker-Hale Model 1200 Super Rifle

Parker-Hale Model 1200 Super Clip Rifle

Parker-Hale Model 1300C Scout Rifle

Parker-Hale Model 2100 Midland Rifle

Parker-Hale Model 2700 Lightweight Rifle

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 11
Page 00916

ER_3088

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 186 of 279

Case 3:17-cv-01017-BEN-JLB   Document 53-10   Filed 04/09/18   PageID.6668   Page 56 of 428

HandGun REP. 163-489, Hand. REP. 163-489 (1994)

Parker-Hale Model 2800 Midland Rifle

Remington Model Seven Bolt-Action Rifle

Remington Model Seven Youth Rifle

Remington Model Seven Custom KS

Remington Model Seven Custom MS Rifle

Remington 700 ADL Bolt-Action Rifle

Remington 700 BDL Bolt-Action Rifle

Remington 700 BDL Varmint Special

Remington 700 BDL European Bolt-Action Rifle

Remington 700 Varmint Synthetic Rifle

Remington 700 BDL SS Rifle

Remington 700 Stainless Synthetic Rifle

Remington 700 MTRSS Rifle

Remington 700 BDL Left Hand

Remington 700 Camo Synthetic Rifle

Remington 700 Safari

Remington 700 Mountain Rifle

Remington 700 Custom KS Mountain Rifle

Remington 700 Classic Rifle

Ruger M77 Mark II Rifle

Ruger M77 Mark II Magnum Rifle

Ruger M77RL Ultra Light

Ruger M77 Mark II All-Weather Stainless Rifle

Ruger M77 RSI International Carbine

Ruger M77 Mark II Express Rifle

Ruger M77VT Target Rifle

Sako Hunter Rifle

Sako Fiberclass Sporter

Sako Hunter Left-Hand Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   12
Page 00917

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 187 of 279

Case 3:17-cv-01017-BEN-JLB Document 53-10 Filed 04/09/18 PageID.6669 Page 57 of 428

HK REP 103-489; Minr. REP 103-489 (1994)

Sako Classic Bolt Action

Sako Hunter LS Rifle

Sako Deluxe Lighweight

Sako Super Deluxe Sporter

Sako Mannlicher-Style Carbine

Sako Varmint Heavy Barrel

Sako TRG-S Bolt-Action Rifle

Sauer 90 Bolt-Action Rifle

Savage 110G Bolt-Action Rifle

Savage 110CY Youth/Ladies Rifle

Savage 110WLE One of One Thousand Limited Edition Rifle

Savage 110GXP3 Bolt-Action Rifle

Savage 110F Bolt-Action Rifle

Savage 110FXP3 Bolt-Action Rifle

Savage 110GV Varmint Rifle

Savage 110FV Varmint Rifle

Savage Model 110FVS Varmint Rifle

Savage Model 112BV Heavy Barrel Varmint Rifle

Savage 116FSS Bolt-Action Rifle

Savage Model 116SK Kodiak Rifle

Savage 110FP Polic Rifle

Steyr-Mannlicher Sporter Models SL, L, M, S, S/T

Steyr-Mannlicher Luxus Model L, M, S

Steyr-Mannlicher Model M Professional Rifle

Tikka Bolt-Action Rifle

Tikka Premium Grade Rifle

Tikka Varmint/Continental Rifle

Tikka Whitetail/Battue Rifle

Ultra Light Arms Model 20 Rifle

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26
Page 00918

ER_3090

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 188 of 279

Case 3:17-cv-01017-BEN-JLB   Document 53-10   Filed 04/09/18   PageID.6670   Page 58 of 428
H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Ultra Light Arms Model 28, Model 40 Rifles

Voere VEC 91 Lightning Bolt-Action Rifle

Voere Model 2166 Bolt-Action Rifle

Voere Model 2155, 2150 Bolt-Action Rifles

Weatherby Mark V Deluxe Bolt-Action Rifle

Weatherby Lasermark V Rifle

Weatherby Mark V Crown Custom Rifles

Weatherby Mark V Safari Grade Custom Rifle

Weatherby Mark V Sporter Rifle

Weatherby Mark V Safari Grade Custom Rifles

Weatherby Weathermark Rifle

Weatherby Weathermark Alaskan Rifle

Weatherby Classicmark No. 1 Rifle

Weatherby Weatherguard Alaskan Rifle

Weatherby Vanguard VGX Deluxe Rifle

Weatherby Vanguard Classic Rifle

Weatherby Vanguard Classic No. 1 Rifle

Weatherby Vanguard Weathermark Rifle

Wichita Classis Rifle

Wichita Varmint Rifle

Winchester Model 70 Sporter

Winchester Model 70 Sporter WinTuff

Winchester Model 70 SM Sporter

Winchester Model 70 Stainless Rifle

Winchester Model 70 Varmint

Winchester Model 70 Synthetic Heavy Varmint Rifle

Winchester Model 70 DBM Rifle

Winchester Model 70 DBM-S Rifle

Winchester Model 70 Featherweight

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 14
Page 00919

Winchester Model 70 Featherweight WinTuff

Winchester Model 70 Featherweight Classic

Winchester Model 70 Lightweight Rifle

Winchester Ranger Rifle

Winchester Model 70 Super Express Magnum

Winchester Model 70 Super Grade

Winchester Model 70 Custom Sharpshooter

Winchester Model 70 Custom Sporting Sharpshooter Rifle

**Centerfire Rifles–Single Shot**

Armsport 1866 Sharps Rifle, Carbine

Brown Model One Single Shot Rifle

Browning Model 1885 Single Shot Rifle

Dakota Single Shot Rifle

Desert Industries G-90 Single Shot Rifle

Harrington & Richardson Ultra Varmint Rifle

Model 1885 High Wall Rifle

Navy Arms Rolling Block Buffalo Rifle

Navy Arms #2 Creedmoor Rifle

Navy Arms Sharps Cavalry Carbine

Navy Arms Sharps Plains Rifle

New Enlgand Firearms Handi-Rifle

Red Willow Armory Ballard No. 5 Pacific

Red Willow Armory Ballard No. 1.5 Hunting Rifle

Red Willow Armory Ballard No. 8 Union Hill Rifle

Red Willow Armory Ballard No. 4.5 Target Rifle

Remington-Style Rolling Block Carbine

Ruger No. 1B Single Shot

Ruger No. 1A Light Sporter

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   15
Page 00920

ER_3092

Ruger No. 1H Tropical Rifle

Ruger No. 1S Medium Sporter

Ruger No. 1 RSI International

Ruger No. 1V Special Varminter

C. Sharps Arms New Model 1874 Old Reliable

C. Sharps Arms New Model 1875 Rifle

C. Sharps Arms 1875 Classic Sharps

C. Sharps Arms New Model 1875 Target & Long Range

Shiloh Sharps 1874 Long Range Express

Shiloh Sharps 1874 Montana Roughrider

Shiloh Sharps 1874 Military Carbine

Shiloh Sharps 1874 Business Rifle

Shiloh Sharps 1874 Military Rifle

Sharps 1874 Old Reliable

Thompson/Center Contender Carbine

Thompson/Center Stainless Contender Carbine

Thompson/Center Contender Carbine Survival System

Thompson/Center Contender Carbine Youth Model

Thompson/Center TCR '87 Single Shot Rifle

Uberti Rolling Block Baby Carbine

**Drillings, Combination Guns, Double Rifles**

Baretta Express SSO O/U Double Rifles

Baretta 455 SxS Express Rifle

Chapuis RGExpress Double Rifle

Auguste Francotte Sidelock Double Rifles

Auguste Francotte Boxlock Double Rifle

Heym Model 55B O/U Double Rifle

Heym Model 55FW O/U Combo Gun

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26    16
Page 00921

Heym Model 88b Side-by-Side Double Rifle

Kodiak Mk. IV Double Rifle

Kreighoff Teck O/U Combination Gun

Kreighoff Trumpf Drilling

Merkel Over/Under Combination Guns

Merkel Drillings

Merkel Model 160 Side-by-Side Double Rifles

Merkel Over/Under Double Rifles

Savage 24F O/U Combination Gun

Savage 24F-12T Turkey Gun

Springfield Inc. M6 Scout Rifle/Shotgun

Tikka Model 412s Combination Gun

Tikka Model 412S Double Fire

A. Zoli Rifle-Shotgun O/U Combo

**Rimfire Rifles–Autoloaders**

AMT Lightning 25/22 Rifle

AMT Lightning Small-Game Hunting Rifle II

AMT Mannum Hunter Auto Rifle

Anschutz 525 Deluxe Auto

Armscor Model 20P Auto Rifle

Browning Auto-22 Rifle

Browning Auto-22 Grade VI

Krico Model 260 Auto Rifle

Lakefield Arms Model 64B Auto Rifle

Marlin Model 60 Self-Loading Rifle

Marlin Model 60ss Self-Loading Rifle

Marlin Model 70 HC Auto

Marlin Model 990l Self-Loading Rifle

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 17
Page 00922

Marlin Model 70P Papoose

Marlin Model 922 Magnum Self-Loading Rifle

Marlin Model 995 Self-Loading Rifle

Norinco Model 22 ATD Rifle

Remington Model 522 Viper Autoloading Rifle

Remington 522BDL Speedmaster Rifle

Ruger 10/22 Autoloading Carbine (w/o folding stock)

Survival Arms AR-7 Explorer Rifle

Texas Remington Revolving Carbine

Voere Model 2115 Auto Rifle

### Rimfire Rifles–Lever & Slide Action

Browning BL-22 Lever-Action Rifle

Marlin 39TDS Carbine

Marlin Model 39AS Golden Lever-Action Rifle

Remington 572BDL Fieldmaster Pump Rifle

Norinco EM-321 Pump Rifle

Rossi Model 62 SA Pump Rifle

Rossi Model 62 SAC Carbile

Winchester Model 9422 Lever-Action Rifle

Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles–Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle

Anschutz 1416D/1516D Classic Rifles

Anschutz 1418D/1518D Mannlicher Rifles

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700 FWT Bolt-Action Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 18
Page 00923

Anschutz 1700D Graphite Custom Rifle

Anschutz 1700D Bavarian Bolt-Action Rifle

Armscor Model 14P Bolt-Action Rifle

Armscor Model 1500 Rifle

BRNO ZKM-452 Deluxe Bolt-Action Rifle

BRNO ZKM 452 Deluxe

Beeman/HW 60-J-ST Bolt-Action Rifle

Browning A-Bolt 22 Bolt-Action Rifle

Browning A-Bolt Gold Medallion

Cabanas Phaser Rifle

Cabanas Master Bolt-Action Rifle

Cabanas Espronceda IV Bolt-Action Rifle

Cabanas Leyre Bolt-Action Rifle

Chipmunk Single Shot Rifle

Cooper Arms Model 36S Sporter Rifle

Dakota 22 Sporter Bolt-Action Rifle

Krico Model 300 Bolt-Action Rifles

Lakefield Arms Mark II Bolt-Action Rifle

Lakefield Arms Mark I Bolt-Action Rifle

Magtech Model MT-22C Bolt-Action Rifle

Marlin Model 880 Bolt-Action Rifle

Marlin Model 881 Bolt-Action Rifle

Marlin Model 882 Bolt-Action Rifle

Marlin Model 883 Bolt-Action Rifle

Marlin Model 883SS Bolt-Action Rifle

Marlin Model 25MN Bolt-Action Rifle

Marlin Model 25N Bolt-Action Repeater

Marlin Model 15YN "Little Buckaroo"

Mauser Model 107 Bolt-Action Rifle

ER_3096

Mauser Model 201 Bolt-Action Rifle

Navy Arms TU-KKW Training Rifle

Navy Arms TU-30/40 Carbine

Navy Arms TU-KKW Sniper Trainer

Norinco JW-27 Bolt-Action Rifle

Norinco JW-15 Bolt-Action Rifle

Remington 541-T

Remington 40-XR Rimfire Custom Sporter

Remington 541-T HB Bolt-Action Rifle

Remington 581-S Sportsman Rifle

Ruger 77/22 Rimfire Bolt-Action Rifle

Ruger K77/22 Varmint Rifle

Ultra Light Arms Model 20 RF Bolt-Action Rifle

Winchester Model 52B Sporting Rifle

**Competition Rifles–Centerfire & Rimfire**

Anschutz 64-MS Left Silhouette

Anschutz 1808D RT Super Match 54 Target

Anschutz 1827B Biathlon Rifle

Anschutz 1903D Match Rifle

Anschutz 1803D Intermediate Match

Anschutz 1911 Match Rifle

Anschutz 54.18MS REP Deluxe Silhouette Rifle

Anschutz 1913 Super Match Rifle

Anschutz 1907 Match Rifle

Anschutz 1910 Super Match II

Anschutz 54.18MS Silhouette Rifle

Anschutz Super Match 54 Targe Model 2013

Anschutz Super Match 54 Targe Model 2007

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   20
Page 00925

Beeman/Feinwerkbau 2600 Target Rifle

Cooper Arms Model TRP-1 ISU Standard Rifle

E.A.A./Weihrauch HW 60 Target Rifle

E.A.A./HW 60 Match Rifle

Finnish Lion Standard Target Rifle

Krico Model 360 S2 Biathlon Rifle

Krico Model 400 Match Rifle

Krico Model 360S Biathlon Rifle

Krico Model 500 Kricotronic Match Rifle

Krico Model 600 Sniper Rifle

Krico Model 600 Match Rifle

Lakefield Arms Model 90B Target Rifle

Lakefield Arms Model 91T Target Rifle

Lakefield Arms Model 92S Silhouette Rifle

Marlin Model 2000 Target Rifle

Mauser Model 86-SR Specialty Rifle

McMillan M-86 Sniper Rifle

McMillan Combo M-87/M-88 50-Caliber Rifle

McMillan 300 Phoenix Long-Range Rifle

McMillan M-89 Sniper Rifle

McMillan National Match Rifle

McMillan Long-Range Rifle

Parker-Hale M-87 Target Rifle

Parker-Hale M-85 Sniper Rifle

Remington 40-XB Rangemaster Target Centerfire

Remington 40-XR KS Rimfire Position Rifle

Remington 40-XBBR KS

Remington 40-XC KS National Match Course Rifle

Sako TRG-21 Bolt-Action Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   21
Page 00926

Steyr-Mannlicher Match SPG-UIT Rifle

Steyr-Mannlicher SSG P-I Rifle

Steyr-Mannlicher SSG P-III Rifle

Steyr-Mannlicher SSG P-IV Rifle

Tanner Standard UIT Rifle

Tanner 50 Meter Free Rifle

Tanner 300 Meter Free Rifle

Wichita Silhouette Rifle

**Shotguns–Autoloaders**

American Arms/Franchi Black Magic 48/AL

Benelli Super Black Eagle Shotgun

Benelli Super Black Eagle Slug Gun

Benelli M1 Super 90 Field Auto Shotgun

Benelli Montefeltro Super 90 20-Gauge Shotgun

Benelli Montefeltro Super 90 Shotgun

Benelli M1 Sporting Special Auto Shotgun

Benelli Black Eagle Competition Auto Shotgun

Beretta A-303 Auto Shotgun

Beretta 390 Field Auto Shotgun

Beretta 390 Super Trap, Super Skeet Shotguns

Beretta Vittoria Auto Shotgun

Beretta Model 1201F Auto Shotgun

Browning BSA 10 Auto Shotgun

Browning Bsa 10 Stalker Auto Shotgun

Browning A-500R Auto Shotgun

Browning A-500G Auto Shotgun

Browning A-500G Sporting Clays

Browning Auto-5 Light 12 and 20

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 22
Page 00927

ER_3099

Browning Auto-5 Stalker

Browning Auto-5 Magnum 20

Browning Auto-5 Magnum 12

Churchill Turkey Automatic Shotgun

Cosmi Automatic Shotgun

Maverick Model 60 Auto Shotgun

Mossberg Model 5500 Shotgun

Mossberg Model 9200 Regal Semi-Auto Shotgun

Mossberg Model 9200 USST Auto Shotgun

Mossberg Model 9200 Camo Shotgun

Mossberg Model 6000 Auto Shotgun

Remington Model 1100 Shotgun

Remington 11-87 Premier shotgun

Remington 11-87 Sporting Clays

Remington 11-87 Premier Skeet

Remington 11-87 Premier Trap

Remington 11-87 Special Purpose Magnum

Remington 11-87 SPS-T Camo Auto Shotgun

Remington 11-87 Special Purpose Deer Gun

Remington 11-87 SPS-BG-Camo Deer/Turkey Shotgun

Remington 11-87 SPS-Deer Shotgun

Remington 11-87 Special Purpose Synthetic Camo

Remington SP-10 Magnum-Camo Auto Shotgun

Remington SP-10 Magnum Auto Shotgun

Remington SP-10 Magnum Turkey Combo

Remington 1100 LT-20 Auto

Remington 1100 Special Field

Remington 1100 20-Gauge Deer Gun

Remington 1100 LT-20 Tournament Skeet

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26
Page 00928

23

**ER_3100**

Winchester Model 1400 Semi-Auto Shotgun

**Shotguns—Slide Actions**

Browning Model 42 Pump Shotgun

Browning BPS Pump Shotgun

Browning BPS Stalker Pump Shotgun

Browning BPS Pigeon Grade Pump Shotgun

Browning BPS Pump Shotgun (Ladies and Youth Model)

Browning BPS Game Gun Turkey Special

Browning BPS Game Gun Deer Special

Ithaca Model 87 Supreme Pump Shotgun

Ithaca Model 87 Deerslayer Shotgun

Ithaca Deerslayer II Rifled Shotgun

Ithaca Model 87 Turkey Gun

Ithaca Model 87 Deluxe Pump Shotgun

Magtech Model 586-VR Pump Shotgun

Maverick Models 88, 91 Pump Shotguns

Mossberg Model 500 Sporting Pump

Mossberg Model 500 Camo Pump

Mossberg Model 500 Muzzleloader Combo

Mossberg Model 500 Trophy Slugger

Mossberg Turkey Model 500 Pump

Mossberg Model 500 Bantam Pump

Mossberg Field Grade Model 835 Pump Shotgun

Mossberg Model 835 Regal Ulti-Mag Pump

Remington 870 Wingmaster

Remington 870 Special Purpose Deer Gun

Remington 870 SPS-BG-Camo Deer/Turkey Shotgun

Remington 870 SPS-Deer Shotgun

Exhibit 26 24
Page 00929

**ER_3101**

Remington 870 Marine Magnum

Remington 870 TC Trap

Remington 870 Special Purpose Synthetic Camo

Remington 870 Wingmaster Small Gauges

Remington 870 Express Rifle Sighted Deer Gun

Remington 879 SPS Special Purpose Magnum

Remington 870 SPS-T Camo Pump Shotgun

Remington 870 Special Field

Remington 870 Express Turkey

Remington 870 High Grades

Remington 870 Express

Remington Model 870 Express Youth Gun

Winchester Model 12 Pump Shotgun

Winchester Model 42 High Grade Shotgun

Winchester Model 1300 Walnut Pump

Winchester Model 1300 Slug Hunter Deer Gun

Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun

Winchester Model 1300 Turkey Gun

Winchester Model 1300 Ranger Pump Gun

**Shotguns–Over/Unders**

American Arms/Franchi Falconet 2000 O/U

American Arms Silver I O/U

American Arms Silver II Shotgun

American Arms Silver Skeet O/U

American Arms/Franchi Sporting 2000 O/U

American Arms Silver Sporting O/U

American Arms Silver Trap O/U

American Arms WS/OU 12, TS/OU 12 Shotguns

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 25
Page 00930

**ER_3102**

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 200 of 279

Case 3:17-cv-01017-BEN-JLB   Document 53-10   Filed 04/09/18   PageID.6682   Page 70 of 428

H&K REP 103-489; Minn. REP 103-489 (1994)

American Arms WT/OU 10 Shotgun

Armsport 2700 O/U Goose Gun

Armsport 2700 Series O/U

Armsport 2900 Tri-Barrel Shotgun

Baby Bretton Over/Under Shotgun

Beretta Model 686 Ultralight O/U

Beretta ASE 90 Competition O/U Shotgun

Beretta Over/Under Field Shotguns

Beretta Onyx Hunder Sport O/U Shotgun

Beretta Model SO5, SO6, SO9 Shotguns

Beretta Sporting Clay Shotguns

Beretta 687EL Sporting O/U

Beretta 682 Super Sporting O/U

Beretta Series 682 Competition Over/Unders

Browning Citori O/U Shotgun

Browning Superlight Citori Over/Under

Browning Lightning Sporting Clays

Browning Micro Citori Lightning

Browning Citori Plus Trap Combo

Browning Citori Plus Trap Gun

Browning Citori O/U Skeet Models

Browning Citori O/U Trap Models

Browning Special Sporting Clays

Browning Citori GTI Sporting Clays

Browning 325 Sporting Clays

Centurion Over/Under Shotgun

Chapuis Over/Under Shotgun

Connecticut Valley Classics Classic Sporter O/U

Connecticut Valley Classics Classic Field Waterfowler

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   26
Page 00931

ER_3103

Charles Daly Field Grade O/U

Charles Daly Lux O/U

E.A.A./Sabatti Sporting Clays Pro-Gold O/U

E.A.A./Sabatti Falcon-Mon Over/Under

Kassnar Grade I O/U Shotgun

Krieghoff K-80 Sporting Clays O/U

Krieghoff K-80 Skeet Shotgun

Krieghoff K-80 International Skeet

Krieghoff K-80 Four-Barrel Skeet Set

Krieghoff K-80/RT Shotguns

Krieghoff K-80 O/U Trap Shotgun

Laurona Silhouette 300 Sporting Clays

Laurona Silhouette 300 Trap

Laurona Super Model Over/Unders

Ljutic LM-6 Deluxe O/U Shotgun

Marocchi Conquista Over/Under Shotgun

Marocchi Avanza O/U Shotgun

Merkel Model 200E O/U Shotgun

Merkel Model 200E Skeet, Trap Over/Unders

Merkel Model 203E, 303E Over/Under Shotguns

Perazzi Mirage Special Sporting O/U

Perazzi Mirage Special Four-Gauge Skeet

Perazzi Sporting Classic O/U

Perazzi MX7 Over/Under Shotguns

Perazzi Mirage Special Skeet Over/Under

Perazzi MX8/MX8 Special Trap, Skeet

Perazzi MX8/20 Over/Under Shotgun

Perazzi MX9 Single Over/Under Shotguns

Perazzi MX12 Hunting Over/Under

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   27
Page 00932

Perazzi MX28, MX410 Game O/U Shotfuns

Perazzi MX20 Hunting Over/Under

Piotti Boss Over/Under Shotgun

Remington Peerless Over/Under Shotgun

Ruger Red Label O/U Shotgun

Ruger Sporting Clays O/U Shotgun

San Marco 12-Ga. Wildflower Shotgun

San Marco Field Special O/U Shotgun

San Marco 10-Ga. O/U Shotgun

SKB Model 505 Deluxe Over/Under Shotgun

SKB Model 685 Over/Under Shotgun

SKB Model 885 Over/Under Trap, Skeet, Sporting Clays

Stoeger/IGA Condor I O/U Shotgun

Stoeger/IGA ERA 2000 Over/Under Shotgun

Techni-Mec Model 610 Over/Under

Tikka Model 412S Field Grade Over/Under

Weatherby Athena Grade IV O/U Shotguns

Weatherby Athena Grade V Classic Field O/U

Weatherby Orion O/U Shotguns

Weatherby II, III Classic Field O/Us

Weatherby Orion II Classic Sporting Clays O/U

Weatherby Orion II Sporting Clays O/U

Winchester Model 1001 O/U Shotgun

Winchester Model 1001 Sporting Clays O/U

Pietro Zanoletti Model 2000 Field O/U

**Shotguns–Side by Sides**

American Arms Brittany Shotgun

American Arms Gentry Double Shotgun

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 28
Page 00933

American Arms Derby Side-by-Side

American Arms Grulla #2 Double Shotgun

American Arms WS/SS 10

American Arms TS/SS 10 Double Shotgun

American Arms TS/SS 12 Side-by-Side

Arrieta Sidelock Double Shotguns

Armsport 1050 Series Double Shotguns

Arizaga Model 31 Double Shotgun

AYA Boxlock Shotguns

AYA Sidelock Double Shotguns

Beretta Model 452 Sidelock Shotgun

Beretta Side-by-Side Field Shotguns

Crucelegui Hermanos Model 150 Double

Chapuis Side-by-Side Shotgun

E.A.A./Sabatti Sabe-Mon Double Shotgun

Charles Daly Model Dss Double

Ferlib Model F VII Double Shotgun

Auguste Francotte Boxlock Shotgun

Auguste Francotte Sidelock Shotgun

Garbi Model 100 Double

Garbi Model 100 Side-by-Side

Garbi Model 103A, B Side-by-Side

Garbi Model 200 Side-by-Side

Bill Hanus Birdgun Doubles

Hatfield Uplander Shotgun

Merkell Model 8, 47E Side-by-Side Shotguns

Merkel Model 47LSC Sporting Clays Double

Merkel Model 47S, 147S Side-by-Sides

Parker Reproductions Side-by-Side

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   29
Page 00934

ER_3106

H&R REP. 103-489; H&R. REP. 103-489 (1994)

Piotti King No. 1 Side-by-Side

Piotti Lunik Side-by-Side

Piotti King Extra Side-by-Side

Piotti Piuma Side-by-Side

Precision Sports Model 600 Series Doubles

Rizzini Boxlock Side-by-Side

Rizzini Sidelock Side-by-Side

Stoeger/IGA Side-by-Side Shotgun

Ugartechea 10-Ga. Magnum Shotgun

**Shotguns—Bolt Actions & Single Shots**

Armsport Single Barrel Shotgun

Browning BT-99 Competition Trap Special

Browning BT-99 Plus Trap Gun

Browning BT-99 Plus Micro

Browning Recoilless Trap Shotgun

Browning Micro Recoilless Trap Shotgun

Desert Industries Big Twenty Shotgun

Harrington & Richardson Topper Model 098

Harrington & Richardson Topper Classic Youth Shotgun

Harrington & Richardson N.W.T.F. Turkey Mag

Harrington & Richardson Topper Deluxe Model 098

Krieghoff KS-5 Trap Gun

Krieghoff KS-5 Special

Krieghoff KS-80 Single Barrel Trap Gun

Ljutic Mono Gun Single Barrel

Ljutic LTX Super Deluxe Mono Gun

Ljutic Recoilless Space Gun Shotgun

Marlin Model 55 Goose Gun Bolt Action

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 30
Page 00935

ER_3107

New England Firearms Turkey and Goose Gun

New England Firearms N.W.T.F. Shotgun

New England Firearms Tracker Slug Gun

New England Firearms Standard Pardner

New England Firearms Survival Gun

Perazzi TM1 Special Single Trap

Remington 90-T Super Single Shotgun

Snake Charmer II Shotgun

Stoeger/IGA Reuna Single Barrel Shotgun

Thompson/Center TCR '87 Hunter Shotgun.".

## SUMMARY AND PURPOSE

The purpose of this bill is to create criminal penalties for the manufacture, transfer, or possession of certain firearms within the category of firearms known as "semiautomatic assault weapons." It also creates such penalties for certain ammunition feeding devices, as well as any combination of parts from which such a device can be assembled.

In reporting legislation banning certain assault weapons last Congress, the Committee on the Judiciary said:

The threat posed by criminals and mentally deranged individuals armed with semi-automatic assault weapons has been tragically widespread. [1]

Since then, the use of semiautomatic assault weapons by criminal gangs, drug-traffickers, and mentally deranged persons continues to grow. [2]

H.R. 4296 will restrict the availability of such weapons in the future. The bill protects the rights of persons who lawfully own such weapons on its date of enactment by a universal "grandfathering" clause and specifically exempts certain firearms traditionally used for hunting and other legitimate support. It contains no confiscation or registration provisions; however, it does establish record-keeping requirements for transfers involving grandfathered semiautomatic assault weapons. Such record-keeping is not required for transfers of grandfathered ammunition feeding devices (or their component parts.) H.R. 4296 expires ("sunsets") on its own terms after 10 years.

## BACKGROUND

A series of hearings over the last five years on the subject of semiautomatic assault weapons has demonstrated that they are a growing menace to our society of proportion to their numbers: [3] As this Committee said in its report to the last Congress:

The carnage inflicted on the American people be criminals and mentally deranged people armed with Rambo-style, semi-automatic assault weapons has been overwhelming and continuing. Police and law enforcement groups all

over the nation have joined together to support legislation that would help keep these weapons out of the hands of criminals. [4]

Since then, evidence continues to mount that these semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder.

Use in Crimes. On April 25, 1994, the Director of the Federal Bureau of Alcohol, Tobacco and Firearms testified that the percentage of semiautomatic assault weapons among guns traced because of their use in crime is increasing:

In 1990, 5.9 percent of firearms traced were assault weapons. In 1993, that percentage rose to 8.1 percent. Since Justice Department studies have shown that assault weapons make up only about 1 percent of the firearms in circulation, these percentages strongly suggest that they are proportionately more often used in crimes. [5]

Law enforcement officials confirm this statistical evidence in accounts of the rising level of lethality they face from assault weapons on the street. For example, the representative of a national police officers' organization testified:

In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and preservation. The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon. [6]

A representative of federal law enforcement officers testified that semiautomatic assault weapons "dramatically escalate the firepower or the user" and "have become the weapon of choice for drug runners, hate groups and the mentally unstable." [7]

The TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals. Cities across the country confiscate more TEC–9s than any other assault pistol. The prototype for the TEC–9 was originally designed as a submachine gun for the South African government. Now it comes standard with an ammunition magazine holding 36 rounds of 9 mm cartridges. It also has a threaded barrel to accept a silencer, and a barrel shroud to cool the barrel during rapid fire. To any real sportsman or collector, this firearm is a piece of junk, yet is very popular among criminals. [8]

The Secretary of Housing and Urban Development testified that criminal gangs in Chicago routinely use semiautomatic assault weapons to intimidate not only residents but also security guards, forcing the latter to remove metal detectors installed to detect weapons. [9]

Use in Mass Killings and Killings of Law Enforcement Officers. Public concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered.

On April 25, 1994, the Subcommittee on Crime and Criminal Justice heard testimony about several incidents representative of such killings.

On February 22, 1994, Los Angeles (CA) Police Department rookie officer Christy Lynn Hamilton was ambushed and killed by a drug-abusing teenager using a Colt AR–15. The round that killed Officer Hamilton penetrated a car door, skirted the armhole of her protective vest, and lodged in her chest. The teenager also killed his father, who had given him

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 [32]
Page 00937

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

the gun, and took his own life as well. Officer Hamilton had been voted the most inspirational officer in her graduating class only weeks before her murder. Officer Hamilton's surviving brother testified about the impact of this murder. [10]

On December 7, 1993, a deranged gunman walked through a Long Island Railroad commuter train, shooting commuters. Six died and 19 were wounded. The gunman used a Ruger semiautomatic pistol. Although the pistol itself would not be classified as an assault weapon under this bill, its 15 round ammunition magazine ("clip") would be banned. The gunman had several of these high capacity 15 round magazines and reloaded several times, firing between 30 to 50 rounds before he was overpowered while trying to reload yet again. The parents of one of the murdered victims, Amy Locicero Federici, testified about the impact of this murder. [11]

On February 28, 1993, 4 special agents of the Bureau of Alcohol, Tobacco and Firearms were killed and 15 were wounded while trying to serve federal search and arrest warrants at the Branch Davidian compound in Waco, Texas. The Branch Davidian arsenal included hundreds of assault weapons, including AR–15s, AK–47s, Street Sweepers, MAC10s and MAC–11s, along with extremely high capacity magazines (up to 260 rounds). [12]

Finally, on July 1, 1993, gunman Gian Luigi Ferri Killed 8 people and wounded 6 others in a San Francisco high rise office building. Ferri–who took his own life–used two TEC DC9 assault pistols with 50 round magazines, purchased from a gun dealer in Las Vegas, Nevada. Two witnesses, both of whom lost spouses in the slaughter, and one of whom was herself seriously injured, testified about this incident. [13]

Numerous other notorious incidents involving semiautomatic assault weapons have occurred. They include the January 25, 1993, slaying of 2 CIA employees and wounding of 3 others at McLean, VA, (AK–47), and the January 17, 1989 murder in a Stockton, CA, schoolyard of 5 small children, and wounding of 29 others (AK–47 and 75 round magazine, firing 106 rounds in less than 2 minutes).

Several witnesses who were victims themselves during such incidents testified in opposition to H.R. 4296/H.R. 3527, and in opposition to the banning of any semiautomatic assault weapons or ammunition feeding devices.

Dr. Suzanna Gratia witnessed the brutal murder, in Luby's cafeteria located in Killeen, Texas, of both of her parents who had just celebrated their 47 weeding anniversary. Just a few days before, she had removed her gun from her purse and left it in her car to comply with a Texas law which does not allow concealed carrying of a firearm. Dr. Gratia testified:

I am mad at my legislators for legislating me out of a right to protect myself and my family. I would much rather be sitting in jail with a felony offense on my head and have my parents alive. As far as these so‑called assault weapons, you say that they don't have any defense use. You tell that to the guy that I saw on a videotape of the Los Angeles riots standing on his rooftop protecting his property and his life from an entire mob with one of these so‑called assault weapons. Tell me that he didn't have a legitimate self‑defense use. [14]

Ms. Jacquie Miller was shot several times with a semiautomatic assault weapon and left for dead at her place of employment with the Standard Gravure Printing Company in Louisville, Kentucky, when a fellow employee went on a killing spree. Now permanently disabled, Ms. Miller testified:

It completely enrages me that my tragedy is being used against me to deny me and all the law abiding citizens of this country to the right of the firearm of our choosing. I refuse in return to use my tragedy for retribution against innocent people just to make myself feel better for having this misfortune. Enforce the laws against criminals already on the books. After all, there are already over 20,000 of them. [15] More won't do a thing for crime control *** You cannot ban everything in the world that could be used as a weapon because you fear it, don't understand it, or don't agree with it.

Exhibit 26
Page 00938

ER_3110

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

This is America, not Lithuania or China. Our most cherished possession is our Constitution and Bill of Rights. Let's not sell those down the river or we could one day find ourselves in a boat without a paddle against the criminals who think we are easy pickings. [16]

Mr. Phillip Murphy used his lawfully-possessed Colt AR–15 H-BAR Sporter semiautomatic rifle–a gun which would be specifically banned by H.R. 4296–to capture one of Tucson, Arizona's most wanted criminals who was attempting to burglarize the home of Mr. Murphy's parents. The 19-year old criminal he captured was a three-time loser with 34 prior convictions who was violating his third adult State parole for a knife assault. Mr. Murphy testified:

I respectfully urge this Committee and the Congress of the United States to restrain themselves from forcing tens of millions of law-abiding Americans like me to choose between the law and their lives. [17]

The Characteristics of Military-Style Semiautomatic Assault Weapons. The question of what constitutes an assault weapon has been studied by the Congress and the executive branch as the role of these guns in criminal violence has grown.

A Bureau of Alcohol, Tobacco and Firearms working group formed under the Bush administration to consider banning foreign imports of such semiautomatic assault weapons conducted the most recent comprehensive study of military assault weapons and the civilian firearms that are modelled after them. [18] The working group formulated a definition of the civilian version, and a list of the assault weapon characteristics that distinguish them from sporting guns. That technical work has to a large extent been incorporated into H.R. 4296. [19]

The working group settled on the term "semiautomatic assault" for the civilian firearms at issue. That term distinguishes the civilian firearms from the fully automatic military weapons (machineguns) [20] after which they are modelled and often simply adapted by eliminating the automatic fire feature. The group determined that "semiautomatic assault rifles *** represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle." [21]

The group elaborated on the nature of those characteristics as follows:

The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK–47, is a weapon designed for killing or disabling the enemy and *** has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles. These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. [22]

The "selective fire" feature to which the working group referred is the ability of the military versions to switch from fully automatic to semiautomatic fire at the option of the user. Since Congress has already banned certain civilian transfer or possession of machineguns, [23] the civilian models of these guns are produced with semiautomatic fire capability only. However, testimony was received by the Subcommittee on Crime and Criminal Justice that it is a relatively simple task to convert [24] a semiautomatic weapon to automatic fire [25] and that semiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns. [26]

The 1989 Report's analysis of assault characteristics which distinguish such firearms from sporting guns was further explained by an AFT representative at a 1991 hearing before the Subcommittee on Crime and Criminal Justice:

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 [34]
Page 00939

We found that the banned rifles represented a distinctive type of rifle characterized by certain military features which differentiated them from the traditional sporting rifles. These include the ability to accept large capacity detachable magazines, bayonets, folding or telescoping stocks, pistol grips, flash suppressors, bipods, grenade launchers and night sights, and the fact that they are semiautomatic versions of military machineguns. [27]

Proponents of these military style semiautomatic assault weapons often dismiss these combat-designed features as merely "cosmetic." The Subcommittee received testimony that, even if these characteristics were merely "cosmetic" in effect, it is precisely those cosmetics that contribute to their usefulness as tools of intimidation by criminals. [28]

However, the expert evidence is that the features that characterize a semiautomatic weapon as an assault weapon are not merely cosmetic, but do serve specific, combat-functional ends. By facilitating the deadly "spray fire" of the weapon or enhancing its portability–a useful attribute in combat but one which serves to enhance the ability to conceal the gun in civilian life. [29]

High-capability magazine, for example, make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent. [30] Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds. Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds. Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. As noted above, tests demonstrate that semiautomatic guns can be fired at very high rates of fire. In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities–from 3 to 5.

Because of the greater enhanced lethality–numbers of rounds that can be fired quickly without reloading–H.R. 4296 also contains a ban on ammunition magazines which hold more than 10 rounds, as well as any combination of parts from which such a magazine can be assembled.

Barrel shrouds also serve a combat-functional purpose. [31] Gun barrels become very hot when multiple rounds are fired through them quickly. The barrel shroud cools the barrel so that it will not overheat, and provides the shooter with a convenient grip especially suitable for spray-firing.

Similar military combat purposes are served by flash suppressors (designed to help conceal the point of fire in night combat), bayonet mounts, grenade launchers, and pistol grips engrafted on long guns. [32]

The net effect of these military combat features is a capability for lethality–more wounds, more serious, in more victims–far beyond that of other firearms in general, including other semiautomatic guns. [33]

### BRIEF EXPLANATION OF H.R. 4296

H.R. 4296 combines two approaches which have been followed in the past in legislation proposed to control semiautomatic assault weapons–the so-called "list" approach and the "characteristics" approach.

The bill does not ban any semiautomatic assault weapons nor large capacity ammunition feeding device (or component parts) otherwise lawfully possessed on the date of enactment. However, records must be kept by both the transferor and the transferee involved in any transfer of these weapons, but not of the feeding devices (or combination of parts).

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26
Page 00940

35

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

The bill explicitly exempts all guns with other than semiautomatic actions—i.e., bolt, slide, pump, and lever actions. In addition, it specifically exempts by make and model 661 long guns most commonly used in hunting and recreational sports, [34] making clear that these semiautomatic assault weapons are not and cannot be subject to any ban.

Section 2(z) of the bill lists 19 specific semiautomatic assault weapons—such as the AK–47, M–10, TEC–9, Uzi, etc.—that are banned. [35] It also defines other assault weapons by specifically enumerating combat style characteristics and bans those semiautomatic assault weapons that have 2 or more of those characteristics. [36]

The bill makes clear that the list of exempted guns is not exclusive. The fact that a gun is not on the exempted list may not be construed to mean that it is banned. Thus, a gun that is not on the list of guns specifically banned by name would only be banned if it met the specific characteristics set out in the characteristics test. No gun may be removed from the exempted list.

H.R. 4296 also bans large capacity ammunition feeding devices—clips that accept more than 10 rounds of ammunition—as well as any combination of parts from which such a device can be assembled.

The bill exempts all semiautomatic assault weapons and large capacity ammunition feeding devices (as well as any combination of parts) that are lawfully possessed on date of enactment. Owners of such semiautomatic assault weapons need do nothing under the bill unless they wish to transfer the semiautomatic assault weapon.

H.R. 4296 differs significantly from previously-proposed legislation—it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns. Most significantly, the ban in the 1991 proposed bill gave the Bureau of Alcohol, Tobacco, and Firearms authority to ban any weapon which "embodies the same configuration" as the named list of guns. The current bill, H.R. 4296 does not contain any such general authority. Instead, it contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons.

### 102d Congress

The Subcommittee on Crime and Criminal Justice held hearings on semiautomatic assault weapons on June 12 and July 25, 1991. A ban on certain semiautomatic assault weapons was included as Subtitle A of Title XX in H.R. 3371, the Omnibus Crime Control Act of 1991. A ban on large capacity ammunition feeding devices was included in the same bill. The bill was reported out of the Judiciary Committee on October 7, 1991. The provisions dealing with semiautomatic assault weapons and large capacity ammunition feeding devices were struck by the House of Representatives by a vote of 247–177 on October 17, 1991.

### 103d Congress

The Subcommittee on Crime and Criminal Justice held hearings on H.R. 4296 and its predecessor, H.R. 3527, which ban semiautomatic assault weapons, on April 25, 1994. The Subcommittee reported favorably on an amendment in the nature of a substitute to H.R. 4296 on April 26, 1994, by a recorded vote of 8–5.

### COMMITTEE ACTION

The Committee on the Judiciary met on April 28, 1994 to consider H.R. 4296, as amended. Two amendments were adopted during the Committee's consideration.

---

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 [36]
Page 00941

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

An amendment was offered to provide that the absence of a firearm from the list of guns specifically exempted from the ban may not be construed as evidence that the semiautomatic assault weapon is banned, and that no gun may be removed from the exempt list so long as the Act is in effect. This amendment was adopted by voice vote.

An amendment was offered to delete a provision that barred from owning any firearms those persons convicted of violating the recordkeeping requirements relating to grandfathered weapons. This amendment was adopted by voice vote.

A reporting quorum being present, the Committee on the Judiciary, by a roll call vote of 20 to 15, ordered H.R. 4296, as amended, favorably reported to the House.

### SECTION-BY-SECTION ANALYSIS

### SECTION 1–SHORT TITLE

This section provides that the Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

### SECTION 2–RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS

Subsection 2(a) makes it unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon (including any "copies or duplicates.")

The ban on transfer and possession does not apply to (1) weapons otherwise lawfully possessed on the date of enactment; (2) any of the firearms (or their replicas or duplicates) listed in Appendix A; (3) any manually operated (bolt, pump, slide, lever action), permanently inoperable, or antique firearms; (4) semiautomatic rifles that cannot accept a detachable magazine that holds more than 5 rounds; or, a semiautomatic shotgun that cannot hold more than 5 rounds in a fixed or detachable magazine.

The fact that a gun is not listed in Appendix A may not be construed to mean that it is banned. No gun listed in Appendix A may be removed from that exempted list so long as the Act is in effect.

Federal departments and agencies and those of States and their subdivisions are exempted. Law enforcement officers authorized to purchase firearms for official use are exempted, as are such officers presented with covered weapons upon retirement who are not otherwise prohibited from receiving such a weapon. Finally, weapons made, transferred, possessed, or imported for the purposes of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 2(b) defines semiautomatic assault weapons, both by name and by characteristics. It lists by name specific firearms, including "copies or duplicates" of such firearms. [37] Characteristics of covered semiautomatic rifles, pistols, and shotguns are defined by separate subsections applicable to each. In the case of rifles and pistols, in addition to being semiautomatic, a gun must be able to accept a detachable magazine and have at least 2 listed characteristics.

In the case of rifles, those characteristics are: (1) folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a bayonet mount; (4) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (5) a grenade launcher.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 [37]
Page 00942

In the case of pistols, the characteristics are: (1) a magazine that attaches to the pistol outside of the pistol grip; (2) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (3) a barrel shroud that permits the shooter to hold the firearm without being burned; (4) an unloaded manufactured weight of 50 ounces or more; and (5) a semiautomatic version of an automatic firearm.

In the case of shotguns, covered weapons must have at least 2 of the following four features: (1) a folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a fixed magazine capacity in excess of 5 rounds; and (4) an ability to accept a detachable magazine.

The section provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban on manufacture, transfer and possession. It also adds use of a semiautomatic assault weapon to the crimes covered by the mandatory minimum of 5 years under 18 USC Section 924(c)(1) for use in a federal crime of violence or drug trafficking crime.

Finally, the section requires that semiautomatic assault weapons manufactured after the date of enactment must clearly show the date on which the weapon was manufactured.

## SECTION 3–RECORDKEEPING REQUIREMENTS
## FOR TRANSFERS OF GRANDFATHERED FIREARMS

This section makes it unlawful to transfer a grandfathered semiautomatic assault weapon unless both the transferor and the transferee complete and retain a copy of federal form 4473 (or its successor). Within 90 days of enactment, the Secretary of the Treasury must issue regulations ensuring the availability of the form to owners of semiautomatic assault weapons. The Committee expects the Secretary to make such forms easily and readily available to such gun owners. The Committee further expects the Secretary to maintain the confidentiality of the requester and to ensure the destruction of any and all information pertaining to any request for such forms immediately upon complying with the request. The Committee does not expect the Secretary to release any such information to any other Department of the Federal, State or local Governments or to use the information in any way other than to comply with the requests for the form. The Committee would consider failure to comply with these expectations a very serious breach.

A person who knowingly violates the recordkeeping requirement shall be fined not more than $1,000, imprisoned for not more than 6 months or both.

## SECTION 4–BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES

Subsection 4(a) makes it unlawful for a person to transfer or possess a large capacity ammunition feeding device (which is defined to include any combination of parts from which such a device can be assembled.)

The ban on transfer and possession does not apply to (1) devices (or component parts) otherwise lawfully possessed on the date of enactment; (2) Federal departments and agencies and those of States and their subdivisions; (3) law enforcement officers authorized to purchase ammunition feeding devices for official use; devices transferred to such officers upon retirement who are not otherwise prohibited from receiving them; and (3) devices (or combination of parts) made, transferred, possessed, or imported for the purpose of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 4(b) defines large capacity ammunition feeding device to mean a magazine, belt, drum, feed strip, or similar device that has a capacity of more than 10 rounds, or can be readily restored or converted to accept more than 10 rounds.

Exhibit 26 [38]
Page 00943

**ER_3115**

It includes any combination of parts from which such a device can be assembled. It exempts an attached tubular device designed to accept and capable of operating only with .22 caliber rimfire ammunition.

Subsection 4(c) adds large capacity ammunition feeding devices to the definition of "firearm" under 18 US Code section 921(a)(3).

Subsection 4(d) provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban.

Subsection 4(e) requires that large capacity ammunition feeding devices manufactured after the date of enactment be identified by a serial number that clearly shows the device was manufactured after the date or imported after the date of enactment, and such other identification as the Secretary of the Treasury may by regulation prescribe.

### SECTION 5–STUDY BY ATTORNEY GENERAL

This section requires the Attorney General to study and report to the Congress no later than 30 months after its enactment the effects of the Act, particularly with regard to its impact–if any–on violent and drug-trafficking crime.

The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment.

### SECTION 6–EFFECTIVE DATE

The Act and the amendment made by the Act take effect on the date of enactment and are repealed effective as of the date that is 10 years after that date.

### SECTION 7–APPENDIX A TO SECTION 922 OF TITLE 18

This section adds, as Appendix A, a list of firearms that are specifically exempted from the ban on semiautomatic assault weapons.

### COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

### COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

### NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   39
Page 00944

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 4296 will have no significant inflationary impact on prices and costs in the national economy.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill H.R. 4296, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. Congress,
Congressional Budget Office.
Washington, DC, May 2, 1994.

Hon. Jack Brooks,
Chairman, Committee on the Judiciary,
House of Representatives, Washington, DC.

Dear Mr. Chairman: The Congressional Budget Office has reviewed H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, as ordered reported by the House Committee on the Judiciary on April 28, 1994. We estimate that enactment of the bill would result in costs to the federal government over the 1995–1999 period of less than $500,000 from appropriated amounts. In addition, we estimate that enactment of H.R. 4296 would lead to increases in receipts of less than $10 million a year from new criminal fines. Such receipts would be deposited in the Crime Victims Fund and spent in the following year. Because the bill could affect direct spending and receipts, pay-as-you-go procedures would apply. The bill would not affect the budgets of state or local governments.

H.R. 4296 would ban the manufacture, transfer, and possession of certain semiautomatic assault weapons not lawfully possessed as of the date of the bill's enactment. The bill also would ban the transfer and possession of certain large-capacity ammunition feeding devices not lawfully possessed as of the date of enactment. In addition, H.R. 4296 would establish recordkeeping requirements for transfers of grandfathered weapons and would direct the Attorney General to conduct a study of the bill's impact. Finally, the bill would create new federal crimes and associated penalties–prison sentences and criminal fines–for violation of its provisions.

The new recordkeeping requirements and the impact study would increase costs to the Department of the Treasury and the Department of Justice, respectively, but we estimate that these costs would be less than $500,000 over the next several years from appropriated amounts. The imposition of new criminal fines in H.R. 4296 could cause governmental receipts to increase through greater penalty collections. We estimate that any such increase would be less than $10 million annually. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

Robert D. Reischauer, Director.

## CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26  40
Page 00945

CHAPTER 44 OF TITLE 18, UNITED STATES CODE

\* \* \* \* \* \* \*

CHAPTER 44—FIREARMS

S 921. Definitions

(a) As used in this chapter—

(1)***

\* \* \* \* \* \* \*

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; [or (D) any destructive device.] (D) any destructive device; or (E) any large capacity ammunition feeding device. Such term does not include an antique firearm.

\* \* \* \* \* \* \*

(30) The term "semiautomatic assault weapon" means—

(A) any of the firearms, or copies or duplicates of the firearms, known as—

(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

(ii) Action Arms Israeli Military Industries UZI and Galil;

(iii) Beretta Ar70 (SC—70);

(iv) Colt AR—15;

(v) Fabrique National FN/FAL, FN/LAR, and FNC;

(vi) SWD M—10, M—11, M—11/9, and M—12;

(vii) Steyr AUG;

(viii) INTRATEC TEC—9, TEC—DC9 and TEC—22; and

(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a bayonet mount;

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26    41
Page 00946

(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

(v) a grenade launcher;

(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of–

(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

(v) a semiautomatic version of an automatic firearm; and

(D) a semiautomatic shotgun that has at least 2 of–

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a fixed magazine capacity in excess of 5 rounds; and

(iv) an ability to accept a detachable magazine.

(31) The term "large capacity ammunition feeding device"–

(A) means–

(i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and

(ii) any combination of parts from which a device described in clause (i) can be assembled; but

(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

S 922. Unlawful acts

(a) It shall be unlawful–

* * * * * * *

(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26  42
Page 00947

ER_3119

(3) Paragraph (1) shall not apply to–

(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

(B) any firearm that–

(i) is manually operated by bolt, pump, lever, or slide action;

(ii) has been rendered permanently inoperable; or

(iii) is an antique firearm;

(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.

The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.

(4) Paragraph (1) shall not apply to–

(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;

(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.

(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.

(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.

(5) As used in this subsection, the term "form 4473" means–

(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or

(B) any other form which–

(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and

(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).

(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.

(3) This subsection shall not apply to–

(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;

(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.

## APPENDIX A

### Centerfire Rifles–Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle

Browning BAR Mark II Safari Magnum Rifle

Browning High-Power Rifle

Heckler & Koch Model 300 Rifle

Iver Johnson M-1 Carbine

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 44
Page 00949

Iver Johnson 50th Anniversary M-1 Carbine

Marlin Model 9 Camp Carbine

Marlin Model 45 Carbine

Remington Nylon 66 Auto-Loading Rifle

Remington Model 7400 Auto Rifle

Remington Model 7400 Rifle

Remington Model 7400 Special Purpose Auto Rifle

Ruger Mini-14 Autoloading Rifle (w/o folding stock)

Ruger Mini Thirty Rifle

**Centerfire Rifles–Lever & Slide**

Browning Model 81 BLR Lever-Action Rifle

Browning Model 81 Long Action BLR

Browning Model 1886 Lever-Action Carbine

Browning Model 1886 High Grade Carbine

Cimarron 1860 Henry Replica

Cimarron 1866 Winchester Replicas

Cimarron 1873 Short Rifle

Cimarron 1873 Sporting Rifle

Cimarron 1873 30" Express Rifle

Dixie Engraved 1873 Rifle

E.M.F. 1866 Yellowboy Lever Actions

E.M.F. 1860 Henry Rifle

E.M.F. Model 73 Lever-Actions Rifle

Marlin Model 336CS Lever-Action Carbine

Marlin Model 30AS Lever-Action Carbine

Marlin Model 444SS Lever-Action Sporter

Marlin Model 1894S Lever-Action Carbine

Marlin Model 1894CS Carbine

Exhibit 26
Page 00950

**ER_3122**

Marlin Model 1894CL Classic

Marlin Model 1895SS Lever-Action Rifle

Mitchell 1858 Henry Replica

Mitchell 1866 Winchester Replica

Mitchell 1873 Winchester Replica

Navy Arms Military Henry Rifle

Navy Arms Henry Trapper

Navy Arms Iron Frame Henry

Navy Arms Henry Carbine

Navy Arms 1866 Yellowboy Rifle

Navy Arms 1873 Winchester-Style Rifle

Navy Arms 1873 Sporting Rifle

Remington 7600 Slide Action

Remington Model 7600 Special-Purpose Slide Action

Rossi M92 SRC Saddle-Ring Carbine

Rossi M92 SRS Short Carbine

Savage 99C Leber-Action Rifle

Uberti Henry Rifle

Uberti 1866 Sporting Rifle

Uberti 1873 Sporting Rifle

Winchester Model 94 Side Eject Lever-Action Rifle

Winchester Model 94 Trapper Side Eject

Winchester Model 94 Big Bore Side Eject

Winchester Model 94 Ranger Side Eject Lever-Action Rifle

Winchester Model 94 Wrangler Side Eject

**Centerfire Rifles--Bolt Action**

Alpine Bolt-Action Rifle

A-Square Caesar Bolt-Action Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   46
Page 00951

ER_3123

A-Square Hannibal Bolt-Action Rifle

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700D Bavarian Bolt-Action Rifle

Anschutz 1733D Mannlicher Rifle

Barret Model 90 Bolt-Action Rifle

Beeman/HW 60J Bolt-Action Rifle

Blaser R84 Bolt-Action Rifle

BRNO 537 Sporter Bolt-Action Rifle

BRNO ZKB 527 Fox Bolt-Action Rifle

BRNO ZKK 600, 601, 602 Bolt-Action Rifles

Browning A-Bolt Rifle

Browning A-Bolt Stainless Stalker

Browning A-Bolt Left Hand

Browning A-Bolt Short Action

Browning Euro-Bolt Rifle

Browning A-Bolt Gold Medallion

Browning A-Bolt Micro Medallion

Century Centurion 14 Sporter

Century Enfield Sporter #4

Century Swedish Sporter #38

Century Mauser 98 Sporter

Cooper Model 38 Centerfire Sporter

Dakota 22 Sporter Bolt-Action Rifle

Dakota 76 Classic Bolt-Action Rifle

Dakota 76 Short Action Rifles

Dakota 76 Safari Bolt-Action Rifle

Dakota 416 Rigby African

E.A.A./Sabatti Rover 870 Bolt-Action Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   47
Page 00952

ER_3124

Auguste Francotte Bolt-Action Rifles

Carl Gustaf 2000 Bolt-Action Rifle

Heym Magnum Express Series Rifle

Howa Lightning Bolt-Action Rifle

Howa Realtree Camo Rifle

Interarms Mark X Viscount Bolt-Action Rifle

Interarms Mini-Mark X Rifle

Interarms Mark X Whitworth Bolt-Action Rifle

Interarms Whitworth Express Rifle

Iver Johnson Model 5100A1 Long-Range Rifle

KDF K15 American Bolt-Action Rifle

Krico Model 600 Bolt-Action Rifle

Krico Model 700 Bolt-Action Rifle

Mauser Model 66 Bolt-Action Rifle

Mauser Model 99 Bolt-Action Rifle

McMillan Signature Classic Sporter

McMillan Signature Super Varminter

McMillan Signature Alaskan

McMillan Signature Titanium Mountain Rifle

McMillan Classic Stainless Sporter

McMillan Talon Safari Rifle

McMillan Talon Sporter Rifle

Midland 1500S Survivor Rifle

Navy Arms TU-33/40 Carbine

Parker-Hale Model 81 Classic Rifle

Parker-Hale Model 81 Classic African Rifle

Parker-Hale Model 1000 Rifle

Parker-Hale Model 1000M African Rifle

Parker-Hale Model 1100 Lightweight Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 48
Page 00953

Parker-Hale Model 1200 Super Rifle

Parker-Hale Model 1200 Super Clip Rifle

Parker-Hale Model 1300C Scout Rifle

Parker-Hale Model 2100 Midland Rifle

Parker-Hale Model 2700 Lightweight Rifle

Parker-Hale Model 2800 Midland Rifle

Remington Model Seven Bolt-Action Rifle

Remington Model Seven Youth Rifle

Remington Model Seven Custom KS

Remington Model Seven Custom MS Rifle

Remington 700 ADL Bolt-Action Rifle

Remington 700 BDL Bolt-Action Rifle

Remington 700 BDL Varmint Special

Remington 700 BDL European Bolt-Action Rifle

Remington 700 Varmint Synthetic Rifle

Remington 700 BDL SS Rifle

Remington 700 Stainless Synthetic Rifle

Remington 700 MTRSS Rifle

Remington 700 BDL Left Hand

Remington 700 Camo Synthetic Rifle

Remington 700 Safari

Remington 700 Mountain Rifle

Remington 700 Custom KS Mountain Rifle

Remington 700 Classic Rifle

Ruger M77 Mark II Rifle

Ruger M77 Mark II Magnum Rifle

Ruger M77RL Ultra Light

Ruger M77 Mark II All-Weather Stainless Rifle

Ruger M77 RSI International Carbine

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 49
Page 00954

ER_3126

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-14, Page 224 of 279

Case 3:17-cv-01017-BEN-JLB    Document 53-10    Filed 04/09/18    PageID.6706    Page 94 of 428

H&K REP. 103-489; Minn. REP. 103-489 (1994)

Ruger M77 Mark II Express Rifle

Ruger M77VT Target Rifle

Sako Hunter Rifle

Sako Fiberclass Sporter

Sako Hunter Left-Hand Rifle

Sako Classic Bolt Action

Sako Hunter LS Rifle

Sako Deluxe Lighweight

Sako Super Deluxe Sporter

Sako Mannlicher-Style Carbine

Sako Varmint Heavy Barrel

Sako TRG-S Bolt-Action Rifle

Sauer 90 Bolt-Action Rifle

Savage 110G Bolt-Action Rifle

Savage 110CY Youth/Ladies Rifle

Savage 110WLE One of One Thousand Limited Edition Rifle

Savage 110GXP3 Bolt-Action Rifle

Savage 110F Bolt-Action Rifle

Savage 110FXP3 Bolt-Action Rifle

Savage 110GV Varmint Rifle

Savage 110FV Varmint Rifle

Savage Model 110FVS Varmint Rifle

Savage Model 112BV Heavy Barrel Varmint Rifle

Savage 116FSS Bolt-Action Rifle

Savage Model 116SK Kodiak Rifle

Savage 110FP Polic Rifle

Steyr-Mannlicher Sporter Models SL, L, M, S, S/T

Steyr-Mannlicher Luxus Model L, M, S

Steyr-Mannlicher Model M Professional Rifle

Tikka Bolt-Action Rifle

Tikka Premium Grade Rifle

Tikka Varmint/Continental Rifle

Tikka Whitetail/Battue Rifle

Ultra Light Arms Model 20 Rifle

Ultra Light Arms Model 28, Model 40 Rifles

Voere VEC 91 Lightning Bolt-Action Rifle

Voere Model 2166 Bolt-Action Rifle

Voere Model 2155, 2150 Bolt-Action Rifles

Weatherby Mark V Deluxe Bolt-Action Rifle

Weatherby Lasermark V Rifle

Weatherby Mark V Crown Custom Rifles

Weatherby Mark V Safari Grade Custom Rifle

Weatherby Mark V Sporter Rifle

Weatherby Mark V Safari Grade Custom Rifles

Weatherby Weathermark Rifle

Weatherby Weathermark Alaskan Rifle

Weatherby Classicmark No. 1 Rifle

Weatherby Weatherguard Alaskan Rifle

Weatherby Vanguard VGX Deluxe Rifle

Weatherby Vanguard Classic Rifle

Weatherby Vanguard Classic No. 1 Rifle

Weatherby Vanguard Weathermark Rifle

Wichita Classis Rifle

Wichita Varmint Rifle

Winchester Model 70 Sporter

Winchester Model 70 Sporter WinTuff

Winchester Model 70 SM Sporter

Winchester Model 70 Stainless Rifle

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 51
Page 00956

ER_3128

Winchester Model 70 Varmint

Winchester Model 70 Synthetic Heavy Varmint Rifle

Winchester Model 70 DBM Rifle

Winchester Model 70 DBM-S Rifle

Winchester Model 70 Featherweight

Winchester Model 70 Featherweight WinTuff

Winchester Model 70 Featherweight Classic

Winchester Model 70 Lightweight Rifle

Winchester Ranger Rifle

Winchester Model 70 Super Express Magnum

Winchester Model 70 Super Grade

Winchester Model 70 Custom Sharpshooter

Winchester Model 70 Custom Sporting Sharpshooter Rifle

**Centerfire Rifles–Single Shot**

Armsport 1866 Sharps Rifle, Carbine

Brown Model One Single Shot Rifle

Browning Model 1885 Single Shot Rifle

Dakota Single Shot Rifle

Desert Industries G-90 Single Shot Rifle

Harrington & Richardson Ultra Varmint Rifle

Model 1885 High Wall Rifle

Navy Arms Rolling Block Buffalo Rifle

Navy Arms #2 Creedmoor Rifle

Navy Arms Sharps Cavalry Carbine

Navy Arms Sharps Plains Rifle

New Enlgand Firearms Handi-Rifle

Red Willow Armory Ballard No. 5 Pacific

Red Willow Armory Ballard No. 1.5 Hunting Rifle

Red Willow Armory Ballard No. 8 Union Hill Rifle

Red Willow Armory Ballard No. 4.5 Target Rifle

Remington-Style Rolling Block Carbine

Ruger No. 1B Single Shot

Ruger No. 1A Light Sporter

Ruger No. 1H Tropical Rifle

Ruger No. 1S Medium Sporter

Ruger No. 1 RSI International

Ruger No. 1V Special Varminter

C. Sharps Arms New Model 1874 Old Reliable

C. Sharps Arms New Model 1875 Rifle

C. Sharps Arms 1875 Classic Sharps

C. Sharps Arms New Model 1875 Target & Long Range

Shiloh Sharps 1874 Long Range Express

Shiloh Sharps 1874 Montana Roughrider

Shiloh Sharps 1874 Military Carbine

Shiloh Sharps 1874 Business Rifle

Shiloh Sharps 1874 Military Rifle

Sharps 1874 Old Reliable

Thompson/Center Contender Carbine

Thompson/Center Stainless Contender Carbine

Thompson/Center Contender Carbine Survival System

Thompson/Center Contender Carbine Youth Model

Thompson/Center TCR '87 Single Shot Rifle

Uberti Rolling Block Baby Carbine

**Drillings, Combination Guns, Double Rifles**

Baretta Express SSO O/U Double Rifles

Baretta 455 SxS Express Rifle

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 53
Page 00958

ER_3130

Chapuis RGExpress Double Rifle

Auguste Francotte Sidelock Double Rifles

Auguste Francotte Boxlock Double Rifle

Heym Model 55B O/U Double Rifle

Heym Model 55FW O/U Combo Gun

Heym Model 88b Side-by-Side Double Rifle

Kodiak Mk. IV Double Rifle

Kreighoff Teck O/U Combination Gun

Kreighoff Trumpf Drilling

Merkel Over/Under Combination Guns

Merkel Drillings

Merkel Model 160 Side-by-Side Double Rifles

Merkel Over/Under Double Rifles

Savage 24F O/U Combination Gun

Savage 24F-12T Turkey Gun

Springfield Inc. M6 Scout Rifle/Shotgun

Tikka Model 412s Combination Gun

Tikka Model 412S Double Fire

A. Zoli Rifle-Shotgun O/U Combo

**Rimfire Rifles—Autoloaders**

AMT Lightning 25/22 Rifle

AMT Lightning Small-Game Hunting Rifle II

AMT Mannum Hunter Auto Rifle

Anschutz 525 Deluxe Auto

Armscor Model 20P Auto Rifle

Browning Auto-22 Rifle

Browning Auto-22 Grade VI

Krico Model 260 Auto Rifle

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 54
Page 00959

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Lakefield Arms Model 64B Auto Rifle

Marlin Model 60 Self-Loading Rifle

Marlin Model 60ss Self-Loading Rifle

Marlin Model 70 HC Auto

Marlin Model 990*l* Self-Loading Rifle

Marlin Model 70P Papoose

Marlin Model 922 Magnum Self-Loading Rifle

Marlin Model 995 Self-Loading Rifle

Norinco Model 22 ATD Rifle

Remington Model 522 Viper Autoloading Rifle

Remington 522BDL Speedmaster Rifle

Ruger 10/22 Autoloading Carbine (w/o folding stock)

Survival Arms AR-7 Explorer Rifle

Texas Remington Revolving Carbine

Voere Model 2115 Auto Rifle

### Rimfire Rifles–Lever & Slide Action

Browning BL-22 Lever-Action Rifle

Marlin 39TDS Carbine

Marlin Model 39AS Golden Lever-Action Rifle

Remington 572BDL Fieldmaster Pump Rifle

Norinco EM-321 Pump Rifle

Rossi Model 62 SA Pump Rifle

Rossi Model 62 SAC Carbile

Winchester Model 9422 Lever-Action Rifle

Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles–Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   55
Page 00960

H.R. REP. 103-489, H.R. REP 103-489 (1994)

Anschutz 1416D/1516D Classic Rifles

Anschutz 1418D/1518D Mannlicher Rifles

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700 FWT Bolt-Action Rifle

Anschutz 1700D Graphite Custom Rifle

Anschutz 1700D Bavarian Bolt-Action Rifle

Armscor Model 14P Bolt-Action Rifle

Armscor Model 1500 Rifle

BRNO ZKM-452 Deluxe Bolt-Action Rifle

BRNO ZKM 452 Deluxe

Beeman/HW 60-J-ST Bolt-Action Rifle

Browning A-Bolt 22 Bolt-Action Rifle

Browning A-Bolt Gold Medallion

Cabanas Phaser Rifle

Cabanas Master Bolt-Action Rifle

Cabanas Espronceda IV Bolt-Action Rifle

Cabanas Leyre Bolt-Action Rifle

Chipmunk Single Shot Rifle

Cooper Arms Model 36S Sporter Rifle

Dakota 22 Sporter Bolt-Action Rifle

Krico Model 300 Bolt-Action Rifles

Lakefield Arms Mark II Bolt-Action Rifle

Lakefield Arms Mark I Bolt-Action Rifle

Magtech Model MT-22C Bolt-Action Rifle

Marlin Model 880 Bolt-Action Rifle

Marlin Model 881 Bolt-Action Rifle

Marlin Model 882 Bolt-Action Rifle

Marlin Model 883 Bolt-Action Rifle

H.R. REP. 103-489, H.R. REP 103-489 (1994)

Marlin Model 883SS Bolt-Action Rifle

Marlin Model 25MN Bolt-Action Rifle

Marlin Model 25N Bolt-Action Repeater

Marlin Model 15YN "Little Buckaroo"

Mauser Model 107 Bolt-Action Rifle

Mauser Model 201 Bolt-Action Rifle

Navy Arms TU-KKW Training Rifle

Navy Arms TU-30/40 Carbine

Navy Arms TU-KKW Sniper Trainer

Norinco JW-27 Bolt-Action Rifle

Norinco JW-15 Bolt-Action Rifle

Remington 541-T

Remington 40-XR Rimfire Custom Sporter

Remington 541-T HB Bolt-Action Rifle

Remington 581-S Sportsman Rifle

Ruger 77/22 Rimfire Bolt-Action Rifle

Ruger K77/22 Varmint Rifle

Ultra Light Arms Model 20 RF Bolt-Action Rifle

Winchester Model 52B Sporting Rifle


**Competition Rifles--Centerfire & Rimfire**


Anschutz 64-MS Left Silhouette

Anschutz 1808D RT Super Match 54 Target

Anschutz 1827B Biathlon Rifle

Anschutz 1903D Match Rifle

Anschutz 1803D Intermediate Match

Anschutz 1911 Match Rifle

Anschutz 54.18MS REP Deluxe Silhouette Rifle

Anschutz 1913 Super Match Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 57
Page 00962

ER_3134

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Anschutz 1907 Match Rifle

Anschutz 1910 Super Match II

Anschutz 54.18MS Silhouette Rifle

Anschutz Super Match 54 Targe Model 2013

Anschutz Super Match 54 Targe Model 2007

Beeman/Feinwerkbau 2600 Target Rifle

Cooper Arms Model TRP-1 ISU Standard Rifle

E.A.A./Weihrauch HW 60 Target Rifle

E.A.A./HW 60 Match Rifle

Finnish Lion Standard Target Rifle

Krico Model 360 S2 Biathlon Rifle

Krico Model 400 Match Rifle

Krico Model 360S Biathlon Rifle

Krico Model 500 Kricotronic Match Rifle

Krico Model 600 Sniper Rifle

Krico Model 600 Match Rifle

Lakefield Arms Model 90B Target Rifle

Lakefield Arms Model 91T Target Rifle

Lakefield Arms Model 92S Silhouette Rifle

Marlin Model 2000 Target Rifle

Mauser Model 86-SR Specialty Rifle

McMillan M-86 Sniper Rifle

McMillan Combo M-87/M-88 50-Caliber Rifle

McMillan 300 Phoenix Long-Range Rifle

McMillan M-89 Sniper Rifle

McMillan National Match Rifle

McMillan Long-Range Rifle

Parker-Hale M-87 Target Rifle

Parker-Hale M-85 Sniper Rifle

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 58
Page 00963

ER_3135

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Remington 40-XB Rangemaster Target Centerfire

Remington 40-XR KS Rimfire Position Rifle

Remington 40-XBBR KS

Remington 40-XC KS National Match Course Rifle

Sako TRG-21 Bolt-Action Rifle

Steyr-Mannlicher Match SPG-UIT Rifle

Steyr-Mannlicher SSG P-I Rifle

Steyr-Mannlicher SSG P-III Rifle

Steyr-Mannlicher SSG P-IV Rifle

Tanner Standard UIT Rifle

Tanner 50 Meter Free Rifle

Tanner 300 Meter Free Rifle

Wichita Silhouette Rifle

**Shotguns--Autoloaders**

American Arms/Franchi Black Magic 48/AL

Benelli Super Black Eagle Shotgun

Benelli Super Black Eagle Slug Gun

Benelli M1 Super 90 Field Auto Shotgun

Benelli Montefeltro Super 90 20-Gauge Shotgun

Benelli Montefeltro Super 90 Shotgun

Benelli M1 Sporting Special Auto Shotgun

Benelli Black Eagle Competition Auto Shotgun

Beretta A-303 Auto Shotgun

Beretta 390 Field Auto Shotgun

Beretta 390 Super Trap, Super Skeet Shotguns

Beretta Vittoria Auto Shotgun

Beretta Model 1201F Auto Shotgun

Browning BSA 10 Auto Shotgun

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 59
Page 00964

**ER_3136**

Browning Bsa 10 Stalker Auto Shotgun

Browning A-500R Auto Shotgun

Browning A-500G Auto Shotgun

Browning A-500G Sporting Clays

Browning Auto-5 Light 12 and 20

Browning Auto-5 Stalker

Browning Auto-5 Magnum 20

Browning Auto-5 Magnum 12

Churchill Turkey Automatic Shotgun

Cosmi Automatic Shotgun

Maverick Model 60 Auto Shotgun

Mossberg Model 5500 Shotgun

Mossberg Model 9200 Regal Semi-Auto Shotgun

Mossberg Model 9200 USST Auto Shotgun

Mossberg Model 9200 Camo Shotgun

Mossberg Model 6000 Auto Shotgun

Remington Model 1100 Shotgun

Remington 11-87 Premier shotgun

Remington 11-87 Sporting Clays

Remington 11-87 Premier Skeet

Remington 11-87 Premier Trap

Remington 11-87 Special Purpose Magnum

Remington 11-87 SPS-T Camo Auto Shotgun

Remington 11-87 Special Purpose Deer Gun

Remington 11-87 SPS-BG-Camo Deer/Turkey Shotgun

Remington 11-87 SPS-Deer Shotgun

Remington 11-87 Special Purpose Synthetic Camo

Remington SP-10 Magnum-Camo Auto Shotgun

Remington SP-10 Magnum Auto Shotgun

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26  60
Page 00965

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Remington SP-10 Magnum Turkey Combo

Remington 1100 LT-20 Auto

Remington 1100 Special Field

Remington 1100 20-Gauge Deer Gun

Remington 1100 LT-20 Tournament Skeet

Winchester Model 1400 Semi-Auto Shotgun


**Shotguns–Slide Actions**


Browning Model 42 Pump Shotgun

Browning BPS Pump Shotgun

Browning BPS Stalker Pump Shotgun

Browning BPS Pigeon Grade Pump Shotgun

Browning BPS Pump Shotgun (Ladies and Youth Model)

Browning BPS Game Gun Turkey Special

Browning BPS Game Gun Deer Special

Ithaca Model 87 Supreme Pump Shotgun

Ithaca Model 87 Deerslayer Shotgun

Ithaca Deerslayer II Rifled Shotgun

Ithaca Model 87 Turkey Gun

Ithaca Model 87 Deluxe Pump Shotgun

Magtech Model 586-VR Pump Shotgun

Maverick Models 88, 91 Pump Shotguns

Mossberg Model 500 Sporting Pump

Mossberg Model 500 Camo Pump

Mossberg Model 500 Muzzleloader Combo

Mossberg Model 500 Trophy Slugger

Mossberg Turkey Model 500 Pump

Mossberg Model 500 Bantam Pump

Mossberg Field Grade Model 835 Pump Shotgun

H.R. REP. 103-489, H.R. REP 103-489 (1994)

Mossberg Model 835 Regal Ulti-Mag Pump

Remington 870 Wingmaster

Remington 870 Special Purpose Deer Gun

Remington 870 SPS-BG-Camo Deer/Turkey Shotgun

Remington 870 SPS-Deer Shotgun

Remington 870 Marine Magnum

Remington 870 TC Trap

Remington 870 Special Purpose Synthetic Camo

Remington 870 Wingmaster Small Gauges

Remington 870 Express Rifle Sighted Deer Gun

Remington 879 SPS Special Purpose Magnum

Remington 870 SPS-T Camo Pump Shotgun

Remington 870 Special Field

Remington 870 Express Turkey

Remington 870 High Grades

Remington 870 Express

Remington Model 870 Express Youth Gun

Winchester Model 12 Pump Shotgun

Winchester Model 42 High Grade Shotgun

Winchester Model 1300 Walnut Pump

Winchester Model 1300 Slug Hunter Deer Gun

Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun

Winchester Model 1300 Turkey Gun

Winchester Model 1300 Ranger Pump Gun

**Shotguns–Over/Unders**

American Arms/Franchi Falconet 2000 O/U

American Arms Silver I O/U

American Arms Silver II Shotgun

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 62
Page 00967

H.R. REP. 103-489; H.R. REP. 103-489 (1994)

American Arms Silver Skeet O/U

American Arms/Franchi Sporting 2000 O/U

American Arms Silver Sporting O/U

American Arms Silver Trap O/U

American Arms WS/OU 12, TS/OU 12 Shotguns

American Arms WT/OU 10 Shotgun

Armsport 2700 O/U Goose Gun

Armsport 2700 Series O/U

Armsport 2900 Tri-Barrel Shotgun

Baby Bretton Over/Under Shotgun

Beretta Model 686 Ultralight O/U

Beretta ASE 90 Competition O/U Shotgun

Beretta Over/Under Field Shotguns

Beretta Onyx Hunder Sport O/U Shotgun

Beretta Model SO5, SO6, SO9 Shotguns

Beretta Sporting Clay Shotguns

Beretta 687EL Sporting O/U

Beretta 682 Super Sporting O/U

Beretta Series 682 Competition Over/Unders

Browning Citori O/U Shotgun

Browning Superlight Citori Over/Under

Browning Lightning Sporting Clays

Browning Micro Citori Lightning

Browning Citori Plus Trap Combo

Browning Citori Plus Trap Gun

Browning Citori O/U Skeet Models

Browning Citori O/U Trap Models

Browning Special Sporting Clays

Browning Citori GTI Sporting Clays

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 63
Page 00968

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Browning 325 Sporting Clays

Centurion Over/Under Shotgun

Chapuis Over/Under Shotgun

Connecticut Valley Classics Classic Sporter O/U

Connecticut Valley Classics Classic Field Waterfowler

Charles Daly Field Grade O/U

Charles Daly Lux O/U

E.A.A./Sabatti Sporting Clays Pro-Gold O/U

E.A.A./Sabatti Falcon-Mon Over/Under

Kassnar Grade I O/U Shotgun

Krieghoff K-80 Sporting Clays O/U

Krieghoff K-80 Skeet Shotgun

Krieghoff K-80 International Skeet

Krieghoff K-80 Four-Barrel Skeet Set

Krieghoff K-80/RT Shotguns

Krieghoff K-80 O/U Trap Shotgun

Laurona Silhouette 300 Sporting Clays

Laurona Silhouette 300 Trap

Laurona Super Model Over/Unders

Ljutic LM-6 Deluxe O/U Shotgun

Marocchi Conquista Over/Under Shotgun

Marocchi Avanza O/U Shotgun

Merkel Model 200E O/U Shotgun

Merkel Model 200E Skeet, Trap Over/Unders

Merkel Model 203E, 303E Over/Under Shotguns

Perazzi Mirage Special Sporting O/U

Perazzi Mirage Special Four-Gauge Skeet

Perazzi Sporting Classic O/U

Perazzi MX7 Over/Under Shotguns

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 64
Page 00969

Perazzi Mirage Special Skeet Over/Under

Perazzi MX8/MX8 Special Trap, Skeet

Perazzi MX8/20 Over/Under Shotgun

Perazzi MX9 Single Over/Under Shotguns

Perazzi MX12 Hunting Over/Under

Perazzi MX28, MX410 Game O/U Shotfuns

Perazzi MX20 Hunting Over/Under

Piotti Boss Over/Under Shotgun

Remington Peerless Over/Under Shotgun

Ruger Red Label O/U Shotgun

Ruger Sporting Clays O/U Shotgun

San Marco 12-Ga. Wildflower Shotgun

San Marco Field Special O/U Shotgun

San Marco 10-Ga. O/U Shotgun

SKB Model 505 Deluxe Over/Under Shotgun

SKB Model 685 Over/Under Shotgun

SKB Model 885 Over/Under Trap, Skeet, Sporting Clays

Stoeger/IGA Condor I O/U Shotgun

Stoeger/IGA ERA 2000 Over/Under Shotgun

Techni-Mec Model 610 Over/Under

Tikka Model 412S Field Grade Over/Under

Weatherby Athena Grade IV O/U Shotguns

Weatherby Athena Grade V Classic Field O/U

Weatherby Orion O/U Shotguns

Weatherby II, III Classic Field O/Us

Weatherby Orion II Classic Sporting Clays O/U

Weatherby Orion II Sporting Clays O/U

Winchester Model 1001 O/U Shotgun

Winchester Model 1001 Sporting Clays O/U

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 65
Page 00970

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Pietro Zanoletti Model 2000 Field O/U

**Shotguns–Side by Sides**

American Arms Brittany Shotgun

American Arms Gentry Double Shotgun

American Arms Derby Side-by-Side

American Arms Grulla #2 Double Shotgun

American Arms WS/SS 10

American Arms TS/SS 10 Double Shotgun

American Arms TS/SS 12 Side-by-Side

Arrieta Sidelock Double Shotguns

Armsport 1050 Series Double Shotguns

Arizaga Model 31 Double Shotgun

AYA Boxlock Shotguns

AYA Sidelock Double Shotguns

Beretta Model 452 Sidelock Shotgun

Beretta Side-by-Side Field Shotguns

Crucelegui Hermanos Model 150 Double

Chapuis Side-by-Side Shotgun

E.A.A./Sabatti Sabe-Mon Double Shotgun

Charles Daly Model Dss Double

Ferlib Model F VII Double Shotgun

Auguste Francotte Boxlock Shotgun

Auguste Francotte Sidelock Shotgun

Garbi Model 100 Double

Garbi Model 100 Side-by-Side

Garbi Model 103A, B Side-by-Side

Garbi Model 200 Side-by-Side

Bill Hanus Birdgun Doubles

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 66
Page 00971

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Hatfield Uplander Shotgun

Merkell Model 8, 47E Side-by-Side Shotguns

Merkel Model 47LSC Sporting Clays Double

Merkel Model 47S, 147S Side-by-Sides

Parker Reproductions Side-by-Side

Piotti King No. 1 Side-by-Side

Piotti Lunik Side-by-Side

Piotti King Extra Side-by-Side

Piotti Piuma Side-by-Side

Precision Sports Model 600 Series Doubles

Rizzini Boxlock Side-by-Side

Rizzini Sidelock Side-by-Side

Stoeger/IGA Side-by-Side Shotgun

Ugartechea 10-Ga. Magnum Shotgun

**Shotguns–Bolt Actions & Single Shots**

Armsport Single Barrel Shotgun

Browning BT-99 Competition Trap Special

Browning BT-99 Plus Trap Gun

Browning BT-99 Plus Micro

Browning Recoilless Trap Shotgun

Browning Micro Recoilless Trap Shotgun

Desert Industries Big Twenty Shotgun

Harrington & Richardson Topper Model 098

Harrington & Richardson Topper Classic Youth Shotgun

Harrington & Richardson N.W.T.F. Turkey Mag

Harrington & Richardson Topper Deluxe Model 098

Krieghoff KS-5 Trap Gun

Krieghoff KS-5 Special

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 67
Page 00972

ER_3144

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Krieghoff KS-80 Single Barrel Trap Gun

Ljutic Mono Gun Single Barrel

Ljutic LTX Super Deluxe Mono Gun

Ljutic Recoilless Space Gun Shotgun

Marlin Model 55 Goose Gun Bolt Action

New England Firearms Turkey and Goose Gun

New England Firearms N.W.T.F. Shotgun

New England Firearms Tracker Slug Gun

New England Firearms Standard Pardner

New England Firearms Survival Gun

Perazzi TM1 Special Single Trap

Remington 90-T Super Single Shotgun

Snake Charmer II Shotgun

Stoeger/IGA Reuna Single Barrel Shotgun

Thompson/Center TCR '87 Hunter Shotgun.

S 923. Licensing

(a)***

* * * * * * *

(i) Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer. The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured. A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.

S 924. Penalties

(a)(1) Except as otherwise provided in this subsection, subsection (b), (c), or (f) of this section, or in section 929, whoever–

(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

(B) knowingly violates subsection (a)(4), (a)(6), (f), (k), [or (q) of section 922] (r), (v), or (x) of section 922;

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

* * * * * * *

(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.

* * * * * * *

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, to imprisonment for ten years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to life imprisonment without release. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried. No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed herein.

* * * * * * *

## SUPPLEMENTAL VIEWS OF HON. DAN GLICKMAN

I supported this bill because it is a narrowly crafted bill focused on specific weapons that have no business being on our streets. It is aimed at rapid fire weapons that have the sole purpose of killing people, and it is aimed at weapons that are more suited for the battlefield than the target range.

I believe that violence in our nation is getting out of hand. It is devastating to read that a student killed a student with a semi-automatic weapon. But it is equally devastating to hear of students killing students with anyone. What we really need to focus on is why students are engaging in violence in the first place. For this reason, I think this legislation must be viewed as part of the effort to reduce crime–in conjunction with the comprehensive crime bill that increases penalties, calls for tougher sentencing, provides for more jails and police officers, and provides for prevention programs.

But we must not abrogate the Second Amendment rights that are provided for in the Constitution. We must be extremely careful that in this legislation and in any legislation in the future, that we are not taking away guns that truly are used for sports, hunting, or self-defense.

I don't believe that this bill is the first step in a long road to banning guns. However, some of my constituents have expressed their fear that the Congress is moving slowly toward banning all guns for all people. We must be absolutely clear that this narrowly crafted legislation is not that first step and is not just a precursor to further, broader federal gun control and federal gun bans. Sport shooters and hunters tell me that they don't want assault weapons on the streets and in the hands of gang members any more than anyone else. But what they don't want is for Congress to take the short step to saying that the hunting rifles are being taken on the streets, and should be taken away. And then the handguns are being used on the streets and should be taken away.

I want to make sure that what we are doing has a purpose–that it gets at the weapons that are being used by gang members and others in killing sprees or other random violence. I want to be able to assure the hunters, sport shooters

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26  69
Page 00974

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

and folks who want to be prepared for self-defense that we're not going to turn around and tell these gun owners that their sporting guns are illegal. This is a good bill, but let's tread very carefully before going any further.

Finally, because I want to make sure that there is no mistake about which guns are banned and which are exempt, especially guns that will be developed in the future, I offered an amendment during Committee markup that was accepted by the Committee. This amendment clarifies that simply because a gun is not on the list of specifically exempted guns, does not mean that that firearm is banned. A firearm must meet the specific criteria set out in the bill, or be specifically named as a banned gun before it can be banned. In other words, the exempted gun list is not exhaustive.

Furthermore, my amendment makes clear that no gun may be taken off the list of specifically exempted guns as long as the act is in effect. In this way, it is absolutely clear that the intent of Congress is that exempted guns remain exempted.

### DISSENTING VIEWS OF HON. F. JAMES SENSENBRENNER, JR., HON. GEORGE GEKAS, HON. LAMAR S. SMITH, HON. BILL McCOLLUM, HON. HOWARD COBLE, HON. STEVE SCHIFF, AND HON. BOB GOODLATTE

We strongly oppose H.R. 4296 which would ban a variety of guns. The primary problem with this bill is that it targets law abiding citizens. If this bill passes, simply possessing a shotgun or rifle could land you in jail. You don't have to shoot anybody. You don't have to threaten anyone, just leaving it in the hall closet is enough to land you in jail. Even if you use the gun for self-defense, you can go to jail.

It is already a federal crime for convicted criminals to possess these weapons, or any other gun for that matter. The laws aimed at these criminals should be fully enforced before we start going into the homes of law-abiding citizens and arresting them.

Another problem with this legislation is that simple, cosmetic changes to certain guns would turn those guns from being illegal to, all of a sudden being legal. For example, simply by removing a pistol grip, or a bayonet mount from a rifle saves the owner from going to jail, but leaves the gun's performance unaffected.

Finally, the problem of these guns has been greatly exaggerated. Although semiautomatic weapons are used in the most high profile killings that make it on the nightly news, in fact, more than 99 percent of killers eschew assault rifles and use more prosaic devices. According to statistics from the Justice Department and reports from local law enforcement, five times as many people are kicked or beaten to death than are killed with assault rifles.

Passing this legislation is an excuse to avoid the real issues of violent crime, and threatens the rights of law-abiding citizens. Therefore, we oppose H.R. 4296.

F. James Sensenbrenner, Jr.
George W. Gekas.
Lamar Smith.
Bill McCollum.
Howard Coble.
Steve Schiff.
Bob Goodlatte.

### DISSENTING VIEWS OF HON. JACK BROOKS

I am strongly opposed to H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, because it misidentifies the causes of violent crime in the United States; diverts national priorities away from meaningful solutions

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 70
Page 00975

to the problem of violent crime; punishes honest American gun owners who buy and use firearms for legitimate, lawful purposes such as, but not necessarily limited to, self-defense, target shooting, hunting, and firearms collection; fails to focus the punitive powers of government upon criminals. Most fundamentally, a prohibition on firearms violates the right of individual Americans to keep and bear arms, protected by the Second Amendment to the Constitution of the United States–a stark fact of constitutional life that the proponents of H.R. 4296 conveniently overlook in their zeal to abridge the rights of law-abiding citizens.

Reasons claimed to justify a prohibition on the firearms that would be affected by H.R. 4296 include the assertion that those particular firearms are used often in the commission of violent crimes. Data on the use of the firearms H.R. 4296 labels as "assault weapons" is not comprehensive, but such data as do exist consistently show that "assault weapons" are involved in a small percentage of violent crimes.

Most of the firearms labelled as "assault weapons" in H.R. 4296 are rifles–yet rifles are the general category of firearms used least often in the commission of violent crimes. The FBI Uniform Crime Reports, 1992, the most recent comprehensive data available, shows that rifles of any description are used in 3.1 percent of homicides, for example, while knives are used in 14.5 percent, fists and feet are used in 5 percent, and blunt objects are used in another 5 percent.

Professor Gary Kleck, of Florida State University, the 1993 recipient of the American Society of Criminology's Hindelang Award, estimates that one-half of 1 percent of violent crimes are committed with "assault weapons." University of Texas criminologist Sheldon Ekland-Olson estimates that one-quarter of rifle-related homicides may involve rifles chambered for military cartridges, which would include not only so-called "assault" type semi-automatic rifles, but non-semiautomatic rifles as well.

Since 1980, rifle-related homicides have declined by more than a third. According to the Metropolitan Police of Washington, D.C., the city which has the highest per capita rate of homicides of any major city in the United States, between 1980–1993 there occurred only 4 rifle-related homicides out of a total of more than 4,200 homicides in the period. The last rifle homicide during the period was recorded in 1984. Other data from D.C. police show that rifles are used in about one-tenth of 1 percent of robberies and assaults.

The California Department of Justice surveyed law enforcement agencies in the state in 1990, as the state's legislature addressed "assault weapon" ban legislation there. The California Department of Justice found that only 3.7 percent of the firearms that are used in homicides and assaults were "assault weapons," defined there to include even more firearms than are defined as "assault weapons" in H.R. 4296.

Connecticut State Police report that less than 2 percent of firearms seized by police in the state are "assault weapons"; the Massachusetts State Police report that "assault" type rifles were used in one-half of 1 percent of homicides between 19851991.

I believe the proponents of H.R. 4296 are in error in claiming that the Bureau of Alcohol, Tobacco and Firearms (BATF) has traced a large number of "assault weapons" to crime. This claim has been effectively contradicted by both the BATF itself and the Congressional Research Service's (CRS) report on the BATF firearms tracing system. The BATF has stated that it "does not always know if a firearm being traced has been used in a crime." For instance, sometimes a firearm is traced simply to determine the rightful owner after it is found by a law enforcement officer.

Each year, the BATF traces about 50,000 firearms, yet only about 1 percent of these traces relate to "assault weapons" that have been seized by police in the course of investigations of violent crimes. Most "assault weapons" traced relate not to violent crime but to property violations, such as stolen guns being traced so that they may be returned to their lawful owners, violations of the Gun Control Act, and other non-violent circumstances.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 [71]
Page 00976

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

As noted by BATF and by CRS in its report to Congress entitled "Assault Weapons: Military-Style Semiautomatic Firearms Facts and Issues" (1992) that firearms traces are not intended to "trace guns to crime," that few "assault weapons" traced relative to violent crime investigations, and that available state and local law enforcement agency data shows relatively little use of "assault weapons" are used frequently in violent crimes.

"Assault weapons" function in the same manner as any other semi-automatic firearm. They fire once with each pull of the trigger, like most firearms. They use the same ammunition as other firearms, both semi-automatic and not. Therefore, "assault weapons" are useful for target shooting, self-defense, hunting, and other legitimate purposes, just as other firearms are.

H.R. 4296 would prohibit rifles that are commonly used for competitive shooting, such as the Springfield A and the Colt "AR–15."

Accessories found on some models of "assault weapons," such as folding stocks, flash suppressors, pistol grips, bayonet lugs, and detachable magazines may look menacing to persons unfamiliar with firearms, but there is absolutely no evidence that any of these accessories provide any advantage to a criminal. As has been demonstrated on many occasions, firearms which H.R. 4296 specifically exempts from its prohibition, firearms not equipped with those accessories, can be fired at the same rate, with the same accuracy, and with the same power as "assault weapons."

Time and again, supporters of H.R. 4296 have claimed that "assault weapons" can be "spray-fired from the hip"; but this is simply not true. The firearms targeted in H.R. 4296 are not machineguns. Machineguns are restricted under the National Firearms Act of 1934. H.R. 4296's guns are semi-automatic, and fire only one shot at a time.

H.R. 4296's limitation on the capacity of ammunition feeding devices would do nothing to reduce the number of rounds available to a criminal. It has been demonstrated frequently that such devices can be switched in less than a second, so a criminal determined to have available a number of rounds greater than H.R. 4296 would permit in a single magazine would need only to possess additional smaller magazines. However, police have reportedly consistently that when criminals fire shots, they rarely discharge more than 2–5 rounds, well below the number of rounds H.R. 4296 would permit in a single magazine.

Most fundamentally, to impinge upon the constitutionally-protected rights of honest, law-abiding Americans on the basis of myth, misinformation, and newspaper headlines is a crime in and of itself. To protect against such a mockery of our Constitution and the infliction of such harm upon our citizens, I intend to oppose H.R. 4296 vigorously on the House floor in the hope that careful reflection will permit cooler heads and the light of reason to prevail.

1 "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102 –242, October 7, 1991, at 202.

2 See, e.g., Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 Firearms; Chief Sylvester Daughtry, President, International Association of Chiefs of Police; Mr. John Pitta, National Executive Director, Federal Law Enforcement Officers Association).

3 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994; Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991; Hearing on Semiautomatic Assault Weapons, Part II, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, July 25, 1991; Hearing on H.R. 1190,

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   72
Page 00977

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5 and 6, 1989.

4 "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102–242, October 7, 1991, at 203.

5 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. John Magaw, Director, Bureau of Alcohol, Tobacco and Firearms).

6 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Tony Loizzo, executive vice president, National Association of Police Organizations). See also, Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal Order of Police) (assault weapons "pose a grave and immediate threat to the lives of those sworn to uphold our laws"); Hearing on H.R. 1190, Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5, 1989 (Testimony of Daniel M. Hartnett, associate director, law enforcement, Bureau of Alcohol, Tobacco and Firearms) ("Fifteen years ago, police rarely encountered armed drug dealers. Today, firearms, especially certain types of semiautomatic weapons, are status symbols and tools of the trade for this country's most vicious criminals.")

7 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

8 Hearing on H.R. 4296 and H.R. 3527, Public Safety and recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

9 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. Henry Cisneros, Secretary, Department of Housing and Urban Development).

10 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ken Brondell, Jr.).

11 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Jacob Locicero and Arlene Locicero).

12 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

13 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Michelle Scully and Steve Sposato).

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 73
Page 00978

H.R. REP. 103-489, H.R. REP. 103-489 (1994)

14 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on crime and Criminal Justice, April 25, 1994 (State of Dr. Suzanna Gratia, Copperas Cove, Texas)

15 The Committee notes that, under the Gun Control Act of 1968 as amended in 1986, it is a Federal felony for a convicted felon to be in possession of any firearm, including an assault weapon, under 18 U.S.C. 922(g)(1). Violations carry up to five years imprisonment and a $250,000 fine. If a criminal—whether previously convicted or not—is carrying an assault weapon and is involved in a drug trafficking crime, that criminal is subject to a mandatory minimum of 5 years imprisonment and a $250,000 fine under 18 U.S.C. 924(c)(1). Any criminal who has three prior violent felony and/or serious drug offenses convictions and is in possession of a firearm is subject to a mandatory minimum of 15 years imprisonment and a $250,000 fine under 18 U.S.C. 924(e)(1).

16 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ms. Jacquie Miller, Louisville, Kentucky).

17 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Mr. Phillip Murphy, Tucson, Arizona).

18 U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989.

19 The ultimate question of law upon which the working group was advising the Secretary of the Treasury was whether these import firearms met a "sporting purpose" test under 18 U.S.C. Code section 925(d). He held that they did not. Although that legal question is not directly posed by this bill, the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features.

20 An automatic gun fires a continuous stream as long as the trigger is held down, until it has fired all of the cartridges ("rounds" or "bullets") in its magazine (or "clip"). Automatic firearms are also known as machineguns. A semi-automatic gun fires one round, then loads a new round, each time the trigger is pulled until its magazine is exhausted. Manually operated guns require the shooter to manually operate a bolt, slide, pump, or lever action to extract the fired round and load a new round before pulling the trigger.

21 U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

22 U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

23 18 U.S. Code, section 922(o).

24 The Committee notes that such conversion is a Federal felony that carries penalties of up to 10 years imprisonment and a $250,000 fine under 26 U.S.C. 5861.

25 Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal order of Police).

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 [74]
Page 00979

26 Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal order of police).

27 Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard Cook, Chief, Firearms Divisions, Bureau of Alcohol, Tobacco and Firearms) at 268.

28 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms, Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Hon. Henry Cisneros, Secretary, Department of Housing and Urban Development and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Paul J. McNulty, Principal Deputy Director, Office of Policy development, Department of Justice) at 288.

29 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard Cook, Chief, Firearms Division, Bureau of Alcohol, Tobacco and Firearms); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

30 U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

31 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

32 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

33 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement and testimony of Dr. David Milzman, Associate Director, Trauma Services, Georgetown University Medical Center, Washington, DC); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

34 See H.R. 4296, Appendix A, for the list.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26   75
Page 00980

ER_3152

35 H.R. 4296 bans the following semiautomatic assault weapons by name (as well as any copies or duplicates, in any caliber): All AK–47 type; Beretta AR–70; Colt AR–15; DC9, 22; FNC; FN–FAL/LAR; Galil; MAC 10, MAC 11–type; Steyr AUG; Street Sweeper; Striker 12; TEC–9; Uzi.

36 While noting that its list is not all-inclusive, the Bureau of Alcohol, Tobacco, and Firearms has listed the following semi-automatic firearms that would be banned based on their general characteristics:

1. Semi-automatic Rifles: AA Arms AR9 semi-automatic rifle; AMT Lightning 25 rifle; Auto Ordnance Thompson Model 1927 carbines (finned barrel versions); Calico M100 carbine; Colt Sporter Rifle (all variations); Federal XC900 carbine; Federal XC450 carbine; Grendel R31 carbine; Iver Johnson M1 carbine (version w/collapsible stock and bayonet mount); Springfield M1A rifle.

2. Pistols: AA Arms AP9 pistol; Australian Automatic Arms pistol; Auto Ordnance Model 1927A5 pistol; American Arms Spectra pistol; Calico Model M950 pistol; Calico Model 110 pistol; All Claridge Hi-Tec pistol; D Max auto pistol; Grendel P–31 pistol; Heckler & Koch SP89 pistol; Wilkinson Linda pistol.

3. Shotguns: Benelli M1 Super 90 Defense shotgun; Benelli M3 Super 90 shotgun; Franchi LAW 12 shotgun; Franchi SPAS 12 shotgun; USAS 12 shotgun.

37 H.R. 4296 bans the following semiautomatic assault weapons by name (as well as any copies or duplicates, in any caliber): All AK–47 type; Beretta AR–70; Colt AR–15; DC9, 22; FNC; FN–FAL/LAR; Galil; MAC 10, MAC 11–type; Steyr AUG; Street Sweeper; Striker 12; TEC–9; Uzi

H.R. REP. 103-489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess. 1994, 1994 WL 168883, 1994 U.S.C.C.A.N. 1820 (Leg.Hist.)

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 26 76
Page 00981

ER_3153

2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

CALIFORNIA 2016 LEGISLATIVE SERVICE

Additions are indicated by **Text**; deletions by
\* \* \*
Vetoes are indicated by ~~Text~~;
stricken material by ~~**Text**~~.

PROPOSITION 63
PROPOSITION 63
SAFETY FOR ALL ACT

[Approved by the Voters on Nov. 8, 2016.]

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

**PROPOSED LAW**
The Safety for All Act of 2016

SECTION 1. Title.

This measure shall be known and may be cited as "The Safety for All Act of 2016."

SEC. 2. Findings and Declarations.

The people of the State of California find and declare:

1. Gun violence destroys lives, families and communities. From 2002 to 2013, California lost 38,576 individuals to gun violence. That is more than seven times the number of U.S. soldiers killed in combat during the wars in Iraq and Afghanistan combined. Over this same period, 2,258 children were killed by gunshot injuries in California. The same number of children murdered in the Sandy Hook elementary school massacre are killed by gunfire in this state every 39 days.

2. In 2013, guns were used to kill 2,900 Californians, including 251 children and teens. That year, at least 6,035 others were hospitalized or treated in emergency rooms for non-fatal gunshot wounds, including 1,275 children and teens.

3. Guns are commonly used by criminals. According to the California Department of Justice, in 2014 there were 1,169 firearm murders in California, 13,546 armed robberies involving a firearm, and 15,801 aggravated assaults involving a firearm.

4. This tragic violence imposes significant economic burdens on our society. Researchers conservatively estimate that gun violence costs the economy at least $229 billion every year, or more than $700 per American per year. In 2013 alone, California gun deaths and injuries imposed $83 million in medical costs and $4.24 billion in lost productivity.

5. California can do better. Reasonable, common-sense gun laws reduce gun deaths and injuries, keep guns away from criminals and fight illegal gun trafficking. Although California has led the nation in gun safety laws, those laws still have

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  1

Exhibit 27
Page 00983

ER_3154

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

loopholes that leave communities throughout the state vulnerable to gun violence and mass shootings. We can close these loopholes while still safeguarding the ability of law-abiding, responsible Californians to own guns for self-defense, hunting and recreation.

6. We know background checks work. Federal background checks have already prevented more than 2.4 million gun sales to convicted criminals and other illegal purchasers in America. In 2012 alone, background checks blocked 192,043 sales of firearms to illegal purchasers including 82,000 attempted purchases by felons. That means background checks stopped roughly 225 felons from buying firearms every day. Yet California law only requires background checks for people who purchase firearms, not for people who purchase ammunition. We should close that loophole.

7. Right now, any violent felon or dangerously mentally ill person can walk into a sporting goods store or gun shop in California and buy ammunition, no questions asked. That should change. We should require background checks for ammunition sales just like gun sales, and stop both from getting into the hands of dangerous individuals.

8. Under current law, stores that sell ammunition are not required to report to law enforcement when ammunition is lost or stolen. Stores should have to report lost or stolen ammunition within 48 hours of discovering that it is missing so law enforcement can work to prevent that ammunition from being illegally trafficked into the hands of dangerous individuals.

9. Californians today are not required to report lost or stolen guns to law enforcement. This makes it difficult for law enforcement to investigate crimes committed with stolen guns, break up gun trafficking rings, and return guns to their lawful owners. We should require gun owners to report their lost or stolen guns to law enforcement.

10. Under current law, people who commit felonies and other serious crimes are prohibited from possessing firearms. Yet existing law provides no clear process for those people to relinquish their guns when they become prohibited at the time of conviction. As a result, in 2014, the Department of Justice identified more than 17,000 people who possess more than 34,000 guns illegally, including more than 1,400 assault weapons. We need to close this dangerous loophole by not only requiring prohibited people to turn[1] in their guns, but also ensuring that it happens.

11. Military–style large-capacity ammunition magazines—some capable of holding more than 100 rounds of ammunition—significantly increase a shooter's ability to kill a lot of people in a short amount of time. That is why these large capacity ammunition magazines are common in many of America's most horrific mass shootings, from the killings at 101 California Street in San Francisco in 1993 to Columbine High School in 1999 to the massacre at Sandy Hook Elementary School in Newtown, Connecticut in 2012.

12. Today, California law prohibits the manufacture, importation and sale of military-style, large capacity ammunition magazines, but does not prohibit the general public from possessing them. We should close that loophole. No one except trained law enforcement should be able to possess these dangerous ammunition magazines.

13. Although the State of California conducts background checks on gun buyers who live in California, we have to rely on other states and the FBI to conduct background checks on gun buyers who live elsewhere. We should make background checks outside of California more effective by consistently requiring the state to report who is prohibited from possessing firearms to the federal background check system.

14. The theft of a gun is a serious and potentially violent crime. We should clarify that such crimes can be charged as felonies, and prevent people who are convicted of such crimes from possessing firearms.

SEC. 3. Purpose and Intent.

The people of the State of California declare their purpose and intent in enacting "The Safety for All Act of 2016" (the "Act") to be as follows:

1. To implement reasonable and common-sense reforms to make California's gun safety laws the toughest in the nation while still safeguarding the Second Amendment rights of all law-abiding, responsible Californians.

Exhibit 27
Page 00984

ER_3155

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

2. To keep guns and ammunition out of the hands of convicted felons, the dangerously mentally ill, and other persons who are prohibited by law from possessing firearms and ammunition.

3. To ensure that those who buy ammunition in California—just like those who buy firearms—are subject to background checks.

4. To require all stores that sell ammunition to report any lost or stolen ammunition within 48 hours of discovering that it is missing.

5. To ensure that California shares crucial information with federal law enforcement by consistently requiring the state to report individuals who are prohibited by law from possessing firearms to the federal background check system.

6. To require the reporting of lost or stolen firearms to law enforcement.

7. To better enforce the laws that require people to relinquish their firearms once they are convicted of a crime that makes them ineligible to possess firearms.

8. To make it illegal in California to possess the kinds of military-style ammunition magazines that enable mass killings like those at Sandy Hook Elementary School; a movie theater in Aurora, Colorado; Columbine High School; and an office building at 101 California Street in San Francisco, California.

9. To prevent people who are convicted of the theft of a firearm from possessing firearms, and to effectuate the intent of Proposition 47 that the theft of a firearm is felony grand theft, regardless of the value of the firearm, in alignment with Sections 25400 and 1192.7 of the Penal Code.

SEC. 4. Lost or Stolen Firearms.

SEC. 4.1. Division 4.5 (commencing with Section 25250) is added to Title 4 of Part 6 of the Penal Code, to read:

pt. 6 t. 4 d. 4.5 pr. § 25250

DIVISION 4.5. LOST OR STOLEN FIREARMS

<< CA PENAL § 25250 >>

25250. (a) Commencing July 1, 2017, every person shall report the loss or theft of a firearm he or she owns or possesses to a local law enforcement agency in the jurisdiction in which the theft or loss occurred within five days of the time he or she knew or reasonably should have known that the firearm had been stolen or lost.

(b) Every person who has reported a firearm lost or stolen under subdivision (a) shall notify the local law enforcement agency in the jurisdiction in which the theft or loss occurred within five days if the firearm is subsequently recovered by the person.

(c) Notwithstanding subdivision (a), a person shall not be required to report the loss or theft of a firearm that is an antique firearm within the meaning of subdivision (c) of Section 16170.

<< CA PENAL § 25255 >>

Exhibit 27
Page 00985

**ER_3156**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

25255. Section 25250 shall not apply to the following:

(a) Any law enforcement agency or peace officer acting within the course and scope of his or her employment or official duties if he or she reports the loss or theft to his or her employing agency.

(b) Any United States marshal or member of the Armed Forces of the United States or the National Guard, while engaged in his or her official duties.

(c) Any person who is licensed, pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, and who reports the theft or loss in accordance with Section 923(g)(6) of Title 18 of the United States Code, or the successor provision thereto, and applicable regulations issued thereto.

(d) Any person whose firearm was lost or stolen prior to July 1, 2017.

<< CA PENAL § 25260 >>

25260. Pursuant to Section 11108, every sheriff or police chief shall submit a description of each firearm that has been reported lost or stolen directly into the Department of Justice Automated Firearms System.

<< CA PENAL § 25265 >>

25265. (a) Every person who violates Section 25250 is, for a first violation, guilty of an infraction, punishable by a fine not to exceed one hundred dollars ($100).

(b) Every person who violates Section 25250 is, for a second violation, guilty of an infraction, punishable by a fine not to exceed one thousand dollars ($1,000).

(c) Every person who violates Section 25250 is, for a third or subsequent violation, guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding six months, or by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment.

<< CA PENAL § 25270 >>

25270. Every person reporting a lost or stolen firearm pursuant to Section 25250 shall report the make, model, and serial number of the firearm, if known by the person, and any additional relevant information required by the local law enforcement agency taking the report.

<< CA PENAL § 25275 >>

25275. (a) No person shall report to a local law enforcement agency that a firearm has been lost or stolen, knowing the report to be false. A violation of this section is an infraction, punishable by a fine not exceeding two hundred fifty dollars ($250) for a first offense, and by a fine not exceeding one thousand dollars ($1,000) for a second or subsequent offense.

(b) This section shall not preclude prosecution under any other law.

SEC. 4.2. Section 26835 of the Penal Code is amended to read:

<< CA PENAL § 26835 >>

Exhibit 27
Page 00986

ER_3157

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

26835. A licensee shall post conspicuously within the licensed premises the following warnings in block letters not less than one inch in height:

(a) "IF YOU KEEP A LOADED FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE OBTAINS IT AND USES IT, RESULTING IN INJURY OR DEATH, OR CARRIES IT TO A PUBLIC PLACE, YOU MAY BE GUILTY OF A MISDEMEANOR OR A FELONY UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER OR LOCKED THE FIREARM WITH A LOCKING DEVICE, TO KEEP IT FROM TEMPORARILY FUNCTIONING."

(b) "IF YOU KEEP A PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON, WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE GAINS ACCESS TO THE FIREARM, AND CARRIES IT OFF–PREMISES, YOU MAY BE GUILTY OF A MISDEMEANOR, UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE, TO KEEP IT FROM TEMPORARILY FUNCTIONING."

(c) "IF YOU KEEP ANY FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE GAINS ACCESS TO THE FIREARM, AND CARRIES IT OFF–PREMISES TO A SCHOOL OR SCHOOL–SPONSORED EVENT, YOU MAY BE GUILTY OF A MISDEMEANOR, INCLUDING A FINE OF UP TO FIVE THOUSAND DOLLARS ($5,000), UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE."

(d) "IF YOU NEGLIGENTLY STORE OR LEAVE A LOADED FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, WHERE A PERSON UNDER 18 YEARS OF AGE IS LIKELY TO ACCESS IT, YOU MAY BE GUILTY OF A MISDEMEANOR, INCLUDING A FINE OF UP TO ONE THOUSAND DOLLARS ($1,000), UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE."

(e) "DISCHARGING FIREARMS IN POORLY VENTILATED AREAS, CLEANING FIREARMS, OR HANDLING AMMUNITION MAY RESULT IN EXPOSURE TO LEAD, A SUBSTANCE KNOWN TO CAUSE BIRTH DEFECTS, REPRODUCTIVE HARM, AND OTHER SERIOUS PHYSICAL INJURY. HAVE ADEQUATE VENTILATION AT ALL TIMES. WASH HANDS THOROUGHLY AFTER EXPOSURE."

(f) "FEDERAL REGULATIONS PROVIDE THAT IF YOU DO NOT TAKE PHYSICAL POSSESSION OF THE FIREARM THAT YOU ARE ACQUIRING OWNERSHIP OF WITHIN 30 DAYS AFTER YOU COMPLETE THE INITIAL BACKGROUND CHECK PAPERWORK, THEN YOU HAVE TO GO THROUGH THE BACKGROUND CHECK PROCESS A SECOND TIME IN ORDER TO TAKE PHYSICAL POSSESSION OF THAT FIREARM."

(g) "NO PERSON SHALL MAKE AN APPLICATION TO PURCHASE MORE THAN ONE PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON WITHIN ANY 30–DAY PERIOD AND NO DELIVERY SHALL BE MADE TO ANY PERSON WHO HAS MADE AN APPLICATION TO PURCHASE MORE THAN ONE PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON WITHIN ANY 30–DAY PERIOD."

**(h) "IF A FIREARM YOU OWN OR POSSESS IS LOST OR STOLEN, YOU MUST REPORT THE LOSS OR THEFT TO A LOCAL LAW ENFORCEMENT AGENCY WHERE THE LOSS OR THEFT OCCURRED WITHIN FIVE DAYS OF THE TIME YOU KNEW OR REASONABLY SHOULD HAVE KNOWN THAT THE FIREARM HAD BEEN LOST OR STOLEN."**

SEC. 5. Strengthening the National Instant Criminal Background Check System.

SEC. 5.1. Section 28220 of the Penal Code is amended to read:

Exhibit 27
Page 00987

**ER_3158**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

<< CA PENAL § 28220 >>

28220. (a) Upon submission of firearm purchaser information, the Department of Justice shall examine its records, as well as those records that it is authorized to request from the State Department of State Hospitals pursuant to Section 8104 of the Welfare and Institutions Code, in order to determine if the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

(b) * * * **The** Department of Justice **shall** participate in the National Instant Criminal Background Check System (NICS), as described in subsection (t) of Section 922 of Title 18 of the United States Code, and * * * shall notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, that the purchaser is a person prohibited from acquiring a firearm under federal law.

(c) If the department determines that the purchaser is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm or is a person described in subdivision (a) of Section 27535, it shall immediately notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact.

(d) If the department determines that the copies of the register submitted to it pursuant to subdivision (d) of Section 28210 contain any blank spaces or inaccurate, illegible, or incomplete information, preventing identification of the purchaser or the handgun or other firearm to be purchased, or if any fee required pursuant to Section 28225 is not submitted by the dealer in conjunction with submission of copies of the register, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall submit corrected copies of the register to the department, or shall submit any fee required pursuant to Section 28225, or both, as appropriate, and, if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(e) If the department determines that the information transmitted to it pursuant to Section 28215 contains inaccurate or incomplete information preventing identification of the purchaser or the handgun or other firearm to be purchased, or if the fee required pursuant to Section 28225 is not transmitted by the dealer in conjunction with transmission of the electronic or telephonic record, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall transmit corrections to the record of electronic or telephonic transfer to the department, or shall transmit any fee required pursuant to Section 28225, or both, as appropriate, and if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(f)(1)(A) The department shall immediately notify the dealer to delay the transfer of the firearm to the purchaser if the records of the department, or the records available to the department in the National Instant Criminal Background Check System, indicate one of the following:

(i) The purchaser has been taken into custody and placed in a facility for mental health treatment or evaluation and may be a person described in Section 8100 or 8103 of the Welfare and Institutions Code and the department is unable to ascertain whether the purchaser is a person who is prohibited from possessing, receiving, owning, or purchasing a firearm, pursuant to Section 8100 or 8103 of the Welfare and Institutions Code, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(ii) The purchaser has been arrested for, or charged with, a crime that would make him or her, if convicted, a person who is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, and the department is unable to ascertain whether the purchaser was convicted of that offense prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(iii) The purchaser may be a person described in subdivision (a) of Section 27535, and the department is unable to ascertain whether the purchaser, in fact, is a person described in subdivision (a) of Section 27535, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

Exhibit 27
Page 00988

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

(B) The dealer shall provide the purchaser with information about the manner in which he or she may contact the department regarding the delay described in subparagraph (A).

(2) The department shall notify the purchaser by mail regarding the delay and explain the process by which the purchaser may obtain a copy of the criminal or mental health record the department has on file for the purchaser. Upon receipt of that criminal or mental health record, the purchaser shall report any inaccuracies or incompleteness to the department on an approved form.

(3) If the department ascertains the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), after the waiting period described in Sections 26815 and 27540, but within 30 days of the dealer's original submission of the purchaser information to the department pursuant to this section, the department shall do the following:

(A) If the purchaser is not a person described in subdivision (a) of Section 27535, and is not prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer of that fact and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to him or her.

(B) If the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer and the chief of the police department in the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact in compliance with subdivision (c) of Section 28220.

(4) If the department is unable to ascertain the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), within 30 days of the dealer's original submission of purchaser information to the department pursuant to this section, the department shall immediately notify the dealer and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to him or her.

(g) Commencing July 1, 2017, upon receipt of information demonstrating that a person is prohibited from possessing a firearm pursuant to federal or state law, the department shall submit the name, date of birth, and physical description of the person to the National Instant Criminal Background Check System Index, Denied Persons Files. The information provided shall remain privileged and confidential, and shall not be disclosed, except for the purpose of enforcing federal or state firearms laws.

SEC. 6. Possession of Large–Capacity Magazines.

SEC. 6.1. Section 32310 of the Penal Code is amended to read:

<< CA PENAL § 32310 >>

32310. (a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, * * * any person in this state who manufactures or causes to be manufactured,

Exhibit 27
Page 00989

ER_3160

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b) For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

**(c) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.**

**(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:**

**(1) Remove the large-capacity magazine from the state;**

**(2) Sell the large-capacity magazine to a licensed firearms dealer; or**

**(3) Surrender the large-capacity magazine to a law enforcement agency for destruction.**

SEC. 6.2. Section 32400 of the Penal Code is amended to read:

<< CA PENAL § 32400 >>

32400. Section 32310 does not apply to the sale of, giving of, lending of, **possession of,** importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties, whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

SEC. 6.3. Section 32405 of the Penal Code is amended to read:

<< CA PENAL § 32405 >>

32405. Section 32310 does not apply to the sale to, lending to, transfer to, purchase by, receipt of, **possession of,** or importation into this state of, a large-capacity magazine by a sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, **or sworn federal law enforcement officer,** who is authorized to carry a firearm in the course and scope of that officer's duties.

SEC. 6.4. Section 32406 is added to the Penal Code, to read:

<< CA PENAL § 32406 >>

32406. Subdivision (c) of Section 32310 does not apply to an honorably retired sworn peace officer, as defined in Chapter 4.5

Exhibit 27
Page 00990

**ER_3161**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

(commencing with Section 830) of Title 3 of Part 2, or honorably retired sworn federal law enforcement officer, who was authorized to carry a firearm in the course and scope of that officer's duties. "Honorably retired" shall have the same meaning as provided in Section 16690.

SEC. 6.5. Section 32410 of the Penal Code is amended to read:

<< CA PENAL § 32410 >>

32410. Section 32310 does not apply to the sale * * *, purchase, **or possession** of any large-capacity magazine to or by a person licensed pursuant to Sections 26700 to 26915, inclusive.

<< Repealed: CA PENAL § 32420 >>

SEC. 6.6. Section 32420 of the Penal Code is repealed.

SEC. 6.7. Section 32425 of the Penal Code is amended to read:

<< CA PENAL § 32425 >>

32425. Section 32310 does not apply to **any** of the following:

(a) The lending or giving of any large-capacity magazine to a person licensed pursuant to Sections 26700 to 26915, inclusive, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

**(b) The possession of any large-capacity magazine by a person specified in subdivision (a) for the purposes specified in subdivision (a).**

**(c)** The return to its owner of any large-capacity magazine by a person specified in subdivision (a).

SEC. 6.8. Section 32435 of the Penal Code is amended to read:

<< CA PENAL § 32435 >>

32435. Section 32310 does not apply to any of the following:

(a) The sale of, giving of, lending of, **possession of,** importation into this state of, or purchase of, any large-capacity magazine, to or by any entity that operates an armored vehicle business pursuant to the laws of this state.

(b) The lending of large-capacity magazines by an entity specified in subdivision (a) to its authorized employees, while in the course and scope of employment for purposes that pertain to the entity's armored vehicle business.

**(c) The possession of any large-capacity magazines by the employees of an entity specified in subdivision (a) for purposes that pertain to the entity's armored vehicle business.**

**(d)** The return of those large-capacity magazines to the entity specified in subdivision (a) by those employees specified in

Exhibit 27
Page 00991

**ER_3162**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

---

subdivision (b).

SEC. 6.9. Section 32450 of the Penal Code is amended to read:

<< CA PENAL § 32450 >>

32450. Section 32310 does not apply to the purchase **or possession** of a large-capacity magazine by the holder of a special weapons permit issued pursuant to Section 31000, 32650, or 33300, or pursuant to Article 3 (commencing with Section 18900) of Chapter 1 of Division 5 of Title 2, or pursuant to Article 4 (commencing with Section 32700) of Chapter 6 of this division, for any of the following purposes:

(a) For use solely as a prop for a motion picture, television, or video production.

(b) For export pursuant to federal regulations.

(c) For resale to law enforcement agencies, government agencies, or the military, pursuant to applicable federal regulations.

SEC. 7. Firearms Dealers.

SEC. 7.1. Section 26885 of the Penal Code is amended to read:

<< CA PENAL § 26885 >>

26885. (a) Except as provided in subdivisions (b) and (c) of Section 26805, all firearms that are in the inventory of a licensee shall be kept within the licensed location.

(b) Within 48 hours of discovery, a licensee shall report the loss or theft of any of the following items to the appropriate law enforcement agency in the city, county, or city and county where the licensee's business premises are located:

(1) Any firearm **or ammunition** that is merchandise of the licensee.

(2) Any firearm **or ammunition** that the licensee takes possession of pursuant to Chapter 5 (commencing with Section 28050)**, or pursuant to Section 30312**.

(3) Any firearm **or ammunition** kept at the licensee's place of business.

SEC. 7.2. Section 26915 of the Penal Code is amended to read:

<< CA PENAL § 26915 >>

26915. (a) ~~* * *~~ **Commencing January 1, 2018, a** firearms dealer **shall** require any agent **or employee** who handles, sells, or delivers firearms to obtain and provide to the dealer a certificate of eligibility from the Department of Justice pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and California firearms dealer number of the firearms dealer with whom the person is employed.

(b) The department shall notify the firearms dealer in the event that the agent or employee who has a certificate of eligibility

Exhibit 27
Page 00992

**ER_3163**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

is or becomes prohibited from possessing firearms.

(c) If the local jurisdiction requires a background check of the agents or employees of a firearms dealer, the agent or employee shall obtain a certificate of eligibility pursuant to subdivision (a).

(d)(1) Nothing in this section shall be construed to preclude a local jurisdiction from conducting an additional background check pursuant to Section 11105. The local jurisdiction may not charge a fee for the additional criminal history check.

(2) Nothing in this section shall be construed to preclude a local jurisdiction from prohibiting employment based on criminal history that does not appear as part of obtaining a certificate of eligibility.

(e) The licensee shall prohibit any agent who the licensee knows or reasonably should know is within a class of persons prohibited from possessing firearms pursuant to Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, or Section 8100 or 8103 of the Welfare and Institutions Code, from coming into contact with any firearm that is not secured and from accessing any key, combination, code, or other means to open any of the locking devices described in subdivision (g).

(f) Nothing in this section shall be construed as preventing a local government from enacting an ordinance imposing additional conditions on licensees with regard to agents **or employees**.

(g) For purposes of this article, "secured" means a firearm that is made inoperable in one or more of the following ways:

(1) The firearm is inoperable because it is secured by a firearm safety device listed on the department's roster of approved firearm safety devices pursuant to subdivision (d) of Section 23655.

(2) The firearm is stored in a locked gun safe or long-gun safe that meets the standards for department-approved gun safes set forth in Section 23650.

(3) The firearm is stored in a distinct locked room or area in the building that is used to store firearms, which can only be unlocked by a key, a combination, or similar means.

(4) The firearm is secured with a hardened steel rod or cable that is at least one-eighth of an inch in diameter through the trigger guard of the firearm. The steel rod or cable shall be secured with a hardened steel lock that has a shackle. The lock and shackle shall be protected or shielded from the use of a boltcutter and the rod or cable shall be anchored in a manner that prevents the removal of the firearm from the premises.

SEC. 8. Sales of Ammunition.

SEC. 8.1. Section 16150 of the Penal Code is amended to read:

<< CA PENAL § 16150 >>

16150. <s>* * *</s> **(a) As used in this part, except in subdivision (a) of Section 30305 and in Section 30306, "ammunition" means one or more loaded cartridges consisting of a primed case, propellant, and with one or more projectiles. "Ammunition" does not include blanks.**

(b) As used in subdivision (a) of Section 30305 and in Section 30306, "ammunition" includes, but is not limited to, any bullet, cartridge, magazine, clip, speed loader, autoloader, or projectile capable of being fired from a firearm with a deadly consequence. "Ammunition" does not include blanks.

Exhibit 27
Page 00993

ER_3164

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

SEC. 8.2. Section 16151 is added to the Penal Code, to read:

<< CA PENAL § 16151 >>

16151. (a) As used in this part, commencing January 1, 2018, "ammunition vendor" means any person, firm, corporation, or other business enterprise that holds a current ammunition vendor license issued pursuant to Section 30385.

(b) Commencing January 1, 2018, a firearms dealer licensed pursuant to Sections 26700 to 26915, inclusive, shall automatically be deemed a licensed ammunition vendor, provided the dealer complies with the requirements of Articles 2 (commencing with Section 30300) and 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4.

<< Repealed: CA PENAL § 16662 >>

SEC. 8.3. Section 16662 of the Penal Code is repealed.

SEC. 8.4. Section 17315 of the Penal Code is amended to read:

<< CA PENAL § 17315 >>

17315. As used in * * * **Articles 2 through 5** of Chapter 1 of Division 10 of Title 4, "vendor" means * * * **an** ammunition vendor.

SEC. 8.5. Section 30306 of the Penal Code is amended to read:

<< CA PENAL § 30306 >>

30306. (a) Any person, corporation, * * * **firm, or other business enterprise** who supplies, delivers, sells, or gives possession or control of, any ammunition to any person who he or she knows or using reasonable care should know is prohibited from owning, possessing, or having under custody or control, any ammunition or reloaded ammunition pursuant to subdivision (a) or (b) of Section 30305, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.

**(b) Any person, corporation, firm, or other business enterprise who supplies, delivers, sells, or gives possession or control of, any ammunition to any person whom the person, corporation, firm, or other business enterprise knows or has cause to believe is not the actual purchaser or transferee of the ammunition, with knowledge or cause to believe that the ammunition is to be subsequently sold or transferred to a person who is prohibited from owning, possessing, or having under custody or control any ammunition or reloaded ammunition pursuant to subdivision (a) or (b) of Section 30305, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.**

**(c)** The provisions of this section are cumulative and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by this section and another provision of law shall not be punished under more than one provision.

SEC. 8.6. Section 30312 of the Penal Code is amended to read:

Exhibit 27
Page 00994

ER_3165

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

<< CA PENAL § 30312 >>

30312. * * * **(a)(1) Commencing January 1, 2018, the sale of ammunition by any party shall be conducted by or processed through a licensed ammunition vendor.**

**(2) When neither party to an ammunition sale is a licensed ammunition vendor, the seller shall deliver the ammunition to a vendor to process the transaction. The ammunition vendor shall then promptly and properly deliver the ammunition to the purchaser, if the sale is not prohibited, as if the ammunition were the vendor's own merchandise. If the ammunition vendor cannot legally deliver the ammunition to the purchaser, the vendor shall forthwith return the ammunition to the seller. The ammunition vendor may charge the purchaser an administrative fee to process the transaction, in an amount to be set by the Department of Justice, in addition to any applicable fees that may be charged pursuant to the provisions of this title.**

**(b) Commencing January 1, 2018, the sale,** delivery or transfer of ownership of * * * ammunition **by any party** may only occur in a face-to-face transaction with the **seller,** deliverer, or transferor * * *, **provided, however, that ammunition may be purchased or acquired over the Internet or through other means of remote ordering if a licensed ammunition vendor initially receives the ammunition and processes the transaction in compliance with this section and Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of this part.**

* * * **(c) Subdivisions** (a) **and (b)** shall not apply to * * * the sale, delivery, or transfer of * * * ammunition to any of the following:

(1) An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale, delivery, or transfer is for exclusive use by that government agency and, prior to the sale, delivery, or transfer of the * * * ammunition, written authorization from the head of the agency employing the purchaser or transferee is obtained, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency employing the individual.

(2) A sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2**, or sworn federal law enforcement officer,** who is authorized to carry a firearm in the course and scope of the officer's duties.

(3) An importer or manufacturer of * * * ammunition or firearms who is licensed to engage in business pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4) A person who is on the centralized list **of exempted federal firearms licensees** maintained by the Department of Justice pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of this title.

(5) A person whose licensed premises are outside this state and who is licensed as a dealer or collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(6) A person who is licensed as a collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, whose licensed premises are within this state, and who has a current certificate of eligibility issued by the Department of Justice pursuant to Section 26710.

(7) * * * **An** ammunition vendor.

(8) A consultant-evaluator.

**(9) A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.**

**(10) A person who purchases or receives ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720.**

**(d)** A violation of this section is a misdemeanor.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.          13

Exhibit 27
Page 00995

ER_3166

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

---

SEC. 8.7. Section 30314 is added to the Penal Code, to read:

<< CA PENAL § 30314 >>

30314. (a) Commencing January 1, 2018, a resident of this state shall not bring or transport into this state any ammunition that he or she purchased or otherwise obtained from outside of this state unless he or she first has that ammunition delivered to a licensed ammunition vendor for delivery to that resident pursuant to the procedures set forth in Section 30312.

(b) Subdivision (a) does not apply to any of the following:

(1) An ammunition vendor.

(2) A sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.

(3) An importer or manufacturer of ammunition or firearms who is licensed to engage in business pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4) A person who is on the centralized list of exempted federal firearms licensees maintained by the Department of Justice pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6.

(5) A person who is licensed as a collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, whose licensed premises are within this state, and who has a current certificate of eligibility issued by the Department of Justice pursuant to Section 26710.

(6) A person who acquired the ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720.

(c) A violation of this section is an infraction for any first time offense, and either an infraction or a misdemeanor for any subsequent offense.

SEC. 8.8. The heading of Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code is amended to read:

pt. 6 t. 4 d. 10 ch. 1 art. 3 pr. § 30342

Article 3. * * * Ammunition Vendors

SEC. 8.9. Section 30342 is added to the Penal Code, immediately preceding Section 30345, to read:

<< CA PENAL § 30342 >>

30342. (a) Commencing January 1, 2018, a valid ammunition vendor license shall be required for any person, firm, corporation, or other business enterprise to sell more than 500 rounds of ammunition in any 30–day period.

(b) A violation of this section is a misdemeanor.

Exhibit 27
Page 00996

ER_3167

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

SEC. 8.10. Section 30347 of the Penal Code is amended to read:

<< CA PENAL § 30347 >>

30347. **(a) An ammunition vendor shall require any agent or employee who handles, sells, delivers, or has under his or her custody or control any ammunition, to obtain and provide to the vendor a certificate of eligibility from the Department of Justice issued pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and address of the ammunition vendor with whom the person is employed, or the name and California firearms dealer number of the ammunition vendor if applicable.**

**(b) The department shall notify the ammunition vendor in the event that the agent or employee who has a certificate of eligibility is or becomes prohibited from possessing ammunition under subdivision (a) of Section 30305 or federal law.**

\* \* \* **(c) An ammunition** vendor shall not permit any **agent or** employee who the vendor knows or reasonably should know is a person described in Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title or Section 8100 or 8103 of the Welfare and Institutions Code to handle, sell, \* \* \* deliver, **or have under his or her custody or control, any** \* \* \* ammunition in the course and scope of employment.

SEC. 8.11. Section 30348 is added to the Penal Code, to read:

<< CA PENAL § 30348 >>

30348. (a) Except as provided in subdivision (b), the sale of ammunition by a licensed vendor shall be conducted at the location specified in the license.

(b) A vendor may sell ammunition at a gun show or event if the gun show or event is not conducted from any motorized or towed vehicle.

(c) For purposes of this section, "gun show or event" means a function sponsored by any national, state, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization or association that sponsors functions devoted to the collection, competitive use, or other sporting use of firearms in the community.

(d) Sales of ammunition at a gun show or event shall comply with all applicable laws including Sections 30347, 30350, 30352, and 30360.

SEC. 8.12. Section 30350 of the Penal Code is amended to read:

<< CA PENAL § 30350 >>

30350. \* \* \* **An ammunition** vendor shall not sell or otherwise transfer ownership of, offer for sale or otherwise offer to transfer ownership of, or display for sale or display for transfer of ownership of any \* \* \* ammunition in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor.

Exhibit 27
Page 00997

**ER_3168**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

SEC. 8.13. Section 30352 of the Penal Code is amended to read:

<< CA PENAL § 30352 >>

30352. (a) Commencing ~~* * *~~ **July 1, 2019, an ammunition** vendor shall not sell or otherwise transfer ownership of any ~~* * *~~ ammunition without, at the time of delivery, legibly recording the following information **on a form to be prescribed by the Department of Justice**:

(1) The date of the sale or other **transfer**.

(2) The purchaser's or transferee's driver's license or other identification number and the state in which it was issued.

(3) The brand, type, and amount of ammunition sold or otherwise transferred.

(4) The purchaser's or transferee's **full name and** signature.

(5) The name of the salesperson who processed the sale or other transaction.

~~* * *~~

**(6)** The purchaser's or transferee's full residential address and telephone number.

**(7)** The purchaser's or transferee's date of birth.

**(b) Commencing July 1, 2019, an ammunition vendor shall electronically submit to the department the information required by subdivision (a) for all sales and transfers of ownership of ammunition. The department shall retain this information in a database to be known as the Ammunition Purchase Records File. This information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The ammunition vendor shall not use, sell, disclose, or share such information for any other purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.**

**(c) Commencing on July 1, 2019, only those persons listed in this subdivision, or those persons or entities listed in subdivision (e), shall be authorized to purchase ammunition. Prior to delivering any ammunition, an ammunition vendor shall require bona fide evidence of identity to verify that the person who is receiving delivery of the ammunition is a person or entity listed in subdivision (e) or one of the following:**

**(1) A person authorized to purchase ammunition pursuant to Section 30370.**

**(2) A person who was approved by the department to receive a firearm from the ammunition vendor, pursuant to Section 28220, if that vendor is a licensed firearms dealer, and the ammunition is delivered to the person in the same transaction as the firearm.**

**(d) Commencing July 1, 2019, the ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition by comparing the person's ammunition purchase authorization number to the centralized list of authorized ammunition purchasers. If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer.**

~~* * *~~ **(e) Subdivisions** (a) **and (d)** shall not apply to ~~* * *~~ sales or other transfers of ownership of ~~* * *~~ ammunition by ~~* * *~~ ammunition vendors to any of the following, if properly identified:

~~* * *~~

~~* * *~~ **(1) An** ammunition vendor.

Exhibit 27
Page 00998

**ER_3169**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

**(2)** A person who is on the centralized list **of exempted federal firearms licensees** maintained by the department pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of this title.

*\* \* \**

**(3) A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.**

**(4)** A gunsmith.

**(5)** A wholesaler.

**(6)** A manufacturer or importer of firearms **or ammunition** licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code, and the regulations issued pursuant thereto.

**(7)** An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale or other transfer of ownership is for exclusive use by that government agency, and, prior to the sale, delivery, or transfer of the *\* \* \** ammunition, written authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made. Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser, transferee, or person otherwise acquiring ownership is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that individual is employed.

**(8) A properly identified sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or properly identified sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.**

**(f)(1) Proper identification is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the purchaser or transferee as a full-time paid peace officer who is authorized to carry a firearm in the course and scope of the officer's duties.**

**(2) The certification shall be delivered to the vendor at the time of purchase or transfer and the purchaser or transferee shall provide bona fide evidence of identity to verify that he or she is the person authorized in the certification.**

**(3) The vendor shall keep the certification with the record of sale and submit the certification to the department.**

**(g) The department is authorized to adopt regulations to implement the provisions of this section.**


SEC. 8.14. Section 30363 is added to the Penal Code, to read:

<< CA PENAL § 30363 >>

30363. Within 48 hours of discovery, an ammunition vendor shall report the loss or theft of any of the following items to the appropriate law enforcement agency in the city, county, or city and county where the vendor's business premises are located:

(1) Any ammunition that is merchandise of the vendor.

(2) Any ammunition that the vendor takes possession of pursuant to Section 30312.

(3) Any ammunition kept at the vendor's place of business.

Exhibit 27
Page 00999

ER_3170

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

SEC. 8.15. Article 4 (commencing with Section 30370) is added to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code, to read:

pt. 6 t. 4 d. 10 ch. 1 art. 4 pr. § 30370

Article 4. Ammunition Purchase Authorizations

<< CA PENAL § 30370 >>

30370. (a)(1) Commencing on January 1, 2019, any person who is 18 years of age or older may apply to the Department of Justice for an ammunition purchase authorization.

(2) The ammunition purchase authorization may be used by the authorized person to purchase or otherwise seek the transfer of ownership of ammunition from an ammunition vendor, as that term is defined in Section 16151, and shall have no other force or effect.

(3) The ammunition purchase authorization shall be valid for four years from July 1, 2019, or the date of issuance, whichever is later, unless it is revoked by the department pursuant to subdivision (b).

(b) The ammunition purchase authorization shall be promptly revoked by the department upon the occurrence of any event which would have disqualified the holder from being issued the ammunition purchase authorization pursuant to this section. If an authorization is revoked, the department shall upon the written request of the holder state the reasons for doing so and provide the holder an appeal process to challenge that revocation.

(c) The department shall create and maintain an internal centralized list of all persons who are authorized to purchase ammunition and shall promptly remove from the list any persons whose authorization was revoked by the department pursuant to this section. The department shall provide access to the list by ammunition vendors for purposes of conducting ammunition sales or other transfers, and shall provide access to the list by law enforcement agencies for law enforcement purposes.

(d) The department shall issue an ammunition purchase authorization to the applicant if all of the following conditions are met:

(1) The applicant is 18 years of age or older.

(2) The applicant is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law.

(3) The applicant pays the fees set forth in subdivision (g).

(e)(1) Upon receipt of an initial or renewal application, the department shall examine its records, and the records it is authorized to request from the State Department of State Hospitals, pursuant to Section 8104 of the Welfare and Institutions Code, and if authorized, the National Instant Criminal Background Check System, as described in Section 922(t) of Title 18 of the United States Code, in order to determine if the applicant is prohibited from possessing or acquiring ammunition under subdivision (a) of Section 30305 or federal law.

(2) The applicant shall be approved or denied within 30 days of the date of the submission of the application to the department. If the application is denied, the department shall state the reasons for doing so and provide the applicant an appeal process to challenge that denial.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    18

Exhibit 27
Page 01000

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

(3) If the department is unable to ascertain the final disposition of the application within 30 days of the applicant's submission, the department shall grant authorization to the applicant.

(4) The ammunition purchase authorization number shall be the same as the number on the document presented by the person as bona fide evidence of identity.

(f) The department shall renew a person's ammunition purchase authorization before its expiration, provided that the department determines that the person is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law, and provided the applicant timely pays the renewal fee set forth in subdivision (g).

(g) The department may charge a reasonable fee not to exceed fifty dollars ($50) per person for the issuance of an ammunition purchase authorization or the issuance of a renewal authorization, however, the department shall not set these fees any higher than necessary to recover the reasonable, estimated costs to fund the ammunition authorization program provided for in this section and Section 30352, including the enforcement of this program and maintenance of any data systems associated with this program.

(h) The Ammunition Safety and Enforcement Special Fund is hereby created within the State Treasury. All fees received pursuant to this section shall be deposited into the Ammunition Safety and Enforcement Special Fund of the General Fund, and, notwithstanding Section 13340 of the Government Code, are continuously appropriated for purposes of implementing, operating and enforcing the ammunition authorization program provided for in this section and Section 30352, and for repaying the start-up loan provided for in Section 30371.

(i) The department shall annually review and may adjust all fees specified in subdivision (g) for inflation.

(j) The department is authorized to adopt regulations to implement the provisions of this section.

<< CA PENAL § 30371 >>

30371. (a) There is hereby appropriated twenty-five million dollars ($25,000,000) from the General Fund as a loan for the start-up costs of implementing, operating and enforcing the provisions of the ammunition authorization program provided for in Sections 30352 and 30370.

(b) For purposes of repaying the loan, the Controller shall, after disbursing moneys necessary to implement, operate and enforce the ammunition authorization program provided for in Sections 30352 and 30370, transfer all proceeds from fees received by the Ammunition Safety and Enforcement Special Fund up to the amount of the loan provided by this section, including interest at the pooled money investment account rate, to the General Fund.

SEC. 8.16. Article 5 (commencing with Section 30385) is added to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code, to read:

pt. 6 t. 4 d. 10 ch. 1 art. 5 pr. § 30385

Article 5. Ammunition Vendor Licenses

<< CA PENAL § 30385 >>

30385. (a) The Department of Justice is authorized to issue ammunition vendor licenses pursuant to this article. The department shall, commencing July 1, 2017, commence accepting applications for ammunition vendor licenses. If an application is denied, the department shall inform the applicant of the reason for denial in writing.

Exhibit 27
Page 01001

ER_3172

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

(b) The ammunition vendor license shall be issued in a form prescribed by the department and shall be valid for a period of one year. The department may adopt regulations to administer the application and enforcement provisions of this article. The license shall allow the licensee to sell ammunition at the location specified in the license or at a gun show or event as set forth in Section 30348.

(c)(1) In the case of an entity other than a natural person, the department shall issue the license to the entity, but shall require a responsible person to pass the background check pursuant to Section 30395.

(2) For purposes of this article, "responsible person" means a person having the power to direct the management, policies, and practices of the entity as it pertains to ammunition.

(d) Commencing January 1, 2018, a firearms dealer licensed pursuant to Sections 26700 to 26915, inclusive, shall automatically be deemed a licensed ammunition vendor, provided the dealer complies with the requirements of Article 2 (commencing with Section 30300) and Article 3 (commencing with Section 30342).

<< CA PENAL § 30390 >>

30390. (a) The Department of Justice may charge ammunition vendor license applicants a reasonable fee sufficient to reimburse the department for the reasonable, estimated costs of administering the license program, including the enforcement of this program and maintenance of the registry of ammunition vendors.

(b) The fees received by the department pursuant to this article shall be deposited in the Ammunition Vendors Special Account, which is hereby created. Notwithstanding Section 13340 of the Government Code, the revenue in the fund is continuously appropriated for use by the department for the purpose of implementing, administering and enforcing the provisions of this article, and for collecting and maintaining information submitted pursuant to Section 30352.

(c) The revenue in the Firearms Safety and Enforcement Special Fund shall also be available upon appropriation to the department for the purpose of implementing and enforcing the provisions of this article.

<< CA PENAL § 30395 >>

30395. (a) The Department of Justice is authorized to issue ammunition vendor licenses to applicants who the department has determined, either as an individual or a responsible person, are not prohibited from possessing, receiving, owning, or purchasing ammunition under subdivision (a) of Section 30305 or federal law, and who provide a copy of any regulatory or business license required by local government, a valid seller's permit issued by the State Board of Equalization, a federal firearms license if the person is federally licensed, and a certificate of eligibility issued by the department.

(b) The department shall keep a registry of all licensed ammunition vendors. Law enforcement agencies shall be provided access to the registry for law enforcement purposes.

(c) An ammunition vendor license is subject to forfeiture for a breach of any of the prohibitions and requirements of Article 2 (commencing with Section 30300) or Article 3 (commencing with Section 30342).

SEC. 9. Nothing in this Act shall preclude or preempt a local ordinance that imposes additional penalties or requirements in regard to the sale or transfer of ammunition.

SEC. 10. Securing Firearms From Prohibited Persons.

Exhibit 27
Page 01002

**ER_3173**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

SEC. 10.1. Section 1524 of the Penal Code is amended to read:

<< CA PENAL § 1524 >>

1524. (a) A search warrant may be issued upon any of the following grounds:

(1) When the property was stolen or embezzled.

(2) When the property or things were used as the means of committing a felony.

(3) When the property or things are in the possession of any person with the intent to use them as a means of committing a public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing them from being discovered.

(4) When the property or things to be seized consist of an item or constitute evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony.

(5) When the property or things to be seized consist of evidence that tends to show that sexual exploitation of a child, in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under 18 years of age, in violation of Section 311.11, has occurred or is occurring.

(6) When there is a warrant to arrest a person.

(7) When a provider of electronic communication service or remote computing service has records or evidence, as specified in Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery.

(8) When the property or things to be seized include an item or evidence that tends to show a violation of Section 3700.5 of the Labor Code, or tends to show that a particular person has violated Section 3700.5 of the Labor Code.

(9) When the property or things to be seized include a firearm or other deadly weapon at the scene of, or at the premises occupied or under the control of the person arrested in connection with, a domestic violence incident involving a threat to human life or a physical assault as provided in Section 18250. This section does not affect warrantless seizures otherwise authorized by Section 18250.

(10) When the property or things to be seized include a firearm or other deadly weapon that is owned by, or in the possession of, or in the custody or control of, a person described in subdivision (a) of Section 8102 of the Welfare and Institutions Code.

(11) When the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 6389 of the Family Code, if a prohibited firearm is possessed, owned, in the custody of, or controlled by a person against whom a protective order has been issued pursuant to Section 6218 of the Family Code, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

(12) When the information to be received from the use of a tracking device constitutes evidence that tends to show that either a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code has been committed or is being committed, tends to show that a particular person has committed a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or will assist in locating an individual who has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code. A tracking device search warrant issued pursuant to this paragraph shall be executed in a manner meeting the requirements specified in subdivision (b) of Section 1534.

Exhibit 27
Page 01003

ER_3174

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

(13) When a sample of the blood of a person constitutes evidence that tends to show a violation of Section 23140, 23152, or 23153 of the Vehicle Code and the person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 23612 of the Vehicle Code, and the sample will be drawn from the person in a reasonable, medically approved manner. This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

(14) Beginning January 1, 2016, the property or things to be seized are firearms or ammunition or both that are owned by, in the possession of, or in the custody or control of a person who is the subject of a gun violence restraining order that has been issued pursuant to Division 3.2 (commencing with Section 18100) of Title 2 of Part 6, if a prohibited firearm or ammunition or both is possessed, owned, in the custody of, or controlled by a person against whom a gun violence restraining order has been issued, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

**(15) Beginning January 1, 2018, the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 29800 or 29805, and the court has made a finding pursuant to paragraph (3) of subdivision (c) of Section 29810 that the person has failed to relinquish the firearm as required by law.**

(16) When the property or things to be seized are controlled substances or a device, contrivance, instrument, or paraphernalia used for unlawfully using or administering a controlled substance pursuant to the authority described in Section 11472 of the Health and Safety Code.

(17) (A) When all of the following apply:

(i) A sample of the blood of a person constitutes evidence that tends to show a violation of subdivision (b), (c), (d), (e), or (f) of Section 655 of the Harbors and Navigation Code.

(ii) The person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 655.1 of the Harbors and Navigation Code.

(iii) The sample will be drawn from the person in a reasonable, medically approved manner.

(B) This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

(b) The property, things, person, or persons described in subdivision (a) may be taken on the warrant from any place, or from any person in whose possession the property or things may be.

(c) Notwithstanding subdivision (a) or (b), no search warrant shall issue for any documentary evidence in the possession or under the control of any person who is a lawyer as defined in Section 950 of the Evidence Code, a physician as defined in Section 990 of the Evidence Code, a psychotherapist as defined in Section 1010 of the Evidence Code, or a member of the clergy as defined in Section 1030 of the Evidence Code, and who is not reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence for which a warrant is requested unless the following procedure has been complied with:

(1) At the time of the issuance of the warrant, the court shall appoint a special master in accordance with subdivision (d) to accompany the person who will serve the warrant. Upon service of the warrant, the special master shall inform the party served of the specific items being sought and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for the items in the areas indicated in the search warrant.

(2)(A) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing.

Exhibit 27
Page 01004

ER_3175

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

(B) At the hearing, the party searched shall be entitled to raise any issues that may be raised pursuant to Section 1538.5 as well as a claim that the item or items are privileged, as provided by law. The hearing shall be held in the superior court. The court shall provide sufficient time for the parties to obtain counsel and make motions or present evidence. The hearing shall be held within three days of the service of the warrant unless the court makes a finding that the expedited hearing is impracticable. In that case, the matter shall be heard at the earliest possible time.

(C) If an item or items are taken to court for a hearing, any limitations of time prescribed in Chapter 2 (commencing with Section 799) of Title 3 of Part 2 shall be tolled from the time of the seizure until the final conclusion of the hearing, including any associated writ or appellate proceedings.

(3) The warrant shall, whenever practicable, be served during normal business hours. In addition, the warrant shall be served upon a party who appears to have possession or control of the items sought. If, after reasonable efforts, the party serving the warrant is unable to locate the person, the special master shall seal and return to the court, for determination by the court, any item that appears to be privileged as provided by law.

(d)(1) As used in this section, a "special master" is an attorney who is a member in good standing of the California State Bar and who has been selected from a list of qualified attorneys that is maintained by the State Bar particularly for the purposes of conducting the searches described in this section. These attorneys shall serve without compensation. A special master shall be considered a public employee, and the governmental entity that caused the search warrant to be issued shall be considered the employer of the special master and the applicable public entity, for purposes of Division 3.6 (commencing with Section 810) of Title 1 of the Government Code, relating to claims and actions against public entities and public employees. In selecting the special master, the court shall make every reasonable effort to ensure that the person selected has no relationship with any of the parties involved in the pending matter. Information obtained by the special master shall be confidential and may not be divulged except in direct response to inquiry by the court.

(2) In any case in which the magistrate determines that, after reasonable efforts have been made to obtain a special master, a special master is not available and would not be available within a reasonable period of time, the magistrate may direct the party seeking the order to conduct the search in the manner described in this section in lieu of the special master.

(e) Any search conducted pursuant to this section by a special master may be conducted in a manner that permits the party serving the warrant or his or her designee to accompany the special master as he or she conducts his or her search. However, that party or his or her designee may not participate in the search nor shall he or she examine any of the items being searched by the special master except upon agreement of the party upon whom the warrant has been served.

(f) As used in this section, "documentary evidence" includes, but is not limited to, writings, documents, blueprints, drawings, photographs, computer printouts, microfilms, X-rays, files, diagrams, ledgers, books, tapes, audio and video recordings, films, and papers of any type or description.

(g) No warrant shall issue for any item or items described in Section 1070 of the Evidence Code.

(h) Notwithstanding any other law, no claim of attorney work product as described in Chapter 4 (commencing with Section 2018.010) of Title 4 of Part 4 of the Code of Civil Procedure shall be sustained where there is probable cause to believe that the lawyer is engaging or has engaged in criminal activity related to the documentary evidence for which a warrant is requested unless it is established at the hearing with respect to the documentary evidence seized under the warrant that the services of the lawyer were not sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud.

(i) Nothing in this section is intended to limit an attorney's ability to request an in-camera hearing pursuant to the holding of the Supreme Court of California in People v. Superior Court (Laff) (2001) 25 Cal.4th 703.

(j) In addition to any other circumstance permitting a magistrate to issue a warrant for a person or property in another county, when the property or things to be seized consist of any item or constitute evidence that tends to show a violation of Section 530.5, the magistrate may issue a warrant to search a person or property located in another county if the person whose identifying information was taken or used resides in the same county as the issuing court.

Exhibit 27
Page 01005

**ER_3176**

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

---

(k) This section shall not be construed to create a cause of action against any foreign or California corporation, its officers, employees, agents, or other specified persons for providing location information.

SEC. 10.2. Section 27930 of the Penal Code is amended to read:

<< CA PENAL § 27930 >>

27930. Section 27545 does not apply to deliveries, transfers, or returns of firearms made pursuant to any of the following:

(a) Sections 18000 and 18005.

(b) Division 4 (commencing with Section 18250) of Title 2.

(c) Chapter 2 (commencing with Section 33850) of Division 11.

(d) Sections 34005 and 34010.

(e) Section 29810.

SEC. 10.3. Section 29810 of the Penal Code is amended to read:

<< CA PENAL § 29810 >>

29810. (a) For any person who is subject to Section 29800 or 29805, the court shall, at the time judgment is imposed, provide on a form supplied by the Department of Justice, a notice to the defendant prohibited by this chapter from owning, purchasing, receiving, possessing, or having under custody or control, any firearm. The notice shall inform the defendant of the prohibition regarding firearms and include a form to facilitate the transfer of firearms. If the prohibition on owning or possessing a firearm will expire on a date specified in the court order, the form shall inform the defendant that he or she may elect to have his or her firearm transferred to a firearms dealer licensed pursuant to Section 29830.

(b) Failure to provide the notice described in subdivision (a) is not a defense to a violation of this chapter.

(c) This section shall be repealed effective January 1, 2018.

SEC. 10.4. Section 29810 is added to the Penal Code, to read:

<< CA PENAL § 29810 >>

29810. (a) (1) Upon conviction of any offense that renders a person subject to Section 29800 or Section 29805, the person shall relinquish all firearms he or she owns, possesses, or has under his or her custody or control in the manner provided in this section.

(2) The court shall, upon conviction of a defendant for an offense described in subdivision (a), instruct the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines, and shall order the defendant to relinquish all firearms in the manner provided in this section. The court shall also provide the defendant with a Prohibited

---

Exhibit 27
Page 01006

ER_3177

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

Persons Relinquishment Form developed by the Department of Justice.

(3) Using the Prohibited Persons Relinquishment Form, the defendant shall name a designee and grant the designee power of attorney for the purpose of transferring or disposing of any firearms. The designee shall be either a local law enforcement agency or a consenting third party who is not prohibited from possessing firearms under state or federal law. The designee shall, within the time periods specified in subdivisions (d) and (e), surrender the firearms to the control of a local law enforcement agency, sell the firearms to a licensed firearms dealer, or transfer the firearms for storage to a firearms dealer pursuant to Section 29830.

(b) The Prohibited Persons Relinquishment Form shall do all of the following:

(1) Inform the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines, and that he or she shall relinquish all firearms through a designee within the time periods set forth in subdivision (d) or (e) by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830.

(2) Inform the defendant that any cohabitant of the defendant who owns firearms must store those firearms in accordance with Section 25135.

(3) Require the defendant to declare any firearms that he or she owned, possessed, or had under his or her custody or control at the time of his or her conviction, and require the defendant to describe the firearms and provide all reasonably available information about the location of the firearms to enable a designee or law enforcement officials to locate the firearms.

(4) Require the defendant to name a designee, if the defendant declares that he or she owned, possessed, or had under his or her custody or control any firearms at the time of his or her conviction, and grant the designee power of attorney for the purpose of transferring or disposing of all firearms.

(5) Require the designee to indicate his or her consent to the designation and, except a designee that is a law enforcement agency, to declare under penalty of perjury that he or she is not prohibited from possessing any firearms under state or federal law.

(6) Require the designee to state the date each firearm was relinquished and the name of the party to whom it was relinquished, and to attach receipts from the law enforcement officer or licensed firearms dealer who took possession of the relinquished firearms.

(7) Inform the defendant and the designee of the obligation to submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer within the time periods specified in subdivisions (d) and (e).

(c)(1) When a defendant is convicted of an offense described in subdivision (a), the court shall immediately assign the matter to a probation officer to investigate whether the Automated Firearms System or other credible information, such as a police report, reveals that the defendant owns, possesses, or has under his or her custody or control any firearms. The assigned probation officer shall receive the Prohibited Persons Relinquishment Form from the defendant or the defendant's designee, as applicable, and ensure that the Automated Firearms System has been properly updated to indicate that the defendant has relinquished those firearms.

(2) Prior to final disposition or sentencing in the case, the assigned probation officer shall report to the court whether the defendant has properly complied with the requirements of this section by relinquishing all firearms identified by the probation officer's investigation or declared by the defendant on the Prohibited Persons Relinquishment Form, and by timely submitting a completed Prohibited Persons Relinquishment Form. The probation officer shall also report to the Department of Justice on a form to be developed by the department whether the Automated Firearms System has been updated to indicate which firearms have been relinquished by the defendant.

(3) Prior to final disposition or sentencing in the case, the court shall make findings concerning whether the probation

Exhibit 27
Page 01007

ER_3178

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

officer's report indicates that the defendant has relinquished all firearms as required, and whether the court has received a completed Prohibited Persons Relinquishment Form, along with the receipts described in paragraph (1) of subdivision (d) or paragraph (1) of subdivision (e). The court shall ensure that these findings are included in the abstract of judgment. If necessary to avoid a delay in sentencing, the court may make and enter these findings within 14 days of sentencing.

(4) If the court finds probable cause that the defendant has failed to relinquish any firearms as required, the court shall order the search for and removal of any firearms at any location where the judge has probable cause to believe the defendant's firearms are located. The court shall state with specificity the reasons for and scope of the search and seizure authorized by the order.

(5) Failure by a defendant to timely file the completed Prohibited Persons Relinquishment Form with the assigned probation officer shall constitute an infraction punishable by a fine not exceeding one hundred dollars ($100).

(d) The following procedures shall apply to any defendant who is a prohibited person within the meaning of paragraph (1) of subdivision (a) who does not remain in custody at any time within the five-day period following conviction:

(1) The designee shall dispose of any firearms the defendant owns, possesses, or has under his or her custody or control within five days of the conviction by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830, in accordance with the wishes of the defendant. Any proceeds from the sale of the firearms shall become the property of the defendant. The law enforcement officer or licensed dealer taking possession of any firearms pursuant to this subdivision shall issue a receipt to the designee describing the firearms and listing any serial number or other identification on the firearms at the time of surrender.

(2) If the defendant owns, possesses, or has under his or her custody or control any firearms to relinquish, the defendant's designee shall submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer within five days following the conviction, along with the receipts described in paragraph (1) of subdivision (d) showing the defendant's firearms were surrendered to a local law enforcement agency or sold or transferred to a licensed firearms dealer.

(3) If the defendant does not own, possess, or have under his or her custody or control any firearms to relinquish, he or she shall, within five days following conviction, submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, with a statement affirming that he or she has no firearms to be relinquished.

(e) The following procedures shall apply to any defendant who is a prohibited person within the meaning of paragraph (1) of subdivision (a) who is in custody at any point within the five-day period following conviction:

(1) The designee shall dispose of any firearms the defendant owns, possesses, or has under his or her custody or control within 14 days of the conviction by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830, in accordance with the wishes of the defendant. Any proceeds from the sale of the firearms shall become the property of the defendant. The law enforcement officer or licensed dealer taking possession of any firearms pursuant to this subdivision shall issue a receipt to the designee describing the firearms and listing any serial number or other identification on the firearms at the time of surrender.

(2) If the defendant owns, possesses, or has under his or her custody or control any firearms to relinquish, the defendant's designee shall submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, within 14 days following conviction, along with the receipts described in paragraph (1) of subdivision (e) showing the defendant's firearms were surrendered to a local law enforcement agency or sold or transferred to a licensed firearms dealer.

(3) If the defendant does not own, possess, or have under his or her custody or control any firearms to relinquish, he or she shall, within 14 days following conviction, submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, with a statement affirming that he or she has no firearms to be relinquished.

(4) If the defendant is released from custody during the 14 days following conviction and a designee has not yet taken

Exhibit 27
Page 01008

ER_3179

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

temporary possession of each firearm to be relinquished as described above, the defendant shall, within five days following his or her release, relinquish each firearm required to be relinquished pursuant to paragraph (1) of subdivision (d).

(f) For good cause, the court may shorten or enlarge the time periods specified in subdivisions (d) and (e), enlarge the time period specified in paragraph (3) of subdivision (c), or allow an alternative method of relinquishment.

(g) The defendant shall not be subject to prosecution for unlawful possession of any firearms declared on the Prohibited Persons Relinquishment Form if the firearms are relinquished as required.

(h) Any firearms that would otherwise be subject to relinquishment by a defendant under this section, but which are lawfully owned by a cohabitant of the defendant, shall be exempt from relinquishment, provided the defendant is notified that the cohabitant must store the firearm in accordance with Section 25135.

(i) A law enforcement agency shall update the Automated Firearms System to reflect any firearms that were relinquished to the agency pursuant to this section. A law enforcement agency shall retain a firearm that was relinquished to the agency pursuant to this section for 30 days after the date the firearm was relinquished. After the 30–day period has expired, the firearm is subject to destruction, retention, sale or other transfer by the agency, except upon the certificate of a judge of a court of record, or of the district attorney of the county, that the retention of the firearm is necessary or proper to the ends of justice, or if the defendant provides written notice of an intent to appeal a conviction for an offense described in subdivision (a), or if the Automated Firearms System indicates that the firearm was reported lost or stolen by the lawful owner. If the firearm was reported lost or stolen, the firearm shall be restored to the lawful owner, as soon as its use as evidence has been served, upon the lawful owner's identification of the weapon and proof of ownership, and after the law enforcement agency has complied with Chapter 2 (commencing with Section 33850) of Division 11 of Title 4. The agency shall notify the Department of Justice of the disposition of relinquished firearms pursuant to Section 34010.

(j) A city, county, or city and county, or a state agency may adopt a regulation, ordinance, or resolution imposing a charge equal to its administrative costs relating to the seizure, impounding, storage, or release of a firearm pursuant to Section 33880.

(k) This section shall become operative on January 1, 2018.

SEC. 11. Theft of Firearms.

SEC. 11.1. Section 490.2 of the Penal Code is amended to read:

<< CA PENAL § 490.2 >>

(a) Notwithstanding Section 487 or any other provision of law defining grand theft, obtaining any property by theft where the value of the money, labor, real or personal property taken does not exceed nine hundred fifty dollars ($950) shall be considered petty theft and shall be punished as a misdemeanor, except that such person may instead be punished pursuant to subdivision (h) of Section 1170 if that person has one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290.

(b) This section shall not be applicable to any theft that may be charged as an infraction pursuant to any other provision of law.

**(c) This section shall not apply to theft of a firearm.**

Exhibit 27
Page 01009

ER_3180

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

SEC. 11.2. Section 29805 of the Penal Code is amended to read:

<< CA PENAL § 29805 >>

29805. Except as provided in Section 29855 or subdivision (a) of Section 29800, any person who has been convicted of a misdemeanor violation of Section 71, 76, 136.1, 136.5, or 140, subdivision (d) of Section 148, Section 171b, paragraph (1) of subdivision (a) of Section 171c, 171d, 186.28, 240, 241, 242, 243, 243.4, 244.5, 245, 245.5, 246.3, 247, 273.5, 273.6, 417, 417.6, 422, 626.9, 646.9, or 830.95, subdivision (a) of former Section 12100, as that section read at any time from when it was enacted by Section 3 of Chapter 1386 of the Statutes of 1988 to when it was repealed by Section 18 of Chapter 23 of the Statutes of 1994, Section 17500, 17510, 25300, 25800, 30315, or 32625, subdivision (b) or (d) of Section 26100, or Section 27510, or Section 8100, 8101, or 8103 of the Welfare and Institutions Code, any firearm-related offense pursuant to Sections 871.5 and 1001.5 of the Welfare and Institutions Code, **Section 490.2 if the property taken was a firearm,** or of the conduct punished in subdivision (c) of Section 27590, and who, within 10 years of the conviction, owns, purchases, receives, or has in possession or under custody or control, any firearm is guilty of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine. The court, on forms prescribed by the Department of Justice, shall notify the department of persons subject to this section. However, the prohibition in this section may be reduced, eliminated, or conditioned as provided in Section 29855 or 29860.

SEC. 12. Interim Standards.

Notwithstanding the Administrative Procedure Act (APA), and in order to facilitate the prompt implementation of the Safety for All Act of 2016, the California Department of Justice may adopt interim standards without compliance with the procedures set forth in the APA. The interim standards shall remain in effect for no more than two years, and may be earlier superseded by regulations adopted pursuant to the APA. "Interim standards" means temporary standards that perform the same function as "emergency regulations" under the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code), except that in order to provide greater opportunity for public comment on permanent regulations, the interim standards may remain in force for two years rather than 180 days.

SEC. 13. Amending the Measure.

This Act shall be broadly construed to accomplish its purposes. The provisions of this measure may be amended by a vote of 55 percent of the members of each house of the Legislature and signed by the Governor so long as such amendments are consistent with and further the intent of this Act.

SEC. 14. Conflicting Measures.

(a) In the event that this measure and another measure on the same subject matter, including but not limited to the regulation of the sale or possession of firearms or ammunition, shall appear on the same statewide ballot, the provisions of the other measure or measures shall be deemed to be in conflict with this measure. In the event that this measure receives a greater number of affirmative votes than a measure deemed to be in conflict with it, the provisions of this measure shall prevail in their entirety, and the other measure or measures shall be null and void.

(b) If this measure is approved by voters but superseded by law by any other conflicting measure approved by voters at the same election, and the conflicting ballot measure is later held invalid, this measure shall be self-executing and given full force and effect.

Exhibit 27
Page 01010

ER_3181

**SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)**

SEC. 15. Severability.

If any provision of this measure, or part of this measure, or the application of any provision or part to any person or circumstance, is for any reason held to be invalid or unconstitutional, the remaining provisions, or applications of provisions, shall not be affected, but shall remain in full force and effect, and to this end the provisions of this measure are severable.

SEC. 16. Proponent Standing.

Notwithstanding any other provision of law, if the State, government agency, or any of its officials fail to defend the constitutionality of this Act, following its approval by the voters, any other government employer, the proponent, or in their absence, any citizen of this State shall have the authority to intervene in any court action challenging the constitutionality of this Act for the purpose of defending its constitutionality, whether such action is in trial court, on appeal, or on discretionary review by the Supreme Court of California or the Supreme Court of the United States. The reasonable fees and costs of defending the action shall be a charge on funds appropriated to the Department of Justice, which shall be satisfied promptly.

Footnotes

1        So in enrolled Prop. 63.

---

**End of Document**                                      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 27
Page 01011

**ER_3182**