No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant*.
_____

**On Appeal from the United States District Court
for the Southern District of California**
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge
_____

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 14 of 17**
_____

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

# FINAL REPORT
## OF THE
## SANDY HOOK ADVISORY COMMISSION

### Presented to

### Governor Dannel P. Malloy
### State of Connecticut

### March 6, 2015

Exhibit 28
Page 01013

*"[W]e would often hear people say, I can't imagine what you're going through. I can't imagine how hard it must be. I can't imagine losing your child. And while we appreciated the sentiment, the fact was that they were imagining it. They were putting themselves into our shoes, for at least a second. And as hard and as horrible as it sounds, we need people to imagine what it is like. We need to empathize with each other, to walk a mile in each other's shoes. Without that imagination, we'll never change."*

–Jeremy Richman, father of Avielle Richman

Exhibit 28
Page 01014

# DEDICATION

The Sandy Hook Advisory Commission dedicates this report to the twenty-six victims who were killed at Sandy Hook Elementary School in Newtown, Connecticut on December 14, 2012, to their families, the Newtown community, and to all those that have come face-to-face with the devastating effects of violence.

The families of the twenty children and six educators killed have created a website in an effort to honor and remember the lives and legacies of each victim. The Commission could think of no better way to honor these individuals than to direct our readers to this site. Here you will learn more about the memorials created for each child and educator killed.



**www.MySandyHookFamily.org**

\* \* \*

**<u>The Children (name/age)</u>**

Charlotte Helen Bacon (6)

Daniel Barden (7)

Olivia Rose Engel (6)

Josephine Gay (7)

Ana Grace Márquez-Greene (6)

i

Exhibit 28
Page 01015

Dylan Christopher Hockley (6)

Madeleine Hsu (6)

Catherine Hubbard (6)

Chase Michael Anthony Kowalski (7)

Jesse McCord Lewis (6)

James Radley Mattioli (6)

Grace Audrey McDonnell (7)

Emilie Parker (6)

Jack Armistead Pinto (6)

Noah Pozner (6)

Caroline Previdi (6)

Jessica Adrienne Rekos (6)

Avielle Rose Richman (6)

Benjamin Andrew Wheeler (6)

Allison Wyatt (6)

**<u>The Adults</u>**

Rachel D'Avino (29)

Dawn Hochsprung (47)

Anne Marie Murphy (52)

Lauren Gabrielle Rousseau (30)

Mary Sherlach (56)

Victoria Leigh Soto (27)

ii

Exhibit 28
Page 01016

# TABLE OF CONTENTS

DEDICATION ............................................................................................... i

FOREWORD.............................................................................................. x

   I.   PREFACE ............................................................................... x

   II.  GOVERNOR DANNEL P. MALLOY'S CHARGE TO THE SANDY HOOK ADVISORY COMMISSION (PRESENTED ON JANUARY 24, 2013) ......... xii

   III. MEMBERSHIP OF THE SANDY HOOK ADVISORY COMMISSION .........xiv

ACKNOWLEDGMENTS....................................................................xvi

EXECUTIVE SUMMARY ............................................................... 1

   I.   THE SUBSTANTIVE COMPONENTS OF THE FINAL REPORT ................. 4

     A.  Safe School Design And Operation....................................... 4

     B.  Law Enforcement, Public Safety And Emergency Response ................. 5

     C.  Mental and Behavioral Health............................................ 7

OVERVIEW OF MASS SHOOTINGS AT SANDY HOOK ELEMENTARY SCHOOL ON DECEMBER 14, 2012................................................. 10

## PART ONE

FINDINGS AND RECOMMENDATIONS OF THE SAFE SCHOOL DESIGN AND OPERATIONS WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION ...................................................................... 14

   I.   PRELIMINARY STATEMENT................................................ 14

     A.  Contents Of Safe School Design And Operations Writing Group Report. ................................................................. 15

     B.  Who Should Read This Report?........................................ 16

     C.  Why The Commission's Recommendations Should Be Credited. ........ 17

   II.  GUIDING PRINCIPLES OF SAFE SCHOOL DESIGN AND OPERATION RECOMMENDATIONS. ...................................................... 20

iii

Exhibit 28
Page 01017

**ER_3188**

A.   The "All Hazards" Approach To Safe School Design And Operation.... 20

B.   The Commission Based Its Recommendations On Their Perceived Efficacy, Not Their Anticipated Cost. .................................................. 23

C.   Safe School Design and Operation Strategies Can And Should Enhance, Not Diminish, Students' Educational Experience. .............. 24

D.   The Importance Of "Situational Awareness." ...................................... 25

E.   The Importance Of Creating A Safe School Climate. .......................... 27

F.   Safe School Design and Operations Strategies Must Be Tailored To The Needs Of Particular Communities And Specific Schools. ............. 29

G.   Safe School Design And Operation Standards Are Not Static.  They Must Be Reviewed And Updated On A Regular Basis. ........................ 31

H.   Successful Implementation Of Safe School Design And Operation Strategies Requires "Local Champions." ............................................ 31

III.   RECOMMENDATIONS ...................................................................... 32

IV.   ENDORSEMENTS AND COMMENTS ..................................................... 38

A.   Endorsement of Public Act 13-3. .......................................................... 38

B.   Endorsement of School Safety Infrastructure Council Report and School Security and Safety Plan Standards. ...................................... 40

V.   KEY SAFE SCHOOL INFRASTRUCTURE COUNCIL STANDARDS ......... 45

**PART TWO**

FINDINGS AND RECOMMENDATIONS OF THE LAW ENFORCEMENT WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION .......... 61

I.   INTRODUCTION ................................................................................. 61

II.   INTERIM REPORT RECOMMENDATIONS ........................................... 63

A.   Firearm Permitting And Registration ................................................. 64

B.   High-Capacity Firearms, Magazine Capacity, And Ammunition ......... 65

C.   Assault Weapons ................................................................................. 67

iv

Exhibit 28
Page 01018

**ER_3189**

D.   Firearm Storage And Security ............................................................ 67

E.   Additional Recommendations Re: Firearms And Ammunition ............ 68

III.   FINAL REPORT RECOMMENDATIONS ................................................ 69

A.   Firearms/Ammunition ....................................................................... 69

B.   Best Practices/Protocols .................................................................... 71

C.   Gun Violence Reduction Strategies ................................................... 77

**PART THREE**

FINDINGS AND RECOMMENDATIONS OF THE MENTAL HEALTH WRITING
GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION ........... 79

I.   INTRODUCTION ................................................................................. 79

II.   MODELS OF CARE ............................................................................. 85

A.   Analysis: Reforming The System ...................................................... 85

1.   Laying the groundwork for lifelong mental health ......................... 87

2.   Treating the whole person and the whole family ............................ 89

3.   Family-centered care ................................................................... 94

4.   Places of care: schools and communities ....................................... 99

5.   Social isolation .......................................................................... 105

6.   Concluding thoughts .................................................................. 108

B.   Recommendations ........................................................................... 109

III.   BARRIERS TO ACCESS: INSURANCE AND FUNDING ISSUES ........... 113

A.   Analysis: System Fragmentation As A Barrier To Effective Care ....... 113

1.   Improving access to effective services in the public system ........... 116

2.   Elevating reimbursement rates to meet the costs of care .............. 117

3.   Improving access to effective services in the private system .......... 119

Exhibit 28
Page 01019

4.   Expanding an overtaxed workforce ............................. 124

5.   Concluding thoughts: Toward a more integrated system of care ... 126

B.   Key Findings And Recommendations ................................ 127

IV.   BARRIERS TO ACCESS: STIGMA AND DISCRIMINATION ................. 130

A.   Analysis: Confronting Mental Health Stigma ................................ 130

1.   Defining stigma ........................................................ 131

2.   The pervasiveness of stigma .......................................... 134

3.   Stigma deters access to care.......................................... 136

4.   Stigma impacts what care is available.................................. 138

5.   Internalized stigma.................................................... 140

6.   The media's role in perpetuating stigma.............................. 142

7.   Effectively combating stigma.......................................... 143

8.   Concluding thoughts .................................................. 149

B.   Key Findings And Recommendations ................................ 150

V.   PRIVACY, CONFIDENTIALITY AND COMMUNITY SAFETY................. 152

A.   Analysis: Privacy In The Service Of Mental Health........................ 152

1.   The HIPAA Privacy Rule............................................... 154

2.   The health information of a minor child ............................. 157

3.   Limits on a parent or guardian's access to health information of
an adult child.......................................................... 158

4.   Communications to health care providers from concerned friends
or family members...................................................... 160

5.   FERPA................................................................. 161

6.   Gray areas between FERPA and HIPAA ....................... 163

Exhibit 28
Page 01020

7.   Concluding Thoughts: Balancing privacy and safety under both HIPAA and FERPA ..................................................... 164

B.   Recommendations ......................................................... 165

VI.  THE ROLE OF MENTAL ILLNESS IN VIOLENT EVENTS .................... 166

A.   Analysis: Mental Illness And Violence, Misconceptions And Realities ................................................................ 166

1.   Identifying risk factors ........................................ 171

2.   Types of violence ............................................... 176

3.   Protective factors .............................................. 176

4.   Self-harm and victimization ..................................... 178

5.   Managing the risk of violence ................................... 179

6.   The limits of violence prediction ............................... 180

7.   From prediction to prevention ................................... 182

8.   Mandatory reporting and firearm ownership ....................... 185

9.   What interventions to take when individuals are at risk for violence ..................................................... 189

10.  Concluding thoughts ............................................. 192

B.   Key Findings And Recommendations ................................... 193

VII. RESPONSE, RECOVERY AND RESILIENCE ................................. 196

A.   Analysis: Promoting Resilience Through Response And Recovery Efforts ......................................................... 196

1.   Disaster response planning ...................................... 198

2.   Training and professional development ........................... 203

3.   Coordination .................................................... 208

4.   Involvement of victims' families ................................ 209

vii

Exhibit 28
Page 01021

ER_3192

5.    Concluding thoughts. ....................................................... 211

B.   Key Findings And Recommendations ................................. 211

CLOSING QUOTE........................................................................ 215

APPENDIX[1]

A.    [Consolidated Recommendations of the Sandy Hook Advisory Commission](#)

B.    [List of Individuals Who Testified Before the Sandy Hook Advisory Commission](#)

C.    [Sandy Hook Advisory Commission Agendas and Meeting Minutes](#)*

D.    [Sandy Hook Advisory Commission Interim Report](#) (dated March 18, 2013)*

E.    [Sandy Hook Elementary School Floor Plan](#)*

F.    [Photographs of weapons used in Sandy Hook Elementary School shootings](#)

G.    Legislation Passed During 2013 General Assembly Session Relating To Sandy Hook:

[Public Act 13-3](#) ("An Act Concerning Gun Violence Prevention And Children's Safety")*

[Public Act 13-220](#) ("An Act Concerning Revisions To The Gun Violence Prevention And Children's Safety Act")*

[Public Act 13-178](#) ("An Act Concerning The Mental, Emotional And Behavioral Health of Youths") and [Report on Implementation of PA 13-178](#)*

[Public Act 13-188](#) ("An Act Concerning School Safety")*

H.    [Report](#) of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newton, Connecticut on December 14, 2012 (dated Nov. 25, 2013), with accompanying [Appendix](#).*

---

[1] Appendix entries denoted by an asterisk (*) are not included in the main report, but are available for download from the Internet via hyperlink.

viii

Exhibit 28
Page 01022

ER_3193

I.      Report of the Child Advocate, "Shooting at Sandy Hook Elementary School," released on November 21, 2014*

J.      State Police Investigative Files re: Shootings at Sandy Hook Elementary School and 36 Yogananda Street*

K.      Report of the Safe School Infrastructure Council (revised and updated to June 27, 2014)

L.      School Security and Safety Plan Standards (v 1.0) (dated Dec. 30, 2013)*

M.      Capitol Region Chiefs of Police Association "Blue Plan" (dated April 24, 2013) (mutual aid response to incidents within Capitol Region)*

Exhibit 28
Page 01023

# FOREWORD

## I.   PREFACE

On December 14, 2012, one of the most vicious and incomprehensible domestic attacks in American history occurred at Sandy Hook Elementary School in Newtown, Connecticut.  Within a few hours, the world understood the gravity of the attack.  Lives were lost in two distinct locations: Sandy Hook Elementary School and a private residence in Newtown.  The scope of the tragedy would take on international proportions, and people from around the world would grieve and mourn alongside the families of Newtown.

Lost in the attack were twenty children and six adult staff members: Charlotte Bacon, Daniel Barden, Rachel D'Avino, Olivia Engel, Josephine Gay, Dawn Hochsprung, Dylan Hockley, Madeleine Hsu, Catherine Hubbard, Chase Kowalski, Jesse Lewis, Ana Márquez-Greene, James Mattioli, Grace McDonnell, Anne Marie Murphy, Emilie Parker, Jack Pinto, Noah Pozner, Caroline Previdi, Jessica Rekos, Avielle Richman, Lauren Rousseau, Mary Sherlach, Victoria Soto, Benjamin Wheeler and Allison Wyatt.

Prior to attacking Sandy Hook Elementary School, Adam Lanza ("A.L."), the lone shooter, murdered his mother, Nancy Lanza, in the home they shared.  Then, as law enforcement approached the elementary school after receiving 911 calls concerning the shootings there, A.L. took his own life.

Shortly thereafter, Connecticut Governor Dannel P. Malloy established the Sandy Hook Advisory Commission.  Comprised of sixteen subject matter experts in the fields of mental health and mental wellness, secure facility design and operations, law enforcement training and response, and public policy implementation, the Commission began taking public testimony from a series of outside experts in January 2013.

The Commission was not intended to be an investigatory body.  It was not intended to tell the story of what happened on December 14, 2012 with academic rigor and forensic precision.  The Commission was not endowed with the power of subpoena; it did not enjoy heightened access to law enforcement

x

Exhibit 28
Page 01024

documents at the local, state, or federal level.  It was not intended to cast a bright light on A.L., and in doing so, make the incomprehensible act somehow comprehensible.  It was not assigned financial resources.  It was endowed only with moral authority as representatives of a state so shaken by this tragedy.

Over a two year period, the panel reviewed laws, policies, and practices in place on December 14, 2012 in order to make recommendations intended to reduce the probability of another tragedy on the scale of what occurred at Sandy Hook Elementary School.  The panel focused its work in three distinct areas: Safe School Design and Operation, Law Enforcement, Public Safety, and Emergency Response, and Mental Health/Mental Wellness.

Although these topic areas are treated as separate sections of this report, mental health/mental wellness support structures, law enforcement training, response, and access, and safe school design and operation weave themselves into a tapestry in which a combination of threads offers the best opportunity for a systematic improvement in the safety of our schools. The Sandy Hook Advisory Commission offers this report as our recommendations for such a tapestry.

The intended audience for this report is broad.  First and foremost, it is for communities that recognize the value of their schools not only as sites for the education of children, but also as neighborhood hubs.  This report is for the boards of education, architects, engineers, and school building committees who design and operate school facilities on a daily basis.  It is for the volunteer and professional providers of guardian services in our towns and cities.  It is for the lawmakers and legislators who weigh issues of public safety.  It is for medical and mental health providers and supporting institutions who understand that the mind and the body are inextricably linked.  It is for the 32% of Americans who, in any given year, will face a mental health challenge and the other 68% who should support them in obtaining the help they need. This report is for all of us.

xi

Exhibit 28
Page 01025

ER_3196

The Sandy Hook Advisory Commission offers this report as a tribute to those lost and to those families who continue to recover from their connection to this tragedy.

## II.   GOVERNOR DANNEL P. MALLOY'S CHARGE TO THE SANDY HOOK ADVISORY COMMISSION (PRESENTED ON JANUARY 24, 2013)

\* \* \*

I want to thank all of you for the time and effort that you will put forth over the coming weeks and months.  I also want to especially thank the mayor, Scott Jackson, for serving as chair of this commission.  I put a great deal of faith in the mayor, and I think he deserves all of it.  He's done outstanding work in his own community and has served on other commissions that I've established previously, and I was very grateful when he accepted my invitation to lead this important and historic commission.

I know that serving on this commission is taking you away from other obligations, including from your families, but I believe that together, once our work is done, we will have made our children, and indeed, our entire state safer.  That's our goal.

The further away we get from December 14, 2012, the more apparent it is to me that the entire country was shaken to its core by the tragic events that occurred at Sandy Hook Elementary School.  This was brought home to me particularly during the time that I was in Washington this past weekend, where people would stop me on the street and want to talk about this and what could be done to make sure that this sort of thing doesn't happen again.  And rather than losing its impact, I would say, or its immediacy over time, the desire for changing our policies and our laws to prevent another incident like this one I think is increasing on a daily basis, not decreasing. That may be one of the great differences between this mass shooting and others.

We must bring about change through a thoughtful and comprehensive debate, one that looks at not only how we can prevent gun violence, but how also we can fix our mental health system.  We must take a serious look at

xii

Exhibit 28
Page 01026

ER_3197

public safety, particularly school safety, so that our children can grow up and go to school without the fear of violence in a culture that does, in fact, glorify violence. We need to have a discussion about stopping that.

The recommendations you will craft over the coming weeks and months will no doubt take us towards the goal, that goal, better mental health, better safety in our schools, and a system that is set up to stop the glorification of violence, but before you get started, there are a few things that I want you to consider.

I believe that responsible, law-abiding citizens of our state have a right to bear arms, but that right cannot come at the expense of public safety. We need to develop a common sense way to regulate access to guns. We need to make sure that our mental health professionals have access to the resources and information they need to get treatment to those who need it. We must make sure the public has better information about what to do when they suspect someone may be battling mental illness.

It's a sad fact that shootings like this are becoming all too common occurrences in our country. It's also a fact that in almost every one of these cases there were warning signs. That's why we need to come up with ways that we as friends, as family, as a society or a school system can better respond to those warning signs and hopefully reduce the stigma of mental illness. I want to say here that reducing that stigma is extremely important. There is a certain reality about mental illness that is not properly accounted for in the public's mind. There's a reality that many citizens, perhaps a majority of our citizens, at some point will experience as mental illness challenge, but with treatment, almost all of those incidences will be overcome. A very small portion or a portion won't be resolved, but yet we attach so much stigma to reaching out, to sitting down, to speaking and getting help or medication that will help a person through that battle. I said in a speech at the U.S. Conference of Mayors last Saturday that we live in a society that has destigmatized violence at the same time that it has refused to destigmatize mental treatment.

xiii

Exhibit 28
Page 01027

**ER_3198**

And last, we must make sure that our schools are both safe and welcoming places where our children can reach their full potential, and teachers can practice their craft without fear.

Let me also add that while this tragedy happened in a school, we must take steps to ensure that the next time it doesn't happen in a movie theatre, at a shopping mall, at a ballgame or on a street corner in any of our cities where street crime, including using guns that were purchased under loopholes, have become a constant problem in our society.

This is a monumental task that you take on. I want to thank you again for the work that you are going to do. I know how seriously each and every one of you takes it. I can think of no better way to honor those that we lost in Newtown just a few short weeks ago than for you to do your hard and good work and come forward with the recommendations that will accomplish our common goals. Thank you very much for allowing me to be with you.

* * *

## III.  MEMBERSHIP OF THE SANDY HOOK ADVISORY COMMISSION

- Scott D. Jackson (Chair): Mayor, Town of Hamden

- Dr. Adrienne L. Bentman; General (Adult) Psychiatry Residency Director, Institute of Living/Hartford Hospital Program; Assistant Professor of Psychiatry, University of Connecticut School of Medicine

- Ron Chivinski: Teacher, Newtown Middle School; Vice President, Connecticut Chapter of the American Federation of Teachers

- Robert Ducibella: Former (retired) Senior and Founding Principal of Ducibella Venter & Santore, Security Consulting Engineers; Senior and Founding Principal, Risk and Protection Consulting Services, LLC

- Terry Edelstein (Vice-Chair): Nonprofit Liaison, Office of Governor Dannel P. Malloy

- Kathleen Flaherty, Esq.: Associate Executive Director, Connecticut Legal Rights Project, Inc.

Exhibit 28
Page 01028

- Alice M. Forrester, Ph.D.: Executive Director, Clifford W. Beers Guidance Clinic, Inc.

- Ezra H. Griffith, M.D.: Professor Emeritus of and Senior Research Scientist in Psychiatry, Deputy Chair for Diversity and Organizational Ethics, Department of Psychiatry, Yale University

- Patricia Keavney-Maruca: Member, State Board of Education; Former technical high school teacher

- Christopher Lyddy: Chief Operating Officer, Advanced Trauma Solutions, Inc.; Former State Representative, 106th Assembly District of Newtown

- Denis McCarthy: Fire Chief and Emergency Management Director, City of Norwalk; Member of the CT Department of Emergency Services and Public Protection Advisory Board

- Barbara O'Connor: Director of Public Safety and Chief of Police, University of Connecticut

- Wayne Sandford: Professor, University of New Haven, Henry C. Lee College of Criminal Justice & Forensic Sciences / Former Deputy Commissioner, Connecticut Department of Emergency Management & Homeland Security / Former Fire Chief, Town of East Haven

- David J. Schonfeld, M.D., FAAP: Director, National Center for School Crisis and Bereavement; Professor of Pediatrics, Drexel University College of Medicine

- Harold I. Schwartz, M.D.: Psychiatrist-in-Chief, Hartford Hospital's Institute of Living; Hartford Healthcare Regional Vice President, Behavioral Health; Professor of Psychiatry, University of Connecticut School of Medicine; Adjunct Professor of Psychiatry, Yale University School of Medicine

- Bernard R. Sullivan (Vice-Chair): Former Chief of Police, City of Hartford; Former Commissioner, Connecticut Department of Public Safety; Former Chief of Staff to Speaker of the House, Connecticut General Assembly

Exhibit 28
Page 01029

## ACKNOWLEDGMENTS

The members of the Sandy Hook Advisory Commission extend their deepest gratitude to the many persons and organizations that supported the work of the commission and contributed in so many different ways to this report. Over the course of two years and thirty meetings, more than 100 persons appeared before the Commission, sometimes more than once, and provided invaluable testimony.  Those individuals are identified in Appendix B. The Commission also gratefully acknowledges the information provided by various individuals, too numerous to name, who did not testify at public hearings, but who communicated their thoughts to the Commission.

The Commission thanks the staff of the Office of Governor Dannel P. Malloy, who helped organize the Commission under the extraordinarily difficult circumstances that prevailed following the December 14, 2012 tragedy and provided support throughout the two years that the Commission has met.

Several organizations and individuals warrant particular recognition. The law firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP served as *pro bono* legal counsel to the Commission and provided extraordinary staff support. Attorney Daniel J. Klau provided sound legal advice to the Commission throughout its two years of work, and his knowledge and judgment proved invaluable.  Attorney Klau also did an exceptional job in assembling and integrating the recommendations from the Commission writing groups and formatting them into what is now the final report of the Commission.  He was supported by Louis R. Pepe, Esq., Sarah Droney, Esq., Cathy Hanrahan Ouellette, Heidi Zabit, Deirdre F. Rossing, Ronel M. Quealy, Bruce E. Beckius, James J. Edwards and Luis Merced.  The contribution of the firm's dedicated attorneys, paralegals, legal assistants, and IT and office support staff to this report cannot truly be calculated.

The Commission also thanks the The University of Connecticut School of Law, which provided both facilities and faculty to the commission.  The Commission is particularly grateful to Professor Susan Schmeiser, who served

xvi

Exhibit 28
Page 01030

ER_3201

as the Reporter for the Commission.  But for Professor Schmeiser's Herculean efforts, especially in connection with the Commission's mental health findings and recommendations, this report would not have been possible.  Thanks also to Catherine Dunn, Patrick Butler, Joshua LaPorte and student research assistant Andrew Glass of the Thomas J. Meskill Law Library, as well as UConn Law students Jeffrey Wisner and Emma Rotondo (Class of 2014), who assisted Professor Schmeiser with her work on behalf of the Commission.

Brenda Cavanaugh, the Executive Director of Community Mediation, Inc., generously donated her time and expertise to the Commission, particularly to members of the mental health writing group.  She was supported by members of her staff, including David Carter, Rachel Hereema and Marge Allende.

The Commission heard many, many hours of testimony over two years of hearings.  Several professional court reporting agencies and their members donated their time to transcribe those many hours of testimony, and members of the Commission frequently referred to those transcriptions during the preparation of this report.  The Commission expresses it great gratitude to John Brandon and his firm, Brandon Huseby Reporting & Video; the Connecticut Court Reporters Association; and the following individual reporters: Suzanne Benoit; Joanne Buck; Melanie G. Collard; Kathleen S. Norton; Michelle Keegan; Kathleen A. Morin; Aimée M. Suhie; Christine E. Borelli; Deborah A. Beausoleil; Chloe M. Stefanelli; Lynne Stein; Jill E. Remillard; Patricia L. Masi; Viktoria V. Stockmal; Susan K. Whitt; Tracy Gow; Marianne Bossé.

Finally, the Commission thanks the teachers and parents of Newtown, Connecticut, who experienced directly the deadly and traumatic events of December 14, 2012 and who shared their personal experience of that tragedy with members of the Commission.  This report cannot bring back their loved ones who died, nor can it heal the wounds of the living.  But the Commission hopes that this report will provide some solace by proposing recommendations

Exhibit 28
Page 01031

that may help other children, parents, teachers and communities avoid similar tragedies.

xviii

Exhibit 28
Page 01032

# EXECUTIVE SUMMARY

On the morning of December 14, 2012, Adam Lanza ("A.L.") killed his mother, Nancy Lanza, while she slept in her bed.  He then drove to the Sandy Hook Elementary School in Newtown, Connecticut, where in the space of several minutes he killed twenty children and six adult staff members.  After killing these persons, and as the police were about to enter the school, A.L. used a pistol to take his own life.

The mass shootings shocked and traumatized the Newtown community, the State of Connecticut, the nation, indeed the entire world.

On January 3, 2013, Governor Dannel P. Malloy announced the formation of the Sandy Hook Advisory Commission[2] to review current policy and make specific recommendations concerning public safety, with particular attention paid to school safety, mental health, and gun violence prevention.  In forming the Commission, Governor Malloy directed it to "look for ways to make sure our gun laws are as tight as they are reasonable, that our mental health system can reach those that need its help, and that our law enforcement has the tools it needs to protect public safety, particularly in our schools."

Recognizing that the Commission would need significant time to study the relevant issues, hold hearings and propose final recommendations, he nonetheless asked the Commission to submit an initial report, focusing largely on gun-related issues, in time for consideration during the regular session of the General Assembly.  The 16-member Commission, chaired by Town of Hamden Mayor Scott Jackson, met seven times between January 24 and March 15 and submitted its Interim Report on March 18, 2013.   The Interim Report proposed fifteen specific recommendations concerning firearm permitting and registration, the possession, sale and use of high-capacity firearms, high capacity magazines, and ammunition, as well as firearm storage

---

[2] The Office of the Governor established a web page specifically for the Commission to post agendas, meetings and other relevant documents, including this report.  *See http://www.governor.ct.gov/malloy/cwp/ view.asp?a=3997&q=516496.*

1

Exhibit 28
Page 01033

ER_3204

and security.  Significantly, the Commission proposed a total ban on the possession, sale or transfer of any firearm capable of firing more than ten rounds without reloading.

In stark contrast to the United States Congress, which was unable to pass meaningful gun legislation in the wake of the Sandy Hook tragedy, the Connecticut General Assembly adopted many of the proposals in the Commission's Interim Report and passed the most significant gun reform legislation in the nation.  That legislation is embodied in Public Act 13-3.[3]

The Commission's Interim Report also included recommendations regarding the development of detailed safe school design and operations standards.  These recommendations resulted in the creation of the School Security Infrastructure Council, see Public Act 13-3, sec. 80-83, and a state/local working group convened by the Department of Emergency Services and Public Protection/Division of Emergency Management and Homeland Security, in consultation with the Department of Education.  See Public Act 13-3, sec. 86.  These bodies initiated the development of safe school design and operation standards, which form the basis of rational and justifiable criteria to guide renovations, expansions and new school construction throughout our state.

Over the next two years, the Commission held twenty-three more hearings and received testimony from 100 experts in the areas of school safety and security, mental health and law enforcement.  *See* Appendix B.  Lacking subpoena power, the Commission necessarily relied on several other state agencies to gather, and eventually release, pertinent information about the shootings and A.L.  The State's Attorney for the Judicial District of Danbury, which had jurisdiction over the Sandy Hook crimes, released a report on November 25, 2013 that summarized the investigatory findings of the State Police.  The State Police released its own investigatory files, with extensive

---

[3] The Connecticut General Assembly passed several modifications to Public Act 13-3 during the same session in which that act was passed.  *See* Public Act 13-220.

2

Exhibit 28
Page 01034

redactions, on December 27, 2013.  Eleven months later, on November 21, 2014, the Office of the Child Advocate issued a report detailing and examining A.L.'s mental health history and the difficulties his family faced in attempting to meet his needs.

The information the Commission obtained from the reports of other state agencies was essential to formulating the final set of policy prescriptions and legislative recommendations presented in this report.  Except as otherwise stated below, this report supersedes the Interim Report.  Consistent with Governor Malloy's charge, those proscriptions and recommendations fall within three substantive areas: (1) safe school design and operations, (2) law enforcement, public safety and emergency response, and (3) mental health and wellness.  The subject-matter experts on the Commission developed a preliminary set of policies and recommendations, which were then submitted to the full Commission for debate, amendment and final approval.  Thus, the recommendations set forth herein represent the consensus of the full Commission.

A listing of all of the Commission's recommendations is set forth in Appendix A.  However, the Commission's recommendations are best understood and appreciated when read in the context of the full report.  Accordingly, the main body of this report is comprised of three sub-sections, which correspond to substantive areas described in the preceding paragraph.  The Table of Contents at the outset of this report is intended to serve as a detailed road map of the Commission's findings, analyses and recommendations.  For readers viewing this report on the Internet, the Table of Contents contains hyperlinks to the related sections of the report, enhancing the ease of navigating the report.  The body of the report also contains many hyperlinks to relevant source materials.  Although particular readers, based on their specific backgrounds, may find some parts of the report more or less relevant than others, the three sub-sections of the report form a cohesive whole.

3

Exhibit 28
Page 01035

ER_3206

## I.      THE SUBSTANTIVE COMPONENTS OF THE FINAL REPORT

### A.      Safe School Design And Operation

The Commission's recommendations concerning safe school design and operation, referred to herein as "SSDO," begin with the premise that there is at least one place, other than a home, in which every person, whether a child or an adult, should feel absolutely safe and secure from harm: *school.*  Short of transforming our schools into gated communities or prison-like environments, however, no school can be freed entirely from the risk of violence. Nevertheless, through safe school design and operation strategies, and through closer coordination with our educators, local law enforcement, fire departments, EMS, public safety personnel, security experts and mental health professionals, our schools can become much safer environments.

Although the Sandy Hook tragedy was a mass shooting incident, the Commission determined that it should not propose a set of recommendations intended only to reduce the risk of that specific type of event from reoccurring at a school. An "active shooter" represents just one type of risk.  Yet schools face a multitude of risks, including natural and man-made disasters. Consequently, the Commission determined that while recommendations concerning safe school design and operations should be informed by historical events, including those involving active shooters, they should address a broader range of potential risks, as planning for the future involves more than just learning from the past.  Consequently, the Commission adopted an "all hazards" risk management approach in developing its recommendations.

The Commission's SSDO recommendations include very detailed design standards, addressing such matters as specialized forced entry resistant glazing for school entry doors and locks for classroom doors.  In particular, the Commission largely endorses the very detailed set of school infrastructure design standards adopted by the state's School Security Infrastructure Council. *See* Appendix K.

4

Exhibit 28
Page 01036

**ER_3207**

The Commission's SSDO recommendations also acknowledge that the fundamental purpose of our schools is to educate our children and, therefore, that proposed security options must enhance, not diminish that educational experience.  Schools should be great places to learn, not just because they are safe and the educational process is uninterrupted, but because the physical design of schools facilitates, excites and engenders interactions between students and students, students and teachers, teachers and teachers, and students, teachers, and staff, the spaces they are in  and the world around them.

Site and school building designs can facilitate these interpersonal interactions or diminish their opportunity for occurrence and their efficacy.  They can affect how learning materials and media are presented, explained, studied, understood, and appreciated.  They can link and connect the theories and principles taught inside with what happens in the real world outside of the school walls, doors, and windows.  The Commission took all of these factors into account in its SSDO recommendations.

Finally, the Commission identifies three critical components of any effective SSDO plan.  First, SSDO strategies must be tailored to the specific needs of particular communities.  A "one-size-fits-all" SSDO strategy is destined for failure.  Second, SSDO standards are not static; they must be reviewed and updated on a regular basis.  Third, the successful implementation of SSDO strategies requires the support of "local champions." Each community or school district should have a small standing committee or commission, comprised of individuals representing the school community, law enforcement, fire, EMS and public health, whose responsibility is to ensure that the SSDO standards and strategies are actually implemented in their community.

## B.   Law Enforcement, Public Safety And Emergency Response

United States civilians own or possess in excess of 300 million guns: as of 2009, they owned or possessed approximately 114 million handguns, 110

5

Exhibit 28
Page 01037

ER_3208

million rifles and 86 million shotguns. The incidence of gun ownership/possession in the United States—nearly one gun on average for every resident—is the highest in the world. Most guns are lawfully owned by law abiding persons who use them for recreational activities, such as hunting and target practice, and/or for self-defense. However, many guns are owned or possessed illegally or, even if legal, are used for unlawful purposes.

Beyond the sheer number of guns in the United States, the *lethality* of readily available firearms and ammunition continues to increase. The connection between the extent of the tragedy at Sandy Hook Elementary School and the lethality of weapons used in the attack on the school is self-evident and beyond dispute. The Commission is deeply concerned about the proliferation, throughout the civilian population, of weapons that were specifically designed for military use during wartime. "Assault weapons" like the AR-15, as well as large capacity magazines often used with those weapons, have no legitimate place in the civilian population. The Commission finds that the cost to society of easy civilian access to assault weapons and large capacity magazines vastly outweighs the benefits of civilian ownership. By contrast, the Commission finds that the significant benefit to society from eliminating civilian ownership and possession of assault weapons and large capacity magazines can be realized with only a minimal burden on persons who want to hunt, engage in target practice or use weapons for self-defense. They remain free to engage in those activities with a vast array of long guns and handguns. In short, the Commission's first goal is simply to limit the possession and use of weapons designed for wartime use to members of our military services and law enforcement personnel.

The Commission acknowledges the United States' long tradition of gun ownership and the Second Amendment rights of gun owners. However, the Commission also notes that although United States Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment right to bear arms is a personal right, the court also held that the right is *not*

6

Exhibit 28
Page 01038

ER_3209

*absolute.*   The Supreme Court further acknowledged in *Heller* that society has the right to regulate gun ownership, possession and use within constitutionally permissible limits.   Through reasonable, constitutionally permissible regulations applicable to long guns, handguns and ammunition, the Commission seeks to minimize to the greatest extent possible the number of gun-related civilian deaths, while respecting the constitutional rights of lawful gun owners.

### C.   Mental and Behavioral Health

A.L.'s mental and behavioral health history, and the connection between that history and the mass shootings at the Sandy Hook Elementary School, has been the subject of intense discussion, analysis and debate over the past two years.   Rather than mine A.L.'s life and interactions with particular mental health systems for insights into how those systems can better serve the state's children, however, the Commission had a different charge.   It was tasked to study the systems themselves.

The mental and behavioral health section of this report begins by addressing the existing mental health system and identifies the essential elements for an effective system that promotes mental health across the lifespan.   These include comprehensive and coordinated systems of care in which behavioral health and physical health are understood as highly interrelated, are given equal priority, and are part of a holistic approach to wellness that sees the individual in the context of the family and broader community.

The report next considers the barriers that impede access to quality care in our current system.   Initially, the Commission examines the system's fragmented payment structure, which undermines care coordination and consistency, denies care to many who most need it, and limits care for reasons that often have little to do with its clinical justifications or efficacy.   The Commission's analysis identifies deficiencies in both the public and private systems of care and calls for increased integration to make effective, clinically

Exhibit 28
Page 01039

ER_3210

indicated services and evidence-based community programs available to children and adults regardless of economic status.

The Commission next addresses the ongoing burdens of stigma and discrimination that afflict the system and its participants, while deterring many in need from pursuing behavioral health services.  Carefully considered efforts to diminish the stigma that attaches to mental disorder and its treatments must play a central role in systemic reform.

The mental health section next turns to issues that implicate potential conflicts between individual privacy and autonomy on the one hand, and community safety on the other.  An overarching theme of this section of the Commission's report is that these interests should be viewed as overlapping, not oppositional.  The report examines central laws and policies that govern matters of privacy, confidentiality and community safety in the domain of mental health treatment, making recommendations that preserve the existing balance while calling for clarification in areas that might frustrate the timely provision of needed care.  The report then considers the vexing topic of violence.  Unthinkably violent episodes such as the Sandy Hook shootings represent not only a loss of precious lives but also a profound disruption of the basic human need for safety and security, which is critical to adults and absolutely essential to children.  There is little comfort to be taken from any explanation following such an event, but somehow it seems easier to believe that the source of such horror lies in an individual's pathology, in a condition that could be cured or contained if adequately identified, than in more indeterminate values and practices that shape our entire culture.  While discerning no clear answers to the question of what role A.L.'s behavioral health challenges played in the violence he ultimately inflicted, the Commission nonetheless turns its attention to what we have learned about the role of mental disorder in violent events.  We review and synthesize the available research on the topic, identify relevant risk factors for violence and offer recommendations for ways to address those risk factors in order to promote

8

Exhibit 28
Page 01040

mental health, diminish the suffering associated with untreated mental illness, and enhance the community's experience of safety.

Finally, the Commission proposes specific steps that communities and schools should take to buttress their members' resilience and equip them to care for one another and themselves in the face of trauma and loss. When a disaster event occurs, whether due to intentional violence or a terrible accident or a phenomenon of nature, its impact on individuals and communities can be devastating and can persist far beyond the immediate aftermath. The Commission contends that, while it is not yet possible to prevent such events from taking place or to insulate people from the suffering that ensues, there is much that governments, schools and other institutions can do to facilitate an effective and humane response. A carefully planned and coordinated response will help to reestablish a critical sense of security, ensure that needed services become available immediately and remain so for as long as necessary, and promote community-wide recovery. Unfortunately, experiences of trauma and loss afflict children, families and communities in ways that extend far beyond large-scale crises, and many of the Commission's recommended measures are germane to such experiences as well as to relatively rare disaster events.

Exhibit 28
Page 01041

## OVERVIEW OF MASS SHOOTINGS AT
## SANDY HOOK ELEMENTARY SCHOOL ON DECEMBER 14, 2012

The mass murder of twenty children and six adults at Sandy Hook Elementary School on December 14, 2012 has previously been described in detail in numerous publications, including the Danbury State's Attorney's report/appendix of November 25, 2013, the investigative files of the Connecticut State Police and the Report of the Child Advocate Concerning the Shootings at Sandy Hook Elementary School.  It is not the purpose of this report to provide a forensic examination of the events of that date.  Accordingly, what follows is an overview of those events, but one which still contains some graphic details.  Some readers may find this disturbing.

\* \* \*

On December 11, 2012, A.L.'s mother, Nancy Lanza, left her home in Newtown, CT for a several day trip to New Hampshire.  A.L. remained home alone during his mother's trip, which she told friends was intended to serve as both a respite from the difficulties of being A.L.'s mother and as an experiment in leaving A.L. alone for longer periods of time.  She checked into the Omni Mount Washington Resort on Tuesday, December 11 at midday and stayed there until shortly after noon on December 13.  She arrived back in Newtown, CT at approximately 10:00 p.m. that evening.

On the morning of December 14, sometime between 8:00 a.m. and 9:00 a.m., A.L. went into his mother's bedroom and shot her in the head four times with a .22 caliber Savage Mark II bolt-action rifle that she had lawfully purchased.  He left the rifle on the floor next to her bed.

After killing his mother, A.L. drove to Sandy Hook Elementary School, which he had attended as a child.  He drove a black 2010 Honda Civic his mother had purchased for him.  He brought with him a small arsenal of weapons, including: a semi-automatic Sig Sauer P226, 9mm pistol; a Glock 20, 10mm semi-automatic pistol; a Bushmaster Model XM15-E2S rifle (a semi-automatic civilian version of the fully automatic M-16 military assault rifle);

10

Exhibit 28
Page 01042

and an Izhmash Saiga-12, 12 gauge shotgun.  He also brought with him over 400 rounds of ammunition and several high capacity magazines, including two Magpul PMAG 30 magazines (for the Bushmaster rifle) duct-taped together in a tactical configuration and capable of holding a total of 60 rounds of 5.56 mm ammunition (30 rounds per magazine).  A.L.'s mother lawfully purchased all of these weapons and ammunition.

A.L. arrived at the school shortly before 9:30 a.m.  Approximately 489 students and 82 staff members were present at the time.  He parked his car in a "No Parking" zone and walked to the front entrance of the school,[4] carrying with him the Bushmaster rifle, the Sig Sauer and Glock pistols and a large supply of ammunition for all three weapons.  He left the shotgun in the car.

As was customary, the front doors of the school were locked.  A.L. used the Bushmaster rifle to shoot out a plate glass window on the right side of the entrance doors to the front lobby.  (Police subsequently recovered eight expended brass 5.56 mm bullet casings from that area of the building.)  A.L. entered the building, wearing a hat and sunglasses and appearing calm.  He turned to his left, facing a hallway with administrative offices and classrooms on each side.  Upon hearing shots, school principal Dawn Hochsprung and school psychologist Mary Sherlach entered the hallway from room 9, where they were attending a meeting.  Another staff member followed them.  A.L. shot and killed Hochsprung and Sherlach in the hallway.  The staff member was shot in the leg and fell to the ground, where she was struck again by further gunfire.  She laid still in the hallway momentarily and then crawled back into room 9 and held the door shut.  Another staff member, who was at the far end of the hallway from where A.L. was standing, was struck in the foot by a bullet.  She retreated into a nearby classroom.

The first 911 call from the school was made at about this time, 9:35:39 a.m.  The Newtown Police Department responded immediately, with the first

---

[4] A floor plan of the school and its exterior is available at: http://www.governor.ct.gov/malloy/lib/malloy/shac_doc_final_report_-_117shesandparkinglotmap.pdf

11

Exhibit 28
Page 01043

ER_3214

officer arriving at the rear of the school (on Crestwood Drive) at 9:39:00.  Less than a minute later three officers, in two separate vehicles, arrived at Dickenson Drive, which leads up to the front of the school.  They drove up to the road to a baseball field near the school, parked their vehicles and proceeding towards the entrance of the school on foot.  A small team of police officers first entered the school at 9:44:50, less than eleven minutes after the first 911 call.

While the police were responding to the 911 calls, A.L. entered the main office, where staff members were hiding.  They heard A.L. open the office door, walk in the office and then leave.  A.L. then walked down the hall and entered two first grade classrooms, rooms 8 and 10, in an indeterminate order.

Substitute teacher Lauren Rousseau and behavioral therapist Rachel D'Avino were in room 8, along with sixteen children.   Using the Bushmaster rifle, A.L. killed Rousseau, D'Avino and 15 children.  (Fourteen children were killed in the classroom.  The fifteenth died after being transported to Danbury Hospital.)  A sixteenth child in the classroom was not shot.  Police investigators subsequently recovered eighty expended 5.56 mm bullet casings from room 8.

Teacher Victoria Soto, behavioral therapist Anne Marie Murphy and sixteen students were in room 10.  A.L. entered that room and, again using the Bushmaster rifle, killed Soto, Murphy and five students.  (Four students were found dead in the room and the fifth was pronounced dead after being transported to the hospital.)   Nine children were able to escape from the classroom and survived, either because A.L. stopped shooting in order to reload or because his weapon jammed.   The police also found two other children uninjured in the classroom.

After killing the occupants of rooms 8 and 10, A.L. killed himself with a single shot to the head from the Glock pistol.  This is believed to have occurred at 9:40 a.m.  His body was found in room 10.  Police subsequently recovered 49 expended 5.56 mm shell casings, and one 10 mm casing, from room 10.

12

Exhibit 28
Page 01044

* * *

Although the Commission has chosen to conclude the description of the
events of December 14, 2012 at the time of A.L.'s death, the Commission
recognizes and acknowledges that, in many ways, the trauma of that event
continues to this day for many of those involved.  While certain events, like the
notification to parents and families that their loved ones were killed in the
attack, can be fixed in time and place, the experiences of the many different
participants are so different after 9:40 a.m. on December 14, 2012 that the
Commission feels it would be a disservice to all to attempt to capture those
experiences in this section of the report.

13

Exhibit 28
Page 01045

## PART ONE

## FINDINGS AND RECOMMENDATIONS OF THE SAFE SCHOOL DESIGN AND OPERATIONS WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION

### I.   PRELIMINARY STATEMENT

There is at least one place, other than a home, in which every person, whether a child or adult, should feel absolutely safe and secure from the threat of physical harm: *school*.   All schools—whether pre-K, K-12, colleges or other post-secondary institutions—are places for learning and personal growth. Sadly, the tragic shootings at Sandy Hook Elementary School, Columbine, Virginia Tech and other institutions taught Connecticut, and have reminded the nation at large, that schools, even elementary schools educating our youngest children, are not immune from the gun violence that afflicts our society.

The initial, and entirely natural, reaction to a tragedy like the shootings at Sandy Hook Elementary School is to consider steps that would make it virtually impossible for such a violent event to occur at a school ever again. The Commission heard testimony about how some countries have transformed their schools into what might at best be described as "gated communities," but which might more accurately be described as akin to minimum security prisons in terms of their design.   Such facilities may, in fact, effectively eliminate some of the risk of an event like Sandy Hook.   But they achieve that objective at great cost, not just financial, but mental, emotional and developmental as well.   That is not the direction the Commission believes the American educational system should follow.

Short of transforming our schools into gated communities or prison-like environments, no school can be freed entirely from the risk of violence. Nevertheless, through improved safe school design and operation (SSDO) strategies, and through closer coordination with our educators, local law enforcement, fire departments, EMS, public safety personnel, security

14

Exhibit 28
Page 01046

**ER_3217**

professionals and mental health experts, our schools can become much safer environments for students, faculty and staff.  Moreover, we can significantly reduce the risk of violence occurring on school grounds without sacrificing our schools' core educational mission and community outreach programs.  Accomplishing these goals can actually improve the educational eco-system and create safe school climates that allow students, teachers, and staff to flourish and excel.

**A.    Contents Of Safe School Design And Operations Writing Group Report**.

The Commission's final report on safe school design and operations reflects four basic goals and objectives.  First, the Commission wanted to learn from the shootings at Sandy Hook and to apply the knowledge it acquired to the areas of school safety and security, from both design and operational perspectives.  Second, the Commission sought to develop specific recommendations to address the absence of a uniform set of standards for safe school design and operations, to establish a mechanism to ensure implementation of proposed standards and to create a rational and credible impetus to fund these security enhancements.  Third, the Commission sought to create a usable resource document—a "best practices" template for use in the design of new schools, renovations, expansion and retrofits to existing schools—reflecting the lessons learned from the Sandy Hook, Columbine, Virginia Tech and other tragic school events.  Fourth, the Commission hoped its work would mark the beginning of a long-term, ongoing process, so that its proposed best practice standards would evolve over time and be updated to reflect new lessons learned, advancements in building construction materials and techniques, security technologies, improvements in our systems of incident response, situational awareness, mental and behavioral health, and changes in our educational institutions.

Consistent with these goals and objectives, this section of the Commission's final report is divided into three main parts.  Part II sets forth

15

Exhibit 28
Page 01047

ER_3218

the guiding principles or philosophy that informed the Commission's work and its recommendations with respect to SSDO. Part III contains additional SSDO-related recommendations beyond those in the Commission's Interim Report dated March 18, 2013. In Part IV the Commission endorses Public Act 13-3 ("An Act Concerning Gun Violence Prevention And Children's Safety") ("P.A. 13-3"), which adopted and implemented many of the Commission's SSDO recommendations from its Interim Report. The Commission also endorses the work product of two important groups that P.A. 13-3 created: the Report of the School Safety Infrastructure Council (SSIC) and the School Security and Safety Plan Standards. Finally, Part V sets forth what the Commission believes are the key standards adopted by the SSIC.

The SSDO portion of the SHAC Report has been extensively informed by the testimony provided to the Commission and the other SHAC sub-committee reports on Law Enforcement and Public Safety and Mental Health.

**B. Who Should Read This Report?**

The Commission's recommendations, and the SSDO standards and strategies that flowed from them, should be of particular interest to all architects, engineers, consultants and contractors who are involved with school design and construction. Of course, school faculty and staff, local school boards, and members of local and state government and organizations involved with new school design and construction or existing school renovations or expansion, should also review these recommendations.

For reasons explained in greater detail below, other organizational groups should also familiarize themselves with the recommendations. In particular, emergency responders, including local law enforcement, fire and EMS personnel, will all play a crucial role in adapting the proposed standards, which are necessarily general in nature, to the specific needs of their particular communities and schools.

It is the Commission's position that building and fire code officials should review this report, as recommendations contained within it or endorsed

Exhibit 28
Page 01048

by standards referenced within it will need to be conformed and/or reconciled with Building and Fire Codes. Often, building and occupant protection schemes run contrary to the requirements for rapid and effective law enforcement, fire department, and EMS response and hence the need for these agencies to familiarize themselves with the report and its references to the Safe School Infrastructure Council recommendations and the School Security and Safety Plan Standards and Templates.

Additionally, a common theme which evolved in the SHAC hearings was the underlying principle that mental and behavioral health are affected by or have an effect upon a Safe School Climate and response to events that occur in and around schools. The Commission therefore advocates for professionals in this field to read this report as well.

Lastly, testimony from the First Selectman of the Town of Newtown identified clearly that events in school eventually require management support from the elected Town leaders. This strongly suggests that town leadership and government have a vested interest in safe schools and the contents of this document.

### C.   Why The Commission's Recommendations Should Be Credited.

The SSDO recommendations set forth in its Interim Report and this report do not simply represent the views of the members of the Commission with expertise in school safety and design and operations, nor do they simply represent the informed opinions of school architects, design professionals, and emergency responders. To prepare this report, but especially to honor the Sandy Hook victims, their families, the on-scene emergency responders, and members of the Newtown school system with meaningful recommendations, the Commission brought together a broader range of subject matters experts than has ever been brought to bear on the creation of SSDO strategies and standards.

More specifically, the Commission explored the cutting edge risk and resiliency tools shared by the Department of Homeland Security. It studied the

17

Exhibit 28
Page 01049

ER_3220

Columbine Commission report and questioned Colorado Governor Bill Ritter about Colorado's response to that tragedy. Professor Richard Bonnie, the Director of the Virginia Commission on Mental Health Law Report and consultant to the Virginia Tech Review Panel, discussed the importance of threat assessment teams as well as gaps in community mental health services. Commissioner Patricia Rehmer of the Connecticut Department of Mental Health and Addiction Services testified that school tragedies have unique aspects that may necessitate a specific plan that differs in some ways from our state comprehensive disaster response plans for natural and man-made disasters. The need for short and long-term intervention may be appropriate in dealing with school response and recovery. (*See* Section VII. "Response, Recovery And Resilience," *infra*, at p. 196.) The Connecticut State Troopers provided detailed testimony on guns, ammunitions, fire arms training, and legal constraints regarding gun sales, control and usage, and so informed the Commission on numerous aspects of school design and operations to address active shooter threats. The Connecticut Police Chief's Association provided a report highlighting the need to take into consideration all of the school facilities used in order to provide the highest level of security and lessen the buildings' vulnerabilities. The Commission learned that target-hardening and crime prevention methods must include an environmental design that incorporates locks, lighting, alarm systems, panic alarms, video surveillance, access control, natural surveillance and territorial concern, a theory that a well-cared for property is less apt to be an area where crime is committed. Architects from the American Institute of Architects Connecticut Chapter and experienced in school design shared their expertise on building fortification and the importance of visibility and being able to delay an intruder, as well as design strategies to enhance incident response, evacuation, shelter-in-place, and rescue and recovery activities. Mila Kennet, Project Manager, Federal Emergency Management Agency (Infrastructure Protection and Disaster Management Division) shared cutting edge risk and resiliency tools as well as

18

Exhibit 28
Page 01050

their Integrated Rapid Visual Screening Risk Assessment. The Commission also heard from Kenneth S. Trump, President, National School Safety and Security Services; William P. Shea, Deputy Commissioner of the Department of Emergency Services and Public Protection (DESPP) with jurisdiction over the Division of Emergency Management and Homeland Security (DEMHS), and William Hackett, State Emergency Management Director at DEMHS, who presented testimony on the role of DEMHS and the function of the State Emergency Operations Center response to the shooting at Sandy Hook Elementary School and described statewide emergency planning initiatives that are relevant to this incident.  Gregg Champlin, New Hampshire School Emergency Planning and Natural Hazards Program Specialist, shared New Hampshire's Emergency Response Planning for Schools and Childcare Programs.

The Commission also received extraordinary testimony from the Newtown Police Chief, the Newtown School Superintendent and Newtown's First Selectman, whose testimony was based on their own personal experience and provided invaluable insights from their perspectives and the family members whom they represented.

The SSDO recommendations, while informing physical plant and school grounds security design and operations, were also informed by extensive testimony from the physical and mental/behavioral health subject matter experts.  This included individuals with diagnosed behavioral health disorders, practicing clinicians, healthcare organizations and health insurance personnel. Insights from these testimonies informed recommendations in the SSDO report as part of the acknowledged premise that schools are an integral component of the community they serve and that the creation of a safe school climate is in part reliant upon a healthy community.  (See Section II.A.4, "Places of care: schools and communities," *infra*, at p. 99.)

19

Exhibit 28
Page 01051

ER_3222

This is only a very partial list of the broad range of experts with whom the Commission consulted, nor does it include written materials that the Commission reviewed.

## II.     GUIDING PRINCIPLES OF SAFE SCHOOL DESIGN AND OPERATION RECOMMENDATIONS.

Although safe school design is ultimately reflected in the physical design and construction of an educational institution, and while safe school operation is ultimately reflected in a set of standards and strategies, the testimony the Commission received underscored the importance of certain basic principles that it believes should inform SSDO recommendations in general.

### A.     The "All Hazards" Approach To Safe School Design And Operation.

The mass shootings at Sandy Hook represent a particular type of violent event—the "active shooter"—that has become too common on school properties. The Commission heard extensive testimony concerning other active shooters, including the mass shootings at Columbine High School in 1999 and at Virginia Tech in 2007.   Commission members also reviewed the extensive written reports of those and other active shooter events.

The Commission notes that the Columbine and Virginia Tech reports focused on two things: 1) understanding and describing in detail the specific event that was that subject of the report; and 2) setting forth recommendations intended to reduce the likelihood of that type of event reoccurring in the future.

What these reports did not do, to the satisfaction of this Commission, was set forth a usable document that codified the recommendations on safe school design and operations learned from these tragedies.  Consequently, the Commission determined that this report would create an industry best practice document that set standards and recommendations to be used moving forward in the design and operation of schools from a safety and security perspective.

After considering the Columbine and Virginia Tech reports and examining how other states have addressed SSDO, the Commission concludes

Exhibit 28
Page 01052

that, while developing strategies specifically intended to address active shooter events is very important, a more holistic approach to SSDO is necessary and appropriate.  The active shooter event represents one type of risk.  But schools face a multitude of risks, including natural and man-made disasters. Consequently, the Commission finds that while recommendations concerning safe school design and operations should be informed by historical events, including those involving active shooters, they should address a broader range of potential risks as planning for the future involves more than just learning from the past.  Although history has a penchant for repeating itself, the Commission was continually reminded that crime profiles evolve as criminal methodologies are addressed.  In short, the Commission adopted an "all hazards" risk management approach in developing its recommendations as the most prudent means to address risk mitigation.

The Commission notes that the School Safety Infrastructure Council adopted the Commission's "all hazards" approach recommendation in its report:

> Based on testimony from experts at the state, regional and federal level, the Council determined that school safety infrastructure planning should be based on an "all hazards" assessment, and that school design safety standards should encourage the use of protective infrastructure design features in all levels or layers of school facility construction including:
>
> > Site development and preparation;
> > Perimeter boundaries and access points;
> > Secondary perimeters up to the building exterior;
> > and the interior of the building itself.
>
> Another important point, made repeatedly by professionals in the field, is that the conduct of these local uniform assessments must be an inclusive process involving police, fire, medical, school and other local officials. This public safety team approach is not only important in the assessment phase, but throughout the design and construction period as well. The need for redundancy and collaboration is essential.
>
> While the work of the SSIC is born of the events in Newtown

21

Exhibit 28
Page 01053

involving a rogue shooter, other potential threats, both natural and manmade, have led the Council to consider an "all hazards" approach to school design and security standards. As a result, the Council has broadened the preventive design standards to incorporate the most up to date seismic and weather related design requirements, while also considering architectural and design deterrents to terrorists, environmental and chemical accidents or attacks.

The need to take an "all hazards approach" to the assessment of school infrastructure vulnerabilities, and the need to develop compliance requirements in school design plans that minimize identified weaknesses and better prepare schools for a host of potential threats is a major goal of the SSIC. In order to develop a uniform set of standards that are adaptable to the many varied school construction sites and types of school construction in Connecticut, there is a need to develop, or adopt, an "all hazards" threat assessment tool that not only recognizes and differentiates the unique security challenges of each facility, but also provides a comparable security analysis of common school security infrastructure characteristics that are part of all major school construction projects.

A uniform risk assessment of a school facility during the design phase of construction allows school districts to acquire a threshold level of awareness and responsiveness to potential threats and can provide a thorough evaluation of school security. A number of potential threats face every individual school facility, each having its own likelihood of occurrence (probability) and potential for injury and damage (severity). A comprehensive risk assessment includes activities to identify and quantify risk utilizing an "all-hazards" approach to threat assessment for both natural and manmade hazards, and can be used as a screening tool for a preliminary design to determine if the critical systems will enhance deterrence, detection, denial, and damage limitation (response) in the event of an emergency. The primary objective of the risk assessment is to find the most effective mitigation measure(s) to achieve a desired level of protection.

SSIC Report at 9-11.

Exhibit 28
Page 01054

**B.    The Commission Based Its Recommendations On Their Perceived Efficacy, Not Their Anticipated Cost.**

Judges and juries are often asked to award money damages as compensation for the loss of a person's life or limb.   In adopting its recommendations, however, the Commission started from the premise that one cannot truly put a price on a child's life.   Thus, the Commission declined to self-censor its own potential recommendations because of concerns about the potential cost of implementing them.   Instead, the Commission was primarily concerned with the efficacy of its recommendations; i.e., the likelihood that a particular recommendation, if implemented, would be effective in protecting students, faculty, staff and other persons authorized to be on school grounds.

The Commission does not believe that any of its recommendations are fiscally impossible or unachievable; such extreme recommendations were dismissed.   Of course, some will prove more expensive than others to implement.   This is to be expected in any protective design and operations strategy.   The development of sources of funding to implement the Commission's recommendations will be essential, but responsibility for identifying and creating funding sources lies primarily with state and local communities and their governing bodies, and the Commission feels strongly that these endeavors must be made a leading priority.

The Commission notes, however, that the cost of improving school safety and security has long-term financial benefits, as well as improved life safety considerations.   The quality of a community's school system is an important factor in maintaining, if not increasing, property values and attracting new residents and businesses.   The quality of a community's school system is not defined solely by traditional measures of student educational performance and the strength of its teachers and curriculum; it includes other factors, such as the perceived and documented safety and security of the community's schools. The Commission believes that communities that implement SSDO standards and strategies, *and therefore create safer schools*, will be more attractive to

23

Exhibit 28
Page 01055

**ER_3226**

potential homebuyers, renters and businesses than communities which, because of cost concerns, do not implement such strategies, or do so only minimally.  It is a generally acknowledged that the strength of a community's school system is a significant factor influencing individual's and family's selection of communities in which to live and work.  Accordingly, the long-term benefits of the Commission's SSDO recommendations should well outweigh their original implementation costs.

### C.    Safe School Design and Operation Strategies Can And Should Enhance, Not Diminish, Students' Educational Experience.

As noted in the Introduction, the Commission's recommendations are based on the principle that SSDO standards and strategies can and should enhance the educational experience, not diminish it. Indeed, the likelihood that states and communities will adopt and implement SSDO standards and strategies is significantly improved if the state and communities perceive them as supporting schools' educational mission.  There is no inherent conflict between implementing measures that create safe school grounds (not just buildings) and the design of physical spaces that contribute to a school's educational mission.

This principle is reflected in the report of the School Safety Infrastructure Council.  See SSIC Report at 2 ("Despite the urgency of achieving school security goals, the SSCI has recognized, from its inception, the need to preserve an educational environment that maintains an open, welcoming and supportive place for teaching and learning.")

Educational institutions are places of learning, cultural and social development, mastering of physical abilities, and should be the locus of community engagement.  They should provide an essential link between how these capabilities are nurtured at home and how they are taught in school.

Great places to learn are great, not just because they are safe, and the educational/learning process is uninterrupted, or because learning and self-development is more effective in an environment free of fear.  They are also

24

Exhibit 28
Page 01056

**ER_3227**

great because their designs facilitate, excite, and engender interactions among students, teachers and staff, the spaces they are in and the world around them.

Site and school building designs can facilitate these interpersonal interactions or diminish their opportunity for occurrence and their efficacy. They can affect how learning materials and media are presented, explained, studied, understood, and appreciated. They can link and connect the theories and principles taught inside with what happens in the real world outside of the school walls, doors, and windows.

Outdoor environments and indoor spaces affect the way we feel, move, and contemplate. These known design consequences must not be unbalanced in favor of protective designs, which while improving personal safety, actually detract from the core missions of self-development through learning from teachers, interacting with peers, and observing how the social process of the "internal school neighborhood" operates successfully or unsuccessfully.

Architectural building designs and the design and landscaping of exterior school grounds can significantly contribute to a sense of connection between interior school spaces and activities and exterior spaces and activities. They can welcome personal approach and engagement or encourage standoff and isolation. They can encourage active participation or informative passive engagement, or they can discourage participation and deny those who cannot participate the opportunity to view and determine their desire or ability to engage. This is true whether for interior classrooms, special event, and activity spaces or exterior areas for sports and recreation.

### D.     The Importance Of "Situational Awareness."

The Commission finds that enhancing "situational awareness" should be a key SSDO objective. Specifically, safe school designs should create, not reduce, opportunities for faculty, staff and students to observe and be more aware, beyond the traditional classroom environment, so that they can observe

Exhibit 28
Page 01057

at the earliest opportunities changes in student or adult behavior that might be cause for concern.

The concept of situational awareness has been advanced in the public domain through the phrase, "if you see something, say something." The concept is that people cannot react to what they are unaware of. By contrast, when a person observes something unusual, he or she can respond or summon assistance.

Reviews of the Sandy Hook, Columbine and Virginia Tech tragedies and testimony received by the Commission demonstrated without any doubt that every second counts between the initiation of a threatening event and the arrival of emergency responders. Seconds and minutes equate to lives lost or saved. Situational awareness is critical to threat identification and the summoning of emergency response.

The Commission found this extremely important in the school environment, as students, teachers, and staff may well be the first incident observer and incident manager until summoned forces arrive. The earliest opportunity for detection is therefore a key ingredient in incident management and consequence mitigation.

School designs should support these observational opportunities irrespective of requirements to delay the aggressor and their acts. However, opportunities for observations of an aggressor may also provide opportunities for the aggressor to acquire their target. School designs must therefore provide the means for students, teachers, and staff to maintain visual control over their environment and close off sight lines once a perceived threat is identified.

As Dr. Marisa Randazzo explained during her presentation to the Commission on March 22, 2013 concerning school threat assessments, school-based attacks are rarely sudden, impulsive acts. To the contrary, they typically involve significant planning by the attacker, who initially conceives of the idea ("ideation"), develops plans to execute the idea ("planning"), gathers the tools he will use for the attack ("acquisition") and then executes the attack

26

Exhibit 28
Page 01058

("implementation").    By  creating  school  environments  that  enhance  the opportunity for faculty, staff and other students to observe student behavior, and by training faculty and staff to be attuned to changes in student behavior, information about a student's ideas and plans for violence may potentially be observed or discovered before harm can occur.  Because information is likely to be scattered and fragmented, however, Dr. Randazzo explained that the key is to act quickly upon an initial report of concern, rapidly gather other pieces of the  puzzle,  and  then  promptly  assemble  the  pieces  to  see  what  picture emerges.

In  short,  situational  awareness  is  a  fundamental  tool  in  behavioral observation,  condition  assessment,  first  response  determination  and management, and incident command control measures.

### E.    The Importance Of Creating A Safe School Climate.

While the physical design of a school, including its grounds, is a critical factor in increasing the safety and security of students, faculty and staff, other factors also contribute to creating a safe school climate.  For example, pre-service training for all  teachers  and  administrators  in  character  building, student  responsibility,  and  anti-bullying  has  been  shown  to  dramatically improve safe school climates.  (See Section VII.A.2, "Training and professional development," *infra*, at p. 203.)

Additionally, relationship building is key to ensuring and maintaining a culture of safety in every school.    Dr. George Sugai, of the University of Connecticut's Neag School of Education and an expert on school climate and student  behavior,  stressed  that  preventing  school  violence  at  every  level requires  better  communication  between  parents,  students,  teachers,  and administrators.    Dr. Sugai testified that  communication and interpersonal relationships are critical to preventing school violence.  The most important thing parents and educators can do, according to Dr. Sugai, is to make sure that they are involved with their children, to prevent a sense of isolation and the  breakdown  in  communication  channels  that  can  lead  to  violence.

Exhibit 28
Page 01059

Respectful, collaborative relationships between and among parents and teachers; teachers and administrators; teachers and students; administrators and the community including law enforcement, first responders, and mental/behavioral health specialists are essential if we are to have greater situational awareness in creating a nonthreatening, accepting, inviting, information sharing and therefore safe environment.  Staff, teachers and community members must feel comfortable referring a student whose behavior raises concern.  This will happen in a supportive non-threatening community. (See Section VI.A.7, "From prediction to prevention," *infra*, at p. 182.)

Safe School Climates are also known to depend upon maintaining acceptable behavioral interactions between students, students and teachers and staff. To assist in assessing the dimensions which help determine and foster a safe school environment, the National School Climate Center has developed a chart[5] which will provide schools with the opportunity to assess and measure their climates.  The Commission advocates for the inclusion of a requirement for every school in the State to assess the quality of their Safe School Climates by using the Comprehensive School Climate Inventory (CSCI) process. It is envisioned that this would assist in reducing the negative effects of bullying and other unacceptable behaviors. This would provide a valid/reliable and "gold standard" process to accomplish the goals of improving Safe School Climates. The CSCI surveys parent/guardians, faculty/staff and students (grades 3 – 12).

Site and school designs play a significant role in creating and supporting a "safe school climate."  Good things tend to happen in good places.  Bad things tend to happen in bad places.  Employing the well-accepted industry best practices of Crime Prevention through Environmental Design (CPTED), security sensitive architecturally spatial designs and space planning adjacencies for school spaces and grounds, and specifying the appropriate

---

[5] Available at: http://www.governor.ct.gov/malloy/lib/malloy/shac_doc_final_report_-_13_csci_dimension_chart_final.pdf

28

Exhibit 28
Page 01060

ER_3231

selection of security responsive building materials and components, has been shown to contribute to and create spaces which both feel and act secure.

Being in a place/space where one feels secure allows the focus to be on the school's mission and the roles teachers and students need and want to fulfill. Self-protection from perceived threats requires expenditures of deleterious and defensive negative energy, a fundamentally subtle distraction from core school activities and accomplishments.

Situational awareness, the ability to know what is happening around you, also plays a fundamental role in providing a sense of comfort, safety, security, and/or heightened anxiety. These perceptions participate in an individual's response to benevolent or threatening circumstances thereby aiding the opportunity to concentrate on school activities planned for that space or to provide an early warning and opportunity for more effective event management. CPTED design strategies and security sensitive architectural and landscape designs foster situational awareness and assist in the creation of a safe school climate.

### F.   Safe School Design and Operations Strategies Must Be Tailored To The Needs Of Particular Communities And Specific Schools.

Although the Commission's recommendations grew out of a particular event at a particular school, they are general in nature and are intended to serve as a basis for safe school design and operation strategies in communities throughout Connecticut and across the country. However, every community is different and every school district and school is different. Thus, the recommendations set forth herein are offered with the expectation that they will be modified to address the particular needs of specific communities, school systems, and schools.

To illustrate, Connecticut has 169 towns and cities and 165 school districts. Some districts have a large number of local police and public safety personnel who can respond to a major event at a school within a few minutes. Other districts are small, may have no local police department at all, and thus

29

Exhibit 28
Page 01061

ER_3232

rely on State Police, making for potentially significantly longer response times. A community that faces longer response times may decide to undertake additional design and operational measures to delay a potential violent offender's entry into a school or onto its grounds. In short, the basic SSDO standards set forth in the Commission's recommendations are intended to be adjusted on a community and site-specific basis.

The Commission notes that the SSIC acknowledged this issue in its report:

> Central to the security assessment process and the development of the School Security and Safety Plan is the need to conduct an emergency response time analysis (ERTA) to deter- mine the actual amount of time needed for a police response to a specific school in a crisis situation. This exercise will also help in appropriate design decisions related to architectural safeguards, locking technologies and locations, and other measures that could deter or delay an intruder for an amount of time necessary to ensure an onsite public safety response prior to deep building penetration. An Emergency Response Time Analysis should be conducted for each proposed school design plan to better inform local planners on which school security design features may be appropriate for impeding the entry of unwanted individuals or preventing or delaying the free movement of such parties in a school facility. (Knowing what the critical response time is can help planners build in essential design components to limit movement, isolate intruders and facilitate response efforts.)

> The need to balance uniform school security infrastructure standards with the needs of local communities to design and build schools that are responsive to local educational needs and objectives.

>> The need to preserve an educational environment for children;

>> The need to establish a uniform school security infrastructure assessment procedure;

>> The need to ensure the school building planning process is inclusive of all local decision makers, public safety, building code and fire and life safety code personnel; and

30

Exhibit 28
Page 01062

**ER_3233**

> The need to establish a cooperative and constructive compliance system that facilitates attainment of the new standards.

SSIC Report at 9.

### G.   Safe School Design And Operation Standards Are Not Static. They Must Be Reviewed And Updated On A Regular Basis.

SSDO standards and strategies are not static.  Like building and fire codes, SSDO standards and strategies must evolve over time as new security threats emerge, security and safety technologies and response strategies change and mental health and gun control programs advance.  Accordingly, the Commission recommends that SSDO standards and strategies must be reviewed and updated regularly (every year) to ensure that they remain current and always reflect best practices.  For that to happen, a standing organization or committee comprised of individuals with the relevant expertise must be created to conduct the regular reviews and updates.

The Commission notes that the General Assembly acknowledged this principle in Public Act 13-3, sec.  80(b):

> The School Safety Infrastructure Council shall develop school safety infrastructure standards for school building projects under chapter 173 of the general statutes and projects receiving reimbursement as part of the school security infrastructure competitive grant program, pursuant to section 84 of this act. . . . *The council shall meet at least annually to review and update, if necessary, the school safety infrastructure standards* and make such standards available to local and regional boards of education.

SSIC Report at 9 (emphasis supplied).

### H.   Successful Implementation Of Safe School Design And Operation Strategies Requires "Local Champions."

The development of a concrete set of SSDO standards and strategies is the necessary first step in enhancing the safety and security of our schools, but it is a meaningless step unless the standards and strategies are actually implemented.  The Commission believes that creating "local champions" is key

31

Exhibit 28
Page 01063

ER_3234

to successful implementation.  Each community or school district should have a small standing committee or commission, comprised of individuals representing the school community, law enforcement, fire, EMS and public health, whose responsibility is to ensure that the SSDO standards and strategies are actually implemented in their community.   This committee or commission may be stand-alone, or it may consist of members of the proposed School Safety Design Committee and the School Security and Safety Committee, based on whether there is a school construction project or an existing school without plans for renovation, expansion or new construction.

## III.   RECOMMENDATIONS

The Commission's Interim Report included twenty-two (22) recommendations addressing safe school design and human resource emergency preparedness.   As previously noted, virtually all of those recommendations were acknowledged and adopted in P.A. 13-3, the Report of the School Safety Infrastructure Council and/or the School Security and Safety Plan Standards.

The Commission's work did not end, however, with the issuance of the Interim Report.  The Commission continued to hear testimony on all issues within the scope of its mission, including SSDO.  In light of that testimony, and having considered P.A. 13-3 and the work of the commissions and task forces that it established, the Commission makes the following additional recommendations:

**RECOMMENDATION NO. 1**:  The SSIC Report includes a standard requiring classroom and other safe-haven areas to have doors that can be locked from the inside.  The Commission cannot emphasize enough the importance of this recommendation.  *The testimony and other evidence presented to the Commission reveals that there has never been an event in which an active shooter breached a locked classroom door.*   Accordingly, the Commission reiterates its recommendation that all classrooms in K-12 schools should be

32

Exhibit 28
Page 01064

**ER_3235**

equipped with locked doors that can be locked from the inside by the classroom teacher *or substitute*.

**RECOMMENDATION NO. 2**:   The Commission also reiterates its recommendation that all exterior doors in K-12 schools be equipped with hardware capable of implementing a full perimeter lockdown.

**RECOMMENDATION NO. 3**:   A feasibility study should be conducted to develop additional safety standards concerning the issuance of classroom keys to substitute teachers.

The Commission makes this recommendation due to the absence of standardized school district policies regarding the issuance of classroom keys to substitute teachers.   Testimony provided to the Commission confirms that the lack of such policies remains a national problem even after the Sandy Hook tragedy.   The Commission recommends the development of realistic, manageable and secure approach to key access and control to ensure that all teachers charged with the well-being of students can lock their assigned classroom doors, but also to address the overall need for maintaining strict building security requirements.   The management of classroom access control should be determined not only through the lens of new locking hardware, but also by examining the control and issuance of keys within all K – 12 schools. The logistics behind the monitor, control, and record keeping of classroom keys will be instrumental for improving school security plans moving forward.

**RECOMMENDATION NO. 4**:   School custodians should be included as members of school security and safety committees.   Custodians have a wealth of knowledge and experience to share with regard to the physical school building and grounds.   Accordingly, the Commission requests that the Governor submit the following recommendendation for consideration by the General Assembly during the 2015 legislative session:[6]

---

[6] The format of the proposed legislation follows the format the General Assembly uses when proposing amendments to existing legislation.  Proposed new text is underlined and proposed deletions from existing text appear in strike-through format.

33

Exhibit 28
Page 01065

**ER_3236**

Section 10-222m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.

(b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of**: (1)** a local police officer**;, (2)** a local first responder**;, (3)** a teacher **employed at the school, selected with the consent and approval of other school or district employees of that classification**; and **(4)** an administrator **employed at the school, selected with the consent and approval of other school or district employees of that classification**; **(5) a custodian** employed at the school**, selected with the consent and approval of other school or district employees of that classification; (6) the school facilities managers; (7)** a mental health professional, as defined in section 10-76t of the general statutes**;; (8)** a parent or guardian of a student enrolled in the school**;** and any other person the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of subsection (c) of section 10-222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

34

Exhibit 28
Page 01066

ER_3237

In furtherance of this recommendation, the Commission also recommends that the School Security and Safety Plan Standards and Template should be changed so that school districts realize the importance of placing custodians on these vital committees.

**RECOMMENDATION NO. 5**: Teachers, administrators and custodians should be appointed to school security and safety committees with the consent and approval of other employees of their same classification. The Commission believes that committee members so appointed may be more empowered to voice their concerns. Accordingly, the Commission recommends the following:

Section 10-222m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.

(b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of**: (1)** a local police officer**;, (2)** a local first responder**;, (3)** a teacher **employed at the school, selected with the consent and approval of other school or district employees of that classification**; and **(4)** an administrator **employed at the school, selected with the consent and approval of other school or district employees of that classification; (5) a custodian** employed at the school**, selected with the consent and approval of other school or district employees of that classification; (6) the school facilities managers; (7)** a mental health professional, as defined in section 10-76t of the general statutes**;, (8)** a parent or guardian of a student enrolled in the school**;** and any other person

35

Exhibit 28
Page 01067

the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of subsection (c) of section 10-222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

**RECOMMENDATION NO. 6**:  Consistent with the guiding principle that the successful implementation of SSDO standards and strategies requires "local champions," as described previously at p.31, the Commission recommends that the State require each school district to create a permanent committee or commission, the purpose of which shall be to ensure SSDO standards and strategies are implemented in the district.  The Commission suggests that the committee consist of the following persons: 1) one person selected by the Superintendent of Schools; 2) one person selected by the local chief of police; 3) one person selected by the local fire chief; 4) one person selected by local EMS; 5) one person selected to represent local public health and safety; and 6) one mental/behavioral health professional.

Additionally, the State should designate an individual at the state Commissioner-level, such as the Commissioner of Education or Commission of the Department of Emergency Services and Public Protection, to whom the local committee shall be required to submit a written status report on or before December 31 of each year.

**RECOMMENDATION NO. 7**:  The State should amend section 80 (a) of P.A. 13-3 to include an architect licensed in the State of Connecticut among the members of the School Safety Infrastructure Council.  Therefore, the Commission requests that the Governor submit this recommendation for consideration by the General Assembly during the 2015 legislative session.

36

Exhibit 28
Page 01068

**ER_3239**

**RECOMMENDATION NO. 8**:  The State should amend section 80(b) of P.A. 13-3 as follows:

> The School Safety Infrastructure Council shall develop school safety infrastructure standards for school building projects under chapter 173 of the general statutes and projects receiving reimbursement as part of the school security infrastructure competitive grant program, pursuant to section 84 of this act. Such school safety infrastructure standards shall conform to Connecticut and national industry best practice standards for school building safety infrastructure and shall include, but not be limited to, standards regarding ~~(1) entryways to school buildings and classrooms, such as, reinforcement of entryways, ballistic glass, solid core doors, double door access, computer controlled electronic locks, remote locks on all entrance and exits and buzzer systems~~ (1) entryways to school buildings, classrooms and other space that can become areas of safe haven, such as, reinforcement of entryways, forced entry and/or ballistic rated glazing, solid core (FE and/or BR) doors, double door access, computer-controlled electronic locks, remotely controlled locks on all entrance and exits and buzzer systems, (2) the use of cameras throughout the school building and at all entrances and exits, including the use of closed-circuit television monitoring, (3) penetration resistant vestibules, and (4) other security infrastructure improvements and devices as they become industry standards. The council shall meet at least annually to review and update, if necessary, the school safety infrastructure standards and make such standards available to local and regional boards of education.

Therefore, the Commission requests that the Governor submit this recommendation for consideration by the General Assembly during the 2015 legislative session.

**RECOMMENDATION NO. 9**:  Each school shall maintain an accurate list of faculty, staff and students, complete with emergency contact information, which shall include, but not be limited to, parents and guardians of students. This information shall be kept at two locations within each school known by appropriate school staff and the emergency response teams for that school.

**RECOMMENDATION NO. 10**:  Each school shall provide safety and security training for faculty, staff and students on how to respond to hazards and/or events in order to provide competent compliance with the All Hazards School Security and Safety Plan Standards.  This training shall include live exercises to test the efficacy of the training program and to provide a means to develop that program as informed by these exercises.  These training programs and exercises shall also include the identification and use of rendezvous points,

Exhibit 28
Page 01069

escape routes, location of safe havens, the means of emergency communication and the role of faculty, staff, emergency responders, etc. These training and exercise programs may benefit from the participation of parents as part of post-event response and recovery operations as determined by each school and school district in accordance with their incident response plans.

**RECOMMENDATION NO. 11**: The Commission recommends that each school identify specific individuals to serve as safety and security wardens, who shall be responsible for executing and managing the safety and security strategies set forth in Recommendation No. 10.

**RECOMMENDATION NO. 12**: In the design of schools, the Commission recommends that classrooms and other spaces of denser population occupancy be located away from the points of building entry and that spaces of lesser occupancy be adjacent to school entry points, without giving up human visual surveillance and situational awareness of the entry points.

## IV.    ENDORSEMENTS AND COMMENTS

In addition to the making the foregoing recommendations, the Commissions also wishes to formally endorse the following actions of the General Assembly and other task forces and commissions created in the wake of the mass shootings at the Sandy Hook Elementary School:

### A.    Endorsement of Public Act 13-3.

In June 2013, the General Assembly passed, and Governor Malloy signed into law, Public Act 13-3, which adopted most of the Commission's Interim Report recommendations concerning safe school designs and operations. The Commission wishes to highlight and commend certain provisions of P.A. 13-3:

1.    The Commission endorses P.A. 13-3, sec. 80-83 which establishes the School Security Infrastructure Council. This provision adopts Interim Report Recommendation 27, which recommended the creation of a blue-ribbon panel of design and security experts to establish a set of school security design standards.

38

Exhibit 28
Page 01070

**ER_3241**

2.      The Commission endorses P.A. 13-3, sec. 86 which requires the Department of Emergency Services and Public Protection (DESPP), in consultation with the Department of Education (SDE), to develop school security and safety plan standards to provide guidance in emergency plan management and to further assist school districts in managing practices and policies relating to school security and safety planning.

3.      The Commission endorses P.A. 13-3, sec. 83(b), which states that the "School Building Projects Advisory Council shall (1) develop model blueprints for new school building projects that are in accordance with industry standards for school buildings and the school safety infrastructure standards, developed pursuant to section 80 of this act."

4.      The Commission endorses P.A. 13-3, sec. 86, which adopts the Commission's Interim Report recommendations that the State develop a set of tools and standards governing school threat and risk assessment and emergency planning and response.  (*See* Interim Report, Recommendations 18 through 26.)

5.      The Commission endorses P.A. 13-3, sec. 87(b), which requires each local and regional board of education to establish a school safety and security committee for each schools within its jurisdiction.   Each such committee "shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan." P.A. 13-3, sec. 87(b).

6.      The Commission endorses P.A. 13-3, sec. 88(c)(1) and (2), which require that the  "principal of each school shall establish a committee or designate at least one existing committee in the school to be responsible for developing and fostering a safe school climate and addressing issues relating to bullying in the school."  P.A. 13-3, sec. 88(c)(1).  Among other things, the committee shall "identify and address patterns of bullying among students in the school." P.A. 13-3, sec. 88(c)(2).

Exhibit 28
Page 01071

**ER_3242**

**B.    Endorsement of School Safety Infrastructure Council Report and School Security and Safety Plan Standards.**

The Commission's Interim Report recommended the creation of a blue-ribbon panel of design and security experts to establish a set of school security design standards.    See Interim Report, Recommendation 27.    The State adopted that recommendation in sections 80-83 of P.A. 13-3, which established the School Security Infrastructure Council.    The Council, in turn, issued a detailed report establishing specific school infrastructure standards.

The Interim Report also recommended that the State develop a set of tools and standards governing school threat and risk assessment and emergency planning and response.    Section 86 of P.A. 13-3 adopted that recommendation and required the Department of Emergency Services and Public Protection (DESPP), in consultation with the Department of Education (SDE), to develop School Security and Safety Plan Standards to provide guidance in emergency plan management and to further assist school districts in managing practices and policies relating to school security and safety planning.    The resultant standards are set forth in full in Appendix L**.**

The Commission endorses both the School Safety Infrastructure Standards Report and the School Security and Safety Plan Standards.    Certain aspects of those documents, however, warrant particular mention.

1.    The Commission endorses the SSIC's recognition of the connection between the state as the primary funding source for local school construction and school design.    The SSIC report states:

> For decades state government has been a primary funding source for local school construction, but has not established uniform preventative school security design standards. In practice, virtually all school safety infrastructure decisions have been made at the local level leading to school construction projects with significantly different security design features across school district boundaries. While maintaining the ability of local school boards to design facilities which are responsive to community needs and conducive to the educational process, the need to achieve a heightened and more uniform level of school safety infrastructure design in each

Exhibit 28
Page 01072

state funded project, as provided for in P.A. 13-3, is now policy.
. . .

Long a primary source of school construction funding, state government will now use its role to require a more comprehensive and uniform consideration of school security measures at the local level. By establishing a universal school security assessment process, by identifying areas of critical concern and by requiring mitigation of observed deficiencies, the state will assume greater responsibility in establishing a more uniform level of school security throughout the state.

SSIC Report at 1.

2.      The Commission endorses the SSIC's recognition of the importance of including all relevant state and local stakeholders in the process of improving school security infrastructure. The SSIC report states:

The state's role in this process does not end with funding state construction and in providing leadership in securing resources and expertise needed to improve school security. It also extends to mobilizing all affected parties in recognizing the importance of this undertaking, in sharing information and technology and in making the goal of improved school safety infrastructure a shared statewide objective. In this effort private vendors and a host of professional associations including the American Council of Engineering Companies of Connecticut, the American Institute of Architects, the Associated Builders and Contractors, the Associated General Contractors of Connecticut and the Connecticut School Construction Coalition have cooperated with the School Safety Infrastructure Council (SSIC) in promoting solutions to the challenging issues of improved school security design.

SSIC Report at 2.

The Commission recommends that the SSIC include among the professional associations referenced above the following: security professionals, law enforcement and emergency responder agencies, and members of the educational system.

3.      The Commission endorses the SSIC's requirement that school systems seeking state funding certify that they have complied with the new

41

Exhibit 28
Page 01073

School Security Infrastructure Standards and related requirements. The Commission feels this is important to provide a definite means of achieving compliance with the recommended security enhancements. The SSIC Report states:

> The provisions of the School Facilities Grant program (Chapter 173) will be modified to require school systems seeking state funding to certify compliance with the new School Safety Infrastructure Standards and related requirements.

SSIC Report at 9.

4. The Commission endorses the SSIC's recommendations that assessments to determine means to enhance school security should include a broad base of subject matter experts. The SSIC Report states:

> Another important point, made repeatedly by professionals in the field, is that the conduct of these local uniform assessments must be an inclusive process involving police, fire, medical, school and other local officials. This public safety team approach is not only important in the assessment phase, but throughout the design and construction period as well. The need for redundancy and collaboration is essential.

SSIC Report at 9.

5. The Commission endorses the SSIC position that developing school safety and security designs and operations must take into account response times by emergency responders. The Report states:

> Central to the security assessment process and the development of the School Security and Safety Plan is the need to conduct an emergency response time analysis (ERTA) to determine the actual amount of time needed for a police [and fire/EMS][7] response to a specific school in a crisis situation.

SSIC Report at 9. The Commission also recommends that the SSIC amend its Report to identify the person or entity who shall be responsible for conducting the emergency response time analysis.

6. The Commission endorses the SSIC's recommendation that due to the sensitivity of school security infrastructure plans, such plans "should be shielded from disclosure under the Freedom of Information

---

[7] The Commission recommends the inclusion of the bracketed language in the SSIC Report.

42

Exhibit 28
Page 01074

ER_3245

Act." SSIC Report at 13.

7.     The Commission supports the following statement concerning the development of school safety infrastructure standards:

> These standards are to be developed by January 1, 2014 and submitted to the legislature at that time. Effective July 1, 2014, all school construction and renovation applications for state funding must comply with these standards, or they will not be approved. Additionally, state grants provided pursuant to the School Security Infrastructure Competitive Grant Program, jointly administered by the Departments of Emergency Services and Public Protection (DESPP), Education (SDE) and Administrative Services (DAS) under section 84 of P.A. 13-3, must be provided in accordance with the SSIC standards on and after these standards are submitted. Finally, any model blueprints for new school building projects that are developed by  the School Building Project Advisory Council pursuant to Conn. Gen. Stat. § 10-292q must include the SSIC standards.

SSIC Report at 3.

8.     The Commission supports the requirement in P.A. 13-3, sec. 86 concerning the development of school security and safety plan standards.  The report states:

> Development of School Security and Safety Plan Standards. P.A. 13-3 (section 86) also requires the Department of Emergency Services and Public Protection (DESPP), in consultation with the Department of Education (SDE), to develop School Security and Safety Plan Standards to provide guidance in emergency plan management and  to further assist school districts in managing practices and policies relating to school security and safety planning. These standards are intended to assist school districts in developing operational school security procedures to respond to security events.

9.     In its Interim Report the Commission identified the need for uniform, comprehensive threat assessment standards.  The SSIC acknowledged the same need in its report:

> Until now school safety has been almost entirely determined by local decision makers, leading to a very uneven and unpredictable level of school security design across school district lines.

43

Exhibit 28
Page 01075

ER_3246

> As an alternative, a uniform comprehensive threat-assessment process and consistent standards and corresponding building plans will help ensure a threshold level of awareness, responsiveness and security.

SSIC Report at 3.

10.    The Commission endorses the SSIC's requirement of a compliance determination process:

> Once a local school district has completed the assessment, identified potential vulnerabilities and proposed specific plans to remediate deficiencies and secure compliance, the Office of School Facilities, Plan Review Unit will evaluate the local plan for adequacy and continue to work with local districts to ensure compliance with established standards

SSIC Report at 12.

11.    The Commission endorses the SSIC's recommendation concerning the timely creation and issuance of School Security Technical Compliance Guidelines:

> At minimum, all school facilities are required to be compliant with state and federal building and fire codes. In other areas of school design and construction, standards and guidelines may be somewhat more variable providing local authorities with the flexibility to create an increased level of safety and security while meeting broader educational objectives. Areas not identified in the Mandatory or Critical Compliance sections noted above will be subject to more flexible guidelines to be incorporated in the School Security Technical Compliance Manual that is currently under development. Once complete this document will be incorporated in the SSIC final report as an updated and free standing Appendix E to be used by design and architectural professionals, along with Appendix A, to achieve security design objectives.

SSIC Report at 14.

12.    The Commission endorses the SSIC's call for the development of a program to inform key stakeholders of changes in school safety infrastructure standards:

> As the Legislature considers implementation of the new standards, the Departments of Education, Administrative Services and

44

Exhibit 28
Page 01076

ER_3247

Emergency Services and Public Protection will develop a broad based orientation program designed to inform interested groups and the general public.

SSIC Report at 14.

13. P.A. 13-3, sec. 81(a) (2) provides that the Commissioner of Education shall have the authority to disapprove any application for a state grant that "is not accompanied by a life-cycle cost analysis approved by the Commissioner of Construction Services . . . ."  Section 81(a)(5) further provides that an application may be disapproved if "the estimated construction cost exceeds the per square foot cost for schools established in regulations adopted by the Commissioner of Construction Services. . . ."

The Commission notes that these provisions should be reviewed for practical applications for security/cost benefit metric.  The Commission further notes that security enactments cost money and, therefore, the per square foot costs will need to be adjusted.

## V.    KEY SAFE SCHOOL INFRASTRUCTURE COUNCIL STANDARDS

As noted, the full set of SSIC standards are set forth in Appendix K.  The Commission feels that it is appropriate, however, to provide in this report a subset of SSIC report's salient recommendations.  The criteria the Commission used to identify this subset of recommendations were:

1. Relative ease of feasibility to implement the recommendation.
2. Opportunity for the recommendation to provide significant safety and security value.
3. Ability to implement the recommendation at a reasonable cost for the extent of protective design value obtained.

The standards set forth below include the Commission's suggested amendments and additions for future SSIC revisions.[8]

---

[8] The reference numbers for each standard are the numbers that appear in the SSIC Report.  Additional standards recommended by the Commission are denoted by an "x."

45

Exhibit 28
Page 01077

ER_3248

### I.     School Site Perimeter Standards

1.1     Crime Prevention Through Environmental Design (CPTED) is a crime prevention strategy that uses architectural design, landscape planning, security systems, and visual surveillance to create a potentially crime free environment by influencing human behavior and should be applied when appropriate.

1.3     Fencing, landscaping, edge treatment, bollards, signage, exterior furnishings and exterior lighting may be used to establish territorial boundaries and clearly delineate areas of public, semi-public, semi-private, and private space.

### *Access Control*

1.4     School boundaries and property lines shall be clearly demarcated to control access to a school facility and shall clearly delineate areas of public, semi-public, semi-private, and private space.

1.5     Where a school is a shared use facility that serves the community, internal boundaries shall be clearly defined to establish a distinct perimeter for both the school and the shared use facilities with separate and secure access points that are clearly defined. Boundaries may be defined by installing fencing, signage, edge treatment, landscaping, and ground surface treatment.

1.7.    The number of vehicle and pedestrian access points to school property shall be kept to a minimum and shall be clearly designated as such.

1.8.    Directional signage shall be installed at primary points of entry to control pedestrian and vehicular access and to clearly delineate vehicular and pedestrian traffic routes, loading/unloading zones, parking and delivery areas. Signage should be simple and have the necessary level of clarity. Signage should have reflective or lighted markings.

1.x.    A means shall be provided to achieve and enforce identity authentication and entry authorization at locations and areas established by school operations protocols.

### *Surveillance*

1.17.   The design shall allow for the monitoring of points of entry/egress by natural and/or electronic surveillance during normal hours of operation and during special events.

1.18.   At minimum, electronic surveillance shall be used at the primary access points to the site for both pedestrian and vehicular traffic.

46

Exhibit 28
Page 01078

ER_3249

1.19.  All points of vehicular  entry/egress shall be adequately illuminated to enhance visibility for purposes of surveillance.

1.20.  Designated pedestrian and vehicular traffic routes shall be adequately illuminated to reinforce natural and or electronic surveillance during evening hours.

1.23.   Locate access points in areas of high visibility that can be easily observed and monitored by staff and students in the course of their normal activities. Natural surveillance may be maximized by controlling access points that clearly demarcate boundaries and spaces.

1.24.  Video surveillance systems may be used around the site perimeter to provide views of points of entry/egress and as a means to securely monitor an area when natural surveillance is not available.

1.26.  Lighting should be sufficient to illuminate potential areas of concealment, enhance observation, and to provide for the safety of individuals moving between adjacent parking areas, streets and around the school facility.

1.xx . Consider the design of video surveillance systems which have the ability to be used locally (on site) by emergency responders and viewed off-site at appropriate locations.

## II.      Parking Areas and Vehicular and Pedestrian Routes

2.2.    At the minimum, electronic surveillance shall be used at the primary access points to the site for both pedestrian and vehicular traffic.

2.3.    Designated pedestrian and vehicular points of entry/egress and traffic routes shall be adequately illuminated to reinforce natural and or electronic surveillance.

2.4.    Signage shall be posted at all vehicular access points and in delivery zones, parking areas and bus loading/unloading zones with rules as to who is allowed to use parking facilities and when they are allowed to do so. Signage should be simple and have the necessary level of clarity. Signage should have reflective or lighted markings.

2.6.    Parking areas shall be adequately illuminated with vandal resistant lighting.

2.7.    Parking shall be prohibited under or within the school building.

Exhibit 28
Page 01079

2.8.   Adequate lighting shall be provided at site entry locations, roadways, parking lots, and walkways from parking to buildings.

2.xx.  Gas service rooms, exterior meters/regulators shall be secured.

2.11.  External access to school facilities shall be kept to a limited number of controlled entrances. Vehicular circulation routes shall be separated and kept to a minimum of two routes per project site for purposes of separating service and delivery areas from visitors' entry, bus drop-off, student parking and staff parking. Circulation routes shall be separated, clearly demarcated, and easily supervised.   Provide vehicle interdiction devices at building entries to preclude vehicle access into the building.

2.13.  A drop-off/pick-up lane shall be designated for buses only with a dedicated loading and unloading zone designed to adequately allow for natural and/or electronic surveillance and to avoid overcrowding and accidents.

2.16.  Design entry roads so that vehicles do not have a straight-line approach to the main building. Use speed-calming features to keep vehicles from gaining enough speed to penetrate barriers. Speed-calming features may include, but are not limited to, speed bumps, safety islands, differing pavement surfaces, landscape buffers, exterior furnishings and light fixtures.

2.18.  Signage text should prevent confusion over site circulation, parking, and entrance location. Unless otherwise required, signs should not identify sensitive or high risk areas. However, signs should be erected to indicate areas of restricted admittance and use of video surveillance.

2.19.  Parking areas should be designed in locations that promote natural surveillance. Parking should be located within view from the occupied building, while maintaining the maximum stand-off distance possible.

2.20.  Locate visitor parking in areas that provide the fewest security risks to school personnel. The distance at which a potentially threatening vehicle can park in relation to school grounds and buildings should be controlled.

2.22.  Consider illuminating areas where recreational activities and other nontraditional uses of the building occur. If video surveillance systems are installed, adequate illumination shall be designed to accommodate it.

2.23.  Consider blue light emergency phones with a duress alarm in all parking areas and athletic fields. If utilized, blue light emergency phones shall be clearly visible, readily accessible and adequately illuminated to accommodate electronic surveillance.

Exhibit 28
Page 01080

2.xx.  Review vehicle access routes to the school and the site civil design with emergency responders to address their incident response requirements.

2.xx.  Design walkways from all parking areas so that they can be observed from within the school by appropriate school staff.

### III.    Recreational Areas – Playgrounds, Athletic Areas, Multipurpose Fields

3.1.   The design shall allow for ground level, unobstructed views, for natural and/or electronic surveillance of all outdoor athletic areas, playgrounds and recreation areas at all times.

3.3.   Pre-kindergarten  and kindergarten play areas shall be separated from play areas designed for other students and physically secured.

3.4.   Athletic areas and multipurpose fields at elementary school buildings shall contain a physical protective barrier to control access and protect the area.

3.5.   Playgrounds and other student gathering areas shall be located away from public vehicle access areas, such as streets or parking lots by a minimum of fifty (50) feet unless prohibited by site constraints.

3.6.   Consider a physical protective barrier around athletic areas and multipurpose fields at secondary school buildings to control access and protect the area.

3.7.   Locate access points to recreational areas in areas of high visibility that can be easily observed and monitored by staff and students in the course of their normal activities. Natural surveillance may be maximized by controlling access points that clearly demarcate boundaries and spaces.

3.9.   Pre-K and K play areas should be designed so that they have visual sightlines to school staff.  Fencing should not diminish this visual connection.

3.**x.**   Review the design of these areas with emergency responders to address their incident response requirements.

Exhibit 28
Page 01081

## IV.   Communication Systems

4.1.   All classrooms shall have two way communications with the administrative office.

4.2.   All communication systems shall be installed in compliance with Connecticut state building and fire code requirements.

4.3.   Emergency Communication Systems (ECS) and/or alarm systems shall have redundant means to notify first responders, supporting agencies, public safety officials and others of an event to allow for effective response and incident management. Alarm systems must be compatible with the municipal systems in place. These systems may include radio, electronic, wireless or multimedia technology which provides real time information (such as audio, visual, mapping and relevant data) directly to first responders.  Points of Broadcast input for these systems shall be reviewed with emergency responders.  A minimum of 2 shall be provided.

4.4.   Emergency Communication Systems (ECS) shall be installed and maintained in accordance with NFPA 72, 2010, or the most current fire code standard adopted by the State of Connecticut. ECS may include but is not limited to public address (PA) systems, intercoms, loudspeakers, sirens, strobes, SMS text alert systems, and other emerging interoperable resource sharing communication platforms.  The design of these systems shall be reviewed with emergency responders.

4.5.   All new buildings shall have approved radio coverage for first responders within the building based upon the existing coverage levels of communication systems at the exterior of the building. The system as installed must comply with all applicable sections of the Federal Communication Commission (FCC) Rules for Communication Systems and shall coordinate with the downlink and uplink pass band frequencies of the respective first responders.  Perform a radio audibility and intelligibility test and modify system design accordingly.

4.6.   All in-building radio systems shall be compatible with systems used by local first responders at the time of installation.

4.12.  Call buttons with direct intercom communication to the central administrative office and/or security office should be installed at key public contact areas.

4.xx.  Develop a strategy and "security team" and equip them with hand-held radios so they can be effective participants in the radio communications system.

Exhibit 28
Page 01082

Case 3:17-cv-01017-BEN-JLB   Document 53-10   Filed 04/09/18   PageID.6834   Page 222 of 428

## V.     School Building Exterior – Points of Entry/Egress and Accessibility

5.1.    Points of entry/egress shall be designed to allow for monitoring by natural and/or electronic surveillance during normal hours of operation and during special events.

5.2.    At minimum electronic surveillance shall be used at the primary points of entry.

5.4.    Lighting shall be sufficient to adequately illuminate potential areas of concealment and points of building entry, and, enhance natural and/or electronic surveillance, and discourage vandalism.

5.8.    Consider blue light emergency phones with a duress alarm along the building perimeter as needed to enhance security. If utilized, blue light emergency phones shall be clearly visible, readily accessible and adequately illuminated to accommodate electronic surveillance.

5.9.    Consider the use of forced entry resistance glazing materials for windows and glazed doors using laminated glass and/or polycarbonate to significantly improve forced entry delay time beyond standard glazing techniques.  A five (5) minute forced entry solution should be the design standard.

### *Main Entrance/Administrative Offices/Lobby*

5.10.  Main entrances shall be well lit and unobstructed to allow for natural and/or electronic surveillance at all times.

5.11.  The design shall allow for visitors to be guided to a single control point for entry.

5.12.  The main entrance assembly (glazing, frame, & door) shall be forced entry resistant to the project standard, with a forced entry time rating as informed by local law enforcement response timing.

5.13.  Plans shall carefully address the extent to which glazing is used in primary entry ways, areas of high risk and areas of high traffic and the degree to which glazing is installed or treated to be bullet, blast, or shatter resistant to enhance the level of security. The district's priorities for the use of natural surveillance, electronic surveillance, natural light and other related security measures may affect this decision and the overall level of security.

5.14.  Main entrance doors shall be  capable of being secured from a central location, such as the central administrative office and/or the school security office.

51

Exhibit 28
Page 01083

5.15.  Video surveillance cameras shall be installed in such a manner to show who enters and leaves the building and shall be monitored at locations which are attended whenever the school is occupied.

5.16.  The design shall allow for providing visitor accessibility only after proper identification.

5. xx. The use of vestibules with forced entry resistant doors and glazing to the project standard should be the design standard.

5.19.  The central administrative offices and/or security offices should have an unobstructed view of the main entrance lobby doors and hallways. If feasible, administrative offices abutting the main entrance should be on an exterior wall with windows for natural surveillance of visitor parking, drop off areas, and exterior routes leading to the main entrance.

5.20.  Walls, forced entry resistant to the project standard, should be hardened in foyers and public entries. Interior and exterior vestibule doors should be offset from each other in airlock configuration.

5.21.  Use vestibules to increase security. The entrance vestibule shall have both interior and exterior doors that are lockable and controllable from a remote location and be designed to achieved enhanced force entry performance as identified to the project forced entry standards.

5.23.  When possible, the design should force visitors to pass directly through a screening area prior to entering or leaving the school. The screening area should be an entrance vestibule, the administration/reception  area, a lobby check in station, an entry kiosk, or some other controlled area. This controlled entrance should serve as the primary control point between the main entrance and all other areas of the school.

5.24.  Control visitor access through electronic surveillance with intercom audio and remote lock release capability at the visitor entrance.

5.25.  Restrict visitor access during normal hours of operation to the primary entrance. If school buildings require multiple entry points, regulate those entry points with no access to people without proper identity authentication and entry authorization. Consider an electronic access control system for authorized persons if multiple entry points are utilized during normal hours of operation.

5.27.  Install a panic/duress alarm or call button at an administrative/security desk as a protective measure.

Exhibit 28
Page 01084

**ER_3255**

5.28.  Proximity cards, keys, key fobs, coded entries, or other devices may be used for access control of students and staff during normal hours of operation. The system may be local (residing in the door hardware) or global (building or district- wide). Prior to installing a customized door access control system refer to the local authority having jurisdiction for compliance with state building and fire code.

5.31.  Consider sensors that alert administrative offices when exterior doors at all primary and secondary points of entry are left open.

5.32.  Consider radio frequency access control devices at primary points of entry to allow rapid entry by emergency responders.  Review this technology with the emergency responders which serve the school facility.

5.33.  Where "forced entry" required construction is required, the forced entry delay time shall be based on the ERTA, and have the forced entry designs informed/validated by a licensed architect, professional engineer or qualified security consultant.

5.xx.  Provide closers on these doors so that they automatically return to a closed, latched, and locked position to preclude unauthorized entry.

### *Exterior Doors*

5.34.  The design shall allow for the points of entry/egress to be monitored by natural and/or electronic surveillance during normal hours of operation and during special events.

5.36.  Lighting at these entry points shall be sufficient to illuminate potential areas of concealment, enhance natural and/or electronic surveillance, discourage and protect against vandalism.

5.39.  Tertiary exterior doors shall be hardened to be penetration resistant and burglar resistant.

5.40.  All exterior doors shall be equipped with hardware capable of implementing a full perimeter lockdown by manual or electronic means and shall be numbered per the SSIC standards.

5.41.  All exterior doors shall be easy to lock and allow for quick release in the event of an emergency by authorized personnel and emergency responders.

5.45. All exterior doors that allow access to the interior of the school shall be numbered in sequential order in a clockwise manner starting with the main

Exhibit 28
Page 01085

entrance. All numbers shall be visible from the street or closest point of entry/egress, contrast with its background and be retro-reflective.

5.48.  Doors vulnerable to unauthorized access may be monitored by adding door contacts or sensors, or may be secured through the use of other protective measures, such as delayed opening devices, or video surveillance cameras that are available for viewing from a central location, such as the central administrative office and/or security office.

5.53.  Specify high security keys and cylinders to prove access control.

5.xx.  Provide closers on these doors so that they automatically return to a closed, latched, and locked position to preclude unauthorized entry.

### Exterior Windows/Glazing/Films

5.55.  Windows may serve as a secondary means of egress in case of emergency. Any "rescue window" with a window latching device shall be capable of being operated from not more than forty eight (48) inches above the finished floor.

5.56.  Each classroom having exterior windows shall have the classroom number affixed to the upper right hand corner of the first and last window of the corresponding classroom. The numbers shall be reflective, with contrasting background and shall be readable from the ground plain at a minimum distance of fifty (50) feet.

5.57.  Plans shall carefully address the extent to which glazing is used in primary entry ways, areas of high risk and areas of high traffic and the degree to which glazing is installed or treated to be bullet, blast, or shatter resistant to enhance the level of security. The district's priorities for the use of natural surveillance, electronic surveillance, natural light and other related security measures may affect this decision and the overall level of security.

5.59.  Design windows, framing and anchoring systems to be shatter resistant, burglar resistant, and forced entry resistant to the project forced entry standards, especially in areas of high risk.  Whenever feasible, specify force entry resistant glazing on all exterior glazing.

5.60.  Resistance for glazing may be built into the window or applied with a film or a suitable additional forced entry resistant "storm" window.

5.61. Classroom windows should be operable to allow for evacuation in an emergency.  Review with the authority having jurisdiction and fire department to balance emergency evacuation, external access, and security requirements.

54

Exhibit 28
Page 01086

ER_3257

## VI.    School Building Interior

Interior physical security measures are a valuable part of a school's overall physical security infrastructure.  Some physical measures such as doors, locks, and windows deter, prevent or delay an intruder from freely moving throughout a school and from entering areas where students and personnel may be located. Natural and electronic surveillance can assist in locating and identifying a threat and minimizing the time it takes for first responders to neutralize a threat.

6.1.    The design shall provide for controlled access to classrooms and other areas in the interior that are predominantly used by students during normal hours of operation to protect against intruders.

6.4.    All interior room numbers shall be coordinated in a uniform room numbering system format. Numbering shall be in sequential order in a clockwise manner starting with the interior door closest to the main point of entry. Interior room number signage shall be wall mounted. Additional room number signage may be ceiling or flag mounted. Interior room number signage specifications and installation shall be in compliance with ADA standards and other applicable regulations as required.

6.x.    Record documentation drawings shall be kept which include floor plans with the room numbering system.  These drawings shall be safeguarded but available for emergency responders.  Review opportunities for emergency responders agencies to have these drawings as well.

6.x.    Review design opportunities to create interior safe havens with forced entry resistant walls and doors.  These may be libraries, auditoriums, cafeterias, gyms or portions of school wings or blocks of classrooms.

6.5.    Establish separate entrance and exit patterns for areas that have concentrated high- volume use, such as cafeterias and corridors, to reduce time required for movement into and out of spaces and to reduce the opportunity for personal conflict. Separation of student traffic flow can help define orderly movement and save time, and an unauthorized user will perceive a greater risk of detection.

6.6.    Consider intruder doors that automatically lock when an intruder alarm or lockdown is activated to limit intruder accessibility within the building. If installed, intruder doors shall automatically release in the event of an emergency or power outage and must be equipped with a means for law enforcement and other first responders to open as necessary.

55

Exhibit 28
Page 01087

### *Interior Surveillance*

6.7.   An intrusion detection system shall be installed in all school facilities.

6.8.   If video surveillance systems are utilized, the surveillance system shall be available for viewing from a central location, such as the central administrative office and/or the school security office, and at points of emergency responder incident management.  Review these locations with emergency responders in the design phase.

6.9.   Consider electronic surveillance in lobbies, corridors, hallways, large assembly areas, stairwells or other areas (such as areas of refuge/safe havens) as a means to securely monitor those areas when natural surveillance is not available.

6.10.  The design of a school facility should allow for the designation of controlled hiding spaces. A controlled hiding place should create a safe place for students and personnel to hide and protect themselves in the event of an emergency. The controlled hiding space should be lockable and readily accessible. A controlled hiding space could be a classroom or some other designated area within the building.

6.xx.  Design interior hallways and adjacent spaces to provide situational awareness of hallway conditions from these rooms, but also provide means to eliminate vision into these rooms as activated by room occupants.

### *Classroom Security*

6.11.  All classrooms shall be equipped with a communications system to alert administrators in case of emergency. Such communication systems may consist of a push-to-talk button system, an identifiable telephone system, or other means.

6.12.  Door hardware, handles, locks and thresholds shall be ANSI/BHMA Grade 1.

6.13.  All classroom doors shall be lockable from the inside without requiring lock activation from the hallway, and door locks shall be tamper resistant.

6.15.  Classroom door locks shall be easy to lock and allow for quick release in the event of an emergency.

6.16.  Classroom doors with interior locks shall have the capability of being unlocked/ released from the interior with one motion.

Exhibit 28
Page 01088

6.17.  All door locking systems must comply with life safety and State of Connecticut building and fire codes to allow emergency evacuation.

**6.**xx.  Provide doors between adjacent classrooms to provide means of moving classroom occupants from one classroom to the next as a means to relocate students and teachers from an impending hallway threat.  Provide such doors with suitable locking hardware to preclude unauthorized tailgating.

**6.xx.**  Provide closers on these doors so that they automatically return to a closed, latched, and locked position to preclude unauthorized entry.

6.20.  If classroom doors are equipped with a sidelight, the glazing should be penetration/forced entry resistant to the project forced entry standard.

6.21.  If interior windows are installed to provide lines of sight into/out of classrooms or other populated areas, certain factors should be taken into consideration relating to the size, placement and material used for those windows, including:

6.21.1.    Minimizing the size of windows or the installation of multiple interspersed smaller windows with barriers in a larger window area to deter intruder accessibility.

6.21.2.    Placing windows at a sufficient distance from the interior locking mechanism to prevent or make difficult the opening of a door or lock from outside.

6.21.3.    Concealing or obstructing window views to prevent an assailant's ability to ascertain the status or presence of persons inside of a classroom during lockdown.

6.21.4.    Hardening window frames and glazing to the project forced entry standards to lessen window vulnerability.

***Large Assembly Areas (gym, auditorium, cafeteria, or other areas of large assembly)***

6.22.  Points of entrance and egress shall be clearly demarcated and designed to meet the project forced entry standards.

6.26.  Lighting shall be sufficient to illuminate potential areas of concealment, enhance natural and/or electronic surveillance, discourage vandalism and protect against vandalism.

57

Exhibit 28
Page 01089

ER_3260

6.29.  Electronic surveillance should be used in large assembly areas and at all exit doors to securely monitor those areas when natural surveillance is not available.

***Shared Space or Mixed Occupancy (library, BOE, mixed use or other community service)***

6.32.  Shared space shall have separate, secure and controllable entrances.

6.33.  The design of shared space should prevent unauthorized access to the rest of the school.

6.34.  The design of shared space shall allow for the monitoring of points of entry/egress by natural and/or electronic surveillance during normal hours of operation.

## VII.   Roofs

7.1.   The design shall allow for roof accessibility to authorized personnel only.

7.2.   Access to the roof should be internal to the building. Roof access hatches shall be locked from the inside.

7.3.   If external access exists, roof ladders should be removable, retractable, or lockable. Screen walls around equipment or service yards should not provide easy access to the roof or upper windows.

**7.x.**  Provide adequate lighting and controls for roof access means and roof access points into the school.

## VIII.   Critical Assets/Utilities

8.1.   Screens at utilities, such as transformers, gas meters, generators, trash dumpsters, or other equipment shall be designed to minimize concealment opportunities and adequate to preclude unauthorized access. Installation of screens at utilities shall be compliant with utility company requirements.

8.2.   Access to building operations systems shall be restricted to designated users with locks, keys and/or electronic access controls. Secure all mechanical rooms with intruder detection sensors.

8.3.   Loading docks shall be designed to keep vehicles from driving into or parking under the facility.

Exhibit 28
Page 01090

8.**x.**    Spaces with critical systems shall be provided appropriate graphics to be recognizable to emergency responders.

8.**x.**    Gas meter/regulator rooms shall be provided with forced entry resistant doors and to the project standards.

8.**x.**    Gas leak detection systems/sensors shall be installed wherever gas metering or appliances are installed.

8.5.    Shipping and receiving areas shall be separated from all utility rooms by at least fifty (50) feet unless prohibited by site constraints. If a site is determined to be physically constrained from reasonably meeting the fifty (50) foot separation requirement, maximize the separation distance between the receiving area and the utility room to the greatest extent possible. Utility rooms and service areas include electrical, telephone, data, fire alarm, fire suppression rooms, and mechanical rooms.

8.6.    Critical building components should be located away from vulnerable areas.  Critical building components may include, but are not limited to:

- Emergency generator;
- Normal fuel storage;
- Main switchgear;
- Telephone distribution;
- Fire pumps;
- Building control centers;
- Main ventilation systems if critical to building operation.
- Elevator machinery and controls.
- Shafts for stairs, elevators, and utilities.

**Other Security Infrastructure and Design Strategies**

9.1.    The design shall include special rooms for hazardous supplies that can be locked.

9.**x.**    The design shall include secured spaces, closets, cabinets or means of protection to minimize the use of dangerous objects from shop, cooking or other similar occupancies.

9.2.    Egress stairwells should be located remotely and should not discharge into lobbies, parking or loading areas.

59

Exhibit 28
Page 01091

**ER_3262**

9.4.   Trash receptacles, dumpsters, mailboxes and other large containers shall be kept at least thirty (30) feet from the building unless prohibited by site constraints. If a site is determined to be physically constrained from reasonably meeting the thirty (30) foot separation requirement,  maximize the separation distance to the greatest extent possible.

Exhibit 28
Page 01092

# PART TWO

## FINDINGS AND RECOMMENDATIONS OF THE LAW ENFORCEMENT WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION

### I.   INTRODUCTION

Regardless of socioeconomic, ethnic, or gender divisions, households across the state and across the nation seek and deserve safety and security for their families; the types of civic spaces that are conducive to supportive environments and places where we want to raise our children.  The ferocity of attacks like those perpetrated at Sandy Hook Elementary School shatters that sense of security and deprives us of the serenity that we all deserve.

In 21st century America, certain topics are destined to divide us.  With great rhetorical flourish, the message boards ignite with sincere passion on these topics.  How we manage firearms in our evolving community is one such topic.

The lethality of the weapons used in the attack on Sandy Hook Elementary School requires that the Commission evaluate access to firearms and ammunition.  The analysis of the Commission is not rooted in dogma or a particular ingrained "world view," but rather a rational analysis of what type of firearms are available to citizens and what that means to the security of communities.  In its analysis, the Commission engaged in a pragmatic, not dogmatic, review.

United States civilians own or possess in excess of 300 million guns: as of 2009, they owned or possessed approximately 114 million handguns, 110 million rifles and 86 million shotguns.[9]  The incidence of gun ownership/possession in the United States—nearly one gun on average for every resident—is the highest in the world.  Most guns are lawfully owned by law abiding persons who use them for recreational activities, such as hunting

---

[9] *See* "Gun Control Legislation," Report of the Congressional Research Service (Nov. 14, 2012) at 8.

Exhibit 28
Page 01093

and target practice, and/or for self-defense.  However, many guns are owned or possessed illegally or, even if legal, are used for unlawful purposes.

The Commission acknowledges the United States' long tradition of gun ownership and the Second Amendment rights of gun owners.  The Commission also notes that although a divided (5-4) United States Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment right to bear arms is a *personal* right, it also held the right is *not absolute.*   The Supreme Court also acknowledged in *Heller* that society has the right to regulate gun ownership, possession and use within constitutionally permissible limits.

The Constitution of the United States compels us to evaluate our nation as a society that changes, grows, and evolves.  And as our world and our collective beliefs mature, so must the laws that govern us.  As Supreme Court Justice Oliver Wendell Holmes, Jr. so eloquently stated regarding the dynamic nature of our legal structure, "It is still more revolting if the grounds upon which [a law] was laid down have vanished long since, and the rule simply persists from blind imitation of the past." The Commission seeks to recommend a framework that applies the broad principles of the Constitution to contemporary reality. Technological advances, economic transformations, and broad changes in the way we perceive the world around us have irrevocably changed the world.  Even as we, as a community, discuss topics of controversy, we must avoid that "blind imitation of the past"; we must understand that we can apply our own technological and cultural tools, even if those tools were unavailable to our forefathers.  We must understand that innovation is a quintessential American trait, and it is our moral obligation to apply these principles of innovation to generate solutions to the issues that we face.

In setting forth the following recommendations, the Commission does not seek to deprive citizens of their right to hunt, engage in target practice or own a firearm for self-defense; nor does the Commission seek to rewrite the Constitution of the United States or centuries' worth of legal decisions

Exhibit 28
Page 01094

pertaining to the right to bear arms.  Rather, the Commission's goals and objectives are two-fold.

First, the Commission is deeply concerned about the proliferation, throughout the civilian population, of weapons that were specifically designed for military use during wartime.  The Commission believes that "assault weapons" like the AR-15, as well as large capacity magazines ("LCM's") often used with those weapons, have no legitimate place in the civilian population.  The Commission finds that the cost to society of easy civilian access to assault weapons and LCM's vastly outweighs the benefits of civilian ownership.  By contrast, the Commission finds that the significant benefit to society from eliminating civilian ownership and possession of assault weapons and LCM's can be realized with only a minimal burden on persons who want to hunt, engage in target practice or use weapons for self-defense.  They remain free to engage in those activities with a vast array of long guns and handguns.  In short, the Commission's first goal is simply to limit the possession and use of weapons designed for wartime use to members of our military services and law enforcement personnel.

Second, through reasonable, constitutionally permissible regulations applicable to long guns, handguns and ammunition, the Commission seeks to minimize to the greatest extent possible the number of gun-related civilian deaths.

## II.    INTERIM REPORT RECOMMENDATIONS

In its Interim Report of March 19, 2013, the Commission made a number of recommendations concerning firearms and ammunition.  The Commission is pleased that the Connecticut General Assembly adopted many of the recommendations during its 2013 legislative session.  The Interim Report findings and recommendations, and their current status as reflected in law, are set forth below.

63

Exhibit 28
Page 01095

ER_3266

### A.     Firearm Permitting And Registration

As of the date of the Interim Report, Connecticut law required registration and permits to own and carry certain firearms.  The Commission found that firearms of significant lethality could be obtained legally without a permit or registration.  According to the Connecticut State Police, there are approximately 1.4 million registered firearms in the State of Connecticut, and possibly up to 2 million unregistered firearms.  Given the lethality of certain models of firearm that do not currently require registration of any sort, the Commission found this discrepancy in permitting and registration to be not only unwarranted, but shocking.  Furthermore, the Commission believed that the lack of uniform control abets "straw purchases"—purchases by one individual made on behalf of a third-party—that can be used to deliver firearms to potential criminals. In order for law enforcement agencies to safely engage in their lawful duties, the Commission proposed the following recommendations:

**RECOMMENDATION NO. 1**.  Mandatory background checks on the sale or transfer of any firearm, including long guns, at private and gun show sales.

**Status:**  Recommendation accepted and adopted by P.A. 13-3, § 1.

**RECOMMENDATION NO. 2**.  Require registration, including a certificate of registration, for every firearm.  This certificate of registration should be issued subsequent to the completion of a background check and is separate and distinct from a permit to carry.

**Status:** Not adopted.  The Commission reaffirms its recommendation requiring the registration of all firearms and requests that the Governor resubmit this recommendation for reconsideration by the General Assembly during the 2015 legislative session.

**RECOMMENDATION NO. 3.**  Require firearms permits to be renewed on a regular basis.  This renewal process should include a test of firearms handling capacity as well as an understanding of applicable laws and regulations.

**Status:** Not adopted.  (Note: Under existing law, a firearm permit is good for five years and may be renewed without the recommended process.  *See*

64

Exhibit 28
Page 01096

Conn. Gen. Stat. § 29-36h.)   The Commission requests that the Governor resubmit this recommendation for legislative action.

### B.    High-Capacity Firearms, Magazine Capacity, And Ammunition

The Commission found that certain types of ammunition and magazines that were readily available at the time it issued its Interim Report posed a distinct threat to safety in private settings as well as in places of assembly. The Commission further found that, despite the lethality of this ammunition, the law imposed only limited controls on its purchase.   The Commission understood that a life can be lost every few seconds in a spree killing.   The Commission took seriously the rights afforded under the Second Amendment, but balanced those rights against the language of the Preamble to the Constitution, which includes assurances of "domestic tranquility" and the obligation to "promote the general welfare."[10] In order to maintain the safety of places of assembly by ensuring that lawful, competent firearms owners are the only individuals lawfully allowed to possess certain types and quantities of ammunition, the Commission proposed the following recommendations:

**RECOMMENDATION NO. 4.**   Institute a ban on the sale, possession, or use of any magazine or ammunition feeding device in excess of 10 rounds except for military and police use. In proposing this recommendation, the Commission recognized that certain sporting events at times involve the use of higher capacity magazines.   However, the consensus of the Commission was that the spirit of sportsmanship can be maintained with lower capacity magazines.

**Status:**      Accepted and adopted by P.A. 13-3, §§ 23-24.

**RECOMMENDATION NO. 5.**   Institute a ban on the possession or sale of all armor-piercing and incendiary bullets, regardless of caliber.   First-time offenses should be classified as a Class D Felony.

_____

[10]  The Commission notes that in January 2014 the Federal District Court of Connecticut rejected a legal challenge to the constitutionality of the gun legislation that the General Assembly enacted and Governor Malloy signed into law in 2013.   _See Shew v. Malloy, 994 F.Supp.2d 234 (D. Conn. 2014)._   As of the date of this report, the District Court's judgment is on review in the Second Circuit Court of Appeals.

65

Exhibit 28
Page 01097

**ER_3268**

**Status:** Accepted and adopted *in part* by P.A. 13-3, § 32 (banning armor-piercing bullets).  The Commission reaffirms its position that the ban should also apply to incendiary bullets and urges the Governor to submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 6**. Allow ammunition purchases only for registered firearms.

**Status:** Not adopted in absence of firearm registration requirement.  The Commission reaffirms its position that the law should only permit individuals to purchase ammunition for registered firearms and requests that the Governor submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 7.** Evaluate best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the Internet.

**Status:** Not adopted. The Commission reaffirms its position that the state should study and evaluate best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the Internet and requests that the Governor submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 8.**  Evaluate the effectiveness of federal law in limiting the purchase of firearms via the Internet to only those individuals who have passed the appropriate background screening.

**Status:**  Not adopted.  The Commission reaffirms its position that the state should study and evaluate the effectiveness of federal law in limiting the purchase of firearms via the Internet to only those individuals who have passed the appropriate background screening and urges the General Assembly to reconsider this recommendation during the 2015 legislative session.

**RECOMMENDATION NO. 9.**  Limit the amount of ammunition that can be purchased at any given time.

Exhibit 28
Page 01098

ER_3269

**Status:** Not adopted. The Commission reaffirms its position that the law should only permit individuals to purchase ammunition for registered firearms and requests that the Governor submit this request to the General Assembly for reconsideration during the 2015 legislative session.

### C.   Assault Weapons

The Commission found that the legal definition of "assault weapon" at the time it issued its Interim Report allowed for cosmetic changes to military-style firearms that did not reduce their lethality, yet facilitated their lawful purchase.  The Commission determined that defining an "assault weapon" by its form rather than its function had been ineffective.  The consensus of the Commission was that gun violence is an issue that transcends the tragedy at Sandy Hook, and the commonality of high-capacity firearms in violent crimes had to be acknowledged.  According to the 2011 Connecticut Uniform Crime Reporting Program, only two (2) of 94 firearm-related homicides in the state were committed with a rifle or a shotgun.  It was the consensus of the Commission that firearm lethality directly correlated to capacity, a correlation borne out not only in Sandy Hook Elementary School, but in other violent confrontations in and beyond Connecticut.  Therefore, the Commission proposed the following recommendation:

**RECOMMENDATION NO. 10.**   Prohibit the possession, sale or transfer of *any* firearm capable of firing more than 10 rounds without reloading. This prohibition would extend to military-style firearms as well as handguns.  Law enforcement and military would be exempt from this ban.

**Status:** Not adopted.  Instead, the General Assembly created of a list of specific semiautomatic rifles, pistols and shotguns that are banned.  *See* P.A. 13-3, §§ 25-31.  The Commission requests the Governor to submit this request to the General Assembly for reconsideration during the 2015 legislative session.

### D.   Firearm Storage And Security

The Commission found that when firearms are present in a household, insufficient safeguards often existed to prevent household members or guests

Exhibit 28
Page 01099

who should not have access to the firearms from gaining access.  To better ensure that only appropriate handlers have direct access to firearms, the Commission recommended the following:

**RECOMMENDATION NO. 11.**  Require that trigger locks must be provided at the time of sale or transfer of any firearm.

**Status:** Not adopted.  The Commission reaffirms its position that the law should require trigger locks to be provided at the time of sale or transfer of any firearm, and requests that the Governor resubmit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 12.**  Require that the state develop and update a "best practices" manual and require that all firearms in a home be stored in a locked container and adhere to these best practices; with current minimum standards featuring a tamper-resistant mechanical lock or other safety (including biometric) device when they are not under the owner's direct control or supervision.  The owner should also be directly responsible for securing any key used to gain access to the locked container.

**Status:**  Accepted and adopted in part by P.A. 13-3, § 54-56.

**E.     Additional Recommendations Re: Firearms And Ammunition**

**RECOMMENDATION NO. 13.**  Require non-residents seeking to purchase a firearm or ammunition in the State of Connecticut to obtain a Certificate of Eligibility and conform to all other regulations applicable to Connecticut residents.

**Status:**  P.A. 13-3 requires that anyone who purchases ammunition in CT must have Connecticut state credentials.  See P.A. 13-3, § 14(c).

**RECOMMENDATION NO. 14.**  Require gun clubs to report any negligent or reckless behavior with a firearm, or illegal possession of any firearm or magazine, to the Connecticut Department of Emergency Services and Public Protection, Commissioner of Public Safety, and local law enforcement.

Exhibit 28
Page 01100

**Status:** Not adopted.  The Commission reaffirms this recommendation and requests that the Governor resubmit it to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 15.**  Requiring promoters of gun shows to receive a permit from the Chief of Police or Chief Elected Official as well as provide notice to the Commissioner of the Connecticut Department of Emergency Services and Public Protection.

**Status:**  Not adopted. The Commission reaffirms this recommendation and requests that the Governor resubmit it to the General Assembly for reconsideration during the 2015 legislative session.

**III.   FINAL REPORT ADDITIONAL RECOMMENDATIONS**

After issuing its Interim Report, the Commission continued to hear presentations by experts in a variety of fields, including law enforcement.  In addition to the recommendations in the Interim Report, which are resubmitted to the extent not previously adopted, the Commission made the following additional findings and proposes the following recommendations.

**A.   Firearms/Ammunition**

**RECOMMENDATION NO. 16.**  Require that any shell casing for ammunition sold or possessed in Connecticut have a serial number laser etched on it for tracing purposes.

*Rationale*:  "Straw purchases" of ammunition enable individuals to circumvent many laws intended to help prevent or reduce gun violence and to assist law enforcement personnel in solving gun-related crimes.  In addition to urging the General Assembly to reconsider Recommendation No. 6, which would limit purchases of ammunition to owners of registered firearms and solely for the specific type of firearm, the Commission also believes that making every round of ammunition traceable will discourage the use of firearms and ammunition for unlawful purposes.  At the same time, applying technological advances to both ammunition and firearms provides a clear and unique economic development opportunity for manufacturers in and beyond

69

Exhibit 28
Page 01101

**ER_3272**

Connecticut.  Given our state's rich manufacturing history, from Eli Whitney to Winchester Repeating Arms, to Colt's Manufacturing Company, we can and should take advantage of the opportunity to spark the next evolutionary leap in firearms and ammunition manufacturing.

**RECOMMENDATION NO. 17.**  Any person seeking a license to sell, purchase or carry any type of firearm in the state should be required to pass a suitability screening process.

*Rationale*:  The Commission finds that certain individuals are not suited to own, possess or use firearms.  A mental health diagnosis, alone, should not serve as a basis for unsuitability.[11] (See Section VI.A.8, *infra,* at p.185.)

---

[11] The Commission agrees with two proposals set forth in the December 2013 report of the Consortium for Risk-Based Firearm Policy, entitled "Guns, Public Health, and Mental Illness: An Evidence-Based Approach for State Policy." The Consortium recommends the following:

1. Current state law should be strengthened to temporarily prohibit individuals from purchasing or possessing firearms after a short-term involuntary hospitalization [for psychiatric treatment].  Concurrently, the process for restoring firearms rights should be clarified and improved. Specifically: (i) States should enact new legislation temporarily prohibiting individuals from purchasing or possessing firearms after a short-term involuntary hospitalization.  This prohibition should be predicated on a clinical finding of danger to self or danger to others; (ii) Restoration of an individual's ability to purchase or possess a firearm following a firearm disqualification due to mental illness should be based on an evaluation by a qualified clinician and a finding that the petition is unlikely to relapse and present a danger to self or others in the foreseeable future.

2. States should enact new prohibitions on individuals' ability to purchase or possess a firearm that reflect evidence-based risk of dangerousness.  Such individuals include: (i) persons convicted of a violent misdemeanor; (ii) persons subject to a temporary domestic violence restraining order; (iii) persons convicted of two or more DWI or DUI's in a period of five years; (iv) persons convicted of two or more misdemeanor crimes involving a controlled substance in a period of five years; (v) a system should be devised to allow family members to obtain a "Gun Restraining Order."  This would allow those closest to an individual to ask the court, based on their testimony as to a threat of violence, to issue a court order authorizing the police to seize any firearms owned or possessed by such individual.

Exhibit 28
Page 01102

The Commission further finds that tension occasionally exists between permitting criteria used by the local firearm permit issuing authority (usually the Chief of Police) and the state Firearms Review Board, which reviews permit denials by the local issuing authority.  To ensure that both the local issuing authority and the Firearms Review Board apply the same criteria, the suitability screening process should be codified in law.  The Commission requests that the Governor submit this recommendation it to the General Assembly for consideration during the 2015 legislative session.

**RECOMMENDATION NO. 18.** To allow, at a judge's discretion, the opportunity to temporarily remove any firearms, ammunition, and carry permits from a person who is the subject of an *ex parte* restraining order, civil protection order or family violence protective order, at the time of the issuance of that order. The Commission believes that the time period between the *ex parte* request and the issuance of a full restraining order, civil protection order or family violence protective order, constitutes a period of critical danger, one that must be recognized under law and addressed via judicial discretion.

> B.     **Best Practices/Protocols**

**RECOMMENDATION NO. 19.**   Grant state-wide peace officer status to all sworn law enforcement officers in Connecticut to assure their ability to respond to any other jurisdiction within the state in the event of a major police emergency, but only at the express invitation of the requesting jurisdiction. Self-dispatch by public safety or EMS resources should be prohibited to prevent over-response.

*Rationale*:   Under existing law, a local law enforcement officer's legal status as such is limited to the specific town in which he/she works.  For example, a police officer in Hartford does not have the legal authority to make an arrest (other than a felony citizen arrest) in Bloomfield or Windsor.  The limited geographic scope of a local law enforcement officer's jurisdiction can be an impediment under certain circumstances, such as the tragedy in Sandy Hook, when a police department may find itself overwhelmed by events and

71

Exhibit 28
Page 01103

**ER_3274**

lacking sufficient resources, both in terms of personnel and equipment, to respond effectively.  In such a case, there is a clear need for police officers from surrounding towns and communities to be able to assist the overwhelmed department and to do so in their official capacities.

**RECOMMENDATION NO. 20.**  Provide funding for the Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security, to establish positions for regional School Safety Planners charged with assisting districts in the planning for all hazards emergencies and the effective exercising of those plans.

*Rationale*:  The Commission believes that developing a set of written standards governing safe school design and operation, and creating a written plan that instructs teachers, staff, local law enforcement, fire and emergency management personnel on how to respond to potential threats, is only the first step towards the goal of making local schools safer for students, faculty, staff and visitors.  A plan that sits on a shelf simply collects dust.  The law has long required local schools to have periodic fire drills to test the efficacy of fire response plans and to train teachers, staff and students how to respond to a real fire if one occurs, and data on school fires, specifically the lack of fatalities in the last half century, evidences the effectiveness of these drills.  The Commission believes that the law should also require local schools to undergo periodic training and drilling of school safety and security plans.

Because local school and law enforcement officials are already overwhelmed with existing responsibilities, the Commission recommends the creation of, and funding for, a new position of regional School Safety Planner. The proposed School Safety Planner would be responsible for developing and overseeing drilling and training at all schools in his/her jurisdiction.  The School Safety Planner would also be responsible for reviewing school security plans on a periodic basis to ensure that they remain current, reflect best practices and are consistent with relevant statutes and ordinances.  The school

Exhibit 28
Page 01104

safety planner would also work with local school officials to ensure recovery, as well as prevention response and mitigation, planning was in place.

**RECOMMENDATION NO. 21.**   Develop regional multi-jurisdictional, multi-discipline, Unified Command concept of operations, integrating local and state police, for major events of great consequence. These plans should include administrative staff of local schools or other entities to assure best information is available.

*Rationale*:  An event in a town that ultimately requires the involvement of a large number of law enforcement officers may not necessarily begin as a major event.  The actual or apparent magnitude of the event may grow over time.   An event that begins as one that local police are fully capable of addressing may evolve into a major event that requires the assistance of law enforcement personnel, as well as fire and EMS personnel, from surrounding communities.

The Commission believes that local communities, acting in concert on a regional basis, should develop a plan that sets forth a *tiered* response to such events.  The Commission recommends the Capitol Region "Blue Plan" as a model for such a plan.[12]  The Blue Plan categorizes events into three stages, each stage reflecting an increasingly serious event that requires the assistance of more law enforcement personnel from surrounding communities.  The plan establishes a unified command for operations, identifies what personnel are required to respond for each stage and designates pre-established staging areas, establishes specific channels for electronic communications, and so on. These plans should give consideration to linkage with the state unified command structure where appropriate.

**RECOMMENDATION NO. 22.**  Establish statewide and/or regional Incident Management Teams for public safety personnel.

---

[12] *See* Appendix M.  Only a portion of the Blue Plan is included in the Appendix. Additional information is available from the Capitol Region Chiefs of Police Association.

73

Exhibit 28
Page 01105

*Rationale***:**  The preceding recommendation pertains primarily to local law enforcement.   The Commission also finds, however, that public safety operations occasionally experience a "resource gap."   For example, if a firefighter dies in the line of duty and the members of the department attend his funeral, a need exists in the relevant municipality for a group of qualified individuals from other communities to assume temporary responsibility for local fire department operations.  Similarly, a small town with a volunteer fire department may face a major fire incident or disaster, which requires a larger and stronger response than the town is equipped to provide.

The Commission recommends the creation of statewide and/or regional Incident Management Teams to fill this resource gap when it occurs.  Incident Management Teams would be comprised of appropriate staff from other towns and communities, who would be prepared to step in to assist with or assume responsibility for public safety management operations when circumstances require.

Ideally, the Commission believes that Incident Management Teams should be a component of the plan proposed in Recommendation No. 20.  To the extent possible, the Commission encourages integration of law enforcement, fire and emergency management personnel into a single plan.

**RECOMMENDATION NO. 23.**  Integrate Public Safety Dispatch centers, with minimum staffing levels, into all major event response plans.

*Rationale.*  This recommendation addresses emergency 911 call centers. The Commission finds that the emergency 911 function is a critical component of any response to a major event.   Accordingly, that function must be a component of any major event response plan.

The Commission further finds that many smaller 911 call centers are often staffed by a single person who handles both call intake and police dispatch functions.  If a major event happens within such a call center's geographic area of responsibility, the single staffer may quickly become overwhelmed.  Accordingly, the Commission believes that 911 call centers

74

Exhibit 28
Page 01106

**ER_3277**

should be subject to a minimum staffing requirement of two people.   If a major event occurs, one person would be responsible for call intake, the other for dispatch.

The Commission recognizes that some communities with smaller 911 call centers may not have the financial resources required to meet the minimum staffing requirement.   The Commission recommends that such communities regionalize their 911 call center function.   In making this recommendation, the Commission does not mean to suggest that communities that choose to regionalize their 911 call center functions should close their police stations at night, when staffing levels might otherwise fall below the recommended minimum level.   Members of the public typically view police stations as a "beacon of light" that should always be open.  The Commission notes, however, that a person other than a police officer (such as a cadet or supernumerary officer) can be available to provide basic assistance to members of the public during evening and early morning hours.

**RECOMMENDATION NO. 24.**   Require that lead agencies that respond to major events conduct a review and provide formal after-action reports, which should be maintained on file with the appropriate public agencies.   (In Connecticut, the Commission recommends that a copy of each after-action report should be provided to, and maintained on file by the Department of Emergency Services and Public Protection and the Connecticut Police Chiefs Association.)

*Rationale*:  The Commission finds that a formal after-the-fact study and analysis of man-made and natural disasters and other major events resulting in significant loss of life or property damage can help states and local communities plan for such events in the future, with the goal of preventing them if possible, but at least minimizing the extent of the damage they cause to persons and property.

For example, formal study and analysis of an event like Sandy Hook may reveal how the shooter entered the building; whether he was allowed entry

75

Exhibit 28
Page 01107

ER_3278

voluntarily or by force; whether surveillances cameras existed and, if so, where they were located and what events they captured; whether classroom doors could be locked (and whether they were locked), etc. The preparation of formal after-action reports of major events will help ensure that states and communities have the most current information about, and are aware of the best practices for planning and responding to, such events.

**RECOMMENDATION NO. 25.** Require the Department of Emergency Services and Public Protection, Division of State Police, in conjunction with the Connecticut Police Chiefs Association, to develop and conduct joint regional exercises of planned responses to major events. Those agencies should also review all existing policies concerning planned responses to active shooters. The review should focus on the best practices for disrupting active shooters as rapidly as possible.

*Rationale.* The development of a plan for addressing major events, such as the Capitol Region "Blue Plan" discussed in connection with Recommendation No. 21, is only a first step toward improving law enforcement, fire and emergency management response to events like Sandy Hook and other manmade and natural disasters. Any plan must be tested. Testing serves multiple purposes. For example, it reveals potential weaknesses in the plan, which can be addressed through revisions to the plan. Testing also serves a critically important joint training function. Events like Sandy Hook require local law enforcement and State Police to work collaboratively. Joint training exercises will help ensure effective collaboration during actual events.

Any response plan should also reflect best practices. Accordingly, the Commission recommends that the Department of Emergency Services and Public Protection and the Connecticut Police Chiefs Association jointly review all existing policies concerning response to active shooters to ensure that they reflect best practices, particularly with respect to disrupting active shooters as quickly as possible.

76

Exhibit 28
Page 01108

**RECOMMENDATION NO. 26.** Expand incident training at Police and Fire Academies in Connecticut.

*Rationale.* Although the Commission hopes that most law enforcement officers and firefighters will never have to face an event like Sandy Hook, training in how to respond to and manage such events should be part of the curriculum at the state's police and fire academies to better prepare First Responder graduates for major events, should they occur.

**RECOMMENDATION NO. 27.** Create a statewide working group to address first responder mental health issues**.**

*Rationale.* First responders face particular challenges in their jobs. Those challenges have the potential to adversely affect first responders' mental health, which in turn adversely affects their ability to perform their jobs effectively.

**RECOMMENDATION NO. 28.** Create and publish a Statewide Donations Management Plan for incidents of statewide consequence. This could be done through Connecticut Care, which was established by P.A. 13-275.

*Rationale.* In the days and weeks after the Sandy Hook tragedy, the Town of Newtown, Connecticut was inundated by gifts from well-meaning people around the country, indeed the world, who hoped the gifts would provide some comfort to the grieving families and members of the community in general. Delivery trucks, even tractor-trailers, filled with items such as stuffed Teddy Bears essentially dumped these gifts on the Town, which was ill-equipped to distribute or store them.

### C. Gun Violence Reduction Strategies

**RECOMMENDATION NO. 29.** Programs should be developed that focus on violence reduction through the educational process or other entities.

*Rationale.* When people feel that their concerns are being heard and addressed by a community that cares, such individuals are less likely to resort to violence as a solution to their problems.

Exhibit 28
Page 01109

**RECOMMENDATION NO. 30.**    Alcohol awareness programs should be included at appropriate points in the K-12 curriculum.

*Rationale.*  Alcohol is the single most prevalent substance associated with violent crime.    Decreasing illegal alcohol consumption by minors and increasing the responsible use of alcohol by persons of legal age to consume it will reduce the number of violent crimes.    The state should develop and support educational programs intended to increase student understanding of the dangerous effects of alcohol consumption, including cognitive impairment.

Exhibit 28
Page 01110

# PART THREE

## FINDINGS AND RECOMMENDATIONS OF THE MENTAL HEALTH WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION

## I. INTRODUCTION

This report now turns to matters surrounding mental health and the larger behavioral health system, topics on which the Commission heard extensive testimony over multiple hearings.  A distinguished group of clinicians, scholars, government officials, advocates and consumers testified on various aspects of our existing systems of care for children, adolescents and adults; others submitted written testimony.  While much of the material brought before the Commission addressed elements of the systems at work in Connecticut, as well as the experiences of individuals and families navigating those systems, the discussion below has broader relevance for mental health across the country and beyond.

As with the rest of this report, we begin with the events of December 14, 2012 to ascertain whether and how inadequacies in existing systems may have contributed to or exacerbated the terrible losses experienced that day.  This section, however, differs from our discussions of school security and law enforcement issues in several key respects.  First, while it has been clear from the beginning that the shootings of 20 first graders and six educators at Sandy Hook Elementary School would have implications for school security and infrastructure as well as for law enforcement and the regulation of firearms, it has been far less clear exactly how these tragic events would intersect with issues related to the mental health system.  This is especially so in light of the fact that almost no details about A.L.'s mental health history emerged until nearly a year after the shootings, and a more complete picture did not take shape until the final months of 2014.  Second, behavioral health and the systems that address it comprise an enormous, and enormously complex, subject.  Third, with the shooter and the person closest to him – his mother –

79

Exhibit 28
Page 01111

**ER_3282**

also deceased on December 14, 2012, much remains unknown about the state of his mind and his mental health in the months leading up to the shootings. Governor Malloy included a close examination of mental health and its systems of care among his charges to this Commission, and Commission members have embraced the opportunity to confront aspects of the behavioral health system that bear on the events of December 14 while possessing broader relevance. Below, we advance carefully considered recommendations for improvements to existing models of care and funding structures, problems of stigma and community safety, and recovery efforts following traumatic events.

The young man responsible for the tragic events of December 14, 2012 was, without a doubt, deeply disturbed.  As noted earlier, this Commission lacked direct access to records documenting his developmental and educational history and had to glean that information from sources in the public domain.  These sources included the Connecticut Police Report released in December of 2013 and State's Attorney Stephen Sedensky's summary of that investigation, both of which were heavily redacted, as well as journalistic accounts and, most recently, the report issued by Connecticut's Office of the Child Advocate, "Shooting at Sandy Hook Elementary School."  The Child Advocate's report, released on November 21, 2014, offers the most comprehensive, detailed and thorough examination of A.L.'s troubled life and the struggles faced by his family to meet his needs.  Its purpose was to review the circumstances that predated his commission of mass murder on December 14, 2012 and to issue any recommendations for improvements in the systems critical to children's developmental, educational and behavioral health that flowed from this review.  The report identifies many points over the course of his life when his needs and impairments went unrecognized, underappreciated, or underserved by the systems with which he had contact.  Ultimately, however, the report emphasizes that no distinct causal lines can be drawn between his experiences – even if in hindsight we can say that they reflected

Exhibit 28
Page 01112

systems failures – or relationships and his decision to take the lives of children and educators at Sandy Hook Elementary School.

This Commission's charge was different. Rather than mine one individual's life and interactions with particular systems for insights into how those systems can better serve the state's children, we were assigned the task of studying the systems themselves. Our work is therefore fully complementary with the work of Connecticut's Child Advocate and our own report incorporates by reference the findings and recommendations advanced in hers. It is important to acknowledge here that the extensive discussion of mental health in which we engage below might be taken as support for the belief that mental illness drove A.L. to commit mass murder at Sandy Hook Elementary School, and that effective treatment of this illness – whether forced on him or undertaken voluntarily – would have prevented the violence. Although he clearly suffered from profound mental, emotional and developmental challenges, nothing in the records addressed by the Child Advocate's report establishes a causal role for mental illness in A.L.'s crimes. Experts who contributed to that report found insufficient evidence to suggest that he would have qualified for a psychotic illness. He did appear to suffer from severe anxiety with obsessive-compulsive features and possibly from Obsessive-Compulsive Disorder, as well as from depression. He had been diagnosed with an autism spectrum disorder based on difficulties with communication, sensory sensitivities and rigidity that emerged at a very early age, and he received the post-mortem diagnosis of anorexia. Nonetheless, a narrow understanding of mental illness cannot fully account for the challenges facing this young man.

Similarly, the Commission recognizes that a narrow understanding of mental health remains insufficient to identify what could have been done to improve A.L.'s chances of living a functional, nonviolent life. His problems and the challenges encountered by his family were multifaceted and not reducible to any particular category of psychiatric illness. In addition, although the

81

Exhibit 28
Page 01113

Lanza family was fortunate enough to have financial resources that permitted them access to potentially helpful evaluation and treatment services, those resources proved insufficient to ensure that his complex needs were adequately met or to protect against increasing social isolation.   The discussion that follows takes as its premise the idea that mental health is not merely the absence of mental disorder.   Instead, mental health must be conceived more broadly to embrace social, emotional and behavioral health and wellness. Available evidence strongly suggests that A.L.'s life and the lives of those close to him, particularly his mother's, were increasingly characterized by a lack of well-being.   According to the World Health Organization, mental health is defined as "a state of well-being in which every individual realizes his or her own potential, can cope with the normal stresses of life, can work productively and fruitfully, and is able to make a contribution to her or his community." World Health Organization.   (2014).   *Mental Health: A State of Well-Being*. Retrieved from http://www.who.int/features/factfiles/mental_health/en/.   The framework of wellness or well-being also has direct relevance to A.L.'s actions and their impact on his victims and the broader community.  Hence the task of the programs, policies and services that make up our mental health system must include not only the identification and treatment of mental illness but also the promotion of social, emotional and psychological wellness throughout the lifespan.

This section first addresses the mental health system that currently exists.  It begins by proposing essential elements for an effective system that promotes mental health across the lifespan.  These include comprehensive and coordinated systems of care in which behavioral health and physical health are understood as highly interrelated, are given equal priority, and are part of a holistic approach to wellness that sees the individual in the context of the family and broader community.  This approach must traverse payment systems and must form part of a concerted focus on healthy child development. Schools are essential players in this approach, both as sites for prevention,

82

Exhibit 28
Page 01114

early intervention and the delivery of services and as learning communities where social and emotional health come to be seen as essential to the process of educating young members of a just and caring society.

It then considers the barriers that impede access to quality care in our current system. We first examine our fragmented payment structure, which undermines care coordination and consistency, denies care to many who most need it, and limits care for reasons that often have little to do with its clinical justifications or efficacy. Our analysis identifies deficiencies in both the public and private systems of care and calls for increased integration to make effective, clinically indicated services and evidence-based community programs available to children and adults, regardless of economic status. We then address the ongoing burdens of stigma and discrimination that afflict the system and its participants, while deterring many in need from pursuing behavioral health services. Carefully considered efforts to diminish the stigma that attaches to mental disorder and its treatments must play a central role in systemic reform.

Following our analysis of systemic barriers that currently frustrate access to quality care and related recommendations, this section turns to issues that implicate potential conflicts between values at the core of our social order: interests in individual privacy and autonomy on the one hand, and community safety on the other. An overarching theme of these final subsections holds that these individual and community interests should be viewed as overlapping rather than opposed. First we examine central laws and policies that govern matters of privacy, confidentiality and community safety in the domain of mental health treatment, making recommendations that preserve the existing balance while calling for clarification in areas that might frustrate the timely provision of needed care. We then take up the vexing topic of violence. Unthinkably violent episodes such as the Sandy Hook shootings represent not only a loss of precious lives but also a profound disruption of the basic human need for safety and security, which is critical to adults and

83

Exhibit 28
Page 01115

ER_3286

absolutely essential to children.  There is little comfort to be taken from any explanation following such an event, but somehow it seems easier to believe that the source of such horror lies in an individual's pathology, in a condition that could be cured or contained if adequately identified, than in more indeterminate values and practices that shape our entire culture.  While discerning no clear answers to the question of what role A.L.'s behavioral health challenges played in the violence he ultimately inflicted, the Commission nonetheless turns its attention to what we have learned about the role of mental disorder in violent events.  We review and synthesize the available research on the topic, identify relevant risk factors for violence and offer recommendations for ways to address those risk factors in order to promote mental health, diminish the suffering associated with untreated mental illness, and enhance the community's experience of safety.

Finally, this section proposes specific steps that communities and schools should take to buttress their members' resilience and equip them to care for one another and themselves in the face of trauma and loss.  When a disaster event occurs, whether due to intentional violence or a terrible accident or a phenomenon of nature, its impact on individuals and communities can be devastating and can persist far beyond the immediate aftermath.  Our contention is that, while it is not yet possible to prevent such events from taking place or to insulate people from the suffering that ensues, there is much that governments, schools and other institutions can do to facilitate an effective and humane response.  A carefully planned and coordinated response will help to reestablish a critical sense of security, ensure that needed services become available immediately and remain so for as long as necessary, and promote community-wide recovery.  Unfortunately, experiences of trauma and loss afflict children, families and communities in ways that extend far beyond large-scale crises, and many of our recommended measures are germane to such experiences as well as to relatively rare disaster events.

Exhibit 28
Page 01116

For each topic, we first offer a detailed analysis of the relevant issues and then identify the Commission's key findings and recommendations. Our analysis draws on the testimony presented to the Commission in both oral and written form, as well as on the expertise of Commission members and on additional resources available in the public domain. Our goal in this section is to take a close look at the concrete systems, funding structures and programs in place to provide mental health services, as well as the laws, policies and attitudes that impact mental health, in order to ascertain how we can best promote the well-being and resilience of children, adults, families and communities.

## II.    MODELS OF CARE

### A.    <u>Analysis: Reforming The System</u>

Despite the existence of a broad array of potentially helpful treatment modalities and services and the efforts of dedicated and skilled professionals, our behavioral health system as a whole fails too many children and adults in need. Indeed, in testimony offered to the Commission and in a variety of other venues, experts and participants at all levels persistently describe our mental health system as "broken." Among the system's major shortcomings, a disproportionate focus on the etiology and symptoms of *illness* rather than the conditions conducive to *health* greatly limits its efficacy and reach. Mental health extends significantly beyond the management of mental illness. Yet for much of the past century, mental health care has remained largely reactive instead of proactive. Our narrow approach to mental health care has generally confined strategies to screening, referral and treatment for mental illness. Just as physical health entails more than the mere absence of disease, however, mental health encompasses overall psychological, emotional and social well-being. Achievement of such well-being demands a more comprehensive approach that prioritizes the promotion of mental health as well as the treatment of mental disorder. While it is critical that we have effective systems in place to identify and treat mental illness, such systems remain insufficient

85

Exhibit 28
Page 01117

**ER_3288**

to promote true mental health.  Instead, we must build systems of care that actively foster healthy individuals, families and communities.  Leading sources suggest that nearly one-quarter of the U.S. population suffers from a diagnosable mental disorder in any given year and up to half of us will struggle with mental health challenges during our lifetimes. If we include substance use disorders the numbers increase significantly, with an estimated 32% of Americans experiencing a behavioral health challenge every year. Many of these disorders emerge in childhood or adolescence. Approximately half of young people qualify for some behavioral health diagnosis by the time they reach 18, and at least one in five youths meets criteria for a lifetime mental disorder that is associated with severe distress and impaired functioning. Merikangas, K. R. et al. (2010). Lifetime Prevalence of Mental Disorders in U.S. Adolescents: Results from the National Comorbidity Survey Replication-Adolescent Supplement (NCS-A). *Journal of the American Academy of Child & Adolescent Psychiatry, 49*(10), 980-989.  As detailed later in this report, our current behavioral health care systems remain woefully fragmented, underfunded and tainted by stigma.  These systems inadequately serve the millions of Americans suffering from a diagnosable mental disorder each year, many of them children and adolescents.

> "Mental health is defined as a state of well-being in which every individual realizes his or her own potential, can cope with the normal stresses of life, can work productively and fruitfully, and is able to make a contribution to her or his community."
>
> World Health Organization. 2014. *Mental Health: A State of Well-Being.* Retrieved from http://www.who/int/features/factfiles/mental_health/en

Examined through the lens of illness, the numbers are sobering. Examined through the lens of wellness, though, they are truly disheartening. According to the Centers for Disease Control and Prevention (CDC), "only about 17% of U.S. adults are considered to be in a state of optimal mental health." Centers for Disease Control and Prevention. (2013). *Mental Health Basics.* Retrieved from http://www.cdc.gov/mentalhealth/basics.htm.  The foundation for optimal mental health is established in infancy and is reinforced through

86

Exhibit 28
Page 01118

ER_3289

childhood and beyond. Our systems of behavioral health care serve the goal of wellness promotion even less effectively than they do the goal of treating mental disorder. The Commission advocates a comprehensive, integrated approach to mental health that prioritizes healthy child development, which in turn requires healthy families and caring, resilient communities.

1.   Laying the groundwork for lifelong mental health

Research in the social, behavioral and life sciences has firmly established the centrality of early childhood to healthy brain development. As Harvard University's Center on the Developing Child explains, "[e]arly experiences affect the development of brain architecture, which provides the foundation for all future learning, behavior, and health. Just as a weak foundation compromises the quality and strength of a house, adverse experiences early in life can impair brain architecture, with negative effects lasting into adulthood." Center on the Developing Child at Harvard University. (2015). *Key Concepts: Brain Architecture.* Retrieved from http://developingchild.harvard.edu/key_concepts /brain_architecture/.html/.

But even a rough beginning does not condemn a child to a lifetime of illness; rather, childhood offers multiple opportunities to develop the psychological, emotional and social resources necessary for resilience. We as a society must endeavor to provide the conditions within which all infants and children can form positive, secure attachments; know that their basic needs for food, shelter and love can be met; receive competent and developmentally appropriate health care; take advantage of educational opportunities to cultivate social and emotional as well as cognitive capabilities; and access effective support and treatment services for any behavioral health challenges that may emerge.

Our current systems fail many children and youth who are at risk for developing behavioral health disorders. Later portions of this report address some of the barriers that frustrate access to effective mental health care. But even where services to treat the symptoms of mental illness are available, these

87

Exhibit 28
Page 01119

ER_3290

> "What is a picture you get in your head of a child who struggles with mental health, a child who needs mental health services? In response to recent calls for a registry of those with mental health issues, I've taken to saying, well, we do a census every ten years, let's just use that because mental health is a continuum, and nearly all of us will struggle with our mental health at one point in our lives.  Some of us will struggle more severely or more often than others, but few will never struggle at all.  When we, as a society, continue to think of those with mental health issues as an us vs. them instead of thinking of mental health as a we, fear and ignorance win.  And fear and ignorance lead to shame, denial and bullying on an individual level and lack of appropriate services, funding and supports on a systemic level."
>
> Abby Anderson, Co-Chair, Children's Committee of The Keep the Promise Coalition, Executive Director, CT Juvenile Justice Alliance, testimony before the Sandy Hook Advisory Commission, April 12, 2013.

work – if at all – primarily for people with existing mental health diagnoses, offering very little in the service of prevention.  In addition, most existing programs and services are structured and financed in ways that deny continuity of care.  What we need instead is a holistic approach that will follow children from birth to adulthood, identifying risk factors, reinforcing protective factors, and promoting positive development throughout.  This approach must include peer as well as professional support and must direct services toward prevention as well as treatment.  It should embrace system-of-care principles, including greater coordination and efficiency of care, community partnerships, inclusion of families and youth as collaborators and decision-makers, and incorporation of evidence-based practices as an organizing framework.  The Commission endorses an integrated model of health care that consolidates primary/pediatric and behavioral health in a medical home.  This model should be family-centered and attuned to the environmental contexts in which families exist.  Although a comprehensive developmental approach begins in the earliest moments of life, our behavioral health system more generally must address the needs of individuals, families and communities across the lifespan.

The earliest years of a person's life lay the groundwork for future wellness.  Even if that person faces behavioral health challenges in later

88

Exhibit 28
Page 01120

ER_3291

childhood or beyond, a strong early foundation can help the person gain the tools necessary to weather such challenges and enjoy a healthy, fulfilling and productive life.  A weak early foundation, on the other hand, can render the person more susceptible to behavioral health problems and diminish the resources available to support recovery.  The comprehensive, integrated model of health care that the Commission supports is essential to reducing the psychological and biological stressors related to experiences of trauma, violence and grief, to stabilizing the health of families, and to promoting the resilience necessary for positive development.  Its promotion of mental health and overall wellness must address the unique needs of babies and young children as well as those of school-aged children, adolescents, young adults and older adults. Our systems of care must afford access to age-appropriate programs and services across the lifespan.

### 2.   Treating the whole person and the whole family

For children and adults alike, physical and emotional health are so deeply interconnected that the separation of one from the other compromises both.  A recent policy brief by the Robert Wood Johnson Foundation called "Are the Children Well?  A Model and Recommendations for Promoting the Wellness of the Nation's Young People" notes that such separation, "which is not supported by science, is usually the result of custom and convenience, and contributes to inequities in services and the social marginalization of affected individuals."  ." Murphy, D. at al. (2014). *Are the Children Well? A Model and Recommendation for Promoting the Mental Wellness of the Nation's Young People.*  Retrieved from  www.rwjf.org/content/dam/farm/reports /issue_briefs/2014/rwjf414424.

At present, our physical and behavioral health care systems largely function independently, without real coordination or integration.  Existing mechanisms for financing health care have reinforced the barriers between these systems.  One persistent problem has been the existence of mental health carve-outs, separate benefits packages and/or funding mechanisms for

Exhibit 28
Page 01121

**ER_3292**

mental health and substance abuse services, detached from other health care, which emerged in the 1970s and 1980s as part of managed care's effort to rein in the rising cost of health care. Widely adopted in both private and public insurance programs, including Medicaid managed care, these carve-outs have contributed to fragmented and inefficient systems that serve most Americans poorly, particularly children. Although rare examples such as Connecticut's Behavioral Health Partnership have achieved a more integrated approach to behavioral health services through a funding mechanism distinct from other health benefits, in general carve-outs have served individuals and communities poorly.

The longstanding bifurcation of care between physical and mental health exacerbates the incidence and severity of illness and potentially contributes to other social problems. Our bodies and minds cannot be so easily separated. Physical ailments are frequently accompanied by psychological, emotional and social difficulties, and people who struggle with behavioral health challenges are especially prone to suffer from disease and even premature death. Yet in a system that addresses mental and physical health separately, these connections remain unlikely to be identified or addressed. In particular, primary care providers have not historically received the training, support or financing to attend to their patients' mental health. Our health care delivery systems and reimbursement paradigms must embrace a holistic approach to health that treats the whole person.

> "Only a third of people with mental health problems access care in a timely manner, and there are significant human and economic costs to poor access and to care that is not effective or is not as effective as it could or should be. And just as an example of that, people with severe emotional or mental health issues tend to live much shorter lives than their peers."
>
> Gary Steck, CEO, Wellmore Behavioral Health, testimony presented to the Sandy Hook Advisory Commission, April 12, 2103

Just as our behavioral and physical health care systems generally exist in separate silos, within the behavioral care system additional silos exist for different populations based on age, employment, socio-economic status,

90

Exhibit 28
Page 01122

ER_3293

involvement with the criminal justice system, diagnosis and other factors. The Commission heard repeatedly about the extent to which our private and public systems create different points of entry and afford access to disparate programs and services. A pervasive lack of integration within and between systems leads to gaps in care, potentially duplicative care, and inappropriate cost-shifting. It is clear to the Commission, and to many others who have studied these issues, that better integrated systems of care are critical to both the effective treatment of mental illness and the successful promotion of psychological, social and emotional wellness among children, adults and communities. Recent findings by the Task Force to Study the Provision of Behavioral Health Services for Young Adults,[13] established after the Sandy Hook shootings pursuant to P.A. 13-3, identify critical shortcomings in Connecticut's overall system of behavioral health care for children, adolescents and young adults that fail individuals, families and the State of Connecticut. Key shortcomings include inadequate identification of behavioral health problems early in children's development, workforce deficits – encompassing insufficient numbers of providers qualified to address the behavioral health care needs of children and young adults and inadequate training in evidence-based evaluation methods and treatments for the existing provider community – and pervasive system fragmentation.

A recent issue brief on integrated physical and behavioral health care from the SAMHSA-HRSA (the federal Substance Abuse and Mental Health Services Administration and Health Resources and Services Administration) Center for Integrated Health Solutions provides a useful schema for thinking about possible models of care integration. This schema reflects a continuum of integrated services ranging from discrete behavioral and physical health care

---

[13] *See* http://www.cga.ct.gov/ph/tfs/20130701
_Task%20Force%20to%20Study%20The%20Provisions%20of%20Behavioral%20Health%20Services%20For%20Young%20Adults/Final%20Report%20for%20the%20Task%20Force%20to%20Study%20the%20Provision%20of%20Behavioral%20Health%20Services%20for%20Young%20Adults.pdf

91

Exhibit 28
Page 01123

systems and settings to blended ones.  On one end are models of coordinated care involving either minimal collaboration or basic collaboration at a distance between primary and behavioral health providers.  In the middle are models of co-located care, where physical proximity between providers who share the same facility facilitates more regular communication and potential collaboration.  At the other end, fully integrated care entails teams of primary and behavioral health providers who seek solutions together and eventually function in a fully merged practice that treats the whole patient. SAMHSA-HRSA Center for Integrated Health Solutions. (2013). *A Standard Framework for Levels of Integrated Healthcare.* Retrieved from www.integration.samhsa.gov/integrated-care-models/A_Standard _Framework_for_Levels_of_Integrated_Healthcare.pdf.  We must transform our fractured, siloed system of health care services into one that embraces care coordination at minimum with a longer-term goal of more complete integration. An integrated system can best treat the whole person, support the whole family and successfully promote true mental health.

    In addition, the Commission endorses a model of health care that integrates pediatrics and behavioral health in ways that are specifically family-centered and attuned to the environmental contexts in which families exist. We must enhance existing medical models of health care services by incorporating findings from neuroscience, child development, family systems and public health on topics such as toxic stress and the lasting effects of trauma and loss on the mind, body and spirit.  To treat the whole person and cultivate wellness across the population, our health delivery systems and reimbursement paradigms should embrace a biopsychosocial model.  First proposed by psychiatrist George Engel in the late 1970s, the biopsychosocial approach departs from an exclusively biomedical model of human health by presuming that the science of medicine "must include the psychosocial dimensions (personal, emotional, family, community) in addition to the biological aspects (diseases) of all patients." Smith, R. C. (2002). The

Exhibit 28
Page 01124

Biopsychosocial Revolution: Interviewing and Provider-Patient Relationships Becoming Key Issues for Primary Care. *Journal of General Internal Medicine,* 17(4), 309-310. A biopsychosocial approach treats the whole person in his or her social context and is by definition a model of integrated care.

Medical and behavioral health practitioners must work as partners in addressing the holistic needs of individual children and adults in the context of their family systems. Providers that integrate both physical and mental health services – either through their own care delivery or through integration of services within a medical home model – should be adequately compensated. Funding paradigms that promote holistic health care will help to incentivize care integration. Although more focused mental health treatment for acute and chronic conditions will remain a necessary component of an integrated system, the continued carving out of behavioral health services from primary health care is generally counterproductive. While primary care providers who accept Medicaid can seek reimbursement for behavioral health screenings, coverage for such screenings is often not available through other funding mechanisms and reimbursement for interventions and treatment by primary care providers is particularly lacking. Funding and care delivery mechanisms that promote wellness models focused on the whole person offer the only clear path to community health.

Positive child development requires access to effective health care, including programs and services associated with behavioral health, but our obligations to children do not end there. We must help children learn pro-social skills and strategies to cope with distress, loss, frustration, and disappointment. We need to ensure that children have sustained and meaningful relationships with caring adults, including supportive and nurturing relationships in schools, other sites of child congregate care, and throughout our communities. We need to take deliberate action when we see a paucity of such relationships. We need to make concerted efforts to minimize children's exposure to adverse events that might compromise healthy

93

Exhibit 28
Page 01125

development, rather than providing ourselves with the false reassurance that children in situations of chronic community violence or poverty get "used to it." We need to actively promote healthy communities and resilience, rather than assuming these will take shape on their own. We need to nurture a positive future outlook, creativity, inquiry, and a sense of mastery in our children. We have to view *healthy* child development as an active process and not just an inevitable product of the passage of time.

Treating mental health as the absence of mental illness works no better than treating physical health as the absence of physical illness. We need instead to promote healthy ways of living, encourage the adoption of health-promoting habits (such as healthy eating, exercise, stress reduction, etc.), and help children learn how to – *and want to* – avoid risky behaviors. We must help them develop the resilience they will need to flourish through adversity. In addition, we must communicate clearly to children and adults across the lifespan the centrality of psychological and emotional health to overall well-being.

3.   Family-centered care

The fragmented nature of Connecticut's care delivery system imposes significant burdens on children and families. Even if families are fortunate enough to connect with a primary care provider who can perform a comprehensive assessment and offer needed referrals, they may be at sea when it comes to navigating other essential programs and professional services. To attend to the needs of their developing children, many families must negotiate multiple systems, including a primary care office; a behavioral health clinic; birth-to-three services; and whatever school services are available. Families have largely been left to manage these on their own, a process that creates confusion and compounds isolation.

94

Exhibit 28
Page 01126

ER_3297

While some progress has been made in Connecticut, such as the expanding availability of home- and community-based behavioral health services for youth and their families, several issues remain unresolved. Currently there are multiple eligibility categories for children based on poverty, custody, un-insurability or disability. Children often move from one eligibility category to another due to changing family circumstances, further fragmenting potential support structures and creating major disruptions in their behavioral health care. In addition, providers must manage several contracts, authorization procedures, eligibility systems, payment structures, utilization criteria and billing procedures for essentially the same or a similar population of youth. The current fee-for-service payment structure further maintains the "silo" funding that creates resource inefficiencies and erects barriers for families. It also establishes disjointed delivery systems that do not require all providers to engage in the collaborative process of family-centered practice and planning that state agencies serving children and youths are committed to delivering.

> "Our system is broken. It is broken for children. There is nothing that is working for these kids and their parents. Their parents don't know where to turn."
>
> Kim Pernerewski, NAMI-CT, testimony presented to the Sandy Hook Advisory Commission, March 22, 2013.

A comprehensive developmental model of mental health has many advantages over the siloed approach that has prevailed in Connecticut and beyond. By prioritizing the prevention of disease, the mitigation of factors that contribute to illness, and the promotion of resilience, the developmental model addresses problems *before* they disrupt the life course of individuals or the welfare of the community. It reaches more than just severe or even episodic mental illness, but psychological, emotional and social well-being more generally. This model emphasizes all aspects of healthy child development, including social, emotional, physical and cognitive development. With the rapid brain growth that occurs in early childhood, efforts to promote the conditions for healthy development in the first years of life are likely to promote

95

Exhibit 28
Page 01127

mental health more effectively than treating problems later in life.  Center on the Developing Child at Harvard University. (2007).  *A Science-Based Framework for Early Childhood Policy: Using Evidence to Improve Outcomes in Learning, Behavior, and Health for Vulnerable Children.*  Retrieved from http://developingchild.harvard.edu/index.php/download_file/-/view/63/. Critically, these conditions include a healthy family in which positive attachment develops between children and their caregivers.

Multiple risk factors that affect families, particularly poverty, family instability and violence, can create the sort of acute and persistent stress that damages the architecture of the developing brain.  Child development experts have labeled such stress "toxic" because its activation of the body's stress response systems, without adequate protections, can wreak severe and lasting damage on many organs of a child's body.  High and persistent levels of stress, particularly where healthy attachments are absent, disrupt neural circuits and weaken a child's foundation for learning and future health, potentially impacting not only the individual child but future generations as well.  To promote healthy child development and foster robust communities, our systems of care must attend to the factors affecting family welfare.  These include an ability to meet the family's basic needs, something we must address if we are to provide services in ways that are supportive, compassionate and preserving of dignity.

Recent research has established that the experience of chronic and potentially toxic stress profoundly affects children's well-being, including their susceptibility to disease and mental illness.  One large-scale study, an ongoing collaboration between the Centers for Disease Control and Prevention in Atlanta, GA and Kaiser Permanente in San Diego, CA, has persuasively linked what the study dubs — adverse childhood experiences (ACEs) to lifelong health and social consequences.  Centers for Disease Control and Prevention. (2014). *Injury prevention & control: Division of violence prevention.*  Retrieved from http://www.cdc.gov/violenceprevention/acestudy/; Health Presentations.  *The*

96

Exhibit 28
Page 01128

ER_3299

*adverse    childhood    experiences    survey.*    Retrieved    from http://acestudy.org/home.  Conducted by Doctors Vincent J. Flitti and Robert F. Anda, this study examined 17,000 middle-class Kaiser Permanente Health Plan members in the San Diego area (80% white/Hispanic, 10% black, 10% Asian; 74% attended college; mean age 57) over fourteen years to determine each individual's current state of health and well-being in light of that person's early exposure to ACEs.  The study illuminated the pervasiveness of traumatic experiences such as physical and sexual abuse, neglect, family violence, family substance abuse, and the loss of a parent in the lives of American children and drew a clear connection between adverse childhood experiences and chronic disease as an adult, as well as risk of other health, social and emotional problems.  Most participants in the study reported at least one ACE, and the vast majority reported two or more.  The study also found that the more traumatic events a participant suffered in childhood, the higher that person's risk as an adult for disease, and social and emotional challenges.  Felitti, V. J., & Anda, R. F.  (2010).  The relationship of adverse childhood experiences to adult medical disease, psychiatric disorders, and sexual behavior: Implications for healthcare.  In R. A. Lanius, E. Vermetten, & C. Pain (Eds.), *The hidden epidemic: The impact of early life trauma on health and disease* (pp. 77-87). Cambridge: Cambridge University Press.

The Commission heard testimony from experts at Yale, UConn, and the National Child Traumatic Stress Network confirming the prevalence of traumatic stress in the lives of American children.  According to Dr. Julian Ford, Professor of Psychiatry at UConn Health Center, by age seventeen up to 67% children have experienced some form of victimization and one in five have experienced at least four different types.[14]  The ACEs study and similar research establish a credible basis for a new paradigm of medical, public

---

[14] *See* http://www.governor.ct.gov/malloy/lib/malloy/SHAC_Doc_2013.04.26 _Ford_presentation.pdf.

Exhibit 28
Page 01129

health, and social service practice that would start with a comprehensive biopsychosocial evaluation at the outset of ongoing health care.

Whether or not factors such as severe economic deprivation or interpersonal violence afflict a family, the presence of mental health problems among family members can provide a source of significant stress. A child's illness in particular may create ongoing stress for parents, siblings and other family members, impact personal relationships within the family, and threaten the family's overall health. Stress on family members can invite other emotional and behavioral problems such as substance abuse, which in turn impact the development of children. An effective system of care must support families in managing the health care of their children. Current funding structures, including fee-for-service payment and mental health carve-outs that maintain siloed funding and delivery systems, exclude holistic treatment of the family. Moreover, just as pediatric providers must approach children's care in the context of their families and broader communities, so too adult providers should treat parents in the context of their families. The Commission recommends cross-training of behavioral health and primary care providers that focuses on families' strengths and accepts the family as a partner in treatment.

Most children fare best when their families take an active role in their health care. Family-centered systems of care must prepare families to become engaged, empowered and educated so that they can act as partners in children's care. Strategies to support families in managing the health care of their children should include incorporating families' input on multidisciplinary healthcare teams. Professionals should assess a family's knowledge about behavioral health, the support systems available to the family, and the barriers to good health facing its members. To identify potential obstacles to effective treatment, clinicians should elicit families' beliefs about the use of various treatment modalities, including psychotropic medications and talk therapy. Negative perceptions of psychiatric medications, mental health professionals or

Exhibit 28
Page 01130

other aspects of behavioral health care may interfere with understanding of and/or adherence to recommended treatment. While such attitudes may reflect specific family dynamics, personalities and/or histories, particular beliefs about behavioral health and mental illness often have broader cultural significance in the communities from which families hail. Systems of care serving children, adults and families must achieve cultural and linguistic competence to make appropriate services and supports available and relevant across a diverse population. Cultural and linguistic competence is also essential to eliminating disparities in care and health outcomes.[15]

4.   <u>Places of care: schools and communities</u>

Children exist within multiple social systems, and their needs can't be isolated from those of the systems in which they function. Schools in particular must be understood as integral to their communities; what happens at school directly impacts the surrounding community and what happens in the community affects its schools and their occupants. Schools must play a critical role in fostering healthy child development and healthy communities. They should provide learning tools geared toward positive development and serve as a locus for preventive care, early identification of behavioral health problems, effective treatment offerings, and referral to appropriate programs and services in the community. Healthy social development can be conveyed by role models such as parents, teachers, community leaders, and other adults in children's lives, but it can also – and should – be actively taught in schools. Our educational system has prioritized children's cognitive development at the expense of their social and emotional development, and this disproportionate focus on academic achievement threatens to become even more entrenched with the increasing centrality of standardized testing. Research clearly demonstrates, however, that social and emotional learning (SEL) curricula have

---

[15] See Connecticut Children's Behavioral Health Plan, available at: http://www.plan4children.org/wp-content/uploads/2014/10/CBH_PLAN_FINAL-_2_.pdf.

Exhibit 28
Page 01131

a positive impact on children's development and actually enhance their academic progress. Durlak, J.A., Weissberg, R.P., Dymnicki, A.B., Taylor, R.D., & Schellinger, K.B. (2011). The Impact of Enhancing Students' Social and Emotional Learning: A Meta-analysis of School-based Universal Interventions. *Child Development*, 82(1), 405-432. See also Schonfeld, D.J. et al. (2014). Cluster-Randomized Trial Demonstrating Impact on Academic Achievement of Elementary Social-Emotional Learning. *School Psychology Quarterly*. Advance online publication. Retrieved from http://eds.a.ebscohost.com/ehost/pdfviewer/pdfviewer?sid=6f697340-6fcb-4143-b5ea-f14a180f5b08%40sessionmgr4001&vid=0&hid=4113.

Social-emotional learning can help children identify and name feelings, including feelings such as frustration, anger and loneliness that potentially contribute to disruptive and self-destructive behaviors. It can also teach children how to employ social problem-solving skills to manage difficult emotions and potentially conflictual situations, avoid and prevent risky behaviors, and establish and nurture positive social relationships.

Social-emotional learning should form an integral part of the curriculum from preschool through high school. It works best when it is a pervasive component of the school environment that informs the culture of the school and the behavior of adult educators. Too often school administrators and teachers view SEL as secondary to academic curricula, worrying that time spent on aspects of SEL will detract from students' academic achievement. As a result, even evidence-based SEL curricula are rarely included past the earliest grades, and where SEL is taught it rarely receives the time and attention it deserves. All schools should implement a sequenced social development curriculum. This curriculum must include anti-bullying strategies and, as appropriate, alcohol and drug awareness as part of a broader substance abuse prevention curriculum for school-aged children. Comprehensive youth development can prepare young people to meet the challenges of adolescence and adulthood through a progressive series of

100

Exhibit 28
Page 01132

activities and experiences that foster social, moral, emotional, physical and cognitive growth.  In this context, a coordinated, comprehensive system of support services for all students ensures that their physical, social, emotional and health needs are met and their school environments are safe and orderly while also promoting their optimal academic development.

While all students benefit from a concerted focus on social-emotional learning, for students struggling with mental health and/or developmental disorders inadequate supports for social and emotional wellness and a lack of attention to SEL can have particularly deleterious consequences.  The recent report issuing from Connecticut's Office of the Child Advocate, which exhaustively chronicles and reflects on A.L.'s educational, behavioral and developmental history, emphasizes the striking absence of social-emotional learning in his educational records.  According to these records, A.L.'s acute difficulties managing the social and behavioral demands of a school environment formed the basis for his placement on "homebound" status beginning in the 8th grade, a disposition under Connecticut education law reserved for children deemed "too disabled to receive services in school even with modifications and supports."  (OCA Report, 2014, p. 43.)  His parents sought, and eventually obtained, a doctor's recommendation that A.L. be exempted from attending school due to his debilitating anxiety.  "Homebound" status differs from home schooling in that the latter represents a commitment by parents to provide an equivalent education outside of a school environment; in Connecticut school districts are not required to provide special education or other services to home-schooled children.  A student on "homebound" status, on the other hand, is by definition a child receiving special education services pursuant to an Individualized Education Program (IEP).

Despite the centrality of social, emotional and behavioral health challenges to A.L.'s identified disabilities, his IEP was directed almost exclusively toward supports for his academic progress.  For example, as his tenth grade year approached and educators involved in crafting his IEP aspired

101

Exhibit 28
Page 01133

ER_3304

to reintegrate him fully into high school classes, "attention to A.L.'s severe disabilities focused [...] on curricular issues rather than on the social and emotional characteristics that were seriously impacting his ability to participate in a regular educational environment" (p. 64). Indeed, the Child Advocate's investigation concluded that "[t]he absence of a plan to address A.L.'s social-emotional issues with a program that was sufficiently intense and therapeutic likely contributed to a situation in which he eventually became increasingly withdrawn and socially isolated" (*Id*).

> "[W]e've got to be very careful, because teachers, caregivers, police officers, judges, courts, child welfare workers, pediatricians, all of us can think that there's something wrong with them [children who have experienced traumatic stress]. There's something wrong, but it is not something wrong with them. They are trying to survive."
>
> Dr. Julian Ford, Professor of Psychiatry, UConn Health Center, testimony presented to the Sandy Hook Advisory Commission, April 26, 2013.

The Child Advocate's report makes clear, however, that this apparent neglect of social, emotional and behavioral health and development that emerges in A.L.'s educational records is not unique to the Newtown schools, but rather is a widespread phenomenon related to resource limitations and the misplaced segregation of academic skills from other aspects of development. What behavioral or developmental support services are available may be "tightly rationed so that districts can serve many children with their allotted resources[,]" which may diminish still further under constrained budgets (p. 82).

The social and emotional health of our students, particularly in low-income communities but also in more affluent ones, is frequently compromised by chronic stress. Such stress presents an ongoing problem in education that schools often lack the resources to address. From bullying to interpersonal violence, substance abuse, parental loss and grief, many of our students and their families live under persistent and pervasive stress that interferes with learning and complicates the educational process. Schools should develop therapeutic mentoring programs, particularly for youth and families

Exhibit 28
Page 01134

experiencing chronic stress.  These programs should be designed with an eye toward those children and families who lack positive supports and connections in their lives.  Since schools are essential parts of their communities, it is neither possible nor desirable to view issues impacting children categorically as either "community" or "school" problems.  Children's experiences in their homes and communities follow them through the school doors, and their experiences in schools accompany them when they leave.  Therefore it is paramount that what they learn, observe and encounter at school impact them positively as they return to their homes and neighborhoods.  While it is also important to respect family privacy, we should not assume that parents do not want, or that children will not benefit from, supportive services provided in school settings to assist them in dealing with the challenges they face in their communities.

School-based health services should be designed to provide screening and referral for developmental and behavioral health problems, exposure to toxic stress, and other risk factors, as well as effective treatment offerings to address trauma, loss and other stressors.  Schools might also invite families to screen for potential stressors and offer resources to parents and other family members to manage and address their own stress and exposure to adverse experiences.  As detailed below in our discussion of response and recovery efforts following disaster events, all professionals working in school-based health centers and indeed throughout the schools must receive training in recognizing signs of trauma exposure, toxic stress and behavioral health challenges.  To address the high cost of ACEs, Connecticut should build and support a collaborative system of care for children and families that starts with the schools.  Schools, primary care and behavioral health providers should use similar standardized, validated screening and assessment tools to improve early identification and treatment of emotional and behavioral problems, including screening for adverse events and other likely causes of toxic stress.

103

Exhibit 28
Page 01135

ER_3306

Schools should partner with behavioral and pediatric health providers and other organizations providing care and support to children and families to enhance community resources and augment the services available in schools. For many children, however, schools offer the only real possibility of accessing services.  School districts should therefore increase the availability of school guidance counselors, social workers, psychologists, and other school health and behavioral health professionals during and after the school day as well as potentially on Saturdays.  School staff should be prepared to assist children in crisis and able to initiate a process that may lead to referral to appropriate additional services (whether within the school or within the community) for support and treatment when indicated.  This is not the same as training teachers and other school professionals who are not mental health providers to provide mental health treatment or therapy.  Teachers of students facing loss can, for example, appreciate the impact of bereavement on children's learning and development, acquire strategies to bolster learning and adjustment for grieving students within the classroom and school setting, and offer empathy and support – all without being expected to provide grief counseling.  They can become capable at identifying children who may benefit from additional support and knowledgeable about referral sources.  Teachers need a school leadership that encourages this role by promoting ongoing professional development in these areas and offering consultation with those more knowledgeable about these issues when teachers have concerns about their students.  Our mental health system in turn must make resources available across the state to assist school professionals in supporting children.  The Commission therefore recommends that the State Department of Education establish a lead section or program on school mental health within its department to facilitate these activities.  We also recommend that the Federal Department of Education develop a comparable department/program to provide guidance and facilitation to programs in individual states.

104

Exhibit 28
Page 01136

In addition, schools should form multidisciplinary risk-assessment teams that gather information on and respond supportively to children who may pose a risk to others or face a risk to themselves due to toxic stress, trauma, social isolation or other factors.  These teams should look to factors such as social connectedness and behavioral changes in identifying children at risk rather than profiling them based on demographic characteristics, or other aspects of their identity in ways that contribute to stigma.  We revisit the risk-assessment process later in this report when discussing the role of mental illness in violent events.

    5.    Social isolation

Although the Lanza family was fortunate enough to escape the kind of financial stress that afflicts so many American families, the severe impairments that emerged for A.L. as he moved through elementary school and beyond placed an enormous strain on his parents, particularly his mother.  Indeed, the stress of managing A.L.'s apparent needs and limitations led his mother down a path of isolation and disconnection from the school system and other community resources.  A.L. himself became so isolated over the course of his adolescence and young adulthood that by the months before the Sandy Hook shootings he spent virtually all of his time alone in his room, his windows blacked out with garbage bags, communicating

> "Nearly 20% of adolescents can be classified as socially excluded (i.e., being ignored or excluded by others), an experience that most liken to "social death".  Research has found significant associations between chronic social ostracism and participation in risk behaviors such as cigarette smoking, alcohol, and/or illicit drug use, higher levels of depression and anxiety, peer victimization, and aggression up to and including school violence.  Retrospective studies have reported that chronic social ostracism, especially experienced during high school, is a risk factor for suicidal ideation and attempts during adulthood. In short, social exclusion threatens psychological and behavior systems that are critical for normal adolescent development, health, and life-longevity."
>
> Richard Gilman, PhD, Professor, University of Cincinnati Department of Pediatrics, Division of Child and Adolescent Psychiatry, Cincinnati Children's Hospital Medical Center, written testimony submitted to the Sandy Hook Advisory Commission

Exhibit 28
Page 01137

with his mother solely by e-mail.  While the isolation experienced by members of the Lanza family may have been unusually extreme, social isolation in general must be viewed as a pervasive public health problem.

In recent years, scientists have established clear associations between social isolation and ill health, even linking loneliness to increased risk of premature death.  Paradoxically enough, in an age of social networking and nearly ubiquitous electronic connection, many American adults, children and families are experiencing unprecedented social isolation.  Such isolation can impact people across the lifespan, but it may present the greatest risks during adolescence and in the later years of life.  Adolescents in particular may become disengaged from their peers and communities due to behavioral health disturbances, bullying, and other circumstances, and their isolation may result from practices of exclusion perpetrated by their peers.

We must educate parents and others about the dangers associated with social isolation.  But education alone is not enough.  In addition, we must build systems of care that include mechanisms and support structures to counter such isolation and offer opportunities for connection to isolated individuals and families.  In other words, systems of care must go hand-in-hand with communities of care.

The Commission is concerned that certain decisions related to educating children outside of a school environment may in some cases exacerbate the risks of social isolation, particularly for those children with identified and pronounced social, emotional and behavioral disturbances.  Although Connecticut in particular imposes very few regulatory requirements on parents who choose to home-school their children, and parents' rights to do so enjoy legal protection, the Commission finds that some home-schooled children with serious social, emotional and behavioral health difficulties may be cut off from needed services if their parents or guardians lack the resources, knowledge or motivation to provide support for healthy development in these areas.

Exhibit 28
Page 01138

Therefore the Commission recommends that each board of education in Connecticut ensure that all children with disabilities – including children with significant emotional, social and/or behavioral difficulties – who are in need of special education and related services in order to make adequate progress be identified and evaluated in accordance with the IDEA.  Without access to supportive services, home-schooling for children with severe social and emotional challenges may not adequately address those children's needs or help them develop the skills they will need to function in society.  Where parents elect to home-school a child with an identified disability, the home-schooled child should have an individual education program (IEP) approved by the special education director of the Area Education Agency and access to special education services.  Currently, Connecticut law requires that parents who choose to educate their children at home or outside of the public school system be prepared to demonstrate "that the child is elsewhere receiving equivalent instruction in the studies taught in the public schools." Conn. Gen. Stat. § 10-184 (2015).  Connecticut statutes afford parents who educate their children in private schools or at home the right to refuse any special education services, and exempts the school district from having to provide such services if the parents decline them.  Conn. Gen. Stat. § 10-184a (2015).  But targeted supports may be essential to address the developmental needs of students with identified social, emotional and behavioral challenges. The risk is particularly acute in a system where the state's attention is directed solely toward the academic content of children's home educational curriculum and where school districts' obligations to support their healthy development generally end there. Connecticut should therefore require that a parent providing home-schooling to a child with identified emotional, social and/or behavioral difficulties of a significant nature sufficient to require special education and related services file with the local superintendent on a regular basis (at least annually) progress reports prepared by an individualized education program team selected by the parent.  The state should also consider requiring that a parent's obligations

107

Exhibit 28
Page 01139

ER_3310

under Conn. Gen. Stat. § 10-184 encompass approval of the individualized education plan and adequate progress as documented in these reports.

When a student's medical and/or mental health condition interferes with the student's school attendance to the extent that the student will miss three or more weeks of school, special education law requires a board of education to provide homebound or hospitalized instruction if recommended by the student's planning and placement team. In A.L.'s case, his mother appears to have sought a recommendation from a community psychiatrist that he be placed on homebound status, and the community psychiatrist furnished such a recommendation during A.L.'s eighth grade year. Over the next few years he returned to school only to a limited extent and with extensive support services. Yet despite the fact that the basis for his original homebound status derived from his acute anxiety symptoms and emotional difficulties, his individualized education plan and related services persistently failed to address his social and emotional needs. This was a grave oversight that the Commission sees as linked to the pervasive inattention to social and emotional learning that plagues our educational system. If the particular disabilities that necessitate "homebound" education include social, emotional and behavioral difficulties, then a student's individualized education program and related services should address these difficulties expressly in addition to providing any necessary academic supports.

### 6. Concluding thoughts

A growing chorus of voices has called for dramatic reforms to existing mental and behavioral health care systems at both the state and national levels. Over a decade ago, the President's New Freedom Commission on Mental Health urged better coordination between primary and behavioral health care and a less fragmented, more consumer- and family-driven system of care, as well as more involvement by schools in children's mental health care. Within the past several months, a Robert Wood Johnson Foundation brief embraced wellness promotion as a model for children's behavioral health, and illuminated

108

Exhibit 28
Page 01140

ER_3311

the harms wrought by the artificial distinction between physical and mental health that has long organized the financing and delivery of health care in our country.  In Connecticut, several reports have emerged over the past two years cataloguing the many shortcomings of our state's behavioral health systems serving child, youth and adult populations. All of these thoughtful investigations have yielded specific recommendations designed to achieve a better integrated, more easily navigable and more equitable behavioral health system.

The Commission joins these voices in urging adoption of a new model of care, one that emphasizes wellness while effectively and compassionately addressing illness; that places positive child development and healthy families front and center; and that breaks down existing silos to provide holistic and continuous care across the population.  We support the Affordable Care Act's (ACA) affirmation that prevention, early intervention, and treatment of mental and substance use disorders are an integral part of improving and maintaining overall health.  Factors essential to this new model of care will include enhanced integration of primary and behavioral health care and a key role for schools in fostering healthy, resilient children, families and communities.

### B.  **Recommendations**[16]

*1.   Recognizing that mental health is more than the absence of mental illness, we must build systems of care that go beyond treating mental illness to foster healthy individuals, families and communities and embrace  overall psychological, emotional and social well-being.*

*2.   To promote true wellness, Connecticut must build a mental health system that targets detection and treatment while building stronger, resilient communities of care.*

*3.   Addressing a fragmented and underfunded behavioral health system tainted by stigma requires building a comprehensive, integrated*

---

[16] The recommendations set forth in this subsection of the report, and in subsequent subsections, are numbered sequentially.

Exhibit 28
Page 01141

ER_3312

approach to care.  The approach will stress family involvement and community resilience. Care will be holistic and involve pediatric and adult medical homes from birth to adulthood, with efforts to ensure continuity of care.  Identifying risk factors, reinforcing protective factors, and promoting positive development throughout will be key goals, and peer as well as professional support will be involved.  Treatment and prevention will be stressed.

4.      To treat the whole person and cultivate wellness across the population, our health delivery systems and reimbursement paradigms should embrace a biopsychosocial model that understands the individual's physical and mental health strengths and challenges in the context of that person's social environment and relationships.

5.      Providers should be incentivized through reimbursement mechanisms to integrate both physical and mental health services, whether through their own care delivery or through integration of services within a medical home model.

6.      To promote healthy child development and foster robust communities, our systems of care must attend to the factors affecting family welfare. Current funding structures must thus be revamped.  The Commission recommends support for models of integrated care driven by family needs in which all providers focus on family strength, address their risk factors, and accept the family as a partner in treatment.

7.      Schools must play a critical role in fostering healthy child development and healthy communities.  Healthy social development can be conveyed by role models such as parents, teachers, community leaders, and other adults in children's lives, but it can also – and should – be actively taught in schools.

8.      Social-emotional learning must form an integral part of the curriculum from preschool through high school.  Social-emotional learning can help children identify and name feelings such as frustration, anger and loneliness that potentially contribute to disruptive and self-destructive behavior.

110

Exhibit 28
Page 01142

**ER_3313**

*It can also teach children how to employ social problem-solving skills to manage difficult emotional and potentially conflictual situations.*

*9.    A sequenced social development curriculum must include anti-bullying strategies.  As appropriate, it should also include alcohol and drug awareness as part of a broader substance-abuse prevention curriculum for school-aged children.*

*10.    Many of our students and their families live under persistent and pervasive stress that interferes with learning and complicates the educational process.  There are many potential resources such as school based health centers that should provide a locus of preventive care, including screenings and referrals for developmental and behavioral difficulties, exposure to toxic stress, and other risk factors, as well as treatment offerings that can address crisis, grief and other stressors.  Alternatively, schools can employ the services of community-based mental health providers such as child guidance clinics.*

*11.    Schools should form multidisciplinary risk-assessment teams that gather information on and respond supportively to children who may pose a risk to others or face a risk to themselves due to toxic stress, trauma, social isolation or other factors.  (See recommendation 39, infra, regarding the role of mental illness in violent events.)   Schools should look to factors such as social connectedness in identifying children at risk; all school staff should be trained in inquiry-based techniques to apply when disciplinary issues arise in order to deepen their understanding of how children's behavior can be linked to underlying stressors.*

*12.    Schools should work with all providers to enhance community resources and augment services available in schools.  For many children schools offer the only real possibility of accessing services, so districts should increase the availability of school guidance counselors, social workers, psychologists, and other school health and behavioral health professionals during and after school as well as potentially on Saturdays.*

111

Exhibit 28
Page 01143

ER_3314

13.     The state and federal departments of education should establish lead sections or programs on school mental health to supplement (not replace) the work of CT DCF.     These sections would play a critical role in conducting and coordinating broad-based prevention and intervention efforts within the school system to help ensure a coordinated, seamless and comprehensive statewide system.

14.     The Commission endorses the recommendations advanced in *Connecticut Children's Behavioral Health Plan*, a report and implementation plan compiled pursuant to Connecticut's *Public Act 13-178*, that call for a comprehensive, developmentally appropriate continuum of care that expands and equalizes culturally relevant resources available to children and their families across payment systems and geographic boundaries.

15.     Each board of education must ensure that children with disabilities be identified and evaluated in accordance with the Individuals with Disabilities Education Act, or IDEA.  Where parents elect to home-school children with an identified disability, the home-schooled child shall have an individual education program (IEP) approved by the special education director of the Area Education Agency, as well as access to special education services.  Periodic reports regarding the progress of such home-schooled children should be filed with the local superintendent (at least annually) and be prepared by an individualized education program team selected by the parent.  The state should consider requiring that a parent's obligations under state law encompass approval of the individualized education plan and adequate progress as documented in these reports.

16.     When the particular disabilities that necessitate "homebound" education include social, emotional and behavioral difficulties, the student's individualized education program and related services must address these difficulties expressly in addition to providing any necessary academic supports.

112

Exhibit 28
Page 01144

### III.   BARRIERS TO ACCESS: INSURANCE AND FUNDING ISSUES

#### A.      Analysis: System Fragmentation As A Barrier To Effective Care

Funding for mental health services in our system of care comes from a variety of public and private sources.  The system itself, which is routinely described as "fragmented," depends for its organization on how its services are funded.  Currently, Connecticut's healthcare system has three tiers: the private system of care, funded through insurance, group health plans, a Consumer-Operated and Oriented Plan (CO-OP) such as HealthyCT, or out-of-pocket expenditures; the public system, funded through Medicaid, Medicare, and Tricare; and healthcare services for those without insurance or other coverage, provided largely through emergency departments and acute care hospitals, community health centers, and free clinics.  These tiers serve different populations largely based on income, and they provide access to disparate services.  Within the behavioral health field, individuals and families who obtain care in the public system may fare better in some respects than those with private insurance, although across these systems underfunding and uncoordinated funding result in inadequate and disorganized access even when services are available.  A fully functional mental health system will require better coordination and access to a broad range of necessary services across payment systems.  In addition, it is essential to institute higher rates of reimbursement for behavioral health providers to cover the actual cost of care and build up a workforce that remains able to meet the ever-expanding needs in this area.

Ample testimony presented to the Commission made clear that the services to which individuals and families have access depend greatly on the source and method of their funding. The Commission heard testimony from Connecticut's Health Care Advocate, Victoria Veltri, suggesting that despite the existence of mental health services in Connecticut targeted toward populations across the lifespan, the fragmentation of such services creates widespread confusion about what exactly is available and who is eligible to receive it.  In

113

Exhibit 28
Page 01145

**ER_3316**

Connecticut, as in states across the country, many state agencies are involved in the provision of mental health and substance abuse services, including the Department of Children and Families, the Department of Mental Health and Addiction Services, the Department of Social Services, the Judicial Branch and the Department of Corrections; yet very little coordination among these agencies takes place. Such coordination is essential to bring coherence and efficacy to a system with a diverse array of services targeting different segments of the population.

Major reports on Connecticut's mental health system released over the past few years have identified significant problems with fragmentation resulting from diverse payment systems and a lack of coordination or consistency among state agencies. Connecticut Office of the Health Care Advocate (OHA). (2013). *Findings and Recommendations: Access to Mental Health and Substance Use Services.* Retrieved from http://www.ct.gov/oha/lib/oha/ report_of_findings_and_recs_on_oha_hearing_1-2-13.pdf; The Task Force to Study the Provision of Behavioral Health Services for Young Adults. (2014). *Final Report.* Retrieved from http://www.cga.ct.gov/ph/tfs/20130701 _Task%20Force%20to%20Study%20The%20Provisions%20of%20Behavioral%2 0Health%20Services%20For%20Young%20Adults/Final%20Report%20for%20t he%20Task%20Force%20to%20Study%20the%20Provision%20of%20Behaviora l%20Health%20Services%20for%20Young%20Adults.pdf; and Connecticut Department of Children and Families (DCF). (2014.) Connecticut Children's Behavioral Health Plan. Retrieved from http://www.plan4children.org/wp-content/uploads/2014/10/CBH_PLAN_FINAL-_2_.pdf. A fragmented system yields unequal access to effective treatment, discontinuities of care for those receiving services, and unsustainable financial burdens for individuals, families and communities.

Definitional issues are critical to the discussion of access. If we restrict our definition of "care" to the traditional medical model of inpatient, outpatient day and residential programs, we will limit access for many to the innovative

114

Exhibit 28
Page 01146

ER_3317

programs that have come to be seen as essential to improved outcomes from mental illness and other challenges to emotional and behavioral health. Funding decisions about behavioral health services must look beyond the biomedical model of mental disorder that has prevailed over the past few decades. Pharmaceutical treatments and more traditional therapies do afford precious relief to many people. For others struggling with mental and substance use disorders, however, psychosocial interventions, programs that address the social environments in which they live, services directed toward the achievement of functional skills and other efforts to engage the whole person are critical elements of recovery.

In Connecticut, major discrepancies exist in the services available to individuals and families based on payment source. Publicly funded programs generally provide a much wider array of services for children and adults suffering from mental illness than do private insurance plans. Commercial insurance tends to limit reimbursement to traditional inpatient and outpatient, episodic services and often will not reimburse care once the symptoms are considered chronic. The full range of services necessary for the effective treatment and recovery of individuals with mental illness remains unavailable to many with commercial insurance. For instance, programs that provide housing and vocational support can be essential components of an effective treatment strategy for individuals battling major mental illness, and without these a person whose illness progresses from acute to chronic will be at a distinct disadvantage. Commercial insurance should reimburse the full panoply of services available through the public system, from those directed toward individuals with severe psychiatric disabilities to those that help the many Americans suffering from mental health challenges across the spectrum.

As a general matter, the bifurcation of behavioral health from other health care has had a number of pernicious effects, one of which is the persistent underfunding of the former. This bifurcation finds vivid expression in behavioral health carve-outs, particularly in the commercial market, which

115

Exhibit 28
Page 01147

**ER_3318**

over the past two decades have removed behavioral health services from many health benefits packages. Many Medicaid managed care plans have provided behavioral health services on a fee-for-service basis apart from other health benefits. In Connecticut, the Behavioral Health Partnership has pioneered a more integrated approach for children, adults and families on the state Medicaid plans that administers behavioral health services in ways designed to promote care coordination, particularly for children. Carve-outs that thwart holistic care as well as true parity between physical and mental health care persist, however, in commercial insurance. Private health plans frequently contract with managed care operations to administer mental health services separate from other benefits. Such carve-outs increase systems fragmentation and perpetuate discriminatory practices that affect both mental health consumers and providers.

1. <u>Improving access to effective services in the public system</u>

While Connecticut's public mental health system is better funded per capita than those of most other states, its resources remain inadequate to serve the ever-expanding needs of the child, adolescent and adult populations. Behavioral health services have suffered in an era of tight state budgets. In her testimony before the Commission and the comprehensive 2013 report issued out of her office, Connecticut's Health Care Advocate Victoria Veltri identified cost-shifting and a dearth of research on the cost-effectiveness

> "In order to facilitate optimum treatment, health care information must flow between providers and a seamless transition of care must be available when multiple systems of care are involved with the individual and family. Payers have not generally incentivized care coordination or communication across treaters, contributing to a fragmented and poorly coordinated mental health system. Current providers are frequently unable to access patients' past psychiatric records in a timely manner which can contribute to care fragmentation."
>
> The Task Force to Study the Provision of Behavioral Health Services for Young Adults. (2014). *Final Report*

of current state programs as two problems plaguing the public system. State agencies such as DCF and DMHAS fund community-based services that assist

116

Exhibit 28
Page 01148

residents in the public system as well as residents with private insurance, and yet the state picks up the tab in many instances.  The OHA report suggests that insight into the relative cost-effectiveness of particular programs might permit the state to accomplish more in areas of real need, even with limited resources.

In addition, recent reports by the legislative Task Force to Study the Provision of Behavioral Health Services for Young Adults and the Department of Children and Families identify a lack of care integration as a feature of Connecticut's system that poorly serves the needs of state residents.  Children, adolescents and young adults are often involved in multiple systems of care, including the mental health system, the substance abuse treatment system, educational systems, the primary care system, DCF, DMHAS and the juvenile justice system.  The lack of treatment coordination among systems addressing the needs of this population increases the likelihood that some people will fall through the cracks and others will receive inadequate care.  Moreover, for the many adolescents and adults with co-occurring mental health disorders and substance use disorders, separate systems of care with diverse funding streams undermine treatment efficacy.  The Commission supports creation of incentives for care coordination, including reimbursement of integrated services and communication between providers.  Across private and public systems, the funding for preventive services and early intervention programs remains inadequate.  Significant improvement in the delivery of necessary services will require additional funding on a consistent basis.

2.      Elevating reimbursement rates to meet the costs of care

Inadequate rates for mental health services under both public and private systems have materially impacted access to and quality of care.  The theme of insufficient reimbursement rates reverberated throughout the Commission's hearings.  People who receive services through Medicaid have virtually no access to private practitioners because payment rates are woefully low.  Testimony before the Commission established that existing Medicaid rates

117

Exhibit 28
Page 01149

have been covering only *half* the cost of providing mental health care.  (See Steck, Plant and Amdur's presentation, April 12, 2013.)  For inpatient care, reimbursement remains substantially below costs.   Hospitals providing inpatient psychiatric care to children and adolescents with Medicaid lose between $300 and $500 per day due to low reimbursement rates even as demand for inpatient treatment increases.  (See testimony of Stephen Larcen, Ph.D., Senior Vice President of Behavioral Health at Hartford Healthcare, May 3, 2013.)  Inadequate reimbursement rates also mean that outpatient clinics furnishing intensive behavioral health services to children and adults lose hundreds of thousands of dollars each year.  *See generally* Report of the Connecticut Community Providers Association, "Prioritizing Community Based Services in CT: How investing in the cost of care for health and human services strengthens families, community and the state economy" (February 2015).[17] Connecticut has pioneered the model of Enhanced Care Clinics (ECC's), which deliver comprehensive and coordinated outpatient behavioral health care to adults and children on Medicaid on both a routine and an urgent basis.  The number of children seen in such specially designated clinics has doubled in recent years while reimbursement rates have remained static, forcing ECC's to operate at enormous

> There are different definitions that dictate whether something is medically necessary.  So as a condition for getting your treatment or service covered under any kind of plan, whether it's Medicaid or a state-regulated plan or a federally regulated plan, you have to prove that it's medically necessary, that you need it basically.  But the definition of what's medically necessary is different in state law than in the Medicaid program, for instance.  So the Medicaid program has a very broad definition of medical necessity, broader than it is for private insurance plans.  So depending on what program you're in, you have a different standard to meet to get your service.  You may also have different benefits, and that happens all the time.
>
> Victoria Veltri, Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013

---

[17] Available at: http://www.governor.ct.gov/malloy/lib/malloy/ shac_doc_final_report_-_final-ccpa-report-february-2015.pdf.

Exhibit 28
Page 01150

losses.    Though somewhat better, Medicare rates increasingly raise the same
issue.

Even the rates provided by commercial insurers are inadequate, and
many mental health clinicians now decline to accept any forms of insurance,
whether public or private.  Access to their services is therefore limited to those
who can pay out of pocket.   Inadequate reimbursement rates have had
dramatic effects on the behavioral health workforce.   Provider networks for
adult care through the public and private systems are insufficient to meet
existing needs, and those for child and adolescent care are even more deficient.
The dearth of providers creates a substantial barrier to access.  (Office of the
Health Care Advocate, 2013, p. 26-27).  It is critical to provide reimbursement
rates under Medicaid and otherwise that actually cover the costs of care.

3.    <u>Improving access to effective services in the private system</u>

Alongside insufficient rates of payment, additional factors impede access
to care for those with commercial insurance.   Even if a clinician has
recommended a certain course of treatment, insurers routinely deny payment
for such care through precertification requirements and review of covered
services.    An individual seeking coverage for behavioral health services
generally must obtain prior authorization from the insurer, although a limited
number of outpatient therapy sessions may be exempt from this requirement.
The principles of mental health parity, enshrined in the Mental Health Parity
and Addiction Equity Act of 2008 and reiterated in the Affordable Care Act,
preclude outright discrimination in private coverage for behavioral health
services; insurance plans may not apply limitations on coverage more
stringently for behavioral health services than for other medical services.   Even
with enhanced parity, though, employment of "medical necessity" criteria in the
precertification and review processes too often facilitates the *denial* rather than
the *provision* of care.

For most services funded through any external source, the payer will
cover only those found to be "medically necessary."  Ms. Veltri testified that

119

Exhibit 28
Page 01151

**ER_3322**

various funding sources, whether a public plan such as Medicaid or a private insurance plan subject to either state or federal regulation, all employ different definitions of medical necessity to determine whether mental health services will be covered. In general, Medicaid uses a broader definition of medical necessity than do most private insurance plans. These vastly divergent approaches to determinations of medical necessity contribute a troubling degree of arbitrariness and inscrutability to our systems of care.

For those with private insurance, "medical necessity" may become an insurmountable obstacle to receiving the care that their providers have deemed most appropriate. In addition to outright denials of care, the processes through which medical necessity determinations are rendered, reviewed, and potentially reversed function to obstruct treatment when it is most needed. These processes are deeply flawed in ways that frustrate access to effective behavioral health care. First, the performance of reviews by contractors or employees of the insurer creates an inherent conflict of interest that compromises the fairness of the process. Second, placement of the burden of proof on the policyholder not only delays much effective treatment but frequently places it altogether out of reach. Individuals and families wrestling with behavioral health challenges are just not equipped to marshal the evidence required to sway a reviewer, who, at least at the internal stages, may be allied with the insurer. Before the enactment of P.A. 13-3 (An Act Concerning Gun Violence Prevention and Children's Safety) in Connecticut, reviewers conducting these determinations did not necessarily have the behavioral health training necessary to qualify as a "clinical peer" to the provider. Conn. Gen. Stat. § 38a-591c (2015). The new law appears to remedy this problem by requiring that health carriers contract with clinical peers to conduct utilization reviews, and specifying minimum qualifications for clinical peers across child, adolescent and adult mental and substance use disorders. Conn. Gen. Stat. § 38a-591c (2015).

120

Exhibit 28
Page 01152

Even with concerted efforts at the federal and state levels to eradicate discrimination in coverage for behavioral health services and implement parity, the employment of "medical necessity" criteria in the precertification and review process around behavioral health services too often results in the denial or delay of needed care.  Currently, a private insurer may fail to pre-certify care or deny ongoing care by virtue of its own determination that the proposed services do not meet medical necessity criteria.  Following such a denial, clinicians employed or chosen by the insurer conduct an initial review, and additional layers of internal review may follow.  Ultimately, in Connecticut, the policyholder may obtain an external review through the Office of the Insurance Commissioner, which assigns independent review organizations on a rotating basis to make final coverage determinations and provides a toolkit to aid consumers in navigating this difficult process.[18]

According to Anne Melissa Dowling, Deputy Commissioner of Insurance, these reviewers end up reversing up to 40% of the denials of coverage.  Throughout the process, the policyholder and provider retain the burden of proof to demonstrate that the proposed treatment is medically necessary.  Some residents also reach out for assistance to the Office of the Healthcare Advocate, much of whose caseload is devoted to behavioral health issues.  Sometimes, patients and families withdraw from treatment out of concern that the obligation for payment will fall to them.  Before the enactment of P.A. 13-3 in Connecticut, reviewers conducting these determinations did not necessarily have the behavioral health training necessary to qualify as a clinical peer to the provider; the recent statute appears to remedy this problem by requiring that health carriers contract with clinical peers to conduct utilization review.  Despite this change, behavioral health providers continue, virtually unanimously, to report repeated and inappropriate denials of care.

---

[18] See http://www.ct.gov/cid/lib/cid/Behavioral_Health_Consumer_Tool_Kit.pdf.

121

Exhibit 28
Page 01153

The Commission concludes that this process still poses a formidable barrier to timely and appropriate care and remains concerned about the conflict of interest inherent in a process in which the payor reviews its own denials of care. The Commission therefore recommends that all appeals of denials of care be processed through an independent entity such as the Office of the Health Care Advocate. Independent clinicians selected by this entity should be available around the clock for such reviews. A second level of review should be available through the same entity. Insurers should be required to provide reimbursement during the denial and appeals period up to the point of ultimate denial by the neutral reviewing party. When a licensed provider determines that a particular course of treatment is medically necessary, the burden of proof should fall to the insurer to demonstrate otherwise. Any conclusion by a reviewer that care is not medically necessary should be based, to the extent possible, on findings in the medical literature. The results of scientific studies, and/or recommendations of recognized health care professional organizations and recognized authorities of evidence of efficacy especially in the absence of scientific studies, should not be discredited solely on the assertion of the insurer. While essential, the involvement of clinical peers alone does not guarantee a fair and impartial review.

> "So it's a major burden on a family to assemble medical documents for reimbursement in a field it knows nothing about. And it's probably not at its best anyway because it's so stressed with the severity of the issue. [...] And some of the terrible things we've seen families have to do in order to qualify for plans or to get coverage just adds to the stress."
>
> Anne Melissa Dowling, Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013

Many people with private health coverage lack access to evidence-based mental health treatment programs available to those in the publicly funded system. The recent Task Force Report identifies this disparity as a significant barrier to effective behavioral health services for children and adults alike in Connecticut. Such programs include Integrated Dual Disorders Treatment

122

Exhibit 28
Page 01154

ER_3325

(IDDT), Intensive In-Home Child and Adolescent Psychiatric Services (IICAPS), Trauma-Focused Cognitive-Behavioral Therapy (TF-CBT), Extended Day Treatment (EDT), Multi-Systems Therapy (MST), Functional Family Therapy (FFT), Multi-Dimensional Family Therapy (MDFT), and Trauma Affect Regulation: Guide for Education and Therapy (TARGET). Despite the fact that these programs have strong evidence of success when implemented effectively (often with the support of a quality assurance process), including reductions in emergency psychiatric admissions, commercial insurers have been historically unwilling to cover such services.

For those with commercial insurance, inadequate provider panels further impede access to care. Most health plans maintain networks, or panels, of providers with whom they contract to furnish services to the plan's members. In the area of behavioral health services, many providers are reluctant to join such panels when the reimbursement they would receive remains so inadequate. Other providers appear on multiple panels but do not actually accept patients from certain plans because of low reimbursement rates. Insurers publish these panel lists for their policyholders to assist them in locating available providers whose services will be eligible for coverage. All too frequently, though, these panel lists become inaccurate and/or outdated, retaining names of clinicians who have resigned from the panel or remain on the panel but do not actually accept new patients with that insurance. To guarantee that panel lists facilitate rather than frustrate access to care, insurers should be required to maintain up-to-date and accurate provider panel lists and to furnish these to policyholders. Connecticut should establish standards for accurate lists, as well as a mechanism for fining or otherwise holding insurers accountable for publishing inadequate lists.

When policyholders reach beyond provider panels to seek treatment from out-of-network providers, their efforts to seek reimbursement from their health plans encounter the same obstacles as those with in-network providers whose prescribed treatments have been denied on medical necessity grounds. Indeed,

123

Exhibit 28
Page 01155

the process of filing for reimbursement and pursuing appeals may fall even harder on those seeking reimbursement who have paid up front for otherwise covered services.  As Deputy Commissioner Dowling observed, many families facing this situation are so ill-equipped to complete the necessary paperwork that they are unable to make an effective case until they have reached their third or fourth reviews, often with the assistance of someone from the Office of the Healthcare Advocate.

4.      Expanding an overtaxed workforce

As noted above, inadequate rates of reimbursement have contributed significantly to workforce deficits in the behavioral health sector.  Clinicians in private practice have been increasingly unwilling to accept insurance due to low reimbursement rates as well as the considerable administrative burdens – altogether unreimbursed – that go along with submitting claims.  The problem is particularly acute in the area of child and adolescent care, with far too few providers serving a population with expanding needs.  In Connecticut, the private provider system of care, in particular nonprofit child guidance clinics, form the central hub for children and families seeking mental health services.  Yet the system has been woefully underfunded and burdened by requirements that mandate oversight of every treatment plan by an MD psychiatrist as well as preauthorization for treatment.  It lacks incentives for growth, improvements in technology or implementation of evidence-based practices.  Although Enhanced Care Clinic requirement have improved access to care for families with Husky insurance under the state Medicaid plan, they have created additional barriers for those with private insurance or who pay out of pocket.  Testimony before the Commission established that demand for child and adolescent psychiatric beds in Connecticut routinely exceeds supply.  The total number of child/adolescent beds in Connecticut has decreased over the last ten years due to the significant financial disincentives for hospitals to provide such beds.

124

Exhibit 28
Page 01156

Connecticut and the rest of the nation must take steps to increase the behavioral health workforce, above all in child and adolescent specialties. According to Connecticut's Health Care Advocate Victoria Veltri, fewer than 8,000 child psychiatrists serve the entire United States population of over 74 million children. Nonprofit providers such as child guidance clinics are currently overwhelmed and underfunded, but strengthening and expanding these providers can quickly develop desperately needed systems of care

"Workforce issues have an enormous influence on the provision of mental health care. At the most basic level they affect **access to care**, since workforce shortages limit the availability of services to children and families in need. For example, there are serious shortages of professionals trained to assess and treat children and adolescents, and severe shortages of child psychiatrists and advanced practice nurses who have prescriptive authority. High levels of workforce turnover negatively affect **continuity of care** since turnover disrupts the relationships between children, families and their providers. Training of the workforce affects **quality of care**, with many non-degreed direct care staff receiving little training, while many professionals receive inadequate training in advanced evidence-based practices for children, youth and families. Training of the workforce also impacts the **appropriateness of care** delivered. For example, most mental health professionals are not formally educated about substance abuse and therefore may not detect or treat abuse in adolescents and their families. Lastly, workforce diversity and cultural competence impact the **relevance of care**. The current mental health workforce lacks much racial diversity and the professions are struggling to define and teach cultural competence within the workforce."

Michael A. Hoge, Ph.D., Yale School of Medicine, Department of Psychiatry, written testimony submitted to the Sandy Hook Advisory Commission.

in Connecticut. Indeed, to meet the expanding needs of children, adults and families, it will be essential to increase the number of clinicians working throughout the system. Measures might include reimbursing psychiatrists serving both adult and pediatric populations at rates equivalent to other specialty care providers; enacting educational loan forgiveness programs that encourage medical students to pursue training in psychiatry, particularly child and adolescent psychiatry; enacting similar programs for graduate students in clinical psychology and social work programs; as well as other targeted efforts

125

Exhibit 28
Page 01157

to bring talented professionals into the mental health workforce and encourage such professionals to serve high-need populations.

5.   Concluding thoughts: Toward a more integrated system of care

Implementation of the Affordable Care Act promises to bring significant changes to the ways in which we think about, organize and fund health care more generally, and behavioral health care specifically, as we move from traditional fee-for-service models of care to what are known as value-based models. Value-based models purport to reward quality of care rather than quantity. More importantly, the ACA embraces the goal of care integration by prioritizing medical homes, which take a patient-centered, comprehensive, team-based and coordinated approach to primary care. It seeks to contain costs in part by encouraging the formation of Accountable Care Organizations, whereby physicians, hospitals and other health care providers create networks to coordinate population-based patient care and receive rewards for delivering care efficiently. As with medical homes, the growth of Accountable Care Organizations under the ACA represents a shift toward better integrated care. The Commission agrees that services that "wrap around" the patient should become the norm. But the transition from a fee-for-service system to population-based care will present systematic complexities, and it is essential that behavioral

> "[S]omething that interferes with accessing care is that we have a very complicated system of providing mental health services. [...] [F]or too many Americans with mental illness, the mental health services and supports they need remain fragmented, disconnected and often inadequate, frustrating the opportunity for recovery. And so what we have are many different provider systems. We have many different state agencies. We have private insurance. We have Medicaid. We have different criteria. And as a result, trying to navigate that when you have a problem is a significant barrier to receiving care. [...] [I]f you're a family or an individual, it can be really daunting to figure out where do I go, which door do I enter. And they all have their own criteria, eligibility criteria, means of access, exclusions, etc. "
>
> Robert Plant, Ph.D., Chief Clinical Officer , Wellmore Behavioral Health, Testimony presented to the Sandy Hook Advisory Commission. April 12. 2013.

126

Exhibit 28
Page 01158

ER_3329

health needs remain a focal point of these coordinated systems. Behavioral health carve-outs may soon be behind us.

The comprehensive system of care envisioned by the Affordable Care Act will require behaviorally competent and collaborative primary care delivered in coordination with co-located mental health professionals. Primary care providers must also have access to effective screening tools and education around behavioral health matters, as well as psychiatric consultation where needed. Connecticut's ACCESS-MH program, funded through DCF pursuant to P.A. 13-3, provides one example of a program geared toward integrating behavioral health services with primary care – in this case, at pediatricians' offices. It is designed to enhance the behavioral health services available to all children and adolescents, regardless of insurance status, by making teams of behavioral health professionals available to primary care providers for consultation, assistance and care services. As detailed elsewhere in this report, the Commission supports efforts such as this one to make behavioral health services available through primary care offices and schools.

**B.     Key Findings And Recommendations**

17.    *A fully functional mental health system will require better coordination and access to a broad range of necessary services across payment systems.*

18.    *Inadequate reimbursement rates combined with high utilization rates at many outpatient behavioral health clinics have made this model of care financially unsustainable. In addition, overall Medicaid rates for adult inpatient care have not increased in at least eight years. Recent increases in rates for inpatient child and adolescent care have been coupled with decreases in other Medicaid reimbursement rates to the same hospitals. The Commission recommends that higher reimbursement rates in both outpatient and inpatient settings, which better reflect the costs of care, be a core component of a redesigned behavioral health care system.*

Exhibit 28
Page 01159

19.     Inadequate reimbursement rates have also impacted the behavioral health workforce, which remains insufficient to meet the needs of many Connecticut residents.   The Commission recommends that, in addition to addressing reimbursement rates, Connecticut identify and take measures to increase the behavioral health workforce.   These might include educational incentives such as loan forgiveness programs.

20.     Connecticut has significant problems with system fragmentation resulting from diverse payment systems and a lack of coordination or consistency among state agencies.  A fragmented system yields unequal access to effective treatment, discontinuities of care for those receiving service, and unsustainable financial burdens for individuals, families and communities.

21.     The definition of "care" must be reviewed. Funding decisions about behavioral health "care" must look beyond the model that has prevailed over the past several decades to embrace psychosocial interventions, services directed toward the achievement of functional skills and other efforts to engage the whole person, which frequently offer the best prognosis for recovery.   A behavioral health diagnosis accompanied by acute, rather than chronic, symptoms should be removed as a prerequisite for access to care.

22.     Commercial insurance should cover the full panoply of services available through the public behavioral health system, e.g., programs that provide housing, vocational and occupational support, and drop-in services that can be essential components of an effective treatment strategy for individuals struggling with severe mental illness.  The Commission recommends continuing efforts to expand coverage to a broad range of evidence-supported services for individuals with private insurance.

23.     Since the goal of optimal health care is to integrate behavioral health seamlessly into comprehensive care, continued use of behavioral health carve-outs, designed to control behavioral health costs rather than increase access, should be phased out as quickly as possible.  The Connecticut Behavioral Health Partnership is noteworthy in designing incentives to coordinated care across

128

Exhibit 28
Page 01160

ER_3331

physical and mental health as well as substance abuse services for Medicaid-funded care despite the existence of a behavioral health carve-out, but full integration and comprehensive care is most likely achieved through eliminating mental health carve-outs altogether.

24.    To guarantee that provider panel lists facilitate, rather than frustrate, access to care, health plans should be required to maintain up-to-date and accurate provider panel lists and to make these available to all members. The Commission recommends that Connecticut establish standards for accurate lists, as well as a mechanism for fining or otherwise holding insurers accountable for publishing inaccurate lists.

25.    Despite recent changes in Connecticut law, behavioral health providers continue, virtually unanimously, to report repeated and inappropriate denials of care.  The Commission therefore recommends that appeals of all denials of care be processed through an independent entity such as the Office of the Health Care Advocate.  Independent clinicians selected by this entity should be available around the clock for such reviews.  A second level of review should be available through the same entity.  Insurers should be required to provide reimbursement during the denial and appeals period up to the point of ultimate denial by the neutral reviewing party.  When a licensed provider determines that a particular course of treatment is medically necessary, the burden of proof should fall to the insurer to demonstrate otherwise. Any conclusion by a reviewer that care is not medically necessary should be based, to the extent possible, on findings in the medical literature.  The results of scientific studies, and/or recommendations of recognized health care professional organizations and recognized authorities of evidence of efficacy especially in the absence of scientific studies, should not be discredited solely on the assertion of the insurer.

26.    The Commission has recommended adoption of models of care that integrate behavioral and general health services.  In the current world of diverse funding and delivery mechanisms, it is impossible to talk about access to mental or behavioral health services in a unified way.  In the Commission's view,

129

Exhibit 28
Page 01161

*Connecticut must find ways to fund integrated models of care for both children and adults that ensure access to quality, affordable, culturally appropriate and timely care for residents throughout the state.*

**IV.      BARRIERS TO ACCESS: STIGMA AND DISCRIMINATION**

     **A.      Analysis: Confronting Mental Health Stigma**

When Governor Malloy addressed this Commission at its first meeting on January 24, 2013, he emphasized the need to reduce the stigma of mental illness, noting aptly that our culture has destigmatized violence yet failed to destigmatize mental health treatment.  Throughout the testimony presented to the Commission, users of mental health services, mental health providers, government officials, academics, members of the law enforcement community and others spoke repeatedly of the ways in which stigma frustrates effective treatment and recovery of individuals with mental health challenges.  Many members of the public still view mental illness as shameful and frightening and perceive people with behavioral health difficulties as different and dangerous. The problem is not limited to people's attitudes, though.  Stigma infects our laws, policies and institutions.

The stigma associated with mental illness impacts individuals, families and communities in significant ways.  Stigma discourages people from accessing care, interferes with care once it is accessed, and informs a fragmented and inadequately funded system of care.  Many individuals who struggle with mental health challenges either do not seek care or discontinue care prematurely, and experts have identified stigma as a major factor.  Despite widespread efforts over the past fifteen years to combat stigma, catalyzed in part by former U.S. Surgeon General David Satcher's 1999 report on Mental Health and the 2003 report of the President's New Freedom Commission on Mental Health, recent studies have found that many Americans still regard people with mental illness as dangerous, incompetent and at fault for their condition. Department of Health and Human Services, U.S. Public Health Service. (1999). *Mental Health, A Report of the Surgeon General.*  Retrieved from

130

Exhibit 28
Page 01162

ER_3333

http://profiles.nlm.nih.gov/ps/access/NNBBHS.pdf;   The   President's   New Freedom   Commission   on   Mental   Health.   (2003).   Retrieved   from http://govinfo.library.unt.edu/mentalhealthcommission/reports/FinalReport/ downloads/FinalReport.pdf.

1.   Defining stigma

According   to   its   common   dictionary   definition,   stigma   is   a   mark   of disgrace   associated   with   a   particular   circumstance,   quality   or   person.   The concept   of   social   stigma   came   into   focus   following   the   1963   publication   of sociologist Erving Goffman's book *Stigma: Notes on the Management of Spoiled Identity*.   Over   the   past   half-century   since   that   book   emerged,   academic researchers, policy makers and others have sought to understand how and why certain conditions and markers of identity, including disability, get stigmatized and   how   the   affected   individuals   or   groups   internalize,   manage   or   resist stigma.   One of the most fundamental insights to come out of this decades-long investigation is that language itself can serve as a powerful agent of stigma.   It may   seem   obvious   that derogatory   terms   for individuals   who   struggle with   mental   health challenges   such   as "psycho"   or   "lunatic" convey   profound disrespect,   but   language can   also   contribute   to stigma   in   more   subtle ways.   When we refer, for   example,   to   "the mentally   ill"   or   call someone   "a schizophrenic"   we   are

> "Mental illness stigma has many components.  Stigma involves disrespectful language, inaccurate stereotypes, negative public attitudes, social exclusion, and loss of self-esteem.  Many people believe, incorrectly, that mental illness indicates fundamental character flaws, a propensity for violence, and lifelong limitations and then act according to those beliefs by isolating, avoiding and belittling those who manifest mental illness.  Those beliefs and behaviors create significant barriers to help-seeking.  Even when effective help is available, many will not take advantage of it for fear of the rejection, isolation, and loss of opportunities that may result when others learn they have sought mental health treatment. Youth with mental health problems are particularly vulnerable to teasing and bullying and, as a result, may try to hide their problems rather than seek appropriate professional assistance."
>
> Dr. Otto Wahl, Professor of Psychology and Director of the Graduate Institute of Professional Psychology, University of Hartford, written testimony submitted to the Sandy Hook Advisory Commission.

Exhibit 28
Page 01163

reducing individuals with mental health challenges to markers of pathology; such language, in turn, helps to justify discriminatory policies and practices. Above all, people living with mental illness are people first.

More recently, experts have developed our understanding of stigma by illuminating its mechanisms. Dr. Bruce Link and Dr. Peggy Phelan have offered an influential model of stigma that identifies four dynamic components through which stigma works its harm. The first is *labeling* – the process by which certain human differences are socially selected for salience. Then labels must be linked to negative attributes or *stereotypes*. In the mental health arena, diagnostic categories help organize information about a person's difficulties and assist providers in designing appropriate treatments to relieve that person's suffering. A diagnosis may also enable someone to better understand his or her condition, to avoid self-blame, and to see a way forward. But mental illness diagnoses can also become labels that subject a person to negative stereotypes, including assumptions about incompetence or dangerousness, and they can limit the person's sense of his or her own potential.

Labels can have a dramatic impact on a person's present and future experience that extends far beyond the descriptive. Nearly fifty years ago, in a groundbreaking study examining the power of labeling, social psychologists Robert Rosenthal and Lenore Jacobson told teachers that certain of their students had scored in the top 20% on a test purported to identify "academic bloomers," or children who were entering a period of intense intellectual development. In reality they chose the children at random, and the students they identified had scored no differently from their peers on an I.Q. test. A year later, when they administered the same I.Q. test, the students labeled "academic bloomers" outperformed their peers by 10-15 points. In other words, the identification of these students as "academic bloomers" influenced the way their teachers taught the children; the teachers' higher expectations of certain students in turn actually fostered dramatic intellectual development.

132

Exhibit 28
Page 01164

ER_3335

The label, randomly assigned, became a self-fulfilling prophecy.[19] Unfortunately, labels can constrain people's potential just as they can expand it.

In addition to labeling, stigma requires the *separation* of insiders from outsiders through which a labeled group is understood as so fundamentally different from the rest of "us" that "they" come to seem less than fully human. For example, although more than one in four Americans wrestles with a diagnosable mental health condition every year, and at least half of Americans will qualify for a diagnosis of mental illness over the course of their lifetimes, we tend to see "the mentally ill" as a discrete group of outsiders whose condition justifies avoidance and a curtailment of rights. Mental illness labels frequently activate a process of dehumanization. ("The default response to a target labeled with mental illness, in the absence of corrective information, may be dehumanization." Martinez, A. G., Piff, P. K., & Hinshaw, S. P. (2011). The Power of a Label: Mental Illness Diagnoses, Ascribed Humanity, and Social Rejection. *Journal of Social and Clinical Psychology*, 30, 1-23, 20.) Labels accompanied by negative stereotypes can blind us to people's full humanity.

Finally, the labeled person experiences *loss of status* and *discrimination*. Link and Phelan emphasize that stigma depends on power differences between those doing the labeling and those labeled. Without social conditions that produce and maintain such power disparities, labels may combine with negative stereotypes and practices of separation but they will not result in significant status loss or discrimination. One of their examples may help to illuminate this distinction. Participants in a program for the treatment of serious mental illness may develop labels for certain members of the hospital staff, dismissively designating some clinicians "pill pushers" and stereotyping them as cold, paternalistic and arrogant. They may even avoid, disparage and exclude members of the labeled group, but the program participants lack "the social, cultural, economic and political power to imbue their cognitions about

---

[19] See generally http://rosenthal.socialpsychology.org.

133

Exhibit 28
Page 01165

ER_3336

staff with serious discriminatory consequences." Link, B.G., & Phelan, J.C. (2001). Conceptualizing Stigma. *American Review of Sociology*, 27, 363-385, 376.   The stigma attached to mental illness, on the other hand, does have serious discriminatory consequences that impact most aspects of a person's life.   In recent years, researchers have identified stigma as a fundamental cause of what they call "diminished life chances," which include housing, employment opportunities and income levels, education and academic outcomes, social relationships, psychological well-being, access to quality health care and good health itself.   Hatzenbuehler, M.L., Phelan, J.C., and Link, B.G. (2013). Stigma as a Fundamental Cause of Population Health Inequalities. *American Journal of Public Health*, 103(5), 813-821.

    2.   The pervasiveness of stigma

Despite widespread advances in understandings of mental illness among experts and the general public alike, negative attitudes toward people with mental illness appear to have become increasingly pervasive over the past several decades.   A 1991 poll measuring Americans' attitudes toward disabilities concluded that "mental illness was the most disturbing type of disability related condition for the general public."   Hinshaw, S.P. (2007). *The Mark of Shame: Stigma of Mental Illness and an Agenda for Change.* New York: Oxford University Press, p. 102.   Research conducted later that decade found that stigma regarding major depression and schizophrenia in particular had increased since the middle of the century even though Americans knew more about mental illness than at any earlier time.   It seems that members of the public had become more likely to

> "I've worked in this field all of my adult life.  I have experienced in my own family serious mental illness.  I'm very much aware of the fact that stigma is the overwhelming issue to people seeking access.  The Surgeon General highlighted this in his 1999 groundbreaking report. [...] Today, even though I think the public understands much more so than ever that these are biologically based illnesses, the public's view of mental health and what we internalize in our own belief system is much more negative than it ever was."
>
> Sheila Amdur, testimony presented to the Sandy Hook Advisory Commission, April 12, 2013.

Exhibit 28
Page 01166

associate major mental illness with dangerousness, possibly due in part to the closing of state psychiatric hospitals beginning in the 1960s and 1970s, inadequate funding of community services, and the increasing numbers of people with mental illness living homeless on the streets, factors that contributed to what some have called the "criminalization of mental illness." As a result of their fears, many Americans are reluctant to interact with people who have mental illnesses.  One large-scale 1996 study capturing Americans' views of mental illness revealed that 38% are unwilling to be friends with someone having mental health difficulties, 64% do not want someone with schizophrenia as a close coworker, and more than 68% would not want someone with depression to marry into their family.  Pescosolido, B.A., et al. (2000). Americans' Views of Mental Health and Illness at Century's End: Continuity and Change. Public report on the MacArthur Mental Health Module, 1996 General Social Survey. Bloomington, IN: Indiana Consortium of Mental Health Services Research, Indiana University; New York, NY: The Joseph P. Mailman School of Public Health, Columbia University.  More recently, in a 2013 poll conducted by the Kaiser Family Foundation, 66% of respondents reported that they would feel very or somewhat uncomfortable if a person with a serious mental illness worked at their child's school, 47% would feel uncomfortable living next door to someone with a serious mental illness, and 41% would feel uncomfortable working with someone who has a serious mental illness.[20]

Stigma is by no means a uniquely American problem; instead, stigma surrounding mental illness has been documented in countries across the globe, whatever their laws and policies on mental disorder.  In their preface to a recent book on mental illness stigma, the authors write: "We know of no society where the stigma of mental illness is not present and potent."  Corrigan, P.,

---

[20] *See*  http://kff.org/disparities-policy/poll-finding/kaiser-health-tracking-poll-february-2013/)

Exhibit 28
Page 01167

Roe, D. & Tsang, H. (2011). *Challenging the Stigma of Mental Illness: Lessons for Therapists and Advocates*. Oxford: Wiley-Blackwell.

Advocates hoped that advances in brain science would help to counteract misunderstandings about mental illness that fuel stigma. But efforts over the past fifteen years to identify the neurobiological basis of some psychiatric illnesses and impart this knowledge to the public do not appear to have diminished stigma. If anything, such efforts seem to have increased social distancing around mental illness and strengthened perceptions of dangerousness. Pescosolido, et al. (2010). "A Disease Like Any Other"? A Decade of Change in Public Reactions to Schizophrenia, Depression, and Alcohol Dependence. *American Journal of Psychiatry*, 167(11), 1321-1330. The explanation that a person's brain is just "wired differently" may elicit fear rather than acceptance. Unfortunately, it appears that little has changed since the publication of the comprehensive Surgeon General's report on mental health in 1999: stigma remains "*the most formidable obstacle* in the arena of mental illness and health" (Surgeon General's Report, 1999, p. 3).

3. <u>Stigma deters access to care</u>

Fear of getting labeled "mentally ill" often discourages people from seeking help for themselves. The potential loss of friends, employment, and the regard of others may eclipse the potential relief from suffering. Indeed, a recent analysis drawing on data from one hundred and forty-four separate studies conducted across the globe concludes that stigma is a key deterrent in accessing mental health

> "This central misconception [conflating mental illness and violent behavior] can distract from other efforts to reduce violence and unnecessarily stigmatize millions with mental health disorders. It could also actually undermine public safety by discouraging people who pose the greatest risk from seeking services, which in turn could result in many with serious mental illness ending up in the criminal justice system, often for minor quality of life offenses and other non-violent offenses. This of course would further perpetuate the mistaken impression that mental illness, criminality and violence are inextricably linked."
>
> Joette Katz, Commissioner, Connecticut Department of Children and Families & former Justice of the Connecticut Supreme Court, testimony before the Sandy Hook Advisory Commission, March 22, 2013

Exhibit 28
Page 01168

care.   Clement, et al. (2015). What is the impact of mental-health-related stigma on help seeking? A Systematic Review of Quantitative and Qualitative Studies.    *Psychological    Medicine*,    45(1):    11-27. Doi:10.1017/S0033291714000129.   A significant percentage (approximately 40% according to the most recent data) of people with serious mental health challenges never pursue treatment, and others begin treatment but discontinue it or fail to adhere fully to the recommended course.    (For a comprehensive review of the topic, see Corrigan, P., Druss, B., and Perlick, D. (2014). The Impact of Mental Illness Stigma on Seeking and Participating in Mental Health Care. *Psychological Science in the Public Interest*, 15(2): 37-70.) According to one sociologist summarizing research on public beliefs about mental illness in the United States, "studies of unmet need consistently report attitudes/beliefs are the primary barrier to care, exceeding the influence of otherwise formidable structural factors (e.g., insurance, finances)," Schnittker, J. (2013). Public Beliefs about Mental Illness. In C.S. Anesthensel, J.C. Phelan & A. Bierman (Eds.), *Handbook of the Sociology of Mental Health* (pp. 75-93). New York, NY: Springer.  The problem may be even more pronounced in the context of child and adolescent mental disorders, with low rates of diagnosis relative to the number of youths who meet diagnostic criteria, and still lowers rates of treatment for those whose disorders are identified.  Pescosolido, B.A. et al. (2008). Public Knowledge and Assessment of Child Mental Health Problems: Findings from the National Stigma Study-Children.   *Journal of the American Academy of Child and Adolescent Psychiatry*, 47(3), 339-349.

The consequences of such deterrence can be grim for the individual, including unrelieved suffering and worse outcomes down the road.   Experts have concluded that "stigma represents a significant public health concern because it is a major barrier to care seeking or ongoing treatment participation." Corrigan, P. (2004). How Stigma Interferes with Mental Health Care.   *American Psychologist,* 59(7), 614-625.   Family members and friends may also suffer.  They may not understand what is happening to their loved

137

Exhibit 28
Page 01169

**ER_3340**

one or may feel helpless to do anything if that person will not pursue treatment. And the community at large bears a burden when one of its members will not get the help he or she needs. Symptoms of untreated mental illness may interfere with a person's ability to participate fully in society. For those with severe mental illness, the consequences could be even more devastating. Although as a general matter mental illness alone contributes little to rates of violence, certain forms of severe mental illness may, if left untreated, increase the risk for violent behavior, and psychiatric illnesses such as major depression clearly raise the risk for *self-harm*. Paradoxically, the stigma surrounding a perceived association between mental illness and violence may actually undermine general safety, since this stigma poses a barrier to care for many who need it most.

### 4. Stigma impacts what care is available

Stigma also affects the availability and quality of care. The persistent underfunding of mental health services, evident in such discriminatory public policies as Medicare lifetime limits on psychiatric treatment and low rates of reimbursement for mental health providers, may result from the stigma attached to mental illness. Although recent reforms such as the federal Mental Health Parity and Addiction Equity Act of 2008 seek to achieve parity between insurance benefits for mental health services and those for other medical care, we have a long way to go before behavioral health care receives equal coverage. As highlighted in this report's discussion of insurance and funding issues as barriers to effective care, precertification requirements that delay and even deter access to behavioral health services must be understood as a product of stigma as well as a mechanism that compounds its effects. Under most private and public insurance plans, behavioral health services (with the exception of limited psychotherapy sessions) require prior authorization – a determination before treatment begins that the services are medically necessary. Private insurers routinely deny coverage under this ill-defined standard for everything from inpatient hospitalization to intensive outpatient treatment to evidence-

138

Exhibit 28
Page 01170

**ER_3341**

based community services.    Long-established fundamental elements of recovery, such as vocational, occupational and social rehabilitation programs, are not reimbursed under private plans. Likewise, more recently validated approaches such as Integrated Dual Disorder Treatment or IDDT, an evidence-based practice that combines substance abuse services with mental health services for people with co-occurring mental health and substance use disorder, receive no coverage.   In addition, commercial insurers generally distinguish between acute and chronic care, denying care for the latter.   By comparison, it is impossible to imagine that reimbursement would be denied at the point that symptoms of congestive heart failure or COPD fail to remit and become chronic.

Even when people do access treatment, they may face expectations of less than full recovery due to stigma within the behavioral health system itself. Individuals with mental health issues are often forced into systems delivery models that focus on their limitations rather than their strengths.   They may encounter dismissive or paternalistic attitudes from clinicians, who may neglect to ask patients about their goals.   Research has established that mental health professionals often harbor some of the same stigmatizing views of their clients that members of the general public do.   Horsfall, J., Cleary, M., & Hunt, G.E. (2010). Stigma in Mental Health: Clients and Professionals.   *Issues in Mental Health Nursing,* 31(7), 450-455.   Systems that make use of peer support and recovery support specialists in addition to professional mental health providers may best promote wellness and encourage consumers to flourish. Such support specialists, however, can be effective only if they receive respect in their dual capacity: as professional partners to other members of the treatment team, and as peers to the person in recovery.

Exhibit 28
Page 01171

### 5.    Internalized stigma

Stigma is first and foremost a function of negative attitudes, exclusionary practices, and discriminatory systems – all external impediments to human flourishing.    But stigma is frequently internalized as well through a dynamic called "self-stigma."   For example, when people with mental health challenges constantly hear messages about their own inferiority, they can begin to believe that a diagnosis of mental illness means an end to achieving their life's goals.   One study dubbed this the "why try" effect, whereby individuals with mental illness internalize negative stereotypes, applying these attitudes toward themselves in ways that undermines their self-esteem and self-efficacy.   They may decline to pursue opportunities that would advance their personal aspirations because they accept the idea that their illness defines them.   Corrigan, P.W., Larson, J.E., Rusch, N. (2009). Self-Stigma and the 'Why Try' Effect: Impact on Life Goals and Evidence-Based Practices. *World Psychiatry*, 8(2), 75-81.  This experience contributes significantly to isolation and demoralization and has been shown to impact a wide range of life outcomes.   Livingston, J.D. & Boyd, J.E. (2010). Correlates and Consequences of Internalized Stigma for People Living With Mental Illness: A Systematic Review and Meta-analysis. *Social Science & Medicine*, 71(12), 2150-2161.

> "My son was diagnosed at the age of eight with bipolar disorder, eight years old.  And let me tell you, when that happened, it was like somebody hit us with a brick, and we didn't know where to turn, we didn't know what to do, we didn't know who to look to. "
>
> Kim Pernerewski, President of NAMI Waterbury, Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013.

Moreover, stigma affects not only the individual diagnosed but also that person's family.  Researchers call this "stigma by association" or "associative stigma."  Van Der Sanden, R.L., Bos, A.E., Slutterheim, S.E., Pryor, J.B., & Kok, G.  (2013). Experiences of Stigma by Association among Family Members of People with Mental Illness. *Rehabilitative Psychology,* 58(1), 73-80.  The fear and shame that surround mental illness, and the social distancing it entails,

140

Exhibit 28
Page 01172

ER_3343

compound the family's burden and deplete its resources. Family members wrestling with a loved one's psychiatric illness frequently go through a grieving process, one that they must endure alone. For both the individual and that person's family, a diagnosis of mental illness evokes a very different response than does a diagnosis of cancer. Rather than bring casseroles, friends and neighbors may stay away, expressing their discomfort through avoidance and gossip. Family members may suffer severe psychological strain and their relationships may become imperiled.

Although it is unclear exactly what role stigma played in the Lanza household, it seems likely that the stigma attached to mental illness and the behavioral health system affected the family's choices and internal dynamics as well as its interactions with the community. Stigma may have informed his mother's decision to withdraw A.L. from treatment at Yale. Stigma almost certainly contributed to the isolation that both experienced. According to the recent report issuing from the Office of the Child Advocate, Ms. Lanza may have both overestimated and underestimated her son's social, emotional, and behavioral health challenges. On the one hand she created and perfected what the Yale Child Study Center's evaluating psychiatrist dubbed a "prosthetic environment" that unwittingly undermined her son's healthy development and enabled his progressive alienation from the community of his peers. Ultimately he became so isolated that he eschewed live human contact altogether. On the other hand, she may have failed to appreciate the full and increasingly alarming extent of his social and emotional impairments. Out of concern for his welfare she narrowed her own world dramatically to accommodate her son, thereby cutting both of them off from potential support structures. The stress and shame of parenting a deeply troubled child may have made it impossible for Ms. Lanza to ask for help in those final years. Nothing in the record before the Commission suggests that offers of assistance were forthcoming. Pervasive stigma compounds the stress and shame that many families experience, and this experience may encourage family members to retreat still further from

141

Exhibit 28
Page 01173

potential social supports.  The Child Advocate's report notes emphatically that stigma can impede the sort of successful family engagement strategies that are critical to the effective care and support of children with emotional, developmental and behavioral challenges.

### 6.  The media's role in perpetuating stigma

Any discussion of this topic would be incomplete without a reflection on the significant role the media plays in perpetuating stigma.  In 1999, a *New York Daily News* headline screamed, "Get The Violent Crazies Off Our Streets!"  A 2013 headline on the cover of the British paper *The Sun* announced "1,200 Killed By Mental Patients," with the number 1,200 highlighted in blood red.  Such headlines strongly bolster the misconception that people with psychiatric illnesses are routinely violent and dangerous.  Since many Americans learn about mental illness principally through visual and print media, the messages they encounter there go a long way toward shaping their attitudes.  As the New Jersey Governor's Council on Mental Health Stigma explains, "[t]hose living with mental illness are sometimes exempt from the sensitivity and compassion that writers, journalists, filmmakers, and television producers afford those living with illnesses such as cancer and diabetes."[21]

Even less obviously sensationalistic media coverage can compound these damaging and inaccurate stereotypes.  Much of the coverage on access to firearms in the wake of tragedies such as the Sandy Hook shootings has focused on restrictions related to a person's history of psychiatric treatment.  For example, a December 21, 2013 *New York Times* article bearing the headline "When the Right to Bear Arms Includes the Mentally Ill" was followed one week later by an editorial provocatively titled "When the Mentally Ill Own Guns." In the second piece, the editors of the *New York Times* referred to the earlier article as a "recent report showing how people who brandish guns, threaten family and neighbors and *even admit to mental illness* are able to get around the police" Editorial Board (December 28, 2013). When the Mentally Ill Own

---

[21] *See* http://www.state.nj.us/mhstigmacouncil/community/media/

142

Exhibit 28
Page 01174

**ER_3345**

Guns. *The New York Times.* The implication here is that an identified mental illness clearly signals dangerousness even if the laws on firearm eligibility do not preclude all of "the mentally ill" from owning guns. As discussed elsewhere in this report, mental illness plays a marginal role in the risk of gun violence, particularly gun violence directed toward strangers, but headlines such as these suggest otherwise. Moreover, recent research confirms that the inordinate focus on mental illness in media coverage of mass shootings clearly increases stigma toward people with serious mental illness and provides fodder for discriminatory policies and practices. McGinty, E.E., Webster, D.W., & Barry, C.L. (2013). Effects of News Media Messages About Mass Shootings on Attitudes Towards Persons With Serious Mental Illness and Public Support for Gun Control Policies. *American Journal of Psychiatry,* 170(5), 494-501. In addition to exacerbating negative attitudes toward people with psychiatric illnesses, media coverage that places mental illness at the center of debates over gun control may irresponsibly distort the issues by suggesting that access to firearms by individuals with mental illness constitutes a significant factor in overall rates of gun violence.

7.    Effectively combating stigma

While it is clear that we must work to eradicate stigma and its effects on people suffering from mental health challenges and their families, it is far less clear how we should go about doing so. Concerted stigma-reduction efforts have had a mixed record of success. For example, as described earlier, clinicians, advocates and policy makers have increasingly presented mental illness as a medical disease with neurobiological origins, partly in response to scientific knowledge and partly in an effort to decrease stigma. At least one recent study, however, establishes that even if the public embraces neurobiological explanations for disorders such as schizophrenia, major depression and alcohol dependence, signs of stigma have not diminished significantly. Indeed, while researchers did identify widespread support for mental health *treatment*, they also found that such support actually went

143

Exhibit 28
Page 01175

ER_3346

hand-in-hand with exclusionary policies toward people with behavioral health challenges. (Pescosolido, B. A., 2010).

Other studies have focused on the particular mechanisms employed in anti-stigma campaigns, identifying three general categories: protest efforts, education, and direct contact with people living with mental illness. They suggest that these approaches have varying degrees of efficacy and that their impact may well depend on the audience. Protests launched against stigmatizing media images and stereotypical depictions of mental illness have witnessed some success in reducing such representations, but their impact on the public's attitudes is less clear. Indeed, the suppression of stereotypes, if not combined with efforts to promote personal contact, may actually exacerbate stigma. Corrigan, P.W., Penn, D.L. (1999). Lessons from Social Psychology on Discrediting Psychiatric Stigma. *American Psychologist,* 54(9), 765-776. Educational campaigns that address many of the misconceptions surrounding mental illness may influence the attitudes of providers within the healthcare system but are unlikely, without more, to make much of a difference to members of the general public. Finally, and of particular concern to this Commission, strong evidence suggests that discussions linking mental illness and violence may exacerbate negative, fearful attitudes toward people with mental health challenges and encourage exclusion and avoidance. Even where such discussions occur in an effort to generate support for mental health services, these negative stereotypes may coincide with contrary impulses, undercutting such support.

A clearly effective way to correct the negative stereotypes held by those outside the mental health field is to contest dehumanization by illuminating the humanity of those who live with mental illness. Where possible, we should foster personal contact between members of the public and people with lived experience of mental illness. Rusch, N., Angermeyer, M.C., Corrigan, P.W. (2005). Mental Illness Stigma: Concepts, Consequences, and Initiatives to Reduce Stigma. *European Psychiatry,* 20(8), 529-539; Corrigan, P.W., Penn,

Exhibit 28
Page 01176

D.L. (1999).   Lessons from Social Psychology on Discrediting Psychiatric Stigma. *American Psychologist,* 54(9), 765-776.   In addition to programs promoting personal contact, media outlets can expose the public to those with lived experience.  We can look to places such as New Zealand, Canada and the United Kingdom, among others, for examples of broad-scale media campaigns to combat stigma.  These efforts appear to have had some salutary effects.  In the case of England's "Time to Change" anti-stigma campaign, launched in 2009, recent survey data finds that media messages aimed at changing attitudes and behaviors around mental health problems have had a positive impact, though a moderate one.   Evans-Lacko, S., Corker, E., Williams, P., Henderson, C., and Thornicroft, G. (2014).  Effect of the Time to Change Anti-Stigma Campaign, Launched in 2009, Recent Survey Data Finds That Media Messages Aimed at Changing Attitude and Behaviors Around Mental Health Problems Have Had a Positive Impact, Though a Moderate One.  *The Lancet Psychiatry,* 1(2), 121-128.[22]  Experts who study mental health stigma agree that media campaigns must incorporate two types of messages to combat stigma effectively: "see the person" messages and recovery-oriented messages.  Both draw attention to the person behind the label and refute gloomy, and potentially self-fulfilling, prognoses.   While short of clear consensus, two additional messages also receive broad support: those that promote social inclusion (also described as a "human rights" message) and those that emphasize the high prevalence of mental disorders.  Experts caution against a "one size fits all" approach, stressing that particular combinations of messages, targeted toward particular audiences, are likely to be most effective.   Clement, S., Jarrett, M., Henderson, C., and Thornicroft, G. (2010).  Messages to Use in Population-Level Campaigns to Reduce Mental Health-Related Stigma: Consensus Development Study. *Epidemiologia e Psichiatria Sociale,* 19(1), 72-29.   The Substance Abuse and Mental Health Services Administration (SAMHSA) has published a comprehensive toolkit called *Developing a Stigma*

---

[22] Available at http://www.time-to-change.org.uk/.

145

Exhibit 28
Page 01177

ER_3348

*Reduction Initiative* that includes a step-by-step guide as well as best practices for successful campaigns to reduce stigma.[23]

Many of the Commission's additional recommendations, while not addressed directly to stigma reduction, may have the salutary effect of decreasing stigma. For example, school-based behavioral health services have the potential to enable children and families to address mental health challenges in an environment relatively free from the stigma that attaches to the mental health system. Even more significantly, they could over time diminish the stigma associated with mental illness by integrating mental health care with other forms of health screening and care available to children through the schools. Schools can communicate to students and their families that mental health is an important component of total wellness.

Programs such as CIT (Crisis Intervention Team Training) and CIT-Y (training directed toward youth issues) for the law enforcement community and Mental Health First Aid for teachers, counselors, parents, neighbors, coaches, youth group leaders, police officers and others can have a direct impact on stigma. The former programs equip law enforcement officers with the tools necessary to assist people experiencing behavioral health crises and to deescalate situations that could otherwise lead to arrest, injury or worse. Mental Health First Aid, a program first developed in Australia, has since 2008 prepared teachers, counselors, parents and others across the United States to recognize the warning signs of a mental health challenge and to offer help until appropriate treatment and support become

> "What CIT and CIT-Y both do, is they create opportunities. [A program like these] reduces the stigma even by us, because we wear badges, we wear uniforms, but we're human beings. Do we have a stigma, do we have a perception of what mental health looks like or what a person in crises looks like? It helps reduce that for everyone. "
>
> Sergeant Chris McKee, Windsor Connecticut Police Department, Testimony before Sandy Hook Advisory Commission, March 22, 2013

---

[23] Available at http://store.samhsa.gov/shin/content//SMA06-4176/SMA06-4176.pdf.

146

Exhibit 28
Page 01178

available.  Strong evidence suggests that this program has not only increased mental health literacy among its participants and connected people to needed services, but also reduced stigma.  The program has taken hold already in parts of Connecticut.

An early focus on social and emotional learning that continues through the upper grades may also work to combat stigma and discrimination. Children who learn not merely to recognize and regulate but also to tolerate emotion may develop less fearful attitudes toward those who do experience behavioral and emotional challenges.  As children proceed through middle and high school, mental health issues should play a central role in the health education curriculum.  Our educational system places an undue emphasis on cognitive skills, and the ascendancy of high-stakes testing only compounds the problem.  To promote healthy development of children and adolescents, we must foster the capacity for empathy alongside critical thinking and creative problem solving.

For adolescents and adults facing mental health diagnoses, effective psychoeducation of both individuals and families can promote acceptance and decrease stigma.  Psychoeducation involves structured programs in which individuals and families are educated about mental illness, its treatments, and strategies for handling typical challenges that might arise in association with a particular condition.  Psychoeducation can also encompass information relevant to a broad range of conditions or circumstances that trigger psychological stress.  The premise of psychoeducation is that knowledge provides a powerful tool for managing behavioral health challenges.  When taught by peers alongside providers, it not only promotes recovery but also offers built-in peer support.

147

Exhibit 28
Page 01179

Psychoeducation should embrace evidence-based practices. Some examples of effective programs include courses such as Parents and Teachers as Allies, eCPR, Mental Health First Aid, Think Trauma and TARGET (Trauma Affect Regulation: Guide for Education and Therapy) that educate the community at large about how to recognize signs of emotional distress and how best to assist those in need. The goal of such programs is not to teach people how to diagnose their family members, friends and neighbors with a mental illness, but instead to recognize that someone whom they might consider "different" or "odd" may in fact need help. Participants learn ways to connect with an individual in need and to empower that person to get help. Courses such as NAMI's Family to

"Allocating money to support people in distress is a natural and conscientious response to a tragedy of this nature. Our communities are in dire need of constructive outlets for aggression and supportive engagement. However, increasing funding for status quo mental health programs [alone] will not accomplish this objective of supporting people experiencing distress. The experience of many patients in the current mental health system is one of frustration after diagnosis because the focus often becomes managing symptoms and minimizing side effects of medication, rather than feeling good and striving for happiness and a meaningful life. This approach is leading to oppression, discrimination and a significant loss of human potential. It is time to support people in ways that appreciate experiences contextually and conceive of suffering as transient. The mental health system should not treat people as if there is something inherently wrong with them from which they cannot recover. We should focus on promoting resilience and encouraging people to take responsibility and be accountable for their actions and their lives. It has been my experience and that of many others that when people learn what they need to do to be well, including the power of nutrition, of working through troubling emotions, of belief in self, of living intentionally rather than simply existing, they recover. Let's work together to create an environment where there are options. Communities need to be created where people feel as if they have been supported when they reach out to talk about their troubles. We must foster the expectation that people will rebuild their lives. We cannot accomplish this aim without including people with psychiatric histories in the conversation."

Deron Drumm, Co-Executive Director of Advocacy Unlimited & Director of Recovery University, written testimony submitted to the Sandy Hook Advisory Commission

148

Exhibit 28
Page 01180

ER_3351

Family and Peer to Peer partner affected individuals and families with others who have been through similar experiences.[24]  Above all, such programs need to incorporate a model of wellness rather than illness.  People living with mental health challenges, their family members and friends need to learn skills to manage their condition.  Diagnosis brings with it a distinct set of challenges, only some of which are due to symptoms of the illness itself.  People with lived experience are role models and can provide examples of a path to a successful recovery.  They can be part of a treatment team as peer support specialists, or providers can refer people in treatment to peer support groups outside of the treatment setting.

Personal accounts coming from those with lived experience of mental illness or their families play an important part in effective stigma-reduction. Such stories can reach people currently struggling with mental health challenges as well as the general public, providing vivid examples for both of recovery and resilience.   One in five people currently lives with a mental fillness.  While most of us know someone living with a mental health challenge, too many of us are afraid to talk about it.  As a community we need to move beyond this silence and toward true acceptance.

8.   Concluding thoughts

As Governor Malloy stated, we must combat the stigma surrounding mental health challenges if we are to achieve a mental health system that effectively and compassionately helps people overcome barriers to health and achieve full participation in our society.   Money invested in anti-stigma campaigns must be spent wisely to create social change.  Since stigma works its harm through stereotyping, social distancing and dehumanization, anti-stigma efforts must involve participants with lived experience of behavioral

---

[24] For resources see http://www.ct.gov/dmhas/lib/dmhas/cosig/ FamilyToolkit.pdf; *see also* http://store.samhsa.gov/product/Family-Psychoeducation-Evidence-Based-Practices-EBP-KIT/SMA09-4423.

149

Exhibit 28
Page 01181

health problems who put a human face on mental illness. Stigma can also distort people's self-understandings as they internalize messages about their own inferiority. Providing people with evidence-based psychoeducation helps to educate, empower and embrace individuals, families, and communities impacted by mental illness. Anti-stigma campaigns must communicate in clear and persuasive terms that a diagnosis of mental illness doesn't have to mean an end to achieving one's life goals.

These efforts should embrace the broader purview of social and emotional health and psychological resilience rather than focusing exclusively on serious mental illness. Stigma around mental health issues can take hold in part because our culture has devalued psychological wellness and emotional awareness. Behavioral health challenges affect all of us, and even diagnosable mental disorder will touch each one of us directly or through those we love. If we can cultivate the capacity for empathy in our children and ourselves, we will go a long way toward eradicating stigma and building a system that promotes true wellness across our society.

### B.    Key Findings And Recommendations

27.    *Notwithstanding widespread efforts over the past two decades to combat stigma, recent studies have found that many members of our society still regard people with mental illness as dangerous, incompetent and at fault for their condition. But a diagnosis of mental illness does not have to mean an end to achieving one's life goals. Systems of care that promote wellness generally and recovery for those who struggle with behavioral health challenges and the effects of traumatic stress can help to diminish stigma and its effects. The media plays a pivotal role in perpetuating stigma but it can also serve as an agent of change, a key player in efforts to eradicate stigma.*

28.    *Research suggests that anti-stigma campaigns should incorporate two types of messages to combat stigma effectively: "see the person" messages that highlight the full humanity of individuals living with mental illness rather than focusing on labels; and recovery-oriented messages that refute gloomy, and*

150

Exhibit 28
Page 01182

*potentially self-fulfilling, prognoses.  But experts caution against a "one size fits all" approach, stressing that particular combinations of messages, targeted toward particular audiences, are likely to be most effective.  The Commission strongly supports research that will identify the most effective measures to reduce stigma, as well as implementation of those measures.*

*29.    Many of the Commission's recommendations regarding models of care and the organization and funding of systems of care, while not addressed directly toward stigma reduction, may have the effect of decreasing stigma.  For example, school-based behavioral health services have the potential to enable children and families to address mental health challenges in an environment relatively free from the stigma that attaches to the mental health system.  Even more significantly, they could over time diminish the stigma associated with mental illness by integrating mental health care with other forms of health screening and care available to children through schools.*

*30.    The Commission recommends the expansion of programs that engage people across the community in issues relevant to mental health. Programs such as CIT (Crisis Intervention Training) and CIT-Y (training directed toward youth issues) for the law enforcement community, as well as Mental Health First Aid for teachers, counselors, parents, neighbors, coaches, youth group leaders, police officers and others, increase mental health awareness among members of the community who can then offer support to children and adults facing mental health challenges and help them access the resources they need.*

*31.    For adolescents and adults facing mental health diagnoses, effective psychoeducation of both individuals and families can promote acceptance and decrease stigma.  Psychoeducation involves structured programs in which individuals and families are educated about mental illness and its treatment, and strategies are given for handling typical challenges that might arise in association with a particular condition.    The goal of such programs is to recognize that someone whom they might consider "different" or "odd" may in*

151

Exhibit 28
Page 01183

**ER_3354**

*fact need help.  Participants learn ways to connect with an individual in need and to empower that person to seek help.  Above all, such programs need to incorporate a model of wellness rather than focus primarily on illness.  People with lived experience serve as role models and can provide examples of a path to a successful recovery.*

**V.     PRIVACY, CONFIDENTIALITY AND COMMUNITY SAFETY**

**A.     Analysis: Privacy In The Service Of Mental Health**

Privacy and confidentiality form integral aspects of an effective and humane mental health system.  Federal and state privacy laws shield information regarding medical treatment generally, and behavioral health treatment specifically, from unauthorized disclosure.  Obligations of confidentiality on the part of medical providers, however, begin with the Hippocratic Oath and find expression in codes of medical ethics.  Additional laws, policies and professional ethics protect the confidentiality of communications between mental health consumers and their treatment providers.  Writing that "[t]he mental health of our citizenry, no less than its physical health, is a public good of transcendent importance," the United States Supreme Court recognized a federal psychotherapist-patient privilege in a 1996 case, *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996).  Such privileges, which exist in every state, safeguard confidential communications between individuals and their psychotherapists against compelled disclosure in court.  They are predicated on the recognition that successful mental health treatment requires honesty and trust.  Very few of us would be willing to share our most intimate thoughts and feelings with a provider without assurance that these would not be revealed publicly, much less used against us in a legal proceeding.

152

Exhibit 28
Page 01184

The right to privacy more broadly garners protection under federal and state constitutions.  But guarantees of privacy are not absolute, even in the context of mental health care.  Instead, they entail a balancing of rights and responsibilities in the interests of individual well-being and community safety.  Questions of privacy and confidentiality implicate a complex tangle of federal laws, including the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, the Family Educational Rights and Privacy Act (FERPA), and statutes directed toward the confidentiality of substance abuse treatment.  In addition to these federal provisions, states have their own laws and policies prohibiting, limiting or – in some cases – mandating the disclosure of mental health information.

In the wake of recent high-profile events in which individuals with psychiatric histories committed acts of mass violence, including the shootings at Virginia Tech University and at an Aurora, CO movie theater, some commentators have called for changes to existing laws in order to permit more ready disclosure of protected health and educational information in the name of public safety.  A closer examination of existing laws, along with the sort of guidance recently provided by the U.S. Department of Health and Human Services, illuminates provisions that permit appropriate disclosure of private information when a clear and imminent and serious threat to public safety exists.  Additional clarification is particularly important in light of the fact that, as the panel appointed to study the Virginia Tech shootings observed, fear of violating applicable laws sometimes leads to

> "The widespread perception is that information privacy laws make it difficult to respond effectively to troubled students.  This perception is only partly correct.  Privacy laws can block some attempts to share information, but even more often may cause holders of such information to default to the nondisclosure options – even when laws permit the option to disclose. […] Much of the frustration about privacy laws stems from lack of understanding.  When seen clearly, the privacy laws contain many provisions that allow for information sharing where necessary."
>
> *Mass Shootings at Virginia Tech, Report of the Review Panel* (August 2007), p. 63.

153

Exhibit 28
Page 01185

ER_3356

excessive caution in cases where disclosure is warranted.  The Commission is divided on whether revisions to existing laws are warranted to permit mental health professionals in some cases to share relevant information about a patient's treatment with family members over the patient's objections.

  1. <u>The HIPAA Privacy Rule</u>

  The federal HIPAA Privacy Rule, which took effect in 2003, protects the privacy of patients' health information while permitting appropriate uses and disclosures of the information when necessary for a patient's treatment, for public health purposes, or for other critical needs such as a serious threat to the health or safety of the patient or third parties.  It applies to "covered entities," which include all health care providers, including mental health care providers, and health plans that transmit health information in electronic form. The information protected, though, encompasses individually identifiable health information transmitted in any format.  Providers must observe the minimum requirements of the Privacy Rule regardless of the state in which they practice, although if a state's laws provide greater protections to patients then providers must adhere to the more stringent laws.  HIPAA distinguishes between situations that permit disclosure of a patient's health information with that patient's express or implied consent and those that require further authorization, typically in the form of a detailed release.

  At the same time that it expands patients' rights to control the disclosure of protected health information ("PHI") and communications about their care, the Privacy Rule permits disclosure of such information in a variety of circumstances.  For instance, HIPAA allows a health care provider to communicate in the patient's presence with a patient's family, friends or other persons who are involved in the patient's care or payment for care, as long as the patient does not object.  Ideally, family and friends play a supportive and integral role in a patient's health care.  When a patient has capacity to make health care decisions and expressly consents to disclosure, HIPAA clearly permits a provider to share relevant information with family members or

154

Exhibit 28<br/>Page 01186

others.    In circumstances where, using professional judgment, the provider may infer consent from a patient's conduct – for example, when a family member or friend is invited into the treatment room – that provider may also discuss such information with third parties.    A more complicated situation arises where a patient is not capable of objecting or granting consent, because the patient is either incapacitated or not present.    In such situations, providers may still disclose information to family members or friends as long as the provider determines, based on professional judgment, that disclosure is in the patient's best interests.    Where the third party is neither a family member nor a friend, the provider "must be reasonably sure that the patient asked the person to be involved in his or her care or payment for care."    U.S. Department of Health and Human Services (HHS). (2014). *Guidance Document: HIPAA Privacy Rule and Sharing Information Related to Mental Health.* http://www.hhs.gov/ocr/privacy/hipaa/understanding/special/mhguidance.html.    In all cases, however, disclosures must be limited to protected health information directly relevant to the person's involvement in the patient's care or payment for care.

The Privacy Rule enumerates other circumstances in which covered entities may use and disclose PHI, including as part of their own "treatment, payment and health care operations."    In other words, they may reveal a patient's health information to further the patient's health care services, to obtain payment or reimbursement for care provided, or to advance their own internal operations.    Providers may not release protected health information to employers, schools, or others for purposes other than treatment, payment or health care operations without a very specific written authorization.

Several external conditions permit providers to disclose portions of a patient's health information.    If a statute or court order requires a provider to disclose individually identifiable health information, then the provider may do so.    In limited circumstances, the Rule permits disclosure for certain public health purposes as well as for the protection of individuals from abuse, neglect

155

Exhibit 28
Page 01187

ER_3358

or domestic violence.   The Rule also allows disclosure for certain law enforcement purposes. In cases where a serious and imminent physical threat to the safety of an individual or the public exists providers may disclose to someone they believe may be able to prevent or lessen that threat.   Again, in all cases disclosure should be limited to the minimum amount of information needed to accomplish its intended purpose.

Like the *Jaffee* case, HIPAA identifies a particularly pressing need for confidentiality in psychotherapeutic relationships.   While the Privacy Rule covers all health information, additional privacy protections apply to notes from psychotherapy sessions.   According to the Privacy Rule, psychotherapy notes are "notes recorded by a health care provider who is a mental health professional documenting or analyzing the contents of a conversation during a private counseling session or a group, joint, or family counseling session and that are separate from the rest of the patient's medical record." (HHS Guidance, p.3.)   These are to be distinguished from information about medication, the modalities and frequency of treatments, results of clinical tests, diagnoses, progress reports, or the like.   They do not include any information contained in a patient's medical record.   Disclosure of psychotherapy notes requires *written authorization* from the patient.

An exception to this extra solicitude granted psychotherapy notes arises if disclosure is mandated by other law.   Such compelled disclosure would generally arise only in situations involving mandatory reporting of abuse and mandatory "duty to warn" situations in which the patient threatens serious and imminent harm against reasonably identifiable victims, or those in which the patient poses a threat of imminent harm to self.   Since the California Supreme Court decided the landmark case of *Tarasoff v. Regents of the University of California* in 1976, almost all states have recognized an exception to therapist-patient confidentiality where a therapist determines that a patient poses a serious threat of harm to others.   In some states, such knowledge triggers a duty to warn or to take other measures to protect potential victims,

156

Exhibit 28
Page 01188

**ER_3359**

while in others, such as Connecticut, it gives providers permission to breach confidentiality without fear of legal reprisal. Connecticut law currently defines this exception differently depending on the professional status of the therapist, with separate statutory provisions applying to psychologists, psychiatrists, social workers, marital and family therapists, and professional counselors. While the statutory "duty" in Connecticut is couched in permissive language, court cases appear to recognize a potentially mandatory duty to protect in situations where a patient poses a threat of imminent harm to a known victim or class of victims.

Under the HIPAA Privacy Rule, if a provider discerns a serious, imminent threat of harm to the patient or to others, the provider may contact a patient's family or law enforcement, consistent with applicable law and standards of ethical conduct. Even where a threat exists, however, disclosures may not be made indiscriminately; they should be made only to people who are reasonably able to prevent the harm or lessen the threat. These may include police officers, family members, school administrators, and campus security.

2.    The health information of a minor child

Children are generally not accorded the same rights to control their health information as are emancipated minors and adults. The Privacy Rule authorizes a health care provider to share information regarding the health and treatment of a minor child with that child's personal representative. HIPAA recognizes that parents, guardians or others acting "in loco parentis" usually have the authority to make health care decisions about their minor children and therefore serve in most cases as personal representatives who can access PHI, authorize disclosure to third parties, and exercise other privacy rights of the child. Exceptions to this provision arise when state law permits a child to access health (including mental health) services without a parent's consent; when someone other than the parent is authorized by law to make health care decisions for the child; or when the parent or guardian assents to a particular confidentiality agreement between the provider and the child. State laws

157

Exhibit 28
Page 01189

ER_3360

determine the specific age at which a child may make his or her own health care decisions for HIPAA purposes. Although parents serving as personal representatives generally have access to information contained in their child's medical records, including information about diagnosis, symptoms and treatment plans, they do not have the right to a copy of notes from the child's psychotherapy sessions. Moreover, if a provider suspects that permitting the parent or guardian to exercise the child's privacy rights might endanger the child or is otherwise not in the child's best interests then the provider need not do so. Similar provisions apply to a legal representative, such as the guardian, of an adult or emancipated minor patient.

3.    Limits on a parent or guardian's access to health information of an adult child

When a child reaches the age of majority, his or her parents or legal guardian no longer have the right to make decisions regarding the adult child's medical care. Under non-emergency circumstances, HIPAA prevents doctors, therapists and other providers from sharing protected information about an adult patient's treatment – even with family members – when the patient has objected to disclosure. Many in the behavioral health community see these HIPAA restrictions as too stringent when applied to family members, particularly in the context of treatment for mental and substance use disorders. A person suffering from the symptoms of a serious mental illness, which might include hallucinations, paranoia, suicidal feelings, and other experiences with the potential to cloud judgment and distort reality, could be poorly positioned to make such decisions. If not privy to critical information about the patient's condition and treatment, family members may remain unable to provide the support necessary for the patient's recovery and may lack the preparation to respond to a potentially volatile situation.

A hypothetical scenario may help to illustrate these dangers. An 18-year-old young man has had to take leave from his first year in college due to his third psychotic episode; he has recently received a diagnosis of

Exhibit 28
Page 01190

schizophrenia.  He lives at home with his parents and is entirely dependent on them, unable to hold employment or live independently.  He does well when he takes medication but rapidly decompensates when he becomes non-compliant.  Although his parents attempt to supervise his medication to ensure that he remains compliant, he does not always cooperate.  He has been readmitted to an inpatient unit following his latest discontinuation of medication.  On the unit, he refuses to sign a release allowing the staff to share information about him with his parents.  When he reveals to staff that he intends to stop his medications again, once discharged, the staff is unable to disclose this to his parents.  In addition, he has decided that his parents are plotting against him and that remaining in their household is dangerous for him.  He has developed a plan to go home on discharge, gather some belongings and hitch-hike to another state where he has a friend who, although they have not been in communication for several years, the patient is sure will take him in.  The staff is similarly unable to advise the parents of this plan because the patient has failed to sign a release.  HIPAA requires a finding of imminent dangerousness to share information without a patient's express or implied permission.  While his treatment providers fear that this patient is clearly on a path to chronic psychosis, homelessness and revolving door admissions, because his behavior cannot be considered imminently dangerous either to himself or others HIPAA makes it unlikely that his parents – his sole support system – will be able to intervene.  If they violate HIPAA's Privacy Rule, providers may be subject to very large fines or, under some circumstances, even graver penalties.

Others within the mental health community, however, maintain that HIPAA's existing exceptions afford sufficient opportunities to protect patients and others from danger.  They are concerned that weakening privacy protections for mental health patients may frustrate treatment by deterring some who need it from seeking or continuing care, and by discouraging truly forthcoming communications with providers in the course of treatment.  Moreover, a less robust approach to privacy might threaten the autonomy of

159

Exhibit 28
Page 01191

mental health consumers, at least in the short-term.  Whereas those persuaded that HIPAA protections go too far in elevating privacy rights over other concerns support efforts to amend the federal law in Congress, advocates of patient privacy oppose such efforts.  Opponents claim that in many cases providers actually hide behind HIPAA, overestimating its restrictions and their own potential liability.  At the very least, efforts must be made to clarify these issues, educate participants across the mental health system on the precise contours of the law, and encourage voluntary communication about treatment to the extent it promotes recovery.

4.   <u>Communications to health care providers from concerned friends or family members</u>

> "It's not that this is a person who is only acting badly in their counseling setting and [is] fine everywhere else.  If we're starting to see real behavioral concerns, we're seeing it in the different areas of their life: in the classroom, in the home, on the playing field, in the workplace if we're dealing with an adult case, for example, and not just in a counseling setting.  So trying to get access to that protected information often doesn't get us more than what we're able to find out through publicly available information or just talking with teachers, for example, or colleagues.  But with mental health professionals involved, one thing that's very important is that we can always provide information to a counselor, to a therapist.  So while psychologists, psychiatrists, social workers can't give us information from a patient, there is nothing that prevents them from receiving information. "
>
> Marisa Randazzo, Ph.D., SIGMA Threat Management Associates, testimony before Sandy Hook Advisory Commission, March 22, 2013.

Although HIPAA and state laws place significant constraints on the disclosure of individually identifiable health information absent a patient's consent or authorization, HIPAA does not prevent concerned family members and others from communicating their own worries about a person's health or safety to a provider.  In the context of mental health treatment, HIPAA permits a health care provider to take information in from family members or friends who are concerned about someone receiving mental health treatment, even if that provider cannot reveal information to those parties.  For instance, in her testimony to the Commission, Marisa

160

Exhibit 28
Page 01192

ER_3363

Randazzo, Ph.D., a national expert on threat assessment and violence prevention, suggested that privacy laws such as HIPAA do not pose a major obstacle to the work of teams focused on identifying students or workers who may pose a threat of harm to themselves or others. According to Dr. Randazzo, while privacy laws may prevent teams conducting threat assessments from accessing protected health information absent emergency services, teams often have access to equally relevant information through other channels such as teachers, friends and family members that may suffice to inform the team as to a person's particular risk factors. Moreover, since HIPAA permits communications *to* providers, knowledge that family members, friends and even threat assessment teams have of a particular patient's behavior may actually contribute to the patient's treatment.  HHS recently clarified that HIPAA "in no way prevents health care providers from listening to family members or other caregivers who may have concerns about the health and well-being of the patient, so the health care provider can factor that information into the patient's care."  (HHS Guidance, 2014, p. 8.)  Any such information transmitted to a provider by someone close to the patient, if given under a promise of confidentiality, may be withheld from the patient "if the disclosure would be reasonably likely to reveal the source of information." (HHS Guidance, 2014, p. 8); 45 C.F.R. § 164.524(a)(2)(v).  The regulations implementing HIPAA carve out this exception to a patient's right of access to protected health information so that family members may communicate relevant safety information without worrying that the patient will feel betrayed upon learning of this communication.

     5.   <u>FERPA</u>

The HIPAA Privacy Rule specifically excludes from its reach records that are protected under The Family Educational Rights and Privacy Act, or FERPA. FERPA guards the privacy of students' education and treatment records.  It applies to all educational agencies and institutions that receive funds under any program administered by the U.S. Department of Education, and therefore

Exhibit 28
Page 01193

reaches virtually all public schools and school districts, as well as most private and all public colleges and university, including medical, law and other professional schools. Since it does not apply to schools that do not receive funding from the U.S. Department of Education, private and parochial elementary and secondary schools are generally exempt from FERPA's requirements. The law requires the written consent of a parent or eligible student before an educational agency or institution may disclose education records or personally identifiable information from education records. At the elementary or secondary school level, "education records" not only encompass a student's academic records but also a student's health records such as immunization records and those residing with a school nurse that are maintained by an educational agency or institution. They also include a student's records on special education services provided under the Individuals With Disabilities Education Act (IDEA). FERPA gives students and their parents the right to inspect all education records.

At postsecondary institutions, a student's medical and psychological treatment records relating to student health or psychological services are generally excluded from the definition of "education records" under FERPA so long as they are created, maintained and used only in connection with that student's treatment. This means that treatment records are available only to professionals providing medical or mental health care to the student, or to other appropriate professionals of the student's choice. A student does not have an automatic right to inspect such records if they are not considered "education records." Such records may be disclosed for other purposes with the written consent of the student or, if a relevant exception applies, without the student's consent. For example, disclosure may be made in connection with a health or safety emergency. Once the records are disclosed for any purposes other than treatment, however, including to the student himself or herself, they become "education records" subject to all other FERPA requirements. If the student is receiving treatment at a university hospital that

162

Exhibit 28
Page 01194

provides such services without regard to a person's status as a student and not on behalf of the university, then records related to the treatment are subject to the HIPAA Privacy Rule rather than FERPA.

As with HIPAA, FERPA's provisions include exceptions that apply when a student's or third party's health or safety is at stake.  Both education and treatment records may be disclosed to appropriate parties without consent in connection with an emergency if necessary to protect the health or safety of the student or others.

6.   Gray areas between FERPA and HIPAA

Because both laws protect the privacy of records that may pertain to a person's health history or treatment, some confusion exists around areas of potential intersection between FERPA and HIPAA.  One area of potential confusion involves the records of health care provided to students in an educational setting.  A public elementary or secondary school that provides health care to students through school-based health clinics, nurses, social workers or other professionals is generally not considered a "covered entity" subject to HIPAA.  The actual records relating to student health are generally considered "education records," and for all schools receiving funding from the Department of Education these records are therefore subject to FERPA rather than the HIPAA Privacy Rule.  In other words, the HIPAA Privacy Rule usually does not apply to schools or those acting on behalf of schools to provide health services to students.  But where an outside provider or entity provides services directly to students without acting on behalf of the school, even if it does so on school grounds, then its records are not subject to FERPA.  Those records may be subject to the HIPAA Privacy Rule if that provider is a "covered entity."  For schools that are not covered by FERPA, such as private schools that do not receive funding from the U.S. Department of Education, the HIPAA Privacy

Exhibit 28
Page 01195

Rule may apply to all individually identifiable health information of students as long as the schools qualify as "covered entities."[25]

### 7.   Concluding thoughts: Balancing privacy and safety under both HIPAA and FERPA

With their extensive limitations on disclosure of private information and their recognition of individual privacy rights, both HIPAA and FERPA codify the deep respect for personal privacy that our society has embraced for more than a century.  Yet both statutes shield private health and educational information from unauthorized disclosure while maintaining exceptions that serve equally significant interests in community safety.  When a person's behavioral health challenges are contributing to a serious and imminent safety threat, then provisions within existing laws permit the sharing of relevant information that would otherwise be shielded from disclosure to the extent that this information is likely to lessen or avert this threat.  Recent guidance from the U.S. Department of Health and Human Services helps to clarify when and how such information may be communicated.  This sort of clarification needs to be combined with outreach to and education of behavioral health care providers. It remains the case, however, that the language of these laws is exceedingly complex.  The guidance documents issued by HHS are themselves densely written and fail to adequately elucidate all relevant issues.  Additional efforts at both the state and federal levels to facilitate appropriate interpretation and application of these laws are therefore warranted.  As recommended by the Task Force to Study the Provision of Behavioral Health Services for Young Adults, Connecticut should "[c]larify, and educate all health care providers regarding, the current HIPAA and FERPA laws that address communications between clinical providers and college, school and university settings where adolescents and young adults study in order to allow enhanced and timely communication when safety due to a mental illness (threat to self or others) is an issue."  (Task Force Report, 2014, p. 62)

---

[25] See http://www2.ed.gov/policy/gen/guid/fpco/doc/ferpa-hipaa-guidance.pdf.

164

Exhibit 28
Page 01196

ER_3367

Some members of the Commission remain concerned that existing laws such as HIPAA that restrict disclosure of treatment information even to parents or other family members over a patient's objection erect an additional barrier to effective care.  Others support communication about treatment consistent with an adult patient's choice as long as no emergency or threat to safety exists. Since threats to safety occur on a continuum from minimal to extreme, there will always be gray zones in which the assessment of the degree of threat and the interpretation of privacy laws create a conundrum for clinicians considering disclosure of patient information.  Although the Commission was unable to arrive at a recommendation concerning these issues, its members agree that privacy laws must be interpreted and applied in ways that facilitate care coordination and the provision of integrated care to the maximum extent possible.  It is particularly critical that information-sharing take place to the full extent permitted under law so that children's needs can be adequately recognized and addressed across schools, health care settings, child guidance clinics, and other institutions critical to their healthy development.

### B. __Recommendations__

*32.   The Commission cautions against measures that would curtail the privacy rights of people living with mental illness in the absence of a clear understanding of what current laws and policies do and do not allow.  Although recent guidance issuing from federal agencies attempts to clear up widespread confusion about how far existing laws go in limiting the sorts of disclosures that might arise in the context of concerns about safety, ambiguities and potential misunderstandings persist.   Additional efforts to clarify and educate providers and the public on these issues are sorely needed.*

*33.   Existing laws permit appropriate disclosure of otherwise private mental health information in situations where a threat to someone's safety appears imminent.  Privacy laws still, however, restrict most communications about a person's mental health treatment absent that person's consent, even where barriers to disclosure frustrate effective care or subject the patient and*

165

Exhibit 28
Page 01197

**ER_3368**

*others to less obvious dangers.   The Commission supports efforts to facilitate communication in the service of effective care while respecting individuals' rights to privacy and autonomy.*

*34.   With respect to children's behavioral health, it is essential that information-sharing take place to the full extent permitted by law so that children's needs can be adequately recognized and addressed across schools, health care settings, guidance clinics, and other institutions critical to their healthy development.  Educational privacy laws should be implemented in such a way that they do not compromise essential communication for children struggling with serious emotional, behavioral and developmental challenges. With parent permission, schools and treatment providers should in general be allowed to share important information that will facilitate the care and education of children.*

## VI.    THE ROLE OF MENTAL ILLNESS IN VIOLENT EVENTS

### A.    Analysis: Mental Illness And Violence, Misconceptions And Realities

What role did mental illness play in A.L.'s decision to take the lives of twenty-six children and adults at Sandy Hook Elementary School, as well as that of his own mother and himself?   As noted in the Child Advocate's exhaustive report on his developmental and educational history, we do not have a definitive answer to that question and may never discover one.  Simply posing the question here, in the context of the Commission's report, may lend credence to popular misconceptions surrounding the extent to which mental illness contributes to violence in America.  As we shift focus from the gun safety implications of the Sandy Hook shootings to the implications for mental health treatment, the Commission remains concerned that a report dwelling on questions of mental illness or mental health risks may cement associations between mental illness and violence for the public.  Indeed, many of the experts who testified before the Commission expressed their hope that discussions of mental health in the aftermath of mass shootings avoid reinforcing the

166

Exhibit 28
Page 01198

ER_3369

perceived link between mental illness and violence.  Nearly half of Americans believe that persons with serious mental illness are "more dangerous than the general population," according to a 2013 public opinion survey whose results appeared online in the *New England Journal of Medicine.*[26]  As noted earlier, such beliefs flow from the pervasive stigma attached to mental illness and contribute unmistakably to the attitudes and behaviors that comprise ongoing stigma.  Therefore, it is essential that we address these

> "The first mental hospital in the American colonies was founded by no lesser light than Benjamin Franklin, who first argued before the Pennsylvania colony that treatment should be provided to people with mental illness for humanitarian reasons because they were in pain.  He was told that the resources weren't available.  He came back in the next session and argued that people with mental illness were 'a terror to their neighbors, who are daily apprehensive of the violences they may commit.'  If you go to Philadelphia now, the treatment facility that was built at that time still stands."
>
> Dr. John Monahan, Professor at the University of Virginia School of Law, Testimony presented to the Sandy Hook Advisory Commission, April 26, 2013.

popular beliefs alongside the relevant empirical research, which largely refutes the presumed association between psychiatric illness and violence while providing a more nuanced account of the salient risk factors for violence. While the Commission's case for improvements to our behavioral health systems may find readier acceptance if accompanied by a promised reduction in societal violence, the real picture is far more complicated.

No significant correlation exists between most psychiatric illness per se and violence, including gun violence, in our culture.  This is true even for severe psychiatric disorders, such as bipolar disorder and major depression. Approximately one fifth of American adults suffer from a diagnosable mental disorder in any given year.  NIMH, *Any Mental Illness Among Adults.* Available at: http://www.nimh.nih.gov/health/statistics/prevalence/any-mental-illness-

---

[26] Barry, C.L., McGinty, E.E., Vernick, J.S., and Webster, D.W. (2013). After Newtown – Public Opinion on Gun Policy and Mental Illness. *The New England Journal of Medicine.* Available at: http://www.nejm.org/doi/full/10.1056/NEJMp1300512.

167

Exhibit 28
Page 01199

ER_3370

ami-among-adults.shtml.  Close to 6% of the U.S. population qualifies for a diagnosis of major psychiatric illness, generally understood to be an illness marked by psychosis, disordered thinking, delusions, hallucinations, and/or severe impairments in daily living.  According to the leading research, however, mental illness underlies somewhere between 3%-5% of violent acts committed in the United States.  Studies demonstrate repeatedly that while untreated psychiatric illness in a narrow subset of the population may increase the risk of violence  to a significant degree for that subset, a diagnosable mental illness is a very weak predictor of interpersonal violence -- particularly compared to other factors such as substance abuse, a history of violence, socio-economic disadvantage, youth, and male gender.  For gun violence in particular, mental illness contributes greatly to rates of suicide but marginally to homicide rates.  Likewise, the Commission heard testimony from experts in the field of Autism Spectrum Disorders suggesting a similarly weak link between such disorders and externally directed violence.  These developmental disorders involve challenges in social functioning, communication and adjustment to change.  Researchers to date have not found any correlation between the presence of an Autism Spectrum Disorder alone and an increased risk for criminal violence.

Yet it is impossible to avoid talking about the mental health implications of tragedies such as the Newtown shootings for a number of reasons.  Despite the widespread assumption that anyone who could commit an act like this *must* be mentally ill, reviews of mass murders committed over the past three decades suggest that many perpetrators would not qualify for a diagnosable mental illness. For example, "offender and offense characteristics of a nonrandom sample of adolescent mass murderers," in *American Academy of Child and Adolescent Psychiatry* found that out of 34 adolescent males involved in 27 school shootings between 1958 and 1999, only 23% had a documented psychiatric history and 6% demonstrated evidence of psychosis around the time of the killings.  Meloy, J.R., Hempel, A.G., Mohandie, K., Shiva, A.A., and Gray, B.T. (2001). Offender and Offense Characteristics of a Nonrandom

168

Exhibit 28
Page 01200

ER_3371

Sample of Adolescent Mass Murderers. *Journal of the American Academy of Child & Adolescent Psychiatry*, 40(6), 719-728.  But even if many would not qualify for a diagnosable mental illness under the current edition of the *Diagnostic and Statistical Manual of Mental Disorders* (the *DSM*), our experience tells us that there is something terribly wrong with such individuals.  We want to assign mental illness as a cause because to do so appears to provide some sort of answer to the question, "How could this happen?"  It also feels unsatisfying to assert that people who commit mass murder do not have a mental illness in the face of several recent mass killings where perpetrators clearly appeared to have psychotic illnesses, specifically the shootings at the Navy Yard, at an Aurora, CO movie theater, and in Tucson, Arizona.

While psychiatric illness is associated with real symptoms and real suffering, diagnosable mental disorder must be understood as both a scientific and a socio-cultural entity. The entire world of aberrant thoughts, feelings and behavior is not captured by any edition of the *DSM*; nevertheless, we experience some types of aberrant behavior as so deviant from the norm that we assume they must reflect illness.  This confusion is compounded by the many conditions which, while technically mental disorders appearing in the *DSM*, are not generally what we mean when we conflate mental illness and violence.

For example, mental health experts understand the personality disorders as constellations of personality characteristics that deviate from the norm, are pervasive and inflexible and lead to distress or impairment.  The behaviors and inner experiences of the personality disorders occur on a continuum with normal behavior and experiences.  They differ vastly from psychosis, the condition many in the general public assume underlies serious violence in the mentally ill.  Press accounts and the written manifesto of Elliot Rodger, who murdered six people and injured thirteen others in a shooting spree in Isla Vista, California in May 2014, suggest strongly that Rodger suffered from an extreme degree of narcissism and likely qualified for a diagnosis of narcissistic personality disorder.  It was a profound sense of entitlement, lack of empathy,

169

Exhibit 28
Page 01201

ER_3372

and rage toward others (particularly women) for rejecting him and achieving happiness that made Rodgers dangerous. There is little, if anything, to suggest that he suffered from a psychotic disorder, and yet media accounts of his crimes reinvigorated the myth that mental illness causes mass violence. Our frequent conflation of serious antisocial deviance and aberrant behavior – of bad behavior and mad behavior – impairs our ability to arrive at even a common definition of mental illness in relation to violent behaviors.

Across the population, mental illness accounts for approximately 4% (with estimates ranging from 3-5%) of the violent acts committed in the United States. If we could somehow eliminate mental illness from American society, then, we would likely be left with more than 95% of the violence we currently experience. With these figures in mind, we can say with confidence that persons who suffer from even significant psychiatric challenges should not in general be considered more prone to violence than the population at large.

Certain exceptions apply to this general observation. These exceptions are primarily limited to two groups: individuals with psychotic/delusional disorders who are currently abusing drugs or alcohol; and young men in their first episode of untreated psychosis, particularly those with persecutory delusions and unregulated anger. We address these issues in more detail below.

But leading studies clearly suggest that, under most circumstances, people living with mental illness are no more violent than the general public. Such studies repeatedly find that a mental illness diagnosis is a weak predictor of violent acts, defined broadly to include hitting, throwing objects and engaging in physical fights as well as using weapons. A diagnosis such as depression, anxiety, bipolar disorder, or schizophrenia alone tells us almost nothing about a person's likelihood of committing acts of violence toward others. For psychiatric patients who are not currently psychotic, there is most likely no more risk of violence than for the average person. Across the

Exhibit 28
Page 01202

population, however, certain risk factors are understood to increase the likelihood that particular individuals will engage in violent behavior.

    1. <u>Identifying risk factors</u>

  Experts have identified certain factors that heighten the risk of violence among people with and without psychiatric disorders.  As a general matter, mental illness correlates with a risk of violent acts far less than do male gender, youth, and social or economic disadvantage.  Other clear risk factors for externally directed violence include a history of serious abuse or other trauma as a child and violent victimization over the life course.  In addition, episodes of recent violence, prior arrests, certain personality disorders such as psychopathy, conduct disorders, high levels of anger, and the presence of escalating violent fantasies all increase the likelihood of violence.  According to a recent article by experts in behavioral health, public health and gun violence, "[e]vidence from studies in criminology and developmental epidemiology has shown that risk factors for crime and violence are similar in persons with mental illness and the general population, and that risk exposure often begins early in life."  Swanson, J.W., McGinty, E.E., Fazel, S., and Mays, V.M. (2014.) Mental Illness and Reduction of Gun Violence and Suicide: Bringing Epidemiologic Research to Policy. *Annals of Epidemiology.* Advance online publication. Available at: <u>http://www.sciencedirect.com/science/</u> <u>journal/10472797</u>. Although some variations emerge with a closer look at particular types of violence, these factors remain salient for violence across the board and homicide in particular.  For example, men perpetrate more than 90% of homicides in the United States.  Men also complete the act of suicide approximately four times as often as women do, many of those by firearm.  The vast majority of school shooters and perpetrators of other mass killings have been male.

Exhibit 28
Page 01203

We also know that substance abuse has a stronger association with acts of violence than does a psychiatric diagnosis.  Substance abuse also combines with mental illness to increase the risk of violence significantly.  In what has been called the best epidemiological study ever conducted on rates of violence among populations with and without diagnosed mental illnesses, persons who abused alcohol were more than twice as likely to commit acts of violence than those diagnosable with a major mental disorder who did not abuse alcohol, and those who abused drugs were nearly three times as likely to engage in violence.  Swanson, J.W., Holzer, C.E., Ganju, V.K., and Jono, R.T. (1990). Violence and Psychiatric Disorder in the Community: Evident from the Epidemiologic Catchment Area Surveys. *Psychiatric Services*, 41(7), 761-770. Another major study showed that where persons living with mental illness were not abusing drugs or alcohol, they had no statistically significant differences in their rates of violence compared to the general public.  Alcohol and drug abuse are highly salient risk factors for violence, and when a person with a psychiatric condition has a simultaneous substance abuse problem, the risk of violence escalates.  Steadman, H. et al. (1998). Violence by People Discharged from Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods. *Archives of General Psychiatry*, 55, 393-401.  (A summary of the study is available at http://www.macarthur.virginia.edu/violence.html.) Substance abuse frequently co-occurs with symptoms of mental disorder, particularly when those symptoms have not received adequate treatment. Drugs and alcohol likely account for much of the increased risk of violence among individuals with psychiatric illnesses.  Therefore, efforts to address the contribution of mental illness to violence generally must confront substance

> "What we know about violence is that it's dynamic.  So every single one of us is capable of engaging in violence under the right circumstances.  If our lives are threatened, a family member's life is threatened, we are capable of acting violently."
>
> Marissa Randazzo, Ph.D., Sigma Threat Management Associates, Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013.

Exhibit 28
Page 01204

abuse to have any measurable effect.

We also know that rates of gun violence in general, and particularly gun fatalities, correlate strongly with higher rates of gun ownership. Whereas the United States has both extremely high rates of gun ownership and high rates of firearm-related deaths, Japan and the United Kingdom have very low gun ownership rates and correspondingly low rates of gun-related deaths. In a recent study evaluating the relationship between rates of gun ownership and deaths by firearms across twenty-seven developed countries, researchers found "a significant positive correlation between guns per capita per country and the rate of firearm related deaths, with Japan being on one end of the spectrum and the US being on the other." Their statistical analysis identified a far weaker correlation between rates of mental illness – estimated by looking at major depressive disorder – and gun deaths, and no significant correlation at all between rates of mental illness and general crime. Bangalore, S. and Messerli, F.H. (2013). Gun Ownership and Firearm-related Deaths, *The American Journal of Medicine*, 126(10), 873-876.

Some countries have dramatically reduced their rates of gun violence with heightened regulation of firearms. For example, Australia implemented strict gun control legislation across its states and territories following the 1996 murder of thirty-five people at a popular tourist destination by a young man with assault weapons. Since then, Australia has seen a significant reduction in firearms-related deaths. The new law banned all automatic and semi-automatic long guns (establishing national buybacks of semi-automatic rifles, self-loading and pump-action shotguns, and handguns) and instituted a strict licensing and registration requirement for all legal firearms. There have been *no mass shootings* in Australia since 1996, and the firearms mortality rate has decreased from approximately .27 per 100,000 to .13 per 100,000 in recent years. Viewed from a different angle, death by firearm is now well over twenty times (and as much as twenty-seven times) more likely to occur in the United States than in Australia. As the Child Advocate's report observed, "[t]he

173

Exhibit 28
Page 01205

**ER_3376**

conclusion that access to guns drives shooting episodes far more than the presence of mental illness is inescapable" (OCA Report, 2014, p. 79).   In addition to declining rates of gun homicide and elimination of mass shootings altogether, rates of suicide by firearm also saw striking declines in Australia during this period.   Peters, R. (2013). Rational firearm regulation: evidence-based gun laws in Australia. In D. Webster & J. Vernick (Eds.), *Reducing gun violence in America: informing policy with evidence and analysis* (pp. 195-204). Baltimore: Johns Hopkins Press.   See also Alpers, P. (2013). The big melt: how one democracy changed after scrapping a third of its firearms. In D. Webster & J. Vernick (Eds.), *Reducing gun violence in America: informing policy with evidence and analysis* (pp. 205-211). Baltimore: Johns Hopkins Press.

One exception to the weak correlation between psychiatric disorder and violence involves individuals undergoing a first psychotic episode, particularly if high levels of anger accompany persecutory or paranoid delusions.   In testimony presented to the Commission, Dr. Madelon Baranoski of the Yale School of Medicine offered a useful account of why particular symptoms of psychosis may increase the risk of violence.   A person suffering from a psychotic illness often confuses internal thought processes with real events in the world.   So if that person is feeling scared, he or she may mistake *thoughts* of danger for *actual* danger.   Likewise, internal feelings of anger and unease may appear to be coming from external sources.   Persecutory delusions, such as beliefs that a person is being spied on or is the target of a conspiracy, can be extremely frightening for someone who cannot reliably distinguish his or her own thoughts from external reality.   Yet even such delusions of persecution do not generally appear to lead to violence in the absence of unregulated anger. High levels of anger increase the risk of violence across our society, whether or not psychiatric illness is present.

Some researchers have estimated that a relatively significant risk of violence – several times the risk for the general public – accompanies a first episode of untreated psychosis, especially during the period between the onset

174

Exhibit 28
Page 01206

**ER_3377**

of illness and the beginning of treatment known as the duration of untreated psychosis, or DUP. A large-scale analysis of the available research on homicides committed by persons with a psychotic illness found that annual homicide rates by individuals with untreated psychosis were approximately *fifteen times higher* than rates for individuals with treated psychotic illnesses. Nielssen, O. and Large, M. (2010). Rates of Homicide During the First Episode of Psychosis and After Treatment: A Systematic Review and Meta-analysis. *Schizophrenia Bulletin*, 36(4), 702-712. For those who had received mental health treatment, total homicide rates were approximately 1 in 10,000 annually. For those in a first episode of psychosis before treatment began, however, homicide rates approached 1 in 700.

A very recent study out of Sweden suggests that a diagnosis of schizophrenia or related psychotic disorder *is* associated with an increased risk for violent offenses, suicide and premature mortality. Researchers also found, though, that specific risk factors beyond the diagnosis enhance the likelihood of these poor outcomes. Published in *The Lancet*, this large-scale study compared records of over 24,000 Swedes diagnosed with schizophrenia to those of their siblings without such diagnoses and of the general population. It isolated three risk factors that typically increase the rates of all three adverse outcomes: drug use disorders, a history of violent criminal behavior, and self-harm. Fazel, S., Wolf, A., Palm, C., and Lichtenstein, P. (2014.) Violent Crime, Suicide, and Premature Mortality in Patients with Schizophrenia and Related Disorders: A 38-Year Total Population Study in Sweden. *The Lancet Psychiatry*, 1(1), 44-54. Once again, this study supports the conclusion that a specific diagnosis alone tells us very little about a person's likelihood of engaging in acts of violence. Instead, we must attend carefully to the particular risk factors that research conducted throughout the world has linked to violence and self-harm.

175

Exhibit 28
Page 01207

**ER_3378**

2.     Types of violence

We have noted that approximately 3-5% of all violence committed in the United States is attributable to persons living with mental illness.   That includes aggressive acts such as pushing another person, other types of assaultive or threatening behavior, and gun violence, among other things. Researchers have identified hitting another person as the type of violence most frequently committed by discharged psychiatric patients.  In one major study, only 2%-3% of the violent acts attributable to discharged psychiatric patients involved a gun or threats of a gun.  Monahan, J. et al. (2001). *Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence.* New York: Oxford University Press.

Absolute rates of violence are low among individuals with mental illness and homicidal violence is extremely rare.  Stranger homicide in particular – the killing of a person unknown to the perpetrator – comprises a very small fraction of the larger picture of violence in our society.  A study conducted by an international team of researchers looking at data from countries across the globe confirmed that stranger homicide by persons with schizophrenia is an extraordinarily rare and unpredictable event, likely occurring at a rate of approximately 1/140,000 people with schizophrenia per year.  The same large-scale analysis found that, across the population, the risk that any person will die at the hands of a stranger with a psychotic illness in any given year amounts to one in 14 million.  Nielssen, O. et al. (2011). Homicide of Strangers by People with a Psychotic Illness. *Schizophrenia Bulletin*, 37(3), 572-579.

3.     Protective factors

When symptoms of mental illness are controlled, the rates of violence among people with psychiatric disorders appear to decrease even further.  The highly regarded MacArthur Violence Risk Assessment Study found that, among individuals with a history of psychiatric hospitalization but no active symptoms of psychiatric disorder in the past year, the rate of any violent behavior was 2% – equivalent to that of the general population.   Monahan, J. et al. (2001).

176

Exhibit 28
Page 01208

*Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence.* New York: Oxford University Press.  A summary of the study and references to additional analyses of the dataset are available at http://macarthur.virginia.edu/risk.html.  As noted earlier, such studies tend to define violence broadly to include acts that range from hitting someone or engaging in a physical altercation to threatening others and/or using weapons.

Where an increased risk of externally directed violence exists, the availability of community treatment appears to offer a critical protective measure.  According to the MacArthur study, while recently discharged psychiatric patients had somewhat elevated rates of violence (11.5% vs. 4.6% in the community) in the first ten weeks after discharge, within this group those who had attended outpatient treatment sessions had considerably lower rates of violence than those who hadn't.  Indeed, *discharged psychiatric patients who had received one session per week of outpatient treatment had rates of violence significantly lower than the general population.*

Early intervention programs intended to reach adolescents and young adults in the prodromal phase of schizophrenia – the period of weeks, months or years in which individuals experience behavioral and psychological abnormalities that precede the onset of fully psychotic symptoms – with supports and early treatment may help to mitigate the risk associated with early psychosis.  Connecticut pioneered two of the first such programs in the country.  STEP, the clinic for Specialized Treatment Early in Psychosis at the Connecticut Mental Health Center in New Haven, is a Yale-DMHAS partnership established in 2006 that provides extensive outpatient services and supports for young people suffering early symptoms of psychosis and their families.  The program has witnessed reductions in inpatient hospitalizations and other clear benefits associated with comprehensive early intervention in the prodromal phase of psychosis.  Srihari, V.H. et al. (2015) First-Episode Services for Psychotic Disorders in the U.S. Public Sector: A Pragmatic Randomized Controlled Trial. *Psychiatric Services.* Advance online publication. Available at:

177

Exhibit 28
Page 01209

**ER_3380**

http://ps.psychiatryonline.org/doi/10.1176/appi.ps.201400236.        The POTENTIAL Early Psychosis Program at Hartford Hospital's Institute of Living, first initiated on a small scale in 2004 and since expanded, has achieved similar results, with a large proportion of the young adults treated thus far successfully pursuing work and/or educational goals.   De Maio, M., Graham, P., Vaughan, D., Haber, L., and Madonick, S. (2015.) Review of International Early Psychosis Programmes and a Model to Overcome Unique Challenges to the Treatment of Early Psychosis in the United States. *Early Intervention in Psychiatry*, 9(1), 1-11.

>    4.   <u>Self-harm and victimization</u>

It is essential to remember that those with mental health challenges are far more likely to be victims of violence than perpetrators.  This is true both at the hands of others and through self-harming behavior.   For example, women with mental illness face a five-fold greater likelihood of experiencing domestic violence than do women without a psychiatric disorder.  *Suicide, the leading type of firearm-related death, is highly correlated with mental disorder.*  Some studies estimate that up to 90-95% of completed suicides are attributable to depression and other psychiatric illnesses, often in combination with substance abuse.  Guns play a major role in suicide; over half of completed suicides involve firearms.  The use of a gun makes it far more likely that a suicide attempt will actually result in death.  Significantly more gun-related deaths in American occur by suicide than by homicide.  In 2010, suicides made up 61.2% of the 31,672 deaths by firearm in the United States, whereas homicides accounted for 35%.   Similar figures exist for 2011: 32,163 gun deaths, of which 19,392 were suicides and 11,078 homicides.  GunPolicy.org. *United States – Gun Facts, Figures and the Law.*  Retrieved from http://www.gunpolicy.org/firearms/region/united-states.       Indeed, mass shootings frequently end with the shooter's suicide, whether directly or through the intervention of law enforcement (a phenomenon known as "suicide by cop").

Exhibit 28
Page 01210

These tragic events cannot be adequately understood without attention to their suicidal dimensions.

      5.   <u>Managing the risk of violence</u>

How can we know who is likely to become violent in the future, and what can we do to stop them?  Risk factors alone tell us little about any individual's future acts of violence.  Mental health professionals have developed two very different approaches to risk assessment: an actuarial approach and a clinical approach. An actuarial risk assessment engages in inductive reasoning, applying known information about others who share certain characteristics such as age, education level, etc. with a particular individual to assess that individual's risk of violence.   Clinical assessments, on the other hand, focus on the particular facts of a particular person's life experience over time.   Neither mechanism, on its own, can reliably predict future violence, although actuarial measures tend to be more accurate than clinical predictions alone.   Clinical factors may be most relevant for hospitalized psychiatric patients with acute illness.  Actuarial methods that look beyond the individual to historical factors appear to be more predictive for long-term community violence.   The most effective approach to managing the risk of future violence combines actuarial and clinical measures in a dynamic assessment that evaluates a person's likelihood of committing violent acts in ways that are sensitive to how that person responds to various interventions.

The fact that experts have identified certain risk factors that enhance the likelihood of violence, however, neither guarantees a certain outcome nor determines what interventions, if any, will effectively mitigate that risk. Findings of "dangerousness" cannot be equated with predictions of a violent act.  In other words, mere knowledge of risk factors does not yield conclusions about what to do next.  Short of involuntary inpatient commitment, involuntary outpatient commitment in those states that have such laws, and gun seizure laws, most risk factors for violence in individuals facing mental health challenges are not susceptible to intervention without their voluntary

179

Exhibit 28
Page 01211

ER_3382

participation.  Where clinicians do identify risk factors that are associated with bad outcomes, they should focus targeted treatment and intervention on those factors that can be changed and monitor those that can't.  For high-risk patients, mental health treatment should attempt to increase risk mitigators and decrease risk aggravators.

In a variety of contexts, risk factors alone produce no certainty of outcome.  For example, cell phone use while driving certainly constitutes a risk factor for accidents – and therefore a kind of dangerousness – and yet it is nearly impossible to predict which drivers will cause accidents in the future.  A diagnosis of mental illness has far less predictive value for future violence than driving while talking or texting on a phone does for future car accidents.  Efforts to manage risk should identify and address risky behaviors, not risky persons.

A person's prior history of violence is the best predictor of future episodes, and each additional episode enhances the predictability of the next one.  Measures that ensure earlier treatment of psychosis and continued treatment in the community would likely prevent at least some violent acts.  Equally important, evidence suggests that early intervention can dramatically

> "[J]ust knowing somebody has mental illness does not make them at an increased risk for violence.  It isn't an associated risk factor."
>
> Dr. Madelon Baranoski, Testimony presented to the Sandy Hook Advisory Commission, April 12, 2013

alter the course of psychotic illness and prevent acute episodes from becoming chronic.  Early intervention, then, not only offers a better prognosis but may further reduce the risk that a young person slipping into untreated psychosis would lash out violently toward family members or strangers.

### 6.    The limits of violence prediction

While it can feel as if our culture is saturated with violence, for predictive purposes stranger violence in general is what is known as a "low base-rate event," and acts of mass violence are considerably more rare.  Attempts to predict such events face little likelihood of success.  Even if we could devise an

Exhibit 28
Page 01212

instrument or method of predicting violence with a 95% rate of accuracy, violence is a rare enough occurrence (with rates of serious violence among even identifiably high risk populations hovering in the low single digits) that our predictions would still yield an unacceptable number of false positives.  In reality, our predictions are far less accurate than that, with actual measures generally achieving no more than a 50% accuracy rate.  Any test that purports to predict future violence will produce far more wrong answers than correct ones.  This combination of low base rate events and tests with low levels of accuracy therefore makes predictions of specific future violent acts something of a fool's errand, with overreaching a near certainty.  Mass fatality incidents such as those that have occurred over the past few years in Newtown, Aurora, Tucson, the Washington Navy Yard, Fort Hood, TX, and – most recently – Isla Vista, CA remain extremely rare, despite their prominence in the media.  Although their incidence appears to have increased in the past several years, such events still account for only *one-tenth of 1%* of all firearm-related homicides in the United States.  American Psychological Association. (2013). *Gun Violence: Prediction, Prevention and Policy*, p. 4.  Retrieved from http://www.apa.org/pubs/info/reports/gun-violence-prevention.aspx.

Although A.L. evidently received no mental health treatment during the five years preceding the shootings at Sandy Hook, some other recent perpetrators of mass violence were involved with the mental health system shortly before their crimes.  The question inevitably arises as to why any mental health professionals who encountered that person failed to prevent such violence. Certain legal reforms that have arisen in the wake of these tragedies assign new reporting requirements to such professionals on the assumption that clinicians possess the expertise and prescience to predict and prevent violence.  Yet the reality is that mental health professionals are ill-equipped to make specific predictions of violence with any accuracy.  Such predictions differ from assessments of risk that equate with the general condition of "dangerousness" (being at significantly higher risk than the norm).

181

Exhibit 28
Page 01213

According to Dr. Michael Norko, Director of Forensic Services at Connecticut's DMHAS and Associate Professor in Yale's Department of Psychiatry, "[w]e can determine current dangerousness reasonably well, for clinical purposes, when the danger is due to psychiatric conditions." (Norko, M. (April 12, 2013). Testimony to the Sandy Hook Advisory Commission.) In other words, clinicians are skilled at identifying which patients currently pose a danger to themselves or to others and at devising ways to manage risks related to psychiatric conditions. But testimony before the Commission from forensic psychiatrists and others makes clear that no one has yet devised a reliable method for predicting *future* violence – who will and will not be violent, when violence will occur, or what the targets of that violence might be.

The field of future violence prediction, whether art or science, achieves modest accuracy at best and is therefore of little clinical utility. Predictive instruments are truly helpful only if nearly infallible. In looking to address deficiencies in the mental health system and productive points of intervention, the Commission's recommendations should not be taken as having the primary goal of violence risk-reduction. Even an improved mental health system, alone, will at best modestly reduce violence in our society. Instead, a welcome outcome of improved and more widely accessible mental health services might be *harm reduction*, including a reduction in self-harm and suffering. Reductions in harm to others may constitute a secondary benefit of a better resourced and more cohesive mental health system that can effectively promote psychological wellness and recovery.

7.     From prediction to prevention

Just as clinical risk assessment is of limited utility in efforts to prevent violence, trait-based profiling appears to represent an ineffective and even counterproductive means of identifying individuals likely to commit acts of targeted violence. The Commission heard testimony from law enforcement officials and others, including an expert school security consultant who worked for the United States Secret Service, suggesting that profiling tends to be

182

Exhibit 28
Page 01214

ER_3385

inaccurate and far more likely to create stigma than to avert harm. An influential report compiled by the Secret Service in collaboration with the U.S. Department of Education on school shootings carried out between 1974 and 2000 specifically determined that "[t]here is no accurate or useful profile of students who engaged in targeted school violence." U.S. Secret Service and U.S. Department of Education. (2002). *The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the United States.* Available at: http://www.secretservice.gov/ntac/ssi_final_report.pdf.

> "When we connect those people, students, former students or others to the right resources to help solve those problems, their thoughts and plans of violence typically go away."
>
> Marissa Randazzo, Ph.D., Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013.

Instead, experts have developed a promising alternative to psychological or demographic profiling called behavioral threat assessment, which focuses on identifying and intervening with individuals whose behavior and/or communications clearly indicate an intention to commit violence. The Secret Service's behavioral threat assessment model has been adapted for use in educational institutions, workplace settings, and the U.S. military. Dr. Marissa Randazzo, a national expert on threat assessment and targeted violence, testified at length to the Commission on the composition, workings and goals of teams called "threat assessment teams" that gather information from multiple sources in response to indications that a student, colleague or other person's behavior has raised alarms. The threat assessment process should focus less on a person's static qualities – an approach closer to profiling – than on the person's current situation, particularly the dynamic elements of what might be changing for the better or worse. Once a team has identified someone who appears to be on a pathway to violence, the team ideally becomes a resource connecting the troubled child, adolescent or adult to the help they need to address their underlying problems. The Commission has recommended above

183

Exhibit 28
Page 01215

ER_3386

that all schools form such multidisciplinary teams to conduct risk assessments for students when concerns are raised.  These would not only identify students at risk for committing violence, but also serve as a resource for children and families facing multiple stressors.  Rather than stigmatize these individuals and families, risk assessment teams should become a "go to" community resource that supports and strengthens families and community connections.

Expertise in predicting any individual person's likelihood of committing violent acts need not form the core of violence-prevention efforts in any event. Instead, a public health approach to violence prevention would emphasize comprehensive, population-based strategies that implement protective mechanisms on a broad scale long before any particular person poses a specific danger.  It takes violence as a systemic problem rather than an individual failing and attempts to address the underlying root causes and risk factors. Hemenway, D. and Miller, M. (2013). Public Health Approach to the Prevention of Gun Violence. *New England Journal of Medicine*, 368, 2033-2035. See also American Psychological Association. (2013). *Gun Violence: Prediction, Prevention and Policy*. Available at: http://www.apa.org/pubs/info/reports/gun-violence-prevention.aspx.  Experts who advocate this sort of approach point to examples such as traffic fatalities and tobacco use, where effective regulation, public awareness campaigns, and other system-wide interventions have successfully enhanced public safety.  To return to the analogy of cell phone use while driving, we do not need to predict the likelihood that any particular driver will cause a traffic accident in order to address the risks such behavior may present.  Rather, we can regulate the use of hand-held devices while driving and communicate to the public about the dangers of distracted driving.

Any effort to reduce violence on a broad scale, however, must address factors known to contribute to the risk of harm, including developmental factors such as chronic childhood adversity, poor behavioral regulation, and social disconnectedness, as well as environmental factors such as poverty and unemployment.  As detailed above, both substance abuse and access to

Exhibit 28
Page 01216

firearms also clearly contribute to the risk that a person will pose a danger to self or others. Therefore, an effective violence-prevention strategy cannot ignore or discount these major risk factors. Likewise, a young man such as A.L. with severe and largely untreated social and emotional challenges, profound and worsening social isolation, a longstanding and obsessive fascination with violence and mass murder, and—perhaps most importantly— unfettered access to an arsenal of firearms would appear to present a number of risk factors for behaviors that could pose a danger to himself and/or others. According to the Child Advocate's extensive investigation of his educational, health and familial history, in A.L.'s case these risk factors were persistently neglected and underestimated.

### 8.   Mandatory reporting and firearm ownership

In the wake of the Sandy Hook shootings, several states rushed to implement mandatory reporting laws and to augment existing laws that make certain persons ineligible to own or purchase firearms. For example, New York enacted the SAFE Act of 2013, which compels mental health professionals to report to county authorities anyone to whom they are currently providing treatment if they believe that person "is likely to engage in conduct that would result in serious harm to self or others." Such a report sets in motion a process for including that person on a statewide database limiting their access to firearms for at least five years. Available at https://www.omh.ny.gov/omhweb/safe_act/nysafe.pdf. While removing guns from those who may legitimately be considered at risk for violence is an eminently worthy goal, the statute incorporates poorly defined criteria for making such determinations and thus threatens to compromise the provider-patient relationship toward uncertain ends. According to the *New York Times*, within the first year and a half of its existence this reporting requirement had led to approximately 34,500 individuals being identified as too mentally

185

Exhibit 28
Page 01217

**ER_3388**

unstable to possess firearms.[27]  The long term impact of New York's reporting requirement may well include increased stigma and diminished trust of the mental health system, which in turn may deter those who need it from seeking treatment.  By contrast, California recently enacted a law that seeks input on a person's potential dangerousness from a broader range of sources close to that person.  The "Gun Violence Restraining Order" bill permits family members to petition a court for a gun restraining order authorizing temporary seizure of firearms – as well as temporarily banning gun purchases – from anyone deemed potentially violent.[28]

While eschewing the broad reporting requirement that New York has assigned to mental health professionals, Connecticut's law now extends mandatory reporting of a person's history of psychiatric treatment in ways that are likely overinclusive and potentially underinclusive.  Connecticut's statute disqualifies for a gun permit or eligibility certificate anyone committed by a court to a psychiatric facility during the prior sixty months.  Conn. Gen. Stat. § 29-38c (2015).  This five-year ban on gun ownership for anyone with a court-ordered commitment represents a significant extension of the prior ineligibility period, which was limited to twelve months.

Controversially, Connecticut's statute makes anyone *voluntarily* admitted to an inpatient psychiatric facility within the past six months ineligible for gun ownership.  Since voluntary admission does not require a clinical determination of dangerousness, some of these voluntary patients may pose no particular risk of violence.  The law now requires the Department of Mental Health and Addiction Services to maintain information on voluntary admissions and to make that information available to the state Department of

---

[27] Available at http://www.nytimes.com/2014/10/19/nyregion/mental-reports-put-34500-on-new-yorks-no-guns-list.html.

[28] Available at https://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml.

186

Exhibit 28
Page 01218

ER_3389

Emergency Services and Public Protection so that DESPP can enforce these gun restrictions.

Laws such as these overreach by employing mental illness as a proxy for dangerousness. In most states, even involuntary inpatient commitment may occur on the basis of *either* dangerousness *or* criteria such as an inability to meet one's basic needs and refusal of treatment. The latter may bear little or no correlation to a risk of violent acts. A recent report by the Consortium for Risk-Based Firearm Policy, composed of leading experts on gun violence prevention, mental health and public health, supports state laws that temporarily prohibit individuals from purchasing or possessing firearms after short-term involuntary hospitalizations predicated on a *clinical finding of danger to self or others*. While such a finding forms the basis for most involuntary commitments, this may not be the case for voluntary hospitalizations, which do not require a finding of dangerousness. The inclusion of voluntary inpatient treatment among the criteria for mandatory reporting to DMHAS and ineligibility for gun ownership also risks discouraging people who need care from accessing it, and adds to the stigma surrounding mental health treatment.

On the other hand, the law does not address individuals who are admitted involuntarily to a psychiatric facility on an emergency basis. In Connecticut, a Physician's Emergency Certificate (PEC) attesting that the person being admitted is a danger to self or others or gravely disabled and in need of immediate care in a psychiatric hospital can result in a 15-day involuntary hospitalization, which can be challenged in court. Without a probate court order supporting or extending the involuntary hospitalization, however, such a hospitalization has no impact on a person's eligibility for gun ownership. Prohibiting gun eligibility for a voluntarily admitted patient while allowing it for a patient admitted under a PEC—and in most instances deemed by two physicians to be dangerous to self or others—reflects an incoherent approach to public safety.

187

Exhibit 28
Page 01219

ER_3390

Current categories of disqualification for firearm ownership under both state and federal law serve as a rough, and often inadequate, proxy for dangerousness. They miss many, if not most, of the people who actually pose a danger of violence. They may also capture people whose psychiatric admissions are predicated on designations such as "grave disability," which generally entail an inability to take care of one's basic needs and have little or no bearing on the likelihood of violence. Hence the December 2013 report by the Consortium for Risk-Based Firearm Policy titled *Guns, Public Health, and Mental Illness: An Evidence-Based Approach for State Policy* recommends that states expand prohibitions on gun ownership using specific criteria that reflect evidence-based risk of dangerousness rather than generalizations informed by stigma.[29]  In addition to involuntarily hospitalized patients clinically identified as dangerous, the report identifies four categories of ineligibility with demonstrable relevance to a risk of future violence: (1) persons convicted of a violent misdemeanor; (2) persons subject to a temporary domestic violence restraining order; (3) persons convicted of two or more DWI or DUIs in a period of five years; and (4) persons convicted of two or more misdemeanor crimes involving a controlled substance in a period of five years.   In a companion report proposing updates to the existing mental health firearm disqualification policies under federal law, the Consortium for Risk-Based Firearm Policy again recommends expansion of existing categories to include evidence-based risk factors for violence. Consortium for Risk-Based Firearm Policy. (2013.) *Guns, Public Health, and Mental Illness: An Evidence-Based Approach for Federal Policy*. Available at: http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/GPHMI-Federal.pdf.  The Commission agrees that these criteria offer a sound basis on which to restrict access to firearms, although the fourth category may

---

[29] Available at: http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/GPHMI-State.pdf

188

Exhibit 28
Page 01220

ER_3391

require additional thought in light of the evolving legal status of substances such as marijuana.

The Commission also supports a reexamination of the language with which existing laws and policies invoke mental health to disqualify individuals from gun ownership.   At present, federal law includes a "mental health prohibitor" barring sales of firearms to anyone "adjudicated a mental defective" or "committed to any mental institution."  18 U.S.C. § 922(d)(4) (2012).  States report information that might disqualify a person from possessing firearms to a national database called the National Instant Criminal Background Check System, or NICS.  Part of the Brady Handgun Violence Prevention Act of 1993, NICS requires federally licensed gun dealers to perform an instant background check on any prospective purchaser.  The system began operating in 1998 through databases managed by the FBI. A 1997 Supreme Court decision, however, ruled under the Tenth Amendment to the United States Constitution that participation in NICS on the part of states must be voluntary rather than mandatory.  *Printz v. United States*, 521 U.S. 898 (1997).  Following the shootings at Virginia Tech, Congress enacted the NICS Improvement Amendments Act of 2007 to augment reporting requirements and increased the number of records maintained in the NICS, but state compliance remains inconsistent and the NICS system remains of limited effectiveness.   NICS Improvement Amendments Act of 2007, Pub. L. No. 110-180, 121 Stat. 2559.  Within the NICS index, a disqualifying mental health history appears in "the Mental Defective File."  Such language reflects and compounds the deep and damaging stigma associated with psychiatric illness.

9.   <u>What interventions to take when individuals are at risk for violence</u>

Programs such as Mental Health First Aid and CIT (Crisis Intervention Team training) that train law enforcement and laypersons to intervene sensitively and effectively when someone is experiencing a mental health crisis may help to avert harmful behaviors.  In addition, Connecticut law currently

Exhibit 28
Page 01221

authorizes law enforcement officers, upon securing a warrant, to seize firearms from anyone who poses a risk of imminent personal injury to self or others. A court must find that probable cause exists and that there is no reasonable alternative to prevent such imminent harm. Rather than single out a psychiatric history as grounds for seizure, the statute includes past involuntary commitment as one among many factors that a court may consider in determining whether a person's recent threats or acts of violence toward self or others suffice to find probable cause for seizure. Other factors include a history of force or threats of force toward others, illegal use of drugs or abuse of alcohol, and the reckless use or brandishing of a gun. Conn. Gen. Stat. § 29-38c (2015). This law represents a sensible approach to gun-violence prevention.

In cases where a mental health professional believes that a client actually poses a risk of imminent harm, state laws across the country permit or even mandate that those professionals take some protective measure, even if doing so breaches confidentiality. Known as Tarasoff duties after the 1976 case by that name, such reporting requirements are spelled out in statutes, case law, or both. While Connecticut statutes merely permit mental health professionals to take action when they believe a patient poses an imminent risk of harm to self or others, our court decisions may recognize an actual duty to protect identifiable victims. Any additional reporting requirements for mental health professionals are likely to be counterproductive, discouraging providers from taking on potentially dangerous patients, deterring people in need from accessing help, and impairing the therapeutic alliance necessary for effective treatment. Such requirements also contribute to the problem of stigma.

A subset of severely mentally ill individuals persistently refuse treatment. There are many reasons for such noncompliance, including unpleasant and even dangerous medication side effects and treatment programs that may be poorly tailored to an individual's needs. For some, however, noncompliance is based on denial of illness. Agnosonosia represents a particularly severe form of

190

Exhibit 28<br>Page 01222

denial of illness in which the person cannot recognize that he or she is ill. Agnosonosia results from a deficit in brain function exactly analogous to the stroke victim's inability to recognize a paralyzed limb.  It is not uncommon in severe and persistent psychotic illness and the prognosis is always poor.  Such individuals often become "revolving door" patients, hospitalized when most ill, then discharged to the community where they soon stop taking medication again, only to deteriorate rapidly and be rehospitalized.  The course of illness is often a worsening one, leading to homelessness and incarceration.

Options for the treatment of such individuals are limited.  In Connecticut, as in most states, when a person is assessed as dangerous to self or others or gravely disabled, the person may be involuntarily committed through a number of procedures.  Once admission to an inpatient unit occurs, procedures are in place through which medication may be administered involuntarily if necessary.  But again, once discharged, the patient may discontinue medication and embark on a cycle of rehospitalization because there is currently no way to require compliance with medication as an outpatient.

In contrast, forty-four states have involuntary outpatient commitment statutes (also known as assisted outpatient treatment) that establish programs through which patients can be treated involuntarily as outpatients.  Many consider such programs controversial.  They clearly challenge the balance between the liberty interests of individuals and their need for treatment. Critics argue that the effectiveness of such programs is unproven, that they are an unjustified intrusion on autonomous decision making, and that they erode trust in caregivers.  Recent research suggests that the burden of involuntary treatment may fall disproportionately on minorities.  Although the outcome data are complex and ambiguous, they do confirm that these programs only work in conjunction with robust treatment services in the community.

Proponents, on the other hand, argue that outpatient commitment is in fact less intrusive than recurrent involuntary inpatient commitments and that

Exhibit 28
Page 01223

it might end the cycle of "revolving door" hospitalizations for some.   Most importantly, they contend that for a subset of the most persistently noncompliant patients, involuntary outpatient commitment may offer the only alternative to a life of chronic persistent illness, with all the dysfunction, early mortality and risk to self and others that condition so often portends.

The Commission was unable to reach agreement on a recommendation pertaining to outpatient commitment.  In a recent editorial appearing in the *Journal of the American Academy of Psychiatry and the Law*, Dr. Michael Rowe of the Department of Psychiatry at Yale Medical School cautioned that "[c]oercive treatment should be undertaken with reluctance, with protections against abuse, and only when there is clear evidence of benefit to the individual, to society, or to both."  Rowe, M. (2013). Alternatives to Outpatient Commitment. *Journal of the American Academy of Psychiatry and the Law*, 41, 332-336, 334.

10.   Concluding thoughts

Dr. Paul Appelbaum of Columbia University's Department of Psychiatry, past president of the American Psychiatric Association, has urged caution in endorsing proposals for increased mental health funding that are predicated on the proposition that violence is largely a problem of mental illness.  He writes that "tying the need for increased funding to public safety will lead to further demonization of people with mental disorders, as well as an inevitable backlash when it becomes clear that more mental health or inpatient beds have not had a major effect on the prevalence of violence. [...] An adequately funded mental health system should be a national priority—but for the right reasons."  Appelbaum, P.S. (2013). Public Safety, Mental Disorders, and Guns. *JAMA Psychiatry*, 70, 565-566.   The Commission finds the connection between psychiatric illness and violent behavior, particularly gun violence, to be far less salient than much recent public discussion would suggest.   Mental illness accounts for no more than 3-5% of the violence our society confronts on a regular basis.   The harms traceable to mental illness are far more likely to be

192

Exhibit 28
Page 01224

**ER_3395**

self-directed than other-directed, and overall the risk of homicidal violence toward strangers by persons suffering from psychiatric illness remains extremely remote. While a narrow subset of the many individuals wrestling with mental health challenges may be at an increased risk for violent behavior, much of this increased risk derives from additional factors such as alcohol or drug abuse, a history of violent victimization, and low socio-economic status. If they are to be effective, any attempts to address the contribution of psychiatric illness to societal violence must take on these other factors rather than deal with mental illness in a vacuum.

In general, clinical predictions of violence have little relevance to public safety and need not form a central component of a broad harm-reduction strategy. One group of individuals with a major psychiatric illness, specifically young men facing a first psychotic episode, may indeed have significantly increased rates of violence as compared to the general population. Yet the evidence strongly suggests that comprehensive early intervention involving effective psycho-education, vocational support, and other elements, in addition to more traditional mental health treatment, helps adolescents and young adults in the early stages of a psychotic disorder weather the dangers of psychosis and achieve real recovery.

Although the Commission emphatically supports additional funding for mental health treatment in Connecticut and beyond, our support does not rest on the claim that better treatment will prevent future acts of mass violence, or indeed will reduce violence generally across our society to a significant degree. Widespread promotion of wellness that prioritizes psychological and emotional health may indeed diminish many of the risk factors for violence. But such efforts must address anger, alienation, and an underdeveloped capacity for empathy – all far more predictive of serious violence than mental illness is.

### B.   Key Findings And Recommendations

*35.   The Commission has found that while untreated psychiatric illness in a narrow subset of the population does increase the risk of violence, a*

Exhibit 28
Page 01225

diagnosable mental illness alone is a very weak predictor of interpersonal violence – particularly compared to other factors such as substance abuse, a history of violence, socio-economic disadvantage, youth, and male gender.  All of these factors have far stronger correlations with a risk of violence than does a psychiatric diagnosis.  For gun violence in particular, mental illness contributes greatly to rates of suicide but marginally to homicide rates.

36.    Accessible community treatment programs can reduce the relatively low risk of violence among most people living with mental illness.  The Commission recommends expansion and increased availability of early intervention programs for those young adults early in the course of developing and/or established mental illness to reduce the likelihood that a person facing a psychotic illness might resort to violence or self-harm. Also, this would offer the best prognosis for a less chronic course of illness, fewer emergency hospitalizations, and greater opportunities for recovery.

37.    The testimony before the Commission from forensic psychiatrists and other experts makes clear that despite the ability to identify the condition of dangerousness, no one has yet devised a reliable method for predicting future violence.  Trait-based profiling appears to represent an ineffective and even counterproductive means of identifying individuals likely to commit acts of targeted violence and instead more likely creates stigma.  Instead, behavioral threat assessment could be useful; it focuses on identifying and intervening with individuals whose behavior and/or communications clearly indicate an intention to commit violence.  This model has been adapted for use in educational institutions, workplace settings, and the U.S. military.

38.    The Commission recommends the formation of multidisciplinary teams to conduct risk assessments in schools.  Each school district in Connecticut should have policies in place that are related to threat assessment and violence management.  School [district]s should form multidisciplinary teams that include an Administrator, a school Police Department Officer, and a school mental health professional (e.g., Psychiatric Social Worker, School Psychologist,

194

Exhibit 28
Page 01226

ER_3397

*Pupil Services and Attendance Counselor), as well as a community mental health provider, to assess threats made in schools. Such teams may also include representatives of faith communities and members of the youth services bureau. These teams should receive training in threat assessment that will enable them to review specific threats and help manage or support any person who issues a threat as well as warning the potential victims. They should also be available when a child or family has been identified with complex stressors that might indicate a need for additional resources to stabilize the family. In this way, risk assessment teams will become "go to" community resources that will support and strengthen families in the community.*

*39.    People with mental health challenges are far more likely to be victims of violence than perpetrators. As a general matter, mass fatalities comprise less than one-tenth of 1% of gun homicides committed in the United States. Guns play a major role in suicide; over half of completed suicides involve firearms; 90-95% of completed suicides are attributable to depression, bipolar disorder, and other psychiatric illnesses, often in combination with substance abuse.*

*40.    As noted in the Law Enforcement section of this report, the Commission supports adoption of the Consortium for Risk-Based Firearm Policy's December 2013 recommendations. The Consortium's recommendations take evidence-based risk categories as a basis for limiting gun eligibility. These are based principally on a history of violent behavior, a reckless use of alcohol or illegal drugs, and a clinical finding of dangerousness. Conversely, recently enacted legislation regarding gun eligibility may go too far in excluding individuals recently admitted to psychiatric institutions as voluntary inpatients, and the Commission urges reconsideration of this provision.*

*41.    The Commission was unable to arrive at a recommendation concerning adopting involuntary outpatient commitment as an option short of involuntary hospitalization in Connecticut.*

195

Exhibit 28
Page 01227

**ER_3398**

## VII.  RESPONSE, RECOVERY AND RESILIENCE

### A.   Analysis:  Promoting  Resilience  Through  Response  And Recovery Efforts

The  Commission  has  advanced  recommendations  for  improving  our systems  of  mental  health  care  and  expanding  access  to  care.    We  have identified a vision for Connecticut's behavioral health system that embraces the total  wellness  of  children,  adults  and  families  and  fosters  empathy, connectedness  and  resilience  throughout  our  communities.    Caring,  resilient communities  are  best  positioned  to  help  members  recover  from  individual challenges  as  well  as  from  disasters  affecting  larger  groups.    Recovery  should focus  on  the  centrality  of  individuals,  families  and  communities;  promote autonomous  functioning  throughout  life;  and  champion  social  connectedness and engagement for all children and adults.

The  term  "recovery"  has  various  meanings.    We  may  speak  of  "recovery" when describing a person's rehabilitation from a physical illness or injury.    We also  use  "recovery"  to  describe  the  restoration  of  lost  money  or  objects.    Both senses  of  recovery  suggest  a  return  to  a  prior  state  of  wellness  or  wholeness. But  when  we  say  someone  is  "in  recovery"  from  a  substance  use  or  mental disorder, we generally mean that the person is managing his or her symptoms in  ways  that  permit  a  productive  and  satisfying  life.    We  are  not  necessarily suggesting  that  the  person  has  achieved  a  cure  or  returned  to  an  earlier  state of  wholeness,  nor  that  the  person  has  reversed  a  loss.    The  recovery  model posits that every individual with mental health challenges, including those with serious  psychiatric  illnesses,  can  live  a  meaningful  life,  participate  fully  in  his or  her  community,  and  strive  to  reach  his  or  her  full  potential.    While  recovery from  individual  mental  illness  is  an  important  consideration,  the  Commission, given  its  charge,  has  chosen  to  focus  our  discussion  of  recovery  on considerations  unique  to  the  context  of  a  school  or  community  crisis  event. For  recommendations  on  national  disaster  preparedness  focusing  on  mental health  concerns  and  issues  relevant  to  children,  see  National  Commission  on

Exhibit 28
Page 01228

Children and Disasters. *2010 Report to the President and Congress* (AHRQ Publication No. 10-M037). (http://archive.ahrq.gov/ prep/nccdreport/nccdreport.pdf). See also Disaster Mental Health Subcommittee of the National Biodefense Science Board. (2008.) *Disaster Mental Health Recommendations Report.* (http://www.phe.gov/ Preparedness/legal/boards/nprsb/Documents/nsbs-dmhreport-final.pdf.)

When a community experiences a horrific crisis event such as the shootings at Sandy Hook Elementary School, recovery in the sense of a cure or reversal is likely unattainable: there is no returning to the state of affairs before twenty-six of Newtown's children and educators were murdered. The lives lost that day are irrecoverable. The community is forever changed. For the victims' families, as well as for those who survived the shootings, the impact is especially profound and indelible. Testifying before the Commission, some victims' families emphasized that the although it is common to speak of a "new normal," this idea does not accord with their reality; when you have lost a young child and so many of the child's classmates, teachers and others in a school massacre, nothing feels normal again. It makes more sense to view recovery as a process, one that will differ for every individual and family affected and will take still different paths for the schools and the community as a whole. Nonetheless, the state can take concrete steps to facilitate this process.

In public sessions the Commission considered extensive testimony related to response and recovery that encompassed both what has been learned from prior disaster events and what has worked and not worked thus far in the aftermath of the Sandy Hook shootings. The Commission heard from the families of victims, local and state officials involved in the recovery efforts, as well as national experts on trauma, disaster recovery and school crisis events. Some Commission members also met in small, private sessions with teachers and parents of children who survived the shootings. Four broad themes emerged out of these sessions: planning; training and professional

Exhibit 28
Page 01229

development; coordination; and involvement of victims' families.  Each of these is critical in assisting a school and broader community and its members through the recovery process.  These themes have helped to organize our recommendations.

A horrific event such as the Sandy Hook shootings is nearly unimaginable before it occurs.  With so many young children – six and seven years old – murdered at their elementary school along with the adults who cared for them, this tragedy in particular was without precedent in our nation's history.  Sadly, though, this was far from the only school shooting in recent memory, and it was one of many mass killings to take place in the past decade.  A recent FBI report confirmed that mass shootings have become far more frequent over the past several years, from an annual average of 6.4 such shootings per year between 2000 and 2006 to 16.4 per year between 2007 and 2013.[30]  Although no community wants to contemplate another such tragedy on the horizon, Connecticut and the nation must proceed in the knowledge that crisis events, whatever form they take, may befall our communities at any time.

### 1.   Disaster response planning

Crisis events are traumatic for everyone involved, particularly those affected directly.  Effective response to and recovery from trauma and loss are best served by advance planning and careful thought.  It is essential to have disaster response protocols in place that can quickly bring order to chaos and begin the long process of recovery.  While certain commonalities exist among different types of crisis events, whether precipitated by natural or human causes, schools have distinctive needs and resources that call for a context-specific approach.  We must consider schools' special populations, developmental and educational missions, and central roles in their communities when devising response and recovery efforts relevant to school crisis events.

---

[30] Available at http://www.nytimes.com/2014/09/25/us/25shooters.html.

Exhibit 28
Page 01230

Although such crisis events are rare, crisis, trauma and loss affect many individual children and families every day and negatively impact their adjustment, development, capacity to learn and function, and ability to reach their full potential.  When we better prepare to meet these needs on a daily basis in each of our schools and throughout our communities, we take a major step forward in preparing to recover from the rare, large-scale crisis events.  In turn, what we invest in preparing to recover from a major crisis will pay major dividends every day, even in communities fortunate enough to escape a major school or community crisis event.

When planning for recovery in the aftermath of a school or community crisis, we should begin from the principle that reliance on individual treatment services alone cannot adequately address the broad range of needs for supportive and therapeutic services such events engender.  A school community response is not the same as providing individual evaluation and treatment to everyone in the school community.  Other models, including psychoeducation and school-based group treatment, are important considerations in this context.  An additional principle that should guide this work is that response and recovery efforts should promote and empower the capacity of local schools and communities to facilitate their own recovery. While short-term support by mental health professionals from outside the community may be required or helpful in the immediate aftermath of a crisis event, the goal should be to transition direct services provided during the recovery process to those who are part of the impacted community or adjoining/nearby communities.  Although ongoing consultation, support, and training may be delivered by outside consultants, these outside supports should ultimately facilitate the training and empowerment of providers within the school and community to enable the recovery to become self-sustaining to the extent possible.

Thus far, schools and school districts throughout the state have had to respond to crisis events on an ad hoc basis.  Earlier in this report we outlined

199

Exhibit 28
Page 01231

specific recommendations for coordinating the law enforcement response to disaster events. In addition, we recommend that Connecticut develop a comprehensive statewide plan for responding to large-scale school crisis events that includes educational and behavioral health agencies. The plan should specify short- and longer-term interventions and acknowledge that responses may require the recruitment of additional behavioral health professionals outside the school district and community so that agency functions are not compromised during a sustained response. A crisis event of significant magnitude tends to draw well-meaning volunteers who want to help in whatever ways they can. As soon as news of the Sandy Hook shootings reached the world beyond Newtown, behavioral health professionals, clergy members and others appeared in the town offering their services. Although the mental health and pastoral needs of the community were considerable, no process existed for screening the credentials of individuals who arrived offering professional services. Going forward, any crisis response plan must include protocols for reviewing and approving credentialed professionals who do not belong to existing networks.

The plan should clarify a range of roles and responsibilities, including the management of the school behavioral health response, provision of security, and operation of a family assistance center and a community assistance center. Lead agencies should be designated for each function as indicated. Relationships with local, regional, state and national experts, agencies and organizations should be in place prior to the event to assist with potential recovery efforts. Competition among mental health providers for access to children has been noted nationally after several high-profile crisis events and can be very disruptive to recovery efforts. Pre-existing memorandums of understanding that anticipate and plan for surge capacity for behavioral health needs in the aftermath of a disaster, while also establishing relationships for service delivery prior to any crisis event, can facilitate more seamless, and less contentious, service delivery when ultimately needed.

Exhibit 28
Page 01232

The state should also provide a short-term support team to school districts overwhelmed by tragedies to assist in planning and decision-making, such as communications, provision of security, and management of the mental health response, personnel and labor issues, and donations. After the shooting at Sandy Hook Elementary School, business groups that volunteered their support and services, such as those related to management of donated goods, were essential to the community's recovery; the Commission therefore recommends including the business community and other groups within the state in such a group. This would be an optional service offered to schools and developed prior to an event. Since school tragedies impact students, parents, school staff, and the larger community, the plan must identify possible interventions for each of these groups.

In addition to the state-level advance plans and protocols, schools and districts should establish standing School Crisis Intervention Teams composed of members from inside and outside of the school systems that can play a critical role in coordinating recovery efforts. These teams should develop plans and policies that can be adapted to each situation. Connecticut's local governance of schools makes it especially critical that a school system's response and recovery efforts are integrated with those of the town in which a crisis event takes place.

An effective recovery plan must recognize that those exposed to mass violence and loss comprise a special community with unique needs. In the context of a school, this community includes students, teachers, families, first responders and other helping professionals such as school and community-based behavioral health and health care providers. Children process traumatic events differently than adults do, and for young children in particular, the full effects of trauma may not emerge for years. Dr. Marleen Wong of the USC School of Social Work, a national expert in school crisis and recovery, cautioned in her testimony to the Commission that existing knowledge about responses to trauma and processes of healing may prove insufficient to

201

Exhibit 28
Page 01233

ER_3404

account for the developmental trajectories of the very young children at Sandy Hook Elementary School who experienced the sudden rupture of deadly violence in their school and classrooms.  But we do know that it is essential for children's recovery to provide school-based services as well as those in the community.

Pre-existing or concurrent stressors or challenges in the lives of students and school staff may be exacerbated or become the primary focus for a child or adult in the aftermath of a school crisis, even if these stressors or challenges have no direct connection with the crisis event.  For example, a student whose parents are experiencing marital conflict or illness may become more concerned about their well-being after a school shooting and seek support for these family issues.  As a result, the needs for supportive services can be significantly underestimated if based only on an assessment of the needs of students or staff who were most directly impacted by the crisis itself; the potential impact on all students and staff within the school or school district must also be considered.  Hence it is critical to assess and address the needs of the entire school community (and broader community) and to develop a systematic response beyond screening and referral for individual treatment services.

In addition to focusing on the distinctive needs of children, we must strengthen our knowledge base about how to meet the needs of the adult personnel who are part of the crisis response in the schools and ensure that we have a plan to address those needs promptly.  Early intervention is crucial for educators as well as students.  While teachers affected by trauma or loss may want to be with their students in the immediate recovery period, as victims themselves as well as caregivers they need significant support to meet the needs of highly traumatized children.  Teachers play a critical role in reestablishing a calm, emotionally stable learning environment in which parents and children alike feel secure, but in order to accomplish this the teachers' own emotional and psychological needs must be adequately

Exhibit 28
Page 01234

addressed.  Beyond those who are directly impacted by a crisis event, including first responders, professionals who work with affected children and families, law enforcement personnel, educators and others may be vulnerable to what is known as vicarious or secondary trauma.  Researchers have determined that exposure to the profound suffering and trauma narratives of others may induce symptoms of trauma, so an effective response and recovery plan should anticipate this possibility and identify mechanisms to help prevent, identify and mitigate secondary traumatic stress.

The process of recovering from traumatic events and adjusting to the deaths of friends or family members must be measured not in weeks or even months, but in years and perhaps decades.  Therefore any recovery plan must anticipate long-term as well as short-term needs.  While funding for immediate recovery efforts must be readily available, it is equally important to harmonize funding mechanisms with the true length of time that services are required and to minimize the discontinuity of services that results from transitory funding mechanisms such as short-term grants.  The plan should also include provisions addressing bereavement and meaning-making through memorialization and commemoration activities so that communities can approach these proactively.  Without such forethought, critical decisions about elements of the recovery process are often made under great stress and less than optimal approaches taken.  A response and recovery plan addressed to large-scale crisis events must also include an articulated policy for dealing with gifts, donations and other resources that can otherwise become a source of conflict and unnecessary suffering for a traumatized and grieving community.

   2.   Training and professional development.

In addition to developing written plans and protocols for dealing with major crisis events, our communities should cultivate skills and relationships that will serve their members well if a crisis event occurs.  In particular, schools can and must prepare teachers, staff and students to take care of themselves and each other in the wake of a crisis.  As discussed above in the

Exhibit 28
Page 01235

context of models of care, trauma, loss and toxic stress are common enough events in the lives of American children that schools should have ongoing mechanisms in place to recognize and assist children in managing the effects of such adversity.   We have recommended that school personnel receive behavioral health training across the board; we now urge that some of this training focus on providing teachers, administrators and other staff with tools they would need to handle crisis events and support students in the recovery process.

School staff should be prepared to be supportive of children and able to initiate a process that may lead to referral to appropriate additional services (within the school and/or within the community) for support and treatment, when indicated.   This is not the same as training school teachers and other school professionals that are not mental health providers to provide mental health treatment or therapy.   Teachers can, for example, appreciate the impact of bereavement on children's learning and development (even outside the context of a school or community crisis event), learn strategies to support learning and adjustment for grieving students within the classroom and school setting, and demonstrate empathy and support – all without being expected to provide grief counseling.   They will then be more capable of identifying children who may benefit from additional support and knowledgeable about referral sources.   The school leadership must support this role by promoting ongoing professional development in these areas and the ability to obtain consultation from those more knowledgeable in these areas when they have concerns about their students, and avenues for referral.

A 2012 survey of over 1,000 American educators, conducted by the New York Life Foundation in conjunction with the American Federation of Teachers (AFT), revealed that a majority of teachers observed declining academic performance and classroom behavior after the death of a student's parent or guardian; 92 percent of educators believe childhood grief is a serious problem that deserves more attention from schools.   Teachers reported that they wanted

Exhibit 28
Page 01236

to provide support and assistance to their students who are grieving, but identified insufficient training and/or professional development as the single most important barrier preventing them from providing this support. Indeed, 93% of classroom teachers reported they had never received bereavement training and only 3% said that their school or district offers this training. The Coalition to Support Grieving Students came together in 2013 to remedy this gap in the educational professions and to develop a set of resources broadly approved by leading professional organizations to guide educators and other school personnel in supporting and caring for their grieving students, available at no charge at www.grievingstudents.org (a site launched in January 2015). The materials can form the foundation for more structured presentations or facilitate self-directed professional development, and were developed and endorsed by the Coalition's Founding Members: American Federation of Teachers (AFT) and National Education Association (NEA); American Federation of School Administrators (AFSA), National Association of Elementary School Principals (NAESP), National Association for Secondary School Principals (NASSP), and School Superintendents Association (AASA); the American School Counselor Association (ASCA), National Association of School Nurses (NASN), National Association of School Psychologists (NASP), and School Social Work Association of America (SSWAA); and the National Center for School Crisis and Bereavement and the New York Life Foundation. We need similar approaches to advancing the comfort level and skills of all school professionals in other areas that relate to the behavioral needs of children and school staff in the aftermath of a crisis.

Teachers, school administrators, and other school personnel should be trained to understand the impact of trauma and loss on learning and provide basic supportive services to help students adjust to a disaster and its aftermath and promote academic achievement. Several studies have shown that after disasters, many children experience post-traumatic stress disorder (PTSD), bereavement, and other behavioral problems, such as increased

205

Exhibit 28
Page 01237

**ER_3408**

aggression or delinquency.     Common effects of crises on students include school absenteeism; school behavior problems, such as aggressive or risk-taking behavior; academic failure; and exacerbation of pre-existing educational problems.     Without sufficient training, educators may not be aware that a student is having difficulty adjusting or coping, and as a result, the student's behaviors, learning patterns, or social interactions may be misinterpreted or mislabeled.

Connecticut should establish statewide training requirements tied to professional certification and recertification, since the most effective way to ensure that teachers and other school personnel receive the basic training necessary to teach and support children effectively in the setting of trauma or loss is to include such training at the pre-service level as a condition of certification/licensure, and at the in-service level as a condition of recertification/license renewal.  Training for teachers and school personnel on how to support children following a disaster should impart basic skills and knowledge in the following areas: the impact of trauma and bereavement on children and their learning; likely reactions; strategies for providing psychological first aid, brief supportive services, and bereavement support; and indications for referral for additional mental health services.

Advance preparation in disaster response is particularly critical in light of the fact that the immediate aftermath of a disaster frequently includes dramatic disruptions to normal routines, increased demands on adults, and other adverse conditions that limit the time and resources available to provide urgently needed training as well as the capacity of professional staff, who are often personally impacted by the crisis themselves, to effectively learn.  Just-in-time training delivered in the immediate aftermath of a crisis event, though certainly better than no training at all, is often not really "in time." Connecticut should therefore create mechanisms to implement ongoing training and professional development programs for teachers and school personnel that impart basic skills outside of crisis circumstances to enable

206

Exhibit 28
Page 01238

ER_3409

these adults to provide services to affected students and to establish statewide training requirements tied to professional certification and recertification.

In addition to school personnel, other professionals who work with children should receive basic training in disaster-related behavioral health issues, including Psychological First Aid, cognitive-behavioral interventions (for school mental health providers), social support interventions, and bereavement counseling and support.  Mental health professionals who work in schools and other child congregate care settings must also receive adequate training related to disaster mental health care for children.  Again, this training should be provided prior to an event, since supportive services should begin during the disaster or in the immediate aftermath and are needed on an ongoing basis at an individual level outside the context of a school or community crisis event.

Connecticut has already begun this process by establishing the DBHIRN network (Disaster Behavioral Health Intervention Response Team),[31] a mobile corps of public and private behavioral health professionals and clergy members who have been trained to respond to crisis events by providing psychological first aid and grief counseling to disaster victims and their families.  Members of the DBHIRN network were deployed to Newtown in the immediate aftermath of the shootings.  Although the network is envisioned as a short-term resource until additional resources can be brought in to address longer term needs, the DBHIRN clinicians formed the nucleus of a three-month mental health response in Sandy Hook.  Clinicians were assigned to each of Newtown's schools as of December 18, and they became available to support family members, students, teachers and other school personnel in the relocated Sandy Hook Elementary School as of its reopening on January 3, 2013.  While the DBHIRN network affords access to an extensive corps of disaster-qualified behavioral health professionals, its function is time-bound, especially given that it is staffed by volunteer clinicians who have pre-existing service responsibilities to other critical government or community agencies.  Therefore

---

[31] *See* http://www.ct.gov/dmhas/lib/dmhas/publications/dbhfactsheetr5.pdf.

207

Exhibit 28
Page 01239

ER_3410

schools and school districts should form preexisting relationships with child behavioral health providers to facilitate more seamless service delivery in the aftermath of a crisis event.

Response and recovery efforts must begin as soon as possible during a crisis event. In a school environment, priority should be placed on stabilizing the situation and establishing an environment in which students and staff feel secure. Recovery must include restoration of the learning environment, reestablishment of emotional safety, and return to a calm routine. Schools should be prepared to support the emotional stabilization of teachers and parents as well as students. These efforts must adapt to an evolving situation and must afford continuing supports and services over time. School districts should develop a monitoring process that will follow affected children throughout their school careers to protect against future vulnerability, victimization and mental health difficulties. School can be a sanctuary, an ideal place to help children learn the skills necessary to manage stress, cope with loss and develop resilience. Although a school crisis event temporarily disrupts this function, specific preparation in disaster recovery will help to restore it. Schools characterized by a well-established culture of empathy, understanding, support and common purpose are particularly likely to remain places of refuge. All schools should promote positive ways to move forward in the face of crisis or adversity.

3.  Coordination

Effective response and recovery efforts after crisis events require extensive coordination across local and state entities. For school crisis events, Connecticut should better integrate the behavioral health and education responses by creating a mechanism that facilitates the immediate coordination of supportive services. Although there may be one lead agency overseeing the recovery efforts, the response and recovery will require integrated and complementary services from multiple state agencies and departments (including the State Department of Education (SDE), DMHAS and DCF).

208

Exhibit 28
Page 01240

Following the Sandy Hook shootings, activation of a unified command system at DMHAS called Incident Command Structure helped to facilitate coordinated decision-making. State Commissioners intimately involved in response and recovery efforts that began hours after the shootings testified before the Commission that the events of December 14 and their aftermath revealed the deep interdependence of various agencies, state and local systems and communities that too often occupy separate silos.

An overwhelming need for behavioral health supports and services emerged in the days, weeks and months that followed the shootings. Mental health professionals assisted with death notification, provided short-term psychological first aid and bereavement counseling, offered trauma treatment to children, school personnel, families, first responders and others, and furnished supports in classrooms and throughout Newtown schools and the relocated Sandy Hook Elementary School. The depth and breadth of this need calls for stronger integration of schools and behavioral health agencies to facilitate the prompt and consistent provision of services for as long as the need exists. It is also important to create linkages to community programs offering bereavement support, faith-based groups that can provide supportive services, and agencies providing victim services. Department of Public Health Commissioner Jewel Mullen highlighted the importance of strengthening the integration of our educational and behavioral health agencies into the unified command system.

4.   Involvement of victims' families

Victims' families spoke eloquently to the Commission of their particular recovery journeys. Despite the extensive resources state and local agencies have devoted to the response and recovery efforts, some families unfortunately have experienced confusion about where to turn for help and whether their input is valued. Family members who testified uniformly praised the state's decision to assign state troopers to each family and indicated that the chaos, bewilderment and desperation of December 14, 2012 began to improve as soon

209

Exhibit 28
Page 01241

as these connections were forged, even while awareness that their children had died in the shootings began to take hold.  They commended the troopers themselves for conducting their roles with the utmost professionalism, compassion and responsiveness.

Other connections have been less successful.  It became clear through their testimony that channels of communication between the families and town government, as well as between the families, the schools and the school board, were less than ideal in the weeks and months after the shootings.  One explanation these families identified was that everyone involved in the response and recovery effort was understandably concerned about exacerbating the traumatic shock and loss these families were experiencing.  This solicitude, combined with what may have been an incomplete understanding of trauma and bereavement, appears to have led school and community officials to exclude victims' families from crucial decision-making processes and to withhold information in an effort to preserve families' privacy.  A couple of parents aptly characterized this as being "kid gloved," or treated with a degree of a caution that felt to some like avoidance.

Each of these family members acknowledged that recovery from trauma and loss involves highly individualized processes; one person may need access to information regarding commemorative activities, school yearbooks and other aspects of the recovery process, while another may need to be insulated from such reminders of their trauma and loss to the maximum extent possible. Since one of the effects of trauma is to shatter a person's sense of control, it is essential to the recovery process that survivors begin regaining control where possible.  Hence communication and engagement with victims of crisis events should not follow a one-size-fits-all approach, but instead should be calculated to enhance each individual's capacity to control his or her own recovery process.  Clear, open channels of information and persistent efforts to make information available to victims are compatible with the individualized experience of trauma and loss to the extent that they leave it to the victims

210

Exhibit 28
Page 01242

**ER_3413**

themselves to decide whether and how to engage. Exclusion and avoidance, even if motivated by compassion, take this decision away from those most directly affected by the crisis event.  A central clearing house for information relevant to disaster response and recovery, with clearly identified channels of access, would help to mitigate the sorts of communication barriers that can impede recovery and risk re-traumatizing vulnerable members of the community.

   5. <u>Concluding thoughts.</u>

Throughout this discussion of response and recovery efforts following large-scale crisis events, we have emphasized the need for advance planning; training and professional development around issues related to trauma, loss and bereavement; broad coordination across agencies, particularly those in the fields of behavioral health and education; and involvement of victims' families in critical decisions.  In addition to these specific recommendations, it is essential to remember that *resilient* individuals and communities generally fare best in the face of adversity.  As a state and a nation, we must seek out and embrace measures that will foster such resilience.

All of the Commission's recommendations in this section of our report should be understood to promote a broad and holistic approach to mental health across the lifespan.  Such an approach will require changes to the funding and delivery structures that provide care as outlined above, as well as multifaceted efforts to destigmatize mental health and prioritize social, emotional and psychological wellness across our culture.  Ultimately, our best prospects for a healthy society, and one less likely to be ravaged by the effects of violence, lie in strong, caring communities where every child, adult and family has enough -- not merely enough to survive, but enough to flourish.

  **B.**  **Key Findings And Recommendations**

* 42. Connecticut should develop a comprehensive statewide plan for effectively responding to large-scale school crisis events that includes educational and behavioral health agencies.  The plan should specify short- and*

Exhibit 28
Page 01243

*longer-term interventions for different populations, and identify funding mechanisms that will minimize discontinuity of services.  It should clarify a range of roles and responsibilities for state and local entities and designate lead agencies for key functions.*

*43.    Connecticut and its municipalities should incorporate an enhanced focus on the mental health implications of disasters and other crisis events into all disaster preparedness and response protocols, and implement measures to address the behavioral health needs of children as well as adults.*

*44.   Connecticut should better integrate behavioral health and educational responses to disaster events by thoughtfully incorporating educational and behavioral health agencies into the state's Unified Command System.*

*45.    Investment in preparing to recover from a major crisis will pay major dividends every day, even in communities fortunate enough to escape a major school or community crisis event.   Meeting needs daily in schools and communities will be a major step in improving everyday functioning as well as recovery from large-scale crises.*

*46.    While short-term support by mental health professionals from outside the community may be required or helpful in the immediate aftermath of a crisis event, the goal should be to transition direct services provided during the recovery process to those who are part of the impacted community or adjoining/nearby communities.  With some outside support, the goal should be empowering and training providers within the school and community to ensure that the recovery is self-sustaining to the extent possible.*

*47.    The state should also offer the option of engaging a short-term support team, developed prior to an event, to school districts overwhelmed by tragedies to assist in planning and decision-making, such as communications, management of mental health response, provision of security, managing personnel and labor issues, and donations.*

212

Exhibit 28
Page 01244

48.    We must strengthen our knowledge base about how to meet the emotional and psychological needs of the adult personnel who are part of the crisis response in the schools and ensure that we have a plan to address those needs promptly.

49.    Any recovery plan must anticipate long-term as well as short-term needs, because the process of recovering from traumatic events may take years. While funding for immediate recovery efforts must be readily available, it is equally important to harmonize funding mechanisms with the true length of time that services are required and to minimize the discontinuity of services that results from transitory funding mechanisms such as short-term grants. The plan should also include provisions addressing bereavement and meaning-making through memorialization and commemoration activities so that communities can approach these proactively.

50.    Connecticut should create mechanisms to implement ongoing training and professional development programs outside of crisis circumstances for teachers and school personnel, and establish statewide training requirements tied to professional certification and recertification. Training for teachers and school personnel on how to support children following a disaster should impart basic skills and knowledge in the following areas: the impact of trauma and bereavement on children and their learning; likely reactions; strategies for providing psychological first aid, brief supportive services, and bereavement support; and indications for referral for additional mental health services.

51.    Connecticut should better integrate the behavioral health and education responses to school crisis events by creating a mechanism that facilitates the immediate coordination of supportive services. Although there may be one lead agency overseeing the recovery efforts, the response and recovery will require integrated and complementary services from multiple state agencies and departments (including SDE, DMHAS and DCF). It is also important to create linkages to community programs offering bereavement support, faith-

213

Exhibit 28
Page 01245

ER_3416

*based groups that can provide supportive services, and agencies providing victim services.*

*52.    To help victims regain a sense of control, communication and engagement with victims of crisis events should not follow a one-size-fits-all approach but instead should be calculated to enhance each individual's capacity to control his or her own recovery process.   A central clearing house for information relevant to disaster response and recovery, with clearly identified channels of access, would help to mitigate the sorts of communication barriers that can impede recovery and risk re-traumatizing vulnerable members of the community.*

214

Exhibit 28
Page 01246

# CLOSING QUOTE

*"In my house, we believe every day is an opportunity to allow love to win."*

–Nelba Márquez-Greene,
mother of Ana Márquez-Greene

Exhibit 28
Page 01247

# **APPENDIX**[*]

A.  Consolidated Recommendations of the Sandy Hook Advisory Commission

B.  List of Individuals Who Testified Before the Sandy Hook Advisory Commission

C.  Sandy Hook Advisory Commission Agendas and Meeting Minutes*

D.  Sandy Hook Advisory Commission Interim Report (dated March 18, 2013)*

E.  Sandy Hook Elementary School Floor Plan*

F.  Photographs of weapons used in Sandy Hook Elementary School shootings

G.  Legislation Passed During 2013 General Assembly Session Relating To Sandy Hook:

Public Act 13-3 ("An Act Concerning Gun Violence Prevention And Children's Safety")*

Public Act 13-220 ("An Act Concerning Revisions To The Gun Violence Prevention And Children's Safety Act")*

Public Act 13-178 ("An Act Concerning The Mental, Emotional And Behavioral Health of Youths") and Report on Implementation of PA 13-178*

Public Act 13-188 ("An Act Concerning School Safety")*

H.  Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newton, Connecticut on December 14, 2012 (dated Nov. 25, 2013), with accompanying Appendix.*

I.  Report of the Child Advocate, "Shooting at Sandy Hook Elementary School," released on November 21, 2014*

_____

[*] Appendix entries denoted by an asterisk (*) are not included in the main report, but are available for download from the Internet via hyperlink.

A

Exhibit 28
Page 01248

J.  State Police Investigative Files re: Shootings at Sandy Hook Elementary School and 36 Yogananda Street*

K.  Report of the Safe School Infrastructure Council (revised and updated to June 27, 2014)

L.  School Security and Safety Plan Standards (v 1.0) (dated Dec. 30, 2013)*

M.  Capitol Region Chiefs of Police Association "Blue Plan" (dated April 24, 2013) (mutual aid response to incidents within Capitol Region)*

B

Exhibit 28
Page 01249

## **APPENDIX** A

## CONSOLIDATED RECOMMENDATIONS OF THE
## SANDY HOOK ADVISORY COMMISSION

**I.    SAFE SCHOOL DESIGN AND OPERATION RECOMMENDATIONS**

1.    The Safe School Infrastructure Council Report ("SSIC Report") includes a standard requiring classroom and other safe-haven areas to have doors that can be locked from the inside.  The Commission cannot emphasize enough the importance of this recommendation.   The testimony and other evidence presented to the Commission reveals that *there has never been an event in which an active shooter breached a locked classroom door.* Accordingly, the Commission reiterates its recommendation that all classrooms in K-12 schools should be equipped with locked doors that can be locked from the inside by the classroom teacher *or substitute.*

2.    The Commission also reiterates its recommendation that all exterior doors in K-12 schools be equipped with hardware capable of implementing a full perimeter lockdown.

3.    A feasibility study should be conducted to develop additional safety standards concerning the issuance of classroom keys to substitute teachers.

4.    School custodians should be included as members of school security and safety committees.  Custodians have a wealth of knowledge and experience to share with regard to the physical school building and grounds. Accordingly, the Commission requests that the Governor submit the following recommendendation for consideration by the General Assembly during the 2015 legislative session:[32]

> Section 10-222m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

---

[32] The format of the proposed legislation follows the format the General Assembly uses when proposing amendments to existing legislation.  Proposed new text is underlined and proposed deletions from existing text appear in strike-through format.

A-1

Exhibit 28
Page 01250

**ER_3421**

(a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.

(b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of**: (1)** a local police officer**;, (2)** a local first responder**;, (3)** a teacher **employed at the school, selected with the consent and approval of other school or district employees of that classification**; and **(4)** an administrator **employed at the school, selected with the consent and approval of other school or district employees of that classification**; **(5) a custodian** employed at the school**, selected with the consent and approval of other school or district employees of that classification; (6) the school facilities managers; (7)** a mental health professional, as defined in section 10-76t of the general statutes**;, (8)** a parent or guardian of a student enrolled in the school**;** and any other person the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of subsection (c) of section 10-222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

In furtherance of this recommendation, the Commission also recommends that the School Security and Safety Plan Standards and Template should be

A-2

Exhibit 28
Page 01251

**ER_3422**

changed so that school districts realize the importance of placing custodians on these vital committees.

 5. Teachers, administrators and custodians should be appointed to school security and safety committees with the consent and approval of other employees of their same classification. The Commission believes that committee members so appointed may be more empowered to voice their concerns. Accordingly, the Commission recommends the following:

Section 10-222m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.

(b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of**: (1)** a local police officer**;, (2)** a local first responder**;, (3)** a teacher **employed at the school, selected with the consent and approval of other school or district employees of that classification**; and **(4)** an administrator **employed at the school, selected with the consent and approval of other school or district employees of that classification**; **(5) a custodian** employed at the school**, selected with the consent and approval of other school or district employees of that classification; (6) the school facilities managers; (7)** a mental health professional, as defined in section 10-76t of the general statutes**;, (8)** a parent or guardian of a student enrolled in the school**;** and any other person the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of

A-3

Exhibit 28
Page 01252

**ER_3423**

subsection (c) of section 10-222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

6.   The Commission recommends that the State require each school district to create a permanent committee or commission, the purpose of which shall be to ensure SSDO standards and strategies are implemented in the district.  The Commission suggests that the committee consist of the following persons: 1) one person selected by the Superintendant of Schools; 2) one person selected by the local chief of police; 3) one person selected by the local fire chief; 4) one person selected by local EMS; 5) one person selected to represent local public health and safety; and 6) one mental/behavioral health professional.

Additionally, the State should designate an individual at the state Commissioner-level, such as the Commissioner of Education or Commission of the Department of Emergency Services and Public Protection, to whom the local committee shall be required to submit a written status report on or before December 31 of each year.

7.   The State should amend section 80 (a) of P.A. 13-3 to include an architect licensed in the State of Connecticut among the members of the School Safety Infrastructure Council.  Therefore, the Commission requests that the Governor submit this recommendation for consideration by the General Assembly during the 2015 legislative session.

8.   The State should amend section 80(b) of P.A. 13-3 as follows:

The School Safety Infrastructure Council shall develop school safety infrastructure standards for school building projects under chapter 173 of the general statutes and projects receiving reimbursement as part of the school security infrastructure competitive grant program, pursuant to section 84 of this act. Such school safety infrastructure standards shall conform to Connecticut and national industry best practice standards for school building safety infrastructure and shall include, but not be

A-4

Exhibit 28
Page 01253

ER_3424

limited to, standards regarding (1) entryways to school buildings and classrooms, such as, reinforcement of entryways, ballistic glass, solid core doors, double door access, computer-controlled electronic locks, remote locks on all entrance and exits and buzzer systems (1) entryways to school buildings, classrooms and other space that can become areas of safe haven, such as, reinforcement of entryways, forced entry and/or ballistic rated glazing, solid core (FE and/or BR) doors, double door access, computer-controlled electronic locks, remotely controlled locks on all entrance and exits and buzzer systems, (2) the use of cameras throughout the school building and at all entrances and exits, including the use of closed-circuit television monitoring, (3) penetration resistant vestibules, and (4) other security infrastructure improvements and devices as they become industry standards. The council shall meet at least annually to review and update, if necessary, the school safety infrastructure standards and make such standards available to local and regional boards of education.

Therefore, the Commission requests that the Governor submit this recommendation for consideration by the General Assembly during the 2015 legislative session.

9. Each school shall maintain an accurate list of faculty, staff and students, complete with emergency contact information, which shall include, but not be limited to, parents and guardians of students. This information shall be kept at two locations within each school known by appropriate school staff and the emergency response teams for that school.

10. Each school shall provide safety and security training for faculty, staff and students on how to respond to hazards and or events in order to provide competent compliance with the All Hazards School Security and Safety Plan Standards. This training shall include live exercises to test the efficacy of the training program and to provide a means to develop that program as informed by these exercises. These training programs and exercises shall also include the identification and use of rendezvous points, escape routes, location of safe havens, the means of emergency communication and the role of faculty, staff, emergency responders, etc. These training and exercise programs may benefit from the participation of parents as part of post-event response and recovery operations as determined by each school and school district in accordance with their incident response plans.

A-5

Exhibit 28
Page 01254

11.   The Commission recommends that each school identify specific individuals to serve as safety and security wardens, who shall be responsible for executing and managing the safety and security strategies set forth in Recommendation No. 10.

12.   In the design of schools, the Commission recommends that classrooms and other spaces of denser population occupancy be located away from the points of building entry and that spaces of lesser occupancy be adjacent to school entry points, without giving up human visual surveillance and situational awareness of the entry points.

## II.   LAW ENFORCEMENT RECOMMENDATIONS

### A.   Interim Report Recommendations And Status

1.   Mandatory background checks on the sale or transfer of any firearm, including long guns, at private and gun show sales.

**Status:**  Recommendation accepted and adopted by P.A. 13-3, § 1.

2.   Require registration, including a certificate of registration, for every firearm.   This certificate of registration should be issued subsequent to the completion of a background check and is separate and distinct from a permit to carry.

**Status:** Not adopted.   The Commission reaffirms its recommendation requiring the registration of all firearms and requests that the Governor resubmit this recommendation for reconsideration by the General Assembly during the 2015 legislative session.

3.   Require firearms permits to be renewed on a regular basis.   This renewal process should include a test of firearms handling capacity as well as an understanding of applicable laws and regulations.

**Status:** Not adopted.   (Note: Under existing law, a firearm permit is good for five years and may be renewed without the recommended process.   *See* Conn. Gen. Stat. § 29-36h.)   The Commission requests that the Governor resubmit this recommendation for legislative action.

4.   Institute a ban on the sale, possession, or use of any magazine or ammunition feeding device in excess of 10 rounds except for military and police

A-6

Exhibit 28
Page 01255

ER_3426

use. In proposing this recommendation, the Commission recognized that certain sporting events at times involve the use of higher capacity magazines. However, the consensus of the Commission was that the spirit of sportsmanship can be maintained with lower capacity magazines.

**Status:**　　　Accepted and adopted by P.A. 13-3, §§ 23-24.

5.　Institute a ban on the possession or sale of all armor-piercing and incendiary bullets, regardless of caliber.　First-time offenses should be classified as a Class D Felony.

**Status:** Accepted and adopted *in part* by P.A. 13-3, § 32 (banning armor-piercing bullets).　The Commission reaffirms its position that the ban should also apply to incendiary bullets and urges the Governor to submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

6.　　Allow ammunition purchases only for registered firearms.

**Status:** Not adopted in absence of firearm registration requirement.　The Commission reaffirms its position that the law should only permit individuals to purchase ammunition for registered firearms and requests that the Governor submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

7.　　Evaluate best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the Internet.

**Status:** Not adopted. The Commission reaffirms its position that the state should study and evaluate best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the Internet and requests that the Governor submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

8.　　Evaluate the effectiveness of federal law in limiting the purchase of firearms via the Internet to only those individuals who have passed the appropriate background screening.

**Status:**　Not adopted.　The Commission reaffirms its position that the state should study and evaluate the effectiveness of federal law in limiting the

A-7

Exhibit 28
Page 01256

**ER_3427**

purchase of firearms via the Internet to only those individuals who have passed the appropriate background screening and urges the General Assembly to reconsider this recommendation during the 2015 legislative session.

9.  Limit the amount of ammunition that can be purchased at any given time.

**Status:**  Not adopted. The Commission reaffirms its position that the law should only permit individuals to purchase ammunition for registered firearms and requests that the Governor submit this request to the General Assembly for reconsideration during the 2015 legislative session.

10.  Prohibit the possession, sale or transfer of *any* firearm capable of firing more than 10 rounds without reloading. This prohibition would extend to military-style firearms as well as handguns.  Law enforcement and military would be exempt from this ban.

**Status:** Not adopted.  Instead, the General Assembly created of a list of specific semiautomatic rifles, pistols and shotguns that are banned.  *See* P.A. 13-3, §§ 25-31.  The Commission requests the Governor to submit this request to the General Assembly for reconsideration during the 2015 legislative session.

11.  Require that trigger locks must be provided at the time of sale or transfer of any firearm.

**Status:** Not adopted.  The Commission reaffirms its position that the law should require trigger locks to be provided at the time of sale or transfer of any firearm, and requests that the Governor resubmit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

12.  Require that the state develop and update a "best practices" manual and require that all firearms in a home be stored in a locked container and adhere to these best practices; with current minimum standards featuring a tamper-resistant mechanical lock or other safety (including biometric) device when they are not under the owner's direct control or supervision.  The owner should also be directly responsible for securing any key used to gain access to the locked container.

A-8

Exhibit 28
Page 01257

13.   Require non-residents seeking to purchase a firearm or ammunition in the State of Connecticut to obtain a Certificate of Eligibility and conform to all other regulations applicable to Connecticut residents.

**Status:**   P.A. 13-3 requires that anyone who purchases ammunition in CT must have Connecticut state credentials.  See P.A. 13-3, § 14(c).

14.   Require gun clubs to report any negligent or reckless behavior with a firearm, or illegal possession of any firearm or magazine, to the Connecticut Department of Emergency Services and Public Protection, Commissioner of Public Safety, and local law enforcement.

**Status:**   Not adopted.  The Commission reaffirms this recommendation and requests that the Governor resubmit it to the General Assembly for reconsideration during the 2015 legislative session.

15.   Requiring promoters of gun shows to receive a permit from the Chief of Police or Chief Elected Official as well as provide notice to the Commissioner of the Connecticut Department of Emergency Services and Public Protection.

**Status:**   Not adopted. The Commission reaffirms this recommendation and requests that the Governor resubmit it to the General Assembly for reconsideration during the 2015 legislative session.

**B.     Final Report Additional Recommendations**

16.   Require that any shell casing for ammunition sold or possessed in Connecticut have a serial number laser etched on it for tracing purposes.

17.   Any person seeking a license to sell, purchase or carry any type of firearm in the state should be required to pass a suitability screening process.

18.   To allow, at a judge's discretion, the opportunity to temporarily remove any firearms, ammunition, and carry permits from a person who is the subject of an *ex parte* restraining order, civil protection order or family violence protective order, at the time of the issuance of that order.  The Commission believes that the time period between the *ex parte* request and the issuance of a full restraining order, civil protection order or family violence protective order, constitutes a period of critical danger, one that must be

A-9

Exhibit 28
Page 01258

**ER_3429**

19.     Grant state-wide peace officer status to all sworn law enforcement officers in Connecticut to assure their ability to respond to any other jurisdiction within the state in the event of a major police emergency, but only at the express invitation of the requesting jurisdiction.  Self-dispatch by public safety or EMS resources should be prohibited to prevent over-response.

20.     Provide funding for the Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security, to establish positions for regional School Safety Planners charged with assisting districts in the planning for all hazards emergencies and the effective exercising of those plans.

21.     Develop regional multi-jurisdictional, multi-discipline, Unified Command concept of operations, integrating local and state police, for major events of great consequence. These plans should include administrative staff of local schools or other entities to assure best information is available.

22.     Establish statewide and/or regional Incident Management Teams for public safety personnel.

23.     Integrate Public Safety Dispatch centers, with minimum staffing levels, into all major event response plans.

24.     Require that lead agencies that respond to major events conduct a review and provide formal after-action reports, which should be maintained on file with the appropriate public agencies.  (In Connecticut, the Commission recommends that a copy of each after-action report should be provided to, and maintained on file by the Department of Emergency Services and Public Protection and the Connecticut Police Chiefs Association.)

25.     Require the Department of Emergency Services and Public Protection, Division of State Police, in conjunction with the Connecticut Police Chiefs Association, to develop and conduct joint regional exercises of planned responses to major events. Those agencies should also review all existing policies concerning planned responses to active shooters.  The review should focus on the best practices for disrupting active shooters as rapidly as possible.

A-10

Exhibit 28
Page 01259

ER_3430

26.    Expand incident training at Police and Fire Academies in Connecticut.

27.    Create a statewide working group to address first responder mental health issues.

28.    Create and publish a Statewide Donations Management Plan for incidents of statewide consequence. This could be done through Connecticut Care, which was established by P.A. 13-275.

29.    Programs should be developed that focus on violence reduction through the educational process or other entities.

30. Alcohol awareness programs should be included at appropriate points in the K-12 curriculum.

**III.    MENTAL AND BEHAVIORAL HEALTH RECOMMENDATIONS**

**A.    Recommendations Re: Models of Care**

1.    Recognizing that mental health is more than the absence of mental illness, we must build systems of care that go beyond treating mental illness to foster healthy individuals, families and communities and embrace overall psychological, emotional and social well-being.

2.    To promote true wellness, Connecticut must build a mental health system that targets detection and treatment while building stronger, resilient communities of care.

3.    Addressing a fragmented and underfunded behavioral health system tainted by stigma requires building a comprehensive, integrated approach to care.  The approach will stress family involvement and community resilience. Care will be holistic and involve pediatric and adult medical homes from birth to adulthood, with efforts to ensure continuity of care.  Identifying risk factors, reinforcing protective factors, and promoting positive development throughout will be key goals, and peer as well as professional support will be involved.  Treatment and prevention will be stressed.

4.    To treat the whole person and cultivate wellness across the population, our health delivery systems and reimbursement paradigms should embrace a biopsychosocial model that understands the individual's physical

A-11

Exhibit 28
Page 01260

**ER_3431**

and mental health strengths and challenges in the context of that person's social environment and relationships.

5.    Providers    should    be    incentivized    through    reimbursement mechanisms to integrate both physical and mental health services, whether through their own care delivery or through integration of services within a medical home model.

6.    To promote healthy child development and foster robust communities, our systems of care must attend to the factors affecting family welfare. Current funding structures must thus be revamped.  The Commission recommends support for models of integrated care driven by family needs in which all providers focus on family strength, address their risk factors, and accept the family as a partner in treatment.

7.    Schools must play a critical role in fostering healthy child development and healthy communities.  Healthy social development can be conveyed by role models such as parents, teachers, community leaders, and other adults in children's lives, but it can also – and should – be actively taught in schools.

8.    Social-emotional learning must form an integral part of the curriculum from preschool through high school.  Social-emotional learning can help children identify and name feelings such as frustration, anger and loneliness that potentially contribute to disruptive and self-destructive behavior.  It can also teach children how to employ social problem-solving skills to manage difficult emotional and potentially conflictual situations.

9.    A sequenced social development curriculum must include anti-bullying strategies.  As appropriate, it should also include alcohol and drug awareness as part of a broader substance-abuse prevention curriculum for school-aged children.

10.    Many of our students and their families live under persistent and pervasive stress that interferes with learning and complicates the educational process.  There are many potential resources such as school based health centers that should provide a locus of  preventive care, including screenings

A-12

Exhibit 28
Page 01261

and referrals for developmental and behavioral difficulties, exposure to toxic stress, and other risk factors, as well as treatment offerings that can address crisis, grief and other stressors. Alternatively, schools can employ the services of community-based mental health providers such as child guidance clinics.

11. Schools should form multidisciplinary risk-assessment teams that gather information on and respond supportively to children who may pose a risk to others or face a risk to themselves due to toxic stress, trauma, social isolation or other factors. (See recommendation 39 below regarding the role of mental illness in violent events.) Schools should look to factors such as social connectedness in identifying children at risk; all school staff should be trained in inquiry-based techniques to apply when disciplinary issues arise in order to deepen their understanding of how children's behavior can be linked to underlying stressors.

12. Schools should work with all providers to enhance community resources and augment services available in schools. For many children schools offer the only real possibility of accessing services, so districts should increase the availability of school guidance counselors, social workers, psychologists, and other school health and behavioral health professionals during and after school as well as potentially on Saturdays.

13. The state and federal departments of education should establish lead sections or programs on school mental health to supplement (not replace) the work of CT DCF. These sections would play a critical role in conducting and coordinating broad-based prevention and intervention efforts within the school system to help ensure a coordinated, seamless and comprehensive statewide system.

14. The Commission endorses the recommendations advanced in Connecticut Children's Behavioral Health Plan, a report and implementation plan compiled pursuant to Connecticut's Public Act 13-178, that call for a comprehensive, developmentally appropriate continuum of care that expands and equalizes culturally relevant resources available to children and their families across payment systems and geographic boundaries.

A-13

Exhibit 28
Page 01262

ER_3433

15.   Each board of education must ensure that children with disabilities be identified and evaluated in accordance with the Individuals with Disabilities Education Act, or IDEA.   Where parents elect to home-school children with an identified disability, the home-schooled child shall have an individual education program (IEP) approved by the special education director of the Area Education Agency, as well as access to special education services. Periodic reports regarding the progress of such home-schooled children should be filed with the local superintendent (at least annually) and be prepared by an individualized education program team selected by the parent.   The state should consider requiring that a parent's obligations under state law encompass approval of the individualized education plan and adequate progress as documented in these reports.

16.   When the particular disabilities that necessitate "homebound" education include social, emotional and behavioral difficulties, the student's individualized education program and related services must address these difficulties expressly in addition to providing any necessary academic supports.

**B.     Recommendations Concerning Barriers To Access: Insurance And Funding Issues.**

17.   A fully functional mental health system will require better coordination and access to a broad range of necessary services across payment systems.

18.   Inadequate reimbursement rates combined with high utilization rates at many outpatient behavioral health clinics have made this model of care financially unsustainable.   In addition, overall Medicaid rates for adult inpatient care have not increased in at least eight years.   Recent increases in rates for inpatient child and adolescent care have been coupled with decreases in other Medicaid reimbursement rates to the same hospitals. The Commission recommends that higher reimbursement rates in both outpatient and inpatient settings, which better reflect the costs of care, be a core component of a redesigned behavioral health care system.

A-14

Exhibit 28
Page 01263

19.     Inadequate reimbursement rates have also impacted the behavioral health workforce, which remains insufficient to meet the needs of many Connecticut residents.   The Commission recommends that, in addition to addressing reimbursement rates, Connecticut identify and take measures to increase the behavioral health workforce.   These might include educational incentives such as loan forgiveness programs.

20.     Connecticut has significant problems with system fragmentation resulting from diverse payment systems and a lack of coordination or consistency among state agencies.   A fragmented system yields unequal access to effective treatment, discontinuities of care for those receiving service, and unsustainable financial burdens for individuals, families and communities.

21.     The definition of "care" must be reviewed. Funding decisions about behavioral health "care" must look beyond the model that has prevailed over the past several decades to embrace psychosocial interventions, services directed toward the achievement of functional skills and other efforts to engage the whole person, which frequently offer the best prognosis for recovery.   A behavioral health diagnosis accompanied by acute, rather than chronic, symptoms should be removed as a prerequisite for access to care.

22.     Commercial insurance should cover the full panoply of services available through the public behavioral health system, e.g., programs that provide housing, vocational and occupational support, and drop-in services that can be essential components of an effective treatment strategy for individuals struggling with severe mental illness.   The Commission recommends continuing efforts to expand coverage to a broad range of evidence-supported services for individuals with private insurance.

23.     Since the goal of optimal health care is to integrate behavioral health seamlessly into comprehensive care, continued use of behavioral health carve-outs, designed to control behavioral health costs rather than increase access, should be phased out as quickly as possible.   The Connecticut Behavioral Health Partnership is noteworthy in designing incentives to coordinated care across physical and mental health as well as substance abuse

A-15

Exhibit 28
Page 01264

services for Medicaid-funded care despite the existence of a behavioral health carve-out, but full integration and comprehensive care is most likely achieved through eliminating mental health carve-outs altogether.

24.  To guarantee that provider panel lists facilitate, rather than frustrate, access to care, health plans should be required to maintain up-to-date and accurate provider panel lists and to make these available to all members. The Commission recommends that Connecticut establish standards for accurate lists, as well as a mechanism for fining or otherwise holding insurers accountable for publishing inaccurate lists.

25.  Despite recent changes in Connecticut law, behavioral health providers continue, virtually unanimously, to report repeated and inappropriate denials of care. The Commission therefore recommends that appeals of all denials of care be processed through an independent entity such as the Office of the Health Care Advocate. Independent clinicians selected by this entity should be available around the clock for such reviews. A second level of review should be available through the same entity. Insurers should be required to provide reimbursement during the denial and appeals period up to the point of ultimate denial by the neutral reviewing party. When a licensed provider determines that a particular course of treatment is medically necessary, the burden of proof should fall to the insurer to demonstrate otherwise. Any conclusion by a reviewer that care is not medically necessary should be based, to the extent possible, on findings in the medical literature. The results of scientific studies, and/or recommendations of recognized health care professional organizations and recognized authorities of evidence of efficacy especially in the absence of scientific studies, should not be discredited solely on the assertion of the insurer.

26.  The Commission has recommended adoption of models of care that integrate behavioral and general health services. In the current world of diverse funding and delivery mechanisms, it is impossible to talk about access to mental or behavioral health services in a unified way. In the Commission's view, Connecticut must find ways to fund integrated models of care for both

A-16

Exhibit 28
Page 01265

children and adults that ensure access to quality, affordable, culturally appropriate and timely care for residents throughout the state.

    **C.**    **Recommendations Concerning Barriers To Access: Stigma And Discrimination.**

    27.    Notwithstanding widespread efforts over the past two decades to combat stigma, recent studies have found that many members of our society still regard people with mental illness as dangerous, incompetent and at fault for their condition. But a diagnosis of mental illness does not have to mean an end to achieving one's life goals.  Systems of care that promote wellness generally and recovery for those who struggle with behavioral health challenges and the effects of traumatic stress can help to diminish stigma and its effects. The media plays a pivotal role in perpetuating stigma but it can also serve as an agent of change, a key player in efforts to eradicate stigma.

    28.    Research suggests that anti-stigma campaigns should incorporate two types of messages to combat stigma effectively: "see the person" messages that highlight the full humanity of individuals living with mental illness rather than focusing on labels; and recovery-oriented messages that refute gloomy, and potentially self-fulfilling, prognoses.  But experts caution against a "one size fits all" approach, stressing that particular combinations of messages, targeted toward particular audiences, are likely to be most effective.  The Commission strongly supports research that will identify the most effective measures to reduce stigma, as well as implementation of those measures.

    29.    Many of the Commission's recommendations regarding models of care and the organization and funding of systems of care, while not addressed directly toward stigma reduction, may have the effect of decreasing stigma.  For example, school-based behavioral health services have the potential to enable children and families to address mental health challenges in an environment relatively free from the stigma that attaches to the mental health system.  Even more significantly, they could over time diminish the stigma associated with mental illness by integrating mental health care with other forms of health screening and care available to children through schools.

A-17

Exhibit 28<br>Page 01266

30.    The Commission recommends the expansion of programs that engage people across the community in issues relevant to mental health. Programs such as CIT (Crisis Intervention Training) and CIT-Y (training directed toward youth issues) for the law enforcement community, as well as Mental Health First Aid for teachers, counselors, parents, neighbors, coaches, youth group leaders, police officers and others, increase mental health awareness among members of the community who can then offer support to children and adults facing mental health challenges and help them access the resources they need.

31.    For adolescents and adults facing mental health diagnoses, effective psychoeducation of both individuals and families can promote acceptance and decrease stigma.    Psychoeducation involves structured programs in which individuals and families are educated about mental illness and its treatment, and strategies are given for handling typical challenges that might arise in association with a particular condition.    The goal of such programs is to recognize that someone whom they might consider "different" or "odd" may in fact need help.   Participants learn ways to connect with an individual in need and to empower that person to seek help.   Above all, such programs need to incorporate a model of wellness rather than focus primarily on illness.   People with lived experience serve as role models and can provide examples of a path to a successful recovery.

**D.     Recommendations Concerning Privacy And Confidentiality.**

32.    The Commission cautions against measures that would curtail the privacy rights of people living with mental illness in the absence of a clear understanding of what current laws and policies do and do not allow. Although recent guidance issuing from federal agencies attempts to clear up widespread confusion about how far existing laws go in limiting the sorts of disclosures that might arise in the context of concerns about safety, ambiguities and potential misunderstandings persist.    Additional efforts to clarify and educate providers and the public on these issues are sorely needed.

A-18

Exhibit 28
Page 01267

ER_3438

33.    Existing laws permit appropriate disclosure of otherwise private mental health information in situations where a threat to someone's safety appears imminent.   Privacy laws still, however, restrict most communications about a person's mental health treatment absent that person's consent, even where barriers to disclosure frustrate effective care or subject the patient and others to less obvious dangers.   The Commission supports efforts to facilitate communication in the service of effective care while respecting individuals' rights to privacy and autonomy.

34.    With respect to children's behavioral health, it is essential that information-sharing take place to the full extent permitted by law so that children's needs can be adequately recognized and addressed across schools, health care settings, guidance clinics, and other institutions critical to their healthy development.   Educational privacy laws should be implemented in such a way that they do not compromise essential communication for children struggling with serious emotional, behavioral and developmental challenges. With parent permission, schools and treatment providers should in general be allowed to share important information that will facilitate the care and education of children.

### E.    Recommendations Concerning Mental Illness And Violence.

35.    The Commission has found that while untreated psychiatric illness in a narrow subset of the population does increase the risk of violence, a diagnosable mental illness alone is a very weak predictor of interpersonal violence – particularly compared to other factors such as substance abuse, a history of violence, socio-economic disadvantage, youth, and male gender.  All of these factors have far stronger correlations with a risk of violence than does a psychiatric diagnosis.   For gun violence in particular, mental illness contributes greatly to rates of suicide but marginally to homicide rates.

36.    Accessible community treatment programs can reduce the relatively low risk of violence among most people living with mental illness. The Commission recommends expansion and increased availability of early intervention programs for those young adults early in the course of developing

A-19

Exhibit 28
Page 01268

and/or established mental illness to reduce the likelihood that a person facing a psychotic illness might resort to violence or self-harm. Also, this would offer the best prognosis for a less chronic course of illness, fewer emergency hospitalizations, and greater opportunities for recovery.

37.    The testimony before the Commission from forensic psychiatrists and other experts makes clear that despite the ability to identify the condition of dangerousness no one has yet devised a reliable method for predicting future violence.  Trait-based profiling appears to represent an ineffective and even counterproductive means of identifying individuals likely to commit acts of targeted violence and instead more likely creates stigma.  Instead, behavioral threat assessment could be useful; it focuses on identifying and intervening with individuals whose behavior and/or communications clearly indicate an intention to commit violence.  This model has been adapted for use in educational institutions, workplace settings, and the U.S. military.

38.    The Commission recommends the formation of multidisciplinary teams to conduct risk assessments in schools.  Each school district in Connecticut should have policies in place that are related to threat assessment and violence management.  School [district]s should form multidisciplinary teams that include an Administrator, a school Police Department Officer, and a school mental health professional (e.g., Psychiatric Social Worker, School Psychologist, Pupil Services and Attendance Counselor), as well as a community mental health provider, to assess threats made in schools.  Such teams may also include representatives of faith communities and members of the youth services bureau.  These teams should receive training in threat assessment that will enable them to review specific threats and help manage or support any person who issues a threat as well as warning the potential victims.  They should also be available when a child or family has been identified with complex stressors that might indicate a need for additional resources to stabilize the family.  In this way, risk assessment teams will become "go to" community resources that will support and strengthen families in the community.

A-20

Exhibit 28
Page 01269

ER_3440

39.     People with mental health challenges are far more likely to be
victims of violence than perpetrators. As a general matter, mass fatalities
comprise less than one-tenth of 1% of gun homicides committed in the United
States.   Guns play a major role in suicide; over half of completed suicides
involve firearms; 90-95% of completed suicides are attributable to depression,
bipolar disorder, and other psychiatric illnesses, often in combination with
substance abuse.

40.     As noted in the Law Enforcement section of this report, the
Commission supports adoption of the Consortium for Risk-Based Firearm
Policy's   December   2013   recommendations.   The   Consortium's
recommendations take evidence-based risk categories as a basis for limiting
gun eligibility. These are based principally on a history of violent behavior, a
reckless use of alcohol or illegal drugs, and a clinical finding of dangerousness.
Conversely, recently enacted legislation regarding gun eligibility may go too far
in excluding individuals recently admitted to psychiatric institutions as
voluntary inpatients, and the Commission urges reconsideration of this
provision.

41.     The Commission was unable to arrive at a recommendation
concerning adopting involuntary outpatient commitment as an option short of
involuntary hospitalization in Connecticut.

**F.     Recommendations Concerning Response, Recovery And
Resilience.**

42.     Connecticut should develop a comprehensive statewide plan for
effectively responding to large-scale school crisis events that includes
educational and behavioral health agencies.   The plan should specify short-
and longer-term interventions for different populations, and identify funding
mechanisms that will minimize discontinuity of services.   It should clarify a
range of roles and responsibilities for state and local entities and designate lead
agencies for key functions.

43.     Connecticut and its municipalities should incorporate an
enhanced focus on the mental health implications of disasters and other crisis

A-21

Exhibit 28
Page 01270

ER_3441

events into all disaster preparedness and response protocols, and implement measures to address the behavioral health needs of children as well as adults.

44.    Connecticut should better integrate behavioral health and educational responses to disaster events by thoughtfully incorporating educational and behavioral health agencies into the state's Unified Command System.

45.    Investment in preparing to recover from a major crisis will pay major dividends every day, even in communities fortunate enough to escape a major school or community crisis event.  Meeting needs daily in schools and communities will be a major step in improving everyday functioning as well as recovery from large-scale crises.

46.    While short-term support by mental health professionals from outside the community may be required or helpful in the immediate aftermath of a crisis event, the goal should be to transition direct services provided during the recovery process to those who are part of the impacted community or adjoining/nearby communities.  With some outside support, the goal should be empowering and training providers within the school and community to ensure that the recovery is self-sustaining to the extent possible.

47.    The state should also offer the option of engaging a short-term support team, developed prior to an event, to school districts overwhelmed by tragedies to assist in planning and decision-making, such as communications, management of mental health response, provision of security, managing personnel and labor issues, and donations.

48.    We must strengthen our knowledge base about how to meet the emotional and psychological needs of the adult personnel who are part of the crisis response in the schools and ensure that we have a plan to address those needs promptly.

49.    Any recovery plan must anticipate long-term as well as short-term needs, because the process of recovering from traumatic events may take years.  While funding for immediate recovery efforts must be readily available, it is equally important to harmonize funding mechanisms with the true length

A-22

Exhibit 28
Page 01271

of time that services are required and to minimize the discontinuity of services that results from transitory funding mechanisms such as short-term grants. The plan should also include provisions addressing bereavement and meaning-making through memorialization and commemoration activities so that communities can approach these proactively.

50.    Connecticut should create mechanisms to implement ongoing training and professional development programs outside of crisis circumstances for teachers and school personnel, and establish statewide training requirements tied to professional certification and recertification. Training for teachers and school personnel on how to support children following a disaster should impart basic skills and knowledge in the following areas: the impact of trauma and bereavement on children and their learning; likely reactions; strategies for providing psychological first aid, brief supportive services, and bereavement support; and indications for referral for additional mental health services.

51.    Connecticut should better integrate the behavioral health and education responses to school crisis events by creating a mechanism that facilitates the immediate coordination of supportive services. Although there may be one lead agency overseeing the recovery efforts, the response and recovery will require integrated and complementary services from multiple state agencies and departments (including, SDE, DMHAS and DCF).  It is also important to create linkages to community programs offering bereavement support, faith-based groups that can provide supportive services, and agencies providing victim services.

52.    To help victims regain a sense of control, communication and engagement with victims of crisis events should not follow a one-size-fits-all approach but instead should be calculated to enhance each individual's capacity to control his or her own recovery process.  A central clearing house for information relevant to disaster response and recovery, with clearly identified channels of access, would help to mitigate the sorts of

A-23

Exhibit 28
Page 01272

ER_3443

communication barriers that can impede recovery and risk re-traumatizing vulnerable members of the community.

A-24

Exhibit 28
Page 01273

ER_3444

## [APPENDIX]{.underline} B

## List of Individuals Who Testified Before the
## Sandy Hook Advisory Commission

| DATE | SPEAKER | TITLE | TOPIC |
|---|---|---|---|
| 01/24/13 | Dannel P. Malloy | Governor of the State of Connecticut | Charge to the Committee |
| 01/24/13 | Stephen Sedensky, Esq. | Danbury State's Attorney | Update on the Sandy Hook investigation |
| 01/24/13 | William Ritter | Former Governor of Colorado | Work of the Columbine Commission |
| 01/24/13 | Richard J. Bonnie, LLB | Director, Institute of Law – Psychiatry and Public Policy, University of Virginia School of Law/Chair of Virginia Commission on Mental Health Law Reform/Consultant to Virginia Tech Review Panel | Work of the Virginia Commission on mental health law reform and the Virginia Tech Review Panel |
| 02/15/13 | Diane Harp Jones | Chief Executive Officer, American Institute of Architects – Conn. Chapter | Safe school design |
| 02/15/13 | Randall S. Luther | Tai Soo Kim Architects | Safe school design |
| 02/15/13 | Richard Munday | Newman Architects | Safe school design |
| 02/15/13 | Richard T. Connell | S/L/A/M Collaborative | Safe school design |
| 02/15/13 | Glenn Gollenberg | S/L/A/M Collaborative | Safe school design |
| 02/15/13 | Jim Laposta | JCJ Architects | Safe school design |
| 02/15/13 | Mila Kennett | Project Manager, Federal Emergency Management Agency | FEMA resources |
| 02/15/13 | Robert Mahoney | Executive Director, Emergency Management Group | Emergency management |
| 02/22/13 | Patricia Rehmer, MSN, HCSE | Commissioner, Department of Mental Health and Addiction Services | State agency trauma response to Sandy Hook |

B-1

Exhibit 28
Page 01274

| 02/22/13 | Joette Katz, J.D. | Commissioner, Department of Children and Families | State agency trauma response to Sandy Hook |
|---|---|---|---|
| 02/22/13 | Stefan Pryor | Commissioner, Department of Education | State agency trauma Response to Sandy Hook |
| 02/22/13 | Jewel Mullen, M.D., MPH, MPA | Commissioner, Department of Public Health | State agency trauma response to Sandy Hook |
| 02/22/13 | Marleen Wong, LCSW Ph.D. | Assistant Dean and Clinical Professor at the University of Southern California School of Social Work | National Child Traumatic Stress Network |
| 02/22/13 | Thomas Demaria, Ph.D. | Long Island University, Director of the Psychological Services Center and Trauma Response Team of the Doctoral Psychology Program | Foundation of the 9/11 Family Center |
| 02/22/13 | John Barry | Superintendent of Aurora Public Schools | Role of school district in meeting needs of a community |
| 02/22/13 | Francis Pumbar | Recovery Coordinator of Aurora Public Schools | Role of school district in meeting needs of a community |
| 03/01/13 | Joe Delehanty | Connecticut State Police, Firearms Training Unit | Processes of purchasing, transferring, or possessing a firearm; regulations on storage and safeguarding weapons; training and qualifications for certain permits and licenses; and different types of weapons, ammunition and magazines |

B-2

Exhibit 28
Page 01275

| 03/01/13 | Barbara Mattson | Connecticut State Police, Special Licensing and Firearms Unit | Processes of purchasing, transferring, or possessing a firearm; regulations on storage and safeguarding weapons; and training and qualifications for certain permits and licenses |
| 03/01/13 | Christine Plourde, Esq. | Connecticut State Police, Legal Affairs Unit, Labor Relations Attorney | Overview of CT firearm statutes |
| 03/01/13 | Marc Montminy | Chief of Police, Manchester Police Department | Emergency protocol by state and local police |
| 03/01/13 | Michael Kehoe | Chief of Police, Newtown Police Department | Emergency protocol by state and local police |
| 03/01/13 | Brendan Campbell | Doctor, Connecticut Children's Medical Center | Use of Firearms in today's society |
| 03/01/13 | Anthony Salvatore | Chief of Police, Town of Cromwell, representing Connecticut Police Chief Association | Gun violence prevention and child safety |
| 03/01/13 | Matthew Reed | Chief of Police, Town of South Windsor, Legislative co-chair of the Connecticut Police Chief Association | Gun violence prevention and child safety |
| 03/08/13 | Gregg Champlin | New Hampshire School Emergency Planning & Natural Hazards Program Specialist | State systems for school emergency planning |
| 03/08/13 | Col. (Ret.) William P. Shea | Deputy Commissioner, Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security | Emergency management infrastructure in Connecticut |
| 03/08/13 | Thomas Vannini | Region 5 Coordinator for The Emergency Management and Homeland Security (DEMHS) | Emergency management infrastructure in Connecticut |

B-3

Exhibit 28
Page 01276

ER_3447

| 03/08/13 | William Hackett | State Emergency Management Director, Division of Emergency Management and Homeland Security (DEMHS), Department of Emergency Services and Public Protection (DESPP) | Emergency management infrastructure in Connecticut |
|---|---|---|---|
| 03/22/13 | Kim Pernerewski | President of the Waterbury Chapter of the National Alliance of Mental Illness | Increasing public awareness of mental health issues and decreasing discrimination through a personal lens |
| 03/22/13 | Louise Pyers | Executive Director of the Connecticut Alliance to Benefit Law Enforcement | Mental health issues that law enforcement officers face |
| 03/22/13 | Chris McKee | Sergeant, Windsor Police Department | Mental health issues that law enforcement officers face |
| 03/22/13 | Sue Bowman | Officer, Windsor Police Department | Mental health issues that law enforcement officers face |
| 03/22/13 | Deron Drumm | Executive Director of Advocacy Unlimited | Personal experiences as a person with mental health disorder |
| 03/22/13 | Bryan Gibb | Director of Public Education at the Nat'l Council for Community Behavioral Healthcare | Mental health first aid |
| 03/22/13 | Anne Melissa Dowling, CFA | Deputy Commissioner, State Department of Insurance | Role of mental health risk assessment and management in the Connecticut insurance and health care sectors |

B-4

Exhibit 28
Page 01277

**ER_3448**

| 03/22/13 | Victoria Veltri, JD, LLM | Connecticut Healthcare Advocate | Role of mental health risk assessment and management in the Connecticut insurance and health care sectors |
|---|---|---|---|
| 03/22/13 | Marisa (Reddy) Randazzo, Ph.D. | Managing Partner, SIGMA Threat Management Associates | Violent case studies where risk assessment and management could have averted tragedy |
| 04/12/13 | Gary Steck | CEO, Wellmore Behavioral Health & Chairman of the Board, Connecticut Community Providers Association | Behavioral health needs of children and youth |
| 04/12/13 | Robert Plant, Ph.D. | Chief Clinical Officer, Wellmore Behavioral Health | Behavioral health needs of children and youth |
| 04/12/13 | Sheila Amdur, MSW | Interim President/CEO, Connecticut Community Providers Association | Behavioral health needs of children and youth |
| 04/12/13 | Eric Arzubi, M.D. | Co-Chair, Keep the Promise Coalition Children's Committee & Fellow, Yale Child Study Center | Behavioral health needs of children and youth |
| 04/12/13 | Abby Anderson, M.A. | Co-Chair, Keep the Promise Coalition Children's Committee & CT Juvenile Justice Alliance | Behavioral health needs of children and youth |
| 04/12/13 | Michael Norko, M.D. | Director of Forensic Services, DMHAS & Associate Professor of Psychiatry, Yale University School of Medicine | Assessment and management of risk, emphasizing the use of a clinical risk assessment model |
| 04/12/13 | Madelon Baranoski, Ph.D., M.S.N. | Associate Professor of Psychiatry/ Vice-Chair of Human Investigation Committee, Yale University | Assessment and management of risk, emphasizing the use of a clinical risk assessment model |

B-5

Exhibit 28
Page 01278

| 04/19/13 | Nadia Ward, Ph.D. | Yale University Department of Psychiatry & Bridgeport School System Intervention Project | Mental health system for adolescents and young adults |
|---|---|---|---|
| 04/19/13 | Cheryl L. Jacques, M.S.N. & A.P.R.N. | Director, Young Adult Services – CT Department of Mental Health and Addiction Services | Mental health system for adolescents and young adults |
| 04/19/13 | Sara Lourie | Client Interagency Planning, CT Department of Children and Families | Mental health system for adolescents and young adults |
| 04/19/13 | Tim Marshall, L.C.S.W. | Director of Community Mental Health Services, CT Department of Children and Families | Mental health system for adolescents and young adults |
| 04/19/13 | Mary Guerrera, L.C.S.W. | Executive Director, Fellowship Place | Mental health system for adults |
| 04/19/13 | Vinod Srihari, M.D. | Yale University, Department of Psychiatry | Mental health system for adults |
| 04/26/13 | John Monahan, Ph.D. | Professor of Law, University of Virginia School of Law | Violence and mental health issues |
| 04/26/13 | Richard J. Bonnie, LLB | Director, Institute of Law – Psychiatry and Public Policy, University of Virginia School of Law/Chair of Virginia Commission on Mental Health Law Reform/Consultant to Virginia Tech Review Panel | Violence and mental health issues |
| 04/26/13 | Robert Pynoos, M.D. & M.P.H. | Co-Director, National Child Traumatic Stress Network | Violence and mental health issues addressing trauma |
| 04/26/13 | Julian Ford, Ph.D. | Professor of Psychiatry, University of Connecticut Health Center | Violence and mental health issues addressing trauma |
| 04/26/13 | Steve Marans, M.S.W. & Ph.D. | Harris Professor of Child Psychiatry/ Professor of Psychiatry/Director, National Center for Child Exposed to Violence/Childhood Violent Trauma Center – Yale University | Violence and mental health issues addressing trauma |

B-6

Exhibit 28
Page 01279

ER_3450

| | | | |
|---|---|---|---|
| 04/26/13 | Robert Franks, Ph.D. | Vice President/Director of Connecticut Center for Effective Practice, Child Health Development Institute | Violence and mental health issues addressing trauma |
| 04/26/13 | Paul Appelbaum, M.D. | Columbia University – Professor of Psychiatry & Director, Division of Psychiatry, Law, and Ethics | Mandatory reporting |
| 04/26/13 | R. Traci Cipriano, J.D., Ph.D. | Licensed Clinical Psychologist, Director of Professional Affairs, Connecticut Psychological Association, Assistance Clinical Professor – Yale Department of Psychology | Mandatory reporting |
| 04/26/13 | Lisa Namerow, M.D. | Attending psychiatrist, Institute of Living/Assistant Professor of Psychiatry and Pediatrics, UCONN School of Medicine | Barriers to access to care |
| 04/26/13 | Stephen Larcen, Ph.D. | Senior Vice President of Behavioral Health, Hartford HealthCare | Barriers to access to care |
| 04/26/13 | Andrew Lustbader, M.D. | Connecticut Council of Child & Adolescent Psychiatry | Mental health access |
| 04/26/13 | Sandra Carbonari, M.D. | Connecticut Chapter of American Academy of Pediatrics | Mental health Access |
| 07/12/13 | Louis R. Pepe, Esq. | McElroy, Deutsch, Mulvaney & Carpenter LLP | Summary of legislation passed in 2013 session that is relevant and meaningful to Commission |
| 07/12/13 | Daniel J. Klau, Esq. | McElroy, Deutsch, Mulvaney & Carpenter LLP | Summary of legislation passed in 2013 session relevant to Commission |

B-7

Exhibit 28
Page 01280

| 07/12/13 | Kenneth S. Trump | President, National School Safety and Security Services | Conversation, focus, policy and funding on school safety |
| 08/16/13 | Donald DeFronzo | Commissioner, Department of Administrative Services, Chair, School Security Infrastructure Council | Update on key topics discussed with SSIC and emerging issues |
| 08/16/13 | David Rubin, Assaf Heffetz, Dov Shiloah | The TIX Group (The Israel Experience in Homeland Security) | Presents perspective method used in Israel to safeguard schools |
| 08/16/13 | Daniel J. Klau, Esq. | McElroy, Deutsch, Mulvaney & Carpenter LLP | Current status of task forces created by recent legislation |
| 12/20/13 | Matthew Reed | Chief, Town of South Windsor Police Department | Newtown police response to the Sandy Hook Elementary School shooting |
| 12/20/13 | Marc Montminy | Chief, Town of Manchester Police Department | Newtown police response to the Sandy Hook Elementary School shooting |
| 1/10/14 | Brenda Bergeron, Esq. | Legal Advisor, Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security | All-hazards school security and safety plan |
| 1/10/14 | Col. (Ret.) William P. Shea | Deputy Commissioner, Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security | All-hazards school security and safety plan |
| 1/17/14 | Terrence W. Macy, Ph.D. | Commissioner, Department of Developmental Services | State of Connecticut resources for individuals with autism |
| 1/17/14 | Jennifer A. Bogin | Director, Division of Autism Services, Department of Developmental Services | State of Connecticut resources for individuals with autism |

B-8

Exhibit 28
Page 01281

| 1/17/14 | Fred R. Volkmar, M.D. | Irving B. Harris Professor in the Child Study Center and Professor of Pediatrics, of Psychiatry and of Psychology, Yale School of Medicine | Autism spectrum disorders and violence |
|---------|------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------|----------------------------------------|
| 1/17/14 | Mathew D. Lerner, Ph.D. | Assistant Professor of Psychology, Psychiatry and Pediatrics, Psychology Department, Stony Brook University; Director, Social Competence and Treatment Lab | Autism spectrum disorders and violence |
| 1/17/14 | Irving B. Harris | Professor in the Child Study Center and Professor of Pediatrics, Psychiatry and Psychology; Chief, Child Psychiatry at Yale-New Haven Children's Hospital; Chair, Child Study Center | Autism spectrum disorders and violence |
| 1/17/14 | Robert and Rose Shea | Parent Advocates | Experience of parents of child with autism |
| 1/17/14 | Timothy K. Carroll, LCSW | Director, Capitol Region Education Council ("CREC") Health Services; Director, CREC Polaris Center | CREC program structure and services |
| 1/17/14 | Carol Kerkin | Assistance Director, CREC Student Services | CREC program structure and services |
| 1/17/14 | Ann Cuvelier | CREC River Street School, Social Worker | CREC program structure and services |
| 1/17/14 | Nancy Canata | CREC Program Director | CREC program structure and services |
| 1/17/14 | Denis McCarthy | Fire Chief and Emergency Management Director, City of Norwalk | Emergency plan for schools and municipal buildings for Norwalk public schools |

B-9

Exhibit 28
Page 01282

ER_3453

| 1/24/14 | Daniel Dodgen, Ph.D. | Director, Division for At Risk Individuals, Behavioral Health, and Community Resilience; Office of the Assistant Secretary for Preparedness and Response; Office of the Secretary; U.S. Department of Health and Human Services | Federal resources |
|---------|----------------------|--------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|-------------------|
| 1/24/14 | Thomas Demaria, Ph.D. | Director of the Psychological Services Center & Trauma Response Team of the Doctoral Psychology Program at C.W. Post Campus of Long Island University | Trauma response |
| 1/24/14 | Vincent B. Giordano, MS | Partner with Denizen Consulting | Student support services policy development |
| 1/24/14 | Francis Pombar | Former Recovery Coordinator for Aurora Public Schools | Recommendations on potential utility of the role of a school system recovery coordinator to promote longer term recovery efforts and how to assess and address mental health needs |
| 1/24/14 | Marleen Wong, LCSW, Ph.D. | Associate Dean and Clinical Professor at the University of Southern California School of Social Work | |
| 2/28/14 | Dora Schriro | Commissioner, Department of Emergency Services and Public Protection | Incident command / unified command |
| 2/28/14 | Col. (Ret.) William P. Shea | Deputy Commissioner, Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security | Incident command / unified command |

B-10

Exhibit 28
Page 01283

| 2/28/14 | Michael K. Kehoe | Police Chief, Town of Newton | Incident command / unified command |
| 2/28/14 | Robin Montgomery | Police Chief, Town of Brookfield | Incident command / unified command |
| 2/28/14 | Marc Montminy | Police Chief, Town of Manchester | Incident command/ unified command |
| 2/28/14 | David Billings | Ass't Fire Chief, town of Manchester | Incident command/ unified command |
| 2/28/14 | Brian Gould | Police Captain, Town of Bristol | Blue Plan |
| 2/28/14 | John Oates | Fire Chief, Town of East Hartford | Incident management teams |
| 2/28/14 | Tami Hodges, MS, CPC | Evergreen Consulting | EAP programs for first responders |
| 2/28/14 | William Rubenstein | Commissioner, Department of Consumer Protection | Donations management issues |
| 6/27/14 | David & Francine Wheeler | Parents of Benjamin Wheeler | Parent perspective |
| 6/27/14 | Michelle Gay | Mother of Josephine Gay | Parent perspective |
| 8/15/14 | Tom Kuroski | President of Newtown Federation of Teachers | Experiences of Newtown teachers following shooting at Sandy Hook Elementary School |
| 8/15/14 | Vincent Riccio | Owner of Security Academy of Connecticut | Active shooter prevention & response efforts |
| 9/12/14 | Joseph V. Erardi, Jr. | Superintendent of Schools of Newtown | Recovery from tragedy; Update on Newtown's school system |
| 9/12/14 | E. Patricia Llodra | First Selectman of Newtown | Making our schools and communities safer and the reflections and concerns of Newtown municipal & school leaders |
| 11/14/14 | Jeremy Richman and Jennifer Hansel | Parents of Avielle Richman | Parent perspective |

B-11

Exhibit 28
Page 01284

ER_3455

| 11/14/14 | Nelba Marquez-Greene | Parent of Ana Marquez-Greene | Parent perspective |
|---|---|---|---|

B-12

Exhibit 28
Page 01285

ER_3456

# **APPENDICES C THROUGH E**
# **(available online only)**

C.    Sandy Hook Advisory Commission Agendas and Meeting Minutes

D.    Sandy Hook Advisory Commission Interim Report (dated March 18, 2013)*

E.    Sandy Hook Elementary School Floor Plan

Exhibit 28
Page 01286

ER_3457

# APPENDIX F

## WEAPONS USED IN
## SANDY HOOK ELEMENTARY SCHOOL SHOOTINGS

Glock 20,10mm



**Sig Sauer P226 9mm**



F-1

Exhibit 28
Page 01287

**Bushmaster Rifle**



**MagPul PMAG 30 cartridges**



**Savage 22 Rifle**



F-2

Exhibit 28
Page 01288

# APPENDICES G THROUGH M
# (available online only)

G.     Legislation Passed During 2013 General Assembly Session Relating To Sandy Hook:

Public Act 13-3 ("An Act Concerning Gun Violence Prevention And Children's Safety")*

Public Act 13-220 ("An Act Concerning Revisions To The Gun Violence Prevention And Children's Safety Act")*

Public Act 13-178 ("An Act Concerning The Mental, Emotional And Behavioral Health of Youths") and Report on Implementation of PA 13-178*

Public Act 13-188 ("An Act Concerning School Safety")*

H.     Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newton, Connecticut on December 14, 2012 (dated Nov. 25, 2013), with accompanying Appendix.*

I.     Report of the Child Advocate, "Shooting at Sandy Hook Elementary School," released on November 21, 2014*

J.     State Police Investigative Files re: Shootings at Sandy Hook Elementary School and 36 Yogananda Street*

K.     Report of the Safe School Infrastructure Council (revised and updated to June 27, 2014)

L.     School Security and Safety Plan Standards (v 1.0) (dated Dec. 30, 2013)*

M.     Capitol Region Chiefs of Police Association "Blue Plan" (dated April 24, 2013) (mutual aid response to incidents within Capitol Region)*

Exhibit 28
Page 01289

ER_3460

LAPD Chief Backs Ban on Some Ammo Magazines | NBC Southern Cal...          http://www.nbclosangeles.com/news/local/beck-lapd-ammunition-ban-nr...



Home   News   I-Team   Weather   Entertainment                                           65°   Connect

Local    U.S. & World    California News    SoCal Sports 4 You    Sports    Health    Tech    Weird    Weather    NewsConference

# LAPD Chief Backs Ban on Some Ammo Magazines

"There is no reason that a peaceful society based on rule of law needs its citizenry armed with 30-round magazines"



LOS ANGELES, CA - JANUARY 6: Los Angeles Police Chief Charlie Beck announces the 2009 crime statistics for Los Angeles on January 6, 2010 in Los Angeles, California. The city is reporting its lowest crime rate in about 50 years with a violent crimes falling 10.8 percent and property crimes down 8 percent compared to 2008. (Photo by David McNew/Getty Images)

LA's police chief said Wednesday he supports a proposed federal ban on the sale of high-capacity ammunition magazines.

If passed, the ban would prohibit the sale or transfer of any magazine that holds more than 10 rounds, though possession of magazines legally purchased before the ban's start date would be allowed.

"There is no reason that a peaceful society based on rule of law needs its citizenry armed with 30-round magazines," Police Chief Charlie Beck said at a news conference, adding that the clips transform a gun "into a weapon of mass death rather than a home-protection-type device."

Jared Loughner, the suspect in the shooting that wounded U.S. Rep. Gabrielle Giffords and killed six people in Arizona, legally bought the 9 mm handgun he's accused of using at a Tucson grocery store. Authorities say he was carrying extended magazines that hold 30 rounds of ammunition.

The federal bill was authored by Rep. Carolyn McCarthy, D-N.Y., whose husband was killed and son seriously wounded in a 1993 shooting. The sale of high-capacity magazines is already banned in California.

March 2011 Culture Calendar

## TRENDING STORIES

1   Take a Look Inside Obama Family's Washington, DC, Home

2   James Responds to Graffiti: Racism a 'Part of the World'

3   Los Angeles 1992 Riots: By the Numbers

4   Performance Interrupted at the Hollywood Bowl

5   SPONSORED   Mt. Rose Ski Tahoe

## WEATHER FORECAST

Los Angeles, CA

65° Overcast
Feels Like 65°

Radar    Forecast    Maps

## WHAT DO YOU THINK?

Exhibit 29
Page 01291        6/1/17, 9:29 AM

**ER_3461**

Privacy policy

NEWSLETTERS

Receive the latest local updates in your inbox

| Email | Sign up |

Privacy policy | More Newsletters

Several law enforcement officials have endorsed the proposed ban, but Beck, who heads the nation's third-largest police force after New York and Chicago, has the highest profile.

The National Rifle Association would do everything in its power to stop the law, the group's spokesman Andrew Arulanandam said. Members of the public should be allowed access to the ammunition clips to protect themselves from attacks by armed mobs, he said.

"When someone is being attacked by multiple people, it is only reasonable that they are given as much opportunity to defend themselves as they need," Arulanandam said.

High-capacity magazines were banned in 1994, but Congress refused to renew the law and it expired in 2004.

Since then, large-capacity magazines have been used in several mass shootings, including the Virginia Tech slayings in 2007 that left 33 dead, and the 2009 attack at Fort Hood, Texas, that killed 13.

McCarthy's bill, which was introduced Jan. 18, currently has 90 co-sponsors.

Published at 12:36 PM PST on Mar 2, 2011 | Updated at 2:22 PM PST on Mar 2, 2011

Copyright Associated Press / NBC Southern California

**You May Like**

Promoted Links by Taboola

Quicken Loans Urges Homeowners To Switch To...
Quicken Loans, NMLS#3030

If you own a computer you must try this game!
Throne: Free Online Game

20 Things 'M*A*S*H' Producers Hid From Fans
Definition

Watch: Missile Interceptor Collides With Target During Defense System Test

Inglewood Officers Who Fatally Shot Couple in Parked Car Are Fired

Elderly Man Detains Intruder Who Attacked His Wife in Their San Jose Home

SPONSORED LINKS                    MORE FROM NBC

Exhibit 29
Page 01292       6/1/17, 9:29 AM

LAPD Chief Backs Ban on Some Ammo Magazines | NBC Southern Cal...      http://www.nbclosangeles.com/news/local/beck-lapd-ammunition-ban-nr...



- Sacramento, California: This Brilliant
  Company Is Disru... (EverQuote Insurance Quotes)
- People In Heavy CC Debt Are In For Big
  Surprise (Weekly Financial)
- No Couple at the Golden Globes Was
  Cuter than These Two (Livingly)
- 25 Makeup Tips All Older Women
  Should Know (Tipmom)
- Sacramento: This Meal Service is
  Cheaper Than Your Local Store (Home Chef)
- Trump Supporters Disrupt Town Hall of
  Democratic Congressman
- Suspect Charged With Murder, Rape in
  Killings of Women Whose Bodies Were...
- Kathy Griffin Apologizes for Bloody,
  Decapitated Trump Image
- Kathy Griffin Axed by CNN Over Trump
  Decapitation Pic
- Feeling Insulted, Mexican to Market
  'Trump' Toilet Paper

Promoted Links by Taboola

## Leave Comments

5 Comments                                          Sort by  Oldest

Add a comment...

**Robert Sanchez**
We don't need to live on a communist society, NRA all the WAY.
Like · Reply · Jan 10, 2013 4:54pm

**Robert Sanchez**
you don't like the USA, Leave today! Gun control. no Way
Like · Reply · Jan 10, 2013 4:56pm

**Robert Sanchez**
Guns kill crime.
Like · Reply · Jan 10, 2013 4:56pm

**Robert Sanchez**
The police can't even protect themselves, leave alone us law abiding citizens.
Like · Reply · Jan 10, 2013 4:59pm

**Robert Sanchez**
Chief, Git a life.
Like · Reply · Jan 13, 2013 5:39pm

Facebook Comments Plugin

Exhibit 29
Page 01293    6/1/17, 9:29 AM

**ER_3463**

LAPD Chief Backs Ban on Some Ammo Magazines | NBC Southern Cal...    http://www.nbclosangeles.com/news/local/beck-lapd-ammunition-ban-nr...

News

Weather

Investigations

Entertainment

Traffic

Contact Us

Connect With Us

FCC Independent Programming Report

FCC News and Information Programming Report

NBC Non-Profit News Partnership Reports

KNBC Public Inspection File

Employment

21st Century Solutions

Send Feedback

Terms of service

Privacy policy

© 2017 NBCUniversal Media, LLC. All rights reserved.

AdChoices

4 of 4

Exhibit 29
Page 01294  6/1/17, 9:29 AM

151

## ORIGINAL ARTICLE

# Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers

**D C Reedy, C S Koper**

...................................................................................................................

*Injury Prevention* 2003;**9**:151–155

See end of article for authors' affiliations

.......................

Correspondence and reprint requests to: Dr Christopher S Koper, Jerry Lee Center of Criminology, University of Pennsylvania, 3814 Walnut Street, Philadelphia, PA 19104, USA; ckoper@sas.upenn.edu

.......................

**Objective:** To examine whether gun assaults committed with semiautomatic pistols are more injurious and lethal than those committed with revolvers.

**Setting:** Jersey City, New Jersey from 1992 through 1996.

**Methods:** Using police records on fatal and non-fatal handgun assaults, $t$ tests and $\chi^2$ tests were employed to determine if attacks with pistols result in more shots fired than those with revolvers, leading to more gunshot victims and more severely wounded victims.

**Results:** More shots were fired in attacks with pistols (average = 3.2 to 3.7) than in attacks with revolvers (average = 2.3 to 2.6). Although pistol use was unrelated to the probability that an incident resulted in any injury or death, it was associated with a 15% increase in the number of wounded victims in those cases in which people were shot (1.15 per pistol case, 1.0 per revolver case), implying that the total number of gunshot victims may have been 9.4% lower had pistols not been used in any attacks. Pistol use was not related to the number of wounds per gunshot victim.

**Conclusions:** The findings provide limited evidence that recent growth in the production and use of pistols has contributed to higher levels of gunshot victimizations. However, available data did not permit an assessment of whether the associations between gun types and assault outcomes are mediated by characteristics of incidents and actors.

C riminal misuse of firearms continues to be one of America's most serious crime and public health problems. Although rates of gun crime have fallen substantially in recent years,[1,2] over 10 000 persons were murdered with firearms in 2000 and another 49 000 assault victims were treated in hospitals for non-fatal gunshot wounds.[1,3] The lifetime medical costs of gunshot injuries total approximately two billion dollars a year, with the majority of these costs stemming from criminal assaults.[4]

Handguns are heavily involved in firearm violence, accounting for 80% or more of guns used in urban crimes and homicides.[5–7] During recent decades, there has been a shift away from production of revolvers to production of semiautomatic pistols in the civilian handgun market. Pistols grew from 28% of handgun production in 1973 to 46% by 1985 and to 80% by 1993.[8,9] This trend is also apparent in criminal weaponry, as pistols have overtaken revolvers as the predominant type of handgun used in crime.[5]

Semiautomatic pistols permit a somewhat more rapid rate of fire than do revolvers, and they often have larger ammunition capacities. The firing mechanism of a semiautomatic firearm loads a new round automatically after each shot. In most pistol models, the gun also recocks for firing automatically after each shot, thereby requiring less pressure on the trigger to fire after the first shot than is required with a revolver, which cocks for firing as the trigger is pulled.[10,11]

Further, a pistol holds ammunition in a detachable magazine. Pistol magazines manufactured before September 1994 commonly hold five to 17 bullets, and magazines produced for some models take as many as 30 or more bullets.[12] Production of pistols with magazines holding more than 10 rounds grew during the 1980s and early 1990s,[11] but was interrupted by the federal *Violent Crime Control and Law Enforcement Act of 1994* (that is, the 1994 Crime Act), which now limits magazine capacity to 10 bullets. However, larger magazines manufactured before 13 September 1994 are still

legal to possess and transfer. Revolvers, in contrast, hold ammunition in a revolving cylinder that typically has five to six bullets (and sometimes up to nine bullets).[10]

Pistols enable shooters to fire more shots more rapidly, potentially increasing the number of persons hit and wounds inflicted per shooting incident. Accordingly, it is possible that the increasing substitution of pistols for revolvers has increased deaths and injuries from gun violence. Such concerns have spurred legislation to restrict or deter the use of semiautomatic weaponry. In addition to limiting ammunition magazine capacity, for example, the federal 1994 Crime Act banned semiautomatic assault weapons (a group of semiautomatic, military-style pistols, rifles, and shotguns) and established penalty enhancements for violent and drug trafficking crimes committed with semiautomatics.

Yet evidence linking the spread of semiautomatic weaponry to higher levels of gun deaths and injuries is limited and equivocal. A few studies made indirect links between the growing use of semiautomatics and rising levels of gun homicide and injuries in some cities during the late 1980s and early 1990s.[7,13,14] However, other studies failed to demonstrate convincing links between city level trends in the use of semiautomatics and lethal gun violence.[15,16] National data also present mixed signs as to whether gun attacks have become more injurious and lethal as semiautomatics have become more prevalent.[2,17,18]

There is little direct empirical evidence on how semiautomatics affect attack outcomes. A few studies of firearm homicides suggest that pistol attacks involve more shots fired on average than attacks with revolvers and that victims killed with semiautomatics having large ammunition magazines have more wounds than victims killed with other guns.[7,19] However, there have been no studies comparing the injuriousness and lethality of attacks with pistols and revolvers. We address this gap using data on handgun homicides and non-fatal handgun

Exhibit 30
Page 01296

152                                                                                         Reedy, Koper

assaults investigated by police in Jersey City, New Jersey during the early to mid-1990s.

## METHODS

Jersey City, New Jersey is a city of approximately 230 000 people. In 1990, its racial composition was 48% white, 30% black, and 22% of other races. Approximately 11% of the city's residents were unemployed in 1990, and almost 19% were living in poverty.[20] Jersey City's violent crime rate in 1995 ranked 11th among 136 cities with populations between 100 000 and 250 000.[21]

The data for this study were collected from the homicide and aggravated assault files of the Jersey City Police Department. Comparisons of police and medical examiner records in urban jurisdictions show police records to be a highly accurate source of data for homicide cases.[22–24] Police records are the single most comprehensive source for city level estimates of non-fatal, assaultive gunshot injuries in places (like Jersey City) that do not have firearm injury surveillance systems that combine police and medical data.[21,25] Moreover, police records are the only data source that can provide city level estimates of gun assaults not resulting in injury, thereby permitting examination of shots fired and hit rates for all gunfire incidents. However, the most minor types of gun assaults (for example, threats without gunfire, assaults resulting in minor or no wounds) tend to be under-represented even in police data.[26] We assume that this bias works comparably for cases involving pistols and revolvers.

Jersey City police investigated 592 homicides and aggravated assaults involving handguns between January 1992 and November 1996. By law, aggravated assaults include cases in which offenders threatened victims with firearms, as well as cases in which offenders shot or attempted to shoot victims. From the case files, project staff recorded information on shots fired, the number of wounded victims, the number of wounds suffered by each victim, and the type(s) of firearm used in the attack as described by police and/or witnesses.

We estimated shots fired based on reported gunshot injuries, physical evidence (for example, shell casings found at the scene), and the accounts of witnesses and actors. If there was conflicting evidence about the number of shots, we established minimum and maximum ranges. If, for example, police found three shell casings at the scene but witnesses reported four shots, then we coded three as the minimum number of shots fired and four as the maximum number of shots fired. For many cases, the shots fired estimate represents a lower bound. To illustrate, if a case had one victim with one gunshot wound and no additional information on shots fired, then we set shots fired equal to one.

Our analysis focuses upon 239 incidents involving pistols and 104 incidents involving revolvers. We excluded 238 incidents from analysis because the type of handgun was not clearly identified in the police report. The analyzed and excluded cases had comparable outcomes: 38.0% of the excluded cases and 34.9% of the analyzed cases resulted in some form of gunshot injury, while 7.3% of the excluded cases and 8.0% of the analyzed cases resulted in deaths. These differences were statistically insignificant ($\chi^2$ p level >0.05). In addition, we excluded 11 cases involving multiple handguns because we could not determine which gun(s) was used in the shooting.

Although reporting officers and witnesses were able to identify the type of firearm (that is, pistol or revolver) used in the analyzed cases, the precise make and model of the handgun was not identified in most of these reports, often because police did not recover the gun used in the crime. Lack of specific gun model information precluded precise measurement of ammunition capacity for all but a very small number of gunfire incidents.

Following an approach similar to that used by Kleck in his national analysis of gun and non-gun assaults,[26] we contrast pistol and revolver cases on a number of dichotomous outcome measures (that is, occurrence of gunfire, occurrence of gunshot injuries or deaths) and continuous outcome measures (that is, number of shots fired, number of wounded victims, number of wounds per gunshot victim) reflecting different stages of gun assaults. In so doing, we test whether gun attacks with pistols result in more shots fired than those committed with revolvers, leading to more gunshot victims and/or more severely wounded gunshot victims.

Because the data were collected originally for a study of trends over time in wounds per gunshot victim,[18,19] only limited information was recorded about the actors or circumstances beyond that noted above. While staff did collect information on a few variables like victim demographics (the victims were predominantly male and African-American) and the number of perpetrators, they did not record information on other potentially important variables, such as offender characteristics or relationships among the actors,[26,27] in a systematic manner, if at all, because such information was outside the scope of the original study and was not always clear from the reports. And since the data were extracted from the homicide and aggravated assault files, there were relatively few known robberies or sexual assaults among the cases (which would have generally appeared in separate case files), resulting in a more homogeneous sample of assaultive incidents. For these reasons, and because no prior study has examined the differential lethality and injuriousness of assaults involving pistols and revolvers, we chose to conduct bivariate analyses. We present $\chi^2$ tests of association for dichotomous measures and $t$ tests of group means for continuous measures, using a probability level of 0.05 to judge the statistical significance of results.

## RESULTS

By definition, all cases in the study involved threats with a firearm. Hence, we begin our analysis by looking at whether offenders fired at their victims, which we define as an attack. (Unless stated otherwise, our unit of analysis is the incident rather than the victim since some incidents involved multiple victims.) As shown at the bottom of figs 1 and 2, assailants using pistols attacked victims in virtually the same proportion of cases as assailants using revolvers (69.0% and 68.3%, respectively). This implies that the type of gun used was not correlated with characteristics of actors or circumstances that might affect the probability of gunfire. In particular, it suggests that offenders using pistols were no more or less likely to attempt to injure or kill their victims than were offenders using revolvers.

Given that the gun was fired, the average number of shots in pistol cases ranged from 3.23 to 3.68, based on minimum and maximum estimates (table 1). In contrast, the average number of shots in revolver cases ranged from 2.30 to 2.58. Using both minimum and maximum shots fired estimates, pistol cases averaged about one more shot than did revolver cases, and this difference was statistically significant in both sets of comparisons.

Further inspection of table 1 shows that about two thirds (68.5%) of pistol cases but only about half (52.1%) of revolver cases involved multiple shots according to the minimum shots fired estimates. Using maximum estimates, over three quarters (78.8%) of pistol cases and about two thirds (66.2%) of revolver cases involved multiple shots. Ten to thirteen percent of pistol cases involved more than six shots, the most common ammunition capacity for revolvers; in contrast, slightly less than 3% of revolver cases involved more than six shots. Finally, 3.6% to 4.2% of pistol cases involved more than 10 shots, the current limit on newly manufactured ammunition magazines.

Exhibit 30
Page 01297

**ER_3466**



**Figure 1**  Outcomes of assault incidents involving semiautomatic pistols (n = 239). Handgun type was not associated with attack outcomes ($\chi^2$ p level >0.05).



**Figure 2**  Outcomes of assault incidents involving revolvers (n = 104). Handgun type was not associated with attack outcomes ($\chi^2$ p level >0.05).

Although pistol cases involved higher numbers of shots, they were not significantly more likely to result in injuries (fatal or non-fatal) than were revolver cases. Attackers killed or injured victims in 57.6% of gunfire cases involving pistols and 56.3% of gunfire incidents involving revolvers (see figs 1 and 2).

However, pistol cases resulted in more wounded persons per incident than did revolver cases. Among those incidents resulting in gunshot injuries, nearly 12% of the pistol incidents involved multiple victims in contrast to none of the revolver

incidents. As shown in table 2 (left panel), the average number of victims in pistol incidents was 1.15 and 1.0 in revolver incidents. Though statistically significant, we should treat this finding cautiously because there was no variation in the number of wounded victims in the revolver cases (hence, the standard deviation was zero for revolver cases). Nonetheless, it appears that injurious attacks with pistols produced 15% more gunshot victims than did those with revolvers.

Extrapolating from this, there were 95 pistol incidents in which one or more persons were shot, producing a total of 109 victims wounded or killed (table 2). Yet our analysis suggests that only 95 persons would have been wounded in those 95 incidents if the offenders had used revolvers rather than pistols. This reduction of 14 gunshot victims would have reduced the overall number of gunshot victims by 9.4% ($(14/(109+40) \times 100)$).

Finally, figs 1 and 2 show that gunshot injury incidents involving pistols were less likely to produce a death than were those involving revolvers (15.8% to 25.0%). A number of factors such as gun caliber, wound location, and the physical condition of the victim influence whether a gunshot victim dies. The higher fatality rate among revolver gunshot victims appears to have been linked, at least in part, to factors like wound location and age (analyses not shown). For example, 42.0% of the wounds sustained by revolver victims were wounds to the head, chest or abdomen, in contrast to only 25.2% of those sustained by pistol victims (wound location was known for 83.3% of the wounds inflicted with revolvers and 87.7% of those inflicted with pistols). Also, 14.3% of revolver gunshot victims but only 3.7% of pistol gunshot victims were over age 35 (age was recorded for 87.5% and 75.7% of revolver and pistol gunshot victims, respectively).

However, the key mechanism for a semiautomatic weaponry effect is the number of wounds—that is, does the higher number of shots fired in pistol cases increase the likelihood that gunshot victims will suffer multiple wounds, thereby making it more likely that the victims will die? Table 2 (right panel) contrasts the number of gunshot wounds sustained by victims in pistol and revolver cases. Although a higher percentage of pistol victims sustained multiple wounds (24.3% to 20% for pistol and revolver victims, respectively), the average number of wounds for pistol victims (1.44) was actually lower than that for revolver victims (1.50). However, neither of these differences was statistically significant. Therefore, we would not expect victims shot with pistols to die more frequently than victims shot with revolvers, holding gun caliber, wound location, the victim's physical condition, and other relevant factors constant.

## DISCUSSION

This analysis of fatal and non-fatal gun attacks in Jersey City provides limited evidence that assaults committed with semiautomatic pistols produce more injured persons than assaults committed with revolvers. Gun attackers using pistols tend to fire more shots than attackers using revolvers. This shot differential does not appear to influence the probability that an incident will result in injury or death, nor the number of wounds sustained by gunshot victims. However, offenders using pistols do tend to wound more persons. Our analysis suggests that the overall number of wounded victims would have been reduced by 9.4% had revolvers been used in all of the attacks.

The results of this study should be qualified on a number of grounds. General limitations to the data were noted earlier. The shots fired variable was measured with less than optimal precision. Further, indicators of wounds per victim may be less accurate in police records than in medical records.

The effects of semiautomatics on gun attack outcomes could also be contingent on the particular models used; gun model identifications were usually missing in these data, thus

Exhibit 30
Page 01298

**ER_3467**

154                                                                                                      Reedy, Koper

**Table 1**    Number of shots fired (% of cases) by handgun type

|  | Minimum estimates | | Maximum estimates | |
|---|---|---|---|---|
| Shots fired | Pistol incidents (n=165) | Revolver incidents (n=71) | Pistol incidents (n=165) | Revolver incidents (n=71) |
| 1 | 52 (31.5) | 34 (47.9) | 35 (21.2) | 24 (33.8) |
| 2 | 37 (22.4) | 13 (18.3) | 37 (22.4) | 20 (28.2) |
| 3 | 27 (16.4) | 9 (12.7) | 33 (20.0) | 9 (12.7) |
| 4 | 13 (7.9) | 5 (7.0) | 19 (11.5) | 6 (8.5) |
| 5 | 13 (7.9) | 6 (8.5) | 11 (6.7) | 8 (11.3) |
| 6 | 6 (3.6) | 2 (2.8) | 8 (4.8) | 2 (2.8) |
| 7 | 4 (2.4) | 2 (2.8) | 3 (1.8) | 1 (1.4) |
| 8 | 3 (1.8) | 0 | 7 (4.2) | 0 |
| 9 | 2 (1.2) | 0 | 3 (1.8) | 1 (1.4) |
| 10 | 2 (1.2) | 0 | 2 (1.2) | 0 |
| 11 | 1 (0.6) | 0 | 2 (1.2) | 0 |
| 12 | 1 (0.6) | 0 | 1 (0.6) | 0 |
| 13 | 1 (0.6) | 0 | 1 (0.6) | 0 |
| 14 | 0 | 0 | 0 | 0 |
| 15 | 1 (0.6) | 0 | 0 | 0 |
| 16 | 2 (1.2) | 0 | 2 (1.2) | 0 |
| 17 | 0 | 0 | 1 (0.6) | 0 |
| Mean* | 3.23 | 2.3 | 3.68 | 2.58 |

*Group means differed significantly for pistol and revolver cases. The $t$ statistic = 3.11 (p<0.01) using minimum shots fired estimates; $t$ statistic = 3.51 (p<0.01) using maximum shots fired estimates; $t$ statistics were calculated using the formula for populations having unequal variances.

**Table 2**    Number of gunshot victims (% of cases) by handgun type and wounds per victim (% of victims) by handgun type

|  | Gunshot victims per incident | | Wounds per gunshot victim | |
|---|---|---|---|---|
| Victims/wounds | Pistol cases (n=95 incidents) | Revolver cases (n=40 incidents) | Pistol cases* (n=107 victims) | Revolver cases (n=40 victims) |
| 1 | 84 (88.4) | 40 (100) | 81 (75.7) | 32 (80) |
| 2 | 8 (8.4) | | 13 (12.1) | 3 (7.5) |
| 3 | 3 (3.2) | | 8 (7.5) | 2 (5.0) |
| 4 | | | 3 (2.8) | 1 (2.5) |
| 5 | | | 1 (0.9) | 1 (2.5) |
| 6 | | | 1 (0.9) | 0 |
| 7 | | | 0 | 1 (2.5) |
| Mean† | 1.15 | 1.0 | 1.44 | 1.5 |

*Two victims were excluded due to missing data.
†Gunshot victims per incident differed significantly for pistol and revolver cases ($t$ statistic = 3.29, p<0.01). Wounds per gunshot victim did not differ significantly for pistol and revolver cases ($t$ statistic = −0.28, p>0.05). T statistics were calculated using the formula for populations having unequal variances.

precluding examination of ammunition capacity or gun quality. Note that a number of the pistol models used most frequently in crime are inexpensive, lower quality guns (often referred to as Saturday Night Specials) that are prone to jamming and often don't have ammunition capacities larger than those of revolvers.[28 29]

In addition, multivariate studies controlling for characteristics of actors and situations might yield different results if those characteristics tend to be related to both weapon selection and attack outcomes. If, for instance, pistol shooters in this study tended to be younger and/or less skilled shooters than revolver shooters, this might explain why the former fired more often yet didn't injure or kill victims in a higher fraction of attacks and tended to hit victims in less vital areas of the body. Other potential confounders might include the nature of the circumstances (for example, whether the shooting was an execution-style shooting), the general health of the victim(s), the type of location (for example, indoor or outdoor location), the distance between the shooter and intended victim(s), and the presence of multiple persons who could have been shot intentionally or accidentally (as bystanders).

Taking the results at face value, nonetheless, this study has potential ramifications for national trends and policy, implying that the spread of pistols during the last few decades may have contributed modestly to higher levels of assaultive gun injuries. Hence, policies to restrict or discourage the use of semiautomatic weapons or restrict ammunition magazine capacity might have the potential to reduce gunshot injuries.

We should be cautious about these inferences, however, because the analyses did not support all of our hypotheses about the effects of pistols. Further, achieving the moderate impacts suggested by this study would require complete elimination of the use of pistols in crime; to the extent that policy falls short of achieving this goal, the benefits may be substantially less and difficult to measure. Finally, these results may not generalize well to other places, although the differential in shots fired between pistol and revolver cases seems consistent with that found in other research.[?]

This study provides a first step in assessing differential levels of injury and death from attacks committed with different types of handguns, and it may spur replications to determine if these results can be generalized to other places and whether characteristics of the situations and actors mediate the relationships between weapon types and attack outcomes. Further research into the dynamics and outcomes of gun attacks can help to both clarify the consequences of changes in

Exhibit 30
Page 01299

**ER_3468**

## Key points

- During recent decades, there has been a shift in the civilian handgun market from production of revolvers to production of semiautomatic pistols, which tend to have larger ammunition capacities and a faster rate of fire.
- The consequences of this trend for public health are not clear, in part because no studies have directly compared the injuriousness and lethality of attacks with revolvers and pistols.
- This study of fatal and non-fatal gun attacks investigated by police in one city found that attacks with pistols tended to result in more shots fired and persons wounded than attacks with revolvers, implying that the number of gunshot victims would have been approximately 9% lower had pistols not been used in any of the attacks.
- The recent spread of semiautomatic pistols has likely contributed modestly to higher levels of assaultive gun injuries.
- Policies to restrict or discourage the use of semiautomatic weapons have the potential to reduce gunshot victimizations, but large reductions in the use of these weapons would be required to realize even modest declines in gunshot victimizations.

the civilian firearm arsenal and assess the potential impact of gun control measures designed to restrict the availability of particular types of firearms.

### ACKNOWLEDGEMENT

Dr Koper conducted this research while working for the Urban Institute, Washington, DC.

This research was supported by grants 1995-IJ-CX-0111 and 1998-IJ-CX-0039 from the National Institute of Justice (United States Department of Justice) to the Urban Institute. The Jerry Lee Center of Criminology, University of Pennsylvania and the Department of Criminology and Criminal Justice, University of Maryland provided additional support. The authors wish to thank a number of persons for assistance: Michael Buerger conducted on-site data collection; Jeffrey Roth provided advice on research design; Garen Wintemute, Charles Wellford, and Robert Brame offered helpful comments on earlier versions of this work; and Lois Mock served as grant monitor to the project. The views expressed are those of the authors and should not be attributed to the Urban Institute, the University of Maryland, the University of Pennsylvania, the United States Department of Justice, or any of the aforementioned individuals.

. . . . . . . . . . . . . . . . . . . .

### Authors' affiliations

D C Reedy, Department of Criminology and Criminal Justice, University of Maryland, College Park
C S Koper, Jerry Lee Center of Criminology, University of Pennsylvania, Philadelphia

### REFERENCES

1 Rennison CM. Criminal victimization 2000: changes 1999–2000 with trends 1993–2000. NCJ-187007. Washington, DC: Bureau of Justice Statistics, US Department of Justice, 2001.

2 Gotsch KE, Annest JL, Mercy JA, et al. Surveillance for fatal and nonfatal firearm-related injuries—United States, 1993–1998. MMWR CDC Surveill Summ (April 13) 2001;50(SS-2):1–34.

3 Simon TR, Saltzman LE, Swahn MH, et al. Nonfatal physical assault-related injuries treated in hospital emergency departments—United States, 2000. MMWR Morb Mortal Wkly Rep 2002;51:460–3.

4 Cook PJ, Ludwig J. Gun violence: the real costs. New York: Oxford University Press, 2000.

5 Bureau of Alcohol, Tobacco, and Firearms. Crime gun trace analysis reports: the illegal youth firearms markets in 17 communities. Washington, DC: US Department of the Treasury, 1997.

6 Hargarten SW, Karlson TA, O'Brien M, et al. Characteristics of firearms involved in fatalities. JAMA 1996;275:42–5.

7 McGonigal MD, Cole J, Schwab CW, et al. Urban firearm deaths: a five-year perspective. J Trauma 1993;35:532–7.

8 Zawitz MW. Guns used in crime. NCJ-148201. Washington, DC: Bureau of Justice Statistics, US Department of Justice, 1995.

9 Bureau of Alcohol, Tobacco, and Firearms. Ready reference 1994. Washington, DC: US Department of the Treasury, 1994.

10 DiMaio JM. Gunshot wounds: practical aspects of firearms, ballistics, and forensic techniques. Boca Raton: CRC Press, 1993.

11 Wintemute GJ. The relationship between firearm design and handgun violence: handguns in the 1990s. JAMA 1996;275:1749–53.

12 Murtz HA, ed. Guns illustrated 1994. Northbrook, IL: DBI Books, 1994.

13 Webster DW, Champion HR, Gainer PS, et al. Epidemiologic changes in gunshot wounds in Washington, DC, 1983–1990. Arch Surg 1992;127:694–8.

14 Block CR, Block R. Street gang crime in Chicago. NCJ-144782. Washington, DC: National Institute of Justice, US Department of Justice, 1993.

15 Koper CS. Gun lethality and homicide: gun types used by criminals and the lethality of gun violence in Kansas City, Missouri, 1985–1993. College Park, MD: Department of Criminology and Criminal Justice, University of Maryland, 1995.

16 Koper CS. Gun density versus gun type: did the availability of more guns or more lethal guns drive up the Dallas homicide rate, 1980–1992? Report to the National Institute of Justice, US Department of Justice. NCJ-187106. Washington, DC: Crime Control Institute, 1997.

17 Kleck G. Targeting guns: firearms and their control. Hawthorne, NY: Aldine de Gruyter, 1997.

18 Koper CS, Roth JA. The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. Journal of Quantitative Criminology 2001;17:33–74.

19 Roth JA, Koper CS. Impact evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994. Washington, DC: Urban Institute, 1997.

20 Bureau of the Census. Washington, DC: US Department of Commerce, 1992.

21 Maguire K, Pastore AL, eds. Sourcebook of criminal justice statistics 1995. NCJ-158900. Washington, DC: Bureau of Justice Statistics, US Department of Justice, 1996.

22 Zahn MA, Riedel M. National versus local data sources in the study of homicide: do they agree? In: Waldo GP, ed. Measurement issues in criminal justice. Beverly Hills: Sage, 1983: 103–20.

23 Lee RK, Waxweiler RJ, Dobbins JG, et al. Incidence rates of firearm injuries in Galveston, Texas, 1979–1981. Am J Epidemiol 1991;134:511–21.

24 Kim AN, Trent RB. Firearm-related injury surveillance in California. Am J Prev Med 1998;15:31–7.

25 Tuinen MV, Crosby A. Missouri firearm-related injury surveillance system. Am J Prev Med 1998;15:67–74.

26 Kleck G. Point blank: guns and violence in America. New York: Aldine de Gruyter, 1991.

27 Felson RB, Messner SF. To kill or not to kill? Lethal outcomes in injurious attacks. Criminology 1996;34:519–45.

28 Wintemute G. Ring of fire: the handgun makers of southern California. Davis, CA: Violence Prevention Research Program, University of California, 1994.

29 Bureau of Alcohol, Tobacco, and Firearms. Crime gun trace analysis reports: the illegal youth firearms markets in 27 communities. Washington, DC: US Department of the Treasury, 1999.

Exhibit 30
Page 01300

ER_3469