No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
_____

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant*.
_____

**On Appeal from the United States District Court
for the Southern District of California
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge**
_____

**APPELLANT'S EXCERPTS OF RECORD
VOLUME 16 of 17**
_____

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

November 21, 2023

C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., | Case No: 17-cv-1017-BEN-JLB |
| Plaintiffs, | **DECLARATION OF ANNA M. BARVIR IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT; EXHIBITS 1-5** |
| v. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | Hearing Date:   April 30, 2018<br>Hearing Time:   10:30 a.m.<br>Judge:   Hon. Roger T. Benitez<br>Courtroom:   5A |

1

DECLARATION OF ANNA M. BARVIR

17cv1017

ER_3637

## DECLARATION OF ANNA M. BARVIR

1.     I am an attorney at the law firm Michel & Associates, P.C., attorneys of record for Plaintiffs in this action. I am licensed to practice law before the United States District Court for the Southern District of California. I am also admitted to practice before the Eastern, Central, and Northern Districts of California, the courts of the state of California, the Supreme Court of the United States, and the D.C., Fourth, Ninth, and Tenth Circuit Courts of Appeals. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

### [Expert Reports]

2.     On October 6, 2017, Plaintiffs served Defendant with Plaintiffs' Disclosure of Expert Witnesses in this matter. Two exhibits were attached to Plaintiffs' disclosure: (1) the Expert Report of Mr. James Curcuruto; and (2) the Expert Report of Mr. Stephen Helsley. A true and correct copy of Mr. Curcuruto's expert report, as appended to Plaintiffs' Disclosure of Expert Witnesses, is attached hereto as **Exhibit 1**. A true and correct copy of Mr. Helsley's expert report, as appended to Plaintiffs' Disclosure of Expert Witnesses, is attached hereto as **Exhibit 2**.

3.     On November 3, 2017, Plaintiffs served Defendant with Plaintiffs' Disclosure of Rebuttal Expert Witnesses in this matter. Two exhibits were attached to Plaintiffs' disclosure: (1) the Expert Rebuttal Report of Professor Gary Kleck; and (2) the Expert Rebuttal Report of Professor Carlisle Moody. A true and correct copy of Professor Kleck's expert rebuttal, as appended to Plaintiffs' Disclosure of Rebuttal Expert Witnesses, is attached hereto as **Exhibit 3**. A true and correct copy of Professor Moody's expert rebuttal, as appended to Plaintiffs' Disclosure of Expert Witnesses, is attached hereto as **Exhibit 4**.

/ / /

/ / /

**ER_3638**

1    4.    On October 6, 2017, Defendant served Plaintiffs with the Expert Report

2  of Dr. Christopher S. Koper. A true and correct copy of Dr. Koper's expert report,

3  without the appendices attached, is attached hereto as **Exhibit 5**.

4    5.    On November 3, 2017, Defendant served Plaintiffs with the Expert

5  Rebuttal Report of John J. Donohue. A true and correct copy of Donohue's expert

6  report is attached hereto as **Exhibit 6**.

7                              **[Firearm and Magazine Basics]**

8    6.    A true and correct copy of the Wikipedia page for "Magazine (firearms)",

9  https://en.wikipedia.org/wiki/Magazine_(firearms) (last visited Mar. 1, 2018) is

10  attached as **Exhibit 7.**

11   7.    A true and correct copy of pages 33-36 from *NRA Guide to the Basics of*

12  *Pistol Shooting* (2d ed. 2009) is attached as **Exhibit 8.**

13   8.    A true and correct copy of pages 22-36 of John Malloy, *Complete Guide*

14  *to Guns & Shooting* (DBI Books, Inc. 1995) is attached as **Exhibit 9.** This excerpt

15  describes various rifle types and magazines.

16   9.    A true and correct copy of pages 95-99 of John Malloy, *Complete Guide*

17  *to Guns & Shooting* (DBI Books, Inc. 1995) is attached as **Exhibit 10.** This excerpt

18  describes semi-automatic pistols.

19   10.    A true and correct copy of Rick Hacker, *Magazine Disconnect*, Am.

20  Rifleman (Sept. 11, 2015) is attached as **Exhibit 11.** This article explains the function

21  of the "magazine disconnector" or "magazine disconnect safety."

22  **[History of Firearms and Magazines Capable of Holding More than Ten Rounds]**

23   11.    A true and correct copy of David B. Kopel, *The History of Firearm*

24  *Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849 (2015), is attached as

25  **Exhibit 12**.

26   12.    A true and correct copy of pages 168-70 of Lewis Winant, *Firearms*

27  *Curiosa* (2009) (1st pub. 1954) is attached as **Exhibit 13**. A true and correct copy of

28  *16-Shot Wheel Lock*, Am.'s 1st Freedom (May 10, 2014), *available at* http://

1    www.nrapublications.org/index.php/17739/a-16-shot-wheel-lock/, is attached as

2    **Exhibit 14.** Thee references document the first known firearm able to fire more than

3    ten rounds without reloading: a 16-shooter using "superposed" loads.

4          13.    A true and correct copy of Clayton E. Cramer & Joseph Olson, *Pistols,*

5    *Crime, and Public Safety in Early America*, 44 Willamette L. Rev. 699 (2008) is

6    attached as **Exhibit 15**. This law review article documents, inter alia, the continued

7    development of multi-shot firearms through the seventeenth and eighteenth centuries.

8          14.    A true and correct copy of *"Defence" Rapid-Fire Gun Patented: 15 May*

9    *1718*, History Channel, http://www.historychannel.com.au/classroom/day-in-

10   history/600/defence-rapid-fire-gun-patented (last visited Mar. 1, 2018) is attached as

11   **Exhibit 16.** This article documents the introduction of the Puckle "Defence Gun,"

12   "the first-well documented rapid-fire gun in the world," in 1718. The "Defence Gun"

13   "held 11 charges and could fire 63 shots in seven minutes, or 9 shots per minute."

14         15.    A true and correct copy of pages 91-103 of Jim Garry, *Weapons of the*

15   *Lewis and Clark Expedition* (2012) is attached as **Exhibit 17**. A true and correct copy

16   of pages 69-70 of John Plaster, *The History of Sniping and Sharpshooting* (2008) is

17   attached as **Exhibit 18**. A true and correct copy of page 31 of Jim Supica, Doug

18   Wicklund & Philip Shreier, *Treasures of the NRA National Firearms Museum* (2013)

19   is attached as **Exhibit 19**. A true and correct copy of the Wikipedia page for the

20   Girandoni Air Rifle, http://en.wikipedia.org/wiki/Girandoni_Air_Rifle (last visited

21   Mar. 1, 2018) is attached as **Exhibit 20**. These resources document the Founding-era

22   popularity of the Girandoni air rifle, with a 20- or 22-shot capacity, and detail its

23   many uses.

24         16.    A true and correct copy of page 683 of Norm Flayderman, *Flayderman's*

25   *Guide to Antique American Firearms and Their Values* (9th ed. 2007) is attached as

26   **Exhibit 21**. This excerpt of *Flayderman's Guide* documents the introduction of the

27   Jennings multi-shot flintlock rifle in 1821 which, according to this resource, allowed

28   12 shots without reloading.

17.     A true and correct copy of page 33 of Jim Supica, Doug Wicklund & Philip Shreier, *Treasures of the NRA National Firearms Museum* (2013) is attached as **Exhibit 22**. A true and correct copy of pages 16, 148-49 and 167 of Jack Dunlap, *American British and Continental Pepperbox Firearms* (1964) is attached as **Exhibit 23**. A true and correct copy of pages 249-50 from Lewis Winant, *Firearms Curiosa* (2009) (1st pub. 1954) is attached as **Exhibit 24**. A true and correct copy of page 66 of *Catalogue of Contents: Doe Run Lead Company's Museum* (July 1, 1912) is attached as **Exhibit 25.** These sources document some advancements in pistol technology from the early 1800s that permitted more than ten shots to be fired without reloading, including a variety of "Pepperbox" pistols that had capacities over 10 rounds.

18.     A true and correct copy of pages 711, 713, and 716 of Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007) is attached as **Exhibit 26**. These pages document several different firearm designs in the 1830s to 1850s that increased ammunition capacity beyond ten rounds.

19.     A true and correct copy of pages 9-44 of Harold F. Williamson, *Winchester: The Gun That Won the West* (1952) is attached as **Exhibit 27**. A true and correct copy of pages 303-06 of Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007) is attached as **Exhibit 28**. A true and correct copy of Joseph Bilby, *The Guns of 1864*, in Am. Rifleman (May 5, 2014), *available at* https://www.americanrifleman.org/articles/2014/5/5/the-guns-of-1864/, is attached as **Exhibit 29.** These sources document the development of the Volcanic Repeating Arms Company's lever action rifle in 1855 with up to a 30-round tubular magazine and its evolution into a 15-round Henry lever action rifle.

20.     A true and correct copy of page 49 of Harold F. Williamson, *Winchester: The Gun That Won the West* (1952) is attached as **Exhibit 30.** A true and correct copy of pages 11 and 22-35 of R.L. Wilson, *Winchester: An American Legend* (1991) is attached as **Exhibit 31**. A true and correct copy of pages 116-29 of Louis A.

DECLARATION OF ANNA M. BARVIR

17cv1017

**ER_3641**

1    Garavaglia & Charles G. Worman, *Firearms of the American West* (1985) is attached
2    as **Exhibit 32**. These sources further explain the evolution of the Henry rifle into the
3    Winchester repeating rifle that could hold 17 rounds in the magazine and 1 in the
4    chamber.

5         21.    A true and correct copy of pages 307-12 of Norm Flayderman*,*
6    *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007)
7    is attached as **Exhibit 33**. A true and correct copy of pages 137, 1240-41 of the *2014*
8    *Standard Catalogue of Firearms* (Jerry Lee ed. 2013) is attached as **Exhibit 34**. A
9    true and correct copy of pages 108-09 of Jim Supica, Doug Wicklund & Philip
10   Shreier, *Treasures of the NRA National Firearms Museum* (2013) is attached as
11   **Exhibit 35**. These sources document the historical popularity of the Winchester
12   M1873 and then the M1892, lever action rifles holding 12 to 17 rounds in tubular
13   magazines.

14        22.    A true and correct copy of pages 122-23 of Norm Flayderman,
15   *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007)
16   is attached as **Exhibit 36**. This reference documents the nineteenth-century popularity
17   of the Colt Lightening rifle, a pump action firearm with a 15-round capacity.

18        23.    A true and correct copy of pages 60-63, 67-71, 204-208, 244-45 of Lewis
19   Winant, *Firearms Curiosa* (2009) (1st pub. 1954) is attached as **Exhibit 37**. These
20   excerpts document the introduction of firearms with detachable box magazines in
21   handguns in the 1850s, including the Jarre harmonica pistol, patented in 1862.

22        24.    A true and correct copy of pages 708-09 of the 2*014 Standard Catalog of*
23   *Firearms* is attached as **Exhibit 38**. A true and correct copy of pages 23, 30-32, 38-39,
24   54-55, and 272 of John W. Breathed, Jr. & Joseph J. Schroeder, Jr., *System Mauser: A*
25   *Pictorial History of the Model 1896 Self-Loading Pistol* (1967) is attached as **Exhibit**
26   **39.** A true and correct copy of John Elliot, *A Sweeping History of the Mauser C96*
27   *Broomhandle Pistol*, Guns.com (Jan. 26, 2012), http://www.guns.com/2012/01/26/a-
28   sweeping-history-of-the-mauser-c96-broomhandle-pistol/ is attached as **Exhibit 40.**

DECLARATION OF ANNA M. BARVIR

1   These excerpts note that semi-automatic pistols were introduced in the late nineteenth

2   century and companies had begun selling firearms and magazines with capacities over

3   ten rounds, including the Model 1896 Broomhandle Mauser, with one variant capable

4   of holding 20 rounds.

5       25.    A true and correct copy of pages 191-92 of Jim Perkins, *American Boys*

6   *Rifles* 1890-1945 (1976) is attached as **Exhibit 41**. These pages explain that in 1911,

7   Savage Repeating Arms Company introduced the Model 1911, a 20-shot repeater that

8   was popular among boys and in shooting galleries.

9       26.    A true and correct copy of page 84 of the *2014 Standard Catalog of*

10  *Firearms* (Jerry Lee ed. 2013) is attached as **Exhibit 42**. This excerpt reflects that, in

11  1927, the Auto Ordinance Company introduced a semi-automatic rifle that used a 30-

12  round magazine.

13      27.    A true and correct copy of page 104 of Patrick Sweeney, *Gun Digest*

14  *Book of the AR-15* (2005) is attached **Exhibit 43**. This page states that the Armalite 15

15  was originally equipped with a 20-round magazine; a 30-round magazine later

16  appeared.

17      28.    A true and correct copy of page 294 of *Gun Digest 24th Anniversary*

18  *Deluxe Edition* (John T. Amber ed. 1969) is attached as **Exhibit 44.** This excerpt lists

19  several other firearms with magazines between 20 and 30 rounds available by 1969.

20      29.    A true and correct copy of page 1102 of *2014 Standard Catalogue of*

21  *Firearms* (Jerry Lee ed. 2013) is attached as **Exhibit 45**. This page recounts the

22  production of the M1A semi-automatic rifle with a 20-round detachable magazine).

23      30.    A true and correct copy of page 1173 of the *2014 Standard Catalog of*

24  *Firearms* (Jerry Lee ed. 2013) is attached as **Exhibit 46**. This excerpt recounts the

25  introduction of the Ruger Mini-14 in 1975 with manufacturer-supplied standard 5-,

26  10-, or 20-round detachable magazines.

27      31.    The following paragraphs introduce reference materials showing that the

28  historical prevalence and ubiquity of citizen firearms with detachable magazines

holding more than ten rounds were not limited to rifles:

      a.     A true and correct copy of pages 182-83, 432-33 of the 2*014 Standard Catalogue of Firearm*s (Jerry Lee ed. 2013) is attached as **Exhibit 47** (Browning Hi-Power pistol with 13-round detachable magazine).

      b.     A true and correct copy of pages 464-65 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) is attached as **Exhibit 48** (Spanish Gabilondo with 20-round "Plus Ultra" was introduced in 1925).

      c.     True and correct copies of pages 72-73 of the *2014 Standard Catalogue of Firearms* and pages 216-17 of Joseph J. Shroeder, Jr., *System Mauser, a Pictorial History of the Model 1896 Self-Loading Pistol* (1967) are attached as **Exhibit 49** (Azul semi-automatic pistol with magazines of 10, 20, and 30 rounds entered the market in 1935). A true and correct copy of page 121 of the *2014 Standard Catalogue of Firearms* is attached as **Exhibit 50** (Beretta model 92 with a 16-round magazine entered the market in 1976).

      d.     A true and correct copy of page 184 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) is attached as **Exhibit 51** (The Browning Double Action with 14 rounds introduced in 1977).

**[Modern Prevalence and Use of Magazines Over Ten Rounds]**

    32.    A true and correct copy of various pages from *Gun Digest* 2017 (71st ed. 2016), which identify the magazine capacities for a variety of handguns and rifles, is attached as **Exhibit 52.**

    33.    True and correct copies of pages from the current websites of various firearm manufacturers advertising firearms for self-defense purposes, and the specifications demonstrating these firearms have a magazine capacity exceeding ten rounds, are attached as **Exhibit 53**. *See* Glock "Safe Action" Gen4 Pistols, Glock, https://us.glock.com/documents/BG_Gen4_6_2010_EN_MAIL.pdf (last visited Mar.

1, 2018) (specifications for the model 17, 19, 22, and 23 pistols, each equipped

standard with 17, 15, 15, and 13-round magazines, respectively, and all marketed as

ideal for personal defense); G19, Glock, https://eu.glock.com/en/products/pistols/g19

(last visited Mar. 1, 2018) (marketed as ideal for "concealed carry purpose" and

equipped standard with a 15-round magazine); M&P®9 M2.0™, Smith & Wesson,

https://www.smith-wesson.com/firearms/mp-9-m20-1 (last visited Mar. 1, 2018)

(marketed as ideal for home and personal protection and equipped standard with a 17-

round magazine); CZ 75 B, CZ-USA, http://cz-usa.com/product/cz-75-b-9mm-black-

16-rd-mag/ (last visited Mar. 1, 2018) (equipped standard with 16-round magazine);

Ruger® SR9®, Ruger, http://www.ruger.com/products/sr9/specSheets/3301.html (last

visited Mar. 1, 2018) (equipped standard with 17-round magazine); P320 Nitron Full-

Size, Sig Sauer, https://www.sigsauer.com/store/p320-nitron-full-size.html (last

visited Mar. 1, 2018) (marketed as ideal for home defense, and equipped standard with

10- to 17-round magazines).

   34. On or about March 1, 2018, I visited the website www.youtube.com as

well as websites for various firearm manufacturers and viewed videos embedded on

those websites. I am informed and believe that the videos found at the following links

are advertisements produced and distributed by firearm manufacturers that are

directed to consumers. These videos advertise firearms that have magazine capacities

exceeding ten rounds as suitable for self-defense, including within the home. Glock

Ges.m.b.H, Gunny & Glock Wrong Diner, Youtube (Nov. 10, 2011),

https://www.youtube.com/watch?v=vsVCHE7ayPE&feature=c4-overview&list=

UUeeqOv%2085TJigJv6YrLHZhfQ; Glock Ges. m.b.H, Gunny & Glock Wrong

House, Youtube (Nov. 13, 2011), http://www.youtube.com/watch?v=6RNcFs-JwOQ;

Glock Ges.m.b.H, Gunny & Glock Wrong Girl, Youtube (Jan. 7, 2013),

http://www.youtube.com/watch?v=a2gCFOtaZPo; Glock Ges.m.b.H, Gunny & Glock

Wrong Convenience Store, Youtube (March 12, 2013), http://www.youtube.com/

watch?v=V8WCM_AAAyY; Glock Ges.m.b.H, Gunny & Glock Wrong Guy,

9

1 Youtube (Nov. 13, 2011), https://www.youtube.com/watch?v=gzb7SLsFwtE&list=

2 UUeeqOv85TJigJv6YrLHZhfQ; Smith & Wesson, Smith & Wesson M&P

3 Advertisement, Youtube (Dec. 22, 2011), http://www.youtube.com/ watch?v=TLuN-

4 JrR4_M; Smith & Wesson M&P Advertisement, Youtube.com (Dec. 22, 2011),

5 https://www.youtube.com/watch?v=g4jn6ry1pSA.

6     35.    A true and correct copy of pages 73-97 from *The Complete Book of*

7 *Autopistols: 2013 Buyer's Guide* (2013) is attached as **Exhibit 54**. These pages

8 identify various models of handguns for sale to the public that come standard with

9 magazines greater than ten rounds.

10     36.    A true and correct copy of Robert A. Sadowski, *The Evolution of Glock*

11 *Pistols*, Handguns Buyer's Guide Mag. (Nov. 25, 2015), *available at*

12 https://www.personaldefenseworld.com/2015/11/the-evolution-of-glock-pistols/ is

13 attached as **Exhibit 55.**

14     37.    A true and correct copy of pages 87 and 89-90 of Massad Ayoob, *The*

15 *Complete Book of Handguns* (2013) is attached as **Exhibit 56.**

16     38.    A true and correct copy of pages 183-87 *NRA Guide to the Basics of*

17 *Personal Protection in the Home* (1st ed. 2000) is attached as **Exhibit 57.**

18                  **[Impact of Magazine Capacity Restrictions]**

19     39.    On October 6, 2017, Defendants served Plaintiffs with the Expert Report

20 of Dr. Christopher S. Koper. Attached to Dr. Koper's expert report was a copy of

21 Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth, *An Updated Assessment of*

22 *the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence,*

23 *1994-2003* (Nat'l Instit. J. 2004). A true and correct copy of *An Updated Assessment*

24 *of the Federal Assault Weapons Ban*, as appended to Professor Koper's expert report,

25 is attached hereto as **Exhibit 58.**

26     40.    A true and correct copy of *What Should America Do About Gun*

27 *Violence?* Full Comm. Hr'g Before U.S. Sen. Jud. Comm., 113th Cong. at 11 (2013),

28 *available at* https://www.judiciary.senate.gov/imo/media/doc/1-30-13Kopel

1    Testimony.pdf (last visited Mar. 1, 2018) is attached as **Exhibit 59**.

2        41.    A true and correct copy of Gary Kleck, *Large-Capacity Magazines and*

3    *the Casualty Counts in Mass Shootings: The Plausibility of Linkage*, 17 J. Research

4    & Pol'y 28 (2016) is attached as **Exhibit 60**.

5                                **[Self-Defense]**

6        42.    A true and correct copy of U.S. Dept. of Justice, Bureau of Justice

7    Statistics, National Crime Victimization Survey, *Criminal Victimization in the United*

8    *States, 2008 Statistical Tables*, Table 37 (Mar. 2009), *available at*

9    https://www.bjs.gov/content/pub/pdf/cvus08.pdf is attached as **Exhibit 61.** This

10   publication notes statistics of violent crime by type of crime, relationship of offender,

11   and number of offenders.

12       43.    A true and correct copy of Massad Ayoob, *Five Gunfighting Myths*

13   *Debunked by Massad Ayoob*, Personal Defense World (Oct. 14, 2014), *available at*

14   www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-

15   ayoob/#armed-and-ready is attached as **Exhibit 62**. Ayoob provides examples of

16   defensive-gun-uses in response to the claim that "if you can't do it with six, you can't

17   do it all."

18       44.    A true and correct copy of Jacob Sullum, *The Threat Posed by Gun*

19   *Magazine Limits* (Jan. 13, 2016), *available at* http://reason.com/archives/2013/01/16/

20   the-threat-posed-by-gun-magazine-limits is attached as **Exhibit 63**.

21       45.    A true and correct copy of Charles Remsberg, *Why One Cop Carries 145*

22   *Rounds of Ammo on the Job*, PoliceOne (Apr. 17, 2013), *available at*

23   https://www.policeone.com/patrol-issues/articles/6199620-Why-one-cop-carries-145-

24   rounds-of-ammo-on-the-job/ is attached as **Exhibit 64**.

25       46.    A true and correct copy of Gus G. Sentementes & Julie Bykowicz,

26   *Documents Detail Cross Keys Shooting*, Balt. Sun (Mar. 21, 2006), *available at*

27   http://articles.baltimoresun.com/2006-03-21/news/0603210220_1_beckwith-police-

28   documents-robbery is attached as **Exhibit 65**.

**ER_3647**

47.    A true and correct copy of *Gun Shop Owner Shoots, Kills Man During Attempted Robbery*, WIS TV (Aug. 9, 2012), *available at* http://www.wistv.com/story/19236842/gun-shop-owner-shoots-kills-man-during-attempted-robbery is attached as **Exhibit 66**.

48.    A true and correct copy of Nieson Himmel, *Police Say Watch Shop Owner Kills 4th, 5th Suspects*, L.A. Times (Feb. 21, 1992), *available at* http://articles.latimes.com/ 1992-02-21/local/me-2663_1_watch-shop-owner is attached as **Exhibit 67**.

49.    A true and correct copy of *Jewelry Store Burglarized, Scene of Deadly 1994 Robbery Attempt*, nbc12.com (2012), *available at* http://www.nbc12.com/story/16445849/jewelry-store-burglarized-scene-of-deadly-1994-robbery-attempt is attached as **Exhibit 68**.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on March 5, 2018.

Anna M. Barvir
Declarant

12
DECLARATION OF ANNA M. BARVIR

17cv1017

**ER_3648**

1
2

**EXHIBITS**
**TABLE OF CONTENTS**

| Exhibit | Description | Page(s) |
|---|---|---|
| 1 | Expert Report of James Curcuruto | 00019-26 |
| 2 | Expert Report of Stephen Helsley | 00027-38 |
| 3 | Expert Rebuttal Report of Professor Gary Kleck | 00039-102 |
| 4 | Expert Rebuttal Report of Professor Carlisle Moody | 00103-167 |
| 5 | Expert Report of Dr. Christopher S. Koper | 00168-195 |
| 6 | Expert Rebuttal Report of John J. Donohue | 00203-241 |
| 7 | Wikipedia page for "Magazine (firearms)", https://en.wikipedia.org/wiki/Magazine_(firearms) | 00242-249 |
| 8 | Pages 33-36 of *NRA Guide to the Basics of Pistol Shooting* (2d ed. 2009) | 00250-255 |
| 9 | Pages 22-36 of John Malloy, *Complete Guide to Guns & Shooting* (DBI Books, Inc. 1995) | 00256-273 |
| 10 | Pages 95-99 of John Malloy, *Complete Guide to Guns & Shooting* (DBI Books, Inc. 1995) | 00281-288 |
| 11 | Rick Hacker, *Magazine Disconnect*, Am. Rifleman (Sept. 11, 2015) | 00289-292 |
| 12 | David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany L. Rev. 849 (2015) | 00293-333 |
| 13 | Pages 168-70 of Lewis Winant, *Firearms Curiosa* (2009) (1st pub. 1954) | 00334-339 |
| 14 | *16-Shot Wheel Lock*, Am.'s 1st Freedom (May 10, 2014) | 00340-342 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

13

| Exhibit | Description | Page(s) |
|---|---|---|
| 15 | Clayton E. Cramer & Joseph Olson, *Pistols, Crime, and Public Safety in Early America*, 44 Willamette L. Rev. 699 (2008) | 00343-366 |
| 16 | *"Defence" Rapid-Fire Gun Patented: 15 May 1718*, History Channel | 00367-369 |
| 17 | Pages 91-103 of Jim Garry, *Weapons of the Lewis and Clark Expedition* (2012) | 00370-385 |
| 18 | Pages 69-70 of John Plaster, *The History of Sniping and Sharpshooting* (2008) | 00386-390 |
| 19 | Page 31 of Jim Supica, Doug Wicklund & Philip Shreier, *Treasures of the NRA National Firearms Museum* (2013) | 00391-394 |
| 20 | Wikipedia page for "Girandoni Air Rifle", https://en.wikipedia.org/wiki/Girandoni_air_rifle | 00402-405 |
| 21 | Page 683 of Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007) | 00406-409 |
| 22 | Page 33 of Jim Supica, Doug Wicklund & Philip Shreier, *Treasures of the NRA National Firearms Museum* (2013) | 00410-413 |
| 23 | Pages 16, 148-49 and 167 of Jack Dunlap, *American British and Continental Pepperbox Firearms* (1964) | 00414-420 |
| 24 | Pages 249-50 of Lewis Winant, *Firearms Curiosa* (2009) (1st pub. 1954) | 00421-425 |
| 25 | Page 66 of *Catalogue of Contents: Doe Run Lead Company's Museum* (July 1, 1912) | 00426-428 |
| 26 | Pages 711, 713, and 716 of Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007) | 00429-434 |

| Exhibit | Description | Page(s) |
|---|---|---|
| 27 | Pages 9-17, 19-44 of Harold F. Williamson, *Winchester: The Gun That Won the West* (1952) | 00442-479 |
| 28 | Pages 303-06 of Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007) | 00480-486 |
| 29 | Joseph Bilby, *The Guns of 1864*, in Am. Rifleman (May 5, 2014) | 00487-497 |
| 30 | Page 49 of Harold F. Williamson, *Winchester: The Gun That Won the West* (1952) | 00498-501 |
| 31 | Pages 11 and 22-35 of R.L. Wilson, *Winchester: An American Legend* (1991) | 00509-526 |
| 32 | Pages 116-29 of Louis A. Garavaglia & Charles G. Worman, *Firearms of the American West* (1985) | 00527-543 |
| 33 | Pages 307-12 of Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007) | 00551-559 |
| 34 | Pages 137, 1240-41 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) | 00560-565 |
| 35 | Pages 108-09 of Jim Supica, Doug Wicklund & Philip Shreier, *Treasures of the NRA National Firearms Museum* (2013) | 00566-570 |
| 36 | Pages 122-23 of Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007) | 00571-575 |
| 37 | Pages 60-63, 67-71, 204-208, 244-45 Lewis Winant, *Firearms Curiosa* (2009) (1st pub. 1954) | 00576-594 |

15

EXHIBITS TABLE OF CONTENTS

**ER_3651**

| Exhibit | Description | Page(s) |
|---|---|---|
| 38 | Pages 708-09 of the *2014 Standard Catalog of Firearms* | 00595-599 |
| 39 | Pages 23, 30-32, 38-39, 54-55, and 272 of John W. Breathed, Jr. & Joseph J. Schroeder, Jr., *System Mauser: A Pictorial History of the Model 1896 Self-Loading Pistol* (1967) | 00600-611 |
| 40 | John Elliot, *A Sweeping History of the Mauser C96 Broomhandle Pistol*, Guns.com (Jan. 26, 2012) | 00612-624 |
| 41 | Pages 191-92 of Jim Perkins, *American Boys Rifles 1890-1945* (1976) | 00625-629 |
| 42 | Page 84 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) | 00630-633 |
| 43 | Page 104 of Patrick Sweeney, *Gun Digest Book of the AR-15* (2005) | 00641-644 |
| 44 | Page 294 of *Gun Digest 24th Anniversary Deluxe Edition* (John T. Amber ed. 1969) | 00645-648 |
| 45 | Page 1102 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) | 00649-652 |
| 46 | Page 1173 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) | 00653-656 |
| 47 | Pages 182-83, 432-33 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) | 00657-663 |
| 48 | Pages 464-65 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) | 00664-668 |
| 49 | Pages 72-73 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) and pages 216-17 of Joseph J. Schroeder, Jr., *System Mauser: A Pictorial History of the Model 1896 Self-Loading Pistol* (1967) | 00669-677 |

16

EXHIBITS TABLE OF CONTENTS

17cv1017

**ER_3652**

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 50 | Page 121 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) | 00678-681 |
| 51 | Page 184 of the *2014 Standard Catalogue of Firearms* (Jerry Lee ed. 2013) | 00682-685 |
| 52 | Pages 369-74, 377-78, 380-87, 391, 395-96, 398-99, 401-07, 409-11, 413-14, 438-47, and 454 from *Gun Digest* 2017 (Jerry Lee ed., 71st ed. 2016) | 00693-736, 00744-747 |
| 53 | Pages from websites of firearm manufacturers advertising firearms | 00748-774 |
| 54 | Pages 73-97 of *The Complete Book of Autopistols: 2013 Buyer's Guide* (2013) | 00775-800 |
| 55 | Robert A. Sadowski, *The Evolution of Glock Pistols*, *Pistols*, Handguns Buyer's Guide Mag. (Nov. 25, 2015) | 00801-811 |
| 56 | Pages 87 and 89-90 of Massad Ayoob, *The Complete Book of Handguns* (2013) | 00819-823 |
| 57 | Pages 183-87 *NRA Guide to the Basics of Personal Protection in the Home* (1st ed. 2000) | 00824-829 |
| 58 | Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (Nat'l Instit. J. 2004) | 00830-866 |
| 59 | *What Should America Do About Gun Violence?* Full Comm. Hr'g Before U.S. Sen. Jud. Comm., 113th Cong. At 11 (2013) | 00867-903 |
| 60 | Gary Kleck, *Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkage*, 17 J. Research & Pol'y 28 (2016) | 00904-924 |

17
EXHIBITS TABLE OF CONTENTS

17cv1017

**ER_3653**

| Exhibit | Description | Page(s) |
|---|---|---|
| 61 | U.S. Dept. of Justice, Bureau of Justice Statistics, National Crime Victimization Survey, *Criminal Victimization in the United States, 2008 Statistical Tables*, Table 37 (Mar. 2009) | 00925-928 |
| 62 | Massad Ayoob, *Five Gunfighting Myths Debunked by Massad Ayoob*, Personal Defense World (Oct. 14, 2014) | 00929-938 |
| 63 | Jacob Sullum, *The Threat Posed by Gun Magazine Limits* (Jan. 13, 2016) | 00939-941 |
| 64 | Charles Remsberg, *Why One Cop Carries 145 Rounds of Ammo on the Job*, PoliceOne (Apr. 17, 2013) | 00942-946 |
| 65 | Gus G. Sentementes & Julie Bykowicz, *Documents Detail Cross Keys Shooting*, Balt. Sun (Mar. 21, 2006) | 00947-949 |
| 66 | *Gun Shop Owner Shoots, Kills Man During Attempted Robbery*, WIS TV (Aug. 9, 2012) | 00950-952 |
| 67 | Nieson Himmel, *Police Say Watch Shop Owner Kills 4th, 5th Suspects*, L.A. Times (Feb. 21, 1992) | 00953-955 |
| 68 | *Jewelry Store Burglarized, Scene of Deadly 1994 Robbery Attempt*, nbc12.com (2012) | 00956-958 |

EXHIBITS TABLE OF CONTENTS

17cv1017

**ER_3654**

**Expert Witness Report of James Curcuruto**
*Duncan, et al. v. Becerra, et al.*
United States District Court (S.D. Cal.)
Case No: 3:17-cv-01017-BEN-JLB
October 6, 2017

## I.    INTRODUCTION

I am James Curcuruto of the National Shooting Sports Foundation. Counsel for plaintiffs in *Duncan v. Becerra* (E.D. Cal. Case No. 3:17-cv-01017-BEN-JLB) have asked me to offer an opinion regarding this case. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

## II.    BACKGROUND & QUALIFICATIONS

I received my associate's degree in business administration from the State University of New York at Cobleskill in 1991 and my bachelor's degree in business management from the University of North Carolina at Wilmington in 1993. My nearly 25-year business work history has focused primarily on sales, marketing, advertising, research, and analysis.

I am currently the Director, Industry Research & Analysis, at the National Shooting Sports Foundation, Inc. (NSSF). I have held this position since November 2009. The NSSF, formed in 1961, is the trade association for the firearms, ammunition, hunting, and recreational shooting sports industry. Its mission is to promote, protect and preserve hunting and the shooting sports. The NSSF has a membership of 10,000 manufacturers, distributors, firearms retailers, shooting ranges, sportsmen's organizations, and publishers.

In my position as Director, Industry Research & Analysis, I am responsible for most of the research activities at NSSF, and I direct the activities of an internal research coordinator as well as several outside companies retained to conduct research and gather market and consumer information useful to NSSF members.

Under my direction, dozens of informational reports and studies focusing on industry topics and trends, including firearms, ammunition, target shooting, and hunting, have been released to the NSSF member base. And many NSSF reports are shared outside the organization as well. Data from these releases has been referenced many times in endemic, non-endemic, online and print newspaper and magazine articles, used in corporate 10K reports, and mentioned in other media. I have authored and provided information for several articles published in trade magazines. I have also been deposed as an expert witness regarding the commonality of magazines capable of holding more than 10 rounds of ammunition.

1

### A.   Published Articles

In the past ten years, I have written or contributed to the following published articles:

| | | |
|---|---|---|
| *Firearms Accidents Drop* | SHOT Business | June/July 2011 |
| *New Study Can Aid Planning* | The Range Report | Winter 2011 |
| *NSSF Releases Report on Diversity* | SHOT Business | April/May 2013 |
| *Participation Trends* | SHOT Business | Aug/Sept 2013 |
| *Industry Research from NSSF* | SHOT Business | Dec. 2013 |
| *Many Uses, Many Sales* | AR Guns and Hunting | May 2014 |
| *The Big Bucks of Target Shooting* | SHOT Business | June/July 2014 |
| *Opening the Clubhouse* | SHOT Business | Dec. 2014 |
| *Improve Your Knowledge* | SHOT Business | Jan. 2015 |
| *Executive Privilege* | SHOT Business | Dec. 2016 |
| Target Audience | SHOT Business | Oct./Nov. 2017 |

### B.   Expert Witness History

In the past four years, I have been deposed and/or testified at trial in the following matters:

- Deposed for *Wilson, et al. v. Cook County, Illinois*, No. 07 CH 4848, In the Circuit of Cook County Illinois County Department, Chancery Division. November 7, 2013 Waterbury, CT 06702.

- Deposed for *Kolbe v. O'Malley*, U.S. District Court for the District of Maryland, January 24, 2014.

- Deposed for *Friedman v City of Highland Park*, May 27, 2014, Windsor Locks, CT 06096.

## III.   COMPENSATION

I am not receiving compensation from any parties to litigation or their counsel in exchange for my opinions.

## IV.   ASSIGNMENT

Plaintiffs' counsel has asked me to provide opinion on the prevalence of firearm magazines capable of holding more than ten rounds of ammunition in American society, including rates of ownership of such magazines by law-abiding citizens.

2

## V.   SUMMARY OF OPINION

There are at least one hundred million magazines of a capacity of more than ten rounds in possession of American citizens, commonly used for various lawful purposes including, but not limited to, recreational and competitive target shooting, home defense, collecting and hunting.

## VI.   ANALYSIS

Many NSSF members manufacture, distribute and/or sell firearms and shooting and hunting-related goods and services, and as is usual and customary for trade associations, the NSSF collects and disseminates industry-specific, non-sensitive data reflecting consumer preferences, market trends and other information for use in their business decisions.  Among the shooting and hunting-related goods and services manufactured, distributed and sold by NSSF members are ammunition magazines.[1] Research conducted by the NSSF and under my direction demonstrates that detachable ammunition magazines are very popular and are commonly owned by millions of persons in the United States for a variety of lawful purposes, including, but not limited to, recreational and competitive target shooting, home defense, collecting and hunting.

In addition to ammunition magazines accompanying firearms that utilize them at the time of sale, such magazines are also widely available for sale as a stand-alone item to individuals who need a replacement, different-capacity, and/or additional magazines.

I am not aware of any singular public source providing reliable figures identifying exactly how many ammunition magazines are manufactured or imported for sale within the United States each year. There are, however, data available to me from which estimations of the number of magazines that have been sold to the general population, as well as how many of those have a capacity for ammunition exceeding ten rounds, can be calculated within a reasonable degree of certainty.

Using such data, I have, in the normal scope of my duties on behalf of the NSSF, calculated estimations of the total number of magazines possessed by consumers in the United States, as well as how many of those have a standard

---

[1] A "magazine" is a receptacle for a firearm that holds a plurality of cartridges or shells under spring pressure preparatory for feeding into the chamber. http://saami.org/glossary/display.cfm?letter=M, Glossary of Terms, Sporting Arms and Ammunition Manufacturers' Institute (SAAMI). While magazines take many forms – box, drum, rotary, tubular, etc. and may be fixed or removable – from the materials I considered and firearms industry professionals I consulted, the figures discussed in this declaration generally (if not exclusively) concern detachable, box magazines.

3

capacity for ammunition exceeding ten rounds. These estimations are published in the NSSF® Magazine Chart attached to this report.

The NSSF® Magazine Chart estimates that 230 million pistol and rifle magazines were in the possession of United States consumers between 1990 and 2015. The data supporting the Chart further shows magazines capable of holding more than 10 rounds of ammunition accounted for approximately 115 million or approximately half of all magazines owned.

Sources used to compile the NSSF® Magazine Chart include the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Annual Firearms Manufacturers and Exports Reports (AFMER), U.S. International Trade Commission (ITC) data, as well as, opinions of firearms industry professionals. To prepare the NSSF® Magazine Chart, only the number of pistols and rifles were used while revolver and shotgun data was excluded as revolvers and the clear majority of shotguns do not utilize magazines.

The ATF AFMER data provide historical figures for pistols by caliber (i.e., the specific ammunition cartridge for which a firearm is chambered) and rifles produced in the United States for consumer purchase. The ITC data provides historical figures for pistol and rifles imported to and exported from the United States for consumer purchase. The total number of firearms available for consumer purchase from 1990 through 2015 was calculated by adding the total U.S. production of firearms with total firearms imported and then subtracting total firearms exported.

The ATF AFMER and ITC data provided estimates of approximately 67.7 million pistols and 42.6 million rifles capable of holding a magazine were available to United States consumers between 1990 and 2015. Firearms industry professionals with knowledge of the pistol and rifle magazine market then allocated magazines to the totals to complete the data provided in the NSSF® Magazine Chart.

It can be assumed that many more such magazines were manufactured in the United States or imported to the United States for sale in the commercial marketplace both prior to 1990 as well as after 2015.

While the figure of 115 million magazines with a capacity greater than 10 rounds in circulation is an estimation based on extrapolation from indirect sources and cannot be confirmed as unequivocally accurate, it is safe to say that whatever the actual number of such magazines in United States consumers' hands is, it is in the tens-of-millions, even under the most conservative estimates.

## VII.  REFERENCES

- Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Annual Firearms Manufacturers and Exports Reports (AFMER).

- U.S. International Trade Commission (ITC) online query system.

## VIII.  ATTACHMENTS

Attached and made a part of this report is a copy of the NSSF® Magazine Chart (Exhibit 1).

## IX.  CONCLUSION

Based on the findings listed above, it is my opinion that magazines that are capable of holding more than ten rounds of ammunition are commonly used by millions of law-abiding Americans for a variety of lawful purposes.

Dated: October 6, 2017

James Curcuruto
11 Mile Hill Road
Newtown, CT 06470
jcurcuruto@nssf.org

5

# EXHIBIT 1



**Expert Witness Report of Stephen Helsley**
*Duncan, et al. v. Becerra, et al.*
United States District Court (S.D. Cal.)
Case No: 3:17-cv-01017-BEN-JLB
October 6, 2017

## I.   INTRODUCTION

Counsel for plaintiffs in *Duncan v. Becerra* (E.D. Cal. Case No. 3:17-cv-01017-BEN-JLB) have asked me to offer an opinion regarding this case. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

## II.   BACKGROUND & QUALIFICATIONS

I am Stephen Helsley, a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and, finally, Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil, and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms.

I was the DOJ's principal firearms instructor for many years, and I am an FBI-certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, VA. I am a member of the American Society of Arms Collectors and a technical advisor to the Association of Firearm and Tool Mark Examiners. For the past 24 years, I was first a state liaison and, then later, a consultant to the National Rifle Association.

I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for U.S. and Russian journals. Throughout my adult life, I have been an active participant in handgun, rifle, and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s.

Finally, I am a collector of firearm-related books—of which I have approximately three thousand. Included in my book collection are approximately 50 different issues of *Gun Digest*, the earliest of which is from 1944. It is a standard resource that is widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

The combination of my consulting work, writing and free time activities puts me in constant contact with gun stores, shooting ranges, gun shows and gun owners. I am also in frequent contact with retirees from DOJ and other law enforcement agencies.

I have qualified as an expert in both criminal and civil matters.

## A.   Published Articles

In the past ten years, I have written or contributed to the following published articles and opinion editorials:

### 1.   Articles

- *Of Birmingham and* Belgium, Double Gun Journal, vol. 18, iss. 2 (2007).
- *The .470 Nitro Express*, Sports Afield (June/July 2007).
- *Readings on the Roots of* the .410, Shooting Sportsman, Nov./Dec. 2007.
- *Hunting in Wales*, Hunting and Fishing (Russia), Dec. 2007.
- *A Pair for a Pair of Friends*, Shooting Sportsman, March/April 2008.
- *A Welsh Fantasy*, Shooting Sportsman, July/Aug. 2008.
- *A Maine Gun Goes Home*, Shooting Sportsman, Sept./Oct. 2008.
- *The Pin Fire Comes Home*, Libby Camps Newsletter, Winter 2008.
- *John Rigby & Co.*, Hunting and Fishing (Russia), July 2008.
- *The All-American Double Rifle*, Safari, Sept./Oct. 2008.
- *Eastern Oregon Odyssey*, Shooting Sportsman, Nov./Dec. 2008.
- *Rigby Marks 275th Anniversary*, Safari, Nov./Dec. 2009.
- *Finding* Papa's Guns, Shooting Sportsman, March/April 2010.
- *The Searcy Stalking Rifle*, Safari, May/June 2010.
- *The Ruggs Riders*, Shooting Sportsman, July/Aug. 2010.
- *Searcy Brings Back the Rising-Bite*, Shooting Sportsman, Sept./Oct. 2010.
- *John Rigby & Co.*, African Hunting Gazette, Fall 2010.
- *The Ageless .416 Rigby*, Safari, Nov./Dec. 2012.
- *J. P. Clabrough*, Shooting Sportsman, March/April 2015.
- *The Mystery of Hemingway's Guns*, Friends and Neighbors, Summer 2015.
- *The Enigma of Hemingway's Guns*, Master Gun (Russia), Sept. 2015.
- *The Mystery of Hemingway's Guns*, CRPA Firing Line, Sept./Oct. 2015.
- *Pistols at Dawn*, CRPA Firing Line, Jan./Feb. 2016.
- *The Silver Star*, CRPA Firing Line, Jan./Feb. 2016.
- *Women Guns & Politics*, CRPA Firing Line, March/April 2016.
- *Hunting the Big Mouse*, CRPA Firing Line, Sept./Oct. 2016.
- *Do Guns Make Heroes? The Congressional Medal of Honor*, CRPA Firing Line, Nov./Dec. 2016.
- *Thumbs-Up Guns*, Shooting Sportsman, Jan./Feb. 2017.
- *Is Your Gun Safely Stored? (Part 1)*, Friends and Neighbors, Summer 2017.
- *History of William Powell and His Patents*, Master Gun (Russia), Aug. 2017.

- *Guns from San Francisco and Birmingham*, Master Gun (Russia), Oct. 2017.
- *Is Your Gun Safely Stored? (Part 2)*, Friends and Neighbors, Autumn 2017.

### 2.  Opinion Editorials

- *It's About Time: State has Eroded Gun Owner's Rights*, Sac. Bee (July 4, 2010).
- *Nevada Views: Is Gun Registration Worth Cost?*, Nev. Rev. J. (Sept. 16, 2012).
- *Gun Roundup Program Has Too Many Flaws*, Sac. Bee (May 3, 2013).

### B.  Expert Witness History

In the past four years, I have not been deposed in or testified at trial as an expert witness.

## III.  COMPENSATION

I am not being compensated for my work on this report.

## IV.  ASSIGNMENT

Plaintiffs' counsel has asked me to provide opinion on the historical existence and prevalence of firearms and/or magazines capable of holding more than ten rounds of ammunition and the reasons law-abiding Americans, including law enforcement and private citizens, so often select such items.

Counsel has also asked that I provide opinion on the utility of firearm magazines with the ability to accept more than ten rounds of ammunition in self-defense, as well as the impact of ten-round magazine limitations on law-abiding citizens.

## V.  OPINIONS & ANALYSIS

*1.   Magazines over ten rounds are, and have historically been, a common choice for self-protection for use in both rifles and handguns.*

The standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of whether its capacity is six, ten, fifteen, or twenty rounds. Various popular handgun models originally came from the manufacturer standard, free from artificial influences like laws restricting capacity, with magazines exceeding ten rounds. Examples include, but are in no way limited to, the Browning High Power (13 rounds) c.1954, MAB PA-15 (15 rounds) c.1966, Beretta Models 81/84 (12/13 rounds) c.1977, S&W Model 59  (14 rounds) c.1971, L.E.S P-18 (18 rounds) c.1980 aka Steyr GB, Beretta Model 92

(15 rounds) c.1980s, and Glock 17 (17 rounds) c.1986. I know there to be many more examples not listed here.

Firearms with a capacity exceeding 10-rounds date to the 'dawn of firearms.' In the late-15th Century, Leonardo Da Vinci designed a 33-shot weapon. In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle. A modified 18th Century version of Lorenzoni's design, with a 12-shot capacity, is displayed at the NRA's National Firearms Museum. Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806—the magazine for which held twenty-two .46 caliber balls.

Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War. During that same period, revolvers with a capacity of 20-rounds were available but enjoyed limited popularity because they were so ungainly.

In 1879, Remington introduced the first 'modern' detachable rifle magazine. In the 1890s, semiautomatic pistols with detachable magazines followed. During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced. As those magazines protruded well below the bottom of the pistol's frame, they weren't practical for use with a belt holster—and by extension concealed carry for self-defense.

In 1935, Fabrique Nationale introduced the Model P-35 pistol with its fully internal 13-round magazine. It would become one of the most widely used military pistols of all time. During WWII, magazine capacity for shoulder-fired arms was substantially increased while most pistols (excluding the P-35) remained at 10-rounds or less. In the mid-1950s the P-35 was rebranded the High Power and imported to the US.

This transition of a firearm from military to civilian use for sport or self-defense is very common. The standards of WWI—the 1903 Springfield rifle and the Colt M1911 pistol are but two of many examples. Civilian sales of both increased after the war as a result of the training "doughboys" received before going to France. The Springfield would become the standard for both rifle hunting and target competition. Likewise, the M1911 Colt pistol was a target-shooting standard for a half-century or more and popular for self-defense.

Between the two world wars, double-action semiautomatic pistols like the Walther PPK and P-38 were introduced. The double-action feature allowed the first shot to be fired in a manner similar to a revolver. Law enforcement agencies in the United States had traditionally used revolvers. However, in the early 1970s, a confluence of events changed that: training funds became widely available and so did the first double action semiautomatic pistol (the S&W M59) with a 14-round magazine. Soon major agencies were transitioning to the M59 and the legion of

other makes that followed—CZ, Colt, HK, Sig-Sauer, Glock, Beretta, Ruger, Smith & Wesson, etc. Pistols with magazine capacities as large as 19-rounds quickly replaced the six-shot revolver.

Law enforcement demand for the new generation of semiautomatic pistols helped create an increased demand in the civilian market. Comparing 1986 and 2010 handgun sales, one can see evidence of that change. According to the Bureau of Alcohol Tobacco Firearms and Explosives, in 1986, 663,000 pistols were sold in the United States versus 761,000 revolvers. In 2010, revolver sales had dropped to 559,000, while pistol sales had grown to 2,258,000. *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Firearms Commerce in the United States, Annual Statistical Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf. The result of almost four decades of sales to law enforcement and civilian clients is millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely multiple millions of magazines for them. My associates who have such pistols also have a considerable number of spare magazines for them. In my case, I have one 19-round and eight 17-round magazines for my Glock.

The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally two spare magazines holding more than ten rounds on the uniform belt. The clear majority of California law enforcement officers carry pistols with double-stack magazines whose capacities exceed those permitted under California Penal Code section 32310.

The home-owner and the concealed weapon permit holder want a pistol that can hold significantly more cartridges than a revolver for the same reason a law enforcement office or soldier wants one—to increase his or her chances of staying alive. For virtuous citizens buy their guns to protect themselves from the same criminals that police carry guns to protect the citizens, the public, and themselves from. For this reason, armed citizens have historically modeled their choice of firearms on what police carry.

   2.   *Limiting the law-abiding citizen to a magazine of ten rounds limits their ability to protect themselves from violent criminals in certain situations. Such limits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds to stop the aggressive actions of offenders, while having negligible impact on the ability of criminals to carry out violent crimes.*

Based on my experience with and understanding of the customs and practices of citizens licensed to carry guns in public, individuals often carry *only*

**ER_3666**

the gun, without spare ammunition or magazines. Similarly, most plainclothes police officers do not find it practical to carry multiple handguns.

Likewise, the average homeowner who keeps a defensive firearm is unlikely to have time to gather spare ammunition or magazines. Rather, they are generally limited to one firearm and its magazine capacity. For the homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally prohibits the gathering of multiple firearms or magazines. Ideally, one hand would be occupied with the handgun and the other with a telephone to call the police. Assuming an individual even had time for a magazine change, most people do not sleep with firearms or magazines attached to their bodies or wearing clothing that would allow them to stow spare magazines or ammunition on their person. They would have only what was in the firearm.

The off-duty officer and the private law-abiding citizen are thus unlikely to have much, if any, spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a spare, loaded rifle or shotgun. Their only communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

Uniformed police officers who are traditionally armed against the same criminals, on the other hand *are* normally wearing body armor. They generally have immediate access to a loaded shotgun and/or loaded patrol rifle with magazines holding more than ten rounds in the patrol car. And they will have instant radio access to dispatch and fellow officers if backup help is needed. Further, they will generally have both a loaded gun *and* two additional magazines. Each of those magazines would generally hold 17 rounds of 9mm or 15 rounds of .40 caliber cartridges. Collective law enforcement experience has determined this to be critical to allowing the officer to survive a gunfight with armed criminals.

What's more, the average citizen is not trained like law enforcement personnel and is generally not as readily prepared for combat with an armed criminal. As noted, they are likely to have a single firearm loaded with a single magazine available, and they are more susceptible to the psychological effects that naturally occur when faced with the threat of deadly violence and tend to deprive one of the focus and clarity of mind necessary to make accurate shots.

For these reasons, having a magazine over ten rounds at one's disposal certainly could make a difference in self-defense situations, and likely would during home invasions or when facing armed attackers. In my opinion, law-abiding citizens will thus be at a disadvantage in such situations if California enforces its ban on the possession of magazines over ten rounds.

Criminals bent on causing harm, on the other hand, are not likely to be meaningfully affected by California's magazine restrictions. Even assuming they were impeded from obtaining magazines over ten rounds by Penal Code section 32310, they could simply arm themselves with multiple weapons and/or magazines, and they often do. Criminals have time to assess and plan shootings, whereas victims do not. Indeed, it is the attacker who chooses when, where, how, and whom to attack. So, the attacker is not as burdened by the surprise and shock that the victim is and is generally prepared for the confrontation with several firearms and a substantial amount of ammunition.

The virtuous citizen cannot practically be expected to have accessible multiple guns, magazines, or spare ammunition at a moment's notice. The victimized citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

Supporters of the magazine capacity limitation may point to some firearm expert who is comfortable with an eight- or nine-shot pistol, or even a five- or six-shot revolver. It should be noted, however, that the operative term there is "expert." The individual who has spent a lifetime training in shooting, and may fire hundreds or even thousands of shots on the range per month, has developed a level of skill and confidence that is not practical to expect from the average police officer or the average law-abiding citizen who keeps a firearm in the home or on his person for protection of self and family.

Finally, it is worth noting that it is difficult to say exactly how many private citizens have fired more than ten rounds in a self-defense shooting, because the number of rounds fired in such cases is very often an omitted fact in written accounts of such defensive gun uses. Often the accounts just say, "multiple shots fired." That could mean more or less than ten. This does not seem to be the case with shootings involving police officers, for which, the number of shots fired is generally documented. In my experience researching such shootings, officers often fire more than ten rounds. And cases where an individual officer fired less than ten rounds, but where multiple officers were shooting, can be fairly characterized as involving more than ten rounds, if the multiple officers involved fired over ten rounds in aggregate. Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection against the same criminals the police are armed to deal with.

> 3.   *A firearm equipped with a magazine capable of holding more than ten rounds is more effective at incapacitating a deadly threat and, under some circumstances, may be necessary to do so.*

Gunfights frequently involve a lot of "missing." This can be the result of improper aim or impact with barriers such as vehicles or walls. One would be hard

pressed to find someone who had been in a gunfight that complained about having too much ammunition.

Some believe that anyone defending themselves can just "shoot to wound." Those who grew up in the 1950s likely watched Roy Rogers shoot the gun out of an evildoers' hand or—if things got really serious—let loose a grazing wound to the arm to settle matters. Such ideas are a fantasy. Equally as silly is the well-known 'fact' that a bullet from a .45ACP cartridge will knock someone to the ground no matter where it strikes them.

The notion that a bullet can "knock-down" a person is a largely Hollywood-inspired myth. Most of us learned in school about Sir Isaac Newton's *Third Law of Motion* that states—"For every action, there is an opposite and equal reaction." Put another way: if the recoil of the firearm doesn't knock you down, neither will the impact of the bullet. Bullets can penetrate skin, cut arteries, brake bones or interrupt nerve function to accomplish what is generally described as "stopping power." A bullet that severs the spine or strikes a certain area of the brain will almost certainly stop an attacker instantly. Bullet design and/or increased velocity may improve performance, but placement is still the most critical factor.

A hit, or even multiple hits, to less vital areas of the body may allow an attacker to continue the assault. This phenomenon is extensively documented in the citations for American heroes who were awarded the Congressional Medal of Honor. Many of these men continued to fight after suffering multiple gunshot wounds, being struck by shrapnel or having an arm or leg severed. *See, e.g., The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85 (Sharp & Dunnigan 1984). A fighter who has overcome fear and is motivated to continue an attack can be difficult to stop. In the infamous 1986 FBI shoot-out with two Florida bank robbers, one of the suspects, Michael Platt, sustained 12 gunshot wounds before dying. Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (October 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious- shootouts-in-us-history/.

"Knockdown" and "Stopping Power" are things I know from personal experience. During my early years as a narcotic agent with the California Department of Justice, I was conducting an undercover investigation of a significant heroin dealer. After purchasing an ounce and a half of heroin from him and the arrest was initiated, he shot me with a .45 first breaking my left arm and severing an artery (Note: I wasn't "knocked down") and then bouncing another round off my spine that exited my right leg. From a prone position, I returned fire at the suspect who was mostly concealed by the trunk of his car. My shots that struck the vehicle failed to penetrate sufficiently to reach him. In the exchange that followed I had another round pass through my right leg, while another entered my left side and lodged in the disc between L3 and L4—where it remains today. Having emptied the 8 rounds in my pistol, I tried to reload. However, with a broken arm and temporary paralysis from the waist down, I was unable to reach

my spare magazine in my left rear pants pocket. Fortunately, at that time the suspect quickly surrendered to my converging surveillance team. Very little pain was initially associated with my wounds and I could have "fought on" if more ammunition had been available. A total of 18 rounds were fired.

Four years later, I was making an undercover cocaine purchase with a new member of my team. I had involved myself to evaluate his performance. The three suspects, two of whom were armed (initially unbeknownst to us) had decided that robbery was a better option than delivering the cocaine. The junior agent was taken hostage and was being held in the state undercover car with a sawed-off rifle to the back of his head and a revolver held against his right side. I was across the street in another undercover car with the money the suspects wanted. I informed the surveillance team that I was going to approach the other vehicle to see what I could do. When I got to the car it was difficult to determine what was happening, as it was a dark, rainy night. I told the agent to exit the vehicle and as he opened the car door and dived out, two shots were fired at him—both missed. I returned fire at the area of the muzzle flash inside the car. Of the eight rounds I fired, the automobile glass defeated most. However, one .45 bullet hit the suspect holding the rifle, causing him serious internal injuries. The suspect with the revolver came out of the passenger door and was struck through the shin with a .45 bullet from a member of the surveillance team who had quietly closed-in on the vehicle. After a short pause the suspects were ordered out of the vehicle. Both of those with gunshot wounds came out fighting. A flashlight to the chin produced the 'stopping power' for the suspect with the internal wound. The suspect with the leg wound was unaware of his injury until he saw the massive blood loss—whereupon he exclaimed "I'm bleeding" and passed out. Twenty-eight rounds were fired into the vehicle with only two hits. For my actions in this incident I was awarded the department's Medal of Valor.

The "take away" from these incidents is that serious bullet wounds aren't necessarily incapacitating and that gunfights can require lots of ammunition.

## VII.   REFERENCES

Silvio Calabi, Steve Helsley & Roger Sanger, *The Gun Book for Boys* 56-57
        (Shooting Sportsman Books 2012).

United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and
        Explosives, *Firearms Commerce in the United States, Annual Statistical
        Update* (2012), *available at* http://www.atf.gov/files/publications/firearms/
        050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf.

*The Congressional Medal of Honor, The Names, The Deeds* 28-29, 52-53, 284-85
        (Sharp & Dunnigan 1984).

Jamie Frater, *Top 10 Most Audacious Shootouts in US History*, Listserve (Oct. 14, 2009), http://listverse.com/2009/10/14/top-10-most-audacious- shootouts-in-us-history/.

## VIII.  CONCLUSION

It is clear to me from my collective experiences and from the analysis described above that firearms and magazines with ammunition capacities exceeding ten rounds have existed and have been in use since at least the 18th Century.

It is also clear that Americans commonly choose and use magazines capable of holding more than ten rounds of ammunition for lawful purposes, including self-defense.

Dated: October 6, 2017

Stephen Helsley

10

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| VIRGINIA DUNCAN, et al., | Case No: 17-cv-1017-BEN-JLB |
| Plaintiffs, | **CERTIFICATE OF SERVICE** |
| v. | |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California, | |
| Defendant. | |

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as: **PLAINTIFFS' DISCLOSURE OF EXPERT WITNESSES**, on the following parties by the following means:

✗ (BY MAIL) As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under the practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Long Beach, California, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date is more than one day after date of deposit for mailing an affidavit.

✗ (BY ELECTRONIC MAIL) As follows: I served a true and correct copy by electronic transmission. Said transmission was reported and completed without error.

Ms. Alexandra Robert Gordon
Deputy Attorney General
alexandra.robertgordon@doj.ca.gov
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Anthony P. O'Brien
Deputy Attorney General
anthony.obrien@doj.ca.gov
1300 I Street, Suite 125
Sacramento, CA 95814

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 6, 2017, at Long Beach, CA.

_Laura Palmerin_
Laura Palmerin

1

CERTIFICATE OF SERVICE

17cv1017

**ER_3672**

**Expert Witness Rebuttal of Dr. Gary Kleck**
*Duncan, et al. v. Becerra, et al.*
United States District Court (S.D. Cal.)
Case No: 3:17-cv-01017-BEN-JLB
November 3, 2017

## I.      INTRODUCTION

I am Dr. Gary Kleck, Emeritus Professor of Criminology & Criminal Justice at Florida State University. Counsel for plaintiffs in *Duncan v. Becerra* (S.D. Cal. Case No. 3:17-cv-01017-BEN-JLB) have asked me to offer a rebuttal opinion regarding this case. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

## II.     BACKGROUND & QUALIFICATIONS

I am an emeritus Professor of Criminology and Criminal Justice at Florida State University. I received my doctorate in Sociology from the University of Illinois in 1979, where I received the University of Illinois Foundation Fellowship in Sociology. I was, at the time of my retirement in May 2016, the David J. Bordua Professor of Criminology at Florida State University, where I served on the faculty from 1978 to 2016. My research has focused on the impact of firearms and gun control on violence, and I have been called "the dominant social scientist in the field of guns and crime." William J. Vizzard, *Shots in the Dark: The Policy, Politics, and Symbolism of Gun Control* 183 (2003).

I have published the most comprehensive reviews of evidence concerning guns and violence in the scholarly literature, which informs and serves as part of the basis of my opinions. I am the author of *Point Blank: Guns and Violence in America*, which won the 1993 Michael J. Hindelang Award of the American Society of Criminology, awarded to the book of the previous several years which "made the most outstanding contribution to criminology." I also authored *Targeting Guns* (1997) and, with Don B. Kates, Jr., *The Great American Gun Debate* (1997) and *Armed* (2001)—books that likewise addressed the topic of guns and violence.

I have also published scholarly research articles in virtually all the leading professional journals in my field. Specifically, my articles have been published in the *American Sociological Review*, *American Journal of Sociology*, *Social Forces*, *Social Problems*, *Criminology*, *Journal of Criminal Law and Criminology*, *Law & Society Review*, *Journal of Research in Crime and Delinquency*, *Journal of Quantitative Criminology*, *Law & Contemporary Problems*, *Law and Human Behavior*, *Law & Policy Quarterly*, *Violence and Victims*, *Journal of the American Medical Association*, and other scholarly journals.

I have testified before Congress and state legislatures on gun control issues, and worked as a consultant to the National Research Council, National Academy of Sciences Panel on the Understanding and Prevention of Violence, as a member of the U.S. Sentencing Commission's Drugs—Violence Task Force, and as a member of the Institute of Medicine and National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-Related Violence. I am a referee for over a dozen professional journals, and serve as a grants consultant to the National Science Foundation.

Finally, I have taught doctoral students how to do research and evaluate the quality of research evidence, and have taught graduate courses on research design and causal inference, statistical techniques, and survey research methodology.

My current curriculum vitae, which includes a full list of my qualifications and publications, is attached hereto as **Exhibit 1.**

In the past four years, I have been deposed and/or testified at trial in the following matters:

- *Heller v. District of Columbia*, D.D.C. (deposed July 2, 2013).

- *Cook et al. v. Hickenlooper*, D. Colo. (deposed and testified Mar. or April 2013).

- *Wilson v. Cook County* (deposed Sept. 16, 2013).

- *Kolbe v. O'Malley*, D. Md. (deposed Jan. 2, 2014).

- *Barbra Schlifer Commemorative Clinic v. HMQ Canada* ("Cross-examined" [Canadian term for deposed] Feb. 24, 2014).

- *Friedman v. City of Highland Park* (deposed May or June 2014).

- *Tracy Rifle and Pistol v. Harris*, E.D. Cal. (deposed Nov. 2, 2016).

## III.   COMPENSATION

I am being compensated for my time in this case at an hourly rate of $400 per hour. My compensation is not contingent on the results of my analysis or the substance of my testimony.

## IV.   ASSIGNMENT

Plaintiffs' counsel has asked me to provide an opinion in response to the opinions presented in the expert reports of Dr. Lucy Allen, Dr. Louis Klarevas, and Dr. Christopher Koper submitted by Attorney General Xavier Becerra.

## V.   OPINIONS & ANALYSIS

### A.   Response to Dr. Lucy Allen's Expert Report

#### 1.   *Allen's Analysis of the NRA Sample of Defensive Gun Uses*

Professor Allen cites data from the "Armed Citizen" column of the National Rifle Association's (NRA) magazine, *American Rifleman*, and concludes that "it is rare for a person, when using a firearm in self-defense, to fire more than ten rounds."[1] She does not confine this conclusion to persons whose defensive gun use (DGU) was reported in the *American Rifleman*, but clearly intends it to apply to Americans in general. The NRA's database of "armed citizen" stories is not a representative sample of DGUs, nor does the NRA even claim it to be so. Allen likewise does not claim that the NRA sample is representative. Indeed, her own remarks indicate the opposite—she acknowledges the possibility of bias in selecting cases "in favor of stories that put use of guns in self-defense in the best possible light."[2] Therefore, there is no formal basis for generalizing the results of any analysis of this sample to any larger population of DGUs.

The utility of the NRA sample is, however, even worse than merely being unrepresentative of DGUs in a general way. More specifically, there is strong reason to believe that the sample will largely exclude DGU incidents in which the defender fired more than 10 rounds. NRA staff nonrandomly select these incidents from news media-reported cases of DGU, most of them submitted by readers of the "Armed Citizen" feature of *American Rifleman*.[3] Based on the content of these stories published in the magazine, it is clear that they are selected to convey the impression that DGU is an extremely legitimate and successful activity, engaged in by law-abiding persons, for clearly legally justifiable purposes, carried out in clearly lawful ways. The reality of the full array of DGUs is considerably more

---

[1] Expert Report of Dr. Lucy P. Allen at 5, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (Oct. 6, 2017) ("Allen Report").

[2] *Id.*

[3] *See, e.g.*, *The Armed Citizen*, Am. Rifleman 10, Nov. 2017 (urging readers to submit news clippings of DGU stories).

diverse, but the NRA has a political agenda to portray DGU in as positive a light as possible.

Thus, Allen is quite right to note that the selection practices of NRA staff are likely to favor inclusion of DGU stories that put DGU "in the best possible light."[4] She does not, however, appear to understand how this bias would work regarding stories in which defenders fired large numbers of rounds. It could not serve the NRA's purposes to disseminate accounts of DGUs in which the defenders appeared to indiscriminately "fling lead," firing arguably excessive numbers of rounds at their adversaries. The more seemingly excessive the defender's use of force appears to be, the less likely it is that his actions would appear to a reader to be justifiable. Likewise, the NRA is unlikely to want to disseminate stories in which effective self-defense was difficult and dangerous, requiring the firing of large numbers of rounds. Instead, NRA staff would better serve their political ends by selecting stories of DGUs in which the defenders used the minimum amount of force needed to defend themselves, firing the fewest rounds needed to serve that purpose. This would bias the sample of selected DGUs in the direction of excluding cases in which many rounds were fired.

Even though the NRA sample is not representative of DGUs in general, Allen's analysis of the NRA sample does nevertheless establish one thing: DGUs in which more than 10 rounds are fired do occur. Her analysis of the NRA sample of identified two incidents in which over 10 rounds were fired, a frequency that Allen characterizes as "rare."[5] This is indeed rare in absolute terms, but then so are acts of gun violence with over 10 rounds fired. Data in Reedy and Koper indicated that crimes less than 2% of gun crimes known to the police involve offenders firing over 10 rounds.[6] Of course, mass shootings are even more rare, and detailed examination of the way mass shootings actually occur indicates that the number of

---

[4] Allen Report, *supra* note 1, at 5.

[5] *Id.* at 12.

[6] D.C. Reedy & Christopher S. Koper, *Impact of Handgun Types on Gun Assault Outcomes*, 9 Injury Prevention 151-155 (2003).

incidents in which use of "large-capacity magazines"[7]is likely to have increased the number of victims killed or injured in a typical year may well be zero.[8]

It is therefore worth considering the implications, for example, if just 0.3% of all DGUs involved over 10 rounds being fired, as Allen's results indicate. National surveys that have specifically asked about DGUs have consistently indicated 0.5-3.5 million DGUs per year,[9] it would be reasonable to assume an annual average of at least 1 million DGUs. If this were the frequency of all DGUs, a 0.3% share would imply a number of DGU incidents with over 10 rounds fired that was huge in absolute terms—about 3,000 per year. Thus, the LCM percentage does not have to be very large in order for it to imply a huge absolute number of incidents or for that number to greatly exceed the number of crimes in which LCM use increased the harm inflicted on victims. In short, Allen's own results from the "Armed Citizen" analysis, taken at face value, imply that there are more DGUs each year in which the defender fires over 10 rounds than there are crimes committed in which LCM use increased the harms inflicted.

>    2.    *Allen's Analysis of 200 DGUs Reported in the News*

DGUs reported in news outlets are no more likely to be representative of all DGUs than the "Armed Citizen" sample. News outlets rarely find out about crimes on their own—they find out about crimes from the police. DGUs that are reported to the police, like the NRA-selected DGUs, are likely to be especially legitimate and justified. Conversely, defenders are less likely to report their DGUs to the police if their actions are likely to appear to the police as involving excessive force or indiscriminate firing of a gun. This means that incidents in which defenders fired over 10 rounds are likely to be rare among DGUs reported to the police and consequently covered by news outlets, regardless of how common such incidents really are.

---

[7] California law defines a "large capacity magazine" as, with limited exceptions, "any ammunition feeding device with the capacity to accept more than 10 rounds." Cal. Penal Code § 16740. I understand that this is not a universally accepted definition. But, for ease of reference, I refer to magazines over ten rounds as "LCMs" throughout this report.

[8] Gary Kleck, *The Effect of Large-Capacity Magazines on the Casualty Count of Mass Shootings: The Plausibility of Linkages*, 17 Just. Res. & Pol'y 28-47 (2016) ("Kleck 2016").

[9] Gary Kleck, *Chapter 6: The Frequency of Defensive Gun Use: Evidence and Disinformation*, in Gary Kleck & Don B. Kates, *Armed: New Perspectives in Gun Control* 213-284 (2001).

Allen uncovered 4,800 news stories of DGUs over a span of six years, but needlessly sampled just 200 of the stories for analysis.[10] Her sample was selected randomly[11] and may well be approximately representative of the full set of DGU *news stories*, but since the set of DGUs reported in the news is itself likely to be an unrepresentative sample of all DGUs, Allen's sampling procedures cannot produce a representative sample of DGUs. She therefore has no basis for generalizing the results of this analysis to the entire population of DGUs.

Leaving aside the unrepresentative character of the sample, it is also needlessly small. Allen did not need to sample cases at all, and she certainly did not need to select so few. She does not explain why she sampled at all.[12] Sampling necessarily introduces sampling error as an additional source of error in her analysis, and it is especially severe if so small a sample (n=200) was selected. Estimates of the percent of DGUs involving over 10 rounds fired will be needlessly imprecise because of Allen's decision to sample and to select so small a sample. If the results of Allen's analysis are correct and 0.3% of DGUs involve over 10 rounds fired, this would mean that one would expect just 0.6 of a DGU of this type to be found in a sample of 200 DGUs (.003 x 200 = 0.6), so it's not surprising (or especially significant) that the small sample examined in Allen's second analysis did not happen to include any DGUs with over 10 rounds fired.

Indeed, the imprecision of Allen's estimate of this percentage is so great that finding zero DGUs of this type in the *sample* (as Allen did)[13] is, statistically speaking, perfectly compatible with a *non*zero percent (such as 0.3%) in the full *population* of all DGUs. Consider, for example, the implications if Allen's estimate of the LCM share derived from her NRA analysis is correct, i.e. that 0.3% of DGUs involve over 10 rounds fired. The 95% confidence interval estimate of this fraction is an estimate that reflects its degree of imprecision due to sampling error and is computed according to this formula:

95% CI = p +/- 1.96 [square root of ([p x q]/n)], where

p=the sample estimate of the proportion of DGUs that involved over 10 rounds fired (0.003),

---

[10] Allen Report, *supra* note 1, at 9.

[11] *Id.*

[12] *See id.* at 8-12.

[13] *Id.* at 11.

q= the sample estimate of the proportion of DGUs that did *not* involve over 10 rounds fired (0.997), and

n= the sample size (200).

The formula yields a 95% confidence interval (CI) estimate of -0.0046 to .0106, which means that we can be 95% confident that the true population proportion of DGUs is between -0.0046 and .0106, or -0.46% and 1.06%.

Since 0% lies within this interval, it means, in plain English, that even if the actual percent of *all* DGUs that involve over 10 rounds fired was 0.3% as indicated by Allen's NRA analysis, one could still easily obtain the 0% *sample estimate* that she obtained in her second analysis from her needlessly small sample of 200 DGUs reported in the news.

Thus, the results of her second analysis are fully compatible with the results of her first analysis, which implied that there are 3,000 or more DGUs each year in the U.S. that involve over 10 rounds fired.

> 3.   *Allen's Claims About the Share of Mass Shootings that Involve LCMs Rely on Sources Known to be Unreliable*

Allen claims that LCMs are "often used in mass shootings."[14] The claim is supported by an analysis of a sample of mass shooting incidents from two sources, *Mother Jones* and The Citizens Crime Commission of New York City,[15] both of which are known to be based on biased samples of mass shootings. The problem with both samples is that they were apparently selected (whether intentionally or not) in a way that favored the inclusion of incidents involving LCMs and disfavored inclusion of incidents not involving LCMs.

Consider the sample analyzed by staff members of *Mother Jones* magazine. Their report purportedly showed that an astounding 86% (31 of 36) of public mass shootings involved an LCM.[16] An unscrupulous analyst could, of course, easily make the LCM share as large as one liked simply by limiting the sample studied to cases already known to involve LCMs, and excluding cases that did not. Therefore, any results based on the *Mother Jones* sample can be trusted only to the extent that

---

[14] *Id.* at 14.

[15] *Id.*

[16] Mark Follman, Gavin Aronsen & Deanna Pan, *US Mass Shootings, 1982-2017: Data from Mother Jones' Investigation*, Mother Jones, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ (last updated Oct. 18, 2017) ("Mother Jones").

their 36 cases were representative of all mass shootings, or at least all those occurring in public places. The reality, however, is that less than 7% of all mass shootings with 3 or more dead—as distinct from the tiny subset analyzed in the *Mother Jones* study—are known to involve LCMs.[17] *Mother Jones*'s 86% figure was obtained only because their selection procedures somehow excluded nearly all mass shootings that did not involve LCMs. The most comprehensive listing of all mass shootings that is currently available is at the Gun Violence Archive (GVA) website, which relies on news media sources for accounts of mass shootings.[18] For the three complete years for which the website has complete coverage, 2014-2016, the compilers identified 136 incidents with three or more people killed.[19] For the same period, the staff of *Mother Jones*, which advocates for LCM bans, could identify just 6 mass shootings in 2014-2016 that were known to involve LCMs.[20]

The Violence Policy Center (VPC), which also advocates for LCM bans, could identify just 9 incidents with three or more victims killed in which a shooter was known to have used a magazine with a capacity exceeding ten rounds.[21] The study by VPC was not limited to mass shootings that occurred in public, but covered all shootings with 3 or more fatalities regardless of their location, yet still uncovered just 9 mass shootings the involved LCMs in 2014-2016—about 3 per year. Thus, less than 7% (9/136=0.066) of mass murders in the United States in 2014-2016 were known to have involved use of an LCM. To the extent that even the GVA compilation is incomplete, and the total number of mass murders still larger than their figures indicate, this LCM share would be still smaller.

In sum, the 9 LCM-involved incidents in 2014-2016 claim just 6.6% of the GVA-documented mass shootings with three or more fatalities in that period—a far cry from the 86% share indicated by the *Mother Jones* data.

One could of course speculate that LCM involvement in some mass shootings was not mentioned in any news story and thus went unnoticed by *Mother*

---

[17] *See* discussion immediately following.

[18] Gun Violence Archive, *Gun Violence Archive 2017*, http://www.gunviolencearchive.org (last visited Nov. 3, 2017).

[19] *Id.* (based on my analysis of GVA's data).

[20] Mother Jones, *supra* note 16.

[21] Violence Policy Center, *High-Capacity Ammunition Magazines Are the Common Thread Running Through Most Mass Shootings in the United States* (July 1, 2017), *available at* http://gunviolence.issuelab.com/resource/high-capacity-ammunition-magazines-are-the-common-thread-running-through-most-mass-shootings-in-the-united-states.html.

*Jones* and VPC staff, but this seems unlikely in light of the intense political and news media interest in LCMs. In any case, I am not aware of any evidence that such cases are common enough to materially affect estimates of the prevalence of LCM use in mass shootings. For the *Mother Jones* estimate of 86% to be even remotely accurate, *Mother Jones* and VPC staffers would have had to have missed huge numbers of LCM-involved mass shootings. Recall that the GVA database identifies, for 2014-2016, 136 mass shootings with 3 or more dead—the cut-off used by *Mother Jones* and VPC staffers to define a mass shooting. If the *Mother Jones* estimate of the share of mass shootings involving LCMs (86%) really was valid and applied to all mass shootings with 3 or more fatalities, there should have been *117* LCM-involved mass shootings (86% of 136) discovered by researchers for the 2014-2016 period. Yet the *Mother Jones* staff managed to discover just *6* public mass shootings with three or more victims killed known to involve LCMs in 2014-2016, and VPC staff discovered only 9 for all locations. If these were indeed the only LCM-involved mass shootings with 3 or more fatalities that could be uncovered by *Mother Jones* and VPC methods, this would mean that those methods captured only about 5% of LCM-involved incidents. The *Mother Jones* and VPC staff were either astoundingly incompetent and their methods extremely ineffective in discovering LCM-involved mass shootings or, more likely, the 86% LCM share estimated in the *Mother Jones* study is simply far too high, and there were actually far fewer than 117 LCM-involved mass shootings to be discovered.

Why, then, did the *Mother Jones* study yield such an extraordinarily high estimate of LCM involvement? The *Mother Jones* study covered only incidents *where magazine capacity could be determined*.[22] Unfortunately, news reporters may feel that magazine capacity is a detail worth reporting in their stories only if it is large. If so, the *Mother Jones* estimate of the LCM share reflects nothing more than the degree to which news outlets regard LCM use as newsworthy, but tells us nothing about the actual prevalence of LCM use in all mass shootings. Very likely, LCM use *is* common in shootings *for which news reporters thought that ammunition capacity was worth mentioning*, but this tells us nothing about how prevalent LCM use is in all mass shootings.

The second source on which relies for her analysis of the prevalence of LCMs in mass shootings, referred to as "The Citizens Crime Commission of New York City,"[23] is afflicted by the exact same problems as the *Mother Jones* sample, so it does not require separate discussion.

---

[22] Expert Report of Dr. Christopher S. Koper at 7, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (Oct. 6, 2017) ("Koper Report").

[23] Allen Report, *supra* note 1, at 13.

4.      *Allen's Analysis of Mass Shootings Says Nothing About Whether LCM Use Causes More Harm in Shooting Incidents*

Allen correctly notes that mass shooters who used LCMs inflicted more casualties than those who did not,[24] but leaves the impression that LCM use must have somehow *caused* the higher casualty count. She does not mention the obvious alternative explanation for this statistical association—that shooters more intent on hurting many people would prepare to do so by acquiring LCMs and bringing them to the scene of their crime. That is, lethality of intent determines both the choice of weaponry and ammunition and the outcome of the crime. If this completely accounts for the association, it means that the association is spurious, i.e. non-causal. That is, it means the LCM use has no effect of its own on the number of casualties inflicted.

This alternative explanation entails two component assertions:

(1)      Greater lethality of offender intent causes shooters to fire more rounds and inflict more casualties.

(2)      Greater lethality of intent makes it more likely that mass shooters will use weaponry they believe is suited to their deadly intentions.

Regarding assertion (1), it is scarcely credible that the outcomes of mass shootings are not affected by what the shooters intended. While the correspondence between intent and outcome may not be perfect, it surely is strong. To my knowledge, no proponent of LCM bans or scholarly student of LCM effects, including Allen, has ever denied this assertion. Thus, assertion (1) appears to be widely accepted.

Likewise, to my knowledge, no proponent of LCM bans or scholarly student of LCM effects has ever denied that mass shooters commonly plan their attacks well in advance, and that this planning includes obtaining firearms and ammunition. News accounts of mass shootings routinely describe the perpetrators of mass shootings planning their attacks weeks or months in advance, acquiring guns and magazines that they later use to kill and injure.[25] Assertion (2) is completely consistent with all evidence about mass shootings known to me or included in Allen's report.

Therefore, the association between (a) LCM use and (b) the numbers of rounds fired and victims hurt in mass shootings, is at least partly (and possibly entirely) spurious, attributable to the effects of (c) shooter lethality of intent on

---

[24] *Id.* at 14.

[25] Kleck 2016, *supra* note 8 (collecting examples).

both (a) and (b). If propositions (1) and (2) are correct, the only way to support the claim that the association between (a) and (b) is *not* entirely spurious (and thus is at least partly causal in nature) is to measure and control for (c). Allen has not done this, nor has anyone else, to my knowledge. Thus, Allen has made no affirmative case for the claim that the association between (a) and (b) is even partially causal, or the position that LCM use has any causal effect on the number of casualties in mass shootings.

Allen's implied position that LCM use actually affects the number of casualties would be strengthened if she could cite details of actual mass shootings that indicate that LCMs were necessary for firing many rounds and inflicting many casualties, or that fewer rounds would have been fired and fewer casualties inflicted, had the shooter lacked LCMs. For example, she might have tried to cite substantial numbers of shootings in which the offender used an LCM, but had only one gun and one magazine, since, in such a situation, bystanders would have a better chance of tackling the shooter while he was reloading, and potential victims would have additional time to escape while the shooter was reloading. Allen did not do this, and she could not do it because there are no such known cases. All mass shooters use multiple guns or multiple magazines and therefore could, even if they did not have LCMs, fire many rounds without significant interruption, by either firing additional guns once the first one was emptied or by quickly changing magazines, something that takes generally takes approximately 2-4 seconds.[26]

> 5. *Allen's Estimates of Defensive Gun Use Frequency in California*

Allen tries to estimate the frequency of DGUs in the home in California using a method that will inevitably produce a radical underestimate. For unexplained reasons, she arbitrarily limits her estimates to DGUs (a) that occurred in the victim's home, and (b) in which the victims faced a robber armed with a firearm.[27] Many Californians can lawfully possess firearms in places other than their homes, and therefore use them in self-defense in nonhome locations. Further, there is no sound reason to exclude cases in which crime victims defended against unarmed offenders or those armed with non-gun weapons. Most robbers commit their crimes without using guns, so this arbitrary limitation is another huge source of underestimation of DGU frequency. For example, the 2008 National Crime Victimization Survey (NCVS) indicated that only 23.7% of all robberies were

---

[26] *Id.* at 41.

[27] Allen Report, *supra* note 1, at 16.

committed by offenders with firearms,[28] and even Allen's California data confined to robberies known to the police indicate that only 29.1% of California robberies in 2011-2016 involved offenders with guns.[29] Thus, this flaw alone implies that there were at least 3 times more robbery victimizations in California than Allen's figures suggest and correspondingly larger numbers of robbery-linked DGUs.

Further, Allen wrongly relies on figures that reflect only crimes known to the police in California, ignoring the fact that only about half of robberies are reported to the police.[30] Adjusting for this fact would, all by itself, double Allen's estimates of home robberies in California and thus her estimates of DGUs occurring in connection with those kinds of crimes.

Finally, and most importantly, the source on which Allen relies for the "national rate" at which crime victims use guns for self-defense has been shown to grossly understate DGU frequency, and its estimates have been strongly contradicted by the findings of all other professionally conducted national surveys.[31] At least 16 national surveys, using probability samples of the U.S. adult population and employing professional interviewers, have found that the annual total of DGUs is anywhere from 0.5 million to 3.5 million, depending on the year the survey was conducted and what subset of DGUs was asked about.[32] No survey has ever generated an estimate even remotely close to the supposed estimate of about 0.1 million (100,000) that some have derived from the source on which Allen relies. The true rate of DGU therefore appears to be at least 5-35 times larger than the estimate on which Allen relies, so her estimates of DGU frequency would all have to be multiplied by numbers ranging anywhere from 5 to 35 before they even began to be realistic.

Considering all these enormous sources of underestimation, Allen's estimates of the frequency of DGU in connection with California home robberies cannot be regarded as even remotely accurate, or even of the correct order of

---

[28] U.S. Dep't of Justice, U.S. Bureau of Justice Statistics, *Criminal Victimization in the United States, 2008 Statistical Tables* (2011), tbl. 66, *available at* http://www.bjs.gov/content/pub/pdf/cvus0804.pdf

[29] Cal. Dep't of Justice, *Crime in California 2016*, tbl. 6 (2017).

[30] U.S. Dep't of Justice, U.S. Bureau of Justice Statistics, *Criminal Victimization in the United States, 2005 Statistical Tables* (2006), tbl. 91, *available at* https://www.bjs.gov/content/pub/pdf/cvus05.pdf ("2005 Tables").

[31] Kleck 2001, *supra* note 9, at 213-29.

[32] *Id.* at 214-29.

magnitude. Consequently, her comparisons of the frequency of DGU with other kinds of events are wildly inaccurate, misleading, and meaningless.[33]

**B.   Response to Dr. Klarevas' Expert Report**

*1.   Klarevas's Qualifications*

Among criminologists, and social scientists generally, the "coin of the realm" in assessing scholarly productivity is the number of articles published in refereed journals. Based on his own Curriculum Vitae, Klarevas has never published a single refereed article on firearms and violence generally, or mass shootings specifically, in his life.[34] That is, he has never published anything on the topic that had to pass review by experts in the field. Indeed, his only publication of any kind on the topic is a popular book on mass shootings, *Rampage Nation: Securing America from Mass Shootings* (2016), which offers mostly unsystematic descriptions of mass shootings and *non-sequitur* opinions about how to prevent them.

Klarevas seems to suggest that his scholarship for that book is impressive because he "assembled 50 years of data capturing all known gun massacres in the United States" for 1966-2015.[35] In fact, he is merely riding on the coattails of Dr. Grant Duwe, who gathered data on every mass murder (not just mass shootings) in the United States for the entire 20th century, 1900-1999.[36] All that Klarevas did in his book was to extend Duwe's work to cover the period 2000-2015, and only for a small subset of mass murders. Klarevas is not an expert on this topic.

*2.   Overheated Rhetoric and Exaggerated Claims of the Threat of "Gun Massacres"*

By way of buttressing his opinion that bans on LCMs have the potential to significantly improve the safety of Americans, Klarevas claims that "gun massacres presently pose the deadliest threat to the safety and security of American society,"[37] and that they are "the greatest and most credible threat to the safety and

---

[33] Allen Report, *supra* note 1, at 16-17.

[34] Expert Report of Dr. Louis Klarevas at app'x A, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (Oct. 6, 2017) ("Klarevas Report").

[35] *Id.* at 5.

[36] See Grant Duwe, *Mass Murder in the United States: A History* (2007).

[37] Klarevas Report, *supra* note 34, at 4.

13
Exhibit 3
00052

**ER_3685**

security of American society in the present era."[38] Klarevas does not explain what he means by mass shootings posing a threat to "security" as distinct from a threat to safety, so I cannot judge this portion of his claim. Regarding threats to safety, however, Klarevas's own data contradict his claim.

He documents 113 "gun massacres" (which he defines as incidents involving 6 or more dead), in which 1,009 people were killed, over the period from 1968 through September 2017.[39] This is a period of 49 and ¾ years, so his own figures imply that an average of 20.3 Americans have been killed in "gun massacres" per year (1009/49.75=20.28). To put this number in perspective, 17,250 Americans were killed in criminal homicides of all types in 2016.[40] Thus, only 1/10th of 1% of all murder victims are killed in "gun massacres."

Alternatively, we can state the degree of threat to the safety of Americans by computing the fraction who will be killed in a "gun massacre" in a given year. Since there were about 323,127,513 Americans in 2016, the annual average of 20.3 deaths implies that the probability of an American dying in a "gun massacre" is about 0.000000063, or 0.0063 per 100,000 population—about 1 in 15.9 million. As a point of comparison, defense expert Lucy Allen has calculated that the rate of Americans dying because they were struck by lightning is 0.09 per 100,000 population.[41] Thus, the risk of an American being killed in a "gun massacre" is less than 1/14th of the risk of being killed by a bolt of lightning—itself a freakishly rare event. However horrific individual mass shootings may be, it is absurd to describe their threat to the safety of Americans as "the greatest threat … to the … safety of American society in the present era."[42] This sort of overheated rhetoric is appropriate to propagandists, not to serious scholars.

---

[38] *Id.* at 5.

[39] *Id.* at 6.

[40] U.S. Fed. Bureau of Investigation, Criminal Justice Info. Servs. Div., *Crime in the United States, 2016*, tbl. 1, *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-1 (last visited Nov. 3, 2017) ("FBI").

[41] Allen Report, *supra* note 1, at 16.

[42] Klarevas Report, *supra* note 34, at 5.

### 3.    *The Frequency of LCM Use in Mass Shootings*

Klarevas claims that many mass shootings involve use of LCMs,[43] basing the claim on the information presented in Appendix B, Table 2. It should first be noted how narrow this claim is. Klarevas does not assert that LCMs are often used in violent crime in general, or gun violence in general, or even mass shootings in general. If he had, the claim would clearly have been wrong, since LCMs are rarely used in those sets of incidents.[44] Instead, this claim only pertains to the very narrow subset of mass shootings that Klarevas labels "gun massacres"—those that involve 6 or more dead. Since such incidents, according to Klarevas's own data[45] occur only about 2.27 times per year in the United States, and claim only $1/10^{th}$ of 1% of murder victims, his claim of LCM involvement is not very significant or relevant to the problem of gun violence in general or even the narrower problem of mass shootings.

More concerning is Klarevas's questionable factual foundation for his assertion. I have checked out each of the incidents for which Klarevas claims there was LCM use, and found that at least 1/3 of his claims cannot be supported. For 17 cases out of 50 claimed incidents, I could not find any affirmative evidence that LCMs were used, despite extensive searches involving the following steps. First, I found that each of these 17 questionable cases could not be found in the VPC compilation of LCM-involved mass shootings.[46] VPC is strongly supportive of LCM bans, and their staff is well-motivated to discover as many LCM-involved mass shootings as they can. As explained above, the VPC compilation covers shootings with 3 or more dead, and all of the incidents that Klarevas claims involved LCMs had at least 6 dead, so all of these 17 dubious cases should have shown up in the VPC compilation. Second, I checked the news sources cited for these dubious cases in the GVA compilation of mass shootings (4 or more shot, fatally or nonfatally), which covers the 2013-2017 period, and is the most comprehensive compilation of mass shootings available.[47] None of the news sources cited as sources in the GVA mentioned any use of LCMs in the dubious cases that occurred in 2013-2017. Finally, I used the NewsBank database of print and broadcast news sources to identify additional news sources on the 17 dubious cases. None of them reported LCM use in any of these cases. Klarevas himself

---

[43] *Id.* at 6 & app'x B, tbl. 2.

[44] Kleck 2016, *supra* note 8, at 29.

[45] Klarevas Report, *supra* note 34, at 6.

[46] Violence Policy Center, *supra* note 21.

[47] Gun Violence Archive, *supra* note 18.

**ER_3687**

does not provide, in his expert report, any specific sources to support his claims regarding each of these mass shootings.

The following are the 17 dubious cases I identified, listed by their date of occurrence as shown in Klarevas's Appendix B, Table 2: 12-8-86, 8-9-91, 5-16-93, 7-29-99, 12-20-00, 3-21-05, 3-25-06, 6-21-06, 10-7-07, 2-7-08, 12-24-08, 1-19-10, 7-7-11, 7-9-14, 5-17-15, 10-1-15, and 9-10-17. It is impossible to prove a negative, such as the assertion that no sources exist to support Klarevas's claims, but I can say that I was unable to find, despite extensive efforts, any affirmative evidence of LCM use in these 17 incidents, nor Klarevas does provide any.

To summarize, by including these 17 dubious cases, in addition to 33 genuine cases, Klarevas overstated the number of LCM-involved "gun massacres" by 52%. He covered a period of nearly 50 years, so there was only about 2/3 of an incident of that type per year in the United States. Such incidents are therefore extremely rare by any reasonable standard. Regardless of how horrific these crimes are individually, taken collectively they do not represent a significant threat to the safety of Americans, never mind the "greatest threat."

> 4.    *Klarevas' Beliefs About How LCMs Increase the Harm Done in Mass Shootings*

In his report, Klarevas lays out how he thinks LCM use increases the harm inflicted by "active shooters" (a term he never defines) in "gun massacres."[48] After noting the uncontroversial facts that shooting victims are more likely to die if struck by more bullets, he builds his case on unsubstantiated and inaccurate personal opinions and speculations that are contradicted by known facts about mass shootings.

He appears to believe that there are 4 ways in which LCM use increases the harm inflicted by mass shooters. First, he claims that, when used in a semiautomatic weapon, "an LCM facilitates the ability of a shooter to fire off rounds at an extremely quick rate."[49] It is important to stress that Klarevas is *not* alluding to the fact that LCM use reduces the number of times a mass shooter would have to change magazines if he wanted to hurt many people, since that is a separate claim he makes later, on page 9. He is instead claiming that a semiautomatic gun can fire faster when it has a larger magazine in it than when it has a smaller magazine! He does not describe any mechanical reason for this difference or cite any evidence whatsoever to support this remarkable claim, and for good reason. To my knowledge, there is no such evidence—the claim is simply false. Although semiautomatic firearms in general can fire more rapidly than other

---

[48] Klarevas Report, *supra* note 34, at 7-11.

[49] *Id.* at 7.

types of firearms, the use of a larger magazine in a semiautomatic firearm does not add to its rate of fire. The state of California does not ban all semiautomatic guns, so would-be mass shooters in the future will still be able to use such guns in their crimes. And the current case concerns the ban on LCMs. Thus, Klarevas's claim is totally irrelevant to the current case as well as factually inaccurate.

Klarevas appears to have misunderstood the arguments of better-informed advocates of LCM bans as to why LCM use might enable mass shooters to fire more rounds in a given period of time. Defense expert Christopher Koper correctly notes that "[l]arge-capacity magazines allow semiautomatic weapons to fire more than 10 rounds without the need for a shooter to reload the weapon."[50] Likewise, a spokesperson for VPC, which advocates for LCM bans, explained that "[h]igh-capacity ammunition magazines facilitate mass shootings by giving attackers the ability to fire numerous rounds without reloading."[51] *This* claim is accurate, though of less significance than LCM advocates believe.[52] It is not, however, the claim that Klarevas was making on page 7. The latter claim is plainly false.

Second, Klarevas asserts that "LCMs also facilitate the ability of a shooter to strike a human target with more than one round."[53] While he accurately notes that victims who suffer multiple gunshot wounds are more likely to die than those who suffer a single wound, Klarevas never explains why or how LCM use would increase a shooter's ability to inflict multiple wounds in the first place. LCM use does not increase the shooter's accuracy, nor does Klarevas claim it does. Indeed, if it increased the shooter's rate of fire, as Klarevas argues, it would *reduce* accuracy because shooters would have less time to align their gun's barrel with a given victim. Likewise, LCM use is irrelevant to how many rounds a would-be mass shooter could bring to the scene of the crime and thus how many total rounds he could fire. Three unbanned 10-round magazines and one banned 30-round magazine both contain 30 cartridges and thus allow the exact same total number of shots to be fired. So, use of LCMs cannot increase the number of victims shot multiple times by increasing the total number of cartridges available to the shooter, any more than it improves shooting accuracy.

---

[50] Koper Report, *supra* 22, at 4.

[51] Press Release, Violence Policy Center, *High-Capacity Ammunition Magazines: The Common Thread That Runs Through Mass Shootings* (Jan. 11, 2011), *available at* http://www.vpc.org/press/press-release-archive/high-capacity-ammunition-magazines-the-common-thread-that-runs-through-mass-shootings/.

[52] Kleck 2016, *supra* note 8, at 42-44.

[53] Klarevas Report, *supra* note 34, at 7.

**ER_3689**

Third, Klarevas argues that "if gunmen run out of bullets (sic), there is a lull in the shooting. This previous down-time affords those in the line of fire with a chance to flee, hide, or fight back."[54] Klarevas addresses the issue of victims fighting back as a separate point,[55] so here I will only discuss the claim regarding increased time to flee or hide. Klarevas misunderstands the relevant issue regarding pauses in shooting. Mass shooters always pause their shooting at some point during their crimes, regardless of whether the pauses are related to the sizes of their magazines, and thus some prospective victims always have times when they could flee or hide. This fact does not change if shooters use different size magazines. Thus, the relevant question is whether shooters who were denied LCMs and who instead substituted magazines of a capacity allowed under LCM law, such as a 10-round capacity, would provide *additional time* for victims to flee or hide, due to the additional magazine changes necessitated by the more limited capacity of each magazine.

Nothing Klarevas that presents bears on this issue at all. He does not even appear to understand the issue, given that he thinks it is somehow supportive of his argument to merely cite mass shootings in which victims flee or take cover.[56] For example, he asserts (based on third- or fourth-hand information[57]) that children in the Sandy Hook school shooting escaped while the shooter was changing magazines. Even if this claim were true, Klarevas says nothing to indicate that the magazine change in question provided any *additional time* for victims to escape beyond the time that elapsed between shots when the shooter was *not* firing.

This distinction is crucial because the best available information indicates that mass shooters generally fire their weapons slowly and deliberately, with substantial intervals between shots. Shooters can easily change detachable magazines in approximately 2-4 seconds depending on the experience of the shooter, but mass shooters nearly all take more than that amount of time between shots anyway, whether changing magazines or not.[58] Thus, if an LCM ban forced at least a few mass shooters to use smaller magazines and change them more times during their crime, the magazine changes would not add any *additional time* for

---

[54] *Id.* at 9.

[55] *Id.* at 10-11.

[56] *Id.* at 9-10.

[57] *See* Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 280 (2016).

[58] Kleck 2016, *supra* note 8, at 42-44.

prospective victims to flee or hide. None of the mass shootings that Klarevas cites contradict this conclusion or even provide relevant information.

Finally, Klarevas repeats a commonly expressed rationale for LCM bans, asserting that "in recent history there have been numerous instances of active shooters being physically confronted by unarmed civilians while reloading, bringing their gun attacks to an abrupt end."[59] The purportedly supporting incidents he cites, however, indicate that once again he misunderstands the relevant issues. Klarevas cites cases in which victims disarmed shooters who were *not* using semiautomatic firearms of the type that can accept LCMs.[60] He also cites them as "just a sampling of examples,"[61] as if he knows of many more supportive cases he could cite if he wanted to. This is highly unlikely considering how unsupportive the 7 cases he cites are of his claims.

Firearms that are *not* semiautomatic take longer to reload than those that are semiautomatic, so the time during which bystanders could tackle the shooter while reloading is considerably longer with non-semiautomatic firearms that must be reloaded one round at a time than it is with semiautomatic guns equipped with detachable magazines. The California LCM ban does not eliminate guns that are semiautomatic in loading mechanism, nor does it ban guns with the ability to accept detachable magazines; it only restricts the capacity of magazines. Thus, cases of bystanders tackling shooters with firearms of a type other than semiautomatic guns that can accept detachable magazines are totally irrelevant to an assessment of the likely effects of the LCM ban.

Klarevas's examples of civilians tackling mass shooters while they were reloading are all, without exception, irrelevant to his claims, mischaracterized by Klarevas, or both. It is therefore worth considering each one to illustrate exactly how he padded out his list of supposedly supportive incidents. I list the 7 shootings in the same order as shown in Klarevas's table on page 11, by date:

12-7-93. The shooter in this incident was in a sense "reloading" when he was tackled by bystanders, but he was not switching one loaded magazine for an emptied one. He had exhausted both of his loaded 15-round magazines, and no bystander tried to tackle him during his exchange of the second 15-round magazine for the first one. Instead, he was finally tackled only when he was trying to reload one round at a time into one of the emptied magazines. Thus, bystander intervention was possible because the shooter brought only 2 loaded magazines, not because he was changing magazines. California law does nothing to cause such

---

[59] Klarevas Report, *supra* note 34, at 10.

[60] *Id.* at 10-11.

[61] *Id.* at 10.

criminals to bring only one or two magazines to a crime scene. Thus, this case does not support a claim that the California ban on LCMs would be likely to increase the frequency of opportunities for bystanders to tackle mass shooters and prematurely end their shooting.

10-30-94. This incident was not a mass shooting—not a single person was shot—and there is no evidence that the shooter was even trying to shoot anyone. The person was firing at a building—the White House. There is no evidence he intended to carry out a mass shooting or even the shooting of a single person.

5-22-98. The shooter in this incident was *not* reloading when he was tackled. Klarevas appears to have uncritically accepted the claims of LCM ban advocates that this was what happened. Instead, the young man who tackled the shooter was shot in the hand while he lunged at the offender—indisputable proof that the shooter was still firing and in possession of a loaded gun, rather than reloading when tackled.[62]

7-7-09. This incident was not a mass shooting, but in any case, the shooter was *not* stopped because bystanders tackled him while he was reloading. He was tackled by bystanders when *his gun jammed*, which is something that can happen regardless of the size of the magazine with which the gun is equipped.

1-22-10. This incident was not a mass shooting either, nor is there any evidence that the offender was intending to commit one.

1-9-11.  This is the incident most widely cited to support Klarevas's claim— the shooting in Tucson, AZ, in which Representative Gabrielle Giffords was wounded—but even this incident does not clearly support that claim. While some bystanders asserted that the shooter was reloading when he was tackled, later police inspection of the magazine the shooter was using at the time revealed that it was defective. Its spring had broken, and the shooter could not have used it to shoot bystanders who tried to tackle him.[63] If the shooter actually stopped firing because he was struggling with a broken magazine, rather than because he was reloading, the incident does not support Klarevas's argument that LCM bans can save lives because they force shooters to change magazines more often, and thereby afford bystanders the opportunity to tackle the shooter. Any magazine, regardless of its capacity, can fail to function because of a defect, thereby facilitating bystander interventions, so limits on magazine capacity are irrelevant to

---

[62] Kleck 2016, *supra* note 8, at 39.

[63] Adam Nagourney, *A Single, Terrifying Moment: Shots, Scuffle, Some Luck*, N.Y. Times A1, Jan. 10, 2011, *available at* http://www.nytimes.com/2011/01/10/us/10reconstruct.html.

how often opportunities for bystander intervention due to magazine failure will occur.[64]

6-6-14. The shooter in this incident was tackled by a bystander while the shooter was reloading a *shotgun*. There was no evidence in Klarevas's source or any news source known to me that the gun was semiautomatic, and certainly none that that shotgun could accept the types of magazines banned by California's LCM ban.

In sum, *none* of Klarevas's cited incidents support his claim that there are "numerous instances" of unarmed civilians stopping mass shooters while they were reloading. Even if all 7 had been supportive, however, 7 cases occurring over the 50-year period studied by Klarevas would be feeble support for a claim that these sorts of interventions are frequent by any reasonable standard. Instead, they appear to be virtually nonexistent.

### 5.   Klaveras' Claims About the Impact of LCM Restrictions

K claims that LCM restriction "result in" fewer gun massacres.[65] This wording is ambiguous as to actual causation, but clearly suggests that restricting magazine capacity *causes* the reduction of the number of "gun massacres." I will respond as if that is he what he was indeed asserting.

Klarevas's support for this claim is the fact that the existence of state LCM bans is *associated with* fewer "gun massacres" and fewer fatalities per incident.[66] He takes a lot of pages to make this simple point, but all he establishes is that this bivariate association exists. Among serious scholars, establishing a statistical association is only the *beginning* of an effort to assess whether one factor has a causal effect on another—not the entirety of the effort.

Klarevas does nothing to assess whether this association is spurious, i.e. non-causal. He does not test whether there is some third factor that affects both the frequency of gun violence and the enactment of stricter gun laws. For example, the degree to which people support or oppose aggressive behavior varies across individual persons, and so is likely to vary across populations, such as the populations of states. State populations that are, on average, more strongly opposed to violence are obviously less likely to engage in criminal gun violence, including the shooting of multiple victims. This is a virtual tautology—almost true by definition. On the other hand, one would also expect state populations who were

---

[64] Kleck 2016, *supra* note 8, at 39-40.

[65] Klarevas Report, *supra* note 34, at 11.

[66] *Id.* at 11-16.

more strongly anti-violence to be more supportive of anti-violence policies, such as stricter gun control laws. In short, the average anti-violence sentiment of a state's population will both increase the likelihood of the state enacting LCM bans, and reduce the incidence of mass shootings—*even if LCM bans have no effect of their own on mass shootings.*

This would produce a spurious association between LCM bans and the rate of mass shooting incidents. To assess whether there is any actual causal effect of LCM bans on mass shootings would require measuring and controlling for (among other factors) the average anti-violence sentiment prevailing in state populations. Klarevas does not do this. He does not control for *any* confounding factors that might generate this sort of spurious association. Consequently, he has no basis for concluding that the association reflects even the slightest causal effect of LCM bans on the harm attributable to mass shootings.

Based on Klarevas's rather sketchy description of his methods, I do not think he even checked whether the incidence of "gun massacres" in any given state decreased after the state implemented LCM bans. Nothing in Appendix B, tables 3 and 4, or in the text on pages 15-16 of Klarevas's report, indicates such comparisons were made. Instead, Klarevas appears to have merely compared states having LCM bans with states that did not. Consequently, as far as Klarevas demonstrates, all the LCM ban states with low rates of mass shooting may have *already* had few mass shootings even *before* the bans went into effect. If so, one can hardly credit the lower incidence of mass shootings to the LCM bans, since causation cannot run backwards—LCM bans passed at a later point in time obviously cannot affect the incidence of mass shootings in any earlier period. Klarevas's failure to even do so simple an analysis as a crude before-and-after comparison of mass-shooting rates is a testament to both his limited knowledge of research methods and his inability to recognize just how weak his evidence really was.

## C.    Response to Dr. Christopher Koper's Expert Report

Professor Koper's overall conclusion about the California ban on LCMs is so weakly phrased as to be virtually meaningless. He says that the law "has the potential" to produce various public safety benefits.[67] Any law, no matter how ill-conceived, has some hypothetical "potential" to produce some benefits, even laws that will actually produce no benefits at all. All that is required to say that a law has potential to produce harms is that one be able to imagine scenarios in which benefit might be produced. Thus, based solely on what Koper explicitly states, even he, California's own expert, is not willing to go so far as to explicitly assert that the law is likely to *actually* reduce any harms of gun violence.

---

[67] Koper Report, *supra* note 22, at 2.

If, however, we interpret his remarks as merely an ultra-cautious way of saying that he thinks the California law is actually like to produce the various benefits he lists, the following remarks apply.

### 1. Koper Never Provides a Relevant Rationale for Why or How the California LCM Ban Would Produce the Benefits He Claims the Law Might Yield

Koper claims that the California ban on LCMs "has the potential" to reduce the number of shots fired in gun attacks, reduce the number of gunshot victims in gun crimes, reduce the number of wounds per gunshot victim, and reduce the lethality of gunshot injuries when they do occur.[68] He does not deny that offenders could substitute other, unbanned magazines for those banned, so he necessarily must believe that even if criminals substitute other magazines (such as magazines holding 10 rounds) for the types of magazines banned by the California LCM ban, the law would still somehow reduce the number of shots fired, number of victims shot, number of victims killed, and so on. He does not, however, provide a logical rationale for *why* such effects should occur. The California law does not prohibit all semi-automatic firearms, or even just all semi-automatic firearms capable of accepting detachable (and potentially large-capacity) magazines. Nor does it ban all detachable magazines that can be quickly switched when a shooter empties a magazine—magazines holding as many as 10 rounds remain legally available. Likewise, nothing in the California law prevents a would-be mass murderer from accumulating hundreds of rounds of ammunition. So why, in this light, would a ban on magazines holding more than 10 rounds produce any of the benefits that Koper forecasts? He does not say.

Other advocates of LCM bans, however, *have* said why they think LCM bans would prevent harm, focusing their arguments almost entirely on mass shootings. They assert that an LCM ban would reduce the casualty count in mass shootings because it would force at least some prospective mass shooters to use smaller capacity magazines, which would in turn force them to change their magazines sooner and more often. This would, they argue, have two benefits. First, it would allow bystanders to tackle the shooter while he was reloading and therefore less dangerous to intervenors, and to do so earlier in the incident. Second, the extra magazine changes would slow the shooter's rate of fire, providing additional time for potential victims to escape, beyond the time they would otherwise have to do so if the shooter changed magazines less often.[69]

It is perhaps understandable why Koper did not discuss these possible mechanisms by which LCM bans could reduce the casualty count in mass

---

[68] *Id.* at 3-4.

[69] Kleck 2016, *supra* note 8, at 31.

shootings. Given the way mass shootings actually transpire in America, neither mechanism is plausible. First, there was only one mass shooting in the entire United States in the 20-year period from 1994 to 2013 in which bystanders *might* have tackled the shooter while he was reloading (the shooting in which Representative Giffords, discussed above, was shot), and even that unique intervention may have occurred when the shooter was struggling with a defective magazine rather than when he was reloading.[70] Second, all mass shooters in this period either used multiple guns or multiple magazines (usually both), which means that they would not have needed to significantly pause their shooting for magazine changes, even if they possessed only magazines holding 10 or fewer rounds. They could either (a) continue to fire with additional guns once the first one was emptied or (b) pause only the 2-4 seconds needed to change detachable magazines of the type left unbanned. Third, mass shooters maintain fairly slow rates of fire, usually averaging more than 4 seconds between shots even when not reloading. Thus, a pause of 2-4 seconds to change magazines would not slow the shooter's rate of fire or provide additional time available for victims to escape.[71] Koper does not refute or even address these facts, nor does he offer any alternative mechanisms by which the California ban on LCMs would prevent harm.

> 2. *Just Like Those of Defense Expert Lucy Allen, Koper's Claims About the Share of Mass Shootings that Involve LCMs Rely on Sources Known to be Unreliable*

Although Koper does not explain why LCM use would affect mass shootings, he nevertheless claims that LCMs are often used in public mass shootings.[72] His primary support is a propaganda report published by *Mother Jones* magazine, which advocates bans on LCMs.[73] That report purportedly showed that an astounding 86% (31 of 36) of public mass shootings involved an LCM.[74] Koper does not explain why one should only focus on events that occurred in public places, or how the magazine's staff selected their tiny sample of 36 cases. Again, one could, easily make the LCM share as large as one liked simply by limiting the sample studied to cases already known to involve LCMs, and excluding cases that did not. Therefore, the *Mother Jones* findings on which Koper relies can be trusted

---

[70] *Id.* at 40.

[71] *Id.* at 42-44.

[72] Koper Report, *supra* note 22, at 5, 7.

[73] *Id.* at 7.

[74] Mother Jones, *supra* note 16.

only to the extent that the sample of 36 cases was representative of all mass shootings, or at least all those occurring in public places.

The reality is that less than 7% of all mass shootings with 3 or more dead—as distinct from the tiny subset analyzed in the *Mother Jones* study—are known to involve LCMs. The most comprehensive listing of all mass shootings that is currently available is at the GVA website, which relies on news media sources for accounts of mass shootings. For the 3 complete years for which the website has complete coverage, 2014-2016, the compilers identified 136 incidents with 3 or more people killed. For the same period, VPC identified just 9 incidents with three or more victims killed in which a shooter was known to have used a magazine with a capacity exceeding ten rounds. Thus, less than 7% (9/136=0.066) of mass murders in the United States in 2014-2016 were known to have involved use of an LCM. The study by VPC was not limited to mass shootings that occurred in public, but covered all shootings with 3 or more fatalities regardless of their location, yet still uncovered just 9 mass shootings the involved LCMs in 2014-2016—about 3 per year. To the extent that even the GVA compilation is incomplete, and the total number of mass murders still larger than their figures indicate, this LCM share would be still smaller. In sum, the 9 LCM-involved incidents in 2014-2016 claim just 6.6% of the GVA-documented mass shootings with 3 or more fatalities in that period—a far cry from the 86% share claimed by MJ and uncritically cited by Koper.

One could speculate that LCM involvement in some mass shootings was not mentioned in any news story and thus went unnoticed by *Mother Jones* and VPC staff, but this seems unlikely in light of the intense political and news media interest in LCMs. In any case, I am not aware of any evidence that such cases are common enough to materially affect estimates of the prevalence of LCM use in mass shootings. For the *Mother Jones* estimate on which Koper relies to be even remotely accurate, *Mother Jones* and VPC staffers would have had to have missed huge numbers of LCM-involved mass shootings. Recall that the GVA database identifies, for 2014-2016, 136 mass shootings with 3 or more dead—the cut-off used by *Mother Jones* and VPC staffers to define a mass shooting. If the *Mother Jones* estimate of the share of mass shootings involving LCMs (86%) really was valid and applied to all mass shootings with 3 or more fatalities, there should have been *117* LCM-involved mass shootings (86% of 136) discovered by researchers for the 2014-2016 period. Yet the *Mother Jones* staff managed to discover just *6* public mass shootings with 3 or more victims killed that involved LCMs in 2014-2016, and VPC staff discovered only 9 for all locations. If these were indeed the only LCM-involved mass shootings with 3 or more fatalities that could be uncovered by *Mother Jones* and VPC methods, this would mean that those methods captured only about 5% of LCM-involved incidents. The *Mother Jones* and VPC staff were either astoundingly incompetent and their methods extremely ineffective in discovering LCM-involved mass shootings or, more likely, the 86% LCM share estimated in the *Mother Jones* study is simply far too high, and there were actually far fewer than 117 LCM-involved mass shootings to be discovered.

Why, then, did the *Mother Jones* study yield such an extraordinarily high estimate of LCM involvement? As Koper notes, the *Mother Jones* study covered only incidents *where magazine capacity could be determined*.[75] Unfortunately, most news outlets may feel that magazine capacity is a detail worth reporting in their stories only if it is large. If so, the *Mother Jones* estimate of the LCM share reflects nothing more than the degree to which news outlets regard LCM use as newsworthy, but tells us nothing about the actual prevalence of LCM use in all mass shootings. Koper also notes that if cases "where magazine capacity could not be determined" are included, then half of cases were known to have involved LCMs.[76] This observation, however, is meaningless if the *Mother Jones* sample itself excluded almost all the non-LCM cases in the first place. If news stories about shootings that did not involve LCMs made no mention of ammunition capacity, these would be treated by Koper as merely cases "where magazine capacity could not be determined"—not as the non-LCM shootings they actually were. Very likely, LCM use *is* common in shootings *for which news reporters thought that ammunition capacity was worth mentioning*, but this tells us nothing about how prevalent LCM use is in all mass shootings.

> 3. *Koper's Claim that Assault Weapons Are Disproportionately Used for Criminal Purposes Is Both Irrelevant and Unsupported*

Koper asserts that "assault weapons" (AWs) are disproportionately used to commit crimes, relative to their share of the total gun stock in the general population. This entire section of Koper's expert report is irrelevant to this case, which deals with LCMs, not AWs. Whether AWs are disproportionately used in crime has no bearing on whether a statewide ban on LCMs is likely to impact public safety. In any event, the claim is unsupported.

To support his claim, Koper necessarily must establish the share of the civilian gun stock that are AWs. He does not. He claims that prior to the federal AW ban, there were "approximately 1.5 million privately owned assault weapons in the United States" (p. 15, lines 8-10), citing for support two of his reports on the impact of the federal AW ban. His citation of two supporting sources is somewhat misleading since the first study does not contain any relevant information that was not included in the second one. The more serious problem is that neither study provides any credible support. One must follow a very long chain of indirect citations to finally track down the ultimate basis for his claim. The cited 2004 Koper report relied on two sources, but both of those sources relied in turn on the same two sources: two newspaper articles, one in the *Atlanta Journal Constitution*

---

[75] Koper Report, *supra* note 22, at 7.

[76] *Id.* at 7-8.

and one appearing in the Cox Newspaper chain.[77] Both articles in turn relied on the same single source of information: an undocumented "estimate" of the AW share by an unnamed informant in the Bureau of Alcohol, Tobacco and Firearms (ATF).[78]

Neither newspaper article explained how this ATF source came up with this estimate, why ATF should be regarded as a source of authoritative information on this topic, or why readers should regard the estimate as anything more than a guess or personal opinion. ATF does gather data on firearms manufactured in the United States, imported from other nations, and exported to other nations, but their data do not provide counts of specific gun models or even counts that distinguish semiautomatic rifles or shotguns from other kinds of rifles or shotguns. Further, these ATF data do not indicate how many guns of any kind, handguns or long guns, have the "military-style" features used to define some AWs. Thus, there are no ATF data that would allow the unnamed ATF informant to produce an evidence-based estimate of the number of AWs in the general civilian population. As far as Koper knows, his 1.5 million "estimate" was nothing more than a wild speculation by an ATF employee pressed by a reporter to toss out a guess on the spur of the moment.

In sum, Koper does not have any idea what the AW share of the general gun stock is, and therefore no basis at all for judging whether the AW share of crime guns is even slightly higher than the AW share of the entire civilian stock of firearms.

### 4. Do Criminals "Prefer" Assault Weapons and LCMs?

Koper nevertheless claims that criminals in some sense "prefer" AWs as crime weapons and that AWs and LCMs "are more attractive to criminals than lawful users."[79] His sole support for this claim is his own 2004 report.[80] Close examination of his cited pages, however, quickly reveals that absolutely nothing there supports a claim that criminals favor AWs or LCMs more than non-criminals, or that even pertains to the issue. Thus, Koper's claim of empirical support is baseless.

---

[77] Christopher S. Koper, et al., Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources, J. Urb. Health 10, Oct. 2, 2017 ("Koper 2017").

[78] Steward, *supra* note 77; Am. Med. Ass'n, *supra* note 77.

[79] Koper Report, *supra* note 22, at 7.

[80] *Id.* at 7 (citing Koper 2017, *supra* note 77, at 17-18).

**ER_3699**

Leaving aside Koper's dubious citation to an irrelevant source, what does genuinely relevant evidence reveal? One useful way to approach this issue is to ask: when criminals have access to AWs, do they choose to actually use them to commit crimes? A survey of a representative national sample of state prison inmates provided information on both (a) the guns that criminals *owned* in the month before the arrest that lead to their imprisonment, and (b) the guns they actually *used* in their crimes. Of those who owned a handgun of any kind in the preceding month, 71% were armed with a handgun when they committed the crime that got them sent to prison. This is consistent with the uncontroversial claim that criminals prefer to use handguns. However, of those who possessed a "military-type" gun, only 16.7% were armed with such a gun when they committed their crimes.[81] Thus, compared to their availability, AWs were *under*represented among these felons' crime guns—some possessed them, but few used them in crime. These results were confirmed with respect to "assault rifles" in particular by surveys of inmates in Virginia prisons in 1992-93, which revealed that although 20% of the offenders had previously possessed "assault rifles," *none* had carried or fired one at their latest crime.[82] Thus, criminals not only do not "prefer" to use military-style guns to commit crimes, they are strongly *dis*inclined to do so, even if they possess one. In sum, under any meaningful interpretation of "preference," criminals do not prefer to use assault weapons.

"Assault rifles" are clearly much larger than the handguns criminals really do favor, and even "assault weapon" handguns such as Uzis are generally larger than other handguns. Since criminals say they favor more concealable handguns (Wright and Rossi 1986, p. 163), this may largely explain why so few criminals prefer to use assault weapons to commit crimes.

   5.   *What Koper's Evaluation of the Federal Assault Weapon Ban Actually Found*

Koper's summary[83] of his findings on the impact of the federal AW/LCM ban[84] is highly selective and misleading. Here are the major conclusions that he drew in his 2004 report, but omitted from his current expert report:

---

[81] Computed from U.S. Dep't of Justice, U.S. Bureau of Justice Statistics, *Survey of State Prison Inmates, 1991* at 18-19, 33 (U.S. Gov't Printing Office 1993).

[82] Commonwealth of Va., Criminal Justice Research Ctr., Dep't of Criminal Justice Servs., *Guns and Violent Crime* 63, Jan. 1994.

[83] Koper Report, *supra* note 22, at 14-19.

[84] Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and*

28

Exhibit 3

00067

1. "There has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs."[85]

2. "There has not been a clear decline in the use of ARs [assault rifles] in crime following implementation of the ban."[86]

3. "The ban has not yet reduced the use of LCMs in crime."[87]

4. "We cannot clearly credit the ban with any of the nation's recent drop in gun violence."[88]

5. If the ban were renewed, its "effects on gun violence are likely to be small at best and perhaps too small for reliable measurement."[89]

Conclusions 1, 4, and 5 would seem to be far more important conclusions than any of those stated in Koper's expert report, since they pertain to the ultimate goals of the federal ban—to reduce gun violence and make it less deadly. In his expert report, Koper chooses to instead stress minor intermediate goals that have no value in and of themselves if they do not lead to reductions in gun violence, such as increases in AW prices,[90] but completely censors out of his current summary of his findings the fact that he did not detect any effect of the ban on gun violence itself. He also gives undue emphasis to what he had accurately labeled in his 2004 report as "speculation"[91] about what *might* have occurred had the federal

_____

*Gun Violence, 1994-2003* (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf ("Koper 2004").

[85] *Id.* at 96.

[86] *Id.* at 2.

[87] *Id.*

[88] *Id.*

[89] *Id.* at 3.

[90] Koper Report, *supra* note 22, at 15.

[91] Koper 2004, *supra* note 84, at 98.

ban been renewed after its 2004 expiration, at the expense of the aforementioned evidence-based findings.[92]

Koper states that "criminal use of assault weapons declined after the federal assault weapons ban was enacted,"[93] but this statement is less meaningful than an unwary reader might think. In this context, Koper was defining "assault weapons" narrowly as those specific guns banned by the federal law. He does not claim that there was any decline in criminal use of firearms having the properties that supposedly made AWs especially dangerous or useful for criminal purposes, such as lethality, higher rates of fire, or the ability to accept detachable (potentially large) magazines. Critics of the federal ban did not claim the ban would fail to reduce use of the specific banned guns; rather, they argued that criminals would just substitute other, non-banned gun types with the same crime-relevant properties that the banned guns possessed. And this is precisely what happened, as Koper himself acknowledged in his 2004 report: "Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs."[94]

Koper nevertheless claims in his expert report that even if we consider substitution of "post-ban assault-type models" (a vague term he does not define), criminal use of AWs declined.[95] Even though the federal AW ban applied to the entire nation, Koper has no national data to sustain this claim. He only cites evidence from his 2004 report that was drawn from police files in six non-randomly selected local jurisdictions, which provide no formal basis for generalizing the results to the United States, as a whole. In any case, these findings are essentially beside the point since they do not indicate any decline in criminal use of guns with the aforementioned crime-relevant properties, but rather only declines in use of a narrowly defined subset of specific gun types, those that were banned by the federal law. Merely taking account of certain specific "post-ban assault-type models" did not allow Koper to determine whether criminals were substituting unbanned guns with equally high rates of fire, equal lethality, and equal ability to accept detachable magazines.

Since Koper does not document even the slightest decline in criminal use of guns with these crime-related properties, his assertion that the federal AW ban reduced criminal use of "assault weapons" as he narrowly defined them is irrelevant to the law's impact on either the volume of gun crime or its deadliness.

---

[92] *See especially* Koper Report, *supra* note 22, at 19-20.

[93] *Id.* at 16.

[94] Koper 2004, *supra* note 84, at 96.

[95] Koper Report, *supra* note 22, at 49-50.

30
Exhibit 3
00069

**ER_3702**

In particular, his claim that "almost 2,900 murders, robberies, and assaults *with assault weapons* were prevented in 2002" by the AW ban is especially trivial and potentially misleading.[96] Who cares if the ban reduced use of banned guns if criminals just substituted equally dangerous unbanned guns?

6.       *Koper Does Not Establish that the Assault Weapon Ban Caused Fewer Criminals to Use LCMs*

Koper also somehow infers that the AW ban reduced criminal "use" of LCMs despite his complete lack of information on criminals *using* LCMs to commit violent crimes. When describing research on the topic, he uses slippery terms like "LCM firearms,"[97] "crimes with LCMs,"[98] and "crime guns equipped with LCMs,"[99] but he never cites any evidence directly bearing on criminal *use* of LCMs in crimes. He never shows that crimes with more than 10 rounds fired declined after the AW ban was implemented, or increased after it expired. As far as he can show, trends in criminal use of "guns equipped with LCMs" were inconsequential regarding numbers of people killed or injured with guns because criminals virtually never make use of larger magazine capacities by firing more rounds than they could fire with magazines of the capacity left unbanned. Indeed, this is precisely what Koper's own research published in scholarly journals indicates. Reedy and Koper found that less than 2% of gun crimes reported to the police involved over 10 rounds being fired.[100] Since crime victims are less likely to report less serious crimes to the police, if one included gun crimes not reported to the police in the computation, this percentage would be lower still. Despite its obvious relevance, Koper does not mention this 2003 finding in his current expert report.

It may well be true that a larger share of guns used by criminals were "equipped with" LCMs after the federal AW ban expired, as Koper claims,[101] but nothing in Koper's supposedly supportive evidence shows even a slight increase in criminals firing more than 10 rounds during their crimes. The Virginia study he

---

[96] *Id.* at 17 (emphasis added).

[97] *Id.* at 21.

[98] *Id.* at 18.

[99] Id.

[100] Reedy & Koper, *supra* note 6, at 154.

[101] Koper Report, *supra* note 22, at 18.

cites[102] at best only pertains to trends in LCM *possession* among criminals before, during, and after the period when the ban was in place, not to trends in LCM *use* in crimes. And even trends in LCM possession cannot be reliably inferred from the Virginia police data unless one is willing to assume that the inclination of Virginia police to note the ammunition capacity of recovered crime guns in their reports was constant over time, unaffected by whether officers believed that the "LCM problem" had been to some extent "solved" by the federal ban on LCMs.

The data Koper cites from his own 2017 study is likewise irrelevant to whether criminal *use* of LCMs is frequent or increasing, since, like the Virginia study, it only bears (at best) on criminal *possession* of LCMs.[103] He discusses evidence supposedly relevant to levels or trends in criminal *use* of LCMs, but a close reading of the 2017 research report reveals that his data actually only pertained to whether recovered crime guns happened to be equipped with LCMs or, worse yet, only whether the guns were "LCM compatible."

As to the increasing criminal *possession* of guns with LCMs,[104] nothing in Koper's evidence establishes that this is any more characteristic of criminals than of non-criminals. As far as he can establish, increased criminal possession of guns with magazine capacities exceeding 10 rounds reflects nothing more than the trends prevailing in the general U.S. population as a whole. Semiautomatic guns have become more popular in the general population in recent decades, and it is common for such guns to come equipped with 15-round magazines or similarly sized magazines that would be prohibited by LCM bans. Criminals often get their guns by stealing them from non-criminals,[105] so whatever trends in gun preference that occur among non-criminals are likely to be reflected in the guns acquired by criminals as well, even if criminals have no special preference for using LCMs in their crimes.

---

[102] *Id.* at 18, 25 (citing David S. Fallis & James V. Grimaldi, *Va. Date Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post (Jan. 23, 2011), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html ("Virginia Study")).

[103] Koper Report, *supra* note 22 (citing Koper 2017, *supra* note 77).

[104] *Id.* at 22.

[105] James D. Wright & Peter Rossi, *Armed and Considered Dangerous: A Survey of Felons and Their Firearms* (1986); Gary Kleck & Shun-Yung Wang, *The Myth of Big-Time Gun Trafficking and the Overinterpretation of Gun Tracing Data*, 56 UCLA L. Rev. 1233, 1233-1294 (2009).

7.   *Koper Does Nothing to Rule Out the Possibility that the Associations He Reported Were Completely Spurious (Non-Causal)*

Koper makes much of the crude bivariate associations between AW/LCM use and the seriousness of gun violence incidents, as measured by numbers of wounded victims, number of wounds per victim, number of fatalities, and the like (pp. 3-4, 8-9). His interpretation of the relevant evidence in his reports on the federal AW/LCM ban, however, ignores the central methodological difficulty of assessing the impact of AWs and LCMs on the outcomes of shootings. He only established that AW and/or LCM use are *associated with* more rounds fired, more victims per incident (e.g., p. 9), i.e. he reports simple two-variable statistical *associations*, but he does not establish whether these associations reflect an actual *causal effect* of AW/LCM use on numbers of shots fired and persons hurt, as opposed to spurious, *non*-causal associations. As even the least experienced researchers know, "correlation is not causation." More specifically, these associations may merely reflect the common impact of the shooter's lethality of intentions on both (1) the outcomes of shootings, and (2) the weapons and magazines that shooters choose to use in their crimes.

I know of no one, including Koper, who questions that shooters who want to shoot and kill more people are, on average, more likely to actually do so. That is, although the correlation is not perfect, the stronger the person's intention to hurt many victims, the more victims they will hurt. Further, given the extensive planning that goes into the more serious mass shootings, one would expect that these same intentions to shoot more victims would also cause the shooter to prepare to do so by selecting weaponry and magazines that they believed (correctly or not) were better suited to this task. As gun control scholar Philip Cook observed long ago, "the assailant's choice of weapon is a good indicator of his intent in assault offenses."[106] I also know of no one, including Koper, who denies that criminals planning to hurt many people are more likely to choose weapons and magazines that they believe will be suited to doing so.

These propositions imply, in short, that the lethality of a shooter's intentions has a positive causal effect on both (a) use of AWs and LCMs, and (b) the number of victims hurt in shootings. This means that lethality of intent will create a spurious (non-causal) positive association between (a) use of AWs or LCMs and (b) the number of victims killed or injured—*even if the use of AWs or LCMs had no causal effect of its own on any of these outcomes*. Unless an analyst statistically controls for lethality of intent, he will fail to detect the spurious character of the association between (a) and (b), and will erroneously conclude, as Koper apparently did, that the association instead reflected an actual causal effect of (a)

---

[106] Phillip J. Cook, *The Role of Firearms in Violent Crime*, in *Criminal Violence* 248 (Marvin E. Wolfgang & Neil Alan Weiner, eds. 1982).

on (b). Koper never controlled for lethality of the shooter's intent, and thus did nothing to rule out the possibility that the association between (a) and (b) is entirely spurious. Indeed, to my knowledge, Koper has not even acknowledged this issue at a theoretical or conceptual level; certainly, he does address it in his expert report. Of course, if AW/LCM has no actual causal effect on crime outcomes, restricting AWs or LCMs will not cause a reduction in gun violence or its seriousness.

As previously noted, Koper failed to describe any plausible causal mechanisms by which LCMs would cause mass shooters to fire more total rounds, inflict more wounds per victim, or kill or injure more victims per incidents. In this light, his failure to rule out the likely spurious character of this LCM/harms correlations is especially damaging. As far as Koper or his readers can tell, LCM use has no causal effect at all on any of the measures of harm in mass shootings that Koper discusses, and the associations he reports are purely the result of more lethal offender intentions increasing both harms inflicted and the use of LCMs.

This same critical shortcoming applies with equal force to the unpublished study by Koper's graduate student cited on page 9 and Koper's 2017 study summarized on pages 20-22. Nothing was done in either study to establish that any of the LCM/harm associations reflected a causal effect of LCM use rather being totally spurious associations.

It is worth noting that Koper never explicitly states that LCMs *cause* more harm in gun crimes, such as causing more people to be killed or wounded. Instead, he consistently uses ambiguous words and phrases such "crimes committed with these weapons are *likely to result in* more injuries, and more lethal injuries, than crimes committed with other firearms"[107] or "attacks with ... guns equipped with LCMs *tend to result in*" more harm.[108] The unwary reader is almost certainly likely to interpret a phrase like "result in" as implying causation, but scholars make a sharp distinction between causal effects and spurious associations. The result of attacks by offenders with LCMs may well have, on average, more harmful *results* than attacks without LCMs, but this by itself does not establish that LCM use caused those results. Koper's use of this slippery terminology in this way allows him to strongly hint to readers a conclusion that his research methods cannot back up.

---

[107] Koper Report, *supra* note 22, at 3.

[108] *Id.* at 8.

## VI.   REFERENCES

Adam Nagourney, *A Single, Terrifying Moment: Shots, Scuffle, Some Luck*, N.Y.
    Times A1, Jan. 10, 2011, *available at* http://www.nytimes.com/2011/
    01/10/us/10reconstruct.html.

Am. Med. Ass'n Council on Scientific Affairs, *Assault Weapons as a Public Health
    Hazard in the United States*, 267 JAMA 3067-3070 (1992).

Cal. Dep't of Justice, *Crime in California 2016*, tbl. 6 (2017).

Christopher S. Koper, *America's Experience with the Federal Assault Weapons
    Ban, 1994-2004*, in *Reducing Gun Violence in America* 157-171 (Daniel W.
    Webster and Jon S. Vernick, eds. 2013).

Christopher S. Koper, Daniel J. Woods & Jeffrey A. Roth, *An Updated Assessment
    of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun
    Violence, 1994-2003* (2004), *available at*
    https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

Christopher S. Koper, et al., *Criminal Use of Assault Weapons and High-Capacity
    Semiautomatic Firearms: An Updated Examination of Local and National
    Sources*, J. Urb. Health, Oct. 2, 2017.

Commonwealth of Va., Criminal Justice Research Ctr., Dep't of Criminal Justice
    Servs., *Guns and Violent Crime*, Jan. 1994.

David S. Fallis & James V. Grimaldi, *Va. Date Show Drop in Criminal Firepower
    During Assault Gun Ban*, Wash. Post (Jan. 23, 2011), *available at*
    http://www.washingtonpost. com/wp-dyn/content/article/2011/01/22/AR
    2011012203452.html

D.C. Reedy & Christopher S. Koper, *Impact of Handgun Types on Gun Assault
    Outcomes*, 9 Injury Prevention 151-155 (2003).

Expert Report of Dr. Christopher S. Koper, *Duncan v. Becerra*, No. 3:17-cv-
    01017-BEN-JLB (Oct. 6, 2017).

Expert Report of Dr. Louis Klarevas, *Duncan v. Becerra*, No. 3:17-cv-01017-
    BEN-JLB (Oct. 6, 2017).

Expert Report of Dr. Lucy P. Allen, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-
    JLB (Oct. 6, 2017).

Gary Kleck, *Chapter 6: The Frequency of Defensive Gun Use: Evidence and
    Disinformation*, in Gary Kleck & Don B. Kates, *Armed: New Perspectives in*

35
Exhibit 3
00074

**ER_3707**

*Gun Control* 213-284 (2001).

Gary Kleck, *The Effect of Large-Capacity Magazines on the Casualty Count of Mass Shootings: The Plausibility of Linkages*, 17 Just. Res. & Pol'y 28-47 (2016).

Gary Kleck & Shun-Yung Wang, *The Myth of Big-Time Gun Trafficking and the Overinterpretation of Gun* Tracing Data, 56 UCLA L. Rev. 1233, 1233-1294 (2009).

Grant Duwe, *Mass Murder in the United States: A History* (2007).

Gun Violence Archive, *Gun Violence Archive 2017*, http://www.gunviolencearchive.org (last visited Nov. 3, 2017).

James D. Wright & Peter Rossi, *Armed and Considered Dangerous: A Survey of Felons and Their Firearms* (1986).

James D. Steward & Andrew Alexander, *Firepower: Assault Weapons in America* 1 (Cox Newspapers 1989).

Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

Mark Follman, Gavin Aronsen & Deanna Pan, *US Mass Shootings, 1982-2017: Data from Mother Jones' Investigation*, Mother Jones, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ (last updated Oct. 18, 2017).

Phillip J. Cook, *The Role of Firearms in Violent Crime*, in *Criminal Violence* 236-91, (Marvin E. Wolfgang & Neil Alan Weiner, eds. 1982).

Press Release, Violence Policy Center, *High-Capacity Ammunition Magazines: The Common Thread That Runs Through Mass Shootings* (Jan. 11, 2011), *available at* http://www.vpc.org/press/press-release-archive/high-capacity-ammunition-magazines-the-common-thread-that-runs-through-mass-shootings/.

U.S. Dep't of Justice, U.S. Bureau of Justice Statistics, *Survey of State Prison Inmates, 1991* (U.S. Gov't Printing Office 1993).

U.S. Dep't of Justice, U.S. Bureau of Justice Statistics, *Criminal Victimization in the United States, 2005 Statistical Tables* (2006), tbl. 91, *available at* https://www.bjs.gov/content/pub/pdf/cvus05.pdf.

U.S. Dep't of Justice, U.S. Bureau of Justice Statistics, *Criminal Victimization in the United States, 2008 Statistical Tables* (2011), tbl. 66, *available at*

https://www.bjs.gov/content/pub/pdf/cvus0804.pdf.

U.S. Fed. Bureau of Investigation, Criminal Justice Info. Servs. Div., *Crime in the United States, 2016*, tbl. 1, *available at* https://ucr.fbi.gov/crime-in-the-u.s/2016/crime-in-the-u.s.-2016/topic-pages/tables/table-1 (last visited Nov. 3, 2017).

Violence Policy Center, *High-Capacity Ammunition Magazines Are the Common Thread Running Through Most Mass Shootings in the United States* (July 1, 2017), *available at* http://gunviolence.issuelab.com/resource/high-capacity-ammunition-magazines-are-the-common-thread-running-through-most-mass-shootings-in-the-united-states.html.

## VIII.   ATTACHMENTS

Attached at Exhibit 1 and made a part of this report is a copy of my curriculum vitae, including a list of all my published works from the last ten years.

Dated: November 3, 2017

Dr. Gary Kleck
The Florida State University
314B Eppes Hall
112 S. Copeland Street
Tallahassee, FL 32302
850-894-1628
gkleck@fsu.edu

37
Exhibit 3
00076

# EXHIBIT 1

Exhibit 3
00077

CURRICULUM VITAE

GARY KLECK

(Updated October 5, 2017)

PERSONAL

Place of Birth:          Lombard, Illinois

Date of Birth:           March 2, 1951

Address:                 College of Criminology and Criminal Justice
                         The Florida State University
                         314B Eppes Hall
                         112 S. Copeland Street
                         Tallahassee, FL 32306-1273

                         Tallahassee, Florida 32306-1127

Telephone Number:        Home: (850) 894-1628

e-mail Address:          gkleck@fsu.edu

CURRENT POSITION

David J. Bordua Emeritus Professor of Criminology, Florida State University

COURTESY APPOINTMENT

Courtesy Professor, College of Law, Florida State University

PROFESSIONAL MEMBERSHIPS

American Society of Criminology

Academy of Criminal Justice Sciences

EDUCATION

A.B.        1973 - University of Illinois, with High Honors and with Distinction in
            Sociology

A.M.        1975 - University of Illinois at Urbana, in Sociology

Ph.D.       1979 - University of Illinois at Urbana, in Sociology

ACADEMIC HONORS

National Merit Scholar, 1969

Freshman James Scholar, University of Illinois, 1969

Graduated from University of Illinois with High Honors and with Distinction in
Sociology, 1973

University of Illinois Foundation Fellowship in Sociology, 1975-76

1993 Winner of the Michael J. Hindelang Award of the American Society of
Criminology, for the book that made "the most outstanding contribution to
criminology"  (for Point Blank: Guns and Violence in America).

Awarded Named Professorship, Florida State University, 2012.

Nominated for University Teaching Award, Florida State University, 2014.

TEACHING POSITIONS

| | |
|---|---|
| Fall, 1991 to May 2016 | Professor, College of Criminology and Criminal Justice, Florida State University |
| Fall, 1984 to Spring, 1991 | Associate Professor, School of Criminology, Florida State University. |
| Fall, 1979 to Spring, 1984 | Assistant Professor, School of  Criminology, Florida State University. |
| Fall, 1978 to Spring, 1979 | Instructor, School of Criminology, Florida State University. |

COURSES TAUGHT

Criminology, Applied Statistics, Regression, Introduction to Research Methods, Law
Enforcement, Research Methods in Criminology, Guns and Violence, Violence Theory
Seminar, Crime Control, Assessing Evidence, Survey Research, Research Design and
Causal Inference.

DISSERTATION

Homicide, Capital Punishment, and Gun Ownership:  An Aggregate Analysis of U.S.
Homicide Trends from 1947 to 1976.  Department of Sociology, University of

Illinois, Urbana.  1979.

PUBLICATIONS (sole author unless otherwise noted)

BOOKS

1991,  Point Blank: Guns and Violence in America.  Hawthorne, N.Y.: Aldine de
2005   Gruyter.  Winner of the 1993 Michael J. Hindelang award of the American
       Society of Criminology.  Republished in 2005 in paperback by Transaction
       Publishers.

       Reviewed in Contemporary Sociology, American Journal of Sociology,
       Social Forces, Journal of Criminal Law and Criminology, The
       Criminologist, The Public Interest, Criminal Law Forum, Social
       Science Review, Criminal Justice Abstracts, Crime, Criminal Justice and
       Law Enforcement, Newsletter of Public Policy Currents, Commonweal,
       Choice, and others.

1997   Targeting Guns: Firearms and their Control. Hawthorne, N.Y.: Aldine de Gruyter.

1997   The Great American Gun Debate: Essays on Firearms and Violence (with Don B.
       Kates, Jr.).  San Francisco: Pacific Research Institute for Public Policy.

2001   (with Don B. Kates) Armed: New Perspectives on Gun Control.  N.Y.:
       Prometheus Books.

       Selected to Choice: Current Reviews for Academic Libraries' 39th annual
       "Outstanding Academic Title List," awarded for "excellence in scholarship and
       presentation, the significance of their contribution to their field, and their value as
       an important treatment of their topic."  Awarded to less than one percent of
       books.

2017   (with Brion Sever) Punishment and Crime: The Limits of Punitive Crime Control.
       NY: Routledge.

RESEARCH MONOGRAPH

       1979   Bordua, David J., Alan J. Lizotte, and Gary Kleck. Patterns of Firearms
       Ownership, Use and Regulation in Illinois.  A Report to the Illinois Law Enforce-
       ment Commission, Springfield, Illinois.

ARTICLES IN PEER-REVIEWED JOURNALS

1979   "Capital punishment, gun ownership, and homicide." American Journal of
       Sociology 84(4):882-910.

3
Exhibit 3
00080

Exhibit 1

**ER_3713**

1981   "Racial discrimination in criminal sentencing: A critical evaluation of the evidence with additional evidence on the death penalty." <u>American Sociological Review</u> 46(6):783-804.

1982   "On the use of self-report data to determine the class distribution of criminal behavior." <u>American Sociological Review</u> 47(3):427-33.

1983   (with David Bordua) "The factual foundation for certain key assumptions of gun control." <u>Law and Policy Quarterly</u> 5(3):271-298.

1985   "Life support for ailing hypotheses: modes of summarizing the evidence on racial discrimination in criminal sentencing." <u>Law and Human Behavior</u> 9(3):271-285.

1986   "Evidence that 'Saturday Night Specials' not very important for crime." <u>Sociology and Social Research</u> 70(4):303-307.

1987   "American's foreign wars and the legitimation of domestic violence." <u>Sociological Inquiry</u> 57(3):237-250.

1988   "Crime control through the private use of armed force." <u>Social Problems</u> 35(1):1-21.

1988   "Miscounting suicides." <u>Suicide and Life-Threatening Behavior</u> 18(3):219-236.

1990   (with Susan Sayles) "Rape and resistance." <u>Social Problems</u> 37(2):149-162.

1991   (with Karen McElrath) "The effects of weaponry on human violence." <u>Social Forces</u> 69(3):669-92.

1993   (with Miriam DeLone) "Victim resistance and offender weapon effects in robbery." <u>Journal of Quantitative Criminology</u> 9(1):55-82.

1993   (with E. Britt Patterson) "The impact of gun control and gun ownership levels on violence rates." <u>Journal of Quantitative Criminology</u> 9(3):249-287.

1993   "Bad data and the 'Evil Empire': interpreting poll data on gun control." <u>Violence and Victims</u> 8(4):367-376.

1995   "Guns and violence: an interpretive review of the field." <u>Social Pathology</u> 1(1):12-47.

1995   "Using speculation to meet evidence." <u>Journal of Quantitative Criminology</u> 11(4):411-424.

1995   (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-

4
Exhibit 3
00081

Exhibit 1

defense with a gun." Journal of Criminal Law & Criminology 86(1):150-187.

1996 "Crime, culture conflict and sources of support for gun control: a multi-level application of the General Social Surveys." American Behavioral Scientist 39(4):387-404.

1996 (with Chester Britt III and David J. Bordua) "A reassessment of the D.C. gun law: some cautionary notes on the use of interrupted time series designs for policy impact assessment." Law & Society Review 30(2):361-380.

1996 (with Chester Britt III and David J. Bordua) "Avoidance and misunderstanding." Law & Society Review 30(2):393-397.

1997 (with Marc Gertz) "The illegitimacy of one-sided speculation: getting the defensive gun use estimate down." Journal of Criminal Law and Criminology 87(4):1446-1461.

1997 (with Tomislav Kovandzic and Marc Gertz) "Defensive gun use: vengeful vigilante imagery vs. reality: results from the National Self-Defense Survey." Journal of Criminal Justice 26(3):251-258.

1998 (with Marc Gertz) "Carrying guns for protection: results from the National Self-Defense Survey." Journal of Research in Crime and Delinquency 35(2):193-224.

1998 "What are the risks and benefits of keeping a gun in the home?" Journal of the American Medical Association 280(5):473-475.

1998 (with Charles Crawford and Ted Chiricos) "Race, racial threat, and sentencing of habitual offenders." Criminology 36(3):481-511.

1999 (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Social Problems 46(2):275-293.

1999 "BATF gun trace data and the role of organized gun trafficking in supplying guns to criminals." St. Louis University Public Law Review 18(1):23-45.

2001 "Can owning a gun really triple the owner's chances of being murdered?" Homicide Studies 5:64-77.

2002 (with Theodore Chiricos) "Unemployment and property crime: a target-specific assessment of opportunity and motivation as mediating factors." Criminology 40(3):649-680.

2004 "Measures of gun ownership levels for macro-level crime and violence research." Journal of Research in Crime and Delinquency 41(1):3-36.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the
        outcomes of crimes." Criminology 42(4):861-909.

2005    (with Brion Sever, Spencer Li, and Marc Gertz) "The missing link in general
        deterrence research." Criminology 43(3):623-660.

2006    (with Jongyeon Tark and Jon J. Bellows) "What methods are most frequently
        used in research in criminology and criminal justice?" Journal of Criminal Justice
        34(2):147-152.

2007    "Are police officers more likely to kill African-American suspects?"
        Psychological Reports 100(1):31-34.

2007    (with Shun-Yung Wang and Jongyeon Tark) "Article productivity among the
        faculty of criminology and criminal justice doctoral programs, 2000-2005."
        Journal of Criminal Justice Education 18(3):385-405.

2008    (with Jongyeon Tark, Laura Bedard, and Dominique Roe-Sepowitz) "Crime
        victimization and divorce." International Review of Victimology 15(1):1-17.

2009    "The worst possible case for gun control: mass shootings in schools."
        American Behavioral Scientist 52(10):1447-1464.

2009    (with Shun-Yung Wang) "The myth of big-time gun trafficking and the
        overinterpretation of gun tracing data." UCLA Law Review 56(5):1233-1294.

2009    (with Tomislav Kovandzic) "City-level characteristics and individual handgun
        ownership: effects of collective security and homicide." Journal of Contemporary
        Criminal Justice 25(1):45-66.

2009    (with Marc Gertz and Jason Bratton) "Why do people support gun control?"
        Journal of Criminal Justice 37(5):496-504.

2011    (with James C. Barnes) "Article productivity among the faculty of criminology
        and criminal justice doctoral programs, 2005-2009." Journal of Criminal Justice
        Education 22(1):43-66.

2011    (with Tomislav Kovandzic, Mark Saber, and Will Hauser). "The effect of
        perceived risk and victimization on plans to purchase a gun for self-protection."
        Journal of Criminal Justice 39(4):312-319.

2013    (with Will Hauser) "Guns and fear: a one-way street?" Crime and Delinquency
        59:271-291.

2013    "Gun control after Heller and McDonald: what cannot be done and what ought to
        be done." Fordham Urban Law Journal 39(5):1383-1420.

2013   (with J. C. Barnes)  "Deterrence and macro-level perceptions of punishment risks: is there a "collective wisdom?"  Crime and Delinquency 59(7):1006-1035.

2013   (with Tomislav Kovandzic and Mark Schaffer) "Estimating the causal effect of gun prevalence on homicide rates: A local average treatment effect approach." Journal of Quantitative Criminology 28(4):477-541.

2014   (with Jongyeon Tark) "Resisting rape: the effects of victim self-protection on rape completion and injury." Violence Against Women 23(3): 270-292.

2014   (with J. C. Barnes) "Do more police generate more crime deterrence?" Crime and Delinquency 60(5):716-738.

2015   "The impact of gun ownership rates on crime rates:  a methodological review of the evidence." Journal of  Criminal Justice 43(1):40-48.

2016   (with Tom Kovandzic and Jon Bellows)  "Does gun control reduce violent crime?  Criminal Justice Review 41:488-513.

2016   "Objective risks and individual perceptions of those risks." Criminology & Public Policy 15:767-775.

2016   (with Dylan Jackson)  "What kind of joblessness affects crime?  A national case-control study of serious property crime."  Journal of Quantitative Criminology 32:489-513.

2016   "Large-capacity magazines and the casualty counts in mass shootings: the plausibility of linkages." Justice Research and Policy 17:28-47.

2016   (with Will Hauser)  "Confidence in the police and fear of crime: do police force size and productivity matter?" American Journal of Criminal Justice 42:86-111.

2016   (with Dylan Jackson)  "Does crime cause punitiveness?"  Crime & Delinquency. Published online 3-27-16.

2017   (with Bethany Mims)  "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Journal of Criminal Justice Education 28(4):467-487.

2017   (with Moonki Hong) "The short-term deterrent effect of executions: An analysis of daily homicide counts."  Forthcoming in Crime & Delinquency.

OTHER PUBLISHED ARTICLES

1985   "Policy lessons from recent gun control research." Law and Contemporary

Problems 49(1):35-62.

1992   "Assault weapons aren't the problem."  New York Times September 1, 1992, p.
       A15.  Invited Op-Ed page article.

1993   "The incidence of violence among young people." The Public Perspective 4:3-6.
        Invited article.

1994   "Guns and self-protection."  Journal of the Medical Association of Georgia 83:42.
       Invited editorial.

1998   "Using speculation to meet evidence: reply to Alba and Messner."  Journal on
       Firearms and Public Policy 9:13-49.

1998   "Has the gun deterrence hypothesis been discredited?"  Journal on Firearms and
       Public Policy 10:65-75.

1999   "There are no lessons to be learned from Littleton."  Criminal Justice Ethics
       18(1):2, 61-63.  Invited commentary.

1999   "Risks and benefits of gun ownership - reply."  Journal of the American Medical
       Association 282(2):136-136.

1999   "The misfire that wounded Colt's."  New York Times October 23, 1999.  Invited
       Op-Ed page article.

1999   "Degrading scientific standards to get the defensive gun use estimate down."
       Journal on Firearms and Public Policy 11:77-137.

2000   "Guns aren't ready to be smart."  New York Times March 11, 2000.  Invited Op-
       Ed page article.

2000   (with Chester Britt III and David J. Bordua) "The emperor has no clothes: using
       interrupted time series designs to evaluate social policy impact."  Journal on
       Firearms and Public Policy 12:197-247.

2001   "School lesson: armed self-defense works."  Wall Street Journal March 27, 2001.
       Invited opinion article.

2001    "Impossible policy evaluations and impossible conclusions: a comment on Koper
        and Roth."  Journal of Quantitative Criminology 17:75-80.

2001   "Absolutist politics in a moderate package: prohibitionist intentions of the gun
       control movement."  Journal on Firearms and Public Policy 13:1-43.

2002   "Research agenda on guns, violence, and gun control."  Journal on Firearms and

8
Exhibit 3                                                          Exhibit 1
00085

**ER_3718**

Public Policy 14:51-72.

2006   "Off target." New York Sun January 5, 2006.  Invited opinion article.

2009   "How not to study the effect of gun levels on violence rates."  Journal on Firearms and Public Policy 21:65-93.

2011   "Mass killings aren't the real gun problem --- how to tailor gun-control measures to common crimes, not aberrant catastrophes."  Wall Street Journal January 15, 2011.  Invited opinion article.

2011   "The myth of big-time gun trafficking."  Wall Street Journal May 21, 2011. Invited opinion article.

2015   "Defensive gun ownership is not a myth: why my critics still have it wrong." Politico Magazine, February 17, 2015.  Online at Politico.Com.

2016   "The impact on crime of state laws allowing concealed weapon carrying among 18-20 year-olds."  To appear in the Journal on Firearms and Public Policy.

2018   "Guns and suicide."  Handbook on Gun Studies.  Edited by Jennifer Carlson, Kristin Goss, and Harel Shapira. NY: Routledge.  In press.

2018   "Gun Control."  The Handbook of Social Control, edited by Matthew Deflem. NY: Wiley.  In press.

## BOOK CHAPTERS

1984   (with David Bordua)  "The assumptions of gun control."  Pp. 23-48 in Don B. Kates, Jr. (ed.) Firearms and Violence: Issues of Regulation. Cambridge, Mass.: Ballinger.

       (Also appeared in Federal Regulation of Firearms, report prepared by the Congressional Research Service, Library of Congress, for the Committee on the Judiciary, United States Senate, 1982).

1984   "The relationship between gun ownership levels and rates of violence in the U.S." Pp. 99-135 in Kates, above.

1984   "Handgun-only gun control: a policy disaster in the making."  Pp. 167-199 in Kates, above.

1996   "Racial discrimination in criminal sentencing."  Pp. 339-344 in Crime and Society, Volume III – Readings: Criminal Justice, edited by George Bridges, Robert D. Crutchfield, and Joseph G. Weis.  Thousand Oaks, Calif.: Pine

Forge Press.

1996    "Gun buy-back programs: nothing succeeds like failure."  Pp. 29-53 in
         Under Fire: Gun Buy-Backs, Exchanges and Amnesty Programs, edited by
         Martha R. Plotkin.  Washington, D.C.: Police Executive Research Forum.

2000    "Firearms and crime."  Pp. 230-234 in the Encyclopedia of Criminology and
         Deviant Behavior, edited by Clifton D. Bryant.  Philadelphia: Taylor
         & Francis, Inc.

2001    (with Leroy Gould and Marc Gertz) "Crime as social interaction."  Pp. 101-114 in
         What is Crime?: Controversy over the Nature of Crime and What to Do About It,
         edited by Stuart Henry and Mark M. Lanier.  Lanham, Md.: Rowman and
         Littlefield.

2003    "Constricted rationality and the limits of general deterrence."  Chapter 13 in
         Punishment and Social Control: Enlarged Second Edition, edited by Thomas G.
         Blomberg.  New York: Aldine de Gruyter.

2004    "The great American gun debate: what research has to say."  Pp. 470-487 in The
         Criminal Justice System: Politics and Policies, 9th edition, edited by George F.
         Cole, Marc Gertz, and Amy Bunger.  Belmont, CA: Wadsworth-Thomson.

2008    "Gun control." Article in The Encyclopedia of Social Problems, edited by
         Vincent N. Parrillo. Thousand Oaks, CA: Sage.

2009    "Guns and crime." Invited chapter.  Pp. 85-92 in 21st Century Criminology: A
         Reference Handbook, edited by J. Mitchell Miller. Thousand Oaks, CA: Sage.

2012    Kovandzic, Tomislav, Mark E. Schaffer, and Gary Kleck. "Gun prevalence,
         homicide rates and causality: A GMM approach to endogeneity bias."  Chapter
         6, pp. 76-92 in The Sage Handbook of Criminological Research Methods, edited
         by David Gadd, Susanne Karstedt, and  Steven F. Messner.  Thousand Oaks, CA:
         Sage.

2012    (with Kelly Roberts) "What survey modes are most effective in eliciting
         self-reports of criminal or delinquent behavior?"  Pp. 415-439 in Handbook of
         Survey Methodology, edited by Lior Gideon.  NY: Springer.

2013    "An overview of gun control policy in the United States."  Pp. 562-579 in The
         Criminal Justice System, 10th edition, Edited by George F. Cole and Marc G.
         Gertz. Wadsworth.

2014    "Deterrence: actual vs. perceived risk of punishment.  Article in Encyclopedia of
         Criminology and Criminal Justice. Berlin: Springer Verlag.

2018    "Gun control."  Chapter in The Handbook of Social Control.  New York: Springer.  Forthcoming.

2018    "Guns and suicide."  Chapter in Handbook of Gun Studies.  NY: Routledge. Forthcoming.

BOOK REVIEWS

1978    Review of Murder in Space City: A Cultural Analysis of Houston Homicide Patterns, by Henry Lundsgaarde.  Contemporary Sociology 7:291-293.

1984    Review of Under the Gun, by James Wright et al. Contemporary Sociology 13:294-296.

1984    Review of Social Control, ed. by Jack Gibbs.  Social Forces 63: 579-581.

1985    Review of Armed and Considered Dangerous, by James Wright and Peter Rossi, Social Forces 66:1139-1140.

1988    Review of The Citizen's Guide to Gun Control, by Franklin Zimring and Gordon Hawkins, Contemporary Sociology 17:363-364.

1989    Review of Sociological Justice, by Donald Black, Contemporary Sociology 19:261-3.

1991    Review of Equal Justice and the Death Penalty, by David C. Baldus, George G. Woodworth, and Charles A. Pulaski, Jr.  Contemporary Sociology 20:598-9.

1999    Review of Crime is Not the Problem, by Franklin E. Zimring and Gordon Hawkins.  American Journal of Sociology 104(5):1543-1544.

2001    Review of Gun Violence: the Real Costs, by Philip  J. Cook and Jens Ludwig. Criminal Law Bulletin 37(5):544-547.

2010    Review of  Homicide and Gun Control: The Brady Handgun Violence Prevention Act and Homicide Rates, by J. D. Monroe. Criminal Justice Review 35(1):118-120.

LETTERS PUBLISHED IN SCHOLARLY JOURNALS

1987    "Accidental firearm fatalities."  American Journal of Public Health 77:513.

1992    "Suicide in the home in relation to gun ownership." The New England Journal of Medicine 327:1878.

1993    "Gun ownership and crime."  Canadian Medical Association Journal 149:1773-

11
Exhibit 3
00088

Exhibit 1

1774.

1999   "Risks and benefits of gun ownership."  Journal of the American Medical Association 282:136.

2000   (with Thomas Marvell) "Impact of the Brady Act on homicide and suicide rates." Journal of the American Medical Association 284:2718-2719.

2001   "Violence, drugs, guns (and Switzerland)."  Scientific American 284(2):12.

2002   "Doubts about undercounts of gun accident deaths." Injury Prevention Online (September 19, 2002). Published online at http://ip.bmjjournals.com/cgi/eletters /8/3/252.

2005   "Firearms, violence, and self-protection."  Science 309:1674. September 9, 2005.

UNPUBLISHED REPORT

1987   Violence, Fear, and Guns at Florida State University: A Report to the President's Committee on Student Safety and Welfare. Reports results of campus crime victimization survey and review of campus police statistics on gun violence (32 pages).

RESEARCH FUNDING

1994   "The Impact of Drug Enforcement on Urban Drug Use Levels and Crime Rates." $9,500 awarded by the U.S. Sentencing Commission.

1997   "Testing a Fundamental Assumption of Deterrence-Based Crime Control Policy." $80,590 awarded by the Charles E. Culpeper Foundation to study the link between actual and perceived punishment levels.

PRESENTED PAPERS

1976   "Firearms, homicide, and the death penalty:  a simultaneous equations analysis." Presented at the annual meetings of the Illinois Sociological Association, Chicago.

1979   "The assumptions of gun control."  Presented at the Annual Meetings of the American Sociological Association, New York City.

1980   "Handgun-only gun control:  A policy disaster in the making."  Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1981   "Life support for ailing hypotheses:  Modes of summarizing the evidence on racial

discrimination."  Presented at the Annual Meetings of the American Society of Criminology, Toronto.

1984    "Policy lessons from recent gun control research."  Presented at the Duke University Law School Conference on Gun Control.

1985    "Policy lessons from recent gun control research." Presented at the Annual Meetings of the American Society of Criminology, San Diego.

1986    "Miscounting suicides."  Presented at the Annual Meetings of the American Sociological Association, Chicago.

1987    (with Theodore G. Chiricos, Michael Hays, and Laura Myers) "Unemployment and crime: a comparison of motivation and opportunity effects."  Annual meetings of the American Society of Criminology, Montreal.

1988    "Suicide, guns and gun control."  Presented at the Annual Meetings of the Popular Culture Association, New Orleans.

1988    (with Susan Sayles)  "Rape and resistance."  Presented at the Annual Meetings of the American Society of Criminology, Chicago, Ill.

1989    (with Karen McElrath)  "The impact of weaponry on human violence." Presented at the Annual Meetings of the American Sociological Association, San Francisco.

1989    (with Britt Patterson)  "The impact of gun control and gun ownership levels on city violence rates."  Presented at the Annual Meetings of the American Society of Criminology, Reno.

1990    "Guns and violence: a summary of the field."  Presented at the Annual Meetings of the American Political Science Association, Washington, D.C.

1991    "Interrupted time series designs: time for a re-evaluation."  Presented at the Annual Meetings of the American Society of Criminology, New Orleans.

1993    (with Chester Britt III and David J. Bordua) "The emperor has no clothes: Using interrupted time series designs to evaluate social policy impact." Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1992    "Crime, culture conflict and support for gun laws: a multi-level application of the General Social Surveys."  Presented at the Annual Meetings of the American Society of Criminology, Phoenix.

1994    (with Marc Gertz) "Armed resistance to crime: the prevalence and nature of self-defense with a gun."    Presented at the Annual Meetings of the American Society

Exhibit 1

of Criminology, Miami.

1995 (with Tom Jordan) "The impact of drug enforcement and penalty levels on urban drug use levels and crime rates." Presented at the Annual Meetings of the American Society of Criminology, Boston.

1996 (with Michael Hogan) "A national case-control study of homicide offending and gun ownership." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

1997 "Evaluating the Brady Act and increasing the utility of BATF tracing data." Presented at the annual meetings of the Homicide Research Working Group, Shepherdstown, West Virginia.

1997 "Crime, collective security, and gun ownership: a multi-level application of the General Social Surveys." Presented at the Annual Meetings of the American Society of Criminology, San Diego.

1998 (with Brion Sever and Marc Gertz) "Testing a fundamental assumption of deterrence-based crime control policy." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1998 "Measuring macro-level gun ownership levels." Presented at the Annual Meetings of the American Society of Criminology, Washington, D.C.

1999 "Can owning a gun really triple the owner's chances of being murdered?" Presented at the Annual Meetings of the American Society of Criminology, Toronto.

2000 "Absolutist politics in a moderate package: prohibitionist intentions of the gun control movement." Presented at the Annual Meetings of the American Society of Criminology, San Francisco.

2001 (with Tomislav V. Kovandzic) "The impact of gun laws and gun levels on crime rates." Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001 "Measures of gun ownership levels for macro-level violence research." Presented at the Annual Meetings of the American Society of Criminology, Atlanta.

2001 "The effects of gun ownership levels and gun control laws on urban crime rates." Presented at the Annual Meetings of the American Society of Criminology, Chicago.

2003 (with Tomislav V. Kovandzic) "The effect of gun levels on violence rates depends on who has them." Presented at the Annual Meetings of the American Society of

Criminology, Denver.

2003    (with KyuBeom Choi) "Filling in the gap in the causal link of deterrence."
        Presented at the Annual Meetings of the American Society of
        Criminology, Denver.

2004    (with Tomislav Kovandzic) "Do violent crime rates and police strength levels in
        the community influence whether individuals own guns?"  Presented at the
        Annual Meetings of the American Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "Resisting crime: the effects of victim action on the
        outcomes of crime."  Presented at the Annual Meetings of the American
        Society of Criminology, Nashville.

2004    (with Jongyeon Tark) "The impact of self-protection on rape completion and
        injury."  Presented at the Annual Meetings of the American Society of
        Criminology, Nashville.

2004    (with Kyubeom Choi) "The perceptual gap phenomenon and deterrence as
        psychological coercion." Presented at the Annual Meetings of the American
        Society of Criminology, Nashville.

2005    (with Jongyeon Tark) "Who resists crime?" Presented at the Annual Meetings of
        the American Society of Criminology, Toronto.

2005    (with Jongyeon Tark and Laura Bedard) "Crime and marriage."  Presented at the
        Annual Meetings of the American Society of Criminology, Toronto.

2006    (with Shun-Yang Kevin Wang)"Organized gun trafficking, 'crime guns,' and
        crime rates."  Presented at the Annual Meetings of the American Society of
        Criminology, Los Angeles.

2006    "Are police officers more likely to kill black suspects?"  Presented at the Annual
        Meetings of the American Society of Criminology, Los Angeles.

2007    (with Shun-Yang Kevin Wang) "The myth of big-time gun trafficking. "Presented
        at the Annual Meetings of the American Society of Criminology, Atlanta.

2007    (with Marc Gertz and Jason Bratton)  "Why do people support gun control?"
        Presented at the Annual Meetings of the American Society of Criminology,
        Atlanta.

2008    (with J.C. Barnes)  "Deterrence and macro-level perceptions of punishment
        risks: Is there a "collective wisdom?"  Presented at the Annual Meetings of the
        American Society of Criminology,  St. Louis.

2009    "The myth of big-time gun trafficking."  Presented at <u>UCLA Law Review</u> Symposium, "The Second Amendment and the Right to Bear Arms After DC v. Heller."  January 23, 2009, Los Angeles.

2009    (with Shun-Yung Wang) "Employment and crime and delinquency of working youth: A longitudinal study of youth employment."  Presented at the Annual Meetings of the American Society of Criminology, November 6, 2009, Philadelphia, PA.

2009    (with J. C. Barnes)  "Do more police generate more deterrence?"  Presented at the Annual Meetings of the American Society of Criminology, November 4, 2009, Philadelphia, PA.

2010    (with J. C. Barnes) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2005-2009."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    (with Will Hauser) "Fear of crime and gun ownership."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2010, San Francisco, CA.

2010    "Errors in survey estimates of defensive gun use frequency: results from national Internet survey experiments."  Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2010    (with Mark Faber and Tomislav Kovandzic)  "Perceived risk, criminal victimization, and prospective gun ownership."  Presented at the annual Meetings of the American Society of Criminology, November 19, 2010, San Francisco, CA.

2011    (with Shun-young Wang) "The impact of job quality and career commitment on delinquency: conditional or universal?"  Presented at the annual Meetings of the American Society of Criminology, November 17, 2011.

2011    (with Moonki Hong) "The short-term deterrent effect of executions on homicides in the United States, 1984-1998."  Presented at the annual Meetings of the American Society of Criminology, November 16, 2011.

2011    (with Kelly Roberts)  "Which survey modes are most effective in getting people to admit illegal behaviors?"  Presented at the annual Meetings of the American Society of Criminology, November 17, 2011.

2011    (with Will Hauser)  "Pick on someone your own size: do health, fitness, and size influence victim selection?" Presented at the annual Meetings of the American Society of Criminology, November 18, 2011.

2011   (with Tomislav Kovandzic) "Is the macro-level crime/punishment association spurious?"  Presented at the annual Meetings of the American Society of Criminology, November 18, 2011.

2012   (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual Meetings of the American Society of Criminology, November 15, 2012.

2013   (with Will Hauser) "Confidence in the Police and Fear of Crime: Do Police Force Size and Productivity Matter?"  Presented at the annual Meetings of the American Society of Criminology, November 22, 2013.

2013.   (with Dylan Jackson) "Adult unemployment and serious property crime: a national case-control study."  Presented at the annual Meetings of the American Society of Criminology, November 22, 2013.

2014   (with Dylan Jackson) "Does Crime Cause Punitiveness?"  Presented at the annual Meetings of the American Society of Criminology, November 20, 2014.

2015   "The effect of large capacity magazines on the casualty counts in mass shootings."  Presented at the annual Meetings of the American Society of Criminology, November 18, 2015.

2015   (with Bethany Mims) "Article productivity among the faculty of criminology and criminal justice doctoral programs, 2010-2014."  Presented at the annual Meetings of the American Society of Criminology, November 20, 2015.

2016   "Firearms and the Lethality of Suicide Methods."  Presented at the annual Meetings of the American Society of Criminology, November 16, 2016.

CHAIR

1983   Chair, session on Race and Crime.  Annual meetings of the American Society of Criminology, Denver.

1989   Co-chair (with Merry Morash), roundtable session on problems in analyzing the National Crime Surveys.  Annual meetings of the American Society of Criminology, Reno.

1993   Chair, session on Interrupted Time Series Designs. Annual meetings of the American Society of Criminology, New Orleans.

1993   Chair, session on Guns, Gun Control, and Violence. Annual meetings of the American Society of Criminology, Phoenix.

1994   Chair, session on International Drug Enforcement. Annual meetings of the

American Society of Criminology, Boston.

1999    Chair, Author-Meets-Critics session, More Guns, Less Crime.  Annual meetings
        of the American Society of Criminology, Toronto.

2000    Chair, session on Defensive Weapon and Gun Use.  Annual Meetings of the
        American Society of Criminology, San Francisco.

2002    Chair, session on the Causes of Gun Crime. Annual meetings of the American
        Society of Criminology, Chicago.

2004    Chair, session on Protecting the Victim.  Annual meetings of the American
        Society of Criminology, Nashville.

DISCUSSANT

1981    Session on Gun Control Legislation, Annual Meetings of the American Society of
        Criminology, Washington, D.C.

1984    Session on Criminal Sentencing, Annual Meetings of the American Society of
        Criminology, Cincinnati.

1986    Session on Sentencing, Annual Meetings of the American Society of
        Criminology, Atlanta.

1988    Session on Gun Ownership and Self-protection, Annual Meetings of the Popular
        Culture Association, Montreal.

1991    Session on Gun Control, Annual Meetings of the American Statistical
        Association, Atlanta, Ga.

1995    Session on International Drug Enforcement, Annual Meetings of the American
        Society of Criminology, Boston.

2000    Session on Defensive Weapon and Gun Use, Annual Meetings of the American
        Society of Criminology, San Francisco.

2004    Author-Meets-Critic session on Guns, Violence, and Identity Among African-
        American and Latino Youth, by Deanna Wilkinson.  Annual meetings of the
        American Society of Criminology, Nashville.

2007    Session on Deterrence and Perceptions, University of Maryland 2007 Crime &
        Population Dynamics Summer Workshop, Aspen Wye River Center, Queenstown
        MD, June 4, 2007.

2009    Session on Guns and Crime, at the DeVoe Moore Center Symposium On

18
Exhibit 3
00095

Exhibit 1

**ER_3728**

The Economics of Crime, March 26-28, 2009.

2012    Panel discussion of news media coverage of high profile crimes
        Held at the Florida Supreme Court On September 24-25, 2012, sponsored by the
        Florida Bar Association as part of their 2012 Reporters' Workshop.

PROFESSIONAL SERVICE

Editorial consultant -
        American Sociological Review
        American Journal of Sociology
        Social Forces
        Social Problems
        Law and Society Review
        Journal of Research in Crime and Delinquency
        Social Science Research
        Criminology
        Journal of Quantitative Criminology
        Justice Quarterly
        Journal of Criminal Justice
        Violence and Victims
        Violence Against Women
        Journal of the American Medical Association
        New England Journal of Medicine
        American Journal of Public Health
        Journal of Homicide Studies

Grants consultant, National Science Foundation, Sociology Program.

Member, Gene LeCarte Student Paper Committee, American Society of Criminology,
1990.

Area Chair, Methods Area, American Society of Criminology, annual meetings in Miami,
November, 1994.

Division Chair, Guns Division, American Society of Criminology, annual meetings in
Washington, D.C., November, 1998.

Dissertation evaluator, University of Capetown, Union of South Africa, 1998.

Division Chair, Guns Division, American Society of Criminology, annual meetings in
Washington, D.C., November, 1999.

Member of Academy of Criminal Justice Sciences selection committee for Editor of
Justice Quarterly, 2007.

Outside reviewer of Dr. J. Pete Blair for promotion to Full Professor in the School of Criminal Justice at Texas State University, San Marcos, 2014.

UNIVERSITY SERVICE

Member, Master's Comprehensive Examination Committee, School of Criminology, 1979-1982.

Faculty Advisor, Lambda Alpha Epsilon (FSU chapter of American Criminal Justice Association), 1980-1988.

Faculty Senate Member, 1984-1992.

Carried out campus crime survey for President's Committee on Student Safety and Welfare, 1986.

Member, Strategic Planning and Budgeting Review Committee for Institute for Science and Public Affairs, and Departments of Physics and Economics, 1986.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986.

Member, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology, Summer, 1986 to present.

Chair, Committee on Graduate Assistantships, School of Criminology, Spring, 1987.

Chair, Ad Hoc Committee on Computers, School of Criminology,  Fall, 1987.

Member, Recruitment Committee, School of Criminology,  Spring, 1988; Spring, 1989; and 1989-90 academic year.

Member, Faculty Senate Committee on Computer-Related Curriculum, Spring, 1988 to Fall, 1989.

Chair, Ad Hoc Committee on Merit Salary Distribution, School of Criminology, Spring, 1988.

Chair, Ad Hoc Committee on Enrollment Strains, Spring, 1989.

Member, Graduate Handbook Committee, School of Criminology,  Spring, 1990.

Member, Internal Advisement Committee, School of Criminology Spring, 1990.

University Commencement Marshall, 1990 to 1993.

Member, School of Criminology and Criminal Justice Teaching Incentive Program award committee.

Chair, Faculty Recruitment Committee, School of Criminology and Criminal Justice, 1994-1995.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 1994-1995.

Member, University Computer and Information Resources  Committee, 1995-1998.

Member, University Fellowship Committee, 1995 to present.

Member, University Library Committee, 1996 to 1999.

Chair, Electronic Access Subcommittee, University Library Committee, 1998 to 1999.

Member, Ad Hoc Committee on Merit Salary Increase Allocation, School of Criminology and Criminal Justice, 1998-1999.

Member, Academic Committee, School of Criminology and Criminal Justice, 2000-present.

Member, Recruiting Committee, School of Criminology and Criminal Justice, 2000-2001.

Member, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2000-present.

Chair, Committee on Ph.D. Comprehensive Examination in Research Methods, School of Criminology and Criminal Justice, 2000-2002.

Chair, Promotion and Tenure Committee, School of Criminology and Criminal Justice, 2001-2002.

Faculty Adviser, School of Criminology and Criminal Justice Graduate Student Association, 2001-present.

Member, ad hoc committee on survey research, School of Criminology and Criminal Justice, 2002.

Coordinator of Parts 2 and 4 of the School of Criminology and Criminal Justice Unit Review, 2002.

Chair, Academic Committee, School of Criminology and Criminal Justice, 2002-2003.

Exhibit 1

Director, Honors Programs, School of Criminology and Criminal Justice, 2002-present.

Member, University Promotion and Tenure Committee, Fall, 2003 to present.

Member of University Graduate Policy Committee, Fall 2003 to present.

Director of Graduate Studies, School (later College) of Criminology and Criminal Justice, April 2004 to May 2011.

Chair, Promotion and Tenure Committee, College of Criminology and Criminal Justice, 2005-2006

Served as major professor on Area Paper by Christopher Rosbough, completed in 2012.

Served as member of dissertation committee of Kristen Lavin, dissertation completed in 2012.

Served as member of dissertation committee of Elizabeth Stupi, dissertation completed in 2013.

Served as outside member on two dissertation committees in 2014-2015: Brian Meehan in the Department of Economics and Adam Weinstein in the English Department.  Both dissertations were completed.

Served as major professor on Area Paper on legalization of marijuana for Pedro Juan Matos Silva, Spring 2015.  Paper completed.

Currently serving as major professor for two doctoral students, Moonki Hong and Sergio Garduno.  Hong is scheduled to finish his dissertation by December 2015, and Garduno will be starting his dissertation in Spring 2016.

PUBLIC SERVICE

Television, radio, newspaper, magazine, and Internet interviews concerning gun control, racial bias in sentencing, crime statistics, and the death penalty.  Interviews and other kinds of news media contacts include Newsweek, Time, U.S. News and World Report, New York Times, Washington Post, Chicago Tribune, Los Angeles Times, USA Today, Boston Globe, Wall Street Journal, Kansas City Star, Philadelphia Inquirer, Philadelphia News, Atlanta Constitution, Atlanta Journal, Arizona Republican, San Antonio Express-News, Dallas Morning News, Miami Herald, Tampa Tribune, Jacksonville Times-Union, Womens' Day,   Harper's Bazaar, Playboy, CBS-TV (60 Minutes; Street Stories) ABC-TV (World News Tonight; Nightline), NBC-TV (Nightly News), Cable News Network, Canadian Broadcasting Company, National Public Radio, Huffington Post, PolitiFact.com, and many others.

Resource person, Subcommittee on Crime and Justice, (Florida House) Speaker's

Advisory Committee on the Future,  February 6-7, 1986, Florida State Capitol.

Testimony before the U.S. Congress, House Select Committee on Children, Youth and Families, June 15, 1989.

Discussant, National Research Council/National Academy of Sciences Symposium on the Understanding and Control of Violent Behavior, April 1-4, 1990, Destin, Florida.

Colloquium on manipulation of statistics relevant to public policy, Statistics Department, Florida State University, October, 1992.

Speech to faculty, students, and alumni at Silver Anniversary of Northeastern University College of  Criminal Justice, May 15, 1993.

Speech to faculty and students at Department of Sociology, University of New Mexico, October, 1993.

Speech on the impact of gun control laws, annual meetings of the Justice Research and Statistics Association, October, 1993, Albuquerque, New Mexico.

Testimony before the Hawaii House Judiciary Committee, Honolulu, Hawaii, March 12, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, March 18, 1994.

Delivered the annual Nettler Lecture at the University of Alberta, Edmonton, Canada, March 21, 1994.

Member, Drugs-Violence Task Force, U.S. Sentencing  Commission, 1994-1996.

Testimony before the Pennsylvania Senate Select Committee to Investigate the Use of Automatic and Semiautomatic Firearms, Pittsburgh, Pennsylvania, August 16, 1994.

Delivered lectures in the annual Provost's Lecture Series, Bloomsburg University, Bloomsburg, Pa., September 19, 1994.

Briefing of the National Executive Institute, FBI Academy, Quantico, Virginia, June 29, 1995.

Speech to personnel in research branches of crime-related State of Florida agencies, Research and Statistics Conference, sponsored by the Office of the State Courts Administrator, October 19, 1995.

Speech to the Third Annual Legislative Workshop, sponsored by the James Madison Institute and the Foundation for Florida's Future, February 5, 1998.

23
Exhibit 3
00100

Exhibit 1

Speech at the Florida Department of Law Enforcement on the state's criminal justice research agenda, December, 1998.

Briefing on news media coverage of guns and violence issues, to the Criminal Justice Journalists organization, at the American Society of Criminology annual meetings in Washington, D.C., November 12, 1998.

Briefing on gun control strategies to the Rand Corporation conference on "Effective Strategies for Reducing Gun Violence,"  Santa Monica, Calif., January 21, 2000.

Speech on deterrence to the faculty of the Florida State University School of Law, February 10, 2000.

Invited address on links between guns and violence to the National Research Council Committee on Improving Research Information and Data on Firearms, November 15-16, 2001, Irvine, California.

Invited address on research on guns and self-defense to the National Research Council Committee on Improving Research Information and Data on Firearms, January 16-17, 2002, Washington, D.C.

Invited address on gun control, Northern Illinois University, April 19, 2002.

Invited address to the faculty of the School of Public Health, University of Alabama, Birmingham, 2004.

Invited address to the faculty of the School of Public Health, University of Pennsylvania, March 5, 2004.

Member of Justice Quarterly Editor Selection Committee, Academy of Criminal Justice Sciences, Spring 2007

Testified before the Gubernatorial Task Force for University Campus Safety, Tallahassee, Florida, May 3, 2007.

Gave public address, "Guns & Violence: Good Guys vs. Bad Guys," Western Carolina University, Cullowhee, North Carolina, March 5, 2012.

Invited panelist, Fordham Law School Symposium, "Gun Control and the Second Amendment,"  New York City, March 9, 2012.

Invited panelist, community forum on "Students, Safety & the Second Amendment," sponsored by the Tallahassee Democrat.

Invited address at University of West Florida, Department of Justice Studies, titled

24<br>Exhibit 3<br>00101

Exhibit 1

"Guns, Self-Defense, and the Public Interest," April 12, 2013.

Member, National Research Council Committee on Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-related Violence, May 2013.

Invited address at Davidson College, Davidson, NC, April 18, 2014.  Invited by the Department of Philosophy.

OTHER ITEMS
Listed in:
Marquis Who's Who, 2009
Marquis Who's Who in the South and Southwest, 25th edition
Who's Who of Emerging Leaders in America, 1st edition
Contemporary Authors
Directory of American Scholars, 10th edition, 2002
Writer's Directory, 20th edition, 2004.

Participant in First National Workshop on the National Crime Survey, College Park, Maryland, July, 1987, co-sponsored by the Bureau of Justice Statistics and the American Statistical Association.

Participant in Second National Workshop on the National Crime Survey, Washington, D.C., July, 1988.

Participant, Seton Hall Law School Conference on Gun Control, March 3, 1989.

Debater in Intelligence Squared program, on the proposition "Guns Reduce Crime." Rockefeller University, New York City, October 28, 2008.  Podcast distributed through National Public Radio.  Further details are available at http://www.intelligencesquaredus.org/Event.aspx?Event=36.

Subject of cover story, "America Armed," in Florida State University Research in Review, Winter/Spring 2009.

Grants reviewer, Social Sciences and Humanities Research Council of Canada, 2010.

Named one of "25 Top Criminal Justice Professors" in the U.S. by Forensics Colleges website (http://www.forensicscolleges.com/), 2014.

**Expert Witness Rebuttal of Dr. Carlisle E. Moody**
*Duncan, et al. v. Becerra, et al.*
United States District Court (S.D. Cal.)
Case No: 3:17-cv-01017-BEN-JLB
November 3, 2017

## I.  INTRODUCTION

I am Dr. Carlisle E. Moody, Professor of Economics at the College of William & Mary. Counsel for plaintiffs in *Duncan v. Becerra* (S.D. Cal. Case No. 3:17-cv-01017-BEN-JLB) have asked me to offer a rebuttal opinion regarding this case. This report sets forth my qualifications, opinions, and scholarly foundation for those opinions.

## II.  BACKGROUND & QUALIFICATIONS

I am a Professor of Economics at the College of William and Mary in Virginia. I graduated from Colby College in 1965 with a major in Economics. I received my graduate training from the University of Connecticut, earning a Master of Economics degree in 1966 and a Ph.D. in Economics in 1970, with fields in mathematical economics and econometrics.

I began my academic career in 1968 as Lecturer in Econometrics at the University of Leeds, Leeds, England. In 1970 I joined the Economics Department at William and Mary as an Assistant Professor, I was promoted to Associate Professor in 1975 and to full Professor in 1989. I was Chair of the Economics Department from 1997-2003. I am still teaching full time at William and Mary. I teach undergraduate and graduate courses in Econometrics, Mathematical Economics, and Time Series Analysis.

I have published over 40 refereed journal articles and several articles in law journals and elsewhere. Nearly all these articles analyze government policies of various sorts. I have been doing research in guns, crime, and gun policy since 2000. I have published 11 articles directly related to guns and gun policy.

I have also consulted for a variety of private and public entities, including the United States Department of Energy, U.S. General Accountability Office, Washington Consulting Group, Decision Analysis Corporation of Virginia, SAIC Corporation, and the Independence Institute.

A full list of my qualifications, as well as a list of my publications, is attached hereto as **Exhibit 1.**

In the past four years, I have written export reports, been deposed, or testified at trial in the following matters:

- *Cooke v. Hickenlooper*, U.S. Dist. Ct., Dist. of Colo., Oct. 25, 2013 (submitted expert report, not deposed, did not testify);

- *Rocky Mountain Gun Owners v. Hickenlooper*, Dist. Ct., City and County of Denver, Case No. 2013-CV-33897, May 1, 2017 (testified).

- *William Wiese, et al v. Becerra,* U.S. Dist. Ct., E. Dist. of Cal., Case No. 2:17-cv-00903-WBS-KJN, April 28, 2017 (submitted expert report, not deposed, did not testify)

## III.   COMPENSATION

I am being compensated for my time in this case at an hourly rate of $250 per hour. My compensation is not contingent on the results of my analysis or the substance of my testimony.

## IV.   ASSIGNMENT

Plaintiffs' counsel has asked me to provide an opinion in response to the opinions presented in the expert reports submitted by Attorney General Xavier Becerra—specifically those of Dr. Louis Klarevas and Dr. Christopher S. Koper.

## V.   SUMMARY OF OPINIONS

The defense's experts posit that magazines over ten rounds increase the number of shots fired in mass shooting incidents and other violent crimes leading to more deaths and injuries. The conclusion they come to is that a ban on such magazines has the potential to reduce deaths and injuries sustained in such events. The defense's experts, however, provide no relevant evidence showing that California's ban would reduce deaths or injuries.

Koper presents evidence concerning the federal weapons ban in effect from 1994-2004, a nationwide ban on (among other things) magazines over ten rounds. His opinion regarding the effectiveness of that ban is largely irrelevant here because the challenged law is limited to California. Koper presents no evidence at all concerning the effectiveness of California's magazine ban, specifically, or statewide bans, more generally.

Klarevas presents some weak evidence that states with magazine bans have had fewer incidents of mass shootings and fewer people killed in mass shootings than states without such bans. He does not present any evidence that the California ban has had any effect, thereby rendering his report irrelevant.

It is my professional opinion, based on my training in economics, econometrics, and policy analysis, my expertise relevant to gun policy, including

bans on "large capacity magazines,"[1] as well as my review and analysis of the relevant data that: (1) California's current ban on acquiring magazines over ten rounds[2] has not had any statistically significant impact on violent crime, including mass shootings, in California; (2) legally possessed magazines over ten rounds (i.e., those that were "grandfathered in" after the state banned acquisition) are not commonly used in mass shootings in California; and (3) bans on such magazines have no effect on violent crime, as illustrated by the results of the Washington Post study of firearms recovered by Virginia law enforcement.

In short, it is my expert opinion that California's acquisition ban has not and will not, even when paired with a possession ban, result in any statistically significant reduction in the number or lethality of mass shooting incidents in California or violent crime rates in general.

## VI.   OPINIONS & ANALYSIS

### A.   California's LCM Acquisition Ban Has Had No Statistically Significant Impact on Violent Crime in California

#### 1.   A Primer on Policy Analysis Using Regression Models[3]

A regression model estimates the possible linear relationship between the dependent (outcome) variable, say the California murder rate, and a set of explanatory variables such as the 1994 assault weapon ban and the California LCM ban. The law variables are so-called "dummy" variables which equal one in those years the law was in effect, zero otherwise. I also include a trend consisting of the numbers 1,2,3, etc. for the years in the sample. The coefficient on the trend shows by how much the murder rate changes each year due to all other factors that affect the murder rate aside from the variables included in the regression model. These

---

[1] California law defines a "large capacity magazine" as, with limited exceptions, "any ammunition feeding device with the capacity to accept more than 10 rounds." Cal. Penal Code § 16740. I understand that this is not a universally accepted definition. But, for ease of reference, I refer to magazines over ten rounds as "large capacity magazines" or "LCMs" throughout this report.

[2] It is my understanding, and I have assumed for purposes of this study, that California has prohibited the manufacture, importation, sale, giving, lending, buying, and receiving of magazines over ten rounds since the enactment of Senate Bill 23 ("SB 23"), which is codified at California Penal Code section 32310(a) and took effect on January 1, 2000. I refer to this prohibition as California's "acquisition ban" throughout this report.

[3] Readers who are familiar with statistical methodology applied to policy analysis can skip this section.

factors include changes in trauma treatment that turn potential murders into assaults, the advent of 911 calls, cell phones, DNA, the national fingerprint directory, ubiquitous security cameras, smartphones with cameras, body cameras on police officers, etc. etc. If the trend is omitted, these influences on crime which are separate and distinct from the effect of any law, will be incorrectly attributed to the LCM ban. I also include a dummy variable for the years 1994-2004 to estimate the effect of the national LCM ban due to the Federal assault weapon ban. If that variable is omitted, the effect of the national ban is incorrectly attributed to the state ban. I also include some variables that are routinely included in almost any crime model: the proportion of the population between 15 and 29, the unemployment rate, income per capita, and a dummy variable for the years of the crack epidemic, 1984-1991.

The coefficient on the California LCM acquisition ban variable estimates the change in the dependent variable, e.g., the murder rate, due to the implementation of the acquisition ban, holding constant the effects of the national ban, the effects of the factors captured by the trend, and the effects of the crack epidemic, income, and unemployment. If the California acquisition ban has been effective in reducing murder, we would expect a negative and significant coefficient on the LCM ban dummy variable indicating a reduction in murder as a result of the ban.

Even if an estimated coefficient is negative, it does not mean the law necessarily had a beneficial effect. If the law had no effect, the coefficient on the law dummy variable could be negative just by chance. In fact, we would expect it to be negative 50 percent of the time. How do we know when an estimated coefficient is significantly different from zero? Answer: when it is so far from zero that we can conclude beyond a reasonable doubt that it is not zero.

A significance test is used for this. Tests for significance are made up of two hypotheses: the null hypothesis (that the law had no effect or equivalently the coefficient is actually zero) and the alternative hypothesis that the law did have an effect (that the coefficient is truly nonzero). We construct a t-statistic consisting of the estimated coefficient divided by its standard deviation (standard deviations are called "standard errors" in the context of a regression coefficient). The larger the value of the estimated coefficient, the more likely that it is not zero. However, given the standard deviation, we would expect some variation around zero even if the true value is zero (i.e., the null hypothesis is true). If the estimated coefficient is distributed according to the normal distribution (the famous bell curve), which is the usual assumption, then it would be quite unusual for an estimated coefficient to be twice as large as its standard error. How unusual? It would only happen 5% of the time if the true value of the coefficient was zero. Therefore, we reject the null hypothesis that the California acquisition ban had no effect if the t-statistic is greater than two.

The usual standard for significance is the 5 percent level, where there is only a five percent chance of a t-statistic that large if in fact the law had no effect on the

murder rate. This is the statistical equivalent of a "reasonable doubt." Sometimes researchers use the 10 percent level, which is considered "marginally significant." I do not use this criterion. Whether the coefficient is significant can be seen by examining the "p-value", which indicates the probability of rejecting the null hypothesis, given the t-statistic. If the p-value is less than .05 there is a smaller than 5% probability that we could have estimated a coefficient this large if it is truly zero (implying significance). If the t-statistic has a p-value greater than .05, then we cannot reject the null hypothesis that there is no relationship between the explanatory variable and the dependent variable.

Since the data for California from 1977 to 2017 is a time series, we have to consider the possibility that the continuous variables (violent crime rate, murder rate, firearm homicide rate) are so-called "random walks." If they are random walks, then the regression must be done in first differences: $Dx(t)=x(t)-x(t-1)$. There are tests for random walks, called "unit root" tests, the most powerful of which is the DFGLS test, which I used to test whether to use first differences.[4] It turns out that all three of the California crime series are random walks, so I report the results of the regressions in first differences. However, in the Appendix below, I report all the results, including the results of estimating the regressions in levels instead of first differences.[5] Note that the effect of the trend is captured by the constant (intercept) in the first difference regression.

In the following tables, the outcome variable is listed first, then names of the independent variables, the corresponding estimated coefficients, t-statistics, and p-values. For convenience, p-values less than .05 are indicated with an asterisk. For the California acquisition ban to have been successful in saving lives, the coefficient on the variable called "LCM ban" must be negative with a p-value less than .05 (or with an asterisk).[6]

---

[4]  Graham Elliot, Thomas J. Rothenberg & James H. Stock, *Efficient Tests for an Autoregressive Unit Root*, 64 Econometrica 813-836 (July 1996), *available at* https://ideas.repec.org/a/ecm/emetrp/v64y1996i4p813-36.html.

[5]  I also test for serial correlation. There is no significant serial correlation in any of my regressions.

[6]  For count data like the number of people killed in mass shootings, the number of incidents of mass shootings, and the number of police officers killed in the line of duty, the data is not distributed normally. For these data, I use the negative binomial model, a generalization of the Poisson model. The negative binomial is the standard model for count data.

## 2.    California's Violent Crime Rate

The California violent crime rate is shown in Figure 1. The dotted vertical lines correspond to the years of the federal assault weapons ban and corresponding national LCM ban. The single solid vertical line corresponds to the California LCM acquisition ban. If the California acquisition ban successfully reduces violent crime, we should see a discontinuity (also called a "break") at or after the solid vertical line.

Figure 1: Violent crime rate, California, 1970-2015



Crime was generally rising until 1991, the last year of the crack epidemic, then generally declining. The downturn came before the federal LCM ban, so it is unlikely to have been caused by the national ban. There is no break at or after 2000, the downward trend just continues. We test these observations in Table 1 below. The violent crime rate includes murders and assaults, including gun assaults. If the California acquisition ban has been successful in reducing violent crime, it will have a negative and significant coefficient in Table 1 below.

Table 1: Violent crime rate, California, 1970-2015

| Outcome | Variable | Coefficient | T-ratio | P-value |
|---------|----------|-------------|---------|---------|
| Violent crime rate | LCM ban | 44.844 | 0.95 | 0.35 |

6

Exhibit 4

00109

**ER_3741**

| | | | |
|---|---:|---:|---:|
| Federal assault weapons ban | -31.547 | -1.00 | 0.32 |
| Percent population 15-29 | 8.984 | 0.43 | 0.67 |
| Crack epidemic 1984-1991 | 2.645 | 0.08 | 0.94 |
| Income per capita | -1.000 | -0.04 | 0.97 |
| Unemployment rate | -2.653 | -0.33 | 0.75 |
| Violent crime rate, lagged | 0.605 | 4.12* | 0.00 |
| Constant | -0.345 | -0.04 | 0.97 |

Notes: first differences, trend coefficient estimated by constant; * $p<0.05$

Unfortunately, the coefficient on the California LCM ban dummy is neither negative nor significant. The federal ban dummy is also not significant. Neither the state nor the federal LCM ban had any significant effect on the violent crime rate.

### 3.    California's Murder Rate

The murder rate in California for 1970-2015 is shown in Figure 2.

<u>Figure 2</u>: Murder rate, California, 1970-2015



The murder rate also begins to decline in 1991, before the federal LCM ban, it increases from 1999-2005, then generally declines for the next 10 years. The regression model is shown in Table 2 below.

<u>Table 2</u>: Murder rate, California, 1970-2015

| Outcome | Variable | Coefficient | T-ratio | P-value |
|---------|----------|-------------|---------|---------|
| Murder rate | LCM ban | 0.586 | 0.73 | 0.47 |
| | Federal assault weapons ban | -0.884 | -1.61 | 0.12 |
| | Percent population 15-29 | 0.225 | 0.60 | 0.55 |
| | Crack epidemic 1984-1991 | 0.360 | 0.61 | 0.54 |
| | Income per capita | -0.288 | -0.64 | 0.52 |
| | Unemployment rate | -0.056 | -0.39 | 0.70 |
| | Murder rate, lagged | 0.452 | 2.97* | 0.01 |
| | Constant | 0.047 | 0.31 | 0.76 |

Notes: first differences, trend coefficient estimated by constant; * $p<0.05$.

Again, the coefficient on the LCM ban is neither negative nor significant. The federal ban also had no significant effect.

## 4.    California Firearm Homicide Rate

The firearm homicide rate is more likely to be affected by a LCM ban than the violent crime rate or the overall murder rate. The firearm homicide rate in California for 1970-2015 is shown in Figure 3.

<u>Figure 3</u>: Firearm homicide rate, California, 1970-2015



8
Exhibit 4
00111

**ER_3743**

The firearm homicide series follows the general murder rate very closely. As we see below, the results are the same.

<u>Table 3</u>: Firearm homicide rate, California, 1970-2015

| Outcome | Variable | Coefficient | T-ratio | P-value |
|---|---|---|---|---|
| Firearm homicide rate | LCM ban | 0.844 | 1.29 | 0.21 |
| | Federal assault weapons ban | -0.606 | -1.39 | 0.17 |
| | Percent population 15-29 | 0.104 | 0.35 | 0.73 |
| | Crack epidemic 1984-1991 | 0.472 | 0.99 | 0.33 |
| | Income per capita | -0.355 | -0.92 | 0.37 |
| | Unemployment rate | -0.064 | -0.56 | 0.58 |
| | Firearm homicide rate, lagged | 0.545 | 3.64* | 0.00 |
| | Constant | 0.056 | 0.46 | 0.65 |

Notes: first differences, trend coefficient estimated by constant; * $p<0.05$.

There is no significant effect of either the state or the federal LCM ban on the gun homicide rate.

## 5.    Number of People Killed in California Mass Shootings

The number of deaths due to mass shootings in California from 1968-2015, as pulled from the data presented by Klarevas, is shown in Figure 4.

<u>Figure 4</u>: Deaths due to mass shootings, California, 1968-2015 (Klarevas data)



9

Exhibit 4

00112

**ER_3744**

The regression analysis is reported in Table 4 below.

Table 4: Mass shooting deaths, California, 1970-2015

| Outcome | Variable | Coefficient | T-ratio | P-value |
|---------|----------|-------------|---------|---------|
| Mass shooting deaths | LCM ban | -2.025 | -0.53 | 0.59 |
| | Federal LCM ban | -0.914 | -0.62 | 0.53 |
| | Trend | -0.701 | -1.60 | 0.11 |
| | Percent population 15-29 | -1.046 | -1.41 | 0.16 |
| | Crack epidemic 1984-1991 | 3.037 | 1.62 | 0.10 |
| | Income per capita | 3.232 | 1.52 | 0.13 |
| | Unemployment rate | 1.219 | 1.60 | 0.11 |
| | Constant | -19.890 | -0.78 | 0.43 |

Notes: negative binomial model, income and unemployment data start in 1970, data from Klarevas, * $p<0.05$

There is no significant effect of either the federal or the state LCM ban on the number of mass shooting deaths in California.

## 6.    Number of Mass Shootings in California

According to Klarevas, between 1968 and 1999 there were 9 incidents of mass shootings in California. Between 2000 and 2015, there were 7 incidents. The regression analysis is presented in Table 5 below.

Table 5: Incidents of mass shootings, California, 1970-2015

| Outcome | Variable | Coefficient | T-ratio | P-value |
|---------|----------|-------------|---------|---------|
| Mass shooting incidents | LCM ban | -2.386 | -1.16 | 0.25 |
| | Federal LCM ban | -1.439 | -1.07 | 0.29 |
| | Trend | -0.235 | -1.18 | 0.24 |
| | Percent population 15-29 | -0.380 | -1.16 | 0.25 |
| | Crack epidemic 1984-1991 | 0.491 | 0.50 | 0.61 |
| | Income per capita | 1.343 | 1.33 | 0.18 |
| | Unemployment rate | 0.409 | 1.42 | 0.15 |
| | Constant | -11.043 | -0.82 | 0.41 |

Notes: negative binomial model, income and unemployment data start in 1970, data from Klarevas, * $p<0.05$

There is no significant effect of either the federal or the state LCM ban on the number of incidents of mass shootings in California.

### 7.    Number of Police Officers Killed in the Line of Duty in California

Koper notes that assault weapons and LCMs are overrepresented in killings of police officers. The implication is that a ban would reduce the number of police officers killed. The data are shown in Figure 5.

<u>Figure 5</u>: Police officers killed in line of duty, California, 1973-2015



The number of officers killed has been declining since 1973. However, the mean before the California LCM ban is 7.5 while the mean after the ban is 4.3. The question is whether this difference is significant. The test is presented in Table 6 below.

<u>Table 6</u>: Police officers killed in the line of duty, California, 1973-2015

| Outcome | Variable | Coefficient | T-ratio | P-value |
| --- | --- | --- | --- | --- |
| Police officers killed | LCM ban | 0.056 | 0.14 | 0.89 |
| | Federal LCM ban | -0.232 | -0.89 | 0.37 |
| | Trend | -0.029 | -0.69 | 0.49 |
| | Percent population 15-29 | -0.089 | -1.23 | 0.22 |
| | Crack epidemic 1984-1991 | -0.405 | -1.93 | 0.05 |
| | Income per capita | -0.078 | -0.35 | 0.72 |
| | Unemployment rate | -0.033 | -0.48 | 0.63 |

11
Exhibit 4
00114

**ER_3746**

| | | | |
|---|---|---|---|
| Constant | 6.453 | 1.83 | 0.07 |

Notes: negative binomial model, * $p<0.05$

Neither the state ban nor the national ban had any significant effect on the number of police officers killed in the line of duty in California.

### 8.     Summary and Conclusions

From the statistical analysis of the effects of the state and federal LCM bans presented above, I conclude that the California LCM acquisition ban had no significant effect on violent crime, murder, firearm homicide, the number of people killed in mass shootings, the number of incidents of mass shootings, or the number of police officers killed in the line of duty.

Similarly, I find that the federal assault weapons law and its national LCM ban had no effect on the California violent crime rate, murder rate, gun murder rate, the number of people killed in mass shootings, the number of incidents of mass shootings, or the number of police officers killed in the line of duty.

### B.     Lawfully Possessed (or Grandfathered) Magazines Over Ten Rounds Are Not Commonly Used in Mass Shootings in California, So Banning Possession of Such Magazines Will Not Reduce the Number or Lethality of Such Incidents

Until the enactment of California Penal Code section 32310(c), the law did not prohibit the possession of LCMs lawfully acquired before January 1, 2000. Therefore, an indeterminate but substantial number of gun owners in California have owned, and continued to own, what I refer to herein as "pre-acquisition-ban" or "grandfathered" LCMs.

Adding a possession ban to California's current acquisition ban might be expected to save lives if it could be shown that grandfathered, pre-acquisition-ban LCMs are regularly used in mass shootings and can be shown to be responsible for death and injury of Californians. Since magazines over ten rounds in California cannot be legally manufactured, sold, transferred, or imported, the only harm they represent is their use by their lawful owner in criminal shootings.[7]

As an expert witness in another case (*Wiese v. Becerra*, E.D. Cal. No. 2:17-cv-00903-WBS-KJN), I conducted a comprehensive study of California mass

---

[7] This argument also requires the assumption that any possession ban would have an appreciable effect on the number of pre-acquisition-ban LCMs used in criminal shootings.

shooting incidents.[8] In doing so, I reviewed the www.massshootingtracker.com data set, which represents an exhaustive list of mass shooting incidents, as the site defines it.[9] From that data set, I found 185 incidents reported for California between January 1, 2013 and June 5, 2017.[10] Of these 185 cases, only three could be shown to involve the use of LCMs.[11] Between June 5 and October 30, 2017, there were 22 more mass shooting incidents in California as reported by www.massshootingtracker.com.[12]

I also reviewed the mass shooting cases reported in Klarevas's *Rampage Nation*, covering the years 1966-2016,[13] as well as his declaration in this case which includes, in his Appendix B, mass shooting cases for the years 1968-2017.[14] Klarevas conveniently lists the presence of LCMs in those cases. In addition, I have reviewed the cases listed in the *Mother Jones* data set, which spans the years 1982-2017, and the Violence Policy Center mass shooting list.[15]

_____

[8]  Declaration of Carlisle E. Moody in Support of Plaintiffs' Motion for Issuance of a Temporary Restraining Order and Preliminary Injunction at 4, *Weise v. Becerra*, No. 2:17-cv-00903-WBS-KJN (June 10, 2017) ("Moody Declaration").

[9] Massshootingtracker.org defines mass shootings within its database as "a single outburst of violence in which four or more people are shot," including the perpetrator. Mass Shooting Tracker, www.massshootingtracker.org (last visited Oct. 25, 2017).

[10] Moody Declaration, *supra* note 8, at 5.

[11] *Id.*

[12] Mass Shooting Tracker, https://massshootingtracker.org/data (last visited Oct. 30, 2017) ("MST Data").

[13]  Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 71-86 (2016).

[14] Expert Report of Dr. Louis Klarevas, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (Oct. 6, 2017) ("Klarevas Report").

[15] Mother Jones, *US Mass Shootings, 1982-2017: Data from Mother Jones' Investigation*, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ (last updated Oct. 18, 2017); Violence Policy Center, *High-Capacity Ammunition Magazines Are the Common Thread Running Through Most Mass Shootings in the United States* (July 1, 2017), *available at* http://gunviolence.issuelab.com/resource/high-capacity-ammunition-magazines-

From all these data, I have been presented with an accurate picture of the California mass shooting incidents since the acquisition ban took effect in 2000. I have determined that pre-acquisition-ban LCMs are simply not used in such incidents.

All the California mass shooting incidents involving LCMs since 2000 are discussed below.

### 1.  Analysis of www.massshootingtracker.com Data, 1/1/2013-6/5/2017

**6/7/13 Santa Monica, CA:** 6 killed including shooter, 4 injured. The perpetrator used a .223 rifle which he assembled from parts. The parts were legally acquired, but the finished rifle was illegal. He was reported to have 40 LCMs with him during the incident. The recent construction of the gun and the age of the shooter (23) indicates that he did not use pre-acquisition-ban LCMs.[16] It is also unlikely that he stored 40 legal LCMs for over 13 years for a rifle that did not exist.

**11/3/13 LAX**: 1 killed, 4 injured including shooter. The perpetrator, armed with what police say was an assault rifle and carrying materials expressing anti-government sentiment, opened fire at Los Angeles International Airport. He killed one person before being chased down himself. He was reported to have used LCMs. However, at 23 he was too young to legally own pre-acquisition-ban LCMs. He was also living out of state before SB 23 was passed.[17]

**12/2/15 San Bernardino, CA:** 16 killed including both shooters, 22 injured. The perpetrators reportedly used LCMs. However, the shooters were children or living outside the country when SB 23 was passed. Also, an accomplice served as a

---

are-the-common-thread-running-through-most-mass-shootings-in-the-united-states.html.

[16] Samantha Tata, *Santa Monica shooter Built Illegal Weapon After Govt Denied Him Firearm,* NBC Los Angeles (June 14, 2013) http://www.nbclosangeles.com/news/local/Santa-Monica-Shooting-Police-News-Conference-Watch-Live-211492801.html

[17] Greg Botelho & Michael Martinez, *FBI: 23-Year-Old L.A. Man Is Suspect in Airport Shooting that Kills TSA Officer*, CNN.com (Nov. 1, 2013), http://www.cnn.com/2013/11/01/us/lax-gunfire/index.html?hpt=hp_t1.

straw purchaser. The weapons were acquired in 2011 and 2012, long after the passage of SB 23.[18]

Of these three incidents, it is a reasonable inference that these incidents did not involve pre-acquisition-ban magazines given media reports involving: (1) the age of the shooter; (2) the illegal assembly of weapons; and/or (3) the illegal acquisition of weapons generally from out of state. And in these three incidents, the shooter would have ignored or flouted existing California law that already prohibits the manufacture or import of LCMs. It is therefore reasonable to infer that an additional ban on the possession of such firearm parts would not have further deterred or prevented the perpetrator from carrying out the shootings.

### 2.   Analysis of www.massshootingtracker.com Data, 6/6/2017-10/30/2017

As of October 30, 2017, there have been 22 mass shootings in California since June 5, 2017, according to www.massshootingtracker.com.[19] News reports mention LCMs in only one of these incidents:

**6/14/17 San Francisco, CA:** 4 killed including shooter, 2 injured. A United Parcel Service worker who killed three of his fellow delivery drivers and then himself in San Francisco used a MAC-10-style "assault pistol" with a 30-round magazine that had been stolen in Utah. He also carried a second handgun that had been stolen in Napa, but did not fire it. The shooter also had a black backpack with a box of bullets inside, which was recovered along with the guns.[20] The LCM used in this incident was illegally imported into California. It was not a pre-acquisition-ban LCM.

Of note is an incident from June 6, 2017, that left three dead and one injured in Fresno. There, the 30-year-old victim of a home invasion involving multiple attackers used an AR-15 rifle to defend himself.[21] Although such a weapon can

---

[18] Mike McIntire, *Weapons in San Bernardino Shootings Were Legally Obtained,* NY Times (Dec. 3, 2015), https://www.nytimes.com/2015/12/04/us/weapons-in-san-bernardino-shootings-were-legally-obtained.html

[19] MST Data, *supra* note 12.

[20] Vivian Ho, *UPS Shooter in San Francisco Used Stolen Gun with 30-round Magazine,* S.F. Gate (June 23, 2017), http://www.sfgate.com/crime/article/UPS-shooter-in-San-Francisco-used-stolen-gun-with-11243414.php.

[21] Jim Guy, *Gunfight at East-central Fresno Home Leaves Three Dead, One Wounded,* Fresno Bee (June 6, 2017), http://www.fresnobee.com/news/local/article154583549.html.

accept an LCM, there is no mention of an LCM in the news reports and the owner would have been too young (13) to have purchased a legal LCM before January 1, 2000.

### 3.    Analysis of Remaining Mass Shooting Incidents in California Since 2000

**1/30/2006 Goleta Postal Shooting, Goleta, CA:** 6 killed. Jennifer San Marco purchased the firearm, a 9 mm Smith &Wesson model 915 handgun equipped with a 15-round magazine, from a pawn shop in Grants, NM in 2005.[22] The magazine was then illegally imported into California. It was not a pre-acquisition-ban magazine.

**12/24/2008 Christmas Party Killings, Covina, CA:** 9 killed. Bruce Jeffrey Pardo, dressed as Santa Clause invaded a Christmas party at his former in-laws' house. He used four, 13-round capacity handguns and a homemade flamethrower. Police found five empty boxes for semiautomatic handguns at his house.[23] The empty boxes indicate that the pistols were probably newly acquired and were therefore not likely to be fitted with pre-acquisition-ban LCMs.

**1/27/2009 Los Angeles, CA:** 6 killed. Ervin Lupoe killed his wife and five children in their home and then killed himself. No LCMs were used.[24]

**3/21/2009 Oakland, CA:** 4 killed. Lovelle Mixon, 26, killed two motorcycle police officers with a semiautomatic handgun after a traffic stop, then fled to his sister's apartment where he had stored a SKS carbine. He killed two police officers with the carbine. Mixon was on parole after serving prison time for armed robbery, thereby in possession of firearms illegally. Although the SKS carbine can accept box magazines of any size, the standard configuration is a 10-round magazine.[25] In any case, Mixon was 16 years old in 1999, making it unlikely that he owned pre-acquisition-ban LCMs.

---

[22] Associated Press, *Postal Killer Believed She Was Target of a Plot*, NBCNews.com (Feb. 3, 2006), http://www.nbcnews.com/id/11167920/#.WfE1 fGhSyUk.

[23] Wikipedia.com, *Covina Massacre* (last updated Oct. 29, 2017), https://en.wikipedia.org/wiki/Covina_massacre.

[24] Klarevas Report, *supra* note 14, App. B at 3.

[25] Wikipedia.com, *SKS* (last updated Oct. 28, 2017), https://en.wikipedia.org/wiki/SKS.

    **10/12/2011 Seal Beach Shootings, Seal Beach, CA:** 8 killed. Scott Dekraai invaded the Salon Meritage hair salon carrying two semiautomatic pistols and a revolver. No LCMs were used.[26]

    **4/2/2012 Oikos University Killings, Oakland, CA:** 7 killed. One L. Goh opened fire on the campus of Oikos University using a semiautomatic handgun and four 10-round magazines. No LCMs were used.[27]

    **2/20/2012 Alturas Tribal Shootings, Alturas, CA:** 4 killed. Cherie Rhodes opened fire during an eviction hearing at the Cederville Rancheria tribal headquarters. She was armed with a 9-mm handgun and a knife.[28] No LCMs were used.

    **5/23/2014 Isla Vista Mass Murder, Isla Vista/Santa Barbara, CA:** 6 killed. Elliot Rodger, 22, used three handguns, all legally purchased in California, all with 10-round magazines. Another 41 loaded 10-round magazines were found with his body in his car. No LCMs were used.[29]

    **4/18/2017 Fresno Downtown Shooting, Fresno, CA:** 3 killed. Kori Ali Muhammad, 39, opened fire walking along a street in downtown Fresno, killing three people randomly in an alleged hate crime prior to being apprehended by police. Over the span of about a minute, Muhammad fired 16 bullets from a .357-caliber revolver over several blocks, killing three white men at random, police said. When he was finally stopped by officers, he acknowledged he was a wanted man.[30] No LCMs were used.

---

[26] Klarevas Report, *supra* note 14, App. B at 3.

[27] *Id.*

[28] *Id.*

[29] Sossy Dombourian, Elisha Fieldstadt & Zoya Taylor, *California Gunman Still Had Hundreds of Rounds: Sheriff*, NBC News (May 24, 2014). https://www.nbcnews.com/storyline/isla-vista-rampage/california-gunman-still-had-hundreds-rounds-sheriff-n113961

[30] Matthew Haag, *Gunman, Thought to Be Targeting Whites, Kills 3 in Fresno, Police Say*, N.Y. Times (April 18, 2017), https://www.nytimes.com/2017/04/18/us/fresno-shooting-rampage-kori-ali-muhammad.html?_r=0.

### 4.   Summary and Conclusions

Thus, after reviewing over 200 mass shooting incidents in California since January 1, 2000, I find that: (1) large capacity magazines were known to be used in only six cases and might have been used in two more; and (2) of the eight cases in which LCMs were, or could have been used, the characteristics of the shooter (age, residence, time of acquisition, etc.) make it extremely unlikely that pre-acquisition-ban LCMs were used in any of these incidents.

In summary, there is no evidence that legally possessed, pre-acquisition-ban LCMs were involved in any in mass shooting incident in California since 2000. It is thus my professional opinion that pre-acquisition-ban LCMs present no significant danger to the citizens of California and a possession ban would have no effect other than turning a large number of law-abiding citizens into criminals.

### C.   The Washington Post Report on LCMs Recovered by Law Enforcement in Virginia Does Not Show that the Federal Ban Had Any Effect on Murders or Gun Homicides

As Koper's expert report notes, in 2011 the Washington Post published the results of its study of a little-known database on weapons recovered by local law enforcement officers in Virginia.[31] The Criminal Firearms Clearinghouse, maintained by the Virginia State Police, contains detailed information regarding "all firearms seized, forfeited, found or otherwise coming into the possession of any state or local law-enforcement agency of the Commonwealth [of Virginia] which are believed to have been used in the commission of a crime."[32] It includes information on the circumstances of each firearm's recovery and each firearm's physical characteristics, including magazine capacity.

The Washington Post study found that, "[t]he number of guns with high-capacity magazines seized by Virginia police dropped during a decade-long federal prohibition on assault weapons, but the rate has rebounded sharply since the ban

---

[31] Expert Report of Dr. S. Christopher Koper at 18-19 & n.22, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (Oct. 6, 2017) ("Koper Report"); David S. Fallis & James V. Grimaldi, *Va. Date Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post (Jan. 23, 2011), *available at* http://www.washingtonpost. com/wp-dyn/content/article/2011/01/22/AR2011012203452.html.

[32] Virginia State Police, *Firearms Transaction Center (FTC)*, Crim. Jus. Info. Servs. (CJIS) Div. Newsletter 1, July 2013, *available at* http://www.vsp.state.va.us/downloads/CJIS_Newsletters/CJIS-Newsletter-July-2013.pdf.

was lifted in late 2004 . . .."[33] This, according to Koper, implies that the federal ban was effective in reducing the number of LCMs used by criminals. "Maybe the federal ban was finally starting to make a dent in the market by the time it ended," the Washington Post reported Koper as claiming.[34]

Garen Wintemute, head of the Violence Prevention Research Program at the University of California at Davis, was also quoted as saying "[t]he pattern in Virginia 'may be a pivotal piece of evidence' that the assault weapons ban eventually had an impact on the proliferation of high-capacity magazines on the streets." He continued:

"Many people, me included, were skeptical about the chances that the magazine ban would make a difference back in 1994" . . . . "But what I am seeing here is that after a few years' lag time the prevalence of high-capacity magazines was declining. The increase since the ban's repeal is quite striking."[35]

Wintemute's comment about the "striking" increase of LCMs recovered in Virginia since the lapse of the federal ban is somewhat alarming. Did this "striking" increase in LCM use by criminals increase homicide in Virginia? The proportion of recovered firearms in the Criminal Firearms Clearinghouse with magazine capacity greater than 10 is shown in Figure 6 along with the corresponding murder and gun murder rate for Virginia from 1993 to 2013.[36]

---

[33] Fallis, *supra* note 30, at 1.

[34] *Id.*

[35] *Id.*

[36] Murder data is taken from the Uniform Crime Reports. Gun homicide is taken from the CDC Wonder data base.

<u>Figure 6</u>: Proportion of crime guns with LCMs and homicide in Virginia



The proportion of crime guns with LCMs initially rose from 1994-1997, the first three years of the federal ban, then declined steadily to 2004, only to rise again after the ban was lifted. On the other hand, the murder rate and the gun homicide rate in Virginia have both declined steadily, revealing no apparent connection between gun homicides and the use of LCM's by criminals.

This observation can be tested by regressing the Virginia gun homicide rate and overall murder rate on the proportion of crime guns with LCMs and a trend term for 1993-2013. Because the time series could be a random walk, which could lead to a spurious regression, I also used first differences. The results are reported below.

<u>Table 7</u>: Proportion of crime guns with LCMs and homicide in Virginia

| Variable | Percent LCM | | Trend | | Autocorrelation | |
|---|---|---|---|---|---|---|
| | Coeff | T-ratio | Coeff | T-ratio | Rho | T-ratio |
| Gun homicide rate | -0.109 | -2.54** | | | 0.713 | 5.15*** |
| with trend | -0.008 | -0.03 | -0.151 | -6.53*** | 0.417 | 1.78* |

20

Exhibit 4

00123

**ER_3755**

| | | | | | | |
|---|---|---|---|---|---|---|
| First differences | -0.027 | -0.07 | -0.158 | -1.23 | -0.552 | -2.56** |
| | | | | | | |
| Log gun homicide rate | -0.028 | -3.03*** | | | 0.694 | 4.52*** |
| with trend | -0.006 | -1.03 | -0.033 | -6.86*** | 0.299 | 1.21 |
| First differences | -0.006 | -0.67 | -0.037 | -1.26 | -0.593 | -2.58** |
| | | | | | | |
| Murder rate | -0.140 | -2.48** | | | 0.774 | 6.03*** |
| with trend | -0.021 | -0.67 | -0.217 | -8.49*** | 0.583 | 2.79** |
| First differences | -0.004 | -0.12 | -0.221 | -1.83* | -0.411 | -1.87* |
| | | | | | | |
| Log murder rate | -0.027 | -2.91*** | | | 0.744 | 4.96*** |
| with trend | 0.000 | -0.06 | -0.036 | -8.86*** | 0.480 | 2.16** |
| First differences | 0.006 | 0.10 | -0.039 | -1.84* | -0.459 | -2.03* |
| | | | | | | |
| Gun murders | -0.021 | -3.03*** | | | | |
| with trend | -0.007 | -1.20 | -0.021 | -4.73*** | | |
| | | | | | | |
| Murders | -0.019 | -2.78*** | | | | |
| with trend | -0.001 | -0.16 | -0.024 | -6.33*** | | |

Notes: *** significant at .01, ** significant at .05, * significant at .10, two-tailed. Percent LCM is the proportion of Virginia crime guns with LCMs. In the first difference model, the trend is estimated by the intercept. Gun murders and murders are estimated using a negative binomial model. See Appendix 2 for details.

If I omit the trend, the estimated coefficient on the proportion of LCMs is negative and highly significant, reflecting the fact that crime in Virginia continued its decline while the proportion of crime guns with LCMs increased substantially.[37]

---

[37] Table 7 also reports the Breusch-Godfrey test for autocorrelation. The regressions in levels show significant positive serial correlation, except for the log of the gun homicide rate, indicating that the t-ratios are likely to be overstated in those cases. In first differences, the serial correlation is negative, indicating that the t-ratios are underestimated. We estimated the regression in both levels and first differences because unit root tests were inconclusive.

However, when I include the trend, which is negative and highly significant, the proportion of LCMs is never significant.

Using a negative binomial model, appropriate for count data, I also regressed the number of gun homicides and murders in Virginia on the LCM proportion and a trend. The results are the same. There is no relationship between the proportion of crime guns with LCMs and either the number of murders or the number of gun homicides. (See Appendix 2 for complete results.)

There is no relationship between the number of public shooting victims and the proportion of LCMs because Virginia had only one such event, the Virginia Tech shooting in 2007, in which the shooter used both standard- and large-capacity magazines holding 10 and 15 rounds.

I conclude that, using data from the Virginia Firearms Clearinghouse, which counts the number of confiscated crime guns with LCMs, I am unable to find any effect of LCMs or the LCM ban on murders or gun homicides. More criminals using more guns with LCMs apparently do not cause more homicides. LCMs appear to have nothing to do with homicide.


## VII.   REFERENCES

Associated Press, *Postal Killer Believed She Was Target of a Plot*, NBCNews.com (Feb. 3, 2006), http://www.nbcnews.com/id/11167920/#.WfE1_GhSyUk.

David S. Fallis & James V. Grimaldi, *Va. Date Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post (Jan. 23, 2011), *available at* http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011_012203452.html.

Declaration of Carlisle E. Moody in Support of Plaintiffs' Motion for Issuance of a Temporary Restraining Order and Preliminary Injunction at 4, *Weise v. Becerra*, No. 2:17-cv-00903-WBS-KJN (June 10, 2017).

Expert Report of Dr. Christopher S. Koper, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (Oct. 6, 2017).

Expert Report of Dr. Louis Klarevas, *Duncan v. Becerra*, No. 3:17-cv-01017-BEN-JLB (Oct. 6, 2017).

Graham Elliot, Thomas J. Rothenberg & James H. Stock, *Efficient Tests for an Autoregressive Unit Root*, 64 Econometrica 813-836 (July 1996), *available at* https://ideas.repec.org/a/ecm/emetrp/v64y1996i4p813-36.html.

Greg Botelho & Michael Martinez, *FBI: 23-Year-Old L.A. Man Is Suspect in Airport Shooting that Kills TSA Officer*, CNN.com (Nov. 1, 2013), http://www.cnn.com/2013/11/01/us/lax-gunfire/index.html?hpt=hp_t1.

Jim Guy, *Gunfight at East-central Fresno Home Leaves Three Dead, One Wounded*, Fresno Bee (June 6, 2017), http://www.fresnobee.com/news/local/article 154583549.html.

Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* (2016).

Mass Shooting Tracker, www.massshootingtracker.org (last visited Oct. 30, 2017).

Mass Shooting Tracker, https://massshootingtracker.org/data (last visited Oct. 30, 2017).

Matthew Haag, *Gunman, Thought to Be Targeting Whites, Kills 3 in Fresno, Police Say*, N.Y. Times (April 18, 2017), https://www.nytimes.com/2017/04/18/us/fresno-shooting-rampage-kori-ali-muhammad.html?_r=0.

Mother Jones, *US Mass Shootings, 1982-2017: Data from Mother Jones' Investigation*, http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data/ (last updated Oct. 18, 2017).

Violence Policy Center, *High-Capacity Ammunition Magazines Are the Common Thread Running Through Most Mass Shootings in the United States* (July 1, 2017), *available at* http://gunviolence.issuelab.com/resource/high-capacity-ammunition-magazines-are-the-common-thread-running-through-most-mass-shootings-in-the-united-states.html.

Virginia State Police, *Firearms Transaction Center (FTC)*, Crim. Jus. Info. Servs. (CJIS) Div. Newsletter 1, July 2013, *available at* http://www.vsp.state.va.us/downloads/CJIS_Newsletters/CJIS-Newsletter-July-2013.pdf.

Vivian Ho, *UPS Shooter in San Francisco Used Stolen Gun with 30-round Magazine*, S.F. Gate (June 23, 2017), http://www.sfgate.com/crime/article/UPS-shooter-in-San-Francisco-used-stolen-gun-with-11243414.php.

Wikipedia.com, *Covina Massacre* (last updated Oct. 29, 2017), https://en.wikipedia.org/wiki/Covina_massacre.

Wikipedia.com, *SKS* (last updated Oct. 28, 2017), https://en.wikipedia.org/wiki/SKS.

## VIII.  APPENDIX AND ATTACHMENT

Attached as **Appendix 1** is a true and correct copy of the complete output of the Stata program used to generate the results reported in Section VI.A. above.

Attached as **Appendix 2** is a true and correct copy of the complete output of the Stata program used to generate the results reported in Section VI.C above.

Attached at **Exhibit 1** and made a part of this report is a copy of my curriculum vitae, including a list of all my published works from the last ten years.

## IX.    CONCLUSION

Based on the findings listed above, it is my opinion that the California acquisition ban on LCMs has had no significant effect on the California murder rate, gun homicide rate, the number of people killed in mass shootings, the number of incidents of mass shootings, or the number of police officers killed in the line of duty.

Similarly, I find that the federal assault weapons law and its national LCM ban had no effect on the California violent crime rate, murder rate, gun murder rate, the number of people killed in mass shootings, the number of incidents of mass shootings, or the number of police officers killed in the line of duty.

The ineffectiveness of the acquisition ban is not due to the fact that possession of LCMs was not prohibited. A comprehensive examination of the incidents of mass shootings indicates that no grandfathered, pre-acquisition-ban LCMs have been used in any mass shootings in California.

It is thus my professional opinion that California's acquisition ban has not and will not, even when paired with a possession ban, result in any statistically significant reduction in the number or lethality of mass shooting incidents in California or violent crime rates in general.

Dated: November 2, 2017

Dr. Carlisle E. Moody
William & Mary
Tyler Hall, Room 336
300 James Blair Dr.
Williamsburg, VA
(757) 221-2373
cemood@wm.edu

24

Exhibit 4
00127

**ER_3759**

## APPENDIX 1

Complete output of the Stata program used to generate the results reported in Section 3.

```
--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
      name:  <unnamed>
       log:  C:\Users\cemood\Box Sync\California\report.log
  log type:  text
 opened on:  18 Oct 2017, 09:33:51

.
. *set more off
.
. tsset year
        time variable:  year, 1968 to 2017
                delta:  1 unit

. gen trend=year-1967

. gen fedban=(year>1993)*(year<2005)

. gen pp1529=pp1519+pp2024+pp2529
(4 missing values generated)

. gen crack=(year>=1984)*(year<=1991)

.
. gen dcrviopc=D.crviopc
(3 missing values generated)

. gen dcrmurpc=D.crmurpc
(3 missing values generated)

. gen dgunhomrate=D.gunhomrate
(5 missing values generated)

. gen dlcmban=D.lcmban
(1 missing value generated)

. gen dfedban=D.fedban
(1 missing value generated)

. gen dpp1529=D.pp1529
(5 missing values generated)

. gen drtpipc=D.rtpipc
(3 missing values generated)

. gen dunrate=D.unrate
(5 missing values generated)

. gen dcrviopc_1=LD.crviopc
(3 missing values generated)

. gen dcrmurpc_1=LD.crmurpc
(3 missing values generated)
```

```
. gen dgunhomrate_1=LD.gunhomrate
(5 missing values generated)

. gen dcrack=D.crack
(1 missing value generated)

.
.
. label var crviopc "Violent crime rate"

. label var crmurpc "Murder rate"

. label var gunhomrate "Firearm homicide rate"

. label var lcmban "LCM ban"

. label var fedban "Federal LCM ban"

.
. label var dcrviopc "Violent crime rate"

. label var dcrmurpc "Murder rate"

. label var dgunhomrate "Firearm homicide rate"

. label var dlcmban "LCM ban"

. label var dfedban "Federal LCM ban"

.
. label var dcrviopc_1 "Violent crime rate, lagged"

. label var dcrmurpc_1 "Murder rate, lagged"

. label var dgunhomrate_1 "Firearm homicide rate, lagged"

. label var crack "Crack epidemic 1984-1991"

. label var dcrack "Crack epidemic 1984-1991"

. label var dpp1529 "Percent population 15-29"

. label var dunrate "Unemployment rate"

. label var drtpipc "Income per capita"

. label var pp1529 "Percent population 15-29"

. label var unrate "Unemployment rate"

. label var rtpipc "Income per capita"

. label var trend "Trend"

. label var polkil "Police officers killed"

. label var killed "Mass shooting deaths, Klarevas"

. label var incidents "Mass shooting incidents, Klarevas"

.
```

2

Exhibit 4

00129

Appendix 1

```
.
. /* violent crime and the LCM ban */
.
. twoway (line crviopc year) if year>1969, xline(1994,lpattern(dash)) xline(2000)
xline(2004,lpattern(dash))

.
. dfgls crviopc

DF-GLS for crviopc                                    Number of obs =     38
Maxlag = 9 chosen by Schwert criterion

                 DF-GLS tau     1% Critical     5% Critical    10% Critical
       [lags]   Test Statistic     Value           Value          Value
----------------------------------------------------------------------------
          9        -1.402         -3.770          -2.723         -2.425
          8        -1.022         -3.770          -2.783         -2.490
          7        -1.045         -3.770          -2.850         -2.559
          6        -1.581         -3.770          -2.921         -2.630
          5        -1.375         -3.770          -2.994         -2.701
          4        -1.189         -3.770          -3.066         -2.769
          3        -1.239         -3.770          -3.133         -2.833
          2        -1.224         -3.770          -3.195         -2.889
          1        -1.171         -3.770          -3.247         -2.937

Opt Lag (Ng-Perron seq t) = 9 with RMSE  36.79024
Min SC   = 7.686171 at lag 1 with RMSE  42.40895
Min MAIC = 7.625905 at lag 1 with RMSE  42.40895

. regress dcrviopc  dlcmban dfedban dpp1529 dcrack drtpipc dunrate dcrviopc_1

      Source |       SS           df       MS      Number of obs   =        45
-------------+----------------------------------   F(7, 37)        =      2.89
       Model |  37953.3085         7  5421.90122   Prob > F        =    0.0163
    Residual |  69380.1786        37  1875.13996   R-squared       =    0.3536
-------------+----------------------------------   Adj R-squared   =    0.2313
       Total |  107333.487        44  2439.39744   Root MSE        =    43.303

------------------------------------------------------------------------------
    dcrviopc |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
     dlcmban |   44.84434   46.96038     0.95   0.346    -50.30644    139.9951
     dfedban |  -31.54718   31.61965    -1.00   0.325    -95.61467    32.52031
     dpp1529 |   8.983775   21.06671     0.43   0.672    -33.70144    51.66899
      dcrack |   2.645099   33.32475     0.08   0.937    -64.87727    70.16747
     drtpipc |  -.999542   25.79697    -0.04   0.969    -53.26916    51.27008
     dunrate |  -2.65343   8.150656    -0.33   0.747    -19.16823    13.86137
   dcrviopc_1 |   .6052954   .146779     4.12   0.000     .3078928    .9026979
       _cons |  -.3448009   8.790083    -0.04   0.969     -18.1552    17.4656
------------------------------------------------------------------------------

. outreg using  table1 ,  starlevels(5) ctitles(Variable,Coefficient, T-ratio, P-value)
varlabels replace stats(b t p) nosubstat

          --------------------------------------------------------
          Variable                 Coefficient  T-ratio  P-value
          --------------------------------------------------------
          LCM ban                      44.844    0.95     0.35
          Federal LCM ban             -31.547   -1.00     0.32
          Percent population 15-29      8.984    0.43     0.67
          Crack epidemic 1984-1991      2.645    0.08     0.94
```

3

Exhibit 4

00130

Appendix 1

**ER_3762**

```
            Income per capita              -1.000    -0.04    0.97
            Unemployment rate              -2.653    -0.33    0.75
            Violent crime rate, lagged      0.605     4.12*   0.00
            Constant                       -0.345    -0.04    0.97
      ---------------------------------------------------------
                              * p<0.05
```

```
. test dpp1529 dcrack drtpipc dunrate

 ( 1)  dpp1529 = 0
 ( 2)  dcrack = 0
 ( 3)  drtpipc = 0
 ( 4)  dunrate = 0

       F(  4,    37) =    0.11
            Prob > F =    0.9790

. regress dcrviopc  dlcmban dfedban dcrviopc_1
```

```
      Source |       SS       df       MS              Number of obs =      46
-------------+------------------------------           F(3, 42)      =    7.46
       Model |  37434.0285      3  12478.0095           Prob > F      =   0.0004
    Residual |  70204.9891     42  1671.54736           R-squared     =   0.3478
-------------+------------------------------           Adj R-squared =   0.3012
       Total |  107639.018     45  2391.97817           Root MSE      =   40.885
```

```
------------------------------------------------------------------------------
    dcrviopc |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
     dlcmban |   45.16038   42.50885     1.06   0.294    -40.62595    130.9467
     dfedban |   -34.9102   28.91836    -1.21   0.234    -93.26981    23.44942
   dcrviopc_1 |  .5888778   .1279103     4.60   0.000     .3307443    .8470113
       _cons |  -1.334702   6.09661    -0.22   0.828    -13.63816    10.96875
------------------------------------------------------------------------------
```

```
. estat bgodfrey, lags(1) small

Breusch-Godfrey LM test for autocorrelation
---------------------------------------------------------------------------
    lags(p)  |          F                   df                  Prob > F
-------------+-------------------------------------------------------------
       1     |        0.718                ( 1,    41 )            0.4016
---------------------------------------------------------------------------
               H0: no serial correlation

. *twoway (line dcrviopc year) if year>1969, xline(1994,lpattern(dash)) xline(2000)
xline(2004,lpattern(dash))
. more

.
. /* murder */
.
. twoway (line crmurpc year) if year>1969, xline(1994,lpattern(dash)) xline(2000)
xline(2004,lpattern(dash))

. dfgls crmurpc

DF-GLS for crmurpc                                    Number of obs =    38
Maxlag = 9 chosen by Schwert criterion
```

```
              DF-GLS tau      1% Critical      5% Critical      10% Critical
     [lags]   Test Statistic     Value            Value            Value
    ------------------------------------------------------------------------------
        9       -1.014          -3.770          -2.723          -2.425
        8       -0.786          -3.770          -2.783          -2.490
        7       -0.968          -3.770          -2.850          -2.559
        6       -1.172          -3.770          -2.921          -2.630
        5       -1.317          -3.770          -2.994          -2.701
        4       -1.334          -3.770          -3.066          -2.769
        3       -1.410          -3.770          -3.133          -2.833
        2       -1.671          -3.770          -3.195          -2.889
        1       -1.707          -3.770          -3.247          -2.937

Opt Lag (Ng-Perron seq t) =  1 with RMSE    .686063
Min SC   = -.5621197 at lag  1 with RMSE    .686063
Min MAIC = -.5328976 at lag  1 with RMSE    .686063

. regress dcrmurpc  dlcmban dfedban dpp1529 dcrack drtpipc dunrate dcrmurpc_1

      Source |       SS       df       MS              Number of obs =      45
-------------+------------------------------           F(7, 37)      =    2.07
       Model |  8.14377879    7  1.16339697           Prob > F       =  0.0723
    Residual |  20.8393118   37  .563224644           R-squared      =  0.2810
-------------+------------------------------           Adj R-squared =  0.1450
       Total |  28.9830906   44  .658706605           Root MSE       =  .75048

------------------------------------------------------------------------------
    dcrmurpc |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
     dlcmban |  .5863887   .8065601     0.73   0.472    -1.047857    2.220635
     dfedban | -.8840157   .5505488    -1.61   0.117    -1.999534    .2315022
     dpp1529 |  .2253544   .3744847     0.60   0.551    -.5334237    .9841324
      dcrack |  .3602601   .586199      0.61   0.543    -.8274918    1.548012
     drtpipc | -.2878104   .4464038    -0.64   0.523    -1.19231     .6166895
     dunrate | -.0560486   .1434289    -0.39   0.698    -.3466631    .234566
   dcrmurpc_1|  .4516491   .152137      2.97   0.005     .1433902    .759908
       _cons |  .0467065   .1517945     0.31   0.760    -.2608583    .3542713
------------------------------------------------------------------------------

. outreg using  table2 ,  starlevels(5) ctitles(Variable,Coefficient, T-ratio, P-value)
varlabels replace stats(b t p) nosubstat
```

```
    ---------------------------------------------------------
    Variable                 Coefficient   T-ratio   P-value
    ---------------------------------------------------------
    LCM ban                      0.586       0.73      0.47
    Federal LCM ban             -0.884      -1.61      0.12
    Percent population 15-29     0.225       0.60      0.55
    Crack epidemic 1984-1991     0.360       0.61      0.54
    Income per capita           -0.288      -0.64      0.52
    Unemployment rate           -0.056      -0.39      0.70
    Murder rate, lagged          0.452       2.97*     0.01
    Constant                     0.047       0.31      0.76
    ---------------------------------------------------------
                  * p<0.05
```

```
. predict e, resid
(5 missing values generated)

. estat bgodfrey, lags(1) small
```

Exhibit 4
00132

Appendix 1

**ER_3764**

```
Breusch-Godfrey LM test for autocorrelation
---------------------------------------------------------------------
   lags(p) |          F                df            Prob > F
-------------+-------------------------------------------------------
      1     |       0.004          ( 1,   36 )        0.9515
---------------------------------------------------------------------
                    H0: no serial correlation

. more

.
. /* gun homicide rate */
.
. twoway (line gunhomrate year) if year>1969, xline(1994,lpattern(dash)) xline(2000)
xline(2004,lpattern(dash))

. dfgls gunhomrate

DF-GLS for gunhomrate                          Number of obs =    36
Maxlag = 9 chosen by Schwert criterion

             DF-GLS tau     1% Critical    5% Critical   10% Critical
   [lags]   Test Statistic     Value          Value          Value
-----------------------------------------------------------------------
      9        -0.875         -3.770         -2.716         -2.412
      8        -0.697         -3.770         -2.775         -2.477
      7        -0.957         -3.770         -2.843         -2.549
      6        -1.083         -3.770         -2.917         -2.623
      5        -1.254         -3.770         -2.994         -2.698
      4        -1.425         -3.770         -3.070         -2.771
      3        -1.600         -3.770         -3.142         -2.840
      2        -2.155         -3.770         -3.208         -2.901
      1        -1.931         -3.770         -3.264         -2.952

Opt Lag (Ng-Perron seq t) =  1 with RMSE  .5520979
Min SC   = -.9889755 at lag  1 with RMSE  .5520979
Min MAIC = -.9030688 at lag  1 with RMSE  .5520979

. regress dgunhomrate  dlcmban dfedban dpp1529 dcrack drtpipc dunrate dgunhomrate_1

      Source |       SS       df       MS              Number of obs =      43
-------------+------------------------------           F(7, 35)      =    2.70
       Model |  6.75439422      7   .96491346          Prob > F      =  0.0241
    Residual |  12.5292156     35  .357977588          R-squared     =  0.3503
-------------+------------------------------           Adj R-squared =  0.2203
       Total |  19.2836098     42  .459133567          Root MSE      =  .59831

-----------------------------------------------------------------------------------
   dgunhomrate |     Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+---------------------------------------------------------------------
      dlcmban |   .8436859   .6538369     1.29   0.205    -.4836736    2.171045
      dfedban |  -.6063146   .437159     -1.39   0.174    -1.493795    .2811653
      dpp1529 |   .1036157   .2944184     0.35   0.727    -.4940854    .7013167
       dcrack |   .4721783   .4757592     0.99   0.328    -.4936642    1.438021
      drtpipc |  -.3549564   .3873536    -0.92   0.366    -1.141326    .4314131
      dunrate |  -.0643103   .1157443    -0.56   0.582    -.2992837    .1706632
 dgunhomrate_1 |  .5453604   .1500127     3.64   0.001     .2408184    .8499024
        _cons |   .0556823   .1222048     0.46   0.651    -.1924066    .3037712
-----------------------------------------------------------------------------------
```

6

Exhibit 4

00133

Appendix 1

**ER_3765**

```
. outreg using  table3 ,  starlevels(5) ctitles(Variable,Coefficient, T-ratio, P-value)
varlabels replace stats(b t p) nosubstat
          --------------------------------------------------------------
             Variable                       Coefficient  T-ratio  P-value
          --------------------------------------------------------------
             LCM ban                            0.844     1.29      0.21
             Federal LCM ban                   -0.606    -1.39      0.17
             Percent population 15-29           0.104     0.35      0.73
             Crack epidemic 1984-1991          0.472     0.99      0.33
             Income per capita                 -0.355    -0.92      0.37
             Unemployment rate                 -0.064    -0.56      0.58
             Firearm homicide rate, lagged      0.545     3.64*     0.00
             Constant                           0.056     0.46      0.65
          --------------------------------------------------------------
                                 * p<0.05

. estat bgodfrey, lags(2) small

Breusch-Godfrey LM test for autocorrelation
---------------------------------------------------------------------
   lags(p)  |          F            df              Prob > F
-------------+-------------------------------------------------------
      2      |        0.829      (  2,   33 )          0.4452
---------------------------------------------------------------------
                   H0: no serial correlation

. *twoway (line gunhomrate year) if yhat ~=., xline(1994) xline(2000) xline(2004)
. more

.
. /* number killed in mass public shootings Klarevas data */
.
. gen kkilled=killed

. replace kkilled=. if killed==0
(35 real changes made, 35 to missing)

. label var kkilled "Number killed in mass shootings, Klarevas"

. twoway (scatter kkilled year) if year>1967, ysc(r(0 25))  xline(1994,lpattern(dash))
xline(2000) xline(2004,lpattern(dash))

.
. nbreg killed lcmban fedban trend pp1529 crack rtpipc unrate, nolog

Negative binomial regression            Number of obs    =       46
                                        LR chi2(7)       =     7.35
Dispersion     = mean                   Prob > chi2      =   0.3932
Log likelihood = -74.530257             Pseudo R2        =   0.0470

---------------------------------------------------------------------
    killed |    Coef.   Std. Err.      z     P>|z|    [95% Conf. Interval]
-----------+---------------------------------------------------------
    lcmban |  -2.025035  3.791376   -0.53   0.593   -9.455996   5.405925
    fedban |  -.9139186  1.468685   -0.62   0.534   -3.792489   1.964652
     trend |  -.7012929  .4384203   -1.60   0.110   -1.560581   .157995
    pp1529 | -1.045867   .7400789   -1.41   0.158   -2.496395   .404661
     crack |  3.036672  1.870139    1.62   0.104   -.628732   6.702076
    rtpipc |  3.231676   2.1214     1.52   0.128   -.9261921  7.389545
```

7

Exhibit 4
00134

Appendix 1

```
      unrate |   1.218783   .7615005     1.60   0.109    -.273731    2.711296
       _cons |  -19.88964   25.47565    -0.78   0.435   -69.82099    30.04172
-------------+----------------------------------------------------------------
     /lnalpha |   1.717326   .3556229                     1.020318    2.414334
-------------+----------------------------------------------------------------
       alpha |   5.569614   1.980682                     2.774076    11.18232
-------------------------------------------------------------------------------
LR test of alpha=0: chibar2(01) = 159.74             Prob >= chibar2 = 0.000

. /***** note: Poisson rejected by likelihood ratio test on alpha *****/
.
. outreg using  table4 ,  starlevels(5) ctitles(Outcome,Variable,Coefficient, T-ratio, P-
value) varlabels replace stats(b t p) nosubstat
```

```
  ---------------------------------------------------------------------------
   Outcome                        Variable                Coefficient  T-ratio  P-value
  ---------------------------------------------------------------------------
   Mass shooting deaths, Klarevas  LCM ban                     -2.025    -0.53     0.59
                                   Federal LCM ban   -0.914     -0.62     0.53
                                   Trend             -0.701     -1.60     0.11
                                   Percent population 15-29  -1.046     -1.41     0.16
                                   Crack epidemic 1984-1991   3.037      1.62     0.10
                                   Income per capita  3.232      1.52     0.13
                                   Unemployment rate  1.219      1.60     0.11
                                   Constant         -19.890     -0.78     0.43
       lnalpha                     Constant                     1.717     4.83*    0.00
  ---------------------------------------------------------------------------
                                 * p<0.05
```

```
.
. more



.
.
. /* number of incidents of mass murder, Klarevas data */
.
. gen x=incidents

. replace x=. if x==0
(35 real changes made, 35 to missing)

. label var x "Number of incidents of mass shootings, Klarevas"

. twoway (scatter x year),  xline(1994,lpattern(dash)) xline(2000) xline(2004,lpattern(dash))

.
. nbreg incidents lcmban fedban trend pp1529 crack rtpipc unrate, nolog
```

```
Negative binomial regression                     Number of obs   =         46
                                                 LR chi2(7)      =       8.53
Dispersion    = mean                             Prob > chi2     =     0.2881
Log likelihood = -28.2365                         Pseudo R2       =     0.1312
```

```
-------------------------------------------------------------------------------
   incidents |      Coef.   Std. Err.      z    P>|z|     [95% Conf. Interval]
-------------+-----------------------------------------------------------------
      lcmban |  -2.385524   2.061694    -1.16   0.247    -6.42637    1.655323
       fedban |  -1.439191   1.348343    -1.07   0.286   -4.081894    1.203512
        trend |  -.2348308   .1984285    -1.18   0.237    -.6237436    .154082
       pp1529 |   -.379523   .3268173    -1.16   0.246   -1.020073    .2610272
```

8

Exhibit 4

00135

Appendix 1

**ER_3767**

```
       crack |   .4911215   .9752547     0.50   0.615    -1.420343    2.402586
      rtpipc |     1.3435   1.007087     1.33   0.182    -.6303553    3.317355
      unrate |   .4089753   .2875448     1.42   0.155     -.154602    .9725527
       _cons |  -11.04284   13.46766    -0.82   0.412    -37.43896    15.35328
-------------+----------------------------------------------------------------
     /lnalpha |  -35.09767          .                       .            .
-------------+----------------------------------------------------------------
       alpha |   5.72e-16          .                       .            .
------------------------------------------------------------------------------
LR test of alpha=0: chibar2(01) = 0.00              Prob >= chibar2 = 1.000

. outreg using  table5 ,  starlevels(5) ctitles(Outcome,Variable,Coefficient, T-ratio, P-
value) varlabels replace stats(b t p) nosubstat


--------------------------------------------------------------------------------
 Outcome                     Variable                 Coefficient  T-ratio  P-value

 Mass shooting incidents, Klarevas  LCM ban                -2.386    -1.16     0.25
                       Federal LCM ban        -1.439    -1.07    0.29
                       Trend                  -0.235    -1.18    0.24
                       Percent population 15-29  -0.380    -1.16    0.25
                       Crack epidemic 1984-1991  0.491     0.50    0.61
                       Income per capita       1.343     1.33    0.18
                       Unemployment rate       0.409     1.42    0.15
                       Constant               -11.043    -0.82    0.41
            lnalpha           Constant                             -35.098
--------------------------------------------------------------------------------
                               * p<0.05


. poisson incidents lcmban fedban trend pp1529 crack rtpipc unrate, nolog

Poisson regression                         Number of obs    =        46
                                           LR chi2(7)       =      8.53
                                           Prob > chi2      =    0.2881
Log likelihood = -28.2365                  Pseudo R2        =    0.1312

------------------------------------------------------------------------------
   incidents |      Coef.   Std. Err.      z    P>|z|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
      lcmban |  -2.385524   2.061694    -1.16   0.247    -6.42637     1.655323
      fedban |  -1.439191   1.348343    -1.07   0.286    -4.081894    1.203512
       trend |  -.2348308   .1984286    -1.18   0.237    -.6237436    .154082
      pp1529 |   -.379523   .3268173    -1.16   0.246    -1.020073    .2610272
       crack |   .4911215   .9752547     0.50   0.615    -1.420343    2.402586
      rtpipc |     1.3435   1.007087     1.33   0.182    -.6303553    3.317355
      unrate |   .4089753   .2875448     1.42   0.155     -.154602    .9725527
       _cons |  -11.04284   13.46766    -0.82   0.412    -37.43896    15.35328
------------------------------------------------------------------------------

. more

.
. /* police officers killed in line of duty */
. drop x

. nbreg polkil lcmban fedban trend pp1529 crack rtpipc unrate,  nolog

Negative binomial regression               Number of obs    =        43
                                           LR chi2(6)       =     31.87
Dispersion     = mean                      Prob > chi2      =    0.0000
```

```
Log likelihood = -89.637301                    Pseudo R2      =     0.1510

------------------------------------------------------------------------------
    polkil |     Coef.   Std. Err.      z    P>|z|    [95% Conf. Interval]
-----------+------------------------------------------------------------------
    lcmban |   .056078   .4088831     0.14   0.891    -.7453181    .8574741
    fedban |  -.2321364  .2598886    -0.89   0.372    -.7415086    .2772359
     trend |  -.0290026  .0421929    -0.69   0.492    -.1116993    .053694
    pp1529 |  -.0893957  .0726395    -1.23   0.218    -.2317665    .052975
     crack |  -.4051925  .2096658    -1.93   0.053     -.81613     .005745
    rtpipc |  -.0784565  .2221189    -0.35   0.724    -.5138015    .3568885
    unrate |  -.0327168  .0676716    -0.48   0.629    -.1653507    .0999171
     _cons |   6.453041  3.518096     1.83   0.067    -.4423013    13.34838
-----------+------------------------------------------------------------------
  /lnalpha | -34.79069       .                        .           .
-----------+------------------------------------------------------------------
     alpha |   7.77e-16      .                        .           .
------------------------------------------------------------------------------
LR test of alpha=0: chibar2(01) = 0.00              Prob >= chibar2 = 1.000

. outreg using  table6 , starlevels(5) ctitles(Outcome,Variable,Coefficient, T-ratio, P-
value) varlabels replace stats(b t p) nosubstat

        -------------------------------------------------------------------
        Outcome               Variable           Coefficient  T-ratio  P-value
        -------------------------------------------------------------------
        Police officers killed  LCM ban               0.056    0.14     0.89
                        Federal LCM ban       -0.232   -0.89    0.37
                        Trend                 -0.029   -0.69    0.49
                        Percent population 15-29  -0.089   -1.23    0.22
                        Crack epidemic 1984-1991  -0.405   -1.93    0.05
                        Income per capita     -0.078   -0.35    0.72
                        Unemployment rate     -0.033   -0.48    0.63
                        Constant               6.453    1.83     0.07
              lnalpha           Constant                       -34.791
        -------------------------------------------------------------------
                                * p<0.05

. test pp1529 rtpipc unrate

 ( 1)  [polkil]pp1529 = 0
 ( 2)  [polkil]rtpipc = 0
 ( 3)  [polkil]unrate = 0

        chi2(  3) =    2.08
      Prob > chi2 =    0.5569

. poisson polkil lcmban fedban trend pp1529 crack rtpipc unrate,  nolog

Poisson regression                             Number of obs   =         43
                                               LR chi2(7)      =      35.30
                                               Prob > chi2     =     0.0000
Log likelihood = -89.637301                    Pseudo R2       =     0.1645

------------------------------------------------------------------------------
    polkil |     Coef.   Std. Err.      z    P>|z|    [95% Conf. Interval]
-----------+------------------------------------------------------------------
    lcmban |  .0560784   .4088831     0.14   0.891    -.7453177    .8574745
    fedban |  -.2321364  .2598886    -0.89   0.372    -.7415086    .2772359
     trend |  -.0290025  .0421929    -0.69   0.492    -.1116991    .0536941
```

Appendix 1

**ER_3769**

```
       pp1529 |  -.0893956   .0726395    -1.23   0.218    -.2317664    .0529752
        crack |  -.4051925   .2096658    -1.93   0.053      -.81613    .005745
       rtpipc |   -.078457   .2221189    -0.35   0.724    -.5138019    .356888
       unrate |  -.0327168   .0676716    -0.48   0.629    -.1653507    .099917
        _cons |   6.453043   3.518097     1.83   0.067    -.4423001   13.34839
------------------------------------------------------------------------------

. gen x=polkil if polkil~=0
(7 missing values generated)

. label var x "Police officers killed"

. twoway (line x year) if year>1972, ysc(r(0 25))  xline(1994,lpattern(dash)) xline(2000)
xline(2004,lpattern(dash))

. mean polkil if year<=1999

Mean estimation                     Number of obs   =         27

--------------------------------------------------------------
             |       Mean   Std. Err.     [95% Conf. Interval]
-------------+------------------------------------------------
      polkil |   7.518519   .6233134       6.23728    8.799758
--------------------------------------------------------------

. mean polkil if year>1999

Mean estimation                     Number of obs   =         16

--------------------------------------------------------------
             |       Mean   Std. Err.     [95% Conf. Interval]
-------------+------------------------------------------------
      polkil |     4.3125   .3732599      3.516915    5.108085
--------------------------------------------------------------
.
. /* regressions in levels instead of first differences */
.
. regress crviopc lcmban fedban pp1529 crack rtpipc unrate L.crviopc

      Source |       SS       df       MS              Number of obs =      46
-------------+------------------------------           F(7, 38)      =  216.16
       Model |  1911311.24     7  273044.462           Prob > F      =  0.0000
    Residual |  48000.0767    38  1263.15991           R-squared     =  0.9755
-------------+------------------------------           Adj R-squared =  0.9710
       Total |  1959311.31    45  43540.2514           Root MSE      =  35.541

------------------------------------------------------------------------------
     crviopc |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
      lcmban |   52.97421   33.32976     1.59   0.120    -14.49837    120.4468
      fedban |  -52.17283   19.85951    -2.63   0.012    -92.37631   -11.96935
      pp1529 |    2.42715   4.805705     0.51   0.616    -7.301492    12.15579
       crack |   33.79697   18.29422     1.85   0.072    -3.237745    70.83169
      rtpipc |  -10.19981   6.295427    -1.62   0.113    -22.94424    2.544612
      unrate |  -8.285666   3.407783    -2.43   0.020    -15.18436    -1.38697
             |
     crviopc |
         L1. |   .9796338   .0422401    23.19   0.000     .8941232    1.065144
             |
       _cons |   178.0654   210.7171     0.85   0.403     -248.509    604.6398
------------------------------------------------------------------------------
```

11
Exhibit 4
00138

Appendix 1

**ER_3770**

```
. estat bgodfrey, lags(1) small

Breusch-Godfrey LM test for autocorrelation
---------------------------------------------------------------------
   lags(p) |       F             df               Prob > F
-------------+-------------------------------------------------------
      1    |     0.326        (  1,   37 )           0.5713
---------------------------------------------------------------------
               H0: no serial correlation

.
. regress crmurpc lcmban fedban pp1529 crack rtpipc unrate L.crmurpc

      Source |       SS           df       MS      Number of obs   =        46
-------------+----------------------------------   F(7, 38)        =     98.40
       Model |  340.195397         7  48.5993424   Prob > F        =    0.0000
    Residual |  18.7677972        38  .493889399   R-squared       =    0.9477
-------------+----------------------------------   Adj R-squared   =    0.9381
       Total |  358.963194        45  7.97695987   Root MSE        =    .70277

---------------------------------------------------------------------------
     crmurpc |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+-------------------------------------------------------------
      lcmban |   1.005674   .6305389     1.59   0.119    -.2707855    2.282133
       fedban |  -.6778448   .3865627    -1.75   0.088      -1.4604    .1047104
       pp1529 |   -.003023   .0970217    -0.03   0.975    -.1994331    .1933871
        crack |   .3856919   .3425114     1.13   0.267    -.3076861     1.07907
       rtpipc |  -.2482905   .1239648    -2.00   0.052    -.4992442    .0026632
       unrate |  -.1237299   .0670494    -1.85   0.073    -.2594643    .0120046
             |
     crmurpc |
         L1. |   .9153736   .0655541    13.96   0.000     .7826663    1.048081
             |
       _cons |   5.672326   4.142842     1.37   0.179     -2.71442    14.05907
---------------------------------------------------------------------------

. estat bgodfrey, lags(1) small

Breusch-Godfrey LM test for autocorrelation
---------------------------------------------------------------------
   lags(p) |       F             df               Prob > F
-------------+-------------------------------------------------------
      1    |     3.304        (  1,   37 )           0.0772
---------------------------------------------------------------------
               H0: no serial correlation

.
. regress gunhomrate lcmban fedban pp1529 crack rtpipc unrate L.gunhomrate

      Source |       SS           df       MS      Number of obs   =        44
-------------+----------------------------------   F(7, 36)        =     56.08
       Model |  130.524965         7  18.6464235   Prob > F        =    0.0000
    Residual |  11.9699041        36  .332497336   R-squared       =    0.9160
-------------+----------------------------------   Adj R-squared   =    0.8997
       Total |  142.494869        43  3.31383416   Root MSE        =    .57663

---------------------------------------------------------------------------
   gunhomrate |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+-------------------------------------------------------------
      lcmban |   1.219866   .5469665     2.23   0.032     .1105663    2.329165
```

Appendix 1

**ER_3771**

```
      fedban |   -.6035338    .319288    -1.89   0.067    -1.25108    .0440122
      pp1529 |   -.0490334   .0777201    -0.63   0.532    -.206657   .1085902
       crack |     .602306   .2905786     2.07   0.045    .0129852   1.191627
      rtpipc |    -.248543   .1099859    -2.26   0.030   -.4716047   -.0254813
      unrate |    -.102815    .055463    -1.85   0.072   -.2152991    .009669
             |
   gunhomrate |
         L1. |    .9880207   .0668339    14.78   0.000    .8524753   1.123566
             |
       _cons |    5.857603   3.459172     1.69   0.099   -1.157922   12.87313
-------------------------------------------------------------------------------

. estat bgodfrey, lags(1) small

Breusch-Godfrey LM test for autocorrelation
---------------------------------------------------------------------
    lags(p) |          F               df           Prob > F
-------------+-------------------------------------------------------
        1   |        4.477          ( 1,   35 )        0.0415
---------------------------------------------------------------------
                     H0: no serial correlation
.
. log close
      name:  <unnamed>
       log:  C:\Users\cemood\Box Sync\California\report.log
  log type:  text
 closed on:  18 Oct 2017, 09:34:02
--------------------------------------------------------------------------------------
      --------------------------------------------------------------------------------
```

**APPENDIX 2**

Complete output of the Stata program used to generate the results reported in Section VI.C.

```
--------------------------------------------------------------------------------------------
--------------------------------------------

        name:  <unnamed>

         log:  C:\Users\cemood\Box Sync\California\Virginia\va.log

    log type:  text

    opened on:  26 Oct 2017, 08:52:43


. use va.dta, clear;


. tsset year;

        time variable:  year, 1990 to 2013

                delta:  1 unit


. rename lgunhomrate gun_hom_rate;


. rename lcrmurpc murder_rate;


. /* gun homicide */

> dfgls gun_hom_rate;


DF-GLS for gun_hom_rate                          Number of obs =    14

Maxlag = 8 chosen by Schwert criterion


                 DF-GLS tau      1% Critical       5% Critical      10% Critical
```

1

Exhibit 4

00141

Appendix 2

```
   [lags]    Test Statistic      Value           Value           Value

-------------------------------------------------------------------------

      8         -1.659          -3.770          -4.084          -3.139

      7         -1.735          -3.770          -3.465          -2.719

      6         -1.855          -3.770          -3.116          -2.510

      5         -1.993          -3.770          -2.981          -2.468

      4         -2.328          -3.770          -3.009          -2.548

      3         -2.103          -3.770          -3.143          -2.705

      2         -1.796          -3.770          -3.332          -2.896

      1         -1.405          -3.770          -3.521          -3.075


Opt Lag (Ng-Perron seq t) = 0 [use maxlag(0)]

Min SC   = -4.374397 at lag  1 with RMSE  .0929491

Min MAIC = -4.070523 at lag  1 with RMSE  .0929491


. regress gun_hom_rate pctlcm;

      Source |       SS           df       MS      Number of obs   =       20

-------------+----------------------------------   F(1, 18)        =     9.21

       Model |  .359084435         1  .359084435   Prob > F        =   0.0071

    Residual |  .701959689        18  .038997761   R-squared       =   0.3384

-------------+----------------------------------   Adj R-squared   =   0.3017

       Total |  1.06104412        19  .055844428   Root MSE        =   .19748


      ---------------------------------------------------------------------

gun_hom_rate |     Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
```

2

Exhibit 4

00142

Appendix 2

```
-------------+----------------------------------------------------------------

    pctlcm |  -.0282314    .0093037    -3.03   0.007    -.0477778    -.0086851

     _cons |   1.928703    .1727546    11.16   0.000     1.565759     2.291647

-------------------------------------------------------------------------------


. regress gun_hom_rate pctlcm trend;


      Source |       SS           df       MS            Number of obs   =        20
-------------+----------------------------------         F(2, 17)        =     39.91
       Model |  .874730451          2   .437365225       Prob > F        =    0.0000
    Residual |  .186313673         17   .010959628       R-squared       =    0.8244
-------------+----------------------------------         Adj R-squared   =    0.8037
       Total |  1.06104412         19   .055844428       Root MSE        =    .10469



-------------------------------------------------------------------------------
gun_hom_rate |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------

      pctlcm |  -.0060742    .0058958    -1.03   0.317    -.0185132     .0063648

       trend |  -.0332869    .0048528    -6.86   0.000    -.0435255    -.0230483

       _cons |   1.947032    .0916205    21.25   0.000      1.75373     2.140335

-------------------------------------------------------------------------------


. estat bgodfrey, lags(1) small;


Breusch-Godfrey LM test for autocorrelation

--------------------------------------------------------------------------
```

3

Exhibit 4

00143

Appendix 2

```
    lags(p) |        F                df              Prob > F
-------------+---------------------------------------------------------
       1    |      1.700           (  1,   16 )         0.2108
-------------+---------------------------------------------------------

                      H0: no serial correlation


. estat hettest;


Breusch-Pagan / Cook-Weisberg test for heteroskedasticity

          Ho: Constant variance

          Variables: fitted values of gun_hom_rate


          chi2(1)    =      0.49

          Prob > chi2 =   0.4822


. regress D.gun_hom_rate D.pctlcm;


      Source |       SS          df      MS        Number of obs   =        19
-------------+----------------------------------    F(1, 17)        =      0.45
       Model | .006849736         1   .006849736    Prob > F        =    0.5130
    Residual | .260889351        17   .015346432    R-squared       =    0.0256
-------------+----------------------------------    Adj R-squared   =   -0.0317
       Total | .267739087        18   .014874394    Root MSE        =    .12388


-------------------------------------------------------------------------
D.          |
```

Appendix 2

**ER_3776**

```
   gun_hom_rate |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
----------------+----------------------------------------------------------------

         pctlcm |

            D1. |  -.0062635   .0093753    -0.67   0.513    -.0260436    .0135166

                |

          _cons |  -.0374536   .0297062    -1.26   0.224    -.1001283    .0252211

----------------+----------------------------------------------------------------


. predict e, resid;

(5 missing values generated)


. estat bgodfrey,lags(1) small;


Breusch-Godfrey LM test for autocorrelation

---------------------------------------------------------------------

    lags(p)  |       F                 df              Prob > F
-------------+-------------------------------------------------------

       1     |     6.520           (  1,   16 )           0.0213

---------------------------------------------------------------------

                    H0: no serial correlation


. regress e L.e D.pctlcm;


      Source |       SS           df       MS      Number of obs   =        18
-------------+----------------------------------   F(2, 15)        =      4.05

       Model |  .089776188         2   .044888094   Prob > F        =    0.0392
```

Appendix 2

**ER_3777**

```
     Residual |  .166197694      15  .011079846   R-squared     =   0.3507
-------------+------------------------------   Adj R-squared =   0.2642
        Total |  .255973881      17  .015057287   Root MSE      =   .10526


------------------------------------------------------------------------------
           e |     Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
           e |
         L1. |  -.5928103    .208259    -2.85   0.012    -1.036704   -.1489167
             |
      pctlcm |
         D1. |  -.0014458   .0079844    -0.18   0.859    -.0184641    .0155725
             |
       _cons |  -.0045456   .0258962    -0.18   0.863    -.0597421    .0506509
------------------------------------------------------------------------------


. newey D.gun_hom_rate D.pctlcm, lag(1);


Regression with Newey-West standard errors    Number of obs  =         19
maximum lag: 1                                 F(  1,     17) =       0.55
                                               Prob > F       =     0.4683


------------------------------------------------------------------------------
D.           |             Newey-West
gun_hom_rate |     Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
```

6

Exhibit 4

00146

Appendix 2

**ER_3778**

```
      pctlcm |

         D1. |  -.0062635   .0084435    -0.74   0.468   -.0240778    .0115508

             |

       _cons |  -.0374536   .0224824    -1.67   0.114   -.0848873    .0099801

------------------------------------------------------------------------------


. /* UCR murder rate */

> drop e;


. dfgls murder_rate;


DF-GLS for murder_rate                        Number of obs =     15

Maxlag = 8 chosen by Schwert criterion
```

|  | DF-GLS tau | 1% Critical | 5% Critical | 10% Critical |
|:---:|:---:|:---:|:---:|:---:|
| [lags] | Test Statistic | Value | Value | Value |
| 8 | -1.274 | -3.770 | -3.702 | -2.892 |
| 7 | -1.468 | -3.770 | -3.257 | -2.604 |
| 6 | -1.768 | -3.770 | -3.024 | -2.482 |
| 5 | -2.542 | -3.770 | -2.960 | -2.489 |
| 4 | -2.651 | -3.770 | -3.021 | -2.590 |
| 3 | -2.528 | -3.770 | -3.163 | -2.748 |
| 2 | -1.553 | -3.770 | -3.343 | -2.927 |
| 1 | -1.483 | -3.770 | -3.517 | -3.091 |

```
Opt Lag (Ng-Perron seq t) =  3 with RMSE  .0627365

Min SC   = -4.815476 at lag  3 with RMSE  .0627365

Min MAIC = -4.549201 at lag  1 with RMSE  .0764065


. regress murder_rate pctlcm;


      Source |       SS           df       MS      Number of obs   =        21
-------------+----------------------------------   F(1, 19)        =      8.48
       Model |  .354364145         1  .354364145   Prob > F        =    0.0089
    Residual |  .793680104        19  .041772637   R-squared       =    0.3087
-------------+----------------------------------   Adj R-squared   =    0.2723
       Total |  1.14804425        20  .057402212   Root MSE        =    .20438


------------------------------------------------------------------------------
 murder_rate |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
      pctlcm |  -.0269564   .0092551    -2.91   0.009    -.0463276   -.0075852
       _cons |   2.205412   .1746858    12.63   0.000     1.839791    2.571034
------------------------------------------------------------------------------


. regress murder_rate pctlcm trend;


      Source |       SS           df       MS      Number of obs   =        21
-------------+----------------------------------   F(2, 18)        =     60.74
       Model |  .999887087         2  .499943544   Prob > F        =    0.0000
    Residual |  .148157162        18  .008230953   R-squared       =    0.8709
```

8
Exhibit 4
00148

Appendix 2

**ER_3780**

```
-------------+---------------------------  Adj R-squared  =   0.8566

     Total |  1.14804425       20  .057402212   Root MSE       =    .09072


-------------------------------------------------------------------------

 murder_rate |    Coef.    Std. Err.      t    P>|t|    [95% Conf. Interval]

-------------+-----------------------------------------------------------

     pctlcm |  -.0002804   .0050943    -0.06   0.957    -.0109831    .0104223

      trend |  -.0359031   .0040542    -8.86   0.000    -.0444205   -.0273856

      _cons |   2.185345   .0775751    28.17   0.000     2.022365    2.348324

-------------------------------------------------------------------------


. estat bgodfrey, lags(1) small;


Breusch-Godfrey LM test for autocorrelation

-------------------------------------------------------------------------

   lags(p)  |      F               df              Prob > F

-------------+-----------------------------------------------------------

      1     |    4.657         (  1,   17 )          0.0455

-------------------------------------------------------------------------

                    H0: no serial correlation


. estat hettest;


Breusch-Pagan / Cook-Weisberg test for heteroskedasticity

        Ho: Constant variance

        Variables: fitted values of murder_rate
```

9
Exhibit 4
00149

Appendix 2

```
        chi2(1)     =      0.11

        Prob > chi2  =   0.7351


. regress D.murder_rate D.pctlcm;


      Source |       SS           df       MS      Number of obs   =       20
-------------+------------------------------    F(1, 18)        =     0.01
       Model |  .000081479          1  .000081479   Prob > F        =   0.9241
    Residual |  .157061195         18  .008725622   R-squared       =   0.0005
-------------+------------------------------    Adj R-squared   =  -0.0550
       Total |  .157142674         19  .008270667   Root MSE        =   .09341


-----------------------------------------------------------------------------
          D. |
  murder_rate |      Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+---------------------------------------------------------------
      pctlcm |
         D1. |   .0005721   .0059201     0.10   0.924    -.0118656    .0130098
             |
       _cons |  -.0388827   .0210796    -1.84   0.082    -.0831694    .0054039
-----------------------------------------------------------------------------


. predict e, resid;

(4 missing values generated)
```

10

Exhibit 4

00150

Appendix 2

**ER_3782**

```
. estat bgodfrey,lags(1) small;


Breusch-Godfrey LM test for autocorrelation

---------------------------------------------------------------------

  lags(p)  |        F                df              Prob > F

-------------+-------------------------------------------------------

     1     |      3.877          (  1,  17 )           0.0655

---------------------------------------------------------------------

                      H0: no serial correlation


. regress e L.e D.pctlcm;


      Source |       SS           df       MS        Number of obs   =       19

-------------+----------------------------------    F(2, 16)        =     2.07

      Model |  .030759281         2   .01537964     Prob > F        =   0.1589

   Residual |  .118985178        16  .007436574     R-squared       =   0.2054

-------------+----------------------------------    Adj R-squared   =   0.1061

      Total |  .149744459        18  .008319137     Root MSE        =    .08624



---------------------------------------------------------------------

        e |     Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]

-------------+-------------------------------------------------------

        e |

       L1. |  -.4590299   .2257132    -2.03   0.059    -.9375206    .0194608

            |

    pctlcm |
```

11

Exhibit 4

00151

Appendix 2

**ER_3783**

```
        D1. |  -.0029138   .0056386    -0.52   0.612    -.0148671    .0090396

            |

       _cons |  -.0040169   .0199469    -0.20   0.843    -.0463025    .0382688

------------------------------------------------------------------------------


. newey D.murder_rate D.pctlcm, lag(1);


Regression with Newey-West standard errors      Number of obs   =        20

maximum lag: 1                                   F(  1,       18) =      0.02

                                                 Prob > F        =    0.9027



------------------------------------------------------------------------------
D.          |             Newey-West
 murder_rate |    Coef.   Std. Err.      t    P>|t|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
      pctlcm |

        D1. |   .0005721   .0046124     0.12   0.903    -.0091182    .0102623

            |

       _cons |  -.0388827   .0167536    -2.32   0.032    -.0740808   -.0036846

------------------------------------------------------------------------------


. nbreg crmur pctlcm;


Fitting Poisson model:


Iteration 0:   log likelihood = -176.04004
```

Appendix 2

```
Iteration 1:   log likelihood = -176.04004


Fitting constant-only model:


Iteration 0:   log likelihood =   -147.583

Iteration 1:   log likelihood = -118.99564

Iteration 2:   log likelihood = -118.69212

Iteration 3:   log likelihood = -118.68877

Iteration 4:   log likelihood = -118.68877


Fitting full model:


Iteration 0:   log likelihood = -115.89173

Iteration 1:   log likelihood = -115.44161

Iteration 2:   log likelihood = -115.43209

Iteration 3:   log likelihood = -115.43209
```

| Negative binomial regression | | | Number of obs | = | 21 |
|---|---|---|---|---|---|
| | | | LR chi2(1) | = | 6.51 |
| Dispersion | = mean | | Prob > chi2 | = | 0.0107 |
| Log likelihood = -115.43209 | | | Pseudo R2 | = | 0.0274 |

```
------------------------------------------------------------------------
      crmur |    Coef.  Std. Err.    z    P>|z|   [95% Conf. Interval]
------------+-----------------------------------------------------------
     pctlcm |  -.018751  .0067401  -2.78  0.005  -.0319614  -.0055406
```

13

Exhibit 4

00153

Appendix 2

```
        _cons |   6.364963    .1266425    50.26   0.000     6.116748    6.613178

--------------+----------------------------------------------------------------

      /lnalpha |  -3.995576    .3466636                     -4.675024   -3.316128

--------------+----------------------------------------------------------------

        alpha |   .0183968    .0063775                      .0093253    .0362931

-------------------------------------------------------------------------------

LR test of alpha=0: chibar2(01) = 121.22              Prob >= chibar2 = 0.000


. nbreg crmur pctlcm trend;


Fitting Poisson model:


Iteration 0:   log likelihood = -113.64944

Iteration 1:   log likelihood = -113.64944


Fitting constant-only model:


Iteration 0:   log likelihood =   -147.583

Iteration 1:   log likelihood = -118.99564

Iteration 2:   log likelihood = -118.69212

Iteration 3:   log likelihood = -118.68877

Iteration 4:   log likelihood = -118.68877


Fitting full model:


Iteration 0:   log likelihood = -110.86745
```

14

Exhibit 4

00154

Appendix 2

**ER_3786**

```
Iteration 1:   log likelihood = -107.26037

Iteration 2:   log likelihood = -106.58883

Iteration 3:   log likelihood = -104.99581

Iteration 4:   log likelihood =  -104.2693

Iteration 5:   log likelihood = -104.26131

Iteration 6:   log likelihood =  -104.2613


Negative binomial regression              Number of obs    =        21

                                          LR chi2(2)       =     28.85

Dispersion     = mean                     Prob > chi2      =    0.0000

Log likelihood =  -104.2613               Pseudo R2        =    0.1216



------------------------------------------------------------------------------
       crmur |      Coef.   Std. Err.      z    P>|z|     [95% Conf. Interval]
-------------+----------------------------------------------------------------
      pctlcm |  -.000778    .0048192    -0.16   0.872    -.0102235     .0086674
       trend |  -.0236072   .0037308    -6.33   0.000    -.0309194    -.0162949
       _cons |   6.337044   .0737494    85.93   0.000     6.192498      6.48159
-------------+----------------------------------------------------------------
     /lnalpha |  -5.347352   .4648032                      -6.25835    -4.436355
-------------+----------------------------------------------------------------
       alpha |   .0047607   .0022128                       .0019144     .011839
------------------------------------------------------------------------------
LR test of alpha=0: chibar2(01) = 18.78          Prob >= chibar2 = 0.000


. nbreg gunhomicides pctlcm;
```

Appendix 2

```
Fitting Poisson model:


Iteration 0:   log likelihood = -139.64638

Iteration 1:   log likelihood = -139.64638


Fitting constant-only model:


Iteration 0:   log likelihood =  -134.6247

Iteration 1:   log likelihood = -107.73181

Iteration 2:   log likelihood = -107.37966

Iteration 3:   log likelihood = -107.37576

Iteration 4:   log likelihood = -107.37576


Fitting full model:


Iteration 0:   log likelihood = -104.25441

Iteration 1:   log likelihood = -103.65453

Iteration 2:   log likelihood = -103.64182

Iteration 3:   log likelihood = -103.64181
```

| Negative binomial regression | | Number of obs | = | 20 |
|---|---|---|---|---|
| | | LR chi2(1) | = | 7.47 |
| Dispersion    = mean | | Prob > chi2 | = | 0.0063 |
| Log likelihood = -103.64181 | | Pseudo R2 | = | 0.0348 |

16
Exhibit 4
00156

Appendix 2

```
          ---------------------------------------------------------------
gunhomicides |     Coef.   Std. Err.      z    P>|z|     [95% Conf. Interval]

-------------+-------------------------------------------------------------

      pctlcm |  -.0208157   .0068776    -3.03   0.002    -.0342956   -.0073358

       _cons |   6.098731   .1269795    48.03   0.000     5.849856    6.347606

-------------+-------------------------------------------------------------

     /lnalpha |  -4.079971   .3734793                     -4.811977   -3.347965

-------------+-------------------------------------------------------------

       alpha |    .016908   .0063148                      .0081318    .0351558

          ---------------------------------------------------------------
LR test of alpha=0: chibar2(01) = 72.01          Prob >= chibar2 = 0.000


. nbreg gunhomicides pctlcm trend;


Fitting Poisson model:


Iteration 0:   log likelihood = -105.02403

Iteration 1:   log likelihood = -105.02402


Fitting constant-only model:


Iteration 0:   log likelihood =  -134.6247

Iteration 1:   log likelihood = -107.73181

Iteration 2:   log likelihood = -107.37966

Iteration 3:   log likelihood = -107.37576

Iteration 4:   log likelihood = -107.37576
```

Appendix 2

**ER_3789**

```
Fitting full model:


Iteration 0:   log likelihood =  -100.6319

Iteration 1:   log likelihood = -96.977163

Iteration 2:   log likelihood = -96.162899

Iteration 3:   log likelihood = -96.134374

Iteration 4:   log likelihood = -96.134321

Iteration 5:   log likelihood = -96.134321


Negative binomial regression            Number of obs   =        20

                                         LR chi2(2)      =     22.48

Dispersion     = mean                    Prob > chi2     =    0.0000

Log likelihood = -96.134321              Pseudo R2       =    0.1047


------------------------------------------------------------------

gunhomicides |    Coef.   Std. Err.     z    P>|z|   [95% Conf. Interval]

-------------+----------------------------------------------------

      pctlcm |  -.0066636  .0055574   -1.20  0.231   -.017556   .0042288

       trend |  -.0210376  .0044435   -4.73  0.000   -.0297468  -.0123285

       _cons |   6.10229   .086847    70.26  0.000    5.932073   6.272507

-------------+----------------------------------------------------

     /lnalpha |  -5.069808  .4764139                 -6.003562  -4.136053

-------------+----------------------------------------------------

       alpha |   .0062836  .0029936                  .0024699   .0159858

------------------------------------------------------------------
```

Appendix 2

```
        LR test of alpha=0: chibar2(01) = 17.78                Prob >= chibar2 = 0.000


    . log close;

           name:  <unnamed>

            log:  C:\Users\cemood\Box Sync\California\Virginia\va.log

     log type:  text

     closed on:  26 Oct 2017, 08:52:44

    --------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------
------------------------------------------------
```

19
Exhibit 4                                          Appendix 2
00159

**ER_3791**

# EXHIBIT 1

Exhibit 4
00160

Curriculum Vita of Carlisle E. Moody

Department of Economics
College of William and Mary
Williamsburg, VA 23187-8795
Email: cemood@wm.edu
Phone: (757) 221-2373

Education

B.A., Colby College, Waterville, Maine, 1965 (Economics)
M.A., University of Connecticut, Storrs, Connecticut, 1966 (Economics)
Ph.D., University of Connecticut, Storrs, Connecticut, 1970 (Economics)

Experience

Professor of Economics, College of William and Mary, 1989-
Chair of the Department of Economics, College of William and Mary 1997- 2003
Associate Professor of Economics, College of William and Mary, 1975-1989.
Assistant Professor of Economics, College of William and Mary, 1970-1975.
Lecturer in Econometrics, University of Leeds, Leeds, England, 1968-1970.

Consultant

Stanford Research Institute
Virginia Marine Resources Commission
U.S. General Accounting Office
U.S. Department of Transportation
U.S. Department of Energy
National Center for State Courts
Oak Ridge National Laboratory
Justec Research.
The Orkand Corporation
Washington Consulting Group

1

Exhibit 4
00161

Exhibit 1

Decision Analysis Corporation of Virginia
SAIC Corporation
West Publishing Group
Independence Institute

---

Research and Teaching Fields

Law and Economics
Econometrics
Time Series Analysis

---

Honors

National Defense Education Act Fellow, University of Connecticut, 1965-1968.
Bredin Fellow, College of William and Mary, 1982.
Member, Methodology Review Panel, Prison Population
Forecast, Virginia Department of Planning and Budget, 1987-1993.
Notable Individuals, Micro Computer Industry, 1983.
Speaker, Institute of Medicine and National Research Council Committe of
Priorities for a Public Health Research Agenda to Reduce the Threat of Firearm-
related Violence, National Academies of Science, Washington, DC, April 23, 2013

---

Refereed Publications

"Firearms and the Decline in Violence in Europe 1201-2010," **Review of European Studies**, 9(2) 2017

"The Impact of Right-to-Carry Laws on Crime: An Exercise in Replication," (with T.B. Marvell, P.R. Zimmerman and Fisal Alemante) **Review of Economics and Finance**, 4(1) 2014, 33-43.

"Did John Lott Provide Bad Data to the NRC? A Note on Aneja, Donohue, and Zhang," (with J.R. Lott and T.B. Marvell) **Econ Journal Watch,** January 2013.

"On the Choice of Control Variables in the Crime Equation," (with T.B. Marvell) **Oxford Bulletin of Economics and Statistics**, 72(5) 2010, 696-715

2

Exhibit 4                                           Exhibit 1
00162

**ER_3794**

"The Debate on Shall-Issue Laws, Continued," (with T.B. Marvell) *Econ Journal Watch*, 6(2) March 2009, 203-217.

"The Debate on Shall-Issue Laws," (with T.B. Marvell) *Econ Journal Watch*, 5(3) September 2008, 269-293.

"Can and Should Criminology Research Influence Policy? Suggestions for Time-Series Cross-Section Studies" (with T.B. Marvell) *Criminology and Public Policy* 7(1) August, 2008, 359-364.

"Guns and Crime," (with T.B. Marvell), *Southern Economic Journal,* 71(4), April, 2005, 720-736.

"When Prisoners Get Out," (with Kovandzic, Marvell and Vieraitis), *Criminal Justice Policy Review,* 15, 2004, 212-228.

"The Impact of Right-to-Carry Concealed Firearms Laws on Mass Public Shootings," (with Tomislav Kovandzic and Grant Duwe), *Homicide Studies*, 6, 2002, 271-296.

"Testing for the Effects of Concealed Weapons Laws: Specification Errors and Robustness," *Journal of Law and Economics,* 44 (PT.2), 2001, 799-813.

"The Lethal Effects of Three-Strikes Laws," (with T.B. Marvell), *Journal of Legal Studies*, 30,  2001, 89-106.

"Female and Male Homicide Victimization Rates: Comparing Trends and Regressors," (with T. B. Marvell), *Criminology*, 37, 1999, 879-902.

"The Impact of Out-of-State Prison Population on State Homicide Rates: Displacement and Free-Rider Effects," (with T.B. Marvell), *Criminology*, 30, 1998, 513-535.

"The Impact of Prison Growth on Homicide," (with T.B. Marvell) *Homicide Studies,* 1, 1997, 215-233.

"Age Structure, Trends, and Prison Populations," (with T.B. Marvell) *Journal of Criminal Justice*, 25, 1997, 114-124.

"Police Levels, Crime Rates, and Specification Problems," (with T.B. Marvell) *Criminology,* 24, 1996, 606-646.

"A Regional Linear Logit Fuel Demand Model for Electric Utilities," *Energy Economics,* 18, 1996, 295-314.

"The Uncertain Timing of Innovations in Time Series: Minnesota Sentencing Guidelines and Jail Sentences," (with T.B. Marvell) *Criminology*, 34, May, 1996.

"Determinant Sentencing and Abolishing Parole: the Long Term Impacts on Prisons and Crime," (with T.B. Marvell), *Criminology,* 34, 1996.

"The Impact of Enhanced Prison Terms for Felonies Committed with Guns" (with T.B. Marvell) *Criminology*, Vol. 33, 1995.

"Prison Population Growth and Crime Reduction." (with T.B. Marvell) *Journal of Quantitative Criminology,* 10, 1994, 109-140.

"Alternative Bidding Systems for Leasing Offshore Oil: Experimental Evidence." *Economica,* 61, 1994, 345-353.

"Forecasting the Marginal Costs of a Multiple Output Production Technology." (with G. Lady), *Journal of Forecasting*, 12, 1993, 421-436.

"Volunteer Attorneys as Appellate Judges." (with T.B. Marvell) *The Justice System Journal*, 16, 1992, 49-64.

"Age Structure and Crime Rates: Conflicting Evidence." (with T.B. Marvell) *Journal of Quantitative Criminology*, 7, 1991, 237-273.

"OCS Leasing Policy and Lease Prices." (with W.J. Kruvant) *Land Economics*, 66, February 1990, 30-39.

"The Effectiveness of Measures to Increase Appellate Court Efficiency and Decision Output." (with T.B. Marvell) *Michigan Journal of Law Reform,* 21, 1988, 415- 442.

"Joint Bidding, Entry, and OCS Lease Prices" (with W.J. Kruvant) *Rand Journal of Economics*, 19, Summer 1988, 276-284.

"Appellate and Trial Caseload Growth: A Pooled Time Series Cross Section Approach" (with T.B. Marvell) *Journal of Quantitative Criminology,* 3, 1987.

"The Impact of Economic and Judgeship Changes on Federal District Court Filings" (with T.B. Marvell) *Judicature*, Vol. 69, No. 3, Oct./Nov. 1985, 156.

"The GAO Natural Gas Supply Model" (with P.A. Valentine and W.J. Kruvant) *Energy Economics*, January 1985, 49-57.

"Strategy, Structure and Performance of Major Energy Producers: Evidence from Line of Business Data" (with A.T. Andersen and J.A. Rasmussen) *Review of Industrial Organization*, Winter, 1984: 290-307.

"Quality, Price, Advertising and Published Quality Ratings" (with R.A. Archibald and C.A. Haulman) *Journal of Consumer Research*, Vol. 4, No. 4, March 1983, 347-56.

"Sources of Productivity Decline in U.S. Coal Mining" (with W. Kruvant and P. Valentine) *The Energy Journal*, Vol. 3, No. 3, 1982, 53-70.

"Seasonal Variation in Residential Electricity Demand: Evidence from Survey Data," (with R.A. Archibald and D.H. Finifter), *Applied Economics*, Vol. 14, No. 2, April 1982, 167-181.

"The Subsidy Effects of the Crude Oil Entitlements Program," *Atlantic Economic Review*, Vol. 8, No. 2, July, 1980, 103.

"Industrial Generation of Electricity in 1985: A Regional Forecast," *Review of Regional Studies*, Vol. 8, No. 2, 1980, 33-43.

"The Measurement of Capital Services by Electrical Energy," *Oxford Bulletin of Economics and Statistics*, February 1974.

"Air Quality, Environment and Metropolitan Community Structure" (With Craig Humphrey), *Review of Regional Studies*, Winter 1973.

"Productivity Change in Zambian Mining" (With Norman Kessel), *South African Journal of Economics*, March 1972.

---

Other Publications

Heller, McDonald and Murder: Testing the More Guns=More Murder Thesis," (with Don Kates), *Fordham Urban Law Review*, Vol. 39, No. 5, 2012.

Brief for the International Law Enforcement Educators and Trainers Association (ileeta), International Association of Law Enforcement Firearms Instructors (ialefi), Southern States Police Benevolent Association, Texas Police Chiefs Association, Law Enforcement Alliance of America, Congress of Racial Equality, the Claremont Institute, Professors Carlisle E. Moody, Roy T. Wortman, Raymond Kessler, Gary Mauser, Dr. Sterling Burnett, and the Independent Institute in support of petitioners," Supreme Court of the United States, no. 08-1521, Otis D. McDonald, et. al. vs. City of Chicago, et. al., December 2009

"Firearms and homicide" in B. Benson and P. Zimmerman (eds.), H*andbook on the Economics of Crime*, Edward Elgar, Northampton, MA 2010, 432-451.

"Is there a relationship between guns and freedom? Comparative results from 59 nations." (with David B. Kopel and Howard Nemerov), *Texas Review of Law and*

"Brief of Academics as Amici Curiae in Support of Respondent." Supreme Court of the United States, No. 07-290, District of Columbia vs. Dick Anthony Heller, February, 2008.

"Econometric research on crime rates: prisons, crime, and simultaneous equations" in Mark Cohen and Jacek Czabanske, *Ekonomiczne, podejscie do przestipczosci*, Ius et Lux, Warsaw, 2007, 235-258.

"Simulation Modeling and Policy Analysis," *Criminology & Public Policy,* 1, 2002, 393-398.

"Game Theory and Football" (with David Ribar), *Access: The Journal of Microcomputer Applications*, Vol. 4, No. 3, Nov./Dec. 1985, 5-15.

"Reasons for State Appellate Caseload Growth" (with T. Marvell) Bureau of Justice Statistics, Department of Justice, 1985.

"State Appellate Caseload Growth: Documentary Appendix." (with Marvell, et. al.) National Center for State Courts, Williamsburg, VA, 1985.

"Model Documentation for the Mini-Macroeconomic Model: MINMAC" Washington, D.C., Energy Information Administration, 1984.

"Neighborhood Segregation." (with E.S. Dethlefsen.) *Byte, The Small Systems Journal*, Vol. 7, No. 7, July 1982, 178-206.

"Technological Progress and Energy Use," Proceedings of the Third Annual University of Missouri, Missouri Energy Council Conference on Energy, October, 1976.

"Technological Change in the Soviet Chemical Industry," Technical Note SSC-TN-2625-8 Stanford Research Institute, 1975 (With F.W. Rushing).

"Feasibility Study of Inter-City Transit Via Southern Railway R/W, Norfolk and Virginia Beach Corridor" (With R.H. Bigelow, S.H. Baker and M.A. Garrett), U.S. Department of Transportation, 1974.

"Productivity Growth in U.S. Manufacturing," in 1973 Proceedings of the Business and Economic Statistics Section, American Statistical Association.

78 Alb. L. Rev. 849

Albany Law Review
2014-2015

Symposium: A Loaded Debate: The Right to Keep and Bear Arms in the Twenty-First Century
Article

David B. Kopel[a1]

Copyright (c) 2015 Albany Law School; David B. Kopel

# *849  THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE PROHIBITIONS

## I. INTRODUCTION

In recent years, the prohibition of firearms magazines has become an important topic of law and policy debate. This article details the history of magazines and of magazine prohibition. The article then applies the historical facts to the methodologies of leading cases that have looked to history to analyze the constitutionality of gun control laws.

Because ten rounds is an oft-proposed figure for magazine bans, Part II of the article provides the story of such magazines from the sixteenth century onward. Although some people think that multi-shot guns did not appear until Samuel Colt invented the revolver in the 1830s, multi-shot guns predate Colonel Colt by over two centuries. [1]

Especially because the Supreme Court's decision in *District of Columbia v. Heller* [2] considers whether arms are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes," [3] the article also pays attention to whether and when particular guns and their magazines achieved mass-market success in the United States. The first time a rifle with more than ten rounds of ammunition did so was in 1866, [4] and the first time a *850 handgun did so was in 1935. [5]

The detailed history of various firearms and their magazines stops in 1979--a year which is somewhat ancient in terms of the current gun control debate. Back in 1979,

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

revolvers still far outsold semiautomatic handguns.[6] No one was trying to ban so-called assault weapons,[7] although such guns were already well established in the market.[8]

For the post-1979 period, Part II briefly explains how technological improvements in recent decades have fostered the continuing popularity of magazines holding more than ten rounds

Part III of the article describes the history of magazine prohibition in the United States. Such prohibitions are of recent vintage, with an important exception: during prohibition, Michigan, Rhode Island, and the District of Columbia banned some arms that could hold more than a certain number of rounds; Ohio required a special license for such guns.[9] The Michigan and Rhode Island bans were repealed decades ago; the Ohio licensing law was repealed in 2014, having previously been modified and interpreted so that it banned no magazines.[10] The District of Columbia ban, however, remains in force today, with some revisions.[11]

The Supreme Court's Second Amendment decisions in *District of Columbia v. Heller* and *McDonald v. Chicago*[12] paid careful **\*851** attention to history . Several post- *Heller* lower court opinions in Second Amendment cases have also examined history as part of their consideration of the constitutionality of gun control statutes. Part IV of this article examines the legality of magazine bans according to the various historical standards that courts have employed.

## II. THE HISTORY OF MAGAZINES HOLDING MORE THAN TEN ROUNDS

In *District of Columbia v. Heller*, the Supreme Court ruled that the District of Columbia's handgun ban was unconstitutional partly because handguns are in "common use."[13] The Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes."[14]

Magazines of more than ten rounds are older than the United States.[15] Box magazines date from 1862.[16] In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified.[17] Handgun magazines of more than ten rounds would become popular in the 1930s.[18]

Exhibit 12

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

### A. Why Consumers Have Always Sought to Avoid Having to Reload During Defensive Gun Use

When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm. The Second Amendment, of course, guarantees the right to an *operable* firearm.[19] As the *Heller* Court explained, the Council of the District of Columbia could not require that lawfully-possessed guns be kept in an inoperable status (locked or disassembled) in the home, because doing so negates their utility with respect to "the core lawful purpose of self-defense."[20]

When the defender is reloading, the defender is especially vulnerable to attack. When ammunition is low but not exhausted (e.g., two or three rounds remaining), that may be insufficient to *852 deter or control the threat, especially if the threat is posed by more than one criminal. If the victim is attacked by a gang of four large people, and a few shots cause the attackers to pause, the victim needs enough reserve ammunition in the firearm to make the attackers worry that even if they rush the victim all at once, the victim will have enough ammunition to knock each attacker down. When guns are fired defensively, it is unusual for a single hit to immediately disable an attacker.

Accordingly, from the outset of firearms manufacturing, one constant goal has been to design firearms able to fire more rounds without reloading.

To this end, manufacturers have experimented with various designs of firearms and magazines for centuries. While not all of these experiments were successful in terms of mass sales, they indicated the directions where firearms development was proceeding. The first experiments to gain widespread commercial success in the United States came around the middle of the nineteenth century.

### B. Magazines of Greater than Ten Rounds are More than Four Hundred Years Old

The first known firearm that was able to fire more than ten rounds without reloading was a sixteen-shooter created around 1580, using "superposed" loads (each round stacked on top of the other).[21] Multi-shot guns continued to develop in the next two centuries, with such guns first issued to the British army in 1658.[22] One early design was the eleven-round "Defence Gun," patented in 1718 by lawyer

Exhibit 12
WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

ER_3802

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

and inventor James Puckle.[23] It used eleven preloaded cylinders; each pull of the trigger fired one cylinder.[24]

As with First Amendment technology (such as televisions or websites), the Second Amendment is not limited to the technology that existed in 1791.[25] The *Heller* Court properly described such an asserted limit as "bordering on the frivolous."[26] But even if *Heller* **\*853** had created such a rule, magazines of more than ten rounds are older than the Second Amendment.

At the time that the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a twenty-two-shot magazine capacity.[27] Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition.[28] At the time, air guns were ballistically equal to powder guns in terms of bullet size and velocity.[29] The .46 and .49 caliber Girandoni rifles were invented around 1779 for use in European armies and were employed by elite units.[30] One shot could penetrate a one-inch thick wood plank or take down an elk.[31]

### C. The Nineteenth Century Saw Broad Commercial Success for Magazines Holding More than Ten Rounds

Firearm technology progressed rapidly in the 1800s. Manufacturers were constantly attempting to produce reliable firearms with greater ammunition capacities for consumers. One notable step came in 1821 with the introduction of the Jennings multi-shot flintlock rifle, which, borrowing the superposed projectile design from centuries before, could fire twelve shots before reloading.[32]

Around the same time, pistol technology also advanced to permit more than ten shots being fired without reloading. "Pepperbox" **\*854** pistols began to be produced in America in the 1830s.[33] These pistols had multiple barrels that would fire sequentially.[34] While the most common configurations were five or six shots,[35] some models had twelve independently-firing barrels,[36] and there were even models with eighteen or twenty-four independently-firing barrels.[37] Pepperboxes were commercially successful and it took a number of years for Samuel Colt's revolvers (also invented in the 1830s) to surpass them in the marketplace.[38]

Exhibit 12

ER_3803

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

The 1830s through the 1850s saw a number of different firearm designs intended to increase ammunition capacity. In 1838, the Bennett and Haviland Rifle was invented; it was a rifle version of the pepperbox, with twelve individual chambers that were manually rotated after each shot.[39] This would bring a new chamber, preloaded with powder and shot, into the breach, ready to be fired.[40] Alexander Hall and Colonel Parry W. Porter each created rifles with capacities greater than ten in the 1850s.[41] Hall's design had a fifteen-shot rotating cylinder (similar to a revolver), while Porter's design used a thirty-eight-shot canister magazine.[42]

The great breakthrough, however, began with a collaboration of Daniel Wesson (of Smith and Wesson) and Oliver Winchester. They produced the first metallic cartridge--containing the gunpowder, primer, and ammunition in a metallic case similar to modern ammunition.[43] Furthermore, they invented a firearms mechanism that was well suited to the new metallic cartridge: the lever **\*855** action.[44] Their company, the Volcanic Repeating Arms Company, introduced the lever action rifle in 1855.[45] This rifle had up to a thirty-round tubular magazine under the barrel that was operated by manipulating a lever on the bottom of the stock.[46] The lever-action allowed a shooter to quickly expel spent cartridges and ready the firearm for additional shots.[47] An 1859 advertisement bragged that the guns could be loaded and fire thirty shots in less than a minute.[48] In 1862, the Volcanic evolved into the sixteen-round Henry lever action rifle, lauded for its defensive utility.[49]

The Henry rifle further evolved into the Winchester repeating rifle, and the market for these firearms greatly expanded with the first gun produced under the Winchester name.[50] Winchester touted the Model 1866 for defense against "sudden attack either from robbers or Indians."[51] According to advertising, the M1866 "can . . . be fired thirty times a minute,"[52] or with seventeen in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds."[53] The gun was a particularly big seller in the American West.[54] There were over 170,000 Model 1866s produced.[55]

Next came the Winchester M1873, "[t]he gun that won the West."[56] The Winchester M1873 and then the M1892 were lever actions holding ten to eleven rounds in tubular magazines.[57] There were over 720,000 copies of the Winchester 1873 made from 1873 to **\*856** 1919.[58] Over a million of the M1892 were

Exhibit 12

**ER_3804**

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

manufactured from 1892 to 1941.[59] The Italian company Uberti, which specializes in high-quality reproductions of western firearms, produces reproductions of all of the above Winchesters today.[60] Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a fifteen-round capacity.[61]

Manufactured in Maine, the Evans Repeating Rifle came on the market in 1873.[62] The innovative rotary helical magazine in the buttstock held thirty-four rounds.[63] It was commercially successful for a while, although not at Winchester's or Colt's levels. Over 12,000 copies were produced.[64]

Meanwhile, the first handgun to use a detachable box magazine was the ten-round Jarre harmonica pistol, patented in 1862.[65] In the 1890s, the box magazine would become common for handguns.[66]

Pin-fire revolvers with capacities of up to twenty or twenty-one entered the market in the 1850s;[67] they were produced for the next half-century, but were significantly more popular in Europe than in America.[68] For revolvers with other firing mechanisms, there were some models with more than seventeen rounds.[69] The twenty-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity.[70] Chain pistols did not win much market share, perhaps in part because the large **857** dangling chain was such an impediment to carrying the gun.[71]

The semiautomatic firearm and its detachable box magazine were invented before the turn of the century. It was the latest success in the centuries-old effort to improve the reliability and capacity of multi-shot guns.

In 1896, Germany's Mauser introduced the C96 "broomhandle" pistol, which remained in production until the late 1930s, selling nearly a million to civilians worldwide.[72] The most common configuration was in ten-round capacity, but there were a variety of models with capacities as low as six or as high as twenty.[73] The latter was the Cone Hammer pistol, with twenty-round box magazine.[74]

The Luger semiautomatic pistol was brought to the market in 1899 (although it is commonly known as the "1900").[75] Through many variants, it was very popular for both civilians and the military markets, and remained in production for nearly

Exhibit 12
00299

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**ER_3805**

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

a century. [76] The most common magazines were seven or eight rounds, but there was also a thirty-two-round drum magazine. [77]

### D. Manufacturers in the Twentieth Century Continued the Trend of Increasing Ammunition Capacity and Reliability for Civilian Firearms.

The twentieth century saw improvements on the designs pioneered in the 1800s and expanding popularity for firearms with more than ten rounds.

**\*858** Since the late 1890s, the Savage Arms Company has been one of the classic American firearms manufacturers. [78] In 1911, the company introduced their bolt-action Model 1911, a twenty-shot repeater with a tubular magazine in .22 short caliber. [79] The rifle was popular for boys and for shooting galleries. [80]

By the 1930s, American manufacturers such as Remington, Marlin, and Winchester were producing many tubular magazine rifles in .22 caliber. [81] These firearms are classic rifles for "plinking" (casual target shooting), especially popular for young people. Based on firearms catalogues from 1936 to 1971, there are over twenty such firearms models from major American manufacturers with magazines of sixteen to thirty rounds in one or more of the calibers. [82]

In 1927, the Auto Ordinance Company introduced their **\*859** semiautomatic rifle that used thirty-round magazines. [83] These rifles are still in production today. [84]

The M-1 carbine was invented for the citizen solider of World War II. [85] Thereafter, the M-1 carbine became and has remained a popular rifle for civilians in America. [86] The U.S. government's Civilian Marksmanship Program, created by Congress, put nearly a quarter million of these guns into the hands of law-abiding American citizens starting in 1963, at steeply-discounted prices. [87] Partly using surplus government parts, the Plainfield Machine Company, Iver Johnson, and more than a dozen other companies cumulatively manufactured over 200,000 for the civilian market, starting in the late 1950s. [88] The standard magazines are fifteen and thirty rounds. [89]

The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds. [90] The AR-15 was brought to the market in 1963, with a **\*860** then-standard magazine of twenty;

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

the thirty-round standard magazine was developed a few years later.[91] The 1994 Supreme Court case *Staples v. United States*[92] described the AR-15 as "the civilian version of the military's M-16 rifle," and noted that many parts are interchangeable between the two guns.[93] The crucial distinction, explained the Court, is that the AR-15 is like all other semiautomatic firearms in that it can fire "only one shot with each pull of the trigger."[94] The Court pointed out that semiautomatic firearms "traditionally have been widely accepted as lawful possessions."[95] So legally speaking, the semiautomatic AR-15 is the opposite of the M-16 machine gun: "[C]ertain categories of guns--no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation--. . . have the same quasi-suspect character we attributed to owning hand grenades . . . . But . . . guns falling outside those categories traditionally have been widely accepted as lawful possessions . . . ."[96]

By 1969, the AR-15 faced competition from the Armalite-180 (twenty-round optional magazine), the J&R 68 carbine (thirty rounds), and the Eagle Apache carbine (thirty rounds).[97]

Springfield Armory brought out the M1A semiautomatic rifle in 1974, with a twenty-round detachable box magazine.[98] The next year, the Ruger Mini-14 rifle was introduced, with manufacturer-supplied standard five, ten, or twenty-round detachable magazines.[99] Both the M1A and the Mini-14 are very popular to this day.[100]

**\*861** By 1979, all of the above guns were challenged in the American market by high-quality European imports such as the Belgian FN-FAL Competition rifle (optional twenty-round magazine), the German Heckler & Koch HK-91 and HK-93 rifles (twenty rounds), the Swiss SIG AMT rifle (twenty rounds), and the Finnish Valmet M-71S rifle (thirty rounds).[101]

Citizen firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. In 1935, Browning introduced the Hi-Power pistol.[102] This handgun was sold with a thirteen-round detachable magazine and is still in production.[103]

In Europe, more so than in America, Browning had to compete against the Spanish Gabilondo twenty-round Plus Ultra, introduced in 1925.[104] Spain's Arostegui,

Exhibit 12
00301
8

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

ER_3807

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

Eulogio brought out the Azul--a semiautomatic with standard magazines of ten, twenty and thirty-- in 1935. [105]

Browning's first notable American competition came with the 1964 introduction of the Plainfield Machine Company's "Enforcer," a pistol version of the M1 carbine with a thirty-round magazine. [106]

A tremendous commercial success was the Beretta model 92, a nine millimeter pistol with a sixteen-round magazine, which entered the market in 1976. [107] In various configurations (currently the Beretta 92F) the Beretta is one of the most popular of all modern handguns. [108] Browning introduced another popular handgun in 1977, the fourteen-round BDA (Browning Double Action). [109] Also coming on the market at this time were European handguns such as Austria's L.E.S. P-18 (eighteen rounds) and **862** Germany's Heckler & Koch VP 70Z (also eighteen rounds). [110]

### E. Magazines After 1979

We end this story in 1979, when Jimmy Carter was President, [111] the Bee Gees bestrode the AM radio Top 40, [112] Gaston Glock was manufacturing curtain rods in his garage, [113] Americans were watching *Love Boat* on broadcast television, [114] and people on the cutting edge of technology were adopting VisiCalc, the first spreadsheet program, run from huge floppy discs. [115]

Long before 1979, magazines of more than ten rounds had been well established in the mainstream of American gun ownership. Indeed, they had been so established before almost everyone alive in 1979 was born.

After 1979, technological improvements continued to foster the popularity of magazines holding more than ten rounds. First of all, there were improvements across the board in manufacturing, so that magazine springs became more reliable, particularly for magazines holding up to thirty rounds. This greatly reduced the risk of a misfeed. Reliability was also enhanced by improvements in shaping the magazines' "lips"--the angled wings at the top of the magazine which guide the next round of ammunition into the firing chamber. [116]

Exhibit 12
00302

ER_3808

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

Magazines of all sizes benefited from increasing use of plastic polymers in manufacturing. [117] Today, many magazine walls are **\*863** made from plastic, rather than metal. Closer tolerances in manufacturing, lower costs, and increased durability have all improved magazine quality and reliability.

Likewise, the vast majority of magazines today have a removable baseplate (also known as a "foot plate"). [118] Removal of the baseplate allows the magazine to be disassembled for cleaning (e.g., removal of gunpowder residue) or repair (e.g., replacing a worn-out spring). [119] The existence of a removable baseplate also makes it possible for consumers to add after-market extenders to a magazine. [120] These extenders may simply increase the grip length (to better fit a particular consumer's hands), and they may also increase capacity by one, two, or three rounds. [121] Thus, a consumer with a ten-round factory magazine can add a two-rounder extender to create a twelve-round magazine.

Most importantly, the double-stack magazine was perfected. In some box magazines, the ammunition is contained in a single column. [122] In the double-stack magazine, there are two columns of ammunition, side-by-side and touching. [123] When the gun is used, the magazine will first reload a round from column A, then a round from column B, then from column A, and so on. [124]

The practical effect is this: for a handgun, a single stack magazine of seventeen rounds would stick out far below the bottom of the grip, making the gun unwieldy for carrying and holstering. With a double-stack configuration, a seventeen-round magazine can fit inside a standard full-sized handgun grip. The practical limitation of grip size (the size of the human hand) means that relatively larger capacity magazines are possible for relatively smaller cartridges. Thus, a double-stack magazine for the midsize nine millimeter round might hold up to twenty or twenty-one rounds, whereas a double-stack for the thicker .45 ACP cartridge would hold **\*864** no more than fifteen.

## III. THE HISTORY OF AMMUNITION CAPACITY BANS

An important factor in the consideration of the constitutionality of firearms laws is whether they are traditional and longstanding. For example, the *Heller* Court pointed out that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban." [125] The handgun ban was contrasted with "longstanding" guns controls, such as those prohibiting gun

Exhibit 12
00303

**ER_3809**

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

possession by felons or the mentally ill. [126] Following *Heller*, the Tenth Circuit has explained that Second Amendment cases must consider "the rarity of state enactments in determining whether they are constitutionally permissible." [127]

At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity. This was not because all guns were single-shot. As detailed above, multi-shot guns predate the Second Amendment by about two hundred years, and Lewis and Clark carried a powerful twenty-two-round gun on their famous expedition. [128]

The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. In 1927, Michigan prohibited "any machine gun or firearm which can be fired more than sixteen times without reloading." [129] Also in 1927, Rhode Island banned "any weapon which shoots more than twelve shots semi-automatically without re-loading." [130]

The Michigan ban was repealed in 1959. [131] That same year, the **\*865** Rhode Island law was changed to fourteen shots, and .22 caliber rimfire guns were excluded. [132] The Rhode Island ammunition capacity law was fully repealed in 1975. [133]

The two statutes applied only to firearms, with Rhode Island only for semiautomatics. Neither statute covered a magazine that was not inserted in a firearm.

In 1933, Ohio began requiring a special permit for the possession or sale of a semiautomatic firearm with an ammunition capacity of greater than eighteen rounds. [134] In 1971, during a recodification of the state criminal code, an exemption for .22 caliber was added, and for other calibers the limit was raised to thirty-two or more rounds. [135]

Significantly, the Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun. [136] (Of course purchase was allowed if one has the special permit.) [137] With or without the permit, one could buy a sixty-round magazine in Ohio. [138] The licensing law was fully repealed in 2014. [139]

Exhibit 12

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

**\*866** The only longstanding statute banning magazines is found in the District of Columbia. In 1932, Congress passed a District of Columbia law prohibiting the possession of a firearm that "shoots automatically or semiautomatically more than twelve shots without reloading."[140] In contrast, when Congress enacted the National Firearms Act of 1934 to impose stringent regulations on machine guns, it chose to impose no restrictions on magazines.[141] When the District of Columbia achieved home rule in 1975,[142] the district council did not choose to repeal the law but instead promptly enacted the bans on handguns and on self-defense with any gun in the home,[143] which were later ruled unconstitutional by the Supreme Court in *Heller*.[144] The District of Columbia interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns.[145] The District stands alone in its historical restriction of magazines.

The only widespread restriction on magazine capacity came in 1994 when Congress enacted a ban on new magazines holding more than ten rounds.[146] The law was in effect until 2004, at which point Congress allowed it to sunset.[147] The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others. The final report, issued in 2004, concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury . . . ."[148] Further, **\*867** "the ban has not yet reduced the use of [such magazines] in crime . . . ."[149] Doctor Koper noted also that state-level firearm bans have not had an impact on crime.[150]

In the modern era, only a few states have enacted magazine restrictions, starting with New Jersey's 1990 ban on magazines over fifteen rounds.[151] That ban applies only to detachable box magazines for semiautomatic firearms.[152] A couple years later, Hawaii banned handgun magazines over twenty rounds, and later reduced that to ten.[153] Maryland in 1994 banned the sale or manufacture of magazines over twenty rounds; the ban did not affect possession, loans, acquisition, or importation.[154] The Maryland limit was reduced to ten in 2013.[155]

In 1999 California banned the sale of magazines over ten rounds but allowed grandfathered possession, and New York did the same in 2000.[156] (Currently, large capacity magazine bans in Colorado, Connecticut, and Massachusetts also

Exhibit 12

have grandfather provisions, while New Jersey, the District of Columbia, and Hawaii do not.)[157] In 2013 New York removed grandfathering and reduced the limit to seven.[158] The seven-round limit was suspended shortly thereafter, since there are no seven-round magazines available for many guns.[159] Instead, the legislature forbade owners of ten-round magazines to load more than seven rounds.[160] This restriction was **868** declared to violate the Second Amendment in a federal district court decision.[161] New York City outlaws rifle or shotgun magazines holding more than five rounds.[162]

Also in 2013, Colorado enacted a ban on magazines over fifteen rounds,[163] and Connecticut did the same for magazines over ten.[164] Both statutes allowed current owners to retain possession.[165]

Finally, one state has followed Ohio's former approach of magazine licensing, rather than prohibition. In 1994, Massachusetts began requiring that possession and additional acquisitions of magazines over ten rounds be allowed only for citizens who have a "Class A" firearms license--which most Massachusetts gun owners have.[166]

## IV. WHAT DOES THE HISTORY MEAN?

Given the history above, what does modern legal doctrine say about the permissibility of outlawing magazines, as in the so-called SAFE Act's ban on possession of magazines of more than ten rounds and loading more than seven rounds in a magazine, or New York City's ban on long gun magazines of more than five rounds? What about bans in other states of more than ten rounds (Maryland, Connecticut, the District of Columbia, California, and Hawaii for handguns only) or more than fifteen rounds (New Jersey and Colorado)?

This Part analyzes these questions in light of Second Amendment **869** precedents from the *Heller* Court and from subsequent cases that have relied at least in part on history and tradition in judging Second Amendment cases.

### A. The Crucial Years: 1789-1791 and 1866-1868

For original meaning of the Second Amendment, the most important times are when the Second Amendment was created and when the Fourteenth Amendment

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

was created, since a core purpose of the latter amendment was to make the individual's Second Amendment right enforceable against state and local government. [167] Congress sent the Second Amendment to the states for ratification in 1789, and ratification was completed in 1791. [168] The Fourteenth Amendment was passed by Congress in 1866, and ratification by the states was completed in 1868. [169]

### 1. Magazines in 1789-1791 and 1866-1868

As of 1789 to 1791, multi-shot magazines had existed for two centuries, and a variety of models had come and gone. [170] The state-of-the-art gun between 1789 and 1791 was the twenty- or twenty-two-shot Girandoni air rifle, powerful enough to take down an elk with a single shot. [171]

By the time that the Fourteenth Amendment was introduced in Congress, firearms with magazines of over ten or fifteen rounds had been around for decades. [172] The best of these was the sixteen-shot Henry Rifle, introduced in 1861 with a fifteen-round magazine. [173] The Henry Rifle was commercially successful, but Winchester Model 1866, with its seventeen-round magazine, was massively successful. [174] So by the time ratification of the Fourteenth Amendment was completed in 1868, it was solidly established that firearms with seventeen-round magazines were in common use.

### *870 2. Magazine Prohibitions in 1789-1791 and 1866-1868

From the colonial period to the dawn of American independence on July 4, 1776, and through the ratification of the Fourteenth Amendment, there were no prohibitions on magazines. Indeed, the first magazine prohibition did not appear until the alcohol prohibition era in 1927. [175] Thus, the historical evidence of the key periods for original meaning strongly suggests that magazine bans are unconstitutional.

### B. "Typically Possessed by Law-Abiding Citizens for Lawful Purposes" or "Dangerous and Unusual"?

The Supreme Court's *Heller* decision distinguished two broad types of arms. Some arms, such as handguns, are "typically possessed by law-abiding citizens for lawful purposes." [176] These arms are also described by the Court as being "in common

Exhibit 12

ER_3813

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

use." [177] In contrast, some other arms are "dangerous and unusual." [178] Examples provided by the Court were short-barreled shotguns or machine guns. [179] The common, typical, arms possessed by law-abiding citizens are protected by the Second Amendment; the "dangerous and unusual" arms are not protected. [180] By definition, "unusual" arms are not "in common use" or "typically possessed by law-abiding citizens for lawful purposes." [181]

The *Heller* Court did not expressly mandate that historical analysis be used when deciding whether an arm is typical or common or "dangerous and unusual." The *Heller* Court approvingly quoted the 1939 Supreme Court decision *United States v. Miller*, [182] which had described the original meaning of the Second Amendment as protecting individually-owned firearms that were "in common use at the time." [183] The *Miller* Court's 1939 decision did not extend Second Amendment protection to sawed-off **\*871** shotguns; [184] as *Heller* explained *Miller*, the *Miller* principle was that sawed-off shotguns are dangerous and unusual. [185]

To be precise, *Miller* did not formally rule that short shotguns are *not* Second Amendment arms; the Court simply reversed and remanded the district court's decision granting criminal defendant Miller's motion to quash his indictment. [186] The Supreme Court said that the suitability of sawed-off shotguns as Second Amendment arms was not a fact that was subject to "judicial notice." [187] Presumably the federal district court in Arkansas could have taken up the remanded case and then received evidence regarding what sawed-off shotguns are used for and how common they are. But Miller and his co-defendant Frank Layton had disappeared long before the case was decided by the Supreme Court. [188]

Regardless, subsequent courts, including the court in *Heller*, read *Miller* as affirmatively stating that sawed-off shotguns are not protected by the Second Amendment. [189]

Even though *Heller*'s "common" or "typical" versus "dangerous and unusual" dichotomy seems primarily concerned with contemporary uses of a given type of arm, history can still be useful. As detailed in Part II, magazines of more than ten rounds have been very commonly possessed in the United States since 1862. [190] Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds that has existed since the mid-nineteenth

century. We have more than a century and a half of history showing such magazines to be owned by many millions of law-abiding Americans. [191]

Thus, a court which today ruled that such magazines are "dangerous and unusual" would seem to have some burden of explaining how such magazines, after a century and a half of being **\*872** "in common use" and "typically possessed by law-abiding citizens for lawful purposes," became "dangerous and unusual" in the twenty-first century.

This is not possible. Today, magazines of more than ten rounds are more common than ever before. [192] They comprise about forty-seven percent of magazines currently possessed by Americans today. [193] The AR-15 rifle (introduced in 1963) is the most popular rifle in American history, with sales of several million; [194] its standard magazines are twenty or thirty rounds. [195]

### C. "Longstanding" Controls Versus "Few Laws in the History of Our Nation"

Just as *Heller* distinguishes types of arms (common or typical versus dangerous and unusual), *Heller* distinguishes types of arms-control laws. One type of arms controls are "longstanding," and these are "presumptively lawful." [196] Examples listed by *Heller* are bans on gun possession "by felons and the mentally ill," bans on carrying guns "in sensitive places such as schools and government buildings," and "conditions and qualifications on the commercial sale of arms." [197]

The *Heller* Court highlighted the unusual nature of the District of Columbia anti-gun laws:

> Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down. In *Nunn v. State*, the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). In *Andrews v. State*, the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," violated **\*873** the state constitutional provision (which the court equated with the Second Amendment). That

ER_3815

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

was so even though the statute did not restrict the carrying of long guns. [198]

What was the history that led the Court to declare the handgun prohibition to be "unusual"--that is, to be the opposite of a traditional gun control that was presumptively constitutional? The District of Columbia handgun ban was enacted in 1975 and took effect in 1976. [199] Chicago enacted a similar ban in 1982, and a half-dozen Chicago suburbs followed suit during the 1980s. [200] In 1837, the Georgia legislature had enacted a handgun ban, but that was ruled unconstitutional on Second Amendment grounds by the unanimous Georgia Supreme Court in 1846. [201] In 1982 and 2005, San Francisco enacted handgun bans, but they were both ruled unlawful because of their plain violation of the California state preemption statute, which forbids localities to outlaw firearms which are permitted under state law. [202]

These are the facts under which the Supreme Court declared handgun bans to be suspiciously rare in America's history--at the other end of the spectrum from the presumptively constitutional "longstanding" controls.

The 1975 District of Columbia handgun ban was thirty-three years old when the Supreme Court decided *Heller* in 2008. This suggests that thirty-three years is not sufficient for a gun control to be considered "longstanding." As detailed in Part III, the first of today's magazine bans was enacted by New Jersey in 1990, at fifteen rounds. [203] The first state-level ten-round ban did not take effect until California passed such **\*874** a law in 2000. [204] These statutes, and other post-1990 magazine bans, would not qualify as "longstanding."

Previously, three states and the District of Columbia had enacted some magazine restrictions during the alcohol prohibition era. [205] The District of Columbia ban, with modifications, is still in effect. [206] The Michigan and Rhode Island bans were repealed long ago. [207] The Ohio special licensing statute allowed the free purchase of any magazine, but required a permit to insert a magazine of thirty-two rounds or more into a firearm; the permit requirement was repealed in 2014. [208] It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms.

Exhibit 12

ER_3816

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

Several post- *Heller* lower courts have conducted in-depth examinations of the history of particular gun control laws. The next Part examines each of those cases and then applies their methodology to the historical facts of bans on magazines of more than five, seven, ten, and fifteen rounds.

### D. Lower-Court Decisions Applying History

#### 1. Ezell v. City of Chicago

After *McDonald v. City of Chicago* made it clear that the Second Amendment applies to municipal governments, the Chicago City Council relegalized handgun possession and outlawed all target ranges within city limits.[209] Assessing the constitutionality of the ban, the Seventh Circuit used a two-step test, similar to analysis that is sometimes used in First Amendment cases: (1) Is the activity or item within the scope of the Second Amendment, as historically understood? If the answer is "no," then the restrictive law does not violate the Second Amendment.[210] (2) If the answer to the first question is "yes," then the court will apply some form of the heightened scrutiny. The intensity of the scrutiny will depend on how close the restriction comes to affecting the core right of armed self-defense.[211]

**\*875** So the *Ezell* court began the step-one analysis by considering whether target practice was historically considered part of the Second Amendment right.[212] Chicago had argued to the contrary, listing some eighteenth- and nineteenth-century state statutes and municipal ordinances restricting firearms discharge within city limits.[213] The Seventh Circuit found almost all of the listed ordinances to be irrelevant.[214] Many of them did not ban firearms discharge but simply required a permit.[215] Others were plainly concerned with fire prevention, an issue that would not be a problem at a properly-designed modern range.[216] Thus:

> Only two--a Baltimore statute from 1826 and an Ohio statute from 1831-- flatly prohibited the discharge of firearms based on concerns unrelated to fire suppression, in contrast to the other regulatory laws we have mentioned. This falls far short of establishing that target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States.[217]

Exhibit 12

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

So according to the Seventh Circuit, the historical example of repressive laws in one state and one city are insufficient to support the inference that the repressed activity is outside the scope of the Second Amendment.[218] The historical basis of restrictions that would affect magazines over fifteen rounds is nearly as thin: two states with statutes enacted in 1927, and later repealed, plus the District of Columbia's 1932 law.[219] As for imposing a ban for guns with magazines of more than ten rounds (or seven or five), there is *no* historical basis. Thus, under the *Ezell* analysis, bans on magazines infringe the Second Amendment right as it was historically understood, and such bans must be analyzed under heightened scrutiny.

2. *United States v. Rene E.*

In 2009, the First Circuit heard a Second Amendment challenge **\*876** to a federal statute that restricted, but did not ban, handgun possession by juveniles.[220] The federal statute was enacted in 1994,[221] and so of course was not "longstanding."[222] The First Circuit looked at the history of state laws restricting juvenile handgun possession, to see if they were longstanding.[223]

The First Circuit found state or local restrictions on handgun transfers to juveniles and judicial decisions upholding such restrictions from Georgia (1911 case), Tennessee (1878 case),[224] Pennsylvania (1881 case),[225] Indiana (1884 case),[226] Kentucky (1888 case),[227] Alabama (1858 case),[228] Illinois (1917 case upholding a Chicago ordinance),[229] Kansas (1883 case allowing tort liability for transfer), and Minnesota (1918 case allowing tort liability for transfer).[230]

Thus, the First Circuit was able to point to six state statutes, all of them enacted well over a century previously.[231] They were buttressed by one municipal ordinance and two cases allowing tort liability, both of these being nearly a century old.[232]

The history of magazine restrictions is considerably weaker than that of the juvenile handgun statutes analyzed in *Rene E.* There were six statutes on juveniles, all of which were enacted before 1890, and one of which predated the Civil War.[233] This is much more than the pair of state statutes on magazines dating from the late 1920s.

Exhibit 12

ER_3818

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

The *Rene E.* case does not attempt to quantify how many state statutes are necessary for a gun control to be longstanding; however, we can say that magazine restrictions fall well short of the historical foundation that the First Circuit relied on to uphold juvenile handgun restrictions. While *Rene E.* and *Ezell* both used history, the particular way that they used it was different. For *Rene E.*, history was mixed in **\*877** with substantive analysis of the modern federal statute, which the First Circuit praised for its "narrow scope" and "important exceptions."[234]

For *Ezell*, history was just the first step. *Ezell* used history to determine that the range ban was not presumptively lawful; once that question was answered, *Ezell* proceeded to analyze the ban under heightened scrutiny.[235]

### 3. *Heller II*

#### a. Majority Opinion

In the 2008 case *District of Columbia v. Heller*, the Supreme Court ruled that two District of Columbia ordinances violated the Second Amendment: the handgun ban and the ban on the requirement that any firearm in the home be kept locked or disassembled and thus unusable for self-defense.[236] Further, the District of Columbia required a permit to carry a gun anywhere (even from room to room in one's home)[237] and permits were never granted; the Court ordered that plaintiff Dick Heller be granted a permit.[238]

The Council of the District of Columbia responded by repealing all three of the unconstitutional ordinances and enacting the most severe gun control system in the United States.[239] Dick Heller and several other plaintiffs challenged the new ordinances in the case known as *Heller II*.[240]

Using the two-step test, the District of Columbia Circuit majority first examined whether any of the challenged provisions were "longstanding."[241] If so, then the provision would be held as not violating the Second Amendment right, with no further analysis needed.[242]

Regarding handgun registration, the majority identified statutes from New York (1911), Illinois (1881), Georgia (1910), Oregon **\*878** (1917), and Michigan (1927).[243] In addition, some jurisdictions required handgun buyers to provide information about themselves to retailers, but did not require that the retailer

Exhibit 12
00313

ER_3819

deliver the information to the government: California (1917), Territory of Hawaii (1927), and the District of Columbia (1932).[244] So "[i]n sum, the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the nation by population."[245]

The requirement that the government be provided with some basic information about persons acquiring handguns, in a manner that was "self-evidently de minimis" was therefore constitutional.[246] Seven states, with laws originating between 1881 and 1927, were apparently sufficiently numerous and "diverse" to qualify as "longstanding."

However, although de minimis registration of handguns was longstanding, many of the new District of Columbia requirements went beyond traditional de minimis systems.[247] Further, "[t]hese early registration requirements, however, applied with only a few exceptions solely to handguns--that is, pistols and revolvers-- and not to long guns. Consequently, we hold the basic registration requirements are constitutional only as applied to handguns. With respect to long guns they are novel, not historic."[248] So the case was remanded to the district court for further fact-finding, since the District of Columbia government had provided the court with almost no information about whether the novel requirements passed heightened scrutiny by being narrowly tailored.[249]

The case had come to the District of Columbia Circuit following cross motions for summary judgment.[250] While the circuit court decided that the novel registration requirements needed a more complete factual record, the panel also decided that the record contained enough information for a ruling on the merits of the District's ban on various semiautomatic rifles, which the district council labeled "assault weapons," and on the District's ban on **879** magazines holding more than ten rounds.[251]

The District of Columbia Circuit majority stated "[w]e are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity."[252] In a footnote, the majority cited the 1927 Michigan magazine statute and the 1932 District of Columbia ordinance detailed in Part III of this article.[253] There is no reason to think that the majority's determination on this point would change if the 1927 Rhode Island statute had also been cited.

Exhibit 12

ER_3820

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

Importantly, the majority did not suggest that the magazine bans enacted in 1990 or thereafter had any relevance to whether magazine bans are "longstanding."

Accordingly, the majority proceeded to analyze the rifle and magazine bans. The majority provided two paragraphs of explanation of why the rifle ban passed intermediate scrutiny and one paragraph on why the magazine ban did so. [254]

Discussion of whether intermediate scrutiny was the correct standard, or whether magazine bans pass intermediate scrutiny, is beyond the scope of this article. However, it does seem to appear that the District of Columbia Circuit would have acted more prudently by remanding the case for fact-finding in the district court. To support the ban, the panel majority could only point to legislative testimony by a gun-prohibition lobbyist and by the District of Columbia police chief, plus a Department of Justice report on the 1994 to 2004 federal ban on such magazines. [255] Notably, the panel majority did not address the report's finding that a ten-year nationwide ban had led to no discernible reduction in homicides, injuries, or the number of shots fired in crimes. [256]

*b. Dissent*

A forceful dissent by Judge Brett Kavanaugh critiqued the majority's application of intermediate scrutiny. [257] He argued that **880** the majority's approach was necessarily incorrect, because its logic on banning semiautomatic rifles would allow a ban on all semiautomatic handguns--which constitute the vast majority of handguns produced today. [258]

More fundamentally, he argued that *Heller* does not tell courts to use tiered scrutiny to assess gun control laws. [259] Rather, *Heller* looks to history and tradition. [260] So gun controls that are well-grounded in history and tradition are constitutional; gun control laws which are not so grounded are unconstitutional. [261]

Using the standard of history and tradition, Judge Kavanaugh argued that the entire District of Columbia registration scheme was unconstitutional. [262] Regarding de minimis handgun registration, the statutes cited by the majority were mostly record-keeping requirements for gun dealers, not centralized information collection by the government. [263] The novel and much more onerous requirements

Exhibit 12
WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

of the District of Columbia registration system for all guns had no basis in history and tradition.[264] For all firearms, any registration system beyond dealer record-keeping requirements was unconstitutional.[265]

Judge Kavanaugh examined the history of semiautomatic rifles and found them to be in common use for over a century and thus protected by the Second Amendment from prohibition.[266] He did not have similar information on magazines and thus urged that the magazine issue be remanded for fact-finding.[267] In light of the evidence on magazines that has been presented subsequent to the 2011 *Heller II* decision, Judge Kavanaugh's methodology **\*881** straightforwardly leads to the conclusion that the District of Columbia magazine ban is unconstitutional.[268] The *Heller II* majority rightly recognized that magazine bans are not "longstanding,"[269] and this article has demonstrated that magazines of more than ten rounds have been a common part of the American tradition of firearms ownership since before the ratification of the Fourteenth Amendment in 1868.

4. *Silvester v. Harris*

Another decision carefully employing historical analysis is *Silvester v. Harris*,[270] from the United States District Court for the Eastern District of California.

A California statute requires that firearms purchasers wait ten days before they can take their gun home from the store.[271] In California, background checks on firearms buyers are sometimes completed within minutes and sometimes can take a week or longer.[272] Senior District Judge Anthony Ishii (appointed to the federal court in 1997 by President Clinton)[273] ruled the waiting period unconstitutional, to the extent that the waiting period lasted longer than the time required to complete the background check on a given buyer.[274]

Like the Seventh Circuit in *Ezell*, Judge Ishii looked to 1791 and 1868 as the crucial periods.[275]

California Attorney General Kamala Harris had directed the court to a book arguing that between 1790 and 1840 many Americans might have to travel for several days in order to buy a gun, so there was a de facto waiting period between the time a person decided to buy a gun and when a person could take possession

Exhibit 12

ER_3822

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

of the gun.[276] Judge Ishii held this irrelevant; the court's job was to consider the legality of government regulations that *882 might impede the exercise of a constitutional right and the book provided no evidence that government-imposed waiting periods for firearm purchases existed between 1790 and 1840.[277]

Another book explained that the first waiting period law was proposed in 1923-- a one-day waiting period for handguns.[278] The law was adopted in California and eventually by eight other states.[279] This too was irrelevant, ruled the court, because it had nothing to do with 1791 or 1868.[280]

The court explained that "[i]t is Defendant's burden to show that the 10-day waiting period either falls outside the scope of Second Amendment protections as historically understood or fits within one of several categories of longstanding regulations that are presumptively lawful."[281]

The complete absence of evidence of waiting periods in 1791 and 1868 eliminated the first possibility.[282] What about the question of whether waiting periods were "longstanding regulations that are presumptively lawful"? The answer to this question is not confined to 1791 and 1868.

The court explained that "the concept of a 'longstanding and presumptively lawful regulation' is that the regulation has long been accepted and is rooted in history."[283] California's 1923 statute did not come close. Besides that, the California wait was only one day and only for retail handguns.[284] Not until 1975 was the number of days extended to double digits and not until 1991 to long guns.[285] Consistent with the unusual nature of waiting periods, only ten states and the District of Columbia today have a waiting period for at least some firearms.[286]

Thus, the court concluded that the plaintiffs' challenge had passed step one of the two-step test,[287] and the court proceeded to apply heightened scrutiny.[288] The court stated that it did not have to decide whether to use strict or intermediate scrutiny.[289] The *883 waiting period statute failed intermediate scrutiny, as applied to persons who already possessed a firearm (based on state registration data), and who passed the background check when purchasing an additional firearm.[290] Therefore, a fortiori, the statute would fail strict scrutiny. The court gave the state legislature 180 days to revise the statute so as to eliminate the post-background-check waiting period for persons who already have a gun.[291] The

Exhibit 12

ER_3823

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 189 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-10   Filed 03/05/18   PageID.4896   Page 45 of
121
THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

plaintiffs had not challenged the waiting period as applied to first-time gun buyers, nor as to persons who had not yet passed the background check. [292]

## V. CONCLUSION

Rifle magazines holding more than ten or fifteen rounds have been common in the United States since the mid-nineteenth century. [293] Handgun magazines over ten rounds have been common since 1935, and handgun magazines over fifteen have been common since the mid-1960s. [294]

Magazine prohibition has historically been rare. There is *no* historical basis for a magazine limit of ten rounds or lower. As for prohibitions with higher limits, there are only two examples, both of them from 1927, the outer edge of what courts have considered to be examples of state statutes that may be considered "longstanding": Michigan (enacted 1927, repealed 1959), Rhode Island (enacted 1927, loosened 1959, repealed 1975). [295] Ohio formerly required a special permit to actually insert a magazine above a certain size into a firearm but never banned sales. [296] (The original limit was eighteen rounds or more and later was thirty-two rounds or more.) [297] As is often the case, the District of Columbia is the *sui generis* outlier, with its 1932 restriction still in effect today, with some modifications. [298]

Of all the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being **\*884** "longstanding" or part of American history and tradition. To the contrary, ammunition capacity limits are far outside the norm of the traditional exercise and regulation of Second Amendment rights. Not until California in 1999 did any state set a magazine limit as low as ten. [299]

What does this mean for modern legal analysis? Under judicial methods which hew closely to history and tradition, the historical absence (of limits of ten or less) or the extreme rarity (limits of fifteen or less) would be sufficient for any such modern limit to be ruled unconstitutional. Owning such magazines is very long-established manner in which the right to arms has historically been exercised in America.

Other courts perform a two-step test. Challengers to magazine limit laws should always pass step one, since magazine limits are not "longstanding."

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

As for step two--review under some form of heightened scrutiny--the Supreme Court taught in *Heller* that when the "severe restriction" of a "ban" has support from "[f]ew laws in the history of our Nation," the law's constitutionality is very doubtful. This was true for the prohibition of handguns, and it is also true for the prohibition of magazines holding more than five, seven, ten, or fifteen rounds.

## Footnotes

a1   Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law. Research Director, Independence Institute, Denver, Colorado. Associate Policy Analyst, Cato Institute, Washington, D.C. Professor Kopel is the author of fifteen books and over ninety scholarly journal articles, including the first law school textbook on the Second Amendment. *See generally* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2012). Professor Kopel's website is http:// www.davekopel.org. The author would like to thank Joseph Greenlee and Noah Rauscher for research assistance.

1   *See* Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008).

2   District of Columbia v. Heller, 554 U.S. 570 (2008).

3   *Id.* at 624-25, 627.

4   *See infra* notes 50-55 and accompanying text.

5   *See infra* notes 102-03 and accompanying text.

6   The U.S. manufacturing figures were compiled by the Bureau of Alcohol, Tobacco & Firearms. Although they were public documents, they were not made widely available in the 1970s. The following are the full-year production data by U.S. manufacturers. The figures do not include production for sale to the military. 1973: 452,232 pistols, 1,170,966 revolvers; 1974: 399,011 pistols, 1,495,861 revolvers; 1975: 455,267 pistols, 1,425,833 revolvers; 1976: 468,638 pistols, 1,425,407 revolvers; 1977: 440,387 pistols, 1,423,984 revolvers; 1978: 499,257 pistols, 1,458,013 revolvers; 1979: 637,067 pistols, 1,531,362 revolvers; 1980: 785,105 pistols, 1,586,149 revolvers. *Statistical Tabulation of Firearms Manufactured in the United States--and Firearms Exported--as Reported Yearly by Bureau of Alcohol, Tobacco and Firearms on ATF Form 4483-A*, AM. FIREARMS INDUSTRY (Nov. 1981) at 28-29.

7   *See* David B. Kopel, *The Great Gun Control War of the Twentieth Century--and Its Lessons for Gun Laws Today*, 39 FORDHAM URB. L.J. 1527, 1578-79 (2012) (beginning of "assault weapon" issue in the mid- and late 1980s); L. Ingram, *Restricting of Assault-Type Guns Okd by Assembly Unit*, L.A. TIMES, Apr. 9, 1985, at 3.

8   Below, this article describes many models of semi-automatic rifles introduced since 1927. *See infra* notes 82-101 and accompanying text. All of them have been labeled an "assault weapon" by one or more proposed bills. *See, e.g.*, LEGAL CMTY. AGAINST VIOLENCE, BANNING ASSAULT WEAPONS--A LEGAL PRIMER FOR STATE AND LOCAL ACTION 59-60 (2004), *available at* http://smartgunlaws.org/ wp-content/uploads/2012/05/Banning_Assault_Weapons_A_Legal_Primer_8.05_entire.pdf (proposing a model assault weapons law).

9   *See infra* notes 129-30, 134, 140 and accompanying text.

10   *See infra* notes 131-33, 135-39 and accompanying text.

Exhibit 12

ER_3825

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

11    *See infra* notes 140-45 and accompanying text.

12    McDonald v. City of Chi., 561 U.S. 742 (2010).

13    District of Columbia v. Heller, 554 U.S. 570, 627-29 (2008).

14    *Id.* at 625.

15    *See infra* notes 21-24 and accompanying text.

16    *See infra* note 65 and accompanying text.

17    *See infra* notes 43-55, 172-73 and accompanying text.

18    *See infra* notes 102-03 and accompanying text.

19    *See Heller*, 554 U.S. at 630, 635 (declaring the District of Columbia's requirement that all firearms in the home be "rendered and kept inoperable at all times" as unconstitutional).

20    *Id.*

21    *See* LEWIS WINANT, FIREARMS CURIOSA 168-70 (2009); *A 16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM (June 2014), http:// www.nrapublications.org/index.php/17739/a-16-shot-wheel-lock/ (NRA member magazine).

22    Cramer & Olson, *supra* note 1, at 716.

23    *Id.* at 716 & n.94.

24    *See id.* at 716-17; *This Day in History: May 15, 1718*, HISTORY, http://www.historychannel.com.au/classroom/ day-in-history/600/defence-rapid-fire-gun-patented (last visited Feb. 21, 2015).

25    *Heller*, 544 U.S. at 582.

26    *Id.* ("Some have made the argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (citations omitted)).

27    JIM SUPICA ET AL., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

28    JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 94 (2012).

29    JOHN L. PLASTER, THE HISTORY OF SNIPING AND SHARPSHOOTING 69-70 (2008)..

30    *See* SUPICA ET AL., *supra* note 27, at 31.

31    *Id.* The Lewis and Clark gun is on display at the National Rifle Association's Sporting Arms Museum in Springfield, Missouri. Mark Yost, *The Story of Guns in America*, WALL ST. J., Sept. 3, 2014, at D5.

32    NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 683 (9th ed. 2007) [hereinafter FLAYDERMAN'S GUIDE]. According to James S. Hutchins, historian emeritus at the National Museum of American History, Smithsonian Institution, Mr. Flayderman has been a "revered expert in antique American arms and a vast range of other Americana for half a century...." James S. Hutchins, *Foreword* to NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING THE AMERICAN LEGEND 7 (2004). Mr. Flayderman has been appointed as historical consultant to the U.S. Army Museum, U.S. Marine Corps Museum, and the State of Connecticut's historic weapons collections. Andrea

Exhibit 12

ER_3826

Valluzzo, *E. Norman Flayderman, 84; Antique Arms Expert*, ANTIQUES & ARTS WKLY. (July 2, 2013), http://test.antiquesandthearts.com/node/185567#.VMvRAGjF8YM.

33   JACK DUNLAP, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS 16 (1964).

34   LEWIS WINANT, PEPPERBOX FIREARMS 7 (1952).

35   *See, e.g.* , *Pocetksize Allen and Thurber Pepperbox Revolver*, ANTIQUE ARMS, http://aaawt.com/html/firearms/f102.html (last visited Feb. 21, 2015).

36   DOE RUN LEAD COMPANY'S MUSEUM, CATALOGUE OF CONTENTS 66 (1912).

37   DUNLAP, *supra* note 33, at 148-49, 167 (describing three European eighteen-shot models and one twenty-four-shot model); SUPICA ET AL., *supra* note 27, at 33 (describing the Marietta eighteen-shot model); WINANT, *supra* note 21, at 249-50 (describing a twenty-four-shot pepperbox).

38   WINANT, *supra* note 34, at 28.

39   FLAYDERMAN'S GUIDE, *supra* note 32, at 711.

40   *See id.*

41   *Id.* at 713, 716.

42   *Id.* The Porter Rifle was said to be able to fire up to sixty shots per minute. Mary Moran, *P.W. Porter, Inventor of the Porter Rifle*, DEAD MEMPHIS TALKING (April 18, 2014), http://deadmemphistalking.blogspot.com/2014/04/pw-porter-inventor-of-porter-rifle.html (reprinting an article from New York Post). About 1250 of these guns were produced. S.P. Fjestad, *What's It Worth? The Porter Rifle*, FIELD & STREAM, http://www.fieldandstream.com/articles/guns/rifles/2009/01/whats-it-worth-porter-rifle (last visited Feb. 21, 2015).

43   *See* FLAYDERMAN'S GUIDE, *supra* note 32, at 303  ("The self-contained cartridge was a special type, the hollowed out conical bullet containing the powder, and backed by the primer."); HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 26-27 (1952).

44   *See Smith & Wesson History*, SMITH & WESSON, http://www.smith-wesson.com/webapp/wcs/stores/servlet/Category4_750001_750051_757941_-1_757938_ 757812_image (last visited Feb. 21, 2015).

45   FLAYDERMAN'S GUIDE, *supra* note 32, at 304.

46   *Id.* at 303; WILLIAMSON, *supra* note 43, at  13.

47   WILLIAMSON, *supra* note 43, at 25. Oliver Winchester had an ownership interest in Volcanic and acquired the company in 1857. FLAYDERMAN'S GUIDE,  *supra* note 32, at 300.

48   WILLIAMSON, *supra* note 43, at 25.

49   *See Id.*, at  28-31; Joseph Bilby, *The Guns of 1864*, AM. RIFLEMAN ((May 5, 2014), http://www.americanrifleman.org/articles/2014/5/5/the-guns-of-1864/. About 14,000 Henry rifles were sold in 1860-66. FLAYDERMAN'S GUIDE,  *supra* note 32, at 305. The Henry Rifle is still in production today. *See About Henry Repeating*, HENRY, http://www.henryrifles.com/about-henry-repeating/ (last visited Feb. 21, 2015).

50   *See* WILLIAMSON, *supra* note 43 , at 49.

51   R.L. WILSON, WINCHESTER: AN AMERICAN LEGEND 32 (1991).

52   WILLIAMSON, *supra* note 43 , at 49.

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

53    LOUIS A. GARAVAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 1866-1894, at 128 (1985). The Winchester Model 1866 was produced until 1898. FLAYDERMAN'S GUIDE, *supra* note 32, at 306.

54    WILSON, *supra* note 51, at 34.

55    FLAYDERMAN'S GUIDE, *supra* note 32, at 306.

56    *Model 1873 Short Rifle* , WINCHESTER REPEATING ARMS, http:// www.winchesterguns.com/products/catalog/detail.asp?family=027C&mid=534200 (last visited Feb. 21, 2015).

57    *Id.*

58    FLAYDERMAN'S GUIDE, *supra* note 32 , at 307. The Model 1873 was Pa Cartwright's gun on the 1959 to 1973 television series *Bonanza*. SUPICA ET AL., *supra* note 27, at 108.

59    FLAYDERMAN'S GUIDE, *supra* note 32 , at 311. The Model 1892 was John Wayne's gun in many movies. SUPICA ET AL., *supra* note 27, at 109.

60    2014 STANDARD CATALOG OF FIREARMS: THE COLLECTOR'S PRICE & REFERENCE GUIDE, 1237 (Jerry Lee ed., 2013). The 1995 edition of this annually-published guide was relied on by the court in *Kirkland v. District of Columbia*, 70 F.3d 629, 635 n.3 (D.C. Cir. 1995).

61    The original Colt held up to fifteen rounds in calibers of .32-.20, .38-.40, and .44-.40. FLAYDERMAN'S GUIDE, *supra* note 32, at 122. Uberti currently produces a modern replica of the Colt Lightning, medium frame model, of which 89,000 were produced between 1884 and 1902. *Id.*

62    *Id.* at 694.

63    DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS293-95 (rev. ed. 1997); FLAYDERMAN'S GUIDE, *supra* note 32 , at 694. A later iteration of the rifle held twenty-five or twenty-eight rounds in the buttstock. DEMERITT, *supra*, at 301. The American Society of Arms Collectors endorses the Demeritt book as "the definitive work for historians and collectors" of Maine guns. DEMERITT, *supra*, at vi.

64    FLAYDERMAN'S GUIDE, *supra* note 32 , at 694.

65    WINANT, *supra* note 21, at 244-45. The magazine stuck out horizontally from the side of the firing chamber, making the handgun difficult to carry in a holster, which perhaps explains why the gun never had mass success. SUPICA ET AL., *supra* note 27, at 33.

66    *See infra* notes 72-77 and accompanying text.

67    SUPICA ET AL., *supra* note 27, at 48-49; WINANT, *supra* note 21, at 67-70.

68    SUPICA ET AL., *supra* note 27, at 49.

69    *See, e.g.*, WINANT, *supra* note 21, at 62-63, 207-08.

70    *Id.* at 204, 206.

71    *See id.* at 205.

72    JOHN W. BREATHED, JR. & JOSEPH J. SCHROEDER, JR., SYSTEM MAUSER, A PICTORIAL HISTORY OF THE MODEL 1896 SELF-LOADING PISTOL 272 (1967) (production of 1,150,000, of which "almost a million" were sold on the commercial, non-military market); *see* John Elliot, *A Sweeping History of the Mauser C96 Broomhandle Pistol*, GUNS.COM (Jan. 26, 2012), http://www.guns.com/2012/01/26/a-sweeping-history-of-the-mauser-c96-broomhandle-pistol/.

Exhibit 12

ER_3828

73    2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 708-09.

74    *Id.*; BREATHED & SCHROEDER, *supra* note 72, at 23, 30-31, 38-39, 54-55. At least between 1896 and 1905, Mauser's direct sales to the United States were small. *Id.* at 266-67.Spain's Astra brought out its own versions of the Mauser, with several models having twenty-round magazines starting in 1928. *Id.* at 208. But these do not appear to have had much distribution in the United States. *Id.* at 266-67.

75    *See* 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 650.

76    Among the many models was the 1906 American Eagle. *Id.* at 653. George Luger's invention was licensed to many companies, including Mauser (Germany) and Vickers (England). *Id.* at 657-58. The gun was never manufactured under Luger's own name. *See id.* at 650-62.

77    JEAN-NOËL MOURET, PISTOLS AND REVOLVERS 126-27 (1993); SUPICA ET AL., *supra* note 27, at 86.

78    *See Savage Arms History*, SAVAGE ARMS, http:// www.savagearms.com/history/ (last visited Feb. 21, 2015).

79    JIM PERKINS, AMERICAN BOYS' RIFLES 1890-1945, at 191 (1976).

80    *Id.* Similarly, the Remington Model 12B Gallery Special was introduced in 1910, with an optional extended magazine that held twenty-five .22 shorts. ROY MARCOT, REMINGTON, "AMERICA'S OLDEST GUN MAKER" 149 (James W. Bequette & Joel J. Hutchcroft eds. 1998).

81    *See, e.g.*, 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 687-88, 870, 1343.

82    Models listed in the 1936 *Shooter's Bible* include; Remington Model 34 bolt action, Remington Model 121 slide action, Remington Model 341 bolt action, Stevens No. 71 slide action, Savage Model 5 bolt action, Stevens Model 76 semiauto, Stevens-Springfield Model 86 bolt action, Winchester Model 62 slide action, and Winchester Model 61 slide action. STOGER ARMS CORP., SHOOTER'S BIBLE, 1936, at 108-09, 112, 123-24, 126-27, 140 (photo. reprint 1974).
Some additional models include: Stevens Model 87 bolt action, Remington 550 semiauto, Mossberg Model 46B bolt action, Mossberg Model 46M bolt action, Winchester Model 74 semiautomatic, Marlin 39 A lever action, and Marlin Model 81 DL bolt action. BOB BROWNELL, 2 THE GUNSMITHS MART, 1949-1950, at 212, 214, 216, 218, 221 (2011) (reprinting article from *Hunting & Fishing*, Oct. 1948).
The 1959 annual edition of the *Shooter's Bible* adds the semiautomatic Savage Model 6 to the above list. STOGER ARMS CORP., SHOOTER'S BIBLE, 1959, at 103 (1959). For some of the models previously mentioned, see *id.* at 80, 87, 91, 101.
Histories of Savage and Stevens firearms include the following not listed above: Stevens No. 66 bolt action, Stevens Model 46 bolt action, Model 1914 slide action, Savage Model 29 slide action, Savage Model 29 G slide action. JAY KIMMEL, SAVAGE AND STEVENS ARMS COLLECTOR'S HISTORY 35 (1990); BILL WEST, SAVAGE AND STEVENS ARMS, at 11--12, 13--8, 14--44, 15--10, 16--10 (1971). Savage purchased Stevens in 1920. *Savage Arms History*, s *upra* note 78.
For use of the *Shooter's Bible* by the courts, see United States v. Olson, No. 94-30387, 1995 U.S. App. LEXIS 36973, at *1-2 (9th Cir. Dec. 15, 1995) (stating that the book was properly used as a source for a Bureau of Alcohol, Tobacco, and Firearms agent's expert opinion); United States v. Fisher, 353 F.2d 396, 399 (5th Cir. 1965) (Gewin, J., dissenting) (considering information in the book to determine whether the evidence relied on by the trial court was sufficient to justify the trial court's holding); Potter v. United States, 167 Ct. Cl. 28, 48 n.1 (Ct. Cl. 1964) (citing the book for the history of Gabilondo firearms); United States v. Precise Imports Corp., 458 F.2d 1376, 1377 (C.C.P.A. 1972) (reviewing the record produced at trial court, which included pages from the 1967 edition of the book).

83    2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 84; *T1-C*, THOMPSON, www.auto-ordnance.com//firearms/thompson-t1-c.asp (last visited Feb. 21, 2015).

84    *See T1-C*, *supra* note 83.

Exhibit 12
00323

**ER_3829**

85    *See* BRUCE N. CANFIELD, BRUCE CANFIELD'S COMPLETE GUIDE TO THE M1 GARAND AND THE M1 CARBINE 163 (1999).

86    *See id.* at 163, 279 (noting high desirability and demand for the firearm after the war ended); *see also* Joseph P. Tartaro, *The Great Assault Weapon Hoax*, 20 U. DAYTON L. REV. 619, 622 (1995) ("[T]he M1 carbine [is] beloved by millions of war veterans, collectors, and recreational shooters.").

87    CANFIELD, *supra* note 85, at 163; LARRY L. RUTH, 2 WAR BABY! COMES HOME: THE U.S. CALIBER .30 CARBINE 575 (R. Blake Stevens ed., 1993); *About the CMP*, CIV. MARKSMANSHIP PROGRAM, http://thecmp.org/about/ (last visited Feb. 21, 2015).

88    *See* CANFIELD, *supra* note 85, at 163, 279 (noting the large quantity of surplus carbine parts and that firms created commercial carbines using these parts in the 1950s and 1960s. The largest producers were Plainfield's 112,000 from 1962 to 1978 and Iver Johnson's 96,700 from 1978 to 1992. *Post WWII Commercially Manufactured M1 Carbines (U.S.A.): Iver Johnson Arms*, M1CARBINESINC.COM, http://www.m1carbinesinc.com/carbine_ij.html (last visited Feb. 21, 2015); *Post WWII Commercially Manufactured M1 Carbines (U.S.A.): Plainfield Machine Co., Inc.*, M1CARBINESINC.COM., http://www.m1carbinesinc.com/carbine_plainfield.html (last visited Feb. 21, 2015). The U.S. Government sold 240,000 of its own surplus in 1963 into the Civilian Marksmanship Program. CANFIELD, *supra* note 85, at 163. Thereafter, the program (then known as "DCM"--Director of Civilian Marksmanship) sold M1s to Americans from the supply of World War II M1 carbines that had been exported to allied nations and subsequently returned to the United States when the allied nation switched to a newer type of rifle. *See* RUTH, *supra* note 87, at 575, 723. As of 2014, the Civilian Marksmanship Program's supply of carbines for sale has been exhausted. *M1 Carbine*, CIV. MARKSMANSHIP PROGRAM, http:// www.thecmp.org/Sales/carbine.htm (last visited Feb. 21, 2015).

89    RUTH, *supra* note 87, at 575.

90    *See* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 12, 809 (2012) (noting the wide range of uses for the gun and its popularity). The "AR" stands for "ArmaLite Rifle." *Modern Sporting Rifle Facts*, NAT'L SHOOTING SPORTS FOUND., http://www.nssf.org/msr/facts.cfm (last visited Feb. 21, 2015). ArmaLite did the initial design work on the AR-15 before selling the rights to Colt's. ARMALITE, INC., A HISTORICAL REVIEW OF ARMALITE 3 (Jan. 4, 2010), *available at* http:// www.armalite.com/images/Library% 5CHistory.pdf.

91    PATRICK SWEENEY, THE GUN DIGEST BOOK OF THE AR-15, at 104 (2005). About this time, the Cetme-Sport semiauto rifle with an optional twenty-round detachable box mag magazine came on the market. GUN DIGEST 1968, at 335 (John T. Amber ed., 22nd Anniversary Deluxe ed. 1967).

92    Staples v. United States, 511 U.S. 600 (1994).

93    *Id.* at 603.

94    *Id.* at 602 n.1, 603.

95    *See id.* at 612.

96    *See id.* at 611-12.

97    *See* GUN DIGEST 1970, at 294 (John T. Amber ed., 24th Anniversary Deluxe ed. 1969).

98    *See* 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 1102 (noting the twenty-round box magazine); *M1A Series*, SPRINGFIELD ARMORY, http:// www.springfield-armory.com/m1a-series/ (last visited Feb. 21, 2015).

99    2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 1173.

Exhibit 12

**ER_3830**

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

100  *See* M1A Scout, *What is an M1A Rifle*, M1A RIFLES (July 2, 2009), http://www.m1arifles.com/tag/m14/; Shawn
     Skipper, *8 Things You Might Not Know About the Ruger Mini-14*, DAILY CALLER (June 3, 2014), http://
     dailycaller.com/2014/06/03/8-things-you-might-not-know-about-the-ruger-mini-14/. Another gun introduced in
     1976 also used magazines larger than fifteen. The Bingham company (from Norcross, Georgia) brought out
     the PPS 50 and AK-22, .22 caliber rifles with detachable magazines of fifty or twenty-nine rounds. 2 014
     STANDARD CATALOG OF FIREARMS, *supra* note 60, at 163. The PPS-50 is currently manufactured by
     Mitchell's Mausers. *See PPS-50/22*, MITCHELL'S MOUSERS, http://www.mauser.org/pps-50-22/ (last visited
     Feb. 21, 2015). That the gun is still in production four decades later is impressive, but the PPS-50 never became
     an all-American favorite as did the M1, AR-15, M1A and the Mini-14.

101  GUN DIGEST 1980, at 319-21 (Ken Warner ed., 34th Anniversary Deluxe ed. 1979). Also on the market were
     the Commando Arms carbine (five, fifteen, thirty or ninety rounds), and the Wilkinson Terry carbine (thirty-
     one rounds). *Id.* at 319, 322.

102  2 014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 182.

103  *Id.* at 432-33.

104  *See id.* at 465.

105  *Id.* at 72; BREATHED & SCHROEDER, *supra* note 74, at 216-17.

106  *See* GUN DIGEST 1965, at 229 (John T. Amber eds., 19th Anniversary Deluxe ed. 1964).

107  2 014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 121.

108  *Id.* at 122. In 1985 the M9 version of this pistol became the standard U.S. military issue sidearm. *Id.* at 124.

109  *Id.* at 184.

110  *See* GUN DIGEST 1980, *supra* note 101, at 297-98. L.E.S. was the American partner of Austria's Steyr. The
     following courts have relied on one of the annual issues of GUN DIGEST: Sturm, Ruger & Co. v. Arcadia
     Mach. & Tool, Inc., No. CV 85-8459 MRP, 1988 U.S. Dist. LEXIS 16451, at *3-4 (C.D. Cal. Nov. 4, 1988); A.
     Uberti & C. v. Leonardo, 892 P.2d 1354, 1364 (Ariz. 1995) (discussing how the inclusion of the defendant's guns
     in the *Gun Digest* established that defendant had sufficient minimum contacts with the state to satisfy personal
     jurisdiction); Couplin v. State, 378 A.2d 197, 202 n.2 (Md. Ct. Spec. App. 1977); Citizens for a Safer Cmty. v.
     City of Rochester, 627 N.Y.S.2d 193, 203 n.5 (Sup. Ct. 1994).

111  JULIAN E. ZELIZER, JIMMY CARTER 3 (2010).

112  *See* DAVID N. MEYER, THE BEE GEES: THE BIOGRAPHY 213-14 (2013).

113  PAUL M. BARRETT, GLOCK: THE RISE OF AMERICA'S GUN 13-16 (2012).

114  GAVIN MACLEOD & MARK DAGOSTINO, THIS IS YOUR CAPTAIN SPEAKING: MY FANTASTIC
     VOYAGE THROUGH HOLLYWOOD, FAITH & LIFE 138-39 (2013).

115  *See, e.g.,* BOB DENTON, THE PC PIONEERS 97-100 (2d ed. 2014); ROBERT E. WILLIAMS & BRUCE
     J. TAYLOR, THE POWER OF: VISICALC (1981) (advising how to properly use the VisiCalc system and
     providing practice exercises on the system).

116  *See generally* David Tong, *The Care, Feeding and Reliability of Semi-Automatic Pistols*,
     CHUCKHAWKS.COM, http://www.chuckhawks.com/care_ reliability_autopistols.htm (last visited Feb. 21,
     2015).

Exhibit 12

ER_3831

117 *See, e.g.*, Tim Lau, *AR15/M16 Magazine Drop Test: Plastic Vs. Aluminum*, MODERN SERVICE WEAPONS, (Dec. 9, 2012), http:// modernserviceweapons.com/?p=1072 (comparing the performance of plastic and aluminum magazines).

118 Michael Shain, Expert Report and Opinion at 5-6, Cooke v. Hickenlooper, No. 13-cv-01300-MSK-MJW (D. Colo. Aug. 1, 2013), available at http://coloradoguncase.org/Shain-report.pdf. Kopel is counsel for the Colorado Sheriffs who are the plaintiffs in this case, which is currently on appeal to the Tenth Circuit.

119 *See* Mike Wood, *3 Simple Keys to Cleaning Your Pistol Magazines*, POLICEONE.COM, July 11, 2014, http:// www.policeone.com/Officer-Safety/articles/7358758-3-simple-keys-to-cleaning-your-pistol-magazines/.

120 Michael Shain, Expert Report and Opinion at 5-7, *Cooke*, No. 13-cv-01300-MSK-MJW.

121 *See, e.g.*, *Magazine Adapters*, TOP GUN SUPPLY, http:// www.topgunsupply.com/gun-accessories-for-sale/ magazine-adapters.html (last visited Feb. 19, 2014) (selling magazine adapters that increase capacity and/or increase grip length).

122 *Magazines, Clips, and Speedloaders*, FIREARMS ADVANTAGE, http:// www.firearmsadvantage.com/ magazines_clips_speedloaders.html (last visited Feb. 21, 2015).

123 *Id.*

124 *Id.*

125 District of Columbia v. Heller, 554 U.S. 570, 629 (2008).

126 *Id.* at 626, 629.

127 Kerr v. Hickenlooper, 744 F.3d 1156, 1178 (10th Cir. 2014).

128 *See supra* notes 21-31 and accompanying text.

129 Act of June 2, 1927, No. 373, § 3, 1927 Mich . Public Acts 887, 888 (repealed 1959) ("It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading ...."). In 1931, the provision was consolidated into section 224 of the Michigan Code.

130 Act of Apr. 22, 1927, ch. 1052, §§ 1, 4, 1927 R.I. Acts & Resolves 256, 256-57 (amended 1959).

131 Under the 1959 revision: "Any person who shall manufacture, sell, offer for sale or possess any machine gun or firearm which shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger ... shall be guilty of a felony...." Act of July 16, 1959, No. 175, sec. 1, § 224, 1959 Mich. Pub. Acts 249, 250. Michigan's current statute on machine guns contains very similar language. *See* MICH. COMP. LAWS SERV. § 750.224 (LexisNexis 2014) ("A person shall not manufacture, sell, offer for sale or possess... [a] machine gun or firearm that shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger.").

132 Firearms Act, ch. 75, secs. 11-47-2, -8, 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975).

133 This was accomplished by changing the Firearms Act's definition of "Machine gun" to mirror the federal definition:
[A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

Exhibit 12

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

Firearms Act, ch. 278, sec. 1, § 11-47-2, 1975 R.I Pub. Laws 738, 738-39, 742 (amended 1989). Rhode Island's definition of machine gun was changed again in 1989. Act of July 10, 1989, ch. 542, sec. 7, § 11-47-2, 1989 R.I. Pub. Laws. 1371, 1375-76 (codified at R.I. GEN. LAWS ANN. § 11-47-2 (West 2014)).

134   Act of Apr. 8, 1933, No. 166, sec. 1, §§ 12819-3, -4, 1933 Ohio Laws 189, 189 (amended 1972).

135   Act of Dec. 22, 1972, No. 511, sec. 1, § 2923.11, 1972 Ohio Laws 1866, 1963; OHIO REV. CODE ANN. § 2923.11 (LexisNexis 2014).

136   *Ohio: Disclaimer*, BUDSGUNSHOP.COM (July. 11, 2014), http:// www.budsgunshop.com/catalog/feeds/ state_reg/ohio_restrictions.pdf.

137   OHIO REV. CODE ANN. § 2923.17.

138   *See, e.g., Surefire 60-Round High-Capacity Magazine MAG5-60*, GANDER MTN., http:// www.gandermountain.com/modperl/product/details.cgi? pdesc=SureFire-60-Round-High-Capacity-Magazine-MAG5-60&i=447625 (last visited Feb. 21, 2015) (allowing online customers to arrange for pick-up of a SureFire 60-Round High-Capacity Magazine at any of nine Ohio stores).

139   H.R. 234, 2013-2014 Leg., 130th Sess. § 2 (Ohio 2014) (enacted) (repealing relevant definition statute, and taking effect Mar. 23, 2015).

140   Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

141   National Firearms Act, Pub. L. 73-474, 48 Stat. 1236 (1934).

142   *D.C. Home Rule*, COUNCIL D.C., http://dccouncil.us/pages/dc-home-rule (last visited Feb. 21, 2015).

143   *See* Firearms Control Regulations Act of 1975, No. 1-142, § 201, 23 D.C. Reg. 1091, 1097 (July 23, 1976).

144   *See supra* notes 13-14, 19-20 and accompanying text.

145   *See* VIVIAN S. CHU, DC GUN LAWS AND PROPOSED AMENDMENTS 5-6 (2011) (("Prior to Heller, the DC Code's definition of 'machine gun' included 'any firearm, which shoots, is designed to shoot or can be readily converted to shoot... semiautomatically, more than 12 shots without manual reloading.' By virtue of this broad definition, any semiautomatic weapon that could shoot more than 12 shots without manual reloading, whether pistol, rifle, or shotgun, was deemed a 'machine gun,' and prohibited from being registered. It appears that under the District's old definition, registration of a pistol was largely limited to revolvers." (quoting D.C. Code § 7-2501.01(10) (LexisNexis 2008))).

146   Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 110103(a)-(b), 108 Stat. 1796, 1998-99.

147   § 110105, 108 Stat. at 2000.

148   CHRISTOPHER S. KOPER ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994-2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

149   *Id.* at 2.

150   *Id.* at 81 n.95.

151   Act of May 30, 1990, ch. 32, §§ 2C:39-1(y), -3(j), 1990 N.J. Laws 217, 221, 235 (codified at N.J. STAT. ANN. § 2C:39-1(y), -3(j) (West 2014)).

152   § 2C:39-1(y). There is an exemption for certain competitive target shooters. *Id.* § 2C:39-3(j).

Exhibit 12
00327

ER_3833

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

153  Act of June 29, 1992, ch. 286, sec. 3. § 134-8, 1992 Haw. Sess. Laws 740, 742 (codified at HAW. REV. STAT. ANN. § 134-8 (LexisNexis 2014)).

154  Act of May 26, 1994, ch. 456, § 36H-5, 1994 Md. Laws 2119, 2165 (amended 2013).

155  *See* Firearm Safety Act of 2013, ch. 427, § 4-305, 2013 Md. Laws 4195, 4210 (codified at MD. CODE. ANN., CRIM. LAW § 4-305 (LexisNexis 2014)).

156  *See* Act of July 19, 1999, ch. 129, sec. 3, § 12020(a)(2), (c)(25), 1999 Cal. Stat. 1781, 1785, 1793 (repealed 2012); Act of Aug. 8, 2000, ch. 189, sec. 11, § 265.02(8), 2000 N.Y. Laws 2788, 2793 (amended 2013).

157  *Large Capacity Ammunition Magazines Policy Summary*, L. CENTER TO PREVENT GUN VIOLENCE (May 31, 2013), http://smartgunlaws.org/large-capacity-ammunition-magazines-policy-summary/; *see supra* notes 158, 165 and accompanying text.

158  Act of Jan. 15, 2013, ch. 1, secs. 38, 46-a, §§ 265.00.23, 265.36, 2013 N.Y. Laws 1, 16, 19 (codified at N.Y. PENAL LAW § 265.36 (McKinney 2014)).

159  Freeman Klopott, *Cuomo's 7-Bullet Limit to Be Suspended Indefinitely, Skelos Says*, BLOOMBERG (Mar. 24, 2013), http:// www.bloomberg.com/news/2013-03-25/cuomo-s-7-bullet-limit-to-be-suspended-indefinitely-skelos-says.html.

160  PENAL §§ 265.36-.37; OFFICE OF DIV. COUNSEL, GUIDE TO THE NEW YORK SAFE ACT FOR MEMBERS OF THE DIVISION OF STATE POLICE 7, 9 (2013), *available at* http://www.nypdcea.org/pdfs/ NYSP_Safe_Act_Field_Guide.pdf.

161  N.Y. State Rifle & Pistol Ass'n v. Cuomo, 990 F. Supp. 2d 349, 372-73 (W.D.N.Y. 2013).

162  N.Y.C., N.Y., ADMIN. CODE § 10-306(b) (2015).

163  Act of Mar. 20, 2013, ch. 48, sec. 1, §§ 18-12-301(2)(a)(I), - 302(1), 2013 Colo. Sess. Laws 144, 144-45 (codified at COLO. REV. STAT. § 18-12-302(1) (2014)).

164  Act of April 4, 2013, P.A. 13-3, § 23, 2013 Conn. Acts 47, 66 (Reg. Sess.) (codified at CONN. GEN. STAT. ANN. § 53-202w (West 2015)).

165  COLO. REV. STAT. § 18-12-302(2) (permitting a person to maintain possession of a banned magazine if he/she owned it prior to the effective date of the law and maintained "continuous possession" thereafter); CONN GEN. STAT. §§ 53-202w(e)(4), 53-202x(a)(1) (permitting a person to maintain possession of a banned magazine if he/she possessed it prior to the effective date of the law and declared it to the government).

166  MASS. GEN. LAWS ANN. ch. 140 §§ 121, 131(a) (West 2014) (allowing possession and acquisition of magazines manufactured before Sept. 1994 by anyone with a Class A license; Matt Carroll, *Snapshot: Gun Licenses Per 1,000, 2012*, BOSTON.COM, (Jan. 24, 2013), http:// www.boston.com/yourtown/specials/snapshot/ massachusetts_snapshot_gun_licenses_2012 (showing the prevalence of Class A licenses in Massachusetts). A 2014 bill enacted in Massachusetts eliminated the lower category of "Class B" firearms licenses, so presumably all licensed firearms owners in Massachusetts will be able to acquire magazines of more than ten rounds, albeit only magazines manufactured before 1995. Act of Aug. 11, 2014, ch. 284, 2014 Mass. Acts, *available at* https:// malegislature.gov/Laws/SessionLaws/Acts/2014/Chapter284.

167  *See, e.g.*, Ezell v. City of Chi., 651 F.3d 684, 702-03 (7th Cir. 2011).

168  JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 90, at 218.

169  *Id.* at 299.

170  *See supra* Part II.B.

Exhibit 12

ER_3834

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

171   *See supra* notes 27-31 and accompanying text.

172   *See supra* notes 32-35 and accompanying text..

173   RICHARD C. RATTENBURY, A LEGACY IN ARMS: AMERICAN FIREARM MANUFACTURE, DESIGN, AND ARTISTRY, 1800-1900, at 135 (2014); *see supra* note 49 and accompanying text.

174   CLIFFORD R. CADWELL, GUNS OF THE LINCOLN COUNTY WAR 50 (2009); RATTENBURY, *supra* note 173, at 136; *supra* notes 55-55 and accompanying text.

175   *See supra* notes 129-30 and accompanying text; s *ee also* Act of June 2, 1927, No. 372, § 3, 1927 Mich . Public Acts 887, 888-89 (repealed 1959) (regulating the possession of and carrying of certain firearms that were capable of firing sixteen shots without reloading).

176   *See id.* at 625, 629 (majority opinion).

177   *Id.* at 627 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)).

178   *Heller*, 554 U.S. at 627.

179   *See id.* at 625, 627.

180   *See id.* at 627.

181   *See id.*

182   *Id.* (quoting *Miller*, 307 U.S. at 179).

183   *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179) (internal quotation marks omitted).

184   *Miller*, 307 U.S. at 178.

185   *Heller*, 554 U.S. at 625.

186   *Miller*, 307 U.S. at 177, 183.

187   *Id.* at 178. "Judicial notice" is when courts rely on facts that are not in the record of the case, but which are indisputably true. FED. R. EVID. 201. For example, they may be a subject of common knowledge (e.g., that in Arkansas, the sun is never visible in the sky at midnight) or can be ascertained from indisputable sources (e.g., that a particular section of the Code of Federal Regulations contains certain language). *See id.*

188   Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U J.L. & LIBERTY 48, 65-68 (2008). *The Peculiar Story of* United States v. Miller was cited by the Court in *Heller*. *Heller*, 554 U.S. at 623.

189   *Heller*, 554 U.S. at 621-22.

190   *See supra* Part II.

191   *See supra* Part II.

192   *See* Fyock v. City of Sunnyvale, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722, at *13 (N.D. Cal. Mar. 5, 2014) (agreeing with and incorporating affidavit from plaintiffs' expert that "whatever the actual number of such magazines in United States consumers' hands is, it is in the tens-of-millions, even under the most conservative estimates.").

193   *Id.* ("Plaintiffs cite statistics showing that magazines having a capacity to accept more than ten rounds make up approximately 47 percent of all magazines owned.").

Exhibit 12

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

194  PATRICK SWEENEY, THE GUN DIGEST BOOK OF THE AR-15, at 14 (2005); *see* Meghan Lisson, *Run on Guns: AR-15s Sales Soar*, CNBC (Apr. 25, 2013), http://www.cnbc.com/id/100673826.

195  SWEENEY, *supra* note 194, at 99.

196  District of Columbia v. Heller, 554 U.S. 570, 626, 627 n.26 (2008).

197  *Id.* at 626-27.

198  *Id.* at 629 (citations omitted) (citing Nunn v. State, 1 Ga. 243, 251 (1846); Andrews v. State, 50 Tenn. 165, 187 (1871)); *see also Heller*, 554 U.S. at 629 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional ...." (quoting State v. Reid, 1 Ala. 612, 616-17 (1840)) (internal quotation marks omitted)).

199  Edward D. Jones, III, *The District of Columbia's "Firearms Control Regulations Act of 1975": The Toughest Handgun Control Law in the United States--Or Is It?*, 455 ANNALS AM. ACAD. POL. & SOC. SCI. 138, 139 (1981).

200  *See* McDonald v. City of Chi., 561 U.S. 742, 749 (2010); Steve Chapman, *Chicago's Pointless Handgun Ban: City Gun Ordinances Proved to Be a Failure*, CHI. TRIB., Mar. 4, 2010, at C21.

201  *Nunn*, 1 Ga. at 246, 251. The *Heller* Court cited this case with approval. *Heller*, 554 U.S. at 612.

202  Fiscal v. City & Cnty. of S.F., 70 Cal. Rptr. 3d 324, 326, 341-42 (Ct. App. 2008); Doe v. City & Cnty. of S.F., 186 Cal Rptr. 380, 381 (Ct. App. 1982).

203  *See supra* note 151-52 and accompanying text.

204  *See supra* note 156 and accompanying text.

205  *See supra* notes 129-30, 134, 140 and accompanying text.

206  *See supra* notes 140-45 and accompanying text.

207  *See supra* notes 131, 133 and accompanying text.

208  *See supra* notes 135-39 and accompanying text.

209  Ezell v. City of Chi., 651 F.3d 684, 690-91 (7th Cir. 2011).

210  *Id.* at 702-03.

211  *Id.* at 703.

212  *Id.* at 704.

213  *Id.* at 705-06.

214  *Id.*

215  *Id.* at 705.

216  *Id.* at 706.

217  *Id.* (quoting District of Columbia v. Heller, 554 U.S. 570, 632 (2008)); *see also Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law... that contradicts the overwhelming weight of other evidence....").

218  *See Ezell*, 652 F.3d at 706.

Exhibit 12

ER_3836

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

219   *See supra* notes 131, 133, 140 and accompanying text.

220   18 U.S.C. § 922(x)(2)-(3) (2013); United States v. Rene E., 583 F.3d 8, 16 (1st Cir. 2009).

221   *Rene E.*, 583 F.3d at 12.

222   *Id.*

223   *Id.* at 14-15.

224   State v. Callicutt, 69 Tenn. 714, 716-17 (1878).

225   McMillan v. Steele, 119 A. 721, 722 (Pa. 1923).

226   State v. Allen, 94 Ind. 441, 441 (1884).

227   Tankersly v. Commonwealth, 9 S.W. 702, 703 (Ky. 1888).

228   Coleman v. State, 32 Ala. 581, 582-83 (1858).

229   Biffer v. Chicago, 116 N.E. 182, 184 (Ill. 1917).

230   Schmidt v. Capital Candy Co., 166 N.W. 502, 503-04 (Minn. 1918).

231   United States v. Rene E., 583 F.3d 8, 14-15 (1st Cir. 2009).

232   *Id.*

233   *Id.*

234   *Id.* at 11-16 ("[T]his law, with its narrow scope and its exceptions, does not offend the Second Amendment."). Exceptions include farm and ranch work as well as target shooting or other activities under parental supervision. 18 U.S.C. § 922(x)(3)(A)(i)-(ii) (2013).

235   Ezell v. City of Chi., 651 F.3d 684, 706 (7th Cir. 2011).

236   District of Columbia v. Heller, 554 U.S. 570, 635 (2008).

237   *Id.* at 574-75.

238   *Id.* at 635.

239   *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1248-49 (D.C. Cir. 2011).

240   *Id.* at 1247.

241   *Id.* at 1252-53.

242   *See id.* at 1252.

243   *Id.* at 1253-54.

244   *See id.* at 1254.

245   *Id.* The court listed seven states that today have handgun registration laws. *Id.* at n.*.

246   *Id.* at 1254-55.

247   *Id.* at 1255.

248   *Id.*

Exhibit 12

ER_3837

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

249   *See id.* at 1247.

250   *See id.*

251   *Id.* at 1246, 1260, 1264.

252   *Id.* at 1260.

253   *Id.* at 1260 n.*.

254   *Id.* at 1262-64.

255   *Id.* at 1263-64.

256   KOPER EL AL., *supra* note 148, at 92.

257   *Heller II*, 670 F.3d at 1285 (Kavanaugh, J., dissenting) ("A ban on a class of arms is not an 'incidental' regulation. It is equivalent to a ban on a category of speech. Such restrictions on core enumerated constitutional protections are *not* subjected to mere intermediate scrutiny review. The majority opinion here is in uncharted territory in suggesting that intermediate scrutiny can apply to an outright ban on possession of a class of weapons that have not traditionally been banned.").

258   *Id.* at 1285-86.

259   *See id.* at 1282.

260   *Id.* ("*Heller* was resolved in favor of categoricalism--with the categories defined by text, history, and tradition--and against balancing tests such as strict or intermediate scrutiny or reasonableness.").

261   *See id.*

262   *Id.* at 1286.

263   *See id.* at 1292-93.

264   *Id.* at 1294.

265   *See id.*

266   *See id.* at 1287 (citing JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 90, at 11).

267   *Heller II*, 670 F.3d at 1296 n.20 (Kavanaugh, J., dissenting) ("The D.C. ban on magazines of more than 10 rounds requires analysis in the first instance by the District Court. In order to apply *Heller*'s test to this prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use. The parties here did not brief that question in much detail. Evidence presented to the District Court on the history and prevalence of magazines of more than 10 rounds would be helpful to the proper disposition of that issue under the *Heller* test. Therefore, I would remand to the District Court for analysis of that issue.").

268   *See* Lindsay Colvin, Note, *History, Heller, and High-Capacity Magazines: What Is the Proper Standard of Review for Second Amendment Challenges?*, 41 FORDHAM URB. L.J. 1041, 1075-80 (2014).

269   *Heller II*, 670 F.3d at 1260.

270   Silvester v. Harris, No. 1:11-CV-2137 AWI SAB, 2014 U.S. Dist. LEXIS 118284 (E.D. Cal. Aug. 25, 2014).

271   CAL. PENAL CODE §§ 26815(a) , 27540(a)  (West 2014).

272   *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *82.

Exhibit 12
00332

ER_3838

THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE..., 78 Alb. L. Rev. 849

273   *Chief District Court Judge Anthony W. Ishii*, U.S. DIST. COURT: E. DIST. OF CAL., http://www.caed.uscourts.gov/caed/staticOther/page_630.htm (last visited Feb. 21, 2015).

274   *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *101-02.

275   *Compare id.* at *30, *with* Ezell v. City of Chi., 651 F.3d 684, 702-03 (7th Cir. 2011).

276   *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *8-9.

277   *See id.* at *9-10, *78.

278   *Id.* at *11.

279   *Id.*

280   *Id.* at *11-12.

281   *Id.* at *75.

282   *Id.* at *75-76.

283   *Id.* at *78 (citations omitted).

284   *Id.* at *79.

285   *Id.*

286   *Id.* at *30.

287   *Id.* at *75-76.

288   *Id.* at *80.

289   *Id.*

290   *Id.* at *90-91, 96-97.

291   *Id.* at *101-03.

292   *See id.* at *23-25.

293   *See supra* notes 43-64 and accompanying text.

294   *See supra* notes 102-06 and accompanying text.

295   *See supra* notes 130, 132-33 and accompanying text.

296   *See supra* notes 136-39 and accompanying text.

297   *See supra* notes 134-35 and accompanying text.

298   *See supra* notes 140-45 and accompanying text.

299   *See supra* note 156 and accompanying text.


78 ALBLR 849

End of Document                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 12

00333

ER_3839

other purpose. Such persons shall hold office during the term of their employment by the state highway department but the authority herein vested shall cease upon the termination of such employment. The persons so appointed shall by reason of such appointment be members of the department of public safety during the terms of such appointment but shall serve without pay as members thereof.

Approved June 2, 1927.

---

[No. 372.]

AN ACT to regulate and license the selling, purchasing, possessing and carrying of certain firearms; to prohibit the buying, selling or carrying of certain firearms without a license therefor; to prohibit the possession of certain weapons and attachments; to prohibit the pawning of certain firearms; to prohibit the sale, offering for sale, or possession for the purpose of sale of written or printed matter containing any offer to sell or deliver certain firearms or devices within this state; to provide penalties for the violations of this act, and to repeal act number two hundred seventy-four of the public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen.

*The People of the State of Michigan enact:*

SECTION 1. The word "pistol" as used in this act shall mean any firearm, loaded or unloaded, thirty inches or less in length. The word "purchaser" shall mean any person who receives a pistol from another by purchase, gift or loan. The word "seller" shall mean any person who sells, furnishes, loans or gives a pistol to another. <span style="float:right">Words defined.</span>

SEC. 2. No person shall purchase a pistol as defined in this act without first having obtained a license therefor as <span style="float:right">License before purchase.</span>

Exhibit 69
00010

888        PUBLIC ACTS, 1927—No. 372.

prescribed herein. The commissioner or chief of police, or his duly authorized deputy, in incorporated cities or in incorporated villages having an organized department of police, and the sheriff, or his authorized deputy, in parts of the respective counties not included within incorporated cities or villages, are hereby authorized to issue licenses to purchase pistols to applicants residing within the respective territories herein mentioned. No such license shall be granted to any person except he be nineteen years of age or over, and has resided in this state six months or more, and in no event shall such a license be issued to a person who has been convicted of a felony or adjudged insane in this state or elsewhere. Applications for such licenses shall be signed by the applicant under oath upon forms provided by the commissioner of public safety. Licenses to purchase pistols shall be executed in duplicate upon forms provided by the commissioner of public safety and shall be signed by the licensing authority. One copy of such license shall be delivered to the applicant and the duplicate of such license shall be retained by such licensing authority as a permanent official record for a period of six years. Such license shall be void unless used within ten days after the date of its issue. Any person who shall sell to another any pistol as defined in this act without complying with the requirements of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment in the county jail not more than ninety days, or both such fine and imprisonment in the discretion of the court. Such license shall be signed in ink by the holder thereof in the presence of the person selling, loaning or giving a pistol to such licensee and shall thereupon be taken up by such person, signed by him in ink and shall be delivered or sent by registered mail within forty-eight hours to the commissioner of public safety. The seller shall certify upon said license in the space provided therefor the name of the person to whom such pistol was delivered, the make, style, calibre and number of such pistol, and shall further certify that such purchaser signed his name on said license in the presence of the seller. The provisions of this section shall not apply to the purchase of pistols from wholesalers by dealers regularly engaged in the business of selling pistols at retail, nor to the sale, barter or exchange of pistols kept solely as relics, souvenirs or curios.

*To whom granted.*

*Executed in duplicate.*

*Misdemeanor; penalty.*

*Unlawful to manufacture, etc., certain firearms, etc.*

Sec. 3. It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand

*Penalty for violation.*

Exhibit 69
00011

**ER_3841**

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 207 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4426   Page 12 of 147

dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. The provisions of this section shall not apply, however, to any person, firm or corporation manufacturing firearms, explosives or munitions of war by virtue of any contracts with any department of the government of the United States, or with any foreign government, state, municipality or any subdivision thereof.

SEC. 4.   Any person who, with intent to use the same unlawfully against the person of another, goes armed with a pistol or other firearm or dagger, dirk, razor, stiletto or knife having a blade over three inches in length, or any other dangerous or deadly weapon or instrument, shall be guilty of a felony and on conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in the discretion of the court.  *Felony, what deemed. Penalty.*

SEC. 5.   No person shall carry a dagger, dirk, stiletto or other dangerous weapon except hunting knives adapted and carried as such, concealed on or about his person, or whether concealed or otherwise in any vehicle operated or occupied by him, except in his dwelling house or place of business or on other land possessed by him.  No person shall carry a pistol concealed on or about his person, or, whether concealed or otherwise, in any vehicle operated or occupied by him, except in his dwelling house or place of business or on other land possessed by him, without a license therefor as herein provided.  Any person violating the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in the discretion of the court.  *Unlawful to carry, etc., dagger, etc.*

SEC.  6.   The prosecuting attorney, the commissioner or chief of police and the commissioner of public safety or their respective authorized deputies in incorporated cities or in incorporated villages having an organized department of police, and the prosecuting attorney, the commissioner of public safety or their authorized deputies, and the sheriff, under-sheriff or chief deputy sheriff in parts of the respective counties not included within incorporated cities or villages shall constitute boards exclusively authorized to issue licenses to carry pistols concealed on the person to applicants residing within the respective territories herein mentioned.  The county clerk of each county shall be clerk of such licensing boards, which boards shall be known in law as "The Concealed Weapon Licensing Board."  No such license to carry a pistol concealed on the person shall be granted to any person except he be nineteen years of age or over and has resided in this state six months or over, and in no event shall such license be issued unless it appears that the applicant has good reason to fear injury to his person or property, or has  *Concealed weapon licensing board. To whom license granted.*

Exhibit 69
00012

ER_3842

other proper reasons, and that he is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony or adjudged insane in this state or elsewhere. **Chairman of board.** The prosecuting attorney shall be the chairman of the said board, which shall convene at least once in each calendar month and at such other times as they shall be called to convene by the chairman. Such licenses shall be issued only upon written application signed by the applicant and on his oath and upon forms provided by the commissioner of public safety. Such licenses shall issue only with the approval of a majority of said board and shall be executed in triplicate upon forms provided by the commissioner of public safety and shall be signed in the name of the concealed weapon licensing board by the county clerk and the seal of the circuit court affixed thereto. One copy of such license shall be delivered to the applicant, the duplicate of said license shall be retained by the county clerk as a permanent official record for a period of six years, and the triplicate of such license shall be forwarded to the commissioner of public safety who shall file and index licenses so received by him and keep the same as a permanent official record for a period **Duration of license.** of six years. Each license shall be issued for a definite period of not more than one year, to be stated in the license, and no renewal of such license shall be granted except upon the filing of a new application. Every license issued hereunder shall bear the imprint of the right thumb of the licensee, or, if that be not possible, of the left thumb or some other finger of such licensee. Such licensee shall carry such license upon his person at all times when he may be carrying a pistol concealed upon his person and shall display such license upon the request of any peace officer.

**When license to expire.** SEC. 7. All licenses heretofore issued in this state permitting a person to carry a pistol concealed upon his person shall expire at midnight, December thirty-one, nineteen hundred twenty-seven.

**When license revoked.** SEC. 8. The licensing board herein created by section six may revoke any license issued by it upon receiving a certificate of any magistrate showing that such licensee has been convicted of violating any of the provisions of this act, or has been convicted of a felony. Such license may also be revoked whenever in the judgment of said board the reason for granting such license shall have ceased to exist, or whenever said board shall for any reasonable cause determine said licensee to be an unfit person to carry a pistol concealed upon his person. No such license shall be revoked except upon written complaint and then only after a hearing by said board, of which at least seven days' notice shall be given to the licensee either by personal service or by registered mail to his last known address. The clerk of said licensing board is hereby authorized to administer an oath to any person testifying before such board at any such hearing.

Exhibit 69
00013

SEC. 9.  On or before the first day of November, nineteen hundred twenty-seven, any person within this state who owns or has in his possession a pistol as defined in this act, shall, if he reside in an incorporated city or an incorporated village having an organized police department, present such weapon for safety inspection to the commissioner or chief of police of such city or village; if such person reside in a part of the county not included within the corporate limits of such city or village he shall so present such pistol for safety inspection to the sheriff of such county.  Any person owning or coming into possession of a pistol after the first day of November, nineteen hundred twenty-seven, shall forthwith present such pistol for safety inspection in the manner provided in this section.  A certificate of inspection shall thereupon be issued in triplicate on a form provided by the commissioner of public safety, containing the name, age, address, description and signature of the person presenting such pistol for inspection, together with a full description thereof; the original of such certificate shall be delivered to the registrant; the duplicate thereof shall be mailed to the commissioner of public safety and filed and indexed by him and kept as a permanent official record for a period of six years, and the triplicate of such certificate shall be retained and filed in the office of said sheriff, or commissioner or chief of police, as the case may be.  The provisions of this section shall not apply to wholesale or retail dealers in firearms or to collections of pistols kept solely for the purpose of display, as relics, souvenirs, curios or antiques, nor to weapons heretofore registered under the provisions of section eleven of act number three hundred thirteen of the public acts of nineteen hundred twenty-five.  Any person who fails to comply with the provision of this section shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding ninety days, or by both such fine and imprisonment in the discretion of the court.

*Safety inspection of weapons.*

*Certificate issued.*

SEC. 10.  No pawnbroker shall accept a pistol in pawn. Any person violating this section of this act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment in the county jail for not more than ninety days or by both such fine and imprisonment in the discretion of the court.

*Pistol not accepted in pawn.*

SEC. 11.  No person shall wilfully alter, remove or obliterate the name of the maker, model, manufacturer's number or other mark of identity of any pistol.  Possession of any such firearm upon which the number shall have been altered, removed or obliterated, shall be presumptive evidence that such possessor has altered, removed or obliterated the same.  Any person convicted under this section shall be punished by a fine not to exceed five hundred dollars or by imprisonment

*Alteration of pistol unlawful.*

Exhibit 69
00014

892                    PUBLIC ACTS, 1927—No. 372.

in the state prison not to exceed two years or by both such fine and imprisonment in the discretion of the court.

**Exceptions to act.**

Sec. 12.   The provisions of section two, three, five and nine shall not apply to any peace officer of the state or any subdivision thereof who is regularly employed and paid by the state or such subdivision, or to any member of the army, navy or marine corps of the United States, or of organizations authorized by law to purchase or receive weapons from the United States or from this state, nor to the national guard or other duly authorized military organizations when on duty or drill, nor to the members thereof in going to or returning from their customary places of assembly or practice, nor to a person licensed to carry a pistol concealed upon his person issued by another state, nor to the regular and ordinary transportation of pistols as merchandise, or to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business, or in moving goods from one place of abode or business to another.

**When unlawfully possessed.**

Sec. 13.   When complaint shall be made on oath to any magistrate authorized to issue warrants in criminal cases that any pistol or other weapon or device mentioned in this act is unlawfully possessed or carried by any person, such magistrate shall, if he be satisfied that there is reasonable cause to believe the matters in said complaint be true, issue his warrant directed to any peace officer, commanding him to search the person or place described in such complaint, and if such pistol, weapon or device be there found, to seize and hold the same as evidence of a violation of this act.

**Forfeited to state.**

Sec. 14.   All pistols, weapons or devices carried or possessed contrary to this act are hereby declared forfeited to the state.

**Certain books, etc., unlawful to sell, etc.**

Sec. 15.   It shall be unlawful to sell or deliver within this state, or to offer or expose for sale, or to have in possession for the purpose of sale, any book, pamphlet, circular, magazine, newspaper or other form of written or printed matter offering to sell or deliver, or containing an offer to sell or deliver to any person within this state from any place without this state any pistol or any weapon or device mentioned in section three hereof.  The provisions of this section shall not apply to sales of or offers to sell pistols at wholesale to persons regularly engaged in the business of selling such pistols at wholesale or retail, nor to sales or offers to sell such pistols made or authorized by the United States government or any department or agency thereof.

**Penalty for violation.**

Sec. 16.   Any person violating the provisions of section fifteen of this act shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed one hundred dollars or by imprisonment in the county jail not to exceed ninety days, or by both such fine and imprisonment in the discretion of the court.

Exhibit 69
00015

**ER_3845**

PUBLIC ACTS, 1927—No. 373.                                    893

SEC. 17.  Act number two hundred seventy-four of the *Acts repealed.* public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen, are hereby repealed:  *Provided, however,* That any *Proviso.* proceedings pending under any of said sections herein repealed shall not be affected hereby but shall be concluded in accordance with the law of such repealed section or sections.

SEC. 18.  This act is declared to be severable, and should *Saving clause.* any section hereof be hereafter declared unconstitutional or otherwise invalid, the remainder of the act shall not be affected thereby.

Approved June 2, 1927.

---

[No. 373.]

AN ACT to amend section twenty-five of chapter thirty of act number three hundred fourteen of the public acts of nineteen hundred fifteen, entitled "An act to revise and consolidate the statutes relating to the organization and jurisdiction of the courts of this state; the powers and duties of such courts, and of the judges and other officers thereof; the forms of civil actions; the time within which civil actions and proceedings may be brought in said courts; pleading, evidence, practice and procedure in civil actions and proceedings in said courts; to provide remedies and penalties for the violation of certain provisions of this act; and to repeal all acts and parts of acts inconsistent with, or contravening any of the provisions of this act," being section thirteen thousand two hundred fifty-three of the compiled laws of nineteen hundred fifteen, as amended by act number two hundred forty-three of the public acts of nineteen hundred seventeen, and to add a new section thereto to stand as section thirty-one.

*The People of the State of Michigan enact:*

SECTION 1.  Section twenty-five of chapter thirty of act *Section amended.* number three hundred fourteen of the public acts of nineteen

Exhibit 65
00016

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 212 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4432   Page 18 of 147

256    January Session, 1927—Chapter 1052.

## CHAPTER 1052.

AN ACT TO REGULATE THE POSSESSION OF FIREARMS.

H 729 A
Approved
April 22, 1927.

*It is enacted by the General Assembly as follows:*

Certain words
and phrases,
how construed:

Section 1.  When used in this act the following words and phrases shall be construed as follows:

"Pistol."

"Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall length less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only.

"Machine gun."

"Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without re-loading.

"Firearm."

"Firearm" shall include any machine gun or pistol.

"Person."

"Person" shall include firm, association or corporation.

"Licensing authorities."

"Licensing authorities" shall mean the board of police commissioners of a city or town where such board has been instituted, the chief of police or superintendent of police of other cities and towns having a regular organized police force, and in towns where there is no chief of police or superintendent of police it shall mean the town clerk who may issue licenses upon the recommendation of the town sergeant;

"Crime of violence."

"Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering.

"Sell."
"Purchase."
"Purchasing."

"Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly."

00018

**ER_3847**

JANUARY SESSION, 1927—CHAPTER 1052.    257

SEC. 2.  If any person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished as provided in this act.  In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence. *Additional punishment under this act.*

*What to be prima facie evidence of intention to commit crime of violence.*

SEC. 3.  No person who has been convicted in this state or elsewhere of a crime of violence shall purchase, own, carry or have in his possession or under his control any firearm. *Who to be denied firearms.*

SEC. 4.  No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act. *Carrying of pistol forbidden, except when.*

*Machine gun.*

SEC. 5.  The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to the members thereof when at or going to or from *Sec. 4 not to apply to whom.*

189

Passed March 30, 1933.

Approved April 6, 1933.

GEORGE WHITE,
*Governor.*

The sectional number herein is in conformity to the General Code.
JOHN W. BRICKER,
*Attorney General.*

Filed in the office of the Secretary of State at Columbus, Ohio, on the 10th day of April, A. D. 1933.

GEORGE S. MYERS,
*Secretary of State.*

File No. 63.

———————

(House Bill No. 166)

## AN ACT

To supplement section 12819 of the General Code by the enactment of supplemental sections 12819-3, 12819-4, 12819-5, 12819-6 and 12819-7, relative to the sale and possession of machine guns.

*Be it enacted by the General Assembly of the State of Ohio:*

SECTION 1. That section 12819 of the General Code be supplemented by the enactment of sections 12819-3, 12819-4, 12819-5, 12819-6 and 12819-7, to read as follows:

**Definitions.**

Sec. 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots.

**Machine gun permit; application; bond of applicant; exceptions.**

Sec. 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures a permit therefor from and at the discretion of the

00021

**ER_3849**

**650**        72d CONGRESS.  SESS. I.  CHS. 464, 465.  JULY 8, 1932.

States, for the purpose of having such communication delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to such addressee in the United States, and as a result thereof such communication is delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to the address to which it is directed in the United States, then such person shall be punished in the same manner and to the same extent as provided in section 1 of this Act: *Provided,* That any person violating this section may be prosecuted either in the district into which such letter or other communication was carried by the United States mail for delivery according to the direction thereon, or in which it was caused to be delivered by the United States mail to the person to whom it was addressed.

*Punishment for.*
*Proviso.*
*Jurisdiction.*

Approved, July 8, 1932.

---

[CHAPTER 465.]

**AN ACT**

*July 8, 1932.*
*[H. R. 8754.]*
*[Public, No. 275.]*

To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes.

*Unauthorized use, etc., of pistols and other dangerous weapons in District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

*Definitions.*

**DEFINITIONS**

"Pistol."

SECTION 1. " Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

"Sawed-off shot-gun."

" Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

"Machine gun."

" Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

"Person."

" Person," as used in this Act, includes, individual, firm, association, or corporation.

"Sell" and "purchase," etc.

" Sell " and " purchase " and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

"Crime of violence."

" Crime of violence " as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

**COMMITTING CRIME WHEN ARMED**

*Committing crime of violence when armed. Punishment for.*

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 216 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4497   Page 83 of 147

crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

*Persons forbidden to possess certain firearms.*
*Convicted of a crime.*

### CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

*Illegally carrying, etc., dangerous weapon.*

### EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

*Exceptions.*
*Law enforcement officers.*
*Army, Navy, or Marine Corps.*
*National Guard, etc., on duty.*
*Other organizations.*
*Carrying to places of assembly, etc.*
*Manufacturer, etc.*

### ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

*Licenses.*

ER_3851

652          72d CONGRESS.  SESS. I.  CH. 465.  JULY 8, 1932.

### SELLING TO MINORS AND OTHERS

Selling to minors or others.    SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

### TRANSFERS REGULATED

Time, etc., provisions.    SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.  At the time of applying for the purchase

Register to be kept.    of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence.  The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years.  No machine gun, sawed-off shotgun, or

Limitations    blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the

Wholesale trade.    superintendent of police of the District of Columbia.  This section shall not apply to sales at wholesale to licensed dealers.

### DEALERS TO BE LICENSED

Dealers to be licensed.    SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided.  No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

### DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

Conditions, etc., for issuing dealers' licenses. *Ante*, p. 556.    SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 218 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4499   Page 85 of 147

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity.  No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been received from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale.

*Records.*

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence.  One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside.  No license to sell at retail shall be granted to anyone except as provided in this section.

*Display, etc., forbidden.*

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

*False information or evidence forbidden.*

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun.  Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

*Alteration, etc., of identification marks, prohibited.*

*Proviso. Experimental work.*

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

*Toys, etc., excepted.*

ER_3853

654          72d CONGRESS.  SESS. I.  CHS. 465, 466.  JULY 8, 1932.

### POSSESSION OF CERTAIN DANGEROUS WEAPONS

Possession of certain dangerous weapons forbidden.

Sec. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

*Proviso. Exceptions.*

### PENALTIES

Punishment for violations.

Sec. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

### CONSTITUTIONALITY

Invalidity of any provision not to affect remainder.

Sec. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

### CERTAIN ACTS REPEALED

Vol. 31, p. 1328, repealed.

Sec. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

July 8, 1932.
[H. J. Res. 462.]
[Pub. Res., No. 35.]

### JOINT RESOLUTION
Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

World War veterans. Appropriation for, to provide transportation from District of Columbia to their homes. *Post,* p. 701.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000: *Provided,* That all amounts expended under this appropriation in behalf of any veteran shall constitute a loan without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

*Proviso. Credited as a loan.*

Approved, July 8, 1932.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Colorado Revised Statutes Annotated
  Title 18. Criminal Code (Refs & Annos)
    Article 12. Offenses Relating to Firearms and Weapons (Refs & Annos)
      Part 3. Large-Capacity Ammunition Magazines

C.R.S.A. § 18-12-301

§ 18-12-301. Definitions

Effective: July 1, 2013
Currentness

As used in this part 3, unless the context otherwise requires:

(1) "Bureau" means the Colorado bureau of investigation created and existing pursuant to section 24-33.5-401, C.R.S.

(2)(a) "Large-capacity magazine" means:

(I) A fixed or detachable magazine, box, drum, feed strip, or similar device capable of accepting, or that is designed to be readily converted to accept, more than fifteen rounds of ammunition;

(II) A fixed, tubular shotgun magazine that holds more than twenty-eight inches of shotgun shells, including any extension device that is attached to the magazine and holds additional shotgun shells; or

(III) A nontubular, detachable magazine, box, drum, feed strip, or similar device that is capable of accepting more than eight shotgun shells when combined with a fixed magazine.

(b) "Large-capacity magazine" does not mean:

(I) A feeding device that has been permanently altered so that it cannot accommodate more than fifteen rounds of ammunition;

(II) An attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition; or

(III) A tubular magazine that is contained in a lever-action firearm.

**Credits**
Added by Laws 2013, Ch. 48, § 1, eff. July 1, 2013.

00088

ER_3855

§ 18-12-301. Definitions, CO ST § 18-12-301

C. R. S. A. § 18-12-301, CO ST § 18-12-301
Current through Ch. 2 of the Second Regular Session of the 71st General Assembly (2018)

End of Document                                     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    2

ER_3856

Connecticut General Statutes Annotated
  Title 53. Crimes (Refs & Annos)
    Chapter 943. Offenses Against Public Peace and Safety

C.G.S.A. § 53-202w

§ 53-202w. Large capacity magazines. Definitions. Sale, transfer or possession prohibited. Exceptions

Effective: June 18, 2013
Currentness

(a) As used in this section and section 53-202x:

(1) "Large capacity magazine" means any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is contained in a lever-action firearm, or (D) a magazine that is permanently inoperable;

(2) "Lawfully possesses", with respect to a large capacity magazine, means that a person has (A) actual and lawful possession of the large capacity magazine, (B) constructive possession of the large capacity magazine pursuant to a lawful purchase of a firearm that contains a large capacity magazine that was transacted prior to or on April 4, 2013, regardless of whether the firearm was delivered to the purchaser prior to or on April 4, 2013, which lawful purchase is evidenced by a writing sufficient to indicate that (i) a contract for sale was made between the parties prior to or on April 4, 2013, for the purchase of the firearm, or (ii) full or partial payment for the firearm was made by the purchaser to the seller of the firearm prior to or on April 4, 2013, or (C) actual possession under subparagraph (A) of this subdivision, or constructive possession under subparagraph (B) of this subdivision, as evidenced by a written statement made under penalty of false statement on such form as the Commissioner of Emergency Services and Public Protection prescribes; and

(3) "Licensed gun dealer" means a person who has a federal firearms license and a permit to sell firearms pursuant to section 29-28.

(b) Except as provided in this section, on and after April 5, 2013, any person who, within this state, distributes, imports into this state, keeps for sale, offers or exposes for sale, or purchases a large capacity magazine shall be guilty of a class D felony. On and after April 5, 2013, any person who, within this state, transfers a large capacity magazine, except as provided in subsection (f) of this section, shall be guilty of a class D felony.

(c) Except as provided in this section and section 53-202x: (1) Any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained prior to April 5, 2013, shall commit an infraction and be fined not more than ninety dollars for a first offense and shall be guilty of a class D felony for any subsequent offense, and (2) any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained on or after April 5, 2013, shall be guilty of a class D felony.

(d) A large capacity magazine may be possessed, purchased or imported by:

00091

ER_3857

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 223 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4506   Page 92 of 147
§ 53-202w. Large capacity magazines: Definitions: Sale; transfer...; CT ST § 53-202w

(1) The Department of Emergency Services and Public Protection, police departments, the Department of Correction, the Division of Criminal Justice, the Department of Motor Vehicles, the Department of Energy and Environmental Protection or the military or naval forces of this state or of the United States;

(2) A sworn and duly certified member of an organized police department, the Division of State Police within the Department of Emergency Services and Public Protection or the Department of Correction, a chief inspector or inspector in the Division of Criminal Justice, a salaried inspector of motor vehicles designated by the Commissioner of Motor Vehicles, a conservation officer or special conservation officer appointed by the Commissioner of Energy and Environmental Protection pursuant to section 26-5, or a constable who is certified by the Police Officer Standards and Training Council and appointed by the chief executive authority of a town, city or borough to perform criminal law enforcement duties, for use by such sworn member, inspector, officer or constable in the discharge of such sworn member's, inspector's, officer's or constable's official duties or when off duty;

(3) A member of the military or naval forces of this state or of the United States;

(4) A nuclear facility licensed by the United States Nuclear Regulatory Commission for the purpose of providing security services at such facility, or any contractor or subcontractor of such facility for the purpose of providing security services at such facility;

(5) Any person who is sworn and acts as a policeman on behalf of an armored car service pursuant to section 29-20 in the discharge of such person's official duties; or

(6) Any person, firm or corporation engaged in the business of manufacturing large capacity magazines in this state that manufactures, purchases, tests or transports large capacity magazines in this state for sale within this state to persons specified in subdivisions (1) to (5), inclusive, of this subsection or for sale outside this state, or a federally-licensed firearm manufacturer engaged in the business of manufacturing firearms or large capacity magazines in this state that manufactures, purchases, tests or transports firearms or large capacity magazines in this state for sale within this state to persons specified in subdivisions (1) to (5), inclusive, of this subsection or for sale outside this state.

(e) A large capacity magazine may be possessed by:

(1) A licensed gun dealer;

(2) A gunsmith who is in a licensed gun dealer's employ, who possesses such large capacity magazine for the purpose of servicing or repairing a lawfully possessed large capacity magazine;

(3) A person, firm, corporation or federally-licensed firearm manufacturer described in subdivision (6) of subsection (d) of this section that possesses a large capacity magazine that is lawfully possessed by another person for the purpose of servicing or repairing the large capacity magazine;

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                                                                2

ER_3858

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 224 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4507   Page 93 of 147

§ 53-202w. Large capacity magazines: Definitions. Sale, transfer..., CT ST § 53-202w

(4) Any person who has declared possession of the magazine pursuant to section 53-202x; or

(5) Any person who is the executor or administrator of an estate that includes a large capacity magazine, or the trustee of a trust that includes a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 53-202x, which is disposed of as authorized by the Probate Court, if the disposition is otherwise permitted by this section and section 53-202x.

(f) Subsection (b) of this section shall not prohibit:

(1) The transfer of a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 53-202x, by bequest or intestate succession, or, upon the death of a testator or settlor: (A) To a trust, or (B) from a trust to a beneficiary;

(2) The transfer of a large capacity magazine to a police department or the Department of Emergency Services and Public Protection;

(3) The transfer of a large capacity magazine to a licensed gun dealer in accordance with section 53-202x; or

(4) The transfer of a large capacity magazine prior to October 1, 2013, from a licensed gun dealer, pawnbroker licensed under section 21-40, or consignment shop operator, as defined in section 21-39a, to any person who (A) possessed the large capacity magazine prior to or on April 4, 2013, (B) placed a firearm that such person legally possessed, with the large capacity magazine included or attached, in the possession of such dealer, pawnbroker or operator prior to or on April 4, 2013, pursuant to an agreement between such person and such dealer, pawnbroker or operator for the sale of the firearm to a third person, and (C) is eligible to possess the firearm on the date of such transfer.

(g) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection (h) of section 29-33.

**Credits**
(2013, P.A. 13-3, § 23, eff. April 4, 2013; 2013, P.A. 13-220, § 1, eff. June 18, 2013.)

Notes of Decisions (3)

C. G. S. A. § 53-202w, CT ST § 53-202w
The statutes and Constitution are current through the 2018 Supplement to the General Statutes of Connecticut, Revision of 1958.

**End of Document**                                              © 2018 Thomson Reuters. No claim to original U.S. Government Works.

§ 7-2506.01. Persons permitted to possess ammunition., DC CODE § 7-2506.01

---

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedPrior Version Held Unconstitutional as Applied by Herrington v. U.S., D.C., Nov. 04, 2010

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

> West's District of Columbia Code Annotated 2001 Edition
> > Division I. Government of District.
> > > Title 7. Human Health Care and Safety. (Refs & Annos)
> > > > Subtitle J. Public Safety.
> > > > > Chapter 25. Firearms Control.
> > > > > > Unit A. Firearms Control Regulations.
> > > > > > > Subchapter VI. Possession of Ammunition.

DC ST § 7-2506.01

Formerly cited as DC ST 1981 §6-2361

§ 7-2506.01. Persons permitted to possess ammunition.

Effective: April 27, 2013

Currentness

(a) No person shall possess ammunition in the District of Columbia unless:

(1) He is a licensed dealer pursuant to subchapter IV of this unit;

(2) He is an officer, agent, or employee of the District of Columbia or the United States of America, on duty and acting within the scope of his duties when possessing such ammunition;

(3) He is the holder of the valid registration certificate for a firearm pursuant to subchapter II of this chapter; except, that no such person shall possess one or more restricted pistol bullets; or

(4) He holds an ammunition collector's certificate on September 24, 1976; or

(5) He temporarily possesses ammunition while participating in a firearms training and safety class conducted by a firearms instructor.

(b) No person in the District shall possess, sell, or transfer any large capacity ammunition feeding device regardless of whether the device is attached to a firearm. For the purposes of this subsection, the term "large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. The term "large capacity ammunition feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

---

00095

§ 7-2506.01. Persons permitted to possess ammunition., DC CODE § 7-2506.01

**Credits**

(Sept. 24, 1976, D.C. Law 1-85, title VI, § 601, 23 DCR 2464; Mar. 16, 1978, D.C. Law 2-62, § 2, 24 DCR 5780; Aug. 2, 1983, D.C. Law 5-19, § 4, 30 DCR 3328; Mar. 31, 2009, D.C. Law 17-372, § 3(n), 56 DCR 1365; Sept. 26, 2012, D.C. Law 19-170, § 2(n), 59 DCR 5691; Apr. 27, 2013, D.C. Law 19-295, § 2(c), 60 DCR 2623.)

Notes of Decisions (51)

Copyright (c) 2012 By the District of Columbia. Content previously published in the District of Columbia Official Code, 2001 Edition is used with permission. Copyright (c) 2018 Thomson Reuters
DC CODE § 7-2506.01
Current through February 20, 2018

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

§ 134-8. Ownership, etc., of automatic firearms, silencers, etc.,..., HI ST § 134-8

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
   Division 1. Government
      Title 10. Public Safety and Internal Security
         Chapter 134. Firearms, Ammunition and Dangerous Weapons
            Part I. General Regulations

HRS § 134-8

§ 134-8. Ownership, etc., of automatic firearms, silencers, etc., prohibited; penalties

Currentness

(a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134-4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; cannons; mufflers, silencers, or devices for deadening or muffling the sound of discharged firearms; hand grenades, dynamite, blasting caps, bombs, or bombshells, or other explosives; or any type of ammunition or any projectile component thereof coated with teflon or any other similar coating designed primarily to enhance its capability to penetrate metal or pierce protective armor; and any type of ammunition or any projectile component thereof designed or intended to explode or segment upon impact with its target.

(b) Any person who installs, removes, or alters a firearm part with the intent to convert the firearm to an automatic firearm shall be deemed to have manufactured an automatic firearm in violation of subsection (a).

(c) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of detachable ammunition magazines with a capacity in excess of ten rounds which are designed for or capable of use with a pistol is prohibited. This subsection shall not apply to magazines originally designed to accept more than ten rounds of ammunition which have been modified to accept no more than ten rounds and which are not capable of being readily restored to a capacity of more than ten rounds.

(d) Any person violating subsection (a) or (b) shall be guilty of a class C felony and shall be imprisoned for a term of five years without probation. Any person violating subsection (c) shall be guilty of a misdemeanor except when a detachable magazine prohibited under this section is possessed while inserted into a pistol in which case the person shall be guilty of a class C felony.

**Credits**
Laws 1988, ch. 275, § 2; Laws 1989, ch. 261, § 6; Laws 1989, ch. 263, § 4; Laws 1992, ch. 286, §§ 3, 4.

Notes of Decisions (13)

H R S § 134-8, HI ST § 134-8
Current through Act 3 (End) of the 2017 1st Special Session, pending text revision by the revisor of statutes.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

§ 134-8. Ownership, etc., of automatic firearms, silencers, etc.,..., HI ST § 134-8

---

**End of Document**                                   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

ER_3863

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedValidity Called into Doubt by Kolbe v. Hogan, 4th Cir.(Md.), Feb. 04, 2016

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

West's Annotated Code of Maryland
   Criminal Law (Refs & Annos)
      Title 4. Weapon Crimes
         Subtitle 3. Assault Weapons and Detachable Magazines (Refs & Annos)

MD Code, Criminal Law, § 4-305
Formerly cited as MD CODE Art. 27, § 36H-5

§ 4-305. Detachable magazines--Prohibited

Effective: October 1, 2013
Currentness

**Scope**

(a) This section does not apply to:

(1) a .22 caliber rifle with a tubular magazine; or

(2) a law enforcement officer or a person who retired in good standing from service with a law enforcement agency of the United States, the State, or any law enforcement agency in the State.

**Prohibited**

(b) A person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 10 rounds of ammunition for a firearm.

**Credits**
Added by Acts 2002, c. 26, § 2, eff. Oct. 1, 2002. Amended by Acts 2013, c. 427, § 1, eff. Oct. 1, 2013.

**Formerly** Art. 27, § 36H-5.

**Editors' Notes**

**LEGISLATIVE NOTES**

Revisor's Note (Acts 2002, c. 26):

This section is new language derived without substantive change from former Art. 27, § 36H-5(b).

The former reference to "any type of" firearm is deleted as surplusage.

00101

ER_3864

**§ 4-305. Detachable magazines—Prohibited, MD CRIM LAW § 4-305**

Defined term: "Person" § 1-101

Notes of Decisions (8)

MD Code, Criminal Law, § 4-305, MD CRIM LAW § 4-305
Current through Chapters 1 to 4 from the 2018 Regular Session of the General Assembly

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedPrior Version Held Unconstitutional by Com. v. Beal, Mass., May 24, 2016

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

Massachusetts General Laws Annotated
Part I. Administration of the Government (Ch. 1-182)
Title XX. Public Safety and Good Order (Ch. 133-148a)
Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 121

§ 121. Firearms sales; definitions; antique firearms; application of law; exceptions

Effective: February 1, 2018
Currentness

As used in sections 122 to 131Q, inclusive, the following words shall, unless the context clearly requires otherwise, have the following meanings:--

"Ammunition", cartridges or cartridge cases, primers (igniter), bullets or propellant powder designed for use in any firearm, rifle or shotgun. The term "ammunition" shall also mean tear gas cartridges.

"Assault weapon", shall have the same meaning as a semiautomatic assault weapon as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(30) as appearing in such section on September 13, 1994, and shall include, but not be limited to, any of the weapons, or copies or duplicates of the weapons, of any caliber, known as: (i) Avtomat Kalashnikov (AK) (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR and FNC; (vi) SWD M-10, M-11, M-11/9 and M-12; (vi) Steyr AUG; (vii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (viii) revolving cylinder shotguns, such as, or similar to, the Street Sweeper and Striker 12; provided, however, that the term assault weapon shall not include: (i) any of the weapons, or replicas or duplicates of such weapons, specified in appendix A to 18 U.S.C. section 922 as appearing in such appendix on September 13, 1994, as such weapons were manufactured on October 1, 1993; (ii) any weapon that is operated by manual bolt, pump, lever or slide action; (iii) any weapon that has been rendered permanently inoperable or otherwise rendered permanently unable to be designated a semiautomatic assault weapon; (iv) any weapon that was manufactured prior to the year 1899; (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable assault weapon; (vi) any semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition; or (vii) any semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine.

<[ Definition of "Bump stock" inserted following definition of "Assault weapon" in first paragraph by 2017, 110, Sec. 18 effective February 1, 2018 applicable as provided by 2017, 110, Sec. 53.]>

"Bump stock", any device for a weapon that increases the rate of fire achievable with such weapon by using energy from the recoil of the weapon to generate a reciprocating action that facilitates repeated activation of the trigger.

"Conviction", a finding or verdict of guilt or a plea of guilty, whether or not final sentence is imposed.

Exhibit 84
00104

§ 121. Firearms sales; definitions; antique firearms; application of..., MA ST 140 § 121

"Deceptive weapon device", any device that is intended to convey the presence of a rifle, shotgun or firearm that is used in the commission of a violent crime, as defined in this section, and which presents an objective threat of immediate death or serious bodily harm to a person of reasonable and average sensibility.

"Firearm", a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of the barrel or barrels is less than 16 inches or 18 inches in the case of a shotgun as originally manufactured; provided, however, that the term firearm shall not include any weapon that is: (i) constructed in a shape that does not resemble a handgun, short-barreled rifle or short-barreled shotgun including, but not limited to, covert weapons that resemble key-chains, pens, cigarette-lighters or cigarette-packages; or (ii) not detectable as a weapon or potential weapon by x-ray machines commonly used at airports or walk- through metal detectors.

"Gunsmith", any person who engages in the business of repairing, altering, cleaning, polishing, engraving, blueing or performing any mechanical operation on any firearm, rifle, shotgun or machine gun.

"Imitation firearm", any weapon which is designed, manufactured or altered in such a way as to render it incapable of discharging a shot or bullet.

"Large capacity feeding device", (i) a fixed or detachable magazine, box, drum, feed strip or similar device capable of accepting, or that can be readily converted to accept, more than ten rounds of ammunition or more than five shotgun shells; or (ii) a large capacity ammunition feeding device as defined in the federal Public Safety and Recreational Firearms Use Protection Act, 18 U.S.C. section 921(a)(31) as appearing in such section on September 13, 1994. The term "large capacity feeding device" shall not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber ammunition.

"Large capacity weapon", any firearm, rifle or shotgun: (i) that is semiautomatic with a fixed large capacity feeding device; (ii) that is semiautomatic and capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device; (iii) that employs a rotating cylinder capable of accepting more than ten rounds of ammunition in a rifle or firearm and more than five shotgun shells in the case of a shotgun or firearm; or (iv) that is an assault weapon. The term "large capacity weapon" shall be a secondary designation and shall apply to a weapon in addition to its primary designation as a firearm, rifle or shotgun and shall not include: (i) any weapon that was manufactured in or prior to the year 1899; (ii) any weapon that operates by manual bolt, pump, lever or slide action; (iii) any weapon that is a single-shot weapon; (iv) any weapon that has been modified so as to render it permanently inoperable or otherwise rendered permanently unable to be designated a large capacity weapon; or (v) any weapon that is an antique or relic, theatrical prop or other weapon that is not capable of firing a projectile and which is not intended for use as a functional weapon and cannot be readily modified through a combination of available parts into an operable large capacity weapon.

"Length of barrel" or "barrel length", that portion of a firearm, rifle, shotgun or machine gun through which a shot or bullet is driven, guided or stabilized and shall include the chamber.

"Licensing authority", the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them.

<[ Definition of "Machine gun" in first paragraph effective until
February 1, 2018. For text effective February 1, 2018, see below.]>

"Machine gun", a weapon of any description, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged by one continuous activation of the trigger, including a submachine gun.

Exhibit 84
00105

ER_3867

<[ Definition of "Machine gun" in first paragraph as amended by 2017, 110, Sec. 20 effective February 1,
2018 applicable as provided by 2017, 110, Sec. 53. For text effective until February 1, 2018, see above.]>

"Machine gun", a weapon of any description, by whatever name known, loaded or unloaded, from which a number
of shots or bullets may be rapidly or automatically discharged by one continuous activation of the trigger, including a
submachine gun; provided, however, that "machine gun" shall include bump stocks and trigger cranks.

"Purchase" and "sale" shall include exchange; the word "purchaser" shall include exchanger; and the verbs "sell" and
"purchase", in their different forms and tenses, shall include the verb exchange in its appropriate form and tense.

"Rifle", a weapon having a rifled bore with a barrel length equal to or greater than 16 inches and capable of discharging
a shot or bullet for each pull of the trigger.

"Sawed-off shotgun", any weapon made from a shotgun, whether by alteration, modification or otherwise, if such
weapon as modified has one or more barrels less than 18 inches in length or as modified has an overall length of less
than 26 inches.

"Semiautomatic", capable of utilizing a portion of the energy of a firing cartridge to extract the fired cartridge case and
chamber the next round, and requiring a separate pull of the trigger to fire each cartridge.

"Shotgun", a weapon having a smooth bore with a barrel length equal to or greater than 18 inches with an overall length
equal to or greater than 26 inches, and capable of discharging a shot or bullet for each pull of the trigger.

<[ Definition of "Trigger crank" inserted following definition of "Shotgun" in first paragraph
by 2017, 110, Sec. 19 effective February 1, 2018 applicable as provided by 2017, 110, Sec. 53.]>

"Trigger crank", any device to be attached to a weapon that repeatedly activates the trigger of the weapon through the
use of a lever or other part that is turned in a circular motion; provided, however, that "trigger crank" shall not include
any weapon initially designed and manufactured to fire through the use of a crank or lever.

"Violent crime", shall mean any crime punishable by imprisonment for a term exceeding one year, or any act of juvenile
delinquency involving the use or possession of a deadly weapon that would be punishable by imprisonment for such
term if committed by an adult, that: (i) has as an element the use, attempted use or threatened use of physical force or
a deadly weapon against the person of another; (ii) is burglary, extortion, arson or kidnapping; (iii) involves the use of
explosives; or (iv) otherwise involves conduct that presents a serious risk of physical injury to another.

"Weapon", any rifle, shotgun or firearm.

Where the local licensing authority has the power to issue licenses or cards under this chapter, but no such licensing
authority exists, any resident or applicant may apply for such license or firearm identification card directly to the colonel
of state police and said colonel shall for this purpose be the licensing authority.

The provisions of sections 122 to 129D, inclusive, and sections 131, 131A, 131B and 131E shall not apply to:

(A) any firearm, rifle or shotgun manufactured in or prior to the year 1899;

Exhibit 84
00106

(B) any replica of any firearm, rifle or shotgun described in clause (A) if such replica: (i) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition; or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; and

(C) manufacturers or wholesalers of firearms, rifles, shotguns or machine guns.

**Credits**

Amended by St.1934, c. 359, § 1; St.1957, c. 688, § 4; St.1959, c. 296, § 1; St.1960, c. 186; St.1968, c. 737, § 1; St.1969, c. 799, § 1; St.1971, c. 456, § 1; St.1973, c. 892, § 1; St.1983, c. 516, § 1; St.1984, c. 116, § 1; St.1989, c. 433; St.1990, c. 511, § 1; St.1996, c. 151, §§ 300, 301; St.1998, c. 180, § 8; St.1999, c. 1, § 1; St.2004, c. 150, §§ 1 to 3, eff. Sept. 13, 2004; St.2014, c. 284, §§ 19, eff. Jan. 1, 2015; St.2014, c. 284, §§ 20, 21, eff. Aug. 13, 2014; St.2017, c. 110, §§ 18 to 20, eff. Feb. 1, 2018.

Notes of Decisions (97)

M.G.L.A. 140 § 121, MA ST 140 § 121
Current through the 2017 1st Annual Session

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

§ 131. Licenses to carry firearms; Class A and B; conditions..., MA ST 140 § 131

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedPrior Version Held Unconstitutional by Fletcher v. Haas, D.Mass., Mar. 30, 2012

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

> Massachusetts General Laws Annotated
> Part I. Administration of the Government (Ch. 1-182)
> Title XX. Public Safety and Good Order (Ch. 133-148a)
> Chapter 140. Licenses (Refs & Annos)

M.G.L.A. 140 § 131

§ 131. Licenses to carry firearms; Class A and B; conditions and restrictions

Effective: February 1, 2018 to December 31, 2020
Currentness

All licenses to carry firearms shall be designated Class A or Class B, and the issuance and possession of any such license shall be subject to the following conditions and restrictions:

(a) A Class A license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) firearms, including large capacity firearms, and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper; and (ii) rifles and shotguns, including large capacity weapons, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as it deems proper. A violation of a restriction imposed by the licensing authority under the provisions of this paragraph shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that the provisions of section 10 of chapter 269 shall not apply to such violation.

The colonel of state police may, after an investigation, grant a Class A license to a club or facility with an on-site shooting range or gallery, which club is incorporated under the laws of the commonwealth for the possession, storage and use of large capacity weapons, ammunition therefor and large capacity feeding devices for use with such weapons on the premises of such club; provided, however, that not less than one shareholder of such club shall be qualified and suitable to be issued such license; and provided further, that such large capacity weapons and ammunition feeding devices may be used under such Class A club license only by such members that possess a valid firearm identification card issued under section 129B or a valid Class A or Class B license to carry firearms, or by such other persons that the club permits while under the direct supervision of a certified firearms safety instructor or club member who, in the case of a large capacity firearm, possesses a valid Class A license to carry firearms or, in the case of a large capacity rifle or shotgun, possesses a valid Class A or Class B license to carry firearms. Such club shall not permit shooting at targets that depict human figures, human effigies, human silhouettes or any human images thereof, except by public safety personnel performing in line with their official duties.

No large capacity weapon or large capacity feeding device shall be removed from the premises except for the purposes of: (i) transferring such firearm or feeding device to a licensed dealer; (ii) transporting such firearm or feeding device to a licensed gunsmith for repair; (iii) target, trap or skeet shooting on the premises of another club incorporated under the laws of the commonwealth and for transporting thereto; (iv) attending an exhibition or educational project or event that is sponsored by, conducted under the supervision of or approved by a public law enforcement agency or a nationally or state recognized entity that promotes proficiency in or education about semiautomatic weapons and for transporting

Exhibit 84
00108

§ 131. Licenses to carry firearms, Class A and B; conditions..., MA ST 140 § 131

thereto and therefrom; (v) hunting in accordance with the provisions of chapter 131; or (vi) surrendering such firearm or feeding device under the provisions of section 129D. Any large capacity weapon or large capacity feeding device kept on the premises of a lawfully incorporated shooting club shall, when not in use, be secured in a locked container, and shall be unloaded during any lawful transport. The clerk or other corporate officer of such club shall annually file a report with the colonel of state police and the commissioner of the department of criminal justice information services listing all large capacity weapons and large capacity feeding devices owned or possessed under such license. The colonel of state police or his designee, shall have the right to inspect all firearms owned or possessed by such club upon request during regular business hours and said colonel may revoke or suspend a club license for a violation of any provision of this chapter or chapter 269 relative to the ownership, use or possession of large capacity weapons or large capacity feeding devices.

(b) A Class B license shall entitle a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) non-large capacity firearms and feeding devices and ammunition therefor, for all lawful purposes, subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper; provided, however, that a Class B license shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place; and provided further, that a Class B license shall not entitle the holder thereof to possess a large capacity firearm, except under a Class A club license issued under this section or under the direct supervision of a holder of a valid Class A license at an incorporated shooting club or licensed shooting range; and (ii) rifles and shotguns, including large capacity rifles and shotguns, and feeding devices and ammunition therefor, for all lawful purposes; provided, however, that the licensing authority may impose such restrictions relative to the possession, use or carrying of large capacity rifles and shotguns as he deems proper. A violation of a restriction provided under this paragraph, or a restriction imposed by the licensing authority under the provisions of this paragraph, shall be cause for suspension or revocation and shall, unless otherwise provided, be punished by a fine of not less than $1,000 nor more than $10,000; provided, however, that the provisions of section 10 of chapter 269 shall not apply to such violation.

A Class B license shall not be a valid license for the purpose of complying with any provision under this chapter governing the purchase, sale, lease, rental or transfer of any weapon or ammunition feeding device if such weapon is a large capacity firearm or if such ammunition feeding device is a large capacity feeding device for use with a large capacity firearm, both as defined in section 121.

(c) Either a Class A or Class B license shall be valid for the purpose of owning, possessing, purchasing and transferring non-large capacity rifles and shotguns, and for purchasing and possessing chemical mace, pepper spray or other similarly propelled liquid, gas or powder designed to temporarily incapacitate, consistent with the entitlements conferred by a firearm identification card issued under section 129B.

(d) Any person residing or having a place of business within the jurisdiction of the licensing authority or any law enforcement officer employed by the licensing authority or any person residing in an area of exclusive federal jurisdiction located within a city or town may submit to the licensing authority or the colonel of state police, an application for a Class A license to carry firearms, or renewal of the same, which the licensing authority or the colonel may issue if it appears that the applicant is not a prohibited person, as set forth in this section, to be issued a license and has good reason to fear injury to the applicant or the applicant's property or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to the restrictions expressed or authorized under this section.

A prohibited person shall be a person who:

(i) has, in a court of the commonwealth, been convicted or adjudicated a youthful offender or delinquent child, both as defined in section 52 of chapter 119, for the commission of (A) a felony; (B) a misdemeanor punishable by imprisonment

Exhibit 84

00109

ER_3871

for more than 2 years ; (C) a violent crime as defined in section 121; (D) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; (E) a violation of any law regulating the use, possession or sale of a controlled substance as defined in section 1 of chapter 94C including, but not limited to, a violation of said chapter 94C; or (F) a misdemeanor crime of domestic violence as defined in 18 U.S.C. 921(a)(33);

(ii) has, in any other state or federal jurisdiction, been convicted or adjudicated a youthful offender or delinquent child for the commission of (A) a felony; (B) a misdemeanor punishable by imprisonment for more than 2 years; (C) a violent crime as defined in section 121; (D) a violation of any law regulating the use, possession, ownership, transfer, purchase, sale, lease, rental, receipt or transportation of weapons or ammunition for which a term of imprisonment may be imposed; (E) a violation of any law regulating the use, possession or sale of a controlled substance as defined in said section 1 of said chapter 94C including, but not limited to, a violation of said chapter 94C; or (F) a misdemeanor crime of domestic violence as defined in 18 U.S.C. 921(a)(33);

(iii) is or has been (A) committed to a hospital or institution for mental illness, alcohol or substance abuse, except a commitment pursuant to sections 35 or 36C of chapter 123, unless after 5 years from the date of the confinement, the applicant submits with the application an affidavit of a licensed physician or clinical psychologist attesting that such physician or psychologist is familiar with the applicant's mental illness, alcohol or substance abuse and that in the physician's or psychologist's opinion, the applicant is not disabled by a mental illness, alcohol or substance abuse in a manner that shall prevent the applicant from possessing a firearm, rifle or shotgun; (B) committed by a court order to a hospital or institution for mental illness, unless the applicant was granted a petition for relief of the court order pursuant to said section 36C of said chapter 123 and submits a copy of the court order with the application; (C) subject to an order of the probate court appointing a guardian or conservator for a incapacitated person on the grounds that the applicant lacks the mental capacity to contract or manage the applicant's affairs, unless the applicant was granted a petition for relief of the order of the probate court pursuant to section 56C of chapter 215 and submits a copy of the order of the probate court with the application; or (D) found to be a person with an alcohol use disorder or substance use disorder or both and committed pursuant to said section 35 of said chapter 123, unless the applicant was granted a petition for relief of the court order pursuant to said section 35 and submits a copy of the court order with the application;

(iv) is younger than 21 years of age at the time of the application;

(v) is an alien who does not maintain lawful permanent residency;

(vi) is currently subject to: (A) an order for suspension or surrender issued pursuant to sections 3B or 3C of chapter 209A or a similar order issued by another jurisdiction; or (B) a permanent or temporary protection order issued pursuant to said chapter 209A or a similar order issued by another jurisdiction, including any order described in 18 U.S.C. 922(g)(8);

(vii) is currently the subject of an outstanding arrest warrant in any state or federal jurisdiction;

(viii) has been discharged from the armed forces of the United States under dishonorable conditions;

(ix) is a fugitive from justice; or

Exhibit 84
00110

(x) having been a citizen of the United States, has renounced that citizenship.

The licensing authority may deny the application or renewal of a license to carry, or suspend or revoke a license issued under this section if, in a reasonable exercise of discretion, the licensing authority determines that the applicant or licensee is unsuitable to be issued or to continue to hold a license to carry. A determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety; or (ii) existing factors that suggest that, if issued a license, the applicant or licensee may create a risk to public safety. Upon denial of an application or renewal of a license based on a determination of unsuitability, the licensing authority shall notify the applicant in writing setting forth the specific reasons for the determination in accordance with paragraph (e). Upon revoking or suspending a license based on a determination of unsuitability, the licensing authority shall notify the holder of a license in writing setting forth the specific reasons for the determination in accordance with paragraph (f). The determination of unsuitability shall be subject to judicial review under said paragraph (f).

(e) Within seven days of the receipt of a completed application for a license to carry or possess firearms, or renewal of same, the licensing authority shall forward one copy of the application and one copy of the applicant's fingerprints to the colonel of state police, who shall within 30 days advise the licensing authority, in writing, of any disqualifying criminal record of the applicant arising from within or without the commonwealth and whether there is reason to believe that the applicant is disqualified for any of the foregoing reasons from possessing a license to carry or possess firearms. In searching for any disqualifying history of the applicant, the colonel shall utilize, or cause to be utilized, files maintained by the department of probation and statewide and nationwide criminal justice, warrant and protection order information systems and files including, but not limited to, the National Instant Criminal Background Check System. The colonel shall inquire of the commissioner of the department of mental health relative to whether the applicant is disqualified from being so licensed. If the information available to the colonel does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law, he shall certify such fact, in writing, to the licensing authority within said 30 day period.

The licensing authority may also make inquiries concerning the applicant to: (i) the commissioner of the department of criminal justice information services relative to any disqualifying condition and records of purchases, sales, rentals, leases and transfers of weapons or ammunition concerning the applicant; (ii) the commissioner of probation relative to any record contained within the department of probation or the statewide domestic violence record keeping system concerning the applicant; and (iii) the commissioner of the department of mental health relative to whether the applicant is a suitable person to possess firearms or is not a suitable person to possess firearms. The director or commissioner to whom the licensing authority makes such inquiry shall provide prompt and full cooperation for that purpose in any investigation of the applicant.

The licensing authority shall, within 40 days from the date of application, either approve the application and issue the license or deny the application and notify the applicant of the reason for such denial in writing; provided, however, that no such license shall be issued unless the colonel has certified, in writing, that the information available to him does not indicate that the possession of a firearm or large capacity firearm by the applicant would be in violation of state or federal law.

The licensing authority shall provide to the applicant a receipt indicating that it received the application. The receipt shall be provided to the applicant within 7 days by mail if the application was received by mail or immediately if the application was made in person; provided, however, that the receipt shall include the applicant's name and address; current license number and license expiration date, if any; the date the licensing authority received the application; the name, address and telephone number of the licensing authority; the agent of the licensing authority that received the application; the type of application; and whether the application is for a new license or a renewal of an existing license.

Exhibit 84
00111

§ 131. Licenses to carry firearms; Class A and B; conditions..., MA ST 140 § 131

The licensing authority shall keep a copy of the receipt for not less than 1 year and shall furnish a copy to the applicant if requested by the applicant.

(f) A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed. A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license. Any revocation or suspension of a license shall be in writing and shall state the reasons therefor. Upon revocation or suspension, the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D. No appeal or post-judgment motion shall operate to stay such revocation or suspension. Notices of revocation and suspension shall be forwarded to the commissioner of the department of criminal justice information services and the commissioner of probation and shall be included in the criminal justice information system. A revoked or suspended license may be reinstated only upon the termination of all disqualifying conditions, if any.

Any applicant or holder aggrieved by a denial, revocation, suspension or restriction placed on a license, unless a hearing has previously been held pursuant to chapter 209A, may, within either 90 days after receiving notice of the denial, revocation or suspension or within 90 days after the expiration of the time limit during which the licensing authority shall respond to the applicant or, in the case of a restriction, any time after a restriction is placed on the license pursuant to this section, file a petition to obtain judicial review in the district court having jurisdiction in the city or town in which the applicant filed the application or in which the license was issued. If after a hearing a justice of the court finds that there was no reasonable ground for denying, suspending, revoking or restricting the license and that the petitioner is not prohibited by law from possessing a license, the justice may order a license to be issued or reinstated to the petitioner or may order the licensing authority to remove certain restrictions placed on the license.

(g) A license shall be in a standard form provided by the executive director of the criminal history systems board in a size and shape equivalent to that of a license to operate motor vehicles issued by the registry of motor vehicles pursuant to section 8 of chapter 90 and shall contain a license number which shall clearly indicate whether such number identifies a Class A or Class B license, the name, address, photograph, fingerprint, place and date of birth, height, weight, hair color, eye color and signature of the licensee. Such license shall be marked "License to Carry Firearms" and shall clearly indicate whether the license is Class A or Class B. The application for such license shall be made in a standard form provided by the executive director of the criminal history systems board, which form shall require the applicant to affirmatively state under the pains and penalties of perjury that such applicant is not disqualified on any of the grounds enumerated above from being issued such license.

(h) Any person who knowingly files an application containing false information shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a house of correction, or by both such fine and imprisonment.

(i) A license to carry or possess firearms shall be valid, unless revoked or suspended, for a period of not more than 6 years from the date of issue and shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years nor more than 6 years from the date of issue; provided, however, that, if the licensee applied for renewal before the license expired, the license shall remain valid after its expiration date for all lawful purposes until the application for renewal is approved or denied. If a licensee is on active duty with the armed forces of the United States on the expiration date of the license, the license shall remain valid until the licensee is released from active duty and for a period not less than 180 days following the release; provided, however, that, if the licensee applied for renewal prior to the end of that period, the license shall remain valid after its expiration date for all lawful purposes until the application for renewal is

Exhibit 84
00112

**ER_3874**

approved or denied. An application for renewal of a Class B license filed before the license has expired shall not extend the license beyond the stated expiration date; provided, that the Class B license shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years nor more than 6 years from the date of issue. Any renewal thereof shall expire on the anniversary of the licensee's date of birth occurring not less than 5 years but not more than 6 years from the effective date of such license. Any license issued to an applicant born on February 29 shall expire on March 1. The fee for the application shall be $100, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $25 of the fee; $50 of the fee shall be deposited into the general fund of the commonwealth and not less than $50,000 of the funds deposited into the General Fund shall be allocated to the Firearm Licensing Review Board, established in section 130B, for its operations and that any funds not expended by said board for its operations shall revert back to the General Fund; and $25 of the fee shall be deposited in the Firearms Fingerprint Identity Verification Trust Fund. For active and retired law enforcement officials, or local, state, or federal government entities acting on their behalf, the fee for the application shall be set at $25, which shall be payable to the licensing authority and shall not be prorated or refunded in case of revocation or denial. The licensing authority shall retain $12.50 of the fee, and $12.50 of the fee shall be deposited into the general fund of the commonwealth. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit such portion of the license application fee into the Firearms Record Keeping Fund quarterly, not later than January 1, April 1, July 1 and October 1 of each year. Notwithstanding any general or special law to the contrary, licensing authorities shall deposit quarterly such portion of the license application fee as is to be deposited into the General Fund, not later than January 1, April 1, July 1 and October 1 of each year. For the purposes of section 10 of chapter 269, an expired license to carry firearms shall be deemed to be valid for a period not to exceed 90 days beyond the stated date of expiration, unless such license to carry firearms has been revoked.

Any person over the age of 70 and any law enforcement officer applying for a license to carry firearms through his employing agency shall be exempt from the requirement of paying a renewal fee for a Class A or Class B license to carry.

(j)(1) No license shall be required for the carrying or possession of a firearm known as a detonator and commonly used on vehicles as a signaling and marking device, when carried or possessed for such signaling or marking purposes.

(2) No license to carry shall be required for the possession of an unloaded large capacity rifle or shotgun or an unloaded feeding device therefor by a veteran's organization chartered by the Congress of the United States, chartered by the commonwealth or recognized as a nonprofit tax-exempt organization by the Internal Revenue Service, or by the members of any such organization when on official parade duty or during ceremonial occasions. For purposes of this subparagraph, an "unloaded large capacity rifle or shotgun" and an "unloaded feeding device therefor" shall include any large capacity rifle, shotgun or feeding device therefor loaded with a blank cartridge or blank cartridges, so-called, which contain no projectile within such blank or blanks or within the bore or chamber of such large capacity rifle or shotgun.

(k) Whoever knowingly issues a license in violation of this section shall be punished by a fine of not less than $500 nor more than $1,000 or by imprisonment for not less than six months nor more than two years in a jail or house of correction, or by both such fine and imprisonment.

(l) The executive director of the criminal history systems board shall send electronically or by first class mail to the holder of each such license to carry firearms, a notice of the expiration of such license not less than 90 days prior to such expiration and shall enclose therein a form for the renewal of such license. The form for renewal shall include an affidavit in which the applicant shall verify that the applicant has not lost any firearms or had any firearms stolen from the applicant since the date of the applicant's last renewal or issuance. The taking of fingerprints shall not be required in issuing the renewal of a license if the renewal applicant's fingerprints are on file with the department of the state

Exhibit 84
00113

§ 131. Licenses to carry firearms; Class A and B; Conditions..., MA ST 140 § 131

police. Any licensee shall notify, in writing, the licensing authority who issued said license, the chief of police into whose jurisdiction the licensee moves and the executive director of the criminal history systems board of any change of address. Such notification shall be made by certified mail within 30 days of its occurrence. Failure to so notify shall be cause for revocation or suspension of said license. The commissioner of criminal justice information services shall provide electronic notice of expiration only upon the request of a cardholder. A request for electronic notice of expiration shall be forwarded to the department on a form furnished by the commissioner. Any electronic address maintained by the department for the purpose of providing electronic notice of expiration shall be considered a firearms record and shall not be disclosed except as provided in section 10 of chapter 66.

(m) Notwithstanding the provisions of section 10 of chapter 269, any person in possession of a firearm, rifle or shotgun whose license issued under this section is invalid for the sole reason that it has expired, not including licenses that remain valid under paragraph (i) because the licensee applied for renewal before the license expired, but who shall not be disqualified from renewal upon application therefor pursuant to this section, shall be subject to a civil fine of not less than $100 nor more than $5,000 and the provisions of section 10 of chapter 269 shall not apply; provided, however, that the exemption from the provisions of said section 10 of said chapter 269 provided herein shall not apply if: (i) such license has been revoked or suspended, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; (ii) revocation or suspension of such license is pending, unless such revocation or suspension was caused by failure to give notice of a change of address as required under this section; or (iii) an application for renewal of such license has been denied. Any law enforcement officer who discovers a person to be in possession of a firearm, rifle or shotgun after such person's license has expired, meaning after 90 days beyond the stated expiration date on the license, has been revoked or suspended, solely for failure to give notice of a change of address, shall confiscate such firearm, rifle or shotgun and the expired or suspended license then in possession and such officer, shall forward such license to the licensing authority by whom it was issued as soon as practicable. The officer shall, at the time of confiscation, provide to the person whose firearm, rifle or shotgun has been confiscated, a written inventory and receipt for all firearms, rifles or shotguns confiscated and the officer and his employer shall exercise due care in the handling, holding and storage of these items. Any confiscated weapon shall be returned to the owner upon the renewal or reinstatement of such expired or suspended license within one year of such confiscation or may be otherwise disposed of in accordance with the provisions of section 129D. The provisions of this paragraph shall not apply if such person has a valid license to carry firearms issued under section 131F.

(n) Upon issuance of a license to carry or possess firearms under this section, the licensing authority shall forward a copy of such approved application and license to the executive director of the criminal history systems board, who shall inform the licensing authority forthwith of the existence of any disqualifying condition discovered or occurring subsequent to the issuance of a license under this section.

(*o*) No person shall be issued a license to carry or possess a machine gun in the commonwealth, except that a licensing authority or the colonel of state police may issue a machine gun license to:

(i) a firearm instructor certified by the municipal police training committee for the sole purpose of firearm instruction to police personnel;

(ii) a bona fide collector of firearms upon application or upon application for renewal of such license.

<[ Second sentence of paragraph (o) added by 2017, 110, Sec. 21 effective February 1, 2018 applicable as provided by 2017, 110, Sec. 53.]>

Exhibit 84
00114

ER_3876

Clauses (i) and (ii) of this paragraph shall not apply to bump stocks and trigger cranks.

(p) The executive director of the criminal history systems board shall promulgate regulations in accordance with chapter 30A to establish criteria for persons who shall be classified as bona fide collectors of firearms.

(q) Nothing in this section shall authorize the purchase, possession or transfer of any weapon, ammunition or feeding device that is, or in such manner that is, prohibited by state or federal law.

(r) The secretary of the executive office of public safety or his designee may promulgate regulations to carry out the purposes of this section.

## Credits

Amended by St.1936, c. 302; St.1951, c. 201; St.1953, c. 319, § 20; St.1953, c. 454; St.1957, c. 688, § 15; St.1959, c. 296, § 6; St.1960, c. 293; St.1969, c. 799, § 11; St.1972, c. 415; St.1973, c. 138; St.1973, c. 892, § 7; St.1974, c. 312; St.1974, c. 649, § 1; St.1975, c. 4, § 1; St.1975, c. 113, § 1; St.1984, c. 420, § 2; St.1986, c. 481, § 2; St.1987, c. 465, § 33; St.1994, c. 24, § 3; St.1996, c. 151, §§ 325 to 329; St.1996, c. 200, § 28; St.1998, c. 180, § 41; St.1998, c. 358, §§ 6 to 9; St.2002, c. 196, § 22; St.2002, c. 513, § 2; St.2003, c. 26, § 429, eff. July 1, 2003; St.2003, c. 46, § 103, eff. July 31, 2003; St.2004, c. 150, §§ 10 to 16, eff. Sept. 13, 2004; St.2008, c. 224, eff. Oct. 29, 2008; St.2010, c. 256, § 97, eff. Nov. 4, 2010; St.2010, c. 466, § 3, eff. April 14, 2011; St.2011, c. 9, §§ 16, 17, eff. April 11, 2011; St.2014, c. 284, §§ 48, 50, 51, 53, 56, 57, eff. Jan. 1, 2015; St.2014, c. 284, § 55, eff. Aug. 13, 2014; St.2017, c. 110, § 21, eff. Feb. 1, 2018.

Notes of Decisions (174)

M.G.L.A. 140 § 131, MA ST 140 § 131
Current through the 2017 1st Annual Session

---

End of Document                                                © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 84
00115

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                    8

New Jersey Statutes Annotated
  Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 2. Definition of Specific Offenses
      Part 5. Offenses Against Public Order, Health and Decency
        Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

This section has been updated. Click here for the updated version.

N.J.S.A. 2C:39-1

2C:39-1. Definitions

Effective: December 23, 2002 to January 15, 2018

Definitions. The following definitions apply to this chapter and to chapter 58:

a. "Antique firearm" means any rifle or shotgun and "antique cannon" means a destructive device defined in paragraph (3) of subsection c. of this section, if the rifle, shotgun or destructive device, as the case may be, is incapable of being fired or discharged, or which does not fire fixed ammunition, regardless of date of manufacture, or was manufactured before 1898 for which cartridge ammunition is not commercially available, and is possessed as a curiosity or ornament or for its historical significance or value.

b. "Deface" means to remove, deface, cover, alter or destroy the name of the maker, model designation, manufacturer's serial number or any other distinguishing identification mark or number on any firearm.

c. "Destructive device" means any device, instrument or object designed to explode or produce uncontrolled combustion, including (1) any explosive or incendiary bomb, mine or grenade; (2) any rocket having a propellant charge of more than four ounces or any missile having an explosive or incendiary charge of more than one-quarter of an ounce; (3) any weapon capable of firing a projectile of a caliber greater than 60 caliber, except a shotgun or shotgun ammunition generally recognized as suitable for sporting purposes; (4) any Molotov cocktail or other device consisting of a breakable container containing flammable liquid and having a wick or similar device capable of being ignited. The term does not include any device manufactured for the purpose of illumination, distress signaling, line-throwing, safety or similar purposes.

d. "Dispose of" means to give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer, or otherwise transfer possession.

e. "Explosive" means any chemical compound or mixture that is commonly used or is possessed for the purpose of producing an explosion and which contains any oxidizing and combustible materials or other ingredients in such proportions, quantities or packing that an ignition by fire, by friction, by concussion or by detonation of any part of the compound or mixture may cause such a sudden generation of highly heated gases that the resultant gaseous pressures are capable of producing destructive effects on contiguous objects. The term shall not include small arms ammunition, or explosives in the form prescribed by the official United States Pharmacopoeia.

Exhibit 85
00117

Sterling MK-6, MK-7 and SAR types

Steyr A.U.G. semi-automatic firearms

USAS 12 semi-automatic type shotgun

Uzi type semi-automatic firearms

Valmet M62, M71S, M76, or M78 type semi-automatic firearms

Weaver Arm Nighthawk.

(2) Any firearm manufactured under any designation which is substantially identical to any of the firearms listed above.

(3) A semi-automatic shotgun with either a magazine capacity exceeding six rounds, a pistol grip, or a folding stock.

(4) A semi-automatic rifle with a fixed magazine capacity exceeding 15 rounds.

(5) A part or combination of parts designed or intended to convert a firearm into an assault firearm, or any combination of parts from which an assault firearm may be readily assembled if those parts are in the possession or under the control of the same person.

x. "Semi-automatic" means a firearm which fires a single projectile for each single pull of the trigger and is self-reloading or automatically chambers a round, cartridge, or bullet.

y. "Large capacity ammunition magazine" means a box, drum, tube or other container which is capable of holding more than 15 rounds of ammunition to be fed continuously and directly therefrom into a semi-automatic firearm.

z. "Pistol grip" means a well-defined handle, similar to that found on a handgun, that protrudes conspicuously beneath the action of the weapon, and which permits the shotgun to be held and fired with one hand.

aa. "Antique handgun" means a handgun manufactured before 1898, or a replica thereof, which is recognized as being historical in nature or of historical significance and either (1) utilizes a match, friction, flint, or percussion ignition, or which utilizes a pin-fire cartridge in which the pin is part of the cartridge or (2) does not fire fixed ammunition or for which cartridge ammunition is not commercially available.

bb. "Trigger lock" means a commercially available device approved by the Superintendent of State Police which is operated with a key or combination lock that prevents a firearm from being discharged while the device is attached to the firearm. It may include, but need not be limited to, devices that obstruct the barrel or cylinder of the firearm, as well as devices that immobilize the trigger.

Exhibit 85
00118

New Jersey Statutes Annotated
  Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
    Subtitle 2. Definition of Specific Offenses
      Part 5. Offenses Against Public Order, Health and Decency
        Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

This section has been updated. Click here for the updated version.

N.J.S.A. 2C:39-3

2C:39-3. Prohibited weapons and devices

Effective: September 3, 2003 to January 15, 2018

Prohibited Weapons and Devices.

**a. Destructive devices.** Any person who knowingly has in his possession any destructive device is guilty of a crime of the third degree.

**b. Sawed-off shotguns.** Any person who knowingly has in his possession any sawed-off shotgun is guilty of a crime of the third degree.

**c. Silencers.** Any person who knowingly has in his possession any firearm silencer is guilty of a crime of the fourth degree.

**d. Defaced firearms.** Any person who knowingly has in his possession any firearm which has been defaced, except an antique firearm or an antique handgun, is guilty of a crime of the fourth degree.

**e. Certain weapons.** Any person who knowingly has in his possession any gravity knife, switchblade knife, dagger, dirk, stiletto, billy, blackjack, metal knuckle, sandclub, slingshot, cestus or similar leather band studded with metal filings or razor blades imbedded in wood, ballistic knife, without any explainable lawful purpose, is guilty of a crime of the fourth degree.

**f. Dum-dum or body armor penetrating bullets.** (1) Any person, other than a law enforcement officer or persons engaged in activities pursuant to subsection f. of N.J.S.2C:39-6, who knowingly has in his possession any hollow nose or dum-dum bullet, or (2) any person, other than a collector of firearms or ammunition as curios or relics as defined in Title 18, United States Code, section 921 (a) (13) and has in his possession a valid Collector of Curios and Relics License issued by the Bureau of Alcohol, Tobacco and Firearms, who knowingly has in his possession any body armor breaching or penetrating ammunition, which means: (a) ammunition primarily designed for use in a handgun, and (b) which is comprised of a bullet whose core or jacket, if the jacket is thicker than .025 of an inch, is made of tungsten carbide, or hard bronze, or other material which is harder than a rating of 72 or greater on the Rockwell B. Hardness Scale, and (c) is therefore capable of breaching or penetrating body armor, is guilty of a crime of the fourth degree. For purposes of this section, a collector may possess not more than three examples of each distinctive variation of the ammunition described above. A distinctive variation includes a different head stamp, composition, design, or color.

Exhibit 85
00119

**g. Exceptions.** (1) Nothing in subsection a., b., c. , d., e., f., j. or k. of this section shall apply to any member of the Armed Forces of the United States or the National Guard, or except as otherwise provided, to any law enforcement officer while actually on duty or traveling to or from an authorized place of duty, provided that his possession of the prohibited weapon or device has been duly authorized under the applicable laws, regulations or military or law enforcement orders. Nothing in subsection h. of this section shall apply to any law enforcement officer who is exempted from the provisions of that subsection by the Attorney General. Nothing in this section shall apply to the possession of any weapon or device by a law enforcement officer who has confiscated, seized or otherwise taken possession of said weapon or device as evidence of the commission of a crime or because he believed it to be possessed illegally by the person from whom it was taken, provided that said law enforcement officer promptly notifies his superiors of his possession of such prohibited weapon or device.

(2) a. Nothing in subsection f. (1) shall be construed to prevent a person from keeping such ammunition at his dwelling, premises or other land owned or possessed by him, or from carrying such ammunition from the place of purchase to said dwelling or land, nor shall subsection f. (1) be construed to prevent any licensed retail or wholesale firearms dealer from possessing such ammunition at its licensed premises, provided that the seller of any such ammunition shall maintain a record of the name, age and place of residence of any purchaser who is not a licensed dealer, together with the date of sale and quantity of ammunition sold.

b. Nothing in subsection f. (1) shall be construed to prevent a designated employee or designated licensed agent for a nuclear power plant under the license of the Nuclear Regulatory Commission from possessing hollow nose ammunition while in the actual performance of his official duties, if the federal licensee certifies that the designated employee or designated licensed agent is assigned to perform site protection, guard, armed response or armed escort duties and is appropriately trained and qualified, as prescribed by federal regulation, to perform those duties.

(3) Nothing in paragraph (2) of subsection f. or in subsection j. shall be construed to prevent any licensed retail or wholesale firearms dealer from possessing that ammunition or large capacity ammunition magazine at its licensed premises for sale or disposition to another licensed dealer, the Armed Forces of the United States or the National Guard, or to a law enforcement agency, provided that the seller maintains a record of any sale or disposition to a law enforcement agency. The record shall include the name of the purchasing agency, together with written authorization of the chief of police or highest ranking official of the agency, the name and rank of the purchasing law enforcement officer, if applicable, and the date, time and amount of ammunition sold or otherwise disposed. A copy of this record shall be forwarded by the seller to the Superintendent of the Division of State Police within 48 hours of the sale or disposition.

(4) Nothing in subsection a. of this section shall be construed to apply to antique cannons as exempted in subsection d. of N.J.S.2C:39-6.

(5) Nothing in subsection c. of this section shall be construed to apply to any person who is specifically identified in a special deer management permit issued by the Division of Fish and Wildlife to utilize a firearm silencer as part of an alternative deer control method implemented in accordance with a special deer management permit issued pursuant to section 4 of P.L.2000, c. 46 (C.23:4-42.6), while the person is in the actual performance of the permitted alternative deer control method and while going to and from the place where the permitted alternative deer control method is being utilized. This exception shall not, however, otherwise apply to any person to authorize the purchase or possession of a firearm silencer.

Exhibit 85
00120

ER_3881

**h. Stun guns.** Any person who knowingly has in his possession any stun gun is guilty of a crime of the fourth degree.

**i.** Nothing in subsection e. of this section shall be construed to prevent any guard in the employ of a private security company, who is licensed to carry a firearm, from the possession of a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course approved by the Police Training Commission in the use of a nightstick.

**j.** Any person who knowingly has in his possession a large capacity ammunition magazine is guilty of a crime of the fourth degree unless the person has registered an assault firearm pursuant to section 11 of P.L.1990, c. 32 (C.2C:58-12) and the magazine is maintained and used in connection with participation in competitive shooting matches sanctioned by the Director of Civilian Marksmanship of the United States Department of the Army.

**k. Handcuffs.** Any person who knowingly has in his possession handcuffs as defined in P.L.1991, c. 437 (C.2C:39-9.2), under circumstances not manifestly appropriate for such lawful uses as handcuffs may have, is guilty of a disorderly persons offense. A law enforcement officer shall confiscate handcuffs possessed in violation of the law.

**Credits**
L.1978, c. 95, § 2C:39-3, eff. Sept. 1, 1979. Amended by L.1979, c. 179, § 2, eff. Sept. 1, 1979; L.1983, c. 58, § 1, eff. Feb. 7, 1983; L.1983, c. 479, § 2, eff. Jan. 12, 1984; L.1985, c. 360, § 2, eff. Nov. 12, 1985; L.1987, c. 228, § 2, eff. July 30, 1987; L.1989, c. 11, § 1, eff. Feb. 1, 1989; L.1990, c. 32, § 10, eff. May 30, 1990; L.1991, c. 437, § 1, eff. Jan. 18, 1992; L.1999, c. 233, § 2, eff. Jan. 1, 2000; L.2000, c. 46, § 5, eff. June 30, 2000; L.2003, c. 168, § 1, eff. Sept. 3, 2003.

**Editors' Notes**

### SENATE LAW, PUBLIC SAFETY AND DEFENSE COMMITTEE STATEMENT

**Senate, No. 650--L.1989, c. 11**

Senate 650 permits a guard who is licensed to carry a firearm and is employed by a private security company to lawfully carry a nightstick when in the actual performance of his official duties, provided that he has satisfactorily completed a training course.

The bill requires that a training course, approved by the Police Training Commission, in the use of a nightstick must be completed before a private security guard licensed to carry a firearm is authorized to carry a nightstick while in the performance of his official duties.

This bill was pre-filed for introduction in the 1988 session pending technical review. As reported, the bill includes the changes required by technical review which has been performed.

N. J. S. A. 2C:39-3, NJ ST 2C:39-3
Current with 2017 laws and resolutions through L.2017, c. 323, 325-332, 334-372, 379-380 and J.R. No. 24

**End of Document** © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 85
00121

**ER_3882**

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 248 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4536   Page 122 of
147
2C:39-9. Manufacture, transport, disposition and defacement of..., NJ ST 2C:39-9

New Jersey Statutes Annotated
Title 2c. The New Jersey Code of Criminal Justice (Refs & Annos)
Subtitle 2. Definition of Specific Offenses
Part 5. Offenses Against Public Order, Health and Decency
Chapter 39. Firearms, Other Dangerous Weapons and Instruments of Crime (Refs & Annos)

This section has been updated. Click here for the updated version.

N.J.S.A. 2C:39-9

2C:39-9. Manufacture, transport, disposition and defacement
of weapons and dangerous instruments and appliances

Effective: November 1, 2013 to January 15, 2018

Manufacture, Transport, Disposition and Defacement of Weapons and Dangerous Instruments and Appliances. a. Machine guns. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of any machine gun without being registered or licensed to do so as provided in chapter 58 is guilty of a crime of the third degree.

b. Sawed-off shotguns. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of any sawed-off shotgun is guilty of a crime of the third degree.

c. Firearm silencers. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of any firearm silencer is guilty of a crime of the fourth degree.

d. Weapons. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of any weapon, including gravity knives, switchblade knives, ballistic knives, daggers, dirks, stilettos, billies, blackjacks, metal knuckles, sandclubs, slingshots, cesti or similar leather bands studded with metal filings, or, except as otherwise provided in subsection i. of this section, in the case of firearms if he is not licensed or registered to do so as provided in chapter 58, is guilty of a crime of the fourth degree. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of any weapon or other device which projects, releases or emits tear gas or other substances intended to produce temporary physical discomfort or permanent injury through being vaporized or otherwise dispensed in the air, which is intended to be used for any purpose other than for authorized military or law enforcement purposes by duly authorized military or law enforcement personnel or the device is for the purpose of personal self-defense, is pocket-sized and contains not more than three-quarters of an ounce of chemical substance not ordinarily capable of lethal use or of inflicting serious bodily injury, or other than to be used by any person permitted to possess such weapon or device under the provisions of subsection d. of N.J.S. 2C:39-5, which is intended for use by financial and other business institutions as part of an integrated security system, placed at fixed locations, for the protection of money and property, by the duly authorized personnel of those institutions, is guilty of a crime of the fourth degree.

e. Defaced firearms. Any person who defaces any firearm is guilty of a crime of the third degree. Any person who knowingly buys, receives, disposes of or conceals a defaced firearm, except an antique firearm or an antique handgun, is guilty of a crime of the fourth degree.

Exhibit 85
00122

ER_3883

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 249 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4537   Page 123 of
147
2C:39-9. Manufacture, transport, disposition and defacement of..., NJ ST 2C:39-9

f. (1) Any person who manufactures, causes to be manufactured, transports, ships, sells, or disposes of any bullet, which is primarily designed for use in a handgun, and which is comprised of a bullet whose core or jacket, if the jacket is thicker than .025 of an inch, is made of tungsten carbide, or hard bronze, or other material which is harder than a rating of 72 or greater on the Rockwell B. Hardness Scale, and is therefore capable of breaching or penetrating body armor and which is intended to be used for any purpose other than for authorized military or law enforcement purposes by duly authorized military or law enforcement personnel, is guilty of a crime of the fourth degree.

(2) Nothing in this subsection shall be construed to prevent a licensed collector of ammunition as defined in paragraph (2) of subsection f. of N.J.S.2C:39-3 from transporting the bullets defined in paragraph (1) of this subsection from (a) any licensed retail or wholesale firearms dealer's place of business to the collector's dwelling, premises, or other land owned or possessed by him, or (b) to or from the collector's dwelling, premises or other land owned or possessed by him to any gun show for the purposes of display, sale, trade, or transfer between collectors, or (c) to or from the collector's dwelling, premises or other land owned or possessed by him to any rifle or pistol club organized in accordance with the rules prescribed by the National Board for the Promotion of Rifle Practice; provided that the club has filed a copy of its charter with the superintendent of the State Police and annually submits a list of its members to the superintendent, and provided further that the ammunition being transported shall be carried not loaded in any firearm and contained in a closed and fastened case, gun box, or locked in the trunk of the automobile in which it is being transported, and the course of travel shall include only such deviations as are reasonably necessary under the circumstances.

g. Assault firearms. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of an assault firearm without being registered or licensed to do so pursuant to N.J.S.2C:58-1 et seq. is guilty of a crime of the third degree.

h. Large capacity ammunition magazines. Any person who manufactures, causes to be manufactured, transports, ships, sells or disposes of a large capacity ammunition magazine which is intended to be used for any purpose other than for authorized military or law enforcement purposes by duly authorized military or law enforcement personnel is guilty of a crime of the fourth degree.

i. Transporting firearms into this State for an unlawful sale or transfer. Any person who knowingly transports, ships or otherwise brings into this State any firearm for the purpose of unlawfully selling, transferring, giving, assigning or otherwise disposing of that firearm to another individual is guilty of a crime of the second degree. Any motor vehicle used by a person to transport, ship, or otherwise bring a firearm into this State for unlawful sale or transfer shall be subject to forfeiture in accordance with the provisions of N.J.S.2C:64-1 et seq.; provided however, this forfeiture provision shall not apply to innocent owners, nor shall it affect the rights of a holder of a valid lien.

The temporary transfer of a firearm shall not constitute a violation of this subsection if [1] that firearm is transferred:

(1) while hunting or target shooting in accordance with the provisions of section 1 of P.L.1992, c. 74 (C.2C:58-3.1);

(2) for shooting competitions sponsored by a licensed dealer, law enforcement agency, legally recognized military organization, or a rifle or pistol club which has filed a copy of its charter with the superintendent in accordance with the provisions of section 1 of P.L.1992, c. 74 (C.2C:58-3.1); or

Exhibit 85
00123

2C:39-9. Manufacture, transport, disposition and defacement of..., NJ ST 2C:39-9

(3) for participation in a training course conducted by a certified instructor in accordance with the provisions of section 1 of P.L.1997, c. 375 (C.2C:58-3.2).

The transfer of any firearm that uses air or carbon dioxide to expel a projectile; or the transfer of an antique firearm shall not constitute a violation of this subsection.

**Credits**
L.1978, c. 95, § 2C:39-9, eff. Sept. 1, 1979. Amended by L.1979, c. 179, § 7, eff. Sept. 1, 1979; L.1980, c. 108, § 1, eff. Sept. 11, 1980; L.1981, c. 480, § 2, eff. Jan. 12, 1982; L.1983, c. 58, § 2, eff. Feb. 7, 1983; L.1987, c. 228, § 3, eff. July 30, 1987; L.1990, c. 32, § 3, eff. May 30, 1990; L.1999, c. 233, § 3, eff. Jan. 1, 2000; L.2007, c. 298, § 1, eff. April 1, 2008; L.2013, c. 111, § 1, eff. Nov. 1, 2013.

Footnotes
1        So in original.
N. J. S. A. 2C:39-9, NJ ST 2C:39-9
Current with 2017 laws and resolutions through L.2017, c. 323, 325-332, 334-372, 379-380 and J.R. No. 24

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 85
00124

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 251 of 272

Case 3:17-cv-01017-BEN-JLB    Document 50-2    Filed 03/05/18    PageID.4540    Page 126 of 147
§ 265.00 Definitions, NY PENAL § 265.00

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedNegative Treatment Reconsidered by New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, 2nd Cir.(Conn.), Oct. 19, 2015

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

McKinney's Consolidated Laws of New York Annotated
    Penal Law (Refs & Annos)
        Chapter 40. Of the Consolidated Laws (Refs & Annos)
            Part Three. Specific Offenses
                Title P. Offenses Against Public Safety
                    Article 265. Firearms and Other Dangerous Weapons (Refs & Annos)

McKinney's Penal Law § 265.00

§ 265.00 Definitions

Effective: July 5, 2013
Currentness

As used in this article and in article four hundred, the following terms shall mean and include:

1. "Machine-gun" means a weapon of any description, irrespective of size, by whatever name known, loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger and includes a sub-machine gun.

2. "Firearm silencer" means any instrument, attachment, weapon or appliance for causing the firing of any gun, revolver, pistol or other firearms to be silent, or intended to lessen or muffle the noise of the firing of any gun, revolver, pistol or other firearms.

3. "Firearm" means (a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length; or (d) any weapon made from a shotgun or rifle whether by alteration, modification, or otherwise if such weapon as altered, modified, or otherwise has an overall length of less than twenty-six inches; or (e) an assault weapon. For the purpose of this subdivision the length of the barrel on a shotgun or rifle shall be determined by measuring the distance between the muzzle and the face of the bolt, breech, or breechlock when closed and when the shotgun or rifle is cocked; the overall length of a weapon made from a shotgun or rifle is the distance between the extreme ends of the weapon measured along a line parallel to the center line of the bore. Firearm does not include an antique firearm.

4. "Switchblade knife" means any knife which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife.

5. "Gravity knife" means any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device.

Exhibit 86
00126

ER_3886

§ 265.00 Definitions, NY PENAL § 265.00

5-a. "Pilum ballistic knife" means any knife which has a blade which can be projected from the handle by hand pressure applied to a button, lever, spring or other device in the handle of the knife.

5-b. "Metal knuckle knife" means a weapon that, when closed, cannot function as a set of plastic knuckles or metal knuckles, nor as a knife and when open, can function as both a set of plastic knuckles or metal knuckles as well as a knife.

5-c. "Automatic knife" includes a stiletto, a switchblade knife, a gravity knife, a cane sword, a pilum ballistic knife, and a metal knuckle knife.

6. "Dispose of" means to dispose of, give, give away, lease, loan, keep for sale, offer, offer for sale, sell, transfer and otherwise dispose of.

7. "Deface" means to remove, deface, cover, alter or destroy the manufacturer's serial number or any other distinguishing number or identification mark.

8. "Gunsmith" means any person, firm, partnership, corporation or company who engages in the business of repairing, altering, assembling, manufacturing, cleaning, polishing, engraving or trueing, or who performs any mechanical operation on, any firearm, large capacity ammunition feeding device or machine-gun.

9. "Dealer in firearms" means any person, firm, partnership, corporation or company who engages in the business of purchasing, selling, keeping for sale, loaning, leasing, or in any manner disposing of, any assault weapon, large capacity ammunition feeding device, pistol or revolver.

10. "Licensing officer" means in the city of New York the police commissioner of that city; in the county of Nassau the commissioner of police of that county; in the county of Suffolk the sheriff of that county except in the towns of Babylon, Brookhaven, Huntington, Islip and Smithtown, the commissioner of police of that county; for the purposes of section 400.01 of this chapter the superintendent of state police; and elsewhere in the state a judge or justice of a court of record having his office in the county of issuance.

11. "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

12. "Shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

13. "Cane Sword" means a cane or swagger stick having concealed within it a blade that may be used as a sword or stiletto.

Exhibit 86
00127

ER_3887

14. [See also subd. 14 below] "Chuka stick" means any device designed primarily as a weapon, consisting of two or more lengths of a rigid material joined together by a thong, rope or chain in such a manner as to allow free movement of a portion of the device while held in the hand and capable of being rotated in such a manner as to inflict serious injury upon a person by striking or choking. These devices are also known as nunchakus and centrifugal force sticks.

14. [See also subd. 14 above] "Antique firearm" means:

Any unloaded muzzle loading pistol or revolver with a matchlock, flintlock, percussion cap, or similar type of ignition system, or a pistol or revolver which uses fixed cartridges which are no longer available in the ordinary channels of commercial trade.

15. "Loaded firearm" means any firearm loaded with ammunition or any firearm which is possessed by one who, at the same time, possesses a quantity of ammunition which may be used to discharge such firearm.

15-a. "Electronic dart gun" means any device designed primarily as a weapon, the purpose of which is to momentarily stun, knock out or paralyze a person by passing an electrical shock to such person by means of a dart or projectile.

15-b. "Kung Fu star" means a disc-like object with sharpened points on the circumference thereof and is designed for use primarily as a weapon to be thrown.

15-c. "Electronic stun gun" means any device designed primarily as a weapon, the purpose of which is to stun, cause mental disorientation, knock out or paralyze a person by passing a high voltage electrical shock to such person.

16. "Certified not suitable to possess a self-defense spray device, a rifle or shotgun" means that the director or physician in charge of any hospital or institution for mental illness, public or private, has certified to the superintendent of state police or to any organized police department of a county, city, town or village of this state, that a person who has been judicially adjudicated incompetent, or who has been confined to such institution for mental illness pursuant to judicial authority, is not suitable to possess a self-defense spray device, as defined in section 265.20 of this article, or a rifle or shotgun.

17. "Serious offense" means (a) any of the following offenses defined in the former penal law as in force and effect immediately prior to September first, nineteen hundred sixty-seven: illegally using, carrying or possessing a pistol or other dangerous weapon; making or possessing burglar's instruments; buying or receiving stolen property; unlawful entry of a building; aiding escape from prison; that kind of disorderly conduct defined in subdivisions six and eight of section seven hundred twenty-two of such former penal law; violations of sections four hundred eighty-three, four hundred eighty-three-b, four hundred eighty-four-h and article one hundred six of such former penal law; that kind of criminal sexual act or rape which was designated as a misdemeanor; violation of section seventeen hundred forty-seven-d and seventeen hundred forty-seven-e of such former penal law; any violation of any provision of article thirty-three of the public health law relating to narcotic drugs which was defined as a misdemeanor by section seventeen hundred fifty-one-a of such former penal law, and any violation of any provision of article thirty-three-A of the public health law relating to depressant and stimulant drugs which was defined as a misdemeanor by section seventeen hundred forty-seven-b of such former penal law.

Exhibit 86
00128

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

**ER_3888**

§ 265.00 Definitions, NY PENAL § 265.00

(b) [As amended by L.1999, c. 635, § 11. See, also, par. (b) below.] any of the following offenses defined in the penal law: illegally using, carrying or possessing a pistol or other dangerous weapon; possession of burglar's tools; criminal possession of stolen property in the third degree; escape in the third degree; jostling; fraudulent accosting; endangering the welfare of a child; the offenses defined in article two hundred thirty-five; issuing abortional articles; permitting prostitution; promoting prostitution in the third degree; stalking in the fourth degree; stalking in the third degree; the offenses defined in article one hundred thirty; the offenses defined in article two hundred twenty.

(b) [As amended by L.1999, c. 635, § 15. See, also, par. (b) above.] any of the following offenses defined in the penal law: illegally using, carrying or possessing a pistol or other dangerous weapon; possession of burglar's tools; criminal possession of stolen property in the third degree; escape in the third degree; jostling; fraudulent accosting; endangering the welfare of a child; the offenses defined in article two hundred thirty-five; issuing abortional articles; permitting prostitution; promoting prostitution in the third degree; stalking in the third degree; stalking in the fourth degree; the offenses defined in article one hundred thirty; the offenses defined in article two hundred twenty.

18. "Armor piercing ammunition" means any ammunition capable of being used in pistols or revolvers containing a projectile or projectile core, or a projectile or projectile core for use in such ammunition, that is constructed entirely (excluding the presence of traces of other substances) from one or a combination of any of the following: tungsten alloys, steel, iron, brass, bronze, beryllium copper, or uranium.

19. "Duly authorized instructor" means (a) a duly commissioned officer of the United States army, navy, marine corps or coast guard, or of the national guard of the state of New York; or (b) a duly qualified adult citizen of the United States who has been granted a certificate as an instructor in small arms practice issued by the United States army, navy or marine corps, or by the adjutant general of this state, or by the national rifle association of America, a not-for-profit corporation duly organized under the laws of this state; or (c) by a person duly qualified and designated by the department of environmental conservation under paragraph d of subdivision six of section 11-0713 of the environmental conservation law as its agent in the giving of instruction and the making of certifications of qualification in responsible hunting practices.

20. "Disguised gun" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive and is designed and intended to appear to be something other than a gun.

21. "Semiautomatic" means any repeating rifle, shotgun or pistol, regardless of barrel or overall length, which utilizes a portion of the energy of a firing cartridge or shell to extract the fired cartridge case or spent shell and chamber the next round, and which requires a separate pull of the trigger to fire each cartridge or shell.

22. "Assault weapon" means

(a) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the following characteristics:

(i) a folding or telescoping stock;

Exhibit 86
00129

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a thumbhole stock;

(iv) a second handgrip or a protruding grip that can be held by the non-trigger hand;

(v) a bayonet mount;

(vi) a flash suppressor, muzzle break, muzzle compensator, or threaded barrel designed to accommodate a flash suppressor, muzzle break, or muzzle compensator;

(vii) a grenade launcher; or

(b) a semiautomatic shotgun that has at least one of the following characteristics:

(i) a folding or telescoping stock;

(ii) a thumbhole stock;

(iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;

(iv) a fixed magazine capacity in excess of seven rounds;

(v) an ability to accept a detachable magazine; or

(c) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the following characteristics:

(i) a folding or telescoping stock;

(ii) a thumbhole stock;

(iii) a second handgrip or a protruding grip that can be held by the non-trigger hand;

(iv) capacity to accept an ammunition magazine that attaches to the pistol outside of the pistol grip;

Exhibit 86
00130

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                                        5

§ 265.00 Definitions, NY PENAL § 265.00

(v) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(vi) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned;

(vii) a manufactured weight of fifty ounces or more when the pistol is unloaded; or

(viii) a semiautomatic version of an automatic rifle, shotgun or firearm;

(d) a revolving cylinder shotgun;

(e) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined in subparagraph (v) of paragraph (e) of subdivision twenty-two of section 265.00 of this chapter as added by chapter one hundred eighty-nine of the laws of two thousand and otherwise lawfully possessed pursuant to such chapter of the laws of two thousand prior to September fourteenth, nineteen hundred ninety-four;

(f) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic pistol or weapon defined in paragraph (a), (b) or (c) of this subdivision, possessed prior to the date of enactment of the chapter of the laws of two thousand thirteen which added this paragraph;

(g) provided, however, that such term does not include:

(i) any rifle, shotgun or pistol that (A) is manually operated by bolt, pump, lever or slide action; (B) has been rendered permanently inoperable; or (C) is an antique firearm as defined in 18 U.S.C. 921(a)(16);

(ii) a semiautomatic rifle that cannot accept a detachable magazine that holds more than five rounds of ammunition;

(iii) a semiautomatic shotgun that cannot hold more than five rounds of ammunition in a fixed or detachable magazine; or

(iv) a rifle, shotgun or pistol, or a replica or a duplicate thereof, specified in Appendix A to 18 U.S.C. 922 as such weapon was manufactured on October first, nineteen hundred ninety-three. The mere fact that a weapon is not listed in Appendix A shall not be construed to mean that such weapon is an assault weapon;

(v) any weapon validly registered pursuant to subdivision sixteen-a of section 400.00 of this chapter. Such weapons shall be subject to the provisions of paragraph (h) of this subdivision;

(vi) any firearm, rifle, or shotgun that was manufactured at least fifty years prior to the current date, but not including replicas thereof that is validly registered pursuant to subdivision sixteen-a of section 400.00 of this chapter;

Exhibit 86
00131

(h) Any weapon defined in paragraph (e) or (f) of this subdivision and any large capacity ammunition feeding device that was legally possessed by an individual prior to the enactment of the chapter of the laws of two thousand thirteen which added this paragraph, may only be sold to, exchanged with or disposed of to a purchaser authorized to possess such weapons or to an individual or entity outside of the state provided that any such transfer to an individual or entity outside of the state must be reported to the entity wherein the weapon is registered within seventy-two hours of such transfer. An individual who transfers any such weapon or large capacity ammunition device to an individual inside New York state or without complying with the provisions of this paragraph shall be guilty of a class A misdemeanor unless such large capacity ammunition feeding device, the possession of which is made illegal by the chapter of the laws of two thousand thirteen which added this paragraph, is transferred within one year of the effective date of the chapter of the laws of two thousand thirteen which added this paragraph.

23. "Large capacity ammunition feeding device" means a magazine, belt, drum, feed strip, or similar device, that (a) has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition, or (b) [Suspended and not effective, pursuant to L.2013, c. 57, pt. FF, § 4, eff. March 29, 2013, deemed eff. Jan. 15, 2013.] contains more than seven rounds of ammunition, or (c) [Suspended and not effective, pursuant to L.2013, c. 57, pt. FF, § 4, eff. March 29, 2013, deemed eff. Jan. 15, 2013.] is obtained after the effective date of the chapter of the laws of two thousand thirteen which amended this subdivision and has a capacity of, or that can be readily restored or converted to accept, more than seven rounds of ammunition; provided, however, that such term does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition or a feeding device that is a curio or relic. A feeding device that is a curio or relic is defined as a device that (i) was manufactured at least fifty years prior to the current date, (ii) is only capable of being used exclusively in a firearm, rifle, or shotgun that was manufactured at least fifty years prior to the current date, but not including replicas thereof, (iii) is possessed by an individual who is not prohibited by state or federal law from possessing a firearm and (iv) is registered with the division of state police pursuant to subdivision sixteen-a of section 400.00 of this chapter, except such feeding devices transferred into the state may be registered at any time, provided they are registered within thirty days of their transfer into the state. Notwithstanding paragraph (h) of subdivision twenty-two of this section, such feeding devices may be transferred provided that such transfer shall be subject to the provisions of section 400.03 of this chapter including the check required to be conducted pursuant to such section.

24. "Seller of ammunition" means any person, firm, partnership, corporation or company who engages in the business of purchasing, selling or keeping ammunition.

25. "Qualified retired New York or federal law enforcement officer" means an individual who is a retired police officer as police officer is defined in subdivision thirty-four of section 1.20 of the criminal procedure law, a retired peace officer as peace officer is defined in section 2.10 of the criminal procedure law or a retired federal law enforcement officer as federal law enforcement officer is defined in section 2.15 of the criminal procedure law, who: (a) separated from service in good standing from a public agency located in New York state in which such person served as either a police officer, peace officer or federal law enforcement officer; and (b) before such separation, was authorized by law to engage in or supervise the prevention, detection, investigation, or prosecution of, or the incarceration of any person for, any violation of law, and had statutory powers of arrest, pursuant to their official duties, under the criminal procedure law; and (c) (i) before such separation, served as either a police officer, peace officer or federal law enforcement officer for five years or more and at the time of separation, is such an officer; or (ii) separated from service with such agency, after completing any applicable probationary period of such service, due to a service-connected disability, as determined by such agency at or before the time of separation; and (d)(i) has not been found by a qualified medical professional employed by such agency to be unqualified for reasons relating to mental health; or (ii) has not entered into an agreement with such agency from which the individual is separating from service in which that individual acknowledges he or she is not qualified

Exhibit 86
00132

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 258 of 272

Case 3:17-cv-01017-BEN-JLB   Document 50-2   Filed 03/05/18   PageID.4547   Page 133 of 147
§ 265.00 Definitions, NY PENAL § 265.00

for reasons relating to mental health; and (e) is not otherwise prohibited by New York or federal law from possessing any firearm.

**Credits**

(L.1965, c. 1030. Amended L.1967, c. 791, § 46; L.1969, c. 123, § 1; L.1972, c. 588, § 1; L.1972, c. 605, § 1; L.1974, c. 179, § 1; L.1974, c. 462, § 1; L.1974, c. 986, §§ 1, 2; L.1974, c. 1041, § 1; L.1976, c. 217, § 1; L.1982, c. 492, § 1; L.1985, c. 61, § 1; L.1986, c. 328, § 2; L.1986, c. 646, § 1; L.1988, c. 264, § 1; L.1990, c. 264, § 1; L.1995, c. 219, § 2; L.1996, c. 354, § 2; L.1997, c. 446, § 2, eff. Aug. 25, 1997; L.1998, c. 378, § 1, eff. Nov. 1, 1998; L.1999, c. 210, § 1, eff. Nov. 1, 1999; L.1999, c. 635, §§ 11, 15, eff. Dec. 1, 1999; L.2000, c. 189, §§ 8 to 10, eff. Nov. 1, 2000; L.2003, c. 264, § 33, eff. Nov. 1, 2003; L.2007, c. 510, § 3, eff. Feb. 11, 2008; L.2008, c. 257, § 3, eff. Nov. 1, 2008; L.2010, c. 232, §§ 2, 3, eff. July 30, 2010; L.2013, c. 1, § 37, eff. Jan. 15, 2013; L.2013, c. 1, § 38; L.2013, c. 1, § 39, eff. March 16, 2013; L.2013, c. 98, § 1, eff. July 5, 2013.)

**Editors' Notes**

## VALIDITY

<For validity of this section, see New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, 990 F.Supp.2d 349, 351 (W.D.N.Y. Dec. 31, 2013) and N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242 (2d Cir. 2015), cert. denied sub nom. Shew v. Malloy, 136 S. Ct. 2486, 195 L. Ed. 2d 822 (2016)>

## PRACTICE COMMENTARIES

*by William C. Donnino*

### History

### Second Amendment

### Definitions

### Firearm and loaded firearm

### Antique firearm

### Assault weapon

### Automatic knife

### Billy

### Chuka stick

### Electronic dart gun

### Electronic stun gun

### Gravity knife

### Kung Fu star

Exhibit 86
00133

ER_3893

§ 265.00 Definitions, NY PENAL § 265.00

**Large capacity ammunition feeding device**

**Penal Law § 265.00(22)(h)**

**Penal Law § 265.02(8)**

**Penal Law § 265.10**

**Penal Law § 265.11**

**Penal Law § 265.36 and § 265.37**

**Machine-gun**

**Metal knuckles**

**Metal knuckle knife**

**Pilum ballistic knife**

**Rifle or shotgun**

**History**

In 1963, as a result of years of study and the recommendations of the Joint Legislative Committee on Firearms and Ammunition, the provisions of the former Penal Law dealing with weapons were revised. L.1963, c. 136; former Penal Law §§ 1896-1904. That revision placed in one section the definitions of most of the substantive crimes [*see* former Penal Law § 1897, "Possession of weapons and dangerous instruments and appliances"].

In 1967, the current Penal Law took effect and carried forward, almost verbatim, the weapon provisions of the former Penal Law, placing the major provisions primarily in Penal Law former § 265.05. In 1974, the then-existing Penal Law § 265.05 was restructured by dividing the various crimes defined in that one section into five sections, currently Penal Law § 265.01 through Penal Law § 265.05, in a degree structure which was generally in accord with the structure of other Penal Law statutes. L.1974, c. 1041.

There were a substantial number of amendments thereafter, most of which added new crimes, and that history is set forth in the comments to the applicable amendment.

**Second Amendment**

The Second Amendment to the Federal Constitution provides: "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

In *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), the Supreme Court held that the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." Thereafter, the Supreme Court applied the Second Amendment to the states. *McDonald v. City of Chicago*, 561 U.S. 742, 786, 130 S.Ct. 3020, 3047, 177 L.Ed.2d 894 (2010).

Exhibit 86
00134

§ 265.00 Definitions, NY PENAL § 265.00

In *Heller*'s view, "the inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose." *Heller*, 554 U.S. at 628.

Thus, the protected weapons are those which were in "common use" at the time of the amendment for lawful purposes, such as self-defense and defense of one's home. *Id.* at 624-27. That reference to weapons in "common use" at the time of the amendment was not intended to necessarily exclude from the amendment's protection weapons presently in common use for lawful purposes, given the Court's holding that the amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. *See Caetano v. Massachusetts*, 577 U.S. ___, 136 S.Ct. 1027, 194 L.Ed.2d 99 (2016).

The amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short barreled shotguns" [*Id.* at 625], machineguns [*Id.* at 624] and a M-16 rifle. *Id.* at 627. Nor does the amendment support "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626.

With respect to regulatory laws, the Court expressly declined to provide an "exhaustive" list of "lawful regulatory measures," but the Court did explain that the Second Amendment does not interdict "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Id.* 626-27 and n.26; *McDonald v. City of Chicago*, 561 U.S. at 786, *supra* (emphasizing the *Heller* limitations of the Second Amendment with respect the ability to carry any weapon in any manner for whatever purpose and with respect to regulatory measures).

Then, in *Caetano v. Massachusetts*, 577 U.S. ___, *supra,* the Court, in a per curiam opinion, rejected the three reasons that the Massachusetts court had given for upholding a state ban on the possession of stun guns and remanded the case for further consideration. The Supreme Court began by reiterating that *Heller* held that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Thus, the state court's first reason, that stun guns "were not in common use at the time of the Second Amendment's enactment" was inconsistent with that holding. Next, the state court had reasoned that stun guns meet the historical exception of prohibiting the carrying of dangerous and "unusual" weapons; but when the state equated "unusual" with the stun gun not in common use at the time of the amendment's enactment, the Supreme Court found that it did no more than reiterate its first erroneous reason. As for its third reason, that stun guns are not readily adaptable to use in the military, the Supreme Court stated that "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected.' "

New York has a statute which parallels the Second Amendment. Civil Rights Law § 4 states: "A well-regulated militia being necessary to the security of a free state, the right of the people to keep and bear arms cannot be infringed."

To date, that statute has not been interpreted to negate any of New York's statutory restrictions on the possession of firearms. *See Moore v. Gallup*, 267 A.D. 64, 45 N.Y.S.2d 63 (3d Dept. 1943), *affirmed without opinion* 293 N.Y. 846, 59 N.E.2d 439 (1944), *but remittitur amended* 294 N.Y. 699, 60 N.E.2d 847 (1945) to state that the Court had held that the New York statutes relating to a license to carry a concealed pistol were not repugnant to the provisions of the Fourteenth Amendment.

Since *Heller*, New York has continued to uphold its statutory scheme which prohibits the possession of a firearm without an appropriate license. In *People v. Hughes*, 22 N.Y.3d 44, 978 N.Y.S.2d 97, 1 N.E.3d 298 (2013), the Court of Appeals held that a conviction of "criminal possession of a weapon in the second degree"

Exhibit 86
00135

**ER_3895**

and "criminal possession of a weapon in the third degree," predicated on the defendant's having been previously convicted of a crime, did not violate the Second Amendment. *See also Schulz v. State of N. Y. Exec.*, 134 A.D.3d 52, 53, 19 N.Y.S.3d 92 (3d Dept. 2015), *appeal dismissed upon the ground that no substantial constitutional question is directly involved* 26 N.Y.3d 1139, 27 N.Y.S.3d 502, 47 N.E.3d 782 (2016); *People v. Perkins,* 62 A.D.3d 1160, 1161, 880 N.Y.S.2d 209 (3d Dept. 2009) ("Unlike the statute at issue in *Heller,* Penal Law article 265 does not effect a complete ban on handguns and is, therefore, not a 'severe restriction' improperly infringing upon defendant's Second Amendment rights. Moreover, in our view, New York's licensing requirement remains an acceptable means of regulating the possession of firearms ... and will not contravene *Heller* so long as it is not enforced in an arbitrary and capricious manner"); *People v. Ferguson,* 21 Misc.3d 1120(A), 873 N.Y.S.2d 513 (Criminal Court, Queens County, 2008) ("... *Heller,* is distinguishable from the case at bar for several reasons. Firstly, at the time of his arrest, defendant was not in his home, but was in an airport. Secondly, the requirement that handguns be licensed in the State of New York is not tantamount to a total ban and, therefore, is not a 'severe restriction' as was the case in *Heller.* Lastly, the Court identified certain presumptively lawful regulatory measures which would survive a constitutional challenge including the carrying of firearms in 'sensitive places.' Licensing is an acceptable regulatory measure and an airport falls within the scope of a 'sensitive place.' ").

In an extensive opinion, including a detailed recitation of the history of New York's regulation of firearms, the Second Circuit Court of Appeals held that the Second Amendment was not violated by New York's statutory requirement that a person who wants to "have and carry concealed [a hand gun], without regard to employment or place of possession" must show that "proper cause" exists for the issuance of a license to do so [Penal Law § 400.00(2)(f)]. *Kachalsky v. County of Westchester*, 701 F.3d 81 (2d Cir. 2012).

### Definitions

The definitions in Penal Law § 265.00 describe the various types of weapons which are regulated by this article, as well as certain terms utilized in the article regulating the licensing of firearms [Penal Law article 400]. Some of those definitions are discussed here; others are discussed in the sections dealing with the crimes in which they are used. The principal weapon regulated by this article is a firearm and thus it is discussed first, with the remaining terms thereafter in alphabetical order.

### Firearm and Loaded Firearm

By definition, a "firearm" is limited to: a pistol, revolver, the so-called "sawed-off" shotgun or rifle, and an "assault weapon" [Penal Law § 265.00(3)]. The vast array of other types of rifles and shotguns are not included within that definition and thus are not a subject of the statutes which utilize the term "firearm" to define a crime. A "rifle" and a "shotgun" are separately-defined terms [Penal Law § 265.00(11) & (12)] and there are statutes which define crimes which pertain separately and solely to them.

The statutory definition of "firearm" does not require that the firearm be loaded. A separate term and definition are provided for a "loaded firearm" [Penal Law § 265.00(15)]. In addition to the common understanding that a firearm is loaded when it contains ammunition, by the statutory definition, a firearm is loaded when there is simultaneous possession of the firearm and ammunition, irrespective of whether the ammunition is in the firearm.

The statutory definition of "firearm" also does not specify that the firearm need be operable. By contrast, the definition of "loaded firearm" does require ammunition "which may be used to discharge" the firearm [Penal Law § 265.00(15)], and the definition of a "machine gun," does require that the weapon, "loaded or unloaded," be one "from which a number of shots or bullets may be rapidly or automatically discharged from

Exhibit 86
00136

§ 265.00 Definitions, NY PENAL § 265.00

a magazine with one continuous pull of the trigger...." *Compare* Penal Law § 10.00(12), defining a "deadly weapon" to mean a "loaded weapon from which a shot, readily capable of producing death or other serious physical injury, may be discharged...."; *People v. Shaffer*, 66 N.Y.S.2d 663, 495 N.Y.S.2d 965, 486 N.E.2d 823 (1985) (the "People failed to establish that the gun ... was a 'deadly weapon' ... that is, both operable and loaded with live ammunition").

However, inherent to the common understanding of what constitutes a firearm and key to its danger is its operability. Hence, to establish that the weapon in issue is a "firearm" the courts have required proof of its operability, that is, that it is capable of discharging ammunition. *See People v. Longshore*, 86 N.Y.2d 851, 852, 633 N.Y.S.2d 475, 657 N.E.2d 496 (1995) ("Although the statute is silent on the point, it is now accepted that to establish criminal possession of a handgun the People must prove that the weapon is operable," and *Longshore* applied that same requirement of operability to a rifle or shotgun).

A firearm that is found in a disassembled condition but is operable when assembled is an operable firearm without any further proof that the defendant was personally capable of rendering the disassembled firearm operable. *People v. Lugo*, 161 A.D.2d 122, 554 N.Y.S.2d 849 (1st Dept. 1990). *See also People v. Cavines*, 70 N.Y.2d 882, 883, 524 N.Y.S.2d 178, 518 N.E.2d 1170 (1987) ("... the fact that the gun malfunctioned [during the commission of a crime], standing alone, does not defeat the overwhelming inference that immediately prior to the pulling of the trigger, the gun was capable of discharging the ammunition, particularly in view of the uncontradicted evidence that when subsequently test-fired, the gun and the bullets were found to be operable").

In addition to the firearm being operable, the ammunition of a loaded firearm must be "live," that is, capable of being discharged by the firearm. Penal Law § 265.00(15). *See People v. Johnson*, 56 A.D.3d 1191, 867 N.Y.S.2d 319 (4th Dept. 2008); *People v. Daniels*, 77 A.D.2d 745, 430 N.Y.S.2d 881 (3d Dept. 1980); *People v. Thomas*, 70 A.D.2d 570, 417 N.Y.S.2d 66 (1st Dept. 1979).

A "firearm" that is not operable may be the subject of a charge of attempted criminal possession of a weapon. *People v. Saunders*, 85 N.Y.2d 339, 624 N.Y.S.2d 568, 648 N.E.2d 1331 (1995).

Neither "pistol" nor "revolver" is defined by statute. They both, however, refer to a handgun. *See* Random House Webster's Unabridged Dictionary (1999) definition of "handgun" ("any firearm that can be held and fired with one hand; a revolver or a pistol"); definition of "pistol" ("a short firearm intended to be held and fired with one hand") and definition of "revolver" ("a handgun having a revolving chambered cylinder for holding a number of cartridges, which may be discharged in succession without reloading").

"Sawed-off" shotgun or rifle was first defined solely as a firearm of a "size which may be concealed upon the person." That inherently imprecise definition proved inadequate. *See People v. Cortez*, 110 Misc.2d 652, 442 N.Y.S.2d 873 (Supreme Court, N.Y. County, 1981). The definition was amended in 1982 [c. 492] and that definition appeared to require that the shotgun or rifle have a barrel "and" an overall length of the specified measurement in order to be classified as a sawed-off shotgun or rifle, and that a weapon made from a shotgun or rifle would be so classified only if its overall length was less than that specified in the definition. *People v. Santiago*, 133 Misc.2d 161, 506 N.Y.S.2d 136 (Supreme Court, N.Y. County, 1986) was of the view that the Legislature intended that a shotgun or rifle, or a weapon made from either of them, should be classified as a "sawed-off" weapon depending upon the length of the barrel "or" overall length, and recommended clarifying legislation. *See also People v. Crivillaro*, 142 Misc.2d 527, 538 N.Y.S.2d 152 (Supreme Court, Bronx County, 1989). In 1988, the Legislature amended the definition to specify that a shotgun or rifle may be deemed a sawed-off weapon if the barrel length alone is less than the specified number of inches (18 for a shotgun, 16 for a rifle), and that any weapon made from a shotgun or rifle may be deemed a sawed-off weapon if the overall length is less than 26 inches [Penal Law § 265.00(3)(b), (c), and (d)]. L.1988, c. 264.

Exhibit 86
00137

**ER_3897**

§ 265.00 Definitions, NY PENAL § 265.00

An "assault weapon," which is separately defined in Penal Law § 265.00(22), was added to the definition of "firearm" in 2000 [c. 189]. By amending the definition of "firearm" to include an "assault weapon," the "assault weapon" became the subject of such crimes as: "criminal possession of a weapon in the fourth degree [Penal Law § 265.01(1), (3)], third degree [Penal Law § 265.02(1), (3), (5)], and second degree [Penal Law § 265.03]; "criminal sale of a firearm" in the second degree [Penal Law § 265.12] and first degree [Penal Law § 265.13]; "criminal sale of a firearm" with the aid of a minor [Penal Law § 265.14] and to a minor [Penal Law § 265.16]; and a couple of crimes defined in Penal Law § 265.10(3) and (6).

In addition to including an "assault weapon" in the definitions of crimes that use the term "firearm," the legislation added some crimes which specifically name an "assault weapon." The first of the amended crimes was "criminal possession of a weapon in the third degree," a felony. It was amended to include a subdivision to prohibit the possession of an assault weapon [Penal Law § 265.02(7)], irrespective of whether it is loaded and irrespective of where the possession takes place. The second of the amended crimes was "manufacture, transport, disposition and defacement of weapons ..." [Penal Law § 265.10]. It was amended to forbid anyone to manufacture, transport, or dispose of any "assault weapon" [Penal Law § 265.10(1), (2) and (3) (first sentence)].

An "antique firearm," which is separately defined in Penal Law § 265.00(14), is expressly excluded from the definition of "firearm."

### Antique Firearm

As noted in the discussion of the definition of "firearm," an "antique firearm" is expressly excluded from the definition of "firearm" [Penal Law § 265.00(3)]. *See also* Penal Law § 265.00(22)(g)(i) exempting "antique firearm," as defined by Federal law, from the definition of "assault rifle." As a result of the exclusion of "antique firearm," as defined by the instant statute, from the definition of "firearm," any proscription related to an "antique firearm" requires a specific reference to that term. *See, e.g.* Penal Law § 265.01(4), making it a crime to possess an "antique firearm."

The term "antique firearm" is separately defined by New York law to mean any "unloaded muzzle loading pistol or revolver with a matchlock, flintlock, percussion cap, or similar type of ignition system, or a pistol or revolver which uses fixed cartridges which are no longer available in the ordinary channels of commercial trade" [Penal Law § 265.00(14)]. It is critical to note that the definition requires that the defined weapon be "unloaded" in order for it to qualify as an "antique firearm"; a weapon which met the structural definition of an "antique firearm" but was loaded would constitute a "firearm" and be subject to the laws applicable thereto. *See People v. Wedgewood*, 106 A.D.2d 674, 483 N.Y.S.2d 440 (2d Dept. 1984)*; People v. Mott*, 112 Misc.2d 833; 447 N.Y.S.2d 632 (Supreme Court, N.Y. County, 1982).

In adding the definition of "antique firearm" in 1974 [c. 986] and excluding it from the definition of "firearm," the Legislature intended that "hobbyists would be permitted to collect ... trade, buy and sell these antique firearms without being subject to the requirements of licensing." *People v. Mott,* 112 Misc.2d at 835, *supra*, quoting the Legislative Memorandum. In 2011, however, the Legislature changed its mind by amending the crime of "criminal possession of a firearm in the fourth degree" [Penal Law § 265.01(4)] to include as a crime, the possession of an "antique firearm." [L.2011 c. 357]. The Legislative Memorandum to the companion bill (Assembly 8456) stated that "[m]odern muzzle loading rifles are essentially a modern single shot rifle. They look and operate very much like a sporting rifle and allow accurate shots at distances up to 200 yards ... [and] can be reloaded in seconds...." There is authority to issue a license to have, possess, collect and carry "antique pistols," as that term is separately defined in Penal Law § 400.00(2)(g).

Exhibit 86
00138

Case: 23-55805, 11/21/2023, ID: 12827648, DktEntry: 15-17, Page 264 of 272

Case 3:17-cv-01017-BEN-JLB    Document 50-2    Filed 03/05/18    PageID.4553    Page 139 of 147
§ 265.00 Definitions, NY PENAL § 265.00

**Assault Weapon**

An "assault weapon" was added to the definition of "firearm" in 2000 [Penal Law § 265.00(3)] and at the same time, was separately defined [Penal Law § 265.00(22)]. L.2000, c. 189. In 2013, the NY SAFE Act amended and significantly revised the definition.

A principal difference between the former and present definition is that the former definition required the requisite firearm to have two military style features or characteristics, while the current definition requires only one. Thus, as the Governor explained: "Under the stricter definitions, semi-automatic pistols [see subdivision 22(c) and (f)] and rifles [see subdivision 22(a) and (f)] with detachable magazines and one military style feature will be considered assault weapons. Semi-automatic shotguns [see subdivision 22(b) and (f)] with one military style feature will also be considered assault weapons." Governor's Press Release, "Governor Cuomo Signs NY Safe Act in Rochester," January 16, 2013. Also included as an assault weapon is a "revolving cylinder shotgun" [subdivision 22(d)].

The definition contains eight paragraphs (a) to (h), several of which define different types of weapon which can be classified as an assault weapon; they are:

    (a) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least one of the listed characteristics;

    (b) a semiautomatic shotgun that has at least one of the listed characteristics;

    (c) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least one of the listed characteristics;

    (d) a revolving cylinder shotgun;

    (e) semiautomatic rifle, shotgun or pistol defined in the former Penal Law § 265.00(22)(e)(v) of the L.2000, c. 189 which had been lawfully possessed, pursuant to laws of 2000, c. 189, prior to September fourteenth, nineteen hundred ninety-four.

The term "semiautomatic" is separately defined in subdivision 21 of the instant section which in lay terms includes any repeating rifle, shotgun or pistol which, although requiring a separate pull of the trigger to fire each round, has the capacity of being fired to extract the spent shell and automatically load a cartridge.

There is a grandfathering provision, paragraphs (f) and (g), exempting certain weapons from the definition.

Assault weapons defined in subdivision (22)(e) or (f), possessed before January 16, 2013, had to be registered by April 15, 2014 [Penal Law § 400.00(16-a)]; except a weapon defined in subdivision (22)(g)(vi) "transferred into the state may be registered at any time, provided such weapons are registered within thirty days of their transfer into the state." Once having registered, the registrant must "recertify" every five years thereafter or suffer revocation of the registration [Penal Law § 400.00(16-a)].

Owners of a grandfathered assault weapon or large capacity ammunition feeding device may only transfer same to a purchaser authorized to possess same or to an individual or entity outside of the state [subdivision 22(h)]. Governor's Press Release, supra. An individual who transfers a grandfathered weapon or large capacity ammunition device to an individual inside New York State or without complying with the other provisions of

Exhibit 86
00139

**ER_3899**

the statute [subdivision 22(h)], shall, except for a large capacity ammunition device transferred within one year of the effective date of the NY SAFE Act, be guilty of a class A misdemeanor [subdivision 22(h)].

### Automatic knife

In 2007, legislation was passed to support and promote the establishment of a "cutlery and knife museum" in the Hudson Valley. L.2007, c. 510. As a result, the museum and its employees would need an exemption from the crime of possession of certain knives. Thus, the term "automatic knife" was created and defined to include a "stiletto, a switchblade knife, a gravity knife, a cane sword, a pilum ballistic knife, and a metal knuckle knife" [Penal Law § 265.00(5-c)], and an exemption from criminal liability was provided for the possession or ownership of automatic knives by a cutlery and knife museum, established pursuant to Education Law § 216-c, or by any employee of the museum when acting in furtherance of the business of the museum [Penal Law § 265.20(d)].

### Billy

There is no statutory definition of "billy." However, in *People v. Ocasio*, 28 N.Y.3d 178, 43 N.Y.S.3d 228, 65 N.E.3d 1263 (2016), the Court described a "billy" as "a cylindrical or rounded, rigid, club or baton with a handle grip which, from its appearance and inherent characteristics, is designed to be used as a striking weapon and not for other lawful purposes." The Court further explained that it matters not whether the "billy" is comprised of wood, metal, or other synthetic material, or that the billy is collapsible or extendible.

### Chuka stick

The "chuka stick" definition [Penal Law § 265.00(14)] was added by L.1974, c. 179. In urging the Governor to approve the legislation, the sponsor of the bill wrote: "The chuka stick is an instrument that may be purchased or easily assembled from two pieces of wood and a piece of thong, cord or chain. With a minimum amount of practice, this instrument may be effectively used as a garrote, bludgeon, thrusting or striking device. The chuka stick is designed primarily as a weapon and has no purpose other than to maim or, in some instances, kill." Letter of Assemblyman Richard C. Ross to the Counsel to the Governor, Governor's Bill Jacket for the L.1974, c. 179.

### Electronic dart gun

The "electronic dart gun" definition [Penal Law § 265.00(15-a)] was added in 1976. L.1976, c. 217. In urging the Governor to approve the legislation, the sponsor of the bill wrote: "There are a number of these devices being manufactured, the most popular of which is called a 'Taser Public Defender.' It is designed to look like a flashlight which can shoot two barbed darts a distance of 15 to 18 feet and deliver a 50,000 volt jolt of electricity effective through an inch of clothing. While the effect of the charge is to stun, knock out or paralyze a person and is temporary, it causes great pain and may well be lethal to a person in poor health." Letter of Senator John D. Caemmerer to the Counsel to the Governor, Governor's Bill Jacket for the L.1976, c. 217.

### Electronic stun gun

In 1990, the Legislature added the definition of an "electronic stun gun" [Penal Law § 265.00(15-c)]. L.1990, c. 264. That definition is like the definition of an "electronic dart gun." Penal Law § 265.00(15-a). A principal difference is that the "electronic dart gun" requires that the electrical shock be passed by means of a dart

Exhibit 86
00140

or projectile. The Governor, who recommended the legislation, indicated that the "availability and use" of a weapon "which passes a high voltage electrical shock to a person by means of direct contact or without resort to a projectile" poses the same threat as an electronic dart gun. 1990 Governor's Approval Memorandum 31. Accordingly, for both weapons, possession per se is a crime. Penal Law §§ 265.01(1); 265.02(1).

There is a difference of judicial opinion on whether, in a prosecution for possession of an "electronic stun gun," the People are required to prove that the defendant knew it was an "electronic stun gun." *Compare People v. Small*, 157 Misc.2d 673, 598 N.Y.S.2d 431 (Supreme Court, New York County, 1993)(knowledge required) *with People v. Voltaire*, 18 Misc.3d 408, 413 n.1, 852 N.Y.S.2d 649 (Criminal Court, Kings County, 2007) (disagreeing with *Small* in a case in which the court decided that the defendant need not know that the knife possessed was a gravity knife) *and People v. Parrilla*, 27 N.Y.3d 400, 33 N.Y.S.3d 842, 53 N.E.3d 719 (2016) (in a prosecution for possession of a "gravity knife," the People must prove that the defendant possessed a "knife," but not that he or she knew that it met the definition of a "gravity knife").

### Gravity knife

The definition of "gravity knife" [Penal Law § 265.00(5)] requires that the knife's blade lock in place automatically; thus, a "butterfly knife," which requires manual locking is not a gravity knife. *People v. Zuniga*, 303 A.D.2d 773, 759 N.Y.S.2d 86 (2d Dept. 2003). A local accusatory instrument which charges a defendant with possession of a gravity knife is jurisdictionally defective when it includes only a "conclusory statement that an object recovered from a defendant is a gravity knife," without any explanation of how the object meets the statutory definition. *People v. Dreyden*, 15 N.Y.3d 100, 104, 905 N.Y.S.2d 542, 931 N.E.2d 526, 528 (2010).

In a prosecution for possession of a "gravity knife," the People must prove that the defendant possessed a "knife," but not that he or she knew that it met the definition of a "gravity knife." *People v. Parrilla*, 27 N.Y.3d 400, 33 N.Y.S.3d 842, 53 N.E.3d 719 (2016). The Appellate Divisions have held that the People are required to prove that the "gravity knife" is operable [*People v. Smith*, 309 A.D.2d 608, 765 N.Y.S.2d 777 (1st Dept. 2003); *People v. Perez*, 123 A.D.2d 721, 506 N.Y.S.2d 961 (2d Dept. 1986)].

### Kung Fu star

In 1982, the possession of a "Kung Fu star" [Penal Law § 265.00(15-b)] with intent to use it unlawfully against another was made a crime. L.1982, c. 840. In 1985, the manufacturing and transporting of a Kung Fu star was made a crime [Penal Law § 265.10]. L.1985, c. 61. In 1988, in recognition that Kung Fu stars may not be manufactured and, in the words of the Legislative Memorandum, that they "serve no legitimate purpose other than as a weapon," the statute was again amended to make the per se possession of a Kung Fu star a crime [Penal Law § 265.01(2)]. L.1988, c. 220.

### Large capacity ammunition feeding device

The concept of a "large capacity ammunition feeding device" [Penal Law § 265.00(23)] (hereinafter "large feeding device") was introduced in 2000 [c. 189] and significantly amended in 2013 by the NY SAFE Act. [L.2013, c. 1, as amended by L.2013, c. 57]. Prior to the amendment, the definition excluded a large feeding device manufactured after September 30, 1994. That limitation was repealed; thus, those large feeding devices are included in the revised definition of a "large feeding device." According to the Legislative Memorandum, the reason for doing so was "because it was impossible to tell the difference between magazines manufactured before or after [September 30, 1994]."

Exhibit 86
00141

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Under the revised definition, a large feeding device is one that "(a) has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition; provided, however, that such term does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition or a large feeding device that is a curio or relic."

The two alternate definitions initially enacted as subdivisions (b) and (c) were in a convoluted way repealed. The import of those alternate subdivisions was to have the definition of a device ultimately limited to one that had a capacity of seven rounds. But, after enactment, it was noted that the smallest manufactured device normally had a capacity of ten rounds. Kaplan and Hakim, "New York Governor Favors Easing Newly Passed Gun Law," New York Times, March 20, 2013 (http://www.nytimes.com/2013/03/21/nyregion/cuomo-seeks-to-ease-a-newly-passed-gun-restriction.html). Thus, before subdivisions (b) and (c) took effect, the NY SAFE Act was itself amended to declare that "the effective date of the amendments adding paragraphs (b) and (c) to such subdivision shall be suspended and not effective." L.2013, c. 57 § 4. There is no provision lifting the "suspension" and making the amendments effective on a future date. As a result, that unique Penal Law language of "suspended and not effective" would appear to have the practical effect of repealing each of those subdivisions and was probably utilized for whatever perceived advantage there was in being able to say the provisions were suspended, rather than repealed. The repeal of subdivision (c) did not, however, appear to affect the "provided, however" language recited above which existed in the law prior to the addition of subdivision (c) and had chronologically followed the repealed language of subdivision (c).

The crimes for which the definition of a large feeding device is utilized include Penal Law § 265.00(22)(h), § 265.10, § 265.11, § 265.02(8), § 265.36, and § 265.37. The import of those statutes is as follows:

### Penal Law § 265.00(22)(h)

A large feeding device that was legally possessed prior to the enactment date of the NY SAFE Act, January 15, 2013, may be transferred to a person authorized to possess same or to an individual or entity outside of New York, provided that such a transfer must be reported, within 72 hours, to the entity with whom the weapon is registered. A person who transfers a device to an individual inside New York state or without otherwise complying with the law's transfer requirements is guilty of a class A misdemeanor, unless the device, the possession of which is made illegal by the NY SAFE Act, was transferred before January 15, 2014 [Penal Law § 265.00(22)(h)].

### Penal Law § 265.02(8)

Prior to, and after, the NY SAFE Act, a provision of the statute defining "criminal possession of a weapon in the third degree," makes it a class D felony when a "person possesses a large capacity ammunition feeding device" [Penal Law § 265.02(8)]. The NY SAFE ACT, however, amended that subdivision to specify that "[f]or purposes of this subdivision," a large feeding device shall "not" include either of the following two feeding devices:

[i] a feeding device lawfully possessed by such person before January 15, 2013 (the effective date of chapter one of the laws of 2013 "which amended this subdivision"), "that has a capacity of, or that can be readily restored or converted to accept more than seven but less than eleven rounds of ammunition." Parenthetically, this exclusion from liability for this felony became covered by the generic definition of a large feeding device when that definition was amended to specify that a large feeding device is one that "has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition." [L.2013, c. 57 § 4; Penal Law § 265.00(23)].

Exhibit 86
00142

[ii] a feeding device "that was manufactured before September [13, 1994], that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition." The exclusion from liability for this felony is in recognition that prior to the NY SAFE Act, it was lawful to possess a feeding device manufactured before September 13, 1994. Notably, however, this exclusion from liability for this felony does not also require that the possessor lawfully possessed the feeding device prior to the effective date of the NY SAFE Act.

### Penal Law § 265.10

As part of the 2000 laws [c. 189], Penal Law § 265.10 ("manufacture, transport, disposition and defacement of weapons and dangerous instruments and appliances") was amended (1) to forbid the to manufacture, transport, or disposal of a "large capacity ammunition feeding device" [Penal Law § 265.10(1), (2) and (3) (first sentence)]; (2) to add a prohibition for the buying, receiving or disposing of a "large capacity ammunition feeding device" which has been defaced for a criminal purpose, which parallels the existing prohibition as it relates to a firearm [Penal Law § 265.10(3) (second sentence)]; and (3) to add a prohibition for "wilfully" defacing a "large capacity ammunition feeding device," which parallels the existing prohibition for wilfully defacing a firearm [Penal Law § 265.10(6)].

### Penal Law § 265.11

Also, as part of the 2000 laws [c. 189], Penal Law § 265.11 ("criminal sale of a firearm in the third degree") was amended to prohibit a person who is "not authorized" to possess a "firearm" from "unlawfully" selling or otherwise disposing of any firearm or "large capacity ammunition feeding device." By contrast, one of the amendments to the crime of "manufacture, transport, disposition and defacement of weapons and dangerous instruments and appliances" made it a crime to "dispose of" [defined in Penal Law § 265.00(6)] a "large capacity ammunition feeding device" [Penal Law § 265.10(3) (sentence one)], without also requiring that the actor not be authorized to possess a firearm. Thus, unless exempted by Penal Law § 265.20, a person who "disposes of" such device (and does so, for example, by a sale of the device) commits a crime, irrespective of whether that person is authorized or not authorized to possess a "firearm."

### Penal Law § 265.36 and § 265.37

The NY SAFE Act added two non-felony offenses, apparently intending to include liability for a feeding device subject to the exceptions to the felony, though arguably not completely fulfilling that intent.

The first added offense was "unlawful possession of a large capacity ammunition feeding device" [Penal Law § 265.36], a class A misdemeanor. The statute makes it "unlawful for a person to knowingly possess a large capacity ammunition feeding device manufactured before September [13, 1994] and if such person lawfully possessed such large capacity feeding device before [January 15, 2013], that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition." Penal Law § 265.36.

A safeguard for those who once lawfully possessed such feeding device is a provision excluding from liability for this crime a person "who has a reasonable belief that such device ... may lawfully be possessed," and who, within 30 days of being notified by law enforcement or a licensing official that possession is unlawful, "surrenders or lawfully disposes of" the feeding device. Once so notified, there exists a reasonable, rebuttable presumption that the possessor knows that the feeding device cannot be lawfully possessed.

The second added offense was "unlawful possession of certain ammunition feeding devices" [Penal Law § 265.37]. This statute makes it "unlawful for a person to knowingly possess an ammunition feeding device where

Exhibit 86
00143

such device contains more than seven rounds of ammunition." L.2013, c. 57. *But see New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 248 (2d Cir. 2015) ("New York's seven-round load limit does not survive intermediate scrutiny in the absence of requisite record evidence and a substantial relationship between the statutory provision and important state safety interests"; accordingly, that provision is unconstitutional). However, there is an exemption from liability for Penal Law sections 265.01, 265.02, 265.03, 265.04, 265.05, 265.10, 265.11, 265.12, 265.13, 265.15 and 270.05 for the "possession and use" at certain specified "indoor or outdoor" firing ranges of a "magazine, belt, feed strip or similar device" that contains more than seven rounds of ammunition, albeit in a feeding device that does not have the capacity of more than ten rounds of ammunition [Penal Law § 265.20(7-f)].

Instead of placing the sentencing provisions applicable to this offense in the Penal Law articles dealing with sentences, the NY SAFE Act, unfortunately, as too many other statutes have done, further complicated the sentencing laws by setting forth the governing sentences for this offense in the statute defining the crime. If the large feeding device is "possessed within the home of the possessor," a first offense is a violation, "subject to" a fine of $250; "each subsequent offense" is a class B misdemeanor, "subject to" a fine of $250 and a term of imprisonment "up to three months." If the large feeding device is not possessed within the home of the possessor, a first offense is a class B misdemeanor, "subject to" a fine of $250 and a term of imprisonment "up to six months"; "each subsequent offense" is a class A misdemeanor. For the class A misdemeanor, no sentence is specified, and thus the normal sentence options will apply. For the specified sentences, it appears that the amount of the fine is the stated amount, there being no language indicating that the fine is "up to" the stated amount; on the other hand, the jail sentences utilize the "up to" language, making them discretionary within that range, which may therefore be from one day up to the stated period. What is mysterious about this type of specified sentences, which are placed outside the sentencing statutes, is whether they exclude any other option in the sentencing statutes which would normally be included in the stated classification.

### Machine-gun

A "machine-gun" is not included in the definition of a "firearm." Unlike the definition of a firearm, rifle or shotgun, the requirement of operability of a machine-gun appears subsumed in its definition, which requires that it be a weapon, "loaded or unloaded, from which a number of shots or bullets may be rapidly or automatically discharged from a magazine with one continuous pull of the trigger...." [Penal Law § 265.00(1)]. *See People v. Woods*, 202 Misc. 562, 564, 114 N.Y.S.2d 611, 613 (N.Y. Magis. Ct. 1952) (purported machine gun was missing two parts and was thus not capable of firing more than one shot at a time and was therefore not a "machine gun").

To an extent, the definition is expanded in the definition of the crime of "criminal possession of a weapon in the third degree" which prohibits the possession of a machine-gun or any other weapon "simulating a machine-gun and which is adaptable for such use." Penal Law § 265.02(2). *See People v. Excell*, 254 A.D.2d 369, 680 N.Y.S.2d 259 (2d Dept. 1998) (the court rejected the claim that because a "Uzi cannot be easily converted into a machine gun," it was thus not adaptable for such use because there was no such statutory qualification).

### Metal knuckles

There is no statutory definition of "metal knuckles." However, in *People v. Aragon*, 28 N.Y.3d 125, 42 N.Y.S.3d 646, 65 N.E.3d 675 (2016), the Court described "metal knuckles" as a "metal object with multiple holes, through which an individual places his or her fingers so that a metal bar rests atop the individual's knuckles. That object is used as a weapon to cause increased pain when the person wearing it hits someone with a fist."

Exhibit 86
00144

### Metal knuckle knife

In 1995, the Legislature added to the list of defined weapons the "metal knuckle knife" [Penal Law § 265.00(5-b)], and then added that weapon to the list of items which constitute a deadly weapon [Penal Law § 10.00(12)], to the list of items the possession or manufacture of which is per se a crime [Penal Law §§ 265.01(1), 265.10(1)], and to the list of items whose presence in an automobile or in a stolen vehicle may give rise to a presumption of possession of that weapon by everyone in the automobile or stolen vehicle [Penal Law § 265.15]. L.1995, c. 219. A "metal knuckle knife" can function as both a set of metal knuckles (possession of which is also a per se crime) and a knife. In the words of the Legislative Memorandum, the "possession and manufacture of weapons such as the metal knuckle knife serve only one purpose, ... to maim or take human life. Police searches of shops in the City of New York have discovered this particular weapon. ... In order to protect society, these weapons must be included within the definition of 'deadly weapons' found in the Penal Law."

In 2008, the definition of "deadly weapon" in Penal Law § 10.00(12) and the instant definition of "metal knuckle knife" were each amended to include "plastic knuckles" because the Legislature determined that "plastic knuckles have just as much impact as the brass knuckles and are just as deadly." Legislative Memorandum. L.2008, c. 257. Also, a number of statutes which prohibit the possession, manufacture and transportation of various deadly weapons were amended to include a prohibition on the possession of "plastic knuckles" [Penal Law §§ 265.01(1); 265.10(1) and (2)].

### Pilum ballistic knife

The "pilum ballistic knife" definition [Penal Law § 265.00(5-a)] was added in 1986. L.1986, c. 328. One advertisement for the knife described it as approximately nine-and-one-half inches long, with a four-and-a-half inch blade. When a button inside the knife handle is pushed, a powerful spring inside the handle can eject the blade, propelling it to a distance of up to 30 feet with considerable force.

### Rifle or shotgun

A sawed-off rifle or shotgun, that is, one with a barrel or overall length less than that prescribed in the statute defining a "firearm" [Penal Law § 265.00(3)], and a rifle or shotgun which qualifies as an "assault weapon" are, for the purposes of this article, a "firearm" and therefore subject to the prohibitions related thereto.

Otherwise, a rifle and a shotgun, as those terms are defined [Penal Law § 265.00(11) and (12)], are not included in the definition of "firearm," and any prohibition related to either requires the specific use of the term "rifle" or "shotgun." *See, e.g.* Penal Law § 265.01(4). In addition to meeting the terms of the definition, a rifle or shotgun must also be operable, that is, capable of discharging ammunition. *People v. Longshore*, 86 N.Y.2d 851, 633 N.Y.S.2d 475, 657 N.E.2d 496 (1995).

Notes of Decisions (132)

McKinney's Penal Law § 265.00, NY PENAL § 265.00
Current through L.2018, chapter 1.

---

End of Document         © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 86
00145

**ER_3905**

§ 265.36 Unlawful possession of a large capacity ammunition..., NY PENAL § 265.36

KeyCite Red Flag - Severe Negative Treatment

Unconstitutional or PreemptedHeld Unconstitutional by New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, W.D.N.Y., Dec. 31, 2013

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

McKinney's Consolidated Laws of New York Annotated
  Penal Law (Refs & Annos)
    Chapter 40. Of the Consolidated Laws (Refs & Annos)
      Part Three. Specific Offenses
        Title P. Offenses Against Public Safety
          Article 265. Firearms and Other Dangerous Weapons (Refs & Annos)

McKinney's Penal Law § 265.36

§ 265.36 Unlawful possession of a large capacity ammunition feeding device

Effective: March 16, 2013
Currentness

It shall be unlawful for a person to knowingly possess a large capacity ammunition feeding device manufactured before September thirteenth, nineteen hundred ninety-four, and if such person lawfully possessed such large capacity feeding device before the effective date of the chapter of the laws of two thousand thirteen which added this section, that has a capacity of, or that can be readily restored or converted to accept, more than ten rounds of ammunition.

An individual who has a reasonable belief that such device is of such a character that it may lawfully be possessed and who surrenders or lawfully disposes of such device within thirty days of being notified by law enforcement or county licensing officials that such possession is unlawful shall not be guilty of this offense. It shall be a rebuttable presumption that such person knows that such large capacity ammunition feeding device may not be lawfully possessed if he or she has been contacted by law enforcement or county licensing officials and informed that such device may not be lawfully possessed.

Unlawful possession of a large capacity ammunition feeding device is a class A misdemeanor.

**Credits**
(Added L.2013, c. 1, § 46-a, eff. March 16, 2013.)

**Editors' Notes**

VALIDITY

<For validity of this section, see New York State Rifle and Pistol Ass'n, Inc. v. Cuomo, 990 F.Supp.2d 349, 351 (W.D.N.Y. Dec. 31, 2013) and N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo, 804 F.3d 242 (2d Cir. 2015), cert. denied sub nom. Shew v. Malloy, 136 S. Ct. 2486, 195 L. Ed. 2d 822 (2016)>

PRACTICE COMMENTARIES

by William C. Donnino

Exhibit 86
00146

§ 265.36 Unlawful possession of a large capacity ammunition..., NY PENAL § 265.36

*See* Practice Commentary to Penal Law § 265.00 with respect to the definition of "large capacity ammunition feeding device."

Notes of Decisions (2)

McKinney's Penal Law § 265.36, NY PENAL § 265.36
Current through L.2018, chapter 1.

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 86
00147

ER_3907