No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

VIRGINIA DUNCAN, *et al.*,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California
*Defendant-Appellant.*

_____

On Appeal from the United States District Court,
Southern District of California
No. 17-CV-1017

_____

## BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, AND MARCH FOR OUR LIVES IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL

_____

*Of Counsel:*

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

November 28, 2023

(*Additional Counsel Listed on Inside Cover*)

Timothy C. Hester
    *Counsel of Record*
Daniel Weltz
Priya Leeds
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com
dweltz@cov.com
pleeds@cov.com

*Counsel for Amici Curiae*

i

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

TABLE OF CONTENTS

IDENTITY AND INTEREST OF *AMICI CURIAE* ................................................. 1

INTRODUCTION ............................................................................................. 1

I.   THE CHALLENGED LAW DOES NOT IMPLICATE THE
     SECOND AMENDMENT BECAUSE IT IMPOSES NO BURDEN
     ON THE RIGHT TO SELF-DEFENSE. ................................................... 2

     A.   The Second Amendment Right Articulated in *Bruen* and *Heller*
          Is Based on Lawful "Self-Defense." ................................................... 2

     B.   The Challenged Law Does Not Burden the Right to Lawful
          Self-Defense. ......................................................................................... 4

II.  THE CHALLENGED LAW IS CONSISTENT WITH THE
     HISTORICAL TRADITION OF FIREARM REGULATION. ...................... 8

     A.   *Bruen* Requires a "More Nuanced Approach" to Historical
          Analysis in Light of "Dramatic Technological Change" or
          "Unprecedented Societal Concerns." ................................................... 9

     B.   Modern Firearms Capable of Firing Repeatedly Without
          Reloading Reflect "Dramatic Technological Change" Requiring
          a "More Nuanced Approach" Under *Bruen*. ..................................... 10

          1.   Firearms capable of firing repeatedly without reloading
               were not widespread among civilians until at least the
               late 19th century. ........................................................................ 10

          2.   Modern firearms capable of firing repeatedly without
               reloading reflect "dramatic technological change"
               resulting in "unprecedented societal concerns." ...................... 20

     C.   The Challenged Law Is "Relevantly Similar" to Early 20th
          Century Laws Restricting Weapons Capable of Firing
          Repeatedly Without Reloading. ......................................................... 23

     D.   The Challenged Law Is Relevantly Similar To 18th and 19th
          Century Historical Laws and Thus Is Constitutional. ...................... 26

CONCLUSION ................................................................................. 28

TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Andrews v. State*,
 50 Tenn. 165 (1871)................................................................26

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New
 Jersey*,
 910 F.3d 106 (3d Cir. 2018) ....................................................4

*Bevis v. City of Naperville*,
 No. 22-4775, 2023 WL 2077392 (N.D. Ill. Feb. 17, 2023).........25, 28

*Bevis v. City of Naperville*,
 No. 23-1353, 2023 WL 7273709 (7th Cir. Nov. 3, 2023).........4, 7, 28

*Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety &
 Homeland Sec.*,
 No. 22-cv-951, 2023 WL 2655150 (D. Del. Mar. 27, 2023)......*passim*

*District of Columbia v. Heller*,
 554 U.S. 570 (2008)...........................................................*passim*

*Duncan v. Bonta*,
 19 F.4th 1087 (9th Cir. 2021), .............................................*passim*

*Duncan v. Bonta*,
 83 F.4th 803 (9th Cir. 2023) ...............................................6, 10

*Duncan v. Bonta*,
 No. 17-cv-1017, 2023 WL 6180472 (S.D. Cal., Sept. 22, 2023) ........7

*English v. State*,
 35 Tex. 473 (1871).................................................................26

*Hanson v. District of Columbia*,
 No. 22-cv-2256, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ....*passim*

*Heller v. District of Columbia* (*Heller II*),
 670 F.3d 1244 (D.C. Cir. 2011)...............................................24

*Herrera v. Raoul*,
   No. 23 CV 532, 2023 WL 3074799 (N.D. Ill. Apr. 25, 2023) ..........................22

*Hill v. State*,
   53 Ga. 472 (1874) .................................................................................26

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ...................................................................5

*Nat'l Ass'n for Gun Rights v. Lamont*,
   No. 3:22-1118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023) ...................*passim*

*New York State Rifle & Pistol Association v. Bruen*,
   142 S. Ct. 2111 (2022)....................................................................*passim*

*Ocean State Tactical, LLC v. State of Rhode Island*,
   No. 22-cv-246, 2022 WL 17721175 (D.R.I. Dec. 14, 2022).....................4, 8, 22

*Oregon Firearms Fed'n v. Kotek*,
   No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023).................*passim*

*Rocky Mountain Gun Owners v. Polis*,
   467 P.3d 314 (Colo. 2020)...................................................................5, 6

*State v. Jumel*,
   13 La. Ann. 399 (1858).........................................................................26

*State v. Langford*,
   10 N.C. 381 (1824) ..............................................................................26

*State v. Misch*,
   214 Vt. 309 (2021)..............................................................................5, 6

*State v. Mitchell*,
   3 Blackf. 229 (Ind. 1833).......................................................................26

*State v. Reid*,
   1 Ala. 612 (1840) .................................................................................26

*United States v. Alaniz*,
   69 F.4th 1124 (9th Cir. 2023) ................................................................3

*Worman v. Healey*,
   922 F.3d 26 (1st Cir. 2019)................................................................4, 5

**Statutes**

Act of Mar. 22, 1923, no. 130, 1923 Vt. Acts & Resolves 130..............................24

Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256 ....................................24

Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887.......................................24

Act of July 8, 1932, Pub. L. No. 72-275, Stat. 650, 652 .......................................25

Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245......................................25

Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189 ................................................25

California Penal Code Section 32310 ......................................................................1

National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 .......................25

**Other Authorities**

@NRA_museums, *Gun of the Day: Wheellock 16-Shooter*, TWITTER
   (Oct. 21, 2018, 9:01 AM), https://perma.cc/6H68-TF7Y ...................................11

*1st DC Cavalry Martial Henry Rifle*, College Hill Arsenal,
   https://perma.cc/LFP3-AVDY ............................................................................18

*Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF ...........................5

*Belton Flintlock*, Military Fandom, https://perma.cc/SSM6-NAJC ........................13

*Bennett & Havilland Revolving Rifle*, Fandom: Military Wiki,
   https://perma.cc/D68U-MSGU ...........................................................................16

Charles Worman, *The Iconic Pepperbox Revolving Pistol*, J. Antiques
   & Collectibles, https://perma.cc/E3K8-W3LH ..................................................14

Chip Lohman, *The History of Colt*, NRA (Jan. 17, 2017),
   https://perma.cc/TV6L-HSMV ...........................................................................15

Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL ...................................................20

Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM ..............................5

*Colt Paterson Revolver, Called The "Texas Colt"*, The Bryan Museum, https://perma.cc/2AG4-MCMM ........................................15

Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M .....................21

Danielle Hollembaek, *The Pepperbox Pistol*, Rock Island Auction Co. (Jan. 16, 2019), https://perma.cc/2ERY-26CX...................................14

David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 854 (2015)............................................15, 17

David Kopel, *Magazines Over 10 Rounds Were Well-known to the Founders*, Reason (Feb. 11, 2020), https://perma.cc/GYS2-XGR6..................12

Declaration of Brian DeLay, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 128)..................................................10, 19

Declaration of Edward Troiano, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3)........................................................................................................6

Declaration of James W. Johnson, *Kolbe v. O'Malley*, No. 1:13-cv-02841 (D. Md. Feb. 14, 2014) (ECF No. 44-3)...................................6

Declaration of Kevin Sweeney, *Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815 (D. Or. Feb. 6, 2023) (ECF No. 124)...................................12, 13

Declaration of Lucy P. Allen, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 123-1) .........................................5

Declaration of Michael Vorenberg, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-2)..........................................................................................................11

Declaration of Randolph Roth, *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-9) ..............................................................................................22, 27

Declaration of Robert Spitzer, *Nat'l Ass'n for Gun Rights v. Campbell*, 1:22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-10) ..........................................................................................*passim*

Declaration of Robert Spitzer, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 122-1) ..........................24, 25, 27

Declaration of Roger Pauly, *Oregon Firearms Federation, Inc.*, No. 2:22-cv-01815 (D. Or. Feb. 6, 2023) (ECF No. 120)........................................21

Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://perma.cc/YR7L-PWPS ..............................................................................................20

*Firearms History and the Technology of Gun Violence*, UC Davis Library, https://perma.cc/YHZ6-8QPG ................................................20

Forgotten Weapons, *Porter Turret Rifle (2nd Variation) - Unsafe in Any Direction*, YouTube (Mar. 7, 2018), https://www.youtube.com/watch?v=Wm_1Ny6r6zg ..........................................16

Giffords Law Center, *Large Capacity Magazines*, Giffords, https://perma.cc/3DKL-ZJMS ..................................................................22

*Henry Rifle*, Civil War @ Smithsonian, https://perma.cc/L7V3-WZPU ...............18

John L. Plaster, *The History of Sniping and Sharpshooting* 70 (2008)...................13

John Paul Jarvis, *Bennett & Havilland Revolving Rifle: A Link in the Repeating Rifle Chain* (Apr. 3, 2012), https://perma.cc/6FLX-AE5G ..............................................................................................16

John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, Guns.com (Mar. 15, 2011), https://perma.cc/57AB-X2BE................................12

John Sammon, *The Case for Caselessness: The Volcanic Rifle* (Apr. 19, 2011), https://perma.cc/462K-M6TA ....................................................17, 18

*Lot 1099: Very Rare Hall 15 Round Percussion Revolving Rifle*, Rock Island Auction Co., https://perma.cc/43X5-EKSG ...........................................17

*POTD: Very Rare Hall 15 Round Percussion Revolving Rifle*, All Outdoor (June 18, 2021), https://www.alloutdoor.com/2021/06/18/potd-rare-hall-revolving-rifle/.....................................................................................................17

*Rare Alexander Hall Percussion Revolving Rifle*, Cowan's, https://perma.cc/T4F3-49KM;.............................................................17

Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162-63 (2007).....................................27

Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020), https://perma.cc/7STW-8WMS ...........................................................19

Seth Isaacson, *The Colt Paterson and Its Predecessors*, Rock Island Auction Company (Aug. 19, 2022), https://perma.cc/ZFH3-6G62...................15

*Volcanic Rifles & Pistols*, Winchester Arms Collectors Ass'n, https://perma.cc/52FB-2PCF .............................................................17

*Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, The Firearm Blog (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62 .............................14

*Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://perma.cc/PRY3-YHSN ...............................................19

## IDENTITY AND INTEREST OF *AMICI CURIAE*[1]

*Amici curiae* are national gun violence prevention organizations. Brady Center to Prevent Gun Violence is the nation's most longstanding non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy and political action. Giffords Law Center to Prevent Gun Violence, a national organization founded more than 30 years ago, promotes and defends the laws and policies proven to reduce gun violence. March for Our Lives is a youth-led non-profit organization dedicated to promoting civic engagement, education and direct action by youth to achieve sensible gun violence prevention policies.

## INTRODUCTION

California Penal Code Section 32310 (the "Challenged Law"), which restricts large-capacity magazines ("LCMs") capable of holding more than ten rounds, is constitutional under the Second Amendment because it does not impose any burden on the "right of armed self-defense" recognized by the Supreme Court in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2133 (2022) and *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008). *See* Part I, *infra*.

Beyond that fundamental and dispositive point, the Challenged Law is also constitutional because it is "relevantly similar" to restrictions on firearms capable of

---

[1] All parties have consented to the filing of this brief. No counsel for a party authored this brief in whole or in part, and no person other than *amici* made any monetary contributions intended to fund the preparation or submission of this brief.

1

firing repeatedly without reloading, which proliferated in the early 20th century once civilians began to gain widespread access to these weapons. *See* Part II.C, *infra*. The Challenged Law is also "relevantly similar" to 18th and 19th century laws that regulated firearms without imposing a meaningful burden on self-defense. *See* Part II.D, *infra*.

## ARGUMENT

## I. THE CHALLENGED LAW DOES NOT IMPLICATE THE SECOND AMENDMENT BECAUSE IT IMPOSES NO BURDEN ON THE RIGHT TO SELF-DEFENSE.

The Challenged Law does not burden the "right to armed self-defense" articulated in *Bruen* and *Heller*. *Bruen*, 142 S. Ct. at 2133. Accordingly, the Challenged Law raises no Second Amendment issue.

### A. The Second Amendment Right Articulated in *Bruen* and *Heller* Is Based on Lawful "Self-Defense."

*Bruen* defines the Second Amendment as "protect[ing] an individual right to keep and bear arms *for self-defense*." 142 S. Ct. at 2125.[2] *Bruen* reiterated *Heller*'s holding "that the Second Amendment protected an individual right *to armed self-defense*" and that "the Second Amendment did not countenance a 'complete prohibition' on the use of 'the most popular weapon chosen by Americans *for self-defense* in the home.'" *Id.* at 2128 (quoting *Heller*, 554 U.S. at 629); *see also id.* at

---

[2] All emphases added unless otherwise noted.

2125 ("In *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms *for self-defense*."). Justice Alito made the point plainly: "All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home *for self-defense*." *Id*. at 2159 (Alito, J., concurring).

When the Court in *Bruen* stated that "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627), it was referring to weapons "in common use" *for self-defense*. As stated above, the Court's reference to "common use" appears in a paragraph restating *Heller*'s holding "that the Second Amendment protected an individual right *to armed self-defense*." *Id.* at 2128. And the following paragraph ends with a quote—also from *Heller*—that "the Second Amendment did not countenance a 'complete prohibition' on the use of 'the most popular weapon chosen by Americans *for self-defense* in the home.'" *Id*. (quoting *Heller*, 554 U.S. at 629); *see also id.* at 2125 ("In *Heller* and *McDonald*, we held that the Second and Fourteenth Amendments protect an individual right to keep and bear arms *for self-defense*.").

Accordingly, as this Court has held, "*Bruen* step one involves a threshold inquiry" into "whether the weapon at issue is '"in common use" today *for self-defense*.'" *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting

3

*Bruen*, 142 S. Ct. at 2134-35)). *See also Bevis v. City of Naperville*, No. 23-1353, 2023 WL 7273709, *10 (7th Cir. Nov. 3, 2023) ("Both Supreme Court decisions and historical sources indicate that the Arms the Second Amendment is talking about are weapons in common use ***for self-defense***."); *Delaware State Sportsmen's Ass'n v. Delaware Dep't of Safety & Homeland Sec.*, No. 22-cv-951, 2023 WL 2655150, *4 (D. Del. Mar. 27, 2023), *appeal docketed*, No. 23-1633 (3d Cir. Apr. 7, 2023) ("the Second Amendment extends only to bearable arms that are in common use for ***self-defense*** today" (quotations omitted)); *Hanson v. District of Columbia*, No. 22-cv-2256, 2023 WL 3019777, *7 (D.D.C. Apr. 20, 2023) (the "critical question" under *Bruen* is whether LCMs "are commonly used or are useful specifically ***for self-defense***").

## B. The Challenged Law Does Not Burden the Right to Lawful Self-Defense.

Research thoroughly examined by numerous courts[3] establishes that LCM restrictions do not burden the "right to armed self-defense" because the ability to fire

---

[3] *See Nat'l Ass'n for Gun Rights v. Lamont*, No. 3:22-1118, 2023 WL 4975979, *21 (D. Conn. Aug. 3, 2023), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023); *Ocean State Tactical, LLC v. State of Rhode Island*, No. 22-cv-246, 2022 WL 17721175, *16 (D.R.I. Dec. 14, 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023); *Hanson*, 2023 WL 3019777, *10–12; *Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, *32–33 (D. Or. July 14, 2023), *appeal docketed*, No. 23-35479 (9th Cir. July 17, 2023); *Duncan v. Bonta*, 19 F.4th 1087, 1104–05 (9th Cir. 2021), *cert. granted, judgment vacated*, 142 S. Ct. 2895, *and vacated and remanded on other grounds*, 49 F.4th 1228 (9th Cir. 2022); *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey,* 910 F.3d 106, 121 n.25 (3d Cir. 2018), *abrogated on other grounds by*

more than ten rounds without reloading is empirically unnecessary for self-defense. A database maintained by the National Rifle Association ("NRA") of "armed citizen" accounts demonstrates that the use of more than ten rounds of ammunition for self-defense is "extremely rare."[4]  Studies of this database establish that the average number of shots fired by civilians in self-defense was about **two**.[5]  Of 736 self-defense incidents from January 2011 to May 2017 reflected in the NRA database, the defender was reported to have fired more than ten bullets in only "***two*** incidents (0.3% of all incidents)."[6]

As this Court has found, "[t]he use of more than ten bullets in defense of the home is *'rare,'* or ***non-existent***."  *Duncan*, 19 F.4th at 1104-05 (citations omitted). Other courts similarly have found no evidence that firing more than ten rounds without reloading is necessary for self-defense.  *See*, *e.g.*, *Worman*, 922 F.3d at 37 ("not one of the plaintiffs or their six experts could identify even a single example of . . . a self-defense episode in which ten or more shots were fired"); *Rocky*

_____

*Bruen*, 142 S. Ct. 2111; *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111; *State v. Misch*, 214 Vt. 309, 356–57 (2021), *reargument denied* (Mar. 29, 2021); *Rocky Mountain Gun Owners v. Polis*, 467 P.3d 314, 331 (Colo. 2020).

[4] Declaration of Lucy P. Allen at 2-3, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 123-1) [hereinafter "Allen Decl."]; *see also Armed Citizen Stories*, NRA-ILA, https://perma.cc/H9BC-95HF.

[5] *See* Claude Werner, *The Armed Citizen – A Five Year Analysis*, Guns Save Lives (Mar. 12, 2012), https://perma.cc/QTL7-U8EM (average of 2.2 defensive shots fired per incident from 1997 to 2001); Allen Decl., *supra* note 4, at 3-4 (same, from January 2011 to May 2017).

[6] Allen Decl., *supra* note 4, at 4.

*Mountain Gun Owners*, 467 P.3d at 331 ("[I]n no case had a person fired even five shots in self-defense, let alone ten, fifteen, or more." (quotations and citation omitted)); *Misch*, 214 Vt. at 356 ("it appears from the available data that . . . the large-capacity magazine . . . is ***almost never used for self-defense***").

Experts have similarly testified that the ability to fire more than ten rounds without reloading is unnecessary and almost unheard of for self-defense. *See* Declaration of Edward Troiano ¶ 10, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-3) ("I am unaware of ***any incident*** in which a civilian has ***ever*** fired as many as 10 rounds in self-defense."); Declaration of James W. Johnson ¶¶ 30-31, *Kolbe v. O'Malley*, No. 1:13-cv-02841 (D. Md. Feb. 14, 2014) (ECF No. 44-3) (then-Baltimore County Police Chief testifying that he was "***unaware of any self-defense incident***" in Baltimore County or "anywhere else in Maryland" for which "it was necessary to fire as many as 10 rounds in self-defense").

The dissent from this Court's order granting a partial stay erroneously rejected this empirical showing, observing that "though it is 'exceedingly rare' for a person to fire more than 10 rounds in self-defense, that is not 'never,'" and "that a citizen did not expend a ***full*** magazine does not mean that the magazine was not 'used' for self-defense purposes." *Duncan v. Bonta*, 83 F.4th 803, 815 (9th Cir. 2023) (Bumatay, J., dissenting) (emphasis in original). But *Bruen* directs courts to assess

whether a challenged regulation imposes a realistic "burden" on weapons commonly used for "armed self-defense," 142 S. Ct. at 2133, not whether a firearm has a *de minimis* hypothetical use in self-defense. Even adopting the dissent's language, where it is "'exceedingly rare' for a person to fire more than 10 rounds in self-defense," and where empirically citizens will "not expend a full [large-capacity] magazine" in self-defense, an LCM ban imposes no meaningful "burden" on lawful self-defense under *Bruen*. Likewise, the district court's observation that an LCM-equipped firearm would be "ready for use, if needed," *Duncan v. Bonta*, No. 17-cv-1017, 2023 WL 6180472, *10 (S.D. Cal., Sept. 22, 2023), misses the fundamental point that banning LCMs does not "burden" an individual's right to lawful self-defense because LCMs are not ***needed*** for self-defense.

Courts evaluating LCM bans since *Bruen* have repeatedly held that such laws do not burden the "right of armed self-defense" and therefore do not implicate the Second Amendment because LCMs are not commonly used for self-defense. *See Bevis*, 2023 WL 7273709, *12 ("high-capacity magazines are much more like machineguns and military-grade weaponry than they are like the many different types of firearms that are used for individual self-defense"); *Hanson*, 2023 WL 3019777, *12 ("the Second Amendment does not cover LCMs because they are not typically possessed for self-defense"); *Kotek*, 2023 WL 4541027, *33-34 ("the Second Amendment's plain text does not cover LCMs" because "Plaintiffs have not

shown that LCMs are commonly employed for self-defense"); *Lamont*, 2023 WL 4975979, *2 (LCMs are "not protected by the Second Amendment because [plaintiffs] have not demonstrated that [they] . . . are commonly sought out, purchased, and used for self-defense"); *Ocean State Tactical, LLC*, 2022 WL 17721175, *14 ("There is simply no credible evidence in the record to support the plaintiffs' assertion that LCMs are weapons of self-defense and there is ample evidence put forth by the State that they are not.").

The Challenged Law therefore does not implicate the Second Amendment because LCMs are not commonly used for armed self-defense. This Court need go no further than this dispositive point to reverse the judgment of the district court.

## II. THE CHALLENGED LAW IS CONSISTENT WITH THE HISTORICAL TRADITION OF FIREARM REGULATION.

Because the Challenged Law does not impose ***any*** burden on "a law-abiding citizen's right to armed self-defense," *Bruen*, 142 S. Ct. at 2133, the Court need not evaluate whether the Challenged Law is "consistent with this Nation's historical tradition of firearm regulation," *id*. at 2126. That analogical second step under *Bruen* applies only in evaluating restrictions that implicate the Second Amendment. *Id*. at 2134.

But even if the Court reaches *Bruen*'s second prong, the Challenged Law is "relevantly similar," *id*. at 2132, to historical laws that regulated arms without unduly burdening armed self-defense. As *Bruen* recognized, "the right to keep and

bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms," *id*. at 2138. "Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." *Id*. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 636).

A.  ***Bruen*** **Requires a "More Nuanced Approach" to Historical Analysis in Light of "Dramatic Technological Change" or "Unprecedented Societal Concerns."**

*Bruen* instructed courts to adopt a "more nuanced approach" to historical analysis when confronted with cases "implicating unprecedented societal concerns or dramatic technological change," because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id*. at 2132. This analysis asks whether challenged regulations are "relevantly similar" to historical analogues, based on "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id*. at 2132-33. It "requires only that the government identify a well-established and representative historical ***analogue***, not a historical ***twin***. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id*. at 2133 (emphases in original).

**B.** **Modern Firearms Capable of Firing Repeatedly Without Reloading Reflect "Dramatic Technological Change" Requiring a "More Nuanced Approach" Under *Bruen*.**

Modern firearms capable of firing repeatedly without reloading reflect the kind of dramatic technological change that *Bruen* held requires a "more nuanced approach" to historical analysis.

**1.** ***Firearms capable of firing repeatedly without reloading were not widespread among civilians until at least the late 19th century.***

The dissent from this Court's order granting a partial stay asserted that "firearms able to fire more than ten rounds were widely possessed by law-abiding citizens by the Second Amendment's incorporation." *Duncan*, 83 F.4th at 814 (Bumatay, J., dissenting). As support, the dissent cited an earlier dissent in this litigation, describing various historical firearms. *Duncan*, 19 F.4th at 1154-55 (Bumatay, J., dissenting).

But, in fact, no firearm capable of firing ten rounds or more without reloading was commonly used by civilians in the United States before at least the late 19th century. Such firearms "constituted less than 0.002% of all firearms in the United States as late as 1872." Declaration of Brian DeLay ¶ 58, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 128) [hereinafter "DeLay Decl."]. Furthermore, legal possession of such firearms before the late 19th century "was limited almost exclusively to U.S. soldiers and civilian law enforcement

officers." Declaration of Michael Vorenberg ¶ 43, *Ocean State Tactical, LLC v. State of Rhode Island*, No. 1:22-cv-00246 (D.R.I. Oct. 14, 2022) (ECF No. 19-2). "Even in World War I, soldiers primarily used bolt-action one shot rifles that could fire about twelve rounds per minute." Declaration of Robert Spitzer ¶ 48, *Nat'l Ass'n for Gun Rights v. Campbell*, 1:22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-10) [hereinafter "Spitzer *Campbell* Decl."].

None of the firearms identified in the dissents in this litigation was widely available to civilians prior to the ratification of the Fourteenth Amendment, and these firearms were generally of almost no practical use for any purpose, much less lawful self-defense:

- **Wheel-lock firearm (1580).** The dissent stated that "the first known firearm capable of firing more than ten rounds without reloading was a 16-shooter invented in 1580." *Duncan*, 19 F.4th at 1154 (Bumatay, J., dissenting). However, this wheel-lock firearm was "anything but common," *see* Spitzer *Campbell* Decl. ¶ 38, and according to the NRA "might have been affordable only [to] kings and nob[i]lity."[7]

---

[7] @NRA_museums, *Gun of the Day: Wheellock 16-Shooter*, TWITTER (Oct. 21, 2018, 9:01 AM), https://perma.cc/6H68-TF7Y.

- **<u>Pim Repeater (early 1700s).</u>** Referring to the Pim Repeater,[8] the dissent stated that "[t]he earliest record of a repeating firearm in America noted that it fired more than ten rounds." *Duncan*, 19 F.4th at 1154 (Bumatay, J., dissenting). However, the Pim repeater was never offered for sale and "no examples of a repeating long-arm by Pim[] survive; it was a novelty." Declaration of Kevin Sweeney ¶ 23, *Oregon Firearms Fed'n v. Kotek*, No. 2:22-cv-01815 (D. Or. Feb. 6, 2023) (ECF No. 124) [hereinafter "Sweeney Decl."].

- **<u>Girandoni air rifle (1779).</u>** The dissent stated that "[a]t the Founding, the state-of-the-art firearm was the Girandoni air rifle with a 22-shot magazine capacity." *Duncan*, 19 F.4th at 1154 (Bumatay, J., dissenting). But the Girandoni air rifle was a military firearm that was impractical for civilian use because it required a wagon-mounted pump filled with water to sustain the pressure needed to operate; without the pump, the rifle required nearly 1,500 manual hand pumps to restore power.[9] Only 1,500 or so were ever built globally, Spitzer *Campbell* Decl. ¶ 42, and only a few of these ended

---

[8] *See* David Kopel, *Magazines Over 10 Rounds Were Well-known to the Founders*, Reason (Feb. 11, 2020), https://perma.cc/GYS2-XGR6 (noting that the repeating firearm invented in 1722 referred to by the dissent was a Pim repeater).

[9] John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, Guns.com (Mar. 15, 2011), https://perma.cc/57AB-X2BE.

up in the United States, John L. Plaster, *The History of Sniping and Sharpshooting* 70 (2008).

- **Belton Rifle (1777)**.  The dissent stated that "[i]n 1777, Joseph Belton demonstrated a 16-shot repeating rifle before the Continental Congress, seeking approval for its manufacture."  *Duncan*, 19 F.4th at 1154 (Bumatay, J., dissenting).  However, the Belton rifle required the shooter to "cock and prime [the rifle] each time before pulling the trigger and firing the gun," so the rifle "was not a rapid-fire repeating arm."  Sweeney Decl. ¶ 33.  It was also so heavy and difficult to operate that using it was "a bit of a three-handed job."  *Id*.  Moreover, this rifle was so rare that "the only evidence of its existence is the correspondence between Belton and Congress" in which Belton described his invention.[10]

- **Pepperbox Pistol (1830s).**  The dissent stated that "[b]y the 1830s, 'Pepperbox' pistols had been introduced to the American public and became commercially successful" and "could fire 5, 6, 12, 18, or 24 rounds without reloading."  *Duncan*, 19 F.4th at 1154 (Bumatay, J., dissenting).  But Pepperbox pistols could generally fire just five or six rounds without

---

[10] *Belton Flintlock*, Military Fandom, https://perma.cc/SSM6-NAJC.

reloading.[11]  Although a Belgian Pepperbox pistol with 24 different barrels was manufactured, it was "monstrously unwield[y]."[12]  Moreover, Pepperbox pistols were notorious for their shortcomings:  the pistol's accuracy did not extend "much beyond the width of a poker table"[13]; its firing power was extremely modest[14]; and it was so unreliable that at times all of its barrels would fire at the same time (a dangerous defect known as "chain-firing").[15]  Pepperbox pistols were not "commercially successful" and faded from view in the early 19th century because they were "heavy, lumpy, and impractical."  Spitzer *Campbell* Decl. ¶ 45 (citations omitted).

- **Colt revolvers (1830s).**  The dissent stated that "[i]t took several years for Samuel Colt's revolvers (also invented in the 1830s) to surpass the Pepperbox pistol in the marketplace." *Duncan*, 19 F.4th at 1154 (Bumatay, J., dissenting).  However, the first Colt revolver, the Paterson (patented in

---

[11]  Charles Worman, *The Iconic Pepperbox Revolving Pistol*, J. Antiques & Collectibles, https://perma.cc/E3K8-W3LH.

[12]  *Wheelgun Wednesday: A Closer Look at Pepperbox Pistols*, The Firearm Blog (Dec. 8, 2021), https://perma.cc/2Z2U-RJ62; Worman, *supra* note 11.

[13]  Worman, *supra* note 11.

[14]  Danielle Hollembaek, *The Pepperbox Pistol*, Rock Island Auction Co. (Jan. 16, 2019), https://perma.cc/2ERY-26CX.

[15]  *Id.*

1836), could hold just six rounds.[16]  Moreover, the Paterson suffered from numerous shortcomings:  it was prone to jamming, was expensive to manufacture, and required the shooter to cock the hammer between each round (unlike modern semi-automatic firearms).[17]  The Paterson also suffered from a "lack of firepower" because the "gun was not strong enough to inflict wounds sufficiently heavy to take an enemy combatant out of the fight."[18]  Colt's company went bankrupt six years after the Paterson was patented due to its significant "design flaws."[19]

- **<u>Bennet and Haviland Rifle (1838).</u>**  The dissent stated that "[f]rom the 1830s to the 1850s, several more rifles were invented with large ammunition capacities, ranging from 12- to 38-shot magazines." *Duncan*, 19 F.4th at 1154 (Bumatay, J., dissenting).  The dissent does not name these firearms, but it cites to a law review article, *see id.* (citing David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 854 (2015)), identifying three such firearms:  (1) the

---

[16] Chip Lohman, *The History of Colt*, NRA (Jan. 17, 2017), https://perma.cc/TV6L-HSMV.

[17] Seth Isaacson, *The Colt Paterson and Its Predecessors*, Rock Island Auction Company (Aug. 19, 2022), https://perma.cc/ZFH3-6G62.

[18] *Colt Paterson Revolver, Called The "Texas Colt"*, The Bryan Museum, https://perma.cc/2AG4-MCMM.

[19] Isaacson, *supra* note 17.

1838 Bennet and Haviland rifle, (2) the 1850s Colonel Parry W. Porter rifle, and (3) the 1850s Alexander Hall rifle. But the Bennet and Haviland's design was "inherently unsafe" for the gunman; using the rifle was known to be as "safe as juggling chainsaws."[20] The rifle "could potentially fire backwards, forwards and to either side," which meant that "if a chain fire did occur (which was not unheard of)" it could result in severe injury or death for the gunman.[21] Experts estimate that fewer than ten of these rifles were made before it "faded into obscurity."[22]

- **<u>Porter Rifle (1850s).</u>** Like the Bennet and Haviland rifle, the Porter rifle was inherently unsafe for the gunman.[23] The rifle had "radial chambers" with at least one chamber pointing back at the shooter[24]—"the notion of having a loaded chamber pointing at your face was less than appealing to

---

[20] John Paul Jarvis, *Bennett & Havilland Revolving Rifle: A Link in the Repeating Rifle Chain*, Guns.com (Apr. 3, 2012), https://perma.cc/6FLX-AE5G.

[21] *Id.*

[22] *Bennett & Havilland Revolving Rifle*, Fandom: Military Wiki, https://perma.cc/D68U-MSGU.

[23] Ian McCollum, *RIA: Porter Turret Rifle, Forgotten Weapons* (Feb. 7, 2016), https://perma.cc/N5J5-R93H.

[24] *Id.*

most people."[25]   Only approximately 1,250 Porter rifles were ever

produced.[26]

- **<u>Hall Rifle (1850s)</u>:**  The Hall rifle had the same "giant flaw" as the Bennet and Haviland rifle, and the Porter rifle, because it could shoot the user.[27] The rifle was "extremely scarce" and was not produced in significant quantities.[28]

- **<u>Volcanic Rifle (1855)</u>:**  Referring to the Volcanic Rifle,[29] the dissent stated that "[b]y 1855, Daniel Wesson (of Smith and Wesson fame) and Oliver Winchester collaborated to introduce the lever action rifle, which contained a 30-round magazine that could be emptied in less than one minute." *Duncan*, 19 F.4th at 1154 (Bumatay, J., dissenting).  But the Volcanic Rifle "suffered from design defects including gas discharge

---

[25] *Id.*

[26] Forgotten Weapons, *Porter Turret Rifle (2nd Variation) - Unsafe in Any Direction*, YouTube (Mar. 7, 2018), https://www.youtube.com/watch?v=Wm_1Ny6r6zg.

[27] *POTD: Very Rare Hall 15 Round Percussion Revolving Rifle*, All Outdoor (June 18, 2021), https://www.alloutdoor.com/2021/06/18/potd-rare-hall-revolving-rifle/.

[28] *Rare Alexander Hall Percussion Revolving Rifle*, Cowan's, https://perma.cc/T4F3-49KM; *see also Lot 1099: Very Rare Hall 15 Round Percussion Revolving Rifle*, Rock Island Auction Co., https://perma.cc/43X5-EKSG.

[29] *See* David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 854 (2015) (identifying the 30-round firearm that evolved into the Henry lever rifle as the Volcanic rifle).

17

around the breech and misfires."[30]  The rifle was also ineffective for self-defense because it was "grossly underpowered" and did not fire with enough force to be a "man stopper."[31]  The rifle was ultimately "[u]npopular because of its unreliability" and "[t]here weren't a lot of these weapons made."[32]

- **<u>Henry lever action rifle (1860).</u>**  The dissent stated that "[a] later iteration of [the Volcanic rifle], the 16-round Henry lever action rifle, became commercially successful, selling about 14,000 from 1860 to 1866." *Duncan*, 19 F.4th at 1154-55 (Bumatay, J., dissenting).  But the Henry rifle was manufactured primarily for military use, and the Henry company ceased production of the Henry rifle after the Civil War.[33]  Moreover, the Henry rifle had significant flaws:  the rifle's firing was underpowered; the rifle was prone to becoming jammed; the barrel became hot with repeated firing; the firing pins were fragile and could break; and the frame was prone to damage, causing the cartridges not to feed into the rifle.[34]

---

[30] John Sammon, *The Case for Caselessness: The Volcanic Rifle*, Guns.com (Apr. 19, 2011), https://perma.cc/462K-M6TA.

[31] *Volcanic Rifles & Pistols*, Winchester Arms Collectors Ass'n, https://perma.cc/52FB-2PCF (last visited Nov. 29, 2022).

[32] Sammon, *supra* note 30.

[33] *Henry Rifle*, Civil War @ Smithsonian, https://perma.cc/L7V3-WZPU (last accessed June 26, 2023).

[34] *1st DC Cavalry Martial Henry Rifle*, College Hill Arsenal, https://perma.cc/LFP3-AVDY.

- **<u>Winchester repeating rifle of 1866.</u>** The dissent stated that "[b]y 1866, the first Winchester rifle, the Model 1866, could hold 17 rounds in the magazine and one in the chamber, all of which could be fired in nine seconds." *Duncan*, 19 F.4th at 1155 (Bumatay, J., dissenting). However, experts have estimated that by 1872 (four years after ratification of the Fourteenth Amendment) fewer than 800 Winchester and Henry rifles combined had been sold to civilians in the United States. *See* DeLay Decl. ¶ 57. The 1866 Winchester rifle also had significant flaws: its exposed magazine was open to dirt and debris, which made it susceptible to jamming; the barrel become dangerously hot after firing; it suffered from poor accuracy and was very heavy when loaded; and it required the shooter to manually manipulate a lever in between each shot (unlike modern semi-automatic firearms).[35]

- **<u>Winchester repeating rifle of 1873</u>**: The dissent stated that "[a] few years [after 1866], Winchester produced the [1873 Winchester], capable of holding 10 to 11 rounds, of which over 720,000 copies were made from 1873 to 1919." *Duncan*, 19 F.4th at 1155 (Bumatay, J., dissenting).

---

[35] *See* Ryan Hodges, *The 1866 Rifle*, Taylor's & Company (Aug. 26, 2020), https://perma.cc/7STW-8WMS; *Why Britain Didn't Adopt the Winchester 1866*, The Armourer's Bench, https://perma.cc/PRY3-YHSN; *see also* Spitzer *Campbell* Decl. ¶ 48.

However, sales of the 1873 Winchester rifle entirely postdated ratification of the Fourteenth Amendment in 1868, and the Winchester did not become popular with civilians until at least the late 19th or early 20th century. Spitzer *Campbell* Decl. ¶ 48.

In short, there is no basis for concluding that multi-shot firearms were anything other than military weapons or exotic oddities before the latter part of the 19th Century.

### 2. *Modern firearms capable of firing repeatedly without reloading reflect "dramatic technological change" resulting in "unprecedented societal concerns."*

Modern firearms capable of firing more than ten rounds without reloading embody dramatic technological changes from the weaponry of the Founding and Reconstruction Eras. For example, unlike the typical Revolutionary-era musket, a modern AR-15 (i) holds 30 rounds (30 times more than a typical musket at the time of the Founding), (ii) fires approximately 45 rounds per minute (15 times more), (iii) shoots accurately from approximately 600 yards (11 times further), (iv) attains a muzzle velocity of over 3,000 feet per second (3 times faster), and (v) can be stored loaded and immediately fired (unlike Founding-era muskets, which were stored empty because of gunpowder degradation).[36] Modern firearms also incorporate

---

[36] Christopher Ingraham, *What 'Arms' Looked Like When the 2nd Amendment Was Written*, Wash. Post (June 13, 2016), https://perma.cc/H6X5-C2NL; *see also Firearms History and the Technology of Gun Violence*, UC Davis Library,

advanced ballistics that make rounds far more deadly than their historical predecessors.[37]  These dramatic technological changes have made the modern repeating firearm "a significantly different weapon than it was at the time of the founding of the republic" and in a "distinctly different class of lethality."  *See* Declaration of Roger Pauly ¶¶ 100-03, *Oregon Firearms Federation, Inc.*, No. 2:22-cv-01815 (D. Or. Feb. 6, 2023) (ECF No. 120).

Even the most advanced firearms of the Civil War era were a far cry from modern firearms.  For example, the 1866 Winchester rifle, discussed above, had a maximum effective range of approximately 100 yards (about one-sixth of an AR-15) and a muzzle velocity of 1,100 feet per second (roughly one-third of an AR-15).[38]

These dramatic technological changes in firearms have also given rise to "unprecedented societal concerns," *Bruen*, 142 S. Ct. at 2132.  Modern LCMs pose a risk of far greater carnage than was imaginable during the Founding or Reconstruction eras.  As a result, the frequency and lethality of mass shootings have

---

https://perma.cc/YHZ6-8QPG (describing the "complicated process" of loading muskets used by soldiers during the Civil War).

[37] *See*, *e.g.*, Ethan Siegel, *The Physics Behind Why Firing a Gun Into the Air Can Kill Someone*, Forbes (Feb. 15, 2017), https://perma.cc/YR7L-PWPS (AK-47 rounds have "a tiny surface area at the bullet tip, [so that] it can easily break through your skin . . . ripping a hole through blood vessels, muscle, and potentially vital organs.").

[38] Dan Alex, *Winchester Model 1866 Lever-Action Repeating Rifle*, Military Factory (Mar. 12, 2019), https://perma.cc/4ZJA-5V4M.

surged in modern times. *See* Declaration of Randolph Roth ¶¶ 54-60, *Nat'l Ass'n for Gun Rights v. Campbell*, No. 22-cv-11431 (D. Mass. Jan. 31, 2023) (ECF No. 21-9) [hereinafter "Roth Decl."]. As of July 2020, LCMs were used in all ten of the deadliest mass shootings of the past decade, and mass shootings from 1990 to 2017 involving LCMs resulted in a 62% higher death toll than those not involving LCMs.[39]

As one federal district court recently found, "the record supports the conclusion that mass shootings carried out with assault weapons and LCMs that result in mass fatalities are a modern societal problem . . . [that] has been spurred by factors and advances in technology that would have been unimaginable to the Founding Fathers." *Lamont*, 2023 WL 4975979, *29. *Accord Ocean State Tactical, LLC*, 2022 WL 17721175, *20; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *10-11.

Courts considering the issue since *Bruen* have overwhelmingly held that modern LCMs reflect the sort of "dramatic technological change" that *Bruen* held requires a more "nuanced approach" to historical analysis. *See Hanson*, 2023 WL 3019777, *13-14; *Lamont*, 2023 WL 4975979, *27-29; *Kotek*, 2023 WL 4541027, *36-38; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *10-11; *Herrera v.*

---

[39] Giffords Law Center, *Large Capacity Magazines*, Giffords, https://perma.cc/3DKL-ZJMS.

*Raoul*, No. 23 CV 532, 2023 WL 3074799, *7 (N.D. Ill. Apr. 25, 2023), *aff'd*, 2023 WL 7273709.

### C. The Challenged Law Is "Relevantly Similar" to Early 20th Century Laws Restricting Weapons Capable of Firing Repeatedly Without Reloading.

Under *Bruen*, although the historical analysis centers around the ratification of the Second Amendment in 1791 and the Fourteenth Amendment in 1868, earlier and later dates nevertheless remain constitutionally relevant to the analysis. *See Bruen*, 142 S. Ct. at 2135-36, 2145. Historical law and practice before 1791 may shed light on the public understanding of the Second Amendment when it was ratified, and historical analogues through the 21st century may "settle" the meaning of the Second Amendment, *id.* at 2136, provided they do not "contradict[] earlier evidence." *Id.* at 2154 n.28.

Historical analogues from the 20th century are particularly relevant when courts are confronted with "dramatic technological change" or "unprecedented societal concerns" and therefore must engage in a "nuanced" historical analysis under *Bruen*. *Id.* at 2132. After all, it would be meaningless to search for specific restrictions on LCMs during the Founding or Reconstruction Eras, when the technology did not exist in its current form and virtually no citizens possessed firearms capable of firing repeatedly without reloading. *See* Part II.B.1, *supra*. As one court concluded, "it would make no sense to divine constitutional significance

23

from non-existent legislation concerning non-existent problems." *Hanson*, 2023 WL 3019777, *16; *see also Lamont*, 2023 WL 4975979, *29.

Once firearms capable of firing repeatedly without reloading began to circulate widely among civilians in the early 20th century, Congress and a majority of states responded by passing laws limiting access to these weapons. *See generally* Declaration of Robert Spitzer at 36-42, *Sullivan v. Ferguson*, No. 3:22-cv-05403 (W.D. Wash. Sept. 1, 2023) (ECF No. 122-1) [hereinafter "Spitzer *Sullivan* Decl."]. For example, in 1923, Vermont prohibited persons engaged in hunting from possessing "an automatic rifle of military type with a magazine capacity of over six cartridges."[40] In 1927, Rhode Island passed a law prohibiting "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[41] That same year, Michigan prohibited any firearm that fired more than sixteen times without reloading.[42] In 1932, Congress passed a law prohibiting "any firearm" in the District of Columbia "which shoots automatically or semiautomatically more than twelve shots without reloading"—a

---

[40] Act of Mar. 22, 1923, no. 130, 1923 Vt. Acts & Resolves 130.

[41] Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, §§ 1, 4.

[42] Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888, § 3.

prohibition that has existed in some form ever since.[43]  In 1933, Ohio outlawed any firearm that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading," and South Dakota banned firearms "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine."[44]  In 1934, Congress passed a law restricting fully automatic weapons nationwide.[45]

In total, between 1925 and 1934, at least 31 states and the District of Columbia restricted access to certain weapons capable of firing repeatedly without reloading,[46] and at least 22 states plus the District of Columbia restricted ammunition magazines or similar feeding devices, and/or imposed round capacity limits.  *See* Spitzer *Sullivan* Decl. at 36-42.  "Regulations concerning removable magazines and magazine capacity were . . . common as early as the 1920s" and "were adopted by nearly half of all states."  *Id*. at 42.

---

[43] Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1248 (D.C. Cir. 2011), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

[44] Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189, § 12819-3; Act of Feb. 28, 1933, ch. 206, 1933 S.D. Sess. Laws 245, 245, § 1.

[45] National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236.

[46] Although most of these laws restricted access to fully automatic weapons, at least seven and as many as ten states, plus the District of Columbia, restricted semi-automatic weapons.  Spitzer *Campbell* Decl. ¶ 10.

The Challenged Law is "relevantly similar," *Bruen*, 142 S. Ct. at 2132-33, to these early 20th century laws. *See Hanson*, 2023 WL 3019777, *15; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *12-14; *Bevis v. City of Naperville*, No. 22-4775, 2023 WL 2077392, *12-16 (N.D. Ill. Feb. 17, 2023), *aff'd*, 2023 WL 7273709. The Challenged Law also has a "comparabl[e] justifi[cation]" to these early 20th century laws, *Bruen*, 142 S. Ct. at 2132-33, because like these laws it addresses the growing threat of mass shootings with negligible effect on lawful armed self-defense. *See Hanson*, 2023 WL 3019777, *15 ("Just as states and the District [of Columbia] enacted sweeping laws restricting possession of high-capacity weapons in an attempt to reduce violence during the Prohibition era, so can the District now."). *Accord Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *13; *Kotek*, 2023 WL 4541027, *45.

### D. The Challenged Law Is Relevantly Similar To 18th and 19th Century Historical Laws and Thus Is Constitutional.

Even putting aside the "more nuanced analysis" based on 20th century analogues, the Challenged Law is also "relevantly similar" to 18th and 19th century laws. Since the Founding Era, states have regulated firearms and other dangerous weapons, and courts have consistently upheld laws that imposed no meaningful burden on self-defense. These include laws restricting where and when firearms could be carried or discharged, *see Hill v. State*, 53 Ga. 472, 474, 482-83 (1874), laws prohibiting certain particularly dangerous weapons, *see State v. Langford*, 10

26

N.C. 381, 383-84 (1824); *English v. State*, 35 Tex. 473, 474, 477 (1871); *Andrews v. State*, 50 Tenn. 165, 171, 188-89 (1871), and laws regulating the manner in which arms could be carried, *see State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833); *State v. Reid*, 1 Ala. 612, 614, 621 (1840); *State v. Jumel*, 13 La. Ann. 399, 399-400 (1858).

For example, in the 18th century, Philadelphia, New York and Boston prohibited the discharge of firearms within their cities, and New Hampshire, Connecticut, Georgia, North Carolina and Rhode Island restricted the discharge of firearms after dark.[47]  New Jersey prohibited the setting of "gun traps" that fired automatically if triggered by a device such as a tripwire,[48] and numerous states banned the possession of certain blunt weapons deemed particularly dangerous, *see* Spitzer *Sullivan* Decl. at 12-17.

In the 19th century, states responded to a nationwide surge in homicides by passing laws severely restricting access to certain dangerous weapons.  *See* Roth Decl. ¶¶ 28-32.  For example, beginning in the 1830s and continuing through the early 20th century, every state (except for New Hampshire) passed laws restricting Bowie knives, a distinctive long-bladed knife commonly used in violent crime.  *See* Spitzer *Sullivan* Decl. at 5-11.  At least 43 states passed laws restricting the

---

[47] *See* Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 162-63 (2007).
[48] *Id.*

concealed carry of certain arms, most commonly pistols and various types of knives and clubs. *Id.* Several additional states also passed laws banning "trap guns" during the 19th century. *Id*. at 16-17.

The Challenged Law is "relevantly similar" to these 18th and 19th century laws because, like these analogues, it restricts access to a particular firearm-related accessory, but does not meaningfully burden armed self-defense. *See* Part I.B, *supra*. Moreover, the Challenged Law is "comparably justified" because it was enacted in response to a dramatic rise in violence and to protect the public. *See* Part II.B.2, *supra*.

Courts that have considered the issue since *Bruen* have consistently held that modern laws banning LCMs are "relevantly similar" to these 18th and 19th century laws. *See Bevis*, 2023 WL 7273709, *17-18; *Kotek*, 2023 WL 4541027, *39-46; *Delaware State Sportsmen's Ass'n*, 2023 WL 2655150, *11-13; *Bevis*, 2023 WL 2077392, *10-16; *Lamont*, 2023 WL 4975979, *31-32.

## CONCLUSION

The Challenged Law does not violate the Second Amendment because: (1) applying the standards of *Bruen* and *Heller*, the Challenged Law does not burden the right to "armed self-defense"; (2) LCMs reflect "dramatic technological change" resulting in "unprecedented societal concerns" and are subject to a "more nuanced approach" to historical analysis, *Bruen*, 142 S. Ct. at 2132; (3) the Challenged Law

is consistent with the country's 20th century history of regulating firearms that can fire repeatedly without reloading, and such historical laws are proper analogues because they were enacted when such arms began to circulate widely among civilians; and (4) the Challenged Law is "relevantly similar" to 18th and 19th century laws that imposed restrictions on firearms and other dangerous weapons without burdening "the right of armed self-defense," *id*. at 2132-33.

Dated: November 28, 2023

Respectfully submitted,

*Of Counsel:*

Douglas N. Letter
Shira Lauren Feldman
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street, NE Suite 400
Washington, DC 20002
(202) 370-8100
dletter@bradyunited.org
sfeldman@bradyunited.org

Esther Sanchez-Gomez
GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE
268 Bush St. #555
San Francisco, CA 94104
(415) 433-2062
esanchezgomez@giffords.org

Ciara Wren Malone
MARCH FOR OUR LIVES
90 Church Street # 3417
New York, NY 10008
(913) 991-4440
ciara.malone@marchforourlives.com

/s/ Timothy C. Hester

Timothy C. Hester
  *Counsel of Record*
Daniel Weltz
Priya Leeds
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com
dweltz@cov.com
pleeds@cov.com

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, none of the *amici curiae* has a parent corporation and no publicly held corporation holds 10% or more of the membership or ownership interests of any *amici*.

Dated: November 28, 2023                    Respectfully submitted,

/s/ Timothy C. Hester
Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

## CERTIFICATE OF SERVICE

I hereby certify that on November 28, 2023, an electronic copy of the foregoing *Amici Curiae* Brief was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the Court's *CM-ECF* system and was served electronically by the Notice of Docket Activity upon registered *CM-ECF* participants.

Dated: November 28, 2023          Respectfully submitted,


 /s/ Timothy C. Hester
Timothy C. Hester
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
(202) 662-6000
thester@cov.com

*Counsel for Amici Curiae*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____ 23-55805 _____

I am the attorney or self-represented party.

**This brief contains** __6,498__ **words,** including _0_ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** ___/s/ Timothy C. Hester___ **Date** ___ November 28, 2023 ___
*(use "s/[typed name]" to sign electronically-filed documents)*