No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VIRGINIA DUNCAN, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, AND CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

*Defendant-Appellant*.

On Appeal from the United States District Court
for the Southern District of California
No. 3:17-cv-01017-BEN-JLB
Hon. Roger T. Benitez

**BRIEF OF EVERYTOWN FOR GUN SAFETY AS AMICUS CURIAE
IN SUPPORT OF DEFENDANT-APPELLANT AND REVERSAL**

Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8201
psen@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

November 28, 2023

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ...................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................... 1

ARGUMENT .................................................................................................... 3

    I.    Plaintiffs Have Not Met Their Burden To Establish that the Second
        Amendment's Plain Text Covers Their Conduct ................................ 3

    II.   The Correct Historical Analysis Centers on the Reconstruction Era
        and Encompasses Consistent 20th-Century Regulations ................... 7

        a.    The Proper Focus for Historical Analysis Is 1868 Rather
            Than 1791 ............................................................................. 7

        b.    The Court Should Also Consider Consistent Later History ... 17

    III.  This Court Should Reject Any Effort To Dismiss the District's
        Historical Analogues as "Outliers" ................................................... 22

CONCLUSION ................................................................................................ 26

# TABLE OF AUTHORITIES

## Cases

*Bevis v. City of Naperville*,
--- F.4th ----, 2023 WL 7273709 (7th Cir. Nov. 3, 2023) ............................passim

*Davenport v. Wash. Educ. Ass'n*,
551 U.S. 177 (2007) .................................................................................... 25

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*,
No. 1:22-cv-00951, 2023 WL 2655150 (D. Del. Mar. 27, 2023), *appeals docketed*,
Nos. 23-1633, 23-1634, 23-1641 (3d. Cir. Apr. 7, 2023) ................................... 22

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..................................................................................passim

*Dobbs v. Jackson Women's Health Org.*,
142 S. Ct. 2228 (2022) ................................................................................ 26

*Ezell v. City of Chicago*,
651 F.3d 684 (7th Cir. 2011) ...................................................................... 10, 13

*Friedman v. City of Highland Park*,
784 F.3d 406 (7th Cir. 2015) ......................................................................... 25

*Gould v. Morgan*,
907 F.3d 659 (1st Cir. 2018) .......................................................................... 10

*Heller v. District of Columbia* (*Heller II*),
670 F.3d 1244 (D.C. Cir. 2011)....................................................................... 19

*Kennedy v. Bremerton School District*,
142 S. Ct. 2407 (2022) ................................................................................ 4, 5

*Kipke v. Moore*,
Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503 (D. Md.
Sept. 29, 2023) ......................................................................................... 12

*McCullen v. Coakley*,
573 U.S. 464 (2014) .................................................................................. 19, 25

*McDonald v. City of Chicago*,
561 U.S. 742 (2010) ................................................................................... 9, 25

*McIntyre v. Ohio Elections Comm'n*,
514 U.S. 334 (1995) ........................................................................... 20

*Md. Shall Issue, Inc. v. Montgomery Cnty.*,
No. 8:21-cv-01736, 2023 WL 4373260 (D. Md. July 6, 2023), *appeal docketed*,
No. 23-1719 (4th Cir. July 10, 2023) ................................................. 11

*Nat'l Ass'n for Gun Rts. v. Lamont*,
No. 3:22-cv-01118, 2023 WL 4975979 (D. Conn. Aug. 3, 2023), *appeal docketed*,
No. 23-1162 (2d Cir. Aug. 16, 2023) ...........................................passim

*Nat'l Rifle Ass'n v. Bondi*,
61 F.4th 1317 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314,
2023 WL 4542153 (July 14, 2023) ............................................... 11, 13

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) .................................................................passim

*Ocean State Tactical, LLC v. Rhode Island*,
646 F. Supp. 3d 368 (D.R.I. 2022), *appeal docketed*, No. 23-1072 (1st Cir. Jan.
18, 2023) ............................................................................................. 4, 5

*Or. Firearms Fed'n v. Kotek*,
No. 2:22-cv-01815, 2023 WL 4541027 (D. Or. July 14, 2023), *appeals docketed*,
Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.)...................... 5, 6, 21

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023) ........................................................... 3, 6

*United States v. Greeno*,
679 F.3d 510 (6th Cir. 2012) ............................................................... 10

*United States v. Meyer*,
No. 4:22-cr-10012, 2023 WL 3318492 (S.D. Fla. May 9, 2023)...................... 15

*United States v. Rowson*,
No. 1:22-cr-00310, 2023 WL 431037 (S.D.N.Y. Jan. 27, 2023) ...................... 21

*We the Patriots, Inc. v. Grisham*,
No. 1:23-cv-00771, 2023 WL 6622042 (D.N.M. Oct. 11, 2023), *appeal docketed*,
No. 23-2166 (10th Cir. Oct. 20, 2023) ................................................. 12

**Other Authorities**

Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (1998) ................ 15, 16

Brief for Independent Institute as Amicus Curiae, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S.) .................................................................. 17, 23

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205 (2018) .............................................................. 17, 23, 24

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1 (2022) ... 13

Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1 (2010) ............................................................ 13

Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (now published at 97 Ind. L.J. 1439), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3766917 .................... 15

Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439 (2022) .......................................................................... 14

Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729 (2008) ............................................................................ 14

Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655 (2008) .......................................................................... 14

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) .................................. 13

Transcript of Oral Argument, *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Nov. 3, 2021) .................................................................. 12

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety (formally, Everytown for Gun Safety Action Fund; hereafter "Everytown") is the nation's largest gun-violence-prevention organization, with over ten million supporters across the country. Everytown was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed after a gunman armed with an assault weapon and large-capacity magazines murdered twenty children and six adults at an elementary school in Newtown, Connecticut. Everytown also includes a large network of gun-violence survivors who are empowered to share their stories and advocate for responsible gun laws, as well as a national movement of high school and college students working to end gun violence.[1]

**INTRODUCTION AND SUMMARY OF ARGUMENT**

California's restrictions on large-capacity magazines are constitutional under the approach to Second Amendment cases established in *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), for the reasons set out in the State's brief, Dkt. 14-1 ("State Br."). Everytown submits this amicus brief to expand on

---

[1] No party's counsel authored this brief in whole or part and, apart from Everytown, no person contributed money to fund its preparation or submission. All parties consent to this brief's submission.

three methodological points. *First*, on the initial, textual inquiry of the *Bruen* framework, Plaintiffs have the burden to establish that large-capacity magazines are protected "arms" within the meaning of the Second Amendment, and they have not met that burden. *Second*, in applying the historical inquiry of the *Bruen* framework—asking whether the regulation is "consistent with the Nation's historical tradition of firearm regulation," 142 S. Ct. at 2130—the Court should center its analysis on 1868, when the Fourteenth Amendment was ratified. Moreover, 1868 is not a cutoff for the historical analysis; examining "legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is also "a critical tool of constitutional interpretation." *District of Columbia v. Heller*, 554 U.S. 570, 605 (2008) (second emphasis added). And, as *Bruen* instructs, this is particularly so where, as here, the challenged law implicates "unprecedented societal concerns or dramatic technological changes." 142 S. Ct. at 2132. *Third*, *Bruen*'s analysis reveals that a small number of laws can be sufficient to establish this nation's tradition of firearm regulation. Although not directly implicated here, given the robust historical record before the Court, Everytown highlights that point in case the Court chooses to address it.

## ARGUMENT

## I. Plaintiffs Have Not Met Their Burden To Establish that the Second Amendment's Plain Text Covers Their Conduct

*Bruen*'s framework requires both a textual inquiry and a historical inquiry. A court first must ask "whether the challenger is 'part of "the people" whom the Second Amendment protects,'" whether the item at issue is an "arm" that is "'in common use' today for self-defense," and "whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 142 S. Ct. at 2134-35). If so, the court proceeds to consider whether the government has shown that its regulation is "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2130. *See generally id.* at 2134-38 (separating application of test into Part III.A (text) and Part III.B (history)). If not, the inquiry ends: self-evidently, if people, items, or conduct are outside the Second Amendment's protection, then the government may regulate them without infringing the Second Amendment. *See Bevis v. City of Naperville*, --- F.4th ----, 2023 WL 7273709, at *10 (7th Cir. Nov. 3, 2023) (explaining that, if laws do not implicate protected "Arms," then "the Second Amendment has nothing to say about these laws: units of government are free to permit them, or not to permit them, depending on the outcome of the democratic process"); *see also*, *e.g.*, *Alaniz*, 69 F.4th at 1128 (describing step one as a "threshold inquiry" and explaining that "[i]f the first step is satisfied, we proceed to *Bruen* step

two"); *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 390 (D.R.I. 2022) (finding historical inquiry unnecessary "[b]ecause … [large-capacity magazines] are neither 'Arms' within the meaning of the Second Amendment's text, nor weapons of 'self-defense'"), *appeal docketed*, No. 23-1072 (1st Cir. Jan. 18, 2023).

The burden to satisfy the initial, textual inquiry is on the party challenging a law. *Bruen* makes this clear by indicating that a presumption that the Constitution protects a plaintiff's conduct arises *after* ("when" or "because") the textual inquiry is satisfied. *See* 142 S. Ct. at 2126, 2141 n.11. The burden shifts to the government only after this threshold analysis. If the burden were on the government throughout—in what would be an unusual departure from ordinary litigation principles—the Court would have said so. Instead, *Bruen* discusses the government's burden only at the historical step. *See, e.g.*, *id.* at 2135 ("[T]he burden falls on [the government] to show that [challenged restriction] is consistent with this Nation's historical tradition of firearm regulation."). Placing the initial burden on plaintiffs also accords with the Court's approach to other constitutional rights. For example, just a week after *Bruen*, the Court announced in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), that "[u]nder this Court's precedents, a plaintiff bears certain burdens to demonstrate an infringement of [their] rights

under the [First Amendment]. If the plaintiff carries these burdens, the focus then shifts to the defendant to [justify] … its actions[.]" *Id.* at 2421.

Accordingly, multiple courts—including the Seventh Circuit—have read *Bruen* to place the burden on plaintiffs to establish that the Second Amendment's plain text applies to the items and conduct at issue. *See Bevis*, 2023 WL 7273709, at *11 ("[P]laintiffs … have the burden of showing that the weapons addressed in the pertinent legislation are Arms that ordinary people would keep at home for purposes of self-defense[.]"); *see also*, *e.g.*, *Nat'l Ass'n for Gun Rts. v. Lamont*, No. 3:22-cv-01118, 2023 WL 4975979, at *15 (D. Conn. Aug. 3, 2023) ("*Bruen* and *Heller* make clear that [p]laintiffs have the burden of making the initial showing that they are seeking to possess or carry firearms that are in common use today for self-defense and are typically possessed by law-abiding citizens for that purpose.") (internal quotation marks omitted), *appeal docketed*, No. 23-1162 (2d Cir. Aug. 16, 2023); *Or. Firearms Fed'n v. Kotek*, No. 2:22-cv-01815, 2023 WL 4541027, at *5 n.4 (D. Or. July 14, 2023) (concluding that "the burden is on the plaintiff … to show that the challenged law implicates conduct covered by the plain text of the Second Amendment," in light of *Bruen*'s language and "first principles of constitutional adjudication"), *appeals docketed*, Nos. 23-35478, 23-35479, 23-35539 & 23-35540 (9th Cir.); *Ocean State Tactical*, 646 F. Supp. 3d at 385 (explaining that "it is

[plaintiffs'] burden to show that large-capacity magazines fall within the purview of the Second Amendment"). This Court should do the same here.[2]

For the reasons set out by the State, Plaintiffs have failed to satisfy their burden at *Bruen*'s first step. *See* State Br. 16-31. Accordingly, this Court may, and should, reverse without proceeding to a historical analysis.[3]

---

[2] Although the district court in this case seemed to recognize that Plaintiffs bear the burden at *Bruen*'s initial, textual step, *see* 1-ER-41, it appeared to limit that burden to showing that "Plaintiffs are law-abiding citizens who want to possess (or keep) and carry (or bear), magazines able to hold more than 10 rounds commonly-owned for lawful purposes," *id.* But, as the State explains, *see* State Br. 16-31, there is much more to the textual analysis—including whether a weapon or accessory is commonly used for self-defense, *see Bruen*, 142 S. Ct. at 2134-35; *Alaniz*, 69 F.4th at 1128, and whether or not it is "most useful in military service," *Heller*, 554 U.S. at 627; *see also Bevis*, 2023 WL 7273709, at *11-14, or "dangerous and unusual," *Heller*, 554 U.S. at 627; *see Bruen*, 142 S. Ct. at 2143—and Plaintiffs bear the burden as to all these aspects of *Bruen*'s first step.

[3] In erroneously finding that Plaintiffs had met their textual burden in this case, the district court relied in part on a firearms survey conducted by Professor William English. *See* 1-ER-10. That survey is not reliable evidence. Its findings are unpublished and were not peer-reviewed, and it fails to disclose its funding sources or measurement tools. A different professor closely associated with gun rights advocacy—whom plaintiffs in other similar gun cases have often used as an expert witness—recently testified, in a challenge to a large-capacity magazine law in Oregon: "I don't think you can rely on" English's survey. *Or. Firearms Fed'n*, No. 2:22-cv-01815, Dkt. 175-7 at 12-13. He testified that English is "vague about exactly how he developed his sample. And there's nothing in his report to contradict the assumption that what he had was a self-selected sample .... And that's not a valid sample technique to generate a sample that's representative of the larger US population." *Id.* at 12. When asked "without that information that is missing, you would not rely on that survey for any purpose?," he stated: "That is correct. I would not rely." *Id.* at 12-13. Moreover, even if English's survey were reliable, it "does not demonstrate that [large-capacity magazines] possess characteristics that make them well-suited for self-defense." *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *21; *see also* State Br. 21-22.

## II. The Correct Historical Analysis Centers on the Reconstruction Era and Encompasses Consistent 20th-Century Regulations

Plaintiffs' claim fails under *Bruen*'s textual inquiry, and that should end the case. However, if the Court proceeds to inquire whether California's large-capacity magazine restrictions are "consistent with the Nation's historical tradition of firearm regulation," *Bruen*, 142 S. Ct. at 2129-30, it may confront the question of whether the most relevant time period for that inquiry centers on the Reconstruction era, and the ratification of the Fourteenth Amendment in 1868, or the founding era, and the ratification of the Second Amendment in 1791, *see id.* at 2138 (reserving the question for a future case). The State has demonstrated that its restrictions are entirely consistent with the American tradition of firearms regulation regardless of which period this Court considers. But if the Court finds it necessary to decide the question, it should conclude that the most relevant time period for that inquiry centers around 1868. And it should further conclude that the historical inquiry extends thereafter—including into the 20th century—to encompass consistent later restrictions, given the "dramatic technological changes" and "unprecedented societal concerns" present in this case. *See id.* at 2132.

### a. The Proper Focus for Historical Analysis Is 1868 Rather Than 1791

As the State has explained, its restrictions are entirely consistent with the American tradition of firearms regulation regardless of whether this Court

7

considers 1868 or 1791 the most relevant period. Historical tradition—from the founding era, to the 19th century, through Reconstruction, into the 20th century, and even up to today—is consistent in demonstrating the constitutionality of restrictions on weapons and accessories "relevantly similar" to the large-capacity magazine restrictions challenged here. *See, e.g.*, State Br. 31, 36-48.[4] Where, as here, the inquiry into the public understanding in 1791 and 1868 yield the same result, the court need not resolve the issue of the correct time period. *See Bruen*, 142 S. Ct. at 2138 (declining to resolve the timeframe question because the relevant history was consistent between 1791 and 1868); *see also, e.g.*, *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *30 n.46 (same). Nevertheless, if this Court reaches the question, it should hold that the inquiry centers on 1868.

To begin with, in a case challenging the constitutionality of a state law, focusing on 1868 is the only way to answer the originalist question: How did the people understand the right at the time of its adoption? The Constitution's protection of the right to keep and bear arms did not constrain the states until 1868; after all, a state "is bound to respect the right to keep and bear arms because of the Fourteenth Amendment, not the Second." *Bruen*, 142 S. Ct. at 2137. Thus,

---

[4] Even if this Court were to focus on 1791 and conclude that history left the Second Amendment's meaning at that time unclear (contrary to the State's evidence), it should rely on 19th-century and 20th-century history to clarify that meaning. *See infra* pp. 17-19.

when the people chose to extend the Bill of Rights to the states in 1868, *their* understanding of the scope of each right at that time should control the originalist analysis today. In a case against a state, to elevate a founding-era understanding of the right over the Reconstruction-era understanding would be to reject what the people understood the right to be at the time they gave it effect. And that, in turn, would violate the originalist mandate of *Heller* and *Bruen*: "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" *Bruen*, 142 S. Ct. at 2136 (quoting *Heller*, 554 U.S. at 634-35; emphasis added in *Bruen*).

Insisting that the 1791 understanding should apply against the states would not make sense given the Supreme Court's lengthy analysis in *McDonald* of the understanding of the right to keep and bear arms around 1868. *See McDonald v. City of Chicago*, 561 U.S. 742, 770-78 (2010) (plurality opinion); *id.* at 826-38 (Thomas, J., concurring in part and concurring in the judgment). It would be extraordinary if the public understanding of the right in 1868 were so central to *whether* the right was incorporated against the states, but irrelevant to *what* right was incorporated. That is presumably why the Seventh Circuit, in a pre-*Bruen* opinion by Judge Sykes, read *McDonald* to have "confirm[ed] that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how

the right was understood when the Fourteenth Amendment was ratified." *Ezell v. City of Chicago*, 651 F.3d 684, 702 (7th Cir. 2011). Several other circuits reached the same conclusion in analyzing the tradition of firearm regulation at the first, historical step of the pre-Bruen Second Amendment framework. *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (following *Ezell*); *Gould v. Morgan*, 907 F.3d 659, 669 (1st Cir. 2018) ("Because the challenge here is directed at a state law, the pertinent point in time would be 1868 (when the Fourteenth Amendment was ratified)."). *Bruen* does not alter that conclusion; the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2138 (leaving open the question whether 1868 or 1791 is the correct focus); *id.* at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*").[5]

---

[5] Between *Heller* and *Bruen*, every federal court of appeals to address the issue concluded that Second Amendment analysis should proceed in two steps: a historical step, in which courts examined whether the challenged law restricted conduct falling within the scope of the Second Amendment, as historically understood; and, if so, a means-end scrutiny step, where courts examined the fit between the government's interest and the challenged law, usually under intermediate scrutiny. *See Gould*, 907 F.3d at 668 (citing cases), *criticized by Bruen*, 142 S. Ct. at 2124, 2126-27. *Bruen* removed means-ends scrutiny from the analysis but confirmed that the step-one analyses in these cases remain, as a general matter, good law. *See* 142 S. Ct. at 2127 (concluding that "[s]tep one of the predominant framework [applied in the lower courts before *Bruen*] is broadly consistent with *Heller*").

A panel of the Eleventh Circuit recently reached the same conclusion post-*Bruen*, holding that, in cases involving state laws, where the understanding of the right to keep and bear arms differs between the founding and Reconstruction eras, "the more appropriate barometer is the public understanding of the right when the States ratified the Fourteenth Amendment and made the Second Amendment applicable to the States." *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1323 (11th Cir. 2023), *vacated on grant of reh'g en banc*, No. 21-12314, 2023 WL 4542153 (July 14, 2023). Although that panel opinion has now been vacated for rehearing en banc, its analysis of the relevant time period remains sound and consistent with originalist principles. As the panel explained:

> This is necessarily so if we are to be faithful to the principle that constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*. As with statutes, when a conflict arises between an earlier version of a constitutional provision (here, the Second Amendment) and a later one (here, the Fourteenth Amendment and the understanding of the right to keep and bear arms that it incorporates), the later-enacted provision controls to the extent it conflicts with the earlier-enacted provision .… The opposite rule would be illogical.

61 F.4th at 1323-24 (alterations adopted) (citations and quotation marks omitted); *see also Md. Shall Issue, Inc. v. Montgomery Cnty.*, No. 8:21-cv-01736, 2023 WL 4373260, at *8 (D. Md. July 6, 2023) (concluding that "historical sources from the time period of the ratification of the Fourteenth Amendment are equally if not more probative of the scope of the Second Amendment's right to bear arms as

applied to the states by the Fourteenth Amendment"), *appeal docketed*, No. 23-1719 (4th Cir. July 10, 2023); *Kipke v. Moore*, Nos. 1:23-cv-01293 & 1:23-cv-01295 (consol.), 2023 WL 6381503, at *6 (D. Md. Sept. 29, 2023) (agreeing with *Maryland Shall Issue*); *We the Patriots, Inc. v. Grisham*, No. 1:23-cv-00771, 2023 WL 6622042, at *8 (D.N.M. Oct. 11, 2023) (agreeing with *Bondi* and *Maryland Shall Issue* that Reconstruction-era sources "are more probative" than founding-era sources as to the Second Amendment's scope), *appeal docketed*, No. 23-2166 (10th Cir. Oct. 20, 2023).

The conclusion that the 1868 understanding of the Second Amendment right should apply in a case against a state is far from radical. Indeed, it was the position former Solicitor General Paul Clement took as counsel for the National Rifle Association's New York affiliate during oral argument in *Bruen*:

> JUSTICE THOMAS: [Y]ou mentioned the founding and you mentioned post-Reconstruction. But, if we are to analyze this based upon the history or tradition, should we look at the founding, or should we look at the time of the adoption of the Fourteenth Amendment, which then, of course, applies it to the states?

> MR. CLEMENT: So, Justice Thomas, I suppose, if there were a case where there was a contradiction between those two, you know, and the case arose in the states, I would think there would be a decent argument for looking at the history at the time of Reconstruction … and giving preference to that over the founding.

Tr. of Oral Arg. at 8:2-17, *Bruen* (No. 20-843).

12

It is also the position of leading originalist scholars. "Many prominent judges and scholars—across the political spectrum—agree that, at a minimum, 'the Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.'" *Bondi*, 61 F.4th at 1322 n.9 (quoting *Ezell*, 651 F.3d at 702) (citing, among others, Josh Blackman, Ilya Shapiro, Steven Calabresi, and Sarah Agudo); *see also* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 Geo. J.L. & Pub. Pol'y 1, 52 (2010) ("1868 is … the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment …. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis." (footnote omitted)); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 115-16 & 116 n.485 (2008) (asserting that "[Akhil] Amar is exactly right" that 1868 meaning controls); Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022) (calling 1868 view "ascendant among originalists"). Others who have endorsed this view include Professors Michael

Rappaport[6] and Stephen Siegel.[7] In sum, originalist analysis compels applying the 1868 understanding of the right to keep and bear arms in a case challenging a state law.

A question raised by that conclusion (though one not directly presented in this case) is what the temporal focus should be in cases challenging *federal* laws. If the public understanding of the Bill of Rights changed between ratification in 1791 and incorporation in 1868, then "[o]riginalists seem," at first glance, to be "forced to either abandon originalism or accept a world in which we have two Bills of Rights, one applicable against the federal government and invested with 1791 meanings and one incorporated against the states and invested with 1868 meanings." Kurt T. Lash, *Respeaking the Bill of Rights: A New Doctrine of Incorporation*, 97 Ind. L.J. 1439, 1441 (2022). But *Bruen* rejected the possibility of different standards for the state and federal governments. 142 S. Ct. at 2137 ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same

---

[6] Michael B. Rappaport, *Originalism and Regulatory Takings: Why the Fifth Amendment May Not Protect Against Regulatory Takings, But the Fourteenth Amendment May*, 45 San Diego L. Rev. 729, 748 (2008). Professor Rappaport directs the University of San Diego School of Law's Center for the Study of Constitutional Originalism.

[7] Stephen A. Siegel, *Injunctions for Defamation, Juries, and the Clarifying Lens of 1868*, 56 Buff. L. Rev. 655, 662 n.32 (2008) ("I am unable to conceive of a persuasive originalist argument asserting the view that, with regard to the states, the meaning of the Bill in 1789 is to be preferred to its meaning in 1868.").

14

scope as against the Federal Government."). Accordingly, originalists must justify applying either the 1868 understanding or the 1791 understanding (where they conflict) to all levels of government.

Existing doctrine does not resolve this choice between 1791 and 1868: *Bruen* noted only that prior decisions had "assumed" (in the context of other individual rights) that the scope for both state and federal governments "is pegged to the public understanding … in 1791." *Id*. If the majority believed those decisions controlled the issue, it would have said so. Instead, the Court expressly left open the question whether 1868 or 1791 is the relevant focus, and it pointed to "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id*. at 2138. The Court then cited two scholars who support the 1868 view, Professors Akhil Amar and Kurt Lash, and none who supports the 1791 view. *See id*. (citing Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* xiv, 223, 243 (1998), and Kurt T. Lash, *Re-Speaking the Bill of Rights: A New Doctrine of Incorporation* (Jan. 15, 2021) (manuscript, at 2), https://papers.ssrn.com/sol3/ papers.cfm?abstract_id=3766917 (now published at 97 Ind. L.J. 1439)); *see also, e.g.*, *United States v. Meyer*, No. 4:22-cr-10012, 2023 WL 3318492, at *2 n.4 (S.D. Fla. May 9, 2023) (noting that "Justice Thomas, writing for the majority in *Bruen*,

signaled an openness to the feedback-effect theory of the Fourteenth Amendment").

On Professor Amar's account, when the Fourteenth Amendment was ratified, then-contemporary understandings of incorporated rights could transform their meaning not only against the states, but also as to the federal government.[8] More recently, Professor Lash wrote—as quoted in *Bruen*—"When the people adopted the Fourteenth Amendment into existence, they readopted the original Bill of Rights, and did so in a manner that invested those original 1791 texts with new 1868 meanings." 142 S. Ct. at 2138 (quoting Lash, manuscript, at 2). On this view, too, 1868 meanings bind both the states and the federal government.

The 1868 view is also consistent with *Bruen*'s instruction on historical methodology through the example of restrictions on firearms in sensitive places. There, the Court indicated that "18th- *and 19th-century*" laws contained adequate restrictions on the possession of guns in legislative assemblies, polling places, and courthouses to satisfy its historical analysis, 142 S. Ct. at 2133 (emphasis added)—

---

[8] *See* Amar, *The Bill of Rights*, *supra*, at xiv (noting that a "particular principle in the Bill of Rights may change its shape in the process of absorption into the Fourteenth Amendment"); *id.* at 223 ("[I]n the very process of being absorbed into the Fourteenth Amendment, various rights and freedoms of the original Bill may be subtly but importantly transformed[.]"); *id.* at 243 (arguing that "the Fourteenth Amendment has a doctrinal 'feedback effect' against the federal government"); *see also id.* at 283 ("[W]ords inserted into the Constitution in 1791 must be read afresh after 1866.").

an incomprehensible statement if the Court believed that the 18th century was the only relevant period. Notably, in the pages of the article and brief the Court cited for that proposition, *see id.*, all of the 19th-century laws restricting guns in any of the three locations the Court listed were from the *late* 19th century.[9]

The district court proclaimed that "the most significant historical evidence comes from 1791, and secondarily 1868," without meaningfully grappling with this debate. *See* 1-ER-43-44. Should the Court reach the question, it should find that 1868 is the proper starting point for *Bruen*'s historical analysis.

### b. The Court Should Also Consider Consistent Later History

In addition to concluding that 1868, rather than 1791, should be the focus of the historical analysis, this Court should also recognize that 1868 is neither a starting line nor a cutoff, and that consistent later history is also highly relevant. *Heller* and *Bruen* both examined history preceding even 1791, *see Heller*, 554 U.S. at 592-93; *Bruen*, 142 S. Ct. at 2135-36, 2142-45; *see also* State Br. 50, and *Heller* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is

---

[9] *See* David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 244-47 (2018) (citing 1870 Louisiana law, 1874 and 1886 Maryland laws, 1873 Texas law, and 1874 decision upholding 1870 Georgia law); Br. for Indep. Inst. as Amicus Curiae at 11-17, *Bruen* (No. 20-843) (July 20, 2021) (disputing relevance of 19th-century laws but (at 16 n.10) citing 1869 Tennessee, 1870 Texas, and 1890 Oklahoma laws that prohibited guns in (among others) polling places).

also "a critical tool of constitutional interpretation," 554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same). *Bruen* clarified that, under this passage in *Heller*, materially later history that *contradicts* the established original meaning of the constitutional text at the relevant point in time would not change that meaning. *See* 142 S. Ct. at 2137, 2154 n.28. But it emphasized that, conversely, "a regular course of practice can liquidate [and] settle the meaning of disputed or indeterminate terms [and] phrases in the Constitution." *Id.* at 2136 (cleaned up) (quoting decision quoting James Madison). Thus, even if evidence in the period up to and around 1868 left the meaning of the Second Amendment right "indeterminate," courts should look to "practice" in the decades that followed to "settle" the meaning of the right. Equally, even if a court were to conclude (contrary to the scholars the Supreme Court cited) that the relevant date is 1791, not 1868, and even if it found evidence in that period indeterminate, it should recognize that later laws (and other historical evidence of regulatory authority) settle the meaning of the Second Amendment right and demonstrate that the challenged law is constitutional.[10]

---

[10] Looking to 19th-century and later evidence can also help contextualize earlier legislative inaction, even if this Court were to conclude that 1791 is the correct focus for historical analysis. For instance, if a regulation passed in the decades around Reconstruction—*within the lifetimes* of some who were alive at the founding—did not raise a constitutional challenge at the time of its passage, and there is no separate historical evidence showing that the regulation would have raised constitutional concern in the decades prior, then it can be inferred that the

Furthermore, *Bruen* counsels that new technologies or new societal concerns may "require a more nuanced approach" to the historical inquiry. *Id.* at 2132; *see also Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1275 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) (explaining that "constitutional principles … must be faithfully applied not only to circumstances as they existed in 1787, 1791, and 1868, for example, but also to modern situations that were unknown to the Constitution's Framers"). If a modern technological development or modern societal concern that warrants a modern firearms regulation did not exist in the time period a court is examining, then self-evidently there will be no historical laws addressing the development or concern to be found in that period—making the consideration of later history particularly crucial. *See McCullen v. Coakley*, 573 U.S. 464, 481 (2014) ("States adopt laws to address problems that confront them.").

The court below, however, erred in several respects when considering 19th-century and later evidence. For one, the district court largely disregarded the State's evidence postdating 1868. *See, e.g.*, 1-ER-44-47 & n.157, 54, 67-68; *see also*

_____

regulation comports with the founding-era public understanding of the right. In other words, absent affirmative evidence to the contrary, a court should presume that a Reconstruction-era or later public understanding of the right (as demonstrated through a regulatory tradition or other historical materials from that period) also reflects the founding-era understanding. Such a presumption also reflects and reinforces the Supreme Court's position that "individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government." *Bruen*, 142 S. Ct. at 2137.

State Br. 50. The court initially attempted to constrain the historical record as ending in 1888, but then—recognizing that this limit was "admittedly arbitrary"—essentially treated 1868 as a cut-off when reviewing the State's evidence. 1-ER-46-47. The district court's apparent understanding of 1868 as a cut-off necessarily rests on the plainly implausible premise that the American people made the Second Amendment applicable to the states in 1868 and then *immediately* changed their minds about its meaning. To the contrary, as Justice Scalia himself explained, "[p]rinciples of liberty fundamental enough to have been embodied within constitutional guarantees are not readily erased from the Nation's consciousness." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375 (1995) (Scalia, J., dissenting). That insight helps explain why, as just discussed, post-ratification history is a "critical tool of constitutional interpretation," *Heller*, 554 U.S. at 605, and can "liquidate" and "settle" the meaning of constitutional terms, *Bruen*, 142 S. Ct. at 2136 (internal quotation marks omitted); *see also Heller*, 554 U.S. at 618-20 (canvassing, among others, treatises from 1873, 1880, and 1891); *Bruen*, 142 S. Ct. at 2153-54 (finding Texas's 1871 law and 1871 and 1875 decisions insufficient to justify New York's law not because they came too late, but because they were from a "single state" and "contradict[ed] the overwhelming weight of other evidence").

Additionally, as the State explains, California adopted the challenged measure in response to the exponential increase in the lethality of firearms and

magazines—*i.e.*, "dramatic technological changes," *Bruen*, 142 S. Ct. at 2132—and the "unprecedented societal concern[]," *id.*, that followed, namely, an epidemic of mass shootings. *See* State Br. 32-36, 45-46; *see also, e.g.*, *Or. Firearms Fed'n*, 2023 WL 4541027, at *36-39 (finding that "modern-day [large-capacity magazines] represent a dramatic technological change from the Founding and Reconstruction-era firearms" and that "mass shootings related to [large-capacity magazines] are an unprecedented societal concern"); *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *29 (reaching same conclusion in denying plaintiffs' preliminary injunction motion as to Connecticut assault weapon and large-capacity magazine laws). Accordingly, a "more nuanced approach" to history, *Bruen*, 142 S. Ct. 2132, including "a broader search for historical analogies," is fully warranted, *United States v. Rowson*, No. 1:22-cr-00310, 2023 WL 431037, at *24 (S.D.N.Y. Jan. 27, 2023).[11]

Here, state and local laws from the period beginning around Reconstruction and continuing into the Prohibition era and later—which are fully consistent with earlier regulations—establish the meaning of the right to keep and bear arms at the time of the Fourteenth Amendment's adoption, and demonstrate the

---

[11] Despite acknowledging the argument that "removable magazines represent a dramatic change in technology and the State is attempting to address a modern societal concern," the district court did not actually engage in a "more nuanced" analysis of historical regulation. 1-ER-60-61. To the contrary, its approach to the historical inquiry, *see id.* at 61-69, was impermissibly restrictive. *See* State Br. 48-50.

constitutionality of California's restrictions. *See* State Br. 41-45 (discussing late 19th- and early 20th-century regulation of particularly dangerous weapons and weapon capacity, which were consistent with earlier laws restricting access to weapons and weapon features associated with increased violence and lethality); *Bevis*, 2023 WL 7273709, at *17-18 (upholding Illinois and municipal laws restricting assault weapons and large-capacity magazines, relying on both late 19th- and 20th-century weapons laws); *Nat'l Ass'n for Gun Rts.*, 2023 WL 4975979, at *26, *31-33 & n.51 (same, for similar Connecticut laws); *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, No. 1:22-cv-00951, 2023 WL 2655150, at *12 (D. Del. Mar. 27, 2023) (relying on consistent 20th-century history to uphold similar Delaware laws), *appeals docketed*, Nos. 23-1633, 23-1634, 23-1641 (3d Cir. Apr. 7, 2023). And, in any event, regardless of whether the Court concludes that the relevant focus for its analysis is 1791 or 1868, it should consider this later historical evidence and the "regular course of practice" in the decades that followed to "settle" the meaning of the right as one that allows for restrictions like California's.

## III. This Court Should Reject Any Effort To Dismiss the District's Historical Analogues as "Outliers"

In its ruling, the district court discounted California's record of historical laws in part by characterizing some of those laws as outliers or as insufficiently representative of a national tradition. 1-ER-57-58, 66-67 (disregarding laws if they applied only in "a handful of states" and "not the vast majority of states"). That

22

was erroneous, given the robust and extensive historical record here. *See, e.g.*, State Br. 36-45. But even if the record were less extensive, the district court's analysis still would have been incorrect because *Bruen*'s discussion of the historical laws justifying sensitive places demonstrates that a small number of laws can establish a tradition.

Specifically, *Bruen* repeated *Heller*'s identification of "schools and government buildings" as sensitive places, 142 S. Ct. at 2133 (quoting *Heller*, 554 U.S. at 626), and then recognized that three additional, more specific locations (legislative assemblies, polling places, and courthouses) were also "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment," *id.* But the sources the Court cited for the historical record justifying restrictions in those three locations identified *only two laws* naming legislative assemblies and *two laws* naming courthouses. *See* Kopel & Greenlee, 13 Charleston L. Rev. at 235, 246; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843).[12] Moreover, the two laws both sources cited as prohibiting guns in legislative assemblies in the pages the Court referenced were from a single colony, Maryland, and were enacted three years apart, in 1647 and 1650. *See* Kopel & Greenlee, 13 Charleston L. Rev. at

---

[12] In addition, *Bruen* repeatedly used the singular when referring to the government's burden to produce "a" historical analogue. *See, e.g.*, 142 S. Ct. at 2133.

235; Br. for Indep. Inst. as Amicus Curiae 11-12, *Bruen* (No. 20-843).[13] Under

*Bruen*'s sensitive places analysis, therefore, a small number of laws can be sufficient

to establish this nation's tradition of firearm regulation, at least so long as there is

not overwhelming affirmative evidence of an enduring tradition to the contrary.[14]

    Concluding that a small number of state and local laws can demonstrate a

"public understanding" of a limitation on the Second Amendment right is also

consistent with bedrock federalism principles that entitle a state to effectuate the

policy choice of its citizens within constitutional bounds. Local conditions matter.

States today may (or may choose not to) "experiment[] with reasonable firearms

---

[13] Notably, one of the Court's sources stated that, "[i]n general, Americans did not seem to mind people coming armed to attend or participate in legislative matters. The United States Congress had no rules against legislative armament, and through the mid-nineteenth century, it was common for Congressmen to be armed." Kopel & Greenlee, 13 Charleston L. Rev. at 235. Accordingly, the Court's reliance on this source further confirms that widespread acceptance of a practice of carrying guns as a matter of policy does not indicate that the practice was constitutionally protected. *See also infra* pp. 24-26 (explaining that to infer constitutional protection from absence of regulation would run against basic principles of federalism).

[14] To be sure, *Bruen* expressed "doubt" that three colonial regulations "could suffice to show a tradition." 142 S. Ct. at 2142. But that tentative statement should not be given undue weight, given the Supreme Court's discussion of sensitive places. Moreover, that comment should be read in light of the Court's subsequent statement that it found an "'overwhelming weight of other evidence regarding the right to keep and bear arms'" that contradicted historical analogues to New York's proper-cause law. *See id.* at 2153-55 (quoting *Heller*, 554 U.S. at 632). Here, there is indisputably no such "overwhelming" evidence of a right to possess large-capacity magazines.

regulations." *McDonald*, 561 U.S. at 785 (plurality opinion) (cleaned up); *see Bevis*, 2023 WL 7273709, at *18 (after concluding that States may constitutionally enact restrictions on the ownership of assault weapons and large-capacity magazines, recognizing that some states may choose not to given local preferences). Likewise, states historically may have chosen not to regulate certain weapons, people, or conduct, not because the public understood the right to keep and bear arms to prevent such regulations, but because of democratically supported policy choices. *See* State Br. 41-42, 47. As Judge Easterbrook explained in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015), "the Constitution establishes a federal republic where local differences are cherished as elements of liberty, rather than eliminated in a search for national uniformity," and "[t]he central role of representative democracy is no less part of the Constitution than is the Second Amendment." *Id.* at 412. And the fact that states have latitude to experiment with regulations that meet their unique needs means that states historically may well have chosen not to regulate to the limits of constitutional permissibility. *Cf., e.g.*, *McCullen*, 573 U.S. at 481 (recognizing that Constitution "does not require States to regulate for problems that do not exist" in their jurisdiction); *Davenport v. Wash. Educ. Ass'n*, 551 U.S. 177, 185 (2007) ("The constitutional floor [by which the First Amendment restricts public-sector] unions' collection and spending of agency fees is not also a constitutional ceiling for state-imposed restrictions."). Accordingly,

while state laws restricting firearms demonstrate that the people of those states understood the right to keep and bear arms to permit such restrictions, the absence of such laws in other states does not warrant any inference that their citizens considered such restrictions unconstitutional.[15]

## CONCLUSION

The Court should reverse the district court's decision.

Dated: November 28, 2023

Respectfully submitted,

/s/ Priyanka Gupta Sen
Janet Carter
William J. Taylor, Jr.
Priyanka Gupta Sen
Everytown Law
450 Lexington Avenue, P.O. Box 4184
New York, NY 10017
(646) 324-8201
psen@everytown.org

Freya Jamison
Everytown Law
P.O. Box 14780
Washington, DC 20044

*Counsel for amicus curiae*
*Everytown for Gun Safety*

---

[15] Indeed, any such inference would be untenable in light of the Court's statement, in a decision issued the day after *Bruen*—with five of the same Justices in the majority—that "the fact that many States in the late 18th and early 19th century did not criminalize" certain conduct "does not mean that anyone thought the States lacked the authority to do so." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2255 (2022).

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55805

I am the attorney or self-represented party.

**This brief contains** | 6,741 | **words,** including | | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
- [ ] it is a joint brief submitted by separately represented parties.
- [ ] a party or parties are filing a single brief in response to multiple briefs.
- [ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [        ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Priyanka Gupta Sen | **Date** | 11/28/23

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                    *Rev. 12/01/22*