No. 23-55805

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

—————————

VIRGINIA DUNCAN, et al.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as Attorney General of the State of California,

*Defendant-Appellant.*

—————————

On Appeal from the United States District Court for the
Southern District of California,
No. 3:17-cv-01017

—————————

**RESPONSE BRIEF FOR APPELLEES**

—————————

C.D. MICHEL
ANNA M. BARVIR
SEAN A. BRADY
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444

PAUL D. CLEMENT
ERIN E. MURPHY
 *Counsel of Record*
MATTHEW D. ROWEN*
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

* Supervised by principals of the firm who are
members of the Virginia bar

*Counsel for Plaintiffs-Appellees*

December 21, 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), plaintiff-appellee California Rifle and Pistol Association, Incorporated, certifies that it does not have a parent corporation and that no publicly held corporation owns more than ten percent of its stock. All other plaintiffs-appellees are natural persons.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ............................................................... 3

STATEMENT OF THE ISSUES .................................................................. 3

CONSTITUTIONAL AND STATUTORY PROVISIONS ................................... 3

STATEMENT OF THE CASE ..................................................................... 4

    A.    Factual and Legal Background .............................................. 4

    B.    Proceedings Below ............................................................. 7

    C.    Prior Proceedings in this Appeal .......................................... 9

SUMMARY OF ARGUMENT .................................................................... 10

STANDARD OF REVIEW ....................................................................... 13

ARGUMENT ......................................................................................... 13

I.    The En Banc Panel Lacks Statutory Authority To Hear This Appeal ......... 13

II.    California's Magazine Ban Violates The Second Amendment ................... 20

    A.    The Second Amendment's Plain Text Unquestionably Covers the Conduct That California's Ban Restricts ..................................... 21

    B.    The Magazines That California Bans Are in Common Use for Lawful Purposes, Including Self-Defense, and Are the Furthest Thing From Highly Unusual in Society at Large Today ...................................... 28

    C.    There Is No Historical Tradition in this Country of Banning Arms That Millions of Law-Abiding Citizens Own for Lawful Purposes ...................................... 37

D.      California Cannot Save Its Sweeping Ban by Pointing to Some Dramatic Technological Change or Novel Societal Problem ............................................................................. 46

III.    California's Confiscatory Ban Violates The Takings Clause ....................... 50

CONCLUSION ....................................................................................... 55

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

## Cases

*Andrus v. Allard*,
444 U.S. 51 (1979) .............................................................................54

*Barnett v. Raoul*,
2023 WL 3160285 (S.D. Ill. Apr. 28, 2023) .....................................36

*Caetano v. Massachusetts*,
577 U.S. 411 (2016) .............................................................. 21, 32, 41

*Campidoglio LLC v. Wells Fargo & Co.*,
870 F.3d 963 (9th Cir. 2017) ..............................................................13

*Chi., Burlington & Quincy Ry. Co. v. City of Chicago*,
166 U.S. 226 (1897) .............................................................................51

*Chi., Burlington & Quincy Ry. Co. v. Illinois*,
200 U.S. 561 (1906) .............................................................................55

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ..................................................................... *passim*

*Duncan v. Becerra*,
265 F.Supp.3d 1106 (S.D. Cal. 2017) ..................................................5

*Duncan v. Becerra*,
742 F.App'x 218 (9th Cir. 2018) ......................................................... 5

*Duncan v. Becerra*,
970 F.3d 1133 (9th Cir. 2020) ..................................................... *passim*

*Duncan v. Bonta*,
19 F.4th 1087 (9th Cir. 2021) ..................................................... *passim*

*Duncan v. Bonta*,
49 F.4th 1228 (9th Cir. 2022) ..................................................... 7, 19

*Duncan v. Bonta*,
142 S.Ct. 2895 (2022) ......................................................................1, 7

iv

*Guerrier v. Garland*,
    18 F.4th 304 (9th Cir. 2021)...............................................................13

*Horne v. Dep't of Agric.*,
    576 U.S. 350 (2015)........................................................ 51, 53, 54

*In re Johns-Manville Corp.*,
    440 B.R. 604 (Bankr. S.D.N.Y. 2010) ...............................................19

*In re Watts*,
    298 F.3d 1077 (9th Cir. 2002)..........................................................14

*Jackson v. City & Cnty. of S.F.*,
    746 F.3d 953 (9th Cir. 2014)................................................11, 22, 52

*Kelo v. City of New London*,
    545 U.S. 469 (2005)........................................................................52

*Koontz v. St. Johns River Water Mgmt. Dist.*,
    570 U.S. 595 (2013)........................................................................53

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)........................................................ 51, 53, 55

*Lucas v. South Carolina Coastal Council*,
    505 U.S. 1003 (1992)......................................................................54

*Moody v. Albemarle Paper Co.*,
    417 U.S. 622 (1974).................................................................*passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022)....................................................................*passim*

*Nat'l Rifle Ass'n v. Bondi*,
    61 F.4th 1317 (11th Cir. 2023).........................................................50

*Nunn v. State*,
    1 Ga. 243 (1846) ...........................................................................43

*Se. Promotions Ltd. v. Conrad*,
    420 U.S. 546 (1975)........................................................................31

*Sekhar v. United States*,
570 U.S. 729 (2013) ................................................................................1

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*,
554 U.S. 269 (2008) ..............................................................................40

*Staples v. United States*,
511 U.S. 600 (1994) ..............................................................................40

*Stevens v. Corelogic, Inc.*,
899 F.3d 666 (9th Cir. 2018) .................................................................13

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
535 U.S. 302 (2002) ..............................................................................51

*Teter v. Lopez*,
76 F.4th 938 (9th Cir. 2023) ................................................... 25, 26, 28

*United States v. Am.-Foreign S.S. Corp.*,
363 U.S. 685 (1960) ......................................................................15, 19

*United States v. Stevens*,
559 U.S. 460 (2010) ......................................................................26, 27

*W. Pac. R.R. Corp. v. W. Pac. R.R. Co.*,
345 U.S. 247 (1953) ..............................................................................16

## Constitutional Provisions

U.S. Const. amend. II ....................................................... 3, 21, 33, 54

U.S. Const. amend. V ............................................................... 3, 51

## Statutes

28 U.S.C. §46(c) ........................................................... *passim*

28 U.S.C. §46(d) ..............................................................................17

Cal. Penal Code §16740.................................................................. 4, 52

Cal. Penal Code §16900...................................................................23

Cal. Penal Code §31910(b)(5) ...........................................................23

Cal. Penal Code §32310 .........................................................................3, 4

Cal. Penal Code §32310(a) ...................................................................4

Cal. Penal Code §32310(c) ............................................................... 4, 52

Cal. Penal Code §32310(d) .............................................................. 4, 52

N.J. Stat. §2C:39-1y .............................................................................38

N.J. Stat. §2C:39-3j ..............................................................................38

N.J. Stat. §2C:39-9h .............................................................................38

1927 Mich. Pub. Acts 887, 888 ............................................................38

1927 R.I. Acts & Resolves 256 ............................................................38

1933 Cal. Stat., ch. 450 ........................................................................39

1933 Minn. Laws ch. 190 .....................................................................38

1933 Ohio Laws 189 ............................................................................39

1934 Va. Acts ch. 96 ............................................................................39

1959 Mich. Pub. Acts 249 ....................................................................39

1959 R.I. Acts & Resolves 260 ............................................................39

1963 Minn. Sess. L. ch. 753 .................................................................39

1965 Cal. Stat., ch. 33 ..........................................................................39

1972 Ohio Laws 1866 ..........................................................................39

1975 Va. Acts, ch. 14 ...........................................................................39

Pub. L. No. 72-275, Stat. 650 (1932) ................................................... 39

Pub. L. No. 73-474, 48 Stat. 1236 (1934) ...........................................40

Pub. L. No. 103-322, 108 Stat. 1796 (1994) ....................................... 38

S.B. 1446, 2015-2016 Reg. Sess. (Cal. 2016) .........................................4

## Other Authorities

9th Cir. Gen. Order 3.6(b) .......................................................................17

*Black's Law Dictionary* (10th ed. 2014) ..................................................52

William English, Ph.D., *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (Sept. 28, 2022), https://bit.ly/3yPfoHw.......................................................... 29, 30

Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* (9th ed. 2007)........................................... 48

Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* (2008)................................................ 50

Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase for Guns and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), https://n.pr/3QMJCC1 ............................................. 29

Nicholas Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* (3d ed. 2021)..................................... 47

David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022), bit.ly/3RNRpQD.......................................................43

Nat'l Shooting Sports Found., *Firearm Production in the United States* (2020), https://bit.ly/3LwJvKh.................................................28

Nat'l Shooting Sports Found., *Modern Sporting Rifle Comprehensive Consumer Report* (July 14, 2022), https://bit.ly/3GLmErS .............................29

Harold L. Peterson, *The Treasury of the Gun* (1962) ............................. 47

*Proceedings of the Virginia Assembly, 1619*, in *Narratives of Early Virginia, 1606-25* (Lyon Gardiner Tyler ed., 1907)............................................44

Harold F. Williamson, *Winchester: The Gun That Won The West* (1952) .................48

**INTRODUCTION**

When California Penal Code §32310 was last before this en banc panel, the Court upheld the state's ban on common arms under intermediate scrutiny and declared that, if the Supreme Court wanted a different outcome, it would have to "tell[] us" itself that this Circuit and others had "fundamentally misunderstood the basic framework for assessing Second Amendment challenges." *Duncan v. Bonta* ("*Duncan V*"), 19 F.4th 1087, 1101 (9th Cir. 2021) (en banc). The Supreme Court responded to that clarion call, emphatically rejecting the two-step intermediate-scrutiny test as fundamentally flawed and making clear once and for all that "the Second Amendment protects the possession and use of weapons that are 'in common use.'" *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 21 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)). Then, for good measure, it vacated and remanded this panel's decision "for further consideration in light of" *Bruen*. *Duncan v. Bonta* ("*Duncan VI*"), 142 S.Ct. 2895 (2022). The fate of California's ban on common arms should now be clear—and, to the district court, it was. But to hear the state tell it, the Supreme Court's paradigm-shifting decision in *Bruen* makes no difference at all except perhaps to (somehow) *expand* states' latitude to restrict law-abiding citizens' ability to keep and bear arms. That "sounds absurd, because it is." *Sekhar v. United States*, 570 U.S. 729, 738 (2013). A straightforward application of *Bruen* confirms that California's ban is unconstitutional.

If this en banc panel reaches the merits, it should affirm. But this panel should not issue any merits decision because it is unlawfully constituted. Under 28 U.S.C. §46(c), "a hearing or rehearing before the court in banc" will be held only if it is "ordered by a majority of the circuit judges of the circuit who are in regular active service." No such order has issued here; rather, the en banc panel from the *previous* appeal, Case No. 19-55376, elected to hear this appeal under Ninth Circuit General Order 3.6(b). *See* Dkt.3 at 1. That procedure may be permissible in circuits where a vote of a majority of the en banc panel is almost by definition a vote of the majority of the Circuit's active judges. But at most only two of the 29 active judges on this Circuit voted to hear this case en banc. The other five votes in favor came from judges who took senior status before this appeal was filed. That procedure conflicts with Section 46(c) or Supreme Court precedent interpreting it.

To be sure, senior judges may sit on properly constituted en banc panels in certain circumstances. But they cannot vote on whether to constitute en banc proceedings in the first place—let alone override the majority of voting active judges and cast the decisive votes to do so. Simply put, "senior judges have not been authorized by implication to participate in ordering a hearing or rehearing in banc." *Moody v. Albemarle Paper Co.*, 417 U.S. 622, 626 (1974) (per curiam). Accordingly, the currently constituted en banc panel must either remand this appeal for assignment to a three-judge panel or call for a fresh en banc vote among the active judges.

## STATEMENT OF JURISDICTION

This en banc panel lacks authority to hear this case under 28 U.S.C. §46(c) because this "hearing … before the court in banc" has not been "ordered by a majority of the circuit judges of the circuit who are in regular active service." Plaintiffs otherwise agree with the state's jurisdictional statement. *See* AG.Br.3-4.

## STATEMENT OF THE ISSUES

1. "Whether the en banc panel that heard and determined appeal No. 19-55376 has statutory authority under 28 U.S.C. §46(c) to decide this appeal, including: (1) when a case or controversy in the courts of appeals may be heard and determined, or reheard and determined, by the en banc court rather than by a three-judge panel; and (2) when senior judges may participate in an en banc decision." Dkt.12 at 1.

2. Whether California's ban on magazines capable of holding more than ten rounds of ammunition, Cal. Penal Code §32310, violates the Second Amendment.

3. Whether that confiscatory ban violates the Takings Clause.

## CONSTITUTIONAL AND STATUTORY PROVISIONS

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Takings Clause provides: "nor shall private property be taken for public use, without just compensation." *Id.* amend. V. All applicable statutes are reproduced in Dkt.14-2, the addendum to the state's brief.

3

## STATEMENT OF THE CASE

### A.     Factual and Legal Background

1. Since 2000, California has been one of the few states to generally prohibit the manufacture, importation, sale, and transfer of any "large-capacity magazine," which California broadly defines as "any ammunition feeding device with the capacity to accept more than 10 rounds," with some exceptions not relevant here. Cal. Penal Code §§32310, 16740.  California initially did not ban possession—i.e., it did not try to confiscate such magazines from those who had lawfully obtained them.  But the legislature eliminated even that modest nod to reliance interests and the Taking Clause, amending the statute in July 2016 to require those in possession of lawfully acquired (and until then lawfully possessed) magazines to surrender, permanently alter, or otherwise dispossess themselves of their magazines. *See* S.B. 1446, 2015-2016 Reg. Sess. (Cal. 2016).  And in November 2016, California voters approved Proposition 63, a ballot initiative that took a similar approach.  *See* Cal. Penal Code §32310.  As the law stands now, any Californian in possession of a magazine that can hold more than ten rounds of ammunition must surrender it to law enforcement for destruction, remove it from the state, sell it to a licensed firearms dealer (who in turn is subject to the law's transfer and sale restrictions), or permanently alter it to destroy its "excess" capacity. *Id.* §32310(a), (d).  Failure to do so is a crime punishable by up to a year in prison, as well as a fine. *Id.* §32310(c).

4

2. Shortly before the ban was scheduled to take effect, plaintiffs sued, challenging it under the Second Amendment and the Takings Clause.[1] While plaintiffs challenged the ban as a whole, they sought a narrow injunction limited to the new possession ban (the command that law-abiding citizens dispossess themselves of magazines that they lawfully acquired). 17-ER-4041-4062, 4070. The district court held that plaintiffs were likely to prevail on all of their claims. *Duncan v. Becerra* ("*Duncan I*"), 265 F.Supp.3d 1106, 1118, 1139 (S.D. Cal. 2017). The state took an interlocutory appeal, and a divided panel of this Court affirmed. *Duncan v. Becerra* ("*Duncan II*"), 742 F.App'x 218, 222 (9th Cir. 2018).

On remand, the parties developed a comprehensive record detailing the history of firearms capable of firing more than ten rounds without reloading. After considering that record, the district court granted plaintiffs summary judgment, holding that the ban violates the Second Amendment and the Takings Clause. 1-ER-74-159.

A divided three-judge panel affirmed. While the panel likewise detailed how the ban finds no support in historical tradition, it ultimately applied the two-step test

---

[1] Plaintiffs include individuals who lawfully possessed and continue to possess magazines capable of holding more than ten rounds; individuals who would like to acquire, for lawful purposes, magazines capable of holding more than ten rounds; and a nonprofit organization that represents law-abiding individuals who, but for California's ban, would retain and/or acquire such magazines.

that governed Second Amendment challenges in this Circuit at the time and held that §32310 violates the Second Amendment under any level of heightened scrutiny. In doing so, the panel concluded that "[t]he record … amply show[ed]" that the magazines California bans "are commonly owned and typically used for lawful purposes, *i.e.*, not unusual"—indeed, "the antithesis of unusual." *Duncan v. Becerra* ("*Duncan IV*"), 970 F.3d 1133, 1146-47 (9th Cir. 2020); *see also id.* at 1167-68.

3. This Court granted rehearing en banc via a majority vote of the then-active judges, and a divided en banc panel reversed. The majority declined to embrace the text, history, and tradition approach that *Bruen* now mandates, instead "reaffirm[ing] our two-step approach." *Duncan V*, 19 F.4th at 1101. Employing that (now-abrogated) approach, the majority "assum[ed], without deciding," that the ban "implicates the Second Amendment," thus obviating the need to engage in "an extensive historical inquiry." *Id*. at 1103. The Court then upheld the ban under intermediate scrutiny, "defer[ring]" to the state's "judgment" "that large-capacity magazines significantly increase the devastating harm caused by mass shootings and that removing those magazines from circulation will likely reduce deaths and serious injuries." *Id*. at 1096, 1104, 1110-11. The panel also rejected plaintiffs' Takings claim, holding that a law that forces people to dispossess themselves of lawfully acquired property does not facially constitute a physical taking. *Id.* at 1112-13.

4. Plaintiffs sought certiorari. The Supreme Court granted plaintiffs' petition, vacated this Court's en banc decision, and remanded "for further consideration in light of" *Bruen*. *Duncan VI*, 142 S.Ct. 2895.

5. While the district court, the three-judge panel, and the en banc dissent had already conducted the comprehensive analysis of historical tradition that *Bruen* requires, the en banc panel nevertheless remanded "for further proceedings," over the dissent of Judges Bumatay and VanDyke. *Duncan v. Bonta* ("*Duncan VII*"), 49 F.4th 1228, 1231-32 (9th Cir. 2022) (en banc). That order addressed attorney's fees, costs, and expenses, and it made clear that "[t]his order constitutes the mandate of this court." *Id.* at 1232.

## B. Proceedings Below

Once the case returned to the district court, the court ordered additional briefing, giving the state ample opportunity to try to justify its ban. The state endeavored to do so, producing a chart of 316 laws covering a 550-year period from 1382 to 1933. 2-ER-345-439; 3-ER-441-596. After thoroughly examining precedent and the factual and historical record, however, the district court concluded that the state came up short and held that §32310 violates the Second Amendment. 1-ER-3-73.

The court first held that ammunition feeding devices are "arms" under the Second Amendment, rejecting the argument that magazines "would have been

thought of as accessories" at the time of the founding. 1-ER-17. And, contrary to the state's insistence that the number of rounds *fired* in self-defense determines Second Amendment protection, the court held that the devices California outlaws are protected because they "are owned and possessed by millions of Americans … for self-defense." 1-ER-27. The court thus rejected the argument that "a magazine larger than 10 rounds is rarely *used* for self-defense'" because people rarely need to "fire more than 10 rounds in self-defense." 1-ER-18-19; *see also* 1-ER-28-35 (casting doubt on empirics of this claim). The court found that position inconsistent with *Heller*, *Caetano*, and *Bruen*, all of which dwelt on commonality, yet none of which examined it through the lens of how many times a gun is typically *fired*. 1-ER-23-25.

Turning to historical tradition, the court rejected the state's attempt to "reframe the 'dangerous and unusual' test as a 'dangerous *or* unusual' test" because the Supreme Court has treated the test as conjunctive—which makes sense, since "all guns and ammunition are dangerous." 1-ER-35. The court likewise rebuffed the related argument "that magazines holding more than 10 rounds are 'most useful in military service' and therefore, can be banned." 1-ER-36. That, the court explained, is not the line *Bruen* drew. In any event, such magazines were a solution to a problem that had "plagued rifles," civilian as much as military, "since their invention centuries ago"—namely, "limited ammunition capacity." 1-ER-5 n.15.

Finally, the court carefully examined—and rejected—the state's purported historical analogues. These ranged from laws that prohibited setting "trap guns," 1-ER-67, and carrying blunt objects and knives, 1-ER-65, to laws regulating concealed carry of pistols, 1-ER-64, and gunpowder storage, 1-ER-61. The court also rejected the state's dubious attempts to rely on restrictions that applied only to Black Americans, Indigenous peoples, or other disfavored groups. 1-ER-47.

Because the state failed to prove that its magazine ban has any relevantly similar historical analogue, the district court declared the law unconstitutional and permanently enjoined its enforcement. 1-ER-73. The court also incorporated "[a]ll relevant findings of fact and conclusions of law set forth in the" summary judgment order, including the holding that §32310 violates the Takings Clause. 1-ER-4.

## C.     Prior Proceedings in this Appeal

The state swiftly appealed and moved for a stay pending appeal and an interim administrative stay. Dkt.2. In an apparently unprecedented move, the en banc panel that decided *Duncan IV* voted to seize both motions and the appeal itself as a "comeback" case.[2] Dkt.3 at 1. The panel issued an administrative stay to consider whether to issue a stay pending appeal, drawing dissents from Judges Ikuta, Nelson, Bumatay, and VanDyke. *Id.* at 4-9. The same majority then granted the stay pending

---

[2] The panel had one change in its composition: Judge Wardlaw was drawn to replace Judge Watford, who retired in the interim.

appeal, concluding that the state was likely to succeed on the merits—though without explaining why. Dkt.10.

Judge Bumatay, joined by Judges Ikuta, Nelson, and VanDyke, dissented on the merits. Dkt.10 at 9-43. Judge Nelson separately dissented to voice "a more fundamental concern with the majority's decision to proceed with this new appeal en banc in the first instance" without first securing a vote by a majority of the Circuit's active judges in favor of doing so and lament that the panel's actions effectively "disenfranchis[ed] seven new active judges." Dkt.10 at 7-8.[3]

## SUMMARY OF ARGUMENT

The currently constituted en banc panel lacks authority to hear this appeal. To be sure, senior judges may participate in *deciding* en banc cases in certain limited circumstances once "a majority of the circuit judges of the circuit who are in regular active service" has voted to institute "a hearing or rehearing before the court in banc." 28 U.S.C. §46(c). But "senior judges have not been authorized … to participate" in the antecedent decision of whether to "order[] a hearing or rehearing in banc." *Moody*, 417 U.S. at 626. And at most only *two* active judges voted to hear this case en banc. That this litigation previously came before this en banc panel does

---

[3] While the majority adhered to its prior decision that the decision to retake the case en banc complied with Ninth Circuit General Order 3.6(b), it reserved decision on whether the procedure followed here complies with 28 U.S.C. §46(c), and requested that the parties brief that issue. *See* Dkt.10 at 5-6.

not remedy that problem. The last time this dispute was here, this Court issued a decision and a mandate. This is now a new appeal, with a new case number. A new vote is thus required to authorize en banc review—and that new vote must be taken by active, not senior, judges.

Should the Court reach the merits, it should hold that California's ban on magazines that first came onto the scene more than a century ago and that tens of millions of Americans today lawfully own violates the Second Amendment.

First, keeping and bearing the feeding devices California outlaws is covered by the plain text of the Second Amendment and thus presumptively protected. As their name suggests, ammunition feeding devices do not just hold ammunition; they actively *feed* ammunition into the firing chamber of common firearms, rendering them integral to the design of semiautomatic firearms and the mechanism that makes them work as intended. Citizens thus carry semiautomatic firearms equipped with magazines for the same constitutionally protected reason that they load those magazines with ammunition: "[W]ithout bullets, the right to bear arms would be meaningless," and the central purpose of the Second Amendment—self-defense—eviscerated. *Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014).

Because the magazines California bans are plainly "arms," the state must prove that they are not commonly kept or carried for lawful purposes such as self-defense. California has never faithfully tried to make that showing, likely because

it is indisputable that tens of millions of Americans lawfully own hundreds of millions of these common arms. Rather, the state's efforts to defend its sweeping ban invite precisely the sort of departure from the Supreme Court's clear teachings that led the Supreme Court to abrogate the approach this Court and others adopted in the decade following *Heller*. The state asks this Court to ignore what the Supreme Court has repeatedly identified as "the Second Amendment's definition of 'arms,'" *Bruen*, 597 U.S. at 28, in favor of a definition more to its liking. It asks this Court to pretend that people do not "use" their firearms when they keep and carry them at the ready for self-defense, even though the Supreme Court has explicitly defined the right as a right to "be[] armed and ready for offensive or defensive action," *id.* at 32, not just to fire firearms at would-be attackers. The state asks this Court to deem historical laws prohibiting the concealed carry of unusual arms analogous to laws prohibiting the acquiring and keeping of common ones, even though *Bruen* rejected just such an effort—based on some of the very same laws, no less. And it asks this Court to indulge in the fiction that magazines that have been around for a century and remain lawful in most of the country are "dramatic technological changes." *Id.* at 27. To accept those strained arguments would be to deny *Bruen*, not apply it.

Even if this Court were to hold that California's ban on common arms is consistent with historical tradition, plaintiffs would still be entitled to relief because California has taken the radical step of requiring people to dispossess themselves of

magazines they lawfully acquired. A law that prohibits people from keeping their property as it was when they lawfully acquired it is not a restriction on how they can use it; it is a physical invasion. And under black-letter constitutional law, a state must pay for what it takes—regardless of its professed justification for taking it.

## STANDARD OF REVIEW

This Court "determine[s its] own jurisdiction *de novo*." *Guerrier v. Garland*, 18 F.4th 304, 308 (9th Cir. 2021). Decisions granting summary judgment are also reviewed de novo. *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 672 (9th Cir. 2018). A summary judgment order may be affirmed on any ground supported by the record. *Campidoglio LLC v. Wells Fargo & Co.,* 870 F.3d 963, 973 (9th Cir. 2017).

## ARGUMENT

### I. The En Banc Panel Lacks Statutory Authority To Hear This Appeal.

1. The text of 28 U.S.C. §46(c) and Supreme Court precedent make clear that this en banc panel lacks statutory authority to decide this case. Section 46(c) consists of two sentences. The first provides the rule governing when and how en banc proceedings can be *ordered*: "Cases and controversies shall be heard and determined by a court or panel of not more than three judges …, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in regular active service." 28 U.S.C. §46(c). Thus, before a court may convene "a hearing or rehearing … in banc," a "majority of the circuit judges of the circuit *who are in regular active service*" must "order[]" it. *Id.* (emphasis added).

13

The second sentence provides the rules governing who may *participate* in proceedings once "a hearing or rehearing" en banc has been ordered by a majority of the active judges. The en banc court "shall consist of all circuit judges in regular active service," except that a circuit with more than 15 active judges may designate an en banc panel consisting of less than its full number—as this Court (and only this Court) has elected to do. *Id.* In addition, a senior judge "of the circuit" may sit as a member of an en banc panel, but only when (1) the en banc court is "reviewing a decision of a panel of which such judge was a member" or (2) the judge is "continu[ing] to participate in the decision of a case or controversy that was heard or reheard by the court in banc at a time when such judge was in regular active service." *Id.* Section 46(c) provides no role, by contrast, for senior judges in the initial ordering of the process. Instead, "the governing statute mandates" that "the decision to convene the en banc court" be made "by a majority of the court's active, nonrecused circuit judges." *In re Watts*, 298 F.3d 1077, 1084 n.3 (9th Cir. 2002) (O'Scannlain, J., concurring in the judgment). Senior judges thus lack statutory authority to vote on whether to "hear[] or rehear[]" a case "in banc." 28 U.S.C. §46(c).

To the extent there was any doubt about that, the Supreme Court eliminated it long ago, squarely holding that senior judges may not "participate in ordering a hearing or rehearing in banc." *Moody*, 417 U.S. at 626. In *Moody*, the Fourth Circuit

14

certified the question of whether a senior judge "may vote to determine whether [a] case should be reheard in banc" if she was on the panel that originally decided the appeal. *Id.* at 624. The Supreme Court provided a definitive answer: No. "[N]either the Court nor Congress has suggested that any other than a regular active service judge is eligible to participate in the making of the decision whether to hear or rehear a case in banc." *Id.* at 626. No matter how flexible the machinery courts may establish to administer the decision whether to hear or rehear a matter en banc, "such a decision can be reached only by voting." *Id.* That makes sense given the "very purpose of the in banc court." *Id.* As the Supreme Court explained more than a decade before *Moody*, the "evident policy" of Section 46(c) is "that the active circuit judges shall determine the major doctrinal trends of the future for their court." *United States v. Am.-Foreign S.S. Corp.*, 363 U.S. 685, 690 (1960).

The state notes that *American-Foreign* dealt with "an earlier version of Section 46(c)," under which "'[a] court in banc shall consist of all active circuit judges of the circuit.'" AG.Br.58. But *Moody* was decided *after* the "1963 amendment to the Judicial Code"—in which Congress "provided that when a senior judge has participated in the original division hearing, such senior judge may later sit on an in banc court rehearing that case"—yet it nevertheless specifically rejected the notion that the 1963 change empowered senior judges to "participate in ordering a hearing or rehearing in banc." 417 U.S. at 626-27. As the Court explained, "voting

on the merits of an in banc case is quite different from voting whether to rehear a case in banc, which is essentially a policy decision of judicial administration." *Id.* at 627. And while Congress has made limited allowance for senior judges to exercise the former authority, "Congress vested this latter authority and responsibility exclusively in 'circuit judges of the circuit who are in regular active service." *Id.* It therefore makes no difference that Section 46(c) does not "compel the court to adopt any particular procedure" for ascertaining the will of the majority of *active* judges. AG.Br.55 (quoting *W. Pac. R.R. Corp. v. W. Pac. R.R. Co.*, 345 U.S. 247, 267 (1953)). Indeed, the fact that Congress has given circuits a free hand to decide how to ascertain that will, while giving them no leeway on the need to ascertain it, underscores that the will of senior judges cannot substitute for that of active ones.

In short, *Moody* definitively answers this Court's question of "when senior judges may participate in an en banc decision," Dkt.12 at 1, which makes it all the more remarkable that the state ignores it. But whether or not the state acknowledges it, the answer is plain: Senior judges may participate in deciding en banc proceedings once they have been instituted under limited, delineated circumstances, but they may not vote on whether a case should be heard or reheard en banc.

2. Applying those settled principles, this panel lacks statutory authority to hear this case. While this appeal arises out of long-running litigation that has produced multiple appeals and an earlier en banc proceeding, this is a new appeal, complete

16

with a new case number. Different case numbers reflect different cases, each of which must under Section 46(c) and *Moody* be subject to its own en banc vote of the active judges. *See* 28 U.S.C. §46(c). In keeping with that understanding, a vote *was* taken on whether to initiate "a hearing or rehearing before the court in banc," *id.*, the first time this Court was asked to take any action in the current appeal. *See* Dkt.3.[4] But that vote was not taken by the active judges—or even a majority of the active judges, *but see* 28 U.S.C. §46(d) (defining a quorum)—on this Court. It was taken by the 11-judge en banc panel that decided *Duncan V* (exception for Judge Wardlaw, who replaced Judge Watford), which consists of six active judges and five senior judges. Under Section 46(c) and *Moody*, senior judges cannot vote on whether to *initiate* an en banc proceeding—yet that is precisely what five senior judges did here.

Making matters worse, the four of those five senior judges who voted in favor of ordering the case heard en banc account for the *majority* of judges who did so. At most only two of the six active judges permitted to vote (Chief Judge Murguia and Judge Wardlaw) voted to hear this case en banc. Of the remaining 27 active judges on this Circuit, four dissented from that determination, and the other 23 were disenfranchised. A procedure under which en banc proceedings are initiated not by

---

[4] To be sure, General Order 3.6(b) frames that initial vote as one on "whether to keep the case." *See* 9th Cir. Gen. Order 3.6(b). But there is no denying that it is, in substance, a vote whether to hear a new appeal en banc.

"a majority of the circuit judges of the circuit who are in regular active service," 28 U.S.C. §46(c), but by a majority consisting mainly of senior judges—over the dissent of a majority of the (very few) active judges permitted to vote, no less—cannot be reconciled with Section 46(c) or *Moody*.[5]

Contrary to the state's view, the fact that a majority of the then-active judges voted to rehear *Duncan IV* en banc back in 2021 does not deprive the 23 remaining active judges of this Court of their power to decide whether *this* case should be heard en banc. To be sure, Section 46(c) allows "any senior circuit judge of the circuit … to continue to participate in *the decision* of a case or controversy that was heard or reheard by the court in banc at a time when such judge was in regular active service." 28 U.S.C. §46(c) (emphasis added); *see* AG.Br.57. But all that means is that judges who take senior status after en banc proceedings are instituted, but before the en banc panel issues its decision in a case it has heard or reheard, may continue to participate in deciding that case.

Judges Paez and Berzon (who took senior status on December 13, 2021, and January 23, 2022, respectively) thus could participate in the proceedings following

---

[5] It is not even clear whether such a procedure is consistent with General Order 3.6(b), which does not expressly address how to proceed should a decision to "keep" a case be made by a majority consisting principally of senior judges, over the dissent of a majority of active judges. But even assuming that General Order 3.6(b) permits such a procedure, Section 46(c) does not.

the Supreme Court's remand in *Duncan VI*, as those proceedings were part and parcel of "the decision of" the *Duncan V* case. There was no need for them (or any other judges) to vote on whether that case should be reheard en banc because it was already pending before a properly initiated en banc panel whose decision and mandate had been vacated. But once the en banc panel decided to "vacate[]" in light of *Bruen*, "remand[]" the case to the district court, and issue "the mandate of this court," *Duncan VII*, 49 F.4th at 1231, "the decision of" that case came to a close. And nothing in the second sentence of Section 46(c) (or anything else) authorizes senior judges to vote on whether to order a subsequent appeal heard en banc just because they participated in deciding an earlier en banc appeal in proceedings that have concluded. Section 46(c) makes plain the permissible role of senior judges, and it does not include voting on whether a case should be heard en banc—ever.

Nor would it make any sense as a policy matter to let a single en banc vote authorize 11 members of the Court to sit en banc in perpetuity. In a system where litigation can drag on for a quarter-century or more, *see, e.g.*, *In re Johns-Manville Corp.*, 440 B.R. 604, 607 (Bankr. S.D.N.Y. 2010), litigants could find themselves before ten senior judges and the Chief Judge. Nothing in Section 46(c) authorizes the en banc process to flip from a method for the majority of the circuit to control its law, *see Am.-Foreign*, 363 U.S. at 690, to very nearly the opposite. In sum, the

current panel lacks authority to hear this case, and it should either send the case to a three-judge panel or convene a new en banc vote of the active judges of the Circuit.

## II. California's Magazine Ban Violates The Second Amendment.

Under a straightforward application of *Bruen*, California's confiscatory magazine ban cannot stand. *Bruen* made clear that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. And once that presumption arises, the state bears the burden of affirmatively proving that its restriction is "consistent with this Nation's historical tradition of firearm regulation." *Id.* There is no longer any room for tiers of scrutiny or rights-diluting interest-balancing; under *Bruen*, "the traditions of the American people" carry the day. *Id.* at 26. The feeding devices that California declares contraband easily fit "the Second Amendment's definition of 'arms,'" as they unquestionably "facilitate armed self-defense." *Id.* at 28. And the state has not (and cannot) come close to demonstrating a historical tradition of prohibiting law-abiding citizens from keeping and bearing anything other than "dangerous and unusual weapons," *id.* at 47 (quoting *Heller*, 554 U.S. at 627), which integral firearm components that tens of millions of Americans lawfully own in the hundreds of millions plainly are not. The district court thus correctly concluded that California's ban violates the Second Amendment.

**A.    The Second Amendment's Plain Text Unquestionably Covers the Conduct That California's Ban Restricts.**

1. Under *Bruen*, a plaintiff's threshold burden is slight:  All a plaintiff must show to establish a prima facie case, and shift the burden to the state to "identify a well-established and representative historical analogue," is that "the Second Amendment's plain text covers [the] conduct" the challenged law restricts.  *Id.* at 17, 30 (emphasis omitted).  Plaintiffs easily satisfy that burden.  California prohibits citizens from keeping and baring feeding devices that hold more than ten rounds of ammunition.  Because the Second Amendment's text plainly covers keeping and bearing, *see* U.S. Const. amend. II ("the right of the people to keep and bear Arms shall not be infringed"), the only question is whether those devices "constitute bearable arms," as "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms."  *Bruen*, 597 U.S. at 28.

The answer is decidedly yes.  As *Bruen* made clear, "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense."  *Id.* (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016) (per curiam)).  That is because "[t]he 18th-century meaning is no different from the meaning today."  *Heller*, 554 U.S. at 581.  "[T]hen as now," the term "arms" broadly encompasses all "'[w]eapons of offence, *or* armour of defence,'" *or* "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'"

21

*Id.* (emphases added) (quoting dictionaries from the 1770s). And that "general definition" unquestionably includes devices that actively feed ammunition into the firing chamber of a firearm. *See* 5-ER-939-949, 957-960, 977. After all, when a citizen takes into her hands a semiautomatic firearm equipped with an ammunition feeding device, she holds both the frame of the firearm and the feeding device attached (or affixed) to it, as well as the bullets within that—all for the lawful purpose of armed self-defense. *See Bruen*, 597 U.S. at 21 ("[T]he Second Amendment protect[s] an individual right to armed self-defense[.]").

The state insists that the Second Amendment does not cover feeding devices *at all*, because even though a magazine is a bearable instrument ("'something that a person' can 'take[] into his hands'"), it "facilitates striking another only when used in conjunction with a firearm." AG.Br.17-18. That nothing-but-the-sum-of-its-parts theory would render the Second Amendment a nullity, as the same could be said of virtually any component of a firearm, be it the grip, the barrel, the trigger, or even the ammunition. It also defies this Court's precedent, which even before *Bruen* recognized that, "without bullets, the right to bear arms would be meaningless." *Jackson*, 746 F.3d at 967. The same is no less true of the devices that feed bullets into firearms. Without a feeding device, semiautomatic firearms can fire, at best, only one round—and none at all if California has its way, as California mandates that semiautomatic pistols be able to fire *only* when the magazine is in place. 5-ER-

959, 989; *see* Cal. Penal Code §31910(b)(5) (requiring pistols to be equipped with a "magazine disconnect mechanism"); *id.* §16900 (defining "magazine disconnect mechanism").

That readily distinguishes ammunition feeding devices from the founding-era cartridge boxes to which the state tries to analogize. AG.Br.18-19. Cartridge boxes were exactly what they sound like: boxes for storing ammunition when it was *not* being used. Ammunition feeding devices are quite different. As their name connotes, they actively *feed* ammunition to the firing chamber of a firearm. When a user pulls the trigger, the round in the chamber fires, and the semiautomatic action combines with the feeding device to feed a new round to the chamber. Founding-era cartridge cases, by contrast, were never attached (let alone affixed) to a firearm, and they played no role in its operation; they were literally just boxes. Saying that a cardboard box is analogous to a device that plays an active role in firing because both "hold" ammunition is like saying that a gas can is analogous to a carburetor because both "hold" fuel.

Ammunition feeding devices are thus plainly "bearable arms" that "facilitate armed self-defense," which is all that the Second Amendment's "definition of 'arms'" requires to render them presumptively protected. *Bruen*, 597 U.S. at 28. Perhaps recognizing as much, the state shifts gears. Although the Attorney General cannot bring himself to admit that Californians have a constitutional right to

23

"acquire, possess, and use magazines that are necessary to render [a] semiautomatic firearm operable," he asserts that "*large-capacity* magazines, 'as a subset of magazines,'" are not arms because they "are *never* necessary to render firearms operable.'" AG.Br.18-19. That is a non-sequitur. Just as "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," nothing in the text draws a necessary/unnecessary distinction either. *Bruen*, 597 U.S. at 32. The threshold textual inquiry *Bruen* mandates does not ask what is "necessary" for civilian self-defense; it asks whether something is a "bearable" "instrument[] that facilitate[s]" it. *Id.* at 28. Devices that play an integral role in the firing of firearms—i.e., that allow modern handguns (the "quintessential self-defense weapon," *Heller*, 554 U.S. at 629) to work as intended—plainly fit that bill, even if some other feeding device could too. By the state's (il)logic, it could ban detachable magazines entirely, on the logic that fixed magazines are good enough (or vice versa), without even implicating the Second Amendment.

It therefore makes no difference under *Bruen*'s threshold textual inquiry that "[e]very firearm that can accept a detachable 'large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended.'" AG.Br.19. All that matters at the threshold is whether what California bans are bearable instruments that facilitate armed self-defense. They unquestionably are, so they are presumptively protected by the Constitution.

2. California asserts that no arm is presumptively protected unless a plaintiff can prove that it is "in common use today." AG.Br.20-21. The state candidly admits that to accept that argument would require "overrul[ing]" *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), which held that common use is relevant only "in the second prong of the *Bruen* analysis," on which the state bears the burden. *Id.* at 949-50; *see* AG.Br.30. California is wrong and *Teter* is right. *Bruen* was emphatic on this point: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 597 U.S. at 17. And just as nothing in the Second Amendment's text draws a home/public or necessary/unnecessary distinction, *see id.* at 32, nor does its text say anything about common use.

To be clear, that does not mean that the Second Amendment guarantees "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Nor does it mean that whether arms are in common use for lawful purposes like self-defense—or, conversely, "dangerous and unusual"—is irrelevant. But considerations that find no purchase in the plain text are not part of the plain text inquiry. It should therefore come as no surprise that the Supreme Court has *twice* instructed that whether a type of arm is "'in common use'"—or instead is "'highly unusual in society at large'"—is part of the "historical tradition," not the textual, inquiry. *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S.

at 627); *see also Teter*, 76 F.4th at 949-50 ("*Heller* itself stated that the relevance of a weapon's dangerous and unusual character lies in the '*historical tradition* of prohibiting the carrying of dangerous and unusual weapons.' It did not say that dangerous and unusual weapons are not *arms.*" (quoting *Heller*, 554 U.S. at 627)). Indeed, *Heller*'s "'examin[ation]' of 'the character of the weapon'" at issue there, AG.Br.21-22 (alteration in original) (quoting *Heller*, 554 U.S. at 622), came a full 40 U.S. Reports pages after the Court concluded its threshold *textual* analysis by holding that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms." *Heller*, 554 U.S. at 582.

The state seems baffled by this approach to constitutional law, but none of this is particularly novel. Take the First Amendment. Just as the plain text of the Second Amendment does not distinguish among different types of "arms," the plain text of the First Amendment does not distinguish among different types of "speech." *See Bruen*, 597 U.S. at 24-25 (drawing this analogy). Hence, in the speech context, "the government must generally point to historical evidence about the reach of the First Amendment's protections" "to carry [its] burden" to show that "expressive conduct falls outside of the category of protected speech." *Id.* at 24-25; *see also id.* at 25 (noting that *United States v. Stevens*, 559 U.S. 460 (2010), "plac[ed] the burden on the government to show that a type of speech belongs to a 'historic and traditional category' of constitutionally unprotected speech"). The government bears that

26

burden precisely because speech that falls outside "the category of protected speech" is still speech within the plain meaning of that term.[6] Likewise, arms that fall outside the category of *protected* arms are still arms. Thus, if a state wants to prohibit a class of arms, it must meet its burden of proving that they belong to a historic and traditional category of *unprotected* arms.

In sum, whether a bearable instrument is unusual and unprotected does not make it any less an "arm" under "the Second Amendment's definition," which covers *all* bearable "instruments that facilitate armed self-defense," even if a state does not believe that they are objectively or best suited to that purpose. *Id.* at 28; *see Heller*, 554 U.S. at 581 (defining "arms" to include "weapons of offence"). The threshold textual inquiry here thus begins and ends with the indisputable fact that the instruments California has outlawed "constitute bearable arms," which suffices to render them "presumptively protect[ed]" by the Second Amendment. *Bruen*, 597 U.S. at 17, 24, 28.

---

[6] To be sure, courts need not conduct the historical inquiry afresh once the Supreme Court has decided that a category of speech is not protected. But as *Stevens* made clear, that historical-tradition burden remains the government's when it asks a court to "declare new categories of speech outside the scope of the First Amendment." 559 U.S. at 472.

**B.     The Magazines That California Bans Are in Common Use for Lawful Purposes, Including Self-Defense, and Are the Furthest Thing From Highly Unusual in Society at Large Today.**

Because the magazines California bans satisfy "the Second Amendment's definition of 'arms,'" the state bears the burden of proving that they can be banned "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17, 28, 33-34.  California has not met and cannot meet that burden.  The Supreme Court has already decided what "arms" may be banned "consistent with this Nation's historical tradition of firearm regulation":  those that are (at a minimum) "'highly unusual in society at large,'" rather than "in common use today." *Id.* at 47 (quoting *Heller*, 554 U.S. at 627).  In the context of a flat ban on arms like §32310, then, the only question is whether the arms that have been banned are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625; *see Teter*, 76 F.4th at 950.  If they are, then a state may not ban them, full stop.

1. That makes this an exceptionally easy case, as the magazines that California bans are exceptionally common in modern America.  The most popular handgun and the most popular long gun in America both come standard with a magazine over ten rounds, as do countless others.  1-ER-93.  Tens of millions of law-abiding Americans lawfully own *hundreds of millions* of these feeding devices. *See, e.g.*, Nat'l Shooting Sports Found., *Firearm Production in the United States* 7 (2020), https://bit.ly/3LwvJvKh.  Indeed, magazines over ten rounds account for about "half

of all magazines" in America. 1-ER-10. And although the state speculates that "a relatively small percentage of gun owners possess a disproportionate number of LCMs," AG.Br.24, the record (and reality) shows that nearly 40 million Americans—more than 10% of the Nation's total population, and nearly half of all American gun owners—own or have owned feeding devices that hold more than ten rounds of ammunition. William English, Ph.D., *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 22-23 (Sept. 28, 2022), https://bit.ly/3yPfoHw. What is more, the numbers are trending upward: Recent data show that 75% of modern rifle magazines have a standard capacity of over ten rounds. Nat'l Shooting Sports Found., *Modern Sporting Rifle Comprehensive Consumer Report* 31 (July 14, 2022), https://bit.ly/3GLmErS.

This ubiquity reflects the fact that the magazines California bans have long been lawful in this country (and remain so in most states). And it is why virtually every federal court to have addressed this question—including two three-judge panels of this Court, and the original en banc dissenters—has concluded that they are in common use. It is equally clear that the typical individual who possesses these commonplace arms does so for lawful purposes. In the vast majority of states, they are perfectly lawful. *See* Lillian Mongeau Hughes, *Oregon Voters Approve Permit-to-Purchase for Guns and Ban High-Capacity Magazines*, NPR (Nov. 15, 2022), https://n.pr/3QMJCC1. And the most frequently cited reasons by the millions of

Americans who own them are target shooting (64.3% of owners), home defense (62.4%), hunting (47%), and defense outside the home (41.7%). English, *supra*, at 23. This makes sense: "When a firearm being used for defense is out of ammunition, the defender no longer has a functional firearm." 16-ER-3802. It is little surprise, then, that law-abiding citizens tend to prefer magazines that will run out of ammunition less often.

Of course, as with any arms, some misuse these arms for unlawful—indeed, awful—purposes. But "criminal use of LCMs is relatively low compared to their market saturation." *Duncan IV*, 970 F.3d at 1149 n.8. And in all events, the same could be said of the handguns at issue in *Heller*. The *Heller* dissenters protested that handguns "are specially linked to urban gun deaths and injuries" and "are the overwhelmingly favorite weapon of armed criminals." 554 U.S. at 682 (Breyer, J., dissenting). The majority did not dispute these points; it just found them irrelevant to whether handguns are constitutionally protected, because that question does not turn on how often arms are misused by criminals. It turns on whether law-abiding citizens commonly keep and bear them for lawful purposes. That is why it was enough in *Heller* that handguns are *typically* possessed for lawful purposes. *See id.* at 624-25 (majority op.). What was true in *Heller* is no less true here, given the millions of law-abiding Americans who own the arms California has banned. Just as in *Heller*, that flat ban is unconstitutional. After all, blanket bans violate the

30

foundational principle that "a free society prefers to punish the few who abuse [their] rights … after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

2. Unable to create a genuine dispute about whether the arms it bans are common,[7] the state complains that the metric the Supreme Court has embraced— i.e., whether an arm is "typically possessed by law-abiding citizens for lawful purposes," *Heller*, 554 U.S. at 625—does "not make for a sensible or administrable constitutional standard." AG.Br.23. But whatever the state (or members of this panel) may think about that test, there is no denying that *Heller* and *Bruen* embraced it. 597 U.S. at 47. Indeed, *Bruen* even went out of its way to make clear that arms that are common "today" are protected even if they were *not* common at the founding. *Id.* It should go without saying that it is not for a state (or a court of appeals) to reject Supreme Court holdings with which it disagrees.

---

[7] The closest the state comes is griping that "Plaintiffs … submitted two wildly different estimates of the number of large-capacity magazines—one nearly five-times greater than the other." AG.Br.24. But the more salient fact is that the *low* estimate—one embraced without contradiction by a panel of this Court—is over 115 million. *Duncan IV*, 970 F.3d at 1142. The variance in expert estimates mostly relates to the fact that tens of millions of Americans also own hundreds of millions of firearms that use such magazines, meaning a disagreement over whether each owner has one or two more magazines per weapon produces disparities that are also in the hundreds of millions.

In all events, the state's circularity critiques are overstated. While *Bruen* focused on the need for a firearm to be "unusual," the historical test asks whether a firearm "is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). Accordingly, *contra* AG.Br.23-24, a state cannot freeze firearms technology in time by banning new models before they can enter the market and become common, as it would still need to show that a new model is "dangerous" in some way that meaningfully differentiates it from arms that are in common use. Far from being "circular," then, the common-use test appropriately trusts the American people's judgment in selecting which arms are appropriate for lawful use. And to the extent that test makes it particularly difficult to belatedly ban firearms already in wide circulation, *see* AG.Br.23, there is every reason to think the *Bruen* majority would view that as a feature, not a bug.

Perhaps seeing that writing on the wall, the state again shifts gears. Seizing on language from *Bruen* and *Heller* asking whether arms are "in common *use*," *Bruen*, 597 U.S. at 47 (emphasis added) (quoting *Heller*, 554 U.S. at 627), the state insists that an arm does not satisfy the common-use test unless civilians commonly *fire* it at assailants during armed confrontations. By the state's telling, then, the feeding devices it bans are not protected because civilians "rare[ly]" "need to fire more than 10 shots in self-defense." AG.Br.25. That is doubly wrong.

At the outset, the state's effort to convert common use into a frequency-of-firing test is not even responsive to its critique that *Bruen* and *Heller* demand circular reasoning. *See* AG.Br.23. After all, whether a particular type of arm is lawful no doubt influences how often it is fired in self-defense situations, not just how often it is kept or carried. But in all events, the state's argument once again defies *Bruen* and *Heller*. The Second Amendment protects the right "to keep and bear Arms," not just to fire them when the need for self-defense arises. U.S. Const. amend. II. That is precisely why the Supreme Court has twice explicitly "confirmed that the right to 'bear arms' refers to the right to 'wear, bear, or carry … for the purpose … *of being armed and ready* for offensive or defensive action in a case of conflict with another person.'" *Bruen*, 597 U.S. at 32 (first ellipsis in original; emphasis added) (quoting *Heller*, 554 U.S. at 584). Under a straightforward reading of both the text of the Constitution and Supreme Court precedent, an individual "uses" her firearm for the Second Amendment's *ne plus ultra* purpose every time she keeps or carries it "at the ready for self-defense." *Id.*

The state's contrary account makes nonsense of *Bruen* and *Heller* in more ways, too. Both cases juxtaposed the phrase "weapons that are those 'in common use at the time'" with the phrase "those that 'are highly unusual in society at large.'" *Id.* at 47 (quoting *Heller*, 554 U.S. at 627). That juxtaposition makes sense only if the "uses" that matter include keeping and bearing, as the latter phrase is nonsensical

33

vis-à-vis a frequency-of-*firing* inquiry. And lest there be any lingering doubt, *Bruen* concluded that people have a right to carry handguns for self-defense without ever asking how often they fire them in self-defense situations—just as *Heller* did when concluding that people have a right to keep handguns for self-defense. *See* Dkt.10 at 25 (Bumatay, J., dissenting) ("[T]he Supreme Court has never looked at the average number of times that a handgun had been fired in self-defense to determine whether it is commonly used for that purpose."). It was enough for the Court in both cases that "handguns are the most popular weapon chosen by Americans for self-defense." *Heller*, 554 U.S. at 629; *see also Bruen*, 597 U.S. at 57. How often citizens keep versus carry firearms equipped with these feeding devices, or fire them at ranges versus at attackers, is therefore legally irrelevant. An individual lawfully "uses" her firearm and the feeding device that facilitates its operation every time she does any of those things.

3. The state's most-useful-in-military-service argument finds no more support in *Heller*, *Bruen*, or historical tradition. *See* AG.Br.27-28. Whether an arm is useful in military service is not relevant to the question the Supreme Court has instructed courts to ask: whether an arm is "in common use" by law-abiding citizens for lawful purposes, as opposed to dangerous and "highly unusual in society at large." *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627). To be sure, *Heller* acknowledged that *application* of that test may compel the conclusion that some of the "weapons

that are most useful in military service—M-16 rifles and the like—may be banned," since they "are highly unusual in society at large." 554 U.S. at 627. But *Heller* nowhere embraced the nonsensical proposition that weapons may be banned *because* they are useful in military service. Nor could it have given the historical tradition it recognized in the very next breath of ensuring that people could "bring the sorts of lawful weapons that they possessed at home to militia duty." *Id.*

Ultimately, then, whether a particular arm may be popular with the military, or may descend from wartime innovation, makes no difference to the constitutional inquiry. What matters is whether the American people have chosen an arm en masse. *Bruen* was emphatic about this: "[T]he traditions of the American people … demand[] our unqualified deference." 597 U.S. at 26. And both *Bruen* and *Heller* could not be clearer the tradition of the American people is that law-abiding citizens may keep and bear arms that are commonly possessed for lawful purposes.

The state protests that, if *Bruen* really means what it says, then fully automatic weapons must be protected because there are hundreds of thousands of "federally-registered machineguns in the United States." AG.Br.24-25. At the outset, hundreds of thousands is a far cry from the hundreds of *millions* of now-banned feeding devices that law-abiding citizens in this country have kept and borne for self-defense for decades. *See supra* pp.28-30. And the state offers no insight into whether those firearms are kept and borne by the relatively small number of Americans who own

35

them for self-defense. Moreover, if anything, the history of fully automatic weapons underscores that the circularity critiques of the common-use test are overblown. Unlike with the semiautomatic firearms that had come on the market several decades earlier, people did *not* clamor to buy Tommy guns when they first came on the civilian market in the mid-1920s. Indeed, "only about 3,000" Tommy guns "had sold" in the United States "[b]y 1925," when states began to ban them en masse, 9-ER-1870, confirming that law-abiding citizens actually care about things like whether they can "accurately shoot and hit their intended target in case of confrontation." *Barnett v. Raoul*, 2023 WL 3160285, at *9 (S.D. Ill. Apr. 28, 2023), *vacated sub nom. Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023).

But in all events, whatever the consequences of the test the Supreme Court has embraced may be, it remains the test that this Court is bound to follow. When *Bruen* rejected means-end balancing as "one step too many," it took "'out of the hands of government' … the power to decide" what the people really need for self-defense. 597 U.S. at 19, 23 (quoting *Heller*, 554 U.S. at 634). After all, the whole point of the Second Amendment is to keep the government from disarming the people. It is little surprise, then, that the framing generation thought it was for the people, not the government, to decide what arms they have a fundamental right to keep and bear. California may not like that holding, but a litigant's displeasure with Supreme Court precedent does not relieve this Court of its obligation to faithfully

follow it. And that is especially so when the displeased litigant is a sovereign state and its objection is to a Supreme Court holding that interprets a fundamental constitutional right more broadly than it would like.

### C. There Is No Historical Tradition in this Country of Banning Arms That Millions of Law-Abiding Citizens Own for Lawful Purposes.

The feeding devices California outlaws facilitate armed self-defense and are the furthest things from highly unusual in modern America. Under a straightforward application of *Bruen*, that should be the end of the analysis. While other Second Amendment cases may require independent examination to determine the country's historical traditions, in the context of a flat ban on a class of arms, the Supreme Court has already instructed that whether the banned arms are commonly owned for lawful purposes *is* the historical test. In all events, even if further historical inquiry were necessary, California has not (and cannot) come close to showing any historical tradition that could justify its sweeping ban. To the contrary, the historical record reveals a long tradition of welcoming technological advancements aimed at enhancing law-abiding citizens' ability to fire repeatedly without reloading.

1. "At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity." 16-ER-3810. That is not because arms capable of firing more than ten rounds were unheard of; they came into existence long before our country and were among the most popular models on the civilian market by the 1860s. *See Duncan V*, 19 F.4th at 1154-55 (Bumatay, J., dissenting). Yet the first

laws regulating firing capacity did not come around for more than 100 years. As for magazines in particular, the history is similar: Even though—as Judges Berzon, Hurwitz, Murguia, Paez, Thomas, and Watford all previously acknowledged— "high-capacity magazines" had become "common" in this country by *at least* "the late nineteenth century or early twentieth century," *id.* at 1130 (Berzon, J., concurring), not one state restricted the manufacture, sale, or possession of ammunition feeding devices (of any capacity) *until the 1990s, see* N.J. Stat. §2C:39-1y, -3j, -9h. The same is true at the federal level. Congress did not regulate magazine capacity until 1994, when it adopted a nationwide ban on feeding devices with a capacity of more than ten rounds. *See* Pub. L. No. 103-322, 108 Stat. 1796 (1994) (formerly codified at 18 U.S.C. §922(w)). Unlike California's ban, however, that federal law was time-limited and operated only prospectively, allowing people who had lawfully acquired such magazines to keep them. *Id.* And Congress allowed the law to expire in 2004 after a Justice Department study revealed that it had produced "no discernible reduction" in violence with firearms across the country. 16-ER-3700-3701.

To be sure, a few states restricted firing capacity of semiautomatic weapons in the early-twentieth century. *See* 1927 Mich. Pub. Acts 887, 888; 1927 R.I. Acts & Resolves 256, 256-57; 1933 Minn. Laws ch. 190. But those modern laws are of little help to the state, especially given that they arrived more than three decades

after semiautomatic weapons started hitting the civilian market and even longer after higher-capacity firearms started gaining popularity. *See* Dkt.10 at 35 (Bumatay, J., dissenting) ("Given their recent vintage, these regulations offer little support for the original public meaning of the Second Amendment."). Moreover, all these laws were either repealed outright or replaced with laws that restricted only fully automatic weapons. *See* 1959 Mich. Pub. Acts 249, 250; 1959 R.I. Acts & Resolves 260, 260, 263; 1963 Minn. Sess. L. ch. 753, at 1229. And none of these laws— which were outliers even while on the books—was ever understood to apply to feeding devices, regardless of capacity. *See* 16-ER-3810-3811.[8] Before 1990, only the District of Columbia restricted law-abiding citizens' ability to keep or bear feeding devices of any size.[9]

---

[8] California and Ohio also enacted licensing laws for certain semiautomatics but did not enact outright bans. *See* 1933 Cal. Stat., ch. 450; 1933 Ohio Laws 189, 189. And while a Virginia law enacted in that era could be read to include semiautomatics that hold more than 16 rounds, it applied only to use of the weapon in a "crime of violence" or "for offensive or aggressive purpose." 1934 Va. Acts ch. 96, §§1(a), 4(d). As with the three laws cited in the text, moreover, each of these laws was either repealed outright or replaced with laws restricting only fully automatic weapons. *See* 1965 Cal. Stat., ch. 33, at 913; 1975 Va. Acts, ch. 14, at 67; 1972 Ohio Laws 1866, 1963; 16-ER-3810-3811.

[9] In 1932, Congress passed a local D.C. law prohibiting the possession of firearms that "shoot[] automatically or semiautomatically more than twelve shots without reloading." Act of July 8, 1932, Pub. L. No. 72-275, §§1, 14, 47 Stat. 650, 650, 652 (1932), *repealed via* 48 Stat. 1236 (1934), *currently codified as amended at* 26 U.S.C. §§5801-72. That law was not understood to sweep up ammunition feeding devices as an original matter. Indeed, when Congress enacted the National Firearms Act imposing stringent regulations on machineguns for the whole country just two

That explains why the Supreme Court, when discussing modern semiautomatic rifles that come standard with 20- or 30-round magazines, opined nearly three decades ago that such arms "traditionally have been widely accepted as lawful possessions" in the United States. *Staples v. United States*, 511 U.S. 600, 612 (1994). Particularly given the ubiquity by the Prohibition Era of firearms with a capacity of more than ten rounds, *see infra* pp.47-48, these few, late-breaking laws do not an enduring tradition make. *See Bruen*, 597 U.S. at 36-38 (rejecting reliance on "a handful of late-19th-century [laws]" because laws enacted long after ratification "come too late to provide insight into the meaning of [the Constitution]" (first alteration added) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 312 (2008) (Roberts, C.J., dissenting))).

2. Against that backdrop, the state's hodgepodge of historical regulations falls far short of justifying its ban. For a historical law to serve as a "proper analogue" to a modern regulation, the two laws must be "relevantly similar" based principally on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. Indeed, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is

---

years later, it chose not to impose any restrictions on magazines. Pub. L. No. 73-474, 48 Stat. 1236 (1934). Nevertheless, after the District achieved home rule in 1975, the new D.C. government interpreted the 1932 law "so that it outlawed all detachable magazines and all semiautomatic handguns." 16-ER-3811.

comparably justified are '*central*' considerations when engaging in an analogical inquiry." *Id.* And even a "relevantly similar" historical analogue must be "well-established and representative." *Id.* at 30. A court may not uphold a restriction just because a state manages to locate a few similar laws from the past, as doing so would "risk[] endorsing outliers that our ancestors would never have accepted." *Id.*

Applying those principles, the state's proposed analogues are nowhere near sufficient. In fact, the state stumbles right out of the gate. The state claims to have identified "a more comprehensive understanding of our Nation's history" under which "'[f]irearms and accessories, along with other dangerous weapons, were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality.'" AG.Br.51. In other words, it claims a historical tradition of restricting weapons that prove especially "dangerous" in the hands of criminals regardless of whether *law-abiding* citizens typically use them for lawful purposes. But the Supreme Court has recognized only a "historical tradition of prohibiting the carrying of 'dangerous *and* unusual weapons.'" *Bruen*, 597 U.S. at 21 (emphasis added) (quoting *Heller*, 554 U.S. at 627). As Justice Alito has explained, "this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring in the judgment). Thus, historical tradition *according to the Supreme Court* is that the dangerousness of an arm *vel non* (let alone its

41

dangerousness in the hands of a criminal) is not enough to justify its prohibition. States may ban only those arms that are dangerous in some way that differentiates them from common arms *in addition* to being "highly unusual in society at large." *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627).

Making matters worse, the state largely ignores *Bruen*'s admonition that it matters "*how* … the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29; *see also Duncan V*, 19 F.4th at 1158-59 (Bumatay, J. dissenting). For example, *Bruen* specifically held that a historical law that restricted only the *concealed* carry of a class of weapons is not relevantly similar to a modern law that prohibits carrying such weapons at all because the degree of burden the laws impose is different in kind. 597 U.S. at 47-48. *A fortiori*, such a law is not relevantly similar to a law that, like §32310, bans both carrying *and keeping* a class of arms.

Nevertheless, the state proceeds to invoke a slew of laws that do not impose anywhere near the degree of burden that §32310 does. Its first proposed analogues—a 1686 East New Jersey law restricting concealed carry of various knives or "other unusual or unlawful weapons" and other "coloni[al] and early State[]" laws "prohibit[ing] the carrying of clubs and similar weapons," AG.Br.37—not only involved what by their own admission were unusual weapons, but generally did not restrict *all* carrying of any types of arms.

42

So too with the state's various "laws restricting the carrying of Bowie knives" in the 1800s. AG.Br.40. Nearly all nineteenth-century Bowie-knife laws were limited to (at most) restricting concealed carry. In fact, most of the restrictions the state cites merely escalated punishments for crimes committed with Bowie knives or targeted concealed carry or open carry with intent to do harm, while leaving intact citizens' right to possess and openly carry—i.e., keep and bear—them for self-defense. And to the extent a couple of laws could be read to ban possession, they were contemporaneously held unconstitutional. *See, e.g.*, *Nunn v. State*, 1 Ga. 243 (1846); *cf. Bruen*, 597 U.S. at 54 (singling out "[t]he Georgia Supreme Court's decision in *Nunn*" as "particularly instructive" regarding the Second Amendment's meaning). In all events, even the most sweeping Bowie knife laws were short-lived. David Kopel, *Bowie Knife Statutes 1837-1899*, Reason.com (Nov. 20, 2022), bit.ly/3RNRpQD.

The state's historical restrictions on so-called "trap guns," AG.Br.38, are even less apposite. Trap guns are not bearable arms; they fire a projectile automatically when a trap (i.e., a trip wire) is triggered. Laws against setting traps thus do not impose *any* "burden [on] a law-abiding citizen's right to *armed* self-defense," *Bruen*, 597 U.S. at 29 (emphasis added); they instead criminalize the act of rigging devices to expel a projectile without any human intervention. Gunpowder-storage restrictions, *see* AG.Br.39-40, are (if possible) even further afield. Laws designed

to ensure that combustible material would not combust *when not in use* are self-evidently different in "how … [they] burden [the] right to armed self-defense," *Bruen*, 597 U.S. at 29, from laws that confine the universe of arms citizens may use.

As for the rest of California's historical narrative, the Supreme Court has already determined the import of the fact "that colonial legislatures sometimes prohibited the carrying of 'dangerous and unusual weapons'": "[E]ven if these colonial laws prohibited the carrying of [certain classes of arms] because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today." *Id.* at 47 (quoting *Heller*, 554 U.S. at 627). *A fortiori*, they cannot justify efforts to prohibit bare possession of such arms. Moreover, whatever laws may have existed about "unusual or unlawful weapons," AG.Br.37, no colony or state in the early Republic prohibited people from carrying (let alone keeping) firearms or their integral components, either openly or concealed. To the contrary, some state and local laws affirmatively encouraged or even *required* such carrying. *See, e.g.*, *Proceedings of the Virginia Assembly, 1619*, in *Narratives of Early Virginia, 1606-25*, at 273 (Lyon Gardiner Tyler ed., 1907). Early regulations either prohibited concealed carry while allowing open carry and possession or merely "prohibit[ed] bearing arms in a way that spreads 'fear' or 'terror' among the people." *Bruen*, 597 U.S. at 50. And as *Bruen* explained in painstaking detail, those laws

44

were never understood to cover commonly owned arms.  *See id.* at 46-70.

Finally, the state's discussion of laws regulating "melee weapons," AG.Br.41, misses the forest for the trees.  Such laws are indeed part of our Nation's history, but what they show is *not* that commonly owned but "uncommonly dangerous" arms were commonly banned.  Rather, they show exactly what *Heller* and *Bruen* held: The only types of arms that states and municipalities have historically restricted (let alone banned outright) in this country are those that were sparingly chosen by law-abiding citizens for lawful purposes, but chosen overwhelmingly by criminals for illicit ends—in other words, weapons that were *both* dangerous *and* unusual.

3. The state ultimately abandons any pretense of a search for relevant similarity and insists that what matters is that (in its view) its sweeping ban on common feeding devices imposes only a "minimal burden on a law-abiding citizen's right to armed self-defense."  AG.Br.47.  But the Supreme Court did not expressly reject the two-step interest-balancing approach just to readopt it *sub silentio* later in the same opinion.  *See Bruen*, 597 U.S. at 19.  *Bruen*'s reference to analogical reasoning and comparable burdens, including the "how" and "why" metrics it employed, was not an invitation to reinject interest-balancing through the backdoor. The Court could not have been clearer:  "Analogical reasoning requires judges to apply faithfully the balance *struck by the founding generation* to modern circumstances…. It is not an invitation to revise that balance through means-end

45

scrutiny." *Id.* at 29 n.7 (emphasis added). And the founding generation considered prohibitions on keeping and bearing common arms the kind of severe incursion on fundamental rights that should not be tolerated. Because California's flat ban on common arms finds no support in "this Nation's historical tradition of firearm regulation," it violates the Second Amendment. *Id.* at 17.

### D. California Cannot Save Its Sweeping Ban by Pointing to Some Dramatic Technological Change or Novel Societal Problem.

Unable to change the historical record, the state pins its hope on a "more nuanced approach." AG.Br.32-36. But *Bruen* countenances a "more nuanced approach" only for laws "implicating unprecedented societal concerns or dramatic technological changes," *Bruen*, 597 U.S. at 27, and §32310 implicates neither. Moreover, the only "more nuanced approach" *Bruen* countenances is one that gives the government *greater leeway* in identifying "historical analogies," *id.*; there is no approach consistent with *Bruen* under which history no longer matters. And no amount of nuance can change the fact that American states and municipalities in the eighteenth and nineteenth centuries did not prohibit law-abiding citizens from possessing arms that were commonly kept and borne for lawful purposes just because they were especially dangerous in the hands of criminals.

1. The absence of any well-established tradition supporting the state's ban is not owing to any "dramatic technological changes." *Bruen*, 597 U.S. at 27. "The first firearm that could fire more than ten rounds without reloading was invented in

around 1580." *Duncan IV*, 970 F.3d at 1147. Several such arms pre-date the Revolution, some by nearly a hundred years. *See* Nicholas Johnson, et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 2197 (3d ed. 2021) (citing Harold L. Peterson, *The Treasury of the Gun* 229 (1962)); 3-ER-660-662. For example, the popular Pepperbox-style pistol could "shoot 18 or 24 shots before reloading individual cylinders." *Duncan IV*, 970 F.3d at 1147. "[C]artridge-fed" "repeating" firearms came onto the scene "at the earliest in 1855 with the Volcanic Arms lever-action rifle that contained a 30-round tubular magazine, and at the latest in 1867, when Winchester created its Model 66, which was a full-size lever-action rifle capable of carrying 17 rounds" that was touted for its ability to "fire 18 rounds in half as many seconds." *Id.* at 1148; *see* 16-ER-3804 (discussing the "first metallic cartridge … similar to modern ammunition" in the 1850s).

These multi-shot firearms were not novelties; "over 170,000" Winchester 66's "were sold domestically," and the successors that replaced the Model 66, the 73 and 92, sold more than ten times that amount in the ensuing decades. *Duncan IV*, 970 F.3d at 1148; *see* 3-ER-667 (describing the Winchester 66 as "the first magazine-fed repeater that held more than ten rounds to achieve commercial success"); *see also* 3-ER-666 (discussing advancements in industrial manufacturing that contributed to the increasing numbers of repeating firearms in civilian hands in the nineteenth century). Winchesters were far from unique in this regard; "the number of distinct

47

types of repeaters by the middle of the nineteenth century was staggering." 3-ER-666; *see, e.g.*, Harold F. Williamson, *Winchester: The Gun That Won The West* 28-31 (1952) (discussing the Henry lever action rifle, which could fire 16 rounds without reloading); Norm Flayderman, *Flayderman's Guide to Antique American Firearms and Their Values* 305 (9th ed. 2007) (noting that 14,000 of these Henry rifles were sold between 1860 and 1866); 3-ER-668-670. And the first semiautomatic firearms with modern box-style detachable magazines came onto the market all the way back in the 1890s. *Duncan IV*, 970 F.3d at 1148.

To be sure, feeding devices capable of holding more than ten rounds were not as common in the nineteenth century as they are today (although they became increasingly popular in the early twentieth century). But the same could be said of pretty much any type of arm (not to mention all manner of other goods) given the advancements in mass production that came about over the past century. The more relevant point is that history refutes any notion that there is something novel about what California has banned. What fed ammunition into the chamber of these firearms were magazines and other ammunition feeding devices capable of holding more than ten rounds. *See* 16-ER-3804 ("The Winchester M1873 and … M1892 were lever actions holding ten to eleven rounds in tubular magazines," and the Evans Repeating Rifle, which hit "the market in 1873," came standard with a "thirty-four round[]" magazine); *Duncan IV*, 970 F.3d at 1148.

48

In short, feeding devices capable of holding more than ten rounds have been part of the fabric of American life for well more than 100 years. That much is not disputable. Indeed, it is not even disputed. To be sure, the state argues that modern firearms and magazines can fire more rounds more accurately and quickly. But that is neither here nor there. (It is also not true; handguns today are not meaningfully better on those scores than, e.g., a Colt Model 1911, which remains in wide circulation.) After all, it would be perverse in the extreme to confine the people whose rights the Second Amendment protects to arms that are less accurate, efficient, and reliable for self-defense—which likely explains why no such historical tradition exists. Far from demonstrating some tradition of treating technological advancements aimed at improving accuracy, capacity, and functionality as nefarious developments that make firearms "too dangerous," history shows that those are precisely the kinds of qualities people have consistently sought when determining how best to protect self, others, and home. Advancements welcomed by law-abiding citizens are simply not the sort of "dramatic technological changes" with which *Bruen* was concerned—as evidenced by the Court's emphatic focus on whether arms are "in common use today."

2. To the extent California seeks to justify its ban as owing to some "unprecedented societal concern[]," *Bruen*, 597 U.S. at 27, that argument fails too. Even accepting the dubious proposition that there is some causal link between the

recent rise in mass shootings and arms that have been lawfully possessed by civilians for the better part of a century, AG.Br.34-35, the unfortunate reality is that mass murder has been a fact of life in the United States for a very long time. *See* 6-ER-1307, 1312-1322, 1332; 8-ER-1822; Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 105-06 (2008); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1319 (11th Cir. 2023). Yet before the 1990s, not one state banned ammunition feeding devices of any capacity, and there were almost no efforts to restrict firing capacity in any way. *See* 3-ER-672.

That indisputable reality renders California's plea for "more nuanced approach" futile. No amount of nuance can change the fact that there has never been any historical tradition of banning arms that *law-abiding* citizens typically keep and use for *lawful* purposes based on the damage they could inflict in the hands of someone bent on misusing them. To the contrary, our historical tradition is one of protecting the rights of law-abiding citizens to defend themselves and others against those who seek to do them harm. *See Bruen*, 597 U.S. at 28; *Heller*, 554 U.S. at 627. Because California Penal Code §32310's ban on common arms flies in the face of that tradition, it violates the Second Amendment.

## III. California's Confiscatory Ban Violates The Takings Clause.

California's decision not only to prospectively ban feeding devices capable of holding more than ten rounds, but to confiscate them from law-abiding citizens who

50

lawfully acquired them before the ban was enacted, is one of the rare government initiatives that violates not one, but two provisions of the Bill of Rights. The Takings Clause is clear: "[P]rivate property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chi., Burlington & Quincy Ry. Co. v. City of Chicago*, 166 U.S. 226, 239 (1897) (incorporating the Clause against the states). Supreme Court precedent is equally clear that a physical taking for which just compensation must be paid occurs whenever the government "dispossess[es] the owner" of property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982); *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 324 n.19 (2002). That is true regardless of whether the property is real or personal: The "categorical duty" to provide compensation applies "when [a state] takes your car, just as when it takes your home." *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015).

California's ban violates those principles, as it forces law-abiding citizens to dispossess themselves of lawfully acquired property with no compensation from the state. Under California law, citizens who lawfully obtained what the state now deems a verboten "large capacity magazine" could avoid criminal liability only if, as of July 1, 2017, they had "[r]emove[d] [the feeding device] from the state," "s[old] [it] to a licensed firearms dealer," "[s]urrende[ed] [it] to a law enforcement agency for destruction," or "permanently altered [it] so that it cannot accommodate more

than 10 rounds." Cal. Penal Code §§16740(a), §32310(c)-(d). In other words, they could avoid criminal liability only by surrendering or partially destroying their lawfully acquired magazines.

There can be no question that surrendering a lawfully acquired feeding device to law enforcement requires physical dispossession. That is no less true of the option to sell lawfully acquired property to a third party; the owner must hand the property over to someone else—the definition of a taking. *See Black's Law Dictionary* (10th ed. 2014) (defining "taking" to include the "transfer of possession"). That the transfer under the latter option is to a private party makes no difference. In *Kelo*, for instance, it did not matter that Ms. Kelo was forced to sell her property to a "private nonprofit entity." *Kelo v. City of New London*, 545 U.S. 469, 473-75 (2005). That makes sense: Whether a government edict forces the owner to hand the property over to the government or to a third party, there is a taking—and an obligation for the state to pay just compensation.

The option to move the lawfully acquired property out of California is no less a taking. California cannot invoke the permissive laws of another state to validate its own unconstitutional restriction. *See Jackson*, 746 F.3d at 967 ("That Jackson may easily purchase ammunition elsewhere is irrelevant."). But even putting that aside, requiring someone to remove property from the state is no less a dispossession than a forced confiscation. Like a mandatory sale or a surrender to the state, a

mandatory transfer out of state directly interferes with the owner's right to *possess* the property, not just to her right to *use* it as she pleases.[10]

The option to alter magazines to accept fewer than ten rounds does not eliminate the taking either. The state identifies no authority for the proposition that letting people "keep" lawfully obtained property on the condition that they convert it into something the state itself views as fundamentally different avoids a takings problem. Nor could it, given that the Supreme Court has already rejected even less palpably transparent government efforts to disguise a taking. In *Horne*, for instance, the raisin growers could have avoided the taking by "plant[ing] different crops" or selling "their raisin-variety grapes as table grapes or for use in juice or wine." 576 U.S. at 365. Similarly, the property owner in *Loretto* could have avoided the taking by converting her building into something other than an apartment complex. 458 U.S. at 439 n.17. But the Court in both cases rejected the argument that such options eliminated the physical taking, explaining that "property rights 'cannot be so easily manipulated.'" *Horne*, 576 U.S. at 365 (quoting *Loretto*, 458 U.S. at 439 n.17). This case is no different just because it involves guns. If anything, this case is *a fortiori*,

---

[10] At minimum, forcing citizens to sell property or take it out of state places an unconstitutional condition on possession, which effects an unconstitutional taking. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606-07 (2013).

as arms are the only type of personal property that the Constitution explicitly says the people may "keep." U.S. Const. amend. II.

That alone distinguishes the state's confiscatory ban from, e.g., laws that add "a drug to [the] schedule of controlled substances," *Duncan V*, 19 F.4th at 1112, as there is no constitutional right to keep or use drugs. But in all events, the lone case *Duncan V* cited for the proposition that a state need not pay just compensation when it "adds to [a] list of contraband," *id.*, does not support that proposition in the slightest. As the Supreme Court has made abundantly clear, *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), "was about regulatory takings, not direct appropriations. Whatever *Lucas* had to say about reasonable expectations with regard to regulations, people still do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 576 U.S. at 358. So too with *Andrus v. Allard*, 444 U.S. 51 (1979); the Court found it "crucial that appellees retain[ed] the rights to possess" the eagle feathers they had lawfully acquired before the ban took effect, *id.* at 66—and unlike here, the government did not condition that right to keep the lawfully acquired feathers on transforming them into something else.

Ultimately, then, the state is left arguing that it may evade the Constitution's categorical just-compensation requirement whenever it effects a physical taking pursuant to its police power. *See* AG.Br.53. But the Supreme Court made clear more than a century ago that the force of the Takings Clause does not vary with the source

of power the state invokes. Whether a law effects a taking is "a separate question" from whether the state has the power to enact it—and an uncompensated taking is unconstitutional "without regard to the public interests that it may serve." *Loretto*, 458 U.S. at 425-26; *accord, e.g.*, *Chi., Burlington & Quincy Ry. Co. v. Illinois*, 200 U.S. 561, 593 (1906). The Constitution thus doubly dooms the state's confiscatory magazine ban.

## CONCLUSION

For the reasons set forth above, this Court should hold that this en banc panel as convened is without statutory authority and either remand the appeal for assignment to a three-judge panel or call for a properly authorized en banc vote. In the alternative, if the Court reaches the merits, it should affirm.

Respectfully submitted,

s/Paul D. Clement

C.D. MICHEL
ANNA M. BARVIR
SEAN A. BRADY
MICHEL & ASSOCIATES, P.C.
180 East Ocean Blvd., Suite 200
Long Beach, CA 90802
(562) 216-4444

PAUL D. CLEMENT
 *Counsel of Record*
ERIN E. MURPHY
MATTHEW D. ROWEN[*]
CLEMENT & MURPHY, PLLC
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
erin.murphy@clementmurphy.com

[*] Supervised by principals of the firm who are members of the Virginia bar

*Counsel for Plaintiffs-Appellees*

December 21, 2023

## STATEMENT OF RELATED CASES

Pursuant to Federal Rules of Appellate Procedure 28-2.6, plaintiffs-appellees state that they are aware of the following related cases:

*Miller v. Bonta*, No. 23-2979 (9th Cir.): Appeal from a final judgment permanently enjoining enforcement of California's ban on so-called assault weapons. The three-judge panel assigned to *Miller* has scheduled oral argument for January 24, 2024.

*Eyre v. Rosenblum*, No. 23-35539 (9th Cir.); *Oregon Firearms Federation v. Kotek*, No. 23-35540 (9th Cir.); *Fitz v. Rosenblum*, No. 23-35478 (9th Cir.); *Azzopardi v. Rosenblum*, No. 23-35479 (9th Cir.): Consolidated appeals from a final judgment upholding Oregon Ballot Measure 114, which bans law-abiding citizens from keeping or bearing ammunition feeding devices that can hold more than ten rounds and requires law-abiding citizens to obtain a permit to purchase a firearm. These consolidated appeals are currently stayed pending resolution of this case.

December 21, 2023

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitation of Circuit Rule 32-1 because this brief contains 13,947 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman type.

December 21, 2023

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on December 21, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

<u>s/Erin E. Murphy</u>
Erin E. Murphy