No. 23-55805

# In the
# United States Court of Appeals
# for the Ninth Circuit

◆

VIRGINIA DUNCAN, et al.,

*Plaintiffs–Appellees,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

*Defendant–Appellant.*

◆

Appeal from the United States District Court
for the Southern District of California
The Honorable Roger T. Benitez
Case No. 3:17-cv-01017-BEN-JLB

◆

**BRIEF OF *AMICI CURIAE* FPC ACTION FOUNDATION,
CALIFORNIA GUN RIGHTS FOUNDATION, AND CENTER FOR
HUMAN LIBERTY IN SUPPORT OF PLAINTIFFS-APPELLEES**

◆

JOSEPH G.S. GREENLEE
  *Counsel of Record*
CODY J. WISNIEWSKI
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *Amici Curiae* make the following statements:

**FPC Action Foundation** has no parent corporation, and as a non-stock nonprofit corporation, no publicly held corporation could own any share of its stock.

**California Gun Rights Foundation** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

**Center for Human Liberty** has no parent corporation, nor is there any publicly held corporation that owns more than 10% of its stock.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

i

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT............................................i

TABLE OF AUTHORITIES ...................................................... iii

STATEMENT OF *AMICI CURIAE* ........................................... 1

CONSENT TO FILE............................................................ 2

SUMMARY OF ARGUMENT ................................................ 3

ARGUMENT ....................................................................5

    I.   *Heller* applied the test for arms prohibitions and held that common arms cannot be banned. ....................................................5

    II.  Repeating arms with greater than 10-round capacities predate the Second Amendment and were popular by the ratification of the Fourteenth Amendment....................................8

        A.  Repeating arms were invented around 1500, and repeating arms capable of firing more than 10 rounds existed by 1580...10

        B.  Repeating arms gained popularity in England during the 17th century, including some with 30-round magazines..........12

        C.  American colonists began manufacturing repeating arms in the mid-1600s and the Founders embraced repeaters capable of firing more than 10 consecutive rounds....................16

        D.  Repeating arms with greater than 10-round capacities became the most popular arms in the 19th century. ...............22

    III. There are no historical prohibitions on arms capable of firing more than 10 rounds. ....................................................... 31

    IV. Any historical analysis should be limited to traditional regulations that applied to firearms—not Bowie knives or other dissimilar weapons. ........................................................... 32

CONCLUSION ................................................................ 34

CERTIFICATE OF COMPLIANCE ....................................... 35

CERTIFICATE OF SERVICE................................................ 36

# TABLE OF AUTHORITIES

## Cases

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) ...................................................................... 7, 8

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ............................................................... 5, 6, 8, 9

*Friedman v. City of Highland Park, Ill.,*
   577 U.S. 447, 136 S. Ct. 447 (2015) ......................................... 7

*Gamble v. United States,*
   139 S. Ct. 1960 (2019) ............................................................ 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   597 U.S. 1 (2022) .......................................................... *passim*

*United States v. Miller,*
   307 U.S. 174 (1939) ............................................................... 6

*Watson v. Stone,*
   148 Fla. 516 (1941) ............................................................. 32

## Statutes and Regulations

1893 Fla. Laws 71 .................................................................... 31

## Other Authorities

*16-Shot Wheel Lock*, America's 1st Freedom, May 10, 2014 ............... 11

*A New Gun Patent*, Athens (Tenn.) Post, Feb. 25, 1853 ...................... 25

Antaris, Leonardo M., *In the Beginning: Semi-Automatic Pistols of the 19th Century*, American Rifleman, Jan. 4, 2018........................... 30

Bresnan, Andrew L., *The Henry Repeating Rifle*,
   RareWinchesters.com, Aug. 17, 2007 ............................... 27

Brown, M.L., FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492–1792 (1980) .................................... 10

Chapel, Charles Edward, GUNS OF THE OLD WEST (1961) ............... 16, 25

Cleveland, H.W.S., HINTS TO RIFLEMEN (1864) ....................................... 27

Demeritt, Dwight, MAINE MADE GUNS & THEIR MAKERS (rev. ed. 1997) ...................................................................... 29

Dougherty, Martin, SMALL ARMS VISUAL ENCYCLOPEDIA (2011) ...... 13, 30

Dunlap, Jack, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS (1964) .................................................................. 24

English, William, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* (May 13, 2022) ........................... 8

Flayderman, Norm, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES (9th ed. 2007)..... 24, 25, 28, 29

Foley, Vernard, *Leonardo and the Invention of the Wheellock*, SCIENTIFIC AM., Jan. 1998 .................................................... 12

Gallay, Alan, COLONIAL WARS OF NORTH AMERICA, 1512–1763 (2015) .. 16

Garavaglia, Louis A. & Worman, Charles G., FIREARMS OF THE AMERICAN WEST 1866–1894 (1985) ....................................... 27

Garry, James B., WEAPONS OF THE LEWIS AND CLARK EXPEDITION (2012) ................................................................ 20, 21

Gilkerson, William, BOARDERS AWAY II (1993)....................................... 23

Greener, W.W., THE GUN AND ITS DEVELOPMENT (9th ed. 1910) ........... 10

Johnson, Nicholas, et al., FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (3d ed. 2022)............ 12

Kopel, David B. & Greenlee, Joseph G.S., *The History of Bans on Types of Arms Before 1900*, 50 J. LEGIS. (forthcoming 2024) .......... 9, 31

iv

Letter from Joseph Belton to the Continental Congress
(Apr. 11, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS,
COMPILED 1774–1789 (1957) ................................................................ 19

Letter from Joseph Belton to the Continental Congress
(July 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS,
COMPILED 1774–1789 (1957) ................................................................ 19

Lewis, Meriwether & Clark, William, THE JOURNALS OF THE LEWIS
& CLARK EXPEDITION, vols. 2–8 (Gary Moulton ed., 1986–1993) ........ 21

McClure, Nancy, *Treasures from Our West: Lukens Air Rifle*,
BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014 ........... 21

Meyer, David R., NETWORKED MACHINISTS: HIGH-TECHNOLOGY
INDUSTRIES IN ANTEBELLUM AMERICA (2006) ...................................... 22

*Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS .......... 29

Mouret, Jean-Noel, PISTOLS AND REVOLVERS (1993) .............................. 30

*National Museum of American History*, SMITHSONIAN INSTITUTION
ARCHIVES ............................................................................................... 18

*Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822 ................. 23

Niles, Samuel, *A Summary Historical Narrative of the Wars in New
England*, *in* MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS,
4th ser., vol. 5 (1837) ............................................................................ 17

Peterson, Harold L., ARMS AND ARMOR IN COLONIAL AMERICA
(1956) ..................................................................................... 10, 15, 18

Peterson, Harold L., THE TREASURY OF THE GUN (1962) ................ *passim*

Pirkle, Arthur, WINCHESTER LEVER ACTION REPEATING FIREARMS:
THE MODELS OF 1866, 1873 & 1876 (2010) ........................................ 28

Plaster, John, THE HISTORY OF SNIPING AND SHARPSHOOTING
(2008) ..................................................................................................... 20

Prenderghast, Gerald, REPEATING AND MULTI-FIRE WEAPONS (2018) ...................................................................................... 20

Report of the Continental Congress (May 15, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789 (Worthington Chauncey Ford ed., 1907) ..................................................... 19

Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789 (Worthington Chauncey Ford ed., 1907) ..................................................... 19

Sawyer, Charles Winthrop, FIREARMS IN AMERICAN HISTORY (1910)..... 16

*Springfield Armory Museum – Collection Record*, REDISCOV.COM ......... 30

Supica, Jim, et al., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM (2013) ....................................................... 20, 24, 30

*The Cookson Gun and the Mortimer Pistols*, AMERICAN RIFLEMAN, vol. 63 (Sep. 29, 1917) ........................................................... 18

THE DIARY OF SAMUEL PEPYS (Henry B. Wheatley ed., 1893) ................ 14

THE LONDON MAGAZINE, JAN–JUNE, 1829, vol. 3 (3d ser., 1829) ........... 11

Tilloch, Alexander, THE PHILOSOPHICAL MAGAZINE AND JOURNAL: COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE (Richard Taylor ed., 1822) ................................................ 23

U.S. NAVY SEAL SNIPER TRAINING PROGRAM (2011) ............................. 29

U.S. Patent No. 8,210 ............................................................................ 25

Walter, John, RIFLES OF THE WORLD (3rd ed. 2006) ............................... 29

Walton, Clifford, HISTORY OF THE BRITISH STANDING ARMY. A.D. 1660 TO 1700 (1894) .............................................................. 14

Williamson, Harold F., WINCHESTER: THE GUN THAT WON THE WEST (1952) ......................................................................... 26

Wilson, R.L., WINCHESTER: AN AMERICAN LEGEND (1991) .......... 26, 27, 28

Winant, Lewis, FIREARMS CURIOSA (1955) ........................... 10, 11, 24, 25

Winant, Lewis, PEPPERBOX FIREARMS (1952) ......................................... 24

## STATEMENT OF *AMICI CURIAE*

**FPC Action Foundation (FPCAF)** is a nonprofit organization dedicated to preserving the rights and liberties protected by the Constitution. FPCAF focuses on research, education, and legal efforts to ensure that the freedoms guaranteed by the Constitution are secured for future generations.

**California Gun Rights Foundation (CGF)** is a nonprofit foundation incorporated under the laws of California with its principal place of business in Sacramento, California. CGF serves its members, supporters, and the public through educational, cultural, and judicial efforts to defend and advance Second Amendment and related rights.

**Center for Human Liberty (CHL)** is a nonprofit organization dedicated to defending and advancing individual liberty and freedom, including the rights and liberties protected by the Constitution. Consistent with this purpose, CHL engages in legal efforts, including the submission of *amicus* briefs, to promote the protection of liberty.

This case concerns *Amici* because it goes to the heart of the fundamental right to armed self-defense, as protected by the Second Amendment to the United States Constitution.

## CONSENT TO FILE

All parties consented to the filing of this brief.[1]

---

[1] No counsel for a party authored this brief in any part. No party or counsel contributed money intended to fund the preparation or submission of this brief. No person other than *Amici* and their members contributed money intended to fund the preparation or submission of this brief.

## SUMMARY OF ARGUMENT

The Supreme Court has already held that bans on common arms violate the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Court applied the test it later expounded in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). First, analyzing the Second Amendment's plain text, the *Heller* Court determined that the Second Amendment extends, prima facie, to all bearable arms. Next, analyzing our nation's historical tradition of firearm regulation, the Court determined that while dangerous and unusual arms may be banned, a ban on common arms violates the Second Amendment. Because handguns are common, the *Heller* Court held the District of Columbia's handgun ban unconstitutional.

Since the *Heller* Court already applied the test for arms prohibitions and held that common arms cannot be banned, *Heller*'s holding is binding and there is no need to conduct the analysis anew. Rather, this Court need only determine whether the arms at issue here are common. They are. California bans magazines capable of holding over 10 rounds, and Americans own over half-a-billion of these magazines.

3

Supreme Court precedent therefore requires that California's ban be held unconstitutional.

Appellant argues for a "more nuanced" approach than *Heller* demands because magazines with greater than 10-round capacities "represent a dramatic technological change" and "implicate an unprecedented societal concern." Appellant's Op. Br. 32 (cleaned up). This is false. Repeating arms with greater than 10-round capacities existed by 1580 and predate the Second Amendment by over two centuries. Despite continuous technological advancements over hundreds of years and widespread popularity once they became affordable in the 19th century, traditionally, repeating arms with greater than 10-round capacities were never banned in America.

Moreover, California's ban cannot be salvaged by analogies to historical restrictions on non-firearm weapons, such as Bowie knives, dirks, and daggers. *Bruen* makes clear that firearm restrictions can be justified only by traditional restrictions on *firearms*.

Because California bans arms that are common and have historically been protected, California's ban violates the Second Amendment.

4

## ARGUMENT

## I. *Heller* applied the test for arms prohibitions and held that common arms cannot be banned.

The Supreme Court applied its Second Amendment test to a handgun ban in *District of Columbia v. Heller*, 554 U.S. 570 (2008), and held that bans on common arms violate the Second Amendment.

The *Heller* Court conducted the same test that the Court later expounded in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*:

> In keeping with *Heller*, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation . . . . the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.

597 U.S. 1, 17 (2022).

Analyzing "Arms" in the Amendment's plain text, the *Heller* Court determined that "[t]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms." 554 U.S. at 582.

Moving next to the nation's tradition of firearm regulation, the Court held that common arms are protected and cannot be banned. Historically, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-

5

defense." *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)). Therefore, "the sorts of weapons protected were those 'in common use at the time.'" *Id.* at 627 (quoting *Miller*, 307 U.S. at 179). As for regulations on particular arms, the Court's extensive historical analysis identified only "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* This traditional regulation "fairly supported" the Court's holding that the Second Amendment protects common arms because common arms are necessarily not dangerous *and unusual. Id.*; *see also Bruen*, 597 U.S. at 47 ("Drawing from this historical tradition [of restrictions on 'dangerous and unusual weapons'], we explained [in *Heller*] that the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'") (quoting *Heller*, 554 U.S. at 627).

Concluding that the nation's tradition of firearm regulation allows only dangerous and unusual arms to be banned, and that handguns—as "the most popular weapon chosen by Americans," *Heller*, 554 U.S. at 629—are common, the *Heller* Court held that "a complete prohibition of their use is invalid," *id.*

6

The concurrence in *Caetano v. Massachusetts* later confirmed this approach: "While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment." 577 U.S. 411, 420 (2016) (Alito, J., joined by Thomas, J., concurring).

Justice Thomas, who authored the *Bruen* opinion, joined by Justice Scalia, who authored the *Heller* opinion, provided additional confirmation of this interpretation of the Court's test in a dissent from a denial of certiorari:

> *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose. . . . Roughly five million Americans own AR-style semiautomatic rifles. The overwhelming majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting. Under our precedents, *that is all that is needed* for citizens to have a right under the Second Amendment to keep such weapons.

*Friedman v. City of Highland Park, Ill.*, 577 U.S. 447, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (citations omitted) (emphasis added).

Thus, for arms prohibitions, "the pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding

7

citizens for lawful purposes today." *Caetano*, 577 U.S. at 420. (Alito, J., joined by Thomas, J., concurring) (emphasis omitted).

California bans magazines capable of holding over 10 rounds. These magazines are unquestionably common: "48.0% of gun owners, about 39 million people, have owned magazines that hold over 10 rounds, and up to 542 million such magazines have been owned." William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned*, at 20 (May 13, 2022).[2] Therefore, "a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

## II. Repeating arms with greater than 10-round capacities predate the Second Amendment and were popular by the ratification of the Fourteenth Amendment.

Appellant argues for a "more nuanced" approach than *Heller* demands because magazines with greater than 10-round capacities "represent a dramatic technological change" and "implicate an unprecedented societal concern." Appellant's Op. Br. 32 (cleaned up). This is false. The banned magazines allow repeating firearms to fire more than 10 consecutive rounds without reloading. Repeating arms with greater than 10-round capacities existed by 1580 and predate the Second

---

[2] https://bit.ly/3HaqmKv.

Amendment by over two centuries.[3] Despite continuous technological advancements over hundreds of years and widespread popularity in the 19th century, traditionally, such repeating arms were never banned in America.[4]

---

[3] This section identifies the most notable repeating arms capable of firing over 10 consecutive rounds produced before the year 1900. For a comprehensive historical analysis, *see* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. at 10–15, 38–41, 55–74 (forthcoming 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4393197.

[4] To be sure, while this brief's historical analysis covers all the historical periods reviewed by *Bruen*, the original 1791 understanding of the Second Amendment controls. *See Heller*, 554 U.S. at 625 (concluding with "our adoption of the original understanding of the Second Amendment"); *Bruen*, 597 U.S. at 28 (the Second Amendment's "meaning is fixed according to the understandings of those who ratified it"); *id.* at 34 ("'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'") (quoting *Heller*, 554 U.S. at 634–35) (emphasis *Bruen*'s). Historical evidence from beyond the Founding Era may be used only to confirm Founding-Era evidence. *See id.* at 37 ("19th-century evidence [i]s 'treated as mere confirmation of what . . . ha[s] already been established'") (quoting *Gamble v. United States*, 139 S. Ct. 1960, 1976 (2019)).

**A. Repeating arms were invented around 1500, and repeating arms capable of firing more than 10 rounds existed by 1580.**

"The desire for . . . repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century."[5]

The first known repeating firearms were 10-shot matchlock arquebuses invented between 1490 and 1530. "The cylinder was manually rotated around a central axis pin[.]"[6] King Henry VIII (reigned 1509–1547) owned a similar firearm.[7]

Henry VIII also owned a multi-shot combination weapon called the Holy Water Sprinkler. "It is a mace with four separate steel barrels, each 9" long. These barrels are formed into a wooden cylinder held with four iron bands, two of which have six spikes each."[8] These German-made weapons became known as "Henry VIII's walking staff," because "with it,

---

[5] Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 215 (1956).

[6] M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492–1792, at 50 (1980).

[7] W.W. Greener, THE GUN AND ITS DEVELOPMENT 81–82 (9th ed. 1910).

[8] Lewis Winant, FIREARMS CURIOSA 14 (1955).

he is represented to have traversed the streets at night, to see that the city-watch kept good order."[9]

The first known repeater capable of firing more than 10 shots was invented around 1580; it could consecutively fire 16 superimposed rounds in Roman candle fashion[10]—meaning with each round stacked on top of another and that the user "could not stop the firing once he had started it."[11]

A similar firearm was patented in England in 1682 by Charles Cardiff. Cardiff's patent protected "an Expedient with Security to make Musketts, Carbines, Pistolls, or any other small Fire Armes to Discharge twice, thrice, or more severall and distincte Shotts in a Singell Barrell and Locke with once Primeing."[12]

These Roman candle-style firearms were innovative, but they were no match for the magazine-fed arms that had gained popularity by the mid-17th century. Unlike the Roman candle-style arms, the magazine-

---

[9] 3 THE LONDON MAGAZINE, JAN–JUNE, 1829, at 46 (3d ser., 1829).

[10] *16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM, May 10, 2014, http://bit.ly/2tngSDD (last visited Dec. 28, 2023); *see also* Winant, FIREARMS CURIOSA, at 168–70.

[11] *Id.* at 166.

[12] *Id.* at 167.

fed repeaters, discussed next, allowed the user to fire one round and then pause to decide whether and when to fire again.

## B. Repeating arms gained popularity in England during the 17th century, including some with 30-round magazines.

"Successful systems [of repeating arms] definitely had developed by 1640, and within the next twenty years they had spread throughout most of Western Europe and even to Moscow."[13] "[T]he two principal magazine repeaters of the era [were] the Kalthoff and the Lorenzoni. These were the first guns of their kind to achieve success."[14]

"The Kalthoff repeater was a true magazine gun. In fact, it had two magazines, one for powder and one for balls. The earliest datable specimens which survive are two wheel-lock rifles made by Peter Kalthoff in Denmark in 1645 and 1646."[15] "[T]he number of charges in the magazines ran all the way from six or seven to thirty."[16]

---

[13] Harold L. Peterson, THE TREASURY OF THE GUN 229 (1962).

[14] *Id.*

[15] *Id.* The wheel-lock was invented by Leonardo da Vinci in the late 16th century. Vernard Foley, *Leonardo and the Invention of the Wheellock*, SCIENTIFIC AM., Jan. 1998, at 96. It was superior to its predecessor, the matchlock, because it could be kept always ready for sudden use and was more reliable. Nicholas Johnson, et al., FIREARMS LAW AND THE SECOND AMENDMENT 148 (3d ed. 2022).

[16] Peterson, THE TREASURY OF THE GUN, at 230.

12

Kalthoff repeaters "were undoubtedly the first magazine repeaters ever to be adopted for military purposes. About a hundred flintlock rifles of their pattern were issued to picked marksmen of the Royal Foot Guards and are believed to have seen active service during the siege of Copenhagen in 1658, 1659, and again in the Scanian War of 1675–1679."[17]

"Examples [of Kalthoff-type repeaters] spread throughout Europe wherever there were gunsmiths with sufficient skill and knowledge to make them, and patrons wealthy enough to pay the cost. . . . [A]t least nineteen gunsmiths are known to have made such arms in an area stretching from London on the west to Moscow on the east, and from Copenhagen south to Salzburg. There may well have been even more."[18]

"The Lorenzoni also was developed during the first half of the Seventeenth Century."[19] It was a magazine-fed Italian repeating pistol that "used gravity to self-reload."[20] The Lorenzonis' ammunition capacity was typically around seven shots. The gun's repeating mechanism

---

[17] *Id.*

[18] *Id.*

[19] *Id.* at 231.

[20] Martin Dougherty, SMALL ARMS VISUAL ENCYCLOPEDIA 34 (2011).

13

quickly spread throughout Europe and to the colonies, and the mechanism was soon applied to rifles as well.[21]

On July 3, 1662, famed London diarist Samuel Pepys wrote about experiencing "a gun to discharge seven times, the best of all devices that ever I saw, and very serviceable, and not a bawble; for it is much approved of, and many thereof made."[22] Abraham Hill patented the Lorenzoni repeating mechanism in London on March 3, 1664.[23] The following day, Pepys wrote about "several people . . . trying a new-fashion gun" that could "shoot off often, one after another, without trouble or danger, very pretty."[24] It is believed that Pepys was referring to a Lorenzoni-style firearm in his March 4, 1664 entry,[25] and perhaps he also was in his 1662 entry.

---

[21] Peterson, THE TREASURY OF THE GUN, at 232.

[22] 4 THE DIARY OF SAMUEL PEPYS 258 (Henry B. Wheatley ed., 1893). Most famous for his compelling diary covering the years 1659–1669, Pepys was also a naval administrator and member of Parliament.

[23] The patent was for a "gun or pistol for small shot carrying seven or eight charges of the same in the stock of the gun." Clifford Walton, HISTORY OF THE BRITISH STANDING ARMY. A.D. 1660 TO 1700, at 337 (1894).

[24] 7 THE DIARY OF SAMUEL PEPYS, at 61.

[25] Peterson, THE TREASURY OF THE GUN, at 232.

Despite Hill's patent, "[m]any other English gunsmiths also made guns with the Lorenzoni action during the next two or three decades."[26] Most notably, famous English gunsmiths John Cookson and John Shaw adopted the Lorenzoni action for their firearms. So did "a host of others throughout the 18th century."[27]

"The Kalthoff and Lorenzoni actions . . . were probably the first and certainly the most popular of the early magazine repeaters. But there were many others. Another version, also attributed to the Lorenzoni family, boasted brass tubular magazines beneath the forestock. . . . Guns of this type seem to have been made in several parts of Europe during the Eighteenth Century and apparently functioned well."[28]

"The Lorenzoni system even found its way to America where records indicate that at least two New England gunsmiths actually manufactured such guns."[29]

---

[26] *Id.*

[27] Peterson, ARMS AND ARMOR IN COLONIAL AMERICA, at 215.

[28] Peterson, THE TREASURY OF THE GUN, at 233.

[29] *Id.* at 232.

### C. American colonists began manufacturing repeating arms in the mid-1600s and the Founders embraced repeaters capable of firing more than 10 consecutive rounds.

Lorenzonis were not the only repeaters manufactured in America. As of the mid-1600s, American repeaters sometimes employed a revolving cylinder that was rotated by hand.[30] "A few repeating arms were made use of in a military way in America."[31] For example, there is "record that [Louis de Buade de] Frontenac in 1690 astonished the Iroquois with his three and five shot repeaters."[32]

As is often the case, the cost of the most advanced firearms precluded much of the population from owning them. But "[b]eginning about 1710 commerce brought wealth to some of the merchants in the

---

[30] *See, e.g.,* 2 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 5 (1939) (six-shot flintlock); Charles Edward Chapel, GUNS OF THE OLD WEST 202–03 (1961) (revolving snaphance).

[31] 1 Sawyer, FIREARMS IN AMERICAN HISTORY, at 28–29.

[32] *Id.* at 29. Frontenac was the governor of New France at the time. Frontenac's army was active in 1690, carrying out attacks against English settlements in Schenectady, New York, Fort Loyal, Maine, and Salmon Falls, New Hampshire, then defending against counterattacks, in addition to attacking the Iroquois. *See* Alan Gallay, COLONIAL WARS OF NORTH AMERICA, 1512–1763, at 240–42 (2015).

16

northern Colonies, and with other luxuries fancy firearms began to be in demand."[33]

In September 1722, John Pim, a Boston gunsmith, entertained some American Indians with a repeater he sold. "[L]oaded but once," it "was discharged eleven times following, with bullets, in the space of two minutes, each which went through a double door at fifty yards' distance." 5 Samuel Niles, *A Summary Historical Narrative of the Wars in New England, in* MASSACHUSETTS HISTORICAL SOCIETY COLLECTIONS, 4th ser., at 347 (1837). Pim produced other repeaters, including a "six-shot, .52 caliber snaphaunce revolver."[34]

The most common American repeaters of the early 18th century may have been Lorenzoni variants known as Cooksons. "Many Americans call[ed] this [Lorenzoni] type of magazine repeater a Cookson because the first such gun to receive attention in this country bore the name of the English gunsmith John Cookson."[35] Mimicking the Lorenzoni system, John Cookson of London invented the Cookson repeater in the

---

[33] 1 Sawyer, FIREARMS IN AMERICAN HISTORY, at 31.

[34] Brown, FIREARMS IN COLONIAL AMERICA, at 257.

[35] Peterson, THE TREASURY OF THE GUN, at 230.

latter half of the 17th century.[36] A Cookson repeater with a 10-round magazine, "believed to have found its way into Maryland with one of the early English colonists," "form[ed] perhaps the capstone of the collection of arms in the National Museum at Washington, D.C."[37]

A Bostonian also named John Cookson advertised a 9-shot repeater in the *Boston Gazette* on April 12 and again on April 26, 1756, explaining that the rifle was,

> made by John Cookson and to be sold at his house in Boston: a handy gun . . . having a Place convenient to hold 9 Bullets, and Powder for 9 Charges and 9 Primings; the said gun will fire 9 Times distinctly, as quick, or as slow as you please[.][38]

"Thus this type of repeating flintlock popular in England from the third quarter of the 17th century, was known and manufactured in Massachusetts early in the 18th century."[39]

---

[36] *Id.* at 231–32.

[37] *The Cookson Gun and the Mortimer Pistols*, AMERICAN RIFLEMAN, vol. 63, at 3, 4 (Sep. 29, 1917). "The US National Museum ceased to exist as an administrative entity in 1967, and at that time the National Museum of History and Technology became a separate museum within the [Smithsonian] Institution." *National Museum of American History*, SMITHSONIAN INSTITUTION ARCHIVES, https://siarchives.si.edu/history/national-museum-american-history (last visited Dec. 28, 2023).

[38] Peterson, ARMS AND ARMOR IN COLONIAL AMERICA, at 215.

[39] *Id.*

In 1777, the Continental Congress ordered one hundred rifles from Joseph Belton,[40] who had informed the Congress that his rifles could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds."[41] Belton demonstrated one such rifle before leading military officers—including General Horatio Gates and Major General Benedict Arnold—and scientists—including David Rittenhouse—who verified that "[h]e discharged Sixteen Balls loaded at one time."[42]

Ultimately, the deal fell through when Belton demanded what the Congress deemed "an extraordinary allowance."[43] But the exchange between Belton and the Continental Congress nevertheless proves that the Founders knew about and embraced repeating arms capable of firing

---

[40] Report of the Continental Congress (May 3, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 324 (Worthington Chauncey Ford ed., 1907).

[41] Letter from Joseph Belton to the Continental Congress (Apr. 11, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, at 123 (1957).

[42] Letter from Joseph Belton to the Continental Congress (July 10, 1777), *in* 1 PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, at 139.

[43] Report of the Continental Congress (May 15, 1777), *in* 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 361.

more than 10 consecutive rounds prior to the ratification of the Second Amendment.

When the Second Amendment was ratified, the state-of-the-art repeater was the Girardoni air rifle that could consecutively shoot 21 or 22 rounds in .46 or .49 caliber by utilizing a tubular spring-loaded magazine.[44] Although an air gun, the Girardoni was ballistically equal to a powder gun,[45] and powerful enough to take an elk with a single shot.[46] Indeed, at the time, "there were many gunsmiths in Europe producing compressed air weapons powerful enough to use for big game hunting or as military weapons."[47] The Girardoni was invented for the Austrian army—1,500 were issued to sharpshooters and remained in service for 25 years, including in the Napoleonic Wars between 1796 and 1815.[48] Isaiah

---

[44] James B. Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

[45] John Plaster, THE HISTORY OF SNIPING AND SHARPSHOOTING 69–70 (2008).

[46] Jim Supica, et al., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[47] Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 91.

[48] Gerald Prenderghast, REPEATING AND MULTI-FIRE WEAPONS 100–01 (2018); Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 91–94. As a testament to the rifle's effectiveness, "[t]here are stories that

Lukens of Pennsylvania manufactured such rifles,[49] along with "many makers in Austria, Russia, Switzerland, England, and various German principalities."[50]

Meriwether Lewis is believed to have acquired from Lukens the Girardoni rifle that Lewis famously carried on the Lewis and Clark Expedition.[51] Lewis mentioned it in his journal 39 times.[52] Most often, Lewis was demonstrating the rifle to impress various American Indian tribes encountered on the expedition, "astonishing" or "surprising" them and making the point that although the expedition was usually outnumbered, the smaller group could defend itself.[53]

---

Napoleon had captured air riflemen shot as terrorists, making it hard to recruit men for the air rifle companies." *Id.* at 92.

[49] Nancy McClure, *Treasures from Our West: Lukens Air Rifle*, BUFFALO BILL CENTER FOR THE AMERICAN WEST, Aug. 3, 2014, https://centerofthewest.org/2014/08/03/treasures-west-lukens-air-rifle/ (last visited Dec. 28, 2023).

[50] Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION, at 99.

[51] *Id.*

[52] Meriwether Lewis & William Clark, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION, vols. 2–8 (Gary Moulton ed., 1986–1993) (2002 printing).

[53] *See e.g.*, 6 *id.* 233 (Jan. 24, 1806 entry: "My Air-gun also astonishes them very much, they cannot comprehend it's [sic] shooting so often and without powder; and think that it is *great medicine* which comprehends every thing that is to them incomprehensible.").

21

**D. Repeating arms with greater than 10-round capacities became the most popular arms in the 19th century.**

Repeating arms—including those that could fire more than 10 consecutive rounds—became some of America's most popular arms during the 19th century.[54]

The U.S. Navy started purchasing repeating arms from Joseph Chambers in 1813 and the Pennsylvania militia soon followed.[55] Chambers developed firearms employing "most of the systems of repeating gunnery known at that time: i.e., multiple barrels, multiple

---

[54] To function properly, repeaters require much closer fittings among their parts than do single-shot firearms. Through the 18th century, gun manufacture was artisanal. By the middle of the 19th century, repeaters were widely available due to a revolution in firearms manufacturing. The federal armories at Springfield, Massachusetts and Harpers Ferry, Virginia, led an industrial revolution in mass production. Machine tools (tools that can make uniform parts), such as jigsaws for cutting wooden gun stocks, allowed firearms to be produced at a greater rate, with greater uniformity, greater quality, and lower cost. The technological advances from the federal armories were widely shared among American manufacturers. By mid-century, what had begun as the mass production of firearms from interchangeable parts had become globally known as "the American system of manufacture"—a system that encompassed sewing machines, and, eventually typewriters, bicycles, and automobiles. *See, e.g.*, David R. Meyer, NETWORKED MACHINISTS: HIGH-TECHNOLOGY INDUSTRIES IN ANTEBELLUM AMERICA 81–84, 252–62, 279–80 (2006).

[55] William Gilkerson, BOARDERS AWAY II, at 124–25, 132, 139, 143, 147–48 (1993).

lock plates, and Roman Candle ignition."[56] Some of Chambers's muskets could "fire 12 [consecutive] shots." *Id.* at 149–50. Many of his swivel guns were "composed of seven musket barrels . . . containing twenty-five shot in each and discharging one hundred-seventy five bullets, by quick succession, in less than one minute."[57] The swivel guns Chambers produced for the Pennsylvania militia had capacities of "224 shots each."[58]

In 1821, the *New York Evening Post* lauded New Yorker Isaiah Jennings for inventing a repeater, "importan[t], both for public and private use," whose "number of charges may be extended to fifteen or even twenty . . . and may be fired in the space of two seconds to a charge."[59] "[T]he principle can be added to any musket, rifle, fowling piece, or pistol" to make it capable of firing "from two to twelve times."[60]

---

[56] *Id.* at 123–34.

[57] *Id.* at 129.

[58] *Id.* at 143.

[59] *Newly Invented Muskets*, N.Y. EVENING POST, Apr. 10, 1822, *in* 59 Alexander Tilloch, THE PHILOSOPHICAL MAGAZINE AND JOURNAL: COMPREHENDING THE VARIOUS BRANCHES OF SCIENCE, THE LIBERAL AND FINE ARTS, GEOLOGY, AGRICULTURE, MANUFACTURES, AND COMMERCE 467–68 (Richard Taylor ed., 1822).

[60] *Id.*

"About 1828 a New York State maker, Reuben Ellis, made military rifles under contract on the Jennings principle."[61]

In the 1830s, the popular pepperbox handguns were introduced. These pistols had multiple barrels—some as many as 24—that could fire sequentially.[62] That same decade, the Bennett and Haviland Rifle used a chain-drive system with 12 rectangular chambers—each loaded with powder and ball—to fire 12-rounds consecutively.[63]

Revolvers were also introduced in the 1830s, by Samuel Colt. They fire repeating rounds like the pepperbox but use a rotating cylinder rather than rotating barrels.[64] A "rotary pistol"—also with a mechanically turned cylinder—was patented in 1836.[65] Pin-fire revolvers with capacities of up to 21 rounds entered the market in the 1850s.[66] So

---

[61] Winant, FIREARMS CURIOSA, at 174.

[62] Jack Dunlap, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS 148–49, 167 (1964); Lewis Winant, PEPPERBOX FIREARMS 7 (1952).

[63] Norm Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 711 (9th ed. 2007).

[64] *See* Winant, FIREARMS CURIOSA, at 25.

[65] *Id.*

[66] Supica, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM, at 48–49; Winant, PEPPERBOX FIREARMS, at 67–70.

did the Walch 12-Shot Navy Revolver, with each of its six chambers holding two rounds that fired separately. It was used in the Civil War and made its way to the western frontier.[67] In 1866, the 20-round Josselyn belt-fed chain pistol made its debut. Some later chain pistols had greater capacities.[68]

Alexander Hall's rifle with a 15-round rotating cylinder was introduced in the 1850s.[69] In 1851, Parry Porter patented "self-loading repeating-rifles" with magazines "constructed to contain thirty rounds."[70] The Porter Rifle could "make sixty discharges a minute."[71] In 1855, Joseph Enouy invented a 42-shot Ferris Wheel pistol.[72]

In 1855, an alliance between Daniel Wesson (later, of Smith & Wesson) and Oliver Winchester led to a series of famous lever-action

---

[67] Chapel, GUNS OF THE OLD WEST, at 188–89.

[68] Winant, FIREARMS CURIOSA, at 204, 206.

[69] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 713, 716.

[70] U.S. Patent No. 8,210, available at https://image-ppubs.uspto.gov/dirsearch-public/print/downloadPdf/0008210 (last visited Dec. 28, 2023).

[71] *A New Gun Patent*, ATHENS (TENN.) POST, Feb. 25, 1853, http://bit.ly/2tmWUbS (reprinted from N.Y. Post); 2 Sawyer, FIREARMS IN AMERICAN HISTORY, at 147.

[72] Winant, FIREARMS CURIOSA, at 208.

repeating rifles. First came the 30-shot Volcanic Rifle, which an 1859 advertisement boasted could be loaded then fired 30 times within a minute.[73]

Then came the 16-shot Henry Rifle in 1861. Tested at the Washington Navy Yard in 1862, "187 shots were fired in three minutes and thirty-six seconds (not counting reloading time), and one full fifteen-shot magazine was fired in only 10.8 seconds . . . hits were made from as far away as 348 feet, at an 18-inch-square target. . . . The report noted, 'It is manifest from the above experiment that this gun may be fired with great rapidity.'"[74] "Advertisements claimed a penetration of eight inches at one hundred yards, five inches at four hundred yards, and power to kill at a thousand yards."[75]

"[F]ueled by the Civil War market, the first Henrys were in the field by mid-1862."[76] Indeed, one of the most famous testimonials of the Henry came from Captain James M. Wilson of the 12th Kentucky Cavalry, who

---

[73] Harold F. Williamson, WINCHESTER: THE GUN THAT WON THE WEST 26–27 (1952).

[74] R.L. Wilson, WINCHESTER: AN AMERICAN LEGEND 11–12 (1991).

[75] Peterson, THE TREASURY OF THE GUN, at 240.

[76] Wilson, WINCHESTER: AN AMERICAN LEGEND, at 11.

used a Henry Rifle to kill seven of his Confederate neighbors who broke into his home and ambushed his family. Wilson praised the rifle's 16-round capacity: "When attacked alone by seven guerillas I found it (Henry Rifle) to be particularly useful not only in regard to its fatal precision, but also in the number of shots held in reserve for immediate action in case of an overwhelming force."[77] Soon after, Wilson's entire command was armed with Henry rifles.[78]

The Henry evolved into the 18-shot Winchester Model 1866, which was touted as having a capacity of "eighteen charges, which can be fired in nine seconds."[79] Another advertisement contained pictures of Model 1866 rifles underneath the heading, "Two shots a second."[80]

"The Indians labeled these guns the 'many-shots' or 'heap-firing.'"[81] In 1876, American Indians used the Model 1866 and Henry rifles in their

---

[77] H.W.S. Cleveland, HINTS TO RIFLEMEN 181 (1864).

[78] Andrew L. Bresnan, *The Henry Repeating Rifle*, RAREWINCHESTERS.COM, Aug. 17, 2007, https://www.rarewinchesters.com/articles/art_hen_00.shtml (last visited Dec. 28, 2023).

[79] Louis A. Garavaglia & Charles G. Worman, FIREARMS OF THE AMERICAN WEST 1866–1894, at 128 (1985).

[80] Peterson, THE TREASURY OF THE GUN, at 234–35.

[81] Wilson, WINCHESTER: AN AMERICAN LEGEND, at 32.

victory at the Battle of Little Bighorn, also known as "Custer's Last Stand."[82]

"One of the most popular of all Winchester arms, the Model 1866 was widely used in opening the West and, in company with the Model 1873, is the most deserving of Winchesters to claim the legend 'The Gun That Won the West.'"[83] Over 170,000 Model 1866s were produced, and over 720,000 Model 1873s were produced by 1919.[84] "Easily one of the most treasured endorsements of the 1873 was from Colonel William F. 'Buffalo Bill' Cody," who praised the firearm's versatility.[85] Magazine capacity for the Model 1873 ranged from 6 to 25.[86]

---

[82] *Id.*

[83] *Id.* at 22.

[84] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 306–07.

[85] Wilson, WINCHESTER: AN AMERICAN LEGEND, at 55.

[86] Arthur Pirkle, WINCHESTER LEVER ACTION REPEATING FIREARMS: THE MODELS OF 1866, 1873 & 1876, at 107 (2010).

28

The Evans Repeating Rifle, manufactured in Maine, was also introduced in 1873; its innovative rotary helical magazine held 34 rounds.[87]

Winchester's other iconic 19th-century rifles were the Model 1886, and then the Model 1892, made legendary by Annie Oakley, and later by John Wayne.[88] These arms had capacities of 15 rounds.[89] Over a million Model 1892 rifles were produced from 1892 to 1941.[90]

The most famous pump-action rifle of the 19th century was the Colt Lightning, introduced in 1884. It could fire 15 rounds.[91]

The first functional semiautomatic firearm was the Mannlicher Model 85 rifle, invented in 1885.[92] Mannlicher introduced new models in 1891, 1893, and 1895.[93] Additionally, numerous semiautomatic

---

[87] Dwight Demeritt, MAINE MADE GUNS & THEIR MAKERS 293–95 (rev. ed. 1997); Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 694.

[88] *Model 1892 Rifles and Carbines*, WINCHESTER REPEATING ARMS, http://bit.ly/2tn03IN (last visited Dec. 28, 2023).

[89] *Id.*

[90] Flayderman, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES, at 311.

[91] *Id.* at 122.

[92] U.S. NAVY SEAL SNIPER TRAINING PROGRAM 87 (2011).

[93] John Walter, RIFLES OF THE WORLD 568–69 (3rd ed. 2006).

handguns utilizing detachable magazines were introduced before the turn of the century: including the Mauser C96,[94] Bergmann Simplex,[95] Borchardt M1894,[96] Borchardt C-93,[97] Fabrique Nationale M1899,[98] Mannlicher M1896 and M1897,[99] Luger M1898 and M1899,[100] Roth-Theodorovic M1895, M1897, and M1898,[101] and the Schwarzlose M1898.[102] Many of these were issued with magazines greater than 10 rounds, including Luger's M1899, which could be purchased with 32-round magazines.[103]

---

[94] Dougherty, SMALL ARMS VISUAL ENCYCLOPEDIA, at 84.

[95] *Id.* at 85.

[96] *Springfield Armory Museum – Collection Record*, REDISCOV.COM, https://bit.ly/SPAR-1062.

[97] Leonardo Antaris, *In the Beginning: Semi-Automatic Pistols of the 19th Century*, AMERICAN RIFLEMAN, Jan. 4, 2018, https://www.americanrifleman.org/content/in-the-beginning-semi-automatic-pistols-of-the-19th-century/ (last visited Dec. 28, 2023).

[98] *Id.*

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] Jean-Noel Mouret, PISTOLS AND REVOLVERS 126–27 (1993); Supica, TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM, at 86.

Thus, by the late 19th century, semiautomatic firearms were in use, and repeating arms that could rapidly fire more than 10 rounds had been popular for decades.

## III. There are no historical prohibitions on arms capable of firing more than 10 rounds.

Although repeating arms have existed since around the time that Columbus first landed in America, and despite the rapid technological advancements throughout the 19th century, there were no prohibitions on any repeating arm before 1900. *See* Kopel & Greenlee, *The History of Bans on Types of Arms Before 1900*, at 196. The only law that specifically restricted repeating arms of any sort was an 1893 Florida law that required a license for repeating rifles. *Id.* That law made it "unlawful to carry or own a Winchester or other repeating rifle . . . without first taking out a license." 1893 Fla. Laws 71. This single law is insufficient justification for California's prohibition for several reasons. First, Florida's law was a licensing law while California's is a prohibition. *Bruen* highlighted the difference by tacitly approving of "licensing regimes" for carrying handguns that "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" while striking down New York's law that prohibited

31

ordinary citizens from carrying. 597 U.S. at 39 n.9. Second, laws from "late-19th-century outlier jurisdictions" cannot establish a tradition. *Id.* at 70; *see also id.* at 46 ("we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation"). Third, the Florida law was racially motivated and enforced. As Florida Supreme Court Justice Rivers H. Buford later explained, the licensing law "was passed . . . for the purpose of disarming the negro laborers" in the state and "was never intended to be applied to the white population." *Watson v. Stone*, 148 Fla. 516, 524 (1941) (Buford, J., concurring). Finally, as Justice Buford further explained, Florida's law was likely unconstitutional: "there had never been any effort to enforce the provisions of this statute as to white people, because it has been generally conceded to be in contravention of the Constitution and non-enforceable if contested." *Id.*

## IV.  Any historical analysis should be limited to traditional regulations that applied to firearms—not Bowie knives or other dissimilar weapons.

*Bruen* makes clear that any historical analysis in this case should be limited to traditional regulations that applied to firearms. The *Bruen* Court considered a challenge to a restriction on the carrying of handguns. In the Court's historical analysis, from the time that firearms began to

"appear in Europe" around "the mid-1500s" through the conclusion of its analysis at the end of the 19th century, the Court considered *only* restrictions that applied to firearms. 597 U.S. at 38–70. The Court did not consider any arms regulations that applied to non-firearms—such as Bowie knives, slungshots, dirks, or daggers—that did not also apply to firearms. *Id*.

As the analysis above shows, repeating arms capable of firing over 10 consecutive rounds without reloading predate the Second Amendment by two centuries. The Continental Congress embraced 16-shot repeating arms, the state-of-the-art as of 1791 was a 22-shot rifle, and by 1868, the 16-shot Henry Rifle and the 18-shot Winchester Model 1866 were overwhelmingly popular. Also by 1868, Americans had seen 24-barreled pistols, 12-chambered rifles, 21-shot revolvers, 20-round belt-fed chain pistols, 42-shot Ferris Wheel pistols, and rifles capable of firing 60 shots in 60 seconds. Thus, repeating arms with over 10-round capacities were well-known throughout American history, and any analogy to non-firearms is inappropriate here.

## CONCLUSION

California's ban on common and historically protected arms should be held unconstitutional.

Respectfully submitted,

/s/ *Joseph G.S. Greenlee*
JOSEPH G.S. GREENLEE
  *Counsel of Record*
CODY J. WISNIEWSKI
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
(916) 517-1665
jgreenlee@fpclaw.org

34

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Cir. R. 29-2(c)(3) because this brief contains 6,252 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typestyle requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in 14-point, proportionally spaced Century Schoolbook font.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*

## CERTIFICATE OF SERVICE

I certify that on December 28, 2023, I served the foregoing with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

/s/ *Joseph G.S. Greenlee*
Counsel for *Amici Curiae*