No. 23-55805

_____

# United States Court of Appeals for the Ninth Circuit

_____

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs-Appellees,*

v.

ROB BONTA,

*Defendant-Appellant.*

_____

On Appeal from the United States District Court
for the Southern District of California
3:17-cv-1017 (Hon. Roger T. Benitez)

_____

**BRIEF OF *AMICUS CURIAE***
**THE NATIONAL SHOOTING SPORTS FOUNDATION, INC.**
**IN SUPPORT OF PLAINTIFFS-APPELLEES AND AFFIRMANCE**

_____

Lawrence G. Keane
THE NATIONAL SHOOTING SPORTS
FOUNDATION, INC.
400 N. Capitol St., NW
Washington, DC 20001
(202) 220-1340

Matthew R. Modderman
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939

Noel J. Francisco
Anthony J. Dick
Harry S. Graver
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
njfrancisco@jonesday.com

Andrew E. Lelling
JONES DAY
100 High Street, 21st Floor
Boston, MA 02110
(617) 960-3939

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1, the National Shooting Sports Foundation, Inc., states that it is a non-profit organization under § 501(c)(6) of the Internal Revenue Code; has no parent corporation; and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ................................................................. i

TABLE OF CONTENTS ............................................................................................... ii

TABLE OF AUTHORITIES ........................................................................................ iii

STATEMENT OF CONSENT ....................................................................................... 1

INTEREST OF *AMICUS CURIAE* ............................................................................. 1

INTRODUCTION ......................................................................................................... 2

ARGUMENT ................................................................................................................. 4

    I.  The Second Amendment Precludes Bans On Arms In Common Use ................. 4

    II. "Large Capacity Magazines" Are Arms In Common Use .................................. 14

CONCLUSION ............................................................................................................. 21

CERTIFICATE OF SERVICE .................................................................................... 22

CERTIFICATE OF COMPLIANCE ........................................................................... 23

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Ass'n of N.J. Rifle & Pistol Clubs v. New Jersey,*
910 F.3d 106 (3d Cir. 2018) ........................................................ 9

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ...................................................... 7, 10, 19, 20

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ............................................................ *passim*

*Duncan v. Bonta,*
19 F.4th 1087 (9th Cir. 2021) ................................................. 9, 18

*Duncan v. Bonta,*
83 F.4th 803 (9th Cir. 2023) ................................................ *passim*

*Duncan v. Bonta,*
970 F.3d 1133 (9th Cir. 2020) .................................................. 16

*Friedman v. City of Highland Park,*
136 S. Ct. 447 (2015) .......................................................... 6, 7, 13

*Fyock v. City of Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) ..................................................... 9

*Heller v. District of Columbia,*
670 F.3d 1244 (D.C. Cir. 2011) ......................................... 6, 8, 9, 18

*Luis v. Gonzales,*
578 U.S. 5 (2016) ................................................................... 9

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ................................................................. 4

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ................................................................ *passim*

*Teter v. Lopez*,
   76 F.4th 938 (9th Cir. 2023) .................................................................... 5, 11

**Other Authorities**

U.S. Constitution, First Amendment ................................................................12

U.S. Constitution, Second Amendment.......................................................*passim*

U.S. Constitution, Fourteenth Amendment.........................................13, 15, 16

Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public
   Safety in Early America*, 44 Willamette L. Rev. 699 (2008) ..........................15

Dave Jordan, *Victim of Home Invasion Speaks; Credits Wife With Saving His Life
   With AR-15*, SpectrumNews Florida (November 1, 2019, 4:37 PM).......................19

David B. Kopel, *The History of Firearm Magazine Prohibitions*, 78 Alb. L.
   Rev. 849 (2015) ......................................................................................*passim*

David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of
   Arms Before 1900*, 50 J. of Legisl. 1 (2024).....................................................14

Federal Rule of Appellate Procedure 29(a) ..........................................................1

Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* (1956)....................15

Heritage Foundation, *Defensive Gun Uses in the U.S.* (Dec. 15, 2023) ..............................18

Mark W. Smith, *NYSPRA v. Bruen*, 24 Harvard J. L. & Pub. Policy, Per
   Curiam 8 (2022) ...........................................................................................14

R.L. Wilson, *Winchester: An American Legend* (1991) ............................................16

William English, *2021 National Firearms Survey: Analysis of Magazine and
   Ownership and Use* (May 4, 2023) ...................................................... 17, 18

William English, *2021 National Firearms Survey: Updated Analysis Including
   Types of Firearms Owned* (May 13, 2022) .................................................. 17, 18

## STATEMENT OF CONSENT

All parties have consented to the filing of this brief pursuant to FRAP 29(a). No party or party's counsel authored this brief, either in whole or in part. Nor has anyone other than *amicus curiae*, its members, or its counsel contributed money to fund this brief.

## INTEREST OF *AMICUS CURIAE*

The National Shooting Sports Foundation, Inc. (NSSF) is the national trade association for the firearms, ammunition, hunting, and shooting sports industry. Formed in 1961, NSSF is a Connecticut 501(c)(6) tax exempt non-profit corporation. NSSF's mission is to promote, protect, and preserve hunting and shooting sports. NSSF has a membership of over 10,300—which includes federally licensed firearms manufacturers, distributors, and retailers; companies that make, distribute, and sell shooting and hunting-related goods and services; sportsmen's organizations; public and private shooting ranges; gun clubs; and industry media. At present, NSSF has nearly 800 members located in the State of California.

The Second Amendment protects NSSF, its members, and all Americans from statutes and regulations seeking to ban, restrict, or limit the constitutional right to keep and bear arms. Such laws are of particular interest to NSSF, as its members engage in lawful commerce involving firearms, ammunition, and related products across the United States—including in California—that makes the exercise of the Second Amendment by the "people" possible. Accordingly, whether California's ban on commonly owned magazines violates the Second Amendment is of tremendous

significance to NSSF and its members. NSSF thus submits this brief in support of the district court's judgment.

## INTRODUCTION

If there are hard *Bruen* cases, this is not one of them. What California inaptly labels "large-capacity magazines"—*i.e.*, those that hold more than ten rounds—are in fact ordinary magazines that come standard with most of the country's most popular firearms. They are the magazine of choice for millions of law-abiding firearm owners, with hundreds of millions in circulation across the country today. And they have been a staple of American firearm ownership for generations—in fact, since the Civil War.

California's categorical ban on what it calls "large-capacity magazines" (LCMs)— which, again, are actually industry standard magazines for both pistols and rifles—thus amounts to a categorical ban on the most common magazines chosen by Americans today for self-defense. And for that reason alone, it is unconstitutional: The Second Amendment prohibits the government from completely banning an arm that is in common use for lawful purposes. While the government may *regulate* such arms—for example, by barring violent felons from possessing them—it cannot ban them outright.

On a preliminary note, there should be no doubt that magazines are "Arms," protected under the Second Amendment. As the plaintiffs have explained, "Arms" include those weapons and their component parts that are carried "for the purpose of offensive or defensive action." *District of Columbia v. Heller*, 554 U.S. 570, 581, 584 (2008); *see also, e.g.*, Resp. Br. at 21-27. There is no doubt that "magazines are included within

that definition." *Duncan v. Bonta*, 83 F.4th 803, 813-14 (9th Cir. 2023) (Bumatay, J., dissenting from grant of stay). After all, "[w]ithout protection of the components that render a firearm operable, like magazines, the Second Amendment right would be meaningless." *Id.* And for that reason, the Second Amendment does not arbitrarily prioritize one piece of hardware over another; it shields firearms, bullets, and magazines alike, because none of those items, standing alone, offer Americans much of anything.

As for regulating "Arms," the Supreme Court has held that any such law must be "consistent with this Nation's historical tradition of firearm regulation." *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 17 (2022). But when an arm is part of America's tradition of firearm *ownership*, an outright ban on it cannot be consistent with America's tradition of firearm *regulation*. Accordingly, when an arm has developed a tradition of common use by law-abiding Americans, an "absolute prohibition" is "off the table." *Heller*, 554 U.S. at 636. That is a bright-line constitutional rule. There is no need for analogical reasoning, or any other further analysis. When Americans put an arm into common use for lawful purposes, the government may not wholly ban it; the state cannot make criminal what the people have made common.

California's law is obviously unconstitutional under this rule. It is a categorical ban on any person at any time possessing a discrete type of arm; in other words, it is a total proscription on LCMs, rather than a tailored regulation addressing their sale, possession, or use. And if LCMs are not in common use, nothing is; indeed, they are a

defining feature of everyday firearm ownership in America. Whatever regulation of LCMs the Constitution may permit, it squarely protects them against a categorical ban.

California tries to justify its ban with strained analogies to a handful of older regulations concerning other types of arms. As the plaintiffs have explained, none of those analogies work, even on their own terms. But California's argument fails for an even more fundamental reason: Once an arm comes into common use for lawful purposes, it is immune from categorical ban *full stop*. A government may regulate sale or possession—so long as the regulation is consistent with historical tradition. But a categorical ban is *per se* unconstitutional.

## ARGUMENT

### I.    THE SECOND AMENDMENT PRECLUDES BANS ON ARMS IN COMMON USE.

The Second Amendment provides that "the right of the people to keep and bear Arms[] shall not be infringed." In *District of Columbia v. Heller*, the Supreme Court held that this amendment guarantees "an individual right to keep and bear arms." 554 U.S. 570, 595 (2008). In *McDonald v. City of Chicago*, the Court confirmed that this right is "fundamental to our scheme of ordered liberty" and "deeply rooted in this Nation's history and tradition." 561 U.S. 742, 767 (2010). And in *New York State Rifle & Pistol Association v. Bruen*, the Court reaffirmed that the government cannot restrict the free exercise of this right unless doing so is consistent with "the historical tradition that delimits the outer bounds of the right." 597 U.S. 1, 19 (2022).

As the Supreme Court has explained, the text of the Second Amendment reflects an "unqualified command" that the right to keep and bear arms shall not be infringed. *Bruen*, 597 U.S. at 17. To be sure, "historical tradition" shows that this right has never been understood to encompass arms that are "dangerous and unusual." *Id.* at 21. But just as clearly, the right does cover the "possession and use of weapons that are in common use." *Id.*. As a result, arms in common use cannot be banned, even if they can be regulated in some manner consistent with our nation's historical tradition of firearm regulation. That is, where an arm has become part of the fabric of American gun ownership—where it is plainly in common use by law-abiding Americans—any attempt to completely ban it is *per se* inconsistent with this country's historical tradition of firearm regulation.

1.       The Second Amendment requires different analyses for *regulations* on arms and for outright *bans*. *See Teter v. Lopez*, 76 F.4th 938, 951 (9th Cir. 2023) (recognizing this distinction). When it comes to regulations—*e.g.*, who may buy an arm or where it may be carried—the question of constitutional validity turns on "reasoning by analogy" to historical regulations. *Bruen*, 597 U.S. at 24. But when it comes to categorical bans, history and tradition command more "straightforward" rules. *Id.* at 26. If an arm is in common use by law-abiding Americans then it cannot be banned, full stop.

Then-Judge Kavanaugh laid out the framework for this analysis while he was on the D.C. Circuit—in a dissenting opinion that later became the law of the land, endorsed in letter and logic by *Bruen*. *Id.* at 31 (quoting *Heller v. District of Columbia*, 670

F.3d 1244, 1275 (D.C. Cir. 2011) (*Heller II*) (Kavanaugh, J., dissenting)). Interpreting the Supreme Court's *Heller* decision, Judge Kavanaugh's opinion explained that the text, history, and tradition of the Second Amendment require different approaches for "*regulations* on the sale, possession, or use of guns," as opposed to absolute "*bans* on categories of guns." 670 F.3d at 1271-72 (emphases added).

As to the former—regulations like *where* an arm may be used, or *who* may use it— the government may "impose regulations" that track similar "traditional, 'longstanding' regulations in the United States." *Id.* at 1273 (quoting *Heller*, 554 U.S. at 626-27). This inquiry typically requires courts to "reason by analogy from history and tradition." *Id.* at 1275. As *Bruen* said: "When confronting such present-day firearm regulations, [the] historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." 597 U.S. at 28.

But categorical *bans* are a different animal. The "historical tradition" of American firearm regulation reveals that "bans on categories of [arms]" are allowed *only* for "[arms] that are 'dangerous and unusual.'" *Heller II*, 670 F.3d at 1271 (Kavanaugh, J., dissenting) (quoting *Heller*, 554 U.S. at 627). The flipside of this historical tradition is a principle—a bright-line rule—that "bans" *cannot* extend to arms "in common use by law-abiding citizens," which are, after all, not unusual by definition. *Id.* at 1272. This principle does not, once more, preclude *all* regulation. The government may still regulate the purchase, possession, and use of such arms. But it simply cannot draw one regulatory arrow from the quiver: A complete and total ban. *See Friedman v. City of*

6

*Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (government cannot "ban[] types of firearms commonly used for a lawful purposes—regardless of whether alternatives exist").

Justice Alito has made the same point: If an arm is "widely owned and accepted as a legitimate means of self-defense across the country," it is part of the nation's tradition of gun ownership, and accordingly cannot be subject to a "categorical ban." *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring). The "pertinent Second Amendment inquiry" is thus whether a given arm is "commonly possessed for lawful purposes *today*." *Id.* (emphasis in original). If so, as *Bruen*'s author has echoed, "that is all that is needed for citizens to have a right under the Second Amendment" to keep and bear such arms. *Friedman*, 136 S. Ct. at 449 (Thomas, J., dissenting from the denial of certiorari).

**2.** Under the Second Amendment and the Supreme Court's precedents, a categorical ban on an arm in common use is thus *necessarily* inconsistent with the nation's tradition of firearm regulation, and unconstitutional. Two cases illustrate this principle in action—one from the Supreme Court, and one from the D.C. Circuit.

First, in *Heller*, the Supreme Court struck down D.C.'s categorical ban on handguns. While the Court spilled much ink on what the Second Amendment meant, it needed only a few paragraphs to explain why D.C.'s law was unconstitutional. 554 U.S. at 628-30. Writing for the majority, Justice Scalia observed that even if not prevalent at the Founding, "handguns are the most popular weapon chosen by

Americans [today] for self-defense in the home." *Id.* at 629. And *that alone* was "enough" to hold D.C.'s "complete prohibition on their use []  invalid." *Id.* Since "the American people have considered the handgun to be the quintessential self-defense weapon," the constitutional analysis required nothing else; it did not matter that *some* handguns were used unlawfully, or that *other* firearms existed for self-defense. *Id.* at 628-29. The people had placed handguns into common use for lawful purposes, and that sufficed to show they could not be outlawed. Although the Second Amendment left governments with "a variety of tools" for "*regulating* handguns," an "absolute prohibition" was the sort of "policy choice[]" that the Constitution squarely took "off the table." *Id.* at 636 (emphasis added).

Second, in his *Heller II* dissent, Judge Kavanaugh followed the same approach in analyzing D.C.'s categorical ban on semi-automatic rifles. He emphasized that "a significant percentage of rifles are semi-automatic" and are "in common use today." 670 F.3d at 1287 (Kavanaugh, J., dissenting). And as shown by the Supreme Court's *Heller* decision, that sufficed: "*Heller* protects weapons that have not traditionally been banned and are in common use by law-abiding citizens. Semi-automatic rifles have not traditionally been banned and are in common use today, and are thus protected under *Heller.*" *Id.* Of course, this is not to say such arms are immune from regulation. "But the government may not *generally ban* semi-automatic guns, whether semi-automatic rifles, shotguns, or handguns." *Id.* at 1288 (emphasis added).

The present case follows *a fortiori* from both *Hellers*: If the Second Amendment precludes a categorical ban on common firearms, then it also precludes a categorical ban on their constitutive parts. *See Luis v. Gonzales*, 578 U.S. 5, 26-27 (2016) (Thomas, J., concurring) ("Without protection of these closely related rights, the Second Amendment would be toothless."); *see also Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Ass'n of N.J. Rifle & Pistol Clubs v. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018). And as discussed below, LCMs come standard with some of the "most popular" firearms in the country. *Duncan v. Bonta*, 19 F.4th 1087, 1155 & n.25 (9th Cir. 2021) (en banc) (Bumatay, J., dissenting).

In all events, the fundamental principle underlying *Heller* controls here. Just as handguns and semi-automatic rifles are the "most popular" firearms in the country for self-defense, *Heller*, 554 U.S. at 629; *Heller II*, 670 F.3d at 1287-88 (Kavanaugh, J., dissenting), so too "large-capacity magazines are the most common magazine chosen by Americans for self-defense," *Duncan*, 83 F.4th at 816 (Bumatay, J., dissenting from the grant of stay pending appeal). Accordingly, an "absolute [LCM] prohibition" is constitutionally "off the table." *Heller*, 554 U.S. at 636.

**3.** Under a faithful application of Supreme Court precedent, California cannot justify its categorical ban on the country's most popular magazines. It is not a close call; and the state does not really try to argue otherwise. Instead, California urges this Court to ignore the Supreme Court's actual words, and adopt a "nuanced" view of

its precedent. Br. at 32. But California's attempt at "nuance" runs headlong into the constitutional limits imposed by the Second Amendment and binding precedent.

*First*, California criticizes the above analysis as a "numbers-only" approach to the Second Amendment. Br. at 23. In its view, the constitutional analysis cannot simply depend on the amount of an arm sold, because having the Second Amendment turn on circulation data is not "a sensible or administrable constitutional standard." *Id.*

But that is a strawman. The Supreme Court has never counted raw numbers. The test simply calls for a common-sense inquiry about whether the arm in question is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, 577 U.S. at 420 (Alito, J., concurring). In *Heller*, the Supreme Court had no trouble determining that handguns are commonly "chosen by Americans" for lawful purposes, because they were "typically *possessed* by law-abiding citizens" for self-defense and the like. 554 U.S. at 625, 629 (emphasis added). And the same conclusion obviously follows for magazines that hold more than ten rounds: They come standard with ordinary semi-automatic handguns and rifles all around the country, and there are (on the most conservative of estimates) well over 100 million in circulation among Americans today.

To be sure, there may be challenging questions at the margins—as with any line-drawing, deciding whether an arm is in "common use," "unusual," or somewhere in between can prove difficult on occasion. But as already noted, and as discussed more below, this case does not require any such parsing. Wherever the "common use" line is drawn, LCMs are comfortably on the covered side of it. If the most popular magazines

10

in the country are not in "common use," then those words have no meaning. *Cf. Teter*, 76 F.4th at 950 (finding "butterfly knives are commonly owned for lawful purposes").

Strawman aside, the reality is that California appears to simply disagree with Supreme Court precedent. The state derides the notion that so long as an arm has become widely popular among law-abiding Americans, it is immune from ban. Br. at 23. But that is *precisely* what the Court has said, and what the Constitution provides. When the people have adopted an arm as a "chosen" means for self-defense (or some other lawful purpose), and it is in turn typically possessed for lawful purposes, governments lose the ability to categorically ban it. *Heller*, 554 U.S. at 629. Governments cannot circumvent that rule by second-guessing the collective wisdom of the people. *Contra* Br. at 25-27 (doing just that). Indeed, the Supreme Court has been pellucid here: When a given arm is among the "most popular" ones "chosen by Americans for self-defense," the "reason" behind that choice is irrelevant—the choice alone makes a "complete prohibition on [its] use [] invalid." *Heller*, 554 U.S. at 629. Said otherwise, in protecting arms in common use, the Constitution ensures that *the people* will have a say in their own defense—and that the arms available to the people do not turn purely on governmental grace.

*Second*, California insists that even if the Second Amendment provides some protection for arms in common use, governments must still have broad powers to restrict firearms whenever "unprecedented societal concerns" or "dramatic

11

technological changes" warrant regulation. Br. at 32-33 (quoting *Bruen*, 597 U.S. at 27). But adopting that exception would swallow any strictures.

Put aside, for starters, that neither of these conditions are met here: While always of concern, gun violence is not new; and firearms capable of firing more than ten rounds without reloading are older than the Republic. *See* Part II *infra*. California's position fails for a more fundamental reason. The above-quoted provisions from *Bruen* stand for the intuitive proposition that since the "regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," there may need to be "present-day firearm regulations" that are "beyond those the Founders specifically anticipated." *Bruen*, 597 U.S. at 27-28. But the presence of new conditions are not license for a "regulatory blank check." *Id.* at 30. Nor are they license for governments to adopt regulations that the Second Amendment otherwise forbids. *Id.*

The latter point is critical. Even if modern circumstances warrant modern regulation, the presence of new problems does not suddenly put all "policy choices" back on "the table." *Heller*, 554 U.S. at 636. That is, *even if* "unprecedented societal concerns" could justify new restrictions on how an arm is sold, possessed, or used, they cannot justify categorical bans that violate the Second Amendment's "fixed" rules. *Bruen*, 597 U.S. at 28. Just as the First Amendment prohibits the government from categorically banning the expression of political viewpoints no matter how "dangerous," the Second Amendment likewise prohibits any categorical "ban" on arms

"commonly used for a lawful purpose." *Friedman*, 136 S. Ct. at 449 (Thomas, J., dissenting from the denial of certiorari). Again, other options may be available—and California would be free to press its societal arguments to justify a narrower law. But the state cites *nothing* in the Court's Second Amendment jurisprudence to bless a total prohibition on popular arms such as LCMs. Nor could it.

*Third*, California attempts to argue that its categorical ban is consistent with history and tradition. But it does not point to a single salient example of a categorical ban on a weapon in common use for lawful purposes—to say nothing of a historical tradition sufficient to justify the ban here. It points to regulations about *where* arms could be used (*e.g.*, knives); or *how* they could be kept (*e.g.*, gunpowder); or bans on concededly "new types" of weapons (*e.g.*, Tommy Guns) that by definition were never in and could not be in common use (Br. at 40). Tellingly, what is missing from this list is a historic ban on any *magazines*—an all but dispositive omission given "rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was ratified." David B. Kopel, *The History of Firearm Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851 (2015). But in all events, as members of this Court have explained at length, none of these analogs work on their own. *See Duncan*, 83 F.4th at 816-21 (Bumatay, J., dissenting from the grant of stay pending appeal).

Here too, however, the reason California cannot come up with anything better is a fundamental one: The actual historical tradition of firearm regulation in this country tracks what the Supreme Court said it is. And once more, that tradition reveals that

13

while governments may regulate aspects of the sale, possession, and use of popular arms, they cannot *categorically ban* them. Indeed, two historians recently surveyed *every* ban on arms in this country before 1900 and came to this inescapable conclusion. *See* David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. of Legisl. 1, 168-69 (2024) (forthcoming), https://ssrn.com/abstract=4393197 [https://perma.cc/65P5-2DDN] ("For every arm surveyed in this article, the mainstream American legal tradition was to limit the mode of carry (no concealed carry), to limit sales to minors (either with bans or requirements for parental permission), and/or to impose extra punishment for use in a crime."); *see also, e.g.*, Mark W. Smith, *NYSPRA v. Bruen*, 24 Harvard J. L. & Pub. Policy, Per Curiam 8 (2022) ("In short, there is zero historical support from the Founding—or even the Reconstruction era—for banning commonly possessed arms; under the *Bruen* test, that is the end of the matter.").

The lesson is that America's historical tradition of firearm regulation precludes governments from *categorically banning* arms in common use. And for all its obfuscation, California offers nothing to get out from under that principle, or indicate the Supreme Court has not meant what it said. Under that bright-line rule, so long as LCMs are in common use, California's ban is obviously unconstitutional.

## II. "LARGE CAPACITY MAGAZINES" ARE ARMS IN COMMON USE.

There is no serious argument LCMs are not in common use. LCMs are overwhelmingly prevalent today. And they have been a feature of lawful American firearm ownership since before there was a United States. In short, LCMs are currently

the most common magazine chosen by Americans for their self-defense, and have been for generations. It is difficult to think of anything *more* in common use than these arms.

**1.** Begin with history. "The desire … for repeating weapons is almost as old as the history of firearms." Harold L. Peterson, *Arms and Armor in Colonial America 1526-1783* 215 (1956). Indeed, firearms able to fire more than ten rounds have been around for centuries. And they were widely popular in this country before telephones. Or in more relevant terms, "magazines of more than ten rounds had become popular by the time that the Fourteenth Amendment was being ratified." Kopel, *supra*, at 851.

The first known firearm able to fire more than ten rounds without reloading was a sixteen-shooter invented under the watchful eye of the first Queen Elizabeth. *Id.* at 852. Such firearms steadily grew in popularity in England, and soon its colonies. *Id.* at 852-53. In 1722, there was the first mention of a gun in America that "though loaded but once … was discharged eleven times following, with bullets, in the space of two minutes." Peterson, *supra*, at 215. And at the Founding, the premier firearm was the Girandoni rifle—an air rifle with a twenty-two-shot magazine capacity, then known for being at the side of Merriweather Lewis on his journey westward. Kopel, *supra*, at 853; *see also, e.g.*, Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public Safety in Early America*, 44 Willamette L. Rev. 699, 716 (2008) ("It is certainly true that firearms technology has advanced since 1791—but not as much as some would like to think.").

Between the ratification of the Second and Fourteenth Amendments, firearms with ten-plus-round capacities proliferated. *See, e.g.*, Kopel, *supra*, at 853-56 (describing

advances in arms, such as "pepperbox" pistols able to fire upwards of 24 rounds before reloading). And the reason why these arms *became* popular is the same reason they have *stayed* popular: They were indispensable to Americans' self-defense. As one example, the Winchester Model 1866—a hugely popular firearm with a 17-round capacity—marketed itself as the best tool for defense against "sudden attack[s]." R.L. Wilson, *Winchester: An American Legend* 32 (1991).

The result is that, by the Civil War, "magazines of more than ten rounds [were] very commonly possessed in the United States." Kopel, *supra*, at 871. And that trend continued unabated for decades. *Id.* at 857-59 & nn. 82, 88 ("The twentieth century saw improvements on the designs pioneered in the 1800s and expanding popularity for firearms with more than ten rounds."); *Duncan*, 83 F.4th at 814 (Bumatay, J., dissenting from the grant of stay pending appeal) (LCMs are element of "shared national history").

Revealingly, there is no history—zero—of any ban on magazine size from the time of the Second or Fourteenth Amendments. "From the colonial period to the dawn of American independence on July 4, 1776, and through the ratification of the Fourteenth Amendment, there were no prohibitions on magazines. Indeed, the first magazine prohibition did not appear until the alcohol prohibition era in 1927." Kopel, *supra*, at 870. More still, of those prohibition-era bans, "all but one have since been repealed." *Duncan v. Bonta*, 970 F.3d 1133, 1150-51 (9th Cir. 2020), *vacated on other grounds*, 19 F.4th 1087. And even now, LCMs are "lawful in at least 41 States and under federal

law." *Duncan*, 83 F.4th at 814 (Bumatay, J., dissenting from the grant of stay pending appeal).

The upshot is that LCMs are nothing new. They are instead part of the historical tradition of firearm ownership in this country; a Second Amendment staple for scores of law-abiding Americans, which have been in common use for the country's existence.

**2.** LCMs are now more popular than ever. Even on conservative estimates, "it is undisputed that more than 100 million large-capacity magazines circulate in the United States." *Duncan*, 83 F.4th at 814 (Bumatay, J., dissenting from the grant of stay pending appeal). And the real figure is likely over a *half billion*. *See* William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 20 (May 13, 2022), https://ssrn.com/abstract=4109494 [https://perma.cc/K9CR-JYZJ]. Moreover, those magazines are not just concentrated in the hands of a few. Studies show roughly *40 million* individuals have owned magazines that hold more than 10 rounds—*i.e.*, *half* of U.S. gunowners. *See, e.g.*, William English, *2021 National Firearms Survey: Analysis of Magazine and Ownership and Use* 20 (May 4, 2023), https://ssrn.com/abstract=4444288 [https://perma.cc/DV55-QT88]; *see also* Kopel, *supra*, at 872 & n.192 (LCMs are about 47% of magazines "currently possessed").

This should be deeply unsurprising, because LCMs *come standard* with America's most popular firearms. That is so with semi-automatic handguns, like the Glock pistol. *See, e.g.*, *Duncan*, 83 F.4th at 814 (Bumatay, J., dissenting from the grant of stay pending appeal); *see also* DOJ, Guns in America: National Survey on Private Ownership and Use

of Firearms, at 5 (May 1997) (documenting trend). So too semi-automatic rifles, like the AR-15. *See, e.g., Duncan*, 19 F.4th at 1155 & n.25 (Bumatay, J., dissenting); *see also Heller*, 670 F.3d at 1261 ("We think it clear enough … that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use'"). In so many words, LCMs are the most common component of America's most common firearms.

And for good reason. While popular in connection with other longstanding uses (*e.g.*, hunting, target shooting, sporting), studies show that over 70% of LCM-owners own them for their "defensive purposes, making it the most common reason cited for ownership of [LCMs]." English 2023, *supra*, at 4. Americans do so, moreover, because having sufficient ammunition—and not having to reload—is critical to turning back would-be assailants, and deterring attacks in the first place. *See* Kopel, *supra*, at 851-52.

These are not mere theoretical concerns. Every single year, there are hundreds, if not thousands, of cases where LCMs prove indispensable for law-abiding Americans to defend themselves and their families. *See, e.g.*, Heritage Foundation, *Defensive Gun Uses in the U.S.*, https://datavisualizations.heritage.org/firearms/defensive-gun-uses-in-the-us/ [https://perma.cc/B33M-AHBQ] (Last Updated: Dec. 15, 2023). The majority of these incidents involve multiple attackers, where handguns—the driving source of LCM ownership in this country—are the primary tool of response. *See* English 2022, *supra*, at 9, 28-33.

Take just one example. In 2019, two masked men broke into Jeremy King's home. They grabbed his 11-year-old daughter, demanded money, and proceeded to beat

King within an inch of his life. Before they could kill him (and perhaps his daughter), King's eight-month-pregnant wife burst into the room with an AR-15 and repelled the attackers. As King put it: They "came in with two normal pistols and my AR stopped it. [My wife] evened the playing field and kept them from killing me." But without an LCM and firearm to match, there is no telling what would have happened. *See* Dave Jordan, *Victim of Home Invasion Speaks; Credits Wife With Saving His Life With AR-15*, SpectrumNews Florida (November 1, 2019, 4:37 PM), https://www.baynews9.com/fl/tampa/news/2019/11/01/victim-of-violent-home-invasion-speaks--credits-wife-with-saving-his-life [https://perma.cc/F4AL-L2K8].

On this front, California has no genuine response. It does not deny that LCMs are overwhelmingly popular in this country, and have been for generations. Nor could it. Instead, the state essentially argues that LCMs are neither necessary nor appropriate for self-defense—that Americans could get by with fewer rounds, and more limited firearms. *See* Br. at 20-31. But as explained, whatever the merits of this position, the Second Amendment forecloses it. The "relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418 (Alito, J., concurring). What matters—the *only* thing that matters—is "that the American people have considered the [LCM] to be the quintessential self-defense [magazine]." *Heller*, 554 U.S. at 629. And for this reason alone, LCMs are immune from a "complete prohibition of their use." *Id.*

19

\* \* \*

California has opted for a complete ban on a type of arm presumptively protected by the Second Amendment. When faced with this sort of categorical limitation on Americans' constitutional rights, the "pertinent Second Amendment inquiry is whether" the arm is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, 577 U.S. at 420 (Alito, J., concurring). If so, the "categorical ban … violates the Second Amendment." *Id.* And here, it is indisputable that LCMs are in common use by law-abiding firearms owners. Once more, they are the *most common* magazine chosen by Americans for self-defense, and have been for generations. California's ban on this overwhelmingly common type of arm—one owned and relied upon by millions of ordinary law-abiding firearm owners—is plainly unconstitutional.

None of this is to say, of course, that California cannot try its hand at a narrower regulation on LCMs in the future—on their sale, possession, or use. But given that LCMs are inescapably in common use, it is black-letter constitutional law that California must engage in at least *some* effort at tailoring in order to regulate them. A categorical ban is "off the table." *Heller*, 554 U.S. at 636. This Court need not hold anything more in order to resolve this case, and invalidate California's obviously unconstitutional ban.

## CONCLUSION

For the above reasons, this Court should affirm the district court's judgment.

Dated: December 28, 2023

Lawrence G. Keane
THE NATIONAL SHOOTING SPORTS
FOUNDATION, INC.
400 N. Capitol St., NW
Washington, DC 20001
(202) 220-1340

Matthew R. Modderman
JONES DAY
901 Lakeside Avenue
Cleveland, Ohio 44114
(216) 586-3939

Respectfully Submitted,

/s/ *Noel J. Francisco*

Noel J. Francisco
Anthony J. Dick
Harry S. Graver
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
njfrancisco@jonesday.com

Andrew E. Lelling
JONES DAY
100 High Street, 21st Floor
Boston, MA 02110
(617) 960-3939

**CERTIFICATE OF SERVICE**

I hereby certify that on December 28, 2023, an electronic copy of the foregoing Amicus Curiae Brief was filed with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit using the Court's CM-ECF system and was served electronically by the Notice of Docket Activity upon registered CM-ECF participants.

Dated: December 28, 2023

Respectfully Submitted,

/s/ *Noel J. Francisco*

Noel J. Francisco
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
njfrancisco@jonesday.com

*Counsel for Amicus Curiae*
*National Shooting Sports Foundation*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** 23-55805

I am the attorney or self-represented party.

**This brief contains** 5,270 **words,** including 0 words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◉ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [          ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Noel J. Francisco **Date** 12/28/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** *Rev. 12/01/22*