No. 23-55805

IN THE
UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

-------------------------------- ♦ --------------------------------

VIRGINIA DUNCAN; PATRICK LOVETTE; DAVID MARGUGLIO;
CHRISTOPHER WADDELL; CALIFORNIA RIFLE & PISTOL
ASSOCIATION, INC., a California corporation,

*Plaintiffs-Appellees,*

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant-Appellant.*

-------------------------------- ♦ --------------------------------

**On Appeal from the United States District Court
for the Southern District of California
3:17-cv-1017 (Hon. Roger T. Benitez)**

-------------------------------- ♦ --------------------------------

**BRIEF OF *AMICUS CURIAE*
THE SECOND AMENDMENT FOUNDATION IN SUPPORT OF
PLAINTIFFS-APPELLEES AND AFFIRMANCE**

----------------------------------------------------- ♦ -----------------------------------

EDWARD ANDREW PALTZIK
MEREDITH LLOYD
SERGE KRIMNUS
BOCHNER PLLC
1040 Avenue of the Americas,
15th Floor
(516) 526-0341
edward@bochner.law

*Counsel for Amicus Curiae*

## CORPORATE DISCLOSURE STATEMENT

*Amicus curiae* The Second Amendment Foundation has no parent corporations, and no publicly held corporation owns 10% or more of the stock of this entity.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ................................................... iii

INTEREST OF *AMICUS CURIAE* ..........................................1

SUMMARY OF ARGUMENT ...............................................1

ARGUMENT ...................................................................4

I.   The Proper Analytical Framework for Determining Whether There Are Any Historical Gunpowder Laws Analogous to the Magazine Capacity Mandate ........................................4

II.  The Gunpowder Laws and the Magazine Capacity Mandate are not Analogues ...............................................................5

    A.   Chronological Summary of Gunpowder Laws .......................5

    B.   The How and Why ...............................................11

CONCLUSION ...................................................................14

CERTIFICATE OF COMPLIANCE .......................................15

CERTIFICATE OF SERVICE ...............................................16

# TABLE OF AUTHORITIES

## Cases

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ........................................................... 4, 11

*McDonald v. City of Chicago,*
561 U.S. 762 (2010) ...................................................... 4, 5, 11

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
597 U.S. 1 (2022) ...................................................... 1, 3, 4, 11

## Statutes

1762 R.I. Pub. Laws 132 ............................................................. 7

1783 Mass. Acts 37, *An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston,* §§ 1-2 ......................................................................... 8, 9

1784 Laws of N.Y. 627. ch. 28 .................................................... 9

1786 N.H. Laws 383, "An Act To Prevent The Keeping Of Large Quantities Of Gun-Powder In Private Houses In Portsmouth And For Appointing A Keeper Of The Magazine Belonging To Said Town." ...... 9

1798-1813 R.I. Pub. Laws 85, "An Act Relative To the Keeping Gun-Powder In The Town of Providence," § 2 ............................................ 10

1801 Mass. Acts 507, "An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same." .................................................................. 10

1806 Ky. Acts 122, § 3 ............................................................. 10

1811 N.J. Laws 300, §1 ........................................................... 10

Act of Apr. 13, 1782, Ch. XIV, 1781-1782, Pa. Laws § XLII ..................... 8

Act of Dec. 6, 1783, Ch. MLIX, 11 Pa. Stat 209, § 1 ................................ 9

CAL. PENAL CODE § 16740 ........................................................ 2

Cal. Penal Code § 32310 .................................... 1, 2, 3, 4, 11, 12, 13, 14

**Other Authorities**

*A Law for the Better Securing of the City of New York from the Danger of Gun Powder* (1763), reprinted in *Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City 39, Image 40* ................ 7, 8

Matthew E. Thomas, Historic Powder Houses of New England: Arsenals of American Independence (Arcadia Publishing, Nov. 5, 2013) ....................................................................... 5, 6, 7, 13

## INTEREST OF *AMICUS CURIAE*[1]

**The Second Amendment Foundation** ("SAF") is a non-profit membership organization founded in 1974 with over 720,000 members and supporters in every State of the Union, including California. Its purposes include education, research, publishing, and legal action focusing on the constitutional right to keep and bear arms. Amicus Curiae has an intense interest in this case because it has many members who reside in the state of California who are prevented from exercising their right to keep and bear arms under the statute at issue, CAL. PENAL CODE § 32310, contrary to "the Second Amendment's text, as informed by history." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 19 (2022). Amicus Curiae also has an interest in this case because of its involvement as a party in *Wiese v. Becerra*, No. 2:17-cv-00903 (E.D. Cal. Apr. 28. 2017), which challenges California's "large capacity magazine" ban. Presently, *Becerra* is stayed, pending the Ninth Circuit's resolution of the instant case.

---

[1] All parties received timely notice and consented to the filing of this brief. No counsel for any party authored the brief in whole or in part. Only *amicus curiae* funded its preparation and submission.

## SUMMARY OF ARGUMENT

With its enactment of PENAL CODE § 32310, California has mandated a limit on the capacity of magazines. This statute severely burdens the core of the right to keep and bear arms because it bans the manufacture and sale or transfer of commonly-owned firearms-related devices used for self-defense and other lawful purposes. Specifically, the statute at issue punishes any person who "manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine" with fines and/or imprisonment. PENAL CODE § 32310(a); *see also* PENAL CODE § 32310(c) (imposing fines for possession of "large-capacity magazines") (the "Magazine Capacity Mandate" or "Section 32310"). "Large-capacity magazines" are defined broadly in California as "any ammunition feeding device with the capacity to accept more than 10 rounds," with limited exceptions not relevant here. PENAL CODE § 16740.

An argument raised by Defendant-Appellant Attorney General Rob Bonta on behalf of the State of California (the "AG") is that historical laws relating to the accumulation and storage of gunpowder, and, closely related, the prevention of fires associated with gunpowder (the

"Gunpowder Laws") somehow provide relevant support for the Magazine Capacity Mandate. Opening Brief of Defendant-Appellant Bonta at 39-40, *Duncan v. Bonta*, No. 23-55805 (9th Cir. Nov. 21, 2023) ("Bonta Brief"). The AG concedes that the Gunpowder Laws "necessarily affected the ability of gun owners to use firearms for self-defense by restricting the availability of gunpowder," but argues that these regulations "were considered to be at the very core of the police power." Bonta Brief at 39 (cleaned up). Plaintiffs-Appellees have convincingly argued that "laws designed to ensure that combustible material would not combust *when not in use* are self-evidently different from the laws that confine the universe of arms citizens may use." Response Brief of Plaintiffs-Appellees at 43-44, *Duncan v. Bonta*, No. 23-55805 (9th Cir. Dec. 21, 2023) (cleaned up) (citing *Bruen*, 597 U.S. at 29).

This brief expands upon Plaintiffs-Appellees' argument and explores in detail the history of Gunpowder Laws. Contrary to the AG's contention, these laws do not support the Magazine Capacity Mandate. Indeed, the Gunpowder Laws arose in contexts entirely separate from the round capacity of firearms, and thus, are not a proper "historical analogue" to Section 32310. *See Bruen*, 597 U.S. at 30. Similarly, they do

not provide the necessary analogue as required by *Bruen*. Thus, the Gunpowder Laws do not offer any "well-established and representative historical *analogue*" to the Magazine Capacity Mandate. *Id*. Section 32310 is simply not "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

## ARGUMENT

### I.    The Proper Analytical Framework for Determining Whether There Are Any Historical Gunpowder Laws Analogous to the Magazine Capacity Mandate

Under *Bruen*, "the government must affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 597 U.S. at 19. Here, in order to satisfy this heavy burden, the AG must point to "historical precedent . . . [that] evinces a comparable tradition of regulation." *Id*. at 27 (internal quotation marks omitted). The government need not identify a "historical *twin*"; rather, a "well-established and representative historical *analogue*" suffices. *Bruen*, 597 U.S. at 30. In *Bruen*, the Court identified two metrics for comparison of analogues proffered by the government against the challenged law: "*how* and *why* the regulation[] burden[s] a law-abiding citizen's right to armed self-defense." *Id*. at 29

4

(emphases added) (citing *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 762 (2010)). The key question is whether the challenged law and proffered analogue are "relevantly similar." *Id.* at 29.

Here, the relevant questions are how the Magazine Capacity Mandate burdens the right to armed self-defense, why it burdens that right, and, based on the how and why, whether it is relevantly similar to any historical analogue. A comparison to the Gunpowder Laws is instructive.

## II.   The Gunpowder Laws and the Magazine Capacity Mandate are not Analogues

### A. Chronological Summary of Gunpowder Laws

Gunpowder Laws that existed in the American Colonies and the early Republic generally restricted the quantity of gunpowder to be stored in a single location. Powder houses were commonly used in the Colonies to store the collective powder, guns, and armaments of a town. MATTHEW E. THOMAS, HISTORIC POWDER HOUSES OF NEW ENGLAND: ARSENALS OF AMERICAN INDEPENDENCE (Arcadia Publishing, Nov. 5, 2013). These storage locations served to consolidate the munitions of a town at a safe distance from flammable structures. *Id.* at 17. Many New

England communities without powder houses elected to store their ammunition in the attics and cellars of meeting houses and barns since these structures were devoid of stoves until about 1820. *Id*. at 16. In fact, "Sunday worshippers were known to flee meetinghouses during lightning storms in the event that lightning might strike the building and ignite the hidden supply of gunpowder." *Id*.

Powder houses were commonly constructed with an eye to safety. Some powder houses went so far as "not to Suffer [allow] any Person to enter said [powder] house with Shoes on." *Id*. at 144. Importantly, shoes at the time were held together by nails, and stepping on a stone risked creating a spark in the powder house, which in turn could have devastating (and explosive) consequences. *Id*. In addition to fire prevention and protection of structures, these statutes were enacted in an effort to *preserve* critical arms assets in view of the growing conflict with the British at the time. *Id*. "The first battles and skirmishes of the American Revolution were fought over preventing the British from capturing the arms and ammunition stored at powder houses in New Castle, New Hampshire, on December 14 and 15, 1774, and at Concord, Massachusetts, on that eventful day of April 19, 1775, when the 'shot

heard round the world' took place at Concord's historic North Bridge." *Id.* at 18. Thus, pre-Founding Gunpowder Laws sought to preserve arms by minimizing the risk of explosions, rather than restricting access to them.

Other statutes sought to improve the safety of powder houses by prohibiting the use of firearms in their close proximity. In 1762, Rhode Island enacted a fire-prevention statute to this effect, which provided that "no person whatsoever shall fire a gun or other fireworks within one hundred yards of the said powder house, upon the penalty of paying a fine . . . ." 1762 R.I. Pub. Laws 132, "An act, providing in case of fire breaking out in the town of Newport." Like the other Gunpowder Laws from the same era, this regulation differed from the Magazine Capacity Mandate in both purpose and execution. The Rhode Island law did not restrict the accumulation of gunpowder in a particular space but sought to prevent people from igniting the gunpowder.

Other examples of Gunpowder Laws include a 1763 statute in the City of New York prohibited the storage of "any more or greater quantity of gunpowder at one time, than twenty-eight pounds weight . . . under the penalty of ten pounds current money of New York, for every offense." *A Law for the Better Securing of the City of New York from the Danger of*

*Gun Powder* (1763), reprinted in *Laws, Statutes, Ordinances and Constitutions, Ordained, Made and Established, by the Mayor, Aldermen, and Commonalty, of the City of New York, Convened in Common-Council, for the Good Rule and Government of the Inhabitants and Residents of the Said City 39, Image 40*. This statute was limited to the City of New York and is far closer to a "sensitive places" regulation than to any type of restriction on ammunition quantity. The Pennsylvania legislature took a different approach, adopting a statute in 1781 that required gunpowder be stored on the top story of a house rather than in a designated powder house. Act of Apr. 13, 1782, Ch. XIV, 1781-1782, Pa. Laws § XLII, at 41.

Recognizing the dangers of improper storage of combustible material, other cities adopted similar requirements for storage of gunpowder when not in use. In 1783, the city of Boston adopted "An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston," which explicitly defines its purpose in the opening clause: "Whereas the depositing of loaded arms in the houses of the town of Boston, is dangerous to the lives of those who are disposed to exert themselves **when a fire happens to break out in said town**." 1783 Mass. Acts 37, *An Act in Addition to the Several Acts*

8

*Already Made for the Prudent Storage of Gun Powder within the Town of Boston*, §§ 1-2 (emphasis added). Philadelphia passed a similar law in 1783, prohibiting the private storage of gunpowder in quantities larger than thirty pounds. Act of Dec. 6, 1783, Ch. MLIX, 11 Pa. Stat 209, § 1, "An Act for the better securing the city of Philadelphia and its liberties from danger of gunpowder."

In 1784, New York again took regulatory action to minimize the risk of explosions posed by improperly stored gunpowder, this time limiting the storage restrictions to "less than one mile to the northward of the city hall of the said city, except in the public magazine at the Freshwater." 1784 Laws of N.Y. 627. Ch. 28, "An ACT to Prevent the Danger Arising from the Pernicious Practice of Lodging Gun Powder in Dwelling Houses, Stores, or Other Places within Certain Parts of the City of New York, or on Board of Vessels within the Harbour Thereof."

Portsmouth, New Hampshire limited private storage to "ten pounds of gunpowder at any one time, which ten pounds shall be kept in a tin canister properly secured for that purpose." 1786 N.H. Laws 383, "An Act To Prevent The Keeping Of Large Quantities Of Gun-Powder In Private Houses In Portsmouth And For Appointing A Keeper Of The Magazine

9

Belonging To Said Town." Around the same time, Providence, Rhode Island required that whoever kept gunpowder "in greater quantity that [sic] twenty-eight pounds" was subject to forfeiture and fine of twenty dollars. 1798-1813 R.I. Pub. Laws 85, "An Act Relative To the Keeping Gun-Powder In The Town of Providence," § 2.

In 1803, Boston expanded its regulation to require that all gun powder be stored in powder houses when it adopted 1801 Mass. Acts 507, "An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same." Lexington, Kentucky similarly regulated storage of gunpowder and "prohibit[ed] any inhabitants of said town, from keeping in the settled parts thereof, any quantity of gun powder **which might in case of fire be dangerous**." 1806 Ky. Acts 122, § 3 (emphasis added).

An 1811 New Jersey statute regulating the manufacture of gunpowder "within a quarter of a mile from any town or village or house of public worship, . . . dwelling house, barn or out house," required only "the consent under hand and seal of all and every the owner or owners of such dwelling house, barn, or out house as aforesaid" as a prerequisite to opening an independently operated powder mill. 1811 N.J. Laws 300, §1.

10

Each of the aforementioned regulations were founded in response to concern over the danger that could be posed by inadvertent ignition of large quantities of stored gunpowder. Accordingly, these regulations sought to alleviate the threat posed by the collection of a large amount of an explosive substance, not the potential for criminal use of ammunition in a readily usable firearm that California uses to justify the Magazine Capacity Mandate. *See* Bonta Brief at 8.

### B. The How and Why

Having reviewed the potential historical analogues, the final step of the analysis is assessment of the "how" and "why" of the Magazine Capacity Mandate versus the "how" and "why" of the Gunpowder Laws identified above. *Bruen*, 597 U.S. at 29 ("*Heller* and *McDonald* point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense.").

Section 32310 burdens the right to self-defense by mandating the use of limited capacity magazines. This unconstitutional statute is applicable only to the mechanism by which ammunition is loaded into a firearm and does not seek to regulate the quality or quantity of stored explosive material.

The "how" is therefore not analogous to any of the Gunpowder Laws, which were entirely directed to non-use storage of explosive material. The Magazine Capacity Mandate is highly dissimilar when compared to the limited historical restrictions reviewed *supra*. Importantly, the Gunpowder Laws only required that combustible material over a certain quantity be stored in a specifically-designated area. They did not impose restrictions on the quantities of powder that could be owned by any person, nor did they restrict the amounts of powder that could be used at one time. In short, this Nation's historical tradition of firearms regulation does not include any Founding Era regulations which restrict the amount of firepower that can be generated at one time. To the extent any regulations limited the quantities of combustible material that could be accumulated in a single place, they only sought to avoid the tragedy that would strike upon the inadvertent ignition of a large amount of combustible material, and to minimize the effect of such ignition. Gunpowder storage laws from the Founding Era are more closely analogous to OSHA regulations controlling the storage of flammable chemical compounds than to the Magazine Capacity Mandate.

Moreover, the "why" of Section 32310 and Gunpowder Laws are also not analogous. The Magazine Capacity Mandate burdens the right to self-defense in order to mitigate the perceived danger posed by "modern technology that allows shooters to use semiautomatic firearms to rapidly fire many consecutive rounds without pausing to reload." Bonta Brief at 1. In contrast, the Gunpowder Laws were specifically directed at fire safety and minimizing the risk of explosions to protect towns from fire danger, and also to preserve gunpowder supply for the Patriot cause during the Revolutionary War. THOMAS, *supra*, at 18. These storage requirements were adopted with the goal of *preserving and maximizing* the ability to generate firepower for the purpose of self-defense while minimizing the risks associated with improper storage of explosive material. Both of these purposes are contrary to the goal of Section 32310. Since the Gunpowder Laws did not impose a comparable burden and were not comparably justified, they are not historical analogues to Section 32310.

## CONCLUSION

The AG's contention that Gunpowder Laws are proper historical analogues to Section 32310 is incorrect. The decision below should be affirmed.

Dated: December 28, 2023   Respectfully Submitted,

/s/ *Edward Andrew Paltzik*
EDWARD ANDREW PALTZIK
MEREDITH LLOYD
SERGE KRIMNUS
BOCHNER PLLC
1040 Avenue of the Americas,
  15th Floor
(516) 526-0341
edward@bochner.law

*Counsel for Amicus Curiae*

14

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 2,644 words, excluding the parts of this brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

DATED: December 28, 2023 /s/ _Edward Andrew Paltzik_
EDWARD ANDREW PALTZIK

*Counsel for Amicus Curiae*

15

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on December 28, 2023. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

DATED: December 28, 2023        /S/ *Edward Andrew Paltzik*
EDWARD ANDREW PALTZIK

*Counsel for Amicus Curiae*