No. 23-55805

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

VIRGINIA DUNCAN, et al.,

*Plaintiffs-Appellees,*

v.

ROB BONTA, in his official capacity as
Attorney General of the State of California,

*Defendant-Appellant.*

On Appeal from the United States District Court
for the Southern District of California
Case No. 3:17-cv-01017
Senior District Judge Roger T. Benitez

**BRIEF OF AMICUS CURIAE STATE OF MONTANA, IDAHO, AND
23 OTHER STATES SUPPORTING PLAINTIFFS-APPELLEES AND
AFFIRMANCE**

RAÚL R. LABRADOR
  *Attorney General of Idaho*
JOSHUA N. TURNER
  *Acting Solicitor General*
IDAHO OFFICE OF THE
ATTORNEY GENERAL
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
josh.turner@ag.idaho.gov
*Counsel for Amicus Curiae
State of Idaho*

AUSTIN KNUDSEN
  *Montana Attorney General*
CHRISTIAN B. CORRIGAN
  *Solicitor General*
PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov
*Counsel for Amicus Curiae
State of Montana*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................ii

INTEREST OF AMICI CURIAE ....................................................................... 1

SUMMARY OF ARGUMENT .......................................................................... 2

ARGUMENT....................................................................................................... 4

    I.    Magazines are "arms" protected by the Second Amendment....... 5

    II.    California bans magazines typically possessed by law-abiding citizens for lawful purposes............................................................ 9

    III.    The magazine capacity limitation doesn't align with this Nation's tradition of firearm regulation. .................................... 16

CONCLUSION ................................................................................................. 20

ADDITIONAL COUNSEL ............................................................................. 22

CERTIFICATE OF COMPLIANCE ................................................................ 24

i

TABLE OF AUTHORITIES

CASES

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*
    910 F.3d 106 (3d Cir. 2018) ....................................................... 6, 7, 8

*Barnett v. Raoul,*
    2023 U.S. Dist. LEXIS 74756 (S.D. Ill. Apr. 28, 2023) ................ 2, 13

*Bevis v. City of Naperville,*
    85 F.4th 1175 (7th Cir. 2023) ......................................... 11-12, 15, 19

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) ....................................................... 1, 10

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................... *passim*

*Duncan v. Becerra,*
    988 F.3d 1209 (9th Cir. 2021) ......................................... 12

*Duncan v. Becerra,*
    970 F.3d 1133 (9th Cir. 2020) ....................................... 12, 15, 17, 18

*Duncan v. Bonta,*
    83 F.4th 803 (9th Cir. 2023) .................................... *passim*

*Duncan v. Bonta,*
    2023 U.S. Dist. LEXIS 169577 (S.D. Cal. Sept. 22, 2023) ........ *passim*

*Ezell v. City of Chi.,*
    651 F.3d 684 (7th Cir. 2011) ......................................... 6,7

*Fyock v. City of Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) ................................... 2, 6, 8

*Hanson v. District of Columbia,*
    2023 U.S. Dist. LEXIS 68782 (D.D.C. Apr. 20, 2023) .................... 7,8

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ................................. 11, 20

*Kolbe v. Hogan,*
   813 F.3d 160 (4th Cir. 2016) ........................................................ 6, 8

*Konigsberg v. State Bar of Cal.,*
   366 U.S. 36 (1961) ............................................................................. 16

*Luis v. United States,*
   58 U.S. 5 (2016) .................................................................................. 5

*McDonald v. City of Chi.,*
   561 U.S. 742 (2010) ....................................................................... 2, 4

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ............................................................. *passim*

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*
   804 F.3d 242 (2d Cir. 2015) ..................................................... 11, 15

*Ocean State Tactical v. Rhode Island,*
   646 F. Supp. 3d 368 (D.R.I. 2022) ............................................. 8, 9

*Teixeira v. Cnty. of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ........................................................... 5

*United States v. Gonzalez,*
   792 F. 3d. 534 (5th Cir. 2015) ........................................................ 6

*Worman v. Healey,*
   922 F.3d 26 (1st Cir. 2019) ............................................................ 15

## OTHER

### United States Constitution
   U.S. Const. amend. II ...................................................................... 2

### Publications
   David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ............................ 10, 12, 18

   *Firearm Production in the United States*, Nat'l Shooting Sports Found. 7 (2020), https://perma.cc/4UTK-TLRA)............................. 12

iii

Inst. of Med. & Nat'l Rsch. Council, *Priorities for Research to Reduce the Threat of Firearm-Related Violence* (The Nat'l Acads. Press ed., (2013)) ............................................................................. 13

William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13–14 (2019)...................................................... 20

William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 7 (Geo. McDonough Sch. of Bus. Rsch. Paper No. 4109494 (2022)) ...................................................... 13

## INTEREST OF AMICI CURIAE

The States of Montana, Idaho, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Iowa, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nebraska, New Hampshire, North Dakota, Ohio, Oklahoma, South Carolina, South Dakota, Texas, Virginia, West Virginia, and Wyoming ("Amici States") submit this amicus brief to safeguard individuals' "constitutional right to bear arms in public for self-defense" against unnecessary intrusions. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2156 (2022). And that necessarily includes the right to keep and bear "modern [arms] that facilitate armed self-defense." *Id.* at 2132 (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (per curiam)). In particular, Amici States address why the amicus brief submitted by our sister states[1] in support of California's harsh restrictions is incorrect as a matter of constitutional text, history, and tradition. Amici States urge this Court to affirm.

---

[1] *See* Dkt. 17, Br. for Amici Curiae Massachusetts, New Jersey, Arizona, Colorado, Connecticut, Delaware, the District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, Michigan, Minnesota, New York, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin in Supp. of Appellant and Reversal ("Mass.Br." or "Massachusetts").

## SUMMARY OF ARGUMENT

Time and again the Supreme Court has reaffirmed that the Second Amendment is not a second-class right. *See District of Columbia v. Heller*, 554 U.S. 570, 594 (2008); *McDonald v. City of Chi.*, 561 U.S. 742, 780 (2010); *Bruen*, 142 S. Ct. at 2156. Because California Penal Code Sections 32310(a) and 16740 regulate conduct covered by the "plain text" of the Second Amendment—"keep[ing] and bear[ing] Arms," *see* U.S. Const. amend. II—they are presumptively unconstitutional.

Magazines, including those criminalized by Sections 32310(a) and 16740, are "arms" within the scope of the Second Amendment because they are necessary to render firearms operable. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111. They're "integral components to vast categories of guns." *Duncan v. Bonta*, 2023 U.S. Dist. LEXIS 169577, at *16 (S.D. Cal. Sept. 22, 2023) (quotations omitted). Indeed, "[i]t is hard to imagine something more closely correlated to the right to use a firearm in self-defense than the ability to effectively load ammunition into the firearm." *Barnett v. Raoul*, 2023 U.S. Dist. LEXIS 74756, at *26 (S.D. Ill. Apr. 28, 2023).

The district court appropriately recognized that California's 10-round ammunition-capacity limit "denies a citizen the federal constitutional right to use common weapons of their own choosing for self-defense." *Duncan*, 2023 U.S. Dist. LEXIS 169577, at *5. Sections 32310(a) and 16740 criminalize magazines that come standard in some of the most popular firearms in America. *See id.* at *6. One estimate puts the number of these magazines in circulation in the United States at over 500 million. *Id.* They're clearly in common use and neither dangerous nor unusual. *Bruen*, 142 S. Ct. at 2128.

Both California and Massachusetts fail to show that Sections 32310(a) and 16740 are part of the historical tradition that delimits the outer bounds of the right to keep and bear arms. *See id.* at 2128 (quoting *Heller*, 554 U.S. at 627). It makes no difference for purposes of the analysis whether an individual uses more than 10 rounds for self-defense. Any time an individual uses a firearm containing a banned magazine for self-defense—whether or not a shot is fired—that individual is using that magazine for self-defense.

Firearms with a capacity of greater than 10 rounds existed during the founding era and were widespread during the ratification. Thus, the

purported historical analogues that Massachusetts offers, including restrictions on the storage of gunpowder during the colonial era and restrictions on magazine capacity during the 1920s and 1930s, are unhelpful to California's case under *Bruen*'s history-and-tradition framework.

## ARGUMENT

"Last year, the Supreme Court had enough of lower courts' disregard for the Second Amendment. It decisively commanded that [courts] must no longer interest-balance a fundamental right and … must look to the Second Amendment's text, history, and tradition to assess modern firearm regulations." *Duncan v. Bonta*, 83 F.4th 803, 808 (9th Cir. 2023) (en banc) (Bumatay, J., dissenting) (citing *Bruen*, 142 S. Ct. at 2129–31). In fact, the Supreme Court "[t]hree times now … has warned courts not to treat the Second Amendment as a disfavored right." *Id.* (citing *Heller*, 554 U.S. at 594; *McDonald*, 561 U.S. 780; *Bruen*, 142 S. Ct. at 2156).

After *Bruen*, courts must determine whether the text of the Second Amendment applies to a person and his proposed conduct. *Bruen*, 142 S. Ct. at 2134–35. For Virginia Duncan, that proposed conduct is keeping or bearing the "arms" prohibited by Sections 32310(a) and 16740. And if the Second Amendment's text covers Duncan's proposed conduct (it does),

4

the government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. The district court properly concluded that California's "extreme ban" on magazines with a capacity greater than 10 rounds conflicted with this Nation's historical tradition of firearms regulation. *Duncan*, 2023 U.S. Dist. LEXIS 169577, *8.

## I. Magazines are "arms" protected by the Second Amendment.

The Second Amendment preserves the right of the people to keep and bear "arms," which "covers modern instruments that facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132. And its protections extend, "prima facie, to *all* instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. More broadly, "the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017); *see also Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) (constitutional rights "implicitly protect those closely related acts necessary to their exercise."). That necessarily includes integral parts of firearms such as bullets and magazines.

5

This Court has recognized a "right to possess the magazines necessary to render … firearms operable." *Fyock*, 779 F.3d at 998. Pre-*Bruen*, two other circuits recognized that magazines are "arms" protected by the Second Amendment. *See Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.* ("ANJRPC"), 910 F.3d 106, 116 (3d Cir. 2018); *Kolbe v. Hogan*, 813 F.3d 160, 175 (4th Cir. 2016). And rightly so. "Without protection of the components that render a firearm operable, like magazines, the Second Amendment right would be meaningless." *Duncan*, 83 F.4th at 813 (Bumatay, J., dissenting); *United States v. Gonzalez*, 792 F. 3d. 534, 536–37 (5th Cir. 2015) ("The problem of limited ammunition capacity has plagued rifles since their invention centuries ago. The earliest rifles fired a single shot, leaving the user vulnerable during reloading. Numerous inventions have sought to eliminate this problem. But from repeating rifles to clips, none has proved as effective as the magazine."); *cf. Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011) (city's ban on firing ranges implicated the Second Amendment because "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use; the core right wouldn't mean much without the training and practice that make it effective").

Massachusetts characterizes magazines as "storage containers for bullets." Mass.Br.9. That's true in the same sense that a motor vehicle's gas tank is a storage container for fuel. It's theoretically possible to operate a gas-powered vehicle without a gas tank, but that would *severely* limit its functionality and utility. *See ANJRPC*, 910 F.3d at 116 ("magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended.").

As one district court observed, classifying magazines as mere "accoutrements" would allow states "to ban all magazines … because a firearm technically does not require any magazine to operate; one could simply fire the single bullet in the firearm's chamber." *Hanson v. District of Columbia*, 2023 U.S. Dist. LEXIS 68782, at *20 (D.D.C. Apr. 20, 2023). And if magazines are not arms, states could make an easy end-run around the Second Amendment by simply banning all firearm components. *Duncan*, 83 F.4th at 813 (Bumatay, J., dissenting). Massachusetts' logic would likewise permit states to limit the capacity of revolvers or other firearms without detachable magazines. And if California had

7

its way, law-abiding citizens would be confined to single-shot pistols and rifles.[2]

Massachusetts' reliance on *Ocean State Tactical v. Rhode Island*, 646 F. Supp. 3d 368 (D.R.I. 2022), is telling. *See* Mass.Br.9. For starters, that decision relied largely on the testimony of a linguistics professor to draw the (discredited) distinction between "arms" and "accoutrements." *Ocean State*, 646 F. Supp. 3d at 377; *see also Fyock*, 779 F.3d at 998; *ANJRPC*, 910 F.3d at 116; *Kolbe*, 813 F.3d at 175; *Hanson*, 2023 LEXIS 68782, at *20. Similarly, in concluding that magazines are "attachments" rather than "a necessary or integral part of the firearm itself," the court looked to historical evidence that there were repeating firearms that didn't use magazines, such as revolvers. *Ocean State*, 646 F. Supp. 3d at 388. That fails the *Bruen* analysis for the reasons set forth in Parts II–III, *infra*.

And *Ocean State*'s distaste for the Supreme Court's Second Amendment jurisprudence is palpable. When discussing the *Bruen* framework, the district court openly quibbled with the Supreme Court's methodology

---

[2] Were it not for *Heller*, *McDonald*, and *Bruen*, California and other states would likely outright ban these common firearms.

8

by quoting Justice Bryer's *dissent*. *See Ocean State*, 646 F. Supp. 3d at 377–78 ("'The majority in *Heller* undertook 40 pages of textual and historical analysis.' 'Two years later, [however,] 21 English and early American historians (including experts at top universities) told us in *McDonald v. Chicago* ... [that historical analysis was] wrong.'") (quoting *Bruen*, 142 S. Ct. at 2177–78 (Breyer, J., dissenting)). At best, *Ocean State* demonstrates a faint-hearted fidelity to *Bruen*'s framework.

Because magazines are "arms," they are prima facie protected by the Second Amendment and California bears the burden of proof under *Bruen*'s history and tradition framework. *See Bruen*, 142 S. Ct. at 2126, 2129–30, 2132.

## II. California bans magazines typically possessed by law-abiding citizens for lawful purposes.

*Bruen* next directs courts to determine whether magazines with greater than 10-round capacity are typically possessed by law-abiding citizens for lawful purposes. The answer is unequivocally yes—so they cannot be considered dangerous *and* unusual. Those magazines are commonly used for self-defense, hunting, and sporting purposes. Sections 32310(a) and 16740, along with similar restrictions in other states, burden the rights of millions of law-abiding citizens to keep and bear

9

magazines (or "arms") that have long been considered appropriate for self-defense.

The district court properly concluded that "[t]here is no American tradition of limiting ammunition capacity and the 10-round limit has no historical pedigree." *Duncan*, 2023 U.S. Dist. LEXIS 169577, at *4. "It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are stand-ard equipment for many popular firearms." David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 874 (2015). And they are legal in 41 States and under federal law. *Duncan*, 83 F.4th at 814 (Bumatay, J., dissenting); *see also Caetano*, 577 U.S. at 420 (citations omitted) ("While less popular than handguns, stun guns are widely owned and accepted as a legitimate means of self-defense across the country. Massachusetts' categorical ban of such weapons therefore violates the Second Amendment."). In one comprehensive study, 48% of respondents confirmed that they owned magazines with a capacity greater than 10 rounds. *Duncan*, 2023 U.S. Dist. LEXIS 169577, at *6. Estimates vary, but another study found that Americans own 542

million magazines that hold more than 10 rounds. *Id.* So they're not just common, they're *ubiquitous*.

Take the Glock 17, for example. It's a 9mm handgun and one of the most popular firearms on the market. There are around 9 million Glock 17's in the United States, and over 65 million worldwide. Its popularity stems from its price, light weight, and reliability. And the Glock 17 comes with a standard 17-round magazine. *Id.*

The evidence before the district court was neither surprising nor unique. This Court concluded "magazines having a capacity to accept more than ten rounds are in common use, and are therefore not danger-ous and unusual." ER-152 (quotation marks omitted). And courts across the country have recognized the widespread use of these magazines by law-abiding citizens. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuom*o ("*NYSRPA*"), 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the … large-ca-pacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) (noting in passing that the record showed that "magazines holding more than ten rounds are indeed in 'common use.'"); *see also Bevis v. City*

*of Naperville*, 85 F.4th 1175, 1214 (7th Cir. 2023) (Brennan, J., dissenting) ("[I]n 2020 it was estimated that approximately 160 million pistol and rifle magazines with a capacity of 11 rounds or more were in U.S. consumer possession from 1990-2018.") (citing *Firearm Production in the United States*, NAT'L SHOOTING SPORTS FOUND. 7 (2020), https://perma.cc/4UTK-TLRA)).

Moreover, there's a longstanding history and tradition of law-abiding Americans owning and using these magazines for self-defense. A prior panel on this case aptly explained that "[f]irearms or magazines holding more than ten rounds have been in existence—and owned by American citizens—for centuries. Firearms with greater than ten round capacities existed even before our nation's founding, and the common use of [large-capacity magazines] for self-defense is apparent in our shared national history." *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020), *vacated by Duncan v. Becerra*, 988 F.3d 1209 (9th Cir. 2021) (granting rehearing en banc); *see also Duncan*, 83 F.4th at 814 (Bumatay, J., dissenting) (citing Kopel, *supra*, at 851 ("In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified.")).

12

These magazines facilitate armed self-defense—which is the core component of the Second Amendment.[3]  *Bruen*, 142 S. Ct. at 2132–33. The district court cited a comprehensive study showing that American gun owners use firearms in self-defense roughly 1.7 million times every year.  *Duncan*, 2023 U.S. Dist. LEXIS 169577, at *7 (citing William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 7 (Geo. McDonough Sch. of Bus. Rsch. Paper No. 4109494, 2022)).  Another study from the Centers for Disease Control puts that number as high as 3 million.  *Id.* (citing Inst. of Med. & Nat'l Rsch. Council, *Priorities for Research to Reduce the Threat of Firearm-Related Violence* 15 (The Nat'l Acads. Press ed., 2013)).

Massachusetts tries to distinguish between common "use" and common "ownership."  Mass.Br.12.  The district court rightly rejected this argument as inconsistent with *Heller*.  *See Duncan*, 2023 U.S. Dist. LEXIS 169577, at *24 ("Focusing on the right to possess a usable arm, *Heller* said, '[w]e consider whether a District of Columbia prohibition on the possession of usable handguns in the home violates the Second

---

[3] "Bruen clearly holds that the Second Amendment protects 'possession and use' of weapons 'in common use' not just weapons in common use for self-defense…."  *Barnett*, 2023 U.S. Dist. LEXIS 74756, at *31.

Amendment to the Constitution.' Actual firing of a handgun in the District was irrelevant.") (quoting *Heller*, 554 U.S. at 573)). Instead, "[c]onstitutional protection is afforded to weapons 'typically possessed by law-abiding citizens for lawful purposes,' focusing on typicality and possession rather than frequency of firing." *Id.* (quoting *Heller*, 554 U.S. at 625).

California's own expert witness reported that sometimes an individual needs more than 10 rounds to defend his or her home or family. *Id.* at *6 n.25. But that's only part of the equation. As discussed above, nearly half of gun owners possess magazines with capacities over 10 rounds. And there are likely hundreds of millions of those magazines in circulation—many used in popular firearms such as the Glock 17. So when someone uses a firearm in self-defense, whether to fend off an intruder in the middle of the night or a grizzly bear in the middle of nowhere, there's a good chance that individual is "using" a magazine with more than 10 rounds. The same is true when individuals use firearms as a deterrent in self-defense situations without firing a shot. The "use" of the firearm isn't limited to firing the weapon. The district court analogized this to wearing a seatbelt in case of collision or using a reserve

14

canopy on a parachute. *Id.* at \*28. Firing a weapon in self-defense—one time or fifteen times—is always a worst-case scenario. Fortunately, the Second Amendment protects the right of citizens to adequately prepare themselves for those contingencies. *See Duncan*, 83 F.4th at 815 (Bumatay, J., dissenting) ("[I]t is unnecessary to look at how often a law-abiding citizen fired a firearm more than ten times to fend off an attacker for our inquiry. Indeed, it would be troubling if our constitutional rights hung on such thin evidence.").

Finally, Massachusetts argues that the banned magazines are "most useful for military service" and therefore not commonly used for armed self-defense. Mass.Br.10–13. That metric was constitutionally suspect before *Bruen*. *See Duncan*, 970 F.3d at 1149 (citing, *e.g.*, *Worman v. Healey*, 922 F.3d 26, 35 (1st Cir. 2019); *NYSRPA*, 804 F.3d at 256). But after *Bruen*, it's dead in the water. *See* 142 S. Ct. at 2133; *see also Bevis*, 85 F.4th at 1221 (Brennan, J. dissenting) ("[T]he Court did not say 'Arms' are defined by using the history and tradition of military versus civilian weaponry.").

15

## III. The magazine capacity limitation doesn't align with this Nation's tradition of firearm regulation.

Common usage aside, to justify its 10-round limitation, California "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation"—only then "may a court conclude that [Duncan]'s conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Courts must follow the course charted by *Heller* and *Bruen* to determine whether modern firearm regulations are consistent with the Second Amendment's text and historical understanding. That analysis requires courts to compare respondents' historical evidence with the "'historical precedent' from before, during, and even after the founding" to see if those historical materials show "a comparable tradition of regulation." *Id.* at 2131–32; *see also id.* at 2136 ("Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*." (quoting *Heller*, 554 U.S. at 634–35) (emphasis in original)).

Even though California's obligation to respect Duncan's right to keep and bear arms flows from the Fourteenth Amendment, not the Second, the rights enumerated in the Bill of Rights, and incorporated against

16

the States after the Fourteenth Amendment's adoption, "have the same scope as against the Federal Government." *Id.* at 2137. And the scope of that right is generally "pegged to the public understanding of the right when the Bill of Rights was adopted in 1791." *See id.* (collecting cases).

Massachusetts' "historical tradition" argument is flawed from the start. It claims California's restrictions "derive from a long tradition of regulating uniquely dangerous, weapons, accessories, gunpowder and ammunition." Mass.Br.17. Massachusetts fails *Bruen*'s reason-by-analogy demand, arguing that colonial-era laws restricting the amount of gunpowder or ammunition that could be in one place are relevant comparisons to laws restricting the capacity of magazines. *See* Mass.Br.20–21. But that's the wrong historical comparison because firearms with greater than 10-round capacity have existed since 1580 and were well-known to the Founders. *See Duncan*, 970 F.3d at 1147, 1149 ("While the Supreme Court has ruled that arms need not have been common during the founding era to receive protection under the Second Amendment, the historical prevalence of firearms capable of holding more than ten bullets underscores the heritage of LCMs in our country's history." (citing *Heller*, 554 U.S. at 582)). In other words, Massachusetts would have this Court

17

evaluate the modern regulation of apples by analogizing to the historical regulation of oranges. In some cases, that could be appropriate. But we have a better historical analogue—the actual regulation of apples (or lack thereof).

A prior panel of this Court detailed the history of these firearms before this Court granted en banc review and vacated the opinion. *See generally Duncan*, 970 F.3d at 1147–49. Importantly, "[a]fter the American Revolution … new firearm designs proliferated throughout the states and few restrictions were enacted on firing capacities." *Id.* at 1147. The Lewis and Clark Expedition carried the Girandoni air rifle in 1804, which had a 22-round capacity. *Id.* In 1867, Winchester introduced its famous Model 66 lever-action rifle able to carry 17 rounds—just like the modern Glock 17. *Id.* at 1148; *see also* Kopel, *supra* at 851 ("In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified.").

Even assuming this Court entertained that particular reason-by-analogy, it still fails *Bruen* and *Heller*. Colonial-era regulations on storage gunpowder are inapplicable to magazine-capacity restrictions. First,

18

the burden on law-biding citizens is asymmetric. *See Heller*, 554 U.S. at 632 ("Nothing about those fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as an absolute ban; *see also Duncan*, 83 F.4th at 820 ("[G]unpowder storage laws would have a minimal effect on law-abiding citizens' use of firearms for self-defense. The same cannot be said for limits on firing more than ten rounds at once."). Second, they served an entirely different purpose. "The 'why' of the gunpowder regulations was to stop fires resulting from the combustion of stored flammable materials." *Bevis*, 85 F.4th at 1217 (Brennan, J., dissenting). Stopping the "accumulation of explosive material" isn't the same public safety interest asserted by California and Massachusetts. *See Duncan*, 83 F.4th at 820.

Massachusetts identifies some restrictions on magazine capacity during the 1920s and 1930s. *See* Mass.Br.25 n.27.[4] *Bruen*, however, cautioned courts "against giving postenactment history more weight than it

---

[4] Massachusetts also provides several tables showing laws restricting rate-of-fire enhancing devices, silencers, certain types of ammunition and shells, and certain firearms, and certain types of destructive devices. *See* Mass.Br.33–53. This is nothing but window dressing without the proper historical analogues and temporal analysis. *See Bruen*, 142 S. Ct. at 2131–33. Thus, the laws Massachusetts cites provide no insight into the original public meaning of the Second Amendment in 1791 or 1868.

can rightly bear." *Bruen*, 142 S. Ct. at 2136. So while a regular course of conduct *can* sometimes "liquidate and settle the meaning of disputed or indeterminate terms and phrases in the Constitution," *id.* (cleaned up), "postratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," *id.* at 2137 (quoting *Heller*, 670 F.3d at 1274 n.6 (Kavanaugh, J., dissenting)); *see also* William Baude, *Constitutional Liquidation*, 71 Stan. L. Rev. 1, 13–14 (2019) (liquidation requires indeterminacy because "[i]f first-order interpretive principles make the meaning clear in a given context, there is no need to resort to liquidation"). In other words, Massachusetts fails to show that the isolated restrictions it identifies reflect "the original public meaning of the Second Amendment." *Duncan*, 83 F.4th at 819.

## CONCLUSION

The district court properly concluded that California's law unconstitutionally restricts the fundamental right to keep and bear common firearm magazines typically possessed for lawful purposes. As prior panels of this Court have done on several occasions (prior to being vacated en banc), this Court should follow the Supreme Court's mandate from

*Heller*, *McDonald*, and *Bruen* by affirming the district court based on the text, history, and tradition associated with the Second Amendment and magazines with a capacity over 10 rounds.

DATED this 28th day of December, 2023.

AUSTIN KNUDSEN
  *Montana Attorney General*

CHRISTIAN B. CORRIGAN
  *Solicitor General*

*/s/Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.
  *Deputy Solicitor General*
Montana Department of Justice
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406) 444-2026
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Attorneys for Amicus State of Montana*

RAÚL R. LABRADOR
  *Idaho Attorney General*

*/s/Joshua N. Turner*
JOSHUA N. TURNER
  *Acting Solicitor General*
Office of the Idaho Attorney General
700 W. Jefferson St.
Suite 210
Boise, ID 83720
(208) 334-2400
josh.turner@ag.idaho.gov

*Attorneys for the State of Idaho*

21

## ADDITIONAL COUNSEL

STEVE MARSHALL
*Attorney General of
Alabama*

TREG TAYLOR
*Attorney General of
Alaska*

TIM GRIFFIN
*Attorney General of
Arkansas*

ASHLEY MOODY
*Attorney General of
Florida*

CHRISTOPHER M. CARR
*Attorney General of
Georgia*

THEODORE E. ROKITA
*Attorney General of
Indiana*

BRENNA BIRD
*Attorney General of
Iowa*

KRIS KOBACH
*Attorney General of
Kansas*

DANIEL CAMERON
*Attorney General of
Kentucky*

JEFF LANDRY
*Attorney General of
Louisiana*

LYNN FITCH
*Attorney General of
Mississippi*

ANDREW BAILEY
*Attorney General of
Missouri*

MICHAEL T. HILGERS
*Attorney General of
Nebraska*

JOHN M. FORMELLA
*Attorney General of
New Hampshire*

DREW H. WRIGLEY
*Attorney General of
North Dakota*

DAVE YOST
*Attorney General of
Ohio*

GENTNER F. DRUMMOND
*Attorney General of
Oklahoma*

ALAN WILSON
*Attorney General of
South Carolina*

MARTY J. JACKLEY
*Attorney General of*
*South Dakota*

JASON MIYARES
*Attorney General of*
*Virginia*

BRIDGET HILL
*Attorney General of*
*Wyoming*

KEN PAXTON
*Attorney General of*
*Texas*

PATRICK MORRISEY
*Attorney General of*
*West Virginia*

23

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, Peter M. Torstensen, Jr., an employee in the Office of the Attorney General of the Montana, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 4,012 words, excluding the parts of the document exempted by Rule 32(f), and complies with the typeface requirements and length limits of Rules 29 and 32(a)(5)–(7), and Circuit Rule 29-2(c)(3).

/s/ *Peter M. Torstensen, Jr.*
PETER M. TORSTENSEN, JR.