No. 23-55805

In the
United States Court of Appeals for the Ninth Circuit
_____

VIRGINIA DUNCAN, ET AL.,
*Plaintiffs-Appellees*,
v.
ROB BONTA, in his official capacity as
Attorney General of the State of California,
*Defendant-Appellant*.
_____

On Appeal from the
United States District Court for
the Southern District of California
_____

Brief *Amicus Curiae* of Gun Owners of America, Inc., Gun Owners
Foundation, Gun Owners of California, Inc., Heller Foundation, Virginia
Citizens Defense League, Tennessee Firearms Association, America's
Future, Inc., U.S. Constitutional Rights Legal Defense Fund,
and Conservative Legal Defense and Education Fund
in Support of Plaintiffs-Appellees and Affirmance
_____

JOHN I. HARRIS III
  SCHULMAN, LEROY & BENNETT, P.C.
  3310 West End Avenue
  Suite 460
  Nashville, TN 37203

JEREMIAH L. MORGAN*
WILLIAM J. OLSON
ROBERT J. OLSON
  WILLIAM J. OLSON, P.C.
  370 Maple Avenue W., Suite 4
  Vienna, VA 22180-5615
  (703) 356-5070
  *Attorneys for Amici Curiae*

December 28, 2023
*Attorney of Record

## DISCLOSURE STATEMENT

The *amici curiae* herein, Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., Heller Foundation, Virginia Citizens Defense League, Tennessee Firearms Association, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund, through their undersigned counsel, submit this Disclosure Statement pursuant to Federal Rules of Appellate Procedure 26.1 and 29(a)(4)(A). These *amici curiae* are non-stock, nonprofit corporations, none of which has any parent company, and no person or entity owns them or any part of them.

*s/Jeremiah L. Morgan*
Jeremiah L. Morgan

i

# TABLE OF CONTENTS

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

I. THE CASE IS NOT PROPERLY BEFORE THE EN BANC PANEL . . . . . . . . 5

    A.    This En Banc Panel Lacks Statutory Authority to Consider this Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    B.    This Court's Disregard for the Second Amendment May Have Contributed to Unusual Procedural Decisions . . . . . . . . . . . . 10

II. CALIFORNIA'S HOSTILITY TO FIREARMS NOW EXTENDS TO THE SUPREME COURT, THE *HELLER* AND *BRUEN* DECISIONS, AND ANY CIRCUIT COURT WHICH FAITHFULLY APPLIES THOSE DECISIONS . . . . . 12

    A.    California Has Demonstrated Hostility to the Supreme Court and *Bruen* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    B.    *Bruen* Reset the Compass . . . . . . . . . . . . . . . . . . . . . . . 15

    C.    California Invites this Court to Take a Narrow View of Self-Defense . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III. HIGH-CAPACITY MAGAZINES ARE PROTECTED BY THE PLAIN TEXT OF THE SECOND AMENDMENT, AND CALIFORNIA FAILED TO PROVIDE RELEVANT HISTORICAL ANALOGUES . . . . . . . . . . . . . . . . 22

A.    California Seeks to Twist the *Bruen* "Plain Text" Test, as It
      Previously Did with the *Heller* Test . . . . . . . . . . . . . . . . . . 24

B.    California Failed to Provide Relevant Historical Analogues for
      Its High-Capacity Magazine Ban . . . . . . . . . . . . . . . . . . . . 29

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

# TABLE OF AUTHORITIES

Page

**UNITED STATES CONSTITUTION**

Article V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15
Amendment II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, *passim*

**STATUTES**

18 U.S.C. § 922 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
28 U.S.C. § 46 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 9
California Penal Code § 16740 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
California Penal Code § 32310 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**CASES**

*Ass'n of N.J. Rifle & Pistol Clubs v. AG N.J.*, 910 F.3d 106
    (3d Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
*Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019). . . . . . . . . . . . 28
*Beers v. AG United States*, 927 F.3d 150 (3d Cir. 2019) . . . . . . . . . . . . . 16
*Caetano v. Massachusetts*, 577 U.S. 411 (2016) . . . . . . . . . . . . . . . . . . 27
*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . 2, *passim*
*Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) . . . . . . . 28
*Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) . . . . . . . . . . . . 30
*Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011) . . . . . . . . 28
*Jackson v. City & County of San Francisco*, 746 F.3d 953
    (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29
*Mai v. United States*, 974 F.3d 1082 (9th Cir. 2020) . . . . . . . . . . . . . . . 12
*Maloney v. Singas*, 351 F. Supp. 3d 222 (S.D.N.Y. 2018) . . . . . . . . . . . . 28
*McDonald v. City of Chicago*, 561 U.S. 742 (2010) . . . . . . . . . . . . . . 3, 16
*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111
    (2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*
*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242
    (2d Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
*NRA, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
    2012 U.S. App. LEXIS 26949 (5th Cir. 2012) . . . . . . . . . . . . . . . . 16
*People v. Webb*, 131 N.E.3d 93 (Ill. 2019) . . . . . . . . . . . . . . . . . . . . . 28
*Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022) . . . . . . . . . . . . . 27

iv

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002) . . . . . . . . . . . . . . . . . 18

*State v. DeCiccio*, 105 A.3d 165 (Conn. 2014) . . . . . . . . . . . . . . . . 28

*State v. Delgado*, 692 P.2d 610 (Or. 1984) . . . . . . . . . . . . . . . . . . . . . 28

*State v. Herrmann*, 873 N.W.2d 257 (Wis. Ct. App. 2015) . . . . . . . . . . . 28

*Teter v. Lopez*, 76 F.4th 938 (2023) . . . . . . . . . . . . . . . . . . . 23, 24, 28

*United States v. Chapman,* 666 F.3d 220 (4th Cir. 2012) . . . . . . . . . . . . . 23

*United States v. Chovan*, 735 F.3d 1127 (2013) . . . . . . . . . . . . . . . 3, *passim*

*United States v. Hudspeth*, 42 F.3d 1013 (7th Cir. 1994) . . . . . . . . . . . . . 7

*United States v. Miller*, 307 U.S. 174 (1939). . . . . . . . . . . . . . . . . . 26, 27

*Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019). . . . . . . . . . . . . . . . . . 28

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) . . . . . . . . . . . . . . . . . . 16

## MISCELLANEOUS

Brief for the States of California, *et al.*, *New York State Rifle & Pistol
     Assn. v. Bruen*, No. 20-843 (Sept. 21, 2021). . . . . . . . . . . . . . . . . . 14

J. Campbell, "California governor signs gun control measures into law,
     including nation's first state tax on firearms and ammunition,"
     *CNN* (Sept. 27, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Sources of Our Liberties (R. Perry and J. Cooper, eds.,
     Am. Bar Fdn., Rev. ed. 1978). . . . . . . . . . . . . . . . . . . . . . . 19, 20

D. Walters, "Gavin Newsom channels Jerry Brown with constitutional
     amendment proposal," *Cal Matters* (Aug. 21, 2023) . . . . . . . . . . . . 14

## INTEREST OF *AMICI CURIAE*[1]

Gun Owners of America, Inc., Gun Owners Foundation, Gun Owners of California, Inc., Heller Foundation, Virginia Citizens Defense League, Tennessee Firearms Association, America's Future, Inc., U.S. Constitutional Rights Legal Defense Fund, and Conservative Legal Defense and Education Fund are nonprofit organizations, exempt from federal taxation under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code. Each is dedicated, *inter alia*, to the correct construction, interpretation, and application of law.

Most of these *amici* have filed four other *amicus* briefs in this case:

- *Duncan v. Becerra*, Brief *Amicus Curiae* of Gun Owners of America, *et al.* (September 23, 2019) (Ninth Circuit, No. 19-55376);

- *Duncan v. Bonta*, Brief *Amicus Curiae* of Gun Owners of America, *et al.* (May 21, 2021) (Ninth Circuit en banc, No. 19-55376);

- *Duncan v. Bonta*, Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.* (April 1, 2022) (U.S. Supreme Court, No. 21-1194); and

- *Duncan v. Bonta*, Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.* (August 23, 2022) (Ninth Circuit on remand, No. 19-55376).

---

[1] All parties have consented to the filing of this brief *amicus curiae*. No party's counsel authored the brief in whole or in part. No party or party's counsel contributed money that was intended to fund preparing or submitting the brief. No person other than these *amici curiae*, their members or their counsel contributed money that was intended to fund preparing or submitting this brief.

## STATEMENT OF THE CASE

This appeal represents yet another chapter in the ongoing battle between the State of California in its efforts to restrict firearms and those seeking to exercise their Second Amendment rights.

In 2000, California prohibited the manufacture, importation, sale, and transfer of so-called large-capacity magazines, which it defines as "any ammunition feeding device with the capacity to accept more than 10 rounds." California Penal Code § 16740. Then, in July 2016, the California legislature banned the possession of large-capacity magazines, and in November 2016, California voters approved Proposition 63, with the same effect.

Plaintiffs-Appellees filed suit and a motion for a preliminary injunction, and two days before the ban was to become effective on July 1, 2017, the district court issued a preliminary injunction pending a full hearing on the merits. On March 29, 2019, the district court granted Plaintiffs' motion for summary judgment.

The district court reached its conclusion by applying two tests. First, it applied the test used in *District of Columbia v. Heller*, 554 U.S. 570 (2008), which asks whether the banned arms are "'in common use' 'for lawful purposes

2

like self-defense.'" *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1142 (S.D. Cal. 2019). Second, the district court applied the Ninth Circuit's two-step test adopted in *United States v. Chovan*, 735 F.3d 1127 (2013), which the district court described as "a tripartite binary test with a sliding scale and a reasonable fit." *Duncan v. Becerra* at 1155.

On the first appeal (No. 19-55376), some of these *amici* filed an *amicus brief* urging the panel that the two-step test was "one step too many," a phrase later used by Justice Clarence Thomas in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2127 (2022). *Amici* urged the panel to apply the simple *Heller* test without interest balancing. Instead, a three-judge panel of this Court applied the *Chovan* two-step balancing test, but found that the high-capacity magazine ban failed even that test. *See Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020).

The Ninth Circuit quickly granted rehearing en banc, vacating the panel's opinion. Some of these *amici* filed another *amicus brief* urging the en banc court to reject the atextual two-step test as wholly incompatible with the Second Amendment and with the Supreme Court's decisions in *Heller* and *McDonald v. City of Chicago*, 561 U.S. 742 (2010). This time, the en banc panel applied the

two-step test and upheld the large-capacity magazine ban. *Duncan v. Bonta*, 19 F.4th 1087 (9th Cir. 2021).

Plaintiffs-Appellees filed a petition for writ of certiorari with the Supreme Court, which *amici* supported with a third *amicus* brief. *Amici* urged the Court to grant review to overturn the atextual, judge-empowering interest-balancing two-step test. Following its decision in *Bruen* on June 23, 2022, the Supreme Court granted the petition, vacated this Court's decision, and remanded to this Court. *See Duncan v. Bonta*, 142 S. Ct. 2895 (2022).

On remand from the Supreme Court, this Court requested supplemental briefing in No. 19-55376 about "the effect of *Bruen* on this appeal, including whether the en banc panel should remand this case to the district court for further proceedings in the first instance." *Amici* filed a fourth supplemental *amicus* brief, urging this Court to render a decision based on the *Bruen* analysis. The district court had already rendered a decision using the simple *Heller* test, which was consistent with *Bruen*, and the facts were not in dispute. Nevertheless, this Court remanded the case to the district court, with Judges Bumatay and VanDyke dissenting. *See Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022). That remand

order "constitute[d] the mandate of this court," thus terminating Docket No. 19-55376.

On remand, the district court again faithfully applied the *Bruen* analysis and reached the same conclusion it had when it previously applied the simple *Heller* test, finding that the large-capacity magazine ban was unconstitutional. *See Duncan v. Bonta*, 2023 U.S. Dist. LEXIS 169577 (S.D. Cal. 2023) ("*Duncan*"). This Court then reconvened an en banc panel and issued a stay of the district court's decision. *See Duncan v. Bonta*, 83 F.4th 803 (9th Cir. 2023).

## ARGUMENT

### I. THE CASE IS NOT PROPERLY BEFORE THE EN BANC PANEL.

#### A. This En Banc Panel Lacks Statutory Authority to Consider this Appeal.

In addition to the issues on appeal, this Court's October 11, 2023 order, Dkt.12, directed the parties to address:

> whether the en banc panel that heard and determined appeal No. 19-55376 has statutory authority under 28 U.S.C. § 46(c) to decide this appeal, including: (1) when a case or controversy in the courts of appeals may be heard and determined, or reheard and determined, by the en banc court rather than by a three-judge panel; and (2) when senior judges may participate in an en banc decision. [*Id.* at 1.]

5

Appellant addressed this threshold issue at the end of his brief, arguing that the en banc panel has authority to hear the appeal, (i) focusing his analysis on this Court's General Orders, while (ii) confusing 28 U.S.C. § 46(c)'s rule for en banc determinations with Supreme Court decisions allowing for administrative flexibility in the operation of that rule. *See* Appellant's Opening Brief ("Appellant's Br.") at 55-58.

For the reasons that follow, as well as for the reasons set forth in the Response Brief for Appellees ("Appellees' Br.") (at 13-20), these *amici* believe that this en banc panel was not properly convened and that the senior judges serving on it lack statutory authority to participate in this proceeding.

Assignment of circuit court judges is governed by 28 U.S.C. § 46(c), which specifies that, initially, "[c]ases and controversies shall be heard and determined by a court or panel of **not more than three judges**." (Emphasis added.) An exception to this rule is provided when "hearing or rehearing before the court in banc is ordered by a **majority** of the circuit judges of the circuit who are **in regular active service**." *Id.* (emphasis added). The Seventh Circuit has persuasively asserted that, although Congress and the Supreme Court provide the circuits with flexibility in the administration of § 46(c), "the Supreme Court in

6

the *Moody* case declined to give the statute a liberal reading that would have allowed a circuit to permit its senior judges to vote, in cases in which they had participated in the panel decision, on whether to grant rehearing en banc," and such a rule also would be applicable in the determination to hear a case initially en banc. *United States v. Hudspeth*, 42 F.3d 1013, 1015 (7th Cir. 1994).

The prior en banc panel in No. 19-55376 had the option to consider the case following the Supreme Court's remand in light of *Bruen*. Indeed, these *amici* encouraged this Court not to remand the case to the district court, but to decide the appeal applying the *Bruen* analysis.[2] But it did not, instead remanding the case to the district court and issuing a mandate, thus terminating the appeal known as No. 19-55376 and adjourning that en banc panel.

Nevertheless, this Court, in its September 28, 2023 order, citing this Court's General Order, stated, "The en banc panel has elected to accept this case as a comeback." Dkt.3 at 1. That decision was error, as now before the Court is a new appeal, with a new docket number, from a new decision of the district court. Although Title 28 and the Federal Rules of Appellate Procedure provide the circuits with flexibility in the assignment of judges to three-judge panels,

---

[2] *See* Brief *Amicus Curiae* of Gun Owners of America, *et al*. (Aug. 23, 2022) in No. 19-55376.

7

including the option to assign the same three judges to "comeback" appeals, § 46(c) requires that the decision to consider this **new appeal** en banc requires a new vote of the **active judges** of this Court.

It was error to have the en banc panel of the **prior** appeal (No. 19-55376) vote to determine whether the **new** appeal (No. 23-55805) should be heard initially en banc. As Appellees explain, out of the 29 active judges on this Court, only two voted for initial hearing en banc,[3] "four dissented from that determination, and the other 23 were disenfranchised" by the procedure utilized. Appellees' Br. at 17. To top it off, **five senior** judges voted for initial hearing en banc **while 23 active** judges were not permitted to vote.

As to the second question raised by the briefing order, although § 46(c) does not allow senior judges to vote to decide whether a case or controversy will be considered by the court en banc, it does allow senior judges to sit on an en banc panel in two situations. The first is if a senior judge was on the three-judge panel that initially heard the case and that panel's decision is under review. *See*

---

[3] One of the two voting for initial hearing en banc was not even on the No. 19-55376 en banc panel, as she was drawn to replace one of the members of the en banc panel who resigned earlier this year. *See* Dkt.3 n.1.

§ 46(c)(1).  The second is where a judge takes senior status during the court's en banc consideration of a case.  *See* § 46(c)(2).[4]

The senior members of this Court are not permitted by § 46(c) to sit on the en banc panel of this case.  The only two situations allowed for senior judges to sit on an en banc court are not applicable here.  First, the en banc court is not "reviewing a decision of a panel of which such judge was a member."  The prior panel was in a different, now-terminated appeal (No. 19-55376), and the decision being reviewed now is a new district court decision.  Second, none of the senior judges on this new en banc panel have taken senior status during the pendency of the current en banc consideration, all having taken senior status prior to the initiation of the present appeal.

Thus, under a straightforward application of 28 U.S.C. § 46(c), en banc consideration of this appeal was not properly decided by this Court, and five senior judges are improperly sitting on this en banc panel.

---

[4]  Congress amended § 46(c) to allow for this second option to avoid judges being removed from an en banc court as soon as they took senior status after briefing and argument but before the en banc decision.

**B.     This Court's Disregard for the Second Amendment May Have Contributed to Unusual Procedural Decisions.**

Dissenting from the order accepting a new appeal to a prior en banc panel as a comeback case, Judge VanDyke recognized what has been obvious to anyone following the Ninth Circuit's Second Amendment jurisprudence. Judge VanDyke compared this Circuit's handling of firearms cases to the "abortion distortion" that has arisen in the judiciary around cases involving abortion laws — or anything adjacent to it. *See* Dkt.3, VanDyke dissent at 1-2. "The story of the Second Amendment in this circuit has been a consistent tale of our court versus the Supreme Court and the Constitution." *Id*. at 5.

Indeed, this Court's view of Second Amendment rights was evidenced by its adoption of the *Bruen*-repudiated two-step test in 2013, which allowed federal judges to interest balance constitutionally protected rights out of existence. In *Chovan*, the Court considered a Second Amendment challenge to 18 U.S.C. § 922(g)(9), prohibiting firearm possession by those convicted of misdemeanor crimes of domestic violence ("MCDV"). The *Chovan* panel did not conduct any analysis of the propriety of the two-step interest balancing test or consider other approaches before simply adopting "the two-step Second Amendment inquiry undertaken by the Third Circuit in *Marzzarella* … and the Fourth Circuit in

10

*Chester*." *Id.* at 1136. Its adoption was questioned at the time, however. Judge Bea noted the majority treated the framework issue as not so much decided but "waived" — "accept[ing] the application of the tiers of scrutiny," but pointing out competing frameworks for Second Amendment analysis, such as by then-Judge Kavanaugh ("'text, history, and tradition'") and commentators who note that interest balancing tests "'don't make sense here' in the Second Amendment context because the language of *Heller* seems to foreclose scrutiny analysis." *Id.* at 1143 (Bea, J., concurring).

Applying the two-step test, *Chovan* concluded that the right of a person convicted of a MCDV to have a firearm "'is not within the core right identified in *Heller* — the right of a *law-abiding, responsible* citizen to possess and carry a weapon for self-defense....'" *Id.* at 1138. Nevertheless, the Court concluded that "[t]he burden ... is quite substantial," because it "amounts to a 'total prohibition'" of his right to keep and bear arms. *Id.* Applying intermediate scrutiny to this non-core-but-severe-burden statute, the Court recited the "important ... government interest of preventing domestic gun violence," and concluded that prohibiting those convicted of a MCDV from having firearms furthers that interest. *Id.* at 1139-1141.

11

From *Chovan* onward, using the two-step test, the Ninth Circuit upheld nearly every firearm restriction that came before it. As Judge VanDyke previously explained:

> To the rational observer, it is apparent that our court just doesn't like the Second Amendment very much. We always uphold restrictions on the Second Amendment right to keep and bear arms. Show me a burden — any burden — on Second Amendment rights, and this court will find a way to uphold it. Even when our panels have struck down laws that violate the Second Amendment, our court rushes in en banc to reverse course…. There exists on our court a clear bias — a real prejudice — against the Second Amendment and those appealing to it. That's wrong. [*Mai v. United States*, 974 F.3d 1082, 1104-05 (9th Cir. 2020) (VanDyke, J., dissenting).]

The present case presents this Court with the opportunity to reset and to decide to follow Supreme Court guidance. However, the refusal of this Court to follow normal procedures in handling this appeal raises concerns as to its willingness to follow the *Bruen* decision.

## II. CALIFORNIA'S HOSTILITY TO FIREARMS NOW EXTENDS TO THE SUPREME COURT, THE *HELLER* AND *BRUEN* DECISIONS, AND ANY CIRCUIT COURT WHICH FAITHFULLY APPLIES THOSE DECISIONS.

The district court's opinion was issued in response to this Court's direction to address how the *Bruen* decision should be applied to evaluate Plaintiffs-Appellees' challenge to the California ban on high-capacity magazines in Cal.

12

Penal Code § 32310. *Duncan v. Bonta*, 49 F.4th 1228 (9th Cir. 2022) (en banc). Both the analysis employed by the district court and the result obtained were fully consistent with *Bruen*'s directives. Nevertheless, California challenges the district court opinion at every turn. On closer examination, it becomes apparent that California's objections are not based on any alleged misapplication of *Bruen*, but rather exist because the district court faithfully followed *Bruen*.

### A. California Has Demonstrated Hostility to the Supreme Court and *Bruen*.

The California government is led by officials who have demonstrated hostility not just to the "right to keep and bear arms," but also to the *Bruen* decision. When *Bruen* was before the Supreme Court on the merits, California joined other states in filing an *amicus* brief urging virtually unlimited latitude for states to restrict gun rights, in stark opposition to the approach eventually taken by the *Bruen* Court.[5] Since the *Bruen* decision was issued, California Governor Gavin Newsom has roundly criticized it, the Supreme Court generally, and those circuit courts that have followed it:

---

[5] *See* Brief for the States of California … as *Amici Curiae*, in Support of Respondents in *New York State Rifle & Pistol Assn. v. Bruen*, No. 20-843 (Sept. 21, 2021) ("[T]here is 'no general right to carry arms into the public square for self-defense….'" *Id*. at 3. "Intermediate Scrutiny Is the Proper Form of Means-Ends Analysis for Public Carry Regulations." *Id*. at 23.)

Newsom slammed last year's landmark US Supreme Court decision expanding gun rights and criticized lower circuit courts that have since overturned gun control measures.[6]

"This Supreme Court is that bad…. The Bruen decision was that bad. When I say code red, this is code red. California's led the nation on common sense gun safety laws."[7]

In fact, Governor Newsom has become so agitated by *Bruen* that he has called upon legislatures of three-quarters of the states to undo that decision by calling for an Article V Constitutional Convention to adopt his Proposed 28th Amendment, *inter alia*, which would limit gun rights. The full contours of the proposed amendment have not yet been identified, but they include a prohibition on the sale, loan, or transfer of so-called "assault weapons" and other pejoratively labeled "weapons of war" to private civilians, and since so-called "high-capacity"[8] magazines transform ordinary semiautomatic rifles into "assault

---

[6] J. Campbell, "California governor signs gun control measures into law, including nation's first state tax on firearms and ammunition," *CNN* (Sept. 27, 2023).

[7] D. Walters, "Gavin Newsom channels Jerry Brown with constitutional amendment proposal," *Cal Matters* (Aug. 21, 2023).

[8] For the last two decades, most gun owners would consider a magazine that can hold 20, 30, or more rounds as a "standard capacity" magazine. Nevertheless, California considers a magazine that can contain more than 10 rounds a "high-capacity" magazine. That is the same limit applied in the short-lived federal ban on magazines — the "Federal Assault Weapons Ban of 1994" which expired in 2004.

weapons" under California law, they could be banned under such an amendment.[9]  By leading an effort to enact a constitutional amendment to enable California to ban high-capacity magazines, Governor Newsom can be seen to have implicitly recognized that California's current ban violates the Second Amendment.  Of course, not wanting to wait for the Article V constitutional amendment process to play out, it is no surprise that California's Opening Brief now asks this Court to find a way to evade *Bruen* according to a playbook it has used in the past — by twisting the Supreme Court's guidance in a manner that undermines its decisions — an invitation that this Court should reject.

**B.    *Bruen* Reset the Compass.**

The *Heller* decision restored life to a pre-existing, constitutionally enumerated individual right that the State of California does not trust its citizens to exercise.  In the aftermath of *Heller*, it appeared that most federal judges across the country also believed it too dangerous to entrust Americans with a right to "keep and bear arms" without a bevy of government restrictions.  Should this Circuit again find novel ways to narrow the *Bruen* holding, it would repeat the mistake in evading the 2008 *Heller* decision (as applied to the federal

---

[9]  *See* California Senate Joint Resolution 7 (passed Sept. 21, 2023).

15

government) and the 2010 *McDonald* decision (as applied to the states) until the corrective *Bruen* decision in 2022.  During this period, courts of appeals invented the "two-step test," which was little more than a cleaned up version of the balancing test urged in dissent by Justice Breyer, but soundly rejected in the majority opinion in *Heller*.  *See Heller* at 634-35.

As discussed, this Circuit adopted the now-abrogated two-step framework to review Second Amendment challenges in *Chovan* at 1136-37.  On step one, this and other circuit courts frequently found that a law restricting firearms did not actually "burden conduct protected by the Second Amendment."[10]  And, often, circuit courts merely "assumed" there was a burden, only to deny rights based on some invented level of scrutiny (employing interest balancing as Justice Breyer urged in his dissent in *Heller*) in step two.  Although the "two-step" test gave the appearance of a legitimate judicial test, in reality it undermined the protection that the Second Amendment was designed to provide.

*Bruen* reset the compass.  The rejected two-step test's subjective and vague "**burden conduct protected by**" test does not appear in *Bruen*, which instead

---

[10]  *See, e.g.*, *Beers v. AG United States*, 927 F.3d 150, 152 (3d Cir. 2019); *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021); *NRA, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 2012 U.S. App. LEXIS 26949 (5th Cir. 2012).

16

requires only that the challenged restriction is envisioned by the "**plain text**" of the Amendment. How *Bruen* applied its "plain text" threshold issue with respect to bearing firearms outside the home illustrates how it should be applied here to so-called "high-capacity magazines."

> We therefore turn to whether the **plain text** of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense…. The Second Amendment's **plain text** thus presumptively guarantees petitioners Koch and Nash a right to "bear" arms in public for self-defense. [*Bruen* at 2134-35 (emphasis added).]

Seeing how *Bruen* handled the issue of "bearing" firearms demonstrates what an examination of the "plain text" means. In the post-*Bruen* period, we again are at risk that courts of appeals, often comprised of judges with no sympathy for that decision, are tempted by litigants like California to find new ways to evade another Second Amendment Supreme Court decision. There is no doubt that many judges love interest-balancing tests, as such tests empower them to issue decisions based on their personal preferences under the guise of objective analysis. Nonetheless, these *amici* urge this Court to accept Justice Scalia's admonition that the Second Amendment is "the very *product* of an interest balancing by the people — which Justice Breyer would now conduct for them

17

anew," and thus is not "subject to future judges' assessments of its usefulness."
*Heller* at 634-35.

The *Heller* Court forbade allowing federal judges to balance
(i) governmental claims of power to protect public safety against (ii) the
individual right to "keep and bear" arms, since the result would be that there
would be "no constitutional guarantee at all." *Id.* Previously, California asked
this Court to twist the *Heller* test to justify many infringements on gun rights,
requiring it to be corrected by the Supreme Court in *Bruen*. Now, as detailed
below, California is asking this Court to twist the *Bruen* test to justify ongoing
infringements on gun rights. This Court should not have followed California's
lead before and certainly should not do so now.

### C. California Invites this Court to Take a Narrow View of Self-Defense.

California takes a very narrow view of the type of self-defense which the
Second Amendment protects. Before *Heller*, California did not believe the
Second Amendment even protected the right of an individual to possess a
handgun in the home.[11] And even then, the self-defense right protected by the

---

[11] Before *Heller*, California apparently took the "collective rights"
position that the Second Amendment only authorized arming a state militia, and
did not establish any individual right whatsoever. *See Silveira v. Lockyer*, 312

Second Amendment is much more robust than resisting a lone intruder, and more than 10 rounds could be required. *See Duncan* at *5, n.25. It also includes the right of Americans to serve in a militia to defend our government against terrorism or other external threat, and also to resist our government, should it someday become tyrannical, to preserve a "free state." *See Heller* at 597-98.

In the Declaration of Independence, America's founders viewed armed resistance to tyranny as not only a "right," but also a "duty." Having experienced the loss of their rights as Englishmen, the American people were not so sanguine to think that the new governments they were creating could not, themselves, devolve into despotism. Thus, the people of Virginia reaffirmed in their 1776 state constitution "that … a majority of the community hath an indubitable, inalienable, and indefeasible right to reform, alter, or abolish" the very government created by such constitution "in such manner as shall be judged most conducive to the public weal." Sources of Our Liberties (R. Perry and J. Cooper, eds., Am. Bar Fdn., Rev. ed. 1978) at 311. *See also* 1776 Pennsylvania Constitution, Sources, p. 329. To that end, the Virginia Constitution guaranteed "a well-regulated militia, composed of the body of the

---

F.3d 1052 (9th Cir. 2002) (cert. denied).

19

people, trained to arms, [as] the proper, natural, and safe defence of a free State…." 1776 Virginia Constitution, Section 13, <u>Sources</u> at 312. To the same end, the Pennsylvania Constitution guaranteed to "the people [the] right to bear arms for the defence of themselves and the state…." 1776 Pennsylvania Constitution, Section XIII, <u>Sources</u> at 330. Self-defense against external threats or government requires robust weapons, sometimes more than those needed for self-defense against a single criminal.

In fact, read in light of *Heller* and *Bruen*, and in stark contrast to California's position, if a bearable arm is useful in militia service, this only **strengthens** the Second Amendment's protection of the firearm under a proper historical analysis. Defense of one's fellow citizens against tyrannical governments and hostile foreign forces was a quintessentially lawful purpose. As *Heller* noted, King George III had attempted to disarm the Americans in order to ensure superiority of firepower to the British:

> [W]hat the Stuarts had tried to do to their political enemies, George III had tried to do to the colonists. In the tumultuous decades of the 1760's and 1770's, the Crown began to disarm the inhabitants of the most rebellious areas. That provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms. [*Heller* at 594.]

20

Effectuating the lawful purpose of defense against tyrannical government and foreign attackers requires parity of firepower with opposing forces. *Heller* makes this clear. The military nature of a bearable arm not only fails to take the weapon outside the ambit of the Second Amendment, but was also in fact one of the intended purposes for which the Amendment was enshrined. There are many reasons why the militia was thought to be "necessary to the security of a free State" including that, "when the able-bodied men of a nation are trained in arms and organized, they are better able to resist tyranny." *Heller* at 598. California's idea that government may prohibit weapons with any military capability — because of that capability — is at direct odds with the purpose and intent of the Second Amendment. As Justice Story noted in his Commentaries:

> The right of the citizens to keep and bear arms has justly been considered as **the palladium of the liberties** of a republic, since it offers a strong moral check against the usurpation and **arbitrary power of rulers**, and will generally, even if these are successful in the first instance, enable the people to **resist and triumph** over them. [Cited in *Heller* at 667-668 (emphasis added).]

California automatically assigns an "offensive" character to military weapons.[12] But in stark contrast with California's position, to the Framers as

---

[12] *See, e.g.*, Appellant's Br. at 2 ("their objective characteristics make them suitable for offensive and military uses rather than ordinary self-defense"); at 27-28 ("Large capacity magazines are thus 'indicative of military firearms'

21

they drafted the Second Amendment, such military applications were defensive, not "offensive." "'In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.'" *Heller* at 624-25.

To the degree that a bearable arm has a military application, as California seeks to demonstrate, that only makes it **more useful** for "militia" service, and therefore, even **more** "necessary to the security of a free State...." The military nature of a weapon does not disqualify its constitutional protections — it enhances them. California claims that "the objective characteristics" of high-capacity magazines makes them military in nature, but because they are more related to the militia clause, thus they are more essential if we are to live in a free country.

## III. HIGH-CAPACITY MAGAZINES ARE PROTECTED BY THE PLAIN TEXT OF THE SECOND AMENDMENT, AND CALIFORNIA FAILED TO PROVIDE RELEVANT HISTORICAL ANALOGUES.

In *Bruen*, the U.S. Supreme Court set out the test to be used by reviewing courts:

---

[and] 'are unquestionably most useful in military service'").

In keeping with *Heller*, we hold that when the Second Amendment's **plain text covers an individual's conduct**, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, **the government must demonstrate** that the regulation is **consistent with this Nation's historical tradition** of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." [*Bruen* at 2126 (emphasis added).]

Step one of the discredited two-step test allowed courts to deem that many firearm restrictions fell "outside the scope of the right as originally understood" and thereby circumvented the constitutional text. Courts skeptical of firearms often would make a threshold finding that an obvious restriction on gun rights did not even "implicate" the Second Amendment. Or, sometimes a court would casually "assume without determining" that the restriction implicated the text only to uphold the restriction using permissive interest balancing under step two.[13]

*Bruen* banished the two-step test once and for all. It confirmed the preeminence of the Constitution's unadorned, "plain text." As this Court recently explained in *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), in

---

[13] *See, e.g., United States v. Chapman,* 666 F.3d 220, 226 (4th Cir. 2012).

23

determining "'whether the plain text of the Second Amendment protects [the plaintiffs'] proposed course of conduct,'" the *Bruen* Court "analyzed only the 'Second Amendment's text,' applying ordinary interpretive principles." *Id*. at 948. Then, it put the burden on the government to show relevant historical analogues of similar restrictions. Here, California's efforts to evade the "plain text" threshold issue should be rejected, and its attempt to demonstrate a pattern of similar restrictions by use of a "nuanced" approach fares no better.

> A.   **California Seeks to Twist the *Bruen* "Plain Text" Test, as It Previously Did with the *Heller* Test.**

Insofar as the California statute criminalizes possession of high-capacity magazines "commonly used" in most states, one would have thought that California would have conceded that "the Second Amendment's **plain text** covers an individual's conduct" in possessing one of the banned magazines. *Bruen* at 2126 (emphasis added). That approach still would have allowed California to attempt to show "this Nation's historical tradition of firearm regulation." *Id*. Rather, California's opening brief denies that the "plain text" of the Second Amendment covers the issue by erroneously adding a "historical" component to what should have been a simple application of "ordinary interpretive principles." Actually, California goes well beyond that — it even

asserts that "As a matter of text and historical understanding, a magazine is not an 'Arm.'" Appellant's Br. at 17. California misstates the *Bruen* rule, as follows:

> The threshold question under the *Bruen* framework is whether plaintiffs have carried their burden to establish that "the Constitution presumptively protects" their proposed course of conduct. *Bruen*, 142 S. Ct. at 2130…. To answer that question, the Court addresses whether "the Second Amendment's **plain text** covers [the] conduct." [*Id*.] at 2129-2130. **That inquiry considers the conduct in light of "the normal and ordinary meaning of the Second Amendment" as well as its "historical background."** *Id*. at 2127 (internal quotation marks omitted). [Appellant's Br. at 16 (emphasis added).]

Although the words "historical background" which California quotes do appear in the *Bruen* decision, California misrepresents them as describing the initial inquiry of the *Bruen* test. Actually, Justice Thomas was describing how *Heller* reached its conclusion that "'the Second Amendment conferred an **individual right** to keep and bear arms.'" *Id*. (emphasis added). Justice Thomas was not discussing the test that courts should apply under *Bruen*'s textual threshold inquiry. Clearly, the "plain text" of the Second Amendment covers the California law, and thus presumptively protects that conduct. If California wants to defend its law and rebut the presumption that the Second Amendment protects so-called "large capacity" magazines, it has the burden to demonstrate relevant

25

historical analogues. California cannot evade that burden by shoehorning "historical background" into the "plain text" analysis, as it previously convinced this Court to do at step one of the two-step test.

After *Bruen*, any court that would conclude that the plain text does not cover a gun magazine would, in the words of Justices Alito and Thomas, "defy" the Supreme Court, for several reasons. Plaintiffs-Appellees' Brief demonstrates that a magazine is an integral component of an arm, and thus itself constitutes an "arm" protected by the Second Amendment. *See* Appellees' Br. at 21-24. Moreover, while *Heller* said that the Second Amendment presumptively applies to "all bearable arms," the Court did not say that the Second Amendment covers **only** bearable arms. Rather, the Court has explained that a proper understanding of "arms" also includes "ordinary military equipment," as demonstrated by the Court's reference to Founding-era statutes that required militia members to be armed not only with firearms but also other "proper accoutrements" such as "a good bayonet and iron ramrod ... a cartridge box ... a good knapsack and canteen," and a "Belt, a Pouch with a Box therein to contain not less than Twenty-four Cartridges ... a proper Quantity of Powder and Ball, two spare

Flints, a Blanket and Knapsack." *United States v. Miller*, 307 U.S. 174, 181-82 (1939).

The term "arms" thus covers not only literal firearms, but all accompanying objects, including magazines, optics, lights and lasers, body armor (*see Heller*, 554 U.S. at 581), holsters and pouches, and the list goes on. The Second Amendment, of course, also covers ammunition, which is not itself a literal "arm" in California's view. *See Jackson v. City & County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them"). As the district court properly concluded, "[n]either magazines, nor rounds of ammunition, nor triggers, nor barrels are specifically mentioned in the Second Amendment ... But without a right to keep and bear triggers, or barrels, or ammunition and the magazines that hold ammunition, the Second Amendment right would be meaningless." *Duncan v. Bonta* at *19. *See also Rigby v. Jennings*, 630 F. Supp. 3d 602, 615 (D. Del. 2022) (emphasis added) ("Defendant has not shown that these firearms **and components** are not commonly owned by law-abiding citizens for lawful purposes."); *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) (stun guns);

27

*Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023) (butterfly knives); *Maloney v. Singas*, 351 F. Supp. 3d 222 (S.D.N.Y. 2018) (nunchuks); *People v. Webb*, 131 N.E.3d 93 (Ill. 2019) (electric arms); *Avitabile v. Beach*, 368 F. Supp. 3d 404 (N.D.N.Y. 2019) (electric arms); *State v. Herrmann*, 873 N.W.2d 257 (Wis. Ct. App. 2015) (switchblades); *State v. DeCiccio*, 105 A.3d 165 (Conn. 2014) (batons and knives); *State v. Delgado*, 692 P.2d 610, 613-14 (Or. 1984) (switchblades).  It is clear that the Second Amendment applies to more than firearms.

In addition, many courts and judges have addressed the issue of high-capacity magazines and have determined that magazines receive the same Second Amendment protections as arms.  *See, e.g.*, *Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019); *Ass'n of N.J. Rifle & Pistol Clubs v. AG N.J.*, 910 F.3d 106, 116 (3d Cir. 2018); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 257, 260 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406, 415 (7th Cir. 2015) (Manion, J., dissenting); *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2011).  As the district court concluded, "[a]ll considered, the best reading of 'arms' includes magazines." *Duncan* at *41.

28

This Court has previously ruled that "without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson* at 967. Certainly, the feeding mechanism for ammunition (which is protected) into a firearm (which is protected) is also protected.

**B.    California Failed to Provide Relevant Historical Analogues for Its High-Capacity Magazine Ban.**

Since high-capacity magazines are presumptively protected by the Second Amendment, the only remaining issue is whether California has "demonstrate[d] that the regulation is **consistent with this Nation's historical tradition** of firearm regulation." *Bruen* at 2126 (emphasis added). There is no means-end scrutiny to be employed and no need or utility for recitations of the dangers and risks of firearms. There is no deference to the legislative branch whatsoever, because "while that judicial deference to legislative interest balancing is understandable — and, elsewhere, appropriate — it is not deference that the Constitution demands here. The Second Amendment 'is the very *product* of an interest balancing by the people....'" *Bruen* at 2131, citing *Heller* at 635.

29

A panel of this Court earlier concluded that "[t]he record shows that firearms capable of holding more than ten rounds of ammunition have been available in the United States for well over two centuries." *Duncan v. Becerra*, 970 F.3d at 1149. "In sum, laws restricting ammunition capacity emerged in 1927 and all but one have since been repealed." *Id*. at 1150-51 (citations omitted). Similarly, in *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), this Court reviewed the denial of a preliminary injunction in a challenge to a local ordinance banning magazines with a capacity over 10 rounds, concluding that the ordinance had no historical analogue, that governed magazines were "'**typically possessed by law-abiding citizens for lawful purposes**,'" and that such magazines were not "'**dangerous and unusual weapons**....'" *Id.* at 996-97 (emphasis added). Although *Bruen* abrogated the two-step analysis used in *Fyock*, *Bruen* did not require a change in that finding.

The Attorney General tries to make much out of *Bruen*'s dicta: "when the challenged regulation 'implicat[es] unprecedented societal concerns or dramatic technological changes,' that 'may require a more nuanced approach.'" Appellant's Br. at 32 (citing *Bruen* at 2132). The district court gave the Appellant plenty of opportunity to provide historical analogues to support the

high-capacity magazine ban. *See Duncan* at \*44. The "best historic analogue" that Appellant could provide to the district court was "a New York City gunpowder storage law following the worst city fire in Colonial America," but that had "nothing to do with gun violence. It was *a fire safety regulation*." *Id.* at \*70-71.

Colonial-era gunpowder (classified today as an "explosive"[14]) is unlike smokeless powder (an accelerant or "propellant"[15]) used in modern ammunition. Colonial-era gunpowder was volatile, hazardous, and often resulted in terrible accidents. In contrast, even large quantities of "modern ammunition" do not create such hazards.[16] Those laws had a different "why" (to prevent cataclysmic explosions) than the high-capacity magazine ban, and fail to establish a relevant historical tradition. If anything, these laws demonstrate the Founders knew how to regulate in this area, yet chose not to.

Instead, the district court found that Appellant "ignores Founding-era laws that present the best analogue" which is that there were many early militia laws

---

[14]  *See* https://www.atf.gov/explosives/black-powder.

[15]  *See* https://www.atf.gov/explosives/docs/newsletter/explosives-industry-newsletter-june-2013/download (modern gunpowder exempt from federal explosive requirements).

[16]  *See* https://www.youtube.com/watch?v=3SlOXowwC4c.

that required citizens to keep a **minimum** number of rounds of ammunition. *See id*. at *80. The district court correctly concluded that Appellant "did not succeed in justifying its sweeping ban and dispossession mandate with a relevantly similar historical analogue." *Id*. at *83.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be affirmed.

Respectfully submitted,

_/s/Jeremiah L. Morgan_

| | |
|---|---|
| JOHN I. HARRIS III | JEREMIAH L. MORGAN* |
| SCHULMAN, LEROY & BENNETT, P.C. | WILLIAM J. OLSON |
| 3310 West End Avenue | ROBERT J. OLSON |
| Suite 460 | WILLIAM J. OLSON, P.C. |
| Nashville, TN 37203 | 370 Maple Avenue W., Suite 4 |
| | Vienna, VA 22180-5615 |
| | (703) 356-5070 |
| | wjo@mindspring.com |
| | *Attorneys for Amici Curiae* |
| December 28, 2023 | *Attorney of Record |

32

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 23-55805

I am the attorney or self-represented party.

**This brief contains** | 6,794 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◯ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

⦿ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [            ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Jeremiah L. Morgan | **Date** | 12/28/2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8** | *Rev. 12/01/22*

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Gun Owners of America, Inc., *et al.*, in Support of Plaintiffs-Appellees and Affirmance, was made, this 28th day of December 2023, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

  */s/Jeremiah L. Morgan*
Jeremiah L. Morgan
Attorney for *Amici Curiae*