No. 23-55805

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

————————

VIRGINIA DUNCAN, et al.,

*Plaintiffs-Appellees*,

v.

ROB BONTA, in his official capacity as
Attorney General of the State of
California,

*Defendant-Appellant*.

————————

On Appeal from the United States District Court
for the Southern District of California
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge

————————

**BRIEF OF AMICUS CURIAE JOHN CUTONILLI
IN SUPPORT OF PLAINTIFFS-APPELLEES FOR AFFIRMANCE**

————————

John Cutonilli
P. O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com

28 December 2023

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, amicus John Cutonilli certifies that the amicus is not a publicly held corporation, that the amicus does not have a parent corporation, and that no publicly held corporation owns 10 percent or more of amicus's stock.

/s/John Cutonilli
John Cutonilli
P. O. Box 372
Garrett Park, MD 20896
jcutonilli@gmail.com

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE...................................................................1

SUMMARY OF ARGUMENTS ....................................................................1

ARGUMENTS ...............................................................................................2

    1.    California misunderstands what "arms" mean.....................................2

    2.    California misunderstands why our Nation's historical traditions
        were created and that "Dangerous and Unusual" and "in Common
        Use" relate to societal uses ................................................................4

    3.    "Weapons that are most useful in military service" is not a Second
        Amendment disqualifier......................................................................8

    4.    LCMs are in common use .................................................................10

    5.    There is insufficient data on the use of specific firearms or LCMs for
        self-defense .......................................................................................12

    6.    History and precedent demonstrate that the people provide for public
        safety ................................................................................................13

    7.    There has been a grave defect in the scrutiny process for nearly 80
        years and lower courts continue to exploit it ...................................16

    8.    Text of the Second Amendment .......................................................20

CONCLUSION............................................................................................22

APPENDIX..................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Association of New Jersey Rifle and Pistol Clubs v. Attorney General New Jersey*, 910 F.3d 106 (2018)..........................................................................................19

*Aymette v. State*, 21 Tenn. 154 (1840) ......................................................................6

*Castle Rock v. Gonzales*, 545 U.S. 748 (2005)..........................................................15

*DeShaney v. Winnebago County*, 489 U.S. 189 (1989)............................................15

*English v. State*, 35 Tex. 473 (1871)..........................................................................6

*FCC v. Beach Communications, Inc.*, 508 U.S. 307 ................................................20

*Fried v. Archer*, 775 A. 2d 430 (Md. Ct. Spec. App.) .............................................15

*Haynes v. State*, 24 Tenn. 120, 5 Hum. 120 (1844)...................................................6

*Heller v. D.C.*, 556 U.S. 570 (2008) ............................................................... passim

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) ....................................................1, 19

*Korematsu v. United States*, 584 F Supp. 1406 (N. D. Cal. 1984).........................17

*N.Y. State Rifle & Pistol Ass'n v. City of N.Y.* - 883 F.3d 45 (2d Cir. 2018) ...........18

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022) ........
........................................................................................................... 1, 4, 5, 9

*State v. Buzzard*, 4 Ark. 18 (1842)........................................................................7, 8

*State v. Chandler*, 5 La. Ann. 489 (1850)..............................................................6, 7

*State v. Reid*, 1 Ala. 612 (1840) ................................................................................6

*State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891) ........................................................6

*Trump v Hawaii*, 138 S.Ct. 2392 (2018)..................................................................18

*Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622........................................19

*Warren v. DC*, 444 A. 2d 1 (DCCA 1981) ..............................................................15

### Statutes

Statute of Winchester (1285) ...................................................................13

### Other Authorities

33 Hen. 8, c. 6, § 1 (1541–1542) (Eng.) ...................................................5

Beattie, J. M., Policing and Punishment in London, 1660-1750: Urban Crime and the Limits of Terror. p. 226 (2001) ....................................................14

J. Malcolm, To Keep and Bear Arms 2 (1994).........................................14

Sklansky, The Private Police, 46 UCLA L. Rev. 1165, 1198 (1999).....................14

The King James I: A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols, reprinted in 1 Stuart Royal Proclamations 359–60 (James F. Larkin & Paul L. Hughes eds., 1973) ...................................................5

### Treatises

W. Blackstone, 4 Commentaries on the Laws of England 148-149 (1769) ...........21

W. Hawkins, Treatise on the Pleas of the Crown ch 63 § 4 (1716) .......................21

## INTEREST OF AMICUS CURIAE[1]

Cutonilli is a resident of Maryland and is subject to similar firearm laws in question in this case. He is unable to successfully bring a lawsuit against Maryland due to the precedent set in *Kolbe v. Hogan,* 849 F.3d 114 (4th Cir. 2017). He seeks to provide additional insight into other aspects of the law that were neither addressed by the plaintiffs-appellees nor in the Lower Court's decision in this case. His intent is to help this Court avoid previous errors so that other fellow Americans are not subject to such laws.

## SUMMARY OF ARGUMENTS

Upending the basis on which the *Kolbe* argument and many other Second Amendment cases largely rests, *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. ___ (2022) unequivocally states that the Second Amendment protects the possession and use of weapons that are "in common use at the time." Importantly, *Bruen* makes no mention of arms that are "most useful in military service" (See *Heller v. D.C.*, 556 U.S. 570, 627 (2008)) – a phrase that California and *Kolbe* rely upon but grossly misinterpret.

---

[1] No party's counsel authored this brief in whole or in part. No party or party's counsel, and no person other than amicus contributed money that was intended to fund preparation or submission of this brief.

This brief expands upon the Plaintiffs-appellants' discussion of California's magazine ban violates the Second Amendment. It demonstrates flaws under California's theory of "arms". It provides historical insight into how the key phrases, "dangerous and unusual" and "in common use," relate to societal biases that carry forward into this case. It provides examples of the commonly accepted uses of large capacity magazines ("LCMs"). It demonstrates that "weapons that are most useful in military service" is not a Second Amendment disqualifier. It demonstrates through references to history and precedent, that the people themselves provide public safety. It provides insight into errors that invalidate the scrutiny process used in the previous *en banc* opinion. It provides clarification of some data about shots fired in self-defense. It also offers additional textual and history-based interpretation of the text of the Second Amendment.

ARGUMENTS

## 1.    California misunderstands what "arms" mean

California and numerous Courts misunderstand what "arms" mean. While they correctly cite the Heller definition ("'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another'", *Heller* at 581.) They fail to understand how this definition relates to firearms.

This definition of "arms" involves more than just the firearm itself. This is because firearms themselves do not typically "cast at or strike another". The

California definition of a firearm demonstrates this fact; "a device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of an explosion or other form of combustion" (CA Pen Code 16520). It is the projectile or bullet that is actually "cast at or strike another". To fulfill the definition of "arms", firearms need to include bullets and projectiles.

While magazines are not "arms" in and of themselves, they are a component of many types of firearms that feed the ammunition (bullets/projectiles) into the barrel and allow certain firearm to operate semiautomatically or automatically. They are no different than any other necessary component of the firearm like the trigger or barrel that contribute to the ability to "cast at or strike another". Cartridge boxes or cartridge cases do not contribute to this ability.

California's misunderstanding of "arms" also impacts other definitions. A number of California laws depend on a firearm operating semiautomatically e.g "assault weapon" or automatically e.g. "machinegun". If the firearm does not include the magazine, as California contends, then these definitions become meaningless along with the laws that depend on these definitions. Without the magazine, "assault weapons" and "machineguns" do not operate semiautomatically or automatically as required under the definitions. This misunderstanding would render many more laws meaningless words.

4

## 2. California misunderstands why our Nation's historical traditions were created and that "Dangerous and Unusual" and "in Common Use" relate to societal uses

The test that Bruen adopts "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen.* at 17 (slip). While Bruen does not provide an "exhaustive survey" of how to do this, they acknowledge that "Heller and McDonald point toward at least two metrics: **how** and **why** the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 20.

Bruen's brief examination of the historical context relates to public and concealed carry provides a case in point for the type of historical and textual analysis privileged by the Court for Second Amendment cases. A fuller examination of the historical prohibitions on some types of public and concealed carry further illuminates analogous misunderstandings and unfounded biases found in California's arguments. California fails to provide any historical evidence as to why the regulation burdened a citizen's right as instructed in *Bruen*.

*Heller* and *Bruen* acknowledged that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 12 quoting *Heller* at 626. They find, for example, that limitations are "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" while, on the other hand, that the Second Amendment protects the possession and use of weapons that

are "'in common use at the time.'" *Id.* at 12 quoting *Heller* at 627. However, neither *Heller* nor *Bruen* fully examine the historical meaning of the key phrases "dangerous and unusual" and "in common use."

For this reason, historical context is essential to understand why concealed carry, and other arms like Bowie knives, were prohibited and to determine if prohibitions such as the California's LCM ban use analogously faulty reasoning. Historically, concealed carry, and other arms like Bowie knives, were equated with criminality, with moral deviancy, when there is no necessary or logical link between the two. A number of statues in force before the Constitution was written provide instructive illustrations of these societal biases embedded in the law of the day. For example, in 1541, a statue against concealed carry was enacted to stop "shamefull muthers roberies felonyes ryotts and routs." by "evil disposed persons." 33 Hen. 8, c. 6, § 1 (1541–1542) (Eng.). Similarly, a 1613 proclamation banned the carrying of "Steelets, pocket Daggers, pocket Dags and Pistols" because they were considered "weapons utterly unserviceable for defence, Militarie practise, or other lawfull use, but odious, and noted Instruments of murther, and mischief," By The King James I: A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols, reprinted in 1 Stuart Royal Proclamations 359–60 (James F. Larkin & Paul L. Hughes eds., 1973).

Similar reasoning may be found in many of the early U.S. state court cases. In *State v. Reid*, 1 Ala. 612 (1840), the court upheld the prohibition on concealed carry because it was believed that concealed weapons would "exert an unhappy influence upon the moral feelings of the wearer, by making him less regardful of the personal security of others." In *State v. Chandler*, 5 La. Ann. 489 (1850), the court upheld the prohibition because it was believed to promote "secret advantages and unmanly assassinations." In *English v. State*, 35 Tex. 473 (1871), the court upheld the prohibition because it was thought to "protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit." In *State v. Workman*, 14 S.E. 9, 11 (W. Va. 1891), the court upheld the prohibition because concealed arms "are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the state."  In *Aymette v. State*, 21 Tenn. 154 (1840), (a concealed carry of a Bowie knife case), the court upheld the prohibition because the legislature has "a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence."  In *Haynes v. State*, 24 Tenn. 120, 5 Hum. 120 (1844), (another concealed carry of a Bowie knife case), the court articulated that the carrying of

Bowie-style knives, "by truculent and evil disposed persons but to often ended in assassition[sic]".

Importantly, in *State v. Buzzard*, 4 Ark. 18, 19 (1842), the court upheld the prohibition on concealed carry because it allowed public carry and, therefore, did not "detract anything from the power of the people to defend their free state and the established institutions of the country." This case is particularly instructive for the current case, as in a contemporary context, the prohibitions it has unjustly enforced in the state of California have detracted from the power of the people to contribute to public safety, as will be shown in Argument 6.

Understanding the historical context through close textual reading enables recognition of the bias inherent in the laws of the day that prohibited concealed carry, and other arms like Bowie knives. It becomes clear, as one court echoes the next down through time, that concealed carry, and other arms like Bowie knives, were prohibited because it was **ONLY** associated with criminal behavior, "murther" and "mischiefe," and the unsavory moral characteristics of "bullies, blackguards, and desperadoes." Open carry, on the other hand, was believed to "incite men to a manly and noble defence of themselves, if necessary, and of their country" See *Chandler*.

Just as there is no necessary connection between concealed carry and criminality, there is no necessary connection between the arms California deems prohibited and criminality – and yet that is the unfounded bias that permeates the state's position. Indeed, in Arguments 4 and 6, it will be demonstrated that such weapons are "in common use" by law enforcement and private security companies because of their effectiveness in *deterring and combatting* criminality.

Following *Bruen's* mandate to root Second Amendment cases firmly in historical and textual analysis, the court should evaluate the meaning of the phrases "dangerous and unusual" and "in common use" in light of these historical cases and the important example set by *State v. Buzzard*, which deftly tailors the right of citizens to bear arms in a way that upholds the intent of the Founders while acknowledging the realities of the contemporary social setting. In being guided by any or all of these cases, the court would be guided rightly by precedent that is intended to limit the consequences of criminally malicious behavior in society while protecting the rights of law-abiding citizens to use them lawfully.

## 3. "Weapons that are most useful in military service" is not a Second Amendment disqualifier

The *Bruen* decision confirms the types of arms that the Second Amendment protects. In doing so, the decision cites the applicable sections of Heller to reiterate the types of arms protected. *Bruen* acknowledges that "the right was not a right to

keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Bruen* slip opinion 12 citing Heller at 626). *Bruen* finds that the Second Amendment protects the possession and use of weapons that are "in common use at the time," i*d.* at 12 and 38-39 citing Heller at 627, and asserts that examples of Second Amendment limitations are "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 12 citing *Heller* at 627. It adds that acceptable limitations are specific to arms that "are highly unusual in society at large." *Id.* at 38-39 citing *Heller* at 627. At no time does *Bruen* refer to any limitation dealing with arms that are "most useful in military service." (See *Heller* at 627).

The *Heller* Court never specified that "weapons that are most useful in military service—M-16 rifles and the like—may be banned" without infringement upon the Second Amendment right. See *Heller* at 627. In the conditional tense, Heller stated, "**It may be objected that if** weapons that are most useful in military service—M-16 rifles and the like—may be banned**, then the Second Amendment right is completely detached from the prefatory clause**" (emphasis added). It was not singling out that militarily useful weapons are beyond the Second Amendment's reach. Instead, the *Heller* Court was acknowledging that the militarily usefulness of weapons, as implied by the prefatory clause, was **NOT** the criterion for Second Amendment protection.

This clarification makes the meaning clear: "We think that Miller's 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind **in common use at the time.**' 307 U. S., at 179." (emphasis added) *Heller* at 624. The third sentence of the paragraph then talks about "sophisticated arms that **are highly unusual in society at large**." (emphasis added).

The concept of military usefulness is introduced by Heller to address -- and flatly reject -- the argument that the prefatory clause protects all military arms. In refutation, Heller states plainly:

> "Indeed, it may be true that no amount of small arms could be useful against modern-day tanks and bombers. But the fact that modern developments have limited the fit between the prefatory clause and the protected right **cannot change our interpretation of the right**" (emphasis added).

As the Bruen decision makes clear, "Weapons that are most useful in military service" is not a Second Amendment disqualifier. The Second Amendment also does not restrict arms to those that have "some reasonable relationship to the preservation or efficiency of a well regulated militia"

**4.      LCMs are in common use**

LCMs are in common use in society today, including in California. In the context of this case, the California legislature has accepted that they play an

important, everyday role in protecting public safety and property. For example, they are in common use in California among federal, state, and local law enforcement and are used in the course and scope their regular duties. In addition, retired law enforcement officers and private security companies are permitted to use them for their personal self-defense and the protection of property. In allowing the use of LCMs not only by the police but also by retired officers and private security companies, the state acknowledges the public safety benefit that s LCMs provide.

Given this fact, it must be asked why – if LCMs provide a demonstrable and valued public safety benefit in the hands of the police and certain private personnel – the same benefit would be denied to law-abiding citizens?

The hyperbolic nature of California's arguments militates against recognition of their beneficial use in society. For example, the California's claims that these arms "triple the number of deaths and injuries sustained in mass-shooting incidents." CA brief pg 29. They cite statistics that supposedly show a capability for enhanced lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns. Yet, clearly, in the hands of the police, retired officers, and, by extension, law-abiding gun owners, it would be very wrong to assume that these weapons are valued for their capability for more wounds, more serious, in more victims. Here,

California conflates the features and capabilities of the weapon itself with the purported intent of its users. Such malicious intent should not be attributed to the government any more than to its law-abiding citizens. Per *Bruen*, this case must be reconsidered in light of the fact that the very arms that are defined by California as LCMs are not only commonly used in society but are demonstrably beneficial for the public good.

**5.     There is insufficient data on the use of specific firearms or LCMs for self-defense**

California claims that LCMs are not needed for self-defense. They reference data in their brief (see Argument I.A.2 "Common use for self-defense) that purports to show the lack of need of LCMs for self-defense. Cutonilli has previously explained flaws in this data. Fortunately, the District Court has adopted much of this explanation as part of its opinion (see section I.C "The Invention of the 2.2 Shot Average").

One of the criticisms of the data that the District Court found was that California and their experts did not provide the stories from the NRA's Armed Citizen database (source of data) to demonstrate how they assigned the number of shots fired to these stories.

Cutonilli is providing a copy of the stories from June 2016 to May 2017 in the appendix to this brief for the Court's review.  It is critical to recognize that 64%

of these stories do not identify the number of rounds fired. Therefore, the Court should understand that using this data to demonstrate the average number of shots fired is flawed. This is due to how little "shots fired" data is in these stories. It should also be noted that the type of arm used is also rarely mentioned either. This is why the plaintiffs provide survey data rather than specific instances.

**6.** **History and precedent demonstrate that the people provide for public safety**

Many U.S. laws are rooted in the English legal system and can be illuminated by an appreciation of their lineage. The *Bruen* decision emphasizes this fundamental point. In the English tradition, the average citizen played a central role in providing law enforcement and protection for society at large. Emerging around the time of King Alfred (c 871), this tradition persisted by custom for hundreds of years and was more formally codified with the Statute of Winchester (1285), which included provisions for arming the people, making arrests, and raising the "hue and cry" to apprehend criminal offenders. The Statute of Winchester further delineated and established the roles of unpaid constables and watchmen—private citizens who functioned as security personnel for their communities.

This system lasted through our founding and was the primary method of law enforcement at the time. Law enforcement was one of the key roles envisioned for

the militia in colonial America and following the Revolution. (See Article 1

Section 8 Clause 15.) Professional law enforcement agencies did not arise until the

mid-19[th] century, and it was not until 1878, with the passage of the Posse

Comitatus Act, that military and law enforcement functions were formally

separated (*Heller* at 716, Breyer dissent). The Maryland State Police pays homage

to this long-standing tradition on its website:

> "Under English common law, every person had an active responsibility for
> keeping the peace…The responsibility included crime prevention through
> vigilance and the apprehension of suspected lawbreakers by groups of
> persons raising the 'hue and cry' or the more official 'posse comitatus.'"

This was the most practical system, given the rural conditions in England

and America at the time (J. Malcolm, To Keep and Bear Arms 2 (1994)). It was not

without its limitations, however, as there was no institutional means to prosecute

felons; that was the job of the victim (Beattie, J. M., Policing and Punishment in

London, 1660-1750: Urban Crime and the Limits of Terror. p. 226 (2001);

Sklansky, The Private Police, 46 UCLA L. Rev. 1165, 1198 (1999)).  Additionally,

with the rise of industrialization in the U.S., many companies found it necessary to

hire private police to protect their interests, which led to the emergence of private

security companies. Today, in fact, in the U.S., the number of security personnel

employed by private security companies outnumbers public police by a factor of

three to two.

However effective police departments may be, the role of the police is inherently limited. Because the government has limited resources, there are limits to the degree of safety the government can provide. This is not merely a practical issue; it is a legal issue as well. As explained in *Warren v. DC*, 444 A. 2d 1 (DCCA 1981), "…courts have without exception concluded that when a municipality or other governmental entity undertakes to furnish police services, *it assumes a duty only to the public at large and not to individual members of the community*." *Id.* at 4 (emphasis added). In that case, the District of Columbia was found to have based its case on the "uniformly accepted rule…that a government and its agents are under no general duty to provide public services, such as police protection, to any particular individual citizen." *Id.* at 4.

Consistently, courts have ruled that public safety, through the government's police power interests, is owed to the public at large and not to any specific individual. (*Warren v. DC*, 444 A. 2d 1 (DCCA 1981), *Fried v. Archer*, 775 A. 2d 430 (Md. Ct. Spec. App.), 2001, *Castle Rock v. Gonzales*, 545 U.S. 748 (2005), *DeShaney v. Winnebago County*, 489 U.S. 189 (1989)). Therefore, the government has no interest in the protection of any specific individual because it cannot deliver protection at the individual level.

Overturning California law on the basis of this historical legacy, with acknowledgement of the role that lawful citizens play in public safety and the arms

that are "in common use" for public safety purposes, will restore Constitutional rights while strengthening law-abiding citizens' ability to contribute to their own safety, that of their families, and the community's safety as well.

## 7.    There has been a grave defect in the scrutiny process for nearly 80 years and lower courts continue to exploit it

*Korematsu v. United States,* 323 US 214 (1944) provides an object lesson in the types of mistakes the courts have made in Second Amendment cases. During World War II the United Stated forced the relocation and incarceration of more than 100,000 Japanese Americans, citing concerns for public safety. The Supreme Court found that "exclusion of those of Japanese origin was deemed necessary because of the presence of an un-ascertained number of disloyal members of the group, most of whom we have no doubt were loyal to this country." *Id.* at 218. The Court's decision resulted in placing restrictions on the Japanese-American population at large—most of whom were law-abiding citizens—because of the purported or potentially illicit acts of a few.

While the court acknowledged that "all legal restrictions which curtail the civil rights of a single racial group are immediately suspect," it still asserted that "pressing public necessity may sometimes justify the existence of such restrictions…" *Id.* at 216. While claiming that it applied "the most rigid scrutiny," it appears, particularly in retrospect, that the Court instead simply deferred to the

government's findings, stating an unwillingness to "reject as unfounded the judgment of the military authorities." *Id.* at 219.

Importantly, the dissent in Korematsu claimed that in deferring to the government, the Court had failed to rule on a key judicial question. In doing so, it had permitted the overstepping of "… the allowable limits of military discretion" and failed to define the "definite limits to [the government's] discretion." *Id.* at 234. In a statement that anticipates the future view of the courts and the American public on the Korematsu decision, the dissent further argued that:

> "[I]ndividuals must not be left impoverished of their constitutional rights on a plea of military necessity that has neither substance nor support." *Id.* at 234 (Murphy, J., dissenting).

A subsequent trial held long after the war, *Korematsu v. United States,* 584 F Supp. 1406 (N. D. Cal. 1984), brought forward substantial evidence that the government omitted relevant information from the Court and also provided misleading information. While the Court decided not to determine any errors of law, it did grant a writ of *coram nobi* and cautioned subsequent courts that:

> "It stands as a caution that in times of distress the shield of military necessity and national security must not be used to protect governmental actions from close scrutiny and accountability. It stands as a caution that in times of international hostility and antagonisms our institutions, legislative, executive and judicial, must be prepared to exercise their authority to protect all citizens from the petty fears and prejudices that are so easily aroused." Id. at 1420

While the Court has only recently said "Korematsu was gravely wrong the day it was decided" *Trump v Hawaii*, 138 S.Ct. 2392, 2423 (2018), it has yet to explain why it was "gravely wrong". One thing is certain.

> "Korematsu was not excluded from the Military Area because of hostility to him or his race. He was excluded because we are at war with the Japanese Empire, because the properly constituted military authorities feared an invasion of our West Coast…" *Korematsu* at 223.

At a time of marked "distress … hostility and antagonism" in the country, the previous *en banc* opinion in this case employs the same unjust logic that was at work in the case of Korematsu, arguing that the government's public safety interest supersedes constitutional guarantees and abridging the rights of law-abiding citizens because of the wrongdoing of others. As in the Korematsu case, the previous *en banc* opinion in this case deferred to the rule maker (the legislature in this instance) without putting the evidence before it to the proper test.

The failure to apply intermediate scrutiny is not unique to the Seventh Circuit but is part of a broader pattern that has become typical of how Second Amendment cases are handled. In *N.Y. State Rifle & Pistol Ass'n v. City of N.Y.* - 883 F.3d 45 (2d Cir. 2018), the City presented no empirical evidence, yet the Second Circuit found the challenged rule met intermediate scrutiny because there was a "substantial fit between the Rule and the City's interest in promoting public safety." *Id*. at 64. An assertion of "substantial fit" stands in for the demonstration

of "substantial evidence." Similarly, in *Kolbe*, the Fourth Circuit found that "The judgment made by the General Assembly of Maryland in enacting the FSA is precisely the type of judgment that legislatures are allowed to make without second-guessing by a court." *Id.* at 140. Again in *Association of New Jersey Rifle and Pistol Clubs v. Attorney General New Jersey*, 910 F.3d 106 (2018), the dissent chastises the majority for substituting "anecdotes and armchair reasoning for the concrete proof that we demand for heightened scrutiny anywhere else." *Id.* at 126. Nonetheless, the majority found that "the Act survives intermediate scrutiny." *Id.* at 122.

While *Bruen* rejected the intermediate scrutiny approach used in the previous *en banc* opinion in this case, this Court should understand the problems that led *Bruen* to its decision. At the core of intermediate scrutiny is the requirement for the government to draw "reasonable inferences based on substantial evidence" because the government "must demonstrate . . . that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 664 (1994). When courts fail to uphold this essential requirement, they fail to maintain the standard of intermediate scrutiny. Without substantial evidence, the intermediate scrutiny standard devolves to the lower order of the rational basis standard, which does not require substantial evidence. Instead, rational basis cases may be decided using "rational

speculation *unsupported by evidence or empirical data*." *FCC v. Beach Communications, Inc.* 508 U.S. 307, 315 (1993) (Emphasis added.) Rational basis is inappropriate for fundamental rights, such as those comprised by the Second Amendment, *Heller* at 628. Infamously, in the Korematsu decision, the Court failed to properly evaluate the evidence and, instead, accepted at face value the government's assessment of the evidence. This abnegation of the court's proper role compromised the constitutional rights of American citizens rather than protecting them – and serves as both an analogy for past Second Amendment cases and an object lesson for future ones.

**8.    Text of the Second Amendment**

As underscored in Heller, the Second Amendment is structurally and grammatically divided into two parts: an operative clause and a prefatory clause. The operative clause guarantees a pre-existing right of the individual to possess and carry weapons in case of confrontation, *Heller* at 592. The prefatory clause, which refers to this right as it relates to the formation of militias, is best understood within the context of the Tenth Amendment, which clarifies the respective powers delegated to the federal government or reserved to the states. At the time of the founding, the Second Amendment was codified to ensure that the federal government did not have the power to disarm the militia. *Id.*, at 599. It ensures that the federal government does not abridge the right of citizens to keep and bear arms.

Additional examples of the right to keep and bear arms appear in state declarations of the period, such as the right to possess arms for self-defense or to hunt. *Id.* at 642 (Stevens dissenting). These examples are enumerated in state declarations because they apply at the state and not the federal level. Together, the Second Amendment plus the various state-level declarations constitute the full expression of citizens' rights to keep and bear arms.

While the right to keep and bear arms is broader than – or extends beyond – the Second Amendment in this way, it is not unlimited. Heller at 627, for example, notes the historical prohibition on carrying "dangerous and unusual weapons," a phrase that originates in the Statute of Northampton. See 4 Blackstone 148–149 (1769). Neither *Heller* nor *Bruen* elaborate on what is meant by "dangerous and unusual weapons," and the legal history since Northampton provides little in the way of a clear definition of the phrase. Nonetheless many assumptions and unfounded assertions have been made. Fortunately, a number of 17th- and 18th-century treaties provide useful interpretive context (W. Blackstone, 4 Commentaries on the Laws of England 148-149 (1769), W. Hawkins, Treatise on the Pleas of the Crown ch 63 § 4 (1716). These texts consistently demonstrate that there was no general prohibition on carrying common arms, as has been reiterated in Bruen.

## CONCLUSION

Upending the basis on which the previous *en banc* opinion in this case argument largely rests, *Bruen* unequivocally states that it protects the possession and use of weapons that are "in common use at the time." Weapons defined by California as LCMs are "in common use" and allow the law-abiding people of California to provide for their own safety and that of their families and communities.

This conclusion is based on a number of factors. The most important of these is based on historical insight into how the key phrases, "dangerous and unusual" and "in common use," relate to societal biases that carry forward into this case. It is based on fact that "weapons that are most useful in military service" is not a Second Amendment disqualifier. It is based on references to history and precedent, that the people themselves provide public safety and on the data about shots fired in self-defense. It is based on insight into errors that invalidate the scrutiny process used in the previous *en banc* opinion and additional textual and history-based interpretation of the text of the Second Amendment.

For the foregoing reasons, this Court should affirm the case for the plaintiffs-appellees.

Respectfully submitted,

/s/ John Cutonilli

John Cutonilli
P.O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com

28 December 2023

# APPENDIX

American Rifleman Armed Citizen June 2016-May 2017

Case: 23-55805, 12/28/2023, ID: 12840060, DktEntry: 58-2, Page 30 of 43

### Official journal

# The **Armed** Citizen®



An escaped convict who probably figured he had nothing to lose by committing a crime while he was on the run was wrong: He lost his life. The former inmate broke into a Vicksburg, Miss., home to hide out. With a knife in hand, he corralled a man and his family into the bathroom, where the criminal tied up the man and held the family hostage. Eventually, the bound man broke free and attacked the escapee. The bad guy overpowered the homeowner, though, and stabbed him in the shoulder. Shortly thereafter, the homeowner's wife persuaded the intruder to let her leave the bathroom to take care of something. She returned with a gun and shot the escapee. She then freed her husband, who shot the suspect again, killing him. The escaped con, who had been jailed on suspicion of murder, had been on the lam for about a week since breaking out of the Warren County jail. (*The Clarion-Ledger*, Jackson, Miss., 3/10/16)

In a battle with a hatchet-wielding masked man, an armed citizen saved the day at a 7-Eleven store in Washington state. One Sunday morning, the armed citizen was drinking coffee at a table in the convenience store when a man with a hatchet came in and started swinging at a customer and a store employee. The 60-year-old holder of a concealed-carry permit drew his gun and fired. The initial investigation found no wrongdoing on the part of the armed citizen, according to the King County Sheriff's Department. (*The Seattle Times*, Seattle, Wash., 3/13/16)

When a man broke into a home in Bangor, Mich., he found himself staring down the barrel of a shotgun held by a female resident. The woman had been entertaining friends when they heard suspicious noises outside. While the guests went outside to investigate, the woman grabbed her shotgun. After the stranger broke in, she held him at gunpoint until the police arrived. (WWMT.com, Kalamazoo, Mich., 3/7/16)

Dinner took an unexpected turn for an off-duty security guard who shot and killed one of two armed thugs who tried to rob him. The guard, who was on a late dinner break but was armed, was eating in the parking lot of a 24-hour Whataburger restaurant. The two criminals approached the diner. When the guard saw that at least one of the two miscreants had a gun, he pulled his own gun and killed the armed robber. That man's cohort fled, but he was later detained. (*San Antonio Express-News*, San Antonio, Texas, 3/18/16)

One employee responded to screams of "active shooter" at his workplace by running out to his car, retrieving his gun, tracking down the shooter and holding him at gunpoint until the authorities arrived. The incident occurred at a Jacksonville, Fla., landscaping company, when a disgruntled employee shot and killed his supervisor. Someone who heard the shots called 911, but it was the armed citizen's quick action that prevented the malcontent from fleeing the scene. The suspect was later arrested and charged with one count of murder. (CBS47 and FOX30, Jacksonville, Fla., 3/10/16)

A 71-year-old Virginia man refused to fall prey to a couple of teenage ruffians who targeted him during an armed robbery attempt; instead, he drew his carry handgun and shot one of the teens to death. The two hoodlums approached the man in an apartment complex. One flashed a gun and then they demanded his valuables. They probably didn't expect him to have a gun on him or that he'd be prepared to use it. But the man didn't hesitate to defend himself, shooting an 18-year-old in the chest and chasing off his younger accomplice. Police have since cleared the man, saying the shooting was self-defense, and a 15-year-old has been charged for his role in the attempted armed robbery. (*Daily Press*, Hampton, Va., 3/14/16)

Some thug who thought a disabled North Carolinian might be a pushover during a home invasion found out otherwise. The Hickory retiree heard someone knocking, but he didn't answer the door. Next, he heard glass shattering as the burglar kicked in the back door. The homeowner grabbed his .22-cal. revolver and shot three times at the intruder, striking him twice. "I felt like I was about to have a heart attack," the resident said. "I didn't want to do this, but I had to." The suspect fled, but police found him at a lounge that was about a mile away. He was taken to a medical center for treatment. Charges were expected to be filed against him. (*Hickory Daily Record*, Hickory, N.C., 2/17/16)

---

**If you have a firsthand "Armed Citizen" experience, call NRA-ILA PR/Communications at (703) 267-3820.**

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or, in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**



OFFICIAL JOURNAL

# The **Armed** Citizen®



I nstilling a respect for the principle of self-defense in her son is one reason why an 88-year-old Chicago woman survived a break-in. The elderly mother was awakened one night by the sound of a gunshot. Fortunately, it had come from her son, who fended off someone who was trying to enter the house through a window. Keeping guns around for self-defense is a practice the elderly woman has followed since her husband was shot and killed during a home invasion more than 50 years ago. "My son said he wasn't going to let that somebody come in that window. He knew those boys came in the house and killed his father. He wasn't going to let somebody come in the house and kill me," the mother told television reporters after the incident. The suspect was taken to a hospital and treated for his injuries. (abc7chicago.com, Chicago, Ill., 3/28/16)

---

S hots rang out in a suburb of Pittsburgh when a homeowner protected his property from four juveniles who were breaking into the home. The boys were trying to enter the home through a window that housed an air conditioner. The armed citizen grabbed his .380 ACP handgun and confronted the intruders. He fired multiple shots, wounding two of the teens. All four of the suspects fled. One of the wounded was found on a nearby bridge; the second was found at a relative's house. The two uninjured accomplices were also caught. All have been charged and placed in a juvenile detention facility. Officials said the homeowner was within his rights to defend his home. (*Tribune-Review*, Pittsburgh, Pa., 3/23/16)

B ad guys who think the elderly and disabled make an easy target better think twice. An elderly man in Missouri, who relies on an oxygen tank, got the better of two ruffians who broke into his home as part of an attempt to steal the man's prescription drugs. The armed citizen was acquainted with one of the would-be thieves, police said, but apparently the bad guy didn't know him well enough to know he kept a gun for defensive purposes. The two men, police said, approached the door and knocked. Since the homeowner recognized one, he opened the door. The suspects, one of whom had a mask over his face, bulled themselves in, pushed the resident aside and started to rifle through his belongings. The citizen grabbed his gun and shot one intruder in the abdomen. (dailyjournalonline.com, Park Hills, Mo., 4/1/16)

---

P olice officers responding to a report of gunshots in Georgia learned that a disabled veteran used his Smith & Wesson M&P to save his life. The man said he was awakened early in the morning when two men, claiming to be police, tried to break into his mobile home. When he checked a video surveillance device, though, the resident had a good idea that they were not police officers. The two armed thugs allegedly fired at the homeowner first, who fired back. No one was injured, but bullet holes that pock-marked the man's trailer were visible for the real police to see. "My gun saved my life," the man told reporters afterward. (WTOC, Savannah, Ga., 3/30/16)

---

O ne of two men charged with murder after a friend of theirs was killed by an armed citizen during a robbery should have been in prison at the time of the alleged murder/ robbery. The criminal was free on bond and awaiting a sentencing of up to five years for a previous assault. Instead of showing up at his February sentencing, he skipped out, and he and some friends allegedly went on a spree of home invasions. One turned deadly for his cohort after a homeowner shot him. The two surviving accomplices face murder charges because someone was killed during a felony. (*The Columbus Dispatch*, Columbus, Ohio, 4/8/16)

---

A West Virginia man was savvy enough to suspect that a young woman who knocked on his door and asked to use the phone might be up to no good. So before he opened the door, he armed himself. He was right. As soon as the door was ajar, two male suspects also hustled into the home. They threatened the resident and demanded that he hand over his valuables. The elderly homeowner instead pulled out a gun and fired multiple times, hitting each of the male intruders. The female accomplice escaped the fray. One of the shooting victims was pronounced dead at the scene. The other was treated for his wounds. He and the woman face charges. (wvmetronews.com, Fairmont, W.Va., 4/19/16) ✍

---

**If you have a firsthand "Armed Citizen" experience, call NRA-ILA PR/Communications at (703) 267-3820.**

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**





## Official Journal

# The **Armed** Citizen®

Two armed citizens who witnessed a drug deal gone bad in New Mexico used their guns to hold a shooter captive until the police arrived to take the suspect into custody. Officers were called to respond to a 7-Eleven after dispatchers received reports of a ruckus. Two men apparently had been fighting over drugs near the parking lot of the convenience store. One of the bad guys pulled a gun and fired several rounds, hitting the other man involved in the drug deal in the leg and nearly shooting some bystanders. Two armed citizens, seeing passersby endangered, tackled the shooter. After they took him down, each pulled a handgun and made sure neither bad guy could flee the area. The shooter faces charges of aggravated assault and other local charges, and the Albuquerque, N.M., police said federal charges are possible because he was a convicted felon who was illegally in possession of a firearm. (*Albuquerque Journal*, Albuquerque, N.M., 5/19/16)

---

Being confined to a wheelchair doesn't mean you can't protect yourself, as a case in Georgia indicates. A disabled Vietnam veteran used a gun to fend off a home intruder after the interloper had forced his way into the veteran's home, Georgia Bureau of Investigation authorities said. The homeowner shot when the outsider lunged toward him after gaining entry to the residence. The bullet hit the suspect in the chest. The bad guy ran away after being shot, but he collapsed outside the home and was pronounced dead after being taken to a nearby hospital. (*Atlanta Journal-Constitution*, Atlanta, Ga., 5/21/16)

---

When a serial armed robber was on the loose in Indiana, just the threat of being shot by a targeted victim was enough to bring his spree to an end. The robbery suspect accosted a woman and flashed a gun at her. Instead of cowering in fear, she pulled out her own concealed handgun, and he turned and ran away. Police caught the fleeing suspect and ended up linking him to a string of break-ins and robberies in the area. The suspect was arrested and charged in connection with possession of a stolen handgun, possession of stolen property and other related crimes. (Fox59, Kokomo, Ind., 5/17/16)

---

An order to keep her former boyfriend away wasn't enough to deter him from harassing her, but a handgun was. Police say a woman in Lexington, Ky., shot a man who failed to comply with a court order to stay away from her. The man, who was shot multiple times, was taken to the University of Kentucky Hospital for treatment. (WKYT, Lexington, Ky., 5/10/16)

---

Amid-afternoon attempted armed robbery backfired for the criminal, who ended up being shot to death by an armed citizen at the Tennessee clothing store he was trying to rob. Officials did not confirm whether the shooter was a store employee. Few of the Extreme Gear customers had much sympathy for the bad guy. "The young people don't believe in nothing but to take, and that's it," one customer told a TV reporter. The suspect was taken to the hospital, where he was listed in critical condition. He died later that night. (WMC Action News 5, Memphis, Tenn., 5/3/16)

---

Fear for his family's safety was the reason a man in Shoreline, Wash., used a handgun to thwart an early-morning break-in at the family home. The homeowner was awakened around 3 a.m. by the sound of someone yelling and kicking at the door. The resident ushered his wife and two children to one room of the home for safety. Then he grabbed his gun, a 9 mm Luger, and his older daughter called 911. While the daughter was talking to dispatchers, the family heard the sound of shattering glass. The head of the household went to see what was going on and saw that the intruder had used a piece of lawn furniture to break a window. The suspect saw the homeowner and started moving toward him. The armed citizen shot in response. Police said no charges were expected to be filed against the resident. (KOMOnews.com, Seattle, Wash., 5/5/16)

---

Home schooling taught an 11-year-old Alabama boy the value of self-defense. The boy was in his home alone when someone broke in. The boy grabbed a handgun and hid while the intruder went upstairs. When the bad guy came down the stairs carrying a hamper full of stuff, he told the boy he was going to kill him and hurled obscenities at the youth. At that point, the boy started firing. The youth credited his stepfather with teaching him how to use a gun for protection. (WVTM-TV, Talladega, Ala., 4/28/16)

---

## If you have a firsthand **"Armed Citizen"** experience, call NRA-ILA PR/Communications at (703) 267-3820.

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or, in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**

**10**

AUGUST 2016  AMERICAN RIFLEMAN

OFFICIAL JOURNAL

# The **Armed** Citizen®



A Detroit-area man used a gun to save himself and his wife from two armed intruders. The criminals accosted the couple outside of their home, then ordered them inside the house and into the basement. With a gun pointed at his head, all Daniel McNamara could think about was how to get to his firearm that he kept in the basement. After the intruders took the couple's wedding rings, cell phones and wallets, one of the miscreants turned to head out of the basement. That's when McNamara found his opportunity. He grabbed his gun and fired two shots, hitting one bad guy before both fled. "Of course I was scared. Who wouldn't be?" McNamara told reporters. "Some goon has a gun to your head and tells you he's going to shoot you because you've seen his face." The injured suspect was arrested at the hospital. There was no report of his accomplice being caught. (WXYZ-TV, Detroit, Mich., 5/24/16)

When a burglar gets a verbal warning to stop but he's doing, it might serve him well to take heed. But someone who was trying to break into a Wilson, N.C., home didn't—and he paid the price. North Carolina law enforcement officials said no charges will be filed against the homeowner, who shot through the door and killed a would-be intruder. "I didn't have no choice but to stop him," the resident told a local TV news reporter. "I didn't want him to come in and hurt me." Police said the homeowner had yelled at the man before firing. (WRAL, Raleigh, N.C., 5/24/16)

Florida prosecutors have ruled that a woman was within her rights to shoot and kill her estranged husband when he was physically assaulting her son. During a birthday party for the boy, the teen and his former step-father got into a dispute outside near the grill. People inside the house heard a loud thump and the boy's mother went outside to see what was going on. Official reports say the woman saw the two brawling. When she tried to intervene, her estranged husband grabbed her and threw her to the ground. He also verbally threatened to kill the boy. The mother got off the ground and went in to get her handgun. She fired two shots, and the man later died at the hospital. (Ocala.com, Ocala, Fla., 5/26/16)

Memorial Day shoppers, including one armed citizen, chased down a suspected thief in Wichita, Kan. Several people in the parking lot of the shopping center witnessed a purse-snatching while a woman was loading shopping bags into her car. A couple responded by running after the man. Once they cornered him, one armed bystander held the trouble-maker at gunpoint until the police arrived. (KWCH-TV, Wichita, Kan., 5/30/16)

Marriage is about teamwork, and an Indianapolis couple illustrated that by pairing up to shoot a home invader. All three family members were sleeping early one morning, when sounds of an intrusion awakened them. The husband confronted the bad guy with a shotgun, but the stranger tried to wrest the gun from the husband's control. The wife, seeing the struggle, grabbed another firearm and told the suspect to back off. He did not comply. Both homeowners ended up firing their guns at some point, fatally wounding the criminal. They cooperated with police and were not charged. (*Indianapolis Star*, Indianapolis, Ind., 5/31/16)

A district attorney in Pennsylvania praised a pharmacy owner who shot and killed a robber, calling the shooting a "public service." Police said an armed man donned a Halloween mask, got out of a vehicle and went into the Bucks County pharmacy. The businessman caught a glimpse of something suspicious on security monitors and saw that the suspect was trying to conceal a shotgun in an umbrella. The pharmacy owner warned the man several times, but the interloper kept coming toward him and jumped a counter. Investigators said the businessman fired nearly a dozen shots, hitting the bad guy several times. The accomplice, who had stayed in the vehicle, was arrested when police arrived. (WPVI-TV, Philadelphia, Pa., 6/3/16)

In South Carolina, a woman who was assaulted by her husband in front of their child shot the man in the leg to protect herself and their child. Police had a hard time sorting out the details because the husband and wife gave conflicting accounts of the dispute, but at some point the man allegedly had his hands around the woman's neck in front of their 12-year-old daughter. The husband was charged in connection with domestic violence and unlawful conduct toward a child; the woman was not charged because she acted in self-defense, police said. (*The Aiken Standard*, Aiken, S.C., 6/1/16) 🖋

---

### If you have a firsthand **"Armed Citizen"** experience, call NRA-ILA PR/Communications at (703) 267-3820.

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or, in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**

SEPTEMBER 2016   AMERICAN RIFLEMAN

## OFFICIAL JOURNAL

# The **Armed** Citizen®



**S**neaking into someone's home overnight turned out to be a poor decision for a bad guy in Snellville, Ga. Shortly before 4 a.m. one day in July, a husband and wife were awakened by the sound of someone attempting to break into their home. The male homeowner retrieved his gun and went to investigate. He discovered a man had put a ladder up against the house and was attempting to climb through the window of the master bathroom. The resident fired at the would-be burglar, and one of the homeowners called 911. While the police were interviewing him, the armed citizen said he was unsure whether the shot had hit the man who was breaking in. A subsequent search found the bad guy lying dead on the roof. Officers determined that the homeowners were within their rights to defend themselves, and they were not charged. (*Atlanta Journal-Constitution*, Atlanta, Ga., 7/29/16)

**A** good guy with a gun kept a multiple-victim shooting near a Lyman, S.C., nightclub from becoming worse. One man got into an argument with another outside the club. He pulled out a gun and fired multiple times into a crowd, injuring three people. One bystander, who was carrying legally, returned fire, striking the shooter in the leg and ending the gunplay. (FoxCarolina.com, Charlotte, N.C., 6/26/16)

**Y**ou've heard of being in someone's doghouse? Well, criminal behavior put one suspect on top of someone's doghouse in Lady Lake, Fla. A homeowner was pulling into his driveway, with his wife and mother-in-law in the car, when he noticed that the door of a client's car he was repairing was open. A moment later, he saw a trespasser—dressed only in a tank top and underwear—running away from the car and into the backyard, busting open a gate in his attempt to flee. The armed citizen pulled his gun and directed the thief to freeze. The suspect, who had climbed on top of a doghouse to try to get away, stayed on that perch until the police arrived and took him into custody. (*Sun Sentinel*, Palm Beach, Fla., 7/21/16)

**O**hio officials recently awarded armed citizen Dylan DeBoard with a Citizens Award of Valor for his role in saving a police officer who was struggling to arrest a drug suspect. Cpl. Michael Wheeler, of the Mount Vernon Police Department, was trying to apprehend a man in June. The suspect became aggressive and, during the ensuing altercation, tried to grab the policeman's firearm. DeBoard, who carries legally, approached with his handgun at the ready and ordered the bad guy to stop what he was doing. The alleged criminal raised his hands and Wheeler completed the arrest without further incident. (*Mount Vernon News*, Mount Vernon, Ohio, 7/26/16)

**M**aternal love knows no bounds, as a defensive shooting in Oregon shows. A mother and her two children returned home one weekend and stumbled upon a stranger in her 10-year-old daughter's bedroom. The woman drew her gun and fired one shot, killing the intruder. Portland police investigated and said that the man apparently entered the home by climbing in through a back window. The mother and her children had only recently moved into the home, and neighbors said some squatters had been there off and on while the house was vacant. (KOIN.com, Portland, Ore., 6/26/16)

**P**olice said they won't charge a New Mexico man who shot someone to protect his daughter. Albuquerque law officers responded to a "shots fired" call and found a 40-year-old man with multiple gunshot wounds to his legs. The investigation revealed that the wounded man, an ex-boyfriend of the daughter, was armed and was trying to gain entry to the residence. The man had a history of allegedly making threats against the woman, and police said the father will not be charged. (KRQE.com, Albuquerque, N.M., 6/24/16)

**D**etroit carjacking suspects got a surprise when they picked an armed citizen as their target. Two men in a vehicle drove up near a man in his car late one evening. One of the criminals then got out, walked toward his target, pulled a gun and ordered the driver to exit his car. The motorist acted like he was complying, but he held a surprise for his attackers—he had a license to carry and was armed. After he got out of his automobile, the assailant and the driver exchanged gunfire, with the attacker taking a shot to the body. The injured bad guy climbed back into his car and his accomplice took him to a hospital. Police later arrested the suspects. (*The Detroit News*, Detroit, Mich., 7/26/16)

---

### If you have a firsthand **"Armed Citizen"** experience, call NRA-ILA PR/Communications at (703) 267-3820.

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or, in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**



American Rifleman, November 2016

## Official journal

# The **Armed** Citizen®



You're never really too old to defend yourself. In Eastpointe, Mich., a 91-year-old man was getting out of his car outside of a pharmacy when he noticed a man approaching him in a threatening manner. The armed citizen declared that he was a permit holder. He waited in his car until the stranger disappeared. But when he got out a little while later to enter the store, the assailant came toward him and raised a weapon over his head at the older man. Warning the miscreant that he was armed, the 91-year-old pulled his .38 Spl.-chambered revolver from his side and opened fire, striking the attacker in the neck. "It doesn't have to be a gun or a knife," said Eric Keiser, Eastpointe deputy police chief. "The suspect had a piece of metal fashioned as a weapon. [The armed citizen] felt his life was in danger." The suspect was transported to an area hospital and was later charged. (MacombDaily.com, Eastpointe, Mich., 8/23/16)

An assailant in West Philadelphia, Pa., lost his life after attacking his ex-girlfriend. The man tried to enter the residence through a downstairs kitchen window. Not one to stand idly by, the woman's new boyfriend pushed the attacker back through the window and temporarily kept him at bay. Undeterred, the assailant made his way up to a second-floor bedroom window and successfully entered the home that way. The woman attempted to defend the home and got into an altercation with him. Her current boyfriend came to her defense, pulling a gun and firing a single shot at the intruder. Officers arrived, and the injured attacker was transported to a local hospital, where he later died. (ABC 6, West Philadelphia, Pa., 8/25/16)

Sleeping on the job gave a store manager the element of surprise so he could take down a bad guy. As closing time was approaching, a manager at a local supermarket in Waterloo, Iowa, decided to take a short nap behind a counter in his store while another employee worked with customers. The manager was awakened by loud talking and heard repeated demands of "Give me money." Looking up, the manager saw a male intruder who was pointing a gun at the store clerk. "He didn't see me before. When he saw me, he pointed the gun to me and said, 'Don't move,'" the manager recalled in a news interview. As the gunman turned his attention back to the clerk, the manager reached for a 9 mm Luger semi-automatic

he had stowed. The bad guy and the manager exchanged fire, with a bullet striking the troublemaker. The intruder then fled. Police later found and arrested the suspect. (WCFCourier.com, Waterloo, Iowa, 8/29/16)

In Oregon, a 15-year-old boy taught a home intruder a lesson. The boy was home alone when he heard someone enter the abode. The teen retrieved a shotgun. When he saw the intruder, he fired and shot the man in the leg. "The juvenile was in fear of his safety, my initial conclusion is that the shooting … was a justifiable use of force," said District Attorney Paul Frasier. (*The World*, Myrtle Point, Ore., 8/6/16)

One criminal paid the price for messing with a mother's son after a recent attempted robbery in Augusta, Ga. One Sunday, two men with crowbars entered a Subway restaurant. When the two men began to act suspiciously, the employee behind the counter went to retrieve a firearm from her purse. After one of the alleged robbers struck her 14-year-old son, who was standing behind the counter, in the back

of the head, the armed citizen opened fire and put two rounds into one of the assailants. The owner of the franchise said he supported his employee's right to carry a firearm for defensive purposes. The suspect who was shot died, and police later apprehended his alleged accomplice. (WRDW 12, Augusta, Ga., 8/25/16)

A good Samaritan came to the aid of a neighbor during a domestic dispute that ended in the death of the aggressor. In Gonzales, La., a man in his home heard people arguing outside. He went to investigate. The neighbor approached the two people—a man and a woman—who were arguing and was accosted by the male. The instigator pointed a handgun at the good Samaritan, who in turn drew his own firearm and shot. When police officers arrived, they determined that the man who had been arguing with the woman was dead. The police said that charges would not be filed against the armed citizen, saying that he ended a dispute that might have led to the death of the woman. (ABC 2, Gonzales, La., 8/20/16)

---

### If you have a firsthand **"Armed Citizen"** experience, call NRA-ILA PR/Communications at (703) 267-3820.

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**

**10**

## Official journal

# The **Armed** Citizen®



Three Philadelphia residents survived an attack by an armed assailant, thanks to a woman who relied upon a gun for self-defense. A pastor, his wife and his son were on their way home from a concert at a local church. As the man and his son were walking to their house, the father saw a stranger who was hunched over and holding a rifle. That man approached the father and son as they were stepping onto their porch. The bad guy demanded the pastor's wallet. After the outsider lunged toward the pastor, the two men tussled for control of the rifle. During the struggle the father yelled at his son to run away, and the assailant struck the pastor on the head. The pastor's wife, who had stayed in the car gathering her belongings, then came to her husband's defense, pulling a handgun from her purse and demanding that the bad guy drop his rifle. The troublemaker then pointed his firearm at her, and she shot him. The attacker limped away. Police later apprehended the man, who had sustained a gunshot wound to the leg. (*The Philadelphia Inquirer,* Philadelphia, Pa., 9/17/16)

Bank robbery doesn't pay when an armed citizen steps up to stop the crime. In Homewood, Ala., a man walked into a local bank and held it up. The hooligan, with a piece of cloth wrapped around his hand as if to hide a gun, ordered the people inside to huddle into a corner and hand over their cell phones. As he got ready to leave the bank, the robber pointed the cloth-covered hand at the bank patrons. An armed citizen saw that as an opportunity, pulling out his concealed firearm and firing at the would-be robber. "I was thinking a lot of people's lives were in danger and my life was in danger, too. He pointed whatever he had at us, so I fired a shot at him," said the citizen. The shot missed, but the police arrived and arrested the bad guy as he was fleeing. (AL.com, Homewood, Ala., 9/21/16)

A recent carjacking in Lubbock, Texas, resulted in a robber facing several charges after threatening a couple. A man and woman were pulling into their driveway when the criminal approached and pointed a handgun at them. As he ordered the male driver to get out of the vehicle and to hand over cash, the woman in the passenger seat retrieved her firearm and tossed it off to her companion. The armed citizen then fired several rounds at the robber, striking him in the leg. Officers found the criminal and booked him. (LubbockOnline.com, Lubbock, Texas, 9/24/16)

Looking for love in Las Vegas could have spelled trouble had the seeker not been armed. A man headed out one night to meet a woman he met on-line. Upon arriving at the designated location, the would-be suitor discovered that the woman had an accomplice. The pair attempted to rob the man, who retrieved his firearm and opened fire on the male assailant. The criminal was taken to a local hospital with injuries that were not life-threatening. Both suspects were charged. (KVVU-TV, Las Vegas, Nev., 9/22/16)

Sounds of a break-in woke up a woman at her residence in Gwinnett County, Ga., one night. The woman retrieved her handgun and went to check out the disturbance. She saw at least three men coming in through her front door. "At that point she began firing rounds from her handgun and struck at least one suspect in the torso killing him," explained Cpl. Deon Washington, a public information officer for the Gwinnett County Police Department. Another foe fired back at that the woman before he and his accomplice fled the scene. No charges were filed against the armed citizen. (*Atlanta Journal-Constitution*, Atlanta, Ga., 9/17/16)

In Chicago, a concealed-carry permit holder warded off an attack late one night. As the armed citizen was sitting with another man in his car, two aggressors with guns approached and attempted to rob the two men. The quick-thinking armed citizen thwarted the attack, firing at the bad guys and hitting one of them. The assailant who was shot was later declared dead at the scene, while the second bad guy got away. (DNAInfo.com, Chicago, Ill., 9/29/16)

Hearing the sound of breaking glass from somewhere inside his home, an Amarillo, Texas, homeowner armed himself and decided to investigate. During his reconnaissance, the man saw a gloved hand with a gun in it reaching through the back door. The homeowner then fired his weapon at the person. The assailant fled the residence without getting inside the home. The homeowner was uninjured. (*Amarillo Globe News*, Amarillo, Texas, 9/15/16)

---

### If you have a firsthand **"Armed Citizen"** experience, call NRA-ILA PR/Communications at (703) 267-3820.

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or in, in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**



## Official journal

# The **Armed** Citizen®



For those who think that a restraining order can protect a person, remember this: A restraining order is just a piece of paper, and sometimes people don't abide by it; in fact, sometimes people react with violence to the very idea of one. That's one takeaway from a defensive shooting that involved parties from two states. A woman called the police to report a stalker was outside the Los Altos Hills, Calif., home where she was staying. She was on the phone with 911 dispatchers when the suspect forced his way into the home and started shooting at her and others inside the residence. Fortunately, a male resident of the home had grabbed a gun before the intruder entered the house. He shot the bad guy several times. The alleged stalker fled but was later hospitalized and charged with attempted murder. He was then identified as someone the woman had known in Georgia. She had asked for a restraining order against him, though it was unclear if one was issued. (*The Mercury News*, San Jose, Calif., 10/17/16)

Sometimes words are enough when an armed citizen is confronting a troublemaker. In Salt Lake City, Utah, a homeowner said the magic words—I have a gun—and scared off two burglary suspects. A man and his wife were awakened by the sound of their garage alarm going off around 3:30 a.m. one morning. The male resident got his gun and went to see what was happening. He saw a stranger inside the car in the garage and he asked what the man was doing. The suspect's accomplice, who had been waiting in a getaway car, noticed that his buddy was being confronted and approached on foot. At that point, the homeowner said he was armed and both suspects scampered off. (*Salt Lake Tribune*, Salt Lake City, Utah, 10/14/16)

One hunter saved the life of another who was being mauled by a bear. The two were scouting for deer on Chicagof Island, Alaska. "They heard a 'whoof' and then a brown bear emerged from the brush, charging at them," troopers wrote in a media release about the shooting. The bear—a sow that was with two cubs—pinned one hunter on the ground and was clawing him before the other hunter sighted in and shot the bear. The man who was mauled was airlifted to a hospital where he was treated for his injuries. (adn.com, Juneau, Alaska, 10/2/16)

Robbery just doesn't pay when the intended victim is armed. A 26-year-old man who thought that two people in a parked car would be easy marks paid for that misjudgment with his life. The bad guy approached the car and started to rob its two passengers at gunpoint. But during the event, one of the people in the car pulled his legally owned handgun and shot the perpetrator. The bad guy's accomplice, a 27-year-old woman who was later charged, drove the wounded man to a hospital, but he was pronounced dead on arrival. (*The News Tribune*, Tacoma, Wash., 10/9/16)

Home invaders: If you're asked to leave, save yourself a heap of trouble and just do it—or you might end up dead. That's what happened to an intruder in Wyoming recently. A stranger entered a Sheridan, Wyo., home in the overnight hours one day. The adult male resident told the intruder to turn around and leave. The miscreant refused. The resident then armed himself with a shotgun and again asked the stranger to leave. When the interloper again refused, the armed citizen fired, fatally hitting the trespasser in the chest. (KTVQ, Sheridan, Wyo., 10/16/16)

When a suspect pulled out a note demanding money, the store manager pulled out a gun. The manager of Belmont Market held the alleged robber at gunpoint until the police arrived and arrested the man. He told a news reporter afterward that he was glad he didn't have to shoot. "The people who come here are excellent, so we don't want to see anything … happening in our neighborhood," the manager said. (WHIO, Dayton, Ohio, 10/13/16)

Keeping guns bedside paid off for an Akron, Ohio, couple. The husband and wife were awakened by noise one morning, but they figured it was just the sound of another family member returning home. A little while later, however, a stranger entered their bedroom. Both residents reached for their guns and held the intruder at gunpoint. When the police arrived and searched the home, they found the man's jacket—with a loaded handgun in the pocket—on the couch in the living room. The man faces multiple charges. (WKYC, Akron, Ohio, 10/17/16) 🏃

---

### If you have a firsthand **"Armed Citizen"** experience, call NRA-ILA PR/Communications at (703) 267-3820.

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or in, in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**

## OFFICIAL JOURNAL

# The **Armed** Citizen®



While it's normal for a deputy to protect the public, it's less normal for an everyday citizen to get a chance to return the favor. But that's what happened in Estero, Fla., recently when an armed citizen shot and killed someone who was attacking a law enforcement officer. The deputy and the assailant had been involved in a high-speed car chase on the interstate. After the vehicles came to a stop, the suspect and Deputy Dean Bardes got out of their respective cars. The suspect, who was armed, then started assaulting the law officer. A passerby, who had a license to carry a concealed handgun, stopped and told the attacker to stop beating up the deputy or he'd shoot. The attacker didn't listen, so the armed citizen fired three times, killing the assailant. Bardes was treated and released for his injuries; he was not shot by the armed suspect. (WINK News, Fort Myers, Fla., 11/14/16)

---

The road can be a dangerous place for anyone—even a carjacker, if he picks a victim who is armed. A woman driving through a Cleveland suburb was cut off in traffic by an SUV. A man exited that vehicle—gun drawn— and approached her car. Fortunately, the woman's 23-year-old son, who is a concealed-carry permit holder, was with her. The young man pulled his firearm in defense and the bad guy fled to his SUV and drove off. Officers later arrested the suspected carjacker. (*Sun Messenger*, Cleveland, Ohio, 11/10/16)

Some burglars just won't quit until they find a place they can break into. But such determination came back to haunt a bad guy in North Carolina. In the town of Benson, police were called before sunrise one November morning and were told that a stranger was "beating on doors in the area" and possibly checking for one that was unlocked. Before the police arrived, the bad guy gained entry to one abode, where the resident had a gun and shot him. The suspect was taken to a medical facility and charges were expected. (WNCN.com, Raleigh, N.C., 11/27/16)

Getting physically removed from a store after causing trouble there apparently bruised a malcontent's ego enough that he sought revenge. After a clerk forcibly escorted an unruly customer from a Sherman, Texas, grocery store, the man threatened to return later. He came back as promised, accosting the clerk as he made his way to a car after locking up the store. When the troublemaker pulled something out of his waistband, the clerk ran toward an alley, drawing his handgun as a precaution. The suspect, now with a machete in hand, pursued the store worker, who fired in self-defense then went back into the store to call the police. The wounded perpetrator ran off, but he was caught a few minutes later after a nearby resident called for an ambulance because a man had collapsed and needed medical aid. (HeraldDemocrat.com, Sherman, Texas, 11/17/16)

An Idaho teen woke up after hearing a sharp banging noise early one morning. He went to investigate, and he saw his father coming into the kitchen and asked about the noise. The older man had pulled into the driveway a minute earlier and noticed that the garage door was partially open, so he went outside to check and saw a stranger crawling out of a window to a spare bedroom. When the intruder noticed he had been seen, he withdrew back into the spare room. The father and son walked through the house toward the room, with the boy grabbing a shotgun from the gun cabinet for protection. Seconds later, the burglar opened fire on the pair, who took cover. In a pause after the shots, the boy stepped forward and fired once into the intruder's abdomen. The bad guy was taken to a hospital; both father and son were unharmed. (*Idaho Statesman*, Boise, Idaho, 11/1/16)

Being home alone can leave one vulnerable, but a gun can turn the tables. An Indiana woman, whose spouse was away, was letting her dog out one evening. As she did, a man in a ski mask approached. She told the man to leave, but he didn't heed her warning. The woman ran inside the house, with the attacker on her heels. He threw the woman against a wall. The woman pushed him away, got up and retreated to a bedroom. The intruder pursued her and climbed on top of her on the bed as she fought against him. She struggled to grab her husband's gun, kept near the bed, and fired two shots at the assailant. The aggressor fled and the woman escaped serious injury. (*Daily Journal*, Bargersville, Ind., 10/23/16)

---

### If you have a firsthand **"Armed Citizen"** experience, call NRA-ILA PR/Communications at (703) 267-3820.

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or, in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**



Case: 23-55805, 12/28/2023, ID: 12843060, DktEntry: 58-2, Page 39 of 43

OFFICIAL JOURNAL

# The **Armed** Citizen®



Crime doesn't pay in Chile—especially when the victim is an American ex-pat who keeps a gun under her pillow. A 61-year-old yoga instructor was alone in her Batuco, Chile, home when four men broke into her residence. Two of the assailants entered her bedroom, hit her on the head with a gun and prepared to tie her up. But the Texas native, a legal concealed-carry holder in Chile, put up a struggle and grabbed her gun, fatally shooting both men who had tried to bind her. Their two accomplices fled before she could exit the bedroom and shoot them. The local prosecutor said the woman will not face any charges because she acted in self-defense. The nature of the attack was such that the authorities were concerned that the woman might be in further danger, so they arranged security for her temporarily. (*The Dallas Morning News*, Dallas, Texas, 11/25/16)

When two armed thugs kicked in the back door of a home in Worthington, Ky., the female resident showed them they picked the wrong victim. The armed citizen fired at both men, shooting one in the chest. The attackers retreated and jumped off the deck before the one who was shot collapsed and died. No charges were filed against the resident; the surviving alleged intruder was charged with murder because his accomplice died during the commission of a felony. (*The Courier Journal*, Louisville, Ky., 11/21/16)

Trouble sometimes comes knocking at the door, and when it happened recently in Miami, the troublemaker ended up paying for it. Early one morning, a stranger parked in front of the home and started banging heavily on the front door. The homeowner grabbed his gun, yelled that he was armed, then shot when the would-be intruder tried to gain entry. The suspect was taken to the hospital and was listed in critical condition. (*Miami Herald*, Miami, Fla., 11/30/16)

Family ties run deep in Rosharon, Texas, where a man defended his mother-in-law during an armed robbery. While the woman was chatting on the phone with her daughter one day, two armed intruders kicked in the door of her home. The woman's daughter, who lives across the street, told her husband of the commotion on the other end of the line. He then grabbed a shotgun and bolted across the street. There he found his mother-in-law had been forced into a back room and had a gun pointed at

her. He exchanged gunfire with the two bad guys, striking one fatally in the chest. The other fled. The armed citizen faces no charges. (*The Alvin Advertiser*, Alvin, Texas, 11/30/16)

Just the threat of being shot is enough to scare off some intruders, and that resolution was good enough for an Arizona man in his 80s. The elderly armed citizen was awakened one night by the sound of someone rifling through his cabinet drawers. The resident grabbed his handgun and confronted the suspect in the other room, ordering the alleged burglar to lie down and saying, "If you move, I'll blow your head off." The homeowner left that room to call 911, and by the time he returned, the interloper had fled. (*Camp Verde Journal*, Camp Verde, Ariz., 10/19/16)

Emergency dispatchers heard gunshots during a 911 call as a Florida man who was reporting an intrusion had to defend himself. The homeowner saw a vehicle enter the driveway of his Welleby Isles home. Three men exited the car, and two of the assailants hopped a fence leading to the caller's backyard. The resident grabbed and loaded his shotgun and called 911.

He told dispatchers that the bad guys had a brick and were trying to break a window, then he fired several times as one of the intruders entered the home. The wounded man died, and his accomplices fled. The armed citizen will not face charges. (*South Florida Sun Sentinel*, Sunrise, Fla., 12/1/16)

A Philadelphia auto repair shop owner learned the value of being prepared. One evening, a suspect attempted to rob the store. The owner responded by pulling his firearm and shooting the assailant in the shoulder, chest and buttocks. The alleged robber fled and was later arrested and taken to a hospital. (*The Philadelphia Inquirer*, Philadelphia, Pa.,12/18/16)

In Chicago, a worker protected his employer's place of business from being knocked off in an attempted robbery. Around 9:45 p.m., two men entered the establishment, announcing to everyone inside that they were going to rob it. The employee pulled his concealed firearm and fired, striking one assailant in the shoulder and the other in the forearm. Both were later arrested, as was a third suspect. (*Chicago Sun-Times*, Chicago, Ill., 11/29/16)

---



**If you have a firsthand "Armed Citizen" experience, call NRA-ILA PR/Communications at (703) 267-3820.**

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**

**MARCH 2017** AMERICAN RIFLEMAN



Official Journal

# The **Armed** Citizen®

A driver passing through Tonopah, Ariz., saved a state trooper's life after a harrowing incident. Just before sunrise, the trooper had stopped to investigate an accident. After discovering a flipped vehicle, the officer went to set out flares to warn other motorists. The driver of the overturned car opened fire on the officer and struck him, prompting the officer to attempt to subdue the man. A passing motorist and concealed-carry holder saw the attack and stopped, asking the officer if he needed help. After the officer said, "yes," the armed citizen went to his vehicle and retrieved his firearm, warning the trooper's attacker to stop. The man did not, so the good Samaritan shot him once, wounding him. While the passerby was tending to the trooper's injuries, the assailant attacked a second time. The armed citizen shot the man again, this time killing him. Arizona Department of Public Safety spokesman Capt. Damon Cecil said the motorist saved the trooper's life. (*The Arizona Republic,* Phoenix, Ariz., 1/17/17)

---

Two Montana miscreants were no match for an armed homeowner during an attempted burglary. Although the intruders targeted an empty cabin in Wolf Creek, Mont., the residents came back while the bad guys were ransacking the home. The couple thought something might be amiss when they spotted an unfamiliar SUV parked outside their cabin. As the couple approached the abode, the two burglars exited the cabin and accosted the homeowners. One of the two mischief-makers pulled a firearm and attempted to shoot it, but the gun misfired. While he attempted to chamber another round, his accomplice approached the homeowner in a threatening manner with a firearm, but the armed citizen drew his concealed handgun and shot the approaching scoundrel in the leg. The residents were unharmed, and police later arrested the two suspects. (*Independent Record,* Helena, Mont., 12/30/16)

---

Uber has a policy barring firearms, but a Florida driver and his fare are alive today because the driver didn't follow the rules. The ride-sharing employee was taking a client to the Fort Lauderdale-Hollywood International Airport when a minivan suddenly cut him off in traffic on a busy street. A man then exited the driver's side of the van with two handguns drawn and attempted to rob those in the car. Instead of getting any money, the gunman got shot. The Uber driver drew his concealed firearm and exchanged fire with the assailant. The attacker, who was shot multiple times, died on the scene, and his accomplice drove the van away. (*Miami Herald,* Miami, Fla., 12/19/17)

---

Would-be thieves picked the wrong victim when they targeted a gun store for a robbery in Mableton, Ga. The owner was minding the shop when two armed thugs burst through the doors in broad daylight and held the man at gunpoint. One of the robbers shouted at him, "Get down on the floor or I'll kill you," the merchant recalled, adding that they then shot at him. With the lives of himself, his employee and two customers in danger, the business owner pulled out a firearm and fatally shot one of the reprobates. He then fired at the second man, who fled the store. Authorities said the business owner lawfully acted in self-defense. (11alive.com, Atlanta, Ga., 1/10/17)

---

Paternal love knows no bounds. Even after being shot twice himself, a Frankford, Pa., father of four defended his family during a home invasion. After hearing a knock on the door to his home late one night, the homeowner answered only to have the person on the porch force his way inside. The resident's wife barricaded herself and the couple's four daughters in an upstairs room during the altercation. The intruder shot, hitting the victim twice, but the armed citizen retrieved a firearm and fired back, with the bullet fatally striking his attacker in the head. The robber was declared dead at the scene. The injured protector was taken to the hospital where he was listed in serious condition. (*The Philadelphia Inquirer,* Philadelphia, Pa. 1/4/17)

---

Attackers come in all forms, both human and animal. A 17-year-old boy in Lignum, Va., was at home looking after his nieces and nephews when he heard noises outside that alarmed him. Concerned for the safety of the children in his care, the boy grabbed his rifle and went to investigate. He saw what turned out to be a 545-pound feral boar tearing up the front yard. The boar saw the boy and charged at him. The boy fired in response. "When he came up to me the way he did, I had no choice but to shoot him," the teen told local media. (Richmond.com, Richmond, Va., 1/27/17)

---

**If you have a firsthand "Armed Citizen" experience, call NRA-ILA PR/Communications at (703) 267-3820.**

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **View this column online at nrapublications.org.**



OFFICIAL JOURNAL

# The **Armed** Citizen®



Early one morning in March, a family in Fresno, Calif., noticed a man carrying a soda bottle and pouring liquid outside the perimeter of their home. The homeowner grabbed his firearm and went outside to investigate. When he confronted the intruder, the stranger attempted to set the homeowner on fire by tossing what turned out to be gasoline from the bottle onto the armed citizen and flicking a lighter at him. The resident fired a shot at the assailant, who grabbed a board as a weapon. The homeowner fired a second shot, after which the troublemaker dropped the board and acquiesced to the resident, who held the man at gunpoint until police arrived. The suspect was arrested and charged with attempted arson, assault with a deadly weapon and trespassing. Apparently, this was not the first time that the mischief-maker had allegedly damaged the home; two previous incidents in February were what prompted the citizen to buy a gun for protection. (Fresnobee.com, Fresno, Calif., 3/1/17)

In Indiana, a state conservation officer owes his life to an armed citizen. After receiving a call about a suspicious person, the officer approached a vehicle parked on the roadside. The vehicle's owner began to resist and fight the officer as he tried to arrest the loiterer. Noticing the disturbance, a nearby resident came to the officer's aid. She fired one shot, and hit the assailant in the torso. The officer, who suffered assault injuries, and the attacker were taken to the hospital, where the bad guy later died. The woman will not be charged. (*The Enquirer*, Rising Sun, Ind., 2/22/17)

Two people were sitting in a car in Venice, Ill., one morning after a Vietnam veteran had driven his friend home. Two thugs approached, one of whom pulled a gun in an attempted robbery. The veteran drew his own firearm and fired at both men, killing one. "Not only did he save himself, his friend and protect everyone around them, he may have saved another individual's life if these people had continued to do this," said Madison County State's Attorney Tom Gibbons. (*Belleville News-Democrat*, Venice, Ill., 2/4/17)

A lover's spat could have turned lethal if not for the efforts of an armed citizen. The ex-boyfriend of an employee came into the 39-year-old's workplace and began to harass the woman. The offender punched the woman several times before throwing her to the ground. A customer saw the commotion and helped. His intervention made the woman's ex angry, and he attacked the armed citizen, trying to grab the man's gun. The good Samaritan fired twice at the suspect, who was taken to a hospital, where he was listed in critical condition. (*Holland Sentinel*, Holland, Mich., 2/24/17)

A store manager got the drop on two alleged criminals in Dublin, Ga. While the manager was going to his vehicle to retrieve something, two men in their early 20s approached from behind. Brandishing a gun, one of the men demanded that the manager give over his valuables and made him sit in the car. The armed citizen played along before retrieving a revolver and firing three shots in their direction, hitting one while the other ran away. Both men were eventually caught and charged with armed robbery and aggravated assault. (*The Courier Herald*, Dublin, Ga., 2/7/17)

Sometimes, a warning is enough to deter a criminal attack. A taxi driver in Gates, N.Y., used that tactic to defend against an irate passenger. After picking up a female passenger, the driver took the woman to four different locations before realizing the individual would not be able to pay. The driver threatened to call 911 when he noticed she had a weapon in her hands. "She had the ice pick and was coming toward me, so I started backing up and she kept coming," the driver told media. The woman attacked the car, damaging it, then came toward him. The driver warned her to stay away before drawing his concealed firearm. The woman paused and the driver hopped into his vehicle and drove away. The alleged assailant was later caught and charged by the police. (13WHAM.com, Gates, N.Y., 1/9/17)

"I would do whatever it takes to protect my business, my family and my customers," said one store owner who did just that against two armed men. The small-business owner was working one night when two men with bandanas over their faces entered the shop, flashing firearms and demanding money. The store owner, who had seen their approach on the security camera, responded by pulling out his own pistol. He refused to hand over his money and instead fired two shots in their direction, causing both intruders to flee. (*Yakima Herald-Republic*, Yakima, Wash., 2/22/17)

---

**If you have a firsthand "Armed Citizen" experience, call NRA-ILA PR/Communications at (703) 267-3820.**

Studies indicate that firearms are used more than 2 million times a year for personal protection, and that the presence of a firearm, without a shot being fired, prevents crime in many instances. Shooting usually can be justified only where crime constitutes an immediate, imminent threat to life, limb, or, in some cases, property. Anyone is free to quote or reproduce these accounts. Send clippings via e-mail to armedcitizen@nrahq.org, or by mail to "The Armed Citizen," 11250 Waples Mill Road, Fairfax, VA 22030-9400. For bonus features, visit "The Armed Citizen Blog" at americanrifleman.org. **For related articles, go to nrapublications.org.**



CERTIFICATE OF COMPLIANCE

1. This motion complies with type-volume limitation of Fed. R. App. P. 29(a)(5) because the amicus brief contains 5166 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

   Dated: 28 December 2023

   /s/ John Cutonilli

   John Cutonilli
   P.O. Box 372
   Garrett Park, MD 20896
   (410) 675-9444
   jcutonilli@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on 28 December 2023, I electronically filed the foregoing United States Court of Appeals for the Ninth Circuit by using the Electronic Document Submission System. I emailed a copy of the document to the following addresses

Mica.Moore@doj.ca.gov Attorneys for Defendant-Appellants

erin.murphy@clementmurphy.com Counsel for Plaintiffs-Appellees

/s/ John Cutonilli

John Cutonilli
P.O. Box 372
Garrett Park, MD 20896
(410) 675-9444
jcutonilli@gmail.com