No. 23-55805

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

———————————

VIRGINIA DUNCAN, ET AL.,

*Plaintiffs and Appellees*,

v.

ROB BONTA, IN HIS OFFICIAL CAPACITY AS
ATTORNEY GENERAL OF THE STATE OF CALIFORNIA,

*Defendant and Appellant.*

———————————

## On Appeal from the United States District Court
## for the Southern District of California
No. 3:17-cv-01017-BEN-JLB
The Honorable Roger T. Benitez, Judge

———————————

## APPELLANT'S REPLY BRIEF

———————————

ROB BONTA
*Attorney General of California*
MICHAEL J. MONGAN
*Solicitor General*
HELEN H. HONG
*Principal Deputy Solicitor General*
THOMAS S. PATTERSON
*Senior Assistant Attorney General*

MICA L. MOORE
*Deputy Solicitor General*
R. MATTHEW WISE
*Supervising Deputy Attorney General*
ROBERT L. MEYERHOFF
KEVIN J. KELLY
JOHN D. ECHEVERRIA
*Deputy Attorneys General*

CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013
(213) 269-6138
Mica.Moore@doj.ca.gov
*Attorneys for Defendant and Appellant*

January 25, 2024

## TABLE OF CONTENTS

**Page**

Introduction ..................................................................................................1

Argument......................................................................................................2

I.  Section 32310 is consistent with the Second Amendment............................2

  A.  Plaintiffs have not established that large-capacity magazines are presumptively protected by the Second Amendment.........................2

    1.  "Arms" .......................................................................................3

    2.  "Common use for self-defense" .................................................5

    3.  "Most useful in military service" ...........................................11

    4.  "Dangerous and unusual".......................................................13

  B.  California's restrictions on large-capacity magazines are consistent with this Nation's historical tradition...............................16

    1.  If the Second Amendment presumptively protects large-capacity magazines, *Bruen*'s historical inquiry and "more nuanced" approach would apply here.....................................16

    2.  Section 32310 is consistent with the historical tradition of regulating especially dangerous weapons as they proliferate and imperil public safety........................................20

II.  Section 32310 does not violate the Due Process Clause or the Takings Clause .............................................................................................25

III.  The en banc panel has authority to decide this appeal ...............................27

Conclusion.................................................................................................30

Certificate of compliance ........................................................................31

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Andrus v. Allard*
    444 U.S. 51 (1979)......................................................................26

*Bevis v. City of Naperville*
    85 F.4th 1175 (7th Cir. 2023)..............................................10, 12

*Caetano v. Massachusetts*
    577 U.S. 411 (2016) ...............................................................14

*Capen v. Campbell*
    ___ F. Supp. 3d ____, 2023 WL 8851005 (D. Mass. Dec. 21, 2023) ...............15

*Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Security (DSSA)*
    ___ F. Supp. 3d ____, 2023 WL 2655150 (D. Del. Mar. 27, 2023)..................24

*District of Columbia v. Heller*
    554 U.S. 570 (2008).........................................................*passim*

*Duncan v. Bonta (Duncan V)*
    19 F.4th 1087 (9th Cir. 2021) ...........................................25, 26

*Duncan v. Bonta (Duncan VIII)*
    83 F.4th 803 (9th Cir. 2023) ...............................................6, 13

*Friedman v. City of Highland Park*
    784 F.3d 406 (7th Cir. 2015)..................................................10

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015)..................................................4, 5

*Hanson v. District of Columbia*
    ___ F. Supp. 3d ____, 2023 WL 3019777 (D.D.C. Apr. 20, 2023) ...........12, 17

*Hollingsworth v. Perry*
    570 U.S. 693 (2013).........................................................28

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Horne v. Department of Agriculture*
576 U.S. 350 (2015)................................................................25

*Knick v. Twp. of Scott*
139 S. Ct. 2162 (2016)...........................................................26

*McCullen v. Coakley*
573 U.S. 464 (2014)...............................................................15

*Miller v. Schoene*
276 U.S. 272 (1928) ..............................................................26

*Moody v. Albemarle Paper Co.*
417 U.S. 622 (1974) ..............................................................27

*Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*)
___ F. Supp. 3d ____, 2023 WL 4975979 (D. Conn. Aug. 3, 2023)..........*passim*

*New York State Rifle & Pistol Ass'n v. Bruen*
597 U.S. 1 (2022).................................................................*passim*

*Nunn v. State*
1 Ga. 243 (1846) ..................................................................21

*Ocean State Tactical, LLC v. Rhode Island*
646 F. Supp. 3d 368 (D.R.I. 2022) .............................................3, 4

*Or. Firearms Fed'n v. Kotek*
___ F. Supp. 3d ____, 2023 WL 4541027 (D. Or. July 14, 2023) ............*passim*

*Strickland v. State*
137 Ga. 1 (1911) ..................................................................21

*Teixeira v. Cnty. of Alameda*
873 F.3d 670 (9th Cir. 2017) ....................................................4, 5

*Teter v. Lopez*
76 F.4th 938 (9th Cir. 2023)....................................................7, 13

# TABLE OF AUTHORITIES
## (continued)

<b>Page</b>

*United States v. Alaniz*
    69 F.4th 1124 (9th Cir. 2023)................................................................6

*United States v. Cox*
    906 F.3d 1170 (10th Cir. 2018).........................................................3

*United States v. Dorsey*
    677 F.3d 944 (9th Cir. 2012).........................................................12

**STATUTES**

United States Code, Title 28
    § 46(c) ................................................................................27, 28
    § 47...........................................................................................29
    § 1292......................................................................................29
    § 1367(a) ................................................................................28
    § 1453(c) ................................................................................29
    § 1915......................................................................................29
    § 2517(b) ................................................................................28

California Penal Code
    § 32310 ............................................................................*passim*

1837 Ala. Acts 7, § 2 ......................................................................21

1881 Ark. Acts 191, ch. 191, § 1-2 ................................................21

1763-1775 N.J. Laws 346, ch. 539, § 10 .......................................22

1837-1838 Tenn. Pub. Act 200, ch. 137, § 1 ................................21

1871 Tex. Laws 25 § 1....................................................................21

33 Hen. 8, ch. 6, § 1 (1541)...........................................................14

# TABLE OF AUTHORITIES
## (continued)

**Page**

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Second Amendment ...............................................................*passim*
    Fifth Amendment ...........................................................................26

**COURT RULES**

Ninth Circuit General Orders
    Gen. Order 3.6(b) .............................................................27, 28, 29
    Gen. Order 5.8(a)-(b) .....................................................................29

**OTHER AUTHORITIES**

Blackstone, *Commentaries on the Laws of England* (1769) ...................................14

Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687 (2016)...............................................15

Schwoerer, *Gun Culture in Early Modern England* (2016) ...................................15

Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* (1782) ......................................................14

## INTRODUCTION

Plaintiffs' understanding of the Second Amendment is "straightforward" (AB 1) but at odds with precedent.[1]  In their view, the Second Amendment presumptively protects all "bearable instruments that facilitate armed self-defense." AB 24.  And the only question a court may ask in determining whether such an instrument may be banned is how many of those instruments are lawfully possessed in the United States.  AB 28.  If the number exceeds a certain threshold "then a state may not ban them, full stop."  *Id.*  In plaintiffs' eyes, "that should be the end of the analysis," AB 37—without any inquiry into historical traditions.

That approach might "make[] this an exceptionally easy case," AB 28, but it is incompatible with the Second Amendment's text and history, Supreme Court precedent, and the great weight of lower-court authority.  The "Second Amendment right . . . extends only to certain types of weapons." *District of Columbia v. Heller*, 554 U.S. 570, 623 (2008); *see New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 21 (2022).  In assessing whether a weapon is presumptively protected, the Supreme Court has considered the character of that weapon.  It has never treated the aggregate number of weapons in circulation as dispositive of the Second Amendment analysis; indeed, it has concluded that certain types of weapons are unprotected and "may be banned" without any

---

[1] "AB" refers to the answering brief; "OB" refers to the opening brief.

1

discussion of their numerical prevalence. *Heller*, 554 U.S. at 627. Even for weapons that are presumptively protected, the Court has stressed that the government may "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition." *Bruen*, 597 U.S. at 24.

Viewed in light of the proper framework, plaintiffs have not carried their burden to establish that large-capacity magazines are presumptively protected. And even if they had, the challenged statute is consistent with our Nation's long tradition of restricting and prohibiting especially dangerous weapons technologies that imperil public safety. Particularly when assessed under the "nuanced approach" that is appropriate for this type of case, *Bruen*, 592 U.S. at 27, Section 32310 imposes "a comparable burden on the right of armed self-defense" to its historical precursors, and "that burden is comparably justified," *id.* at 29.

Plaintiffs' claim under the Takings Clause also fails. And the presently constituted en banc panel has statutory authority to hear this appeal.

## ARGUMENT

## I.   SECTION 32310 IS CONSISTENT WITH THE SECOND AMENDMENT

### A.   Plaintiffs Have Not Established That Large-Capacity Magazines Are Presumptively Protected by the Second Amendment

Plaintiffs concede that they have the "threshold burden" of establishing that the possession of large-capacity magazines is presumptively protected. AB 21. But they characterize that burden as a "slight" one, *id.*, which merely requires a

showing that the challenged law concerns "bearable instruments that facilitate armed self-defense." AB 24. That approach would extend presumptive constitutional protection to weapons like M16s that the Supreme Court has said may be banned—not to mention countless accessories that do not themselves constitute "arms." And it is inconsistent with Supreme Court precedent, which looks to several related considerations bearing on the meaning of the Second Amendment *before* concluding that a "type of weapon" is "eligible for Second Amendment protection." *Heller*, 554 U.S. at 622. Those considerations mostly relate to the "character of the weapon" (*id.*): whether it is "'in common use' today for self-defense," *Bruen*, 597 U.S. at 32; whether it is "most useful in military service," *Heller*, 554 U.S. at 627; and whether it is a "'dangerous and unusual weapon[],'" *id.* None of them supports plaintiffs' position here. *See* OB 16-31.

### 1. "Arms"

Plaintiffs first assert that large-capacity magazines "easily," "decidedly," "unquestionably," and "plainly" constitute "arms" under the original meaning of the Second Amendment. AB 21, 22, 23. All those adverbs cannot compensate for the fact that a detachable magazine is not itself "a 'thing . . . use[d] in wrath to *cast at or strike* another.'" *Ocean State Tactical, LLC v. Rhode Island*, 646 F. Supp. 3d 368, 386 (D.R.I. 2022); *see* OB 17-18. Just as "[a] silencer is a firearm accessory" and "not a weapon in itself," *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir.

2018), so too a magazine is not a weapon in itself. At the founding and thereafter, such firearms accessories were known as "accoutrements," not "arms," *Ocean State*, 646 F. Supp. 3d at 387—even if they could be "attached" or "affixed" (AB 22) to a firearm, *see, e.g.*, 7-ER-1574 (describing "Gun Slings" as accoutrements).

Plaintiffs characterize the State as "insist[ing] that the Second Amendment does not cover [ammunition] feeding devices *at all*." AB 22. That is not the State's position. Even though a magazine is not an "arm," "the Second Amendment also 'protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense.'" OB 19 (quoting *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc)). That ancillary protection extends to the right to "bullets necessary to use" firearms and the "'right to possess the magazines necessary to render [protected] firearms operable'" by feeding ammunition into the firing chamber. *Id.* (quoting *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015), *abrogated on other grounds by Bruen*, 597 U.S. 1).

The problem for plaintiffs is that *large-capacity* magazines indisputably are not necessary to render *any* authorized semiautomatic firearm operable: every firearm that can accept a detachable "large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended." 7-ER-1584. Plaintiffs say this fact "makes no difference" to the analysis. AB 24. But this Court already explained why it makes a difference: whether a non-arm

4

accessory is "necessary" to the functioning of a protected firearm is the critical question in determining whether it is protected. *E.g.*, *Teixeira*, 873 F.3d at 677; *Fyock*, 779 F.3d at 998.

Plaintiffs misread *Bruen* when they assert that "[a]ll that matters at the threshold is whether what California bans are bearable *instruments* that facilitate armed self-defense." AB 24 (emphasis added). *Bruen*'s reference to "instruments that facilitate armed self-defense" was qualified: the Court was speaking of "instruments *that constitute bearable arms*." 597 U.S. at 28 (quoting *Heller*, 554 U.S. at 582) (emphasis added). An instrument that is not itself an arm (and is not necessary to render an arm operable) is outside the scope of the Second Amendment. Plaintiffs tacitly recognize as much. They appear to concede that "founding-era cartridge boxes" are not "arms." AB 23. A cartridge box was certainly "bearable," however, and it facilitated armed self-defense by providing the bearer easy access to a "paper cartridge that contained a pre-measured load of gunpowder and a ball" necessary to reload a musket. 2-ER-239. Plaintiffs' test would improperly treat cartridge boxes—and all manner of other non-arm instruments that might somehow facilitate self-defense—as "arms."

### 2. "Common use for self-defense"

The inquiry into "common use for self-defense" considers not just prevalence but also the "character of the weapon" and in particular whether it is a "self-

defense weapon." *Heller*, 554 U.S. at 622, 629. The characteristics of large-capacity magazines show that they are offensive instruments designed to maximize casualties, not self-defense weapons. OB 20-31. Plaintiffs disregard precedent establishing that they have the burden to show that large-capacity magazines are in "common use for self-defense," and they badly misunderstand the scope of that inquiry.

1. Plaintiffs contend that whether a weapon is commonly used for self-defense is only relevant at the second stage of the *Bruen* framework, where the State bears the burden. AB 25. Ninth Circuit precedent—which plaintiffs do not cite—says the opposite: The "threshold inquiry," referred to as "*Bruen* step one," considers "whether the weapon at issue is '"in common use" today for self-defense,' and whether the 'proposed course of conduct' falls within the Second Amendment." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023). Only if that "first step is satisfied" does the Court "proceed to *Bruen* step two, at which the 'government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.*; *see also Duncan v. Bonta*, 83 F.4th 803, 810, 811 (9th Cir. 2023) (*Duncan VIII*) (Bumatay, J., dissenting) (whether "'weapons [are] "in common use" today for self-defense'" is one of "the Second Amendment's 'textual elements,'" informing whether "the Constitution 'presumptively protects [plaintiffs'] conduct'").

6

*Bruen* compels that sequencing. In that case, the Court first asked whether the plaintiffs were "part of 'the people' whom the Second Amendment protects," *Bruen*, 597 U.S. at 31-32; whether handguns "are weapons 'in common use' today for self-defense," *id.* at 32; and "whether the plain text of the Second Amendment protects [plaintiffs'] proposed course of conduct," *id.* Only *after* answering those questions in the affirmative did the Court treat that conduct as "presumptively" protected (*id.* at 33) and place "the burden . . . on [the State]" to show that its law was "consistent with this Nation's historical tradition." *Id.* at 33-34.[2]

According to plaintiffs, "[t]he state candidly admits that to accept" that sequencing "would require 'overrul[ing]' *Teter v. Lopez*, 76 F.4th 938 (9th Cir. 2023), which held that common use is relevant only 'in the second prong of the *Bruen* analysis,' on which the state bears the burden. *Id.* at 949-50; *see* A.G.Br.30." AB 25. That mischaracterizes both the State's brief and this Court's precedent. The cited page of the State's brief addressed the related but distinct inquiry into whether a weapon is "dangerous and unusual." OB 30. And the three-judge panel in *Teter* held (incorrectly, *see* OB 30-31; *infra* p. 14) that "whether butterfly knives are '*dangerous and unusual*' is a contention as to which [the State]

---

[2] A later passage in *Bruen* reiterated the Court's conclusion that handguns are "in 'common use' for self-defense today," 597 U.S. at 47, but that cannot plausibly be read as an "instruct[ion]" (AB 25) that this conclusion is irrelevant to the threshold stage of the *Bruen* framework.

bears the burden of proof in the second prong of the *Bruen* analysis." 76 F.4th at 950 (emphasis added). The panel could not have placed the "common use for self-defense" inquiry at *Bruen*'s "second prong" because the earlier decisions in *Bruen* and *Alaniz* said the opposite.

2. Plaintiffs' discussion of whether large-capacity magazines are in common use for self-defense ignores the objective characteristics of those magazines, *see* OB 22, focusing instead on the total number they say are owned in the United States, *e.g.*, AB 28 ("*hundreds of millions*"). In their view, that counting exercise alone establishes that large-capacity magazines are a constitutionally protected self-defense weapon: if a weapon (or "instrument") is purchased in sufficient numbers then "a state may not ban [it], full stop." *Id.* Plaintiffs' brief never identifies the magic number, but they suggested below that as few as 200,000 would suffice. *See* D. Ct. Dkt. 50-1 at 16. That would mean that if 1 in every 1,679 Americans chooses to purchase a bearable weapon (or accessory), no government in the United States could prohibit its use or possession—regardless of its objective dangerousness or character as an offensive weapon.

The Supreme Court has never adopted that alarming understanding of the Second Amendment. To the contrary, *Heller* emphasized the importance of examining the "character of the weapon" at issue. 554 U.S. at 622. It then considered the specific features of handguns (such as size, weight, and shape) that

8

render them a "self-defense weapon." *Id.* at 629. The Court later reiterated that "'individual self-defense is "the *central component*" of the Second Amendment right.'" *Bruen*, 597 U.S. at 29. And when it recognized that certain types of weapons "may be banned"—and called out short-barreled shotguns and M16 rifles as examples—it did so without mentioning the numerical prevalence of those weapons. *Heller*, 554 U.S. at 625, 627. If the Court had truly "embraced" (AB 31) plaintiffs' numbers-only approach, it would have discussed how many of those weapons existed before declaring them categorically unprotected.

Plaintiffs have no response to that point, and their brief only underscores the problems with their approach. They do not identify any evidence of original meaning establishing that the weapons eligible for protection are defined exclusively by contemporary ownership data. They acknowledge the difficulties associated with making accurate numerical estimates. *See* AB 31 n.7 (discussing "disparities" and "variance in expert estimates"). Their brief declines to identify what they think the dispositive cut-off number is—or to explain what historical evidence or constitutional principles might guide a court in determining that number. And they cannot even bring themselves to take a forthright position on whether the presence of "hundreds of thousands of 'federally-registered machineguns in the United States'" means that a State may not ban machineguns. AB 35; *see* AB 36 ("whatever the consequences of" the numbers-only test with

9

respect to machineguns, "this Court is bound to follow" it). *But see Heller*, 554 U.S. at 624 (it would be "startling" to conclude that "restrictions on machineguns [are] unconstitutional").

Plaintiffs do concede that States may ban *some* exceedingly dangerous weapons—but only when those weapons are also exceedingly rare. AB 32. In their view, if just a few States legalize such a weapon and the requisite number is purchased (perhaps as few as 200,000), every State loses the authority to prohibit that weapon—no matter how dangerous it is or how much it imperils public safety. That "would be absurd." *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015). Plaintiffs' exclusive reliance on modern sales and ownership data is irreconcilable with "a test rooted in the Second Amendment's text, as informed by history." *Bruen*, 597 U.S. at 19; *see* Oral Argument Recording 45:16-45:35, *Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) (No. 23-1353), http://tinyurl.com/2kmw5s7a (Judge Easterbrook: "All of that is totally extrinsic to either the language of the Constitution or the history of the Constitution. And I wonder how . . . that totally anachronistic approach can be the one required by the Constitution.").

3. Plaintiffs also invoke survey data (which their own expert criticized, *see* Everytown Br. 6 n.3) about the reasons why some modern gun-owners prefer "magazines that will run out of ammunition less often." AB 30. But that "does not

demonstrate that [large-capacity magazines] possess characteristics that make them well-suited for self-defense." *Nat'l Ass'n for Gun Rights v. Lamont* (*NAGR*), ___ F. Supp. 3d ____, 2023 WL 4975979, at *21 (D. Conn. Aug. 3, 2023).  Indeed, if self-reported subjective preferences were sufficient to establish that something is a self-defense weapon, "nearly every firearm or firearm accessory purchased in this country would satisfy that test." *Or. Firearms Fed'n v. Kotek*, ___ F. Supp. 3d ____, 2023 WL 4541027, at *30 (D. Or. July 14, 2023).

What the objective characteristics of large-capacity magazines demonstrate is that those instruments are offensive in nature; were originally designed and produced for military use; allow an attacker to maximize casualties by firing a large number of uninterrupted rounds at a rapid rate; and could create a "considerable risk" to innocent family members and neighbors if used in a self-defense situation.  10-ER-2235; *see* 10-ER-2234, 10-ER-2272-2274, 10-ER-2317-2318, 12-ER-2741-2742; OB 22, 27-28.  In actual self-defense situations, moreover, civilians nationwide hardly ever fire more than 10 shots.  *See* OB 25-26. Plaintiffs' brief does not contest the accuracy of that data.

### 3.    "Most useful in military service"

The Supreme Court has also emphasized the related consideration that weapons "most useful in military service—M-16 rifles and the like—may be banned." *Heller*, 554 U.S. at 627.  Plaintiffs do not dispute that large-capacity

magazines "'are particularly designed and most suitable for military . . . applications.'" *Hanson v. District of Columbia*, ___ F. Supp. 3d ____, 2023 WL 3019777, at *8 (D.D.C. Apr. 20, 2023); *see* AB 34-35. And the Seventh Circuit recently relied on that consideration in holding that a law restricting large-capacity magazines is likely constitutional. *See Bevis*, 85 F.4th at 1188-1197. Plaintiffs ignore that holding, but effectively invite this Court to create a conflict with the Seventh Circuit by arguing that it "makes no difference to the constitutional inquiry" whether a weapon is most useful in military service. AB 34.

This Court does not "lightly create a circuit split," *United States v. Dorsey*, 677 F.3d 944, 957 (9th Cir. 2012), and there is no basis for doing so here. As plaintiffs read *Heller*, the Supreme Court merely "acknowledged that *application* of" a numbers-only inquiry might sometimes "compel the conclusion that" certain weapons used in military service may be banned. AB 34-35. But again, *Heller* did not reference the numerical prevalence of M16 rifles and comparable weapons "that are most useful in military service" before concluding that they "may be banned." 554 U.S. at 627. That is not to say that *any* weapon used by the military is unprotected. It is only to say what is apparent from *Heller*: that certain types of offensive, militaristic weapons and instruments "may be reserved for military use." *Bevis*, 85 F.4th at 1194. That includes large-capacity magazines. *Id.* at 1197; OB 27-28.

### 4. "Dangerous and unusual"

Plaintiffs acknowledge (AB 41) the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627. That tradition applies to weapons that are "especially dangerous" in the sense that they present a heightened "level of lethality or capacity for injury." *NAGR*, 2023 WL 4975979, at *16; *see* OB 28-31. But plaintiffs misunderstand the nature of that tradition and how it factors into the constitutional analysis.

Like the three-judge panel in *Teter*, plaintiffs contend that the State bears the burden on this issue "'in the second prong of the *Bruen* analysis.'" AB 25 (quoting *Teter*, 76 F.4th at 949-950). The better view is that this tradition is properly considered as part of the threshold inquiry into whether a weapon is presumptively protected. *See, e.g.*, *NAGR*, 2023 WL 4975979, at *16; *Kotek*, 2023 WL 4541027, at *34. The Second Amendment "codif[ied] a pre-existing right." *Heller*, 554 U.S. at 603. And this tradition—which long-predated the founding—undoubtedly informed how the text was originally understood and what weapons were viewed as protected. *See id.* at 627 (discussing the tradition as the source of a "limitation on the right"); *see also Duncan VIII*, 83 F.4th at 810 (Bumatay, J., dissenting) (the exclusion of "'dangerous and unusual weapons'" from the "definition" of "Arms" is one of "the Second Amendment's 'textual elements'").

13

Plaintiffs also misunderstand the nature of this tradition. They contend that it establishes "a conjunctive test," under which "[a] weapon may not be banned unless it is *both* dangerous *and* unusual." AB 41 (quoting *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring)). In other words, they believe "the dangerousness of an arm . . . is not enough to justify its prohibition" in *any* circumstance—no matter how exceedingly dangerous that arm might be. AB 41-42. That view has never been adopted by a majority of the Supreme Court. It is inconsistent with the leading historical treatise cited in *Heller*, and with other historical sources. *See* 4 Blackstone, *Commentaries on the Laws of England* 148 (1769) ("[t]he offence of riding or going armed, with dangerous *or* unusual weapons, . . . is particularly prohibited" (emphasis added)); *see also* Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 17-18 (ed. 1782) (identifying certain dangerous weapons that may be "restrain[ed]," without reference to numerical prevalence).

Plaintiffs do not respond to that historical evidence or identify any historical authority of their own that understood the "dangerous and unusual" tradition as they do. Nor have they attempted to establish that the early weapons prohibited as part of this tradition—such as crossbows, *see* 33 Hen. 8, ch. 6, § 1 (1541)—were rare in a numerical sense at the time they were banned. It would be surprising if

14

they were, since governments (then and now) do not "regulate for problems that do not exist" but instead "adopt laws to address the problems that confront them." *McCullen v. Coakley*, 573 U.S. 464, 481 (2014). For example, history suggests that Henry VIII prohibited crossbows precisely because of concerns arising from their increased popularity. *See* Schwoerer, *Gun Culture in Early Modern England* 55 (2016) (noting the "wanton pleasure that men now have in using of crossbows").

Ultimately, plaintiffs' understanding of the "dangerous and unusual" tradition rests not on history, but on their assumption about the grammatical significance of the word "and." As other courts have recognized, however, grammar does not require plaintiffs' "conjunctive interpretation." *E.g.*, *NAGR*, 2023 WL 4975979, at *16. The phrase "dangerous *and* unusual" operates as a hendiadys: a device where "two terms separated by a conjunction work together as a single complex expression." Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 688 (2016). It describes weapons that—like large-capacity magazines—"pose substantial dangers far beyond those inherent in the design of ordinary firearms." *Capen v. Campbell*, ___ F. Supp. 3d ____, 2023 WL 8851005, at *16 (D. Mass. Dec. 21, 2023). It does not prescribe a strict numerical "test" (AB 41) barring any government from restricting

15

such a weapon (or accessory) as soon as some minimum number of models has been purchased.

## B. California's Restrictions on Large-Capacity Magazines Are Consistent with This Nation's Historical Tradition

Plaintiffs also misunderstand the second stage of the *Bruen* framework. If this Court holds (or assumes) that large-capacity magazines are presumptively protected, *Bruen* directs that the State must have an opportunity to justify the challenged law by pointing to evidence that it is consistent with our Nation's historical tradition. Plaintiffs first attempt to sidestep that inquiry, urging the Court to rely on modern ownership numbers as the sole and dispositive evidence of historical tradition. And when they turn to the actual evidence of tradition, they effectively demand a historical twin. *Bruen* foreclosed those arguments. Viewed in light of the "nuanced" analogical approach that is appropriate for this type of case, *Bruen*, 597 U.S. at 27, Section 32310 fits comfortably within the long American tradition of restricting and prohibiting especially dangerous weapons technologies after they proliferated and began to imperil public safety. OB 31-52.

### 1. If the Second Amendment presumptively protects large-capacity magazines, *Bruen*'s historical inquiry and "more nuanced" approach would apply here

Plaintiffs argue that "the Supreme Court has already instructed that" the number of weapons lawfully owned in the United States today "*is* the historical test" for this kind of case. AB 37. But if the Court had intended for a weapon's

16

popularity to supplant the historical inquiry, it would have said so. What *Bruen* instead held—clearly and repeatedly—is that if a plaintiff establishes that the Second Amendment "presumptively protects" his proposed conduct, the government then has an opportunity to "demonstrate that [its] regulation is consistent with this Nation's historical tradition of firearm regulation." *E.g.*, *Bruen*, 597 U.S. at 17.

The Court also stressed that "the historical analogies" in *Bruen* and *Heller* "[were] relatively simple to draw," but that future "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 27. Plaintiffs concede that *Bruen*'s "more nuanced approach" "gives the government *greater leeway* in identifying 'historical analogies.'" AB 46. But they argue that it does not apply here. *Id.* Nearly every post-*Bruen* decision to consider that argument in a suit challenging restrictions on large-capacity magazines has properly rejected it. OB 32-33. Large-capacity magazines are dramatically different in technological terms from what was available in 1791 and 1868, and they have contributed to an unprecedented rise in the number of shootings in which lone gunmen use them to murder many victims in minutes. OB 34-35. Because no government would have had any reason to address those issues in 1791 or 1868, *Bruen*'s analogical inquiry must be conducted at a higher level of generality. *See Hanson*, 2023 WL 3019777,

at *16 ("[I]t would make no sense to divine constitutional significance from non-existent legislation concerning non-existent problems.").

Plaintiffs are simply incorrect that this case does not involve "any 'dramatic technological changes.'" AB 46. Even by plaintiffs' account, the first "box-style detachable magazines" were not marketed until around the turn of the twentieth century. AB 48. And plaintiffs' own summary judgment evidence (which their brief does not address) detailed the late-twentieth-century "'technological improvements'" that markedly increased the lethality of those magazines. OB 34 (quoting 16-ER-3808-3809). Those advancements enabled a rate and volume of sustained shooting that would have been impossible with technologies available at the ratification of the Second and Fourteenth Amendments. *See, e.g.*, *Kotek*, 2023 WL 4541027, at *38, *39; 8-ER-1829.

Plaintiffs focus their arguments on early "firearm[s] that could fire more than ten rounds without reloading." AB 46. But those examples do not remotely establish that the technology at issue here is comparable to what was available then. Their lead example (AB 46-47) is the fact that a London gunsmith in 1580 created an "uncontrolled" discharge by loading "a standard" gun barrel with "an alternating sequence of gunpowder and balls." 2-ER-251. The founding-era "Pepperbox-style pistol" (AB 47) was "impractical," accident-prone, and "lack[ed] accuracy." 9-ER-1887. The "Volcanic Arms lever-action rifle" (AB 47) was

18

patented in 1854, but the actual weapons "were few, flawed, and experimental." 9-ER-1886. The other repeating rifles invoked by plaintiffs were not semi-automatic weapons; they could not be operated without the shooter manually cranking a lever before each shot; and they required manual reloading—"one round at a time." 9-ER-1889; *see* OB 33-34.[3]

As to modern societal concerns, plaintiffs' only response is to say "that mass murder has been a fact of life in the United States for a very long time." AB 50. That ignores the modern concern that prompted Section 32310: the recent and unprecedented increase in shootings in which lone gunmen "'inflict mass casualties in a matter of seconds and maintain parity with law enforcement in a standoff.'" OB 34. That crisis is not inevitable and it is plainly facilitated by large-capacity magazines. There were just three shootings in the three decades after World War II in which a lone gunman killed 10 or more victims; there have

---

[3] Plaintiffs assert that "arms capable of firing more than 10 rounds . . . were among the most popular models on the civilian market by the 1860s." AB 37; *see* AB 47 ("'over 170,000 Winchester 66's 'were sold domestically'"). But they ignore evidence that such weapons "made up a tiny fraction of all firearms in the United States during Reconstruction" and were possessed "almost exclusively [by] U.S. soldiers and civilian law enforcement officers." 10-ER-2123, 10-ER-2098-2099; *see* OB 33-34; Brady Br. 19-20; *Kotek*, 2023 WL 4541027, at *38-39 ("less than 0.002 percent of firearms in the United States at the time of the Fourteenth Amendment").

been at least 15 such shootings since 2009—all but two involving large-capacity magazines. *See* 8-ER-1694; 10-ER-2303.

> **2. Section 32310 is consistent with the historical tradition of regulating especially dangerous weapons as they proliferate and imperil public safety**

Plaintiffs assert that the historical evidence identified by the State is "nowhere near sufficient" to justify Section 32310. AB 41. But their cursory discussion of that evidence (AB 42-45) betrays an approach that would turn the Second Amendment into "a regulatory straightjacket"—just what *Bruen* warned against. 597 U.S. at 30. The Supreme Court stressed that States need not identify a historical "dead ringer" to justify a law, only "historical precursors" that are "analogous enough to pass constitutional muster." *Id.*; *see also id.* at 27 (discussing "more nuanced approach").

The tradition that is relevant here extends from the founding, throughout the nineteenth century, to today: American governments have heavily restricted or prohibited weapons that are especially dangerous to public safety, particularly after those weapons proliferated in society to the point that they presented a substantial threat. *See* OB 36-45. That "broad[] tradition" has "target[ed] specific dangers posed by the characteristics" of particularly dangerous weapons, while "leav[ing] available sufficient avenues of carrying firearms for self-defense." *NAGR*, 2023 WL 4975979, at *33.

20

Plaintiffs ignore that historical forest and instead seek to distinguish each one of the trees. As to nineteenth century restrictions on Bowie knives, for example, plaintiffs emphasize that many of those laws "restrict[ed] concealed carry." AB 43; *see* AB 42. In fact, a number of the laws prohibited all forms of carry, *see, e.g.*, 1881 Ark. Acts 191, ch. 191, § 1-2; 1871 Tex. Laws 25 § 1, and *Heller* recognized that a "historical tradition of prohibiting the *carrying*" of certain weapons can support a "limitation on the right *to keep* and carry arms," 554 U.S. at 627 (emphasis added). Plaintiffs assert that the Bowie knife laws that "could be read to ban possession . . . were contemporaneously held unconstitutional" (AB 43), but that is unsupported.[4] And plaintiffs ignore laws that substantially restricted the use of Bowie knives, such as by banning their sale, *see* 1837-1838 Tenn. Pub. Act 200, ch. 137, § 1, or taxing them at a prohibitive rate, *see* 1837 Ala. Acts 7, § 2.

Next, plaintiffs reject any analogy to trap guns and gunpowder-storage restrictions, on the ground that those regulations did not concern "bearable arms." AB 43. But those historical precursors demonstrate the founding generation's

---

[4] Plaintiffs cite only one state court decision, *Nunn v. State*, 1 Ga. 243 (1846), which involved a pistol—not a Bowie knife. To the extent plaintiffs read *Nunn* to hold that States may not ban the possession of *any* arms, that view cannot be squared with precedent or tradition. *See, e.g.*, *Strickland v. State*, 137 Ga. 1, 8 (1911) (*Nunn* "was never intended to hold that" there was "some inherent right to keep and carry arms or weapons of every description").

concern with firearms modifications and firearms-related practices that posed a dire threat to the lives of innocent civilians. OB 38-39. With that concern in mind, colonial legislatures enacted solutions that plainly burdened the right of self-defense. Trap-guns were banned because they were considered "most dangerous," *e.g.*, 1763-1775 N.J. Laws 346, ch. 539, § 10—even though users "typically" employed them for defensive purposes, 9-ER-1902. Gunpowder restrictions, enacted to reduce the risk of mass fatalities from explosions or fires, effectively placed a ceiling on the number of rounds that a household could fire by limiting the amount of powder stored in each household. OB 39.

Plaintiffs concede that flat bans on slungshots and other similar weapons are a relevant "part of our Nation's history," but seek to distinguish them on the ground that those weapons were "sparingly chosen by law-abiding citizens for lawful purposes." AB 45. They do not offer any historical evidence to support that assertion—just their own *ipse dixit*.

As to firearms, plaintiffs barely mention nineteenth-century restrictions on the carry of concealable pistols, *see* OB 42, instead emphasizing that the "first laws regulating firing capacity did not come around for more than 100 years." AB 37-38. That is not surprising: nothing like modern large-capacity magazines existed in the first century of our republic, *supra* pp. 18-19, so "the lack of a distinctly similar historical regulation" (*Bruen*, 597 U.S. at 26) is to be expected. Between

22

1927 and 1934, however, over a dozen States restricted semiautomatic firearms, fully automatic firearms, or both based on their ability to fire a certain number of shots without reloading. OB 44-45. In plaintiffs' view, these laws are "of little help" because "they arrived more than three decades after semiautomatic weapons started hitting the civilian market." AB 38-39. But a legislature need not address every new technology when it first emerges; it may wait to act when that technology creates a "societal problem" or a "regulatory challenge[]." *Bruen*, 597 U.S. at 26, 27.[5] Nor can the significance of these laws be dismissed on the ground that they were not "understood to apply to feeding devices." AB 39. Like Section 32310, they responded to a surge in violence that was directly facilitated by a particularly lethal firearms technology. *See, e.g.*, 9-ER-1872-1875.

Plaintiffs ultimately contend that none of the State's historical examples "impose[d] anywhere near the degree of burden that §32310 does." AB 42. That is incorrect. Section 32310 does not prevent any law-abiding gun owner from possessing or using any authorized firearm for self-defense. While it limits the number of rounds in each magazine to 10, it imposes no limits on how many authorized magazines a person may possess or carry. And Americans almost never

---

[5] And if such a law is eventually "repealed" or "replaced" (AB 39) for policy or political reasons, that is not evidence that the State lacked constitutional authority to enact it in the first place.

need to fire more than 10 rounds in self-defense.  OB 25-26 & n.6.  Restrictions on large-capacity magazines thus impose (at most) "a minimal burden on the right to armed self-defense" that is comparable to the burden imposed by historical precursors.  *Kotek*, 2023 WL 4541027, at *39; *see Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.* (*DSSA*), ___ F. Supp. 3d ____, 2023 WL 2655150, at *12 (D. Del. Mar. 27, 2023).[6]

This is not improper "interest-balancing through the backdoor."  AB 45.  It is a straightforward application of *Bruen*:  a "'*central*' consideration[] when engaging in [the] analogical inquiry" is "whether modern and historical regulations impose a comparable burden."  597 U.S. at 29.  And the comparable burden imposed by Section 32310 is also "comparably justified."  *Id.*  Like its historical precursors, Section 32310 responds to pressing public safety concerns by restricting an especially dangerous weapons technology that is not necessary to armed self-defense and that imperils the lives of innocent civilians.  OB 48.

---

[6] *Heller* did not "reject[]" (D. Ct. Dkt. 132 at 16) consideration of the continued availability of other magazines when assessing burden.  It instead explained that the severe burden imposed by a complete "ban [on] the possession of handguns"— "the quintessential self-defense weapon"—was not lessened by the fact that long guns were still allowed.  *Heller*, 554 U.S. at 629.  In contrast, Section 32310 does not ban firearms, it restricts the capacity of magazines—and magazines necessary to use every type of semiautomatic firearm remain available.

## II.  SECTION 32310 DOES NOT VIOLATE THE DUE PROCESS CLAUSE OR THE TAKINGS CLAUSE

Plaintiffs have abandoned any argument under the Due Process Clause, and their argument that Section 32310 constitutes an uncompensated taking of "private property . . . for public use" (U.S. Const. amend. V) is meritless.  Plaintiffs appear to take the position (AB 54-55) that "any time a state adds to its list of contraband—for example, by adding a drug to its schedule of controlled substances—it must pay all owners for the newly proscribed item." *Duncan v. Bonta*, 19 F.4th 1087, 1112 (9th Cir. 2021) (en banc) (*Duncan V*), *cert. granted, judgment vacated*, 142 S. Ct. 2895 (2022).  As this Court previously observed, "[n]othing in the case law" establishes that novel proposition.  *Id.*[7]

Plaintiffs ignore appellate decisions rejecting takings claims in the context of state bans on other weapons accessories and gambling machines.  *See* OB 53.  The cases they do discuss are not to the contrary.  In *Horne v. Department of Agriculture*, 576 U.S. 350, 361 (2015), for example, the Court addressed a direct "government acquisition[]" of lawful personal property, not a prohibition on contraband.  That "clear physical taking" required the transfer of raisins (and "[t]itle to the raisins") "from the growers to the Government."  *Id.*  The growers

---

[7] Plaintiffs seek to distinguish Section 32310 from bans on controlled substances because "there is no constitutional right to keep or use drugs."  AB 54.  But this Court would only need to reach the takings issue if it agreed with the State that there is also no constitutional right to large-capacity magazines.

"los[t] the entire 'bundle' of property rights in the appropriated raisins—'the rights to possess, use, and dispose of' them." *Id.* at 361-362. The large-capacity magazines at issue here, in contrast, are not lawful in California; the State "in no meaningful sense takes title to, or possession of," the prohibited magazines, *Duncan V*, 19 F.4th at 1113; and the challenged statute allows owners to sell large-capacity magazines, to move them out of the State, or to continue to possess and use their magazines by modifying them to fit 10 rounds. OB 52; *cf. Andrus v. Allard*, 444 U.S. 51, 66 (1979) (no taking even though the challenged law "prevent[ed] the most profitable use of [plaintiffs'] property"). That type of regulation is consistent with citizens' general understanding that the government may restrict or even prohibit the possession of personal property that presents a danger to health or public safety. *See* OB 52; *cf. Miller v. Schoene*, 276 U.S. 272 (1928).

And even if Section 32310 did effect a taking, that would not support affirmance of the district court's injunction, because plaintiffs could turn to state law for a "just compensation remed[y]." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2176 (2016); *see* OB 54 n.15. Plaintiffs have waived any response to that argument by not addressing it.

### III. The En Banc Panel Has Authority to Decide This Appeal

The current en banc panel may decide this appeal consistent with 28 U.S.C. § 46(c) and this Court's General Orders. OB 55-58. Plaintiffs' contrary position—which reads Section 46(c) in a way that would mean General Order 3.6(b) is unlawful—is unpersuasive.

Plaintiffs devote most of their arguments (AB 13-16) to defeating a straw man. They explain that text and precedent establish that senior judges "may not vote on whether" to institute en banc proceedings. AB 16. But no one disputes that. Section 46(c) directs that "[c]ases and controversies shall be heard and determined" by a three-judge panel "unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in regular active service." 28 U.S.C. § 46(c); *cf. Moody v. Albemarle Paper Co.*, 417 U.S. 622, 626 (1974) (per curiam).

Here, a majority of the active judges who were in regular service in February 2021 *did* vote for rehearing en banc in this same case or controversy, in the course of a prior appeal arising out of the same summary judgment motion. OB 56. Once that vote was taken, Section 46(c)'s requirement for a majority vote of the active judges in this case or controversy was satisfied—and judges who were active at the time of that vote and assigned to the en banc panel were statutorily authorized "to continue to participate in the decision of [the] case or controversy" as a member of

27

that en banc panel, even after they became "senior circuit judge[s]." 28 U.S.C.
§ 46(c). Section 46(c) does not require a new en banc vote following the inception
of a subsequent appeal that is part of the same case or controversy. General Order
3.6(b) tracks that understanding of the statute: if "a new appeal is taken following
a remand or other decision by an en banc court," that "en banc court will decide
whether to keep the case."

Plaintiffs emphasize that "[t]he last time this dispute was here, this Court
issued a decision and a mandate," and "[t]his is now a new appeal." AB 11. That
is all correct, but it does not mean that Section 46(c) requires "a fresh en banc vote
among the active judges." AB 2. Plaintiffs read Section 46(c) as if it stated that
each "new appeal" must be heard by a three-judge panel absent a majority vote of
the active judges at the time of that new appeal. The statute Congress actually
wrote, however, refers to "a case or controversy." 28 U.S.C. § 46(c). And that
term of art extends to the entire adversarial dispute between two parties, not just a
single appeal within that dispute. *See, e.g.*, *Hollingsworth v. Perry*, 570 U.S. 693,
700 (2013) (the words "'case' or 'controversy'" include those "dispute[s]" that are
"'historically viewed as capable of resolution through the judicial process'"); 28
U.S.C. § 1367(a) (conferring supplemental jurisdiction on district courts over "all
other claims that are so related to claims in the action . . . that they form part of the
same case or controversy"); *id.* § 2517(b) (satisfaction of judgments against the

United States represent a "full discharge . . . of all claims and demands arising out of the matters involved in the case or controversy").[8]

Plaintiffs note that this appeal has been assigned "a new case number." AB 17. But that is just to say that it is a new appeal—not that it is a new "case or controversy" within the meaning of Section 46(c). Plaintiffs also argue that General Order 3.6(b) does not "make any sense as a policy matter." AB 19. But Congress gave this Court broad discretion to "'devise its own administrative machinery'" governing the en banc process—and to make its own judgments about what constitutes sound policy. OB 55. Plaintiffs' fears about senior judges using General Order 3.6(b) "to control [the] law" of this Circuit "in perpetuity" (AB 19) are not persuasive, especially in light of the possibility of rehearing en banc before the full Court. *See* Ninth Cir. Gen. Order 5.8(a)-(b).

Finally, plaintiffs assert that a new en banc "vote *was* taken" at the outset of this appeal that improperly included some senior judges and excluded many active judges. AB 17. In the next breath, however, they acknowledge that it was actually a vote of the en banc panel about "'whether to keep the case,'" just as contemplated by General Order 3.6(b). AB 17 n.4. Under the present circumstances—where this appeal and the prior one arose from the same district

---

[8] When Congress instead intends to refer to an "appeal," it knows how to do so. *E.g.*, 28 U.S.C. §§ 47, 1292, 1453(c), 1915.

court adjudicating the same claims in the context of the same summary judgment motion filed by the same plaintiffs—the en banc panel's decision to keep the case was entirely reasonable.

## CONCLUSION

The judgment of the district court should be reversed, and this Court should remand for entry of judgment in favor of the Attorney General.

Dated:  January 25, 2024                    Respectfully submitted,


                                    */s/ Mica L. Moore*
                                    _____

                                    ROB BONTA
                                    *Attorney General of California*
                                    MICHAEL J. MONGAN
                                    *Solicitor General*
                                    HELEN H. HONG
                                    *Principal Deputy Solicitor General*
                                    THOMAS S. PATTERSON
                                    *Senior Assistant Attorney General*
                                    MICA L. MOORE
                                    *Deputy Solicitor General*
                                    R. MATTHEW WISE
                                    *Supervising Deputy Attorney General*
                                    ROBERT L. MEYERHOFF
                                    KEVIN J. KELLY
                                    JOHN D. ECHEVERRIA
                                    *Deputy Attorneys General*
                                    *Attorneys for Defendant and Appellant*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s):** <u>No. 23-55805</u>

I am the attorney or self-represented party.

**This brief contains <u>6,996 words</u>,** including _____ words manually counted in any visual images, and excluding the items exempted by FRAP 32(f).

The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[x] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature:** *<u>/s/ Mica L. Moore</u>*     **Date:** <u>January 25, 2024</u>