**ROB BONTA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

300 SOUTH SPRING STREET, SUITE 1702
LOS ANGELES, CA 90013-1230

Public: (213) 269-6000
Telephone: (213) 269-6138
E-Mail: Mica.Moore@doj.ca.gov

August 12, 2024

VIA CM/ECF

Molly Dwyer, Clerk of Court
Office of the Clerk
U.S. Court of Appeals for the Ninth Circuit
P.O. Box 193939
San Francisco, CA 94119-3939

RE: *Duncan, et al. v. Bonta*, No. 23-55805
     Citation of Supplemental Authority

Dear Ms. Dwyer:

Appellant writes to notify this Court of the Fourth Circuit's en banc decision in *Bianchi v. Brown*, No. 21-1255 (Aug. 6, 2024). The Fourth Circuit considered a Second Amendment challenge to a Maryland law banning assault weapons. After rejecting plaintiffs' facial challenge because plaintiffs "failed to show that each firearm regulated by the Maryland statute is within the ambit of the Second Amendment," slip op. 27, the court considered the constitutionality of Maryland's restrictions on AR-15s, *id.* at 27-38. The court applied *Bruen*'s "two-step methodology," *id.* at 11, and concluded at the first step that "the covered firearms are not within the scope of the constitutional right to keep and bear arms for self-defense." *Id.* at 13; *see id.* at 14-27. The court further held that "even if the text of the Second Amendment were read to encompass the covered firearms, the statutory provisions would nonetheless be constitutional" because Maryland's ban on AR-15s is consistent with "a strong tradition of regulating excessively dangerous weapons once it becomes clear that they are enacting an inordinate toll on public safety and societal well-being," while "nonetheless preserving avenues for armed self-defense." Slip op. at 3, 13; *see id.* at 42-63; OB 36-41. Ten judges joined the opinion for the court; one judge concurred in the judgment; and five judges dissented. Slip op. 2.

Sincerely,

*/s/ Mica L. Moore*

MICA MOORE
Deputy Solicitor General

For     ROB BONTA
        Attorney General

Attachment.

cc: All Counsel of Record (via CM/ECF)

**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-1255**

---

DOMINIC BIANCHI, an individual and resident of Baltimore County; DAVID
SNOPE, an individual and resident of Baltimore County; MICAH SCHAEFER, an
individual and resident of Anne Arundel County; FIELD TRADERS LLC, A
resident of Anne Arundel County; FIREARMS POLICY COALITION, INC.;
SECOND AMENDMENT FOUNDATION; CITIZENS COMMITTEE FOR THE
RIGHT TO KEEP AND BEAR ARMS

        Plaintiffs - Appellants

v.

ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland;
COL. WOODROW W. JONES, III, in his official capacity as Secretary of State
Police of Maryland; R. JAY FISHER, in his official capacity as Sheriff of Baltimore
County, Maryland; EVERETT L. SESKER, in his official capacity as Sheriff of
Anne Arundel County, Maryland

        Defendants - Appellees

-------------------------------------

JOHN CUTONILLI

        Amicus Supporting Appellants

and

GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE; BRADY CENTER
TO PREVENT GUN VIOLENCE; MARCH FOR OUR LIVES; EVERYTOWN
FOR GUN SAFETY

        Amici Supporting Appellees.

———————

Appeal from the United States District Court for the District of Maryland at Baltimore. James K. Bredar, Senior District Judge.  (1:20−cv−03495−JKB)

———————

Argued:  March 20, 2024                                    Decided: August 6, 2024

———————

Before DIAZ, Chief Judge, and WILKINSON, NIEMEYER, KING, GREGORY, AGEE, WYNN, THACKER, HARRIS, RICHARDSON, QUATTLEBAUM, RUSHING, HEYTENS, BENJAMIN and BERNER, Circuit Judges.

———————

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Diaz, Judge King, Judge Wynn, Judge Thacker, Judge Harris, Judge Heytens, Judge Benjamin, and Judge Berner joined. Chief Judge Diaz wrote a concurring opinion, in which Judge King, Judge Wynn, Judge Thacker, Judge Benjamin, and Judge Berner joined. Judge Gregory wrote an opinion concurring in the judgment. Judge Richardson wrote a dissenting opinion, in which Judge Niemeyer, Judge Agee, Judge Quattlebaum, and Judge Rushing joined.

———————

**ARGUED:**   Peter A. Patterson, COOPER & KIRK, PLLC, Washington, D.C., for Appellants.   Robert A. Scott, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Appellees.  **ON BRIEF:**   Raymond M. DiGuiseppe, THE DIGUISEPPE LAW FIRM, P.C., Southport, North Carolina; Adam Kraut, FIREARMS POLICY COALITION, Sacramento, California; David H. Thompson, Tiernan B. Kane, COOPER & KIRK, PLLC, Washington, D.C., for Appellants.  Brian E. Frosh, Attorney General, Ryan R. Dietrich, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, for Baltimore, Maryland, for Appellees. John Cutonilli, Garret Park, Maryland, for Amicus John Cutonilli.  Esther Sanchez-Gomez, Leigh Rome, William T. Rome, GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE, San Francisco, California, for Amicus Giffords Law Center to Prevent Gun Violence.  Douglas N. Letter, Shira Lauren Feldman, BRADY CENTER TO PREVENT GUN VIOLENCE, Washington, D.C., for Amicus Brady Center to Prevent Gun Violence. Ciara Wren Malone, MARCH FOR OUR LIVES, New York, New York, for Amicus March for Our Lives.  Eric B. Bruce, Jennifer Loeb, Washington, D.C., Aaron R. Marcu, Brandt Henslee, Yulia Dernovsky, Daniel Hodgkinson, Susannah Benjamin, Taylor Jachman, FRESHFIELDS BRUCKHAUS DERINGER US LLP, New York, New York, for Amici Giffords Law Center to Prevent Gun Violence, Brady Center to Prevent Gun Violence, and March for Our Lives.  Janet Carter, William J. Taylor, Jr., Priyanka Gupta Sen, EVERYTOWN LAW, New York, New York, for Amicus Everytown for Gun Safety.

———————

2

WILKINSON, Circuit Judge:

The elected representatives of the people of Maryland enacted the Firearms Safety Act of 2013 in the wake of mass shootings across the country and a plague of gun violence in the state. This case is about whether the Act's general prohibition on the sale and possession of certain military-style "assault weapons," including the AR-15, the AK-47, and the Barrett .50 caliber sniper rifle, is unconstitutional under the Second Amendment.

We considered this issue as an en banc court in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc), where we held that Maryland's regulation of these assault weapons is consistent with the Second Amendment. However, in *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), the Supreme Court clarified how courts are to resolve Second Amendment challenges and rejected part of our approach in *Kolbe*.

With the respectful consideration and benefit of *Bruen*, we now uphold the judgment below. The assault weapons at issue fall outside the ambit of protection offered by the Second Amendment because, in essence, they are military-style weapons designed for sustained combat operations that are ill-suited and disproportionate to the need for self-defense. Moreover, the Maryland law fits comfortably within our nation's tradition of firearms regulation. It is but another example of a state regulating excessively dangerous weapons once their incompatibility with a lawful and safe society becomes apparent, while nonetheless preserving avenues for armed self-defense.

For these reasons, we decline to wield the Constitution to declare that military-style armaments which have become primary instruments of mass killing and terrorist attacks in the United States are beyond the reach of our nation's democratic processes. In so holding,

we offer no view on how a state should regulate firearms. Nor do we do anything to impose Maryland's regulations upon other states. We do hold, however, that Maryland was well within its constitutional prerogative to legislate as it did. We therefore reject the challenges of appellants and affirm the judgment of the district court.

Our friends in dissent would rule the Maryland statute unconstitutional. They would go so far as to uphold a facial challenge to the enactment, meaning that there is no conceivable weapon, no matter how dangerous, to which the Act's proscriptions can validly be applied. In so doing, they reject the centuries of common law that infused accommodation in the rights our founding generation recognized. And in creating a near absolute Second Amendment right in a near vacuum, the dissent strikes a profound blow to the basic obligation of government to ensure the safety of the governed. Arms upon arms would be permitted in what can only be described as a stampede toward the disablement of our democracy in these most dangerous of times. All this we shall explain.

The Supreme Court remanded this case for reconsideration in light of *Bruen*, a task which we shall, with great respect, perform. We conclude that *Bruen* did not mandate an abandonment of our faith in self-governance, nor did it leave the balance struck throughout our history of firearms regulation behind.

## I.

Maryland law prohibits any person in the state from selling, purchasing, receiving, transporting, transferring, or possessing an "assault weapon," subject to limited exceptions. Md. Code, Crim. Law § 4-303. A violator of this statute faces up to three years' imprisonment. *Id.* § 4-306. Maryland law enforcement officers are authorized to seize and

dispose of weapons sold, purchased, received, transported, transferred, or possessed in violation of the law. *Id.* § 4-304.

The statute defines "assault weapon" as "(1) an assault long gun; (2) an assault pistol; or (3) a copycat weapon." *Id.* § 4-301(d). The term "assault long gun," in turn, encompasses more than forty-five enumerated long guns "or their copies, regardless of which company produced and manufactured" the firearm. *Id.* § 4-301(b); *see* Md. Code, Pub. Safety § 5-101(r)(2). These proscribed guns include an assortment of military-style rifles and shotguns capable of semiautomatic fire, such as the AK-47, almost all models of the AR-15, the SPAS-12, and the Barrett .50 caliber sniper rifle. *See* Md. Code, Pub. Safety § 5-101(r)(2). The term "assault pistol" encompasses more than fifteen enumerated firearms and their copies. These include the TEC-9 and semiautomatic variants of the MAC-10, MP5K, UZI, and other military-style submachine guns. Md. Code, Crim. Law § 4-301(c).

"Copycat weapon" is defined as a firearm that is not an assault long gun or assault pistol yet is covered by at least one of the following six categories:

> (i) a semiautomatic centerfire rifle that can accept a detachable magazine and has any two of the following:
>
>> 1. a folding stock;
>>
>> 2. a grenade launcher or flare launcher; or
>>
>> 3. a flash suppressor;
>
> (ii) a semiautomatic centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds;

(iii) a semiautomatic centerfire rifle that has an overall length of less than 29 inches;

(iv) a semiautomatic pistol with a fixed magazine that can accept more than 10 rounds;

(v) a semiautomatic shotgun that has a folding stock; or

(vi) a shotgun with a revolving cylinder.

*Id.* § 4-301(h).

Appellants are three Maryland residents who allege that they are legally eligible to possess and acquire firearms, three nonprofit gun rights organizations to which the residents belong, and a licensed firearms dealer based in Maryland. On November 13, 2020, appellants filed a complaint under 42 U.S.C. § 1983 in the U.S. District Court for the District of Maryland against the then-Attorney General of Maryland and other state law enforcement officials. Appellants contended that these officials' enforcement of Maryland's assault weapons regulations was unconstitutional under the Second Amendment's right to keep and bear arms as applied to the states through the Fourteenth Amendment. They sought a declaratory judgment that the regulations prevented them from exercising their right to keep and bear arms, as well as an injunction to prohibit appellees from enforcing the statute.

In their complaint, however, appellants "acknowledge[d] that the result they seek is contrary to *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017)." J.A. 6. In *Kolbe*, we upheld against a constitutional challenge the very same Maryland statute at issue here insofar as it applied to "assault long guns and those copycat weapons that are rifles and shotguns." *Kolbe*, 849 F.3d at 122 n.2. Our en banc opinion rested on two distinct grounds. We first

concluded that the assault weapons at issue were "not constitutionally protected arms." *Id.* at 130 (emphasis omitted). We then found that, even assuming the Second Amendment reached such weapons, the Maryland regulations survived intermediate scrutiny. *Id.*

In the instant case, appellees answered the complaint by citing *Kolbe* and arguing that the suit should be dismissed for failure to state a claim. The district court agreed and dismissed the case on March 3, 2021. It noted that *Kolbe* controlled and agreed with appellants' concession that the court "ha[d] no discretion but to dismiss [their] complaint." J.A. 42. Appellants timely appealed. Their brief focused on the statute's regulation of semiautomatic assault rifles, as opposed to the parts of the statute targeting semiautomatic assault pistols and shotguns.

We affirmed the district court in a per curiam opinion on September 14, 2021. We too noted that appellants had conceded their argument was "squarely foreclosed" by *Kolbe*, and we observed that a panel of our court is "not authorized to reconsider an en banc holding." *Bianchi v. Frosh*, 858 F. App'x 645, 646 (4th Cir. 2021) (internal quotation marks omitted).

Appellants petitioned the Supreme Court for writ of certiorari on December 16, 2021, arguing that our en banc decision in *Kolbe* should be overturned. *See* Petition for Writ of Certiorari, *Bianchi v. Frosh*, 142 S. Ct. 2898 (2022) (mem.) (No. 21-902). Appellees responded at the Court's request. *See id.*

On June 23, 2022, before ruling on the cert petition, the Supreme Court decided *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022). In *Bruen*, the Court disavowed as "one step too many" the two-step framework that our court used in *Kolbe*

7

and that other federal circuit courts had nearly universally employed to assess Second Amendment claims in the wake of *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Bruen*, 597 U.S. at 19. Although "[s]tep one of the predominant framework"—which was "rooted in the Second Amendment's text, as informed by history"—was "broadly consistent with *Heller*," the Court emphasized that the "means-end scrutiny" at the second step was improper. *Id.* Because "the Second Amendment . . . codified a *pre-existing* right," courts were not to engage in interest balancing to determine whether a challenged regulation was constitutionally permissible. *Id.* at 20 (quoting *Heller*, 554 U.S. at 592). Instead, we were tasked with discerning the historical scope of the right and parsing whether the challenged regulation was consistent with it. *Id.* at 22–24.

A week after *Bruen* was decided, the Supreme Court granted appellants' petition for writ of certiorari, vacated the judgment, and remanded the case for further consideration in light of *Bruen*. *See Bianchi v. Frosh*, 142 S. Ct. at 2898–99. We ordered the parties to provide supplemental briefing, and a panel of this court heard oral argument on December 6, 2022. Before an opinion issued, however, our court voted to rehear the case en banc. We received additional supplemental briefing from the parties, and heard oral argument as a full court on March 20, 2024. Now, with the benefit of *Bruen*, we can proceed to decide this case.[1]

---

[1] We thank our friend Judge Richardson for his dissenting opinion. The procedural history to which he alludes, *see* Dissenting Op. at 87 n.2, reflects nothing more than the good-faith efforts of every member of our court to reach a well-reasoned decision in a challenging set of cases.

II.

The Second Amendment instructs, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This single sentence provides us with a lofty command, but little concrete guidance. In the past two decades, the Supreme Court has stepped in to provide this guidance, offering a methodological framework by which to structure our inquiry.

The development of this framework began with *District of Columbia v. Heller*, 554 U.S. 570 (2008). In *Heller*, the Supreme Court held that the Second Amendment safeguards the right to possess a firearm within one's home for self-defense. *Id.* at 635. To reach that conclusion, the Court distilled the Second Amendment into its constituent parts, engaged in linguistic and historical analysis to interpret the original meaning of each, and determined that the Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. The Court recognized that the Amendment "codified a *pre-existing* right" to keep and bear arms, *id.*, which, at the time of the nation's founding, was understood by Americans to be a "right of self-preservation," *id.* at 595 (quoting 2 *Blackstone's Commentaries: With Notes of Reference* 145 n.42 (St. George Tucker ed. 1803) [hereinafter Tucker's Blackstone]). The Court therefore found that "self-defense" is "the *central component* of the right." *Id.* at 599.

In rejecting the "argument, bordering on the frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment," the Court in *Heller* stated that "the Second Amendment extends, prima facie, to all instruments that constitute

bearable arms, even those that were not in existence at the time of the founding." *Id.* at 582. The Court clarified this statement later in the opinion, where it emphasized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

There, the Court explained that the Second Amendment does not guarantee "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Indeed, the Court found it would be "startling" to read the Second Amendment such that "the National Firearms Act's restrictions on machineguns . . . might be unconstitutional." *Id.* at 624. Thus, the Court acknowledged that it was not in serious dispute that "weapons that are most useful in military service—M-16 rifles and the like— may be banned." *Id.* at 627.

The Court recognized an additional limitation on the types of arms that the Second Amendment protects. It interpreted the holding of a previous Second Amendment decision, *United States v. Miller*, 307 U.S. 174 (1939), to stand for the proposition "that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." *Heller*, 554 U.S. at 625. In other words, "dangerous and unusual weapons" that are not "in common use" can be prohibited. *Id.* at 627.

In the wake of *Heller*'s recognition of the individual right to keep and bear arms and its limitations, circuit courts across the nation—including ours—interpreted *Heller* to permit a means-end approach for assessing the constitutionality of firearms regulations. *See, e.g.*, *Kolbe*, 849 F.3d at 133; *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 254 & n.49 (2d Cir. 2015); *GeorgiaCarry.Org, Inc. v. U.S. Army Corps of Eng'rs*, 788 F.3d

1318, 1322 (11th Cir. 2015). In evaluating such regulations against Second Amendment challenges, a court would first inquire "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Kolbe*, 849 F.3d at 133. If the challenged law did so, the court would then apply either intermediate or strict scrutiny, "depend[ing] on the nature of the conduct being regulated and the degree to which the challenged law burdens the right." *Id.*

As this approach percolated in the lower courts, the Supreme Court's subsequent Second Amendment opinions did little to alter the status quo. In *McDonald v. City of Chicago*, the Court held that "the Second Amendment right is fully applicable to the States," but otherwise endorsed *Heller* as is. 561 U.S. 742, 791 (2010). And in *Caetano v. Massachusetts*, a per curiam Court reaffirmed two aspects of *Heller*: that "the Second Amendment extends . . . to . . . arms . . . that were not in existence at the time of the founding"; and that the Second Amendment may protect arms beyond "weapons useful in warfare." 577 U.S. 411, 412 (2016) (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 582).

Then came *Bruen*. Rejecting the means-end approach of the lower courts, the *Bruen* Court set out a two-step methodology oriented towards text, history, and tradition. Under this approach, a court first looks to the text of the Second Amendment to see if it encompasses the desired conduct at issue. 597 U.S. at 24. If the text does not extend to the desired conduct, that conduct falls outside the ambit of the Second Amendment, and the government may regulate it. But if a court finds that the text *does* encapsulate the desired conduct, the analysis moves to the second step, where the burden shifts to the government

to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Only if such consistency is shown can a court conclude that the regulation is constitutionally permissible. *Id.*

The Court in *Bruen* found that the New York regulation at issue, which required an individual to "demonstrate a special need for self-protection distinguishable from that of the general community" before he could carry a handgun outside of his home, did not satisfy this history-and-tradition test. *Id.* at 70. The Court first determined that the plaintiffs' "proposed course of conduct—carrying handguns publicly for self-defense" readily fell within the plain text of the Second Amendment. *Id.* at 32. Thus, the burden shifted to New York to show that its regulation was "consistent with this Nation's historical tradition of firearm regulation." *Id.* at 33–34.

After examining multiple historical regulations on the public carry of weapons, the *Bruen* Court determined that none of them was sufficiently analogous to the regulation at issue. *See id.* at 38–70. Specifically, the Court held that the New York regulation was unconstitutional because, "[a]part from a few late-19th-century outlier jurisdictions, American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense," nor have these governments "required law-abiding, responsible citizens to demonstrate a special need . . . in order to carry arms in public." *Id.* at 70 (internal quotation marks omitted).

In so holding, the *Bruen* Court was clear that it was "apply[ing]" the "test that [it] set forth in *Heller*." *Id.* at 26. It reiterated that "the right secured by the Second Amendment is not unlimited," and, as such, it is "not a right to keep and carry any weapon whatsoever

in any manner whatsoever and for whatever purpose." *Id.* at 21 (quoting *Heller*, 554 U.S. at 626). Justice Alito further elaborated on this point in his concurrence, explaining that the majority's "holding decides nothing . . . about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns." *Id.* at 72 (Alito, J., concurring).

III.

With this background in mind, we proceed to our analysis of the assault weapons regulations at issue. We hold that the covered firearms are not within the scope of the constitutional right to keep and bear arms for self-defense, and thus Maryland's regulation of them can peaceably coexist with the Second Amendment. Moreover, even if the text of the Second Amendment were read to encompass the covered firearms, the statutory provisions at issue would nonetheless be constitutional. Our nation has a strong tradition of regulating excessively dangerous weapons once it becomes clear that they are exacting an inordinate toll on public safety and societal wellbeing.

This conclusion that the Maryland regulation is consistent with the Constitution is not some sort of edict to the rest of the states, obligating them to follow suit. States may take a variety of approaches to address the nation's mass shooting crisis beyond the regulation of firearms, such as expanding mental health services or bolstering law enforcement's capacity to respond. We make no comment on the effectiveness of these or any other measures. We simply recognize that Maryland acted well within the scope of its own police powers in responding to the demands of its own citizens. Nothing in our opinion

foists the values of Maryland upon, say, South Carolina, or those of South Carolina upon Maryland. We choose to honor the worthy virtues of federalism and democracy, not to stifle them. To do otherwise would unduly impede the workings of legislative bodies across our country as they struggle to meet the challenges of today and tomorrow.

A.

Pursuant to *Bruen*, we begin by asking whether the "plain text" of the Second Amendment guarantees the individual right to possess the assault weapons covered by the Maryland statute. 597 U.S. at 24. At first blush, it may appear that these assault weapons fit comfortably within the term "arms" as used in the Second Amendment.

We know, however, that text cannot be read in a vacuum. *See Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) ("To strip a word from its context is to strip that word of its meaning."). *Heller* and *Bruen* confirmed the importance of reading the Amendment in context by repeatedly emphasizing that "it has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 592); *see also United States v. Price*, No. 22-4609, slip op. at 8–12 (4th Cir. Aug. 6, 2024) (majority opinion). In other words, the Second Amendment codified "the right to keep and bear arms": a specific entitlement with a particular meaning in the ratifying public's consciousness, with baked-in prerogatives and qualifications alike. *See Bruen*, 597 U.S. at 21 ("[L]ike most rights, the right secured by the Second Amendment is not unlimited." (quoting *Heller*, 554 U.S. at 626)).

This understanding of the text of the Second Amendment is consistent with the way we read other constitutional provisions. Take the First Amendment. *See id.* at 24–25

14

(analogizing the Court's Second Amendment framework to "how we protect other constitutional rights" like "the freedom of speech in the First Amendment"). That provision establishes that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Reading the text devoid of its historical context, one might conclude that the Constitution prohibits governmental restrictions on libel, incitement, true threats, fighting words, or falsely shouting fire in a crowded theater. Such activity is, after all, "speech." But effective constitutional interpretation requires a recognition that the First Amendment was enacted against a backdrop of laws and societal understandings that circumscribed these types of communications because they did not advance the underlying purposes that the right to free speech was codified to protect. *See United States v. Rahimi*, 144 S. Ct. 1889, 1911–12 (2024) (Kavanaugh, J., concurring); *Heller*, 554 U.S. at 595 ("[W]e do not read the First Amendment to protect the right of citizens to speak for *any purpose*."); *Bruen*, 597 U.S. at 15 (same) (citing U.S. Const. amend. I). Thus, inherent in the Speech Clause is the limitation that certain types of activity that fall within a literal reading of the word "speech" are not protected by the free speech right enshrined in the First Amendment.

The upshot is that the text of the Second Amendment, like the text of other constitutional provisions, must be interpreted against its historical and legal backdrop. *See Bruen*, 597 U.S. at 25 (endorsing "reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right"). What we must do under *Bruen*, then, is assess the historical scope of the right to keep and bear arms to determine whether the text of the Second Amendment encompasses the right to possess the

15

assault weapons at issue. *See Price*, No. 22-4609, slip op. at 12–13 (majority opinion) ("[W]e can *only* properly apply step one of the *Bruen* framework by looking to the historical scope of the Second Amendment right.").

## B.

This was the question we earlier faced as an en banc court in *Kolbe*. Our primary holding in that case was that the assault weapons regulated by the statute were not within the scope of the Second Amendment. 849 F.3d at 136. Specifically, we resolved the case by finding that the covered weapons were "'like' 'M-16 rifles', i.e., 'weapons that are most useful in military service,' and thus outside the ambit of the Second Amendment." *Id.* (quoting *Heller*, 554 U.S. at 627). It was only after "we affirm[ed] the district court's award of summary judgment in favor of the State" on those grounds that we turned to finding, "[i]n the alternative," that the assault weapons regulations survived intermediate scrutiny. *Id.* at 137–38.

It is true that *Kolbe* was decided before *Bruen*. But contrary to appellants' claims, *Bruen* did not abrogate *Kolbe*'s entire holding. While the Court in *Bruen* held that the means-end balancing we conducted in our secondary, alternative analysis was "one step too many," it did not disturb our principal holding that the covered assault weapons were outside the ambit of the individual right to keep and bear arms. *Bruen*, 597 U.S. at 19. The Court was careful to note that only "the Courts of Appeals' second step" was "inconsistent with *Heller*'s historical approach and its rejection of means-end scrutiny." *Id.* at 24. On the other hand, when it came to our primary approach, the *Bruen* Court did not reject this type of analysis, finding that it was "broadly consistent with *Heller*." *Id.* at 19; *see also Hanson*

*v. District of Columbia,* 671 F. Supp. 3d 1, 8 (D.D.C. 2023) ("*Bruen* did not disturb the analysis Courts of Appeals conducted under the first step of their framework."). We therefore respectfully reaffirm the conclusion we reached in *Kolbe* that the covered weapons "are not constitutionally protected arms." 849 F.3d at 130 (emphasis omitted).

C.

The validity of this conclusion becomes clear when viewed in light of the purpose of the individual right to keep and bear arms. *Heller* established that "the *central component*" of the individual right codified by the Second Amendment was "self-defense." 554 U.S. at 599; *see also Bruen*, 597 U.S. at 32; *McDonald*, 561 U.S. at 767. The common-law right to self-defense, in turn, was understood by the founding generation to mean the right of "a citizen to 'repel force by force' when 'the intervention of society in his behalf, may be too late to prevent an injury.'" *Heller*, 554 U.S. at 595 (quoting 2 Tucker's Blackstone 145) (internal alteration omitted). The pre-existing right codified by the Second Amendment is thus about amplifying the power of individual citizens to project force greater than they can muster with their own bodies so that they may protect themselves when government cannot.

Limitations on this right to self-defense have been recognized in common law since before our nation's founding. One involves the necessity of imminence. A citizen cannot launch a preemptive assault against another when he faces solely the possibility of some threat hours or days away, or when he is seeking revenge for a harm already wrought by another. *See* 4 William Blackstone, *Commentaries of the Laws of England* 184 (1769) [hereinafter Blackstone] ("This right of natural defence does not imply a right of attacking:

for, instead of attacking one another for injuries past or impending, men need only have recourse to the proper tribunals of justice."). Rather, force may only be used in self-defense when reasonably necessary. *See id.* (stating "the right of preventive defence" may only be exercised "when certain and immediate suffering would be the consequence of waiting for the assistance of the law"). A second limitation circumscribes who can be the object of force used in self-defense. A citizen generally cannot use force against an innocent bystander to protect himself from an assailant, such as by turning the bystander into a human shield. *See id.* at 30 "([T]hough a man be violently assaulted, and hath no other possible means of escaping death, but by killing an innocent person; this fear and force shall not acquit him of murder; for he ought rather to die himself, than escape by the murder of an innocent."). Yet another limitation is on the amount of force that may be used. Deadly force, for example, generally may not be used except against a person who poses an impending threat of death or serious bodily harm. *See id.* at 185 ("The party assaulted must therefore flee . . . as far as the fierceness of the assault will permit him: for it may be so fierce as not to allow him to yield a step, without manifest danger of his life, or enormous bodily harm; and then in his defence he may kill his assailant instantly.").

The above limitations and qualifications do not undermine the importance of self-defense when one's person is imperiled. And the exact scope of the self-defense right has ebbed and flowed over time and across jurisdictions. *Compare id.* (requiring where possible a defender flee before using deadly force), *with* Tex. Penal Code § 9.31 (permitting a defender to stand his ground). But meaningful limits on the right have always existed. Our legal tradition has never seriously contemplated that a citizen may employ

18

force against another whenever he chooses upon mere speculation that such person poses a prospective threat.

As these limitations on the right to self-defense demonstrate, there are societal interests that can prevail over the right to protect oneself with force. The imminence requirement, for example, ensures that the justice system, not the individual, is the preferred user of force to restrain unlawful action when that system has the time and capacity to act. *See* 4 Blackstone 184. And restrictions on how much force may be employed, and against whom force may be used, clarify that it is not just the rights to life and liberty of the defender that matter, but also those of other members of society. Else, how could we have any society at all?

These limitations inform the historical backdrop of the right ultimately enshrined in our Constitution: to keep and bear arms for the purpose of self-defense. Just as the right to self-defense had limitations at the time of the founding, so too did the right to keep and bear arms that enabled it. As the Supreme Court recognized in *Heller*, the Second Amendment "is the very *product* of an interest balancing by the people." 554 U.S. at 635. In crafting the Amendment, the Framers aimed to safeguard the right to individual self-preservation while recognizing appropriate limitations—including those already inherent in the common-law right to self-defense—that permitted the maintenance of an amicable and orderly society. Thus, courts are "not [to] read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation." *Id.* at 595.

One qualification recognized by *Heller* is on *who* can keep and bear arms: there are "longstanding prohibitions on the possession of firearms by felons and the mentally ill."

*Id.* at 626. While these individuals maintain a right to self-preservation, society has concluded that the danger that they will misuse their armament-amplified power is too great to permit possession. *See Rahimi*, 144 S. Ct. at 1896–97; *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) ("History is consistent with common sense: it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns."). Another limitation involves *where* arms can be carried: "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" are permissible. *Heller*, 554 U.S. at 626; *accord Bruen*, 597 U.S. at 30. Again, citizens in these places have no less of a right to protect themselves. But our society has deemed that giving people the capacity to use large amounts of force at a moment's notice in a sensitive place is not worth the danger that they will unlawfully deploy such force against innocent civilians or public figures there. These limitations, ultimately, reflect a careful balancing of interests between individual self-defense and public protection from excessive danger that existed within the meaning of the phrase "the right to keep and bear arms" when the Second Amendment was ratified.

For our purposes, the most relevant limitation that emerged from this consideration of individual and societal interests is upon *what* arms may be kept and carried. As recognized in *Heller*, "the Second Amendment right . . . extends only to certain types of weapons"; it is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 623, 626. Arms typically used by average citizens for self-defense are generally within the ambit of the Second Amendment, presumably because these arms had proven over time to effectively amplify an individual's

power to protect himself without empowering him to singlehandedly reign terror upon a community. *See id.* at 624–25. But other weapons—variously referred to as "dangerous or unusual," *e.g.*, 4 Blackstone 148, or "dangerous and unusual," *e.g.*, *Heller*, 554 U.S. at 627; *State v. Langford*, 10 N.C. 381, 383 (1824)—could be banned without infringing upon the right to bear arms, *see Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 47; 4 Blackstone 148–49; *Langford*, 10 N.C. at 383–84. Such excessively dangerous arms were not reasonably related or proportional to the end of self-defense—but rather were better suited for offensive criminal or military purposes—and were thus understood to fall outside the reach of the right. *See Heller*, 554 U.S. at 627; *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 102–03 (D. Conn. 2023).

This dichotomy between these two types of arms is reflected in the concrete examples of exempted arms that the Supreme Court offered us in *Heller*. A corollary to "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" 554 U.S. at 627, is that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns," *id.* at 625. Further, the Court recognized that "weapons that are most useful in military service," such as "M-16 rifles and the like," can be "banned." *Id.* at 627. The *Heller* Court placed such weapons of crime and war in explicit contradistinction to the handgun, "the quintessential self-defense weapon," which it emphasized was squarely within the ambit of the Second Amendment. *Id.* at 629.

What brings all the weapons beyond the scope of the Second Amendment together, and what separates them from the handgun, is their ability to inflict damage on a scale or

in a manner disproportionate to the end of personal protection. As such, they are weapons most suitable for criminal or military use. For instance, Congress began regulating sawed-off shotguns and short-barreled rifles after they became infamously associated with "notorious Prohibition-era gangsters like Bonnie Parker and Clyde Barrow." *Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 47 (1st Cir. 2024). These firearms "are more easily concealable than long-barreled rifles but have more destructive power than traditional handguns," making them particularly desirable to malefactors and crooks. U.S. Dep't of Just., *Justice Department Announces New Rule to Address Stabilizing Braces, Accessories Used to Convert Pistols into Short-Barreled Rifles* (Jan. 13, 2023); *see also Carson v. State*, 247 S.E.2d 68, 73 (Ga. 1978) (upholding ban on sawed-off shotguns and noting they "are of a size such as can easily be concealed and which are adapted to and commonly used for criminal purposes"); *State v. LaChapelle*, 451 N.W.2d 689, 691 (Neb. 1990) (holding states may regulate sawed-off shotguns as "a weapon which is used almost exclusively for a criminal purpose"). And the M16 was adopted by the U.S. Army as the standard-issue infantry rifle "due to its phenomenal lethality and reliability, as well as its increased ability to penetrate helmets and body armor." *Lamont*, 685 F. Supp. 3d at 101 (internal quotation marks omitted); *see also Kolbe*, 849 F.3d at 124.

We also recognize that the Supreme Court, in the handful of Second Amendment cases that it has decided, has not yet had the opportunity to clarify the full array of weaponry that falls outside the ambit of the Second Amendment. For instance, consider arms that disable an adversary over time, such as those that release slow-acting poison. An umbrella gun that fires a ricin-laced pellet, while a bearable arm, is utterly ineffective at

countering imminent threats for which the right to self-defense exists because it takes hours for ricin to have a debilitating effect. *See Ricin and The Umbrella Murder*, CNN (Oct. 23, 2003); Ctrs. for Disease Control and Prevention, *Questions and Answers About Ricin* (Apr. 4, 2018). Additionally, some bearable arms deliver force so excessive for self-defense that no reasonable person could posit that the Constitution guarantees civilian access to them. *See, e.g.*, *Bevis v. City of Naperville*, 85 F.4th 1175, 1198 (7th Cir. 2023) ("Everyone can also agree, we hope, that a nuclear weapon such as the . . . 51-pound W54 warhead, can be reserved for the military, even though it is light enough for one person to carry."), *cert. denied sub nom. Harrel v. Raoul*, No. 23-1010, 2024 WL 3259606 (U.S. July 2, 2024); *see also Heller*, 554 U.S. at 627.

As should be clear, these are not the modern equivalents of weapons that were commonly possessed and employed for self-preservation by your shopkeeper, or your butcher, or your blacksmith up the road in colonial America—the disarmament of whom the Second Amendment was ratified to prevent. *See Heller*, 554 U.S. at 598–99. The Second Amendment, with its "central component" of "individual self-defense," is not concerned with ensuring citizens have access to military-grade or gangster-style weapons. *Bruen*, 597 U.S. at 29 (emphasis omitted). In short, then, while the Second Amendment jealously safeguards the right to possess weapons that are most appropriate and typically used for self-defense, it emphatically does not stretch to encompass excessively dangerous weapons ill-suited and disproportionate to such a purpose.

Our friends in dissent argue that there is not simply a right to individual self-defense but to "collective" self-defense. Dissenting Op. at 103–04. This view has several problems.

One, it contradicts both the purpose and language of *Heller* and *Bruen* quoted in the preceding paragraph. The second problem is one of self-contradiction. The dissent announces a right to "communal self-defense" and then proceeds directly to disregard the community's judgment as expressed in the Maryland statute as to how communal self-defense can be most effectively safeguarded. The third problem is the dissent's conversion of a right of self-defense to a right to possess arms whose uses on offense are all too prominent and apparent. Either alone or in combination these hurdles underscore the danger of expanding appellants' right far beyond the careful exposition of the Second Amendment that *Heller* and *Bruen* articulated.

### D.

Having elucidated our understanding of the Second Amendment's text in its historical context, we turn to the Maryland regulations under challenge in the present case. Our analysis confirms that the covered weapons are not within the ambit of the "right to keep and bear arms" as codified within the plain text of the Second Amendment.

As an initial matter, we note that appellants have brought a facial challenge to the assault weapons regulations. The Supreme Court has instructed that facial challenges are "disfavored" because they "often rest on speculation," "short circuit the democratic process," and "run contrary to the fundamental principle of judicial restraint." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008). A facial challenge is "the 'most difficult challenge to mount successfully.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also id.* at 1907 (Gorsuch, J., concurring). "To succeed in a typical facial attack, [appellants] would have to establish

24

'that no set of circumstances exists under which [the statute at issue] would be valid,' or that the statute lacks any 'plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 472 (2010) (quoting *Salerno*, 481 U.S. at 745; *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring in judgments)).

Appellants have not met this high bar. Many of the firearms regulated by the Maryland statute are "dangerous and unusual weapons" that are not "in common use today for self-defense." *Bruen*, 597 U.S. at 21, 32 (internal quotation marks omitted). Rather, they are weapons "most useful in military service" with firepower far exceeding the needs of the typical self-defense situation. *Heller*, 554 U.S. at 627. These weapons therefore do not fit within the Second Amendment's ambit and thus "may be banned." *Id.*

Consider, for example, the Barrett .50 caliber semiautomatic sniper rifle, one of the forty-five covered long guns. *See* Md. Code, Pub. Safety § 5-101(r)(2)(ix). This rifle fires bullets powerful enough to "to disable or destroy military targets such as armored personnel carriers, radar dishes, communications vehicles, missiles, aircraft, bulk fuel and ammunition storage sites." Am. Bar Ass'n, Bar Ass'n of S.F. Special Comm. on Gun Violence, *Restriction of Sale of .50 Caliber Sniper Weapons* (Aug. 7, 2005). Heralded as "[t]he most powerful sniper rifle in the U.S. military," the Barrett .50 cal. "is capable of long range destruction of military targets at distances exceeding a mile . . . with the power of a rocket or mortar but with the precision of a sniper rifle." *Id.*; Caleb Larson, *Barrett M82: The U.S. Military's Most Powerful Sniper Rifle*, Real Clear Defense (Nov. 30, 2020). This extraordinary combination of power and precision has helped Mexican cartels outgun police, with the Barrett rifle becoming "a very symbolic weapon in the narco world" that

25

"shows you're on the top of the game." Diego Oré and Drazen Jorgic, *'Weapon of War':
The U.S. Rifle Loved by Drug Cartels and Feared by Mexican Police*, Reuters (Aug. 6,
2021).

Appellants made no effort to present evidence that this sniper rifle is "in common
use today for self-defense" and not a "dangerous and unusual" weapon outside of the
Second Amendment's ambit. *Bruen*, 597 U.S. at 21, 32. How could they? Common sense
dictates that restricting the possession of this type of weapon is consistent with the original
meaning of the Second Amendment as elucidated in *Heller* and *Bruen*. With its very limited
ability to serve the defensive needs of the average citizen yet its extraordinary capability
to advance the offensive purposes of criminals, terrorists, and soldiers, the Barrett .50
caliber sniper rifle is exactly the type of firearm that is "most useful in military service"
and "may be banned" consistent with the Second Amendment. *Heller*, 554 U.S. at 627.

Nor do appellants seek to overcome this barrier with respect to many other long
guns regulated by the statute, such as the Striker-12 and other street sweeper shotguns. *See*
Md. Code, Pub. Safety § 5-101(r)(2)(xxxviii)-(xxxix). These shotguns each have a twelve-
round revolving cylinder most useful for riot control and military combat, and their
possession has been highly restricted by the federal government under the National
Firearms Act for over three decades. *See* ATF Rul. 94-2 (regulating Striker-12 and street
sweeper shotguns under the "destructive device" provision of 26 U.S.C. § 5845(f)(2));
*United States v. White*, 2017 WL 11528245, at *3 (W.D. Mo. Oct. 13, 2017). Perhaps
recognizing the steep uphill climb that such an argument would face, appellants did not

devote even a page of their complaint or briefing to posit how these specific prohibitions are unconstitutional.

In short, appellants have failed to show that each firearm regulated by the Maryland statute is within the ambit of the Second Amendment. And so the broad relief their facial challenge seeks is not ours to grant.

## E.

We do recognize, however, that the parties thoroughly briefed the issue of whether the Second Amendment protects a citizen's ability to purchase and possess an AR-15, which appellants refer to as the "paradigmatic semiautomatic rifle targeted by 'assault weapons' laws." Appellants' Suppl. Opening Br. 25. This is also the question we primarily considered at our en banc oral argument. Because it has been fully briefed and considered after a remand from the Supreme Court, we find the question of whether the AR-15 is within the ambit of the Second Amendment appropriate to address here. Not to address it would be to bypass the very heart of the dispute in this proceeding.

## 1.

The intertwined origins of the AR-15 and its military version, the M16, show that these weapons were intended for offensive combat applications rather than individual self-defense. *See Lamont*, 685 F. Supp. 3d at 101. In the late 1950s, the U.S. Army was seeking an improved infantry weapon. General Willard G. Wyman called upon firearms manufacturers to develop a lightweight yet lethal combat rifle that would penetrate a steel helmet at 500 yards. *See* Dallas T. Durham, *The M-16: Tradition, Innovation, and Controversy*, U.S. Army Command & Gen. Staff Coll. (2021). Armalite Corporation

responded by developing the AR-15, which originally was a selective-fire rifle with both semiautomatic and automatic firing capability. *See Lamont*, 685 F. Supp. 3d at 74.

The AR-15 quickly gained popularity with the U.S. military, which, by the end of 1963, had purchased over 100,000 AR-15s and had begun to combat test them in Vietnam. O.P. Bruno et al., *M16 Rifle Sys.: Reliability and Quality Assurance Eval.*, U.S. Army Materiel Command Aberdeen Rsrch. and Dev. Ctr., at App. II-1–II-2 (July 1968). Early testing "discovered that a 7- or even 5-man squad armed with AR-15s could do as well or better in hit-and-kill potential . . . than the traditional 11-man squad armed with M14 rifles," the U.S. military's standard-issue rifle during the late 1950s. *See Kolbe*, 849 F.3d at 124. Further testing by the military and CIA concluded that the AR-15 was "superior in virtually all respects to the – a. M-1 rifle, b. M-1 and M-2 Carbines, c. Thompson Sub-machine gun and d. Browning Automatic rifle." Advanced Rsch. Projects Agency, *Field Test Rep., AR-15 Armalite Rifle* (Aug. 20, 1962). The AR-15 also became popular in Vietnam, where the military found that it was a "more desirable weapon" than any of the alternative military rifles, carbines, or submachineguns. Advanced Rsch. Projects Agency, *Rep. of Task No. 13A, Test of Armalite Rifle, AR-15*, at 4 (July 31, 1962). The military designated the AR-15 rifle the "M16" and adopted it as the standard-issue infantry rifle in the late 1960s. *See M16 Rifle Sys.*, at App. II-4; Encyc. Britannica, *M16 Rifle* (July 15, 2024).

During this same period, Colt, which had obtained the trademark and patents for the AR-15 from Armalite, created a semiautomatic version of the rifle for the civilian market. *See Lamont*, 685 F. Supp. 3d at 74. In 1977, the patents to the AR-15 expired, and a number

of manufacturers started selling semiautomatic rifles built on the AR-15 platform. *See* Emily Witt, *How the AR-15 Became an American Brand*, New Yorker (Sept. 27, 2023); Greg Myre, *A Brief History of the AR-15*, Nat'l Pub. Radio (Feb. 28, 2018).

The civilian versions of the AR-15 have not strayed far from the rifle's military origin. The AR-15 continues to use the same internal piston firing system and the same ammunition as the M16. *See Bevis*, 85 F.4th at 1195–96 & n.9; *Adams Arms, Inc. v. Sig Sauer, Inc.*, 2010 WL 3119777, at *1 (M.D. Fla. Aug. 2, 2010). Its bullets leave the muzzle at a similar velocity of around 3000 feet per second, have a similar effective area target range of up to 875 yards, and deliver a similar amount of kinetic energy upon impact. *See Bevis*, 85 F.4th at 1196. Contemporary versions of the AR-15 and M16 have both incorporated additional combat-functional features. These include a flash suppressor that conceals the shooter's position and facilitates night combat operations, and a pistol grip that enables fast reloading and accuracy during sustained firing. *See Kolbe*, 849 F.3d at 125; *Lamont*, 685 F. Supp. 3d at 75; *Rupp v. Bonta*, 2024 WL 1142061, at *12 (C.D. Cal. Mar. 15, 2024). Most versions of the AR-15, like the M16, use detachable 20-round or 30-round magazines that increase the weapon's effective rate of fire and are most useful in prolonged firefights with enemy combatants. *See N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349, 365 (W.D.N.Y. 2013). Both weapons are also compatible with up to 100-round magazines. *See Kolbe*, 849 F.3d at 125. Other combat-functional features that the AR-15 and M16 share include a threaded barrel for the affixing of a flash suppressor, recoil compensator, or silencer; a barrel shroud to protect the shooter's hands from excessive heat during sustained firing; and a rail integration system for the mounting of

sights, scopes, slings, flashlights, lasers, foregrips, bipods, bayonets, and under-barrel grenade launchers or shotguns. *See id.* at 137; U.S. Army FM 3-22.9, at 2-7 (Aug. 12, 2008).

The firepower of the AR-15 and M16 is a key component of their "phenomenal lethality." *Lamont*, 685 F. Supp. 3d at 101. Built to generate "maximum wound effect" and to pierce helmets and body armor, *id.* at 100, AR-15 bullets discharge at around "three times the velocity of a typical handgun," *Rupp*, 2024 WL 1142061, at *11. These higher velocity rounds "hit fast and penetrate deep into the body," creating severe damage. *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1073 (N.D. Ill. 2023). When a bullet fired from an AR-15 impacts human tissue, it typically "yaws" or turns sideways. *Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 599 (D. Del. 2023). As it passes through the body, the rotated bullet creates a large, "temporary cavity" or "blast wave" that can be "up to 11-12.5 times larger than the bullet itself," *id.* (internal quotation marks omitted)—an effect known as "cavitation," *Capen v. Campbell*, 2023 WL 8851005, at *15 (D. Mass. Dec. 21, 2023). So, while a "typical 9mm [bullet] wound to the liver" from a commonly used handgun like the Glock 19 "will produce a pathway of tissue destruction in the order of one inch to two inches," an AR-15 wound "will literally pulverize the liver, perhaps best described as dropping a watermelon onto concrete." *Id.* (internal alterations omitted). The "catastrophic" damage caused by AR-15 rounds means that the injuries they leave in their wake—such as "multiple organs shattered," bones "exploded," and "soft tissue absolutely destroyed"—"often cannot be repaired" by trauma surgeons. *Del. State Sportsmen's Ass'n*, 664 F. Supp. 3d at 599–600

(internal quotation marks omitted); *see also Kolbe*, 849 F.3d at 124; N. Kirkpatrick et al., *The Blast Effect: This Is How Bullets from an AR-15 Blow the Body Apart*, Wash. Post (Mar. 27, 2023).

Another key aspect of the destructiveness of the AR-15 and M16 is their pairing of high muzzle velocity with a comparative lack of recoil. AR-15s can fire rounds "in rapid succession on a precise target, even while standing or moving, because a shooter's position is relatively unaffected by the recoil of each shot." *Capen*, 2023 WL 8851005, at *15. This lower recoil makes the AR-15 "uniquely dangerous" compared to other high-powered rifles, which tend to have greater recoil that "necessarily disrupts follow-on shots." *Id.*

The primary difference between the M16 and AR-15—the M16's capacity for automatic fire, burst fire, or both, depending on the model—pales in significance compared to the plethora of combat-functional features that makes the two weapons so similar. The U.S. Army Field Manual instructs that semiautomatic fire is "[t]he most important firing technique during fast-moving, modern combat" because it "is the most accurate technique of placing a large volume of fire on . . . multiple, or moving targets." U.S. Army FM 3-22.9, at 7-8 (Aug. 12, 2008); *see also Rupp*, 2024 WL 1142061, at *10. Indeed, a decorated former U.S. Navy SEAL stated that he "[n]ever once fired full auto in combat" during a decade of special operations combat deployments, including the 2011 Osama Bin Laden raid. @mchooyah, Twitter (Oct. 3, 2017, 5:04 PM), https://perma.cc/7JXA-YK97. Moreover, the AR-15's rate of fire can "be easily converted to . . . mimic military-grade machine guns" with devices like bump stocks, trigger cranks, and binary triggers. *Bevis*, 657 F. Supp. 3d at 1074; *see also Del. State Sportsmen's Ass'n*, 664 F. Supp. 3d at 600. In

31

*Garland v. Cargill*, the Court recently emphasized that "[s]hooters have devised techniques for firing semiautomatic firearms at rates approaching those of some machine guns." 602 U.S. 406, 411 (2024); *see also id.* at 429 (Alito, J., concurring) ("[A] semiautomatic rifle with a bump stock can have the same lethal effect as a machinegun."). Additionally, nothing in *Cargill* evinced any affirmative endorsement of bump stocks. The case rested on a close reading of statutory text and regulatory deviation from it, which is not before us here. *See id.* at 415 (majority opinion).

Between its firepower, accuracy, and modifiability, the "net effect" of the AR-15's "military combat features is a capability for lethality." *Kolbe*, 849 F.3d at 144. All this is a far cry from any notion of civilian self-defense.

2.

Illicit uses of the AR-15 have demonstrated just how much destruction the weapon can cause in the wrong hands. When used for criminal purposes, the AR-15 and other assault rifles "result in more numerous wounds, more serious wounds, and more victims." *Id.* at 140 (quoting *Cuomo*, 804 F.3d at 262). AR-15s are disproportionately used in mass shootings: one recent examination found that although AR-platform rifles constituted about 5% of the firearms in the United States, they were used in 25% of mass shootings. *Rupp*, 2024 WL 1142061, at *11. Moreover, in a grim testament to the gun's deadliness, mass shootings are over 60% more deadly when an AR-15 or similar assault rifle is used. *See id.* ("[O]ver the past ten years, there have been 12.9 fatalities per shooting when an assault rifle is used in a mass shooting, as opposed to 7.8 fatalities per shooting where an assault rifle is not used."). Four of every five "mass shootings that resulted in more than 24 deaths

involved the use of assault rifles," *id.*, as did every single mass shooting involving more than 40 deaths, *see* The Violence Project, *Mass Shooter Database* (database updated Jan. 2024). In short, the AR-15 and other assault rifles are the preferred weapons for those bent on wreaking death and destruction upon innocent civilians.

Their utility for mass killing has made the AR-15 and similar assault rifles the most popular arms for terrorist attacks in the United States. The perpetrator of the Pulse nightclub shooting—which was "the deadliest terrorist attack in the United States since September 11, 2001"—used an assault rifle similar to the AR-15 that is covered by the "copycat weapon" provision of Maryland's assault weapons regulation. *See* Frank Straub et al., *Rescue, Response, and Resilience*, U.S. Dep't of Just. Cmty. Oriented Policing Servs., at 1, 7 (2017). With his rifle in hand, the ISIS-aligned perpetrator walked into the Orlando nightclub and fired approximately 200 rounds in five minutes. *Id.* at 18, 23–24. Despite a police detective being on scene who called in the shooting as soon as it began, and despite the SWAT team arriving six minutes later, the terrorist was able to shoot 102 innocent people, killing 49 of them. *Id.* at x, 77. Police found so many people lying shot and bleeding on the dance floor that one officer—in a desperate attempt to triage casualties and save lives—shouted, "if you're alive, raise your hand." *Id.* at 22. Another responding officer who had served three combat tours in the U.S. military described his experience in the nightclub: "I was a platoon sergeant again. I stepped out of being a cop and back into being a platoon sergeant. We were in a war zone." *Id.* at 21.

Indeed, AR-15 or AK-47 type assault rifles covered by the Maryland regulations have been used in every major terrorist attack on U.S. soil in the past decade: the 2015 San

33

Bernardino office attack (14 victims killed, 24 injured), the 2016 Pulse nightclub shooting (49 victims killed, 58 injured), the 2018 Pittsburgh synagogue shooting (11 victims killed, 6 injured), the 2019 El Paso Walmart shooting (23 victims killed, 22 injured), and the 2022 Buffalo supermarket shooting (10 victims killed, 3 injured). *See id.* at vii, 7; U.S. Dep't of Just. Cmty. Oriented Policing Servs., *Bringing Calm to Chaos: A Critical Incident Rev. of the San Bernardino Pub. Safety Response*, at xiii, 39 (2016); Campbell Robertson et al., *11 Killed in Synagogue Massacre; Suspect Charged With 29 Counts*, N.Y. Times (Oct. 27, 2018); Kayla McCormick & Phil Helsel, *El Paso Walmart Mass Shooter Sentenced to 90 Consecutive Life Terms*, NBC News (July 7, 2023); Emily Mae Czachor, *Gunman in Buffalo Supermarket Shooting Pleads Guilty*, CBS News (Nov. 28, 2022). As modern information technologies have increasingly shifted the terrorism threat towards "lone offenders" who are often driven to extremism "by a mix of conspiracy theories; personalized grievances; and enduring racial, ethnic, religious, and anti-government ideologies," AR-15s will likely remain a crucial instrument of terrorism in the United States so long as they are widely available. U.S. Dep't of Homeland Sec., *Homeland Threat Assessment 2024* at v, 3 (Sept. 14, 2023).

In addition to being the weapons of choice for mass killing and terrorism, AR-15s and similar assault rifles are "uniquely dangerous to law enforcement." *Capen*, 2023 WL 8851005, at *13. These firearms place law enforcement officers "at particular risk" because "their high firepower" causes their bullets to readily penetrate police body armor. *Heller v. District of Columbia*, 670 F.3d 1244, 1263 (D.C. Cir. 2011); *see also Del. State Sportsmen's Ass'n*, 664 F. Supp. 3d at 600; *Lamont*, 685 F. Supp. 3d at 98–99. AR-15s also

"allow criminals to effectively engage law enforcement officers from great distances," giving them a "military-style advantage." *Kolbe*, 849 F.3d at 127.

The impact of these dangers is starkly displayed in the statistics of slain law enforcement officers. Despite the relative rarity of assault weapons, studies have estimated that they have been used to gun down between 13% to 20% of those officers killed in the line of duty. *See Lamont*, 685 F. Supp. 3d at 99. Moreover, assault rifles have been used in the deadliest recent attacks on law enforcement officers, such as the 2016 killing of five Dallas police officers and the 2024 murder of four officers, including three U.S. Marshals task force members, in Charlotte. *See* Sopan Deb et al., *8 Officers Are Shot, 4 Fatally, While Serving Warrant in Charlotte*, N.Y. Times (Apr. 29, 2024).

As criminals and terrorists have increasingly turned to AR-15s and similar assault rifles, there have been "multiple incidents in which [they] outgun police." *Del. State Sportsmen's Ass'n*, 664 F. Supp. 3d at 600. One of these instances was again the Pulse nightclub terrorist attack. The detective who was on scene when the shooting began "recognized that his Sig Sauer P226 9mm handgun . . . was no match for the .223 caliber rifle being fired inside the club and moved to a position that afforded him more cover in the parking lot." *See* Frank Straub et al., *Rescue, Response, and Resilience*, at 16. The first police officers on scene at the Uvalde, Texas elementary school shooting that left 19 students and two teachers dead similarly "concluded they were outgunned[, a]nd that they could die" after identifying the shooter's gun as an "AR," and thus "opted to wait for the arrival of a Border Patrol SWAT team . . . based more than 60 miles away." Zach Despart, *"He Has a Battle Rifle": Police Feared Uvalde Gunman's AR-15*, Tex. Tribune (Mar. 20,

2023). Time after time, the sheer power of AR-15 style rifles has contributed to hesitation by police in confronting mass shooters, exacerbating the bloodshed and trauma that result. *See, e.g.*, Mirna Alsharif and David K. Li, *Parkland Shooting Verdict: School Security Officer Scot Peterson Acquitted Over Failure to Confront Gunman*, NBC News (June 29, 2023); Faith Karimi & Chris Boyette, *Las Vegas Police Fires an Officer Who 'Froze' in Hotel Hallway During 2017 Massacre*, CNN (July 4, 2019).

3.

We have described the AR-15's capacities in abundant detail to demonstrate just how far outside the animating purposes of the Second Amendment this weapon lies. While we know that the AR-15 thrives in combat, mass murder, and overpowering police, appellants have failed to demonstrate that the weapon is suitable for self-defense. This is likely because such a showing would be difficult to make. Indeed, many of the weapon's combat-functional features make it ill-suited for the vast majority of self-defense situations in which civilians find themselves.

To wit: the heightened firepower of AR-15s "pose[s] a serious risk of 'over-penetration'—that is, [bullets] passing through their intended target and impacting a point beyond it." *Capen*, 2023 WL 8851005, at *15. For example, AR-15 rounds "can pass through most construction materials, even at ranges of 350 yards," thereby threatening the lives of "bystanders, family members, or other innocent persons well outside the intended target area." *Id.*; *see also Kolbe*, 849 F.3d at 127 ("[R]ounds from assault weapons have the ability to easily penetrate most materials used in standard home construction, car doors, and similar materials."). Overpenetration poses a grave risk in the home—"where the need

36

for defense of self, family, and property is most acute," *Heller*, 554 U.S. at 628—because firing an AR-15 in close quarters will often put the safety of cohabitants and neighbors in jeopardy, *see Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019).

The large magazines that are integral to the AR-15's effectiveness in combat and mass murder are also ill-suited for typical self-defense scenarios. As the First Circuit has noted, "civilian self-defense rarely—if ever—calls for the rapid and uninterrupted discharge of many shots." *Ocean State Tactical*, 95 F.4th at 45. Indeed, "most homeowners only use two to three rounds of ammunition in self-defense," *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen. N.J.*, 910 F.3d 106, 121 n.25 (3d Cir. 2018), with one study finding that when citizens fire shots in self-defense, they fire an average of two shots and, 97% of the time, fire five shots or fewer, *Lamont*, 685 F. Supp. 3d at 96; *see also Kolbe*, 849 F.3d at 127; *Worman*, 922 F.3d at 37; *Hanson*, 671 F. Supp. 3d at 14–16.

The AR-15 also does not have any of the advantages that the Supreme Court identified in *Heller* as establishing the handgun as the "quintessential self-defense weapon . . . for home defense." 554 U.S. at 629. Compared to a handgun, the AR-15 is heavier, longer, harder to maneuver in tight quarters, less readily accessible in an emergency, and more difficult to operate with one hand. *See id.*; *see also Capen*, 2023 WL 8851005, at *15.

Outside the home, the AR-15 has even less utility for self-defense. It is significantly less concealable than a handgun and much more difficult to carry while conducting daily activities. *See Capen*, 2023 WL 8851005, at *15. When shot in cities, towns, or other densely populated areas where armed confrontations most often occur, the AR-15 presents

at least as great a risk as it does in the home of harming innocent bystanders due to overpenetration. *See id.*; *Kolbe*, 849 F.3d at 127; *Worman*, 922 F.3d at 37. Moreover, public carry of an AR-15 in modern-day America may well "spread[] 'fear' or 'terror' among the people" due to its frequent and devastating use in mass shootings of innocent civilians—an effect that our common-law tradition has long regarded as incompatible with lawful carry for self-defense. *Bruen*, 597 U.S. at 50.

In sum, the AR-15—with its military origination, combat-functional features, and extraordinary lethality—has "the same basic characteristics, functionality, capabilities, and potential for injury as the" M16. *Capen*, 2023 WL 8851005, at *14. And its all too frequent use in terrorism, mass killing, and police murder shows that the AR-15 offers firepower ill-suited and disproportionate to fulfilling the Second Amendment's purpose of armed self-defense. Therefore, just like the M16, the AR-15 is "most useful in military service" and "may be banned" consistent with the Second Amendment. *Id.*

## F.

Appellants take umbrage with our method of analysis, contending that "arms that are 'in common use today' are constitutionally protected and cannot be banned." Appellants' Suppl. Opening Br. 2 (quoting *Bruen*, 597 U.S. at 47). According to their reading of *Heller* and *Bruen*, the covered assault rifles are "unquestionably arms within the meaning of the Second Amendment" because they are "'instruments that constitute bearable arms.'" *Id.* at 18 (quoting *Heller*, 554 U.S. at 582). Therefore, say appellants, the possession of the covered rifles cannot be prohibited because they are "in common use," with "millions of law-abiding citizens choos[ing] to possess" them, and thus "by definition

*will not* fit into" the "historical tradition of prohibiting the carrying of dangerous and unusual weapons" acknowledged in *Heller* and *Bruen*. *Id.* at 19, 27 (internal quotation marks omitted). Under this view, so long as enough law-abiding citizens own a type of firearm, that type of firearm cannot be prohibited.

As an initial matter, this argument misreads *Heller* and *Bruen*. In those cases the Supreme Court did not posit that a weapon's common use is conclusive evidence that it cannot be banned. Rather, the Court instructed that "the Second Amendment protects *only* the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" *Bruen*, 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627) (emphasis added). In other words, weapons that are *not* in common use can safely be said to be *outside* the ambit of the Second Amendment. But the logic does not work in reverse. Just because a weapon happens to be in common use does not guarantee that it falls within the scope of the right to keep and bear arms.

Appellants' argument also does not resolve the difficulties in determining which weapons would pass its ill-conceived popularity test. Appellants posit that a weapon need only be in common use today for lawful purposes, but *Bruen* implies that a weapon must be "in common use today for self-defense" to be within the ambit of the Second Amendment. 597 U.S. at 32 (internal quotation marks omitted); *see Bevis*, 85 F.4th at 1192; *Price*, No. 22-4609, slip op. at 19–20 (majority opinion). Appellants contend that mere possession of a firearm by a requisite quantity of Americans is sufficient, but the Court's choice of the phrase common *use* instead of common *possession* suggests that only instances of "active employment" of the weapon should count, and perhaps only active

employment in self-defense. *See, e.g.*, *Bailey v. United States*, 516 U.S. 137, 143–45 (1995). Appellants further contend that all semiautomatic rifles should be categorized as the same type of firearm when conducting a common use inquiry, and thereby disregard the exponential differences in firepower between a small-bore rimfire rifle and a .50 caliber sniper rifle. What is more, appellants do not provide a clear threshold for the number of firearms they believe must be possessed to be in common use. *Cf. United States v. Berger*, 2024 WL 449247, at *7 (E.D. Pa. Feb. 6, 2024) ("[A]pproximately 740,000 machineguns [were] registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives as of May 2021.").

Most importantly, appellants' proposed common use inquiry leads to absurd consequences because it totally detaches the Second Amendment's right to keep and bear arms from its purpose of individual self-defense. We have noted that certain bearable arms—such as the M16, the short-barreled shotgun, the ricin pellet-firing umbrella gun, and the W54 nuclear warhead—are not protected by the Second Amendment. But under appellants' common use inquiry, any one of these or similarly dangerous weapons could gain constitutional protection merely because it becomes popular before the government can sufficiently regulate it. Appellants admitted as much when they conceded at oral argument that the government could not prohibit possession of a "machine gun," a "bazooka," or "any firearm" so long as the weapon was "in common use." Oral Argument at 14:00–14:58, *Bianchi v. Brown*, No. 21-1255 (4th Cir. 2024).

Such a trivial counting exercise makes a mockery of the careful interest balancing between individual self-defense and societal order that our legal tradition has carved into

the heart of the right to keep and bear arms. It also ignores the reality that weapons may well proliferate before lawmakers comprehend that they are ill-suited or disproportionate to self-defense. Indeed, dangerousness and unusualness need not be static concepts. That would foreclose the ability of legislators to assess these characteristics and to enhance their knowledge through observation and experience. We cannot reasonably expect our representatives to be fortune tellers, anticipating the score of dangers posed by advances in weapons technology. This is particularly true as the pace of weapons manufacturing and distribution has continued to accelerate in recent years. *See, e.g.*, *What Is a Ghost Gun?*, CBS News (Apr. 11, 2022). We decline to hold that arms manufacturers can secure constitutional immunity for their products so long as they distribute a sufficient quantity before legislatures can react. A constitutional right with a "meaning . . . fixed according to the understandings of those who ratified it" cannot be read to expand or contract based on nothing more than contemporary market trends. *Bruen*, 597 U.S. at 28.

*Bruen*'s admonition that the right to keep and bear arms extends only to those weapons "'in common use' today for self-defense" reflects the fact that the Second Amendment protects only those weapons that are typically possessed by average Americans for the purpose of self-preservation and are not ill-suited and disproportionate to achieving that end. 597 U.S. at 32, 47; *see also Lamont*, 685 F. Supp. 3d at 71. As

demonstrated above, the AR-15 is a combat rifle that is both ill-suited and disproportionate to self-defense. It thereby lies outside the scope of the Second Amendment.[2]

IV.

In *Bruen*, the Supreme Court emphasized the importance of using history and tradition in determining whether a firearms regulation is permissible under the Second Amendment. *See* 597 U.S. at 25 (stressing that "reliance on history to inform the meaning of constitutional text—especially text meant to codify a *pre-existing* right—is, in our view, more legitimate, and more administrable" than means-end scrutiny); *id.* at 17 (noting that "[o]nly if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command" (internal quotation marks omitted)). Out of respect for the Supreme Court's order remanding this case after *Bruen*, we think it appropriate to reckon with the tradition of weapons regulation in this country and assess whether the Maryland statute is

---

[2] Because appellants have not shown that the AR-15 or any of the other assault weapons at issue are within the scope of the Second Amendment, there is no need to remand the case to the district court for further proceedings. Neither party preferred a remand, and for good reason. As appellants themselves argued, remand "is neither necessary nor appropriate" because, to decide this case, we "need only consult 'legislative facts' . . . [those] 'that bear on the justification for legislation, as distinct from' adjudicative facts, which are facts 'concerning the conduct of parties in a particular case.'" Appellants' Suppl. Opening Br. 33 (quoting *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012)). Our thorough review of such legislative facts has made plain that the covered assault weapons are not within the protection of the Second Amendment. To return the case to the district court for further proceedings would accomplish nothing other than to leave the Maryland law in limbo while the litigation yo-yos along a perpetual string of remands and appeals. The Supreme Court acknowledged as much by concluding that a case-specific factual record was unnecessary to decide *Bruen*. *See* 597 U.S. at 11. The Court has done its job in *Bruen*, and the Maryland legislature has done its job in enacting the statute. Now it is time that we do ours.

harmonious with it. In light of that analysis, we find that the Maryland regulation is readily "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 34.

The statute is one of many in a storied tradition of legislatures perceiving threats posed by excessively dangerous weapons and regulating commensurately. Indeed, the arc of weapons regulation in our nation has mimicked a call and response composition, in which society laments the harm certain excessively dangerous weapons are wreaking, and the state, pursuant to its police power, legislates in kind. The Maryland statute is but another example of this constructive, indeed indispensable, dialogue.

## A.

Under *Bruen*, we must engage in "reasoning by analogy" to "determin[e] whether a historical regulation is a proper analogue for a distinctly modern firearm regulation." 597 U.S. at 28–29. To do so, we consider "whether [the] modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 29. The analogue need not be "a historical *twin*," but must be "a well-established and representative historical *analogue*." *Id.* at 30. Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

Second Amendment analysis is heavily historical, and to bypass an inquiry into history here would be an inexplicable omission. The Court in *United States v. Rahimi* reaffirmed *Bruen*'s approach to history. As Chief Justice Roberts wrote for the *Rahimi* majority, "The law must comport with the principles underlying the Second Amendment,

but it need not be a 'dead ringer' or a 'historical twin.'" *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 30); *see also id.* at 1907 (Gorsuch, J., concurring) ("To prevail, the government need not show that the current law is a 'dead ringer' for some historical analogue." (quoting *Bruen*, 597 U.S. at 30)); *id.* at 1904–05 (Sotomayor, J., joined by Kagan, J., concurring) (noting that "the Court rejects [a] rigid approach to the historical inquiry" and that a "shared principle" between the old and new laws "is sufficient").

The use of history is thus important not just to remain consistent with the drafters' understanding but also to acquaint Americans with the glories and flaws of our own history and founding generation. It is vital to appreciate that while history may fix the date on which certain events occur, the understanding of history is not frozen in time. *See id.* at 1897 (majority opinion) (explaining that *Heller* and *Bruen* "were not meant to suggest a law trapped in amber"). This understanding deepens as new sources become available and new insights are advanced. Such ongoing learning compels consultation with the historical record, without at the same time using history as a set of minute instructions or a "straightjacket." *Bruen*, 597 U.S. at 30. This is what we think Justice Barrett meant when she recently wrote that "[h]istorical regulations reveal a principle, not a mold." *Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring). We take it as such here. This use of history does not update the Constitution, but rather enriches our view of the Framers' understanding of it.

*Bruen* further instructs that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged

regulation is inconsistent with the Second Amendment." 597 U.S. at 26. But if a case "implicat[es] unprecedented societal concerns or dramatic technological changes," courts may need to take "a more nuanced approach." *Id.* at 27.

B.

This case calls for such a nuanced approach. The ripples of fear reverberating throughout our nation in the wake of the horrific mass shootings in, for example, Las Vegas, Orlando, Blacksburg, Sandy Hook, Sutherland Springs, El Paso, Uvalde, Lewiston, Parkland, San Bernardino, Binghamton, Fort Hood, Thousand Oaks, Virginia Beach, Washington, D.C., Aurora, Monterey Park, Pittsburgh, Geneva County, Boulder, Buffalo, Covina, Dayton, Red Lake, Roseburg, San Jose, Santa Fe, Allen, Charleston, Indianapolis, Manchester, Omaha, and Plano—each of which occurred in the 21st century and resulted in at least nine fatalities—stem from a crisis unheard of and likely unimaginable at the founding. *See* The Violence Project, *Mass Shooter Database* (database updated Jan. 2024).

Certainly it would have been shocking to the Framers to witness the mass shootings of our day, to see children's bodies "stacked up . . . like cordwood" on the floor of a church in Sutherland Springs, Texas; to hear a Parkland, Florida high school student describe her classroom as a "war zone" with "blood everywhere"; to be at a movie in Aurora, Colorado when suddenly gunfire erupted, leaving "bodies" strewn and "blood on seats, blood on the wall, blood on the emergency exit door"; to run past "shoes scattered, blood in the street, bodies in the street" while bullets blazed through the sky in Dayton, Ohio; to watch law enforcement officers encounter "a pile of dead children" in Sandy Hook, Connecticut; to stand next to one of those officers as he tried to count the dead children, but "kept getting

confused," as his "mind would not count beyond the low teens." Silvia Foster-Frau et al., *Terror on Repeat: A Rare Look at the Devastation Caused by AR-15 Shootings*, Wash. Post (Nov. 16, 2023).

What did our forebears have by way of comparison, when they were drafting the Second and Fourteenth Amendments? Nothing even close. "[T]here is no known occurrence of a mass shooting resulting in double-digit fatalities from the Nation's founding in 1776 until . . . 1949." *Oregon Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 803 (D. Ore. 2022). Yet, in modern mass shootings involving assault weapons, the death toll is often in the dozens.

Rapid advancements in gun technology are a central cause of this mass carnage. "[W]hile mass murder has been a fact of life in the United States since the mid-nineteenth century, it was a group activity through the nineteenth century because of the limits of existing technologies." *Lamont*, 685 F. Supp. 3d at 105 (internal quotation marks omitted). Back then, "[t]he only way to kill a large number of people was to rally like-minded neighbors and go on a rampage" using the firearms and melee weapons available at the time. *Id.* These weapons were "certainly lethal but did not provide individuals or small groups of people the means to inflict mass casualties on their own." *Id.*

In sharp contrast, AR-15s and the like are designed to empower an individual soldier to kill as many people in as little time as possible, as we demonstrated above. It took only 32 seconds for a lone shooter to murder nine people and shoot 17 others in Dayton, Ohio. Emily Shapiro, *26 Shot in 32 Seconds: New Details, Videos Released in Dayton Mass Shooting*, ABC News (Aug. 13, 2019). It took about two minutes for a single shooter to

46

kill ten people and injure three at a supermarket in Buffalo, New York. N. Kirkpatrick et al., *The Blast Effect: This Is How Bullets from an AR-15 Blow the Body Apart*, Wash. Post (Mar. 27, 2023). It took less than three minutes for a married couple to murder 14 people and injure 24 at an office in San Bernardino, California. *Id.*

These are not our forebears' arms, and these are not our forebears' calamities. We thus take the instruction of *Bruen* to engage in a "more nuanced approach" to address these "unprecedented societal concerns." 597 U.S. at 27.

C.

Upon canvassing the historical record of arms regulations, and relying with gratitude on the careful work of professional historians, what we deduce is this: legislatures, since the time of our founding, have responded to the most urgent and visible threats posed by excessively harmful arms with responsive and proportional legislation. They have devised well-tailored solutions to the most salient issues plaguing their communities, while nonetheless protecting the core right of their citizens to defend themselves with arms in pressing circumstances. When a weapon's potential for widespread criminal abuse or unreasonable capacity to inflict casualties became apparent to lawmakers, they did not hesitate to regulate in response. We hold that the Maryland statute fits comfortably within this venerable tradition.

On the cusp of the Revolutionary War, firearms were a common fixture in the American home, but they were not used often in homicides. Randolph Roth, *Why Guns Are and Aren't the Problem: The Relationship Between Guns and Homicide in American History*, *in A Right to Bear Arms? The Contested Role of History in Contemporary Debates*

47

*on the Second Amendment* 116 (Jennifer Tucker et al. eds., 2019). And this small slice of homicides committed with firearms was cut from a relatively small pie, as interpersonal violence among colonists and early Americans rarely resulted in death. *See id.*; *Baird v. Bonta*, 2023 WL 9050959, at \*31 (E.D. Cal. Dec. 29, 2023).

The reason firearms were so infrequently used in homicides in the 18th century was because they had limited utility for such a purpose. Many early Americans owned a musket or a fowling piece, but these weapons were prone to misfiring and needed to be reloaded after each shot, a time-consuming process that required acumen and experience. Roth, *Why Guns Are and Aren't the Problem*, at 116–17; Joseph Blocher & Eric Ruben, *Originalism-by-Analogy and Second Amendment Adjudication*, 133 Yale L.J. 99, 153 (2023). Keeping firearms preemptively loaded was difficult, as the gunpowder of the day readily absorbed moisture and could corrode the gun's metal barrel and firing mechanism. Roth, *Why Guns Are and Aren't the Problem*, at 117; *Baird*, 2023 WL 9050959, at \*31. "Guns thus generally were not kept or carried loaded in 1791." Blocher & Ruben, *Originalism-by-Analogy*, 133 Yale L.J. at 153. Early Americans instead engaged in impromptu fights with their hands and feet, or used melee weapons such as "whips, sticks, hoes, shovels, axes, [or] knives." Roth, *Why Guns Are and Aren't the Problem*, at 117. Pre-Revolution, then, there was little regulation of firearms in America, as they were seldom used in "homicides that grew out of the tensions of daily life." *Id.*

One exception to this early lack of regulation was the restriction on gunpowder. Aggregation of gunpowder concerned colonists as large amounts of the substance "could kill many people at once if ignited." *Ocean State Tactical*, 95 F.4th at 49. In response to

this danger—which resulted from the accumulation of firepower disproportionate to the lawful purpose of individual self-defense—a handful of American cities and states restricted the quantity of gunpowder that an individual could possess.[3]

During the 19th century, the nation saw a surge in interpersonal violence. Starting in the South and then sprawling northward, eastward, and westward, homicide rates swelled. *See* Randolph Roth, *American Homicide* 180, 199–201, 299–302, 337 (2009). The proportion of killings committed with firearms increased as well. *See* Randolph Roth, *American Homicide Supplemental Volume: Weapons Figures*, Figures 25, 29, 34, 38 (2009); Roth, *Why Guns Are and Aren't the Problem*, at 122.

Improvements in weapons technology contributed to this rise in interpersonal violence. In the mid-19th century, gunmakers like Samuel Colt greatly improved the designs of percussion-cap repeating pistols, and "breech-loading revolvers, shotguns, and rifles" became widely available to consumers. Roth, *Why Guns Are and Aren't the Problem*, at 121; *see also* Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Calif. L. Rev. (forthcoming 2025) (manuscript at 41, 44). Repeating pistols and most breech-loading guns could fire multiple rounds without reloading. Roth, *Why Guns Are and Aren't the Problem*, at 120–21; DeLay, *The Myth of Continuity*, at 41, 44. Breech-

---

[3] *See, e.g.*, 1784 N.Y. Laws 627 (mitigating "Danger Arising from the Pernicious Practice of Lodging Gun Powder" in New York City by limiting the amount of gunpowder in one place to 28 pounds, separated into four canisters); Act of Dec. 6, 1783, chap. 1059, 11 Pa. Stat. 209; 1786 N.H. Laws 383–84; An Act Relative to the Keeping Gun-Powder in the Town of Providence, 1798–1813 R.I. Pub. Laws 85, § 2; 1801 Mass. Acts 507; 1806 Ky. Acts 122 § 3; 1811 N.J. Laws 300, § 1. We appreciate the good work of the Duke Center for Firearms Law in building its Repository of Historical Gun Laws.

loading guns could also be kept loaded with minimal risk of corrosion and were more accurate than their flintlock and percussion-lock predecessors. *See* Roth, *Why Guns Are and Aren't the Problem*, at 121; Robert J. Spitzer, *Understanding Gun Law History After Bruen: Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 81–82 (2023). "Americans scrambled to buy" these weapons, which were "ideal for killing in the heat of the moment." Roth, *Why Guns Are and Aren't the Problem*, at 121. Once people got their hands on these guns, "they kept them everywhere: in their homes, in their wagons, in saddle bags, purses, and pockets." *Id.* As a result, civilians had easy access to more portable and precise firearms than ever before.

Knives, too, advanced in lethality. Designed for the express purpose of fighting, dirks and Bowie knives generally had longer blades than ordinary knives, crossguards to protect users' hands, and clip points that made it easier to stab an opponent. *See* Declaration of Prof. Randolph Roth at 19, *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63 (D. Conn. Aug. 3, 2023) [hereinafter Roth Declaration]; David B. Kopel et al., *Knives and the Second Amendment*, 47 U. Mich. J.L. Reform 167, 180 (2013). Bowie knives "were widely used in fights and duels, especially at a time when single-shot pistols were often unreliable and inaccurate." Spitzer, *Understanding Gun Law History*, 51 Fordham Urb. L.J. at 89. As the Supreme Court of Texas explained, "The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least," but "[t]he bowie-knife differs from these in its device and design; it is the instrument of almost certain death." *Cockrum v. State*, 24 Tex. 394, 402 (1859).

The country set out to do something about the surge in homicides that had been driven, in part, by the development of these more effective arms. Citizens and lawmakers alike recognized that deadly yet concealable weapons—especially pistols, revolvers, and fighting knives—were the primary culprits in a large proportion of the homicides and assaults of the day. In 1834, for instance, the grand jurors of Jasper County, Georgia, denounced the lack of restrictions on concealable weapons. Roth, *American Homicide*, at 218–19. They told their lawmakers that it was "common" practice among the more violently inclined to "arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves," which resulted in the "stabbing shooting & murdering so many of our citizens." *Id.*

When confronted with these "public safety concerns over the increase in gun violence and the proliferation of concealable weapons," legislatures responded in kind. They passed restrictions on carry, and, in some cases, outright bans on the possession of certain more dangerous weapons. *See* DeLay, *The Myth of Continuity*, at 41, 52. Indeed, over the course of the 19th century and into the early 20th century, nearly every single state would either regulate the carry of certain firearms or place severe restrictions on their possession.[4]

---

[4] Act of Feb. 1, 1839, No. 77, 1838 Ala. Laws 67; An Act to Define and Publish Crimes in the District of Alaska, ch. 429, § 114, 117, 30 Stat. 1253, 1270 (1899); Act of Mar. 18, 1889, No. 13, § 1, 1889 Ariz. Sess. Laws 16; Ark. Stat. Rev. ch. XLIV, § 13 (1837); Act of Apr. 16, 1850, ch. 99, § 127, 1850 Cal. Stat. 229, 245; Act of Aug. 14, 1862, 1862 Colo. Sess. Law 56; Act of June 2, 1923, ch. 252, § 3, 1923 Conn. Pub. Acts 3707, 3707; Del. Rev. Code tit. 15, ch. 97, § 13 (1852); Act of Nov. 18, 1858, § 1, *The Laws of the Corporation of the City of Washington* 418 (William B. Webb, ed., 1868); *A Digest of* (Continued)

*the Laws of the State of Florida* 403 (James F. McClellan, ed., 1881); Act of Dec. 25, 1837, 1837 Ga. Laws 90; Act of Mar. 19, 1913, No. 22, 1913 Haw. Sess. Laws 25; Act of Feb. 17, 1909, H.B. No. 62, 1909 Idaho Sess. Laws 6; Act of Apr. 16, 1881, § 4, 1881 Ill. Laws 73, 74; Act of Apr. 19, 1913, ch. 297, 1913 Iowa Acts 307; Act of Jan. 14, 1820, ch. XXIII, 1819 Ind. Acts 39; Act of March 4, 1881, ch. XXXVII, § 23, 1881 Kan. Sess. Laws 79, 92; Act of Mar. 25, 1813, 1812 La. Acts 172; Me. Stat. Rev. tit. XII, ch. 169, § 16 (1840); Act of Feb. 26, 1872, ch. 42, 1872 Md. Laws 56; Act of May 31, 1887, No. 129, 1887 Mich. Pub. Acts 144; Minn. Penal Code § 334 (1889); Act of Feb. 28, 1878, ch. XLVI, 1878 Miss. Laws 175; Act of Mar. 5, 1883, 1883 Mo. Laws 76; Act of Jan. 11, 1865, 1864 Mont. Laws 355; An Act to Adopt and Establish a Criminal Code for the Territory of Nebraska, ch. 1, § 135, 1858 Neb. Laws 41, 69; Act of Jan. 14, 1853, 1852 N.M. Laws 67; Act of Mar. 27, 1891, ch. 105, § 209, 1891 N.Y. Laws 127, 176–77; N.D. Rev. Code § 7313 (1895); Act of Mar. 18, 1859, 1859 Ohio Laws 56; Penal Code of the Territory of Oklahoma, ch. XXV, art. 39, § 20, 1890 Okla. Sess. Laws 412, 476; Act of Dec. 22, 1853, ch. XVI, § 17, 1853 Or. Laws 184, 220; Act of Apr. 8, 1851, No. 239, § 4, 1851 Pa. Laws 381, 382; Act of May 3, 1893, ch. 1180, 1893 R.I. Pub. Laws 231; Act of Dec. 24, 1880, No. 362, § 1, 1880 S.C. Acts 447; S.D. Rev. Penal Code § 471 (1903); Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15; Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25 (1st Sess.); Wash. Rev. Code § 929 (1881); W. Va. Code ch. CXLVIII, § 7 (1870); Wis. Stat. Rev. tit. XXVII, ch. 175, § 18 (1858); Wyo. Stat. ch. XXXV, § 127 (1876). Some 19th-century laws also banned the sale or exchange of certain arms, including most pistols. *See, e.g.*, Act of Apr. 1, 1881, ch. XCVI, § 3, 1881 Ark. Acts 191, 192; Act of Mar. 17, 1879, ch. XCVI, 1879 Tenn. Pub. Acts 135. These Acts have been carefully laid forth in Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 62 nn.34, 36, 63 n.48, 64 n.49 (2017).

In addition to regulating firearms, legislatures targeted excessively dangerous weapons such as Bowie knives,[5] dirks,[6] sword canes,[7] metal knuckles,[8] slingshots,[9] and

---

[5] *See, e.g.*, Act of Jan. 27, 1838, ch. CXXXVII, 1837 Tenn. Pub. Acts 200 (forbidding sale or transfer of "any Bowie knife or knives, or Arkansas tooth picks, or any knife or weapon that shall in form, shape, or size resemble a Bowie knife or any Arkansaw tooth pick"); Act of Feb. 1, 1839, No. 77, § 1, 1838 Ala. Laws 67, 67 (outlawing concealed carry of "any species of fire arms, or any bowie knife, Arkansaw [sic] tooth-pick, or any other knife of the like kind, dirk, or any other deadly weapon"); Act of Feb. 28, 1878, ch. XLVI, § 1, 1878 Miss. Laws 175, 175 (prohibiting concealed carry of "any bowie knife, pistol, brass knuckles, slung shot or other deadly weapon of like kind or description" with a self-defense exception); Act of Jan. 30, 1889, ch. 37, 1889 Tex. Gen. Laws 33 (outlawing open and concealed carry of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, or knuckles made of any metal or any hard substance, bowie-knife, or any other kind of knife manufactured or sold for purposes of offense or defense"). A full survey of laws regulating Bowie knives is available in Section V(B) of David B. Kopel & Joseph G. S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 298–328 (2024).

[6] Dirks are "fighting knives" that "come in a variety of sizes and shapes." Kopel & Greenlee, *The History of Bans*, at 328. *See id.* at 328–35 for a full range of dirk legislation from the 19th century. Laws ranged from complete bans on carry; to bans on open and concealed carry in certain locations and with bad intent; to bans on only concealed carry.

[7] A sword cane is a "sword concealed in a walking stick." Kopel & Greenlee, *The History of Bans*, at 289. For a list of sword cane regulations from the 19th century, *see id.* at 335–38. These included outright sales bans, bans on carry, and prohibitions on brandishing in a threatening manner unless in self-defense.

[8] Metal knuckles are "devices attached to one's second through fifth fingers to make the fist a more powerful weapon," often made of brass. Kopel & Greenlee, *The History of Bans*, at 359. Like with other excessively dangerous weapons, restrictions included bans on sales and manufacture, as well as restrictions on carry and brandishing. *See id.* at 360–64.

[9] A slungshot comprises a weight fastened to the end of a chain or rope that can be swung around to apply blunt force to an opponent. Kopel & Greenlee, *The History of Bans*, at 344. Restrictions on slungshots were more severe and widespread than restrictions on other excessively dangerous weapons, as more states banned the sale and possession of slungshots than of any other weapon. *Id.* at 346–47, 351. Other states regulated manner of carry and forbade brandishing. *See id.* at 347–50.

sand clubs.[10] *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 62–68 (2017). These weapons were particularly suitable for fighting and "popular[] with street criminals." David B. Kopel & Joseph G. S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Legis. 223, 345 (2024). Those who carried clubs, for instance, were called "devils and lurking highwaymen." Spitzer, *Understanding Gun Law History*, 51 Fordham Urb. L.J. at 96. Slungshots, too, "were a regular part of criminal weaponry," and "gangsters could be merciless in their use." *Id.* at 97. Laws addressing these weapons ranged from outright bans on their manufacture, sale, and possession; to enhanced criminal penalties for those who used the weapons to commit crimes; to prohibitions on both open and concealed carry. *See supra* nn.4–9. At least three-quarters of states also enacted brandishing laws,[11] which generally barred "exhibit[ing]" these dangerous weapons "in a rude, angry or threatening manner."[12] A number of these regulations did, however, make exceptions for those who

---

[10] A sand club "is a small bag of sand attached to a short handle" that was often used by law enforcement officers and criminals. Kopel & Greenlee, *The History of Bans*, at 355–56. States and localities enacted numerous restrictions on sand clubs, including categorical bans on their manufacture and sale and bans on concealed carry. *See id.* at 356–57.

[11] Spitzer, *Understanding Gun Law History*, 51 Fordham Urb. L.J. at 99.

[12] *E.g.,* Act of Sept. 30, 1867, § 1, 1867 Ariz. Sess. Laws 21, 21; *see also* Act of Mar. 13, 1875, ch. XVII, § 1, 1875 Ind. Acts 62 (Spec. Sess.).

could demonstrate they had carried or brandished the weapon in reasonable anticipation of being attacked.[13]

A handful of state supreme courts found these statutory regulations on especially dangerous weapons to be consistent with the right to keep and bear arms. In *Aymette v. State*, the Supreme Court of Tennessee sustained the conviction of a man who illegally concealed a Bowie knife under his clothes, emphasizing that "[t]he Legislature . . . ha[s] a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens." 21 Tenn. 154, 159 (1840). The state law was justified, in the court's view, as it existed "to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms." *Id.*; *see also Haynes v. Tennessee*, 24 Tenn. 120, 122 (1844) (upholding conviction of concealed carrying of a "Mexican pirate-knife" and noting that "[t]he design of the statute was to prohibit the wearing of bowie-knives, and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil-disposed persons but too often ended in assassination"); *Cockrum*, 24 Tex. at 402–03

---

[13] *See, e.g.*, 1880–1881 Ala. Laws 38, ch. 44 (banning concealed carry of bowie knives, pistols, and air guns, but allowing "evidence, that the defendant has good reason to apprehend an attack [to] be admitted . . . in justification of the offense"); 1871 Tex. Gen. Laws 25, ch. 34 (banning all carry of "any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass-knuckles, [or] bowie knife," with an exception for "immediate and pressing" fear of unlawful attack); 1877 Mo. Laws 240 (forbidding the exhibit of "deadly weapon[s] in a rude, angry, or threatening manner, not in the necessary defence of his family, person, or property"). These and a variety of other laws with similar exceptions are documented in Kopel & Greenlee, *The History of Bans*, at 287–368.

(upholding penalty enhancement for homicides committed with a Bowie knife after noting that the it was "an exceeding[ly] destructive weapon" and "the most deadly of all weapons in common use").

In sum, then, 18th and 19th century legislatures "passed laws in a number of states that restricted the use or ownership of certain types of weapons," once it "became obvious that those weapons . . . were being used in crime by people who carried them concealed on their persons and were thus contributing to rising crime rates." Roth Declaration at 20. These legislatures—in balancing individual rights and public peacekeeping—permitted individuals to defend themselves with firearms, while ridding the public sphere of excessively dangerous and easily concealable weapons that were primarily to blame for an increase in violent deaths.

At the end of the 19th century, a different type of homicide began to emerge: mass murder spurred by the commercial availability of weaponry that empowered individuals to kill many people quickly. Dynamite, invented in 1866, was one such example. *Lamont*, 685 F. Supp. 3d at 109. Because it was rather cheap yet very destructive, it was favored by violent activists and anarchists and was employed in a number of infamous bombings between 1919 and 1920, including "the murder of 38 people and the wounding of 143 in an attack on Wall Street, 36 dynamite bombs mailed to justice officials, newspaper editors, and businessmen (including John D. Rockefeller), and a failed attempt to kill Attorney General A. Mitchell Palmer and his family." Roth Declaration at 38–39.

Another weapon that surfaced during the turn of the century was the semiautomatic firearm, which became available to consumers in the 1890s. DeLay, *The Myth of*

*Continuity*, at 49. Colt began marketing increasingly effective semiautomatic pistols, culminating in the release of the M1911. *Id.* at 51. Fully automatic weapons quickly followed, with the Thompson submachine gun being patented in 1920. Spitzer, *Understanding Gun Law History*, 51 Fordham Urb. L.J. at 61. While the "Tommy gun" was initially created for use in World War I as "'purely a military weapon,'" it arrived on the battlefield too late to gain any real traction during that conflict. *Id.* (quoting William J. Helmer, *The Gun That Made the Twenties Roar* 75 (1st ed. 1969)). The Tommy gun was marketed to civilians and police forces with little success, in part due to its expense and lack of controllability. *Id.* at 61–62; Roth Declaration at 38. It instead became popular during the interwar period "with criminals, especially bootleggers." Kopel & Greenlee, *The History of Bans*, at 287 n.490; Spitzer, *Gun Law History*, 80 Law & Contemp. Probs. at 68; Helmer, *The Gun That Made the Twenties Roar*, at 126 ("As a criminal's weapon, the Tommygun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it had never come off the drawing board."). Other military firearms that had been developed for World War I, such as the Browning Automatic Rifle, similarly "found favor among criminals and gangsters in the 1920s and early 1930s." Spitzer, *Understanding Gun Law History*, 51 Fordham Urb. L.J. at 63.

The upshot was that early 20th-century criminals gained access to weapons with firepower not seen before in civilian life. Some models of the Tommy gun could "go through a 100-round drum magazine in four seconds." *Id.* at 61. The Browning Automatic Rifle was a heavy machine gun that could fire up to ten rounds per second. *See id.* at 63. Moreover, these firearms' detachable magazines "empowered individual shooters to inflict

far more damage on more people than had been possible with earlier technologies." DeLay, *The Myth of Continuity*, at 52. When the guns were used, "they exacted a devastating toll and garnered extensive national attention," becoming inextricably linked to notorious crimes including the St. Valentine's Day Massacre (seven gang members and associates killed) and the Kansas City Massacre (four law enforcement officers and one prisoner killed). Spitzer, *Understanding Gun Law History*, 51 Fordham Urb. L.J. at 63; Roth Declaration at 39; Encyc. Britannica, *St. Valentine's Day Massacre* (Feb. 7, 2024); Fed. Bureau of Investigation, *Kansas City Massacre and "Pretty Boy" Floyd* (last visited May 12, 2024). These national tragedies put pressure on government to do something about machine guns.

Once again, legislatures responded. And though they enacted regulations in a later century than the ratification of the Second and Fourteenth Amendments, the tide of legislative responses to technological advances in weaponry has persisted throughout our history. So, while we acknowledge that "post-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text," we see these 20th-century enactments as steps trod along a well-worn path. *Bruen*, 597 U.S. at 36. These later-in-time regulations remain relevant in tracing the broader and consistent story of our nation's regulation of excessively dangerous weaponry.

The Federal Explosives Act of 1917 regulated possession of dynamite and a wide array of other explosives—regulations that were later expanded by the Organized Crime Control Act of 1970. Pub. L. 65-68, 40 Stat. 385 (1917); Pub. L. 91-452, 84 Stat. 922

(1970). As for semiautomatic and automatic weapons, a great number of jurisdictions took action. At least 29 states enacted anti-machine-gun laws between 1925 and 1934,[14] and ten states restricted semiautomatic weapons between 1927 and 1934.[15] At the federal level, Congress banned possession in the District of Columbia of "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading." Pub. L. No.

---

[14] *See* Act of July 29, 1927, ch. 552, 1927 Cal. Stat. 938; Act of Feb. 25, 1931, ch. 249, 37 Del. Laws 813; Act of July 8, 1932, Pub. L. No. 72-275, 47 Stat. 650, 651–52 (D.C.); An Act to Regulate the Hunting of Wild Deer etc., ch. 6621, § 8, 1913 Fla. Laws 116, 117; Act of June 6, 1933, ch. 16111, § 1, 1933 Fla. Laws 623, 623; Act of Apr. 27, 1933, No. 26, § 7, 1933 Haw. Sess. Laws 35, 38–39 (Spec. Sess.); Act of July 2, 1931, S.B. No. 18, 1931 Ill. Laws 452; Act of Mar. 9, 1927, ch. 156, 1927 Ind. Acts 469; Act of Apr. 19, ch. 234, 1927 Iowa Acts 201; Act of Nov. 28, 1933, ch. 62, 1933 Kan. Sess. Laws 76 (Spec. Sess.); Act of July 7, 1932, No. 80, 1932 La. Acts 336; Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413; Act of June 2, 1927, No. 372, § 3–4, 1927 Mich. Pub. Acts 887, 888–89; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231; Act of June 1, 1929, H.B. No. 498, 1929 Mo. Laws 170; Act of Apr. 29, 1929, ch. 190, 1929 Neb. Laws 673; Act of Mar. 19, 1927, ch. 95, 1927 N.J. Laws 180; Act of Apr. 15, 1931, ch. 435, 1931 N.Y. Laws 1033; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Act of Apr. 8, 1933, ch. 64, 1933 Ohio Laws 189; Act of Mar. 10, 1933, ch. 315, 1933 Or. Laws 488; Act of Apr. 25, 1929, No. 329, 1929 Pa. Laws 777; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256; Act of Mar. 2, 1934, No. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245; Act of Oct. 25, 1933, ch. 82, 1933 Tex. Gen. Laws 219 (1st Called Sess.); Act of Mar. 22, 1923, No. 130, § 1, 1923 Vt. Acts & Resolves 127; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137; Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335; Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24, 30–32 (1st Extraordinary Sess.); Act of May 28, 1929, ch. 132, 1928–1929 Wis. Sess. Laws 157. These laws are compiled in Spitzer, *Understanding Gun Law History*, 51 Fordham Urb. L.J. at 64 n.38.

[15] Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413; Act of June 2, 1927, No. 372, 1927 Mich. Pub. Acts 887, 888–89; Act of Apr. 10, 1933, ch. 190, § 1(a)–(b), 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, No. 64, 1933 Ohio Laws 189; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137; Act of July 2, 1931, S.B. No. 18, 1931 Ill. Laws 452; Act of July 7, 1932, No. 80, 1932 La. Acts 336; Act of Mar. 2, 1934, No. 731, 1934 S.C. Acts 1288. We thank Spitzer, *Gun Law History*, 80 Law & Contemp. Probs. at 68, 70–71, for this compilation.

72-275, 47 Stat. 650 (1932). The National Rifle Association endorsed the ban, announcing its "desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the States of the Union." S. Rep. No. 72-575, at 4–6 (1932). Two years later, Congress enacted the National Firearms Act of 1934, which severely curtailed the civilian possession and general circulation of automatic weapons, as well as sawed-off shotguns, short-barreled rifles, and silencers. Pub. L. No. 73-474, 48 Stat. 1236 (1934). As Judge Wynn's fine opinion in *United States v. Price* explained, and as the Supreme Court recognized in *Miller* and *Heller*, such regulation accorded with the historical understanding of the scope of the Second Amendment right. No. 22-4609, slip op. at 9–11 (majority opinion).

Over the course of the 20th century, the dangers posed by semiautomatic weapons began to manifest more potently as "a new generation of more expensive and more deadly guns[] entered the criminal market." Spitzer, *Understanding Gun Law History*, 51 Fordham Urb. L.J. at 102. In the mid-to-late 20th century, a profound uptick in crime occurred. Law enforcement at the time lamented that "[t]he ready availability of and easy access to assault weapons by criminals has increased . . . dramatically"—a particular problem given that standard-issue police weapons were "no match against a criminal armed with a semi-automatic assault weapon." H.R. Rep. No. 103-489, at 13–14 (1994). Simultaneously, the nation's mass shooting crisis was beginning to emerge, with a 1989 killing of five schoolchildren in Stockton, California prompting public outcry about assault rifles. *See* Charles Mohr, *U.S. Bans Imports of Assault Rifles in Shift by Bush*, N.Y. Times (Mar. 15, 1989). In response, President George H.W. Bush temporarily banned the import of assault

rifles in 1989, and California became the first state to restrict the possession of assault weapons that same year. *See id.* As the excessively dangerous nature of these weapons became apparent, Congress enacted a ten-year ban on assault weapons and large-capacity magazines in 1994. Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994). Once again, citizens had called for something to be done about the illicit use of excessively dangerous arms, and their elected representatives responded. *See* DeLay, *The Myth of Continuity*, at 55 ("Technological changes provoking social concerns that lead to public safety legislation. That is the nation's tradition of firearms regulation.").

\* \* \*

Taking a long view of this history, a definable arc of technological innovation and corresponding arms regulation begins to emerge. Whether these laws and regulations were wise or effective is surely a matter of debate. The point is, however, that legislatures were not disabled constitutionally from enacting them. Spurred often by the demands of the military for use in international armed conflict, weapons became progressively sophisticated and capable of inflicting enormous offensive harm. Arms, for example, were far more advanced at the end of The Great War and World War II than they were at the start of those conflicts. Once introduced to stop an oncoming battlefield foe, firearms frequently transitioned to civilian use and became capable of inflicting greater harms in a lessened time period. The Cold War and contemporary competition between great powers have not diminished arms competition. To the contrary, if the pace of innovation today is any indication, this is just the beginning.

Throughout this history lies a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians. In documenting the course of weapons regulations, we see states and localities responding to the calls of their citizens to *do something* about the horrors wrought by excessively dangerous weapons, while preserving the core right of armed self-defense. When violence surged in the public square, states and localities responded by regulating the manner of carry; forbidding brandishing; and banning the sale, manufacture, and possession of weapons that were particularly useful for offensive and criminal purposes. And as some modern firearms became capable of inflicting mass horrors, government did not hesitate to circumscribe their possession while leaving intact the right to own weapons more suitable to the Second Amendment's purpose of personal protection.

The Maryland statute at issue is yet another chapter in this chronicle. It only regulates weapons that are ill-suited for and disproportionate to the objective of self-defense, while honoring the right of Americans to possess arms more compatible with the Second Amendment's purpose. The legislation is a direct response to the calls of citizens who fear it is only a matter of time before mass violence will afflict their communities absent government intervention. In heeding their outcry, Maryland is in the company of centuries of state governments that have done the same.

The Supreme Court has made clear that the Second Amendment is an integral component of the Bill of Rights. But as our nation's history has shown, it is "neither a regulatory straightjacket nor a regulatory blank check." *Bruen*, 597 U.S. at 30. The Amendment has not disabled the ability of representative democracy to respond to an

urgent public safety crisis. To disregard this tradition today—when mass slaughters multiply and the innovation of weaponry proceeds apace—could imperil both the perception and reality of well-being in our nation. We therefore hold that Maryland's regulation of assault weapons is fully consistent with our nation's long and dynamic tradition of regulating excessively dangerous weapons whose demonstrable threat to public safety led legislatures to heed their constituents' calls for help.

V.

When our Founders bravely coalesced around that revolutionary piece of parchment, quill pens in hand, they certainly sought to protect the citizenry's inherent liberties from the often oppressive hand of government. At the same time, though, our Founders organized their fellow countrymen into a civilized society with an elected government, which necessarily entailed the ceding of unadulterated freedom for the nation's common good. *See* John Locke, *Two Treatises of Government* (1689). Much as the branch of a willow offers a gentle bend so that the wind may blow and the birds may nest, so too did our predecessors craft a political community in which rights must sometimes bend to better accommodate the rights of others.

One way in which our nation agreed to temper our individual liberties was by accepting that the pre-existing rights codified within our Constitution came with inherent qualifications crafted through centuries of common law. The Second Amendment was no exception. The right to keep and bear arms must be read within the context of how the Framers conducted this balancing of individual rights with societal prerogatives when they enacted the Second Amendment. Far from disturbing this basic balance, *Heller* and *Bruen*

reaffirmed it, making clear that lower courts are duty bound to apply the terms of the balance enshrined in the Constitution's text, not to dictate such terms themselves. The language of entitlement is qualified by the language of limitation in those opinions, and we are bound to respect both.

The founding generation's understanding that the Second Amendment codified a right that is less than absolute is all the more important today, when modern armaments are increasingly used for crimes so mean and vile that it is difficult even to read about them. Imagine, then, *living* through these recent tragedies. Imagine the sense of loss that afflicts not only the moment, but the lifetimes of those families and friends affected. And then imagine that you mobilize and lobby your representatives to pass preventative legislation, only to be told by a court that your Constitution renders you powerless to save others from your family's fate. The Second Amendment, as elucidated by *Heller* and *Bruen*, does not require courts to turn their backs to democratic cries—to pile hopelessness on top of grief. We shudder to imagine the hubris with which a court would disable representative government at the very moment that lethal technologies are proceeding at an accelerated and indeed unprecedented pace. In 79 A.D., the Roman Emperor Vespasian proclaimed, "Woe is me, I think I am becoming a god." *Oxford Concise Dictionary of Quotations* 386 (Susan Ratcliffe ed., 6th ed. 2011). The Supreme Court, in alluding to the balance struck by our own founding generation, has avoided a judicial environment where Vespasian would fit right in.

The Framers recognized they could not foresee all the dangers that novel weaponry would someday pose, or the circumstances that would invoke the basic power of

government to protect the governed. Maryland is a testament to their prescience, though other states with other characteristics and other approaches to this problem may be as well. We have before us nothing more or less than a challenge to one state's regulation of assault weapons. Following *Heller* and *Bruen*, we hold that the Maryland statute is plainly a constitutional enactment.

VI.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED.*

DIAZ, Chief Judge, with whom Judges KING, WYNN, THACKER, BENJAMIN, and BERNER join, concurring:

In the wake of one of this country's most horrific mass shootings, Maryland's legislature acted. Using the considerable police power afforded to it by our Constitution, and heeding the pleas for action of its constituents, the State banned the type of weapon (and similar weapons) that had been used to gun down twenty children and six staff members at Sandy Hook Elementary School.

Judge Wilkinson's masterful and eloquent opinion for the majority (which I join in full) explains why Maryland's ban "peaceably coexist[s]" with the Second Amendment's text, Majority Op. at 13, adheres to our Nation's "strong tradition of regulating excessively dangerous weapons," *id.*, and satisfies well-understood notions of federalism meant to be abridged only sparingly and with good reason. I write briefly to comment on how this case lays *Bruen*'s challenges bare.

As my colleagues have explained, *Bruen* "[r]eject[ed] the means-end approach" many lower courts had used after *Heller* in favor of a "two-step methodology oriented towards text, history, and tradition."[1] Majority Op. at 11; *see also* Dissenting Op. at 109–10. First, a court "looks to the text of the Second Amendment to see if it encompasses the desired conduct at issue." Majority Op. at 11 (citing *Bruen*, 597 U.S. at 24). If it doesn't, then we all go home. But if it does, then "the analysis moves to the second step, where the

---

[1] *Bruen* appears to have rejected the post-*Heller* two-step test as "one step too many," *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 19 (2022), only to replace it with another two-step test.

burden shifts to the government to 'justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'" *Id.* at 11–12 (quoting *Bruen*, 597 U.S. at 24). Easy enough.

Except that it hasn't been. *Bruen* has proven to be a labyrinth for lower courts, including our own,[2] with only the one-dimensional history-and-tradition test as a compass. Questions abound at the framework's two steps, so that "courts, operating in good faith, are struggling at [each] stage of the *Bruen* inquiry."[3] Others have well summarized many of these consequential gaps, so I won't belabor them here.[4] But courts, tasked with sifting through the sands of time, are asking for help. And the Supreme Court's recent attempt to decipher the *Bruen* standard in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), offered little instruction or clarity about how to answer these persistent (and often, dispositive) questions.

Look no further for a front row seat to this confusion than the principal opinions authored today. Each was written by a thoughtful colleague, who engaged in an exhaustive

---

[2] *See, e.g.*, *United States v. Price*, No. 22-4609, slip op. at 39 (Quattlebaum, J., concurring) (acknowledging a "puzzle" in whether courts assess a firearm's "common use"—a "limit to the Second Amendment['s]" protection—"at *Bruen*'s first or second step").

[3] *United States v. Daniels*, 77 F.4th 337, 358 (5th Cir. 2023) (Higginson, J., concurring), *cert. granted, judgment vacated*, No. 23-376, 2024 WL 3259662 (U.S. July 2, 2024).

[4] *See, e.g.*, *id.*; *see also Rahimi*, 144 S. Ct. at 1926–30 (Jackson, J., concurring).

sweep of history, only to reach diametrically opposed conclusions about what that history means.

I think my friend Judge Wilkinson has the far better of the argument. His robust textual analysis and nuanced historical survey each offer—at least in this case—"a way to bring discipline to the increasingly erratic and unprincipled body of law that is emerging after *Bruen*." *Id.* at 1929 (Jackson, J., concurring) (cleaned up).

But if courts are to apply and replicate precedent consistently, then either the *Bruen* framework is failing, or we are. And if the cacophony of decisions we've seen post-*Bruen* is any indication,[5] then confusion isn't simply a bug of the framework—it's a feature, even if unintended. Hewing true to our oaths, we've done our best to apply *Bruen* faithfully, but the law shouldn't work like this.

Particularly so given the horrific consequences. Gun violence generally is, and mass shootings specifically are, on the rise.[6] In fact, gun violence is seen by at least some experts as an epidemic.[7] Technological advances in guns have moved them ever farther from the

---

[5] *See, e.g.*, Jacob D. Charles, *The Dead Hands of a Silent Past:* Bruen*, Gun Rights, and the Shackles of History*, 73 Duke L.J. 67, 129–45 (2023) (describing common obstacles courts face in implementing *Bruen* and the "divergent conclusions" those courts have reached).

[6] John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Research Center (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/ [https://perma.cc/U8B8-KGWR]; *see also* The Violence Project, *Mass Shooter Database* (database updated Jan. 2024).

[7] Ellen Barry, *Surgeon General Declares Gun Violence a Public Health Crisis*, N.Y. Times (June 24, 2024); *see also Firearm Violence in the United States*, Johns Hopkins Bloomberg School of Public Health, Center for Gun Violence Solutions, (Continued)

Second Amendment's revolutionary-era musket to something unrecognizably faster, more accessible, and more lethal.[8]  One such weapon, whose popularity seemingly knows no bounds, is the AR-15.

The court's principal opinions describe the AR-15's history, its popularity, its firepower, its destructiveness, its lawful uses, and its unlawful ones.  They illustrate, quite persuasively, why the AR-15 has become the chosen weapon of mass shooters and terrorists.  *See, e.g.*, Dissenting Op. at 164–65 (describing the AR-15's superiority to a handgun and other rifles because of its balance of force, accuracy, controlled recoil, and maneuverability); *see also id.* at 165 ("The AR-15's perceived superiority is aided by many features that make it wieldable for people of all ages and sizes.").  "Indeed," as Judge Wilkinson explains, the "AR-15 or AK-47 type assault rifles covered by the Maryland regulations have been used in every major terrorist attack on U.S. soil in the past decade." Majority Op. at 33–34 (recounting terrorist incidents in San Bernadino, Orlando, Pittsburgh, El Paso, and Buffalo).[9]

---

https://publichealth.jhu.edu/center-for-gun-violence-solutions/research-reports/firearm-violence-in-the-united-states [https://perma.cc/U9LL-U3MS] (last accessed July 19, 2024).

[8] A gun owner might say that more advanced weapons may better serve self-defense ends.  It's a fair point, and is exactly why history alone cannot and should not dictate the outcome in a case such as this, and why the legislature, as here, can balance competing public safety and self-defense interests in a democratic forum.

[9] We saw the cycle repeat itself on Saturday, July 13, when a former President of the United States, at a crowded campaign event and protected by the Secret Service, was nearly assassinated by an AR-15.  Tragically, one man was killed, and two others were (Continued)

The "history-only" view of my dissenting colleagues, while cleaving to all of *Bruen*'s strictures and none of its oxygen, would dismiss these public safety concerns of today as untethered to the discernible legislative footprints of 250 years ago.[10]  In their mind, because the modern regulation addressing those public safety concerns has cosmetic differences with its historical precursor, or imposes a slightly different burden, the legislature is helpless to act.[11]

That cannot be.  Why even have a ballot box when our laws are fossilized in a history book?  That's no way to foster a democracy, but it's an effective way to paralyze one.

Of course, the Court doesn't require "a law trapped in amber," *Rahimi*, 144 S. Ct. at 1897, demanding only a historical "principle, not a mold," *id.* at 1925 (Barrett, J., concurring).  Whatever those instructions mean on the ground, Maryland has responded to current public safety concerns, consistent with historical principles supporting the regulation of dangerous weapons.

---

critically wounded.  *The Assassination Attempt Against Donald Trump*, N.Y. Times (July 14, 2024).

[10]  My dissenting colleagues insist that the Second Amendment's mandate is "absolute" and "unequivocal."  Dissenting Op. at 85.  That may describe their approach to modern firearms regulation, but it's not the one dictated in *Bruen*.  597 U.S. at 21 ("Like most rights, the right secured by the Second Amendment is not unlimited." (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 626 (2008) (decapitalization removed)).  The Second Amendment isn't a second-class right, but neither is it sacrosanct.

[11]  And if the retort is that a state may act in other ways to protect its citizens, the dissent's author struck down just such an attempt—a handgun licensing regime passed by the Maryland legislature.  *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1040 (4th Cir. 2023), *reh'g en banc granted*, No. 21-2017(L), 2024 WL 124290 (4th Cir. Jan. 11, 2024).

Although we "offer no view," Majority Op. at 4, on whether Maryland's legislative approach is the right one, we do conclude that its representatives acted with both its constituents, *and* our country's history, in proper view.

* * * *

At a June 12 high school graduation in Newtown, Connecticut, twenty names were called, though no student crossed the stage.[12]  They had never left their first-grade classrooms.  All because of one man, six minutes, and an AR-15.  This chilling episode (and many like it) should give us pause.[13]  It gave the people of Maryland pause and propelled its legislature to act.

It is neither a "trope[]" nor "hyperbole," Dissenting Op. at 166, to recite truthfully the carnage wrought by such weapons.  And we refuse today to shackle Maryland's representatives as they work in good faith to stop the bloodshed.

History should guide.  The Constitution should anchor.  But neither should drown us.

---

[12] Claire Fahy, *Sandy Hook Victims are Remembered on Day They Would Have Graduated*, N.Y. Times (June 13, 2024).

[13] The majority describes similar such massacres that required even less time to exact a devastating toll.  *See* Majority Op. at 46–47 (detailing that a lone shooter needed only thirty-two seconds to murder nine people and injure seventeen in Dayton, Ohio, and that another needed only two minutes to kill ten people and injure three in Buffalo, New York).

71

GREGORY, Circuit Judge, concurring in the judgment:

In the interim between the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), our Circuit assessed Second Amendment challenges under a two-part framework that considered the history of the Second Amendment right as well as the government's interests in protecting its citizens. *Kolbe v. Hogan*, 849 F.3d 114, 133 (4th Cir. 2017), abrogated in part by *Bruen*, 597 U.S. 1. In *Bruen*, the Supreme Court rejected the latter portion of that framework as "one step too many," and held that the government may not justify a firearms regulation on the basis that it promotes an important interest. *Bruen*, 597 U.S. at 17. Rather, the Court said, a regulation can survive a Second Amendment challenge only if the government can demonstrate that the challenged regulation is consistent with our country's historical tradition of firearm regulation. *Id*.

As I read it, that binding precedent instructs that we refrain from balancing the right guaranteed by the Second Amendment against the general governmental interests of safety and order, and instead confine our analysis to history and tradition. *Id*. at 17, 19. Because I believe the majority did not adhere to that instruction, I cannot join the majority's opinion. But because Maryland's statute is relevantly similar to historic weapons prohibitions, I concur in the judgment.

I.

My colleagues in the majority suggest that, under *Bruen*, the plain text of the Second Amendment limits its purview to weapons "in common use today for self-defense." Majority

Op. at 39, 41. In their estimation, only "those weapons that are typically possessed by average Americans for the purpose of self-preservation and are not ill-suited and disproportionate to achieving that end" are entitled to constitutional protection. *Id*. at 41.

At the other end of the spectrum, my colleagues in the dissent read *Bruen* much more broadly and posit that any weapon in common use for lawful purposes is necessarily not dangerous and unusual at step two, and is, therefore, automatically protected by the Second Amendment. Dissenting Op. at 144. Based on that interpretation, the dissent maintains that because millions of people across the country own the semiautomatic rifles challenged here, the Constitution prohibits Maryland from banning those weapons. *Id*. at 153.

I disagree with both positions. I do not read *Bruen* to define "arms" as narrowly as the majority does or to otherwise cabin the Second Amendment right to effectively cover only handguns and the like. Nor do I share in the dissent's view that under *Bruen* a legislature may only prohibit weapons that are not in common use for lawful purposes and particularly useful for criminal activity. Dissenting Op. at 145. Rather, as I see it, Supreme Court precedent and the historical tradition require courts to examine a firearm with regard to more than its utility for self-defense or lawless behavior in determining whether the weapon is dangerous and unusual.

The Supreme Court has not yet defined the purview or instructed on the proper placement of the dangerous and unusual analysis. In that vacuum, courts have struggled to interpret the scope of the constitutional right to bear arms as informed by *Bruen* and other Supreme Court precedent. *Bruen* itself bears much of the responsibility for that

Herculean exercise. In determining that New York could not prohibit possession of handguns under the tradition of prohibiting dangerous and unusual weapons the Supreme Court explained:

> Whatever the likelihood that handguns were considered "dangerous and unusual" during the colonial period, they are indisputably in "common use" for self-defense today. They are, in fact, "the quintessential self-defense weapon." Thus, even if these colonial laws prohibited the carrying of handguns because they were considered "dangerous and unusual weapons" in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.

*Bruen*, 597 U.S. at 47. As a threshold matter, the Supreme Court's conclusion, as expressed in that portion of the opinion, must be read with the understanding that (1) the statute at issue in *Bruen* prohibited most New Yorkers from possessing any firearm, and (2) the Supreme Court had previously recognized handguns as the "quintessential self-defense weapon." *See id.* at 47; *see also Heller*, 554 U.S. at 629 (stating that "the American people have considered the handgun to be the quintessential self-defense weapon).

With that context in mind, I understand the Supreme Court's statement as simply clarifying that if the Second Amendment is to have any teeth, firearms regulations cannot completely prohibit citizens from possessing handguns generally, which New York's statute effectively did. Nothing in that quote, elsewhere in *Bruen*, or in any other precedential Second Amendment case forecloses the conclusion that a class of firearms in common use can be prohibited because they are dangerous and unusual, or that a person may possess a weapon that is not in common use for self-defense.

Rather, I interpret the Supreme Court's precedent to date as establishing that the Second Amendment presumptively protects all bearable arms, but history supports

regulation of arms that are dangerous and unusual, *including but not limited to*, those arms not presently in common use. *See Heller*, 554 U.S. at 582 (explaining that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."); *id*. at 627 (recognizing that the historical tradition of prohibiting "dangerous and unusual" weapons "fairly support[s]" excluding weapons "not in common use at the time" from Second Amendment protection); *see also Bruen*, 597 U.S. at 21.

Under that interpretation, a statute that prohibits possession of a weapon in common use for a lawful purpose is not per se unconstitutional. Similarly, a statute that regulates weapons not in common use for self-defense does not automatically fall outside of the Second Amendment's protection. Our analysis therefore does not necessarily begin and end with determining whether the weapon or weapons covered under a challenged statute are in common use—be it for lawful purposes or self-defense—as my colleagues suggest. Majority Op. at 39, 41; Dissenting Op. at 145–46, 153. Rather, whether a weapon is in common use is but one factor that we must consider in the Second Amendment analysis.

II.

As the dissent notes, data indicates that AR-style semiautomatic rifles represented 20% of all firearms sold in 2020, that at least 16 million Americans owned a semiautomatic rifle at some point, and that over 50% of semiautomatic rifle owners indicated that they own the weapon for self-defense, hunting, or another lawful purpose. Dissenting Op. at 149–50. That data suggests that these arms are widely circulated and possessed by millions

75

of people throughout the nation for lawful purposes, including self-defense.  Our Court also acknowledged the popularity of AR-15s and similar semiautomatic rifles years ago in *Kolbe*, and that popularity has only increased since.  *See Kolbe*, 849 F.3d at 128–29 (acknowledging that "[t]he plaintiffs' evidence reflect[ed] that, since it was first marketed to the public in 1963, '[t]he AR-15 has become the most popular civilian rifle design in America and is made in many variations by many companies'").  Given those facts, it is clear that semiautomatic rifles are in common use for lawful purposes today.

\*    \*    \*

I pause to note that despite "reaffirm[ing] the conclusion we reached in *Kolbe* that [semiautomatic rifles covered under Maryland's statute] are not constitutionally protected arms," presumably at step one, the majority conducted a *Bruen* step two analysis during which it assessed whether semiautomatic rifles can be prohibited as dangerous and unusual. In that analysis, the majority took liberty to extensively discuss mass shootings and other criminal uses of semiautomatic rifles of the type covered under Maryland's statute.  *See e.g.* Majority Op. at 32–36, 45–47.  The majority also referred to "a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians."  *Id*. at 62.

Elsewhere, the majority claimed that "our society has deemed that giving people the capacity to use large amounts of force at a moment's notice in a sensitive place is not worth the danger that they will unlawfully deploy such force against innocent civilians or public figures there."  *Id*. at 20.  According to the majority, those limitations, "reflect a careful balancing of interests between individual self-defense and public protection from excessive

danger that existed within the meaning of the phrase the right to keep and bear arms" when the Second Amendment was ratified. *Id*. The majority again mentioned the "careful interest balancing between individual self-defense and societal order" immediately before discussing its view of "dangerousness and unusualness" later in its opinion. *Id*. at 40–41.

In my view, the majority's analysis is comprised of the very sort of means-end scrutiny that *Bruen* explicitly forbids courts from applying in the Second Amendment context. *Bruen*, 597 U.S. at 19; *see also id*. at 29 n.7 (stating that the step two analysis does not give courts license to "engage in independent means-end scrutiny under the guise of an analogical inquiry . . . Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances . . . It is not an invitation to revise that balance through means-end scrutiny"). Indeed, as one of our sister circuits recently put it, "*Bruen* makes clear that the question whether a burden is comparably justified cannot be answered by pointing to the gravity of the harms the legislation was designed to avert and the appropriateness of the mechanism they adopt." *Bevis v. City of Naperville, Illinois*, 85 F.4th 1175, 1200 (7th Cir. 2023) (internal quotation and citation omitted), *cert. denied sub nom. Harrel v. Raoul,* 144 S. Ct. 2491 (2024).

That said, we cannot ignore the horrific tragedies the majority highlights in its opinion. Over the past two decades, our nation has in fact suffered at the hands of those who elected to inflict turmoil on innocent victims, communities, and our society overall. Unfortunately, our nation's citizens are faced with the fear that we, or our loved ones, may be harmed while shopping for groceries, enjoying outside entertainment, taking a class, attending a religious service, or otherwise engaging in what should be a safe activity. I am

sympathetic to the very troubling realities on which the majority sheds light.  However, I believe that binding precedent prohibits us from considering those tragedies, or a legislature's interest in limiting or preventing them, when assessing the validity of a statute that implicates the Second Amendment.

To me, *Bruen* dictates that, despite the concerns plaguing society, in determining whether Maryland's statute is constitutional, we must limit our consideration to history and tradition to determine whether the government has demonstrated that Maryland's statute is analogous to a historic weapons prohibition.  *Bruen*, 597 U.S. at 19 (stating that Supreme Court precedent "do[es] not support applying means-end scrutiny in the Second Amendment context"); *see also id.* at 22 (recognizing that the Court has "rejected the application of any judge-empowering interest-balancing inquiry that asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests").  Against that backdrop, I now proceed to the step two analysis.

## III.

Under *Bruen*, if a statute regulates conduct covered by the Second Amendment, the government must justify the challenged statute at step two by proving that it "comport[s] with the principles underlying the Second Amendment."  *United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (citing *Bruen*, 597 U.S. at 30).  Notably, the government is not required to identify a historical prohibition that is a "dead ringer" or a "historical twin" to survive a Second Amendment challenge.  *Id.*  Rather, the government need only

demonstrate that its prohibition "is consistent with the principles that underpin our regulatory tradition." *Id*.

How and why the challenged statute burdens the Second Amendment right are significant considerations in determining whether the law is "relevantly similar" to a historical analogue though they are not the only factors a court may consider in its assessment. *Id*.; *see also id*. ("Why and how the regulation burdens the right are central to this inquiry."); *Bruen*, 597 U.S. at 29 (stating that the Court was not undertaking to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment" but that Supreme Court precedent directs us to consider "how and why" the regulation burdens the right).

Although our Court disagrees about much regarding the parameters of the Second Amendment right and analysis, we all seem to agree that there is a historical tradition in our nation of prohibiting dangerous and unusual weapons based on characteristics and functions that caused the lawmakers of those times to classify them as dangerous and unusual when compared to other weapons. Majority Op 20–21, 41; Dissenting Op. at 144. In first recognizing that tradition, Justice Scalia cited several sources[*] documenting "affray

---

[*] *See* 4 Blackstone 148–149 (1769) ("The offense of riding or going armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, 2 Edw. III. c. 3. upon pain of forfeiture of the arms, and imprisonment during the king's pleasure:  in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armor."); 3 B. Wilson, Works of the Honourable James Wilson 79 (1804) ("[T]here may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people."); J. Dunlap, The New–York Justice 8 (1815) ("It is likewise said to be an
(Continued)

laws" and laws prohibiting "riding or going armed" with dangerous and unusual weapons.

*Heller*, 554 U.S. at 627.  Notably, and contrary to the dissent's focus on the term "carrying,"

Justice Scalia recognized protecting only weapons in common use as an "important

limitation on the right to *keep* and *carry* arms."  *Id*. (emphasis added).  In my view, those

laws demonstrate that our nation has always permitted legislation regulating certain aspects

of the way in which an individual chooses to exercise his Second Amendment right.  In

other words, although we all have the right to bear arms, a legislature may prohibit us from

exercising that right in a manner that could cause harm to or terror in others.  Thus, at

minimum, the government could meet its burden in this case by analogizing the manner

---

affray, at common law, for a man to arm himself with dangerous and unusual weapons, in
such manner as will naturally cause terror to the people."); C. Humphreys, A Compendium
of the Common Law in Force in Kentucky 482 (1822) ("Riding or going armed with
dangerous or unusual weapons, is a crime against the public peace, by terrifying the people
of the land which is punishable by forfeiture of the arms, and fine and imprisonment.  But
here it should be remembered, that in this country the constitution guaranties to all persons
the right to bear arms; then it can only be a crime to exercise this right in such a manner,
as to terrify the people unnecessarily."); 1 W. Russell, A Treatise on Crimes and Indictable
Misdemeanors 271 (1826) ("[I]t seems certain that in some cases there may be an affray
where there is no actual violence; as where persons arm themselves with dangerous and
unusual weapons in such a manner as will naturally cause a terror to the people; which is
said to have been always an offence at common law and is strictly prohibited by several
statutes."); H. Stephen, Summary of the Criminal Law 48 (1840) ("Riding or going armed
with dangerous or unusual weapons . . . is a misdemeanor punishable with forfeiture of the
arms and imprisonment during the king's pleasure"); E. Lewis, An Abridgment of the
Criminal Law of the United States 64 (1847) ("[W]here persons openly arm themselves
with dangerous and unusual weapons, in such a manner as will naturally cause a terror to
the people.  Which is said to have always been an offence at common law, an affray may
be committed without actual violence."); F. Wharton, A Treatise on the Criminal Law of
the United States 726 (1852) ("[T]here may be an affray where there is no actual violence;
as where a man arms himself with dangerous and unusual weapons, in such a manner as
will naturally cause a terror to the people which is said to have been always an offence at
common law, and is strictly prohibited by the statute.").

and reasoning that underscores Maryland's statute to historical prohibitions of dangerous and unusual weapons for reasons unrelated to their common use. But the dissent disagrees that such an analogy would satisfy the government's burden.

According to the dissent, in order to justify the challenged statute under the historical tradition of regulating dangerous and unusual weapons, the government must prove that semiautomatic rifles are not typically possessed by law-abiding citizens for lawful purposes. Dissenting Op. at 144. That test is too narrow in that it equates common use (which it seems to define based on the prevalence of the firearms in the public domain) with usualness and cabins the Second Amendment analysis to determining whether a weapon is in common use based on its utility for lawful and lawless purposes. I do not believe that the Court's precedents support such a limitation.

In fact, the Supreme Court has never said (or even implied) that weapons in common use are necessarily not dangerous and unusual, that "not in common use" and "dangerous and unusual" are synonymous, or that legislation that covers a weapon in common use is per se unconstitutional. The Court has, however, said that according the protections of the "right to keep and carry arms" only to those weapons "in common use at the time" is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 627; *Bruen*, 597 U.S. at 21. That guidance indicates that those weapons not in common use may be banned under the tradition of prohibiting the carrying of dangerous and unusual weapons. But it does not shield weapons in common use from scrutiny concerning their dangerousness and unusualness. Thus, while a weapon not in common use is deemed dangerous and unusual, it does not follow that a weapon in

common use is not dangerous and unusual.  Instead, "not in common use" is one criteria that may be used to ban a weapon under the "dangerous and unusual" umbrella.

So what else falls under the umbrella?  Given that neither the Supreme Court's precedents nor history clarify how we should interpret "dangerous and unusual" in connection with the Second Amendment, I look to the ordinary meaning of the words at the time the Second Amendment was ratified for guidance.

The 1773 edition of Samuel Johnson's dictionary defined "dangerous" as "Hazardous; perilous; full of danger," and defined "unusual" as "Not common; not frequent; rare."  Dangerous, 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978); Unusual, 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978). Notably, nothing in these definitions directs our attention to the legality of the object to which they refer, nor to the destruction in the wake of its usage.  Rather, both individually and collectively, dangerous and unusual, are used to describe the object to which they refer, in its entirety and considering its characteristics.  I see no reason why these words should not be interpreted in connection with the Second Amendment in a manner consistent with their ordinary meanings at the time the Amendment was ratified.

Moreover, it "would be a startling reading," *see Heller*, 554 U.S. at 624, of those definitions to assume that they do not apply to the object in its entirety—including its characteristics, features, and functions.  A firearm may therefore be dangerous for reasons other than its suitability for unlawful purposes, such as its firing capability; or unusual for reasons other than its rarity or numerosity as a whole, such as the object's rare potency, potentiality, or other unique function.  And a legislature may ban a weapon equipped with

functions that render it dangerous and unusual, irrespective of how many people own it. That is exactly what the Maryland legislature elected to do here.

Maryland's statute bans AR-15s and other semiautomatic rifles with characteristics that make them excessively dangerous and highly unusual in society. We previously considered the lethality of these sorts of weapons in *Kolbe* where we noted that the weapons have "features designed to achieve their principal purpose—killing or disabling the enemy." *Kolbe*, 849 F.3d at 125 (internal quotations omitted). There, we recognized that these weapons could shoot a large number of rounds at far distances at a high rate of speed, are often capable of accepting large-capacity magazines, and use rounds that can pierce body armor and most materials. *Id*. at 125, 127. We also determined that many of the features of these weapons increase their utility for lethality. *Id*. at 137. We said:

> flash suppressors, barrel shrouds, folding and telescoping stocks, pistol grips, grenade launchers, night sights, and the ability to accept bayonets and large-capacity magazines serve specific, combat-functional ends . . . the net effect of [which] is a capability for lethality—more wounds, more serious, in more victims—far beyond that of other firearms in general, including other semiautomatic guns.

*Id*. We further noted that, despite only being a semiautomatic weapon (which requires repeated trigger engagement), the AR-15's rate of fire enables it to empty a thirty-round magazine in as little as five seconds. *Id*. at 136.

The Seventh Circuit recently discussed the AR-15's characteristics in assessing challenges to an Illinois statute that prohibits weapons like those at issue here. *Bevis*, 85 F.4th at 1175. According to that court, the AR-15 has a semiautomatic rate of 300 rounds per minute, an effective range (distance a bullet will travel with accuracy) of 602 to 875

yards, a muzzle velocity (speed a bullet travels when fired) of 2800 to 3100 feet per second and delivers the kinetic energy (energy transferred to the target on impact) of 1220 to 1350 foot-pounds. *Id*. at 1196. In layman's terms, the AR-15 can hit a target several hundred yards away in seconds and cause massive damage on impact. Additionally, given the weapon's features and the distance it can fire with accuracy, a shooter using this type of weapon may be undetectable. The ability of these weapons to cause grave damage, from a great distance, without detection make them dangerous and unusual in society at large. Maryland's ban is therefore consistent with the principles that underlie our nation's historical tradition of prohibiting dangerous and unusual weapons.

IV.

As courts continue to grapple with *Bruen*, unfortunately in the midst of successive tragedies, we will no doubt see the boundaries of the historical tradition of regulating dangerous and unusual weapons being defined. At this juncture, I would simply hold that Maryland's ban on certain semiautomatic rifles falls within the boundaries of our nation's historical tradition of regulating dangerous and unusual weapons, wherever those boundaries may ultimately lie. I therefore concur in the judgment.

84

RICHARDSON, Circuit Judge, with whom Judges NIEMEYER, AGEE, QUATTLEBAUM, and RUSHING join, dissenting:

After the Supreme Court decided *New York State Rifle and Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), it remanded this case for us to determine whether Maryland's "assault weapons" ban violates the Second Amendment. Yet before the panel could issue its opinion, our court voted to take the case en banc. Now, the majority decides that Maryland's ban is perfectly consistent with the Second Amendment. But the majority's rationale disregards the Second Amendment and controlling precedent. Rather than considering the Amendment's plain text, the majority sidesteps it altogether and concocts a threshold inquiry divorced from the right's historic scope. To make matters worse, it then misconstrues the nature of the banned weapons to demean their lawful functions and exaggerate their unlawful uses. Finally, to top it all off, the majority cherry-picks various regulations from the historical record and pigeonholes them into its preferred—yet implausible—reading of our Nation's historical tradition of firearms regulation.

I respectfully dissent. The Second Amendment is not a second-class right subject to the whimsical discretion of federal judges. Its mandate is absolute and, applied here, unequivocal. Appellants seek to own weapons that are indisputably "Arms" within the plain text of the Second Amendment. While history and tradition support the banning of weapons that are both dangerous *and* unusual, Maryland's ban cannot pass constitutional muster as it prohibits the possession of arms commonly possessed by law-abiding citizens for lawful purposes. In holding otherwise, the majority grants states historically unprecedented leeway to trammel the constitutional liberties of their citizens.

## I.    Background

Appellants challenge the constitutionality of Maryland's ban on the possession, sale, purchase, transfer, or receipt of an "assault weapon," with some minor exceptions not relevant here.  Md. Code Ann., Crim. Law § 4-303.  The ban defines "assault weapon" to include both a specific list of centerfire rifles and all semiautomatic centerfire rifles that have one of three criteria:  (1) a fixed magazine that can hold more than ten rounds; (2) an overall rifle length under twenty-nine inches; or (3) a detachable magazine and at least two of a folding stock, grenade or flare launcher, or flash suppressor.  *Id.* § 4-301(h); Md. Code Ann., Pub. Safety § 5-101(r)(2).[1]  Our Court, sitting en banc, held that this ban did not violate the Second Amendment in *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc).

When Appellants filed their complaint in 2020, their challenge was foreclosed by *Kolbe*.  They admitted as much, acknowledging that they sought to have *Kolbe* overturned by us or the Supreme Court.  Maryland filed an answer and sought to proceed to discovery, but the district court *sua sponte* dismissed the complaint for failure to state a claim because *Kolbe* was binding, on-point precedent.  We affirmed.  *Bianchi v. Frosh*, 858 F. App'x 645 (4th Cir. 2021).  Appellants then petitioned for certiorari and, after the Supreme Court decided *Bruen*, the Court granted the petition, vacated our panel opinion, and remanded the case for reconsideration.  *Bianchi v. Frosh*, 142 S. Ct. 2898 (2022).

---

[1] The ban also prohibits the ownership of "assault pistols" and certain shotguns. Md. Code Ann., Crim. Law §§ 4-301(d), (h), 4-303; Md. Code Ann., Pub. Safety § 5-101(r)(2).  In their complaint, Appellants challenged these provisions as violating the Second Amendment.  But in this appeal, Appellants only challenge the ban on semiautomatic rifles.

On remand, we ordered the parties to provide supplemental briefing addressing *Bruen*'s impact on the case. A panel then heard oral argument on December 6, 2022. But after more than thirteen months of delay, the judges of this Court took the case from the assigned panel and granted initial hearing en banc.[2] We then requested more briefing, and we held en banc oral argument on March 20, 2024.

## II. Maryland's ban violates the Second Amendment.

This case is our en banc Court's first attempt to implement the Supreme Court's decision in *Bruen*. It is incumbent on us to do so correctly and faithfully to our original law. So I begin by examining the historical background of the Second Amendment before turning to the Supreme Court's decisions in *District of Columbia v. Heller*, 554 U.S. 570 (2008), *Bruen*, and, most recently, *United States v. Rahimi*, 144 S. Ct. 1889 (2024). Next, I explain why our decision in *Kolbe* departed from *Heller* and was abrogated by *Bruen*. I then examine the tradition of prohibiting dangerous and unusual weapons and conclude

---

[2] This unorthodox procedural posture bears some explanation. After hearing the case in December 2022, the initial panel majority reached a decision and promptly circulated a draft opinion. Yet for more than a year, no dissent was circulated. The panel thus held the proposed opinion in accordance with our custom that majority and dissenting opinions be published together. A year later—as the proposed opinion sat idle—a different panel heard arguments in *United States v. Price* (No. 22-4609), which also involved interpreting and applying *Bruen*. The *Price* panel quickly circulated a unanimous opinion that reached a conclusion at odds with the *Bianchi* majority's year-old proposed opinion. Facing two competing proposed published opinions, the Court declined to let the earlier circulated opinion control. Rather, in January 2024, we "invoked the once-extraordinary mechanism of initial-en-banc review." *Mayor of Balt. v. Azar*, 799 F. App'x 193, 195–96 (4th Cir. 2020) (Richardson, J., dissenting). I hope that we will not find ourselves in this posture again soon. *Cf. United States v. Gibbs*, 905 F.3d 768, 770 (4th Cir. 2018) (Wynn, J., voting separately) (suggesting that majority opinions may be issued without awaiting dissenting opinions to prohibit those dissenting opinions from exercising a "pocket veto" to "deny or delay fairness and justice").

that Maryland's ban is not justified by this tradition, since the tradition does not support a complete ban on the possession of weapons that are commonly used for lawful purposes. Finally, I respond to the majority's novel and unfounded construction of the Second Amendment and its application to this case.

## A.  The Second Amendment and Supreme Court Precedent

### 1.  Historical Background of the Second Amendment

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  Like many amendments, this text codified a preexisting right.  *Heller*, 554 U.S. at 592.  Grasping its scope thus depends on an understanding of its historical development.

For much of England's history, the country had neither a standing professional army nor a regular police force.  Joyce Lee Malcolm, *To Keep and Bear Arms:  The Origins of an Anglo-American Right* 2 (1994).  The responsibility for maintaining peace, order, and safety in the community fell primarily on the people themselves.  Townsfolk would take turns patrolling and keeping watch over the town by day and by night.[3]  When a felony occurred, villagers were expected to raise the "hue and cry," which would require all

---

[3] The "watch and ward," as this duty was called, was to be performed "by men able of body, and sufficiently weaponed," though persons unfit to serve could hire a substitute. Malcolm, *To Keep and Bear Arms*, *supra*, at 4.  It was first imposed on householders by a 1233 ordinance and was later consolidated by the Statute of Winchester in 1285.  *Id.* at 4 n.6.  Anyone who failed to perform this duty would be punished.  *Id.* at 4.

neighbors to pursue the fleeing suspect until he was captured.[4]  Local sheriffs could also summon the *posse comitatus*—composed of every able-bodied male from ages fifteen to sixty—to help pursue lawbreakers, suppress riots, and keep the public peace.[5]  Finally, for large-scale emergencies like invasion or insurrection, the civilian militia could be mobilized.[6]  From everyday safeguards to emergency responses, the English people

---

[4] The hue and cry dates back as far as the early Middle Ages, but, like the watch and ward, it was formalized by the Statute of Winchester.  Malcolm, *To Keep and Bear Arms*, *supra*, at 2; David A. Sklansky, *The Private Police*, 46 UCLA L. Rev. 1165, 1196–97 (1999).  When the cry was raised, all villagers—men, women, and children—were expected to answer it, and anyone who failed to participate could be fined or imprisoned. John H. Langbein, Renée Lettow Lerner & Bruce P. Smith, *The History of the Common Law:  The Development of Anglo-American Legal Institutions* 21–22 (2009); Joyce Lee Malcolm, *The Right of the People to Keep and Bear Arms:  The Common Law Tradition*, 10 Hastings Const. L.Q. 285, 291 (1983).  Townsfolk would arrive with whatever weapons they were required to keep and could use deadly force if necessary to prevent escape. David B. Kopel, *The* Posse Comitatus *and the Office of Sheriff:  Armed Citizens Summoned to the Aid of Law Enforcement*, 104 J. Crim. L. & Criminology 761, 788–89 (2015).

[5] Literally the "power and force of the country," Kopel, *The Posse Comitatus*, *supra*, at 789, the *posse comitatus* was a body of "uncompensated, temporarily deputized citizens assisting law enforcement officers," Gautham Rao, *The Federal Posse Comitatus Doctrine:  Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America*, 26 L. & Hist. Rev. 1, 2 (2008).  Although trained militia forces became the preferred mode of keeping the peace by the seventeenth century, posses were still deployed occasionally until the nineteenth century.  Malcolm, *To Keep and Bear Arms*, *supra*, at 3; Kopel, *The Posse Comitatus*, *supra*, at 791.

[6] Sir William Blackstone claimed that King Alfred first organized the Anglo-Saxon militia, 1 William Blackstone, *Commentaries on the Laws of England* \*397, though some recent scholarship suggests that it may have arisen earlier, Robert Leider, *The State's Monopoly of Force and the Right to Bear Arms*, 116 N.W. U. L. Rev. 35, 49 (2021).  The Statute of Winchester required every able-bodied man between fifteen and sixty to enroll in the militia.  *Id.*  The militia was mostly a defensive force used to repel invasion and suppress internal conflict, and it could not be taken outside the realm.  Malcolm, *To Keep and Bear Arms*, *supra*, at 4–5.  (England traditionally enlisted or impressed professional troops for foreign wars, or employed mercenaries, though it began to maintain a standing
(Continued)

themselves were largely responsible for protecting the realm from internal and external threats.

The people could only fulfill these duties if they owned arms and were skilled in their use. Hence, English monarchs took great steps to ensure that the general populace had the necessary armaments and skill to be mobilized when the need arose. Nathaniel Bacon, *A Historical and Political Discourse of the Laws and Government of England* 40 (1682) ("[A]ll were bound upon call under peril of Fine, and were bound to keep Arms for the preservation of the Kingdom, their Lords, and their own persons."). For instance, the Assize of Arms, enacted in 1181 during the reign of Henry II, classified the population by income and required members of each class to own certain military weapons and armor. *See* 27 Hen. 2, §§ 1–2 (1181). The Statute of Winchester later recodified these requirements in 1285 and imposed mandatory militia service on all able-bodied males. *See* 13 Edw. St. 2 c. 6 (1285). Besides requiring private ownership of military weapons, the Crown also obliged members of the militia to report for muster and military duty and to engage in mandatory training sessions. Malcolm, *To Keep and Bear Arms*, *supra*, at 5–6; Granville Sharp, *Tracts Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia* 18 (3d ed. 1782) ("And indeed the laws of England always required the people to be armed, and not only to be *armed*, but to be expert in *arms* . . . .").

---

army in the seventeenth century. Leider, *The State's Monopoly of Force*, *supra*, at 50.) Starting in the late seventeenth century, it became common to raise and rely on smaller militia groups with special training. Malcolm, *To Keep and Bear Arms*, *supra*, at 4–5.

In England, then, arms keeping was a duty that facilitated the people's responsibility to protect their communities.

For our purposes, the pivotal period in English history is that between the Restoration and the Glorious Revolution. Upon the return of the Stuart dynasty in 1660, King Charles II recognized the need to secure his power against a population that had recently beheaded his father. So he formed both a special militia and a private army of loyal volunteers, which he then used to police opponents of his regime and confiscate their weapons. Stephen Halbrook, *That Every Man Be Armed: The Evolution of a Constitutional Right* 42 (rev. ed. 2013). The king's efforts to disarm the broader population were aided by the enactment of the Militia Act of 1662, which empowered royal officers to search the homes and seize the arms of any person considered dangerous to the peace of the kingdom, and the Game Act of 1671, which effectively disqualified most of the population from keeping arms. Malcolm, *The Right of the People*, *supra*, at 301–05; *Heller*, 554 U.S. at 592–93. Charles II's successor, the Catholic James II, would later use these same statutes to disarm his Protestant subjects and quarter his standing army among them. *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 157 (1840).

The tyrannical reign of the Stuarts brought about the Glorious Revolution, which saw James II abdicate the throne for William of Orange and his wife, Mary. But the experience under the Stuarts had revealed the danger of military force concentrated in the Crown's hands and the importance of having an armed populace to resist government oppression. *Heller*, 554 U.S. at 593; *Aymette*, 21 Tenn. at 157. So the English people sought and obtained assurances of their fundamental rights and liberties from their new

monarchs.  The Declaration of Rights, codified as the English Bill of Rights, lamented James II's attempt to overthrow "the Laws and Liberties of this Kingdom" by "causing severall good Subjects being Protestants to be disarmed at the same time when Papists were both Armed and Imployed contrary to law."  1 W. & M., Sess. 2, c. 2 (1688).  It then declared as one of the thirteen "true, auntient and indubitable Rights and Liberties" that "the Subjects which are Protestants may have Arms for their Defence suitable to their Condition and as allowed by Law."  *Id.*  The English Bill of Rights thus ensured that the English people would be allowed "to defend their just rights[] and compel their rulers to respect the laws."  *Aymette*, 21 Tenn. at 157.

By the American Founding, the English Bill of Rights was understood to enshrine an individual right to keep arms for protection against public and private violence.  *Heller*, 554 U.S. at 594.  Blackstone explained that the right "of having arms"—declared by the English Bill of Rights and derived from "the natural right of resistance and self-preservation"—was an "auxiliary right" which "serve[d] principally as [a] barrier[] to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property."  1 Blackstone, *supra*, at *136, *139; 2 J.L. de Lolme, *The Rise and Progress of the English Constitution* 886–87 (1784) (A. Stephens ed., 1838).  It ensured that Englishmen possessed arms "for their own defence" and could fulfill their duty to assist "in the execution of the laws and the preservation of the public peace."  William Blizard, *Desultory Reflections on Police* 60 (1785); Sharp, *supra*, at 27 (explaining that the right to have arms existed "for mutual as well as private defence").  But it also allowed them to defend against government violations of their rights, such as "when the

92

sanctions of society and laws are found insufficient to restrain the violence of oppression." 1 Blackstone, *supra*, at \*139; Sharp, *supra*, at 27.  The right to arms thus ensured that the English people had adequate means to defend themselves against private violence and public oppression.

This English backdrop informed the public's understanding of the right to keep arms in the American colonies.  Living thousands of miles from their homeland, with neither a professional police force nor a standing army, the colonists were forced to rely on themselves to keep the peace and defend against external threats.  Leider, *The State's Monopoly of Force*, *supra*, at 51.  Unsurprisingly, they resorted to familiar institutions, like the hue and cry and the *posse comitatus*, to fight crime and respond to other public emergencies.[7]  They also relied heavily on the militia; every colony except Pennsylvania[8]

---

[7] Describing the *posse comitatus*, James Wilson explained that "[n]o man above fifteen and under seventy years of age, ecclesiastical or temporal," was exempt from service.  James Wilson, *Lectures on Law*, *in* 2 *Collected Works of James Wilson* 1017 (Kermit L. Hall & Mark David Hall eds., 2007).  Similarly, during the trial of British soldiers involved in the Boston massacre, the court instructed the jury about the duty to muster force in response to the hue and cry:  "It is the duty of all persons (except women, decrepit persons, and infants under fifteen) to aid and assist the peace officers to suppress riots &c. when called upon to do it.  They may take with them such weapons as are necessary to enable them effectually to do it."  3 John Adams, *Legal Papers of John Adams* 285 (L. Kinvin Wroth & Hiller B. Kobel eds., 1965).

[8] Because its Assembly was dominated by Quakers, who were pacificists, Pennsylvania did not have a compulsory militia until the Revolution.  Robert Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America*, 25 L. & Hist. Rev. 139, 146 (2007); Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. Firearms & Pub. Pol'y 1, 10 (2004).  Hence, when its frontiers were attacked by Indians in the 1750s, citizens organized voluntary military organizations to defend themselves.  Nathan Kozushanich, *Defending Themselves:  The Original Understanding of the Right to Bear Arms*, 38 Rutgers L.J. 1041, 1047–51 (2007).

required most able-bodied, free, white men, usually those between ages sixteen and sixty, to enlist in the militia. Churchill, *supra*, at 145. Militias served many important public functions during this time: They "protected communities from bandits and vigilantes, guarded prisoners, served as patrols, prevented lynchings when unpopular executions were scheduled, had riot duty, helped settle land-related disputes, and helped manage public ceremonies and parades, providing domestic security of the state." Michael J. Golden, *The Dormant Second Amendment: Exploring the Rise, Fall, and Potential Resurrection of Independent State Militias*, 21 Wm. & Mary Bill Rts. J. 1021, 1044 (2013); *see also* Akhil Amar, Heller*, HLR, and Holistic Legal Reasoning*, 122 Harv. L. Rev. 145, 164 (2008). Domestic security in the colonies, like in Medieval England, was a community endeavor.

None of this would have been possible without ready access to arms. So it is no surprise that firearm possession was widespread in the colonies. Those who departed for the New World received express assurances from the Crown that they could keep and use weapons for their defense.[9] To ensure sufficient arms, most colonies required members of the militia to keep certain arms—usually one "cutting weapon" (like a sword or bayonet)

---

[9] Many colonial charters expressly guaranteed the right to have arms. David B. Kopel & Joseph G.S. Greenlee, *The History of Bans on Types of Arms Before 1900*, 50 J. Leg. 223, 236–37 (2024). The colonists were also guaranteed the liberties and rights of English subjects, which soon came to include the right to keep arms secured by the English Bill of Rights. *Id.* at 237–38; Malcolm, *To Keep and Bear Arms*, *supra*, at 138; *see, e.g.*, Thomas Jefferson, *Notes on the State of Virginia* (1788), *reprinted in The Portable Thomas Jefferson* 23, 157–60 (Merrill D. Peterson ed., 1975) (recounting how Virginian colonists, following armed resistance to abuses by Oliver Cromwell and Parliament, secured a written convention in 1651 guaranteeing "that they shall have & enjoy such freedomes and priviledges as belong to the free borne people of England").

and at least one firearm—that would be useful for defense of the community.[10]

Additionally, many colonies required even those exempt from militia service to keep

---

[10] Commonly required firearms included the musket (a heavy military gun), the firelock (a type of musket), and the "fusee" or "fuzee" (a gun of smaller size and caliber). *See* Kopel & Greenlee, *supra*, at 247–49; *The General Laws and Liberties of the Connecticut Colonie: Revised and Published by Order of the General Court* 49, 49 (1672) (requiring "a good Musquet, Carbine or other Gun" and "a Sword"); An Act for Ordering & Regulating the Militia of this Province & for the Better Security and Defence Thereof (1678), *in 7 Proceedings and Acts of the General Assembly, October 1678–November 1683*, at 53, 54 (1889) (Maryland) (requiring "one good serviceable fixed Gunn"); An Act for Regulating of the Militia § 5 (1693), *in Massachusetts—Acts, Laws and Orders 1692–1694*, at 48, 49 (requiring "a well fixt Firelock Musket" and "a good Sword or Cutlash"); An Act for the Better Settling and Regulating the Militia, and Appointing Look Outs § 5 (1703), *in 9 The Statutes at Large of South Carolina: Containing the Acts Relating to Roads, Bridges and Ferries, with an Appendix, Containing the Militia Acts Prior to 1794*, at 618, 618 (David J. McCord ed., 1841) (requiring "a good sufficient gun, well fixed" and "a sword, bayonet or hatchet"); An Act for Settling the Militia (1705), *in 3 William Waller Hening, The Statutes at Large: Being a Collection of All the Laws of Virginia, From the First Session of the Legislature, in the Year 1619*, at 335, 338 (1823) (requiring "a firelock, musket or fusee well fixed" and "a good sword"); An Act for Settling the Militia of this Province (1713), *in The Laws and Acts of the General Assembly of His Majesties Province of* Nova Casarea *or New-Jersey* 17, 17 (1717) (requiring "one good sufficient Musquet or Fuzee well fixed" and "a Sword or Bagonet"); An Act for the Regulation of the Militia § 5 (1718), *in 2 Albert Stillman Batchellor, Laws of New Hampshire, Province Period* 284, 285 (1913) (requiring "a well fix'd, Firelock Musket, of Musket or Bastard-Musket bore" and "a good Sword or Cutlash"); Act of 1719, *in The Charter and the Acts and Laws of His Majesties Colony of Rhode-Island, and Providence-Plantations in America* 85, 87 (Sidney S. Rider ed., 1895) (requiring "one good Musket or Fuzee" and "one good Sword, or Baionet"); An Act for Establishing a Militia Within this Government (1742), *in Laws of the Government of New Castle, Kent and Sussex upon Delaware* 171, 172 (1741) (requiring "Muskets or Firelocks"); An Act for the Better Regulating the Militia of this Government, § 4, 1746 N.C. Acts 244, 244 (requiring "a Gun, fit for service" and "a Sword, Cutlass, or Hanger"); An Act for Regulating the Militia of the Colony of New York (1755), *in 3 The Colonial Laws of New York From the Year 1664 to the Revolution* 1051, 1053 (Charles Z. Lincoln et al., eds., 1894) (requiring "a well fixed Musket or Fuzee" and "a good Sword"); An Act for the Better Ordering of the Militia (1773), *in 19:1 Allen D. Candler, The Colonial Records of the State of Georgia* 291, 296 (1911) (requiring "one Gun or Musket fit for Service" and "a Bayonet Sword or Hatchet"); An Act for Forming and Regulating the Militia; and for Encouragement of Military Skill, for the Better Defence of this State (Continued)

weapons in their homes in case of emergency, such as a sudden attack on the settlement.[11]

Yet because most colonists could not afford to own an array of arms, particularly firearms,

they typically satisfied these requirements by keeping weapons that were common for

individual self-defense or hunting.[12]  Arms keeping in the colonies was thus a privilege

---

(1779), *in Vermont State Papers, Being a Collection of Records and Documents, Connected with the Assumption and Establishment of Government by the People of Vermont; Together with the Journal of the Council of Safety, the First Constitution, the Early Journals of the General Assembly, and the Laws from the Year 1779 to 1786, Inclusive* 305, 307 (1823) (requiring "a well fixed firelock . . . or other good fire-arms, . . . a good sword, cutlass, tomahawk or bayonet").

[11] *See* Kopel & Greenlee, *supra*, at 242–43; An Act for Military Discipline (1639), *in* 1 *Proceedings and Acts of the General Assembly January 1637/8–September 1664*, at 77, 77–78 (1883) (Maryland) (requiring "every house keeper or house keepers" to keep arms "within his her or their house"); Acts and Orders of 1647, § 29, *in Colonial Origins of the American Constitution:  A Documentary History* 183, 183–84 (Donald S. Lutz ed., 1998) (Rhode Island) ("every Inhabitant of the Island above sixteen and under sixty years old"); *The General Laws and Liberties of the Connecticut Colonie*, *supra*, at 49 ("every Male person within this Jurisdiction above the age of sixteen"); Bill for the Settlement of the Militia (1684), *in* 1 *The Colonial Laws of New York*, *supra*, at 161, 161 ("[A]ll persons though freed from Training by the Law yet that they be obliged to Keep Convenient armes and ammunition in Their houses as the Law directs to others."); An Act for Regulating the Militia (1693), *supra*, § 5 (every soldier "and other Householder"); An Act for Settling the Militia of this Province (1713), *supra*, at 17 (all men between sixteen and sixty, even those exempt from militia service); An Act for the Regulation of the Militia (1718), *supra*, § 5 (every "Listed Souldier or Householder"); An Act for Establishing a Militia Within this Government (1742), *supra*, at 171 ("every Freeholder and taxable Person"); An Act for Amending and Further Continuing the Act for the Better Regulating and Disciplining the Militia § 5 (1762), *in* 9 Hening, *supra*, at 534, 535 ("[E]very person so exempted shall always keep in his house or place of abode such arms, accoutrements, and ammunition, as are by the said act required to be kept by the militia of this colony . . . ."); An Act for Forming and Regulating the Militia; and for Encouragement of Military Skill, for the Better Defence of this State (1779), *supra*, at 307 ("every listed soldier or other householder").

[12] Harold L. Peterson, *Arms and Armor in Colonial America 1526–1783*, at 179 (1956); George C. Neumann, *Swords & Blades of the American Revolution* 6–15, 252–54 (1973); Churchill, *supra*, at 167; *United States v. Miller*, 307 U.S. 174, 179 (1939).

and duty of all individuals that facilitated both "defense of oneself and one's community." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 427 (4th Cir. 2021)[13]; Amar, *supra*, at 164 ("[I]ndividual self-protection and community defense were not wholly separate spheres.").

Defense of one's community was not limited to protecting against criminals or hostile foreign forces, though. Social contract theory hypothesized that individuals voluntarily entered political society to protect their rights, including their right to self-defense, from violation by others.[14] The body politic then delegated political authority for its protection to the government via a constitution.[15] But the people remained constantly wary that the government would abuse its political authority and invade their rights. Indeed, the English experience under the Stuarts demonstrated that this was a real danger. So the people reserved a degree of military power for themselves and exercised it through institutions like the militia and the *posse comitatus*.[16] Maintaining a decentralized and

---

[13] *Vacated as moot by Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322 (4th Cir. 2021).

[14] John Locke, *Two Treatises of Government* 184 (1694) (Haffner Pub. 1947); James Wilson, *Of Municipal Law, in* 1 *Collected Works of James Wilson*, *supra*, at 549, 553–54 *see also* Jud Campbell, *Republicanism and Natural Rights at the Founding*, 32 Const. Comment 85, 88 (2017).

[15] Locke, *supra*, at 186–88; Wilson, *Lectures on Law*, *supra*, at 556; *see also* Campbell, *supra*, at 89.

[16] *See* Tench Coxe, "An American Citizen IV" (Oct. 21, 1878), *in* 13 *Documentary History of the Ratification of the Constitution* 431, 435 (John P. Kaminski & Gaspare J. Saladino eds., 1981) ("The militia, *who are in fact the effective part of the people at large*, will render many troops *quite unnecessary*."); Federal Farmer, "Letter XVIII" (Jan. 25, (Continued)

dispersed force in this way would mitigate the need for a standing army, which was commonly feared to have interests separate from those of the community and to be a ready instrument of tyranny.[17]  And it ensured that if the government ever did turn armed force upon the people, they could readily resist.  The keeping of arms in the colonies thus facilitated self-defense not only against acts of private violence and foreign threats, but also against any despotic government that tried to invade the colonists' liberties.

---

1788), *in* 17 *Documentary History of the Ratification*, *supra*, at 360, 362 ("A militia, when properly formed, are in fact the people themselves, and render regular troops in a great measure unnecessary."); Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 L. & Contemp. Probs. 31, 35 (2020) ("Citizens . . . played a key role in executive functions through institutions like the *posse comitatus* and militia."); Rao, *supra*, at 10 ("In its migration to America, . . . colonists transformed the *posse comitatus* from an instrument of royal prerogative to an institution of local self-governance."); Akhil R. Amar, *The Bill of Rights* 56 (1998) ("[T]he militia was a local institution, bringing together representative citizens to preserve popular values of their society."); *Heller*, 554 U.S. at 595–96.

[17] "Brutus VIII" (Jan. 19, 1788), *in The Anti-Federalist:  Writings by Opponents of the Constitution* 150, 152 (Herbert J. Storing ed., 1985) ("[A] standing army is still a standing army by whatever name it is called; they are a body of men distinct from the body of the people; they are governed by different laws, and blind obedience, and an entire submission to the orders of their commanding officer, is their only principle; the nations around us, sir, are already enslaved, and have been enslaved by those very means; by means of their standing armies they have every one lost their liberties; it is indeed impossible that the liberties of the people in any country can be preserved where a numerous standing army is kept up."); Letter of Samuel Adams to James Warren (Jan. 7, 1776), *in* 3 *The Writings of Samuel Adams 1773–1777*, at 250, 250–51 (Harry Alonzo Cushing ed., 1907) ("Men who have been long subject to military Laws and inured to military Customs and Habits may lose the Spirit and Feeling of Citizens.  And even Citizens, having been used to admire the Heroism which the Commanders of their own Army have displayed, and to look up to them as their Saviors may be prevail'd upon to surrender to them those Rights for the protection of which against Invaders they had employd and paid them."); *see also* Steven J. Heyman, *Natural Rights and the Second Amendment*, 76 Chi.-Kent L. Rev. 237, 264–65 (2000); Leider, *The State's Monopoly*, *supra*, at 51–52.

The colonists' fear of tyranny ultimately materialized in the leadup to the American Revolution.  Concerned by growing colonial resistance to British policies, King George III and his royal officials imposed an embargo on all incoming arms and ammunition shipments, obstructed access to colonial magazines, and even ordered soldiers to confiscate arms and ammunition.  David Kopel, *How the British Gun Control Program Precipitated the American Revolution*, 6 Charleston L. Rev. 283, 291–301 (2012).  The colonists responded by organizing special militias free from royal control and invoking their right to keep arms for their defense.[18]  *Id.* at 301–12.  And when British troops marched on Lexington and Concord in 1775 to seize the colonists' military supplies, they were met by

---

[18] *See, e.g.*, "A Watchman" (Jan. 13, 1775), *in* 1 *American Archives*, 4th ser. 1064–65 (Peter Force ed., 1846) ("And I must here beg leave to recommend to the consideration of the people on this Continent, whether, when we are by an arbitrary decree prohibited the having Arms and Ammunition by importation, we have not, by the law of self-preservation, a right to seize upon those within our power, in order to defend the liberties which *God* and nature have given to us . . . ."); William Wirt, *Sketches of the Life and Character of Patrick Henry* 141 (1826) ("Sir, we are not weak, if we make a proper use of those means which the God of nature hath placed in our power.  Three millions of people, armed in the holy cause of liberty, and in such a country as that which we possess, are invincible by any force which our enemy can send against us.") (recording Patrick Henry's speech at the Second Virginia Convention meeting); George Mason, "Remarks on Annual Elections for the Fairfax Independent Company" (Apr. 1775), *in The Papers of George Mason 1725–1792*, at 229, 229 (Robert A. Rutland ed., 1970) ("This company is essentially different from a common collection of mercenary soldiers.  It was formed upon the liberal sentiments of public good, for the great and useful purposes of defending our country, and preserving those inestimable rights which we inherit from our ancestors; it was intended in these times of extreme danger, when we are threatened with the ruin of that constitution under which we were born, and the destruction of all that is dear to us, to rouse the attention of the public, to introduce the use of arms and discipline, to infuse a martial spirit of emulation, and to provide a fund of officers; that in case of absolute necessity, the people might be the better enabled to act in defence of their invaded liberty.").

militiamen bearing their own arms and willing to sacrifice their lives to defend their liberties. Malcolm, *To Keep and Bear Arms*, *supra*, at 145.

Over a decade later, concerns about a tyrannical federal government would dominate debates over the proposed Constitution. Antifederalists feared that the lack of a bill of rights and increased national powers would allow Congress to disarm the populace and rule by standing army or select militia.[19] In response, Federalists argued that Congress would be given no authority to infringe the fundamental right of the people to keep arms and that, if Congress ever attempted to do so, the widespread ownership of arms would enable the people to resist.[20] For example, James Madison explained that Americans had

---

[19] *See, e.g.*, Federal Farmer, "Letter III" (Oct. 10, 1787), *in* 2 *The Complete Anti-Federalist* 234, 242 (Herbert J. Storing ed., 1981) ("Should one fifth, or even one eighth part of the men capable of bearing arms, be made a select militia, as has been proposed, and those the young and ardent part of the community, possessed of but little or no property, and all the others put upon a plan that will render them of no importance, the former will answer all the purposes of an army, while the latter will be defenceless."); The Pennsylvania Convention (Dec. 6, 1787) (statement of John Smilie), *in* 2 *Documentary History of the Ratification*, *supra*, at 507, 508–09 ("Congress may give us a select militia which will, in fact, be a standing army—or Congress, afraid of a general militia, may say there shall be no militia at all. . . . When a select militia is formed; the people in general may be disarmed."); *Heller*, 554 U.S. at 599.

[20] Noah Webster, *An Examination of the Leading Principles of the Federal Constitution* 43 (1787) ("The supreme power in America cannot enforce unjust laws by the sword; because the whole body of the people are armed, and constitute a force superior to any band of regular troops that can be, on any pretense, raised in the United States."); Tench Coxe, "A Pennsylvanian III" (Feb. 20, 1788), *in* *The Origin of the Second Amendment: A Documentary History of the Bill of Rights* 275, 276 (David E. Young ed., 2d ed. 2001) ("Who are the militia? *are they not ourselves*. Is it feared, then, that we shall turn our arms *each man against his own bosom*. Congress have no power to disarm the militia. Their swords, and every other terrible implement of the soldier, are *the birth-right of an American*."); Foreign Spectator, "Remarks on the Amendments to the Federal Constitution" (Nov. 7, 1778), *in id.* at 556, 556 ("While the people have property, arms in (Continued)

the "advantage of being armed" over European nations, which, together with the existence of subordinate governments, would form a "barrier" against tyranny.  *The Federalist No. 46*, at 321–22 (James Madison) (Jacob E. Cooke ed., 1961); *see also id.* at 321 (noting that a standing army turned against the people "would be opposed [by] a militia amounting to near half a million of citizens with arms in their hands, officered by men chosen from among themselves, fighting for their common liberties, and united and conducted by governments possessing their affections and confidence").  Alexander Hamilton echoed these same sentiments, insisting that if Congress ever threatened the people with a standing army, "that army [could] never be formidable to the liberties of the people while there is a large body of citizens, little, if at all, inferior to them in discipline and the use of arms, who stand ready to defend their own rights and those of their fellow-citizens." *The Federalist No. 29*, at 184 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).

The Federalists eventually managed to persuade Americans to ratify the Constitution.  Yet they failed to assuage the people's concerns over the lack of specifically enumerated rights.  So when the First Congress convened, Madison proposed a bill of rights to be added to the Constitution.  After various revisions, the First Congress eventually approved, and the states ratified, ten amendments to the Constitution, the second of which secured for the people the right to keep and bear arms.

---

their hands, and only a spark of a noble spirit, the most corrupt congress must be mad to form any project of tyranny."); Alexander White, "To the Citizens of Virginia" (Feb. 22, 1788), *in* 8 *Documentary History of the Ratification, supra*, at 401, 404–05.

The Second Amendment can be understood only in light of the centuries of history that preceded it. It did not create a fundamental right anew. Rather, as has long been recognized, it secured a preexisting right that developed over centuries in the Anglo-American tradition.[21] At its most basic level, that right guarantees that "the people" can have and carry arms in defense of themselves and their communities.[22] Self-defense, in

---

[21] *See* Thomas M. Cooley, *The General Principles of Constitutional Law in the United States of America* 298 (1898) (explaining that the Second Amendment "was adopted with some modification and enlargement from the English Bill of Rights"); William Rawle, *A View of the Constitution of the United States of America* 126 (1829) (2d ed. 2003) (explaining that the preexisting right was secured by the English Bill of Rights); *United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (concluding that the Second Amendment is not "in any manner dependent upon [the Constitution] for its existence"); *see also Robertson v. Baldwin*, 165 U.S. 275, 281 (1897) ("The law is perfectly well settled that the first 10 amendments to the constitution, commonly known as the 'Bill of Rights,' were not intended to lay down any novel principles of government, but simply to embody certain guaranties and immunities which we had inherited from our English ancestors . . . .").

[22] 2 St. George Tucker, *Blackstone's Commentaries* *300 (1803) (tying the right to have arms to "[t]he right of self defence," which "is the first law of nature"); 2 Wilson, *Lectures on Law*, *supra*, at 1142 (explaining that the right to keep and bear arms facilitates "defence of one's person or house," which is "the great natural law of self-preservation"); Joel Tiffany, *A Treatise on the Unconstitutionality of American Slavery* 117–18 (1849) ("[T]he right to keep and bear arms also implies the right to use them if necessary in self defence; without this right to use the guaranty would have hardly been worth the paper it consumed."); *Johnson v. Tompkins*, 13 F. Cas. 840, 852 (Baldwin, Circuit Justice, C.C.E.D. Pa. 1833) (No. 7,416) (explaining that citizens have "a right to carry arms in defence of his property or person, and to use them, if either were assailed with such force, numbers or violence as made it necessary for the protection or safety of either"); *State v. Reid*, 1 Ala. 612, 619 (1840) (explaining that the right authorizes the bearing of arms "for the purposes of defending himself and the State"); *State v. Chandler*, 5 La. Ann. 489, 490 (1850) ("This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassinations."); *Cockrum v. State*, 24 Tex. 394, 401 (1859) ("The right of a citizen to bear arms, in the lawful defense of himself or the state, is absolute."); *State v. Duke*, 42 Tex. 455, 458 (1875) (explaining (Continued)

other words, is its foundational purpose.  But self-defense can be individual or collective.

And the Second Amendment expressly ensures that the people can preserve "the security

of a free State"—that is, a "free country" or "free polity"[23]—should their government ever

threaten their inviolable liberties.[24]  Individual and communal self-defense against both

foreign and domestic threats were thus the purposes enshrined in the Second Amendment

---

that the right protects the keeping and bearing of arms "in the defense of himself or the State").

[23] Eugene Volokh, "*Necessary to the Security of a Free State*," 83 Notre Dame L. Rev. 1, 5 (2007); *Heller*, 554 U.S. at 597.

[24] Tench Coxe, "A Pennsylvanian" (June 18, 1789), *in The Complete Bill of Rights* 296, 296 (Neil H. Cogan ed., 2d ed. 2015) ("As civil rulers, not having their duty to the people duly before them, may attempt to tyrannize, and as the military forces which must be occasionally raised to defend our country, might pervert their power to the injury of their fellow citizens, the people are confirmed by the next article in their right to keep and bear their private arms."); 2 Tucker's *Blackstone*, *supra*, at *300 ("Wherever standing armies are kept up, and the right of the people to keep and bear arms is, under any colour or pretext whatsoever, prohibited, liberty, if not already annihilated, is on the brink of destruction."); Rawle, *supra*, at 125–26 ("No clause in the constitution could by any rule of construction be conceived to give congress a power to disarm the people.  Such a flagitious attempt could only be made under some general pretense by a state legislature.  But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both."); Joseph Story, *Commentaries on the Constitution of the United States* § 1897, at 620 (4th ed. 1873) ("The right of the citizens to keep and bear arms has justly been considered as the palladium of the liberties of a republic, since it offers a strong moral check against the usurpation and arbitrary power of rulers, and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them."); *Cockrum*, 24 Tex. at 401–02 ("The object of the clause first cited, has reference to the perpetuation of free government, and is based on the idea, that the people cannot be effectively oppressed and enslaved, who are not first disarmed."); Cooley, *supra*, at 298 ("The right declared was meant to be a strong moral check against the usurpation and arbitrary power of rulers, and as a necessary and efficient means of retaining rights when temporarily overturned by usurpation.").

upon ratification.  That text still being law, they remain the Amendment's purposes to this day.

### 2.  *Heller*, *Bruen*, and *Rahimi*

For many years, the Second Amendment lay dormant as a sort of second son among other constitutional rights.  But that changed with the Supreme Court's decision in *Heller*, 554 U.S. 570.   *Heller* not only established that the Second Amendment secures an individual right that extends to keeping a handgun in the home for self-defense, but also elucidated the Amendment's aforenoted purposes and the principle that the Amendment protects the possession of weapons in common use for lawful purposes today.

*Heller* involved a Second Amendment challenge to the District of Columbia's prohibition on possessing handguns in the home.  *Id.* at 573.  In rejecting the claim that the Second Amendment has no role outside of formal militia service, the Court began its analysis by examining the ordinary meaning of the constitutional text.  *Id.* at 576–77. Starting with the words "right of the people," the Court determined that the Second Amendment secures an individual right, rather than a collective right, for "all members of the political community, not an unspecified subset."  *Id.* at 579–81.  It then found that the word "Arms" refers to all "[w]eapons of offence, or armour of defence" or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another."  *Id.* at 582 (first quoting 1 Samuel Johnson, *Dictionary of the English Language* 106 (4th ed. 1773); and then quoting 1 Timothy Cunningham, *A New and Complete Law Dictionary* (1771)).  From these sources, the Court concluded that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were

not in existence at the time of the founding." *Id.* Finally, the Court found that to "keep arms" meant to "have" or "possess" weapons, while to "bear arms" meant to "carry" them. *Id.* at 582–92. Putting all this together, the Court held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592.

The Court then canvassed various historical sources to confirm its semantic interpretation of the Amendment's plain text. *See Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) (explaining *Heller*'s use of history to understand the text). First, it examined the "historical background" of the right, including English history from the late 1600s onwards, establishing the importance of arms keeping in the American colonies. *Heller*, 554 U.S. at 592–95 ("[T]he Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right."). It then compared the Second Amendment's language to similar provisions in state constitutions from before and after the Amendment's adoption. *Id.* at 600–03. Lastly, it canvassed various post-ratification sources, such as writings by Founding-era jurists, nineteenth-century case law, public and Congressional discussions, and post-Civil War commentary. *Id.* at 605–19 (explaining that post-ratification evidence can be used "to determine *the public understanding*" of the constitutional text). These sources confirmed the Court's initial interpretation of the plain text: The Second Amendment protects an individual right to keep and bear arms, independent of militia service.

Along the way, the Court explained the purposes for which the Second Amendment right was secured. Based on its reading of the historical record, the Court concluded that

the "central component" of the Second Amendment is the right to keep and bear arms for individual self-defense. *Id.* at 599. But the Court did not hold that this is its *only* purpose. *See McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (explaining that *Heller*'s "central holding" was that "the Second Amendment protects a personal right to keep and bear arms *for lawful purposes*, most notably for self-defense within the home" (emphasis added)); *Cruikshank*, 92 U.S. at 553 (explaining that the right protects "bearing arms for a lawful purpose" (internal quotation marks omitted)). To the contrary, the Court also identified other lawful purposes, like hunting and—important to our case—defense of the community at large against violence and government tyranny. *Heller*, 554 U.S. at 599. Drawing on the right's historical background, the Court found that "the right secured in 1689 as a result of the Stuarts' abuses was by the time of the founding understood to be an individual right protecting against both *public and private violence*." *Id.* at 594 (emphasis added). Later, the Court recognized that the right existed to preserve a "citizens' militia"— not merely an "organized militia"—that would serve "as a safeguard against tyranny." *Id.* at 600. The Court thus reaffirmed that the right to keep and bear arms exists for several lawful purposes besides individual self-defense.

The Court next examined its precedents, particularly *United States v. Miller*, 307 U.S. 174. In *Miller*, the Court upheld an indictment against two men charged with unlawfully transporting a short-barreled shotgun in violation of the National Firearms Act, 48 Stat. 1236 (1934), which imposes strict taxation and registration requirements on owners of especially dangerous firearms, including short-barreled shotguns and machine guns. *Miller*, 307 U.S. at 176. In its brief before the Court, the government argued that

the regulated weapons had "no legitimate use in the hands of private individuals" and "frequently constitute[d] the arsenal of the 'public enemy' and the 'gangster.'"  Brief of the United States at 20, *Miller*, 307 U.S. 174 (No. 696).  The Court began its opinion by explaining that the Second Amendment was adopted to preserve the militia and therefore "must be interpreted and applied with that end in view." *Miller*, 307 U.S. at 178.  And it found that, at the Founding, the militia consisted of ordinary citizens who "were expected to appear bearing arms supplied by themselves and of the kind *in common use* at the time." *Id.* at 179 (emphasis added).  Yet the defendants had provided no evidence that short-barreled shotguns were "part of the ordinary military equipment" or "could contribute to the common defense." *Id.* at 177.  So the Court rejected their challenge, finding that the possession or use of such weapons had no "reasonable relationship to the preservation or efficiency of a well regulated militia." *Id.*

Although Justice Stevens argued that *Miller* supports a militia-based interpretation of the Second Amendment, *Heller*, 554 U.S. at 637 (Stevens, J., dissenting), the Court in *Heller* read *Miller* to establish "the *type of weapon* . . . not eligible for Second Amendment protection," *id.* at 622 (majority op.).  It acknowledged that *Miller* could be read to hold that "only those weapons useful in warfare are protected." *Id.* at 624.  But this language, the Court clarified, must be read alongside *Miller*'s finding that the traditional militia included men "bringing arms 'in common use at the time' for lawful purposes like self-defense." *Id.* (quoting *Miller*, 307 U.S. at 179).  In other words, weapons the people commonly used at the Founding were precisely those that were also useful in civilized warfare.  So the Court in *Heller* concluded that "the Second Amendment does not protect

those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns"—even if such weapons happen to be useful in warfare. *Id.* at 625.

Later, the Court clarified the historical basis of the "common use" limitation recognized in *Miller*. *See id.* ("[*Miller*] accords with the historical understanding of the scope of the right . . . ."). This limitation, the Court found, "is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* The Court then explained that, because of this limitation, the Second Amendment does not protect "arms that are highly unusual in society at large"—such as "M-16 rifles and the like"—even though such arms are "most useful for militia service." *Id.* These weapons are therefore unprotected not because they aren't "Arms" under the plain text, but because they fall within the historical tradition of regulating dangerous and unusual weapons.

Applying this framework, the Court held that the District of Columbia's ban on handguns violated the Second Amendment. "The handgun ban," the Court explained, amounted "to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for [self-defense]" and extended even to the home, "where the need for defense of self, family, and property is most acute." *Id.* at 628. And the Court found that there is no historical justification in our Nation's history for completely banning an arm commonly owned for lawful purposes. *Id.* at 628–29. Nor did it matter that the District permitted the possession of other weapons, like long guns. "It is enough to note," the Court explained, "that the American people have considered the handgun to be the quintessential self-defense weapon," likely due to its ready accessibility and ease of use, among other things. *Id.* at 629. "Whatever the reason," though, "handguns are the most popular weapon

chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.*[25]

In *Heller*'s wake, courts of appeals—including our own—created a two-step framework for assessing Second Amendment challenges. *United States v. Chester*, 628 F.3d 673, 680–83 (4th Cir. 2010); *see Bruen*, 597 U.S. at 18–19 & n.4 (collecting cases). We first asked whether a challenged regulation burdened conduct protected by the Second Amendment, based on a historical inquiry into the scope of the right at the time of the Founding. *Chester*, 628 F.3d at 680. If it did, then we would assess the regulation's constitutionality using means-end scrutiny, the strength of which turned on the severity of the burden. *Id.*

The Supreme Court eventually rejected this approach in *Bruen*. 597 U.S. at 19. *Bruen* involved a Second Amendment challenge to New York's "may issue" licensing scheme for the concealed carry of handguns. *Id.* at 10–18. "*Heller* and *McDonald*," the Court explained, "do not support applying means-end scrutiny in the Second Amendment context." *Id.* at 19. Indeed, these cases had already found that means-end scrutiny and interest balancing, which require "judges to assess the costs and benefits of firearms restrictions," *McDonald*, 561 U.S. 790–91, are antithetical to the idea of an enumerated Bill of Rights, for "[t]he very enumeration of the right takes out of the hand of the government—even the Third Branch of Government—the power to decide on a case-by-

---

[25] The Court also held that the District's requirement that handguns in the home be rendered and kept inoperable at all times violated the Second Amendment, since this restriction made it "impossible for citizens to use them for the core lawful purpose of self-defense." *Heller*, 554 U.S. at 630.

case basis whether the right is really worth protecting," *Heller*, 554 U.S. at 634. These cases rather established a "test rooted in the Second Amendment's text, as informed by history," which requires the government to "prove that its firearms regulation is part of the historical tradition that delineates the outer boundaries of the right to keep and bear arms." *Bruen*, 597 U.S. at 19.

The Court then articulated the test that governs all Second Amendment challenges. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Id.* at 24. At that point, the challenged regulation is unconstitutional unless the government "demonstrate[s] that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* Only then "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

Recognizing that historical analysis is no easy matter, the Court clarified how courts should assess whether a contemporary regulation tracks with historical forbears. Some cases, the Court explained, are easy. "For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.* at 26. "Likewise," the Court clarified, "if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional." *Id.* at 26–27. Or, finally, if earlier generations attempted to enact analogous regulations but failed because of constitutional concerns, the fact of rejection

110

would be probative of unconstitutionality.  *Id.* at 27.  Put simply, if a general societal problem has never been successfully combatted through a materially similar firearm regulation, that is strong evidence that the challenged regulation is unconstitutional.

That said, the Court recognized that other cases are not so simple, especially those involving "unprecedented social concerns" or "dramatic technological changes."  *Id.* at 28. Such cases demand a "more nuanced approach," requiring courts to reason by analogy and determine whether past and present regulations are "relevantly similar."  *Id.* at 28–29 (quoting Cass Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)). Although the Court did not provide an "exhaustive survey" of relevant similarity, it did identify two indicators that should guide analogical reasoning:  "how" and "why" the regulations burden the right to keep and bear arms.  *Id.* at 29.  In other words, whether past and present regulations impose a "comparable burden" ("how") and whether that burden is "comparably justified" ("why") are "central" considerations when reasoning by analogy. *Id.* (quoting *McDonald*, 561 U.S. at 767).

Applying this framework, the Court held that New York's "may issue" licensing regime violated the Second Amendment.  It first concluded that the Second Amendment's plain text "presumptively guarantees petitioners . . . a right to 'bear' arms in public for self-defense."  *Id.* at 33.  The Court then examined the government's historical analogues and found that it had failed to prove a historical tradition "of broadly prohibiting the public carry of commonly used firearms for self-defense."  *Id.* at 38.

After our en banc Court heard argument in this case, the Supreme Court handed down the latest installment in the Second Amendment saga, *Rahimi*.  *Rahimi* involved a

challenge to 18 U.S.C. § 922(g)(8), which prohibits an individual subject to a domestic violence restraining order from possessing a firearm. 144 S. Ct. at 1894–96. The Court began its analysis by reaffirming that, "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation'" using history and tradition. *Id.* at 1897 (quoting *Bruen*, 597 U.S. at 24). It nonetheless emphasized, as it had in *Heller* and *Bruen*, that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *Id.* at 1897–98. "The law must comport with the *principles* underlying the Second Amendment, but it need not be a 'dead ringer' or 'historical twin.'" *Id.* at 1898 (quoting *Bruen*, 597 U.S. at 30 (emphasis added)). The Court then concluded that § 922(g)(8) was constitutional as applied to the defendant, against whom a restraining order was issued upon a finding that he posed "a credible threat to the physical safety" of another, § 922(g)(8)(C)(i), since it was analogous to historical laws "preventing individuals who threaten physical harm to others from misusing firearms," *Rahimi*, 144 S. Ct. at 1896.

## B. *Kolbe* is demonstrably inconsistent with *Heller* and has been abrogated by *Bruen*.

This case requires us to consider the viability of our decision in *Kolbe* after *Bruen*, a question that implicates two important relationships: our horizontal relationship to past Circuit precedent and our vertical relationship to Supreme Court precedent.

Horizontal stare decisis is a well-settled doctrine in the courts of appeals that varies in strength based on the level of review. When a panel of our Court considers past panel or en banc precedents, it ordinarily must apply them "as a mechanical mandate." *Payne v.*

*Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021). Our en banc Court, by contrast, may overrule prior panel or en banc precedents. *McMellon v. United States*, 387 F.3d 329, 333–34 (4th Cir. 2004) (en banc). In determining whether to overrule a past decision, we are guided by traditional stare decisis considerations, *Payne*, 998 F.3d at 654, the most important of which is whether a past decision is "demonstrably erroneous," *Gamble v. United States*, 587 U.S. 678, 717–18 (2019) (Thomas, J., concurring); *see also* Caleb Nelson, *Stare Decisis and Demonstrably Erroneous Precedents*, 87 Va. L. Rev. 1, 21–48 (2001) (explaining the traditional doctrine of stare decisis at the Founding).

Even greater than our obligation to follow our own precedent, however, is our obligation to follow decisions of the Supreme Court. So even if horizontal stare decisis would otherwise dictate that we follow past Circuit precedent, we cannot do so "if its reasoning or holding is inconsistent with a Supreme Court decision." *United States v. Banks*, 29 F.4th 168, 175 (4th Cir. 2022); *Rose v. PSA Airlines, Inc.*, 80 F.4th 488, 504 (4th Cir. 2023). This is especially so when "'a superseding contrary decision of the Supreme Court' . . . specifically rejected the reasoning on which our decision was based." *Etheridge v. Norfolk & W. Ry. Co.*, 9 F.3d 1087, 1090–91 (4th Cir. 1993) (quoting *Busby v. Crown Supply, Inc.*, 896 F.2d 833, 840–41 (4th Cir. 1990)).

*Kolbe* had two holdings. It first held that the rifles Maryland bans are not protected by the Second Amendment because they are "'like' 'M-16 rifles,'" in that both are "'weapons that are most useful in military service.'" 849 F.3d at 121 (quoting *Heller*, 554 U.S. at 627). In the alternative, *Kolbe* held that, even if the banned rifles are protected by

the Second Amendment, Maryland's ban passes constitutional muster under intermediate scrutiny. *See id.*

The latter holding obviously conflicts with *Heller* and does not survive *Bruen*. The Court in *Bruen* explained that means-end scrutiny has no place under the Second Amendment. *See Bruen*, 597 U.S. at 19. And it cited *Kolbe*'s second holding as an example of the analysis it was rejecting. *See id.* (citing *Kolbe*, 849 F.3d at 133). So that holding is no longer good law.

*Kolbe*'s first holding cannot survive, either. Its "'like' 'M-16 rifles'" test bears no resemblance to either *Bruen*'s plain-text step or its historical-tradition step. Indeed, *Kolbe* explicitly declined to engage with the historical tradition authorizing the ownership of weapons commonly used for lawful purposes and prohibiting the ownership of "dangerous and unusual" weapons. 849 F.3d at 135–36 & n.10. So its reasoning is nothing more than a pre-*Bruen* anachronism.[26] *See also Rahimi*, 144 S. Ct. at 1897–98 (confirming that Second Amendment challenges must be assessed against text and history).

Even without *Bruen*, we should readily overrule *Kolbe* because it is demonstrably inconsistent with *Heller*. *Heller* did not establish a standalone exception to the Second Amendment for weapons "most useful for military service." *Kolbe*, 849 F.3d at 136. Rather, the Court explained that "the Second Amendment extends, prima facie, to all

---

[26] The majority argues that *Bruen* did not abrogate *Kolbe* because the Supreme Court described step one of the prior two-step approach—which considered the Second Amendment's historical meaning—as "broadly consistent with *Heller*." Majority Op. at 16–17 (quoting *Bruen*, 597 U.S. at 19). But *Kolbe* explicitly refused to consider the right's original scope and relied instead on isolated sentences from *Heller* divorced from context. *See* 849 F.3d at 136 & n.10. So *Bruen* did not affirm the path we took in that case.

instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582. It then identified an important "limitation" on the right based on "the historical tradition of prohibiting the carry of 'dangerous and unusual weapons.'" *Id.* at 627. But, as I will soon explain, that limitation only extends to weapons "commonly used by criminals," *id.* at 623 (quoting Brief of the United States at 18–21, *Miller*, 307 U.S. 174), that are "highly unusual in society at large," *id.* at 627. It does not extend to weapons that *are* commonly used for lawful purposes, *even if* they happen to be "most useful in military service." *See id.* *Kolbe* explicitly refused to consider whether Maryland's ban prohibits weapons that are in common use or are dangerous and unusual. This gross misreading of *Heller* is reason enough to abandon it.

### C.  Maryland's ban violates the Second Amendment.

Since *Kolbe* no longer controls, I must assess whether Maryland's ban is constitutional under *Bruen*'s two-part analysis.  I first ask whether the Second Amendment's plain text covers Appellants' proposed course of conduct. *Bruen*, 597 U.S. at 17. If so, then the regulation is unconstitutional unless Appellees can show that it "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

Applying this framework, it is evident that Maryland's semiautomatic-rifle ban violates the Second Amendment. Maryland's law regulates conduct protected by the plain text of the Second Amendment, since it prohibits "the people" from "keep[ing]" certain "Arms." And Appellees have failed to justify Maryland's ban under history and tradition. The proscribed arms are indisputably in common use by law-abiding citizens for lawful

purposes.  So they are not "dangerous and unusual" weapons and cannot be prohibited consistent with the Second Amendment.

### 1.  Maryland's law regulates conduct protected by the plain text of the Second Amendment.

The Second Amendment reads:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  To successfully launch a facial challenge against a firearm regulation, a challenger must first show that the law regulates conduct that falls within the Amendment's plain text.[27]  *Rahimi*, 144 S. Ct. at 1897; *Bruen*, 597 U.S. at 24. Accordingly, the challengers here must demonstrate three things:  (1) Maryland's law applies to "the people" entitled to the right; (2) it covers "Arms"; and (3) it regulates the "keep[ing]" or "bear[ing]" of those arms.  *Heller*, 554 U.S. at 579–86; *Bruen*, 597 U.S. at 32–33.

Maryland's law regulates conduct covered by the Second Amendment's plain text. First, it applies to "the people."  *Heller* explained that "the people" is a term that "unambiguously refers to all members of the political community, not an unspecified

---

[27] In *Bruen*, the Court focused on whether the challengers' proposed course of conduct fell within the plain text of the Amendment.  *See* 597 U.S. at 31–33.  But *Bruen* seems to have involved an as-applied challenge.  This case, by contrast, involves a facial challenge, which requires a challenger "to 'establish that no set of circumstances exists under which the Act would be valid.'"  *Rahimi*, 144 S. Ct. at 1898 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  It therefore seems that we must consider the conduct Maryland's law targets as a whole, instead of these challengers' particular conduct.  *See id.* at 1907 (Gorsuch, J., concurring) (concluding that "the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment"); *id.* at 1933 (Thomas, J., dissenting) (finding that the challenged law "targets conduct encompassed by the Second Amendment's plain text").

subset." *Heller*, 554 U.S. at 580; *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990) (explaining that "the people" referenced in the First, Second, Fourth, Ninth, and Tenth Amendments "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community"). Since Maryland's ban applies to all "person[s]," with limited exceptions, Md. Code Ann., Crim. Law § 4-303(a), it targets "the people" protected by the Amendment's plain text.

Second, Maryland's law bans a class of semiautomatic rifles that fall within the plain meaning of "Arms." Relying on Founding-era dictionaries, *Heller* recognized an expansive definition of "Arms" that includes all "weapons of offence, or armour of defence" and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Heller*, 554 U.S. at 581 (quotations omitted). And *Heller* clarified that the right is not limited to weapons that existed at the time of the Founding, nor to certain classes of weapons, but "extends, prima facie, to all instruments that constitute bearable arms, even those that were not found in existence at the time of the Founding." *Id.* at 582.

There is no question that the class of banned semiautomatic rifles meets this definition. Rifles are instruments that can be borne and used to harm others. So it is no surprise that they have been recognized as "Arms" covered by the Second Amendment since the Founding. *See, e.g.*, *Miller*, 307 U.S. at 182 (noting a 1785 state militia statute that allowed citizens to carry "good rifles with proper accoutrements, in lieu [of muskets]"); *Andrews v. State*, 50 Tenn. (3 Heisk.) 165, 178 (1871) (defining "arms" to

117

include "rifle[s] of all descriptions"). Nor does it matter that these rifles, unlike those at the Founding, are semiautomatic. That feature only enhances their ability to "cast at or strike another" in "offence" or "defence"—the defining characteristics of "Arms." *Heller*, 554 U.S. at 581 (citations omitted); *see Rahimi*, 144 S. Ct. at 1898 (emphasizing that the Second Amendment's protections are not limited to "muskets and sabers"). If it were otherwise, then *Heller* could not have found modern semiautomatic handguns protected by the right. 554 U.S. at 628–29. Therefore, the class of banned semiautomatic rifles are "Arms" under the Second Amendment's plain text.

Third, Maryland's law regulates conduct protected by the Second Amendment. *Heller* confirmed that the Second Amendment "guarantee[s] the individual right to possess and carry arms in case of confrontation." *Id.* at 592. But Maryland prohibits Appellants and others from keeping or bearing such arms at all, even "for self-defense and other lawful purposes." J.A. 17. So Maryland's law targets conduct protected by the Second Amendment's plain text.

Appellees do not contest any of the above analysis. Instead, they argue that Appellants should have to make one more showing at *Bruen*'s plain-text first step. *Heller*, Appellees note, emphasized that "the Second Amendment right . . . extends only to certain types of weapons," *i.e.*, those in common use by law-abiding citizens for lawful purposes. 554 U.S. at 623, 625–26. And Appellees contend that *Heller*, in saying this, was defining what constitutes an "Arm" under the plain meaning of the Second Amendment. So Appellees think that Appellants must prove at *Bruen*'s first step that the prohibited firearms are in common use today.

The easiest way to assess this claim would be to determine where *Bruen* conducted this inquiry. Yet *Bruen* is somewhat ambiguous on this point. On the one hand, when determining whether the plaintiffs' conduct fell within the plain text of the Second Amendment, the Court mentioned that handguns are "weapons 'in common use' today for self-defense." *Bruen*, 597 U.S. at 32 (quoting *Heller*, 554 U.S. at 627). This could be read to suggest that the "common use" inquiry defines what counts as an "Arm" within the plain meaning of the text. On the other hand, the Court later explained that the tradition of prohibiting the carry of "dangerous and unusual" weapons did not justify New York's may-issue regime, because handguns are "indisputably in 'common use' for self-defense today." *Id.* at 47. So *Bruen* alternatively could be read as making the "common use" question part of the step-two inquiry. Unsurprisingly, *Bruen*'s invocation of this language at both steps has generated confusion among the circuits. *Compare United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023), *rev'd*, 144 S. Ct. 1889 (step one), *and United States v. Alinez*, 69 F.4th 1124, 1128 (9th Cir. 2023) (step one), *with Teter v. Lopez*, 76 F.4th 938, 949–50 (9th Cir. 2023), *vacated and reh'g en banc granted*, No. 20-15048, 2024 WL 719051 (9th Cir. Feb. 22, 2024) (step two); *see also Bevis v. City of Naperville*, 85 F.4th 1175, 1198 (7th Cir. 2023) ("There is another aspect of the *Bruen* framework, which is whether the regulated weapons are 'in common use.' There is no consensus on whether the common-use issue belongs at *Bruen* step one or *Bruen* step two.").[28]

---

[28] *See also* Jamie G. McWilliam, *The Relevance of "In Common Use" After* Bruen, Harv. J.L. & Pub. Pol'y Per Curiam (Fall 2023).

When we take a wider view of *Bruen*'s framework, though, it is easier to fit the pieces together. The Court explained that the step-one inquiry is based on whether the "plain text" of the Second Amendment covers an individual's conduct. 597 U.S. at 17. That text protects the right to keep and bear "Arms"—"not 'Arms in common use at the time.'" *Bevis*, 85 F.4th at 1029 (Brennan, J., dissenting). And when considering this plain text, the Court in *Heller* defined "Arms" to include "[w]eapons of offence" and "anything that a man wears for his defence." *Heller*, 554 U.S. at 581 (citations omitted). The Court never mentioned the "common use" inquiry when discussing the Amendment's plain text.

Instead, it was not until *forty pages later*, when dealing with other precedents, that the Court first mentioned the "common use" limitation. *See id.* at 621–26. While discussing *Miller*, the Court stated that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Id.* at 623, 626. But it never grounded this limitation in the Amendment's text. Rather, the Court derived it from "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627. It was thus from our Nation's historical tradition of firearm regulation, and not the plain meaning of "Arms," that *Heller* drew this limitation on the scope of the right.

This being the case, the "common use" inquiry best fits at *Bruen*'s second step. After all, that step concerns limitations drawn from historical regulations. *Bruen*, 597 U.S. at 34. So a litigant challenging a weapons ban should be able to satisfy step one by showing that he is part of "the people," that his weapon is covered by the plain meaning of "Arms," and that he seeks to "keep" or "carry" those arms. Then, at step two, the burden ought to

fall on the government to prove that the challenged regulation is relevantly analogous to our Nation's historical tradition of firearm regulation.[29]

Maryland's ban thus regulates conduct covered by the plain text of the Second Amendment. I therefore proceed to consider whether it resembles our Nation's historical tradition of firearm regulation.

> **2. Maryland's ban on certain semiautomatic rifles violates the Second Amendment because these arms are in common use for lawful purposes.**

At *Bruen*'s second step, Appellees must prove that our Nation's historical tradition justifies Maryland's ban on semiautomatic rifles. *Heller* already identified one such tradition: the tradition prohibiting the carry of "dangerous and unusual weapons." *See* 554 U.S. at 627. So a straightforward application of *Heller* would seemingly require us to determine whether the banned weapons are dangerous and unusual. If they are, then they

---

[29] Why, then, did the Supreme Court mention "common use" at the plain-text step? Most likely, the Court was simply recognizing that arms in common use, like handguns, are "Arms" within the plain text. But this does not mean that weapons not in common use are not "Arms" within the plain text. Indeed, *Rahimi* confirms this interpretation. Besides mentioning that handguns are in common use, the Court in *Bruen* also noted that the plaintiffs—"two ordinary, law-abiding, adult citizens"—were part of "the people." 597 U.S. at 31–32. But when considering whether the defendant in *Rahimi*, a violent lawbreaker, was entitled to possess a gun, the Court did not reject his claim from the jump by holding that he was not part of "the people." Rather, the Court proceeded immediately to *Bruen*'s second step and upheld the restriction under history and tradition, thus heavily implying that it considered him part of "the people" at *Bruen*'s *first* step. *See Rahimi*, 144 S. Ct. at 1898–1903; *see also id.* at 1907 (Gorsuch, J., concurring) ("In this case, no one questions that the law Mr. Rahimi challenges addresses individual conduct covered by the text of the Second Amendment."); *id.* at 1933 (Thomas, J., dissenting) (explaining why Rahimi was part of "the people"). So just as the term "the people" includes but is not limited to ordinary, law-abiding, adult citizens, the term "Arms" includes but is not limited to arms in common use.

can be prohibited. But if they either are not dangerous or not unusual, then their prohibition would violate the Second Amendment.

Rather than following in *Heller*'s footsteps, Appellees try to blaze their own path through the historical record. Drawing mostly from nineteenth- and twentieth-century regulations on the carry of certain weapons, Appellees argue that our Nation's historical tradition allows the government to ban "extraordinarily dangerous weapons that pose heightened risks" to public safety. Appellee's Br. at 37 (decapitalized). And Appellees seem to think that such weapons can be banned *even if* they are commonly possessed for lawful purposes. In other words, Appellees seem to think that our history and tradition support *two* kinds of arms bans: (1) bans on weapons that are dangerous and unusual, and (2) bans on weapons that are exceptionally dangerous.

But the historic laws Appellees cite do not represent a new and previously unknown tradition. Rather, when properly understood, they represent the same principle already identified in *Heller*: The Second Amendment protects weapons commonly used for lawful purposes but does not protect dangerous and unusual weapons. As I will demonstrate, this principle extends back far before the Second Amendment and forward long after its enactment.

Accordingly, I begin by extrapolating support for and examining the contours of this tradition. Then, I apply my findings to Maryland's ban on certain semiautomatic rifles, concluding that the challenged ban violates the Second Amendment because it prohibits possession of weapons commonly possessed by law-abiding citizens for lawful purposes.

But first, some ground rules. My goal is to discern the original law of the Second Amendment. William Baude & Stephen E. Sachs, *Grounding Originalism*, 113 Nw. U. L. Rev. 1455, 1457–58 (2019); *see Heller*, 554 U.S. at 634–35 (indicating that courts should interpret constitutional rights according to "the scope they were understood to have when the people adopted them"). The Second Amendment's plain text is the best evidence of this original law. *See Heller*, 554 U.S. at 576. So the fact that a challenger's conduct falls within the plain text is enough to presume that it is constitutionally protected. *Bruen*, 597 U.S. at 17. Yet we know that the Second Amendment codified "a pre-existing right" that originated in historical customary law. *Heller*, 554 U.S. at 592. And though it adopts this preexisting right, the text of the Second Amendment does not spell out its historic contours in full detail. *See id.* at 626–27. Therefore, we look to history and tradition to grasp the full scope of the right as it was ratified in 1791 and incorporated against the states in 1868.[30] *Bruen*, 597 U.S. at 34–35.

This background helps us understand the utility (and limits) of relying on history and tradition. Our Nation's historical tradition of firearms regulation is evidence of enduring principles that fall within the original scope of the Second Amendment right. *See id.* at 33–37. But it is just that—*evidence*—and nothing more. The mere fact that certain regulations once existed does not itself prove a constitutional principle. *Id.* at 46. Nor is the nonexistence of similar historical regulations conclusive proof of a present law's

---

[30] As in *Rahimi* and *Bruen*, I need not decide whether the Second Amendment should be interpreted as understood in 1791 or 1868. History and tradition reveal a unitary constitutional principle that spans both historical periods, as I will explain.

unconstitutionality. *Id.* at 26–27. The end goal of our historical analysis is to unearth the fundamental principles that "underpin our regulatory tradition," not the regulations themselves. *Rahimi*, 144 S. Ct. at 1898.

### a. History and tradition support the banning of dangerous *and* unusual weapons, but not weapons commonly used for lawful purposes.

I begin by considering the English history of regulating the right to keep or carry certain arms. This is, after all, where *Heller* and *Bruen* started. 554 U.S. at 592–93; 597 U.S. at 39–46. At the same time, I am mindful of *Bruen*'s admonition that "not all history is created equal." 597 U.S. at 34. "'[T]he language of the Constitution cannot be interpreted safely except by reference to the common law and to British institutions *as they were when the instrument was framed and adopted*,' not as they existed in the Middle Ages." *Id.* at 39 (quoting *Ex parte Grossman*, 267 U.S. 87, 108–09 (1925)). Accordingly, I only rely on English tradition insofar as it bears on the original scope of the Second Amendment in America.

Appellees do not cite any English history or custom from before the Founding that supports a ban on possessing certain firearms. This is probably because *Bruen* already covered this ground and found it lacking. *See id.* at 39–46; *see also* Kopel & Greenlee, *supra*, at 228–31. As detailed above, English subjects were required for much of England's history to possess military weapons. And what arms bans did exist were scarce. For example, in 1383, King Richard II outlawed the possession of "launcegays"—a kind of lightweight lance—but did not ban the heavier war lance. 7 Rich. 2 c. 8 (1383); Kopel & Greenlee, *supra*, at 230. Likewise, in 1541, Henry VIII prohibited anyone under a certain

income level from owning and using handguns shorter than a yard unless he had a license. 33 Hen. 8 c. 6, §§ 1–2 (1541). But rather than reflecting a fear of dangerous weapons, that statute ensured that Englishmen would not quickly replace the reliable military longbow with novel—but less effective—handguns. *Bruen*, 597 U.S. at 42. Regardless, this statute gradually fell into disuse, and the last recorded prosecutions under it occurred in the late seventeenth century. *See id.* at 43 n.10; Kopel & Greenlee, *supra*, at 231. Finally, in 1616, James I outlawed "dags"—a type of small handgun—yet this decree seems to have been disregarded. *See* A Proclamation Against Steelets, Pocket Daggers, Pocket Dagges and Pistols (Robert Barket ed., 1616); Kopel & Greenlee, *supra*, at 10. All in all, I know of no longstanding English practice lasting until the Revolution of prohibiting the possession of types of arms, extraordinarily dangerous or otherwise.

English history is more ambiguous when it comes to regulating the *carry* of certain weapons. When Edward III assumed the throne in 1327, the country was in a state of unrest, as bands of knights and other malefactors roved the land committing acts of violence. *Bruen*, 597 U.S. at 40. Parliament responded by enacting the Statute of Northampton in 1328, which provided that most Englishmen could not "come before the King's Justices, or other of the King's Ministers doing their office, with force and arms, nor bring no force in affray of the peace, nor to go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or other Ministers, nor in no part elsewhere, upon pain to forfeit their Armour to the King, and their Bodies to Prison at the King's pleasure." 2 Edw. 3 c. 3 (1328). Exactly how often the statute was enforced, however, is less apparent. As *Bruen* explained, it had become basically obsolete by the

125

late seventeenth century, and it was interpreted narrowly to prescribe only actions done with evil intent or malice.  *See* 597 U.S. at 43–44 (discussing the prosecution of Sir John Knight).

For our purposes, the Statute of Northampton is relevant because of the kinds of weapons it prohibited people from carrying with such ill intent.  Blackstone explained that the Statute codified the preexisting, common-law "crime against the public peace" of "*riding* or *going armed*, with *dangerous or unusual weapons*," which would "terrify[] the good people of the land."[31]  4 Blackstone, *supra*, at *148–49 (third emphasis added). Serjeant William Hawkins similarly recognized that an individual violated the common-law offense when he carried "*dangerous and unusual Weapons*, in such a Manner as will naturally cause a Terror to the People."  1 *A Treatise of Pleas of the Crown* 135 (3d ed. 1739) (emphasis added).  By contrast, Hawkins explained, "Persons of Quality are in no Danger of offending against this Statute by wearing *common Weapons* . . . for their Ornament or Defence," since then it would be apparent that they had no "Intention to commit any Act of Violence or Disturbance of the Peace."  *Id.* at 136 (emphasis added); *see also* Theodore Barlow, *Justice of the Peace* 12 (1745).  The distinction undergirding

---

[31] As this quote demonstrates, Blackstone described the offense as applying to dangerous *or* unusual weapons.  Several other sources borrowed this formulation.  Still, as the quotations illustrate, the overwhelming majority of English and American authorities described the offense as applying to dangerous *and* unusual weapons.  Nineteenth-century state courts similarly required that a weapon have both qualities to fit within this tradition. And lest there be any doubt on this question, *Heller* explained that the tradition applies to "dangerous *and* unusual weapons."  554 U.S. at 627 (emphasis added) (internal quotation marks omitted).  Accordingly, history and tradition require a weapon to be both dangerous and unusual—not merely dangerous or unusual.

the crime therefore seems to have been between the carry of dangerous and unusual weapons, which would terrify the people, and the carry of common weapons, which would not terrify the people. And this largely tracks the weapons that the Statute apparently proscribed. As *Bruen* explained, likely the only weapons covered by the Statute were those like launcegays, which were frequently worn to breach the peace. *See* 597 U.S. at 41. By contrast, the Statute did not prohibit the wearing of those weapons commonly carried for self-defense and other lawful purposes, like knives or daggers. *Id.* at 41–42.

When we cross the Atlantic, the picture in the colonies looks much the same. Appellees do not identify any practice of prohibiting certain arms in the English colonies. This should come as no surprise. As explained earlier, the colonists were guaranteed by the Crown the right to have arms and needed those arms to protect themselves against internal and external threats. For this reason, most colonies *required* their inhabitants— whether they were members of the militia or not—to keep firearms in their homes. And those same colonies *resisted* efforts by the British to deprive them of their arms, recognizing that this posed an existential threat to their liberties. I am unaware of any laws before the American Founding that deprived citizens of the right to possess certain weapons.[32] Kopel & Greenlee, *supra*, at 261.

---

[32] Appellees do cite one late eighteenth- and several late nineteenth-century regulations prohibiting the setting of "trap guns"—weapons rigged to fire on burglars or game when a device was tripped. But these regulations did not prohibit the possession of any type of firearm; they prohibited only certain dangerous *uses* of firearms. *See* Kopel & Greenlee, *supra*, at 365–66. They therefore did not impose a relevantly similar burden on the right to keep arms and cannot justify Maryland's total ban on certain firearms. *See Bruen*, 597 U.S. at 29.

There were, however, similarities between English and early American practices when it came to prohibiting the carry of weapons. Most notably, several colonies and states recognized the common-law offense codified by the Statute of Northampton. *Bruen*, 597 U.S. at 47, 50. In the late seventeenth century, two colonies—Massachusetts (1692) and New Hampshire (1699)—adopted their own versions of the Statute of Northampton.[33] *See* Act of Aug. 22, 1692, No. 6, 1692 Mass. Acts & Laws 10, 11–12; N.H. Acts & Laws 1, 2 (Fowle ed., 1761). Two states—Virginia (1786) and Massachusetts (1795)—followed suit after the Revolution. *See* Act of Nov. 27, 1786, ch. XXII, 1792 Va. Acts 33, 33; Act of Jan. 29, 1795, § 2, *in* 2 *Laws of the Commonwealth of Massachusetts From November 28, 1780 to February 28, 1807*, at 652, 653 (1807). And at least two other states—Delaware (1852) and South Carolina (1870)—did the same during the nineteenth century. 1852 Del. Stat. 330, 333, § 13; Act of Mar. 1, 1870, No. 288, § 4, 1869–70 S.C. Acts 402, 403.

Later sources confirm that in America, as in England, the common-law offense was construed to cover the carry of dangerous and unusual weapons, but not the carry of common ones. This is how antebellum courts understood the offense. *See, e.g.*, *State v. Langford*, 10 N.C. 381, 383–84 (1824) (explaining that an affray could occur "when a man

---

[33] Additionally, a 1686 law in East New Jersey prohibited the *concealed* carry of "unusual and unlawful Weapons" like pocket pistols, "Skeines," "Stilladers," daggers, or dirks. An Act Against Wearing Swords, &c., ch. IX, *in The Grants, Concessions, and Original Constitutions of the Province of New Jersey* 289, 290 (2d ed. 1881). It also prohibited "planters"—farm or plantation owners—from carrying pistols except in narrow circumstances. *Id.*; *Bruen*, 597 U.S. at 48–49. It did not, however, prohibit non-planters from carrying weapons openly, nor planters from carrying long guns for self-defense. *Bruen*, 597 U.S. at 48–49. This, again, imposed a very different burden on the right than Maryland's total prohibition does.

arms himself with *dangerous and unusual weapons*, in such a manner as will naturally cause a terror to the people" (emphasis added)); *O'Neill v. State*, 16 Ala. 65, 67 (1849) (explaining that people were guilty of the offense if they "arm themselves with *deadly or unusual weapons* for the purpose of an affray, and in such manner as to strike terror to the people" (emphasis added)).  It is also how treatise writers described it.[34]  *See, e.g.*, Wilson, *Lectures on Law*, *supra*, at 1138 ("In some cases, there may be an affray, where there is no

---

[34] *See* William W. Hening, *New Virginia Justice, Comprising the Office and Authority of a Justice of the Peace, in the Commonwealth of Virginia* 18 (1795) ("[T]he wearing of common weapons . . . will not subject a person to the penalties of this act."); James Parker, *Conductor Generalis:  or the Office, Duty, and Authority of the Justices of the Peace* 11 (1788) ("[P]ersons of quality are in no danger of offending against this statute, by wearing common weapons . . . for their ornament or defence . . . ."); John Haywood, *The Duty and Office of Justices of Peace* 10 (1800) ("The riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land . . . ."); Tucker's *Blackstone*, *supra*, at *149 ("The offence of riding or *going* armed, with dangerous or unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton . . . ."); John A. Dunlap, *The New-York Justice* 8 (1815) ("It is likewise said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people."); Henry Potter, *The Office and Duty of a Justice of the Peace* 39 (1816) (explaining that justices of the peace could "bind" all those who "go about with unusual weapons or attendance, to the terror of the people"); Charles Humphreys, *A Compendium of the Common Law in Force in Kentucky* 482 (1822) ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of the arms, and fine and imprisonment.  But here it should be remembered, that in this country, the constitution guarranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily."); Henry J. Stephen, *Summary of the Criminal Law* 85 (1834); Ellis Lewis, *An Abridgment of the Criminal Law of the United States* 64 (1847) (explaining that "[r]iding or going armed with dangerous or unusual Weapons" was proscribed by the Statute of Northampton); Francis Wharton, *A Treatise on the Criminal Law of the United States* 527–28 (1852) ("[I]t seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute.").

actual violence; as where a man arms himself with *dangerous and unusual weapons*, in such a manner, as will naturally diffuse a terrour among the people" (emphasis added)); 1 William Russell, *A Treatise on Crimes and Indictable Misdemeanors* 271–272 (2d ed. 1826) (explaining that the bearing of arms fell outside the offense "unless it be accompanied with such circumstances as are apt to terrify the people; from whence it seems clearly to follow, that *persons of quality are in no danger of offending against the statute by wearing common weapons*" (emphasis added)). So in America, as in England, the common-law offense was widely construed to distinguish between dangerous and unusual weapons and common weapons.

It is worth pausing to summarize the ground I have covered so far. The above survey of the relevant history reveals no longstanding or well-settled practice of prohibiting the possession of certain weapons in England, colonial America, or the early American Republic. To the contrary, both countries were permissive when it came to which arms their citizens kept, since widespread arms ownership ensured public safety and served as a buttress against tyrannical rulers. At the same time, both England and America did regulate the carry of certain "dangerous and unusual weapons." These weapons seem to have been targeted because they were uncommon and inspired fear of lawbreaking or violence in the general public. But the prohibitions on carry did not extend to "common" weapons.

Moving forward to consider nineteenth-century regulations, I recognize the need to proceed with caution. On the one hand, both *Heller* and *Bruen* considered nineteenth-century practice. *See* 554 U.S. at 629; 597 U.S. at 51–70. Indeed, *Heller* described "how the Second Amendment was interpreted from immediately after its ratification through the

end of the 19th century" as "a critical tool of constitutional interpretation." 554 U.S. at 605. On other hand, *Bruen* cautioned that post-ratification practice, like pre-enactment history, is only useful insofar as it informs the original scope of the Second Amendment. 597 U.S. at 35–36. So even though "open, widespread, and unchallenged" practices from after 1791 can inform our understanding of an ambiguous text, *id.* at 36 (quoting *NLRB v. Noel Canning*, 583 U.S. 513, 572 (2014) (Scalia, J., concurring in the judgment)), post-ratification practice *inconsistent* with the text's original meaning "obviously cannot overcome or alter that text," *id.* (quoting *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1274 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Thus, I must determine whether the principles revealed by nineteenth-century evidence are consistent with principles that predated that time.

As the majority helpfully explains, nineteenth-century America was a place of improved weapons technologies and increased interpersonal violence. *See* Majority Op. at 49–51. This prompted widespread legislative responses to the dangers posed by the sale, possession, and carry of weapon weapons considered particularly "dangerous" or "deadly." Between the start of the nineteenth century and the beginning of the Civil War, at least six jurisdictions outlawed the possession, sale, or exchange of weapons like pistols, Bowie knives, or slung-shots.[35] At least four jurisdictions taxed the ownership or sale of such

---

[35] Act of Dec. 25, 1837, § 1, 1837 Ga. Pub. Acts 90, 90 (possession or sale of Bowie knives, pistols, dirks, sword canes, or spears); Act of Jan. 27, 1838, ch. CXXVII, § 1, 1837–38 Tenn. Acts. 200, 200 (sale or exchange of Bowie knives, Arkansas tooth-picks, or similar knives); Act of Nov. 12, 1849, No. 36, § 1, 1849 Vt. Pub. Acts 26, 26 (possession, manufacture, sale, or exchange of slung shots); Act of Apr. 7, 1849, ch. 278, § 1, 1849 (Continued)

weapons.[36]   Meanwhile, at least seven jurisdictions prohibited the concealed carry of

dangerous weapons in all or most circumstances,[37] while about four jurisdictions prohibited

all carry—concealed or open—of dangerous weapons.[38]   Efforts to crack down on these

weapons only increased after the Civil War.  From Reconstruction through the end of the

nineteenth century, at least nine jurisdictions enacted or reenacted statutes outlawing the

possession, sale, or exchange of dangerous weapons,[39] while six jurisdictions taxed their

---

N.Y. Laws 403, 403 (manufacture, sale, or exchange of slung shots); Act of Apr. 15, 1850, ch. 194, § 2, 1850 Mass. Acts & Resolves 401, 401 (manufacture or sale of slung shots); Act of Mar. 10, 1856, ch. 636, § 1, 1855 Ky. Acts 96, 96 (buying or selling of Colts, brass knuckles, or slung-shots).

[36] Act of June 30, 1837, No. 11, §§ 1–2, 1837 Ala. Acts 7, 7 (sale of Bowie knives and Arkansas tooth-picks); Act of Feb. 10, 1838, No. 21, § 1, 1838 Fla. Acts 36, 36 (sale of dirks, pocket pistols, sword canes, and Bowie knives); Act of Jan. 28, 1851, ch. CXXL, § 5, 1850–51 N.C. Laws 241, 243 (property tax on pistols, Bowie knives, and sword canes, but only if "worn or carried about the person of the owner"), Act of Mar. 2, 1854, ch. 1, § 1, 1854 Miss. Laws 49, 50 (property tax on Bowie knives, Arkansas tooth-picks, sword canes, and dueling or pocket pistols).

[37] Act of Mar. 25, 1813, § 1, 1813 La. Acts 172, 172; Act of Jan. 14, 1820, ch. XXIII, § 1, 1819 Ind. Laws 39, 39; Act of Jan. 28, 1835, ch. 860, 1835 Fla. Acts 318, 318; *Revised Statutes of the State of Arkansas, Adopted at the October Session of the General Assembly of Said State, A.D. 1837*, at 280 (1838); Act of Feb. 2, 1838, ch. 101, § 1, 1838 Va. Acts 76, 76; Act of Feb. 1, 1839, No. 77, § 1, 1838 Ala. Acts 67, 67; Act of Mar. 18, 1859, § 1, 1859 Ohio Acts 56, 56.

[38] Act of Feb. 3, 1813, *in* 2 *A Digest of the Statute Law of Kentucky:  Being a Collection of all the Acts of the General Assembly of a Public and Permanent Nature, From the Commencement of the Government to May Session 1822*, at 1010, 1010 (William Littell & Jacob Swigert eds., 1822); Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Acts. 15, 15; Act of Dec. 25, 1837, § 1, 1837 Ga. Pub. Acts 90, 90; Act of Feb. 2, 1860, § 2, 1859–60 N.M. Laws 94, 94.

[39] Act of Aug. 6, 1868, No. 13, ch. VII, § 11, 1868 Fla. Acts 67, 95 (manufacture or sale of slung shots); N.D. Rev. Code § 7313, N.D. Penal Code § 455 (1877) (manufacture, sale, or exchange of slung shots); Act of Mar. 17, 1789, ch. XCVI, § 1, 1879 Tenn. Acts (Continued)

---

135, 135–36 (sale or exchange of belt pistols, pocket pistols, revolvers, or any other kind of pistol except army or navy pistols); Act of July 26, 1881, ch. 676, § 408, 1881 N.Y. Laws 1, 102 (manufacture, sale, or exchange of slung shots, billies, sand clubs, or metal knuckles); Act of Apr. 1, 1881, No. XCVI, § 3, 1881 Ark. Acts 191, 192 (sale or exchange of dirks, Bowie knives, swords, spears, brass or metal knucks, razors, or pistols (except army or navy pistols)); 1881 Mass. Pub. Stats. 1132, 1164, Pt. IV, ch. 206, § 11 (manufacture or sale of slung shots or metal knuckles); Act of Apr. 16, 1881, § 1, 1881 Ill. Laws 73, 73 (possession, sale, or exchange of slung shots, metallic knuckles, or other deadly weapons); Minn. Penal Code § 333 (1886) (manufacture, sale, or exchange of slung shots, sand clubs, or metal knuckles); 1890 Okla. Sess. Laws. 412, 476 (manufacture, sale, or exchange of slung shots).

ownership or sale.[40]    Additionally, at least twenty-three jurisdictions prohibited the

concealed carry of dangerous weapons,[41] while at least ten jurisdictions prohibited all carry

of such weapons.[42]

---

[40] Act of Feb. 22, 1866, § 11, 1865–66 Ala. Acts 3, 7 (property tax on pistols, revolvers, Bowie knives, and knives of like description); Act of May 13, 1871, ch. 33, Art. III, § 1, 1871 Miss. Laws 816, 819–20 (property tax on pistols, dirks, Bowie knives, and sword-canes); Act of Mar. 31, 1875, ch. 230, Sch. B, § 18, 1874–75 Va. Acts 281, 282–83 (property tax on Bowie knives, dirks, rifles, muskets, and other firearms (except those issued by the state to militia members)); Act of Dec. 9, 1882, Tit. II, No. 18, § 2, 1882–83 Ga. Acts 34, 37 (tax on dealers in pistols, revolvers, dirks, or Bowie knives); Act of Jan. 3, 1890, No. 1, § 1, 1889 Fla. Acts 1, 6 (tax on dealers in pistols, Bowie knives, or dirks); Act of June 9, 1893, ch. 216, § 35, 1891–92 Ky. Acts 930, 1001 (tax on dealers in pistols, Bowie knives, dirks, brass knuckles, or slung-shots).

[41] Act of Mar. 1, 1864, ch. CXXVII, § 1, 1863–64 Cal. Stat. 115, 115–16; Act of Jan. 11, 1865, § 1, 1864 Mont. Acts 355, 355; Act of Feb. 27, 1867, ch. XXX, § 1, 1867 Nev. Stat. 66, 66; Act of Jan. 9, 1868, ch. XXII, § 149, 1867 Colo. Rev. Stat. 191, 229; 1887–89 D.C. Stat. 154, 178, D.C. Crimes § 119; Act of Feb. 15, 1872, ch. 7, § 1, 1872 Wis. Gen. Laws 17, 17; Act of Feb. 26, 1872, ch. 42, § 246, 1872 Md. Laws 56, 57; Act of Mar. 4, 1873, ch. 58, § 25, 1873 Nev. Stat. 719, 724; N.D. Rev. Code § 7313, N.D. Penal Code § 457 (1877); Act of Feb. 28, 1878, ch. XLVI, § 1, 1878 Miss. Laws 175, 175; Act of Mar. 5, 1879, ch. 127, § 1, 1879 N.C. Laws 231, 231; Act of Dec. 24, 1880, No. 361, § 1, 1880 S.C. Acts 447, 447–48; Act of Feb. 19, 1881, No. 44, § 1, 1880 Ala. Acts 38, 38; 1881 Wash. Code 157, 181, Wash. Crim. Code § 929; Act of Mar. 6, 1882, ch. 219, § 1, 1881–82 Va. Acts 233, 233; Act of Apr. 16, 1681, § 3, 1881 Ill. Laws 73, 74; Act of Mar. 5, 1883, § 1, 1883 Mo. Laws 76, 76; Act of Aug. 17, 1883, No. 93, § 1, 1882–88 Ga. Acts 48, 48–49; 1887 Ore. Code 886, 977, Ore. Crim. Code § 1969; Act of Apr. 22, 1875, No. 97, § 1, 1875 Mich. Acts. 136, 136; Act of Mar. 27, 1891, ch. 105, § 209, 1891 N.Y. Laws 127, 176; Act of May 3, 1893, ch. 1180, § 1, 1893 R.I. Acts 231, 231–32; Act of Mar. 3, 1899, § 117, 1867–1905 Ark. Acts 121, 139.

[42] Act of Jan. 29, 1869, ch. XXXII, § 1, 1869 N.M. Laws 72, 72; Act of June 11, 1870, ch. XIII, § 1, 1869–70 Tenn. Acts. 28, 29; Act of Dec. 15, 1871, ch. XC, § 1, 1871 Tex. Acts 25, 25; Act of Dec. 2, 1875, ch. 52, § 1, 1876 Wyo. Laws 352, 352; Act of Mar. 4, 1881, ch. 37, § 23, 1881 Kan. Laws 79, 92; Act of Apr. 1, 1881, No. XCVI, § 1, 1891 Ark. Acts 191, 191; Act of Mar. 24, 1882, ch. CXXV, § 1, 1882 W. Va. Acts 421, 421–22; Act of Mar. 18, 1889, No. 13, § 1, 1889 Ariz. Laws 16, 16; Act of Feb. 4, 1889, § 1, 1889 Idaho Laws 23, 23; 1890 Okla. Territory Stats. 495, 495, Art. 47, §§ 1–2.

Relying on these statutes, Appellees argue that there is a historical tradition of prohibiting the keeping or carrying of exceptionally dangerous weapons that are closely associated with criminal activity.  And as a matter of historical fact, this does seem to have been the main problem these statutes addressed.  *See* Robert Leider, *Our Non-Originalist Right to Bear Arms*, 89 Ind. L.J. 1587, 1602 (2014) (explaining that the Antebellum regulations were enacted because the presence of dangerous and deadly weapons could turn "slight personal offenses" into "deadly conflicts"); Robert Spitzer, *Understanding Gun Law History After* Bruen*:  Moving Forward by Looking Back*, 51 Fordham Urb. L.J. 57, 90 (2023) (describing how the Bowie knife in particular was used widely in fights, duels, brawls, and other criminal activities).   But we must remember that historic regulations are relevant only insofar as they evince constitutional *principles* that undergird the right.  *Rahimi*, 144 S. Ct. at 1898.  And when determining what that principle is, we ought to consider, when possible, how contemporary courts passed on the constitutionality of those laws.  *See Bruen*, 597 U.S. at 27 ("[I]f some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of constitutionality."); *id.* at 68 (explaining that "judicial scrutiny" of past laws reveals "the basis of their perceived legality"); *id.* (declining to consider some regulations "[a]bsent any evidence explaining *why* [they] were understood to comport with the Second Amendment"); *cf. The Federalist No. 37*, at 236 (James Madison) (Jacob E. Cooke ed., 1961) (explaining that "a series of particular discussions and adjudications" can help ascertain the meaning of constitutional provisions).  Indeed, both *Heller* and *Bruen* relied

135

extensively on state court decisions to understand the same laws Appellees put forth to justify Maryland's ban.  *See* 554 U.S. at 629; 597 U.S. at 52–55, 64–66, 68 & n.30.

Fortunately, we do not lack reading material.  Throughout the nineteenth century, state courts often entertained challenges to the very statutes Appellees cite.  Many of these decisions upheld various statutes because they merely regulated the *manner* of carrying these weapons, without considering whether their possession or carry could be completely prohibited.[43]  Yet some decisions went a step further and considered the kinds of arms citizens could be prohibited from keeping or carrying.  And when drawing this line, courts generally tracked a distinction we've seen before:  that between dangerous and unusual weapons and common weapons.

The best way to grasp this principle is to see it in action.  I'll start with two decisions out of Tennessee.  In *Aymette v. State*, a man was convicted for wearing a Bowie knife concealed under his clothing, which violated Tennessee's 1838 concealed carry ban.  21 Tenn. at 156; *see* Act of Jan. 27, 1838, ch. CXXVII, § 2, 1837–38 Tenn. Acts. 200, 200–01.  The Tennessee Supreme Court began its opinion by explaining that the right to keep and bear arms was "adopted in reference" to the events of the Glorious Revolution and exists for the "common defense" of "the people."  21 Tenn. at 157–58.  In light of this

---

[43] *See, e.g.*, *State v. Mitchell*, 3 Blackf. 229, 229 (Ind. 1833); *Chandler*, 5 La. Ann. at 489–90; *Pope's Ex'r v. Ashley's Ex'r*, 13 Ark. 262, 267 (1853); *State v. Jumel*, 13 La. Ann. 399, 400 (1858); *Sutton v. State*, 12 Fla. 135, 136–37 (1867); *Carroll v. State*, 28 Ark. 99, 101 (1872); *State v. Speller*, 86 N.C. 697, 700 (1882); *State v. Bias*, 37 La. Ann. 259, 260 (1885); *State v. Shelby*, 90 Mo. 302, 304–06 (1886); *State v. Wilforth*, 74 Mo. 528, 530–31 (1891); *Commonwealth v. Murphy*, 166 Mass. 171, 172–73 (1896); *In re Brickey*, 8 Idaho 597 (1902); *but see Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 91–92 (1822) (holding that a legislature could not even regulate the carry of weapons).

136

purpose, the court found that the right protects those arms "usually employed in civilized warfare[] and that constitute the ordinary military equipment." *Id.* These being protected arms, the court concluded that the legislature may "regulat[e] the manner in which [such] arms may be employed," but it may not totally prohibit their use. *Id.* at 159. By contrast, it explained, the right does not protect "those weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin." *Id.* at 158. These weapons "would be useless in war" and "could not be employed advantageously in the common defense of the citizens." *Id.* "The legislature, therefore, ha[s] a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens, and which are *not* usual in civilized warfare, or would not contribute to the common defense." *Id.* at 159. Applying these principles, the court upheld the conviction, since the statute prohibited concealed carry of a Bowie knife—a weapon the court deemed uncommon for lawful purposes and closely associated with criminal activity. *See id.* at 161–62.

After the Civil War, Tennessee went a step further and banned all carry of certain dangerous weapons, including pistols and revolvers. Act of June 11, 1870, ch. XIII, § 1, 1869–70 Tenn. Acts 28, 28. This prompted new constitutional challenges. In *Andrews v. State*, a defendant moved to quash an indictment against him for violating the statute because it failed to specify what kind of pistol he was carrying. 50 Tenn. at 166. As in *Aymette*, the Tennessee Supreme Court recognized that the right to keep and bear arms only protects "the usual arms of the citizen of the country, and the use of which will properly train and render him efficient in defense of his own liberties as well as of the

137

State." *Id.* at 179 (including "the rifle of all descriptions, the shot gun, the musket, and [the] repeater"). And even though the uses of common arms could be *regulated* "to subserve the general good" (such as to prevent crime), their keep and carry could not be completely *prohibited*, for "[t]he power to regulate does not fairly mean the power to prohibit; on the contrary, to regulate, necessarily involves the existence of the thing or act to be regulated." *Id.* at 179–81. The court then applied these principles to the statute before it. It first upheld the prohibition on carrying dirks, sword canes, Spanish stilettos, and pistols, since, under *Aymette*, these were uncommon for lawful purposes and closely associated with criminal activity. *Id.* at 186. But the court found that the Act potentially included military revolvers—*i.e.*, weapons commonly owned for public defense—within its reach. *Id.* If so, then "the prohibition of the statute is too broad to be allowed to stand," since it would completely prohibit the bearing of a protected arm. *Id.* at 187–88. The court therefore quashed the indictment for failing to specify which weapon the defendant was carrying. *Id.* at 192.[44]

Next, consider the Texas Supreme Court's decision in *State v. Duke*, 42 Tex. 455. *Duke* involved a constitutional challenge to an 1871 Texas statute prohibiting the carry of "deadly" weapons, including pistols, unless the person had reasonable grounds to fear an

---

[44] One year later, the Tennessee legislature amended the statute to allow for the carry of "an army pistol, or such as are commonly carried and used in the United States Army," openly in a person's hands. Act of Dec. 14, 1871, ch. XC, § 1, 1871 Tenn. Acts 81, 81. The Tennessee Supreme Court subsequently upheld the conviction of a man who carried a military revolver concealed, concluding that "[t]his was a legitimate exercise of the power to regulate the wearing of the weapon" and did "not interfere with the right of keeping the arm, or of bearing it for common defense." *State v. Wilburn*, 66 Tenn. 57, 63 (1872); *see also Porter v. State*, 66 Tenn. 106, 108 (1874).

immediate and pressing attack on his person. *Id.* at 456; Act of Dec. 15, 1871, ch. XC, § 1, 1871 Tex. Acts 25, 25. Unlike the Tennessee Supreme Court, the Texas Supreme Court took a broader view of the Second Amendment right, explaining that it protects "such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State." *Duke*, 42 Tex. at 458. The court's definition thus encompassed arms common for public *and private* defense.[45] The court then explained that, while the legislature could regulate the right to carry such common arms, it could not so heavily regulate them as to "trespass[] on the constitutional rights of the citizen." *Id.* at 459. Yet the court ultimately concluded that the Texas statute did not go so far as to infringe the right, since it still permitted individuals to carry for self-defense when they had "reasonable grounds" to fear for their safety. *Id.*

Finally, *Fife v. State*, 31 Ark. 455 (1876). In *Fife*, the Arkansas Supreme Court upheld a man's conviction for openly carrying a pocket pistol, in violation of Arkansas' 1875 ban on the carry of pistols. *Id.* at 456–57; Act of Feb. 16, 1875, § 1, 1874–75 Ark. Acts 156, 156. Relying on *Aymette*, the court found that "the arms which [the Second Amendment] guarantees American citizens the right to keep and to bear, are such as are needful to, and ordinarily used by a well regulated militia, and such as are necessary and

---

[45] This was an abrupt departure from the court's earlier decision in *English v. State*, where it had held that the Second Amendment only protects arms "useful and proper to an armed militia." 35 Tex. 473, 474 (1871); *see Duke*, 42 Tex. at 458 ("We acquiesce in the [*English*] decision, but do not adopt the opinion expressed that the word 'arms,' in the Bill of Rights, refers only to the arms of a militiaman or soldier.").

suitable to a free people, to enable them to resist oppression, prevent usurpation, [and] repel invasion." *Fife*, 31 Ark. at 458. Yet the pistol in question was no such arm. It was "not such as is in ordinary use, and effective as a weapon of war, and useful and necessary for 'the common defense.'" *Id.* at 461. And it was also "such as is usually carried in the pocket, or of a size to be concealed about the person, and used in private quarrels and brawls." *Id.* Thus, the court concluded that the legislature could completely prohibit the carry of such firearms "without any infringement of the constitutional right of the citizens of the State to keep and bear arms for their common defense."[46] *Id.* at 462.

What do these four cases have in common? At a basic level, these state courts disagreed over the underlying purposes of the Second Amendment: *Aymette*, *Andrews*, and *Fife* thought that it only exists to provide for the public defense, while *Duke* held that it also protects individual self-defense. (In hindsight, and with the benefit of *Heller*, we now know that *Duke* got it right. *Heller*, 554 U.S. at 597–600.) Yet despite this preliminary disagreement, all four courts assessed the challenged statutes according to the same principle. Each of them determined whether the regulated weapon was in common use for lawful purposes. If it was, then they held that the government could regulate the possession

---

[46] The Arkansas Supreme Court reached a different result two years later in *Wilson v. State*, 33 Ark. 557 (1878). This time, a defendant was charged and convicted for openly carrying an army revolver "commonly used in warfare." *Id.* at 569. The Arkansas Supreme Court explained that, this being a protected "war arm[]," the legislature could only regulate the way it was carried, such as prohibiting its carry concealed. *Id.* at 560. "But to prohibit the citizen from wearing or carrying a war arm" the Court held, was "an unwarranted restriction upon his constitutional right to keep and bear arms." *Id.* "If cowardly and dishonorable men sometimes shoot unarmed men with army pistols or guns, the evil must be prevented by the penitentiary and gallows, and not by a general deprivation of a constitutional privilege." *Id.*

or carry of that weapon, but that it could not completely ban it. Yet if that weapon was not in common use for lawful purposes, and if the weapon was particularly useful for criminal activity, then the government could outlaw it.

This reasoning was the rule, not the exception. With possibly two outliers, every state court that considered the types of arms that could be prohibited coalesced around this basic principle.[47] These courts may have disagreed over the purposes for which the right

---

[47] *See Aymette*, 21 Tenn. at 158; *State v. Smith*, 11 La. Ann. 633, 633–34 (1856) ("The arms there spoken of are such as are borne by a people in war, or at least carried openly. . . . This was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well-disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provide."); *Cockrum*, 24 Tex. at 402–03 (holding that the legislature could regulate the use of Bowie knives but could not completely prohibit their use, since these weapons were "in common use" for, among other things, "lawful defense"); *English*, 35 Tex. at 474 ("[T]he provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils, and fights between maddened individuals, since such only are properly known by the name 'arms,' and such only are adapted to promote 'the security of a free state.'"); *Duke*, 42 Tex. at 455; *Andrews*, 50 Tenn. at 179; *Wilburn*, 66 Tenn. at 59–63; *Fife*, 31 Ark. at 461; *State v. Burgoyne*, 75 Tenn. 173, 175–76 (1881) (reaffirming *Aymette* and *Andrews*); *Dabs v. State*, 39 Ark. 353, 355 (1882) (reaffirming *Fife*); *State v. Workman*, 35 W. Va. 367, 373 (1891) ("So, also, in regard to the kind of arms referred to in the amendment, it must be held to refer to the weapons of warfare to be used by the militia, such as swords, guns, rifles, and muskets,— arms to be used in defending the state and civil liberty,—and not to pistols, bowie-knife, brass knuckles, billies, and such other weapons as are usually employed in brawls, street fights, duels, and affrays, and are only habitually carried by bullies, blackguards, and desperadoes, to the terror of the community and the injury of the state."); *see also Reid*, 1 Ala. at 619 ("[T]he Legislature cannot inhibit the citizen from bearing arms openly, because it authorizes him to bear them for the purposes of defending himself and the State, and it is only when carried openly, that they can be efficiently used for defence.").

There are two potential outliers that merit discussion. In *Nunn v. State*, the Georgia Supreme Court held that Georgia's 1837 statute was unconstitutional insofar as it (Continued)

was secured, the line between a regulation and a prohibition, or how to categorize particular weapons (*e.g.*, is a Bowie knife dangerous and unusual?). Yet they widely concurred that the government can prohibit particular weapons only if they are (1) particularly useful for criminal activity, and (2) not common for lawful purposes. *See* William Baude & Robert Leider, *The General Law Right to Bear Arms*, 99 Notre Dame L. Rev. (forthcoming 2024) (manuscript at 28). By contrast, these same courts broadly concluded that the government can regulate, but cannot prohibit, the keeping or bearing of arms commonly used for lawful

---

prohibited *both* the concealed *and* open carry of certain dangerous weapons. 1 Ga. 243, 251 (1846); Act of Dec. 25, 1837, *supra*, § 1, at 90. Along the way, the court explained that the Second Amendment guarantees the right "to keep and bear arms of every description, and not such as are merely used by the militia." *Nunn*, 1 Ga. at 251. One could read this decision as holding that the Second Amendment does not permit the banning of *any* weapons, even dangerous and unusual ones. *See Hill v. State*, 53 Ga. 472, 475–76 (1874) (interpreting *Nunn* to establish that weapons like pocket-pistols, dirks, sword-canes, toothpicks, Bowie knives, and other dangerous weapons were protected by the Second Amendment). Insofar as this is what the Georgia Supreme Court held, it is inconsistent with the overwhelming authority to the contrary.

The North Carolina Supreme Court arguably swung too far in the opposite direction in *State v. Huntly*, 25 N.C. 418 (1843) (per curiam). In *Huntly*, the court found that North Carolina common law incorporated the common-law offense recognized by the Statute of Northampton. *Id.* at 421–22. It then concluded that all guns were "unusual" weapons within the meaning of that offense, even though they were commonly owned at the time, because they were not commonly *carried*. *Id.* at 422. But this position conflicts with that of English and American treatise writers, which distinguished dangerous and unusual weapons from "common" weapons without limiting the latter category to weapons commonly carried. *See, e.g.*, Hawkins, *supra*, at 136; 1 Russell, *supra*, at 271–272. It is also inconsistent with the multitude of other state court decisions from this period that focused on whether a weapon was commonly possessed or used, not carried. And it is likewise at odds with *Heller*, which similarly focused on possession or usage. 554 U.S. at 624–25. So *Huntly*, like *Nunn*, is an outlier of little value in discerning the nature of "dangerous and unusual" weapons in the Anglo-American legal tradition. *See Bruen*, 597 U.S. at 65 ("[W]e will not give disproportionate weight to . . . a pair of court decisions . . . that contradicts the overwhelming majority of other evidence regarding the right to keep and bear arms." (internal quotation marks omitted)).

purposes.  *See id.*  It was on this basis that nineteenth-century regulations were assessed, and only on this basis that they withstood (or failed) constitutional scrutiny.[48]

We can now step back and view the whole historical picture.[49]  From English common law to early American practice, many jurists contended that the carry of

---

[48] Late nineteenth-century treatise writers agreed on this point, too, though they typically held the view that the right only protects weapons commonly used for defense of the body politic.  *See* Cooley, *supra*, at 299 ("The arms intended by the Constitution are such as are suitable for the general defence of the community against invasion or oppression, and the secret carrying of those suited merely to deadly individual encounters may be prohibited."); 2 Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 124, at 77–75 (1858) ("[T]he provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and brawls and fights between maddened individuals; since such, only, are properly known by the name of 'arms;' and such, only, are adapted to promote 'the security of a free State.'"); 2 Joel Prentiss Bishop, *Commentaries on the Law of Statutory Crimes* § 793, at 469 (1883) ("[T]he keeping and bearing of arms has reference only to war, and possibly also to insurrections wherein the forms of war as far as practicable observed; yet certainly not to broils, bravado and tumult, disturbing the public repose, or to private assassination and secret revenge."); Henry Campbell Black, *Handbook of American Constitutional Law*, § 144, at 403 (1895) ("The 'arms' here meant are those of a soldier.  They do not include dirks, Bowie knives, and such other weapons as are used in brawls, fights, and riots.  The citizen has at all times the right to keep such arms of modern warfare, if without danger to others, and for purposes of training and efficiency in their use, but not such weapons as are only intended to be instruments of private feuds or vengeance."); 2 Emlin McClain, *A Treatise on the Criminal Law as Now Administered in the United States* § 1030, at 205 (1897) ("The constitutional provisions as to the right to bear arms relate to the arms of warfare which the subject may keep and use for purposes of training and defense, and not to such other weapons as are employed in riots and disorders.").

[49] As in *Bruen*, I will not consider twentieth-century historical evidence that may conflict with earlier evidence.  597 U.S. at 66.  But I do note in passing that my understanding of the tradition is consistent with the Court's decision in *Miller*.  In its brief before the Supreme Court, the government argued that the weapons regulated by the National Firearms Act had "no legitimate use in the hands of private individuals" and "frequently constitute[d] the arsenal of the 'public enemy' and the 'gangster.'"  Brief of the United States at 20, *Miller*, 307 U.S. 174.  In other words, the government seems to have claimed that the weapons regulated by the National Firearms Act were dangerous and
(Continued)

dangerous and unusual weapons, unlike common weapons, could be subject to heightened regulation. Several colonies and states eventually enacted laws regulating the carry of such weapons. Later, as state regulations and bans of dangerous weapons multiplied, nineteenth-century state courts drew from the earlier tradition to assess the constitutionality of the challenged regulations.[50] They widely concluded that the Second Amendment permits the government to ban dangerous and unusual weapons but that it does not permit the government to ban weapons commonly used for lawful purposes. The line between dangerous and unusual weapons, on the one hand, and common weapons, on the other, thus has deep roots in our tradition.

Besides being deeply rooted, this principle also accords with the customary basis of the Second Amendment. The Second Amendment recognizes a preexisting right rooted in

---

unusual. (Indeed, the government quoted extensively from the nineteenth-century state court decisions, most notably *Aymette*. *See id.* at 18–20.) And the Court in *Miller* accepted this argument, for it ultimately held, as explained in *Heller*, that dangerous weapons like short-barreled shotguns were not in common use for lawful purposes. *See* 554 U.S. at 625.

[50] Indeed, many state courts and treatise writers explicitly treated nineteenth-century statutes as of the same tradition as the Statute of Northampton. *See, e.g.*, 2 Bishop, *Statutory Crimes*, *supra*, §§ 783–86, at 464–65 ("This common-law offence has also been extended, regulated, and confirmed by statutes in some of our States."); 2 Bishop, *Criminal Law*, *supra*, §§ 120–21, at 73–74 (same); Humphreys, *supra*, at 482 ("Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land, which is punishable by forfeiture of arms, and fine and imprisonment. . . . We have a statute on the subject, relating to concealed weapons."); Wharton, *supra*, at 527–28; *Workman*, 35 W. Va. at 372 (drawing from the Statute to justify a carry regulation); *English*, 35 Tex. at 475–76 (same); *see also* Christpoher Gustavus Tiedeman, *Treatise on the Limitations of Police Power in the United States Considered from Both a Civil and Criminal Standpoint* § 143, at 503 (1886) ("It cannot be questioned that the habit of carrying concealed weapons tends to engender strife . . . . The prohibition of carrying concealed weapons is, therefore, an appropriate remedy for the suppression of street affrays.").

144

the practices and usages of the American people.  At the Founding, the people commonly kept certain arms for lawful purposes like self-defense and brought those same arms to perform militia service.  *Heller*, 554 U.S. at 624–25.  So it makes sense that, when identifying the weapons that fall within the scope of the right, our tradition would at least protect those arms customarily held by the people for lawful purposes.  At the same time, we know that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id.* at 626.  The government has an obligation to combat lawlessness and deter violence.  Our tradition thus permits the government to prohibit weapons particularly useful for unlawful activity, so long as those weapons are not of the kind common for lawful purposes.  In this way, the government can target lawbreaking and violence without trammeling the rights of the remaining, law-abiding members of the body politic.

This, then, is the history underlying *Heller*'s "dangerous and unusual" limitation on the right to possess or carry certain arms.  The Supreme Court may not have "undertake[n] an exhaustive historical analysis" of the exact details of this tradition.  *Heller*, 554 U.S. at 626.  But it nevertheless picked up on an enduring principle that stretched back far before and extended far after the Second Amendment's adoption.  This principle reveals that the Second Amendment permits the government to ban weapons that are not commonly possessed for lawful purposes and are particularly useful for criminal activity.  But it does not permit the government to ban weapons that are not particularly useful for unlawful

activity,[51] nor weapons that are commonly possessed for lawful purposes, even if they happen to be dangerous.

### b. Maryland's ban prohibits weapons that are commonly used for lawful purposes.

Having canvassed the historical record, I now apply my findings to this dispute. Appellees indirectly attempt to place their law within the historical tradition of regulating dangerous and unusual weapons, but to do so they must prove two things. First, Appellees must show that the banned weapons are "not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Second, Appellees must show that the banned weapons are particularly useful for criminal activity. If Appellees make both showings, then Maryland's ban is constitutional. But if the prohibited weapons are

---

[51] This conclusion might not seem obvious at first, but it follows necessarily from the foregoing discussion. The tradition of regulating dangerous and unusual weapons applied only to weapons that were unusual *and* "dangerous," *i.e.*, particularly useful for unlawful activity. In other words, that a weapon was dangerous was a necessary, but not sufficient, condition for it to fall within this tradition. It therefore follows that if a weapon is not "dangerous," as that term was historically understood, then it may not be prohibited under this tradition. *See Bruen*, 597 U.S. at 29 (focusing on whether a historic regulation was "comparably justified"); *Rahimi*, 144 S. Ct. at 1898 (instructing us to examine the "reasons" a historic law was enacted). There might be other regulatory traditions that could justify such a ban (I venture no opinion on this question today), but the tradition of regulating dangerous and unusual traditions wouldn't be one of them.

Consider an example. Suppose that, as firearms proliferate, hunting crossbows become increasingly uncommon. Suppose further that Maryland subsequently banned all hunting crossbows. If Maryland tried to justify its law by pointing to the tradition of regulating dangerous and unusual weapons, it could not simply assert that hunting crossbows are now unusual. Rather, Maryland would also have to show that hunting crossbows are particularly useful for criminal activity. Otherwise, Maryland's ban would not be analogous to historic regulations of dangerous and unusual weapons, since it would not "impose[] similar restrictions for similar reasons" as the laws within that tradition. *Rahimi*, 144 S. Ct. at 1898.

commonly possessed for lawful purposes, or if they are not dangerous, then they cannot be banned consistent with the Second Amendment.

I start with common usage because it turns out to be dispositive. A thing is "common" if it has "the quality of being public or generally used." Bryan Garner, *Garner's Dictionary of Legal Usage* 179 (3d ed. 2011). Whether a type of weapon is in common use is thus largely an "objective and largely statistical inquiry" that examines broad patterns of usage and the reasons behind that usage. *Kolbe*, 849 U.S. at 153 (Traxler, J., dissenting) (quoting *Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016)); *Duncan v. Becerra*, 970 F.3d 1133, 1147 (9th Cir. 2020); *see also Heller*, 554 U.S. at 628–29 (noting that handguns are common because they are "overwhelmingly chosen by American society for [self-defense]"); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (explaining that tasers and stun guns are common because hundreds of thousands of them have been sold to private citizens and they are considered a legitimate means of self-defense). Importantly, we assess common usage based on usage patterns *today*, not those at the time of the Founding. *See Heller*, 554 U.S. at 582; *Caetano*, 577 U.S. at 411–12 (reversing a state court for examining whether stun guns were in common use at the Founding); *Bruen*, 597 U.S. at 47 ("Whatever the likelihood that handguns were considered 'dangerous and unusual' during the colonial period, they are indisputably in 'common use' for self-defense today."). And in conducting this inquiry, we consider the practices of *all* Americans, not simply those within the state of Maryland. *See Heller*, 554 U.S. at 628 (explaining that handguns are "overwhelmingly chosen by *American society* for [self-defense]" (emphasis added)); *Bruen*, 597 U.S. at 26 (describing the Second Amendment as

a balance "struck by the traditions of the *American people*" (emphasis added)); *see also* *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (examining taser and stun gun usage "across the country").

I have no difficulty concluding that the class of semiautomatic[52] rifles banned by Maryland's law are in common use by law-abiding citizens today. The easiest way to see why is to focus on one weapon within this class, the AR-15—the most popular (and most polarizing) semiautomatic rifle in circulation today.[53] The AR-15 was first developed as a military rifle in the 1950s by ArmaLite. After limited success, ArmaLite sold the patent to Colt, which rebranded it as the M-16 and sold it to the military for use in Vietnam in the 1960s. Later, Colt created a semiautomatic version of the AR-15 and began marketing it

---

[52] A "semiautomatic" rifle is one "that fires only one shot with each pull of the trigger, and which requires no manual manipulation by the operator to place another round in the chamber after each round is fired." *Staples v. United States*, 511 U.S. 600, 602 n.1 (1994). It is distinct from an "automatic" rifle, which "fires repeatedly with a single pull of the trigger" and "continue[s] to fire until its trigger is released or the ammunition is exhausted." *Id.*; *see also Garland v. Cargill*, 602 U.S. 406, 410–11 (2024).

[53] As I explain elsewhere, the tradition of regulating dangerous and unusual weapons focused on types or classes of weapons, which it distinguished by their functional characteristics. *See United States v. Price*, No. 22-4609, slip op. at 70–73 (4th Cir. Aug. 6, 2024) (Richardson, J., dissenting). Maryland's law targets a class of semiautomatic rifles that are distinguished by certain functional characteristics. *See* Md. Code Ann., Crim. Law § 4-301(h); Md. Code Ann., Pub. Safety § 5-101(r)(2). The appropriate analysis, therefore, is whether these weapons as a class are dangerous and unusual. And because the AR-15 is one weapon within this class, if the AR-15 is in common use, it follows that the class as a whole is in common use. Accordingly, I focus on the common usage of the AR-15.

to civilians and law enforcement. Colt's patent expired in 1977, and other companies began mass producing similar models for civilian use.[54]

Today, the AR-15 and its variants are one of the most popular and widely owned firearms in the Nation. As of 2021, there are at least twenty-eight million AR-style semiautomatic rifles in circulation.[55] Roughly 2.8 million of those weapons entered the market in 2020 alone, making up around 20% of all firearms sold that year.[56] For context, this means that there are more AR-style rifles in the civilian market than there are Ford F-Series pickup trucks on the road—the most popular truck in America.[57] And when we look at actual ownership statistics, the numbers tell the same story. Various studies estimate

---

[54] For the history of the AR-15, see Greg Myre, *A Brief History of the AR-15*, NPR (Feb. 28, 2018), https://www.npr.org/2018/02/28/588861820/a-brief-history-of-the-ar-15 [https://perma.cc/A6SK-8JYV]; Emily Witt, *How the AR-15 Became an American Brand*, New Yorker (Sept. 27, 2023), https://www.newyorker.com/books/under-review/how-the-ar-15-became-an-american-brand [https://perma.cc/J2Z4-JUBX]; Jon Schuppe, *America's Rifle: Why So Many People Love the AR-15*, NBC News (Dec. 27, 2017), https://www.nbcnews.com/news/us-news/america-s-rifle-why-so-many-people-love-ar-15-n831171 [https://perma.cc/9ELK-9857].

[55] *NSSF Releases Most Recent Firearm Production Figures*, Nat'l Shooting Sports Found. (Jan. 11, 2024), https://www.nssf.org/articles/nssf-releases-most-recent-firearm-production-figures-2024/ [https://perma.cc/C533-T8TV].

[56] Cong. Rsch. Serv., *House-Passed Assault Weapons Ban of 2022 (H.R. 1808)* 2 (Aug. 4, 2022); Nat'l Shooting Sports Found., *Firearms Retailer Survey Report* 9 (2021), https://www3.nssf.org/share/PDF/pubs/Firearms-Retailer-Survey-Report-2021.pdf [https://perma.cc/ZQC3-WNHH].

[57] *See* Brett Foote, *There Are Currently 16.1 Million Ford F-Series Pickups on U.S. Roads*, Ford Auth. (Apr. 9, 2021), https://fordauthority.com/2021/04/there-are-currently-16-1-million-ford-f-series-pickups-on-u-s-roads/ [https://perma.cc/9DSQ-XMEE].

that at least 16 million, but possibly up to 24.6 million, Americans own or have owned AR-style rifles.[58]

Not only are these arms widely owned; they also are widely owned for many lawful purposes. One survey from 2021 found that the most commonly reported reasons for owning AR-style rifles are recreational target shooting (66% of respondents),[59] home defense (61.9%),[60] hunting (50.5%), defense outside the home (34.6%), and competitive

---

[58] *See* Emily Guskin, Aadit Tambe & Jon Gerberg, *Why Do Americans Own AR-15s?*, Wash. Post (Mar. 27, 2023), (estimating that about 16 million Americans—approximately 20% of gun owners—own AR-15-style rifles); William English, *2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned* 33 (May 13, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4109494 [https://perma.cc/9L8W-Y3HT] (estimating that 24.6 million Americans—approximately 30% of gun owners—have owned an AR-15 or similarly styled rifle); *see also* Nat'l Shooting Sports Found., *Sport Shooting Participation in the U.S. in 2020* iii (2020), https://www3.nssf.org/share/PDF/pubs/Sport-Shooting-Participation-2020.pdf [https://perma.cc/G353-9XME] (reporting that over 20 million American adults participated in target shooting with AR-15-style rifles).

[59] Target shooting is necessary for "maintain[ing] proficiency in firearm use," which is "an important corollary to . . . self-defense." *Ezell v. City of Chicago*, 651 F.3d 684, 708 (7th Cir. 2011); *see also* Blizard, *supra*, at 60 ("From the proposition, that the possession and the use of arms, to certain purposes, is lawful, it seems to follow, of necessary consequence, that it cannot be unlawful *to learn how to use them* (for such lawful purposes) with *safety* and *effect*."); *Andrews*, 50 Tenn. at 178 ("[T]he right to keep arms . . . involves the right to practice their use.").

[60] I pause to reject the majority's distinction between "common use" and "common possession," Majority Op. at 39–40, and explain why "possession" is itself a "use." As stated, almost 62% of AR-15 owners point to self-defense of the home as their primary reason for owning their weapons. But that does not mean those owners have ever had to discharge their firearms for that purpose. On the contrary, keeping the arm is merely a contingency. Yet in possessing the arm, those citizens are "using" it as a form of insurance. The same can be said for those who possess firearms to be prepared in the event of hostile invasion or tyrannical government. In those circumstances, keeping the arm functions both as a backup plan and even as a deterrent. Though these might be passive "uses," they are
(Continued)

sports shooting (32.1%). English, *supra*, at 33–34. Another survey conducted in 2022 found that respondents reported self-defense (65%), target shooting (60%), the potential breakdown of law and order (42%), and hunting (18%) as major reasons for owning AR-15s. Guskin, Tambe & Gerberg, *supra*.[61] These are lawful purposes for owning weapons, ones which have a long pedigree in our Nation's tradition of firearm ownership and ones recognized by *Heller* as protected by the Second Amendment.

It is therefore unsurprising that Appellees, faced with this overwhelming evidence, do not contest that semiautomatic rifles like the AR-15 are common for lawful purposes.[62] Indeed, for many years now, this question has been "beyond debate." *Kolbe*, 849 F.3d at 156 (Traxler, J., dissenting). In *Staples v. United States*, for example, the Supreme Court contrasted semiautomatic rifles like AR-15s with "machineguns, sawed-off shotguns, and artillery pieces," finding that the former are "commonplace," "generally available," and

---

still uses. *See Heller*, 554 U.S. at 630 (using "ban the *possession* of handguns" and "prohibition of *their use*" interchangeably and determining that handguns are commonly used without discussing how often they're fired).

[61] *See also* Nat'l Shooting Sports Found., *Modern Sporting Rifle Comprehensive Consumer Report* 18 (2022), https://www3.nssf.org/share/PDF/pubs/NSSF-MSR-Comprehensive-Consumer-Report.pdf [https://perma.cc/GT6M-C97D] (finding that the most commonly reported reasons for owning an AR-style rifle are recreational target shooting and home and self-defense).

[62] Appellees originally requested that we remand the case for further factfinding on the common usage of semiautomatic rifles. The original panel would have honored that request. Yet our Court has blazed ahead and resolved these issues before either the district court or panel could take a first pass on them. So I must proceed using the best publicly available information, ever mindful of the caution I must show in relying on legislative facts. *See Kadel v. Folwell*, 100 F.4th 122, 204–06 (4th Cir. 2024) (Quattlebaum, J., dissenting).

"widely accepted as lawful possessions." 511 U.S. at 603, 610–12. After *Heller*, at least two appellate courts reached this same conclusion, as did the authors of both *Heller* and *Bruen*. *See Heller II*, 670 F.3d at 1261 ("We think it clear enough in the record that semi-automatic rifles . . . are indeed in 'common use . . . .'"); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons . . . at issue are 'in common use' as that term was used in *Heller*."); *Friedman v. City of Highland Park*, 577 U.S. 1039, 136 S. Ct. 447, 449 (2015) (mem.) (Thomas, J., joined by Scalia, J., dissenting from the denial of certiorari) (explaining that semiautomatic rifles like the AR-15 are commonly owned for lawful purposes); *see also Heller II*, 670 F.3d at 1287 (Kavanaugh, J., dissenting) ("Semi-automatic rifles have not traditionally been banned and are in common use today, and are thus protected under *Heller*."). Two of *Bruen*'s dissenters, and the replacement for the *Bruen* dissent's author, seem to agree. *Cargill*, 602 U.S. at 429–30 (Sotomayor, J., joined by Kagan and Jackson, JJ., dissenting) (describing "semiautomatic rifles" as "commonly available"). Plus, other branches of government have affirmed this conclusion. For example, in 2022, the Bureau of Alcohol, Tobacco, Firearms and Explosives described AR-15 style rifles as "one of the most popular firearms in the United States," including for "civilian use." *Definition of 'Frame or Receiver' and Identification of Firearms*, 87 Fed. Reg. 24652, 24652, 24655 (Apr. 26, 2022).

Thus, the evidence shows that millions of Americans have chosen to equip themselves with semiautomatic rifles, like the AR-15, for various lawful purposes. So

Appellees have failed to prove that these weapons are "unusual" such that they can be constitutionally outlawed.  Maryland's ban therefore violates the Second Amendment.

## III.  The Majority

Faced with this mountain of evidence, what does the majority do?  It ignores it completely.  In its place, the majority first constructs a "plain-text" inquiry that has no basis in the Second Amendment's plain text or the Supreme Court's precedents.  It then applies this test in an exaggerated and hyperbolic fashion divorced from actual facts about the firearms at issue.  Finally, the majority offers a cursory account of the relevant history that crumbles under the slightest scrutiny.

### A.  The majority concocts a threshold inquiry divorced from the Second Amendment's plain text.

The majority begins its analysis by reaffirming our decision in *Kolbe*.  Yet rather than taking isolated statements from *Heller* out of context, as we did in *Kolbe*, the majority gallantly attempts to ground *Kolbe*'s holding in the Second Amendment's plain text.  The Second Amendment's plain text, the majority explains, must be read "in context" according to its central (and seemingly lone) purpose:  the right of individual self-defense.  Majority Op. at 14–16, 17.  Drawing from the common law of self-defense, the majority concludes that the right only protects weapons that are "most appropriate and typically used for self-defense," but not "excessively dangerous weapons ill-suited and disproportionate to such a purpose" and "most suitable for criminal or military use."  *Id.* at 17–24.  The majority then applies this novel framework and concludes that the banned weapons are not even protected by the Second Amendment's plain text, because they are military-style, criminal

weapons that are, in my good friend's expert opinion, "ill-suited and disproportionate to self-defense." *Id.* at 42.

It is remarkable that the majority, for all its claimed fidelity to the Second Amendment's plain text, barely mentions that text at all, let alone *Heller*'s construction of it. *Heller* already conducted a "textual analysis" of the Second Amendment based on its "normal and ordinary meaning" and confirmed its interpretation against "the historical background" of the right. 554 U.S. at 576–78, 592 (internal quotation marks omitted). It found that the term "Arms" includes all "[w]eapons of offence" and therefore "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Id.* at 581–82 (internal quotation marks omitted). And it concluded that the right codified by the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Id.* at 592. Under this definition, semiautomatic rifles obviously qualify as "Arms." Before deftly ripping the rug out from under the ordinary reader, even the majority seems to agree. *See* Majority Op. at 14 ("At first blush, it may appear that these assault weapons fit comfortably within the term 'arms' as used in the Second Amendment.").

Instead of analyzing this text, however, the majority pivots to reading it in light of its alleged sole purpose: the right of individual self-defense. It then contrives limits on the constitutional text based on how the majority thinks this purpose is best fulfilled. But the Supreme Court rejected this exact approach to constitutional interpretation in *Giles v. California*, 554 U.S. 353 (2008). There, the Court warned against deriving exceptions to constitutional rights based on judicial notions of the text's underlying "policies,"

"purposes," or "values." *Id.* at 374–75 (internal quotation marks omitted). It explained that "[i]t is not the role of courts to extrapolate from the words of [a constitutional right] to the values behind it, and then to enforce its guarantees only to the extent they serve (in the courts' views) those underlying values." *Id.* at 375. Rather, judges must honor the "specific means" chosen by the people to achieve those underlying purposes. *Id.* And in the Second Amendment context, we derive those means using text and history—not by speculating how *we* as judges would have conducted that original balance *today*.

Even if I were to ignore the Supreme Court's warning and interpret the plain text in this fashion, the majority still errs by adopting an overly cramped view of the Second Amendment's original purpose. The majority thinks that the Second Amendment exists solely to protect individual self-defense. Tellingly, however, the majority cites *no* evidence that the "ratifying public's consciousness" ever read the Second Amendment in such a cramped fashion. Majority Op. at 14. Nor does the majority cite anywhere in *Heller*, *Bruen*, or *Rahimi* where the Court adopted such a limiting construction. That would have been an odd reading, indeed, seeing as the ratifying population widely agreed that the Second Amendment served larger purposes than individual self-defense, including the defense of the body politic and the prevention of tyranny.

The idea that the Second Amendment serves purposes besides personal self-defense is not some fantasy of a bygone era. Americans *today* rely on privately owned arms for several lawful purposes beyond defending their individual persons. For example, many states, including Florida, Georgia, and Texas, are being overrun by feral hogs that cause massive agricultural damage and spread disease. Sam Chernikoff & Janet Loehrke,

*America's Got a $2.5 Billion Wild Hog Problem. These States See the Worst of It*, USA
Today (updated Nov. 27, 2023),
https://www.usatoday.com/story/news/nation/2023/11/21/which-states-have-the-worst-
wild-hog-problem/71658126007/ [https://perma.cc/8XJ9-MZSC]. Without adequate
means to quell this porcine invasion, the afflicted states rely heavily on private citizens to
hunt these animals and slow their spread.[63] *Id.* Some states, meanwhile, still deploy
privately armed posses to aid law enforcement in maintaining public order and
apprehending wrongdoers.[64] And when law and order break down and police fail to
provide aid, the duty for ensuring the safety of vulnerable communities falls on the people
who occupy them. *See, e.g.*, Kyung Lah, *The LA Riots Were a Rude Awakening for
Korean-Americans*, CNN (updated Apr. 29, 2017),
https://www.cnn.com/2017/04/28/us/la-riots-korean-americans/index.html
[https://perma.cc/SP7C-HN9H]. All in all, though individual self-defense is an important
purpose of the Second Amendment right, the other historic purposes behind its enactment
remain relevant today.

Besides unduly narrowing the scope of the Second Amendment, the majority also
misapprehends the nature of historic "limitations" on the right. Majority Op. at 19.
Contrary to the majority's claims, these limitations did not arise from abstract reflection on

---

[63] Speaking from experience, many hog hunters deploy the exact weapons that
Maryland bans, including the AR-15.

[64] For example, when serial killer Ted Bundy escaped from police custody in 1977,
Colorado law enforcement convened a posse, carrying private firearms, and deployed it to
successfully apprehend him. *See* Kopel, *The Posse Comitatus*, *supra*, at 812–13.

the pros and cons of self-defense, nor from an idiosyncratic reading of the Second Amendment's plain text. Rather, these contours are "limits on the exercise of th[e] right" drawn from our Nation's historical tradition of firearms regulation—limits derived at *Bruen*'s *second* step. *Bruen*, 597 U.S. at 21. *Heller*, *Bruen*, and *Rahimi* are clear on this point. *Heller* identified the "presumptively lawful" limit on who can keep and bear arms in "longstanding prohibitions on the possession of firearms by felons and the mentally ill." 554 U.S. at 626, 627 n.26; *see also Rahimi*, 144 S. Ct. at 1898–1903 (analyzing a status-based restriction at *Bruen*'s second step). It drew the limit on where arms can be borne from longstanding "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626; *Bruen*, 597 U.S. at 30. And it derived the limit on what kinds of arms may be possessed from "the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Heller*, 554 U.S. at 627 (internal quotation marks omitted); *Bruen*, 597 U.S. at 21. At no point did the Court ever ground these qualifications in the Second Amendment's plain text, let alone in vague musings about the boundaries of individual self-defense. Reading the text in "context" is no more than a Trojan Horse the majority uses to sneak its preferred values into the plain-text inquiry.[65]

---

[65] This is evident from the majority's invocation of First Amendment doctrine. The Supreme Court has indeed recognized that certain categories of speech are unprotected by the First Amendment. *See, e.g.*, *Counterman v. Colorado*, 600 U.S. 66, 73 (2024). But such speech is unprotected because history and tradition tell us so, not because it falls outside the plain meaning of "speech." *See United States v. Stephens*, 559 U.S. 460, 468 (2010). That is why *Bruen* analogized the *second* step of its analysis to these historic First Amendment limitations. 597 U.S. at 24–25. The majority even seems to acknowledge that (Continued)

When it comes to describing the substance of these limitations, the majority fares no better. At no point did *Heller* instruct federal judges to decide whether a particular weapon is "reasonably related or proportional to the end of self-defense." Majority Op. at 21. That would be an odd mandate, indeed, as it would require federal judges to decide which weapons are most suitable for a country of individuals with different needs and abilities. Rather, the Supreme Court looked to the usage of the American people to determine which weapons *they* deem most suitable for lawful purposes. *Heller*, 554 U.S. at 629. And though the Court did mention several reasons why Americans prefer handguns for self-defense, this was not dispositive to the Court's analysis. "Whatever the reason," the Court explained, "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Id.* It is thus the customary practices of the American people—not the uninformed meditations of federal judges—that determine which weapons are protected by the Second Amendment.

Equally perplexing is the majority's construction (or deconstruction) of the category of "dangerous and unusual" weapons. The majority is correct that weapons particularly useful for criminal activity were historically considered "dangerous" within the meaning of that phrase. But such dangerous weapons could be banned only if they were also *unusual*. That is why *Heller* could say that laws banning weapons like short-barreled shotguns and machine guns are constitutional. These weapons have long been linked to

---

historically unprotected speech can still "fall within a literal reading of the word 'speech.'" Majority Op. at 15. Yet when it comes to the right to keep and bear arms, it pretends that its historical limitations are somehow rooted in the Second Amendment's plain text.

criminal activity, as the majority notes.  *See* Majority Op. at 21–22; *see also Heller*, 554 U.S. at 623.  And they also are "not typically possessed by law-abiding citizens for lawful purposes," and thus "highly unusual in society at large."  *Heller*, 554 U.S. at 625, 627.  *Heller* confirmed what history and tradition already established:  A weapon must be both dangerous *and* unusual in order to be banned.

Nor is there any support for the majority's assertion that the term "dangerous," at least by the time of the Revolution, included within its ambit *military* weapons.  As I have explained, history and tradition establish the exact opposite.  At the Founding, citizens commonly possessed weapons useful for both self-defense *and* for militia service.  *Miller*, 307 U.S. at 179; *Heller*, 554 U.S. at 624–25 ("In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same." (quoting *State v. Kessler*, 289 Ore. 359, 368 (1980)).  And throughout the nineteenth century, state courts and treatise writers widely and repeatedly asserted that protected "Arms" included those commonly kept by citizens for public defense.  *See, e.g.*, *Andrews*, 50 Tenn. at 179; *Duke*, 42 Tex. at 458; *see also Heller*, 554 U.S. at 618 ("[A] militia would be useless unless the citizens were enabled to exercise themselves in the use of warlike weapons." (quoting J. Pomeroy, *An Introduction to the Constitutional Law of the United States* § 239, at 152–53 (1868))); *id.* at 619 ("Some general knowledge of firearms is important to the public welfare; because it would be impossible, in case of war, to organize promptly an efficient force of volunteers unless the people had some familiarity with weapons of war." (quoting B. Abbott, *Judge and Jury: A Popular Explanation of the Leading Topics in the Law of the Land* 333 (1880))).  The

159

idea that weapons useful for military purposes are "dangerous," as that term was historically understood, has no basis in our historical tradition.

Finally, the majority's treatment of *Heller*'s common-use test is unclear and perplexing. At various points, the majority seems to acknowledge that the Second Amendment protects weapons in common use for lawful purposes. *See* Majority Op. at 20 (explaining that the Second Amendment protects "[a]rms typically used by average citizens for self-defense"); *id.* at 23 (describing protected weapons as those "typically used for self-defense"). And at one point, the majority seems to require Appellants to prove that *each individual banned firearm* is in common use, *see id.* at 25–27, even though *Heller* conducted this inquiry at a class-wide level,[66] *see Heller*, 554 U.S. at 628–29 (assessing the common usage of "handguns" and contrasting them with "long guns"); *see also Price*, slip op. at 70–73 (Richardson, J., dissenting). At other times, however, the majority seems unenthusiastic about this inquiry, lambasting it as an "ill-conceived popularity test" that leads to "absurd consequences." Majority Op. at 39–40. And when it comes to AR-15s, the majority refuses to consider their common usage at all, choosing instead to replace Americans' opinions of their utility with its own.

This flip-flopping is especially strange in light of this Court's parallel holding in *United States v. Price*, No. 22-4609, which also puts the common-use test at *Bruen*'s first

---

[66] The majority's qualms about conducting a facial analysis are a red herring. Majority Op. at 24–25. Every semiautomatic rifle prohibited by Maryland is an "Arm" under the plain text of the Second Amendment. So Maryland's law is facially unlawful unless Appellees prove that the banned weapons *as a class* are dangerous and unusual, which, as I have already explained, they fail to do.

step. While this case's majority describes the common-use inquiry as ill-conceived and absurd, the *Price* majority (composed of many of the same judges) describes it as "an inquiry that courts are equipped to apply consistently." *Price*, slip op. at 20. And it articulates a common-use framework broadly similar to the one I developed above.[67] *Id.* at 19–20 (examining the degree of widespread usage and considering the purposes behind that usage). It is odd that the same Court would malign an inquiry in one case that it praises in a different case issued on the same day. This inconsistency is sure to perplex district courts and litigants in future cases.

In the end, the majority's plain-text inquiry is anything but that. It has no basis in the text of the Second Amendment. It has zero support in the Amendment's historical background. And it misconstrues the Supreme Court's binding precedent already interpreting these two sources. For a decision purporting to faithfully apply *Heller* and *Bruen*, today's majority departs from their commands.

**B. Even under the majority's concocted test, semiautomatic rifles would be protected by the Second Amendment, because they are useful and appropriate for self-defense and are neither "military weapons" nor more useful for criminal activity than handguns.**

Even if the majority's novel framework were correct, however, Maryland's ban would still be unconstitutional. If you're going to manufacture a test that turns on a weapon's functionality and utility, you must look at actual evidence of its functions and

---

[67] I say "broadly similar" because the *Price* majority believes we should hypothesize about a weapon's lawful uses, while I think we should examine the reasons shared by *the people* for owning certain weapons. *See Price*, slip op. at 77–78 (Richardson, J., dissenting).

161

uses, rather than speculate about both.  And the facts show that semiautomatic rifles like the AR-15 are useful and appropriate for self-defense.  They are not "military-style" weapons; they are civilian versions with meaningfully different functionalities.  Not to mention, they are used far less for criminal ends than other protected weapons like handguns.

Before I begin, it's important to establish the basics of individual self-defense.  Lawful self-defense is not and has never been a one-size-fits-all endeavor.  The goal in self-defense situations is stopping attackers in their tracks.  Buford Boone Declaration at J.A. 2176, *Kolbe*, 849 F.3d 114 (No. 14-1945).  This means that a defender needs a weapon accurate enough to strike the attacker, powerful enough to knock him down, and maneuverable enough to get on target.  Unfortunately, tradeoffs exist between these variables.  A more powerful weapon can generate greater recoil and muzzle climb, making each shot less accurate.  Maximizing accuracy, meanwhile, can reduce stopping power.  And a weapon's size and style often affect not only maneuverability but also accuracy and stopping power.  Thus, there is no magic bullet when it comes to self-defense.  Anyone who desires a weapon to defend himself must weigh these variables and judge which weapon best maximizes them for his particular circumstances.

As *Heller* observed, many Americans believe that handguns strike this balance best.  554 U.S. at 629.  Indeed, handguns offer many features that are conducive to individual self-defense in the home.  Handguns are easier to store and more readily accessible in case of emergency.  *Id.*  They cannot easily be knocked aside or taken by a would-be attacker.  *Id.*  They require less strength to carry than your typical rifle.  *Id.*  And they can be wielded

162

with one hand in case of injury or to call the police.  *Id.*  It is consequently no surprise that "handguns are the most popular weapon chosen by Americans for self-defense in the home."  *Id.*

But there are drawbacks to handguns, too, ones that meaningfully curtail their utility for self-defense in the home.  The most important of these is their inferior stopping power. A bullet's wounding power is based mainly on the kinetic energy it generates when it strikes a target, which in turn depends on the combination of the bullet's mass and its exit velocity ($\frac{1}{2}$ x M x $V^2$, to be precise).  E. Gregory Wallace, *"Assault Weapon" Lethality*, 88 Tenn. L. Rev. 1, 44 (2020).  As handguns generally have significantly lower exit velocity, the average handgun is less likely to halt an aggressor than a rifle.  Boone Declaration, *supra*, at J.A. 2131; Gary Roberts Declaration at J.A. 2098–99, *Kolbe*, 849 F.3d 114.

Inferior stopping power isn't the only problem.  Handguns are also less accurate than most rifles.  Unlike rifles, handguns lack a shoulder stock, so it is harder to hold them steady and aim them accurately.  Guy Rossi Declaration at J.A. 2131, *Kolbe*, 849 F.3d 114. This also means that they absorb less recoil from the propulsion of the bullet and generate more kick and muzzle climb.  *Id.*  The net combination of these features is that handguns, though compact and easily maneuvered, are less accurate than rifles.  Roberts Declaration, *supra*, at J.A. 2097–98.

Given these limitations, many Americans choose other weapons to protect themselves and their homes against unlawful aggressors.  To them, the AR-15 strikes a superior balance of force and accuracy.  For one, the AR-15 is more powerful than a

handgun; though it typically uses a smaller bullet than many handguns, it generates greater exit velocity and thus imparts significantly more force upon striking its target.  Wallace, *"Assault Weapon" Lethality*, *supra*, at 44–45.[68]  Yet it is simultaneously more accurate than a handgun, thanks to features like a shoulder stock for absorbing recoil.  Roberts Declaration, *supra*, at J.A. 2098.  At the same time, the AR-15 can be more accurate than many other rifles, too, since it shoots a smaller bullet and generates less recoil.  Wallace, *"Assault Weapon" Lethality*, *supra*, at 35, 45.  Many Americans therefore believe that the AR-15 thus strikes an optimal balance between stopping power and accuracy, making it, for them, a superior instrument of lawful self-defense.[69]

---

[68] The traditional AR-15 shoots a 5.56mm round.  Some AR-15 rifles use a larger barrel bore to shoot the heavier .300 Blackout, which provides a different set of tradeoffs from the lighter 5.56mm round.  But suffice to say, experts can debate the relative merits, in a given set of circumstances, of rifles shooting 5.56mm or .300 Blackout rounds, as well as compare those rifles with handguns firing .38 or .45 caliber rounds.

[69] The majority, relying on *Kolbe*, claims that the AR-15's increased stopping power risks over-penetration and threatens innocent bystanders.  Majority Op. at 36–37.  In reality, the opposite is true.  Handgun rounds are more likely to over-penetrate structures like walls than an AR-15's 5.56mm rounds because the latter more often fragment or lose stability as they pass through structures.  Wallace, *"Assault Weapon" Lethality*, *supra*, at 37–38; *see also* Mass. Mun. Police Training Comm., *Basic Firearms Instructor Course: Patrol Rifle* 3 (2007), http://www.mlefiaa.org/files/MPTC_NEWS/Patrol_Rifle_Student_Manual_2010.pdf [https://perma.cc/ZX3X-LQCQ] ("[T]he 5.56mm NATO (.233 Remington) will penetrate fewer walls than service pistol rounds or 12 gauge slugs."); Roberts Declaration, *supra*, at J.A. 2101 (describing an FBI study concluding that AR-15 bullets "had no over-penetration issues compared with the other service caliber handgun, shotgun, or rifle ammunition").  And because handguns are less accurate than AR-15s, especially at longer range, they pose a greater threat of stray fire to innocent bystanders.  For these reasons, law enforcement has long found the AR-15 to be an effective weapon for urban building raids and hostage situations.  Boone Declaration, *supra*, at J.A. 2168–69.

The AR-15's perceived superiority is aided by many features that make it wieldable for people of all ages and sizes. The AR's pistol grip, for example, controls recoil and enhances accuracy. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 396 (1994). Likewise, the telescoping stock allows users to adjust the weapon's length based on their size and enhances maneuverability in tight spaces. Boone Declaration, *supra*, at J.A. 2182. The flash suppressor, meanwhile, prevents blindness in low-light conditions (such as a nighttime home invasion) and protects the barrel from dirt and other obstructions. Jim Supica Declaration at J.A. 2264, *Kolbe*, 849 F.3d 114. And the barrel shroud guards the shooter's hand from the hot barrel and protects the barrel from damage. E. Gregory Wallace, *"Assault Weapon" Myths*, 43 S. Ill. U. L.J. 193, 231 (2018). This combination of features makes the AR-15, for many, a useful tool for self-defense that is in many ways superior to a typical handgun.[70]

Thus, the mere fact that the AR-15 lacks some advantages of the handgun does not make it unsuitable for self-defense. The majority seems to think that *Heller* created a one-size-fits-all list of factors for determining whether a gun is proportional and appropriate for self-defense. But the Court did no such thing. Rather, it simply identified the reasons why

---

[70] The majority claims that the large-capacity magazines compatible with the AR-15 are unnecessary for self-defense because homeowners typically fire a low volume of shots to incapacitate intruders. Majority Op. at 37. But this implies that homeowners are not entitled to prepare for the worst just in case they need more bullets than are normally necessary. The majority's complaint also "applies to all semiautomatic weapons, including constitutionally-protected handguns, [since] any firearm that can hold a magazine can theoretically hold one of any size." *Kolbe*, 849 F.3d at 158 (Traxler, J., dissenting); Roberts Declaration, *supra*, at J.A. 2096.

many Americans choose handguns for self-defense while leaving open the possibility that many *other* Americans choose different weapons for this purpose. *See Heller*, 554 U.S. at 629. And the evidence shows that the AR-15 is abundantly useful and appropriate for individual self-defense.

The majority's treatment of the AR-15's utility for lawful self-defense is bad enough. Yet just as bad is the majority's claim that this weapon is "better suited" for military and criminal purposes. *See* Majority Op. at 21, 27–36. Rather than engaging with the actual facts, the majority trades in tropes and hyperbole to portray the AR-15 as a menacing weapon with no other utility than the slaughtering of enemy combatants and innocents. Not only is this picture untrue, but it also demonizes the millions of Americans who lawfully keep these weapons to defend themselves and their communities.[71]

The majority begins by detailing the AR-15's military origins. Majority Op. at 27–30. But this is nothing unique to the AR-15; *most* popular civilian firearms were first designed for military use. Wallace, *"Assault Weapon" Myths*, *supra*, at 200; Gary Kleck, *Point Blank: Guns and Violence in America* 70 (1991) ("Most firearms, no matter what their current uses, derive directly or indirectly from firearms originally designed for the military."). The Glock 17—the most popular handgun in the world—was designed for the Austrian military and police. The Remington Model 30 bolt-action sporting rifle is a

---

[71] What must the majority think of the millions of Americans who own these weapons? Either they must be fools, completely ignorant of what is required to defend themselves and their homes, or they are secret mass murderers. Or perhaps there's a third option. Maybe, just maybe, these law-abiding citizens understand something that the majority doesn't.

derivative of the M1917 Enfield rifle deployed by American troops in the First World War. The Winchester Model 1873, which was popular with cowboys, soldiers, and law enforcement alike because of its reliability and accuracy, evolved from repeating rifles first used in the Civil War.  And the Browning 1911, today widely in civilian use, was first designed to provide greater stopping power for members of the United States military.  Far from inhabiting separate spheres, civilian and military uses of particular firearms often go hand in hand.[72]

This fact should surprise no one.  Firearms are *supposed* to be effective—that is why civilians use them for self-defense.  The very functions that make a weapon useful for military purposes—lethality, accuracy, durability, and maneuverability, to name a few—are functions that make a weapon useful for lawful self-defense, too.  So in choosing a firearm for that purpose, civilians naturally gravitate toward weapons that have already proved capable of repelling attackers.

---

[72] For information about the military origins of these popular civilian firearms, see *How the Glock Became America's Weapon of Choice*, NPR (Jan. 24, 2012), https://www.npr.org/2012/01/24/145640473/how-the-glock-became-americas-weapon-of-choice [https://perma.cc/U292-5ZJG]; John F. Lacy, *Remington Model 30 Bolt Action, High Power Rifles*, Remington Soc'y of Am., https://www.remingtonsociety.org/remington-model-30-bolt-action-high-power-rifles/ [https://perma.cc/S2NL-BBMA];  *The Rifle That Won the West: A History of the Winchester Model 1873*, Field & Stream (Jan. 5, 2021), https://www.fieldandstream.com/story/guns/winchester-model-1873-gun-that-won-the-west/ [https://perma.cc/JAS5-6RB7]; *The History of the 1911 Pistol*, Browning (Jan. 24, 2011), https://www.browning.com/news/articles/historical/history-1911-pistol.html [https://perma.cc/5F7P-YU5P].

Moreover, the majority's argument fails for the simple fact that *the AR-15 is not a military weapon*. The defining feature of a military rifle is its "selective-fire" capability, which allows the user to toggle between semiautomatic, burst, and fully automatic modes of fire. Rossi Declaration, *supra*, at J.A. 2189. Weapons like the M-16 and the M-4, for instance, are selective-fire rifles. But the AR-15 is not a selective-fire rifle. Rather, it can only fire semiautomatically, which is why the Supreme Court once described it as "the *civilian version* of the military's M-16 rifle." *Staples*, 511 U.S. at 603 (emphasis added). The ability to fire in automatic or burst mode is thus the defining feature of a military rifle, and this is the feature that the AR-15 lacks.[73]

The majority dismisses this distinction as irrelevant because it believes that there are supposedly few, if any, tactical advantages to having a selective-fire rifle. Majority Op. at 31. Its primary evidence? A *single tweet* from a former Navy Seal, who stated that firing in fully automatic mode is "not always necessary." Robert J. O'Neill (@mchooyah), Twitter (Oct. 3, 2017, 5:04 PM), https://x.com/mchooyah/status/915321621908508673 [https://perma.cc/7JXA-YK97]. But if the majority is correct, then why is there not one military in the world that uses purely semiautomatic rifles? Nelson Lund, *Fourth Circuit Shootout: "Assault Weapons" and the Second Amendment*, 24 Geo. Mason L. Rev. 1233, 1238 (2017); Wallace, *"Assault Weapon" Myths*, *supra*, at 205. And why does the National Firearms Act heavily regulate automatic weapons, but not semiautomatic rifles?

---

[73] The majority notes that the AR-15's rate of fire can be increased with devices like bump stocks, trigger cranks, and binary triggers. Majority Op. at 31–32. But the solution to this problem is to regulate the modifications, not the weapons themselves. *Cf. Cargill*, 602 U.S. at 429 (Alito, J., concurring).

The obvious answer is that there *are* significant tactical advantages to having a weapon that can shoot in automatic mode, even if these features are not deployed regularly. The very same U.S. Army Field Manual cited by the majority later explains that "[i]n some combat situations, the use of automatic or burst fire can improve survivability and enhance mission accomplishment." U.S. Army FM 3-22.9, at 7-13 (Aug. 12, 2008). These situations include clearing buildings, launching final assaults, engaging in close-quarters combat, gaining initial firing superiority, laying down suppressive fire, and warding off surprise enemy attacks. *See id.* at 7-13, 7-16, 7-19. Only selective-fire rifles can perform these important functions. It is therefore no surprise that the military has shunned the AR-15 for selective-fire rifles like the M-16 and M-4.[74]

The majority then touts the AR-15's criminal uses, portraying it as a destructive device which is only useful for slaughtering innocents and police officers. Majority Op. at 32–36. Not only are these claims exaggerated, but they also can and have been made about handguns. Yet when faced with these same arguments, the Court in *Heller* concluded that public-safety concerns cannot justify disarming millions of law-abiding citizens of the handguns they commonly own for lawful purposes. *See* 554 U.S. at 636. The millions of Americans who similarly own semiautomatic rifles are entitled to the same treatment.

---

[74] The irony of the majority's position is that the United States military is now *phasing out* the M-16 and M-4 rifles for some infantry units because their smaller rounds make them less lethal against improved body armor technology. *See* Kyle Mizokami, *The Army's Next-Gen Infantry Weapons Will Be More Lethal and More Accurate*, Popular Mechs. (Apr. 21, 2022); Todd South, *Army Chooses Sig Sauer to Build Its Next Generation Squad Weapon*, Army Times (Apr. 19, 2022).

If proportional use in crime is the correct metric, then handguns pose a greater threat to public safety than semiautomatic rifles. Compared to handguns, rifles of all kinds are used in far fewer crimes. For example, the FBI estimates that there were about 152,969 homicides committed between 2013 and 2022. *Expanded Homicide Data*, Fed. Bureau of Investigation Crime Data Explorer (last visited June 21, 2024). Of these, approximately 3,560 (just over 2%) were committed with rifles (of any kind), while roughly 67,431 (about 44%) were committed with handguns. *Id.* More broadly, a 2018 study suggests that "assault weapons" account for only 2–9% of gun crimes in general. *See* Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: An Updated Examination of Local and National Sources*, 95 J. Urb. Health 313, 318 (2018). And a 2016 survey by the Bureau of Justice Statistics found that only 1.5% of state and federal prisoners reported possessing a rifle during the offense for which they were incarcerated, and only 0.8% reported actually showing, pointing, or discharging it. Mariel Alper & Lauren Glaze, *Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016*, at 5 (Jan. 2019) (U.S. Department of Justice, Bureau of Justice Statistics).. At the macro level, therefore, semiautomatic rifles seem to be used in only a small proportion of crimes compared to handguns.

Perhaps because it recognizes these overall trends, the majority focuses instead on statistically narrower categories of criminal activity. First, the majority claims that assault rifles are "uniquely dangerous to law enforcement." Majority Op. at 34 (quoting *Capen v. Campbell*, No. 22-11431, 2023 WL 8851005, at *13 (D. Mass. Dec. 31, 2023)). Yet once again, the majority overstates the facts and elides nuance. It is true that the banned

170

semiautomatic rifles have a higher firepower that allows perpetrators to engage officers at a long distance and potentially penetrate body armor. But this is true of basically *all* rifles, not simply the banned ones. Wallace, *"Assault Weapon" Lethality*, *supra*, at 38. Moreover, in claiming that "assault weapons" are used to kill between 13% to 20% of all officers killed in the line of duty, the majority combines two studies conducted over different time periods. Majority Op. at 35. One study, conducted over *twenty years ago*, found that "assault weapons" were used in at least 20% of officer killings. *See Nat'l Ass'n for Gun Rights v. Lamont*, 685 F. Supp. 3d 63, 99 (D. Conn. 2023). The other study found that, between 2009 and 2013, "assault weapons" were used in only 13.2% of police murders. *Id.* at 99. But whichever number is more accurate, the majority never mentions that the murder of police officers is statistically rare. For example, the second study found that 219 firearms were used to kill police officers between 2009 and 2013. Koper et al., *supra*, at 318. At a rate of 13%, this means that only around 29 of those 219 weapons were "assault weapons." I do not want to be misunderstood. Any death of our first responders is tragic. But our natural outrage over such deaths should not cause us to overlook actual facts. Twenty-nine is an extremely small number of murders when compared to the overall number of homicides or the overall number of assault rifles owned in America.[75]

---

[75] For a more updated count, the FBI estimates that sixty law-enforcement officers were feloniously killed in the line of duty in 2022. Fed. Bureau of Investigation, *Law Enforcement Officers Killed and Assaulted* 1 (Spring 2023). Of those sixty, forty-nine were killed with firearms. *Id.* at 3. And of those forty-nine, only six were confirmed to have been killed with rifles of any kind. *Id.*

Second, the majority invokes the use of AR-15s and similar rifles in several recent mass public shootings.[76]  Majority Op. at 32–34.  Like shootings of police officers, mass public shootings are terribly tragic events, but they are also statistically far rarer than other shootings.  The Violence Project estimates that between 1966 and 2023, there have been 193 mass public shootings, which have resulted in 1,391 deaths.  The Violence Project,

---

[76] When discussing this topic, it's important use the right terminology.  Scholars who study this area typically distinguish between "mass shootings" and "mass public shootings."  The Congressional Research Service defines a "mass shooting" as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and in one or more locations in close geographical proximity."  William J. Crouse & Daniel J. Richardson, *Mass Murder with Firearms: Incidents and Victims, 1999–2013*, at 10 (2015), https://sgp.fas.org/crs/misc/R44126.pdf [https://perma.cc/H2NZ-TJ3V].  It meanwhile defines a "public mass shooting" as "a multiple homicide incident in which four or more victims are murdered with firearms—not including the offender(s)—within one event, and at least some of the murders occurred in a public location or locations in close geographical proximity (e.g., a workplace, school, restaurant, or other public settings), and the murders are not attributable to any other underlying criminal activity or commonplace circumstance (armed robbery, criminal competition, insurance fraud, argument, or romantic triangle)."  *Id.*

These terminological differences matter for analyzing the data.  Studies generally show that "assault weapons" (predominately rifles) are used in just over 25% of mass public shootings.  *See* Crouse & Richardson, *supra*, at 16 (27.5%); *Key Findings*, The Violence Project (last visited June 4, 2024), https://www.theviolenceproject.org/key-findings/ [https://perma.cc/FYY6-HVTM] (28%).  By contrast, studies typically show that assault weapons are used in a smaller proportion of mass shootings.  *See* Crouse & Richardson, *supra*, at 29 (9.78%); Koper et al., *supra*, at 317 (estimating that assault weapons are used in somewhere between 10% and 36% of mass shootings but clarifying that the latter number is likely attenuated).  So when the majority claims that AR-style rifles are used in 25% of "mass shootings," it presumably is referring to narrower category of mass public shootings, not the broader category of all mass shootings.  *See* Majority Op. at 32–33.

*supra*.[77]  To put that in perspective, mass public shootings accounted for fewer than 1% of all firearm-related homicides in the United States over this period.  Sharon Shahid & Megan Duzor, *History of Mass Shooters*, Voice of Am. (last updated June 1, 2021), https://projects.voanews.com/mass-shootings/ [https://perma.cc/DRJ8-92Y5]; *see also* Cong. Rsch. Serv., *Public Mass Shootings*, *supra*, at 1 ("[P]ublic mass shootings account for few of the murders related to firearms that occur annually in the United States.").  Plus, the majority glosses over the utility of handguns for mass public shooters.  If assault weapons are only used in 25% of mass public shootings, this means that other weapons like handguns are used in almost 75% of those shootings.  And some studies indicate that the use of handguns in these situations can actually pose unique risks not associated with semiautomatic rifles.[78]

    In no sense do I intend to minimize the value of the lives lost in these shootings.  Far from it.  But it is necessary to place the majority's claims in context.  There is little basis for claiming that semiautomatic rifles are more useful for or more used in criminal

---

[77] *See also* Cong. Rsch. Serv., *Public Mass Shootings in the United States:  Selected Implications for Federal Public Health and Safety Policy* 6 (2013), (estimating that mass public shootings accounted for 547 deaths between 1983 and 2012); Crouse & Richardson, *supra*, at 15 (estimating that mass public shootings accounted for 446 deaths between 1999 and 2013).

[78] For example, a 2018 study of wounding patterns found that a victim's probability of death is *higher* in shootings involving a handgun than in shootings involving a rifle. Babak Sarani et al., *Wounding Patterns Based on Firearm Type in Civilian Public Mass Shootings in the United States*, 228 J. Am. Coll. Surgeons 228, 232 (2019) (basing this conclusion on the finding that handgun victims are four times more likely to have three or more bullet wounds than rifle victims, possibly because the greater kinetic energy from a rifle bullet is more likely to knock the victim down before they can be hit by a successive bullet).

173

activity than other weapons.  The data shows the exact opposite:  Handguns are by far a greater existential threat to the peace and safety of our communities.  Yet rather than assessing these facts, the majority spends pages upon pages describing mass shootings in graphic detail.  This is not judicial reasoning; it is fearmongering designed to invoke the reader's passions and mask lack of substance.

It is noteworthy that the majority's arguments against semiautomatic rifles are nothing new.  In *Heller*, the District of Columbia argued that it prohibited handgun possession because these were "particularly dangerous types of weapons."  Brief for Petitioners at 45, *Heller*, 554 U.S. 570 (No. 07-290); *see also* Oral Argument at 18:53–19:08, *Heller*, 554 U.S. 570 ("especially dangerous"); *id.* at 37:05–17 ("inherently dangerous weapons").  It presented statistics showing that handguns "are disproportionately linked to violent and deadly crime," including murder, robbery, and assault, and that "[a] crime committed with a pistol is 7 times more likely to be lethal than a crime committed with any other weapon."  Brief for Petitioners at 4, *Heller*, 554 U.S. 570 (internal quotation marks omitted).  And it asserted that handguns are uniquely dangerous to law-enforcement officers, since they account for the vast majority of law-enforcement murders and "pose particular dangers" to officers performing everyday duties. *Id.* at 4, 51.

The dissenting Justices in *Heller*, *McDonald*, and *Bruen* echoed these same claims. In *Heller*, Justice Breyer argued that "[h]andguns are involved in a majority of firearm deaths and injuries in the United States," 554 U.S. at 697 (Breyer, J., dissenting), and that they "appear to be a very popular weapon among criminals," *id.* at 698.  Later, in

*McDonald*, both Justice Stevens and Justice Breyer extolled the unique dangers posed by handgun violence in urban environments and opposed incorporating the Second Amendment against the states.  561 U.S. at 902, 907 (Stevens, J., dissenting); *id.* at 924 (Breyer, J., dissenting).  And in *Bruen*, Justice Breyer lamented rising mass shootings, 597 U.S. at 85–86 (Breyer, J., dissenting), noted the exceptional danger firearms pose to police officers, *id.* at 88–89, and described handguns as "the most popular weapon chosen by perpetrators of violent crimes," *id.* at 90.

Yet faced with these constant invocations of the unique dangers of handguns, the Supreme Court refused to cast aside the constitutional liberties of millions to prevent the unlawful actions of the few.  In *McDonald*, for instance, the Court emphasized that the Second Amendment "is not the only constitutional right that has controversial public safety implications" and declined to withhold its protections from state citizens simply because "the right at issue has disputed public safety implications."  561 U.S. at 783.  Similarly, in *Bruen*, the Court underscored that "[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'"  597 U.S. at 70 (quoting *McDonald*, 561 U.S. at 780).

Despite these repeated admonitions, today's majority chooses to balance away Second Amendment freedoms because it judges their value to be outweighed by their public safety implications.  And make no mistake about it, the majority is engaging today in precisely the kind of interest balancing that *Heller*, *McDonald*, and *Bruen* rejected.  The majority's new framework allows judges to decide just how important they think certain firearms are for self-defense and then to weigh this finding against the threat they believe

those arms pose to the public at large.  Indeed, the entire concept of "proportionality" is merely a license for unelected judges to usurp the public's role in determining whether a particular weapon is sufficiently *tailored* to the important *interest* of self-defense.  Sound familiar?  Whereas the Supreme Court has instructed that constitutional claims live or die based on the original scope of the Second Amendment, the majority places them at the feet of federal judges who are ill-suited to deciding what is "most" suitable and proportionate to defend one's person and one's home.

**C.    History and tradition do not support the banning of dangerous arms that are in common use for lawful purposes.**

Finally, I turn to the majority's historical arguments.  The majority claims to identify a historical tradition of prohibiting "excessively dangerous weapons," whether or not those weapons are in common use for lawful purposes.  Majority Op. at 43.  Yet the majority simply retells the same death-and-destruction story it told at the plain-text stage, waxing poetic about the dangers of gun violence and the blood of children.  This is a far cry from *Bruen*'s careful consideration of our Nation's history and tradition.

Start with the majority's evidence (or lack thereof) from the Founding era.  The majority does not identify any laws from this period limiting the possession of especially dangerous weapons.  *See id.* at 48 ("Pre-Revolution, then, there was little regulation of firearms in America . . . .").  Nor does it mention the English and early American restrictions on the carry of "dangerous and unusual" weapons.  This is probably because these regulations cut *against* the majority's stated principle.  The common-law offense codified by the Statute of Northampton only applied to weapons that were both dangerous

*and unusual*, which is why commentators repeatedly explained that it did not prohibit the carry of "common" weapons. *See, e.g.*, Hawkins, *supra*, at 136; Barlow, *supra*, at 12; 1 Russell, *supra*, at 271–72. The fact that a weapon was especially harmful was necessary but not sufficient to limit its possession or carry.

The majority's only Founding-era evidence is several gunpowder regulations from the early Republic. Contrary to the majority's claims, these laws did not limit the quantity of gunpowder a person could possess, nor did they aim to mitigate "the accumulation of firepower disproportionate to the lawful purpose of individual self-defense." Majority Op. at 48–49. Rather, they just restricted the amount of powder a person could store *in any single location* and required excess powder to be kept in the public magazine.[79] And their stated purpose was to prevent the outbreak of fires, not to prevent people from amassing enough firepower to commit acts of violence. *See Heller*, 554 U.S. at 632; Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73

---

[79] Act of Dec. 6, 1783, ch. MLIX, § 1, 11 Pa. Stat. 209, 209–10 (prohibiting anyone within two miles of the city from "keep[ing] *in any house, shop or cellar, store or place whatsoever*, . . . *other than in the said public magazines*, any more or greater quantity *at any one time* than thirty pounds weight of gun-powder" (emphasis added)); Act of Apr. 18, 1784, ch. 28, 1784 N.Y. Laws 627, 627 (prohibiting any person from "hav[ing] or keep[ing] any quantity of gun powder exceeding twenty-eight pounds weight, *in any one place*, less than one mile to the northward of the city hall of the said city, *except in the public magazine*" (emphasis added)); Act of Feb. 28, 1786, § 1, 1786 N.H. Laws 383, 383–84 (ten pounds); An Act Relative to Keeping Gun-Powder in the Town of Providence, 1798–1813 R.I. Pub. Laws 85, § 2 (twenty-eight pounds); Act of June 19, 1801, § 2, 1801 Mass. Acts 507, 508 (twenty-five pounds); Act of Dec. 27, 1803, § 3, 1806 Ky. Acts 121, 122 ("any quantity of gun powder which might in case of fire be dangerous"). The majority also cites an 1811 New Jersey statute that prohibited manufacturing gunpowder or setting up a powder magazine near a town. *See* Act of Feb. 7, 1811, §§ 1–2, 1811 N.J. Laws 300. But that too is merely a regulation regarding location, not an outright ban on possession.

Fordham L. Rev. 487, 510–12 (2004).  For these reasons, the Court in *Heller rejected these exact laws* when offered to justify the District's handgun ban because they did "not remotely burden the right of self-defense as much as an absolute ban on handguns."  554 U.S. at 632.  Historic gunpowder regulations therefore offer no support for a tradition of prohibiting the possession of especially dangerous, but commonly held, weapons.

The majority next invokes the many nineteenth-century restrictions on the possession and carry of deadly weapons like pistols and Bowie knives.  Once again, the majority never considers why these laws were consistent with the Second Amendment.  States certainly *enacted* these laws because they wanted to limit possession or carry of weapons commonly used by criminals.  But to restate yet again, they were considered *constitutional* only insofar as they applied to weapons that were both dangerous *and unusual*. *See, e.g.*, *Smith*, 11 La. Ann. at 633; *Fife*, 31 Ark. at 461.  By contrast, courts repeatedly explained that these laws were unconstitutional insofar as they prohibited the keeping or carrying of "such arms as are commonly kept, according to the customs of the people, and are appropriate for open and manly use in self-defense, as well as such as are proper for the defense of the State." *Duke*, 42 Tex. at 458; *see also Andrews*, 50 Tenn. at 179.

The majority tries to invoke several of these decisions to support its position, yet it selectively quotes them in a way that obscures their full reasoning.  *Aymette* did not simply hold that "[t]he Legislature . . . ha[s] a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens."  Majority Op. at 55 (quoting *Aymette*, 21 Tenn. at 159).  Rather, the full quotation reads: "The legislature . . . ha[s] a right to

178

prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and *which are not usual in civilized warfare, and would not contribute to the common defence*." *Aymette*, 21 Tenn. at 159 (emphasis added). In other words, *Aymette* adopted the longstanding distinction between dangerous and unusual weapons and common weapons, and it upheld Tennessee's statute after determining that the regulated weapons fell into the former category.[80] *Id.* at 158 (describing the regulated weapons as "usually employed in private broils," "efficient only in the hands of the robber and the assassin," "useless in war," and incapable of being "employed advantageously in the common defence of the citizens").

The majority then correctly notes that the Texas Supreme Court in *Cockrum v. State* upheld a penalty enhancement for manslaughters committed with Bowie knives because such arms were "an exceeding[ly] destructive weapon" and "the most deadly of all weapons." Majority Op. at 55–56 (quoting *Cockrum*, 24 Tex. at 402–03). But in that same opinion, the court clarified that, because it judged that the Bowie knife was "in common use," "[t]he right to carry a bowie-knife for lawful defense [was] secured" and the

---

[80] The majority also cites *Haynes v. Tennessee*, 24 Tenn. 120 (1844). But *Haynes* was about whether a "Mexican pirate knife" fell within the "spirit" of the statutory prohibition, not whether the statute was constitutional. *Id.* at 122–23. Every Tennessee case that considered the constitutional question found that the legislature could prohibit the keeping or carrying of dangerous and unusual weapons but that it could not prohibit the keeping or carrying of weapons common for lawful purposes. *See Aymette*, at 159; *Andrews*, 50 Tenn. at 179–80; *Wilburn*, 66 Tenn. at 59; *Burgoyne*, 75 Tenn. at 176.

legislature could not penalize its carry so as to "deter the citizen from its lawful exercise."[81] *Cockrum*, 24 Tex. at 402–403.  The court then upheld the conviction only because the legislature had merely punished the use of a Bowie knife to kill someone and had not prohibited carrying Bowie knives altogether.  *Id.*  Thus, neither *Aymette* nor *Cockrum* stand for the idea that the government may ban any weapon so long as it is exceedingly dangerous.  Rather, both establish that weapons common for lawful purposes, even especially deadly ones, cannot be prohibited.

Finally, the majority relies on twentieth-century regulations on automatic and semiautomatic rifles.[82]  But as the majority rightly notes, this evidence is probative only if it is consistent with the tradition that came before it.  *See Bruen*, 597 U.S. at 56 n.28.  The mere fact that semiautomatic and automatic rifles were regulated during this time cannot alone establish that Maryland's law is constitutional.  We must judge the constitutionality of these bans in light of the longstanding tradition allowing the outlawing of dangerous and unusual weapons.

---

[81] The Texas Supreme Court later held in *English* that the Second Amendment did not protect the keeping or bearing of Bowie knives.  35 Tex. at 475–77.  But this was not based on disagreement with the underlying principle espoused in *Cockrum*.  Rather, the court determined that Bowie knives were unprotected because they were only "employed in quarrels and broils, and fights between maddened individuals" and were not commonly used for lawful purposes.  *See id.*  It was thus disagreement over the application of the principle, and not with the principle itself, that caused their divergent treatment of Bowie knives.

[82] No one here is arguing that explosives like dynamites are protected by the Second Amendment.  *But see* Majority Op. at 56, 58–59.  But were such a challenge to arise, a court would have to consider whether such instruments are bearable "Arms" under the Second Amendment's plain text and whether they are dangerous and unusual.

Some of these regulations may pass constitutional muster. *Heller* suggested that sawed-off shotguns and machine guns are unprotected by the Second Amendment because they are "commonly used by criminals," 554 U.S. at 623 (quoting Brief for United States at 18–21, *Miller*, 307 U.S. 174), *and* are "not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625; *see id.* at 627 (explaining that these weapons "are highly unusual in society at large"); *see also Miller*, 307 U.S. at 178. So *Heller* indicates that laws like the National Firearms Act fit within the historical tradition of prohibiting dangerous and unusual weapons.

But there is no similar constitutional case to support restrictions on semiautomatic firearms. Relatively speaking, semiautomatic rifles are less useful for crime than short-barreled shotguns, automatic rifles, or even handguns. More importantly, they are commonly possessed by millions of law-abiding American citizens for many different lawful purposes. As a result, there is no basis for banning these kinds of weapons. The majority's evidence to the contrary is simply nonexistent.

\* \* \*

In *Heller*, the Supreme Court held that the Second Amendment prohibits the government from banning firearms that are commonly possessed today by law-abiding citizens for lawful purposes. 554 U.S. at 628–30. Soon after, the citizens of Maryland asked us to vindicate their right to own a type of firearms routinely chosen for individual self-defense and other lawful purposes. But rather than applying *Heller*'s clear mandate, we balked and created a "heretofore unknown test" based on stray dicta, taken out of context, from the Court's opinion. *Kolbe*, 849 F.3d at 155 (Traxler, J., dissenting) (internal

quotation marks omitted).  Then, adding insult to injury, we held that, even if they did have a right to own such weapons, that right was defeasible because of broader societal problems for which they were not responsible.

Eventually, the Supreme Court intervened and corrected course.  *Bruen* reaffirmed that the Second Amendment does not license federal judges to balance away precious liberties for the sake of broader societal interests.  597 U.S. at 22.  And it reiterated that when it comes to "defining the character of the right," "suggesting the outer limits of the right," "or assessing the constitutionality of a particular regulation," courts must rely on text and history.  *Id.*

Once again, Maryland citizens ask us to protect their right to keep and bear arms, secured to them by the Second Amendment.  Yet once again, our Court rejects their claim, this time substituting one previously unknown test for another.  Now, to trigger Second Amendment scrutiny at all, a litigant must first prove that the precise model of firearm he seeks to own (and only that model) is in common use for personal self-defense (and only personal self-defense).  He then must convince federal judges that his preferred firearm is more useful for self-defense than it is for criminal or military purposes (whatever that means).  But even if he somehow makes this showing, all the government has to do is gesture toward the weapon's dangerous capabilities and argue that the weapon is just too good at being a weapon.  As soon as it does, our Court will bend his right like a willow branch to accommodate societal interests it deems more important.

This is not how constitutional rights are supposed to work.  I, like the majority, revere the authority of the people to govern themselves.  But in our system, the ultimate

expression of "We the People" is the Constitution of the United States.  And the act of enforcing it over contrary legislation implies no superiority of judicial over legislative power.  Rather, as Hamilton once explained, "[i]t only supposes that the power of the people is superior to both; and that where the will of the legislature declared in its statutes, stands in opposition to that of the people declared in the constitution, the judges ought to be governed by the fundamental laws."  *The Federalist No. 78*, at 525 (Alexander Hamilton) (Jacob E. Cooke ed., 1961).  "This is of the very essence of judicial duty." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803).

Our duty to enforce the Constitution does not evaporate when the right at issue has "controversial public safety implications."  *McDonald*, 561 U.S. at 783.  The Second Amendment was adopted to ensure that the people are equipped to protect themselves against both public and private violence.  It is a weighty responsibility, undoubtedly, and one that other nations deem unworthy of entrusting to their citizens.  Yet our system does so all the same.  The Founders learned from experience that the people are most vulnerable to abuse when they lack the means to defend themselves, so they guaranteed that the people would always have adequate means to safeguard their liberties.  Today, the majority disregards the Founders' wisdom and replaces it with its own.  "But before popping the champagne on the [Fourth Circuit's] latest edict, maybe someone should wonder whether we purchase today's victory at the cost of tomorrow's freedom."  J. Harvie Wilkinson III, *Of Guns, Abortions, and the Unraveling Rule of Law*, 95 Va. L. Rev. 253, 257 (2009).

I respectfully dissent.